# EXHIBIT D

Baker said that they saw and/or talked to each other several times a year. On a professional level, Baker recalled that Sussmann represented Twitter and other tech companies in some litigation involving the FBI. He also confirmed that he and Sussmann had recently sat on a panel at a meeting of the Association of Private Security Professionals. Sussmann interviewed Baker during the panel discussion.

Baker confirmed that Sussmann met him in his office prior to the election and provided him with information regarding the alleged backdoor channel of communication between the Trump organization and Alfa Bank (hereafter referred to as the Alfa Bank matter). Baker said his recollection was that he did not know at the time of their meeting that Sussmann was representing the DNC in other matters. (Baker then advised, in the interest of full disclosure, that after he left the FBI, he interviewed for a position with Perkins Coie, the law firm for which Sussmann worked. He said that he may have met an attorney at the firm named Mark Elias at that time, but he does not know anything else about Elias.)

With respect to his meeting about the Alfa Bank matter with Sussmann, Baker recalls that Sussmann called him at work and said he needed to see Baker at Baker's office at FBIHQ. Sussmann arrived at Baker's office alone and gave Baker some electronic media and some paper approximately one inch thick. He and Baker met alone in Baker's office, with no one else present. Sussmann advised Baker that some cyber security researchers had discovered the information and brought it to Sussmann's attention. The information purported to describe a digital relationship between the Trump organization and Alfa Bank, and Sussmann gave Baker a technical description of that relationship. Sussmann also told Baker he thought it was important for the FBI to have the information. Sussmann also told Baker that the press had the information. Baker said that Sussmann did not specify that he was representing a client regarding the matter, nor did Baker ask him if he was representing a client. Baker said it did not seem like Sussmann was representing a client. Baker repeated his earlier assertion that he did not know Sussmann was representing the DNC at the time and Sussmann did not advise him of that fact at this particular meeting. Baker also said he did not know Sussmann's firm, Perkins Coie, represented the Hillary Clinton campaign. Baker does not recall Sussmann advising him of the rationale for the cybersecurity researchers bringing the information to him. Additionally, Baker recalls Sussmann telling him that he believed the information was serious and credible. Baker said the meeting with Sussmann lasted approximately 15-20 minutes and he described it as short and cordial. He did not feel there was anything inappropriate about Sussmann meeting with him and providing the information to him.

Baker advised that immediately after meeting with Sussmann, he contacted either AD Priestap or SA Strzok. Baker recalls that he either took the information Sussmann had provided to one of them or it was picked up from his office almost immediately. He recalls that he got rid of it that day.

Baker was then advised that AD Priestap had taken notes of their call that day. When advised that Priestap had written the name Todd Hinnen in his notes, Baker advised that he was familiar with Hinnen who was a partner in Perkins Coie and had previously worked as an attorney in the DOJ NSD. He said Hinnen was not at the meeting he attended with Sussmann that day.

Baker said he could not recall telling Priestap at that time that Sussmann represented the DNC and the Clinton Foundation, but he (Baker) may have known it at the time. He recalls telling Priestap, as the notes reflect, that individuals who worked in the cybersecurity field, corporate world, and academia, with whom he was familiar, such as Matt Blaze, Susan Landau, and Steve Bellovin, had

SCO_FBIPROD_004642

SCO-006251

Subject to Protective Order