UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal Case No. 21-582 (CRC) |
| : | |
| MICHAEL A. SUSSMANN, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S DISCOVERY UPDATE AND REQUEST FOR ADDITIONAL TIME TO PRODUCE RESIDUAL DISCOVERY MATERIALS**

1. The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully submits this update on the status of discovery matters in the above-referenced case. As explained in further detail below, the Government expects to produce substantially all Rule 16 and *Brady* materials of which the prosecution team is currently aware by the Court's January 28, 2022 deadline for unclassified/declassified discovery, and the February 11, 2022 deadline for classified discovery. The Government therefore expects to comply with the Court's December 14, 2021 Order. Nevertheless, because of (1) more than two dozen broad and detailed written discovery requests that the Government has received from the defense in recent months, (2) the ongoing resource and personnel limitations imposed by the COVID-19 pandemic, (3) the Government's extraordinarily broad approach to discovery in this case, and (4) the volume and inherent complexity of the discovery, the Government also continues to collect, process, and review certain discrete and limited categories of materials that may yield further discoverable information. The Government also maintains an active, ongoing criminal investigation of the defendant's conduct and other matters. Accordingly, while the Government has complied diligently with its

1

discovery obligations, it respectfully requests permission from the Court to produce any residual discovery materials resulting from its ongoing reviews by March 18, 2022 – the same date on which the Government is required to produce *Giglio*/Jencks Act materials and approximately eight weeks before trial.

2.   The Government has consulted counsel for the defendant who consents to the extension of the Government's production deadline for certain unclassified materials until February 11, 2022 (the current deadline for the completion of classified/declassified discovery). The defendant, however, objects to the production of any Rule 16 discovery materials beyond that date. An email from defense counsel setting forth the defendant's position is attached hereto as Exhibit A.

3.   As set forth in further detail below, the Government already has substantially complied with its Rule 16 discovery obligations, and any additional discovery the Government produces as a result of ongoing searches likely will not prejudice the defendant. As is true in almost any criminal prosecution, the Government continues to gather and search additional records to ensure that the defendant receives any documents, records, or information that arguably could be relevant to or assist his defense. Permitting the Government to search for and produce such residual discovery – particularly where the Special Counsel maintains an active, ongoing criminal investigation – is both reasonable and consistent with the Government's practices in other cases. To the extent the defense believes that any discovery produced after February 11, 2022 might prejudice the defendant or require the defense to amend or supplement any of its motions, the Government would not object to any reasonable adjournments or additional filings by the defense.

## **DISCOVERY PRODUCED TO THE DEFENDANT**

4. The defendant is charged in a one-count indictment with making a materially false statement to an FBI official, in violation of Title 18, United States Code, Section 1001. Despite the discrete and straightforward nature of the defendant's alleged criminal conduct, the Government has sought to meet, and indeed exceed, its Rule 16 discovery obligations by applying a broad and accommodating approach to the defendant's discovery requests. The Government and the defense have engaged in what the defense itself has described as a collaborative and productive dialogue on discovery matters, including numerous phone calls.

5. The prosecution team has been prompt and comprehensive in producing wide-ranging materials to the defense. The discovery materials produced to date have included large quantities of Jencks Act and *Giglio* materials that a criminal defendant typically would receive only closer to trial, and other materials that the Federal Rules likely do not require the Government to produce at all. In particular, the Government to date has produced more than approximately 133,000 pages of materials in classified and unclassified discovery, which contain the core of the Rule 16 discovery in this case. The Government expects to produce approximately 492,285 additional pages of materials later this week, consisting of, among other things, voluminous materials from third parties and one government agency, many of which may not be directly pertinent to the charged conduct, but which the Government is producing in an abundance of caution, pursuant to the defendant's requests, and for the purpose of completeness. Examples of the discovery materials that the Government has already provided to the defense include:

a. The entirety of the FBI's electronic case file for the investigation of the Russian Bank-1 allegations – in both classified and unclassified form – with only minor redactions to protect especially sensitive and/or highly classified information;

b. 94 Reports of Interview prepared by Government investigators in connection with the Special Counsel's Investigation, including but not limited to interviews of the following witnesses:

  i. the former FBI General Counsel to whom the defendant made the alleged false statement;

  ii. a former FBI Assistant Director for Counterintelligence who took notes reflecting the defendant's alleged false statement;

  iii. a former FBI Deputy General Counsel who took notes reflecting the defendant's alleged false statement;

  iv. more than 24 other current and former FBI employees;

  v. two former employees of the government agency referred to in the Indictment as "Agency-1;"

  vi. eight current and former employees of the government agency referred to in the Indictment as "Agency-2;"

  vii. eight current and former employees of the company referred to in the Indictment as Internet Company-1;

  viii. four current and former employees of the companies referred to in the Indictment as Internet Company-2 and Internet Company-3;

      ix. the former chairman of the law firm referred to in the Indictment as "Law Firm-1;"

      x. a former employee of the Clinton Campaign;

      xi. four current and former employees of the university referred to in the Indictment as "University-1;" and

      xii. an employee of the individual referred to in the Indictment as "Tech Executive-1."

c. all exhibits and documents referenced in the above-described interviews, including all investigators' notes taken during the interviews;

d. numerous reports of phone calls between the Special Counsel team and counsel for several witnesses or subjects in this investigation, including counsel for the individual referred to in the Indictment as "Originator-1;"

e. all notes, electronic communications, and other records of which the prosecution team is currently aware that memorialized the defendant's alleged false statement to the FBI and his similar false statement to Agency-2;

f. approximately 10,881 pages of additional emails, notes, and other documents from the FBI, Agency-2, and other government agencies concerning or potentially relating to the charged conduct;

g. transcripts of sworn grand jury testimony by the following witnesses (along with their accompanying Grand Jury Exhibits):

      i. the above-referenced former FBI General Counsel;

    ii. the above-referenced former FBI Assistant Director for Counterintelligence;

    iii. a former FBI Deputy Assistant Director for Counterintelligence;

    iv. an FBI Special Agent who served as case agent for the FBI's Russian Bank-1 investigation;

    v. an FBI Headquarters Supervisory Special Agent assigned to the Russian Bank-1 investigation;

    vi. two current employees of Agency-2;

    vii. the attorney previously employed by Law Firm-1 who is referred to in the Indictment as "Campaign Lawyer-1;"

    viii. two current or former employees of University-1; and

    ix. a former employee of Internet Company-3.

h. 12 partially redacted transcripts of interviews conducted by the DOJ's Office of Inspector General in connection with the OIG's investigation of the FBI's Crossfire Hurricane investigation;

i. approximately 110,223 pages of records received from private entities in response to document requests or grand jury subpoenas, including from:

    i. the Clinton Campaign;

    ii. a political organization;

    iii. Law Firm-1;

    iv. Internet Company-1;

    v. Internet Company-2;

   vi. Internet Company-3;

   vii. University-1;

   viii. the entity referred to in the Indictment as the "U.S. Investigative Firm;" and

   ix. a public relations firm that advised Law Firm-1 concerning public statements issued in 2018 about the defendant's meeting with the former FBI General Counsel.

j. FBI phone logs for the above-referenced former FBI General Counsel and the former FBI Assistant Director for Counterintelligence;

k. FBI phone logs for eight additional current and former FBI employees;

l. FBI phone logs reflecting calls between the defendant and FBI personnel;

m. a classified memorandum and related reports of interviews pertaining to a criminal investigation previously conducted by the U.S. Department of Justice regarding a potential leak of classified information;

n. the transcript of an interview conducted by the DOJ Office of Inspector General in connection with an administrative inquiry that is currently ongoing;

o. approximately 396 emails from within the FBI's holdings sent to, from, or copying the defendant's email address at Law Firm-1 for the time period January of 2016 through June of 2017; and

p. approximately 226 emails from within the FBI's holdings involving a company founded by the person referred to in the Indictment as "Tech Executive-1."

6.  With regard to the already-produced discovery materials that originated with FBI and other government agencies, the vast majority of those materials were originally classified at least at the Secret level, and many at the Top Secret or Sensitive Compartmented Information levels. Producing discovery to the defense therefore required the Government to seek declassification of each document and/or approval from the original classifying authority to produce the documents in classified discovery. As the Court is aware, that process is often complex and time-consuming. That is particularly true during the current COVID-19 pandemic when a substantial percentage of federal employees are working from home and are thus unable to access classified systems and data. The Government nevertheless has completed the declassification and classified discovery process for the documents produced to date on an extremely expedited basis.

## RESPONSES TO THE DEFENDANT'S DISCOVERY REQUESTS

7.  In addition to the above, the Government has taken a number of steps, in some cases extraordinary or unprecedented, to ensure that it meets its discovery obligations. The Government has responded promptly to dozens of specific requests raised by the defendant's counsel, which the defense has conveyed in six separate discovery letters. To cite just several examples:

   a. On September 27, 2021, the defense requested, among other things, "all evidence derived by electronic surveillance [and] all statements made by the Defendant during tape-recorded, wire-tapped, or eavesdropped conversations." In response, the Special Counsel team conducted a search of the defendant's name over all FBI criminal electronic surveillance/wiretap intercepts, regardless of time period and without subject matter limitation, and verbally provided information regarding the results (if any) to counsel.

b. On September 27, 2021, the defense also requested "any and all communications or documents, including records, notes, or memoranda regarding background investigations into Mr. Sussmann in connection with his national security clearances with [several government agencies]." In response, the Government requested those materials from the FBI and another agency. The Government has produced some of those materials and expects to produce the remainder (totaling more than 900 pages) later this week in redacted form in advance of its current unclassified discovery deadline.

c. On September 27, 2021, the defense also requested "any and all documents, policies (including the relevant portions of the FBI Domestic Investigations and Operations Guide ["DIOG"]), guidance, instructions, and communications concerning the FBI's intake and processing of tips from civilians, including anonymous tips reported through the FBI's tip lines and any other means of transmission." In response, the Special Counsel team collected from the FBI and produced to the defense the relevant portions of the FBI's DIOG. After further conversations with the defense, the prosecution team again met with and made further requests of FBI leadership to locate any additional policies or protocols responsive to this request and will produce the results (if any) as soon as it receives them.

d. On September 27, November 22, and November 30, 2021, the defense requested, in substance, "any and all documents including the FBI's communications with *The New York Times* regarding any of [the Russian Bank-1] allegations in the fall of 2016." In a subsequent January 10, 2022 letter, the defense also asked for information relating to a meeting attended by reporters from the *New York Times*, the then-FBI General Counsel,

9

  the then-FBI Assistant Director for Counterintelligence, and the then-FBI Assistant Director for Public Affairs. In response to these requests, the Special Counsel's Office, among other things, (i) applied a series of search terms to its existing holdings and (ii) gathered *all* of the emails of the aforementioned Assistant Director for Public Affairs for a two-month time period, yielding a total of approximately 8,900 potentially responsive documents. The Special Team then reviewed each of those emails for relevant materials and produced approximately 37 potentially relevant results to the defense.

e. On September 27, 2021 and subsequent dates, the defense also requested, among other things, materials regarding relationships between Tech Executive-1's companies and "the FBI or any other government agency [including] the government's reliance on information . . . the Companies have provided[.]" In response to this request, the Government has, among other things, requested that the FBI identify any contracts that the agency has maintained with seven different companies that were founded, owned, controlled by, or otherwise connected to, Tech Executive-1. The Government will provide these materials to the defense to the extent they are discoverable, and subject to classification issues. In addition, with regard to one of Tech Executive-1's companies, the Special Counsel team previously requested and obtained from the FBI *every* unclassified email in FBI holdings containing reference to that company's email domain, comprising approximately 17,000 documents. For those documents dating from within the 2016 time period, the Government has reviewed and produced potentially relevant materials to the defense, totaling approximately 226 emails. For the

emails falling outside the 2016 time period, the Government is continuing to review those emails and will produce responsive results to the defense as soon as possible. The Government is also conducting other searches and communicating with other government agencies regarding Tech Executive-1's companies in order to identify additional potentially responsive materials.

f. On October 13, 2021, the defense requested, among other things, to inspect the original notes that a former FBI Assistant Director of Counterintelligence took reflecting the defendant's alleged false statement. The original notes were contained in a hard-bound notebook located at FBI Headquarters and contained extremely sensitive and highly classified information on a variety of topics and unrelated investigative matters. The Government immediately agreed to make the original notebook available to the defense in redacted form, and the defense conducted its review of the notebook on October 20, 2021.

g. On December 10, 2021, the defense requested, among other things, *all* of the prosecution team's communications with counsel for witnesses or subjects in this investigation, including, "any records reflecting any consideration, concern, or threats from your office relating to those individuals' or their counsels' conduct. . . and all formal or informal complaints received by you or others" about the conduct of the Special Counsel's Office."  Although communications with other counsel are rarely discoverable, especially this far in advance of trial, the Government expects to produce certain materials responsive to this request later this week. The Government notes that it is doing so despite the fact that certain counsel persistently have targeted prosecutors and

investigators on the Special Counsel's team with baseless and polemical attacks that unfairly malign and mischaracterize the conduct of this investigation. For example, certain counsel have falsely accused the Special Counsel's Office of leaking information to the media and have mischaracterized efforts to warn witnesses of the consequences of false testimony or false statements as "threats" or "intimidation." Despite the inflammatory and unfounded nature of these accusations, the Special Counsel's Office intends to produce these materials to the defense to avoid any suggestion that it seeks to conceal these communications for some bad purpose.

8. In a step that is extraordinary in a criminal case, the Special Counsel's Office also previously directed the FBI to query the defendant's last name and a common misspelling of the defendant's name ("Sussmann" and "Sussman") over all FBI email and instant messaging systems – including Unclassified, Secret, and Top Secret systems – for the time period January 1, 2016 through April 30, 2017. The FBI then provided the results of these searches – totaling approximately 79,000 items – to the Special Counsel team. The FBI also searched its case management system for the names "Michael Sussmann" or "Michael Sussman." The Special Counsel team is reviewing each of these more than 79,000 documents to eliminate duplicates and false hits (*e.g.*, documents pertaining to individuals named "Sussman" or "Sussmann" *other than* the defendant) and to identify further potentially relevant materials. To date, the Government has produced to the defense approximately 1,099 of the documents that resulted from this search. The Special Counsel team expects to complete its review of these documents within approximately the next two weeks. Of those that the Government determines should be disclosed in discovery, the Government will (i) immediately produce unclassified documents to the defense, and (ii) submit

12

classified documents to the FBI for expedited declassification and approval to produce in classified discovery.

9. In sum, the Government has gone beyond the discovery protocols that are typical in a false statements case, or indeed most cases, and believes that it has substantially exceeded what is required under Rule 16.

## ADDITIONAL DISCOVERY MATERIALS

10. In light of the expansive nature of the discovery in this case, the unusual demands and limitations placed on the Government by the COVID-19 pandemic, and the wide-ranging nature of the defendant's written discovery requests, the Government continues to collect and review certain discrete and limited categories of materials – including some outlined above – that may yield additional discovery. These categories include the following:

    a. ***DOJ Office of Inspector General Materials.*** On October 7, 2021, at the initiative of the Special Counsel's Office, the prosecution team met with the DOJ Inspector General and other OIG personnel to discuss discoverable materials that may be in the OIG's possession. The Special Counsel's office subsequently submitted a formal written discovery request to the OIG on October 13, 2021, which requested, among other things, all documents, records, and information in the OIG's possession regarding the defendant and/or the Russian Bank-1 allegations. The Special Counsel also requested any transcripts or other documents within the OIG's possession containing certain search terms. In response, the OIG provided, and the Government has produced to the defense in redacted form, relevant transcripts of interviews conducted by the OIG during its review of the FBI's Crossfire Hurricane investigation. On December 17, 2021, the OIG also provided to the prosecution team a written forensic report concerning a particular cyber-related matter that the

13

defendant brought to the OIG's attention in early 2017 on behalf of an anonymous client. In particular, the report reflects that in early 2017, the defendant reported to an OIG Special Agent in Charge that one of the defendant's clients had observed that a specific OIG employee's computer was "seen publicly" in "Internet traffic" and was connecting to a Virtual Private Network in a foreign country. At the time the OIG provided this forensic report to the Special Counsel in December 2021, the OIG represented to the prosecution team that it had "no other file[] or other documentation" relating to this cyber matter. The Government provided the report to the defense on December 23, 2021. Subsequent to this disclosure to the defense, the Special Counsel team has become aware of additional potentially discoverable materials in the OIG's possession:

      i.    *First,* in a discovery call with the prosecution team on January 20, 2021, defense counsel informed the Government that the defendant met personally with the DOJ Inspector General in March 2017 when conveying the aforementioned cyber issue to the OIG. The defense further stated that the defendant's client in that matter was Tech Executive-1, the same individual on whose behalf the Indictment alleges the defendant also met with the FBI in September 2016. Upon learning this information, the prosecution team promptly made further inquiries of the OIG. On the next day, January 21, 2021, the OIG informed the Special Counsel for the first time that the defendant in fact met in March 2017 with the Inspector General and his then-General Counsel concerning the above-described cyber matter. The OIG had not previously informed the Special Counsel's Office of this meeting with the defendant. Over the past few days, including over this last weekend, the OIG has been gathering and providing further documentation and information relating to that meeting to the Special Counsel's Office. Given the meeting's potential relevance to the charges at hand, the Special Counsel's Office will work expeditiously with the OIG

14

to conduct interviews and to collect and disclose any further discoverable materials to the defense.

      ii.  *Second,* in early January 2022, the Special Counsel's Office learned for the first time that the OIG currently possesses two FBI cellphones of the former FBI General Counsel to whom the defendant made his alleged false statement, along with forensic reports analyzing those cellphones. Since learning of the OIG's possession of these cellphones, the Government has been working diligently to review their contents for discoverable materials. The Government expects to make those materials available to the defense later this week.

      iii.  *Third*, in January 2022, the OIG informed the Special Counsel's Office for the first time that it would be extremely burdensome, if not impossible, for the OIG to apply the search terms contained in the prosecution team's October 13, 2021 discovery request to certain of the OIG's holdings – namely, emails and other documents collected as part of the OIG's investigation. The OIG therefore requested that the Special Counsel's Office assist in searching these materials. The Government is attempting to resolve this technical issue as quickly as possible and will keep the defense (and the Court as appropriate) updated regarding its status.

    b.  ***FBI Inspection Division Materials.*** The FBI's Inspection Division is currently conducting an investigation concerning the performance of FBI personnel in the FBI's Crossfire Hurricane investigation. The Inspection Division's investigation of these matters remains ongoing. Given the potential overlap in issues relevant to the instant prosecution, the Special Counsel's Office has requested, but not yet received, the interview reports and associated documents for a number of current and former FBI personnel who were interviewed by the Inspection Division. There are numerous sensitivities and legal considerations surrounding these interview reports and related documents, given that (i) the Inspection Division's investigation has

not concluded, and (ii) some of the relevant interviews present potential *Garrity* issues. *See Garrity v. New* Jersey, 385 U.S. 493 (1967); *see also Kalkines v. United* States, 473 F. 3d 1391 (Ct. Cl. 1973). While the Government expects that any discoverable information in these documents is more likely to constitute *Giglio* or Jencks material, as opposed to Rule 16 or *Brady* material, the Government will promptly make any appropriate disclosures to the defense.

        c.    **"Sussmann"/"Sussman" Searches of FBI Systems.** As noted above, the prosecution team has been reviewing and producing to the defense classified and unclassified materials resulting from its search of FBI communications and the FBI's case management system for the defendant's name (and variations thereof). Of the more than 79,000 documents yielded by these searches, the prosecution team has approximately 1,700 remaining classified and unclassified documents to review. The team expects to produce most of the remaining responsive documents to the defense before the current classified discovery deadline of February 11, 2022. To the extent the Government produces materials beyond that date, it expects the materials will be of a relatively small quantity and will more likely contain Jencks Act and *Giglio* materials than Rule 16 or *Brady* materials. In addition, some of the classified materials responsive to this search may require motion practice under the Classified Information Procedures Act.

        d.    **Tech Executive-1's Companies.** As noted above, the prosecution team has taken a number of steps in response to the defense's request to identify business contracts and other relationships between the U.S. government and several companies tied to Tech Executive-1. With regard to contracts and other formal arrangements with the FBI, the prosecution team believes it will likely be able to produce most, if not all, such materials by the February 11, 2022 deadline for classified discovery, but the search for and production of those and other relevant materials could

possibly extend beyond that date. With regard to the ongoing email review of more than approximately 17,000 documents containing reference to one of Tech Executive-1's companies, the prosecution team expects it will be in a position to complete its remaining production of discoverable material by the end of February. The Government will keep the defense and the Court apprised of its progress on these reviews.

    e. ***FBI Policies Regarding Anonymous Tips.*** As noted above, the prosecution team is working with the FBI to identify any additional policies and procedures responsive to the defendant's discovery request regarding the handling of anonymous tips. The Government believes it will likely be in a position to produce any such documents, if they exist, by the current classified discovery deadline of February 11, 2022, but the search and production could possibly extend beyond that date.

    f. ***Miscellaneous Discovery.*** In an abundance of caution and to ensure compliance with its discovery obligations, the Government continues to make additional investigative and discovery requests of various agencies, and to interview and re-interview relevant witnesses. The prosecution team also continues to conduct further reviews of its existing holdings. (For example, the defense informed the Government in a letter dated November 30, 2021 that it believes "there were additional Agency-2 employees at the [February 9, 2017] meeting with Mr. Sussmann" beyond those contained in the Government's discovery. Since receiving this letter, the Government has been undertaking additional steps to determine if additional personnel were, in fact, present at this meeting with Agency-2 employees – evidence of which the Government has not identified to date.) In addition, the Special Counsel's office maintains an active, ongoing criminal investigation of these and other matters that is not limited to the offense charged in the

Indictment. Accordingly, and as is inevitable in many criminal cases, the Government expects to receive additional information and documents in the coming weeks that may be relevant to the charged conduct. As the Government has assured the defense, the Government will promptly disclose any such discoverable materials.

11. In light of the foregoing, the Government respectfully submits that it is appropriate and reasonable for the Court to permit the prosecution team to produce limited, residual discovery on or before March 18, 2022. The Government will nevertheless endeavor to produce such materials well in advance of that date. The Government also will consent to the filing by the defense of any additional or supplemental motions that are based on, or prompted by, the Government's residual discovery. Finally, and as it has done throughout the discovery process, the Government will update the defense (and the Court as appropriate) regarding its progress on all of the above discovery issues.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Government's request to permit the production of any residual discovery on or before March 18, 2022.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

 /s/ Andrew J. DeFilippis
Jonathan E. Algor
Assistant Special Counsel
jonathan.algor@usdoj.gov

Andrew J. DeFilippis
Assistant Special Counsel
andrew.defilippis@usdoj.gov

Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov