UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case No. 21-582 (CRC) |
| | : | |
| MICHAEL A. SUSSMANN, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MOTION TO INQUIRE INTO POTENTIAL CONFLICTS OF INTEREST

1.  The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully moves this Court to inquire into potential conflicts of interest arising from the representation of the defendant by his current counsel, Latham & Watkins LLP ("Latham"). The Government has discussed these matters with the defense and believes that any potential conflicts likely could be addressed with a knowing and voluntary waiver by the defendant upon consultation with conflict-free counsel as appropriate. The Government believes that any such waiver should be put on the record prior to trial. As set forth in further detail below, it is possible that conflicts of interest could arise from the fact that Latham and/or its employees (i) previously represented others in the Special Counsel's investigation whose interests may conflict with those of the defendant, (ii) previously represented the defendant and his prior employer in connection with events that likely will be relevant at trial or at any sentencing, and (iii) maintained professional and/or personal relationships with individuals who could be witnesses in these proceedings. Accordingly, for the reasons set forth below, the government respectfully requests that the Court inquire into the potential conflicts of interest set forth herein. Defense counsel has advised that the defendant has

1

been apprised of these issues, understands that he has the right to consult independent counsel, and presently intends to waive any potential conflict of interest. In support of this Motion, the government represents the following:

## FACTUAL BACKGROUND

2. The defendant is charged in a one-count indictment with making a materially false statement to the FBI, in violation of Title 18, United States Code, Section 1001 (the "Indictment"). As set forth in the Indictment, on Sept. 19, 2016 – less than two months before the 2016 U.S. Presidential election – the defendant, a lawyer at a large international law firm ("Law Firm-1") that was then serving as counsel to the Clinton Campaign, met with the FBI General Counsel at FBI Headquarters in Washington, D.C. The defendant provided the FBI General Counsel with purported data and "white papers" that allegedly demonstrated a covert communications channel between the Trump Organization and a Russia-based bank ("Russian Bank-1"). The Indictment alleges that the defendant lied in that meeting, falsely stating to the General Counsel that he was not providing the allegations to the FBI on behalf of any client. In fact, the defendant had assembled and conveyed the allegations to the FBI on behalf of at least two specific clients, including (i) a technology executive ("Tech Executive-1") at a U.S.-based Internet company ("Internet Company-1"), and (ii) the Clinton Campaign.

3. The defendant's billing records reflect that the defendant repeatedly billed the Clinton Campaign for his work on the Russian Bank-1 allegations. In compiling and disseminating these allegations, the defendant and Tech Executive-1 also had met and communicated with another law partner at Law Firm-1 who was then serving as General Counsel to the Clinton Campaign ("Campaign Lawyer-1").

4. The Indictment also alleges that, beginning in approximately July 2016, Tech Executive-1 had worked with the defendant, a U.S. investigative firm retained by Law Firm-1 on behalf of the Clinton Campaign, numerous cyber researchers, and employees at multiple Internet companies to assemble the purported data and white papers. In connection with these efforts, Tech Executive-1 exploited his access to non-public and/or proprietary Internet data. Tech Executive-1 also enlisted the assistance of researchers at a U.S.-based university who were receiving and analyzing large amounts of Internet data in connection with a pending federal government cybersecurity research contract. Tech Executive-1 tasked these researchers to mine Internet data to establish "an inference" and "narrative" tying then-candidate Trump to Russia. In doing so, Tech Executive-1 indicated that he was seeking to please certain "VIPs," referring to individuals at Law Firm-1 and the Clinton Campaign.

5. The Government's evidence at trial will also establish that among the Internet data Tech Executive-1 and his associates exploited was domain name system ("DNS") Internet traffic pertaining to (i) a particular healthcare provider, (ii) Trump Tower, (iii) Donald Trump's Central Park West apartment building, and (iv) the Executive Office of the President of the United States ("EOP"). (Tech Executive-1's employer, Internet Company-1, had come to access and maintain dedicated servers for the EOP as part of a sensitive arrangement whereby it provided DNS resolution services to the EOP. Tech Executive-1 and his associates exploited this arrangement by mining the EOP's DNS traffic and other data for the purpose of gathering derogatory information about Donald Trump.)

6. The Indictment further details that on February 9, 2017, the defendant provided an updated set of allegations – including the Russian Bank-1 data and additional allegations relating

3

to Trump – to a second agency of the U.S. government ("Agency-2"). The Government's evidence at trial will establish that these additional allegations relied, in part, on the purported DNS traffic that Tech Executive-1 and others had assembled pertaining to Trump Tower, Donald Trump's New York City apartment building, the EOP, and the aforementioned healthcare provider. In his meeting with Agency-2, the defendant provided data which he claimed reflected purportedly suspicious DNS lookups by these entities of internet protocol ("IP") addresses affiliated with a Russian mobile phone provider ("Russian Phone Provider-1"). The defendant further claimed that these lookups demonstrated that Trump and/or his associates were using supposedly rare, Russian-made wireless phones in the vicinity of the White House and other locations. The Special Counsel's Office has identified no support for these allegations. Indeed, more complete DNS data that the Special Counsel's Office obtained from a company that assisted Tech Executive-1 in assembling these allegations reflects that such DNS lookups were far from rare in the United States. For example, the more complete data that Tech Executive-1 and his associates gathered – but did not provide to Agency-2 – reflected that between approximately 2014 and 2017, there were a total of more than 3 million lookups of Russian Phone-Provider-1 IP addresses that originated with U.S.-based IP addresses. Fewer than 1,000 of these lookups originated with IP addresses affiliated with Trump Tower. In addition, the more complete data assembled by Tech Executive-1 and his associates reflected that DNS lookups involving the EOP and Russian Phone Provider-1 began at least as early 2014 (*i.e.*, during the Obama administration and years before Trump took office) – another fact which the allegations omitted.

7. In his meeting with Agency-2 employees, the defendant also made a substantially similar false statement as he had made to the FBI General Counsel. In particular, the defendant

4

asserted that he was not representing a particular client in conveying the above allegations. In truth and in fact, the defendant was representing Tech Executive-1 – a fact the defendant subsequently acknowledged under oath in December 2017 testimony before Congress (without identifying the client by name).

## APPLICABLE LAW

8. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. A defendant's Sixth Amendment right includes the "right to representation that is free from conflicts of interest," *Wood v. Georgia*, 450 U.S. 261, 271 (1981), but also carries a "presumption in favor of counsel of choice," *Wheat v. United States*, 486 U.S. 153, 160 (1988). At the same time, a criminal defendant's right to retain counsel of his choice is not absolute. The "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 46 U.S. at 159. Thus, even if a defendant waives the right to conflict-free representation, the presumption in favor of defendant's counsel of choice "may be overcome not only by a demonstration of actual conflict but also by a showing of a serious potential for conflict." Wheat, 486 U.S. at 163–64.

9. As the D.C. Circuit explained in *United States v. Lopesierra–Gutierrez*, 708 F.3d 193, 199–200 (D.C. Cir. 2013), "a defendant's counsel-of-choice right may sometimes be trumped by a conflict of interest." This is because "where a defendant's chosen counsel suffers from a conflict of interest, . . . the court's own institutional interests" are implicated. *Id*. Guaranteeing conflict-free counsel protects not just defendants' rights, but also the "'[f]ederal courts['] ... independent interest in ensuring that criminal trials are conducted within the ethical standards of

5

the [legal] profession and that legal proceedings appear fair to all who observe them.'" *Id*. (alterations in original) (quoting *Wheat*, 486 U.S. at 161).

10. Since the Court has an independent interest in investigating potential conflicts, *see Wheat*, 486 U.S. at 161, the Court retains "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id*. at 163. Accordingly, "[i]f in the context of a particular case the district court believes a conflict is intolerable, it may decline to accept a defendant's waiver." *Lopesierra–Gutierrez*, 708 F.3d at 202. "In making this determination, a court balances the defendant's right to choose his representative against both the defendant's countervailing right to conflict-free representation and the court's independent interest in the integrity of criminal proceedings." *Id*. at 200 (emphasis in original). The key inquiry in this analysis is the "nature and extent of the conflict." *Id.*

## DISCUSSION

11. The Government respectfully requests that the Court inquire concerning the following issues that may give rise to potential conflicts of interest with regard to Latham's current representation of the defendant:

**I. Latham's Prior Representations in the Special Counsel's Investigation**

　**A. Latham's Prior Representation of Law Firm-1 and Campaign Lawyer-1 in This Investigation**

12. From approximately July 2020 through approximately July 2021, Latham represented three separate clients – the defendant, Law Firm-1, and Campaign Lawyer-1 – in

connection with the Special Counsel's investigation.[1]  As part of its representations, Latham communicated and met with the Special Counsel's Office and other DOJ officials on behalf of each of these clients.  As noted above, the Indictment alleges that Tech Executive-1 conferred and consulted with both the defendant and Campaign Lawyer-1 on multiple occasions in connection with the Russian Bank-1 allegations.  As a result, the Government expects that testimony at trial will address factual issues concerning, among other things, (i) the extent to which the defendant did or did not inform Campaign Lawyer-1 and Law Firm-1 that he was billing work on the Russian Bank-1 allegations to the Clinton Campaign, (ii) the extent to which the defendant did or did not inform or receive instructions from Campaign Lawyer-1 and Law Firm-1 regarding his billing of the Clinton Campaign and his meeting with the FBI General Counsel, and (iii) the defendant's potential motives to mislead the FBI concerning whether he was working with or on behalf of the Clinton Campaign, Campaign Lawyer-1, and Tech Executive-1.  In each of these areas, the defendant's interests may diverge from those of Campaign Lawyer-1 and Law Firm-1.  In addition, to the extent that the defendant's factual accounts might differ from those of Campaign Lawyer-1 and Law Firm-1 on these issues, Latham may already have gained privileged insights to any such differences from their prior, confidential attorney-client communications.  *Cf. United States v. Gotti*, 9 F. Supp. 2d 320, 323–25 (S.D.N.Y. 1998) ("attorney-client relationship with the witness or co-defendant gave rise to continuing obligations of loyalty and confidentiality that may be breached when the confidences are required to be exploited in, for example, cross examining [a] former

---

[1] One of the Latham attorneys who represented the defendant during this time period is now serving at the U.S. Department of Justice.  It is the understanding of the Special Counsel's Office that this attorney expeditiously and appropriately recused himself from any involvement in the Special Counsel's investigation and these proceedings.

client"); *cf. also United States v. Weaver*, 265 F.3d 1]074, 1075–77 (D.C. Cir. 2001) (holding that counsel's representation of a client and a potential witness against the client created a conflict of interest).

13. Moreover, it is possible that the defendant, having recently resigned from his partnership at Law Firm-1, is currently or will become in an adversarial posture with his former employer. Latham – through its prior representation of Law Firm-1 – likely possesses confidential knowledge about Law Firm-1's role in, and views concerning, the defendant's past activities. Accordingly, the Government believes that potential conflicts of interest may exist or arise from Latham's prior representations of Campaign Lawyer-1 and Law Firm-1 in this investigation.

### B. Law Firm-1's Representation of the Clinton Campaign and Another Political Organization

14. Potential conflicts of interest might also arise from the fact that during the time period when Latham represented all three of the aforementioned clients, one of those clients, Law Firm-1, was representing both the Clinton Campaign and a related political organization ("Political Organization-1") in the Special Counsel's investigation. Law Firm-1's representations of those clients began in approximately May 2021 and ended in approximately July 2021. The Government believes that Law Firm-1's prior representations of these entities may give rise to potential conflicts of interest because it is possible that Law Firm-1 shared confidential facts and/or communications concerning its representation of those clients with its then-counsel, Latham. In addition, to the extent the Government offers documents and other evidence at trial that it obtained from the Clinton Campaign and/or Political Organization-1, Latham's duties to its former client (Law Firm-1) might cause its interests to diverge from those of the defendant in connection with such evidence and/or the cross examination of witnesses. Accordingly, the Government respectfully requests that the

8

Court inquire into any potential conflicts, including an examination of whether Law Firm-1's own representations of the Clinton Campaign and Political Organization-1 may contribute to or amplify such conflicts. *Gotti*, 9 F Supp. 2d at 323-25.

## II.     Latham's Other Representations in Related Matters

16.     In addition to the above representations, Latham also has represented the defendant, Law Firm-1, and Campaign Lawyer-1 in other matters that predated the existence of the Special Counsel's investigation but which are likely relevant to these proceedings. In particular, the Government is aware of the following:

### A. Latham's Representation of the Defendant in his December 2017 Congressional Testimony

16.     Latham served as counsel to the defendant and Law Firm-1 in connection with the defendant's December 2017 testimony before the House Permanent Subcommittee on Intelligence. That testimony addressed the Russian Bank-1 allegations and other matters. At numerous times during the defendant's testimony, attorneys from Latham interjected to clarify and/or address issues relating to attorney-client privilege and other topics.[2] In his testimony, the defendant acknowledged bringing the Russian Bank-1 allegations to the FBI General Counsel and to Agency-2 on behalf of a specific client, namely, Tech Executive-1 (whom the defendant did not identify by name). The Government expects to offer this testimony at trial to prove that the defendant knowingly and intentionally lied when he stated to the FBI General Counsel in September 2016 that he was *not* acting on behalf of "any client." The Government also may seek to establish that the defendant's Congressional testimony itself was knowingly and intentionally misleading insofar as it failed to

---

[2] Both of the Latham attorneys who were present for the defendant's testimony (one of whom is the Department of Justice employee referenced above) have since left the firm.

disclose that the defendant billed work on the Russian Bank-1 allegations to the Clinton Campaign. Because Latham attorneys played a role in, and were witnesses to, this testimony and related conversations, it is possible that their past advice might give rise to a potential conflict of interest. For example, it is possible that motion practice surrounding the admissibility of this testimony may require consideration of issues such as the appropriate boundaries of the attorney-client privilege, the potential waiver of such privilege by the defendant or Tech Executive-1 and the Clinton Campaign, and/or the potential applicability of an advice of counsel defense. Because Latham attorneys witnessed the defendant's testimony and advised both the defendant and his employer in connection therewith, it is possible that conflicts of interest would arise in connection with these matters. *Gotti*, 9 F. Supp. 2d at 324 ("An attorney may be disqualified if he has first-hand knowledge of events that may be part of the government's proof at trial.")

**B. Latham's Advice to Law Firm-1 in Connection with Public Statements in 2018**

17. In 2018, Latham also advised Law Firm-1 concerning the drafting and issuance of statements to the media that Law Firm-1 made concerning the defendant's October 2016 meeting with the FBI General Counsel. Those statements – which the defendant appears to have reviewed or assisted in drafting – were at least partially inaccurate and/or misleading. The Government therefore may seek to offer these statements at trial pursuant to Rule 404(b) or other provisions of law. The two statements are, in pertinent part, as follows:

- On or about October 12, 2018, Law Firm-1 issued a statement to multiple media outlets in which the firm stated, in part: "When Sussmann met with [the FBI General Counsel] on behalf of a client, it was not connected to the firm's representation of the Hillary Clinton Campaign, the DNC or any Political Law Group client."

- On or about October 18, 2018, the then-Managing Partner of Law Firm-1 wrote a letter to the editor of a major newspaper in which he asserted, in part, "Mr. Sussmann's meeting with the FBI General Counsel James Baker was on behalf of a client with no connections to either the Clinton campaign, the DNC or any other Political Law Group client."

Privilege logs and redacted emails obtained from Law Firm-1 in this investigation reflect that in the days before the issuance of these statements, Latham attorneys sent, received, and/or were copied on correspondence relating to the drafting and dissemination of the statements. (Much of the substance of those emails was redacted and withheld from the Special Counsel's Office pursuant to Law Firm-1's assertion of attorney-client privilege and attorney work product protections). Because the defendant was aware of and/or reviewed these media statements, the Government may seek to offer them as evidence pursuant to Rule 404(b) or other provisions of law to establish that the defendant sought to conceal the Clinton Campaign's ties to the Russian Bank-1 allegations from the FBI and others.[3] Latham's advice concerning these statements therefore may become at issue in motions *in limine*, trial testimony, or other aspects of these proceedings. Accordingly, Latham may encounter potential conflicts of interest in advising the defendant concerning past events in which Latham played a significant role.

---

[3] According to counsel for Law Firm-1, the attorneys at Law Firm-1 and Latham who participated in drafting and/or reviewing these statements were unaware at the time that the defendant had billed work on the Russian Bank-1 allegations to the Clinton Campaign.

### III. Defense Counsel's Prior Interactions with Witnesses or Potential Witnesses

18. Based on its review of documents in its investigation and other information, the Special Counsel's Office also has learned that one of the members of the defendant's current defense team ("Defense Team Member-1") previously worked as Special Counsel to the then-FBI Director from 2013 to 2014. In connection with that work, Defense Team Member-1 developed professional and/or personal relationships with several individuals who later were involved with and/or knowledgeable of the FBI's investigation of the Russian Bank-1 allegations. For example, Defense Team Member-1 appears to have developed a professional relationship with the former FBI General Counsel to whom the defendant made his alleged false statement and who will likely be a central witness at trial.[4] While it is unlikely that these past interactions and activities will give rise to an actual conflict of interest, the Government respectfully requests in an abundance of caution that the Court inquire with the defense concerning whether Defense Team Member-1's relationships with persons and entities who might be witnesses in this case could give rise to a potential conflict or appearance issue and, if so, whether the defendant waives any such conflict. *See Lyle v. Artuz*, No 03-CV-5155 (CBA), 2006 WL 1517750 at *20 (E.D.N.Y. May 31, 2006)

---

[4] Following his employment at the FBI, Defense Team Member-1 worked from 2014 to early 2017 as an attorney in the EOP which, as noted above, was involved in certain factual issues that the Government expects will be relevant at trial and any sentencing proceedings. Latham has represented to the Government that while employed at the EOP, Defense Team Member-1 had no role in the aforementioned events or arrangements involving Tech Executive-1, Internet Company-1, and/or allegations involving the purported use of Russian-made phones. The Government similarly has not seen evidence to suggest that Defense Team Member-1 had any role in, or direct knowledge of, the Russian Bank-1 allegations or the FBI's ensuing investigation.

(examining whether defense counsel's relationship with a trial witness gave rise to a conflict of interest).

## **CONCLUSION**

For the foregoing reasons, the Court should inquire regarding the potential conflicts of interest set forth above.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

 /s/ Andrew J. DeFilippis
Jonathan E. Algor
Assistant Special Counsel
jonathan.algor@usdoj.gov

Andrew J. DeFilippis
Assistant Special Counsel
andrew.defilippis@usdoj.gov

Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov