**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>*v.*<br><br>**MICHAEL A. SUSSMANN,**<br><br>*Defendant*. | Case No. 1:21-cr-00582 |

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO
STATE AN OFFENSE AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................2

LEGAL STANDARD.............................................................................................4

ARGUMENT ..........................................................................................................5

    A.    The Indictment Must Sufficiently Allege That Mr. Sussmann's False
           Statement Was "Material" ..................................................................5

           1.    A false statement is "material" only if it concerns a <u>specific
                  governmental decision</u>. ..............................................................5

           2.    A false statement is "material" only if it has a <u>sufficient nexus</u> to a
                  specific governmental decision....................................................9

    B.    The Only False Statement Charged Is Immaterial As A Matter Of Law..............11

           1.    The only decision the FBI was trying to make was the decision
                  whether to commence an investigation....................................................11

           2.    Mr. Sussmann's alleged false statement could not have influenced
                  the FBI's decision to commence an investigation. ....................................13

    C.    Any Broader Reading Of Materiality Would Raise Serious Constitutional
           And Other Concerns ..................................................................20

           1.    The Supreme Court has constrained similarly expansive
                  government charging decisions to ensure compliance with the
                  Constitution.............................................................................21

           2.    A broad interpretation of Section 1001 threatens First Amendment-
                  protected speech.......................................................................22

           3.    Accepting the Special Counsel's theory of materiality would
                  imperil day-to-day communications between lawyers and the
                  government. ............................................................................25

CONCLUSION......................................................................................................26

Defendant Michael A. Sussmann, by and through undersigned counsel and pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), respectfully moves this Court to dismiss the Indictment because the single count therein "fail[s] to state an offense."

## INTRODUCTION

This is a case of extraordinary prosecutorial overreach.  It has long been a crime to make a false statement to the government.   But the law criminalizes only false statements that are *material*—false statements that *matter* because they can actually affect a specific decision of the government.  By contrast, false statements about ancillary matters—false statements about what Blackstone called "trifling collateral circumstances"—are immaterial and cannot give rise to criminal liability.   Accordingly, where individuals have been prosecuted for providing tips to government investigators, they have historically been charged with making a false statement only where the tip itself was alleged to be false, because that is the only statement that could affect the specific decision to commence an investigation.  Indeed, the defense is aware of no case in which an individual has provided a tip to the government and has been charged with making any false statement other than providing a false tip.  But that is exactly what has happened here.

In the fall of 2016, Michael Sussmann, a prominent national security lawyer, voluntarily met with the Federal Bureau of Investigation ("FBI") to pass along information that raised national security concerns.  He met with the FBI, in other words, to provide a tip.  There is no allegation in the Indictment that the tip he provided was false.  And there is no allegation that he *believed* that the tip he provided was false.  Rather, Mr. Sussmann has been charged with making a false statement about an entirely ancillary matter—about who his client may have been when he met with the FBI—which is a fact that even the Special Counsel's own Indictment fails to allege had any effect on the FBI's decision to open an investigation.

1

Mr. Sussmann did not make any false statement to the FBI.  But in any event, the false statement alleged in the Indictment is immaterial as a matter of law.  Furthermore, allowing this case to go forward would risk criminalizing ordinary conduct, raise First Amendment concerns, dissuade honest citizens from coming forward with tips, and chill the advocacy of lawyers who interact with the government.  The Special Counsel's unprecedented and unlawful overreach should not be countenanced, and the single count against Mr. Sussmann should be dismissed for the reasons set forth in greater detail below.

## BACKGROUND

Michael Sussmann is a national security and cybersecurity attorney who practiced at a prominent international law firm during the time period relevant to the Indictment.  *See* Indictment ¶ 8.  He has "represented numerous clients in cybersecurity, privacy, and national security-related matters," including the Democratic National Committee and other high-profile political clients. *Id.* ¶¶ 9, 28.  He has decades of experience in government and private practice, and at all times relevant here maintained an active national security clearance.

In September 2016, Mr. Sussmann arranged a one-on-one meeting with James Baker, then-General Counsel of the FBI, to advise him of suspicious internet data involving the Trump Organization and Russian Bank-1 (hereinafter "the Russian Bank-1 Information") that raised serious national security concerns and would soon be reported in the media.  *Id.* ¶¶ 3, 27.  Mr. Sussmann arranged for this meeting on behalf of his client, Tech Executive-1, who conveyed the data and analysis regarding the Russian Bank-1 Information to Mr. Sussmann.  *See id.* ¶¶ 18-19, 25.  At the September 19, 2016 meeting between Mr. Sussmann and Mr. Baker, Mr. Sussmann provided Mr. Baker with an overview of the concerns raised by the Russian Bank-1 Information, and notified Mr. Baker that a news story would be published later that week.  *Id.* ¶ 27.  In the days after Mr. Sussmann's meeting with Mr. Baker, the FBI opened an investigation to assess the

Russian Bank-1 Information.  *Id.* ¶ 32.  The FBI ultimately "concluded that there was insufficient evidence to support the allegations of a secret communications channel with Russian Bank-1."  *Id.* ¶ 7.

The Indictment alleges that, in meeting with Mr. Baker, Mr. Sussmann falsely stated "that he was not acting on behalf of any client in conveying particular allegations concerning a Presidential candidate, when in truth, and in fact, and as [Mr. Sussmann] well knew, he was acting on behalf of specific clients, namely, Tech Executive-1 and the Clinton Campaign."  *Id.* ¶ 46.  He did not.

Even so, the Indictment tellingly does not allege that the information Mr. Sussmann furnished to Mr. Baker was false or fraudulent or misleading in any way.  Nor does the Indictment allege—and the facts do not and cannot show—that Mr. Sussmann's purported false statement was material to the FBI's decision whether to initiate an investigation into the Russian Bank-1 Information.  Instead, the Indictment twists itself into knots to try to establish the materiality of Mr. Sussmann's purported false statement.  Specifically, the Special Counsel contends that Mr. Sussmann's alleged false statement was material because:

(1) it "misled the FBI General Counsel and other FBI personnel concerning the political nature of his work and deprived the FBI of information that *might have* permitted it more fully to assess and uncover the origins of the relevant data and technical analysis, including the identities and motivations of SUSSMANN's clients," *id.* ¶ 5 (emphasis added);

(2) had the FBI uncovered the origins of that data and technical analysis, the FBI "*might have* learned, among other things, that (i) in compiling and analyzing the Russian Bank-1 allegations, Tech Executive-1 had exploited his access to non-public data at multiple Internet companies to conduct opposition research concerning Trump; (ii) in furtherance of these efforts,

Tech Executive-1 had enlisted, and was continuing to enlist, the assistance of researchers at a U.S.-based university who were receiving and analyzing Internet data in connection with a pending federal government cybersecurity research contract; and (iii) SUSSMANN, Tech Executive-1, and Law Firm-1 had coordinated, and were continuing to coordinate, with representatives and agents of the Clinton Campaign with regard to the data and written materials that SUSSMANN gave to the FBI and the media," *id.* ¶ 6 (emphasis added); and

(3) it was "relevant" to the FBI whether "SUSSMANN[] was providing [the allegations] as an ordinary citizen merely passing along information, or whether he was instead doing so as a paid advocate for clients with a political or business agenda.  Had SUSSMANN truthfully disclosed that he was representing specific clients, it *might have* prompted the FBI General Counsel to ask SUSSMANN for the identity of such clients, which, in turn, *might have* prompted further questions.  In addition, absent SUSSMANN's false statement, the FBI *might have* taken additional or more incremental steps before opening and/or closing an investigation.  The FBI also *might have* allocated its resources differently, or more efficiently, and uncovered more complete information about the reliability and provenance of the purported data at issue." *Id.* ¶ 32 (emphasis added).

## LEGAL STANDARD

Prior to trial, a criminal defendant may move to dismiss an indictment based on a "defect in the indictment, including . . . failure to state an offense" if the "motion can be determined without a trial on the merits[.]"  Fed. R. Crim. P. 12(b)(3)(B).  For such motions, "[t]he operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." *United States v. Sanford*, *Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012).  "When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations." *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

**ARGUMENT**

**A.   The Indictment Must Sufficiently Allege That Mr. Sussmann's False Statement Was "Material"**

The law does not criminalize *every* false statement that is made to the government.  On the contrary, throughout our common law history, the law has distinguished between false statements of consequence, which can fairly give rise to criminal liability, and false statements of little or no significance, which cannot.  Thus, "materiality" is the legal standard that has long separated the one category from the other.  *Kungys v. United States*, 485 U.S. 759, 769 (1988) (noting that the use of materiality "in the context of false statements to public officials goes back as far as Lord Coke").  Materiality is the standard that has long served to circumscribe the types of false statements that are worthy of prosecution.  As Blackstone himself put it, where a false statement is "in some point *material* to the question in dispute," it can be actionable; but where a false statement concerns "some trifling collateral circumstance, to which no regard is paid," it cannot. *Id.* (emphasis added) (quoting 4 W. Blackstone, Commentaries *137).

Consistent with this well-established principle, with its deeply-rooted history, Title 18, United States Code, Section 1001(a)(2) criminalizes only a "*materially* false, fictitious, or fraudulent statement or representation" made "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."  18 U.S.C. § 1001(a)(2) (emphasis added).  Indeed, materiality is considered to be an "essential element" of the modern federal false statement offense.  *United States v. Verrusio*, 762 F.3d 1, 20 (D.C. Cir. 2014); *see also United States v. Stone*, 394 F. Supp. 3d 1, 12 (D.D.C. 2019).

> *1.   A false statement is "material" only if it concerns a <u>specific governmental decision</u>.*

The Supreme Court has made clear that to be material, a false statement must be more than merely of interest to the government.  Rather, a false statement must concern a specific decision

of a governmental agency and "have 'a natural tendency to influence, or [be] capable of influencing, the decision.'" *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys*, 485 U.S. at 770). Thus, as Justice Scalia explained in *Gaudin*, "[d]eciding whether a statement is 'material' requires the determination of at least two subsidiary questions . . . (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?'" *Id.* at 512. Only after a court has identified the "statement" and the relevant "decision" can a court answer the "ultimate question": "whether the statement was material to the decision." *Id.*

Following *Gaudin*'s lead, courts regularly assess materiality by determining what statement was made and what decision the agency was trying to make. *United States v. Creel*, 458 F. App'x 412, 414 (5th Cir. 2012) ("To determine materiality under § 1001, we seek to ascertain . . . *the decision that the agency was attempting to make*." (emphasis added) (citing *United States v. Najera Jimenez*, 593 F.3d 391, 399-400 (5th Cir. 2010))); *United States v. Facchini*, 874 F.2d 638, 643 (9th Cir. 1989) ("[T]o assess [a false statement's] intrinsic capability [of influencing or affecting the agency's decision], a court must consider whether a statement could, under some set of foreseeable circumstances, significantly affect *an action* by a federal department or agency." (emphasis added)); *United States v. Diggs*, 613 F.2d 988, 999 (D.C. Cir. 1979) ("The test of materiality is whether the statement 'has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a (particular) determination.'" (quoting *Weinstock v. United States*, 231 F.2d 699, 701-02 (D.C. Cir. 1956))); *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 123 n.16 (D.D.C. 2015) ("'[A] statement is material if it has a natural tendency to influence, or is capable of influencing' an agency's *action*." (emphasis added) (*quoting United States v. Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010))).

Numerous cases confirm that false statements are material only where they concern a specific governmental decision.  In *United States v. Johnson*, for instance, defendant Joseph Johnson was charged with and convicted of making a false statement to a district court judge under Section 1001 because he "posed as an attorney and filed a fabricated document on the civil docket of one of the lawsuits against [Bill] Cosby."  19 F.4th 248, 252 (3d Cir. 2021).  The Court turned to "the subsidiary question of 'what decision was the agency trying to make?'"  *Id*. at 257 (quoting *Gaudin*, 515 U.S. at 509).  "[F]atal to the Government's case," however, there was simply no "decision entrusted to the Judge [that] could have possibly been influenced by the [document]," which of course meant that "even if considered by the Judge," the false statement "could [not] have been relevant, much less material, to any *decision*."  *Id.* (emphasis added).  Lacking "evidence of some decision entrusted to the Judge that could have been affected by Johnson's no doubt false statement," the government failed to "establish materiality."  *Id.*

Similarly, in *United States v. Camick*, defendant Leslie Lyle Camick was convicted of making a false statement in violation of Section 1001 by using his "deceased brother's name and identity" in filing a provisional patent application to the Patent and Trademark Office ("PTO"). 796 F.3d 1206, 1210-11 (10th Cir. 2015).  Here, too, the court sought to "identify the decision to be made by the relevant decision[-]making body, in this case the PTO."  *Id.* at 1218.  Yet, "the information contained in a provisional application will only become relevant to a PTO decision if the applicant takes additional action on the application within one year of filing," which Camick had not done.  *Id.* at 1219.  Thus, Camick's false statements in his provisional patent application could not influence "the decision of the decision[-]making body" for the simple reason that "there [was] no decision to be made," and they were "therefore immaterial."  *Id.* (citation omitted).

And in *United States v. Litvak*, defendant Jesse Litvak, a securities broker and trader for Jefferies & Company, was charged with making several fraudulent misrepresentations to a number of Jefferies's counterparties, including some Public-Private Investment Funds ("PPIFs") (funded, in part, by the Department of Treasury), in order to "covertly reap excess profit for Jefferies in the course of transacting residential mortgage-backed securities." *United States v. Litvak*, 808 F.3d 160, 165-66 (2d Cir. 2015). To successfully establish the charged Section 1001 offenses, the government had to identify an "actual *decision* of the *Treasury* that was reasonably capable of being influenced by Litvak's misstatements." *Id.* at 172. And even though "Litvak's misstatements may have negatively impacted the Treasury's investments, that this impact would have been reflected in aggregate monthly reports submitted by PPIF managers to the Treasury, and that the misstatements were the impetus for an investigation by the Treasury that eventually led to Litvak's prosecution," the Treasury had nevertheless "cast itself as a limited partner in the PPIFs, and retained 'no authority to tell the investment managers' which [securities] to purchase or at what price to transact." *Id.* Thus, the government failed to articulate how "Litvak's misstatements were capable of influencing a *decision* of the *Treasury*." *Id.*

Finally, under D.C. Circuit law, a false statement can be material where it affects a specific governmental decision or a specific function of the agency to which it was addressed. *Moore*, 612 F.3d at 701. But there is no legally significant difference between the two where, as in this case, the purported false statement was allegedly directed toward prompting the agency to initiate an investigation. *See, e.g.*, *United States v. Stadd*, 636 F.3d 630, 638-39 & n.9 (D.C. Cir. 2011) (recognizing *Moore* but holding that "[t]he jury charge correctly" defined a "material" statement as one that "has a natural tendency to influence, or is capable of influencing, *the decision* of the decision-making body to which it was addressed" (emphasis added)); *see also Symantec Corp.*,

130 F. Supp. 3d at 123 n.16 (describing *Moore* as holding that "'a statement is material if it has a natural tendency to influence, or is capable of influencing' an agency's action").

> ## 2.   *A false statement is "material" only if it has a <u>sufficient nexus</u> to a specific governmental decision.*

It is not enough that a false statement concern a specific governmental decision. To be material, the false statement must also be capable of *influencing* that decision. And that requires that the false statement have a sufficient nexus, or close connection, to the decision at issue. *See, e.g.*, *United States v. Naserkhaki*, 722 F. Supp. 242, 248 (E.D. Va. 1989) (explaining that "[w]here, as here, a misstatement relates to an ancillary, non-determinative fact, it is not material and cannot support a conviction under Section 1001"); *Facchini*, 874 F.2d at 643 (noting that a "false statement must . . . be capable of having some non-trivial effect on a federal agency"); *cf. United States v. Martinez*, 855 F.2d 621, 624 (9th Cir. 1988) (accepting, in 18 U.S.C. § 1623 prosecutions, that "the government must establish materiality by showing a 'nexus' between the false statements and the scope of the grand jury investigation").

Courts have not hesitated to vacate false statement convictions absent a sufficient nexus (or close connection) between the alleged false statement and the specific governmental decision at issue. In *United States v. Naserkhaki*, the defendant resident alien was prosecuted for, among other things, falsely stating in his Refugee Travel Document ("RTD") application to the Immigration and Naturalization Service ("INS") that "he had not previously applied for an RTD from the United States" (when in truth he had already applied for an RTD in New York a week prior). 722 F. Supp. at 244. A false statement, the court said, that "relates to an ancillary, non-determinative fact . . . is not material and cannot support a conviction under Section 1001." *Id.* at 248. And the government failed to disclose "such relation or connection between the misstatement concerning the prior New York application and the decision to issue the RTD," *id.* at 249, because

none of the inquiries the INS examiner had to consider when presented with defendant's RTD application, "on their face, implicate[d] the information defendant misstated concerning his prior New York RTD application. *Id.* at 247. The government had to offer a "much closer fit . . . between the particular misstatement and the relevant" government decision. *Id.* at 248. The false statement, in other words, was "immaterial because it [was] irrelevant *to defendant's eligibility for an RTD*." *Id.* (emphasis added).

Similarly, in a Sixth Circuit case, *United States v. Qaisi*, the defendants were charged with making false statements as part of their application for citizenship to the INS by stating they were "currently living together as man and wife and had resolved their marital difficulties." 779 F.2d 346, 347 (6th Cir. 1985). The only decision for the INS relevant *to the citizenship application* was whether the couple's marriage was pretextual, *not* the "viability" of the marriage. *Id.* at 348. In "premis[ing] materiality on viability," then, the government "failed to establish that there was a false statement that was material *to the issue at hand*." *Id.* (emphasis added). Likewise, in the Ninth Circuit's decision in *United States v. Facchini*, two groups of defendants made false statements in order to improperly receive unemployment insurance benefits. 874 F.2d at 643. To be material, the false statements had to have a "non-trivial effect on a federal agency"—meaning they "could, under some set of foreseeable circumstances, *significantly* affect an action by a federal department or agency." *Id.* (emphasis added). The first group's false statements satisfied this requisite "direct causal link between [the] statements and action by the Department of Labor" because the statements "resulted in the improper disbursement of federal funds." *Id.* at 644. The second group's false statements made only to the State of Oregon, however, failed to satisfy the materiality requirement because their "effect, actual or potential, . . . on the federal government's limited administrative role [was] *negligible*." *Id.* (emphasis added).

In *Kungys*, too, the Supreme Court held that defendant's misrepresentations about his date and place of birth on his naturalization petition were not material for purposes of the "concealment or misrepresentation" provision of 8 U.S.C. § 1451(a) because those falsely asserted facts were not "relevant to his qualifications for citizenship," and "the true date and place of birth [could not even] predictably have disclosed other facts relevant to his qualifications." 485 U.S. at 774.

**B.    The Only False Statement Charged Is Immaterial As A Matter Of Law**

The Indictment against Mr. Sussmann plainly fails to allege a false statement that meets this legal standard for materiality.  Following the Supreme Court's clear instruction in *Gaudin*, in order to assess the materiality of the false statement that Mr. Sussmann is alleged to have made, this Court must ask what statement he is alleged to have made to the FBI; what decision the FBI was trying to make; and whether the false statement could have influenced that decision.  Here, even accepting all the allegations in the Indictment as true—and the evidence would prove otherwise—the only decision the FBI was trying to make was the decision whether or not to commence an investigation into the allegations of suspicious internet data involving the Trump Organization and Russian Bank-1.  Ample precedent—and the Special Counsel's own allegations in this case—make clear that Mr. Sussmann's purported false statement did not influence, and was not capable of influencing, that decision.

1.    *The only decision the FBI was trying to make was the decision whether to commence an investigation.*

Common sense alone dictates that when a false statement is allegedly made to an investigative agency and there is no investigation pending, the only decision that the agency could try to make is the decision whether to *initiate* an investigation in the first place.  After all, absent an existing investigation, there is no other formal exercise of governmental power that a false statement could conceivably influence.

11

Case law unsurprisingly confirms this common-sense logic.  In *United States v. Hansen*, former Representative George W. Hansen was convicted under Title 18, United States Code, Section 1001 for making certain material omissions on financial disclosure statements that he was required to submit under the Ethics in Government Act of 1978.  772 F.2d 940, 942 (D.C. Cir. 1985).  On appeal to the D.C. Circuit, Hansen argued, among other things, "that his omissions could not have been material because no federal agency or department 'was conducting any inquiry or investigation, or making any determination whatever, that would have been affected in the slightest if Congressman Hansen had . . . put on his [financial disclosure] forms the debts and transactions which the indictment allege[d] he should have reported.'"  *Id.* at 949 (emphasis added).

Writing for the D.C. Circuit, then-Judge Scalia rejected Hansen's argument.  According to the court, Hansen's lies were material because they could influence the critical decision *whether to initiate an investigation*.  According to Judge Scalia, "[a] lie influencing the possibility that an investigation might commence stands in no better posture under § 1001 than a lie distorting an investigation already in progress."  *Id.*  Because Hansen's omissions "tended to conceal information that would have *prompted investigation or action*," *id.* at 950 (emphasis added), they met the test of materiality, i.e., "whether the statement 'has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a [particular] determination,'" *id.* at 949 (citation omitted).  It stands to reason from *Hansen* that, for a false statement to be material where the government has not already begun an investigation, courts must inquire whether the false statement was capable of influencing or "prompt[ing]" the government's decision to "commence" an "investigation or action."  *See id.*; *see also, e.g.*, *United States v. Carrasquillo*, 239 F. App'x 634, 635 (2d Cir. 2007) (Although the government was "not actively investigating

whether defendant owned an unauthorized firearm," defendant's false "statement that he had never owned an off-duty firearm was clearly material . . . as it *went to the heart* of whether [the defendant] had the means of engaging in . . . possibly unprofessional conduct," for which the government "had the authority to investigate" and which the government then investigated. (emphasis added)).[1]

### 2.   Mr. Sussmann's alleged false statement could not have influenced the FBI's decision to commence an investigation.

Precedent and the allegations in the Indictment (and lack thereof) make clear that Mr. Sussmann's purported false statement is immaterial as a matter of law because it did not influence and could not have influenced the FBI's decision *whether* to initiate an investigation into the suspected links between the Trump Organization and Russian Bank-1.

As set forth above, in order to influence a governmental decision, a false statement must have a sufficient nexus, or close connection, to the decision at issue.  *See, e.g.*, *Naserkhaki*, 722 F. Supp. at 248; *Facchini*, 874 F.2d at 643.  Where an agency is deciding whether to initiate an investigation, a false statement about the subject matter of the potential investigation—such as a false tip—would surely be material.  *See United States v. Kim*, 808 F. Supp. 2d 44, 59 (D.D.C. 2011) ("A false statement concerning the subject of an investigation will generally be deemed material because it will have a tendency to influence the investigators.").  In such a case, there is clearly a sufficient nexus between the alleged statement and the governmental decision whether to initiate an investigation.  Thus, the Department of Justice historically has prosecuted legions of cases in which an individual has provided a false tip to the government.  Among many other cases,

---

[1] The possibility of a false statement influencing the *initiation* of a government investigation in *Hansen* (at issue here) stands in stark contrast to the much more common occurrence of a false statement possibly influencing an *ongoing* investigation (not at issue here).  *See, e.g.*, *United States v. Safavian*, 649 F.3d 688, 690-92 (D.C. Cir. 2011) (holding false statements were material because they could influence "the *course* of the FBI's investigation" that was already underway after the FBI's receipt of an anonymous tip (emphasis added)).

John Habenstein pleaded guilty to falsely tipping the FBI off to ships en route to American cities that contained weapons of mass destruction[2]; Rodney Phipps pleaded guilty to interstate threats and a false threat connected to several "swatting" calls, i.e., hoax emergency calls made in order to elicit an armed police response for the purpose of harassing someone[3]; Ryan Lin pleaded guilty to, among other things, nine counts of hoax bomb threats to various police forces, falsely stating there were bombs planted at high schools, shopping malls, courts, government buildings, and hotels[4]; Edgar Johnson, pleaded guilty to "us[ing] a cellular telephone to call Southside Fire in Chatham County, Georgia, and falsely report[ing] a bomb threat at Elba Island"[5]; and Brian Rini was indicted for,[6] among other things, making materially false statements under 18 U.S.C. § 1001(a)(2) for claiming to be a long-missing juvenile and for falsely claiming to be the victim of juvenile sexual trafficking.[7]

---

[2] *See* Criminal Complaint, United States v. Habenstein, No. 02-mj-3500 (D.N.J. July 8, 2002), ECF No. 1; Michael Moss, *THREATS AND RESPONSES: LAW ENFORCEMENT; False Terrorism Tips to F.B.I. Uproot Lives of Suspects*, N.Y. Times (June 19, 2003), https://www.nytimes.com/2003/06/19/us/threats-responses-law-enforcement-false-terrorism-tips-fbi-uproot-lives-suspects.html.

[3] *See* Indictment, United States v. Phipps, No. 19-cr-00069 (D. Del. May 16, 2019), ECF No. 5; Judgment in Criminal Case, United States v. Phipps, No. 19-cr-00069 (D. Del. May 16, 2019), ECF No. 48.

[4] *See* Information, United States v. Lin, No. 18-cr-10092 (D. Mass. Apr. 9, 2018), ECF No. 26; Plea Agreement, United States v. Lin, No. 18-cr-10092 (D. Mass. May 9, 2018), ECF No. 31.

[5] *See Former Georgia Prison Guard Sentenced in Connection with Sexual Assaults of Female Inmates and Bomb Threat*, Dep't of Just., Off. of Pub. Affs. (June 11, 2018), https://www.justice.gov/opa/pr/former-georgia-prison-guard-sentenced-connection-sexual-assaults-female-inmates-and-bomb; Criminal Information, United States v. Johnson, No. 17-cr-00105 (S.D. Ga. Aug. 16, 2017), ECF No. 1; Plea Agreement, United States v. Johnson, No. 17-cr-00214 (S.D. Ga. June 11, 2018), ECF No. 24.

[6] Rini ultimately pleaded guilty to only aggravated identity theft. *See* CRIMINAL MINUTES Before United States District Judge Michael R. Barrett, United States v. Rini, No. 19-cr-00044 (S.D. Ohio Jan. 9, 2020), ECF No. 32.

[7] *See Man Who Claimed to Be Long-Missing Boy Gets 2 Year Sentence, Apologizes to Boy's Family*, CBS News (Dec. 16, 2020, 6:52 AM), https://www.cbsnews.com/news/brian-rini-

In this case, however, Mr. Sussmann is not charged with providing a false tip to the FBI. Indeed, the Indictment does not make a single allegation that the Russian Bank-1 Information he conveyed to the FBI was false.  Moreover, the Indictment does not allege that Mr. Sussmann knew—or should have known—that the Russian Bank-1 Information was false.  Instead, Mr. Sussmann is charged simply with purportedly lying about whether he was acting on behalf of a particular client when conveying that information.  That is, the alleged false statement concerns, at most, Mr. Sussmann's purported motivation for providing the tip to the FBI—not the tip itself. A false statement of this sort does not have the requisite close nexus to the FBI's decision whether to initiate an investigation and is thus incapable of influencing *that* decision as a matter of law.

In fact, the defense is not aware of a single case in which the government has prosecuted (let alone convicted) a tipster not for providing a false tip but for providing a false statement about something ancillary to the tip, for instance, the tipster's motivation for giving a tip to law enforcement in the first place.  The above examples are cases on point.  Habenstein, the aspiring for-hire terrorism expert, ostensibly concealed his commercial motives for lying about weapons of mass destruction; Phipps, Lin, and Johnson, intending to dupe the government into harassing innocent individuals with swatting calls and hoax bomb threats, did not notify the government of whatever perverse motives animated their falsities; and Rini did not tell the FBI that, in lying about who he was and falsely claiming to be a victim of juvenile sex trafficking, his goal was to get away from his own family.  Yet each of the defendants was prosecuted specifically for providing a false *tip*—not for lying about or failing to disclose their motives for so doing.

---

timmothy-pitzen-man-who-claimed-to-be-long-missing-boy-gets-two-year-sentence-apologizes-to-boys-family/; Indictment, United States v. Rini, No. 19-cr-00044 (S.D. Ohio Apr. 17, 2019), ECF No. 12.

The prosecution and conviction in *United States v. Rodgers* is also illustrative.  The defendant was prosecuted under Section 1001 for falsely telling the FBI that his wife had been kidnapped, and the Secret Service that his "estranged girlfriend" planned to assassinate the President.  466 U.S. 475, 476-77 (1984).  The defendant was not prosecuted for concealing his apparent motive for the false tips (a desire to "locate his wife") or for lying about the status of his relationship (calling her his "estranged girlfriend" and suggesting she had involuntarily left, when in fact she was his wife and had left the defendant voluntarily).  *Id.* at 477.

That the government apparently has never prosecuted anyone for alleged false statements regarding subject matter other than the reported wrongdoing makes sense.  For good reason, the materiality element limits criminal liability to false statements *that matter*.  And in this context, a false statement regarding a matter like motivation is not capable of influencing the government's decision whether to initiate an investigation.

The Indictment in this case only serves to confirm that obvious reality.  Likely because the charged false statement is so manifestly immaterial, the Special Counsel resorted to a series of vague allegations about materiality in the Indictment.  But none of these allegations address whether Mr. Sussmann's purported false statement could have influenced the only legally significant decision at issue—the FBI's decision *whether* to investigate the Russian Bank-1 Information.

For example, paragraph 5 of the Indictment suggests that Mr. Sussmann's purported false statement was material because it "misled the FBI General Counsel and other FBI personnel concerning the political nature of his work and deprived the FBI of information that might have permitted it more fully to assess and uncover the origins of the relevant data and technical analysis, including the identities and motivations of Sussmann's clients."  Indictment ¶ 5.  And paragraph 6

16

goes on to detail what the FBI might have learned had it "uncovered the origins of the relevant data and analysis." *Id.* ¶ 6.  Nowhere in these paragraphs, however, does the Indictment suggest that the "relevant data and technical analysis" were themselves false.  Nowhere in these paragraphs does the Indictment suggest that Mr. Sussmann knew or should have known that those materials were false.  And nowhere in these paragraphs does the Indictment suggest that Mr. Sussmann's purported false statement affected the decision whether to investigate the Russian Bank-1 Information.

The same is true of Paragraph 32 of the Indictment.  That Paragraph alleges that Mr. Sussmann's purported false statement was material because it was "relevant" to the FBI whether he was providing the information "as an ordinary citizen" or whether he was doing so "as a paid advocate for clients with a political or business agenda." *Id.* ¶ 32.  The Paragraph goes on to explain the reason that this would have been "relevant" is because it "*might have*" led the FBI General Counsel to ask about the identity of Mr. Sussmann's clients; the FBI "*might have*" taken "additional or more incremental steps before opening and/or closing an investigation"; the FBI "*might have* allocated its resources differently" and "uncovered more complete information." *Id.* (emphasis added).  Again, nowhere in the Indictment is there an allegation that the information Mr. Sussmann provided was false.  Nowhere is there an allegation that Mr. Sussmann knew—or should have known—that the information was false.  And nowhere is there an allegation that the FBI would not have opened an investigation absent Mr. Sussmann's purported false statement. The closest the Indictment comes is the suggestion that Mr. Sussmann's supposed client relationships were "relevant" because they "might have" led the FBI to take "additional or incremental steps."  But the law in this Circuit is clear that relevance is not enough to establish materiality because "[a] statement may be relevant but not material." *See Weinstock*, 231 F.2d at

701 ("To be 'relevant' means to relate to the issue.  To be 'material' means to have probative weight, i.e., reasonably likely to influence the tribunal in making a determination required to be made."); *see also, e.g.*, *Litvak*, 808 F.3d at 174 (stating that materiality was not proven where the government only "established that [defendant's] misstatements may have been *relevant* to the" government decisionmaker).  And the operative governmental decision here is not how the FBI would have gone about opening an investigation, but *whether* the FBI would have opened that investigation.

Moreover, even the Indictment's own allegations undermine any claim that the false statement could have been material.  The Indictment alleges that the FBI "might have" taken "additional or incremental steps" had it known of Mr. Sussmann's purported clients.  But there is no reason the FBI would have acted differently if it learned of Mr. Sussmann's supposed relationship with the Clinton Campaign.  The FBI was already aware of what the Indictment described as the "political nature of his work."  Indictment ¶¶ 5, 32.  Indeed, the Indictment makes clear that the FBI and Mr. Baker himself were well aware that Mr. Sussmann was representing the Democratic National Committee at a time when Hillary Clinton, the Democratic nominee for president, *was* the Democratic National Committee.  *See id.* ¶ 28 ("Michael Sussman[n] – Atty: [Law Firm-1] . . . Represents DNC, Clinton Foundation, etc.").  Similarly, there is no reason the FBI would have acted differently if it learned of Mr. Sussmann's supposed relationship with Tech Executive-1.  The Indictment again makes clear that the FBI and Mr. Baker himself were aware that Mr. Sussmann had received the information from cyber experts.  *See id.* ("Been approached by Prominent Cyber People (Academic or Corp. POCs)[—]People like: [three names redacted]").[8]

---

[8] And tellingly, the Indictment includes no explanation as to why such information would have been material to the FBI's decision whether or not to initiate an investigation when Tech Executive-1—far from being a stranger to the FBI—was someone with whom the FBI had a long-

Both precedent and the allegations of the Indictment therefore make clear that Mr. Sussmann's purported false statement is immaterial as a matter of law. And it is altogether unsurprising that the discovery that the Special Counsel has produced only serves to reinforce that fact. Multiple individuals involved in the FBI's subsequent investigation of the data provided by Mr. Sussmann have confirmed that the purported false statement had no impact on the investigation, including the decision whether to open it. The FBI also regularly accepts and investigates information provided by anonymous tipsters.[9] And moreover, the FBI General

---

standing professional relationship of trust and who was one of the world's leading experts regarding the kinds of information that Mr. Sussmann provided to the FBI.

[9] *See* FBI – Tips Electronic Tip Form, https://tips.fbi.gov/contact (last visited Feb. 17, 2022) ("The FBI requests [contact information] to assist in further investigating your tip. You do not have to provide your name or other personal information"). When initially processing tips, the FBI's Domestic Investigations and Operations Guide (Sept. 28, 2016) ("DIOG") permits use of only limited investigative methods. The purpose of this limited evaluation is only to enable an FBI employee to answer the following question: "Does the complaint, observation, or information appear to present a credible basis to open an Assessment . . . or to open a Predicated Investigation consistent with the standards set forth in the DIOG?" DIOG 5.1.1, FBIDomesticInvestigationsandOperationsGuideDIOG2016VersionPart01of02.pdf.

Nothing in this section states that an FBI employee should inquire about or evaluate the motivations of the person submitting the tip. In fact, agents may not interview the source of the tip or re-contact them for any purpose other than "eliminating confusion." DIOG 5.1.1.5, FBIDomesticInvestigationsandOperationsGuideDIOG2016VersionPart01of02.pdf.

Instead, the DIOG anticipates that FBI employees will evaluate with an objective eye any voluntary information provided by a private individual. *See* DIOG 18.5.7, FBIDomesticInvestigationsandOperationsGuideDIOG2016VersionPart01of02.pdf ("Investigative Method: Information Voluntarily Provided by Governmental or Private Entities"). This section does not describe any requirement to investigate the source or motivations of the individual, but notes that "[i]f the originator of information reported to the FBI characterized an individual, group, or activity in a certain way, and that characterization should be documented for completeness of the FBI record, the FBI record . . . should reflect that another party, and not the FBI, is the originator of the characterization." *Id.* That admonition is repeated throughout the DIOG's guidance on investigative methods. *See* DIOG 18.4; 18.5.1; 18.5.2; 18.5.3; 18.5.4; 18.5.5; 18.5.6;                                                            18.5.7, FBIDomesticInvestigationsandOperationsGuideDIOG2016VersionPart01of02.pdf .

Counsel himself confirmed in testimony under oath before Congress that the FBI investigates evidence of crimes regardless of the political affiliation of the source of the evidence.[10]

At the end of the day, Hillary Clinton herself could have publicly handed over the Russian Bank-1 Information and the FBI would still have investigated it. And if Mr. Sussmann had not met with Mr. Baker and Newspaper-1 published its article as anticipated, *see* Indictment ¶ 27(e), the FBI surely would have initiated its investigation then as well. Thus, Mr. Sussmann's purported statement about his clients was utterly immaterial to the decision of whether to investigate the Russian Bank-1 Information because it is precisely the kind of "ancillary, non-determinative fact," *Naserkhaki*, 722 F. Supp. at 248—or "trifling collateral circumstance," *Kungys*, 485 U.S. at 769— that has never given rise to criminal liability.

### C.   Any Broader Reading Of Materiality Would Raise Serious Constitutional And Other Concerns

Any broader reading of materiality would eviscerate the critical limiting function that this "essential element" serves and would open the door to prosecution of virtually *any* false statement to *any* government official. Under the theory of materiality endorsed by the Special Counsel, a false statement is material for Section 1001 purposes so long as the government offers some reason for why the statement *might have been* relevant in some abstract sense. A person could be criminally prosecuted for providing truthful information to a government agency (e.g., a terrorist

---

[10] Mr. Baker's testimony aligns with the DIOG's instructions, *supra* n. 9. Mr. Baker was asked whether "the mere notion that someone who is a Democrat or Republican . . . comes to you with information, should that information somehow be discounted or considered less credible because of, you know, partisan affiliation?" Interview of James A. Baker Before the H. Comm. on the Judiciary Joint with the Comm. On Government Reform and Oversight at 54 (Oct. 3, 2018), https://s3.documentcloud.org/documents/5805759/Baker-Transcript.pdf. Mr. Baker responded: "Well, the FBI is responsible for protecting everybody in this country. Period, full stop. And we do that, without regard to who they are or what their political background is or anything else. If they believe they have evidence of a crime or believe they have been a victim of a crime, we will do what we can within our lawful authorities to protect them." *Id.*

threat) simply because she lied about her motivation for reporting that information (e.g., seeking revenge after a failed relationship with the terrorist).   Such a capacious understanding of materiality would risk overcriminalization, chill valuable First Amendment speech, and intrude on legal advocacy and lawyer-client relationships.

> ### 1.  *The Supreme Court has constrained similarly expansive government charging decisions to ensure compliance with the Constitution.*

In recent years, the Supreme Court has repeatedly admonished the government for prosecuting, and the lower courts for allowing prosecutions, that stretch the scope of criminal liability under federal statutes.  In *Kelly v. United States*, the Supreme Court interpreted the wire fraud and federal-program fraud provisions under 18 U.S.C. §§ 1343 and 666(a)(1)(A) to criminalize only fraudulent schemes that "aim to obtain money or property," which "prevents these statutes from criminalizing all acts of dishonesty by state and local officials."  140 S. Ct. 1565, 1568, 1571, 1574 (2020).  In *McDonnell v. United States*, the Court rejected the government's argument that the statutory term "official act" "encompasses nearly any activity by a public official."  136 S. Ct. 2355, 2367 (2016).  In *Yates v. United States*, the Court adopted a "narrower reading" of the term "tangible object" under 18 U.S.C. § 1519 of the Sarbanes-Oxley Act "to cover only objects one can use to record or preserve information, not all objects in the physical world."  574 U.S. 528, 536, 543 (2015).   In *Bond v. United States*, the Court determined that the criminalization of the use of "chemical weapon[s]" under 18 U.S.C. § 229(a) of the Chemical Weapons Convention Implementation Act of 1998, although "defined extremely broadly," did not reach an "amateur attempt by a jilted wife to injure her husband's lover" because such an expansive reading "would mark a dramatic departure from th[e] constitutional structure."  572 U.S. 844, 848, 860, 866, (2014).   And in *Skilling v. United States*, the Supreme Court adopted a "limiting

construction" of the honest services wire fraud statute under 18 U.S.C. § 1346 that "encompass[es] only bribery and kickback schemes."  561 U.S. 358, 410-12 (2010).

Section 1001 runs the risk of raising similar separation of powers and overreach concerns. Jurists and commentators alike have expressed reservations about the potentially expansive scope of Section 1001.  As then-Judge Kavanaugh acknowledged, there are "difficult issues that can arise in prosecutions under the ever-metastasizing § 1001" and such "prosecutions can pose a risk of abuse and injustice."  *Moore*, 612 F.3d at 702-03 (Kavanaugh, J., concurring); *see United States v. Yermian*, 468 U.S. 63, 82 (1984) (Rehnquist, J., dissenting) (raising concerns about making "a surprisingly broad range of unremarkable conduct a violation of federal law" (citation omitted)); *United States v. Binette*, 945 F. Supp. 2d 223, 226-27, 230 (D. Mass. 2013) ("Courts have repeatedly expressed concern about the potential misuse of the federal false statement statute.").[11] A proper understanding of the limiting purpose served by the materiality element would help mitigate that risk—and this case provides a prime example of the prosecutorial abuses courts and commentators have long cautioned against.

> 2.    *A broad interpretation of Section 1001 threatens First Amendment-protected speech.*

Interpreting Section 1001 materiality too broadly creates the additional risk of chilling First Amendment-protected speech.  That is what the Special Counsel is prosecuting here: an alleged false *statement*.  And it is no answer to say that (as charged) the speech is false and so protection is not needed.  As a plurality of the Supreme Court recently reaffirmed, it has "never endorsed the categorical rule . . . that false statements receive no First Amendment protection."  *United States*

---

[11] *See also, e.g.*, Lisa Kern Griffin, *Criminal Lying, Prosecutorial Power, and Social Meaning*, 97 Cal. L. Rev. 1515, 1516 1557-62 (2009); Steven R. Morrison, *When Is Lying Illegal? When Should It Be? A Critical Analysis of the Federal False Statements Act*, 43 John Marshall L. Rev. 111, 140 (2009).

*v. Alvarez*, 567 U.S. 709, 719 (2012).  To the contrary, "[t]he First Amendment *requires* that we protect some falsehood in order to protect speech that matters."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) (emphasis added).

In holding that the Stolen Valor Act was unconstitutional, the Court distinguished Section 1001.  *See Alvarez*, 567 U.S. at 720 (plurality opinion); *id.* at 734-35 (Breyer, J., concurring).  But that discussion hinged on the limited nature of Section 1001.  In what some have treated as the controlling decision, Justice Breyer (joined by Justice Kagan) viewed Section 1001 as constitutional because it is "limited to circumstances where a lie is likely to work particular and specific harm by interfering with the functioning of a government department," and because it "also require[s] a showing of materiality."  *Id.* at 734-35 (Breyer, J., concurring).  And the plurality narrowly described Section 1001 as limited to "false statements made to Government officials, in communications *concerning official matters*."  *Id.* at 720 (plurality opinion) (emphasis added).  As one academic put it, "[t]he upshot of *Alvarez* was that the constraining elements of false speech offenses must actually constrain false speech prosecutions, else the offenses risk the same problems as the unconstitutional Stolen Valor Act."  Judith P. Miller, *Defending Speech Crimes*, 2020 Univ. Chi. Legal F. 177, 182-83 (2020).  In short, to avoid a serious First Amendment problem, the materiality element must be construed as limiting Section 1001 prosecutions to those "likely to work particular and specific harm"—i.e., not alleged ancillary falsehoods that could not possibly influence the decision at issue.

The resulting chill on First Amendment speech that would be felt if the Special Counsel's expansive view of materiality prevails would be devastating.  Well-intentioned lay people with truthful information about criminal wrongdoing would be discouraged from providing that information to law enforcement for fear of a felony prosecution under Section 1001.  After all,

"[w]hen the specter of criminal prosecution hangs over the head of every citizen who reports suspected violations, individuals will naturally hesitate, or even refuse, to provide vital information." *Friedman v. United States*, 374 F.2d 363, 369 (8th Cir. 1967). That would contravene the "important social policy . . . served by an open line of communication between the general public and law enforcement agencies." *Id.*; *see FBI Tip Line: Web Portal Received 'Actionable' Tips Daily*, FBI (Mar. 1, 2016), https://www.fbi.gov/news/stories/fbi-tip-line-receives-actionable-tips-daily ("Tips to the FBI have led to captures of Top Ten fugitives and short-circuited scores of criminal and terrorist plots.").

To put a fine point on it: the tipsters who would be chilled are those providing *truthful* information about criminal wrongdoing that the FBI or other government agencies should be investigating. The fear is that they would later be criminally prosecuted for (purportedly) lying about ancillary matters, such as their motivation for reporting the criminal wrongdoing in the first place. So, a jilted ex-wife would think twice about reporting her ex-husband's extensive gun-smuggling operation lest the FBI later decide to prosecute her for failing to disclose her motivation for turning him in. If would-be tipsters or sources fear that an incomplete disclosure will subject them to criminal liability, the FBI would be seriously weakened in its ability to gather information from the public, and recruit and maintain confidential human sources. *See* Peter Strzok, *The Sussmann Indictment, Human Source Handling, and the FBI's Declining FISA Numbers*, Lawfare (Oct. 22, 2021), https://www.lawfareblog.com/sussmann-indictment-human-source-handling-and-fbis-declining-fisa-numbers (describing risk to confidential human source recruitment of the Sussmann Indictment, based on his more than 20 years of experience at the FBI). However, proper application of the materiality element would mitigate these concerns: without an ongoing

investigation, the tipster could only be prosecuted if she provided the government with false information about the criminal wrongdoing itself (i.e., an actual false tip).

> 3.   *Accepting the Special Counsel's theory of materiality would imperil day-to-day communications between lawyers and the government.*

That the alleged false statement at issue here was made by one lawyer to another (government) lawyer about the existence of an attorney-client relationship makes the Special Counsel's overreach even more problematic. If lawyers fear criminal liability for their routine interactions with government lawyers, there will be an inevitable chilling effect upon day-to-day communications between lawyers and the government, and lawyer-client relationships more generally.

There is a reason why state and federal jurisdictions have recognized the litigation privilege, which broadly immunizes lawyers for making "defamatory" statements "concerning another" in communications in judicial and quasi-judicial proceedings. *Messina v. Krakower*, 439 F.3d 755, 760 (D.C. Cir. 2006) (quoting Restatement (Second) of Torts § 586 (1977)); *Hawthorne v. Washington Metro. Area Transit Auth.*, 702 F. Supp. 285, 288 (D.D.C. 1988). That privilege (and others) further the "public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." *Messina*, 439 F.3d at 760 (citation omitted). The same concept is codified in Section 1001 itself, which provides that the criminal prohibition does "not apply to a party to a judicial proceeding, *or that party's counsel* . . ." 18 U.S.C. § 1001(b) (emphasis added). And while Mr. Sussmann was not representing his client in connection with a judicial proceeding, any practicing lawyer understands that client relationships and one's work on behalf of clients are not so limited.

Subjecting lawyers to criminal scrutiny of this nature would inject fear into the attorney-client relationship and interfere with the ability of lawyers to zealously represent their clients.

Lawyers who interact with the government may be reluctant to represent certain clients, to develop a relationship of trust with certain clients, or to make effective arguments when approaching the government on behalf of their clients.  The same policies that are enshrined in various privileges and in Section 1001 itself warrant a cautious and circumspect approach when deciding whether and how a false statement prosecution should proceed in the context of lawyer-to-lawyer communications about a client relationship.  The materiality element should not be read to authorize such a dangerous and unprecedented prosecution.

## CONCLUSION

For the foregoing reasons, the one-count Indictment against Mr. Sussmann must be dismissed.

Dated:  February 17, 2022                    Respectfully submitted,

                                             /s/Sean M. Berkowitz
                                             Sean M. Berkowitz (*pro hac vice*)
                                             LATHAM & WATKINS LLP
                                             330 North Wabash Avenue
                                             Suite 2800
                                             Chicago, IL 60611
                                             Tel: (312) 876-7700
                                             Fax: (312) 993-9767
                                             Email: sean.berkowitz@lw.com

                                             Michael Bosworth (*pro hac vice*)
                                             LATHAM & WATKINS LLP
                                             1271 Avenue of the Americas
                                             New York, NY 10020
                                             Tel: (212) 906-1200
                                             Fax: (212) 751-4864
                                             Email: michael.bosworth@lw.com

                                             Natalie Hardwick Rao (D.C. Bar # 1009542)
                                             Catherine J. Yao (D.C. Bar # 1049138)
                                             LATHAM & WATKINS LLP
                                             555 Eleventh Street, NW
                                             Suite 1000
                                             Washington, DC 20004
                                             Tel: (202) 637-2200
                                             Fax: (202) 637-2201
                                             Email: natalie.rao@lw.com
                                             Email: catherine.yao@lw.com