UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case No. 21-582 (CRC) |
| | : | |
| MICHAEL A. SUSSMANN, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT**

The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully submits this opposition to the defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Docket No. 39, hereinafter "Def. Mot."). For reasons stated below, the government submits that the motion should be denied.

**FACTUAL BACKGROUND**

The defendant is charged in a one-count indictment with making a materially false statement to an FBI official, in violation of Title 18, United States Code, Section 1001. As set forth in the Indictment, on September 19, 2016 – less than two months before the 2016 U.S. Presidential election – the defendant, a lawyer at a large international law firm ("Law Firm-1") that was then serving as counsel to the Clinton Campaign, met with the FBI General Counsel at FBI Headquarters in Washington, D.C. The defendant provided the FBI General Counsel with purported data and "white papers" that allegedly demonstrated a covert communications channel between the Trump Organization and a Russia-based bank ("Russian Bank-1"). The Indictment alleges that the defendant lied in that meeting, falsely stating to the General Counsel that he was not providing the

1

allegations to the FBI on behalf of any client. In fact, the defendant had assembled and conveyed the allegations to the FBI on behalf of at least two specific clients, including (i) a technology executive ("Tech Executive-1") at a U.S.-based Internet company ("Internet Company-1"), and (ii) the Clinton Campaign.

The defendant's billing records reflect that the defendant repeatedly billed the Clinton Campaign for his work on the Russian Bank-1 allegations. In compiling and disseminating these allegations, the defendant and Tech Executive-1 also had met and communicated with another law partner at Law Firm-1 who was then serving as General Counsel to the Clinton Campaign ("Campaign Lawyer-1").

The Indictment also alleges that, beginning in approximately July 2016, Tech Executive-1 had worked with the defendant, a U.S. investigative firm retained by Law Firm-1 on behalf of the Clinton Campaign, numerous cyber researchers, and employees at multiple Internet companies to assemble the purported data and white papers. In connection with these efforts, Tech Executive-1 exploited his access to non-public and/or proprietary Internet data. Tech Executive-1 also enlisted the assistance of researchers at a U.S.-based university who were receiving and analyzing large amounts of Internet data in connection with a pending federal government cybersecurity research contract. Tech Executive-1 tasked these researchers to mine Internet data to establish "an inference" and "narrative" tying then-candidate Trump to Russia. In doing so, Tech Executive-1 indicated that he was seeking to please certain "VIPs," referring to individuals at Law Firm-1 and the Clinton Campaign.

The Government's evidence at trial will also establish that among the Internet data Tech Executive-1 and his associates exploited was domain name system ("DNS") Internet traffic

pertaining to (i) a particular healthcare provider, (ii) Trump Tower, (iii) Donald Trump's Central Park West apartment building, and (iv) the Executive Office of the President of the United States ("EOP").

The Indictment further details that on February 9, 2017, the defendant provided an updated set of allegations – including the Russian Bank-1 data and additional allegations relating to Trump – to a second agency of the U.S. government ("Agency-2"). The Government's evidence at trial will establish that these additional allegations relied, in part, on the purported DNS traffic that Tech Executive-1 and others had assembled pertaining to Trump Tower, Donald Trump's New York City apartment building, the EOP, and the aforementioned healthcare provider. In his meeting with Agency-2, the defendant provided data which he claimed reflected purportedly suspicious DNS lookups by these entities of internet protocol ("IP") addresses affiliated with a Russian mobile phone provider ("Russian Phone Provider-1"). The defendant further claimed that these lookups demonstrated that Trump and/or his associates were using a type of Russian-made wireless phone in the vicinity of the White House and other locations.

In his meeting with Agency-2 employees, the defendant also made a substantially similar false statement as he had made to the FBI General Counsel. In particular, the defendant asserted that he was not representing a particular client in conveying the above allegations. In truth and in fact, the defendant was continuing to represent Tech Executive-1[1] – a fact the defendant subsequently acknowledged under oath in December 2017 testimony before Congress (without identifying the client by name).

---

[1] By February 9, 2017, the Clinton Campaign for all intents and purposes no longer existed.

**LEGAL STANDARD**

Federal Rule of Criminal Procedure 12 permits a motion to dismiss the indictment based on "a defect in the indictment or information, including . . . failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).  In ruling on a motion to dismiss, the court must assume the truth of the indictment's factual allegations. *United States v. Knowles*, 197 F. Supp. 3d 143, 149 (D.D.C. 2016). To sufficiently state an offense, an indictment need only "inform the defendant of the nature of the accusation against him."  *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001).  An indictment must "first, contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117 (1974).  "[A] pretrial motion to dismiss an indictment allows a district court to review the sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. Mosquera-Murillo,* 153 F. Supp. 3d 130, 154 (D.D.C. 2015) (internal citation and quotation marks omitted).  As such, a dismissal of an indictment "is granted only in unusual circumstances" because a court's supervisory power to dismiss an indictment "directly encroaches upon the fundamental role of the grand jury." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

**ARGUMENT**

The defendant moves to dismiss the sole count of the Indictment on the grounds that his alleged false statement to the FBI General Counsel is immaterial as matter of law, and thus runs afoul of 18 U.S.C. § 1001(a)(2)'s dictate that only "*materially* false fictitious, or fraudulent

statement[s] or representation[s]" be criminalized. *See* Def. Mot. at 5. This argument is without merit.

### A. The Indictment Sufficiently Alleges that the Defendant's False Statement Was Material

Although Section 1001 does not define "materially," the Supreme Court has held that a materially false statement has "a natural tendency to influence, or [be] capable of influencing, the decision of the decision-making body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988). However, as the Supreme Court explained in *United States v. Gaudin*, a statement need not actually influence an agency for it to be material; it need only have "a natural tendency to influence, or [be] capable of influencing" an agency function or decision. 515 U.S. 506, 509 (1995). "Proof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its potential effects." *United States v. Hansen*, 772 F.2d 940, 949 (D.C. Circuit 1985).

Distilled to its core, the defendant's argument is as follows: At the time of the defendant's alleged false statement, the only "discrete decision" to be made by the FBI was whether to initiate an investigation based on the information provided by the defendant. The defendant further claims that because his alleged false statement dealt only with his "purported motivation" for bringing the information to the FBI – as opposed to the substance of the information – the false statement could not have influenced the FBI's decision whether to initiate an investigation. *See* Def. Mot. at 15-16. Defendant appears to argue that materiality should only be viewed through the lens of a specific agency decision at a discrete moment in time; in this case, whether the defendant's information was material to the FBI's decision to initiate an investigation.

But courts have not construed the materiality element so narrowly. To the contrary, a false statement is material if it has "a natural tendency to influence or is capable of influencing, *either* a discrete decision *or any other function of the agency* to which it was addressed." *United States v. Moore*, 612 F.3d 698, 701–02 (D.C. Cir. 2010) (emphasis added). In *Moore*, the D.C. Circuit joined its sister circuits in recognizing that a false statement is material if it has the capability to influence a "discrete decision" or "any other function of the agency." *See, e.g., United States v. Alemany Rivera,* 781 F.2d 229, 235 (1st Cir. 1985) ("test for materiality under 18 U.S.C. § 1001 is . . . whether [the statement] had the capacity to influence a government function"); *United States v. Lichenstein,* 610 F.2d 1272, 1278 (5th Cir. 1980) ("false statement must simply have the capacity to impair or pervert the functioning of a government agency"); *United States v. White,* 270 F.3d 356, 365 (6th Cir. 2001) ("'materiality' is a fairly low bar . . . . [T]he government must present at least some evidence showing how the false statement in question was capable of influencing federal functioning."); *United States v. Moore,* 446 F.3d 671, 681 (7th Cir. 2006) (statement is material if it "has a natural tendency to influence, or . . . is capable of affecting, a government function"); *United States v. Calhoon,* 97 F.3d 518, 530 (11th Cir. 1996) ("it is enough if the statements had a natural tendency to influence [ ] or [were] capable of affecting or influencing a government function") (internal quotation marks deleted). Accordingly, the materiality of a defendant's false statement survives long past the initiation of an investigation and encompasses the means and methods of an investigation. As discussed more fully below, and as set forth in the Indictment, the defendant's false statement was capable of influencing *both* the FBI's decision to initiate an investigation and its subsequent conduct of that investigation.

In any event, the defendant's arguments on the materiality of his statement are also premature. The Supreme Court in *Gaudin* held that materiality is an essential element of Section 1001 that must be resolved by a jury. *Gaudin*, 515 U.S. at 512. As Judge Sporkin reiterated in *United States v. Cisneros*:

> [T]he Supreme Court has held that materiality is an element of § 1001 that must be determined by the jury. Deciding whether or not a statement is material "requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?'; and (b) 'what decision was the agency trying to make?'. The ultimate question: (c) 'whether the statement was material to the decision,' requires applying the legal standard of materiality ... to these historical facts." [The defendant] asserts that while the jury is entitled to determine (a) and (b), (c) should be decided by the judge as a matter of law. However, the *Gaudin* Court explicitly rejected this argument by holding that (c) is a "mixed question of law and fact" that must be given to the jury to decide.
>
> Despite *Gaudin,* [the defendant] insists that the Court should resolve the element of materiality as a matter of law "if no reasonable juror could find an alleged falsehood material in light of undisputed evidence of its immateriality." At this stage of the proceedings, before the Government has had the opportunity to present its evidence at trial, the Court cannot determine whether or not the Government's case is sufficient to go to a jury. The proper time for [the defendant] to raise this claim is at trial.

26 F. Supp. 2d 24, 40-41 (D.D.C. 1998) (internal citations omitted).

The defendant cites to multiple cases where the Supreme Court and Circuit Courts have held that the false statements and misrepresentations at issue were immaterial as a matter of law. *See* Def. Mot. at 7-10. But critically, all of those cases involved post-conviction appeals or motions to vacate the conviction after the Government presented its case at trial. Accordingly, none of these cases support the defendant's requested relief here – that is, that the court dismiss the Indictment before trial because it fails to sufficiently allege that the defendant's false statement is

7

material. What the cases do show is that courts have routinely declined to usurp the jury's role in making the determination on whether a false statement is material. *See, e.g. United States v. Johnson*, 19 F.4th 248, 252 (3d Cir. 2021).

Even so, the cases cited by the defendant are clearly distinguishable. For example, in *United States v. Camick*, the Tenth Circuit reversed a Section 1001 conviction upon finding that the statements at issue were not material because the relevant government decision-making body, the Patent and Trademark Office ("PTO"), never saw or reviewed the filing which contained them. 796 F.3d 1206, 1218 (10th Cir. 2015). As a result, the false statements were immaterial because it was impossible for any decision by the PTO to be affected. *Id.* In the Second Circuit's decision in *United States v. Litvak*, the court likewise reversed a jury trial conviction for false statements because the defendant's misstatements in residential mortgage-backed securities transactions were not capable of influencing any decisions of the U.S. Treasury. 808 F.3d 160, 172 (2d Cir. 2015). And in *United States v. Naserkhaki*, the court there held that one of two false statements contained in a defendant's application for refugee travel documents was immaterial because it related "to an ancillary, non-determinative fact," specifically, the fact that the defendant had failed to inform the agency that he had submitted a prior application for the travel documents. 722 F. Supp. 242, 248 (E.D. Va. 1989).[2] In contrast, the defendant made his false statement directly to the FBI General Counsel on a matter that was anything but ancillary: namely, the existence *vel non* of attorney-client relationships that would have shed critical light on the origins of the allegations at issue.

---

[2] In *Naserkhaki*, after concluding that only one of the two misrepresentations was material, the district court ordered a new trial because the jury's verdict did not separately address each false statement. In *Griffin v. United States*, 502 U.S. 46, 54-57 (1991), the Supreme Court abrogated the *Naserkhaki* decision. *See United States v. Dedman*, 527 F.3d 577, 599 (6th Cir. 2008).

### B.  The Defendant's False Statement was Material to the FBI's Initiation of the Investigation

The defendant's false statement to the FBI General Counsel was plainly material because it misled the General Counsel about, among other things, the critical fact that the defendant was disseminating highly explosive allegations about a then-Presidential candidate on behalf of two specific clients, one of which was *the opposing Presidential campaign*. The defendant's efforts to mislead the FBI in this manner during the height of a Presidential election season plainly could have influenced the FBI's decision-making in any number of ways. The defendant's core argument to the contrary rests on the flawed premise that the FBI's only relevant decision was binary in nature, *i.e.*, whether or not to initiate an investigation. But defendant's assertion in this regard conveniently ignores the factual and practical realities of how the FBI initiates and conducts investigations. For example, the Government expects that evidence at trial will prove that the FBI could have taken any number of steps prior to opening what it terms a "full investigation," including, but not limited to, conducting an "assessment," opening a "preliminary investigation," delaying a decision until after the election, or declining to investigate the matter altogether. Indeed, a host of factors play into the FBI's decision of whether and how to initiate an investigation, which include, among others, the source and origins of the information. Here, had the defendant truthfully informed the FBI General Counsel that he was providing the information on behalf of one or more clients, as opposed to merely acting as a "good citizen," the FBI General Counsel and other FBI personnel might have asked a multitude of additional questions material to the case initiation process. They might have asked, for example, whether the defendant's clients harbored any political biases or business motives that might cast doubt on the reliability of the information. And

9

they also likely would have conducted additional, behind-the-scenes steps (database checks, case file searches, etc.) to assess the defendant's potential motivations and those of his clients. Indeed, it is obvious that a lawyer presenting himself as a paid advocate for a client naturally raises specific concerns related to bias, motivation, and the reliability of the information being provided.

Moreover, the Department of Justice and the FBI maintain stringent guidelines on dealing with matters that bear on U.S. elections. Given the temporal proximity to the 2016 U.S. presidential election, the FBI also might have taken any number of different steps in initiating, delaying, or declining the initiation of this matter had it known at the time that the defendant was providing information on behalf of the Clinton Campaign and a technology executive at a private company.

Accordingly, and contrary to the defendant's argument that a tipster's "motivation" is insignificant and "ancillary" (Def. Mot. at 15), the evidence at trial will demonstrate that a person's motivation in providing information to the FBI can be a highly material fact in determining whether and how the FBI opens an investigation and then conducts an investigation it has opened. And the evidence will show that it would have been all the more material here because the defendant was providing this information on behalf of the Clinton Campaign less than *two months* prior to a hotly contested U.S. presidential election. In sum, the evidence will demonstrate that the defendant's false statement to the FBI General Counsel had the capacity to influence the lawful function of the FBI as it related to the case initiation phase.

### C. The Defendant's False Statement was Material to the FBI's Conduct of the Investigation

The evidence at trial will also establish that the defendant's false statement had the capacity to influence the FBI's conduct of this investigation. For example, had the defendant truthfully disclosed the fact that he represented Tech Executive-1, the FBI likely would have asked certain questions and conducted interviews during the investigation that would bear directly upon the information's reliability and/or Tech Executive-1's motivation in providing the information. Namely, as the defendant's motion reveals (Def. Mot. at 18-19, fn. 8), Tech Executive-1 had a history of providing assistance to the FBI on cyber security matters, but decided in this instance to provide politically-charged allegations anonymously through the defendant and a law firm that was then-counsel to the Clinton Campaign. Given Tech Executive-1's history of assistance to law enforcement, it would be material for the FBI to learn of the defendant's lawyer-client relationship with Tech Executive-1 so that they could evaluate Tech Executive-1's motivations. As an initial step, the FBI might have sought to interview Tech Executive-1. And that, in turn, might have revealed further information about Tech Executive-1's coordination with individuals tied to the Clinton Campaign, his access to vast amounts of sensitive and/or proprietary internet data, and his tasking of cyber researchers working on a pending federal cybersecurity contract.

Moreover, had the FBI known that the defendant was presenting the information on behalf of even an anonymous client, rather than purporting to provide the information as a concerned citizen, they also likely would have been able to more fully investigate the genesis of the aforementioned white papers, including the role of the defendant and others in obtaining, drafting, and compiling the analysis of the data.

11

In an effort to downplay the materiality of this false statement, the defendant asserts that the FBI General Counsel was aware that the defendant represented the DNC. *See* Def. Mot at 18. But the Government expects that evidence at trial will establish that the FBI General Counsel was aware that the defendant represented the DNC on *cybersecurity matters* arising from the Russian government's hack of its emails, *not* that he provided political advice or was participating in the Clinton Campaign's opposition research efforts. Indeed, the defendant held himself out to the public as an experienced national security and cybersecurity lawyer, not an election lawyer or political consultant. Accordingly, when the defendant disclaimed any client relationships at his meeting with the FBI General Counsel, this served to lull the General Counsel into the mistaken, yet highly material belief that the defendant lacked political motivations for his work.

In any event, even if FBI personnel had been aware of the defendant's relationship specifically to Democratic politics, it would be of no moment. It is black letter law that materiality does not turn on the actual knowledge of investigators at the time of the false statement. Indeed, as Justice Scalia stated in *Brogan v. United States*:

> It could be argued, perhaps, that a disbelieved falsehood does not pervert an investigation. But making the existence of this crime turn upon the credulousness of the federal investigator (or the persuasiveness of the liar) would be exceedingly strange; such a defense to the analogous crime of perjury is certainly unheard of.

522 U.S. 398, 402 (1998). In fact, a statement can be material even if the decision-maker has already arrived at a conclusion before the statement is made. *See United States v. Safavian*, 649 F.3d 688 (D.C. Cir. 2011); *see also Moore*, 612 F.3d at 701-702. To that end, "[w]hen statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand

absolutely no chance of succeeding, they satisfy the materiality requirement of [Section] 1001." *United States v. Lupton*, 620 F.3d 790, 806-807 (7th Cir. 2010).

The defendant's focus on the discovery in this case only further demonstrates the need for this element to be decided by a jury. *See, e.g.*, Def. Mot. at 19. These issues are highly fact-laden. Indeed, the expected testimony of multiple government witnesses will refute the defendant's argument that the defendant's false statement was immaterial. As noted above, the government expects that current and former FBI employees will testify at trial that understanding the origins of data and information is relevant to the FBI in multiple ways, including to assess the reliability and motivations of the source. None of this is novel. An evaluation of a source can (and often does) influence the FBI's decisions regarding its initial opening decisions and subsequent investigative steps. That alone is sufficient to establish materiality.

### D. The Defendant's False Statement does not Raise Constitutional Concerns

Finally, the defendant argues that the government's theory of materiality raises serious constitutional concerns which risks "overcriminalization, chill[s] valuable First Amendment speech, and intrude[s] legal advocacy and lawyer-client relationships." Def. Mot. at 21.

First, the defendant's assertion that the government's theory of materiality amounts to prosecutorial overreach is wrong. The application of the materiality standard to the defendant's conduct is straightforward here. The defendant claimed that he was not acting on behalf of any clients when, in fact, he hid his relationship with clients who harbored political and business interests tied to allegations against a then-Presidential candidate. And he made this false statement to the FBI as it carried out its functions of receiving and investigating national security threats. The

13

defendant's false statement thus plainly could "adversely affect" the FBI in its ability to perform this important function. *United States v. Hansen*, 772 F.2d 940, 949 (D.C. Cir. 1985). That is all that is required under Section 1001. Ultimately, the charges here are neither novel nor do they "stretch the scope of criminal liability" under Section 1001, and the defendant's inflated concerns about overreach and overcriminalization should be rejected.

Second, the defendant is mistaken that the prosecution of the defendant for false statements in this case would result in chilling protected speech. In support, the defendant primarily relies on the Supreme Court's decision in *United States v. Alvarez*, which held that false statements are not categorically unprotected by the First Amendment. 567 U.S. 709, 722 (Kennedy, J.) (plurality opinion); *id.* at 733 (Breyer, J. concurring in the judgment). As Justice Breyer explained, the government has little interest in policing a harmless untruth that we tell to "provide the sick with comfort, or preserve a child's innocence." *Id.* at 733. But the Court stopped well short of protecting lying generally. Indeed, as Justice Kennedy noted "there are instances in which the falsity of speech bears upon whether it is protected." *Id.* at 721 (plurality opinion).

Section 1001, however, does not police harmless untruths or "white lies." Instead, it targets *materially* false statements to government agencies, which courts across the country and the Supreme Court in *Alvarez* have held is not protected speech. False statements under Section 1001 merit no First Amendment protection because the statute is necessary "to protect agencies from the perversion which might result from [] deceptive practices." *Alvarez*, 567 U.S. at 748 (Alito, J. dissenting) (quoting *United States v. Gilliland*, 312 U.S. 86, 93 (1941) (quotation marks omitted)). Indeed, this statute (and those like it) only criminalizes those false statements and lies that are particularly likely to produce harm. And while the defendant's motion seeks to equate the

14

defendant with a "jilted ex-wife [who] would think twice about reporting her ex-husband's extensive gun-smuggling operation," this comparison is absurd. Def. Mot. at 24. Far from finding himself in the vulnerable position of an ordinary person whose speech is likely to be chilled, the defendant – a sophisticated and well-connected lawyer – chose to bring politically-charged allegations to the FBI's chief legal officer at the height of an election season. He then chose to lie about the clients who were behind those allegations. Using such rare access to the halls of power for the purposes of political deceit is hardly the type of speech that the Founders intended to protect. The Court should therefore reject defendant's invitation to expand the scope of the First Amendment to protect such conduct.

Third, the defendant's assertion that the charges in this case will somehow imperil communications between lawyers and the government is also fanciful. As a former government attorney and prosecutor, the defendant was well aware that the law required him to be honest and forthright when communicating with the FBI. Despite that knowledge, the defendant chose to conceal from the FBI that he was acting as a paid advocate for clients with political and business agendas. This false statement deprived the FBI of critical information that might have permitted it to better allocate its resources, make critical decisions regarding the opening or conduct of the investigation, and examine the origins of the purported data. That lawyers should be honest in their dealings with federal law enforcement agencies is not an imposition that the Constitution prohibits. It is an expectation that undergirds the integrity of our legal system. Accordingly, nothing about this case should create fear of criminal liability for lawyers in their routine interactions with government lawyers. The essential element of materiality in Section 1001 cases guards against this concern. Under the law, only materially false statements that could influence a government

15

agency's decision or functions rise to the level worthy of criminal prosecution. Such is the case here.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's Motion to Dismiss the Indictment.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

 /s/ Jonathan E. Algor
Jonathan E. Algor
Assistant Special Counsel
jonathan.algor@usdoj.gov

Andrew J. DeFilippis
Assistant Special Counsel
andrew.defilippis@usdoj.gov

Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

Brittain Shaw
Assistant Special Counsel
brittain.shaw@usdoj.gov