**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA,**

*v.*

**MICHAEL A. SUSSMANN,**

*Defendant*.

Case No. 1:21-cr-00582

---

**DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE REGARDING THE GATHERING OF DATA, THE ACCURACY OF DATA OR ITS ANALYSIS, OR THE STEELE DOSSIER AND TO STRIKE THE SAME, AND MEMORANDUM IN SUPPORT**

Defendant Michael A. Sussmann, by and through his counsel, hereby moves *in limine* to preclude three categories of evidence and/or arguments that the Special Counsel has suggested it might offer, namely, evidence and arguments concerning: (1) the gathering of DNS data by Mr. Sussmann's former client Rodney Joffe, and/or other data scientists, and fellow business personnel of Mr. Joffe (collectively "Mr. Joffe and Others"); (2) the accuracy of this data and the accuracy of the conclusions and analysis based on this data; and (3) Christopher Steele and information he separately provided to the Federal Bureau of Investigation ("FBI") (including the so-called "Steele Dossier") (all three, collectively, the "Joffe and Steele Conduct").

## INTRODUCTION

For years, the Special Counsel investigated (1) whether any individuals committed crimes by gathering DNS data regarding Alfa Bank's potential connection to then-candidate Trump in and around 2016; (2) whether any individuals conspired to defraud the government by providing the Alfa Bank data to the government; (3) and whether Christopher Steele committed crimes in connection with information he separately provided to the FBI. The Special Counsel has not,

however, brought a single charge—against any defendant—based on any of this alleged conduct. And the single false statement charge brought against Mr. Sussmann surely does not flow from the gathering of data, the accuracy of that data, the accuracy of the conclusions based on that data, or any information Mr. Steele may have provided to the FBI.

Now, however, the Special Counsel wants to introduce evidence at Mr. Sussmann's trial regarding the Joffe and Steele Conduct, even though: (1) Mr. Sussmann has not been charged with any crimes relating to that conduct, and (2) the Special Counsel has not identified, nor could he, any evidence showing that Mr. Sussmann:

- was involved in the gathering of the data;

- was involved in the experts' analysis of that data;

- had any reason to doubt the authenticity and accuracy of the data;

- had any reason to question the experts' conclusions about that data; or

- had any awareness Mr. Steele was separately providing information to the FBI.

The Special Counsel should be precluded from offering evidence and arguments concerning the Joffe and Steele Conduct for three simple reasons. *First*, the conduct is utterly irrelevant to the charged crime; it is not even a close call. The Special Counsel has not charged a substantive scheme to defraud the government, nor has he charged a conspiracy to defraud the government. The manner in which the data was gathered, the objective strength and reliability of that data and/or conclusions drawn from the data, and the information that Christopher Steele separately provided to the FBI all have no bearing on the only crime the Special Counsel chose to charge: whether Mr. Sussmann falsely stated that he was not acting on behalf of a client when he met with Mr. Baker. This is particularly true because the Joffe and Steele Conduct does not even involve Mr. Sussmann. *Second*, the Special Counsel's supposed justifications for introducing such

evidence are meritless as he does not—and cannot—demonstrate a connection between such evidence and the charge against Mr. Sussmann. *Third*, permitting the Special Counsel to adduce such evidence would necessitate multiple trials-within-a-trial on complicated—and collateral—issues that would only confuse the jury and unfairly prejudice Mr. Sussmann.

It seems that the Special Counsel wants to use Mr. Sussmann's trial much as he used the Indictment against Mr. Sussmann: to try to promote a baseless narrative that the Clinton Campaign conspired with others to trick the federal government into investigating ties between President Trump and Russia. But there was no such conspiracy; the Special Counsel hasn't charged such a crime; and the Special Counsel should not be permitted to turn Mr. Sussmann's trial on a narrow false statement charge into a circus full of sideshows that will only fuel partisan fervor. *Cf.* Complaint, *Trump v. Clinton*, No. 2:22-cv-14102-DMM (S.D. Fla. Mar. 24, 2022) (liberally citing the Special Counsel's *Motion to Inquire Into Potential Conflicts of Interest* of February 11, 2022 [hereinafter "Motion to Inquire"] in support of a broad conspiracy between the Clinton Campaign, Mr. Sussmann, Mr. Joffe, and dozens of other defendants). Mr. Sussmann's trial is not the proper venue for the Special Counsel to introduce inflammatory and irrelevant allegations regarding the 2016 election and the propriety of investigations into Mr. Trump. And he certainly should not permitted to force Mr. Sussmann to litigate a series of mini-trials about collateral matters in the course of trying to prove up such a grand conspiracy theory.

It may be proper for the parties to adduce evidence that directly reveals what Mr. Sussmann knew about the gathering of the data, the accuracy of the data or conclusions drawn from the data, or the Steele Dossier, and his state of mind relating to the same. But it would be wholly improper for the Special Counsel to adduce evidence, unmoored from the false statement charge against Mr. Sussmann, regarding the conduct of others that was unknown to Mr. Sussmann and did not involve

him.  And that is precisely what the Special Counsel seeks—but should not be permitted under Rules 401 or 403—to do here.

## BACKGROUND

### A.    Evidence Regarding the Gathering of Data by Mr. Joffe and Others

The Special Counsel has indicated his intent to introduce evidence and argument pertaining to the "origins" of the data gathered by Mr. Joffe and Others underlying (1) the information regarding data connections between Alfa Bank and the Trump Organization provided to the FBI in September 2016 (the "Alfa Bank Information") and (2) information provided to Agency-2 in February 2017, which included updated Alfa Bank Information and additional information regarding Russian phones on Trump-related computer networks, among others (the "YotaPhone Information").  In a supplement to his Federal Rule of Evidence 404(b) notice provided to the defense on March 23 (the "Supplemental Notice"), the Special Counsel argues that such data gathering "constitute[s] direct evidence of the charged offense" as "factual context for the defendant's conduct" and "to prove the existence of the defendant's attorney-client relationships with [Mr. Joffe] and the Clinton Campaign."  Suppl. Notice at 2.

The Indictment alleges that Mr. Joffe used his companies and business colleagues to improperly access and/or "exploit" data for research regarding Trump/Russia connections.  *See* Indictment ¶¶ 6, 21.  Specifically, the Indictment alleges that during the summer of 2016, Mr. Joffe reached out to various companies in which he held ownership interests to request that they gather data to identify connections between Mr. Trump and Russia.  *See id.* ¶ 22(a)-(g).  Employees conducted searches pursuant to Mr. Joffe's instructions and reported their findings to Mr. Joffe.  *See id.* ¶ 22(f)-(i).  Around the same time, the Indictment alleges that Mr. Joffe also asked colleagues at one of his companies and at the Georgia Institute of Technology to conduct data research to identify potential ties between Mr. Trump and Russia.  *See id.* ¶ 23.  The Indictment

suggests that from July 2016 through approximately February 2017, in conducting their research, these individuals improperly accessed or used data obtained in connection with a forthcoming government contract.  *See id.* ¶ 23(a)-(e).

Mr. Sussmann contests the implication that Mr. Joffe and Others' conduct was inappropriate or unlawful.  But in any event, the Indictment does not allege that Mr. Sussmann was a party to or otherwise involved in any of this conduct, nor is there any evidentiary basis to suggest that Mr. Sussmann—who is not a data scientist—was involved in such conduct.  In his Supplemental Notice, the Special Counsel suggests that data was gathered "in a manner that may be considered objectionable—whether through invasions of privacy, breaches of contract, or other [unspecified] unlawful or unethical means."  Suppl. Notice at 2.  But the Supplemental Notice does not identify—nor could it—any evidence that *Mr. Sussmann* had any awareness of or involvement in the alleged "objectionable" conduct of others related to gathering data, to the extent there even was any such "objectionable" conduct.  Similarly, in his Motion to Inquire, the Special Counsel erroneously asserted that Mr. Joffe and Others "exploited" data from Trump Networks and the Executive Office of the President of the United States ("EOP") in gathering data ultimately provided to Agency-2.  Dkt. No. 35, ¶ 5.  Yet again, the Special Counsel made no allegation that Mr. Sussmann was in any way involved in, or aware of, the purported gathering or "exploitation" of such data.  Nor could the Special Counsel make such an argument.  Discovery has yielded no evidence that Mr. Sussmann was involved in the gathering of data.

### B.    Evidence Regarding the Accuracy of the Data or the Accuracy of the Analysis of/Conclusions About the Data

The Special Counsel has also provided notice of his intention to adduce evidence regarding the accuracy of both "the purported data *and* [the] allegations" that Mr. Sussmann provided to the FBI and Agency 2.  *See* Suppl. Notice at 2 (emphasis added).  During the pre-trial conference on

March 31, 2022 before this Court, the Special Counsel disclaimed an intention to offer evidence or argument regarding the *accuracy* of the data Mr. Sussmann eventually provided to the government.  Hr'g Tr. at 41:5-42:15 (Mar. 31, 2022).  But the Special Counsel's actions indicate that, at minimum, he intends to adduce evidence and testimony regarding Mr. Joffe and Others' analyses of, and conclusions drawn from, the data (i.e., that the analysis provided to the FBI and Agency 2 may have "misstated, overstated, and/or cherry-picked facts") given that:  (1) the Special Counsel continues to reserve the right to call an expert to testify to both the reliability, authenticity, and completeness of the technical data *and* the "plausibility" of conclusions drawn from that data, *see* J. Durham Letter to S. Berkowitz at 2-3 (Mar. 30, 2022) [hereinafter "Expert Disclosure"], and (2) in a teleconference on April 1, 2022, the Special Counsel also announced his intent to introduce testimony from FBI and Agency-2 personnel and/or companies that hosted or processed data for the Trump Organization regarding their views on the data and the resulting conclusions therefrom.

Mr. Sussmann again disputes the Special Counsel's recent allegations regarding the accuracy of the data or the analyses drawn therefrom.  Regardless, with respect to the data provided to the FBI, the Indictment makes *no* allegation regarding the accuracy of that data or the conclusions reached about the data.  The Indictment notes simply that the FBI's investigation found "insufficient evidence" to determine there was a covert communications channel.  *See* Indictment ¶ 7.  The Indictment describes various discussions amongst Mr. Joffe and individuals *other than Mr. Sussmann* pertaining technical aspects of the data and conclusions that could be drawn therefrom, but none of the communications described in the Indictment involve Mr. Sussmann, nor is there any suggestion that Mr. Sussmann was aware of these communications among Mr. Joffe and Others.  *See id.* ¶¶ 23(f)-(k), 24(e)-(i).  Similarly, there is no allegation or

evidence that Mr. Sussmann, a lawyer without a technical or science background, had the professional expertise to engage in these discussions.

With respect to Agency-2, the Indictment makes no allegation whatsoever regarding the accuracy of the information or data or analyses provided, much less an allegation that *Mr. Sussmann* had any reason to doubt the accuracy of the data or the analysis or conclusions drawn from that data. Elsewhere, the Special Counsel has suggested that data provided to Agency-2 was "misstated, overstated, and/or cherry-picked facts," Suppl. Notice at 2, was incomplete and/or misleading, *see* Dkt. No. 35, ¶ 5, or that "more complete data" would have undermined the YotaPhone Information. *See id.* ¶ 6. But the Indictment does not allege, nor has the Special Counsel suggested, that there is reason to believe that Mr. Sussmann was aware of any purported issues pertaining to any data and analysis given to him and that he provided to Agency-2.

### C.     Evidence Regarding the Steele Dossier

The Special Counsel also indicated during a telephone conference on March 11, 2022 that he intends to introduce evidence and argument pertaining to reports and information that Christopher Steele separately provided to the FBI—i.e., the so-called "Steele Dossier." Not only that, but the Special Counsel also produced witness statements for Mr. Steele pursuant to 18 U.S.C. § 3500, presumably because the Special Counsel seeks to call Mr. Steele as a witness at trial. However, the Indictment contains *no reference* to Mr. Steele or the inflammatory Steele Dossier. The Indictment similarly contains *no allegations*—nor is there any evidence of—Mr. Sussmann's knowledge, awareness, or involvement in any of Mr. Steele's efforts to provide information to the government.

### LEGAL STANDARD

To prove a false statement under 18 U.S.C. §1001(a)(2), the Special Counsel must show that the defendant (1) knowingly and willfully (2) made a materially false or fraudulent statement

or representation (3) in relation to a matter within the jurisdiction of one of the federal branches of government. *See United States v. Moore*, 612 F.3d 698, 700 (D.C. Cir. 2010). Evidence that speaks to the essential elements of the crime—falsity of the statement, knowledge that the statement was false, and materiality—may accordingly be relevant. *See United States v. Russo*, 104 F.3d 431, 433 (D.C. Cir. 1997) ("[R]elevancy 'exists only as a relation between an item of evidence and a matter properly provable in the case.'" (quoting Fed. R. Evid. 401, Advisory Committee's Note)). But such evidence is only relevant to the extent that the proponent of the evidence—here, the Special Counsel— can demonstrate it has a "tendency to make a fact more or less probable than it would be without the evidence" *and* "the fact is of consequence in determining the action." Fed. R. Evid. 401; *see United States v. O'Neal*, 844 F.3d 271, 278 (D.C. Cir. 2016).

Evidence that lacks a connection to the charge or the defendant's scope of knowledge, including as to the defendant's state of mind, is decidedly not relevant. *See, e.g.*, *United States v. Wade*, 512 F. App'x 11, 14 (2d Cir. 2013) (excluding testimony about another act because it "was not temporally or physically linked" to the crime at issue and the "testimony presented a risk of juror confusion and extended litigation of a collateral matter"); *United States v. Libby*, 467 F. Supp. 2d 1, 15-16 (D.D.C. 2006) (rejecting attempts to "elicit . . . what others were told" as "simply irrelevant to the defendant's state of mind" in a false statements and perjury case); *United States v. George*, 786 F. Supp. 56, 64 (D.D.C. 1992) (without the "crucial link" that "defendant knew what information others had," that information is not material to the defendant's state of mind in an obstruction and false statements case); *United States v. Secord*, 726 F. Supp. 845, 848-49 (D.D.C. 1989) (information of which the defendant had no knowledge is necessarily immaterial to the defendant's state of mind, intent, or motive in a false statements case).

And even where evidence may be relevant, a court must exclude that evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time." Fed. R. Evid. 403; *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011). The law is clear that evidence which invites wasteful mini-trials on matters collateral to the charge should be excluded. *See, e.g.*, *United States v. Fonseca*, 435 F.3d 369, 375-76 (D.C. Cir. 2006) (excluding evidence on collateral matters that would have "led to both delay and a 'mini-trial' on a collateral matter" that "Rule 403 seeks to avoid"); *Sarin v. Poojan, Inc.*, 2010 WL 5463250, at *6 (M.D. Pa. Dec. 29, 2010) (excluding evidence that would create "a sideshow that distracts the jury" with a "trial within a trial" requiring the defendant to spend "substantial amount of time discrediting the [findings]" and delaying actual trial).

In particular, courts will exclude crimes or the wrongdoing of others not at issue in the cases before them in order to eliminate the risk of complex and prejudicial mini-trials that would only serve to confuse the jury. *See United States v. Potapova*, 800 F. App'x 14, 16 (2d Cir. 2020) (upholding exclusion of another crime due to concerns of a mini-trial with evidence of "minimal probative value" with "serious risk of jury confusion" given the scope and factual complexity of the scheme); *United States v. Thibeaux*, 784 F.3d 1221, 1226 (8th Cir. 2015) (upholding the exclusion of evidence regarding separate shooting with a separate gun as "likely to be complex [and] result in a mini-trial regarding a collateral matter"); *United States v. Malpeso*, 115 F.3d 155, 163 (2d Cir. 1997) (excluding evidence of a law enforcement leak related to the actions of two non-parties as the "likely (and presumably intended) effect" would be "to shift the focus away from the relevant evidence of the defendant['s] wrongdoing" to matters that are, at most, "tangentially related").

More generally, a court must exclude any "inflammatory" evidence that "would tend to invite a jury to punish [the defendant] for conduct that is not at issue in this case" or factors not relevant to the charge.  *See United States v. Hawley*, 562 F. Supp. 2d 1017, 1048 (N.D. Iowa 2008) (excluding "inflammatory" evidence that "would tend to invite a jury to punish [the defendant] for conduct that is not at issue in this case" that would "confuse the issues and generate a trial within a trial on collateral issues"); *Libby*, 467 F. Supp. 2d at 15-16 (excluding evidence regarding threatened terrorist attacks that would "cause confusion of the issues" and "needlessly draw the jury's attention away from the actual controversies in this case"); *United States v. Duran*, 884 F. Supp. 534, 536-37 (D.D.C. 1995) (excluding evidence that would "inflame the jury into reaching an impassioned and irrational verdict" (citation omitted)).

## ARGUMENT

Mr. Sussmann is charged only with allegedly making a single false statement to the FBI in September 2016 about whether he was "acting on behalf of a client."  Collateral evidence or argument regarding the origins and sources of data that he did not gather; the accuracy of data that he did not analyze and did not have the technical knowledge to analyze; and separate information that he did not know Mr. Steele provided to the government are all utterly irrelevant to the one crime with which he has been charged.  This evidence would confuse and mislead the jury, unfairly prejudice Mr. Sussmann, waste the Court and the jury's time on collateral issues, and inevitably lead to precisely the sorts of complex trials-within-a-trial that the law does not allow and which courts so greatly disfavor.  Except to the extent it directly reveals Mr. Sussmann's intent or state of mind, such evidence must be precluded.

A.      **The Court Should Preclude Evidence and Argument Regarding the Gathering of the Data Provided to the FBI and Agency-2**

The Special Counsel has asserted he will offer evidence regarding the "origin" of the technical data gathered by Mr. Joffe and Others as "direct evidence" of "factual context for the defendant's conduct" and "the existence of the defendant's attorney-client relationships with [Mr. Joffe] and the Clinton Campaign" as to both the data provided to the FBI in September 2016 and the data provided to Agency-2 in 2017.[1]  Suppl. Notice at 2.  Contrary to the Special Counsel's claim, evidence regarding the manner in which data was gathered does not provide "factual context" for one simple reason:  Mr. Sussmann was not involved in any manner in gathering the data and did not even have the technical expertise to participate in such activities.  Similarly, the gathering of the data is not relevant to or proof of the existence of Mr. Sussmann's client relationships.

*First*, evidence regarding the manner in which data was gathered cannot provide relevant "factual context" for Mr. Sussmann's alleged false statement to Mr. Baker in September 2016— the only charge for which he is on trial.  With respect to the data provided to FBI, Mr. Sussmann was simply not a party to the efforts to gather the data.  And the Special Counsel has certainly not alleged or provided evidence showing that Mr. Sussmann was involved in any purportedly "objectionable" conduct by Mr. Joffe and Others, many of whom Mr. Sussmann did not know and whom were unfamiliar with Mr. Sussmann.  Nowhere does the Special Counsel provide, as he must, any evidence of a "crucial link" between: (a) what Mr. Sussmann actually did or knew of; and (b) what others did or knew.  *Cf. George*, 786 F. Supp. at 64.  The law is clear that discussions

---

[1] Mr. Sussmann will address in a separate motion the Special Counsel's arguments that such evidence constitutes admissible evidence under Rule 404(b). *See generally* Def.'s Resp. to the Special Counsel's Rule 404(b) Notices & Mot. to Exclude Certain Evid. Under Rules 403 & 404(b) (Apr. 4, 2022) [hereinafter "Defendant's 404(b) Response"].

between and among others is "simply irrelevant to [Mr. Sussmann's] state of mind."  *See Libby*,
467 F. Supp. 2d at 15-16; *Secord*, 726 F. Supp. at 848-49 ("Defendant's state of mind can come
only from what he hears or sees.").

Similarly, to the extent the Special Counsel suggests that data Mr. Sussmann provided to
Agency-2 was also gathered in an "objectionable" manner, that allegation is utterly irrelevant to
the charge against Mr. Sussmann.  Mr. Sussmann is not charged with any crime for his meeting
with Agency-2, nor does the Indictment allege that he was in any way involved with any efforts to
gather data for Agency-2.  (Mr. Sussmann understands that the Special Counsel seeks to introduce
evidence of a purported similar false statement to Agency-2, which he will address in a separate
motion.[2])  But evidence regarding the provenance of data gathered for a different agency months
after the charged conduct simply cannot relate to any fact of consequence for determining whether
Mr. Sussmann was "acting on behalf of a client" in his meeting with Mr. Baker.  *See* Fed. R. Evid.
401; *O'Neal*, 844 F.3d at 278 (finding testimony was properly excluded when "trial counsel failed
to show what fact . . . would have been made 'more or less probable' by the proffered testimony").
Such evidence is therefore irrelevant factual context for the sole false statement charged here.

*Second*, the Special Counsel similarly fails to demonstrate how evidence regarding the
gathering of the data is in any way relevant to prove the existence of Mr. Sussmann's attorney-
client relationships.  The Special Counsel has accused Mr. Sussmann of falsely concealing two
client representations during a meeting with Mr. Baker at the FBI—pertaining to Mr. Joffe and the
Clinton Campaign.  There cannot be any credible argument that the data-gathering sheds light on
Mr. Sussmann's representation of Mr. Joffe, because there is no evidence that Mr. Sussmann was
involved in the data-gathering or that it was being done to give to Mr. Sussmann, as Mr. Joffe's

---

[2] *See generally* Def.'s 404(b) Resp.

counsel.  It is just as specious to suggest that the data-gathering bears on Mr. Sussmann's attorney-client relationship with the Clinton Campaign.  There is no evidence that the Clinton Campaign directed or was involved in the gathering of data, via Mr. Sussmann or otherwise.  Nor is there any evidence of communications on issues pertinent to the Indictment between Mr. Joffe and the Clinton Campaign.  As such, the manner in which data was gathered has no bearing on Mr. Sussmann's attorney-client relationship with the Clinton Campaign.  This is particularly true of the data provided to Agency-2, given that the meeting with Agency-2 occurred three months *after* the 2016 election when the Clinton Campaign no longer had any meaningful existence.

*Third*, given that the Special Counsel clearly intends to argue that such data-gathering was "objectionable" and even unlawful, it would be unfairly prejudicial to Mr. Sussmann because he was not even involved, in any way, with such conduct.  It would "shift the [jury's] focus away from" matters relevant to the actual charge against Mr. Sussmann to instead focus on the collateral legal issue of whether, unbeknownst to Mr. Sussmann, data was purportedly gathered in some kind of bad fashion.[3]  *See Malpeso*, 115 F.3d at 163; *Libby*, 467 F. Supp. 2d at 15-16 (excluding evidence that would "cause confusion of the issues" and "needlessly draw the jury's attention away from the actual controversies in this case").  In doing so, the Special Counsel would be inviting the jury to conclude that Mr. Sussmann is guilty by association.  This is wholly improper.  *See Hawley*, 562 F. Supp. 2d at 1048 (excluding "inflammatory" evidence that "would tend to invite a jury to punish [the defendant] for conduct that is not at issue in this case"); *see also United States v. Moore*, 2022 WL 715237, at *5 (D.D.C. Mar. 9, 2022) (rejecting questioning that would lead to

---

[3] This theory is itself premised on a dubious legal theory of liability.  *See Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021) (holding that an individual does not "exceed authorized access" under the Computer Fraud and Abuse Act by accessing information that is otherwise available to them, even for improper motives).

a mini-trial and create a "risk that the jury bases its decision on something other than the established propositions in the case" (internal quotation marks and citation omitted)).

*Fourth*, given the potential prejudice arising out of any effort to suggest that the data was gathered in some "objectionable" way, if admitted into evidence, Mr. Sussmann would be forced to contest the salacious and prejudicial allegations.  That would necessitate a long, complex, and confusing mini-trial on a collateral matter in which Mr. Sussmann was not involved—a mini-trial involving the analysis of highly technical contracts, privacy law, and other matters that have nothing to do with what Mr. Sussmann told Mr. Baker about clients in September 2016.  *See Potapova*, 800 F. App'x at 16 (excluding evidence of factually complex scheme that carried "serious risk of jury confusion"); *United States v. Poindexter*, 942 F.2d 354, 362 (6th Cir. 1991) (finding evidence of a "convoluted mathematical conversion" was "substantially more likely to confuse the jurors than enlighten them" where the prosecution failed to connect the evidence to the illicit purchase at issue); *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1346-1347 (3d Cir. 2002) (excluding evidence where introduction of "expansive allegations" of "marginal relevance" would require time consuming mini-trial on rebuttal allegations).

### B.    The Court Should Preclude Evidence and Argument Regarding the Accuracy of the Data and the Conclusions Drawn Therefrom Provided to the FBI and Agency-2

The Special Counsel has also indicated an intention to offer evidence that (1) the data Mr. Sussmann provided was inaccurate; and (2) the analysis and conclusions drawn from that data were inaccurate.  Suppl. Notice at 2 (seeking to introduce evidence regarding the "strength and reliability" of the data and allegations provided to the FBI and Agency-2, including that the white papers "may have misstated, overstated, and/or cherry-picked facts" or that certain FBI or Agency-2 personnel determined that "data was potentially incomplete, fabricated, and/or exaggerated").  And while the Special Counsel seems to have suggested to the Court on March 31, 2022 that it had

no intention of adducing evidence or making arguments that the data was inaccurate, Hr'g Tr. at 41:5-42:14, the Special Counsel confusingly continues to reserve the right to have an expert testify that (1) the data Mr. Sussmann provided was inaccurate; and (2) the analysis and conclusions drawn from that data were inaccurate.  Expert Disclosure at 2-3.

The defense does not dispute that it may be proper for witnesses from the FBI to testify, in limited and summary form, to the fact that they ultimately arrived at the conclusion that the allegations were not substantiated.  The defense also does not dispute that evidence that directly bears on Mr. Sussmann's state of mind regarding the data or the conclusions may be relevant.  But it would be wholly improper for the Special Counsel to do what it now apparently seeks to do— call multiple witnesses, including from the FBI, Agency-2, and companies that hosted or processed data for the Trump Organization, to testify about their own views about the data or the analysis that Mr. Sussmann ultimately passed along to the government.  Such evidence is irrelevant; it would be unfairly prejudicial; and it would necessitate a highly complex and wasteful mini-trial about a matter the Special Counsel deliberately did not allege or charge.

*First*, evidence regarding the accuracy of the data or the conclusions drawn from that data is simply irrelevant to the false statement charge against Mr. Sussmann.  Mr. Sussmann is not charged with defrauding the government or with a conspiracy to do that or anything else.  There is no allegation or evidence that Mr. Sussmann was privy to *any* of the communications between Mr. Joffe and Others about the data or its analyses that the Special Counsel misleadingly cites in the Indictment.  There is no allegation or evidence that Mr. Sussmann—who is not a DNS expert— believed or had any reason to believe there was any issue with the data or with the analysis or conclusions drawn therefrom.  The thoughts and beliefs of others about the accuracy of the data or about the accuracy of the conclusions is simply not relevant to Mr. Sussmann's state of mind or to

the more general question of whether Mr. Sussmann made a false statement about his clients to Mr. Baker. *See Libby*, 467 F. Supp. 2d at 15-16 ("[W]hat others were told" was "simply irrelevant to the defendant's state of mind."); *Secord*, 726 F. Supp. at 848-49 ("Conversations or correspondence which never reached Defendant in any manner . . . remain immaterial to motive."); *United States v. Kaufman*, 2021 WL 4084523, at *22-23 (S.D.N.Y. Sept. 7, 2021) (testimony regarding comparative analyses conducted after the conduct at issue "would have been improper *post hoc* speculation about [the defendant's] intent" as the defendant "could not have had knowledge of much of this information during the relevant time period . . . and in any case failed to show his awareness of any of it that existed during that time").

The accuracy of the information and underlying data provided to Agency-2 similarly bears no relevance to the charge against Mr. Sussmann. Factually, the provision of such data is inconsistent with the Special Counsel's theory that Mr. Sussmann was secretly acting on behalf of the Clinton Campaign: this data was provided to Agency-2 *five months after* Mr. Sussmann's meeting with the FBI, after the presidential election, and when the Clinton campaign had effectively ceased to exist. But moreover, there is no charge, allegation, or evidence that Mr. Sussmann believed or had reason to believe that the information he received from Mr. Joffe and provided to Agency-2 was anything other than accurate. Others' communications analyzing the data in which Mr. Sussmann was not involved, and their independent views of the conclusions drawn from that data that were not shared with Mr. Sussmann, are wholly irrelevant to the charge against Mr. Sussmann or his state of mind.

*Second*, the Special Counsel has utterly failed to provide an explanation for how such evidence is admissible against Mr. Sussmann. Instead, the Special Counsel simply asserts that evidence regarding the strength and reliability of the information provided to the FBI and Agency-

2 is "direct evidence" of the false statements charge against Mr. Sussmann.  Suppl. Notice at 2.  But whether the data provided to FBI was "strong" or not simply has no bearing on whether Mr. Sussmann was acting on behalf of a particular client when he provided information to the FBI.  And evidence of the strength of separate data provided five months later to Agency-2, when one of Mr. Sussmann's purported clients—the Clinton Campaign—was defunct, has even less bearing on Mr. Sussmann's purported false statement in September 2016.  Once again, Mr. Sussmann is not charged with making a false statement about the quality of the information and underlying data he provided, but rather with a purported false statement about his representation of clients.  The strength of the data, and the conclusions based on that data, are utterly irrelevant to that question.

*Third*, once again, the introduction of such evidence would divert the jury's attention from the actual charge and force a mini-trial on the accuracy of the data provided, or the accuracy of the conclusions, neither of which are relevant to the charged crime.  Particularly in light of the Special Counsel's recent expert notice and apparent intent to elicit testimony regarding the accuracy of others' technical analyses of the data, it is clear such a mini-trial would necessarily involve a battle between experts and detailed testimony on highly complicated issues of fact irrelevant to the charged false statement.  *See* Minute Order, *United States v. Stone*, No. 1:19-cr-00018-ABJ (D.D.C. Sept. 26, 2019) (referencing Gov't's Mot. in Lim. at 2, No. 1:19-cr-00018-ABJ (July 26, 2019), ECF No. 153) (court excluded "evidence or argument regarding Russian interference in the 2016 election" that the government argued was "irrelevant to the charges at issue" and also "presents a serious risk of jury confusion, prejudice, and delay" as to the false statements, and other charges in connection with a Congressional investigation into possible Russian interference).  The jury would undoubtedly be confused and Mr. Sussmann unfairly prejudiced by conflicting testimony, including from experts, regarding highly complex technical issues irrelevant to the

charged crime.  *See Akbar v. City of Chi.*, 2009 WL 3335364, at *3 (N.D. Ill. Oct. 14, 2009) (excluding evidence where introduction would require extensive cross on ancillary issues).

### C.    The Court Should Preclude Evidence and Argument Regarding the Information that Christopher Steele Separately Provided to the FBI

Finally, the Special Counsel has indicated an intent to introduce documentary and testimonial evidence and argument regarding the Steele Dossier.  The Special Counsel offers no explanation as to why such evidence is properly admissible at Mr. Sussmann's trial.  And nor could he.  This topic too is utterly irrelevant to the charged crime and—similar to the Special Counsel's Motion to Inquire—would be provocative and inflammatory when publicized.  Any modicum of relevance would be so substantially outweighed by risk of confusion, delay, waste, and unfair prejudice as to require this evidence be precluded.

*First*, the Steele Dossier is not relevant to Mr. Sussmann's case.  There are no charges against Mr. Steele, and neither Mr. Steele nor his dossier is mentioned in the Indictment.  The Special Counsel has spent years engaged in a separate investigation regarding Mr. Steele's reporting to the FBI and the sources he used for that reporting; that investigation resulted in the indictment of a different defendant in a different jurisdiction.  *See* Indictment, *United States v. Danchenko*, No. 1:21-cr-245 (AJT) (E.D. Va. Nov. 3, 2021).  There are no allegations whatsoever in Mr. Sussmann's Indictment—nor for that matter, in Mr. Danchenko's—that Mr. Sussmann was aware of or involved in Mr. Steele's decision to separately provide information to the FBI.  And the Special Counsel has produced neither discovery nor § 3500 statements nor any other information that prove as much.  Indeed, the Special Counsel has hardly produced any discovery regarding Mr. Steele at all.  That is because, as the Special Counsel is well aware, Mr. Steele's

conduct is wholly irrelevant to the charge against Mr. Sussmann.[4]  Insofar as the Special Counsel apparently seeks to introduce evidence outside the scope of Mr. Sussmann's involvement or knowledge, such evidence has no place in Mr. Sussmann's trial.  *See Libby*, 467 F. Supp. 2d 15-16 ("[W]hat others were told" was "simply irrelevant to the defendant's state of mind."); *Secord*, 726 F. Supp. 845, 848-49 (information of which the defendant had no knowledge is necessarily immaterial to the defendant's state of mind, intent, or motive).

*Second*, allowing evidence regarding Mr. Steele would invite a distracting and highly prejudicial mini-trial on a fraught topic with no connection to the charge in this matter.  *See* Minute Order, *Stone*, No. 1:19-cr-00018-ABJ (Sept. 26, 2019) (referencing Gov't's Mot. in Lim., No. 1:19-cr-00018-ABJ (July 26, 2019), ECF No. 153) (excluding "evidence or argument regarding Russian interference in the 2016 election" that the government argued was "irrelevant to the charges at issue" and also "presents a serious risk of jury confusion, prejudice and delay"); *Sarin*, 2010 WL 5463250, at *6 (excluding an evidentiary "sideshow that distracts the jury" in which "[t]he [defendant] will have to spend a substantial amount of time discrediting the [findings]," needlessly extending trial); *United States v. Ferguson*, 246 F.R.D. 107, 116 (D. Conn. 2007) (excluding additional evidence of fraud that was "far less probative of the defendants' knowledge and intent [than the] admissible evidence already available" and would "risk diverting the jury's attention to [a] collateral question" and a trial within a trial regarding the same); *Duran*, 884 F. Supp. at 536-37 (excluding evidence that would arouse "very strong feelings among jurors" and was of only "tenuous relevance").  Introducing evidence about the Steele Dossier would require the jury to hear testimony and evidence about a complicated set of facts involving Mr. Steele, none

---

[4] To the extent the Special Counsel has now changed course, he has failed to comply with his discovery obligations and this Court's Order that all discovery and all material subject to 18 U.S.C. § 3500 and *Giglio v. United States*, 405 U.S. 150 (1972) be produced by March 18, 2022.

of which pertain to *Mr. Sussmann's* actions or the false statement charge against him.  And it would require the jury to consider the wholly collateral issue of Mr. Steele's decision and motivation to separately provide information to the FBI, and the credibility of that information.

*Third*, whatever negligible relevance, if any, that evidence regarding Mr. Steele and the Steele Dossier may have at trial, that relevance would be substantially outweighed by the danger of unfair prejudice and should otherwise be precluded under Rule 403.  By introducing such evidence, the Special Counsel will unnecessarily inflame certain followers of this case and sensationalize the allegations here for no good reason.  This trial is not about Mr. Steele or his dossier.  It is about a single statement made at a single meeting that took place more than five years ago between Mr. Sussmann and Mr. Baker.  The Special Counsel cannot now use Mr. Sussmann's false statement trial as an opportunity to put Mr. Steele's alleged actions before the jury, in the hopes that they will, in turn, look less favorably on Mr. Sussmann.  *Malpeso*, 115 F.3d at 163. This evidence therefore must be excluded.

Finally, should the Special Counsel seek to call Mr. Steele as a witness or even mention Mr. Steele, the defense would require additional information regarding exactly what evidence the Special Counsel seeks to introduce and why.  Mr. Sussmann reserves the right to object to the introduction of any evidence, including witness testimony by or about Mr. Steele, including on relevance and prejudice grounds.

### D.    Irrelevant and Unfairly Prejudicial Evidence Excluded from Trial Should Also be Struck from the Indictment To The Extent the Indictment is Provided to the Jury

To the extent the Court intends to read or provide the Indictment to the jury, Mr. Sussmann also moves pursuant to Federal Rule of Criminal Procedure 7(d) to strike, as irrelevant and unfairly prejudicial, portions of the Indictment that correspond to the evidence he seeks to preclude here. *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998) (noting the court may strike

surplusage from an indictment where "it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial" (citations omitted)); *United States v. Hubbard*, 474 F. Supp. 64, 82 (D.D.C. 1979) (prejudicial language includes that which would "encourage the jury to draw inferences that the defendants are believed to be involved in activities not charged in the indictment").  Irrelevant and unfairly prejudicial allegations that pertain to the gathering of data, *see, e.g.*, Indictment ¶¶ 6, 21, 22(a)-(i), 23(a)-(e), and the accuracy of the data, *see, e.g.*, *id.* ¶¶ 21, 22(f)-(i), 23(f)-(k), 24(e)-(i) must be struck from the Indictment.  *See* Exhibit A (Indictment with Mr. Sussmann's proposed strikes).

## CONCLUSION

For the foregoing reasons, Mr. Sussmann requests that this Court issue an order (1) precluding the Special Counsel from introducing any evidence or arguments to the jury regarding (a) the gathering of data by Mr. Joffe and Others; (b) the accuracy of this data and the accuracy of the conclusions and analysis based on this data; and (c) Christopher Steele and information he separately provided to the FBI (including the so-called "Steele Dossier"), and (2) striking this irrelevant and unfairly prejudicial evidence from the Indictment, to the extent the Indictment is provided to the jury.

Dated:  April 4, 2022                    Respectfully submitted,

                                         */s/Sean M. Berkowitz*
                                         Sean M. Berkowitz (*pro hac vice*)
                                         LATHAM & WATKINS LLP
                                         330 North Wabash Avenue
                                         Suite 2800
                                         Chicago, IL 60611
                                         Tel: (312) 876-7700
                                         Fax: (312) 993-9767
                                         Email: sean.berkowitz@lw.com

                                         Michael Bosworth (*pro hac vice*)
                                         LATHAM & WATKINS LLP
                                         1271 Avenue of the Americas
                                         New York, NY 10020
                                         Tel: (212) 906-1200
                                         Fax: (212) 751-4864
                                         Email: michael.bosworth@lw.com

                                         Natalie Hardwick Rao (D.C. Bar # 1009542)
                                         Catherine J. Yao (D.C. Bar # 1049138)
                                         LATHAM & WATKINS LLP
                                         555 Eleventh Street, NW
                                         Suite 1000
                                         Washington, DC 20004
                                         Tel: (202) 637-2200
                                         Fax: (202) 637-2201
                                         Email: natalie.rao@lw.com
                                         Email: catherine.yao@lw.com