# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 21-cr-582 |
| | : | |
| v. | : | |
| | : | |
| MICHAEL A. SUSSMANN, | : | VIOLATIONS: |
| | : | 18 U.S.C. § 1001(a)(2) |
| Defendant. | : | (Making a False Statement) |
| | : | |
| | : | |

## <u>INDICTMENT</u>

The Grand Jury charges that:

A.  <u>Introduction and Overview</u>

1.      In or about late October 2016 – approximately one week before the 2016 U.S. Presidential election – multiple media outlets reported that U.S. government authorities had received and were investigating allegations concerning a purported secret channel of Communications between the Trump Organization, owned by Donald J. Trump, and a particular Russian bank ("Russian Bank-1").

2.      According to one of these articles published by a major U.S. newspaper ("Newspaper-1"), intelligence officials possessed information concerning "what cyber experts said appeared to be a mysterious computer back channel between the Trump Organization and [Russian Bank-1]." The article further reported that the Federal Bureau of Investigation ("FBI") had "spent weeks examining computer data showing an odd stream of activity to a Trump Organization server," and that "[c]omputer logs obtained by [Newspaper-1]" showed "that two servers at [Russian Bank-1] sent more than 2,700 'look up' messages . . . to a Trump-connected server

beginning in the spring." According to other articles, this information had been assembled by an anonymous computer researcher who used the moniker "Tea Leaves."

3.       The FBI had, in fact, initiated an investigation of these allegations in response to a meeting that **MICHAEL A. SUSSMANN**, the defendant herein – a lawyer at a major international law firm ("Law Firm-1") – requested and held with the FBI General Counsel on or about September 19, 2016 at FBI Headquarters in the District of Columbia. **SUSSMANN** provided to the FBI General Counsel three "white papers" along with data files allegedly containing evidence supporting the existence of this purported secret communications channel.

4.       During the meeting, **SUSSMANN** lied about the capacity in which he was providing the allegations to the FBI. Specifically, **SUSSMANN** stated falsely that he was not doing his work on the aforementioned allegations "for any client," which led the FBI General Counsel to understand that **SUSSMANN** was acting as a good citizen merely passing along information, not as a paid advocate or political operative. In fact, and as alleged in further detail below, this statement was intentionally false and misleading because, in assembling and conveying these allegations, **SUSSMANN** acted on behalf of specific clients, namely, (i) a U.S. technology industry executive ("Tech Executive-1") at a U.S. Internet company ("Internet Company-1"), and (ii) the Hillary Clinton Presidential Campaign (the "Clinton Campaign").

5.       **SUSSMANN**'s lie was material because, among other reasons, **SUSSMANN**'s false statement misled the FBI General Counsel and other FBI personnel concerning the political nature of his work and deprived the FBI of information that might have permitted it more fully to assess and uncover the origins of the relevant data and technical analysis, including the identities and motivations of **SUSSMANN**'s clients.

6.     Had the FBI uncovered the origins of the relevant data and analysis, and as alleged below, it might have learned, among other things, that ~~(i) in compiling and analyzing the Russian Bank-1 allegations, Tech Executive-1 had exploited his access to non-public data at multiple Internet companies to conduct opposition research concerning Trump; (ii) in furtherance of these efforts, Tech Executive-1 had enlisted, and was continuing to enlist, the assistance of researchers at a U.S. based university who were receiving and analyzing Internet data in connection with a pending federal government cybersecurity research contract; and (iii)~~ **SUSSMANN**, Tech Executive-1, and Law Firm-1 had coordinated, and were continuing to coordinate, with representatives and agents of the Clinton Campaign with regard to the data and written materials that **SUSSMANN** gave to the FBI and the media.

7.     The FBI's investigation of these allegations nevertheless concluded that there was insufficient evidence to support the allegations of a secret communications channel with Russian Bank-1. In particular, and among other things, the FBI's investigation revealed that the email server at issue was not owned or operated by the Trump Organization but, rather, had been administered by a mass marketing email company that sent advertisements for Trump hotels and hundreds of other clients.

B.     The Defendant

8.     At all times relevant to this Indictment, **SUSSMANN** was employed at Law Firm-1. Previously, **SUSSMANN** was employed by the U.S. Department of Justice ("DOJ") in various capacities. In his work at the DOJ, **SUSSMANN** became familiar with U.S. criminal laws, including Title 18, United States Code, Section 1001, which criminalizes the making of materially false statements to U.S. officials.

9.      In his Work at Law Firm-1, **SUSSMANN** represented numerous clients in cybersecurity, privacy, and national security-related matters. In or about April 2016, the Democratic National Committee ("DNC") retained **SUSSMANN** to represent it in connection with the hacking of its email servers by the Russian government. In connection with his representation of the DNC as the victim of a hack, the defendant met and communicated regularly with the FBI, the DOJ, and other U.S. government agencies. In or around the same time period, **SUSSMANN** was also advising the Clinton Campaign in connection with cybersecurity issues.

C.    Law Firm-1 and Its Role in the 2016 Presidential Election Campaign

10.     Law Firm-1 was at all times relevant to this Indictment an international law firm based in the United States. In or about April 2015, the Clinton Campaign retained Law Firm-1 as its counsel for the 2016 U.S. Presidential election. A law partner at Law Firm-1 ("Campaign Lawyer-1") acted as the Clinton Campaign's General Counsel.

11.     As part of its efforts to assist the Clinton Campaign and the DNC, Law Firm-1 retained a particular investigative Firm (the "U.S. Investigative Firm") to gather information regarding Trump's purported ties to Russia. Throughout the Presidential campaign, the U.S. Investigative Firm worked with Law Firm-1, members of the media, and others to gather and disseminate purported evidence of Trump's ties to Russia.

D.    Tech Executive-1

12.     Tech Executive-1 was at all times relevant to this Indictment an executive of a particular Internet company ("Internet Company-1"), which offers various Internet-related services and products, including Domain Name System ("DNS") resolution services, to its customers. (DNS is a naming system for devices connected to the Internet that translates recognizable domain names, *e.g.*, http://www.google.com, to numerical IP addresses, *e.g.*,

4

123.456.7.89. A DNS "lookup" refers to an electronic request by à particular computer or device to query information from another device or server.)

13.     By virtue of his position at Internet Company-1 and other companies, Tech Executive-1 maintained direct or indirect access to, and the ability to provide others access to, large amounts of internet and cybersecurity data, including DNS data.

14.     In or about February 2015, Tech Executive-1 retained **SUSSMANN** as his lawyer in connection with a matter involving an agency of the U.S. government. **SUSSMANN** also frequently served as outside counsel to Internet Company-1, which was a significant source of revenue for Law Firm-1 and **SUSSMANN**. At all times relevant to this Indictment, Tech Executive-1 served as **SUSSMANN**'s primary point of contact at Internet Company-1.

15.     In or about November 2016, Tech Executive-1 claimed to have been previously offered a position in the government in the event Hillary Clinton won the Presidency, stating in an email days after the U.S. Presidential election: "I was tentatively offered the top [cybersecurity] job by the Democrats when it looked like they'd win. I definitely would not take the job under Trump."

E.     The Russian Bank Allegations

16.     By in or around late July 2016, the aforementioned computer researcher who used the moniker "Tea Leaves" ("Originator-1") had assembled ~~purported~~ DNS data reflecting apparent DNS lookups between Russian Bank-1 and an email domain, "mail1.trump-email.com" (the "Russian Bank Data"). The ~~purported~~ data spanned the time period from on or about May 4, 2016 through on or about July 29, 2016.

17.     At all times relevant to this Indictment, Originator-1 was a business associate of Tech Executive-1. By in or about July 2016, Tech Executive-1 and others were in possession of the Russian Bank Data.

18.     Also, in or about July 2016, Tech Executive-1 alerted **SUSSMANN** to the Russian Bank Data.

19.     Over the ensuing weeks, and as part of their lawyer-client relationship, **SUSSMANN** and Tech Executive-1 engaged in efforts with Campaign Lawyer-1 and individuals acting on behalf of the Clinton Campaign to share information about the Russian Bank Data with the media and others, claiming that it demonstrated the existence of a secret communications channel between the Trump Organization and Russian Bank-1.

<u>SUSSMANN Bills the Clinton Campaign for His Communications with Tech Executive-1 and Campaign Lawyer-1</u>

20.     From in or about late July through in or about mid-August 2016, **SUSSMANN**, Tech Executive-1, and Campaign Lawyer-1 coordinated and communicated about the Russian Bank-1 allegations during telephone calls and meetings, which **SUSSMANN** billed to the Clinton Campaign (denoted in Law Firm-1's billing records by its official corporate name, "HFACC, Inc.").

        a.     For example, on or about July 29, 2016, **SUSSMANN** and Campaign Lawyer-1 met with personnel from the U.S. Investigative Firm in Campaign Lawyer-1's office. **SUSSMANN** billed his time in this meeting to the Clinton Campaign under the category "General Political Advice" with the billing description "meeting with [Campaign Lawyer-1], others regarding [] confidential project." (For all of **SUSSMANN**'s other billing entries cited herein that he billed to the Clinton Campaign, he similarly billed his time to the campaign under the category "General Political Advice").

b.      On or about July 31, 2016, **SUSSMANN** billed the Clinton Campaign for twenty-four minutes with the billing description, "communications with [Campaign Lawyer-1] regarding server issue."

c.      On or about August 12, 2016, **SUSSMANN**, Campaign Lawyer-1, and Tech Executive-1 met in Campaign Lawyer-1's office. In connection with this meeting, **SUSSMANN** billed his time to the Clinton Campaign with the billing description "confidential meetings with [Campaign Lawyer-1], others."

d.      In or around the same time period, **SUSSMANN**, Campaign Lawyer-1, and personnel from the U.S. Investigative Firm began exchanging emails with the subject line, "Connecting you all by email."

e.      On or about August 17, 2016, **SUSSMANN**, Campaign Lawyer-1, and Tech Executive-1 conducted an additional conference call. **SUSSMANN** billed this time to the Clinton Campaign with the billing descriptions "telephone conference with [Tech Executive-1], [Campaign Lawyer-1]."

f.      On or about August 19, 2016, **SUSSMANN** and Campaign Lawyer-1 conducted an additional in-person meeting that appeared in **SUSSMANN**'s calendar as "Meeting with [Tech Executive-l's first name]." **SUSSMANN** billed this time to the Clinton Campaign within the billing description stating, in part, "confidential meeting with [Campaign Lawyer-1], others[.]"

g.      Later in or about August 2016, Tech Executive-1 exchanged emails with personnel from the U.S. Investigative Firm.

Tech Executive-1 Uses His Access at Multiple Internet Companies to Conduct Opposition
Research and Create a "Narrative" Regarding Trump

21.    As alleged in further detail below, in or around the same time period—and in
furtherance of his efforts with **SUSSMANN** and Campaign Lawyer-1 to disseminate allegations
regarding Trump—Tech Executive-1 used his access at multiple organizations to gather and mine
public and non-public Internet data regarding Trump and his associates, with the goal of creating
a "narrative" regarding the candidate's ties to Russia.

22.    Tech Executive-1 later shared ~~certain~~ results of ~~these~~ data searches and analysis
with **SUSSMANN** so that **SUSSMANN**, in turn, could provide them to the media and the FBI.

Tech Executive-1 Obtains Internet Data Relating to Trump from Internet Company-2

a.    For example, in or about early August 2016—the same time period of his
aforementioned communications with **SUSSMANN** and Campaign Lawyer-1—Tech Executive-
1 directed and caused employees of two companies in which he had an ownership interest
("Internet Company-2" and "Internet Company-3") to search and analyze their holdings of public
and non-public internet data for derogatory information on Trump.

b.    At all times relevant to this Indictment, Internet Company-2 was a company
that, among other things, collected DNS data from various points on the Internet.

c.    At all times relevant to this Indictment, Internet Company-3 was owned by
the same company as Internet Company-2. As part of its business, Internet Company-3 received
data that had been collected by Internet Company-2 or its parent company, and then used and
analyzed that data in order to advise its private sector customers on cybersecurity and business
risks.

d.    In or about early August 2016, Tech Executive-1 called an individual at
Internet Company-3. During the call, Tech Executive-1 instructed the individual to task Internet

8

Company 3 employees to search for any Internet data reflecting potential connections or communications between Trump or his associates and Russia.

e.      In connection with this tasking, Tech Executive-1 later stated that he was working with someone who had close ties to the Democratic Party and to Hillary Clinton.

f.      The aforementioned individual and other personnel at Internet Company-3 were uncomfortable regarding this tasking from Tech Executive-1 because they believed that using the companies' data in this manner was inappropriate. They complied with the tasking, however, because Tech Executive-1 was a powerful figure at both companies.

g.      In connection with this tasking, Tech Executive-1 emailed to Internet Company-3 personnel a five-page document (the "Trump Associates List") listing six associates of Trump and a purported U.S.-based lobbyist for Russian Bank-1 who was also discussed in written materials prepared by the U.S. Investigative Firm that **SUSSMANN** would later provide to the FBI General Counsel. The Trump Associates List contained detailed personal information for these individuals, including, for example, their names, home addresses, personal email addresses, business names, business websites and email domains, suspected IP addresses for those domains, and information pertaining to the spouse of one of these associates. Tech Executive-1 directed that these individuals should be a focus of Internet Company-3's data queries and analysis.

h.      On or about August 15, 2016, employees of Internet Company-2, acting at the request of Internet Company-3, queried their holdings of non-public Internet data against a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 email addresses and domains that related or referred to Trump, the Trump Organization, the aforementioned Trump associates, and/or Russian Bank-1 (*i.e.*, the bank that was the subject of the allegations that **SUSSMANN** later conveyed to the FBI General Counsel).

9

~~i.~~     ~~During the same time period, employees of Internet Company-3 also drafted and provided to Tech Executive-1 a written paper reflecting, in substance, some of the same technical observations contained in the Russian Bank-1 allegations that **SUSSMANN** later conveyed to the FBI.~~

~~**Tech Executive-1 Tasks Originator-1 and University Researchers to Search for Internet Data Regarding Trump**~~

~~23.~~     ~~Also in or around the same time period, and in connection with Tech Executive-1's joint efforts with **SUSSMANN**, Tech Executive-1 similarly tasked Originator-1 and two computer researchers ("Researcher 1" and "Researcher 2") who worked at a U.S. based university ("University-1") to search broadly through Internet data for any information about Trump's potential ties to Russia. In connection with this tasking, and as alleged in further detail below, Tech Executive-1's goal was to support an "inference" and "narrative" regarding Trump that would please certain "VIPs." Moreover, and as alleged below, Tech Executive-1 provided information that he gathered through these interactions to his lawyer, **SUSSMANN**, so that **SUSSMANN** Could assist in drafting and disseminating materials to the media and the FBI.~~

~~*Background on the Agency-1 Contract*~~

~~a.~~     ~~At the time of these exchanges in or about August 2016, a federal government agency ("Agency-1") was in the process of finalizing, but had not yet signed, a cybersecurity research contract with University-1 (the "Agency-1 Contract"). The primary purpose of the Agency-1 Contract was for University-1 researchers to receive and analyze large quantities of public and non-public data (including DNS data) from various Internet companies in order to identify the perpetrators of malicious cyber-attacks and protect U.S. national security.~~

b. ~~Originator-1 was not a participant in the contract but was the founder of a company that University-1 researchers were considering as a potential data provider under the contract.~~

c. ~~Tech Executive-1 and his employer, Internet Company-1, would ultimately sell large amounts of historical and ongoing DNS data to University-1 for use and analysis under the Agency-1 Contract.~~

d. ~~Although the Agency-1 Contract was not signed until in or around November 2016, Internet Company-1 – through Tech Executive-1 – provided University-1 with early access to its Internet data in order to establish a "proof of concept" for work under the contract. Among the data that University-1 accessed through Internet Company-1 was the DNS data of an Executive Branch office of the U.S. government ("Office-1"), which Internet Company-1 had come to possess as a sub-contractor in a sensitive relationship between the U.S. government and another company.~~

e. ~~The purpose of providing Internet Company-1's data to University-1 during this time period was to enable researchers who worked under the Agency-1 Contract to protect U.S. networks from cyberattacks. From in or about July 2016 through at least in or about February 2017, however, Originator-1, Researcher-1, and Researcher-2 also exploited Internet Company-1's data and other data to assist Tech Executive-1 in his efforts to conduct research concerning Trump's potential ties to Russia, including the Russian Bank-1 allegations that~~ **SUSSMANN** ~~would later convey to the FBI.~~

<em>~~Research Concerning Trump~~</em>

f. ~~For example, on or about July 29, 2016, Researcher-2 emailed to Researcher-1 the Russian Bank Data compiled by Originator-1.~~

11

g.      On or about August 19, 2016, Researcher-1 queried internet data maintained by Internet Company-1 for the aforementioned mail1.trump-email.com domain that was the subject of the allegations **SUSSMANN** would later convey to the FBI. Researcher-1 then emailed Tech Executive-1 and others a list of domains that had communicated with it—none of which appeared to have links to Russia. Researcher-1 noted that the list "does not make much sense with the storyline you have," referring to the storyline connecting Trump to Russia.

h.      On or about August 20, 2016, Originator-1 emailed Tech Executive-1, Researcher-1, and Researcher-2, stating, among other things, that "even if we found what [Tech Executive-1] asks us to find in DNS, we don't see the money flow, and we don't see the content of some message saying 'send the money here'." Originator-1 then explained that it would be possible to "fill out a sales form on two websites, faking the other company's email address in each form," and thereby cause them "to appear to communicate with each other in DNS." Originator-1 then concluded: "I[f] [Tech Executive-1] can take the *inference* we gain through this team exercise . . . then work to develop even an inference may be worthwhile . . . .It's just not the case that you can rest assured that Hillary's opposition research and whatever professional gov[ernments] and investigative journalists are also digging [will] come up with the same things[.]" (asterisks in original).

i.      On or about the same date, Tech Executive-1 clarified in an email to Originator-1, Researcher-1, and Researcher-2 that the "task" he had given them was "indeed broad" and further stated, in part:

> **Being able to provide evidence of *anything* that shows an attempt to behave badly in relation to this, the VIPs would be happy.** They're looking for a true story that could be used as the basis for closer examination.

(emphasis added; asterisks in original). Regarding the Russian Bank-1 allegations that he had provided to **SUSSMANN**, Tech Executive-1's email stated: "[T]he prior hypothesis was all that they needed: [a] mailserver dedicated or related to [T]rump ... and with traffic almost exclusively with [Russian Bank-1] was sufficient to do the job." Tech Executive-1 continued, "Trump has claimed he and his compan[ies] have had NO dealings with .ru other than the failed Casino, and the Miss universe pageant. He claims absolutely NO interaction with any financial institutions. So any potential like that would be jackpot."

j.      On or about August 21, 2016, Tech Executive-1 emailed the recipients, urging them to push forward with additional research concerning Trump, which he stated would "give the base of a very useful narrative." Later in the same email, Tech Executive-1 expressed his own belief that the "trump-email.com" domain (referring to the subject of the allegations that **SUSSMANN** conveyed to the FBI) was not a secret communications channel with Russian Bank-1, but "a red herring," noting that the host for that domain "is a legitimate valid [customer relationship management] company." Tech Executive-1 therefore concluded that "we can ignore it, together with others that seem to be part of the marketing world."

k.      On or about August 22, 2016, Researcher-1 emailed the aforementioned recipients, expressing continued doubt regarding the Russian Bank-1 allegations that **SUSSMANN** would later convey to the FBI, and raising concerns about the researchers' bias against Trump:

> Let[']s for a moment think of the best case scenario, where we are able to show (somehow) that DNS [] communication exists between Trump and R[ussia], **How do we plan to defend against the criticism that this is not spoofed [] traffic we are observing? There is no answer to that.** Let's assume again that they are not smart enough to refute our "best case" scenario. [Tech Executive-1], you **do realize that we will have to expose every trick we have in**

~~our bag to even make a very weak association?~~ Let[']s all reflect ~~upon that for a moment. Sorry folks, but unless we get combine netflow and DNS traffic collected at critical points between suspect organizations, we cannot technically make any claims that would fly public scrutiny.~~

~~[…]~~

~~The only thing that drive[s] us at this point is that we just do not like [Trump]. This will not fly in eyes of public scrutiny. Folks, I am afraid we have tunnel vision.~~ Time to regroup?

~~(emphasis added).~~

<u>SUSSMANN and His Client Prepare a White Paper Summarizing the Russian Bank-1 Allegations</u>

24.  ~~Despite the aforementioned views that the Russian Bank Data and allegations were a "red herring" that should be "ignored,"~~ **SUSSMANN**, Tech Executive-1, Originator-1, and the University-1 researchers began to draft, review, and revise a "white paper" summarizing the Russian Bank-1 allegations that **SUSSMANN** would later provide to the FBI. **SUSSMANN** continued to bill time on these matters to the Clinton Campaign.

a.  For example, on or about September 5, 2016, **SUSSMANN** began billing work for the drafting of the aforementioned white paper. **SUSSMANN** billed this work to the Clinton Campaign with a billing description that read, in part, "**work on white paper**; follow-up telephone conferences and email." (emphasis added),

b.  On or about September 6, 2016, **SUSSMANN** continued to work on the white paper. On or about the same date, **SUSSMANN** also met with representatives of the U.S. Investigative Firm and communicated with the media. **SUSSMANN** billed this work to the Clinton Campaign with the billing description, "Meeting with consultant [and Campaign Lawyer-1]; **revisions to white paper;** meeting with expert; **meeting with expert and reporter; follow-up meeting with reporter**; conversations with [Campaign Lawyer-1]," (emphasis added).

14

c.      On or about September 7, 2016, **SUSSMANN** continued work on the white paper. **SUSSMANN** billed his time for that work to the Clinton Campaign with the billing description, "Meetings and other communications regarding confidential project; **work on written materials**."

(emphasis added).

d.      On or about September 14, 2016 – five days before his meeting with the FBI General Counsel – **SUSSMANN** continued work on the white paper. **SUSSMANN** also met with Tech Executive-1 in **SUSSMANN**'s office. On or about the same date, **SUSSMANN** billed time to the Clinton Campaign with the billing description "**Multiple meetings** regarding confidential project, **draft white paper** []," and to Internet Company-1 with the billing description, "communications regarding confidential project." (emphasis added).

e.      ~~On or about the same day — and just five days before **SUSSMANN** conveyed the aforementioned allegations to the FBI — Tech Executive-1 sent the white paper that **SUSSMANN** had been working on to Originator-1, Researcher-1, and Researcher-2. In an email, Tech Executive-1 sought their views as to whether the paper's allegations would be "plausible" to "security experts," even if the allegations were not demonstrably true:~~

> ~~Please read as if you had no prior knowledge or involvement, and **you were handed this document as** a **security expert (NOT** a dns expert) and were asked: 'Is this plausible as an explanation?' **NOT to be able to say that this is, without doubt, fact, but to merely be plausible. Do NOT spend more than a short while on this** (If you spend more than an hour you have failed the assignment). Hopefully less. :)~~

~~(emphasis added).~~

f.        On or about the same date, Researcher-1 replied, stating that the white paper achieved Tech Executive-1's objective, but noting that the paper "smartly" avoided discussing weaknesses or "holes" in the paper's hypothesis:

> A DNS **expert would poke several holes** to this hypothesis (primarily around visibility, about which **very smartly you do not talk about**). That being said, I do not think even the top security (non DNS) researchers can refute your statements. Nice!

(emphasis added).

g.        On or about September 15, 2016, Originator-1 responded to Tech Executive-1, stating, in part, that the paper's conclusion was "plausible" in the "narrow scope" defined by Tech Executive-1.

h.        On or about the same date, Researcher-2 replied, acknowledging that questions remained, but stating, in substance and in part, that the paper should be shared with government officials.

i.        On or about September 16, 2016, Originator-1 replied to the aforementioned recipients, discussing an allegation that **SUSSMANN** would soon convey to the FBI regarding Russian Bank-1's alleged use of a purported "TOR exit node" (*i.e.*, a node used for anonymized internet traffic) at a particular U.S.-based healthcare company ("Healthcare Company-1") to communicate with the Trump Organization. Originator-1's email stated, in part, "[Tech Executive-1] has carefully crafted a message that could work to accomplish the goals."

SUSSMANN Shares the Russian Bank-1 Allegations with the Media

25.        In or around the same time period, **SUSSMANN**, acting on behalf of Tech Executive-1 and the Clinton Campaign, disseminated the Russian Bank-1 allegations to the media. **SUSSMANN** billed this time to the Clinton Campaign.

16

a.      For example, on about August 30, 2016, Reporter-1 – who would later author the above-referenced October 31, 2016 article about the Russian Bank-1 allegations – emailed **SUSSMANN**: "I'm back in town. I see Russians are hacking away. [A]ny big news?"

b.      **SUSSMANN** replied on the same date: "Mind reader! . . . Can you meet Thurs and Fri?"

c.      On or about September 1, 2016, **SUSSMANN** met with Reporter-1. **SUSSMANN** billed his time for the meeting to the Clinton Campaign under the broader billing description "confidential meetings regarding confidential project."

d.      On or about September 12, 2016, **SUSSMANN** spoke with Campaign Lawyer-1 via phone regarding **SUSSMANN**'s efforts to communicate with Newspaper-1 regarding the Russian Bank-1 allegations. **SUSSMANN** and Campaign Lawyer-1 each billed the call to the Clinton Campaign with Campaign Lawyer-1 using the billing description "teleconference with M. Sussmann re: [Newspaper-1]," and **SUSSMANN** using the description "work regarding confidential project."

e.      On or about September 15, 2016, Campaign Lawyer-1 exchanged emails with the Clinton Campaign's campaign manager, communications director, and foreign policy advisor concerning the Russian Bank-1 allegations that **SUSSMANN** had recently shared with Reporter- 1. Campaign Lawyer-1 billed his time for this correspondence to the Clinton Campaign with the billing entry, "email correspondence with [name of foreign policy advisor], [name of campaign manager], [name of communications director] **re: [Russian Bank-1] Article**." (emphasis added).

17

<u>SUSSMANN Prepares for His Meeting with the FBI</u>

26.     From on or about September 17 through on or about September 18, 2016 – *i.e.*, the weekend before **SUSSMANN**'s Monday meeting with the FBI General Counsel – **SUSSMANN** continued to work on disseminating the Russian Bank-1 allegations on behalf of Tech Executive-1 and the Clinton Campaign, and continued to bill his work to the campaign.

            a.      For example, on or about September 17, 2016, **SUSSMANN** spoke on the phone with Researcher-2. During the phone call, **SUSSMANN**, among other things, requested that Researcher-2 speak on background with members of the media regarding the Russian Bank-1 allegations, which Researcher-2 did over the course of the following weeks.

            b.      On or about the same date, **SUSSMANN** sent to Researcher-2 an electronic file containing materials he would provide two days later to the FBI General Counsel, including, among other things, the aforementioned white paper that **SUSSMANN** had assisted in drafting, and another white paper drafted by the U.S. Investigative Firm concerning purported ties between Russian Bank-l's parent company and the Russian government.

            c.      **SUSSMANN** billed all of the aforementioned work on or about September 17, 2016 to the Clinton Campaign with the billing description "Multiple telephone conferences and **other communications with experts, media**; communications with [Campaign Lawyer-1]." (emphasis added).

            d.      On or about the next day – Sunday, September 18, 2016 – **SUSSMANN** continued to work on the Russian Bank-1 allegations, and to prepare for his meeting with the FBI. **SUSSMANN** billed this time to the Clinton Campaign with the billing description "Further communications and work regarding confidential project."

<u>SUSSMANN's False Statement to the FBI General Counsel</u>

27.    On or about September 19, 2016, **SUSSMANN** met with the FBI General Counsel at FBI Headquarters in the District of Columbia to convey the Russian Bank-1 allegations. No one else attended the meeting. During the meeting, the following, in substance and in part, occurred:

a.    **SUSSMANN** stated falsely that he was not acting on behalf of any client, which led the FBI General Counsel to understand that **SUSSMANN** was conveying the allegations as a good citizen and not as an advocate for any client;

b.    **SUSSMANN** stated that he had been approached by multiple cyber experts concerning the Russian Bank-1 allegations;

c.    **SUSSMANN** provided the names of three cyber experts, but did not name or mention Tech Executive-1, the Clinton Campaign, or any other person or company referenced above;

d.    **SUSSMANN** described the allegations of a secret Trump Organization server that was in communication with Russian Bank-1, including that Russian Bank-1 had used a TOR exit node located at Healthcare Company-1 to communicate with the Trump Organization;

e.    **SUSSMANN** stated that media outlets were in possession of information about the Trump Organization's secret server, and that a story would be published on Friday of that week;

f.    **SUSSMANN** provided to the FBI General Counsel two thumb drives and hard copy papers, which contained and were comprised of the following:

i.    the aforementioned white paper that **SUSSMANN** had assisted in drafting, entitled *White Paper #1 Auditable V3*, which contained no date or author's name;

ii.     a white paper drafted by Researcher-2, which was entitled, *White Paper Comments: Time Series Analysis of Recursive Queries,* dated September 19, 2016, and contained no author's name;

iii.    the aforementioned white paper drafted by the U.S. Investigative Firm regarding Russian Bank-1 and its parent company, which contained no date or author's name; and

iv.     eight files containing the Russian Bank Data and other ~~purported~~ data and information relating to the mail1.trump-email.com domain.

28.     Immediately after the aforementioned September 19, 2016 meeting, the FBI General Counsel spoke with the Assistant Director of the FBI's Counterintelligence Division. During their conversation, the FBI General Counsel conveyed the substance of his meeting with **SUSSMANN**. The Assistant Director took contemporaneous handwritten notes which reflect, in substance, the above-referenced statements by **SUSSMANN** and state, in relevant part:

Michael Sussman[n] – Atty: [Law Firm-1] – **said not doing this for any client**

•     Represents DNC, Clinton Foundation, etc.
       []
•     Been approached by Prominent Cyber People (Academic or Corp. POCs)
       People like: [three names redacted]

(emphasis added)

29.     **SUSSMANN** billed his meeting with the FBI General Counsel to the Clinton Campaign with the billing description, "work and communications regarding confidential project."

30.     **SUSSMANN**'s statement to the FBI General Counsel that he was not acting on behalf of any client was knowingly and intentionally false. In truth and in fact, and as **SUSSMANN** well knew, **SUSSMANN** acted on behalf of and in coordination with two specific clients of Law Firm-1, *i.e.*, Tech Executive-1 and the Clinton Campaign, in assembling and conveying these

allegations. In particular, and as also alleged above, Tech Executive-1 consulted and relied on **SUSSMANN** as his lawyer to assist in disseminating the Russian Bank-1 allegations. Moreover, all or nearly all of **SUSSMANN**'s recorded time and work relating to the Russian Bank-1 allegations prior to the meeting with the FBI (including communications with the media) were billed to the Clinton Campaign. Indeed, and as **SUSSMANN** concealed and failed to disclose, (i) **SUSSMANN** had spent time drafting one of the white papers he provided to the FBI General Counsel and billed that time to the Clinton Campaign, and (ii) the U.S. Investigative Firm – which at the time was also acting as a paid agent of the Clinton Campaign – had drafted another of those white papers.

31.    In addition, and as alleged in further detail below, **SUSSMANN** testified under oath before Congress in 2017 that he, in fact, conveyed the Russian Bank-1 allegations to the FBI General Counsel "on behalf of my client." *See* Paragraph 44, *infra*.

32.    In the days following **SUSSMANN**'s meeting with the FBI General Counsel, and as a result of that meeting, the FBI opened an investigation of the Russian Bank-1 allegations. **SUSSMANN**'s false statement to the FBI General Counsel was material to that investigation because, among other reasons, it was relevant to the FBI whether the conveyor of these allegations (**SUSSMANN**) was providing them as an ordinary citizen merely passing along information, or whether he was instead doing so as a paid advocate for clients with a political or business agenda. Had **SUSSMANN** truthfully disclosed that he was representing specific clients, it might have prompted the FBI General Counsel to ask **SUSSMANN** for the identity of such clients, which, in turn, might have prompted further questions. In addition, absent **SUSSMANN**'s false statement, the FBI might have taken additional or more incremental steps before opening and/or closing an investigation. The FBI also might have allocated its resources differently, or more efficiently, and

uncovered more complete information about the reliability and provenance of the ~~purported~~ data at issue.

<u>SUSSMANN Continues to Communicate with the Media on Behalf of His Clients</u>

33.     Further demonstrating that **SUSSMANN** carried out the aforementioned work on behalf of his clients, **SUSSMANN** continued in the weeks following this meeting to coordinate with Tech Executive-1, Campaign Lawyer-1, and the U.S. Investigative Firm to disseminate the Russian Bank-1 allegations to the media. **SUSSMANN** continued to bill his time for such work to the Clinton Campaign.

34.     For example, on or about October 10, 2016, **SUSSMANN** emailed Reporter-1 a link to an opinion article which asserted, in substance and in part, that Newpaper-l's investigative reporters had not published as many stories regarding Trump as other media outlets. The subject line of **SUSSMANN**'s email was "for your editors," and the body stated, "You should send this link to them." At or around that time, and according to public sources, Reporter-1 was working on an article concerning the Russian Bank-1 allegations, but Reporter- l's editors at Newspaper-1 had not yet authorized publication of the article.

35.     On or about October 30, 2016, an employee of the U.S. Investigative Firm (the "Investigative Firm Employee") forwarded another reporter ("Reporter-2") a tweet, which indicated that the FBI Director had "explosive information about Trump's ties to Russia." The Investigative Firm Employee's email stated, "time to hurry," suggesting that Reporter-2 should hurry to publish an article regarding the Russian Bank-1 allegations. In response, Reporter-2 emailed to the Investigative Firm Employee a draft article regarding the Russian Bank-1 allegations, along with the cover message: "Here's the first 2500 words."

36.     On or about the following day, October 31, 2016, both Reporter-1 and Reporter-2 published articles regarding the Russian Bank-1 allegations.

37.     On or about the same date, **SUSSMANN** continued to communicate with several reporters about the media coverage, billing these communications to the Clinton Campaign with the billing description, "Communications regarding [Reporter-2's employer] story, [Newspaper-1] reporting; communications with [another news outlet]."

38.     Soon after the 2016 U.S. Presidential election, the Clinton Campaign ceased to exist, and **SUSSMANN** stopped billing his recorded time on these matters to the Clinton Campaign. In the ensuing months, **SUSSMANN** billed some of his time on the Russian Bank-1 allegations and related matters to Tech Executive-1.

<u>SUSSMANN Repeats His False Statement to Another Government Agency</u>

39.     In or about late 2016 and early 2017, Tech Executive-1, Originator-1, and Researcher-2 continued to compile additional information and data regarding the Russian Bank-1 allegations, and gathered other ~~purported~~ data allegedly involving Trump-related computer networks and Russia (collectively, the "Updated Allegations"). **SUSSMANN** would later convey these allegations to another U.S. government agency ("Agency-2"). In doing so, and as alleged below, **SUSSMANN** repeated, in substance, the same false statement he had made to the FBI General Counsel that he was not acting on behalf of a client.

*SUSSMANN Seeks a Meeting with Agency-2*

40.     In or about late December 2016, **SUSSMANN** contacted the General Counsel of Agency-2 to set up a meeting regarding the Updated Allegations, but the meeting did not go forward.

41.     Approximately one month later, **SUSSMANN** contacted a former employee of Agency-2 (the "Former Employee") in a further attempt to obtain a meeting at Agency-2. The Former Employee communicated with **SUSSMANN** on or about January 31, 2017, during which the following, in substance and in part, occurred:

a.     Contrary to his prior false representation to the FBI General Counsel and a representation he would subsequently make to Agency-2 (see below), **SUSSMANN** advised the Former Employee that he represented a "client."

b.     **SUSSMANN** summarized the Updated Allegations.

c.     **SUSSMANN** requested that the Former Employee assist him in obtaining a meeting with Agency-2 and stated that if Agency-2 was not interested, **SUSSMANN**'s client would likely go to Newspaper-1 with the allegations.

*SUSSMANN Repeats His False Statement to Agency-2*

42.     On or about February 9, 2017, **SUSSMANN** met with two Agency-2 employees ("Employee-1" and "Employee-2") at a location outside the District of Columbia. At the meeting, the following, in substance and in part, occurred;

a.     **SUSSMANN** stated falsely – as he previously had stated to the FBI General Counsel – that he was "not representing a particular client." In truth and in fact, and as **SUSSMAN** had acknowledged to the Former Employee just days earlier, **SUSSMANN** was representing a client.

b.     **SUSSMANN** disclosed that Law Firm-1 was active in representing several Democratic Party causes and officer-holders, including both the DNC and Hillary Clinton. **SUSSMANN** stated, however, that such work was unrelated to his reasons for contacting Agency-2.

24

c.      **SUSSMANN** discussed and described the Updated Allegations, including new details concerning the Russian Bank-1 allegations that he had not provided to the FBI General Counsel.

d.      **SUSSMANN** provided to the Agency-2 Employees (i) several white papers, and (ii) multiple data files containing ~~purported~~ DNS data, ranging from 2016 through early 2017.

43.     After the meeting with **SUSSMANN**, Employee-1 and Employee-2 drafted and revised a Memorandum for the Record that reflected the above-described statements by **SUSSMANN.**

<u>SUSSMANN Contradicts His False Statements in Testimony Before Congress</u>

44.     In or about December 2017, **SUSSMANN** testified under penalty of perjury before staffers of the House Permanent Select Committee on Intelligence, which was investigating Russian interference and other matters relating to the 2016 Presidential election. During his testimony, **SUSSMANN** directly contradicted his false statements to the FBI and Agency-2 that he was not acting on behalf of any client:

Q:      [] When you decided to engage the two principals, one, [the FBI General Counsel] in September, and the general counsel of [Agency-2] in December, you were doing that **on your own volition,** based on information another client provided you. Is that correct?

A:      **No.**

Q:      So what was — **so did your client direct you** to have those conversations?

A:      **Yes.**

Q:      Okay. And **your client also was witting** of you going to [redacted] in February to disclose the information that individual had provided you?

A:      **Yes**

[. . .]

Q:      Okay. I want to ask you, so you mentioned that **your client directed you** to have these engagements with the FBI and [redacted] and to disseminate the information that client provided you. Is that correct?

A:      Well, I apologize for the double negative. It isn't not correct, but when you say my client directed me, we had a conversation, as lawyers do with their clients, about client needs and objectives and the best course to take for a client. And so it may have been a decision that we came to together. I mean, I don't want to imply that I was sort of directed to do something against my better judgment, or that we were in any sort of conflict, but this was -- **I think it's most accurate to say it was done on behalf of my client.**

(emphasis added).

## <u>COUNT ONE</u>

45.     Paragraphs 1 to 44 are incorporated by reference.

46.     On or about September 19, 2016, within the District of Columbia, **MICHAEL A. SUSSMANN**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about September 19, 2016, the defendant stated to the General Counsel of the FBI that he was not acting on behalf of any client in conveying particular allegations concerning a Presidential candidate, when in truth, and in fact, and as the defendant well knew, he was acting on behalf of specific clients, namely, Tech Executive-1 and the Clinton Campaign.

(In violation of Title 18, United States Code, Section 1001(a)(2))