**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Case No. 21-582 (CRC)** |
| | : | |
| **MICHAEL A. SUSSMANN,** | : | |
| | : | |
| **Defendant.** | : | |


### THE GOVERNMENT'S MOTIONS *IN LIMINE*

The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully moves *in limine* for the admission and exclusion of certain evidence at trial. Specifically, the Government moves to (i) admit witnesses' contemporaneous notes of conversations with the FBI General Counsel, (ii) admit emails referenced in the Indictment and other, similar emails, (iii) admit certain acts and statements (including the defendant's February 2017 meeting with a government agency, his December 2017 Congressional testimony, and his former employer's October 2018 statements to the media) as direct evidence or, alternatively, pursuant to Federal Rule of Evidence 404(b), (iv) exclude evidence and preclude argument concerning allegations of political bias on the part of the Special Counsel, and (v) admit an October 31, 2016 tweet by the Clinton Campaign.[1]   For reasons stated below, the Government submits that the motions should be granted.

---

[1] Currently, the Government does not know what particular defenses counsel plans to mount at trial. While it is plain from the defendant's motion to dismiss that he plans to make a materiality defense, the defendant may choose to raise other theories of defense as well. Accordingly, the Government's motions *in limine* here are intended to address evidentiary issues that might arise as part of various possible defense theories.

## FACTUAL BACKGROUND

The defendant is charged in a one-count indictment with making a materially false statement to an FBI official, in violation of Title 18, United States Code, Section 1001.  As set forth in the Indictment, on September 19, 2016 – less than two months before the 2016 U.S. Presidential election – the defendant, a lawyer at a large international law firm ("Law Firm-1") that was then serving as counsel to the Clinton Campaign, met with the FBI General Counsel at FBI Headquarters in Washington, D.C. The defendant provided the FBI General Counsel with purported data and "white papers" that allegedly demonstrated a covert communications channel between the Trump Organization and a Russia-based bank ("Russian Bank-1").  The Indictment alleges that the defendant lied in that meeting, falsely stating to the General Counsel that he was not providing the allegations to the FBI on behalf of any client.  In fact, the defendant had assembled and conveyed the allegations to the FBI on behalf of at least two specific clients, including (i) a technology executive ("Tech Executive-1") at a U.S.-based Internet company ("Internet Company-1"), and (ii) the Clinton Campaign.

Indeed, on September 18, 2016 at 7:24 p.m., *i.e.*, the night before the defendant met with the General Counsel, the defendant conveyed the same lie in writing and sent the following text message to the General Counsel's personal cellphone:

> Jim – it's Michael Sussmann.  I have something time-sensitive (and sensitive) I need to discuss.  Do you have availibilty for a short meeting tomorrow?  ***I'm coming on my own – not on behalf of a client or company – want to help the Bureau.***  Thanks.  (emphasis added).

The FBI General Counsel responded: "Ok.  I will find a time.  What might work for you?"  To which the defendant replied: "Any time but lunchtime – you name it."

The defendant's billing records reflect that the defendant repeatedly billed the Clinton Campaign for his work on the Russian Bank-1 allegations.  In compiling and disseminating these

2

allegations, the defendant and Tech Executive-1 also had met and communicated with another law partner at Law Firm-1 who was then serving as General Counsel to the Clinton Campaign ("Campaign Lawyer-1").

The Indictment also alleges that, beginning in approximately July 2016, Tech Executive-1 had worked with the defendant, a U.S. investigative firm retained by Law Firm-1 on behalf of the Clinton Campaign (the "U.S. Investigative Firm"), numerous cyber researchers, and employees at multiple Internet companies to assemble the purported data and white papers.  In connection with these efforts, Tech Executive-1 exploited his access to non-public and/or proprietary Internet data. Tech Executive-1 also enlisted the assistance of researchers at a U.S.-based university ("University-1") who were receiving and analyzing large amounts of Internet data in connection with a pending federal government cybersecurity research contract.  Tech Executive-1 tasked these researchers to mine Internet data to establish "an inference" and "narrative" tying then-candidate Trump to Russia.  In doing so, Tech Executive-1 indicated that he was seeking to please certain "VIPs," referring to individuals at Law Firm-1 and the Clinton Campaign.

The Government's evidence at trial will also establish that among the Internet data Tech Executive-1 and his associates exploited was domain name system ("DNS") Internet traffic pertaining to (i) a particular healthcare provider ("Healthcare Company-1"), (ii) Trump Tower, (iii) Donald Trump's Central Park West apartment building, and (iv) the Executive Office of the President of the United States ("EOP").

The Indictment further details that on February 9, 2017, the defendant provided an updated set of allegations – including the Russian Bank-1 data and additional allegations relating to Trump – to a second agency of the U.S. government ("Agency-2").  The Government's evidence at trial will establish that these additional allegations relied, in part, on the purported DNS traffic that

Tech Executive-1 and others had assembled pertaining to Trump Tower, Donald Trump's New York City apartment building, the EOP, and Healthcare Company-1. In his meeting with Agency-2, the defendant provided data which he claimed reflected purportedly suspicious DNS lookups by these entities of internet protocol ("IP") addresses affiliated with a Russian mobile phone provider ("Russian Phone Provider-1"). The defendant further claimed that these lookups demonstrated that Trump and/or his associates were using a type of Russian-made wireless phone in the vicinity of the White House and other locations.

In his meeting with Agency-2 employees, the defendant also made a substantially similar false statement as he had made to the FBI General Counsel. In particular, the defendant asserted that he was not representing a particular client in conveying the above allegations. In truth and in fact, the defendant was continuing to represent at least Tech Executive-1– a fact the defendant subsequently acknowledged under oath in December 2017 testimony before Congress (without identifying the client by name).[2]

## ARGUMENT

**I.     Witnesses' Notes of Conversations with the FBI General Counsel are Admissible as Prior Consistent Statements and Past Recollections Recorded**

### A. Factual Background

On September 19, 2016, soon after he met with the defendant, the FBI General Counsel spoke with the then-FBI Assistant Director for Counterintelligence (the "Assistant Director") and with one of his Deputy General Counsels (the "Deputy General Counsel").[3] In communicating with these officials, the General Counsel relayed the details of his meeting with the defendant,

---

[2] By February 9, 2017, the Clinton Campaign for all intents and purposes no longer existed.

[3] Given the passage of time and lack of recollection by these witnesses, it is unclear whether the General Counsel spoke with these witnesses separately or at the same time.

including defendant's specific representation that he was not there on behalf of any client.  Both

the Assistant Director and the Deputy General Counsel took contemporaneous notes.   The

Assistant Director wrote the following in his FBI notebook, which stated, among other things,

"said not doing this for any client":



Similarly, the Deputy General Counsel took the following notes, which stated, in part, "No specific

client but group of cyber academics talked w/ him about research":

### B.  Applicable Law

*Prior Consistent Statements*

Hearsay—a statement made other than at a hearing or trial in which the declarant is testifying and which a party offers for the truth of the matter asserted—is generally inadmissible. Fed. R. Evid. 801(c).  However, a prior statement is "not hearsay" if the declarant testifies, is subject to cross-examination about the statement, and the statement "is consistent with the declarant's testimony and is offered. . . to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying," or to "rehabilitate the declarant's credibility as a witness when attacked on another ground."  Fed. R Evid. 801(d)(1)(B)(i)-(ii). To be admitted, a prior consistent statement offered under sub-provision (d)(1)(B)(ii) of this Rule must have been made "before the charged recent fabrication or improper influence or motive." *Tome v. United States*, 513 U.S. 150, 167 (1995) (interpreting prior version of Fed. R. Evid. 801(d)(1)(B)).

Admissibility of a prior consistent statement is typically triggered by impeachment during cross-examination of the declarant-witness, thus enabling the sponsoring party to present evidence of the prior consistent statement on re-direct.  But the necessary impeachment can also occur earlier in the trial, even as early as during the opposing party's opening statement, which then permits the sponsoring party to elicit evidence of a prior consistent statement during direct examination.  *United States v. Foster*, 652 F.3d 776, 787 (7th Cir. 2011) (holding trial judge properly admitted evidence of declarant-witness's prior consistent statement during direct examination by prosecution when the defense "clearly implied in [its] opening statement that [the witness] would lie about [the defendant's] involvement in the robbery in order to curry favor with the government"), *cert. denied*, 566 U.S. 1029 (2012); *see also United States v. O'Connor*, 650 F. 3d 839, 862-63 (2d Cir. 2011) (noting defendant-appellants' attacks on victim's credibility "had

begun. . . in their opening statements"), *cert. denied*, 565 U.S. 1148 (2012); *United States v. Belfast*, 611 F. 3d 783, 817 (11th Cir. 2010) (same), *cert. denied*, 562 U.S. 1236 (2011).  All that is required for impeachment to trigger the admissibility of a prior consistent statement is "a suggestion that the [declarant-]witness consciously altered his testimony."  *United States v. Casoni*, 950 F. 2d 893, 903-04 (3d Cir. 1991).

As noted above, under sub-provision (d)(1)(B)(ii) of Rule 801, a prior consistent statement of a declarant-witness is also "not hearsay" when "offered to rehabilitate the declarant's credibility as a witness when attacked on another ground," *i.e.*, on a ground other than that the witness recently fabricated his testimony or that the witness acted from a recent improper influence or motive.  Fed. R. Evid. 801(d)(B)(ii).  According to the Advisory Committee Notes, this provision, added in 2014, "extend[s] substantive effect to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency or faulty memory."  Courts appear to have uniformly held, as the Advisory Committee Note suggests, that the new provision allows for the admission of a declarant witness's prior consistent statement when the testimony is challenged on the ground of faulty memory, without regard to when the prior consistent statement was made.  *United States v. Flores*, 945 F. 3d 687, 704-06 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 375 (2020); *United States v. Cox*, 871 F. 3d 479, 487 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 754 (2018).

### *Past Recollection Recorded*

Certain notes, summaries, memoranda, or other records written by a person to document their observations or impressions may be admitted as past recollection recorded under Federal Rule of Evidence 803(5).  *See, e.g.*, *U.S. v. Orm Hieng*, 679 F. 3d 1131, 1143 (9th Cir. 2012); *U.S. v. Green*, 258 F. 3d 683, 689 (7th Cir. 2001).  To satisfy this hearsay exception, the proponent must

establish that (1) the record is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (2) the record was made or adopted by the witness when the matter was fresh in the witness's memory; and (3) the record accurately reflects the witness's knowledge. Fed. R. Evid. 803(5). For a statement to fall within this exception, the proponent must demonstrate that the witness-declarant's memory has faded so that he is no longer able "to testify fully and accurately." Fed. R. Evid. 803(5); *U.S. v. Jones*, 601 F. 3d 1247, 1262 (11th Cir. 2010) (finding that the government sufficiently demonstrated, based on the witness's answers, that the witness lacked "clear and distinct recollection" regarding her interview with law enforcement agent). If admitted, the record may be read into evidence but may not itself be received as an exhibit unless offered by opposing counsel. *See* Fed. R. Evid. 803(5).

### C. Discussion

The Government moves to admit the Assistant Director's and Deputy General Counsel's contemporaneous handwritten notes on two grounds: as prior consistent statements by the General Counsel and as past recorded recollection as to these witnesses. As discussed below, the Government anticipates that one of the principal defense strategies at trial will be to attack the General Counsel's credibility and attempt to impeach him on cross-examination with prior testimony. For example, the defendant will likely try to impeach the General Counsel on cross examination by suggesting that he knew that the defendant represented political clients and was either mistaken in his recollection of what the defendant said in the meeting or is somehow biased or fabricating. Accordingly, if the defense raises such impeachment arguments in their opening statements or on cross-examination of the General Counsel, both witnesses' notes would be admissible as prior consistent statements made to these witnesses by the former General Counsel. More specifically, and as can be seen from the records themselves, both sets of notes are squarely

consistent with what the Government expects the General Counsel will testify at trial—namely, that the defendant affirmatively told him that he was not bringing the information to the FBI on behalf of any client.[4]   The notes also contain additional statements that will be consistent with the General Counsel's testimony at trial, such as the defendant's representation that he had been "approached" by cyber experts, and that the data involved a "secret" connection between a Trump company server and Russian Bank-1.   The notes will therefore be admissible to rebut any impeachment or argument about fabrication, mis-recollection, or misunderstanding about whether the defendant was there on behalf of any client.[5]

In addition, the Government expects that both of the note-takers' testimony at trial will establish a sound basis for the admission of the notes as "past recollection recorded."   First, both sets of notes memorialize details from the General Counsel's account of that meeting on the very same day it took place.   In fact, the Government expects the General Counsel will testify that he believes he spoke to these witnesses soon after the meeting took place, when the details were fresh in his mind.   The Government's evidence will further establish that both witnesses took these notes contemporaneously with the General Counsel's reporting of the meeting to them.   Finally, the notes would be admissible as past recollections recorded of both witnesses because neither witness currently recalls these matters "well enough to testify fully and accurately."   Fed. R. Evid. 803(5).

---

[4] In addition, this statement would also be admissible to show the General Counsel's "state of mind," as his repeating the defendant's claim he was not there for a client was of sufficient importance to the General Counsel that he relayed it to these other FBI officials.   Fed R. Evid. 803(3).

[5] The Assistant Director's notes further reflect that the General Counsel understood from the defendant that the information the defendant was providing to the FBI—that a "secret" Trump server was communicating with Russian Bank-1—would be the subject of an upcoming news article that Friday (and another article in several weeks). This portion of the notes is also not hearsay because it is admissible to explain the General Counsel's and the FBI's course of conduct in contacting the relevant news organization to request they delay publication of the story.

However, both witnesses will testify that their notes accurately reflect what the General Counsel told them at that time. Accordingly, these notes meet the Rule's requirement that the relevant records must be made while the information is fresh in a witness's mind and accurately reflect their knowledge at the time. Accordingly, the notes should be admitted under Federal Rule of Evidence 803(5).

## II. The Court Should Admit the Emails Cited in the Indictment and Other, Similar Emails

The Government next moves to admit at trial the emails cited in the Indictment and other similar communications (i) between Tech Executive-1 and various researchers and Internet company employees, and (ii) between and among the U.S. Investigative Firm (which, as noted above, Law Firm-1 hired in 2016 on behalf of the Clinton Campaign) and various third parties, including the media.

As set forth below, these communications are highly probative because they refute the defendant's alleged statement to the FBI that he did not provide the Russian Bank-1 allegations to the FBI "on behalf of any client." In particular, these communications establish that the defendant's clients – Tech Executive-1, the Clinton Campaign, and their agents – communicated and coordinated with each other and with third parties regarding the very same allegations that the defendant provided to the FBI, thus evidencing their attorney-client relationships surrounding the Russian Bank-1 allegations. Such evidence is probative and central to the Government's case since the majority of communications between the defendant and his clients have been redacted or withheld due to asserted attorney-client privilege. Fed. R. Evid. 401. In addition, the aforementioned communications demonstrate the materiality of the defendant's lie insofar as they reveal the political origins and purposes for this work. And those political origins are especially

probative here because they provided a motive for the defendant to conceal his clients' involvement in these matters. *Id.*

In addition to their probity, these non-privileged communications are also admissible and/or not hearsay because (i) the Government does not intend to offer the vast majority of the statements reflected in these communications for their truth, *see* Fed R. Evid. 802(c)(2), and (ii) regardless of whether they are being offered for the truth, the relevant communications are nevertheless admissible as co-conspirator statements made in furtherance of a joint venture. *See* Fed. R. Evid. 801(d)(2)(E).

### A. Applicable Law

Again, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Statements are not hearsay if they are not "offered . . . to prove the truth of the matter asserted." *Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 83 (D.D.C. 2011) (citing MCCORMICK ON EVID. § 249 (6th ed. 2009) ("If [a] statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay.")). For example, statements are non-hearsay if they shed light on an individual's "intent, motive, or state of mind, help to explain his future conduct, [or] serve to refute any possibility of mistake or misunderstanding." *United States v. Safavian*, 435 F. Supp. 2d 36, 45–46 (D.D.C. 2006) (emails received by defendant were "admissible because they might help to explain [defendant's] motive and intent at the time he undertook certain actions"). In addition, "directives," taskings, commands, or other "verbal acts" are generally not hearsay because they do not constitute assertions. *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 42 (D.D.C. 2003); *see also Michigan First Credit Union v. Cumis Ins. Soc., Inc.,* 641 F. 3d 240, 251 (6th Cir. 2011) (holding that a "command" was not hearsay because it was "a verbal act without truth value"); *United States*

*v. Rodriguez–Lopez*, 565 F. 3d 312, 314–15 (6th Cir. 2009) (holding that "commands" are not hearsay because they are not "assertive speech").

Rule 801(d)(ii)(C) authorizes the admission of an out-of-court statement against a particular party when the statement "was made by a person whom the party authorized to make a statement on the subject." In addition, Rule 801(d)(2)(E) authorizes the admission of an out-of-court statement "by a co-conspirator of a party during the course and in furtherance of the conspiracy." Where a defendant objects to such an admission, however, the district court must find by a preponderance of the evidence that a conspiracy existed and that the defendant and declarant were members of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). A court can preliminarily admit hearsay statements of co-conspirators, subject to connection through proof of conspiracy. *See United States v. Jackson*, 627 F. 2d 1198, 1218 (D.C. Cir. 1980) (approving procedure). To admit a statement under Rule 801(d)(2)(E), the court must find (i) that there was a conspiracy; (ii) that its members included the declarant and the party against whom the statement is offered; and (iii) that the statement was made during the course of and in furtherance of the conspiracy. *Bourjaily* 483 U.S. at 175.

Importantly, although Rule 801(d)(2)(E) refers to "conspiracy" and "co-conspirators," the D.C. Circuit has expressly held that "the doctrine is not limited to unlawful combinations." *United States v. Weisz*, 718 F. 2d 413, 433 (D.C. Cir. 1983). "Rather, the rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials, 'embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are . . . admissible against the others, if made in furtherance of the common goal.'" *United States v. Gewin*, 471 F. 3d 197, 201–02 (D.C. Cir. 2006) (citing *Weisz*, 718 F. 2d at 433)). In quoting and citing the 1974 Senate Advisory Committee note to Rule

801(d)(2)(E), the D.C. Circuit has also explained that "[Rule 801(d)(2)(E)] was meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purpose of this [R]ule even though no conspiracy has been charged." *Weisz*, 718 F. 2d at 433 (citations and quotation marks omitted); *United States v. Owens*, 484 U.S. 554, 562 (1988) (invoking Advisory Committee note in interpreting Federal Rules of Evidence).

At least six other Circuits have similarly held that the objective of a joint venture for these purposes need not be criminal. *United States v. Russo*, 302 F. 3d 37, 45 (2d Cir. 2002) ("[T]he objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all"); *Government of the Virgin Islands v. Brathwaite,* 782 F. 2d 399, 403 (3d Cir. 1986) (same); *United States v. Nelson,* 732 F.3d 504, 516 (5th Cir. 2013) (same); *United States v. Kelley,* 864 F.2d 569, 573 (7th Cir.) (same); *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1984) (same); *United States v. Layton,* 855 F.2d 1388, 1400 (9th Cir. 1988) (same), *cert. denied,* 489 U.S. 1046 (1989), overruled on other grounds by *Guam v.  Ignacio,* 10 F.3d 608 (9th Cir. 1993); *United States v. Saimiento-Rozo*, 676 F.2d 146, 149-50 (5th Cir. 1982) (same).  That is because "[c]onspiracy as an evidentiary rule differs from conspiracy as a crime.  The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law." *Coe*, 718 F. 2d at 835.

### B.  Discussion

Relevant communications between and among Tech Executive-1, various researchers and internet company employees, and certain members of the U.S. Investigative Firm – examples of which are described in further detail below – are all admissible because they are not being offered for their truth and/or reflect statements made in furtherance of a joint venture between and among the defendant, Tech Executive-1, and representatives or agents of the Clinton Campaign.

*Joint Venture Involving the Defendant, Tech Executive-1, and the Clinton Campaign*

As an initial matter, the Government expects that the evidence at trial will show that beginning in late July/early August 2016, the defendant, Tech Executive-1, and agents of the Clinton Campaign were "acting in concert toward a common goal," *Gewin*, 471 F. 3d at 201–02, namely, the goal of assembling and disseminating the Russian Bank-1 allegations and other derogatory information about Trump and his associates to the media and the U.S. government.

In particular, the evidence will show that in late July and early August, Tech Executive-1 commenced a project in coordination with the defendant and Law Firm-1 to support an "inference" and "narrative" tying Trump to Russia.  For example, calendar entries will show that on August 12, August 17, and August 19, 2016, Tech Executive-1 had meetings and/or conference calls with the defendant and the Clinton Campaign's General Counsel (*i.e.*, Campaign Lawyer-1).[6]  During or around that same time period, Tech Executive-1 began tasking his own employees and associates to mine and assemble internet data that would support an "inference" or "narrative" tying Trump to Russia. Tech Executive-1 expressly stated in emails that a purpose of this effort was to please these "VIPs," apparently referring to the defendant, Campaign Lawyer-1, and the Clinton Campaign.

Expected witness testimony, documents already in the public record, and other evidence to be offered at trial establish that these efforts amounted to a joint venture:

- For example, the Government expects that testimony at trial will establish that in approximately early-to-mid-August 2016, Tech Executive-1 called the CEO of a company in

---

[6] The Government anticipates that, if called as a witness, Campaign Lawyer-1 would testify that he does not recall how many calls/meetings took place with the defendant and Tech Executive-1 or the specifics of those calls/meetings.  Campaign Lawyer-1 believes, however, that he likely discussed the Russian Bank-1 allegations on one or more of these calls.

which he maintained an ownership interest (referred to in the Indictment as "Internet Company-2") and instructed the CEO to search data maintained by his company and another, affiliated company (referred to as "Internet Company-3") for information concerning the online activities of Trump and his associates.[7]  Tech Executive-1 stated to the CEO that he was working with a person at a firm in Washington, D.C. with close ties to Hillary Clinton campaign and the Democratic Party.  Tech Executive-1 also emailed to the CEO a document containing the physical addresses, email addresses, IP addresses and other personal information for various Trump associates, including some of these associates' spouses and family members (the "Trump Associates List").

- The Government expects that testimony at trial will reveal that the aforementioned CEO was highly uncomfortable with this task.  The CEO and others complied with the instructions, however, because Tech Executive-1 was a powerful figure at these companies.  The companies thereafter embarked on a data analysis/opposition research project concerning Trump and his associates, which they codenamed "Crimson Rhino."

- The evidence will show that during or around the same time period, Tech Executive-1 similarly tasked the person referred to in the Indictment as "Originator-1" and other researchers with opposition research regarding Trump.  Reflecting a common plan to commission such research, Tech Executive-1 emailed to these researchers the same Trump Associates List that he had provided to the aforementioned CEO.

- Testimony at trial will establish that among the individuals whom Tech Executive-1 and Originator-1 enlisted in this project were researchers at University-1 who were assigned to a then-pending federal cybersecurity contract with a U.S. government agency ("Agency-1").  At

---

[7] Internet Company-3, among other things, places or gains access to sensors on the Internet's infrastructure that allow it to collect large quantities of Internet domain name system ("DNS") traffic from around the globe, which it then sells.

the time, Tech Executive-1 was negotiating an agreement between his then-employer ("Internet Company-1") and University-1 to sell large amounts of internet data to the university for use under the Agency-1 contract.  The intended purpose of this agreement and University-1's sensitive work with Agency-1 was to gather and analyze internet metadata in order to detect malicious cyberattacks.  As set forth in the Indictment, however, Tech Executive-1 and Originator-1 worked with two of these University-1 researchers ("Researcher-1" and "Researcher-2") to mine internet data for the purpose of assisting the aforementioned opposition research.

- As part of these efforts, the defendant and Law Firm-1 began facilitating collaboration and sharing of information between and among Tech Executive-1, the U.S. Investigative Firm, and the Clinton Campaign.  For example, email records reflect that in August 2016, the defendant began exchanging emails with personnel from the U.S. Investigative Firm and Campaign Lawyer-1 containing the subject line, "connecting you all by email."  (The contents of these emails have been redacted and withheld pursuant to asserted attorney-client privilege.)

- Later that month, Tech Executive-1 also began communicating with personnel from the U.S. Investigative Firm. (The U.S. Investigative Firm has similarly withheld the contents of such communications as subject to attorney-client privilege.)

- Email records to be offered at trial and described in further detail below reflect that in the ensuing months, employees of the U.S. Investigative Firm communicated with reporters regarding the Russian Bank-1 allegations and urged them to publish articles regarding the Russian Bank-1 allegations.

- Publicly-available evidence also reflects that the defendant took further steps to integrate the Russian Bank-1-related allegations into the Clinton Campaign's opposition research efforts.  For example, in the summer of 2016, the defendant met in Law Firm-1's offices with the

author of a now well-known dossier regarding Trump (referred to in the Indictment as "U.K. Person-1") and personnel from the U.S. Investigative Firm.  U.K. Person-1 had at the time been retained by the U.S. Investigative Firm to conduct opposition research for the Clinton Campaign. Although the defendant testified before Congress that the purpose of the meeting was to "vet" U.K. Person-1 for the Clinton Campaign given the defendant's knowledge of national security matters, U.K. Person-1 has testified under oath in the United Kingdom that, during the meeting, the defendant told him at the meeting about the Russian Bank-1 allegations.  U.K. Person-1 further testified that after the meeting, personnel from the U.S. Investigative Firm tasked U.K. Person-1 to research and produce intelligence reports about Russian Bank-1, which he did.

- According to U.S. government records and public information, U.K. Person-1 also later provided the substance of the Russian Bank-1 allegations to personnel from the U.S. State Department, and the U.S. Investigative Firm provided such information to an official at the U.S. Department of Justice.

- Emails, billing records, and testimonial evidence to be offered at trial reflect that during approximately the same time period – and *before* approaching the FBI about these matters – the defendant provided the Russian Bank-1 allegations to a reporter from a major U.S. newspaper.

- As set forth in the Indictment, law firm billing records reflect that after providing the Russian Bank-1 allegations to the media, the defendant apprised Campaign Lawyer-1 of his efforts who, in turn, appears to have communicated with the Clinton Campaign's senior leadership concerning these issues.

- Emails and billing records will further show that, during the same time period, the defendant and Tech Executive-1 worked together on drafting a "white paper" that summarized the

Russian Bank-1 allegations, which the defendant provided to the FBI during his September 19, 2016 meeting.  The defendant billed time drafting this paper to the Clinton Campaign.  As described in further detail below, the evidence also will establish that Tech Executive-1 also solicited input on this white paper from the aforementioned University-1 researchers.

- The evidence will show that the defendant also incorporated at least one of the aforementioned researchers into his efforts to disseminate the Russian Bank-1 allegations to the media for the benefit of the Clinton Campaign.  For example, emails reflect that on September 17, 2016 – two days before his meeting with the FBI – the defendant emailed Researcher-2, stating that "We have a mutual acquaintance," in context apparently referring to Tech Executive-1.  The Government expects that if called as a witness, Researcher-2 would testify that soon thereafter, the defendant spoke with Researcher-2.  Researcher-2 would further testify that in their conversation, Researcher-2 asked the defendant whether the data underlying the Russian Bank-2 allegations had been lawfully collected and/or used.  The defendant assured Researcher-2 that it had, thus reflecting the defendant's apparent knowledge concerning the data's origins.  Researcher-2 would also testify that the defendant asked Researcher-2 to speak with the media about the Russian Bank-1 allegations, which Researcher-2 subsequently did.

- At his September 19, 2016 meeting with the FBI General Counsel, the defendant provided three white papers to the FBI, which were drafted, respectively, by (i) the defendant, Tech Executive-1, and possibly others, (ii) Researcher-2, and (iii) the U.S. Investigative Firm (which, as noted above, the evidence will show was being paid by the Clinton Campaign at the time of the defendant's meeting).

- On October 31, 2016, the aforementioned reporter and another media outlet published articles regarding the Russian Bank-1 allegations.  Within hours of these articles, the

Clinton Campaign issued tweets and public statements concerning the purported existence of a secret communications channel involving the Trump Organization and Russian Bank-1.

- Finally, the evidence of a joint venture or conspiracy will establish that in November 2016, soon after the Presidential election, Tech Executive-1 emailed a colleague, stating, "I was tentatively offered the top [cybersecurity] job by the Democrats when it looked like they'd win." Ind. ¶ 15.

In sum, the above evidence, public information, and expected testimony clearly establishes by a preponderance of the evidence that the defendant and Tech Executive-1 worked in concert with each other and with agents of the Clinton Campaign to research and disseminate the Russian Bank-1 allegations. Accordingly, these parties acted as "joint venturer[s]" and therefore should be "considered as [] co-conspirator[s] for the purpose of [Rule 801(d)(2)(E) even though no conspiracy has been charged." *Weisz*, 718 F. 2d at 433.

### Emails Involving Tech Executive-1 and Internet Researchers

Given this backdrop, emails and communications on these topics between and among Tech Executive-1, employees of various Internet companies, and/or the aforementioned researchers are admissible under the joint venture doctrine pursuant to Rule 801(d)(2)(E) and under other, applicable Rules of Evidence.

For example, on or about August 20, Originator-1 sent the following lengthy email, which is quoted in part at Paragraph 23(h) of the Indictment:

> NOTE: The Russian money launderers, sometimes assisted by Americans ***like those you see listed in the PDF [Tech Executive-1] just shared [the Trump Associates List],*** and others you'll see in [name redacted]'s next document .... Cyprus is one of the places they like. That's where [Russian Bank-1]-Forex is organized. Choose .com or .ru when studying their domains ... and remember we don't need a russian IP, domain or company for money to flow from Russians to Trump.

19

[Russian Bank-1]-* has massive tentacles in so many countries including the USA.

***Regarding this whole project, my opinion is that from DNS all we could gain even in the best case is an *inference*.***

I have not the slightest doubt that illegal money and relationships exist between pro-Russian and pro-Trump, meaning actual people very close to Trump if not himself. And by Putin's traditional style, people Putin controls, but not himself. He controls the oligarchs and they control massive fortunes and cross nearly all major industries in a vast number of countries.

***But even if we found what [Tech Executive-1] asks us to find in DNS we don't see the money flow, and we don't see the content of some message saying "send me the money here" etc.***

***I could fill out a sales form on two websites, faking the other company's email address in each form, and cause them to appear to communicate with each other in DNS. (And other ways I can think of and I feel sure [Researcher-2] can think of.)***

***IF [Tech Executive-1] can take the *inference* we gain through this team exercise ... and cause someone to apply more useful tools of more useful observation or study or questioning ... then work to develop even an inference may be worthwhile.***

***That is how I understood the task. Because [Tech Executive-1] didn't tell me more context or specific things.*** What [name redacted] has been digging up is going to wind up being significant. It's just not the case that you can rest assured that Hil[l]ary's opposition research and whatever professional govts and investigative journalists are also digging ... they just don't all come up with the same things or interpret them the same way. But if you find any benefit in what she has done or is doing, you need to say so, to encourage her. Because we are both killing ourselves here, every day for weeks.

I'm on the verge of something interesting with hosts that talk to the list of Trump dirty advisor domain resources, and hosts that talk to [Russian Bank-1]-* domains. Take even my start on this and you have Tehran and a set of Russian banks they talk to. I absolutely do not assume that money is passing thru Tehran to Trump. It's just one of many *inferences* I'm looking at.

> SAME IRANIAN IP THAT TALKS TO SOME TRUMP ADVISORS, also talks to:
>
> [list of domains redacted]
>
> (Capitals don't mean SUPER SIGNIFICANT it was just a heading.)
>
> Many of the IPs we have to work with are quite MIXED in purpose, meaning that a lot of work is needed to WINNOW down and then you will still only be left in most cases with an *inference* not a certainty.
>
> Trump/ advisor domains I've been using. ***These include ALL from [Tech Executive-1's] PDF [the Trump Associate's List]*** plus more from [name redacted]'s work:
>
> [list of domains redacted]
>
> [RUSSIAN BANK-1] DOMAINS
>
> [list of domains redacted]
>
> More needs to be added to both lists.

(emphasis added).

The Government respectfully submits that none of the above email – or other, similar emails – constitutes inadmissible hearsay.  As an initial matter, such communications are clearly probative separate and apart from their specific assertions because they reflect the fact that Tech Executive-1's tasking triggered and/or affected particular research efforts that ultimately culminated in the defendant's September 2016 meeting with the FBI General Counsel. Accordingly, the Government does not seek to offer any of this email for its truth (*i.e.*, its analytical hypotheses, assertions, or inferences) but, rather, to establish the factual context in which the email arose and the effects it had on the recipients, including to explain the defendant's "future conduct." *Safavian*, 435 F. Supp. 2d at 45–46.  More specifically, the Government does not seek to prove whether Originator-1 and the email's recipients "s[aw] the money flow," whether Russian Bank-

1 has "massive tentacles" in many countries, or whether or not the researchers could in fact "fak[e]" internet data and cause the appearance of communications.  Rather, the Government intends to offer this email to show that the technical issues and allegations discussed therein are *the very same issues* that the defendant discussed with Tech Executive-1, Campaign Lawyer-1, and the FBI, thereby proving the existence of the defendant's attorney-client relationships on these issues.

Moreover, even if this email were offered for the truth of its contents, it would still be admissible because Originator-1 sent the message in furtherance of the above-described joint venture to gather and disseminate purportedly derogatory internet data regarding a Presidential candidate.  *Weisz*, 718 F. 2d at 433.

Tech Executive-1's response to this email, which is quoted in part at Paragraph 23(i) of the Indictment, is similarly admissible.  It states:

> *So the task is indeed broad.*
>
> *Being able to provide evidence of \*anything\* that shows an attempt to behave badly in relation to this, the VIPs would be happy.*
>
> *They're looking for a true story that could be used as the basis for closer examination.*
>
> *So the prior hypothesis was all that they needed: A mailsever dedicated or related to trump configured with an ACL, and with traffic almost exclusively with [Russian Bank-1] was sufficient to do the job.* Even though there was no evidence of financial exchange, there was clear communication.
>
> Trump has claimed he and his company have had NO dealings with .ru other than the failed Casino, and the Miss universe pageant. He claims absolutely NO interaction with any financial institutions.
>
> *So any potential like that would be jackpot.*

(emphasis added).   As with the prior email, the Government does not seek to offer this correspondence for the truth of its specific assertions, *i.e.*, that Trump had denied having business with Russia; that "the VIPs" would be "happy" with particular information; or that such VIPs were looking for a "true story."   Rather, the Government intends to offer this email for the different purpose of demonstrating that the issues and efforts reflected therein related directly to the defendant's subsequent meeting with the FBI and therefore tend to prove the existence of the attorney-client relationships about which he lied.   Accordingly, the email is not hearsay.   *See Gibbs v. State Farm Mutual Insurance Co.,* 544 F. 2d 423, 428 (9th Cir. 1976) (letter informing the insurer's attorney that father of child injured in accident "would have been happy" with a particular settlement was properly admitted to show that insurer had received this information and did not constitute hearsay).   In addition, much of the email's content reflects instructions or commands from Tech Executive-1 ("the task is indeed broad"), which, as noted above, constitute "verbal acts" that are not hearsay. *Mitchell*, 274 F. Supp.  2d at 42.  Other portions of the email reflect statements of Tech Executive-1's subjective beliefs or perceptions ("any potential like that would be jackpot"), which also do not constitute hearsay because the Government does not seek to prove or endorse their truth.   In any event, the Court could properly deal with this concern by issuing an appropriate limiting instruction.

To the extent it could be argued that the Government seeks to prove the truth of the email's assertion that the "task" Tech Executive-1 issued was "indeed broad," or its suggestion that this task originated with certain "VIPs" (*i.e.*, Law Firm-1 and the Clinton Campaign), such communications are still admissible as co-conspirator statements.   Indeed, they reflect that Tech Executive-1 was acting in furtherance of the joint venture's goal of assembling and disseminating purportedly derogatory information about Trump's and his associates' internet activities.

Accordingly, the email – and other emails that reflect efforts to create a "narrative" or "inference" connecting Trump to Russia – are admissible in their entirety as reflecting co-conspirator statements.[8] *Gewin*, 471 F. 3d at 201–02.

Similarly, admissible are emails from the same time period which reflect that Tech Executive-1 (i) proceeded to disseminate the Russian Bank-1 allegations despite having previously expressed, and received others' expressions of, serious doubts and differing views about their strength, and (ii) purposefully crafted a written analysis to conceal the allegations' potential weaknesses. These emails constitute even stronger evidence of a joint venture or conspiracy. For example, and as partially set forth in the Indictment:

- On August 21, 2016, Tech Executive-1 urged the researchers to push forward with additional research concerning Trump, which he stated would "give the base of a very useful narrative." Ind. ¶ 23(j). Later in the same email, Tech Executive-1 expressed his own belief that the "trump-email.com" domain was "a red herring," noting that the host for that domain "is a legitimate valid [customer relationship management] company." Tech Executive-1 therefore concluded that "we can ignore it, together with others that seem to be part of the marketing world." *Id.*[9]

---

[8] Such statements are also admissible on the alternative grounds that they satisfy Rule 801(d)(ii)(C), which provides that statements are not hearsay if they are "made by a person whom the party [against whom the statement is being offered] authorized to make a statement on the subject." Because Tech Executive-1' reference to "VIPs" refers to the defendant (and others), it reasonable to conclude that the defendant "authorized" these taskings and certain statements reflected in this email.

[9] The Government expects that if called as a witness, Researcher-2 would testify that he (Researcher-2) subsequently convinced Tech Executive-1 of the plausibility of the Russian Bank-1 allegations based on a review of additional data.

- On August 22, 2016, Researcher-1 expressed his own view in an email that Tech Executive-1's research project was flawed, stating in part:

> Lets for a moment think of the best case scenario, where we are able to show (somehow) that DNS (MX or otherwise) communication exists between Trump and R[ussia]. ***How do we plan to defend against the criticism that this is not spoofed UDP traffic we are observing?*** There is no answer to that.  Lets assume again that they are not smart enough to refute our "best case" scenario. [Tech Executive-1], you do realize that we will have to expose every trick we have in our bag to even make a very weak association?  Let[']s all reflect upon that for a moment.  [S]orry folks, but unless we get combine netflow and DNS traffic collected at critical points between suspect organizations, ***we cannot technically make any claims that would fly public scrutiny.*** This is not a typical attribution problem when the two parties (defenders vs. attackers) are clearly separated. In this case we will have not only the Trump folks trying to sho[o]t this down, but all the privacy freaks trying to come up with a crazy conspiracy theory on how we obtain the data.  Sorry to say this, we are nowhere close coming with a plan to attack this problem that will fly in the public domain. ***The only thing that drive us at this point is that we just do not like [Trump]. This will not fly in eyes of public scrutiny.   Folks, I am afraid we have tunnel vision.*** Time to regroup?"

Ind. ¶ 23(k) (emphasis added).

- On September 15, 2016, Tech Executive-1 solicited the researchers' views on the white paper he and the defendant had been drafting, and, in doing so, arguably implied that he was seeking to mislead non-DNS experts: "Please read as if you had no prior knowledge or involvement, and you were handed this document as a security expert (NOT a dns expert) and were asked: 'Is this plausible as an explanation?' NOT to be able to say that this is, without doubt, fact, but to merely be plausible. Do NOT spend more than a short while on this (If you spend more than an hour you have failed the assignment). Hopefully less. :)"  Ind. ¶ 24(e).

- On the same date, Researcher-1 replied, endorsing Tech Executive-1's approach: "A DNS expert would poke several holes to this hypothesis (primarily around visibility, about

which very smartly you do not talk about). That being said, I do not think even the top security (non-DNS) researchers can refute your statements. Nice!"  Ind. . ¶ 24(f).  (The Government expects Researcher-1 will testify at trial that he endorsed Tech Executive-1's approach of downplaying the paper's weaknesses because Tech Executive-1 was important to the success of the then-pending Agency-1 contract with University-1, and Researcher-1 therefore felt pressure to please Tech Executive-1.  Apart from this email, however, Researcher-1 consistently maintained that the Russian Bank-1 data did not support any definitive conclusions.)

- On September 15, 2016, Originator-1 responded to Tech Executive-1, stating, in part, that the paper's conclusion was "plausible" in the "narrow scope" defined by Tech Executive-1, and noting in part that: "if the whitepaper intends to say that there are communications between at least [Russian Bank-1] and Trump, which are being intentionally hidden by [Russian Bank-1] and Trump, I absolutely believe that is the case."

- Researcher-2 replied on the same date, stating in part, "I would preface the whitepaper by noting the criminal context of the inquiry.  .  .  .While I'm not aware of any EULA privacy rights Trump might expect, I expect they all vanish when his network is used for criminal purposes. (Want to bribe people? Use cash in envelopes, not ACH transfers.) So from an organizational point of view, this data collection is consistent with anti-cyber crime policies.  I'd be happy to help write/review more drafts, if I better understood the audience. (Hopefully the i[n]tended audience are officials who have subpoena powers, who can investigate the purpose the private VPN with [Russian Bank-1].  I believe this is at a threshold of probable cause for violation of Commerce Dept sanctions, FEC elections rules, and has releva[n]cy for the Bureau's Fancy Bear inquiry, etc._ I also have some graphs/animations of the Trump [] router, which I can clean

up and contribute. (They merely give a glimpse of aggregate volume, since we lack actual flows.) I'd need until the weekend."

     • On September 16, 2016, Originator-1 emailed these researchers, discussing, among other things, the draft white paper's allegation that there was a "TOR exit node" (*i.e.*, a node used for anonymized internet traffic) at a particular U.S.-based healthcare company ("Healthcare Company-1") that Russian Bank-1 purportedly had used to communicate with the Trump Organization:

> **[Researcher-2],** *You give your adversaries every courtesy, while your adversary advances with baseball bats.* It's certainly admirable, and I would expect nothing less of you. If everyone in America were as measured, fair and careful, what concerns could we ever have?  It would be easy for you or I to introduce doubt and my kind of scientific accuracy at points where people need to make a decision how to vote - or a decision about where to look for actions counter to our national interests.  Many people are not able to weigh the intricacies of probability or connection that you and I weigh regarding packet contents, protocols, src and dst.
>
> You can't sell KFC with the scientifically accurate statement that dead chicken parts are heated to 180 F for 6 minutes in a solution of triacylglycerols. You just say "Finger Lickin' Good". Both are true.
>
> *I have no reason to think that [Russian Bank-1] has a VPN somehow through mail1.trump-email.com.* That would suggest we are dealing with masterminds of the internet, at [Russian Bank-1], maybe [Healthcare Company-1/its owners], and Trump. It would be interesting to discover, fun to understand. It COULD be.  Instead of masterminds of internet protocols, I imagine we have ordinary thugs all around.
>
> I firmly believe that [Russian Bank-1/Healthcare Company-1]/ Trump are communicating with that server mail1.trump-email.com as an artifact of the processing.
>
> []
>
> *[Tech Executive-1's] carefully designed actions* provide the possibility of: 1. causing the adversaries to react. Stop using? Explain?  2. Getting more people with more resources to find out

the things that are unknown, whether those be NON-internet channels of connection between Trump, [Healthcare Company-1][owners of Healthcare Company-1], [Russian Bank-1] ... money flows, deals, God knows it could be [owners of Healthcare Company-1's] children married to Russians who run [Russian Bank-1]. Or like Researcher-2 shared, someone's wife vacationing with someone else's wife. I have no clue. These are things other people may look into, if they know a direction of interest to look. 3. Legal action to protect our country from people who act against our national interests.

***I don't care in the least whether I'm right or wrong about VPN from [Russian Bank-1], [TOR] from Russian Bank-1, or just SMTP artifact pointing to a 3-way connection. [Tech Executive-1] has carefully crafted a message that could work to accomplish the goals. Weakening that message in any way would in my opinion be a mistake.***

(emphasis added).

All of these communications are admissible and not hearsay because, as noted above, the Government does not intend to prove the truth of the various subjective opinions, views, or positions being expressed by these researchers.  The Government does not, for example, seek to prove the truth of the emails' assertions that the Russian Bank-1 allegations would not "fly in the face of public scrutiny;" that Trump and his associates were "ordinary thugs all around;" or that Originator-1 "firmly believe[ed]" that Russian Bank-1 was "communicating with th[e] server mail1.trump-email.com as an artifact of the processing."  Rather, the Government intends to offer these emails as proof that the Russian Bank-1 allegations arose and evolved in the context of a specific research project involving these academics and the defendant's alleged client, Tech Executive-1.  Accordingly, these emails are not hearsay.

Indeed, many of the emails' contents are relevant and not hearsay for the additional reason that they shed important light on the defendant's and Tech Executive-1's "intent, motive, or state of mind," and "help to explain their future conduct."  *Safavian*, 435 F. Supp. at 45–46.  In

particular, the mere fact that these emails (i) existed in written form *prior* to the defendant's September 19, 2016 meeting with the FBI and (ii) reflected instances of serious doubts about whether the Russian Bank-1 data might have been "spoofed," a "red herring," "wrong," or a product of "tunnel vision" or bias against Trump, provided Tech Executive-1 and the defendant with motive to conceal the origins and provenance of the Russian Bank-1 allegations from the FBI. In particular, a reasonable jury could infer from these and other facts that Tech Executive-1 made the defendant aware of these prior doubts and therefore supplied the defendant – as Tech Executive-1's representative – with a motive to conceal their client relationship from the FBI General Counsel.  A jury could similarly infer that even if Tech Executive-1 did not make the defendant aware of these communications, he nevertheless instructed the defendant to deny the existence of such a client relationship for the same reason (*i.e.*, to avoid the FBI's potential discovery of the doubts reflected in these prior discussions).

This is particularly true because one of the white papers that the defendant assisted Tech Executive-1 in drafting and then delivered to the FBI stated unambiguously that "[w]hile there may be *possible* explanations for the configurations of mail1.trumpemail.com and the [Healthcare Company-1] TOR node, there is no *plausible* explanation other than that [Russian Bank-1] and the Trump Organization are using multiple sophisticated layers of protection to obfuscate their communications."  (emphasis in original).  The same white paper further stated that "[t]he only plausible explanation for this server configuration is that it shows the Trump Organization and [Russian Bank-1] to be using multiple sophisticated layers of protection in order to obfuscate their considerable recent email traffic."  This disparity between the white paper's strong assertions and some of these prior email communications therefore would naturally cause Tech Executive-1 to fear that the FBI might inquire with him or these researchers as to how the allegations were

compiled, reviewed, and analyzed.  Thus, completely separate and apart from whether the assertions and opinions in these emails are true, the existence of such a written record alone provided a motive for Tech Executive-1 to conceal the origins of the materials that the defendant provided to the FBI.  Accordingly, these emails are admissible as non-hearsay.

Moreover, to the extent the Government arguably seeks to prove the truth of any assertions contained within these emails, those messages are still admissible because they clearly reflect a "joint venture" or conspiracy to disseminate information for political purposes, for the reasons described above.  *Weisz*, 718 F. 2d at 433.  More specifically, these emails show that the researchers and Tech Executive-1 were acting in concert with the defendant and others to gather and spread damaging information about a Presidential candidate shortly before the scheduled election.

### *Emails Involving the U.S. Investigative Firm*

Finally, the Government respectfully submits that numerous communications in which personnel from the U.S. Investigative Firm sought to discuss, advance, and disseminate the Russian Bank-1 allegations are admissible for the same and other reasons.  For example, the Government seeks to offer, among others, the following emails obtained from the U.S. Investigative Firm:

- On October 15, 2016 – two weeks before news stories would first appear about the Russian Bank-1 allegations – a reporter emailed an employee of the U.S. Investigative Firm, stating in part, "anything new Russkie/Donald wise?," to which the U.S. Investigative Firm employee responded, "do the [expletive] [Russian Bank-1] secret comms story.  It's hugely important.  Forget the wikileaks side show."

- On the same date, the reporter replied:

[T]he problem with the [Russian Bank-1] story at this point is that my cyber expert colleagues cannot satisfy themselves about the authenticity of some of the key data, which they say from what they can tell is NOT public data. We are in contact with your experts via different channels but my colleague [] in Silicon Valley still hasn't got the confidence he says he needs to understand where all the data originated. If you can help more with this pls do…

- Later on that date, the U.S. Investigative Firm employee replied: "It's everyone's problem.  Call [Researcher-2] at [University-1]."

- On October 22, 2016, another reporter, who would soon publish a news story regarding the Russian Bank-1 allegations, emailed Researcher-2 at his University-1 email address:

I'm a reporter with [news outlet redacted].  I've just been explained the [Russian Bank-1]/Trump story.  My sense is that other reporters have called on you for help—and that this is a somewhat frustrating process.  I wish [Newspaper-1] had published its story.  This is a crucial piece of reporting.  As you will see, I have been on the Trump/Russia case before pretty much anyone.  I began writing about [Trump's former campaign manager]'s ties back in April.  Then I wrote this story in early July. []

In both cases, my articles helped drive coverage in the MSM [mainstream media].  Would it be possible to talk? I've been presented with the underlying facts of the story and find them completely convincing.  I've explained the facts to my editors and they want me to push to get the piece done quickly.  I have their complete and total backing.  But before I can publish, I need some help from a well-versed expert such as yourself.

- On October 30, 2016, the aforementioned U.S. Investigative Firm employee forwarded to the same reporter a tweet stating that the U.S. Senate Majority Leader had "talked w/ top NatSec officials who say that [the FBI Director] 'possesses explosive information' about Trump's ties to Russia."  The U.S. Investigative Firm employee's email stated: "time to hurry." The reporter replied "Here's the first 250 words," and included in the email a partial draft of the article for the U.S. Investigative Firm employee's review.  The reporter published the article the next day.

The above emails are admissible for at least three reasons.  *First*, these emails constitute business records of the U.S. Investigative Firm and therefore are admissible as non-hearsay.  Fed R. Evid. 803(6).

*Second*, certain of these emails (namely, those sent by the U.S. Investigative Firm) constitute communications in furtherance of the above-described joint venture, insofar as they indisputably reflect a common plan and mutual coordination among the U.S. Investigative Firm, Tech Executive-1, the defendant, and the aforementioned university researchers (*e.g.,* "Call [Researcher-2] at [University-1]") to generate press coverage about the Russian Bank-1 allegations.

*Third*, such emails constitute non-hearsay because the Government does not seek to offer them for the truth of their assertions (*e.g.,* "my articles helped drive coverage [of Trump's former campaign manager]" or "my colleague [] in Silicon Valley still hasn't got the confidence he says he needs").  Rather, the Government will introduce these emails to establish, among other things, their factual context and future effects.  Namely, the Government will offer these emails to show that the media's coverage of the Russian Bank-1 allegations was triggered in part by the defendant's work and coordination with Tech Executive-1, the University-1 researchers, the Clinton Campaign, and the U.S. Investigative Firm.

## III.    The Court Should Admit Certain Acts and Statements as Direct Evidence, or Alternatively, Pursuant to Federal Rule of Evidence 404(b)

The government next moves to admit certain evidence and statements, including evidence of (i) the defendant's February 2017 meeting at Agency-2, (ii) the defendant's December 2017 Congressional testimony, and (iii) Law Firm-1's statements to the media in October 2018.

### A.  Applicable Law

Federal Rule of Evidence 404(b) provides that evidence of "other crimes, wrongs or acts" may not be admitted to prove bad character, but may be admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  The standards governing the admissibility of evidence under Rule 404(b) are well established:

> [A] Rule 404(b) objection will not be sustained if: 1) the evidence of other crimes or acts is relevant in that it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence; 2) the fact of consequence to which the evidence is directed relates to a matter in issue other than the defendant's character or propensity to commit crime; and 3) the evidence is sufficient to support a jury finding that the defendant committed the other crime or act.

*United States v. Bowie*, 232 F. 3d 923, 930 (D.C. Cir. 2000) (internal quotations omitted).

Although under Rule 404(b) evidence of other crimes or wrongs is not permissible to prove a "person's actions conformed to his character," *United States v. Crowder*, 141 F. 3d 1202, 1206 (D.C. Cir. 1998), it is a "[Rule] of inclusion rather than exclusion" and is quite permissive, prohibiting the admission of other crimes evidence in but one circumstance—for the purpose of proving that a person's actions conformed to his character." *United States v. Jenkins,* 928 F. 2d 1175, 1180 (D.C. Cir. 1991) (internal quotations omitted).  Thus, evidence is admissible for purposes "*unrelated* to the to the defendant's character or propensity to commit crime, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *United Stated v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) (quoting Fed. R. Evid. 404(b)) (emphasis in original).

### B.  The Defendant's Meeting with Agency-2

#### 1.  Relevant Facts

As discussed above, on February 9, 2017, the defendant provided a similar set of allegations to Agency-2 that he had previously provided to the FBI General Counsel.  Specifically, the defendant provided Agency-2 with an updated version of the Russian Bank-1 allegations and a new set of allegations that supposedly demonstrated that Trump and/or his associates were using one or more Russian Provider-1 phones in the vicinity of the White House and other locations.  In his meeting with two Agency-2 employees ("Employee-1" and "Employee-2"), the defendant made a substantially similar false statement as he had made to the FBI General Counsel, *i.e.*, the defendant asserted that he was not representing a particular client in providing the updated allegations to Agency-2 (the "2017 False Statement").   However, as discussed above, the evidence at trial will demonstrate that the defendant was representing Tech Executive-1 in connection with his meeting at Agency-2.[10]   Later that same day, Employee-1 drafted a Memorandum for the Record ("MFR") that reflected the substance of the meeting including the 2017 False Statement.  Specifically, Employee-1 wrote, in part, the following:

> Sussmann advised that he was not representing a particular client and the information he was volunteering to us was not privileged.  His *contacts* wished to provide information to the USG through Sussmann, but the *clients* preferred to remain anonymous.

(emphasis added).

Thereafter, employee-1 emailed the draft MFR to Employee-2 and wrote, "Here you go.  Feel free to add/subtract/edit as needed."   On February 23, 2017, Employee-2 responded to

---

[10]  As noted above at p. 4, n.2, at the time of the meeting with Agency-2 employees in February 2017, the Clinton Campaign for all intents and purposes no longer existed.

Employee-1 and attached a new version of the MFR.  Employee-2 wrote, in part, "I have reviewed and revised the attached MFR.  In the new version, Employee-2 revised the above-quoted paragraph to reflect the fact that the defendant had not used the term "clients" but rather "contacts." Specifically, Employee-2 revised the passage as follows:

> Sussmann advised that he was not representing a particular client and the information he was volunteering to us was not privileged. His *contacts* wished to provide information to the USG through Sussmann, but the *contacts* preferred to remain anonymous.

(emphasis added).

The government anticipates that Employee-2 will testify that the defendant, in fact, stated during the above-referenced meeting that he was not representing a particular client.  (Employee-2 would further testify that he made the above change to the MFR in order to correct an error in the initial draft regarding the defendant's words, and that the revised MFR accurately reflected that the defendant did *not* use the word "clients.")  The Government expects that Employee-1 will testify similarly that he recalls the defendant stating he was not representing a particular client. Employee-1 similarly believes that the revised MFR's language was accurate.

### 2.  Discussion

The Government should be permitted to admit the 2017 False Statement as direct evidence of the charged crime.  Indeed, the defendant told the *same* lie to Agency-2 as he did to the FBI about substantively related allegations. And he did so less than five months apart.  Evidence of such a false statement to a separate government agency concerning the same and related allegations bears directly on the existence and nature of the charged crime and is admissible as evidence thereof.  As the D.C. Circuit has held:

> Evidence of criminal activity other than the charged offense is not considered extrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense,

> if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of trial[.]

*United States v. Badru*, 97 F. 3d 1471, 1474 (D.C. Cir. 1996) (quoting *United States v. Weeks,* 716 F. 2d 830, 832 (11th Cir. 1983) (*per curiam*).   Here, evidence of the 2017 False Statement is necessary "to complete the story" of the charged crime because it reflects the defendant's consistent and continuing efforts to disseminate information to the government while hiding the fact that he was representing an actual client.

Alternatively, the Government should be permitted to admit the 2017 False Statement pursuant to Rule 404(b) as evidence of the defendant's intent, preparation, knowledge, and absence of mistake.   The 2017 False Statement is substantially the same as the false statement charged in the Indictment and concerns, in part, the same or similar allegations that he brought to the FBI less than five months before.   *See United States v. Long*, 328 F. 3d 655, 661 (D.C. Cir. 2003) ("Evidence of a similar act must meet a threshold level of similarity in order to be admissible to prove intent."); *United States v. DeLoach*, 654 F. 2d 763, 769 (D.C. Cir. 1980) ("the admissible bad acts evidence need not show incidents identical to the events charged, so long as they are closely related to the offense").   Moreover, the 2017 False Statement is highly probative of the defendant's intent, preparation, knowledge, and absence of mistake in connection with the charged false statement.   Indeed, the 2017 False Statement is exceedingly relevant because it "shows a pattern of operation that would suggest intent," and such a pattern tends to defeat any innocent explanation for the false statement.   *See Long*, 328 F. 3d at 661 (quoting 2 Weinstein's Federal Evidence § 404.22[1][a]).

Furthermore, the 2017 False Statement satisfies the balancing test of Rule 403.   The statement is highly probative, as described above, and does not reflect conduct that is any more

sensational, disturbing, or prejudicial than the charged crime.  Indeed, it is *the same* conduct simply carried out on a different occasion.  Therefore, the 2017 False Statement does not give rise to any unfair prejudice that substantially outweighs its probative value.  *See United States v. Bell*, 795 F. 3d 88, 99-100 (D.C. Cir. 2015) (Rule 403 balancing test satisfied where the other-acts evidence is not "any more sensational or disturbing" than the charged crimes) (quoting *United States v. Roldan-Zapata*, 916 F. 2d 795, 804 (2d Cir. 1990)).

Accordingly, the defendant's conduct supports the inference that both statements (the charged false statement and the 2017 False Statement) reflected a common "plan" and an "intent" to conceal the role of certain clients in the defendant's work.  Such evidence also further supports the inference that the defendant's false statements to two different agencies were not simply a product of "mistake" or "accident" but, rather, reflected a deliberate effort to conceal the involvement of any clients in his work.

### C.  Law Firm-1's Statements to the Media

#### 1.  Relevant Facts

On October 12, 2018, Law Firm-1 issued a statement to multiple media outlets in which the firm stated, in part: "When Sussmann met with [the FBI General Counsel] on behalf of a client, it was not connected to the firm's representation of the Hillary Clinton Campaign, the DNC or any Political Law Group client."  The following week, on October 18, 2018, the then-Managing Partner of Law Firm-1 wrote a letter to the editor of a major newspaper in which he asserted, in part, "Mr. Sussmann's meeting with the FBI General [] was on behalf of a client with no connections to either the Clinton campaign, the DNC or any other Political Law Group client."  The Government expects that the evidence it will introduce at trial, including, but not limited to, the defendant's billing records, will reflect that Law Firm-1's statements to the media – which the evidence will show the

defendant reviewed or assisted in drafting – were false (as to Law Firm-1's statement), and at least partially inaccurate and/or misleading (as to the managing partner's statement).  The Government further expects that evidence and testimony at trial will establish that defendant failed to inform his law firm's leadership that he had, in fact, billed work on the Russian Bank-1 allegations to Clinton Campaign.

### 2.  Discussion

Law Firm-1's statements to the media and the defendant's participation in the review and/or drafting of those statements are direct evidence of the defendant's intent to conceal his representation of the Clinton Campaign with respect to the allegations the defendant brought to the FBI General Counsel.  Indeed, evidence of the defendant's participation in the drafting or review of these statements is admissible as direct evidence because his actions (and omissions) are "inextricably intertwined" with the charged crime.  That is because they demonstrate the defendant's continuing efforts over time to conceal from the FBI, the public, and some of his own colleagues that he carried out certain work on behalf of the Clinton Campaign.  *See e.g., United States v. Allen*, 960 F. 2d 1055, 1058 (D.C. Cir. 1992).  As discussed above, this evidence is necessary to "complete the story" of the charged crime.  *Badru*, 97 F.3d at 1474.

Alternatively, evidence of the defendant's conduct with respect to Law Firm-1's statements to the media is admissible pursuant to Federal Rule of Evidence 404(b).  The defendant could have easily corrected Law Firm-1's apparent belief that the defendant's work on the Russia Bank-1 allegations "was not connected to the firm's representation of the Hillary Clinton Campaign, the DNC or any Political Law Group client."  He chose not to.  This fact alone is highly probative of the defendant's knowledge, intent, and plan with respect to the charged false statement.  This evidence also tends to refute any potential defense that the defendant mistakenly failed to inform

the FBI General Counsel that he was representing at least one client (the Clinton Campaign) at their September 19, 2016 meeting.

### D.  The Defendant's Congressional Testimony

#### 1.  Relevant Facts

On December 18, 2017, the defendant testified under oath before the House Permanent Select Committee on Intelligence.  During that testimony, the defendant addressed certain questions about his participation in providing the Russian Bank-1 and Russian Phone Provider-1 allegations to the FBI and Agency-2.   During the proceedings, the following exchange, in part, occurred:

|  |  |
|---|---|
| QUESTION: | Okay. Did you have any other meetings with any other administration officials regarding the information you conveyed to the FBI GC and [Agency-2] G[eneral] C[ounsel]?  Was there anyone else you contacted that worked for the Federal Government? |
| DEFENDANT: | Not that I recall. |
| QUESTION: | Okay.  So those are the only two?  Now, I want to ask you, what was the information about? |
| DEFENDANT: | The information was about communications, or potential communications between persons unknown in Russia, and persons unknown associated with the Trump Organization. |
| QUESTION: | Information that was given to you by a client? |
| DEFENDANT: | Yes. |
| QUESTION: | So that information was not given to you by any other source but the client you represented? |
| DEFENDANT: | Absolutely. |

[. . .]

QUESTION: No, that's fair. So let me ask you this question: When you decided to engage the two principles, one, [FBI General Counsel] in September, and the general counsel of [Agency-2] in December, you were doing that on your own volition, based on information another client provided you. Is that correct?

DEFENDANT: No.

QUESTION: So what was -- so did your client direct you to have those conversations?

DEFENDANT: Yes.

QUESTION: Okay. And your client also was witting of you going to – in February to disclose the information that individual had provided you?

DEFENDANT: Yes.

QUESTION: Back to the FBI. You obviously had a conversation or you had a meeting at the FBI with [the General Counsel]. Was there anybody else in the room from the FBI in that room with you?

DEFENDANT: No.

[. . .]

QUESTION: Okay. I want to ask you, so you mentioned that your client directed you to have these engagements with the FBI and - and to disseminate the information that client provided you. Is that correct?

DEFENDANT: Well, I apologize for the double negative. It isn't not correct, but when you say my client directed me, we had a conversation, as lawyers do with their clients, about client

> needs and objectives and the best course to
> take for a client. And so it may have been a
> decision that we came to together. I mean, I
> don't want to imply that I was sort of directed
> to do something against my better judgment,
> or that we were in any sort of conflict, but this
> was -- I think it's most accurate to say it was
> done on behalf of my client.

## 2. Discussion

For the same reasons as discussed above, the Government should be permitted to introduce the defendant's Congressional testimony as direct evidence of the charged crime. The defendant's testimony flatly contradicts his representations to the FBI General Counsel and Agency-2 employees, *i.e.*, that the defendant was not providing the allegations to the FBI and Agency-2 on behalf of any client. This evidence is "inextricably intertwined" with the charged crime. *See e.g., Allen*, 960 F.2d at 1058. As discussed more fully below, the defendant's "post-scheme" conduct is inherently intrinsic to the charged offense notwithstanding that it took place after the end of the period of activity charged in the indictment. As such, this evidence is probative of the defendant's knowledge and intent, as well as consciousness of guilt. *See United States v. Bajoghli*, 785 F.3d 957, 965 (4th Cir. 2015).

Alternatively, and in addition, the defendant's Congressional testimony is admissible pursuant to Federal Rule of Evidence 404(b) as a further reflection of the defendant's plan and intent over time to obscure the origins and political nature of his work on the Russian Bank-1 allegations. This testimony directly relates to the core fact at issue in this case: the defendant's representation of clients during the September 19, 2016 meeting with the FBI General Counsel. Moreover, the defendant's testimony is relevant for the additional reason that it misleadingly conveyed the impression to Congress that the defendant's only client for the Russian Bank-1 allegations was Tech Executive-1. Indeed, during points in the testimony not quoted above, the

defendant was specifically asked if the U.S. Investigative Firm was his client in these matters, and whether the firm's head or another of its employees had provided him the "information" he gave to the FBI General Counsel. The defendant's answer failed to disclose or volunteer that the investigative firm, in fact, had drafted one of the white papers that the defendant gave to the FBI General Counsel. The testimony also carefully avoided mention that the only client billed for the defendant's pre-election work on those allegations was the Clinton Campaign. Therefore, this testimony is relevant to prove the defendant's "motive," "knowledge," "intent," and "plan," insofar as the defendant exhibited a consistent pattern of seeking to conceal the Clinton Campaign's role as a beneficiary of, and billed party for, the Russian Bank-1 allegations.

## IV.     The Court Should Exclude Evidence and Preclude Argument Concerning Allegations of Political Bias on behalf of the Special Counsel

The Government expects that defense counsel may seek to present evidence at trial and make arguments that depict the Special Counsel as politically motivated or biased based on his appointment by the prior administration. Notwithstanding the patently untrue nature of those allegations, such matters are irrelevant to this case and would create a substantial danger of unfair prejudice, confusion, and delay. In particular, the government seeks to preclude the defendant from introducing any evidence or making any argument concerning the circumstances surrounding the appointment of the Special Counsel and alleged political bias on the part of the Special Counsel's Office. Indeed, the defendant has foreshadowed some of these arguments in correspondence with the Special Counsel and others, and their assertions lack any valid basis.

Only relevant evidence is admissible at trial. Fed. R. Evid. 402. The definition of relevance is inclusive, *see* Fed. R. Evid. 401(a), but depends on the possibility of establishing a fact that "is of consequence in determining the action," Fed. R. Evid. 401(b). Evidence is therefore relevant only if it logically relates to matters that are at issue in the case. *E.g.*, *United States v. O'Neal*, 844

F. 3d 271, 278 (D.C. Cir. 2016); *see Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008). The party seeking to introduce evidence bears the burden of establishing relevancy. *Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990).

Here, the defendant is charged with making a false statement to the FBI General Counsel in violation of 18 U.S.C. § 1001. A jury will have to decide only whether the defendant knowingly and willfully made a materially false statement to the FBI General Counsel. Nothing more, nothing less. Baseless political allegations are irrelevant to the crime charged. *See, e.g.*, *United States v. Regan*, 103 F. 3d 1072, 1082 (2d Cir. 1997) (claims of Government misconduct are "ultimately separate from the issue of [a defendant's] factual guilt"); *United States v. Washington*, 705 F. 2d 489, 495 (D.C. Cir. 1983) (similar). Evidence or argument concerning these issues should therefore be excluded. *See* Fed. R. Evid. 402; *see, e.g.*, *O'Neal*, 844 F,3d at 278; *United States v. Stone*, 19 CR 18 (D.D.C. Sept. 26, 2019) ECF Minute Order (granting the government's motion *in limine* to exclude evidence or argument regarding alleged misconduct in the government's investigation or prosecution of Roger Stone).

The only purpose in advancing these arguments would be to stir the pot of political polarization, garner public attention, and, most inappropriately, confuse jurors or encourage jury nullification. Put bluntly, the defense wishes to make the Special Counsel out to be a political actor when, in fact, nothing could be further from the truth.[11] Injecting politics into the trial proceedings is in no way relevant and completely unjustified. *See United States v. Gorham*, 523 F. 2d 1088, 1097-1098 (D.C. Cir. 1975) (upholding trial court's decision to preclude evidence

---

[11] By point of fact, the Special Counsel has been appointed by both Democratic and Republican appointed Attorneys General to conduct investigations of highly-sensitive matters, including Attorneys General Janet Reno, Michael Mukasey, Eric Holder, Jeff Sessions and William Barr.

relevant only to jury nullification); *see also United States v. Rushin*, 844 F. 3d 933, 942 (11th Cir. 2016) (same); *United States v. Castro*, 411 Fed. App'x 415, 420 (2d Cir. 2011) (same); *United States v. Funches*, 135 F.3d 1405, 1408-1409 (11th Cir. 1998) (same); *United States v. Cropp*, 127 F.3d 354, 358-359 (4th Cir. 1997). With respect to concerns about jury nullification, this Circuit has opined:

> [Defendant's] argument is tantamount to the assertion that traditional principles concerning the admissibility of evidence should be disregarded, and that extraneous factors should be introduced at trial to become part of the jury's deliberations. Of course a jury can render a verdict at odds with the evidence and the law in a given case, but it undermines the very basis of our legal system when it does so. The right to equal justice under law inures to the public as well as to individual parties to specific litigation, and that right is debased when juries at their caprice ignore the dictates of established precedent and procedure.

*Gorham*, 523 F.2d at 1098.

Even if evidence related to the defendant's anticipated allegations had "marginal relevance" to this case (which it does not), the "likely (and presumably intended) effect" would be "to shift the focus away from the relevant evidence of [the defendant's] wrongdoing" to matters that are, at most, "tangentially related." *United States v. Malpeso*, 115 F. 3d 155, 163 (2d Cir. 1997) (upholding exclusion of evidence of alleged misconduct by FBI agent).

For the foregoing reasons, the defendant should not be permitted to introduce evidence or make arguments to the jury about the circumstances surrounding the appointment of the Special Counsel and alleged political bias on the part of the Special Counsel.

## V.     The Court Should Admit Tweets by the Clinton Campaign

The Government next moves *in limine* to admit an October 31, 2016 tweet from the Clinton Campaign that discussed the Russian Bank-1 allegations which the defendant provided to the FBI.

### A.  Relevant Facts

As set forth in the Indictment, on or about October 31, 2016 – approximately one week before the 2016 U.S. Presidential election – multiple media outlets reported that the FBI had received and was investigating the allegations concerning a purported secret channel between the Trump Organization and Russian Bank-1.

On that day, the newspaper referred to in the Indictment as "Newspaper-1" published an article titled *Investigating Donald Trump, F.B.I. Sees No Clear Link to Russia*.  The article discussed that the FBI possessed information concerning "what cyber experts said appeared to be a mysterious back channel between the Trump Organization and [Russian Bank-1]."  The article further reported that the FBI "had spent weeks examining computer data showing an odd stream of activity to a Trump Organization server," and that the newspaper had been provided computer logs which evidenced this activity.  The article also noted that at the time of the article, the FBI had not found "any conclusive or direct link" between Trump and the Russian government and that "Hillary Clinton's supporters . . . pushed for these investigations."

On the same date, another media outlet published an article titled *Was a Trump Server Communicating With Russia?*, which likewise discussed at length the allegations which the defendant provided to the FBI.

As noted above, in the months prior to the publication of these articles, the defendant had communicated with the media and provided them with the Russian Bank-1 data and allegations. The evidence will show that the defendant also kept Campaign Lawyer-1 apprised of his efforts. Campaign Lawyer-1, in turn, communicated with the Clinton Campaign's leadership about potential media coverage of these issues.

For example, billing records and emails reflect that on September 1, 2016, the defendant met with the reporter who published the aforementioned Newspaper-1 article.  The defendant billed his time for the meeting to the Clinton Campaign under the broader billing description "confidential meetings regarding confidential project."

Billing records further reflect that on September 12, 2016, just one week prior to the defendant's meeting with the FBI General Counsel, the defendant and Campaign Lawyer-1 communicated about the defendant's efforts to share the Russian Bank-1 allegations with Newspaper-1.

In addition, on September 15, 2016, Campaign Lawyer-1 provided an update to the Clinton Campaign regarding the Russian Bank-1 allegations and the not-yet-published Newpaper-1 article, sending an email to the Clinton Campaign's campaign manager, communications director, and foreign policy advisor, which he billed to the Clinton Campaign as "email correspondence with [name of foreign policy advisor], [name of campaign manager], [name of communications director] re: [Russian Bank-1] Article."

On the same day that these articles were published, the Clinton Campaign posted a tweet through Hillary Clinton's Twitter account which stated: "Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."  The tweet included a statement from a Clinton Campaign advisor which made reference to the media coverage article and stated, in relevant part, that the allegations in the article "could be the most direct link yet between Donald Trump and Moscow[,] that "[t]his secret hotline may be the key to unlocking the mystery of Trump's ties to Russia[,]" and that "[w]e can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections."

### B.  Discussion

Typically, newspaper articles and tweets constitute inadmissible hearsay, and cannot be admitted into evidence to support the truth of the matter asserted.  *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002) ("Unsupported newspaper articles usually provide no evidence of the reporter's perception, memory or sincerity and, therefore, lack circumstantial guarantees of trustworthiness."); *see also Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005). As noted above, however, a statement is not hearsay if it is admitted to show its effect on the listener or reader, not the truth of the matter.  Fed. R Evid. 801(c)(2), 803(1), (3).  And when used for that purpose, courts often admit newspaper articles or other types of evidence, such as tweets, to show state of mind or other matters.  *See Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015); *see also United States v. Buck*, 2017 WL 5201447, at *2 (S.D.N.Y. Oct. 30, 2017); *Rivera v. Incorporated Vill. of Farmingdale*, 29 F. Supp. 3d 121, 128-30 (E.D.N.Y. 2013).

The above-referenced tweet is not hearsay because it is not being offered for its truth. Indeed, the Government believes that the tweet's assertions regarding a "covert server" between the Trump Organization and Russian Bank-1 are false.  The Government will instead offer this tweet to show the existence of the defendant's attorney-client relationship with the Clinton Campaign, which is directly relevant to the false statement charge.  In particular, and as detailed above, the evidence at trial will demonstrate that the defendant provided the Russian Bank-1 allegations to the media for the purpose of benefiting the Clinton Campaign, and his billing records reflect that he repeatedly billed the campaign for this work.  Such efforts also continued after the defendant's meeting with the FBI General Counsel.  For instance, on October 10, 2016, the defendant emailed the aforementioned Newspaper-1 reporter an opinion article regarding Trump, suggesting that the the reporter should share it with his "editors" in an apparent effort to help the

reporter convince them to publish an article regarding the Russian Bank-1 allegations.  In addition, on the date these articles were finally published, the defendant again billed the Clinton Campaign for his communications with both reporters who authored them.

The fact that the Clinton Campaign immediately issued a tweet concerning the articles – after receiving foreknowledge of these issues from the Law Firm-1 – is probative of the defendant's client relationship.  Indeed, the Government will offer this evidence to prove, among other things, that one of the defendant's primary goals in his work on the Russian Bank-1 allegations was to generate negative publicity concerning Trump that would benefit the Clinton Campaign.  Accordingly, the tweet is admissible as non-hearsay.

## CONCLUSION

For the foregoing reasons, the Court should grand the Government's motions *in limine*.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:
 /S/ _____
Jonathan E. Algor
Assistant Special Counsel
jonathan.algor@usdoj.gov

Andrew J. DeFilippis
Assistant Special Counsel
andrew.defilippis@usdoj.gov

Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

Brittain Shaw
Assistant Special Counsel
brittain.shaw@usdoj.gov