1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
      - - - - - - - - - - - - - - - x
3     THE UNITED STATES OF AMERICA,
                                      Criminal Action No.
4                   Plaintiff,        1:21-cr-00582-CRC-1
                                      Thursday, March 31, 2022
5     vs.                             10:05 a.m.

6     MICHAEL A. SUSSMANN,

7                   Defendant.
      - - - - - - - - - - - - - - - x
8

9     _____

10        TRANSCRIPT OF MOTION HEARING AND STATUS CONFERENCE
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE
      _____

12    APPEARANCES:

13    For the United States:      **ANDREW DeFILIPPIS, ESQ.**
                                  **SPECIAL COUNSEL'S OFFICE**
14                                145 N Street Northeast
                                  Washington, DC 20002
15                                (212) 637-2231
                                  andrew.defilippis@usdoj.gov
16
      For the Defendant:          **MICHAEL BOSWORTH, ESQ.**
17                                **SEAN M. BERKOWITZ, ESQ.**
                                  **LATHAM & WATKINS LLP**
18                                1271 Avenue of the Americas
                                  New York, NY 10020
19                                (212) 906-1200
                                  michael.bosworth@lw.com
20                                sean.berkowitz@lw.com

21
      Court Reporter:             Lisa A. Moreira, RDR, CRR
22                                Official Court Reporter
                                  U.S. Courthouse, Room 6718
23                                333 Constitution Avenue, NW
                                  Washington, DC  20001
24                                (202) 354-3187

25

1          P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  We're on the record for

3   Criminal Case 21-582, *United States of America vs. Michael*

4   *Sussmann*.

5          Counsel, please identify yourselves for the

6   record.

7          MR. DeFILIPPIS:  Good morning, Your Honor; Andrew

8   DeFilippis for the government.  Also on the video from the

9   Special Counsel's Office are Assistant Special Counsels

10  Michael Keilty, Brittain Shaw, and Jonathan Algor.

11         THE COURT:  Good morning, Mr. DeFilippis.  Good to

12  see you.

13         MR. BERKOWITZ:  Good morning, Your Honor; Sean

14  Berkowitz, Michael Bosworth, Natalie Rao, and Catherine Yao

15  on behalf of Mr. Sussmann, who is also present by video.

16         THE COURT:  Good morning, everybody.

17         Mr. Sussmann, do we have your permission to

18  proceed by video this morning?

19         THE DEFENDANT:  Yes, Your Honor.  Good morning.

20         THE COURT:  Good morning.

21         Okay.  All right.  Mr. Berkowitz, it's your

22  motion.  I thought I might be able to lure you to D.C.

23  today, but I guess not, huh?

24         MR. BERKOWITZ:  Unfortunately, no.  I'm in New

25  York with Mr. Bosworth, who is going to be actually handling

1    our discussion on the motion today, Your Honor.

2              THE COURT:  Okay.  Please proceed, Mr. Bosworth.

3              MR. BOSWORTH:  Thanks, Your Honor.  And we know

4    the Court's read the briefs so we don't want to unduly

5    belabor our arguments here, but just on top, you know, I

6    think it's important to begin with, you know, this is an

7    unprecedented false statement prosecution.

8              To our knowledge -- and Special Counsel hasn't

9    said otherwise -- never before has an individual who

10   provided a tip to the government been prosecuted for making

11   a false statement that's ancillary to the tip itself.

12   That's not a false tip.  And we think that there's a reason

13   the Special Counsel is charging this new ground, and it's

14   because he's embracing a theory of materiality that is

15   virtually unbounded and that effectively reads that element

16   out of the law.

17             And so today, you know, in addition to answering

18   any questions that Your Honor has, we want to explain to you

19   why we think the Special Counsel's theory of materiality is

20   wrong, why the allegations in the indictment don't support a

21   theory of materiality that's right, and there are really

22   three core points that we want to make on this score that

23   emphasize what materiality is and what it isn't and why this

24   indictment just doesn't pass muster.

25             And I'll address each of these three, but just to

1    name them on top:  first, to be material a false statement

2    has to relate to a specific decision that a government

3    agency is trying to make; second, to be material the false

4    statement has to have a sufficient nexus or connection to

5    that decision; and third, the false statement has to have an

6    effect on that decision that's more than trivial or

7    negligible.  And I want to go through just each of these,

8    explain why we think we're right about it, and why this

9    indictment just doesn't cut it.

10            So first, you know, is why a false statement has

11   to relate to a specific decision.  So the Supreme Court, you

12   know, has made clear that in determining whether a false

13   statement's material you have to ask two questions.  First,

14   you have to ask what is the false statement.  And then

15   second, you have to ask, well, what decision was the agency

16   trying to make so that --

17            THE COURT:  Let me stop you there, Mr. Bosworth.

18            MR. BOSWORTH:  Sure.

19            THE COURT:  We're in the D.C. Circuit.  Obviously

20   the *Moore* case very explicitly adopted not just the discrete

21   decision prong of the standard but also the other function

22   by the agency prong.  The statement has to be capable of

23   influencing either the discrete decision, as you say, or

24   some other function of the relevant agency.

25            Are you saying that that is not the correct

1    standard, and that the Supreme Court's discussion of the

2    standard in *Gaudin* supplants that description of the

3    standard?

4              MR. BOSWORTH:  No, Your Honor, and we pointed out

5    the *Moore* decision in our opening brief.

6              Our argument is that in this context, where a

7    statement is made to an investigative agency and there is no

8    investigation pending, the operative discrete decision and

9    the function are one and the same.  There is no

10   investigation pending so the decision, to the extent you're

11   focused on one, is, you know, are we going to initiate an

12   investigation, and the function is are we going to initiate

13   an investigation.  They sort of collapse on each other.

14             THE COURT:  But you don't contest that one of the

15   functions of the FBI is to conduct investigations.

16             MR. BOSWORTH:  No.  Of course not.

17             THE COURT:  Okay.  And so the government's theory,

18   I take it, is that the allegedly false statement here

19   influenced that function; influenced not only the initiation

20   of the investigation but the function of later conducting

21   that investigation.  Why isn't that correct?

22             MR. BOSWORTH:  So in the -- so if you look at the

23   actual standard, right, which is, you know, is it capable of

24   affecting the discrete agency decision or the specific

25   function to which the statement was addressed?  In this

1    case, the function to which it was addressed and the

2    decision to which the false statement, you know, was

3    addressed is the decision to open an investigation in the

4    first place.

5         THE COURT:  But isn't it a function of the agency

6    to which it was addressed?  The statement was addressed to

7    the FBI.  The function of the agency or one function of that

8    agency is conducting investigations.  And the theory, as I

9    read it -- and I'll certainly ask Mr. DeFilippis -- is that

10   that statement influenced not only the initial decision but

11   the later conduct or approach to the investigation.

12        MR. BOSWORTH:  Right, and that's certainly their

13   theory.  You know, I think it's notable the government

14   hasn't cited a single case in support of that theory, the

15   notion that a false statement has evergreen materiality.  So

16   a statement made to an investigative agency where no

17   investigation exists, under the Special Counsel's view,

18   continues to be material, affects the investigation itself,

19   affects the decision to close even though all of that post-

20   dates the initial context in which the statement was made.

21   So we don't, you know, with respect, agree with that

22   description of the law.

23        But even to the extent that Your Honor, you know,

24   disagrees with us and thinks, you know, well, this is broad

25   enough to sweep in any of the investigation itself, you

1    know, this leads to the problem they have, I think, with the

2    second point that I want to make, which is, you know, in

3    addition to affecting the decision or the function -- which

4    in this case we suggest is one and the same -- the statement

5    still has to be about something that is the subject of the

6    investigation, right?  That, we think, the law is clear on.

7                   In cases --

8                   THE COURT:  I'm sorry, but before we get there --

9                   MR. BOSWORTH:  Sure.

10                  THE COURT:  -- let's assume you are correct that

11   the relevant point of influence is the decision.

12                  You have characterized the decision as whether to

13   open an investigation or not.  In opposition, the Special

14   Counsel has argued, well, it's not a binary decision.  There

15   are several different types of investigations that the FBI

16   could have pursued:  a full investigation, a preliminary

17   investigation, something called an assessment.

18                  Let's assume that the decision was, you know, to

19   investigate.  Respond to their argument that there were

20   several types of investigations that could have been

21   conceivably considered, and that those may have been

22   influenced, those different approaches may have been

23   influenced by the statement that Mr. Sussmann is alleged to

24   have made.

25                  MR. BOSWORTH:  Sure.  You know, and I think the

1    first and most important response that we'd have is that

2    that's not a theory of materiality that was included in this

3    indictment.  They returned a 27-page speaking indictment

4    that not only included extensive allegations about the

5    conduct -- obviously which we disagree with, but that's for

6    another day -- but also included three specific paragraphs

7    that provided, in detail, what their theory of materiality

8    was in this case.  And I think the Court, for the purposes

9    of this motion to dismiss, has to stick within the four

10   corners of the indictment, right?

11          We hear that --

12          THE COURT:  I'm sorry, I noted that argument in

13   your briefs.

14          MR. BOSWORTH:  Yes, sir.

15          THE COURT:  Is there any case authority for that

16   proposition?  I mean, that struck me as more of a civil

17   standard where, you know, on a motion to dismiss, you know,

18   under Rule 12(b)(6) we are obviously confined to the civil

19   complaint.

20          Is there an analogous principle for a criminal

21   indictment?

22          MR. BOSWORTH:  Yes.  I think that we cited -- let

23   me just pull it up.  In our reply brief we cite a couple of

24   the cases that talk about the standard that's to be applied

25   on a motion to dismiss and why the Court has to just look at

1    the indictment, and we can pull those cites for Your Honor.

2            And, you know, we think that the logic of those

3    cases, which talks about just looking to the four corners in

4    the indictment, right, to the -- right, for the same reason

5    that the government says look, don't buy the defendant's

6    argument about why this is immaterial because, you know,

7    they're citing discovery and making fact arguments, right?

8            We think the same holds in the other direction;

9    you know, that for the purpose of this inquiry where the

10   government has explicitly laid out a theory of materiality

11   in the indictment, that it is proper to look at that theory,

12   assess it as it is or isn't, you know, and that's it.

13           If the government had all these additional

14   arguments about why the statement was material, why this

15   could have affected the initial investigation, et cetera,

16   you would have thought, if they were good enough, they'd be

17   in this indictment, and they aren't.

18           And I think that that's -- you know, that's the

19   top line and most important response, that we're not talking

20   about the record.  We're not talking about what the evidence

21   at trial will show.  We're talking about what allegations

22   they chose to include in this indictment.  That's Point 1.

23           THE COURT:  How does that jibe with the principle

24   that materiality is an element of 1001 and must be put to a

25   jury after having heard the government's evidence, which may

1      or may not be the indictment?

2              MR. BOSWORTH:  Sure.  I think it doesn't jibe with

3      that statement, but with respect -- I don't think that that

4      statement is the correct standard that's got to be applied

5      in this context.  For sure, in the ordinary case, you know,

6      materiality, which, you know, in the garden variety case is

7      a factor of an inquiry, is something that's going to have to

8      go to a jury because in most cases you've just got an

9      indictment that either includes bare-bone, you know,

10     allegations of statutory elements or not quite this lengthy

11     a speaking indictment.

12              It's unusual that in this case there is an

13     indictment that includes specific allegations about why the

14     statement was material, all right?  And under principles of

15     notice, among other things, you know, that's the

16     government's theory.  That's what they will have to prove at

17     trial.  To the extent that they deviate and try to prove

18     materiality through some other mechanism or to prove that

19     the statement was material for reasons they haven't provided

20     notice of in the indictment, you know, we will likely have

21     arguments to you about why that's an impermissible variance,

22     et cetera.

23              We think this is the statement of the theory of

24     the case that binds them here, and we think that you've got

25     to, as a result, look at that, and no more, for these

1    purposes.  And because they have included a lengthy

2    discussion of materiality, the Court can assess those

3    allegations now and decide is that sufficient or is it not.

4    Right?  You can assume that everything that they've alleged

5    true for the purposes of this motion and decide is it

6    enough.  Right?  In the same way that after all the evidence

7    is in, you know, at a Rule 29 argument the Court would take

8    stock of what they've proved, which presumably in this case

9    would be the allegations they've included in the indictment.

10          If it's not enough now, it's not enough then.  And

11   we think that it's appropriate to consider whether this is

12   material now, and we don't think that there's anything in

13   the law that would preclude the Court from making that kind

14   of assessment at this point.

15          THE COURT:  Okay.

16          MR. BOSWORTH:  Your Honor, I don't know if you

17   have more questions on that first piece, which is clearly

18   not that persuasive, so let me move to Point 2, okay?

19          THE COURT:  Move to Point 2.

20          MR. BOSWORTH:  Okay.  So the second point that we

21   have here is that in their theory of the case, and whether

22   it's these allegations of materiality or anything else, the

23   fact remains that the false statement that is charged here

24   is a false statement that does not go to what was the

25   ultimate subject of the investigation that the FBI

1    conducted, and we think the law is clear that, in order to

2    be material, a false statement can't be ancillary to the

3    subject of the investigation.  It's got to have a sufficient

4    nexus, a close-enough fit to that subject, in order to

5    matter.

6            We think that's one of the reasons why we haven't

7    ever seen a case like this, where someone who provided a tip

8    to the government was charged with making a false statement

9    about something other than the tip.  Because the tip is

10    obviously, you know, material.  That's the subject of the

11    investigation.

12            Here, however, there's no allegation in the

13    indictment that the tip itself was false.  There's no

14    allegation that Mr. Sussmann made a false statement about

15    something that was the subject of the investigation, right?

16    The only false statement charged here is that Mr. Sussmann,

17    you know, falsely represented whether he had clients in the

18    meeting with the government -- you know, with the FBI in the

19    first place.

20            THE COURT:  Can I ask one question just for

21    clarification?

22            MR. BOSWORTH:  Of course.

23            THE COURT:  I obviously don't have the benefit of

24    the discovery in this case.  Based on your review of the

25    discovery and your discussions with the government, do you

1    understand it that Mr. Baker will say that he asked a

2    question -- namely, Are you here on behalf of any client? --

3    and the answer was no; or that Mr. Sussmann -- or that he

4    will say Mr. Sussmann volunteered or otherwise affirmatively

5    stated "I am not here on behalf of any client"?

6              MR. BOSWORTH:  I think it's the latter, Your

7    Honor.

8              THE COURT:  Okay.

9              MR. BOSWORTH:  And there are many things that --

10             THE COURT:  I'm not sure that it matters, but just

11   for clarification's sake.

12             MR. BOSWORTH:  Yes, Your Honor.  And there's not a

13   whole lot that the Special Counsel and we agree on.  I think

14   that they will agree on that point, that Mr. Sussmann did,

15   you know -- whatever he may have said about whether he had

16   clients was something that -- in the first instance was

17   something he volunteered, which, you know, is one of the

18   reasons we will argue there was no intent to mislead, et

19   cetera.  Because the context here certainly matters.

20             But moving on from that point though, Your Honor,

21   you know, the fact remains that the only false statement

22   charged here is that -- and our argument is that under clear

23   cases that talk about what matters and doesn't in the

24   context of investigations, a statement that is not a

25   statement about something that is the subject of the

 1   investigation is simply immaterial.  It can't influence the

 2   ultimate decision or the ultimate investigative function

 3   here.  And for that reason alone, you know, or as a

 4   supplemental reason we think, you know, this false statement

 5   is immaterial as a matter of law.  It's just too far afield

 6   of the thing that actually was the subject of the

 7   investigative work that the FBI did.

 8              THE COURT:  Okay.

 9              MR. BOSWORTH:  The third point I'd make -- and

10   actually, let me just make one other quick point, which is,

11   you know, here a lot of the thrust of the government's

12   argument, including about what the other allegations are and

13   what the evidence at trial will otherwise show, you know,

14   was about, well, they would have asked this question, they

15   might have asked that question.

16              It's important to note just for context, although

17   it's obviously not something the Court considers, we don't

18   think that the evidence shows that Mr. Baker or anyone else

19   at the FBI ever asked Mr. Sussmann, "Hey, by the way, where

20   did this information come from?"  No one asked.  Not once.

21   Ever.  Regardless of who his clients were, if the source of

22   his information was so critical to the government's

23   investigation, if it mattered so much, you'd think at some

24   point someone would have said, "Hey, buddy, you provided

25   this tip to the government.  Where did this stuff come from?

1    Who gave it to you?  Where did -- how did they get it?"

2              You know, the thrust of the Special Counsel's

3    argument is that it's so important to test the reliability

4    of the sources of this information.  You've got to push on

5    the origins of the information.

6              Nobody asked about it, whether it was from a

7    client or not, and that, you know, is an additional reason

8    certainly, if we get to it at trial, that, you know, it's

9    going to be really difficult for the government to establish

10   that, you know, any of this is material.

11             Putting that aside, though, and moving to the

12   third point, you know, we do think that the effect of the

13   false statement or the purported false statement on the

14   investigation -- either the decision to initiate the

15   investigation or the way in which the investigation was

16   conducted, the effect has to be something that's more than

17   trivial.  It's got to be something that's more than

18   negligible.  And here we don't think that any of the

19   allegations the government -- the Special Counsel's made,

20   either in the indictment or in their briefs, actually go

21   beyond a trivial or negligible, you know, impact.

22             Here, you know, looking at the indictment, the

23   indictment itself, you know, is framed, you know, in two

24   parts.  One, there's Paragraphs 5 and 6 that talk about why

25   the origins of the data would have been relevant.  None of

1    that actually talks about the effect on the investigation

2    itself, so that's, in our view, pretty irrelevant.  And as I

3    mentioned, they never even asked that.

4         The money paragraph, I think for these purposes,

5    is Paragraph 32 of the indictment, which sets out at least,

6    you know, in the indictment why it was that the purported

7    false statement was material here.  And the way in which

8    that paragraph is framed itself is insufficient as a matter

9    of law.  It says, you know, the false statement was material

10   because it was relevant to the FBI whether this, whether

11   that, had he disclosed this or that.  You know, it basically

12   says it was material because this information would have

13   been relevant.

14        The law is also clear, though -- and we cited some

15   cases to this effect -- that relevance doesn't cut it.

16   There's a difference between whether a statement's material

17   and whether a statement is relevant.  A statement can be

18   relevant but still be immaterial.  D.C. Circuit said that,

19   Ninth Circuit said that, and we have those cases in the

20   brief.

21        And then if you look at the specific, you know,

22   investigative steps that the government's suggesting were

23   influenced somehow here, it's, well, they might have asked

24   these questions which might have led to these questions.

25   You know, that's not the kind of, you know, demonstration of

1    a serious impact on the actual investigation or on the

2    actual decision whether to open an investigation in the

3    first place.

4              THE COURT:  And, again, why aren't those jury

5    questions?

6              MR. BOSWORTH:  I think it's a closer call on

7    whether that is, you know, sufficient as a matter of law.

8    Are these good enough?  Right?  You can look at the

9    indictment and know that the statement that's charged is not

10   a statement about the subject of the investigation.

11             How much of an impact did this have?  If you get

12   to it, I think that that, it's fair to say, is a closer jury

13   question than a Court question.  But even there I think the

14   jury would have to be properly instructed that they'd have

15   to find that the effect was something that's more than

16   negligible or trivial; that it actually influenced the

17   decision.

18             Because on this point -- and it's just worth, you

19   know, emphasizing sort of why we're making the point -- you

20   know, if the standard is one that the statement has to

21   actually influence the government's, you know, decision or

22   their investigation, that means it's got to matter.  I mean,

23   that's what materiality is all about.

24             So we think it is important that, you know, if it

25   got to it, that a jury be instructed it's got to be about

1    something that's not ancillary.  It can't be a

2    nondeterminative fact.  It can't have had a negligible or

3    trivial impact.  It's got to have mattered.  If it got to

4    it, you know, you could expect we'll seek jury instructions

5    along those lines or, you know, in a Rule 29 make arguments

6    that they haven't, you know, made the cut there.

7           I think, you know, at bottom, you know, on the

8    materiality standard -- and we've addressed, I think, the

9    three main points that we wanted to make on this.

10           You know, what I want to just spend another moment

11   on, if the Court will permit it, is the theory of

12   materiality that the government is advocating here, which is

13   that any statement that's made to an investigative agency at

14   any time can be material at any moment in the life of an

15   investigation, from its birth to its death.  That is a

16   pretty sweeping theory of materiality, and we are not aware

17   of support for that broad a reading of materiality in the

18   law, and I don't think that the government, you know, can

19   cite any cases in support of that proposition.

20           That's significant in the broader context of

21   developments in the law.  And just to make the prudential

22   point that we made at the end, you know, in the past couple

23   of decades the Supreme Court has consistently reined in

24   overreaching prosecutors, whether it's in a fraud context or

25   corruption or otherwise, where the government is

1    overcriminalizing conduct, is stretching too far.  Right?

2    You know, the fisherman's fish counts as a tangible object

3    under Sarbanes-Oxley, that kind of thing.

4            The Supreme Court has really reined in the

5    overcriminalization of federal law.  I think, if you're

6    adopting a theory of materiality that says that any

7    statement made to an investigative agency at any time can

8    give rise to federal criminal liability, that's exactly the

9    kind of overreaching, overbroad approach to the criminal law

10   that the Court has really rejected.  That's one.

11           I think, you know, in assessing what kind of

12   materiality standard is appropriate, it's also important to

13   just reflect on the impact that this will have on the

14   willingness of individuals to come forward with tips and on

15   lawyering in general.  You know, we made this point that,

16   you know, the Special Counsel sort of brushes away as

17   unimportant or fanciful.

18           But we all have an interest in a functioning

19   public safety investigative apparatus that encourages people

20   to come forward when they've got credible tips of crimes, as

21   Mr. Baker himself has testified, and then they'll look if an

22   agency like the FBI wants to evaluate the evidence and take

23   steps to protect the American people.  If individuals know

24   that they can be prosecuted for coming forward with what

25   they believe is a good tip because they made some extraneous

1    ancillary statement that the government later believes is

2    false, that will unquestionably have a chilling effect on

3    the willingness of individuals to bring tips to the

4    government.

5          And it's particularly worrisome in the context of

6    lawyers.  It is astonishing that the Special Counsel has

7    charged a well-respected national security lawyer with

8    providing a tip that they don't even allege was bad, that

9    they don't even allege was false, to the government.  And

10   they are charging him and now saying and we have to go to a

11   jury on this case with making what they say is a false

12   statement about who his client was when even the FBI didn't

13   care where this information came from in the first place.

14         That will have the kind of chilling effect on

15   lawyer engagement with government lawyers that is not good

16   for anybody.  That's the reason why there are protections in

17   place in litigation; in other words, to protect the zone of

18   legal advocacy, to ensure that lawyers can be zealous

19   advocates for their clients.  They can interact with the

20   government.  And, you know, this is exactly the kind of

21   prosecution that will have a chilling effect on that kind of

22   legal advocacy to no one's better.

23         THE COURT:  It is the materiality element that is

24   designed to be the check on the type of chilling effects

25   that you're fearful of.

1          MR. BOSWORTH:  Absolutely.  And when the theory of

2    materiality is one that makes any statement material no

3    matter how irrelevant, no matter how ancillary to the

4    subject of the investigation, then that's no check at all.

5          And so to the extent that we care about the First

6    Amendment and, you know, lawyer, you know, advocacy in

7    interactions with the government, it's more important that

8    the actual standard that this Court adopts is one that

9    ensures that the statements that matter that are clearly

10   material do give rise to criminal liability and the

11   statements that don't matter don't.

12          THE COURT:  And it's not your argument, I take it,

13   that the motivations of a tipper or the providence of the

14   information that he or she is providing, putting aside its

15   accuracy, that that can never be material to the FBI's

16   response to that information or law enforcement's response

17   to that information.  You're just saying that the statement

18   here is too far afield.

19          MR. BOSWORTH:  That's correct, Your Honor.  Right.

20   As you can imagine, there are any number of circumstances

21   where the source of information may well implicate the

22   subject of the investigation itself, right?

23          For example, if you're passing along, "Hey, I

24   heard that this group of people is about to rob a bank,"

25   right?  Where that information came from is certainly part

 1     and parcel of the subject of the investigation.  How do they

 2     know it?  What did they hear?  That sort of thing.

 3              This is a very different piece because the data

 4     that ultimately was passed along was data, right, that can

 5     be examined and analyzed and assessed, and it speaks for

 6     itself.  To the extent that, you know, the data is wrong,

 7     doesn't support the conclusions that others passed along,

 8     well, here Mr. Sussmann gave all that to the FBI so the FBI

 9     could reach its own conclusions.  So in this case --

10              THE COURT:  Even if that data may have been

11     developed at the request of a competing presidential

12     campaign?

13              MR. BOSWORTH:  Yes.

14              THE COURT:  Okay.

15              MR. BOSWORTH:  The data is data no matter where it

16     comes from.

17              And, you know, not to go into it, but, you know,

18     there's also the sort of contextual argument.  This is one

19     of the arguments that we make about why here the notion

20     that, you know, hiding the relationship of Hillary Clinton's

21     campaign -- you know, the notion that Mr. Sussmann was

22     hiding the existence of the campaign and any involvement

23     he would have had here doesn't make a whole lot of sense.

24     Mr. Sussmann himself interacted with the FBI as a lawyer for

25     the Democratic National Committee not years before, but

1    weeks before the meeting with Jim Baker.  Jim Baker and the

2    FBI knew that he was a lawyer who, among many other clients

3    across sectors, represented a partisan client.

4         The government's animating theory here is that,

5    well, he was hiding the involvement of another partisan

6    client here.

7         What is the realistic delta between the Democratic

8    National Committee in an election year and the Democratic

9    National Committee's nominee for president in an election

10   year?  Not much.  And it's not for nothing that -- as the

11   discovery shows and, if we get to it, the evidence at trial

12   will show -- the FBI, as they talked about these

13   allegations, you know, to the extent that folks were witty

14   of Mr. Sussmann's connection to it, said, oh, the DNC lawyer

15   gave this, the DNC lawyer provided that.  Right?  The

16   indictment itself makes that clear; that the assistant

17   director's notes that are included in the indictment

18   specifically note that this information came from someone

19   who was a DNC lawyer.

20        So part of the argument about why none of this

21   could have ever mattered in the end is that the FBI knew

22   well that Mr. Sussmann was someone who represented partisan

23   clients in this presidential campaign, you know.  So it just

24   defies logic that he would have, you know, hid that and

25   gotten some benefit out of it.

1        For a related reason, right, if the theory is that

2   there was this grand conspiracy between Hillary Clinton and

3   Fusion GPS and Christopher Steele and Michael Sussmann to

4   ply the FBI with bad data, for one, that hasn't been

5   charged.  There's not a conspiracy that's charged.  There's

6   not a scheme to defraud that's been charged.  There's just a

7   false statement.

8        But even if that's your world view -- and it seems

9   to be the Special Counsel's world view -- the last thing

10  that the Clinton campaign would have done to perpetrate this

11  great scheme would be to send in a lawyer who's got a known

12  relationship with a partisan client with the DNC.  It just

13  doesn't make any sense.

14        That's an evidentiary argument, Your Honor, so --

15        THE COURT:  I think we're getting a little too far

16  afield.

17        MR. BOSWORTH:  We sure are.

18        THE COURT:  Anything else?

19        MR. BOSWORTH:  No, other than because ancillary

20  matters like that aren't relevant here, for the same reason

21  this false statement, we think, is immaterial as a matter of

22  law, and we'd ask the Court to dismiss the indictment for

23  that reason.

24        THE COURT:  Okay.  Mr. DeFilippis.

25        MR. DeFILIPPIS:  Thank you, Your Honor, and I

1    think the appropriate starting place here would be the legal

2    standard, which I don't think the defense has contested in

3    their briefs or their argument.  In citing the *Knowles* case

4    and other D.C. Circuit cases, "In ruling on a motion to

5    dismiss, the Court must assume the truth of the factual

6    allegations in the indictment."

7              And, Your Honor, I think Mr. Bosworth mentioned

8    Paragraph 32 of the indictment.  I think it's worth reading

9    a portion of Paragraph 32 of the indictment, which says that

10   "Sussmann's false statement to the FBI General Counsel was

11   material to the investigation because, among other reasons,

12   it was relevant to whether the FBI" -- "to the FBI whether

13   the conveyor of these allegations was providing them as an

14   ordinary citizen merely passing along information or whether

15   he was, instead, doing so as a paid advocate for clients

16   with a political or business agenda."

17             So that, Your Honor, is relevance, which

18   Mr. Bosworth points is a step short of materiality.

19             But the indictment goes on --

20             THE COURT:  I'm sorry, let me just interrupt.

21             MR. DeFILIPPIS:  Yes.

22             THE COURT:  And what actions does the government

23   believe the FBI may have taken in response to what you

24   contend will be a truthful answer to that question other

25   than what it took in response to what he said or what he

1    allegedly said?

2            MR. DeFILIPPIS:  Yes, Your Honor.  So -- and if I

3    could continue with that paragraph, which sort of lays that

4    out:  "Had Sussmann truthfully disclosed that he was

5    representing specific clients, it might have prompted the

6    FBI General Counsel to ask Sussmann for the identity of such

7    clients."

8            THE COURT:  So let's stop there.

9            MR. DeFILIPPIS:  Yes, Your Honor.

10           THE COURT:  And, first of all, is Mr. Bosworth

11   correct that the alleged false statement is an affirmative

12   one as opposed to a "no" answer to a question posed to him

13   by Mr. Baker?

14           MR. DeFILIPPIS:  I think that's right, Your Honor.

15   I never want to presume what a witness will say on the

16   stand, but I think that's correct.

17           THE COURT:  Of course.  So the theory -- I take it

18   the government's theory is not that his alleged statement

19   would have caused the FBI to open or not open an

20   investigation, or to devote more or fewer resources to that

21   investigation, but that the effect was that it lulled them

22   into not asking a series of follow-up questions about the

23   sources and origins of the underlying data which, in your

24   view, would be material to those functions of the FBI.

25           So a "no" answer to the client question caused

1    Mr. Baker and others at the FBI not to ask the types of

2    questions that Mr. Bosworth suggested -- "Hey, Michael,

3    where did this stuff come from?  You know, who gave it to

4    you?  What is this?" -- and that they would have asked those

5    questions had he given a "yes" answer to the client

6    question.

7              Is that the government's basic theory?

8              MR. DeFILIPPIS:  Your Honor, I think it's all of

9    the above.  I think all of the -- not only might they have

10   asked who the client was, but the indictment also itself

11   says that, "In addition, absent Sussmann's false statement,

12   the FBI might have taken additional or more incremental

13   steps before opening and/or closing an investigation."  So

14   that gets at the point Your Honor referenced before of a

15   preliminary or poll or assessment.  It also says that the

16   FBI might have allocated its resources differently or more

17   efficiently and uncovered more complete information about

18   the reliability and providence of the purported data at

19   issue.

20             So I think, Your Honor, the indictment really lays

21   out the full complicated decision tree that the FBI faced

22   here, which was, number one, where is this coming from and

23   who are the clients at issue, if anybody; and number two,

24   how do we go forward and investigate these allegations based

25   on the information we have.  And all of those decisions were

1    affected or could have naturally been affected by this

2    defendant's alleged lie.

3            And, Your Honor, Mr. Bosworth points to the

4    fact that there was no open investigation at the time that

5    Mr. Sussmann made his false statement.  In our view, that

6    enhances and multiplies the materiality of this false

7    statement.

8            In many cases, Your Honor, the government's

9    accused of charging process crimes when somebody is already

10   under investigation and they lie and affect the course of

11   that investigation.  Here the defendant didn't just affect

12   the course of the investigation.  He prompted an

13   investigation.  He triggered an investigation, which, in the

14   government's view, multiplies the materiality of his false

15   statement because he caused the FBI to initiate a new

16   investigation based on misleading information.

17           THE COURT:  Okay.  Respond to -- is Mr. Bosworth

18   correct that the government is not taking the position that

19   the underlying information was false?

20           MR. DeFILIPPIS:  Yes, Your Honor.  So two points

21   in response to that.

22           One is that no matter what information is

23   presented to the government -- whether it's data, whether

24   it's human sourced information -- it is always paramount

25   where the information came from, and it is always paramount

1    what the motivations, intentions, background is of the

2    person providing the information.

3              Your Honor, we will put on the stand at trial

4    witnesses who will say that, when you're analyzing data, you

5    don't simply close your eyes to where the data came from and

6    compare it to other data or look for corroboration through

7    other sources.  The first thing any responsible forensic

8    analyst will ask is "Where was the data from?"  And, Your

9    Honor, what the defendant did --

10             THE COURT:  But if that is a -- if that's the

11   first thing a responsible investigator would ask, then why

12   would it matter whether Mr. Sussmann was there on behalf of

13   a client or not?  Wouldn't the natural question have been,

14   "Where did this stuff come from?"

15             MR. DeFILIPPIS:  Your Honor, the reason that this

16   was so important here is because the defendant lulled the

17   FBI General Counsel into thinking that the defendant was

18   separated from the origins and providence of this data;

19   lulled the general counsel into thinking he wasn't being

20   paid for this work, he was coming as a good citizen; and,

21   therefore, made it less likely that they would think he

22   would answer those crucial questions.

23             I would also point out, Your Honor, that

24   materiality does not focus on the subjective circumstances

25   of a particular government official.  The standard is

1    whether it could have a tendency to affect the functions of

2    an agency objectively in the abstract.  And so there is case

3    law that we cite in our brief, Your Honor, that says even if

4    the government official knows full well that the statement

5    being made is false or knows full well other information

6    that contradicts it, it's still material.

7              And so that, Your Honor, is why we think -- all

8    the more reason why it's a jury question, but all the more

9    reason, Your Honor, why we think, even under those facts,

10   even if the FBI could have asked more or might have asked

11   more, it doesn't affect the objective standard that this

12   statement would have a tendency or could have a tendency to

13   affect agency decision-making.

14             THE COURT:  Let's go to jury-versus-judge

15   questions.  As I read your brief -- and correct me if I'm

16   wrong -- your position is that materiality in a 1001 charge

17   is always a jury question.  And the defendant's position is,

18   well, there are at least certain categories of cases where

19   the allegation is that the statement was ancillary or

20   nondeterminative where it may be a pretrial question for the

21   judge under Rule 12.

22             Is that your position, that materiality is always

23   a jury question?

24             MR. DeFILIPPIS:  Your Honor, I think the answer is

25   yes.  And if there's an exception to that, we haven't found

1    it.

2              All of the cases, even cited in the defendant's

3    brief, are ones where materiality was successfully

4    challenged.  It was either in a Rule 29 after the government

5    presented its case at trial or on appeal.  We have not

6    located a case where the indictment was dismissed on those

7    grounds.

8              THE COURT:  You know, just to take an extreme

9    hypothetical, right?  Say that the government alleged that

10   Mr. Sussmann came to the meeting from New York when, in

11   fact, he came to the meeting from Boston, you know,

12   something like that, or, perhaps more apt, the Tenth Circuit

13   case that was cited where the alleged false statement was

14   made in a preliminary PTO application, and, you know, the

15   evidence showed that the Patent Office actually never even

16   sees a preliminary PTO application, okay?

17             What if, you know, the government alleged a false

18   statement that fell into one of those categories of

19   statements where courts have held, you know, even on Rule 29

20   that, you know, that's just not material as a matter of law?

21   Could the Court then grant a pretrial motion to dismiss?

22             MR. DeFILIPPIS:  Yes, Your Honor.  I'm not saying

23   there could never be a case --

24             THE COURT:  Okay.

25             MR. DeFILIPPIS:  -- in which the Court could never

1   have a -- one of the other cases cited, the *Litvak* case,

2   which involved, you know, a decision that the Treasury

3   Department wasn't actually responsible for as the alleged

4   link for materiality.  There are certainly cases where there

5   might be a stronger case that on the face of the indictment

6   it doesn't allege materiality.

7        But I think in these circumstances where we have

8   information of a highly politically charged nature that is

9   brought to the FBI at the height of an election season, and

10  the alleged lie is that the defendant is not acting on

11  behalf of a client when, as the indictment alleges, one of

12  the clients was the opponent of the person who the

13  information was pertaining to, I think, Your Honor, that

14  well exceeds any argument that on its face the indictment

15  doesn't allege materiality.

16       And so I think, you know, the idea that there

17  should be some exception for attorneys in their dealings

18  with the government, quite the contrary, Your Honor.  I

19  think attorneys are well aware that they have an obligation

20  of candor in their dealings with the government, and to

21  carve out some kind of exception there because we don't want

22  to deter attorneys from bringing allegations to the

23  government, that's not the intent of this.  That's not the

24  effect of this.  Attorneys can bring anything they want to

25  the government as long as they're open and forthcoming about

1    what it is that they're saying and doing.

2            And so, Your Honor, I don't think the chilling

3    effect laid out by the defense is a real prospect.  I don't

4    think it's a danger.  If this Court would allow this

5    indictment to proceed, there would be no chilling effect on

6    attorneys or ordinary citizens.

7            THE COURT:  Okay.  Thank you very much.

8            Mr. Bosworth, brief last word?

9            MR. BOSWORTH:  Yes, Your Honor.  Two points.

10           One, I think it's significant that the Special

11   Counsel has conceded they're not alleging that the tip that

12   Mr. Sussmann provided was false, because that's what

13   underscores what an unprecedented prosecution this is.

14   Because he has been charged with making a false statement

15   that is ancillary to the tip itself where there's no

16   allegation that the tip itself was false.  That's one.

17           Two -- and Your Honor may well think this is a

18   fact question that will have to be hashed out in front of

19   the jury, but if, as the Special Counsel claims, the first

20   question that investigators would ask is where did the data

21   come from, that's the question that's paramount, it is

22   simply nonsensical for -- that the FBI did not ask those

23   questions here or that the FBI was lulled into believing

24   that the data was good.  And there are two reasons why.

25           One, Mr. Sussmann is a lawyer.  It's not like he's

1    sitting on a pool of DNS data.  They knew it came from

2    someone other than Mr. Sussmann, and they knew it because

3    that's obvious from the nature of the information.

4           They also knew it because, as Mr. Baker has

5    testified and otherwise indicated, you know, repeatedly,

6    Mr. Sussmann told him that the information originated with

7    various cyber experts.  At no point did the FBI say, "Who

8    are those experts?  Can we talk to them?  Where did they get

9    it from?"  So the notion that Mr. Sussmann's statement about

10   a client somehow affected the FBI's willingness to ask the

11   basic questions they ask in any case just doesn't hold

12   water.

13          We think, for all the reasons that we've argued,

14   Judge, that this statement is simply immaterial as a matter

15   of law.  It's not the kind of statement that matters because

16   it doesn't go to the subject of the investigation.  It

17   didn't have the kind of impact that you would expect a

18   material statement to have, and we think it's cause for the

19   indictment to be dismissed.

20          THE COURT:  Thank you.  The Court will take the

21   motion under advisement, and we'll try to get something out

22   sooner rather than later.  Well-briefed and argued on both

23   sides.

24          All right.  We scheduled this block as both a

25   motions hearing and a status conference.  There have been a

1     few things to come in recently.

2             I saw the government's CIPA 4 notice and

3     application.  I have briefly reviewed it.  I've not had an

4     opportunity to fully review it.  I may well have some

5     questions that will require an ex parte with the government.

6             My past practice has been also to do an ex parte

7     with the defense so that -- you know, in order to tell

8     whether a piece of information is relevant and helpful to

9     the defense, I may need a better idea of what the defense

10    actually is.  I'm not sure if that procedure will be

11    necessary here, but if it is, we'll reach out to you folks

12    to schedule a classified proceeding that will require, you

13    know, coming here to D.C.  So we'll try to get on that

14    sooner rather than later as well.

15            There were no 404(b) notices filed; is that

16    correct, Mr. DeFilippis?

17            MR. DeFILIPPIS:  Your Honor, the government did

18    send to the defense 404(b) notices.  We'd be happy to

19    provide that to the Court as well, if Your Honor would like.

20            THE COURT:  Yes.  Let me take a look at those.

21            MR. DeFILIPPIS:  Sure.

22            MR. BERKOWITZ:  And I think that those may be the

23    subject of some motions in limine as well, Your Honor, from

24    our perspective.  We got two separate 404(b) notices.  One

25    that was untimely from our perspective, but we'll address

1    all of that at the appropriate time.

2         THE COURT:  And I saw the proposed jury

3    questionnaire.  I will probably just incorporate your

4    proposals into the questionnaire that we ultimately issue

5    and resolve any disputed questions on our own without a

6    further hearing, so we will be back in touch with you all

7    about that.

8         That was all on my list.  Anything else while

9    we're here?

10        MR. DeFILIPPIS:  Your Honor, from the government,

11   just a couple of administrative-type matters.

12        First, the defense's deadline to file its Section

13   5 motion to declassify materials is April 4th, and we

14   noticed that the Court hadn't set any briefing schedule for

15   a reply to that.  So we were going to ask, I think with the

16   defense's consent -- but the defense will correct me, if I'm

17   wrong -- if the government could have until April 25th to

18   reply to that?  That would allow us time to consult with the

19   relevant agencies about any potential declassification.

20        THE COURT:  Mr. Berkowitz?

21        MR. BERKOWITZ:  Yes, I think as long as it doesn't

22   impact the ultimate trial date, we'll work with them on that

23   schedule.  We'd obviously like to have as much of that

24   resolved as much as possible, and hopefully they will be

25   able to get as much of the information that we think is

1    necessary declassified as possible and use that time in

2    order to do that as opposed to say why they didn't do it.

3    And if they can confer with us in the meantime to let us

4    know if there are going to be significant issues, we can

5    raise that with the Court in good faith.

6              THE COURT:  That's fine.  I would prefer not to

7    let the trial date slip, Mr. DeFilippis, so let's get after

8    it, okay?

9              MR. DeFILIPPIS:  Yes, Your Honor.  No, the

10   government's intent is to go to trial on the 16th of May.

11             And the second matter was -- and I think this is a

12   joint application -- that the parties be permitted to file

13   motions in limine of up to 50 pages.  We will certainly

14   endeavor to keep it shorter than that, but we wanted to be

15   safe, and perhaps Your Honor's resisting that one.

16             THE COURT:  50 pages per motion, or 50 pages

17   total?

18             MR. DeFILIPPIS:  Total, Your Honor.

19             THE COURT:  All right.  Well, that's fine.

20             MR. DeFILIPPIS:  Thank you, Your Honor.

21             THE COURT:  Try to be brief.

22             MR. DeFILIPPIS:  We will, Your Honor.

23             THE COURT:  Anything else?

24             MR. BERKOWITZ:  On behalf of Mr. Sussmann, I do,

25   unfortunately, have a couple of matters I want to bring to

1    the Court's attention that are recent developments.  They

2    concern experts and intention of the Special Counsel to

3    attack certain assertions of privilege and discovery.  And

4    I'll try and hit them briefly and answer any questions that

5    you have, Judge.

6            Last night, on a call with the Special Counsel,

7    they gave us notice about a potential expert witness.  They

8    sent a follow-up letter, which was a brief three-page

9    disclosure and a short five-page CV, about an expert who was

10   an agent assigned to the cyber division technical analysis

11   unit.

12           There are multiple problems we have with this.

13   And I'm happy to address it in a briefing schedule, but just

14   at a high level, we think the notice is untimely.  We've

15   been asking about potential experts since September.  3500

16   material was required weeks ago, and on the eve of trial,

17   six weeks away, to get an expert really does not give us

18   sufficient time to develop a counter expert and to respond.

19           Second, the notice is --

20           THE COURT:  I'm sorry, you'll have to brief it,

21   but what is the nature of the testimony?

22           MR. BERKOWITZ:  So the nature of the testimony is

23   outlined in the three pages, Judge.  It is they will provide

24   background information regarding two technical topics:  DNS

25   data and TOR.  So that's a technical issue.

```
 1              The second, and perhaps more troubling, is --

 2              THE COURT:  Aren't we going to want this jury to

 3      be able to understand the underlying technology?

 4              MR. BERKOWITZ:  Certainly we want them to

 5      understand what DNS data is, Your Honor.  It will --

 6              THE COURT:  You might want to start with the

 7      Court, too.

 8              MR. BERKOWITZ:  It was one of the first questions

 9      I had.  It's essentially two computers talking to each

10      other, and I don't know that that is the subject of, quote,

11      expert testimony or not.

12              One of the hard things for us, Judge, is what

13      exactly is he going to say?  There's no report.  And if all

14      he's going to do is give us two sentences about what DNS

15      data is, I doubt we'd come in and complain.  Maybe we could

16      have a stipulation on that.

17              But, you know, what if he goes further and says

18      things that we don't think are accurate, et cetera?  So --

19              THE COURT:  Why don't you talk to each other and

20      figure out exactly what the purpose of the testimony is and

21      how long it will be.  Sometimes everything under the sun

22      goes in these notices, and, in fact, the proponent doesn't

23      plan on eliciting everything in the notice.

24              MR. BERKOWITZ:  Yes, we'll talk.  I think it

25      probably makes sense for us to set a briefing schedule in
```

1    anticipation of there being a potential issue.

2           The second subject, Judge, is a harder, squishier

3    one, which is a reservation that essentially says that to

4    the extent that Mr. Sussmann questions witnesses about the

5    data and the accuracy of the data, or makes arguments that

6    the data was accurate, or perhaps even that he understood

7    was accurate, they reserve the right to challenge the

8    accuracy of the data.  And that really is unhelpful on a

9    number of levels and not really an expert on data.  We're

10   going to be filing a motion that says we think the only

11   thing that's relevant is Mr. Sussmann's state of mind as to

12   the accuracy of the data.

13          And we do intend, to be clear, to put on

14   information about Mr. Sussmann's knowledge and understanding

15   from information that he learned from other people.  That

16   shouldn't allow them to call an expert under some *in*

17   *terrorem* threat that they reserve the right to come in and

18   challenge the underlying accuracy of the data.

19          And, again, we're happy to brief this, Your

20   Honor.  I don't mean to try and catch you cold.  I wanted to

21   raise the issue because I think it's really important given

22   the timely situation here.

23          THE COURT:  I think we do need to brief it, but

24   since we're here, I guess how will this play out if the case

25   gets to trial?

1          Mr. DeFilippis, I take it you're not planning on

2     offering anyone in your case-in-chief to undermine the

3     accuracy of the data to the extent that that's relevant at

4     all.

5          MR. DeFILIPPIS:  Your Honor, the primary purpose

6     of this witness, as we said in the letter, would be

7     essentially a tutorial on Domain Name System data.  The

8     reason we had the paragraph or the section at the end was

9     that, to the extent the defense seeks to put at issue in the

10    trial whether the data was authentic or real or whether the

11    allegation submitted to the FBI was true, we certainly

12    intend to have FBI witnesses testify that their

13    investigation found the allegation was unsupported.

14          But to the extent the defense's cross-examination

15    would --

16          THE COURT:  That's different than whether the data

17    was accurate or not, right?

18          MR. DeFILIPPIS:  That's true, Your Honor, and that

19    is a much more complicated issue, whether the data was, in

20    whole or in part real, manipulated, cherry-picked, or any of

21    the above.  And I think all we were saying is that, to the

22    extent the defense puts those issues on the table, we were

23    reserving the right of this expert to opine on it.

24          But our primary intent was to --

25          THE COURT:  I guess a threshold question.  I mean,

1    we've argued about the accuracy of the data in connection

2    with this motion, you know, to what extent this was a

3    precedented or unprecedented prosecution, but what is the

4    relevance to the actual charge of the accuracy of the

5    underlying data?  Is it relevant at all?

6            MR. DeFILIPPIS:  And, Your Honor, I don't want to

7    suggest that we are going to make this an aspect of our

8    case-in-chief, but it certainly would be relevant if the

9    data were cherry-picked, manipulated, or fabricated because

10   it might go to the motive the defendant could have had to

11   conceal the origins of the data.  And I'm not suggesting

12   we're going to make that argument, but at least on an

13   abstract level, Your Honor, that is why it might be

14   relevant.

15           MR. BERKOWITZ:  And -- well --

16           THE COURT:  Go ahead.

17           MR. BERKOWITZ:  And, again, we are moving in

18   limine on this exact issue, that the accuracy of the data

19   be given; you know, the trial within a trial that that would

20   include.

21           And the lack of relevance really isn't

22   Mr. Sussmann's knowledge about it, right?  If they have

23   somebody that says that Mr. Sussmann knew that the data was

24   cherry-picked, which they don't, that might be relevant,

25   Your Honor, to his motives, but whether -- I mean, this

1    is -- this is DNS data that you and I and Mr. Sussmann and

2    others need people to explain, right?  It's not intuitive.

3    It's data.  It's numbers.  It's not as if it's something

4    that is, in fact, knowable without much more inquiry.

5          And so we're going to raise that in this case

6    what's relevant is what is in Mr. Sussmann's mind, what he

7    was told, what was communicated about those issues.  And

8    getting into a sideshow about the accuracy of the data,

9    which Special Counsel acknowledged they didn't intend to --

10   you know, on a materiality motion they didn't intend to

11   argue it wasn't accurate, nor do we intend to argue anything

12   other than Mr. Sussmann believed, to the extent that we can

13   prove that, and I understand we'll have to tie it up.

14          So I think that's the clear way of doing it, and

15   it will be the subject of a motion in limine.

16          THE COURT:  I get it, and we'll obviously

17   entertain any motion.

18          Anything else?

19          MR. BERKOWITZ:  Yes, so a briefing schedule on

20   that expert issue, if we can't come to ground on it, Your

21   Honor.  You can give it to us now.  You can give it to us

22   later, but I want to make sure we get that.

23          And the other issue is that we learned last night

24   that the Special Counsel is seeking, via, I believe, their

25   motion in limine, to litigate the issue of privilege and

1    challenge certain assertions of privilege.  They've

2    threatened to do this for some period of time, frankly,

3    during the investigation, but they failed to take action

4    challenging the privilege by Hillary from Erica, the

5    Democratic National Committee, Fusion, and others.  And only

6    last night we learned that they do intend to challenge that

7    privilege in the context of the motion in limine.

8              A couple of problems with that, Judge.

9              First, it's, you know, wildly untimely from our

10   perspective.  This is something that could have been done

11   years ago, if, in fact, they were going to do it.  It

12   implicates the underlying case in so many different ways, in

13   terms of what 3500 material would be, what witnesses can

14   testify about, what they might testify about.

15             And it's inappropriate to brief it, number two, in

16   the context of a motion in limine.  The people who hold the

17   privilege aren't even parties to this litigation.  They

18   don't have a briefing schedule, and it strikes me that this

19   is an issue that ought to be separately dealt with than in

20   the motion in limine context.  We don't know exactly what

21   the scope of the challenge of the privilege is, how it will

22   play out with witnesses.

23             One of our motions in limine is going to be how to

24   deal with assertions of privilege and other issues that come

25   up in the context of the case where a number of people, we

1      understand, are asserting a privilege and could assert a

2      privilege to questions that would be asked.  And we think --

3              THE COURT:  I'm sorry, these are potential defense

4      witnesses who may be expected to assert a privilege in

5      response to cross-examination?

6              MR. BERKOWITZ:  I don't believe so.  I believe

7      that they're prosecution witnesses.

8              THE COURT:  Prosecution witnesses, okay.

9              MR. BERKOWITZ:  Yes.  So those are the issues and

10     the concerns, and it's obviously, you know, a bit of a

11     hornet's nest that we need to make sure that we're as clear

12     and thoughtful about as possible.

13             THE COURT:  Can you address that issue,

14     Mr. DeFilippis?

15             MR. DeFILIPPIS:  Yes, Your Honor.  And I would say

16     that we've been working for some time in good faith with the

17     privilege holders, the asserted privilege holders whose

18     privilege is being asserted over various documents in this

19     case.  Those privilege holders would be Tech Executive 1,

20     the Clinton campaign, and another political organization.

21     We have tried for some time to understand better the theory

22     of privilege that is being asserted over various documents,

23     and, you know, we have had conversations and have been

24     unable to get comfort as to the grounding and bases of

25     various privilege theories that have been asserted here.

1    We now intend to call one or more witnesses from

2    places like the investigative firm that was working for the

3    Clinton campaign and from the Law Firm 1 described in the

4    indictment, the defendant's former employer.  And in the

5    context of hashing out the appropriate scope of testimony

6    for those witnesses, it's unavoidable that we have to

7    consider the question, okay, what is validly privileged and

8    what is not.

9    And so, Your Honor, for example, the Clinton

10   campaign is asserting privilege over communications of Tech

11   Executive 1 that they're not copied on, and so we have to

12   get to the bottom of, okay, is that a valid assertion of the

13   privilege.

14   There's also an assertion that the opposition

15   research being done by the investigative firm in this case

16   was all pursuant to legal advice, and while, you know,

17   obviously we don't have insight into what's in the

18   redactions, it's an assertion that we're trying to test and

19   see if it's valid.

20   So, Your Honor, I think it's fair to say we

21   haven't come to ground fully.  We're working on our motion.

22   But these issues are unavoidable, and we've been working for

23   quite some time to get to the bottom of it.

24   THE COURT:  Well, it strikes me that this is not a

25   motion in limine issue.  It's a motion to compel, right?

1          MR. DeFILIPPIS:  We may fashion it as that, Your

2    Honor.  I think the reason we were thinking of it as a

3    motion in limine is because there are discrete witnesses

4    where this comes up in their testimony.

5          THE COURT:  Okay.  And there will be a third party

6    on the other side of this motion other than the defendant,

7    correct?

8          MR. DeFILIPPIS:  That's right.  I imagine they

9    will want to be heard, Your Honor.

10          THE COURT:  Yes, I think we need to handle this on

11    a different track than the motion in limine schedule set

12    forth in the pretrial order.  And, again, the soonest we can

13    do this, the better.

14          MR. BERKOWITZ:  Yes.  And I can't underscore

15    enough, Your Honor, that this issue, and the potential

16    challenge to the privilege issue, is an issue that has been

17    talked about and discussed for well over a year, going back

18    to the investigation stage.  Honestly, to only now bring it

19    up six weeks before trial is, you know -- we'll make

20    arguments about violations of due process, and I do mean

21    that, and unfairness, and we're going to get new information

22    about what they might say.

23          You know, this isn't communications with

24    Mr. Sussmann, right?  They're communications with third

25    parties that we don't necessarily know what the issues are.

1    So it's, in our view -- and I say this, you know, with all

2    respect, but an ambush late in the day that could change the

3    entire parameter and focus of the case.

4              And so we're deeply concerned about it and agree

5    it makes sense to make sure that we brief it as quickly and

6    expeditiously as we can.

7              THE COURT:  All right.  Why don't you all do this.

8    Why don't you all get together and see if you can propose a

9    briefing schedule for both of the issues that you mentioned.

10   If there are competing proposals, let me know that.  And

11   then we'll set schedules for both of those issues, okay?

12   Does that make sense?

13             MR. BERKOWITZ:  Yes, that works.  And there were

14   some -- there's several thousand pages of discovery that we

15   were told that we were going to get soon.  We had a

16   discussion on that this morning.  And I don't think I need

17   to raise anything about that until we see what's actually in

18   there, so that's all we had.

19             THE COURT:  All right.  If there's nothing else,

20   we are adjourned, and we will see you the next time, all

21   right?

22             MR. BERKOWITZ:  Thank you, Judge.

23             MR. DeFILIPPIS:  Thank you, Your Honor.

24                  (Whereupon the hearing was

25                   concluded at 11:08 a.m.)

1        **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8        **NOTE:**  This hearing was held remotely by Zoom or some

9    other virtual platform and is subject to the technological

10   limitations of court reporting remotely.

11              Dated this 31st day of March, 2022.

12

13

14                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
15                              United States Courthouse
                                Room 6718
16                              333 Constitution Avenue, NW
                                Washington, DC 20001

17

18

19

20

21

22

23

24

25