**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Case No. 21-582 (CRC)** |
| | : | |
| **MICHAEL A. SUSSMANN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MOTION TO COMPEL THE PRODUCTION OF PURPORTED PRIVILEGED COMMUNICATIONS WITHHELD BY NON-PARTY ENTITIES FOR *IN CAMERA* INSPECTION BY THE COURT**

1.    The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully moves this Court to compel certain third parties to produce to the Court for *in camera* review certain communications which are currently being withheld from production and the Government's trial evidence based on asserted attorney-client privilege and work product protections.  As set forth in greater detail below, privilege logs and other non-privileged materials produced to the Government to date raise questions concerning the validity, scope, and extent of the privilege assertions being made here.  While the Government necessarily lacks complete information and therefore has drawn no final conclusions in this regard, the Government respectfully submits that it is appropriate for the Court to conduct an *in camera* review of certain limited documents in order to resolve these issues and ensure that only legitimately privileged and/or attorney work product-protected communications and testimony be withheld from the otherwise admissible evidence and testimony that is presented to the jury at trial.  The Government respectfully requests this review because, among other reasons:

1

(1)      Non-party entities the Democratic National Committee ("DNC"), Hillary for America ("HFA"), the entity referred to in the Indictment as the "U.S. Investigative Firm," and the law firm referred to in the Indictment as "Law Firm-1," have all withheld and/or redacted documents and communications that the government otherwise might seek to admit at trial based on an apparent theory that political opposition research and/or public relations work conducted by the U.S. Investigative Firm at the behest of those entities falls within the legitimate scope of attorney-client privilege and work-product protections.  They have done so despite the fact that almost all of these materials appear to lack any connection to actual or expected litigation or the provision of legal advice.  In fact, of the 1,455 documents withheld by U.S. Investigative Firm, only 18 emails and attachments involve an attorney.

(2)      During the relevant time period in 2016 and continuing until at least in or around 2021, individuals currently or previously affiliated with the U.S. Investigative Firm, HFA, and/or Law Firm-1 intentionally failed to maintain requisite confidentiality over materials and communications arising from their work relating to the 2016 U.S. Presidential election and, therefore, did not legitimately avail themselves of, or have subsequently waived, the protections of the attorney-client privilege and/or work product doctrines.

(3)      In connection with this investigation and the pending trial in this case, the DNC and HFA have asserted attorney-client privilege and/or work product protections over communications solely between a technology executive referred to in the Indictment as "Tech Executive-1" and a person from the U.S. Investigative Firm whom the Government has subpoenaed to testify at trial, despite the fact that no one from either the DNC or HFA is copied on certain of these communications.    Tech Executive-1's counsel has also claimed privilege over these

2

communications even though Tech Executive-1 did not retain and was not retained by the U.S. Investigative Firm.

## **FACTUAL BACKGROUND**

2.      The Government assumes the Court's familiarity with the facts contained in the Indictment and in its prior filings.

3.      On or about March 22, 2021, as part of its grand jury investigation, the Special Counsel's Office served a grand jury subpoena on U.S. Investigative Firm.  As relevant here, the subpoena requested relevant materials relating to, among other things, "**non-privileged** records involving [Law Firm-1], [the defendant], or any other lawyers" and "correspondence with or among computer researchers regarding these data and allegations," concerning allegations of (i) a purported secret communications channel between the Trump Organization and Russian Bank-1 and (ii) use of Russian Phone Provider-1 phones by Donald Trump and/or individuals affiliated with Donald Trump.  In a subsequent subpoena, served on or about July 9, 2021, the Special Counsel's Office requested that U.S. Investigative Firm produce non-privileged records concerning documents and/or agreements relating to the retention of U.S. Investigative Firm by the DNC and HFA.

4.      Since receiving service of these subpoenas, U.S. Investigative Firm, through counsel, has complied with the subpoena and produced relevant documents on a rolling basis.  In doing so, however, the U.S. Investigative Firm has withheld approximately 1,455 documents that are responsive to the subpoenas based on claims of attorney-client privilege and attorney work product protections.  For most of the responsive documents, the privilege log explains that the reason for withholding is because they contain "research prepared at the direction of [Law Firm-1]

in anticipation of litigation, and for the purpose of providing legal advice." The vast majority of the entries reflect communications with no lawyer listed as a sender, recipient, or copied party.

5.      The Government similarly served one or more grand jury subpoenas covering records involving the same or similar subject matters to the DNC, HFA, Law Firm-1, Tech Executive-1 and certain companies with which Tech Executive-1 is or was affiliated. The DNC, HFA, Law Firm-1, and the aforementioned companies have made productions of documents with accompanying privilege logs. Tech Executive-1, however, continually has asserted his Fifth Amendment right against self-incrimination over any responsive documents within his personal possession, custody, or control.

6.      On September 16, 2021, the Government issued grand jury subpoenas to Law Firm-1 and the U.S. Investigative Firm, requiring them to produce – in redacted form – the documents previously listed on privilege logs prepared by counsel for those entities so that such documents would be available for admission into evidence at any trial in this matter. Those entities subsequently produced the requested documents with redactions.

## APPLICABLE LAW

7.      The attorney-client privilege applies to communications that a client conveys to his attorney for the purpose of securing an opinion on law, legal services, or assistance in a legal proceeding. *See In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (internal citations omitted). The privilege is extended to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administrative justice." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn co. v. United States*, 449 U.S. 383, 389 (1981)). Because the privilege "has the

effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *United States v. Zolin*, 491 U.S. 554, 562 (1989) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

8.      Still, the privilege, if it exists, is neither absolute nor inviolable.  "Thus, where there are close calls, the Court will put a thumb on the scales in favor of narrow construction of the elements of the privilege." *United States v. Singhal*, 800 F. Supp. 2d 1, 6 (D.D.C. 2011).  For example, when a client abuses the system by consulting an attorney for the purpose of furthering criminal or fraudulent activity, the attorney-client privilege is overcome by the "crime-fraud exception" and such information loses its protected status. *Id.*  In such circumstances, the value to society of encouraging attorney-client communications is outweighed by the "costs of probative evidence foregone." *In re Grand Jury Proceedings*, 183 F.3d 71, 76 (1st Cir. 1991).

*The Intermediary Doctrine*

9.      Although disclosure to a third party generally vitiates the attorney-client privilege, this Court and others have recognized an exception to this rule where the third party is a necessary intermediary between the client and attorney. *See In re Lindsey*, 158 F.3d 1263, 1279-80 (D.C. Cir. 1998); *United States v. Kovel*, 296 F.2d 918, 921-22 (2d Cir. 1961).  "[T]he typical case in which the intermediary doctrine has been held to apply involves the client's fundamental inability to communicate without an intermediary" — that is, where a defendant and an attorney speak different languages and need an interpreter to communicate. *In re Lindsey*, 158 F.3d at 1280.  This exception has likewise been applied to other situations where intermediaries are necessary, such as where an attorney utilizes an accountant to understand a client's financial information. *Kovel*, 296 F.2d at 921-22.

5

10.     But the "intermediary" exception is narrowly construed.  In considering whether a client's communication with his or her lawyer through an intermediary is privileged, the "critical factor" is "that the communication be made 'in confidence for the purpose of obtaining legal advice from the lawyer." *In re Lindsey*, 158 F.3d at 1280 (citing *Linde, Thomson, Langworthy, Kohn & Van Dyke v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (emphasis and quotations removed)).

*The Common Interest Rule*

11.     "The joint defense privilege, often referred to as the common interest rule, is an extension of the attorney-client privilege that protects from forced disclosure communications between two or more parties and/or their respective counsel if they are participating in a joint defense agreement." *United States v. Hsia*, 81 F. Supp. 2d 7, 16 (D.D.C. 2000).  It protects communications between the parties where they are "part of an on-going and joint effort to set up a common defense strategy" in connection with actual or prospective litigation. *In re Bevill, Bresler & Schulman Asset Management*, 805 F. 2d 120, 126 (3d Cir. 1986); *see also In re Grand Jury Subpoena*, 274 F. 3d 563, 575 (1st Cir. 2001).  "It permits a client to disclose information to [its] attorney in the presence of joint parties and their counsel without waiving the attorney-client privilege and is intended to preclude joint parties and their attorneys from disclosing confidential information learned as a consequence of the joint defense without permission." *United States v. Hsia*, 81 F. Supp. 2d at 16.  "[T]he rule applies not only to communications subject to the attorney-client privilege, but also to communications protected by the work-product doctrine." *In re Grand Jury Subpoenas*, 902 F. 2d 244, 249 (4th Cir. 1990); *see also Lugosch v. Congel*, 219 F.R.D. 220,

240 (N.D.N.Y. 2003) ("The exchange of work product among attorneys with identical litigation perspectives should not render such tangible information vulnerable to pretrial discovery.")

12.     "[T]he joint defense or common interest rule presupposes the existence of an otherwise valid privilege." *In re Grand Jury Subpoenas*, 902 F.2d at 249.   All attorney-client communications or work product therefore must first satisfy the traditional requisites for the attorney-client or work product privilege before they become or remain privileged.   Once these requirements are satisfied, shared or jointly created material must pass an additional test: It must be disclosed pursuant to a common legal interest and pursuant to an agreement to pursue a joint defense.   *Cf. Gregory J. Kopta*, Applying the Attorney-Client and Work Product Privileges to Allied Party Exchange of Information in California, 36 U.C.L.A. L. REV. 151, 197 (1988).   It is also established that the party asserting the attorney-client or work product privilege always bears the burden of demonstrating that the communications/documents sought to be shielded are, in fact, privileged.   *See*, Fed. R. Civ. P. 26(b)(5); *In re Lindsey*, 158 F.3d 1263, 1270 (D.C.Cir.1998).   The same is true in the context of the joint defense privilege.   *See In re Bevill, Bresler & Schulman Asset Management*, 805 F.2d at 126.

13.     "In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived."   *In re Bevill, Bresler & Schulman Asset Management*, 805 F. 2d 120 at 126.   It is incumbent on a party claiming the joint defense privilege, therefore, to establish that "the parties had agreed to pursue a joint defense strategy."   *Id.*   "Some form of joint strategy is necessary to establish a [joint defense agreement] rather than merely the impression of one side." *United States*

*v. Weissman*, 195 F. 3d 96, 100 (2d Cir. 1999).  Obviously, a written agreement is the most effective method of establishing the existence of a joint defense agreement, although an oral agreement whose existence, terms and scope are proved by the party asserting it, may be enforceable as well. *See Hsia*, 81 F. Supp. 2d at 17.

14.     If a joint defense agreement has been proven to exist and the scope of the agreement is clear, the party seeking to claim privilege still must demonstrate that the specific communications at issue were designed to facilitate a common legal interest; a business or commercial interest will not suffice.  *See, e.g., Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995).  "The privilege arises out of the need for a common [legal] defense, as opposed merely to a common problem."  *Medcom Holding Company v. Baxter Travenol Laboratories*, 689 F. Supp. 841, 844 (N.D. Ill. 1988).  The joint defense privilege thus requires evidence of a "coordinated legal strategy" between two or more parties.  *Shamis v. Ambassador Factors Corporation*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999)."  *See also Minebea Co. v. Papst*, 228 F.R.D. 13, 15–16 (D.D.C.  2005).

## DISCUSSION

15.     The Government respectfully requests that the Court compel third parties to produce to the Court for *in camera* review certain communications which are currently being withheld from production to the Government based on asserted protections that require scrutiny.  The Government has attached hereto as Exhibit A the redacted documents or privilege log entries pertaining to such documents as to which it seeks the Court's *in camera* review.

## I.   The U.S. Investigative Firm's Provision of Opposition Research and Media Relations Services to Law Firm-1, HFA, and DNC

16.     The first category of documents for which the Government seeks *in camera* review are select documents that would appear to involve or relate to the U.S. Investigative Firm's provision of opposition research and media strategy-related services to the HFA, DNC, and/or Law Firm-1.  In particular, the Government (1) attaches a redacted version of the retention agreement between Law Firm-1 and the U.S. Investigative Firm, and (2) lists 38 emails and attachments between and among Law Firm-1, Tech Executive-1 and/or U.S. Investigative Firm employees.

17.     As an initial matter, the DNC and HFA's claims of privilege over communications involving the U.S. Investigative Firm's work for those entities during the 2016 Presidential election would appear to stretch and potentially contravene the appropriate bounds of the attorney-client privilege.  The Government does not dispute that the U.S. Investigative Firm conducted opposition research regarding Trump's purported ties to Russia at the behest of the Clinton Campaign and the DNC through a retention agreement with Law Firm-1.  But in doing so, the U.S. Investigative Firm was not primarily providing or supporting expertise relating to *legal advice*; instead, it appears that the investigative firm's primary, if not sole, function was to generate opposition research materials that the firm then shared widely with members of the media, the U.S. State Department, the Department of Justice, the Federal Bureau of Investigation ("FBI"), members of Congress, and others.  These efforts resulted in numerous media articles and reports in the period before and after the U.S. Presidential election.  Perhaps most notably, the U.S. Investigative Firm retained a United Kingdom-based investigator ("U.K. Person-1") who compiled information and reports that became a widely-known "dossier" containing allegations of purported coordination between Trump and the Russian government.  The firm also drafted one of the white papers that the defendant provided to

the FBI General Counsel in their meeting on September 19, 2016.  That white paper, which is attached hereto as Exhibit B, provided an overview of the parent company of Russian Bank-1 and described its purported ties to Russian government officials and certain U.S. persons and entities.

18.     Any analysis of the purpose for lawyer-client relationship naturally must begin with applicable retention agreements.  Here, in April 2015, HFA engaged Law Firm-1 and Campaign Lawyer-1 to provide "legal counseling and representation of [HFA] in connection to its legal affairs, including the Federal Election Commission and other regulatory requirements and general organizational and compliance matters."  The HFA agreement also covered legal services related to "state election matters and preparation for post-election recounts/contests."  In or about October 2015, the DNC and the Democratic Congressional Campaign Committee engaged Law Firm-1 to provide legal advice in connection with the "Federal Election Commission and other regulatory requirements and general organizational and compliance matters."  Neither agreement even mentioned opposition research, public relations strategy, or similar services as included within its scope.

19.     Subsequent to these engagements, on or about April 1, 2016, Law Firm-1 engaged the U.S. Investigative Firm in connection with the 2016 U.S. Presidential election.  As set forth in the letter memorializing that engagement, attached hereto as Exhibit C, the purported purpose was for the U.S. Investigative Firm to support Law Firm-1's legal advice to clients on "defamation, libel and similar laws in which accuracy is an essential legal element."

20.     Many, if not most, of the actions taken by the employees of U.S. Investigative Firm thereafter do not appear to have been a necessary part of, or even related to, Law Firm-1's legal advice to HFA and the DNC.  Instead, contemporaneous communications and other evidence make

clear that the primary purpose of the U.S. Investigative Firm's work relating to the U.K. Person-1 dossier, the Russian Bank-1 allegations, and other issues was to assemble and publicize allegations that would aid the campaign's public relations goals.[1]  For example:

- *None* of the privilege logs or documents produced by the above entities would appear on their face to refer or relate to litigation or anticipated litigation whatsoever, much less to litigation involving libel or defamation.

- According to public information and interviews conducted by the Special Counsel's Office, in July 2016 – approximately *one month* after being retained by the U.S. Investigative Firm, U.K. Person-1 shared purported intelligence that he had collected with an FBI agent, a U.S. Department of Justice official, and a U.S. State Department official.

- In addition, according to interviews conducted by the Special Counsel's Office, the Clinton Campaign's Chair and other high-ranking HFA officials were not even aware at this time of U.K. Person-1's identity and did not know that he or the U.S. Investigative Firm specifically had been retained on their behalf.  (Such witnesses appear to have been generally aware that Law Firm-1 had assembled a team to conduct opposition research and claim to have been briefed only to a limited degree on the products and details of that work.)

- According to open source information and public statements, beginning in or around July 2016, the founder of the U.S. Investigative Firm actively communicated and arranged meetings

---

[1] Certain of these allegations themselves would later prove unsubstantiated and a basis for future litigation and liability.  *Christopher Steele's Firm Ordered in U.K. to Pay Damages to Russian Bankers*, WALL STREET JOURNAL, July 8, 2020, Allen Cullison and Georgi Kantchev (available at https://www.wsj.com/articles/christopher-steeles-firm-ordered-in-u-k-to-pay-damages-to-russian-bankers-11594247095).

with numerous members of the media about the U.S. Investigative Firm's ongoing work.  Personnel

from the U.S. Investigative Firm also facilitated meetings between reporters and U.K. Person-1 in

order to share information from the aforementioned confidential "dossier" with such reporters.[2]

These efforts resulted in, among other things, a September 23, 2016 article in *Yahoo News*, which

contained considerable factual detail about U.K. Person-1's opposition research, including

allegations that a named Trump campaign advisor had met with Russian officials.[3]  The article also

included an assertion from an anonymous senior U.S. law enforcement official that the FBI was

looking into the allegations.

- As set forth in the Government's motions *in limine*, the U.S. Investigative Firm

aggressively pushed media outlets to cover the Russian Bank-1 allegations, despite the fact that

Tech Executive-1 and certain of his associates *and* the U.S. Investigative Firm had expressed or

acknowledged a lack of certainty about the information's reliability.

- Most relevant here, on October 15, 2016 – two weeks before news stories would

first appear about the Russian Bank-1 allegations – a reporter emailed an employee of the U.S.

---

[2] *See, e.g.*, *Crime in Progress*, Glenn Simpson & Peter Fritsch, p. 109 (describing how the U.S. Investigative Firm rented rooms at the Tabard Inn on September 22, 2016 to offer individualized briefings to journalists with U.K. Person-1); *see also The Real Story Behind the Steele Dossier*, Peter Nicholas, THE ATLANTIC, November 21, 2019 (noting that "[the U.S. Investigative Firm's] office in Washington's Dupont Circle neighborhood became 'something of a public reading room' for journalists seeking information about Trumpworld" and that "[l]ooking to meet with reporters and possibly advance stories about Trump and Russia, [investigative firm personnel] made an appearance at the  Democratic convention in Philadelphia in July 2016. While there, they met the New York Times executive editor. . . Two months later, [firm personnel] arranged for Steele to come to Washington and meet privately with the Washington Post and marquee investigative reporters at the Times, The New Yorker, ABC News and other outlets."

[3] *U.S. intel officials probe ties between Trump adviser and Kremlin*, September 23, 2016, YAHOO NEWS.

Investigative Firm, stating in part, "anything new Russkie/Donald wise?," to which the U.S. Investigative Firm employee responded, "do the [expletive] [Russian Bank-1] secret comms story. It's hugely important.  Forget the wikileaks side show."

- On the same date, the reporter replied:

  > [T]he problem with the [Russian Bank-1] story at this point is that *my cyber expert colleagues cannot satisfy themselves about the authenticity of some of the key data,* which they say from what they can tell is NOT public data. *We are in contact with your experts* via different channels but my colleague [] in Silicon Valley still hasn't got the confidence he says he needs to understand where all the data originated. If you can help more with this pls do…

(emphasis added).

- Later on that date, the U.S. Investigative Firm employee replied: "***It's everyone's problem***.  Call [Researcher-2] at [University-1]."  (Emphasis added).

- On October 30, 2016, the aforementioned U.S. Investigative Firm employee forwarded to the same reporter a tweet stating that the U.S. Senate Majority Leader had "talked w/ top NatSec officials who say that [the FBI Director] 'possesses explosive information' about Trump's ties to Russia."  The U.S. Investigative Firm employee's email stated: "time to hurry." The reporter replied, "Here's the first 250 words," and included in the email a partial draft of the article for the U.S. Investigative Firm employee's review.  The reporter published the article the next day.

21.     That the U.S. Investigative Firm played this role in promoting the wide dissemination of its own and others' research would appear to contravene any notion that the primary purpose of their work was to aid confidential legal advice from Law Firm-1 about potential libel and defamation litigation.  If anything, such conduct – urging reporters to "hurry" to publish

stories before "problem[s]" about "authenticity" had been resolved – would itself arguably *create* significant libel and defamation litigation risk.  And even if the U.S. Investigative Firm's other work did in some respects prove important to Law Firm-1's provision of legal advice, that alone would not render such work and related communications privileged.  *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 54 (S.D.N.Y. 2000) (the "possibility that communications between [a public relations firm and a law firm] may help the latter to formulate legal advice is not in itself sufficient to implicate the privilege [because] 'the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client'" quoting *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999)); *see also id.* (declining to apply attorney-client privilege to a public relations firm because, "far from serving the kind of 'translator' function served by the accountant in *Kovel*, the firm provided "ordinary public relations advice.")

22.     Given the foregoing facts, assertions of attorney-client privilege and work product protections as to the U.S. Investigative Firm's work deserve careful scrutiny.  Importantly, the DNC and HFA's position that such work falls within the scope of the privilege has been rejected in this district before.  *See Blumenthal v. Drudge*, 186 F.R.D. 236, 243 (D.D.C. 1999).  In *Blumenthal*, the court held that advice from a "media, journalistic [or] political" consultant that is not used in providing legal advice is not privileged because the communication is not "made in confidence for the purpose of obtaining legal advice from the lawyer."  *Id.*  Such is the case here, and the aforementioned entities' blanket assertions of privilege and work product protections over essentially all internal communications by the U.S. Investigative Firm warrants *in camera* review.

14

23.     In addition, the above facts and information suggest that even if a valid privilege did exist at the commencement of the relationship, any such privilege might since have been waived. Indeed, personnel from the U.S. Investigative Firm have published a lengthy book that describes in considerable detail their investigative firm's internal discussions and deliberations, including conversations with Campaign Lawyer-1.  Glenn Simpson & Peter Fritsch, *Crime in Progress* (2019), p. 56-57 (describing the U.S. Investigative Firm's pitching their work to Campaign Lawyer-1); *id.* at 109-112 (describing strategy to set up briefings by U.K. Person-1 with members of the press).  And the authors appear to expressly suggest that Campaign Lawyer-1 purposefully structured the U.S. Investigative Firm's relationship with Law Firm-1 to maintain confidentiality over their work. *Id.* at 57 ("[Campaign Lawyer-1] said [U.S. Investigative Firm] would be reporting only to him, which sounded great to [the U.S. Investigative Firm employees].  They didn't want to have any contacts with the campaign brass.  [Campaign Lawyer-1] wanted it that way for legal reasons: If [their] communications were with a lawyer, they could be considered privileged and kept confidential.")

24.     Moreover, in March 2020, U.K. Person-1 testified in a foreign proceeding about his work for the U.S. Investigative Firm.  U.K. Person-1 described, among other things, the contents and substance of meetings he conducted as part of his work, including a July 2016 meeting with the defendant and the U.S. Investigative Firm at Law Firm-1's offices in which they discussed the Russian Bank-1 allegations.  Testimony of U.K. Person-1, March 18, 2020, *In the High Court of Justice, Queen's Bench Division*, Claim QB-2018-006349, at 1-3; *see also* Supplemental Witness Statement of UK Person-1, *In the High Court of Justice, Queen's Bench Division*, Claim QB-2018-

006349.[4]  Accordingly, these extensive public disclosures by former agents of HFA, DNC, and Law

Firm-1 likely vitiate any assertion that those entities maintained sufficient confidentiality over their

work and deliberations to avoid a waiver of the attorney-client privilege and work product

protections.  *United States v. All Assets Held at Bank Julius Baer & Co.*, 315 F.R.D. 103, 109

(D.D.C. 2016).

     25.    Accordingly, the Government respectfully requests that the Court review *in camera*

the un-redacted versions of (i) the enclosed retention agreement between Law Firm-1 and the U.S.

Investigative Firm[5] and (ii) documents contained at rows 1 through 30 of Attachment A, to

---

    [4] U.K. Person-1 also testified that "because the U.S. Investigative Firm's client was a law firm, I understood that the purpose of this intelligence-gathering exercise was to provide [Law Firm-1] with information for the purposes of the provision of legal advice to its client and/or for prospective legal proceedings in the US, as further discussed below . . . [Campaign Lawyer-1] did not state that the research was being sought for and/or on behalf of the Hillary Clinton campaign, and he did not inform me of the identity of his client. He merely told me that he was a partner of [Law Firm-1] and his business card made reference to the same.  In light of the context in which [my company] was being asked to investigate and provide any relevant intelligence, the nature of the work we were being asked to do, and the entity which was asking for it, however, I formed the view that [Law Firm-1's] objective was to advise on legal issues arising or otherwise assist with contemplated legal proceedings to overturn an anticipated adverse Presidential election result for Mrs Clinton."

    U.K. Person-1's largely un-informed speculation in this regard, however, is not determinative and does not obviate the need to analyze the actual work and communications at issue before making a determination about the applicability of attorney-client privilege and work product protections.

    [5] The contents of retention agreements and communications relating thereto are not typically privileged.  *See United States v. Naegele*, 468 F. Supp. 2d 165, 171 (D.D.C. 2007) ("[T]he amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege[, but] correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege."); *Duttle v. Bandler & Kass,* 127 F.R.D. 46, 52 (S.D.N.Y. 1989) (holding it is "black letter law that '[a]ttorneys' bills and communications regarding retainer agreements are not privileged").

determine if they, or the currently redacted portions of such documents, are subject to valid claims of attorney-client privilege or work product protections.

## II.     Communications Involving Tech Executive-1 and the U.S. Investigative Firm

26.     The Government next moves for *in camera* review of (i) certain communications between the U.S. Investigative Firm and Tech Executive-1 that appear to relate to the Russian Bank-1 allegations, and (ii) other emails that precede, and appear to relate to, those communications. These communications include, among other things, emails between Tech Executive-1 and an employee of the U.S. Investigative Firm whom the Government has subpoenaed as a trial witness (the "Investigative Firm Witness").

### A.  Relevant Background

27.     By way of background, at the same time the defendant and Law Firm-1 represented the DNC and HFA, the defendant also represented Tech Executive-1.  The contours of that representation remain somewhat murky.  In or about February 2015, Tech Executive-1 retained the defendant as his lawyer in connection with an investigation of the DOJ Office of Inspector General in which Tech Executive-1 was a witness.  The defendant also frequently served as outside counsel to Internet Company-1, which was a significant source of revenue for Law Firm-1 and the defendant.  In his December 2017 testimony before the House Permanent Subcommittee on Intelligence, the defendant acknowledged bringing the Russian Bank-1 allegations to the FBI General Counsel and to Agency-2 on behalf of a specific client, namely, Tech Executive-1 (whom the defendant did not identify by name).

28.     As is detailed in the Indictment, the defendant never billed Tech Executive-1 or Internet Company-1 for his pre-election work on the Russian Bank-1 allegations, but instead billed

that work to the Clinton Campaign.  Indeed, in early September 2016, the defendant and Tech Executive-1 began to draft a white paper which he would later provide to the FBI.  At that time, the defendant billed his work on the white paper to the Clinton Campaign.  For instance, on September 5, 2016, the defendant billed work to the Clinton Campaign that read, in part, "work on white paper; follow-up telephone conferences and email."  Ind. ¶ 24a.  And on September 6, 2016, the defendant billed the Clinton Campaign for his work on the Russian Bank-1 allegations, with a description "Meeting with consultant [and Campaign Lawyer-1]; revisions to white paper; meeting with expert; meeting with expert and reporter; follow up meeting with reporter; conversations with [Campaign Lawyer-1]."  *Id.* ¶ 24b.  Nevertheless, both the defendant's and Tech Executive-1's counsel have represented to the government that the defendant represented Tech Executive-1 in these matters during the relevant time period of the Indictment.

29.     Privilege log entries reflect that in or around August 2016, the defendant and Tech Executive-1 began communicating with the U.S. Investigative Firm in connection with what appears to be the Russian Bank-1 allegations.  In particular, on August 11, 2016, the defendant, Campaign Lawyer-1, and the U.S. Investigative Firm exchanged emails with the subject line, "connecting you all by email."

30.     Thereafter, on August 26, 2016, an employee of the investigative firm ("Investigative Firm Employee") emailed the defendant with the subject "Re: hey".  A few days later, on August 30, 2016, U.S. Investigative Firm employees began to exchange drafts of a document titled: "[Name of Russian Bank-1's Parent Company] Overview," which the defendant would provide to the FBI General Counsel at their September 19, 2016 meeting and which is attached hereto as Exhibit B.

31.     In addition, according to the U.S. Investigative Firm's privilege log, on August 30, 2016, Tech Executive-1 sent an email to the defendant and the Investigative Firm Witness with the subject line, "Privileged Client/Attorney Communication-New York 1," with two attachments named "PGP_MIME Versions Identification.dat" and "OpenPGP encrypted message.asc".

32.     Thereafter, on August 30, 2016, Tech Executive-1 and the Investigative Firm Witness exchanged two additional emails without copying the defendant.  The next day, Tech Executive-1 sent another email to the defendant and the Investigative Firm Witness titled, "Privileged Client/Attorney Communication-New York 2," with two attachments.

33.     As noted above, billing records show that on or about the same date, the defendant exchanged emails with the author of the Newspaper-1 article asking for a meeting, which occurred on September 1, 2016.  The defendant billed his time for the meeting to HFA under the broader billing description "confidential meetings regarding confidential project."

34.     The Government respectfully submits that the above documents, and the additional documents listed in Exhibit A, warrant *in camera* review.  As an initial matter, counsel for the HFA and DNC have asserted attorney-client privilege and work product protections over *all* of these communications, including those *solely* involving Tech Executive-1 and the Investigative Firm Witness.  In addition, counsel for HFA, the DNC, the U.S. Investigative Firm, and Tech Executive-1 all have confirmed that Tech Executive-1 was not retained by, and did not himself retain, any of those entities.  Accordingly, it does not appear that these emails solely between Tech Executive-1 and the Investigative Firm Witness reflect confidential communications sent or prepared for the purpose of obtaining or dispensing legal advice.  Rather, these communications likely reflect non-

19

confidential efforts by separate individuals and entities to share or exchange information after having been connected with each other by a third party, *i.e.*, Law Firm-1.

35.     To the extent these entities continue to assert privilege over the cited documents, they cannot plausibly rely on the "intermediary" exception.  To be sure, the record available to the Government does not reflect that employees of the U.S. Investigative Firm were necessary in any way to facilitate Law Firm-1's provision of legal advice to HFA and DNC, much less to Tech Executive-1.  As noted above, many of the actions taken by the U.S. Investigative Firm pursuant to its retention agreement fell outside the purpose outlined in Law Firm-1's engagement letter – that is, to provide expertise related to Law Firm-1's legal advice to the DNC and Clinton Campaign regarding defamation and libel.  When U.S. Investigative Firm employees communicated with Tech Executive-1, they were doing so in furtherance of collaborating and promoting the Russian Bank-1 allegations, not facilitating legal advice from [Law Firm-1] to Tech Executive-1.  Simply put, these were communications related to political opposition research and were not made "in confidence for the purpose of obtaining legal advice from the lawyer."  *In re Lindsey*, 158 F.3d at 1280.  Any confidentiality that Tech Executive-1 might have otherwise maintained over these communications was waived when he and the defendant chose to disclose such information to a third party that did not have any formal or informal contract or retention agreement with Tech Executive-1 (*i.e.*, the U.S. Investigative Firm).

36.     Nor can the DNC and HFA claim that they share a common legal interest with Tech Executive-1.  To satisfy this standard, the DNC and HFA would have to show that the parties understood the communications were in furtherance of a shared legal interest and that the common interest be legal, rather than commercial or personal.  *In re Lindsey*, 148 F.3d at 1106 ("[A]dvice

on political, strategic, or policy issues" cannot be "shielded from disclosure by the attorney-client privilege.")  Although Tech Executive-1 could and did apparently share a common personal interest in seeking to promote the success of the Clinton Campaign in the 2016 Presidential Election, such a relationship does not and cannot fall in the narrow category that is reserved for co-litigants pursuing a shared legal strategy.  *United States v. Philip Morris USA*, 99-CV-2496, 2004 WL 5355972, at *6 (D.D.C. Feb. 23, 2004) ("The privilege applies only to legal advice and not to business opinions or public relations advice.")  Because, at most, Tech Executive-1 is a third party with no privileged relationship to the DNC and HFA, Tech Executive-1's inclusion on communications with employees of U.S. Investigative Firm and the defendant waived any arguably applicable attorney-client privilege.  The fact that employees of U.S. Investigative Firm shared information gained through such communications with others, including various members of the media, further "demonstrate[s] that the communication was not intended to be confidential." McCormick on Evidence, § 91 & n.9 (8th ed.).

37.     Finally, determining the appropriate contours of the attorney-client privilege and work product protections in this context will be critical to establishing the appropriate bounds of trial testimony for the aforementioned Investigative Firm Witness.  To date, counsel for the DNC and HFA have permitted witnesses whom the Government has interviewed to discuss little, if any, substance of their work under the relevant retention agreements.  This is so even though it appears that much of that work – including the work product it generated – was not maintained under practices of strict confidentiality and did not appear to be essential to the provision of any legal advice, anticipated litigation, or actual legal proceedings.  While several witnesses, including Campaign Lawyer-1, have informed the Government that Campaign Lawyer-1 did, in fact dispense

legal advice to HFA and the DNC in connection with the U.S. Investigative Firm's work, it does not appear that *most* of the relevant communications furthered, or were exchanged in order to facilitate, such advice.   Because the proper application of attorney-client privilege and other privileges requires *particularized* analysis of the purpose and circumstances of *individual* communications (as well as of the contents of specific *portions* of those communications to determine what should be redacted), the Government submits that *in camera* review is appropriate here.   *Vento v. I.R.S.*, 714 F. Supp. 2d 137, 154 (D.D.C. 2010) (holding that "documents will not be protected in their entirety, unless redacting the portions of the documents that reveal deliberations is impossible"); *see also SEC v. Gulf & Western Industries*, 518 F. Supp. 675, 682 (D.D.C. 1981).

38.   After conducting an *in camera* review of the documents described in Exhibit A, the Government respectfully requests that the Court should order the production in unredacted form of any such documents for which the court determines that the attorney-client privilege and/or work product protections do not apply.

## **CONCLUSION**

For the foregoing reasons, the Court should conduct an *in camera* review of the retention agreement between Law Firm-1 and the U.S. Investigative Firm and the documents listed in Exhibit A.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

/s/ Jonathan E. Algor
Jonathan E. Algor
Assistant Special Counsel
jonathan.algor@usdoj.gov

Andrew J. DeFilippis
Assistant Special Counsel
andrew.defilippis@usdoj.gov

Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

Brittain Shaw
Assistant Special Counsel
brittain.shaw@usdoj.gov