# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

*v.*

**MICHAEL A. SUSSMANN,**

      *Defendant*.

Case No. 1:21-cr-00582

---

## DEFENDANT'S RESPONSE TO THE SPECIAL COUNSEL'S MOTIONS *IN LIMINE*

Defendant Michael A. Sussmann, by and through undersigned counsel, respectfully submits this opposition to the Special Counsel's Motions *in Limine*, *see* Dkt. No. 61 (hereinafter "SCO Motion").

## INTRODUCTION

In his Motion, the Special Counsel declares that "[a] jury will have to decide only whether the defendant knowingly and willfully made a materially false statement to the [Federal Bureau of Investigation ("FBI")] General Counsel.  Nothing more, nothing less."  SCO Motion at 43.  We agree.  And yet throughout this case and his Motion, the Special Counsel seeks to put other people, other conduct, and other issues on trial that have nothing to do with the narrow false statement crime the Special Counsel has actually brought against Mr. Sussmann.  Indeed, with no apparent sense of irony, he spends the bulk of his Motion literally trying to prove a conspiracy theory—a so-called "joint venture" that even he concedes was *lawful*—in order to convince this Court to admit into evidence numerous confusing, irrelevant, and prejudicial emails that Mr. Sussmann did not send, receive, or even have knowledge of.  The Court should not countenance the Special Counsel's effort to make this case more than it is, and it should keep the jury's focus where it

should be: on whether or not Mr. Sussmann made a materially false statement to the FBI—"nothing more, nothing less," as the Special Counsel has said.

For the reasons set forth below, Mr. Sussmann respectfully submits: (1) this Court should deny the Special Counsel's Motion to admit Mr. Priestap's and Ms. Anderson's notes, and prohibit the Special Counsel from offering the notes into evidence, eliciting any testimony about them, or publishing them to the jury at any time (*see infra* pp. 3-9); (2) this Court should deny the Special Counsel's Motion to admit certain third-party emails and other "similar communications" (*see infra* pp. 9-27); (3) this Court should deny the Special Counsel's Motion to admit an October 31, 2016 tweet from Hillary Clinton (*see infra* pp. 27-32); (4) this Court should only admit, pursuant to Rule 404(b), (a) the specific statement Mr. Sussmann is alleged to have made to the Central Intelligence Agency (the "CIA"), (b) certain discrete portions of Mr. Sussmann's testimony before the House Permanent Select Committee on Intelligence ("HPSCI") that pertain to Mr. Sussmann's September 2016 meeting with Mr. Baker, and (c) two specific statements Perkins Coie LLP ("Perkins Coie") made to the news media—and this Court should find that the Special Counsel has waived his right to seek the admission of four other categories of evidence pursuant to Rule 404(b), namely, (a) the gathering of the data by Mr. Joffe and others, (b) the accuracy of the data gathered by Mr. Joffe and others and the conclusions drawn therefrom, (c) Mr. Sussmann's purported statement to the CIA that his meeting with Mr. Baker was on a "similar but unrelated matter," and (d) the purported failure by Mr. Sussmann to preserve certain text messages in violation of Perkins Coie policies (*see infra* pp. 32-44); and (5) while Mr. Sussmann agrees that evidence of political motivation or bias on the part of the Special Counsel is not relevant to Mr. Sussmann's trial, this Court should confirm that Mr. Sussmann may introduce evidence or

argument concerning independently relevant matters such as witness credibility or investigatory tactics (*see infra* pp. 44-45).

## ARGUMENT

### A.    The Special Counsel's Motion *in Limine* Regarding Mr. Priestap's and Ms. Anderson's Notes Should be Denied

The Special Counsel first moves to admit notes taken by then-Assistant Director E. William "Bill" Priestap and then-Deputy General Counsel Trisha Anderson in connection with conversations they purportedly had with Mr. Baker after his meeting with Mr. Sussmann (the "Notes"). As Mr. Sussmann anticipated in his own motion regarding the Notes, the Special Counsel seeks to admit the Notes as either: (1) Mr. Baker's prior consistent statements, pursuant to Federal Rule of Evidence 801(d)(1)(B), or (2) Mr. Priestap's and Ms. Anderson's past recollections recorded, pursuant to Federal Rule of Evidence 803(5). For all the reasons explained in Mr. Sussmann's motion, however, this unreliable triple hearsay should not be admitted on either of those grounds, nor should the Special Counsel be permitted to elicit any testimony about the Notes or publish them to the jury. These Notes—taken by two people who were not even witness to Mr. Sussmann's statement—epitomize the type of untrustworthy evidence the hearsay rules are meant to exclude and, if admitted into evidence, would prejudice Mr. Sussmann and mislead the jury to overvalue the scattered scribblings of two FBI employees who cannot be subject to meaningful cross-examination.

### 1.    The Notes are Not Admissible as Mr. Baker's Prior Consistent Statements

The Special Counsel asserts, without analysis, that if Mr. Sussmann impeaches Mr. Baker's credibility or memory, the Court should admit the Notes as Mr. Baker's prior consistent statements because "both sets of notes are squarely consistent with what the Government expects the General Counsel will testify at trial." SCO Motion at 8-9. To be sure, and as Mr. Sussmann acknowledged

in his own motion, if the Special Counsel can lay a proper foundation (which the defense does not concede), it could be permissible for the Special Counsel to elicit testimony from *Mr. Baker* about his own prior consistent statements.  But the Special Counsel has not cited a single case in support of the extraordinary proposition that the government may prove up the prior consistent statements of one witness by introducing the unsigned, unsworn notes of another witness who lacks any specific memory about them.  In fact, there is meaningful law to the contrary.  And the Special Counsel's motion should be denied for three independent reasons, any one of which would be sufficient: (1) Mr. Baker did not adopt the Notes as accurate immediately following his conversation with either Mr. Priestap or Ms. Anderson; (2) neither Mr. Priestap nor Ms. Anderson can be subject to meaningful cross-examination about their conversation with Mr. Baker, let alone the content of their Notes; and (3) the Notes are fundamentally and fatally unreliable.

*First*, as noted in Mr. Sussmann's Motion *in Limine* to Exclude Testimony or Evidence Pertaining to Former FBI Assistant Director Bill Priestap's and Deputy General Counsel Trisha Anderson's Notes, ECF No. 58 (the "Motion to Exclude the Notes"), the law is clear that where one witness's statements are recorded in the notes of another, the notes may only be "properly treated as a prior consistent statement" where, "immediately following the [underlying conversation]," the declarant "adopted the notes as accurate and in accord with his own recollection." *United States v. Rubin*, 609 F.2d 51, 62 (2d Cir. 1979), *aff'd*, 449 U.S. 424 (1981); *see also United States v. Ho*, 984 F.3d 191, 209 (2d Cir. 2020) (finding that text messages could be treated as a prior consistent statement because the witness "could be said to have adopted, *at the time*, the view expressed in the [record]" (emphasis added)), *cert. denied*, 141 S. Ct. 2862 (2021).  In this case, however, Mr. Baker did not "adopt[] the notes as accurate and in accord with his own recollection" "immediately following" his conversations with Mr. Priestap or Ms.

Anderson, as is required.  Mr. Baker reviewed the Notes, for the first time, *years* after they were created.  *See* Mem. of Special Couns.'s Interview of J. Baker at SCO-3500U-009270 (June 11, 2020).  And there is no evidence that he adopted the scattered sentence fragments captured in the Notes as accurate in any event.  *See* J. Baker Grand Jury Test. at SCO-3500U-009339 (June 10, 2021) (suggesting that Mr. Priestap's notes are incomplete); *id.* at -340 (clarifying that he could not remember all the details in Mr. Priestap's notes).

*Second*, as explained in greater detail in Mr. Sussmann's Motion to Exclude the Notes, where the government seeks to introduce a prior consistent statement through a third-party witness, the third-party witness must be subject to meaningful cross-examination.  *See, e.g.*, *United States v. Hebeka*, 25 F.3d 287, 292 (6th Cir. 1994) (accepting prior consistent statement where "[b]oth witnesses [the third-party witness and the declarant] were *subject to cross examination concerning their memory* of past events" (emphases added)); *United States v. Montague*, 958 F.2d 1094, 1095, 1099 (D.C. Cir. 1992) (holding government could admit a declarant's prior consistent statement "through the *testimony* . . . of a third party" police officer that "took the statement, *identified* it, and *presented it to the jury*" (emphases added)); *Gibbs v. Doe*, No. 4:17-CV-00179-RBH, 2018 WL 5013596, at *2 (D.S.C. Oct. 16, 2018).  Here, however, neither Mr. Priestap nor Ms. Anderson can be subject to meaningful cross-examination about the Notes or Mr. Baker's purported statements to them, because they simply do not remember them.  For his part, Mr. Priestap does not "recall actually writing these notes," nor does he even remember who gave him the information in the Notes or why he wrote them down.  *See* E.W. Priestap's Grand Jury Test. at SCO-3500U-018798, -815 (June 3, 2021).  For her part, Ms. Anderson has at best a "vague recollection" of a conversation with Mr. Baker, forgetting "specifics" and expressing "surprise[]" at the content of

her notes.  Mem. of Special Couns.'s Interview of T. Anderson at SCO-3500U-000088, -96 (Jan. 5, 2022).

*Third*, the Notes are fatally unreliable.  *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) ("untrustworthy evidence should not be presented to the triers of fact").  They are a triple hearsay game of telephone, purportedly reflecting what one person wrote about what another person said about what yet another person said.  The Notes consist of half-formed, incomprehensible sentence fragments.  They were not sworn, adopted, typed, or preserved in any remotely formal report or transcript.  And unsurprisingly, no participants to the conversations underlying the Notes—not the note-takers, Mr. Baker, nor anyone else—remembers when the Notes were created, during which meetings they were taken (if any), why they were written, who wrote them, or even who provided the information recorded in them.  The hearsay rules are intended to exclude precisely this sort unreliable evidence.  *Id*.

2.      *The Notes Are Not Admissible as Mr. Priestap and Ms. Anderson's Past Recollections Recorded*

The Special Counsel breezily argues, in the alternative, that "the note-takers' testimony at trial will establish a sound basis for the admission of the notes as 'past recollection[s] recorded'" pursuant to Rule 803(5).  SCO Motion at 9.  But the Special Counsel fails to acknowledge the requirements of that Rule and, more critically, fails to discuss the ways in which the Notes actually fall far short of meeting those requirements.

*First*, the Special Counsel cannot establish that the records here relate to matters the authors "once knew."  Fed. R. Evid. 803(5)(A) (to qualify as a recorded recollection, the record must be "on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately").  Here, Mr. Priestap has no recollection of taking the notes—or even if his notes reflect a conversation with Mr. Baker.  E.W. Priestap's Grand Jury Test. at SCO-3500U-018815-16 (June

3, 2021) (testifying that he "[does] not recall actually writing these notes" and was "not certain whether th[e] conversation reflected in the notes . . . was with Mr. Baker or maybe with someone else"). Ms. Anderson only has a "vague recollection" of the conversation and does not remember "specifics" of her conversation with Mr. Baker in any event. Mem. of Special Couns.'s Jan. 5, 2022 Interview of T. Anderson at SCO-3500U-000088, -96. Given these vacant memories of insignificant events that occurred nearly six years ago, the Special Counsel cannot possibly establish that the Notes meet the first requirement of Rule 803(5).

*Second*, the Special Counsel cannot establish that Mr. Priestap or Ms. Anderson made or adopted the Notes when the "matter[s]" were "fresh" in their minds. Fed. R. Evid. 803(5)(B). Here, neither Mr. Priestap nor Ms. Anderson can say when they actually took their notes. *See* E.W. Priestap's Grand Jury Test. at SCO-3500U-018798 (June 3, 2021) (Mr. Priestap testifying that he "[didn't] remember why [he] wrote them down and who gave [him] the information"); Mem. of Special Couns.'s Interview of T. Anderson at SCO-3500U-000088 (Jan. 5, 2022) (Ms. Anderson explaining she "thinks" the relevant conversation occurred with Mr. Baker one-on-one, after the deputies meeting, only based on the way the notes were written). Indeed, Mr. Priestap has expressly and affirmatively said he has "no idea" when he wrote the critical phrase—"said not doing this for any client"—a phrase that appears to have been written in a different font and at an angle, suggesting they may have even been added at some other time. *See* E.W. Priestap's Grand Jury Test. at SCO-3500U-018816 (June 3, 2021). Without being able to say when they wrote the Notes, Mr. Priestap and Ms. Anderson cannot establish that they took their respective notes at a time when the matters were "fresh" in their mind.[1]

---

[1] While the Special Counsel suggests that Mr. Baker "will testify that he . . . spoke to these witnesses . . . when the details were fresh in *his* mind," SCO Motion at 9 (emphasis added), that is utterly beside the point. The question is not whether Mr. Baker spoke to the witnesses when the

*Third*, and most critically, the Special Counsel cannot demonstrate, as the Rule requires, that the Notes "accurately reflect" Mr. Priestap's and Ms. Anderson's "knowledge." Fed. R. Evid. 803(5)(C). Where, as here, "a person perceives an event and reports it to another person who records the statement," both the original witness and "[t]he recorder must . . . *testify to the accuracy of his transcription*." *United States v. Schoenborn*, 4 F.3d 1424, 1427-28 (7th Cir. 1993) (emphases added) (citation omitted); *see also United States v. Booz*, 451 F.2d 719, 725 (3d Cir. 1971) (same). The recorder must also offer "testimony [that] sufficiently supports" that the record "accurately reflected his knowledge at th[e] time [it was written], notwithstanding his inability (at the time of trial) to remember the [underlying] event itself." *Parker v. Reda*, 327 F.3d 211, 213-14 (2d Cir. 2003) (per curiam).

The Special Counsel's assertion that "both witnesses will testify that their notes accurately reflect what the [Mr. Baker] told them," SCO Motion at 10, is puzzling. This claim is flatly irreconcilable with the Jencks Act material the Special Counsel has produced for these witnesses. Again, Mr. Priestap has testified to the grand jury, under oath and under penalty of perjury, that he does "not recall actually writing these notes," does not "remember why [he] wrote them down," and does not remember "who gave [him] the information." E.W. Priestap's Grand Jury Test. at SCO-3500U-018798, -815 (June 3, 2021). And Ms. Anderson has similarly said to the Special Counsel that she has, at most, a "vague recollection" of a conversation with Mr. Baker but does

---

matters were fresh in his mind; the question is whether Mr. Priestap and Ms. Anderson took notes of the purported conversations when the matter was fresh in *their* minds. Fed. R. Evid. 803(5)(B) (requiring that a record have been "made or adopted *by the witness* when the matter was fresh in *the witness's* memory" (emphases added)); *see also, e.g.*, *United States v. Hieng*, 679 F.3d 1131, 1143 (9th Cir. 2012) (holding a testifying detective's tally sheet containing numerical information from *other* detectives met Rule 803(5)'s requirements because the detective "testified that he accurately recorded the numbers each [of the other] detective[s] reported to him *immediately after they gave him their verbal reports*, while the matter was fresh in *his* mind" (emphases added)).

not otherwise recall many "specifics," and could only offer guesswork as to what her notes mean. Mem. of Special Couns.'s Interview of T. Anderson at SCO-3500U-000088 (Jan. 5, 2022).  We are aware of no witness statements produced by the Special Counsel in which either Mr. Priestap or Ms. Anderson have said that their Notes accurately reflect what Mr. Baker told them.  And how could they, given that they cannot confirm when the Notes were taken; what Mr. Baker said; or what the Notes even mean.  It is difficult to conceive of a situation in which past recorded recollections could be less reliable.[2]

The Court should accordingly deny the Special Counsel's Motion and prohibit him from offering the Notes into evidence, eliciting any testimony about them, or publishing them to the jury at any time.

### B.    The Court Should Preclude the Admission of Emails Not Involving Mr. Sussmann

The Special Counsel seeks to admit two categories of emails that Mr. Sussmann did not send, receive, or even have knowledge of: (1) various emails between Mr. Joffe, computer researchers, and others involved in gathering and analyzing data (the "Researcher Emails"); and (2) various emails between members of the press and, as a general matter, Fusion GPS (the "Fusion Emails" and together with the Researcher Emails, the "Emails").

---

[2] The Special Counsel also includes, in two short footnotes, two alternative grounds for admitting the Notes.  *First*, he argues that the Notes can be admitted to prove Mr. Baker's state of mind.  *Second*, he argues that the Notes can be admitted to prove Mr. Baker and the FBI's course of conduct.  SCO Motion at 9 nn.4-5.  These arguments—which do not include a single citation to any authority—are obviously without merit, as evidenced by the Special Counsel's unwillingness to discuss them even in the body of his Motion.  The Notes prove neither Mr. Baker's state of mind nor his or the FBI's course of conduct.  If anything could prove them, it would be Mr. Baker's own statements, to which he can testify without the need for unreliable, extrinsic evidence that is otherwise inadmissible under the theories the Special Counsel has actually chosen to brief.

As set forth in greater detail below, the Special Counsel's Motion should be denied for three principal reasons. *First*, the Special Counsel has not articulated any lawful basis for admitting the emails as proof of something other than the truth of the matter asserted. *Second*, the Special Counsel cannot meet his burden of proving to this Court—by a preponderance of the evidence—that the emails contain statements made in furtherance of any cognizable conspiracy or joint venture. *Third*, the emails are irrelevant to the only crime with which Mr. Sussmann has been charged; the emails would prejudice Mr. Sussmann; and, as a simple review of the Special Counsel's twenty-page Motion makes clear, this jumble of evidence will only serve to needlessly confuse the jury. Indeed, for similar reasons and in similar circumstances, a court in this District rejected the government's effort to admit, in a false statements case, emails purportedly sent in furtherance of an uncharged conspiracy. *See United States v. Safavian*, 435 F. Supp. 2d 36 (D.D.C. 2006).

The Special Counsel has elsewhere suggested that a jury here will "have to decide only whether the defendant knowingly and willfully made a materially false statement to the FBI General Counsel. Nothing more, nothing less." SCO Motion at 43. The defense agrees, and for this reason, emails that did not even involve Mr. Sussmann, emails that have no bearing on his state of mind, and emails that shed no light on what specifically he said to Mr. Baker are irrelevant and should not be admitted into evidence at trial.

## 1.   *Background*

The Special Counsel seeks to admit "emails cited in the Indictment and other similar communications" as "highly probative" evidence to "refute the defendant's alleged statement to the FBI that he did not provide the [Alfa Bank] allegations to the FBI 'on behalf of any client.'" SCO Motion at 10. The Special Counsel has not identified the complete universe of emails he has in mind, but he primarily relies on, as examples, at least ten Researcher Emails and seven Fusion

Emails.  Mr. Sussmann cannot address with any specificity statements which the Special Counsel does not identify, and insofar as the Special Counsel seeks to introduce "other similar communications" in addition to the examples provided, Mr. Sussmann reserves the right to offer specific responses and objections to the same.

a.      The Researcher Emails

The Special Counsel's Motion mostly focuses on nine emails the Special Counsel seeks to admit between Mr. Joffe and other technical experts, in which the participants discuss their Domain Name System ("DNS") data hypotheses, challenges pertaining to the analyses of that data, and technical conclusions that may be drawn from the same.  *See id.* at 19-27.  The Special Counsel also submits a tenth email from Mr. Joffe to a fellow employee following the election.  *See id.* at 19.  We set forth in Table 1, below, a summary of the example Researcher Emails identified in the Motion.

| Table 1. Researcher Emails | | | | |
| --- | --- | --- | --- | --- |
| Date & Time | Sender | Recipient(s) | Subject | Citation |
| Aug. 20, 2016 9:12 PM | April Lorenzen | To: Rodney Joffe Cc: Manos Antonakakis, David Dagon | next | SCO Motion at 19-21. |
| Aug. 20, 2016 9:18 PM | Rodney Joffe | To: April Lorenzen Cc: Manos Antonakakis, David Dagon | Re: next | SCO Motion at 22. |
| Aug. 21, 2016 11:46 PM | Rodney Joffe | To: Manos Antonakakis Cc: David Dagon, April Lorenzen | Re: Little more analysis | SCO Motion at 24. |
| Aug. 22, 2016 6:24 PM | Manos Antonakakis | To: April Lorenzen Cc: Rodney Joffe, David Dagon | Re: fire and forget vs. steps | SCO Motion at 25. |
| Sept. 14, 2016 8:35 PM | Rodney Joffe | To: Manos Antonakakis, David Dagon, April Lorenzen | White Paper | SCO Motion at 25. |
| Sept. 14, 2016 8:58 PM | Manos Antonakakis | To: Rodney Joffe Cc: David Dagon, April Lorenzen | Re: White Paper | SCO Motion at 25-26. |
| Sept. 15, 2016 9:55 AM | April Lorenzen | To: Rodney Joffe, Manos Antonakakis, David Dagon | Re: White Paper | SCO Motion at 26. |
| Sept. 15, 2016 2:35 PM | David Dagon | To: April Lorenzen Cc: Rodney Joffe, Manos Antonakakis | Re: White Paper | SCO Motion at 26-27. |
| Sept. 16, 2016 10:35 AM | April Lorenzen | To: David Dagon Cc: Rodney Joffe, Manos Antonakakis | courtesy | SCO Motion at 27-28. |
| Nov. 17, 2016 4:38 AM | Rodney Joffe | To: Nicolai Bezsonoff | Re: Trump transition team now lacks cyber security expertise \| VentureBeat \| Security \| by Reuters | SCO Motion at 19. |

These "example" communications fall into three categories.

*First*, the Special Counsel sets forth emails between Mr. Joffe, Manos Antonakakis (a Georgia Institute of Technology ("Georgia Tech") researcher), April Lorenzen (a business associate of Mr. Joffe), and David Dagon (another Georgia Tech researcher) from August 20-22, 2016, in which they discuss DNS research. In particular—and as set forth in the many pages of text excerpted by the Special Counsel in his Motion—they discuss certain DNS data to be reviewed, how to approach the DNS data, open-source research they have independently conducted, hypotheses about what the DNS data may show, and challenges faced in their data review.

*Second*, the Special Counsel identifies emails between Mr. Joffe, Mr. Antonakakis, Ms. Lorenzen, and Mr. Dagon from September 14-16, 2016, in which Mr. Joffe provides a white paper pertaining to hypotheses drawn from the DNS data, through which Mr. Joffe seeks and receives the researchers' feedback on the same.

*Third*, on November 17, 2016, in response to an article sent by a fellow employee about the Trump Administration's lack of a cybersecurity expert, Mr. Joffe states that he was offered "the top job by the Democrat side when it looked like they'd win." SCO Motion at 19.

The Special Counsel has not alleged that there is anything unlawful about any of the above-communications; the Special Counsel has not alleged that Mr. Sussmann had knowledge of any of these communications; and obviously, the Special Counsel has not (and could not) allege that Mr. Sussmann was a party to any of these communications.

b.      The Fusion Emails

The Special Counsel also seeks to admit seven emails "among others" from October 2016, which he describes as "communications in which personnel from [Fusion GPS ("Fusion")] sought to discuss, advance, and disseminate the [Alfa Bank] allegations." SCO Motion at 30. In point of

fact, all the emails do not involve Fusion: one of them is an email between a reporter and David

Dagon.  The only common party to all seven emails is a member of the press.

| Table 2. Fusion Emails | | | | |
|---|---|---|---|---|
| Date & Time | Sender | Recipient(s) | Subject | Citation |
| Oct. 18, 2016 10:59 AM | Mark Hosenball (*Reuters*) | Peter Fritsch (Fusion) | Re: i heard | SCO Motion at 30. |
| Oct. 18, 2016 11:01 AM | Peter Fritsch (Fusion) | Mark Hosenball (*Reuters*) | Re: i heard | SCO Motion at 30. |
| Oct. 18, 2016 11:04 AM | Mark Hosenball (*Reuters*) | Peter Fritsch (Fusion) | Re: i heard | SCO Motion at 31. |
| Oct. 18, 2016 4:02 PM | Peter Fritsch (Fusion) | Mark Hosenball (*Reuters*) | Re: i heard | SCO Motion at 31. |
| Oct. 22, 2016 13:55 PM | Franklin Foer (*Slate*) | David Dagon | Trump/Russia article | SCO Motion at 31. |
| Oct. 30, 2016 | Peter Fritsch (Fusion) | Franklin Foer (*Slate*) | Reid | SCO Motion at 31. |
| Oct. 30, 2016 | Franklin Foer (*Slate*) | Peter Fritsch (Fusion) | Re: Reid | SCO Motion at 31. |

These seven emails represent three email conversations: (1) an email conversation between

a *Reuters* reporter and Fusion; (2) an email from a *Slate* reporter to David Dagon on October 22,

2016; and (3) a conversation between a *Slate* reporter and Fusion prompted by a tweet from a

reporter for the *Huffington Post*.  Once again, the Special Counsel has not alleged that there is

anything unlawful about any of the above communications; the Special Counsel has not alleged

that Mr. Sussmann had knowledge of any of these communications; and obviously, the Special

Counsel has not (and could not) allege that Mr. Sussmann was a party to any of these

communications.

> 2. *The Special Counsel Has Failed to Identify a Lawful Basis for Admitting the Emails to Prove Something Other than the Truth of the Matter Asserted*

The Special Counsel claims that the Emails are admissible because they are not being

offered to prove the truth of the matter asserted.  In support of this claim, the Special Counsel

principally and variously contends that the Emails are admissible: (1) to establish relevant "factual

context," SCO Motion at 21; (2) to prove "the defendant's and [Mr. Joffe's] . . . state of mind," *id.*

at 28; and (3) because they are "verbal acts." *Id.* at 23.  Each of these contentions is completely lacking in merit and provides no basis for admitting communications that are textbook hearsay.

*First*, the Emails cannot be admitted simply because the Special Counsel deems them to be "factual context."  The Special Counsel has not cited any authority for the proposition that calling out-of-court statements "context" transforms them into something other than hearsay.  In fact, courts including the D.C. Circuit have soundly rejected precisely this ploy.  *See United States v. Stover*, 329 F.3d 859, 870 (D.C. Cir. 2003) (refusing to accept the government's claim that "all out-of-court statements offered for context do not constitute hearsay"); *see also United States v. Vo*, 766 F. App'x 547, 549 (9th Cir. 2019) ("[I]nvoking the word 'context' does not permit an end-run around the hearsay rules such that the government may smuggle into evidence all [of the informant's] statements."); *United States v. DeCologero*, 530 F.3d 36, 59 (1st Cir. 2008) (affirming exclusion of statements as hearsay that provided "context" only if true).

In *Stover*, for example, the government introduced an out-of-court declarant's statement that drugs should be referred to as clothes as evidence of the fact that the defendant used clothing terminology to refer to drugs in other conversations.  In the government's view, because such a statement provided "context," it did not constitute hearsay.  The D.C. Circuit categorically disagreed.  According to the court, the fact "that a statement provides context to other evidence does not mean that the statement is not hearsay.  All relevant evidence provides context to the events underlying the charged crime.  The question is whether the statement is offered for its truth." *Stover*, 329 F.3d at 870.  The D.C. Circuit then determined that the evidence in question was offered for the truth, not for context, because the jury could only conclude that people referred to drugs as clothes "through the statement's content," which made the statement hearsay.  *Id.*  The same logic applies here.  The Special Counsel argues that the Emails variously provide "context"

for the origins of "the [Alfa Bank] allegations," SCO Motion at 28, and an alleged connection

between "the media's coverage of the [Alfa Bank] allegations [and] the defendant's work and

coordination with [Mr. Joffe] . . . the . . . researchers, the Clinton Campaign, and [Fusion]." *Id.* at

32.  But the jury could only make those inferences "through the statement's content."  *Stover*,

329 F.3d at 870.  That makes the statements inadmissible hearsay, not admissible context.

      *Second*, the Emails cannot properly be admitted to prove "the defendant's and [Mr. Joffe's]

. . . state of mind."  SCO Motion at 28.  To the extent the Special Counsel argues that the Emails

prove Mr. Joffe's state of mind, that is of no moment.  Mr. Joffe is not on trial here, and his state

of mind is beside the point.  *See United States v. Libby*, 467 F. Supp. 2d 1, 15-16 (D.D.C. 2006)

(rejecting attempts to "elicit . . . what others were told" as "simply irrelevant to the defendant's

state of mind" in a false statements and perjury case).  To the extent the Special Counsel argues

that the Emails prove Mr. Sussmann's state of mind, that borders on frivolous.  Mr. Sussmann did

not send any of the Emails; Mr. Sussmann did not receive any of the Emails; and the Special

Counsel has not pointed to any evidence showing that Mr. Sussmann is aware of their existence or

their contents.

      The only thing the Special Counsel has to offer on this score is an impermissible invitation

for the jury to engage in rank speculation about what Mr. Joffe told Mr. Sussmann.  That is, after

all, what the Special Counsel means when he says that "a reasonable jury could infer . . . that

[Mr. Joffe] made the defendant aware of" the contents of the communications or that a "jury could

similarly infer that even if [Mr. Joffe] did not make the defendant aware of these communications,

he nevertheless instructed the defendant to deny the existence of such a client relationship."  SCO

Motion at 29.  But the law forbids the jury from engaging in this kind of baseless guesswork—

particularly about communications that the attorney-client privilege was meant to protect.  *See*

*Sleight v. United States*, 82 F.2d 459, 461 (D.C. Cir. 1936) (finding that courts "uniformly condemn" inviting the jury to "convict upon inferences and deductions . . . as to the guilt of the defendant" without "some substantial evidence"); *see also Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 775 (4th Cir. 1990) (holding a fact-finder may not draw a negative inference about the substance of information withheld on the basis of privilege because it "would intrude upon the protected realm of the attorney-client privilege"); *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999) ("[W]e know of no precedent supporting [an adverse] inference based on the invocation of the attorney-client privilege."), *abrogated on other grounds by Moseley v. Secret Catalogue*, 537 U.S. 418, 425-48 (2003).

Critically, the Special Counsel is missing the necessary link he needs for the Emails to possibly constitute state of mind evidence as to Mr. Sussmann. *United States v. George*, 786 F. Supp. 56, 64 (D.D.C. 1992) (without the "crucial link" that "defendant knew what information others had," that information is not material to the defendant's state of mind in an obstruction and false statements case); *United States v. Secord*, 726 F. Supp. 845, 848-49 (D.D.C. 1989) (information of which the defendant had no knowledge is necessarily immaterial to the defendant's state of mind, intent, or motive in a false statements case). And guesswork about what was said in privileged communications cannot lawfully provide such a link.

*Third*, the Emails cannot be admitted as so-called "verbal acts." The Special Counsel seems to believe that any direction constitutes a verbal act that is not hearsay. But the Special Counsel is wrong on the facts and on the law. As to the former, the Special Counsel has not even identified an Email that contains an actual "direction." The best he can do is point to an email in which Mr. Joffe, talking about the data-gathering, states that "the task is indeed broad." But even that email does not contain a directive or command, but rather a description. SCO Motion at 23.

16

In any event, the Special Counsel's conception of what constitutes a "verbal act" does not square with the Rules of Evidence or the well-settled law of this Circuit.  The D.C. Circuit has made clear that "a 'verbal act' is a statement that 'affects the legal rights of the parties.'"  *Stover*, 329 F.3d at 870 (quoting Fed. R. Evid. 801 Advisory Committee's Note).  For example, in *First Data Merchant Services Corp. v. SecurityMetrics, Inc.*, "contract terminations"—as potentially affecting legal rights—"might constitute verbal acts," whereas "customer communications" "regarding . . . why [customers] decided not to renew or sign a contract" are "inadmissible hearsay."  672 F. App'x 229, 236-37 (4th Cir. 2016).  Thus, even accepting *arguendo* that the "tasking" the Special Counsel has identified was indeed a direction, it was *still* not a "verbal act" within the meaning of Rule 801.

Despite its use of the term "verbal act," *Mitchell v. DCX, Inc.* is not to the contrary.  In *Mitchell*, plaintiffs sued the defendant in a civil rights action that alleged, among other things, that defendant "failed to dispatch cabs . . . because the requests were for service in [a] predominantly African-American" neighborhood.  *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 37 (D.D.C. 2003). Accordingly, and unlike here, there existed in *Mitchell* a valid non-hearsay purpose to admit certain statements by the defendant's dispatchers to residents of that neighborhood: "to show that the dispatcher stated the words, not that [the listener] was actually working on honoring the request." *Id.* at 42.  That the declarants "often *heard* dispatchers announcing requests for service from" the predominantly African-American neighborhood "differently than requests for service from" another neighborhood was probative of differential treatment *regardless* of the truth of those announcements.  *Id.* (emphasis added).  In fact, one of the declarants "made quite clear" that the announcements were *not* truthful, thereby undercutting any notion that the *Mitchell* out-of-court statements were being offered for their truth.

But none of the principles of either the D.C. Circuit's verbal act doctrine or *Mitchell* support admitting any of the Emails here.  Collaborative communications amongst colleagues are a far cry from the "verbal acts" recognized by the law.  And, unlike in *Mitchell*, the Special Counsel here seeks to admit such statements for the truth of the matter asserted: to show that the recipients of the "tasking" here were, in fact, "working on honoring the request."  *Id.* at 42; *see also* SCO Motion at 21 (noting "communications are clearly probative separate and apart from their specific assertions *because they reflect the fact that [Mr. Joffe's] tasking triggered and/or affected particular research efforts* that ultimately culminated in the defendant's September 2016 meeting with the FBI General Counsel" (emphasis added)).

Thus, there is no basis for admitting any of the Emails for something other than the truth of the matter asserted.

3.    *The Special Counsel Has Failed to Meet His Burden of Proving, by a Preponderance of the Evidence, that the Emails Are Statements in Furtherance of a Conspiracy or Joint Venture*

The Special Counsel also requests that the Emails be admitted for their truth "as co-conspirator statements made in furtherance of a joint venture" pursuant to Rule 801(d)(2)(E).  SCO Motion at 11.  But to prevail on this request, the Special Counsel must convince the Court, by a preponderance of the evidence, that "(1) a conspiracy existed, (2) that it involved the declarant and the defendant . . . (3) that the statement was made during the course of the conspiracy, and (4) that the statement was made in furtherance of the conspiracy."  *Safavian*, 435 F. Supp. 2d at 46.  And the Special Counsel must do precisely that in this case, in which the purported conspiracy is uncharged; the purported conspiracy has a lawful object; and the conduct implicates core First Amendment rights.  The Special Counsel cannot come close to meeting his burden, and, like the court in *United States v. Safavian*, this Court should reject the Special Counsel's effort to prove up a separate, complicated, and uncharged conspiracy in a simple false statement case.

*First*, the Special Counsel has not demonstrated, by a preponderance or otherwise, that a viable "conspiracy" or "joint venture" existed.  Indeed, the Special Counsel has not even articulated a coherent theory of what the conspiracy or joint venture was.  The Special Counsel has advanced no fewer than *seven* formulations of what the supposed joint venture was in this case. At times, he has suggested that the joint venture was to "assembl[e] and disseminat[e] the [Alfa Bank] allegations and other derogatory information about Trump and his associates to the media and the U.S. government," SCO Motion at 14; at other times he has suggested that the joint venture was "supporting an 'inference' and 'narrative' tying Trump to Russia," *id.*; at other times still, he has suggested that the joint venture was to "mine internet data for the purpose of assisting . . . opposition research," *id.* at 16; to "gather and disseminate purportedly derogatory internet data," *id.* at 22; "spread damaging information about a Presidential candidate shortly before the scheduled election," *id.* at 30; "disseminate information for political purposes," *id.*; and "generate press coverage about the [Alfa Bank] allegations," *id.* at 32.

The Special Counsel's inability to identify a discrete, consistent, and coherent enterprise itself shows how much he is overreaching here.  And it is legally significant because courts look to the commonality of co-conspirators' goals and their degree of involvement with one another in analyzing the contours of a purported conspiracy.  *See United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009) ("Whether a course of conduct should be classified as a single conspiracy or divided into multiple conspiracies depends on whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan.").  Moreover, since associations in fact and overlapping interests are inadequate to establish a joint venture, *see Stover*, 329 F.3d at 869 (drug transactions inadequate basis to a finding of conspiracy between transacting parties); *United States v. Beckham*, 968 F.2d 47, 51

(D.C. Cir. 1992) ("[M]ere physical proximity and friendship" were not sufficient to infer specific intent to further a common objective where the "evidence tends to show at most that [declarant] turned to [defendant] as an alternative source of supply" for drugs), to admit statements pursuant to Rule 801(d)(2)(E) the Special Counsel must show that the declarants "shared a common agreement, enterprise, plan, or goal." *Dyer v. McCormick & Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 241 (D.D.C. 2017).

Here, the Special Counsel has not come close to demonstrating any such agreement.  For one thing, the Special Counsel has not pointed to a single witness who will testify to the existence of a conspiracy of the kind he is suggesting.  And witness statements and other documents produced to the defense prove precisely the opposite—that the Researchers clearly lacked a shared "common goal" to disseminate information about Mr. Trump, to the press or otherwise.  David Dagon, for example, has stated that he did not even have a good understanding of "the audience" for the white paper.  *See* SCO Motion at 26-27.  Manos Antonakakis made clear that he had no knowledge of why Mr. Joffe was interested in the project.  Interview of M. Antonakakis, at SCO-3500U-000246 (July 30, 2021).  And far from manifesting an agreement to participate in the goal, Mr. Antonakakis also made clear in the Emails that he *disagreed* with the plan.  *See, e.g.*, SCO Motion at 25 ("[W]e are nowhere close [to] coming [up] with a plan. . . . Folks, I am afraid we have tunnel vision.").

*Second*, even assuming that the Special Counsel has managed to show a joint venture—and he has not—he has otherwise failed to show that *each* of the declarants and Mr. Sussmann were members of the *same* purported "conspiracy" or "joint venture," as is required by Rule 801(d)(2)(E).  *See Dyer*, 264 F. Supp. 3d at 240; *Beckham*, 968 F.2d at 51.  There is no evidence that the Researchers were working in concert with the Clinton Campaign or were even aware of

the Campaign's activities.  *See, e.g.*, SCO Motion at 20 (Ms. Lorenzen stated that "[i]t's just not the case that you can rest assured that Hil[l]ary's opposition research and whatever professional govts and investigative journalists are also digging"); Tel. Call with Counsel for A. Lorenzen at SCO-008373 (Oct. 25, 2021) (Ms. Lorenzen stated she was not aware that Mr. Joffe was purportedly working with or passing information to the Clinton Campaign); D. Dagon's Grand Jury Test. at SCO-3500U-010353 (Aug. 19, 2021) (Mr. Dagon stated he was not aware that Mr. Joffe was purportedly working with or passing information to the Clinton Campaign, nor did he have any knowledge that the Clinton Campaign may have been Mr. Sussmann's client.).  This dispels any notion of individuals "acting in concert" together towards a common goal.  *United States v. Gewin*, 471 F.3d 197, 201-02 (D.C. Cir. 2006).

*Third*, the Special Counsel has also failed to establish that the statements in the Emails were actually statements made during and in furtherance of the purported joint venture.  Statements in furtherance are those that "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy."  *United States v. Edmond*, 52 F.3d 1080, 1110-11 (D.C. Cir. 1995) (quoting *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988)).  Here, many of the statements identified by the Special Counsel do no such thing.  Some of the statements frustrate, rather than advance, the purported joint venture.  SCO Motion at 25 (Mr. Antonakakis rejected the work of others and criticized them for having "tunnel vision").  Some of the statements post-date the election when the purported joint venture would have logically come to an end.  *Id.* at 19 (arguing that Mr. Joffe wrote an email suggesting he "was tentatively offered the top [cybersecurity] job by the Democrats").  Some of the statements are merely descriptive.  *See id.* at

22 (Mr. Joffe's reference to "the VIPs"); *cf. United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010) (statement that co-conspirator was "dangerous" "did not further the conspiracy").

In any event, no email could, in fact, be properly admitted unless the Court undertook a careful statement-by-statement review to determine if a given statement actually was in furtherance. *See Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2019 WL 5656101, at *3 (E.D. Pa. Oct. 31, 2019) (noting that "[i]n *Williamson v. United States*, 512 U.S. 594 (1994), the Supreme Court adopted a narrow definition of 'statement' for the purposes of determining a statement's admissibility under Rule 804(b)(3)" and "accept[ing] the task of analyzing each [co-conspirator] sentence individually for its admissibility").[3]  And here, the Court should not expend the time or judicial resources to engage in this kind of review.  *See Safavian*, 435 F. Supp. 2d at 47 ("Statements from an uncharged conspiracy may be excluded because they are remote or unrelated to the *charges* in the indictment.") (emphasis added).

*Safavian* is instructive on this score.  In *Safavian*, the defendant was charged with, *inter alia*, making false statements about a golf trip paid for by Washington D.C. lobbyist Jack Abramoff.  The government sought to introduce thirteen emails involving Mr. Abramoff—but not Mr. Safavian—at Mr. Safavian's false statement trial.  The government's theory was that the emails were co-conspirator statements made in furtherance of an uncharged honest services fraud conspiracy in which Mr. Abramoff purportedly provided benefits in exchange for official action

---

[3] To the extent the Special Counsel were to be permitted to admit certain statements "subject to connection" through proof of a conspiracy at trial, there is an obvious risk that this case results in a mistrial—there is no curative instruction that would un-ring the bell regarding the grand and contentious conspiracy that the Special Counsel seeks to put before the jury.  *See United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 186-87 (D.D.C. 2015) (explaining that if the government has failed to meet its burden to prove a conspiracy, the court must on motion, and may *sua sponte*, "strike the testimony that has not been sufficiently connected and direct the jury to disregard it" or must grant a mistrial if such instruction cannot cure the prejudicial admission).

by the defendant, then a high-ranking official at the General Services Administration. *Safavian*, 435 F. Supp. 2d at 46-47; *see also United States v. Safavian*, 429 F. Supp. 2d 156, 157-58 (D.D.C. 2006). The Court rejected the government's attempt to offer the thirteen emails. *Safavian*, 435 F. Supp. 2d at 48.

According to the *Safavian* court, the "steps necessary to reach the conclusion that Mr. Safavian committed honest services fraud, that certain other individuals were part of an Abramoff/Safavian conspiracy to do so, and that these e-mails contain statements made by others in furtherance of that conspiracy require the [c]ourt to make numerous findings-essentially conducting a mini-trial within the trial." *Id.* Among other things, the court would have to determine that the conspiracy "ha[d] been proven," that "uncharged individuals participated in a conspiracy with Mr. Safavian," and that the "specific statements contained within the proffered e-mails were made in furtherance of that conspiracy." *Id.* Ultimately, the court "exercise[d] its discretion in declining to undertake this lengthy journey," because the court was not confident that the government would carry its burden and because the thirteen emails contained "either redundant information or information that could be testified to by Mr. Abramoff, should the government choose to call him." *Id.*

The same logic applies here. There is no reason for this Court to undertake a "lengthy journey" to evaluate the Special Counsel's purported conspiracy all for the sake of getting seventeen emails into evidence. Here, too, the Court would have to determine whether the Special Counsel's supposed joint venture "had been proven," that "uncharged individuals participated in a conspiracy with Mr. [Sussmann]," and that the "specific statements contained within the proffered e-mails were made in furtherance of that conspiracy." As in *Safavian*, this Court should not be confident that the Special Counsel will prevail. And there is even less of a reason here to

undertake the time-intensive work to decide whether to admit seventeen emails.  The contents of the emails here, unlike in *Safavian*, are utterly irrelevant.[4]

4.   *The Emails Should Be Precluded Under Rule 403 as Irrelevant, Prejudicial, and Confusing*

Even if the Emails could be admitted under a hearsay exception, they should still be precluded under Rule 403 because they are irrelevant to the charged crime, they would unfairly prejudice Mr. Sussmann, and they would hopelessly confuse the jury.

*First,* the Emails are irrelevant.  Mr. Sussmann did not send any of the Emails; Mr. Sussmann did not receive any of the Emails; Mr. Sussmann is not referred to in any of the Emails;

---

[4] There is likewise no merit to the Special Counsel's claims that: (1) an email of Mr. Joffe can be admitted as an "authorized statement;" or (2) the Fusion Emails can be admitted as business records.  As to the former, the Special Counsel seems to suggest that because Mr. Joffe made a passing reference to trying to please "VIPs," that is a statement that can be admitted pursuant to Rule 801(d)(2)(C) as a statement authorized by Mr. Sussmann.  An authorized statement is one that an agent makes with specific authorization of the principal.  *See Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-cv-01182-RCL, 2019 WL 4044046, at *11 (D.D.C. Aug. 27, 2019) (declarant employee asserted that he was authorized to speak on behalf of defendant employer), vacated and remanded on other grounds, 24 F.4th 686 (D.C. Cir. 2022).  Here, there is no suggestion that Mr. Sussmann authorized this email or its statements, much less that he was even aware of it.  *See Safavian*, 435 F. Supp. 2d at 48-49 (declarant's copying of defendant on email was not sufficient to infer an agency relationship when she did not testify she was so authorized to send on defendant's behalf).  As to the latter, there is no merit to the Special Counsel's claim that the Fusion Emails are business records.  The "business records" exception encompasses records "kept in the course of a regularly conducted activity of a business," *see* Fed. R. Evid. Rule 803(6), under the rationale that such records are highly accurate, "customarily checked for correctness," and "record keepers are trained in habits of precision."  *New York v. Microsoft Corp.*, No. CIV A. 98-1223 (CKK), 2002 WL 649951, at *2 (D.D.C. Apr. 12, 2002) (quoting *United States v. Baker*, 693 F.2d 183, 188 (D.C. Cir. 1982)).  One-off and informal correspondence with reporters does not meet the requirements of Rule 803(6)(b), nor has the Special Counsel so much as attempted to establish that any of the emails had any of the indicia of accuracy and correctness required.  *See id.* at *2 (email failed to satisfied the exception where plaintiffs failed to establish it was the "regular practice" of employees to write and maintain such emails or provide any information regarding the practice of composition and maintenance of such emails); *see also Queen v. Schultz*, 671 F. App'x 812, 815 (D.C. Cir. 2016) (district court did not abuse its discretion when it excluded emails after writer testified his focus was to get a television show, not to keep email records precisely accurate).

and there is no evidence Mr. Sussmann was made aware of the Emails or their contents at that time.  The Emails thus lack the "crucial link" to Mr. Sussmann that could even conceivably make them relevant.  *Cf. George*, 786 F. Supp. at 64 (without the "crucial link" that "defendant knew what information others had," that information is not material to the defendant's state of mind).  Moreover, even the subject matter of the Emails is irrelevant.  The Researcher Emails, after all, concern the data-gathering and data analysis that is irrelevant for all the reasons set forth in Mr. Sussmann's Motion *in Limine* to Preclude Evidence Regarding the Gathering of Data, the Accuracy of Data or Its Analysis, or the Steele Dossier, ECF No. 60—principally, that Mr. Sussmann was not involved in, nor is he on trial for, the gathering of the data or the actual analysis of that data.  So too is the subject matter of the Fusion Emails irrelevant.  Those emails concern communications between Fusion and journalists from *Slate* and *Reuters*.  They lack any meaningful connection to a meeting Mr. Sussmann had with Mr. Baker in order to give the FBI a heads up about an expected story from *The New York Times*—a meeting that happened weeks before the Fusion Emails.

*Second*, the Emails are unfairly prejudicial to Mr. Sussmann.  The Special Counsel did not charge Mr. Sussmann with any scheme to defraud the government, nor did he charge Mr. Sussmann with any kind of conspiracy, nor has anyone else said they were involved in any conspiracy with Mr. Sussmann.  And what the Special Counsel wants to do, in introducing the Researcher Emails, is to tar Mr. Sussmann with the purported bad conduct of others by labeling and treating them all as co-conspirators.  Indeed, the Special Counsel wants to make it appear as though Mr. Sussmann was aware that there were "expressions of[] serious doubts and differing views" about the Alfa Bank information and that Mr. Sussmann knowingly engaged in an effort to pass along "misstated," "overstated," "cherry-picked," "incomplete," "fabricated," or

"exaggerated" information.  J. Durham Letter to S. Berkowitz at 2 (Mar. 23, 2022), attached hereto as Exhibit A.  But Mr. Sussmann did no such thing.  There is not a shred of evidence that Mr. Sussmann believed or had reason to believe that there was anything improper about the manner in which the data was gathered; that there was anything inaccurate about the data; or that there was anything inaccurate about the conclusions drawn from that data.  The Special Counsel simply wants to insinuate such matters by trying to prove up the knowledge and conduct of others.  But this would unquestionably, unfairly, and improperly prejudice Mr. Sussmann—as would enabling the Special Counsel to parade as much evidence about Fusion and Christopher Steele as possible in the hopes that the jury will punish Mr. Sussmann for others' purported conduct.  *See Lauderdale v. Russell*, No. 1:16-cv-02684-TWP-TAB, 2020 WL 95064, at *2 (S.D. Ind. Jan. 8, 2020) (excluding evidence pursuant to Rules 401, 402, and 403 "relating to high-profile allegations of law enforcement misconduct" because "this type of evidence could confuse the jury, delay the trial, and mislead the jury to [tie] the conduct of Defendants in this case to [the] conduct of others"); *United States v. Hawley*, 562 F. Supp. 2d 1017, 1048 (N.D. Iowa 2008) (excluding "inflammatory" evidence that "would tend to invite a jury to punish [the defendant] for conduct that is not at issue in this case" that would "confuse the issues and generate a trial within a trial on collateral issues"); *see also United States v. Malpeso*, 115 F.3d 155, 163 (2d Cir. 1997) (excluding evidence with the "presumably intended[] effect" of "shift[ing] the focus away from the relevant evidence" to matters that are, at most, "tangentially related").

*Third*, the Emails would undoubtedly confuse the jury by prompting a trial-within-a-trial on wholly collateral matters.  This is a one-count, one-statement, one-defendant case.  Yet here, the Special Counsel seeks to prove up a far-flung conspiracy involving individuals and entities too numerous to count, including data scientists, Rodney Joffe, Rodney Joffe's companies, Rodney

Joffe's business associates, the Clinton Campaign, Fusion, Georgia Tech, the Defense Advanced Research Projects Agency, Christopher Steele, Marc Elias, Perkins Coie, and others. This veritable web of individuals and entities is "substantially more likely to confuse the jurors than enlighten them" and should be excluded for that reason alone. *United States v. Poindexter*, 942 F.2d 354, 362 (6th Cir. 1991). Moreover, permitting introduction of this evidence at trial would necessarily force Mr. Sussmann, this Court, and the jury to engage in a complex and unnecessary mini-trial on collateral issues in the Special Counsel's effort to admit what amounts to approximately seventeen Emails. *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1346-1347 (3d Cir. 2002) (excluding evidence where introduction of "expansive allegations" of "such low probative value" would require time-consuming mini-trial on rebuttal allegations); *Sarin v. Poojan, Inc.*, No. 3:08-CV-1077, 2010 WL 5463250, at *6 (M.D. Pa. Dec. 29, 2010) (excluding evidence that would create "a sideshow that distracts the jury" with a "trial within a trial" requiring the defendant to spend "substantial amount of time discrediting the [findings]" and delaying actual trial).

### C.   The Special Counsel's Motion *in Limine* To Admit A Tweet By the Clinton Campaign Should Be Denied

The Special Counsel next moves to admit an October 31, 2016 tweet from Hillary Clinton, prompted by an article published in *Slate*, in which she states that "[c]omputer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."[5] The Tweet also attached a statement issued by her then-campaign advisor, Jake Sullivan, declaring among other things, "[i]t raises even more troubling questions in light of Russia's masterminding

---

[5] Hillary Clinton (@HillaryClinton), Twitter (Oct. 31, 2016, 8:36 PM), https://twitter.com/HillaryClinton/status/793250312119263233?s=20&t=BOa3E0mjLBJ_ty6NM I1ZSw (the "Tweet").

of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign.  We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections."  *Id*.[6]

The Tweet is inadmissible for two fundamental reasons.  First, contrary to the Special Counsel's misleading statement of the law, the Tweet is hearsay and it is plainly being offered for the truth: so that the Special Counsel can argue that the Campaign's plan all along was to make a public statement about "federal authorities" looking into the "direct connection between Trump and Russia."  Second, the Tweet—which Mr. Sussmann did not author, issue, authorize or even know about—is irrelevant, prejudicial, and would only confuse and distract the jury from the single false statement charge it must decide.

### 1.      The Tweet is inadmissible hearsay

The Special Counsel contends that the Tweet is not hearsay and suggests that, although "newspaper articles and tweets constitute inadmissible hearsay," "courts often admit newspaper articles or other types of evidence, such as tweets, to show state of mind or other matters."  SCO Motion at 47.  And the Special Counsel has cited five cases in support of one or the other of these propositions.  *Id.*  The clear implication of the Special Counsel's argument is that courts routinely do what he is asking this Court to do, and that the cases he cites support his proposed course of action.

Yet again, the Special Counsel is engaging in misleading overreach.  In truth, not one of the five cases the Special Counsel relies on in his Motion supports his contention that a tweet, like a newspaper article, may be admissible in certain circumstances.  *See Atkins v. Fischer*, 232 F.R.D.

---

[6] The Special Counsel's Motion refers to "tweets" by the Clinton Campaign.  SCO Motion at 44. To the extent the Special Counsel seeks to admit tweets other than the lone October 31, 2016 tweet referenced in the Motion, Mr. Sussmann likewise objects.

116, 132 (D.D.C. 2005) (standing for the proposition that "newspaper articles constitute inadmissible hearsay, and cannot be admitted into evidence to support the truth of the matter asserted"); *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002) (same); *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015) (holding a court may take judicial notice of newspaper articles for purposes of demonstrating the articles "contained certain information which (true or not) should have put plaintiff on notice of the need to investigate her potential claims."); *United States v. Buck*, No. 13 Cr. 282 (JSR), 2017 WL 5201447, at *2 (S.D.N.Y. Oct. 30, 2017) (considering whether newspaper articles could be admitted to demonstrate a defendant was on notice that his later actions were illegal); *Rivera v. Incorporated Vill. of Farmingdale*, 29 F. Supp. 3d 121, 128-30 (E.D.N.Y. 2013) (holding newspaper articles were admissible to demonstrate defendant later carried out a redevelopment plan with discriminatory intent and notice of the plan's controversy).  In fact, not one of the cases the Special Counsel cites even mentions tweets, and several counsel against their admissibility.  Nor does he cite any authority that a tweet, unlike a newspaper article, is admissible in any circumstance.  *See* SCO Motion at 47.

Moreover, even if the law regarding newspaper articles applied to tweets, it would not support the admission of the Tweet here.  The Special Counsel suggests that the cases he cites stand for the proposition that a tweet can be "admitted to show its effect on the listener or reader." *Id.*  According to the Special Counsel, "when used for that purpose . . . tweets [can] show state of mind[.]" *Id.*  Even accepting the Special Counsel's gloss on the cases he cites—which, again, do not involve tweets—the October 31 Tweet is still not admissible.  Time does not flow backward. The Tweet, which was posted on October 31, 2016, does not reveal anything about Mr. Sussmann's state of mind over a month earlier, when he purportedly made the alleged false statement.

Nor is there any support for the notion that the Tweet can be admitted not for its truth, but to "show the existence of the defendant's attorney-client relationship with the Clinton Campaign" because "[t]he fact that the Clinton Campaign immediately issued a tweet concerning the article[][7] . . . is probative of the defendant's client relationship." SCO Motion at 47-48. The only way that the jury could arrive at such a conclusion is by considering the Tweet's content—by accepting it as true that the Clinton Campaign cared about the Alfa Bank information and wanted to disseminate it publicly. Regardless of the gloss the Special Counsel attempts to put on it, that means the Tweet is being offered to prove the truth of the matter asserted. *See also Stover*, 329 F.3d at 870 (finding the fact "that a statement provides context to other evidence does not mean that the statement is not hearsay."). And as courts have done when confronted with similar issues involving social media, this Court should preclude the Tweet as inadmissible hearsay. *See, e.g., United States v. Krug*, No. 1:15-CR-00157 RJA, 2019 WL 3162091, at *6 (W.D.N.Y. July 16, 2019) (excluding social media post because it was "offered for the truth of the matter asserted."); *Poneman v. Nike, Inc.*, 161 F. Supp. 3d 619, 630 (N.D. Ill. 2016) (excluding tweets as inadmissible hearsay that cannot be considered by the court in the absence of testimony or sworn affidavits from the declarants).

### 2.    *The Tweet should be excluded as irrelevant, prejudicial, and confusing*

Even if the Tweet were properly being offered to prove something other than the truth—and it is not—the Tweet still would be inadmissible under Federal Rule of Evidence 403.

First, the Tweet is irrelevant. Mr. Sussmann is alleged to have made a false statement about whether he was acting on behalf of clients when conveying the Alfa Bank information to the FBI

---

[7] Though the Special Counsel characterizes the Tweet to refer to multiple articles, it in fact refers to only one—the piece published by *Slate*. *See* Tweet ("In response to a new report from *Slate* . . . .").

on September 19, 2016.  The Tweet, however, concerns a statement made by the Clinton Campaign

over a month later, after an online magazine published a separate article about the Alfa Bank

information.  There is no evidence that Mr. Sussmann wrote, authored, authorized, or knew about

the Tweet.  There is no evidence that the FBI was aware of or was affected by the Tweet.  And

there is no evidence that Mr. Sussmann's meeting with Mr. Baker had anything to do with the

Clinton Campaign's broader media strategy: if anything, Mr. Sussmann's meeting with Mr. Baker

only served to frustrate, not advance, that strategy.  An article in *The New York Times* was about

to published.  Going to the FBI could only have created a risk that the FBI would do something to

get in the way of that story—which is exactly what happened after Mr. Sussmann's meeting,

because, as Mr. Baker has himself acknowledged, the FBI reached out to *The New York Times* to

ask them to hold off on the story.  *See* Interview of J. Baker Before the Comm. on the Judiciary

(Day 2), 118 (2018) ("[In] a subsequent phone call that I had with [Mr. Sussmann], . . . I asked

him on behalf of the Bureau, after having discussed it internally, who it was at the press that—that

we could talk to about this, because we wanted them to not publish right away.").

Second, the Tweet is substantially more prejudicial than probative.  There is a real danger

that if the Tweet were admitted, the jury would believe that Hillary Clinton herself was part of the

Special Counsel's uncharged conspiracy and that she had a direct interest or involvement in Mr.

Sussmann's efforts.  Drawing the candidate herself into this matter in this way would be unfair to

Mr. Sussmann and would only serve to "stir the pot of political polarization, garner public

attention, and, most inappropriately, confuse jurors[.]" SCO Motion at 43.  Indeed, Mr. Trump

himself has already brought a highly-publicized (but baseless) lawsuit against Ms. Clinton, among

others, precisely because of the sensationalized allegations the Special Counsel has already made

in this case.  See Compl. ¶ 8, *Trump v. Clinton*, No. 2:22-cv-14102-DMM (S.D. Fla. Mar. 24,

2022) (noting that the "full extent of the Defendants' wrongdoing has been steadily and gradually exposed by Special Counsel John Durham, who has been heading a DOJ investigation into the origins of the Trump-Russia conspiracy").

We agree that "[b]aseless political allegations are irrelevant to the crime charged." SCO Motion at 43. As a result, the Special Counsel's motion to introduce the Tweet from Hillary Clinton should be denied. *Id.* at 44-48; *see also* Fed. R. Evid. 403; *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (finding a court must exclude evidence when its probative value is substantially outweighed by danger of unfair prejudice, confusing the issues, misleading the jury, or wasting time); *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (explaining that unfair prejudice occurs where the jury is "lure[d] . . . into declaring guilt on a ground different from proof specific to the offense charged").

**D. The Special Counsel's Sweeping Claims That Three Categories of Certain Acts and Statements are Admissible as Direct Evidence Must be Rejected and Instead Only Certain Discrete Statements May Be Admitted Pursuant to Rule 404(b).**

The Special Counsel next seeks the admission of three acts and/or statements either as direct evidence or, in the alternative, as "other acts" evidence pursuant to Rule 404(b): (1) a single statement Mr. Sussmann purportedly made to the CIA, "assert[ing] that he was not representing a particular client in providing the updated allegations," *see* SCO Motion at 34; (2) Mr. Sussmann's HPSCI testimony, *see id.* at 39-41; and (3) two statements issued by Perkins Coie to the media in October 2018, *see id.* at 37-38. As set forth in greater detail below, Mr. Sussmann does not object to the admission of the specific statement he is alleged to have made to the CIA; certain discrete portions of his HPSCI testimony that pertain to Mr. Sussmann's September 2016 meeting with Mr. Baker; and the two specific Perkins Coie statements pursuant to Rule 404(b), or evidence regarding the role Mr. Sussmann played in causing those two statements to be made, if any.

However, Mr. Sussmann does object to all three categories of evidence being admitted as direct evidence and further objects to the manner in which the Special Counsel has mischaracterized this evidence—and the inferences to be drawn from it—for Rule 404(b) purposes.

We must, however, begin by objecting to the manner in which the Special Counsel has approached his Rule 404(b) obligations—a course of conduct that reflects disrespect for this Court's rules and Mr. Sussmann's rights.

*First*, the Special Counsel violated this Court's directive to provide notice of any Rule 404(b) evidence he sought to introduce by March 18, 2022. *See* ECF No. 30. That meant that, under the applicable rules, the Special Counsel was required to "provide reasonable notice" and to "articulate in th[at] notice the permitted purpose for which [he] intends to offer the evidence and the reasoning that supports that purpose." Fed. R. Evid. 404(b)(3). He did no such thing. Instead, on this Court's March 18 deadline, the Special Counsel simply identified—in a barebones letter— four categories of potential Rule 404(b) evidence. *See* J. Durham Letter to S. Berkowitz (Mar. 18, 2022), attached hereto as Exhibit B. It was only five days later that the Special Counsel provided the required "reasoning" for that original notice,[8] in an untimely "Supplemental Notice" that contained no explanation or justification for its tardiness. *See* Ex. A. To make matters worse, the Supplemental Notice also improperly provided notice of two *new* categories of purported Rule

---

[8] Even then, in several instances the Special Counsel only vaguely claimed that the proffered evidence was admissible "as 'other act' evidence pursuant to Federal Rule of Evidence 404(b) to prove the defendant's motive, intent, plan, and absence of mistake or accident," *see, e.g.*, Ex. A at 2, but merely parroting the language of the rule is insufficient to provide notice. *See, e.g.*, *United States v. Edwards*, 540 F.3d 1156, 1163-64 (10th Cir. 2008) (expressing disapproval where "the government simply asserted without explanation or analysis that the convictions were being offered 'to prove the defendant's intent in the current case, to prove his knowledge, to prove his motive in this case, to prove that there was no mistake or accident'" and holding that the lower court "abused its discretion by admitting this [Rule 404(b)] evidence" pursuant to such "unsupported assertions" by the government "that the evidence was obviously relevant for all of these purposes").

404(b) evidence—neither of which was mentioned in the original Rule 404(b) notice provided on March 18.  Specifically, the Supplemental Notice indicated that the Special Counsel also sought to introduce evidence as to how the data Mr. Sussmann provided to the FBI and the CIA was gathered by Mr. Joffe and others, and evidence concerning the accuracy of that data and its analysis.  *See* Ex. A; *see also* Def.'s Apr. 4, 2022 Rule 404(b) Resp., attached hereto as Exhibit C.

*Second*, in both his Original and Supplemental Rule 404(b) notices, the Special Counsel leveled unjust and baseless allegations of obstruction of justice against Mr. Sussmann—and he did so, it seems, without doing even the bare modicum of diligence that any reasonable prosecutor would do.  In particular, the Special Counsel claimed that Mr. Sussmann failed to preserve certain text messages in violation of his former law firm's (i.e., Perkins Coie's) internal policy, and that this purported violation gave rise to an inference that Mr. Sussmann intended to obstruct justice.  However, the Special Counsel leveled those incendiary allegations without even bothering to obtain copies of the relevant Perkins Coie policies that Mr. Sussmann supposedly violated.  As the Special Counsel did not have the policies in question, the defense had no choice but to request that this Court issue a time-sensitive subpoena pursuant to Rule 17 to obtain the polices directly from Perkins Coie.  *See* Ex. C at 24.  As expected, none of the policies that Perkins Coie produced required the preservation of any of the text messages in question, contrary to the Special Counsel's baseless claims.  *Id.*  Mr. Sussmann should not have had to waste his or the Court's time because the Special Counsel took an accuse-first, gather-evidence-later approach.

*Third*, the Special Counsel is taking the meritless position that he has the right to seek to admit, pursuant to Rule 404(b), evidence of other bad acts that he has not included in his current Motion.  Specifically, the Special Counsel has only moved to admit the three categories of acts or statements described above.  He has not sought the admission of four *other* categories of evidence

34

identified in his Rule 404(b) notices, namely:  (1) the gathering of the data by Mr. Joffe and others;

(2) the accuracy of the data gathered by Mr. Joffe and others and the conclusions drawn therefrom;

(3) Mr. Sussmann's purported statement to the CIA that his meeting with Mr. Baker was on a

"similar but unrelated matter"; and (4) the aforementioned purported failure by Mr. Sussmann to

preserve certain text messages in violation of Perkins Coie policies.

Because the Special Counsel has refused to concede that, in failing to move on the above

four items, he is no longer seeking to admit them, Mr. Sussmann is now forced to move this Court

for a ruling that the Special Counsel has waived his right to introduce such evidence pursuant to

Rule 404(b).  *See, e.g.*, *United States v. Roberts-Rahim*, No. 15-CR-243 (DLI), 2015 WL 6438674,

at *3 (E.D.N.Y. Oct. 22, 2015) (holding that because a party failed to raise certain evidentiary

arguments in their motion, they "ha[ve] waived any objection [they] might later attempt to raise

regarding the admission or preclusion of evidence . . . and such waiver will not be excused except

for good cause."); *Hersko v. United States*, No. 13-CV-3255 (JLC), 2016 WL 6126461, at *7

(S.D.N.Y. Oct. 20, 2016) ("Although it is not entirely clear, plaintiff appears to concede that

[certain evidence] is inadmissible.  To the extent that plaintiff did not intend to concede this point,

plaintiff has waived any opposition to it, as plaintiff's . . . papers are otherwise silent with respect

to [the evidence], despite defendants' detailed arguments in favor of preclusion.").  And, in any

event, the other Rule 404(b) evidence for which the Special Counsel provided notice would have

been inadmissible for any number of additional reasons.  *See generally* Ex. C.

> 1.    *Mr. Sussmann Does Not Object to the Introduction of the CIA Statement*
>       *Identified by the Special Counsel, but Objects to Evidence and Argument*
>       *About Any Additional Purported False Statements, the Accuracy of the Data*
>       *He Presented to the CIA, and the Accuracy of Conclusions Drawn About*
>       *the Data He Presented to the CIA*

The Special Counsel first seeks to offer evidence that when Mr. Sussmann met with the

CIA, he "made a substantially similar false statement as he had made to the FBI General Counsel,"

namely "that he was not representing a particular client in providing the updated allegations to [the CIA] . . . ." SCO Motion at 34. The Special Counsel asserts that this statement is admissible as either: (1) "direct evidence of the charged crime," because it "is necessary 'to complete the story' of the charged crime," SCO Motion at 35-36; or (2) other acts evidence pursuant to Rule 404(b).

As to the first, the Special Counsel has again misrepresented the law. The Special Counsel cites *United States v. Badru* for the proposition that evidence of other acts is admissible as direct evidence if "it is necessary 'to complete the story' of the charged crime . . . ." SCO Motion at 35-36 (citing *United States v. Badru*, 97 F.3d 1471, 1474 (D.C. Cir. 1996). But subsequent to *Badru*, the D.C. Circuit held that "there is no general 'complete the story' or 'explain the circumstances' exception to Rule 404(b) in this Circuit . . . ." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000); *see also United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) ("[I]n defining the contours of intrinsic evidence that is not subject to Rule 404(b), [the D.C. Circuit has] rejected the rule . . . that evidence is intrinsic if it 'completes the story' of the charged crime."); *United States v. Roberson*, No. 21-cr-102 (JDB), 2022 WL 35643, at *3 (D.D.C. Jan. 4, 2022) (collecting cases and stressing that "[t]he D.C. Circuit has adopted a very narrow understanding of what counts as an 'intrinsic' act, explicitly rejecting the application of that label to evidence that merely 'completes the story' . . . .").

Nor does this case fit within any of the narrow circumstances in which the D.C. Circuit will admit "other act" evidence as direct evidence of the charged crime. Specifically, the D.C. Circuit has held that certain "other acts" may be admissible as direct evidence, but only if they constitute "evidence . . . of an act that is *part of* the charged offense" or otherwise consists of "acts performed *contemporaneously* with the charged crime . . . if they facilitate the commission of the charged crime." *Bowie*, 232 F.3d at 929 (emphasis added). Here, the statement to the CIA cannot

possibly be part of the charged offense (concerning a single, different statement), and it was not made contemporaneously with the charged crime.  In fact, it was made five months later, in different circumstances, to a different agency, in a way that conflicts with the Special Counsel's theory that Mr. Sussmann lied to Mr. Baker to help Hillary Clinton win the election—because the election was long since over.

In any event, Mr. Sussmann does not object to the introduction of this discrete CIA statement pursuant to Rule 404(b).[9]  But Mr. Sussmann disagrees with the Special Counsel's characterization and interpretation of that statement, and he reserves his right to introduce evidence rebutting the Special Counsel's claims, including evidence that will demonstrate that Mr. Sussmann  disclosed to CIA personnel that he had a client and that he had worked with political clients.  *See, e.g.,* Mem. of Conversation at SCO-3500U-010119-120 (Jan. 31, 2017) ("Sussman[n] said that he represents a CLIENT who does not want to be known. . . Sussman[n] would not provide the client's identity and was not sure if the client would reveal himself . ."); *id.*at SCO-3500U-010120 ("Sussman[n] is [] openly a Democrat and openly told [CIA personnel] that he does lots of work with DNC").

Further, although the Special Counsel has not made mention of it in his Motion, Mr. Sussmann continues to object to the introduction of any evidence or argument regarding the accuracy of the data he provided to the CIA, the manner in which it was gathered, or the accuracy of the conclusions drawn from the data.  *See* Ex. C at 12-18.  And again, to the extent that the Special Counsel seeks to argue that Mr. Sussmann made an "additional" purported false statement

---

[9] However, contrary to the Special Counsel's claims, because Mr. Sussmann has asserted no defense of mistake or accident, the CIA statement is not admissible to show absence of mistake pursuant to Rule 404(b).  *See, e.g.*, *DiRico v. City of Quincy*, 404 F.3d 464, 468 n.10 (1st Cir. 2005) ("Moreover, as a general matter, *the absence of mistake or accident exception to Rule 404(b) does not apply unless the opposing party first raises a claim of mistake or accident*." (emphasis added)).

to the CIA—namely, that Mr. Sussmann stated that "he had brought information to the FBI on a similar, but 'unrelated' matter"—the Special Counsel has waived his right to make that argument because he has not moved on it here.  *See id.* at 20.  In any event, and as described in Mr. Sussmann's Rule 404(b) Response, none of that evidence satisfies either Rule 404(b)'s threshold requirements for admissibility anyway, nor can it otherwise bypass Rule 403's bar on evidence that is prejudicial and of limited probative value.  *See id.* at 19-21.

> ## 2. *Mr. Sussmann Does Not Object to the Introduction of the Two Perkins Coie Statements Themselves, but Does Object to the Introduction of Lay Witness Testimony Concerning the Veracity of Those Statements*

Next, the Special Counsel seeks to admit, as either direct evidence or as Rule 404(b) evidence in the alternative, two statements that Perkins Coie issued to the media in October 2018. Mr. Sussmann disagrees that the statements to the media could constitute direct evidence.  Here, the statements were not "part of the charged offense or . . . [an] act[] performed contemporaneously with the charged crime if [it] facilitate[s] the commission of the charged crime."  *Roberson*, 2022 WL 35643, at *3.  Instead, the statements were made by other individuals *over two years* after the single charged false statement was allegedly made and are therefore inadmissible as direct evidence.  *See, e.g.*, *United States v. Sitzmann*, 856 F. Supp. 2d 55, 60 (D.D.C. 2012) (rejecting the government's claim that evidence "outside the period of the charged [crime]" constituted direct evidence because it was "neither part of the charged offense nor [a] contemporaneous act[] that facilitated the commission of the charged offense" and noting that "[a]t best, th[e] evidence 'completes the story' . . . leading up to the [charged conduct]" and therefore constitutes "evidence that is not admissible as intrinsic evidence in this Circuit." (citation omitted)).

In any event, as explained in Mr. Sussmann's Rule 404(b) Response, he does not object to the introduction of those two Perkins Coie statements themselves, or evidence regarding the role he played in causing those statements to be made, if any.  *See* Ex. C at 22.  However, Mr. Sussmann

does object to the Special Counsel's intent to offer opinion testimony from others, including the former Managing Partner of Perkins Coie, that those Perkins Coie statements may have been false or misleading.  Any such testimony plainly runs afoul of well-established law—as reflected in this Court's standard jury instructions—which provides that the credibility, accuracy, and truth or falsity, of any statement is the provenance of the jury, not lay witnesses.  *See* Final Jury Instructions at 9, *United States v. Shi*, No. 17-cr-110 (D.D.C. July 24, 2019), ECF No. 252 (Cooper, J.) ("[A] witness may not testify as to his or her opinions or conclusions."); *see also United States v. Savage*, 970 F.3d 217, 285 n.76 (3d Cir. 2020) (explaining that the Third Circuit's model jury instruction on lay witness testimony provides that "[w]itnesses are not generally permitted to state their personal opinions about important questions in a trial." (citation omitted)).  Thus, any evidence or argument as to the credibility of those statements falls outside the parameters of permissible lay witness testimony and must be rejected as more prejudicial than probative pursuant to Rule 403.

And Mr. Sussmann likewise objects to the Special Counsel's attempt to argue that he had an affirmative duty to volunteer information about his timekeeping practices with respect to the Clinton Campaign.  To be sure, Mr. Sussmann's statements about his client are relevant, but the Special Counsel baselessly claims that Mr. Sussmann "conceal[ed] from . . . some of his own colleagues that he carried out certain work on behalf of the Clinton Campaign," *see* SCO Motion at 38, while identifying no evidence of an affirmative duty to volunteer that information, no evidence that Mr. Sussmann was asked about it, and no evidence that Perkins Coie—which processed and had access to all of Mr. Sussmann's timekeeping records—was unaware of Mr. Sussmann's work.  Thus, any such evidence fails Rule 404(b)'s threshold requirements.  *See, e.g.*, *United States v. Loveless*, 139 F.3d 587, 592 (8th Cir. 1998) ("In order for evidence of prior . . . acts to be admissible under Rule 404(b), the government must prove, by a preponderance of the

evidence, that the defendant committed the acts." (citation omitted)). Furthermore, this evidence plainly runs afoul of Rule 403, as it would inevitably result in a time consuming mini-trial on issues unrelated to the charged conduct, as Mr. Sussmann is not charged with lying to Perkins Coie. At bottom, this purported evidence is extremely prejudicial; has virtually no probative value as to the charged conduct; would result in a sweeping, time-consuming mini-trial on an ancillary issue; and must be rejected. *See, e.g.*, *Coleman*, 306 F.3d at 1346-1347 (excluding evidence where introduction of "expansive allegations" of "such low probative value" would require time consuming mini-trial on rebuttal allegations).

> 3.  *Mr. Sussmann's Does Not Object to the Introduction of Relevant Portions of his HPSCI Testimony Pursuant to Rule 404(b)*

Finally, the Special Counsel seeks to introduce evidence of Mr. Sussmann's testimony before HPSCI at trial. As an initial matter, the Special Counsel should be required to specify which portions of Mr. Sussmann's HPSCI testimony he actually seeks to admit. Mr. Sussmann's HPSCI testimony is 93 pages long, and surely not all of that testimony is relevant. *See, e.g.*, *United States v. Scott*, 677 F.3d 72, 81-83 (2d Cir. 2012) (explaining that "evidence admitted under 404(b) must be relevant to an issue *in dispute*" and holding that testimony proffered by the government was improperly admitted because it concerned an issue "not in dispute during the trial"). The Special Counsel's Motion appears to concede as much, with its apparent focus on "certain questions [put to Mr. Sussmann] about his participation in providing the [Alfa Bank] and [YotaPhone] allegations to the FBI and [the CIA]." SCO Motion at 39. He claims that this testimony is direct evidence because it "contradicts [Mr. Sussmann's] representations to [Mr. Baker] and [CIA] employees" and is thus "'inextricably intertwined' with the charged crime." *Id.* at 41. Again, the Special Counsel's claims do not pass muster. The law is clear that Mr. Sussmann's HPSCI testimony—which occurred *over a year* after the charged conduct—cannot constitute direct evidence of the

single false statement at issue.[10]  *See United States v. Wilkins*, 538 F. Supp. 3d 49, 80 (D.D.C. 2021).

In any event, Mr. Sussmann does not object to the introduction of discrete portions of his HPSCI testimony concerning his providing the Alfa Bank information to the FBI and the CIA, pursuant to Rule 404(b).  *See generally* Ex. C at 21.  However, Mr. Sussmann does object to certain of the Special Counsel's proposals.

*First*, Mr. Sussmann objects to the Special Counsel's request that he be permitted to offer evidence or argument that Mr. Sussmann purportedly "avoided mention of the fact that the only client billed for [his] pre-election work on th[e] [Alfa Bank] allegations was the Clinton Campaign."  As explained in Mr. Sussmann's Rule 404(b) Response, this claim is without merit. *See* Ex. C at 21-22.  The Special Counsel has not identified a single question put to Mr. Sussmann by members of Congress or their staff that would have called for a responsive answer concerning his billing time to the Clinton Campaign.   And, the Special Counsel has not identified any obligation whatsoever that would have required Mr. Sussmann to independently volunteer this information when testifying before HPSCI.   Accordingly, the assertions in the Special Counsel's Rule 404(b) notices and his Motion cannot establish the necessary predicate for introducing such evidence or argument pursuant to Rule 404(b), and it must be rejected.  *See, e.g.*, *Loveless*, 139 F.3d at 592 ("In order for evidence of prior . . . acts to be admissible under Rule 404(b), the government must prove, by a preponderance of the evidence, that the defendant committed the acts." (citation omitted)).

---

[10] And the Special Counsel's reliance on *United States v. Bajoghli*, 785 F.3d 957, 965 (4th Cir. 2015), which reflects the Fourth Circuit's "complete the story" rule, is of no moment—the D.C. Circuit has, of course, rejected that rule.  *See supra*, at 36-37.

*Second*, Mr. Sussmann objects to the Special Counsel's apparent intention to offer portions of his HPSCI testimony regarding Fusion.  This proposal is, once again, untimely and constitutes yet another violation of the rules and this Court's Order.  The Special Counsel was required to give Rule 404(b) notice on March 18, 2022.  The notice he provided on that date made absolutely no mention of Fusion.  *See* Ex. B.  Nor did the untimely Supplemental Notice that the Special Counsel provided on March 23 make any mention of Fusion.  *See* Ex. A.  It is only now, over three weeks after Rule 404(b) notice was due, that he for the first time signals any intention to offer portions of Mr. Sussmann's HPSCI testimony regarding Fusion.

Moreover, the Special Counsel has mischaracterized the record in a misleading effort to make Mr. Sussmann's testimony about Fusion seem relevant.  The Special Counsel claims that Mr. Sussmann was "specifically asked if [Fusion] was his client in these matters, and whether [Fusion's] head or another of its employees had provided him the 'information' he gave to the FBI General Counsel."  SCO Motion at 42.  According to the Special Counsel, Mr. Sussmann's subsequent "answer failed to disclose or volunteer that [Fusion] in fact, had drafted one of the white papers that [he] gave to the FBI General Counsel."  *Id.*  This is a distortion of the record. Mr. Sussmann was not asked whether Fusion gave him the information he provided to the FBI. Instead, after testifying that he gave the FBI and the CIA information about "potential communications between persons unknown in Russia, and persons unknown associated with the Trump Organization," Mr. Sussmann was asked if that "[i]nformation [] was given to you by a client?"  HPSCI Test. at 59.  Mr. Sussmann responded "Yes."  *Id.*  Mr. Sussmann was then asked, "*[w]as that client* Glenn Simpson," to which he responded "I have *never represented* Glenn Simpson."  *Id.* at 59-60 (emphasis added).  Subsequently, Mr. Sussmann was asked if that information "[w]as . . from Peter Fritsch," to which he responded "[n]o, it was not," or if it came

from "Thomas Kattan [sic]," to which he responded "I don't know who that person is."  *Id.* at 60-61.  All of these responses were true—the information that Mr. Sussmann provided to Mr. Baker and the CIA about potential communications between Russia and the Trump Organization was provided to him by Mr. Joffe, not Fusion.

Shortly thereafter, Mr. Sussmann was asked "[w]as your client Fusion GPS," to which he responded "my client *was not* Fusion GPS."  HPSCI Test. at 74 (emphasis added).  Mr. Sussmann was then asked "*[w]as your client -- the client that gave you the information* that you shared with the FBI and the [CIA] --" at which point Representative Conaway interjected, "I'm a CPA not a lawyer.  So Steele comes to you.  Is Steele your client?"  HPSCI Test. at 75-76 (emphasis added).  Mr. Sussmann responded "[n]o."  *Id.* at 76.  As neither Fusion nor Mr. Steele were his clients, his responses were accurate.  *Id.*  And, contrary to the Special Counsel's mischaracterizations, the questions at issue explicitly inquired whether Mr. Sussmann's client—who he testified *was not* Fusion, Glenn Simpson, Peter Fritsch, Thomas Catan, or Christopher Steele—had provided him the information that he gave to Mr. Baker.

To be sure, Fusion did create a background paper about Alfa Bank that Mr. Sussmann provided to the FBI.  But the Special Counsel has not identified a single question that Mr. Sussmann was actually asked that called for a response regarding that work.  Mr. Sussmann's testimony regarding Fusion cannot satisfy the threshold requirements of Rule 404(b); it is irrelevant; it would confuse the jury, it would prejudice Mr. Sussmann; and the Special Counsel should not be permitted to introduce it at trial.  *See, e.g.*, *Loveless*, 139 F.3d at 592 ("In order for evidence of prior . . . acts to be admissible under Rule 404(b), the government must prove, by a preponderance of the evidence, that the defendant committed the acts." (citation omitted)); Minute Order, *United States v. Stone*, No. 1:19-cr-00018-ABJ (Sept. 26, 2019) (referencing Gov't Mot.

in Lim., No. 1:19-cr-00018-ABJ (July 26, 2019), ECF No. 153) (excluding "evidence or argument regarding Russian interference in the 2016 election" that the government argued was "irrelevant to the charges at issue" and also "presents a serious risk of jury confusion, prejudice and delay"); *Sarin*, 2010 WL 5463250, at *6 (excluding an evidentiary "sideshow that distracts the jury" in which "[t]he [defendant] will have to spend a substantial amount of time discrediting the [findings]," needlessly extending trial); *see also generally* Ex. C at 21-22.

### E.   The Court Should Not Preclude Evidence Concerning Witness Credibility or Other Independently Relevant Evidence and Argument

Finally, the Special Counsel moves to exclude evidence and argument that "depict the Special Counsel as politically motivated or biased based on his appointment by the prior administration."  SCO Motion at 42.  To be clear, the defense has no intention of offering any evidence or argument regarding the Special Counsel's political motivations or bias.

That said, the law must and does permit a defendant's cross-examination of witnesses about their own motivations, bias, reliability, and credibility.  *See United States v. Safavian*, Crim. No. 05-0370 (PLF), 2008 WL 5255534, at *1 (D.D.C. Dec. 12, 2008) ("some questions . . . that touch on [vindictive or selective prosecution] also may go to the bias, prejudice or credibility of a particular witness," and that the propriety of resulting inquiries are "on a continuum"); *United States v. Yagman*, No. CR 06-227(A)-SVW, 2007 WL 9724391, at *5 (C.D. Cal. May 16, 2007) ("Defendant is entitled to question the government's witnesses concerning their credibility, bias, and reliability"); *United States v. Stewart*, No. 03 CR. 717 (MGC), 2004 WL 113506, at *1-2 (S.D.N.Y. Jan. 26, 2004) ("defendants are, of course, free to raise questions about the credibility and reliability of cooperating witnesses).

So too does the law permit a defendant to present evidence or argument surrounding the investigative tactics employed by the Special Counsel, including threatening to prosecute

witnesses with perjury unless they provided certain testimony, failing to timely interview witnesses in the first place, and failing to follow FBI protocol. *See United States v. Fieger*, No. 07-CR-20414, 2008 WL 996401, at *2-3 (E.D. Mich. Apr. 8, 2008).

Mr. Sussmann reserves all rights to present evidence or argument along such lines.

## CONCLUSION

For the reasons set forth above, Mr. Sussmann respectfully submits: (1) this Court should deny the Special Counsel's Motion to admit Mr. Priestap's and Ms. Anderson's notes, and prohibit the Special Counsel from offering the notes into evidence, eliciting any testimony about them, or publishing them to the jury at any time; (2) this Court should deny the Special Counsel's Motion to admit certain third-party emails and other "similar communications"; (3) this Court should deny the Special Counsel's Motion to admit an October 31, 2016 tweet from Hillary Clinton; (4) this Court should only admit, pursuant to Rule 404(b), (a) the specific statement Mr. Sussmann is alleged to have made to the CIA, (b) certain discrete portions of Mr. Sussmann's testimony before HPSCI that pertain to Mr. Sussmann's September 2016 meeting with Mr. Baker, and (c) two specific statements Perkins Coie made to the news media—and this Court should find that the Special Counsel has waived his right to seek the admission of four other categories of evidence pursuant to Rule 404(b), namely, (a) the gathering of the data by Mr. Joffe and others, (b) the accuracy of the data gathered by Mr. Joffe and others and the conclusions drawn therefrom, (c) Mr. Sussmann's purported statement to the CIA that his meeting with Mr. Baker was on a "similar but unrelated matter," and (d) the purported failure by Mr. Sussmann to preserve certain text messages in violation of Perkins Coie policies; and (5) while Mr. Sussmann agrees that evidence of political motivation or bias on the part of the Special Counsel is not relevant to Mr. Sussmann's trial, this Court should confirm that Mr. Sussmann may introduce evidence or argument concerning independently relevant matters such as witness credibility or investigatory tactics.

Dated: April 15, 2022

Respectfully submitted,

*/s/ Sean M. Berkowitz*

Sean M. Berkowitz (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
Email: sean.berkowitz@lw.com

Michael Bosworth (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
Email: michael.bosworth@lw.com

Natalie Hardwick Rao (D.C. Bar # 1009542)
Catherine J. Yao (D.C. Bar # 1049138)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: natalie.rao@lw.com
Email: catherine.yao@lw.com