**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Case No. 21-582 (CRC)** |
| | : | |
| **MICHAEL A. SUSSMANN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE* AND
RULE 404(b) OBJECTIONS**

The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully provides herein its Opposition to the Defendant's Motions *in Limine* and Rule 404(b) Objections. As set forth in further detail below, all of the evidence that the Government seeks to offer at trial is relevant, admissible, and not unduly prejudicial, and the defendant's objections to the Government's Rule 404(b) notices are without merit.

**I.   The Defendant's Motion to Preclude Evidence or Argument Regarding Matters Purportedly Subject to the Attorney-Client Privilege Should Be Denied**

The defendant moves to preclude the Government from (i) introducing privilege logs into evidence, (ii) showing redacted documents to the jury where information has been withheld based on assertions of attorney-client privilege, and (iii) identifying for the jury the name of the party or parties asserting privilege over such documents. The defendant's motion to preclude such evidence lacks merit. Given the circumstances of this case and the content of the defendant's alleged false statement, the non-privileged fact that communications occurred between the defendant and specific persons and entities (such as Tech Executive-1 and the U.S. Investigative Firm) is highly

probative to establish the falsity and materiality of the defendant's alleged false statement that he was not acting on behalf of any client. Accordingly, such evidence is admissible.

As an initial matter, the Government currently expects to introduce all, or nearly all, of the above-described evidence through actual redacted documents, rather than privilege logs. Thus, while courts have found that privilege logs may indeed be presented to juries with judicial oversight, *see, e.g., Huawei Techs. Co. Ltd v. T-Mobile US, Inc*., No. 216CV00052JRGRSP, 2017 WL 7052463, at *1–2 (E.D. Tex. Sept. 20, 2017) (*in limine* order requiring parties to approach the bench or provide explanation to the Court before offering privilege log at trial), the Government here seeks primarily to offer email "header" information containing the date, time, sender, recipient, copied parties, and subject line of relevant communications—all of which is non-privileged. (The content of such emails have been redacted at the request of the relevant privilege holders.)

The crux of the Indictment's allegation is that the defendant falsely stated that he was not working for any client in connection with the Russian Bank-1 allegations. The redacted, non-privileged emails that the Government seeks to admit are therefore highly probative insofar as they reflect "to," "from," and subject line information of communications between and among the defendant and his alleged clients or their agents. For example, the Government expects to offer redacted, non-privileged documents containing header information of communications[1]:

- between the defendant and Tech Executive-1;

---

[1] The Government also intends to offer redacted billing records reflecting the defendant's work on behalf of the Clinton Campaign and Tech Executive-1. It is unclear whether the defendant also objects to the admission of such evidence. The Government contends that such billing records are admissible on the same bases as set forth herein with respect to redacted emails.

2

- between and among the defendant, Tech Executive-1, Campaign Lawyer-1, and the
  U.S. Investigative Firm employees; and

- between and among Campaign Lawyer-1 and Clinton Campaign leadership.

These email headers constitute straightforward, non-privileged proof that the defendant was in fact working on behalf of two clients (*i.e.*, the Clinton Campaign and Tech Executive-1) when he conveyed the Russian Bank-1 allegations to the FBI.  Indeed, in a case about an alleged false denial of attorney-client relationships, there are few things *more probative* than non-privileged records evidencing communications between an attorney and his clients.

The primary cases the defendant cites to bar such evidence are inapposite.  *See, e.g.¸ Parker v. Prudential Insurance Co.*, 900 F. 2d 772, 775 (4th Cir. 1990); *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999);  *In re: Gen. Motors LLC Ignition Switch Litig.*, No 14-MD-2543 (JMF), 20154 WL 8130449, at *3 (S.D.N.Y. Dec. 3, 2015); *In re EpiPen Mktg. Sales Pracs. & Antitrust Litig.*, No. 17-md-2785-DDC-TFF, 2022 WL 226130 (D. Kan. Jan. 26, 2022); *Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2013 WL 1816162, at *2–4 (N.D. Ill. Apr. 29, 2013).  In *none* of those cases did the core factual issue to be decided by the jury include the existence or non-existence of an attorney-client relationship.  Accordingly, unlike here, facts concerning communications between lawyer and client were, at most, peripheral to the issues to be decided at trial.  And in those cases, the relevant courts did not hold or presume that there was a categorical bar to the admission of privilege logs, redacted documents, or similar evidence. For example, in *In re EpiPen*, the Court merely held that the plaintiffs had not made "any *showing at this stage* that the privilege logs are relevant."  2022 WL 226130 at * 17. (emphasis added). Similarly, in *In re Gen Motors LLC*, the Court held that despite the Court's instructions that the

parties should seek to avoid privilege invocations before the jury, "the likelihood of some references seems high [and] [i]n anticipation of that possibility, the parties shall confer and propose appropriate limiting instructions."  20154 WL 8130449, at *4.  And finally, in *Goldberg*, the Court precluded reference to certain attorney-client communications because the proffered purpose for admitting them would have supported a prejudicial inference that the defendants acted "fraudulently" by ignoring the advice of their counsel.  2013 WL 1816162, at *2–4.

Here, by contrast, the Government does not seek to establish any specific inferences, much less prejudicial ones, about the *substance* of the legal advice that the defendant conveyed to Tech Executive-1 or the Clinton Campaign (beyond the subject matter of that advice).  Rather, it seeks to establish the *existence* of advice-giving relationships concerning the Russian Bank-1 allegations. And unlike in the cases that the defendant cites, the alleged crime here indisputably concerns and centers upon the existence of such relationships.  Because attorney-client privileged information cannot itself be reviewed by the Government or presented to the jury, this non-privileged header information is in many instances the Government's best, and in some cases the only, available evidence that particular communications occurred.

In light of these facts, and consistent with prior caselaw, the Government therefore submits that the appropriate course is to permit the admission of redacted, non-privileged documents while allowing the parties to propose any limiting instructions that may be appropriate.  *See, e.g., Romero v. Helmerich & Payne Int'l Drilling Co*., No. 15-CV-00720-NYW, 2017 WL 3268878, at *4 (D. Colo. Aug. 1, 2017) (permitting the presentation of redacted, attorney-client privileged documents before the jury but holding that "[t]he court will also instruct the jury. . .  that some redactions to documents have been made and that the jury should not speculate as to what has been redacted);

4

*United States v. Sussman*, 709 F.3d 155, 175 (3d Cir. 2013) (District Court "did not abuse its discretion by allowing redacted documents to be admitted into evidence and used by the jury during deliberations rather than confining the reference to them to a stipulation of their existence"); *In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Inj. Litig.*, No. 2:13-CV-170, 2016 WL 659112, at *60 (S.D. Ohio Feb. 17, 2016) ("[relevant] emails were in no way unfairly prejudicial . . . because the purportedly objectionable portions were redacted.")[2]; *In re EpiPen*, 2022 WL 226130 at * 17.

Finally, the defendant's argument that the Court should bar the Government from offering evidence that the Clinton Campaign and Tech Executive-1 have asserted the privilege over particular documents is similarly without merit.  It is manifestly relevant to the charged offense that both the Clinton Campaign and Tech Executive-1 have asserted attorney-client privilege over documents involving the defendant that concern or relate to the Russian Bank-1 allegations.  Such information is inherently probative because – as alleged in the Indictment – the defendant claimed he did *not* assemble those allegations on behalf of any client.   For this reason, the Clinton Campaign's and Tech Executive-1's privilege claims over documents relating to the Russian Bank-

---

[2] The District Court in *In re: E. I. Du Pont De Nemours & Co* instructed the jury as follows:

> There will be some documents in this case that will have evidence that may be admissible and also some evidence in the document that would not be admissible. In that case there will be redactions or blackening out of those parts of the document that are not proper under the rules of evidence and does not constitute evidence that you should consider. So, I instruct you to simply ignore what has been blacked out. Don't guess or speculate as to what's been blacked out. But then just treat what's left in the document as proper evidence for your consideration.

*Id.*

1 allegations naturally undermine, and tend to refute, the defendant's assertion to the FBI General

Counsel.  They are therefore highly probative.

Moreover, the mere fact that these specific privilege holders have applied or requested

redactions is not unduly prejudicial because it reflects nothing more than a claimed legal interest in

particular documents and does not give rise to inferences that would inflame, confuse, or bias the

jury's deliberations.  Indeed, by moving to preclude this information, the defendant seeks to have

it both ways: namely, he seeks to shield the jury from the contents of relevant communications

based on purported privilege being asserted by his former clients, but also seeks to prevent the jury

from learning basic, *non-privileged* facts about the identities of such clients who are asserting the

privilege.  Because the aforementioned assertions of privilege make it more likely that the defendant

lied to the FBI General Counsel in stating that he was not acting on behalf of any client, they are

highly probative and not unduly prejudicial.

## II.   The Defendant's Motion to Exclude Testimony Pertaining to Notes Taken by Former FBI Officials Should be Denied

### A. The Notes Are Admissible as Substantive Evidence of Prior Consistent Statements

The defendant next seeks to exclude any evidence or testimony concerning notes reflecting

the FBI General Counsel's prior consistent statements, even though it is close to certain that the

defense will attack this witness's credibility, veracity, and memory in opening arguments and on

cross-examination.  In support, the defendant asserts that in order for the prior consistent statements

to be admissible, they must first qualify under the hearsay exception for past recollection recorded.

Alternatively, the defendant claims that admission of these prior consistent statements would

amount to improper bolstering of the witness's testimony.   But defendant's assertions are

6

misguided, as Federal Rule of Evidence 801(d)(1)(B) governs the admissibility of the witness's prior consistent statements.

As set forth in the Government's motion *in limine*, Rule 801(d)(1)(B) specifically provides two independent bases for the admission of his prior consistent statements as substantive evidence. First, where the declarant testifies at trial, his prior consistent statements are "not hearsay" if admitted "to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B).  As the Supreme Court has made clear, the earlier statement is admissible as substantive evidence—*i.e.*, for the truth of the matter asserted—to rebut a charge of recent fabrication, improper influence, or motive, provided that the statement was made prior to any motive to fabricate. *Tome v. United States,* 513 U.S. 150, 162 (1995).  Second, a declarant's prior statement that is consistent with his trial testimony is also admissible when offered to rehabilitate the witness's credibility where the witness is attacked on another ground, such as inconsistency or faulty memory.  *See United States v. Flores*, 945 F.3d 687, 705 (2d Cir. 2019) (affirming trial court's admission of notes as prior consistent statements after defendant's opening statement challenged witness's memory).

The Government's evidence at trial will establish that shortly after his meeting in which the defendant falsely stated that he was not there on behalf of any client, the FBI General Counsel spoke to the FBI's then-Assistant Director for Counterintelligence ("Assistant Director") and to one of his Deputy General Counsels ("Deputy General Counsel") and relayed details of his meeting with the defendant.  Given that defendant made his false statement directly to the FBI General Counsel, the defense likely will seek to impeach his testimony in opening statements and/or on cross-

examination.[3]  In either instance, once the defense attacks the FBI General Counsel's testimony in such a manner, his statements are admissible as substantive evidence of prior consistent statements. *See United States v. Montague*, 958 F.2d 1094, 1096 (D.C. Cir. 1992) (stating that "when a defense attorney pursues a line of questioning designed to impugn the motives of a witness, she assumes the risk that the government will introduce rebuttal evidence under Rule 801(d)(1)(B)); *United States v. O'Connor*, 650 F.3d 839, 862-63 (2d Cir. 2011) (affirming trial court's admission of prior consistent statements before declarant's testimony where defense began attack on witness's credibility in opening argument).  Moreover, these prior statements are admissible through the FBI General Counsel himself, *or through another witness* to the statements who is available for cross-examination.  *See Montague*, 958 F.2d at 1099 (affirming trial court's admission of prior consistent statement made by witness to police officer).

Accordingly, contrary to the defense's assertion that application of Rule 801(d)(1)(B) to the General Counsel's prior statements would be "unprecedented," the Rule's application here is straightforward, routine, and entirely appropriate.

Nor would the introduction of such testimony amount to "bolstering."  As described above, Rule 801(d)(1)(B) expressly prescribes and contemplates that such evidence is admissible under circumstances when the *opposing party* elects to attack the credibility or reliability of the witness's testimony.  Accordingly, such prior consistent statements necessarily are admissible to *rebut* attacks on the witness's testimony and not to improperly bolster it.

**B.   The Notes are Also Admissible Under the Hearsay Exception for Past Recollection Recorded**

---

[3] The defense to date has not indicated that it will refrain from such argument.

Separately, the contemporaneous notes of both the Assistant Director and the Deputy General Counsel are also admissible under the hearsay exception for past recollection recorded. Fed. Rule Evid. 805(3).  To qualify as past recollection recorded, the proponent must establish a foundation that (i) the record is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (ii) the record was made when the matter was fresh in the witness's memory; and (iii) the record accurately reflects the witness's knowledge.  Fed. R. Evid. 803(5).  While the precise thrust of the defendant's argument is unclear, he seems to suggest that the Government has not met these factual predicates.  But this argument puts the cart before the horse.  Of course the Government has not *yet* laid the full factual predicate for the application of this exception because these witnesses have not yet testified at trial.  The defendant's reliance on selected quotes from those witnesses' interview reports and/or prior grand jury testimony is of no moment.  The Government was not required to lay the requisite foundation in the grand jury or in witness interviews where the prohibition against hearsay evidence is inapplicable.  It can and will, however, establish a proper foundation at trial.  As described in the Government's motion *in limine*, the Government expects that both the Assistant Director and the Deputy General Counsel will testify that their notes were taken during one or more exchanges with the FBI General Counsel on September 19, 2016, but neither can recall a precise setting or specific details.  In addition, the witnesses will testify that they took their respective notes contemporaneously, and that the notes accurately memorialized information they learned from the FBI General Counsel at that time.  As such, the defendant's assertions, which rest on cherry-picked phrases from interview reports and grand jury testimony, are unavailing.  The notes at issue are text book past recollections recorded,

and once the witnesses establish the proper foundation during their trial testimony, the notes may be read into evidence.

### III.    The Defendant's Motion Seeking an Order to Compel the Government to Immunize Tech Executive-1 Should be Denied

The defendant next moves *in limine* to compel the government to grant Tech Executive-1 immunity as a witness or, if the Government is not willing to do so, to dismiss the case against the defendant.   The defendant's arguments should be rejected.   Indeed, to now arbitrarily force the Government to immunize Tech Executive-1 merely because the defense believes he would offer arguably helpful testimony to the defendant would run afoul of the law and inject the Court into matters plainly reserved to the Executive Branch.

#### A.  Applicable Law

"Generally, a trial court has no authority, in the absence of a request by the government, to provide use immunity for a defense witness."  *See United States v. Heldt*, 668 F.2d 1238, 1282-83 (D.C. Cir. 1981).  Indeed, "the government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized." *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) (citing *United States v. Turkish*, 623 F.2d 769, 774 (2d Cir. 1980).

Nevertheless, defense counsel asks the Court to present the Government with a drastic decision – either grant Tech Executive-1 immunity or dismiss the Indictment.  The D.C. Circuit has suggested that such an approach should only be considered in "extraordinary circumstances" in cases of "prosecutorial misconduct."  *United States v. Lugg*, 829 F.2d 101, 104 (D.C. Cir. 1989) (citing to *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988); *United States v. Praetorius*, 622 F.2d 1054, 1064 (2d Cir. 1979).

In *Ebbers*, the Second Circuit set forth a two-pronged test to determine the "extraordinary circumstances" when a court must require the government to grant a defense witness immunity. According to *Ebbers*, a court first must determine whether the government has "used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation." *Ebbers*, 458 F.3d at 119 (internal citation and quotations omitted).   The *Ebbers* court provided potential examples of a "discriminatory" grant of immunity, which include "threats, harassment, or other forms of intimidation," or simply "a decision . . . to confer immunity on some witnesses and not on others." With respect to this latter example, however, the court opined that "it may also be the case that the immunity decision in question are so obviously based on legitimate law enforcement concerns . . . that it is clear that a court cannot intervene without substantially hampering the administration of justice." *Id.*

Second under *Ebbers*, the defendant must demonstrate that evidence provided by an immunized witness "will be material, *exculpatory* and not cumulative and is not obtainable from any other source." *Ebbers*, 458 F.3d at 119 (emphasis added).  In that regard, "exculpatory evidence is material when it tends to show that the accused is not guilty." *Id.* (quoting *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002)).

Put plainly, "the Fifth Amendment does not require that defense witness immunity be ordered whenever it seems fair to grant it."  *United States v. Bahadar*, 954 F.2d 821, 825 (2d Cir. 1992 (quotations and citations omitted).   Absent some credible allegations of prosecutorial misconduct, it is solely in the government's purview to grant immunity to witnesses.

## B.  Discussion

The defendant's argument fails for several reasons. *First*, the Government has in no way threatened, bullied, harassed or otherwise committed misconduct in its dealings with Tech Executive-1.  *Ebbers*, 458 F.3d at 119.  Indeed, the Government has never spoken directly with Tech Executive-1.  It has instead communicated with his lawyer principally via telephone and email over the past two years.  The Government did so initially to determine if Tech Executive-1 would be willing to meet with the Government and share his knowledge of these matters—an offer which his counsel repeatedly rejected on the basis of Tech Executive-1's voluntary invocation of his Fifth Amendment right against self-incrimination.[4]  Since its initial communications with Tech Executive-1's counsel, the Government also has repeatedly answered counsel's questions regarding Tech Executive-1's status in the investigation and has shared specific details regarding the nature of the investigation.  Tech Executive-1 was a "subject"[5] of the investigation prior to the defendant's indictment; he remained a "subject" following the return of the indictment; and he still remains a "subject" one month short of trial.   Thus, unlike in the cases cited by the defense, there can be no credible argument that the government improperly threatened Tech Executive-1 with prosecution, much less did so *after* learning that he might testify for the defense.  Defense counsel has provided no examples of how the Government has "actively discouraged [Tech Executive-1] from testifying through threats of prosecution, intimidation, or coercive badgering."   *Smith*, 997 F.2d at 680. Merely responding to counsel's inquiries about his client's status in the investigation cannot

---

[4] In 2021, counsel on one occasion agreed to meet with the Government, purportedly to share certain information on behalf of his client, but abruptly canceled that meeting at the instruction of his client.

[5] "A 'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation."  Justice Manual 9-11.151.

reasonably be deemed "coercive."  Indeed, case law in this and other districts confirms that the Government must actively and improperly threaten a witness in connection with their testimony to warrant a grant of immunity.  Otherwise, no adequate basis exists.  *See United States v. Davis*, 974 F.2d 182, 186 (D.C. Cir. 1992) ("[T]he Sixth Amendment is not implicated every time a prosecutor or trial court offers advice regarding the penalties of perjury"); *United States v. Smith*, 478 F.2d 976 (D.C. Cir. 1973) (prosecutors met with a potential defense witness *during trial* outside the presence of his counsel and threatened the witness with charges should he testify on behalf of the defendant); *United States v. Morrison*, 535 F.2d 223, 227 (3rd Cir. 1976) (finding prosecutorial misconduct where "the actions of the prosecutor in his repeated warnings [to prosecute a potential defense witness] culminated in a highly intimidating personal interview were completely unnecessary"). Nothing the defense has alleged, and certainly nothing the Government has done here with regard to Tech Executive-1, even remotely resembles the conduct of the prosecutors in those other cases.

*Second*, Defense counsel's further entreaties that there is "no meaningful likelihood that [Tech Executive-1] will be prosecuted" because more than five years have passed since the defendant's September 2016 meeting are based on naked and uninformed speculation.  Indeed, defense counsel is not – and could not be – aware of all the evidence that the Government has collected and continues to collect, or of the possible violations of law it is investigating.

*Third,* the defendant has not alleged – nor could he – that the Government has exercised "immunity in a discriminatory way." *Ebbers*, 458 F.3d at 119. The only witness currently immunized by the government, Researcher-2, was conferred with that status on July 28, 2021 – over a month prior to the defendant's Indictment in this matter.  And the Government immunized Researcher-2 because, among other reasons, at least five other witnesses who conducted work

relating to the Russian Bank-1 allegations invoked (or indicated their intent to invoke) their right against self-incrimination.  The Government therefore pursued Researcher-2's immunity in order to uncover otherwise-unavailable facts underlying the opposition research project that Tech Executive-1 and others carried out in advance of the defendant's meeting with the FBI.  To argue that the Government has engaged in a discriminatory use of immunity here by granting such a witness immunity but not another is absurd.  Indeed, the Government's decision not to offer immunity to Tech Executive-1 was entirely reasonable and consistent with the Department of Justice's practices, given that Tech Executive-1 played a critical leadership role in assembling and submitting the allegations at issue, and therefore would likely carry greater criminal exposure and potential culpability in the event the Government's investigation were to reveal or confirm the commission of crimes other than the offense currently charged.  (The Government also currently intends to seek immunity at trial for an individual who was employed at the U.S. Investigative Firm. But unlike Tech Executive-1, that individual is considered a "witness" and not a "subject" of the Government's investigation based on currently-known facts.)

Finally, the defendant fails to plausibly allege – nor could he – that the Government here has "deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation." *Ebbers*, 458 F. 3d at 119 (internal citation and quotations omitted).  The defendant's motion proffers that Tech Executive-1 would offer exculpatory testimony regarding his attorney-client relationship with the defendant, including that Tech Executive-1 agreed that the defendant should convey the Russian Bank-1 allegations to help the government, not to "benefit" Tech Executive-1.  But that testimony would – if true – arguably contradict and potentially incriminate the defendant based on his sworn testimony to Congress in

14

December 2017, in which he expressly stated that he provided the allegations to the FBI *on behalf of an un-named client* (namely, Tech Executive-1). And in any event, even if the defendant and his client did not seek specifically to "benefit" Tech Executive-1 through his actions, that still would not render his statement to the FBI General Counsel true. Regardless of who benefited or might have benefited from the defendant's meeting, the fact still remains that the defendant conducted that meeting *on behalf* of (i) Tech Executive-1 (who assembled the allegations and requested that the defendant disseminate them) and (ii) the Clinton Campaign (which the defendant billed for some or all of his work). The proffered testimony is therefore not exculpatory, and certainly not sufficiently exculpatory to render the Government's decision not to seek immunity for Tech Executive-1 misconduct or an abuse.[6] The defendant therefore has not met his burden of demonstrating, among other things, that the evidence provided by an immunized witness would tend to show he is "not guilty." *Ebbers*, 458 F.3d at 119.

In sum, the Government has complied with its obligations under the law. Thus, "[w]hatever it takes to constitute a deprivation of a fair trial by the prosecution's failure to exercise its broad discretion on immunity grants, the present case does not present it." *Lugg*, 892 F.2d at 104. The Government respectfully submits that the Court should not grant the extraordinary relief sought by the defendant.

**IV.    The Defendant's Motion to Preclude Evidence Concerning the Gathering and Accuracy of DNS Data and Related Analysis Should be Denied**

---

[6] The defendant's further proffer that Tech Executive-1 would testify that (i) the defendant contacted Tech Executive-1 about sharing the name of a newspaper with the FBI General Counsel, (ii) Tech Executive-1 and his associates believed in good faith the Russian Bank-1 allegations, and (iii) Tech Executive-1 was not acting at the direction of the Clinton Campaign, are far from exculpatory. Indeed, even assuming that all of those things were true, the defendant still would have materially misled the FBI in stating that he was not acting on behalf of any client when, in fact, he was acting at Tech Executive-1's direction and billing the Clinton Campaign.

The defendant next moves to preclude evidence concerning (i) the gathering of DNS data by Tech Executive-1 and his associates, and (ii) the accuracy *vel non* of this data and of the conclusions and analysis based on such data. The defendant's arguments downplay or misstate relevant facts and fail to cite supporting law. Accordingly, the Court should deny the defendant's motion.

As to the gathering of DNS data by Tech Executive-1 and his associates, evidence reflecting such activities is a necessary factual backdrop to the charged conduct and therefore is plainly admissible. In particular, facts concerning when, why, and how Tech Executive-1 came to possess and/or convey the purported data and analysis are all relevant to the jury's understanding of the critical meeting that the defendant had with the FBI General Counsel on September 19, 2016. In particular, such facts will shed important light on the (i) background and substance of the Russian Bank-1 allegations that the defendant provided to the FBI; (ii) the nature of the defendant's work and relationships with his alleged clients; (iii) the authorship of the various white papers and other materials; (iv) the factual context for the defendant's alleged false statement; and (v) specific reasons why the defendant and/or his clients would have wanted to conceal the origins and provenance of this data and their work. Facts concerning the origins of such purported data and related allegations therefore constitute direct evidence of the charged offense because they are part of the story of the alleged crime and tend to prove the existence of the defendant's attorney-client relationships with both Tech Executive-1 and the Clinton Campaign.

These facts are also particularly relevant where, as here, the defendant is expected to claim that his alleged lie to the FBI was *immaterial*. In that context, such facts will permit the jury not only to evaluate the truth or falsity of the defendant's alleged statement, but also to consider what

material information the defendant's alleged lie concealed and what alternative investigative steps or conclusions the FBI might have pursued had the defendant *not* lied to General Counsel in this manner.   All of these facts are therefore not "extrinsic or extraneous but, rather are 'inextricably intertwined with the evidence regarding the charged offense, [and are] necessary to complete the story of the crime . . . .' *United States v. Badru*, 97 F.3d [1471,] 1474 (D.C. Cir. 1996) (citing *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983)).'"   *United States v. Eiland*, No. CRIM.04-379(RCL), 2006 WL 516743, at *4 (D.D.C. Mar. 2, 2006).

Nor does the defendant's attempt to distance himself factually from the origins of the purported data and allegations aid his argument.  As an initial matter, the Government has already proffered to the Court and/or expects to offer at trial considerable evidence that the defendant – a former DOJ cyber lawyer who identified himself as an expert in privacy, cybersecurity, and technology law – was involved in and/or aware of the data's origins. For example:

- Days before his meeting with the FBI, the defendant emailed Researcher-2 – the author of one of the relevant white papers and one of the primary researchers who analyzed the Russian Bank-1 allegations – stating that they had a mutual friend, referring to Tech Executive-1.

- Also in mid-September 2016, Researcher-2 left a voicemail for the defendant at his office seeking to speak with him.

- If called as a witness,[7] Researcher-2 would testify that soon thereafter, he spoke with the defendant and raised concerns about whether the data concerning Trump and Russian Bank-1 was being unlawfully collected and used.

---

[7] The Government has not yet made a final determination regarding which researchers it will call as witnesses at trial.

17

- Reflecting sufficient awareness of the data's origins to opine on the issue, the defendant assured Researcher-2 that the data had, in fact, been lawfully collected and used. Researcher-2 would testify, in particular, that the defendant stated that the data was collected under contracts for what is described as "passive DNS" collection, and that the use of the data complied with principles of "informed consent." Researcher-2 would further testify that he understood the defendant to be familiar with the "corporate sources" of the relevant data.

- Billing records demonstrate that in September 2016, the defendant billed the Clinton Campaign for "drafting" a "white paper," which, in context, referred to the Russian Bank-1 white paper—reflecting that the defendant had enough familiarity with the data and relevant subject matters to assist in crafting the relevant analysis.

- Testimony at trial will further establish that during his meeting with Agency-2, the defendant described the relevant Russian Bank-1 and Russian Phone Provider-1 data as "private collection," distinguishing it from Government-collected data.

- According to Agency-2 records and expected testimony at trial, the defendant also stated that the data he was providing was "DNS information [that] his contacts had gathered."

- The evidence at trial will also establish that the defendant carried with him to the FBI and Agency-2 two separate sets of thumb drives containing data files that were named, among other things, "log of DNS lookups for mail.trump_email.com, 851.txt," "[Russian Phone Provider-1]-cpwest[8]," "[Russian Phone Provider-1]-eop.csv," "[Russian Phone Provider-1]-[Healthcare Provider-1].csv," and "[Russian Phone Provider-1]-trumporg.csv," all apparent references to the specific source and/or destination of purported DNS lookups.

---

[8] "cpwest" apparently refers to Trump's Central Park West apartment building.

The foregoing facts support the inference that the defendant was partially or fully aware of the origins and provenance of the relevant data, and that he participated meaningfully in the analysis of such data.  To the extent such data was obtained in a manner that was illegal or unethical, a jury reasonably could infer that the defendant and his clients shared a potential motive to conceal material facts—particularly since the defendant assured one of the relevant researchers (Researcher-2) that the collection and use of the data was lawful.

But even assuming the defendant was *unaware* of the data's precise origins, facts concerning the opposition research project that Tech Executive-1 and his associates conducted, combined with the defendant's own billing of time on the Russian Bank-1 allegations to the Clinton Campaign, still supplied a highly plausible motive for the defendant to deny the involvement of his clients in these matters.  Such facts are also probative for the additional reason that they reflect a shared "plan" between the defendant, Tech Executive-1, and/or the Clinton Campaign to collect and disseminate materials through the defendant, and evince "preparation" for the meeting at which the defendant made his alleged false statement.  Fed R. Evid. 404(b).  Accordingly, all of this evidence is admissible as direct evidence and, alternatively, as "other acts" evidence pursuant to Rule 404(b), regardless of whether it sheds light on arguably unethical and/or criminal conduct. *Eiland*, 2006 WL 516743, at *4  ("As long as evidence of the uncharged criminal conduct is offered as direct evidence of a fact in issue, and not as circumstantial evidence of the character of the accused, it is admissible independent of its superficial similarity to that which would be considered evidence of 'other crimes' under Rule 404(b)." *United States v. Gray*, 292 F. Supp. 2d 71, 77-78 (D.D.C. 2003) (Lamberth, J.) (citing *Badru*, 97 F.3d at 1475 (citing 22 CHARLES A. WRIGHT &

KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5239 at 450 (1978))).

The defendant's efforts to pre-emptively bar additional evidence concerning the accuracy of the data and allegations at issue also should be rejected.  As the Government has made clear in its prior filings, its approach to these issues at trial will depend, in part, on the particular defenses and arguments that the defendant raises.  If the defendant were to concede or decline to dispute the fact that no secret channel of communications *actually existed* between the mail1.trump-email.com server at issue and Russian Bank-1, then the Government would not seek to offer proof concerning the ultimate accuracy and reliability of the relevant data.

At a minimum, however, the Government does expect to adduce evidence at trial reflecting (i) the fact that the FBI and Agency-2 concluded that the Russian Bank-1 allegations were untrue and unsupported and (ii) the primary bases for these conclusions, including the particular investigative and analytical steps taken by these agencies.  (For example, while the FBI did not reach an ultimate conclusion regarding the data's accuracy or whether it might have been in whole or in part genuine, spoofed, altered, or fabricated, Agency-2 concluded in early 2017 that the Russian Bank-1 data and Russian Phone Provider-1 data was not "technically plausible,"  did not "withstand technical scrutiny," "contained gaps," "conflicted with [itself]," and was "user created and not machine/tool generated."  The Special Counsel's Office has *not* reached a definitive conclusion in this regard.)

Separate and apart from whether the data was actually unreliable or provided a motive for the defendant to lie, evidence concerning the steps the FBI and Agency-2 took to investigate these matters is critical to establishing materiality because it will enable the jury to evaluate those steps

which, in turn, will inform their conclusions about whether the defendant's alleged false statement was material and could tend to influence or impair government functions.  In this regard, the Government also intends to call a witness from at least one of the companies responsible for using and maintaining the mail1.trump-email.com mass marketing server that was the subject of the Russian Bank-1 allegations.  Such witness's testimony will be highly probative for two reasons: first, to establish and explain the steps that the FBI took in its investigation (including contacting and obtaining information directly from these companies), and second, to inform the jury's basic understanding of the mail1.trump-email.com email server that was the subject of the Russian Bank-1 allegations and the defendant's alleged false statement.

As the Government sets forth more fully in its separately-filed response to the defendant's motion concerning expert testimony, the Government also reserves the right to elicit testimony, including expert testimony on rebuttal or otherwise, concerning the ultimate accuracy and/or reliability of the data.  For example, if called to testify on these matters, the Government's expert would explain his view that while he has not determined with certainty whether the data at issue was in whole or in part authentic, fabricated, spoofed, or cherry-picked, the purported data nevertheless does *not* support a number of specific conclusions set forth in the primary white paper that the defendant worked on with Tech Executive-1 and provided to the FBI.  The expert would further testify that several statements in that white paper – including its main conclusion that the "only plausible" explanation for the referenced DNS lookups was a covert communications channel – are inaccurate and/or over-stated.  And he would testify, for example, that a person who had basic technical familiarity with TOR (a vehicle for anonymized internet traffic) would know that the

paper's assertions regarding Russian Bank-1's purported exclusive use of a TOR exit node at Healthcare Company-1 were inaccurate and lacked support.

Such testimony might become highly relevant if, for example, the defendant seeks to persuade the jury that he *reasonably* relied in good faith on Tech Executive-1's analytical conclusions and therefore lacked a motive to conceal information about his clients.  In that event, it would only be fair that the Government be permitted to rebut or challenge the purported reasonableness of the defendant's reliance.  And regardless, such opinions by the Government's expert would also be relevant to explain why Tech Executive-1 and the defendant would have had a motive to instruct his counsel to conceal Tech Executive-1's involvement in these matters.

Such testimony concerning the data's accuracy and/or reliability might also prove relevant if the defendant seeks to persuade the jury that the mass marketing server at issue was, *in fact*, used to establish a secret channel of communications, despite the passage of time and the evidence to the contrary.  Permitting the defense to advance such an argument unopposed would serve to sow confusion, advance conspiracy theories, and unfairly prejudice the jury's consideration of the defendant's false statement and its materiality.

In short, because the defendant's alleged false statement occurred in the context of highly technical allegations and information, it is only natural and proper that such technical concepts and analysis will be a part of the Government's presentation of the evidence.  Because the relevance of any particular evidence or conclusion in this regard depends on the particular theories and arguments that the defense might advance, the Government respectfully submits it is appropriate for the Court to reserve decision on these matters until the Government and the Court have gained a fuller picture of the defense's trial strategy.

## V.  The Defendant's Motion to Preclude Testimony Concerning U.K. Person-1 Should be Denied

Next, the defendant moves to preclude evidence and argument regarding information that a United Kingdom based investigator ("U.K. Person-1") provided to the FBI.  As detailed below, this information is highly probative because it provides evidence regarding the attorney-client relationships surrounding the Russian Bank-1 allegations.

As set forth in the Government's prior filings, in or about June 2016, the U.S. Investigative Firm retained U.K. Person-1 on behalf of both Law Firm-1 and the Clinton Campaign.  *See* Dkt. No. 64 at 9-10, 15-16.  U.K. Person-1 then compiled information and reports that became a "dossier" which contained allegations of purported coordination between Trump and the Russian government.   In the summer of 2016, the defendant met with U.K. Person-1 at Law Firm-1's offices, during which the defendant told U.K. Person-1 about the Russian Bank-1 allegations.  After the meeting, personnel from the U.S. Investigative Firm tasked U.K. Person-1 to research and produce intelligence reports about Russian Bank-1, which he did.[9]  *Id.*

According to U.S. government records and public information, U.K. Person-1's dossier included a report about Russian Bank-1's relationship with Vladimir Putin.   The relevant report, dated September 14, 2016 – just five days before the defendant's meeting with the FBI – was titled "Russia/US Presidential Election: Kremlin-[Russian Bank-1] Group Cooperation."  Separately, in October 2016, U.K. Person-1 also provided Tech Executive-1's allegations regarding a purportedly

---

[9] As noted in the Government's prior filing, U.K. Person-1 testified to these facts in a foreign legal proceeding.  Regardless of whether the substance of that foreign testimony is offered or admissible at trial, the Government proffers such information here in order to demonstrate the relevance to the charged conduct of certain evidence concerning U.K. Person-1.

secret server between Russian Bank-1 and the Trump Organization to a U.S. State Department official at a meeting in Washington, D.C.

All of this evidence is highly probative, insofar as it establishes that the defendant (i) represented and worked for the Clinton Campaign in connection with its broader opposition research efforts, (ii) took steps to integrate the Russian Bank-1 allegations into those opposition research efforts, (iii) coordinated with  U.K. Person-1, the U.S. Investigative Firm, and Tech Executive-1 in connection with the Russian Bank-1 allegations, and (iv) carried out his September 19, 2016 meeting with the FBI in order to, among other things, further the interests of the Clinton Campaign with assistance from the U.S. Investigative Firm.

Importantly, the Government does not seek to introduce the entirety of the U.K. Person-1 dossier into evidence but, rather, seeks to offer only the one report described above that discusses Russian Bank-1's alleged ties to Putin.  Contrary to the defendant's assertion, the Government is *not* interested in creating a "circus full of sideshows" or engaging in "mini-trials" concerning U.K. Person-1 and his reporting.  Rather, the Government seeks only to introduce limited information pertaining to U.K. Person-1, as it is highly probative of the central issue in dispute in this case, *i.e.*, whether the defendant was acting on behalf of the Clinton Campaign when he assembled and conveyed the Russian Bank-1 allegations.

And finally, U.K Person-1's information is interwoven with the Government's proof because the former FBI Assistant Director's notes referenced above contain *on the same page as the Russian Bank-1 allegations* (and on the following page) additional notes reflecting that FBI Headquarters received parts of the U.K. Person-1 dossier from an overseas FBI agent *on the very same date* as the defendant's meeting with the FBI General Counsel.  Those notes state, among

24

other things, that the dossier's author was hired by the U.S. Investigative Firm to "dig up dirt on Trump" for an un-named U.S. client.  The fact that FBI Headquarters received on the same date both sets of information involving the same political campaign (the Clinton Campaign), the same law firm (Law Firm-1), and the same investigative firm (the U.S. Investigative Firm) makes U.K. Person-1's involvement in these matters relevant.  It is also strong evidence concerning the materiality of the defendant's alleged false statement that he was not acting for any client.

Moreover, this evidence satisfies the balancing test of Rule 403.  Any prejudicial effect deriving from the controversial nature of the U.K. Person-1 dossier is greatly outweighed by the probative value of this evidence on what will be a core factual issue—*i.e.,* the defendant's ties to, and attorney-client relationship with, the Clinton Campaign.  Indeed, the subject matters addressed in the relevant U.K. Person-1 report, and in testimony concerning U.K. Person-1's role in these events, are no more politically charged or prejudicial than other, plainly admissible evidence regarding allegations of a secret server between Russian Bank-1 and the Trump Organization.  *See United States v. Day*, 591 F.2d 861, 878 (D.C. Cir. 1978) ("[I]t is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged.") (citing McCormick on Evidence (2d ed. 1972) p. 453 n. 55).  If necessary, the Court certainly could fashion an appropriate limiting instruction to guard against any risk of unfair prejudice.  *See United States v. McCarson*, 527 F.3d 170, 174 (D.C. Cir. 2008) ("where as here, there is no compelling or unique evidence of prejudice, we deem such limiting instruction sufficient to protect a defendant's interest in being free from undue prejudice") (internal quotation marks and citation omitted); *see also United States v. Bell*, 795 F.3d 88, 100 (D.C. Cir. 2015); *United States v. Gartmon*, 146 F.3d 1015, 1023 (D.C. Cir. 1998).

## VI. The Defendant's Objections to the Government's Rule 404(b) Notices are Meritless

Finally, the defendant lodges various objections to the admission of certain evidence that the Government noticed pursuant to Rule 404(b).  Each of these objections is meritless and the Court should therefore admit the noticed categories of evidence at trial.

### A.  The Government's 404(b) Notice was Timely

As an initial matter, the defendant's argument that the Government's March 23, 2022 supplemental Rule 404(b) notice was untimely and prejudicial is baseless.  The Government timely filed its initial Rule 404(b) notice on March 18, 2022.  Less than a week later, and partially in response to comments that defense counsel made on a conference calls with the Special Counsel's Office, the Government filed a supplemental notice which contained two additional categories of evidence that the government intends to introduce at trial but did not initially conceive as Rule 404(b) evidence—namely, the "origins of the purported data at issue" and "evidence concerning the strength and reliability of the relevant data and allegations."   The supplemental notice expressly stated that the Government believes "the below evidence falls squarely within the definition of *direct* evidence of the charged offense." (emphasis added). It continued to explain, however, that "our recent discussions, including the conference call we held last Friday, have raised the prospect that you may hold a different view. We therefore are providing herein notice pursuant to Rule 404(b) for [] additional categories of evidence [] *in an abundance of caution and to aid your preparation for trial*." (emphasis added).

In a further abundance of caution, and also to aid the defense, the Government provided in that same letter further (and rather detailed) explanations supporting the admission of the other

categories of evidence that the Government had previously noticed in its prior, March 18, 2022 letter.

The defendant now seeks to punish the Government for exercising an abundance of caution in seeking to ensure – within days of its original notice – that the defense understood fully the categories of evidence the Government would seek to admit at trial and the proffered bases for that evidence. Any argument that the defense suffered undue prejudice on account of this gesture of good faith cannot withstand scrutiny. Indeed, the defendant has retained highly-skilled and competent counsel, and the Government provided this supplemental notice to the defendant nearly two months prior to trial. The defendant characterizes the supplemental notice as "untimely" but fails to demonstrate, as he must, how the purportedly untimely notice prejudiced the defendant at such a relatively early stage in the parties' trial preparations. *See United States v. Watson*, 409 F.3d 458, 465 (D.C. Cir. 2005). Accordingly, no punitive actions or other remedy by the Court is appropriate.

### B. The Government should be Permitted to Provide Context for the Defendant's February 9, 2017 False Statement to Agency-2

The defendant next moves to preclude the Government from offering portions of his December 2017 Congressional testimony. The defense, in part, agrees with the Government that testimony concerning the defendant's February 9, 2017 meeting with Agency-2 is relevant and admissible under Rule 404(b) to prove the defendant's motive, intent, plan, absence of mistake and lack of accident. In particular, the defendant states that he does not object to the introduction of his statement to Agency-2 that he was not acting on behalf of a particular client in providing the allegations to Agency-2. *See* Def. 404(b) Resp. at 20. However, the defendant *does* object to the government's introduction of other evidence providing the fuller context of the defendant's meeting

with Agency-2, including, but not limited to, the specific information exchanged in the meeting. This evidence is plainly necessary to provide context and backdrop to the defendant's false statement to Agency-2.   Without this information, the jury would be forced to analyze the defendant's statement in a vacuum.  *See United States v. Flores*, 888 F.3d 537, 544 (1st Cir. 2018) ("Attempting to analyze each piece of evidence in a vacuum is inconsistent with Supreme Court case law, which makes pellucid that each item is to be considered as part of the totality of the circumstances.")

As noted, the defendant objects to the introduction of additional statements that the defendant made to Agency-2 personnel during the meeting.  In one such statement, the defendant informed Agency-2 personnel that he had previously brought information to the FBI on a "similar," but "unrelated" matter, referring to the Russian Bank-1 allegations.  As stated in the Government's 404(b) notice, this statement was misleading because information regarding the Russian Bank-1 allegations was *among* the materials that the defendant provided to Agency-2, and it was therefore not "unrelated."  The defendant objects to the introduction of this statement by claiming that the Government has no evidence that the defendant's statement was false or misleading.  The defendant also argues that this statement, even if false or misleading, "has no bearing on the charged crime." *Id.* at 20.   But as set forth below, regardless of whether this statement was true, partially true, or – as the Government contends – false and misleading, the statement is admissible because it provides crucial context for the defendant's meeting and the other statements he made therein.

To provide the jury with the full context of the defendant's meeting with Agency-2, the government plans to offer evidence at trial reflecting that on January 31, 2017, the defendant had a conversation with a former Agency-2 employee ("Former Employee-1").  During that conversation,

the defendant asked Former Employee-1 for assistance in setting up a meeting with Agency-2 personnel to provide Agency-2 with certain information that a "client" (in context, Tech Executive-1) had provided to the defendant.   The defendant described this information, in sum and substance, as the Russian Phone Provider-1 allegations, which the Government has summarized in previous filings with the Court.  When Former Employee-1 inquired if the defendant had brought these allegations to the FBI, the defendant stated, in sum and substance, that his client "did not want to provide this to the FBI as he knows that the FBI did not have resources to deal with these issues[.]" The defendant subsequently stated that if Agency-2 was not interested in the allegations, the client would most likely go to the New York Times. (In order to provide the Court with a more comprehensive recounting of the expected testimony, the Government attaches hereto as Exhibit A an email from Former Employee-1 summarizing his exchange with the defendant).

On February 9, 2017, the defendant met with Agency-2 employees and made substantially the same false statement as the one the Indictment charges he made to the FBI General Counsel just months earlier.  This statement is memorialized in a Memorandum for Record ("MFR") prepared after the meeting.  The MFR reflects that the defendant, in addition to providing an updated version of the Russian Phone Provider-1 allegations, also provided an updated version of the Russian Bank-1 allegations to Agency-2.  Following the description of the Russian Bank-1 allegations, the Agency-2 employee wrote in the *next* paragraph:

> [Agency-2 Employee] advised Mr. Sussmann that given the location of such activities [redacted] and involvement of US Persons, we would need to refer all relevant information to the FBI.  [Agency-2 Employee] also advised that [they would] need to report any evidence of criminal activity to the FBI/DOJ.  Mr. Sussmann had no objections to providing any relevant information to the FBI.  He mentioned that he had previously contacted [the] FBI General Counsel, [] on a similar, though unrelated, matter.  Based on how the FBI had handled

> the matter, and because he thought [Agency-2] had the necessary technical expertise, he wanted to pass the current information directly to [Agency-2]

In context, the defendant's statement that he had provided the FBI with "similar, though unrelated" allegations is false, or at best, misleading. Indeed, the defendant had also provided the Russian Bank-1 allegations to the FBI on September 19, 2016. (In order to provide context to the Court, a partially-redacted version of the Agency-2 MFR is attached hereto as Exhibit B.)

The defendant next argues that even if this statement was false and/or misleading, the statement has "no bearing on the charged crime." This argument misses the mark. The statement bears directly on the Russian Bank-1 allegations, which underpin the meeting in which the charged false statement was made. Moreover, as stated in the Government's 404(b) notice, this statement is also relevant as part of the broader factual context of the Agency-2 meeting and supports an inference of the defendant's "intent" and "plan" to deceive Agency-2 by prompting them to act on information without truthfully describing or disclosing the relevant background, including the fact that the FBI had already been made aware of the allegations in the very meeting in which the charged crime occurred. And it reinforces the significance and materiality of the defendant's lie that he made the effort to tell it on multiple occasions to two separate government agencies.

Furthermore, the defendant's statement to Former Employee-1 that his client would likely bring the allegations to the New York Times absent a meeting with Agency-2, is consistent with the defendant's actions of providing the Russian Bank-1 allegations to the New York Times.

In sum, all of the evidence to be offered by the Government regarding the defendant's meeting with Agency-2 is intertwined with the defendant's offense conduct, and the contents of the Agency-2 meeting are therefore admissible.

**C. The Government Should be Permitted to Introduce All Relevant Portions of the Defendant's Congressional Testimony**

The defendant next challenges the admission of the portions of the defendant's December 2017 Congressional testimony *other than* those in which he discusses the client on whose behalf he met with the FBI General Counsel. But other portions of that testimony are plainly admissible—first, as direct evidence of the charged crime, second, as the defendant's own statements, and, third, pursuant to Rule 404(b).

As stated in its Rule 404(b) notice, separate and apart from its relevance as direct evidence that the defendant's statement to the FBI General Counsel was false, the defendant's December 2017 Congressional testimony is relevant and admissible pursuant to Rule 404(b) to prove, among other things, the defendant's "motive," "intent," "plan," and "knowledge." In particular, the defendant's testimony misleadingly conveyed the impression to Congress that the defendant's *only* client for the Russian Bank-1 allegations was Tech Executive-1. That testimony failed to disclose the fact that the only client billed for the defendant's pre-election work on those allegations was the Clinton Campaign. Therefore, this testimony is relevant to prove the defendant's "motive," "knowledge," "intent," and "plan," insofar as the defendant exhibited a consistent pattern of seeking to hide the Clinton Campaign's role as a beneficiary of, and billed party for, the Russian Bank-1 allegations. In this regard, the Government plans to offer portions of the defendant's Congressional testimony that bear upon two highly relative facts, namely, (1) the defendant's relationship to, and work for, the Clinton Campaign, and (2) the defendant's provision of the Russian Bank-1 allegations to the media. For the reasons stated below, the government should be able to introduce the following relevant areas of that transcript which are probative of those facts:

31

*First*, to demonstrate and corroborate that the defendant was acting on behalf of the Clinton Campaign in assisting its opposition research efforts and attending his September 19, 2016 meeting with the FBI, the Government anticipates introducing portions of the defendant's testimony during which the defendant stated that he met with U.K. Person-1 at Law Firm-1's offices in the summer of 2016. As the Court is aware, and as noted above, U.K. Person-1 had at the time been retained by the U.S. Investigative Firm to conduct opposition research for the Clinton Campaign. Although the defendant testified before Congress that the purpose of the meeting was to "vet" U.K. Person-1 for the Clinton Campaign given the defendant's knowledge of national security matters, U.K. Person-1 has testified under oath in the United Kingdom that, during the meeting, the defendant told him at the meeting about the Russian Bank-1 allegations. U.K. Person-1 further testified that after the meeting, personnel from the U.S. Investigative Firm tasked U.K. Person-1 to research and produce intelligence reports about Russian Bank-1, which he did.[10] In addition to the defendant's billing records, evidence of the defendant's 2016 meeting with U.K. Person-1 is highly probative of the fact that the defendant was acting on behalf of Clinton Campaign during his September 19, 2016 meeting with the FBI.

*Second*, to demonstrate the defendant's intent to conceal his work on behalf of the Clinton Campaign, the Government will offer portions of the defendant's Congressional testimony in which he is asked specifically by Congress whether the U.S. Investigative Firm or various of its employees were the anonymous "client" who provided Russian Bank-1-related information to the defendant. In his answers, the defendant denies that the U.S. Investigative Firm and/or these employees were

---

[10] As noted above, the Government proffers this publicly-available evidence in order to demonstrate the relevance to the charged conduct of the defendant's meeting and interactions with U.K. Person-1.

his client.  The defendant fails to state or volunteer that the U.S. Investigative firm, in fact, had drafted and provided to the defendant one of the white papers that the defendant then gave to the FBI General Counsel.  Nor does the defendant disclose that he billed his Russian Bank-1-related work to the same campaign that hired the U.S. Investigative Firm (the Clinton Campaign).

*Third*, the Government will offer portions of the defendant's Congressional testimony in which the defendant acknowledges that he shared the Russian Bank-1 allegations with members of the media before and after his meeting with the FBI, including with specific journalists whom he identifies.  This testimony corroborates the anticipated testimony of the former FBI General Counsel, specifically that the during their September 19, 2016 meeting, the defendant informed the General Counsel that the Russian Bank-1 allegations already had been provided to the media.

All of the above evidence bears directly on the subject matter and specific contents of the defendant's meeting with the FBI General Counsel.  Such evidence is also highly probative because it concerns the clients whom the Government has alleged the defendant represented at that meeting.  Accordingly, it is admissible as direct evidence and, alternatively, pursuant to Rule 404(b).

### D.  The Government Should Be Permitted to Introduce Evidence and Argument Regarding Law Firm-1's Statements to the Media

The defendant also moves to preclude certain evidence or argument concerning the Law Firm-1 press statements and "evidence regarding the role the defendant played in causing them to be made." Def. Mot. at 22. The defendant claims that the Government is improperly seeking to introduce "lay opinion testimony" as to credibility of the statements in the press.  The defendant's argument is incorrect.

*First*, the Government should be permitted to present this relevant 404(b) evidence which proves, *inter alia*, the defendant's motive and intent to conceal the involvement of politically-

motivated parties in his work on the Russian Bank-1 allegations in 2016. The fact that the defendant participated in the drafting, approval, and/or issuance of press statements that affirmatively claimed that the defendant's client was *not* the Clinton Campaign (when in fact, he billed the campaign for the very work at issue in the press statements) is clearly probative of the crime charged and not unduly prejudicial.

*Second*, the Government is not seeking to usurp a credibility finding from the jury through lay opinion testimony.  Indeed, the Government does not plan to elicit the "opinion" of the then-Managing Partner of Law Firm-1 as to whether he *currently* "thinks" the press statements were false or misleading.   Rather, the Government will appropriately elicit testimony as to the circumstances in which the statements were created, reviewed, and approved; what information was (and was not) provided by the defendant or others in drafting these statements; and whether the Managing Partner knew any of the media statements to be false *at the time* based on what he knew from his role in managing the firm.   Because such testimony flows directly from the witness's knowledge of relevant facts, none of it encroaches on the jury's role as the finder of fact on ultimate issues in the case.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant the Government's Motions *in Limine* and

permit the Government to offer the categories of evidence outlined in its Rule 404(b) notices.

<div style="margin-left:40%">

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

 /S/ _____
Jonathan E. Algor
Assistant Special Counsel
jonathan.algor@usdoj.gov

Andrew J. DeFilippis
Assistant Special Counsel
andrew.defilippis@usdoj.gov

Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

Brittain Shaw
Assistant Special Counsel
brittain.shaw@usdoj.gov

</div>