# Exhibit 1

UNCLASSIFIED,  COMMITTEE SENSITIVE

EXECUTIVE SESSION

PERMANENT SELECT COMMITTEE ON INTELLIGENCE,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:  MARC ELIAS

Wednesday, December 13, 2017

Washington, D.C.

The interview in the above matter was held in Room HVC-304, the Capitol,

commencing at 2:07 p.m.

Present:  Representatives Ros-Lehtinen, Wenstrup, Gowdy, Schiff, Himes,

UNCLASSIFIED,  COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

Carson, Speier, Quigley, Swalwell, Castro, and Heck.

3

Appearances:

For the PERMANENT SELECT COMMITTEE ON INTELLIGENCE:

███████████████████████████

█████████████████████████

██████████████████████████████

For MARC ELIAS:

KATHRYN H. RUEMMLER, ESQ.

555 ELEVENTH STREET, N.W., SUITE 1000

WASHINGTON, DC 20004-1304

NICHOLAS MCQUAID, ESQ.

885 THIRD AVENUE (AT 53RD STREET)

NEW YORK, NY 10022-4834

UNCLASSIFIED, COMMITTEE SENSITIVE

███████        Good afternoon all.   Thanks very much.   Sorry for the

delay.   This is a transcribed interview of Marc Elias.

Thanks for being with us today.

For the record, I am ████████  ████  counsel for the House Permanent

Select Committee on Intelligence, for the majority here.   Also present are other

members and staff present who will identify themselves during the course of the

proceedings.

Before we begin, I just wanted to state a few things for the record.

The questioning will be conducted by members and staff.   During the

course of this interview members and staff may ask questions during their allotted

time period.   Some questions may seem basic, but that is because we need to

clearly establish facts and understand the situation.

Please do not assume we know any facts you have previously disclosed as

part of any other investigation or review.

This interview will be conducted at the unclassified level.

During the course of this interview, we will take any breaks that you desire.

But we do ask that you give complete and fulsome replies to all questions based

on your best recollections.

If a question is unclear or you're uncertain in your response, please let us

know.   And if you do not know the answer to a question or can't remember, simply

say so.

You are entitled to have counsel present for you during this interview, and I

see that you've brought them with you today.

At this time, if counsel could please state their names for the record.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED,  COMMITTEE  SENSITIVE

For being with us today.

MS. RUEMMLER:   Kathryn Ruemuller, from Lathan and Watkins, on behalf of the witness.

MR. MCQUAID:   And Nick McQuaid.   I'm from Lathan and Watkins, also on behalf of the witness.

█████████   Thank you.

The interview will be transcribed.   There is a reporter making a record of these proceedings so we can easily consult a written compilation of your answers.

Because the reporter cannot record gestures, we ask that you answer all questions verbally.   If you forget to do this, you might be reminded to do so.   You may also be asked to spell certain terms or unusual phrases.

Consistent with the committee's rules of procedure, you and your counsel, upon request, will have an opportunity to inspect the transcript of this interview in order to determine whether your answers were correctly transcribed.

The transcript will remain in the committee's custody.   And the committee also reserves also the right to request your return for additional questions should the need arise.

The process for the interview will be as follows.   The majority will be given 45 minutes to ask questions, then minority will be given 45 minutes to ask questions, after which time the majority will be given 15 minutes to ask questions and the minority will be given 15 minutes to ask questions.   These 15-minute rounds will continue until both sides have completed their questioning.

These time limits will be adhered to by all sides.   Time will be kept for each portion of the interview with warnings given at the 5- and 1-minute mark, respectively.

UNCLASSIFIED,  COMMITTEE  SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

To ensure confidentiality, we ask that you do not discuss the interview with anyone other than your attorneys.

You're reminded that it is unlawful to deliberately provide false information to Members of Congress or staff.

And lastly, the record will reflect that you are voluntarily participating in this interview, which will be under oath.

Mr. Elias, could raise your right hand to be sworn?

Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

MR. ELIAS:  I do.

███████     Thank you very much.   Just a reminder, make sure the microphone is on at all times.

MR. ELIAS:  I have it on.

███████     Thanks very much.

Mr. Chairman, Mr. Gowdy, over to you for any opening remarks.

MR. GOWDY:  I have none.

███████     Over to you for any opening remarks.

MR. SCHIFF:  I welcome you to the committee and appreciate you being here.

MR. ELIAS:  I'm happy to be here.

MS. RUEMMLER:  And I do have a few if you don't mind, 

███████     Please.

MS. RUEMMLER:  There are a couple of things that I wanted to state for the record before we start, given that Mr. Elias is an attorney and as we understand it is here in his capacity as an attorney in connection with work that he

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

did on behalf of clients.

As we explained in our letter to Mr. Conaway on November 29th, the committee majority's request seeks confidential information about Mr. Elias' work on behalf of his clients.   We expect that the questions today will request similar information and we wanted to address this issue before we begin.

While Mr. Elias is committed to cooperating with the committee and providing information pertinent to the committee's investigation, his ability to do so is limited by his ethical obligation to protect client confidences under the D.C. Bar Rules of Professional Conduct.

It has long been recognized that the attorney-client privilege is an ancient cornerstone of our legal system and serves an important public interest in protecting communications between attorneys and their clients.

D.C. Rules of Professional Conduct, Rule 1.6, by which Mr. Elias is bound, makes clear that a client has a reasonable expectation that information relating to the client will not be disclosed by their lawyer, and that any such disclosure can only be compelled in accordance with recognized exceptions to the attorney-client privilege and work product doctrine.

Furthermore, under Rule 1.6, when a lawyer is called as a witness to give testimony concerning a client, a lawyer must invoke the privilege when it is applicable, absent waiver by the client.

We have conferred with Mr. Elias's clients, Hillary for America and the Democratic National Committee, and they have not waived the privilege with respect to Mr. Elias' testimony today.

As a result, and consistent with these ethical obligations, Mr. Elias is obligated not to answer any questions from the committee that intrude upon client

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

8

confidences and this sacrosanct relationship been the attorney and the client.

In light of these important considerations, we had asked the committee majority to consider a process where we could have discussed the committee's questions in detail beforehand so we could have determined whether there was areas of inquiry that could be answered without intruding into the attorney-client and work product privileges.   The committee majority refused to engage in that process, and thus we'll be forced to determine on a question-by-question basis whether or not Mr. Elias is permitted to answer.

███████████   Thank you.

Mr. Elias, do you have any opening comments?

MR. ELIAS:   No, other than I obviously want the committee to get to the bottom of any Russian interference in the U.S. elections, as I know all of you do. But as counsel said, there are restraints placed on me as an attorney, which I'm sure those of you in the room who are attorneys are sensitive to and aware of, so --

MR. PATEL:   Thank you very much.

Mr. Gowdy.

MR. GOWDY:   I will start and I will let Dr. Wenstrup.

Welcome.

Who do you consider your client to be?   Who did you consider your client to be?

MR. ELIAS:   I'm sorry, I have a lot of clients.

MR. GOWDY:   Well, with respect to this specific fact pattern, DNC and Hillary for America, are those the only two?

MR. ELIAS:   I guess I'm not -- I'm not trying to be dense.   I represent the

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

DNC and I represent Hillary for America.   So they are clients.

MR. GOWDY:   Well, I'm not trying to be dense either.   Your client made reference to the privilege belongs to the client and not to you.   And I was wondering who we would go ask for a waiver.

MR. ELIAS:   Oh, sorry.   Now I understand, yes.   The Democratic National Committee and Hillary for America.

MR. GOWDY:   Okay.   Where do you currently work?   How about we start there?

MR. ELIAS:   I'm a partner at the law firm Perkins Coie in Washington.

MR. GOWDY:   How long have you been there?

MR. ELIAS:   I started there as a summer associate in the summer of 1992 and then I joined as an associate after graduation in 1993.

MR. GOWDY:   And what's your practice area?

MR. ELIAS:   Broadly speaking, political law.   I represent candidates, parties, outside organizations, corporations that want to be involved in the political process.

MR. GOWDY:   Who at the DNC did you deal with?

MR. ELIAS:   During which time period?

MR. GOWDY:   Any time period.

MR. ELIAS:   Since the beginning of my practice --

MR. GOWDY:   How about we start with 2015?

MR. ELIAS:   Okay.   In 2015, I had a number of contacts at the DNC.   You know, it would number in the dozens.

MR. GOWDY:   Well, why don't we start with whoever would be able to provide you the waiver so you can answer all of our questions.   Who would we go

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

to there?

MR. ELIAS:   So I think it would be the current DNC, right, because the

privilege belongs to -- belongs to the organization.

MR. GOWDY:  So that would be Tom Perez.

MR. ELIAS:   That would be the chairman of the DNC, the executive

director, and presumably the other officers of the DNC.

MR. GOWDY:   And can you attach a name with those different positions

for me?

MR. ELIAS:   Well, Tom Perez is the chair.   Jessica O'Connell is the

executive director.

I'm embarrassed to say I don't know all the officers.   It's public information,

the vice chairs of the committee and the officers.   I'm happy to get that for you.

It's, I think, on their website, all the officers.

MR. GOWDY:   Who is Tom Perez's predecessor?

MR. ELIAS:   His immediate predecessor was Donna Brazille, and his

predecessor before that was Congresswoman Wasserman Schultz.

MR. GOWDY:   How did you come to hire Fusion GPS?

MR. ELIAS:   I came to hire them -- they approached me and indicated that

they might be a good fit for doing work to support the legal efforts of my clients.

MR. GOWDY:   When you say they approached me, who is "they"?

MR. ELIAS:   They were Peter Fritsch and Glenn Simpson.

MR. GOWDY:   To the best of your recollection, what precisely did they tell

you?

MR. ELIAS:   They told me that --

MS. RUEMMLER:   Just to clarify, this is prior to his engagement with them.

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. GOWDY:   I didn't think you considered them to be one of your clients. I didn't hear that in the list.   So if they're not a client, is there a privilege that would be associated with what they told you?

MS. RUEMMLER:   Yes.

MR. ELIAS:   Yes.

MR. GOWDY:   What privilege would that be?

MS. RUEMMLER:   It would be a combination of the attorney-client and work product.   Fusion GPS was hired by Perkins Coie as a consultant to assist Mr. Elias in providing legal advice to the campaign.   So like any other --

MR. GOWDY:   Well, then Perkins Coie would be the client, not the lawyer.

MS. RUEMMLER:   Perkins Coie retained Fusion to --

MR. GOWDY:   Right.

MS. RUEMMLER:   -- assist it through --

MR. GOWDY:   So is your position you cannot tell me what Fusion GPS said to you when they came to seek your services, that there is an attorney-client privilege that prevents that conversation from being part of the record?

MS. RUEMMLER:   No.   That's why I asked what timeframe you were asking.   Prior to the engagement of Fusion GPS the witness can go ahead and answer any questions about his interaction with Fusion.

MR. GOWDY:   Okay.   We'll start there.

MR. ELIAS:   So they told me that they had been retained by a -- previously -- by a wealthy Republican -- they didn't identify who -- to do research on then candidate Trump -- and they had done a lot of research on Trump -- and thought that if I was going to be looking to hire a consultant to help me advise the campaign on issues relating to Trump, that they would be a good fit

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

because they already had a strong background in many of the areas that were likely going to come up.

MR. GOWDY:   You used the word research.   What do you mean by research?

MR. ELIAS:   I didn't know what they had -- they were describing what they had done for this Republican wealthy individual.   So I didn't -- I wasn't privy to it. They were telling me that they had done a research project for this wealthy Republican.

MR. GOWDY:   You've been practicing law for how long?

MR. ELIAS:   I've been practicing law since 1993.

MR. GOWDY:   Right.   And you're a smart guy.

MR. ELIAS:   Thank you.

MR. GOWDY:   So you're not going to hire somebody without asking, okay, what did you find?   I don't think you are going to take their word that we had some really good research on Donald Trump, hire us, and we will be sure to share it with you.

MR. ELIAS:   I wasn't looking -- I wasn't going to hire them or anyone else based on what research they had done and were going share with me.

As you know, Congressman, as someone who has run campaigns and has been involved in campaigns, campaigns have lots of researchers.   There is no shortage of researchers.

What I was looking for was a consultant who was going to help me in providing services to the campaign.   And the fact that they had relevant background in Trump and his businesses and his -- the complex nature of his holdings and that he was familiar with his past lawsuits, were all things that were

UNCLASSIFIED, COMMITTEE SENSITIVE

attractive to me.

So it was not that they had done this research and it was going to be delivered to me, but rather it was that they had background in this.

You know, I've done, I've litigated a number of redistricting cases. Oftentimes when I retain an expert in those congressional redistricting cases I'm interested to know, is this someone who has been an expert in this State before? Do they know the relevant geography?   Do they know the voting patterns?   It doesn't mean I'm asking -- it doesn't mean just don't -- you know, you're just going to take what you did before.

MR. GOWDY:   No.   But I'm sure you would be interested in how many times that expert had been reversed.

MR. ELIAS:   How many times the expert's been reversed?

MR. GOWDY:   Sure.

MR. ELIAS:   Experts don't get reversed.

MR. GOWDY:   Sure they do.   Their maps get reversed all the time. Expert-drawn maps get reversed.   We're not going to talk about reapportionment or redistricting.

You actually answered my question, wittingly or unwittingly.   Business dealings, public records, that's what I'm getting at.   You used the word research, and then in your answer you said business dealings.   I think you used the word elaborate business dealings.   What else?

Had you ever hired Fusion GPS before?

MS. RUEMMLER:   You can answer that.

MR. ELIAS:   I had not.

MR. GOWDY:   Okay.   So this is you have for a client one of the two major

UNCLASSIFIED, COMMITTEE SENSITIVE

political parties in this country.   And you could hire anyone you wanted to do oppo research on a candidate.

MR. ELIAS:   Uh-huh.

MR. GOWDY:   And you wound up hiring a company you'd never hired before.   And my question is, why?

MR. ELIAS:   So I think there were a couple of things that went into it.   The first, like I said, was they had familiarity with then candidate Trump.

MR. GOWDY:   Well, let me stop you there.   How did you know that?

MR. ELIAS:   Because they told me that they had familiarity with then candidate Trump because they had been working on a research project up until that point for an unnamed wealthy Republican.

MR. GOWDY:   Right.   And your follow-up question would be, research project into what?

MR. ELIAS:   I think I understood that their research included research in -- that involved his business holdings and lawsuits, which were the principal topics that I would have been interested in, knowing what they -- what their -- how familiar they were with him.

MR. GOWDY:   Okay.   You met Peter Fritsch and Glenn Simpson.   They told you they'd been doing research for a wealthy Republican.

MR. ELIAS:   Yes.

MR. GOWDY:   And we've defined research a little bit.   And you did what after that?

MR. ELIAS:   I thought about it.   They had come -- I had never worked with them.   They had a reputation in the general community.   So I was familiar with them in the same way that I would be familiar with an expert who I'd never worked

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

with before.   And so I thought about, you know, what -- and I don't know how much mental impression you want me to get into about this.

MS. RUEMMLER:   If you can avoid doing that.

MR. ELIAS:   Yeah.

I was evaluating the best way to provide services to my clients and came to the conclusion that they were -- that they would help me do that.

MR. GOWDY:   And who did you come to that conclusion with?   Who did you consult before you reached that conclusion?

MR. ELIAS:   Myself.

MR. GOWDY:   You didn't talk to anyone else?

MR. ELIAS:   About whether to retain them or who they were?

MR. GOWDY:   Yes, whether to retain them.

MR. ELIAS:   I mean, I made the decision whether to retain them.

MR. GOWDY:   I guess what I'm getting at is what was your stream of money with which to retain them?   Where did that come from?

MR. ELIAS:   The money with which to retain them came from the Clinton campaign, Hillary for America, called the Clinton campaign, and the Democratic National Committee.

MR. GOWDY:   Were you on retainer?   Did you have X amount of money per month to spend?

MR. ELIAS:   It was a little more complicated than that.   There were some matters that we were doing on a fixed monthly fee.   There were some matters we were doing that we were billing hourly rates, some with caps.   It would really -- it was a mixture of arrangements.

MR. GOWDY:   What was the dollar amount you were approved to decide

UNCLASSIFIED, COMMITTEE SENSITIVE

on your own without consultation with them?

MR. MCQUAID:   If you could just clarify what the statement was about, what you said about your relationship, how you were being paid or how the --

MR. ELIAS:   Oh, I thought -- I'm sorry.   I was talking about how Perkins was being paid.

MR. GOWDY:   Both.

MR. ELIAS:   Okay.   So with respect to how Perkins was being paid, not necessarily related to this project, just --

MR. GOWDY:   Here, let my try to demystify it.   I think you answered my question that you consulted with no one other than yourself to decide to retain Fusion GPS.

MR. ELIAS:   I made that decision.

MR. GOWDY:   Which is great if you're paying the bill, you can do what you want.   I presume you weren't spending your own money.

MR. ELIAS:   Correct.

MR. GOWDY:   All right.   Whose money were you spending?

MR. ELIAS:   Right.   So I was spending the campaign's and the DNC's.

MR. GOWDY:   Right.   And my question to you was, were you authorized up to a certain dollar amount to consult no one other than yourself?

MR. ELIAS:   I now understand.

So with respect to this particular project, I consulted with Robby Mook, who was the campaign manager, to get budget approval to be able to spend money in order for me to retain consultants.   This was the consultants that I retained, but I didn't need to consult on the identity of the consultants.

MR. GOWDY:   All right.   And how much money did Robby Mook approve

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

you to spend?

MR. ELIAS:  I'm going to do the best I can by memory here.   It is all on FEC reports.

But my recollection is that initially it was a total of $60,000 split between the campaign and -- $60,000 split 30 and 30 between the campaign and the DNC. And then there additional expenses associated with that, that changed month to month, were relatively modest initially and grew larger as the campaign drew on.

MR. GOWDY:   Now, were you paying, was that 30-30 split for work that had already been done by Fusion GPS?   Was that a retainer for them to do additional work?   What was the 60,000?

MR. ELIAS:   It was to provide the information that I requested or needed in order to do what I needed to do.   So it was not --

MR. GOWDY:   Was it the research they'd already done?

MR. ELIAS:   So it was not in -- it was not a dump of research they had done.   I was not aware of the full scope of what they had done.   There were a couple of things as part of that initial conversation you were asking about that they, you know, I was led to believe they had done, but they were obviously working for someone else and had confidentiality with those clients.

So I never -- it was not like here is going to be a dump of that research for you.   It was that I would have questions or documents or would need judgment around issues that would arise and they would be in a position to provide those things.

Whether they already had them or not, I didn't know and didn't much matter to me.   It was just that if I wanted to know, for example, you know, what is the bankruptcy file from the, you know, Trump casino bankruptcy, I was going to have

UNCLASSIFIED, COMMITTEE SENSITIVE

a mechanism to have information, have visibility into that.   Whether they had collected that or not collected that for someone else, I wouldn't -- I wouldn't know.

MR. GOWDY:   That initial meeting with Fusion GPS, Fritsch and Simpson, in particular, did they discuss Russia, contacts within Russia, Trump's dealings with Russia, business or otherwise?

MR. ELIAS:   I don't believe so.   But I don't recall a thousand percent.   But I don't believe so.

MR. GOWDY:   All right.   So if I have the right picture in my mind, Fusion GPS is trying to interest you in work they've already done without violating that client's confidentiality, but at the same time entice you enough that you are interested in retaining them yourself.   Is that fair?

MR. ELIAS:   I think that's more or less fair, yeah.

MR. GOWDY:   Okay.   And that enticement included business dealings, bankruptcies.   What else?

MR. ELIAS:   Law -- interactions in the litigation arena generally.   Not just bankruptcies.   Bankruptcies is a subset of litigation, as you know.   Then candidate Trump was -- had a history of being quite litigious, both as a plaintiff and as a defendant.

MR. GOWDY:   You've been doing this type of work for how long?

MR. ELIAS:   I graduated law school in 1993.   I started doing political law work -- there really wasn't a field as such, but, you know, in the mid-'90s when there was more -- campaign finance became a much bigger deal in elections.

The House was -- you know, the House flipped control in 1994.   There was just more money in politics generally, after 1994, both in the House and Senate races.   The Presidential races got much bigger.   So mid-'90s.

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. GOWDY:   Had you ever had a client that wanted opposition research done before?

MR. ELIAS:   I would venture to say that most campaigns want opposition --

MR. GOWDY:   Probably all of them, right?

MR. ELIAS:   Right.

MR. GOWDY:   And bankruptcies, and being sued, and suing others is not really a novel area of looking into.   That's pretty garden variety for oppo research, Isn't it?

MR. ELIAS:   It might be garden variety for opposition research.   It's not -- I would not say it is something that many researchers who are not lawyers are going to -- are going to be able to penetrate.

MR. GOWDY:   Had you retained any firms that had done it in the past, looked for suits filed or filed against, or bankruptcies?

MS. RUEMMLER:   Just at any point in time in his career?

MR. GOWDY:   Sure.

MS. RUEMMLER:   I think you can answer that in general.

MR. ELIAS:   Yes.

MR. GOWDY:   All right.   That's not high math.   You don't even have to be that good of a lawyer to say, hey, we should probably check and see whether or not this person is litigious, whether or not they keep really bad rental properties and get sued a lot.   That's not high math.

But yet you'd never hired Fusion GPS in the past.   So there are plenty of other people who do this exact same kind of work.

MR. ELIAS:   Uh-huh.

MR. GOWDY:   So why Fusion GPS this time?

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:   They were -- they had approached me.   They had a background in it.   They were recommended, you know.   They were thought highly of in the community.

MR. GOWDY:   The oppo research firm that you had hired the election right before Fusion GPS, were they also those same things, highly respected, had a good reputation in the community, did solid work?

MR. ELIAS:   So I think I just want to -- I just want to be clear.   I hire consultants -- you can call them opposition research firms -- I hire consultants to perform legal services for clients not infrequently.   And I usually am trying to solve a problem or trying to understand something that they bring expertise to.   And I do the best I can to find the right fit.

I can't tell you that in each of those instances I do an RFP where I interview 50 firms and narrow it down.   Sometimes it is reputational, sometimes it's based on word of mouth recommendation, sometimes it's based on past prior experience.

MR. GOWDY:   How many employees does Fusion GPS have?

MR. ELIAS:   I don't know.

MR. GOWDY:   How many of them are attorneys?

MR. ELIAS:   I don't know.

MR. GOWDY:   Well, you used the phrase legal services, which has a pretty specific meaning to me and you, which means if you're not a lawyer you probably ought not be doing it.

MR. ELIAS:   Well, they weren't providing legal services.

MR. GOWDY:   But that's the phrase you used, that you were looking for someone to provide legal services.

MR. ELIAS:   If I said, then I misspoke.   I don't think I said that.

UNCLASSIFIED, COMMITTEE SENSITIVE

What I intended to say, either way, so the transcript says, is that I was providing legal services for the campaign.   For me to provide those services I needed expertise and access to information, public record.

MR. GOWDY:   And you needed it in every other election that you'd ever been part of, and yet you managed to muddle your way through all of those elections without ever hiring Fusion GPS.

MR. ELIAS:   True.

MR. GOWDY:   So why now?

MR. ELIAS:   I could say the same thing.   They had -- they approached me and seemed to have a background in a very complex --

MR. GOWDY:   Let me tell you what I hear when you say that, and perhaps there's just a disconnect.

They approached you.   They can't divulge what their other client had told them or paid for them to do.   And I've heard bankruptcies and suits filed either as the plaintiff or suits where you were the defendant.   That is hardly a --

MR. ELIAS:   Where Trump was the defendant.

MR. GOWDY:   Right.   That's hardly an area of expertise.   That are 100 different people that can search court records for you.

MR. ELIAS:   Let me try it this way, maybe this will help.   I did not know it at the time, but it's since been a matter of public record.   I believe Donald Trump has been involved in 7,000 lawsuits.

MR. GOWDY:   Okay.

MR. ELIAS:   Okay?   That is not a typical circumstance.   Okay?   I don't think I've ever been involved with a client of any kind in the political arena where you're talking about that volume of litigation.   And that litigation spanned from

UNCLASSIFIED, COMMITTEE SENSITIVE

slips and falls to complex bankruptcies and restructuring.

So in order for me to be able to adequately understand that scope and be able to digest that and help make legal judgments that would be relevant to my client, I thought it would be helpful to have a consultant.

This was a consultant that was saying, we already have familiarity.   I assumed not with all 7,000.   I assumed not with every kind of lawsuit.   But they seemed to have a general understanding of the breadth of his business holdings, his financial holdings, and the kinds of litigation he had been involved in.

And that was valuable when I was evaluating hiring them or hiring someone else, because Mr. Trump was not a typical candidate.   If Mr. Trump had been in Congress for 20 years and had been on the Appropriations Committee, maybe I would have hired a former Appropriations Committee person who could explain to me how the appropriations process used to work when there were earmarks, something I wouldn't otherwise be familiar with, but which might be useful.

So it's not you'd never hired them before.   Each client presents and needs a different set of legal skills and a different set of consultants to help me provide those legal skills.

MR. GOWDY:   I'm with you, I hear you.   But a cynic might hear that you hired a small consulting firm, we'll use that, that you'd never hired before.   They couldn't tell you specifically what they had because of confidentiality concerns for the previous client.

MR. ELIAS:   Right.

MR. GOWDY:   And yet in what may well be the biggest election you ever took part in -- it's Presidential, you may have been involved in other Presidentials.

MR. ELIAS:   I was.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

23

MR. GOWDY:  But it doesn't get much bigger than Presidential.   And you hired a firm you'd never hired before, based on a meeting where they said they have quote, "research."   And we've defined research as bankruptcies and court filings that you could have hired a law clerk to go find.

MR. ELIAS:   So as I said, it was based on their reputation in the community, recommendations, and --

MR. GOWDY:   Recommendations from whom?

MR. ELIAS:   One of my partners had recommended them to me as a firm that had done good work in his experience and that they had a good reputation.

MR. GOWDY:   All right.   So I think we're up to $60,000.   What is the total amount of money that Perkins Coie paid Fusion GPS?

MR. ELIAS:   I know it's in the letter we -- I don't remember the --

MR. GOWDY:   I won't hold you to it.   Just give me a ballpark.   More than $60,000?

MR. ELIAS:   I think it was -- well, it was -- I'm sorry, $60,000 a month.

MR. GOWDY:   $60,000 a month.

MR. ELIAS:   I'm sorry, yes.   It was 30 and 30 per month.

MR. GOWDY:   So $60,000 a month.   What was the duration of --

MR. ELIAS:   And then plus expenses.

MR. GOWDY:   What was the duration of that agreement or could either party --

MR. ELIAS:   It was -- it was -- it was from -- and you said you're not going to hold it to me -- hold me to it.

MR. GOWDY:   I'm not looking for any more investigations to start than we already have.

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  It was some time in the spring.

MR. GOWDY:  Okay.

MR. ELIAS:  I want to say maybe April, but that could be off a month one way or the other.  And it ended in -- at the end of October.

MR. GOWDY:  So May, June, July, August, September, October.

MR. ELIAS:  I think April, I think April.  I don't know, maybe.

MR. GOWDY:  All right.  So 7 months times $60,000.  I'll let you help me with the math there.

MR. ELIAS:  I went to law school.

MR. GOWDY:  $400,000 and something, Himes, is that close?

MR. HIMES:  It's close.

MR. GOWDY:  All right.  So we're not quite close to the million.

MR. ELIAS:  Right.

MR. GOWDY:  Where is the other half of it, those expenses?

MR. ELIAS:  Yes.

MR. GOWDY:  And did you get a detailed summary?  Do they fill out billing sheets like lawyers do where they say 0.7 hours spent opening a letter?

MR. ELIAS:  Fortunately for the rest of the world, nobody fills out time sheets like lawyers do.

MR. GOWDY:  What were those expenses they incurred?

MR. ELIAS:  So the expenses were -- and, again, by category -- if I had to guess, but it's an educated guess, I would bet that the largest expenses were probably copying and court expenses, you know, getting copies of transcripts, getting copies of files.  Getting, like -- getting a complete case file for a major piece of complex litigation, the copying cost to the courthouse could be $10,000,

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

$20,000.

MR. GOWDY:   Did they provide monthly updates to you on what they were finding?

MR. ELIAS:   Yes.   More than monthly.

MR. GOWDY:   In writing or orally or both.

MR. ELIAS:   Typically orally.   Typically it was orally, more often than monthly, though.

MR. GOWDY:   When did you first hear the name Christopher Steele?

MR. ELIAS:   When did I first hear the name Christopher Steele?   To the best of my recollection, I first heard the name Christopher Steele in July.

MR. GOWDY:   From whom?

MS. RUEMMLER:   You can answer that.

MR. ELIAS:   It would have either been Peter or Glenn.   I would guess Peter.

MR. GOWDY:   What was the nature of what you were told?

MS. RUEMMLER:   As stated, that question calls for information that's protected by applicable privileges and I would instruct the witness not to answer.

MR. GOWDY:   And this is where I'm trying to figure it out.   You're a law firm that hired nonlawyers to do work for you.   These nonlawyers are reporting back to you.   You're the client, you're not the lawyer.

So will you waive attorney-client privilege and tell me what your client said to you?

MR. ELIAS:   I'm happy to explain it or you can -- from my vantage point it's really simple.   Again, let's just take redistricting, for an example, because I know it is something that everyone in this room is familiar with.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

If I as a law firm hire an expert who is going to help me understand whether Hispanic -- whether there's cohesive voting in a part of Texas among Hispanics, okay, that is a consulting expert who is hired by me so that I can provide legal advice to my client in that case, say the plaintiff in a redistricting case, there is a privilege that attaches in my conversations with that consultant, consulting expert, because that consulting expert is helping me provide legal services.

MR. GOWDY:   So you consider this a work product privilege and not an attorney-client privilege.

MS. RUEMMLER:   In certain circumstances it's work product, in certain circumstances it's attorney-client.   It depends.   I think the question that you just asked called for work product in that particular instance.

MR. GOWDY:   And I thought what you read at the very beginning was attorney-client as opposed to work product, but perhaps I missed part of what you read.

MS. RUEMMLER:   It is both.

MR. GOWDY:   So it is your position that you either cannot or will not answer even though you are the client and could waive.

MR. ELIAS:   I'm happy to consult with counsel, but I don't believe I can waive.

MR. GOWDY:   Why?   Who would be aggrieved if you waived?

MS. RUEMMLER:   Because under the D.C. Rules of Professional Conduct, Rule 1.6, which is the rule I referenced earlier, it is not just the attorney-client privilege that's covered by that rule, but it's also the work product privilege.

And the reason is, is that the work is being done on behalf of Mr. Elias'

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

client.   And therefore, absent consent of his client, he is not at liberty and in fact is required to maintain confidentiality around not only attorney-client communications, but also work product.

MR. GOWDY:   And that's true even if the client -- and we'll consider for this hypothetical the DNC or Hillary for America to be the client -- even if they weren't part of the decisionmaking, even if it's just your client talking to Fusion GPS, they still avail themselves of this privilege?

MS. RUEMMLER:   Well, I think that assumes facts that are not present on --

MR. GOWDY:   I haven't asked him about any of his conversation the other way.   I've asked him about conversations with Fusion GPS.

MS. RUEMMLER:   Understood, but I think --

MR. GOWDY:   And I'm sure he is not going tell me whether or not he relayed any of that information back to who really is his client.   Nor am I going to ask.

MS. RUEMMLER:   Okay.

MR. GOWDY:   I'm just trying to find out what you talked about with a vendor that you hired.

MS. RUEMMLER:   And again, our position is that he is constrained by the rules of ethical conduct, absent expressed consent or instruction from his ultimate clients, in this case Hillary for America and the DNC, not to disclose any kind of confidences, including information that's protected by the work product doctrine. So he doesn't have the unilateral authority under his ethical obligations to make -- to disclose that information.

MR. GOWDY:   Did you know who Chris Steele's sources were?

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  No.

MR. GOWDY:   When did you first hear the nature of his investigative work?

MS. RUEMMLER:   You can answer that.

MR. ELIAS:   When did I first -- I'm sorry, can you -- I got distracted by asking her.

MR. GOWDY:   When did you hear first of the nature of his investigative work?

MR. ELIAS:   For?

MR. GOWDY:   He wasn't in Madagascar looking into Donald Trump, that he was in Russia.

MR. ELIAS:   Right, right.   I think in early Julyish, late June, early July, mid-July.

MR. GOWDY:   Do you remember what you were told and by whom?

MS. RUEMMLER:   That question calls for information protected by the attorney-client work product privileges, and therefore I instruct the witness not to answer.

MR. GOWDY:   Do you know whether any of Christopher Steele's ▮▮▮▮▮
▮▮▮▮▮▮▮

MR. ELIAS:  I assume so.

MR. GOWDY:   And you assume so why?

MR. ELIAS:   Can I consult with her to ask her --

MR. GOWDY:   I would never stop you from talking to your attorney.

[Discussion off the record.]

MR. GOWDY:   I think we were to the point where I was asking your -- you

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

correct me if I'm wrong -- whether or not you knew any of Chris Steele's 
████████  And I think your answer was you assumed so.   And I may have
asked you why you assumed that.

MR. ELIAS:   That's where we left off.

MR. GOWDY:   All right.

MS. RUEMMLER:   And that question, as stated, calls for information that's
protected by the attorney-client work product privileges and therefore I instruct the
witness not to answer.

MR. GOWDY:   How does what he assumed imply attorney-client work
product?

MS. RUEMMLER:   The question, as stated, calls for the disclosure --

MR. GOWDY:   Right.   And I'm trying to figure out how to rephrase the
question, which is why I asked how does me asking him what he assumed.   What
word would you like me to substitute?

MS. RUEMMLER:   It's generally not the lawyer's job to rephrase the
questions.

MR. GOWDY:   And generally privileges aren't recognized in committees of
Congress, so we're both in unchartered territory right here.

MS. RUEMMLER:   Indeed.

MR. GOWDY:   Well, let me ask you this --

MS. RUEMMLER:   I think you can ask him what he knows.   Why don't we
start there?

MR. GOWDY:   I thought I did.   I thought I asked you if you knew whether
or not any of Christopher Steele's ████████████   And you're the one
you used the word assumed.

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  Yeah, I assumed so.   I'm trying to be very precise.   I'm not -- look, I don't want to try to slice this into saying no --

MR. GOWDY:   Why did you assume that?

MR. ELIAS:   I assumed so.

MR. GOWDY:   Why did you assume that?

MS. RUEMMLER:   And again, that question, as stated, calls for information that's protected by the attorney-client privilege.

MR. GOWDY:   What was the basis for your assumption?

MS. RUEMMLER:   You can answer that without getting into content.

MR. ELIAS:   Okay, now I don't understand.   Could we just step out so that I know what --

MS. RUEMMLER:   Yes.

MR. ELIAS:   I apologize.   I'm just trying to walk the line here.   I'm sure as an attorney you appreciate this.

[Discussion off the record.]

MR. ELIAS:   The basis of my assumption, which I think is what you asked, was it was based on my communications with Fusion, with Peter and with Glenn Simpson.

MR. GOWDY:   Did you know then, when you were having these conversations, ███████████████████████████████████████████████
███████████████████████████████████

MR. ELIAS:   Did I know then?

MR. GOWDY:   Yeah.   I don't have time for a philosophical discussion about how do you ever really know anything.   So --

MR. ELIAS:   I'm not trying to do that.

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. GOWDY:  Nor am I by asking it.

MR. ELIAS:  I understand.   Did I know then whether ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ No, not really.

MR. GOWDY:  Well, see, those are two different answers.   That's how
some lawyers hear, no and not really.   Was it no or not really?

MR. ELIAS:  I'm trying to -- I'm trying to recall, to be precise.   The
information you're asking would not have been important information to me, so I
think the answer is no.

MR. GOWDY:  Well, let me ask you this.   You're paying a good bit of
money to a firm that you've never retained before and they're doing research.
And you know that some of that research involves other countries.

MR. ELIAS:  Yes.

MR. GOWDY:  And they're relaying that information back to you.   And I'm
sure at some point you're asking, how do you know that?   What's the proof?
What's the evidence?   What's the basis of what you just told me?

I'm sure you would do what we've asked whether or not the FBI has done,
which is corroborate, contradict, vet, otherwise investigate information you're being
told.

MR. ELIAS:  So you'll cut me off if I'm going the place I can't go.

I am not the FBI and did not have either the expertise or the tools or the
experience that you ascribe that the FBI should have and could have.   So if you
are asking me did I have a method to independently corroborate or vet, to use
your words, what information I was receiving, other than relying upon the
professional -- the professionalism and expertise of the consultants that I retain,
no, I don't.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

I also don't rerun regression analysis when I get a regression analysis from a statistical expert.   I'm assuming that they are doing a proper statistical analysis and that they're providing the output to me.

So I -- in that respect, with all due respect, Congressman, the parallel between me and the FBI really doesn't hold up.

MR. GOWDY:   Well, let me ask you this way.   Were you interested in information that was accurate or inaccurate?

MR. ELIAS:   Accurate.

MR. GOWDY:   All right.   Does it benefit your client to -- well, let's just use what happens sometimes around here.   Information gets leaked.   That information is false.   It's embarrassing for whatever network may have run it.   So it's not in their best interest to go with inaccurate information.   So you would be interested in the accuracy of what was being relayed to you.

MR. ELIAS:   Absolutely.

MR. GOWDY:   Right.   And how would you test the accuracy of it given the fact you'd never hired the firm before, didn't have a past with the firm.   And they're a pretty small boutique firm compared to some of the ones you could have hired.   They're in another country doing research in a Presidential race.   Something tells me you're not just going to say, oh, that's neat, we'll run with that.   Aren't you going to want to know how they knew that?

MR. ELIAS:   So to be clear, the firm that I hired was a domestic firm.   You characterize it as small and I don't challenge that.   I don't actually know how many employees they have.   They retained a firm in London, which I also don't know how big or small or, you know, they are.

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

[3:00 p.m.]

MR. GOWDY:   Well, I don't want to interrupt you, but let me ask you this: Would you have to sign off on that decision?   Did you have to sign off on decisions to hire subcontractors or vendors?

MR. ELIAS:   I had the authority to under the contract.   I didn't in all instances.   I did in this instance.

MR. GOWDY:   Why do you think they brought this instance to your attention?

MR. ELIAS:   It wasn't that.   It was there were times where if they were getting court filings from, say, a district court in Kansas -- I made that up; I don't think there was a district court in Kansas -- I would not have expected them to come to me and say:   We're going to hire this copy service or that copy service.

So I'm just trying to be precise.   I had the authority to, and in this instance, I did.   There were times where it just -- it wouldn't have mattered who the subcontractor was.

███████████   Five minutes.

MR. GOWDY:   But it is a little different when you are hiring a subcontractor that is in another country.

MR. ELIAS:   Yes.   That's why I said, in this instance, I did.

MR. GOWDY:   Whether that country is Russia, Madagascar, or what used to be Somalia, it doesn't matter, right?   That would be something you would be interested in.

MR. ELIAS:   Again, depending on the nature of the work.   I mean, if I wanted copies of -- of public court filings in Canada and they were -- and the question was, do we hire this runner copying firm or that runner copying firm, I

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

wouldn't have signed off, I wouldn't have cared and signed off on that either.

So the fact that it was not in the same country would not have been the -- would not necessarily have been the dividing line.

MR. GOWDY:   All right.   This is probably where we're going to have to end it for this session, but I don't want to trick you.   These aren't trick questions. So I'll tell you what we're going to come back to.

I'm trying to understand your interest -- I think you testified you have no interest in inaccurate information.   It doesn't do you any good; it doesn't do your client any good.

MR. ELIAS:   True.

MR. GOWDY:   So, when you're told something, whether it's as salacious as a golden shower in a hotel room in Moscow or whether you're told about some seemingly innocuous business transaction, at this level, you cannot afford to make mistakes.

So I'm going to ask you again, what was your process of vetting or investigating what you were being told on the other end of the phone?

MR. ELIAS:   It very much depended on the nature of the information and what utility I saw in the information.   So you could imagine there was information that I would receive from a consultant as a general matter that is highly relevant and easily confirmed, and then there is information that is not relevant that is easily confirmed, then there's information that's not relevant that's hard to confirm, and information that's very relevant that's hard to confirm.   So you've got different -- you've got different criteria.

Typically, the stuff that is most relevant to me is stuff that is more easily confirmed.   Some of what --

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. GOWDY:   Or difficult to disprove, depending on what environment we're in.

MR. ELIAS:   Sure.

MR. GOWDY:   I'm assuming that you are not a campaign consultant and, therefore, would not make decisions on what information to run with or not run with on your own.

MR. ELIAS:   Generally true.

MR. GOWDY:   All right.   So who would you communicate the information you gleaned from Fusion GPS back to?

MR. ELIAS:   If I was to transmit it to anyone --

MR. GOWDY:   Well, let me stop you right there.   Why would you not?

MR. ELIAS:   Because they were consulting on things I needed done to help represent the campaign.

MR. GOWDY:   Right.   But you're not running for President.

MR. ELIAS:   That's true.

MR. GOWDY:   Not yet.   So --

MR. ELIAS:   I promise you never.

MR. GOWDY:   So chances are great --

MR. ELIAS:   I may be the only one in the room who can say that.

MR. GOWDY:   No, there would be a few others of us.   Chances are great you're not going to utilize the information yourself in your own personal capacity.

MR. ELIAS:   True.

MR. GOWDY:   So the information would be utilized, if at all, on behalf of your client upstream.   So what would be the use in accumulating information and not sharing it with the client that retained you in the first place?

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:   Sometimes you get information, and it's just not that useful.

MR. GOWDY:   Well, let's do it this way:   Did you ever relay any of the information you received from Fusion GPS to the DNC?

MS. RUEMMLER:   You can answer.

MR. ELIAS:   Yes.

MR. GOWDY:   Beginning when?

MR. ELIAS:   Beginning when?   Around the convention time.

MR. GOWDY:   I should have been watching, but I wasn't.   I don't remember when the convention was.   Yours or ours?

MR. ELIAS:   That's why I said convention time.

MR. GOWDY:   I didn't watch either one of them.

MR. ELIAS:   Mid-July.

MR. GOWDY:   Who at the DNC would you communicate with on the most regular of bases?

MR. ELIAS:   About this topic or others?

MR. GOWDY:   Yes.

MR. ELIAS:   There were -- there were researchers who were --

MR. PATEL:   One minute.

MR. ELIAS:   -- who were doing -- they were researchers doing research or rapid response on Trump.   And oftentimes -- or not often, on a number of occasions, there would be interest on their part in information about his business dealings or financial holdings or lawsuits that I would be a resource to them on. And that started around the time of the convention.

MR. GOWDY:   I'm out of time.   When we come back after Mr. Himes and Mr. Schiff, Mr. Quigley, we'll get into the dossier.   And then I'm going to ask you

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

about the server and what role, if any, you may have played when the server was compromised, just so --

MR. ELIAS:   Which server?

MR. GOWDY:   DNC server.

MR. ELIAS:   Oh, I'm sorry.

MR. GOWDY:   Just so we'll play straight-up poker, and you'll know where we're going.

MR. ELIAS:   As I said at the beginning, I think the work of this committee to get to the efforts of Russia to compromise our elections is vitally important.   So I want to be as helpful as I can, consistent with my ethical obligations.

MR. SCHIFF:   Thank you, Mr. Elias.   I just have a few questions.   Then I'm going to pass it off to Mr. Himes.

It sounds like when you -- and you may or may not be able to answer these questions.   It sounds like when you retained Fusion GPS, you were predominantly interested in their expertise in litigation and whatever experience they might have, not only in investigating litigation but also what background they had in Trump and his businesses and his business litigation.   Is that accurate?

MR. ELIAS:   That is accurate.

MR. SCHIFF:   And were you also interested in their background in financial crimes investigations?

MR. ELIAS:   Yes, and I put that in the category of business, of the business, the expertise around his businesses.

MR. SCHIFF:   Now, Glenn Simpson also had an expertise in Russia. Was that part of your interest, or was it predominantly focused on the business litigation?   Was that something, if you can answer, whether you were looking for

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

in expertise or was this something that he offered as part of his pitch?

MR. ELIAS:   To the best of my recollection, that did not come up in the pitch, and I don't believe I knew that prior to the retention.

MR. SCHIFF:   So he wasn't retained to do Russia research, from your perspective?

MR. ELIAS:   No.

MR. SCHIFF:   Did you have the --

MR. ELIAS:   I mean, not as part of the initial retention.

MR. SCHIFF:   Was it the nature of the relationship with this particular consultant that he was given some running room in what he was allowed to look at, and if he found things that he thought would be of interest or concern to your client, that he would bring it to your attention, that you could then say, "yes, pursue that," or "no, that's not a particular interest"?

MR. ELIAS:   Yes.   Like I -- you know, as I said in a redistricting case, I can hire a statistician or a mathematician expecting that they are going to look at a variety -- they're going to look at the composition, the racial composition of a district from a variety of perspectives, using their expertise, and then they're going to come to me and say:   Okay.   Here are some fruitful things we might need to pursue with additional data, with additional analysis.   Do you want us to go collect this data?   Do you want us to do this or not?

And it was similar.   So yes.

MR. SCHIFF:   I was thinking, for Dr. Wenstrup, of a medical -- if you were a malpractice lawyer and you're retained to determine whether a physician botched a surgery, not that that would ever happen, and you retain an expert and they go out and do research, then presumably what they communicate to you is

UNCLASSIFIED, COMMITTEE SENSITIVE

covered by work product, et cetera.

But if you are looking at one particular form of potential malpractice and your expert doesn't find evidence of it, but while they're looking examining the medical records, they find actually the physician misdiagnosed the problem, then you would have -- they would have the authorization to bring that to your attention. You could authorize whether you wanted them to pursue that or not.   Is that --

MR. ELIAS:   Correct.

MR. SCHIFF:   And at some point -- again, if you can answer, at some point after they were retained predominantly to look into financial issues or litigation issues, did Fusion GPS bring to your attention information that they had uncovered of concern vis-à-vis the candidate and Russia?

MS. RUEMMLER:   You can answer that yes or no.

MR. ELIAS:   Can you repeat it?

MR. SCHIFF:   At some point, did Fusion GPS bring to your attention, whether that was what you had retained them for or not, that there were concerns they wanted you to know about vis-à-vis the candidate and Russia?

MR. ELIAS:   Can I consult with counsel?

[Discussion off the record.]

MR. ELIAS:   Yes.

MR. SCHIFF:   I think I still remember the question.   Let me ask you one other question, and then I'm going to hand off to Mr. Himes.

Were you aware that Fusion GPS had done some Russia investigative work for their prior conservative client?

MR. ELIAS:   I was unaware.

MR. SCHIFF:   I yield to Mr. Himes.

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:   I was unaware either way.

MR. HIMES:   Thank you.   Thank you, Mr. Elias.

I want to start with some big picture questions and then, assuming time, we'll get back to some of the more detailed questions that Mr. Gowdy started with. And let me give you the rubric here.   Maybe this will help in answering the questions.   One of the sort of useful frames in this investigation has been a distinction between the unconventional and the conventional.   Garden variety stuff, normal course of business.   We're in worlds here where the general public may not know the ins and outs of opposition research, or the general public may not know that it's not unconventional for a Presidential candidate to shake the hand of an ambassador at a hotel.   There could potentially be things that follow from that that would be unconventional, just as there could be in the opposition research realm.

So I'm going to ask you a whole bunch of questions, and I guess I'd ask for your help in helping us understand and, more importantly, the public understand where things get unconventional, because in this realm, the production of the Steele dossier and some of the allegations, it certainly got beyond my experience of what would be conventional in opposition research.   So let's just start sort of at a general level.

Tell us briefly about your experience working with campaigns and, in particular, undertaking opposition or assisting with opposition research.

MR. ELIAS:   So, you know, it's hard to -- every campaign is -- every client and certainly every campaign is kind of unique, I think.   We all just saw that in the special election in Alabama, which was unique.   And, you know, we saw that in the Virginia race, Virginia Governor's race.   That was unique.   I mean, in some

UNCLASSIFIED, COMMITTEE SENSITIVE

ways, it's hard to generalize between campaigns, because there are -- there are

things that make them similar and then there are things that make them quite

different.

I think that as the -- this is maybe more of a philosophical answer than

you're looking for.

MR. HIMES:   Let me ask a more specific question then.

MR. ELIAS:   Yes.

MR. HIMES:   How prevalent is the use of opposition research in Federal

campaigns, by which I mean Senate, House, President?

MR. ELIAS:   I think every campaign that I am aware of on either side of the

aisle conducts some measure of opposition research.

MR. HIMES:   Okay.   And at the Presidential level, both Republican and

Democratic Presidential campaigns conduct opposition research?

MR. ELIAS:   Absolutely.

MR. HIMES:   And would that typically involve both internal researchers and

the hiring of law firms and other external consultants?

MR. ELIAS:   It would definitely involve internal researchers and the hiring

of external consultants, yes.

MR. HIMES:   You may not know the answer to this question, but the

Trump campaign, to your knowledge, were they conducting opposition research on

Secretary Clinton and her campaign?

MR. ELIAS:   I'm not privy to the Trump campaign, but I assume so.

MR. HIMES:   Okay.   So let's sort of talk a little bit about the specifics of

this opposition research.   And, again, I'm going to ask for your help in identifying

what is conventional and what is unconventional.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

Is a Presidential campaign retaining a law firm like your own, would you characterize that as conventional?

MR. ELIAS:  I -- every Presidential campaign retains -- every major Presidential campaign has retained counsel, virtually every Senate campaign has, and increasingly, House campaigns do.

MR. HIMES:   So there's nothing unusual about the retention of counsel?

MR. ELIAS:  No.

MR. HIMES:   Would it be conventional or unconventional for that counsel in a Presidential campaign to hire subcontractors, as you have -- as you did with Fusion GPS?

MR. ELIAS:   No.   It would be quite common.

MR. HIMES:   Okay.   Mr. Gowdy asked you a lot of questions about the retainer fees and other revenues you received for this.   Was there anything in the fee arrangements you had with either the DNC or the Clinton campaign that you would regard as unconventional against your own experience, in terms of fees, retainers, that sort of thing?

MR. ELIAS:   No.   It's very -- it's typical of what we and I know the Republican lawyers on the other side charge and basically similarly structured on both sides of the aisle.

MR. HIMES:   Mr. Gowdy asked you a lot about -- I think I heard three times -- about the decision to hire Fusion GPS.   I'm not going to indulge in a tautology.   Obviously, anybody you hire you hire for the first time once.

MR. ELIAS:   Right.

MR. HIMES:   At the time that you engaged Fusion GPS, you I think testified that, at that time, you were not aware of research that they had done with

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

respect to Russian connections.   Is that correct?

MR. ELIAS:   Correct.

MR. HIMES:   Okay.   So, at the time you made that hire, apart from what you said, that they were attractive because they came to you, because they were recommended, if memory serves, and because they had experience in researching a candidate with an unusual number of litigation events, was there anything unconventional that struck you when you were considering that, anything particularly unconventional about them or your decision to hire them?

MR. ELIAS:   No.

MR. HIMES:   At the time that you made the hire -- and maybe I'm asking the same question, but at the time that you made that hire, did you have any suspicions that Fusion GPS may have engaged in any sort of unethical, improper, or illegal behavior?

MR. ELIAS:   No.

MR. HIMES:   If after engaging them, you had such suspicions, because let's face it, they had -- they hired a foreign entity in London, which involved Mr. Steele, which uncovered allegations which I at least would label unconventional -- if at any point in that process you had suspected any sort of unethical, improper, or illegal behavior, would you have been under any obligation as an attorney to disclose or in any way raise that issue, your concerns?

MR. ELIAS:   It would depend on the nature of the illegal or unethical, depending whether it was illegal or unethical and what the nature of it was.   If I had had -- if I had had that concern, though, I would have -- at a minimum, I would have terminated them.

MR. HIMES:   Okay.   And I can, therefore, assume that, since you did not

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

terminate them, you never had that concern.

MR. ELIAS:  I did not.

MR. HIMES:   Okay.   You made reference in the hiring decision that Mr. Gowdy was asking you about that they came recommended.   Can you tell us who recommended their hiring?

MR. ELIAS:   Can I consult with you?

MS. RUEMMLER:   Yes, absolutely.

[Discussion of the record.]

MS. RUEMMLER:   Just for the record, we should probably just have the question re-asked.   It doesn't have to be precise.

MR. HIMES:   You made reference to the fact that you received a recommendation to hire Fusion GPS.   Who made that recommendation?

MR. ELIAS:   One of my law partners.

MR. HIMES:   One of your law partners.   Okay.   Did anybody associated with the DNC or with the Clinton campaign in any way recommend at that point in time that you make this hire?

MR. ELIAS:   No, other than a partner of mine, by definition, is associated with the clients.   But no.

MR. HIMES:   Okay.   But that individual was associated with the clients solely in virtue --

MR. ELIAS:   Of being a lawyer, of being at Perkins Coie.   Back to your tautology.

MR. HIMES:   Yeah, okay.   And, again, just to go back to something Mr. Gowdy was exploring, let me ask this generally, and then I'm going to ask it specifically.   Generally, when you receive work product from any subcontractor,

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

you testified that you don't go back and rerun regression analyses.   But your and your firm's reputation is presumably important, and, therefore, generally, you would apply critical faculties in evaluating the information you got and make a judgment yourself as to whether it had a degree of credibility that would warrant passing it on to your client.   Is that fair?

MR. ELIAS:   Yes.   But, again, remember, sometimes I am hiring that expert to do that regression analysis, not to pass on to my client.   I'm doing it so that I can be a smarter and better lawyer for my client.   Does that distinction make sense?

MR. HIMES:   I think it does.   I think it does.   I guess what I'm trying to get at -- and I understand that at some point we're going to stumble into privilege here, but I'm trying to establish the extent to which the information that made its way from Christopher Steele's sources to Christopher Steele to the non-U.S. operation to Fusion GPS to you, I'm trying to establish the extent to which it was conveyed to the Clinton campaign or the DNC and the process that you would have undertaken to determine whether it was accurate or inaccurate and the extent to which you would have participated in a strategic discussion about whether that information would be used.

MS. RUEMMLER:   I think you can provide a general description of how you would, in general, engage with your client with respect to information that -- that Fusion was sharing with you.

MR. ELIAS:   I would -- depending on what information it was, it might be information that would be directly useful to the client.   It might be information that was not directly useful to the client, but was useful to the client that I had, that I had -- that I was educated about.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

So that would be the first threshold:   Is this something that is primarily to allow me to be able to form legal judgments?   So, for example, if there was -- and this is something that I regularly do for campaigns at all levels.   If there is a television ad that a campaign wishes to run that is going to make an allegation against an opponent, a Republican in my practice, a Republican opponent, among the things that I am hired to do is to provide counsel as to whether or not that allegation that is going to be aired by a Democratic campaign may run afoul or run the risk of civil litigation over -- for defamation or invasion of privacy or some other civil or copyright violation.

In the main, the client, my client doesn't really care what the information is that I got to convey to them.   They just want to make sure that I am on top of the information so that I can help say to the people making the ads, "yes, you can say this," "no, you can't say that."

So I just want to frame that, because I said that Fusion came to me in the way that they did and that I hired them as a consultant.   The fact that they did opposition research for that prior client -- like I said, the campaign had lots of opposition researchers.   I was engaging them to help me be smarter so that there was information I could pass along to the client, some of which would be distilled and incorporated into other judgments I had about legal issues.   Some would be less filtered.   Some would be more filtered.   Some wouldn't be passed on at all. But I think that that's an important distinction.

MR. HIMES:   Okay.   So last big picture question, then I want to get back to some nitty-gritty.

MR. ELIAS:   Yep.

MR. HIMES:   Again, you know, the distinction between the conventional

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

and the unconventional, maybe even the sensational, is sort of important -- is very important to this committee.   And I -- you know, there are allegations made out there that the Trump campaign colluded with Russia.   That is an allegation that this committee is about understanding.

MR. ELIAS:   Right.

MR. HIMES:   There are allegations out there which, quite frankly, I don't understand the logic of, but, nonetheless, they're out there, and please don't ask me to run you through the logic, but there are allegations that somehow the Clinton campaign and/or the DNC worked with the Russians, paid the Russian sources to come up with damaging allegations against Donald Trump and subsequently the President.

I don't understand or lend any particular credence to those allegations, but I do want to ask you some questions, because you're at the nexus of that connection between campaign, DNC, all the way to Fusion, Orbis, Steele.

So, at any point in time, did you see any evidence that anybody associated with the Clinton campaign or the DNC was communicating directly with Fusion GPS, with Orbis, with Michael Steele, or any of his sources?

MR. ELIAS:   You mean Christopher Steele?

MR. HIMES:   Sorry.   Christopher Steele, yes.

MR. ELIAS:   So I would be -- you know, we're all surprised in life about -- you're only surprised about what you're surprised about.   I would be more than surprised if anyone -- if anyone who worked for the DNC or the Clinton campaign was communicating with Christopher Steele or Russian -- or, for that matter, you know, as far as I know, anyone in Russia.

You know, you may tell me that you all know of meetings at the policy level

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

between governments and transition -- or not transitions, but, you know, campaigns pre-transition.   But with respect to this, the stuff I know about and was responsible for, I'm confident that there -- that Christopher Steele and the -- or any Russians he was dealing with had no dealings with the Clinton campaign or the DNC.

    MR. HIMES:   Okay.   Thank you.   I note that you left out Fusion and Orbis.

    MR. ELIAS:   Oh, Orbis.   I assume that Orbis is Christopher Steele, but I don't know that.

    MR. HIMES:   Okay.

    MR. ELIAS:   That's based on by what I read in -- what I read in the press.   Isn't Orbis the same as -- isn't that his --

    MR. HIMES:   I think it's his organization, yes.

    MR. ELIAS:   Okay, yes.   So I put that in the same bucket.

    MR. HIMES:   Okay.

    MR. ELIAS:   With respect to Fusion, it is -- it is -- it is possible -- it's more than possible.   I think there may have been instances in which people in the -- associated with the campaign or the DNC had relationships with or otherwise had interaction with Fusion around, you know -- but not around the -- not around Christopher Steele issues.

    MR. HIMES:   So you weren't the sole gatekeeper between people at the DNC, the Clinton campaign --

    MR. ELIAS:   I was the sole.   I was the -- I was the gatekeeper.   But there were -- but there were instances in which there were some interactions otherwise.   But that -- but I was the gatekeeper.

    MR. HIMES:   Okay.   Are these interactions that would be covered under

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

the privilege that we've discussed today?

MS. RUEMMLER:   I think we should consult because I don't know the answer.

MR. HIMES:   Okay.

MS. RUEMMLER:   So I can advise.

[Discussion off the record.]

MR. ELIAS:   Let me -- I think I can clarify this.   There were -- in the representation of the Clinton campaign and the DNC, I had, you know, probably, all told, a couple of dozen of lawyers who reported to me, both inside my firm and inside the organizations.   Outside of the legal -- outside of lawyers who reported directly to me, which is why I said I was the gatekeeper, there -- I'm unaware of there being any contacts between -- between Fusion and anyone with the campaign.   And those contacts within my legal team, you know, the buck stops with me.   I was -- they were acting as -- you know, as my agents.

MR. HIMES:   Okay.   That's helpful.   Thank you.

All right.   Let me just get into some sort of nitty-gritty questions.   First, just following up on something Mr. Gowdy asked you, he was -- appeared interested in your decision to hire Fusion GPS for litigation research because its employees are not lawyers.   Is it fair to say that litigation research often includes nonlawyers of all sorts of varieties, accountants, journalists, et cetera?

MR. ELIAS:   From my standpoint, I won't say a hundred -- I won't say never to anything, but I -- I am -- I am hiring people who are not lawyers.   If I needed lawyers, I have lawyers.   So, yes, it is typically people who have an expertise other than being a lawyer.

MR. HIMES:   Yes, got it.   Great.   Let's get back to some of the

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

circumstances around the hiring of Fusion GPS, and I'll try not to be repetitive.
But so you were referring to the fact that you knew at the time that Fusion had
been retained by a wealthy Republican.

Is that -- I understand the previous hiring of Fusion GPS to have been done
by the Washington Free Beacon.   Is that the wealthy Republican you're talking
about?

MR. ELIAS:  Well, I don't know.

MR. HIMES:  Okay.

MR. ELIAS:  I can only tell you how it was communicated to me.   It was
not on behalf of a conservative newspaper; it was on behalf of a wealthy
Republican.

MR. HIMES:  And did they disclose the name of that wealthy Republican?

MR. ELIAS:  No.

MR. HIMES:  They just told you, "We have been hired by a wealthy
Republican"?

MR. ELIAS:  Yes.

MR. HIMES:  Okay.  So it's quite possible it could be somebody
associated with the Free Beacon?   You just don't know?

MR. ELIAS:  Yes.

MR. HIMES:  Okay.   What was the date of that conversation?

MR. ELIAS:  I don't know.   It would have been in, I'm guessing, the
March-April timeframe.

MR. HIMES:  March-April, okay.   Did you receive any of the reports that
were produced by Fusion for the, as what you understood, the wealthy
Republican?

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:   I don't even know if they produced reports for the wealthy Republican.   So I don't know.

MR. HIMES:   Okay.   So they never offered you reports that they characterized as having been already done.   They just told you, "We've done research"?

MR. ELIAS:   Right.

MR. HIMES:   Okay.   Okay.   And I think you alluded to this, but let me just ask it more precisely.   You said that the conversation, the initial conversation with Fusion GPS was March or April, and then, if I took notes well, you said that you came to know that Christopher Steele was involved in research in July.

MR. ELIAS:   That's my best estimate, yes.

MR. HIMES:   Okay.   And how was Christopher Steele, when you learned of his involvement, how was his involvement and who he was characterized to you?

MS. RUEMMLER:   I think that question, as stated, calls for privileged information, so I'm going to have to instruct you not to answer.

MR. HIMES:   Okay.   Well, in the interest of not causing another conference, I'm going to move on.

Had you known Mr. Simpson before you hired Fusion GPS?

MR. ELIAS:   So I believe that he wrote some of the stories at one of the newspapers in the mid-nineties about some of my clients.   So I knew who -- I knew who he was as a newspaper reporter, but I wouldn't say we had anything other than the relationship that one has when a newspaper is writing negative stories about your clients.

MR. HIMES:   So is it fair to say that prior to that meeting in which he

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

shopped his services, you had -- prior to that meeting, you had never discussed Trump, Clinton, campaigns, Russia, any of that?

MR. ELIAS:  No.

MR. HIMES:  Okay.  How frequently did you communicate with individuals from Fusion GPS during the election cycle, upon their engagement?

MR. ELIAS:  Yes.  I said this when Congressman Gowdy said "monthly" and I said it was more frequent than monthly.  I would say -- yeah, I would say typically -- if I had to put a number on it, I'd say weekly.

MR. HIMES:  Okay.

MR. ELIAS:  Yeah, it was a little dependent on what else was going on in my -- you know, I was going back and forth to Brooklyn, you know, regularly.  I can't complain to Members of Congress about having to travel every week, but it was --

MR. HECK:  Please don't if it's Brooklyn.

MR. ELIAS:  But it was -- so -- but I would say, in general, it was weekly.

MR. HIMES:  Okay.  Over the course of those conversations, did you tell Fusion GPS what to explore in their investigation?

MR. ELIAS:  Yes.  Yes.  Generally, yes, with the understanding -- and I think the med mal example is a good one, which is, you know, understanding that they may come across other things and they bring them to your attention and say, "Is this something we should pursue or not?"

MR. HIMES:  Right.  And the conversation in which you were introduced to Steele, which I think you recall was in July --

MR. ELIAS:  No, that's when I learned the name.

MR. HIMES:  The name.  At what point in those conversations did the

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

concept of Russia get introduced?   You start on bankruptcies and business dealings, normally garden variety stuff.   At what point did the concept of Russia and Donald Trump's possible involvement in any way with Russia, at what point did that come up?

MS. RUEMMLER:   You can describe the timeframe without getting into content.

MR. ELIAS:   Okay.   Well, I'm going to describe the timeframe with very limited reference to the content.   It was sometime after the Democratic National Committee was hacked by Russia and the Trump campaign, through the platform at the RNC and other public statements, were taking an unconventional positive posture towards Russia.   So you would have to look at the public clips to figure out.

MR. HIMES:   So, just to be very clear, the hack occurs, it does not become public for some period of time.   When you say after the DNC --

MR. ELIAS:   After it's public.

MR. HIMES:   So after the disclosure, the public disclosure of the hack, it was at some point after that public disclosure that Russia as a concept first comes up in your relationship with Fusion GPS?

MR. ELIAS:   I -- yes.   It could have been the week of the public disclosure, the week before, but in that general timeframe.

MR. HIMES:   Okay.

MR. ELIAS:   And I don't remember when the platform meeting of the RNC was, but that would be the other sort of temporal point I would look at.

MR. HIMES:   Okay.   Did you receive work products that were produced with research conducted by anyone other than Chris Steele?

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  I don't know what you mean.

MR. HIMES:  So --

MR. ELIAS:  I received work products from Fusion.

MR. HIMES:  Yeah, yeah.  Let me ask that more precisely.   Did Fusion give you work product that was not associated with the work done by Chris Steele?

MR. ELIAS:  You'd have to ask them.

MR. HIMES:  Okay.  How did you receive information from Fusion?  Was it written?  You've obviously -- you said you had regular conversations.   Did they also produce written reports for you?

MR. ELIAS:  Sometimes.   It depended on the nature of what I was looking for.   Sometimes it was -- you know, particularly with court files, it would be the raw files, because I -- you know, I'd want to look at and make some judgments myself on the legal merits.   Sometimes it would be orally.   They would just tell me, you know, "This is something that is of interest."   And sometimes it would be in written form in one form or another.

MR. HIMES:  Okay.  So here I'm going to go back to sort of my conventional/unconventional distinction.   You're doing opposition research, litigation, bankruptcy.   I would categorize that as conventional.   It may or may not be good for the candidate involved, but it's pretty -- at some point in your discussions with Fusion GPS, were you troubled by reporting that they provided you to?   And what I would define as troubled would be because you saw or heard something that was unconventional.

MR. ELIAS:  I'm not sure why unconventional would be troubling.   I mean, that -- I don't mean that philosophically.   Is the question "did I receive information

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

that was unconventional" or "did I receive information that was troubling"?

MR. HIMES:   Did you receive information that was troubling to you?

MR. ELIAS:   Troubling that they provided it to me or troubling as a citizen

of the country?

MR. HIMES:   Both.

MR. ELIAS:   Yes, I received information that was troubling as a citizen of

the country or as, you know, someone who cares about democracy.

MR. HIMES:   And when was that?

MR. ELIAS:   In the summer and early fall.

MR. HIMES:   And what type of details did you find troubling?

MS. RUEMMLER:   I think that question, as stated, unfortunately, calls for

information protected by applicable privileges, so I'm going to instruct him not to

answer.

MR. HIMES:   Let me rephrase the question then.   What values, ethical

concerns you had, were violated by the information that troubled you?

MR. ELIAS:   I was concerned that a foreign adversary had hacked into one

of the two major political parties for the purpose of influencing the outcome of the

2016 Presidential election and potentially other elections, including the

congressional election, and that there might be U.S. individuals who had some

role -- and I'm not going to use the word "collusion" or "conspiracy" because that's

all for you all to decide -- but that might have some role in that, and I found that

deeply troubling.

MR. HIMES:   So you look at some work product, and now you've told us

why you find it troubling.   This is quite important to this committee's work.

Are there other things that you are provided that this committee may not

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

have?   And we have had the Steele dossier for a long time and all the things associated with it.   Are there things that caused you to be troubled that you think we may, as a committee, not have access to?

MR. ELIAS:   It's a hard question to answer because I don't know what you have access to.

MR. HIMES:   Well, let's start with the assumption that we -- that all that we have access to is the so-called Steele dossier.

MR. ELIAS:   I think there are other things that are troubling.

MR. HIMES:   That we may not have?

MR. ELIAS:   Well, that's what I don't know whether you have or not.

MR. HIMES:   If you assume that all we have is what is publicly available -- let me put it that way.   If you assume that all we have is what is publicly available, are there other things that you are aware of that we may not have that caused you to be troubled?

MS. RUEMMLER:   I think that the question, as stated, as you are aware of, is okay and you can answer that.

MR. ELIAS:   So, I mean, this is publicly available information, but it's illustrative, and I don't know whether this is something the committee, you know, is aware of or not aware of.   But it was deeply troubling to me that among the records that were hacked and produced on the internet were records that seemed to target -- or not seemed, that targeted particular congressional races in what appeared to me, just my opinion, betrayed a high level of sophistication of how to influence important congressional races.   I mean, it struck me -- and I apologize if this goes beyond your question.   But it struck me that it was plausible that the Republican -- I'm sorry.   It was plausible that Russia had expertise to hack a party

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

and post emails on the internet.   It was plausible that they would know that John Podesta's emails would be important.   It was plausible that -- that they would be timed around the Democratic convention and that all of that could be done without the involvement of anyone in the United States.

It seemed to me less plausible or, to put it another way, troubling that swing House district opposition research would be posted in a way that seemed to me, again, just as just one person, seemed targeted to influence the -- to create the maximum impact in those swing House races to hurt Democrats.

I would dare say that not even every member of this committee would, if given the -- was able to hack either the Democratic Congressional Campaign Committee or the National Republican Congressional Committee, would have the level of sophistication to pick out the kinds of records that were picked out and put online.   And certainly, it seemed to me unlikely that a foreign adversary sitting in Moscow did that.

So I found that deeply troubling, and I do find that deeply troubling.   I assume that is information that is within the possession of the committee, however, though, because it's -- it's public -- it's public information.   It was posted -- you know, that information was posted on WikiLeaks.

MR. HIMES:  Well, let me follow up on that point, and I don't want to beat this dead horse, but it's important.   What I'm trying to get at here -- the committee obviously is interested in getting all the evidence.   You saw things that were troubling.   There's no way for us to know if you -- if we have everything that you have seen that was troubling.   The example you just gave was an example of the -- a public example.   We can easily check that.   So let me see if I can ask this artfully.

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

Is it possible that you saw material that has not become public that is evidence one way or another of things that you found troubling that might be in the scope of this committee's investigation?   If the answer to that question is yes, obviously, we have that much more reason and there may already be enough reason to get the DNC and the Clinton campaign to waive privilege.   But the point is, if you believe that there is material evidence that is of interest to the committee, we have to figure out a way to get it.

MR. ELIAS:   As I sit here -- it's an interesting question, and it's one I'd like to reflect on.   But, as I sit here today, I can't think of anything that is not public that falls in that category.

MR. HIMES:   Okay.   That's helpful.

MR. ELIAS:   Just more that I can think of things that are public that I have given thought to the inferences to, which is more in the hypothetical -- or not hypothetical, the example I used.

MR. HIMES:   Okay, great.   We're almost out of time on our side here, but just a couple quick questions.   Did you ever speak with the FBI or other law enforcement about claims in any of the work product you saw?

MR. ELIAS:   No.

MR. HIMES:   And why not?

MR. ELIAS:   Why didn't I talk to the FBI about it?

MR. HIMES:   You sort of talked about being troubled to an extent that you were really concerned about the suborning of our system.

MR. ELIAS:   Look, I was aware that the FBI was investigating the hack of the Democratic Party and of John Podesta's emails and others.   I was aware that -- that other lawyers, including lawyers at my firm, were talking to the FBI

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

about those matters.   I don't have a security clearance.   I never wanted a security clearance.   Maybe it's because I didn't want to have to take my Apple watch off.   But so that's one reason.

The second is that, by the time we got to September, there was an attribution to Russia by the 17 intelligence agencies.   So I guess the short answer is it seemed like they were -- I assumed the law enforcement was kind of on the case, such as it was.

MR. HIMES:   You just made reference to the fact that you knew that some of your law partners were talking to the FBI.   Can you elaborate on that?   Was that as part of the investigation, or was that something separate?

MR. ELIAS:   No.   So one of my partners handled the DNC breach for the -- for the DNC, and I know that he -- his name is Michael Sussmann.   He has whatever security clearances, like a whole bunch of letters after it.

So, you know, he was talking to whomever.   And he was a former DOJ cybercrimes guy.   So he was dealing with the FBI around the breach and the hack, and I just didn't have any reason to --

████████████   Five minutes.

MR. ELIAS:   -- sort of put myself into that mix.

MR. HIMES:   And was that the only -- again, you made this reference to your partners dealing with the FBI.   Is that the only example?

MR. ELIAS:   Yes.   Michael would be the only example.

MR. HIMES:   Okay.   So --

MR. ELIAS:   I meant -- maybe I should have said partner.

MR. HIMES:   Partner, okay.   Okay.   So you weren't making reference to the possibility that a partner was cooperating with the Mueller investigation or

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

anything?

MR. ELIAS:   With the Mueller investigation?   No.

MR. HIMES:   Okay.   So -- okay, got it.

MR. ELIAS:   No, I thought we were talking back in the time period.

MR. HIMES:   Yeah, okay.   Four minutes now?

███████████   Yes.

MR. HIMES:   Okay.   You became -- I asked the question previously; you became aware of Russia as a concept you estimated in July.   Do you know when Fusion GPS made the Steele hire to assist in their research?

MR. ELIAS:   I think I said the Russia as a concept was before July.   I think I said I became aware of Steele in July --

MR. HIMES:   Okay.

MR. ELIAS:   -- the name Christopher Steele in July.   I -- and the reason why I say that is I believe that that hire was made sometime in June.

MR. HIMES:   In June, okay.   Have you ever met Chris Steele?

MR. ELIAS:   I did.

MR. HIMES:   Where and when?

MR. ELIAS:   I met him once in the fall of 2016.   I had a, sort of a brief, you know, sort of "hello, nice to meet you" kind of meeting.

MR. HIMES:   There's a long tradition in this committee of the nature of meetings, so I try to avoid that nightmare.

So this was not a business meeting.   This was not you need to meet a subsource and everything.   The way you make it sound, it was sort of like you crossed, you know, at a cocktail party or -- so give us --

MR. ELIAS:   No, it was not crossing at a cocktail party.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MS. RUEMMLER:  I think the original question was where and when.   You missed the where.

MR. ELIAS:  I'm sorry.   I apologize.   Where was at Perkins Coie.   When was in the fall.

MR. HIMES:   In the fall.   Can you be more specific than "in the fall"?

MR. ELIAS:   I'm going to guess it was late September or early October.

MR. HIMES:   And what was the purpose of his visit to Perkins Coie?

MS. RUEMMLER:   You can describe the purpose generally.

MR. ELIAS:   I'm trying to remember.   I don't recall whether he was coming to meet me and sort of introduce himself or whether they were using a conference room for something else and that happened.   I just don't remember.

MR. HIMES:  Okay.   You characterized this as a brief meeting.   Did you communicate with him about his work in that meeting?

MS. RUEMMLER:   You can answer that yes or no.

MR. ELIAS:  Yes.

MR. HIMES:  Okay.   Was that the only time you communicated with Chris Steele prior to the election?

MR. ELIAS:  Yes.

MR. HIMES:   What about subsequent to the election?

MR. ELIAS:   I don't believe I -- no, I've never spoken -- I believe -- I'm 99.9 percent sure that was the only time I communicated before the election, and I never communicated with him after the election.

MR. HIMES:   Okay.   When did you actually receive the so-called Steele dossier?

MR. ELIAS:   So -- can I answer?

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MS. RUEMMLER:  Yes.  You can answer, yes.   Answer it succinctly.

MR. ELIAS:  Got it.  As what has been portrayed on BuzzFeed, I never received the Steele dossier in that form.

MS. RUEMMLER:  That's responsive.

MR. HIMES:   In the one meeting you had with Christopher Steele, had you received, in whatever form you received it in, this so-called information contained in the Steele dossier?

MS. RUEMMLER:  You can answer.

MR. ELIAS:  Some of it.

MR. HIMES:   Some of it.   Okay.   I think we've got about another minute, right?   We'll yield our time.   Take a quick break.

[Recess.]

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

[4:05 p.m.]

DR. WENSTRUP:   Let's go to the work you do on campaigns, or the firm does on campaigns.   So you do Presidential campaigns, non-Presidential campaigns, your firm has traditionally?

MR. ELIAS:   Yes, House, Senate.   Traditionally, House, Senate, Presidential, governor.

DR. WENSTRUP:   Is this the first Presidential campaign for Perkins Coie?

MR. ELIAS:   No, no, no.

DR. WENSTRUP:   Is this your first involvement with a Presidential campaign?

MR. ELIAS:   No.

DR. WENSTRUP:   And I just want to be clear too that Fusion is not a client, right, because clients pay you, you don't pay them.

MR. ELIAS:   Fusion is not a client.

DR. WENSTRUP:   Okay.   When you engage and your clients come to you, as you have stated, DNC and Hillary for America, those are your clients, but just using them as an example, we don't even have to say them, but any client that comes to you, do they come to you with a set of expectations?

Like, you make an agreement, you make an arrangement, we're here hiring you, this is what we expect of you?   Do they usually come forth with a list of expectations of services they expect you to provide?

MR. ELIAS:   They usually have a core set of expectations.   I tell folks that, you know, I think, by and large, I typically get hired by campaigns because of campaign finance laws.   So, like, that is kind of like a core expectation.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

Beyond that, some have other additional expectations.   Some don't.
Some just want just that core.

DR. WENSTRUP:   Right, but they could hire you, just say, hey, we want to
be able to call you every once in a while for legal advice, or they could hire you
and say, we want you to hire our opposition research.   We want you to do A, B, C,
and D.   And you're probably going to write a contract that says what the
expectations are.   I would imagine, as attorneys, you are going to want that
defined as you go into this contract.   Or is it just --

MR. ELIAS:   No.   Our -- most law firms, not just ours, but most law firms,
the engagement letters that are used to retain law firms are fairly nonspecific.

DR. WENSTRUP:   So you just hired Fusion GPS on your own?   They
didn't ask you to hire someone for opposition research?

MR. ELIAS:   Well, two different questions.

One is, you asked what the contract was between us and campaigns
generally.   And the answer is that most clients, whether they are in the political
space or not political space, law firm engagement letters tend to be fairly general
and not quite as --

DR. WENSTRUP:   So most of your clients, then, you are saying, will come
to you and hire you, and you will bill them, and you can do whatever you want?

MR. ELIAS:   No.   That's not what I'm saying.

DR. WENSTRUP:   I mean within campaign finance rules or whatever the
case may be.

In other words, you don't always hire a legal team to go out and find
someone to do the opposition research.   People don't do that all the time, I can
tell you that.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  No, I agree.   I was answering just the question about what the written agreement says.

With respect to the scope of services, so I think, again, speaking generally, because I think that's the way you framed the question, there are campaigns that hire us to serve as general counsel to the campaign and to be responsible for all of the legal affairs of the campaign.

And there are campaigns that hire us to do more discrete pieces of it, where they're not looking for us to do -- to be in charge of all their legal affairs, they may just want us to do a piece of it.

DR. WENSTRUP:   That's my point.   So there was apparently in this case with the DNC and with the Clinton campaign an expectation that you would hire opposition research, because you went and did it.   And they didn't balk.   They paid the bill.

MR. ELIAS:   There was an expectation --

DR. WENSTRUP:   I assume they paid the bill.   I'm sorry.

MR. ELIAS:   They did.

DR. WENSTRUP:   Okay.

MR. ELIAS:   There was an expectation that we would hire the consultants, including research consultants, necessary to enable us to provide services to the campaign.

DR. WENSTRUP:   Was that in writing in this case?

MR. ELIAS:   I don't believe so.   I think our engagement letter simply says we'll serve as general counsel for the campaign, but I haven't --

DR. WENSTRUP:   That includes all that.   That's interesting.   I'm not an attorney, so you have to bear with me here.   That kind of blows me away.   As a

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

client, I would sure want it in writing, but that's just me, I guess.

Were there any competitors to Fusion in this case?   Were there any other opposition research firms that you entertained, that you spoke with, that you considered for the job?

MR. ELIAS:  Yes.

DR. WENSTRUP:  Were any others hired?

MR. ELIAS:  By Perkins?

DR. WENSTRUP:  Uh-huh.   That you would have had oversight on, you would say, yeah, hire them as well, they're bringing this to the table, that to the table.

MR. ELIAS:   But that where Perkins hired them?

DR. WENSTRUP:   Yeah.   Just as you did Fusion GPS.

MR. ELIAS:   There may have been.

DR. WENSTRUP:   I'd be curious to know who they may have been as well.

In the hiring process, do you ask for references when you're bringing in somebody you've never worked for?   Do you look them up on Facebook?   Do you look for four stars or five stars?   You know, what's your process when you --

MR. ELIAS:   Yeah.   So it depends on the -- it depends on the circumstance.   Sometimes it's reputational.   So, you know, we might retain a cybersecurity remediation firm, and it would be reputational.   You know, there are a handful of them that are well known and, you know, you generally know what they have been involved in in the past through public sources.

There are times where it is based on word of mouth or individualized recommendation, someone says, hey, I think these folks do good work, they have done good work in the past.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

There are times where it's just experience or expertise, they have a particular expertise in a particular field.

DR. WENSTRUP:  And they're known for that?

MR. ELIAS:  And they're known for that.

DR. WENSTRUP:  Okay.  When it comes, you decide, okay, we're going to go with you, do you negotiate a payment schedule or do they just say --

MR. ELIAS:  Yes.

DR. WENSTRUP:  -- this is what we charge, take it or leave it?

MR. ELIAS:  You always try to negotiate.  Sometimes, depending on who they are, sometimes it's more negotiation, sometimes it's less.

DR. WENSTRUP:  So in this case, I think you said, and I may have gotten this wrong, 60,000 a month with Fusion?

MR. ELIAS:  I think that --

DR. WENSTRUP:  To start anyway.

MR. ELIAS:  I think that --

DR. WENSTRUP:  Plus expenses.

MR. ELIAS:  I think it was -- I think it was 25 a month for the DNC and 25 a month for -- I think Perkins was paying 25 and 25, plus expenses.

DR. WENSTRUP:  Okay.  And did you say, "Well, give us a sample of some of your work"?  Because they're coming to you and they're saying, hey, we've done all this research already, and so you should hire us.

So do you say, okay, give me a sample of what you got, does that happen?

MR. ELIAS:  In this case -- again, you know, I think at the congressional level, oftentimes what you're looking for in a campaign is a research book.  I don't know whether they did or didn't do a research book for their prior rich person, their

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

prior client.

I wasn't -- I wouldn't have hired them to do a research book.   The campaign had dozens of researchers to do research books.

I was hiring them to provide expert consulting services to me on the things that I thought were important so that I could provide services to the campaign.   So getting a sample wouldn't have been meaningful unless it was on a topic that I was, you know, I really focused on.

DR. WENSTRUP:   Well, I know when I hire someone to do writing, I get a sample of their writing before I make the hire.   You know, I'm kind of curious about their product.

And they say they've already produced a product, and I think the next thing that I'd be curious about, and wonder if you did this, is, you know, I would say, well, listen, you've already produced a product, somebody paid you once for it. So do I get a discount rate, because you've already got it done?

Or did they actually -- were they able to double the bill -- double bill on this --

MR. ELIAS:   So it's a fair question.   I think both to your last point and this one, I would say I was mindful, as I always am, of, you know, since I'm in the client confidence business, I am mindful of other people's obligations to keep things confidential.

So, you know, I wouldn't have pressed them for, you know, hey, what did you -- what exactly did you do for this other, or give me what you gave them. That wouldn't have struck me as, frankly, as appropriate.

On the billing question, you know, I assumed that I was going to save money for the firm and ultimately therefore for the clients by the fact that they had

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

such a broad preexisting familiarity.

I mean, one of the first things you asked before I hired them, like, what were the things I would have thought about before I hired them.   I think, and I could be wrong, this is public record, that Donald Trump has written, I think, five books.

So at a minimum, someone's going to need to read the five books.   I don't know if it's five books he wrote or five books was written about him, but there's a genre of work about him.

And if someone has already done that, then I assumed I was going to save money relative to someone who is walking in cold.

DR. WENSTRUP:  Well, if I was hiring you, I would want to make sure you were doing that, to be honest with you, you know, be a little frugal with my money.

So, again, I'm not a lawyer, but in these situations, if I'm seeking legal advice for my campaign and opposition research is coming in with stuff, I would certainly want the legal team to take a look at it.

MR. ELIAS:   The legal team -- I'm sorry, the legal team take a look at?

DR. WENSTRUP:  The legal team to take a look at it.

I guess I'm going to ask you this bluntly.   Do you ever in your situation say, if you can't prove it, don't use it?

MR. ELIAS:  Say that to who?

DR. WENSTRUP:  A client.

MR. ELIAS:  Yes.

DR. WENSTRUP:  Okay.

MR. ELIAS:  Yes.   In fact, you may have been out of the room for this. One of the things, which I assume your lawyers do for your campaign that I think good campaign lawyers do, is when campaigns are making claims, for example, in

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

television ads, they review them and they say, you can't say this.   You can't say

that, you know, Congressman Gowdy voted against this bill when, in fact, the

history of this isn't; or you can't say he lied about X, Y, and Z when in fact that

isn't -- you know, he's going to sue you for defamation.

    So part of the job of the lawyer is to say, no, you can't make this claim.

    DR. WENSTRUP:  Thank you.

    Mr. Gowdy.

    MR. GOWDY:   Mr. Himes, towards the end, you were discussing with him

what you believed to be the one and only time you met Christopher Steele --

    MR. ELIAS:  Yes.

    MR. GOWDY:   -- which I think, if I remember your testimony correctly, was

the fall of 2016, and maybe we narrowed it down to September?

    MR. ELIAS:   I just don't remember if it was late September or early

October.

    MR. GOWDY:   All right.   And if I remember right, the meeting took place at

your law firm?

    MR. ELIAS:   It did.

    MR. GOWDY:   And that would be the Washington office of your law firm?

    MR. ELIAS:   The Washington, D.C., office.   We actually have a

Washington State office.

    MR. GOWDY:   All right.   The Washington, D.C., office.

    Do you recall who, if anyone, accompanied Mr. Steele to that meeting?

    MR. ELIAS:   So what I recall is it was someone from -- it was either Peter

or Glenn or both.   It was Mr. Steele and it was a third or fourth person, who was a

woman.   And I don't recall who -- whether she was another Fusion person or she

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

was a Steele person.  I don't know.

MR. GOWDY:  Are you familiar with the name Nellie Ohr?

MR. ELIAS:  No.

MR. GOWDY:  So you don't remember whether it was a Fusion employee or someone that was just accompanying Mr. Steele?

MR. ELIAS:  Honestly, I don't.

MR. GOWDY:  Who set up the meeting?

MR. ELIAS:  Fusion.

MR. GOWDY:  And the purpose of the meeting was what?

MS. RUEMMLER:  If you can describe the purpose generally.

MR. ELIAS:  Yeah.  The purpose from my end, as I understood it, was to say hello and meet someone who had been doing work, who otherwise I had not had any contact with.

MR. GOWDY:  Why was that important?

MR. ELIAS:  Can I?

MS. RUEMMLER:  I think you can give your opinion about why you thought was important.

MR. ELIAS:  I thought it was important because -- I think that it was important to -- I think that the Fusion folks thought it was important that Mr. Steele hear from me directly that I was aware of his work and was appreciative.

MR. GOWDY:  You couldn't do that in a telephone call?

MR. ELIAS:  See, this is -- I don't recall.  I don't know if you were here.  I don't recall whether he was -- they were in town, like, meeting and this was a -- this was --

MR. GOWDY:  Meeting at your law firm?

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

MR. ELIAS:   Using a conference room or whether this was scheduled.   I just don't remember.

MR. GOWDY:   Do you remember discussing with Mr. Steele any sources that he may ███████████?

MR. ELIAS:   No.

███████   One minute.

MR. GOWDY:   Do you remember asking Mr. Steele about any of the ██████████████ for any of the work that he had produced?

MR. ELIAS:   Can I answer?

MS. RUEMMLER:   You can answer "yes" or "no."

MR. ELIAS:   No.

MR. GOWDY:   How long did the meeting last?

MR. ELIAS:   Ten, 15 minutes.

MR. GOWDY:   I am looking at a letter from Matthew Garringer (ph).   Am I pronouncing that name right?

MR. ELIAS:   That's correct.

MR. GOWDY:   I will try to summarize the letter.   It is giving Fusion GPS permission to answer a very small number of questions that they saw fit to answer when we were talking to them.

So for want of a better explanation, I guess it's a waiver from Perkins Coie to Fusion GPS that you can talk about X, Y, and Z.   Is that a mischaracterization of the letter?

MS. RUEMMLER:   Well, I think you can -- you are the witness.   I think you can answer.

MR. GOWDY:   It's really not a trick question.

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  I think the letter speaks for itself.   I don't know.

MR. GOWDY:  I do too.   I do too.

MR. ELIAS:  I don't know.

MR. GOWDY:   I guess what I'm getting at is whether or not you asked any of your clients for a waiver to be able to answer any questions today?

MR. ELIAS:  Do you mean the two clients we have talked about?

MR. GOWDY:   The DNC and Hillary for America.   Is that right?

MR. ELIAS:  Yeah.

MS. RUEMMLER:  I think what I said at the outset was that we have discussed the matter with them and they -- neither DNC nor Hillary for America has authorized Mr. Elias to disclose any attorney-client privileged information.

MR. GOWDY:   But you would agree that's very different than whether or not you asked?

MS. RUEMMLER:   Well, I think that that question as stated actually calls for information that's protected by the applicable privileges.

MR. GOWDY:   I haven't asked for their answer yet.   I just asked whether he asked.

MS. RUEMMLER:   Well, I think his question to them is also covered by the attorney-client relationship, and I'd instruct him not to answer.

MR. GOWDY:   Mr. Heck.

[Discussion off the record.]

MR. HECK:  Mr. Elias, let me go back to the beginning.   Remind me, sir, what year you graduated from law school.

MR. ELIAS:  I graduated law school in 1993.

MR. HECK:  And did you indicate earlier that you had interned the year

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

before?

MR. ELIAS:   I was a summer associate, which is the equivalent of an internship.

MR. HECK:   With?

MR. ELIAS:   With Perkins Coie the summer before.   So the summer of 1992.

MR. HECK:   And did you immediately go to work for Perkins Coie upon graduation?

MR. ELIAS:   I did.

MR. HECK:   Have you been there continuously?

MR. ELIAS:   I did.   I didn't grow up with enough money to not work.

MR. HECK:   And at what point, again, did you begin specializing in political law?

MR. ELIAS:   So some time, I'd say, in the mid-1990s.   I have sometimes joked that I owe my career to Newt Gingrich, because it was the -- it was the House taking -- the Republicans taking control of the House that really ushered in a much larger -- the role of campaigns became much larger.

MR. HECK:   And are you currently the managing partner for the political law practice at Perkins Coie?

MR. ELIAS:   Yeah.   I chair the practice.

MR. HECK:   You chair the practice?

MR. ELIAS:   I do.

MR. HECK:   And how many lawyers report to you or work with you?

MR. ELIAS:   I think it's now 31.

MR. HECK:   Are those all in Washington, D.C.?

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:   No.   They're predominantly in Washington, D.C., but we have some in Chicago, we have a couple in Phoenix.   I think that's it.

MR. HECK:   At what point since you were first hired at Perkins Coie did you begin having input and/or responsibility for hiring outside consultants to assist you in the political law support you gave to clients?

MR. ELIAS:   Good question.   You know, as an associate -- so I was an associate from '93 to 2001.   So as a senior associate, I -- you know, there were a handful of matters that I was involved in where I was in a position where I had that authority.

But as an associate, you're an employee, so it's always constrained by the partner for whom you are working.   Once I became a partner, then I was, you know, authorized to do that.

MR. HECK:   And you became chair again when?

MR. ELIAS:   I became chair in two thousand and -- when did Craig leave?

MS. RUEMMLER:   [Inaudible.]

MR. HECK:   Your attorney knows when you became chair?

MR. ELIAS:   I became chair because one of my partners left to become White House counsel.   So my counsel knows when that happened.   So it was in 2009.

MR. HECK:   And have served continuously in that capacity since?

MR. ELIAS:   Indeed.

MR. HECK:   So let's deal just with the time since you've become chair.

MR. ELIAS:   Okay.

MR. HECK:   Can you estimate the number of consultants that you have hired?

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:   If you count repeats as separate engagements, because they were engaged for separate clients, probably 20, 25.

MR. HECK:   Twenty to 25 nonduplicated?

MR. ELIAS:   I'm saying it may be the same consultant, but they'd be separate engagements of them.   In other words, I might engage a consultant for one matter here and then a year later for something --

MR. HECK:   So that would be two?

MR. ELIAS:   That would be two, yeah.

MR. HECK:   Can you estimate the number of different consultants that you have hired over that period of time?   So, for example --

MR. ELIAS:   Ten to 12.

MR. HECK:   -- Mr. Elias, it's not one consultant 25 times?

MR. ELIAS:   No, no.   Ten to 12.

MR. HECK:   So would it be fair to say that it is the norm over time for you to regularly hire someone for the first time?

MR. ELIAS:   Yeah.

MR. HECK:   That's more than once a year --

MR. ELIAS:   Yeah.

MR. HECK:   -- if I do my math correctly.

You mentioned that you would tell Fusion GPS what to look for in its research?   Did you indicate that earlier?

MR. ELIAS:   I said that I would give them direction on what research they could do that would help me do my job.   So I might say, I will make -- this is a -- this is not waiving privilege because it's a hypothetical.

I might say, okay, I know that the campaign is likely going to want to make

UNCLASSIFIED, COMMITTEE SENSITIVE

public statements about the way the local Scottish population was treated around Trump's golf course in Scotland, so I need -- I'm going to need records of lawsuits or, you know, documentary films which exist only in Scotland so that I can see that and digest it.   And, you know, that would be an example.

MR. HECK:   So you gave them specific direction at times -- if you are using that as a hypothetical example, that's very --

MR. ELIAS:   In that hypothetical example, I wouldn't know whether there are court filings or not, whether there are movies -- documentary films or not, whether he's beloved by the population of Scotland or hated by the population of Scotland.

So I would just say, like, what can you help me gather that relates to his relationship in Scotland?   And then they would go off and, you know, see what they come back with.   And then I might say, this is useful, this is not worth using, this is not worth passing along, this is really worth passing along, this is worth me just knowing as a fact in the back of my brain so that when there is a particular ad that's going to run, I know this is a dividing line.

MR. HECK:   I'm trying to differentiate between whether the direction you gave them was of a broad topical nature or of a specific nature.

MR. ELIAS:   It depended.

MR. HECK:   Meaning both?

MR. ELIAS:   Both, yeah.   Sometimes one and sometimes the other, depending on the topic or depending on the need.

MR. HECK:   How often did you give them that direction?

MR. ELIAS:   So like I said, I met with them typically, or spoke to them typically, I'd say on average, once a week.

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. HECK:   I assume that part of the purpose of those meetings, however, would be for you to receive information --

MR. ELIAS:   Sure.

MR. HECK:   -- not just, then, to give direction.

MR. ELIAS:   Yeah.   It was both.   It was a give-and-take.   I mean, it was iterative, which is the way I would normally work with any consultant, is they're reporting back to you information.   That is then shaping your judgment as to what further work is worth pursuing or not.

MR. HECK:   And if they were retained May, June, July, August, September, October, basically 6 months, approximately, and you met approximately once a week, then we're talking, by your best estimate, at least 20 such meetings --

MR. ELIAS:   Yeah.   Yeah.

MR. HECK:   -- where these kinds of iterative conversations would take place of receiving information and giving either broad or specific direction.

MR. ELIAS:   Yes.

MR. HECK:   Did you ever direct them -- pardon the use of this phrase -- directly or indirectly to find a specific conclusion?

MR. ELIAS:   I wasn't looking for conclusions.   I was looking for information.

MR. HECK:   Did you ever direct them, directly or indirectly, to procure a certain fact not yet in evidence, to use the legal term?

MR. ELIAS:   I would ask them to help find out if a fact was correct.

MR. HECK:   Why are you pointing at me?

MR. GOWDY:   Oh.   I thought you were looking at me.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. HECK:  I was.

MR. GOWDY:  Oh.

MR. HECK:  I'm trying to get over the fact that none of those election experts are in their Washington State office.

MR. GOWDY:  You are so popular, you don't need an expert.

MR. ELIAS:  That's not entirely true.  None of the members of the group --

MR. HECK:  You mentioned Scottsdale and Chicago.  I heard no mention of Seattle.

MR. ELIAS:  No member of the political law group is in Seattle, but we have three lawyers who are out there who do work for Democratic campaigns.

MR. HECK:  I think I know that.

MR. ELIAS:  But they're in the labor group.  And it's a point of contention. So I refuse to count them, because they're not in my group.  They would tell you they are, they should be counted.

MR. HECK:  I might mention that to them.

MR. ELIAS:  You should.  It's a jurisdictional dispute that we have, kind of like the stuff you guys do.

MR. HECK:  I yield back, Mr. Chair.  Thank you.

MR. GOWDY:  All right.  I will get this in before we go vote.

I'm going to ask you about a couple names.  And then here is the question, whether or not you talked to them in 2016.

MR. ELIAS:  Sure.

MR. GOWDY:  Natalia Veselnitskaya.

MR. ELIAS:  I don't know who that is, so I doubt it.

MR. GOWDY:  All right.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  If you tell me who it is, I might be able to --

MS. RUEMMLER:  [Inaudible.]

MR. ELIAS:  No.

MR. GOWDY:  I'm happy to -- well, I'm not going to get you to change your answer.  She is ostensibly a Russian lawyer that --

MR. ELIAS:  No.

MR. GOWDY:  -- I think most of the world knows met with Donald Trump Jr.

MR. ELIAS:  No.

MR. GOWDY:  Not as much of the world knows met with Glenn Simpson.

MR. ELIAS:  No.

MR. GOWDY:  Bruce Ohr.

MR. ELIAS:  I don't know who that is.

MR. GOWDY:  Andrew McCabe.

MR. ELIAS:  Is he the Director of the FBI?

MR. GOWDY:  Deputy.

MR. ELIAS:  Oh.  No.

MR. GOWDY:  Peter Strzok.

MR. ELIAS:  I don't know who that is.

MR. GOWDY:  Debbie Wasserman Schultz.

MR. ELIAS:  Yes.

MR. GOWDY:  Were you part of the decision on whether or not to surrender the server that had been hacked to the Bureau?

MR. ELIAS:  No.

MR. GOWDY:  Do you know anything about it?

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  Yes.

MR. GOWDY:  What do you know about it?

MS. RUEMMLER:  I assume that anything that you know is from a privileged --

MR. ELIAS:  Correct.

MS. RUEMMLER:  -- communication.  So I instruct you not to answer.

MR. GOWDY:  I don't know whether any of these assertions are true, they've been made.  I don't make any judgment about the validity of them.  I'm just going to ask you whether or not you're familiar with them.

Whether or not Fusion GPS paid reporters.

MR. ELIAS:  I have no reason to think that that's true.  No, I don't know anything about it.

MR. GOWDY:  Whether Fusion GPS sent Christopher Steele to certain media outlets in the fall of 2016.

MR. ELIAS:  I am aware that he talked to media outlets in that time period.

MR. GOWDY:  Well, there are a number of ways you could be aware of it.  You could have actually read an article where he was quoted in it.  You could have known ahead of time.  So how were you aware?

MR. ELIAS:  I hate to take a break, but I think we're going to have to.

MS. RUEMMLER:  All right.  A quick one.

MR. GOWDY:  All right.

MR. ELIAS:  I know.

[Recess.]

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

[4:38 p.m.]

MR. GOWDY:   I think we had established that you did not know anything about Fusion GPS paying reporters.   And I think my next question is whether or not you knew anything about Fusion GPS sending Christopher Steele to media outlets in the fall of 2016.

MR. ELIAS:   And I think I said yes.

MR. GOWDY:   And then I will probably ask, how did you know that?

MR. ELIAS:   That's where I think we were up to.

MS. RUEMMLER:   And that, I think, calls for privileged information and I'd instruct him not to answer.

MR. GOWDY:   Were you part of the decision to send him to media outlets?

MR. ELIAS:   I was aware of it.

MR. GOWDY:   Before or after?

MR. ELIAS:   Before.

MR. GOWDY:   Were you part of selecting which media outlets would be approached?

MR. ELIAS:   No.

MR. GOWDY:   I gleaned from your earlier testimony that what people referred to as the dossier, you never saw in the form of what's called a dossier.

MR. ELIAS:   Correct.

MR. GOWDY:   I'm assuming you saw individual summaries of investigative work that was later compiled into a dossier.

MR. ELIAS:   Some of it.   Some of it.   But not all of it.

MR. GOWDY:   And how would those -- what you did see, how would it come to you?

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  Either in person, in hard copy, or orally.

MR. GOWDY:  From whom?

MR. ELIAS:  Either Mr. Simpson or Mr. Fritsch.

MR. GOWDY:  And when did that begin?

MR. ELIAS:  I'm trying to remember.   I think late -- either early -- maybe early July, late -- maybe late June, early July.

MR. GOWDY:  Are you familiar with the expression "paid media" versus "earned media"?

MR. ELIAS:  Yes.

MR. GOWDY:  All right.   And how do you distinguish between the two?

MR. ELIAS:  Paid media is like television commercials, radio, television, or paid advertising, things that the campaigns pay for.

Earned media, or free media, is stuff that the press will report or will go viral via Twitter or Facebook, but not paid.

MR. GOWDY:  Would there be an order in which you pursued those two forms of media?   Would you try the --

MR. ELIAS:  Me?

MR. GOWDY:  -- free route first?   Just in general campaigns.   Would you try to shop a story to a reporter before you invested any money in disseminating whatever it is you wanted disseminated?

MR. ELIAS:  Not always.   Sometimes yes, sometimes no.   It really depends.

I mean, my experience with campaigns is sometimes they want to get a story written about it first in the free media.   Sometimes they'd rather control the way the issue is presented and they'd rather do paid media first.   It really just

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

depends on the campaign, the campaign manager, and their philosophy.

MR. GOWDY:   All right.   I want to make sure I get it right.   So if I get this wrong, let me try to summarize it, you can correct me.

You were not aware if Fusion GPS paid reporters to report on any aspect of what's later been called the dossier?

MR. ELIAS:   Correct.

MR. GOWDY:   You were aware beforehand of a decision at least contemplated or debated to send Steele to certain media outlets?

MR. ELIAS:   Correct.

MR. GOWDY:   You did not have a hand in selecting those media outlets?

MR. ELIAS:   I did not.

MR. GOWDY:   Were you present when it was discussed which media outlets might be friendliest to that entreat?

MS. RUEMMLER:   You can answer whether you were present.

MR. ELIAS:   Yes.

MR. GOWDY:   Did that conversation take place at your law firm?

MS. RUEMMLER:   You can answer that if you recall.

MR. ELIAS:   That's what I'm trying to remember, if I recall.

I think so, but I don't -- I can't honestly say 100 percent.

MR. GOWDY:   If it had not taken place at your law firm, where would it have taken place?

MR. ELIAS:   By phone.

MR. GOWDY:   You believe you saw some of the material --

MR. ELIAS:   Yes.

MR. GOWDY:   -- in its organic form before it went into the dossier --

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ELIAS:  Yes.

MR. GOWDY:  -- but perhaps not all of it?

MR. ELIAS:  Yes.  Correct.

MR. GOWDY:  Do you recall asking that any follow-up work be done after you read portions of it?

MR. ELIAS:  Yes.

MR. GOWDY:  And what was the nature of that follow-up work you contemplated?

MS. RUEMMLER:  I think that's protected by privilege and I'd instruct you not to answer.

MR. GOWDY:  Well, he answered one of the questions.

I'm trying to get back to kind of where we started, which is what duty, if any, exists to investigate assertions and how they would be investigated.

MR. ELIAS:  Taking it out of the dossier and putting it in a more abstract, which I think will be helpful to you, because I think it will --

MR. GOWDY:  Only if it's done quickly, because I got to go vote.

MR. ELIAS:  Because I think it will allow me to say more.

It depends what the goal is.  Sometimes you get as a lawyer, as a Congressman, you get assertions, and you just don't do anything with it.  So there's no duty or anything to do anything with it.  You are just not -- it's just not -- it's not useful, it's not interesting, it's not --

MR. GOWDY:  Well, you would agree --

MR. ELIAS:  And sometimes it is.

MR. GOWDY:  -- it could impact your willingness and ability to believe other material produced.  If someone brings you 10 facts, 9 of which you don't believe,

UNCLASSIFIED, COMMITTEE SENSITIVE

that could --

MR. ELIAS:  Sure.

MR. GOWDY:  -- that could in theory impact whether or not you believe the tenth.

MR. ELIAS:  Absolutely.

MR. GOWDY:  Hence the need for some form of corroboration, investigation, vetting, understanding better where that information came from.

MR. ELIAS:  I think in my experience in the context of campaigns generally, these campaigns are moving very, very fast.   I'm not evaluating this for a congressional committee or the FBI a year later.   I'm making judgments in realtime whether the information I'm receiving is information that is going to be useful or not useful to the task that I have.

If it is not useful to the task I have, then it's simply not useful and there is no point in me chasing it down.

If it is useful, then, yes, I will do more -- I will do more follow-up, depending on whether it's -- what that level is.   That level might be to get more case files, that level might be to consult a second expert, it might be to try to do further vetting, to use your term.

But I don't think it's true that every time I get a piece of information from a consultant, I am under some obligation or would find it a good use of time to track it down.

MR. GOWDY:  I am not even insinuating that you are under an obligation, but if I were to tell you that your car had just been stolen, it would be really relevant to you whether or not I heard that from the chief of the Capitol Police or whether or not I heard that from one of my colleagues who had a reputation for

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

mendacity.

MR. ELIAS:   That's true.   And if you told me that Kash had jaywalked, I wouldn't follow up.

MR. GOWDY:   But if it were something that were important that you were interested in, why not ask the folks at Fusion GPS or Christopher Steele, Where did you get that information?

MR. ELIAS:   I assumed -- can I say?

MS. RUEMMLER:   Yeah.   Go ahead.

MR. ELIAS:   I assumed that I was dealing with professionals who had their own sets of confidential arrangements and had their own professional judgment. And I did not view myself in a position to sort of engage a second-level review of information that I received.

If I received information and it was useful and it was verifiable and it was information that I felt comfortable with, then it went in one bucket.   If it was information that wasn't, it wasn't.

MR. GOWDY:   Early on in your interview today, you said that you were very interested in learning as much as possible and that the committee should continue looking into Russia's efforts to interfere with our 2016 election cycle.

MR. ELIAS:   Absolutely.

MR. GOWDY:   But you would agree that that would be relevant or either side, whether it was efforts to assist the Trump campaign through official Russian Government channels or whether it was a current or former Russian Government employee who was feeding information to Steele.   It's still an effort to influence the outcome of the election, right?

MR. ELIAS:   I would encourage the committee to do everything it can to

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

figure out whether Russia or any other foreign state tried to influence our election.

I'm not going to -- I'm not expert to comment on whether --

MR. GOWDY:  Well, when you say a foreign state, Great Britain doesn't

leap to people's mind, for the most part --

MR. ELIAS:  Right.

MR. GOWDY:  -- except for the fact that Chris Steele is a British citizen.

MR. ELIAS:  True.

MR. GOWDY:  So that could be a foreign country, foreign citizen's effort to

influence an election.   Agree?

MR. ELIAS:  I didn't say a foreign citizen.   I said a foreign state.

MR. GOWDY:  Does it matter to you whether the person's a current or

former employee of that foreign state?

MR. ELIAS:  I --

MR. GOWDY:  Does it matter whether they're accessing information that

may be held by that foreign state?

MR. ELIAS:  I mean, we're now into a philosophical discussion perhaps,

but --

MR. GOWDY:  But it's not philosophical if -- if someone relied on Russian

sources that were government sources.   Then it's outside the realm of the

philosophical into the realm of what happened.

MR. ELIAS:  Well, first of all, you may know more about what happened

than I do.

MR. GOWDY:  I don't.   That's why I'm asking you.

MR. ELIAS:  Number one.

Number two, I think that at the point that the Russian Government through

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

its intelligence agencies victimized the Democratic National Committee and
they were --

MR. GOWDY:  And John Podesta.

MR. ELIAS:  And John Podesta.

MR. GOWDY:  I agree 100 percent.

MR. ELIAS:  And they were the victim.

MR. GOWDY:  I agree 100 percent.

MR. ELIAS:  And I think it was a reasonably prudent step, and you may
disagree, to try to determine what facts we as a -- I could know in my efforts to
represent my client, what facts I could know about the involvement of anyone in
that process.

MR. GOWDY:  I am not equating, I am not equating Christopher Steele
checking with some sources in Russia with the Russian Government's active
measures to impact and hack a DNC server or John Podesta's email or to partner
with WikiLeaks to disseminate.  I'm not equating them.

I'm just saying that if we're going to look into Russia's efforts to influence
the 2016 election cycle, I would vote for looking into all of them.  And they're very
creative and they don't have our country's best interest in mind, and I don't think it
is unreasonable to ask who Chris Steele's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which is
kind of the genesis of why I'm asking you that.

And I'm sure the privilege you cited earlier is the same one you're going to
cite now.

MR. ELIAS:  As to who

MR. GOWDY:  Yes.

MS. RUEMMLER:  Well, I mean, I think you can go ahead and answer

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

that.

MR. ELIAS:  I have -- I don't know.

MR. GOWDY:  All right.  Last question, and then ▮ has got something

for you.

Did either of your clients ever query you with specificity about expenses?

MR. ELIAS:  With respect to this work or other work?

MR. GOWDY:  This work.

MR. ELIAS:  No.

MR. GOWDY:  Because I thought it was $30,000, but now it's $25,000 per

client, per month, right?

MR. ELIAS:  It was -- let me clarify, because --

MR. GOWDY:  I wasn't quarreling with you, but it does matter.

MR. ELIAS:  No.  It was $30,000 billed to the client, plus expenses.

Fusion charged Perkins Coie $25,000 -- it was billed to client $60,000 -- billed from

Fusion to us at $50,000, and both those expenses are on top.  So there was

$10,000 of it which was paid to Perkins Coie for managing, for the additional costs

of managing our work.

MR. GOWDY:  All right.  I think we established from a math standpoint

that at least half the total amount of money that came from those two clients would

have gone for expenses and not for that base retainer?

MR. ELIAS:  That's right.

MR. GOWDY:  And your testimony is they never queried you on what was

the nature of the expenses, are these copying charges for bankruptcy proceedings

or are you paying people for information in Samaria?

MR. ELIAS:  I think it was somewhere in between.  I think it -- they

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

were -- I think that Robby knew.   I would tell Robby, we're going" --

MS. RUEMMLER:   We're on the record, so you have to say who you are talking about.

MR. ELIAS:   Sorry.   I thought you were going to claim privilege.

MS. RUEMMLER:   No.

MR. ELIAS:   I would tell Mr. Mook -- sorry -- you know, this month it's going to be, you know, substantially higher.   Sometimes I'd be able to give him an estimate, sometimes not.

And sometimes -- and depending on the nature of it, I might tell him, you know, this is because we're going to have just a boatload of copying expenses, or this is because I'm hiring additional consultants, or subconsultants.   But that would be the level of detail.

MR. GOWDY:   

DR. WENSTRUP:   Just real quick.

You mentioned earlier, you used the phrase you found some things troubling as a citizen.

MR. ELIAS:   Yeah.

DR. WENSTRUP:   And I think we all can agree that Russia is willing to create chaos in any election here and to create chaos in any way that they can within the system of the United States.

Do you find it troubling as a citizen only if it's affecting one party or either party?

MR. ELIAS:   Oh, I find it troubling if it affects either party.   I think that now you've really just asked me my opinion, so take this for what it's worth, not on behalf of any of my clients.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

I think that when -- I think that the chairs of the six national party committees should all agree that if anyone is hacked, no other party will use that information in any way and will in fact take some active measure, to use perhaps the wrong term, to actually mitigate it in some way, that, you know, would have to be worked out.

No, I don't view this as a partisan issue.   I think that it's wrong for the conduct to be taking place against either party.   Which is why, you know, as I look back, if I could do it again, I would have -- I would have tried to spend more money to try to learn more, more quickly.

DR. WENSTRUP:   I find it troubling as a citizen about the hacking and I find it troubling as a citizen that Russians are potentially and likely involved with the dossier.   It's troubling either way, and I would guess you agree with me on that.

MR. ELIAS:   If you -- I don't have enough knowledge about when you say that Russians were involved in the dossier.   I mean that genuinely.   I'm not privy to what information you all have.

It sounds like the suggestion is that Russia somehow gave information to the Clinton campaign vis-à-vis one person to one person, to another person, to another person, to me, to the campaign.   That strikes me as fanciful and unlikely, but perhaps you all -- as I said, I don't have a security clearance.   You all have facts and information that is not available to me.   But I certainly never had any hint or whiff.

██████████   This won't take long.   I have just got a couple of quick questions.

BY 

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

Q       So you, Marc Elias, on behalf of the DNC and the Hillary Clinton campaign retained Fusion GPS.   Is that correct?

A       I'm sorry.

Q       I'll say it again.

A       I was saying --

Q       It's okay.

A       I was saying goodbye.

Q       They're going to votes.   This won't take long.

You, Marc Elias and Perkins Coie, on behalf of the DNC and the Hillary Clinton campaign, retained Fusion GPS?

A       True.

Q       And then Fusion GPS in turn retained the services of Christopher Steele and Orbis International?

A       Yes.   I understand those -- I said this before -- I understand those two to be the same.

Q       The same thing?

A       Okay.

Q       For purposes of this, we will say Christopher Steele and Orbis International are the same thing.

A       Okay.

Q       So Fusion GPS, after they were hired by you, they went out and retained Chris Steele?

A       Right.

Q       Where I got a little lost was, did you say you had a sign-off on that or, like, a say in that relationship, that is, Fusion's relationship to Christopher Steele?

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MS. RUEMMLER:  I think you --

MR. ELIAS:  Yeah.  I had a sign-off on that they were going to retain someone.  The who the someone was, I think as a contractual matter, I probably had the authority to, but in practice, I didn't.  I mean, I didn't exercise that authority.

BY ████████

Q      So in this instance, you did not exercise that --

A      I wouldn't have known who -- who -- I don't come out of an intelligence background.

Q      Sure.  And about what timeframe are we talking about?  What month and year are we talking here?

A      As I said, it would be after the hack and after the rules and bylaws platform, Republican platform.

Q      Give me an approximate timeframe.

A      So I'm guessing it was June.

Q      Of 2016?

A      2016.

Q      Okay.  So when was the first time you became aware that Fusion GPS had retained Chris Steele?

A      As the name Chris Steele?

Q      Right.

A      I think it was in early July, but it could have been late June.

Q      Again, 2016, correct?

A      All of this is 2016.

Q      Okay.  Thanks.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

And the first time you met Chris Steele, you said, was at the Perkins Coie law offices in Washington, D.C., when he came to your law office.   Is that correct?

A      Yep.

Q      And you said he came with a few folks that you identified were possibly Mr. Katan, Mr. Fritsch, and another lady?

A      Yeah.   A younger woman.   And I -- you know, I'd say she was in her twenties.

Q      Okay.

A      But I don't know.

Q      Fair enough.   And I'm sure -- but in the bookkeeping world of private practice, which I've never been a part of, so I'm just going to assume here, that your office has a record of who attended that meeting and the time and date of that meeting?

A      The time and date -- here -- it is possible we would have the time and date.

Q      Would you have the attendees?

A      Unlikely.

Q      So there is no record at Perkins Coie --

A      I don't know.   I think this is something counsel should take back.

Q      That's where I was getting.   Would you through your counsel take back for action whether or not there is any information that could show us who was at that meeting in the fall, late September, early October of 2016, at the Washington.

MS. RUEMMLER:   Yes, we will.

█████████   At your law office?

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

MS. RUEMMLER:   We will check and see if we have anything in the office.

█████████   Thanks.   And any information on that would be appreciated.

BY █████████

Q       So in late September, early October, you have representatives of Fusion GPS and Christopher Steele sitting in your law office.   Anyone else walk in and out of that meeting?

A       I don't think so.   No.   I mean --

Q       Okay.   And correct me if the following characterization is incorrect. You, Perkins Coie, were paid by the DNC and the Hillary Clinton campaign for your services in total somewhere around $5 million or $6 million?

A       If that's what the reports say.

Q       Okay.   And some of that money was then utilized for you to go about and conduct your business, which would involve retaining Fusion GPS?

A       A relatively small part would involve that, yes.

Q       What is your recollection of that number?

A       Well, if it was $5 million or $6 million in total, then, you know, I don't know what the -- what you would say is probably about a million dollars.

Q       A million dollars.   Okay.   And you knew of all these transactions involving money between your law firm and Fusion GPS, because you would have to have signed off on it?

A       Sure.   Yeah.

Q       So as you sit in late September, early October of 2016 in your law offices with representatives from Fusion GPS and Christopher Steele, you, the attorney for the DNC and Hillary campaign, knew you had paid those individuals approximately a million dollars at that point in time for services?

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

A       Well, most of what they were paid, though, didn't go to them.   It was just expenses.

Q       When you say "they" and "them" --

A       Any -- either Fusion or Christopher Steele.

Q       Right.   But I'm just saying you are aware -- I mean, you must be aware or agree with the fact that money went to them that you signed off on?

A       Yeah.

Q       So you knew that at the time of the meeting?

A       Yeah.

Q       Okay.   And my question to you is, were members of the Democratic National Committee or the Hillary campaign for America aware of that meeting before or after it took place in 2016 in your Washington, D.C., law office?

A       No.

Q       So you never informed anyone back at the DNC or HR -- or the Hillary for America that you had met with both Fusion GPS and Christopher Steele?

A       No.

Q       Did you ever -- or did they ever become aware that the individuals that you had retained, Fusion GPS and Christopher Steele, who would ultimately produce what's known as the dossier, were ever in your law offices?

A       No.

Q       Okay.   You said you did not have a sort of -- you did not have a hand in which media outlets Christopher Steele was sent to in the fall of 2016, but you're aware of it.   Is that correct?

A       Yeah.   I did not direct that, but I was aware of it.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

Q      You could have also told them not to do it?

MS. RUEMMLER:   I mean, it's a hypothetical question.

MR. ELIAS:   Hypothetically, yes.

███████████      Okay.   But you chose not to, right?   I mean, he did it.

MS. RUEMMLER:   I think, again, the communications between Mr. Elias and Fusion are, I think, covered by privilege, so I'd instruct him not to answer.   But if it's a hypothetical, I think he can answer.

███████████      Okay.   Fair enough.

Why did you not stop Mr. Steele from speaking to media in the fall of 2016 after he was in your Washington, D.C., law offices?

MS. RUEMMLER:   I think that assumes facts that haven't been established.

But you can answer the question the best you can.

MR. ELIAS:   I thought that the information that -- I thought that the information that he or they wished to convey was accurate and important.

Q      So the information that Fusion GPS and Christopher Steele wished to portray to the media in the fall of 2016 at that time, you thought, was accurate and important?

A      As I understand it.

Q      As you understood it.   Sitting here today, do you still consider that information that was relayed to the media in the fall of 2016 after the meeting in your law offices to be accurate and important?

A      Yes.

Q      Have you had the opportunity to verify it independently?

A      No.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

Q      So how do you know it's still accurate and important?

A      You asked me my opinion.

Q      Right.

A      That's my opinion.

Q      Okay.   But it hasn't changed?

A      It has not changed.

Q      Have you followed up with anyone at Fusion GPS or Chris Steele on that matter?

A      No.

Q      And would you say the information that became -- ultimately became the dossier that was published on BuzzFeed, are you familiar with that?

A      I skimmed it when it came out.

Q      Okay.   Was there any information that was accurately portrayed in that dossier that was relayed by Christopher Steele to the media in the fall of 2016?

A      I don't know what he actually conveyed to the media.   I mean, I was not present when he -- if he conveyed information to the media.

There were -- there was information in it that I was familiar with.   There was information in it that I was not familiar with.   Some of the information that was in it I think has actually proved true.   So, you know, my opinion that it was accurate and important, I think I was right.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

[5:05 p.m.]

BY ████████

Q      Okay.   When you say some of the information, give me a percentage.

A      I don't know.

Q      I mean, more than 50 percent, less than 50 percent?

A      That I thought was accurate and important?

Q      Yeah.

A      I don't know.   Of the whole dossier or of what I --

Q      Of what you have knowledge of.

A      It's hard to do that.

Q      Okay.

A      It's really hard to.   I mean --

Q      Would agree that there's parts of that dossier that remain unverified to this day?

A      I assume there are.

Q      Okay.

A      I mean, you would know -- you would know better than I what is verified and what is not, because you have a security clearance, we're sitting in a SCIF, and you have access to the intelligence.

Q      I understand that, but I'm asking what you knew based on your relationships since you were the individual who hired Fusion GPS, who then retained Christopher Steele on behalf of the DNC and the Hillary Clinton campaign for America in the fall of 2016 and they ended up in your law offices in the fall of

UNCLASSIFIED, COMMITTEE SENSITIVE

2016.   So I'm asking you, based upon your knowledge.

A        And I've told you based on my knowledge.

Q        Okay.   Were you aware that Fusion GPS had relationships with individuals in the Department of Justice?

A        No.

Q        Have you met with any individuals from the Department of Justice about the matters that we've talked about today?

A        No.   Well, I've -- not as a -- not as a witness.   As you probably --

Q        Yeah, I don't mean as a witness.   I don't want into get that.   I just mean have you met with any individuals --

A        Not me as a witness.

Q        Right.

A        But as a lawyer to others.   You know, as you know, as you probably know the Department reached out to various Democratic-related entities around the hack.

Q        Oh, okay.   So in your capacity as a lawyer for individuals such as the DNC, and possibly CrowdStrike, or anything like that?

MR. MCQUAID:   I think what Mr. Elias answered is that he has not met with individuals related to the -- as a witness has not met with the law enforcement.   To extent you're asking about his work as a lawyer, that would go into --

███████        Yeah, I'm not asking about that.

MR. ELIAS:   That's what I was --

███████        I'm not asking about that.

MR. ELIAS:   Not as a witness.

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

BY ███████████

Q      Fair enough.

And excluding as a witness, but just as a private citizen in your capacity, in your personal time, have you ever met with any individuals with the Department of Justice?

A      No, no, no, no, no.   I met with you all as a lawyer for a client.   So I'm trying to exclude --

Q      And my last questioning is just basically related to the DNC hack real quick.   Was it your decision that the DNC hire CrowdStrike?   Were you involved with that at all?

A      [Nonverbal response.]

Q      Do you know who took that for action over there?

MS. RUEMMLER:   If you know who hired CrowdStrike.   You can answer that if you know.

MR. ELIAS:   I believe Michael Sussmann, but I could be wrong.

MR. PATEL:   And then with Michael Sussmann, was he involved with any of the matters that we talked about today as they pertain to Fusion GPS, Christopher Steele, and the ultimate production of the material that was -- resulted from their work?

MS. RUEMMLER:   I think as stated that question calls for information that's protected under privilege, and I instruct you not to answer.

████████████   That's all I've got.

You guys have anything?

████████████   No.

We just appreciate your patience today, Mr. Elias.

UNCLASSIFIED, COMMITTEE SENSITIVE

PROPERTY OF THE UNITED STATES HOUSE OF REPRESENTATIVES

UNCLASSIFIED, COMMITTEE SENSITIVE

No further questions.

████████████    Thanks for coming in.

MR. ELIAS:  Thanks.   Thanks for having me.

[Whereupon, at 5:09 p.m., the interview was concluded.]