```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                         Criminal Action No.
 4                  Plaintiff,           1:21-cr-00582-CRC-1
                                         Wednesday, April 20, 2022
 5     vs.                               10:37 a.m.

 6     MICHAEL A. SUSSMANN,

 7                  Defendant.
       - - - - - - - - - - - - - - - x
 8
       _____
 9
                    TRANSCRIPT OF MOTION HEARING
10         HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                    UNITED STATES DISTRICT JUDGE
11     _____

12     APPEARANCES:

13     For the United States:     ANDREW DeFILIPPIS, ESQ.
                                  SPECIAL COUNSEL'S OFFICE
14                                145 N Street Northeast
                                  Washington, DC 20002
15                                (212) 637-2231
                                  andrew.defilippis@usdoj.gov
16

17     For the Defendant:         SEAN M. BERKOWITZ, ESQ.
                                  LATHAM & WATKINS LLP
18                                1271 Avenue of the Americas
                                  New York, NY 10020
19                                (212) 906-1200
                                  sean.berkowitz@lw.com
20

21     Court Reporter:           Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
22                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
23                                Washington, DC  20001
                                  (202) 354-3187
24

25
```

```
1                    P R O C E E D I N G S
2            THE COURTROOM DEPUTY:  We're here today for
3    criminal motion hearing in 21-582, *The United States of*
4    *America vs. Michael A. Sussmann.*
5            Beginning with counsel for the government, please
6    identify yourselves for the record.
7            MR. DeFILIPPIS:  Good morning, Your Honor; Andrew
8    DeFilippis for the government.  Also joining the conference
9    call are Assistant Special Counsels Brittain Shaw, Johnny
10   Algor, and Michael Keilty.
11           THE COURT:  Good morning, everybody.
12           MR. BERKOWITZ:  Good morning, Your Honor; Sean
13   Berkowitz, Michael Bosworth, Natalie Rao, and Catherine Yao
14   on behalf of Mr. Sussmann, who is present on the Zoom.
15           THE COURT:  All right.  Good morning.
16           Mr. Berkowitz, just to move things along a bit,
17   let me see if I can first sort of frame the issues and set
18   the goal post for what I understand, at least, are the
19   disputes here.
20           First of all, with respect to evidence regarding
21   the accuracy of the underlying data, as I read the
22   pleadings, the government does not intend to elicit evidence
23   about the accuracy of the data unless the defense puts it at
24   issue, which you've said you do not intend to do.
25           That said, the government does intend to introduce
```

 1    evidence in three areas:  one, the FBI's conclusion, which I

 2    understand is that the data Mr. Sussmann provided to the FBI

 3    did not support the underlying allegations; second, what

 4    investigative steps the agency took in general to reach that

 5    conclusion; and third, expert testimony by Agent Martin that

 6    explains some of the technical concepts in the white papers

 7    to the jury.

 8          So I guess my question is, have I framed that

 9    correctly?  And if so, what precisely is your objection to

10    the government offering evidence in those three categories

11    assuming you're not going to put the accuracy or

12    truthfulness of the underlying data at issue?

13          MR. BERKOWITZ:  Thank you, Judge.  I think you

14    generally framed the issue, although the devil, as it always

15    is, is in the details, and our concern coming out of the

16    filings is that it's not as clean as you suggest, and that

17    we would like it to be, in terms of where the goal posts

18    are.  Some of the filings that the government put in suggest

19    or implicate a broader suggestion as to what might come in

20    as well as some of the exhibits they introduced.

21          So let me take your framework --

22          THE COURT:  And we can get to the gathering of the

23    data later, but let's just talk about the accuracy and

24    truthfulness of the data.  Okay?

25          MR. BERKOWITZ:  So as to the accuracy of the

 1    underlying data, the government indicated that it did not

 2    intend to, in its case-in-chief, attack the accuracy of the

 3    data, and then there was the caveat that you noted, unless

 4    the defense, through cross-examination or otherwise, puts it

 5    in issue, and we don't understand exactly what that means.

 6          Let me say, we do not intend to offer evidence

 7    that there was a link, if you will, between Trump's servers

 8    and the Alfa-Bank.

 9          Having said that, we may very well, through cross-

10    examination or otherwise, put into evidence that

11    Mr. Sussmann would have reasonably believed the accuracy of

12    the data, and we would need to obviously lay a foundation

13    for that and tying it to him.  Does that then open the door

14    to have Special Agent Martin testify in its case-in-chief

15    that somebody with Mr. Sussmann's background or somebody

16    else could not have reasonably believed that?

17          We don't think that should be allowed, but we want

18    to know where those lines are, and if, in fact, that is

19    going to open the door, what is it would Special Agent

20    Martin say?  Because the only thing that we've seen in their

21    filing is that he would say a person with reasonable

22    knowledge about DNS data, you know, would not have believed

23    the conclusions, or something to that effect.

24          Let me give you the exact quote on that.  I think

25    what they had written on Page 21 of their motion, EC-70, is

1       that Martin would testify "that a person who had basic

2       technical familiarity with TOR (a vehicle for anonymized

3       internet traffic) would know that the paper's assertions

4       regarding Russian Bank's purported exclusive use of a TOR

5       exit node at Healthcare Company No. 1 were inaccurate and

6       lacked support."

7                 That type of thing is difficult for us, number

8       one, to understand how it would be relevant, but, number

9       two, how could we get an expert to refute that without more

10      details?  So that's one issue.

11                THE COURT:  Let's stop there, okay, before we get

12      to the three areas that the government says that it intends

13      to offer Agent Martin for in its case-in-chief.

14                MR. BERKOWITZ:  Yes.

15                THE COURT:  Mr. DeFilippis, if the defense

16      suggests through cross-examination that a reasonable person

17      in Mr. Sussmann's shoes or, you know, a person with his

18      background would have a reasonable belief in the accuracy of

19      the data regardless of whether it turned out to be accurate

20      or not, what do you intend to introduce or why would that

21      open the door to the actual accuracy of the data?

22                In other words, you know, is there something about

23      the data on its face that it's just so unbelievable that

24      there's no way that Mr. Sussmann could have reasonably

25      believed in its accuracy or other extrinsic evidence showing

1     that, you know, he knew it to be faulty?  Apart from that,

2     why do you need to get into the actual data through an

3     expert?

4              MR. DeFILIPPIS:  Your Honor, I think it would

5     depend highly on exactly how the line of cross went and how

6     this came out on the stand.  I do think it would be unfair

7     and prejudicial to the jury to allow arguments that would

8     imply or suggest the truth, so I think we have to

9     distinguish the truth of the allegation that there was a

10    secret channel of communications and whether the data itself

11    was in some case fabricated, cherry-picked, or

12    misrepresented.

13             Just --

14             THE COURT:  Okay.  On that first question,

15    Mr. Berkowitz, I don't hear you saying that you're going to

16    suggest that there was a secret communication channel

17    notwithstanding the FBI's filings.

18             MR. BERKOWITZ:  Correct.

19             THE COURT:  Okay.

20             MR. DeFILIPPIS:  And so, Your Honor, if the

21    defense's position -- and in terms of the government's

22    nonexpert testimony, as Your Honor correctly pointed out, we

23    intend to offer evidence of the steps the FBI took to look

24    into this allegation, the conclusions they reached, and the

25    basis for those conclusions.

1          Now, the government expects to take the position

2     at trial that on a human level, as to the truth or falsity

3     of the allegation of a secret channel, our position will be

4     that there was no such secret channel of communications, and

5     we will --

6          THE COURT:  Let's stop there.  And you know more

7     about this case than I do, but my understanding was that the

8     FBI concluded that the data provided, plus any other

9     evidence that it uncovered during its investigation, did not

10    support the existence of a secret communication channel.

11    That's slightly different than there was none or there was

12    one, right?  The evidence wasn't there to support a

13    conclusion for the continuation of the investigation.

14          Is that a fair read, and is that basically what

15    the witnesses are going to say?

16          MR. DeFILIPPIS:  Your Honor, I guess it's a bit

17    difficult to prove a negative definitively, but I think the

18    government's position, as former Special Counsel Mueller has

19    testified, is that by that time the government had concluded

20    it was not true; in other words, that there was not a secret

21    channel.  And I think there are FBI agents who would testify

22    that was their belief as well.

23          We do intend to call to the stand representatives

24    of one or both of the companies that used and maintained

25    this server, and I think it will become clear, through the

1    testimony of those witnesses, that those companies did not

2    establish a secret channel of communications with the Trump

3    organization and a Russian bank.

4           Now, all of that testimony, Your Honor, can come

5    in and would not contradict the defense's position without

6    getting into the question of was the data -- were the look-

7    ups represented on these thumb drives fabricated, cherry-

8    picked, modified.  We don't have to get into that to

9    simply -- and, Your Honor, the defense has made this case,

10   and it's their absolute right to do so, about materiality,

11   so the jury needs a complete picture, Your Honor, of the

12   decision trees and the investigative conclusions that the

13   FBI reached and faced, and the involvement of those

14   companies in the investigation is part of that.  The

15   testimony of those witnesses is part of that.

16          But if the defense is going to concede or not

17   dispute that there was no secret communications channel,

18   then in our case-in-chief we do not anticipate making this a

19   trial about the data.  It would be about the FBI's

20   investigation.

21          THE COURT:  I know the devil's in the details,

22   Mr. Berkowitz, but in terms of your need to go out and

23   retain, you know, a counter expert analyzing the data and

24   all of the stuff that's in the white paper, doesn't that

25   dispose of that issue?

1              MR. BERKOWITZ:  So if what I'm hearing is correct,

2       the government does not intend to offer expert testimony

3       about the existence or about the accuracy of the data or the

4       accuracy of the conclusions based on a cross-examination or

5       theory of defense that Mr. Sussmann himself had no reason to

6       doubt the accuracy.  If that is the case, on the expert

7       issue I think we will have comfort cabining, of course, the

8       DS data that we talked about last time and understanding the

9       extent of what it would say on that.  I think that does

10      satisfy.

11              I'm troubled at the next level of what

12      Mr. DeFilippis said, that the factual witnesses would be

13      getting into issues about the existence or nonexistence and

14      the underlying information that the FBI obtained after the

15      tip or information was provided by Mr. Sussmann.  That is

16      irrelevant.  It will create a trial within a trial, and it

17      was not what was charged.

18              This case is not about whether the information

19      that was provided was accurate, whether the conclusions

20      drawn from that were accurate or not.  And getting into

21      levels of detail about what multiple witnesses may or may

22      not have said when the FBI interviewed them will prejudice

23      the jury and will be literally -- we will then need to put

24      on other evidence related to those issues.

25              The FBI's conclusion ultimately was that the

1    allegations weren't substantiated.  Certainly, Judge, we

2    would not stop the government from doing -- coming up with

3    that conclusion as well as talking in general nature about

4    the investigative steps that they took.  What troubles us is

5    the government's implication or suggestion that what they

6    ultimately found -- what the FBI ultimately found in their

7    investigation about the accuracy or not of the data and the

8    conclusions goes to Mr. Sussmann's motive because they're

9    not tying what the FBI actually learned to what Mr. Sussmann

10   knew.

11            And in terms of materiality, the materiality issue

12   is what steps they would have taken based on the information

13   that Mr. Sussmann provided about his client or not.

14            Now, we don't stipulate that he made any

15   misrepresentations.  The issue on materiality is whether, if

16   they had known, quote, the truth, as the government purports

17   it to be, would they have taken different investigative

18   steps?  That's a whole different kettle of fish than the

19   underlying accuracy of the data.  And we've got dozens of

20   exhibits on the list, Judge, that go into FBI reports and

21   what everybody told them and all those issues.  You know, we

22   could be here all summer trying that case, and we do not

23   think that that is necessary or relevant in a false

24   statement case.

25            THE COURT:  Mr. DeFilippis, it seems that everyone

1    agrees, at least to some extent, that the effect that

2    Mr. Sussmann's alleged statements had on the trajectory of

3    the investigation is relevant to materiality, okay?  And so,

4    you know, if you put on agency representatives to talk

5    about, you know, how their investigation was affected by the

6    information that they received and what investigative steps

7    they took, who they interviewed, and how that would have

8    been different had they known allegedly that Mr. Sussmann

9    wasn't actually representing a client, why do you need

10   people from the companies who maintained the servers to talk

11   about what the FBI did or did not do?

12              MR. DeFILIPPIS:  Two reasons, Your Honor.

13              First, it's because the people at those companies

14   are the logical and, frankly, the only witnesses who are

15   most capable of explaining what this server was.  And now we

16   don't need to go into enormous detail on that, but that's an

17   important piece of --

18              THE COURT:  I thought Agent Martin is prepared to

19   testify about, you know, what these servers are, what DNS

20   data is, what, you know, an onion router is, and to provide

21   a jury with sufficient technical background to understand

22   the references and the terms and the discussion in the white

23   papers?

24              MR. DeFILIPPIS:  So what Agent Martin can testify

25   about is DNS servers and DNS data.  What he is not an expert

1    in -- and I don't think would be comfortable testifying

2    to -- is how a mass marketing email server functions and the

3    interactions between those companies in using and

4    maintaining that server.  He is not an expert in that sort

5    of area of private sector marketing server type to opine on

6    those matters.

7            The second reason, Your Honor, is that the FBI did

8    reach out to these companies, and if the jury is being asked

9    to look at the full decision tree that was before the FBI of

10   interviews they conducted, interviews they might have

11   conducted, further investigative steps they took or didn't

12   take -- and, again, we're not expecting extremely detailed

13   or lengthy testimony, but we do think that it is central and

14   highly probative for the jury at least to hear from these

15   companies and to understand, okay, what was this server that

16   the defendant made an allegation about, what did those

17   companies do in response to the FBI's inquiries, and how did

18   that or might that have played into the investigative steps

19   that the FBI could take had they been given the full picture

20   about what -- about these allegations, who the clients were,

21   and where it came from.

22           THE COURT:  None of those companies are acting in

23   reliance on whether Mr. Sussmann had a client or not.  The

24   FBI may be acting in reliance on that, and isn't that the

25   question of relevance here and materiality?

1          MR. DeFILIPPIS:  Yes, Your Honor, and it's the

2     FBI's reliance on that that matters and that could have

3     affected the way the FBI approached these companies,

4     followed up with them, didn't follow up with them.  All of

5     that -- and, again, not hours and hours of testimony on this

6     point, but all of that is relevant for the jury to get the

7     picture of the public sector and private sector steps that

8     the FBI took and could have taken.

9          And we do think, Your Honor, that the basic

10    testimony that there was no such secret channel is

11    necessary, number one, because it's factual.  It's true.

12    And the defense doesn't seem to dispute it.  But absent that

13    testimony, cross-examination implying or suggesting that

14    reliance on this data was reasonable without allowing the

15    government to counter that with at least the basic fact that

16    there was no such channel is going to leave the jury with a

17    prejudiced view that's prone towards the conspiracy theory

18    that this was, in fact, true.

19          And so we think, again --

20          THE COURT:  His reliance is unreasonable only if

21    there's something about the data on its face that would

22    indicate that to a person in his shoes regardless of what

23    all of the technical experts at the FBI later concluded,

24    right?

25          MR. DeFILIPPIS:  Your Honor, I think that would be

1    true if it were the data alone that the defendant presented

2    to the FBI, but one of the white papers acknowledges that

3    this was a spam advertising server at issue and tries to

4    explain that away.  In other words, even though Tech

5    Executive 1 had, you know, weeks earlier decided this was a

6    red herring because it was a spam marketing server, the

7    defendant then put that at issue when he gave the white

8    paper to the FBI acknowledging that but then trying to

9    explain it away.

10           And so those companies are in the mix, Your Honor,

11   of the allegation, but more importantly of the

12   misrepresentation.

13           THE COURT:  Brief response, Mr. Berkowitz.

14           MR. BERKOWITZ:  Yes, so a couple of interesting

15   things there because Mr. DeFilippis's argument is internally

16   inconsistent in positing that he needs to have the people

17   from the servers themselves testify to the accuracy of

18   whether there was a link.

19           You said, "Well, why can't the FBI or Special

20   Agent Martin do this?"

21           "Well, because they don't have the expertise to

22   talk about that."

23           Well, Mr. Sussmann certainly does not have that

24   expertise, and we're then looping back into what, on its

25   face, is or is not relevant.

1          Let me give you -- Judge, this is the data, right?

2    There are over 10,000 pages in just one exhibit of this.  In

3    looking at it on its face, nobody's going to testify that

4    this data is or is not accurate or supporting the

5    conclusions, and certainly someone in Mr. Sussmann's

6    position would not.

7          I think that we are getting into a dangerous game

8    of offering links and details about what the FBI -- people

9    testifying about what they told the FBI, what steps they

10   took.

11         If the FBI wants to testify about the general

12   steps they took and the general steps they wouldn't have

13   taken and the reasons why, we can cross-examine them on

14   that, but we're going far afield.

15         And the concept or suggestion that we are not

16   contesting the conclusion that there was no link is not

17   necessarily accurate.  We're saying it was not

18   substantiated.  We don't intend to have a trial on whether

19   it was or was not accurate, but finding something not

20   substantiated is far different than saying that it's false

21   or incorrect.

22         And we don't want to get into that game.  We don't

23   think that it's relevant.

24         Mr. Sussmann is charged with lying about whether

25   he had a client or not when he presented information to the

1    FBI and the FBI's reliance on that data and what they did.

2    Let the FBI talk in general natures about what they did and

3    that it was not substantiated.

4         Getting into the ultimate accuracy or not, again,

5    Mr. DeFilippis seems to suggest that that's exactly what

6    they want to do through these witnesses and the conclusions

7    that were drawn, resolving itself to the CIA issue, which is

8    a separate one from what we're talking about.  But I think

9    we need to draw some line that ties back to Mr. Sussmann and

10   the relevance here.

11        THE COURT:  Well, how is the government supposed

12   to rebut your argument that Mr. Sussmann reasonably relied

13   on the data without making an argument or eliciting

14   testimony that the data is such that no one in his shoes

15   could possibly or reasonably have relied on?

16        MR. BERKOWITZ:  Well, they could do it by

17   suggesting that somebody told him that it wasn't accurate,

18   Your Honor.  They could suggest that on its face, that the

19   data is so unbelievable that a reasonable person without the

20   technical DNS expertise would have known that.

21        Again, they're looking to go to motive as to why

22   or why not he might have said something, and I think that if

23   you're talking about motive, you need to get some level of

24   direct evidence that would tie to this.

25        And by the way, Judge, in order for us to prove it

1    up, you know, we're going to need to do that as well.  You

2    know, making the implication or inferential issues presents

3    its own challenges.

4              THE COURT:  Okay.  Putting aside the conclusion

5    and the investigative depths, any objections to the general

6    background on the technology involved that the government

7    has proffered that Agent Martin will testify to, the bullet

8    points on Page 3 of the government's opposition to your

9    expert motion?

10             MR. BERKOWITZ:  What I would say is that they

11   provided -- so the first bullet point, I would say no.

12             The second bullet point, I would say no.

13             The third bullet point of how private companies

14   and entities gain access, if it's generalized, I would say

15   no.

16             The next three bullet points start getting into, I

17   think, some potential issues such as a description of the

18   types of conclusions that can be drawn about that and the

19   origin and sources of the data.  And I think that the

20   government provided in their exhibits a PowerPoint, Judge,

21   Exhibit 1700, that we need to go through in some detail to

22   look at the proper scope.

23             So we're not suggesting -- we're not stipulating

24   that Agent Martin, you know, who was a police officer on the

25   street ten years ago, is necessarily qualified to talk about

1    all of this, but that can be handled through cross-

2    examination.  We are not contesting that he should be

3    allowed to testify in a general nature about this stuff so

4    the jury has some sense as to what these lines of data could

5    mean.

6              THE COURT:  So we'll issue something that gives

7    some general, you know, guideposts for what we will allow

8    and what we will not allow.  Obviously much of this will

9    have to wait until trial or voir dire of Agent Martin on his

10   background and qualifications.

11             All right.  Anything else on the accuracy/

12   truthfulness before we move to the gathering of the data?

13             MR. BERKOWITZ:  So, Judge, yes, I would say that

14   the -- another major item or issue relates to the CIA

15   witnesses and memos related to the accuracy of the data and

16   the conclusions of the data because that's even a separate

17   issue from the FBI.  And I can give you some parameters on

18   that, unless you want to start with questions.

19             THE COURT:  No, go ahead.

20             MR. BERKOWITZ:  Okay.  We don't understand why the

21   CIA's analysis of the data and conclusions drawn from the

22   data are at all relevant.  They were apparently authored by

23   an individual that the Special Counsel no longer has on

24   their witness list, and so we don't know, as an initial

25   matter, whether they even intend to introduce the evidence.

1    Regardless of that, the evidence and argument are not

2    relevant.

3            First, the Court -- with respect to the data, they

4    suggest in their motion that the provider data was not

5    technically plausible, did not withstand technical scrutiny,

6    contained gaps, conflicted with itself, and was user-created

7    and not machine- or tool-generated.

8            Let me be really clear.  The CIA's conclusion was

9    not, as their brief could be read to suggest, that the data

10   was fabricated by individuals.  Rather, it was merely that

11   comma-separated values, or CSVs, were used or assembled and

12   not machine-generated; so the author of the report writes

13   "column headings are missing," "date and time values are not

14   formatted," and "detailed YotaPhone information is missing."

15   So we don't even know whether this person would talk about

16   YotaPhones, which we otherwise have objected to, or the FBI

17   data.

18           And what the CIA may have concluded, which is

19   inconsistent with what the FBI concluded, you know, months

20   later, truly is irrelevant.  So it's on two different

21   levels.

22           Number one, the YotaPhone accuracy or inaccuracy

23   shouldn't come in at all, and the FBI accuracy of data or

24   conclusions, what they may have concluded in February,

25   again, has no relevance whatsoever to this.  The CIA

1    meeting, to the extent that it's relevant at all, is

2    relevant in terms of him restating the comment about his

3    client or not client.

4           So let me stop there.  I'm happy to answer other

5    questions.

6           THE COURT:  One clarification question.  Is the

7    data that was provided to the FBI the same that was later

8    provided to the CIA, or are there different data sets

9    involved?

10          MR. BERKOWITZ:  If you think of a Venn diagram,

11   there's an overlap, Judge, with respect to the DNS data and

12   the white papers, but there's also entirely separate

13   information that would have been provided related to

14   YotaPhone and other issues.  So does that clarify?

15          THE COURT:  Yes.

16          Mr. DeFilippis, response to that?

17          MR. DeFILIPPIS:  Yes, Your Honor.  So on the

18   Agency 2 conclusion, I think the bottom line from the

19   government is, if the government is permitted to put on

20   witnesses from Listrak and Sendyne, the two companies at

21   issue, the CIA meeting and the conclusions the CIA reached

22   are undoubtedly relevant.

23          However, if the government is permitted to advance

24   the basic conclusion that this was not a true allegation and

25   support it with testimony from those companies, I think we

1    could limit the testimony from Agency 2 simply to elicit

2    that they concluded, like the FBI, that this was not a true

3    allegation.  In fact, Your Honor, they passed that

4    conclusion back to the FBI in February of 2017, so it is

5    relevant in the long arc of the FBI's investigation.

6         But, Your Honor, we recognize that Your Honor or

7    the defense might have concerns about the allegation in the

8    CIA paper, so if we are permitted to admit the testimony I

9    described before, I think we can describe the Agency 2

10   conclusions at a broad level.

11        I would say, just in response to Mr. Berkowitz,

12   that having spoken with the author of that paper, I think it

13   is that person's view that the data was created by the

14   users.  It was that it was actually created by them.  I want

15   to emphasize, we are not endorsing that conclusion.  We have

16   not reached that conclusion.

17        But, Your Honor, I think the appropriate balance

18   would be, again, this distinction between the truth of the

19   allegation versus the truth or accuracy of the data.  And if

20   the government is permitted to submit the limited testimony

21   I've described about the fact that the allegation was false,

22   including through those two companies, we will keep the

23   testimony from Agency 2 to a broad level.

24        MR. BERKOWITZ:  I can respond, if you want, Judge.

25   I just -- I don't want to --

1          THE COURT:  Go ahead.

2          MR. BERKOWITZ:  Okay.  This is not some trade-off;

3     if we're allowed to get X, we won't do Y.

4          They have said -- since initially saying, in

5     response to your pointed question on materiality, "we do not

6     intend to get into the accuracy of the data," everything

7     he's said since then on this call suggests that's exactly

8     what they want to do, whether it's through Listrak or

9     Sendyne or the CIA, who Mr. DeFilippis has apparently spoken

10    to but is not even on their witness list.

11         This is not some "we may do this, we may do that."

12    This is about my client's right to be tried on what is

13    relevant in the case, and we don't think that any of that

14    issue, other than what the FBI's general conclusion was and

15    what investigative steps they took, should come into

16    evidence because it literally will create a much more

17    detailed trial within this trial, and that's not what the

18    rules of evidence are designed to do.

19         THE COURT:  Let's move to the gathering issue,

20    and, again, let me try to set the stage first.

21         Mr. Berkowitz, you seemed to acknowledge that, you

22    know, some general background on who gave Mr. Sussmann the

23    data, what it is, where it came from, and under what general

24    circumstances it was obtained is necessary and appropriate

25    to give the jury some context as to the allegations and why

1    we're here.

2            As I read it, the government also wants to

3    introduce evidence showing that Mr. Joffe and these

4    researchers assembled the data in an improper manner.  They

5    say that that's relevant to Mr. Sussmann's motive to

6    allegedly lie in order to conceal that improper collection

7    as well as potentially to the nature of any attorney-client

8    relationship that he had with Mr. Joffe.

9            You seem to agree that that evidence might be

10   relevant at least to motive.

11           If there was evidence suggesting that Mr. Sussmann

12   was involved in the collection of the data, and you say that

13   there is no such evidence, the government has indicated --

14   well, let me stop there.  Is that a fair framing of the

15   issue at this point?

16           MR. BERKOWITZ:  Yes, Your Honor, with the caveat

17   that, you know, we understand why they might think it would

18   be relevant if he were involved or had knowledge that the

19   information that was collected was somehow misleading.

20           THE COURT:  Right.

21           MR. BERKOWITZ:  Correct.

22           THE COURT:  Or was gathered in an improper or

23   illegal manner, correct?  That would be something that he

24   might want to conceal.

25           MR. BERKOWITZ:  Understood, Your Honor.  I don't

1    know that we would necessarily agree to that, but I

2    understand that that could be a fair argument that somebody

3    might make.

4         And I don't think we believe that's actually what

5    happened, but I also know that Mr. Dagon's material might

6    suggest that that could be something they would offer about

7    whether the DNS data was gathered properly.

8         THE COURT:  So the nub of this dispute is whether

9    the government has proffered sufficient evidence to support

10   an inference by the jury that Mr. Sussmann was involved in

11   the collection of the data and was knowledgeable enough

12   about how it was collected and the circumstances surrounding

13   it or a reasonable juror could conclude that that was

14   something that he would want to conceal.  Is that the heart

15   of the dispute?

16        And you say there is no evidence.  The government

17   has suggested a few pieces of evidence that could give rise

18   to such an inference.

19        MR. BERKOWITZ:  So, yes, and this is an issue that

20   is the subject of extensive briefing, and, you know, we were

21   contemplating, you know, moving from the accuracy of the

22   data to this issue.  We would be comfortable talking about

23   that in more detail on the 27th, Judge.

24        THE COURT:  Do you want to defer that until next

25   week?

1              MR. BERKOWITZ:  I think so.  Let me just say this

2      in answer to your question, Judge.

3              There are dozens of communications and emails

4      between the data scientists about this data that

5      Mr. Sussmann is not on, and that kind of core of that

6      information we don't think should come in or is relevant to

7      come in.  And I'm happy to get into more detail about that,

8      but there's obviously things related to joint venture and

9      conspiracy and other stuff that is the subject of extensive

10     briefing.

11             If you're prepared, we can certainly talk about

12     it, but the reason we expedited this was our concern on

13     experts and what was coming in on the accuracy of the data

14     with those issues.

15             THE COURT:  Well, I'll tell you what.  I don't

16     want to get into joint venture and all of that email

17     correspondence that Mr. Sussmann is not involved in, but the

18     government has proffered a couple of pieces of evidence,

19     including discussions with Researcher 2 regarding whether

20     the collection was legal or not, billing records indicating

21     that he may have had a hand in drafting at least one of the

22     white papers, and emails suggesting that he knew it was a

23     private collection effort as opposed to a government

24     collection effort.

25             I guess the bottom line question is, why aren't

1    those pieces of evidence sufficient to give rise to the kind

2    of inference that the government wants to draw?

3           MR. BERKOWITZ:  So related to whether the

4    information was collected appropriately, separate and apart

5    from the accuracy of what the information was --

6           THE COURT:  Yes.

7           MR. BERKOWITZ:  -- I think that we would --

8    depending on what the actual evidence that they would

9    proffer is, I think that we would deal with that on cross-

10   examination, if they were to put that in.  But that's much

11   different than whether the data were manipulated or

12   incorrect or presented in a misleading way, right?

13          THE COURT:  That issue raises the 403 concerns

14   that you've raised.

15          MR. BERKOWITZ:  Correct.

16          THE COURT:  All right.

17          Briefly, Mr. DeFilippis.  And we can pick this up

18   again next week, if necessary.

19          MR. DeFILIPPIS:  Yes, Your Honor.  And I just want

20   to be clear, very briefly, that the government's primary

21   theory per the admission of evidence about the gathering of

22   the data is not the motive argument we laid out.

23          We certainly believe that's relevant.  But the

24   reason the gathering of the data is relevant, and just very

25   briefly, is that those are the very streams that

1    corroborate, substantiate, and allow the government to prove

2    which clients were involved in the defendant's meeting with

3    the FBI.

4            So the three white papers that the defendant

5    submitted to the FBI, without the jury having the context

6    for how those originated, were created and were assembled,

7    they will not be able to effectively evaluate that

8    conclusion.  And those three papers, when you have the full

9    context, establish that the three -- it's a trifecta of the

10   involvement of the defendant's client.  So you have one

11   paper by the investigative firm that was hired by the

12   Clinton Campaign; you have another paper drafted by Tech

13   Executive 1 and Mr. Sussmann as a result of a whole number

14   of tasking that Tech Executive 1 issued and carried out at

15   the university with Researcher 2, with Researcher 1; and you

16   have a paper by Researcher 2 who was involved in these

17   efforts.

18           Now, the way the government intends to prove,

19   absent insight into privileged information, is that -- the

20   way the government intends to prove these client

21   relationships is precisely through those facts, of how did

22   these data streams and substantive allegations arise, who

23   assembled them, how did they get to the defendant.  So at

24   the end of the day, that is what will allow the jury to

25   evaluate who the client was.

 1          And so that is our primary theory, Your Honor.

 2     The motive is certainly there, but I think the main thrust

 3     of the government's proof at trial will be that

 4     Mr. Sussmann's two clients -- the Clinton Campaign and Tech

 5     Executive 1 -- were integrally involved in the assembling of

 6     those three white papers and the underlying data.

 7          THE COURT:  Fair enough.  But you have other

 8     evidence of the attorney-client relationships, correct?  You

 9     have billing records.  You have testimony from the client

10     organizations potentially.  Why do you need data about the

11     gathering of the data to establish that there were attorney-

12     client relationships?  Isn't that duplicative?

13          And I'm just thinking about 403 issues.

14          MR. DeFILIPPIS:  No, Your Honor, we don't think

15     it's at all duplicative, and the reason for that is that the

16     billing records and email headers on their own are quite

17     unrevealing in a sense, number one, that the defendant was

18     very sparse in general in his billing entries, and, number

19     two, there's only so much you can tell from an email header,

20     which the defense also is seeking to oppose admission of.

21          If left to just the header communications and the

22     billing records, Your Honor, the jury would not have

23     anything near the full context of how this meeting arose or

24     how the papers and the data originated.  And none of that,

25     Your Honor, is more prejudicial than probative in the sense

1    that it is the very process by which those papers were

2    created.

3         The jury is fully entitled to know, Your Honor,

4    that this project originated with Tech Executive 1.  It was

5    carried out with the help of agents at the Clinton Campaign,

6    and there were meetings with Campaign Lawyer 1 and the

7    defendant in which Tech Executive 1 was encouraged to create

8    an inference and a narrative tying the presidential

9    candidate to Russia through data.

10        And so, Your Honor, I think, without all that

11   context, the jury will be left with a very sparse and unfair

12   understanding of the background for this.

13        THE COURT:  Briefly, Mr. Berkowitz.

14        MR. BERKOWITZ:  Yes.  So there were three white

15   papers, Your Honor, which you asked, and I don't know if

16   you've made your way through all of them.  The first two

17   white papers, I don't think there's any suggestion that

18   there was anybody other than the data scientists that were

19   involved in those, and there's evidence that Mr. Sussmann

20   revealed --

21        THE COURT:  Let's stop there.  I've got to say

22   that the findings prefaced don't sound like something that a

23   data scientist would have written.

24        MR. BERKOWITZ:  Understood, Your Honor, but that

25   doesn't go to the collection of the gathering of the data --

1          THE COURT:  Understood.

2          MR. BERKOWITZ:  -- which is what we're chatting

3    about.  In the collection and gathering of the data, you

4    don't need to know whether that data was collected in

5    violation of any contract or not to prove up what

6    Mr. DeFilippis has suggested.

7          He then apparently takes White Paper 3, which is

8    the equivalent of a Wikipedia search of Alfa-Bank, to

9    somehow tie into this broad conspiracy that the Clinton

10   Campaign was involved in all of this, and that's where we

11   get into 403 issues.

12         The information about the background of Alfa-Bank

13   that was prepared by Fusion doesn't necessarily tie in or

14   suggest, in the way that Mr. DeFilippis suggests, that he

15   was there on behalf of the Clinton Campaign.  There are

16   people from the Clinton Campaign that one could call to ask

17   that question.  There are billing records that one could

18   call.

19         It's starting to get into a far-afield issue of

20   whether this was also something that -- you know, all of the

21   other work that Fusion did somehow comes in, and the

22   connections with the campaign were on Square 4 into the 403

23   issues.

24         THE COURT:  All right.  We may defer some of this

25   until next week.

```
 1                    MR. BERKOWITZ:  Understood.

 2                    THE COURT:  Why don't we leave it at that for now,

 3          and we will try to get something out on the parameters of

 4          the data accuracy issue just to keep the ball moving, okay?

 5                    MR. BERKOWITZ:  We very much appreciate your

 6          accommodation, Your Honor.

 7                    THE COURT:  All right.  We also have these

 8          privilege challenges or your motion to compel,

 9          Mr. DeFilippis.  I see we've had a number of intervenors

10          seek to file pleadings.  You need to respond -- you need to

11          reply, I suppose, right?

12                    MR. DeFILIPPIS:  Yes, Your Honor.  I believe our

13          due date is Monday.

14                    THE COURT:  Your due date is Monday, okay.  And we

15          have not set a hearing for that, which we need to do, I

16          suppose.

17                    MR. DeFILIPPIS:  Sure, Your Honor.  The

18          government's available whenever Your Honor would like.

19                    THE COURT:  Okay.  There will be quite a cast so

20          we may need to figure out a way to streamline that.  I don't

21          know if there are overlapping arguments and whether the

22          privilege holders can coordinate some sort of way, but we'll

23          deal with that.

24                    All right.  Anything else, Mr. Berkowitz?

25                    MR. BERKOWITZ:  Your Honor, we intend, just so you
```

1    know and are not taken by surprise, to put in a very short

2    reply on some of the motion in limine issues on Friday so

3    that you'll have it in advance of the hearing.

4           We're looking forward to seeing you in person for

5    the first time in a while next week.

6           THE COURT:  I'm looking forward to it as well.

7    Travel safely, and we'll see you next week.

8           MR. BERKOWITZ:  Thank you so much.

9           MR. DeFILIPPIS:  Thank you, Your Honor.

10           (Whereupon the hearing was

11            concluded at 11:21 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL COURT REPORTER

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

**NOTE:**  This hearing was held remotely by Zoom or some other virtual platform and is subject to the technological limitations of court reporting remotely.

Dated this 20th day of April, 2022.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001