**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Case No. 21-582 (CRC)** |
| | : | |
| **MICHAEL A. SUSSMANN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S REPLY TO THE DEFENDANT'S AND NON-PARTY
INTERVENORS' FILINGS CONCERNING THE GOVERNMENT'S MOTION TO
COMPEL THE PRODUCTION OF PURPORTED PRIVILEGED COMMUNICATIONS
FOR *IN CAMERA* INSPECTION**

The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully provides herein its reply to the oppositions and other filings made by defendant, Michael Sussmann (the "defendant"), Perkins Coie LLP ("Perkins Coie"), Hillary for America, Inc. ("HFA"), the Democratic National Committee ("DNC"), Fusion GPS, and the individual referred to in the Indictment and herein as "Tech Executive-1."  As set forth in further detail below, none of the arguments or facts contained in these parties' filings and accompanying affidavits undermine the Government's limited request that the Court review 38 relevant documents *in camera* to determine if they are being properly withheld from the Government's trial evidence based on the attorney-client privilege and attorney work product protections.  Indeed, the purported privilege holders who have intervened do so in a case in which the defendant is alleged to have

1

denied representing *any client* when he brought the Russian Bank-1 allegations to the FBI. [1]  And these parties are advancing a highly novel, and seemingly broad, theory of attorney-client privilege, namely, that Fusion GPS's political opposition research – which triggered a sizeable outflow of unverified derogatory information into the media, the government, and the public – was, in reality, confidential expert work intended to support legal advice regarding libel and defamation.  Even more novel, the purported privilege holders here contend that they all maintained a common legal interest in that work, despite the fact that the group includes Tech Executive-1, with whom none of other purported privilege holders had any formal or informal legal relationship.  Accordingly, and as set forth in further detail below, the Court should reject the parties' efforts to prevent limited judicial review of their privilege determinations, particularly where those determinations have a direct and unavoidable bearing on upcoming trial testimony.

## I.  The Government's Motion is Timely

As an initial matter, the defendant and others accuse the Government of carrying out an untimely "full frontal assault" on the attorney client privilege by raising these issues more than a month before trial.  (Def. Opp. at 1.)  But those characterizations distort reality.  Indeed, the opposite is true: the primary reason the Government waited until recently to bring these issues to the Court's attention was because it wanted to carefully pursue and exhaust all collaborative avenues of resolving these matters short of litigation.  The Government did so *to avoid* bringing a challenge to the parties' privilege determinations and to ensure that it first gathered all relevant facts and

---

[1] The Government acknowledges – and indeed, the Indictment alleges – that the defendant maintained attorney-client relationships with the Clinton Campaign and Tech Executive-1.  At issue here, however, is the proper *scope* of the attorney-client privilege and attorney work product protections being asserted by those clients.

provided the relevant privilege holders with notice and an opportunity to explain the bases for their privilege assertions.  Even the emails between the Government and counsel that the defendant quotes in his opposition reflect this very purpose.  *See., e.g.,* Def. Opp. at 7 (quoting emails in which the Special Counsel's Office stated that it "wanted to give all parties involved the opportunity to weigh in before we. . . seek relief from the Court" and requested a call "to avoid filing motions with the Court.").

In addition, over the course of months, and until recently, the Government has been receiving voluminous rolling productions of documents and privilege logs from numerous parties. The Government carefully analyzed such productions in order assess and re-assess the potential legal theories that might support the parties' various privilege assertions.  In connection with that process, the Special Counsel's Office reached out to each of those parties' counsel numerous times, directing their attention to specific documents where possible and communicating over email and phone in an effort to obtain non-privileged explanations for the relevant privilege determinations.[2] The Government also supplied multiple counsel with relevant caselaw and pointed them to documents and information in the public domain that it believed bore on these issues.  The Government was transparent at every step of these discussions in stating that it was contemplating seeking the Court's intervention and guidance.  Unfortunately, despite the Government's best efforts and numerous phone calls, it was not able to obtain meaningful, substantive explanations to support these continuing broad assertions of privilege and/or work product protections.

---

[2] In response to these inquiries and discussions, Tech Executive-1's counsel withdrew his client's privilege assertions over a small number of documents, and Fusion GPS produced a redacted version of its retention agreement with Perkins Coie.

It was only recently, when the Government determined it would need to call an employee of Fusion GPS as a trial witness (the "Fusion Witness"), that the Government concluded these issues could not be resolved without the Court's attention.  Because all or nearly all of the Fusion Witness's expected testimony on these matters concern work carried out under an arrangement that the privilege holders now contend was established for the purpose of providing legal advice, it is essential to resolve the parties' potential disputes about the appropriate bounds of such testimony (and the redaction or withholding of related documents).

Critically, the Government here is only seeking *in camera* review of a relatively small quantity of documents.  Moreover, it has not taken any final position concerning whether those documents are, in fact, properly subject to privilege and attorney work product assertions.  Contrary to the defendant's assertion, courts routinely entertain post-indictment motions to compel the production of grand jury subpoenaed documents previously withheld on attorney-client privilege grounds.  *See e.g., United States v. Singhal*, 842 F. Supp. 2d 1 (D.D.C. 2011) (following defendant's indictment, court granted government's motion to compel the production of certain subpoenaed documents that had previously been withheld on attorney-client privilege grounds); *United States v. Spinosa*, 21 CR 206, 2021 WL 2644936 (S.D.N.Y. June 28, 2021) (granting the government's post-indictment motion for an in camera review of grand jury subpoenaed documents previously withheld on attorney-client privilege grounds);  *United States v. Ceglia*, 12-CR-876, 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015) (court conducted a post-indictment in camera review of certain grand jury subpoenaed documents withheld on attorney-client privilege grounds.)

Accordingly, the Government respectfully submits that far from carrying out an "ambush" or a "frontal assault," it has proceeded here reasonably and with appropriate caution.

4

## II.   The Parties' Privilege and Work Product Assertions Warrant *In Camera* Review

The parties' recent submissions underscore, rather than allay, the Government's concerns about the broad scope of the privilege assertions being made here. Perhaps recognizing that only a small quantity of the communications at issue involve an attorney, Fusion GPS and the other parties now rely primarily on the theory that the communications are attorney work product, rather than core attorney-client *privileged* materials.  *See, e.g.*, Fusion GPS Opp. at 8 – 11.   But in order for work product protections to apply, the records at issue must specifically relate to, and support, the provision of confidential legal advice in anticipation of litigation.  Indeed, the question is "'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation.'" *Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 586 n. 42 (D.C. Cir.1987) (quoting 8 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2024 at 198 (1970) (emphasis added)). As explained further below, no such showing has been made here.  Moreover, even if such a showing had been made, the Government has also met its factual burden of demonstrating the need to obtain discovery of work product-protected materials.  Accordingly, *in camera* review is warranted.

### A.  Fusion GPS's Work Was Primarily Opposition Research, Not Support to Legal Advice

*First*, the factual record overwhelmingly reflects that Fusion GPS's primary function was to collect and disseminate derogatory information into the public sphere, not to provide private "expertise" in support of legal advice.  Although former HFA General Counsel Marc Elias states in his affidavit filed with this Court that "Fusion's role was to provide consulting services in support of . . . legal advice . . . related to defamation, libel and similar laws," and that "Fusion's work was

incorporated and *distilled into my judgments* about legal issues" (Dkt. 866-4, Elias Aff. at 4) (emphasis added), the factual record and Fusion GPS's own communications raise serious questions about this depiction.

As an initial matter, if Fusion GPS's work product was, in fact, intended primarily to support "legal advice" about how to *avoid* liability for "defamation, libel, and similar laws," one would expect contemporaneous emails and documents to reflect that Fusion GPS and/or its clients exercised some degree of caution and care before publicizing unverified or potentially inflammatory materials. Moreover, if rendering such advice was truly the intended purpose of Fusion GPS's retention, one would also expect the investigative firm to seek permission and/or guidance from HFA or its counsel *before* sharing such derogatory materials with the media or otherwise placing them into the public domain. In other words, if the purpose of Fusion GPS's retention was – as Mr. Elias implies – to determine the bounds of what could (and could not) be said publicly without committing libel or defamation, then the record would reflect genuine efforts to remain within those bounds. And it would also reflect efforts to do so confidentially.

But the facts and documents available to the Government to tell a different story. Indeed, the documents produced by Fusion GPS to date reflect *hundreds* of emails in which Fusion GPS employees shared raw, unverified, and uncorroborated information – including their own draft research and work product – with reporters. And they appear to have done so as part of a (largely successful) effort to trigger negative news stories about one the Presidential candidates. For example, and as reflected in the attached Exhibit A[3]:

---

[3] The Government is filing Exhibit A under seal due personally-identifiable information contained within the referenced emails. The Government will file a redacted version of Exhibit A on the public docket if the Court so orders.

- On May 14, 2016, a Fusion GPS employee emailed a Slate reporter who would publish an article about the Russian Bank-1 allegations several months later.  In the exchange and subsequent emails, the employee shared portions of research that Fusion GPS was conducting regarding a Trump advisor ("Trump Advisor-1").  The employee and one of Fusion GPS's co-founders subsequently exchanged additional emails with the reporter in which they conveyed information Fusion GPS had gathered regarding, among other things, Trump Advisor-1, Russian Bank-1, and a purported board member of Russian Bank-1 who later would appear in the Fusion GPS white paper that the defendant provided to the FBI.  Ex. A at 1-3.

- On July 26, 2016, the same Fusion GPS co-founder emailed a Wall Street Journal reporter and conveyed certain allegations regarding Trump Advisor-1, which Fusion GPS recently had obtained from the author of the now-famous "dossier" concerning Trump (whom Fusion GPS had hired in approximately May 2016).  In the email, the Fusion GPS co-founder stated, in part, "Well this thing is only gonna get bigger.  You know the Russians aren't done dumping.  OTR [Off the record] the easy scoop **waiting for confirmation**: that dude [Trump Advisor-1] met with Igor Sechin when he went to Moscow earlier this month. [] Needless to say, a Trump advisor meeting with a former KGB official close to Putin. . . would be huge news."  *Id.* at 7 (emphasis added).

- In a subsequent email on the same date, the Fusion GPS co-founder urged the reporter to "call [a named U.S. Representative] or [a named U.S. Senator]," stating, "I bet they are concerned about what [Trump Advisor-1] was doing other than giving a speech over 3 days in Moscow."  *Id.*

- On July 29, 2016, another reporter – to whom the Fusion GPS co-founder had also passed the aforementioned information regarding Trump Advisor-1 – wrote to another Fusion GPS

co-founder: "That [Trump Advisor-1] met with Sechin or Ivanov. 'Its bullshit. Impossible,' said one of our Moscow sources."  In an email to the reporter later that day, the co-founder wrote: "No worries, I don't expect lots of people to believe it. It is, indeed, hard to believe."  *Id.* at 16.

- On July 31, 2016, a reporter emailed the same co-founder of Fusion GPS and asked him, in part, "you guys have any of the underlying docs for [Trump Advisor-1] companies in Oklahoma and elsewhere?  ". . . you linked to company called [company name].  Checked those registration forms but did not see [Trump Advisor-1] listed.  Any further thoughts on [Trump Advisor-1] investments?"  Thereafter, the Fusion GPS co-founder responded with the name of the aforementioned board member of Russian Bank-1.  *Id.* at 17.

- On July 27, 2016, an ABC News reporter emailed one of the Fusion GPS co-founders concerning an individual who was then President of the Russian-American Chamber of Commerce ("Chamber President-1"), stating, in part, "making arrangements to interview [Chamber President-1].  We should chat."  *Id.* at 14.

- On July 28, 2016, a Fusion GPS employee emailed the same ABC News reporter, copying the Fusion GPS co-founder, and attached a "comprehensive report" regarding Chamber President-1.  The report appears to contain information gathered from public sources and/or commercial databases.  *Id.* at 15.

- On September 8, 2017, a Fusion GPS employee emailed a Washington Post reporter attaching a document prepared by another Fusion GPS employee: "doc one of our associates wrote. i believe [another Washington Post reporter] has a copy we believe but can't prove that [abbreviation for Trump Advisor-1] and this guy et al. have some profit sharing arrangement out there somewhere my guess would be cyprus or BVI or cayman."  *Id.* at 22.

8

- On September 27, 2016, a New York Times reporter who would later publish an article regarding the Russian Bank-1 allegations emailed one of the aforementioned co-founders of Fusion GPS, asking if Chamber President-1 had an email address associated with Russian Bank-1. *Id.* at 35.

- On the same date, the Fusion GPS co-founder replied to the reporter, stating in part, "see below from ip-tracker.org from three weeks ago."  The email then stated that Chamber President-1 "was using an IP address registered in Moscow," and noted that a telecom company under the same parent company as Russian Bank-1 "was its internet service provider."  The email then included additional screenshots, links, and other internet-related information pertaining to Chamber President-1 that Fusion GPS had apparently gathered.  *Id.* at 34.

- On October 5, 2016, one of the aforementioned Fusion GPS co-founders sent to a Yahoo News reporter a September 1, 2016 draft of the same Fusion GPS white paper that the defendant had provided to the FBI General Counsel three weeks earlier.  The co-founder stated, "off the record – all open source tho." Later that day, the co-founder sent the same Fusion GPS draft white paper to a Reuters reporter.  *Id.* at 36.

- On the same date, the Fusion GPS co-founder sent an email to the aforementioned New York Times reporter, providing him with a website link to Russian Bank-1-related data that apparently had been posted to the internet.  The reporter responded, "thanks[,] where did this come from," to which the co-founder replied, in part: "no idea. our tech maven says it was first posted via reddit."  (The referenced "tech maven" is the Fusion Witness whom the Government expects to call at trial.)  *Id.* at 55.

- On October 31, 2016 – the same date that both Slate and the New York Times published new articles about the Russian Bank-1 allegations – one of the Fusion GPS co-founders emailed the Yahoo News reporter, stating, "Big story on the trump Alfa server moving early pm. OTR [Off the record]. ***USG [United States Government] absolutely investigating.  Campaign will light up*** I imagine."  *Id.* at 59 (emphasis added).

- On the same date, the Fusion GPS co-founder sent an identical email to the aforementioned Reuters reporter.  *Id.* at 60.

In sum, Fusion GPS records themselves – none of which copy or contain reference to a single lawyer – reflect that far from acting primarily as a confidential expert or legal advisor on these issues, the firm functioned instead as an aggressive disseminator of information, and as what one journalist has called "something of a public reading room for journalists seeking information about Trumpworld."  *The Real Story Behind the Steele Dossier*, Peter Nicholas, THE ATLANTIC, November 21, 2019.  And while such political consulting and media relations work is entirely permissible in the political realm, a "public reading room" logically does not serve as an appropriate forum or facilitator of confidential legal advice.

In addition to the foregoing emails, the book published by Fusion GPS's co-founders, *Crime in Progress: Inside The Steele Dossier and the Fusion GPS Investigation of Donald Trump,* underscores and compounds this point.  Fusion GPS claims in its opposition that the portions of the book cited by the Government in its Motion do not reflect actual internal deliberations or work product.  *See* Fusion GPS Opp. at 17-18.  But the book does contain other, detailed and express discussions of *the very same types* of research and internal communications that Fusion GPS's counsel now seek to withhold from the Government's trial evidence.  For example, the book

recounts, among other things, the following episodes clearly reflecting Fusion GPS's internal research and/or deliberations:

- "In early May, Fritsch asked Berkowitz to expand on the Russia angle.  The result was a fifteen-page memorandum Fritsch described in a May 19 email to Berkowitz as 'a true tour de sleaze.'  It's first line: 'Donald Trump's connections to Vladimir Putin's Russia are deeper than generally appreciated and raise significant national security concerns.'" *Crime In Progress*, pg. 61.

- "Fusion's in-house cyber ninja, [name of the Government's expected Fusion GPS trial witness], was asked to analyze the DC Leaks site.  Her assessment came back quickly. 'The poor English and amateurish site architecture—no SSL encryption, open downloads folder—screams 'Russian hackers' to me,' she said." *Id.* at 75.

- "Simpson and Fritsch decided not to tell Elias, the Clinton Campaign's attorney, that [Christopher Steele] was going to the FBI.  While Elias was aware that Fusion had engaged someone outside the United States to gather information on Trump's ties to Russia, he did not ask who it was or what the person's credentials were.  In this case it was better to ask forgiveness, they reasoned." *Id.* at 96.

- "Fusion's research into property records showed that many of the Trump-branded properties [Chamber President-1] claimed to be pushing on Russian investors were located in New York and three huge condo towers north of Miami Beach in a community called Sunny Isles Beach,

a.k.a. 'Little Moscow.'  .  .  . That's where Fusion decided to dedicate considerable research muscle."[4]

While counsel for Fusion GPS and the aforementioned privilege holders now seek retroactively to throw a blanket of privilege over such internal communications and research, this change of tack lacks support in the law.  The above record reflects clearly that Fusion GPS did *not* treat as sufficiently confidential in the first place the very categories of information that it now seeks to withhold from the Government.  Fusion GPS therefore did not adequately maintain, and at the very least has now waived, the confidentiality of the foregoing categories of information.  And while Fusion GPS claims in its Opposition that the Court should exercise its discretion to construe any waiver narrowly, *see* Fusion GPS Opp. at 16; *In re Sealed Case,* 767 F.2d 793, 809 (D.D.C. April 23, 1982), the Government respectfully submits that Fusion GPS's repeated and extensive disclosures to the media and the public on a wide variety of topics over the course of numerous years counsels against limiting any waiver.

---

[4] In fact, on September 24, 2016, the Fusion GPS co-founder emailed two New York Times reporters internal Fusion GPS-created research reports on Trump's real estate holdings including a report titled "Sunny Isles Realty 8.17.16.docx."  In sending the reports, the Fusion GPS co-founder wrote

> Gents good to see you yesterday.  sounded like you might be interested in some of the attached russia-related material.  these are internal, open source research drafts, as agreed, pls treat this as background/not for attribution.  as you'll see it's all easily replicated anyway.  Can also send you a [name]/Toronto memo once i dig it out.  I'm skipping over [name] and [company name].  believe your guys have done that up . . . leave it to you to distribute internally, or not, as you see fit.  don't believe sunny isles/hollywood or panama or toronto have been touched by brands xy or z.  amazingly, don't think anyone has done up the trump tower poker ring story either. pretty vivid color there.

Nor does the record reveal any indications whatsoever that the specific materials being withheld bore a direct relationship to legal advice. The parties' arguments falter especially in light of the affidavits that HFA Campaign Chair John Podesta and Campaign Manager Robby Mook submitted in connection with the instant Motion.    Tellingly, neither affidavit makes reference to specific instances of legal advice that Elias dispensed to HFA based on Fusion GPS's research. Both Messrs. Podesta and Mook appear to have assumed – without actual, first-hand knowledge, that "whatever work Perkins Coie performed. . . was done for the purpose of providing legal services and legal advice[.]" (Mook Aff. at 2).  But that is not enough.  Indeed, the Mook and Podesta affidavits provide or describe no examples of occasions when Elias advised them on laws concerning libel, defamation, or any other legal issue.

In addition, the Government has interviewed Mr. Mook.  During that interview, Mook stated that he could not recall any specific instances of legal advice that Perkins Coie provided based on Fusion GPS's work.  When asked if he would have remembered such advice if it had been given, Mook stated that such a question was difficult to answer given the passage of time.  While Mook stated that he and others at HFA believed in 2016 that there was a real prospect of litigation from Trump, and that legal advice and considerations were therefore "baked in" to HFA's arrangements with any opposition research Perkins Coie oversaw, Mook also stated that:

- HFA decided in 2016 to bifurcate its opposition research efforts pertaining to Trump between (i) the campaign's Research Department, which handled domestic

opposition research,[5] and (ii) Perkins Coie, which handled and oversaw "international" opposition research;

- HFA decided to place its "international" opposition research under Perkins Coie because the firm could, for example, better facilitate researchers' travel overseas, and because HFA wanted to protect the individuals who conducted such international research;

- Mook received general updates concerning the findings of Perkins Coie's opposition research, but he was not aware specifically who had been retained to conduct such research;

- Mook was not aware that Perkins Coie and/or the researchers were sharing any of their work with the media or the FBI (with the exception of the Russian Bank-1 allegations, which campaign leadership decided to share with the press).

Based on the foregoing, the privilege holders have not provided a valid reason to avoid *in camera* review. To be sure, the Government does not dispute that perceived litigation risk from then-candidate Trump may well have prompted a desire among HFA officials to maintain confidentiality over aspects of their opposition research, and to avoid discovery (literally or legally) of their work product in the event of such litigation. Nor does the Government dispute that HFA may have assumed that placing such work under a law firm would ensure such confidentiality. But seeking to keep work confidential alone does not automatically transform that work into services rendered in support of *legal advice*. And the *Kovel* line of cases cited by Fusion GPS – which arose in the

---

[5] Notably, even though the Research Department appears to have conducted similar work, it was *not* under the sole supervision of lawyers—reflecting that the work at issue likely was not inherently privileged or directly related to legal advice.

context of actual professional services provided by accountants, scientific experts, translators, and the like – has little apparent applicability to these facts.  That is because the current record makes plain that Fusion GPS was not acting in the same fashion as would an accountant or other professional providing expert services to a law firm.  Indeed, what accountant supporting a law firm's representation would share their analysis of a client's financial information with reporters prior to rendering a completed tax return or analysis?  What translator assisting such a lawyer's representation would seek the publication in the media of yet-to-be-translated materials?  Absent proof that the specific communications at issue here directly supported legal advice or related specifically to anticipated litigation, they are not privileged.  *See In re Grand Jury Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B) Grand Jury Witness*, 265 F. Supp. 2d 321, 331 (S.D.N.Y. 2003) (holding that "[c]ommunications with the [public relations] consultants, some of which took place in the presence of the lawyers while others were [without lawyers]. . . were covered by the privilege *provided the communications were directed at giving or obtaining legal advice.*) (emphasis added).

The parties' arguments here are especially tenuous given that Fusion GPS appears to have displayed none of the caution or markers of confidentiality that would typically accompany a legal effort to assess or avoid liability for libel or defamation. To use another analogy, the parties' privilege theory here is akin to claiming that a homeowner pursued "legal advice" regarding noise complaints by having his lawyer hire a marching band to perform in his backyard.  Fusion GPS, having worked aggressively and loudly within media circles to seed its un-vetted work product into the public domain, cannot now presumptively and in wholesale fashion claim the protections that are reserved specifically for confidential legal advice.  And even if *some* of Fusion GPS's work did

actually support legal advice, it is incumbent upon the parties to limit their privilege assertions to *those* specific communications.  Thus, it is appropriate for the Court to conduct an *in camera* review of the relevant materials to determine which, if any, of the purportedly privileged communications actually meet the applicable standards.  *See United States v. Zolin*, 491 U.S. 554 (1987) (holding that *in camera* review "may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception" where there is a "reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability"); *Kerr v. U. S. Dist. Court for Northern Dist. of California,* 426 U.S. 394, 405-06 (1976) (holding that "*in camera* review of the documents is a relatively costless and eminently worthwhile method to insure that the balance between petitioners' claims of irrelevance and privilege and plaintiffs' asserted need for the documents is correctly struck."); *In re Sealed Case,* 146 F.3d 881 (D.C. Cir. 1998) (remanding to the District Court "for the court to review the documents *in camera* to determine whether, under all the circumstances, the lawyer prepared them 'in anticipation of litigation,' or whether they were prepared in the ordinary course of business").

### B.  Tech Executive-1 Cannot Claim Privilege or Work Product Protections Over Fusion GPS Materials

Nor can Tech Executive-1 presumptively seek to cover himself under the HFA and DNC's privilege umbrella.  Tech Executive-1's opposition asserts that the privilege claims by all three of these parties are proper because the *Kovel* doctrine protects the work product of a retained expert "whether [the expert is] hired by the lawyer or the client."  Tech Exec. Opp. at 2 (citation omitted). But Tech Executive-1 ignores the critical and dispositive fact that Perkins Coie hired Fusion GPS to assist *HFA and the DNC*, not Tech Executive-1.  Indeed, Tech Executive-1 did not pay at all for Fusion GPS's services, and Perkins Coie did not charge Tech Executive-1 for such services.  Nor

did Perkins Coie maintain an agreement, contract, or other arrangement reflecting that Fusion GPS was providing services specifically to aid Perkins Coie's legal representation of Tech Executive-1. Indeed, Tech Executive-1 does not cite a single case in which a lawyer's client validly claimed privilege or work product protections over materials prepared for the benefit of *another client*.

### C.  The Government Has Met Its Burden to Access Fusion GPS's Work Product

Finally, even if the parties had established a sufficient basis to establish that the materials in question are protected by the attorney work product doctrine – which they have not – the Government's need for the materials is sufficient to overcome the barrier to discovery of work product-protected materials (as opposed to the comparatively higher barrier to discovery of attorney-client privileged information).

As has been set forth in prior filings, the work-product privilege protects "material 'obtained or prepared by an adversary's counsel' in the course of his legal duties, provided that the work was done 'with an eye toward litigation.'" *In re Sealed Case*, 676 F.2d at 809 (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)). This material includes the attorney's "interviews, statements, memoranda, correspondence, briefs, mental impressions," and "personal beliefs." *Hickman*, 329 U.S. at 511. The work-product privilege affords greater protection to "opinion work product, which reveals 'the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation,'" than to "fact work product, which does not*." FTC v. Boehringer Ingelheim Pharm., Inc*., 778 F.3d 142, 151 (D.C. Cir. 2015) (quoting FED. R. CIV. P. 26(b)(3)(B)). Fact work product is discoverable "upon showing a substantial need for the materials and an undue hardship in acquiring the information any other way," *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997), a test we equate with

a requirement "to show 'adequate reasons' why the work product should be subject to discovery," *Boehringer*, 778 F.3d at 153 (quoting *In re Sealed Case*, 676 F.2d at 809). Opinion work product, in contrast, "is virtually undiscoverable." *Vinson & Elkins*, 124 F.3d at 1307. *In re Grand Jury Investigation*, No. MC 17-2336 (BAH), 2017 WL 4898143, at *12 (D.D.C. Oct. 2, 2017)

Where a party seeks to overcome work product protection, it must show either that "it has a substantial need for the materials to prepare its case and cannot, without undue hardship obtain their substantial equivalent by other means" for fact work product, or make an "extraordinary showing of necessity" to obtain opinion work product. *Boehringer*, 778 F.3d at 153 (D.C. Cir. 2015) (quotations omitted).

Here, the vast majority of the relevant materials likely constitute fact work product, given that few of the communications involve an attorney. In addition, the Government has met both prongs of the relevant test. *First*, the Government has a "substantial need" for materials that it has requested the Court to review *in camera*. Those materials include, for example, communications between Tech Executive-1 and the Fusion Witness whom the Government will call at trial. The Fusion Witness is, to the Government's knowledge, the *only* Fusion GPS employee who exchanged emails with Tech Executive-1 concerning the Russian Bank-1 allegations (or any other issue). The Fusion Witness also (i) acted as the firm's primary "technical" expert; (ii) worked for an extended time period on issues relating to the Russian Bank-1 allegations; (iii) was a part of the team that handled work under Fusion's contract with HFA and the DNC; and (iv) met in 2016 with various parties – including Law Firm-1, Tech Executive-1, and the media – about the Russian Bank-1 allegations. As such, the Fusion Witness undoubtedly possesses unique insight to the core issue to be decided by the jury—*i.e.*, whether the defendant was acting on behalf of one or more clients

when he worked on the Russian Bank-1 allegations.   Accordingly, the Government has a "substantial need" to obtain the Fusion Witness's communications relating to the Russian Bank-1 allegations.

Moreover, the materials for which the Government has requested *in camera* review also include internal Fusion GPS communications regarding one of the three white papers that the defendant provided to the FBI, namely, the "[Russian Bank-1's parent company] Overview" paper. Communications regarding the origins and background the very Fusion GPS paper that the defendant brought to the FBI are therefore likely to shed unique light on the defendant's meeting with the FBI General Counsel, including the defendant's work on behalf of his clients.   Fusion GPS's communications regarding that paper in the days prior to the defendant's meeting with the FBI General Counsel are also likely to reveal information about the paper's intended purpose and audience.   Such facts will, again, shed critical light on the defendant's conduct and meeting with the FBI.

*Second*, the Government cannot "without undue hardship obtain the[] substantial equivalent" of these materials "by other means."   *Boehringer Ingelheim Pharms., Inc*., 778 F.3d at 153.   That is because these materials constitute mostly internal Fusion GPS communications and, accordingly, are not available from any other source.   To the extent these communications reflect emails with Tech Executive-1, they are similarly unavailable because Tech Executive-1 has invoked his Fifth Amendment right against self-incrimination. Therefore, obtaining the materials or their substantial equivalent from another source would not merely present an "undue hardship," but rather, is impossible.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's Motions to Compel the

Production of Purported Privileged Communications Withheld by Non-Party Entities for *in Camera*

Inspection by the Court.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

 /S/_____
Jonathan E. Algor
Assistant Special Counsel
jonathan.algor@usdoj.gov

Andrew J. DeFilippis
Assistant Special Counsel
andrew.defilippis@usdoj.gov

Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

Brittain Shaw
Assistant Special Counsel
brittain.shaw@usdoj.gov