**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

MICHAEL A. SUSSMANN,

        Defendant.

Criminal Case No. 21-582 (CRC)

**NON-PARTY FUSION GPS'S OPPOSITION TO GOVERNMENT'S MOTION TO
COMPEL THE PRODUCTION OF PURPORTED PRIVILEGED COMMUNICATIONS
FOR _IN CAMERA_ INSPECTION BY THE COURT**

Non-party Fusion GPS ("Fusion") began responding to the Government's Grand Jury subpoena almost one year ago, withholding certain documents protected by the attorney-client privilege and work product protections because they are related to its work at the direction of the law firm Perkins Coie.  Now, mere weeks before trial, the Government for the first time "raise[s] questions concerning the validity, scope, and extent of [those] privilege assertions" before this Court.  Mot. at 1.  The Government, however, fails to set forth a valid basis for its request to compel _in camera_ inspection of these documents by this Court.

The Court should dismiss this Motion as procedurally improper for the reasons set forth in the Defendant's opposition.  The Court should also dismiss the Government's eleventh-hour attempt to pierce the privilege of non-parties over documents that the Government has not even attempted to show are relevant to the Indictment.

Finally, the Court should deny the motion for _in camera_ inspection of the documents because it is evident based on the facts and the privilege log that the documents have properly been withheld on grounds of privilege and attorney work product, so there is an insufficient showing to

justify the use of judicial resources to review the individual documents. *N.L.R.B. v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 307 (D.D.C. 2009).

The Government has long been aware that Fusion's work for the law firm Perkins Coie is privileged.  In April 2016, Fusion was retained by then-partner Marc Elias at Perkins Coie LLP to assist in providing legal advice to its clients, the Hillary for America Campaign Committee, Inc. ("HFA") and the Democratic National Committee ("DNC"), during the 2016 presidential campaign.  Elias retained Fusion expressly to support his legal advice related to "defamation, libel, and similar laws in which accuracy is an essential element," and the retention specifically contemplated the need for such advice for potential and ongoing litigation that could emerge against Perkins' clients based on their public statements about then-candidate Trump.  Elias Decl. ¶ 11.[1]  Elias had a subjectively (and objectively) reasonable concern about Mr. Trump's litigiousness given his numerous threats of and actual litigation against his critics.  Levy Decl. ¶ 19; Elias Decl. 5–7.  Indeed, that concern was prescient, with Mr. Trump having recently launched litigation seeking tens of millions of dollars against every interested party here (including Fusion, Perkins, DNC, HFA, Mr. Sussmann, Mr. Elias, Mr. Joffe and scores of others), and Alfa Bank embarking on scorched-earth tactics against these parties and others (before it voluntarily withdrew its claims following the significant sanctions against it related to Russia's conduct in the Ukraine).  *See, e.g.*, *Trump v. Clinton*, No. 2:22-cv-14102 (S.D. Fla. 2022); *AO Alfa-Bank v. John Doe*, Case No. 2021 CA 000683 2 (D.C. Super. Ct. 2021); *AO Alfa-Bank v. John Doe*, Case No. 50-2020-CA-006304-XXXX-MB (Fla. Circuit Ct. 2020); *AO Alfa-Bank v. John Doe*, Case No. CI-20-04003 (Pa. Ct. Comm. Pl. 2020).

---

[1]  HFA and DNC have concurrently moved to file the declarations of Marc Elias, John Podesta, and Robby Mook with the Court.  These declarations will be referred to as "Elias Decl.," "Podesta Decl.," and "Mook Decl.," respectively.

The Government attempts to characterize Fusion's work as opposition research and media outreach, rather than privileged investigative work and analysis. But it is not a binary choice between opposition research or privileged investigative work protected by the attorney work product doctrine. In navigating highly sensitive and complex facts related to an opposition candidate who was famously litigious, Elias retained Fusion on behalf of Perkins to assist as an expert investigative consultant, following a well-established path repeatedly endorsed and accepted by numerous courts, by which expert consultants can assist counsel. In these situations, the consultant's work is treated as an extension of counsel's work—and thus subject to privilege and work product protections. *See United States v. Nobles,* 422 U.S. 225, 238–39 (1975) (work-product protection extends to attorney's "investigators"); *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (extending attorney-client privilege to include accounting firm retained by attorney)*.* The Government's attempt to argue for broad subject-matter waiver of this privilege, without pointing either to any specific disclosure of privileged communications by the privilege holders, or to a rationale for imposing broad waiver on the basis of any purported limited disclosures, should not be countenanced. Fusion has continuously asserted and maintained privilege claims at the direction of the privilege holders over documents and testimony regarding the work that Fusion performed for Perkins in 2016.

The Government also misses the mark with respect to communications between Rodney Joffe, Fusion employee Laura Seago, and the Defendant Michael Sussmann, who was Joffe's attorney. Communications between Seago and Joffe were part of Fusion's protected investigative work and thus are protected work product. Moreover, the clients—HFA, DNC, and Joffe—had a shared interest in determining the legal risks and implications associated with potentially explosive

information related to Mr. Trump.  All parties have consistently treated their communications as privileged and confidential, and so no privilege has been waived.

The Government has failed to show that Fusion's claims of privilege are deficient or that the documents properly listed in Fusion's privilege log warrant *in camera* review.  Accordingly, and for the reasons explained more fully below, the Court should deny the Government's Motion.

## BACKGROUND

I.   **Fusion's Role in Assisting Perkins Coie's Provision of Legal Advice During the 2016 Campaign**

In April 2015, the law firm Perkins Coie was retained by HFA, the principal campaign committee of Secretary Hillary Clinton's 2016 presidential campaign, to serve as its General Counsel.  Elias Decl. ¶ 3; Mook Decl. ¶ 3.  Marc Elias, then a partner at Perkins Coie, served as the client lead for HFA and held the campaign title General Counsel.  *Id.*  The terms of this engagement included, among other things, "legal counseling and representation of [HFA] in connection to its legal affairs, including Federal Election Commission and other regulatory requirements and general organizational and compliance matters."  *Id.*  Elias also served as outside General Counsel for the DNC from 2009 until September 2021.  Elias Decl. ¶ 4.  This engagement included legal counseling and representation of DNC in connection with Federal Election Commission and other regulatory requirements and general organizational and compliance matters.  *Id.*  Perkins Coie—like many firms who serve as counsel for political committees— routinely advised HFA and DNC on client advertisements and public statements both before and after publication to ensure compliance with applicable campaign finance, defamation, copyright, and political broadcasting laws, rules, and regulations.  Elias Decl. ¶ 5.

By April 2016, it was clear that Donald Trump would be the Republican Presidential nominee.  Mr. Trump had a complex business and litigation history that was and would continue

to be subject to intense media scrutiny.[2]  Mr. Trump also had a history of being litigious, of which

Mr. Elias was well aware.[3]  Mr. Trump, in fact, had already threatened to sue numerous, diverse

parties for statements and advertisements made during the 2016 election cycle.[4]  Moreover, as the

presidential campaign heated up, it was publicly reported that DNC had been hacked by Russia,

and that stolen materials were being publicly disseminated in a manner that appeared to assist then-

candidate Trump.  Elias Decl. ¶ 13.  Then-candidate Trump was also calling for Russia to take

action to release Clinton's emails.[5]  Elias understood the litigation risk from statements made by

HFA and DNC about Mr. Trump was real and that he would need to be prepared to advise them

on such issues as they emerged in the campaign.  *See* Elias Decl. ¶¶ 11–12, 16; *see also* Mook

Decl. ¶ 6.

       While both DNC and HFA had their own internal research and communications staff, Elias

Decl. ¶ 8, Elias needed an expert consultant with expertise in obtaining and evaluating public

record documents to assist him in providing legal advice.  Elias Decl. ¶ 10–12; Levy Decl. Ex. 1

---

[2]  *See, e.g.*, Levy Decl. Ex. 1 at 18 (Elias HPSCI Interview Transcript) (Elias stating Trump "had
a history of being quite litigious"); Elias Decl. ¶ 6–7.

[3]  *See, e.g.*, Levy Decl. Ex. 2 (*Donald Trump Settled a Real Estate Lawsuit, and a Criminal Case
Was Closed*, N. Y. TIMES) (Apr. 5, 2016); Levy Decl. Ex. 3 (*Trump Suit Claiming Defamation
Is Dismissed*, N.Y. TIMES) (July 15, 2009) (detailing Mr. Trump's defamation suit against
author reporting his wealth was only "$150 million to $250 million," not billions).

[4]  *See, e.g.*, Levy Decl. Ex. 4 (*Donald Trump Threatens to Sue Club for Growth Over Ad
Campaign*, N.Y. TIMES) (Sep. 22, 2015) (discussing letter send by Mr. Trump's lawyer over
ads asserting Trump would raise taxes); Levy Decl. Ex. 5 (*Trump lawsuit aims to set record
straight on where he slept in Las Vegas*, LAS VEGAS SUN) (Oct. 29, 2015) (describing Mr.
Trump's lawsuit over a flyer about where Trump slept during a campaign stop); Levy Decl.
Ex. 6 (*Trump threatens top Bush donor with defamation suit over 'hater' ads*, POLITICO) (Dec.
7, 2015) (outlining letter sent by Mr. Trump's lawyer over ads which called Mr. Trump a
"hater" and "narcissistic [bully]"); Levy Decl. Ex. 7 (*Exclusive: Trump's 3,500 lawsuits
unprecedented for a presidential nominee*, USA TODAY) (June 1, 2016) (reporting that Mr.
Trump or one of his organizations had filed 1,900 lawsuits as of mid-2016).

[5]  *See, e.g.*, Levy Decl. Ex. 8 (*Donald Trump Calls on Russia to Find Hillary Clinton's Missing
Emails*, N.Y. TIMES (July 27, 2016)).

at 21–22.  In April 2016, Elias retained Fusion on behalf of Perkins for the express purpose of

obtaining expert consultant services to aid in the "provision of legal advice" related to "defamation,

libel, and similar laws in which accuracy is an essential legal element." Mot. Ex. C at 1; Elias Decl.

¶ 11.  The engagement specifically contemplated Fusion's role of providing "public record

information and strategy" to Perkins Coie such that it could advise its clients on potential and

actual litigation, which in the course of the 2016 campaign involved advertisements and statements

regarding then-candidate Donald Trump.  Mot. Ex. C; *see also* Elias Decl. ¶ 11.

Law firms regularly hire investigative firms such as Fusion in anticipation of litigation and

in furtherance of providing legal advice.[6]  Elias served as the primary point of contact for Fusion,

and he provided direction on the research and information he needed to provide legal advice to

HFA and DNC.  Elias Decl. ¶ 12.  He oversaw Fusion's work and was in regular contact with

Fusion throughout the engagement.  *See* Levy Decl. Ex. 1 at 46–52 (Elias "would tell Fusion GPS

what to explore in their investigation" and engaged Fusion "to help [him] be smarter so that there

was information [he] could pass along to the client, some of which would be distilled and

incorporated into other judgments [he] had about legal issues."  *Id.* (Elias communicated with

Fusion "weekly," on average).

## II.    Fusion's Response to the Government's Grand Jury Subpoenas

On September 16, 2021, the Government indicted Defendant Michael Sussmann on a

single count of making a materially false statement to the Government.  In particular, the

Government alleges that Sussmann "stated to the General Counsel of the FBI that he was not acting

---

[6] As Fusion's co-founder, Glenn Simpson, stated under oath, Fusion's clients were mostly "corporate clients and banks and large law firms," including work regarding "high-dollar litigation"—and its typical engagements were not for election-related purposes.  Levy Decl. Ex. 9 at 6–7.

on behalf of any client in conveying particular allegations concerning a Presidential candidate, when in truth, and in fact, . . . he was acting on behalf of specific clients." Indictment ¶ 46.

In March and July 2021, the Government served grand jury subpoenas on Fusion, requesting materials related to the Trump-Alfa Bank allegations, use of certain Russian phones by Mr. Trump or affiliated individuals, and documents related to Fusion's retention by DNC and HFA. Mot. at 3. As the Government concedes, Fusion complied with the subpoenas and produced documents on a rolling basis.[7] On April 22, 2021, August 26, 2021, January 10, 2022, and March 11, 2022, Fusion also produced privilege logs of withheld, responsive documents that were protected by the attorney-client privilege and attorney work product protection. Levy Decl. ¶¶ 17–18. The majority of the documents at issue in the Government's Motion were identified in privilege logs by August 2021; the Government has also been in possession of the Perkins Coie-Fusion engagement letter since June 18, 2021.

Almost a year after Fusion's initial production, the Government moves to compel review of the Perkins-Fusion engagement letter and 38 emails and attachments listed on Fusion's privilege log—produced in response to a ***grand jury*** subpoena—in an explicit attempt to use these materials for trial evidence. The Court should deny the Government's eleventh-hour Motion to further burden Fusion and other non-party privilege holders on whose behalf Fusion asserted privilege claims.

---

[7] In addition to Fusion, Perkins Coie, HFA, DNC and others also received grand jury subpoenas, with which they complied by producing responsive non-privileged documents and privilege logs. *See, e.g.*, Non-Party Perkins Coie's Response to Government's Motion to Compel.

**LEGAL STANDARD**

"[W]hen a grand jury issues a valid subpoena for documents, they must be produced unless protected by a recognized privilege."  *In re Sealed Case*, 676 F.2d 793, 807 (D.C. Cir. 1982).[8]  If the documents are privileged, "they need not be produced unless the privileged relation from which they derive was entered into or used for corrupt purposes or unless an 'objective consideration' of fairness requires disclosure to prevent undue manipulation of the privilege."  *Id.* at 807–08.  Where *in camera* inspection is requested, the Court need not use scarce judicial resources to review individual documents if from the facts and the privilege log there is a sufficient basis for finding that the documents were properly withheld on grounds of privilege.  *Jackson Hosp. Corp.*, 257 F.R.D. at 307.  And "[c]aution and the need to eliminate even the potential for prejudice to the holder of the privilege, require that *in camera* inspection never be any greater than absolutely necessary."  *Id.*

**ARGUMENT**

The documents the Government seeks to compel were created as part of the work Fusion performed in support of Perkins's legal representation of HFA and DNC, which is protected by both work-product protection and the attorney-client privilege.  The government has made no showing that *in camera* review of these privileged documents is "absolutely necessary."  *Jackson Hosp. Corp.*, 257 F.R.D. at 307.

**I.     Fusion's Work for Perkins is Protected by the Attorney Work Product Doctrine**

The work-product doctrine protects material prepared by an attorney's "investigators and other agents," if prepared in anticipation of litigation.  *U.S. v. Nobles*, 422 U.S. 225, 238–39 (1975).

---

[8]  Fusion joins in the arguments in Mr. Sussmann's brief that the Government's motion is procedurally improper.

Work product encompasses both the "opinions, judgments, and thought processes" of attorneys and their agents—such as documents containing analysis of law or fact—as well as facts and other materials obtained or prepared by counsel or their agents. *In re Sealed Case*, 676 F.2d 793, 809–10 (D.C. Cir. 1982); *see also Alexander v. F.B.I.*, 198 F.R.D. 306, 313 (D.D.C. 2000) (notes made from witness interviews are protected work product). The work-product doctrine applies if, in light of the "factual situation in the particular case," the information "can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quotation omitted). The party asserting protection over information "must have 'had a subjective belief that litigation was a real possibility,' and that belief must have been 'objectively reasonable.'" *Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Att'ys*, 844 F.3d 246, 251 (D.C. Cir. 2016) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)). The Government challenges the privilege claims made over all 38 documents in Exhibit A. Because Fusion's work for Perkins in 2016, reflected in the documents at issue, was undertaken because of an objectively reasonable belief that litigation was a real possibility, and such work would not have occurred if not for that anticipated litigation, the privilege claims over the logged documents are valid.

### A.   Fusion's Work is Protected by the Work-Product Doctrine Because Perkins Reasonably Anticipated Litigation.

The Government does not argue (nor could it) that Elias did not reasonably anticipate that statements by HFA and DNC during the 2016 election campaign regarding then-candidate Trump might result in defamation-like claims or other litigation. *See* Elias Decl. ¶¶ 6, 12, 17–18. It is well-established that counsel need not have a specific case in mind, so long as there is a reasonable anticipation of future litigation. *See, e.g.*, *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982) (work product protection attaches "provided that the work was done with an eye toward litigation"

(quotation omitted)).  Indeed, as the D.C. Circuit has recognized, "[i]t is often *prior to the emergence of specific claims* that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur." *In re Sealed Case*, 146 F.3d at 886 (emphasis added).  Much like in *In re Sealed Case*, where the D.C. Circuit upheld a work-product claim by an attorney advising the Republican National Committee with respect to a politically charged financial transaction, in 2016 there was "intense focus" and "public criticism," *id.*, regarding Mr. Trump's various prior litigations and known litigiousness, as well as regarding a potential relationship with Russia and other financial entanglements.  It was therefore "objectively reasonable" for Perkins, on behalf of HFA and DNC, to anticipate the legal need to understand the factual accuracy of these issues, in anticipation of potential litigation arising from their statements regarding Mr. Trump, generally, as well as specifically with regard to information regarding alleged links to Russia.

### B.   Fusion's Work Was Performed in the Anticipation of Litigation.

Elias retained Fusion because of these well-founded concerns.  Elias Decl. ¶¶ 6–7,11.  The "primary object," *In re Sealed Case*, 146 F.3d at 884, of Fusion's engagement and work at the direction of Elias, was assisting Perkins in protecting its clients in anticipated litigation.  *E.g.*, Mot. Ex. C at 1; Elias Decl. ¶ 12; Levy Decl. Ex. 1 at 46 (Elias provided legal advice, including whether allegations made in a campaign ad "may run afoul or run the risk of civil litigation" and he engaged Fusion to provide information that would be "incorporated into [his] judgments . . . about legal issues").

Fusion's relationship with Perkins in 2016 confirms that Fusion's work was not to generate opposition research materials for public dissemination, Mot. at 6, but rather to provide investigative services in support of Perkins's representation of HFA and DNC.  Elias Decl. ¶ 12. Importantly, both HFA and DNC maintained their own separate, large research staffs whose

responsibility was to research then-candidate Trump.  Elias Decl. ¶ 8.  In contrast, Elias engaged Fusion and he was Fusion's point of contact for its work; Elias directed Fusion's work to research and investigate highly sensitive issues about which the campaigns might make public statements, anticipating litigation could ensue.  *See* Elias Decl. ¶¶ 11–12.  The withheld documents and internal communications at issue are squarely within the "zone of privacy" afforded to Fusion, Perkins's investigative agent, and its analysis related to then-candidate Trump.  *Nat'l Ass'n of Crim. Def. Lawyers*, 844 F.3d at 251 (work product protection provides attorneys and agents "with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories"); *Nobles*, 422 U.S. at 238 (work-product doctrine protects internal communications and "material prepared by agents for the attorney").

That Fusion or its subcontractor communicated with reporters generally regarding the allegations that Mr. Trump was secretly communicating with a Russian bank, Mot. at 13, does not render the investigative analysis it conducted non-work product, just as the public filing of a legal brief (or an interview on the courthouse steps) does not mean a lawyer's confidential advice to a client or internal files suddenly lose their protection.  *Cf. Alexander v. F.B.I.*, 198 F.R.D. 306, 315 (D.D.C. 2000) ("It cannot be the law that a subsequent [communication], inspired by confidential communications but not revealing any confidential information, would waive privilege.").  The Government's reliance on public, non-privileged actions by Fusion, such as communicating with reporters about facts surfaced in its investigation, to argue that none of its work is privileged, Mot. 11–13, is misplaced.  As the D.C. Circuit has instructed, "material generated in anticipation of litigation may also be used for ordinary business purposes without losing its protected status," and work product can "serve[] multiple purposes, so long as the protected material was prepared because of the prospect of litigation."  *Deloitte LLP*, 610 F.3d at 138.

Fusion was operating as an investigative researcher to help Elias provide legal advice, not as HFA or DNC's opposition researcher, and the evidence demonstrates the unique role it played. *See, e.g.*, Elias Decl. ¶¶ 11–12. That Fusion's investigative work may have involved research regarding an opposition candidate does not mean that it was not done to assist Perkins in providing legal services and advice to its clients. To deny work-product protection in this case would discourage lawyers from engaging experts needed to provide effective legal advice in complex matters, all of which is "critical to effective legal thinking"—particularly in representing political candidates who, unfortunately, must operate in an atmosphere of legal peril. *In re Sealed Case*, 146 F.3d at 886 (citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

### C.    The Government Has Not Made the Necessary Showing to Overcome Work Product Protection.

Where a party seeks to overcome work product protection, it must show either that "it has a substantial need for the materials to prepare its case and cannot, without undue hardship obtain their substantial equivalent by other means" for fact work product, or make an "extraordinary showing of necessity" to obtain opinion work product. *F.T.C. v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 153 (D.C. Cir. 2015) (quotations omitted). The Government has attempted to do neither. In support of its need for the documents, the Government simply states that it "otherwise might seek to admit [the withheld documents] at trial," Mot. at 2, and that it hopes to "establish[] the appropriate bounds of trial testimony," *id.* at 21. This is plainly insufficient under even the less-stringent test for fact work product.

A "moving party's burden is generally met if it demonstrates that the materials are relevant to the case, the materials have a unique value apart from those already in the movant's possession, and 'special circumstances' excuse the movant's failure to obtain the requested materials itself." *Boehringer Ingelheim Pharms.*, 778 F.3d at 155. The Government has not even attempted to show

that the documents at issue are relevant to its indictment of Mr. Sussmann for lying to the Government about whether he was representing a client when he met with the FBI General Counsel on September 19, 2016.  Indeed, 19 of the documents *post-date* the meeting at issue.  *See* Mot. Ex. A rows 12–30.  Nor has the Government attempted to show that these privileged documents "have a unique value apart from" documents already in its possession.  The Government fails to argue why it believes that (1) the privileged, withheld documents will provide it with information supporting its charge—that Sussmann lied about who he was representing in a meeting with the FBI—or that (2) it does not already have sufficient evidence to establish what such privileged documents purportedly would show.  Accordingly, the Government has shown neither a substantial need nor undue hardship for the withheld materials, and its bid to overcome work-product protection should be denied.

## II.      Fusion's Work for Perkins is Also Protected by the Attorney-Client Privilege

The documents the Government seeks to compel fall well within the bounds of attorney work-product protection.  However, the Government's arguments against applying the *Kovel* doctrine to Fusion's work also fail, because the purpose of Perkins's engagement with Fusion was to facilitate the provision of legal advice to its clients.  The attorney-client privilege protects "confidential communication between attorney and client, including by and to non-attorneys serving as agents of attorneys," if made "for the purpose of obtaining or providing legal advice to the client."  *In re Kellogg Brown & Root, Inc.* ("*KBR*"), 756 F.3d 754, 757 (D.C. Cir. 2014).  Under *Kovel* and its progeny, the attorney-client privilege extends to communications by third parties that an attorney hires to facilitate "the effective consultation between the client and the lawyer."  *Kovel*, 296 F.2d at 922.

Attorney-client privilege can also attach to "reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information

obtained from the client." *F.T.C. TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir. 1980).  As the D.C. Circuit recognized in adopting the *Kovel* doctrine, the doctrine helps "to preserve the effectiveness of counsel in our legal system," by allowing counsel to address increasingly complicated factual issues that arise in the course of legal practice.  *Id.*  Courts have applied the *Kovel* doctrine to a wide range of non-lawyers who assist counsel in providing legal services, "such as investigators, interviewers, technical experts, accountants, physicians, patent agents, and other specialists in a variety of social and physical sciences." *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 71 (S.D.N.Y. 2010) (quotation omitted).  Importantly, legal advice need not be *the only* purpose for communications to nonetheless be protected by the attorney-client privilege: so long as "obtaining or providing legal advice was one of the significant purposes" of the communications, the attorney-client privilege applies.  *See KBR*, 756 F.3d at 760.

Here, the information that Fusion was hired to investigate was complicated, particularly as it related to Russian connections to Mr. Trump, including but not limited to the DNS allegations involving the Trump Organization and Alfa.  This work was being done against the backdrop that the DNC and at least one other democratic organization had been hacked by Russia—that is Russia or entities working at its direction had infiltrated their servers and/or computers and stolen voluminous materials. Elias Decl. ¶ 13.  Elias could not, without the assistance of expert investigative analysis, understand the complex information that Fusion was hired to investigate. *See, e.g.*, Levy Decl. Ex. 1 at 22 (Elias hired Fusion "to be able to adequately understand th[e] scope" of Trump's entanglements "and be able to digest that and help make legal judgments that would be relevant" to his clients).  And without understanding the factual accuracy of such material, Elias could not effectively provide legal advice to HFA and DNC regarding the legal implications, including with regard to "the legal risks of speaking publicly," involving highly

complex and sensitive information that was developing in the course of the 2016 Presidential campaign. *In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321, 330 (S.D.N.Y. 2003) (protecting PR firm communications under *Kovel* and explaining that advising clients in legal jeopardy regarding their public statements was one of "the[] most fundamental client functions" performed by lawyers).

The cases relied on by the Government (at 14) are inapposite. In *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000), and *Blumenthal v. Drudge*, 186 F.R.D. 236 (D.D.C. 1999), the court found that *Kovel* was inapplicable because the consultants whose documents were at issue were hired for the benefit of their own services "as opposed to enabling counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice." *Calvin Klein*, 198 F.R.D. at 55. Here, by contrast, Fusion has shown that its work was crucial to assisting Elias in understanding the facts and assessing the legal implications of HFA and DNC's possible statements regarding Mr. Trump and others. *See* Elias Decl. ¶ 12, 16–17. Fusion's engagement was explicitly for the purpose of supporting the legal advice Perkins was providing to HFA and DNC "related to defamation, libel and similar laws in which accuracy is an essential legal element." Elias Decl. ¶ 11. Far from "simply providing ordinary public relations advice," Fusion's investigative work enabled Elias to understand the legal implications of communications from HFA and DNC and advise them accordingly. *See* Elias Decl. ¶ 12. Moreover, courts have held that the privilege protects consultants advising lawyers on matters other than information received directly from the client such as "the state of public opinion in a community" or the impact of juror backgrounds. *In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 326.

The Government's argument (at 10) that providing such advice was outside the scope of Perkins's engagements with HFA and DNC shows a misunderstanding of the role of legal advisers to political campaigns; providing this sort of legal advice to political clients is routine. Elias Decl. ¶ 5. Moreover, the argument that Fusion was conducting opposition research is beside the point. It is no different from saying that the accounting firm in *Kovel* was doing accounting work, not legal work. The question is not what work *Fusion* was doing, but whether *Perkins*, the attorney, was using it in furtherance of legal advice to its clients. Fusion has established that its work— whatever label is given to it—was to assist Perkins's provision of legal advice to its clients. *See* Elias Decl. ¶ 11–12; 17–18. Fusion has therefore properly withheld the documents at issue pursuant to attorney-client privilege.

III.     **There Has Been No Waiver**

The Government also argues in conclusory fashion that "even if a valid privilege did exist," "any such privilege might since have been waived" by (1) Fusion employees publishing a book about the 2016 election, (2) Christopher Steele's testimony in a foreign legal proceeding, (3) meetings between Fusion and Steele and reporters, and (4) a meeting between Steele and the FBI. Mot. at 15; *see also id.* at 11–13. But courts have repeatedly held that public disclosure does ***not*** "warrant[] a broad court-imposed subject matter waiver" over all internal communications on the same subject matter, and that any waiver should not be "broaden[ed] . . . beyond those matters actually revealed." *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987); *see also In re Sealed Case*, 676 F.2d at 809 n.54 ("Courts . . . retain discretion not to impose full waiver as to all communications made on the same subject matter where the client has merely disclosed a communication to a third party as opposed to making some use of it."); *Long v. Motion Picture Ass'n of Am.*, 2021 WL 5446278, at *6 (D.D.C. Nov. 22, 2021) (the court has the discretion to define subject-matter waiver narrowly); *see also* Fed. R. Evid. 502(a) ("waiver extends to an

undisclosed communication or information . . . only if (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together").  The Government also fails to identify a single instance in which the *client* authorized a disclosure of the information, which is necessary to find waiver.  *See Nat'l Sec. Counselors v. CIA*, 969 F.3d 406, 411–12 (D.C. Cir. 2020).  The Government's attempt to argue for wholesale waiver of all privilege claims is extreme and unsupported, and the Court should reject it.

Moreover, even with regard to the supposed *non-client* disclosures the Government raises, it has not shown that these alleged disclosures in fact disclosed privileged materials or communications, a threshold requirement for waiver.  *In re Sealed Case*, 676 F.2d at 818 (waiver occurs "[w]hen a party reveals part of a *privileged communication* in order to gain an advantage in litigation" (emphasis added)).  First, the Government points to *Crime in Progress*, a book published by two Fusion principals, Glenn Simpson and Peter Fritsch.  Mot. at 15.  The Government contends that the book "describes in considerable detail [Fusion's] internal discussions and deliberations, including conversations with Campaign Lawyer-1."  *Id.*  However, the Government cites only two passages, neither of which discloses privileged information:  The first passage details a meeting with Elias *before he engaged Fusion—i.e.*, prior to the privileged relationship.  *Id.*  The second passage relied on by the Government to argue for broad subject-matter waiver provides further detail on Steele's meetings with reporters and other third parties, but does not disclose any privileged information or communications.[9]  The Government does not

---

[9]  Moreover, the "notes on sources" section of *Crime in Progress* states: "The nature of our engagement with the law firm Perkins Coie prevents us from recounting our communications after we were retained.  We described one meeting with Marc Elias that occurred before we were hired.  Perkins has not released us from our obligations to keep our communications
*(Cont'd on next page)*

point to a specific disclosure of privileged information in *Crime in Progress*; relying indiscriminately on a 368-page book does not suffice to show a disclosure of privileged information or support a broad waiver. *See In re von Bulow*, 828 F.2d at 102 (holding that "extrajudicial disclosure [in a book] of an attorney-client communication—one not subsequently used by the client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication").

Second, the Government details meetings and communications between Christopher Steele and Fusion and reporters. Mot. at 11–13. The Government argues vaguely that Steele and Fusion "communicated" about their "ongoing work" and "share[d] information" from their work but does not allege or show that any specific privileged information or communications—as opposed to non-privileged facts—were shared with these reporters. Indeed, in the "[m]ost relevant" communication the Government points to, a Fusion employee tells a reporter to report on the Alfa Bank story. *Id.* at 12–13 ("do the [expletive] [Russian Bank-1] secret comms story"). The Government does not explain how this email, or any of Fusion or Steele's communications with reporters, discloses any privileged information whatsoever.

Third, the Government points to a meeting between Christopher Steele and the FBI in which Steele "shared purported intelligence that he had collected" one month after being retained by Fusion. Mot. at 11. Other than temporal proximity, the Government does not contend that Steele was working solely with Fusion, or that he shared privileged information or communications at all, let alone that he shared privileged information or communications obtained in the course of his work with Fusion. Because the Government failed to show that these purported

---

confidential, nor have other clients." Glenn Simpson & Peter Fritsch, *Crime in Progress* 284 (2019); *see* Levy Decl. ¶ 14.

disclosures actually disclosed privileged information, they cannot provide the basis for subject-matter waiver.[10]

Even if the Government has shown the disclosure of privileged information or communications, its subject-matter waiver claim still fails because only clients can waive attorney-client privilege, and the Government has not pointed to any waiver of any type—let alone broad subject-matter waiver—by the *clients*. None of the alleged disclosures—communications by Fusion and Steele with the media, Fritsch and Simpson's book, Steele's meetings with the FBI, and Steele's U.K. testimony—involve any communication or waiver by any client.[11] It is "axiomatic that the attorney-client privilege is held by the *client*," and therefore an attorney or agent's disclosure "is not treated as a waiver of the privilege." *Nat'l Sec. Counselors*, 969 F.3d at 411–12 (quotations omitted). Similarly, while the ability to protect work product extends to both clients and attorneys, and the client and attorney can waive it, each can do so "only as to himself." *In re Doe*, 662 F.3d 1074, 1079 (4th Cir. 1983). Neither HFA nor DNC ever authorized Fusion, its employees, or Steele to waive privilege. *See, e.g.*, Podesta Decl. ¶ 4. The Government cites no

---

[10] It is not clear whether the Government contends that Sussmann providing a non-privileged white paper to the FBI waived privilege over all internal drafts and communications related to that white paper, nor is it clear whether the white paper discussed by the Government is related to the documents in Exhibit A. *See* Mot. at 9–10. Regardless, it is black letter law that public disclosure of a final product, like a filing, does not waive privilege over the privileged communications and work product that led to the creation of the final product. *See, e.g.*, *Cause of Action Institute v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336, 350 (D.D.C. 2018) ("Drafts of documents that are prepared with the assistance of counsel for release to a third party are protected under attorney-client privilege . . . even if the final draft is ultimately disclosed to a third party." (internal quotation omitted)); *W. Trails, Inc. v. Camp Coast to Coast, Inc.*, 139 F.R.D. 4, 14 (D.D.C. 1991) (where communications "relating to preliminary drafts" of documents were intended to be kept confidential, those drafts are "protected under the attorney-client privilege").

[11] In any event, Steele met with the FBI in July 2016 on his own to discuss what he had learned, without the knowledge or authorization of the privilege holders to disclose privileged information or otherwise waive the privilege.

evidence to show any voluntary disclosure of—or authorization of the disclosure of—privileged communications or documents by the *clients*, and so no waiver could have occurred either as to protected work product or communications protected by the attorney-client privilege.

Finally, the Government makes no showing that anyone (client or otherwise) made selective disclosures of privileged information "to gain an advantage" in the underlying litigation, as needed to make a finding that subject matter waiver occurred. *In re Sealed Case*, 676 F.2d at 818. The Government relies on purported disclosures made by Fusion and Steele that were not made as part of this or any other litigation where the *privilege holders* sought "to use the disclosed material for advantage in the litigation but to invoke the privilege to deny [their] adversary access to additional materials that could provide an important context for proper understanding of the privileged materials." *US Airline Pilots Ass'n v. Pension Ben. Guar. Corp.*, 274 F.R.D. 28, 32 (D.D.C. 2011) (quotation omitted). The Government has not shown that these purported disclosures are at all related to the documents in Exhibit A, let alone that this is one of the "*unusual situations* in which fairness requires a further disclosure of related, protected information." *Hughes v. Abell*, 2012 WL 13054819, at *3 (D.D.C. Mar. 7, 2012) (quoting Fed. R. Evid. 502 explanatory note) (emphasis added).

The Government's reliance on *United States v. All Assets Held at Bank Julius Baer & Co.*, 315 F.R.D. 103 (D.D.C. 2016), is thus unavailing. In that case, the claimant argued that his request for a private letter ruling ("PLR Request") from the IRS should not be disclosed to the government in an *in rem* asset forfeiture action. *Id.* at 105–106. The claimant contended that the PLR Request (an inquiry regarding a taxpayer's status) constituted opinion work product, and that disclosure to the IRS did not waive work-product protection because the IRS was not his "adversary." *Id.* at 106. The Court found that the claimant had waived protection over the PLR Request because he

disclosed the document to the IRS, "the very entity with whom he anticipated litigation." *Id.* at 114. The Government does not argue here that any disclosures *by the clients* were made of protected material to *potential adversaries* in litigation. "And because [work product protection] looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, the work product privilege is not automatically waived by any disclosure to a third party." *In re Sealed Case*, 676 F.2d at 809.

The Government argues for broad subject matter waiver but fails to address all of the case law holding that "the disclosure of privileged work-product information does not extend to other privileged information merely because they pertain to the [same] subject matter." *Trs. of Elec. Workers Local 26*, 266 F.R.D. 1, 15 (D.D.C. 2010) (citing *In re United Mine Workers of Am. Empl. Benefit Plans Litig.*, 159 F.R.D. 307, 311 (D.D.C. 1994)); *see also Williams & Connolly v. S.E.C.*, 662 F.3d 1240, 1244 (D.C. Cir. 2011) (Disclosure "of some [work product] does not necessarily destroy" protection for all work product "of the same character" (quotation omitted)). There is no reason for this Court to entertain broad subject-matter waiver of privilege claims by non-parties at this stage.

## IV.     Ms. Seago's Communications with Mr. Joffe are Privileged

The Government's arguments regarding communications between Ms. Laura Seago, a Fusion employee, and Mr. Rodney Joffe are also erroneous. The Government moves to compel review of four emails and four attachments to those emails. The four emails between Ms. Seago, Mr. Joffe, and Mr. Sussmann are all expressly marked as "Privileged Client/Attorney Communication" in their subject lines. Ex. A. at 3. The Government argues that, based on entries in Fusion's privilege log, "it does not appear that the[] emails solely between Tech Executive-1 and the Investigative Firm Witness reflect confidential communications" and that "[a]ny confidentiality that Tech Executive-1 might have otherwise maintained" over communications

with Sussmann "was waived when he and the defendant chose to disclose such information to a third party that did not have any formal or informal contract or retention agreement with Tech Executive-1." Mot. at 19–20.

As explained above, however, Ms. Seago's communications with Mr. Joffe were part of Fusion's investigative work in anticipation of litigation and in support of Perkins's provision of legal advice to HFA and DNC.  *See supra* pp. 8–13; *Nobles*, 422 U.S. at 238–39.  Thus, communications between Ms. Seago and Mr. Joffe are no different from other investigative work by Fusion protected from disclosure under the work-product doctrine, and the Government does not address why, even if the attorney-client privilege does not apply, the work-product doctrine would not protect these communications.

Furthermore, communications between Ms. Seago and Mr. Joffe are protected under the common interest rule.  Under that rule, individuals may share information with persons who share a common interest (as was the case here) without waiving the attorney-client privilege if "(1) the disclosure is made due to actual or anticipated litigation; (2) for the purpose of furthering a common interest; and (3) the disclosure is made in a manner not inconsistent with maintaining confidentiality against adverse parties." *Holland v. Island Creek Corp.*, 885 F. Supp. 4, 6 (D.D.C. 1995).  Common-interest protection does not, as the Government insinuates, depend on the existence of a joint-defense agreement.  Mot. at 6–7.  It has long been held that "'common interests' should not be construed as narrowly limited to co-parties." *United States v. Am. Tel. & Telegraph Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980); *cf. Deloitte LLP*, 610 F.3d at 141 ("reasonable expectation of confidentiality may derive from common litigation interests" *or* may be "rooted in a confidentiality agreement or similar arrangement").  The litigation risk associated with the Trump-Alfa Bank allegations was obvious, and Mr. Joffe, HFA, and DNC all had common legal

interests in understanding the factual accuracy of that information and legal implications of speaking about it.  *See* Elias Decl. ¶¶ 14–18.  Courts in this circuit have generally interpreted common interest protection broadly, holding that "[s]o long as transferor and transferee anticipate litigation against a common adversary on the same issue or issues, they have strong common interests in sharing" privileged information.  *Am. Tel. & Telegraph Co.*, 642 F.2d at 1299. Moreover, any disclosure of privileged information between Fusion and Mr. Joffe was consistent with maintaining confidentiality with Mr. Joffe—all parties have consistently maintained their privilege claims over the communications between the parties and have not disclosed them to any possible adversaries, including the Government.[12]  Where, as here, all parties to communications treat those communications as privileged and confidential and have a reasonable basis to believe that the recipients of disclosed information will keep it confidential, it is not dispositive of the privileged nature of those communications that the parties understood them to be privileged on different bases.  HFA, DNC, and Fusion had shared interests in preparing for possible litigation based on the explosive information regarding Mr. Trump, even if the parties understood Fusion's role differently.  Accordingly, Fusion properly asserted privilege regarding Ms. Seago's communications involving Mr. Joffe and/or Mr. Sussmann.

## CONCLUSION

For the foregoing reasons, Fusion respectfully requests that the Court deny the Government's Motion to Compel.

---

[12]  The Government's allegation that Fusion employees "shared information gained through" communications with Mr. Joffe "with others, including various members of the media," Mot. at 21, is unsupported, and in any event untethered to the documents at issue in the Government's motion.

Respectfully submitted,

Dated:   April 18, 2022

  /s/ Joshua A. Levy
Joshua A. Levy (D.C. Bar No. 475108)
Rachel M. Clattenburg (D.C. Bar No. 1018164)
Kevin P. Crenny (D.C. Bar No. 1765044)
LEVY FIRESTONE MUSE LLP
1701 K St. NW, Suite 350
Washington, DC 20006
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
eas@levyfirestone.com

*Counsel for Non-Party Fusion GPS*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 26, 2022, I electronically filed the foregoing Opposition and accompanying Declaration and Exhibits using the CM/ECF System, which serves a copy on all counsel of record.

   /s/ Joshua A. Levy   
Joshua A. Levy
