# Exhibit 9

UNCLASSIFIED, COMMITTEE SENSITIVE

EXECUTIVE SESSION

PERMANENT SELECT COMMITTEE ON INTELLIGENCE,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:  GLENN SIMPSON

Tuesday, November 14, 2017

Washington, D.C.

The interview in the above matter was held in Room HVC-304, the Capitol, commencing at 2:13 p.m.

Present:  Representatives Conaway, King, Rooney, Ros-Lehtinen, Gowdy, Schiff, Himes, Speier, Quigley, Swalwell, Castro, and Heck.

UNCLASSIFIED, COMMITTEE SENSITIVE

<u>Appearances:</u>

For the PERMANENT SELECT COMMITTEE ON INTELLIGENCE:



For GLENN SIMPSON:

ROBERT F. MUSE, ESQ.

JOSHUA LEVY, ESQ.

RACHEL CLATTENBURG, ESQ.

UNCLASSIFIED, COMMITTEE SENSITIVE

███████████        Good afternoon.   This is an unclassified transcribed

interview of Mr. Glenn Simpson.

Thank you for speaking to us today.   For the record, I am ██████████ a

staff member of the House Permanent Select Committee on Intelligence.   Others

present today will introduce themselves when they speak.

But before we begin, I have a security reminder.   If you haven't left your

electronics outside, please do so at this time.   That includes blackberries,

iPhones, androids, tablets, iPads, or eReaders, laptops, iPods, MP3 players,

recording devices, cameras, wireless headsets, pagers, and any type of bluetooth

wristbands or watches.

I also want to state a few things for the record.   The questioning will be

conducted by members and staff during their allotted time period.   Some

questions may seem basic, but that is because we need to clearly establish facts

and understand the situation.   Please do not assume we know any facts you have

previously disclosed as part of any other investigation or review.

We ask that you give complete and fulsome replies to questions, based on

your best recollection.   If a question is unclear or you are uncertain in your

response, please let us know.   And if you do not know the answer to a question or

cannot remember, simply say so.

During the course of this interview, we will take any breaks that you desire.

This interview will be transcribed.   There is a reporter making a record of

these proceedings so we can easily consult a written compilation of your answers.

Because the reporter cannot record gestures, we ask that you answer verbally.   If

you forget to do this, you might be reminded to do so.   You may also be asked to

spell certain terms or unusual phrases.

You are entitled to have a lawyer present for this interview, though you are not required to do so.  I see that you have counsel present and would ask that your attorneys make an appearance for the record.

MR. LEVY:  Joshua Levy, counsel for Glenn Simpson.

MR. MUSE:  I am Bob Muse, also counsel for Glenn Simpson.

Thank you.  To ensure confidentiality, we ask that you do not discuss this interview with anyone other than your --

MS. CLATTENBURG:  Rachel Clattenburg, also for Glenn Simpson.

To ensure confidentiality, we ask that you do not discuss the interview with anyone other than your attorney.

Consistent with the committee rules of procedure, you and your counsel, if you wish, will have a reasonable opportunity to inspect the transcript of this interview in order to determine whether your answers were correctly transcribed. The transcript will remain in the committee's custody.  The committee also reserves the right to request you return for additional questions should the need arise.

The process for today's interview is as follows:  The majority will be given 45 minutes to ask questions; and the minority will be given 45 minutes to ask questions.  Immediately thereafter, we will take a 5-minute break, after which the majority will be given 15 minutes to ask questions; and the minority will be given 15 minutes to ask questions.  These time limits will be strictly adhered to, with no extensions being granted.  Time will be kept for each portion of the interview, with warnings given at the 5-minute and 1-minute marks.

Our record today will reflect that you are appearing voluntarily, pursuant to

UNCLASSIFIED, COMMITTEE SENSITIVE

an agreement dated today.   Under procedures adopted for the 115th Congress

that have been provided to you along with Rule 11 of the rules of the House of

Representatives, only you or your personal counsel may make objections during a

deposition.

I also want to state for the record that the agreement that has been struck

today was signed by both Mr. Conaway and Mr. Schiff.

Objections must be stated concisely and in a nonargumentative manner.   If

you or your counsel raises an objection, the interview will proceed and testimony

taken is subject to any objection.   You may refuse to answer a question only to

preserve a testimonial privilege.   When you or your counsel have refused to

answer a question to preserve a testimonial privilege, the objection may be ruled

on by the chairman after the interview has recessed.

Finally, you are reminded that it is unlawful to deliberately provide false

information to Members of Congress or staff.

As this interview is under oath, please raise your right hand.   Do you swear

to tell the truth, the whole truth, and nothing but the truth?

MR. SIMPSON:  I do.

████████████████   The record will reflect that the witness has been duly

sworn.

MR. CONAWAY:   Gentlemen, thank you for coming.

Adam, any comments before we start?

MR. CONAWAY:   All right.   The floor is yours.

MR. GOWDY:   Good afternoon, Mr. Simpson.

MR. SIMPSON:   Good afternoon.

MR. GOWDY:   My name is Trey Gowdy.   I'm from South Carolina.   I will

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

ask you questions initially.   If I ask you any question that you don't understand, just ask me to rephrase it.

MR. SIMPSON:  Okay.

MR. GOWDY:  It won't be a trick question.   It will be because I ask it inartfully.

Where do you work and how long have you worked there?

MR. SIMPSON:  I work at a consulting firm here in Washington.   The trade name is Fusion GPS.   The entity, the legal entity is called Bean LLC.   And I've been there since I believe 2010.   And it's a research consulting firm.

MR. GOWDY:  All right.   That was my next question.   What does Fusion GPS do?

MR. SIMPSON:  It's a commercial research firm, sometimes also does strategy, public affairs.   The primary line of work we're in is research.   Generally, it specializes in public records research, other sort of journalistic style information gathering.

MR. GOWDY:  When someone uses the phrase "opposition research," does that mean anything to you?   Does that have any trade meaning?

MR. SIMPSON:  Well, I was introduced to opposition research when I was a reporter on Capitol Hill.   And so the conventional term is usually people who work on campaigns who are looking for information that will be useful in debates or other election related activities is my general historical understanding of the term.

MR. GOWDY: Does Fusion GPS do what you just described as opposition research?

MR. SIMPSON:  From time to time.   It's not very -- it's not a very big part of our business.   Generally, we have -- we work for corporate clients and banks

UNCLASSIFIED, COMMITTEE SENSITIVE

and large law firms. And most of our work is not election-related, it has to do with fraud and corruption investigations and policy disputes and high-dollar litigation.

MR. GOWDY: Were you hired by a person or entity in either 2015 or 2016 to do research into then-candidate Donald Trump?

MR. SIMPSON: Yes, we were. We were hired around October, September-October of 2015.

MR. GOWDY: By whom?

MR. SIMPSON: The Free Beacon has been publicly stated as the client or identified to the committee as the client, and I can confirm that.

MR. GOWDY: All right. I'm going to be asking you questions even though there's been public reporting. I don't want anybody in the media to take any offense, but sometimes they're right, sometimes they're not right. So --

MR. SIMPSON: I can agree with that.

MR. GOWDY: So in this instance, we can all celebrate the fact that they were correct. You were hired by the Washington Free Beacon?

MR. SIMPSON: That was the client, yes.

MR. GOWDY: All right. And what were your instructions? What were you asked to do?

MR. SIMPSON: I -- that's I think covered -- our client relationships are confidential, and so I can't get into what anyone specifically told me. I think I can speak more broadly and say that it was an open-ended look at Donald Trump's business career and his litigation history and his relationships with questionable people, how much he was really worth, how he ran his casinos, what kind of performance he had in other lines of work.

It was a very broad unfocused look, which is the way we do our business.

8

UNCLASSIFIED, COMMITTEE SENSITIVE

Essentially, we don't usually allow clients to tell us what to look at and what not to look at, because we don't think that's a smart way of trying to understand a subject.  So, generally speaking, we just do an open-ended look at everything we can find.

So it starts with literature review.  We obtain all the books we can on a subject and order them all, you know, used from Amazon, and all the newspaper articles, all the court records, all the public records you can lay your hands on.  And only after you've digested all that information do you start to figure out, you know, where to focus your inquiries.

MR. GOWDY:  Were you asked to write a report or just accumulate information?

MR. SIMPSON:  Again, I need to steer clear of specific communications I had with my clients, but I can tell you that as a business practice, generally speaking, we do engagements on a 30-day basis, and at the end of the 30 days we write a report about what we found.  And if there's specific things that are interesting, a particular lawsuit or a dispute or a business deal or something like that, you know, we will write a separate treatment of that issue.

But, generally speaking, for most of our clients, particularly in the beginning of an engagement, it's a 30-day assignment, and at the end of 30 days you get a report.  And if you think what we told you was interesting and you want more, we can sign up again.

MR. GOWDY:  Well, I really am trying to limit the number of times your lawyer has to lean over there and give you counsel, so I'm trying to stay within the parameters of what I think you feel like you're able to answer.

But are you asked to write what some of our friends may refer to as a fair

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

and balanced piece, or are they primarily interested in negative information?

MR. SIMPSON:  Well, we've only had a very small number of political clients.  So I can tell you, I mean, our methodology doesn't really change.  We -- my firm is -- all the principals are former journalists, so we don't come out of the political combat industry.  We come out of the, you know, journalism industry, which is all about sort of sticking to the facts and not leaping to conclusions and not trying to, you know, come up with a hit piece on anybody.  So, generally speaking, you know, what we get compensated for is producing reliable treatments of whatever the subject is.

And I should just add, I mean, it doesn't -- it doesn't help us or our clients if we only look for negative information.  What the clients want is all the information.  And so, you know, someone -- if you're in a campaign and the, you know, other side is a businessman and you're reviewing his career, it's important information whether he's a good businessman or bad businessman.  And you don't want your client trying to make an issue of his business career if he's a brilliant businessman who knows how to make money in an honest and ethical way.

MR. GOWDY:  All right.  Let me ask you about a couple words you just used.  You just used the words "good" and "bad," which some would argue are inherently subjective; but you also used the word "facts," and what did you mean when you used the word "facts"?

MR. SIMPSON:  I mean, factual information is -- a lot of what we do is gather facts.  And sometimes facts are provable facts; sometimes facts are established facts; sometimes they're allegations, factual allegations.  So we do all of the above.  When you gather up lawsuit information, for example, you have two sides making factual allegations against each other; and what's important is that

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

you have a reliable, credible basis for your information.

And, you know, it is a lot like journalism in that journalism is called the first draft of history, where essentially you're gathering up information, and your job is not to determine the truth, it's to gather credible information and to present all the possibilities and all the reliable information you can find.

But, you know, every day in the newspaper every story has two sides to it, and it's not the reporter's job to figure out who's telling the truth and who's not or who's right and who's wrong, it's to be responsible and professional in gathering up all of the facts and allegations and presenting them in a neutral way.   So our method is journalistic, and our reports are written along those lines.

MR. GOWDY:  Do you draw a distinction between facts and allegations?

MR. SIMPSON:  Certainly.

MR. GOWDY:  What is that distinction?

MR. SIMPSON:  Well, I mean, a fact is something that's subjectively verifiable to all reasonable observers; and an allegation is something that hasn't been confirmed.

MR. GOWDY:  All right.   No offense to people that do what you do for a living, but if it is all publicly available, why do people need to hire you?

MR. SIMPSON:  Well, we live in an information society, and there's a lot of information out there.   Some people are good at finding it and processing it, and others not so much, or it's just a question of specialization.

So you're running a business and you're busy running your business and you think that the guy who's your main competitor is cheating or maybe paying a bribe to steal a contract from you.   And that's not your main line of work.   You don't know how to investigate whether someone is engaged in corruption or

UNCLASSIFIED, COMMITTEE SENSITIVE

whether they've got a bad business history.  And so, you know, you hire someone who specializes in that kind of work.  So we specialize in finding records and reading things and digesting large volumes of information.

MR. GOWDY:  If I understood your testimony correctly, you don't specialize in political opposition research?

MR. SIMPSON:  It's not a major line of business for us.  It's, you know, every couple of years, 3, 4, when there's a Presidential campaign we get asked to do stuff.  We sometimes get asked to do stuff in California initiatives and other things.

Generally speaking, the market niche that we occupy is not the opposition research niche.  I don't think our pricing structure is conducive to getting opposition research business, which is -- generally doesn't pay very well.

MR. GOWDY:  Well, given that and given the fact that it's not your niche, why did the Washington Free Beacon approach you about doing the research on candidate Trump?

MR. SIMPSON:  Well, one of our, you know, specialties that I think people know is that we are good at business investigations, corporate investigations, and Mr. Trump is a big businessman.

So I can't get into exactly sort of what was said, but -- and, in fact, I don't think I even remember, you know, if I had that kind of information.  But I think it's reasonable to interpret that it was because we have a background doing business investigation.

MR. GOWDY:  And how long were you employed by the Washington Free Beacon?

MR. SIMPSON:  As I said, I think we started in September or October, and

UNCLASSIFIED, COMMITTEE SENSITIVE

I think it wound down in April, sometime in the spring.  As the Republican primaries came to an end, it became obvious that that work was going to end.

MR. GOWDY:  Did you rely on sources or subsources during your work for the Washington Free Beacon?

MR. SIMPSON:  I don't specifically remember.  We may have engaged someone.  Typically speaking, we engage subcontractors to gather documents in far away places.  And, you know, far away in this case may be even just being California or Illinois or something like that.  So I assume we had some subcontractors, for instance, but I don't specifically remember.

MR. GOWDY:  At some point, did the Washington Free Beacon stop paying you for the project into then-candidate Trump?  Did the business relationship end?

MR. SIMPSON:  I remember that we stopped doing the Trump work for the Beacon sometime in the spring of 2016.

MR. GOWDY:  Did you pick up --

[Discussion off the record.]

MR. SIMPSON:  He just reminded me, I don't know the exact date of when the payments, the last payment was.  And so I can tell you, generally speaking, that I -- you know, in the division of labor in my company, I don't handle the invoicing and banking stuff.  So I can tell you more substantively when it stopped, but I don't -- you know, the records are not something that I'm immersed in.

MR. GOWDY:  Well, let's go with that.  When did the work stop?

MR. SIMPSON:  I think it was April or May.

MR. GOWDY:  All right.  And were you retained by a subsequent client to pick up on the work that you had begun?

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. SIMPSON: It was the same subject. And obviously, the first work was informed by the new project. But, you know, it wasn't like a direct line continuum. It was similar work, but we obviously by then knew quite a bit about Mr. Trump and his business career and his associations and all that.

MR. GOWDY: Well, that leads me to ask were you approached by a subsequent client or did you market yourself to other people as having started this research and being willing to continue it?

MR. SIMPSON: I think that covers a client confidentiality area, but I can -- I also can tell you I don't specifically remember how it -- what the genesis of it was.

MR. GOWDY: You've got to help me here. Being approached by the first client you testified at some length about, and now I'm asking about how you were approached by the second client. So why would the second client be governed by confidentiality concerns, but the first one not?

MR. SIMPSON: It would — it would depend on the nature of the communication. But I'm not the only person in my company, so I think the answer -- I don't think I have the answer to your question, in any event.

MR. GOWDY: Did you have a second client interested in opposition research on candidate Trump?

MR. SIMPSON: Yes, sir.

MR. GOWDY: Who was that second client?

MR. SIMPSON: I think the records indicated that it's Perkins Coie, and I can confirm that.

MR. GOWDY: And who is Perkins Coie?

MR. SIMPSON: It's a law firm. I think they're headquartered in Seattle,

UNCLASSIFIED, COMMITTEE SENSITIVE

and they're a big law firm.

MR. GOWDY:   Had you ever worked for them in the past?

MR. SIMPSON:   I don't think I can get into the -- essentially, I haven't been released by any clients to get into my work for them.

Generally speaking, we sign confidentiality agreements with all of our clients, which is an essential part of the kind of work we do.   And I haven't been released or directed to get into whether I worked for these clients before or what kind of things I did for them.

MR. GOWDY:   So I assume you did not sign a confidentiality agreement with the Washington Free Beacon?

MR. SIMPSON:   I actually don't know.   We --

MR. GOWDY:   I'll direct this to your lawyer.   This is what I'm trying to avoid, picking and choosing which questions you want to answer.

MR. LEVY:   Yes.   Just to be clear, I think what he was trying to do in response to your questions on the Washington Free Beacon was talk as a general matter why the company would be hired.   I thought he was careful to say he wasn't getting into the actual conversations or communications with the Free Beacon.

So, in that sense, he is trying to be consistent.   He has not been released by either client to talk about confidential client communications, but he will tell you about the work and he's here all night for you.

[Discussion off the record.]

MR. SIMPSON:   I mean, my answer for the second client would be the same as my answer for the first, which is that I worked for the Wall Street Journal for about 15 years, and I specialized in complex financial investigations, political

corruption, that sort of thing, and it's what I'm known for.

And so, you know, I can't tell you what other people were thinking about why they hired me, but, generally speaking, people hired me because that's what they know I do.

MR. GOWDY:  Well, let's try to approach it this way:  When you were hired by Perkins Coie, did you consider them to be the client?

MR. SIMPSON:  Yes.

MR. GOWDY:  Do you recall who, if anyone, you specifically talked to at Perkins Coie?

MR. SIMPSON:  I think that would be getting into client communication.

MR. GOWDY:  I'm going to have to look at my colleague from California. For months and months I have been hearing about all the privileges that we do not recognize in congressional investigations, and this is a brand new one to me.  So is this a privilege that we recognize?

MR. SCHIFF:  I think the answer is we should get through the interview, and then we can decide whether there's a privilege we are going to recognize or whether we're going to use compulsory process.  I don't know the answer, but I suggest we try to get as much information as we can voluntarily and then figure out whether we need any more than that.

MR. ROONEY:  Well, this did come up, as you know, with another witness where I was in chair and this exact thing came up.  And I asked the witness to answer one of your questions, because of this congressional committee not recognizing the privilege of attorney-client.  And they answered the question.  So we didn't wait until it was over.

MR. SCHIFF:  But we had a couple interviews, one in which we asked

UNCLASSIFIED, COMMITTEE SENSITIVE

about other clients, and we were not allowed to get the answers because there was an objection on your side that it was beyond the scope or we shouldn't just be asking about other clients that weren't necessarily related.   So we've had kind of rulings that have gone back.   I don't know whether --

MR. ROONEY:   That's fine, but we're just trying to get the information here. And if I was willing to make Carter Page answer a question for Mr. Swalwell that he did not want to answer and begged us not to answer, and I made him answer it, and he's trying to get some background information on his client, it's kind of like, you know, it's not a two-way street, and that's not really fair.

MR. SCHIFF:   Carter Page was subpoenaed to come in, because he wouldn't cooperate otherwise.   I'm not objecting to the question.   I just don't know the answer.   And so I'm not objecting to the question, though.   And my only suggestion was we try to get all the answers we can get answered, and then we can figure out, okay, we need to go back and say we need to get answers to these questions or maybe we get what we need.   That was just my suggestion.   But I'm --

MR. GOWDY:   All right.   We'll keep trying.

MR. CONAWAY:   Just to be clear, you're invoking attorney-client privilege with all these folks or just client-client privilege or just work product?   I mean, what is it?

MR. LEVY:   It's a voluntary interview, and so he's just respectfully declining to answer this question.

MR. CONAWAY:   On what basis?

MR. LEVY:   He's got a confidentiality obligation to the client.   The client has not waived that confidentiality for him to get into his communications with the

UNCLASSIFIED, COMMITTEE SENSITIVE

client. He can, however, talk to you as long as you'd like about the work that he did, his communications with Mr. Steele, the work on the dossier. He just can't talk about communications with the client, because they are confidential, and those confidentiality considerations have not been waived.

MR. CONAWAY: I'm going to figure out a way to officially put the objection on the record so that when we revisit how we enforce the House investigatory prerogatives, we'll know what to do. So what do we do?

███████████ I think what we should do is, if you can't answer the question, raise the objection.

MR. CONAWAY: He won't answer the question.

███████████ He won't answer the question. So there's been an objection. And I'll just say that the witness is reminded that he may refuse to answer a question only to preserve a testimonial privilege. Neither the U.S. House of Representatives nor the committee recognizes any purported nondisclosure privileges associated with common law, including attorney-client privilege, attorney work product protections; and neither the U.S. House of Representatives or the committee recognizes any purported contractual privileges, including those supposedly deriving from nondisclosure agreements.

So we'll just raise that's the objection that's on the record. We'll move on to the next question.

MR. LEVY: And just to ask clarification just so we're making sure we're all proceeding under the same rules, are those rules for staff depositions or for voluntary interviews, which is what this is?

███████████ Well, we consider this to be a -- this is a voluntary staff deposition. You're here on a voluntary basis.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. LEVY:   Okay.   The letter that we had talked about last week said voluntary interview, which we thought was covered by a different set of rules. We're happy to follow whatever rules govern.   Of course, we're going to follow the rules, but just want clarity on what they are.

MR. SCHIFF:   The only thing I will say is we had this issue come up with a witness who was subpoenaed, and we read the advisement that those privileges are not -- they are not recognized.

So the only thing I would commend to you is you can assert whatever privilege you want today, but if the majority decides that they need more information, they'll have to bring you back under subpoena.   Then those privileges won't be recognized.

So I think the more information you're able to give today, the greater likelihood we won't have to bring you back under a subpoena.

MR. LEVY:   Understood.   And that's our aim today is to cooperate as much as we can with the entire committee today.   I appreciate that.   And while we've not yet seen a copy of the letter, we understand that the letter was going to withdraw the subpoena.   We have it now.   Okay.   And let me just -- no, this is not the letter.

MR. CONAWAY:   No, it's one signed by me.

MR. MUSE:   The subpoena has been withdrawn.   We have that.

MR. LEVY:   Because I believe in the other situation the members are referencing, the subpoena was not withdrawn.

MR. SCHIFF:   Correct.   I mean, you're not under subpoena at this moment, but my point is the more forthcoming you can be, the greater the likelihood you won't have to be brought back under subpoena.

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. LEVY: Understood.

MR. GOWDY: Mr. Simpson, were you aware that Perkins Coie was retained by the DNC?

MR. SIMPSON: I'm aware. I was aware of that and have been for years that they have -- they were one of the main lawyers for the Democratic party, yes. I don't have any specific awareness --

MR. GOWDY: That wasn't my precise question. With respect to this fact pattern, with respect to your firm being retained, were you aware that Perkins Coie was working on behalf of the DNC?

MR. SIMPSON: Yes. I mean, I know that they are — the DNC is a client of Perkins Coie. I don't — I didn't see it -- nobody gave me a document or informed me specifically of that.

MR. GOWDY: Did you think the law firm was just doing it on their own?

MR. SIMPSON: I'm sorry, I don't understand your question.

MR. GOWDY: Did you think the law firm was just doing it on their own?

MR. SIMPSON: Doing what? Doing --

MR. GOWDY: Opposition research into candidate Trump.

MR. SIMPSON: No.

MR. GOWDY: Paying you to do opposition research into candidate Trump, did you think Perkins Coie was doing that on their own?

MR. SIMPSON: No, sir. What I'm trying to explain is that I have been in Washington for several decades, and I spent a lot of time on Capitol Hill and it was well-known to me that Perkins Coie represented the DNC.

MR. GOWDY: Is that the only way that you knew that they were doing work on behalf of the DNC when they retained you in this specific fact pattern?

20

MR. SIMPSON: I'm not sure I understand what you're trying to ask me, but if it's -- I'm not going to get into what discussions I had with my client about who their clients were.

MR. GOWDY: I'm looking at a release from Perkins Coie that is giving me more information than you are. Have you seen the release where they released you from some of your confidentiality obligations?

MR. SIMPSON: I would like to see a copy of that, if you don't mind.

MR. GOWDY: Do your lawyers not have it?

MR. SIMPSON: It's been a busy time. Okay. Okay. I'm sorry if I'm not giving you a clear answer. I knew it was the DNC that we were working for.

MR. GOWDY: Okay. How did you know it was the DNC?

MR. SIMPSON: I honestly don't -- I couldn't tell you if someone specifically said, this is for the DNC.

MR. GOWDY: Well, how else would you know it was for the DNC? Did you read it?

MR. SIMPSON: As I'm trying to explain, I know -- I've been in Washington for a long time, and Perkins Coie represents the DNC.

MR. GOWDY: So you knew it by habit and custom?

MR. SIMPSON: I'm -- yes.

MR. GOWDY: By habit and custom?

MR. SIMPSON: I feel like I'm in a difficult position, because I have not been released from my client -- by my client to talk about anything that we talked about, but I'm trying to give you the answer that I think you want, which is I was definitely aware that Perkins Coie represented the DNC and that they were the client in this matter.

21

MR. GOWDY:  Right.  And I'm asking you how you knew that?

MR. SIMPSON:  And I'm -- I don't know what to tell you other than that I was generally aware that Perkins Coie represented the DNC.

MR. GOWDY:  Okay.  So how did your work for Perkins Coie begin?

MR. SIMPSON:  My recollection is we began to review what we had learned over the previous months and talk about what we would do, you know, now that we would have resources to pursue this -- some of these matters further. So it's -- when you get into that point of a piece of research, you begin to develop lines of inquiry and things that you think might be important, things you want to -- that other people are -- you know other people are interested in.

So we began to develop more specific lines of inquiry.  So they would be -- so the things that we started looking at specifically were a lot of Mr. Trump's overseas business deals, his history with regard to tax disputes.  We were very interested in things like his clothing line and where his -- you know, he -- I can't remember exactly when this came up, but we gradually figured out that he -- while he was running on a platform of economic nationalism that he's outsourced his clothing line to developing countries.  So we were interested in the labor practices around his factories.

You know, we had gradually accumulated more and more things about his bankruptcies.  And we had gotten a better sense of who his business partners were.  So those were issues.  So we sort of -- when we reached an agreement about, you know, funding and we thought we would have funding to do a bunch of things, we began to look for people who could help us pursue some of these things.  And I guess that's a general description of what we began to do.

MR. GOWDY:  Were the lines of inquiry dictated by the client or suggested

UNCLASSIFIED, COMMITTEE SENSITIVE

by the client, or did you come up with those on your own?

MR. SIMPSON:  Generally speaking, we seek and usually receive a lot of leeway to develop our lines of inquiry.  And typically, when you're already familiar with the subject and the client isn't -- and that was obviously the case here -- you're running the investigation.

. So we like to get -- we like to have a lot of freedom to pursue everything or the things that we think are important, because we have found from experience that clients, you know, generally they have something that they maybe are trying to do or have some preconceived notions about things, and we find that to be unhelpful.  So I'd say, in general, we were the architects of the research and we made most of the decisions about what to look for and where to look.

MR. GOWDY:  What was the budget for you to enjoy the freedom to pursue the lines of inquiry you wanted to pursue?

MR. SIMPSON:  I don't remember being given a specific expenses budget. I think the fees were $50,000 a month.

MR. GOWDY:  Flat fee, $50,000 a month?

MR. SIMPSON:  That's right.

MR. GOWDY:  Plus expenses, minus expenses?

MR. SIMPSON:  Plus expenses, yes.

MR. GOWDY:  How did you come to know Christopher Steele?

MR. SIMPSON:  I met Chris in -- I left the Wall Street Journal in 2009. And in my last few years at the Wall Street Journal, I had been living in Belgium, in Brussels, and had developed a line of reporting around the former Soviet Union and crime and corruption in the former Soviet Union.

And I had written a series of articles about Vladimir Putin and a lot of

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

corruption and organized crime activities sort of making its way westward from Russia, and eventually started doing a lot of work on Ukraine, corruption in Ukraine and gas trade in Ukraine, and connections to the Russian mafia.   That's when I first came across Paul Manafort.

And in any event, when I decided to leave the Journal in 2009, I had developed a lot of relationships with people who worked on organized crime issues, Russian organized crime issues, and had become known as someone who specialized in that.   And a mutual acquaintance of ours suggested that – Chris had just left the British Government, and a mutual acquaintance of ours suggested that we might be able to work together or at least, you know, had a lot in common.

And so I don't remember the details, but we were introduced.   We met. And, you know, it turned out we did, in fact, have a, you know, kind of obsessive interest in a pretty obscure -- what was then a pretty obscure subject.   And, you know, this is 2009, so we've just come off of 8 years of focus in the national security world on al-Qa'ida, Islamic terrorism.   And I had spent several years specializing on that.

And so there were very few people at that time who were interested in this issue, and so the small number of us tended to meet at conferences and that sort of thing.   So over time, Chris and I would have coffee together when I was in London or he was in Washington, and we would talk about various Russian  . corruption issues, organized crime, oligarchs.

MR. GOWDY:  How did he come to work on this project?

MR. SIMPSON:  As I said, I mean, we've done other things together.   And over – well, at the very beginning of this project, one of the very first things that I focused on was Donald Trump's relationship with a convicted racketeer named

UNCLASSIFIED, COMMITTEE SENSITIVE

Felix Sater, and who was alleged to have an organized crime, Russian organized crime background.

And over the course of the first phase of this or the first project, we developed a lot of additional information suggesting that the company that Donald Trump had been associated with and Felix Sater, Bayrock, was engaged in illicit financial business activity and had organized crime connections.

We also had sort of more broadly learned that Mr. Trump had long time associations with Italian organized crime figures.   And as we pieced together the early years of his biography, it seemed as if during the early part of his career he had connections to a lot of Italian mafia figures, and then gradually during the nineties became associated with Russian mafia figures.

And so all of that had developed by the spring of 2016 to the point where it was not a speculative piece of research; it was pretty well-established.   And Mr. Trump had, quite memorably, attempted to downplay his relationship with Mr. Sater in ways that I found, frankly, suspicious and not credible.   Saying he wouldn't recognize him on the street, but there were pictures of them together.

And the other people around Bayrock were also from the former Soviet Union and also had associations suggestive of possible organized crime ties. One of them is a guy named Tevfik Arif, A-r-i-f, who it turned out his real name was Tofik Arifov, and that he was an alleged organized crime figure from the central Asia.

So there was all that. And then, you know, we also increasingly saw that Mr. Trump's business career had evolved over the prior decade into a lot of projects in overseas places, particularly in the former Soviet Union, that were very opaque, and that he had made a number of trips to Russia, but said he'd never

UNCLASSIFIED, COMMITTEE SENSITIVE

done a business deal there.   And I found that mysterious.

And so I had the perfect person to go see if they could figure out what was going on there.   And so that's how I decided to ask Chris if he could look into it for me.   And I had -- the initial engagement with Chris was much like we do.   I didn't hire him for a long-term engagement.   I said, take 30 days, 20 or 30 days, and we'll pay you a set amount of money, and see if you can figure out what Trump's been up to over there, because he's gone over a bunch of times, he said some weird things about Putin, but doesn't seem to have gotten any business deals.

So that was the initial assignment.   It was pretty open-ended.   I didn't say, find me this or get me that.   I just said, see if you can figure out what's going on over there.   .

MR. GOWDY:   And how much did you pay Chris Steele?

MR. SIMPSON:   I think what we've told the committee from the bank records is that it was ultimately $160,000.   That sounds right to me.   I think probably the initial engagement was for 20 or 30 thousand dollars.   There's, you know, currency differences between pounds and dollars, so I don't remember how it was denominated or exactly how it was priced.

MR. GOWDY:   Now, help me understand this.   Would that payment for Steele have been expensed to the law firm, or would Fusion have paid that out of its own money that it received from the law firm?

MR. SIMPSON:   I believe, at least if things were running the way I hope they ran, it was expensed to the law firm.

MR. GOWDY:   So Perkins Coie paid Chris Steele?

MR. SIMPSON:   I think it was -- I mean, I think we billed them for it.

MR. GOWDY:   Okay.   ████████████████████████████

MR. SIMPSON:  I was generally aware of Chris' history.  You know, because of the strictures on government work, when you're involved in intelligence and talking about it, we never discussed in any great detail what kind of work he did.  And at least publicly it was -- even though he had been exposed in a prior leak by a former government agent over there, so it was, in fact, in the public domain that he had worked for British Intelligence, he generally didn't talk about his government work other than the way you would if you formerly worked for the government.  I used to work for the government, you know.  Sometimes he would say foreign office.  But we had mutual friends who were familiar with his background.

MR. SCHIFF:  Just to clarify, Mr. Gowdy, you're not confirming or denying, you're just asking?

MR. GOWDY:  I'm just asking what he said.

MR. SIMPSON:

MR. GOWDY:  Did you ever have any conversations with the FBI?

MR. SIMPSON:  Not about this, no.

MR. GOWDY:  Did Chris Steele go to Russia as part of this project?

MR. SIMPSON:  No, sir.

MR. GOWDY:  How do you know that?

MR. SIMPSON:  Well, that's what he told me.  I mean, assuming -- unless it was a covert thing that he was keeping from his client, he would have billed me for it.

MR. GOWDY:  How was he able to accumulate information in Russia if he didn't go?

MR. SIMPSON:  Well, so to be clear, he really would not be safe if he went to Russia.  He's been exposed as a former undercover British Intelligence officer who worked in Moscow.  So it wouldn't be wise for him to go to Russia.

███████████████          Five minutes, Mr. Gowdy.

MR. SIMPSON:  So, to answer your question, you know, generally speaking, his line of work is very different from mine and that was why I hired him. So I do mostly public records and we don't do much interviewing.  But I'm familiar with how his work is done.  And generally, you have a network of sources who live in or came from the place that you're interested in.  So, you know, generally speaking, you would have -- you would run a network of subsources or subcontractors who travel around and gather information for you.  And so without getting into who his sources are, I can say generally, he hires people who can travel and talk to people and find out what's going on.

MR. GOWDY:  Were you able to vet or corroborate or contradict any of the sources or subsources?

MR. SIMPSON:  We did get into assessing the credibility of the sources and whether they were in a position to know the things that they were saying.  I didn't ask for the specific identities of specific people.  Some people, I think I know who they are for other reasons.  But that's about as much as I can say.

We did a lot of -- when the first reports came in, we did a lot of discussing of whether this was credible information.  And obviously, evaluating human Intelligence is not the same thing as looking at documents.  And so it's a much trickier process and the thresholds are different.  And so what you're really trying

28

to do, which is kind of like interviewing in journalism, is figure out whether there's reason to think that what's being said is credible.   And so we did a lot of that.

MR. GOWDY:   Can you give me an example of something that he produced to you that you found to be not credible?

MR. SIMPSON:   No, I don't think anything comes to mind.   I mean, I must say my original reaction to all this was to suspend judgment.   I was not particularly interested in some of the things that he found that are among the most controversial, because I didn't think they were useful or important for what I was trying to do.   And so I to this day can't tell you whether a lot of those things -- I just don't have a strong view as to whether they are false or true, per se.

But what we did do is look at names and places and people and whether they matched up with information we could get elsewhere.   And all of that, as far as it went, checked out.   I haven't seen anything that has contradicted anything in the memos to date, at least not that I can think of.

MR. GOWDY:   Well, that's a very different standard.   You haven't seen anything to contradict it, whereas my question was, what did you have that corroborates it?   How were you able to assess the accuracy of the information, the underlying information he provided you?

MR. SIMPSON:   I'm sorry, I thought you asked me whether there was anything in there that I found to be wrong.

MR. GOWDY:   I did.

MR. SIMPSON:   I haven't found anything to be wrong.   If you'd like me to get into more of the corroboration, I can do that.

MR. GOWDY:   Yes, I'm sure we will get into that.   My other question is, was there anything not included in your report that you concluded was wrong?   In

29

other words, I think my primary question was, is there anything that Steele, his sources or subsources told you that you didn't include because you immediately found it to be incredible?   And I think your answer was no.

MR. SIMPSON:   That is correct.   My answer to that is no.

MR. GOWDY:   And how did you assess the reliability of that information, given the fact that you did not talk to the sources or subsources?

MR. SIMPSON:   So it's obviously a challenging thing to assess human intelligence, field interviews, and it is different from looking at a lawsuit.   But there are similarities to the interview process in journalism, where there are elements of people, what people say that you can check.

And so, you know, for example, in one report they described how the Kremlin's election operation was being run by Sergei Ivanov, who is the head of the presidential administration, and, you know, gave a number of details about that. That was news to me. I thought if you were going to run an intelligence operation against the United States, you'd use the SVR. They'd be in charge.

As I dug into some of the more obscure academic work on how the Kremlin operates by some of the more distinguished scholars of the subject, I found that Ivanov is, in fact, or was at the time, in fact, the head of a sort of internal kind of White House plumber's operation for the Kremlin and that he seemed to have the kind of duties that were being described in this memo.

So either this person was familiar with some fairly obscure research or they knew what they were talking about.   So that's the kind of work you can do.   You can do a lot of that work.   And that's why I think I can give a much more definitive answer on whether anything's been disproved, because, generally speaking, when you're evaluating things, you're looking for things that someone clearly made up.

UNCLASSIFIED, COMMITTEE SENSITIVE

30

And I couldn't find anything that was clearly made up. They had accurate names and events that, while not totally secret, were pretty obscure that turned out to be on target.

We -- you know, they identified -- one memo identified a Russian guy who worked for an NGO called Rossotrudnichestvo, which is -- you know, I didn't know it at the time, but I was able to learn from looking at it that the FBI considers that to be a front for the SVR. So, you know, either the people were extremely knowledgeable about a lot of obscure intelligence stuff or, you know, they -- what they're saying had some credibility.

I'll add that, you know, again, like journalism, British Intelligence methodology is a kind of strict recitation of what sources are saying. And so, you know, I didn't do this -- I've never done this much work with Chris, but in the process of doing this work, you know, I learned a good bit about British Intelligence methodology.

And in a way, it is like journalism, because they are somewhat rigid in reporting what sources in the field are saying, and, you know, they -- they don't do a lot of the -- this is what this guy said, but we don't think it's true or we believe this or we believe that he might have gotten the data wrong. They just -- it's a kind of a here's what they said type report.

So, again, what we were trying to do is evaluate whether the information was credible. Chris is the spy. I'm the ex-journalist, so I defer a lot to his professionalism. From everything I know now and knew at the time, he's an extremely well-regarded professional. And I had no reason -- I have no reason today to change my opinion.

MR. STEWART: Time is up.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. SCHIFF:   Mr. Simpson, you described understanding Perkins Coie's client was likely to be DNC because of the long relationship between the two.   Did you know who Free Beacon was doing the work for?

MR. SIMPSON:   I don't know that they were doing the work for anyone.   I mean, it's a foundation.   So it's a freestanding entity, to my knowledge.

MR. SCHIFF:   Well, without getting into conversations, client conversations, can you tell us what you know about the Free Beacon and why they were likely employing you to do this kind of work?

MR. SIMPSON:   I think they were from the wing of the Republican party that was concerned about a takeover of the party by the Donald Trump wing.   And as you probably know, there was a pretty brutal struggle during the primaries between the more traditional conservatives and the more sort of populist, nationalist, protectionist conservatives.   So I think they were from the free markets arm of the party.

MR. SCHIFF:   And do you know whether it was their intention to -- I mean, I only know of them as a very conservative publication.   Do you know whether it was their intention to publish the information that you provided them or to provide it to one of the GOP opponents of Mr. Trump, or more than one of the opponents?

MR. SIMPSON:   I can tell you that the information that we gathered appeared in print in various places, not just the Beacon.   And I don't have any specific knowledge of it being provided to a particular candidate, or at least not in any kind of -- I don't think that they were a proxy for a specific candidate, not to my knowledge.

MR. SCHIFF:   So you saw your work product, what you could recognize as your work product appear in various publications, not just theirs?

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. SIMPSON:  Right.  Well, so the way that we work is that we're all ex-journalists.  And, you know, part of the business idea behind the company is that, you know, research is expensive, and if we gather it and have it and journalists call us looking for things, you know, we will work with them.  And so we would get calls from journalists during the primaries saying, what do you know about Trump this or Trump that?  And we would provide them with that information.

So I want to be clear that, you know, it appeared in other places because other journalists called us and asked us about it.  And we would ask -- well, I'm sorry.  I'm not going to say -- in general, let me just say in general, if a reporter calls you and says, I need information on such-and-such, and it's of significance to your client, you know, you would call the client and say, do you have any objection to, you know, you know, helping this reporter?  So in both of these instances, you know, I think those rules would generally apply.

MR. SCHIFF:  Well, in that circumstance, though, the reporter calling you would know that the Free Beacon -- that the publication you're working for was a client, right?

MR. SIMPSON:  Not necessarily.

MR. SCHIFF:  So it might be part of your practice that if you're doing work on behalf of a client, it could be I guess one of two situations:  The client could either authorize you to talk to reporters on their behalf; or if a reporter called you and asked you for information, you could check with your client as to whether you have their permission to share the information?

MR. SIMPSON:  That is correct.  And, I mean, generally speaking, you know, we get a fair number of inquiries about, you know, lots of different subjects.

MR. SCHIFF:  You wouldn't be sharing information without your client's approval one way or the other?

MR. SIMPSON:  That's right.

MR. SCHIFF:  And can you tell us what publications your work appeared within, in terms of the work that you were doing for the Free Beacon?

MR. SIMPSON:  It would -- I would struggle to come up with a list right now.  I'm -- that was, you know, a good while ago.  I think we probably had inquiries from, you know, all the networks and most of the major papers.  And I don't have a specific recollection of who published what.

MR. SCHIFF:  Did your work product appear on Fox News?

UNCLASSIFIED, COMMITTEE SENSITIVE

[3:11 p.m.]

MR. SIMPSON:  I honestly don't know.

MR. SCHIFF:  And how about Breitbart?

MR. SIMPSON:  Again, I'm sorry to say, I just -- I don't have any recollection.

MR. SCHIFF:  Now, you don't have a recollection because there might be other people at the firm who would be providing that information, or it would be you but you just don't recall?

MR. SIMPSON:  It would be a little of both.  I mean, those aren't my go-to news sources, so I don't really spend a lot of time -- you know, I don't read Breitbart every day, and I certainly don't watch FOX every day.

So, you know, if it ran in The New York Times and it was my work, I'd probably remember it, but not if -- and so -- but it's also true that, you know, we have 12 or so people in the company, and depending on the matter, someone else might have handled it.

MR. SCHIFF:  So this might also be a situation where your client, the Free Beacon, might be providing information to various news sources without discussing it with you?

MR. SIMPSON:  Yes.

MR. SCHIFF:  I see.  So in that case, it could appear on FOX even though you didn't have a conversation with FOX yourself?

MR. SIMPSON:  That's right.

MR. SCHIFF:  During the time that you were doing work for Free Beacon, you had mentioned some work in the first phase.  You had discovered business relationships with Felix Sater and Bayrock.  By first phase, do you mean while you

were doing work for Free Beacon?

MR. SIMPSON:  It was one of the first things we found.  And I should emphasize, it was, you know -- originally I saw it in the New York Times article, so it wasn't a great investigative discovery.  But then when I read into it and I found depositions in which he was, you know, more than evasive about the relationship, that's when I got really interested.

MR. SCHIFF:  So during the period of time you were working for Free Beacon, you came across some of the first information about candidate Trump's business ties in Russia, including those with Felix Sater.

MR. SIMPSON:  Yep, that's correct.  And lots of other issues came up during the primaries that raised concerns in my mind about whether there might be connections -- Donald Trump might have unexplained connections to Russia or people involved in that part of the world.

I mean, among other things, eventually Paul Manafort was appointed to his campaign as the -- first the convention manager and then the chairman -- or the campaign manager.  And I knew a lot about Paul Manafort from my career at The Wall Street Journal.  I had written a number of stories about his involvement with Oleg Deripaska and the pro-Russia party in Ukraine and another oligarch named Firtash.  And I had even written a story about whether he should have registered as a foreign agent.

All that had occurred years earlier.  So when he suddenly surfaced, I was, you know, struck by that.

MR. SCHIFF:  Now, he surfaced though after you were no longer working for Free Beacon, right?

MR. SIMPSON:  I think he originally -- I don't remember the dates, but I

UNCLASSIFIED, COMMITTEE SENSITIVE

think it was somewhere in the transition period.

MR. SCHIFF:  I'm sorry, the -- oh, your transition period.

MR. SIMPSON:  Yeah, between --

MR. SCHIFF:  Well, the convention was in July, I believe.

MR. SIMPSON:  The convention was in July, but Paul Manafort surfaced with the Trump campaign in like March.

MR. SCHIFF:  So if you would go through with us some of the Russia-related things that concerned you that you learned in that first phase while you were doing work for the Free Beacon, as best you can recall.

MR. SIMPSON:  Well, the Bayrock, the funding of Bayrock was, I think, much of what we initially were concerned about and focused on.  The company seemed to have some sort of funding source from either Russia or the former Soviet Union that was opaque.  So we spent a lot of time looking at the people around that and their backgrounds and why Mr. Trump would be in business with them.  So that was one of the major issues.

Another one that I think surfaced in probably the early winter was the amazing number of people from the former Soviet Union who had purchased properties from Mr. Trump, including Dmitry Rybolovlev, who purchased a derelict estate at an extreme markup in Florida.  And a number of other people bought into his properties.

We also looked at his trips and marketing activities in Russia.  And I think all of that came up, you know, during the first phase of the project.

MR. SCHIFF:  You mentioned that you'd done a lot of work as a journalist in terms of Russian organized crime, financial crimes, organized crime more generally.  What can you tell us about how the Russians launder their money and

UNCLASSIFIED, COMMITTEE SENSITIVE

whether that was an issue of concern during the first phase of your work for Free
Beacon?

MR. SIMPSON: I guess the general thing I would say is that, you know,
the Russians are far more sophisticated in their criminal organized crime activities
than the Italians, and they're a lot more global. They understand finance a lot
better. And so they tend to use quite elaborate methods to move money.

You know, obviously, the offshore system has grown in sophistication in the
last decade or so, too, so they've taken advantage of that. Things that I had
wrote about involved laundering money through security straits, laundering money
through fake arbitrations in court, laundering money through commodities deals.

I mean, if you can think of a way to launder money, the Russians are pretty
good at it. But they specifically understand financial markets. So I think I can tell
you all of that.

I can tell you also that the Russians are much more integrated in the way
they operate with the political -- the sort of legitimate business structures. So you
don't find too many Italian mafia guys who are major shareholders in big media
companies, but you definitely can find Russian mafia guys who are big
shareholders in international media companies.

So the only way that -- well, the thing that comes to mind, of course, is the
real estate deals. And, you know, it did come to our attention during this, you
know, first round or this first part of the project that there were a lot of real estate
deals where you couldn't really tell who was buying the property. And sometimes
properties would be bought and sold, and they would be bought for one price and
sold for a loss shortly thereafter, and it didn't really make sense to us.

And we had done a lot of work for previous investigations on people buying

38

condos in order to get visas under the EB-5 program. So we were very familiar with a pattern of corruption and illicit finance related to purchasing of condos.

MR. SCHIFF: Did you find evidence of that with respect to Mr. Trump?

MR. SIMPSON: I think a lot of what we found is subsequently -- there have been similar articles published. "Evidence," I think, is a strong word. I think we saw patterns of buying and selling that we thought were suggestive of money laundering.

I think what I was saying to Mr. Gowdy about sort of, you know, because we are not law enforcement, we don't have compulsory power, and we also don't have, you know -- we're not lawyers, or prosecutors, or even special -- even secret agents.

Generally, we find patterns of things, and then if it seems like it's potentially a law enforcement matter then we would turn it over to law enforcement. Or, you know, if it's enough to write a story, we would give it to a journalist.

MR. SCHIFF: And, in this case, what facts came to your attention that concerned you that the buying and selling of properties -- the buying and selling of Trump properties might indicate money laundering?

MR. SIMPSON: There was -- well, for one thing, there was various criminals were buying the properties. So there was a gangster -- a Russian gangster living in Trump Tower.

MR. SCHIFF: Who was that?

MR. SIMPSON: His gangster name is Taiwanchik. I couldn't spell his actual name. But, you know, I mean, these are the kind of things that prompted us to hire Mr. Steele. We had a gangster named Taiwanchik living in Trump Tower who had been under -- I'm sorry, he was -- I think he was running

UNCLASSIFIED, COMMITTEE SENSITIVE

a -- his associates were living in Trump Tower, and he was running a high-stakes gambling ring out of Trump Tower, while he himself was a fugitive for having rigged the skating competition at the Salt Lake Olympics and a bunch of other sporting events engaged in rigging.

And when Mr. Trump went to the Miss Universe pageant in 2013, Taiwanchik was there in the VIP section with Mr. Trump and lots of other Kremlin biggies. So that kind of thing raised questions with us.

Generally speaking, the patterns of activity that we thought might be suggestive of money laundering were, you know, fast turnover deals and deals where there seemed to have been efforts to disguise the identity of the buyer.

MR. SCHIFF:  And during what time period did you see indications of fast turnover transactions or transactions made in the name of people who were not the actual purchasers?

MR. SIMPSON:  Well, I mean, there were sort of periods -- what we saw was that beginning in the early 2000s, when he began to do business with Bayrock and to do some of these other deals, that these were the problematic deals that he entered into.   So it was essentially the previous decade of business deals, 2005 onward.

MR. SCHIFF:  And up until what point?  Do you recall?  Or continuing to the present?

MR. SIMPSON:  Well, I mean, some of the things that we have -- that we looked at that we thought were very concerning are existing investments in projects, and specifically a project in Panama, the one in Toronto.   Those both got a lot of fraud associated with them, a lot of fraud allegations, a lot of activity that I would say smacks of fraud, and a lot of Russian mafia figures listed as buyers who

UNCLASSIFIED, COMMITTEE SENSITIVE

may or may not have actually put money into it.

And so there's a couple of -- so a couple of the big condo tower deals offshore, outside the United States, I think both of those are in bankruptcy now, Mr. Trump is no longer associated with them.

The other one that is -- was concerning to us was -- is the golf courses in Scotland and Ireland.

MR. SCHIFF: And did you see Russian money involved with those as well?

MR. SIMPSON: Well, we had -- you know, we saw what Eric Trump said about Russian money being available for his golf -- for the golf course projects, making remarks about having unlimited sums available. And, you know, because Mr. Trump's companies are generally not publicly traded and don't do a lot of public disclosure, we can only look -- have a limited look into the financing of those projects.

But because the Irish courses and the Scottish courses are under U.K., you know, Anglo corporate law, they have -- they file financial statements. So we were able to get the financial statements. And they don't, on their face, show Russian involvement, but what they do show is enormous amounts of capital flowing into these projects from unknown sources and -- or at least on paper it says it's from The Trump Organization, but it's hundreds of millions of dollars. And these golf course are just, you know, they're sinks. They don't actually make any money.

So, you know, if you're familiar with Donald Trump's finances and the litigation over whether he's really a billionaire, you know, there's good reason to believe he doesn't have enough money to do this and that he would have had to

41

have outside financial support for these things.

Again, you know, because of what I do, it's sort of in this middle area where we mostly are working off public records. A lot of what I do is analyze whether things make sense and whether they can be explained. And that didn't make sense to me, doesn't make sense to me to this day.

MR. SCHIFF: Now, you mentioned that unlike the Italian organized crime, the Russian organized crime is more integrated into Russian Government, Russian corporate life.

MR. SIMPSON: American Government, American corporate life.

MR. SCHIFF: American Government, American corporate life. If the Russians were laundering money through Trump golf courses or Trump condos, would the Russian Government be aware of this? Would they be either knowing or active participants potentially in this?

MR. SIMPSON: Well, so what is well known and well established in criminology now is that the Russian mafia is essentially under the dominion of the Russian Government and Russian Intelligence Services. And many of the oligarchs are also mafia figures.

And the oligarchs, during this period of consolidation of power by Vladimir Putin, when I was living in Brussels and doing all this work, was about him essentially taking control over both the oligarchs and the mafia groups.

And so basically everyone in Russia works for Putin now. And that's true of the diaspora as well. So the Russian mafia in the United States is believed by law enforcement criminologists to have -- to be under the influence of the Russian security services. And this is convenient for the security services because it gives them a level of deniability.

So I'm sorry for the long answer, but essentially, if people who seem to be associated with the Russian mafia are buying Trump properties or arranging for other people to buy Trump properties, it does raise a question about whether they're doing it on behalf of the government.

MR. SCHIFF: Now, whether they're doing it on behalf of the government or they're doing it -- whether they're doing it on behalf of the government, it would be your expert opinion that it would be known to the government if it's on --

MR. SIMPSON: Certainly.

MR. SCHIFF: -- any substantial scale?

MR. SIMPSON: Certainly, yes.

MR. SCHIFF: Might that provide the Russian Government leverage vis-à-vis now-President Trump?

MR. SIMPSON: Yes.

MR. SCHIFF: So if, as the President's son boasted some years ago, they were getting lots of financing from Russia and that financing were illicit, that would be known to the Kremlin.

MR. SIMPSON: I think -- I mean, yes, I think that's true. I think we had more specific reporting than that from Chris, and I think it's credible.

MR. SCHIFF: Now, the work that was produced during that first phase with the Free Beacon, what form did that take? Would you be providing, say, like 30-day reports to the Free Beacon, if you're able to answer? And maybe you can say more generically what form that would take.

We've seen the form of Christopher Steele's reporting, although we don't know what form that would have been presented to your client. But what form generally would this information take?

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. SIMPSON:   So our typical practice is you hire me for a flat fee, you don't tell me what to do, and I give you a report in 30 days.   And you say, "I'm interested in this guy.  I think he's a crook."  And I say, "Okay, give me 30 days and X amount of money, and I'll give you a report."

If an engagement continues past 30 days, we tend to break out specific issues.   So once you've done a survey, which is what that initial thing is generally called, then you know, "Oh, well, this guy has a long history of gambling problems, and we're going to do a separate on his history of gambling problems."   It's a little like a white paper.

MR. SCHIFF:   You've described the -- and, again, just focusing on the first phase information you found about property purchases that were concerning with potential Russian money, you've talked about the ties to Felix Sater -- were there any other Russian links that you found during the first phase?

MR. SIMPSON:   I'm sorry for the pause.   This issue came up in various guises, and I'm trying to think of some specifics.   And offhand I just -- I mean, there were things like -- there were all kinds of random things.

There were, for instance, one of the -- you know, we bought all of Trump's books and all the books about Trump, and I remember there were things about trips to Russia, and that was a big thing.

And there was, prior to the 2013 Miss Universe fair, there was an earlier Trump vodka marketing project in Russia that later became something that we were very interested in.   It's difficult in my mind to get the chronology right, so, you know, a lot of these things were coming up in the spring, which is, you know, a period when we were ending the first part and starting the second.

MR. SCHIFF:   And what did you find notable about the Trump vodka

44

UNCLASSIFIED, COMMITTEE SENSITIVE

issue?

MR. SIMPSON:  That it seemed like there was an orchestrated effort by someone to help Trump out with -- to help him market, you know, these branded products in Russia, and that it was -- it was just very mysterious.   And then we later found some of the people who came up after the first Steele memo were involved in some of those efforts.

And so it seemed to be -- it seemed like it was part of the origin or the middle point of this relationship.   It was a little further back, where it was a little less heavy.

MR. SCHIFF:  And what was the period of -- did Trump go to Russia on this vodka promotion or his family members?

MR. SIMPSON:  I don't think he was there.   I think his representatives were there.   I don't believe there's a record of him being there himself.

MR. SCHIFF:  And what were the contacts that later emerged in the Steele work?

MR. SIMPSON:  Well, one of the guys who organized this trip was a guy who's currently known as Sergi Millian.   And he's been in the press a good bit, I think, although not recently.   And, you know, he came up in connection with that, and then he came up in connection with Chris' work as one of the people around Trump who had a Russian background, and unexplained, you know, a lot of unexplained things.

So when we looked at him, we found that he ran a sort of shadowy kind of trade group called the Russian-American Chamber of Commerce, which is -- Russians are known to use chambers of commerce and trade groups as fronts for intelligence operations.

UNCLASSIFIED, COMMITTEE SENSITIVE

45

And this guy, his name -- his real name or his original name that he came to the United States wasn't Sergi Millian. It was Siarhei Kukuts, and that's a pretty different name. And he changed his name when he got to Atlanta.

And when we looked at him some more, we found two different resumes for him. In one resume he said he was from Belarus and he went to Minsk State; and then in another he was from Moscow and went to Moscow State. In one he said he worked for the Belarussian Foreign Ministry; in the other, he said he worked for the Russian Foreign Ministry.

He was a linguist, also an interesting thing about his background. And as time went on, yeah, we found other things about him. We found a picture of him with Donald Trump. He boasted to people that he had sold hundreds of millions of dollars in Trump condos, Trump real estate to Russians, that he was some kind of exclusive agent for Trump in Russia and that he organized this trade fair.

·And then, you know, as further time went on, we found he was connected to Michael Cohen, the President's lawyer. And eventually, after boasting about a lot of this stuff on camera, on tape, to the TV network, he backed away from all of it suddenly when the Russia controversy began to get hot.

And Michael Cohen was very adamant that he didn't actually have a connection to Sergi, even though he was one of only like 100 people who followed Sergi on Twitter. And they -- we had Twitter messages back and forth between the two of them just -- we just pulled them off of Twitter.

And then, I guess, last but not least, he, you know -- as we became more and more interested in his background and the press started to write stories about him, it came out that he was associated with this Russian friendship entity called Rossotrudnichestvo, and that he was involved in organizing a junket to Moscow for

46

some American businessmen that was the subject of an FBI investigation, because it was a suspected recruiting operation.  And the FBI had questioned people who were involved in this trip about whether they were recruited by the Russians when they went to Moscow.

So it was that kind of thing.

MR. SCHIFF:  To your knowledge, was Mr. Millian one of the sources for Christopher Steele in the dossier?

MR. SIMPSON:  I'm not in a position to get into the identity of the sources for the dossier for security reasons, primarily.

MR. SCHIFF:  And what other concerns were raised or issues were raised about Mr. Trump's connections to Russia, either in the first phase or the second phase of your work, separate and apart from Mr. Steele's so-called dossier?

MR. SIMPSON:  Well, eventually, partly through Sergi Millian, partly through other things we learned, we gradually began to understand more about ·Michael Cohen, the President's lawyer, and his background, and that he had a lot of connections to the former Soviet Union, and that he seemed to have associations with organized crime figures in New York and Florida, Russian organized crime figures.  And --

MR. SCHIFF:  And which figures were those?

MR. SIMPSON: I was afraid you were going to ask me that. I can't remember a lot of the names. There was Simon Garber, the taxi king. And I guess another guy's name is Evgeny Freidman, who are people he was in the taxi business with.

There was some other transactions that are in some litigation in Florida over a mysterious missing payment that some of the people in that dispute had

been identified as organized crime figures.  Those are the ones that come to mind.

So Mr. Cohen had a very different image for much of the campaign as a -- simply a sort of pugnacious New York lawyer, and we gradually began to see that he was, you know -- people told us he spoke Russian.  And his father-in-law is from Ukraine.  He seems to have a lot of business dealings over there and, in fact, has a conviction for a money laundering-related crime.

All these things caused a good bit of concern.  I guess the big one, the other big one, was the Agalarovs, who seemed to be, you know, the central figures in the Trump-Russia relationship.  And so we spent a lot of time looking at them.

I, as sort of an amateur student of Russian oligarchs and criminals, I hadn't come across them before.  So I thought -- I at first didn't think they were that interesting.  But as we've, you know, learned more about them, it's become more troubling.

You know, I now -- I know now that they've been -- the Agalarovs started operating in the United States around the time of the fall of the Soviet Union and are associated with people who are connected to previous episodes of money laundering that are serious, the Bank of New York scandal.

And they themselves -- we found a case in tax court involving the Agalarovs that describes a lot of activity from that period and a criminal investigation of the Agalarovs from that period.

MR. SCHIFF:  What period was that?

MR. SIMPSON:  Early '90s.  And I just know from my reading on this stuff that a lot of agents of influence from Russia came to the United States in that period to launder money, and that, you know, we now know that the Russian

Intelligence Services never really closed up shop, and that they continue to insert people in the United States and run operations in the United States.

And so all of that is pretty troubling. I'd say -- I could generalize and say that, you know, as we've got deeper and deeper into understanding, you know, Donald Trump's business career and his history, it gradually reached a point where it seemed like most of the people around Trump had a connection to Russian organized crime or Russia in one way or another.

I could probably think of more if I think on it, but those are the big ones.

MR. SCHIFF: And knowing what you do about the Agalarovs, what do you think is the significance of the fact that the -- that Aras Agalarov was responsible, at least according to these public emails, for setting up the meeting at Trump Tower?

MR. SIMPSON: I think it's a reasonable interpretation that that was a Russian Government-directed operation of some sort, based on what I know now.

MR. SCHIFF: When you continued this work -- and let me just ask you, in terms of Free Beacon, you mentioned what your retainer was with Perkins Coie. What was your retainer with Free Beacon?

MR. SIMPSON: I think it was the same.

MR. SCHIFF: So 50,000 a month?

MR. SIMPSON: I mean, I don't literally remember.

MR. SCHIFF: But it was in the same ballpark?

MR. SIMPSON: We generally have a rate, a flat rate.

MR. SCHIFF: We know of your work vis-à-vis Christopher Steele. Did your work for Perkins Coie continue with these Russian lines of inquiry quite separate and apart from what Christopher Steele was doing?

49

MR. SIMPSON:  Yes.  I mean, because we've not had liberty to talk about all these things, there's been a lot of misconception about this whole process.  So, you know, it's a much broader project where we're not just looking at Russia and we're not just doing Russia stuff with Chris.  We're doing our own Russia work.

So, you know, in addition to things like finding someone who can look into a Mexican, you know, suit factory to see how they treat their workers, we are scanning Russian newspapers or newspapers all around the world for information about these subjects.  I have staff who prepare white papers on various subjects.

So without, you know, being too specific about it, in terms of the work product, you know, Chris' memos -- I mean, I guess it would be helpful to explain. So Chris' memos are raw field memoranda.  They're from interviews with his source network.  I didn't tell him what to write, you know, I didn't edit them. They're what came into me from him.  And they're, you know, to my knowledge, the only drafts.

So ordinarily I would take material like that, that I got from a subcontractor in the field, and I would incorporate it into a more polished memorandum.  And, you know, my style is a more journalistic style, so I'm not going to just give you what Tom, Joe, and Harry said.  I'm going to say, here is what people said, and here is what we think that really means, what's really going on.  It's a very analytical product.  And, you know, that's to sort of guide the client's ability to make decisions.

And in this case, the material that came in from Chris was of such a kind of disturbing and serious nature, I didn't want to do that.

█████████  Five minutes.

MR. SIMPSON:  So, because, you know, I'm an amateur student of a lot of

UNCLASSIFIED, COMMITTEE SENSITIVE

this stuff, not a pro.  And the line of reporting that was coming in from him was, you know, extraordinary and not something that I usually would be doing as a research person based in Washington, D.C.  So I segregated that, and I never incorporated it into anything else.

MR. SCHIFF:  You mentioned the limitations on your ability to follow the money in terms of the potential money laundering involving Russian figures in The Trump Organization.

Two questions.  One is, did you also look at the Kushner business operation?  Did you find any facts that caused concern in terms of potential money laundering through the Kushner properties or organization?

And second, we do have the subpoena power that you don't.  It is within the scope of our investigation to determine whether this was one of the Russian active measures, the use of financial means to entangle Mr. Trump.  How would you go about using that?  What institutions would you look at to be able to confirm or reject those allegations?

MR. SIMPSON:  On the first question, I -- we looked at the Kushner project in Jersey City.  Kushner was another case of someone who I sort of misjudged.  I didn't think he was going to be very interesting and very important, partly because he was so young.

But in any event, we did look at some Kushner stuff and specifically focused on the project in Jersey City, I think partly because Trump had a position in that project, and discovered that it was -- one of the central mysteries of Donald Trump is that, you know, beginning in the mid-2000s he was not a creditworthy businessman.

And so he -- you know, so if you're analyzing, you know, someone who

UNCLASSIFIED, COMMITTEE SENSITIVE

says they're a billionaire but can't get a bank loan, you know, there's this whole issue of where is the credit coming from.   And so, you know, we were always trying to figure out where -- how he was financing various things.

So anyway, we looked at this Jersey City project, and it was going to be financed by selling visas to foreign citizens who were seeking green cards from the United States.   And I knew from previous investigations that that program was -- there were a lot of irregularities in that program, and that, in fact, the government, the U.S. Government had conducted previous investigations into whether foreign intelligence figures were using the EB-5 program to get people into the United States.

So in any event, we looked at all of that.   And I don't believe we concluded -- we found any specific events of fraud, but it all had took on the appearance of a controversial thing, which later became true.   And, in fact, it did become very controversial that they were using EB-5 to fund that project.

MR. SCHIFF:   Did you look at the other -- the Manhattan Tower project of Kushner's?

MR. SIMPSON:   No.   No, we never did.

MR. SCHIFF:   Did you ever obtain, with respect to the money laundering allegations, any of the President's tax returns?

MR. SIMPSON:   No.   But we did --

█████████:   One minute.

MR. SIMPSON:   We did look at other ways of finding out what his practices were with regards to taxes, and we found some great, interesting documents in Las Vegas, I believe, and various other locations where he would -- I think gave much more realistic assessments of the income and values of his properties.

UNCLASSIFIED, COMMITTEE SENSITIVE

And I suppose he would say he was lowballing them to save on taxes, but I think he was actually probably telling more truthful statements about the financial condition of a lot of his properties, which was extremely poor.

So there are interesting real estate tax records among the few tax records you can get publicly.

MR. SCHIFF:  We'll yield back to the majority.

MR. ROONEY:  Does the gentleman need a break?

MR. SIMPSON:  I'd love to take a break.

[Recess.]

MR. ROONEY:  We are going to get called to votes probably here in the next 10 to 20 minutes, so I'm going to try to do a little bit of a lightning round, if I could.

But I just want to -- you know, generally speaking, with the stories that you were telling Mr. Schiff, you know, it's interesting that it seems like -- and correct me if I'm wrong --it seems like --they're fascinating, by the way. I mean, the story about him financing Doonbeg in Ireland through money that we can't really trace but has sort of the fingerprints of Russian mobsters.

I mean, I just -- it's almost like we need a plus one.   And I'm not saying you're wrong.   I'm just saying it seems like with all this stuff that there's, you know, not the sort of, as what Trey was talking about, allegation versus fact, that, you know, with all those things that we talked -- that you talked to Adam about, we never really got to the fact part.

Is that true?   Or do you feel like with your investigation that you made the conclusion that you think that those things are true — or not that you think that they are, but they are true?

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. SIMPSON:  I think it's a great question.  The -- you know, I mean, essentially we ended up spending almost a year on this project.  And, you know, it was a private -- because it's all private work in the sense of nongovernmental, without any legal process to compel production of information, we can only reach a certain point.

And at the time that we -- you know, that Chris decided to take this to the FBI, I wasn't convinced of the facts of anything in terms of — I wasn't convinced that there was a specific crime that occurred.

I thought it was a possible crime of progress and that there was possibly very serious crimes, but, you know, I'm an ex-journalist, so I'm not really in a position to prove that anyone's engaged in a crime.

I mean, you know, sometimes you do find proof of criminal activity in an investigation, but more often than not you find things that are suggestive or raise questions.  And --

MR. ROONEY: Right. That's exactly my point, is that if we knew that Donald Trump was working with the Russian mafia to fund Doonbeg in Ireland, then there's no way he would be President.  So, I mean, that's why it's so fascinating.

And, again, it might have been, but when you also add the caveat "but we didn't" -- there wasn't actually Russian names on the ledger or whatever, like that final step.  And so, you know, I'll equate that to the election as well with your opposition research and with the dossier and everything else.

Do you feel like, you know, we -- with what you found or what Mr. Steele found that we got to the point where we could conclusively say as fact that the Russian Government and the Trump campaign were colluding with each other to

UNCLASSIFIED, COMMITTEE SENSITIVE

beat Hillary Clinton?   Can we make that final step there?   Or is that a lot of circumstantial evidence that, you know, one could form an opinion to but never gets beyond the --

MR. SIMPSON:   I'm -- I mean, as far as I'm concerned, where we are now, as opposed to back then -- back then we had what appeared to be credible allegations of some sort of a pattern of surreptitious contacts between the Trump campaign and Russian people either working for the government or acting on behalf of the Russian Government.   As Chris wrote, it was, you know, I think a wide-ranging conspiracy, was the way he put it.

I think that the evidence that has developed over the last year, since President Trump took office, is that there is a well-established pattern of surreptitious contacts that occurred last year that supports the broad allegation of some sort of an undisclosed political or financial relationship between The Trump Organization and people in Russia.

I'm certainly not prepared to say and never wanted to be the person who had to determine whether that's a criminal conspiracy.

MR. ROONEY:   Do you with these investigations, like, you know, the campaign came and went, the Steele dossier is here, the subject matter, but to answer those questions, do you ever continue or did you in this case continue to investigate just to see if you could find the answers to those unresolved questions?

I guess my question is, did you keep investigating even though you weren't being paid anymore?

MR. SIMPSON:   Well, I think it's in the record that, you know, Chris continued to supply information to us after the election.   And, obviously, in the

UNCLASSIFIED, COMMITTEE SENSITIVE

period immediately after the election we were -- I don't know if you could say we were working on it, but we were certainly unemployed.   And obviously this was the central issue in my life at that time.   Unfortunately, it sort of still is.

But anyway, so there was --

MR. ROONEY:   Well, if you ever make any conclusions on any of those, you probably -- anyway.   Go ahead.

MR. SIMPSON:   I mean --

MR. ROONEY:   Let me go to some specific ones, because we are in a shorter -- are we 15 minutes?

Okay.   This is our lightning round.

You may have already answered this with Mr. Gowdy, but did you know who Mr. Steele's sources were in Russia?

MR. SIMPSON:   I knew generally where they're positioning.   In other words, we would discuss generally where that person sat in relation to a senior government official or, you know, what other position they held.   So --

MR. ROONEY:   Did you generally consider them credible, if you knew them?

MR. SIMPSON:   Well, you can't -- I mean, I can't evaluate the credibility of someone on the other side of the --

MR. ROONEY:   So you just trusted Mr. Steele's vouch?

MR. SIMPSON:   I have great trust in Mr. Steele's professional ability to find sources with credible information.

MR. ROONEY:   Did you know how he paid these sources?

MR. SIMPSON:   Yeah.   You know, essentially, my -- what I was doing was corroborating the information they were providing -- or trying to -- or

determining whether it was credible.   So that was a lot of the work that we did there.

I think you asked about paying of sources.   I think that's something that's erroneous that's been in the press.

MR. ROONEY:   How so?

MR. SIMPSON:   To my knowledge, Chris does not pay sources for information.

MR. ROONEY:   So they give it up for free?

MR. SIMPSON:   When you're running a source network, essentially what you are doing is paying subcontractors to --

MR. ROONEY:   Right.

MR. SIMPSON:   -- circulate and gather information in conversations.   And, again, this is not my specialty, which is why I hired him, but essentially it's hiring people to go talk to their contacts.

And I think as a member of the Intelligence Committee that maybe you're familiar with this, but they don't -- you know, when you have subcontractors in the field doing interviews, meeting people in bars, talking shop, they don't say, "I've been hired to go out and ask questions and see what people say," but that's essentially what happens.

So what I think the misconception is, is that, you know, Chris has got people -- or Chris calls people up and says, "I'll give you $5,000 if you tell me what's going on with the Trump operation."   And that didn't happen.

MR. ROONEY:   Are you sure?

MR. SIMPSON:   Well, I've asked Chris about it, and he said it doesn't -- didn't happen.

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ROONEY:   Okay.   Do you or anyone else independently verify or corroborate any information in the dossier?   This is sort of a repeat of a question I just asked, but we're talking about verification here.

MR. SIMPSON:   Yes.   Well, numerous things in the dossier have been verified.   You know, I don't have access to the intelligence or law enforcement information that I see made reference to, but, you know, things like, you know, the Russian Government has been investigating Hillary Clinton and has a lot of information about her and is -- and the Trump people are interested in getting that information.   I mean, that turned out to be true.

It was also true, you know -- I mean, if you just think back to the chronology of this, when the original memos came in saying that the Kremlin was mounting a specific operation to get Donald Trump elected President, that was not what the Intelligence Community was saying.

The Intelligence Community was saying they are just seeking to disrupt our election and our political process, and that this is sort of kind of just a generally nihilistic, you know, trouble-making operation.   And, you know, Chris turned out to be right, it was specifically designed to elect Donald Trump President.

MR. ROONEY:   Do you -- did you find anything to -- that you verified as false in the dossier, since or during?

MR. SIMPSON:   I have not seen anything --

MR. ROONEY:   So everything in that dossier, as far as you're concerned, is true or could be true?

MR. SIMPSON:   I didn't say that.   What I said was it was credible at the time it came in.   We were able to corroborate various things that supported its credibility.

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. ROONEY:   Well, do you know now if anything's false?

MR. SIMPSON:   I did answer that.   No, I don't know if anything is false.

MR. ROONEY:   Okay.   What media --

███████:   Five minutes.

MR. ROONEY:   What media outlet did Steele brief regarding the dossier?
Media outlets.

[4:18 p.m.]

MR. SIMPSON:  I think what we've said before and what I'm in a position to say is that we talked generally about the findings of this to a select group of news organizations.

MR. ROONEY:  Which ones?

MR. SIMPSON:  Major media.

MR. ROONEY:  Anything specific?

MR. SIMPSON:  I --

MR. ROONEY:  Okay.  Did you direct Steele to brief the media outlets, and why?

MR. SIMPSON:  Yeah.  We did it together.   Initially, the reason was that we were -- everyone assumed that Hillary Clinton was going to win the election, and when we initially briefed the media, that was our assumption.

And I have a sort of different longstanding interest, which is Russian influence in the United States and foreign interference in elections.   And, I mean, this may sound hard to believe, but I wanted people to know about what we had found, because I thought it was important.   And so a lot of the people that we briefed weren't campaign reporters, they were national security reporters.

And, you know, I started out doing work on this issue of foreign interference in American elections at The Wall Street Journal in the '90s, and I wrote a series of articles about a Chinese government operation to help elect Bill Clinton.   And so it's been something that I've been very interested in and concerned about for a very long time.

MR. ROONEY:  Did you learn that Steele had briefed the FBI on the dossier materials?

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. SIMPSON:  I eventually learned that, yes.  I'm sorry, let me correct that.  He told me -- well, I can walk you through the sequence.

MR. ROONEY:  Just when did he tell you?

MR. SIMPSON:  He originally said:  I think we should go -- this information is national security information.  I think we should report it to the FBI.  That was in July or late June, shortly after the first memo.

MR. ROONEY:  Sixteen?

MR. SIMPSON:  Sixteen.  He said:  I'm a former intelligence officer, and we're your closest ally.  You know, I have obligations, professional obligations.  If there's a national security emergency or possible national security issue, I should report it.

MR. ROONEY:  So this was before he actually did it?

MR. SIMPSON:  Yes.

MR. ROONEY:  Okay.

MR. SIMPSON:  And I -- so I didn't say okay.  I just said:  Let me think about it, I'm not sure what I should do here.

MR. ROONEY:  So did you give him any direction?

MR. LEVY:  He wasn't finished.

MR. ROONEY:  I'm sorry.

MR. SIMPSON:  It's a quick story.  So he said he needed -- that we needed to do this or he needed to do this.  And I didn't -- couldn't think -- first of all, he didn't volunteer that he had a relationship that he could do it.  He just raised the issue.  And at some point he did say -- I said:  Well, I wouldn't know who to talk to and I don't know -- I just didn't know -- feel qualified to do that.  And he said:  I know people at the FBI and I can do it.

UNCLASSIFIED, COMMITTEE SENSITIVE

And I said:  So you're telling me that you think this is serious enough that it needs to be reported to law enforcement, and that you're confident enough in your sources, it's your professional judgment and your professional obligation, that you should report this to the FBI?  And he said yes.

MR. ROONEY:  It sounds like you weren't sure if it was serious enough.

MR. SIMPSON:  Well, I mean, I don't -- he's the spy and I'm the ex-journalist.  So basically, he's the one who is a security official by profession.  And I wasn't going to substitute my judgment for his, that's correct.

So he then went to report it to the FBI.  And I didn't tell him to do it.  I didn't tell him not to do it.  I assented in it.

_____:  One minute.

MR. ROONEY:  Did you brief or meet with any other intelligence officials regarding the dossier?

MR. MUSE:  Could you repeat that question?

MR. ROONEY:  Did you meet with intelligence officials regarding the dossier?

MR. SIMPSON:  No one from -- that I -- no.

MR. ROONEY:  Are you aware on anyone meeting with the CIA regarding the dossier?

MR. SIMPSON:  No.

MR. ROONEY:  Were Perkins Coie, Mark Elias, and the DNC or the Hillary team aware that the dossier was being briefed to intelligence officials or the FBI?  Do you know that?

MR. SIMPSON:  I'm going to -- I can't talk about communications with my client, but I can give you what I think is a useful answer, which is that we did not.

UNCLASSIFIED, COMMITTEE SENSITIVE

At least I can tell you about generally what I -- what my -- what I did.

So Chris went and reported this to the Bureau.   And he came back and said:  I reported this to the Bureau.   And we did not ask permission from the client to do that.   The client didn't instruct us to do that.   It was -- he was -- you know, it was viewed as reporting a crime in progress, sort of a citizenship obligation.

You know, at some point later on, you know, I think that, as the questions -- I'm not sure how to say this -- as the hack attack by the Russians on the Democrats became a major issue in late -- later in the year, questions of whether to engage with the FBI, you know, became more of a general issue.

MR. ROONEY:   My time is up, but I will say that I think that the Russian scores in that Salt Lake Olympics were pretty low.   Very suspicious.   I didn't get to ask you about that, but -- it's always the Russians.   Like everybody's got a 10 or a 9 and the Russians are like 5.

MR. SCHIFF:   Before I pass it off to Mr. Quigley, you didn't have a chance to answer one of the questions I posed at the end.   That is, we do have the subpoena power.   If we are to get to the bottom of the issue of whether Russian organized crime money was used in the flipping of these properties and the purchase of the golf course and this is a lever over the President, what institutions would you use that process with to get to the bottom of it?

MR. SIMPSON:   I guess I would -- if I were issuing the subpoenas, I would, you know, first need to identify the underlying -- the banks that had custody of that information.   That would be the banks that would service the brokers.

So the first thing that I would do would be to subpoena the brokers and the people, the other people that were involved in the transactions, and the title

UNCLASSIFIED, COMMITTEE SENSITIVE

companies and the other intermediaries that would have that kind of information.

Then I would go to the banks next.  But I actually think some of the intermediary entities in a lot of these transactions are going to be where a lot of the information is.

MR. SCHIFF:  And those intermediaries are going to be the real estate brokers as well as the licensing companies?

MR. SIMPSON:  Yeah.

MR. SCHIFF:  And the title companies?

MR. SIMPSON:  Yeah.  And then you would -- you know, ultimately you would find -- I mean, in the case of Florida, which is the one where we spent an enormous amount of time on, you know, I would subpoena the Diazers (ph). And I would subpoena the company that was run by Elena Baronoff, who was the true person behind a lot of those deals. And she's an Uzbek immigrant, suspected organized crime figure, who took the Trumps on various tours to Russia, brokered a lot of those deals.

She died of cancer, but -- in 2015 -- but her husband and son still run that company and I suspect they still have those records.  And that would tell you a lot.

And in general, I would look at Elena Baronoff's operation. She also had a lot of curious involvement with a businessman in Sicily named Dino Papale, who we think has organized crime ties as well, and has a lot of interesting relationships with the Russians as well, and has hinted strongly that he organized secret meetings between Donald Trump and the Russians in Sicily.

We spent a lot of time looking at that particular network.  And I think you would ultimately get to the financial institutions by looking at the actual real estate

UNCLASSIFIED, COMMITTEE SENSITIVE

transactions.

MR. SCHIFF:  And that particular family, were they involved in the flipping of that house with the --

MR. SIMPSON:  No.  No, the Rybolovlev deal, I'm not sure I know that much about the brokering of the Rybolovlev deal.

The other one that I would subpoena is the related group, and they were the ones that were involved with the Trump Hollywood.  And there was a lot of interesting transactions involving the Trump Hollywood.  And that was -- that's a guy named Jorge Perez, who's a major developer who was in the picture with Sergi Millian and Donald Trump that I was talking about previously.

MR. SCHIFF:  And in terms of the Panama, Canada, and Scotland transactions, any suggestions there?

MR. SIMPSON:  So I think in the -- I'm trying to think of the creative way to do this.  I mean, as you may know, you know, most of these transactions are cleared through New York.  And the other sort of central place for information is SWIFT in Brussels.  But I would go for the clearing banks in New York that cleared the transactions, you know.

And there's -- again, it's these sort of intermediary entities that have no real interest in protecting the information, and all you have to do is ask for it and they just sort of produce it by rote.  So we've done a lot of money laundering investigations where we go to the trust companies and the clearing entities.

And so, you know, all dollar transactions are generally cleared through New York.  So, you know, the main thing you have to do is identify the banks that were used.  So I don't know if the money was moved via Deutsche Bank or what the other banks were.  In fact, I've never gotten around to trying to figure that out.

. UNCLASSIFIED, COMMITTEE SENSITIVE

65

MR. SCHIFF:   Thank you.

Mr. Quigley.

MR. QUIGLEY:   Good afternoon.   Thanks for being here.

Let me give you an opportunity.   You said that Mr. Steele was a perfect hire.   I think you used you trusted him a lot.   Could you elaborate why you thought he was such a perfect hire, why you trusted him so much?   I know you said you had talked to him, you had met with him.   Did you have to do any other due diligence or what did you know about him and his reputation before?

MR. SIMPSON:   Sure.   So basically the way the information biz works is, you know, it's a tricky business.   A lot of it is about talent spotting, finding people that are reliable, produce reliable information.   There's a lot of, I don't know if I'd call it fraud, but there's a lot of BS where people tell you stuff that doesn't turn out to be right.

And so, you know, it's sort of like, again, being a journalist, where you're trying to figure out who your reliable sources are.   So the more exotic the topic, the harder it is to find someone who doesn't sell you BS.

And, you know, one of the problems with the business is that basically if you contract with a guy to go find something out or go look into a subject, he doesn't -- he rarely comes back and says:   I got nothing for you, I wasn't able to find anything out.   They'll just -- if they can't find anything out, they'll just make it up.

So sorry for the long answer.   But, anyway, Chris was a reliable provider of information that turned out to be reliable.   And so -- so there was all that.

He was also -- he just had a very -- he was -- I think I -- I think I might have said somewhere else that he was a Boy Scout.   And, you know, he's just a fairly

UNCLASSIFIED, COMMITTEE SENSITIVE

buttoned-down kind of guy who you could count on to do the work.

MR. QUIGLEY:   When exactly did he start working under contract?

MR. SIMPSON:   My recollection is that, you know, we began talking about the -- I don't remember when we started talking about the engagement, but the work started in June, I believe.

MR. QUIGLEY:   Okay.

MR. SIMPSON:   Possibly late May, but --

MR. QUIGLEY:   And when would you have gotten the first batch of information, or was it all at once?

MR. SIMPSON:   The first memo is dated, I think, June 20th, somewhere around there.

MR. QUIGLEY:   Okay.   And then how often did you get information and what -- was it varied quantities or --

MR. SIMPSON:   Well, this was a very unusual situation, because right around the time that the work started, it became public that the FBI suspected the Russians of hacking the DNC.   And so there was sort of an extraordinary coincidence.   It wasn't really a coincidence but, you know, our own interest in Russia coincided with a lot of public disclosures that there was something going on with Russia.

And so what was originally envisioned as an original -- as just a sort of a survey, a first cut of what might be -- whether there might be something interesting about Donald Trump and Russia quickly became more of an effort to help my client manage a, you know, exceptional situation and understand what the heck was going on.

So after the original reporting, I don't remember what I specifically said, but

UNCLASSIFIED, COMMITTEE SENSITIVE

it essentially was:   I think we're going to need you for the foreseeable future, so just keep, you know, talking to your sources and sending us memos whenever you have information.

MR. QUIGLEY:   And without getting into the exact communications, when did you start alerting your client that this might have been a bigger deal than, as you just described it, than originally thought?

MR. SIMPSON:   Yeah.  I mean, I think that would call for a confidential client communication.   I think what I can say is -- well, let me put it this way.   I think it's now public that, you know, the FBI had gone to the DNC prior to this and told them, you know, that they'd been hacked by the Russian Government.

And, you know, foreign intelligence services hacking American political operations is not that unusual, actually, and there's a lot of foreign intelligence services that play in American elections.   And so that in itself isn't actually totally alarming.   The Chinese did it last time.   Indians do it.   But when it became --

███████████   Five minutes.

MR. SIMPSON:   When the suggestion that they were going to weaponize that information and that this was more than just an intel gathering operation, that they were actually going to engage in active measures, that was when, you know, it became a major issue.   And I think by late June there was a lot of signs that that was going to happen.

MR. QUIGLEY:   The dossier was published.   Other elements were published.   What wasn't published?   Are there still documents?   Is there still information that was garnered by either Mr. Steele or others that the public isn't aware of at this point, on this point?

MR. SIMPSON:   Well, to just put it on the record, we were not the ones

UNCLASSIFIED, COMMITTEE SENSITIVE

that gave this document to BuzzFeed, and I was not happy when this was published. I was very upset. I thought it was a very dangerous thing and that someone had violated my confidences, in any event.

I think the story is largely known and that there's very little that was left on the cutting room table from that time. I think, you know, there's a little bit of, you know, color, I would say. You know, this guy that we were talking about earlier, Sergi Millian, isn't named in the dossier, but is someone who was important.

MR. QUIGLEY: But you also said that -- and correct me if I got this wrong -- that you continued to get information after the election.

MR. SIMPSON: Yes, sir.

MR. QUIGLEY: You still say the same thing, that most of this is out there, despite even getting information after the election?

MR. SIMPSON: I mean, I think that the story of the Russian operation against the United States and the pattern of surreptitious contacts between The Trump Organization and Russia, I don't think that's -- I don't think that's -- we're even anywhere close to having the full story.

MR. QUIGLEY: But are there any documents you think that would be helpful that were accumulated?

MR. SIMPSON: To the committee?

MR. QUIGLEY: Yes.

MR. SIMPSON: Yes, absolutely. I mean, I think -- I think this tax court case involving the Agalarovs is an important document. I think that there's -- I guess going back to your subpoena question, I also -- you know, the Crocus Group has a much longer history in the United States than people realize, and I think there's all kind of good documents.

MR. QUIGLEY:   But are there documents that you would have in your possession --

MR. SIMPSON:   Oh.

MR. QUIGLEY:   -- that weren't public record that would be helpful?

MR. SIMPSON:   I don't think from that period.   Well, so the collection of memoranda that are known as the dossier, I mean, that was basically it.   I mean, there wasn't --

MR. QUIGLEY:   Now, you say you're familiar with people who do intelligence work.   I'm sure you're aware that sometimes they talk about levels of certainty they have, right?   Like on any one issue, how many sources they have, how confident they are.

In your conversations with Mr. Steele, did he express his level of certainty on these matters?

MR. SIMPSON:   So, I mean, I'm not intimately familiar with how the Brits do it, but they seem to do it a little differently.   Chris' standard presentation, I mean, essentially, you know, because he's a Russianist, his standard presentation starts with a little talk about disinformation.

Then he says, you know:   I was the lead Russianist at MI6 in the final years of my career.   And I was previously stationed in Moscow.   And I speak Russian.   And I've done Russian intelligence/counterintelligence issues all my life. And the central problem when you're a Russian intelligence expert is disinformation, and that the Russians have, you know, a long history and an advanced capability in disinformation.

And so, you know, before we go any further, I just want you to know that, you know, this is my -- the fundamental problem with my profession.   And it

UNCLASSIFIED, COMMITTEE SENSITIVE

should be assumed that in any sort of intelligence gathering that you do there will be some disinformation.   And I'm trained to spot that and filter it out, but, you know, you should understand that it's -- you know, no one's perfect.

And so we've essentially filtered out everything that we think is disinformation and we're not going to present that to you here.   We're going to present to you things that we think come from credible sources, but we're not going to warrant to you that what we -- that this is -- that this is all true.   And, you know --

MR. QUIGLEY:   He said it was raw data.   Is that correct?

MR. SIMPSON:   Yeah.

MR. QUIGLEY:   In some an respect?

MR. SIMPSON:   It's HUMINT, right?   It's human source information.

██████████   One minute.

MR. SIMPSON:   And humans sometimes lie, and more frequently they just get it wrong.

MR. QUIGLEY:   Did he ever, in talking to you subsequent to the release of the document, say that he thought he would alter any of it after the fact or information he had gathered later?

MR. SIMPSON:   I have -- I have talked to him about that.   And he remains -- he continues to believe that it is largely not disinformation.

MR. QUIGLEY:   I think that's our time.   We have votes, right?

MR. ROONEY:   We have to vote.   Before we break, I just want to ask one question, based on Adam's question, just so I don't forget, and then we'll come back, if that's cool.

All those questions that Mr. Schiff asked about, you know, with the

UNCLASSIFIED, COMMITTEE SENSITIVE

71

subpoena power and where we would go if we wanted to find out about Scotland and Panama and Toronto and Ireland, and you were talking about like the brokers and I guess the banks in Switzerland and New York, my only question is, why didn't you do that?

MR. SIMPSON:   I don't have subpoena power.

MR. ROONEY:   So there's no other way that you could -- there's no other way that you could access that information other than just subpoena, having a subpoena in those countries?

MR. SIMPSON:   Well, I mean, the way that I would do it if I was a U.S., you know, entity that had subpoena power is I would figure out --

MR. ROONEY:   No, not us.   Like you, as Fusion, an opposition research guy, why couldn't you do it?

MR. SIMPSON:   Because it's generally not legal.   Financial privacy protections.

I mean, so my specialty and the reason that I --

MR. ROONEY:   That's fine.   I just didn't know that.   All right.   Thank you.

█████████:   Are you okay to keep going?

MR. LEVY:   Yes.   Let me just say one thing.

[Discussion off the record.]

█████████:   Okay to continue?

MR. SIMPSON:   Yes.

█████████:   Great, thanks.   So I think we have it for 15, and we'll go. We're still doing 15-minute rounds.   Mr. Rooney took about 2 minutes asking his question, so I've got about 13 left.

## EXAMINATION

BY 

Q    I just want to circle back to a couple things, Mr. Simpson.

When you say Christopher Steele provided you with raw data, you know, we take that to mean that that's information that has not been analyzed through the rest of, you know, the IC apparatus, for lack of a better term.   Would you agree that that's what raw data is and that's what he gave you?

A    I think I was using it in a somewhat less technical way.   But, you know, but colloquially speaking, I mean, it was just sort of intended to say:   Yes, this is field -- information from the field that has been collected, and it has been subjected to some level of sifting and analysis by Chris, because he's attempted to filter out unreliable sources or disinformation.

And so it's not totally raw.   I mean, it's been through one round of harvesting.

Q    So Mr. Steele communicated to you that he had done some analytical work on the data that he provided you?

A    Yeah.   I mean, he said he applied his professional skills to this to figure out whether it was credible.

Q    Right.   It's not like he just wrote everything down on a piece of paper and then handed it to you.   He did apply his professional skills to it somewhat?

A    Yeah.   I mean, you can take that from reading the stuff that's been published.   I mean, he put some level of summarizing what -- you know, essentially what he did was he talked to enough sources that you can summarize what they collectively are telling you, and that's in the writing of the memos.

Q    And to follow up on Mr. Quigley's questioning, there was some information -- you said the large bulk of it is published in the dossier that was

published by BuzzFeed, but there was some information that's not out there. Is this some information that Mr. Steele provided you in relationship to the work you had hired him to perform for you?

A     What I was specifically referring to was there's discussions of identities of sources that we had, and obviously that's not in there. And, you know, I can't think of another specific thing that's not in there, but there's like pieces of work that we -- you know, things that didn't make it in there that he conveyed to me orally that weren't that significant. I can't think of examples of them.

But I guess I was trying to be really careful to say that, you know, we worked -- we did this project over a number of months and we had discussions of things that didn't make it into the memos.

Q     Is that recorded somewhere, all that other information –

A     No.

Q     -- at your company?

A     No.

Q     No.   So it doesn't exist?

A     It's -- right.   It's -- I'm referring to mostly phone conversations and meetings.

Q     But you didn't record any notes or anything like that?

A     I don't do that, no.

Q     Okay.   Just checking.

I just want to check back to your relationship with Perkins Coie.   Did you, Fusion, you, Mr. Simpson, or somebody at your behest approach Perkins Coie, or did they approach you?

A     I don't -- I don't have firsthand knowledge of that question.   I think -- I

can tell you that the original discussions were not handled by me. They were handled by my partner. So I don't think he's going to be in a position to talk about it, but I don't even -- I mean, to the extent I know anything, it's just secondhand. I don't have a good memory of it.

Q    Okay. And your partner being? Sorry.

A    Peter Fritsch.

Q    Okay. Thank you. And your relationship with Perkins Coie, remind me, lasted about how many months?

A    So this is -- so I'm the chief executive, and I generally interface with clients, but we have a division of labor. I don't do the invoicing and I don't keep the financial records. So it's very difficult for me to tell you things that I think you have in your financial records anyway.

But if you're talking substantively, the Perkins Coie engagement ended with the election. And whether there was money that came in the door from them after that, overhang from the work, would be normal.

Q    Did your relationship with Perkins Coie involve you doing any work on any other candidates, Republican or Democrat?

A    You mean under this engagement?

Q    Yes.

A    That's a great question. I don't recall. I don't think so. I think the primaries were over and Trump was -- wasn't the official nominee, but he was the obvious nominee.

Q    Were there other engagements with Perkins Coie that are related relevant to our matter that you did do research for other folks?

MR. LEVY: Can you repeat that question?

████████: Sure. Were there -- he mentioned that there may have been other engagements. So I'm asking if there are any other engagements that are relevant to our investigation in which they were tasked to do -- he and Fusion were tasked to do research on whomever.

MR. LEVY: Are you asking about other engagements with Perkins Coie?

████████ Yes.

MR. LEVY: That are relevant to your investigation?

BY ████████:

Q    Correct.

A    Well, I mean, of course, it's your power to say what's relevant and not ours, but I don't think there was -- we didn't do anything else in 2016 with them.

Q    Okay.

A    Sorry.

Q    That's fine.

A    I want to -- so just on this question of the finances, we were talking about how much money we got from the various clients before, and I think -- I think it's in the records and I need to just -- I'd just like to note that the Free Beacon, I don't remember how much they paid us, but it doesn't -- I think it's not $50,000 a month. I don't know what it was.

Q    Okay. In speaking with them --

A    And the same with Perkins. I'm sorry, but it's not my strong suit.

Q    Okay. We'll rely on the record.

Switching over to your relationship with the Free Beacon, was it your position, your relationship and your engagement with the Free Beacon, that you were only to do -- collect information and research against or on then-candidate

Trump or others as well in that process?

A    My recollection was that from the beginning of the project it was Donald Trump. And if at some point somebody -- so -- and that was my primary if not sole focus for the entirety of the project. I can't speak for whether someone in my company was asked about something else.

Q    Okay. So it's possible the Free Beacon also asked your company to conduct research on others that were running for President at the time?

A    It's possible. I don't have knowledge of it.

Q    Okay. Do you know who would, or would there be any records of it?

A    You know, I guess we -- yeah. My partner would be the other person that would get a request like that, but beyond that I don't really know.

Q    Your partner again being Mr. --

A    Peter Fritsch.

Q    -- Fritsch. Are there any records of that? Would there be any records of that, of documenting what you were hired to work on?

A    I don't know.

Q    Do you know who would know?

A    My partner.

Q    Peter Fritsch. Okay, thank you.

Switching gears a little bit, going over to you testified earlier that Mr. Steele went to the FBI at a certain point in time, approximately late June 2016. Is that correct?

A    Yeah. I think what I said was he raised the issue of going to the FBI with me after the first memo. And I didn't give him an answer or I didn't sign off on that. And then he raised it again a few days later.

And by approximately early July, like 1st or 2nd, I had given my assent to him doing it as a professional obligation or a citizenship obligation.   And then that's when he did it, sometime around the 4th of July.

Q    So in early July, is it fair to say in early July that you knew that Mr. Steele had taken some information to the FBI?

A    I think he said he was going to, and then later he told me he did.

Q    When did that occur, approximately?

A    I think it was probably right after the 4th of July.

Q    Okay.   So not like a month later?

A    No.

Q    Okay.   Did he tell you about any other communications he had with the FBI in relation to this matter?

A    Yes.   The -- originally, he told me:   I met with them and I informed them of my concerns.   And they said thank you and said they would get back to us if they were going to follow up, if they needed to follow up.

And we were sort of almost immediately plunged into, you know, a very intense situation with regard to the -- the hacking attacks that were going on, and so it didn't come up again for, you know, weeks if not months.

Q    Do you know if he, Mr. Steele, informed the FBI about your relationship, that is, the relationship he had with you and Fusion GPS?

A    I don't -- my recollection is that he disclosed that he was doing this for a private client, and that he would have disclosed something about who the private client was.

I also don't think, though, that Chris at this time knew the identity of the client.   And so initially, at least, he would have been only able to say:  . I have a

political client, a Democratic client or something like that, which is what I would have told him.   So I don't think he was in a position to disclose the identity of the client to the FBI originally.

Q     I don't mean the client.   I mean you and Fusion GPS.

A     I don't know.   But probably, because he –

Q     Do you know if he did?

A     No, I don't.   So there was a long period where we didn't hear from them.   And then later they got back in touch with Chris and asked for a second meeting.

Q     Did the FBI ever reach out to you or Fusion GPS in relation to the matters that Mr. Steele informed them upon?

A     No.

Q     You've never heard from anyone in the U.S. Government in relation to those matters, either the FBI or the Department of Justice?

A     After the election.   I mean, during the election, no.

Q     What did you hear after and from whom and when?

A     I was asked to provide some information to the Justice Department.

Q     By whom and when?

A     It was by a prosecutor named Bruce Ohr, who was following up.   You know, I can't remember when.   It was sometime after Thanksgiving, I think.

Q     Thanksgiving of 2016?

A     Yes.

Q     Did Mr. Ohr reach out to you, or how did that shake out? Originally,

A     I think Chris  – it was someone that Chris Steele knows.                                    I think –

UNCLASSIFIED, COMMITTEE SENSITIVE

Q    I'm sorry. Chris Steele knows who?

A    Bruce Ohr.

Q    Okay.

A    And I met Bruce too through organized crime conferences or something like that.   And Chris said he had been — Chris told me that he had been talking to Bruce, that he had told Bruce about what happened, and that Bruce wanted more information, and suggested that I speak with Bruce.

The context of this is that it was after the election.   A very surprising thing had happened, which is that Donald Trump had won.   There was -- we were -- by that time, we were enormously concerned about rapidly accumulating indications that the Russian Government had mounted a massive attack on the American election system and that, you know, Donald Trump or his associates might have been involved.

And there was a lot of alarming things happening, including Donald Trump saying things about Vladimir Putin that didn't really make any sense, weren't ordinary things for a Republican to say, and, you know -- anyway.

So we had also by this time given this information to the FBI, and they had, you know, told — indicated to Chris that they were investigating it, and then told — apparently told The New York Times they weren't.

And so it was not clear to us whether anyone at a high level of government was aware of the information that Chris had gathered and provided to the FBI. And, you know, so we were, frankly, you know, very scared for the country and for ourselves and felt that if we could give it to someone else, we should, higher up.

And so Chris suggested I give some information to Bruce, give him the background to all this.   And we eventually met at a coffee shop, and I told him the

UNCLASSIFIED, COMMITTEE SENSITIVE

story.

████████████   My time is up.   Thank you.

Over to you guys.

████████████   Off the record.   We're going to take a 5-minute break.

[Recess.]

████████████   We can go back on the record.

My name is ████████████   I'm with the minority staff.   I suspect my

colleague ████████ may also have questions.   He's the ████████████ for the

minority.

BY ████████████

Q    I wanted to clarify first, if you recall, how many reports did you produce

for the Washington Free Beacon?   I believe you did it on generally a monthly

basis.   So --

A    I think what -- I think what I said was that our practice when we begin

an engagement is to do reports on a monthly basis, and that, you know, it would

have been regular order in this case.

I don't recall specifically how many, and I can't really -- I mean, it would

be -- it would be -- right, it is covered by client confidentiality, but I also think it

would be guessing.

Q    Okay.

A    In general, what happens as an engagement unfolds is that after 2 or

3 months of producing monthly reports, again, we branch out into subject areas

and we start producing white papers.   And so if an engagement lasts for 6

months, you can assume that there's a lot of subpapers on individual subjects.

Q    So you were employed by the Free Beacon for 8 or 9 months, I

believe, based on your prior testimony.   Does that sound about right?

A   Yeah.   So I think what I said was that we began the work in September or October of 2015, and it began to wind down in the spring as the primaries began to wind down.   And the financial records, there's some lag time in financial records, so I don't -- I can't say what they show.

Q   Do you keep copies of all the reports you provide to your clients?

A   It depends on the case.   Sometimes we -- I mean, the work product is the property of the client.   So we frequently are asked to hand over all of our copies or certify that they've been disposed of.

Q   Mr. Simpson, you mentioned earlier that you did not incorporate what has become known as the Steele dossier, that you did not incorporate that into your reports, as is your normal practice.   Is that -- am I understanding correctly?

A   Yes.   Yes, that's what I said.

Q   So did that -- those raw reports, I'll call it the Steele dossier, did that product go to your client, Perkins Coie?

A   I can't answer that, if it did.

Q   Would you have provided -- let me step back.

Is it fair to say that in the course of your Trump research for Perkins Coie, that research included work separate from what Chris Steele conducted?

A   A large amount of work.

Q   Moving to a slightly different topic.   In the course of your work for both the Washington Free Beacon and Perkins Coie, what other individuals associated with President Trump came up in your research who would have been a concern?

A   There were a large number of other individuals that we looked at that were seriously concerning.   And we -- there were numerous Italian organized

UNCLASSIFIED, COMMITTEE SENSITIVE

crime figures that we identified that Donald Trump had relationships with and clearly knew were criminals.

Q    When you hired Mr. Steele, did you tell him what to look for in his research?

A    No.  I -- generally speaking, you know, the challenge is to find qualified, reliable people, and, you know, when I have those people, I tend to not tell them what to do, much like I tend to push back on people who try to tell me what to do.

Q    Did you tell Mr. Steele what you expected him to find?

A    No.

What I will say is I was quite shocked by what he came back with, and what I -- the general mandate was to look into Donald Trump's business dealings in Russia and to see if he could come up with a little bit more information about who is doing business over there and why, you know, in the course of all these trips he never seemed to be able to consummate a deal.   So that was the general assignment.

Q    Did you ever task Mr. Steele with finding certain information related to his business dealings or anything else?

A    I think in the latter parts of the project there were things I specifically asked about.  The one that comes to mind is Michael Cohen.  As I mentioned a little earlier, I didn't understand Michael Cohen to be a significant figure in the Donald Trump world for a long part of this project.

We eventually began to realize that he was a lot more than, you know, the President's sort of pit bull personal attorney and that he was the person who -- I mean, a number of things came up in the course of the year.

UNCLASSIFIED, COMMITTEE SENSITIVE

One of the things that we learned that caught my interest was we learned from reporters that serious questions about Donald Trump's activities in Russia and the former Soviet Union went to Michael Cohen, and that he was the only person who had information on that subject or was in a position to answer those questions.

So if you ask about Donald Trump's taxes, it goes to Allen Garten.  And if you ask about, you know, his position on something, it would go to Hope Hicks.  And none of these things -- these things go -- went to Michael Cohen.

▮▮▮▮▮▮▮▮:  I just realized that Congressman Swalwell is in the room, so I'm going to turn it over to him.

MR. SWALWELL:  Thank you, Mr. Simpson.

And earlier you stated that you didn't think Jared Kushner was relevant because of his age, and I had interrupted.  I said, I take offense to that.

But just on Michael Cohen, and I'll turn it back over to our staff.  Did you ever research whether Michael Cohen had any aliases or other names that he used?  Did you ever find anything out about that?

MR. SIMPSON:  A little bit.  The possibility that he had two passports or used a different formulation of his name was something -- I can't remember -- we asked around about or thought about trying to get information on, but ultimately did not.

MR. SWALWELL:  Did you ever come across the name Michael Cohn, C-o-h-n, with links, common addresses but different social security numbers?

MR. SIMPSON:  I think my staff probably did come across stuff like that, but we didn't make much of it.  It looked like a typo.

MR. SWALWELL:  When it came to Donald Trump Jr., did you have similar

concerns, as you've mentioned with Mr. Cohen and Mr. Kushner, as to his contacts with Russians as it related to money or investments for the Trump businesses?

MR. SIMPSON:   Yes.   I'm trying to remember.   In general, we knew from the open source work that we had done that Donald Trump Jr. was -- had done a lot of travel to Russia and was involved in a lot of these discussions, that he'd done -- he'd gone to Kazakhstan for reasons that we didn't -- we weren't sure of, he'd gone to Latvia, and he'd been to Russia.   And we eventually formed the view that the Russians were very interested in him or that he'd had a lot of deals with them.

I don't remember a lot of specifics beyond that.

MR. SWALWELL:   What is your knowledge of Donald Trump, Donald J. Trump, the father's travel to Russia?   Can you tell us how many times you believe he has traveled to Russia, in your research?

MR. SIMPSON:   I believe that he's been to Russia a minimum of four or five times, and that he's been going to Russia since the late Soviet years.

And we -- we did spend a lot of time digging into the origins of his interest in Russia and his fascination with Russia and it's an interesting tale.   I mean, it's -- he -- one of the few people who Donald Trump calls like a good friend is a guy named Howard Lorber, who is a real estate investor.

And Lorber was one of the --one of the early --there was sort of a swashbuckling crowd of American investors who moved into Russia in those early years when it was really wild. And Lorber --I'm trying to remember the names of the other ones, but there was a small group of people and Donald was pretty tight with them.

And, again, that was one of the reasons the whole thing struck me as mysterious, because it seemed like he had been there, you know, numerous times and never come back with a deal.  And, you know, there could be an innocent explanation for that, which is that he could never find somebody that -- you know, an honest partner.  In any event, I wanted to try to figure that out.

MR. SWALWELL: Does the name Bennett LeBow sound familiar to you?

MR. SIMPSON: LeBow is an associate of Lorber's, and Liggett-Ducat was his company. And they are the ones who, it appears, introduced Donald Trump to Russia, from what we can tell.

MR. SWALWELL:  To your knowledge, prior to the 2013 trip for Miss Universe, when had he last gone to Russia?

MR. SIMPSON:  There's reporting in the Steele memos about another trip prior to that to St. Petersburg.

MR. SWALWELL:  When do you believe that trip took place?

MR. SIMPSON:  I would be guessing.

MR. SWALWELL:  I'm going to yield back to the ranking member.  And Mr. Castro might have some questions.

MR. CASTRO:  In all of your research and your review of Trump assets, did you come across any reason to believe that any Kushner assets had been used to pay off Trump debts or there was any mixing of the businesses by the two families and companies?

MR. SIMPSON:  Well, the Jersey City project was -- I remember there was some Trump involvement in the Jersey City project, which was kind of a Kushner branded project.  So there clearly was things that they were doing together.

UNCLASSIFIED, COMMITTEE SENSITIVE

What we heard from people familiar with the story was that the Kushner family and their connections were a big attraction for Trump before the marriage and that, you know -- I mean, I don't want to -- I'm trying to be polite about it, but, I mean, there was a business element to the whole, you know, connection.  And I will hasten to add that I was not able --

███████████:  One minute.

MR. SIMPSON:  -- to confirm any of this, and I didn't share this widely, certainly not in any kind of formal way with anyone.

You know, the Kushners are ethnic Russian and they, we were told, had relationships of their own with Russian capital.  And, you know, the exact story I think was that their relationships were with the Russian diaspora in the New York area.

So more broadly speaking, during the '70s, in the Refusenik era, there was a lot of Russian Jewish immigration to the New York area.  And a lot of those people had -- well, I'll just say there was a lot of immigration, and that community is very large, and a lot of people became very successful and wealthy.  And, as I understand it, those are the connections that the Kushners have to outside capital.

MR. CASTRO:  Thank you.

BY ███████████:

Q    Mr. Simpson, good afternoon.  Thank you for being here.  I'm ██████, a member of the majority staff.

Switching gears, could you please briefly describe for us Fusion's engagement with the Baker Hostetler law firm in connection with the Prevezon litigation in the Southern District of New York?

A    Sure.  Baker Hostetler is a big Midwestern Republican-oriented law

UNCLASSIFIED, COMMITTEE SENSITIVE

firm that is one of my oldest clients.   And I began working for Baker, I believe, in 2009 or '10, and I've done a number of cases with them.   And I generally provide litigation support, which is research, gathering documents, figuring out who to subpoena, and sometimes dealing with witnesses and media and other things.

I think the Prevezon matter was probably the fourth or fifth matter I've done with them.   They're very serious, sober, reputable attorneys, and I like working with them.

And so they approached me originally in late 2013 with this matter.   I didn't know anything about Prevezon, didn't know anything about most of this stuff. Didn't know who Browder was, William Browder was.

But, in any event, the original issue that was presented to me was not really a Russia issue, it was a money — it was like a technical question about money laundering, which was whether the government could possibly prove that money from some specific fraud in Russia went into these projects in New York, these real estate projects.

And John Moscow, one of the partners there, who's an old contact of mine from when he was a money laundering prosecutor and I was a money laundering reporter, walked me through the technical aspects of the financial transactions.

And to my — I was skeptical, but he persuaded me that there were some assumptions and leaps in logic that were made about the chain of entities and banks that raised questions about whether they could really prove that this money from over here went to this property over there.

So I was -- so that was -- originally we were retained to help with the technical aspects of it. And I think more broadly as it, you know, became — I

guess -- well, sorry.

So I didn't agree to work on it at that time. I believe we discussed it. They went away. Then they came back a few months later, which would have been early 2014, when it had become more apparent to them that this was going to be a significant piece of litigation, and said: We want to bring you on for litigation support.

And, again, litigation support, I had done it for them before. Basically, you know, use your journalistic skills to help us gather information, who to subpoena, read documents, write analyses of evidence, all of that. And then, as you get into the sort of more public phase of a court dispute, help them manage all the public aspects as well.

So while I don't, you know, I don't run a PR firm, part of that is, you know, the media aspects of litigation support. So I think -- I think the original engagement covered all of those things.

So in the early phase of this, the very first thing that we -- I remember having to do was help investigate the client.

So I didn't -- we didn't know much about the client. Obviously, the lawyers have responsibility to evaluate whether the client is engaged in anything improper, and they certainly have to determine the sources of their funds.

And they represented to me that this was a minor player in Russia, and to the -- I couldn't find much on them myself. There was -- you know, it's just a fairly obscure real estate company.

[5:29 p.m.]

MR. SIMPSON:  You know, I don't know the entire landscape of oligarchs in Russia, but these guys are obviously not significant oligarchs in Russia.  That's what we could tell.

In any event, the first thing that a lawyer wants to know at the beginning of a case like this, and most cases, is whether their client's story is true.  So that was the first thing that we did was we interviewed the client.  They interviewed the client and got the client's story.

And the client's story was that these allegations that were in this Justice Department forfeiture complaint originated with an organized crime figure in Moscow, who had been blackmailing them and had been prosecuted, arrested and prosecuted for blackmailing them.

So we had to investigate whether that story was true.  So we, you know, spent a long time looking at this guy.  His name is Dimitry Barenovsky (ph).  And the story that Natalia Veselnitskaya provided to us was that he was a captain in the Solntsevo brotherhood, which is the dominant mafia family in Moscow and known — you know, it surfaces in parts of the Trump story, bizarrely, and was run by a guy named Semion Mogilevich.

So Natalia is the one telling us the this story because she is the lawyer for Prevezon and had apparently been involved in this extortion matter, and so she's got all the information from the courts about this alleged shakedown.  And she was introducing me as some kind of former government lawyer who's the one who hired Baker.

So I worked for Baker, and she's the one who hired Baker.  I didn't get to introduced to her originally.  This was information she provided to Baker that they

then provided to me.

In any event, we eventually were able to confirm that the story was basically true, that this guy was a gangster, he was known to western law enforcement as a gangster, and he, in fact, had been prosecuted and thrown in jail for this extortion racket.

So then the question was, well, how did this story get from a convicted gangster in Moscow into a Justice Department forfeiture complaint?   And so the lawyers, the Baker lawyers deposed a government agent, an ICE agent who did the work, did the investigation, and he said he got it from this businessman named William Browder.

And so then the question became, well, where did Browder get it from? Did he get it from the gangster, or was it, you know, from some other source?   So we began to try to do various types of discovery to figure all that out.   So I may have -- I don't know if I'm giving you too much here, but this is basically the origin of this case.

So over the course of 2014, most of what I did was looking at this Russian organized crime figure, looking at, you know, all the events around the extortion case in Russia, and had to try to help them to figure out how all this information somehow made its way into a Justice Department civil forfeiture complaint.

And eventually, that led us to Mr. Browder, who is a former American citizen, who gave up his citizenship and moved -- when he started making a lot of money in Russia, and was living in the UK.   And he didn't want to explain any of this to us.

We originally wrote him a letter.   The lawyers wrote him a letter saying, can you tell us what's going on here, and he declined.   And so then the lawyers asked

me to figure out how we could subpoena him.  So I found that his hedge fund was registered in Delaware and therefore had corporate presence in the United States, which meant that, theoretically, at least, he can be subpoenaed through his hedge fund because he was listed as an officer in the records.

So we subpoenaed the hedge fund.  We then retroactively filed new documentation with the SEC, taking his name off the record, said it was all a mistake.  And he said you can't subpoena me.  I'm not really an officer of that hedge fund.

So we were, you know -- that was litigated for a while.  And meanwhile, the lawyers said, see if you can figure out another way to subpoena this guy.  And his position was that, you know, he was -- you know, he had brought this case to the Justice Department but he didn't want to be questioned about bringing this case to the Justice Department, and that he was immune from being questioned about it other than through the Hague process because he's a foreign citizen.

So, you know, we knew he was appearing in the media a lot, and then he probably came to the U.S. to do media appearances and other events.  And so we began to look at that, and I just began doing what I would normally do, which is to look at other things about this witness, what else do we need to know about this witness, especially because they don't want to be open with us.

So eventually I discovered that he owned a mansion in Aspen, Colorado, or at least he seemed to.  He was connected to it by real estate records and DMV records, but it was held through some shell companies.

Anyway, we were looking at that, and I don't remember the exact sequence of events, but someone, I think the lawyers or maybe me and my staff, discovered that he was going to be in Aspen for an event.  So we organized a service, a

UNCLASSIFIED, COMMITTEE SENSITIVE

subpoena service, which I supervised.

And we had a private investigator, a lawyer, and another, I think, PI and, you know, we organized to confront him in the parking lot of the Aspen Institute and serve him a subpoena.   And when we did that, he ran away, so jumped in his limo and -- or his SUV and went back to his mansion.   So dropped the subpoena on the ground.

So that commenced a lot more litigation over whether we had adequately served him a subpoena, whether a subpoena in Colorado is valid for an action in New York.   And, you know, I was -- that was a lot of what I did.

His resistance to cooperating with the civil process, of course, made us more curious about why he was, you know, determined to not cooperate with the civil process, and to the point of changing lawyers, hiring ever-more expensive law firms, and spending what must have been large sums of money to not cooperate with a civil subpoena.   And so that made me curious about why he didn't want to cooperate.

And I'll add parenthetically that when I was working as a reporter and living in Brussels and investigating Russian corruption and organized crime, I had met Mr. Browder and asked him for help investigating Vladimir Putin, and he had lectured me on Putin not being corrupt and being a bit — someone who's very helpful to -- the best thing that had happened to Russia in a long time.

And at that time, Browder was making a lot of money in Russia.   So anyway, so in light of all of that, I became curious and it was part of my job to investigate the activities of Mr. Browder in Russia and his hedge fund in Russia.

And so, you know, in 2014 and I think 2015, we spent a lot of time looking into his hedge fund in Russia and how they made their money, who their clients

UNCLASSIFIED, COMMITTEE SENSITIVE

were, in addition to, you know, litigating all these other issues about whether we had served him adequately.

We discovered, you know, many things about his activities in Russia and his general finances, his pattern of avoiding taxation, his use of offshore shell companies and tax haven jurisdictions, particularly in Cypress and the BVI.

We identified a number of his clients.   And, you know, we kept trying to subpoena him.   Eventually -- again, he kept saying I have no connection to the U.S., I never go there, we kept finding more houses.   We found a house in New Jersey.   All of this is in the court record, and it's all public information.

Ultimately, we found him in New York City, outside of The Daily Show, and served him a third time.   And this time we taped the whole thing, and he did the same thing.   He jumped out of the limo and he dropped the subpoena and he ran away, so -- but this time it was all on tape and we had already litigated all this. And the judge was very familiar with this scenario.

And, you know, as all the other discovery was taking place, it became more and more apparent that, you know, Bill Browder had taken this information and given it to the government and that, you know, he was the source of these allegations.   And so it became more and more important to understand why he was making these allegations and, you know, whether he had any basis to do so.

███████████   We'll leave it there for now.   Thank you.

MR. SCHIFF:  Mr. Simpson, just to follow up, you mentioned that one of the things that you found suspicious was that Mr. Trump would go to Russia or his son would go to Russia, and they seemed to have a great interest in Russia but never came back with any deals.

MR. SIMPSON:  Yes.

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. SCHIFF:  And what was your suspicion that they did come back with? Are you suggesting that what they came back with was not a real estate deal but rather -- or not a real estate deal in Russia but rather Russian money that would be used in Trump properties?

MR. SIMPSON:  No,  I'm not suggesting that.  I mean, you know, there is my state of mind at the time and what I think now or what we eventually began to think.  I honestly didn't have any preconceived notions about what was going on. I found it puzzling.

And, I guess, my initial thought was that he, you know -- I mean, the wrap on Donald Trump is he says he's a great businessman, but he's really not a great businessman.  And he talks a good game and a lot of it is baloney.  And so, you know, I thought -- one of the things I thought was that he wants to do a deal in Russia, but his lawyers won't let him because of the FCPA.

And that every time he gets close to closing a deal in Russia, it gets shot down by his own lawyers because they think he's going to get prosecuted for some sort of corruption offense.  And that was my hypothesis, I would say, in the early part of this.

What I later came to believe was that he was, in fact, developing different kinds of business relationships with the Russians than, you know, the sort of marquee thing that he always talked about, which was building a tower in Moscow, and that, in fact, you know, he'd found other ways to profit from his relationship with that.

The Miss Universe contest was a profitable venture for him, and I don't think we have a full accounting of, you know, how much he got paid and where the money came from for putting that on in Russia.  But we know that it was -- what

UNCLASSIFIED, COMMITTEE SENSITIVE

we've seen is that it was 10 million, and I think it came from the Agalarovs.  So that was one.

There's the Trump vodka business that was earlier.  And then ultimately, you know, what we came to realize was that the money was actually coming out of Russia and going into his properties in Florida and New York and Panama and Toronto and these other places.

And what we, you know, gradually begun to understand, which, you know, I suppose I should kick myself for not figuring out earlier, but I don't know that much about the real estate business, which is I alluded to this earlier, so, you know, by 2003, 2004, Donald Trump was not able to get bank credit for – and if you're a real estate developer and you can't get bank loans, you know, you've got a problem.

And all these guys, they used leverage like, you know -- so there's alternative systems of financing, and sometimes it's -- well, there's a variety of alternative systems of financing.   But in any case, you need alternative financing.

One of the things that we now know about how the condo projects were financed is that you have to -- you can get credit if you can show that you've sold a certain number of units.

So it turns out that, you know, one of the most important things to look at is -- this is especially true of the early overseas developments, like Toronto and Panama -- you can get credit if you can show that you sold a certain percentage of your units.

And so the real trick is to get people who say they've bought those units, and that's where the Russians are to be found, is in some of those pre-sales, is what they're called.   And that's how, for instance, in Panama they got the credit

of -- they got a -- Bear Stearns to issue a bond by telling Bear Stearns that they'd sold a bunch of units to a bunch of Russian gangsters.

And, of course, they didn't put that in the underwriting information, they just said, we've sold a bunch of units and here's who bought them, and that's how they got the credit.   So that's sort of an example of the alternative financing.

Now, the other way that he got financing was by not being an equity partner in the project, finding an equity partner and offering, you know, licensing or marketing arrangement where, you know, he was the, you know, the brand.

But, you know, what I began to conclude was that the Trump brand is a mixed brand and that, you know, he may have had other ways of lining up buyer interests showing that he had buyer interest to his equity partners and telling them we've got lots of Russians who are going to buy these properties, and that's why we should do this project.

And I think the Trump Hollywood is an example and the Sunny Isles Beach are some of the best domestic examples of that kind of interplay.

MR. SCHIFF: And tell me about the Trump Hollywood project. That was an example of the latter or the former? Did they get the financing from what you could tell because they got a bunch of Russians to presale, or did they go to a bank and say these are our investors, or how did they go about that?

MR. SIMPSON:  Well, eventually, I mean, they lost the project.  It went under.  I can't -- I'm not -- I'm sure we did look at who the creditors were, who the lenders were.   This is the project that Sergi Millian appears to have been involved in, and there's a picture of Jorge Perez, Donald Trump, and Sergi Millian.

And he tells a story about meeting Donald Trump at the golf -- at a racetrack, drinking a bottle of Crystal with him, seems -- he gave him some

UNCLASSIFIED, COMMITTEE SENSITIVE

Crystal.   And that was in the early phases of the project.   So it was clear that Donald Trump -- so the equity partner was the related group.

It was clear that this Russian had been brought into this with Trump, and what you can surmise from that is that he's there to say there are buyers.   We can bring you buyers for this property.   And that's what a developer needs to know is that he's got buyer interest.

MR. SCHIFF:   And how does it work?   Let's say Sergi Millian or someone else lines up the Russian buyers.   The Russian buyers sign presale agreements. Trump can then get financing for the rest of the project.   Do the buyers go through and buy the properties, or is that no longer necessary, once you've obtained the bank financing you can actually sell them to real people?

MR. SIMPSON:   So it's fraud if they don't.   I mean, you have to warrant to the lender that you've already sold X number of units.   And there's supposed to be contracts, downpayments, all of that sort of thing.   So in the case of Panama where the evidence is the most vivid, there's -- the buyers were fake.   I mean, they were real people.   They just never paid.

MR. SCHIFF:   And you say the evidence is most vivid, is it -- did this come out in Panama Papers?   How do you know that this is the case?

MR. SIMPSON:   This -- it's in public records.   I mean, I think there's media interest in this, and there's going to probably be more stories about it.   But I've heard about it.   It's been -- there's lawsuits that we found during the election by some of the later buyers alleging that the earlier buyers, that it was a fraud, and describes marketing events at Mar-a-Lago with Trump and various Russians where, you know, it's clear that Trump is working with Russians to sell these condos in Panama and some of the -- you know, the project, like all these projects,

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

eventually went belly up, and -- although I think it did get built.

Anyway, so these lawsuits were the original -- were the source of the original allegations. And I believe there are lawsuits in Toronto with similar allegations and the guys connected to the Toronto project are Russian mafia too. And, in fact, there's Toronto-based Russian mafia guys who are involved in the Panama project.

And in any event, so the origin of the allegations is defrauded buyers. The real chumps or the marks are the guys at the end of the process who come in thinking that they're going to be moving into a building that's already got all this, you know, financing and other tenants and it turns out that those people have walked away.

MR. CASTRO: Could I ask a question, Adam?

MR. SCHIFF: Yes.

MR. CASTRO: There was reporting, I think, in the New York Times or in the press about Jared Kushner and Ivanka Trump being looked at by the Manhattan DA, I think, because of the same principle that they were essentially -- the idea that they were fabricating the percentage of the units that had been sold basically to hook in more buyers. Did you look at that project at all?

MR. SIMPSON: Well, that was the Trump SoHo, and that project was riddled with fraud, but I had not heard that allegation prior to those stories. But it is, in fact -- I mean, that's a good observation. I had the same observation, which was it does resemble the allegations from these other projects.

MR. SCHIFF: You mentioned earlier that not everything that Christopher Steele found or came up with made it into the reports because there was certain

UNCLASSIFIED, COMMITTEE SENSITIVE

things that either couldn't be verified or might be the subject of Russian disinformation.

Is there anything now, with the benefit of hindsight with the allegations that have become public, that would cause you now to think, well, actually, what he came up with that we excluded from the report may have been accurate after all?

MR. SIMPSON: No. Actually, I mean, I'm -- what I think I was saying when you were out of the room was it would -- it's a microscopic kind of thing. There's very little that we did that is actually in the dossier. You know, there are -- I was trying to think of an example, and I had trouble coming up with one, of something that we discarded because we didn't believe it.

MR. SCHIFF: And didn't you, during the course of your work, uncover any information regarding a connection between Trump or those around him and WikiLeaks?

MR. SIMPSON: Yes. I mean, you've seen some of the public reporting. We gradually -- I mean, this would be separate from the Steele stuff, but, you know, we gradually towards the end of the project became very interested in -- you know, Roger Stone bragged about having his contact. We tried to figure out who the contact was.

We started going into who Stone was and who his relationships were with, and essentially the trail led to sort of international far right. And, you know, Brexit happened, and Nigel Farage became someone that we were very interested in, and I still think it's very interesting.

And so I have formed my own opinions that went through -- that there was a somewhat unacknowledged relationship between the Trump people and the UKIP people and that the path to WikiLeaks ran through that. And I still think that

UNCLASSIFIED, COMMITTEE SENSITIVE

today.

MR. SCHIFF:  And when you talk about the connection between the Trump campaign and the Brexit campaign, is that a line you're drawing through Cambridge Analytica, or were there other lines you were drawing there?

MR. SIMPSON:  Well, Bannon went over to the UK in or around 2011. And originally, he was trying to set up a sort of British tea party, which was an inopportune choice of

MR. SCHIFF:  The anti tea party.

███████████:  One minute.

MR. SIMPSON:  And so, you know, some of it  - so there's -- it really isn't, I don't think, that Cambridge is the nucleus.  I think that it's    there's some Bannon connections. I know there's -  and there's some other Bannon Stone associates, a guy named Theodore Roosevelt Malloch, who was — is an American who was living over there and associating with UKIP and, I believe, is a significant figure in this.

So I don't  - I had had some run into Cambridge and Analytica previously, and I would -  there was a lot of skepticism about whether they really were capable about doing anything or whether they were just selling snake oil, and that was certainly my view when I first heard about them years earlier. So I don't view them as nucleus. The Mercers, I think are significant.

MR. SCHIFF: And, I mean, were you able to find any factual links between the Mercers and Assange or WikiLeaks or Farage?

MR. SIMPSON: Well, I mean, the things that we heard, which, you know, I think could be sorted out by an official inquiry are that Nigel Farage made a number of trips to New York and had a number of meetings — Nigel Farage and

UNCLASSIFIED, COMMITTEE SENSITIVE

Air Bank had a number of trips to the U.S., and that they sort of -- that there's been a misrepresentation of the length of that relationship and the extent of it.

There's -- I've been told and have not confirmed that Nigel Farage had additional trips to the Ecuadoran Embassy than the one that's been in the papers and that he provided data to Julian Assange.

MR. SCHIFF:   What kind of data?

███████████    Time is up.

MR. SCHIFF:   Can we just get an answer to that.

MR. SIMPSON:   A thumb drive.

MR. SCHIFF:   Thumb drive.   Thank you.

EXAMINATION

BY ████████

Q    Just a couple questions, Mr. Simpson.

Did the DNC or the Hillary Clinton campaign for presidency ever direct Christopher Steele to discuss the contents of his dossier with the media that you're aware of?

A    I was the one that directed him to do that.

Q    Okay.   When did you direct Christopher Steele to discuss the contents of his dossier with the media?

A    I think that there was -- I believe it was late -- it was sometime in September or October.   I hesitate to be too specific because it's a little blurry.

Q    Of 2016?

A    Yes, sir.

Q    Did you do that of your own volition, or did you do that at the direction of a client or another entity?

A     I want to be as helpful I can without getting into client communications. So I guess I would like to say generally, I mean -- generally when reporters -- when we have to deal with the press, we would inform our clients that we were doing -- you know, in any case if you're dealing with the press, it's incumbent on you to, you know, make sure your client knows that.

Q     Right.  So are you saying it's a particular client confidentiality that prevents you from asking  - answering who, if anyone, directed you to have Christopher Steele go to the media with the dossier information?

MR. LEVY:  First, I'm not sure you characterized his testimony correctly; but second, he has been as helpful as he can be with this question without getting into confidential client communications.

████████:  No, I understand.   I'm just trying to look for which confidential client communication he's referring to, because certain clients have provided disclosures and relief from that confidentiality agreement.

MR. LEVY:  This client has not authorized Mr. Simpson to discuss confidential client communications.

████████: Okay. So this client would not be then Perkins Coie?

MR. LEVY:  Perkins Coie has not authorized Mr. Simpson to discuss client communications.

████████  This specific communication?

MR. LEVY:  Any.

████████:  Any.   So their statements in -- that the general counsel for Perkins Coie wrote releasing Fusion GPS from client confidentialities, are you aware of that?   Are you --

MR. LEVY:  That letter releases Fusion GPS from no longer protecting the

UNCLASSIFIED, COMMITTEE SENSITIVE

identity of the client.   It does not release Fusion GPS from client communications.

███████████:   I understand.   So if Perkins Coie were to at some point in the future provide such a disclaimer or a release, would you then be in a position to answer that question?

MR. LEVY:   We'd have to look at it and -- but if it released our client from confidentiality, we'd take that under advisement and talk to their counsel and --

███████████:   Okay.

MR. LEVY:   I want to make sure we're not waiving other privileges that we've asserted in this investigation as well, including the First Amendment, but --

BY ███████████

Q   And my last question for you, Mr. Simpson, is why did you go to direct Mr. Steele to go to the media with the information in the Steele dossier?

A   Sure.   Well, so there were two instances of this or rounds of it, and I think I was beginning to recount this earlier.   In the -- in whatever the first round was, I assume it was sometime in mid-September or early October, it was mainly about telling the press, a few high-level members of the national security press, and the, you know, top-level press that we had information that there was a Russian intelligence operation that the Russians were engaged in, you know, that this was more than just hacking, and that there was a major effort to interfere with the election, and that it allegedly involved the Trump Organization.

And the reason for that, the motivation for that was mainly because I thought that this was historic and that it was something the press needed to investigate and know about and ask the Intelligence Community about because I wanted to expose it.

But, you know, we were operating under the assumption at that time that

UNCLASSIFIED, COMMITTEE SENSITIVE

Hillary Clinton was going to win the election and so there was no urgency to it.
And there was an assumption on my part that nothing would be published about
any of this any time likely before the election, and I wanted to tell them about it
because that was when it was happening.

But I didn't, you know -- it was -- basically in a political campaign, you know,
when you get past Labor Day people stop publishing stories that could be
perceived as a late hit or an October surprise or some kind of a stunt.

And so, you know, in a presidential campaign you're sort of winding down at
that point.   You know, all of the information that you needed to gather for debates
or political ads or anything like that, it's all been gathered.

And so -- anyway, so we wanted people to know.   And we were also of the
view by that point -- we'd been doing the research for two-plus months -- we were
of the view that there was really something here, that this was really bad, and that
there was some serious allegations that it wasn't just Russians.   It was Russians
working with Americans.

So that was round one.   Then -- and indeed, no one ran off and wrote a big
story about how Russian -- how a British spy is -- thinks that, you know, the
Russians are working with the Trump people.

There were, you know, a trickle of stories, you know, I guess more than a
trickle, but there were some very limited stories about people associated with
Trump having connections to the Russians.   And I can remember specifically
there being stories about Carter Page and his trip to Moscow and the fact that that
was something that was of FBI interest, and that Carter Page stuff is something
that we covered with the media.

But anyway, so none of that made a dent in the sort of general coverage,

UNCLASSIFIED, COMMITTEE SENSITIVE

and it didn't bother me because I wasn't expecting any of it to really make a dent.

[6:05 p.m.]

MR. SIMPSON:  Come the end of October, some extraordinary things started happening.  The Russians -- WikiLeaks releases John Podesta's emails, and then, you know, most extraordinary of all, James Comey sends a letter to Congress saying he is reopening the Hillary Clinton email investigation.  And that was, I believe, around the 25th.  And, you know, if you are me, you know, and you have been in politics and campaigns and investigations, and this is your whole world, and you have been doing it basically since you got out of college, you know, one of the things that you -- that is really ingrained in you is the rules of Washington -- and when I say rules, I mean like regulations of the Justice Department about interfering with an election.  It is not something that you are just aware of as a technical requirement, it is something the people embrace, which is that law enforcement shouldn't interfere in elections by announcing investigations of people at the last minute.

And so we were shocked, and I felt -- I mean, I guess I was angry.  But in any case, you know, the result of that was predictable, which is that, you know, it began to influence the election.  And, so, we tried to decide how to respond to that.  And when I say "we," I mean like me and my little, you know, company, and Chris and, you know -- I didn't have any dealings with Mrs. Clinton or any of these other people.  They were dealing with -- that was their thing.  But I was sitting on this piece of knowledge, which was that, in fact, the FBI was investigating the Trump organization for possibly having illegal dealings with the Government of Russia.  And you can imagine if you are me or Chris Steele and we have been sitting here working -- ███████████████████████████████████████

████████████████ and they seemed to be very seriously running a

counterintelligence/espionage investigation of the Donald Trump organization, and all of a sudden they announce that they are reopening Hillary case, you know, you're kind of, what's going on here?

So at that point, I, of course, was really confused, and I would say Chris was a little scared, because he didn't -- he thought that -- he didn't really understand what was going on with the FBI.  In any event, at that point I felt like the rules had just been thrown out and that Comey had violated the sort of one of the more sacrosanct policies, which is not announcing law enforcement activity in the closing days of an election.

And so, we began talking to the press again about -- we decided that if James Comey wasn't going to tell people about this investigation that, you know, he had violated the rules, and we would only be fair if the world knew that both candidates were under FBI investigation.

BY ▮▮▮▮▮▮▮▮

Q    Which outlets in the press were you talking to?

A    I am not going to answer that.

Q    Okay.  Do you know John Podesta?

A    I have known John since he was working in the Clinton administration.

Q    Had you met with Mr. Podesta in the fall in the election campaign season?

A    No.

Q    So you never met with Mr. Podesta in September or October or November of 2016?

A    No.

Q    Had you had any communications with Mr. Podesta from, say, May

of 2016 through November of 2016 regarding the matters we are discussing today?

A    No.  I don't think so.

Q    So have you ever exchanged or has he ever requested, he being John Podesta, information regarding the Steele dossier or its contents on behalf of the Hillary Clinton campaign from you or your company, Fusion GPS?

MR. LEVY:  Just to clarify your question, because it got fast, you are talking about during that same time period, May to November 2016?

  : Yeah.

BY

Q    Let's go May through November 2016.

A    No.

Q    Any time before May that you ever communicated with Mr. Podesta about that information?

A    No.  I think the -- as I say, I knew John when I was covering the Clinton scandals and he was in the White House working for Bill Clinton.  And I saw him now and then on the subway after that, and I didn't see him or talk to him, or, to my recollection, have any other kind of communication with him in 2015 or 2016.

Q    So to the best of your memory, you never met with him or had any communications with him during those 2 years?

A    That's right.

  : Thank you.

BY

Q    So earlier a moment ago you were discussing how after Comey sent

this memo reopening the Clinton investigation, you said we had to decide how to respond.  Who is "we" in that statement?

A    It's mainly a reference to myself and to Chris.  You know, it was mainly between Chris and myself.

Q    Anyone else?

A    You know, I am not going to get into client communications, but, you know, I was still working for a client at that time.

Q    Did you discuss with your client how to respond?

MR. LEVY:  I think that is confidential.

MR. SIMPSON:  I am not going to give you that.

BY ▮▮▮▮▮▮▮▮▮

Q    And you said that the response you decided on was to inform the press that both candidates were under FBI investigation?

A    Well, what I thought was appropriate was for -- to give the press enough information so that they could go to the FBI and ask them if both candidates were under investigation.  So what we more specifically did was, you know, we told them that, you know, we had given this information to the FBI and that, you know, we thought the FBI was probably investigating, and that they should ask the FBI if, in fact, they were investigating.  And so they did.  So the FBI, it appears, told them they weren't investigating.

Q    Did you testify earlier, it was your opinion as a Washington veteran that you thought Mr. Comey's statement, or letter, might improperly or irregularly influenced the outcome of the 2016 Presidential election?

A    I am sorry, could you repeat that?

Q    I believe you testified earlier, and I just wanted to confirm, that you

110

thought Mr. Comey's letters to Congress and/or statements concerning the reopening of the Clinton investigation might improperly have an influence on the outcome of the 2016 election?

A    It's my understanding that -- it was my feeling at the time he had violated both the norms of our campaigns and Justice Department policy by disclosing or announcing or taking those kinds of investigative steps within 2 weeks of Election Day.

Q    And one of the reasons those norms were in place or you thought his actions were improper, is that there was at least the very high potential for those actions to influence the 2016 election.   Isn't that right?

A    Yes, it is.

Q    So by deciding what you were going to do in response once the, as you said, the rule book had been thrown out the window, was it also your purpose or intent to counterbalance Mr. Comey's actions by potentially influencing the outcome of the election?

A    Well, I guess I would put it a little differently.   So, I mean, the first thing that happened when this FBI stuff came out was that we were totally shocked.   And Chris was concerned that something was happening at the FBI that we didn't understand, and that there may be some political maneuvering or improper influence.   And, so, we were very concerned that the information that we had about the Russians trying to interfere in the election was going to be covered up.   And this was some really bad stuff.   We were now in late October, and it was clear that there was a massive attack on our election system by the Kremlin.   And that it was, you know, a crisis, and that, you know, so we felt that this needed to be exposed.

And so it wasn't so much, you know, a case of, you know, tit for tat as that we didn't really understand what's happening, and it was really bad stuff that was happening, and if the press is going to be writing about all these investigations, we should expose this stuff.

Q     And was the purpose or intent of the exposure to potentially affect the outcome of the election?

A     It was to expose a sinister plot by Vladimir Putin, a hostile foreign power, to attempt to alter the outcome of an American Presidential election.  And that was the goal.   You know, and again, I mean, basically our behavior after the election was of the same basic character.  At some point, it became about blowing the whistle on this.   And I would say that was the point at which it was a lot bigger issue.   And as an ex-journalist, I still have a little bit of that in my blood, and I wanted to expose it for the sake of letting people know what's going on.

Q     And did you discuss that plan to expose this information with Perkins Coie, the Clinton campaign, or the DNC?

A     I am going to decline to answer that.

MR. SCHIFF:  Mr. Simpson, I want to ask you a very open-ended question, because a lot of the information has been very helpful, but I am concerned that we may not know the right questions to ask you.   So let me ask it in a very general way.   You know the parameters of our investigation.   We are interested in any contacts between then-candidate Trump, his family, his campaign, and the Russians.   We are particularly interested in any of the Russian active measures, any leverage the Russians may exert over the President or his team.

You have itemized a number of things, including Russian money involved in transactions with Trump properties, and suspicious activity potentially between the

campaign, Nigel Farage and Assange-Wikileaks. Are there other issues that came to your attention that are not contained in the Steele dossier that you think we ought to be aware of that you either were able to substantiate in part, or you were not able to fully investigate but you think that, in the exercise of due diligence, that we really need to?

MR. SIMPSON:   So I guess the first one that I think that we haven't covered at all, would be the Center for the National Interest and the people involved in the Center for the National Interest.   And among other things -- well, importantly Dimitri Simes is known in the Russian expat community as a suspected Russian agent.   And I believe he is known to the FBI as a suspected Russian agent.   And I think that you could develop more information in that area from talking to Russian intelligence defectors and people who come to this country and have been given refuge from Russian intelligence.

There are a number of Russian defectors who, I think, maybe could speak to that.   I think there are some records around that might reflect some of that. And I think that is -- given their fundamental role in creating the Trump foreign policy, I think that is a really important area.   I think talking to Russian intelligence defectors in general about what they think was going on and what they've heard is probably a useful thing to do.

I think that the origins of the Manafort-Stone-Trump relationship is an interesting area.   I have looked, spent a lot of time looking last year at Roger Stone -- you know, Roger Stone made a joke at one point about how Paul Manafort had disappeared, and he was last seen like carting bags of cash onto Yanukovich's plane or something like that.   You know, Roger Stone has done work in Ukraine.   He did work in Ukraine around the same time as Manafort.

And I think he has a little more knowledge of Manafort's Ukrainian activities. And they both -- Stone was a protege of a Republican political fellow named Arthur Finkelstein, who hired him to work on the Nixon campaign. And Finkelstein was one of the first consultants to really appreciate how to target voters in a way that somewhat resembles the way the Trump campaign and the Russians did. And he spent many years -- he worked -- Finkelstein worked with Stone and Manafort in Ukraine in or around 2005, 2006, for the same cast of bad guys. And later went off to Hungary to work for the pro-Russian prime minister there, Victor Orban, and went into business over there. And there is a lot of allegations coming out of the Hungarian expat community about all of that. And, so, I think that is an important area. That is one of the -- you know, we've picked up that Hungary is inside the EU, and it's essentially -- you know, Orban is essentially a Putin puppet and the GRU has a big station there, and there is a lot of unexplained travel by various people. And we have heard a lot of rumors about that, and a lot of allegations since beginning of last year.

MR. SCHIFF: And I mean this is obviously a public transcript, we know about Carter Page's travel there. Are there other individuals --

MR. SIMPSON: Well, it was our information that Gorka had been there about three times. At least two of those he tried to keep low profile. I am told J.D. Gordon did, but I don't know -- I just don't know whether that is reliable. I guess this is transitioning into another area, if you are interested in looking at things, is, you know, the European travel of certain people. And I would include Jared and Ivanka in that.

And there is a very puzzling sequence of events that we spent a lot of time looking at -- first of all, I will just back up and say, you know, travel records. My

UNCLASSIFIED, COMMITTEE SENSITIVE

assumption is that, you know, the FBI or the Special Counsel, like one of their methodological first steps would be to get all the travel records for all these people, as they are relatively doable if you are in law enforcement.   And I think that would tell you a lot.   But there is a specific sequence of events that has intrigued us for a long time, where Cohen and Ivanka and Jared and Trump, and I can't remember whether Manafort's in this mix too, are all in the Hamptons area in August, and Dmitry Rybolovlev's plane is somewhere nearby, and flies to Nice.   And then most of these guys sort of come off -- fall off the radar and then, you know, I think it's the 12th of August, Rybolovlev's plane lands in Dubrovnik, and Jared and Ivanka surface in Dubrovnik.   And I don't know how they got there or whether they got there on his plane.

But those are things I have been interested in for a long time.   The plane, you know, we have been told that Rybolovlev's boat was also nearby.   There were all these other yachts nearby and that, you know, there had been rumors of meetings between Trump people and Russians on yachts off Dubrovnik.   And the Rybolovlev jet then flies to Budapest from Dubrovnik.   And I can't tell you whether it's meaningful or not, but there are certainly things I was interested in and still find unanswered and intriguing.   I guess the same would -- again, I don't know what Mr. Cohen has told you, but his public statements about his whereabouts I found unsatisfying.

MR. SCHIFF:  Did you find evidence that Mr. Cohen had been part of this delegation?

MR. SIMPSON:  Again, our abilities to do these things are pretty limited, but we can be creative.   And we found, you know, his daughter's Instagram account had her hop-scotching around this general southern Europe area during

some of this time.  And I haven't refreshed my memory about all of this, but, you know, we got the impression that he was with her for some of the time.  And then, you know, given the specificity of the allegations in the second Prague memo about their meeting in Prague, I have been — you know, given the gravity of the allegation and the specificity of it, generally I have been waiting for -- I mean, I would sit down -- if that allegation had been made about me, I would sit down with my lawyer and we would reconstruct my whereabouts, and we would look through credit card bills and airplane tickets and, you know, my phone records.  And there is many, many ways to account for your whereabouts in modern life if you want to.  And I haven't seen him put any of that stuff out.  So I find that intriguing.

MR. SCHIFF:  And what other issues do you recommend that we look at?

MR. SIMPSON:  I think the history of the Agalarovs is important, and the role that Irakly Kaveladze played in the Trump Tower meeting is important.  And I think that there is a lot to find out about Kaveladze.  You know, I should add, as we have said publicly, I was not aware of the Trump Tower meeting, and no one told me about it before it, and no one told me about it after.  But I have a little bit of knowledge of Kaveladze and a little bit of knowledge of the Agalarovs.  Kaveladze surfaced in a previous money laundering investigation.  I think there is more information about that money laundering investigation in the possession of the government than just the GAO report, and that Kaveladze has been working with the Agalarovs since the early '90s, and they have been involved in a lot of money laundering, and that some of it goes back to suspected KGB money laundering.

So, I think that is a rich area.  And I was as shocked as anyone to see, you know, these two matters intersect in the way they did.  I nonetheless feel it's very

important to get to the bottom of what was going on there.   So I think there is a lot to look for there.

████████████   Three minutes, sir.

MR. SCHIFF:   Any other areas that you haven't discussed already that raise concerns for you that you were not able to finish in terms of your own investigation?

MR. MUSE:   Since you have 3 minutes, why don't we take a little bit of a break, and then we might be a little more efficient.   Is that okay?

MR. SCHIFF:   Sure.

[Recess.]

MR. SIMPSON:   Okay.   I did think of some things.

MR. MUSE:   So we are back on the record?

MR. SCHIFF:   Yes, back on the record.

MR. SIMPSON:   So, you know, I could probably think of other things, but I think one thing that is worth looking at is the relationships among people that are not known to be related, whether the Agalarovs know the Arifs, whether some of the other Russian oligarchs, whether they have social or business relationships, including that Roman Abramovich.   And I think this question of the travel histories of Don Jr. and Ivanka, and whether they had other meetings with Russians is an area that is unexhausted.   And specifically, the connections between the Ibramovichs and Ivanka and Jared is something that requires looking into, if it hasn't been.

So those are kind of -- I mean, as I look at a lot of these guys, I see, you know, a Russian Central Asian organized crime nexus.   So, I think the Arifs are in that category, and the Agalarovs are in that category, and I think they know each

other.   I think they go to each other's children's weddings.   And I think those weddings take place in Italy.

So that is important.   I think there is a lot of activity we saw around the island of St. Martin in the Caribbean, and a lot of Russian activity.   President Trump has a property there he has been quietly trying to sell.   And there might have been some meeting activity there.   The Turkey-Russia connection I think is deeper than is generally understood.   I think that the Turkey-Russia -- I think that the influence campaign that General Flynn got caught up in is reflective of that. And I think it's not been excavated.   And I think that Roger Stone may have connections to that matter that are unexplored.

MR. SCHIFF:   Why do you say that?

MR. SIMPSON:   Things I heard from sources.   I think Ted Malloch is an important person in this whole picture.   And he may have had some role in all that.   He is an interesting person who crosses over from Brexit, UKIP, Trump, and the Turkey-Russia issue.   And then the last thing I would add is, you know, we haven't talked about Deutsche Bank at all.   You know, I think they obviously know a fair bit.   But they are obviously within your subpoena power, and I am assuming you probably already asked them to provide information.

   You are out of time, sir.

MR. SCHIFF:   Thank you.

BY 

Q    So this round I am going to attempt to keep my questions short, and would ask that you might be brief with your answers.   I appreciate how fulsome you have been in response to our questions, but want to be respectful of everybody's times.   So if we could get through some things quickly, and as

UNCLASSIFIED, COMMITTEE SENSITIVE

necessary we can elaborate.   Can you just briefly describe how you met individual Natalia Veselnitskaya or came to know her?

A     Sure.   I think this is largely included in the previous answer, but I was retained by Baker Hostetler, and didn't know of her existence until they told me there was a lawyer for the Prevezon company, a Russian lawyer.   And eventually, they mentioned her a few times, and eventually they mentioned her name.   And at some point, you know, they introduced me to her.

Q     Do you recall when that was?

A     I don't.   I assume it was sometime in mid-2014.

Q     And I assume that you have seen reporting, or otherwise know that she attended what has become known as the Trump Tower meeting on June 9, 2016?

A     Yes.

Q     And that she presented material to Trump associates regarding Bill Browder and the Magnitsky Act.   Are you aware of that?

A     I am aware of that.

MR. LEVY:   Are you aware of the report?

BY 

Q     Are you aware that she presented material relating to Bill Browder and the Magnitsky Act during that meeting?

A     I have read that.   To be clear, I didn't know about this meeting before it happened, and I didn't know about it after it happened.   And I found out about it, I think, you know, within a day of it being disclosed in the New York Times. Someone called me and said you heard about this meeting?   And I said no.   So anyway, that was the first I had heard about it.   That was in the spring of this year.

UNCLASSIFIED, COMMITTEE SENSITIVE

I, of course, have read that information -- some of the -- one of the subjects was
Browder.  And I have been asked about it by another committee, and so I am
familiar with that.

Q    Is the information that she provided during that meeting, did it
incorporate information that you or Fusion GPS had come up with as part of your
work on the President investigation?

MR. LEVY:  He has already told you he wasn't at the meeting and wasn't
told about the meeting before or afterwards, so I don't know how he could answer
that question.

██████████     Mr. Levy, I understand that he has testified he doesn't know
about the meeting before or afterwards, but that does not preclude his knowledge
of what Ms. Veselnitskaya potentially presented from press reports or from talking
to others after the fact.  If he has no knowledge of what she presented or how it
relates to his work, I am happy to -- he is welcome to testify to that effect.

A    I have no knowledge of what transpired at that meeting.  No one has
ever told me what happened there.  But I will say, you know, the Prevezon case
was about the issues that she reportedly talked about.  So that is all I can tell you.

Q    Have you seen the reporting, and particularly, the talking points or
materials on this topic, recently published by The New York Times?

MR. LEVY:  You want to show a document to him?

MR. SIMPSON:  Is there a specific report that you are referring to?  I
mean they have done a lot of reporting on this.  So I don't know how to answer
your question.

                BY 

Q    So there was a specific report within the past month or so stating that

the material or the talking points that Veselnitskaya presented during this Trump Tower meeting had been socialized in some way with the Kremlin.   And attached to that report was a set of documents purporting to be --

A     Oh --

Q     -- the talking points.

MR. LEVY:   There is a lot floating around on the Internet, and The New York Times has published a number of stories on this subject.   And I just would ask, out of fairness to the witness, if there is a specific article or publication to which you are referring, if you could just produce it and show it to the witness so there is no confusion for the record.

MR. GLABE:   I am asking if he knows about the specific material.   If he doesn't know about it, we can refresh his memory later.   But I am just asking whether he knows about this specific material.

MR. LEVY:   I appreciate that.   I just think that the question itself is not sufficiently precise, particularly if there is an actual newspaper story that we could show him.

 All right.   We will do that on the next round.

BY

Q     When was the last time that you saw Ms. Veselnitskaya in person prior to her meeting at Trump Tower on the afternoon of June 9th, 2016?

A     We were at a hearing at the U.S. Court of Appeals in New York City. And I attended the hearing along with the rest of the Baker legal team.   She was there.

Q     And so we includes her?

A     She was -- yes.

Q    Do you recall what time the hearing was?

A    No.  I believe it was in the morning.

Q    And this is the morning of June 9th?

A    I think it was -- according to what what's been reported in the papers, if the Trump Tower meeting was on June 9th, yes, it was the same day.  And yeah, it was a sort of obligatory event for me.  I was part of the litigation team and, you know, former Attorney General Mukasey was arguing for the Prevezon side, and so we were all there.

Q    And what conversations did you have, if any, with Ms. Veselnitskaya while you were attending this hearing?

A    Mrs. Veselnitskaya did not speak much English.  And so my conversations with her, every time I met her, were pretty limited.  And I don't remember having any conversation other than pleasantries.

Q    And following the hearing, where did you go after that?

A I had one other event that I know of was I was trying to help the law firm find a PR firm to handle trial PR. And I met with Weber Schandwick I think, is the PR firm. These trips to New York sort of blur in my mind. I may have had another meeting with another PR firm as well.  I just don't remember.  But in any case, the only thing I remember is one meeting with a PR firm at a hotel somewhere, and then it was my son's high school graduation.  It was an event for my son's high school graduation, so I went to the train station and came home.

Q    On June 9th?

A    That's my recollection.

Q    So were you anywhere with Ms. Veselnitskaya that day after the court hearing?

UNCLASSIFIED, COMMITTEE SENSITIVE

    A    Not that I recall.

    Q    And do you recall the next time you saw her after the afternoon of June 9th?

    A    It was a day or two later.  I think it was -- I mean if June 9th was a Friday, I probably -- maybe Saturday or Sunday, there was a social dinner that was organized by the partner for whom I had worked during my relationship with Baker Hostetler, Mark Cymrot, and it was at a restaurant called Barcelona, and there was a variety of people there.  There were some people from journalism and books, and my wife and I, and Ms. Veselnitskaya was there with Rinat Akhmetshin and a couple other people.

    Q    And this is in -- where is this?

    A    This is in Washington.

    Q    Okay.  So a couple days after the weekend of --

    A    It may have been a day after or two.  I believe it was the same weekend.

    Q    And did you have any conversations with Ms. Veselnitskaya, either directly or through an interpreter at this dinner?

    A    Nothing I specifically recall.  I recall that they were at the other end of the table from me.  But you know, we had drinks before, and I might have said something to her.  I just -- it wouldn't stick in my mind.

    Q    But it's your testimony that you didn't talk to her about the, what's become known as the Trump Tower meeting before it occurred?

    A    Neither before nor after.

    Q    And you didn't, in fact, find out about that meeting until 2017?

    A    That's correct.  That is my testimony.

UNCLASSIFIED, COMMITTEE SENSITIVE

123

Q   And remind me of the date of the first Steele memo.

A   Somewhere around June 20, 2016.   Something like that.

Q   So by June 9th, this project that you were doing for -- Mr. Steele had been engaged in your research on behalf of Perkins Coie?

A   I think so.   But, I mean, I had been investigating Trump for like 8 months.

Q   I mean, we have talked a lot about coincidences and interesting connections, but, I mean, it's quite something that you would have been investigating Trump for 8 months, and one of your colleagues from this other litigation who you were with shortly before and after the meeting had, in fact, met with Trump Jr. and other high ranking Trump associates on a related topic in the same time period.

MR. LEVY:   Is there a question?

   No.

BY

Q   You mentioned briefings that you set up with Christopher Steele in September and October of 2016.   In addition to kind of events that you did together, did you or anyone at Fusion independently discuss the dossier with journalists?   Or the materials that became known as the dossier or are contained in the memorandum?

A   I understand the question.   You know, it informed my discussions with reporters beginning, I think, in probably July.   And I don't remember -- I don't remember specifics from the early part other than at the Democratic Convention they had just released -- WikiLeaks had released all the Debbie Wasserman Schultz material.   And so it was plain from public evidence that there was a hack

attack afoot. And based on things that the FBI had reportedly told the DNC, which were in The Washington Post, that it was the Russians, and that they were weaponizing the hack. They were not engaged in surveillance, they were engaged in an active measure. And so the question of what the Russians were up to was on everyone's lips, especially the investigative reporters that I deal with. And so I definitely -- it definitely informed my discussions with people.

Q    Consistent with your -- the custom and practices you described earlier, did you preclear these meeting engagements with your client?

A    I didn't say that. I am not sure what you are referring to in terms of my previous statements. I think I have been fairly careful to not get into what I did and didn't say to my client. But what I think what I said, what I can say generally is that if I am talking to the press about a piece of research I am doing, you know, I would want to be -- I would want my client -- my client would be aware of that. But I am also a professional, and, so, I don't need to clear every reporter conversation I have beforehand, or even report it afterwards with a client.

Q    In addition to these press engagements both with Chris Steele and those that you did independently, did you, Mr. Steele, or anyone at Fusion brief any lawmakers or congressional staff regarding the dossier material or Steele's findings during this period?

A    I don't think so. No, I don't remember doing that.

█████████ : We will yield back to you guys.

MR. SCHIFF: No more questions at this time. I defer to Ms. Speier.

MS. SPEIER: Thank you, Mr. Simpson, for being here, and for your attitude. I would like to kind of focus on some of the real estate. At one point I think earlier you referred to that mansion in Florida as a derelict estate. Is that the

word you used?

MR. SIMPSON:   I don't remember the exact words, but it had fallen into disrepair.

MS. SPEIER:   So, it was purchased by Mr. Trump for $41 million and sold to Mr. Rybolovlev for $95 million.   And since there had been few improvements made by then-developer Mr. Trump, what is your opinion, I guess, as to why that big hike in the sale price?

MR. SIMPSON:   Well, I originally dismissed this transaction as a runoff, or not relevant, because of my imperfect and incomplete understanding of the whole timeline.   And I had never heard of Dmitry Rybolovlev.   So it seemed like an absurd acquisition.   But the explanation for why he overspent was that he was hiding money from his wife.   And the depiction of him as a sort of reckless big spender was pretty thoroughly developed in the press.

So, I mean this guy was spending money like a drunken sailor on all kinds of things, and people were ripping him off in art deals.   So that was my original take on this.   Also, when we first heard about it, it didn't fit with my timeline of when Trump seemed to have gotten deeply involved with the Russians.

Later, as I understood more, I began to realize that it actually was in the sort of first trimester of the Trump-Russia relationship, in that it actually fit in pretty well with some of the early things that had happened.   I also began to learn more about Dmitry Rybolovlev.   And that changed my view.

In particular, I didn't know in the early period that he was closely linked to Igor Sechin, and that, in fact, he was accused of essentially destroying an entire city environmentally with his potash mining operations, and was criminally accused, and managed to get out of it and walk out of Russia with billions of

dollars with the apparent assistance of Sechin and Sechin's people. And subsequently, received a report from a Russian emigre who is familiar with these events that that was -- there were political or corruption aspects to that.

So, as my understanding of what I think has been happening developed, I began to think, again, about all of this, and I am now very suspicious that he was deliberately overpaying. And, I mean, what we have seen over the last couple of years that, as sort of cynical and conspiracy minded as I am, I am still shocked by all kinds of things that have happened here, including the Trump Tower meeting. And what we have seen is that a number of oligarchs have left Russia in recent years who seem to still be doing the bidding of the Kremlin. And to some extent, they like to have an image as someone who is on the outs with the Kremlin, but when you look closely, they are not. And you know, when we looked at Rybolovlev's plane travel, you could see that he was going to Moscow all the time, and that all his legal problems went away, and that there was questions about whether he really did get ripped off in these art deals or whether he just said he got ripped off as a way of accounting for all the money that's missing. So I am now of the view that that transaction is suspicious.

MS. SPEIER: And the additional $50-plus million that Donald Trump received was for what purpose?

MR. SIMPSON: I don't know. I mean -- you mean the profit from that?

MS. SPEIER: Right.

MR. SIMPSON: Trump just claimed it was one of his great business deals. He just claimed he talked him into paying double, which was odd, because the market was going south at that point.

MS. SPEIER: You indicated that beyond the dossier and the Christopher

UNCLASSIFIED, COMMITTEE SENSITIVE

Steele research, that you conducted your own research on Russia.   And I think you have shared with us some of that.   Is there other elements of your Russian research that would be helpful to us?

MR. SIMPSON:   One of the things, you know, that we worked on, I just saw a story coming in here sort of about financial transfers from Russia through Russian, you know, diplomatic entities, and how that was something that, you know, there have been SARs on.   And you know, we investigated -- so there was in one of the early memos, might even have been the first one, said "Money is being distributed in the United States through the auspices of pension payments." And you know, they are basically getting the money into the country and handing it out using fake pension payments.   And this is like one of those things that I ran down as a way of evaluating the credibility of the dossier or of this memo.   And so the question is, Well, do the Russians hand out lots of money in the United States through pension payments?   And the answer is they do.   And it's actually kind of interesting.   I mean there is a ton, or many thousands of Russian emigres who -- you know, it was a communist country, so everyone worked for the government, so the government has liabilities, pension liabilities in the U.S. that are big.

And furthermore, there has been investigations by the Social Security Administration about those payments and about whether some Russian emigres are getting Social Security from both countries.   And those are just ordinary fraud investigations whether the recipients are engaged in a form of welfare fraud.   But in the course of all that, it lays out some of the operation of how this money moves.   And that all depicted to me a perfect way of moving money in the United States that was largely untraceable, and protected by diplomatic privileges.

UNCLASSIFIED, COMMITTEE SENSITIVE

So even in a sanctions environment, you can move this money in under color of pensions.   So all of that was to me, and is, very interesting.   And then we identified a woman in Florida, a lawyer whose name escapes me, who used to work for Gazprom, and seemed to have connections to Michael Cohen, who said she was a -- had a legal, you know, some legal role with the Russian Embassy in Washington helping to distribute Russian pension payments.   And, so, all that was interesting and curious, and I wish I had been able to follow up on it more.

Other work that we did in the dossier that I think was really useful and is worth following up on, so we did a similar thing when we got the Carter Page information, which was, you know, gee, we will never -- I will never find a way to confirm whether he talked to Igor Sechin, but what was he doing in Moscow at this school meeting?   And was he on the schedule in advance?   Couldn't find much indication that this had been long announced in advance.   Seemed to be hastily arranged.   Who is behind this school?   Who are the oligarchs?   That was interesting.   There are some oligarchs that are involved in the school that show up in other aspects of this.

And, you know, eventually after the election, because I was somewhat consumed with these matters, I began -- I began, you know, I guess to back it up a little bit, when I left the Wall Street Journal, one of the reasons why I left the Wall Street Journal was because I wanted to write more stories about Russian influence in Washington, D.C., on both the Democrats and the Republicans.   And I had written up a couple cases, the Curt Weldon case, some other cases, and I had talked to some sources, and everyone said the Russians are back, and they are buying influence in Washington left and right, and it's scary and crazy, and they are trying to bribe all these Congressmen.   And so I wrote a bunch of stories

about it.  And eventually the Journal lost interest in that subject.  And I was frustrated.  And with the change of ownership --

Anyway, that was where I left my journalism career.  So hadn't paid much attention to it.  And now, all of a sudden, all these issues that were at the end of my journalism career came back, and I became somewhat consumed with them again, and I began reading court cases involving Russian espionage in the United States.

I went over the Anna Chapman case, the case of the 10 illegals.  And an interesting aspect of that case is that one of the people who was targeted was Hillary Clinton's -- one of her big donors was -- seemed to be the Russians' target in that case.  And another aspect of the case was a guy who was trying to get a job at the New America Foundation.  And it suggested that there was, you know, a pretty elaborate attempt by the Russians to infiltrate our softer target institutions.

You know, instead of, you know, breaking into the CIA, you are breaking into, you know, places where, you know, an open society leaves open.

So anyway, in the course of reading up on my espionage cases, I found a case involving a guy named Buryakov, Evgeny or Eugene, who worked for, I think, it was Sberbank and he was arrested as an illegal Russian intelligence agent. And then in the prosecution, they identified people that he was trying to recruit. And one of the guys fit the description of Carter Page.  And so eventually, you know, a reporter asked Carter Page, Hey, is this you, and he said yes.  And so, you know, I mean in terms of like things that have turned out to be accurate about the dossier, I mean like, okay, so this guy seems like a zero, but, in fact, you know, in espionage tradecraft, you know, you are not going to target, you know, someone with a good job and a stable family and a long work history, because

UNCLASSIFIED, COMMITTEE SENSITIVE

they are going to tell you to get lost.   But you are going to target someone who is greedy, lonely, ambitious.   And he fit the picture.

And it turned out that he, in fact, had been a long-time target of Russian intelligence and under investigation by U.S. counterintelligence.   So, you know, that's a long way of saying I think there are other espionage and sanctions cases that shed light on the bigger operation.

MS. SPEIER:   All right.   Let me move onto another property, the Soho property.   What do you know about Tamir Sapir?

MR. SIMPSON:   I used to know a lot.   I don't remember.   I think he is of Central Asian background.   I believe he is deceased now.   And I believe he is -- I guess there is some inter-marriage.   I can't remember how it is.   But I remember something about weddings and them being socially connected.   That's about all I remember.   I am sort of thinking back to one of the other questions that Congressman Schiff asked about, things to look at.   And it's kind of an uncomfortable -- I don't know really how to put it, but there is a lot of -- Putin seems to be very interested in the Jewish Diaspora.   And there seems to be, especially, the sort of Orthodox or ultra religious or conservative, and there is a definitely something interesting to all that.   Chabad, in particular, is a subject that is curious and interesting.

And Putin essentially took over the Russian Jewish community and the leadership of the Russian Jewish community.   And appears, for reasons I can't fully explain to be -- this appears to be a very interesting route for the Russians. And again, I think there are many routes for the Russians.   They use trade groups, they use ethnic association groups, and at least -- and they use religious groups.

UNCLASSIFIED, COMMITTEE SENSITIVE

The Orthodox church is also an arm of the Russian State now.  And when I used to do terrorism reporting, the Mossad guys used to tell me about how the Russians were laundering money through the Orthodox church in Israel, and that it was intelligence operations.  So --

MS. SPEIER:  So the extent to which they are funding persons within let's say the Russian Orthodox church or funding the church, is the expectation then that those who are here in the United States, members of the Russian Orthodox church are doing something on behalf of Russia?

MR. SIMPSON:  Well, I think -- I mean the thing that I have looked at is more in Europe, but it's using the Orthodox church as a cover to move money and for operational cover reasons, to give people, agents jobs.  A lot of the senior people in the church are ex-KGB, or maybe still KGB.  And so -

MS. SPEIER:  And very religious, I guess.

MR. SIMPSON:  These are actually quite well documented.  The other thing is the history of Russian espionage, a lot of the stuff they have been doing lately is really out of the old playbook.  So from my background, as I don't have sort of any great investigative powers, so I read a lot.  And a lot of what you read in the history of Soviet espionage is what you have been seeing lately.  In any case, oh, and the classic one of course is Kompromat.  So, you know, that obviously is something that harkens back.

Q How about Mr. Mashkevich?

███████████:  One minute, ma'am.

MR. SIMPSON:  He is interesting.  He is another Central Asian organized crime figure who is extremely well known to international law enforcement, involved in a lot of money laundering activities, a lot of kleptocracy, comes out of

the mining industry, and is big in Kazakhstan, a member of the trio, as they are called. And I believe that Moskovich (ph) also has connections to the Sapirs and the Arifs.

MS. SPEIER: He was one of the financial backers evidently of Bayrock.

MR. SIMPSON: Yes, that's right.

MS. SPEIER: And somehow, then associated with Trump Soho, or not?

MR. SIMPSON: Yes, absolutely. I think that that whole thing is -- there is a lot left there. I don't know if you have ever asked Ivanka Trump what she was doing in Kazakhstan, but she was there. So was Don Jr., I believe. She talks about it in her book. She doesn't say what she was doing there, you but she says she was there. I think she mentions eating a cow stomach.

 We are at time, ma'am.

BY

Q    So Mr. Simpson, I just handed you a New York Times article entitled Talking Points Brought to Trump Tower Meeting Were Shared With Kremlin from The New York Times. Do you recall reading or otherwise being familiar with this article?

A    So I read the article at the time. I didn't realize that this was appended to the article. Is this from the article?

Q    So in addition to the article, I have handed you a two-page memo that according to the article was a document provided by the office of Mr. Chaika, the Russian prosecutor, to an American Congressman in approximately April of 2016, paragraphs of which were also incorporated in the talking points that Ms. Veselnitskaya brought to the Trump Tower meeting.

And particularly, with respect to this memo, if you have a chance to look it

133

over, does it reflect or incorporate research that Fusion did?   Does that two-page memo reflect or incorporate research that Fusion did in the Prevezon litigation?

A      I don't know for sure.   Actually, someone sent me a memo that I think was in Russian, and it wasn't this one.   Yeah, like last week.   Sorry.   It was linked to a news article.   Right.   So, I have not studied this closely.   And I certainly had no role in putting this together.   And I didn't -- wasn't at the meeting, and I wasn't aware of what transpired at the meeting, including what was discussed.

Q      So let's sort of take a -- I understand that's your testimony.   So take it one at a time.   Have you seen this -- do you recall seeing this memo before?

A      I actually don't.   Someone sent me one that was different, but -- so there was an article in Foreign Policy recently where they said we've got the memo.   And I remember looking at it, and I don't remember it being this one. And I did read this article.   I am familiar with some of the information in here.

Q      Is it the same -- well, I believe you have already testified that your research connected to the Prevezon case involved Mr. Browder.   Did it also involve researching the Ziff Brothers?

A      Yes.

Q      And did you share information in that connection with Ms. Veselnitskaya?

A      Well, I would write memoranda for Baker Hofstetler.   And yeah, I think I -- it ultimately -- ultimately would go to Ms. Veselnitskaya, in the litigation.

Q      Were you aware that she was sharing information on these topics with the Russian prosecutor general's office?

A      I don't know.   I can tell you what I -- what happened, which was that

UNCLASSIFIED, COMMITTEE SENSITIVE

as Mr. Browder became a more central figure in the Prevezon litigation, and the question of whether he was, in fact, evading his taxes in Russia became an issue, we began to try to understand the Hermitage Fund and how it worked, and whether it paid taxes and who its clients were and its structure. So I conducted some research on these dozens of shell companies that were associated with the Hermitage Fund based in Cyprus.

    Q    Was one of those Giggs Enterprises Limited?

    A    I think so.

    Q    Zhoda Limited?

    A    Yep.

    Q    Peninsular Heights Limited?

    A    I think so.

    Q    And so once you conducted that research, it made its way, you understood, to Ms. Veselnitskaya. Did you understand at the time that it was potentially making its way from her to the upper ranks of the Kremlin?

    A    No.

    Q    But it is fair to say, however, that the negative viewpoints expressed in this memo regarding Mr. Browder and Mr. Magnitsky are consistent with the Kremlin's own viewpoints on these matters?

    A    They are consistent with the Kremlin's. They are not consistent with mine. Obviously, the Kremlin has very strong feelings on these things. I do not. I obviously think that Sergey Magnitsky was killed in prison by neglect, if not worse. And I think that William Browder's position that he holds now on Vladimir Putin is very similar to mine. And so --

    Q    Have you shared that opinion with Ms. Veselnitskaya?

UNCLASSIFIED, COMMITTEE SENSITIVE

135

A    That's a funny question.   But I don't -- actually, my wife has shared those opinions with Ms. Veselnitskaya.   I can't remember whether I said those things.   In any event, I do remember doing this research.   I thought it was good research.   It was research for the lawsuit.   I didn't think it was important research. I thought it was well done.   We were able to figure out from a pretty big paper chase who the clients of this hedge fund were.   And in fact, they potentially do have tax liability in Russia if the Hermitage Fund was cheating on their taxes in Russia.   So that was the point of the research.

Q    But does it disturb or trouble you at all that this research was incorporated, used somehow, found its way in part to what you described earlier as a part of a Russian Government-directed operation?

A    I prepared this research in connection with an American lawsuit for an American law firm.

Q    I understand.

A    It all happens to be accurate.   And so, you know, if someone used this research that they, you know, commissioned through a law firm for a legitimate legal purpose, took it and repurposed it in some other way, I can't say as I am upset by that.   I mean, I must say in my business, right, I am in the information business, so when people commission research from you, it becomes their property when you are finished with the research, when you give it to them. So if they decide to go and use it for something else, I mean, that's just beyond my control.   So I will add that, you know, as someone who is not a fan of Vladimir Putin, I don't take any great -- I certainly am not happy to do anything that anyone would think was helping Vladimir Putin.   And to the extent that this has subjected me to an unfair accusation that I was engaged in some kind of Kremlin operation, I

136

UNCLASSIFIED, COMMITTEE SENSITIVE

find that very regrettable.

    Q    You mentioned, I believe earlier, that in addition to Ms. Veselnitskaya, Mr. Akhmetshin was also at the dinner a couple days after this meeting?

    A    That's my recollection.

BY 

Q    And had you met Mr. Akhmetshin before?

A    I have known Mr. Akhmetshin since I was a reporter at the Wall Street Journal.

Q    And other than this dinner, have you, Mr. Akhmetshin, and Ms. Veselnitskaya ever had any meetings together?

A    I don't know whether the three of us have met together specifically.  I think there have been other meetings or maybe lunches or something that -- where we have all been present.   At the time of the most of this case, she was just a lawyer from Russia.   So I don't have a very clear memory of all the meetings and lunches and things.

Q    Did you understand her to be acting on behalf of the Russian Government or to have had a past relationship with the Russian Government?

A    I certainly didn't understand her to be acting on behalf of the Russian Government.   And it was my impression that she was not a heavy hitter in Moscow or with the Kremlin.   She seemed to be ambitious, but she didn't seem to be, you know, carrying the Kremlin stripes.   I just remember she was introduced to me as someone who had previously been a government lawyer, and described to me by the Baker lawyers as actually a very good lawyer who seemed to really have a strong command of facts.   And in my dealings with her, that turned out to be true.   I mean she was able to produce a lot of records on these criminal cases that we were interested in.

Q    Did Mr. Akhmetshin work with you on the Prevezon litigation?

A    I mean we both worked on the same case, and I had occasion to deal

UNCLASSIFIED, COMMITTEE SENSITIVE

with him.  But he was brought in at a much later date.  For most of the case it was just litigation, and he had no role.

Q   Have you worked with him on other matters?

A   I don't -- I mean we have never done business together.

Q   So you have never paid him or --

A   Not that I can think of.

Q   Who besides yourself -- who at Fusion besides yourself worked on both the Prevezon project for Baker Hofstetler and the dossier research for Perkins Coie?

A   I mean I am not sure anyone fits that precise description.  It is a small company, so there may have been some people who had some kind of tangential connection to both matters.  I just want to add that we have had a lot of harassment and security concerns, particularly very lately.

And so if you want to -- I am not sure how to navigate this.  I will try to answer your questions, but I am also a little concerned about some of my staff are younger.  Some of them have young children.  So I am a little uncomfortable getting into too much of that kind of thing.

Q   Okay.  Were there individuals besides yourself who either worked for Fusion or on behalf of Fusion worked on both the Prevezon project and the research for Perkins Coie?

A   I mean there is one in particular who did some work on both cases as a subcontractor.  I actually think within my staff there is not much overlap.  We have a long-standing relationship with a subcontractor named Ed Baumgartner who has a degree in Russian from Vassar, I think.  And I don't know if you would call him a linguist, he is not a translator, but he works for us on Russian things

UNCLASSIFIED, COMMITTEE SENSITIVE

involving the Russian language.

So I don't read or speak Russian.   So we retained Ed to -- originally in the Prevezon case to do some interviews in Moscow, I think, and retrieve some records from Russia.   And other Russian language-related tasks as part of the litigation and discovery process.

Q   So Mr. Baumgartner went to Russia on your behalf in the Prevezon matter?

A   With the lawyers, yes.

Q   And he worked on the Perkins Coie matter as well?

A   Eventually.   So by the spring of 2016 the Prevezon thing was on hold, and basically focused on this appellate hearing, which didn't involve a lot of Russia stuff.   And then it basically everything got stayed until the decision was -- anyway, in any event, I don't recall Edward working on -- I recall him working on Prevezon and not on the other matter.   There came a time when the Prevezon matter was less active and we had a need for more work on the other matter.   And I specifically remember assigning him to do work in the summer or fall of 2016 on Michael Cohen's business connections to Russia and Ukraine and his father-in-law's background in Russia.   And so he worked on both.   And I think Edward might have also worked on some Manafort stuff, although I am less clear on that.

Q   Did he travel to Russia on your or Fusion's behalf in connection with the Trump research?

A   Did he travel -- no.   Not that I know of.

MR. SCHIFF:  Ms. Speier?

MS. SPEIER:  There has been many reports on the Bank of Cyprus and

UNCLASSIFIED, COMMITTEE SENSITIVE

the use by Russian oligarchs of that bank to launder money through it and the role Wilbur Ross played in that.   Do you have any information on that?

MR. SIMPSON:   Not really.   I mean Rybolovlev was also, you know, a figure at the Bank of Cyprus.   And some Paul Manafort shell company accounts wound up I think at the Bank of Cyprus.   So there is definitely some overlap.   But I couldn't tell you whether -- I don't have an opinion on whether it's significant.

MS. SPEIER:   Okay.   There was a report that -- you referenced earlier about how Donald Trump worked with the Italian Mafia in the 90s I think, and then in the 2000s it appears he was working with the Russian Mafia.   That was what you testified to earlier today.

MR. SIMPSON:   That's correct.

MS. SPEIER:   At Trump Tower in New York City, the New York Police arrested 29 suspects who were allegedly running gambling rings and money laundering out of two condos, one of which occupied an entire floor in Trump Tower. One of the bosses that I think you mentioned earlier, Tokhtakhovno was the only target that slipped away, and then was seen later with Donald Trump in a VIP section of the Miss Universe Pageant in Moscow. Do you know anything more about that Mafia organization operating out of Trump Tower?

MR. SIMPSON:   I mean I am trying to summon it from my memory.   We spent a lot of time looking at this.   I mean there was another guy -- I don't remember anything that I think is notable that would be useful for you.

MS. SPEIER: The investment in the Trump International Hotel and Tower in Toronto. It appears that Mr. Trump's original partner was Leib Waldman, who was a fugitive who fled to Toronto from the United States after pleading guilty to bankruptcy fraud and embezzlement in 1995. The Ritz Carlton, which had

UNCLASSIFIED, COMMITTEE SENSITIVE

originally been named as the hotel operator, then abandoned the project after Waldman's status was revealed.

Mr. Trump's other partners included a man who illegally converted a New York factory to loss only to have the city order all his tenants evicted to protect them from hazardous conditions.  Another partner owned a nursing home company which was cut off from Federal funds due to concerns that the residents' safety was at risks . . Alex Schnaider, a Russian-born Canadian national, became the principal developer. Schnaider had no previous hotel or condo development experience. His most apparent qualification seemed to be that he had made a lot of money quickly.

Financing came from an Austrian bank with no apparent experience in Canadian development, and which had been accused of acting as a conduit for Russian money laundering. Schnaider made misleading statements about the project, and ultimately the project failed and went through bankruptcy. The new buyer removed Mr. Trump's name from the project. What do you know about that?

A Schnaider (ph) is probably the most interesting of those characters. His father-in-law is a very important figure in the history of the KGB-Mafia alliance . He is named Boris Birshtein. Boris is connected to Mr. Moskovich. And all these people know each other. And they are all connected in one way or another to the Russian Mafia, and some of them are connected to the intelligence services. These guys in particular, I believe, if I am remembering things correctly, have connections to the Solntsevo Brotherhood, which is the dominant Mafia family.

And Beerstein was the manager of the KGB's offshore funds after the collapse of the Soviet Union, and is well known in European law enforcement for

UNCLASSIFIED, COMMITTEE SENSITIVE

his activities.   And he is known to Belgian law enforcement, French, and crosses paths with Moskovich on a lot of this stuff. So we are talking about the same crowd. Raiffeisen Bank was during that period the main service bank for the top level Russian corruption and organized crime activity.

So I wrote a lot about Raiffeisen in those days because they were laundering the money from the Mafia gas trading scheme that Putin was running between Ukraine and Russia. And when the Mogilevich Dmytro Firtash network was setting up their finance role and corporate operations to siphon money off the gas trade, they did it with Raiffeisen. And they came up in several other cases, and they were the go to bank for top level Russian dirty stuff.

In regard to all that, and again going back to your earlier question, I think that there is a lot of information to be had from Canadian law enforcement and from Belgian law enforcement about some of these characters.   I think you they know pretty well who these guys are, and they have been looking at them for a long time.

MS. SPEIER:  Okay.  What is the interest of Russia with the National Rifle Association?

MR. SIMPSON:  I think that most of what we have found is pretty much out there now.  You know, it's been said by others, but, you know, what eventually — it appears the Russians, you know, infiltrated the NRA.  And there is more than one explanation for why.  But I would say broadly speaking, it appears that the Russian operation was designed to infiltrate conservative organizations.  And they targeted various conservative organizations, religious and otherwise, and they seem to have made a very concerted effort to get in with the NRA.

And so there is a Russian banker-slash-Duma member-slash-Mafia leader

UNCLASSIFIED, COMMITTEE SENSITIVE

named Alexander Torshin who is a life member of the NRA. And we spent a lot of time investigating Mr. Torshin. And he is well known to Spanish law enforcement for money laundering activity, and you have probably seen the press articles. And I think the Spanish files on him should be available to you. And he, as you know, was supposed to have a meeting with President Trump after the inauguration. And somebody noticed that there had been some stories about him that weren't pretty good.

So he is one of the more important figures, but, you know, another woman with whom he was working, Maria Butina, also was a big Trump fan in Russia, and then suddenly showed up here and started hanging around the Trump transition after the election and rented an apartment and enrolled herself at AU, which I assume gets you a visa.

MS. SPEIER:   She rented an apartment where?

MR. SIMPSON:   AU Park in Tenleytown.   Went to American University and rented an apartment up there.   I think she is suspicious.   I guess the last thing I will say on this is that we just started seeing this stuff when all the other Russia stuff started bubbling up.   And the thing I found, you know, the most absurd about this is that, you know, Vladimir Putin is not in favor of universal gun ownership for Russians.   And so it's all a big charade, basically.

MS. SPEIER:   You said there were other conservative groups.   Are there other conservative groups in the United States that they have infiltrated to your knowledge?

MR. SIMPSON:   I think there's been — we have done some research on some religious groups having relationships with the Russians, having, developing, and pursuing relationships with various religious groups.   The names of them

UNCLASSIFIED, COMMITTEE SENSITIVE

escape my mind.   But there has been a lot of that.   And then there has been the

independence movements, California independence, Texas independence.   You

know, it's a big operation.

███████████   Five minutes, ma'am.

MS. SPEIER:  You said that Mr. Steele provided you information after the

election as well.   So it wasn't in the dossier?

MR. SIMPSON:   It actually was in what's known as the dossier.   It's just it

came in after the election and we weren't being paid for it.   And that's been a

subject of litigation.   Some of that stuff led to a lawsuit.   But in any event, you

know, yes.   So in the period immediately after the election, Chris had a source

network and, you know, some of the sources continued providing information for a

little while.   It's just, you know, when you set something up it kind of takes a while

to taper off.   So we received some new alarming stuff about this Prague meeting

that came in after the election.

MS. SPEIER:  And it appears that one of the sources was mysteriously

killed?

MR. SIMPSON:   That's not my information.   I mean there was a series of

episodes where people were arrested or died mysteriously that came shortly after

the disclosure of the existence of this information.   And I do believe there was a

bit of an old fashioned purge.

And I think that -- but to my knowledge, it wasn't anyone that helped us.   I

think it was more likely people who were taking the opportunity to settle scores or

were falsely accused, as often, you know, just like in the old days, and/or were

sources of the U.S. Intelligence Community, not us.

MS. SPEIER:  In researching Donald Trump's finances, and the fact that

UNCLASSIFIED, COMMITTEE SENSITIVE

he was, you know, financially underwater, it seems in the mid-2000s, how much of his income was coming purely from naming rights?  Have you ever tried to figure that out?

MR. SIMPSON:  No.  Of course, you know, getting reliable information about his finances was pretty hard.  But I think it was -- I mean I think that sort of non-equity revenues was a big part of it.  I also think that, you know, a lot of his income comes from trusts and things that his father set up, and that he doesn't actually make that much money, you know, in terms of profits from his own activities.  He still funds much of his -- from, you know, assets that were acquired by his father.

MS. SPEIER:  Ivana Trump, did she have any involvement in any of this?

MR. SIMPSON:  Not to my knowledge.  But we have looked at the Czech issue, and, you know, Ivanka and Don Jr. speak a little bit of Czech, spent summers in the Czech countryside.  And we examined, you know, whether that had any connection to the allegations of a Prague meeting.  But other than that, I mean we have looked at -- her continuing involvement with the whole Trump organization is something we thought was interesting and looked at.  But beyond that, I don't remember.

  One minute.

MR. SCHIFF:  I have a few more questions.  But I will hand back.

BY 

Q    I am pleased to report I believe this will be our last round.

So I believe it is your testimony that you continued to receive information from Mr. Steele, but were not -- after the election, but were no longer being paid for that.  Is that correct?

UNCLASSIFIED, COMMITTEE SENSITIVE

A    Yes.  I think what I was specifically talking about was the -- I think it's the last memo or one or two, whatever is at the very end of the collection known as the dossier was not paid for and not part of any engagement.

Q    Now, I infer from your sort of recollection of all these issues, as well as from your use of the present tense, that you remain active in researching these issues.  Is that correct?

A    Well, I remain interested in all of these issues.  What I do in terms of my other work is not something I am in a position to talk about.

Q    So after you are no longer being paid by Perkins Coie and then there is a time where you received information but weren't being paid, did you then resume engagements with respect to the issues?

A    I am not going to get into any of my current work, but, you know, I still run my company and we still have, you know, lots of business.

Q    Does any of that business relate to the issues that we discussed today?

A    I am not going to answer that.

Q    As I am sure you are aware, what's become known as the dossier was published on January 10th of 2017, I believe, by Buzzfeed.  I believe it was your testimony earlier that you did not -- or Fusion did not provide the dossier to Buzzfeed.  Is that correct?

A    That's correct.

Q    Do you know who did provide the dossier to Buzzfeed?

A    No.  I have my suspicions, but they are just guesses.

Q    I am suspecting Mr. Levy is not going to entertain -- allow us to entertain those guesses.

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. LEVY:  I am not the witness, but generally speaking it's not good to speculate.

MR. SIMPSON:  I think what I would like to say, to be clear to everybody, is that we treated this information with a great deal of care.  And we did that for a lot of different reasons, but among other things, because we thought this was a real national security issue, and because we thought that if it was just put out there in the way it was put out that people could get hurt and that people literally risked their lives to tell us some of this stuff, and that there was a lot of security issues around it.  So I was very upset when it was published.

BY █████████

Q    Prior to the publication on January 10th, how many journalists would you estimate that you talked to either with Mr. Steele or separately related to this information?

A    I mean again I would be guessing.

Q    In this case I am asking for an estimate based on your best recollection.

A    I am not going to guess, but I will say that again, the depiction of this document as having been peddled around town, it wasn't peddled around town by me.  And if someone was peddling it, it was without my knowledge and against my wishes.  And to the extent that we discussed some of the information in the dossier, I would say it was, you know, a relatively small number of reporters.

Q    Would you estimate it as more or less than 10?

A    I mean it's really hard for me to guess, but you know, it's a low number like that.

Q    You mentioned that you felt this information had sort of national

security significance.  You mentioned how Mr. Steele proceeded with respect to this information.  Did you at any time approach the FBI directly regarding this information or your findings?

MR. LEVY:  By the way, he has testified for over -- nearly 6 hours, so he said a lot more than that, but you can answer the question.

MR. SIMPSON:  I didn't approach the FBI.

BY 

Q    Are you aware of anyone who did on Fusion's or Perkins Coie's behalf?

A    Beyond Chris Steele?

Q    Yes, beyond Chris Steele.

A    No.

Q    So we appreciate the opportunity to get your voluntary testimony today.  We also have sought document production.  Are you prepared to voluntarily provide documents that are responsive to the subpoena?  Or I am sorry, to our request?

MR. LEVY:  You have our response to the subpoena for documents.  You also have knowledge that some of our position is now the subject of pending litigation about which we will have a hearing tomorrow.

▉▉▉▉▉:  No.  Well, let me clarify.  We issued a voluntary request, followed by a subpoena.  The subpoena has now been lifted.  Mr. Simpson is testifying here voluntarily.  Having lifted the subpoena, we are now back to the voluntary phase of your testimony.  So the question is with respect to the request to Fusion -- or to Mr. Simpson, is he prepared to voluntarily provide documents relevant to this committee's investigation?

UNCLASSIFIED, COMMITTEE SENSITIVE

MR. LEVY:  We have to stand on the same privileges that we already have.  We will take the request back and evaluate it.

████████████  So is your answer no, see our letter of October 16th, or you will consider the request?

MR. LEVY:  It is please look at our letter from October 16, and we will take it back.

████████████  But I am a bit confused, because your letter of October 16 also stated numerous reasons why Mr. Simpson and his colleagues were not prepared to testify voluntarily.  He has now testified voluntarily and been quite, as you pointed out, quite fulsome and extensive in his remarks, which we appreciate.

So to the extent that the letter of October 16th is no longer sort of current with respect to his testimony since he has now provided testimony voluntarily, how is it that the arguments in that letter are relevant or attain with respect to the document production?

MR. LEVY:  I don't know that we need to go through this back and forth, quite frankly, but we are very pleased that the committee was able to reach the agreement that we had asked for on October 3rd that Mr. Nunes rejected in a day. It's the same agreement that we reached with the two other committees investigating the same subject matter area.  We are glad that we have gotten to this point.

Obviously, the agreement that we reached came through some careful discussion between both the majority and the minority members of this committee and counsel for Mr. Simpson.  We appreciate that the subpoena has now been lifted.  But the privileges are the privileges.  They are legal claims.  We have asserted them.  They are in the letter.

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

█████████   So is it your position that the privileges asserted in the letter preclude any production of any documents so that we can advise our members accordingly?

MR. LEVY:   As I said, I think it would be helpful if we took the request back, discussed it among ourselves.  Now that the subpoena has been lifted it's a new day.   That said, we are not waiving any of the privileges that we have asserted in the letter.

█████████   Understood.

█████████   And also pursuant to ████████ line of questioning, will Mr. Simpson provide his work email address to this committee?

MR. LEVY:   Off the record.   Meaning not on the transcript, but we can give it to you.

██████████:   Right.   That's fine.   If you as his counsel can just send it to the committee.

MR. LEVY:   We can do that.

████████:   Thank you.

MR. LEVY:   And if he could do so without waiving any objections or privileges.

████████:   Understood.   Thank you very much.   One moment.   Sorry, just two more lines of questioning, Mr. Simpson.

[Discussion off the record.]

BY ██████████

Q    Mr. Simpson, did you or Fusion GPS ever conduct any sort of research during the 2016 Presidential election cycle on then-candidate Hillary Clinton?

UNCLASSIFIED, COMMITTEE SENSITIVE

A    I guess it depends on how you define the cycle.

Q    I will help you.  From January 1, 2015 through the election.

A    I don't specifically remember, but what I can say is that the Clinton Foundation and related issues has come up in my work a lot.  And I can't remember when the last time was.  So it's hard to be categorical.

Q    I guess I can narrow it down a little more for you.  Were you tasked by anyone or sought out by any company, agency, individual to conduct research -- without naming those individuals -- to conduct the research on then-candidate Hillary Clinton?

A    Yeah.  I think we agreed to talk to you about these two matters that you rightly are interested in.  And I have tried to be as helpful as possible.  So that would be not something that I am prepared to talk about.  I will say that I have gotten journalistic inquiries about this subject, and I have tried to be helpful to reporters about this subject.

Obviously, at some point, you know, that became a conflict of interest.  But it is something that I just know a fair bit about because of all the work that we have done over the years.

Q    All right.  Just so I am clear, I think our agreement, and Mr. Levy can correct me if I am wrong, we are investigating the 2016 election campaign cycle, irrespective of party.  So that's why my question was directed in that fashion.

MR. LEVY:  Let me just take a 10-second break to confer with Mr. Simpson.

    Sure.  Go ahead.

MR. SCHIFF:  And I want to specify too that while the scope of our investigation is into the Russian active measures campaign, as well as

UNCLASSIFIED, COMMITTEE SENSITIVE

connections between the Trump campaign -- or either campaign and the Russians, some things that are beyond the scope of that are not what we are asking about.

[Discussion off the record.]

MR. SIMPSON: No one hired me to investigate Hillary Clinton in 2015 or 2016. What did happen is that issues about Hillary Clinton came up in other investigations, and I can't remember the specifics, and I just remember they came up. A lot of times when we have a client come to us because of some business matter that is connected to politics or policy in Washington, the question of whether there was improper influence is part of the research. And I remember issues about policy, foreign policy coming up in other cases where it looked like -- and in fact there was --

I am a little tired, but I think the question of whether people exerted influence through the Clinton Foundation was part of some business investigation that we were doing. She didn't come up in Prevezon, the nuclear stuff. The nuclear stuff had come up over the years, and it's something I know little about.

BY ▮▮▮▮▮▮▮▮:

Q    Lastly, you brought up the Clinton Foundation. Is there any of the work conducted by you or Fusion GPS relevant to the Clinton Foundation related to our investigation, the parameters we have described? Can you shed some light on that?

A    No. I mean I would tell you if it did. Not that I can think of.

Q    Sorry. And last question. Did you similarly along the lines of the Democratic side, were you hired, without naming the entities, were you retained, you or Fusion GPS, to conduct or find research on any of the other 16 Republican

UNCLASSIFIED, COMMITTEE SENSITIVE

UNCLASSIFIED, COMMITTEE SENSITIVE

candidates in the field?

MR. LEVY:  I am sorry, can you repeat that question?

BY  :

Q     Sure.   Were you or Fusion GPS retained, without naming or identifying the clients, to conduct research on any of the other 16 Republican candidates in the 2016 election cycle?

A     That question, in the way you phrased it, has refreshed my memory, and I was -- I remember we did work on Ted Cruz.   And I think it was part of the Beacon matter.   And it was a long while ago in this whole thing.   And I just didn't remember it, but now I remember we looked at some Cruz-related stuff.

Q     Any of the other candidates, of the other 16 candidates?

A     I don't remember.   But it was, you know, it was a while ago.   I just don't recall.

Q     Fair enough.   If you do remember, would you just let your counsel know so he could provide the appropriate documentation to us?

A     Sure.

   Thanks very much.   Scott, do you have anything?   Over to you.

Thank you.

MR. SCHIFF:  I just have a few more questions.   I think we are almost at the end.   First of all, before I forget, thank you for your testimony today and all of your cooperation.   It has been I think very helpful to all of us.

On the document issue, we are not in the loop for the most part on the litigation.   That's being handled by the majority without much not only input, but knowledge of the minority.

UNCLASSIFIED, COMMITTEE SENSITIVE

154

 Mr. Schiff?

MR. SCHIFF: Yeah.

 I apologize for interrupting, but I just want to clarify, happy to discuss that issue, but I just want to clarify in reference to the earlier comments that Mr. Levy made that when I was asking about documents, I was asking about our document request to Fusion and to Mr. Simpson separate and apart from any document request for banking records or anything else.

MR. SCHIFF: Yeah. You know, as I was saying, we are not that privy to what the litigation is over, what documents, what the scope of that is. And I don't know how, therefore, that bleeds over into the document request here. If there are documents within the scope of what we have been asking about that you are able to provide, we would encourage you to do it.

But again, because I don't understand the litigation, I can't speak to how that may influence what the court may decide your obligation, your privileges are vis-à-vis other documents. So I can't speak to that.

So a few final questions. I want to make sure I understand this correctly. Your firm is retained by Prevezon for assistance in the litigation. Is that right? I am sorry, by Baker Hostetler. Is that right?

MR. SIMPSON: Correct.

MR. SCHIFF: Baker Hostetler represents Prevezon.

MR. SIMPSON: Correct.

MR. SCHIFF: Veselnitskaya is a Russian attorney for Prevezon.

MR. SIMPSON: Correct.

MR. SCHIFF: It sounds like former Attorney General Mukasey also was an attorney on behalf of Prevezon.

155

MR. SIMPSON:  He was an appellate attorney.

MR. SCHIFF:  So you didn't work directly for Veselnitskaya.  You worked for Baker Hofstetler.

MR. SIMPSON:  That's right.  I have a long-standing relationship with Baker Hofstetler, covering a variety of cases.  Only this one has anything to do with Russia.

MR. SCHIFF:  So the work that you compiled you compiled for Baker Hofstetler for use in the Prevezon case.

MR. SIMPSON:  That's correct.

MR. SCHIFF:  What Ms. Veselnitskaya may have done with any information produced in that litigation, would she have shared that information with you?

MR. SIMPSON:  Generally speaking, no.  But she did say to me at one point that she thought the Ziff Brothers information was important.  And I didn't really understand what she was talking about.  It didn't seem that important to me.

MR. SCHIFF:  Are you aware of any connections that Veselnitskaya may or may not have with Russian intelligence?

MR. SIMPSON:  No.

MR. SCHIFF:  It was reported in the emails setting up the Trump Jr., Trump Tower meeting that this had been arranged by Mr. Agalarov, Aras Agalarov, and Emin as well.  There was a reference to information obtained from Mr. Chaika, I think he was referred to as the crown prosecutor.  Are you aware of any relationship between Ms. Veselnitskaya and Mr. Chaika?

MR. SIMPSON:  I have read about that in the newspaper.  I don't believe she ever told me that she had a relationship with him.  I mean first of all, we do

everything through translators, and so we wouldn't have very fulsome exchanges. But I believe that she may have alluded at times to giving information to the government for purposes of tax law enforcement.

And to the extent that she made references to, you know -- it was in connection with -- at least I understood it to be in connection with some kind of a tax enforcement action to recover taxes, unpaid taxes.   And I can't remember whether she mentioned having any relationship with the chief prosecutor.

MR. SCHIFF:   But she did mention she had some relationship with the government, at least as far as providing tax information was concerned?

MR. SIMPSON:   Right.   She didn't say she was a government agent, she didn't say she worked for the intelligence services, she didn't say any of that.   All she said was something about this information is good because it has to do with the unpaid taxes.

MR. SCHIFF:   So if she was doing work for the intelligence agencies, she wouldn't confide that in you?

MR. SIMPSON:   No, that's true.

MR. SCHIFF:   And would it be your practice to discuss with one client work you are doing for another client?

MR. SIMPSON:   No.

MR. SCHIFF:   So the work you were employing Mr. Steele to do would not be something you would have shared with Ms. Veselnitskaya?

MR. SIMPSON:   I didn't share it with most of my employees.   Yes, to answer you, generally speaking we compartmentalize things, both like a law firm would, and in running an intelligence operation you would too.

So if we are -- so we don't tell one subcontractor what another

subcontractor is doing.  We don't tell our subs who our clients are.  And we certainly don't tell one client what we are doing with another client.

MR. SCHIFF:  And Ms. Veselnitskaya never fed you information that made it into the materials that you were providing your Perkins Coie client?

MR. SIMPSON:  No.  In fact, the only information I even remember get getting from Ms. Veselnitskaya was the criminal case extortion case files in 2014. And they didn't even come to me, they went to Baker Hofstetler, and they went into the, you know, e-discovery program.  And I just had access to the translated version.

MR. SCHIFF:  The reason I ask this question is, and you probably have seen this, there is a conspiracy theory that the Russians were, either through Ms. Veselnitskaya or else ways, feeding you misinformation to go into the dossier to spur an FBI investigation as part of a Russian active measures campaign.  Is there any truth to that theory that you can see?

MR. SIMPSON:  There is no truth to that theory to my mind.  I would certainly agree with the observation that for these matters to have intersected in the way they did is, you know, remarkable.  And it caught me totally by surprise, and I have spent a lot of time thinking about what it means, if it means anything.

And as best as I can figure, the Russians were up to a lot of stuff, and I knew only about some of it.  And I am one of a relatively small number of people who does a lot of work in these areas.  And so the fact that I ended up, you know, having two connections to this stuff is not shocking to me because, as I say, the sort of Russia field is not very big.  So that part of it's not that surprising.  But it still was a surprise the way these intersected.

MR. SCHIFF:  Now, the CEO of Prevezon was who?

158

MR. SIMPSON: Denis Katsyv.

MR. SCHIFF: And would Mr. Katsyv be considered an oligarch?

MR. SIMPSON: No. At least he doesn't have a media profile as an oligarch. And that was the thing that I scanned for when the case came in. You know, are these guys -- can they get visas to the U.S.? Are they considered connected with some Mafia outfit? Do they go to the Kremlin to meet with Putin? And there was none of that.

So, you know, so it seemed okay to me. I wouldn't, you know -- they just didn't have much of a profile. And so I figured if they were big oligarchs, and especially bad oligarchs, that I would have heard of them.

MR. SCHIFF: And were you aware of any connection between Mr. Katsyv and the Russian Government?

MR. SIMPSON: Well, his father was a -- at the time that I was retained, his father was a minister in the Moscow city government. He was the transportation minister. And he is later, he is now the deputy head of the state railroad, state railroad company. And so that's a connection.

MR. SCHIFF: And did the father, to your knowledge, have any connections with Mr. Chaika?

MR. SIMPSON: I have no idea.

MR. SCHIFF: Or did Mr. Katsyv have any connections to Mr. Agalarov?

MR. SIMPSON: Well, what I have heard in recent months is that there is some connection, or maybe even read it, I can't remember, but there is some connection between Agalarov and Ms. Veselnitskaya. And I don't know what it is. I don't even remember where I heard it.

MR. SCHIFF:  Well, the emails would demonstrate some link.

MR. SIMPSON:  Well, right.  There was some kind of a -- she represented him or something.

MR. SCHIFF:  In the litigation, I think as you have described it, Mr. Browder would have been a hostile witness or a hostile party to Prevezon's interests.  Is that fair to say?

MR. SIMPSON:  Yes.

MR. SCHIFF:  In that respect, the Kremlin's interests would be aligned with Prevezon, not the -- who was the other party?

MR. SIMPSON:  The U.S. Justice Department.

MR. SCHIFF:  The U.S. Justice Department.  So the Kremlin's interests would have been aligned against U.S. Treasury or U.S. Justice Department and with Prevezon.

MR. SIMPSON:  Yes.  And at the time this case got underway, it seemed pretty obscure.  It was a civil money laundering case.  But in retrospect, what I think might have happened was that -- so when the case started it wasn't about William Browder.  It was about a technical argument about whether you could prove that money from something in Russia went into this real estate development.  And so it didn't have a political dimension to me particularly, it was a technical argument.  And that is how the case was introduced to me, and the fight was going to be over what the bank records showed.

So it was a reasonably interesting case, but not very potentially controversial.  But as we went into discovery, you know, the discovery trail led to Vladimir Putin's biggest critic.  And, you know, at that point, because it became sort of a focal point of the case where the allegations came from and whether they

UNCLASSIFIED, COMMITTEE SENSITIVE

could be supported, you know, I ended up doing work on Vladimir Putin's biggest critic. And you know, that wasn't what I set out to do. And it made me uncomfortable.

MR. SCHIFF:  But it may have been within the understanding of either the Kremlin or the Russian intelligence agencies that the party on the opposite side of this, the party that had instigated this was their nemesis, Mr. Browder.

MR. SIMPSON:  You know, if you want to spin it out far enough, it's possible they knew that's where the trail would go. But we didn't -- at least the other lawyers and I didn't know that was where this would head.

MR. SCHIFF:  The reason I am asking this is you have Ms. Veselnitskaya working on this litigation, which leads to Mr. Browder.

MR. SIMPSON:  Uh-huh.

MR. SCHIFF:  And therefore leads to the Magnitsky Act. You have Ms. Veselnitskaya at this meeting at Trump Tower about the Magnitsky Act. You have the Magnitsky Act being one of the highest priorities of the Kremlin to repeal.

Does that in your experience tell you something about Ms. Veselnitskaya's importance to the Kremlin, relationship with the Kremlin? Is it suggestive in any way that she may have had a bigger role than you knew at the time?

MR. SIMPSON:  Well, I mean let me say, you know, I have certainly been mulling whether my original view of her as a minor player was wrong. And I think it would be natural to ask yourself that. But I will add that, I mean a couple of things there. One, you know, this legislative issue wasn't about overturning the Magnitsky Act, it was about the name of some global Magnitsky Act, which as I understand it wasn't really even targeted at Russia. So, you know, it's unclear to me what the real plan was if there was some Kremlin plan behind all of that.

UNCLASSIFIED, COMMITTEE SENSITIVE

So, you know, what I think happened was that when they saw that we were finding stuff that tended to discredit Mr. Browder -- so the Russians have been trying to discredit Browder forever.   And they churn out fake news on Browder.   They do fake movies accusing him of murder and all this other baloney.   And my view is that when we started producing actual information in court that was embarrassing to him, and tended to raise questions about his activities in Russia, that they opportunistically began to try to exploit that.

And that would fit with my view of Ms. Veselnitskaya as well, which is that she viewed the success that we had in finding certain kinds of information as a ticket to political advancement in Moscow.   There is only one way up in Russia, and that is do something that impresses Vladimir Putin.   And so, you know, I could be wrong, but we viewed her as a very ambitious but not particularly, you know, someone with a lot of juice.

MR. SCHIFF:   That sounds like a description of Carter Page.

MR. SIMPSON:   But I could be wrong about all of this and I am prepared to be wrong because these people are Russians.   So knowing that I don't know who everyone is when you are dealing with Russians, I avoid trying to -- I avoid situations where something could happen that I would be compromised.

So I always refuse to go to Russia.   And I only did this case because it was one of my oldest clients.   And I still got sucked into something that, you know, I mean thank God I didn't know anything about the Trump Tower meeting or I would really have some explaining to do.

MR. SCHIFF:   One way for a young -- well, I don't know about young, but one way for an ambitious lawyer to move up the ladder you said was to do something to please Vladimir Putin.   Establishing a relationship with a potential

future President of the United States and offering help against their opponent would be one way of doing that, would it not?

MR. SIMPSON:   That's in character with the Natalia that I know.   She seemed ambitious and opportunistic.

MR. SCHIFF:   All right.   Let me ask you a few last questions.   Did you come across in your research anything related to the allegation you may have seen publicly that Erik Prince had a meeting in the Seychelles arranged by foreign parties?   Did that allegation or any facts related to it come to your attention?

MR. SIMPSON:   Not specifically that, but Erik Prince's role in the sort of back of a lot of this stuff has come to my attention.   And one of the -- I guess I would rather not say anything else.   But I just think that he seems to be connected to some of the people who have been making accusations against me.   And I have questions about whether he is the one who is --

MR. SCHIFF:   And in terms of your investigation, though, did you find any facts related to his foreign travel or his relationships or any work that he was doing on behalf of the Trump campaign?

MR. SIMPSON:   Not that I can specifically remember.

MR. SCHIFF:   It's been publicly reported that Don Jr.  went to Paris, had a meeting with a pro-Russian think tank.   Was that a subject of your investigation as well?

MR. SIMPSON:   Yes.   We did a lot of work on -- so Russia is a major theater of operation -  I am sorry, France is a major theater of operation for the Russian services.   And they have a lot of, you know, phony think tanks and other operations there. And they were very active in the French Presidential election, and they have been very -- there is a guy named Malofeev who sort of runs

those operations for the Russians in that area.   And we looked at all that and mapped all that and concluded that, you know, it was part of the operation.

But beyond that, I believe, you know, we were -- we were told that Kushner had also been to Paris, but I don't think we could ever confirm that.   But we looked at some of those people, and they were definitely Russian assets would be my view.

MR. SCHIFF: Professor Mifsud come to your attention?

MR. SIMPSON: No. Professor Mifsud did not come to my attention.


Q      How about Mr. Papadopoulos?

MR. SIMPSON:   Yes.

MR. SCHIFF:   And in what way?

MR. SIMPSON:   As someone who was a clone of Carter Page and had connections to the Russians.

MR. SCHIFF:   Did you come across any facts related to Papadopoulos that were beyond those that were contained in the information?

MR. SIMPSON:   I don't think so.   We have been looking at him for a while, but I was still surprised by what I saw there.

MR. SCHIFF:   You mentioned a Florida woman, Russian origin, worked for Gazprom, connected to the embassy, connected to Michael Cohen.   If you are able to refresh your recollection and provide her name to the committee, that would be helpful.

MR. SIMPSON:   Sure.

MR. SCHIFF:   The kompromat which has become so much a focus of any discussion of the dossier, are there any of the facts related to that, the salacious

video that were not a part of the dossier or other like allegations that came to your attention?

MR. SIMPSON:  No.  I mean, you know, we were asked about other allegations by reporters that didn't come from us, and I am not -- we were asked about earlier stories of earlier trips and whether other things had happened, and similar things.  Actually not similar things, more sort of less colorful.  But anyway, girls.  And, you know, we didn't -- I mean to be clear, we never set out to investigate whether Donald Trump or anyone else was engaged in sexual activity for the sort of practical reason that I just didn't think it was a useful subject to investigate.

I investigate business stuff and financial crime and corruption and those kind of things.  That's my gig.  So people came to us with stories that we never pursued.  And we were recently asked by some reporter did you write a memo in 2015 about -- I had no idea what they were talking about.  You know, we threw a line in the water and Moby Dick came back, and we didn't know what to do with it at first.  So anyway.

MR. SCHIFF:  And, you know, from your description of your relationship with Mr. Steele, I take it that you sent him to find what he could find.  You didn't send him to go find evidence of candidate Trump entertaining women in whatever way in a hotel.

MR. SIMPSON: No. But I think this underscores a really important point, which is that so kompromat is a big deal for Chris Steele. It is not a big deal for Glenn Simpson, because my professional world is financial crime and politics and the other things. But he is in Russian intelligence. You know, that's his specialty, and a lot of what you are worrying about.

So when he explains all this, he has other cases where people have been kompromatted. And it's something he has dealt with his entire adult life. So I can't tell you he wasn't looking for that, because it was probably something that was among the things that he would have asked someone to check.

MR. SCHIFF: It is Russian tradecraft that he would have been familiar with?

MR. SIMPSON: Correct. So when the information comes back that there is kompromat but that there is also a conspiracy afoot, you know, each of us sees our piece of the elephant, right? I am like, oh, my God, there is a conspiracy afoot. And he is like, oh, my God, there is a kompromat problem.

So when he says we have got to go to the FBI, or he wants to go to the FBI, he is specifically concerned about the kompromat issue and whether, you know, a Republican -- whether a candidate for President of the United States, a nominee has been kompromatted. And he feels that it's his duty to report that.

I assume because part of his old job was reporting politicians who had been kompromatted, and that he thought it was, you know, de rigeur or something. But my feeling was, you know, we should report the rest of this alleged crime. I mean I was comfortable with him doing it.

MR. SCHIFF: We yield back.

█████████: We are adjourned, sir.

MR. SCHIFF: Thank you very much.

[Whereupon, at 8:20 p.m., the interview was concluded.]