<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    THE UNITED STATES OF AMERICA,
                                       Criminal Action No.
 4                  Plaintiff,         1:21-cr-00582-CRC-1
                                       Wednesday, April 27, 2022
 5    vs.                              2:02 p.m.

 6    MICHAEL A. SUSSMANN,

 7                  Defendant.
      - - - - - - - - - - - - - - - x
 8
      _____
 9
                    TRANSCRIPT OF MOTION HEARING
10        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                    UNITED STATES DISTRICT JUDGE
11    _____

12    APPEARANCES:

13    For the United States:      ANDREW DeFILIPPIS, ESQ.
                                  JONATHAN EDGAR ALGOR, IV, ESQ.
14                                MICHAEL T. KEILTY, ESQ.
                                  DEBORAH BRITTAIN SHAW, ESQ.
15                                SPECIAL COUNSEL'S OFFICE
                                  145 N Street Northeast
16                                Washington, DC 20002
                                  (212) 637-2231
17
      For the Defendant:          SEAN M. BERKOWITZ, ESQ.
18                                MICHAEL BOSWORTH, ESQ.
                                  CATHERINE YAO, ESQ.
19                                NATALIE HARDWICK RAO, ESQ.
                                  LATHAM & WATKINS LLP
20                                1271 Avenue of the Americas
                                  New York, NY 10020
21                                (212) 906-1200

22
      Court Reporter:             Lisa A. Moreira, RDR, CRR
23                                Official Court Reporter
                                  U.S. Courthouse, Room 6718
24                                333 Constitution Avenue, NW
                                  Washington, DC  20001
25                                (202) 354-3187
</pre>

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Good afternoon, everyone.

3    We're here for a criminal motion hearing in Case 21-582, *The*

4    *United States of America vs. Michael A. Sussmann*.

5              Beginning with counsel for the government, please

6    approach the lectern and state your name for the record.

7              MR. DeFILIPPIS:  Good afternoon, Your Honor;

8    Andrew DeFilippis for the government.  With me at counsel

9    table are Assistant Special Counsels Brittain Shaw, Johnny

10   Algor, and Michael Keilty.

11             THE COURT:  Okay.  Good afternoon, everyone.

12             Mr. DeFilippis, feel free to take your mask off,

13   if you're addressing the Court.

14             MR. DeFILIPPIS:  Thank you, Your Honor.

15             MR. BERKOWITZ:  Good afternoon, Your Honor; Sean

16   Berkowitz, Michael Bosworth, Natalie Rao, and Catherine Yao

17   on behalf of Mr. Sussmann, who is also present in court.

18             THE COURT:  Good afternoon, Mr. Berkowitz.

19   Welcome to Washington.

20             MR. BERKOWITZ:  Nice to see you, Judge.

21             THE COURT:  Good to see everybody in person for a

22   change.

23             All right.  I think someone forgot to pay the

24   light bill up here.

25             All right.  We have quite a number of issues to

1    get through this afternoon.  What I thought would make sense

2    was to try to clear away some of the underbrush and then get

3    to the bigger ticket issues at the end.

4            Why don't we start with the 404(b) notices and

5    objections, putting aside the issue of the gathering of the

6    underlying data.  There were a number of objections that I

7    think we can get through in fairly short order; some of

8    which may require brief argument, others I don't think do

9    apart from some clarifications that I may ask you about.

10           The first issue:  There was an objection to

11   certain aspects of the October 2018 public statements by the

12   law firm, Perkins Coie.  As I understand it, the defense

13   does not object to those press releases coming in or to

14   evidence of Mr. Sussmann's role in drafting those releases,

15   but there is an issue as to testimony from the managing

16   partner or other representatives of the firm.

17           And I guess, Mr. DeFilippis, the first question

18   is, do you plan on calling a representative of the firm to

19   opine on the releases or the circumstances surrounding their

20   creation or whether the firm took any steps subsequent to

21   the releases to determine whether the information in them

22   was accurate or not?

23           MR. DeFILIPPIS:  Yes, Your Honor.  I think we did

24   put the former managing partner of the firm on our witness

25   list.  I would say that this likely is going to depend on

1   how testimony comes in at trial.

2           I think regardless, the government does not intend

3   to spend a lot of time on this issue, but we think that if

4   it is to come in at trial and if the jury is to know about

5   the statements made by Perkins Coie, we think it is

6   certainly relevant, and perhaps the core relevance of those

7   statements are Mr. Sussmann's role in the drafting,

8   approval, and issuance of those statements.

9           THE COURT:  Okay.

10          MR. DeFILIPPIS:  So I would say it's not a

11  certainty, but we currently have him on the list.

12          THE COURT:  Okay.  We'll reserve, then, on any

13  other testimony until trial.

14          Do you plan on getting the billing records in

15  through that witness or through another witness?

16          MR. DeFILIPPIS:  Your Honor, the billing records

17  would come in, we hope, through a stipulation and then

18  published through a summary witness.

19          THE COURT:  Okay.

20          All right.  Mr. Sussmann's testimony before HSPCI.

21  There was no objection to that.  Any other issues related to

22  that?

23          MR. BOSWORTH:  Yes, Your Honor.  So Mr. Sussmann

24  doesn't object to the admission of portions of the HSPCI

25  testimony that are relevant; so to the extent that he

1    testified about the meeting with the FBI, the meeting with

2    the CIA, who his client was, you know, that kind of

3    testimony is clearly relevant.

4              THE COURT:  Right.

5              MR. BOSWORTH:  What we have objected to are

6    certain portions of additional testimony that the Special

7    Counsel has said that they want to offer.  For example, they

8    want to offer the testimony seemingly in toto to argue that

9    Mr. Sussmann concealed his relationship with the Clinton

10   Campaign.

11             Our position is there was never a question that

12   was put to him that required him to answer here's my

13   relationship with the Clinton Campaign, nor has the

14   Special Counsel identified any free-standing obligation that

15   Mr. Sussmann had to disclose any relationship with the

16   Clinton Campaign.

17             So to the extent that they want to argue here's

18   another, you know, bad act, another, you know, piece of

19   evidence of concealment of the client relationship, we think

20   that's improper, and there's not a sufficient factual

21   predicate for it.

22             THE COURT:  Okay.

23             MR. BOSWORTH:  There are other portions --

24             THE COURT:  I will let them ask "Did he mention

25   anything about the Clinton Campaign?"  And if the answer is

 1      no, you can clean that up on cross-examination and elicit

 2      the fact that he wasn't asked a direct question.

 3                    MR. BOSWORTH:  All right.

 4                    THE COURT:  I don't think that that's prejudicial.

 5                    MR. BOSWORTH:  The other portion, Your Honor, was

 6      the portion of the testimony that they seek to elicit

 7      regarding Mr. Steele.  I think, you know, to the extent

 8      that --

 9                    THE COURT:  Why don't we get to that.

10                    MR. BOSWORTH:  Exactly.  Thank you, Your Honor.

11                    THE COURT:  Okay.  The failure to preserve text

12      messages on the defendant's iPhone.  Is that still a live

13      issue?  I didn't see anything in your concluding brief on

14      that.

15                    MR. DeFILIPPIS:  Your Honor, the government, I

16      think, has decided we're not going to include that in our

17      case-in-chief.  Again, we reserve the right on rebuttal, but

18      we don't intend to make a point of that in our case-in-

19      chief.

20                    THE COURT:  Okay.  Evidence of the Special

21      Counsel's alleged bias.  The defense will not raise that

22      issue, I assume, Mr. Berkowitz?

23                    MR. BERKOWITZ:  Your Honor --

24                    THE COURT:  Apart from eliciting testimony as to

25      the investigative steps that the Special Counsel may have

 1    taken.

 2              MR. BERKOWITZ:  Correct, yes.

 3              THE COURT:  Okay.

 4              MR. BERKOWITZ:  And to the extent it reflects

 5    witness bias, Your Honor, in terms of --

 6              THE COURT:  I can hear you, Mr. Berkowitz, but I'm

 7    going to ask you to come to the mic so that the court

 8    reporter can pick you up.

 9              MR. BERKOWITZ:  Thank you.

10              I think our carveout, Judge, was to the extent

11    that it could also reflect witness bias that Special Counsel

12    Durham might have been investigating a particular witness.

13    We could ask about that as well.

14              THE COURT:  That strikes me as fair game, but

15    we'll reserve until it comes in.

16              MR. BERKOWITZ:  Understood.

17              THE COURT:  All right.  The Clinton Campaign

18    Tweet, the Court will exclude that as hearsay.  To the

19    extent that the government believes that it offers some

20    connection to the campaign and an attorney-client

21    relationship, it's likely duplicative of other evidence, so

22    the Tweet will not come in.

23              All right.  There was some back-and-forth about

24    the statement to the CIA in 2017 and that meeting.  The

25    defense, I understand, has no objection to the aspect of the

1        statement that relates to whether he was there on behalf of

2        a client, but there's a dispute about a purported second

3        part of the statement as to whether he had given similar or

4        related or unrelated information to the FBI earlier.

5              Mr. Berkowitz, you can be heard on that.  I'm not

6        terribly persuaded by the government's position that that

7        was a false statement, and I think it's something that you

8        can deal with on cross, but I tend to agree with the

9        government that it relates to the alleged common plan to

10       mislead folks about the general issue of the Russia

11       allegations, so feel free to address it.

12             MR. BOSWORTH:  Understood, Your Honor.  We respect

13       that ruling.

14             We would just ask, though -- and I don't know if

15       the Court was about to take up other aspects of that

16       meeting.  We would draw a line around the statements that

17       Mr. Sussmann made at the meeting.  So to the extent he

18       provided information or the agency then investigated it or

19       reached conclusions about its accuracy, we would submit none

20       of that is relevant, shouldn't come in, didn't reflect

21       Mr. Sussmann's state of mind, also could not have had any

22       direct bearing on the FBI investigation, which, just for the

23       Court's awareness, an agent had recommended closing weeks

24       before Mr. Sussmann even went to the agency.

25             THE COURT:  Well, we dealt with that somewhat in

```
 1      the data analysis --

 2                  MR. BOSWORTH:  Yes, Your Honor.

 3                  THE COURT:  -- ruling.

 4                  MR. BOSWORTH:  Yes.

 5                  THE COURT:  But we can defer on those other

 6      issues.

 7                  Okay.  Moving to the defense's motions in limine.

 8      There was a motion to strike portions of the indictment.

 9      The Court's practice is not to send the indictment back to

10      the jury so I think that takes care of that issue.

11                  There was a motion in limine to exclude privilege

12      logs and privileged indications on redacted documents.  Is

13      that still an issue, Mr. DeFilippis?

14                  MR. DeFILIPPIS:  It is, Your Honor, for the simple

15      reason that the vast majority of billing records, even

16      emails that we received from Perkins Coie, were redacted for

17      privilege reasons.

18                  Absent showing the jury those redacted documents,

19      there's really no way to get that into evidence.  And in

20      terms of privilege logs --

21                  THE COURT:  Well, you can show redacted

22      documents --

23                  MR. DeFILIPPIS:  Oh, I --

24                  THE COURT:  -- assuming that the unredacted

25      portions are relevant and otherwise admissible, but the
```

1    redactions should not say "redacted because of privilege."

2    I mean, generally assertions of privilege should not be made

3    in front of the jury, and so that would apply to a privilege

4    log as well as to any redactions that might indicate the

5    reason for the objection was attorney-client privilege.

6          MR. DeFILIPPIS:  And just two caveats there, Your

7    Honor.

8          THE COURT:  Okay.

9          MR. DeFILIPPIS:  One is on privilege logs.  For

10   most documents, we have issued trial subpoenas in order to

11   obtain the redacted versions of what is ever on a privilege

12   log.  We are in the process still of receiving some of

13   those; so there may be additional documents that won't be a

14   surprise to the defense because they have the privilege

15   logs, but the redacted versions of the raw documents we'll

16   be turning over to them.

17          And the second, Your Honor, is --

18          THE COURT:  But you don't intend to seek to

19   introduce the logs themselves?

20          MR. DeFILIPPIS:  No.  As long as we can replicate

21   them, which we have almost entirely done in redacted

22   documents, we wouldn't intend to.

23          THE COURT:  Okay.

24          MR. DeFILIPPIS:  And then the second issue, Your

25   Honor, is we did argue in our motion that in this case,

1   because the lie itself relates to privilege relationships,

2   that just the bare fact that the material was redacted as

3   privileged is probative in and of itself.

4          In the normal case, where an attorney-client

5   relationship is not at issue in the lie or in the false

6   statement, totally understandable, Your Honor, why courts,

7   you know, don't deem that relevant for the jury to know.  I

8   think the government's view here is that because of the

9   unique nature of this case, the fact that they are made for

10  privilege is probative of the fact that there was an

11  attorney-client relationship.

12         And it's not a prejudicial fact.  It's just a fact

13  that the clients have asserted privilege over those

14  documents.  We're not going to ask the jury to speculate

15  about, you know, the nature of anything further other than

16  the fact that someone has asserted a privilege here.

17         THE COURT:  Okay.  Well, look, I am at a

18  disadvantage with respect to this and numerous other issues

19  because, you know, you guys have been living and breathing

20  this for however many years, and I'm somewhat new to it.  I

21  haven't seen the discovery.  I haven't seen the 302s.  I

22  don't know who you're going to call as witnesses.

23         But it seems to me, based on what I've learned,

24  that, you know, you anticipate having witnesses and billing

25  records and perhaps other evidence to show that there was an

 1    attorney-client relationship with the relevant parties.  And
 2    so to the extent you would need a document or a privilege
 3    log that shows that someone asserted a privilege with
 4    respect to a communication with Mr. Sussmann would seem to
 5    be duplicative of a lot of other evidence that you plan on
 6    putting on.  And so in addition to the privilege prejudice,
 7    there are other 403 issues.
 8              But we can -- we'll see how that plays out at
 9    trial.
10              MR. DeFILIPPIS:  Okay.  Thank you, Your Honor.
11              MR. BOSWORTH:  Your Honor?
12              THE COURT:  Mr. Bosworth.
13              MR. BOSWORTH:  Just if I could be heard briefly on
14    the redacted document issue?
15              THE COURT:  Sure.
16              MR. BOSWORTH:  Our understanding is that to the
17    extent there is relevant information in some of these
18    redacted documents, like the emails, what the Special
19    Counsel ultimately seeks to admit -- they said it in their
20    brief -- is, you know, who sent the email, who received it,
21    the subject, the date, that sort of thing.
22              We're certainly open to stipulating to those -- to
23    that kind of header information.  We actually do think --
24    and if the Court will just permit me to pass up documents
25    for the Court's review.

1          THE COURT:  Sure.

2          MR. BOSWORTH:  We actually think that the

3    character of the redacted documents here is actually quite

4    prejudicial.  All the emails that we've received, for

5    example, that are redacted are documents that look like this

6    with huge black boxes which, you know, if you're an

7    inquisitive juror, you would be wondering, well, what's

8    underneath that?  We think that the way that these documents

9    have been redacted invites the kind of guessing and, even

10   worse, the kind of drawing of adverse inferences that the

11   law doesn't permit.

12          We think we can side step that problem completely.

13   To the extent that there are documents with relevant

14   nonprivileged information like headers, we're happy to

15   stipulate to that with the government, but we think putting

16   documents like this in front of the jury invites confusion

17   and ultimately could prejudice Mr. Sussmann.

18          THE COURT:  Okay.  Well, as you know, each side is

19   entitled to prove their case through evidence of their

20   choosing in lieu of stipulations.  Even if one is offered, I

21   get the point about a document like this with two pages of

22   redactions.  We can get around that by just, you know,

23   having an excerpted or, you know, something in ellipses or

24   some indication that the body of the text has been redacted.

25          MR. BOSWORTH:  Okay.  Thank you, Your Honor.

```
 1              THE COURT:  All right.

 2              All right.  Those were the more straightforward

 3     things that I noted on my list.  Why don't we get to some of

 4     the other issues.

 5              It doesn't really matter the particular order, but

 6     I think in order of the way that they were presented, maybe

 7     let's start with the Joffe testimony.

 8              MR. BERKOWITZ:  As you'll see, Your Honor,

 9     Mr. Bosworth and I have split these up so we'll be tag

10     teaming, but each motion we'll do separately.

11              THE COURT:  Okay.

12              MR. BERKOWITZ:  Your Honor, just briefly, I think

13     that the issues have been teed up appropriately in the

14     motions.  The standard, which seems to be agreed on, is that

15     if there's an overreach by the government to prevent a

16     witness from testifying and that witness could offer

17     exculpatory testimony, the government should be left with a

18     choice.

19              And the key issue here, I think, is what the

20     government has done is sufficient overreach under *Evers;* for

21     example, improper conduct.  And our view, Judge, is telling

22     a witness that they continue to face criminal liability for

23     a statute that has already run, without giving them any

24     specific information or proffering any information on behalf

25     of Mr. Joffe, is essentially *in terrorem* effect.
```

1           The letter that Mr. Tyrell wrote about his

2    conversation with the government was, look, you have

3    sufficient information to plead the Fifth.  You know, you

4    don't need any more from us, and we're not going to tell you

5    anything more.

6           When pressed, they say they're still percolating

7    information about the YotaPhones.

8           The YotaPhone information was presented at the CIA

9    meeting.  To the extent that Mr. Joffe is connected to that,

10   that was February of 2017.  There is no good faith

11   perspective, in our view, of any criminal liability after

12   that, and they say our statement to that effect is naked

13   speculation.

14          And with respect and recognition, we don't know

15   what else may or may not be out there, but we think we're

16   entitled to some offer of proof, even if it's in camera to

17   you, that there is actual criminal liability or exposure

18   that remains.  Because Mr. Joffe -- this is a key central

19   witness in the case.  I can get into why, but I think you

20   understand.

21          THE COURT:  Right.  So this is somewhat of a novel

22   issue, so it's a unique motion.  There is not a whole lot of

23   case law.  I've read a couple of cases that you all have

24   cited, and they seem to all involve conduct that could be

25   described as prosecutorial misconduct.

1       You've used that moniker, which is a pretty strong

2   thing to, you know, accuse the government of here.  And I've

3   read those cases, and many of them deal with direct

4   communications by the government to a witness or, you know,

5   pretty either explicit or implicit threats as to what the

6   government will do by way of prosecution, if the witness

7   chooses to testify.

8       I don't see anything of that kind here.  You know,

9   if a lawyer asks the government whether their client -- you

10  know, what's their client's status, and the government

11  honestly says, you know, he's a subject, you know, they're

12  ethically obligated to give that answer.

13      You were a prosecutor.  You know that you would

14  have done the same thing.

15      And so I'm not sure you have cited any cases that

16  would permit me to grant the remedy that you seek here.

17      MR. BERKOWITZ:  So all of that is fair, Your

18  Honor.  Let me just say a couple of things in response.

19      And we, I think, have tried to be very tempered in

20  our remarks, and we don't toss around terms lightly.  I

21  think what we're trying to get at is a tactical decision by

22  the government to prevent a witness from testifying by

23  suggesting that they face criminal exposure when we are

24  aware, based on the information that we know of, of no

25  realistic prospect of that.

1          And it's one thing to say that they are a subject.

2     And you're right, I was a prosecutor, and that's the answer,

3     if, in fact, you have a good faith reason to believe there

4     is.

5          What we're suggesting is we don't have visibility

6     into that, and all the information that we're aware of

7     suggests that that criminal exposure ended.  And so we are

8     left, I guess, on some level to speculate, but usually you

9     have a sense of, well, look, you could be prosecuted for X,

10    you could be prosecuted for Y.

11         Without knowing what is out there and with such a

12    critical witness, we think it's fair game to at least put

13    them to their proof and have there be some finding that

14    there is exposure.

15         And I would say that this is a novel area, and so

16    the case law isn't well developed, but if, in fact, you

17    lived in a world where somebody said you face criminal

18    exposure when you really don't and invite them to take

19    the Fifth as opposed to testifying, I think that that would

20    be ultimately considered to be the type of conduct that

21    would be frowned upon when that witness is as important as

22    Mr. Joffe is.

23         So those are our thoughts on it, Your Honor, and I

24    appreciate your obviously having read the cases and thought

25    about what is a challenging issue.

1          THE COURT:  What if the Court were to grant your

2     motion in limine to keep out the information that he

3     provided later to the CIA, and all the YotaPhone stuff is

4     not in the case?  Do you believe that Mr. Joffe would -- and

5     seeing that that appears to be the basis of the government's

6     position that there is some continuing exposure, do you

7     think Mr. Joffe would see fit to change his position?

8          MR. BERKOWITZ:  I don't know, Your Honor.  We

9     haven't had that discussion with him and whether the

10    government would agree not to cross him on issues related to

11    those issues.  I think it would be hard for him to decide

12    without knowing what the specific issues were.

13          But I'm certainly open to asking Mr. Joffe

14    those -- through his counsel those types of questions.

15          THE COURT:  Okay.  All right.

16          Mr. DeFilippis?

17          MR. DeFILIPPIS:  Yes, Your Honor, and --

18          THE COURT:  You see the potential prejudice,

19    correct?  No one is saying that you've engaged in

20    misconduct, but the defendant has a right to call witnesses

21    to defend himself against very serious charges, and

22    Mr. Joffe would appear to be a key witness for the defense.

23          MR. DeFILIPPIS:  Understood, Your Honor.  I think

24    the key here is that all of the cases in which this fairly

25    extraordinary step has been taken have been ones where there

1    is overreach, where the prosecutors are threatening,

2    intimidating.

3            I'm hesitant, on the public record, particularly

4    in the weeks before trial, to go into any ongoing

5    investigative matters.  But as Your Honor's aware, certain

6    statutes of limitations are longer than five years, and it

7    seems that, Your Honor, the efforts to --

8            THE COURT:  Give me an example.

9            MR. DeFILIPPIS:  18 USC 1031, Your Honor, which

10   involves defrauding the government in connection with

11   procurement and contract matters.  There is a DARPA

12   contract, a federal contract, at issue here, which we have

13   been looking at closely.

14           And I will say, in response to Mr. Berkowitz's

15   point because --

16           THE COURT:  And just to be clear --

17           MR. DeFILIPPIS:  Yes, Your Honor.

18           THE COURT:  -- because this is important, you have

19   taken the position, I believe, that none of the allegations

20   in the indictment or in any of these motions that we've been

21   dealing with regarding the information that Mr. Sussmann

22   provided to the FBI would be the basis for any criminal

23   exposure for Mr. Joffe.

24           You've said you've not accused him of a crime.

25   Maybe impropriety, maybe misuse, but not a crime.

1          MR. DeFILIPPIS:  Your Honor, we have certainly

2     said we have not -- we have not, to this point, charged a

3     crime, but we have said all along we have an ongoing

4     investigation.  So we're not able to say that no crime was

5     committed, I think would be a fair statement of the

6     government's argument.

7          I would note also that while the CIA meeting was

8     in February of 2017 -- and this is in the discovery so I'm

9     not saying anything the defense doesn't know -- there were

10    subsequent efforts after that to provide those materials to

11    another branch of government, to the legislative branch, and

12    so it wasn't as if these efforts simply stopped on February

13    9th of 2017.

14         That's about as much as I'd like to say on the

15    public record, Your Honor.  I would just go back to the

16    point that forcing immunity on the government is something

17    that should be reserved for rare cases where there's abuse,

18    where there's misconduct, and I think Mr. Berkowitz,

19    perhaps, even concedes there's not that kind of activity

20    here.

21         We've been quite measured in dealing with counsel,

22    in doing our investigation in a discreet way, and so, Your

23    Honor, we're also not saying that one is going to be charged

24    here, but we -- as Your Honor pointed, we have to be candid

25    when individuals' counsel call us and ask us for a status.

1          And the definition of "subject" on the DOJ

2     manual is quite broad.  It's anyone whose conduct falls

3     within the scope of an investigation.  And so, Your Honor,

4     we, you know, in all candor and transparency, had to inform

5     Mr. Joffe's counsel of his status.

6          THE COURT:  So there's a case from the early '70s.

7     I think it's the -- where the government approached a

8     witness during trial, and there was a dispute about what the

9     government actually said, whether it was simply, you know,

10    advising the -- the *Smith* case -- advising the defendant or

11    the potential witness of his Fifth Amendment rights or

12    whether it was intimidation.  And the Court said there that,

13    you know, even if the government's motives were pure, the

14    inability of the defense to call the witness, who is a key

15    witness -- he would testify as to whether the victim pulled

16    out a knife or not -- was a Sixth Amendment violation.

17         I think it went up on appeal, and the Circuit

18    reversed the conviction.

19         Could I do that regardless of whether I found that

20    the government had some bad motive?

21         MR. DeFILIPPIS:  And, Your Honor, if I'm recalling

22    that case correctly, even if the Court said that the

23    government didn't intend to commit misconduct, the facts of

24    that case are different because it was the government that

25    took the initiative to initiate a conversation with the

1    witness and to expressly warn the witness -- if I'm

2    recalling the case -- expressly warn the witness that if you

3    testify and perjure yourself.

4        So it was framed in a way such that the

5    government, in response to learning they were a witness,

6    took steps on its own to dissuade that witness from

7    testifying or warn them about the consequences of their

8    testimony.

9        In this individual's case, for Tech Executive 1,

10    we received a call from his counsel shortly after presumably

11    he had expressed some intention to testify, and we were

12    asked what his status was.  We answered honestly.  We

13    answered the question.

14        But this was not the case where the government

15    learned that Mr. Joffe wanted to testify and we picked up

16    the phone or approached Mr. Joffe.  It's also very

17    different, Your Honor, when the government approaches a

18    witness directly as opposed to counsel.

19        So I think those are the key distinguishing facts

20    here.

21        And even though in the *Smith* case they didn't

22    fully ascribe bad motives to the government, the surrounding

23    dynamic was a much more, I would say, threatening one.

24        MR. BERKOWITZ:  And I'll try and be brief and just

25    point out a couple of the key points.

 1           With respect to the overreach, Judge, the *Evers*

 2     case talks about deliberately denying immunity for the

 3     purposes of withholding exculpatory information and gaining

 4     a tactical advantage.  Threats are not necessary.

 5           And here what happened is a special counsel who

 6     has been looking into these cases -- into this stuff for

 7     years -- is near the end of its useful life in all

 8     likelihood and should be able to make a decision about

 9     whether Mr. Joffe has committed a crime.

10           And, two, on the eve of information percolating,

11     which I think happened in April and May even though

12     Mr. Joffe wasn't involved, the information they're talking

13     about percolating, not being able to make that decision, we

14     believe, is a tactical decision.

15           What Mr. --

16           THE COURT:  Other than the timing, do you have --

17     can you proffer anything to support that contention?

18           MR. BERKOWITZ:  I guess what I would say, Judge,

19     is that based on the record that we're aware of -- and I

20     understand we don't know everything, and so I'm being

21     recognizing of that -- there's nothing that Mr. Joffe did

22     post February.

23           And so we think that the record is clear.  They've

24     been looking at this forever.  I don't know of any ongoing

25     steps that are going to enlighten their decision, and the

1    Special Counsel, whose sole focus with the team of

2    prosecutors who have been looking at these issues in light

3    of the importance of Mr. Joffe, ought to be able to make a

4    decision about this.  And not making the decision and

5    telling Mr. Tyrell that Mr. Joffe's status was sufficient to

6    establish a good faith basis to invoke the privilege, it

7    just seems as if there's a way to, you know, force them to

8    make the call.  And that's really where we're at, Judge.

9         And, again, it's hard for me to stand up here, I

10   recognize -- I don't throw around allegations or accusations

11   lightly, and so I'm trying to be very sensitive to what I

12   don't know.

13        But what I do know is that Mr. Joffe's important.

14   The investigation -- to Mr. Sussmann's defense.  The

15   investigation has been going on for a long time.  The

16   information that we're aware of that would have subjected

17   him to liability has since passed, and we would ask that at

18   a minimum you do some diligence into whether, in fact, there

19   is a good faith basis for suggesting he continues to face

20   liability.

21             THE COURT:  Okay.  I understand your position.

22             MR. BERKOWITZ:  Yes.

23             THE COURT:  You know, the timing is what it is.

24   I'm not sure -- whether or not they should have made a draw

25   by now doesn't necessarily give me the authority to force

1   them to do so and hearsay the presumption of a good faith

2   representation by the government, but we will -- I'll take

3   it under advisement, okay?

4           All right.  On the issue of the notes, it seems to

5   me that whether either the Priestap or the Anderson notes --

6   and correct me if I'm wrong, but I think the same analysis

7   applies, same evidentiary analysis applies to each --

8   whether they are prior consistent statements of Mr. Baker or

9   the past recollection recorded of Mr. Priestap or

10  Ms. Anderson depends, in the first instance, on what

11  Mr. Baker testifies to, right?

12          And second, whether -- if he testifies to the

13  statement charged or attributed to Mr. Sussmann, whether the

14  defense attacks his credibility.  And then it depends on

15  what Mr. Priestap or Ms. Anderson says about their memories

16  of the statement and the makings of the notes.

17          And so I think -- I understand the issues.  It has

18  the feel of a second-year evidence exam.  And we've done

19  some noodling about it, and at the end of the day I think

20  there's a way for them to come in under one or both of those

21  exceptions, but likely not to be admitted as evidence but to

22  be read to the jury depending upon what predicates are laid

23  for the various hearsay exceptions.

24          So we can lay that out in a little more detail in

25  writing, but the bottom line is I think it's premature to

1    decide at this point.

2              All right.  Why don't we move to the emails, the

3    emails among Mr. Joffe and the researchers and Fusion.

4              MR. DeFILIPPIS:  Your Honor, which side would you

5    like to hear first from?

6              THE COURT:  So it's the government's motion,

7    right?  So why don't we hear from you first.

8              MR. DeFILIPPIS:  Sure.  Your Honor, in this area

9    the government relies on two principal arguments.  The first

10   being -- and this requires a bit of a sort of email-by-email

11   analysis, but the first being that the vast, vast majority,

12   if not all of the emails' content, is not being offered for

13   its truth.  In order to be hearsay, as Your Honor knows, the

14   statement has to be offered for the truth of its content.

15   In other words, whatever the speaker is saying, we have to

16   be offering it to show that that is true.

17             Why these emails are relevant, Your Honor -- I'll

18   get to our second -- our other argument, the joint venture

19   argument, but put aside that argument.

20             Why these emails are admissible is because we are

21   not offering them to show -- I mean, these emails, as Your

22   Honor has seen, are, in some places, all over the place in

23   terms of their content.  There are some in which the

24   researchers are expressing some hesitation.  There are some

25   in which they're expressing a desire to forge ahead despite

1    doubt.  The government is not seeking to admit any of those

2    statements to prove that what Researcher 2 said on this date

3    is true or what, you know, Tech Executive 1 said on that day

4    is true.

5           Why those statements are highly probative, Your

6    Honor, is because, again, this is a case in which the

7    defendant is alleged to have lied about a relationship, a

8    client relationship, and these emails tell the story.  These

9    emails are how the allegations that Mr. Sussmann brought to

10   the FBI arose.  It is how they were assembled, and it was

11   all part of one common effort.

12          And so, Your Honor, there are some -- perhaps half

13   of the content of these emails, it is absolutely clear that

14   the government is not offering them for its truth because

15   the government would probably take the opposite position.

16   And so -- and, Your Honor, I'm happy to address particular

17   emails or any --

18          THE COURT:  But isn't it the case, though, that

19   you are offering them on materiality and motive?  Right?

20   That Mr. Sussmann concealed the fact that he had a client or

21   was there representing Mr. Joffe or others because he had --

22   he knew about limitations in the data, and that was a reason

23   for him to conceal why he was there.

24          And these emails, regardless of the words of any

25   particular one, you're offering them to show that the

1      researchers had concerns about the data, right?  And so

2      you're offering them for the truth of that proposition, that

3      the folks who were in on this common venture had concerns

4      about the data that Mr. Sussmann wanted to keep in the dark

5      and, therefore, did not reveal to Mr. Baker why he was

6      there.  And so, the truth of the emails is that we have

7      concerns.

8              Now, you know, if that's a -- if that's an

9      acceptable basis -- if that's relevant, right, you could

10     certainly call those researchers.  You could call Mr. Joffe.

11     They could testify about how -- you know, what was going on

12     in, you know, those few weeks in August or whenever.

13             So, A, you know, why do you need the emails?  And

14     B, aren't the emails hearsay because they're being offered

15     for the truth of the proposition that, you know, this was

16     bad data and, therefore, Mr. Sussmann had a motive to

17     conceal?

18             MR. DeFILIPPIS:  Yes, Your Honor, and two points

19     on that.

20             First on the motive point, I think we certainly

21     make the motive point in our brief more to say that there

22     was -- it's not so much that we are trying to prove -- so if

23     the statement is there was no secret channel between the

24     Trump organization and Alfa-Bank -- say that's a statement

25     in one of those emails -- we are not offering that email to

1     prove that there was no secret channel.

2              We're offering that -- if we were to make a motive

3     argument, it would not be that we were seeking the truth of

4     that statement.  It would be that when Mr. Sussmann went

5     into the FBI, there was a written record among Mr. Joffe's

6     colleagues that they had doubts and therefore the very

7     existence of that written record -- now, it also has

8     statements the other way, that there was a secret channel.

9              All we're saying is that the existence of that

10    written record itself might have provided a motive for

11    Mr. Joffe or Mr. Sussmann to tell the lie that we allege he

12    did.  Now, that is the government's secondary argument.

13             The principal argument we're making, Your Honor,

14    is that these emails show a back-and-forth that tie

15    Mr. Joffe to the data that went into the FBI, that tie

16    Mr. Joffe to the white papers that went into the FBI, and

17    tie Mr. Joffe to the entire effort which, absent that --

18             THE COURT:  Mr. Joffe or Mr. Sussmann?

19             MR. DeFILIPPIS:  First Mr. Joffe.  And the reason

20    why that's important, Your Honor, is, again, because the

21    defendant is alleged to have lied about whether, among other

22    things, he had a relationship with Mr. Joffe, an attorney-

23    client relationship.

24             Now, we are not going to try -- we are not going

25    to see the truly privileged communications that they had

1     between each other, nor should we.  But in terms of how does

2     the government prove --

3               THE COURT:  Well, let's just -- you know, words

4     matter, and let's just be clear.  He wasn't asked "Are you

5     here on behalf of Mr. Joffe?" and said no.  He didn't say

6     "I'm not here on behalf of Mr. Joffe."

7               He said generally, allegedly, he's not here on

8     behalf of a client, so at this point I'm not sure how

9     relevant Mr. Joffe actually is at the time of the statement.

10              MR. DeFILIPPIS:  I guess, Your Honor, our answer

11    to that would be, if the government has to prove, which we

12    will prove, that that statement that I'm not here for any

13    client is false, it's the government's burden to say, "Okay,

14    who were the clients?"

15              THE COURT:  Of course.

16              MR. DeFILIPPIS:  So our counter to that is

17    Mr. Joffe was a client and the Clinton Campaign.

18              All of that -- and we think the --

19              THE COURT:  So if I don't let you put in these

20    emails, how are you going to prove that Mr. Joffe was a

21    client, if Mr. Sussmann contests that?

22              MR. DeFILIPPIS:  So, Your Honor, then the proof

23    shifts principally to Mr. Sussmann's testimony in Congress.

24    But, remember, he doesn't use any name.  He just says "a

25    client."

1          THE COURT:  Right.

2          MR. DeFILIPPIS:  And then we have the redacted

3     billing records which typically Mr. Sussmann's -- number

4     one, Mr. Sussmann did not bill Mr. Joffe at all prior to the

5     meeting with Mr. Baker.  He billed all of those activities

6     to the Clinton Campaign.

7          THE COURT:  Yes.

8          MR. DeFILIPPIS:  So we're really left with his

9     testimony and the billing records to the Clinton Campaign.

10          This, Your Honor, again underscores why I

11     think, for the jury to have the full picture here, the

12     joint venture becomes critical because, in a case where

13     Mr. Sussmann is alleged to have lied about relationships,

14     that's exactly what the rule about co-conspirator statements

15     was intended to capture.

16          In other words, you have a joint venture where

17     individuals are working in concert towards a common goal,

18     and the idea is that when various individuals are working in

19     concert towards a common goal, so much so that they're

20     advancing a common project, their statements are admissible

21     against each other.

22          And, Your Honor, typically, in most criminal

23     cases, that's used in the conspiracy, the criminal

24     conspiracy context.  But the defense has not disputed that

25     six or seven circuits -- and every circuit to address the

1    issue -- have held that it need not be a provably criminal

2    joint venture.

3              THE COURT:  Right.  So I understand that point.

4              MR. DeFILIPPIS:  Yes.

5              THE COURT:  I think you're right on that point,

6    but in practice -- you know, I read a bunch of those cases,

7    and it seems like, you know, for co-conspirator statements

8    to be admitted, typically it's in a conspiracy case; or if

9    it's not a conspiracy case, the joint undertaking or

10   conspiracy is criminal in some way.

11             I have not seen one case where the charge is not

12   conspiracy and the alleged conspiracy in which the

13   statements are being made in furtherance of it is not

14   criminal or improper in any way.

15             Would this be the first time?

16             MR. DeFILIPPIS:  Your Honor, I think -- so we

17   would not expressly allege to the jury that it was criminal.

18   There are aspects of it that may be improper.

19             THE COURT:  Right.

20             MR. DeFILIPPIS:  Your Honor, whether -- in civil

21   cases, certainly courts have admitted joint venture

22   statements, and we think that -- we think that this is the

23   paradigmatic case where such a statement in a noncriminal

24   joint venture should be admitted for two reasons.

25             One is because, again, this was a lie about a

1    relationship.  And I think it's not very common that that is

2    the nature of a false statement, that it's a false statement

3    denying a relationship.  And so in order to prove those

4    relationships, the only way to prove them is to show the

5    jury what folks were saying who were involved in those

6    relationships.

7           And I think, Your Honor, that most -- that this

8    hasn't come up often should not cause the Court to hesitate

9    just because these facts are a bit different than your

10   standard drug case or, you know, your standard criminal

11   case.

12          The policy rationale underlying the rule is agency

13   law.  It's that when Mr. Joffe and Mr. Sussmann and the

14   Clinton Campaign are working in concert to achieve a common

15   goal, it is permissible to offer their statements against

16   each other.

17          THE COURT:  Okay.  So who was part of this joint

18   venture, in your view?

19          MR. DeFILIPPIS:  So, Your Honor, it would be three

20   principal categories of people.  We have the researchers and

21   company personnel who supported Mr. Joffe once they were

22   tasked by Mr. Joffe.

23          THE COURT:  Okay, but they were just tasked.

24   You've made the point yourself that some of them, you know,

25   had concerns.  Some of them had issues with the data.  Some

1    had concerns that what they were doing was proper or not

2    until they were satisfied that it was.

3              MR. DeFILIPPIS:  That's true, Your Honor, but --

4              THE COURT:  How are they members of this cabal?

5              MR. DeFILIPPIS:  Your Honor, the law, again, is

6    quite clear, and I don't think the defense has disputed it.

7    We cited a case in our most recent filing that you do not

8    have to, one, buy into the entire scope or, you know, full

9    scope of the conspiracy.  A co-conspirator does not have to

10   be fully aware of the conspiracy, nor does a co-conspirator

11   have to know the identities of all their co-conspirators.

12             THE COURT:  But just going back to jury

13   instructions --

14             MR. DeFILIPPIS:  Yes.

15             THE COURT:  -- you have to know the general

16   purpose and you have to, you know, concur in the overall

17   conspiratorial object.

18             MR. DeFILIPPIS:  You do, Your Honor --

19             THE COURT:  Is that fair?

20             MR. DeFILIPPIS:  -- just to distill it down as to

21   each category of people.  The thrust of this joint venture

22   was that there was a decision and an effort to gather

23   derogatory Internet-based data about a presidential

24   candidate -- about a presidential candidate among these

25   folks.  There were the researchers who began doing that, it

1   seems, before Perkins Coie became fully involved, and there

2   are emails we will offer that show that data was being

3   pulled in late July and August.

4        So the researchers were the engine of this joint

5   venture in the sense that they were doing the work, and they

6   were doing -- and the emails make clear they were doing it

7   for the express purpose of finding derogatory information in

8   Internet data.  So that's one category.

9        All of those folks, whether they at some point

10  developed hesitations -- Researcher 1, you know, was, of

11  all of them, the most reluctant at the end of the day when

12  Mr. Joffe circulated the white paper that Mr. Sussmann would

13  bring to the FBI, and it was sort of a wink and a nod

14  request for comment.  Look at this paper as a nonexpert

15  would and see if it essentially would pass muster, and

16  Researcher 1 said nice job, I think a nonexpert would buy it

17  essentially.  So at the end of the day he was willing to

18  advance the goal.

19        We also have, Your Honor, the members -- the

20  Campaign Lawyer 1, the general counsel to the Clinton

21  Campaign and Fusion GPS.  They played critical roles and

22  very much similar roles in the -- sorry, pursued similar

23  goals in the joint venture insofar as once Mr. Joffe was

24  connected with Fusion GPS and with lawyers from Perkins

25  Coie, like Campaign Lawyer 1, the emails reflect very

1    clearly that the VIPs had desires.  They wanted this

2    Internet data to be pulled for this purpose, and Mr. Joffe,

3    in classic joint venture form, tells the researchers the

4    VIPs would be happy if we could support this inference and

5    this narrative.

6            And so, Your Honor, it's a classic joint venture

7    in the sense that you have the VIPs, meaning Perkins Coie

8    and the campaign; you have Mr. Joffe as the client

9    intermediary; and you have, for lack of a better word, the

10   worker bees who are bringing the data and funneling it into

11   this effort.

12           So, Your Honor, all of that, we think, is well

13   within the bounds of the law insofar as it does not have to

14   be criminal and also insofar as each member of it doesn't

15   have to have full involvement.

16           So Researcher 2, for example, said that -- he has

17   said he was not aware that the campaign was involved, but we

18   have a CEO of a tech company who initially ran some data for

19   Tech Executive 1 who said that Tech Executive 1 told him

20   expressly I'm working with a D.C. firm with ties to the

21   Clinton Campaign.

22           And so, Your Honor, we think on the bare facts --

23           THE COURT:  Okay.

24           MR. DeFILIPPIS:  -- it's fairly clear.

25           THE COURT:  And assuming that I agree that it's

1   relevant, you could get that in by calling witnesses without

2   the emails, correct?

3          MR. DeFILIPPIS:  Certainly some of it, Your Honor,

4   we could --

5          THE COURT:  Yes.

6          MR. DeFILIPPIS:  -- admit through the witnesses.

7          THE COURT:  Okay.  Mr. Berkowitz?

8          MR. BERKOWITZ:  Thank you, Your Honor.

9          Make no mistake, these emails are being offered

10  for the truth.  I think that most --

11         THE COURT:  For what truth?  I mean, obviously

12  they're not all being offered for the truth of the exact

13  words because some of them are -- you know, the government

14  disagrees with or would not stand behind.

15         What's the truth that they're being offered for?

16         MR. BERKOWITZ:  They're being offered, as

17  Mr. DeFilippis suggested, to tell this larger narrative

18  about some type of conspiracy that they read into the

19  documents.  It was, you know, very subtle, but he said to

20  please the VIPs, which, of course, are Perkins Coie and the

21  Clinton Campaign.  That's not in the documents.  They're

22  being offered to suggest and imply that there was a

23  relationship between all of these parties together, and so

24  that's the narrative that they want the documents to tell.

25         And merely saying that it fills out context,

1    right, for what's going on doesn't overcome the hearsay

2    burden.  It still -- they still have to overcome that, and

3    the way that they seem to try and get there, and what

4    Mr. DeFilippis conceded is their major argument, is this co-

5    conspirator joint venture issue.

6              All to prove what?  To prove that there was a

7    relationship, an attorney-client relationship, between

8    Mr. Sussmann and Mr. Joffe.

9              Judge, we are not going to -- we are not going to

10   contest that, that there was an attorney-client relationship

11   between --

12             THE COURT:  Generally or with respect to the FBI

13   meeting?

14             MR. BERKOWITZ:  Generally in the sense that the

15   attorney-client relationship related to the providing of

16   this information to Mr. Sussmann, okay?  And that's what

17   they're talking about here, is the gathering and collection

18   of the data.  That's different.

19             And what is striking here -- and I think you've

20   put your finger on it.  We've all been doing this a long

21   time.  I have never seen a case where there's the suggestion

22   of a civil joint venture or conspiracy to get in statements

23   which are intended to prove a criminal violation, legitimate

24   First Amendment protected statements, even if they could

25   establish a joint venture -- we'll get there in a minute --

1    being shown to prove a criminal violation.  They're not even

2    relevant, Judge, to the criminal case, and let me tell you

3    why.

4           The concept, right -- what we're talking about

5    here we cannot unmoor from the actual charge.  He's charged

6    with lying about whether he had a client when he went to

7    meet with the FBI or whether he was there on behalf of a

8    client.  The reason that Mr. DeFilippis suggests all these

9    things are so relevant is to establish that Mr. Joffe was

10   the client and they wanted to hide the fact that the

11   information was gathered and collected in a particular way

12   or there were concerns about it.

13          What do we know is undisputed?  That Mr. Baker

14   will testify that Mr. Sussmann said the information was from

15   cyber experts, okay?  Not whether it was a client or not,

16   but it was from cyber experts.

17          And did anybody at the FBI ask Mr. Sussmann:  Who

18   are the cyber experts?  Where did you get the information?

19          Nobody asked him that.  Nobody even spoke with

20   Mr. Sussmann.

21          So to suggest somehow that whether he had a client

22   is what he was trying to conceal -- if he's trying to

23   conceal something, it would be the source of the data under

24   their theory, and he says he got it from cyber experts.

25          A simple question that could have been asked is,

1    "Who are the cyber experts?"

2          He doesn't lull anybody by saying he has no client

3    because he says this is the source of the data.  That's what

4    would be critical here.  Nobody asked him.  So it doesn't

5    even go to motive or relevance, and I think that's really

6    important.

7          In addition, he is nowhere to be found on any of

8    these documents.  If you look at the *Safavian* case, which we

9    cite to you, there Mr. Safavian is on some of the documents.

10   It could go to his state of mind.  It could go to a number

11   of different issues as you go through the emails.

12         Mr. Sussmann's absence on these documents is

13   striking.  They are clearly -- and you heard Mr. DeFilippis

14   talk about the fact that this is to show what Mr. Joffe's

15   purpose was, his state of mind.  They're clearly inviting

16   the leak and speculation that if Mr. Joffe knew it,

17   Mr. Sussmann might have known it.  That --

18         THE COURT:  Well, to be fair, I think their theory

19   is that despite the fact that Mr. Sussmann's not on these

20   emails, his involvement in meetings and correspondence with

21   the same people around the same time soon before the meeting

22   creates an inference that he, you know, was knowledgeable

23   about and was involved in the operation that they were

24   engaging in and that, therefore, because he was in the joint

25   venture, any particular joint venture statement is

1    admissible under the hearsay exception.

2         MR. BERKOWITZ:  Understood, and so a couple of

3    points in response to that, which is their theory.

4         Number one, they don't need these emails to prove

5    that up.  They immunized Mr. Dagon and can ask him

6    questions.  There are emails and other communications that

7    could be used.  There are billing records and people

8    attending meetings that they could certainly ask about.

9         Number two, the joint venture that they seem to be

10   hypothesizing is a constantly moving target, and it appears

11   to have landed on the scope of the indictment.  Everything

12   we've alleged in the indictment, the story that we, you

13   know, have been investigating for however many years, is the

14   scope of the joint venture.

15        What they need to do, as you know from, you know,

16   *Bourjaily* and any other number of criminal cases, is that

17   they've got to actually say that the declarant and the

18   defendant were part of the joint venture, whatever that

19   might be here.  It seems so broad that literally any

20   statement could be part of it, that the statement was in

21   furtherance.

22        As you pointed out, most of these statements are

23   not in furtherance of a common scheme.  They're questioning.

24   They're raising issues.  They're not an effort to do

25   something.

1        And certainly the fact that Mr. Joffe tasks people

2    with doing things, if they don't know what the purpose is,

3    where it's going, that it was going to be presented to the

4    FBI, none of that is connected, and you would need to do an

5    email-by-email analysis.

6        And I think with respect to each of these, that

7    would come out and suggest that there is no furtherance of

8    the conspiracy and that these people were not members of a

9    single conspiracy such that -- and the conspiracy, of

10   course, is opposition research against a political

11   candidate, which is not remarkable in and of its own sense,

12   but they're using that to prove a criminal case.  They want

13   to essentially tell a story, a nefarious story, and have a

14   mini trial about that.

15       And what ultimately I think we would ask you to

16   consider, Judge, is even if they've met all those hurdles --

17   which they've not -- what's the 403 analysis on this?  How

18   is it that this information is relevant to the limited

19   charge here when Mr. Sussmann's state of mind is not

20   directly impacted, when he is not a party to these

21   communications, and when he's charged with lying about his

22   client, not about the source of the information, which he

23   clearly communicated to everybody.

24       I think the briefs on this and the cases do a

25   really nice job of laying forth our concerns.  I'm happy to

1   answer specific questions, but I'd leave it at that.

2              THE COURT:  Okay.  Why don't we move on.  We'll

3   get something out in writing on this issue, hopefully sooner

4   rather than later.

5              Since you're up there, Mr. Berkowitz, the Steele

6   dossier, does that generally fall in the same bucket, or are

7   there --

8              MR. BERKOWITZ:  So --

9              THE COURT:  -- other arguments?

10             MR. BERKOWITZ:  I think it's generally in the same

11  bucket.  What I would say, Judge, is that we don't know,

12  sitting here today, what's left of the Steele proof that the

13  government would offer.  They've informed us -- we were on a

14  call with them yesterday and asking about 3500 material,

15  which we hadn't seen on Mr. Steele, and they said, well, the

16  reality is that he's out of the country and isn't likely to

17  be a witness.

18             Without him as a witness, Judge, we don't believe

19  there's any evidence about Mr. Steele that would be

20  admissible to come in.  If they were to offer -- there is a

21  meeting that we understand Mr. Sussmann attended where

22  Mr. Steele was at in July of 2016.  That's part of the HSPCI

23  testimony that Mr. Bosworth talked about.  That's really the

24  only evidence of that meeting and the testimony there

25  related to whether he vetted him, not anything related to

1    these Alfa-Bank allegations or anything else.

2            Mr. Steele then goes on to do other things, no

3    connection to Mr. Sussmann from the evidentiary record that

4    we're aware of.  And so invoking even his name is a

5    lightening rod in this case because he is somebody who is

6    probably one of the best known -- there was, I think, a two-

7    or three-year investigation into him, into the Steele

8    dossier, which has nothing to do here.  So even the

9    implication of Mr. Steele's name in this case we think would

10   be unduly prejudicial given the lack of probative evidence.

11           There is no doubt that they will establish, I

12   believe, that Mr. Sussmann was aware of Fusion and had

13   meetings with people from Fusion.  I'm not sure how they'll

14   prove that, but that's not the issue.  It's the Steele piece

15   which we're focused on.

16           THE COURT:  Okay.  Mr. DeFilippis, is that still

17   in play or not?

18           MR. DeFILIPPIS:  Yes, Your Honor.

19           THE COURT:  How so?

20           MR. DeFILIPPIS:  Your Honor, a few ways in

21   which -- now, let me say first, we intend the testimony and

22   evidence on this to be limited to the intersection between

23   Mr. Steele's efforts and the Russian Bank 1, the Alfa-Bank

24   efforts, and there is a strong intersection even if it is

25   limited and, you know, not a sprawling collection of

1     evidence, so a few ways.

2              First, Mr. Sussmann testified, and the very

3     testimony that we intend to offer -- Mr. Sussmann testified

4     that he met with Mr. Steele in the summer of 2016.  We also

5     know that Mr. Steele, after that meeting, immediately after

6     that meeting, was tasked by Fusion GPS to look into Alfa-

7     Bank, into the Russian Bank 1 allegations.

8              We also know, Your Honor --

9              THE COURT:  Let's back up.  Is he on your witness

10    list?

11             MR. DeFILIPPIS:  Steele?  He was on our witness

12    list, Your Honor, but is not -- we don't expect to call him

13    because he's not cooperating with us.

14             THE COURT:  So the statement would come in as a

15    party statement, and someone from Fusion's on your witness

16    list to testify as to their dealings with Steele?

17             MR. DeFILIPPIS:  We have someone from Fusion on

18    the witness list, Your Honor, and -- yes.

19             THE COURT:  Okay.

20             MR. DeFILIPPIS:  To the extent they know about

21    Steele, as Your Honor --

22             THE COURT:  I'm just trying to game out how this

23    stuff would actually play out at trial --

24             MR. DeFILIPPIS:  Yes, so let me go through the

25    ways it would come out at the trial.

1        THE COURT:  -- if it's relevant.  Okay.

2        MR. DeFILIPPIS:  The campaign manager of the

3    Clinton Campaign has told the government that he viewed the

4    Steele opposition research and the Alfa-Bank research as

5    part of the same work stream.  In other words, it was

6    intermixed.  All of the Steele efforts were part of the same

7    Perkins Coie/Fusion GPS opposition research work stream.

8        We intend to offer the notes that we've discussed

9    from Mr. Priestap, which, on the very same page as the

10   Alfa-Bank allegations that Mr. Baker received, on that very

11   same day, is when the Steele information made its way to FBI

12   headquarters from the field.

13       To the extent the defense has put materiality as

14   kind of the capstone issue of this case, it is certainly

15   material to the FBI if they have, staring them in the face

16   on the same page of notes, two different pieces of research

17   that came from the same law firm and the same investigative

18   firm and largely through the same lawyers about the same

19   candidate.  It seems, Your Honor, that there is a high

20   degree of relevance of how would the FBI have evaluated

21   Mr. Sussmann's statement if he had simply disclosed who was

22   behind all of this and led them to realize that, in fact,

23   this opposition research that we're getting on the same day

24   at FBI headquarters is coming from the same firm and the

25   same set of researchers.

```
 1              THE COURT:  So this all goes to the joint venture

 2      theory that there is -- there was this effort at opposition

 3      research that the defendant was a part of, and that provides

 4      a motivation for him to make the statement that he did to

 5      Mr. Baker.

 6              MR. DeFILIPPIS:  I think it's certainly a part

 7      of --

 8              THE COURT:  So it's another thread of the alleged

 9      common venture.

10              MR. DeFILIPPIS:  I think it's certainly a part of

11      that, Your Honor.  I think it's also relevant separate and

12      independent from that.

13              So I think that to the extent Mr. -- to the extent

14      Mr. Sussmann claims at trial, sure, all of this was for

15      Rodney Joffe, you know, the Alfa-Bank matter was for Rodney

16      Joffe but it wasn't a part of the broader Clinton Campaign

17      research efforts, this wasn't a political exercise, this was

18      just concerned researchers giving me stuff that I brought

19      into the Bureau separate from the campaign; the meeting with

20      Christopher Steele is incredibly probative and relevant to

21      that because it shows that Mr. Sussmann himself was

22      integrated into that whole effort and integrated Mr. Joffe's

23      efforts into that very, very effort.  So even if it's just

24      looking at Christopher Steele's involvement as opposed to

25      what Mr. Joffe did with companies and the university
```

1    researchers, Your Honor, this, taken in isolation or

2    together, is highly probative.

3              And we think we can limit the prejudice on this

4    because we're not going to go anywhere near the more well-

5    known or salacious parts of that dossier or anything like

6    that.  We're just trying to establish the extent to which

7    Mr. Steele's work intersected with the Alfa-Bank matter.

8              THE COURT:  Okay.

9              MR. BERKOWITZ:  So let me be really clear.  All of

10   what Mr. DeFilippis just talked about is not going to prove

11   to be the case, and the reality of what happened hasn't even

12   been disclosed to us by the government.  It's been learned

13   through public record searches and so forth.  So let me run

14   through really quickly what will and what won't come into

15   evidence.

16             If you allow anything related to Mr. Steele, there

17   is HSPCI testimony, which you've seen, where Mr. Sussmann

18   says he was -- and I'm paraphrasing -- at his law firm.  He

19   was asked by Marc Elias to vet somebody about an hour before

20   the meeting.  He didn't even know Mr. Steele was going to be

21   there, and he had a relatively innocuous conversation with

22   him where he asked about his background or credentials and

23   so forth.  Period.

24             The next thing that Mr. DeFilippis said is that

25   after that meeting, at some point --

1          THE COURT:  And who else was in that meeting?

2          MR. BERKOWITZ:  Two people from Fusion who are not

3     on the government's witness list.  And Mr. Elias was not

4     present for the vetting piece of it.

5          Fast forward, the next thing that Mr. DeFilippis

6     says happens is that Mr. Steele starts doing research on

7     Alfa-Bank.

8          And you said, "Well, how is that going to come in?

9     Is there anyone from Fusion on your witness list?"

10          And Mr. DeFilippis said there is someone and we

11     believe it would come in, or words to that effect.

12          The only person from Fusion on their witness list

13     is Laura Seago, who either I think has been immunized or

14     will be immunized, and we understand that she would say

15     she doesn't recall that she even knows Mr. Steele or is

16     able to talk about what he did.  And so we don't know

17     that they actually are able to get anything in about what

18     Mr. Steele did or didn't do.  Certainly there's no evidence

19     that Mr. Sussmann was aware of what Mr. Steele was doing.

20     No evidence of that.

21          To the extent that the Clinton Campaign manager

22     felt that whatever Mr. Steele was doing was part of the same

23     overall package, there's no evidence that Mr. Sussmann was

24     connected to that, and we would not expect the campaign

25     manager to say that Mr. Sussmann was aware.

1          The next piece, and I think sort of the capstone,

2     as Mr. DeFilippis calls it, is that the same day that

3     Mr. Sussmann shows up to meet with Mr. Baker to give him a

4     heads up about the story that is coming out in *The New York*

5     *Times* they get information that is sourced to Mr. Steele

6     related to Alfa-Bank, okay?  This is really important in

7     terms of what's done.

8          And I'm quoting from their brief.  It says,

9     "additional notes reflecting that FBI headquarters received

10    part of the U.K. Person 1" -- Mr. Steele -- "dossier from an

11    overseas FBI agent on the very same date of the meeting.

12    The notes state, among other things, the dossier's author

13    was hired by a US investigative firm to dig up dirt on Trump

14    for an unnamed US client."

15         So they would have you believe that this was part

16    of a joint venture to provide false information coinciding

17    at the same time at the FBI.  What they don't say is that

18    Mr. Steele, at the same time this was going on, was a source

19    for the FBI and provided that information, he's testified

20    elsewhere, not on behalf of anybody but because he was

21    concerned about security interests.  In other words, he says

22    he doesn't even know that his client was aware that he was

23    going to the FBI.  He did it for national security reasons.

24         We're happy to provide that information for you.

25    It was not provided to us in 3500 material.

1          They want to make the argument that it was

2     provided as part of a larger conspiracy when, in fact,

3     Mr. Steele was acting -- was known to be, at least to people

4     including Mr. Baker, a source called "Crown" to the FBI and

5     acting as a source with that information being provided, I

6     think, to a Rome-based agent.

7          In any event, the leap of faith and what we're

8     getting at here is what you're going to see, which is a

9     trial within a trial about what Mr. Steele was doing and how

10    he was acting that has no basis on anything and, again, no

11    connection whatsoever.

12         Mr. Sussmann testified before Congress that he

13    doesn't recall ever seeing Steele again after that initial

14    meeting, wasn't aware of anything that he was doing and the

15    timing of this.  It's not that the information was provided

16    to the FBI on the same day.  It just happened to land on the

17    desk later in that time.

18         So this type of issue, Judge, is ripe for 403

19    analysis to the extent that there would be any relevance.

20    It's really dangerous to scoop all these isolated pieces

21    together and say, "Aha, look what we got."

22         So I'll leave it at that.

23         THE COURT:  Okay.

24         I believe that's all.  We dealt with the data

25    accuracy issue in the order.  We will be dealing with the

1     motion in limine or the motion to compel the privilege

2     documents or to pierce the privilege assertions.

3              Is there anything else we've not covered?

4              MR. BERKOWITZ:  The only thing, Judge -- and it

5     may be encompassed in what you're considering on the co-

6     conspirator -- is whether the information that was collected

7     by Mr. Joffe and others was done in an improper or unethical

8     way and whether that should come in.  I'm happy to address

9     that.

10             THE COURT:  I think that goes to the whole

11    gathering subset.

12             All right.  I noticed the defense's CIPA 5

13    submission.  Have we been working with each other to come up

14    with responses?  I'm just trying to anticipate sort of the

15    time commitment and scheduling without obviously going into

16    any classified --

17             MR. BERKOWITZ:  So I think --

18             THE COURT:  -- materials.

19             MR. BERKOWITZ:  I think I can safely say that we

20    were informed of a filing related to Section 5 that was put

21    in the SCIF.  Only one of our team at this date has the

22    appropriate clearance to have read it, an associate.  We're

23    hoping -- we've talked to Special Counsel.  We're hoping to

24    make sure that Mr. Bosworth -- I need to be read in.

25    Mr. Bosworth and Ms. Rao are, we're told, closed.  We raised

 1    it with the Special Counsel.

 2              Until we can read it, we can't respond to it,

 3    Judge, and we're told that that should happen next week.  I

 4    don't want to speak for Special Counsel.

 5              MR. ALGOR:  Yes, Your Honor, that's accurate, and

 6    we're working with the CISOs regarding that.  As well,

 7    within the government's motion, it addressed both Section 5

 8    and Section 6 issues, and so our hope is also, with some of

 9    the declassification of materials, that we'll be able to

10    address, you know, subsequent to defense seeing those

11    materials --

12              THE COURT:  Okay.

13              MR. ALGOR:  -- many of the items.

14              THE COURT:  The clock is ticking.

15              MR. ALGOR:  Yes, Your Honor.

16              THE COURT:  And if there are going to be disputes

17    over summaries or substitutions, we've got to schedule time

18    to work those out.

19              MR. ALGOR:  Yes, Your Honor.

20              THE COURT:  Okay.

21              Anything else, Counsel?

22              MR. DeFILIPPIS:  Your Honor, just one -- we just

23    want to confirm.  On the CIA meeting, is it the correct

24    understanding Your Honor's going to set parameters on that?

25    We just weren't entirely clear.

```
 1                THE COURT:  Yes.

 2                MR. DeFILIPPIS:  Okay.  Thank you, Your Honor.

 3                THE COURT:  Yes.  And we set a date for the

 4     privilege assertion.

 5                MR. BERKOWITZ:  May 4th.

 6                THE COURT:  May 4th.

 7                MR. BERKOWITZ:  You said, Judge, and we're

 8     coordinating with counsel on the privilege assertion side,

 9     and hopefully we can, you know, do this all in less than an

10     hour and try to make it as --

11                THE COURT:  Okay, if you could streamline the

12     argument to the extent possible.  There are lots of

13     overlapping issues, I think.

14                MR. BERKOWITZ:  Yes, and I think that everybody

15     will be ready for questions that you have.  You do a really

16     nice job, I can say, of focusing the issues, and we'll try

17     to make sure that people are prepared to do that.

18                THE COURT:  Okay.

19                MR. BERKOWITZ:  The only other issue --

20                THE COURT:  Flattery will get you nowhere.

21                MR. BERKOWITZ:  My audience of one for the time

22     being, I guess.

23                The only other issue, Judge, is in light of the

24     order that you issued, we very much appreciate, last Friday

25     in a timely fashion, it raised some issue about the scope of
```

1    what the expert will say.  We've asked Special Counsel to

2    provide additional disclosures about what they will say, and

3    they've indicated to us that they're putting that together.

4    And if we have to seek your intervention, we will, but we're

5    working with them in a professional way.

6             THE COURT:  That's fine.  As you know, inevitably

7    some of this should wait for trial, you know.

8             MR. BERKOWITZ:  Which is rapidly approaching.

9             THE COURT:  All right.  I think that's it.

10            The matter is taken under advisement to the extent

11   the Court has not ruled from the bench, and we will stand in

12   recess.  Have a good day.

13                     (Whereupon the hearing was

14                      concluded at 3:14 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1  **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3        I, LISA A. MOREIRA, RDR, CRR, do hereby

4  certify that the above and foregoing constitutes a true and

5  accurate transcript of my stenographic notes and is a full,

6  true and complete transcript of the proceedings to the best

7  of my ability.

8      Dated this 27th day of April, 2022.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25