# FEDERAL ELECTION COMMISSION

## FIRST GENERAL COUNSEL'S REPORT

**MUR 7291**
DATE COMPLAINT FILED:  Oct. 25, 2017
DATE OF NOTIFICATION:  Oct. 27, 2017
DATE OF LAST RESPONSE:  Dec. 14, 2017
DATE OF ACTIVATION:  Oct. 30, 2018

ELECTION CYCLE:  2016
EXPIRATION OF SOL: Mar. 1, 2021/Jan. 31, 2022

| | |
|---|---|
| **COMPLAINANT:** | Campaign Legal Center |
| **RESPONDENTS:** | DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer |
| | Hillary for America and Elizabeth Jones in her official capacity as treasurer |

**MUR 7331**
DATE COMPLAINT FILED:  Feb. 26, 2018
DATE OF NOTIFICATION:  Mar. 5, 2018
DATE OF LAST RESPONSE:  June 4, 2018
DATE OF ACTIVATION:  June 1, 2018

ELECTION CYCLE:  2016
EXPIRATION OF SOL: Mar. 1, 2021/Jan. 31, 2022

| | |
|---|---|
| **COMPLAINANT:** | Americans for the Trump Agenda |
| **RESPONDENTS:** | DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer |
| | Hillary for America and Elizabeth Jones in her official capacity as treasurer |

**MUR 7449**
DATE COMPLAINT FILED:  Aug. 2, 2018
DATE OF NOTIFICATION:  Aug. 8, 2018
DATE OF LAST RESPONSE:  Oct. 17, 2018
DATE OF ACTIVATION:  Oct. 30, 2018

ELECTION CYCLE:  2016
EXPIRATION OF SOL: Mar. 1, 2021/Jan. 31, 2022

| | |
|---|---|
| **COMPLAINANT:** | Coolidge Reagan Foundation |

| | | |
|---|---|---|
| 1 | **RESPONDENTS:** | DNC Services Corp./Democratic National |
| 2 | | Committee and William Q. Derrough in his |
| 3 | | official capacity as treasurer |
| 4 | | Hillary for America and Elizabeth Jones in her |
| 5 | | official capacity as treasurer |
| 6 | | Perkins Coie LLP |
| 7 | | Marc Elias |
| 8 | | Fusion GPS |
| 9 | | Christopher Steele |
| 10 | | |
| 11 | **RELEVANT STATUTES AND** | 52 U.S.C. § 30104(b)(5)(A) |
| 12 | **REGULATIONS:** | 52 U.S.C. § 30121(a)(1)(A), (a)(1)(C), (a)(2) |
| 13 | | 11 C.F.R. § 104.3(b)(3), (4)(i), (vi) |
| 14 | | 11 C.F.R. § 104.9(a), (b) |
| 15 | | 11 C.F.R. § 110.20(b), (f), (g), (h)(1), (i) |
| 16 | | |
| 17 | **INTERNAL REPORTS CHECKED:** | Disclosure Reports |
| 18 | | |
| 19 | **FEDERAL AGENCIES CHECKED:** | None |

20 **I.      INTRODUCTION**

21        The three Complaints in these matters allege that the Democratic National Committee

22 and the authorized committee of Democratic Party nominee Hillary Clinton failed to file accurate

23 disclosure reports when they mischaracterized the payee and purpose of certain disbursements

24 disclosed as made to Perkins Coie LLP ("Perkins Coie") for legal services, when in fact the

25 payments were passed through to the research firm Fusion GPS ("Fusion") for the purpose of

26 opposition research and should have been disclosed as such.[1]   Hillary for America, Inc. and

27 Elizabeth Jones in her official capacity as treasurer ("HFA") and the DNC Services

---

[1]        MUR 7291 Compl. ¶¶ 1-2 (Oct. 25, 2017); MUR 7331 Compl. at 2 (Feb. 26, 2018); MUR 7449 Compl. at 2, 10-14 (Aug. 2, 2018).  The MUR 7449 Complaint also alleges that Perkins Coie partner Marc Elias and Perkins Coie aided and abetted the alleged reporting violations by the respondent committees.  MUR 7449 Compl. at 14-16. MUR 7331 is also the subject of the First General Counsel's Report in MURs 7304, 7331, *et al.* (Hillary Victory Fund), which is currently pending with the Commission, wherein we recommend that the Commission sever these allegations from MUR 7331 and merge them into MUR 7291.  *See* MUR 7331 Compl. at 2; First Gen. Counsel's Rpt. at 8, 35, MURs 7304, 7331, *et al.*

1 Corp./Democratic National Committee and William Derrough in his official capacity as treasurer

2 ("DNC") (collectively, the "Committees") contend that the disbursements at issue were properly

3 disclosed because Perkins Coie LLP hired Fusion GPS to support its provision of legal services

4 to them, and the Committees did not contract with or make payments to Fusion.[2]

5       The MUR 7449 Complaint contains additional allegations that Christopher Steele, a

6 foreign national whose firm was a subcontractor for Fusion, violated the foreign national

7 provisions of the Federal Election Campaign Act of 1971, as amended (the "Act"), and

8 Commission regulations in several respects:  by soliciting contributions from foreign nationals

9 when he sought information from other foreign nationals in conducting his research;[3] by making

10 a prohibited in-kind foreign national contribution by providing his research to Mother Jones, a

11 magazine that used it in an article critical of Clinton's general election opponent, Donald

12 Trump;[4] and by providing information to the Committees through intermediaries and, thereby,

13 indirectly participating in the Committees' decision-making processes concerning expenditures.[5]

14 The respondents generally contend that no contributions resulted from Steele's work because he

---

[2]      MUR 7291 Hillary for America Resp. at 2-8 (Dec. 14, 2017) ("MUR 7291 HFA Resp."); MUR 7291 DNC Services Corp./Democratic National Committee Resp. at 2-8 (Dec. 14, 2017) ("MUR 7291 DNC Resp."); MUR 7331 Hillary Victory Fund/Hillary for America/DNC Services Corp./Democratic National Committee Joint Resp. at 2, 4-5, 11-17 (June 4, 2018) ("MUR 7331 HFA/DNC Resp."); MUR 7449 Hillary for America/DNC Services Corp./Democratic National Committee/Perkins Coie LLP/Marc Elias Joint Resp. at 2-9 (Oct. 3, 2018) ("MUR 7449 HFA/DNC Resp.").

[3]      MUR 7449 Compl. at 16-21.  The MUR 7449 Complaint further alleges that Elias and HFA substantially assisted Steele in the solicitation of donations by foreign nationals because, while Elias was serving as general counsel to HFA, he hired Fusion, which in turn hired Steele's firm.  *Id.* at 18.

[4]      *Id.* at 18-20.

[5]      *Id.* at 20-21.

1  was paid for his services at a fair market rate,[6] the media exemption applies to Mother Jones,[7]

2  and Steele did not participate in the decision-making processes of the Committees by indirectly

3  providing them with information.[8]

4        For the reasons set forth below, we recommend that the Commission:  (1) find reason to

5  believe that HFA and the DNC violated 52 U.S.C. § 30104(b)(5)(A) by failing to properly report

6  Fusion as the payee with respect to certain disbursements; (2) take no action at this time with

7  respect to the purposes of such disbursements that were reported by the Committees; (3) dismiss

8  the allegations that Elias and Perkins Coie violated 52 U.S.C. § 30104(b)(5)(A) by allegedly

9  aiding and abetting the filing of inaccurate disclosure reports; (4) dismiss the allegations that

10  Steele violated 52 U.S.C. § 30121 and 11 C.F.R. §§ 110.20(b), (f), (g), and (i); (5) dismiss the

11  allegations that Elias and HFA violated 11 C.F.R. § 110.20(h)(1); and (6) dismiss the allegations

12  that Fusion violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20.  Additionally, we recommend

13  that the Commission authorize compulsory process.

14  **II.    FACTUAL BACKGROUND**

15        HFA is the authorized committee of Hillary Clinton's 2016 presidential campaign, and

16  the DNC is the national committee of the Democratic Party.[9]  Fusion is a research consulting

17  firm headquartered in Washington, DC.[10]  Glenn Simpson is the majority owner of Fusion and

---

[6]     MUR 7449 HFA/DNC Resp. at 10-11; Fusion GPS Resp. at 2 (Oct. 17, 2018) ("Fusion Resp."); Christopher Steele Resp. at 6-12 (Oct. 11, 2018) ("Steele Resp.").

[7]     Steele Resp. at 12-16.

[8]     MUR 7449 HFA/DNC Resp. at 12; Steele Resp. at 16-19.

[9]     *See* Amended Statement of Organization, HFA (June 8, 2016); Amended Statement of Organization, DNC (Sept. 17, 2018).

[10]     *See* http://www.fusiongps.com/.

1   has testified under oath regarding the research conducted by Fusion for Clinton and the DNC.[11]

2   Christopher Steele is a British national who worked as a subcontractor to Fusion through his

3   investigative research firm, Orbis Business Intelligence.[12]  Perkins Coie is a law firm of which

4   Marc Elias is a partner.[13]  Elias's biography on Perkins Coie's website states that he "served as

5   general counsel to" HFA "in 2016."[14]  In their responses, the Committees acknowledge that

6   Perkins Coie served as General Counsel for HFA and the DNC during the 2016 election cycle.[15]

7       **A.     Reporting of Payments for Fusion's Services**

8          Perkins Coie was approached by Fusion in March 2016 and agreed to pay for the

9   continuation of research on then-candidate Donald J. Trump that Fusion had conducted on behalf

---

[11]     *See* U.S. House of Representatives Permanent Select Committee on Intelligence, Executive Session, Interview of Glenn Simpson, 5-6 (Nov. 14, 2017), http://docs.house.gov/meetings/IG/IG00/20180118/106796/HMTG-115-IG00-20180118-SD002.pdf ("Simpson House Interview") (noting that Simpson testified under oath); U.S. Senate Judiciary Committee, Interview of Glenn Simpson, 9-10, 14 (Aug. 22, 2017), https://www.feinstein.senate.gov/public/_cache/files/3/9/3974a291-ddbe-4525-9ed1-22bab43c05ae/934A3562824CACA7BB4D915E97709D2F.simpson-transcript-redacted.pdf ("Simpson Senate Interview") (providing that Simpson did not testify under oath but that he understood that making a false statement to Congress was a federal crime).  Fusion is the trade name of Bean LLC, which is a Delaware corporation registered in the District of Columbia.  *See* Simpson Senate Interview at 14-15; Simpson House Interview at 6; Delaware Dep't of State Div. of Corps., *General Information Name Search*, https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx (enter Entity Name:  Bean LLC or File No.:  4854128); D.C. Dep't of Consumer and Regulatory Affairs, *My D.C. Business Center Quick Search*, https://mybusiness.dc.gov/#/quicksearch (enter Business Name:  Bean or File No.:  L53032).

[12]     MUR 7449 Compl. at 2-3, 7-8 (citing Jane Mayer, *Christopher Steele, The Man Behind the Trump Dossier*, THE NEW YORKER (Mar. 12, 2018), https://www.newyorker.com/magazine/2018/03/12/christopher-steele-the-man-behind-the-trump-dossier ("New Yorker Article")).  Steele asserts in his response that the MUR 7449 "Complaint is full of inaccuracies," though he does not identify which facts are inaccurate.  Steele Resp. at 3 (arguing that even assuming the accuracy of all facts alleged in the Complaint, the Commission should not proceed against Steele).  According to the New Yorker Article, Steele co-founded Orbis, which is located in Mayfair, London, UK, in 2008.

[13]     *See Marc E. Elias*, Perkins Coie LLP, https://www.perkinscoie.com/en/professionals/marc-e-elias html; MUR 7291 DNC Resp. at 2.

[14]     *See Marc E. Elias*, Perkins Coie LLP, https://www.perkinscoie.com/en/professionals/marc-e-elias html.

[15]     MUR 7291 HFA Resp. at 2, 7; MUR 7291 DNC Resp. at 2, 7.

1    of a Republican donor.[16]  Marc Elias and Perkins Coie reportedly formally retained Fusion in

2    April 2016.[17]  HFA and the DNC state that the research was for the purpose of supporting

3    Perkins Coie's representation of them.[18]  HFA campaign manager Robby Mook, when asked in a

4    televised interview whether HFA had paid for the "dossier," stated "I didn't know that we were

5    paying the contractor that created that document" but acknowledged that "I asked our lawyer and

6    I gave him a budget allocation to investigate" Trump's business dealings, "particularly the

7    international aspect," which Mook characterized as "this massive tree of LLCs and shell

8    companies" that left HFA "overwhelmed" and "out of our league."[19]  Simpson, when asked in

9    his congressional testimony whether he was aware, when Fusion was retained by Perkins Coie,

10   that Perkins Coie was working on behalf of the DNC, testified that "nobody gave me a document

---

[16]      MUR 7291 HFA Resp. at 2, Ex. 1; MUR 7291 DNC Resp. at 2, Ex. 1; MUR 7449 HFA/DNC Resp., Ex. 1; MUR 7291 Compl. ¶ 5 (citing Adam Entous, Devlin Barrett, and Rosalind Henderman, *Clinton Campaign, DNC Paid for Research that Led to Russia Dossier*, THE WASHINGTON POST (Oct. 24, 2017), https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html?utm_term=.e2c61bfdabee ("Post Article")).  Fusion had previously been paid by The Washington Free Beacon, which stopped paying in April or May 2016 once Trump appeared to secure the Republican nomination for President.  *See* Simpson House Interview at 11-12.

[17]      *See* MUR 7291 Compl. ¶ 5 (citing Post Article); *see also* MUR 7449 Compl. at 4; Simpson House Interview at 12-13.  The Post Article cites sources "familiar with the matter."  The information provided by HFA, the DNC, Perkins Coie, and Elias is largely drawn from a letter from Perkins Coie to the Zuckerman Spaeder LLP ("Zuckerman") law firm, counsel for Fusion, authorizing Zuckerman to disclose certain information regarding Perkins Coie's hiring of Fusion.  MUR 7291 HFA Resp. at 2, Ex. 1 (Letter from Matthew J. Gehringer, General Counsel, Perkins Coie, to William W. Taylor, III, Zuckerman (Oct. 24, 2017); MUR 7291 DNC Resp. at 2, Ex. 1 (same); MUR 7449 HFA/DNC Resp. at 3, Ex. 1 (same).

[18]      MUR 7291 HFA Resp. at 2; MUR 7291 DNC Resp. at 2; MUR 7331 HFA/DNC Resp. at 16-17; MUR 7449 HFA/DNC Resp. at 3.

[19]      *Anderson Cooper 360, Anderson Cooper Interview with Robby Mook* (CNN television broadcast Nov. 3, 2017) ("CNN Interview") (relevant portion begins at approximately 5:35) (copy of video available in VBM and available at https://www.cnn.com/videos/politics/2017/11/04/robby-mook-ac360-dnc-brazile-full-interview.cnn); *see also* New Yorker Article (stating that Mook approved Perkins Coie's budget request for opposition research, despite not knowing at the time who would be performing the work); Simpson Senate Interview at 139-40 (testifying that the "dossier" published online by Buzzfeed in January 2017, which was comprised of sixteen pre-election memoranda and one post-election memorandum, represents the "entire universe" of memoranda Steele and Orbis created for Fusion).

1   or informed me specifically of that" but also that he did not think Perkins Coie was engaging

2   Fusion for itself; Simpson further testified that "I have been in Washington for several decades,

3   and I spent a lot of time on Capitol Hill and it was well-known to me that Perkins Coie

4   represented the DNC."[20]  Fusion likely worked for Perkins Coie on a series of 30-day contracts,

5   and their relationship ended with the 2016 presidential election.[21]

6        Fusion reportedly stated that it was paid $1.02 million by Perkins Coie for fees and

7   expenses related to the research on Trump.[22]  Perkins Coie publicly acknowledged that it hired

8   Fusion on behalf of HFA and the DNC, and the Committees appear to have shared the costs

9   related to Fusion's work for Perkins Coie.[23]  In fact, the DNC reported making a $66,500

10  payment to Perkins Coie on August 16, 2016, for "Research Consulting," which the DNC

11  acknowledges was the first DNC payment for Perkins Coie's "legal consulting supported by the

---

[20]    Simpson House Interview at 19-21 (explaining further that "I knew it was the DNC that we were working for" because "I was generally aware that Perkins Coie represented the DNC").  Simpson did not address whether he knew that HFA was also a client, but he did deny having any "dealings" with Clinton.  *Id.* at 106.  Simpson also, however, testified that he had, over the years, fielded journalists' questions about the Clinton Foundation and Hillary Clinton, but that "at some point, you know, that became a conflict of interest."  *Id.* at 150-51 (not specifying at which point he knew that became a conflict or how he knew).

[21]    MUR 7291 HFA Resp., Ex. 1; MUR 7291 DNC Resp., Ex. 1; *see* MUR 7449 HFA/DNC Resp., Ex.1; *see* Simpson House Interview at 8, 74 (explaining that Fusion's business practice was to engage with a client on a 30-day contract, provide a report to the client, and engage for another 30 days if the client chose to do so); Simpson Senate Interview at 289-90.

[22]    MUR 7449 Compl. at 5 (citing Mark Hosenball, *Ex-British Spy Paid $168,000 for Trump Dossier, U.S. Firm Discloses*, REUTERS (Nov. 1, 2017), https://www.reuters.com/article/us-usa-trump-russia-dossier/ex-british-spy-paid-168000-for-trump-dossier-u-s-firm-discloses-idUSKBN1D15XH ("Reuters Article") (citing a public statement by Fusion)).  The MUR 7331 Complaint alleges that HFA and the DNC paid $12 million "for an opposition research project to link Donald Trump to Russia" but provides no information supporting that figure.  MUR 7331 Compl. at 2.

[23]    MUR 7449 Compl. at 4 (citing Kenneth P. Vogel, *Clinton Campaign and Democratic Party Helped Pay for Russia Trump Dossier*, THE NEW YORK TIMES (Oct. 24, 2017), https://www.nytimes.com/2017/10/24/us/politics/clinton-dnc-russia-dossier.html ("Times Article"); MUR 7291 Compl. ¶ 5 (citing Post Article); *see also* MUR 7291 HFA Resp. at 2, Ex. 1; MUR 7291 DNC Resp. at 2, Ex. 1; MUR 7449 HFA/DNC Resp. at 3, Ex. 1.

1  research efforts of Fusion."[24]  Overall, the DNC reported paying $5,267,642.67 to Perkins Coie

2  between March and December 2016.[25]  HFA reported paying a total of $4,941,201.09 to Perkins

3  Coie between March and December 2016.[26]  The reported $1.02 million figure representing

4  Perkins Coie's total payments to Fusion would comprise 8.4% of all the fees paid to Perkins

5  Coie by the Committees during the 2015-2016 election cycle.  HFA reported the purpose of all

6  amounts it paid Perkins Coie as "Legal Services."  The DNC, for the most part, reported that the

7  purpose of its Perkins Coie payments was "Legal and Compliance Consulting."  In addition,

8  other DNC payments to the law firm listed "Postage & Shipping," "Travel," "Data Services

9  Subscription," and "Printing & Copying."

10      HFA and the DNC assert that Perkins Coie retained Fusion to assist with its legal

11  representation of the Committees and that neither committee contracted directly with Fusion or

12  made any payments directly to Fusion.[27]  Therefore, HFA and the DNC contend, the

13  disbursements at issue were properly disclosed and the complaints should be dismissed.[28]

---

[24]    MUR 7291 DNC Resp. at 2 n.2, 8 (also stating that the August payment was "for legal services that had been subcontracted to Fusion"); MUR 7291 Compl. ¶ 9.

[25]    *See generally* DNC 2016 Disclosure Reports.  The DNC paid Perkins Coie $6,726,407.25 between January 1, 2015, and December 31, 2016, of which $6,466,711.46 was for "Legal and Compliance Consulting."  *See* MUR 7291 Compl. ¶ 9; *see generally* DNC 2015-16 Disclosure Reports.

[26]    *See generally* HFA 2016 Disclosure Reports.  HFA paid $5,631,421.02 to Perkins Coie between January 1, 2015, and December 31, 2016 for "Legal Services."  *See* MUR 7291 Compl. ¶ 8; *see generally* HFA 2015-16 Disclosure Reports.

[27]    MUR 7291 HFA Resp. at 2; MUR 7291 DNC Resp. at 2; MUR 7331 HFA/DNC Resp. at 2, 11; MUR 7449 HFA/DNC Resp. at 2-3.

[28]    MUR 7291 HFA Resp. at 2-8; MUR 7291 DNC Resp. at 2-8; MUR 7331 HFA/DNC Resp. at 11-17; MUR 7449 HFA/DNC Resp. at 2-9, 13.

1 **B. Orbis's Opposition Research**

2 After contracting with Perkins Coie, Fusion hired Steele's firm, Orbis, and paid it

3 $168,000 to assist in conducting opposition research on Trump.[29]  When first hired by Fusion,

4 Steele reportedly was not informed that the work was on behalf of HFA and the DNC.[30]  The

5 MUR 7449 Complaint alleges that Steele received information he included in the dossier from

6 Russian nationals, and that complaint thus contends that HFA thereby "collaborated with the

7 Russians in a desperate, and ultimately failed, attempt to steal the election."[31]  To gather

8 intelligence, Orbis, which specializes in human intelligence, reportedly "employs dozens of

9 confidential 'collectors' around the world, whom it pays as contract associates."[32]  The

10 "collectors" in turn "harvest intelligence from a much larger network of unpaid sources, some of

11 whom don't even realize they are being treated as informants."[33]  Steele referred generally to

---

[29]    MUR 7449 Compl. at 7-8; Reuters Article; New Yorker Article (reporting that Orbis "agreed to do opposition research on Trump's murky relationship with Russia" and that Mook "approved Perkins Coie's budget request for opposition research"); Simpson Senate Interview at 76-77, 82-86 (testifying that Fusion hired Steele's firm in May or June 2016 to focus on Trump's Russian business activities).

[30]    New Yorker Article; *see also* Simpson Senate Interview at 60-61, 92 (describing Fusion's practices generally, and specifically in the Trump-related work, in compartmentalizing its subcontractors, including by withholding the identity of Fusion's client unless there is a need to know, such as for due diligence or potential conflicts); Simpson House Interview at 77-78 (testifying that Simpson would have told Steele that the client was political and a Democrat, but that Steele did not know the identity of Fusion's client at the time Steele spoke with the FBI in July 2016).

[31]    MUR 7449 Compl. at 2; *see also* Simpson Senate Interview at 271-72 (describing Steele's methodology); Simpson House Interview at 27, 29-30, 55-56, 69-70 (providing examples of information Steele obtained and confirming that Steele said he does not pay sources for information).

[32]    New Yorker Article (noting that "collectors" can include private investigators at smaller firms, investigative reporters, and "highly placed experts in strategically useful jobs" and can be paid as much as $2,000 per day, depending on the task and length of engagement); *see also* Simpson Senate Interview at 271-72 (describing Simpson's understanding of field operations as follows:  "You commission people to gather information for you rather than sort of paying someone for a document or to sit for an interview"); Simpson House Interview at 56 (testifying that Steele "does not pay sources for information" but runs a source network in which he pays subcontractors to "circulate and gather information in conversations . . . essentially it's hiring people to go talk to their contacts . . . meeting people in bars, talking shop") .

[33]    New Yorker Article (explaining that the unpaid sources "occasionally receive favors . . . such as getting their children into Western schools" though money does not change hands because of legal concerns (*e.g.*, about

1    sources in the dossier with descriptions indicating that they may have been foreign nationals

2    (*e.g.*, "'a former top-level Russian intelligence officer still active inside the Kremlin'").[34]

3         The MUR 7449 Complaint also alleges that Steele provided a copy of the dossier to

4    Fusion, which provided it to Perkins Coie, which then provided it to HFA and/or the DNC.[35]

5    Publicly available information, however, indicates that Fusion did not provide a written copy of

6    the dossier to Elias or Perkins Coie, although it did provide oral reports to Elias, who

7    summarized some of that information for HFA and the DNC.[36]  Steele reportedly provided a

8    copy of the dossier to the FBI and to a reporter at Mother Jones, which published an article about

9    it on October 31, 2016, which the MUR 7449 Complaint alleges was intended to influence the

---

insider trading or bribery laws with respect to government officials) and because payments may encourage sources to embellish)); *see also* Simpson Senate Interview at 175-76 (testifying, as to Simpson's inquiries about Steele's sources, "I was really careful throughout this process to not ask a lot of specific sourcing questions.  There are some things I know that I just don't feel comfortable sharing because obviously it's been in the news a lot lately that people who get in the way of the Russians tend to get hurt").

[34]    New Yorker Article (quoting Steele's dossier and stating that "Steele's specialty was gathering information from informed sources, many of them Russian"); *see also* Simpson Senate Interview at 87-88 (describing Steele as "the lead Russianist at MI6" but declining to discuss specific sources due to security concerns); Simpson House Interview at 164-65 (describing Steele's "specialty" as Russian intelligence and tradecraft.  Simpson described "a large diaspora of Russians around the world and people in Moscow that, you know, are talking to each other all the time" and noted that, in June 2016, "no one was really focused on sort of this question of whether Donald Trump had a relationship with the Kremlin.  So, you know, when Chris [Steele] started asking around in Moscow about this, the information was sitting there.  It wasn't a giant secret.  People were talking about it freely."  Simpson Senate Interview at 87-88 (noting also that "later," when Russia "became a subject of great controversy," "people clammed up").

[35]    MUR 7449 Compl. at 9 (alleging this fact, but without noting any source for the allegation); *see also* Simpson Senate Interview at 145, 267-69 (clarifying that "what people call the dossier is not really a dossier.  It's a collection of field memoranda, of field interviews, a collection that accumulates over a period of months" and stating that the "dossier" published on Buzzfeed represents the written work product Fusion received from Orbis); *but see* Simpson House Interview at 49-50, 81 (stating that Simpson kept Steele's dossier separate and did not incorporate it into his work product for Perkins Coie).

[36]    *See* New Yorker Article (reporting that Fusion briefed only Elias on the information in the dossier and did not send him copies of the memoranda prepared by Steele and also noting that "Elias broadly summarized some of the information to top campaign officials, including the campaign manager, Robby Mook").

1   outcome of the Presidential election.[37]  Fusion and Steele assert in response that foreign

2   nationals may work as campaign vendors if they are paid fair market value.[38]  Steele also

3   contends that the payments Fusion received from Perkins Coie and the payments it made to

4   Orbis were made at a fair market value rate.[39]

5          As stated above, the MUR 7449 Complaint also alleges that Elias and HFA violated

6   Commission regulations by substantially assisting Steele in the solicitation of contributions by

7   foreign nationals because Elias hired Fusion when he was working in an official capacity for

8   HFA as its general counsel.[40]  The Committees, Perkins Coie, and Elias assert that they did not

9   solicit, accept, or substantially assist with any contribution by a foreign national.[41]  They also

10  assert that the MUR 7449 Complaint fails to set forth any facts supporting the allegation that a

11  foreign national was involved in the decision-making of HFA or the DNC.[42]

---

[37]      MUR 7449 Compl. at 9-10 (citing David Corn, *A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*, MOTHER JONES (Oct. 31, 2016), https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/ ("Mother Jones Article")); *but see* Simpson House Interview at 103-07, 110-11 (explaining that, when Simpson first directed Steele to speak with national security press in late September or early October 2016, he did so "under the assumption at that time that Hillary Clinton was going to win the election and so there was no urgency to it . . . that nothing would be published about any of this any time likely before the election" but that, in late October 2016, after what appeared, to Simpson, to be law enforcement attempts to influence the election, Simpson and Steele returned to the press, not to influence the election, but to blow the whistle and "expose a sinister plot by Vladimir Putin, a hostile foreign power, to attempt to alter the outcome of an American Presidential election"); Simpson Senate Interview at 160-67, 177; Simpson House Interview at 61-62, 101-02, 109, 123-24 (noting, generally, that Simpson directed Steele to speak with reporters in the fall of 2016 and that Simpson may have informed Perkins Coie of that in keeping with his practice to advise clients when he speaks with reporters); New Yorker Article (reporting that HFA chairman and campaign manager did not know about Steele until Mother Jones article appeared and did not read dossier until it was published online on Buzzfeed in early 2017).

[38]      Fusion Resp. at 2; Steele Resp. at 6-7.

[39]      Steele Resp. at 6-7.

[40]      MUR 7449 Compl. at 18.

[41]      MUR 7449 HFA/DNC Resp. at 2.

[42]      *Id.*

1    **III.    LEGAL ANALYSIS**

2    **A.    Reporting Disbursements**

3        The Act and Commission regulations require political committees to report the name and

4    address of each person to whom they make expenditures or other disbursements aggregating

5    more than $200 per calendar year, or per election cycle for authorized committees, as well as the

6    date, amount, and purpose of such payments.[43]   The relevant reporting requirements under the

7    Act and Commission regulations are intended to ensure public disclosure of "where political

8    campaign money comes from and how it is spent."[44]   Disclosure requirements also "deter[] and

9    help[] expose violations" of the Act and Commission regulations.[45]

10        **1.    Disclosure of Payees of Disbursements**

11        Neither the Act nor Commission regulations address the concepts of ultimate payees,

12    vendors, agents, contractors, or subcontractors in this context.[46]   The Commission determined in

13    Advisory Opinion 1983-25 (Mondale) ("AO 1983-25") that in certain circumstances reporting

---

[43]    52 U.S.C. § 30104(b)(5), (6); 11 C.F.R. § 104.3(b)(3)(i), (ix) (political committees other than authorized committees); *id.* § 104.3(b)(4)(i), (vi) (authorized committees); *id.* § 104.9(a), (b) (all political committees).

[44]    *Buckley v. Valeo*, 424 U.S. 1, 66 (1976); *see also Citizens United v. FEC*, 558 U.S. 310, 369-71 (2010) (describing importance of disclosure requirements to serve informational interest, because "transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages").

[45]    *SpeechNow.org v. FEC*, 599 F.3d 686, 698 (D.C. Cir. 2010) (en banc); *see also Buckley*, 424 U.S. at 67-68 (explaining that disclosure requirements "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light" and that "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations" of the Act); *McConnell v. FEC*, 540 U.S. 93, 196 (2003) (concurring with the stated government interests in disclosure requirements described in Buckley — "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce" the Act and Commission regulations).

[46]    Advisory Op. 1983-25 (Mondale) at 2.  As discussed below, the Commission has since addressed the requirements of section 30104(b)(5) in certain situations not applicable to these facts.  *See* Reporting Ultimate Payees of Political Committee Disbursements, 78 Fed. Reg. 40,625, 40,626-27 (July 8, 2013) ("Ultimate Payee Interpretive Rule") (clarifying committees' obligation to report "ultimate payees" in three specific scenarios that are not vendor specific).

MUR744900095

1   committees are not required to separately report payments that the committee's vendors make to

2   subvendors when those payments are for services or goods used in the performance of the

3   vendor's contract with the committee.[47]  In that advisory opinion, a committee, Mondale for

4   President, Inc., planned to contract with a media consulting group for media related services,

5   including media production and the purchase of television and radio time.[48]  In reaching its

6   conclusion, the Commission found several facts to be significant in concluding that the

7   committee was not required to separately report or itemize payments to its vendor's subvendors:

8   (1) the vendor at issue had a legal existence as a corporation separate from the operations of the

9   committee; (2) the vendor's principals did not hold any staff positions with the committee;

10  (3) the committee conducted arm's length negotiations with the vendor that resulted in formation

11  of a final contract; (4) the vendor was not required to devote its "full efforts" to the contract and

12  expected to have contracts with other campaigns and entities; and (5) the committee had no

13  interest in the vendor's other contracts.[49]

14          The Commission has applied the analytical framework identified in AO 1983-25 when

15  considering whether a committee's reported payment to a vendor satisfies the reporting

16  requirements of section 30104(b)(5) in light of an allegation that the committee should have

17  reported the identity of a subvendor.  For example, in MUR 6510 (Kirk), the Commission found

18  no reason to believe that the respondent committee failed to adequately report disbursements in

---

[47]     AO 1983-25 (Mondale) at 3.

[48]     *Id.* at 1.

[49]     *Id.* at 3.

1    connection with payments to a media firm that subcontracted various media services.[50]

2    Applying the factors outlined in AO 1983-25, the Commission concluded that the committee did

3    not need to report the media vendor's payments to the subvendor.[51]  In MUR 6894 (Russell), the

4    respondents reported payments to a media consulting firm, which purchased media buys on

5    behalf of the respondents.[52]  The Commission found that the media consultant separately

6    contracted with the stations for air time and paid them accordingly, while also receiving

7    commissions from the respondents and concluded that the reporting did not violate the Act.[53]  As

8    in AO 1983-25, MUR 6510 and MUR 6894 both involved firms hiring subvendors that provided

9    the same type of services provided by the vendors.[54]

10         The Commission has, however, found reason to believe committees violated the Act's

11    reporting requirements in matters where the record suggests facts materially distinguishable from

12    those considered in AO 1983-25, such as when a committee reported a vendor that served merely

13    as a stand-in for payments to another particular recipient the committee avoided disclosing.  For

---

[50]    Factual & Legal Analysis at 12, MUR 6510 (Kirk for Senate, *et al.*); *cf.* Factual & Legal Analysis at 4-6, MUR 6818 (Allen Weh for Senate) (dismissing allegation that committee violated the Act by failing to itemize payments to a payroll company after committee quickly amended reports in response to RFAIs to include itemization and where committee allegedly intentionally hid said payments).

[51]    Factual & Legal Analysis at 12-13, MUR 6510 (Kirk for Senate, *et al.*); *see also United States v. Jesse Benton, John Tate, and Dimitrios Kesari*, 890 F.3d 697, 709 (8th Cir. May 11, 2018), *cert. denied*, 2019 WL 1231756 (Benton), 2019 WL 1231758 (Tate), 2019 WL 1231759 (Kesari) (Mar. 18, 2019) (noting that in AO 1983-25 and MUR 6510, "the Commission concluded that the vendors and subvendors had provided the services described by the campaign").

[52]    Factual & Legal Analysis at 1-2, MUR 6894 (Steve Russell for Congress); *see also* First Gen. Counsel's Rpt. at 3, MUR 6894 (Steve Russell for Congress) (noting that the payments in question were disbursements made by the media consultant "to a subvendor in connection with services the vendor provided to the Committee").

[53]    Factual & Legal Analysis at 1, MUR 6894 (Steve Russell for Congress).

[54]    AO 1983-25 at 1-2 (media firm planned to hire subvendors that would provide additional media services); MUR 6894 (Steve Russell for Congress) (media firm paid television stations for media buys); MUR 6510 (Kirk for Senate, *et al.*) (media vendor paid subvendor for media and communications consulting).

1    instance, in MUR 4872 (Jenkins), a committee directly hired a vendor — Impact Mail — to

2    perform phone bank services on the committee's behalf.  When the committee discovered that

3    David Duke's name and phone number appeared on caller identification for calls placed by

4    Impact Mail's phone bank, the committee took measures to conceal its relationship with Impact

5    Mail by routing its payments to Impact Mail through a second vendor, Courtney

6    Communications, and reporting Courtney Communications as the payee on disclosure reports.[55]

7    Although Courtney Communications was a vendor that provided media services for the

8    committee during the period in question, Impact Mail was not a subvendor of Courtney

9    Communications because Courtney Communications "had no involvement whatsoever with the

10   services provided by Impact Mail."[56]  Its only role was "to serve as a conduit for payment to

11   Impact Mail so as to conceal the transaction with Impact Mail."[57]

12        Similarly, in MUR 3847 (Stockman), the Commission applied the framework laid out in

13   AO 1983-25, found the matter distinguishable, and found probable cause to believe that the

14   committee violated the reporting requirements of the Act by reporting payments to a vendor,

15   which was an unincorporated proprietorship run by two committee officials, for approximately

16   $470,000 in committee expenses for a variety of purposes, including the costs of at least one

17   "subvendor" who created communications pursuant to a direct contract between the subvendor

18   and the candidate and his committee.[58]  The Commission rested its determination on the facts

---

[55]     Conciliation Agreement at 2-4, MUR 4872 (Jenkins).

[56]     *Id.* at 3-4.

[57]     *Id.* at 4.

[58]     Amend. Certification, MUR 3847 (Stockman) (Dec. 8, 1997) (available at
https://www.fec.gov/files/legal/murs/3847.pdf at 1,539); Gen. Counsel's Brief at 33-37, MUR 3847 (Stockman)
(available at https://www.fec.gov/files/legal/murs/3847.pdf at 1,416).

1   that the reported vendor's principals held positions with the committee; the vendor was not

2   incorporated; there was no formal contract between the vendor and the committee; the vendor

3   was devoted largely to the committee, worked out of the committee's headquarters, and used its

4   facilities; and the principals of the vendor held themselves out to the public as officials of the

5   committee.[59]  The Commission concluded that these facts reflected that the reported vendor

6   served as merely an intermediary for payments to other payees (including the purported

7   "subvendor") and thus, under the Act, the committee was required to report the true purpose and

8   recipients of the payments made through the vendor.[60]

9        More recently, in MUR 6800 (Ron Paul 2012), committee officials directly hired Iowa

10   state senator Kent Sorenson and negotiated the terms of his compensation.[61]  Sorenson was

11   compensated through an intermediary — ICT, Inc. — so that the committee could conceal

12   payments made to him.[62]  Similarly, in MUR 6724 (Bachmann), Bachmann's committee and

13   Sorenson agreed that he would be paid by the committee through an intermediary — C&M —

14   that simply added Sorenson's monthly payments to the monthly fees it was already collecting

15   from the committee.[63]

---

[59]    Conciliation Agreement at 6-7, MUR 3847 (Stockman) (available at
https://www.fec.gov/files/legal/murs/3847.pdf at 1,576).

[60]    Gen. Counsel's Brief at 37, MUR 3847 (Stockman); Conciliation Agreement at 7, MUR 3847 (Stockman).

[61]    Factual & Legal Analysis at 1-6, 10, MUR 6800 (Ron Paul 2012)

[62]    *Id.* at 4, 10; *see supra* note 51.

[63]    Factual & Legal Analysis at 2-3, MUR 6724 (Bachmann for President); *see* Conciliation Agreement at 2,
MUR 6724 (Bachmann for President).

1          The Commission has also addressed the requirements of section 30104(b)(5) in certain

2    situations not applicable to the facts presented here.[64]  In the Ultimate Payee Interpretive Rule,

3    the Commission clarified a committee's obligation to report "ultimate payees" in three specific

4    scenarios not articulated in the Act or Commission regulations:  (1) reimbursements to

5    individuals who advance personal funds to pay committee expenses; (2) payments to credit card

6    companies; and (3) candidates who use personal funds to pay committee expenses without

7    reimbursement.[65]  Although HFA and the DNC reference this rule in support of their claim that

8    they correctly reported the payments that were paid through Perkins Coie to Fusion,[66] the

9    Ultimate Payee Interpretive Rule clearly states that it does not apply to the issue of vendors and

10   subvendors:  "[T]he Commission is only addressing the three issues at hand and is not extending

11   the clarification to situations in which a vendor, acting as the committee's agent, purchases

12   goods and services on the committee's behalf from subvendors.  The relationship between

13   committees and its vendors raises different issues than the relationships that exist in these three

14   circumstances."[67]

15          HFA and the DNC also rely on MUR 6698 (United Ballot PAC), in which there was an

16   insufficient number of votes for the Commission to find reason to believe that a candidate

---

[64]       *See* Ultimate Payee Interpretive Rule, 78 Fed. Reg. at 40,625.

[65]       Ultimate Payee Interpretive Rule, 78 Fed. Reg. at 40,626.

[66]       MUR 7291 HFA Resp. at 4; MUR 7291 DNC Resp. at 4; MUR 7331 HFA/DNC Resp. at 13-14; MUR
7449 HFA/DNC Resp. at 5.

[67]       Ultimate Payee Interpretive Rule, 78 Fed. Reg. at 40,626.  The interpretive rule stemmed from a Directive
69 request that also addressed only those three factual scenarios, with no mention of broader applicability.  *See*
Memorandum to the Commission from Patricia C. Orrock, Chief Compliance Officer, et al., Regarding Request for
Guidance from the Commission, Pursuant to Directive 69, regarding Itemization of Ultimate Payee of Committee
Disbursements (LRA #912, Itemization of Ultimate Payee), FEC (Oct. 12, 2012).

1    committee violated the Act by failing to properly disclose a payment that was passed through

2    two intermediary entities before being used by a state-registered political organization, United

3    Ballot PAC, to pay for get-out-the-vote activity on the candidate's behalf.[68]  The First General

4    Counsel's Report in MUR 6698 analyzed the candidate committee's use of the intermediary

5    entities as distinguishable from the material facts of AO 1983-25, concluding that they were used

6    in an apparent attempt to conceal from the public the arrangement with United Ballot PAC.[69]  In

7    their Statement of Reasons, three Commissioners explained their position that the Ultimate

8    Payee Interpretive Rule does not address such a scenario and distinguished the matter from MUR

9    4872 (Jenkins) and MUR 3847 (Friends of Steve Stockman), stating that there were factual

10   differences between those MURs and MUR 6698.[70]

11        Here, though not as stark as the more recent examples in which the Commission or this

12   office has distinguished AO 1983-25, there is reason to believe that HFA and the DNC did not

13   report the appropriate payee with respect to Fusion.  The present transaction differs substantially

14   from the arrangement the Commission approved in AO 1983-25, and the record suggests that,

15   through their counsel, HFA and the DNC authorized the hiring of Fusion for research services

16   that should have been reported as payments to Fusion rather than as payments to Perkins Coie.

---

[68]     Certification, MUR 6698 (United Ballot PAC) (Feb. 25, 2016); First Gen. Counsel's Rpt. at 8-16, MUR 6698 (United Ballot PAC); *see* MUR 7291 HFA Resp. at 5; MUR 7291 DNC Resp. at 5; MUR 7331 HFA/DNC Resp. at 14-15; MUR 7449 HFA/DNC Resp. at 6.

[69]     First Gen. Counsel's Rpt. at 8-9, MUR 6698 (United Ballot PAC).

[70]     Statement of Reasons, Comm'rs. Petersen, Goodman, and Hunter at 3-4, MUR 6698 (United Ballot PAC). The Statement of Reasons did not enumerate the factual differences.

1    Contrary to the arguments of HFA and the DNC,[71] this matter does not fit cleanly within

2    the facts the Commission considered in AO 1983-25.  As an initial matter, AO 1983-25 involved

3    a media firm that planned to serve as a vendor to the committee and hire subcontractors that

4    would provide additional media services.[72]  Here, a law firm acting on behalf of the Committees

5    hired a subcontractor to continue to conduct opposition research that it had previously been

6    conducting on behalf of another client.  HFA and the DNC contend that Perkins Coie hired

7    Fusion in furtherance of the legal services it was providing, and correctly point out that legal

8    services may require the use of a range of subvendors, such as private investigators, while still

9    remaining part of the provision of legal services.[73]  In interviews with the U.S. Senate Judiciary

10   Committee and the U.S. House of Representatives Permanent Select Committee on Intelligence,

11   Simpson himself identified an example of legal support services that Fusion has provided to

12   another law firm.[74]  While the principle HFA and the DNC assert is correct, its application may

13   fairly be questioned here, where the Committees have provided little explanation of how

14   Fusion's research was related to the firm's own provision of legal services.  The Committees

---

[71]    MUR 7291 HFA Resp. at 7; MUR 7291 DNC Resp. at 7; MUR 7331 HFA/DNC Resp. at 13, 16; MUR 7449 HFA/DNC Resp. at 8; *see* 52 U.S.C. § 30108(c) (persons engaging in transactions or activity that is indistinguishable in all its material aspects from the transaction or activity approved in an advisory opinion and who act in good faith in accordance with the provisions and findings of the advisory opinion cannot be sanctioned for violating the Act as a result of their actions).

[72]    AO 1983-25 at 1-2.

[73]    *See, e.g.,* MUR 7291 HFA Resp. at 2-3, 7 (discussing, generally, law firms' use of subvendors and, specifically, Perkins Coie's use of Fusion "to support its provision of legal services"); MUR 7291 DNC Resp. at 2-3, 7 (same).

[74]    *See* Simpson Senate Interview at 20 (describing Fusion's role as "a research, strategy, consulting firm" and its clients as "corporations to law firms, various investment funds, people involved in litigation"); *id.* at 36 (testifying, with respect to litigation-related work for a different law firm, that "when you're a subcontractor to a law firm, you know, you're sort of in a lane and, you know, my lane was research, discovery, [a witness's] business practices, his activities in Russia, his history of avoiding taxes"); Simpson House Interview at 6-7 (noting that Fusion does opposition research for campaigns from "time to time" but generally works for "corporate clients and banks and large law firms").

1  submitted four responses in the instant matters, providing multiple opportunities to explain the

2  circumstances of Perkins Coie's use of Fusion's research in connection with its legal work for

3  the Committees.[75]  But the responses are limited to repeated but conclusory statements that

4  Perkins Coie "retained Fusion GPS in order to support its provision of legal services"[76] and that

5  the law firm hired Fusion to "'assist in its representation of'" HFA and the DNC.[77]  These

6  assertions fail to address the available information undermining the Committees' position that

7  Fusion's services were "used in performance of" Perkins Coie's legal services contracts with

8  HFA and the DNC.[78]  That information includes the nature of Fusion's prior and current work on

9  this matter[79] and Fusion's seeking of a client such as the DNC rather than Perkins Coie's seeking

10  of services in support of a particular legal need.[80]  Although these circumstances do not foreclose

---

[75]   MUR 7291 HFA Resp. at 2, 7, Ex. 1; MUR 7291 DNC Resp. at 2, 7, Ex. 1; MUR 7331 HFA/DNC Resp. at 17; MUR 7449 HFA/DNC Resp. at 3, 8, Ex.1.  No response provides any explanation or example of Fusion's support for, or assistance in, Perkins Coie's provision of legal services.  We recognize that attorney-client privilege may constrain a full explanation of all such "support," but note that the responses did not provide even the most basic connection between HFA's request, which may have been what Mook identified publicly in his CNN Interview, for assistance to investigate Trump's business dealings, "particularly the international aspect" of "LLCs and shell companies," and Perkins Coie's engagement of Fusion.  CNN Interview.

[76]   MUR 7291 HFA Resp. at 7; MUR 7291 DNC Resp. at 7; MUR 7449 HFA/DNC Resp. at 8.

[77]   MUR 7291 HFA Resp. at 2, Ex. 1; MUR 7291 DNC Resp. at 2, Ex. 1; MUR 7331 HFA/DNC Resp. at 16; MUR 7449 HFA/DNC Resp. at 3, Ex. 1.

[78]   AO 1983-25 at 2 (proposed subvendor would provide additional media services "used in performance of" the media firm vendor's contract with the committee); Factual & Legal Analysis at 10-11, MUR 6724 (Bachmann for President) ("[T]here is no evidence that Sorenson's services as Iowa State Chair were 'used in performance of' C&M's contract with the Committee."); *see also* Factual & Legal Analysis at 12, MUR 6510 (Kirk for Senate) (citing AO 1983-25).

[79]   *See* Simpson House Interview at 13, 19 (when asked if Simpson had a second client interested in opposition research on Trump, Simpson answers yes and states that Perkins Coie was that client); Steele Resp. at 3-4, 6-19 (not specifically taking issue with the MUR 7449 Complaint's characterization of Steele's work for Fusion as opposition research and instead arguing the absence of any violation even on assumed facts); supra note 29 (citing source characterizing Orbis's work as opposition research).

[80]   *See* MUR 7291 HFA Resp. at 2, Ex. 1 (Letter from Matthew J. Gehringer, General Counsel, Perkins Coie, to William W. Taylor, III, Zuckerman (Oct. 24, 2017) (stating that "Fusion GPS approached Perkins Coie in early March of 2016")); MUR 7291 DNC Resp. at 2, Ex. 1 (same); MUR 7449 HFA/DNC Resp. at 3, Ex. 1 (same); New

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 21 of 42

1   the possibility that Fusion's services supported Perkins Coie's legal representations of the

2   Committees, the current information raises a reasonable inference that Fusion's work was

3   principally opposition research that the Committees funded through their General Counsel and

4   was not in support of the firm's representations.

5         In addition, similar to MUR 3847 (Stockman), Elias's dual roles as a Perkins Coie partner

6   and a HFA official (General Counsel), as well as the firm's role as General Counsel,[81] is

7   distinguishable from a material fact on which the Commission determined, in AO 1983-25, that a

8   committee would not have to separately report subvendors, namely, that the vendor and

9   requesting committee had no overlapping staff.[82]  There is no question that Perkins Coie, a large

10   law firm with a variety of practice areas, is a separate legal entity from the Committees.  But the

11   degree of overlapping management here due to the nature of the role of General Counsel presents

12   the question as to whether Fusion was retained to work for Perkins Coie because Fusion would

13   be of assistance with Perkins Coie's legal work or because Fusion would be performing

14   opposition research services for HFA and the DNC (or, perhaps, both).  To the extent that Elias

15   and Perkins Coie, as General Counsel to the Committees, retained Fusion to perform opposition

16   research services for the Committees, this matter resembles those described above in which the

17   Commission found reason to believe committees violated the reporting requirements of the Act

18   by hiring vendors but reported only their payments to intermediaries.  For his part, Simpson has

19   explained that Fusion knew that Perkins Coie had a longstanding relationship with the DNC;

---

Yorker Article (reporting that Fusion persuaded Marc Elias, the general counsel for the Clinton campaign, to subsidize the unfinished research on Trump).

[81]     MUR 7291 HFA Resp. at 2, 7; https://www.perkinscoie.com/en/professionals/marc-e-elias.html.

[82]     AO 1983-25 at 3.

1   Perkins Coie has stated that it was approached by Fusion.[83]  These circumstances suggest that

2   Fusion approached Perkins Coie as a means of approaching the DNC.

3       Perkins Coie's representation of both HFA and the DNC further differs from the facts

4   identified in AO 1983-25, in which the reporting committee stated that it would have no interest

5   in its vendor's contracts with other entities.[84]  And the circumstances presented in AO 1983-25

6   appeared to concern a matter of administrative convenience, with no indication that the

7   motivation was to avoid public disclosure of the payments passed through the vendor to the

8   subvendor.  However, in the instant matter, the MURs 7331 and 7449 Complaints allege that

9   HFA and the DNC may have wanted to avoid disclosure of payments to an opposition research

10   firm during the 2016 Presidential campaign.[85]

11       In the responses filed with the Commission in MUR 7291, neither HFA nor the DNC

12   deny that they were aware that Perkins Coie was working specifically with Fusion.[86]  Further,

13   the public record indicates that HFA campaign manager Robby Mook provided the budget

14   authorization to Perkins Coie for research into Trump's businesses, and Mook has reportedly

15   acknowledged that the campaign was briefed on information likely generated from Fusion's

---

[83]     *See supra* note 20 and accompanying text; *supra* note 80.

[84]     *See* First Gen. Counsel's Rpt. at 29-30, MUR 7304, *et al.* (Hillary Victory Fund, *et al.*) (asserting that the available record in that matter indicates that HFA had authority over actions taken by the DNC during the 2016 Presidential election)

[85]     *See* MUR 7331 Compl. at 2; MUR 7449 Compl. at 1-2.

[86]     *See generally* MUR 7291 HFA Resp. at 1-8; MUR 7291 DNC Resp. at 1-8; MUR 7331 HFA/DNC Resp. at 11-17; MUR 7449 HFA/DNC Resp. at 1-8.  Simpson concedes that he did not talk to HFA campaign chairman John Podesta in 2015 or 2016.  Simpson House Interview at 107-08.  In addition, Simpson states that it would have been normal practice for Fusion to notify its client before discussing the opposition research with members of the media. Simpson House Interview at 101-02, 109, 123-24; Simpson Senate Interview at 204-07, 209-10, 277-78.  Simpson also states that he "was definitely aware that Perkins Coie represented the DNC and that they were the client." Simpson House Interview at 20; *see supra* section II.A, note 20 and accompanying text.

1    research, though he states that he did not know the source of the material at that time.[87]

2    Although press accounts include that "Mook had approved Perkins Coie's budget request for

3    opposition research without knowing who was producing it," reports also indicate that Elias, as

4    General Counsel for HFA and representing Perkins Coie which was counsel to the DNC,

5    received briefings by Fusion's majority owner Glenn Simpson on Fusion's research and briefed

6    Mook on information received from Fusion.[88]  Simpson testified before Congress that he did not

7    "specifically remember" "the genesis" of how he ended up being retained by his "second client"

8    Perkins Coie and that he believed that the DNC was his ultimate client.[89]  In their MUR 7449

9    Response, HFA, the DNC, Elias, and Perkins Coie state that Perkins Coie "billed [the

10   Committees] for the work that it did in connection with conducting and managing the Fusion

11   GPS research."[90]  As stated above, the DNC described its initial August 2016 payment to Perkins

12   Coie for Perkins Coie's "legal consulting supported by the research efforts of Fusion" as having

13   the purpose of "Research Consulting." [91]  The record also shows that Perkins Coie provided

14   compliance consulting services to the DNC, which presumably involved the review or

---

[87]        *See* CNN Interview; New Yorker Article.

[88]        New Yorker Article; *see also* CNN Interview (Mook states that he gave HFA's attorney a "budget allocation to investigate" Trump).

[89]        Simpson House Interview at 13, 19-21 (also explaining that initial contact between Perkins Coie and Fusion was with Simpson's partner and not Simpson).

[90]        MUR 7449 HFA/DNC Resp. at 3.

[91]        *See supra* note 24 and accompanying text.  As noted above, the information provided by the Committees is largely based on the letter from Perkins Coie to Zuckerman, which states that Fusion approached Perkins Coie in March 2016 and suggested that Perkins Coie retain Fusion to continue opposition research on Trump and that Perkins Coie retained Fusion in April 2016 "to perform a variety of research services" and "[t]o assist in its representation of the DNC and [HFA]."  MUR 7291 HFA Resp. at 2, Ex. 1; MUR 7291 DNC Resp. at 2, Ex. 1; MUR 7449 HFA/DNC Resp. at 3, Ex. 1.  The assertions set forth in this letter have not been verified and would need to be examined further during our investigation.  Specifically, and as noted in this report, HFA, the DNC, Perkins Coie, and Elias have not provided details regarding how Fusion's opposition research assisted Perkins Coie in its representation of the Committees.

1    production of disclosure reports filed with the Commission.  Accordingly, these circumstances

2    indicate awareness by the Committees of Fusion's opposition research role in connection with

3    the disbursements for services that were paid through Perkins Coie.

4                2.      <u>Disclosure of Purpose of Disbursements</u>

5           Commission regulations define "purpose" as a "brief statement or description of why the

6    disbursement was made."[92]  "The 'purpose of disbursement' entry, when considered along with

7    the identity of the disbursement recipient, must be sufficiently specific to make the purpose of

8    the disbursement clear."[93]  The Commission has determined that the description of purpose

9    should be sufficient to allow "a person not associated with the committee [to] easily discern why

10    the disbursement was made when reading the name of the recipient and the purpose."[94]

11    Examples of sufficient statements of purpose include, but are not limited to, dinner expenses,

12    media, salary, polling, travel, party fees, phone banks, travel expenses, travel expense

13    reimbursement, and catering costs.[95]  The Commission has concluded that "the description

14    'media' is considered as a satisfactory description for a payment that is, in fact, made for media,

15    such as the purchase of media time or media space."[96]  In addition to the non-exhaustive list of

16    examples included in the regulation, the Commission has provided guidance that a description of

17    purpose such as "Consultant-Legal" is sufficient for a disbursement to a consultant; the

---

[92]      11 C.F.R. § 104.3(b)(3)(i)(A), (B); *id.* § 104.3(b)(4)(i)(A).

[93]      *See* Statement of Policy: "Purpose of Disbursement" Entries for Filings with the Commission, 72 Fed. Reg. 887 (Jan. 9, 2007) ("Purpose Statement of Policy") (citing 11 C.F.R. §§ 104.3(b)(3)(i)(B), (4)(i)(A)).

[94]      Purpose Statement of Policy, 72 Fed. Reg. at 888.

[95]      11 C.F.R. § 104.3(b)(3)(i)(B); *id.* § 104.3(b)(4)(i)(A).

[96]      AO 1983-25 at 2.

1    sufficiency of the description is read in context with the name of the payee.[97]  Additional

2    guidance set forth on the Commission's website includes "Legal / Legal Fees / Legal Services"

3    as a sufficient description of purpose.[98]

4         During the 2016 election cycle, HFA disclosed $5.6 million in payments made to Perkins

5    Coie whose purpose was reported as "Legal Services."[99]  The DNC, during the same 2016 cycle,

6    disclosed more than $6.4 million in payments issued to Perkins Coie for the purpose of "Legal

7    and Compliance Consulting."[100]  In addition to these DNC legal expenses, the record indicates

8    that the DNC also reported one disbursement of $66,500 to Perkins Coie, for "legal consulting

9    supported by the research efforts of Fusion," with the purpose of "Research Consulting."[101]  The

10   DNC indicated in its response that this payment was "the first time it made a payment" for such

11   Fusion-supported services.[102]  And, according to Fusion's reported public statement, Perkins

12   Coie paid a total of $1.02 million to Fusion in 2016 for the purpose of conducting opposition

13   research on Trump using funds obtained from HFA and the DNC.[103]

---

[97]    Purpose Statement of Policy, 72 Fed. Reg. at 888; *see also* FEC Campaign Guide for Congressional Candidates at 103 (June 2014) (the description of purpose must be sufficiently specific such that it makes clear the reason for the disbursement when considered in conjunction with the payee's identity).

[98]    FEC, Purposes of Disbursement (last updated July 13, 2017), https://www.fec.gov/help-candidates-and-committees/purposes-disbursement; *see also* Purpose Statement of Policy, 72 Fed. Reg. at 888 (indicating that additional guidance will be posted at the URL in this footnote).

[99]    *See supra* note 26.

[100]   *See supra* note 25.

[101]   MUR 7291 DNC Resp. at 2 n.2; 8; MUR 7449 HFA/DNC Resp. at 8.

[102]   MUR 7291 DNC Resp. at 8; MUR 7449 HFA/DNC Resp. at 8.

[103]   *See* Reuters Article.

1       HFA and the DNC maintain that the purpose was correctly reported as "legal services,"

2  again on the basis that Fusion was hired in connection with the legal services provided by

3  Perkins Coie.[104]  In addressing "purpose" reporting, like they did with "payee" reporting, the

4  Committees have not provided details on how Fusion's research supported Perkins Coie's legal

5  work.  The Committees claim that the Commission recognizes that legal services can include a

6  "range of diverse legal services" including litigating, advising on trademark issues and vetting

7  staff, but the responses never state that Fusion's research was used for those services.[105]  A

8  person reading the Committees' disclosure reports would not have been able to discern that the

9  Committees were disbursing funds for the purpose of what appears to have been opposition

10  research by reading the name of the recipient (*i.e.*, Perkins Coie) together with the reported

11  purpose (*i.e.*, legal services or legal or compliance consulting).[106]  The fact that the DNC's initial

12  payment to Perkins Coie for services supported by Fusion disclosed the purpose of "Research

13  Consulting," indicates that the DNC was aware that "research" was the specific purpose of this

14  and later disbursements to Perkins Coie for its work supported by Fusion.[107]  The DNC argues

15  that all subsequent payments made to Perkins Coie "for all of its legal services" disclosed a

---

[104]       MUR 7291 HFA Resp. at 2-3, 6-7; MUR 7291 DNC Resp. at 2-3, 6-7; MUR 7331 HFA/DNC Resp. at 12-13; MUR 7449 HFA/DNC Resp. at 3-4, 7-8.

[105]       MUR 7291 HFA Resp. at 6; MUR 7291 DNC Resp. at 6; MUR 7331 HFA/DNC Resp. at 15; MUR 7449 HFA/DNC Resp. at 6-7.

[106]       *See* Purpose Statement of Policy, 72 Fed. Reg. at 888.

[107]       MUR 7291 DNC Resp. at 8; MUR 7449 HFA/DNC Resp. at 8.  Further, Advisory Opinion 1983-25 (Mondale for President), which addresses disclosure of vendor payments to subvendors, provides that a committee would be required to report an adequate description of the purpose of its payments to its vendors.  AO 1983-25 at 2; *see supra* section III.A.1.  The committee in AO 1983-25 stated that it would disclose a specific description of purpose for each payment made to the vendor, such as media consulting fees, media photocopy expenses, or media buys, which the Commission noted when it determined that the committee would not have disclose vendor payments to subvendors.  AO 1983-25 at 2.

1   purpose of "Legal and Compliance Consulting," when, in fact, subsequent payments disclosed a

2   variety of purposes including, but not limited to, "Postage & Shipping," "Travel," "Data Services

3   Subscription," and "Printing & Copying."[108]

4        Thus, the available information suggests that HFA and the DNC did not properly disclose

5   the purpose of the disbursements to Perkins Coie, for what appears to have been opposition

6   research done by Fusion.  Where respondents disclosed inadequate or incorrect purposes, the

7   Commission has held the respondents accountable, finding reason to believe that they violated

8   the Act.[109]  Nonetheless, we recommend no action at this time with respect to the Committees'

---

[108]   *Compare* MUR 7291 DNC Resp. at 2 n.2 *with, e.g.,* DNC Services Corp./Dem. Nat'l Committee 2016 October Quarterly Report at 4,463-71 (Oct. 20, 2016) (disclosing purposes of "Legal and Compliance Consulting," "Travel," "Data Services Subscription," "Postage & Shipping," "Catering, Food & Beverage," and "Printing & Copying"); DNC Services Corp./Dem. Nat'l Committee 2016 Post-General Report at 15,294-96 (Dec. 8, 2016) (disclosing purposes of "Legal and Compliance Consulting," "Travel," "Data Services Subscription," "Postage & Shipping," and "Catering, Food & Beverage").  The DNC characterizes the payments for purposes other than "Legal and Compliance Consulting" and "Research Consulting" as payments for "expenses auxiliary to its legal services." MUR 7291 DNC Resp. at 2 n.2.

[109]   *See, e.g.*, Report of the Audit Division at 13-14 (Dallas County Republican Party) (Nov. 19, 2008) (respondent disclosed an inadequate or incorrect purpose for 50 disbursements totaling $215,261 where committee sometimes reported generic purposes such as professional fees and fundraising consultant, which did not allow a person to easily discern why the disbursements were made when reading the payee and purpose together); Factual & Legal Analysis at 2-3, MUR 6204 (Dallas County Republican Party) (finding reason to believe that committee violated, *inter alia*, 52 U.S.C. § 30104(b)(5) (formerly 2 U.S.C. § 434(b)(5)); Report of the Audit Division at 12-13 (Cranley for Congress) (Apr. 23, 2008) (sample review projected $1.4 million in disclosed disbursements lacked required information including, but not limited to, missing or inadequate purposes, for which a person could not easily discern why the disbursements were made when reading the payee and purpose together); Certification, MUR 6134 (Cranley for Congress) (Nov. 19, 2008) (approving the Report of the Audit Division dated April 23, 2008 as the Factual & Legal Analysis); Conciliation Agreement at 4, 6, MUR 5635 (Conservative Leadership Political Action Committee); Final Audit Report, Conservative Leadership Political Action Committee (Nov. 29, 2004) (committee failed to disclose a correct or adequate purpose for disbursements totaling over $1.6 million).  In cases involving a limited number of disbursements or small amount of money, the Commission has dismissed the matter or referred it to the Commission's Alternative Dispute Resolution Office ("ADRO").  *See, e.g.*, Certification at 3, MUR 6518 (Newt Gingrich, *et al.*) (June 24, 2015) (referring allegations to the ADRO that respondents failed to disclose an adequate purpose for one $47,005 disbursement); MUR 6638 (Todd Long for Congress) (dismissing allegation that respondent incorrectly described the purpose of two disbursements totaling $21,667 as "check" where respondent committee corrected description and terminated).  In addition, a recent decision by the United States Court of Appeals for the Eighth Circuit rejected an argument that identifying a purpose of "audio/visual expenses" for payments that were actually compensation for an endorsement did not cause a committee's disclosure reports to be false.  *See United States v. Jesse Benton, John Tate, and Dimitrios Kesari*, 890 F.3d 697 (8th Cir. May 11, 2018), *cert. denied*, 2019 WL 1231756 (Benton), 2019 WL 1231758 (Tate), 2019 WL 1231759 (Kesari) (Mar. 18, 2019) (affirming the convictions of three former Ron Paul 2012 campaign officials for, *inter alia*, violating the Act by

1   reporting of the purpose of the disbursements, pending an investigation into whether the

2   Committees incorrectly identified Perkins Coie as the payee.

3           3.    <u>Alleged Aiding and Abetting of False Reporting</u>

4        The MUR 7449 Complaint alleges that Elias and Perkins Coie violated the Act by aiding

5   and abetting false reporting by HFA and the DNC by "funneling" disbursements to Fusion

6   through Perkins Coie.[110]  In support of this allegation, the MUR 7449 Complaint cites several

7   cases upholding convictions for aiding and abetting in *criminal* campaign finance cases but does

8   not provide support for an aiding and abetting violation under the Act in the *civil* enforcement

9   context.[111]  Elias and Perkins Coie state that these are not cognizable allegations before the

10   Commission.[112]  Moreover, the particular context here, in which Elias and Perkins Coie are also

11   the Committees' compliance counsel, presents an additional consideration counseling against an

12   aiding and abetting violation.  In light of these considerations, as well as the foregoing discussion

---

causing false campaign finance reports to be filed with the Commission) (Kesari was, and the Ron Paul 2012 Presidential Campaign Committee, Inc., is, a respondent in MUR 6800

[110]      MUR 7449 Compl. at 14-16.

[111]      *Id.* at 15-16; *see* Second Gen. Counsel's Rpt. at 6-7, MUR 6800 (Ron Paul 2012) (explaining that the Act does not have a provision akin to 18 U.S.C. § 2 that holds an individual liable for "willfully causing" reporting violations or for aiding and abetting or assisting a reporting violation)        *cf.* Factual and Legal Analysis at 2, MUR 5712 (Gov. Arnold Schwarzenegger) (finding no such liability in the context of aiding and abetting the solicitation of soft money donations); *FEC v. Swallow*, 304 F. Supp. 3d 1113, 1118 (D. Utah 2018) (striking the helping or assisting portion of the Commission's regulation codified at 11 C.F.R. § 110.4(b)(1)(iii)); Statement of Policy Regarding Treasurers Subject to Enforcement Proceedings, 70 Fed. Reg. 3 (Jan. 3, 2005) (explaining that treasurers may, in certain matters, be notified in both their official and personal capacities and that, in such matters, the Commission will make findings as to the committee and the treasurer in both their official and personal capacities).

[112]      MUR 7449 HFA/DNC Resp. at 9-10.

1   of direct liability on the part of the Committees and their treasurers, we recommend that the

2   Commission dismiss these allegations.

3           4.    <u>Conclusion</u>

4       For the reasons set forth above, we recommend that the Commission find reason to

5   believe that HFA and the DNC violated 52 U.S.C. § 30104(b)(5)(A) by failing to accurately

6   disclose the payees of disbursements but take no action at this time as to whether the Committees

7   failed to accurately disclose the purpose of disbursements.  We also recommend that the

8   Commission dismiss the allegations that Elias and Perkins Coie violated 52 U.S.C.

9   § 30104(b)(5)(A) by allegedly aiding and abetting the filing of inaccurate disclosure reports.

10   **B.**    **Foreign National Activity**

11       The Act prohibits any "foreign national" from directly or indirectly making a contribution

12   or donation of money or other thing of value in connection with a federal, state, or local election,

13   making a contribution or donation to a committee of a political party, or making an

14   expenditure.[113]  The Act's definition of "foreign national" includes an individual who is not a

15   citizen or national of the United States and who is not lawfully admitted for permanent residence

16   as well as a "foreign principal" as defined in 22 U.S.C. § 611(b), which, in turn, includes a

17   "partnership, association, corporation, organization, or other combination of persons organized

18   under the laws of or having its principal place of business in a foreign country."[114]  Commission

19   regulations also prohibit any person from knowingly soliciting, accepting, or receiving a

---

[113]    52 U.S.C. § 30121(a)(1); *see also* 11 C.F.R. § 110.20(b), (c), (f).

[114]    52 U.S.C. § 30121(b)(2); 22 U.S.C. § 611(b)(3); *see also* 11 C.F.R. § 110.20(a)(3).

1    contribution from a foreign national[115] and provide that "[n]o person shall knowingly provide

2    substantial assistance in the solicitation, making, acceptance, or receipt of a contribution or

3    donation prohibited by" 11 C.F.R. § 110.20(b)-(d) and (g).[116]

4        The Act defines "contribution" as "any gift, subscription, loan, advance, or deposit of

5    money or anything of value made by any person for the purpose of influencing any election for

6    Federal office."[117]  "[A]nything of value includes all in-kind contributions" such as "the

7    provision of any goods or services without charge or at a charge that is less than the usual and

8    normal charge."[118]  The Commission has recognized the "broad scope" of the foreign national

9    contribution prohibition and found that even where the value of a good "may be nominal or

10    difficult to ascertain," such contributions are nevertheless prohibited.[119]  Notwithstanding the

11    foreign national provisions, Commission regulations permit any person or company — foreign or

12    domestic — to provide goods or services to a political committee, without making a contribution,

---

[115]    11 C.F.R. § 110.20(g); *see also* 52 U.S.C. § 30121(a)(2) (not including the "knowingly" standard).  To solicit means "to ask, request, or recommend, explicitly or implicitly, that another person make a contribution, donation, transfer of funds, or otherwise provide anything of value."  11 C.F.R. § 110.20(a)(6) (citing 11 C.F.R. § 300.2(m)).

[116]    11 C.F.R. § 110.20(h)(1).

[117]    52 U.S.C. § 30101(8)(A)(i).

[118]    11 C.F.R. § 100.52(d)(1); *see also* 52 U.S.C. § 30101(8)(A)(i); Advisory Op. 2007-22 at 1, 5-6 (Hurysz) ("AO 2007-22") (concluding, *inter alia*, that a committee could not accept without charge election materials used in Canadian campaigns but could purchase such materials with campaign funds and the candidate's personal funds).

[119]    AO 2007-22 at 6 (citing Contribution Limitations and Prohibitions, 67 Fed. Reg. 69,928, 69,940 (Nov. 19, 2002)) ("As indicated by the title of section 303 of [the Bipartisan Campaign and Reform Act of 2002], "Strengthening Foreign Money Ban," Congress amended [52 U.S.C. § 30121] to further delineate and expand the ban on contributions, donations, and other things of value by foreign nationals.").

1    if that person or company does so as a "commercial vendor," *i.e.*, in the ordinary course of

2    business, and at the usual and normal charge.[120]

3           Commission regulations implementing the Act's foreign national prohibition further

4    provide:

> 5    A foreign national shall not direct, dictate, control, or directly or indirectly
> 6    participate in the decision-making process of any person, such as a corporation,
> 7    labor organization, political committee, or political organization with regard to
> 8    such person's Federal or non-Federal election-related activities, such as decisions
> 9    concerning the making of contributions, donations, expenditures, or
> 10    disbursements . . . or decisions concerning the administration of a political
> 11    committee.[121]

12    The Commission has explained that this provision also bars foreign nationals from "involvement

13    in the management of a political committee."[122]

14           The MUR 7449 Complaint alleges that Steele, a foreign national, conducted work on

15    behalf of Fusion in a manner that caused him to solicit other foreign nationals for information

---

[120]    11 C.F.R. § 114.2(f)(1); *see* 11 C.F.R. § 116.1(c) (defining "commercial vendor" as "any persons providing goods or services to a candidate or political committee whose usual and normal business involves the sale, rental, lease or provision of those goods or services"); Factual and Legal Analysis at 4-6, MUR 5998 (Lord Jacob Rothschild) (no reason to believe that foreign national venue owners made or facilitated a contribution by renting venue to a committee for a fundraising event and charging the committee the "usual commercial rates"). Goods or services provided at the usual and normal charge do not constitute "anything of value" under the Act, and the person providing those goods or services does not thereby make a contribution. *See* 11 C.F.R. § 100.52(d)(2).

[121]    11 C.F.R. § 110.20(i); *see* Factual and Legal Analysis at 6, MUR 7122 (American Pacific Int'l Capital, Inc.) (finding reason to believe foreign nationals "violated 52 U.S.C. § 30121(a)(1)(A) by participating in decisions involving election-related activities").

[122]    Contribution Limits and Prohibitions, 67 Fed. Reg. 69,928, 69,946 (Nov. 19, 2002); *see also* Advisory Op. 2004-26 at 2-3 (Weller) (noting that foreign national prohibition at section 110.20(i) is broad and concluding that, while foreign national could participate in committees' activities as a volunteer without making a prohibited contribution, she "must not participate in [the candidate's] decisions regarding his campaign activities" and "must refrain from managing or participating in the decisions of the Committees"). A foreign national commercial vendor may be subject to section 110.20(i), notwithstanding exclusion from the definition of "contribution" of the vendor's provision of goods or services in the ordinary course of business at the usual and normal charge. *See* First Gen. Counsel's Rpt., MURs 7350, 7351, 7357, and 7382 (Cambridge Analytica LLC, *et al.*)

1    regarding Trump, including, but not limited to, files, records, recordings, and videos.[123]  The

2    MUR 7449 Complaint further alleges that Steele did so as an agent of Fusion, Perkins Coie, and

3    HFA.[124]  Therefore, according to the MUR 7449 Complaint, Steele's solicitation of "things of

4    value" from other foreign nationals may have constituted the solicitation of contributions to the

5    committees.[125]

6           The available information indicates that Steele worked for Fusion through Orbis, which

7    appears to be a company organized under the laws of or having its principal place of business in

8    the United Kingdom and, therefore, a foreign national.  Steele, through Orbis, which appears to

9    be in the business of intelligence-based research focusing on Russia, reportedly paid "collectors"

10   of intelligence who sought and received information from unpaid sources, some or all of whom

11   may have been foreign nationals.[126]  Steele obtained the information in what appears to be a

12   commercial operation where the collectors were paid, Orbis was paid, and Fusion was paid, and

13   the available record does not indicate or suggest that any of these persons was not paid fair

14   market value for their services.  The available information does not show that unpaid foreign

15   nationals who may have provided information (and from whom Steele may have indirectly

16   solicited such information) expended funds themselves or utilized their own or others' resources

17   to gather information passed to collectors (and from the collectors to Orbis and Steele); indeed,

18   the record indicates that people were "talking freely" in Russia and some of the sources may not

19   have known they were sources, let alone that they were providing information that was being

---

[123]    MUR 7449 Compl. at 17.

[124]    *Id.*

[125]    *Id.*

[126]    *See* New Yorker Article; *see also* MUR 7449 Compl. at 17.

1 gathered by Fusion.  As such, the record does not support a reasonable inference that unpaid

2 sources in Steele's intelligence gathering chain made (or were solicited to make) contributions in

3 the form of information for the purpose of influencing an election for federal office in violation

4 of 52 U.S.C. § 30121 and 11 C.F.R. § 110.20(b).

5       Nor do Steele or Orbis appear to have solicited foreign national contributions as agents of

6 the DNC, HFA, or Fusion, as alleged in the MUR 7449 Complaint.  The Commission's

7 regulations define "agent" as "any person who has actual authority, either express or implied, . . .

8 [t]o solicit, direct, or receive any contribution, donation, or transfer of funds."[127]  Because we

9 conclude that the record does not support an inference that Steele himself solicited contributions

10 in the form of information for the purpose of influencing an election for federal office, we also

11 conclude that the record does not support an inference that Steele did so as an agent of the DNC,

12 HFA, or Fusion.  Accordingly, the available information fails to give rise to a reasonable

13 inference that Steele solicited in-kind foreign national contributions in violation of 52 U.S.C.

14 § 30121 and 11 C.F.R. § 110.20(g).[128]

---

[127]      11 C.F.R. § 300.2(b)(1)(i); Definitions of "Agent" for BCRA Regulations on Non-Federal Funds or Soft Money and Coordinated and Independent Expenditures, 71 Fed. Reg. 4975 (Jan. 31, 2006) (defining "agent" as "'any person who has actual authority, either express or implied' to perform certain actions.").  Although the Commission has not defined "agent" in the context of the ban on foreign national contributions, applying the definition set forth in the soft money rules appears appropriate given that the Commission has also referred to the meaning of "to solicit" at section 300.2(m) of the soft money rules when defining that term for purposes of section 110.20.  *See* 11 C.F.R. § 110.20(a)(6).

[128]      The available record in the instant matter differs from the record in MUR 7271 (DNC, *et al.*), in which we recommend that the Commission find reason to believe that the DNC, its contractor (Chalupa), and the contractor's firm (C&A) violated 52 U.S.C. § 30121(a)(2) and 11 C.F.R. § 110.20(g) on a record indicating that Chalupa, purportedly acting as an agent of the DNC, solicited in-kind contributions, in the form of information regarding Trump, from unpaid Ukrainian Embassy officials in 2016.  *See* First Gen. Counsel's Rpt. at 2-14, MUR 7271
      In MUR 7271, the record indicates that a Ukrainian Embassy employee reportedly "claimed that the embassy was 'coordinating an investigation' with Chalupa and 'the Hillary team'" and that the Ukrainian Embassy reportedly utilized its resources and expended funds for opposition research.  *Id*. at 5, 9 (citing Kenneth P. Vogel and David Stern, *Ukrainian Efforts to Sabotage Trump Backfire*, POLITICO (Jan. 11, 2017).

1    Similarly, because we conclude that the record does not support an inference that Steele

2    himself solicited contributions in the form of information for the purpose of influencing an

3    election for federal office, we also conclude that the record does not support an inference that

4    Elias and HFA violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20(h)(1) by substantially

5    assisting Steele in such solicitations.[129]

6    To the extent that the MUR 7449 Complaint alleges that Fusion violated the Act or

7    Commission regulations, given that we conclude above that the record does not show that

8    foreign national sources made contributions to the Committees, we further conclude that the

9    record does not support an inference that Fusion violated 52 U.S.C. § 30121 and 11 C.F.R.

10   § 110.20.

11   The MUR 7449 Complaint also alleges that Steele made a contribution or expenditure

12   prohibited by sections 110.20(b) and (f), respectively, by providing the dossier to a Mother Jones

13   journalist with the intent to influence the 2016 Presidential election.[130]  Although the MUR 7449

14   Complaint does not specify to whom Steele made the alleged contribution, and under what legal

15   theory, it alleges that Steele provided the dossier to Mother Jones to ensure that it was "widely

16   distributed" and, in doing so, to relieve HFA and the DNC of the costs of releasing the dossier

---

[129]    *See* MUR 7449 Compl. at 18.  Moreover, the available record does not indicate that Elias or Perkins Coie, as General Counsel of the Committees, knew the details of Orbis's or Steele's business practices in the collection of human intelligence.

[130]    MUR 7449 Compl. at 19, 21.  The MUR 7449 Complaint uses the word "donation" instead of "contribution," but, because the Complaint also specifies that Steele acted in connection with and for the purpose of influencing a federal election, this report analyzes this as an allegation of a foreign national "contribution."  *See id.* at 19, ¶ 73; 11 C.F.R. § 110.20(b) (prohibiting foreign national "contribution or donation … in connection with any Federal, State, or local election"); *compare* 11 C.F.R. § 110.20(a)(2) (defining "donation" for purposes of foreign national prohibitions by reference to 11 C.F.R. § 300.2(e)) *and* 11 C.F.R. § 300.2(e) (defining "donation" for purpose of soft money rules as a "payment, gift, subscription, loan, advance, deposit, or anything of value given to a person, but that does not include contributions") *with* 11 C.F.R. § 100.52(d)(1) (defining "contribution").

1    themselves.[131]  Steele's Response cites the press exemption, which provides that, except in cases

2    where the news organization is owned or controlled by a candidate, committee, or political party,

3    any costs associated with covering a news story are not contributions or expenditures.[132]  Steele

4    contends that because the journalist could not have made a contribution, donation, or

5    expenditure, it follows that Steele did not either, even if he provided the information for the

6    purpose of influencing the Presidential election.[133]

7           To the extent that the MUR 7449 Complaint alleges Steele made an in-kind contribution

8    to the Committees by distributing the dossier via Mother Jones, thereby relieving the Committees

9    of the costs of distribution, the record does not support such a conclusion because Mother Jones

10   did not, in fact, distribute the dossier when it published its article on October 31, 2016; the

11   dossier was not publicly distributed until after the election.[134]  To the extent that the MUR 7449

12   Complaint alleges that Steele made an in-kind contribution to the Committees under a theory that

13   he made a coordinated expenditure or coordinated communication, the available information

14   does not support a conclusion that Steele coordinated with either of the Committees when he

---

[131]     MUR 7449 Compl. at 20.

[132]     Steele Resp. at 13.  *See* 52 U.S.C. § 30101(9)(B)(i) (excluding from definition of "expenditure" the cost incurred in covering or carrying a news story, commentary, or editorial by any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate); 11 C.F.R. § 100.132 (same, and including websites and internet publications); 11 C.F.R. § 100.73 (same, but excluding from definition of "contribution").

[133]     Steele Resp. at 14 (citing MUR 296 (76) (Penthouse Magazine) (finding no reason to believe that magazine violated the Act by publishing an advertisement advocating the defeat of Jimmy Carter "given the overriding protection of the First Amendment" in activities of the press and that the advertisement was an effort to sell more magazines)).

[134]     *See supra* notes 19, 35, and 37 (discussing publication of dossier online in January 2017); Mother Jones Article; *see also* New Yorker Article (describing Steele speaking to Mother Jones, and other press at the time, "on background").

1   provided information to Mother Jones.[135]

2          To the extent that the MUR 7449 Complaint alleges that Steele made an indirect foreign

3   national contribution to the Committees because the Committees received a benefit or value from

4   the article Mother Jones published, we analyze whether Mother Jones's publication of the article

5   is itself a contribution or expenditure.[136]  We conclude that Mother Jones's costs incurred in

6   producing, promoting, and distributing the article appear to be exempt from the definitions of

7   "contribution" and "expenditure" under the media exemption.[137]  First, Mother Jones appears to

8   be a press entity that produces and disseminates, on a regular basis, news stories, editorials,

9   and/or commentary.[138]  Second, Mother Jones is not alleged, and does not appear, to be owned or

10  controlled by a political party, political committee, or candidate and appears to have been acting

11  within its legitimate press function when it published the relevant article because the materials

---

[135]        *See* MUR 7449 Compl. at 19 (alleging Steele provided the dossier to Mother Jones "in his personal capacity and not as an agent . . . or at the direction of, the DNC or HFA"); 11 C.F.R. §§ 109.20, 109.21 (treating coordinated expenditures and communications, respectively, as in-kind contributions); *see also* New Yorker Article (reporting that HFA chairman and campaign manager maintain that they did not know about Steele specifically until after Mother Jones article appeared).  Similarly, the Complaint does not allege and the record does not support a determination that Steele made a contribution by republishing HFA's "campaign materials."  *See* 11 C.F.R. § 109.23 (describing in-kind contribution for dissemination, distribution, or republication of materials "prepared by" a candidate or her committee).  The record shows that Fusion did not provide Steele's work product to the Committees such that they could be considered materials prepared by the campaign.  *See supra* note 36.

[136]        *Cf.* Factual and Legal Analysis at 7, MUR 6481 (RTTV America, Inc.) (dismissing allegation that domestic media company violated foreign national provisions of the Act in connection with a show aired on a Russian Federation-founded media outlet in light of facts showing U.S. citizen was "responsible for all editorial decisions relating to the content").  The record does not suggest that Steele had any direction or control over the content of the Mother Jones Article.

[137]        *See* Advisory Op. 2011-11 (Colbert) at 8-10 (describing scope of exemption with respect to different payments by press entity); Advisory Op. 2008-14 (Melothe) at 5-6 (same); Advisory Op. 2003-34 (Showtime) at 3 (same).

[138]        *See, e.g.,* Advisory Op. 2016-01 (Ethiq) at 2-3 (noting that Commission "applies a two-step analysis to determine whether this media exemption . . . applies" looking, in the first step, at "whether the entity engaging in the activity is a press entity within the meaning of the Act and Commission regulations"); Advisory Op. 2010-08 (Citizens United); Advisory Op. 2005-16 (Fired Up!); Advisory Op. 1996-16 (Bloomberg).

1   were available to the general public and they were comparable to those ordinarily issued by

2   Mother Jones.[139]

3          As for Steele, we recommend that the Commission dismiss the allegations because it is

4   not clear in general that the scope of the prohibitions in sections 110.20(b) and (f) extend to a

5   foreign national source's provision of information to press entities to use in the production and

6   dissemination of news stories about federal elections that qualify for the media exemption.[140]  In

7   addition, the support cited in the Complaint regarding Steele's suggested liability here is not

8   persuasive — the advisory opinions cited all involve foreign national direct participation in

9   political campaigns and direct contributions to political committees, a provision which is

10  discussed further below.[141]  As such, the current record does not support a reasonable inference

11  that Steele made a contribution or expenditure in violation of 11 C.F.R. § 110.20(b) or (f) by

12  providing information to Mother Jones.

---

[139]      *See* Advisory Op. 2016-01 (Ethiq) (describing second step in Commission's two-step analysis, *i.e.,* whether the press entity is owned or controlled by a political party, committee, or candidate and whether it acted in its legitimate press function); *Reader's Digest Ass'n v. FEC,* 509 F. Supp. 1,210, 1,214-15 (S.D.N.Y. 1981).

[140]      *Cf.* Factual and Legal Analysis at 7, MUR 6080 (Clarion Fund, Inc.) (finding no reason to believe a section 501(c)(3) entity violated the Act when it produced and distributed, allegedly with the funding of foreign nationals, a film, produced by a Canadian, concluding that "because the film distribution did not constitute an independent expenditure or an electioneering communication, the prohibition against foreign nationals making expenditures does not apply"); *but cf.* Factual and Legal Analysis at 6, 8, MUR 6982 (Project Veritas) (concluding that an individual — described by respondents as a reporter engaged in undercover journalism — appeared to violate the foreign national prohibition of the Act by knowingly providing substantial assistance to a foreign national in making a direct contribution to a candidate as part of that "investigative" activity, but dismissing as a matter of prosecutorial discretion); MUR 6982 Project Veritas Action Fund Resp. at 1 (Nov. 9, 2016) (characterizing the individual as a "reporter" and her activity as "undercover journalism," but making no assertion any respondent was a press entity); Advisory Op. 2005-19 (Inside Track) at 4 (concluding that statements by "a person calling into [a radio] program" would be within the radio program's legitimate press function and, therefore, the radio program's press exemption); *Reader's Digest Ass'n,* 509 F. Supp. at 1,215 ("No inquiry may be addressed to sources of information, research, motivation, connection with the campaign, etc." until it is determined that the press exemption is inapplicable).

[141]      *See* MUR 7449 Compl. at 19.

1    Finally, the MUR 7449 Complaint alleges that Steele "indirectly participated in [the]

2    decision making processes [of HFA and the DNC] concerning expenditures" by providing the

3    dossier to the Committees (indirectly through Fusion and Perkins Coie) in violation of 11 C.F.R.

4    § 110.20(i).  The available information does not support this allegation.  Steele's firm Orbis's

5    usual and normal business appears to involve providing the services it was hired by Simpson to

6    provide in the spring of 2016 to assist Fusion with research regarding Trump.[142]  No specific

7    information indicates that Orbis charged less than its usual and normal rate for those services.[143]

8    Thus, as a commercial vendor, Orbis could provide services to a political committee so long as

9    foreign nationals did not participate directly or indirectly in the committee's decision-making

10   process with regard to election related activities.

11   Steele drafted a series of memoranda based on the information he gathered (*i.e.*, the

12   dossier) and provided the memoranda, intermittently, to Fusion, which in turn shared some of the

13   information therein, but not Steele's or Orbis's work product, with Perkins Coie, which in turn

14   shared some of the information with the Committees.  The record thus supports Steele's assertion

15   that he "had no involvement in [the Committees'] decisions about how to expend their resources

16   or how to use (or not use) the information he provided in the 2016 election campaign."[144]  In

17   addition, the record reflects that Steele provided research to Fusion without suggestions, advice,

---

[142]    *See* MUR 7449 Compl. at 7-8; New Yorker Article; Simpson Senate Interview at 76-77, 82-86; Simpson House Interview at 25-26, 66.

[143]    Steele Resp. at 3; MUR 7449 Compl. at 17.  To the extent he was compensated for his services, there does not appear to be any contribution related to the work that he performed in violation of 52 U.S.C. § 30121 and 11 C.F.R. § 110.20.

[144]    Steele Resp. at 18-19.

1    or recommendations as to how the research could be used.[145]  In MUR 6959 (DNC), the

2    Commission found no reason to believe that Cindy Nava, a foreign national, participated in the

3    decision-making or management processes of the DNC by performing online research and

4    translation services for a political committee as a volunteer.[146]  As in MUR 6959, the available

5    record in the instant matter does not indicate that Steele "participated in the decision-making or

6    management processes" of HFA and the DNC.[147]  Instead, Steele provided information to

7    Fusion, which summarized some of that information, rather than forwarding Steele or Orbis's

8    work product, for the Committees' representatives.  Given these facts, the record does not

9    establish a reasonable inference that that foreign national "participated" in the Committees'

10    decision making in violation of the Act's foreign national prohibition.[148]

11           Accordingly, we recommend that the Commission dismiss the allegations that Steele

12    violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20(b), (f), (g), and (i).  We also recommend that

---

[145]     Simpson House Interview at 49 (describing Steele's dossier as "raw field memoranda" taken "from interviews with his source network").

[146]     Factual and Legal Analysis at 1-2, MUR 6959 (DNC).

[147]     *Id*. at 4.  The facts in the instant matter are distinguishable from the facts in MURs 7350, 7351, 7357, and 7382 (Cambridge Analytica LLC, *et al*.), where foreign national employees of Cambridge Analytica were embedded in the committees themselves and directly provided strategic communications and targeting advice to the committees, as supported by internal documents supplied by a whistleblower, among other evidence.  *See* First Gen. Counsel's Rpt., MURs 7350, 7351, 7357, and 7382 (Cambridge Analytica LLC, *et al.*)

[148]     *See* 11 C.F.R. § 110.20(i); Factual and Legal Analysis at 4-6, MUR 5998 (Lord Jacob Rothschild) (finding no reason to believe that foreign national venue owners violated the Act by renting a venue to a political committee where, *inter alia*, the record showed that the owners did not participate in decision-making regarding the committee's fundraising event).

1   the Commission dismiss the allegation that Elias and HFA violated 11 C.F.R. § 110.20(h)(1) and

2   dismiss the allegation that Fusion violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20.

3   **IV.   PROPOSED INVESTIGATION**

4          In order to determine whether HFA and the DNC properly disclosed payments to Perkins

5   Coie for Fusion's work, we would investigate the relationship between the Committees and

6   Fusion.  This would include a determination of who decided to hire Fusion and why it was

7   decided that their research services would be provided to Perkins Coie.  Because HFA and the

8   DNC contend that Fusion's work was in furtherance of the services provided by Perkins Coie,

9   we will seek to determine the nature of the legal services for which HFA and the DNC retained

10   Perkins Coie, to include obtaining relevant invoices Perkins Coie prepared for the Committees,

11   while also being mindful of the attorney-client privilege.  In addition, given that Perkins Coie

12   was providing compliance consulting services to the DNC, we will seek information regarding

13   who reviewed and approved the Committees' respective disclosure reports filed with the

14   Commission as it relates to their knowledge of the payments to Fusion.  We will seek to conduct

15   our investigation through voluntary means but recommend that the Commission authorize the

16   use of compulsory process, including the issuance of appropriate interrogatories, document

17   subpoenas, and deposition subpoenas, as necessary.

18   **V.   RECOMMENDATIONS**

19         **MURs 7291, 7331, and 7449**

20       1.     Find reason to believe that Hillary for America, Inc. and Elizabeth Jones in her
21               official capacity as treasurer and DNC Services Corp./Democratic National
22               Committee and William Q. Derrough in his official capacity as treasurer violated
23               52 U.S.C. § 30104(b)(5)(A) by misreporting the payee of funds paid to Fusion
24               GPS through Perkins Coie LLP;

25       2.     Take no action at this time with respect to the allegations that Hillary for
26               America, Inc. and Elizabeth Jones in her official capacity as treasurer and DNC

| | | |
|---|---|---|
| 1 | | Services Corp./Democratic National Committee and William Q. Derrough in his |
| 2 | | official capacity as treasurer violated 52 U.S.C. § 30104(b)(5)(A) and (b)(6)(B)(v) |
| 3 | | and 11 C.F.R. § 104.3(b)(3)(i) and (b)(4)(i) by misreporting the purpose of funds |
| 4 | | paid to Fusion GPS through Perkins Coie LLP; |

5    **MUR 7449**

6    3.    Dismiss the allegations that Marc Elias and Perkins Coie LLP violated 52 U.S.C.
7          § 30104(b)(5)(A);

8    4.    Dismiss the allegations that Christopher Steele violated 52 U.S.C. § 30121 and
9          11 C.F.R. § 110.20(b), (f), (g), and (i);

10   5.    Dismiss the allegations that Marc Elias and Hillary for America, Inc. and
11         Elizabeth Jones in her official capacity as treasurer violated 11 C.F.R.
12         § 110.20(h)(1);

13   6.    Dismiss the allegations that Fusion GPS violated 52 U.S.C. § 30121 and
14         11 C.F.R. § 110.20;

15   **MURs 7291, 7331, and 7449**

16   7.    Approve the attached Factual and Legal Analyses;

17   8.    Authorize compulsory process; and

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 42 of 42

1      9.     Approve the appropriate letters.

2                              Lisa J. Stevenson
3                              Acting General Counsel
4
5
6  _____
7  DATE                          Charles Kitcher
8                              Acting Associate General Counsel for
9                                Enforcement
10
11
12
13
14                             Mark Allen
15                             Assistant General Counsel
16
17
18
19
20                             Anne B. Robinson
21                             Attorney

22
23
24
25
26
27