```
1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2
     - - - - - - - - - - - - - - - x
3    THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
4                 Plaintiff,           1:21-cr-00582-CRC-1
                                       Wednesday, May 4, 2022
5    vs.                               10:04 a.m.

6    MICHAEL A. SUSSMANN,

7                 Defendant.
     - - - - - - - - - - - - - - - x
8

9    _____

10                   TRANSCRIPT OF MOTION HEARING
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE
     _____
12   APPEARANCES:

13   For the United States:     ANDREW DeFILIPPIS, ESQ.
                                JONATHAN EDGAR ALGOR, IV, ESQ.
14                              MICHAEL T. KEILTY, ESQ.
                                DEBORAH BRITTAIN SHAW, ESQ.
15                              SPECIAL COUNSEL'S OFFICE
                                145 N Street Northeast
16                              Washington, DC 20002
                                (212) 637-2231

17   For the Defendant:         SEAN M. BERKOWITZ, ESQ.
                                MICHAEL BOSWORTH, ESQ.
18                              CATHERINE YAO, ESQ.
                                NATALIE HARDWICK RAO, ESQ.
19                              LATHAM & WATKINS LLP
                                1271 Avenue of the Americas
20                              New York, NY 10020
                                (212) 906-1200
21

22   For Rodney Joffe:          STEVEN A. TYRRELL, ESQ.
                                WEIL, GOTSHAL & MANGES LLP
23                              2001 M. Street NW, Suite 600
                                Washington, DC 20036
24                              (202) 682-7000


25   (CONTINUED ON NEXT PAGE)
```

```
 1      APPEARANCES (CONTINUED):

 2      For Fusion GPS:              JOSHUA AARON LEVY, ESQ.
                                     LEVY FIRESTONE MUSE LLP
 3                                   900 17th Street NW, Suite 1200
                                     Washington, DC 20006
 4                                   (202) 261-6564

 5      For Hillary for America:     ROBERT P. TROUT, ESQ.
                                     SCHERTLER ONORATO MEAD &
 6                                   SEARS LLP
                                     555 13th Street, NW
 7                                   Suite 500 West
                                     Washington, DC 20004
 8                                   (202) 628-4199

 9      Court Reporter:              Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
10                                   U.S. Courthouse, Room 6718
                                     333 Constitution Avenue, NW
11                                   Washington, DC  20001
                                     (202) 354-3187

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Your Honor, this is

 3     Criminal Case 21-582, United States of America vs. Michael

 4     A. Sussmann.

 5              Starting with the government, please approach the

 6     podium to introduce yourselves for the record.

 7              MR. ALGOR:  Good morning, Your Honor; Jonathan

 8     Algor, Michael Keilty, Brittain Shaw, and Andrew DeFilippis

 9     for the United States.

10              THE COURT:  Good morning, Mr. Algor.  Good to see

11     a new face up there.

12              MR. ALGOR:  Same here.

13              MR. BERKOWITZ:  Good morning, Your Honor; Sean

14     Berkowitz along with Michael Bosworth, Natalie Rao, and

15     Catherine Yao on behalf of Mr. Sussmann, who is also present

16     in court.

17              THE COURT:  Okay.  Good morning.

18              Good morning, Mr. Sussmann.

19              THE DEFENDANT:  Good morning.

20              THE COURT:  I trust your commute went a little

21     more smoothly than last time?

22              THE DEFENDANT:  Yes.

23              THE COURT:  Okay.  Good.

24              All right.  How are we going to divide this,

25     Mr. Berkowitz?  We've got a lot of players today.
```

1          MR. BERKOWITZ:  Yes.  So we have spoken with the

2     relevant constituents, Your Honor.  Obviously the government

3     will speak on their behalf.  I will speak briefly on behalf

4     of Mr. Sussmann and address any questions you have with

5     respect to our filing.

6          Mr. Trout is here on behalf of HFA; Mr. Levy is

7     present and will speak on behalf of Fusion; and Steve

8     Tyrrell is here and will speak on behalf of Mr. Joffe.  The

9     other -- those are the only speaking roles that we

10    anticipate.

11          There are other people here on behalf of Perkins

12    Coie and the DNC that, to the extent that you have

13    questions, they would be welcome to address them and are

14    here to address them, but they weren't otherwise planning to

15    speak.

16          THE COURT:  That's fine.

17          What I'd like to start with are a few clarifying

18    questions, just for my benefit, from Fusion, and then we'll

19    hear from the government on the motion.

20          So Mr. Levy.

21          MR. LEVY:  Good morning, Your Honor.

22          THE COURT:  Good morning.

23          All right.  Just so that I am clear, Fusion

24    asserted the privilege over some 1,400, 1,500 documents in

25    response to the two -- or the first two grand jury subpoenas

1     it received.

2              MR. LEVY:  That's correct, at the direction of the

3     privilege-holder's counsel.

4              THE COURT:  Okay.  And we're here today about 38

5     documents that the government would like me to review in

6     camera, but I take it Fusion asserted privilege over more

7     than the 38.  You asserted privilege over the 1,500?

8              MR. LEVY:  That's correct.

9              THE COURT:  But you produced a number of documents

10    as well.  Obviously I've seen emails from Fusion employees

11    to members of the press.

12              How many documents did you roughly produce to

13    the Special Counsel?

14              MR. LEVY:  We produced hundreds of documents,

15    thousands of pages.  I don't recall the exact number, Your

16    Honor.

17              THE COURT:  Okay.  And how did you make the draw

18    between the privilege assertion and the documents that you

19    produced?  Basically anything that went to a third party you

20    produced, and internal emails you withheld.  Is that fair?

21              MR. LEVY:  We shared documents with counsel for

22    the privilege-holders, and the counsel for the privilege-

23    holders here, it's the DNC and HFA, as well as Perkins Coie,

24    the law firm that represented both of those clients.  They

25    reviewed those documents and made judgment calls about which

1    documents were privileged, and we followed those

2    instructions and included the privilege documents in a log,

3    produced the nonprivileged documents.

4         There were some internal emails that were

5    privileged --

6         THE COURT:  Okay.

7         MR. LEVY:  -- because they were communications and

8    work product conducted during the period of engagement

9    between Fusion and Perkins Coie pursuant to the Kovel

10    letter.

11         THE COURT:  Okay.  So with respect to the internal

12    emails that were generally withheld based on privilege,

13    there have been a lot of discussions in the briefs as to

14    what role Fusion was playing, whether it was playing the

15    role of a consultant or advisor to Mr. Elias for the purpose

16    of providing legal advice, or, according to the government,

17    it was providing opposition research services and public

18    relations services and interactions with the press.

19         Was there any effort made by the privilege-holder

20    to review those internal emails based on the two potential

21    roles that Fusion could have been playing in the case?

22         MR. LEVY:  I think that question's probably best

23    addressed to counsel for the privilege-holders because they

24    were the ones reviewing it.

25         It's my understanding that they were looking at

1      those emails with the understanding of what the purpose of

2      the engagement was and what the purpose of Fusion's work was

3      for Perkins Coie.

4              But I would recommend that -- I'm happy to -- I

5      have some knowledge of that, but I think it's probably a

6      question best addressed to the privilege-holder.

7              THE COURT:  Fair enough, okay.

8              Mr. Algor.

9              MR. ALGOR:  Thank you, Your Honor.

10             The government submits that there's an adequate

11     basis for Your Honor to review in camera the 38 messages

12     which we noticed in Exhibit A.

13             The parties here advance a very broad and

14     novel theory of attorney-client privilege and work product

15     protections that Fusion GPS's opposition research, which

16     clearly you can even tell from the privilege logs is exactly

17     what they're doing within this, is somehow protected under

18     the attorney-client privilege, which is based on the

19     agreement that was entered into between Perkins Coie and

20     Fusion GPS.  And that agreement -- I think where we start

21     with that, and to quote that is, "it was legal advice based

22     on defamation, libel, and similar laws in which accuracy is

23     an essential element."

24             And when you look at the materials that -- or

25     excuse me, the privilege log and the subject headings and

1    the individuals that are participating in this, nothing

2    shows that this was based on any legal advice or even

3    consultation and providing expertise to Perkins Coie so that

4    they could provide legal advice to HFA.

5             THE COURT:  Okay.  Do you dispute that one of

6    Fusion's roles, at least, or one of the purposes of its

7    engagement and its work was to inform Perkins's advice to

8    the clients as to whether particular pieces of information

9    were accurate, were true, were, you know, plausible enough

10   for the campaign to comment on?

11            MR. ALGOR:  So I think, in theory, that's exactly

12   what the engagement was meant to be.

13            THE COURT:  Okay.

14            MR. ALGOR:  I would --

15            THE COURT:  And do you think Fusion did work

16   towards that end?

17            MR. ALGOR:  It's hard to determine from our

18   vantage whether they did so based on -- because we can't

19   look at the underlying communications.  But, I mean, when

20   you look at the declarations based on Mr. Elias's

21   declaration, Mr. Mook -- and we've actually interviewed him

22   as well.  In each one of those they were taking measures to

23   shield and keep those protected materials from discovery,

24   but they were not providing -- Mr. Mook says they were not

25   providing specific legal advice regarding that and regarding

1    the defamation or libel, but, instead, providing research

2    that was then promoted -- and that's clearly been shown --

3    that was promoted throughout to the news media.

4            THE COURT:  Let's put the promotion to the side,

5    okay?  You know, I can imagine a scenario where Mr. Elias

6    picks up the phone and calls Mr. Fritsch or Mr. Simpson and

7    says, look, there's this -- there are these allegations out

8    there about X, Y, and Z.  What do you guys think?  Can you

9    do some research on that?  Give me a white paper.  Give me

10   some background, because I need to be in a position to tell

11   the campaign whether, you know, this is real or this is

12   Memorex.  And so research developed by the investigator

13   would seem to fit within that scenario.

14           I'm not saying that that's what happened, but

15   certainly that's a plausible and a factual scenario, and it

16   would be consistent with what Mr. Elias has said the purpose

17   of the engagement was.

18           Is that fair?

19           MR. ALGOR:  I think, within that, though -- when

20   you look at the Kovel doctrine, you know, within that, in

21   that instance, the advice, the expertise they were providing

22   is, is this research -- is this research legitimate in

23   providing the legal advice of whether anticipated litigation

24   would occur.  And instead, what is being done is solely to

25   shield opposition research.  And so this is --

```
1            THE COURT:  How do you know that?  I mean, I
2    don't -- how do you know that that's solely the reason
3    that --
4            MR. ALGOR:  Your Honor, there might be --
5            THE COURT:  -- Fusion was hired and what Fusion
6    did generally?
7            MR. ALGOR:  To clarify, Your Honor, there are --
8    there might be instances where, Your Honor, that may have
9    occurred, but what you see by their actions and by the -- by
10   what went out to the media and the third -- and the
11   documents that have been produced by Fusion GPS which went
12   to the media, it shows that it was pure opposition research;
13   that it was not intended to provide expertise regarding --
14   so that Perkins could provide legal advice to HFA.  And so I
15   think it's distinguishing.
16           I am not saying that there was never an
17   instance where Mr. Elias was seeking out certain expertise
18   from Fusion, but what I am saying is when you look at
19   instances -- and cabined along within this is the 38
20   messages that we've identified which is related to the Alfa-
21   Bank allegation.  And when you see that Fusion is promoting
22   all that material, it's distinguishable, clearly, from the
23   situation that Your Honor is explaining.
24           THE COURT:  And you believe that I would be able
25   to make that distinction by looking at -- let's segregate
```

1    the first 30, which I take are internal Fusion emails,

2    versus the second eight, which seem to be correspondence

3    between Mr. Sussmann and Mr. Joffe, who appear to be in an

4    attorney-client relationship at that point.

5              MR. ALGOR:  Right.

6              THE COURT:  Let's take the first 30.

7              What about the emails, based on the privilege log

8    information that you've been given, do you think I will be

9    able to use to determine whether they were created in aid of

10   a -- you know, let's call it a fact-checking operation or,

11   you know, libel consulting function as opposed to a

12   dissemination of opposition research function?

13             MR. ALGOR:  So we don't see underneath those

14   emails obviously.

15             THE COURT:  Understood.

16             MR. ALGOR:  But I do think you'll be able to tell,

17   one way or the other from how the individuals at Fusion are

18   communicating, whether they were actually doing so to

19   provide expertise to Perkins or actually creating documents

20   that would be opposition research promoted to the FBI, to

21   U.S. Congress, as well as to the media.

22             THE COURT:  Okay.  So let's look at the --

23   Exhibit A, the privilege log that you've attached.

24             And what's special about the first 30, say?  I

25   mean, why is it that these are the ones that you want the

1    Court to review?

2              MR. ALGOR:  Yes, Your Honor.  So -- and I think

3    this gets to what Mr. Sussmann's counsel is talking about.

4              We have identified Ms. Seago as a core

5    witness that can talk to the relationships between Fusion,

6    between Mr. Joffe, HFA, and Mr. Sussmann.  And so what we

7    see is -- and we've seen through public records testimony

8    from Ms. Seago about meetings with those individuals in late

9    August, and that she is the technical expert of Fusion GPS

10   who is the most immersed of all of them regarding Alfa-Bank

11   testimony -- or Alfa-Bank allegations.  So that is why we

12   were focused on the Laura Seago testimony.

13             In addition, the white -- one of the three white

14   papers that goes into the FBI is being created in and around

15   the same time that Ms. Seago is participating in meetings

16   with Mr. Sussmann and Mr. Joffe, and that white paper is

17   being created by Fusion GPS.

18             THE COURT:  Okay.  So a number of these entries

19   have an attachment which appear to be either final versions

20   or draft versions of that white paper.  Is that --

21             MR. ALGOR:  Correct, Your Honor.

22             THE COURT:  Am I reading that correct?

23             MR. ALGOR:  Yes, that's correct.

24             THE COURT:  Okay.  And depending on what the

25   emails say, you may want to introduce them through

1    Ms. Seago?

2              MR. ALGOR:  That's correct, Your Honor.

3              THE COURT:  Okay.

4              MR. ALGOR:  And it's also important context within

5    Ms. Seago's testimony about what Fusion GPS's role was

6    regarding that white paper, and also Mr. Sussmann bringing

7    those allegations to the FBI; and then subsequently the

8    Fusion GPS's role in promoting that material to the media.

9              THE COURT:  Okay.  And obviously you haven't seen

10   these emails.  You don't know what they say.  But you think

11   there is a possibility, based on the descriptions in the

12   privilege log, that they would be relevant and admissible

13   through Ms. Seago for that purpose?

14             MR. ALGOR:  Yes, Your Honor.

15             THE COURT:  Okay.

16             The defense has raised some procedural objections

17   to I think the use and introduction of the emails; namely,

18   that you have waited too long after the assertion of the

19   privilege -- on the eve of trial now -- to bring the issue

20   to me.

21             I take it you're saying that even if I were to

22   agree with them about the specific emails that have been

23   withheld, I would still have to deal with the privilege

24   issue with respect to Ms. Seago's testimony.

25             MR. ALGOR:  Yes, Your honor.  I think, when we

1    were -- and as Your Honor's calendar and the pretrial

2    schedule, when we were going through how to prove the

3    relationship between Fusion, HFA, Mr. Sussmann, and

4    Mr. Joffe, we looked at certain witnesses, and this clearly

5    was, in our view, one of the key witnesses to explain that

6    attorney-client relationship; that there were two clients

7    here, and these were the steps that were being taken.

8                And so as a result, that's when -- and we had been

9    dealing with defense counsel and other counsel regarding

10   privilege issues, and many of which we're not even bringing

11   to Your Honor.  This is really, in our view, a modest ask to

12   deal with the issues that's not just regarding the

13   documents, but also Ms. Seago's testimony.

14               THE COURT:  So if I were to rule that the 30

15   emails are not privileged, you're not going to come back to

16   me with the 1,500 that you want to review --

17               MR. ALGOR:  Your Honor, so I -- not for this

18   trial.  I do think that Your Honor's decision, though, is

19   important for other investigations and looking at it,

20   because we do think that these attorney-client work product

21   privileges arguments -- and we briefed this extensively, but

22   they just don't pass any of the tests regarding any of the

23   opposition research as compared to expertise provided and

24   legal advice.

25               THE COURT:  Okay.  Let me go back to my

1      hypothetical, all right?  What if the facts were that

2      Mr. Elias asked Fusion to create this white paper, this

3      background on Alfa and all of these connections, in order

4      for him to advise the campaign on the accuracy of any

5      statements the campaign might make in anticipation of

6      potential defamation litigation?

7                     My review of these emails is not going to tell

8      me -- is not going to confirm that factual scenario.  Or how

9      will my review of the emails tell me whether they originated

10     by -- you know, from Mr. Elias or someone else at Perkins in

11     connection with legal advice or whether they originated some

12     other way?

13                     MR. ALGOR:  So, Your Honor, there are a few things

14     there.

15                     THE COURT:  All right.

16                     MR. ALGOR:  So first, that's part of the problem

17     here, is that we don't have the specificity regarding what

18     was actually -- you know, whether this was explicit from

19     Mr. Elias regarding -- in relation to expertise and

20     providing legal advice to HFA.  We have no idea about this.

21     This, from the face of it, when you look at it, is them

22     creating opposition research and a white paper that's being

23     provided to the FBI and others.

24                     And so we can't make that determination, and

25     there's never been an explanation, except through broad

1    strokes, that Fusion GPS was engaged in providing expertise

2    to -- and so you see that in the declarations of Mr. Mook,

3    Mr. Podesta's declaration as well.  There's no real

4    indication here that any of these specifically related to

5    what we've identified, that this was in relation to

6    providing legal advice to HFA.

7          Second, I think also, Your Honor, when we look at

8    Ms. Seago's communications with Mr. Joffe, I think we also

9    argue that there is no privilege there, that that was broken

10   because Mr. Joffe never engaged or retained or had any type

11   of agreement, at least as far as we're aware of, for Fusion

12   GPS to provide.

13         THE COURT:  Why does that matter, who retained

14   Fusion?  If Mr. Sussmann says, look, you know, I think, you

15   know, Mr. Elias has a relationship with Fusion.  These guys

16   are experts.  I think we should check with them as to the

17   information that you've developed, Rodney.  You know, I'd

18   like for you to talk to them.  I'd like for you to have a

19   conversation with them.  And that's part of an attorney-

20   client relationship between Mr. Sussmann and Mr. Joffe.  How

21   is that not privileged?  Why isn't Seago an intermediary in

22   that scenario?

23         MR. ALGOR:  Because the actual -- it's prepared

24   for the benefit of another client in this instance, and

25   so -- HFA, and so there would have to be some indication

1     that Mr. Joffe was entering into an agreement also to

2     receive that benefit.

3            And so I think it does break -- and that that --

4     and so I don't think that that actually follows with what

5     Your Honor's description is.

6            THE COURT:  Even if Mr. Sussmann is cc'd on the

7     chain and it bears an attorney-client header indicating that

8     everyone assumed that the communications would be

9     confidential?

10           MR. ALGOR:  Well, I don't think just because -- I

11    mean, as Your Honor is aware from your prior practices, I

12    think most people in this courtroom are aware, there are

13    emails that have attorney-client privilege at the bottom

14    that people put on that.  That doesn't necessarily mean that

15    it is attorney-client privilege.

16           In addition, just because they're claiming that,

17    doesn't mean that it's true as well.

18           And I think within that, also, when we look at it,

19    we look at it from a business interest, not from a legal

20    interest within that relationship.  And so meaning there was

21    an interest in promoting this, but the legal interest in --

22    from legal advice, from defamation or libel, was not in the

23    same regarding that, and so the agreement's not there

24    regarding the parties.

25           THE COURT:  But I understand that the argument --

1    the privilege argument with respect to the Joffe/Sussmann/

2    Seago communication to be somewhat different than just

3    defamation risk.

4         This is Mr. Sussmann giving Mr. Joffe advice about

5    the use and dissemination of the information and Ms. Seago,

6    interposed as an intermediary, to aid in the provision of

7    that advice.  Why isn't that not a fair assessment of what's

8    going on?

9         MR. ALGOR:  So, again, Your Honor, we don't know

10   what that actually says.

11        THE COURT:  I know.

12        MR. ALGOR:  And so what we're saying here, though,

13   is that nothing of this shows from -- the actions of Fusion

14   and what we see from the privilege log, that this was in

15   furtherance of legal advice.  And so Seago's being on with

16   Joffe, that that is --

17        THE COURT:  But your whole theory is that

18   Mr. Sussmann was in the meeting representing Joffe as

19   part of an attorney-client relationship, so obviously there

20   was provision of legal advice, based on your theory, from

21   Mr. Sussmann to Mr. Joffe.

22        MR. ALGOR:  Correct.  And I don't think that --

23   that's not -- that's distinguished from that -- that

24   Mr. Sussmann was going and representing the Clinton Campaign

25   and Mr. Joffe in that meeting is separate from Fusion GPS's

```
 1    opposition research; and so that's, I think, the distinction
 2    within those communications.
 3              THE COURT:  Okay.
 4              MR. ALGOR:  And, Your Honor, subsequent to any
 5    other questions you have --
 6              THE COURT:  That's fine.  Thank you.
 7              MR. ALGOR:  Thank you, Your Honor.
 8              THE COURT:  All right.  Who is up first?
 9              MR. BERKOWITZ:  Good morning, Your Honor.
10              THE COURT:  Good morning.
11              MR. BERKOWITZ:  We'll be brief subject to any
12    questions that you have.
13              The government chose to charge a case with
14    attorneys and privilege all over the place.  It's almost a
15    law school hypothetical where it's everywhere you turn, and
16    we're going to have to deal with issues at trial.
17              What our concern is is that this motion was filed
18    on April 6th.  We're now less than two weeks before trial.
19    And while they're talking about 38 documents, the reality is
20    that if Your Honor were to make a ruling that privilege
21    doesn't exist with respect to some of those documents, we're
22    looking at a ripple effect that could cover 1,400 or 1,500
23    other documents.
24              We have to take a look and evaluate and analyze
25    what else is out there.  We also have to think what the
```

1    implications are from testimony from a witness who we don't

2    have any information about what it is she would say on these

3    issues.  And honestly, it would prejudice Mr. Sussmann to a

4    tremendous extent at this late stage to make a ruling on

5    privilege.

6             The government responds --

7             THE COURT:  Don't I have to make a ruling with

8    respect to Ms. Seago's testimony?  They're entitled to ask

9    her what they're going to ask her, and if her counsel claims

10   privilege, then I've got to resolve that, and it seems

11   likely that that would happen.

12            MR. BERKOWITZ:  It does seem likely that that

13   would happen, Your Honor.  And that's an issue that,

14   frankly, could have been addressed well before putting her

15   on the stand.

16            THE COURT:  Yes, but that's different than the

17   subpoena issue.

18            MR. BERKOWITZ:  Yes.  And so if we have to deal

19   with that, then we have to deal with the particular

20   questions and answers that they're going to ask her, and you

21   can rule based on what you do.  Having thousands of

22   documents that may get called into issue is an entirely

23   different situation and analysis here.

24            Ms. Seago --

25            THE COURT:  And why is it a different analysis?  I

1    suppose the documents raise work product whereas her

2    testimony certainly would raise attorney-client, but maybe

3    not work product.

4              MR. BERKOWITZ:  Correct.  And it is --

5              THE COURT:  I'm just thinking out loud.

6              MR. BERKOWITZ:  Yes.  But what it also

7    encompasses, Your Honor, is if you rule in a particular way,

8    it could call into question other documents that we're going

9    to need to analyze and look at that may be relevant on

10   issues.  And what we're saying is that that exercise of

11   having to go through and look at all those and re-evaluate

12   privileges that have been asserted since, frankly, last

13   summer is something that would prejudice us to have to do.

14             If she gets up there and testifies consistent with

15   what the privilege assertions are, I would expect that, you

16   know, there's good faith associated with those types of

17   assertions, if a lawyer's doing that, and you can make that

18   determination based on what the lawyer's representation is.

19   I don't think that you need to look at dozens of documents

20   and potentially thousands of documents with a ripple effect

21   associated with that.

22             It then blends into some relevance, Your Honor,

23   which I don't want to mess up too much.  But the concept

24   that Ms. Seago is going to talk about, the relationship and

25   the existence, they have the information that they need, as

1    we talked about last time in connection with the motions in

2    limine.  It's unclear what it is they intend to speak with

3    her about, and it is unfathomable that the concept of

4    privilege and concerns about those privileges literally just

5    occurred to them when we were arguing the motions to

6    dismiss.

7         To the extent that the Fusion relationship with

8    Perkins Coie and Mr. Sussmann and others was relevant,

9    that's something that they've known for a long period of

10   time, and they have information that is out there that has

11   been produced that they're able to prove their case or not.

12        They charged the case.  The fact that this

13   issue is still, you know, an open one for them ten days

14   before trial is really on them; it's not on the Court or on

15   Mr. Sussmann to have to deal with.  This is an issue that

16   very well could have been addressed a long time ago.

17        And to the extent that, you know, they are going

18   to try and breach the privilege, frankly, with respect to

19   Ms. Seago or otherwise, they should have dealt with that

20   before.  She told them in July of 2021 that this privilege

21   existed.  If they had an issue or a concern, they should

22   have raised it then.  Frankly, anything related to that

23   could prejudice us.

24        We don't know what she would say or what the

25   issues are.  There's no 302.  There's no report of

1    interview.  And opening that can of worms is something, from

2    a timing perspective, that would be entirely inappropriate.

3                    THE COURT:  All right.  Finish your thought.

4                    MR. BERKOWITZ:  One other piece, Your Honor, as we

5    noted in our motion.  Their theory seems to be that there's

6    some conspiracy between the parties to work in concert.

7                    What we do know, from discovery that's been

8    produced, is there was an email that was sent to a reporter

9    by Fusion.  It's cited in a footnote in our brief from

10   Mr. Fritsch to Mr. Hosenball on October 5th of 2016.

11                   THE COURT:  The DNS is not us.

12                   MR. BERKOWITZ:  I'm sorry?

13                   THE COURT:  The DNS is not us.

14                   MR. BERKOWITZ:  Exactly.  The background paper is

15   unrelated to all the Alfa-Bank, DNS -- the white paper is

16   unrelated to the DNS information.  And so the speculation

17   that it's related is inconsistent with the discovery that's

18   been produced.

19                   So, Your Honor, really there are counsel here who

20   can talk about their good faith in asserting the privilege,

21   and you can ask them whatever questions.  Our main issue is

22   that we're less than two weeks from trial, and this is a

23   topic that could and should have been dealt with much

24   earlier so that we're not here.

25                   The cases that they cite are -- the three cases

1    they cite in their reply are not anywhere close to this.

2    They're crime fraud exception, all three of them, and they

3    are, you know, a minimum of six to eight months before the

4    trial, and those cases were to have -- were to have come

5    about.

6          THE COURT:  Right.  Well, look, I mean, what if I

7    were to agree with the government that, you know, internal

8    communications -- and obviously I don't know what these

9    emails say, but internal communications about an effort to

10   create and disseminate opposition research -- and I'm not

11   putting a derogatory meaning on "opposition research"; it's

12   done all the time; it's commonplace -- but that that does

13   not, under the case law, fall within the attorney-client or

14   work product privileges, and therefore allow them to inquire

15   of Ms. Seago as to internal communications with other Fusion

16   employees about that effort.

17         How does that create ripple effects?  How does

18   that materially prejudice your trial preparations?  That's a

19   pretty straightforward line of inquiry.

20         And you obviously already know about all of the

21   communications with the press from Fusion.

22         MR. BERKOWITZ:  So part of it depends on your

23   motion in limine rulings in terms of what the proper scope

24   is for any of that.

25         THE COURT:  Yes, which is one reason I haven't

 1    issued it yet because this is all somewhat related.

 2         MR. BERKOWITZ:  And I wasn't being critical.  I'm

 3    just saying to answer your question, I need to know the

 4    parameters.

 5         What I would say, Judge, is it's hard to answer

 6    your question directly because I don't know what she would

 7    say and what implications on what she would say would have

 8    and whether it would need to be addressed and put in

 9    context, in a broader context, from other witnesses and

10    other documents.  And so I'm a little bit in the dark about

11    the implications of what it would mean.

12              What I can tell you is that it would cause us

13    to re-evaluate defense strategy and other issues and have to

14    address what she says, how she says it, and what its impact

15    on Mr. Sussmann is.

16         And so it could be almost nothing, but it could be

17    a tremendous amount of information.

18         THE COURT:  All right.  Thanks.

19         Before we hear from the privilege-holders, if the

20    government could address this issue, the ripple effect and

21    trial prep and timing issues.

22         MR. ALGOR:  Yes, Your Honor.

23         I don't think we -- obviously, when we presented

24    this, we cabined it to a relevant witness that we expected

25    would testify at trial and a limited number of documents

1    regarding that, and so I don't -- the issue regarding Fusion

2    GPS's role is well known to the defense.  It's been briefed

3    in a number of motions in limine; and as Mr. Berkowitz

4    references, we're obviously aware of potential differences

5    regarding our case-in-chief depending on Your Honor's

6    rulings.

7            But in our view, this is key evidence regarding

8    the two attorney-client relationships and how Fusion GPS

9    and HFA were related within that and intertwined; and she

10   is the sole Fusion GPS witness tied to Mr. Joffe, HFA, and

11   Mr. Sussmann.

12           THE COURT:  Okay.

13           All right.  Who is next?

14           MR. TROUT:  Good morning, Your Honor; Robert Trout

15   for the Hillary Clinton Campaign, also known as Hillary for

16   America or HFA.

17           THE COURT:  Good morning, Mr. Trout.  Are you

18   hitting them straight these days?

19           MR. TROUT:  Doing my best, Your Honor.  I've got a

20   new hip so it's going to be a while before I get through 18.

21           Your Honor, the government here has an erroneously

22   cramped view of the attorney-client privilege and the

23   attorney work product, and it has an erroneously expansive

24   view of waiver.  And I think the problem is is that they

25   have this binary choice, which we regard to be a false

1    choice, between is it opposition research or is it covered

2    by the privilege or attorney work product?  It can't be

3    both, according to the government.  And that, I think, is a

4    false choice, and I think this case, as much as any case,

5    illustrates the point.

6              Let me -- I know that everybody is anxious to

7    relive the 2016 presidential election, but let me just hit a

8    few of the highlights.

9              In April of 2016, that was when Fusion was engaged

10   by Perkins Coie, and at that time Donald Trump was clearly

11   the presumptive nominee of the Republican party, and Hillary

12   Clinton was, by all accounts, going to be the nominee of the

13   Democratic party.

14             In April of 2016, Donald Trump famously was

15   refusing to disclose his tax returns.  He owned and

16   controlled a private corporation with far-flung operations.

17   It was largely opaque, although there were a number of

18   bankruptcies and failed businesses.

19             Candidate Trump had made statements regarding

20   Vladimir Putin that, to put it euphemistically, were

21   unconventional.  He and President Putin had exchanged

22   admiring comments about each other in contrast to what was

23   the conventional wisdom, which was that Vladimir Putin, at

24   least as expressed by candidates at the time, was a thug, a

25   murderer, and autocrat, and an abuser of human rights.

1          As the campaign went on, as we know, the DNC was

2     hacked by Russian hackers, and in due course, in the summer

3     of 2016 -- in July, I believe it was -- a would-be Commander

4     in Chief invited a foreign adversary, Russia, to conduct a

5     cyber attack against a U.S. citizen.

6          At the same time, Your Honor, Donald Trump was

7     notorious for using litigation as a weapon against his --

8     anyone who was adverse to him, whether it was a family

9     member, whether it was a business competitor, or whether, in

10    this case, it was a political opponent.

11         It is true Donald Trump was an opposition

12    candidate to Hillary Clinton.  It is true that the campaign

13    wanted to do due diligence.  Call it due diligence, call it

14    research, call it fact-finding, but they wanted to get the

15    facts regarding the obvious issues that were going to come

16    up in the campaign relating to his business and any

17    connections he might have had to Russia.

18         It couldn't have been more obvious.  And so, as

19    the campaign heated up and took center stage, it was also

20    obvious that litigation was a genuine risk of whatever the

21    Hillary Clinton Campaign was going to be doing about these

22    important issues that were going to be center stage in the

23    campaign.

24         Was it obvious that the campaign would be well-

25    served by getting as much accurate information as it could?

1    Of course.

2            Was it obvious that the campaign would -- how

3    would the campaign go about getting that factual information

4    in the context of these opaque business operations and

5    potential Russian connections?  You go to a law firm.  It's

6    obvious.  And that's what they did.

7            So when they talk about -- when the government

8    talks about, well, this is just opposition research, we say,

9    Mr. Elias said, no, it may have been research about an

10   opposition candidate, but the real purpose for us doing this

11   is we wanted to get our facts straight.  We wanted to know

12   what we were talking about.  We wanted to -- yes, we wanted

13   to uncover this material, but we wanted to do it accurately

14   because we fully expected, and as the Court knows, HFA,

15   Hillary Clinton, John Podesta, and others have all been sued

16   by Donald Trump on the very issues that are in this case.

17           And so --

18           THE COURT:  Well, be that as it may, and I may not

19   disagree with anything you just said, but isn't the question

20   before me whether the specific work product at issue or the

21   specific communications -- let's start with work product --

22   were created in anticipation of litigation?

23           MR. TROUT:  Correct.

24           THE COURT:  Now, if, as I spun out in my hypo to

25   the government, White Paper No. 2 and all of the research

1    that it includes was created in order to assist Mr. Elias in

2    providing advice to the White House or to the campaign about

3    potential litigation risk or defamation risk given the

4    opposing candidate's litigiousness, that's one thing.

5    Right?

6            But you've seen the emails that were produced, and

7    when, you know, Fusion tells a reporter, "Do the F-ing

8    Alfa-Bank secret comm story; it's hugely important; forget

9    the WikiLeaks sideshow," how is that assisting Mr. Elias in

10   providing legal advice to the campaign?

11           MR. TROUT:  So, Your Honor --

12           THE COURT:  That seems a much more direct --

13   that's assisting a media relations strategy.  It's getting

14   the information out into the public realm.

15           MR. TROUT:  And that has been produced.

16           THE COURT:  Fine.  So what if the email that was

17   withheld is talking about, you know, this is the document

18   that we need to get to the *New York Times* in order to push

19   this story?  Wouldn't that fall within the same purpose as

20   the actual communications with the press that were produced?

21           MR. TROUT:  Well, Your Honor, I'm --

22           THE COURT:  I don't know what they say.

23           MR. TROUT:  Yes.  I think that that's the core

24   problem here.

25           Let me expand a little bit on this point that --

```
1              THE COURT:  So I guess my question is -- I read
2      Mr. Elias's declaration.  I understand, from his
3      perspective, the purpose of Fusion's retention, and it may
4      well have done research that directly facilitated legal
5      advice or defamation risk.  But I'm not convinced that that
6      is a basis for a blanket assertion of the privilege over
7      every internal email, which I understand the campaign and
8      the DNC has asserted.
9              MR. TROUT:  Well, I think the point, though, Your
10     Honor, is that when we looked at the -- at what should be
11     produced and made the judgment, no, this should be produced,
12     it was mindful of the very point that you are raising.
13              But I do think that it is also true that a -- in
14     this case, Fusion, Fusion was individuals who had a history
15     in journalism at the Wall Street Journal, and they know
16     other journalists.  And so at such time as they were
17     satisfied that, yes, this is a real issue that deserves to
18     be put out there, I think there's nothing wrong with the
19     campaign deploying the talents that were available to it to
20     see to it that the message got out.  And if that meant --
21              THE COURT:  I don't think anyone is saying there's
22     anything wrong with it.
23              MR. TROUT:  Right.
24              THE COURT:  The question is whether that's
25     privileged or not.
```

1          MR. TROUT:  Right.

2          And when they communicated with the, you know,

3     press for that purpose, they -- yes, they are making that

4     available.  It's not privileged, and it was produced.

5          I think it's important to remember, whenever a

6     lawyer makes a presentation to a judge or jury and, you

7     know, presents a narrative to a judge or jury or, for that

8     matter, when a lawyer makes a presentation to the Department

9     of Justice, a written submission, for example, or a Wells

10    submission to the SEC, they are using the results of

11    attorney work product to make that submission, and yet no

12    one would suggest that even an early draft of a Wells

13    submission should be produced, that there's some sort of a

14    waiver.

15          THE COURT:  Yes, I get you on the waiver issue.

16          MR. TROUT:  Okay.

17          And the last point I would make on waiver, Your

18    Honor, is that they have referred to various disclosures --

19          THE COURT:  But using an intermediary to help

20    develop a Wells submission may be different than what this

21    intermediary did, at least in some circumstances.

22          MR. TROUT:  I'm sorry, Your Honor.  I just wasn't

23    following your point.

24          THE COURT:  Yes.  So I take it that provision of a

25    final Wells submission to the SEC is not going to waive all

 1      drafts.

 2              MR. TROUT:  Right.

 3              THE COURT:  Because the accountants who were

 4      helping you with the Wells submission were working as an

 5      intermediary consistent with the case law to develop a legal

 6      strategy with litigation either anticipated or there.  I

 7      think that does not necessarily mean that Fusion's

 8      activities here fell within the intermediary doctrine.

 9              MR. TROUT:  Well, but some of them certainly could

10      have, and some of them may have involved actually making

11      disclosures to the press.  And those activities in which

12      they made disclosures to the press, they are appropriately

13      disclosed to -- they are appropriately not withheld on

14      grounds of privilege, and they weren't here.

15              But that doesn't mean that -- because they have

16      had those disclosures that don't fall within the privilege,

17      that doesn't mean that they are -- that all of their

18      internal disclosures or all of their internal communications

19      shouldn't be privileged.

20              THE COURT:  I agree with that so long as they're

21      in anticipation of litigation.

22              MR. TROUT:  I understand.  And if there is one

23      thing, Your Honor, that it seems to me is clear is there

24      is -- there was every reason to anticipate litigation in

25      this particular case.

1            And the final point that I would make, Your Honor,

2     is that a lot of the government's argument, to me, sounds

3     like Mr. Elias's sworn statements are not to be believed;

4     and I just don't think that's appropriate.  I understand the

5     context in which we're here, but I do not believe it is

6     appropriate for the government to rely on an argument that

7     Mr. -- essentially it's just kind of made up because of

8     their perception of how a general counsel for the campaign

9     ought to have done things.

10           And so, on the basis of kind of a pretty sketchy

11    record or scant record, they are essentially saying it

12    wasn't done that way here; and, therefore, Mr. Elias

13    shouldn't be believed.  I don't think that that's proper and

14    appropriate under the circumstances.

15           THE COURT:  Okay.  If I decide to review the 38

16    emails, are there any emails that the Campaign would like me

17    to review that might support its position that Fusion's

18    internal communications on these issues were for the purpose

19    of providing legal support as opposed to pure opposition

20    research and dissemination that is not covered by the

21    privilege?

22           MR. TROUT:  Your Honor, I don't -- as I stand

23    here, I don't have anything in mind to suggest that, but I

24    do think that Mr. Elias is entitled to go about his business

25    in the way that he thinks is appropriate and to essentially

 1   assimilate the information as he feels it's appropriate and

 2   to respond as he feels it's appropriate.  If that's in a

 3   phone call as opposed to an email, so be it.  That's up to

 4   Mr. Elias.  And I think he was very clear about that.

 5               THE COURT:  Okay.  Very well.  Thank you.

 6               MR. TROUT:  Thank you.

 7               MR. TYRRELL:  Good morning; Steven Tyrrell on

 8   behalf of Rodney Joffe.

 9               THE COURT:  Good to see you, Mr. Tyrrell.

10               MR. TYRRELL:  Nice to see you, Judge.  It's been a

11   long time.

12               Your Honor, I don't know that I can articulate our

13   arguments any better than you have through your pointed

14   questions to the government, but perhaps I could provide a

15   little context and make a few key points.

16               As you've recognized, Mr. Joffe stands in a very

17   different position than HFA.  These are separate

18   relationships.  The eight emails or the four emails -- eight

19   documents in total -- are different from the bulk of the

20   material that are the subject of the Special Counsel's

21   motion.

22               In terms of context, Your Honor, Mr. Joffe, in the

23   summer of 2016, received some information from some

24   researchers regarding a potential connection between a bank

25   in Russia and the Trump organization.  Mr. Joffe didn't

1    discover that data, he didn't instigate that research, but

2    he instantly recognized that it was very sensitive

3    information.  And he had relationships with law enforcement

4    and the intelligence communities, so he went to a lawyer,

5    who had advised him for five years in the past, to discuss

6    the implications of the data and what to do with it.  That

7    lawyer was Mr. Sussmann.

8             And, again, he had an existing relationship with

9    Mr. Sussmann that went back quite some time.  And Your Honor

10   has already touched upon some of the subject areas that he

11   sought advice about from Mr. Sussmann.

12            Now, in the context of that established

13   relationship, it was suggested that Mr. Joffe attend a

14   meeting with representatives of Fusion and with Mr. Elias.

15            Prior to that meeting, Mr. Joffe had never met

16   Mr. Elias; he didn't know who Mr. Elias was.  He had never

17   heard of Fusion GPS.  He had never met any of the people who

18   attended that meeting, this single meeting.

19            But before the meeting, he spoke with his

20   attorney; and based on his discussion with his attorney, he

21   understood that Fusion was an investigative firm that

22   Perkins engaged to assist it with resources and expertise in

23   connection with advice that it was rendering -- that it

24   rendered to its clients.  There was no discussion of

25   specific clients, but --

1          THE COURT:  And, I'm sorry -- feel free to answer

2     this or not -- but the fact that Mr. Sussmann and Mr. Elias

3     were at the same law firm was simply happenstance?

4          MR. TYRRELL:  Mr. Joffe understood, based on

5     his discussions, that Mr. Elias was a senior partner of

6     Mr. Sussmann's.  That's all that I have.  That's my

7     understanding of what my client understood at the time.

8          So he understood that Fusion was an investigative

9     firm that worked with Perkins on behalf of its clients to

10    assist it in rendering legal advice.  And he also

11    understood, based on his discussion with his lawyer, that

12    the discussion that then ensued in this single meeting --

13    we're talking about a single meeting -- was subject to the

14    attorney-client and attorney work product privileges.

15         Sometime after that meeting -- and, you know,

16    there are some challenges around pinpointing the exact date,

17    but it was within a couple of weeks -- my client had an

18    email exchange with Ms. Seago, who is one of the people who

19    attended the meeting who, as the government has

20    acknowledged, sort of had technical expertise, which my

21    client understood.  And those communications are reflected

22    in Documents 31 through 38, which are part of the

23    government's motion to compel; Exhibit A, I think, to their

24    original motion.

25         Consistent with his understanding about the

1    meeting, my client, a nonlawyer, marked the email

2    privileged, client-attorney communication, and he copied

3    his lawyer, Mr. Sussmann.  And then, to the best of my

4    client's knowledge, he had no further interaction with

5    anyone at Fusion after that email exchange.  He was

6    actually disappointed because he had a hope that they might

7    bring some expertise to the situation that might assist

8    Mr. Sussmann in advising him as to the appropriate course of

9    action with regard to the data and the implications of the

10   data.

11          Your Honor, we believe this is quintessentially a

12   Kovel case.  As far as Mr. Joffe understood, Fusion was a

13   third party that was hired by his counsel to supply

14   resources and expertise that were essential to the legal

15   advice that Mr. Joffe was seeking from Mr. Sussmann on an

16   extremely complex and sensitive matter.  Mr. Joffe's few

17   communications with Fusion were made in confidence and with

18   the understanding that they were privileged as reflected in

19   his contemporaneous markings on the emails and the fact that

20   he copied his attorney on the emails.

21          Now, at base -- and I could get into --

22          THE COURT:  Let's stop here.

23          MR. TYRRELL:  Sure.

24          THE COURT:  If we could go to the privilege log

25   entries for 31 through 38.  Do you have those in front of

1    you?

2              MR. TYRRELL:  I don't, but I have them pretty well

3    in my memory.  I can try to --

4              THE COURT:  So the first one is to Mr. Joffe or I

5    guess from Mr. Joffe to Ms. Seago and Mr. Sussmann.

6              And then there are two right under it, and it

7    doesn't indicate who the "to" or "from" -- who the sender or

8    the recipient is, but there are two attachments.  Are those

9    just the attachments to the first email?

10             MR. TYRRELL:  Well, there are -- Mr. Joffe is a

11   cyber security expert, and he was trying to exchange

12   something called PGP keys with Ms. Seago --

13             THE COURT:  Okay.

14             MR. TYRRELL:  -- so that their communications

15   would be secure and encrypted.  So some of the attachments

16   are actually just simply an exchange of PGP keys.  But there

17   is at least one or -- there's one or two attachments that's

18   not that, and I'm really not -- I'd be happy to answer that

19   in camera ex parte.

20             THE COURT:  Okay.

21             MR. TYRRELL:  But I don't think that's something

22   that I can disclose in this open hearing, Your Honor.

23             THE COURT:  All right.  Proceed.

24             MR. TYRRELL:  Sure.  Sure.

25             And, again, I can get into the particulars of the

1    Special Counsel's argument, but I think, Your Honor, at base

2    what they're arguing here is that because Mr. Joffe's

3    counsel may not have dotted all the Is and crossed all the

4    Ts, Mr. Joffe doesn't have a sustainable claim of privilege.

5    But that argument, Your Honor, would make the privilege the

6    subject of a lawyer's actions as opposed to the client's

7    intent and understanding regarding the purpose of his

8    communications.  And that's not the law.  It can't be the

9    law.  It shouldn't be the law.

10        The privilege, as you know, exists to enable

11    clients to speak openly with their attorneys and others

12    assisting their attorneys without fear that those

13    communications will become public at some future date.  And

14    the argument that the Special Counsel has advanced here runs

15    directly counter to that purpose, and it should be rejected.

16        And I'd just like to make one final point, Your

17    Honor, because I was here for last week's hearing, and I

18    think this came up a little bit, and that relates to the

19    concerns that have been raised about the timing of this

20    motion.

21        We spoke with the Special Counsel's Office about

22    this well before the indictment in this case was returned,

23    and we made our position regarding these emails and the

24    meeting with Ms. Seago and the two other Fusion people and

25    Mr. Sussmann and Mr. Elias clear to the Special Counsel.

1  We've never deviated from that position, and, frankly

2  speaking, since that time, we've never really had any

3  substantive discussions with them about our position.

4      So if they wanted to challenge our assertion of

5  privilege as to this limited universe of documents -- again,

6  which is separate from the other larger piece with regard to

7  HFA -- they should have done so months ago.  I don't know

8  why they waited until now, Your Honor, but I want to be

9  clear.  I want to say without hesitation that it's not

10  because there was ever any discussion with us about

11  resolving this issue without court intervention.

12      THE COURT:  That was my question.  Were you

13  adamant a year ago?

14      MR. TYRRELL:  Pardon me?

15      THE COURT:  Were you adamant a year ago that --

16      MR. TYRRELL:  Yes.  We've been throughout.  We

17  were not willing to entertain resolution of this without

18  court intervention.

19      THE COURT:  Very well.

20      MR. TYRRELL:  Thank you, Your Honor.

21      THE COURT:  Welcome back.

22      MR. LEVY:  Thank you very much, Your Honor.

23      I briefly wanted to address a couple of factual

24  matters to help explain why the government has not met its

25  burden to show a substantial need for the attorney work

1     product at issue here, let alone the heightened burden for

2     the attorney-client privileged material.

3              Number one, the 38 emails at issue that Fusion

4     included in its log in response to the government's grand

5     jury subpoena do not discuss the defendant's meeting with

6     the FBI at all; and that is because, Your Honor, no one at

7     Fusion GPS, including the Fusion witness, had any knowledge

8     about the meeting that Mr. Sussmann had with the government.

9     They had no discussions about any plans for this meeting.

10    They weren't briefed on the meeting beforehand or

11    afterwards.

12             Number two, in the reply brief the government

13    submitted in support of its motion to compel, late in the

14    brief, late in the game, the government finally tries to

15    explain why it has met this burden, and it tries to hang its

16    hat on this testimony of the Fusion witness, Ms. Seago.  And

17    in its brief, the government says that Ms. Seago has unique

18    possession of knowledge as to what the government tries to

19    characterize as the core issue in the case.  But the

20    government mischaracterizes that core issue.  The government

21    says that the core issue in this case is whether the

22    defendant was representing any client in 2016 with regard to

23    the Russian Bank 1 allegations.

24             That's not the core issue in the case,

25    respectfully.  The core issue in the case is whether the

1      defendant knowingly made a false and misleading statement to

2      the government when he met with the government about whether

3      he was there on behalf of a client or not that day.  And as

4      to that issue, Your Honor, Ms. Seago, the Fusion witness,

5      has no knowledge.  And the government knows this.

6              In parallel to the government's investigation of

7      this case, Russian Bank 1, Alfa-Bank, was pursuing its own

8      discovery in a civil case.  They subpoenaed and deposed

9      Ms. Seago last year.  There's a transcript of that

10     deposition.  It's in the public record.  The government's

11     made clear to counsel that it has that deposition

12     transcript, and we can furnish a copy of it to the Court.

13             And in that deposition, I represented Ms. Seago.

14     We claimed privilege over that which was privileged.  So

15     when the defense says that they do not have visibility into

16     what Ms. Seago would say that's covered by the privilege,

17     they're correct.  And at the same time the government

18     knows that Ms. Seago has no knowledge of the meeting between

19     Mr. Sussmann and the FBI, and that's at Pages 151 to 152 of

20     that transcript.

21             THE COURT:  All right.  If you could file the --

22     not file it, but provide it to the Court.

23             MR. LEVY:  File it with the Court?  Sure.

24             THE COURT:  You don't need to file it.  Just

25     provide it to the Court.  You can hand it up, or send us an

```
 1    email.

 2              MR. LEVY:  All right.  No problem.  I can do that

 3    right now.

 4              (Pause)

 5              MR. LEVY:  And we've excerpted for Your Honor

 6    Pages 151 to 173.  This is the portion of the examination

 7    where the Russian Bank's lawyers are asking Ms. Seago about

 8    the allegations in the indictment.

 9              And it's very clear that she has no knowledge

10    about the meeting, that she doesn't recall any discussions

11    about the meeting, that she didn't work on this white

12    paper that allegedly was provided to the government by

13    Mr. Sussmann.

14              This is the memo that, again, the government has

15    talked about today in its papers as to why it's so important

16    to pierce this privilege.  Ms. Seago didn't contribute to

17    it, doesn't know who did, doesn't know who researched it,

18    doesn't know who wrote it, doesn't know its purpose; and the

19    government's aware of all that.

20              And so for all those reasons, the government has

21    failed to meet its burden to say that there is any kind of a

22    need for this privileged material.

23              THE COURT:  Okay.  Thank you.

24              Anyone else?

25              MR. BERKOWITZ:  I have the deposition up, which is
```

1    why I have this, Your Honor.

2              Sean Berkowitz, very briefly following up on

3    Mr. Levy's remarks.

4              The civil deposition that you have I do think is

5    instructive on some of the questions that you asked me and

6    the government's theory.  I'll cite one other passage, which

7    is at Page 93 when the Alfa-Bank lawyers showed Ms. Seago a

8    copy of the indictment in this case and asked her about

9    Paragraph 20A, which is the July 29th meeting, that says

10   Mr. Sussmann and Elias met with personnel from Fusion in

11   Perkins's offices.

12             And the question that was asked was:  "So were you

13   aware of this July 28th meeting between Sussmann and

14   personnel of Fusion?

15             "ANSWER:  Not that I recall.

16             "QUESTION:  Were you aware of this meeting after

17   it happened?

18             "ANSWER:  Not that I recall.

19             "QUESTION:  Did anyone ever discuss this meeting

20   with you?

21             "Answer:  Not that I recall.

22             That's at 93 and 94.

23             And so to the extent that somehow Ms. Seago is

24   viewed as the critical linchpin on the handoff of these

25   issues, that is another piece that we know about from her

1    deposition.

2          And as Mr. Levy indicated, there were a number of

3    questions that were asked and answered.  There was also

4    privilege asserted throughout with respect to substantive

5    issues; and that's been in the public record, I believe,

6    since November of last year.

7          That's all I have, Judge.

8          THE COURT:  All right.  Anyone else?

9          All right.  Last word to the government?

10         MR. ALGOR:  So just a few things, Your Honor, just

11   to cover.

12         And first I want to start with Mr. Trout's

13   comments regarding HFA.  What's clear there is that even in

14   some of your questions, that there is -- there appears to be

15   no indication specific to the messages and those that are

16   addressed here in Exhibit A that there was legal advice

17   provided from Perkins Coie regarding these materials.  So

18   taking separate of the hypothetical that Your Honor provided

19   regarding whether there were instances where Mr. Elias could

20   have sought expertise from Fusion GPS and/or Mr. Sussmann

21   regarding that, that in these instances that we've

22   identified, there's nothing to present there.

23         In addition -- and turning to the instances

24   regarding Mr. Joffe -- again, we don't have an ability to

25   see those materials, but as Your Honor identifies, you see

1    communications between Mr. Joffe and Ms. Seago that don't

2    include Mr. Sussmann.  And, again, there is a distinction

3    here.  When an individual is retaining, through his counsel,

4    an expert, a consultant of some sort, you would see some

5    kind of agreement there, whether oral -- and we have no

6    indication that that existed.  And so we believe that that

7    does break the privilege; that there was no indication that

8    that actually existed.

9           And finally, in relation to the arguments

10   regarding Ms. Seago's testimony, who she understood or

11   believed that she was -- who she understood regarding

12   Fusion's client is a key part of the government's case-in-

13   chief here, and notwithstanding her memories of specific

14   meetings, that is -- her understanding of who Fusion GPS's

15   client is when she's meeting with Mr. Sussmann and when

16   she's meeting with Mr. Joffe is relevant here.  It's highly

17   probative regarding the attorney-client relationships that

18   Mr. Sussmann had with HFA and Mr. Joffe.  And so we do

19   believe, regardless of her specific memory of instances,

20   that that core fact is relevant here.

21          And barring any other questions, that's all we

22   have.

23          THE COURT:  Okay.

24          All right.  Thank you, all, for the presentations.

25   I'm going to grant the government's motion for in camera

48

1    review of the 38 emails.  I don't think that that is a

2    significant intrusion on the privilege, just for the Court

3    to review them.

4         As you've probably guessed from my questions, I

5    am -- I have no reason to doubt the representations made by

6    Mr. Elias as to the purpose of Fusion's retention as

7    reflected in the Perkins's retention agreement with Fusion,

8    but that does not mean that all of the activities that

9    Fusion engaged in were subject to attorney or client

10   protections.  And I do think that there is a distinction

11   between hiring a public relations firm to provide

12   fact-checking or consulting on litigation risk and the

13   affirmative creation and dissemination of research about an

14   opposing candidate or business, for that matter.

15        This is obviously a very unique circumstance.

16   Usually these issues come up in the business context.

17        Whether review of the documents will reveal

18   whether Fusion was creating work product that is covered or

19   not covered remains to be seen.  I don't know.  So we'll

20   have to see what the emails actually say.

21        That still leaves the relevance issues as well as

22   the prejudice issues and the knock-on effects from the

23   defense from the introduction and use of the emails, but I

24   think that I'm probably going to have to deal with this

25   issue nonetheless because of what the government may plan to

1    ask Ms. Seago about.  All right?

2              With respect to the Joffe/Sussmann/Seago emails, I

3    am dubious that the government has met its burden to pierce

4    the privilege, but I will take a look at the emails

5    nonetheless.  So if the defense could produce or the

6    privilege-holders or whomever it's easier to get access to

7    them, if you could provide the unredacted emails to the

8    Court under seal by the end of the day, I'd appreciate it.

9              Any other issues on this?

10             Mr. Trout?

11             And one case that -- no one really talked about

12   cases, but I found Judge Rakoff's decision in the *Calvin*

13   *Klein* case up in New York somewhat instructive on this whole

14   issue, so...

15             MR. TROUT:  Defining this somewhat broadly, this

16   does relate to privilege, Your Honor.

17             I was here last week when the Court, I thought

18   very clearly, expressed the view that it would not be

19   appropriate to put before the jury the fact that attorney-

20   client privilege had been asserted as grounds for not

21   allowing evidence to be heard.

22             One of my -- HFA has been subpoenaed to provide

23   evidence.  My understanding is that the evidence to be

24   provided is the assertion of the privilege at trial.

25             I raised this with Mr. DeFilippis right after the

1    hearing last week, and I have not gotten a response.  But I

2    wanted to be -- I wanted to make sure that I was clear about

3    what the Court's ruling would be.  I can file a motion to

4    quash, if that's appropriate, but I was thinking I could

5    work this out with Mr. DeFilippis.  And I was expecting a

6    response, but we just -- he's been busy, I'm sure.

7              THE COURT:  All right.  Well, see if you can work

8    it out, but I think I was pretty clear.

9              MR. TROUT:  Okay.  Thank you.

10             THE COURT:  All right.  If there's nothing else on

11   that, we have our pretrial on Monday.

12             Generally I like to go over each side's witness

13   list.  I have the government's.

14             Mr. Berkowitz, if you could provide chambers a

15   copy of your witness list.

16             MR. BERKOWITZ:  I believe we have, Your Honor.

17             THE COURT:  You have?  Okay.  Good.

18             And the same with the exhibit list.  We've

19   obviously dealt with a number of evidentiary issues

20   regarding potential exhibits.  I'm not going to go

21   exhibit by exhibit, but if there are other categories of

22   material that we think might be disputed or will take up

23   jury time, let's try to raise those issues, to the extent we

24   can, on Monday.

25             Obviously, you know, we can't anticipate every

1   evidentiary issue, but I like to try to at least deal with

2   things that are known at the time.

3           We'll go over jury selection.  I have the

4   questionnaire.  There don't seem to be that many disputes,

5   which is helpful.  I appreciate that.

6           But I will resolve -- I think we asked you all for

7   an electronic version.  We'll resolve the disputes, and

8   we'll give you a copy of the final questionnaire on Monday.

9   And we'll leave it to you all to make a sufficient number of

10  copies.  I believe we need 125, at least, but we'll have

11  that number to be provided to the venire that comes in on

12  Wednesday, I believe.

13          MR. ALGOR:  Yes, Your Honor.

14          THE COURT:  We have a placeholder in the schedule

15  for a CIPA 6 proceeding.  Where are we?  Will we need to use

16  that?  Will there be any disagreements over proposed -- or

17  will there be any proposed substitutions or summaries?  And

18  if so, will there be any disputes over them?

19          MR. ALGOR:  Yes, Your Honor.  I can speak to that.

20          So following this argument, we're going to be

21  meeting in a SCIF here at the courthouse with defense

22  counsel --

23          THE COURT: Okay.

24          MR. ALGOR:  -- to meet and confer regarding their

25  notice.  I do anticipate that there will be certain issues.

1    Our hope is that after today we'll have a limited number of

2    issues to have in front of Your Honor, and so following the

3    meet and confer, I anticipate filing a letter seeking a

4    Section 6 hearing on Monday.

5              THE COURT:  Okay.  We also have --

6              MR. ALGOR:  I believe that you had also --

7              THE COURT:  We may have some time --

8              MR. ALGOR:  Correct.

9              THE COURT:  -- Tuesday as well.

10             MR. ALGOR:  Yes, Your Honor.

11             THE COURT:  I have other matters, but we could fit

12   something in Tuesday as well.  I'll leave that to you all.

13             MR. ALGOR:  Okay.  Thank you, Your Honor.

14             THE COURT:  All right.  Anything else?

15             MR. BERKOWITZ:  Nothing else, Your Honor, on

16   behalf of Mr. Sussmann, Your Honor.

17             THE COURT:  Okay.

18             All right.  Well, the matter is under advisement,

19   and we're adjourned.  Have a good day.

20                  (Whereupon the hearing was

21                   concluded at 11:20 a.m.)

22

23

24

25

1              **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8         Dated this 4th day of May, 2022.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25