## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**UNITED STATES OF AMERICA**,

v.

**MICHAEL A. SUSSMANN**,

Defendant.

---

Case No. 21-cr-582 (CRC)

## <u>OPINION AND ORDER</u>

Before the Court are the parties' motions *in limine* to introduce certain evidence, or to exclude certain evidence the opposing side may seek to introduce, at Mr. Sussmann's upcoming trial.  The Court assumes general familiarity with the issues in the case.

The Court has already granted in part and denied in part both parties' motions regarding evidence about the accuracy of the data that Mr. Sussmann provided to the FBI in his September 2016 meeting with the Bureau's then-General Counsel James Baker, and the defense's related motion to exclude the government's proposed expert testimony on that topic.  <u>See</u> Order (Apr. 25, 2022), ECF No. 95 ("Data Order").  The Court held a hearing on the remaining motions *in limine* on April 27, 2022, during which it ruled from the bench on some issues and reserved ruling on others.  The Court now turns to those issues on which it reserved judgment.

### I.   **Legal Standards**

"[M]otions *in limine* are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'"  <u>Graves v. District of Columbia</u>, 850 F. Supp. 2d 6, 10 (D.D.C. 2011) (quoting <u>Bradley v. Pittsburgh Bd. of Educ.</u>, 913 F.2d 1064, 1070 (3d Cir. 1990)).  They are not a vehicle to resolve factual disputes or weigh the sufficiency of the evidence.  <u>Id.</u>  "Rather, parties should target their arguments to demonstrating why certain items

or categories of evidence should (or should not) be introduced at trial, and direct the trial judge to specific evidence in the record that would favor or disfavor the introduction of those particular items or categories of evidence." Id. at 11 (citing United States ex rel. El–Amin v. George Washington Univ., 533 F. Supp. 2d 12, 19 (D.D.C. 2008)). Trial judges retain broad discretion in making evidentiary rulings, including determining the probative value or prejudicial effect of evidence. Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008).

Evidence is only admissible if it is relevant—meaning it "has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence," Fed. R. Evid. 401—and its probative value is not "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403.

## II. Analysis

### A. Evidence Regarding the Gathering of the Data

The first motion presented involves the data that Mr. Sussmann provided to the FBI. The data was supplied to Mr. Sussmann by technology executive Rodney Joffe, and was claimed to support the existence of an internet communications channel between Donald Trump and Russia's Alfa Bank. The government has notified the defense under Federal Rule of Evidence 404(b) that it intends to seek admission of evidence concerning how that data was gathered. Gov't Suppl. Notice at 2 (Mar. 23, 2022), ECF No. 68-1. This evidence includes, according to the government, facts suggesting that the "data was obtained in a manner that may be considered objectionable." Id. By that, the government presumably is referring to an allegation that Mr. Joffe accessed some of the data in breach of certain cybersecurity-related contracts he or his companies had with the U.S. government. Indeed, the government has indicated to Mr. Joffe's

2

counsel that his conduct with respect to the data remains subject to criminal investigation by a grand jury.  More on that later.

The government contends that evidence about the origins and gathering of the data constitutes direct proof of the crime charged against Mr. Sussmann—a sole count of lying to the FBI about whether he was providing the data and related "white papers" on behalf of any client—because it provides "important factual context for the defendant's conduct" and tends to show the existence of attorney-client relationships between the defendant and both Mr. Joffe and Hillary Clinton's 2016 presidential campaign.  Id.  The government further argues that, if the Court deems the data-gathering evidence not to be intrinsic to the charged offense, it is still admissible under Rule 404(b) as "other act" evidence going the defendant's motive, intent, preparation, plan, and absence of mistake or accident.  The defense moves to exclude this evidence, at least to the extent that Mr. Sussmann was uninvolved in or unaware of the data collection effort.

This dispute is framed by the parties' competing theories of how the data came to be.  In brief, the government contends that the Alfa Bank data was gathered as part of a concerted effort to collect and disseminate derogatory opposition research about Donald Trump.  Participants in this purported joint undertaking, according to the government, include the Clinton Campaign; the Campaign's General Counsel and then-partner in the Perkins Coie law firm, Marc Elias; an investigative firm retained by Mr. Elias, Fusion GPS; the defendant; Mr. Joffe; and several computer researchers working at Mr. Joffe's direction.  The government has proffered the existence of at least some circumstantial evidence connecting Mr. Sussmann to certain aspects of the data gathering effort.  See Gov't Opp'n to Def.'s Mots. in Lim. at 17–18, ECF No. 70 (promising that testimony will establish that Mr. Sussmann was aware of the "corporate sources"

of the data and assured Researcher-2 that the data had been lawfully collected); Indictment ¶¶ 20,

23 (alleging that beginning in mid-August, Mr. Sussmann, Mr. Joffe, and Mr. Elias met on two

different occasions and, shortly thereafter, Mr. Joffe emailed the researchers about the data); id. ¶

24 (describing billing entries indicating that Mr. Sussmann helped draft one of the white papers

that was provided to the FBI.  The government contends that Mr. Sussmann's desire to conceal

this joint venture—particularly the Clinton Campaign's involvement—supplied a motive for him

to misrepresent to Mr. Baker that he was not providing the data to the FBI on behalf of any

client, when he was actually representing both Mr. Joffe and the Campaign.

     The defense paints a different picture.  As the Court gleans from various of the defense's

pleadings and arguments, its case will be that Mr. Joffe obtained and analyzed the relevant data

independently of Mr. Sussmann and the Clinton Campaign; that Mr. Joffe enlisted the defendant,

with whom he a preexisting attorney-client relationship, for legal advice on how to handle and

disseminate the data to a wider audience; that Mr. Sussmann reasonably believed, based on the

understanding of the data that he gained from Mr. Joffe, that it tended to support the existence of

a communications link between Alfa Bank and Mr. Trump; that Mr. Sussmann and Mr. Joffe

shared the view that bringing the potential communications channel to the FBI's attention was

important to protect national security, regardless of any political implications; and that Mr.

Sussmann sought an audience with Mr. Baker for that purpose.  The defense has acknowledged

that Mr. Sussmann at least received the data in connection with his legal representation of Mr.

Joffe, see Mot. Hr'g Tr. at 38:6–18, but (as the Court understands) denies that he had an

attorney-client relationship with the Clinton Campaign that covered activities related to the Alfa

Bank data.

The jury is entitled to hear both these narratives.  The parties may therefore bring out otherwise admissible trial evidence supporting their competing theories regarding the gathering and use of the data.  Permissible areas of inquiry include how the data came into being and who was involved in its collection and analysis, as well as how Mr. Sussmann came to possess the data, what he did with it, and why.  The basis for admission of the evidence depends on its purpose.  To the extent the evidence shows that Mr. Sussmann's involvement in the data gathering was part of legal work for either Mr. Joffe or the Clinton Campaign, it is "intrinsic" to the charged offense.  The D.C. Circuit defines intrinsic evidence as "that [which] is part of the charged offense," and "uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime."  United States v. Bowie, 232 F.3d 923, 929–30 (D.C. Cir. 2000).  Evidence of Mr. Sussmann's client work is "part of the charged offense" because in order to prove the alleged lie to the FBI, the government necessarily must prove that Mr. Sussmann was in fact representing a client.  Otherwise, this evidence may be offered for a proper 404(b) purpose, the most applicable of which is Mr. Sussmann's purported motive for concealing the political nature of the Alfa Bank data effort.

The Court will impose certain limitations on the use of this evidence, however.  As the Court previously ruled, unless the defense opens the door for admission by vouching for the data, the government will not be permitted to put on extensive evidence about its accuracy.  See Data Order at 3–4.

The Court will also provisionally limit the presentation of evidence that the collection of the data by Mr. Joffe or others was somehow "objectionable."  The Special Counsel has not proffered sufficient evidence showing that Mr. Sussmann had concerns that the data was obtained inappropriately, or that he had any independent knowledge about the data collection

beyond whatever he may have learned from Mr. Joffe through privileged communications.

Evidence of improper data collection by Mr. Joffe or others done without Mr. Sussmann's

knowledge is, at best, only marginally probative of his supposed motive to lie to the FBI.  United

States v. George, 786 F. Supp. 56, 64 (D.D.C. 1992); United States v. Libby, 467 F. Supp. 2d 1,

15–16 (D.D.C. 2006) (evidence of "what others were told . . . will be excluded because it is

simply irrelevant to the defendant's state of mind").  Moreover, whether Mr. Joffe, who is not on

trial, violated the terms of any of his contracts with the government—let alone committed a

crime—is the type of collateral issue that risks confusing the jury and distracting from the

pertinent issues in the case.  See United States v. Fonseca, 435 F.3d 369, 376 (D.C. Cir. 2006)

(affirming exclusion of evidence that would have led to a "'mini-trial' on a collateral matter");

Wade v. Mantello, 333 F.3d 51, 60 (2d Cir. 2003) (holding testimony supporting theory of third-

party culpability properly excluded because "marginal relevance was outweighed by dangers of

juror prejudice and confusion").

    B.  Emails Between Researchers, Mr. Joffe, Fusion, and the Press

       Having established the basic rules of the road for the data-gathering evidence, the Court

turns to the defense's objections to specific emails discussing the data that the Special Counsel

has indicated he will seek to admit.  In particular, the government seeks to admit emails between

Mr. Joffe, two researchers from the Georgia Institute of Technology (referred to in the

indictment as Researcher-1 and Researcher-2), and another computer researcher who allegedly

compiled the data at issue (referred to as Originator-1).  In these emails, the researchers and Mr.

Joffe discuss the data collection effort and their conclusions about the data.  The government also

seeks to admit a set of emails between Fusion GPS employees and members of the press.  Gov't

Mot. in Lim. at 10, ECF No. 61.  The Special Counsel offers two arguments for admission: (1)

that the emails are not offered for their truth and are thus not hearsay; and (2) that the statements

in the emails were made in furtherance of a joint venture between Mr. Sussmann, Mr. Joffe, and

"representatives or agents" of the Clinton Campaign, and are thus admissible as non-hearsay

under Fed. R. Evid. 801(d)(2)(E).  Mr. Sussmann responds generally that (1) the statements *are*

hearsay, as they are offered for their truth, (2) the Special Counsel has not established the

existence of a joint venture, the necessary predicate to admit the statements as non-hearsay co-

conspirator statements, and (3) the probative value of the statements at issue are outweighed by

the danger of unfair prejudice, confusion, or delay.

"Hearsay is an out-of-court statement offered for the truth of the matter asserted."

United States v. Thompson, 279 F.3d 1043, 1047 (D.C. Cir. 2002); Fed. R. Evid. 801(c).  An

out-of-court statement offered for some other purpose, such as "elucidating a speaker's or a

listener's state of mind," is not hearsay.  United States v. Williams, 358 F.3d 956, 963 (D.C. Cir.

2004).[1]  However, a statement that merely gives "context" to another statement may nonetheless

be hearsay, if the context provided by the statement depends on its truth.  See United States v.

Stover, 329 F.3d 859, 870 (D.C. Cir. 2003); United States v. DeCologero, 530 F.3d 36, 59 (1st

Cir. 2008).

The Special Counsel argues in the alternative that the emails may be admitted as co-

conspirator statements under Fed. R. Evid. 801(d)(2)(E) regardless of whether they are offered

for their truth.  Federal Rule of Evidence 801(d)(2)(E) provides: "A statement is not hearsay

if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a

---

[1] Statements that demonstrate the reasonableness of a belief, Crockett v. Abraham, 284
F.3d 131, 134 (D.C. Cir. 2002), "establish the course of the investigation," United States v.
Taylor, 569 F.3d 742, 749 (7th Cir. 2009), or constitute  a "verbal act," United States v. Stover,
329 F.3d 859, 870 (D.C. Cir. 2003), are also not hearsay.

party during the course and in furtherance of the conspiracy.'" See Bourjaily v. United States,

483 U.S. 171 (1987) (alteration and omissions in original).  The joint venture need not be a

criminal one.  United States v. Brockenborrugh, 575 F.3d 726, 735 (D.C. Cir. 2009) ("[D]espite

its use of the word 'conspiracy,' Rule 801(d)(2)(E) allows for admission of statements by

individuals acting in furtherance of a lawful joint enterprise.").  And, "[a]s with all evidence,"

any statements admitted into evidence must be relevant to a "fact of consequence in the case."

Williams, 358 F.3d at 963 (cleaned up).  "Moreover, such a statement may be excluded, even if

relevant, if its probative value is substantially outweighed by the danger of unfair prejudice."  Id.

(citing Fed. R. Evid. 403).

     With that background, the Court turns to the emails at issue.  The first batch is comprised

of emails exchanged between Mr. Joffe, Georgia Tech researchers Manos Antonakakis and

David Dagon (Researchers 1 and 2), and April Lorenzen, a third computer researcher unaffiliated

with Georgia Tech (referred to as Originator-1) in August and September 2016.  These

individuals were not employees of Fusion GPS nor were they directly associated with the Clinton

Campaign or Perkins Coie.  None of these emails were sent or received by Mr. Sussmann.  The

emails generally reflect the researchers' hypotheses about the data and the conclusions they

believed could be drawn from it.  The second batch of emails are between Fusion GPS

employees and members of the press from mid-to-late October 2016.  These emails appear to

relate to Fusion's attempts to disseminate the Alfa Bank allegations.  Mr. Sussmann did not

receive these emails either.  The last email was sent by Mr. Joffe to one of his employees on

November 17, 2016.

     The Court will first address whether the emails are non-hearsay—i.e., whether they are

being offered for something other than the truth of the matter asserted.  For any remaining

emails, the Court will next address whether the government can admit the emails as statements of co-conspirators in a lawful joint venture.

### 1. *Emails between Researchers and Mr. Joffe*

The government argues that these emails are not offered for the truth of the matter asserted, but rather to show that the technical issues Mr. Joffe and the researchers discussed were the same issues Mr. Sussmann discussed with Mr. Joffe and Mr. Elias.  According to the government, the fact that Mr. Joffe and the researchers corresponded about the data tends to prove that Mr. Sussmann had an attorney-client relationship with Mr. Joffe on the same topics. Gov't Mot. in Lim. at 22, 29; Mot. Hr'g Tr. at 26:20–27:11 (Apr. 27, 2022).

This theory of relevance falls short.  At most, these emails reveal that the Alfa Bank allegations were assembled and discussed by the researchers and Mr. Joffe.  The emails were not sent or received by Mr. Sussmann nor do they mention him.  On their faces, the emails reveal nothing about Mr. Sussmann's attorney-client relationship with Mr. Joffe.  "Relevant evidence, Rule 401 tells us, is 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  United States v. Foster, 986 F.2d 541, 545 (D.C. Cir. 1993) (quoting Fed. R. Evid. 401).  The fact of consequence at issue here is whether Mr. Sussmann represented Mr. Joffe in connection with assembling the data or providing it to the FBI.  Emails between Mr. Joffe and third parties do not tend to make that fact any more or less probable than it would be without those emails.  Accordingly, the emails are simply not relevant to the government's stated purpose for offering them.

The government also argues that the mere fact that a written record of the researchers' concerns exists would provide Mr. Sussmann a motive to conceal the source of the data from the

FBI.  Under that theory, the government argues, the emails are not offered for their truth but simply to show the written record existed.  Mot. Hr'g Tr. at 29:2–12.  This theory fails as well. A written record of concerns would inform Mr. Sussmann's motive to conceal only if he knew such a record existed.  The Special Counsel has not established that Mr. Sussmann received these emails or was ever told about them.  As of now, then, the emails are not relevant to his state of mind.  Libby, 467 F. Supp. 2d at 15–16 (evidence of "what others were told . . . will be excluded because it is simply irrelevant to the defendant's state of mind"); cf. United States v. Safavian, 435 F. Supp. 2d 36, 44 (D.D.C. 2006) (admitting certain emails received by the defendant to show his "state of mind at the time he received them").  The Court may revisit this determination if the government shows that Mr. Sussmann at some point received these emails or became aware of their contents.

Finally, this first batch of emails is unlikely to be admissible for an independent reason: the emails reflect the researchers' views on the accuracy of the data and how it was collected. The Court has already ruled that information about the accuracy of the data will not be admissible unless Mr. Sussmann opens the door.  See Data Order at 2.  Most of the emails the government has proffered so far relate to that exact issue.  E.g., Gov't Mot. in Lim. at 20 (email from Originator-1) ("I could fill out a sales form on two websites, faking the other company's email address in each form, and cause them to communicate with each other in DNS."); id. at 25 (email from Researcher-1) ("How do we plan to defend against the criticism that this is not spoofed UDP traffic we are observing?"); id. at 27 (email from Originator-1) ("I firmly believe that [Russian Bank-1/Healthcare Company-1]/Trump are communicating with that server . . . as an artifact of the processing.").  The Court has already ruled that these kinds of technical issues and conclusions about the data are not relevant unless further evidence at trial establishes that

Mr. Sussmann knew about them.  To the extent the government seeks to introduce other emails from the researchers that do not concern these topics, the Court will reserve judgment as to whether any particular email contains inadmissible hearsay, is relevant, or is more probative than unfairly prejudicial.

### 2.  Fusion Emails with the Press

The second batch of emails the government seeks to introduce are exchanges between Fusion GPS employees and various reporters dating from mid-late October 2016.  These emails show that (1) Fusion employees urged reporters to write stories on the Trump-Alfa Bank connection, and (2) when presented with questions about the data, a Fusion employee directed a reporter to David Dagon (Researcher-2) for a response.  Gov't Mot. in Lim. at 30–31.

These emails are admissible as non-hearsay because the Special Counsel does not appear to be offering them for their truth, but rather to demonstrate that Fusion GPS and the researchers shared the ultimate goal of disseminating the Alfa Bank allegations to the press.  The email referencing David Dagon also shows that at least one employee of Fusion was familiar with Dagon and suggested a member of the press contact him.  Accordingly, the Court will provisionally hold that these emails can be admitted, subject to proper foundation and a limiting instruction that they are not to be considered for the truth of the matter asserted.  The Court will reserve judgment as to the admissibility of any additional email it has not yet seen.

### 3.  Emails from Mr. Joffe

The Special Counsel has also identified three emails from Mr. Joffe that it seeks to introduce, either as non-hearsay statements or as co-conspirator statements.

The first one was sent from Mr. Joffe to the researchers informing them that "the task is indeed broad" and "the VIPs would be happy" if they could find anything linking Trump to Russia.  Gov't Mot. in Lim. at 22.

The Court finds that this email is being offered for the truth of the matter asserted and therefore may be admitted only as a non-hearsay co-conspirator statement or under a hearsay exception.  The email reflects when and why Mr. Joffe tasked the researchers with the data collection project—i.e., that the "VIPs" were "looking for a true story that could be used as the basis for closer examination."  Id.  The government argues this statement "tend[s] to prove the existence of the attorney-client relationship about which [Mr. Sussmann] lied."  Id. at 23.  However, this statement only suggests a connection between Mr. Joffe, the Clinton Campaign, and Fusion if his statement is true.  Mr. Joffe's relationship is demonstrated by the fact that the "VIPs" were looking for such a story and "would be happy" if one emerged.  If that were not the case, and Mr. Joffe was instead insinuating that he had a closer relationship to the "VIPs" than he really did, then this email would not be evidence of Mr. Joffe's relationship with anyone.  This email could therefore only be admissible as a co-conspirator statement, which the Court addresses below, or under an exception the government has not yet raised.

The second email is from Mr. Joffe to the researchers soliciting their views on the white paper he had been drafting with Mr. Sussmann.  Id. at 25.  In this email, Mr. Joffe asks the researchers how they thought a "security expert"—rather than an expert on DNS data—would view the white paper.  Indictment ¶ 24(e).  This email is not hearsay because nothing in the email is offered for the truth of the matter asserted—the email is a combination of a task ("please read") and a question ("Is this plausible as an explanation?").  Those statements are not assertions and thus cannot be hearsay.  See Mitchell v. DCX, Inc., 274 F. Supp. 2d 33, 42

(D.D.C. 2003) ("directives," taskings, commands, or other "verbal acts" are generally not hearsay because they do not constitute assertions); United States v. Oguns, 921 F.2d 442, 449 (2d Cir. 1990) ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." (citing Inc. Publ'g Corp. v. Manhattan Magazine, Inc., 616 F. Supp. 370, 388 (S.D.N.Y. 1985))).  The email is thus admissible with proper foundation.

The third email is from Mr. Joffe to a colleague after the November 2016 election expressing that he was offered a top cybersecurity job "by the Democrats when it looked like they'd win."  Indictment ¶ 15.  This email is inadmissible hearsay, as it is offered for the truth of the matter asserted and does not fit into any hearsay exception.  The email would evince Mr. Joffe's affinity for the campaign as well as his motive to disseminate the allegations, but only if he had in fact been offered a "top cybersecurity job" by the Clinton Campaign.[2]

C.  Co-Conspirator Statements

The government argues in the alternative that all the above emails, and other similar ones, may be admitted as co-conspirator statements under Fed. R. Evid. 801(d)(2)(E) regardless of whether they are offered for their truth.  To recap, the Federal Rules provide that "[a] statement . . . is not hearsay" if "[t]he statement is offered against a party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E); see Bourjaily, 483 U.S. at 173.  The joint venture need not be criminal in nature.  Brockenborrugh, 575 F.3d at 735.

---

[2] This email would also not fit within the definition of a co-conspirator statement, even if one had been proven.  It makes no reference to the Alfa Bank allegations, does nothing to further the purported goal of disseminating those allegations, and post-dates the joint venture.

Before admitting a statement under this provision, the Court must determine the existence

of a joint venture by a preponderance of the evidence.  This finding must be based, "at least

partially, on some independent evidence of the conspiracy" beyond the hearsay statement.

United States v. Apodaca, 275 F. Supp. 3d 123, 137 (D.D.C. 2017).  The Court must also find

that the defendant and the declarant "participated in a single conspiracy and that the statement

was made during and in furtherance of that conspiracy."  White, 116 F.3d at 912.  "Thus, the

ultimate admissibility determination must rest both on finding that the challenged co-conspirator

statement is in furtherance of the conspiracy and, at least partially, on some independent

evidence of the conspiracy."  Apodaca, 275 F. Supp. 3d at 137.

The government submits that Mr. Joffe, Mr. Sussmann, and the Clinton Campaign

(or its agents) were "acting in concert toward a common goal"—i.e., "assembling and

disseminating the [Alfa Bank] allegations and other derogatory information about Trump

to the media and the U.S. government."  Gov't Mot. in Lim. at 14.  It further argues the

Georgia Tech researchers, employees of various internet companies, and Fusion GPS

were part of this joint venture.  Id. at 19, 32.

The Court will exercise its discretion not to engage in the kind of extensive evidentiary

analysis that would be required to find that such a joint venture existed, and who may have

joined it, in order to admit these emails under Rule 801(d)(2)(E).  While the Rule permits

introduction of co-conspirator statements on the basis advanced by the Special Counsel, there are

a number of considerations that counsel against doing so here.

For starters, Mr. Sussmann is not charged with a conspiracy.  Granted, the rule does

permit the introduction of co-conspirator "even if the defendant is not formally charged with any

conspiracy in the indictment."  Safavian, 435 F. Supp. 2d at 47 (citing United States v. Russo,

302 F.3d 37, 45 (2d Cir. 2002)).  But when the relevant conspiracy is uncharged, extensive

presentation of evidence about that conspiracy is likely to confuse the jury and distract from the

issues at hand.  See id. ("Statements from an uncharged conspiracy may be excluded because

they are remote or unrelated to the charges in the indictment, or if their admission would confuse

or mislead the jury").

      The value of engaging in a separate conspiracy determination is also lessened by the fact

that the Special Counsel seeks to introduce these co-conspirator statements "not with respect to

the specific crime[] for which Mr. [Sussmann] has been indicted," but with respect to an

uncharged and lawful joint venture.  Safavian, 435 F. Supp. 2d at 47–48.  That is, the emails are

generally being offered not as direct evidence that Mr. Sussmann lied to the FBI, but for the

ancillary reason that, if the data did originate in this "politically-laden way," and Mr. Sussmann's

clients were involved, Mr. Sussmann would have had a motive to conceal such a project from the

FBI.  Gov't Reply Re: Mots. in Lim. at 4, ECF No. 94.

      Moreover, while the Special Counsel has proffered some evidence of a collective effort to

disseminate the purported link between Trump and Alfa Bank to the press and others, the

contours of this venture and its participants are not entirely obvious.  The Special Counsel is

correct that co-conspirators need not know "all the details of the plan or even possess the same

motives."  Id. at 6.  But, co-conspirators must have at least "shared a common goal."  Def.'s

Opp'n at 19, ECF No. 68 (citing Brockenborrugh, 575 F.3d at 737).  The Court is particularly

skeptical that the researchers—who were not employed by Mr. Joffe, Fusion GPS, or the Clinton

Campaign, and most of whom never communicated with Mr. Sussmann—shared in this common

goal.  While it appears undisputed that Mr. Joffe tasked the researchers with compiling the data,

the extent to which they knew the audience or purpose of the project remains unclear.  E.g.,

Gov't Mot. in Lim. at 26 (researcher did not know the audience for the white paper).  Indeed, the

Special Counsel himself at times omits the researchers from the alleged joint venture.  See id. at

19 (the evidence establishes "that the *defendant* and *Tech Executive-1* worked in concert with

each other and *with agents of the Clinton Campaign* to research and disseminate the [Alfa Bank]

allegations") (emphasis added).  Additionally, some evidence suggests that Fusion GPS

employees had no connection to the gathering or compilation of the Alfa Bank data, even if they

may have communicated with the press about it later.  See Ex. A to Gov't Reply Re: Mot. to

Compel at 53, ECF No. 99 (Fusion email stating "the DNS stuff? not us at all").  Where exactly

Mr. Sussmann fits into the enterprise is similarly murky at this stage.

Given these present ambiguities, deciding whether a particular statement falls within this

rule would require a finding during trial that this broader uncharged conspiracy existed, and that

both Mr. Sussmann and the author of any particular email were members of it.  It would then

require an individualized determination of whether "the specific statements contained within the

proffered e-mails were made in furtherance of that conspiracy."  Safavian, 435 F. Supp. 2d at 48.

Because no conspiracy is charged in the indictment, this undertaking would essentially amount to

a second trial on a non-crime conducted largely for the purpose of admitting "other acts"

evidence of Mr. Sussmann's motive rather than his commission of the singular and narrow crime

with which he has been charged.

This sort of particularized evidentiary analysis is especially unwarranted given that the

Court has already ruled on the admissibility of many of the emails on other grounds.  Whatever

few emails remain that the Court has not yet seen are likely to be either irrelevant or redundant of

other admissible evidence.[3]  To the latter point, the government has indicated that it intends to

call one or both of the Georgia Tech researchers at trial.  Either of them could testify to their role

in assembling the data, how they came to be tasked with the project, and whether they believed

the research was done for the Clinton Campaign or some other purpose.  Accordingly, the Court

will "exercise[] its discretion" not "to undertake this lengthy journey" for the sake of a few "e-

mails that contain either redundant information or information that could be testified to" by other

witnesses.  Safavian, 435 F. Supp. 2d at 48.

*  *  *

To sum up through this point, the government may attempt to connect the dots between

the various participants in the collection and use of the Alfa Bank data.  Those connections

provide context to the lone charge and are generally relevant either as intrinsic evidence of the

veracity of Mr. Sussmann's alleged statement to Mr. Baker, or as Rule 404(b) "other acts"

evidence concerning his purported motive to conceal his client relationships from the FBI.  But

as it stands now, the government must steer clear of evidence regarding the accuracy of the data,

which the defense does not plan to place at issue, and whether Mr. Joffe's role in the collection

effort was somehow "objectionable" or illegal.  Nor will the Court conduct a time-consuming

and largely unnecessary mini-trial to determine the existence and scope of an uncharged

conspiracy to develop and disseminate the Alfa Bank data.  The Court is confident the

---

[3] Of course, if the Special Counsel seeks to admit other, relevant emails for a non-hearsay purpose, the Court will consider that during trial.  The Court may also be better equipped to address any objections under Rule 403 at that time.  Old Chief v. United States, 519 U.S. 172, 185 (1997) ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point." (quoting 22 C. Wright & K. Graham, Federal Practice and Procedure § 5250, pp. 546–47 (1978))).

government can effectively pursue its case without the marginal information such an inquiry might yield about Mr. Sussmann's motives and client relationships.

    D.  <u>Bill Priestap and Trisha Anderson's Notes</u>

Moving to the next issue, the defense seeks to exclude notes taken by two of Mr. Baker's deputies sometime after his meeting with Mr. Sussmann.  The Special Counsel argues the notes themselves can come in under two hearsay exceptions: either as prior consistent statements of Mr. Baker, Fed R. Evid. 801(d)(1)(B), or as recorded past recollections of Mr. Preistap and Ms. Anderson, Fed. R. Evid. 803(5).  Review of those rules, however, makes it clear that whether the notes may be read into evidence under either exception depends both on whether Mr. Baker's credibility is attacked and on Mr. Priestap and Ms. Anderson's testimony.  Accordingly, the Court will lay out the steps needed to admit the notes, but will reserve judgment on whether such foundation has been laid until trial.

Beginning with Mr. Baker's past recollection recorded.  Federal Rule of Evidence 801(d)(1)(B) provides that a statement is not hearsay if, "the declarant" (here, Mr. Baker) "testifies and is subject to cross-examination about a prior statement, and the statement . . . is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."  Accordingly, the statement cannot be admitted to bolster Mr. Baker's credibility before it is attacked.

If Mr. Baker's memory is challenged on cross examination,[4] his prior consistent statement would be admissible to bolster his testimony.  But the notes are not Mr. Baker's, so he cannot testify to their contents.  The Rule is clear that a past recorded recollection may be admitted if the record "was made or adopted *by the witness* when the matter was fresh in the witness's memory."  Fed. R. Evid. 803(5)(B) (emphasis added).  There is no evidence that Mr. Baker "made or adopted" these notes.  The notes therefore do not meet the definition of a recorded recollection of Mr. Baker.  Accordingly, the government may only introduce the statements through Mr. Priestap's or Ms. Anderson's live testimony about their respective notes.  See United States v. Montague, 958 F.2d 1094, 1099 (D.C. Cir. 1992) (holding that "Rule 801(d)(1)(B) does not bar introduction of the prior consistent statement through a witness other than the declarant," and a third-party officer presenting the prior statement testified at trial); United States v. Hebeka, 25 F.3d 287, 292 (6th Cir. 1994) ("Rule 801 can be met even when a third party testifies as to someone else's prior statement," and "[b]oth witnesses were subject to cross examination concerning their memory of past events.").

The evidentiary analysis is the same for either of the note takers.  Taking Ms. Anderson as an example, her notes are admissible only if she testifies that the conversation is something she "once knew about but now cannot recall well enough to testify fully and accurately," her testimony establishes that the notes were made while the conversation was fresh in her mind, and the notes accurately reflect her knowledge.  Fed. R. Evid. 803(5).  If Ms. Anderson is able to testify fully and accurately about her conversation with Mr. Baker, the notes would no longer be

---

[4] This strikes the Court as no sure thing given the recent revelation of a text message apparently sent by Mr. Sussmann to Mr. Baker the day before their meeting indicating that he was not attending the meeting on behalf of a client.  See Gov't Mot. in Lim. at 2.

needed, and so would no longer be admissible under Rule 803(5).  In addition, if the government

is unable to establish the foundation the Rule requires, the notes likewise cannot be admitted.

A final note:  Even if the notes satisfy the standard for a past recollection recorded, the

notes themselves likely would not come in.  So long as they are offered by the government as

rehabilitation evidence—as the Special Counsel suggests it might—their contents may only be

read into evidence, not "received as an exhibit" for the jury to view.  Fed. R. Evid. 803(5)

(allowing past recollections to be "received as an exhibit *only* if offered by an adverse party"—in

this case Mr. Sussmann (emphasis added)).

E.  The CIA Meeting

Next up, the government seeks to introduce statements Mr. Sussmann made during a

meeting with the CIA in February 2017 under Fed. R. Evid. 404(b).  In particular, the

government alleges that when Mr. Sussmann provided an additional set of allegations about the

candidate Trump's ties to Russia to the CIA, he said he was "not representing a particular client."

Indictment ¶ 42(a).  The government also alleges Mr. Sussmann made an additional false

statement during that meeting—that he had previously brought "similar, 'but unrelated'"

information to the FBI.  Gov't Suppl. Notice at 2.  Specifically, Mr. Sussmann allegedly

provided to the CIA an updated version of the Alfa Bank data, as well as an additional set of

allegations about Russian-made phones that were used on Trump networks (the "YotaPhone

allegations").  The Special Counsel claims Mr. Sussmann's description of this second set of

allegations as "unrelated" to the information he brought to the FBI was misleading because the

two sets of allegations were, in fact, related.  The defense objects to the introduction of this

second statement, and submits that the Special Counsel should not be permitted to argue this

additional statement was false.  The government contends both statements are admissible under Rule 404(b) to show Mr. Sussmann's motive, plan, and absence of mistake or accident.

The Court has already ruled from the bench that both statements are admissible, assuming the government lays a proper foundation.  Whether Mr. Sussmann's description of the YotaPhone allegations as "unrelated" to the Alfa Bank allegations was actually misleading can be confronted on cross examination.  However, the Court will not permit this line of inquiry to lead to additional technical testimony about the YotaPhone allegations or their accuracy. Discussions amongst CIA employees about the data, and any conclusions the CIA may have drawn about the accuracy of the data after the meeting had ended, are not relevant to Mr. Sussmann's earlier statement to the FBI.  Therefore, the same parameters the Court has set for the DNS data will apply to the accuracy and gathering of the YotaPhone data as well.

F.   Whether the Special Counsel Must Immunize Mr. Joffe

As noted previously, the final motion before the Court concerns Mr. Joffe's availability as a trial witness.  Mr. Joffe is reportedly willing to be a defense witness but has indicated that, if called to testify, he would invoke his rights under the Fifth Amendment.  Mr. Sussmann maintains the Special Counsel "has made it impossible for [him] to call Mr. Joffe as an exculpatory witness" by informing Mr. Joffe's lawyer that Mr. Joffe remains a "subject" of the Special Counsel's investigation, even though nearly six years have passed since the relevant events took place.  Def.'s Mot. Re: Immunity at 1, ECF No. 59.  Mr. Sussmann argues that the Special Counsel's "threat[]" of criminal prosecution long past the running of any applicable statute of limitations amounts to prosecutorial misconduct.  Id. at 5.  On that basis, he urges the Court to order the Special Counsel to extend use immunity to Mr. Joffe or, if he refuses to do so,

to dismiss the indictment based on a violation of Mr. Sussmann's constitutional right to a fair

trial.  For the reasons explained below, the Court will deny this request.

"[P]rosecutorial . . . actions aimed at discouraging defense witnesses from testifying

ha[ve] been deemed to deprive the criminal defendant of his Sixth Amendment compulsory

process right."  United States v. Davis, 974 F.2d 182, 186 (D.C. Cir. 1992); see also United

States v. Simmons, 670 F.2d 365, 368 (D.C. Cir. 1982) ("The right of a defendant to establish a

defense by presenting his own witnesses is a fundamental element of due process of law." (citing

Washington v. Texas, 388 U.S. 14, 19 (1979)).  In United States v. Smith, 478 F.2d 976 (D.C.

Cir. 1973), for example, the D.C. Circuit reversed a judgment of conviction when the prosecutor

improperly threatened a key defense witness the night before his scheduled testimony.  Id. at

978–79; see also United States v. Simmons, 670 F.2d 365, 369 (D.C. Cir. 1982) (stating that "the

action of the United States Attorney [in Smith] was completely uncalled-for and constituted an

improper threat to deprive the defendant of a witness"); United States v. Blackwell, 694 F.2d

1325, 1341 (D.C. Cir. 1982) (noting it would have been reversible error for the prosecutor to

warn potential witness that if she testified, a gun charge that was dropped could be reinstated

against her).

However, absent the type of "extraordinary circumstances" described above, the Court

has no authority to order the government to grant a witness immunity.  United States v. Lugg,

892 F.2d 101, 104 (D.C. Cir. 1989); see also United States v. Heldt, 668 F.2d 1238, 1282 (D.C.

Cir. 1981) ("Generally, a trial court has no authority, in the absence of a request by the

government, to provide use immunity for a defense witness."); United States v. Ebbers, 458 F.3d

110, 119 (2d Cir. 2006) (to obtain relief, a "defendant must show that the government has used

immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment

through 'overreaching,' or has deliberately denied 'immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation'" (citations omitted)).

No such extraordinary circumstances are present here.  Unlike the situation in <u>Smith</u>, or that noted in <u>Blackwell</u>, the Special Counsel's Office has not contacted Mr. Joffe directly to attempt to dissuade him from testifying.  Nor has the defense offered evidence that the Special Counsel's refusal to grant Mr. Joffe immunity is unmoored from any legitimate law enforcement purpose.  <u>See</u> <u>Ebbers</u>, 458 F.3d at 119 (affirming denial of defendant's request because the government's immunity decisions were "consistent with legitimate law enforcement concerns").  At oral argument, the Special Counsel pointed to at least one hypothetically relevant criminal statute with a seven-year statute of limitations.  Mot. Hr'g Tr. at 19:9–13; <u>see</u> 18 U.S.C. § 1031.  Accordingly, the Special Counsel's continued representation that Mr. Joffe is a subject of its investigation, rather than simply a witness, does not amount to prosecutorial misconduct on this record.  The Court therefore has no basis to order the Special Counsel to extend use immunity to Mr. Joffe.[5]

### III.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [58] Defendant's Motion to Exclude Testimony or Evidence Pertaining to Former FBI Assistant Director Bill Priestap's and Deputy General Counsel Trisha Anderson's Notes is DENIED.  It is further

---

[5] The Court notes that its limitation on the presentation of evidence concerning the propriety of Mr. Joffe's conduct in relation to the Alfa Bank data—which is the Special Counsel's stated basis for his "subject" status—could affect Mr. Joffe's decision to invoke the Fifth Amendment.

**ORDERED** that [59] Defendant's Motion to Dismiss Case if the Special Counsel Does Not Immunize Rodney Joffe is DENIED.  It is further

**ORDERED** that [61] Special Counsel's Motion in Limine is GRANTED in part and DENIED in part.  It is further

**ORDERED** that [57] Defendant's Motion to Preclude the Special Counsel from Presenting Evidence or Argument Regarding Matters Subject to the Attorney-Client Privilege  is GRANTED in part and DENIED in part, as explained on the record on April 27, 2022.

   **SO ORDERED**.


                     _____
                     CHRISTOPHER R. COOPER
                     United States District Judge

Date: <u>May 7, 2022</u>