<pre>
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       * * * * * * * * * * * * * * *   )
 3     UNITED STATES OF AMERICA,       )      Criminal Action
                                       )       No. 21-00582
 4                     Plaintiff,      )
                                       )
 5        vs.                          )
                                       )
 6     MICHAEL A. SUSSMANN             )      Washington, D.C.
                                       )      May 9, 2022
 7                     Defendant.      )      11:03 a.m.
                                       )
 8     * * * * * * * * * * * * * * *   )

 9

10               TRANSCRIPT OF PRETRIAL CONFERENCE
           BEFORE THE HONORABLE CHRISTOPHER R. COOPER,
11                  UNITED STATES DISTRICT JUDGE

12

13     APPEARANCES:

14     FOR THE GOVERNMENT:       ANDREW DeFILIPPIS, ESQ.
                                 MICHAEL T. KEILTY, ESQ.
15                               BRITTAIN SHAW, ESQ.
                                 JONATHAN E. ALGOR, IV, ESQ.
16                               SPECIAL COUNSEL'S OFFICE
                                 145 N Street, Northeast
17                               Washington, D.C. 20002

18

       FOR THE DEFENDANT:        SEAN M. BERKOWITZ, ESQ.
19                               MICHAEL BOSWORTH, ESQ.
                                 CATHERINE YAO, ESQ.
20                               NATALIE H. RAO, ESQ.
                                 LATHAM & WATKINS, LLP
21                               1221 Avenue of the Americas
                                 New York, New York 10020
22
       REPORTED BY:             LISA EDWARDS, RDR, CRR
23                              Official Court Reporter
                                United States District Court for the
24                                District of Columbia
                                333 Constitution Avenue, Northwest
25                              Washington, D.C. 20001
                                (202) 354-3269
</pre>

```
1              THE COURTROOM DEPUTY:  Your Honor, this is
2    Criminal Case 21-582, the United States of America versus
3    Michael A. Sussmann.
4              Counsel, please come forward to identify
5    yourselves for the record, starting with the Government.
6              MR. DeFILIPPIS:  Good morning, your Honor.  Andrew
7    DeFilippis for the Government.  With me at counsel table are
8    Assistant Special Counsels Michael Keilty, Brittain Shaw and
9    Johnny Algor.
10             THE COURT:  Good morning.
11             MR. BERKOWITZ:  Good morning, your Honor.  Sean
12   Berkowitz along with Michael Bosworth, Natalie Rao,
13   Catherine Yao on behalf of Mr. Sussmann, who is present in
14   court.
15             THE COURT:  Good morning, Mr. Berkowitz.
16             MR. BERKOWITZ:  Good morning.
17             THE COURT:  I hope everyone had a nice weekend.
18             This is our pretrial conference.  My agenda list
19   for this morning, just to give you a roadmap, I'd like to
20   address one loose end on the motions in limine ruling.
21             I'd like to go through each side's witness list to
22   see where things stand with respect to the witnesses that
23   you intend to call.  I'd like to review the exhibit list
24   submissions that were made recently.  I don't intend to go
25   through exhibit by exhibit, but just categorically.  I'd
```

1    like to understand what issues still may be in dispute after

2    the issuance of the motions *in limine* ruling and hear

3    argument on that.

4            I'd like to go over the jury questionnaires or at

5    least our changes to them, go over voir dire procedures and

6    then just some loose ends about trial logistics and then

7    take up anything you all want to bring to the Court's

8    attention.

9            So the more I sort of dug into each side's sort of

10   theories of relevance over the weekend as we finalized the

11   last motions *in limine* ruling, which you obviously got, I

12   thought I might revisit one issue.  And that is the Clinton

13   campaign press release from October, late October, I guess.

14           I provisionally ruled that that would not be

15   admissible based on the submissions that you all made.  And

16   I ruled from the bench without really getting any argument

17   on that issue.  And my previous understanding was that it

18   was being offered to show a direct attorney-client

19   relationship between Mr. Sussmann and the campaign as well

20   as potentially the effect on the listener under a hearsay

21   exception.

22           But I guess my question, as I have thought more

23   about this, given the sort of two competing theories of the

24   case and two narratives laid out in the Court's ruling on

25   the motion *in limine*, is whether it is relevant not for the

1    truth, but to show the campaign's connection to the alleged

2    public relations effort to play stories regarding the

3    Alfa-Bank data with the press and that therefore it is sort

4    of context for the Government's motive theory, that

5    Mr. Sussmann sought to conceal that effort, as well as the

6    campaign's general connection to that effort.

7            So, Mr. Berkowitz, please address that if you

8    want.

9            MR. BERKOWITZ:  Yes, your Honor.  Thank you for

10   raising the issue.

11           THE COURT:  Yes.  And I will also say that I've

12   never introduced a tweet at a trial.  And there are certain

13   evidentiary issues with what a tweet is and who it is sent

14   by.  I would like to avoid those issues.  But there is a

15   separate press release, which I'm not quite sure I

16   appreciated when I ruled from the bench a week and a half

17   ago.

18           MR. BERKOWITZ:  So let me try and address the

19   contextualized issue, your Honor.

20           With respect to the campaign's involvement or PR

21   connection to the Alfa-Bank story, we expect there will be

22   testimony or other evidence that ties that together.  And I

23   know that in your motion *in limine* ruling, you assumed

24   without saying we conceded it that we were taking the

25   position that Mr. Sussmann was not acting on behalf of

1    Hillary for America.

2            We're not going to be taking the position that he

3    was not counsel for Hillary for America in connection with

4    various efforts and communications; and we will obviously

5    address that at trial.  But I don't know that the connection

6    between the campaign and PR efforts, opposition research to

7    get the story of Alfa-Bank out there is going to be

8    something that's in dispute.

9            And I would ask that you, as you think about this

10   issue, which is somewhat inflammatory because it gets the

11   candidate -- it's a month after; it's a different newspaper

12   issue; and there's no connection between Mr. Sussmann and

13   that tweet to suggest that he was involved in that or was

14   otherwise doing it.

15           And so as it's evaluated, I think contextualizing

16   what else is coming into evidence, I think that that tweet

17   is more prejudicial than it would be probative.  It also

18   relates to a number of other issues that you note from an

19   evidentiary standpoint.

20           So we don't think that the tweet itself for all

21   the reasons in our motion, but also because it's not -- it

22   would be cumulative, I think, of the other evidence related

23   to whether there was a connection at the time about that.

24           Without getting into too much work product or

25   issues, there were updates to the campaign related to, for

1    example, the possibility of a *New York Times* story coming

2    out.  And I think that that will be what's relevant as

3    opposed to the larger issue of, you know, whether they

4    continue to try and press that after the meeting.

5            THE COURT:  I appreciate that.  But there were a

6    couple double negatives in there.

7            MR. BERKOWITZ:  Please correct me or ask me to

8    refocus it.

9            THE COURT:  Did I understand you to say that the

10   defense will not be contesting that he was representing the

11   campaign in connection with some of the media outreach that

12   was going on?

13           MR. BERKOWITZ:  Correct.

14           THE COURT:  Mr. DeFilippis?

15           MR. DeFILIPPIS:  Yes, your Honor.  Let me just

16   briefly say that I think it's plain from the contents of the

17   tweet and the press statements themselves that the

18   Government is not offering those for their truth.  So I

19   think your Honor, it seems, agrees that they're not hearsay.

20   It's more of a relevance/probity thing.

21           And while I don't have it in front of me, your

22   Honor, when you read the contents both of the press

23   statement and the tweet, the thrust of them is the very

24   culmination of Mr. Sussmann's work and strategy, which was

25   twofold:  First, the strategy, as the Government will argue

1    at trial, was to create news stories about this issue, about

2    the Alfa-Bank issue; and second, it was to get law

3    enforcement to investigate it; and perhaps third, your

4    Honor, to get the press to report on the fact that law

5    enforcement was investigating it.

6          And we see all three things there reflected in the

7    tweet and in the press statement.  It says something to the

8    effect of, Donald Trump has a secret channel with Russia and

9    the FBI should look into this or we trust that the FBI is

10   looking into this.

11         That is highly probative, your Honor, because it

12   is, as I said, the culmination of everything the Defendant

13   was trying to do as he billed work to the campaign.

14         And we expect to call at least currently, your

15   Honor, the campaign manager of the Hillary Clinton campaign,

16   who will say this was a conscious decision.  After being

17   briefed specifically on Mr. Sussmann's efforts, the campaign

18   made a conscious decision, authorized at the very highest

19   levels of the campaign, to share the Alfa-Bank allegations

20   with the media.

21         THE COURT:  Well, if that's going to be the case,

22   and he's not contesting that he was representing the

23   campaign in connection with that effort, isn't the tweet

24   cumulative?  It's icing on the cake.  Right?

25         MR. DeFILIPPIS:  I don't think so, your Honor,

 1    only because we will not have, your Honor -- we will not

 2    call reporters to the stand who will in fact confirm that

 3    the campaign spoke to the media.  We will not -- we will

 4    have essentially the testimony of a campaign official.

 5           And then the only way to show, your Honor, how the

 6    campaign actually capitalized on what it was that

 7    Mr. Sussmann did in the media is to -- and it's a very

 8    limited -- as your Honor knows, it's not long.  It's not

 9    particularly or really at all prejudicial, your Honor,

10    because the contents of it are essentially just the

11    candidate and one of her advisors adopting the allegation

12    that Mr. Sussmann has been working on.

13           So, your Honor, it's really just context and the

14    pure result of everything that Mr. Sussmann and the campaign

15    were working on in this regard.  And it's not inflammatory.

16    It simply states the allegation and it states that the

17    campaign hopes the FBI's looking into it.

18           We --

19           THE COURT:  I'll reserve on it.  Let's see how the

20    evidence comes in.  And just don't open on it.

21           MR. DeFILIPPIS:  Okay.  Thank you, your Honor.

22           MR. BERKOWITZ:  Your Honor, I was also asking

23    permission to approach, but I guess I don't need to here.

24           Mr. DeFilippis in describing the relevance focused

25    on the portion of the tweet that was different than you or I

1    were talking about, that calling on the FBI to investigate.

2            That in and of itself in our -- from our

3    perspective suggests that they are offering the tweet for

4    the truth of the matter, that that's what the campaign

5    desired and wanted and that it was a accumulation of the

6    efforts.

7            Number one, it's not the truth; and in fact, it's

8    the opposite of the truth.  We expect there to be testimony

9    from the campaign that, while they were interested in an

10   article on this coming out, going to the FBI is something

11   that was inconsistent with what they would have wanted

12   before there was any press.  And in fact, going to the FBI

13   killed the press story, which was inconsistent with what the

14   campaign would have wanted.

15           And so we think that a tweet in October after

16   there's an article about it is being offered to prove

17   something inconsistent with what actually happened.

18           THE COURT:  I understand.

19           Let's move to the respective witness lists.

20           Mr. DeFilippis, let me start with you.  And I

21   don't put folks on a clock.  I'm not going to give you time

22   limits.  But what I'd like to do is go through each witness,

23   confirm whether you're still planning to call them or not,

24   generally the subject matter and how long you think you'll

25   need so that I can gauge particularly for the jury's benefit

```
 1    how long we're going to be here.
 2              MR. DeFILIPPIS:  Sure, your Honor.
 3              THE COURT:  So Ms. Anderson?
 4              MR. DeFILIPPIS:  Yes.  We still intend to call
 5    Ms. Anderson, your Honor.
 6              THE COURT:  That's with respect to the followup
 7    meeting?
 8              MR. DeFILIPPIS:  That's right, your Honor.  The
 9    notes and the meeting -- the debrief from Mr. Baker.  We
10    don't expect it to be particularly long.
11              THE COURT:  So 30 minutes?
12              MR. DeFILIPPIS:  Yeah.  I think that's probably
13    about right, your Honor, for direct.  Maybe even a little
14    less for the direct itself.
15              THE COURT:  Okay.  Apple custodian?
16              MR. DeFILIPPIS:  Your Honor, we think there will
17    not be a need for that.  We've been in discussions with a
18    stipulation.  So hopefully no.
19              Mr. Antonakakis?  Is he No. 1 or 2?  I always
20    get --
21              MR. DeFILIPPIS:  He is Researcher 1, your Honor.
22    And I think that -- I would say that --
23              THE COURT:  Generally, counsel, at this point,
24    let's just use names because --
25              MR. DeFILIPPIS:  Sure.
```

1          THE COURT:  -- it's going to confuse everybody.

2          MR. DeFILIPPIS:  Understood, your Honor.

3          So I think there the answer in light of -- we're

4    analyzing your Honor's ruling.  I think in light of your

5    Honor's ruling, the answer is possibly yes.  We're a bit on

6    the fence as to Mr. Antonakakis, so that's where we stand.

7    I think his testimony would likely be -- certainly his

8    direct would be under an hour.

9          THE COURT:  Mr. Baker?

10          MR. DeFILIPPIS:  Yes, your Honor.  His testimony

11   will be perhaps our longest or one of our longer witnesses.

12   It could go -- the direct could go a couple hours or so.

13          THE COURT:  Special Agent Batty?

14          MR. DeFILIPPIS:  I think the answer there, your

15   Honor, is possibly no.  We have not made a final decision,

16   but we are looking to see if any of his testimony is

17   cumulative of others.

18          THE COURT:  Mr. Chadason?

19          MR. DeFILIPPIS:  Likely yes, your Honor.

20          THE COURT:  About how long?

21          MR. DeFILIPPIS:  Probably under a half-hour.

22          THE COURT:  Mr. Dagon?

23          MR. DeFILIPPIS:  Likely no, your Honor.

24   Obviously, there's a possibility or in rebuttal or such.

25   But likely no.

```
1            THE COURT:  Mr. DeJong?

2            MR. DeFILIPPIS:  Probably, yes.  Mr. DeJong's

3    testimony would be I'd estimate about a half-hour or less.

4            THE COURT:  And the general subject area?

5            MR. DeFILIPPIS:  He was an employee of Neustar

6    whom Mr. Joffe tasked to pull data from Neustar's holdings.

7            THE COURT:  So it's the source of the data?

8            MR. DeFILIPPIS:  Yes.  Exactly, your Honor.

9            THE COURT:  Mr. Elias?

10           MR. DeFILIPPIS:  I think possibly yes, your Honor.

11   There's another witness who we'll address at the end who we

12   recently have decided we may call, and we have to evaluate

13   whether there may be overlap there.

14           Mr. Elias, if he were called, would be -- I expect

15   his direct would be under 45 minutes.

16           THE COURT:  Mr. Mook?

17           MR. DeFILIPPIS:  Yes.  Currently we intend to call

18   him, your Honor.  Best guess, perhaps around 30 minutes to

19   45 minutes.

20           THE COURT:  Special Agent Gaynor?

21           MR. DeFILIPPIS:  Yes.  We would intend to call

22   Special Agent Gaynor.  Probably a half-hour to 45 minutes.

23           THE COURT:  That's on the course of the

24   investigation?

25           MR. DeFILIPPIS:  That's right, your Honor.  He was
```

1    a headquarters agent assigned to the investigation.  So it

2    gives the sort of FBI headquarters's perspective on the

3    investigation.

4                THE COURT:  Mr. Grasso?

5                MR. DeFILIPPIS:  Yes, your Honor.  Probably a

6    half-hour or less.  He's a special agent whom Mr. Joffe

7    separately provided a piece of the Alfa-Bank allegations to.

8                THE COURT:  Special Agent Heide?

9                MR. DeFILIPPIS:  Yes, your Honor.  We intend to

10   call Special Agent Heide.  He was one of the case agents on

11   the investigation.  We expect his would be among our longer

12   witnesses, perhaps a couple hours.

13               THE COURT:  Special Agent Hellman?

14               MR. DeFILIPPIS:  Yes.  This was, your Honor, a

15   cyber agent who first analyzed the Alfa-Bank allegations

16   when they came in.  We expect his testimony would be perhaps

17   about a half-hour, perhaps a little less.

18               THE COURT:  And Agent Martin?  We talked about him

19   before.

20               MR. DeFILIPPIS:  Yes.  Your Honor, we're trying to

21   keep Agent Martin's testimony relatively brief in light of

22   your order.  So I think probably under a half-hour.

23               THE COURT:  Steven M.?

24               MR. DeFILIPPIS:  Your Honor, I think it is

25   unlikely we would call him in our case in chief.  Possibly

```
 1    in rebuttal, but unlikely.
 2              THE COURT:  Mr. Novick?
 3              MR. DeFILIPPIS:  Yes.  We do intend to call
 4    Mr. Novick, the CEO of a company who was also tasked by
 5    Mr. Joffe to mine data and prepare analysis.  His testimony
 6    would be perhaps 45 minutes of direct or 45 minutes to an
 7    hour.
 8              THE COURT:  Kevin P.?
 9              MR. DeFILIPPIS:  Yes, your Honor.  We intend to
10    call Kevin P.  And he will speak to the meeting at the CIA.
11              THE COURT:  And the Government has not moved to
12    present any of these witnesses under pseudonyms.  Will the
13    identities be known or how are we going to deal with that?
14              MR. DeFILIPPIS:  So our proposal, your Honor --
15    and we can put this in writing; I think we had intended to
16    do that -- our proposal would be to have them testify as
17    they're listed here.  I don't think the defense has an
18    objection to that.  But we're happy to put it in writing if
19    your Honor would like.
20              THE COURT:  I'm fine with that so long as there's
21    no objection.  But if there is, let's tee that up sooner
22    rather than later.
23              MR. DeFILIPPIS:  Okay.
24              THE COURT:  And that's 30 minutes?
25              MR. DeFILIPPIS:  Yes, your Honor.
```

```
1                 THE COURT:  Mr. Priestap?

2                 MR. DeFILIPPIS:  Yes.  We do intend to call him.

3      I think, your Honor, probably around a half-hour.

4                 THE COURT:  Ms. Sands?

5                 MR. DeFILIPPIS:  Ms. Sands was, in addition to

6      Mr. Heide, one of the case agents on the investigation.  So

7      hers could go up to a couple hours, perhaps.

8                 THE COURT:  Special Agent Schaaf?

9                 MR. DeFILIPPIS:  Your Honor, I think it's unlikely

10     we will call him in our case in chief.

11                THE COURT:  Ms. -- is it "Seago" or "Seago"?

12                MR. DeFILIPPIS:  Your Honor, I'm not 100 percent

13     sure.  I think I've heard both.

14                MR. BOSWORTH:  "Seago."

15                MR. DeFILIPPIS:  "Seago."  Yes.  We do intend to

16     call Ms. Seago.  Hard to estimate the length of her

17     testimony, but perhaps an hour.

18                THE COURT:  Mr. McMahon?

19                MR. DeFILIPPIS:  Yes.  The former DNC employee.

20     His testimony we think will be quite brief, perhaps under 15

21     minutes.  He had lunch with Mr. Sussmann immediately before

22     his meeting with Mr. Baker.

23                THE COURT:  And a summary witness?

24                MR. DeFILIPPIS:  Yes.  We will have a summary

25     witness, your Honor.  Precisely who will have that honor we
```

1    haven't quite decided.  But we'll let the defense know as

2    soon as we do.

3            THE COURT:  So do you have a case agent?  Was

4    there a motion to have a case agent?

5            MR. DeFILIPPIS:  We do not.  It may be an agent

6    who's our summary witness, but we're not looking to put a

7    case agent on the stand.

8            THE COURT:  Okay.

9            MR. DeFILIPPIS:  Two other witnesses, your Honor,

10   who we recently informed the defense in light of your

11   rulings and other considerations.  So the defense has

12   been -- I think we've made a lot of progress on

13   stipulations, at least in principle.

14           We think we still will call a custodian from

15   Perkins Coie from the Perkins Coie billing department just

16   to explain to the jury what a law firm bill is, how Perkins

17   Coie does its time entry practices and its bills, just

18   because again it's something that probably most jurors won't

19   be familiar with.  And we think some short testimony on that

20   would help frame the documents.

21           THE COURT:  So no other Perkins witnesses?

22           MR. DeFILIPPIS:  So long as we all sign

23   stipulations, that would be the idea.

24           Then the other witness, your Honor, is someone

25   named Debbie Fine, F-I-N-E.  She was a lawyer employed by

1    the Clinton campaign at the time who appears to have been

2    the only actual campaign employee who participated in the

3    daily Fusion GPS calls and updates.  So we have let her

4    counsel know that we likely intend to call her.  Again, as I

5    said before, we'll have to evaluate whether there's overlap

6    with Mr. Elias.  But we're undertaking to do that.

7              THE COURT:  She would be how long?

8              MR. DeFILIPPIS:  Again, hard to say, your Honor.

9    We have not -- I would say probably about an hour or less.

10             THE COURT:  So I haven't tallied all these

11   estimates, but with cross-examination, over a week?

12             MR. DeFILIPPIS:  It may be, your Honor.  And some

13   of these may go quickly; some may go longer.  But it could

14   go into the second week.

15             THE COURT:  Into the second week.  Okay.

16             Mr. Berkowitz?

17             MR. BERKOWITZ:  A couple of issues, if I may, with

18   respect to their witness list in light of this.  And then we

19   can go through our witness list one at a time, your Honor,

20   as you did with them.

21             THE COURT:  Sure.

22             MR. BERKOWITZ:  We will evaluate if they are not

23   going to be calling certain people whether we need to; and

24   we'll work with them on whether there may be documents that

25   we'd like to get in, for example, through Steve M. that

1    could be used or relevant for Kevin P., but Steve M. would

2    lay the foundation.  We'll work with them on those so we

3    don't need to call them solely purposes of that.

4           With respect to Kevin P. and Steve M., while we

5    have no objection to that for security reasons, we would ask

6    that you inform the jury why it is we're calling them by

7    their first and last initial and get some direction from the

8    Court as to how to address them, if at all, by name.  Your

9    order doesn't like us to call witnesses by first name, which

10   I understand that.  Calling somebody Mr. M. or Mr. P. may be

11   awkward.  We can just do away with it.  But some direction

12   on that or some agreement between the parties so we're

13   treating them in the same way.

14           THE COURT:  Mr. Red and Mr. Blue?

15           MR. BERKOWITZ:  Yeah.  Exactly.  "Clowns to the

16   left of me, jokers to the right."

17           So with respect to Special Agent Martin, we

18   received -- as we had indicated to you, we had asked and the

19   Government said they would -- a supplement on his testimony.

20   We have some concerns about the scope of what they've

21   identified.  And I'm happy to address that with you now, at

22   a later time today or in a brief motion.  But we think that

23   they identified nine bullet points, six of which we think go

24   outside the scope of the three buckets that you had

25   identified in your order.

1        THE COURT:  So this is since the order?

2        MR. BERKOWITZ:  Correct.

3        THE COURT:  Why don't you file something.

4        MR. BERKOWITZ:  Will do.

5        So those, I think, are the issues, putting aside

6   some privilege issues that may come up that we're going to

7   want to talk to you about, and mechanically how best to deal

8   with that so we're not in a position of having Mr. Elias or

9   Ms. Seago or Ms. Fine on the stand and having their lawyers

10  pop up to assert a privilege.  And we have a suggestion on

11  that which we're happy to talk about whenever.

12        THE COURT:  You're going to get an order on the

13  email privilege issues soon.  But I agree that there may be

14  privilege issues with Seago and Elias, and we should deal

15  with them beforehand, if possible.

16        MR. BERKOWITZ:  Okay.  And I think a simple

17  proffer beforehand of the topics, and we can go through

18  what's on side and off side.

19        I'm happy to go through our witnesses, if you'd

20  like.

21        THE COURT:  Shoot.

22        MR. BERKOWITZ:  The first one, we skip all the way

23  to G with Ben Gessford.

24        THE COURT:  And you've incorporated by reference

25  the Government's list, which is fine.

 1              MR. BERKOWITZ:  Yes.

 2          So with respect to -- well, let me address that.

 3    We assume, Judge -- but assuming in a case like this is

 4    never a good idea, so let me ask -- that if, for example,

 5    Mr. Elias is called as a witness and we have questions of

 6    Mr. Elias which arguably go outside the scope of their

 7    direct but that we would otherwise call him, we can deal

 8    with that while he's on the stand here?

 9              THE COURT:  Yes.  I would rather not have to call

10    people twice.

11              MR. BERKOWITZ:  Great.

12          Mr. Gessford is with the FBI.  We would expect

13    that he would testify, if called, relating to certain Lync

14    messages, L-Y-N-C messages, which are internal FBI messages,

15    about Clinton and the DNC and kind of the knowledge of

16    whether these allegations were provided on their behalf or

17    whether Mr. Sussmann was connected in some way to Clinton

18    and DNC.  The testimony would be very brief; I'll say under

19    30 minutes.

20          The next witness on our list is Walter Giardina.

21    He is also with the FBI.  We would expect that if we called

22    him he would talk about wanting to initiate an investigation

23    after an article came out in Slate in the October time

24    period to reflect how the FBI might have reacted if they had

25    seen an article in a publication, that they would typically

1   open that type of investigation again in under 30 minutes.

2              THE COURT:  So this is materiality?

3              MR. BERKOWITZ:  Correct.  Yes.

4              Tasha Gauhar:  I don't know that you'd have had

5   time to read our submission from last night, Judge, but she

6   is the author of the notes from March 6th, 2017, that

7   reference the Alfa-Bank allegations being provided to the

8   FBI by a lawyer on behalf of a client.

9              Shawn Henry we do not currently expect to call.

10             Ms. Gauhar, by the way, again, would be under 30

11  minutes, Judge.

12             Michael Horowitz, who is an inspector general at

13  the Department of Justice:  If called, we would expect his

14  topic to be about Mr. Sussmann providing information to the

15  Inspector General in a way of -- almost in conformity that

16  is consistent with his practice to provide information to

17  law enforcement where he thinks there may be concerns or

18  issues.  And that one also involved Mr. Joffe, your Honor.

19             Eric Lichtblau with *The New York Times*:  He's the

20  author or -- I'm sorry -- he is the person at *The New York*

21  *Times* that Mr. Sussmann and Mr. Joffe were communicating

22  with about the potential story that caused him to give a

23  heads-up to the FBI that that story might be coming out.

24             There is an issue here that I want to alert you

25  to.  We reached out to Mr. Lichtblau's counsel, actually

1    counsel for *The New York Times*, to explore their willingness

2    in light of the First Amendment issues to testify at the

3    trial.  And we told him that both Mr. Sussmann and Mr. Joffe

4    would waive any privilege associated with the press

5    privilege; and that gave *The New York Times* comfort that,

6    notwithstanding their normal policy of objecting, they would

7    allow him to testify about his interactions with

8    Mr. Sussmann and Mr. Joffe, communications between the two

9    as well as communications with the FBI that wouldn't be

10   protected by privilege because the FBI reached out to them

11   to ask them to hold the story.

12         They did tell us that they would object to

13   questioning Mr. Lichtblau about independent research he did

14   in support of the story, you know, people he spoke with to

15   verify sources and other types of things that were not

16   communicated to Mr. Sussmann.

17         We told him from our perspective that seemed like

18   a fair line to draw, and we would not get into that.

19         He's reached out to the Government on that issue,

20   and it appears there may be -- again, I don't want to speak

21   for the Government -- but it appears that they may not be in

22   a position today to give *The New York Times* that assurance.

23   And so we expect *The New York Times* sometime this week will

24   be filing a motion on that issue to tee it up for your

25   Honor.

1          I know you're welcoming all this additional paper.

2          THE COURT:  One more intervenor in the mix.

3          MR. BERKOWITZ:  "All the news that's fit to

4     print."

5          THE COURT:  That issue is not baked yet,

6     obviously?  It's not?

7          MR. BERKOWITZ:  I'm sorry?

8          THE COURT:  It's not baked yet?

9          MR. BERKOWITZ:  Correct.  Correct.

10          We would expect his testimony to last probably an

11     hour or so.

12          Mary McCord is the acting AAG, again, would

13     testify to her notes referencing a client at that March 6th,

14     2017, meeting.

15          Jonathan Moffa is the FBI --

16          THE COURT:  Ms. McCord, 30 minutes?

17          MR. BERKOWITZ:  Or less.

18          Mr. Moffa with the FBI would testify to

19     materiality, knowing the source of the information was

20     Mr. Sussmann.

21          Scott Schools had notes related to the March 6th

22     meeting.  We talked to him about a stipulation, and I know

23     he's talking to the special counsel about whether there

24     could be a stipulation that would avoid the need for him to

25     testify.  If he were to testify, I would expect it to be 15

```
 1    minutes or less.

 2           And then we have some character witnesses.  We're

 3    trying to determine, number one, whether -- you know, the

 4    number and the amount.  And it's going to be I want to say a

 5    game-time decision.  But as you know, it's relatively short.

 6           THE COURT:  That's fine.

 7           So it's looking like two weeks?

 8           MR. BERKOWITZ:  I think that's probably fair.

 9           THE COURT:  We'll see how it goes.  But that's

10    what I should expect to tell the jury?

11           MR. BERKOWITZ:  Yes.

12           THE COURT:  Let's move to the exhibit list

13    objections.  Given everything else that's been going on, I

14    have not had a chance to really tear into it too closely.

15           Why don't we start with the defense's objections

16    to the Government's exhibits and see if you can frame it in

17    a way that eliminates any issues that have been resolved by

18    the motion in limine ruling or that for any other reason

19    might be off the table.

20           MR. BERKOWITZ:  So as you know, the exhibit lists

21    were exchanged before your motion in limine ruling, your

22    Honor.  And what might be helpful would be to get a revised

23    exhibit list in light of that.  I think a lot of our

24    objections were related to accuracy of the data and

25    otherwise.  We don't know what they're still purporting to
```

1    put in.  To the extent that as we get closer we could get a

2    revised list that eliminates those that they're not going to

3    go into, that would I think streamline the issues.

4          In --

5          THE COURT:  Just as a matter of logistics, I'd

6    like a physical binder of each side's exhibits, you know,

7    the first morning of trial just so that I can flip through

8    them as the witness is being asked about them.  So a revised

9    list that pares down the number of exhibits would be

10   helpful.

11         Also, with respect to witnesses, if there is any

12   prior testimony for prior-inconsistent-statement inquiries,

13   it would be helpful to have any prior testimony here at the

14   bench just to streamline it.

15         MR. BERKOWITZ:  Understood.  So if potentially

16   we'd be attempting to impeach witnesses with prior

17   testimony, that we would have a binder for your Honor that

18   would have by tabs 302s, testimony, so that when we say this

19   date that that's Tab 4, your Honor.

20         THE COURT:  Perfect.

21         MR. BERKOWITZ:  Okay.  The issues or the general

22   topics, Judge, that we would expect a revised witness list

23   to reflect would be, you know, there were privilege log

24   excerpts, emails between the researchers and Mr. Joffe,

25   exhibits sought to be offered as statements of

1    co-conspirators and the like.  Knowing what of those they

2    still intend to use would be helpful in teeing up the

3    issues.

4            Short of that, your Honor, we do have a number of

5    different objections that are hard to frame into buckets

6    because they go to relevance that we can't understand why

7    particular documents and categories of documents would be

8    relevant.  And without understanding the context for which

9    they're being offered, it's a challenge for us on a one-off

10   basis to kind of come up here and argue each one of them.

11           THE COURT:  Well, there are a couple categories

12   that you've identified.  Records of Neustar is one.

13           MR. BERKOWITZ:  Yes.

14           THE COURT:  So, Mr. DeFilippis, what's the

15   relevance basis for those?

16           MR. DeFILIPPIS:  Yes, your Honor.  I think it

17   would be a limited number of records.

18           Mr. DeJong, who your Honor asked about earlier,

19   was the employee at Neustar who Mr. Joffe typically relied

20   upon to pull data.  And so it would be a limited set of

21   emails reflecting his efforts to do that in response to

22   Mr. Joffe's request.

23           THE COURT:  That sounds fair.

24           Mr. Berkowitz?

25           MR. BERKOWITZ:  It depends on how limited and what

1    the set is.  I think we'll look at that.  I'm certainly not

2    suggesting categorically that there wouldn't be any Neustar

3    documents that would be relevant.

4            And one -- I think it's in everybody's interest

5    not to have multiple objections while a witness is

6    testifying.  It slows things down.  There will by necessity

7    be things that come up that we can't anticipate.

8            But, for example, before Mr. DeJong testifies, to

9    the extent that we could be made aware of which particular

10   exhibits there are, to the extent that there are issues that

11   they intend to show to him, we could raise it that morning.

12   We'll certainly work hard in advance of that to identify any

13   issues or concerns that we can't come to agreement on.  But

14   I do think if there are categories that we can get a steer

15   from you before a witness testifies, it would be really

16   helpful.

17           THE COURT:  That's fair.

18           ZETAlytics, Infoblox, Packet Forensics:  Are

19   these, Mr. DeFilippis, the same categories or same basis?

20           MR. DeFILIPPIS:  Yes, your Honor.  On Infoblox, I

21   don't anticipate we will be using records from there.

22   ZETAlytics and Packet Forensics, again, a limited number of

23   documents, perhaps mostly relating to the testimony of Jared

24   Novick, who worked for a related company and was tasked by

25   Mr. Joffe.

1          THE COURT:  I'll tell you what:  Before that

2    witness testifies or any of these witnesses, just flag

3    emails that you might -- that you intend to offer that you

4    think might elicit an objection so that we can deal with

5    it --

6          MR. DeFILIPPIS:  Sure.

7          THE COURT:  -- that morning or before the witness

8    testifies so as not to have a lot of bench conferences.

9          MR. DeFILIPPIS:  Yes, your Honor.

10          THE COURT:  By the way, the bench conferences will

11    be done -- have you all used these closed-circuit phones?

12          MR. DeFILIPPIS:  No, your Honor.

13          THE COURT:  So each side will have a phone or

14    multiple phones that will connect with me and to the other

15    side.  We can put the husher on and have essentially a bench

16    conference without having people crowd around the court

17    reporter and the courtroom deputy for traditional bench

18    conferences.  I've found that they work pretty well.

19          MR. BERKOWITZ:  Even with a voice as loud as mine,

20    the jury won't hear, your Honor?

21          THE COURT:  Use your stage voice.

22          MR. BERKOWITZ:  Okay.  And there are -- again, on

23    the categories of phone records that go through 2021, we're

24    interested to identify which portions the special counsel

25    intends to use.  Obviously, I think the relevance would be

1        in the 2016 category.

2                THE COURT:  I'm sorry.  I lost you there.

3                MR. BERKOWITZ:  Yeah.  So there are phone records

4        that were identified by the special counsel such as Exhibit

5        1304, which are Mr. Joffe's records, which are through 2021,

6        as a date.  We wouldn't expect that they would actually put

7        in evidence of 2021, 2020.  We think the relevance is more

8        limited.  And I don't know that there's a disagreement.  It

9        might have just been done out of fulsomeness.

10               And there are also unmarked exhibits that we

11       recently received calendar invitations for meetings between

12       Mark Elias and Fusion that Mr. Sussmann's not on which we

13       don't think are relevant absent some connection, maybe

14       subject to your ruling.  But those are another category that

15       we have as well as Fusion GPS records that we hope have been

16       addressed by your rulings.  But we'll need to see a revised

17       version.

18               THE COURT:  How about the Government's objections?

19       There are a handful, right?

20               MR. DeFILIPPIS:  Yes, your Honor.  And I think

21       some of our objections were less in the form of full, you

22       know, blanket objections, but we just wanted to flag issues.

23               I think the first was just there were dozens and

24       dozens of emails on the defense's exhibit list reflecting

25       Mr. Sussmann's communications with the FBI both in relation

1    to his representation of the DNC for the hack and then for

2    the campaign related to cyber issues.

3           We're not disputing that the jury's entitled to

4    know he did those things.  I think all we were asking is

5    that your Honor -- and perhaps in similar fashion, if they

6    can let us know the notice before, we don't think the jury

7    needs hundreds of emails on those topics, many of which may

8    be hearsay.  And again, we think that those are probative

9    for discrete purposes that we don't want to waste the jury's

10   time.

11          Then there are notes of FBI and DOJ personnel.

12   That was I think in part the subject of the defense's

13   briefing last night.  Again, I think on the notes of Special

14   Agent Gaynor, who are the notes referenced in the first part

15   of our objections, those -- Special Agent Gaynor will

16   testify.  They can cross-examine him.  But I don't know that

17   his notes without a proper foundation should come into

18   evidence or without some hearsay exception.

19          THE COURT:  So I have not read what came in last

20   night.  But can you just summarize that issue for me?  I

21   understand six months after the meeting with Mr. Baker

22   there's a meeting in the FBI regarding the investigation.

23   There are six or seven people there; and at least one

24   person, maybe others, write in their notes apparently that

25   there was a client involved.

 1              MR. DeFILIPPIS:  Right.

 2              So yes.  That's the gist of the factual piece of

 3     it, your Honor.

 4              We located those statements in the notes in

 5     February or early March, when we received a huge production

 6     from the DOJ Inspector General's office.  As soon as we

 7     noticed that in the notes, we put them on very rapid

 8     declassification at the FBI and turned them over to the

 9     defense about a week later.

10              We then, speaking internally as the Government,

11     decided it would be important to flag those notes for the

12     defense.  And so the day that we produced them, we got on a

13     call.  We wanted to be in a position to flag it in a way

14     that we didn't just put it in the end of a paragraph of a

15     discovery letter.  We flagged for the defense that we were

16     going to be producing notes and that that included notes in

17     which the word "client" appeared.  And we told them that we

18     thought that would be relevant to them.

19              We then --

20              THE COURT:  And the authors of those notes or at

21     least some of the authors are on one party's or another's

22     exhibit list.  Correct?

23              MR. DeFILIPPIS:  Your Honor, I think we may have

24     marked them in an abundance of caution for cross-examination

25     purposes and the like.  But we don't intend to offer those

1    notes at trial.

2          I don't think they're on the defense's exhibit

3    list, but they did indicate to us in a meeting that they

4    might intend to offer them, which is why we flagged it in

5    our response.

6          Let me just say that there was absolutely no

7    effort by the Government to delay here or to hide these in a

8    large production.  That is precisely why we got on a phone

9    call and flagged it for the defense.

10          THE COURT:  So there's no relevance objection.

11    You identified them as potential *Brady*; you've disclosed

12    them.  And so the objection is hearsay?

13          MR. DeFILIPPIS:  Exactly, your Honor.  We didn't

14    say in our submission that -- we just wanted the defense to

15    do the same that we did, which is proffer a hearsay theory.

16    They claim they may be able to meet past recollection

17    recorded.  They claim that they're present sense

18    impressions.  That one I think, your Honor, if that were the

19    definition of present sense impressions, then I think all

20    contemporaneous notes would be present sense impressions.

21          Again, the Government hasn't had a full chance to

22    study last night's submission.  I think we're skeptical that

23    there's a nonhearsay basis to admit them.  Certainly it

24    sounds like they intend to call some of these participants

25    in the meeting.

1          But I think we would ask your Honor for the same,

2     which your Honor has done for us, which is see if at trial a

3     proper foundation is laid for any hearsay exception.

4          THE COURT:  Mr. Berkowitz?  Who would you offer

5     the notes through and who either on the Government's list or

6     on your list took the notes?

7          MR. BERKOWITZ:  Yeah.  So Tasha Gauhar would be --

8     let me set the stage just a little bit.

9          There's a meeting on March 6th of 2017, as

10    Mr. DeFilippis indicated, where the acting attorney general,

11    Dana Boente, is being apprised of the status of various

12    pieces of the Russia investigation.  And there are several

13    note-takers at that meeting, which involved high-level

14    people both at the FBI as well as the Department of Justice.

15         Two of those notes included the references that

16    we've been talking about.  One is Tasha Gauhar, who wrote

17    down that the Alfa-Bank allegations were provided the FBI by

18    an attorney on behalf of a client; and then Mary McCord, who

19    was also on our witness list, wrote "client" and "attorney."

20    And those are the two authors of the notes that were at the

21    meeting.

22         Interestingly or relevantly --

23         THE COURT:  Who spoke those words?

24         MR. BERKOWITZ:  Mr. --

25         THE COURT:  Do we know?

 1            MR. BERKOWITZ:  We believe Andy McCabe spoke those

 2     words, your Honor.

 3            THE COURT:  He's not on anybody's list?

 4            MR. BERKOWITZ:  He's not on the list because those

 5     comments, as we indicated in our motion, are not being

 6     offered for the truth of what Mr. Sussmann said.  They're

 7     for materiality as to what the FBI understood relative to

 8     that issue.  Their state of mind, if you will.

 9            Mr. Baker was at the meeting where these words

10     were reported and recorded.  Mr. Priestap was at the

11     meeting, he of the previous notes.  We believe Ms. Anderson

12     was also at the meeting.  So several of the Government

13     witnesses were at a meeting where various people are

14     reporting and summarizing this, that the notes were provided

15     on behalf of a client.

16            And we think that's very relevant on a number of

17     different issues that are nonhearsay.

18            THE COURT:  So your position is, whether or not

19     the data was provided on behalf of a client, that is what

20     the investigators understood based on what Mr. McCabe said

21     and others recorded?

22            MR. BERKOWITZ:  Correct; and Mr. Baker's failure

23     to say:  Wait a second.  This is really an important issue,

24     for gosh's sakes, and you're now saying something

25     inconsistent with what I understood.

1          In addition, the notes that as we all know from

2     the Priestap-Anderson briefing, your Honor, Mr. Baker was

3     shown their notes from shortly after his meeting with

4     Mr. Sussmann to refresh his recollection, which is what

5     apparently refreshed his recollection, but he wasn't shown

6     notes of a meeting that he attended where something

7     different was said.

8          All of these are things that --

9          THE COURT:  If that's a proper nonhearsay,

10    nontruth purpose, then Ms. McCord or the other witness will

11    be able to say what Mr. McCabe said and that his statement

12    would be nonhearsay without the notes coming in.  Right?

13         MR. BERKOWITZ:  What I would --

14         THE COURT:  Do you need the notes if the witnesses

15    report a nonhearsay statement by Mr. McCabe?

16         MR. BERKOWITZ:  What we would have, then, your

17    Honor -- and I believe I can proffer, and we did it in this

18    motion, which I know you'll read -- neither Ms. Gauhar nor

19    Ms. McCord have an independent recollection of anything that

20    happened at the meeting.  But they would say that they would

21    have recorded what was said accurately and their notes would

22    accurately reflect what was said in the meeting.

23         THE COURT:  I think I need to read it, and we'll

24    deal with that before either of them testifies.

25         MR. BERKOWITZ:  And I think we probably need to

 1    deal with it before, for example, Mr. Baker or Mr. Priestap,

 2    because we do think that there would be a relevant

 3    cross-examination for those folks.  And we can --

 4          THE COURT:  Was Priestap at the later meeting?

 5          MR. BERKOWITZ:  Yes.

 6          THE COURT:  And Baker was at the later meeting?

 7          MR. BERKOWITZ:  Yes; as was Ms. Anderson.

 8          THE COURT:  Got it.

 9          MR. BERKOWITZ:  Your Honor, Mr. DeFilippis also

10    raised the issue as to Mr. Gaynor's notes.  I want to

11    address that briefly.  That's addressed very briefly in

12    Footnote 1 of our filing from last night.

13          Those notes of Mr. Gaynor are on the Government's

14    exhibit list, and we marked them for identification because

15    there may be relevant cross-examination issues.  This is

16    353, 370 and 410, the defense exhibits that we're talking

17    about.  And the special counsel's exhibit is 279.

18          Our point here is to the extent that we would

19    offer them --

20          THE COURT:  Give me the defense numbers again.

21          MR. BERKOWITZ:  Defense Nos. 353, 370 and 410.

22    And the special counsel exhibit is 279.  And this is

23    addressed in about nine lines of Footnote 1 of our filing at

24    Document 123 last night.

25          But very briefly, we don't know that we would

1     actually offer the notes.  We would use them to

2     cross-examine Mr. Gaynor.  It depends on what he says as to

3     whether they would be needed to be marked.  To the extent we

4     would offer them, we would obviously address it at the time.

5                THE COURT:  Okay.

6                MR. BERKOWITZ:  And if you'd like me to, I can

7     address the Government's other issue that you raised, which

8     was -- or that Mr. DeFilippis raised, which are these

9     300-and-some notes.

10               THE COURT:  I trust you will not be seeking to

11    admit 300 emails?

12               MR. BERKOWITZ:  What I would say, Judge, is that

13    certainly we would not be taking witnesses through 327

14    emails.  We would selectively cross-examine witnesses to

15    show the FBI's knowledge that Mr. Sussmann represented HFA,

16    that he represented the DNC, that he represented the

17    Democratic Congressional Committee.

18               And we would potentially offer as a group exhibit

19    all of those that could be used in a summary form to show

20    the categories and the buckets.  We wouldn't waste time

21    going through 300-and-some exhibits.  But the sheer volume

22    of those communications, which are, to be clear, all either

23    directly between Mr. Sussmann and the FBI or internal FBI

24    documents that discuss specifically Mr. Sussmann and his

25    representation of these --

```
1              THE COURT:  No.  I understand your relevance
2      argument.  I mean, typically, a compilation exhibit like
3      that would be admitted through an agent or someone or a
4      custodian of records that has reviewed the documents and can
5      explain that they all relate to a certain topic, and there's
6      a compilation or a summary presented.
7              How would you do something like that here?  Who
8      would you admit them through?
9              MR. BERKOWITZ:  So one option -- I don't have a
10     direct answer for you, Judge, because we haven't yet decided
11     how, if at all, we intend to do that.  It could either be
12     done through an FBI witness where we provide that witness in
13     advance the documents and ask them to review it if he's
14     going to have a summary witness on just to literally say:
15     On cross-examination, you've also reviewed X number of
16     documents.  Y fall into this category.  And we'll try to
17     work something out with them in advance.
18             Otherwise, we could I guess find somebody, whether
19     it's a paralegal or otherwise, to call to the stand to do
20     that exercise.
21             THE COURT:  I've had paralegals testify to that
22     effect before.
23             MR. BERKOWITZ:  Yeah.
24             THE COURT:  We're not going to have a witness go
25     through 300 emails.
```

1      MR. BERKOWITZ:  Nor was I suggesting that.  But to

2   be clear, we may selectively use a handful with particular

3   witnesses to show their --

4      THE COURT:  Just the bottom line to me is, is the

5   idea that this is a mountain of correspondence that he was

6   having with the campaign and the DNC about cybersecurity

7   issues around the same time to put in context why he may

8   have entered a particular billing record for the campaign as

9   opposed to somebody else?

10      MR. BERKOWITZ:  No.  So these are communications

11   with the FBI --

12      THE COURT: Oh, I'm sorry.

13      MR. BERKOWITZ:  -- on behalf of the DNC, the DCC

14   and HFA with the FBI.  So it goes to their knowledge that

15   this gentleman shows up --

16      THE COURT:  His *bona fides* with the FBI?

17      MR. BERKOWITZ:  Not just his *bona fides*, but his

18   *bona fides* as a Democratic lawyer, as a lawyer for Hillary

19   for America.  The concept that somehow they would be trying

20   to hide his association with those clients or entities would

21   be, I think, fair game to suggest, Oh, my gosh, we thought

22   that -- we had no idea that this person was affiliated with

23   Democrats.

24      THE COURT:  Got it.

25      I would suggest a summary exhibit or summary

1   testimony based on someone's review of all those documents

2   in advance.

3            MR. BERKOWITZ:  And to cross-examine witnesses

4   with select ones to show -- they're saying, "If we had known

5   X"; and then to show them, "Well, the FBI knew Y and Z,

6   which suggests they knew his political affiliation" is

7   something that goes to materiality of somebody saying, "If

8   we'd known that these were provided by somebody connected to

9   the Clinton campaign, we might have done something

10  different."

11           THE COURT:  I think that's fair.

12           MR. DeFILIPPIS:  Your Honor, just one more issue

13  on our objections.

14           THE COURT:  Yes.

15           MR. DeFILIPPIS:  The last category we had

16  identified were a number of news articles about -- again, on

17  the face of -- the headlines of the articles about --

18  "Donald Trump's ties to Russia," I think, was the primary

19  theme of the news articles.

20           We just -- number one, they're news articles,

21  which we don't think have, you know, probative weight here.

22           Number two, we do not want to make this a trial on

23  Donald Trump's ties to Russia.

24           And again, we don't have a lot of context for

25  which it would be -- why the defense would want to offer all

1    of those.  But I think our initial reaction is they would be

2    a distraction.

3              THE COURT:  Mr. Berkowitz?

4              MR. BERKOWITZ:  So as we understand the objection,

5    your Honor, it's not to articles generally.  They have

6    articles on their exhibit list.  It's to articles that talk

7    about the issues with Trump and Russia in the summer of

8    2016.

9              THE COURT:  I think it's broader than that.  It's

10   sending back multiple newspaper articles to the jury with

11   all sorts of stuff in them, and the jury is spending its

12   time reading newspaper articles.

13             MR. BERKOWITZ:  Fair enough.  And I don't think

14   we're looking to put in, you know, a tremendous amount of

15   articles.

16             The articles that we think are relevant, your

17   Honor, relate to what's going on in the world in July and

18   August of 2016, which provide context and animate what's

19   going on for Mr. Sussmann and Mr. Joffe and why there are

20   potential national security issues associated with this.

21             As you'll remember, you know, on July 27th, at a

22   press conference -- again, this is shortly before the

23   researchers start looking into issues, according to the

24   Government -- Trump has a press conference that says:

25   Russia, if you're listening, I hope that you're able to find

1    the 30,000 emails that are missing.  I think you'll probably

2    be rewarded mightily by our press.

3          That fact being out there and well known provides

4    context for the work that's done and the motivation

5    potentially to go to the FBI as to why it would be relevant

6    that there were connections between -- potential connections

7    between Trump and Russia.

8          We are not suggesting that they are true.  We're

9    not looking to do that.  And maybe one of the things that

10   could be done is to, you know, question witnesses about

11   those facts without sending the articles themselves back to

12   them, because you're right, your Honor:  We're not looking

13   on either side to have them review the articles in the press

14   for their truth.  We all know that many times things come

15   out in the press that turn out not to be accurate.

16          But the fact that this was what was going on in

17   the world at this time we think is very relevant to the

18   state of mind and the rationale behind this as well as the

19   opposition research that was going on.

20          THE COURT:  Well --

21          MR. BERKOWITZ:  The DNC hack --

22          THE COURT:  -- Mr. Elias, Mr. Mook, Mr. Baker

23   perhaps can all certainly testify to that.  Right?

24          MR. BERKOWITZ:  I think that they certainly could,

25   your Honor.

```
 1              THE COURT:  Well, we'll reserve on the newspaper

 2    articles.  But I don't want to send a raft of newspaper

 3    articles back to the jury and waste their time reading them.

 4              MR. BERKOWITZ:  We hear you.

 5              THE COURT:  Let's move to the questionnaires.

 6    First of all, both sides, thank you to both sides for

 7    limiting the number of questions, for not giving me 200

 8    questions to look through.  There were very few disputes as

 9    to what should or should not be asked, which the Court

10    appreciates.

11              We've arrived at 89 questions, and we'll give each

12    side a copy just to go down the list of how we've resolved

13    the handful of disputes that there were.

14              The defense proposed including a question asking

15    whether the potential juror voted or not.  We will ask that

16    question, but with a caveat saying "without revealing who

17    you voted for."

18              We did not include the defense's proposed question

19    about law enforcement experience.  There were several other

20    questions about law enforcement, like having applied and

21    whatnot.  So we felt that that was duplicative.

22              We did include the defense's proposed question

23    about whether a juror had ever applied for a security

24    clearance or not.

25              We did not include the next two questions about
```

1    familiarity with the security clearance process.

2           We included the special counsel's additions to

3    Question 51 regarding Packet and ZETAlytics.  I don't know

4    to what extent those entities will be mentioned, but there's

5    no harm in asking.

6           And we slightly revised the prior Question 58 and

7    took out the proposed third clause proposed by the special

8    counsel and substituted it with "the Federal Government's

9    investigation of Russian interference in the 2016 election,"

10   which was a more neutral presentation in my view.

11          So very few changes.

12          On the logistics, we will have everyone come --

13   first of all, we will send you an electronic version of the

14   questionnaire.  Work it out amongst yourselves.  But we'll

15   need you to make 125 copies of the questionnaire.

16          I think we're calling in 100 potential jurors

17   Wednesday morning.  They'll assemble in the ceremonial

18   courtroom.  We'll have counsel tables set up for each side.

19   I will introduce myself, give them an overview of the

20   process.  I'll ask each side to introduce themselves, to

21   introduce Mr. Sussmann.

22          Then you all will leave.  We will allow the

23   jury -- it usually takes for this questionnaire probably an

24   hour and a half, maybe two.  Some people are slower than

25   others.  Some write more stuff in the margins than others.

1    We'll have a law clerk stay behind to answer any questions

2    the jurors have about the questionnaire.

3              After all the questionnaires are completed, we'll

4    look to you all to make two copies of each questionnaire,

5    one for each side, and to return the originals to the Court.

6              We'll need to check with the jury office, but we

7    will then give you all at least a day, maybe a little

8    longer, but probably a day to go through the questionnaires

9    and to decide on any jurors that both sides would like to

10   strike for cause.  If both sides agree to strike any

11   particular juror, we would not call them back for voir dire

12   on Monday.

13             Once we eliminate those people, the jury office

14   needs time to advise folks when to show up next week.  We'll

15   call in one tranche Monday morning, one tranche Monday

16   afternoon and, if necessary, another tranche Tuesday

17   morning.

18             I would hope to pick a jury on Monday, but it may

19   well bleed into Tuesday.

20             Any questions about that?

21             Once we eliminate the agreed-upon jurors, we will

22   bring each juror individually in this courtroom for

23   individualized voir dire.  There will be brief followup by

24   me and then by you all regarding the answers that they've

25   given on the questionnaires.  If there's any challenge for

1    cause, you have to make it before we get to the next juror

2    in line.  We'll qualify 32 plus an additional two or three

3    just as a buffer.

4           And then you'll exercise your peremptories,

5    standard number of peremptories.  I do the Arizona method.

6    I don't know if you're familiar with that, but it's the

7    easiest method for me.  Each side will exercise all of its

8    strikes against the regular jurors at the same time, and

9    then we'll do another round exercising one strike each

10   against the alternate seats.

11          My standard practice is to have two alternates.

12   Do you think we need more in this case?

13          MR. DeFILIPPIS:  No, your Honor.  Not from the

14   Government's perspective.

15          MR. BERKOWITZ:  No, your Honor.

16          THE COURT:  So we'll go with two.  You know, we

17   are still in a pandemic.  The last jury trial I had three

18   weeks ago, a juror reported one morning that he had been in

19   contact with someone who had tested positive, but had tested

20   himself and was negative.

21          And so, you know, there is a chance -- maybe you

22   should think about this -- that we might lose folks because

23   of either -- or have to take a break because of COVID

24   issues.  So think about how that implicates how many

25   alternates you think we should have.

1          Any questions about that process?  And we'll go

2      over it again the morning of.

3          MR. BERKOWITZ:  Just briefly, so I'm tracking your

4      Honor.

5          THE COURT:  Yes.

6          MR. BERKOWITZ:  It sounds as if to the extent that

7      either side believes a juror should be struck for cause

8      after Wednesday's meetings and review of questionnaires and

9      the other side doesn't, you don't need to be made aware of

10     that?

11         THE COURT:  No.

12         MR. BERKOWITZ:  We would deal with that in the

13     course of that particular --

14         THE COURT:  That's right.  Just give me a list of

15     agreed-upon strikes so that I can tell the jury office who

16     not to call back.  And then when we do individual voir dire,

17     I'll ask both sides if they move to strike for cause.

18         MR. BERKOWITZ:  And I think we studied up on the

19     Arizona method, knowing that that's what you use.

20         What number of strikes does the defense have and

21     does the Government have, your Honor?  Is it ten?

22         THE COURT:  Ten to the defense, six for the

23     Government.

24         MR. BERKOWITZ:  I don't think I've got anything

25     further on that issue.

1          THE COURT:  And then one each on top of that for

2     the alternate seats.  And we'll pick the alternate seats in

3     advance.  No one will know besides us who the alternate

4     seats are.

5          On sort of IT issues, will each side have a

6     paralegal running the exhibits off their own system or are

7     you going to share?  How is that going to work?

8          MR. DeFILIPPIS:  The Government will have

9     Ms. Arsenault, your Honor, who's here in the courtroom.  We

10    have not yet discussed with the defense how they intend to

11    do it.

12         MR. BERKOWITZ:  We'll also have somebody who will

13    be available to run our exhibits and put impeachment

14    materials and so forth up.

15         I believe they've been in touch or will be in

16    touch with your staff in order to make sure that we run it

17    smoothly and understand it.

18         THE COURT:  John Cramer is very accommodating.

19    He's very good.  So just hook up with him beforehand just so

20    there are no glitches.

21         MR. BERKOWITZ:  Will do.

22         THE COURT:  There are always glitches, but as few

23    as possible.

24         MR. BERKOWITZ:  That's technology.

25         THE COURT:  Yes.

```
 1                  Any demonstratives for openings?

 2                  MR. BERKOWITZ:  Your Honor, on behalf of

 3       Mr. Sussmann, we would intend to run some type of PowerPoint

 4       that may have, you know, evidence that we expect to come in

 5       as well as potential things such as a timeline or something

 6       along those lines.

 7                  THE COURT:  Well, if it's a piece of evidence

 8       that's subject to an objection that the Court hasn't ruled

 9       as admissible, I don't want to have to interrupt you

10       midstream to deal with an objection to an exhibit being

11       shown to the jury.

12                  Otherwise, if it's a PowerPoint or a diagram or a

13       drawing of some sort, just let the other side know

14       beforehand so that they're in a position to object.

15                  MR. BERKOWITZ:  Understood.

16                  How soon in advance should each side --

17                  THE COURT:  The night before.

18                  MR. BERKOWITZ:  Okay.

19                  THE COURT:  The morning of.  The morning of is

20       fine.

21                  Anything else?

22                  MR. DeFILIPPIS:  Your Honor, just a few brief

23       evidentiary things that we want to make sure we have the

24       Court's guidance on.

25                  Number one is, in our reading of your Honor's
```

1    rulings, we don't think we saw anything on the issues

2    relating to Christopher Steele, Mr. Sussmann's testimony

3    about Mr. Steele and then the intersection between Steele

4    and the Alfa-Bank issue.  So we just wanted to flag that for

5    your Honor.

6            Second would be on the CIA meeting, we understand

7    your Honor to have said that with regard to the YotaPhone

8    allegations, the Government shouldn't elicit from the CIA

9    what they concluded about those allegations.

10           Mr. Sussmann did also present the CIA with the

11   Alfa-Bank allegations.  And we just wanted to clarify

12   whether we're permitted to elicit from the CIA the basic

13   conclusion that they determined it was not a substantiated

14   allegation.

15           THE COURT:  I guess the question is:  Did the CIA

16   reach that conclusion independently or did they share their

17   conclusion with the FBI?  And did that conclusion affect the

18   scope or trajectory or conclusion that the FBI made, which

19   is obviously relevant to materiality?

20           MR. DeFILIPPIS:  So they reached it independently.

21   They issued a report which said essentially that the data

22   underlying both of them did not support the proffered

23   conclusion.  They then sent that to the FBI, which

24   essentially chose to take no further action on it because it

25   looked like the CIA agreed with them.

 1                   And so that was -- and we would not get into --

 2                   THE COURT:  Did the FBI receive that conclusion

 3      before it closed its investigation?

 4                   MR. DeFILIPPIS:  It would have been a couple

 5      months after, your Honor.

 6                   THE COURT:  I don't see how that's relevant, then,

 7      to what the FBI did with the information, what conclusions

 8      it drew from the information.  And therefore, I'm not sure

 9      it goes to materiality.

10                   MR. DeFILIPPIS:  Okay.  And then finally, your

11      Honor, we completely obviously respect your ruling on

12      attorney-client privilege and that we should not elicit from

13      witnesses that there have been invocations of

14      attorney-client privilege here.

15                   I think we would just ask your Honor to keep an

16      open mind on one issue, which is:  When you see the actual

17      exhibits and the number of exhibits in which most of the

18      content is redacted, the defense has proposed a jury

19      instruction which we've been discussing, but which would

20      essentially tell the jury that redactions can be made for

21      any number of reasons and you should pay no mind to them.

22                   We think that the way it actually comes in at

23      trial could confuse the jury such that it may be simpler and

24      less prejudicial to all sides if the jury simply is told at

25      some point that there have been redactions made for

1    attorney-client privilege, that they're proper redactions.

2    And again, maybe just something for your Honor to consider

3    as you see the evidence come in.

4         But our concern is that the jury's going to be

5    lost and confused if there are a large number of exhibits

6    where most of it is redacted.  And to just say simply:

7    There have been redactions made for privilege and other

8    issues, again, we --

9         THE COURT:  What I typically do, in general, I try

10   to be as transparent with my jury as possible.  So I

11   wouldn't wait until the jury instructions, you know.  As

12   soon as there's an exhibit like that where there are

13   redactions for whatever reason, I would say, you know:

14   Ladies and gentlemen, I know that it may be -- well, I would

15   say that sometimes evidence is only admitted if it's

16   consistent with the Rules of Evidence.  And many times, a

17   document is relevant for one reason but not for another.

18   And when nonadmissible or irrelevant material is in an

19   exhibit, the way that we deal with it is through redactions.

20   And I don't know what's behind the redactions, nor should

21   you speculate about what's there.  This is a standard

22   procedure when we have an exhibit that has some admissible

23   information and some inadmissible information, but not get

24   into the fact that it's been redacted because of privilege.

25         MR. DeFILIPPIS:  Okay.  And I think our only

1   concern there is sort of it affects how we argue those

2   documents to the jury.  And if the jury comes away thinking

3   that what is under there is irrelevant, then we sort of --

4   in our view about the attorney-client relationship, we may

5   well want the jury to infer it related to Alfa-Bank.  In

6   other words, because the client relationship is so much at

7   issue here, it's just a bit tricky to think about how to

8   navigate that.

9          THE COURT:  Well, the other suggestion, which I

10  referred to maybe inelegantly the last time we were here, is

11  instead of having three pages of blocked-out documents, just

12  have no redacted boxes, but bracketed, you know, "Redacted,"

13  with one word.

14         MR. DeFILIPPIS:  Okay.  And we have at least so

15  far changed the color of the redactions in response to the

16  defense.  So we'll continue to work on that.

17         THE COURT:  Did you make them pink or something?

18         MR. DeFILIPPIS:  Just white, your Honor.

19         THE COURT:  Just white.  Okay.

20         MR. BERKOWITZ:  A couple of -- I'll go in reverse

21  order at least in terms of the specifics.

22         As to the redaction issue, we agree, your Honor.

23  We raised this issue that telling the jury something the

24  first time a redacted document comes up makes sense.  What

25  you suggested certainly seems like a reasonable approach and

1    consistent with what you've done in other matters.

2         We had also suggested the possibility:  To the

3    extent that the reason something is relevant is to show that

4    on this date this person communicated with this person on

5    this topic.  You could just show that box and not show

6    redactions.

7         You said:  They can try their case how they want,

8    and we need to be careful about allowing them to try their

9    case how they want and then trying to argue things from it

10   that might be impermissible to suggest that what's behind --

11        THE COURT:  I would rather something to show that

12   there's something that's been redacted --

13        MR. BERKOWITZ:  Yeah.

14        THE COURT:  -- because that changes the content of

15   the email if the jury thinks that there's just a blank

16   transmission of an email at X time from Person Y to Person

17   Z.

18        MR. BERKOWITZ:  And in some cases, it's probably

19   that's exactly what it is and there is no text that's

20   redacted.  The way the redactions were done as I understand

21   it is literally just to black out everything even if there

22   was no text underneath it.  But it seems as if we're

23   trending towards something.  We'll see how they want to

24   respond to that.

25        THE COURT:  Okay.

 1          MR. BERKOWITZ:  With respect to -- I think you

 2     addressed their question on the CIA meeting.  On the opening

 3     issue, we're probably going to want some guidance from you

 4     beforehand on the March 6th issue.  I don't think you

 5     necessarily need to rule whether the notes themselves are

 6     admissible, but at least whether we're allowed to talk about

 7     that meeting and what somebody might have reported would be

 8     helpful, because I think that's something we would like to

 9     open on.

10          THE COURT:  Okay.

11          MR. BERKOWITZ:  There are a couple of other items.

12     With respect to witnesses, I think your Honor's order

13     typically requires --

14          THE COURT:  And again, on that point, you do not

15     anticipate having a witness who will testify that those

16     words were said at the meeting.  So in order for you to get

17     in any evidence of the fact that those words may have been

18     said, you need those notes?

19          MR. BERKOWITZ:  Correct.  The people who wrote the

20     notes will testify, but they won't remember.  They will say

21     accurately -- they will say:  If I wrote those notes, those

22     are my notes of this meeting and would accurately reflect

23     what was said at the meeting.

24          THE COURT:  Okay.  Got it.

25          MR. BERKOWITZ:  And I think our pleading lays it

1    forth more elegantly than I could here; and I know you'll

2    take a look at it.

3          With respect to witnesses, Judge, your pretrial

4    order, standing order, says that 36 hours before somebody

5    testifies you should give the order and to give the order

6    the Friday beforehand.

7          We would expect to get -- we would like to get the

8    Government's witness order for the first day of trial as

9    soon as practicable but no later than Friday of this week,

10   if that makes sense.  I don't think that puts them in a

11   tough spot.

12         THE COURT:  That's fine.  You guys are pros.  No

13   surprises.  You know, give the order of call as soon as you

14   think you know it.  Okay?  And obviously, there can be

15   changes.  People get sick; people get delayed.  And we can

16   switch on the fly.  But just be respectful of each other.

17         MR. BERKOWITZ:  There were a couple of outstanding

18   *Giglio* issues, your Honor, that we've been in touch with the

19   Government about.  I would expect to the extent we can't

20   reach accommodation we would raise that with you the morning

21   of the witness's testimony.

22         THE COURT:  Okay.  So given the estimates of how

23   long the trial will be, we'll try to get started as close --

24   to have the jury here at 9:00, get started as close to 9:00

25   as possible.  If there are preliminary issues, let the law

 1    clerk know.  We'll try to deal with them at 8:30.

 2              We'll have a 15-minute break in the morning, a

 3    15-minute break in the afternoon, an hour and 15 on average

 4    for lunch.  Given it seems likely that we'll go into the

 5    second week, we should probably plan not to meet on Friday,

 6    the first Friday.

 7              MR. BERKOWITZ:  Not to meet?

 8              THE COURT:  Not to meet the first Friday, unless

 9    you all want to.

10              MR. BERKOWITZ:  All I would say is --

11              THE COURT:  Generally, lawyers would prefer to

12    take that Friday off.

13              MR. BERKOWITZ:  All I would say is if it's going

14    much slower than we anticipated, I don't think anyone wants

15    to go into a third week.  We can revisit that.

16              THE COURT:  We can revisit that.  But I would

17    accommodate that request if you were to make it.

18              MR. BERKOWITZ:  Is there going to be an overflow

19    courtroom, Judge, that will be piping in the trial?

20              THE COURT:  Yes.  There'll be a media room.  We'll

21    have a certain number of seats.  That's determined by the

22    Chief Judge's office, not me, reserved for media, a certain

23    number for family and other members of the defense and then

24    a certain number for the Government.

25              MR. BERKOWITZ:  You'll let us know that at some

```
 1     point?
 2              THE COURT:  At some point.
 3              MR. BERKOWITZ:  Thank you, Judge.
 4              THE COURT:  There will be a media room where
 5     everything will be fed, but no public phone line.
 6              MR. DeFILIPPIS:  Your Honor, if jury selection
 7     were to take most of Monday, would it be your Honor's
 8     practice to still have openings as much as it will allow or
 9     to put openings to Tuesday?
10              THE COURT:  Opens will not be before Tuesday.
11              MR. DeFILIPPIS:  Okay.
12              THE COURT:  If we pick a jury Monday, it's going
13     to take all day.
14              MR. DeFILIPPIS:  Okay.
15              THE COURT:  If there's nothing else, we're
16     adjourned.
17              Tomorrow is CIPA day, correct?
18              MR. BERKOWITZ:  It is.
19              THE COURT:  We'll see you tomorrow.
20              MR. BERKOWITZ:  We're making progress.
21              THE COURT:  Good.  Keep it up.
22              (Proceedings adjourned.)
23
24
25
```

## **CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby

certify that the foregoing constitutes a true and accurate

transcript of my stenographic notes, and is a full, true,

and complete transcript of the proceedings produced to the

best of my ability.


Dated this 9th day of May, 2022.


/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269