### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>v.<br><br>**MICHAEL A. SUSSMANN**,<br><br>Defendant,<br><br>**TECH EXECUTIVE-1, FUSION GPS, DEMOCRATIC NATIONAL COMMITTEE, PERKINS COIE LLP, HILLARY FOR AMERICA**,<br><br>Intervenors. | Case No. 21-cr-582 (CRC) |

### OPINION AND ORDER

The government has moved the Court to review *in camera* 38 emails that were withheld by the investigative research firm Fusion GPS based on attorney-client privilege and the attorney-work-product doctrine in response to two grand jury subpoenas issued to Fusion during the investigation of this case.  Fusion withheld the emails and related attachments at the request of Hillary Clinton's 2016 presidential campaign ("Hillary for America").  In 2015, Hillary America and the Democratic National Committee ("DNC") retained the law firm Perkins Coie to provide various legal services.  Perkins Coie partner Marc Elias led the representation while also serving as the campaign's General Counsel.  Perkins Coie later hired Fusion GPS to assist its work for the campaign.  Specifically, Perkins's engagement letter with Fusion provided that Fusion's work would support the firm's provision of legal advice related to "defamation, libel, and similar laws[.]"  Gov't Mot. to Compel, Exhibit C, ECF No. 64-3 (Retainer Agreement).

Meanwhile, in the summer of 2016, technology executive Rodney Joffe obtained certain data reflecting communications between internet servers maintained for the Trump Organization

and servers belonging to Russia's Alfa Bank.  Believing the data could support the existence of a secret communications link between Alfa Bank and the Trump campaign and wishing to disseminate it to a wider audience, Mr. Joffe shared the data with the defendant, then-Perkins Coie partner Michael Sussmann, who had represented Mr. Joffe and his company on unrelated matters.  Mr. Sussmann, in turn, apparently alerted Mr. Elias to the existence of the data.  Fusion employees then met with Mr. Sussmann, Mr. Joffe, and Mr. Elias in August 2016; drafted a "white paper" containing publicly sourced background information on Alfa Bank, including its connections to the Russian government; and provided that white paper to members of the press while urging them to write stories on Trump's purported secret Russian communications channel.

During the same time period, Mr. Joffe communicated by email with Fusion employee Laura Seago, copying Mr. Sussmann.  Ms. Seago is expected to testify at Mr. Sussmann's upcoming trial, which is scheduled to begin on May 16, 2022.

The 38 emails and attachments that are the subject of the government's motion are among approximately 1500 documents that Fusion GPS withheld from its grand jury production on privilege grounds.  (Fusion produced other, non-privileged documents in response to the subpoenas.)  Based on Fusion's privilege log entries, the government suspects that the 38 documents relate to Fusion's efforts to seed stories in the press about Mr. Trump's ties to Alfa Bank.  The government argues that this type of opposition research and media-relations activity is not encompassed by the attorney-work-product doctrine or attorney-client privilege and, therefore, the emails were erroneously withheld.  The government thus moved the Court to review the documents *in camera* to confirm its suspicions.  Fusion GPS, Hillary for America, the DNC, and Mr. Joffe all intervened to defend the privilege assertions.  Mr. Sussmann separately

objected to *in camera* review and to any subsequent use of the emails by the Special Counsel at trial.  Among his objections are that the Special Counsel was informed of Fusion's privilege assertions more than a year ago, and has waited too long to challenge them on the eve of trial. The Court granted the government's motion for *in camera* review after a hearing and has now had an opportunity to review the emails and attachments.

      A.  <u>Application of the Asserted Privileges</u>

      Applying the two asserted privileges to the 38 emails it has reviewed, the Court finds that Fusion GPS had no valid basis to withhold 22 of the 38 emails, but that it has met its burden to establish privilege over the remaining 16.  The Court analyzes each category separately.

      *1.    The Non-Privileged Emails*

      The emails that are not subject to any privilege mostly involve internal communications among Fusion GPS employees.  The Court begins with the attorney-work-product assertion. Hillary for America has submitted a sworn declaration from its general counsel, Marc Elias. HFA Mot. to Intervene, Exhibit 4, ECF No. 86-4 ("Elias Decl.").  He states, consistent with Fusion's engagement letter, that Perkins Coie retained the firm "to provide consulting services in support of the legal advice attorneys at Perkins Coie were providing to specific firm clients 'related to defamation, libel, and similar laws in which accuracy is an essential legal element.'" Elias Decl. ¶ 11.  Mr. Elias attests that he generally provided direction for Fusion's work and that "on some occasions, Fusion's work was distilled and incorporated into [his] judgments about legal issues, while in other instances, [he] shared the results of Fusion's work with [his] clients," including the Clinton Campaign and the DNC.  <u>Id.</u> ¶ 12.  As further background, Mr. Elias explains that representing political campaigns has often required him to provide advice on the risks of defamation claims by opposing candidates based on statements made or information

disseminated by his clients.  Id. ¶ 5.  These risks were especially acute in the 2016 campaign, Mr. Elias says, due to Donald Trump's well-documented history of litigiousness.  Id.

Counsel for Fusion GPS, Joshua Levy, has also submitted a declaration, which echoes Mr. Elias's attestation that Fusion's investigative work was undertaken to aid Perkins Coie's representation of Hillary for America and the DNC.  Fusion Opp'n Re: Mot. to Compel, Exhibit 1 ¶ 26, ECF No. 103-1 ("Levy Decl.").  With respect to the analysis of the Alfa Bank data specifically, Mr. Levy states that "Fusion conducted that analysis for the purpose and in furtherance of Perkins's provision of legal advice to its clients concerning, among other things, litigation risks facing those clients . . . during the 2016 election cycle."  Id. ¶ 28.  It was on this basis that Hillary for America directed Fusion to assert work-product privilege over the withheld emails.

The attorney-work-product doctrine "precludes discovery of the mental impressions and work product of attorneys, whether those mental impressions are captured in notes, memoranda, briefs, or another form, so long as the work product was produced in the anticipation of litigation."  United States v. Edelin, 128 F. Supp. 2d 23, 40 (D.D.C. 2001).  This protection extends to material prepared by an attorney's "investigators and other agents" if that work was also prepared in anticipation of litigation.  United States v. Nobles, 422 U.S. 225, 238–39 (1975); see United States v. Kovel, 296 F.2d 918 (2d Cir. 1961).  Applying this principle, courts routinely extend the privilege to a range of third-party professionals who assist attorneys in providing legal advice during or in anticipation of litigation.  E.g., Kovel, 296 F.2d at 922 (translators and accountants); In re Grand Jury Subpoenas Dated March 24, 2003, 265 F. Supp. 2d 321, 325 (S.D.N.Y 2003) (law clerks and secretaries); In re G–I Holdings, 218 F.R.D. 428, 436 (D.N.J. 2003) (tax expert); United States v. Alvarez, 519 F.2d 1036, 1045–46 (3d Cir. 1975)

(psychiatrist).  That said, the privilege should not "be construed to engulf 'all manner of services.'"  Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp., 5 F.3d 1508, 1515 (D.C. Cir. 1993) (quoting FTC v. TRW, Inc., 628 F.2d 207, 212 (D.C. Cir. 1980)).

The Court has no reason to question Mr. Elias's declaration that Perkins Coie retained Fusion to assist in his provision of legal advice to the Clinton Campaign, or that one aspect of his advice to the campaign was assessing the risk of potential defamation claims resulting from its public statements.  And that risk was far from academic given Mr. Trump's track record of lawsuits.  To the extent Fusion conducted research or other investigative services that informed Mr. Elias's advice in that regard, its work product would therefore be protected.  That is so even if the work product closely resembles classic "opposition research."  See In re Grand Jury Subpoenas, 265 F. Supp. 2d at 330 (upholding work product protection over work provided by public relations consultant that informed the lawyers' "fundamental client functions—such as [] advising the client of the legal risks of speaking publicly").

But the record before the Court establishes that Fusion did more in connection with the Alfa Bank allegations than simply provide information and analysis to Mr. Elias so that he could better advise the Campaign on defamation risk.  Based on non-privileged emails that Fusion did produce to the grand jury, and on the withheld emails the Court has reviewed *in camera*, it is clear that Fusion employees also interacted with the press as part of an affirmative media relations effort by the Clinton Campaign.  That effort included pitching certain stories, providing information on background, and answering reporters' questions.  See generally Gov't Reply Re: Mot. to Compel, Ex. A, ECF No. 97-1.  Some of the emails at issue—including internal Fusion GPS discussions about the underlying data and emails circulating draft versions of one of the background white papers that was ultimately provided to the press and the FBI—relate directly

to that undertaking.  And because these emails appear not to have been written in anticipation of litigation but rather as part of ordinary media-relations work, they are not entitled to attorney-work-product protection.  See Calvin Klein Trademark Trust v. Wachner, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) ("[A]s a general matter public relations advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called 'work product' doctrine."); see also Blumenthal v. Drudge, 186 F.R.D. 236, 243 (D.D.C. 1999) (declining to extend attorney-client privilege to work provided by a consultant with "media, journalistic and political consulting experience" because he was "was retained for the value of his own advice, not to assist the defendant's attorneys in providing their legal advice").

Nor does the attorney-client privilege apply to these 22 emails.  The attorney-client privilege protects "confidential communication between attorney and client, including by and to non-attorneys serving as agents of attorneys," if made "for the purpose of obtaining or providing legal advice to the client."  In re Kellogg Brown & Root, Inc. ("KBR"), 756 F.3d 754, 758 (D.C. Cir. 2014); see also Kovel, 296 F.2d at 922 (the attorney-client privilege extends to communications by third parties that an attorney hired to facilitate "the effective consultation between the client and the lawyer").  "So long as obtaining or providing legal advice was one of the significant purposes" of the communications, the attorney-client privilege applies.  KBR, 756 F.3d at 759–60.

Fusion argues, as it did in the work-product context, that its communications are covered by attorney-client privilege because they assisted Mr. Elias in his representation of Hillary for America.  Fusion Opp'n at 14–15.  Again, the Court does not doubt that some of Fusion's investigative work supported and informed Mr. Elias's legal advice to the Clinton Campaign and the DNC.  But certain of their communications appear to relate solely to disseminating the

information they and others had gathered.  Furthermore, none of these withheld emails involve communications between Fusion and Mr. Elias or Hillary for America.  See Calvin Klein, 198 F.R.D. at 54 (only documents that "contain or reveal confidential communications from the underlying client . . . for the purpose of obtaining legal advice" are protected by attorney-client privilege).  Therefore, for the same reason the work-product privilege does not apply, the attorney-client privilege also does not apply these 22 emails and their attachments.[1]

Consistent with this ruling, Fusion is directed to provide the Special Counsel the documents numbered 2–11, 15, 16, 19–21, and 24–30 in the privilege log accompanying the government's motion by Monday, May 16, 2022.

### 2.  The Privileged Emails

The remaining 16 emails (and attachments) are privileged.  Eight of these emails also involve internal communications among Fusion GPS employees, but the Court is unable to tell from the emails or the surrounding circumstances whether they were prepared for a purpose other than assisting Perkins Coie in providing legal advice to the Clinton Campaign in anticipation of litigation.  The Court therefore finds that the privilege holders have met their

---

[1] The Court rejects the government's invitation to find a wholesale waiver of attorney-client and work-product protections due to the publication of a book by Fusion's principals, Glenn Simpson and Peter Fritsch, or due to Christopher Steele's testimony in a foreign proceeding in March 2020.  Neither of these revelations appear to divulge actual privileged content, and regardless, the privilege may only be waived by the client—here, HFA.  See Nat'l Sec. Couns. v. Cent. Intel. Agency, 969 F.3d 406, 411–12 (D.C. Cir. 2020) (it is "axiomatic that the attorney-client privilege is held by the client," and therefore an attorney or agent's disclosure "is not treated as a waiver of the privilege" unless the agent "was acting on behalf of the client when making the disclosures").  The Court additionally rejects the government's contention that Fusion's communications with the press waive all related, internal communications on the same subject.  Alexander v. F.B.I., 198 F.R.D. 306, 315 (D.D.C. 2000) ("It cannot be the law that a subsequent [communication], inspired by confidential communications but not revealing any confidential information, would waive the privilege.").

burden to establish privilege based on the sworn declarations of Mr. Elias and Mr. Levy. Furthermore, the government has not shown "a substantial need for the materials" in order to pierce the privilege and access Fusion's work product.  Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP, 124 F.3d 1304, 1307 (D.C. Cir. 1997).

The last eight emails (with attachments) comprise two email chains initiated by Mr. Joffe; both are labelled "Privileged Client/Attorney Communications" and include transmissions of information to Mr. Sussmann and Fusion employee Laura Seago.  Mr. Joffe (the apparent client here) has not offered a declaration supporting his privilege assertions.  But he explains in his opposition brief that "the purpose of the [] communications at issue was to obtain [Fusion's] assistance in cybersecurity and technical matters to allow Mr. Sussmann to provide [Mr. Joffe] competent, informed legal advice."  Joffe Opp'n Re: Mot. to Compel, ECF No. 101, at 3–4.  The content and context of the emails are consistent with that explanation.   And contrary to the government's argument, Ms. Seago's presence on the emails does not vitiate the privilege.  By all accounts, her involvement related to the technical analysis of the data, which would naturally inform Mr. Sussmann's advice to his client about the data.  It is irrelevant that she was retained by Mr. Elias as opposed to Mr. Joffe or Mr. Sussmann.  Application of the intermediary doctrine turns on the role the intermediary played, not on who retained her.  See Kovel, 296 F.2d at 922 (presence of an investigator or other expert does not destroy the privilege, "whether hired by the lawyer or by the client"); see also Holland v. Island Creek Corp., 885 F. Supp. 4, 6 (D.D.C. 1995) (disclosure to a third-party does not waive the attorney-client privilege if "(1) the disclosure is made due to actual or anticipated litigation; (2) for the purpose of furthering a common interest; and (3) the disclosure is made in a manner not inconsistent with maintaining

confidentiality against adverse parties."). Therefore, these emails (and attachments) were properly withheld as privileged attorney-client communications.

    B.  <u>Timeliness of the Special Counsel's Motion</u>

    Apart from the validity of the privilege assertions, the defense separately objects to the government's motion to compel as untimely. The chronology is largely undisputed. The Special Counsel served its first subpoena on Fusion in March 2021, and Fusion began producing documents on a rolling basis the following month. Fusion and Perkins provided privilege logs to the Special Counsel around the same time, and Fusion provided a second privilege log in August 2021. In May, June, and August, the Special Counsel corresponded with the various privilege holders about their assertions of privilege; the privilege holders apparently remained steadfast in their positions. Similar discussions happened in early January 2022 between the Special Counsel and the DNC. The Special Counsel filed this motion on April 6, 2022.

    Based on the above timeline, the Court generally agrees with the defense that the government waited too long to compel production of the withheld emails. A right may be forfeited "by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." <u>Yakus v. United States</u>, 321 U.S. 414, 444 (1944). "As a general rule, when a party fails to object timely to discovery requests, such objections are waived." <u>In re Papst Licensing GMBH & Co. KG Litig.</u>, 550 F. Supp. 2d 17, 22 (D.D.C. 2008); <u>Buttler v. Benson</u>, 193 F.R.D. 664, 666 (D. Colo. 2000) ("A party cannot ignore available discovery remedies for months and then, on the eve of trial, move the court for an order compelling production.").[2]

_____

    [2] Indeed, D.C. Circuit precedent suggests "deciding a motion to compel . . . is the functional equivalent of deciding a motion to quash" under Fed. R. Civ. P. 45, which must be "timely filed." <u>Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC</u>, 286 F.R.D. 8, 10

Based on the above timeline, the Special Counsel waited some eight months after it was aware of the privilege holders' final position to seek court intervention.  See Def's Resp. at 6–7, ECF No. 71.  The Special Counsel responds that it was engaged in good faith discussion with the privilege holders to resolve this issue without burdening the Court.  That may well be so, and the Court obviously encourages parties to negotiate disputes on their own.  Still, the record shows that these discussions ended in January 2022—yet the Special Counsel waited to file this motion until April 6, 2022, just over a month before trial was set to begin.  And, given the number of privilege holders involved and the fact-bound nature of the issues, resolving the motion has naturally taken us to the eve of trial.

Under these circumstances, allowing the Special Counsel to use these documents at trial would prejudice Mr. Sussmann's defense.  See Armenian Assembly of Am., Inc. v. Cafesjian, 772 F. Supp. 2d 129, 158–59 (D.D.C. 2011) (production of documents "on the eve of trial . . . forced Defendants to spend a significant amount of time and resources reviewing these materials instead of preparing their witnesses, rehearsing their arguments, and otherwise preparing").  Although these documents are relatively few in number and do not strike the Court as being particularly revelatory, the Court is not in the best position to predict how new evidence might affect each side's trial strategy and preparation.  The Court therefore will not, as a matter of principle, put Mr. Sussmann in the position of having to evaluate the documents, and any implications they might have on his trial strategy, at this late date.  See United States v. Alvin, 30 F. Supp. 3d 323, 343 (E.D. Pa. 2014) (granting defendant's motion to dismiss indictment on speedy trial grounds, noting that the defendant "was put in the position of requiring" a prior

---

(D.D.C. 2012); see also Advisory Committee Note, Fed. R. Crim. P. 17 (1944) ("This rule is substantially the same as Rule 45(a) of the Federal Rules of Civil Procedure.").

continuance "by the Government's failure to turn over discovery" until five days before trial); <u>Leka v. Portuondo</u>, 257 F.3d 89, 101 (2d Cir. 2001) (disclosure of evidence on the eve of trial "tend[s] to throw existing strategies and preparation into disarray").

Accordingly, the government will not be permitted to introduce the emails and attachments that the Court has ruled are not subject to privilege.  The Court takes no position on the other approximately 1500 documents that Fusion GPS withheld as privileged, as they are not the subject of the government's motion.  However, the Court will apply the principles set forth above to any assertions of privilege during witness testimony at trial.

\* \* \*

For the foregoing reasons, it is hereby

**ORDERED** that Fusion GPS, or the relevant privilege holder, produce the documents numbered 2–11, 15, 16, 19–21, and 24–30 in the privilege log to the Special Counsel by Monday, May 16, 2022.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>May 12, 2022</u>