```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                         Criminal Action No.
 4                  Plaintiff,           1:21-cr-00582-CRC-1
                                         Tuesday, May 17, 2022
 5     vs.                               9:07 a.m.

 6     MICHAEL A. SUSSMANN,              *MORNING SESSION*

 7                  Defendant.
       - - - - - - - - - - - - - - - x
 8

 9     _____

10                     TRANSCRIPT OF JURY TRIAL
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE
       _____
12
       APPEARANCES:
13
       For the United States:     ANDREW DeFILIPPIS, ESQ.
14                                 JONATHAN EDGAR ALGOR, IV, ESQ.
                                   MICHAEL T. KEILTY, ESQ.
15                                 BRITTAIN SHAW, ESQ.
                                   SPECIAL COUNSEL'S OFFICE
16                                 145 N Street Northeast
                                   Washington, DC 20002
                                   (212) 637-2231
17
       For the Defendant:         SEAN M. BERKOWITZ, ESQ.
18                                 MICHAEL BOSWORTH, ESQ.
                                   CATHERINE YAO, ESQ.
19                                 NATALIE HARDWICK RAO, ESQ.
                                   LATHAM & WATKINS LLP
20                                 1271 Avenue of the Americas
                                   New York, NY 10020
21                                 (212) 906-1200

22     Court Reporter:            Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
23                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
24                                 Washington, DC  20001
                                   (202) 354-3187
25
```

1                        I N D E X

2

3   WITNESS                                      PAGE

    **SPECIAL AGENT DAVID MARTIN**
4        (By Ms. Shaw).................................... 316
         (By Mr. Bosworth)................................ 348
5        (By Ms. Shaw).................................... 358

6   **SPECIAL AGENT SCOTT HELLMAN**
         (By Mr. DeFilippis).............................. 360

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Good morning, Your Honor.
3    We're on the record for Criminal Case 21-582, United States
4    of America vs. Michael Sussmann.
5              THE COURT:  All right.  Good morning, everybody.
6    Just give me a second to get situated up here.
7              (Pause)
8              THE COURT:  Okay.
9              MR. DeFILIPPIS:  Good morning, Your Honor.  Just
10   to enter our appearances:  Andrew DeFilippis, Brittain Shaw,
11   Jonathan Algor, and Michael Keilty for the government this
12   morning.
13             THE COURT:  Okay.  Good morning, everybody.
14             Mr. Durham, welcome.  I didn't say hello
15   yesterday.
16             MR. DURHAM:  Thank you.  Good morning.
17             MR. DeFILIPPIS:  Your Honor, just a couple of
18   preliminary matters from the government.
19             One is we wanted to inform the Court and the
20   defense that we learned last evening that Dr. Manos
21   Antonakakis, who is on our witness list, has decided to
22   invoke his Fifth Amendment right, and so we will not be
23   calling him as a witness.
24             We also just wanted to flag for the Court that
25   Ms. Kori Arsenault, our paralegal who will be sitting at
```

 1    counsel table throughout the trial, will likely serve as a

 2    summary witness, and so we just want to get the Court's

 3    permission, without objection from the defense, that she can

 4    both serve as a summary witness and sit at counsel table.

 5              THE COURT:  That's fine.

 6              MR. DeFILIPPIS:  Thank you, Your Honor.

 7              THE COURT:  All right.

 8              All right.  I think we still have a couple of

 9    straggler jurors.  With 16 that may be more of a problem

10    than usual.

11              All right.  There are a couple of evidentiary

12    issues that are on my plate.  Who wants to address the

13    expert supplemental notifications?

14              MR. DeFILIPPIS:  Your Honor, very briefly, these

15    are the issues that the defense has flagged.  First, I think

16    the main issue that they addressed in their motion is that

17    they object to testimony from Special Agent Martin to the

18    effect that what -- to the -- testimony that would describe

19    what it is that DNS data or look-ups can allow one to

20    conclude and what they cannot allow one to conclude.

21              We intend, through Special Agent Martin, to keep

22    that discussion completely unconnected to the facts of this

23    particular case.  So, for example, Your Honor, we expect

24    that Special Agent Martin will say that by looking at a DNS

25    look-up alone one cannot tell whether an email was actually

1    sent, whether a communication actually occurred.  And that,

2    Your Honor, is not in any way controversial.  It's not

3    opining on the facts of this case, or even on any particular

4    data.

5            All it's doing, Your Honor, is to explain to the

6    jury what DNS data is and what a person can conclude from

7    the existence of that data alone.  And I think that's

8    important for them to understand.

9            THE COURT:  Okay.  I don't hear the defense to

10   object to that; in other words, Subcategories 1 through 3.

11   It's sort of 4 through 9, which deal with a concept or

12   several different concepts.

13           And as I understand it, you know, there are --

14   there's an almost infinite amount of DNS traffic in the

15   world; and if someone collects a sample data set of traffic

16   to or from a particular domain name, the conclusions that

17   can be drawn from that data set will depend upon how that

18   sample size compares to the universe of DNS data that is out

19   there.  And that strikes me as a matter of statistics,

20   whether the sample size is representative enough to draw

21   conclusions from.  I think I get that.

22           You know, if you wanted to know how many three-

23   pointers Seth Curry hit in a season, you'd want access to

24   all of his games, not just 10 games or 20 games or home

25   games, right?

1          And so, you know, that doesn't sound terribly

2    controversial to me, but I guess the question for this case

3    is, you know, how is that rooted in what the FBI actually

4    included or looked at or drew conclusions from in this case?

5          I mean, I take it that the ultimate goal is to

6    show that the visibility or the data coverage or the sample

7    size somehow affected the trajectory of the investigation.

8    Is that ultimately what this is going to be used to show?

9          MR. DeFILIPPIS:  So I think -- and you're right,

10   Your Honor, that was the -- we understood them to flag the

11   first, but also this issue.

12          I think all we expect Special Agent Martin to do

13   is explain the concept of visibility to the jury.  And the

14   reason why he needs to explain that for the jury to evaluate

15   materiality is because whenever the Bureau investigates data

16   that it has received -- and particularly DNS data -- the

17   insight or lack of insight one has into the visibility of

18   that data -- in other words, you know, is this 2 percent of

19   available traffic or 90 percent? -- in evaluating the data

20   itself, that is a concept that the Bureau has to consider.

21   And so it goes to the materiality of the origins of that

22   data.

23          THE COURT:  Well, but isn't the question here

24   whether a case agent -- is your case agent later going to

25   testify that that was something that the FBI looked at or

1    wanted to look at in this case and was unable to do so, and

2    that that negatively affected the FBI's investigation in

3    some way?

4         MR. DeFILIPPIS:  Yes, and I expect Special Agent

5    Hellman, who will testify likely today, Your Honor, I expect

6    that that is a concept that he will say was relevant to the

7    determination that -- determinations he was making as he

8    drafted analysis of the data that came in.

9         And, again, I don't think we -- for example,

10   another way in which this comes up is that the FBI routinely

11   receives DNS data from various private companies who collect

12   that data, and it is always relevant sort of the breadth of

13   visibility that those companies have.  So it's relevant

14   generally, but also in this particular case the fact that

15   the FBI did not have insight into the visibility or lack of

16   visibility of that data certainly affected steps that the

17   FBI took.

18        THE COURT:  Okay.  But Mr. Sussman has not

19   been accused of misrepresenting who the source is.  He's

20   simply -- but rather who the client is.  So how do you link

21   that to the materiality of the alleged false statement?

22        MR. DeFILIPPIS:  Because, Your Honor, I think we

23   view them as intertwined.  It was because -- it was in part

24   because Mr. Sussman said he didn't have a client that made

25   it more difficult for the FBI to get to the bottom of the

1    source of this data or made it less likely they would, and

2    so -- and, again, I don't think we expect to dwell for a

3    long time on this, but I think the agents and the technical

4    folks will say that that is part of why the origins of the

5    data are extremely relevant when they took investigative

6    steps here.

7              THE COURT:  Okay.

8              MR. DeFILIPPIS:  And I would note one more

9    thing --

10             THE COURT:  There's also a reference to testimony

11   about spoofing of data.  Is there going to be any testimony

12   that this data was spoofed or that the FBI analyzed the data

13   and concluded that because it was spoofed it undermined the

14   support for the allegation?

15             MR. DeFILIPPIS:  Yes.  So, today, Your Honor,

16   we -- Special Agent Hellman --

17             THE COURT:  And tell me what "spoofed" means in

18   lay terms.

19             MR. DeFILIPPIS:  So "spoofed," Your Honor, refers

20   to the concept that it's always a possibility, when you look

21   at DNS data, that it was intentionally created to create the

22   appearance of look-ups or transactions between two computers

23   or two IP addresses, but that those did not, in fact, occur.

24             And Special Agent Hellman, when he testifies

25   today -- now, Your Honor's ruling we understand to permit us

1    to put into evidence anything about what the FBI analyzed

2    and concluded as its investigation unfolded because that

3    goes to the materiality of the defendant's statement.  So

4    Special Agent Hellman -- through Agent Hellman we will offer

5    into evidence a paper he prepared when the data first came

6    in, and among its conclusions is that the data might -- he

7    doesn't use the word "spoof" -- but might have been

8    intentionally generated and might have been fabricated.

9    That was the FBI's initial conclusion in what it wrote up.

10           So in order for the jury to understand the course

11   of the FBI's investigation and the conclusions that it drew

12   at each stage, those concepts are at the center of it.

13           THE COURT:  Did the FBI ultimately determine that

14   the data was fabricated in any way?

15           MR. DeFILIPPIS:  It ultimately did not reach a

16   conclusion on that.

17           You know, as you know, the CIA --

18           THE COURT:  So that did not bear on its conclusion

19   that the allegations were not substantiated?

20           MR. DeFILIPPIS:  Your Honor, I think we'll have

21   to -- we'll ask Agent Hellman that.  I think it certainly

22   was part of the mix.

23           The lack of visibility into the authenticity of

24   that data -- in other words, the lack of confidence they

25   were able to establish that it was real data -- certainly

1          contributed to the final conclusions of the investigation.

2                    THE COURT:  We spent a lot of time, Counsel,

3          talking about data accuracy, and this strikes me as now

4          getting into whether data was falsified or not.  And with

5          the defense's representation that it will not suggest that

6          there was a link based on the data, I thought that at

7          least -- that sounds, to me, out of bounds.

8                    MR. DeFILIPPIS:  Okay.  Your Honor, I'm sorry.  We

9          understood your ruling to be that the FBI's conclusions as

10         it went along were okay as long as we weren't asserting the

11         conclusion that it was, in fact, fabricated.

12                   You know, I mean, it's difficult to chart the

13         course of the FBI's investigation unless we can elicit at

14         each stage what it is that the FBI concluded.

15                   THE COURT:  All right.  Mr. Bosworth.  I'm sorry,

16         Mr. Bosworth.

17                   MR. BOSWORTH:  Yes, Your Honor.  And I think the

18         colloquy you were just having gets to the central concern,

19         which is based on the proof that we think that the

20         government is trying to elicit, including what they're now

21         trying to elicit from the expert.  They're using the ruling

22         that they can get into the ultimate conclusions the FBI drew

23         as a back door to showing why the data was inaccurate.

24                   The concern here is that if they can start

25         offering expert testimony on when data can be fabricated or

1    not, if they can start offering testimony on, you know, how

2    strong the data is, if they can elicit from an agent --

3                THE COURT:  Just on the sample size strength of

4    the data.

5                MR. BOSWORTH:  Yes.

6                THE COURT:  I mean, do you contest that?  Those

7    seem pretty uncontroversial propositions.

8                MR. BOSWORTH:  It is uncontroversial, and the FBI

9    never asked about it.

10               So it is true, right, that the strength of the

11   conclusions would depend on the volume of the data, where

12   the data came from.  The FBI never asked.  They never asked

13   Mr. Sussman.  They never said, "Who are these cyber experts?

14   Where did they get this stuff from?"

15               So it is true, and it is an uncontestable

16   proposition, but they never asked about it here.

17               And obviously, if Your Honor lets in that

18   testimony, we can deal with it on cross-examination and

19   argument, but it is a little curious now with, you know,

20   this range of expert testimony about the strength, you know,

21   of the conclusions you can draw based on the sample size of

22   the DNS data.  To have that argument when that was never

23   anything that they looked into during the investigation just

24   feels a little weird.

25               THE COURT:  Okay.  I'll allow the testimony about

1    the statistical shortcomings or contours of the DNS data.  I

2    will not allow him to talk about whether it's fabricated or

3    spoofed.  I think that definitely encroaches on the Court's

4    order regarding the data, and I think it's a little

5    inconsistent with how the government has represented

6    previously that it was not challenging or would not be

7    contending that the data was false.  And so I don't want to

8    get into that.

9            But in terms of the statistical significance and

10   how that might relate to the weakness or the strengths of

11   the conclusions that one can draw from the data, I think

12   that's fair game.

13           All right.  On -- go ahead.

14           MR. DeFILIPPIS:  Your Honor, just --

15           THE COURT:  And the defense can deal with that in

16   cross.

17           MR. DeFILIPPIS:  Yes.  Logistically, Your Honor,

18   we do have the paper I referenced, which the agent prepared,

19   which we intended to offer into evidence.  I guess we would

20   propose, then, that the portion of the paper that discusses

21   that issue, the potential fabrication or spoofing, we would

22   redact?

23           THE COURT:  Yes.

24           And is there any objection to the paper coming in?

25           MR. BERKOWITZ:  Your Honor, we had raised this

1    issue with Mr. DeFilippis last night.  It may actually be

2    worthwhile for the Court to take a look at it.  It's about a

3    two-and-a-half-page paper.

4            The high-level conclusions we certainly have no

5    objections coming in, too; in other words, the top of it and

6    the fact that they draw certain conclusions and close it out

7    and pass it along.

8            There's some level of detail that I want to review

9    closer.  We had raised the fabrication point, and why don't

10   we take a crack at seeing if we can agree --

11           THE COURT:  Okay.

12           MR. BERKOWITZ:  -- as to what it looks like; and

13   if not, we'll raise it with you, Your Honor.

14           THE COURT:  Sounds good.

15           MR. BERKOWITZ:  Wonderful.

16           THE COURT:  All right.  And on Mr. Steele?

17           MR. DeFILIPPIS:  I'm sorry, Your Honor, did you

18   want to hear from the government?

19           THE COURT:  Yes, just a few questions.

20           I guess the question -- the basic question is what

21   testimony do you want to elicit about him; and what

22   documents, if any, do you want to try to introduce and

23   through whom?

24           MR. DeFILIPPIS:  Yes.

25           THE COURT:  I know there's been a lot of talk

1    about the general topic, but what is it exactly you want to

2    get in?

3              MR. DeFILIPPIS:  So I think it would come down

4    mainly to this, Your Honor.  First, the defendant, in his

5    testimony before Congress, described his meeting with

6    Mr. Steele at Perkins Coie, so when we read in his testimony

7    into evidence, likely pursuant to a stipulation, we would

8    propose to cover that portion of the testimony.

9              Second, when Mr. Priestap testifies, the same page

10   of notes that contains the notes we're all familiar with

11   about the Alfa-Bank matter also contains a series of notes

12   reflecting the receipt of the Steele dossier information by

13   FBI headquarters on the same day.

14             THE COURT:  And when you say "the Steele dossier

15   information," do you mean the entire dossier or just the

16   parts of the dossier that relate to Alfa-Bank?

17             MR. DeFILIPPIS:  So I think what we would elicit

18   through him is that -- so the dossier's drafting continued

19   after September 19th and actually continued even after the

20   election, so it was a portion of the dossier.

21             We would intend only to elicit from Mr. Priestap

22   the fact that the dossier or some portion of the dossier

23   came into FBI headquarters on that day.  I don't think we

24   would offer --

25             THE COURT:  So you're not offering the dossier or

 1    a redacted version of the dossier.  You just want to connect

 2    the dots between Mr. Sussman and Mr. Steele through the

 3    meeting, and the fact that the FBI received similar

 4    allegations in the form of a dossier?

 5              MR. DeFILIPPIS:  Correct.  And I think, Your

 6    Honor, we -- in that testimony, we probably would not even

 7    have Mr. Priestap testify to the specific content of any

 8    dossier report, just to reflect its receipt.  And I think

 9    the notes reflect that they were aware that it was prepared

10    by an opposition research firm, Fusion GPS, at the behest of

11    a law firm, so we would elicit that sort of --

12              THE COURT:  And the evidentiary purpose would be

13    to bolster your motive?

14              MR. DeFILIPPIS:  I think motive, Your Honor.  Also

15    materiality.  Because the notion is that if the Bureau knew

16    that the same campaign and the same law firm and the same

17    investigative firm were presenting the Alfa-Bank matter and

18    the Steele matter at essentially the same time, it would

19    have affected their views of those materials and the steps

20    they took.

21              THE COURT:  Okay.

22              MR. DeFILIPPIS:  And then we may, Your Honor --

23    with Mr. Elias today, we may elicit broadly Mr. Elias's role

24    in, of course, retaining Fusion GPS, but also the Steele

25    dossier's role in that broader project.  Again, without

1     going into any specifics of any reports.

2              And then finally, Your Honor, we would -- likely

3     through an FBI agent -- seek to either elicit or offer into

4     evidence the dossier report that references Alfa-Bank, but

5     no other dossier reports.

6              THE COURT:  And is this the same dossier report

7     that Mr. Priestap received?

8              MR. DeFILIPPIS:  Your Honor, I would have to check

9     which reports came in on which day, but I don't think he

10    would be able to speak to the granularity of that either.

11    In other words, I don't think he will know whether that

12    report came in on a particular day.

13             I mean, it does bear a -- it has a date on it, I

14    think, of September 14th, but --

15             THE COURT:  And is that report the same as White

16    Paper 3?

17             MR. DeFILIPPIS:  No.  In fact, it doesn't speak to

18    data or even a secret server.  What it speaks to is

19    Alfa-Bank's reported ties to the Kremlin.

20             THE COURT:  Mr. Berkowitz?

21             MR. BERKOWITZ:  Judge, this would be an incredibly

22    prejudicial and damaging line of questioning and evidence

23    that is wholly disconnected from relevance.  The facts that

24    will come in at trial are as follows:

25             Mr. Sussman, on or about July 29th of 2016, was

 1    asked to, quote, vet Mr. Steele in a meeting at Perkins

 2    Coie's offices.  I believe he testified largely to that

 3    before Congress.

 4              THE COURT:  Okay.  Well, I understand that.

 5              MR. BERKOWITZ:  Yes.

 6              THE COURT:  But he met with him.

 7              MR. BERKOWITZ:  Correct.

 8              THE COURT:  And the government may suggest that

 9    the purpose of the meeting was other than to vet.  And so

10    why isn't that -- at least the meeting and any activities

11    that Mr. Sussman and Mr. Steele were involved in together or

12    that Mr. Sussman was knowledgeable of, why isn't that the

13    subject of cross-examination?

14              MR. BERKOWITZ:  So, first of all, which witness

15    are we going to cross-examine about that?  Mr. Steele is not

16    testifying.

17              There is no evidence, that I'm aware of, that will

18    come in that says what they spoke about or that Alfa-Bank

19    even came up in that meeting.  No evidence.

20              Number two, the evidence related to the Steele

21    dossier that they say arrived in Mr. Priestap's --

22              THE COURT:  Was Mr. Elias at the meeting?

23              MR. BERKOWITZ:  I don't -- I believe Mr. Elias's

24    testimony will be he doesn't recall being at that meeting.

25              Number two, Mr. Priestap's undated notes

1    suggesting receipt from a foreign intelligence source of a

2    Steele dossier are accurate.  What they are trying to do is

3    to suggest that it was somehow coordinated.

4           What Mr. DeFilippis left out is that, in unrelated

5    testimony that will not come in in this court, Mr. Steele

6    has talked about the fact that he was a British intelligence

7    agent known as Crown who provided the information to

8    British intelligence in his capacity as a confidential

9    source for them, and British intelligence passed it along to

10   the FBI several days before or weeks before, and it landed

11   on Mr. Priestap's desk on or around the same time.

12          THE COURT:  And you can't get that in?

13          MR. BERKOWITZ:  We can't get it in.  Neither can

14   they.  And so the suggestion that there was some coordinated

15   effort is actually inconsistent with what we believe the

16   evidence is.

17          If Mr. Steele were here, it would be a different

18   kettle of fish, but the suggestion that there is this --

19   that the Steele dossier was part of some larger conspiracy

20   is just not true, number one.

21          And more importantly, there's not any evidence,

22   other than inference, that Mr. Sussman met on one day with

23   Mr. Steele and all of a sudden all of the work that

24   Mr. Steele does that has any Alfa issues all of a sudden

25   becomes relevant in the trial against Mr. Sussman for motive

1    evidence.

2         And the absence of their ability to tie it up and

3    establish a direct connection is not prejudicial, but will

4    leave a misleading impression on the jury of the

5    connections.

6         THE COURT:  All right.  I'm going to reserve on

7    this.  Don't open on Steele.  I will likely allow you to ask

8    Mr. Elias about that meeting to the extent that he

9    remembers.

10        I'm not inclined to let in the dossier, and I want

11   to go back and read the testimony regarding how the

12   information came to the FBI, okay?

13        MR. DeFILIPPIS:  Your Honor, I apologize.  Just

14   two very quick factual points because I just want to make

15   sure the Court has an accurate understanding.

16        It is not the case that the dossier came to the

17   FBI through British intelligence.  Mr. Steele gave it to an

18   FBI agent in Rome, and it made its way from that agent to

19   FBI headquarters.  Mr. Steele was, we understand, in

20   communication with Fusion GPS about that, but it did not

21   come through British intelligence.

22        THE COURT:  Okay.  Let me just ask this question.

23   Can the government proffer any evidence that the report was

24   given to Mr. Priestap as part of the oppo research effort

25   that we've all been talking about as opposed to through

1   British intelligence or another source?

2               MR. DeFILIPPIS:  Your Honor, I think what we --

3               THE COURT:  And is the jury just going to

4   speculate about how it got there?

5               MR. DeFILIPPIS:  Two things, Your Honor.

6               One, Ms. Seago, who will testify either today or

7   tomorrow, will say that she met with Christopher Steele.  So

8   certainly there will be evidence in the record that this was

9   part of Fusion GPS's opposition research.  They, in fact,

10  hired Mr. Steele.

11              And secondly, the very same testimony that

12  Mr. Berkowitz just cited of Christopher Steele in an

13  overseas proceeding, in that same testimony he said that the

14  first time he learned about the Alfa-Bank secret server

15  allegations was in that meeting with Mr. Sussman when,

16  number one, he said Mr. Sussman told him about the

17  allegations; and, number two, he testified that immediately

18  after that meeting Fusion GPS tasked him to write a paper, a

19  dossier report, about Alfa-Bank.

20              So while we are not going to call Mr. Steele at

21  trial, in terms of proffering to the Court, we certainly

22  have strong suggestion that it was, at least in part, very

23  much part of the Fusion GPS opposition research effort.

24              THE COURT:  Okay.  And does the Court have that

25  foreign testimony?

1          MR. DeFILIPPIS:  I don't think you do, Your Honor,

2     but we are happy to get it to you.

3          THE COURT:  If you could give that to me.

4          MR. DeFILIPPIS:  Sure, sure.

5          MR. BERKOWITZ:  And, Your Honor, we'll provide you

6     with the public document that we were referring to in terms

7     of his acting as a British intelligence source and so forth,

8     so you'll have that as well.

9          THE COURT:  Please do.  Thank you.

10         All right.  Is the jury ready?

11         THE COURTROOM DEPUTY:  Yes.

12         THE COURT:  We're going to bring them in.  I will

13    give them the standard preliminary instructions.  There was

14    one small dispute in the parties' suggestions with respect

15    to the instructions.

16         Mr. DeFilippis, you don't want me to say that the

17    indictment alleges that he was acting on behalf of specific

18    clients and then name those clients?  Isn't that exactly

19    what the indictment alleges?

20         MR. DeFILIPPIS:  Your Honor, if we had such an

21    objection, we'll drop it.

22         THE COURT:  Very well.  Okay.

23         You can bring them in.

24         (Jury enters courtroom)

25         THE COURT:  Good morning, ladies and gentlemen.

1              JURORS IN UNISON:  Good morning.

2              THE COURT:  You all came back.  I hope you had a

3      good evening and are ready to go.

4              Before we begin opening statements in the case,

5      I'd like to give you a few preliminary instructions just to

6      explain how the trial will work and some of the ground rules

7      that we'll follow for the next two weeks.  These

8      instructions are no substitute for the detailed legal

9      instructions that I will give you at the end of the trial,

10     but, again, they're just intended to give you a sense of

11     what will be going on in the courtroom and what your

12     responsibilities as jurors will be.

13             Now, the first thing you should notice is that

14     each one of you has been given a notebook.  Some jurors find

15     it useful to take notes; some find it distracting.  It is

16     entirely up to you whether to take notes or not.  If you do

17     take notes, feel free to write down whatever you'd like.

18             The notebooks will be locked in the courtroom

19     during recesses and overnight and will be destroyed at the

20     end of trial, so you should not worry about anyone ever

21     seeing what you write in your notebook.

22             As I noted yesterday, there are 16 of you, but

23     only 12 of you will wind up deliberating in this case.

24     Usually there are only two alternates, but, because of the

25     COVID risks and some other factors, we have decided to

1    expand that number to four alternates for this particular

2    trial.  The four alternate seats were randomly selected

3    before we picked the jury.  I will not disclose to anyone

4    who the alternates are until the end of my final

5    instructions and before the jury begins its deliberations.

6         And any of the seats could be alternate seats.  It

7    could be the far four over there, the far four over here, or

8    any number in the middle.  So because any seat could be the

9    alternate seat, you should think of yourselves as regular

10   jurors and give this case your fullest and most serious

11   attention during trial.

12        As I explained yesterday, this is a criminal case

13   that began when a grand jury issued an indictment.  The

14   defendant, Michael Sussmann, is being tried on a single

15   criminal charge:  that he willfully and knowingly made a

16   materially false, fictitious, and fraudulent statement or

17   representation in a matter before the Federal Bureau of

18   Investigation; namely, that Mr. Sussman stated to the

19   general counsel of the FBI that he was not acting on behalf

20   of any client in conveying particular allegations, when, in

21   fact, he was acting on behalf of two specific clients,

22   namely Rodney Joffe and the Hillary Clinton Campaign.

23        Mr. Sussman has pled not guilty to that charge.

24        At the end of the trial, you will have to decide

25   whether or not the evidence presented has convinced you

1    beyond a reasonable doubt that Mr. Sussman committed this

2    offense.

3           To prove the offense, the government must prove

4    beyond a reasonable doubt each element of the charged

5    offense.  I will give you instructions on those elements at

6    the end of the case.

7           You should understand that the indictment that I

8    just summarized is not evidence.  The indictment is just a

9    formal way of charging a person with a crime in order to

10   bring him or her to trial.  You must not think of the

11   indictment as evidence of the guilt of the defendant just

12   because he has been indicted.  And, again, at the end of the

13   trial you will have to decide whether the government has

14   proven each element beyond a reasonable doubt.

15          Every defendant, including Mr. Sussman, is

16   presumed to be innocent.  This presumption remains

17   throughout the trial unless and until he is proven guilty

18   beyond a reasonable doubt.  The burden is always on the

19   government.

20          If the government proves each element of the

21   offense beyond a reasonable doubt, it is your duty to find

22   Mr. Sussman guilty of the offense.  But if you find the

23   government has not proven one or more element of the

24   offense, you must find Mr. Sussman not guilty.

25          Now, throughout the trial you will hear me refer

1    to the government or the Special Counsel.  When I do that, I

2    mean the prosecution team or one of the lawyers from the

3    Special Counsel's Office.  And I know they introduced

4    themselves yesterday, but why don't we have Ms. Shaw

5    introduce the prosecution team again.

6              MS. SHAW:  Thank you, Your Honor.

7              Good morning.  My name is Brittain Shaw.  I'm

8    joined at counsel table with Andrew DeFilippis, Jonathan

9    Algor, Michael Keilty, John Durham, and Kori Arsenault.

10             Thank you, Your Honor.

11             THE COURT:  And when I refer to the defense, I

12   mean the defendant or defense counsel or any other member of

13   the defense team.

14             Mr. Berkowitz?

15             MR. BERKOWITZ:  Good morning.  Nice to see

16   everybody again.

17             As I said yesterday, my name is Sean Berkowitz,

18   and I, along with Michael Bosworth, Natalie Rao, and

19   Catherine Yao have the privilege of representing Michael

20   Sussmann, who is present in court at the end of the table.

21             Thank you.

22             THE COURT:  All right.  So the trial will proceed

23   over the next couple of weeks in four stages.

24             First will be opening statements.  The government

25   will begin with its opening statement, and I believe the

1   defendant will give an opening statement thereafter.  The

2   opening statements by the lawyers are not evidence.  They

3   are intended simply to give you a roadmap or a preview of

4   what the evidence or what each side thinks the evidence will

5   show.

6           The second stage is the presentation of evidence.

7   The government will begin with what we call its case-in-

8   chief.  They will call witnesses.  An attorney will conduct

9   a direct examination of a witness, followed by cross-

10  examination by the other side, and a brief redirect

11  examination by the government.

12          After the government's case, the defense may, but

13  is not required to, put on its case-in-chief.  If it does,

14  it will follow the same order:  direct examination, cross-

15  examination, and redirect.

16          The government may then choose to bring a brief

17  rebuttal case.

18          During the presentation of evidence, the lawyers

19  will be asking questions.  Like their opening statements,

20  their questions are not evidence.  The only evidence is the

21  sworn testimony of witnesses and exhibits or documents

22  admitted into evidence.

23          The third stage of the case will be instructions

24  on the law, and that's when I will give you detailed

25  instructions that you will use during your deliberations.

1            The fourth stage will be closing arguments, again,

2     in the same order:  the government, the defense, and then a

3     brief rebuttal by the government.  Like the other arguments,

4     closing arguments are not evidence.  They are only intended

5     to help you understand what the evidence has shown from each

6     side's perspective.

7            I will then give you a few final instructions, and

8     you will begin your deliberations.

9            My responsibilities are to run a fair and

10    efficient trial, to rule on legal questions that arise

11    during the trial, and to instruct you on the law.  It is

12    your sworn duty to accept the law as I instruct.

13           For your part, you -- and only you -- are the

14    ultimate deciders of the facts in this case.  You will weigh

15    the evidence, and you will judge the credibility and the

16    believability of the witnesses.

17           You are likely to hear me sustain an objection --

18    or occasionally attorneys will object to questions by the

19    other side or the admission of evidence by the other side.

20    Occasionally I will sustain an objection.  If I do that, the

21    question must be withdrawn, and you must not speculate what

22    the witness's answer would be.

23           If the witness has already answered a question, an

24    objection to which I have sustained, I will strike that

25    answer from the record, and you are to disregard what the

 1    witness said.

 2              If I overrule an objection, that means the

 3    question stands, and the witness must answer the question.

 4              When the parties object to a question or to the

 5    admission of evidence, they are simply doing their jobs.  Do

 6    not fault one side or the other for objecting more or less

 7    to the other side's questions.

 8              As I will continue to remind you throughout the

 9    trial, it is very important that you not discuss the case

10    with anyone, including your fellow juror members.  Also

11    avoid listening to or reading anything about the case.

12              We're all going to be in the same courthouse for

13    the next couple of weeks, and it seems like a big building,

14    but you are likely to run into folks in the hall.  There are

15    lots of parties in this case.  You may run into the

16    defendant or into one or more of the lawyers or into folks

17    on my staff.  If the attorneys or anyone avoid contact with

18    you, they are not being rude; they're just trying to observe

19    the rules of the Court, so don't take any offense from that.

20              If you hear a conversation about the case in your

21    presence, please let Ms. Jenkins or one of the marshals

22    know, and we'll figure out how to deal with that.

23              I hope and expect not, but it is possible that you

24    might be approached during trial by a member of the media.

25    You are not to speak with anyone about the trial, including

1    the media, while the trial is ongoing.  If you are

2    approached, and it makes you feel uncomfortable saying no,

3    please let me know that that has happened.

4            Once the trial is over, it will be up to you

5    whether to talk about the trial and with whom.

6            Again, no independent research about the case or

7    social media postings about the case.

8            Ms. Moreira here is our crack court reporter.  She

9    will be taking down everything that is said in open court,

10   but you will not have a transcript of the trial back in the

11   jury room when you begin your deliberations.  You must rely

12   on your memories and your notes, if you choose to take them.

13           All right?  So with that, ladies and gentlemen,

14   please pay close attention, and we will begin with the

15   opening statement from, I believe, Ms. Shaw.

16           MS. SHAW:  Thank you, Your Honor.

17           The evidence will show that this is a case about

18   privilege:  the privilege of a well-connected D.C. lawyer

19   with access to the highest levels of the FBI; the privilege

20   of a lawyer who thought that he could lie to the FBI without

21   consequences; the privilege of a lawyer who thought that for

22   the powerful the normal rules didn't apply, that he could

23   use the FBI as a political tool.

24           Ladies and gentlemen of the jury, on September 19,

25   2016, the defendant, Michael Sussmann, a high-powered D.C.

1    lawyer, went to the FBI bringing serious allegations about a

2    presidential candidate on the eve of the election, serious

3    allegations about secret communications with a foreign

4    adversary.  But when the defendant walked into FBI

5    headquarters on Pennsylvania Avenue, the evidence will show

6    that he bypassed normal channels.  He went straight to the

7    FBI general counsel's office, the FBI's top lawyer.  He then

8    sat across from that lawyer and lied to him.  He told a lie

9    that was designed to achieve a political end, a lie that was

10   designed to inject the FBI into a presidential election.

11          What was the lie?  The defendant told the FBI

12   general counsel that he was bringing them information about

13   a presidential candidate on his own, not on behalf of any

14   client, but as a good citizen.

15          But the evidence will show that that wasn't true.

16   The defendant wasn't there as a concerned citizen.  He was

17   doing it not for one client, but for two:  the opposing

18   presidential campaign and an Internet executive.  The

19   defendant lied to direct the power and resources of the FBI

20   to his own ends and to serve the agendas of his clients.

21          Now, as the judge has just told you, the defendant

22   is charged with one count of making false statements to the

23   FBI; that is, for willfully and knowingly making a

24   materially false statement to the general counsel of the

25   FBI.  And the government's evidence will show you beyond a

1   reasonable doubt that the defendant is guilty of that

2   charge.

3          So let me briefly tell you what the evidence will

4   show.

5          The evidence will show that on Sunday, September

6   18th, the defendant, a powerful attorney at a major D.C. law

7   firm, texted his friend, James Baker, who was the FBI's

8   general counsel; like I said, its top lawyer.  He texted

9   Baker on Baker's personal cell phone, and he asked to meet

10  Baker the next day.  He told Baker he had something time-

11  sensitive and sensitive he wanted to give to the FBI.

12         The defendant went on to write in this text that

13  he was, quote, coming on his own, not on behalf of any

14  client or company, unquote, and that he just wanted to,

15  quote, help the Bureau, end quote.

16         You will see the text for yourselves.  You will

17  see that these are the defendant's own words.

18         Now, Baker had known the defendant since they

19  served together at the Department of Justice years before,

20  and so he agreed to meet with him on short notice.  He

21  agreed to meet with him on an urgent basis because he

22  trusted him.

23         The evidence will further show that when the

24  defendant met with the general counsel of the FBI, that that

25  is when he committed the crime charged here.

1          The defendant lied to the FBI official's face.

2     When they met, he told Baker again that he was not there on

3     behalf of any client, that he just wanted to help the FBI.

4     That is the false statement that's charged in the

5     indictment.

6          The evidence will show that the defendant then

7     proceeded to tell Baker that he had received information and

8     data that supposedly showed a secret channel of

9     communication between the Trump organization and a Russian

10     bank called Alfa-Bank.  The defendant told Mr. Baker that

11     some cyber researchers had come upon this secret channel and

12     that a major news outlet was set to run the story within

13     days.

14          The evidence will show that the defendant gave

15     Mr. Baker two thumb drives containing that data as well as

16     white papers that describe the allegations.  He gave him

17     these thumb drives, and he left.

18          Now, you will hear from James Baker that after

19     that meeting he came away thinking that Mr. Sussman had

20     given this information to him as a good citizen, not on

21     behalf of any client.  You will learn that Baker and other

22     high-ranking FBI officials promptly opened a case and

23     directed FBI resources to investigate these serious

24     allegations.  They opened an investigation, an investigation

25     that would later find that the server was merely a spam

1    email server used for sending out marketing emails.  The

2    server did not reflect a crime, nor was it a threat to

3    national security.

4         But there was a crime in all of this:  the

5    defendant's lie to the FBI's general counsel.  He lied to

6    the FBI's general counsel saying he was not acting on behalf

7    of any client.

8         The evidence will also show that the defendant was

9    there not on behalf of just one client, but on two clients:

10   the Hillary Clinton Campaign and an Internet executive named

11   Rodney Joffe.

12        Now, before I talk about the evidence, let me

13   address the proverbial elephant in the room.

14        Some people have very strong feelings about

15   politics and about Russia, and many people have strong

16   feelings about Donald Trump and Hillary Clinton.  But we are

17   not here because these allegations involve either of them,

18   nor are we here because the defendant's client was the

19   Clinton Campaign.

20        We are here because the FBI is our institution

21   that should not be used as a political tool for anyone; not

22   Republicans, not Democrats, not anyone.  So whatever your

23   political views might be, they can't be brought to your

24   decisions that you will be asked to make in this courtroom.

25        Your task in this trial is straightforward.  As

1    Judge Cooper explained to you, your role is to consider the

2    evidence and apply the law as he instructs you.  And I

3    expect that one of the laws he will instruct you about is

4    that under the law of the United States, if you make a

5    knowingly materially false statement to the FBI, that's a

6    crime.  It's that simple.

7          So what will the evidence show?  The evidence will

8    show that defendant's lie was all part of a bigger plan, a

9    plan that the defendant carried out in concert with two

10   clients, the Hillary Clinton Campaign and Internet executive

11   Rodney Joffe.  It was a plan to create an October surprise

12   on the eve of the presidential election, a plan that used

13   and manipulated the FBI, a plan that the defendant hoped

14   would trigger negative news stories and cause an FBI

15   investigation, a plan that largely succeeded.

16         How did the defendant execute this plan?  Through

17   his two clients.

18         First, the Clinton Campaign.  You're going to hear

19   that in the summer of 2016, as the presidential election was

20   heating up, the defendant was working at a major D.C. law

21   firm which was acting as legal counsel for the Clinton

22   Campaign.  You're also going to find as part of -- hear that

23   as part of their campaign efforts they were hired and were

24   paying an investigative firm called Fusion GPS that was

25   hired to do what's called opposition research.

1          Now, opposition research is something that happens

2     in politics, and it has for years.  Republicans do it.

3     Democrats do it.  There's nothing illegal about it.

4          You're going to learn that Fusion GPS was doing

5     opposition research on behalf of the campaign, and through

6     this their investigators and researchers were digging up any

7     dirt they could find about the opposing candidate, Donald

8     Trump.  And when they found something that was dirty, they

9     would plant it in the press and, ultimately, with the FBI.

10         This brings us to the defendant's second client,

11    Rodney Joffe.

12         You're going to hear around the same time that

13    Joffe and others were conducting their own kind of

14    opposition research, but it was a different kind.  The

15    evidence will show that Joffe was a high-ranking executive

16    at an Internet company and also had interests in other

17    Internet companies.  You will learn that Joffe and one of

18    his companies used the defendant as their lawyer, and that

19    they paid the defendant and his firm over a million dollars

20    per year.

21         The evidence will show that given his position at

22    these various Internet companies, Joffe had access to vast

23    amounts of Internet traffic and data.  That included what's

24    known as DNS data, which stands for Domain Name System data.

25    You will learn that DNS data is basically the digital trail

1    that's created when computers look each other up on the

2    Internet in an effort to communicate.  It's part of the

3    trail that we all leave when we send emails or surf the

4    Internet.

5          The evidence will show that in the summer of 2016,

6    Joffe and others started using their access to huge amounts

7    of Internet traffic to conduct opposition research.  They

8    started looking at the Internet for any information about

9    the online activities of Trump, his associates, and certain

10   family members.

11         The evidence will show that later Joffe gave this

12   DNS data to the defendant.  This was the data they would

13   later claim showed that the Trump organization was

14   supposedly using a secret email server to communicate with

15   the Russian bank called Alfa-Bank.

16         The evidence will show that Joffe and the

17   defendant knew that the server was a spam email server, but

18   they also claimed that it was being used as a secret

19   communication channel between the Trump organization and

20   Russia.

21         Now, the evidence will show that the defendant saw

22   this supposed data as a golden opportunity to deliver a big

23   win for both of his clients and to influence a political

24   election, and so he brought together his two clients, Joffe

25   and the Clinton Campaign.

1          You will learn that the defendant put Joffe in

2    touch with the top lawyer for the Clinton Campaign, and he

3    also connected Joffe with the Fusion GPS research firm,

4    which was also being paid by the Clinton Campaign.  He

5    arranged calls and meetings between the two.

6          That's where the defendant's plan took shape, and

7    the evidence will show that the plan had three parts:  a

8    look, a leak, and a lie.

9          First the look.

10          The evidence will show that as Sussmann and Joffe

11    met and coordinated with representatives of the Clinton

12    Campaign and Fusion GPS, they looked for more data.  You

13    will hear that Joffe instructed people at his companies to

14    scour Internet traffic for any derogatory information they

15    could find about Trump or his associates' online Internet

16    activities, including potential ties to Alfa-Bank or to

17    Russia.  And you will see that Fusion GPS did the same using

18    their access to other information.

19          Second, the leak.  You will hear from the evidence

20    that the defendant and Joffe then leaked the Alfa-Bank

21    allegations to a reporter at the *New York Times* with the

22    hope and expectation that he would run a story about it.

23          Third, the lie.  You will see that when the

24    reporter didn't publish this story right away, the defendant

25    and others decided to bring this information to the FBI and

1      to create a sense of urgency, to also tell the FBI that a

2      major news organization was running a story within days.

3      That's when the defendant requested the meeting with the FBI

4      general counsel and told him that he was not doing this for

5      any client.

6              The evidence will show you that the defendant had

7      at least two reasons to lie.

8              First you're going to hear that the defendant was

9      a cyber security lawyer who had been hired earlier that year

10     by the Democratic National Committee to represent them in

11     relation to a computer hack where they'd been the victim.

12     Because of this, the defendant was in frequent contact with

13     the FBI about the hack investigation.  They considered him

14     to be the DNS -- I mean, the DNC attorney for that matter.

15     Because they viewed him as the DNC lawyer for the hack, the

16     defendant knew that if he came in and told them that he was

17     representing a political candidate at this time, weeks

18     before an election, they might not meet with him right away,

19     let alone open an investigation.

20             Second, the defendant knew that if he could get

21     the FBI to investigate the matter and reach out to the press

22     to try to stop the story, that that would make the story

23     more attractive to the press, and they would report on it.

24             Now, all the while, ladies and gentlemen, the

25     evidence will show that the defendant was billing his time

1   on this project to the Clinton Campaign.  You will see the

2   billing records that show that instead of being a good

3   citizen, the defendant was billing his time to a client.

4   The campaign was footing the bills.

5           And so when the defendant walked these allegations

6   into the FBI and said he wasn't doing this for any client,

7   that was false.  It was false because the defendant

8   personally billed his time to the Clinton Campaign, and it

9   was false because he was also bringing these allegations on

10  behalf of his other client, Rodney Joffe.

11          You are also going to hear that the defendant

12  doubled down on his lie.  Just five months later, the

13  defendant got himself another meeting with a government

14  agency.  This time the CIA.  At the CIA he brought the same

15  allegations about Alfa-Bank along with some other

16  allegations.

17          You will hear that in setting up that meeting, the

18  defendant told a retired CIA employee that he was seeking a

19  meeting on behalf of a client; but you will also hear that

20  during the actual meeting he told the CIA he was not there

21  on behalf of any client, the same lie the defendant told

22  James Baker.  And so in doing so, he confirmed the lie that

23  he made to James Baker.

24          This was not a mistake or a slip of the tongue.

25  It was a concerted effort to conceal his clients.

1          Finally, I also expect that you're going to hear

2     that the defendant actually got caught in his lies when he

3     was required to testify under oath before Congress in

4     December 2017, and when he testified under oath, he was

5     specifically asked about the meetings with the FBI and the

6     CIA.

7          During that testimony, the defendant admitted that

8     he'd carried out both of these meetings on behalf of a

9     specific anonymous client.  He was referring to Joffe.  In

10    other words, the defendant gave Congress something that he

11    hadn't given the FBI, something that he hid from them.

12         But the evidence will show that the defendant hid

13    something from Congress, too, which is when he approached

14    the FBI's general counsel that day with the Alfa-Bank

15    allegations.  As the election was approaching, he billed his

16    time on that matter not to the unnamed client, but rather to

17    the Clinton Campaign.  His own sworn testimony will prove to

18    you that he lied to the FBI and that he's guilty in this

19    case.

20         So what is the evidence?  How are we going to

21    prove to you that the defendant lied to the FBI?

22         Let me first mention, you may hear some of this

23    evidence out of order.  Testimony from witnesses might not

24    be chronological.  Just dealing with scheduling conflicts,

25    complications from COVID, and so forth, it's a little like

1    air traffic control.  But you will hear all the evidence,

2    not just in this order I'm about to tell you.

3              Go back to the evidence.

4              You're going to have three types of evidence:

5    documents, physical evidence, and, of course, witness

6    testimony.

7              What will the documents show you?

8              You're going to see that the defendant put his lie

9    in writing.

10             You're going to see his 42-word text to Baker the

11   night before the meeting where he said he wasn't coming on

12   behalf of any client or company.

13             You're going to see in black and white his billing

14   records that show that the defendant billed his work on this

15   project to the Clinton Campaign.

16             You're going to see emails and phone records that

17   show that beginning in the summer of 2016 the defendant

18   worked with Fusion GPS to develop the Trump/Alfa story and

19   plant it in the press.

20             You will also see internal FBI records and emails,

21   records that will show you that the defendant's lie

22   mattered, how it misled the officials into thinking he was

23   acting as a good citizen, causing them to take steps and

24   devote resources to what was ultimately a spam email server

25   and not a national security threat.

1          You're also going to hear from a number of

2     witnesses.

3          You will hear from James Baker, the FBI general

4     counsel to whom the defendant made this false statement.

5          You're also going to hear from two other officials

6     who Baker briefed after his meeting with the defendant, the

7     very same day it happened, and who memorialized what was

8     said in their notes.

9          You will hear from the agents who investigated

10    these allegations, what they did and what they found.

11         And you will hear from an FBI cyber expert who is

12    going to explain to you the basics of DNS data and some of

13    the terminology you might hear in the witness's testimony

14    here.

15         You will also hear from employees of Joffe's

16    company who Joffe tasked to search the Internet in support

17    of defendant's plan.

18         You will hear from an employee of Fusion GPS who

19    will tell you about Fusion's work on these issues.

20         And you will hear from an employee of the

21    defendant's former law firm, who will help explain the

22    firm's billing practices, procedures, and help you to

23    understand the billing records you might see.

24         Finally, we have several pieces of physical

25    evidence.

1          First, you're going to have a chance to review the

2    handwritten notes of the two officials who met with James

3    Baker the day of the meeting and who wrote down the

4    defendant's lie based on a conversation with Baker.

5          Next you're going to have the two thumb drives the

6    defendant gave to James Baker and the FBI that day, the two

7    thumb drives he bought for the meeting, the two thumb drives

8    he loaded with the data in the white papers, the two thumb

9    drives which the evidence will show he charged to the

10   Clinton Campaign.

11          Now, before I sit down, I want to go back to where

12   I began.

13          This is a case about privilege.  No one should be

14   so privileged as to have the ability to walk into the FBI

15   and lie for political ends.

16          Ladies and gentlemen, whether we are Democrats or

17   Republicans, whether we hate Donald Trump or like him, we

18   have to agree that some things have to be above politics.

19   One of those things is our law enforcement agencies, and the

20   other is the truth.

21          After you have heard all the evidence here, you

22   will know the truth here; that the defendant lied to the

23   FBI, and that it wasn't a trivial matter or a mistake.  The

24   evidence will show that this was a breach of trust between a

25   citizen and a law enforcement agency whose mission is to

 1     protect us from enemies both foreign and domestic.  The FBI

 2     should never be used as a political pawn.

 3              Thank you very much for your attention, and thank

 4     you for serving on this jury.

 5              The government is going to have the opportunity to

 6     come back and speak with you again at closing argument, and

 7     you will hear Judge Cooper explain the law to you.  At that

 8     time we will ask you to consider all of the evidence.

 9              If you carry out your duties as Judge Cooper

10     instructs you, we are confident that you will return the

11     only verdict that is consistent with the law and consistent

12     with the facts, that the defendant is guilty.

13              Thank you.

14              THE COURT:  Thank you, Ms. Shaw.

15              Mr. Bosworth.

16              MR. BOSWORTH:  Good morning.

17              JURORS IN UNISON:  Good morning.

18              MR. BOSWORTH:  And may it please the Court.

19              Michael Sussmann didn't lie to the FBI.  Michael

20     Sussmann wouldn't lie to the FBI.  If we're thinking about

21     the FBI as our institution, there is nobody who would agree

22     with that statement more than Michael Sussmann.

23              Michael Sussmann is a serious national security

24     and cyber security lawyer.  For over a decade he worked

25     right alongside the FBI as a federal prosecutor.  For over

1    the next decade he worked alongside the FBI as a national

2    security lawyer in private practice.  For over two decades

3    he had a top secret clearance, because that's how much the

4    FBI trusted him.

5          And in the summer of 2016, this serious national

6    security lawyer got information that raised serious national

7    security concerns at a time when questions were swirling

8    about Donald Trump's connections to Russia.  One of his

9    long-time clients, Rodney Joffe, who you heard a little bit

10   about, came to him with information showing another

11   potential connection between Trump and Russia, a connection

12   that showed weird contacts between Donald Trump's business

13   organizations and a Russian bank owned by Vladimir Putin's

14   closest associates.  And Mr. Sussman took that seriously

15   because it came from Rodney Joffe.

16         Rodney Joffe is no Internet executive.  Rodney

17   Joffe is one of the world's leading cyber experts.  He's one

18   of the leading experts on DNS data, the very stuff that is

19   at issue in this case.  He is so trusted that our

20   government, our institution, the FBI, made him -- asked him

21   to be a confidential informant for the FBI.  That's how much

22   they trusted him.  That's how much they relied on him.

23         And you think Mr. Sussman got a million dollars of

24   business from Rodney Joffe's companies?  Rodney Joffe got

25   tens of millions of dollars from the federal government

1    giving them advice, selling them DNS data.

2          Rodney Joffe knew DNS data inside and out, and

3    when he came to Michael Sussmann with that information,

4    Michael Sussmann took it seriously.  And Mr. Sussman agreed

5    with Mr. Joffe to make this public.

6          The plan from the start was to go public with

7    serious information so that the American people could decide

8    for themselves what it showed.  That was the plan, to go to

9    the press.

10          And that's what they did.  They went right to the

11    top.

12          What you didn't hear is they took that information

13    to a Pulitzer-Prize-winning reporter at the *New York Times*,

14    and he was going to write a story about it.  He met with

15    Mr. Sussman.  He met with Mr. Joffe.  He researched the

16    things that reporters do, and he was going to go with the

17    story.  He was going to go public with a big story about it.

18          And if Michael Sussmann hadn't spent a career

19    working alongside the FBI, if Michael Sussmann didn't care

20    about the FBI, we wouldn't be here because, at the last

21    minute, when Mr. Sussman knew and heard and believed that a

22    story was going to run about this, what did he do?  He

23    didn't keep his mouth shut.  He didn't let the story come

24    out.  He went to the FBI.

25          And he went to the FBI to give them a heads up

1      that the story was coming.  He gave them -- he went to the

2      FBI so that -- to tell them that this story was coming so

3      they wouldn't be caught flat-footed, so they wouldn't be

4      caught by surprise.  He went to the FBI to help the FBI,

5      which is exactly what Mr. Sussman said in the text message

6      he sent to Mr. Baker that started this whole thing off.

7              Now, you heard the evidence is going to show that

8      this meeting was all about the Clinton Campaign.  You will

9      hear the meeting with the FBI is the exact opposite of what

10     the Clinton Campaign would have wanted.

11             Was the Clinton Campaign generally one of

12     Mr. Sussman's clients?  Yes.

13             Was the Clinton Campaign a client on this effort

14     to get a story in the press?  Yes.  There's nothing

15     secretive about that.

16             But this FBI meeting was something very different.

17     The FBI meeting was something that they didn't authorize,

18     that they didn't direct him to do, and that they wouldn't

19     have wanted him to do.  Because you know what happened?  As

20     the evidence will show, when Mr. Sussman went to the FBI to

21     tell them about this story, the FBI effectively shut it

22     down.  The exact opposite of what the Clinton Campaign would

23     want.  They'd want a big story that hurts Trump and helps

24     them, and Mr. Sussman, by going to the FBI, shut that all

25     down.  He was there to help the FBI.

1          So what are we doing here?  The government's

2     theory doesn't make sense.  The evidence will not support

3     this charge, and today I want to walk through that evidence

4     with you.  I want to talk to you about what I think the

5     evidence will show and what I think the evidence will not

6     show, and I want to do it by focusing on four key questions.

7          First, what did Michael Sussmann actually say to

8     the FBI?  I'll answer that.

9          Second, is what he said false?

10          Third, did he intend to say something false?

11          Fourth, did it matter?

12          And I want to go through those one by one.

13          To convict Mr. Sussman here, the government has to

14     prove beyond a reasonable doubt the answers to each of these

15     questions.  They've got to jump over each and every one of

16     these hurdles.  And I submit to you that they're going to

17     stumble at every turn.

18          So here's how I want to use my time.  I want to

19     briefly talk through the story line and tell you some of the

20     relevant evidence so you can get a better feel for what

21     happened and why it was that Mr. Sussman ultimately met with

22     the FBI.  And then I want to walk through these four

23     questions:  What did he truly say?  Was it false?  Did he

24     intend to say something false?  Did it matter?

25          So let's get started, and let's get started with

1   two of the people who are most key here.

2              First, Mr. Sussman.  Now, I told you a little bit

3   about him, but I want you to hear a little bit more so you

4   understand how nonsensical this charge is.

5              Put aside that Mr. Sussman's a good man or a

6   family man.  You will hear that Mr. Sussman is an honest

7   man.  He spent over 12 years working for the United States

8   Department of Justice prosecuting crimes under Democrats and

9   Republicans alike.  Then he went to Perkins Coie, a private

10  law firm that is one of the top hundred firms in the country

11  that's been around for over a hundred years.  And at Perkins

12  Coie, Mr. Sussman became a prominent national security and

13  cyber security lawyer, advising all sorts of clients about

14  all sorts of issues.

15             Through that work he interacted with the FBI, the

16  CIA, the government at the top levels.  He trusted them, and

17  they trusted him.  That's why he had a top secret clearance.

18  That's why he had a special badge that enabled him to walk

19  in and out of the FBI and the CIA just like he was an

20  employee.  His whole livelihood depended on his credibility

21  with these agencies, and he'd never throw that away.

22             You know who else had a relationship with the

23  government?  Rodney Joffe, the Internet executive who was

24  the world's leading cyber expert, the world's leading expert

25  on DNS data, who was an FBI confidential informant, who had

1    relationships up and down the government, who got paid tens

2    of millions of dollars for DNS data, for his advice, because

3    that's how much the government trusted him.  That's how much

4    they relied on him.

5           So in the summer of 2016, Mr. Joffe, this expert,

6    came to Mr. Sussman for help.  Again, at a time when there

7    were all sorts of questions in the world about Donald

8    Trump's ties to Russia, Mr. Joffe presented evidence that

9    there was another tie, that there were these weird look-ups.

10   And so basically it's just one computer trying to find where

11   another computer lives on the Internet, and it tries to look

12   up the address, and there's a record of one computer trying

13   to find another.  That's what DNA data is in my nonexpert

14   understanding.

15          And all this evidence showed that there were weird

16   connections between Mr. Trump's business, the Trump

17   organization, and Alfa-Bank, this Russian bank.

18          And Mr. Joffe came to Mr. Sussman with this

19   information, and Mr. Sussman agreed to help him out, to help

20   him figure out how to get this public.

21          Why would he help?

22          Well, one, it's his job.  He's a lawyer.  You help

23   clients.

24          Two, he knew and trusted Mr. Joffe.  He was

25   someone he worked with for years, and Mr. Sussman was well

1    aware of Mr. Joffe's credibility and reliability in the eyes

2    of the federal government.

3         And third, Mr. Sussman had his own experience with

4    Russian interference in the 2016 election.  A few months

5    before, in the spring of 2016, the Russians hacked the

6    Democratic party servers, the Democratic National Committee,

7    the DNC.

8         A lot of initials in this case.  Those are some of

9    them.

10        And you're going to hear when the Russians hacked

11   DNC servers, the DNC hired Mr. Sussman to be their lawyer,

12   and he interacted with the FBI on their behalf.  And the FBI

13   knew full well that Mr. Sussman was a lawyer for the

14   Democratic party itself.

15        So what happened?  After Mr. Sussman agreed to

16   help, Mr. Joffe and cyber experts that he was working with

17   pulled together the data, analyzed the data.

18        Now, was Mr. Sussman involved in the data

19   gathering?  No.  The evidence will show Mr. Sussman wasn't

20   involved in the analysis of the data.  Mr. Sussman didn't

21   know that there was a spam server.

22        This is what DNS looks like.  You'll see during

23   trial.  And it should be on your monitors, if it's not --

24   it's not.

25             THE COURT:  Can everyone see?

1          MR. BOSWORTH:  Whether you can see it or not, you

2     still can't make sense of it.  It's a jumbo of numbers and

3     letters.  And what is at issue in this case is thousands of

4     pages of this kind of gobbledygook.  It takes a cyber expert

5     to understand this.  In fact, as you heard, it's so

6     complicated the government is calling a special expert at

7     this trial to explain it to you.  That's how complicated it

8     is.

9          Mr. Sussman wasn't involved in any of this.

10          What he was involved in was helping to make this

11     public.  So he went to Mr. Elias -- you heard about that;

12     Mr. Elias is one of his law firm partners who was the

13     general counsel for the Clinton Campaign -- and he told him,

14     hey, I'm working on this story, you know.  And you'll hear

15     about that.

16          And Mr. Sussman knew that the Clinton Campaign

17     would benefit from this story.  The Clinton Campaign was one

18     of his clients.  And because the Clinton Campaign would

19     benefit from this story, because they were aware, he treated

20     them as his client, and he billed to them as his client.

21          There's nothing remarkable about lawyers billing

22     to clients.  That's how it works.

23          And by the way, the reason that these bills show

24     up with Mr. Sussman's entries to the Clinton Campaign is

25     because Mr. Sussman himself billed those entries.  He showed

1    I'm doing work for the Clinton Campaign.  Hardly the sort of

2    thing you would do if you're trying to keep it all a big

3    secret.

4            So then what happened?

5            You'll hear -- there's not much left on the story

6    part -- that right around Labor Day Mr. Sussman went to the

7    *New York Times* to pitch this story.  He reached out to Eric

8    Lichtblau, a Pulitzer-Prize-winning reporter who we expect

9    you'll hear from in this case, and he arranged to meet with

10   Mr. Lichtblau.  He had meetings with Mr. Lichtblau.  He

11   introduced Mr. Joffe to Mr. Lichtblau.  And Mr. Lichtblau, a

12   serious esteemed reporter, was working on a story and was

13   about to publish it.

14           And that's when we get to the FBI.  At that

15   moment.  Not when he's frustrated the story's not coming

16   out.  When he believes the story is imminent, it's about to

17   come out.

18           You will see that on September 18th, Sunday,

19   September 18th, Mr. Sussman received an email with

20   information suggesting that the Trump campaign was freaking

21   out about a story about Russia and Trump that was about to

22   come out in *The New York Times*.  The story seemed imminent.

23           And what happens two hours later?  That's when the

24   text goes out.  That's when Mr. Sussman realizes he has to

25   reach out to the FBI to give them a heads up that this story

1   is coming so that they're not caught off guard.  And he

2   tells the FBI, he tells Mr. Baker in the context of that

3   text, that he wants to help the Bureau, which is exactly

4   what he did.

5          So the next day Mr. Sussman meets with Mr. Baker

6   for less than 30 minutes.  Mr. Baker didn't take any notes

7   of the meeting.  You'll hear Mr. Baker didn't record the

8   meeting.  Mr. Baker didn't write a report of the meeting,

9   which is what FBI agents live to do.  Nothing.  And there's

10  no one else present in the meeting either.

11         And at that meeting Mr. Sussman told Mr. Baker

12  this big story's about to come out in a news organization.

13  I want you to understand it.  Here's the information it's

14  based on.  And he didn't ask for anything in return.

15         And that meeting was only the first of multiple

16  interactions that Mr. Baker and Mr. Sussman had that week.

17         And I want to, before I get into that, just say

18  one thing.  There was talk of the relationship between

19  Mr. Baker and Mr. Sussman.  This clip gives you a good sense

20  of what that relationship was like.  This is a short clip

21  from an interview of Mr. Baker that Mr. Sussman did in the

22  months before this meeting in September, and it's at a

23  conference for privacy professionals where Mr. Sussman

24  interviewed Mr. Baker.

25              (Video clip being played)

1              MR. BOSWORTH:  Privilege?

2              Relationships.  Relationships matter, especially

3      in the small world of national security lawyers.

4              And ask yourselves, after you hear the evidence

5      and you see Mr. Baker:  Do you think Mr. Sussman would throw

6      his career away, his life away, to tell a lie to that guy?

7              So they have this meeting on September 19th, that

8      Monday.  There are no notes, no recordings, no reports.  And

9      that's one of a series of interactions that occur that week.

10             The text happens Sunday.  The meeting happens

11     Monday.  There's a phone call on Wednesday.  There's a phone

12     call on Thursday.  Contact, contact, contact.

13             And notably, none of that contact was recorded.

14     There are no notes of any of that.  No reports of any of

15     that.  No witnesses to any of that.

16             You heard that after Mr. Baker met with

17     Mr. Sussman some other people took notes.  They're not going

18     to be able to explain them.  You'll see those notes for

19     yourselves.  But there are no notes for any of these other

20     phone calls.  There are no notes for the other interactions.

21     More on that in a moment.

22             So the FBI investigation.

23             So after Mr. Sussman meets with them, two things

24     happen.

25             One, the FBI decides we do want to investigate,

1    and they reach out to *The New York Times*, and they ask them

2    to hold the story.  This story that was supposed to be a

3    help to the Clinton Campaign, that was going to be good for

4    the Clinton Campaign, gets shut down.  That's the first

5    thing that happens.

6         The second thing that happens is the FBI

7    investigates.  And you will hear that they did the things

8    that the FBI can do that private citizens like Rodney Joffe

9    can't do.  They issued subpoenas.  They interviewed

10   witnesses.  They got extra data.  They did the things

11   necessary to figure out whether this evidence of potential

12   communication between the Trump organization and Alfa-Bank

13   was real or not.  And they ultimately found, nope, nothing

14   to worry about here.

15        Mr. Sussman said there might be smoke.  They

16   looked and said, no fire.  Which is what they do with tips

17   they get day after day after day.  That's what the FBI does.

18        That's the story.

19        So now let's go into the questions.

20        The first question:  What did Michael Sussmann

21   actually say?  Well, you know about the text message that

22   Sunday.  But what about the meeting on Monday and the phone

23   calls later that week?

24        Now, you've heard, well, Mr. Baker's going to come

25   in here, and he will tell you Mr. Sussman said that he was

1    not meeting with me on behalf of a client.  But with

2    respect, Ms. Shaw didn't tell you all that Mr. Baker has

3    said.

4              What else has Mr. Baker said?  What hasn't he

5    said?

6              You will hear that in 2018 Mr. Baker testified

7    under oath that he had no memory whatsoever of whether

8    Sussmann was there on behalf of a client.

9              You'll hear in 2019 he testified under oath that

10   Sussmann did talk about clients.

11             You'll hear that in 2020 he told the Special

12   Counsel that the topic of whether there was a client never

13   came up.

14             Now, they want you to believe Mr. Baker's memory

15   is clear, but you will see Mr. Baker's memory is clear as

16   mud.  And is that all that surprising?  How many of you can

17   remember a conversation you had at work six years ago that

18   you didn't take notes of, that you didn't record, and that

19   no one else was there for?  Hard to do.  Hard to remember

20   what you did yesterday, let alone what someone specifically

21   said to you six years ago.  And nothing that the government

22   introduces into evidence here will show you -- will prove to

23   you exactly what was said in the conversations that

24   Mr. Sussman had with Mr. Baker.

25             And here's why that matters.  The claim here is

1      that Mr. Sussman told Mr. Baker he wasn't there on behalf of

2      a client, and the FBI itself said the exact opposite.

3              In a meeting just months later, the FBI -- I think

4      you can see that -- was asked to brief the senior officials

5      at the Department of Justice in the Trump administration,

6      and the FBI at the highest level got together a briefing for

7      DOJ for the Acting Attorney General handling this matter to

8      talk through all the different Russia investigations, and

9      they gave a briefing about this Alfa-Bank investigation.

10     And where did they say that the allegations came from?  They

11     said -- you can see it crystal clear in black and white --

12     an attorney brought to FBI on behalf of his client.

13             Mr. Sussman is charged here with saying the exact

14     opposite.  But the FBI said no, he was there on behalf of

15     his client.

16             Now, this is an important meeting.  This wasn't a

17     casual get-together.  This is a briefing of the senior-most

18     officials of our institution, the FBI, to the Department of

19     Justice.  And what did they say?  That when it came to this

20     case, the allegations were brought by an attorney on behalf

21     of his client.  The exact opposite of what Mr. Sussman is

22     charged with lying about here.

23             And you know what else you'll learn?  You know who

24     was at that meeting where the FBI at the highest levels said

25     this came from an attorney on behalf of his client?  Jim

1    Baker himself, the man who will say, nope, Sussmann never

2    said that; of course not; he wasn't there on behalf of a

3    client.

4              This shows the opposite.  It shows that the FBI

5    thought, as of that point, that the information did come

6    from an attorney on behalf of his client.  So either by then

7    Baker believed it, too, or Baker didn't care, because none

8    of it mattered in the first place.  That's reasonable doubt

9    if there ever was.

10             Next, is what Mr. Sussman said false?  Well, if

11   you don't know what he said, you can't know that it's false.

12   But here, even assuming that the government is able to prove

13   what they claim Mr. Sussman said -- and you should have

14   serious reasonable doubt that they can -- is what he said

15   false?

16             Well, this goes down to why Mr. Sussman was at the

17   FBI in the first place.  And you will see, and the evidence

18   will show, Mr. Sussman did not go to the FBI to do the

19   Clinton Campaign's bidding.  This meeting was the opposite

20   of what they wanted.  No one told him to go.  No one

21   authorized him to go.  No one wanted him to go.

22             And also, use your common sense.  If the Clinton

23   Campaign really wanted to send in an attorney who could

24   conceal his relationship with them, Mr. Sussman is the last

25   person they'd send in.  He was someone the FBI knew

1    represented partisan clients.

2              The FBI knew that he represented the Clinton

3    Campaign that summer.  The FBI knew he was an attorney for

4    the DNC, the Democratic party itself.  The FBI knew -- on

5    the very day that Michael Sussmann spoke to Jim Baker on the

6    phone, the FBI wrote a memo calling him the Clinton

7    Campaign's lawyer.  That's not the kind of person you'd send

8    in to conceal a relationship with the Clinton Campaign on

9    the Alfa-Bank stuff.

10             And Mr. Joffe wasn't there to promote --

11   Mr. Sussman wasn't there to promote Mr. Joffe's interests

12   either.

13             As the FBI itself will tell you in this trial,

14   Mr. Joffe had nothing to gain from this meeting; and, if

15   anything, if Mr. Sussman had told the FBI about Mr. Joffe,

16   they would have taken all of this more seriously, not less,

17   given who Mr. Joffe is.

18             Third -- I'm speeding up, because I want to finish

19   up -- did Mr. Sussman intend to make a false statement?

20   That's another important hurdle that the government has to

21   leap over here to convict Mr. Sussman, and they can't.

22             Ask yourselves:  What would Michael Sussmann gain

23   by lying to Mr. Baker?  Nothing.

24             What would he lose?  Everything.  He'd lose his

25   credibility, his relationship with Baker, his security

1   clearance, his livelihood.  For what?

2          And ask yourselves:  Are these the actions of

3   someone who is trying to lie, who is trying to do something

4   deceitful?

5          If he was trying to hide who was behind the Alfa-

6   Bank allegations, why would he tell Jim Baker that he,

7   himself, got the information from cyber experts?

8          If he was trying to dupe the FBI, why give them

9   the data that they could evaluate for themselves and make

10  whatever conclusions they wanted about whether it was good

11  or bad?

12         And if he wasn't motivated by a genuine interest

13  in national security, why did he go to the CIA -- you heard

14  about this -- in February of 2017, months after the

15  election, when there wasn't even a Clinton Campaign in

16  existence anymore?

17         Because, you will learn, he had a genuine interest

18  in national security and doing the right thing.

19         And you know what else shows Mr. Sussman's good

20  intent?  What he actually said to the CIA.  Unlike the FBI,

21  which seems not to have taken notes of all these important

22  conversations, the CIA took a lot of notes.

23         When Mr. Sussman met with that former CIA employee

24  to set up the meeting, did he say, "No, I'm just here as a

25  good citizen.  I'm trying to just do the right thing here"?

1    No.  He said, "I do have a client."  You'll see the memo

2    that that former CIA employee wrote.

3              Client, client, client, client, client, client,

4    client.

5              This is not the effort of someone trying to hide

6    the existence of a client.  He told them.  And then a week

7    and a half later, when that guy, who knew he had a client,

8    set up a meeting, Mr. Sussman went in and said, well, look,

9    I'm not representing the client for the purpose of this

10   meeting, because he was trying to do the right thing.  He

11   was trying to help the CIA, just like he was trying to help

12   the FBI, by bringing information -- that is, national

13   security concerns -- to their attention, and by this point

14   it was a different set of information all together.

15             And you'll see at that meeting Sussmann said I'm

16   not representing a particular client, knowing that he had

17   just told the guy setting up the meeting there was a client.

18   You can have a client but not go to a meeting for that

19   client.  He said he wasn't expecting anything in return.  He

20   said, "Look, I'm a partisan" -- just FYI, something he

21   didn't have to say to the FBI because they knew it full

22   well -- and he said, "If you want to speak to the guy behind

23   all this, let me know.  It's on the table."

24             Not the words or deeds of someone trying to hide

25   something.

312

1           The last question:  Did this matter?  Did what

2      Mr. Sussman say about his client matter?

3           The government's theory here is that by concealing

4      his relationship with the Clinton Campaign, that affected

5      the investigation.  They didn't investigate, you know, with

6      an assumption that there was politics involved.  The

7      evidence shows the exact opposite.  They knew from the

8      beginning, no matter what Mr. Sussman said, that there could

9      be politics afoot.  They knew that he was a lawyer for the

10     Democratic national party, DNC, the Democratic National

11     Committee.  They knew he was a lawyer for the Clinton

12     Campaign.

13          And you can see it.  You will see it.  The notes

14     from this investigative file, the notes of what the FBI did

15     after they got the Alfa-Bank allegations are littered with

16     references to Mr. Sussman as being a DNC lawyer, a political

17     lawyer, a Democratic lawyer, a lawyer for the Clintons.

18     These are just a few of the examples.

19          He's essentially a lawyer representing the

20     Democratic National Committee and Clinton, and they're

21     saying that his political affiliations were hidden.  They

22     were out and about, loud and clear for everyone to see.

23          And you're also going to see one other thing.

24     There are going to be witnesses from the FBI who are going

25     to testify here, and they're going to come and tell you it

1    was so important to know who Mr. Sussman's clients were.  It

2    is so important to know the motivations of the source, like

3    Mr. Sussman, walking in the door giving information, so

4    important for us to know that.

5             Judge the FBI by what they did, not by what

6    they're saying now.  If the motivation of a source was so

7    important, you would think they would have interviewed

8    Michael Sussmann himself during this investigation.

9             These are just some of the people involved in the

10   investigation.  They're the main players, and most of them

11   are going to testify here.  How many of these people

12   interviewed Michael Sussmann about his motivations?  Zero.

13   None.

14            If they cared so much about the motivations of the

15   people supplying the data, well, Mr. Sussman told them he

16   got this data from cyber experts.  How many of these people

17   investigating this case so thoroughly interviewed the cyber

18   experts to ask them, "Hey, why are you doing this?  Do you

19   have a motivation that we should know about, some bias we

20   need to hear about?"  Zero.  Not one.

21            No one interviewed Mr. Sussman, no one interviewed

22   the cyber experts, because no one cared about the

23   motivations of him or his cyber experts, let alone his

24   clients.

25            And do you know why?  You will hear it's because

1    what mattered was the data.  They could look at the data and

2    see is it good, is it bad.  And who did they get the data

3    from?  That guy.

4          At the end of the day, it's going to be clear that

5    no one cared about the motivations of Mr. Sussman or his

6    cyber experts, let alone his clients.  That's what they're

7    saying now, but judge them by what they did then, not what

8    they're saying now.

9          Ladies and gentlemen, I'm concluding now, and I

10   appreciate your patience listening to the opening statement

11   on behalf of Mr. Sussman and for your patience listening to

12   the opening on behalf of the government.

13         It is essential that you are here because you are

14   here to give the government a fair trial, and you're here to

15   give Mr. Sussman a fair trial.  And you can do that by

16   focusing on the key questions that this case turns on.

17         What did he say?

18         Was it false?

19         Did he intend for it to be false?

20         Did any of this matter?

21         And I'd ask that you keep an open mind as the

22   trial goes on.  You're going to hear from one witness and

23   believe one thing, and then hear the opposite from a

24   different witness and maybe believe another.  You'll hear

25   something on direct and something on cross; something in the

 1    government's case, something in the defense case.

 2              You don't reach a conclusion until all the

 3    evidence is in and the government can come back and talk to

 4    you about what it shows and Mr. Berkowitz can come back to

 5    you and talk to you about what it shows.

 6              And I'll leave you with this:  As jurors, you have

 7    the extraordinary responsibility to do justice in this case,

 8    and as jurors, you have the extraordinary responsibility to

 9    prevent injustice.  This case is an injustice, and I

10    suspect, when all the evidence is in, you will agree.

11              Thank you.

12              THE COURT:  Thank you, Mr. Bosworth.

13              All right.  Ladies and gentlemen, we're going to

14    take our morning break.  We will generally break for about

15    15 or 20 minutes every morning depending on where the

16    witness testimony is.  So why don't we come back ready to go

17    at 11:00 a.m.

18              Ms. Jenkins, should they leave their notes in

19    their chair or take them with them?

20              THE COURTROOM DEPUTY:  Leave them in the chair.

21              THE COURT:  You can leave your notes in the chair,

22    and we're going to exit out the back door here.

23              (Jury exits courtroom)

24              THE COURT:  All right.  We'll see you in 15

25    minutes.

```
 1                    (Recess taken)
 2             THE COURT:  Welcome back, everyone.  Please be
 3    seated, and I believe we are ready for the government's
 4    first witness.
 5             Ms. Shaw.
 6             MS. SHAW:  Thank you, Your Honor.  The United
 7    States calls Special Agent David Martin.
 8             THE COURT:  All right.  Step right up, sir.
 9    Please have a seat or remain standing and raise your right
10    hand.
11                    (Witness sworn)
12             THE COURT:  You can feel free to remove your mask,
13    if you'd like.
14             THE WITNESS:  Thank you.
15             THE COURT:  All right.  Please proceed.
16                SPECIAL AGENT DAVID MARTIN, Sworn
17                       DIRECT EXAMINATION
18    BY MS. SHAW:
19    Q.  Good morning, Agent Martin.  Could you please introduce
20    yourself for the jury, and spell your last name for the
21    court reporter.
22    A.  My name is David Martin, M-A-R-T-I-N.
23    Q.  And Agent Martin, where is it that you work?
24    A.  I'm a Supervisory Special Agent for the Federal Bureau
25    of Investigation.
```

1    Q.  And what is your title there?  What unit are you the

2    Supervisory Special Agent for?

3    A.  I'm the chief of the Cyber Technical Analysis Unit.

4    Q.  Okay.  And how long have you been with the FBI?

5    A.  I've been with the FBI for about 13 years, since July of

6    2009.

7    Q.  Okay.  Before we get into your career at the FBI, what's

8    your educational background?

9    A.  Oh, I have a bachelor of science degree in computer

10   science and psychology with minors in business and math from

11   the University of Denver.  And then I have a master's degree

12   in information security and engineering with a

13   specialization in digital forensics and incident response

14   from the Sands Technology Institute.

15   Q.  And before you joined the Bureau, did you work anywhere

16   else?

17   A.  Yes.  I had positions as a computer crime specialist for

18   the Colorado Bureau of Investigation and as a police officer

19   for the City of Littleton, Colorado.

20   Q.  So you mentioned you've been with the Bureau for about

21   13 or so years.  Why don't we walk through some of the

22   positions that you've had there.

23          How did you start out at the FBI?

24   A.  My first assignment is I was assigned to the Detroit

25   Field Office in the Detroit Cyber Task Force.

1    Q.  And what sort of cases would you do at the Cyber Task

2    Force?

3    A.  I primarily worked computer intrusion cases, and then

4    also intellectual property rights and child exploitation

5    cases.

6    Q.  All right.  And would it be fair to say that those

7    investigations involved examining or looking at what's

8    called DNS data?

9    A.  Yes.  The investigations often involved examining and

10   analyzing network traffic, and DNS data was one of the key

11   parts of that.

12   Q.  And when we say "network traffic," are we referring to

13   the Internet?

14   A.  Computer -- yes, various kinds of computer networks, the

15   Internet being probably the most largest -- the most largest

16   and well known of them.

17   Q.  So after being a special agent in the cyber division,

18   did you -- where did you go next within the Bureau?

19   A.  So after that I took a job at FBI Cyber Division at

20   headquarters in the cyber -- in the Technical Operations

21   Unit.

22   Q.  And where is that located?  It's not in Detroit, right?

23   A.  No.  It's in Chantilly, Virginia.

24   Q.  Okay.  And how did your responsibilities change in that

25   position?

1    A.  So in that position I managed technical operations,

2    which basically affected network traffic to help facilitate

3    our investigations, did things like decoding network

4    traffic, and helping to respond to computer intrusion

5    incidents.  So hacking, basically.

6    Q.  So would it be fair to say it was the same array of

7    cyber investigations that you'd worked on as a special agent

8    that you were now supervising?

9    A.  Yes.  It was a very -- very similar kind of cases.

10   Q.  And, again, would it be fair to say that it included

11   analysis and review of DNS data?

12   A.  Yes, frequently.

13   Q.  Okay.  And after that position, did you progress to

14   another position within the Bureau?

15   A.  So after that I spent four years running our Cyber

16   Incident Response Team, which is known as CAT [sic].

17   Basically that team would respond to major computer

18   intrusions all over the country and the world, and we would

19   investigate those.

20   Q.  And about how many agents were you supervising within

21   that unit?

22   A.  So we had about 50 agents scattered throughout the field

23   that were all part of that unit or as part of that team.

24   Q.  And would they consult with you about issues that arose

25   within the investigations they were conducting?

1    A.  Yes, frequently.

2    Q.  And would it be fair to say that those included DNS data

3    and Internet traffic?

4    A.  Without -- basically every investigation involves that

5    in some way.

6    Q.  And then your next position with the Bureau?

7    A.  So after that I moved to the Cyber Technical Analysis

8    Unit where I managed the Advanced Digital Forensics program.

9    Q.  And in very general terms for those of us that may not

10   be specialists, what does the advanced forensics group do?

11   A.  So basically it's a group of technical specialists that

12   analyze very complex computer forensics cases, so examining

13   hard drives and phones and things like that to see if

14   they've been hacked.  They also do what they call reverse-

15   engineering of malware; so basically take apart computer

16   viruses and figure out how they work.

17   Q.  And when you say "malware," are you talking about what

18   most of us would say is a virus?

19   A.  Yes, virus or a Trojan or -- they have a lot of

20   different terms for them.

21   Q.  Okay.  And then, in your current position, how have your

22   responsibilities changed?

23   A.  So I was then promoted to unit chief of the Cyber

24   Technical Analysis Unit, so I manage about 70 or so

25   contractors and government employees who do the same

1    intrusion forensics and malware analysis as well as a group

2    that does the --

3              THE COURT REPORTER:  I'm going to ask you to slow

4    down.

5              THE WITNESS:  Okay, sorry.

6    A.  It manages our network traffic analysis and handles our

7    subscriptions to different data sets, so things like passive

8    DNS and other data sets out there.

9    Q.  All right.  Well, we'll get to passive DNS in a little

10   bit.

11             How many investigations, about, would you say that

12   you're sort of overseeing at any one time in your current

13   position?

14   A.  We're probably supporting close to a dozen different

15   investigations in the field at any given time.

16   Q.  And approximately how many agents?

17   A.  So most of my -- most of my unit is professional

18   support, so it's mostly computer scientists and contract

19   technical specialists.

20   Q.  And do you review and consult with them on their

21   findings and developments in their investigations?

22   A.  Yes.  So I do technical reviews of their reports.

23   Q.  So in addition to your work at the Bureau, have you gone

24   through any professional training related to cyber security

25   or cyber attacks like you've spoken about?

1   A.  Yes.  I've taken approximately 20 continuing education

2   classes on various topics ranging from network traffic

3   analysis, malware analysis, digital forensics and incident

4   response, and similar subjects to that.

5   Q.  And in addition to those trainings, have you received

6   any professional certifications?

7   A.  Yes.  I have about a dozen professional certifications

8   in the same sort of subject areas, including the GIAC

9   security expert certification.

10  Q.  So you said GIAC.  Is that G-I-A-C?

11  A.  That's right.  It's G-I-A-C.  It's the Global

12  Information Assurance Certification group, I guess.

13  Q.  And tell us just generally what that certification

14  means.

15  A.  So it's basically -- it's considered one of the most

16  difficult-to-obtain certifications in information security.

17  It basically -- you have to demonstrate knowledge in a

18  lot -- a wide range of subjects in computer security and

19  these technical fields.

20  Q.  And do you have an idea of how many people receive that

21  certification?

22  A.  I believe there are less than 200 people with that

23  certification in the world.

24  Q.  I'm sorry?

25  A.  I believe there are less than 200 people with that

1    certification in the world.

2    Q.  In the world.  Okay.  Thank you.

3              In addition to your certifications, have you

4    received any awards for your work at the Bureau?

5    A.  Yes.  I've received a few awards of different

6    commendations from the Bureau as well as the Attorney

7    General's Award for Excellence in information technology,

8    and U.S. Attorneys awards.

9    Q.  And in addition to awards, have you published any

10   articles or given presentations in your area of

11   specialization?

12   A.  Yes.  As part of my master's program, I published

13   several peer-reviewed articles, one of which was on the

14   topic of network traffic analysis.

15             MS. SHAW:  Your Honor, at this time I would ask

16   for Agent Martin to be certified as an expert.

17             THE COURT:  In the area...?

18             MS. SHAW:  In the area of cyber security and DNS.

19             THE COURT:  Any objection?

20             MR. BOSWORTH:  No objection.

21             THE COURT:  Okay.  The Court will qualify Agent

22   Martin as an expert to provide testimony in the area of

23   cyber security and DNS data analysis.

24             Ladies and gentlemen, there are generally two

25   types of witnesses that you might hear from.  There are lay

1    witnesses who have some involvement in the facts of this

2    particular case, but there is also a category of witnesses

3    called expert witnesses who the attorneys sometimes call to

4    help the jury understand scientific or technical areas based

5    on their professional or academic expertise.  And Agent

6    Martin has been qualified as an expert for this trial, okay?

7              MS. SHAW:  Thank you, Your Honor.

8    BY MS. SHAW:

9    Q.  So Agent Martin, in preparation for your testimony

10   today, did you prepare a slide show or tutorial that you

11   might want to show the jury?

12   A.  Yes.  I prepared a set of slides to illustrate some of

13   the -- some of the concepts of DNS and the network called

14   The Onion Router or TOR.

15   Q.  And if I could show you Government's Exhibit 1700, do

16   you recognize what Government's Exhibit 1700 is?

17   A.  That's my PowerPoint presentation.

18             MS. SHAW:  Your Honor, I'd move to admit

19   Government's 1700.

20             THE COURT:  Any objection?

21             MR. BOSWORTH:  No objection.

22             THE COURT:  So moved.

23             MS. SHAW:  Okay.  If we could move to the second

24   page.

25             Third page, I guess.  Let's stop here.

1    BY MS. SHAW:

2    Q.  So let's start with DNS or Domain Name System.  What is

3    that?

4    A.  So DNS is basically a way to map human readable names of

5    things like Google.com or Yahoo.com to numerical IP

6    addresses.  And it works kind of the same way -- it's a bit

7    more complex, but it works kind of similarly to a phone book

8    where it maps a person's name to a numerical telephone

9    number.

10   Q.  And before we get into the right side of the

11   demonstrative, how did this DNS or Domain Name System come

12   about?  What was the origin of this?

13   A.  So the origin is that the Internet was first developed

14   essentially in research -- like in a research setting, at

15   universities and research labs where it was used on a fairly

16   small scale, and people could just use numerical IP

17   addresses to communicate.  So they would remember that

18   1.2.3.4 was one server and 1.2.3.5 was another server.

19            Obviously, as there got to be a lot more of these

20   and people started using them more widely, it got really

21   hard to remember all those different numbers.  And so

22   instead of having to try and memorize hundreds or thousands

23   of numbers, they came up with a way of mapping names to

24   numbers; and that was where DNS came from.

25   Q.  So on the slide on the right, you have a comparison of

1    phone book and DNS.  Maybe you could describe for the jury

2    what that's about?

3    A.  Yes.  So the phone book you have -- you have a set of

4    names on the left-hand side of different people.  You have a

5    set of numbers on the right-hand side.  And for most people,

6    myself included, names are easier to remember than numbers.

7    So you can look in the phone book.  If you know you're

8    trying to talk to Mr. Smith, you can go down and find his

9    number [sic] and look over and find his phone number.

10   Q.  And with respect to DNS, I see there's a different

11   format, but it's the same concept?

12   A.  Yes.  It's very similar.  Basically you have a numerical

13   IP address, which is what your computers use to talk to one

14   another.  So your computer will use an IP address to talk to

15   a web server when you're going to a website or using your

16   email or something like that.

17           And trying to memorize a lot of these numbers is

18   very difficult.  I mean, there's very few IP addresses that

19   even I memorize.  It's a lot easier to remember I want to go

20   to Google.com or Yahoo.com or YouTube or something like

21   that.

22           MS. SHAW:  If we could have the next slide,

23   please.

24   Q.  Okay.  If you could walk us through how a DNS request

25   or -- actually, let me back up.

 1              Is a DNS request the same as what we might call a

 2     look-up?

 3     A.  Yes.  They're synonymous.

 4     Q.  All right.  If you can start walking us through what

 5     we're seeing here.

 6     A.  My apologies.  You can actually ignore the thing that

 7     says "http" right there.  That was a glitch in my slides.

 8     That doesn't come into play until the very end.

 9              What we have here is we have our user on the left-

10     hand side.  And let's say, for argument's sake, this is my

11     great aunt who has never used Google before.  On the right-

12     hand side you have a picture of the world with a bunch of

13     lines around it.  This is basically -- this represents the

14     Internet.  So this is a bunch of different wires and

15     fiberoptic cables and satellites and all of the other things

16     that use the Internet to communicate around the world.

17              And our user over here on the left-hand side, my

18     great aunt, has her laptop, and though she doesn't know

19     this, her computer has an IP address, and that's that

20     108.18.158.20, and we're going to say for argument's sake

21     this is a -- or, sorry, it's a Verizon FiOS.  So it's a --

22              THE COURT:  Agent Martin, you need to slow down

23     just a little bit for the court reporter, particularly when

24     you're clicking through numbers.

25              Go ahead.

1    A.  So she has a Verizon FiOS IP at her house.  She's

2    plugged into her home Internet connection.  And she's

3    decided she'd like to visit Google.com.

4    Q.  Next slide, please.

5    A.  So she goes through her browser, and she types in

6    Google.com.  And everything that happens from this point on

7    is pretty much transparent to her.  She has no idea her

8    computer is doing this, but her computer is.

9            So the first thing the computer is going to do

10   is -- again, she's never used Google.com before, so it's

11   going to look it up in its own sort of internal address

12   book.  And it's going to say, "Do I already know the IP

13   address for Google.com?"

14           So next.

15   Q.  Next slide, please.

16   A.  And so this is what they call local DNS, and that's just

17   basically a directory of IP addresses and domains that the

18   computer already knows about.  And so in this case she

19   doesn't -- her computer doesn't know the address for Google,

20   so it's going to ask its -- what they call the default DNS

21   server.

22   Q.  Next slide, please.

23   A.  And this -- in this case, it's basically a DNS server

24   from Verizon, so it's for -- Internet service provider has

25   this DNS server.  And she's going to ask that server what

1    the IP address is for Google.com.

2    Q.  And let me just stop you there.  And, again, she's typed

3    in "Google," but this is a sort of a numeric inquiry from

4    your aunt to the Verizon DNS server?

5    A.  Yes.  This is all being transmitted without her being

6    able to -- I mean, as a user, you don't see any of this

7    happening behind the scenes.

8    Q.  Sorry.  Go ahead.

9    A.  So let's say in this example that the FiOS DNS server

10   doesn't know Google.com's IP.

11   Q.  Next slide.

12   A.  So it's going to check with what they call the root DNS

13   servers.  And the root DNS servers are -- they're basically

14   a group of 13 logical servers out there, that their IP

15   addresses never really change, and all the other DNS servers

16   in the world know that's the first place to stop when you're

17   trying to look up a new item -- a new address.

18   Q.  Could you just give us an example of some of these root

19   servers.  Are they, you know, some for com and some for biz,

20   like different suffixes?

21   A.  So these are actually a level above that.  So these know

22   the address to the .com server and -- the server for .com,

23   and there's a server for .net, and there's a server for .us

24   and things like that.  So those are the only addresses that

25   this server knows.

1    Q.   Okay.  And so this root server is asking for the IP?

2    A.   Yeah.  So the FiOS DNS server, what's called a recursive

3    resolver, makes a request and asks the root DNS server what

4    the IP address is for Google.com, and it says that it's

5    asking on behalf of my great aunt.

6    Q.   All right.  Next slide, please.

7    A.   So the root DNS server doesn't store this kind of

8    information.  So it says to go ask what they call the TLD or

9    the Top Level Domain server for .com, because it ends in

10   .com.  So it's going to say, all right, go to C. -- this

11   string of servers -- and that's the .com name server.

12   Q.   And, again, this is all behind the scenes when you type

13   it in?

14   A.   Yes, this is all behind the scenes.

15   Q.   Next slide, please.

16   A.   So then it goes to the -- they're going to go to the

17   .com server, and the .com server, they're going to ask it

18   the same question:  What's the IP address for Google.com?

19   Q.   Okay.

20   A.   Next.

21          And then -- so the .com server doesn't know the IP

22   address for Google.com, but it does know who can give a

23   definitive or an authoritative answer to that, so it knows

24   what server knows Google.com's IP address for sure, and

25   that's -- in this case it's NS1.Google.com.

1    Q.  And just so we're clear, this is sort of an exaggerated

2    series of look-ups for purposes of illustrating all the

3    possible steps.  Would it be fair to say that many of these

4    steps might be -- in our heavily Internet-intensive world,

5    we don't have to even get this far?

6    A.  Yes.  It's -- I mean, in most cases you're going to --

7    if you look up Google.com, it's going to look on your local

8    PC, and you've probably resolved that at some point in the

9    past, so it's already going to know the IP address.  And if

10   not, almost certainly your Internet service provider will

11   know the IP address.

12          So it may not have to work its way all the way

13   through this chain, but it can, if it has to.

14   Q.  And before I move on, again, if you can, TLD, that

15   stands for Top Level Domain?

16   A.  Yes, and so that's basically the last thing in the

17   domain.  So the .com or the .net or the .biz, or whatever

18   the last portion of an IP -- or the DNS or domain name is.

19   Q.  Next slide, please.

20   A.  So finally it's going to reach the authoritative Google

21   DNS server.  And this is -- this is a server that's run by

22   Google itself, and it knows for sure what the IP address for

23   www.Google.com is, and so it's going to provide that answer

24   back to the user.

25   Q.  Next slide, please.

1    A.  So it can say I can authoritatively say that this is the

2    IP address for it.  So then it's going to return that back

3    across -- across the wire.

4    Q.  Next slide.

5    A.  And so now the web browser knows that Google.com equals

6    this IP address.

7             So at this point the DNS look-up and request is

8    complete.  Your computer now knows what the address for

9    Google.com is.  But it hasn't taken any other steps yet.  It

10   hasn't actually connected to Google.com.

11            So the DNS query is done.  The DNS query doesn't

12   connect to the www.Google.com IP address.  It returns that

13   answer to the web browser, and then the web browser reaches

14   out and makes another connection.

15   Q.  Next slide.

16   A.  So then the web browser, now knowing what the right IP

17   address is to connect to Google, it makes what they call an

18   http or what's commonly known as a web request for the web

19   server for Google.com, and you see the following web page.

20            Next.

21            And there is the old familiar Google web page.

22            So basically in the time that it's taken to enter

23   Google.com and hit the enter key, within probably less than

24   a second, all of this has happened on the backside,

25   completely invisible to the user.  And then you've made a

1   connection to Google, and you have the web page that you're

2   looking at.

3   Q.  And would this -- going back to your phone analogy,

4   would it be similar to when we dial into our phone?  We

5   don't see all of the cell towers connecting, but eventually

6   we get through to the pizza place or wherever it is we're

7   trying to reach?

8   A.  Yes.  That's a similar kind of thing.  There's a lot of

9   things that happen behind the scenes to make it happen, but

10  to the user it's kind of abstracted away so you don't see

11  it.

12  Q.  Next slide, please.

13          All right.  This slide's entitled "Passive DNS."

14  As simply as you can, explain for all of us, what is passive

15  DNS?

16  A.  So passive DNS is basically capturing a copy of DNS

17  queries that are happening on the Internet at a certain

18  place or series of places.

19  Q.  And when you say "queries," would that be a look-up?

20  A.  Yes, so look-up or a query.

21  Q.  All right.  So what are we looking at in this slide?  I

22  see we have -- is this your aunt again?

23  A.  This is my great aunt again.

24          So she's over here making -- making different

25  look-ups.  We have the same DNS server for her Internet

1    service provider there, and then we have a couple different

2    DNS servers for illustrations.  I picked Yahoo, Google, and

3    Facebook.

4    Q.  All right.  And I see that you have something that --

5    two things that are labeled "Passive DNS Sensor."  What can

6    you tell us about passive DNS sensors?

7    A.  So passive DNS sensors are set up at different --

8    usually at a place that -- usually at companies that provide

9    DNS services, and they are run by commercial services that

10   make -- that basically make an agreement with the different

11   DNS providers to make a copy of any DNS requests that come

12   across, and then the answers to those questions, and then

13   report that back to their -- back to their company.

14   Q.  And you said that these were commercial.  Who might be

15   some of the clients of these commercial passive DNS

16   collectors?

17   A.  A lot of them are used on information security, so

18   people who are doing network defense, trying to block

19   spammers, trying to identify hackers or compromise

20   computers.

21   Q.  And could you -- do you know a few names of some of the

22   companies that might collect this passive DNS?

23   A.  Yes, so some of them would be companies like Farsight,

24   Packet Forensics, or Neustar.

25   Q.  Okay.  So why don't you pull up the next slide, please.

1          All right.  So if you could walk us through what's

2     happening here?

3     A.  So here we've made a -- it's going to be a simplified

4     DNS look-up, so the same sort of process in the last slide

5     happened.  The request went through to the Google DNS

6     server, and you got the answer back, found out the IP

7     address for Google.com, and there were no passive DNS

8     sensors at the server, the DNS server that returned that

9     answer.  And so there's -- there's nothing recorded in the

10    passive DNS log.

11    Q.  And when you say "passive DNS log," you're indicating

12    the section -- the heading on the left of the demonstrative?

13    A.  That's correct.  It will get populated here shortly.

14    Q.  And tell us a little bit more about this straight route

15    to the Google sensor.  Is that unusual?

16    A.  No.  It's -- obviously there are a lot of different DNS

17    servers in the world, and none of the passive DNS companies

18    have sensors at all of them.  I don't know how many

19    thousands or millions of DNS sensor -- or DNS servers there

20    may be in the world, but there are -- the passive DNS data

21    is not being collected at all of them.

22    Q.  So would it be fair to say that those are kind of gaps

23    within the collection of passive DNS?

24    A.  Yes.  So passive DNS kind of works on the principle that

25    there is a -- that they're taking a sampling of the total

1    Internet traffic in the world and trying to draw conclusions

2    based on that.

3    Q.  Okay.  The next slide, please.

4    A.  One more click.  There we go.

5         All right.  So we have another connection.  So

6    this time there's a DNS query for Yahoo, and in this case it

7    does go through one of these passive DNS sensors.  And when

8    the query is made, the DNS sensor makes a copy of that --

9    makes a copy of that query and it puts it into this format

10   here.  And this particular format is called JSON, and

11   it's -- it's a format that can store a lot of information,

12   and it's very easy for a lot of computer programs to read.

13   It's somewhat less easy for humans to read.

14   Q.  And when you're referring to the format, you're

15   referring to the data that's right underneath "Passive DNS

16   Logs" on the visual?

17   A.  So yes, so it's the data that begins with "Date," and it

18   has a lot of brackets and colons.

19   Q.  And that is recording the fact that your great aunt

20   looked up the IP for Yahoo and it went through the Yahoo

21   server?

22   A.  Yes.  So it records several different pieces of

23   information.  So it says what time the query was made, who

24   made the query, who answered the query, so which DNS server

25   answered the query, and then what the answer to that query

 1    was, among a few other different pieces of information.

 2    Q.  Next slide.

 3    A.  So then we have another similar kind of look-up.  They

 4    look up the IP address for Facebook.  There's a passive DNS

 5    sensor in this path, too, and so it makes another entry here

 6    in the logs, and it shows the same information:  who looked

 7    it up, where did they look it up, what was the answer, and

 8    when was the query made.

 9    Q.  So in looking at these logs, is there another format

10    that might be a little more user friendly --

11    A.  Yes, oftentimes these are converted into a format that's

12    called a comma-separated or tab- or type-separated value

13    format.  And it's basically designed to be turned into a

14    spreadsheet so it's a little bit easier to read either just

15    looking at it as a text file or putting it into something

16    like Excel.

17    Q.  Ready for the next slide?

18    A.  And so this here is an example of one of these kind of

19    formats.  So they've taken a subset of the fields.

20            So in this case the fields that are listed are the

21    time that the query was made, and then there's this little

22    separator character here that tends to be referred to as a

23    pipe.  There's what domain was queried for.  And then the

24    third field is who made the query, who looked it up.

25    Q.  Now, you indicated that the different fields refer to

1    different things, but this looks like a lot less information

2    than we had on the last screen.  How does that translate to

3    this?  Do you pick and choose which data fields you want to

4    put into this log?

5    A.  Yes.  So depending on how you export the data from sort

6    of the raw format that it started with, you can pick to

7    export every field, or you can decide that you're only

8    interested in a certain subset of those fields here.  And in

9    this case there was a certain subset of fields chosen.

10   Q.  And just looking at this, for example, if you sent

11   this --

12              THE COURT REPORTER:  Can you speak into the

13   microphone, please.

14              MS. SHAW:  Oh, sure.  Sorry.  Sorry.  I'm

15   challenged between my eyesight and the microphone.

16   Q.  So in terms of the categories that were selected here,

17   would I automatically know that that's the date, and that's

18   the IP, or would I have said -- have to write back and say,

19   "Agent Martin, what are the column headers, or what's the

20   key for this?"

21   A.  Yes, because, I mean, it's hard to tell from this

22   whether -- which -- I mean, the time field is pretty easy to

23   figure out, that that's probably a time there saying the 6th

24   of May of this year at 8:14 in the morning.

25              The domain name field, it might be kind of hard to

1    see what that actually represents.  And with the IP address,

2    you can wonder whether is that the user's IP?  Is that the

3    DNS server's IP?  Is that Yahoo's IP?

4              So generally, when you -- when you export data to

5    this format, you put what they call a header at the top.  So

6    these are like your -- when you have it in Excel Workbook,

7    you'll have the column header at the top of each one to say

8    what each one of these fields means.

9    Q.  Okay.  Is there another slide on DNS before we move on

10   to --

11   A.  I think that's it.

12   Q.  Before we move on to the next topic, I just wanted to

13   ask you a few questions about what we just reviewed in the

14   slides with respect to DNS.

15             What does a DNS look-up tell us in most basic

16   terms?

17   A.  A DNS look-up tells you that one computer looked up the

18   IP address for a particular domain name.

19   Q.  And I realized I didn't ask you.  The IP address, does

20   that stand for "Internet protocol"?

21   A.  That's correct.

22   Q.  Now, does the existence of a DNS look-up, such as what

23   we might see in these logs, mean that there was an actual

24   connection between the computer, your great aunt's computer,

25   and Facebook?

1   A.  No, it doesn't -- there are two separate processes.  You

2   can conduct a DNS look-up as -- basically as a way to -- as

3   the first step of another connection, or you can look up --

4   do a DNS look-up entirely on its own.

5   Q.  And similarly, would a DNS look-up be able to tell you

6   whether there were, in fact, communications such as emails

7   between the two IP addresses?

8   A.  No, a DNS look-up on its own cannot tell you that.

9   Q.  Okay.  And similarly, does it -- would an IP look-up be

10  able to tell you any substance that was passed between that

11  IP address and the look-up -- the one that was looked up?

12  A.  No.  You would have to have a different source of data.

13  So you would have to -- you would have to have another

14  source of data to establish whether there was an actual

15  connection or what occurred during that connection.

16  Q.  So other than the look-up that was illustrated in these

17  slides, is there anything else that can trigger an IP look-

18  up?

19  A.  There actually -- there's multiple different things it

20  can do at a time.  A lot of -- there are some utilities that

21  are just designed to look up IP addresses.  There's a

22  command in Linux that's called DIG, D-I-G, just kind of like

23  digging a hole, and it's designed to -- it takes an IP -- or

24  it takes a domain name and it brings back the IP address for

25  it.  And it's just used for -- system administrators and

1     people like that use it to look up domain names.

2              You also have a lot of security appliances, things

3     like spam filters or firewalls or things that are supposed

4     to -- that are trying to block cyber attacks on networks

5     that will look up IP -- or look up domain names to try and

6     find out where they are or if they match; like in the case

7     of email, whether the domain matches with the IP.

8              So if you're getting a phishing email that says

9     this is coming from Amazon, your account has been suspended,

10    but if they look up the domain name that it's coming from

11    and it's not really Amazon, then the spam filter may choose

12    to block it that way.

13    Q.  Okay.  And one more vocab term.  What does "visibility"

14    mean when we talk about DNS?

15    A.  So it's -- particularly with passive DNS, it just means

16    what -- which servers -- which DNS servers a particular

17    passive DNS server can see.

18              So let's say, just for a completely contrived

19    example, if there are a thousand DNS servers on the

20    Internet, and there are passive DNS sensors for a particular

21    company on ten of them, then they'd have 10 percent

22    visibility over the total Internet.

23    Q.  And how does visibility affect an analyst's

24    understanding of DNS data?

25    A.  So it basically -- like analysts have to take into

1    consideration that any -- any passive DNS data that they're

2    seeing represents a portion of all the DNS look-ups on the

3    Internet.  But there are obviously DNS queries that are

4    happening that are not being picked up by that passive DNS

5    source.

6           So if you see something in the passive DNS

7    records, you know that that query had been made; however,

8    you can't prove that a query was not made by it not being in

9    the DNS record or the passive DNS records.

10   Q.  So would it be fair to say that the collection source

11   and its visibility would be something that would be

12   important for the analyst to know in addressing this kind of

13   data?

14   A.  It's something that's good to know, although it's very

15   hard to -- like you can't tell how -- I mean, no one knows

16   exactly how many total DNS servers are on the Internet, so

17   it's hard to say what percentage of visibility you actually

18   do have for many of these commercial passive DNS services.

19   Q.  Okay.  All right.  Can I have the next slide, please.

20          Okay.  TOR, can you tell us what TOR is.

21   A.  So "TOR" is an acronym for The Onion Router, and it's

22   a -- it's basically a network that's designed to help people

23   stay anonymous on the Internet.

24   Q.  And if you could, explain how it helps people stay

25   anonymous on the Internet.

1    A.  All right.  So it's operated by a group call The TOR

2    Project.  It's a nonprofit Internet privacy organization,

3    and it's basically run -- they run a network of computers

4    that are operated by different volunteers who agree to

5    participate in the network.  And at the most basic level

6    it -- every time you connect to a website or a resource on

7    the Internet, it routes that connection through a random

8    path.

9          So instead of going directly from your Internet

10   service provider to the website you're visiting, it's going

11   to route through a random series of other servers on the

12   Internet, oftentimes even in different countries.  So you

13   may start here in Northern Virginia, end up in a server in

14   the U.K., back down to South America, and then come out in

15   Egypt before coming back to Google.

16   Q.  Before going on to the demonstration of how that works,

17   you indicate that there's a published list of TOR exit

18   nodes.  Tell us about that.

19   A.  Yes, so The TOR Project keeps a list of all the

20   different IPs that were used as TOR exit nodes over time,

21   and they have this data published on the Internet, and it's

22   available back to February of 2010.

23   Q.  So if I were to have an IP address, I could go to The

24   TOR Project and look up whether it's on there and as a TOR

25   exit node?

1    A.  That's correct.

2    Q.  All right.  Next slide, please.

3             Help us understand TOR a little bit better.  What

4    are we seeing here?

5    A.  All right.  So this is a -- this is a graphic -- a

6    pretty good infographic that we got from the Electronic

7    Frontier Foundation, which is another nonprofit that's

8    committed to Internet privacy, and it shows basically how

9    to -- how the TOR connection works.

10            So the first step is that we have Alice here, and

11   she'd like to browse through a particular website, and she'd

12   like to do it anonymously, for whatever reason.  And so the

13   first thing she does is she goes to a server run by Dave

14   here and has -- the server's part of the TOR network -- and

15   gets a list of all the TOR nodes from that server, and it's

16   called a directory server.

17   Q.  Next slide.

18   A.  So sort of the next step is that Alice's TOR client on

19   her computer -- it's usually part of a web browser.  So they

20   have a thing called the TOR browser.  It kind of automates a

21   lot of this process.  And so she -- the TOR software picks a

22   random path out of all the different TOR nodes that it knows

23   of, it picks three random nodes and then sends the traffic

24   through it in such a way that each node only knows the next

25   node.

1          So the first -- the first computer here knows

2     Alice's IP, and it knows the second node's IP.

3          The second node knows the first and the third, but

4     not Alice or Bob.

5          And then the third knows the middle node and Bob,

6     but not any of the other ones.

7     Q.  And if you were to search on TOR like Alice is doing,

8     was it going to go through the same path every time?

9     A.  No, it's not going to.

10    Q.  Next slide, please.

11    A.  So here is a connection.  So now Alice is going to --

12    she's done looking at Bob's website.  She's now going to be

13    going to Jane's website, and so in this case she picks a new

14    path for this new connection.  It picks three different

15    nodes in a different order, and then it makes the connection

16    to Jane's website, and Alice is able to browse that.

17    Q.  And would Alice know the path that it took?

18    A.  I believe Alice could -- her software would know the

19    path that it took, but, like, anybody on the other side

20    wouldn't know the path.

21    Q.  Is there a next slide?

22    A.  I believe that's the end of it.

23    Q.  Okay.  So let's go back to the --

24          MS. SHAW:  Keep the TOR up.

25    Q.  So what's the purpose -- we talked about the encryption

1    that happens between these.  What's the purpose behind this

2    TOR routing system?

3    A.  It's basically just to make sure it's -- it's to make it

4    difficult to determine who is actually visiting a particular

5    site.

6              There's a number of reasons that people will do

7    this.  Sometimes it's because they're in a country that

8    restricts freedom of speech, and they want to get around

9    government censorship in one of those kind of countries.  It

10   can also be used just because people want to browse

11   anonymously because they're concerned with privacy.  And

12   it's also used by a lot of malicious actors to do things

13   like connecting to -- like hacking computers and doing

14   things like that.  So it can be used for a whole variety of

15   reasons.

16   Q.  So you mentioned that it takes a random path and that

17   the exit node will be different, potentially, each time you

18   use TOR.  Would you ever have it set up so that the exit

19   node was at the same place every time?

20   A.  No.  I don't know if it's even possible to configure --

21   it might be possible to force TOR to do this somehow by

22   messing with the software, but that would actually

23   decrease your security to do that, because you would then be

24   coming -- you'd basically be turning TOR into just a simple

25   proxy.

1          Where -- a proxy server is where you send your

2     traffic to a server, and then it comes out from another

3     predictable place every time.  So things like -- people will

4     use them sometimes if they want to -- these simple proxies

5     will use them to stream Netflix from a different country or

6     something like that.  But you wouldn't want to do that sort

7     of thing through TOR because it's significantly slower than

8     a regular connection because you -- for privacy, it has to

9     jump through three different servers before it gets to where

10    it's going.

11    Q.  And then you mentioned privacy.  So, for example, the

12    bottom computer there next to Bob, if I were to set that up

13    and say that that was going to be my TOR exit node -- let's

14    just assume that I could -- how would that affect my ability

15    to stay private with what I was doing on the Internet using

16    TOR?

17    A.  It would make you a lot easier to spot because if

18    you're -- you're consistently connecting to a place, and

19    you're trying to -- you consistently connect to a server

20    without revealing who you are.  If you're constantly coming

21    out of the same TOR exit node, it's a lot easier to figure

22    out it's the same person coming back over and over again, as

23    opposed to if you're using TOR the way it's supposed to work

24    and that it does work and coming out of random exit nodes

25    every time, it's very hard to tell whether -- whether any

1    two TOR connections are in any way related.

2              MS. SHAW:  Thank you, Agent Martin.

3              THE WITNESS:  Thank you.

4                    CROSS EXAMINATION

5    BY MR. BOSWORTH:

6    Q.  Good morning, Special Agent Martin.

7    A.  Good morning.

8    Q.  We've never met before, correct?

9    A.  I don't believe so.

10   Q.  Okay.  So this is pretty complicated stuff, this DNS

11   business?  I'm envious.

12   A.  It can be, yes.  There are a lot of nuances behind it.

13   Q.  And you're an expert in this, right?

14   A.  I use it -- I use it and analyze DNS traffic quite

15   frequently.

16   Q.  And you became an expert because of your education and

17   experience leading to today, correct?

18   A.  That's correct.

19   Q.  All right.  So you studied computer science in college?

20   A.  That's correct.

21   Q.  You got a master's degree?

22   A.  Yes.

23   Q.  You got training for what seems like hundreds of hours?

24   A.  Yes, quite a few.

25   Q.  And you got all these certifications in various cyber

1    security and DNS subject matters?

2    A.  Yes, in multiple cyber security matters.

3    Q.  And so all that education and training is what enables

4    you today to understand this and explain this to the jury

5    and to walk us through how DNS works, right?

6    A.  That's correct.

7    Q.  Now, you testified on direct examination about what a

8    DNS look-up is.  Is it fair to say that at the most

9    elemental level it's just one computer trying to find out

10   where another server is on the Internet?

11   A.  Yes; at a very basic level, yes.

12   Q.  That's the only level I can do it.

13              It doesn't, for example, show that one computer

14   is, in fact, sending an email to another computer?

15   A.  That's correct.  They're -- like in order to send an

16   email, it will do a DNS look-up, but the fact that there was

17   a DNS look-up doesn't mean that an email was sent.

18   Q.  And similarly, just because there was a look-up doesn't

19   mean that one particular computer connected to the website

20   of another computer, right?

21   A.  That's correct.

22   Q.  And it doesn't show the content of any emails that might

23   have been exchanged between one computer and another

24   computer?

25   A.  That's correct.  It simply shows the domain name was

1    looked up.

2    Q.  And that's a basic fact about DNS data.  It shows a

3    potential connection, but it doesn't show the actual

4    connection or what's going on in the interaction between one

5    computer and another?

6    A.  Yes.  I mean, so in the most strictly technical sense, a

7    DNS look-up is a connection in and of itself, but any

8    connection to the IP that was returned by the DNS look-up is

9    not in the DNS data so...

10   Q.  Got it.

11   A.  In that regard, the look-up is totally separate from any

12   kind of substantive communication after the fact.

13   Q.  Got it.

14           So it is a basic fact that the look-up is

15   different from the substantive communication?

16   A.  That's correct.

17   Q.  And any cyber expert would know that fact, right?

18   A.  That's correct.

19   Q.  And the FBI's cyber experts would know that fact?

20   A.  Yes, I believe so.

21   Q.  And to actually figure out if one computer is connecting

22   to the other computer, an investigator would need to do

23   more, right, would need more information?  Is that fair to

24   say?

25   A.  Yes.  There would have to be an additional investigation

1    to determine that.

2    Q.  So, for example, you could get a search warrant to

3    figure out what's going on at a server, correct?

4    A.  Potentially.  There are multiple different techniques

5    you could use depending on the context.

6    Q.  Okay.  And you could use subpoenas to try to get

7    information, right?

8    A.  Yes.  Subpoenas can be used to get information from

9    different service providers.

10   Q.  Okay.  And you could interview people at a service

11   provider who are at a server, correct?

12   A.  Potentially you could, depending on what level of

13   knowledge and access they had.

14   Q.  Okay.  And those are things that the FBI can do, right?

15   A.  Yes.

16   Q.  Those are things that a private citizen like me couldn't

17   do, right?

18   A.  There are -- I mean, people -- yes, you can't -- a

19   private citizen can't get a search warrant or a subpoena or

20   any of those sorts of legal processes.

21   Q.  I can't force a server to give me information about

22   what's going on with someone's communications, correct?

23   A.  No, not without a court issuing an order.  I mean, as an

24   attorney relevant to a case, I'm sure that you could get a

25   subpoena or get a court order for information.

1    Q.  And those steps that we just discussed are steps that

2    only law enforcement officers can take, getting a search

3    warrant, getting a subpoena?  Yes or no.

4    A.  They are -- I mean, there are other ways of getting a

5    subpoena.  For example, in a civil -- in a civil case,

6    different litigants can -- and their attorneys can get court

7    orders and subpoenas for information relevant to the case.

8    But in general, in a criminal investigation, law enforcement

9    would go to the U.S. Attorney's Office or to the prosecuting

10   authority to get the Court to issue that process.

11   Q.  Okay.  Let me just do it again so we get a clear yes or

12   no, if you can.

13            So law enforcement officers can issue search

14   warrants to figure out if one computer is, in fact,

15   communicating with another, correct?

16   A.  Law enforcement officers can request search warrants and

17   serve them, yes.

18   Q.  Okay.

19   A.  But the judge issues the search warrant.

20   Q.  They can request a search warrant.  They can't get a

21   search warrant.

22   A.  Correct.  They can request a search warrant from a judge

23   and then serve that search warrant to get the information.

24   Q.  You testified on direct examination about visibility

25   into the source of DNS data.  Do you remember that

1    testimony?

2    A.  Yes.

3    Q.  Okay.  Just to be clear, the FBI doesn't have access to

4    all the DNS data in the world, correct?

5    A.  Certainly not.

6    Q.  And the FBI gets access to data sometimes by purchasing

7    DNS data; is that correct?

8    A.  That's correct.

9    Q.  And fair to say the more the government pays for DNS

10   data, the more valuable it is to the government?

11   A.  Not necessarily.  There -- having multiple sort of

12   passive DNS sources is useful because there's a different --

13   each set of data has a different sort of area of visibility.

14   So having a couple or a few different passive DNS providers

15   can be valuable, but I don't know that it's necessarily --

16   how that value scales with price.

17   Q.  But you get what you pay for, right?

18   A.  It is a paid service.  You don't get it for free.

19   Q.  Okay.  Do you know a man by the name of Rodney Joffe?

20   A.  I've met him before.

21   Q.  You met him before?

22   A.  Yes.

23   Q.  So I take it you know him?

24   A.  I wouldn't say I know him.  I've met him on -- related

25   to a case.

```
1    Q.  And he's someone who is a DNS expert, too, right?

2    A.  That's my understanding.

3    Q.  He's someone who is highly respected and trusted in the

4    cyber security community, correct?

5    A.  He's well known in the cyber security community.

6    Q.  Are you aware that he and his companies maintain

7    contracts with the U.S. government resulting in payments of

8    tens of millions of dollars for services including DNS data?

9    A.  Not specifically.  I know that there are some contracts,

10   but I don't know the specifics of the contracts with

11   Neustar.

12   Q.  Were you aware that Rodney Joffe had patents in DNS

13   data?

14   A.  I believe I had heard that before.

15   Q.  And he founded companies that specialize in DNS data?

16   A.  Yes.

17   Q.  And he was someone that the FBI in the 2016 time period

18   respected.  Fair to say?

19   A.  As far as I know.

20   Q.  And he's someone that the FBI relied on, correct?

21   A.  I would say that the -- I don't know --

22              THE COURT:  I'm sorry, sir.  What was your last

23   answer?

24              THE WITNESS:  What's that?

25              THE COURT:  What was your last answer?
```

```
 1                    THE WITNESS:  Martin.

 2                    THE COURT:  Your last answer.

 3                    THE WITNESS:  Oh, sorry.

 4                    THE COURT:  As far as I know?

 5                    THE WITNESS:  As far as I -- sorry, the last

 6      question was...?

 7                    MR. BOSWORTH:  I can rephrase it.

 8                    THE COURT:  Repeat the last question.

 9                    MR. BOSWORTH:  Yes, sir.  Let me withdraw it and

10      rephrase it.

11      BY MR. BOSWORTH:

12      Q.  Are you aware that Rodney Joffe was a confidential human

13      source for the FBI?

14      A.  I was told that after the fact.

15      Q.  I want to go back to some of the questions about

16      visibility.

17                    So you were asked:  Would it be good to know about

18      the collection and source of DNS data that's provided to the

19      government?  Do you remember those questions?

20      A.  Yes.

21      Q.  Okay.  And you said it would be good to know that.

22      A.  Yes, it would be good to know the source.

23      Q.  And if you cared about the data, and you wanted to know

24      and have visibility, then you would want to know where the

25      data came from, correct?
```

1    A.  Yes, I would like to know where the data came from.

2    Q.  And if you really cared about having visibility into the

3    data, you'd want to speak to that source to figure out

4    where, in the DNS landscape, they were getting this stuff

5    from, correct?

6    A.  So I would want to -- I would want to know where the --

7    so any time that we're using a data source, we want to know

8    what the provenance of that data is, so we want to know

9    whether -- whether -- like I said, what company we purchase

10   that data from or if it had been provided to us by a witness

11   or a victim or someone of that nature, whether that --

12   whether that data -- like basically where they got that data

13   from.

14            So basically data that we, as the FBI, purchased,

15   I would have to be able to cite what the source of that data

16   was.  And then if it was data provided by a third party, a

17   victim or a witness, we'd want to know where that data came

18   from.

19   Q.  Okay.  Let me try to ask this as a yes or no question.

20            If you cared about having visibility into DNS data

21   in the possession of the government, you would want to know

22   what the source of that data is, correct?

23   A.  Correct.

24   Q.  And finally, you know, this is a case against

25   Mr. Sussman sitting at the table over there.  You don't know

```
 1        Mr. Sussman, correct?

 2        A.  I believe I met him one time, but I don't recall

 3        specifically.

 4        Q.  Okay.  You weren't part of the FBI team that

 5        investigated allegations of links between Alfa-Bank and the

 6        Trump organization, correct?

 7        A.  No, I was not part of that team.

 8        Q.  You don't know what Mr. Sussman knows about DNS data,

 9        correct?

10        A.  I have no base -- I have the documentary evidence that

11        was provided and nothing more.

12        Q.  Okay.  So just to be clear, you don't know what

13        Mr. Sussman does or doesn't know about DNS data, correct?

14        A.  Correct.

15        Q.  And you weren't at the meeting Mr. Sussman had with

16        Mr. Baker on September 19, 2016, correct?

17        A.  No, I was not at the meeting.

18        Q.  Not part of the follow-up calls between Mr. Baker and

19        Mr. Sussman in September 2016?

20        A.  No.

21        Q.  No idea what they talked about during those

22        conversations?

23        A.  No.

24                MR. BOSWORTH:  Okay.  Thank you, Your Honor.

25                THE COURT:  Ms. Shaw?
```

```
1              MS. SHAW:  Very briefly, Your Honor.
2                        REDIRECT EXAMINATION
3    BY MS. SHAW:
4    Q.  So Special Agent Martin, Mr. Bosworth was asking you
5    about search warrants, things that the FBI can do that a
6    private citizen couldn't do with respect to DNS -- finding
7    evidence about DNS data.  During the presentation you talked
8    about the passive DNS sensors and the companies that own
9    those.
10             Would someone at those companies be able to access
11   their own -- the DNS data that they were collecting?
12   A.  Yes, definitely.
13   Q.  All right.  And with respect to the FBI, when it's
14   looking to do an investigative step such as a search
15   warrant, would it typically want to have information about
16   the source and the reliability of the source to be able to
17   tell the judge so that he or she could evaluate that search
18   warrant?
19   A.  Yes.  That's critical information for applying for legal
20   process.
21   Q.  Okay.  Mr. Bosworth asked you about Rodney Joffe.  Do
22   you know whether Mr. Joffe is still a CHS?
23             MR. BOSWORTH:  Objection.
24             THE COURT:  Basis?
25             Overruled.
```

1              To the extent you know.

2              THE WITNESS:  Huh?

3              THE COURT:  You may answer to the extent that you

4     know.

5              THE WITNESS:  Okay.

6     A.  No, I have no idea.

7     Q.  Are you aware that Mr. Joffe was closed for cause as a

8     source?

9     A.  No.

10             MS. SHAW:  I have nothing further.

11             THE COURT:  All right.  Agent Martin, thank you

12    very much for your testimony.  You are excused.  Please

13    don't discuss your testimony with anyone until the case is

14    over, okay?  Have a good day.

15             Okay.  Ladies and gentlemen, feel free to stand up

16    and stretch, if you'd like.  I know those chairs aren't

17    always as comfortable as they can be.

18             All right.  Are you all set?

19             MR. DeFILIPPIS:  Yes.

20             THE COURT:  Okay.

21             MR. DeFILIPPIS:  Your Honor, the government calls

22    Special Agent Scott Hellman.

23             THE COURT:  All right.  Mr. Hellman.

24             Okay.  Step right up, sir.  Feel free to remove

25    your mask, remain standing, and raise your right hand to be

1    sworn.

2                    (Witness sworn)

3                    THE COURT:  Please have a seat.

4                    SPECIAL AGENT SCOTT HELLMAN, Sworn

5                    DIRECT EXAMINATION

6    BY MR. DeFILIPPIS:

7    Q.  Good morning, Special Agent Hellman.

8    A.  Good morning, sir.

9    Q.  Could you state and just spell your name for the record.

10   A.  Scott Hellman, spelled S-C-O-T-T, H-E-L-L-M-A-N.

11   Q.  Agent Hellman, where do you currently work?

12   A.  I work for the FBI.

13   Q.  What's your position there?

14   A.  I'm a Supervisory Special Agent.

15   Q.  And what is a Supervisory Special Agent?

16   A.  I don't lead my own investigations any longer; I lead a

17   team of investigators who investigate cyber crime.

18   Q.  Now, over the course of your career at the FBI,

19   generally speaking, what kinds of work have you done?

20   A.  I've spent all 14 years of my time in the FBI

21   investigating cyber crime, and then a small amount of that

22   time investigating intellectual property rights crimes.

23   Q.  And geographically where have you been located while

24   you're working at the FBI?

25   A.  Most of my time has been spent investigating in San

1    Francisco, and then I spent three years at FBI headquarters

2    in the D.C. area.

3              THE COURT:  Sir, would you mind explaining to the

4    jury briefly what cyber crime is and what intellectual

5    property crime is.

6              THE WITNESS:  Absolutely.

7              So in the FBI -- so cyber crime for us is

8    investigating different types of hacking crimes.  So someone

9    gains unauthorized access into a computer or a computer

10   network and maybe takes things or looks at things, a

11   computer system that they don't have the authority to gain

12   access to, and that would be for cyber crime.

13             Intellectual property rights crimes could be

14   copyrights violations or you're stealing something that's

15   considered a trade secret or maybe a trademarks violation,

16   something along those lines.

17             THE COURT:  Thank you.

18   BY MR. DeFILIPPIS:

19   Q.  And Agent Hellman, is the FBI divided into divisions and

20   units?

21   A.  Yes.

22   Q.  And is there something called the cyber division?

23   A.  Yes.

24   Q.  And what is -- what does the cyber division do?

25   A.  So cyber division investigates a wide range of different

1      cyber crimes from maybe financially motivated crimes, people

2      stealing information to make money, or maybe it could be

3      coming from a foreign country that's trying to hack into

4      government systems or sensitive systems to steal

5      information.  A wide range of different types of cyber

6      crimes.

7      Q.  Is there another division of the FBI called the

8      counterintelligence division?

9      A.  Yes.

10     Q.  And, briefly, what does the counterintelligence division

11     do?

12     A.  Counterintelligence.  It's certainly not my area of

13     expertise, but the brunt of it is they're going to be

14     looking at foreign countries trying to gain information

15     about the United States through a variety of means.

16     Q.  And are there cases in which the cyber division and the

17     counterintelligence division collaborate or work together?

18     A.  Yes.

19     Q.  Over the course of your career, have you done cyber

20     investigations that involved national security matters?

21     A.  Yes.

22     Q.  How familiar or unfamiliar are you with what is known as

23     DNS or Domain Name System data?

24     A.  I know the basics about DNS.

25     Q.  And in your understanding, on a very basic level, what

```
1    is DNS?

2    A.  DNS is basically how one computer would try and

3    communicate with another computer.  It wouldn't have to be a

4    communication, but, for example, if I'm interested in going

5    to website XYZ.com, my computer needs to know the IP address

6    of XYZ, so it's going to ask a question to DNS servers.  And

7    the question would be:  Tell me what the IP address is for

8    website XYZ.com.

9         And so DNS is the process of translating a domain

10   name or a website name to that IP address so the two

11   computers can transmit information back and forth.

12   Q.  What was your position at the FBI in 2016?

13   A.  Midway through 2016 I moved to FBI headquarters, and I

14   was a program manager in cyber division.

15   Q.  What does a program manager do?

16   A.  So I worked with different field offices whose

17   responsibility it was to investigate cyber crimes, so I

18   facilitated -- tried to help those different offices

19   coordinate together.

20   Q.  Physically or geographically, where were you based?

21   Where was your office?

22   A.  I was based in Chantilly, Virginia.

23   Q.  And how far or close is that from FBI headquarters in

24   Washington, D.C.?

25   A.  It's about an hour away.
```

```
 1    Q.  Now, did there come a time when you learned about
 2    information that the FBI received concerning a supposedly
 3    secret channel of communications between the Trump
 4    organization and a Russian bank called Alfa-Bank?
 5    A.  Yes.
 6    Q.  When was that?
 7    A.  That was in September of 2016.
 8    Q.  Do you remember beginning, end of the month?  Do you
 9    remember a date?
10    A.  September 19th of 2016.
11    Q.  Now, in getting ready to testify today, have you
12    reviewed documents, records, emails, and the like?
13    A.  Yes.
14    Q.  And so when you testify to dates, are you basing that on
15    your refreshed recollection of that review?
16    A.  Yes.
17    Q.  Now, when you learned of this information that had come
18    into the FBI, what, if anything, did you learn about who
19    took it in, who at the FBI received it?
20    A.  I learned that the information was provided to then-FBI
21    General Counsel James Baker.
22    Q.  And who alerted you to this information?  Was it
23    Mr. Baker, or was it someone else?
24    A.  No, it was my supervisor at the time, Special Agent Nate
25    Batty.
```

1    Q.   Okay.  And he was your supervisor in the cyber division?

2    A.   Yes.

3    Q.   Now, Agent Hellman, are you familiar with the term

4    "chain of custody"?

5    A.   Yes.

6    Q.   And in FBI terms, what does "chain of custody" mean?

7    A.   So chain of custody is a mechanism by which, when you

8    collect a piece of evidence, you want to make sure you can

9    track exactly who had custody over that evidence; and so

10   it's essentially a piece of paper that you're going to sign

11   or someone's going to sign when they first collect it.

12           And then if they hand the evidence to somebody

13   else, then that person's going to need to sign it, and the

14   next person's going to need to sign it.  So if at some point

15   you need to use that evidence, say at a trial, you have a

16   record of everyone who has had custody over that evidence.

17   Q.   Is that commonly done when evidence is collected by the

18   FBI?

19   A.   Yes.

20   Q.   Now, in the case of this information I was just asking

21   you about -- the Alfa-Bank/Trump organization information --

22   did you play a role in any chain-of-custody process there?

23   A.   Yes.

24   Q.   And what was your role?

25   A.   My role was to obtain signatures from people who had had

 1    custody over the evidence, which were some thumb drives.

 2    Q.   Now, did you do that by yourself or with others?

 3    A.   I did it in coordination with multiple other people.

 4    Q.   Okay.  And who were those people, to the extent you

 5    remember?

 6    A.   It would have been Nate Batty, who was my supervisor at

 7    the time, and another FBI employee named Jordan Kelly.

 8    Q.   Did you do all of that on the day the evidence or

 9    materials came into the FBI on September 19th or another

10    day?

11    A.   No.  We obtained signatures for the chain of custody the

12    next day, on September 20th.

13    Q.   Why was that?

14    A.   The thumb drives presumably were at FBI headquarters,

15    and we were in Chantilly, and so we drove out the next --

16    the subsequent day to obtain the thumb drives and obtain the

17    signatures for the chain.

18    Q.   And when you say "we drove out," who drove out?

19    A.   It was me and my supervisor, Nate Batty.

20    Q.   Special Agent Hellman, I'm going to show you on the

21    screen there what's been premarked Government Exhibit 282.

22    Do you see that document?

23    A.   Yes.

24    Q.   Do you recognize what it is?

25    A.   I do.

1    Q.  And what is it?

2    A.  It's the chain of custody that we -- or I and multiple

3    other people obtained signatures for for the evidence

4    that -- the evidence in question.

5    Q.  And do you recognize it from your involvement in

6    actually preparing the chain and obtaining those signatures?

7    A.  Yes.

8              MR. DeFILIPPIS:  Your Honor, the government offers

9    Government Exhibit 282.

10             MR. BERKOWITZ:  No objection.

11             THE COURT:  So moved.

12             MR. DeFILIPPIS:  And, Ms. Arsenault, if we could

13   publish that to the jury.

14   Q.  Special Agent Hellman, there are a number of boxes and

15   lines on the chain of custody.  Do you see those?

16   A.  Yes.

17   Q.  Now, in the upper right of the chain of custody form we

18   see it says "Signature of Seizing Individual."  Can you just

19   describe what that means.

20   A.  That's basically the first person to receive a piece of

21   evidence.

22   Q.  And so in this case who was that?

23   A.  James Baker, general counsel for the FBI.

24   Q.  Is that the individual you mentioned before as the

25   person you understood had received this Alfa-Bank/Trump-

1   related information?

2   A.  Yes.

3   Q.  And then just describe for us how does one interpret

4   who, in order, would have taken custody of the evidence at

5   issue?  In other words, what's the order along the form?

6   A.  So you're going to read the form after the initial

7   receipt.  It's going to be reading left to right.  So you

8   have someone with the initial receipt, and then you would

9   skip to the next to the left.  You would go down one row to

10  the left.

11          So it says "Relinquished Custody."  Whoever that

12  person is would have handed it off to someone else.  So in

13  this case it would be Baker relinquishing it to Peter

14  Strzok.  So you would look to the right, and it would say

15  "Accepted Custody," and you would continue down that path.

16          So one person hands it off to somebody else.

17  You're going to have one person relinquish, and then the

18  next person accepts it.  And both have to sign, and so forth

19  and so on.

20  Q.  Okay.  So in this case it looks like it started with

21  Mr. Baker, and then he relinquished custody there on the top

22  left; is that right?

23  A.  Second row on the left he relinquished custody, yes.

24  Q.  And to whom did Mr. Baker relinquish custody?

25  A.  Peter Strzok.

1    Q.  Do you recall what position Peter Strzok had at the FBI?

2    A.  I believe he was in the counterintelligence division,

3    but I don't remember what his position was.

4    Q.  Okay.  And then the next person to whom Mr. Strzok

5    relinquished custody?

6    A.  To Eric Sporre.

7    Q.  And who is Eric Sporre?

8    A.  Eric Sporre was senior executive in cyber division.  He

9    was the deputy assistant director at the time for cyber

10   division.

11   Q.  And then, according to this chain of custody, who did

12   Mr. Sporre give the materials to?

13   A.  To Nate Batty.

14   Q.  And was that your supervisor who you mentioned before?

15   A.  Yes.

16   Q.  Okay.  And then presumably, if we follow the rest, we

17   would see who else handled the materials; is that right?

18   A.  Yes.

19   Q.  What is your understanding of the materials that came

20   in?  What did they consist of?

21   A.  So the materials that came in were basically broken into

22   two parts.  One was some technical data, so numbers and

23   website names or domain names; and then the other was a

24   narrative presumably explaining -- giving a summary of that

25   data and explaining some conclusions about whoever wrote the

1  summary, their conclusions based upon their analysis of the

2  data.

3  Q.  And returning to the chain of custody, did you actually

4  go to Mr. Baker's office to get his signature on this form?

5  A.  Yes, I did.

6  Q.  And which -- did you then go to others to get their

7  signatures, or was that handled by others?

8  A.  I was able to get a signature from Mr. Baker as well as

9  Mr. Sporre; but Peter Strzok was not available, and someone

10  else obtained his signature.

11  Q.  And when you went to Mr. Baker's office, do you remember

12  what, if anything, was said during that discussion or during

13  that interaction?

14  A.  I remember being in the office, but I don't distinctly

15  recall what the conversation was.

16          I do remember after the fact, though, that I was

17  frustrated that I was not able to identify who had provided

18  these thumb drives, this information to Mr. Baker.  He was

19  not willing to tell me.

20  Q.  And if you look on the chain of custody form, is there a

21  place on the form where you have to write where it came

22  from, or no?

23  A.  Not on this form, no.

24  Q.  Okay.  And is there another form that sometimes records

25  that?

1    A.  Yes.

2    Q.  And what is that form called?

3    A.  It's typically called a green sheet, and it's basically

4    whenever you seize something, whether someone provides it to

5    you voluntarily or you seize it through a court order, you

6    write down the date and the time where you got it and where

7    you got it from.  And usually that's so at the end of the

8    case, when you need to return pieces of evidence, you know

9    who to return it to.

10   Q.  So was it your testimony before that at the end of this

11   process you were not able to determine where the thumb

12   drives and the materials came from?

13   A.  That's correct.

14   Q.  And was that -- did you otherwise speak to Mr. Baker in

15   connection with this case?

16   A.  No.

17   Q.  And so do you know whether or not Mr. Baker told others

18   where he obtained the materials from?

19   A.  I do not know.

20   Q.  Now, once the materials had been logged and the chain of

21   custody was created, were you asked to do anything in

22   particular to analyze or otherwise do something with the

23   materials?

24   A.  Yes.  I was asked to perform two tasks in tandem with

25   Special Agent Batty, and our tasks were, number one, to look

1    at this data, look at the data and look at the narrative

2    that it came with and identify were there any what's known

3    as cyber equities.  And by that it was, was there any

4    allegation of a hacking.  That's what cyber division does.

5    We investigate hacking.  So was there an allegation that

6    somebody or some company or some computer had been hacked.

7    That was first.

8              And then the second was to review the data with

9    our technical background and provide some assessment as to

10   what we thought about the data and what we thought about the

11   narrative that it came with.

12   Q.  And who, if anyone, assisted you or collaborated with

13   you in that effort?

14   A.  It was me and Nate Batty.

15   Q.  That's your supervisor?

16   A.  Yes, sir.

17   Q.  Now, what principally, from the materials, did you rely

18   on to do your analysis?

19   A.  So it was really two things.  It was looking at the

20   data, the technical data itself.  There was a summary that

21   it came with.  And then also we were comparing what we saw

22   in the data, sort of the story that the data told us, and

23   then looking at the narrative that it came with and

24   comparing our assessment of the data to the narrative.

25   Q.  If I could show you what's been premarked as Government

1    Exhibit 217, which should appear on your screen there.

2    A.  Yes.  It says 247.

3    Q.  Okay.  So looking at Government Exhibit 217, do you

4    recognize this document?

5    A.  Yes.

6    Q.  And what is this?

7    A.  This is essentially the summary or narrative that came

8    along with the technical data.

9    Q.  And you recognize it from having looked at it at the

10   time?

11   A.  Yes.

12          MR. DeFILIPPIS:  Your Honor, the government offers

13   Government Exhibit 217.

14          MR. BERKOWITZ:  No objection.

15          THE COURT:  217's admitted.

16          MR. DeFILIPPIS:  Ms. Arsenault, if we could

17   publish that one.

18   BY MR. DeFILIPPIS:

19   Q.  So Agent Hellman, I just want to direct your attention

20   to the top level portion of that paper.  What is the title

21   of this paper?

22   A.  "White Paper #1 - Auditable V3."

23   Q.  Okay.  And then below that, there's a heading that says

24   "Findings."  Do you understand this paper to be what you

25   testified earlier, the document that set out the narrative

1    of allegations that Mr. Baker received?

2    A.  Yes.

3    Q.  And under "Findings," would you just read for the jury

4    that section there.

5    A.  Absolutely.

6           "The Trump Organization is using a very unusually-

7    configured 'secret' email server in Pennsylvania for current

8    and ongoing email communications with Alfa Bank (Moscow),

9    and with Alfa Bank (Moscow) through another unusually-

10   configured server (a 'TOR exit node') at Spectrum Health in

11   Michigan.

12          "These servers are configured for direct

13   communications between the Trump organization and Alfa Bank

14   to the exclusion of all other systems.

15          "The only plausible explanation for this server

16   configuration is that it shows the Trump Organization and

17   Alfa Bank to be using multiple sophisticated layers of

18   protection in order to obfuscate their considerable recent

19   email traffic."

20   Q.  Okay.  Thank you.

21          Does that accord with what you remember the gist

22   of the allegation was that you were analyzing?

23   A.  Yes.  That was the brunt of the allegation that came

24   along with the data.

25   Q.  And in connection with that analysis, did you also take

1    a look at the data itself that was underlying this paper?

2    A.  Yes.

3    Q.  And if I could show just to you on your screen what's

4    been marked Government Exhibit 208.

5           And Agent Hellman, this is about an 18- or 19-page

6    document.  But you just see the first page here.  Do you

7    recognize this?

8    A.  It appears to be a portion of the technical data that

9    came along with the narrative.

10          MR. DeFILIPPIS:  All right.  Your Honor, the

11   government offers Government Exhibit 208.

12          MR. BERKOWITZ:  No objection.

13          THE COURT:  So moved.

14   Q.  And if we look at that first page there, Agent Hellman,

15   what kind of data is this?

16   A.  It appears to be -- as far as I can tell, it looks to

17   be -- it's log data.  So it's a log that shows a date and a

18   time, a domain, and an IP address.  And, I mean, that's --

19   just looking at this log, there's not too much more from

20   that.

21   Q.  And do you understand this to be at least a part of the

22   DNS data that was contained on the thumb drives that I think

23   you testified about earlier?

24   A.  Yes.

25   Q.  Now, if you look towards the center of the fields of

1    data there, there's a part that says

2    "mail1.trump-email.com."

3    A.   Yes.

4    Q.   What do you understand that to be?

5    A.   The allegation that came along with this technical data

6    was that there was a secret communication channel -- I'm

7    trying to -- pardon me if I'm paraphrasing -- a secret

8    communication channel between a domain controlled by the

9    Trump organization, and that would be the mail1.trump-

10   email.com, and that was to be the domain that was alleged to

11   be communicating with Alfa-Bank.

12   Q.   Okay.  And then I just want to draw your attention back

13   to the paper we had seen, Government Exhibit 217.

14   A.   Yes.

15   Q.   So when this paper said in the portion you read that

16   "The Trump Organization is using a very unusually-configured

17   'secret' email server in Pennsylvania," did you understand

18   the server to be the mail1.trump-email.com server?

19   A.   That's what was being alleged in the document, yes.

20             MR. DeFILIPPIS:  And, Ms. Arsenault, if we could

21   go to the third page of that document to the footnote.

22   Q.   It says there, Agent Hellman, that "mail1.trump-

23   email.com is hosted by a Pennsylvania-based company,

24   Listrak, which is a reasonably well known CRM" -- or

25   customer relationship management -- "company that provides

1    large-scale distribution of marketing emails (usually

2    sending emails to thousands of recipients hundreds of times

3    a day)."

4            What do you understand that to be referring to,

5    the CRM concept?

6    A.  This particular piece is not something that we -- I

7    don't really have a strong recollection of us talking

8    through this piece considerably.

9    Q.  Okay.  And are you familiar with the notion of spam

10   email?

11   A.  Yes.

12   Q.  And do you understand this to be similar or equivalent

13   to spam servers?

14   A.  I don't know that I would have couched this necessarily

15   as a spam server, but perhaps something that's being used

16   for marketing or sending marketing emails.

17   Q.  Got it.  But you said you didn't focus particularly

18   strongly on that piece of this paper?

19   A.  Correct.

20   Q.  Okay.  So tell us how you went about doing your analysis

21   with Mr. Batty.

22   A.  As I mentioned, the first piece was we had to identify

23   was there any real allegation of hacking; and there was not.

24   That was our first task by our supervisor.  There was not.

25           The allegation was that someone purported to find

1    a secret communication channel between the Trump

2    organization and Russia.  And so we identified first that,

3    no, we didn't think that there was any cyber equity, meaning

4    that there was probably nothing more for cyber to

5    investigate further, if there was no hacking crime.

6          And then the second piece was really just looking

7    at the data, getting an understanding of what story does

8    this data tell me, and then comparing it against the

9    narrative that it came along with.

10   Q.  And so did you and Mr. Batty do that together?

11   A.  We did.

12   Q.  And what did your analysis, generally speaking, find?

13   A.  We did not agree with the conclusion in the paper.  We

14   did not agree that this data represented the finding of a

15   secret channel of communication between the Trump

16   organization and Russia.

17   Q.  What were some of the reasons for that?

18   A.  First, I felt that whoever had written that paper had

19   jumped to some conclusions that were not supported by the

20   technical data.

21          Number two, I felt that the methodology that they

22   used to do their analysis was -- the methodology they chose

23   was questionable to me, or it was not a way that I would

24   have chosen to do it and felt like it was a roundabout way

25   to go about doing it, so it was questionable.

1            And number three, just overall looking at the

2    overall conclusion they had come to was that they had found

3    a secret communication between Trump, the Trump

4    organization, and Russia, and that just didn't make sense to

5    us because we're looking at a domain.  Why would a

6    presidential candidate put their own name in the domain

7    name, the supposedly secret domain, in a domain name that

8    was easily connectible to the organization; and then why

9    would it be -- that computer be connecting directly to

10   another computer in Russia, if this was all supposed to be a

11   secret communication.  So that piece of it just didn't ring

12   true at all.

13   Q.  And when you testified earlier, I think your first

14   reason was that some of the conclusions put forth you

15   disagreed with or -- can you explain that a little bit more?

16   A.  Yes.  So in one example, I believe the researchers or

17   whoever wrote that paper said that they had attempted to

18   connect with this Trump email server, or purported Trump

19   email server, and that the Trump email server returned an

20   error message basically -- returned an error message.  And

21   from that, they were assuming that that Trump email server

22   would only communicate with certain devices and not with

23   theirs.

24            And that didn't make sense to me.  It was sort of

25   like if I knocked on your door, and you told me to go away,

1    I don't want to talk to you, I'm then going to assume that

2    you're only willing to talk to other people.  I can't make

3    that assumption.  I don't know if you're willing to talk to

4    anybody.

5           But that's what they had done.  When they received

6    an error message, they assumed that that computer wasn't

7    willing to talk to them, but it was willing to talk to

8    others, and there was no evidence to suggest that.

9           So assumptions like that is what I was referring

10   to.

11   Q.  And, Special Agent Hellman, putting aside the

12   authenticity of the data or where the data might have come

13   from, if you assume the data was real, did you agree with

14   the paper's conclusions in terms of what that data showed?

15   A.  No.

16   Q.  Why was that?

17   A.  The data itself, it just -- there was not enough data

18   there to make the conclusion that there was, A, any

19   communication or, B, any secret communication between the

20   Trump organization and Russia.

21   Q.  Okay.  If I could show you what's been marked Government

22   Exhibit 247, which will show up on your screen.  Do you

23   recognize that document, Agent Hellman?

24   A.  It's not on the screen yet.

25   Q.  Okay.

 1    A.  Yes.

 2    Q.  What are you looking at there?

 3    A.  This is the summary document that Special Agent Batty

 4    and I drafted together.  It was our summary of the data.

 5              MR. DeFILIPPIS:  Your Honor, the government offers

 6    Government Exhibit 247.

 7              MR. BERKOWITZ:  No objection, subject to the

 8    agreement we had about what's in there, correct?

 9              MR. DeFILIPPIS:  Yes.

10              THE COURT:  Okay.  So moved.

11              So we'll publish that to the jury.

12    BY MR. DeFILIPPIS:

13    Q.  Special Agent Hellman, how long would you say it took

14    you and Special Agent Batty to write this up?

15    A.  Inside of a day.

16    Q.  Inside of a day, you said?

17    A.  Yes.

18    Q.  And any particular reason why it was done so quickly?

19    A.  Our job was to analyze the data, draft this sort of

20    summary, and then we were to pass our summary and the thumb

21    drives on to the Chicago division for further analysis.

22    Q.  Okay.  Now, let me direct your attention to the top line

23    of the paper there, the top paragraph.

24              Could you just read that first paragraph there.

25    A.  "Assessment of the provided white paper and supporting

1    document on (2) thumb drives.

2          "SUMMARY - ECOU 1 assess there is no CyD equity in

3    this report and that the research conducted in the report

4    reveals some questionable investigative steps taken and

5    conclusions drawn.  This opinion is drawn from the following

6    observations."

7    Q.   Okay.  First on terminology, what is "ECOU 1"?

8    A.   So ECOU was the unit I was in in cyber headquarters.  In

9    stands for Eurasian Cyber Operations Unit.  And we basically

10   helped to manage field offices who were investigating cyber

11   threats coming from Eurasia, mostly Russia.

12   Q.   And then when the paper says "there is no CyD equity,"

13   CyD?

14   A.   Right.  "CyD" is cyber division.  And so we're saying we

15   did not identify any allegation of hacking, so there is

16   nothing else for CyD or cyber division to investigate

17   further.

18   Q.   It then says that "the research conducted in the report

19   reveals some questionable investigative steps and

20   conclusion" -- "taken and conclusions drawn.  This opinion

21   is drawn from the following observations."

22          Is that what you referred to before about the

23   methodology for the author of this paper?

24   A.   Yes.

25   Q.   Now, let me ask you, were you able to determine from any

1    of these materials who had actually drafted the paper

2    alleging the secret channel?

3    A.  No.

4    Q.  In other words, was it contained anywhere in the

5    documents?

6    A.  No.

7    Q.  Let me direct your attention to a later part of that

8    paper, which is the last page.

9         THE COURT:  And ladies and gentlemen, you will

10   notice that a portion of this document has been redacted.

11   You are probably going to see that with other documents that

12   are introduced throughout the trial.  And there are lots of

13   reasons why a certain portion of a document cannot be shown

14   to a jury, so you are not to speculate at all as to what's

15   behind those redactions.  And it will be a pretty common

16   occurrence in this case.  Okay?

17        Go ahead.

18   Q.  Special Agent Hellman, if you would just start reading

19   where it says "it appears" at the end of that first

20   paragraph there.

21   A.  "Furthermore, it appears suspicious that the presumed

22   suspicious activity began approximately three weeks prior to

23   the stated start of the investigation conducted by the

24   researcher."

25   Q.  What did you mean there?

1    A.  We found it to be very -- conveniently coincidental that

2    someone was presumably looking for suspicious activity

3    between two computers, and they started looking, and they

4    found that the activity had just started three weeks prior.

5    So the timing of when their investigation started and when

6    the suspicious activity started seemed to be coincidentally

7    close in time in proximity.

8    Q.  Okay.  Now, let me direct you to the next paragraph

9    there.  Just read the first sentence beginning "Finally."

10   A.  "Finally, it appears abnormal that a presidential

11   candidate, who wanted to conduct secret correspondence with

12   the Russian government (or a Russian bank), would (1) name

13   his secret server 'mail1.trump-email.com', (2) use a domain

14   (trump-email.com) registered to his own organization, and

15   then (3) communicate directly to the Russian bank's IP

16   address (as opposed to using TOR or proxy servers)."

17   Q.  So I think you testified a bit to this earlier, but what

18   did you mean to say there?

19   A.  That that -- those facts don't suggest secret

20   communication of any sort.

21   Q.  And in what respect?

22   A.  That the connections to the people alleging or the

23   organization allegedly having the secret communications were

24   very overt.  The name "Trump" was in the domain.  The domain

25   was registered to an organization associated with Trump.  So

1   that doesn't suggest -- to me did not suggest secret

2   communications.

3   Q.   Okay.  And the last sentence of that paragraph, what

4   does that say?

5   A.   "ECOU 1 also assesses Russian state-sponsored technical

6   sophistication to exceed the OpsSec of that suggested in the

7   report."

8   Q.   The term -- so ECOU 1 we know.  OpsSec, what is OpsSec?

9   A.   "OpsSec" stands for operation security.

10  Q.   And what does "operation security" mean?

11  A.   It's basically either you or your organization's

12  capability of protecting -- it could be protecting

13  communications, protecting information, obfuscating or

14  hiding your ability to hide secret information.

15  Q.   Okay.  And in what sense did you conclude that Russian

16  state-sponsored technical sophistication to exceed -- ECOU

17  assesses that Russian technical sophistication exceeds the

18  OpsSec of that suggested in the report.  What does that

19  mean?

20  A.   It means that this alleged communication was having --

21  was happening fairly directly between this Trump domain and

22  this Russian domain, and that having worked or -- having

23  worked investigations involving Russian state-sponsored

24  cyber capability, we believe that Russia would have a much

25  more technical capability to hide communications; and if

1   they were to be secret, that Russia would have the ability

2   to hide those communications.  They wouldn't be so overt and

3   direct between this Trump domain and this Russian domain.

4   Q.  Now returning to the first page of your analysis.

5          So we looked at the top part, which set out your

6   top-line conclusion.  You then have a portion of the paper

7   that says, "The investigators who conducted the research

8   appear to have done the following."

9          Now, Special Agent Hellman, it appears to be a

10  pretty technical discussion, but can you just tell us, in

11  that first part of the paper, what did you set out and what

12  did you conclude?

13  A.  It looks to be that they were looking for domains

14  associated with Trump, and the way that they did that was

15  they looked at a list of sort of all domains and looked for

16  domains that had the word "Trump" in them as a way to narrow

17  down the number of domains they were looking at.

18         And then they wanted to find, well, which of that

19  initial set of Trump domains, which of them are email

20  servers associated with those domains.  And the way they did

21  that was to search for terms associated with email, like

22  "mail" or other email-related terms to then narrow down

23  their list of domains even further to be Trump-associated

24  domains that were email servers.

25  Q.  And did you opine on the soundness of that methodology?

1      In other words, did you express a view as to whether this

2      was a good way to go about this project?

3      A.  We did not -- I did not feel that that was the most

4      expeditious way to go about identifying email servers

5      associated with the domain.

6      Q.  And why was that?

7      A.  You can name an email server anything you want.  It

8      doesn't have to have the words "mail" or "SMTP" in it.  And

9      so by -- if you're just searching for those terms, I would

10     wager to guess you would miss an actual email server because

11     there are other -- there are other more technical ways that

12     you can use -- basically look-up tools, Internet look-up

13     tools where you can say, for any domain, tell me the

14     associated email server.  That's essentially like a

15     registered email server.

16          But the way that they were doing it was they were

17     just looking for key terms, and I think that it just didn't

18     make sense to me why they would go about identifying email

19     servers that way as opposed to just being able to look them

20     up.

21     Q.  Was there anything else about the methodology used here

22     by the writer or writers of this paper that you found

23     questionable or that you didn't agree with?

24     A.  I think just the overall assumptions that were being

25     made about that the server itself was actually communicating

1    at all.  That was probably one of the biggest ones.

2    Q.  And what, if anything, did you conclude about whether

3    you believed the authors of the paper or author of the paper

4    was fairly and neutrally conducting an analysis?  Did you

5    have an opinion either way?

6              MR. BERKOWITZ:  Objection, Your Honor.

7              THE COURT:  Basis?

8              MR. BERKOWITZ:  Objection on foundation.  He asked

9    him his opinion.  He's not qualified as an expert for that.

10             THE COURT:  I'll overrule it.

11   A.  Sorry, can you please repeat the question?

12   Q.  Sure.  Did you draw a conclusion one way or the other as

13   to whether the authors of this paper seemed to be applying a

14   sound methodology or whether, to the contrary, they were

15   trying to reach a particular result?  Did you --

16   A.  Based upon the conclusions they drew and the assumptions

17   that they made, I did not feel like they were objective in

18   the conclusions that they came to.

19   Q.  And any particular reasons or support for that?

20   A.  Just the assumption you would have to make was so far

21   reaching, it didn't -- it just didn't make any sense.

22   Q.  And then -- okay.

23             Now, once this paper was drafted, what, if

24   anything, did you and Mr. Batty do with it?

25   A.  We drafted it, and then we sent it on to Chicago where

1    there was another FBI -- numerous other FBI individuals or

2    employees that were performing additional analysis and

3    investigation.

4    Q.  And going back -- before we get to Chicago, going back

5    to your ultimate conclusions here, to what extent were you

6    and Mr. Batty jointly comfortable that the paper you wrote

7    reflected sound analysis?

8    A.  We both drafted this paper together, and we felt very

9    comfortable that both of us came to the same ultimate

10   conclusion, that we did not agree with the narrative that

11   came along with it.

12   Q.  And to what extent were you comfortable that you and

13   Mr. Batty had reached your conclusions independent of any

14   personal views or any other bias or other factors?

15   A.  Very, very confident.

16   Q.  Why --

17   A.  I'm sorry, go ahead.

18   Q.  Why is that?

19   A.  Special Agent Batty and I were -- he was my supervisor,

20   but we were also close friends, spoke regularly.  And so I

21   know that he and I shared very different views on a wide

22   range of different topics, and as a result, we both felt

23   very proud of the work that we did.  Despite the fact that

24   we had drastically differing views on various topics, we

25   both came to the same conclusion when we were drafting this

1    assessment.

2    Q.  Now, you mentioned FBI Chicago.  How did they come to

3    get involved in this?

4    A.  I don't know, other than all I was told at the time was

5    that Chicago was performing some -- they called it like a

6    special or special investigation, and they were going to be

7    doing some further analysis, and we were to provide our

8    analysis and the thumb drives to them.

9    Q.  And is it fair to say that the cyber division, which you

10   talked about before, they passed on this or decided not to

11   investigate it?

12   A.  Yes, correct.

13   Q.  Why was that?

14   A.  There was no cyber equity.  There was no allegation of

15   hacking, so there was no hacking crime for us to investigate

16   further.

17   Q.  Is it your understanding that the FBI opened an

18   investigation into this matter?

19   A.  I believe that's true.

20   Q.  And was that Chicago, FBI Chicago?

21   A.  I think so.

22   Q.  Okay.  Now, did you have any subsequent involvement in

23   any investigation that was done?

24   A.  Certainly no involvement in the investigation.  I did

25   have some communication with some of the agents in Chicago

1    briefly after this event.

2    Q.  To the extent you recall, what were the name or names of

3    those agents?

4    A.  Primarily it was Allison Sands, Special Agent Allison

5    Sands, and then one or two emails with Special Agent Curtis

6    Hiede.

7    Q.  Generally speaking, what was the nature of your

8    interactions after you had done this paper, interactions

9    with them?

10   A.  Primarily with Allison, it was to discuss our assessment

11   of this document or assessment of this technical data, and

12   to get an understanding of whether she and Chicago had come

13   to the same conclusions that we had.

14   Q.  And over the course of your discussions, what did you

15   find about that or hear about that?

16   A.  That Chicago had looked at the data further and had

17   agreed with our assessment that they also did not concur

18   with this idea that there was a secret communication channel

19   between the Trump organization and Russia.

20   Q.  When the FBI opens an inquiry or some kind of

21   investigation, are there different levels or types of

22   investigations?

23   A.  There are.

24   Q.  And can you just explain to the jury what those levels

25   are.

1   A.  So there's basically three levels.  We have assessments

2   and preliminary investigations and full investigations, and

3   you have to have a certain amount of data and facts before

4   you can open one of those various different levels.

5   Q.  Could you just explain to the jury the levels in order

6   of sort of least expansive and most expansive and what might

7   affect the level of an investigation?

8   A.   Sure.  So if you have specific articulable facts that a

9   crime has occurred, then you can open a full investigation.

10          If you've got an allegation that something's

11  happened, that this crime has occurred, as opposed to very

12  specific facts, then you could open a preliminary.

13          I don't remember the specific language for an

14  assessment, but essentially the assessment is the lowest

15  form of investigation.

16          And the different -- the main difference between

17  them is once you open one of those up, you have different

18  investigative tools that you're allowed to use.

19          For the lowest level, you only have a very small

20  number of things you can do.  For example, if I only opened

21  an assessment, I can't go and perform a search warrant or go

22  into someone's home; whereas, if you open a full

23  investigation, you have many more investigative tools that

24  you're allowed to use.  But, of course, that has to be

25  predicated on specific facts that you believe -- that you

1    believe in that show that a crime has occurred.

2    Q.  And does the FBI, in your experience, sometimes take

3    information to trigger investigations from individuals

4    outside the FBI?

5    A.  Absolutely.

6    Q.  And in determining what level of investigation would be

7    triggered, how, if at all, can it be relevant the motivation

8    of whoever is giving you the information?

9    A.  The motivation of whoever is giving me the information

10   is very relevant because it's going to provide context for

11   me to decide how much I trust or believe in that

12   information.

13            So if I believe that information, I believe it's a

14   fact, then I might be able to then justify opening a full

15   investigation.  But if I -- depending upon where it's coming

16   from, if I feel, hmm, the motive that they have suggests

17   that I may not believe in the information or I might need

18   more information to help me understand how truthful it is, I

19   may not be able to open that full investigation.

20   Q.  And if someone has motivations that the FBI might

21   consider suspect or not fully neutral or pure, how might, if

22   at all, that affect whether an assessment, a preliminary, or

23   a full investigation is opened?

24   A.  If someone has motives that are not -- that are very

25   questionable, I may not open that full investigation.  I

1    might want to collect more independent data to support

2    whatever the allegation is, so I might open a lower-level

3    investigation initially, if at all.

4    Q.  In this case, the Alfa-Bank --

5              THE COURT:  Mr. DeFilippis, how much longer?

6              MR. DeFILIPPIS:  Your Honor, I'd say less than

7    five minutes.

8              THE COURT:  Okay.

9    Q.  In the case of the Alfa-Bank allegations, do you know

10   what kind of investigation was opened or not?

11   A.  I think it was a full, but I didn't know at the time.

12   Q.  Okay.  Let me ask you this:  Would it have mattered to

13   you to know where this data came from?

14   A.  It would, yes.

15   Q.  Why?

16   A.  It would have mattered -- well, I think on one hand it

17   would not have mattered from the technical standpoint.  If

18   I'm looking at technical data, the data's going to tell me

19   whatever story the data's going to tell me independent of

20   where it comes from.  So I still would have done the same

21   technical analysis.

22            But knowing where the data comes from helps to

23   tell me -- it gives me context regarding how much I believe

24   in the data, how authentic it is, do I believe it's real,

25   and do I trust it.

1    Q.  Now, would it have mattered to you or not whether the

2    data came from someone with a political affiliation or

3    motivation?  To what extent would that matter to you?

4    A.  It would matter for the same reasons; that it's going to

5    be a data point that I take into consideration when -- if I

6    were to be the person to open a case, in this case it wasn't

7    me, but I would use that as a data point to help me

8    determine what my sort of initial steps are going to be.

9    Q.  To what extent would it matter to you whether the data

10   came from someone who had a business interest or

11   relationship with the U.S. government?

12   A.  For the same reasons, I would want to know.  It's going

13   to have the same impact.  I'm going to look at it, and it's

14   going to give me some context to help me understand how

15   truthful the data might be.

16   Q.  And to what extent would it have mattered, if at all, if

17   the person giving you the data was doing it on their own

18   behalf or someone else's behalf?

19   A.  It would be a data point that I would want to know.

20   Q.  And why is that?

21   A.  Well, if someone is providing the data on someone else's

22   behalf, I'm going to want to know who that someone else is

23   so I can understand what their motivations might be for

24   providing the data.

25            MR. DeFILIPPIS:  Okay.  Thank you very much,

1   Special Agent Hellman.

2              THE WITNESS:  Thank you.

3              THE COURT:  Okay.  Ladies and gentlemen, we're

4   going to take our lunch break.  We'll take about an hour and

5   ten minutes, so if you could reconvene at 2:00.  Feel free

6   to eat in the cafeteria or walk outside.

7              No discussion about the case.  No research about

8   the case.  Have a nice lunch, and we'll be ready to go at

9   2:00.

10             (Jury exits courtroom)

11             THE COURT:  Agent Hellman, you can step down.

12  Please don't discuss your testimony over the lunch hour,

13  okay?

14             All right.  We're adjourned.  See you at 2:00,

15  unless there's something -- have a seat everybody.

16             THE COURTROOM DEPUTY:  There's nothing.

17             THE COURT:  Mr. Bosworth, do you have something?

18             MR. BOSWORTH:  Yes, Your Honor, briefly.  Either

19  now or after lunch, whatever the Court's preference is.

20             THE COURT:  Let's do it when we get back.

21             MR. BOSWORTH:  Okay.

22             (Lunch recess taken)

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3                    I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 17th day of May, 2022.

9

10                                   <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
                                     Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

**'** 

**'mail1.trump** [1] - 384:13
**'mail1.trump-email. com'** [1] - 384:13
**'secret'** [2] - 374:7, 376:17
**'TOR** [1] - 374:10

**/**

**/s/Lisa** [1] - 397:10

**1**

**1** [7] - 254:10, 373:22, 382:2, 382:7, 384:12, 385:5, 385:8
**1.2.3.4** [1] - 325:18
**1.2.3.5** [1] - 325:18
**10** [2] - 254:24, 341:21
**10020** [1] - 250:20
**108.18.158.20** [1] - 327:20
**11:00** [1] - 315:17
**12** [2] - 271:23, 298:7
**1271** [1] - 250:19
**13** [3] - 317:5, 317:21, 329:14
**14** [1] - 360:20
**145** [1] - 250:15
**14th** [1] - 265:14
**15** [2] - 315:15, 315:24
**16** [2] - 253:9, 271:22
**17** [1] - 250:4
**1700** [3] - 324:15, 324:16, 324:19
**17th** [1] - 397:8
**18** [1] - 375:5
**18th** [3] - 280:6, 302:18, 302:19
**19** [2] - 278:24, 357:16
**19-page** [1] - 375:5
**19th** [4] - 219:9, 304:7, 364:10, 366:9
**1:21-cr-00582-CRC-1** [1] - 250:4

**2**

**2** [3] - 255:18, 382:1, 384:13
**20** [3] - 254:24, 315:15, 322:1
**200** [2] - 322:22, 322:25
**20001** [2] - 250:24, 397:13
**20002** [1] - 250:15
**2009** [1] - 317:6

**2010** [1] - 343:22
**2016** [16] - 265:25, 278:25, 283:19, 285:5, 290:17, 294:5, 299:5, 300:4, 300:5, 354:17, 357:16, 357:19, 363:12, 363:13, 364:7, 364:10
**2017** [2] - 289:4, 310:14
**2018** [1] - 306:6
**2019** [1] - 306:9
**202** [1] - 250:24
**2020** [1] - 306:11
**2022** [2] - 250:4, 397:8
**208** [2] - 375:4, 375:11
**20th** [1] - 366:12
**21-582** [1] - 252:3
**212** [2] - 250:16, 250:20
**217** [4] - 373:1, 373:3, 373:13, 376:13
**217's** [1] - 373:15
**247** [3] - 373:2, 380:22, 381:6
**282** [2] - 366:21, 367:9
**29th** [1] - 265:25
**2:00** [3] - 396:5, 396:9, 396:14

**3**

**3** [3] - 254:10, 265:16, 384:15
**30** [1] - 303:6
**316** [1] - 251:4
**333** [2] - 250:23, 397:12
**348** [1] - 251:4
**354-3187** [1] - 250:24
**358** [1] - 251:5
**360** [1] - 251:6

**4**

**4** [1] - 254:11
**42-word** [1] - 290:10

**5**

**50** [1] - 319:22

**6**

**637-2231** [1] - 250:16
**6718** [2] - 250:23, 397:12
**6th** [1] - 338:23

**7**

**70** [1] - 320:24

**8**

**8:14** [1] - 338:24

**9**

**9** [1] - 254:11
**90** [1] - 255:19
**906-1200** [1] - 250:20
**9:07** [1] - 250:5

**A**

**a.m** [2] - 250:5, 315:17
**ability** [6] - 268:2, 292:14, 347:14, 385:14, 386:1, 397:7
**able** [18] - 258:25, 265:10, 304:18, 308:12, 329:6, 340:5, 340:10, 345:16, 356:15, 358:10, 358:16, 370:8, 370:17, 371:11, 382:25, 387:19, 393:14, 393:19
**abnormal** [1] - 384:10
**absence** [1] - 268:2
**absolutely** [3] - 361:6, 374:5, 393:5
**abstracted** [1] - 333:10
**academic** [1] - 324:5
**accept** [1] - 276:12
**Accepted** [1] - 368:15
**accepts** [1] - 368:18
**access** [11] - 254:23, 278:19, 284:22, 285:6, 286:18, 351:13, 353:3, 353:6, 358:10, 361:9, 361:12
**accord** [1] - 374:21
**according** [1] - 369:11
**account** [1] - 341:9
**accuracy** [1] - 259:3
**accurate** [3] - 267:2, 268:15, 397:5
**accused** [1] - 256:19
**achieve** [1] - 279:9
**acronym** [1] - 342:21
**acting** [8] - 270:7, 270:17, 272:19, 272:21, 282:6, 283:21, 290:23, 307:7

**Action** [1] - 250:3
**actions** [1] - 310:2
**activities** [3] - 266:10, 285:9, 286:16
**activity** [4] - 383:22, 384:2, 384:4, 384:6
**actors** [1] - 346:12
**actual** [5] - 288:20, 339:23, 340:14, 350:3, 387:10
**addition** [4] - 321:23, 322:5, 323:3, 323:9
**additional** [2] - 350:25, 389:2
**address** [37] - 253:12, 282:13, 299:12, 326:13, 326:14, 327:19, 328:11, 328:13, 328:19, 329:1, 329:17, 329:22, 330:4, 330:18, 330:22, 330:24, 331:9, 331:11, 331:22, 332:2, 332:6, 332:8, 332:12, 332:17, 335:7, 337:4, 339:1, 339:18, 339:19, 340:11, 340:24, 343:23, 363:5, 363:7, 363:10, 375:18, 384:16
**addressed** [1] - 253:16
**addresses** [9] - 257:23, 325:6, 325:17, 326:18, 328:17, 329:15, 329:24, 340:7, 340:21
**addressing** [1] - 342:12
**adjourned** [1] - 396:14
**administration** [1] - 307:5
**administrators** [1] - 340:25
**admission** [2] - 276:19, 277:5
**admit** [1] - 324:18
**admitted** [3] - 275:22, 289:7, 373:15
**Advanced** [1] - 320:8
**advanced** [1] - 320:10
**adversary** [1] - 279:4
**advice** [2] - 295:1, 299:2
**advising** [1] - 298:13
**affect** [4] - 341:23, 347:14, 392:7,

393:22
**affected** [6] - 255:7, 256:2, 256:16, 264:19, 312:4, 319:2
**affiliation** [1] - 395:2
**affiliations** [1] - 312:21
**afoot** [1] - 312:9
**agencies** [2] - 292:19, 298:21
**agency** [2] - 288:14, 292:25
**agendas** [1] - 279:20
**Agent** [49] - 253:17, 253:21, 253:24, 255:12, 256:4, 257:16, 257:24, 258:4, 258:21, 316:7, 316:19, 316:23, 316:24, 317:2, 323:16, 323:21, 324:5, 324:9, 327:22, 338:19, 348:2, 348:6, 358:4, 359:11, 359:22, 360:7, 360:11, 360:14, 360:15, 361:19, 365:3, 366:20, 367:14, 371:25, 373:19, 375:5, 375:14, 376:22, 380:11, 380:23, 381:3, 381:13, 381:14, 383:18, 386:9, 389:19, 396:1, 396:11
**agent** [13] - 255:24, 260:2, 261:18, 265:3, 267:7, 268:18, 318:17, 319:7, 364:24, 391:4, 391:5
**AGENT** [4] - 251:3, 251:6, 316:16, 360:4
**agents** [8] - 257:3, 291:9, 303:9, 319:20, 319:22, 321:16, 390:25, 391:3
**ago** [2] - 306:17, 306:21
**agree** [10] - 262:10, 292:18, 293:21, 315:10, 343:4, 378:13, 378:14, 380:13, 387:23, 389:10
**agreed** [6] - 280:20,

280:21, 295:4,
299:19, 300:15,
391:17
**agreement** [2] -
334:10, 381:8
**ahead** [5] - 261:13,
327:25, 329:8,
383:17, 389:17
**air** [1] - 290:1
**alerted** [1] - 364:22
**Alfa** [32] - 263:11,
263:16, 264:17,
265:4, 265:19,
266:18, 267:24,
269:14, 269:19,
281:10, 285:15,
286:16, 286:20,
288:15, 289:14,
299:17, 305:12,
307:9, 309:9, 310:5,
312:15, 357:5,
364:4, 365:21,
367:25, 374:8,
374:9, 374:13,
374:17, 376:11,
394:4, 394:9
**Alfa-bank** [23] -
263:11, 263:16,
264:17, 265:4,
266:18, 269:14,
269:19, 281:10,
285:15, 286:16,
286:20, 288:15,
289:14, 299:17,
305:12, 307:9,
309:9, 312:15,
357:5, 364:4,
376:11, 394:4, 394:9
**Alfa-Bank's** [1] -
265:19
**Alfa-Bank/Trump** [2] -
365:21, 367:25
**Algor** [2] - 252:11,
274:9
**ALGOR** [1] - 250:13
**Alice** [7] - 344:10,
345:4, 345:7,
345:11, 345:16,
345:17, 345:18
**Alice's** [2] - 344:18,
345:2
**alike** [1] - 298:9
**allegation** [12] -
257:14, 372:4,
372:5, 374:22,
374:23, 376:5,
377:23, 377:25,
382:15, 390:14,
392:10, 394:2
**allegations** [24] -

258:19, 264:4,
269:15, 269:17,
272:20, 279:1,
279:3, 281:16,
281:24, 282:17,
286:21, 288:5,
288:9, 288:15,
288:16, 289:15,
291:10, 307:10,
307:20, 310:6,
312:15, 357:5,
374:1, 394:9
**alleged** [4] - 256:21,
376:10, 376:19,
385:20
**allegedly** [1] - 384:23
**alleges** [2] - 270:17,
270:19
**alleging** [2] - 383:2,
384:22
**Allison** [3] - 391:4,
391:10
**allow** [5] - 253:19,
253:20, 260:25,
261:2, 268:7
**allowed** [2] - 392:18,
392:24
**almost** [2] - 254:14,
331:10
**alone** [6] - 253:25,
254:7, 287:19,
306:20, 313:23,
314:6
**alongside** [3] - 293:25,
294:1, 295:19
**alternate** [3] - 272:2,
272:6, 272:9
**alternates** [3] -
271:24, 272:1, 272:4
**amazon** [2] - 341:9,
341:11
**Amendment** [1] -
252:22
**America** [2] - 252:4,
343:14
**AMERICA** [1] - 250:3
**American** [1] - 295:7
**Americas** [2] - 250:19
**amount** [3] - 254:14,
360:21, 392:3
**amounts** [2] - 284:23,
285:6
**analogy** [1] - 333:3
**Analysis** [3] - 317:3,
320:7, 320:24
**analysis** [23] - 256:8,
300:20, 319:11,
321:1, 321:6, 322:3,
323:14, 323:23,
370:1, 372:18,

374:25, 377:20,
378:12, 378:22,
381:21, 386:4,
388:4, 389:2, 389:7,
390:7, 390:8, 394:21
**analyst** [1] - 342:12
**analyst's** [1] - 341:23
**analysts** [1] - 341:25
**analyze** [4] - 320:12,
348:14, 371:22,
381:19
**analyzed** [3] - 257:12,
258:1, 300:17
**analyzing** [2] - 318:10,
374:22
**Andrew** [2] - 252:10,
274:8
**ANDREW** [1] - 250:12
**anonymous** [3] -
289:9, 342:23,
342:25
**anonymously** [2] -
344:12, 346:11
**answer** [15] - 276:22,
276:25, 277:3,
297:8, 330:23,
331:23, 332:13,
335:6, 335:9,
336:25, 337:7,
354:23, 354:25,
355:2, 359:3
**answered** [3] - 276:23,
336:24, 336:25
**answers** [2] - 297:14,
334:12
**Antonakakis** [1] -
252:21
**apart** [1] - 320:15
**apologies** [1] - 327:6
**apologize** [1] - 268:13
**appear** [2] - 373:1,
386:8
**appearance** [1] -
257:22
**appearances** [1] -
252:10
**APPEARANCES** [1] -
250:11
**appliances** [1] - 341:2
**apply** [2] - 278:22,
283:2
**applying** [2] - 358:19,
388:13
**appreciate** [1] -
314:10
**approached** [3] -
277:24, 278:2,
289:13
**approaching** [1] -
289:15

**area** [6] - 323:10,
323:18, 323:22,
353:13, 361:2,
362:12
**area..** [1] - 323:17
**areas** [2] - 322:8,
324:4
**argument** [3] - 260:19,
260:22, 293:6
**argument's** [2] -
327:10, 327:20
**arguments** [3] - 276:1,
276:3, 276:4
**arise** [1] - 276:10
**arose** [1] - 319:24
**arranged** [2] - 286:5,
302:9
**array** [1] - 319:6
**arrived** [1] - 266:21
**Arsenault** [5] - 252:25,
274:9, 367:12,
373:16, 376:20
**articles** [2] - 323:10,
323:13
**articulable** [1] - 392:8
**aside** [2] - 298:5,
380:11
**asserting** [1] - 259:10
**assess** [1] - 382:2
**assesses** [2] - 385:5,
385:17
**assessment** [11] -
372:9, 372:24,
381:25, 390:1,
391:10, 391:11,
391:17, 392:14,
392:21, 393:22
**assessments** [1] -
392:1
**assigned** [1] - 317:24
**assignment** [1] -
317:24
**assistant** [1] - 369:9
**assisted** [1] - 372:12
**associated** [7] -
384:25, 386:14,
386:20, 386:21,
386:23, 387:5,
387:14
**associates** [2] - 285:9,
294:14
**associates'** [1] -
286:15
**assume** [3] - 347:14,
380:1, 380:13
**assumed** [1] - 380:6
**assuming** [2] - 308:12,
379:21
**assumption** [3] -
312:6, 380:3, 388:20

**assumptions** [3] -
380:9, 387:24,
388:16
**assurance** [1] - 322:12
**attacks** [2] - 321:25,
341:4
**attempted** [1] - 379:17
**attention** [8] - 272:11,
278:14, 293:3,
311:13, 373:19,
376:12, 381:22,
383:7
**attorney** [10] - 275:8,
280:6, 287:14,
307:12, 307:20,
307:25, 308:6,
308:23, 309:3,
351:24
**Attorney** [2] - 307:7,
323:6
**Attorney's** [1] - 352:9
**attorneys** [4] - 276:18,
277:17, 324:3, 352:6
**Attorneys** [1] - 323:8
**attractive** [1] - 287:23
**auditable** [1] - 373:22
**authentic** [1] - 394:24
**authenticity** [2] -
258:23, 380:12
**author** [2] - 382:23,
388:3
**authoritative** [2] -
330:23, 331:20
**authoritatively** [1] -
332:1
**authority** [2] - 352:10,
361:11
**authorize** [1] - 296:17
**authorized** [1] -
308:21
**authors** [2] - 388:3,
388:13
**automates** [1] -
344:20
**automatically** [1] -
338:17
**available** [3] - 255:19,
343:22, 370:9
**Avenue** [2] - 250:19,
250:23, 279:5,
397:12
**avoid** [2] - 277:11,
277:17
**award** [1] - 323:7
**awards** [4] - 323:4,

323:5, 323:8, 323:9
**aware** [8] - 264:9,
266:17, 300:1,
301:19, 354:6,
354:12, 355:12,
359:7

# B

**bachelor** [1] - 317:9
**background** [2] -
317:8, 372:9
**backside** [1] - 332:24
**bad** [2] - 310:11, 314:2
**badge** [1] - 298:18
**Baker** [57] - 280:7,
280:9, 280:10,
280:18, 281:2,
281:7, 281:10,
281:15, 281:18,
281:21, 288:22,
288:23, 290:10,
291:3, 291:6, 292:3,
292:4, 292:6, 296:6,
303:2, 303:5, 303:6,
303:7, 303:8,
303:11, 303:16,
303:19, 303:21,
303:24, 304:5,
304:16, 306:2,
306:4, 306:6,
306:24, 307:1,
308:1, 308:7, 309:5,
309:23, 309:25,
310:6, 357:16,
357:18, 364:21,
364:23, 367:23,
368:13, 368:21,
368:24, 370:8,
370:18, 371:14,
371:17, 374:1
**Baker's** [6] - 280:9,
305:24, 306:14,
306:15, 370:4,
370:11
**Bank** [27] - 263:11,
263:16, 264:17,
265:4, 266:18,
269:14, 269:19,
281:10, 285:15,
286:16, 286:20,
288:15, 289:14,
305:12, 307:9,
309:9, 310:6,
312:15, 357:5,
364:4, 374:8, 374:9,
374:13, 374:17,
376:11, 394:4, 394:9
**bank** [7] - 281:10,
285:15, 294:13,
299:17, 364:4,

384:12
**bank's** [1] - 384:15
**Bank's** [1] - 265:19
**Bank/Trump** [2] -
365:21, 367:25
**base** [1] - 357:10
**based** [12] - 259:6,
259:19, 260:21,
292:4, 303:14,
324:4, 336:2,
363:20, 363:22,
370:1, 376:23,
388:16
**basic** [7] - 262:20,
339:15, 343:5,
349:11, 350:2,
350:14, 362:25
**basics** [2] - 291:12,
362:24
**basing** [1] - 364:14
**basis** [3] - 280:21,
358:24, 388:7
**Batty** [14] - 364:25,
366:6, 366:19,
369:13, 371:25,
372:14, 377:21,
378:10, 381:3,
381:14, 388:24,
389:6, 389:13,
389:19
**bear** [2] - 258:18,
265:13
**became** [2] - 298:12,
348:16
**becomes** [1] - 267:25
**BEFORE** [1] - 250:10
**began** [3] - 272:13,
292:12, 383:22
**begin** [6] - 271:4,
274:25, 275:7,
276:8, 278:11,
278:14
**beginning** [4] -
290:17, 312:8,
364:8, 384:9
**begins** [2] - 272:5,
336:17
**behalf** [31] - 270:17,
272:19, 272:21,
279:13, 280:13,
281:3, 281:21,
282:6, 282:9, 284:5,
288:10, 288:19,
288:21, 289:8,
290:12, 300:12,
306:1, 306:8, 307:1,
307:12, 307:14,
307:20, 307:25,
308:2, 308:6,
314:11, 314:12,

330:5, 395:18,
395:22
**behest** [1] - 264:10
**behind** [9] - 310:5,
311:22, 329:7,
330:12, 330:14,
333:9, 346:1,
348:12, 383:15
**believability** [1] -
276:16
**believes** [1] - 302:16
**below** [1] - 373:23
**benefit** [2] - 301:17,
301:19
**BERKOWITZ** [18] -
250:17, 261:25,
262:12, 262:15,
265:21, 266:5,
266:7, 266:14,
266:23, 267:13,
270:5, 274:15,
367:10, 373:14,
375:12, 381:7,
388:6, 388:8
**Berkowitz** [5] -
265:20, 269:12,
274:14, 274:17,
315:4
**best** [1] - 397:6
**better** [2] - 297:20,
344:3
**between** [32] - 257:22,
264:2, 281:9,
285:19, 286:5,
292:24, 294:11,
294:12, 299:16,
303:18, 305:12,
338:15, 339:24,
340:7, 340:10,
346:1, 349:23,
350:4, 357:5,
357:18, 364:3,
374:13, 376:8,
378:1, 378:15,
379:3, 380:19,
384:3, 385:21,
386:3, 391:19,
392:16
**beyond** [7] - 273:1,
273:4, 273:14,
273:18, 273:21,
279:25, 297:14
**bias** [2] - 313:19,
389:14
**bidding** [1] - 308:19
**big** [6] - 277:13,
285:22, 295:17,
296:23, 302:2,
303:12
**bigger** [1] - 283:8

**biggest** [1] - 388:1
**billed** [5] - 288:8,
289:15, 290:14,
301:20, 301:25
**billing** [7] - 287:25,
288:2, 288:3,
290:13, 291:22,
291:23, 301:21
**bills** [2] - 288:4,
301:23
**bit** [11] - 294:9, 298:2,
298:3, 321:10,
325:6, 327:23,
335:14, 337:14,
344:3, 379:15,
384:17
**biz** [2] - 329:19,
331:17
**black** [2] - 290:13,
307:11
**block** [3] - 334:18,
341:4, 341:12
**Bob** [3] - 345:4, 345:5,
347:12
**Bob's** [1] - 345:12
**bolster** [1] - 264:13
**book** [5] - 325:7,
326:1, 326:3, 326:7,
328:12
**Bosworth** [5] - 259:15,
259:16, 274:18,
293:15, 315:12,
358:4, 358:21,
396:17
**BOSWORTH** [18] -
250:17, 259:17,
260:5, 260:8,
293:16, 293:18,
301:1, 304:1,
323:20, 324:21,
348:5, 355:7, 355:9,
355:11, 357:24,
358:23, 396:18,
396:21
**Bosworth)...................
..............** [1] - 251:4
**bottom** [2] - 256:25,
347:12
**bought** [1] - 292:7
**bounds** [1] - 259:7
**boxes** [1] - 367:14
**brackets** [1] - 336:18
**breach** [1] - 292:24
**breadth** [1] - 256:12
**break** [3] - 315:14,
396:4
**brief** [4] - 275:10,
275:16, 276:3, 307:4
**briefed** [1] - 291:6
**briefing** [3] - 307:6,

307:9, 307:17
**briefly** [8] - 253:14,
280:3, 297:19,
358:1, 361:4,
362:10, 391:1,
396:18
**bring** [5] - 270:12,
270:23, 273:10,
275:16, 286:25
**bringing** [4] - 279:1,
279:12, 288:9,
311:12
**brings** [2] - 284:10,
340:24
**British** [7] - 267:6,
267:8, 267:9,
268:17, 268:21,
269:1, 270:7
**Brittain** [2] - 252:10,
274:7
**BRITTAIN** [1] - 250:14
**broader** [1] - 264:25
**broadly** [1] - 264:23
**broken** [1] - 369:21
**brought** [5] - 282:23,
285:24, 288:14,
307:12, 307:20
**browse** [3] - 344:11,
345:16, 346:10
**browser** [7] - 328:5,
332:5, 332:13,
332:16, 344:19,
344:20
**brunt** [2] - 362:13,
374:23
**building** [1] - 277:13
**bunch** [2] - 327:12,
327:14
**burden** [1] - 273:18
**Bureau** [10] - 272:17,
280:15, 316:24,
317:15, 318:18,
319:14, 320:6,
321:23, 323:4, 323:6
**bureau** [6] - 255:15,
255:20, 264:15,
303:3, 317:18,
317:20
**business** [6] - 294:12,
294:24, 299:16,
317:10, 348:11,
395:10
**BY** [10] - 316:18,
324:8, 325:1, 348:5,
355:11, 358:3,
360:6, 361:18,
373:18, 381:12
**bypassed** [1] - 279:6

# C

cables [1] - 327:15
cafeteria [1] - 396:6
campaign [6] - 264:16,
279:18, 283:23,
284:5, 288:4, 302:20
Campaign [34] -
272:22, 282:10,
282:19, 283:10,
283:18, 283:22,
285:25, 286:2,
286:4, 286:12,
288:1, 288:8,
289:17, 290:15,
292:10, 296:8,
296:10, 296:11,
296:13, 296:22,
301:13, 301:16,
301:17, 301:18,
301:24, 302:1,
305:3, 305:4,
308:23, 309:3,
309:8, 310:15,
312:4, 312:12
Campaign's [2] -
308:19, 309:7
candidate [6] - 279:2,
279:13, 284:7,
287:17, 379:6,
384:11
cannot [4] - 253:20,
253:25, 340:8,
383:13
capability [3] - 385:12,
385:24, 385:25
capacity [1] - 267:8
capturing [1] - 333:16
care [2] - 295:19,
308:7
cared [6] - 313:14,
313:22, 314:5,
355:23, 356:2,
356:20
career [5] - 295:18,
304:6, 317:7,
360:18, 362:19
carried [2] - 283:9,
289:8
carry [1] - 293:9
case [69] - 253:23,
254:3, 255:2, 255:4,
255:24, 256:1,
256:14, 268:16,
271:4, 271:23,
272:10, 272:12,
273:6, 275:7,
275:12, 275:13,
275:17, 275:23,
276:14, 277:9,

277:11, 277:15,
277:20, 278:6,
278:7, 278:17,
281:22, 289:19,
292:13, 294:19,
300:8, 301:3, 302:9,
307:20, 313:17,
314:16, 315:1,
315:7, 315:9, 324:2,
328:18, 328:23,
330:25, 336:6,
337:20, 338:9,
341:6, 345:13,
351:24, 352:5,
352:7, 353:25,
356:24, 359:13,
365:20, 367:22,
368:13, 368:20,
371:8, 371:15,
383:16, 394:4,
394:9, 395:6, 396:7,
396:8
Case [1] - 252:3
case-in [1] - 275:7
case-in-chief [1] -
275:13
cases [7] - 318:1,
318:3, 318:5, 319:9,
320:12, 331:6,
362:16
casual [1] - 307:17
CAT [1] - 319:16
categories [1] -
338:16
category [1] - 324:2
CATHERINE [1] -
250:18
Catherine [1] - 274:19
caught [4] - 289:2,
296:3, 296:4, 303:1
causing [1] - 290:23
cell [2] - 280:9, 333:5
censorship [1] - 346:9
center [2] - 258:12,
375:25
central [1] - 259:18
certain [8] - 262:6,
285:9, 333:17,
338:8, 338:9,
379:22, 383:13,
392:3
certainly [10] - 256:16,
258:21, 258:25,
262:4, 269:8,
269:21, 331:10,
353:5, 362:12,
390:24
CERTIFICATE [1] -
397:1
certification [6] -

322:9, 322:12,
322:13, 322:21,
322:23, 323:1
certifications [5] -
322:6, 322:7,
322:16, 323:3,
348:25
certified [1] - 323:16
certify [1] - 397:4
chain [15] - 331:13,
365:4, 365:6, 365:7,
365:22, 366:11,
366:17, 367:2,
367:6, 367:15,
367:17, 369:11,
370:3, 370:20,
371:20
chain-of-custody [1] -
365:22
chair [3] - 315:19,
315:20, 315:21
chairs [1] - 359:16
challenged [1] -
338:15
challenging [1] -
261:6
chance [1] - 292:1
change [2] - 318:24,
329:15
changed [1] - 320:22
channel [10] - 281:8,
281:11, 285:19,
364:3, 376:6, 376:8,
378:1, 378:15,
383:2, 391:18
channels [1] - 279:6
Chantilly [3] - 318:23,
363:22, 366:15
character [1] - 337:22
charge [5] - 272:15,
272:23, 280:2,
297:3, 298:4
charged [7] - 273:4,
279:22, 280:25,
281:4, 292:9,
307:13, 307:22
charging [1] - 273:9
chart [1] - 259:12
check [2] - 265:8,
329:12
Chicago [10] - 381:21,
388:25, 389:4,
390:2, 390:5,
390:20, 390:25,
391:12, 391:16
chief [4] - 275:8,
275:13, 317:3,
320:23
child [1] - 318:4
choose [4] - 275:16,

278:12, 338:3,
341:11
chose [1] - 378:22
chosen [2] - 338:9,
378:24
Christopher [2] -
269:7, 269:12
CHRISTOPHER [1] -
250:10
chronological [1] -
289:24
CHS [1] - 358:22
CIA [14] - 258:17,
288:14, 288:18,
288:20, 289:6,
298:16, 298:19,
310:13, 310:20,
310:22, 310:23,
311:2, 311:11
cite [1] - 356:15
cited [1] - 269:12
citizen [10] - 279:14,
279:16, 281:20,
288:3, 290:23,
292:25, 310:25,
351:16, 351:19,
358:6
citizens [1] - 305:8
city [1] - 317:19
civil [2] - 352:5
claim [3] - 285:13,
306:25, 308:13
claimed [1] - 285:18
classes [1] - 322:2
clear [9] - 306:15,
307:11, 312:22,
314:4, 331:1,
352:11, 353:3,
357:12
clearance [3] - 294:3,
298:17, 310:1
click [1] - 336:4
clicking [1] - 327:24
client [51] - 256:20,
256:24, 272:20,
279:14, 279:17,
280:14, 281:3,
281:21, 282:7,
282:9, 282:18,
284:10, 287:5,
288:3, 288:6,
288:10, 288:19,
288:21, 289:9,
289:16, 290:12,
296:13, 301:20,
306:1, 306:8,
306:12, 307:2,
307:12, 307:15,
307:21, 307:25,
308:3, 308:6, 311:1,

311:3, 311:4, 311:6,
311:7, 311:9,
311:16, 311:17,
311:18, 311:19,
312:2, 344:18
clients [22] - 270:18,
272:21, 279:20,
282:9, 283:10,
283:17, 285:23,
285:24, 288:25,
294:9, 296:12,
298:13, 299:23,
301:18, 301:22,
306:10, 309:1,
313:1, 313:24,
314:6, 334:15
Clinton [38] - 272:22,
282:10, 282:16,
282:19, 283:10,
283:18, 283:21,
285:25, 286:2,
286:4, 286:11,
288:1, 288:8,
289:17, 290:15,
292:10, 296:8,
296:10, 296:11,
296:13, 296:22,
301:13, 301:16,
301:17, 301:18,
301:24, 302:1,
305:3, 305:4,
308:19, 308:22,
309:2, 309:6, 309:8,
310:15, 312:4,
312:11, 312:20
Clintons [1] - 312:17
clip [3] - 303:19,
303:20, 303:25
close [6] - 262:6,
278:14, 321:14,
363:23, 384:7,
389:20
closed [1] - 359:7
closer [1] - 262:9
closest [1] - 294:14
closing [3] - 276:1,
276:4, 293:6
Coie [3] - 263:6, 298:9,
298:12
Coie's [1] - 266:2
coincidental [1] -
384:1
coincidentally [1] -
384:6
collaborate [1] -
362:17
collaborated [1] -
372:12
collect [5] - 256:11,
334:22, 365:8,

365:11, 394:1
**collected** [2] - 335:21, 365:17
**collecting** [1] - 358:11
**collection** [3] - 335:23, 342:10, 355:18
**collectors** [1] - 334:16
**collects** [1] - 254:15
**college** [1] - 348:19
**colloquy** [1] - 259:18
**colons** [1] - 336:18
**Colorado** [2] - 317:18, 317:19
**COLUMBIA** [1] - 250:1
**column** [2] - 338:19, 339:7
**com** [10] - 329:19, 329:22, 330:9, 330:10, 330:11, 330:17, 330:21, 331:17
**comfortable** [4] - 359:17, 389:6, 389:9, 389:12
**coming** [18] - 261:24, 262:5, 280:13, 290:11, 296:1, 296:2, 302:15, 303:1, 341:9, 341:10, 343:15, 346:24, 347:20, 347:22, 347:24, 362:3, 382:11, 393:15
**comma** [1] - 337:12
**comma-separated** [1] - 337:12
**command** [1] - 340:22
**commendations** [1] - 323:6
**commercial** [4] - 334:9, 334:14, 334:15, 342:18
**committed** [3] - 273:1, 280:25, 344:8
**Committee** [4] - 287:10, 300:6, 312:11, 312:20
**common** [2] - 308:22, 383:15
**commonly** [2] - 332:18, 365:17
**communicate** [7] - 285:2, 285:14, 325:17, 327:16, 363:3, 379:22, 384:15
**communicating** [3] - 352:15, 376:11, 387:25

**communication** [20] - 254:1, 268:20, 281:9, 285:19, 305:12, 350:12, 350:15, 363:4, 376:6, 376:8, 378:1, 378:15, 379:3, 379:11, 380:19, 384:20, 385:20, 390:25, 391:18
**communications** [11] - 279:3, 340:6, 351:22, 364:3, 374:8, 374:13, 384:23, 385:2, 385:13, 385:25, 386:2
**community** [2] - 354:4, 354:5
**companies** [15] - 256:11, 256:13, 284:17, 284:18, 284:22, 286:13, 294:24, 334:8, 334:22, 334:23, 335:17, 354:6, 354:15, 358:8, 358:10
**company** [10] - 280:14, 284:16, 290:14, 291:16, 334:13, 341:21, 356:9, 372:6, 376:23, 376:25
**compares** [1] - 254:18
**comparing** [3] - 372:21, 372:24, 378:8
**comparison** [1] - 325:25
**complete** [2] - 332:8, 397:6
**completely** [3] - 253:22, 332:25, 341:18
**complex** [2] - 320:12, 325:7
**complicated** [3] - 301:6, 301:7, 348:10
**complications** [1] - 289:25
**compromise** [1] - 334:19
**computer** [52] - 287:11, 299:10, 299:11, 299:12, 317:9, 317:17, 318:3, 318:14, 319:4, 319:17, 320:12, 320:15,

321:18, 322:18, 326:14, 327:19, 328:8, 328:9, 328:18, 328:19, 332:8, 336:12, 339:17, 339:24, 344:19, 345:1, 347:12, 348:19, 349:9, 349:13, 349:14, 349:19, 349:20, 349:23, 349:24, 350:5, 350:21, 350:22, 352:14, 361:9, 361:11, 363:2, 363:3, 363:5, 372:6, 379:9, 379:10, 380:6
**computers** [8] - 257:22, 285:1, 326:13, 334:20, 343:3, 346:13, 363:11, 384:3
**conceal** [2] - 288:25, 308:24, 309:8
**concealing** [1] - 312:3
**concept** [7] - 254:11, 255:13, 255:20, 256:6, 257:20, 326:11, 377:5
**concepts** [3] - 254:12, 258:12, 324:13
**concern** [2] - 259:18, 259:24
**concerned** [2] - 279:16, 346:11
**concerning** [1] - 364:2
**concerns** [2] - 294:7, 311:13
**concert** [1] - 283:9
**concerted** [1] - 288:25
**conclude** [6] - 253:20, 254:6, 385:15, 386:12, 388:2
**concluded** [3] - 257:13, 258:2, 259:14
**concluding** [1] - 314:9
**conclusion** [13] - 258:9, 258:16, 258:18, 259:11, 315:2, 378:13, 379:2, 380:18, 382:20, 386:6, 388:12, 389:10, 389:25
**conclusions** [27] - 254:16, 254:21, 255:4, 258:6, 258:11, 259:1, 259:9, 259:22,

260:11, 260:21, 261:11, 262:4, 262:6, 310:10, 336:1, 369:25, 370:1, 378:19, 379:14, 380:14, 382:5, 382:20, 388:16, 388:18, 389:5, 389:13, 391:13
**concur** [1] - 391:17
**conduct** [4] - 275:8, 285:7, 340:2, 384:11
**conducted** [4] - 382:3, 382:18, 383:23, 386:7
**conducting** [3] - 284:13, 319:25, 388:4
**conference** [1] - 303:23
**confidence** [1] - 258:24
**confident** [2] - 293:10, 389:15
**confidential** [4] - 267:8, 294:21, 298:25, 355:12
**configuration** [1] - 374:16
**configure** [1] - 346:20
**configured** [4] - 374:7, 374:10, 374:12, 376:16
**confirmed** [1] - 288:22
**conflicts** [1] - 289:24
**Congress** [5] - 263:5, 266:3, 289:3, 289:10, 289:13
**connect** [6] - 264:1, 332:12, 332:17, 343:6, 347:19, 379:18
**connected** [4] - 278:18, 286:3, 332:10, 349:19
**connectible** [1] - 379:8
**connecting** [5] - 333:5, 346:13, 347:18, 350:21, 379:9
**connection** [23] - 268:3, 294:11, 328:2, 332:14, 333:1, 336:5, 339:24, 340:3, 340:15, 343:7, 344:9, 345:11, 345:14, 345:15,

347:8, 350:3, 350:4, 350:7, 350:8, 371:15, 374:25
**connections** [5] - 268:5, 294:8, 299:16, 348:1, 384:22
**consequences** [1] - 278:21
**consider** [4] - 255:20, 283:1, 293:8, 393:21
**considerable** [1] - 374:18
**considerably** [1] - 377:8
**consideration** [2] - 342:1, 395:5
**considered** [3] - 287:13, 322:15, 361:15
**consist** [1] - 369:20
**consistent** [2] - 293:11
**consistently** [2] - 347:18, 347:19
**conspiracy** [1] - 267:19
**constantly** [1] - 347:20
**constitutes** [1] - 397:4
**Constitution** [2] - 250:23, 397:12
**consult** [2] - 319:24, 321:20
**contact** [6] - 277:17, 287:12, 304:12, 304:13
**contacts** [1] - 294:12
**contained** [2] - 375:22, 383:4
**containing** [1] - 281:15
**contains** [2] - 263:10, 263:11
**contending** [1] - 261:7
**content** [2] - 264:7, 349:22
**contest** [1] - 260:6
**context** [5] - 303:2, 351:5, 393:10, 394:23, 395:14
**continue** [2] - 277:8, 368:15
**continued** [2] - 263:18, 263:19
**continuing** [1] - 322:1
**contours** [1] - 261:1
**contract** [1] - 321:18
**contractors** [1] - 320:25

contracts [3] - 354:7, 354:9, 354:10
contrary [1] - 388:14
contributed [1] - 259:1
contrived [1] - 341:18
control [1] - 290:1
controlled [1] - 376:8
controversial [2] - 254:2, 255:2
conveniently [1] - 384:1
conversation [4] - 277:20, 292:4, 306:17, 370:15
conversations [3] - 306:23, 310:22, 357:22
converted [1] - 337:11
conveying [1] - 272:20
convict [2] - 297:13, 309:21
convinced [1] - 272:25
Cooper [3] - 283:1, 293:7, 293:9
COOPER [1] - 250:10
coordinate [1] - 363:19
coordinated [3] - 267:3, 267:14, 286:11
coordination [1] - 366:3
copy [4] - 333:16, 334:11, 336:8, 336:9
copyrights [1] - 361:14
correct [39] - 264:5, 266:7, 335:13, 339:21, 344:1, 348:8, 348:17, 348:18, 348:20, 349:6, 349:15, 349:21, 349:25, 350:16, 350:18, 351:3, 351:11, 351:22, 352:15, 352:22, 353:4, 353:7, 353:8, 354:4, 354:20, 355:25, 356:5, 356:22, 356:23, 357:1, 357:6, 357:9, 357:13, 357:14, 357:16, 371:13, 377:19, 381:8, 390:12
correspondence [1] - 384:11
couched [1] - 377:14
counsel [17] - 253:1,

253:4, 272:19, 274:8, 274:12, 279:12, 279:24, 280:8, 280:24, 282:5, 282:6, 283:21, 287:4, 289:14, 291:4, 301:13, 367:23
Counsel [4] - 259:2, 274:1, 306:12, 364:21
Counsel's [1] - 274:3
COUNSEL'S [1] - 250:14
counsel's [1] - 279:7
count [1] - 279:22
counterintelligence [5] - 362:8, 362:10, 362:12, 362:17, 369:2
countries [3] - 343:12, 346:9, 362:14
country [5] - 298:10, 319:18, 346:7, 347:5, 362:3
couple [7] - 252:17, 253:8, 253:11, 274:23, 277:13, 334:1, 353:14
course [9] - 258:10, 259:13, 264:24, 290:5, 308:2, 360:18, 362:19, 391:14, 392:24
court [10] - 267:5, 274:20, 278:8, 278:9, 316:21, 327:23, 351:23, 351:25, 352:6, 371:5
Court [13] - 250:22, 250:22, 252:19, 252:24, 262:2, 268:15, 269:21, 269:24, 277:19, 293:18, 323:21, 352:10, 397:11
COURT [95] - 250:1, 252:5, 252:8, 252:13, 253:5, 253:7, 254:9, 255:23, 256:18, 257:7, 257:10, 257:17, 258:13, 258:18, 259:2, 259:15, 260:3, 260:6, 260:25, 261:15, 261:23, 262:11, 262:14, 262:16, 262:19, 262:25, 263:14,

263:25, 264:12, 264:21, 265:6, 265:15, 265:20, 266:4, 266:6, 266:8, 266:22, 267:12, 268:6, 268:22, 269:3, 269:24, 270:3, 270:9, 270:12, 270:22, 270:25, 271:2, 274:11, 274:22, 293:14, 300:25, 315:12, 315:21, 315:24, 316:2, 316:8, 316:12, 316:15, 321:3, 323:17, 323:19, 323:21, 324:20, 324:22, 327:22, 338:12, 354:22, 354:25, 355:2, 355:4, 355:8, 357:25, 358:24, 359:3, 359:11, 359:20, 359:23, 360:3, 361:3, 361:17, 367:11, 373:15, 375:13, 381:10, 383:9, 388:7, 388:10, 394:5, 394:8, 396:3, 396:11, 396:17, 396:20, 397:1
Court's [2] - 253:2, 261:3, 396:19
courthouse [1] - 277:12
Courthouse [2] - 250:23, 397:11
courtroom [6] - 270:24, 271:11, 271:18, 282:24, 315:23, 396:10
COURTROOM [4] - 252:2, 270:11, 315:20, 396:16
cover [1] - 263:8
coverage [1] - 255:6
COVID [2] - 271:25, 289:25
crack [2] - 262:10, 278:8
create [3] - 257:21, 283:11, 287:1
created [3] - 257:21, 285:1, 371:21
credibility [4] - 276:15, 298:20, 300:1, 309:25
crime [17] - 273:9,

280:25, 282:2, 282:4, 283:6, 317:17, 360:17, 360:21, 361:4, 361:5, 361:7, 361:12, 378:5, 390:15, 392:9, 392:11, 393:1
crimes [8] - 298:8, 360:22, 361:8, 361:13, 362:1, 362:6, 363:17
criminal [3] - 272:12, 272:15, 352:8
Criminal [2] - 250:3, 252:3
critical [1] - 358:19
CRM [2] - 376:24, 377:5
cross [7] - 260:18, 261:16, 266:13, 266:15, 275:9, 275:14, 314:25
CROSS [1] - 348:4
cross-examination [2] - 260:18, 266:13
cross-examine [1] - 266:15
Crown [1] - 267:7
CRR [3] - 250:22, 397:3, 397:10
crystal [1] - 307:11
curious [1] - 260:19
current [3] - 320:21, 321:12, 374:7
curry [1] - 254:23
Curtis [1] - 391:5
custody [20] - 365:4, 365:6, 365:7, 365:9, 365:16, 365:22, 366:1, 366:11, 367:2, 367:15, 367:17, 368:4, 368:21, 368:23, 368:24, 369:5, 369:11, 370:3, 370:20, 371:21
Custody [2] - 368:11, 368:15
customer [1] - 376:25
cyber [60] - 260:13, 281:11, 287:9, 291:11, 293:24, 294:17, 298:13, 298:24, 300:16, 301:4, 310:7, 313:16, 313:17, 313:22, 313:23, 314:6, 318:17, 318:19, 318:20,

319:7, 321:24, 321:25, 323:18, 323:23, 341:4, 348:25, 349:2, 350:17, 350:19, 354:4, 354:5, 360:17, 360:21, 361:4, 361:7, 361:12, 361:22, 361:24, 361:25, 362:1, 362:5, 362:16, 362:19, 363:14, 363:17, 365:1, 369:8, 369:9, 372:3, 372:4, 378:3, 378:4, 382:8, 382:9, 382:10, 382:14, 382:16, 385:24, 390:9, 390:14
Cyber [6] - 317:3, 317:25, 318:1, 319:15, 320:7, 320:23
CyD [5] - 382:2, 382:12, 382:13, 382:14, 382:16

D

D.C [4] - 278:18, 278:25, 280:6, 283:20, 361:2, 363:24
damaging [1] - 265:22
data [173] - 253:19, 254:4, 254:6, 254:7, 254:15, 254:17, 254:18, 255:6, 255:15, 255:16, 255:18, 255:19, 255:22, 256:8, 256:11, 256:12, 256:16, 257:1, 257:5, 257:11, 257:12, 257:21, 258:5, 258:6, 258:14, 258:24, 258:25, 259:3, 259:4, 259:6, 259:23, 259:25, 260:2, 260:4, 260:11, 260:12, 260:22, 261:1, 261:4, 261:7, 261:11, 265:18, 281:8, 281:15, 284:23, 284:24, 284:25, 285:12, 285:22, 286:12, 291:12, 292:8, 294:18, 295:1,

295:2, 298:25,
299:2, 299:13,
300:17, 300:18,
300:20, 305:10,
310:9, 313:15,
313:16, 314:1,
314:2, 318:8,
318:10, 319:11,
320:2, 321:7, 321:8,
323:23, 335:20,
336:15, 336:17,
338:3, 338:5, 339:4,
340:12, 340:14,
341:24, 342:1,
342:13, 343:21,
350:2, 350:9,
352:25, 353:4,
353:6, 353:7,
353:10, 353:13,
354:8, 354:13,
354:15, 355:18,
355:23, 355:25,
356:1, 356:3, 356:7,
356:8, 356:10,
356:12, 356:14,
356:15, 356:16,
356:17, 356:20,
356:22, 357:8,
357:13, 358:7,
358:11, 362:23,
369:22, 369:25,
370:2, 372:1, 372:8,
372:10, 372:20,
372:22, 372:24,
373:8, 374:24,
375:1, 375:8,
375:15, 375:17,
375:22, 376:1,
376:5, 378:7, 378:8,
378:14, 378:20,
380:12, 380:13,
380:14, 380:17,
381:4, 381:19,
391:11, 391:16,
392:3, 394:1,
394:13, 394:18,
394:22, 394:24,
395:2, 395:5, 395:7,
395:9, 395:15,
395:17, 395:19,
395:21, 395:24
**data's** [2] - 394:18,
394:19
**date** [6] - 265:13,
336:17, 338:17,
364:9, 371:6, 375:17
**Dated** [1] - 397:8
**dates** [1] - 364:14
**Dave** [1] - 344:13
**DAVID** [2] - 251:3,

316:16
**David** [2] - 316:7,
316:22
**day)** [1] - 377:3
**days** [3] - 267:10,
281:13, 287:2
**DC** [3] - 250:15,
250:24, 397:13
**deal** [4] - 254:11,
260:18, 261:15,
277:22
**dealing** [1] - 289:24
**decade** [2] - 293:24,
294:1
**decades** [1] - 294:2
**deceitful** [1] - 310:4
**December** [1] - 289:4
**decide** [5] - 272:24,
273:13, 295:7,
338:7, 393:11
**decided** [5] - 252:21,
271:25, 286:25,
328:3, 390:10
**deciders** [1] - 276:14
**decides** [1] - 304:25
**decisions** [1] - 282:24
**decoding** [1] - 319:3
**decrease** [1] - 346:23
**deeds** [1] - 311:24
**default** [1] - 328:20
**defendant** [62] - 263:4,
272:14, 273:11,
273:15, 274:12,
275:1, 277:16,
278:25, 279:4,
279:11, 279:16,
279:19, 279:21,
280:1, 280:6,
280:12, 280:18,
280:24, 281:1,
281:6, 281:10,
281:14, 282:8,
283:9, 283:13,
283:16, 283:20,
284:18, 284:19,
285:12, 285:17,
285:21, 286:1,
286:20, 286:24,
287:3, 287:6, 287:8,
287:12, 287:16,
287:20, 287:25,
288:3, 288:5, 288:7,
288:11, 288:13,
288:18, 288:21,
289:2, 289:7,
289:10, 289:12,
289:21, 290:8,
290:14, 290:17,
291:4, 291:6, 292:6,
292:22, 293:12

**Defendant** [2] - 250:7,
250:17
**defendant's** [11] -
258:3, 280:17,
282:5, 282:18,
283:8, 284:10,
286:6, 290:21,
291:17, 291:21,
292:4
**defense** [12] - 252:20,
253:3, 253:15,
254:9, 261:15,
274:11, 274:12,
274:13, 275:12,
276:2, 315:1, 334:18
**defense's** [1] - 259:5
**DeFilippis** [53] -
250:12, 252:9,
252:10, 252:17,
253:6, 253:14,
255:9, 256:4,
256:22, 257:8,
257:15, 257:19,
258:15, 258:20,
259:8, 261:14,
261:17, 262:1,
262:17, 262:24,
263:3, 263:17,
264:5, 264:14,
264:22, 265:8,
265:17, 267:4,
268:13, 269:2,
269:5, 270:1, 270:4,
270:16, 270:20,
274:8, 359:19,
359:21, 360:6,
361:18, 367:8,
367:12, 372:12,
373:16, 373:18,
375:10, 376:20,
381:5, 381:9,
381:12, 394:5,
394:6, 395:25
**DeFilippis)**.................
............. [1] - 251:6
**definitely** [2] - 261:3,
358:12
**definitive** [1] - 330:23
**degree** [3] - 317:9,
317:11, 348:21
**deliberating** [1] -
271:23
**deliberations** [4] -
272:5, 275:25,
276:8, 278:11
**deliver** [1] - 285:22
**Democratic** [9] -
287:10, 300:6,
300:14, 309:4,
312:10, 312:17,

312:20
**Democrats** [4] -
282:22, 284:3,
292:16, 298:8
**demonstrate** [1] -
322:17
**demonstration** [1] -
343:16
**demonstrative** [2] -
325:11, 335:12
**Denver** [1] - 317:11
**Department** [3] -
280:19, 307:5,
307:18
**department** [1] - 298:8
**depended** [1] - 298:20
**DEPUTY** [4] - 252:2,
270:11, 315:20,
396:16
**deputy** [1] - 369:9
**derogatory** [1] -
286:14
**describe** [5] - 253:18,
281:16, 326:1,
367:19, 368:3
**described** [1] - 263:5
**designed** [6] - 279:9,
279:10, 337:13,
340:21, 340:23,
342:22
**desk** [1] - 267:11
**despite** [1] - 389:23
**destroyed** [1] - 271:19
**detail** [1] - 262:8
**detailed** [2] - 271:8,
275:24
**determination** [1] -
256:7
**determinations** [1] -
256:7
**determine** [6] -
258:13, 346:4,
351:1, 371:11,
382:25, 395:8
**determining** [1] -
393:6
**Detroit** [3] - 317:24,
317:25, 318:22
**develop** [1] - 290:18
**developed** [1] - 325:13
**developments** [1] -
321:21
**devices** [1] - 379:22
**devote** [1] - 290:24
**dial** [1] - 333:4
**difference** [1] - 392:16
**different** [54] - 254:12,
267:17, 284:14,
296:16, 307:8,
311:14, 314:24,

320:20, 321:7,
321:14, 323:5,
325:21, 326:4,
326:10, 327:14,
329:20, 333:24,
334:1, 334:7,
334:10, 335:16,
336:22, 337:1,
337:25, 338:1,
340:12, 340:19,
343:4, 343:12,
343:20, 344:22,
345:14, 345:15,
346:17, 347:5,
347:9, 350:15,
351:4, 351:9, 352:6,
353:12, 353:13,
353:14, 361:8,
361:25, 362:5,
363:16, 363:18,
389:21, 389:22,
391:21, 392:4,
392:16, 392:17
**differing** [1] - 389:24
**difficult** [5] - 256:25,
259:12, 322:16,
326:18, 346:4
**difficult-to-obtain** [1] -
322:16
**DIG** [2] - 340:22
**digging** [2] - 284:6,
340:23
**Digital** [1] - 320:8
**digital** [3] - 284:25,
317:13, 322:3
**DIRECT** [2] - 316:17,
360:5
**direct** [14] - 268:3,
275:9, 275:14,
279:19, 296:18,
314:25, 349:7,
352:24, 373:19,
374:12, 381:22,
383:7, 384:8, 386:3
**directed** [1] - 281:23
**directly** [4] - 343:9,
379:9, 384:15,
385:21
**director** [1] - 369:9
**directory** [2] - 328:17,
344:16
**dirt** [1] - 284:7
**dirty** [1] - 284:8
**disagreed** [1] - 379:15
**disclose** [1] - 272:3
**disconnected** [1] -
265:23
**discuss** [4] - 277:9,
359:13, 391:10,
396:12

405

discussed [1] - 352:1
discusses [1] - 261:20
discussion [4] -
253:22, 370:12,
386:10, 396:7
discussions [1] -
391:14
dispute [1] - 270:14
disregard [1] - 276:25
distinctly [1] - 370:14
distracting [1] -
271:15
distribution [1] - 377:1
DISTRICT [3] - 250:1,
250:1, 250:10
divided [1] - 361:19
division [20] - 318:17,
318:19, 361:22,
361:24, 361:25,
362:7, 362:8,
362:10, 362:16,
362:17, 363:14,
365:1, 369:2, 369:8,
369:10, 372:4,
381:21, 382:14,
382:16, 390:9
divisions [1] - 361:19
DNA [1] - 299:13
DNC [8] - 287:14,
287:15, 300:7,
300:11, 309:4,
312:10, 312:16
DNS [151] - 253:19,
253:24, 254:6,
254:14, 254:18,
255:16, 256:11,
257:21, 260:22,
261:1, 284:24,
284:25, 285:12,
287:14, 291:12,
294:18, 295:1,
295:2, 298:25,
299:2, 300:22,
318:8, 318:10,
319:11, 320:2,
321:8, 321:9,
323:18, 323:23,
324:13, 325:2,
325:4, 325:11,
325:24, 326:1,
326:10, 326:24,
327:1, 328:16,
328:20, 328:23,
328:25, 329:4,
329:9, 329:12,
329:13, 329:15,
330:2, 330:3, 330:7,
331:18, 331:21,
332:7, 332:11,
333:13, 333:15,

333:16, 333:25,
334:2, 334:5, 334:6,
334:7, 334:9,
334:11, 334:15,
334:22, 335:4,
335:5, 335:7, 335:8,
335:10, 335:11,
335:16, 335:17,
335:19, 335:20,
335:23, 335:24,
336:6, 336:7, 336:8,
336:15, 336:24,
337:4, 339:3, 339:9,
339:14, 339:15,
339:17, 339:22,
340:2, 340:4, 340:5,
340:8, 341:14,
341:15, 341:16,
341:17, 341:19,
341:20, 341:24,
342:1, 342:2, 342:3,
342:4, 342:6, 342:9,
342:16, 342:18,
348:10, 348:14,
349:1, 349:5, 349:8,
349:16, 349:17,
350:2, 350:7, 350:8,
350:9, 352:25,
353:4, 353:7, 353:9,
353:12, 353:14,
354:1, 354:8,
354:12, 354:15,
355:18, 356:4,
356:20, 357:8,
357:13, 358:6,
358:7, 358:8,
358:11, 362:23,
362:24, 363:1,
363:2, 363:6, 363:9,
375:22
document [13] - 270:6,
366:22, 373:4,
373:25, 375:6,
376:19, 376:21,
380:23, 381:3,
382:1, 383:10,
383:13, 391:11
documentary [1] -
357:10
documents [7] -
262:22, 275:21,
290:5, 290:7,
364:12, 383:5,
383:11
DOJ [1] - 307:7
dollars [5] - 284:19,
294:23, 294:25,
299:2, 354:8
domain [32] - 254:16,
330:9, 331:15,

331:17, 331:18,
337:23, 338:25,
339:18, 340:24,
341:1, 341:5, 341:7,
341:10, 349:25,
363:9, 369:23,
375:18, 376:8,
376:10, 379:5,
379:6, 379:7,
384:13, 384:24,
385:21, 385:22,
386:3, 387:5, 387:13
Domain [4] - 284:24,
325:2, 325:11,
362:23
domains [9] - 328:17,
386:13, 386:15,
386:16, 386:17,
386:19, 386:20,
386:23, 386:24
domestic [1] - 293:1
Donald [6] - 282:16,
284:7, 292:17,
294:8, 294:12, 299:7
done [11] - 332:11,
345:12, 360:19,
362:19, 365:17,
380:5, 381:18,
386:8, 390:23,
391:8, 394:20
door [4] - 259:23,
313:3, 315:22,
379:25
dossier [20] - 263:12,
263:14, 263:15,
263:16, 263:20,
263:22, 263:25,
264:1, 264:4, 264:8,
265:4, 265:5, 265:6,
266:21, 267:2,
267:19, 268:10,
268:16, 269:19
dossier's [2] - 263:18,
264:25
dots [1] - 264:2
doubled [1] - 288:12
doubt [9] - 273:1,
273:4, 273:14,
273:18, 273:21,
280:1, 297:14,
308:8, 308:14
down [21] - 263:3,
271:17, 278:9,
288:12, 292:3,
292:11, 296:22,
296:25, 299:1,
305:4, 308:16,
321:4, 326:8,
327:22, 343:14,
368:9, 368:15,

371:6, 386:17,
386:22, 396:11
dozen [2] - 321:14,
322:7
Dr [1] - 252:20
draft [1] - 381:19
drafted [6] - 256:8,
381:4, 383:1,
388:23, 388:25,
389:8
drafting [2] - 263:18,
389:25
drastically [1] - 389:24
draw [7] - 254:20,
260:21, 261:11,
262:6, 336:1,
376:12, 388:12
drawn [5] - 254:17,
382:5, 382:20,
382:21
drew [4] - 255:4,
258:11, 259:22,
259:24
drives [16] - 281:15,
281:17, 292:5,
292:7, 292:9,
320:13, 366:1,
366:14, 366:16,
370:18, 371:12,
375:22, 381:21,
382:1, 390:8
drop [1] - 270:21
drove [3] - 366:15,
366:18
dupe [1] - 310:8
Durham [2] - 252:14,
274:9
DURHAM [1] - 252:16
during [16] - 260:23,
271:19, 272:11,
275:18, 275:25,
276:11, 277:24,
288:20, 289:7,
300:22, 313:8,
340:15, 357:21,
358:7, 370:12
duties [1] - 293:9
duty [2] - 273:21,
276:12
dwell [1] - 257:2

E

easier [5] - 326:6,
326:19, 337:14,
347:17, 347:21
easily [1] - 379:8
easy [3] - 336:12,
336:13, 338:22
eat [1] - 396:6

ECOU [6] - 382:2,
382:7, 382:8, 385:5,
385:8, 385:16
EDGAR [1] - 250:13
education [3] - 322:1,
348:16, 349:3
educational [1] -
317:8
effect [1] - 253:18
effectively [1] - 296:21
efficient [1] - 276:10
effort [8] - 267:15,
268:24, 269:23,
285:2, 288:25,
296:13, 311:5,
372:13
efforts [1] - 283:23
Egypt [1] - 343:15
either [11] - 265:3,
265:10, 269:6,
282:17, 303:10,
308:6, 309:12,
337:14, 385:11,
388:5, 396:18
election [10] - 263:20,
279:2, 279:10,
283:12, 283:19,
285:24, 287:18,
289:15, 300:4,
310:15
electronic [1] - 344:6
element [4] - 273:4,
273:14, 273:20,
273:23
elemental [1] - 349:9
elements [1] - 273:5
elephant [1] - 282:13
Elias [5] - 264:23,
266:22, 268:8,
301:11, 301:12
Elias's [2] - 264:23,
266:23
elicit [10] - 259:13,
259:20, 259:21,
260:2, 262:21,
263:17, 263:21,
264:11, 264:23,
265:3
email [31] - 253:25,
282:1, 285:14,
285:17, 290:24,
302:19, 326:16,
341:7, 341:8,
349:14, 349:16,
349:17, 374:7,
374:8, 374:19,
376:17, 377:10,
379:18, 379:19,
379:21, 386:19,
386:21, 386:22,

386:24, 387:4,
387:7, 387:10,
387:14, 387:15,
387:18
**email-related** [1] -
386:22
**email.com** [5] - 376:2,
376:10, 376:18,
376:23, 384:14
**email.com'** [1] -
384:13
**emails** [11] - 282:1,
285:3, 290:16,
290:20, 340:6,
349:22, 364:12,
377:1, 377:2,
377:16, 391:5
**employee** [7] - 288:18,
291:18, 291:20,
298:20, 310:23,
311:2, 366:7
**employees** [3] -
291:15, 320:25,
389:2
**enabled** [1] - 298:18
**enables** [1] - 349:3
**encroaches** [1] -
261:3
**encryption** [1] -
345:25
**end** [17] - 271:9,
271:20, 272:4,
272:24, 273:6,
273:12, 274:20,
279:9, 280:15,
314:4, 327:8,
343:13, 345:22,
364:8, 371:7,
371:10, 383:19
**ends** [3] - 279:20,
292:15, 330:9
**enemies** [1] - 293:1
**enforcement** [6] -
292:19, 292:25,
352:2, 352:8,
352:13, 352:16
**engineering** [2] -
317:12, 320:15
**enter** [3] - 252:10,
332:22, 332:23
**enters** [1] - 270:24
**entire** [1] - 263:15
**entirely** [2] - 271:16,
340:4
**entitled** [1] - 333:13
**entries** [2] - 301:24,
301:25
**entry** [1] - 337:5
**envious** [1] - 348:11
**equals** [1] - 332:5

**equities** [1] - 372:3
**equity** [4] - 378:3,
382:2, 382:12,
390:14
**equivalent** [1] - 377:12
**Eric** [4] - 302:7, 369:6,
369:7, 369:8
**error** [3] - 379:20,
380:6
**especially** [1] - 304:2
**ESQ** [8] - 250:12,
250:13, 250:13,
250:14, 250:17,
250:17, 250:18,
250:18
**essential** [1] - 314:13
**essentially** [7] -
264:18, 312:19,
325:14, 365:10,
373:7, 387:14,
392:14
**establish** [3] - 258:25,
268:3, 340:14
**esteemed** [1] - 302:12
**Eurasia** [1] - 382:11
**Eurasian** [1] - 382:9
**evaluate** [3] - 255:14,
310:9, 358:17
**evaluating** [1] - 255:19
**eve** [2] - 279:2, 283:12
**evening** [2] - 252:20,
271:3
**event** [1] - 391:1
**eventually** [1] - 333:5
**evidence** [100] - 258:1,
258:5, 261:19,
263:7, 265:4,
265:22, 266:17,
266:19, 266:20,
267:16, 267:21,
268:1, 268:23,
269:8, 272:25,
273:8, 273:11,
275:2, 275:4, 275:6,
275:18, 275:20,
275:22, 276:4,
276:5, 276:15,
276:19, 277:5,
278:17, 279:5,
279:15, 279:25,
280:3, 280:5,
280:23, 281:6,
281:14, 282:8,
282:12, 283:2,
283:7, 284:15,
284:21, 285:5,
285:11, 285:16,
285:21, 286:7,
286:10, 286:19,
287:6, 287:25,

289:12, 289:20,
289:23, 290:1,
290:3, 290:4, 290:5,
291:25, 292:9,
292:21, 292:24,
293:8, 296:7,
296:20, 297:2,
297:3, 297:5,
297:20, 299:8,
299:15, 300:19,
304:4, 305:11,
306:22, 308:17,
312:7, 315:3,
315:10, 357:10,
358:7, 365:8, 365:9,
365:12, 365:15,
365:16, 365:17,
366:1, 366:8, 367:3,
367:4, 367:21,
368:4, 371:8, 380:8
**evidentiary** [2] -
253:11, 264:12
**exact** [6] - 296:9,
296:22, 307:2,
307:13, 307:21,
312:7
**exactly** [7] - 263:1,
270:18, 296:5,
303:3, 306:23,
342:16, 365:9
**exaggerated** [1] -
331:1
**examination** [9] -
260:18, 266:13,
275:9, 275:10,
275:11, 275:14,
275:15, 349:7,
352:24
**EXAMINATION** [4] -
316:17, 348:4,
358:2, 360:5
**examine** [1] - 266:15
**examining** [3] - 318:7,
318:9, 320:12
**example** [14] - 253:23,
256:9, 329:9,
329:18, 337:18,
338:10, 341:19,
347:11, 349:13,
351:2, 352:5, 363:4,
379:16, 392:20
**examples** [1] - 312:18
**exceed** [2] - 385:6,
385:16
**exceeds** [1] - 385:17
**Excel** [2] - 337:16,
339:6
**excellence** [1] - 323:7
**exchanged** [1] -
349:23

**exclusion** [1] - 374:14
**excused** [1] - 359:12
**execute** [1] - 283:16
**executive** [7] - 279:18,
282:10, 283:10,
284:15, 294:16,
298:23, 369:8
**Exhibit** [12] - 324:15,
324:16, 366:21,
367:9, 373:1, 373:3,
373:13, 375:4,
375:11, 376:13,
380:22, 381:6
**exhibits** [1] - 275:21
**existence** [4] - 254:7,
310:16, 311:6,
339:22
**exit** [10] - 315:22,
343:17, 343:20,
343:25, 346:17,
346:18, 347:13,
347:21, 347:24,
374:10
**exits** [2] - 315:23,
396:10
**expand** [1] - 272:1
**expansive** [2] - 392:6
**expect** [9] - 253:23,
255:12, 256:4,
256:5, 257:2,
277:23, 283:3,
289:1, 302:8
**expectation** [1] -
286:22
**expecting** [1] - 311:19
**expeditious** [1] -
387:4
**experience** [3] - 300:3,
348:17, 393:2
**expert** [20] - 253:13,
259:21, 259:25,
260:20, 291:11,
298:24, 299:5,
301:4, 301:6, 322:9,
323:16, 323:22,
324:3, 324:6,
348:13, 348:16,
350:17, 354:1, 388:9
**expertise** [2] - 324:5,
362:13
**experts** [11] - 260:13,
294:17, 294:18,
300:16, 310:7,
313:16, 313:18,
313:22, 313:23,
314:6, 350:19
**explain** [15] - 254:5,
255:13, 255:14,
271:6, 291:12,
291:21, 293:7,

301:7, 304:18,
333:14, 342:24,
349:4, 379:15,
391:24, 392:5
**explained** [2] - 272:12,
283:1
**explaining** [3] - 361:3,
369:24, 369:25
**explanation** [1] -
374:15
**exploitation** [1] -
318:4
**export** [3] - 338:5,
338:7, 339:4
**express** [1] - 387:1
**extent** [10] - 268:8,
359:1, 359:3, 366:4,
389:5, 389:12,
391:2, 395:3, 395:9,
395:16
**extra** [1] - 305:10
**extraordinary** [2] -
315:7, 315:8
**extremely** [1] - 257:5
**eyes** [1] - 300:1
**eyesight** [1] - 338:15

# F

**fabricated** [5] - 258:8,
258:14, 259:11,
259:25, 261:2
**fabrication** [2] -
261:21, 262:9
**face** [1] - 281:1
**Facebook** [3] - 334:3,
337:4, 339:25
**facilitate** [1] - 319:2
**facilitated** [1] - 363:18
**fact** [25] - 256:14,
257:23, 259:11,
262:6, 263:22,
264:3, 265:17,
267:6, 269:9,
272:21, 301:5,
336:19, 340:6,
349:14, 349:16,
350:2, 350:12,
350:14, 350:17,
350:19, 352:14,
355:14, 370:16,
389:23, 393:14
**factors** [2] - 271:25,
389:14
**facts** [11] - 253:22,
254:3, 265:23,
276:14, 293:12,
324:1, 384:19,
392:3, 392:8,
392:12, 392:25

**factual** [1] - 268:14
**fair** [16] - 261:12, 276:9, 314:14, 314:15, 318:6, 319:6, 319:10, 320:2, 331:3, 335:22, 342:10, 349:8, 350:23, 353:9, 354:18, 390:9
**fairly** [3] - 325:15, 385:21, 388:4
**false** [21] - 256:21, 261:7, 272:16, 279:22, 279:24, 281:4, 283:5, 288:7, 288:9, 291:4, 297:9, 297:10, 297:23, 297:24, 308:10, 308:11, 308:15, 309:19, 314:18, 314:19
**falsified** [1] - 259:4
**familiar** [5] - 263:10, 332:21, 362:22, 365:3, 377:9
**family** [2] - 285:10, 298:6
**far** [9] - 272:7, 331:5, 354:19, 355:4, 355:5, 363:23, 375:16, 388:20
**farsight** [1] - 334:23
**fault** [1] - 277:6
**FBI** [170] - 255:3, 255:25, 256:10, 256:15, 256:17, 256:25, 257:12, 258:1, 258:13, 259:14, 259:22, 260:8, 260:12, 263:13, 263:23, 264:3, 265:3, 267:10, 268:12, 268:17, 268:18, 268:19, 272:19, 278:19, 278:20, 278:23, 279:1, 279:4, 279:7, 279:10, 279:11, 279:19, 279:23, 279:25, 280:11, 280:24, 281:1, 281:3, 281:22, 281:23, 282:20, 283:5, 283:13, 283:14, 284:9, 286:25, 287:1, 287:3, 287:13, 287:21, 288:6, 289:5, 289:11,

289:18, 289:21, 290:20, 291:3, 291:11, 292:6, 292:14, 292:23, 293:1, 293:19, 293:20, 293:21, 293:25, 294:1, 294:4, 294:20, 294:21, 295:19, 295:20, 295:24, 295:25, 296:2, 296:4, 296:9, 296:16, 296:17, 296:20, 296:21, 296:24, 296:25, 297:8, 297:22, 298:15, 298:19, 298:25, 300:12, 302:14, 302:25, 303:2, 303:9, 304:22, 304:25, 305:6, 305:8, 305:17, 307:2, 307:3, 307:6, 307:12, 307:14, 307:18, 307:24, 308:4, 308:17, 308:18, 308:25, 309:2, 309:3, 309:4, 309:6, 309:13, 309:15, 310:8, 310:20, 311:12, 311:21, 312:14, 312:24, 313:5, 317:4, 317:5, 317:7, 317:23, 318:19, 351:14, 353:3, 353:6, 354:17, 354:20, 355:13, 356:14, 357:4, 358:5, 358:13, 360:12, 360:18, 360:20, 360:24, 361:1, 361:7, 361:19, 362:7, 363:12, 363:13, 363:23, 364:2, 364:18, 364:19, 364:20, 365:6, 365:18, 366:7, 366:9, 366:14, 367:23, 369:1, 389:1, 390:2, 390:17, 390:20, 391:20, 393:2, 393:4, 393:20
**FBI's** [11] - 256:2, 258:9, 258:11, 259:9, 259:13, 279:7, 280:7, 282:5, 282:6, 289:14,

350:19
**February** [2] - 310:14, 343:22
**federal** [3] - 293:25, 294:25, 300:2
**Federal** [2] - 272:17, 316:24
**feelings** [2] - 282:14, 282:16
**fellow** [1] - 277:10
**felt** [5] - 378:18, 378:21, 378:24, 389:8, 389:22
**few** [12] - 262:19, 271:5, 276:7, 300:4, 312:18, 323:5, 326:18, 334:21, 337:1, 339:13, 348:24, 353:14
**fiberoptic** [1] - 327:15
**fictitious** [1] - 272:16
**field** [9] - 317:25, 319:22, 321:15, 337:24, 338:7, 338:22, 338:25, 363:16, 382:10
**fields** [9] - 322:19, 337:19, 337:20, 337:25, 338:3, 338:8, 338:9, 339:8, 375:25
**Fifth** [1] - 252:22
**figure** [10] - 277:22, 299:20, 305:11, 320:16, 338:23, 347:21, 350:21, 351:3, 352:14, 356:3
**file** [2] - 312:14, 337:15
**filter** [1] - 341:11
**filters** [1] - 341:3
**final** [3] - 259:1, 272:4, 276:7
**finally** [7] - 265:2, 289:1, 291:24, 331:20, 356:24, 384:9, 384:10
**financially** [1] - 362:1
**findings** [2] - 321:21, 374:3
**Findings** [1] - 373:24
**fine** [1] - 253:5
**finish** [1] - 309:18
**FiOS** [4] - 327:21, 328:1, 329:9, 330:2
**fire** [1] - 305:16
**firewalls** [1] - 341:3
**firm** [12] - 264:10, 264:11, 264:16, 264:17, 280:7,

283:21, 283:24, 284:19, 286:3, 291:21, 298:10, 301:12
**firm's** [1] - 291:22
**firms** [1] - 298:10
**first** [47] - 253:15, 255:11, 258:5, 263:4, 266:14, 269:14, 271:13, 274:24, 283:18, 286:9, 287:8, 289:22, 292:1, 297:7, 298:2, 303:15, 305:4, 305:20, 308:8, 308:17, 316:4, 317:24, 325:13, 328:9, 329:16, 340:3, 344:10, 344:13, 345:1, 345:3, 365:11, 367:20, 372:7, 375:6, 375:14, 377:22, 377:24, 378:2, 378:18, 379:13, 381:24, 382:7, 383:19, 384:9, 386:4, 386:11
**fish** [1] - 267:18
**five** [2] - 288:12, 394:7
**flag** [2] - 252:24, 255:10
**flagged** [1] - 253:15
**flat** [1] - 296:3
**flat-footed** [1] - 296:3
**focus** [1] - 377:17
**focusing** [2] - 297:6, 314:16
**folks** [3] - 257:4, 277:14, 277:16
**follow** [4] - 271:7, 275:14, 357:18, 369:16
**follow-up** [1] - 357:18
**followed** [1] - 275:9
**following** [4] - 332:19, 382:5, 382:21, 386:8
**follows** [1] - 265:24
**footed** [1] - 296:3
**footing** [1] - 288:4
**footnote** [1] - 376:21
**FOR** [1] - 250:1
**force** [2] - 346:21, 351:21
**Force** [2] - 317:25, 318:2
**foregoing** [1] - 397:4
**foreign** [6] - 267:1, 269:25, 279:3,

293:1, 362:3, 362:14
**forensics** [5] - 317:13, 320:10, 320:12, 321:1, 322:3
**Forensics** [2] - 320:8, 334:24
**form** [11] - 264:4, 367:17, 368:5, 368:6, 370:4, 370:20, 370:21, 370:23, 370:24, 371:2, 392:15
**formal** [1] - 273:9
**format** [10] - 326:11, 336:9, 336:10, 336:11, 336:14, 337:9, 337:11, 337:13, 338:6, 339:5
**formats** [1] - 337:19
**former** [3] - 291:21, 310:23, 311:2
**forth** [5] - 270:7, 289:25, 363:11, 368:18, 379:14
**foundation** [2] - 344:7, 388:8
**founded** [1] - 354:15
**four** [8] - 272:1, 272:2, 272:7, 274:23, 297:6, 297:22, 319:15
**fourth** [2] - 276:1, 297:11
**Francisco** [1] - 361:1
**fraudulent** [1] - 272:16
**freaking** [1] - 302:20
**free** [6] - 271:17, 316:12, 353:18, 359:15, 359:24, 396:5
**freedom** [1] - 346:8
**frequent** [1] - 287:12
**frequently** [3] - 319:12, 320:1, 348:15
**friend** [1] - 280:7
**friendly** [1] - 337:10
**friends** [1] - 389:20
**frontier** [1] - 344:7
**frustrated** [2] - 302:15, 370:17
**full** [11] - 300:13, 311:21, 392:2, 392:9, 392:22, 393:14, 393:19, 393:23, 393:25, 394:11, 397:5
**fullest** [1] - 272:10
**fully** [1] - 393:21
**furthermore** [1] -

383:21
**Fusion** [13] - 264:10, 264:24, 268:20, 269:9, 269:18, 269:23, 283:24, 284:4, 286:3, 286:12, 286:17, 290:18, 291:18
**Fusion's** [1] - 291:19
**FYI** [1] - 311:20

# G

**G-I-A-C** [1] - 322:11
**gain** [4] - 309:14, 309:22, 361:11, 362:14
**gains** [1] - 361:9
**game** [1] - 261:12
**games** [4] - 254:24, 254:25
**gaps** [1] - 335:22
**gathering** [1] - 300:19
**general** [16] - 263:1, 272:19, 279:7, 279:12, 279:24, 280:8, 280:24, 282:5, 282:6, 287:4, 289:14, 291:3, 301:13, 320:9, 352:8, 367:23
**General** [2] - 307:7, 364:21
**General's** [1] - 323:7
**generally** [9] - 256:14, 296:11, 315:14, 322:13, 323:24, 339:4, 360:19, 378:12, 391:7
**generated** [1] - 258:8
**gentlemen** [11] - 270:25, 278:13, 278:24, 287:24, 292:16, 314:9, 315:13, 323:24, 359:15, 383:9, 396:3
**genuine** [2] - 310:12, 310:17
**geographically** [2] - 360:23, 363:20
**get-together** [1] - 307:17
**GIAC** [2] - 322:8, 322:10
**gist** [1] - 374:21
**given** [8] - 268:24, 271:14, 281:20, 284:21, 289:11, 309:17, 321:15, 323:10

**glitch** [1] - 327:7
**global** [1] - 322:11
**goal** [1] - 255:5
**gobbledygook** [1] - 301:4
**golden** [1] - 285:22
**Google** [12] - 327:11, 328:19, 329:3, 331:20, 331:22, 332:17, 332:21, 333:1, 334:2, 335:5, 335:15, 343:15
**Google.com** [17] - 325:5, 326:20, 328:3, 328:6, 328:10, 328:13, 329:1, 330:4, 330:18, 330:22, 331:7, 332:5, 332:9, 332:10, 332:19, 332:23, 335:7
**Google.com's** [2] - 329:10, 330:24
**Government** [10] - 366:21, 367:9, 372:25, 373:3, 373:13, 375:4, 375:11, 376:13, 380:21, 381:6
**government** [51] - 252:11, 252:18, 259:20, 261:5, 262:18, 266:8, 268:23, 273:3, 273:13, 273:19, 273:20, 273:23, 274:1, 274:24, 275:7, 275:11, 275:16, 276:2, 276:3, 288:13, 293:5, 294:20, 294:25, 297:13, 298:16, 298:23, 299:1, 299:3, 300:2, 301:6, 306:21, 308:12, 309:20, 314:12, 314:14, 315:3, 320:25, 346:9, 353:9, 353:10, 354:7, 355:19, 356:21, 359:21, 362:4, 367:8, 373:12, 375:11, 381:5, 384:12, 395:11
**government's** [6] - 275:12, 279:25, 297:1, 312:3, 315:1, 316:3
**Government's** [3] -

324:15, 324:16, 324:19
**GPS** [12] - 264:10, 264:24, 268:20, 269:18, 269:23, 283:24, 284:4, 286:3, 286:12, 286:17, 290:18, 291:18
**GPS's** [1] - 269:9
**grand** [1] - 272:13
**granularity** [1] - 265:10
**graphic** [1] - 344:5
**great** [6] - 327:11, 327:18, 330:5, 333:23, 336:19, 339:24
**green** [1] - 371:3
**ground** [1] - 271:6
**group** [6] - 320:10, 320:11, 321:1, 322:12, 329:14, 343:1
**guard** [1] - 303:1
**guess** [6] - 255:2, 261:19, 262:20, 322:12, 324:25, 387:10
**guilt** [1] - 273:11
**guilty** [7] - 272:23, 273:17, 273:22, 273:24, 280:1, 289:18, 293:12
**guy** [5] - 304:6, 311:7, 311:17, 311:22, 314:3

# H

**H-E-L-L-M-A-N** [1] - 360:10
**hack** [4] - 287:11, 287:13, 287:15, 362:3
**hacked** [4] - 300:5, 300:10, 320:14, 372:6
**hackers** [1] - 334:19
**hacking** [10] - 319:5, 346:13, 361:8, 372:4, 372:5, 377:23, 378:5, 382:15, 390:15
**half** [2] - 262:3, 311:7
**hall** [1] - 277:14
**hand** [9] - 316:10, 326:4, 326:5, 327:10, 327:12, 327:17, 359:25,

365:12, 394:16
**handed** [1] - 368:12
**handled** [2] - 369:17, 370:7
**handles** [1] - 321:6
**handling** [1] - 307:7
**hands** [1] - 368:16
**handwritten** [1] - 292:2
**happy** [1] - 270:2
**hard** [9] - 306:19, 320:13, 325:21, 338:21, 338:25, 342:15, 342:17, 347:25
**hardly** [1] - 302:1
**HARDWICK** [1] - 250:18
**hate** [1] - 292:17
**header** [2] - 339:5, 339:7
**headers** [1] - 338:19
**heading** [2] - 335:12, 373:23
**headquarters** [10] - 263:13, 263:23, 268:19, 279:5, 318:20, 361:1, 363:13, 363:23, 366:14, 382:8
**heads** [2] - 295:25, 302:25
**Health** [1] - 374:10
**hear** [49] - 254:9, 262:18, 273:25, 276:17, 277:20, 281:18, 283:18, 283:22, 284:12, 286:13, 286:19, 287:8, 288:11, 288:17, 288:19, 289:1, 289:22, 290:1, 291:1, 291:3, 291:5, 291:9, 291:11, 291:13, 291:15, 291:18, 291:20, 293:7, 295:12, 296:9, 298:3, 298:6, 300:10, 301:14, 302:5, 302:9, 303:7, 304:4, 305:7, 306:6, 306:9, 306:11, 313:20, 313:25, 314:22, 314:23, 314:24, 323:25, 391:15
**heard** [10] - 292:21, 294:9, 295:21, 296:7, 301:5,

301:11, 304:16, 305:24, 310:13, 354:14
**heating** [1] - 283:20
**heavily** [1] - 331:4
**HELD** [1] - 250:10
**Hellman** [26] - 256:5, 257:16, 257:24, 258:4, 258:21, 359:22, 359:23, 360:7, 360:10, 360:11, 361:19, 365:3, 366:20, 367:14, 373:19, 375:5, 375:14, 376:22, 380:11, 380:23, 381:13, 383:18, 386:9, 396:1, 396:11
**HELLMAN** [2] - 251:6, 360:4
**hello** [1] - 252:14
**help** [25] - 276:5, 280:15, 281:3, 291:21, 291:22, 296:4, 296:25, 299:6, 299:19, 299:21, 299:22, 300:16, 303:3, 305:3, 311:11, 319:2, 324:4, 342:22, 344:3, 363:18, 393:18, 395:7, 395:14
**helped** [1] - 382:10
**helping** [2] - 301:10, 319:4
**helps** [3] - 296:23, 342:24, 394:22
**hereby** [1] - 397:3
**hid** [2] - 289:11, 289:12
**hidden** [1] - 312:21
**hide** [6] - 310:5, 311:5, 311:24, 385:14, 385:25, 386:2
**hiding** [1] - 385:14
**Hiede** [1] - 391:6
**high** [4] - 262:4, 278:25, 281:22, 284:15
**high-level** [1] - 262:4
**high-powered** [1] - 278:25
**high-ranking** [2] - 281:22, 284:15
**highest** [3] - 278:19, 307:6, 307:24
**highly** [1] - 354:3
**Hillary** [4] - 272:22,

282:10, 282:16, 283:10
**himself** [5] - 288:13, 301:25, 308:1, 310:7, 313:8
**hired** [5] - 269:10, 283:23, 283:25, 287:9, 300:11
**hit** [2] - 254:23, 332:23
**hmm** [1] - 393:16
**hold** [1] - 305:2
**hole** [1] - 340:23
**home** [3] - 254:24, 328:2, 392:22
**honest** [1] - 298:6
**Honor** [51] - 252:2, 252:9, 252:17, 253:6, 253:14, 253:23, 254:2, 254:5, 255:10, 256:5, 256:22, 257:15, 257:19, 258:20, 259:8, 259:17, 260:17, 261:14, 261:17, 261:25, 262:13, 262:17, 263:4, 264:6, 264:14, 264:22, 265:2, 265:8, 268:13, 269:2, 269:5, 270:1, 270:5, 270:20, 274:6, 274:10, 278:16, 316:6, 323:15, 324:7, 324:18, 357:24, 358:1, 359:21, 367:8, 373:12, 375:10, 381:5, 388:6, 394:6, 396:18
**Honor's** [1] - 257:25
**HONORABLE** [1] - 250:10
**hope** [3] - 271:2, 277:23, 286:22
**hoped** [1] - 283:13
**hosted** [1] - 376:23
**hour** [3] - 363:25, 396:4, 396:12
**hours** [2] - 302:23, 348:23
**house** [1] - 328:1
**http** [2] - 327:7, 332:18
**huge** [1] - 285:6
**human** [2] - 325:4, 355:12
**humans** [1] - 336:13
**hundred** [2] - 298:10, 298:11
**hundreds** [3] - 325:22,

348:23, 377:2
**hurdle** [1] - 309:20
**hurdles** [1] - 297:16
**hurts** [1] - 296:23

**I**

**idea** [5] - 322:20, 328:7, 357:21, 359:6, 391:18
**identified** [1] - 378:2
**identify** [5] - 334:19, 370:17, 372:2, 377:22, 382:15
**identifying** [2] - 387:4, 387:18
**ignore** [1] - 327:6
**illegal** [1] - 284:3
**illustrate** [1] - 324:12
**illustrated** [1] - 340:16
**illustrating** [1] - 331:2
**illustrations** [1] - 334:2
**immediately** [1] - 269:17
**imminent** [2] - 302:16, 302:22
**impact** [1] - 395:13
**important** [10] - 254:8, 277:9, 307:16, 309:20, 310:21, 313:1, 313:2, 313:4, 313:7, 342:12
**importantly** [1] - 267:21
**impression** [1] - 268:4
**IN** [3] - 250:1, 271:1, 293:17
**inaccurate** [1] - 259:23
**incident** [2] - 317:13, 322:3
**Incident** [1] - 319:16
**incidents** [1] - 319:5
**inclined** [1] - 268:10
**included** [5] - 255:4, 284:23, 319:10, 320:2, 326:6
**including** [7] - 259:20, 273:15, 277:10, 277:25, 286:16, 322:8, 354:8
**inconsistent** [2] - 261:5, 267:15
**incredibly** [1] - 265:21
**independent** [4] - 278:6, 389:13, 394:1, 394:19
**indicate** [1] - 343:17
**indicated** [1] - 337:25

**indicating** [1] - 335:11
**indicted** [1] - 273:12
**indictment** [7] - 270:17, 270:19, 272:13, 273:7, 273:8, 273:11, 281:5
**Individual** [1] - 367:18
**individual** [1] - 367:24
**individuals** [2] - 389:1, 393:3
**inference** [1] - 267:22
**infinite** [1] - 254:14
**influence** [1] - 285:23
**infographic** [1] - 344:6
**inform** [1] - 252:19
**informant** [2] - 294:21, 298:25
**information** [65] - 263:12, 263:15, 267:7, 268:12, 279:12, 281:7, 281:20, 285:8, 286:14, 286:18, 286:25, 294:6, 294:10, 295:3, 295:7, 295:12, 299:19, 302:20, 303:13, 308:5, 310:7, 311:12, 311:14, 313:3, 317:12, 322:12, 322:16, 323:7, 330:8, 334:17, 336:11, 336:23, 337:1, 337:6, 338:1, 350:23, 351:7, 351:8, 351:21, 351:25, 352:7, 352:23, 358:15, 358:19, 362:2, 362:5, 362:14, 363:11, 364:2, 364:17, 364:20, 364:22, 365:20, 365:21, 368:1, 370:18, 385:13, 385:14, 393:3, 393:8, 393:9, 393:12, 393:13, 393:17, 393:18
**initial** [5] - 258:9, 368:6, 368:8, 386:19, 395:8
**initials** [1] - 300:8
**inject** [1] - 279:10
**injustice** [1] - 315:9
**innocent** [1] - 273:16
**inquiry** [2] - 329:3, 391:20
**inside** [3] - 295:2,

381:15, 381:16
**insight** [3] - 255:17, 256:15
**instead** [3] - 288:2, 325:22, 343:9
**institute** [1] - 317:14
**institution** [4] - 282:20, 293:21, 294:20, 307:18
**instruct** [3] - 276:11, 276:12, 283:3
**instructed** [1] - 286:13
**instructions** [10] - 270:13, 270:15, 271:5, 271:8, 271:9, 272:5, 273:5, 275:23, 275:25, 276:7
**instructs** [2] - 283:2, 293:10
**intellectual** [4] - 318:4, 360:22, 361:4, 361:13
**intelligence** [8] - 267:1, 267:6, 267:8, 267:9, 268:17, 268:21, 269:1, 270:7
**intend** [6] - 253:21, 263:21, 297:10, 297:24, 309:19, 314:19
**intended** [4] - 261:19, 271:10, 275:3, 276:4
**intensive** [1] - 331:4
**intent** [1] - 310:20
**intentionally** [2] - 257:21, 258:8
**interacted** [2] - 298:15, 300:12
**interaction** [2] - 350:4, 370:13
**interactions** [5] - 303:16, 304:9, 304:20, 391:8
**interest** [3] - 310:12, 310:17, 395:10
**interested** [2] - 338:8, 363:4
**interests** [2] - 284:16, 309:11
**interference** [1] - 300:4
**internal** [2] - 290:20, 328:11
**Internet** [45] - 279:18, 282:10, 283:10, 284:16, 284:17, 284:22, 284:23, 285:2, 285:4, 285:7, 285:8, 286:14,

286:15, 291:16, 294:16, 298:23, 299:11, 318:13, 318:15, 320:3, 325:13, 327:14, 327:16, 328:24, 331:4, 331:10, 333:17, 333:25, 336:1, 339:20, 341:20, 341:22, 342:3, 342:16, 342:23, 342:25, 343:2, 343:7, 343:9, 343:12, 343:21, 344:8, 347:15, 349:10, 387:12
**internet** [1] - 328:2
**Internet-intensive** [1] - 331:4
**interpret** [1] - 368:3
**intertwined** [1] - 256:23
**interview** [2] - 303:21, 351:16
**interviewed** [7] - 303:24, 305:9, 313:7, 313:12, 313:17, 313:21
**introduce** [3] - 262:22, 274:5, 316:19
**introduced** [3] - 274:3, 302:11, 383:12
**introduces** [1] - 306:22
**intrusion** [3] - 318:3, 319:4, 321:1
**intrusions** [1] - 319:18
**investigate** [12] - 281:23, 287:21, 304:25, 312:5, 319:19, 360:17, 363:17, 372:5, 378:5, 382:16, 390:11, 390:15
**investigated** [2] - 291:9, 357:5
**investigates** [3] - 255:15, 305:7, 361:25
**investigating** [6] - 313:17, 360:22, 360:25, 361:8, 382:10
**Investigation** [2] - 272:18, 316:25
**investigation** [40] - 255:7, 256:2, 258:2, 258:11, 259:1, 259:13, 260:23, 281:24, 283:15,

410

287:13, 287:19,
304:22, 307:9,
312:5, 313:8,
313:10, 317:18,
320:4, 350:25,
352:8, 383:23,
384:5, 389:3, 390:6,
390:18, 390:23,
390:24, 391:21,
392:7, 392:9,
392:15, 392:23,
393:6, 393:15,
393:19, 393:23,
393:25, 394:3,
394:10
**investigations** [16] -
307:8, 318:7, 318:9,
319:3, 319:7,
319:25, 321:11,
321:15, 321:21,
360:16, 362:20,
385:23, 391:22,
392:2, 393:3
**investigative** [9] -
257:5, 264:17,
283:24, 312:14,
358:14, 382:4,
382:19, 392:18,
392:23
**investigator** [1] -
350:22
**investigators** [3] -
284:6, 360:17, 386:7
**invisible** [1] - 332:25
**invoke** [1] - 252:22
**involve** [1] - 282:17
**involved** [11] - 266:11,
300:18, 300:20,
301:9, 301:10,
312:6, 313:9, 318:7,
318:9, 362:20, 390:3
**involvement** [4] -
324:1, 367:5,
390:22, 390:24
**involves** [1] - 320:4
**involving** [1] - 385:23
**IP** [54] - 257:23, 325:5,
325:16, 326:13,
326:14, 326:18,
327:19, 328:1,
328:12, 328:17,
329:1, 329:10,
329:14, 330:1,
330:4, 330:18,
330:21, 330:24,
331:9, 331:11,
331:18, 331:22,
332:2, 332:6,
332:12, 332:16,
335:6, 336:20,

337:4, 338:18,
339:1, 339:2, 339:3,
339:18, 339:19,
340:7, 340:9,
340:11, 340:17,
340:21, 340:23,
340:24, 341:5,
341:7, 343:23,
345:2, 350:8, 363:5,
363:7, 363:10,
375:18, 384:15
**IPs** [1] - 343:20
**issue** [9] - 253:16,
255:11, 261:21,
262:1, 294:19,
301:3, 352:10,
352:13, 368:5
**issued** [2] - 272:13,
305:9
**issues** [7] - 253:12,
253:15, 267:24,
291:19, 298:14,
319:24, 352:19
**issuing** [1] - 351:23
**item** [1] - 329:17
**itself** [11] - 255:20,
300:14, 307:2,
309:4, 309:13,
331:22, 350:7,
372:20, 375:1,
380:17, 387:25
**IV** [1] - 250:13

## J

**James** [9] - 280:7,
281:18, 288:22,
288:23, 291:3,
292:2, 292:6,
364:21, 367:23
**Jane's** [2] - 345:13,
345:16
**Jenkins** [2] - 277:21,
315:18
**Jim** [3] - 307:25,
309:5, 310:6
**job** [3] - 299:22,
318:19, 381:19
**jobs** [1] - 277:5
**Joffe** [46] - 272:22,
282:11, 283:11,
284:11, 284:13,
284:15, 284:17,
284:22, 285:6,
285:11, 285:16,
285:24, 286:1,
286:3, 286:10,
286:13, 286:20,
288:10, 289:9,
291:16, 294:9,
294:15, 294:16,

294:17, 294:24,
295:2, 295:5,
295:15, 298:23,
299:5, 299:8,
299:18, 299:24,
300:16, 302:11,
305:8, 309:10,
309:14, 309:15,
309:17, 353:19,
354:12, 355:12,
358:21, 358:22,
359:7
**Joffe's** [4] - 291:15,
294:24, 300:1,
309:11
**John** [1] - 274:9
**joined** [2] - 274:8,
317:15
**jointly** [1] - 389:6
**Jonathan** [2] - 252:11,
274:8
**JONATHAN** [1] -
250:13
**Jordan** [1] - 366:7
**JSON** [1] - 336:10
**judge** [8] - 265:21,
276:15, 279:21,
313:5, 314:7,
352:19, 352:22,
358:17
**JUDGE** [1] - 250:10
**Judge** [3] - 283:1,
293:7, 293:9
**July** [1] - 265:25
**july** [1] - 317:5
**jumbo** [1] - 301:2
**jump** [2] - 297:15,
347:9
**jumped** [1] - 378:19
**juror** [1] - 277:10
**jurors** [6] - 253:9,
271:12, 271:14,
272:10, 315:6, 315:8
**JURORS** [2] - 271:1,
293:17
**JURY** [1] - 250:9
**jury** [28] - 254:6,
255:13, 255:14,
258:10, 268:4,
269:3, 270:10,
270:24, 272:3,
272:5, 272:13,
278:11, 278:24,
293:4, 315:23,
316:20, 324:4,
324:11, 326:1,
349:4, 361:4,
367:13, 374:3,
381:11, 383:14,
391:24, 392:5,

396:10
**Justice** [4] - 280:19,
298:8, 307:5, 307:19
**justice** [1] - 315:7
**justify** [1] - 393:14

## K

**keep** [5] - 253:21,
295:23, 302:2,
314:21, 345:24
**keeps** [1] - 343:19
**Keilty** [2] - 252:11,
274:9
**KEILTY** [1] - 250:13
**Kelly** [1] - 366:7
**kettle** [1] - 267:18
**key** [7] - 297:6, 298:1,
314:16, 318:10,
332:23, 338:20,
387:17
**kind** [23] - 284:13,
284:14, 301:4,
309:7, 319:9, 325:6,
325:7, 330:7, 333:8,
333:10, 335:22,
335:24, 337:3,
337:18, 338:25,
340:22, 342:12,
344:20, 346:9,
350:12, 375:15,
391:20, 394:10
**kinds** [2] - 318:14,
360:19
**knocked** [1] - 379:25
**knowing** [3] - 311:16,
332:16, 394:22
**knowingly** [3] -
272:15, 279:23,
283:5
**knowledge** [2] -
322:17, 351:13
**knowledgeable** [1] -
266:12
**known** [10] - 267:7,
280:18, 284:24,
318:16, 319:16,
332:18, 354:5,
362:22, 372:2,
376:24
**knows** [15] - 328:18,
329:25, 330:23,
330:24, 331:22,
332:5, 332:8,
342:15, 344:22,
344:24, 345:1,
345:2, 345:3, 345:5,
357:8
**Kori** [2] - 252:25,
274:9

**Kremlin** [1] - 265:19

## L

**labeled** [1] - 334:5
**Labor** [1] - 302:6
**labs** [1] - 325:15
**lack** [4] - 255:17,
256:15, 258:23,
258:24
**ladies** [11] - 270:25,
278:13, 278:24,
287:24, 292:16,
314:9, 315:13,
323:24, 359:15,
383:9, 396:3
**landed** [1] - 267:10
**landscape** [1] - 356:4
**language** [1] - 392:13
**laptop** [1] - 327:18
**large** [1] - 377:1
**large-scale** [1] - 377:1
**largely** [2] - 266:2,
283:15
**larger** [1] - 267:19
**largest** [2] - 318:15
**last** [17] - 252:20,
262:1, 295:20,
308:24, 312:1,
316:20, 331:16,
331:18, 335:4,
338:2, 354:22,
354:25, 355:2,
355:5, 355:8, 383:8,
385:3
**LATHAM** [1] - 250:19
**law** [20] - 264:11,
264:16, 275:24,
276:11, 276:12,
280:6, 283:2, 283:4,
283:20, 291:21,
292:19, 292:25,
293:7, 293:11,
298:10, 301:12,
352:2, 352:8,
352:13, 352:16
**laws** [1] - 283:3
**lawyer** [26] - 278:18,
278:20, 278:21,
279:1, 279:7, 279:8,
280:8, 284:18,
286:2, 287:9,
287:15, 293:24,
294:2, 294:6,
298:13, 299:22,
300:11, 300:13,
309:7, 312:9,
312:11, 312:16,
312:17, 312:19
**lawyers** [6] - 274:2,

275:2, 275:18, 277:16, 301:21, 304:3
**lay** [2] - 257:18, 323:25
**layers** [1] - 374:17
**lead** [2] - 360:16
**leading** [5] - 294:17, 294:18, 298:24, 348:17
**leak** [2] - 286:8, 286:19
**leaked** [1] - 286:20
**leap** [1] - 309:21
**learn** [8] - 281:21, 284:4, 284:17, 284:25, 286:1, 307:23, 310:17, 364:18
**learned** [5] - 252:20, 269:14, 364:1, 364:17, 364:20
**least** [6] - 259:7, 266:10, 269:22, 287:7, 375:21, 392:6
**leave** [6] - 268:4, 285:3, 315:6, 315:18, 315:20, 315:21
**left** [12] - 267:4, 281:17, 302:5, 326:4, 327:9, 327:17, 335:12, 368:7, 368:9, 368:10, 368:22, 368:23
**left-hand** [2] - 326:4, 327:17
**legal** [5] - 271:8, 276:10, 283:21, 351:20, 358:19
**less** [10] - 257:1, 277:6, 303:6, 309:16, 322:22, 322:25, 332:23, 336:13, 338:1, 394:6
**letters** [1] - 301:3
**level** [17] - 262:4, 262:8, 307:6, 329:21, 330:9, 331:15, 343:5, 349:9, 349:11, 349:12, 351:12, 362:25, 373:20, 392:7, 392:19, 393:6, 394:2
**levels** [8] - 278:19, 298:16, 307:24, 391:21, 391:24, 392:1, 392:4, 392:5

**Lichtblau** [5] - 302:8, 302:10, 302:11
**lie** [20] - 278:20, 279:8, 279:9, 279:11, 282:5, 283:8, 286:8, 286:23, 287:7, 288:12, 288:21, 288:22, 290:8, 290:21, 292:4, 292:15, 293:19, 293:20, 304:6, 310:3
**lied** [7] - 279:8, 279:19, 281:1, 282:5, 289:18, 289:21, 292:22
**lies** [1] - 289:2
**life** [1] - 304:6
**likely** [8] - 253:1, 256:5, 257:1, 263:7, 265:2, 268:7, 276:17, 277:14
**line** [4] - 265:22, 297:19, 381:22, 386:6
**lines** [3] - 327:13, 361:16, 367:15
**link** [2] - 256:20, 259:6
**links** [1] - 357:5
**Linux** [1] - 340:22
**Lisa** [1] - 250:22
**LISA** [1] - 397:3
**list** [6] - 252:21, 343:17, 343:19, 344:15, 386:15, 386:23
**listed** [1] - 337:20
**listening** [3] - 277:11, 314:10, 314:11
**Listrak** [1] - 376:24
**litigants** [1] - 352:6
**littered** [1] - 312:15
**Littleton** [1] - 317:19
**live** [1] - 303:9
**livelihood** [2] - 298:20, 310:1
**lives** [1] - 299:11
**LLP** [1] - 250:19
**loaded** [1] - 292:8
**local** [2] - 328:16, 331:7
**located** [2] - 318:22, 360:23
**locked** [1] - 271:18
**log** [6] - 335:10, 335:11, 338:4, 375:17, 375:19
**logged** [1] - 371:20
**logical** [1] - 329:14
**logistically** [1] - 261:17

**logs** [4] - 336:16, 337:6, 337:9, 339:23
**long-time** [1] - 294:9
**look** [68] - 253:19, 253:25, 256:1, 257:20, 257:22, 262:2, 285:1, 286:8, 286:9, 299:9, 299:11, 311:8, 314:1, 326:7, 326:9, 327:2, 328:11, 329:17, 331:2, 331:7, 332:7, 333:19, 333:20, 333:25, 335:4, 337:3, 337:4, 337:7, 339:15, 339:17, 339:22, 340:2, 340:3, 340:4, 340:5, 340:8, 340:9, 340:11, 340:16, 340:17, 340:21, 341:1, 341:5, 341:10, 342:2, 343:24, 349:8, 349:16, 349:17, 349:18, 350:7, 350:8, 350:11, 350:14, 368:14, 370:20, 371:25, 372:1, 375:1, 375:14, 375:25, 387:12, 387:19, 395:13
**Look** [1] - 311:20
**look-up** [27] - 253:25, 327:2, 332:7, 333:19, 333:20, 335:4, 337:3, 339:15, 339:17, 339:22, 340:2, 340:4, 340:5, 340:8, 340:9, 340:11, 340:16, 349:8, 349:16, 349:17, 349:18, 350:7, 350:8, 350:11, 350:14, 387:12
**look-ups** [6] - 253:19, 257:22, 299:9, 331:2, 333:25, 342:2
**looked** [16] - 255:4, 255:25, 260:23, 286:12, 305:16, 336:20, 337:6, 337:24, 339:17, 340:11, 350:1, 373:9, 386:5, 386:15, 391:16
**looking** [25] - 253:24,

285:8, 318:7, 333:2, 333:21, 337:9, 337:15, 338:10, 345:12, 358:14, 362:14, 372:19, 372:23, 373:3, 375:19, 378:6, 379:1, 379:5, 381:2, 384:2, 384:3, 386:13, 386:17, 387:17, 394:18
**looks** [7] - 262:12, 300:22, 338:1, 361:10, 368:20, 375:16, 386:13
**lose** [2] - 309:24
**loud** [1] - 312:22
**lower** [1] - 394:2
**lower-level** [1] - 394:2
**lowest** [2] - 392:14, 392:19
**lunch** [5] - 396:4, 396:8, 396:12, 396:19, 396:22
**lying** [2] - 307:22, 309:23

## M

**M-A-R-T-I-N** [1] - 316:22
**mail** [2] - 386:22, 387:8
**mail1.trump** [4] - 376:2, 376:9, 376:18, 376:22
**mail1.trump-email.** **com** [2] - 376:2, 376:18
**main** [3] - 253:16, 313:10, 392:16
**maintain** [1] - 354:6
**major** [5] - 280:6, 281:12, 283:20, 287:2, 319:17
**malicious** [1] - 346:12
**malware** [4] - 320:15, 320:17, 321:1, 322:3
**man** [5] - 298:5, 298:6, 298:7, 308:1, 353:19
**manage** [2] - 320:24, 382:10
**managed** [2] - 319:1, 320:8
**management** [1] - 376:25
**manager** [2] - 363:14, 363:15
**manages** [1] - 321:6
**manipulated** [1] -

283:13
**Manos** [1] - 252:20
**map** [1] - 325:4
**mapping** [1] - 325:23
**maps** [1] - 325:8
**marked** [2] - 375:4, 380:21
**marketing** [4] - 282:1, 377:1, 377:16
**marshals** [1] - 277:21
**Martin** [19] - 253:17, 253:21, 253:24, 255:12, 316:7, 316:19, 316:22, 316:23, 323:16, 323:22, 324:6, 324:9, 327:22, 338:19, 348:2, 348:6, 355:1, 358:4, 359:11
**MARTIN** [2] - 251:3, 316:16
**mask** [2] - 316:12, 359:25
**master's** [3] - 317:11, 323:12, 348:21
**match** [1] - 341:6
**matches** [1] - 341:7
**materiality** [5] - 255:15, 255:21, 256:21, 258:3, 264:15
**materially** [3] - 272:16, 279:24, 283:5
**materials** [12] - 264:19, 366:9, 369:12, 369:17, 369:19, 369:21, 371:12, 371:18, 371:20, 371:23, 372:17, 383:1
**math** [1] - 317:10
**matter** [21] - 254:19, 263:11, 264:17, 264:18, 272:17, 287:14, 287:21, 289:16, 292:23, 297:11, 297:24, 304:2, 307:7, 312:1, 312:2, 312:8, 314:20, 390:18, 395:3, 395:4, 395:9
**mattered** [5] - 290:22, 308:8, 314:1, 394:12, 394:16, 394:17, 395:1, 395:16
**matters** [5] - 252:18, 306:25, 349:1, 349:2, 362:20

**mean** [28] - 255:5, 259:12, 260:6, 263:15, 265:13, 274:2, 274:12, 287:14, 326:18, 329:6, 331:6, 338:21, 338:22, 339:23, 341:14, 342:15, 349:17, 349:19, 350:6, 351:18, 351:23, 352:4, 365:6, 375:18, 383:25, 384:18, 385:10, 385:19
**meaning** [1] - 378:3
**means** [8] - 257:17, 277:2, 322:14, 339:8, 341:15, 362:15, 367:19, 385:20
**mechanism** [1] - 365:7
**media** [3] - 277:24, 278:1, 278:7
**meet** [5] - 280:9, 280:20, 280:21, 287:18, 302:9
**meeting** [49] - 263:5, 264:3, 266:1, 266:9, 266:10, 266:19, 266:22, 266:24, 268:8, 269:15, 269:18, 281:19, 287:3, 288:13, 288:17, 288:19, 288:20, 290:11, 291:6, 292:3, 292:7, 296:8, 296:9, 296:16, 296:17, 303:7, 303:8, 303:10, 303:11, 303:15, 303:22, 304:7, 304:10, 305:22, 306:1, 307:3, 307:16, 307:24, 308:19, 309:14, 310:24, 311:8, 311:10, 311:15, 311:17, 311:18, 357:15, 357:17
**meetings** [4] - 286:5, 289:5, 289:8, 302:10
**meets** [2] - 303:5, 304:23
**member** [2] - 274:12, 277:24
**members** [2] - 277:10, 285:10
**memo** [2] - 309:6,

311:1
**memorialized** [1] - 291:7
**memories** [1] - 278:12
**memorize** [3] - 325:22, 326:17, 326:19
**memory** [3] - 306:7, 306:14, 306:15
**mention** [1] - 289:22
**mentioned** [7] - 317:20, 346:16, 347:11, 367:24, 369:14, 377:22, 390:2
**merely** [1] - 281:25
**message** [5] - 296:5, 305:21, 379:20, 380:6
**messing** [1] - 346:22
**met** [17] - 266:6, 267:22, 269:7, 280:24, 281:2, 286:11, 292:2, 295:14, 295:15, 297:21, 304:16, 310:23, 348:8, 353:20, 353:21, 353:24, 357:2
**methodology** [6] - 378:21, 378:22, 382:23, 386:25, 387:21, 388:14
**Michael** [21] - 252:4, 252:11, 272:14, 274:9, 274:18, 274:19, 278:25, 293:19, 293:22, 293:23, 295:3, 295:4, 295:18, 295:19, 297:7, 305:20, 309:5, 309:22, 313:8, 313:12
**MICHAEL** [3] - 250:6, 250:13, 250:17
**Michigan** [1] - 374:11
**microphone** [2] - 338:13, 338:15
**middle** [2] - 272:8, 345:5
**midway** [1] - 363:13
**might** [32] - 258:6, 258:7, 258:8, 261:10, 277:24, 282:23, 287:18, 289:23, 291:13, 291:23, 305:15, 323:25, 324:11, 327:1, 331:4, 334:14, 334:22,

337:10, 338:25, 339:23, 346:21, 349:22, 380:12, 392:6, 393:14, 393:17, 393:20, 393:21, 394:1, 394:2, 395:15, 395:23
**million** [2] - 284:19, 294:23
**millions** [4] - 294:25, 299:2, 335:19, 354:8
**mind** [2] - 314:21, 361:3
**minors** [1] - 317:10
**minute** [1] - 295:21
**minutes** [5] - 303:6, 315:15, 315:25, 394:7, 396:5
**misleading** [1] - 268:4
**misled** [1] - 290:22
**misrepresenting** [1] - 256:19
**miss** [1] - 387:10
**mission** [1] - 292:25
**mistake** [2] - 288:24, 292:23
**mix** [1] - 258:22
**moment** [2] - 302:15, 304:21
**Monday** [3] - 304:8, 304:11, 305:22
**money** [1] - 362:2
**monitors** [1] - 300:23
**month** [1] - 364:8
**months** [5] - 288:12, 300:4, 303:22, 307:3, 310:14
**MOREIRA** [1] - 397:3
**Moreira** [3] - 250:22, 278:8, 397:10
**MORNING** [1] - 250:6
**morning** [20] - 252:2, 252:5, 252:9, 252:12, 252:13, 252:16, 270:25, 271:1, 274:7, 274:15, 293:16, 293:17, 315:14, 315:15, 316:19, 338:24, 348:6, 348:7, 360:7, 360:8
**Moscow** [2] - 374:8, 374:9
**most** [19] - 272:10, 298:1, 307:17, 313:10, 318:15, 320:18, 321:17, 322:15, 326:5, 331:6, 339:15,

343:5, 349:8, 350:6, 360:25, 387:3, 392:6
**mostly** [2] - 321:18, 382:11
**motion** [1] - 253:16
**motivated** [2] - 310:12, 362:1
**motivation** [5] - 313:6, 313:19, 393:7, 393:9, 395:3
**motivations** [7] - 313:2, 313:12, 313:14, 313:23, 314:5, 393:20, 395:23
**motive** [4] - 264:13, 264:14, 267:25, 393:16
**motives** [1] - 393:24
**mouth** [1] - 295:23
**move** [5] - 324:18, 324:23, 331:14, 339:9, 339:12
**moved** [6] - 320:7, 324:22, 363:13, 367:11, 375:13, 381:10
**MR** [81] - 252:9, 252:16, 252:17, 253:6, 253:14, 255:9, 256:4, 256:22, 257:8, 257:15, 257:19, 258:15, 258:20, 259:8, 259:17, 260:5, 260:8, 261:14, 261:17, 261:25, 262:12, 262:15, 262:17, 262:24, 263:3, 263:17, 264:5, 264:14, 264:22, 265:8, 265:17, 265:21, 266:5, 266:7, 266:14, 266:23, 267:13, 268:13, 269:2, 269:5, 270:1, 270:4, 270:5, 270:20, 274:15, 293:16, 293:18, 301:1, 304:1, 323:20, 324:21, 348:5, 355:7, 355:9, 355:11, 357:24, 358:23, 359:19, 359:21, 360:6, 361:18, 367:8, 367:10, 367:12, 373:12, 373:14,

373:16, 373:18, 375:10, 375:12, 376:20, 381:5, 381:7, 381:9, 381:12, 388:6, 388:8, 394:6, 395:25, 396:18, 396:21
**MS** [18] - 274:6, 278:16, 316:6, 316:18, 323:15, 323:18, 324:7, 324:8, 324:18, 324:23, 325:1, 326:22, 338:14, 345:24, 348:2, 358:1, 358:3, 359:10
**mud** [1] - 306:16
**multiple** [8] - 303:15, 340:19, 349:2, 351:4, 353:11, 366:3, 367:2, 374:17
**must** [7] - 273:3, 273:10, 273:24, 276:21, 277:3, 278:11

# N

**Name** [4] - 284:24, 325:2, 325:11, 362:23
**name** [25] - 254:16, 270:18, 274:7, 274:17, 316:20, 316:22, 325:8, 330:11, 331:18, 338:25, 339:18, 340:24, 341:10, 349:25, 353:19, 360:9, 363:10, 379:6, 379:7, 384:12, 384:24, 387:7, 391:2
**named** [2] - 282:10, 366:7
**namely** [2] - 272:18, 272:22
**names** [10] - 325:4, 325:23, 326:4, 326:6, 334:21, 341:1, 341:5, 369:23, 391:2
**narrative** [10] - 369:24, 372:1, 372:11, 372:23, 372:24, 373:7, 373:25, 375:9, 378:9, 389:10
**narrow** [2] - 386:16, 386:22
**Natalie** [1] - 274:18

413

**NATALIE** [1] - 250:18
**Nate** [5] - 364:24, 366:6, 366:19, 369:13, 372:14
**National** [4] - 287:10, 300:6, 312:10, 312:20
**national** [4] - 282:3, 290:25, 293:23, 294:1, 294:5, 294:6, 298:12, 304:3, 310:13, 310:18, 311:12, 312:10, 362:20
**nature** [2] - 356:11, 391:7
**necessarily** [3] - 353:11, 353:15, 377:14
**necessary** [1] - 305:11
**need** [9] - 313:20, 327:22, 350:22, 350:23, 365:13, 365:14, 365:15, 371:8, 393:17
**needs** [2] - 255:14, 363:5
**negative** [1] - 283:14
**negatively** [1] - 256:2
**net** [2] - 329:23, 331:17
**Netflix** [1] - 347:5
**network** [14] - 318:10, 318:12, 319:2, 319:3, 321:6, 322:2, 323:14, 324:13, 334:18, 342:22, 343:3, 343:5, 344:14, 361:10
**networks** [2] - 318:14, 341:4
**Neustar** [2] - 334:24, 354:11
**neutral** [1] - 393:21
**neutrally** [1] - 388:4
**never** [14] - 260:9, 260:12, 260:13, 260:16, 260:22, 293:2, 298:21, 306:12, 308:1, 327:11, 328:10, 329:15, 348:8
**New** [6] - 250:20, 286:21, 295:13, 302:7, 302:22, 305:1
**new** [4] - 329:17, 345:13, 345:14
**news** [4] - 281:12, 283:14, 287:2, 303:12

**next** [45] - 271:7, 274:23, 277:13, 280:10, 292:5, 294:1, 303:5, 308:10, 318:18, 320:6, 326:22, 328:4, 328:14, 328:15, 328:22, 329:11, 330:6, 330:15, 330:20, 331:19, 331:25, 332:4, 332:15, 332:20, 333:12, 334:25, 336:3, 337:2, 337:17, 339:12, 342:19, 344:2, 344:17, 344:18, 344:24, 345:10, 345:21, 347:12, 365:14, 366:12, 366:15, 368:9, 368:18, 369:4, 384:8
**nice** [2] - 274:15, 396:8
**night** [2] - 262:1, 290:11
**nobody** [1] - 293:21
**node** [9] - 343:25, 344:24, 344:25, 345:3, 345:5, 346:17, 346:19, 347:13, 347:21
**node'** [1] - 374:10
**node's** [1] - 345:2
**nodes** [7] - 343:18, 343:20, 344:15, 344:22, 344:23, 345:15, 347:24
**none** [4] - 304:13, 308:7, 313:13, 335:17
**nonexpert** [1] - 299:13
**nonprofit** [2] - 343:2, 344:7
**nonsensical** [1] - 298:4
**normal** [2] - 278:22, 279:6
**Northeast** [1] - 250:15
**northern** [1] - 343:13
**notably** [1] - 304:13
**note** [1] - 257:8
**notebook** [2] - 271:14, 271:21
**notebooks** [1] - 271:18
**noted** [1] - 271:22
**notes** [26] - 263:10, 263:11, 264:9,

266:25, 271:15, 271:16, 271:17, 278:12, 291:8, 292:2, 303:6, 304:8, 304:14, 304:17, 304:18, 304:19, 304:20, 306:18, 310:21, 310:22, 312:13, 312:14, 315:18, 315:21, 397:5
**nothing** [14] - 284:3, 296:14, 301:21, 303:9, 305:13, 306:21, 309:14, 309:23, 335:9, 357:11, 359:10, 378:4, 382:16, 396:16
**notice** [3] - 271:13, 280:20, 383:10
**notifications** [1] - 253:13
**notion** [2] - 264:15, 377:9
**NS1.Google.com** [1] - 330:25
**nuances** [1] - 348:12
**number** [18] - 266:20, 266:25, 267:20, 269:16, 269:17, 272:1, 272:8, 291:1, 325:9, 326:9, 346:6, 367:14, 371:25, 378:21, 379:1, 386:17, 392:20
**numbers** [9] - 301:2, 325:21, 325:23, 325:24, 326:5, 326:6, 326:17, 327:24, 369:22
**numeric** [1] - 329:3
**numerical** [4] - 325:5, 325:8, 325:16, 326:12
**numerous** [1] - 389:1
**NW** [2] - 250:23, 397:12
**NY** [1] - 250:20

---

# O

**oath** [4] - 289:3, 289:4, 306:7, 306:9
**obfuscate** [1] - 374:18
**obfuscating** [1] - 385:13
**object** [4] - 253:17, 254:10, 276:18, 277:4

**objecting** [1] - 277:6
**objection** [18] - 253:3, 261:24, 270:21, 276:17, 276:20, 276:24, 277:2, 323:19, 323:20, 324:20, 324:21, 358:23, 367:10, 373:14, 375:12, 381:7, 388:6, 388:8
**objections** [1] - 262:5
**objective** [1] - 388:17
**observations** [2] - 382:6, 382:21
**observe** [1] - 277:18
**obtain** [4] - 322:16, 365:25, 366:16
**obtained** [4] - 366:11, 367:3, 370:10, 371:18
**obtaining** [1] - 367:6
**obviously** [4] - 260:17, 325:19, 335:16, 342:3
**occasionally** [2] - 276:18, 276:20
**occur** [2] - 257:23, 304:9
**occurred** [5] - 254:1, 340:15, 392:9, 392:11, 393:1
**occurrence** [1] - 383:16
**October** [1] - 283:11
**OF** [4] - 250:1, 250:3, 250:9, 397:1
**offense** [7] - 273:2, 273:3, 273:5, 273:21, 273:22, 273:24, 277:19
**offer** [4] - 258:4, 261:19, 263:24, 265:3
**offering** [3] - 259:25, 260:1, 263:25
**offers** [4] - 367:8, 373:12, 375:11, 381:5
**Office** [2] - 274:3, 352:9
**OFFICE** [1] - 250:14
**office** [6] - 279:7, 317:25, 363:21, 370:4, 370:11, 370:14
**officer** [1] - 317:18
**officers** [3] - 352:2, 352:13, 352:16
**offices** [2] - 266:2, 363:16, 363:18,

382:10
**OFFICIAL** [1] - 397:1
**Official** [1] - 250:22
**official** [1] - 397:11
**official's** [1] - 281:1
**officials** [6] - 281:22, 290:22, 291:5, 292:2, 307:4, 307:18
**often** [1] - 318:9
**oftentimes** [2] - 337:11, 343:12
**old** [1] - 332:21
**once** [4] - 278:4, 371:20, 388:23, 392:17
**one** [93] - 252:19, 252:19, 253:20, 253:25, 255:17, 257:8, 261:11, 267:20, 267:22, 269:6, 269:16, 270:14, 271:14, 273:23, 274:2, 277:6, 277:16, 277:21, 279:17, 279:22, 282:9, 283:3, 284:17, 292:13, 292:19, 294:8, 294:17, 296:11, 297:12, 297:15, 298:10, 299:10, 299:12, 299:22, 301:12, 301:17, 303:10, 303:18, 304:9, 304:25, 306:19, 308:20, 308:21, 312:23, 313:20, 313:21, 313:22, 314:5, 314:22, 314:23, 318:10, 321:12, 322:15, 323:13, 325:18, 326:13, 336:4, 336:7, 337:18, 339:7, 339:8, 339:17, 340:11, 341:13, 342:15, 346:9, 349:9, 349:13, 349:19, 349:23, 350:4, 350:21, 352:14, 357:2, 363:2, 368:3, 368:9, 368:16, 368:17, 369:22, 371:25, 373:17, 379:16, 388:1, 388:12, 391:5, 392:4, 392:17, 394:16

**ones** [2] - 345:6, 388:1
**ongoing** [2] - 278:1, 374:8
**onion** [2] - 324:14, 342:21
**online** [2] - 285:9, 286:15
**open** [13] - 268:7, 278:9, 287:19, 314:21, 392:4, 392:9, 392:12, 392:17, 392:22, 393:19, 393:25, 394:2, 395:6
**opened** [6] - 281:22, 281:24, 390:17, 392:20, 393:23, 394:10
**opening** [10] - 271:4, 274:24, 274:25, 275:1, 275:2, 275:19, 278:15, 314:10, 314:12, 393:14
**opens** [1] - 391:20
**operated** [2] - 343:1, 343:4
**operation** [2] - 385:9, 385:10
**Operations** [1] - 318:20
**operations** [2] - 319:1, 382:9
**opine** [1] - 386:25
**opining** [1] - 254:3
**opinion** [4] - 382:5, 382:20, 388:5, 388:9
**oppo** [1] - 268:24
**opportunity** [2] - 285:22, 293:5
**opposed** [5] - 268:25, 347:23, 384:16, 387:19, 392:11
**opposing** [2] - 279:17, 284:7
**opposite** [9] - 296:9, 296:22, 307:2, 307:14, 307:21, 308:4, 308:19, 312:7, 314:23
**opposition** [8] - 264:10, 269:9, 269:23, 283:25, 284:1, 284:5, 284:14, 285:7
**OpsSec** [5] - 385:6, 385:8, 385:9, 385:18
**order** [16] - 258:10, 261:4, 273:9, 275:14, 276:2,

289:23, 290:2, 345:15, 349:15, 351:23, 351:25, 368:4, 368:5, 371:5, 374:18, 392:5
**orders** [1] - 352:7
**Organization** [3] - 374:6, 374:16, 376:16
**organization** [22] - 281:9, 285:13, 285:19, 287:2, 299:17, 303:12, 305:12, 343:2, 357:6, 364:4, 365:21, 374:13, 376:9, 378:2, 378:16, 379:4, 379:8, 380:20, 384:14, 384:23, 384:25, 391:19
**organization's** [1] - 385:11
**organizations** [1] - 294:13
**origin** [2] - 325:12, 325:13
**origins** [2] - 255:21, 257:4
**otherwise** [2] - 371:14, 371:22
**outlet** [1] - 281:12
**outside** [2] - 393:4, 396:6
**overall** [3] - 379:1, 379:2, 387:24
**overnight** [1] - 271:19
**overrule** [2] - 277:2, 388:10
**overruled** [1] - 358:25
**overseas** [1] - 269:13
**overseeing** [1] - 321:12
**overt** [1] - 384:24, 386:2
**own** [16] - 279:13, 279:20, 280:13, 280:17, 284:13, 289:17, 300:3, 328:11, 340:4, 340:8, 358:8, 358:11, 360:16, 379:6, 384:14, 395:17
**owned** [1] - 294:13

## P

**Packet** [1] - 334:24
**page** [12] - 262:3,

263:9, 324:24, 324:25, 332:19, 332:21, 333:1, 375:6, 375:14, 376:21, 383:8, 386:4
**PAGE** [1] - 251:2
**pages** [1] - 301:4
**paid** [4] - 284:19, 286:4, 299:1, 353:18
**Paper** [2] - 265:16, 373:22
**paper** [33] - 258:5, 261:18, 261:20, 261:24, 262:3, 269:18, 365:10, 373:20, 373:21, 373:24, 375:1, 376:13, 376:15, 377:18, 378:13, 378:18, 379:17, 381:23, 381:25, 382:12, 382:23, 383:1, 383:8, 386:6, 386:11, 387:22, 388:3, 388:13, 388:23, 389:6, 389:8, 391:8
**paper's** [1] - 380:14
**papers** [2] - 281:16, 292:8
**paragraph** [5] - 381:23, 381:24, 383:20, 384:8, 385:3
**paralegal** [1] - 252:25
**paraphrasing** [1] - 376:7
**pardon** [1] - 376:7
**part** [27] - 256:23, 257:4, 258:22, 267:19, 268:24, 269:9, 269:22, 269:23, 276:13, 283:8, 283:22, 283:23, 285:2, 302:6, 319:23, 323:12, 344:14, 344:19, 357:4, 357:7, 357:18, 375:21, 376:1, 383:7, 386:5, 386:11
**participate** [1] - 343:5
**particular** [21] - 253:23, 254:3, 254:16, 256:14, 265:12, 272:1, 272:20, 311:16, 324:2, 336:10, 339:18, 341:16, 341:20, 344:11, 346:4, 349:19,

371:22, 377:6, 381:18, 388:15, 388:19
**particularly** [4] - 255:16, 327:23, 341:15, 377:17
**parties** [2] - 277:4, 277:15
**parties'** [1] - 270:14
**partisan** [2] - 309:1, 311:20
**partners** [1] - 301:12
**parts** [4] - 263:16, 286:7, 318:11, 369:22
**party** [5] - 300:6, 300:14, 309:4, 312:10, 356:16
**pass** [2] - 262:7, 381:20
**passed** [2] - 267:9, 340:10, 390:10
**passive** [31] - 321:7, 321:9, 333:13, 333:14, 333:16, 334:5, 334:6, 334:7, 334:15, 334:22, 335:7, 335:10, 335:11, 335:17, 335:20, 335:23, 335:24, 336:7, 336:15, 337:4, 341:15, 341:17, 341:20, 342:1, 342:4, 342:6, 342:9, 342:18, 353:12, 353:14, 358:8
**past** [1] - 331:9
**patents** [1] - 354:12
**path** [10] - 337:5, 343:8, 344:22, 345:8, 345:14, 345:17, 345:19, 345:20, 346:16, 368:15
**patience** [2] - 314:10, 314:11
**Pause** [1] - 252:7
**pawn** [1] - 293:2
**pay** [2] - 278:14, 353:17
**paying** [1] - 283:24
**payments** [1] - 354:7
**pays** [1] - 353:9
**PC** [1] - 331:8
**peer** [1] - 323:13
**peer-reviewed** [1] - 323:13
**Pennsylvania** [4] - 279:5, 374:7,

376:17, 376:23
**Pennsylvania-based** [1] - 376:23
**people** [33] - 282:14, 282:15, 286:13, 295:7, 298:1, 304:17, 313:9, 313:11, 313:15, 313:16, 322:20, 322:22, 322:25, 325:16, 325:20, 326:4, 326:5, 334:18, 341:1, 342:22, 342:24, 346:6, 346:10, 347:3, 351:10, 351:18, 362:1, 365:25, 366:3, 366:4, 367:3, 380:2, 384:22
**per** [1] - 284:20
**percent** [3] - 255:18, 255:19, 341:21
**percentage** [1] - 342:17
**perform** [2] - 371:24, 392:21
**performing** [2] - 389:2, 390:5
**perhaps** [1] - 377:15
**period** [1] - 354:17
**Perkins** [4] - 263:6, 266:1, 298:9, 298:11
**permission** [1] - 253:3
**permit** [1] - 257:25
**person** [14] - 254:6, 273:9, 308:25, 309:7, 347:22, 367:20, 367:25, 368:12, 368:16, 368:17, 368:18, 369:4, 395:6, 395:17
**person's** [3] - 325:8, 365:13, 365:14
**personal** [2] - 280:9, 389:14
**personally** [1] - 288:8
**perspective** [1] - 276:6
**Peter** [4] - 368:13, 368:25, 369:1, 370:9
**phishing** [1] - 341:8
**phone** [14] - 280:9, 290:16, 304:11, 304:20, 305:22, 309:6, 325:7, 326:1, 326:3, 326:7, 326:9, 333:3, 333:4
**phones** [1] - 320:13
**physical** [2] - 290:5,

415

291:24
**physically** [1] - 363:20
**pick** [2] - 338:3, 338:6
**picked** [3] - 272:3,
334:2, 342:4
**picks** [4] - 344:21,
344:23, 345:13,
345:14
**picture** [1] - 327:12
**piece** [9] - 365:8,
365:10, 367:20,
377:6, 377:8,
377:18, 377:22,
378:6, 379:11
**pieces** [4] - 291:24,
336:22, 337:1, 371:8
**pipe** [1] - 337:23
**pitch** [1] - 302:7
**pizza** [1] - 333:6
**place** [10] - 308:8,
308:17, 329:16,
333:6, 333:18,
334:8, 346:19,
347:3, 347:18,
370:21
**places** [1] - 333:18
**Plaintiff** [1] - 250:4
**plan** [12] - 283:8,
283:9, 283:11,
283:12, 283:13,
283:15, 283:16,
286:6, 286:7,
291:17, 295:6, 295:8
**plant** [2] - 284:9,
290:19
**plate** [1] - 253:12
**plausible** [1] - 374:15
**play** [2] - 327:8,
365:22
**played** [1] - 303:25
**players** [1] - 313:10
**pled** [1] - 272:23
**plugged** [1] - 328:2
**point** [10] - 262:9,
308:5, 311:13,
328:6, 331:8, 332:7,
365:14, 395:5,
395:7, 395:19
**pointers** [1] - 254:23
**points** [1] - 268:14
**police** [1] - 317:18
**political** [11] - 278:23,
279:9, 282:21,
282:23, 285:23,
287:17, 292:15,
293:2, 312:16,
312:21, 395:2
**politics** [5] - 282:15,
284:2, 292:18,
312:6, 312:9

**populated** [1] - 335:13
**portion** [12] - 261:20,
263:8, 263:20,
263:22, 331:18,
342:2, 373:20,
375:8, 376:15,
383:10, 383:13,
386:6
**position** [12] - 284:21,
318:25, 319:1,
319:13, 319:14,
320:6, 320:21,
321:13, 360:13,
363:12, 369:1, 369:3
**positions** [2] - 317:17,
317:22
**possession** [1] -
356:21
**possibility** [1] - 257:20
**possible** [4] - 277:23,
331:3, 346:20,
346:21
**postings** [1] - 278:7
**potential** [5] - 261:21,
286:16, 294:11,
305:11, 350:3
**potentially** [3] -
346:17, 351:4,
351:12
**power** [1] - 279:19
**powered** [1] - 278:25
**powerful** [2] - 278:22,
280:6
**PowerPoint** [1] -
324:17
**practice** [1] - 294:2
**practices** [1] - 291:22
**predicated** [1] -
392:25
**predictable** [1] - 347:3
**preference** [1] -
396:19
**prejudicial** [2] -
265:22, 268:3
**preliminary** [6] -
252:18, 270:13,
271:5, 392:2,
392:12, 393:22
**premarked** [2] -
366:21, 372:25
**preparation** [1] - 324:9
**prepare** [1] - 324:10
**prepared** [4] - 258:5,
261:18, 264:9,
324:12
**preparing** [1] - 367:6
**presence** [1] - 277:21
**present** [2] - 274:20,
303:10
**presentation** [4] -

275:6, 275:18,
324:17, 358:7
**presentations** [1] -
323:10
**presented** [2] -
272:25, 299:8
**presenting** [1] -
264:17
**presidential** [8] -
279:2, 279:10,
279:13, 279:18,
283:12, 283:19,
379:6, 384:10
**press** [6] - 284:9,
287:21, 287:23,
290:19, 295:9,
296:14
**presumably** [4] -
366:14, 369:16,
369:24, 384:2
**presumed** [2] -
273:16, 383:21
**presumption** [1] -
273:16
**pretty** [7] - 260:7,
328:7, 338:22,
344:6, 348:10,
383:15, 386:10
**prevent** [1] - 315:9
**preview** [1] - 275:3
**previously** [1] - 261:6
**price** [1] - 353:16
**Priestap** [5] - 263:9,
263:21, 264:7,
265:7, 268:24
**Priestap's** [3] -
266:21, 266:25,
267:11
**primarily** [3] - 318:3,
391:4, 391:10
**principally** [1] -
372:17
**principle** [1] - 335:24
**privacy** [6] - 303:23,
343:2, 344:8,
346:11, 347:8,
347:11
**private** [8] - 256:11,
294:2, 298:9, 305:8,
347:15, 351:16,
351:19, 358:6
**privilege** [7] - 274:19,
278:18, 278:19,
278:21, 292:13,
304:1
**privileged** [1] - 292:14
**Prize** [2] - 295:13,
302:8
**problem** [1] - 253:9
**procedures** [1] -

291:22
**proceed** [2] - 274:22,
316:15
**proceeded** [1] - 281:7
**proceeding** [1] -
269:13
**proceedings** [1] -
397:6
**process** [7] - 335:4,
344:21, 352:10,
358:20, 363:9,
365:22, 371:11
**processes** [2] - 340:1,
351:20
**professional** [5] -
321:17, 321:24,
322:6, 322:7, 324:5
**professionals** [1] -
303:23
**proffer** [1] - 268:23
**proffering** [1] - 269:21
**program** [4] - 320:8,
323:12, 363:14,
363:15
**programs** [1] - 336:12
**progress** [1] - 319:13
**project** [4] - 264:25,
288:1, 290:15, 387:2
**Project** [3] - 343:2,
343:19, 343:24
**prominent** [1] - 298:12
**promote** [2] - 309:10,
309:11
**promoted** [1] - 320:23
**promptly** [1] - 281:22
**proof** [1] - 259:19
**property** [4] - 318:4,
360:22, 361:5,
361:13
**propose** [2] - 261:20,
263:8
**proposition** [1] -
260:16
**propositions** [1] -
260:7
**prosecuting** [2] -
298:8, 352:9
**prosecution** [2] -
274:2, 274:5
**prosecutor** [1] -
293:25
**protect** [1] - 293:1
**protecting** [3] -
385:12, 385:13
**protection** [1] - 374:18
**protocol** [1] - 339:20
**proud** [1] - 389:23
**prove** [8] - 273:3,
289:17, 289:21,
297:14, 306:22,

308:12, 342:8
**proven** [3] - 273:14,
273:17, 273:23
**provenance** [1] -
356:8
**proverbial** [1] - 282:13
**proves** [1] - 273:20
**provide** [7] - 270:5,
323:22, 331:23,
334:8, 372:9, 390:7,
393:10
**provided** [8] - 267:7,
355:18, 356:10,
356:16, 357:11,
364:20, 370:17,
381:25
**provider** [5] - 328:24,
331:10, 334:1,
343:10, 351:11
**providers** [3] - 334:11,
351:9, 353:14
**provides** [2] - 371:4,
376:25
**providing** [2] - 395:21,
395:24
**proxies** [1] - 347:4
**proximity** [1] - 384:7
**proxy** [2] - 346:25,
347:1, 384:16
**psychology** [1] -
317:10
**public** [6] - 270:6,
295:5, 295:6,
295:17, 299:20,
301:11
**publish** [5] - 286:24,
302:13, 367:13,
373:17, 381:11
**published** [4] - 323:9,
323:12, 343:17,
343:21
**Pulitzer** [2] - 295:13,
302:8
**Pulitzer-Prize-
winning** [2] - 295:13,
302:8
**pull** [1] - 334:25
**pulled** [1] - 300:17
**purchase** [1] - 356:9
**purchased** [1] -
356:14
**purchasing** [1] - 353:6
**pure** [1] - 393:21
**purported** [2] -
377:25, 379:18
**purpose** [5] - 264:12,
266:9, 311:9,
345:25, 346:1
**purposes** [1] - 331:2
**pursuant** [1] - 263:7

416

**put** [9] - 258:1, 275:13, 286:1, 290:8, 298:5, 338:4, 339:5, 379:6, 379:14
**Putin's** [1] - 294:13
**puts** [1] - 336:9
**putting** [1] - 337:15, 380:11

## Q

**qualified** [2] - 324:6, 388:9
**qualify** [1] - 323:21
**queried** [1] - 337:23
**queries** [3] - 333:17, 333:19, 342:3
**query** [16] - 332:11, 333:20, 336:6, 336:8, 336:9, 336:23, 336:24, 336:25, 337:8, 337:21, 337:24, 342:7, 342:8
**questionable** [6] - 378:23, 378:25, 382:4, 382:19, 387:23, 393:25
**questioning** [1] - 265:22
**questions** [17] - 262:19, 275:19, 275:20, 276:10, 276:18, 277:7, 294:7, 297:6, 297:15, 297:23, 299:7, 305:19, 314:16, 334:12, 339:13, 355:15, 355:19
**quick** [1] - 268:14
**quickly** [1] - 381:18
**quite** [2] - 348:14, 348:24
**quote** [4] - 266:1, 280:13, 280:15

## R

**raise** [3] - 262:13, 316:9, 359:25
**raised** [3] - 261:25, 262:9, 294:6
**random** [6] - 343:7, 343:11, 344:22, 344:23, 346:16, 347:24
**randomly** [1] - 272:2
**range** [5] - 260:20, 322:18, 361:25, 362:5, 389:22

**ranging** [1] - 322:2
**ranking** [2] - 281:22, 284:15
**RAO** [1] - 250:18
**Rao** [1] - 274:18
**rather** [2] - 256:20, 289:16
**raw** [1] - 338:6
**RDR** [3] - 250:22, 397:3, 397:10
**reach** [8] - 258:15, 287:21, 302:25, 305:1, 315:2, 331:20, 333:7, 388:15
**reached** [2] - 302:7, 389:13
**reaches** [1] - 332:13
**reaching** [1] - 388:21
**read** [10] - 263:6, 268:11, 336:12, 336:13, 337:14, 368:6, 374:3, 376:15, 381:24, 384:9
**readable** [1] - 325:4
**reading** [3] - 277:11, 368:7, 383:18
**ready** [7] - 270:10, 271:3, 315:16, 316:3, 337:17, 364:11, 396:8
**real** [5] - 258:25, 305:13, 377:23, 380:13, 394:24
**realized** [1] - 339:19
**realizes** [1] - 302:24
**really** [8] - 308:23, 325:20, 329:15, 341:11, 356:2, 372:19, 377:7, 378:6
**reason** [5] - 255:14, 301:23, 344:12, 379:14, 381:18
**reasonable** [9] - 273:1, 273:4, 273:14, 273:18, 273:21, 280:1, 297:14, 308:8, 308:14
**reasonably** [1] - 376:24
**reasons** [8] - 287:7, 346:6, 346:15, 378:17, 383:13, 388:19, 395:4, 395:12
**rebuttal** [2] - 275:17, 276:3
**receipt** [5] - 263:12,

264:8, 267:1, 368:7, 368:8
**receive** [2] - 322:20, 367:20
**received** [13] - 255:16, 264:3, 265:7, 281:7, 302:19, 322:5, 323:4, 323:5, 364:2, 364:19, 367:25, 374:1, 380:5
**receives** [1] - 256:11
**recent** [1] - 374:18
**Recess** [1] - 316:1
**recess** [1] - 396:22
**recesses** [1] - 271:19
**recipients** [1] - 377:2
**recognize** [7] - 324:16, 366:24, 367:5, 373:4, 373:9, 375:7, 380:23
**recollection** [2] - 364:15, 377:7
**reconvene** [1] - 396:5
**record** [9] - 252:3, 269:8, 276:25, 299:12, 303:7, 306:18, 342:9, 360:9, 365:16
**recorded** [2] - 304:13, 335:9
**recording** [1] - 336:19
**recordings** [1] - 304:8
**records** [11] - 288:2, 290:14, 290:16, 290:20, 290:21, 291:23, 336:22, 342:7, 342:9, 364:12, 370:24
**recursive** [1] - 330:2
**redact** [1] - 261:22
**redacted** [2] - 264:1, 383:10
**redactions** [1] - 383:15
**redirect** [2] - 275:10, 275:15
**REDIRECT** [1] - 358:2
**refer** [3] - 273:25, 274:11, 337:25
**reference** [1] - 257:10
**referenced** [1] - 261:18
**references** [2] - 265:4, 312:16
**referred** [2] - 337:22, 382:22
**referring** [7] - 270:6, 289:9, 318:12, 336:14, 336:15, 377:4, 380:9

**refers** [1] - 257:19
**reflect** [3] - 264:8, 264:9, 282:2
**reflected** [1] - 389:7
**reflecting** [1] - 263:12
**refreshed** [1] - 364:15
**regard** [1] - 350:11
**regarding** [5] - 261:4, 268:11, 394:23
**registered** [3] - 384:14, 384:25, 387:15
**regular** [2] - 272:9, 347:8
**regularly** [1] - 389:20
**relate** [2] - 261:10, 263:16
**related** [6] - 266:20, 321:24, 348:1, 353:24, 368:1, 386:22
**relation** [1] - 287:11
**relationship** [9] - 298:22, 303:18, 303:20, 308:24, 309:8, 309:25, 312:4, 376:25, 395:11
**relationships** [3] - 299:1, 304:2
**relevance** [1] - 265:23
**relevant** [10] - 256:6, 256:12, 256:13, 257:5, 267:25, 297:20, 351:24, 352:7, 393:7, 393:10
**reliability** [2] - 300:1, 358:16
**relied** [3] - 294:22, 299:4, 354:20
**relinquish** [2] - 368:17, 368:24
**Relinquished** [1] - 368:11
**relinquished** [3] - 368:21, 368:23, 369:5
**relinquishing** [1] - 368:13
**rely** [2] - 278:11, 372:17
**remain** [2] - 316:9, 359:25
**remains** [1] - 273:16
**remarkable** [1] - 301:21
**remember** [17] - 306:17, 306:19, 325:17, 325:21, 326:6, 326:19,

352:25, 355:19, 364:8, 364:9, 366:5, 369:3, 370:11, 370:14, 370:16, 374:21, 392:13
**remembers** [1] - 268:9
**remind** [1] - 277:8
**remove** [2] - 316:12, 359:24
**repeat** [2] - 355:8, 388:11
**rephrase** [2] - 355:7, 355:10
**report** [15] - 264:8, 265:4, 265:6, 265:12, 265:15, 268:23, 269:19, 287:23, 303:8, 334:13, 382:3, 382:18, 385:7, 385:18
**reported** [1] - 265:19
**Reporter** [3] - 250:22, 250:22, 397:11
**REPORTER** [3] - 321:3, 338:12, 397:1
**reporter** [6] - 278:8, 286:21, 286:24, 295:13, 302:8, 302:12, 316:21, 327:23
**reporters** [1] - 295:16
**reports** [6] - 265:1, 265:5, 265:9, 304:8, 304:14, 321:22
**represent** [1] - 287:10
**representation** [2] - 259:5, 272:17
**representative** [1] - 254:20
**representatives** [1] - 286:11
**represented** [4] - 261:5, 309:1, 309:2, 378:14
**representing** [5] - 274:19, 287:17, 311:9, 311:16, 312:19
**represents** [3] - 327:13, 339:1, 342:2
**Republicans** [4] - 282:22, 284:2, 292:17, 298:9
**request** [9] - 326:24, 327:1, 330:3, 332:7, 332:18, 335:5, 352:16, 352:20, 352:22
**requested** [1] - 287:3

417

**requests** [1] - 334:11
**required** [2] - 275:13, 289:3
**research** [18] - 264:10, 268:24, 269:9, 269:23, 278:6, 283:25, 284:1, 284:5, 284:14, 285:7, 286:3, 325:14, 325:15, 382:3, 382:18, 386:7, 396:7
**researched** [1] - 295:15
**researcher** [1] - 383:24
**researchers** [3] - 281:11, 284:6, 379:16
**reserve** [1] - 268:6
**resolved** [1] - 331:8
**resolver** [1] - 330:3
**resource** [1] - 343:6
**resources** [3] - 279:19, 281:23, 290:24
**respect** [7] - 270:14, 306:2, 326:10, 339:14, 358:6, 358:13, 384:21
**respected** [2] - 354:3, 354:18
**respond** [2] - 319:4, 319:17
**response** [2] - 317:13, 322:4
**Response** [1] - 319:16
**responsibilities** [4] - 271:12, 276:9, 318:24, 320:22
**responsibility** [3] - 315:7, 315:8, 363:17
**rest** [1] - 369:16
**restricts** [1] - 346:8
**result** [2] - 388:15, 389:22
**resulting** [1] - 354:7
**retaining** [1] - 264:24
**retired** [1] - 288:18
**return** [6] - 293:10, 303:14, 311:19, 332:2, 371:8, 371:9
**returned** [4] - 335:8, 350:8, 379:19, 379:20
**returning** [2] - 370:3, 386:4
**returns** [1] - 332:12
**revealing** [1] - 347:20
**reveals** [2] - 382:4,

382:19
**reverse** [1] - 320:14
**review** [6] - 262:8, 292:1, 319:11, 321:20, 364:15, 372:8
**reviewed** [3] - 323:13, 339:13, 364:12
**reviews** [1] - 321:22
**right-hand** [1] - 326:5
**rights** [3] - 318:4, 360:22, 361:13
**ring** [1] - 379:11
**risks** [1] - 271:25
**roadmap** [1] - 275:3
**Rodney** [18] - 272:22, 282:11, 283:11, 284:11, 288:10, 294:9, 294:15, 294:16, 294:24, 295:2, 298:23, 305:8, 353:19, 354:12, 355:12, 358:21
**role** [6] - 264:23, 264:25, 283:1, 365:22, 365:24, 365:25
**Rome** [1] - 268:18
**Room** [2] - 250:23, 397:12
**room** [2] - 278:11, 282:13
**root** [6] - 329:12, 329:13, 329:18, 330:1, 330:3, 330:7
**rooted** [1] - 255:3
**roundabout** [1] - 378:24
**route** [2] - 335:14, 343:11
**router** [2] - 324:14, 342:21
**routes** [1] - 343:7
**routinely** [1] - 256:10
**routing** [1] - 346:2
**row** [2] - 368:9, 368:23
**rude** [1] - 277:18
**rule** [1] - 276:10
**rules** [3] - 271:6, 277:19, 278:22
**ruling** [3] - 257:25, 259:9, 259:21
**run** [11] - 276:9, 277:14, 277:15, 281:12, 286:22, 295:22, 331:21, 334:9, 343:3, 344:13
**running** [2] - 287:2, 319:15

**Russia** [17] - 282:15, 285:20, 286:17, 294:8, 294:11, 299:8, 302:21, 307:8, 378:2, 378:16, 379:4, 379:10, 380:20, 382:11, 385:24, 386:1, 391:19
**Russian** [15] - 281:9, 285:15, 294:13, 299:17, 300:4, 364:4, 384:12, 384:15, 385:5, 385:15, 385:17, 385:22, 385:23, 386:3
**Russians** [2] - 300:5, 300:10

## S

**sake** [2] - 327:10, 327:20
**sample** [6] - 254:15, 254:18, 254:20, 255:6, 260:3, 260:21
**sampling** [1] - 335:25
**San** [1] - 360:25
**Sands** [3] - 317:14, 391:4, 391:5
**sat** [1] - 279:8
**satellites** [1] - 327:15
**saw** [2] - 285:21, 372:21
**scale** [2] - 325:16, 377:1
**scales** [1] - 353:16
**scattered** [1] - 319:22
**scenes** [4] - 329:7, 330:12, 330:14, 333:9
**scheduling** [1] - 289:24
**science** [3] - 317:9, 317:10, 348:19
**scientific** [1] - 324:4
**scientists** [1] - 321:18
**SCOTT** [3] - 251:6, 360:4, 360:10
**Scott** [2] - 359:22, 360:10
**scour** [1] - 286:14
**screen** [6] - 338:2, 366:21, 373:1, 375:3, 380:22, 380:24
**Seago** [1] - 269:6
**SEAN** [1] - 250:17
**Sean** [1] - 274:17

**search** [17] - 291:16, 345:7, 351:2, 351:19, 352:2, 352:13, 352:16, 352:19, 352:20, 352:21, 352:22, 352:23, 358:5, 358:14, 358:17, 386:21, 392:21
**searching** [1] - 387:9
**season** [1] - 254:23
**seat** [5] - 272:8, 272:9, 316:9, 360:3, 396:15
**seated** [1] - 316:3
**seats** [3] - 272:2, 272:6
**second** [15] - 252:6, 263:9, 275:6, 284:10, 286:19, 287:20, 297:9, 305:6, 324:23, 332:24, 345:2, 345:3, 368:23, 372:8, 378:6
**secondly** [1] - 269:11
**secret** [27] - 265:18, 269:14, 279:3, 281:8, 281:11, 285:14, 285:18, 294:3, 298:17, 302:3, 361:15, 364:3, 376:6, 376:7, 378:1, 378:15, 379:3, 379:7, 379:11, 380:19, 383:2, 384:11, 384:13, 384:19, 384:23, 385:1, 385:14, 386:1, 391:18
**secretive** [1] - 296:15
**section** [2] - 335:12, 374:4
**security** [32] - 282:3, 287:9, 290:25, 293:23, 293:24, 294:2, 294:6, 294:7, 298:12, 298:13, 304:3, 309:25, 310:13, 310:18, 311:13, 317:12, 321:24, 322:9, 322:16, 322:18, 323:18, 323:23, 334:17, 341:2, 346:23, 349:1, 349:2, 354:4, 354:5, 362:20, 385:9, 385:10
**see** [49] - 274:15,

280:16, 280:17, 286:17, 286:23, 288:1, 290:8, 290:10, 290:13, 290:16, 290:20, 291:23, 300:22, 300:25, 301:1, 302:18, 304:5, 304:18, 306:15, 307:4, 307:11, 308:17, 311:1, 311:15, 312:13, 312:22, 312:23, 314:2, 315:24, 320:13, 326:10, 329:6, 332:19, 333:5, 333:10, 333:22, 334:4, 339:1, 339:23, 341:17, 342:6, 366:22, 367:15, 367:18, 369:17, 375:6, 383:11, 396:14
**seeing** [5] - 262:10, 271:21, 327:5, 342:2, 344:4
**seek** [1] - 265:3
**seeking** [1] - 288:18
**seem** [1] - 260:7
**seize** [2] - 371:4, 371:5
**Seizing** [1] - 367:18
**selected** [2] - 272:2, 338:16
**selling** [1] - 295:1
**send** [6] - 285:3, 308:23, 308:25, 309:7, 347:1, 349:15
**sending** [4] - 282:1, 349:14, 377:2, 377:16
**sends** [1] - 344:23
**senior** [3] - 307:4, 307:17, 369:8
**senior-most** [1] - 307:17
**sense** [12] - 271:10, 287:1, 297:2, 301:2, 303:19, 308:22, 350:6, 379:4, 379:24, 385:15, 387:18, 388:21
**sensitive** [3] - 280:11, 362:4
**sensor** [5] - 334:5, 335:15, 335:19, 336:8, 337:5
**sensors** [7] - 334:6, 334:7, 335:8, 335:18, 336:7,

341:20, 358:8
**sent** [5] - 254:1, 296:6, 338:10, 349:17, 388:25
**sentence** [2] - 384:9, 385:3
**separate** [2] - 340:1, 350:11
**separated** [2] - 337:12
**separator** [1] - 337:22
**September** [14] - 263:19, 265:14, 278:24, 280:5, 302:18, 302:19, 303:22, 304:7, 357:16, 357:19, 364:7, 364:10, 366:9, 366:12
**series** [5] - 263:11, 304:9, 331:2, 333:18, 343:11
**serious** [10] - 272:10, 279:1, 279:2, 281:23, 293:23, 294:5, 294:6, 295:7, 302:12, 308:14
**seriously** [3] - 294:14, 295:4, 309:16
**serve** [5] - 253:1, 253:4, 279:20, 352:17, 352:23
**served** [1] - 280:19
**server** [72] - 265:18, 269:14, 281:25, 282:1, 282:2, 285:14, 285:17, 290:24, 300:21, 325:18, 326:15, 328:21, 328:23, 328:25, 329:4, 329:9, 329:22, 329:23, 329:25, 330:1, 330:2, 330:3, 330:7, 330:9, 330:11, 330:17, 330:21, 330:24, 331:21, 332:19, 333:25, 335:6, 335:8, 336:21, 336:24, 341:17, 343:13, 344:13, 344:15, 344:16, 347:1, 347:2, 347:19, 349:10, 351:3, 351:11, 351:21, 374:7, 374:10, 374:15, 376:17, 376:18, 377:15, 379:18, 379:19, 379:21,

384:13, 387:7, 387:10, 387:14, 387:15, 387:25
**server's** [1] - 339:3, 344:14
**servers** [24] - 300:6, 300:11, 329:13, 329:14, 329:15, 329:19, 330:11, 334:2, 335:17, 335:19, 341:16, 341:19, 342:16, 343:11, 347:9, 363:6, 374:12, 377:13, 386:20, 386:24, 387:4, 387:19
**servers)** [1] - 384:16
**service** [7] - 328:24, 331:10, 334:1, 343:10, 351:9, 351:10, 353:18
**services** [4] - 334:9, 342:18, 354:8
**serving** [1] - 293:4
**SESSION** [1] - 250:6
**set** [18] - 254:15, 254:17, 281:12, 310:24, 311:8, 311:14, 324:12, 326:3, 326:5, 334:7, 346:18, 347:12, 353:13, 359:18, 373:25, 386:5, 386:11, 386:19
**Seth** [1] - 254:23
**sets** [2] - 321:7, 321:8
**setting** [3] - 288:17, 311:17, 325:14
**several** [5] - 254:12, 267:10, 291:24, 323:13, 336:22
**shape** [1] - 286:6
**shared** [1] - 389:21
**Shaw** [8] - 252:10, 274:4, 274:7, 278:15, 293:14, 306:2, 316:5, 357:25
**SHAW** [19] - 250:14, 274:6, 278:16, 316:6, 316:18, 323:15, 323:18, 324:7, 324:8, 324:18, 324:23, 325:1, 326:22, 338:14, 345:24, 348:2, 358:1, 358:3, 359:10
**Shaw)**........................
............ [2] - 251:4,

251:5
**sheet** [1] - 371:3
**short** [2] - 280:20, 303:20
**shortcomings** [1] - 261:1
**shortly** [1] - 335:13
**show** [53] - 255:6, 255:8, 275:5, 278:17, 279:5, 279:15, 279:25, 280:4, 280:5, 280:23, 281:6, 281:14, 282:8, 283:7, 283:8, 284:15, 284:21, 285:5, 285:11, 285:16, 285:21, 286:7, 286:10, 287:6, 287:25, 288:2, 289:12, 290:7, 290:14, 290:17, 290:21, 292:9, 292:24, 296:7, 296:20, 297:5, 297:6, 300:19, 301:23, 306:22, 308:18, 324:10, 324:11, 324:15, 349:13, 349:22, 350:3, 366:20, 372:25, 375:3, 380:21, 380:22, 393:1
**showed** [7] - 281:8, 285:13, 294:12, 295:8, 299:15, 301:25, 380:14
**showing** [2] - 259:23, 294:10
**shown** [2] - 276:5, 383:13
**shows** [12] - 308:4, 310:19, 312:7, 315:4, 315:5, 337:6, 344:8, 349:25, 350:2, 374:16, 375:17
**shut** [4] - 295:23, 296:21, 296:24, 305:4
**sic** [1] - 326:9
**sic]** [1] - 319:16
**side** [12] - 275:4, 275:10, 276:19, 277:6, 325:10, 326:4, 326:5, 327:10, 327:12, 327:17, 345:19
**side's** [2] - 276:6,

277:7
**sign** [5] - 365:10, 365:11, 365:13, 365:14, 368:18
**Signature** [1] - 367:18
**signature** [3] - 370:4, 370:8, 370:10
**signatures** [1] - 365:25, 366:11, 366:17, 367:3, 367:6, 370:7
**significance** [1] - 261:9
**significantly** [1] - 347:7
**similar** [8] - 264:3, 319:9, 322:4, 326:12, 333:4, 333:8, 337:3, 377:12
**similarly** [4] - 325:7, 340:5, 340:9, 349:18
**simple** [3] - 283:6, 346:24, 347:4
**simplified** [1] - 335:3
**simply** [5] - 256:20, 275:3, 277:5, 333:14, 349:25
**single** [1] - 272:14
**sit** [2] - 253:4, 292:11
**site** [1] - 346:5
**sitting** [2] - 252:25, 356:25
**situated** [1] - 252:6
**six** [2] - 306:17, 306:21
**size** [5] - 254:18, 254:20, 255:7, 260:3, 260:21
**skip** [1] - 368:9
**slide** [26] - 324:10, 325:25, 326:22, 328:4, 328:15, 328:22, 329:11, 330:6, 330:15, 331:19, 331:25, 332:4, 332:15, 333:12, 333:21, 334:25, 335:4, 336:3, 337:2, 337:17, 339:9, 342:19, 344:2, 344:17, 345:10, 345:21
**slide's** [1] - 333:13
**slides** [4] - 324:12, 327:7, 339:14, 340:17
**slip** [1] - 288:24
**slow** [2] - 321:3, 327:22

**slower** [1] - 347:7
**small** [5] - 270:14, 304:3, 325:16, 360:21, 392:19
**Smith** [1] - 326:8
**smoke** [1] - 305:15
**SMTP** [1] - 387:8
**so..** [1] - 350:9
**social** [1] - 278:7
**software** [3] - 344:21, 345:18, 346:22
**someone** [29] - 254:15, 299:25, 306:20, 308:25, 310:3, 311:5, 311:24, 354:1, 354:3, 354:17, 354:20, 356:11, 358:10, 361:8, 364:23, 368:8, 368:12, 370:9, 371:4, 377:25, 384:2, 393:20, 393:24, 395:2, 395:10, 395:18, 395:21, 395:22
**something's** [1] - 392:10
**sometimes** [6] - 324:3, 346:7, 347:4, 353:6, 370:24, 393:2
**somewhat** [1] - 336:13
**sophisticated** [1] - 374:17
**sophistication** [3] - 385:6, 385:16, 385:17
**sorry** [12] - 259:8, 259:15, 262:17, 321:5, 322:24, 327:21, 329:8, 354:22, 355:3, 355:5, 388:11, 389:17
**Sorry** [2] - 338:14
**sort** [23] - 254:11, 256:12, 264:11, 302:1, 318:1, 321:12, 322:8, 328:11, 329:3, 331:1, 335:4, 338:5, 344:18, 347:6, 353:11, 353:13, 372:22, 379:24, 381:19, 384:20, 386:15, 392:6, 395:8
**sorts** [4] - 298:13, 298:14, 299:7, 351:20
**sound** [3] - 255:1,

388:14, 389:7
**soundness** [1] -
386:25
**sounds** [2] - 259:7,
262:14
**source** [23] - 256:19,
257:1, 267:1, 267:9,
269:1, 270:7, 313:2,
313:6, 340:12,
340:14, 342:5,
342:10, 352:25,
355:13, 355:18,
355:22, 356:3,
356:7, 356:15,
356:22, 358:16,
359:8
**sources** [1] - 353:12
**South** [1] - 343:14
**spam** [9] - 281:25,
285:17, 290:24,
300:21, 341:3,
341:11, 377:9,
377:13, 377:15
**spammers** [1] -
334:19
**speaking** [3] - 360:19,
378:12, 391:7
**speaks** [1] - 265:18
**SPECIAL** [5] - 250:14,
251:3, 251:6,
316:16, 360:4
**Special** [31] - 253:17,
253:21, 253:24,
255:12, 256:4,
257:16, 257:24,
258:4, 274:1, 274:3,
306:11, 316:7,
316:24, 317:2,
348:6, 358:4,
359:22, 360:7,
360:14, 360:15,
366:20, 367:14,
371:25, 380:11,
381:3, 381:13,
381:14, 383:18,
386:9, 389:19, 396:1
**special** [9] - 298:18,
301:6, 318:17,
319:7, 364:24,
390:6, 391:4, 391:5
**specialist** [1] - 317:17
**specialists** [3] -
320:10, 320:11,
321:19
**specialization** [2] -
317:13, 323:11
**specialize** [1] - 354:15
**specific** [8] - 264:7,
270:17, 272:21,
289:9, 392:8,

392:12, 392:13,
392:25
**specifically** [4] -
289:5, 306:20,
354:9, 357:3
**specifics** [2] - 265:1,
354:10
**spectrum** [1] - 374:10
**speculate** [3] - 269:4,
276:21, 383:14
**speech** [1] - 346:8
**speeding** [1] - 309:18
**spell** [2] - 316:20,
360:9
**spelled** [1] - 360:10
**spent** [7] - 259:2,
295:18, 298:7,
319:15, 360:20,
360:25, 361:1
**spoken** [1] - 321:25
**sponsored** [3] - 385:5,
385:16, 385:23
**spoof** [1] - 258:7
**spoofed** [5] - 257:12,
257:13, 257:17,
257:19, 261:3
**spoofing** [2] - 257:11,
261:21
**Sporre** [5] - 369:6,
369:7, 369:8,
369:12, 370:9
**spot** [1] - 347:17
**spreadsheet** [1] -
337:14
**spring** [1] - 300:5
**staff** [1] - 277:17
**stage** [5] - 258:12,
259:14, 275:6,
275:23, 276:1
**stages** [1] - 274:23
**stand** [2] - 339:20,
359:15
**standard** [1] - 270:13
**standing** [2] - 316:9,
359:25
**standpoint** [1] -
394:17
**stands** [5] - 277:3,
284:24, 331:15,
382:9, 385:9
**start** [9] - 259:24,
260:1, 295:6,
317:23, 325:2,
327:4, 343:13,
383:18, 383:23
**started** [12] - 285:6,
285:8, 296:6,
297:25, 325:20,
338:6, 368:20,
384:3, 384:4, 384:5,

384:6
**state** [4] - 360:9,
385:5, 385:16,
385:23
**state-sponsored** [3] -
385:5, 385:16,
385:23
**statement** [13] -
256:21, 258:3,
272:16, 274:25,
275:1, 278:15,
279:24, 281:4,
283:5, 291:4,
293:22, 309:19,
314:10
**statements** [5] -
271:4, 274:24,
275:2, 275:19,
279:22
**STATES** [3] - 250:1,
250:3, 250:10
**States** [7] - 250:12,
252:3, 283:4, 298:7,
316:7, 362:15,
397:11
**statistical** [2] - 261:1,
261:9
**statistics** [1] - 254:19
**stay** [3] - 342:23,
342:24, 347:15
**steal** [1] - 362:4
**stealing** [2] - 361:14,
362:2
**Steele** [24] - 262:16,
263:6, 263:12,
263:14, 264:2,
264:18, 264:24,
266:1, 266:11,
266:15, 266:20,
267:2, 267:5,
267:17, 267:19,
267:23, 267:24,
268:7, 268:17,
268:19, 269:7,
269:10, 269:12,
269:20
**stenographic** [1] -
397:5
**step** [7] - 316:8, 340:3,
344:10, 344:18,
358:14, 359:24,
396:11
**steps** [12] - 256:16,
257:6, 264:19,
290:23, 331:3,
331:4, 332:9, 352:1,
382:4, 382:19, 395:8
**still** [4] - 253:8, 301:2,
358:22, 394:20
**stipulation** [1] - 263:7

**stop** [4] - 287:22,
324:25, 329:2,
329:16
**store** [2] - 330:7,
336:11
**stories** [1] - 283:14
**story** [34] - 281:12,
286:22, 286:24,
287:2, 287:22,
290:18, 295:14,
295:17, 295:22,
295:23, 296:1,
296:2, 296:14,
296:21, 296:23,
297:19, 301:14,
301:17, 301:19,
302:5, 302:7,
302:12, 302:16,
302:21, 302:22,
302:25, 305:2,
305:18, 372:22,
378:7, 394:19
**story's** [2] - 302:15,
303:12
**straggler** [1] - 253:9
**straight** [2] - 279:6,
335:14
**straightforward** [1] -
282:25
**stream** [1] - 347:5
**Street** [1] - 250:15
**strength** [3] - 260:3,
260:10, 260:20
**strengths** [1] - 261:10
**stretch** [1] - 359:16
**strictly** [1] - 350:6
**strike** [1] - 276:24
**strikes** [2] - 254:19,
259:3
**string** [1] - 330:11
**strong** [5] - 260:2,
269:22, 282:14,
282:15, 377:7
**strongly** [1] - 377:18
**Strzok** [5] - 368:14,
368:25, 369:1,
369:4, 370:9
**studied** [1] - 348:19
**stuff** [5] - 260:14,
294:18, 309:9,
348:10, 356:4
**stumble** [1] - 297:17
**Subcategories** [1] -
254:10
**subject** [6] - 266:13,
322:8, 349:1, 381:7
**subjects** [2] - 322:4,
322:18
**submit** [1] - 297:16
**subpoena** [4] -

351:19, 351:25,
352:3, 352:5
**subpoenas** [4] -
305:9, 351:6, 351:8,
352:7
**subscriptions** [1] -
321:7
**subsequent** [2] -
366:16, 390:22
**subset** [3] - 337:19,
338:8, 338:9
**substance** [1] - 340:10
**substantiated** [1] -
258:19
**substantive** [2] -
350:12, 350:15
**substitute** [1] - 271:8
**succeeded** [1] -
283:15
**sudden** [2] - 267:23,
267:24
**suffixes** [1] - 329:20
**suggest** [7] - 259:5,
266:8, 267:3, 380:8,
384:19, 385:1
**suggested** [2] - 385:6,
385:18
**suggesting** [2] -
267:1, 302:20
**suggestion** [3] -
267:14, 267:18,
269:22
**suggestions** [1] -
270:14
**suggests** [1] - 393:16
**summarized** [1] -
273:8
**SUMMARY** [1] - 382:2
**summary** [10] - 253:2,
253:4, 369:24,
370:1, 372:20,
373:7, 381:3, 381:4,
381:20
**summer** [6] - 283:19,
285:5, 290:17,
294:5, 299:5, 309:3
**Sunday** [4] - 280:5,
302:18, 304:10,
305:22
**supervising** [2] -
319:8, 319:20
**supervisor** [8] -
364:24, 365:1,
366:6, 366:19,
369:14, 372:15,
377:24, 389:19
**Supervisory** [4] -
316:24, 317:2,
360:14, 360:15
**supplemental** [1] -

253:13
**supplying** [1] - 313:15
**support** [6] - 257:14,
291:16, 297:2,
321:18, 388:19,
394:1
**supported** [1] - 378:19
**supporting** [2] -
321:14, 381:25
**supposed** [5] -
285:22, 305:2,
341:3, 347:23,
379:10
**supposedly** [4] -
281:8, 285:14,
364:2, 379:7
**surf** [1] - 285:3
**surprise** [2] - 283:11,
296:4
**surprising** [1] - 306:16
**suspect** [2] - 315:10,
393:21
**suspended** [1] - 341:9
**suspicious** [4] -
383:21, 383:22,
384:2, 384:6
**Sussman** [89] -
256:18, 256:24,
260:13, 264:2,
265:25, 266:11,
266:12, 267:22,
267:25, 269:15,
269:16, 272:18,
272:23, 273:1,
273:15, 273:22,
273:24, 281:19,
294:14, 294:23,
295:4, 295:15,
295:21, 296:5,
296:20, 296:24,
297:13, 297:21,
298:2, 298:6,
298:12, 299:6,
299:18, 299:19,
299:25, 300:3,
300:11, 300:13,
300:15, 300:18,
300:19, 300:20,
301:9, 301:16,
301:25, 302:6,
302:19, 302:24,
303:5, 303:11,
303:16, 303:19,
303:21, 303:23,
304:5, 304:17,
304:23, 305:15,
305:25, 306:24,
307:1, 307:13,
307:21, 308:10,
308:13, 308:16,

308:18, 308:24,
309:11, 309:15,
309:19, 309:21,
310:23, 311:8,
312:2, 312:8,
312:16, 313:3,
313:15, 313:21,
314:5, 314:11,
314:15, 356:25,
357:1, 357:8,
357:13, 357:15,
357:19
**Sussman's** [5] -
296:12, 298:5,
301:24, 310:19,
313:1
**SUSSMANN** [1] -
250:6
**Sussmann** [23] -
252:4, 272:14,
274:20, 278:25,
286:10, 293:19,
293:20, 293:22,
293:23, 295:3,
295:4, 295:18,
295:19, 297:7,
305:20, 306:8,
306:10, 308:1,
309:5, 309:22,
311:15, 313:8,
313:12
**sustain** [2] - 276:17,
276:20
**sustained** [1] - 276:24
**swirling** [1] - 294:7
**Sworn** [2] - 316:16,
360:4
**sworn** [6] - 275:21,
276:12, 289:17,
316:11, 360:1, 360:2
**synonymous** [1] -
327:3
**system** [3] - 340:25,
346:2, 361:11
**System** [4] - 284:24,
325:2, 325:11,
362:23
**systems** [3] - 362:4,
374:14

## T

**tab** [1] - 337:12
**table** [6] - 253:1,
253:4, 274:8,
274:20, 311:23,
356:25
**tandem** [1] - 371:24
**Task** [2] - 317:25,
318:1
**task** [2] - 282:25,

377:24
**tasked** [2] - 269:18,
291:16
**tasks** [2] - 371:24,
371:25
**Team** [1] - 319:16
**team** [8] - 274:2,
274:5, 274:13,
319:17, 319:23,
357:4, 357:7, 360:17
**Technical** [4] - 317:3,
318:20, 320:7,
320:24
**technical** [25] - 257:3,
319:1, 320:11,
321:19, 321:22,
322:19, 324:4,
350:6, 369:22,
372:9, 372:20,
373:8, 375:8, 376:5,
378:20, 385:5,
385:16, 385:17,
385:25, 386:10,
387:11, 391:11,
394:17, 394:18,
394:21
**techniques** [1] - 351:4
**technology** [2] -
317:14, 323:7
**telephone** [1] - 325:8
**ten** [2] - 341:21, 396:5
**tends** [1] - 337:22
**tens** [3] - 294:25,
299:1, 354:8
**term** [3] - 341:13,
365:3, 385:8
**terminology** [2] -
291:13, 382:7
**terms** [14] - 257:18,
261:9, 269:21,
270:6, 320:9,
320:20, 338:16,
339:16, 365:6,
380:14, 386:21,
386:22, 387:9,
387:17
**terribly** [1] - 255:1
**testified** [11] - 266:2,
269:17, 289:4,
306:6, 306:9, 349:7,
352:24, 373:25,
375:23, 379:13,
384:17
**testifies** [2] - 257:24,
263:9
**testify** [9] - 255:25,
256:5, 264:7, 269:6,
289:3, 312:25,
313:11, 364:11,
364:14

**testifying** [1] - 266:16
**testimony** [34] -
253:17, 253:18,
257:10, 257:11,
259:25, 260:1,
260:18, 260:20,
260:25, 262:21,
263:5, 263:6, 263:8,
264:6, 266:24,
267:5, 268:11,
269:11, 269:13,
269:25, 275:21,
289:7, 289:17,
289:23, 290:6,
291:13, 315:16,
323:22, 324:9,
353:1, 359:12,
359:13, 371:10,
396:12
**text** [9] - 280:12,
280:16, 290:10,
296:5, 302:24,
303:3, 304:10,
305:21, 337:15
**texted** [2] - 280:7,
280:8
**THE** [111] - 250:1,
250:1, 250:10,
252:2, 252:5, 252:8,
252:13, 253:5,
253:7, 254:9,
255:23, 256:18,
257:7, 257:10,
257:17, 258:13,
258:18, 259:2,
259:15, 260:3,
260:6, 260:25,
261:15, 261:23,
262:11, 262:14,
262:16, 262:19,
262:25, 263:14,
263:25, 264:12,
264:21, 265:6,
265:15, 265:20,
266:4, 266:6, 266:8,
266:22, 267:12,
268:6, 268:22,
269:3, 269:24,
270:3, 270:9,
270:11, 270:12,
270:22, 270:25,
271:2, 274:11,
274:22, 293:14,
300:25, 315:12,
315:20, 315:21,
315:24, 316:2,
316:8, 316:12,
316:14, 316:15,
321:3, 321:5,
323:17, 323:19,

323:21, 324:20,
324:22, 327:22,
338:12, 348:3,
354:22, 354:24,
354:25, 355:1,
355:2, 355:3, 355:4,
355:5, 355:8,
357:25, 358:24,
359:2, 359:3, 359:5,
359:11, 359:20,
359:23, 360:3,
361:3, 361:6,
361:17, 367:11,
373:15, 375:13,
381:10, 383:9,
388:7, 388:10,
394:5, 394:8, 396:2,
396:3, 396:11,
396:16, 396:17,
396:20
**theirs** [1] - 379:23
**themselves** [3] -
274:4, 295:8, 310:9
**then-FBI** [1] - 364:20
**theory** [2] - 297:2,
312:3
**thereafter** [1] - 275:1
**they've** [3] - 297:15,
320:14, 337:19
**thinking** [3] - 281:19,
290:22, 293:20
**thinks** [1] - 275:4
**third** [11] - 275:23,
286:23, 297:10,
300:3, 309:18,
324:25, 337:24,
345:3, 345:5,
356:16, 376:21
**thoroughly** [1] -
313:17
**thousand** [1] - 341:19
**thousands** [4] - 301:3,
325:22, 335:19,
377:2
**threat** [2] - 282:2,
290:25
**threats** [1] - 382:11
**three** [11] - 254:22,
286:7, 290:4,
344:23, 345:14,
347:9, 361:1, 379:1,
383:22, 384:4, 392:1
**throughout** [6] -
253:1, 273:17,
273:25, 277:8,
319:22, 383:12
**throw** [2] - 298:21,
304:5
**thumb** [15] - 281:15,
281:17, 292:5,

292:7, 292:8, 366:1,
366:14, 366:16,
370:18, 371:11,
375:22, 381:20,
382:1, 390:8
**Thursday** [1] - 304:12
**tie** [2] - 268:2, 299:9
**ties** [3] - 265:19,
286:16, 299:8
**timing** [1] - 384:5
**tips** [1] - 305:16
**title** [2] - 317:1, 373:20
**TLD** [2] - 330:8,
331:14
**today** [10] - 256:5,
257:15, 257:25,
264:23, 269:6,
297:3, 324:10,
348:17, 349:4,
364:11
**together** [12] - 266:11,
280:19, 285:24,
300:17, 307:6,
307:17, 311:14,
362:17, 363:19,
378:10, 381:4, 389:8
**tomorrow** [1] - 269:7
**tongue** [1] - 288:24
**took** [14] - 256:17,
257:5, 264:20,
286:6, 294:14,
295:4, 295:12,
304:17, 310:22,
318:19, 345:17,
345:19, 364:19,
381:13
**tool** [2] - 278:23,
282:21
**tools** [4] - 387:12,
387:13, 392:18,
392:23
**top** [19] - 262:5, 279:7,
280:8, 286:2, 294:3,
295:11, 298:10,
298:16, 298:17,
330:9, 331:15,
339:5, 339:7,
368:21, 373:20,
381:22, 381:23,
386:5, 386:6
**top-line** [1] - 386:6
**topic** [4] - 263:1,
306:12, 323:14,
339:12
**topics** [3] - 322:2,
389:22, 389:24
**TOR** [31] - 324:14,
342:20, 342:21,
343:1, 343:17,
343:19, 343:20,

343:24, 344:3,
344:9, 344:14,
344:15, 344:18,
344:20, 344:21,
344:22, 345:7,
345:24, 346:2,
346:18, 346:21,
346:24, 347:7,
347:13, 347:16,
347:21, 347:23,
348:1, 384:16
**total** [3] - 335:25,
341:22, 342:16
**totally** [1] - 350:11
**touch** [1] - 286:2
**towards** [1] - 375:25
**towers** [1] - 333:5
**track** [1] - 365:9
**trade** [1] - 361:15
**trademarks** [1] -
361:15
**traffic** [20] - 254:14,
254:15, 255:19,
284:23, 285:7,
286:14, 290:1,
318:10, 318:12,
319:2, 319:4, 320:3,
321:6, 322:2,
323:14, 336:1,
344:23, 347:2,
348:14, 374:19
**trail** [2] - 284:25, 285:3
**training** [3] - 321:24,
348:23, 349:3
**trainings** [1] - 322:5
**trajectory** [1] - 255:7
**transactions** [1] -
257:22
**transcript** [3] - 278:10,
397:5, 397:6
**TRANSCRIPT** [1] -
250:9
**translate** [1] - 338:2
**translating** [1] - 363:9
**transmit** [1] - 363:11
**transmitted** [1] - 329:5
**transparent** [1] - 328:7
**treated** [1] - 301:19
**trial** [34] - 253:1,
265:24, 267:25,
269:21, 271:6,
271:9, 271:20,
272:2, 272:11,
272:24, 273:10,
273:13, 273:17,
273:25, 274:22,
276:10, 276:11,
277:9, 277:24,
277:25, 278:1,
278:4, 278:5,

278:10, 282:25,
300:23, 301:7,
309:13, 314:14,
314:15, 314:22,
324:6, 365:15,
383:12
**TRIAL** [1] - 250:9
**tried** [2] - 272:14,
363:18
**tries** [1] - 299:11
**trigger** [3] - 283:14,
340:17, 393:3
**triggered** [1] - 393:7
**trivial** [1] - 292:23
**Trojan** [1] - 320:19
**true** [8] - 260:10,
260:15, 267:20,
279:15, 379:12,
390:19, 397:4, 397:6
**truly** [1] - 297:23
**Trump** [31] - 281:9,
282:16, 284:8,
285:9, 285:13,
285:19, 286:15,
292:17, 294:11,
296:23, 299:16,
302:20, 302:21,
305:12, 307:5,
357:6, 364:3, 374:6,
374:13, 374:16,
376:9, 376:16,
378:1, 378:15,
379:3, 379:18,
379:19, 379:21,
380:20, 384:24,
384:25, 385:21,
386:3, 386:14,
386:16, 386:19,
386:23, 391:19
**trump** [1] - 384:14
**Trump's** [4] - 294:8,
294:12, 299:8,
299:16
**Trump-associated** [1]
- 386:23
**trump-email.com** [1] -
384:14
**Trump/Alfa** [1] -
290:18
**trust** [3] - 292:24,
393:11, 394:25
**trusted** [9] - 280:22,
294:4, 294:19,
294:22, 298:16,
298:17, 299:3,
299:24, 354:3
**truth** [2] - 292:20,
292:22
**truthful** [2] - 393:18,
395:15

**try** [7] - 262:22,
287:22, 325:22,
341:5, 351:6,
356:19, 363:2
**trying** [31] - 259:20,
259:21, 267:2,
277:18, 299:10,
299:12, 302:2,
310:3, 310:5, 310:8,
310:25, 311:5,
311:10, 311:11,
311:24, 326:8,
326:17, 329:17,
333:7, 334:18,
334:19, 336:1,
341:4, 347:19,
349:9, 362:3,
362:14, 376:7,
388:15
**Tuesday** [1] - 250:4
**turn** [1] - 297:17
**turned** [1] - 337:13
**turning** [1] - 346:24
**turns** [1] - 314:16
**tutorial** [1] - 324:10
**two** [42] - 257:22,
257:23, 262:3,
266:20, 266:25,
268:14, 269:5,
269:17, 271:7,
271:24, 272:21,
279:17, 281:15,
282:9, 283:9,
283:17, 285:24,
286:5, 287:7, 291:5,
292:2, 292:5, 292:6,
292:7, 292:8, 294:2,
298:1, 299:24,
302:23, 304:23,
323:24, 334:5,
340:1, 340:7, 348:1,
363:10, 369:22,
371:24, 372:19,
378:21, 384:3, 391:5
**two-and-a-half-page**
[1] - 262:3
**type** [2] - 330:12,
337:12
**type-separated** [1] -
337:12
**typed** [1] - 329:2
**types** [6] - 290:4,
323:25, 328:5,
361:8, 362:5, 391:21
**typically** [2] - 358:15,
371:3

## U

**U.K** [1] - 343:14
**U.S** [5] - 250:23,

323:8, 352:9, 354:7,
395:11
**ultimate** [5] - 255:5,
259:22, 276:14,
389:5, 389:9
**ultimately** [7] - 255:8,
258:13, 258:15,
284:9, 290:24,
297:21, 305:13
**unable** [1] - 256:1
**unauthorized** [1] -
361:9
**uncomfortable** [1] -
278:2
**unconnected** [1] -
253:22
**uncontestable** [1] -
260:15
**uncontroversial** [2] -
260:7, 260:8
**undated** [1] - 266:25
**under** [7] - 283:4,
289:3, 289:4, 298:8,
306:7, 306:9, 374:3
**underlying** [1] - 375:1
**undermined** [1] -
257:13
**underneath** [1] -
336:15
**understood** [3] -
255:10, 259:9,
367:25
**unfamiliar** [1] - 362:22
**unfolded** [1] - 258:2
**UNISON** [2] - 271:1,
293:17
**unit** [7] - 317:1,
319:21, 319:23,
320:23, 321:17,
382:8, 382:9
**Unit** [4] - 317:3,
318:21, 320:8,
320:24
**UNITED** [3] - 250:1,
250:3, 250:10
**United** [7] - 250:12,
252:3, 283:4, 298:7,
316:6, 362:15,
397:11
**units** [1] - 361:20
**universe** [1] - 254:18
**universities** [1] -
325:15
**University** [1] - 317:11
**unless** [3] - 259:13,
273:17, 396:15
**unlike** [1] - 310:20
**unnamed** [1] - 289:16
**unquote** [1] - 280:14
**unrelated** [1] - 267:4

**unusual** [1] - 335:15
**unusually** [3] - 374:6, 374:9, 376:16
**unusually-configured** [1] - 376:16
**up** [86] - 252:6, 253:25, 256:10, 258:9, 266:19, 268:2, 271:16, 271:23, 278:4, 283:20, 284:6, 285:1, 288:17, 295:25, 299:1, 299:12, 301:24, 302:25, 306:13, 309:18, 309:19, 310:24, 311:8, 311:17, 316:8, 325:23, 326:25, 327:2, 328:11, 329:17, 331:7, 332:7, 333:19, 333:20, 334:7, 334:25, 335:4, 336:20, 337:3, 337:4, 337:7, 337:24, 339:15, 339:17, 339:22, 340:2, 340:3, 340:4, 340:5, 340:8, 340:9, 340:11, 340:16, 340:18, 340:21, 341:1, 341:5, 341:10, 342:4, 343:13, 343:24, 345:24, 346:18, 347:12, 349:8, 349:16, 349:17, 349:18, 350:1, 350:7, 350:8, 350:11, 350:14, 357:18, 359:15, 359:24, 380:22, 381:14, 387:12, 387:20, 392:17
**upper** [1] - 367:17
**ups** [6] - 253:19, 257:22, 299:9, 331:2, 333:25, 342:2
**urgency** [1] - 287:1
**urgent** [1] - 280:21
**useful** [2] - 271:15, 353:12
**user** [7] - 327:9, 327:17, 329:6, 331:24, 332:25, 333:10, 337:10
**user's** [1] - 339:2
**usual** [1] - 253:10

**utilities** [1] - 340:20

# V

**V3** [1] - 373:22
**valuable** [2] - 353:10, 353:15
**value** [2] - 337:12, 353:16
**variety** [2] - 346:14, 362:15
**various** [7] - 256:11, 284:22, 318:14, 322:2, 348:25, 389:24, 392:4
**vast** [1] - 284:22
**verdict** [1] - 293:11
**Verizon** [4] - 327:21, 328:1, 328:24, 329:4
**version** [1] - 264:1
**vet** [2] - 266:1, 266:9
**victim** [3] - 287:11, 356:11, 356:17
**Video** [1] - 303:25
**view** [2] - 256:23, 387:1
**viewed** [1] - 287:15
**views** [5] - 264:19, 282:23, 389:14, 389:21, 389:24
**violation** [1] - 361:15
**violations** [1] - 361:14
**Virginia** [3] - 318:23, 343:13, 363:22
**virus** [2] - 320:18, 320:19
**viruses** [1] - 320:16
**visibility** [18] - 255:6, 255:13, 255:17, 256:13, 256:15, 256:16, 258:23, 341:13, 341:22, 341:23, 342:11, 342:17, 352:24, 353:13, 355:16, 355:24, 356:2, 356:20
**visit** [1] - 328:3
**visiting** [2] - 343:10, 346:4
**visual** [1] - 336:16
**Vladimir** [1] - 294:13
**vocab** [1] - 341:13
**volume** [1] - 260:11
**voluntarily** [1] - 371:5
**volunteers** [1] - 343:4
**vs** [2] - 250:5, 252:4

# W

**wager** [1] - 387:10
**walk** [9] - 292:14, 297:3, 297:22, 298:18, 317:21, 326:24, 335:1, 349:5, 396:6
**walked** [2] - 279:4, 288:5
**walking** [2] - 313:3, 327:4
**wants** [2] - 253:12, 303:3
**warrant** [11] - 351:2, 351:19, 352:3, 352:19, 352:20, 352:21, 352:22, 352:23, 358:15, 358:18, 392:21
**warrants** [3] - 352:14, 352:16, 358:5
**was..** [1] - 355:6
**Washington** [4] - 250:15, 250:24, 363:24, 397:13
**WATKINS** [1] - 250:19
**ways** [2] - 352:4, 387:11
**weakness** [1] - 261:10
**web** [11] - 326:15, 332:5, 332:13, 332:16, 332:18, 332:19, 332:21, 333:1, 344:19
**website** [12] - 326:15, 343:6, 343:10, 344:11, 345:12, 345:13, 345:16, 349:19, 363:5, 363:8, 363:10, 369:23
**Wednesday** [1] - 304:11
**week** [4] - 303:16, 304:9, 305:23, 311:6
**weeks** [7] - 267:10, 271:7, 274:23, 277:13, 287:17, 383:22, 384:4
**weigh** [1] - 276:14
**weird** [4] - 260:24, 294:12, 299:9, 299:15
**welcome** [2] - 252:14, 316:2
**well-connected** [1] - 278:18
**whatsoever** [1] - 306:7
**whereas** [1] - 392:22

**White** [2] - 265:15, 373:22
**white** [5] - 281:16, 290:13, 292:8, 307:11, 381:25
**whole** [3] - 296:6, 298:20, 346:14
**wholly** [1] - 265:23
**wide** [4] - 322:18, 361:25, 362:5, 389:21
**widely** [1] - 325:20
**willfully** [2] - 272:15, 279:23
**willing** [5] - 370:19, 380:2, 380:3, 380:7
**win** [1] - 285:23
**wind** [1] - 271:23
**winning** [2] - 295:13, 302:8
**wire** [1] - 332:3
**wires** [1] - 327:14
**withdraw** [1] - 355:9
**withdrawn** [1] - 276:21
**witness** [18] - 252:21, 252:23, 253:2, 253:4, 266:14, 275:9, 276:23, 277:1, 277:3, 290:5, 314:22, 314:24, 315:16, 316:4, 316:11, 356:10, 356:17, 360:2
**WITNESS** [12] - 251:2, 316:14, 321:5, 348:3, 354:24, 355:1, 355:3, 355:5, 359:2, 359:5, 361:6, 396:2
**witness's** [2] - 276:22, 291:13
**witnesses** [12] - 275:8, 275:21, 276:16, 289:23, 291:2, 304:15, 305:10, 312:24, 323:25, 324:1, 324:2, 324:3
**wonder** [1] - 339:2
**wonderful** [1] - 262:15
**word** [2] - 258:7, 386:16
**words** [12] - 254:10, 255:18, 258:24, 262:5, 265:11, 280:17, 289:10, 311:24, 368:5, 383:4, 387:1, 387:8
**Workbook** [1] - 339:6
**works** [7] - 301:22,

325:6, 325:7, 335:24, 343:16, 344:9, 349:5
**world** [15] - 254:15, 299:7, 304:3, 319:18, 322:23, 323:1, 323:2, 327:12, 327:16, 329:16, 331:4, 335:17, 335:20, 336:1, 353:4
**world's** [1] - 294:17, 298:24
**worry** [2] - 271:20, 305:14
**worthwhile** [1] - 262:2
**write** [10] - 269:18, 271:17, 271:21, 280:12, 295:14, 303:8, 338:18, 370:21, 371:6, 381:14
**writer** [1] - 387:22
**writers** [1] - 387:22
**writing** [1] - 290:9
**written** [1] - 378:18
**wrote** [7] - 258:9, 292:3, 309:6, 311:2, 369:25, 379:17, 389:6
**www.Google.com** [2] - 331:23, 332:12

# X

**XYZ** [1] - 363:6
**XYZ.com** [2] - 363:5, 363:8

# Y

**Yahoo** [4] - 334:2, 336:6, 336:20
**Yahoo's** [1] - 339:3
**Yahoo.com** [2] - 325:5, 326:20
**Yao** [1] - 274:19
**YAO** [1] - 250:18
**year** [3] - 284:20, 287:9, 338:24
**years** [12] - 280:19, 284:2, 298:7, 298:11, 299:25, 306:17, 306:21, 317:5, 317:21, 319:15, 360:20, 361:1
**yesterday** [6] - 252:15, 271:22, 272:12, 274:4, 274:17, 306:20

423

**York** [6] - 250:20,
   286:21, 295:13,
   302:7, 302:22, 305:1
**yourself** [2] - 316:20,
   366:2
**yourselves** [6] - 272:9,
   280:16, 304:4,
   304:19, 309:22,
   310:2
**YouTube** [1] - 326:20

## Z

**zero** [2] - 313:12,
   313:20