```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA,      Criminal Action No.
             Plaintiff,            1:21-CR-00582-CRC-1

                                   May 17, 2022
             vs.                   2:19 p.m.

MICHAEL A. SUSSMANN,               *AFTERNOON SESSION*
             Defendant.
```

---

```
              TRANSCRIPT OF JURY TRIAL
   HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
            UNITED STATES DISTRICT JUDGE
```

---

APPEARANCES:

```
For the United States:    ANDREW DeFILIPPIS, ESQ.
                          JONATHAN EDGAR ALGOR, IV, ESQ.
                          MICHAEL T. KEILTY, ESQ.
                          BRITTAIN SHAW, ESQ.
                            SPECIAL COUNSEL'S OFFICE
                            145 N Street Northeast
                            Washington, DC 20002
                            (212) 637-2231


For the Defendant:        SEAN M. BERKOWITZ, ESQ.
                          MICHAEL BOSWORTH, ESQ.
                          CATHERINE YAO, ESQ.
                          NATALIE HARDWICK RAO, ESQ.
                            LATHAM & WATKINS LLP
                            1271 Avenue of the Americas
                            New York, NY 10020
                            (212) 906-1200



Court Reporter:           Lorraine T. Herman, RPR, CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6718
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3187
```

<u>I N D E X</u>

| <u>WITNESS</u> | <u>PAGE</u> |
|---|---|

**SCOTT HELLMAN**

| | |
|---|---|
| Cross-Examination by Mr. Berkowitz | 429 |
| Redirect Examination by Mr. DeFelippis | 481 |
| Recross-Examination by Mr. Berkowitz | 496 |

**STEVE DEJONG**

| | |
|---|---|
| Direct Examination by Mr. DeFilippis | 501 |
| Cross-Examination by Mr. Bosworth | 524 |

<u>E X H I B I T S</u>

| <u>EXHIBIT</u> | | <u>PAGE</u> |
|---|---|---|
| Defendant's No. 513 | Admitted into Evidence | 460 |
| Defendant's No. 514 | Admitted into Evidence | 468 |
| Defendant's No. 531 | Admitted into Evidence | 496 |
| Government's No. 111 | Admitted into Evidence | 512 |
| Government's No. 1600 | Admitted into Evidence | 515 |
| Government's No. 1602 | Admitted into Evidence | 517 |
| Government's No. 717 | Admitted into Evidence | 519 |
| Government's No. 716 | Admitted into Evidence | 521 |
| Government's No. 719 | Admitted into Evidence | 523 |

1              **P R O C E E D I N G S**

2              **THE COURT:**  All right.  I hope everyone had a nice

3      lunch.

4              Mr. Bosworth, I think I cut you off.

5              **MR. BOSWORTH:**  Thank you, Your Honor.

6              There had been two issues.  Now there's just one.

7              **THE COURT:**  If I waited another 10 minutes, would

8      there be zero?

9              **MR. BOSWORTH:**  By dinner time you'll be good.

10             The issue relates to the subject matter that we

11     objected over during Special Agent-1's testimony, and I just

12     wanted to explain a little more and, apologies, I should

13     have said I wanted to pick up the phone to discuss.

14             And that relates to the termination of Rodney

15     Joffe's status as a confidential human source.

16             **THE COURT:**  Right.

17             **MR. BOSWORTH:**  Our understanding is that Mr. Joffe

18     was terminated as a source for cause in 2021 as an outgrowth

19     of this investigation.  Our concern is that the termination

20     of Mr. Joffe sounds prejudicial as though he had been

21     charged or at least raises questions about whether he has

22     been separately charged, that's a reason for his absence, or

23     that there's something else going on that they are not

24     hearing about.

25             We think that it's appropriate to limit discussion

1    of his status as a source to the time period relevant in the

2    indictment, 2016, '17, '18, but we think it is prejudicial

3    to explore or elicit further testimony about his termination

4    given that it happened so late and was connected to this

5    case.  That's the basis of the objection, and we think this

6    will keep coming up so we just wanted to file it.

7              THE COURT:  Remind me, the witness said he was not

8    aware of whether he had or had not been terminated; is that

9    right?

10             MR. BOSWORTH:  That's correct.

11             THE COURT:  So it's not so much the evidence

12   that's in the record but --

13             MR. BOSWORTH:  It's what's to come.

14             THE COURT:  -- prophylactic?

15             MR. BOSWORTH:  Yes, sir.

16             THE COURT:  Do you want to respond or?

17             MR. DeFILIPPIS:  Yes, briefly, Your Honor.

18             I think the government's view is that Mr. Joffe's

19   termination as a source really does concern his conduct in

20   2016 and the reason he was terminated.  Although it came to

21   light because of this investigation, the reason he was

22   terminated, as we understand it from the FBI, is because of

23   what he did in connection with the conduct that the

24   defendant was involved in, which is, rather than bringing

25   this Alfa-Bank information to his source handler, bringing

1      it to the general counsel of the FBI, that was a breach of

2      how a source is supposed to report information.

3              So to the extent that the defense is trying to

4      advance the argument, which they are absolutely entitled to,

5      that Mr. Joffe was at one time a trusted source, a paid

6      source, absolutely, they should be able to do that.  But we

7      think it would unfairly hamstring the government to not be

8      able to point out that, in fact, the very things he was

9      doing as alleged in this case were a breach of what a source

10     is supposed to do.

11              **THE COURT:**  I want you to steer clear of that

12     topic for two reasons.  One, as Mr. Bosworth said, what's at

13     issue is how he was regarded by the FBI at the time, not

14     subsequently.

15              Second, the Court has already ruled that the

16     propriety of his gathering and collection effort and what he

17     did with the data is not at issue.  So for those two

18     reasons, let's keep that out.

19              **MR. DeFILIPPIS:**  Okay, Your Honor.

20              **THE COURT:**  Thanks.

21              **THE COURT:**  All right.

22              Are we ready to go?  Mr. Berkowitz, you'll be

23     crossing him?

24              **MR. BERKOWITZ:**  I figure I should do some work

25     today.

1    **THE COURT:**  You may step up.

2    **CROSS-EXAMINATION OF SCOTT HELLMAN**

3    **DEPUTY CLERK:**  Your Honor, jury panel.

4    (Jury entered the courtroom.)

5    **THE COURT:**  All right.  Welcome back, ladies and

6    gentlemen.  I hope you enjoyed your lunch.  We are ready to

7    get back started with the cross-examination of Agent

8    Hellman.  You can be seated.

9    I would remind you that you're still under oath.

10   **THE WITNESS:**  Yes, sir.

11   BY MR. BERKOWITZ:

12   **Q.**   Special Agent Hellman, you don't know my client,

13   Michael Sussmann, do you?

14   **A.**   No, sir.

15   **Q.**   You've never spoken with him?

16   **A.**   Correct, no.

17   **Q.**   You don't know what role, if any, he played in the

18   white paper that you analyzed?

19   **A.**   At the time, no.

20   **Q.**   You didn't know what he knew or didn't know about

21   the white paper.  Correct?

22   **A.**   Correct.

23   **Q.**   You don't even know, at least as of that time, who

24   it was that provided the thumb drive and white paper to

25   Mr. Baker, do you?

1      **A.**    That's correct.  I did not know.

2      **Q.**    In fact, at least as of 2020, you said to this day

3  I still don't know.  Correct?

4      **A.**    Correct.

5      **Q.**    Nor do you know what happened in the meeting

6  between Mr. Baker and Mr. Sussmann on September 19th.

7  Correct?

8      **A.**    Correct.  I did not know anything about a meeting.

9      **Q.**    Or any of the subsequent communications that

10  Mr. Baker and Mr. Sussmann had.  Right?

11      **A.**    Correct.

12      **Q.**    And you don't know me, do you?

13      **A.**    No, sir.

14      **Q.**    Never met before?

15      **A.**    Correct.

16      **Q.**    But you do know Mr. DeFilippis.  Correct?

17      **A.**    I do.

18      **Q.**    And, in fact, you've met with him a number of

19  times in connection with this case.  Correct?

20      **A.**    Yes.

21      **Q.**    Do you know how many times?

22      **A.**    In person?

23      **Q.**    Or via telepresence?

24      **A.**    I believe three times in telepresence and another

25  in person.  And then, dating back to 2020, maybe two

1    additional times, maybe five telepresence and one in person

2    plus today.

3        **Q.**   If I told you it was six, do you think that would

4    be correct?  I'll run through each of them with you briefly.

5        **A.**   Could be.

6        **Q.**   So March 12th of 2020, you met with Mr. DeFilippis

7    in order to be interviewed in connection with this case.

8    Correct, as a fact witness?

9        **A.**   Yes.

10       **Q.**   And during that interview, there was an FBI

11   Special Agent Beutler that was present?

12       **A.**   I believe that's accurate.

13       **Q.**   And typically when an FBI -- when there is an

14   interview conducted with an FBI agent present, the FBI agent

15   takes notes.  Correct?

16       **A.**   The FBI takes notes pretty much during any

17   interview.

18       **Q.**   And in connection with an interview involving a

19   case, those notes can be written up into a report.  Correct?

20       **A.**   Yes.

21       **Q.**   Those reports are what's known as an FBI-302.

22   Correct?

23       **A.**   Yes, it would be known as an FD-302.

24       **Q.**   It's something that's common to people like us,

25   but the jury doesn't know.  Explain to the jury, if you

1      could, what an FBI-302 is and what the purpose of it is.

2          **A.**    The purpose of a 302 is to document pretty much

3      any observation an FBI agent might make.  If that's an

4      interview, you interview someone, you're going to take notes

5      and then you're going to document anything that was talked

6      about during the interview.

7          **Q.**    The agent is trained to be accurate in their note

8      taking.  Correct?

9          **A.**    Yes.  We do have practice doing interviews during

10     training, yes.

11         **Q.**    And that is because, at some point, the witness

12     may testify at trial.  Correct?

13         **A.**    Yes.

14         **Q.**    And you want to have as accurate a reflection as

15     possible as you do of what occurred.  Correct?

16         **A.**    Yes.

17         **Q.**    Does the FBI ever tape record interviews?

18         **A.**    Yes.

19         **Q.**    Okay.  Do you know whether your interviews were

20     tape recorded?

21         **A.**    I do not believe they were.

22         **Q.**    And with respect to -- so we talked about March

23     12th of 2020.

24                You met the very next day.  Correct?

25         **A.**    Yes.

1      Q.    With Mr. DeFilippis and Special Agent Beutler?

2      A.    Over the phone, yes.

3      Q.    I'm sorry over the phone.  Was it a factual

4    interview?  In other words, were you providing them

5    information in connection with the case?

6      A.    Yes.

7      Q.    And did you call them back or did they call you

8    back to follow up?

9      A.    I called them back to follow up.

10      Q.    You went and looked at some more information; is

11    that right?

12      A.    I remembered additional things.  I hadn't talked

13    about the -- prior to that previous interview on the 12th, I

14    hadn't really thought about the situation in almost two

15    years.  We had the initial interview.  And then I thought

16    about it some more, remembered some additional things, and

17    called back to make sure I was providing complete answers to

18    their questions.

19      Q.    Because it can be difficult to remember things

20    from several years ago.  Right?

21      A.    Yes.

22      Q.    Sometimes you refresh your recollection before you

23    talk about them.  Right?

24      A.    Yes.

25      Q.    And you also spoke with Nate Batty around that

1    time.  Right?

2        **A.**   Yes.

3        **Q.**   Did you talk to him before the first interview to

4    kind of get ready for it?

5        **A.**   I think so, but I don't remember.

6        **Q.**   Is that something that you encourage witnesses to

7    do, to talk to other witnesses to see if your recollections

8    are consistent?

9        **A.**   No.

10       **Q.**   Okay.  It's not something that would be ordinary

11   practice.  Correct?

12       **A.**   Correct.  I was unaware at the time what the topic

13   of the interview would be.  I was making some assumptions.

14       **Q.**   And then, more recently, you met with

15   Mr. DeFilippis and I think Johnny Algor, who is also at the

16   table here, who's an Assistant U.S. Attorney.  Correct?

17       **A.**   Yes.

18       **Q.**   They wanted to talk to you about whether you might

19   be able to act as an expert in this case about DNS data?

20       **A.**   Correct.

21       **Q.**   You said, while you had some superficial

22   knowledge, you didn't necessarily feel qualified to be an

23   expert in this case.  Correct, on DNS data?

24       **A.**   On DNS data, that's correct.

25       **Q.**   You then met on May 6th, May 12th and yesterday,

1    May 16th, and when I say met, it could have been via

2    telepresence.  I don't know.  But you interacted with them

3    in connection with preparation for your testimony.  Correct?

4         A.   Yes.

5         Q.   And last night they even went over with you what I

6    might ask you.  Right?

7         A.   Correct.

8         Q.   Okay.  So hopefully, we can make this smooth,

9    since it's my first time meeting and talking to you, but

10   let's see what we can do.  Let's turn to your testimony.

11   I'm going to hit the topics.  You testified a little bit

12   about yourself.  Right?

13        A.   Yes.

14        Q.   You testified a little bit about obtaining the

15   evidence, the collection of the evidence.  Correct?

16        A.   Yes.

17        Q.   You testified about your analysis of what you did

18   with the evidence.  Right?

19        A.   Yes.

20        Q.   You testified about your conclusions about the

21   analysis of the evidence?

22        A.   Yes.

23        Q.   And then finally why you think it mattered if you

24   knew the source, essentially.  Right?  High-level topics?

25        A.   Correct.

1    Q.   Okay.  That's my road map just so you know where

2    we're going for the cross-examination.  So let's talk about

3    your background.  You are a Supervisory Special Agent.

4    Correct?

5    A.   Yes, sir.

6    Q.   Let's break that down.  "Supervisory", I think you

7    said, was you no longer do investigations, you supervise

8    them?

9    A.   Correct.

10   Q.   How many people do you supervise?

11   A.   When I have a full team, it would be 10 agents and

12   several additional support staff.

13   Q.   Okay.  And "special", you are a special agent.  Is

14   there something unusual about you that you're a special

15   agent, sir?

16   A.   No, special agents and the term agent can be used

17   interchangeably.  There's no difference between calling

18   someone an agent or a special agent in the FBI.

19   Q.   So all FBI agents are special agents?

20   A.   Yes.

21   Q.   And you testified -- and Ms. Beutler, who was

22   present for your first two interviews, is also a special

23   agent.  Right?

24   A.   Yes.

25   Q.   Agents or special agents, interchangeably, they're

1    the ones who actually do investigations.  They take notes,

2    yes?

3         **A.**   Yes.

4         **Q.**   Write reports.  Correct?

5         **A.**   Correct.

6         **Q.**   And Jim Baker was a name we've heard here.  He was

7    with the FBI in 2016.  Right?

8         **A.**   Yes.

9         **Q.**   Was he an agent or special agent?

10        **A.**   I don't think so.  I think he was general counsel

11   for the Bureau.  I don't believe he was a special agent.

12        **Q.**   So not an investigator?

13        **A.**   Correct.

14        **Q.**   Now you are and were assigned in 2016 to the cyber

15   division of the FBI.  Correct?

16        **A.**   Yes, sir.

17        **Q.**   And I'm repeating some of it just to set the jury.

18   There's a cyber division and a counter intelligence

19   division.  Correct?

20        **A.**   Yes.

21        **Q.**   And the cyber division, is that the initials or

22   acronym is Cy?

23        **A.**   CyD.

24        **Q.**   CyD?

25        **A.**   Yes, so Cy for cyber and then D for division.

438

1     Q.   What is the acronym for the counter intelligence

2   division?

3     A.   CD.

4     Q.   CD.  Okay so CyD or CD?

5     A.   Correct.

6     Q.   And you mentioned, under Mr. DeFilippis'

7   questioning, that you sometimes collaborate.  The two

8   divisions sometimes work together.  Right?

9     A.   Yes.

10    Q.   As of 2016, there was a big divide between the two

11   divisions.  Correct?

12    A.   There were -- in 2016, there were competing points

13   of view as to whether or not the cyber division should be

14   part of the counter intelligence division, and so there was

15   oftentimes disagreement between the two divisions.

16    Q.   Would you call that a big divide?

17    A.   I would call it -- there was many, many

18   disagreements.

19    Q.   Did you call it a big divide when you met with

20   Mr. DeFilippis and Special Agent Beutler on March 12th of

21   2020?

22    A.   If that's what's in the notes, then it certainly

23   could have been something I said.

24    Q.   Do you want to see the report?  Would that refresh

25   your recollection?

1          **A.**    Sure.

2                **MR. BERKOWITZ:**  Judge, you have materials.  My

3     question to you is would you like me to put it up on the

4     screen or give him --

5                **THE COURT:**  Well, if you're refreshing, he should

6     read them to himself.

7                **MR. BERKOWITZ:**  Okay.

8                **THE WITNESS:**  I don't recall specific -- I'm

9     sorry, sir.

10               **THE COURT:**  Either way.  Either way.

11               **THE WITNESS:**  I don't recall specifically what I

12    said.  I can certainly read it, and I can describe it as a

13    big divide now, sure.

14    **BY MR. BERKOWITZ:**

15         **Q.**    Okay.  Big divide meaning that there were

16    disagreements between the divisions about whether they

17    should be merged or otherwise.  Correct?

18         **A.**    Yes.

19         **Q.**    So the cyber division itself never actually opened

20    an investigation, you testified.  Correct?

21         **A.**    Not to this allegation.

22         **Q.**    Because you concluded pretty quickly that there

23    was no hack?

24         **A.**    There was no allegation of -- that's correct.

25    There was no allegation of a hacking incident nor did we

1    observe anything to suggest that there are any facts to show

2    that there was a hacking incident.

3         **Q.**   How long did it take you to figure that out?

4         **A.**   Not very long.

5         **Q.**   Like five minutes?

6         **A.**   We were -- I couldn't specify the specific amount

7    of time.

8         **Q.**   Less than an hour?

9         **A.**   It was inside of a day.  But that specific piece,

10   it was reading through the narrative.  There was no

11   allegation that there was a hacking incident.  And then

12   looking at the data, there was nothing to suggest or no

13   facts to show that this -- that a hack had occurred.

14        **Q.**   Okay.  And so the cyber division had what's

15   referred to in the FBI as "no equity".  Correct?

16        **A.**   Yes, sir.  That's correct.

17        **Q.**   Can you explain to the jury what do you mean when

18   you say or when you conclude the cyber division has no

19   equity in this evidence?

20        **A.**   Sure.  So if there was an allegation of hack, then

21   it would be up to the cyber division to decide further what

22   do we do with this?  Do we investigate it?  Do we not?

23   Those are choices we would have, sort of ownership of it,

24   because our job was to investigate hacking crimes.

25             But when there's no -- in that case, we would have

441

1    equity.  We would have some ownership.  As there was none,

2    we did not have any cyber equity.  There was no allegation

3    of hacking.

4         Q.   You were asked to do a technical analysis, at

5    least at a high level, and later we'll talk more about that?

6         A.   Yes.

7         Q.   And did you become aware at some point that the

8    counter intelligence division actually opened an

9    investigation into this?

10        A.   Yes.

11        Q.   Okay.  So let's turn to collection of the

12   evidence.  I think you testified that you learned from Nate

13   Batty that General Counsel Baker had received some evidence.

14   Correct?

15        A.   Yes.

16        Q.   Do you remember if you said it was on September

17   19th?

18        A.   I think so, yes.

19        Q.   Do you remember where that happened and what Nate

20   Batty said to you?

21        A.   I don't -- I mean I think I was in Chantilly,

22   probably at my desk.  I don't remember specifically what he

23   said to me, no.

24        Q.   Did he indicate to you that you and he were going

25   to go collect the evidence?

1      **A.**   At that time, I don't remember.

2      **Q.**   Okay.  What caused you to go collect the evidence,

3   if you know?

4      **A.**   I knew, through my experience, that we were going

5   to need to -- I knew -- I was told at some point that we had

6   to provide the evidence to Chicago.  So I knew that we --

7   the proper procedure would be to collect the evidence.

8   Check it into an evidence control room and have the evidence

9   control room ship it out to Chicago so that there would be a

10  proper chain of custody.

11     **Q.**   Do you remember who told you that?

12     **A.**   I -- that was my own thoughts.

13     **Q.**   Who told you that the evidence needed to go to

14  Chicago?

15     **A.**   Oh, I think Nate.  I don't remember.

16     **Q.**   And I'm from Chicago.  You weren't sending it to

17  me.  Tell the jury what was in Chicago?

18     **A.**   There was another team of agents involved in what

19  -- all we knew is that they were involved in some sort of

20  special investigation.  And they were going to investigate

21  or look into this further.

22     **Q.**   So at this point, on the 19th or the 20th, had you

23  been asked to do any work with respect to the evidence or

24  just collect it and send it?

25     **A.**   It was collect it, assess it for cyber equities,

1   and then look at it from sort of a technical point of view

2   and give it some sort of high-level analysis before we pass

3   it on.

4       Q.   So that would have been Mr. Batty telling you

5   that?

6       A.   Yes.

7       Q.   Do you remember where he heard it from, who gave

8   him direction, because FBI, if nothing else, is a

9   hierarchical place.  Right?

10      A.   I believe he heard it from his direct or one of

11  our -- someone in our chain of command, I believe it was

12  Deputy Assistant Director Sporre, Eric Sporre.

13      Q.   A Deputy Assistant Director, does he oversee a

14  particular side of the division?  In other words, where is

15  he in the reporting structure?  Is he above special agents,

16  above supervisory special agents?

17      A.   All of us would be special agents.  It would

18  probably be supervisory special agents and then unit chiefs

19  -- Nate would have been a unit chief -- then it would

20  section chiefs and then I think DAD is one level above that.

21      Q.   So relatively high up?

22      A.   Sure.

23      Q.   And you and Special Agent Batty drove on the 20th,

24  or maybe you walked, I don't know, or took public

25  transportation, you traveled from Chantilly, Virginia, to

1    FBI headquarters right here in the District.  Correct?

2         **A.**   Yes, that's correct.

3         **Q.**   Do you remember who you met with when you got to

4    FBI headquarters relative to this collection of evidence?

5         **A.**   I believe we met with Jordan Kelly, who was

6    working for the executive staffing unit for cyber division.

7         **Q.**   So you, Ms. Kelly and -- Special Agent Kelly?

8         **A.**   She's not a Special Agent, no.

9         **Q.**   What is her role?

10        **A.**   I actually don't remember her role at this point.

11        **Q.**   Is she an agent?  Is she an investigator?  Is she

12   an administrator or is she a --

13        **A.**   I think she would be more on the administrative

14   side of things.

15        **Q.**   Okay.  And what did the three -- what did the

16   three of you discuss on September 20th relative to this

17   evidence?

18        **A.**   That we needed to obtain signatures for three

19   people who had -- we believed had been in -- or had custody

20   over this evidence.

21        **Q.**   Okay.  And what happened next relative to this?

22        **A.**   I don't remember the exact timeframe, but I know,

23   at one point, Nate had to go to some other meeting.  And we

24   -- Jordan and I went and obtained the signature from then

25   FBI General Counsel, James Baker.

1      **Q.**   So it was the three of you meeting.  When you

2    obtained the signature from Mr. Baker on that chain of

3    custody form --

4           **MR. BERKOWITZ:**  And let's put that up, if we can.

5    That is Government Exhibit 282.

6           (Whereupon, the exhibit was published.)

7    **BY MR. BERKOWITZ:**

8      **Q.**   So in the upper right hand corner of that

9    document, that's you getting -- Mr. Baker is filling it out

10   in your presence with Ms. Kelly there?

11     **A.**   Yes.

12     **Q.**   Nobody else in the room to the best of your

13   recollection?

14     **A.**   Correct.

15     **Q.**   Although it indicates date and time, 2:30 p.m. on

16   the 19th, that's when he received it, not when you did.

17   Right?

18     **A.**   That's correct.  I believe it was backdated to

19   reflect when he received the evidence.

20     **Q.**   Some people might think backdated is a dirty

21   thing, but it was appropriate to do here because you wanted

22   to be accurate?

23     **A.**   Correct.  It was appropriate to talk to the person

24   who received the data, when did you receive it.  That's what

25   goes on the form so we know exactly when that person

1     received it.

2          **Q.**   And at that meeting did you say -- I don't know if

3     you call him Mr. Baker or Jim, whatever you call him.  Did

4     you say to him, Where did you get it from?

5          **A.**   I don't remember.  I do not remember any

6     conversation in the room.

7          **Q.**   In that meeting?

8          **A.**   Correct.

9          **Q.**   Okay.  And after you got Mr. Baker's signature --

10         **A.**   Yes.

11         **Q.**   -- what did you do next?

12         **A.**   Somewhere in there -- I think Pete Strzok was not

13    available, and I think at that point Nate came back from his

14    meeting.  Me and Nate went to Deputy Assistant Director

15    Sporre to obtain his signature.

16         **Q.**   So that's going to be the third one down.  He

17    indicated that -- Sporre, who was the one who sort of

18    directed you to do this in the first place, said that he

19    received it at about 5 p.m.  Correct?

20         **A.**   Yes.

21         **Q.**   He indicated he got it from Mr. Strzok, Special

22    Agent Strzok?

23         **A.**   Correct.

24         **Q.**   In the meeting with Special Agent Sporre, it was

25    you, Jordan Kelly?

1    A.    I don't remember if Jordan was there or not.

2    Q.    Okay.  Who else would have been in the meeting?

3    A.    Just me, Nate and Mr. Sporre, and I don't remember

4  if Jordan was there or not.

5    Q.    At this time, Mr. Batty comes back into the

6  picture?

7    A.    Yes.

8    Q.    At that meeting, did you say to Special Agent

9  Sporre, Hey, where did this come from?

10   A.    Yes.

11   Q.    What did he say?

12   A.    He told us that it came from a sensitive source.

13   Q.    Okay.  And what is a sensitive source, to your

14  knowledge?

15   A.    It's kind of a broad -- I mean, it could be many

16  different things.

17   Q.    Could it be an anonymous source?

18   A.    I suppose that's possible depending upon the

19  context.

20   Q.    You know Mr. Batty has characterized it as the

21  evidence coming from an anonymous source.  Correct?

22   A.    I'm not sure if that's what Mr. Batty

23  characterized it as.

24   Q.    And do you remember -- let's take a look -- do you

25  not recall or are you saying it didn't happen, because I can

1      show you something to refresh your recollection?

2          **A.**   I don't recall.

3          **Q.**   Okay.  Let's take a look, just for the witness and

4      read it to yourself, a copy of your 302 on March 20th -- I'm

5      sorry, March 12th, Page 2, Paragraph -- I'm sorry Page 6,

6      Paragraph 3?

7          **A.**   This is not my 302.  It is a 302 about me but it's

8      not one that I wrote.

9          **Q.**   It's about you.  Correct?

10         **A.**   Yes.

11         **Q.**   Okay.  So let's take a look at SH-01, Page 6,

12     Paragraph 3.

13             **MR. BERKOWITZ:**  If you can blow that out for him.

14     **BY MR. BERKOWITZ:**

15         **Q.**   And read that to yourself?

16         **A.**   Yes.

17         **Q.**   Okay.  So having read that, does it refresh your

18     recollection that Nate Batty thought that it had come from

19     an anonymous source whereas you thought it was from a

20     sensitive source?

21         **A.**   I don't know if that's what he thought.  That's

22     how he characterized it in an email to me.

23         **Q.**   Okay.  Now, next thing that happened, you get it

24     from Sporre.  Did you understand that Special Agent Sporre

25     knew where it came from?

1    **A.**    I did not -- I'm not sure.

2    **Q.**    Not sure either way?

3    **A.**    Correct.

4    **Q.**    Now, the next thing that happened, with respect to

5    this -- I guess it was two thumb drives and some paper or

6    just two thumb drives?

7    **A.**    My recollection is it was two thumb drives and

8    some hard copy paper.

9    **Q.**    So you then go where and to get whose signature?

10   **A.**    At that point, we left because Mr. Strzok was

11   unavailable, and we left the chain of custody with Jordan to

12   obtain Mr. Strzok's signature at a later date.

13   **Q.**    Okay.  So she's the one who got Mr. Strzok's

14   signature.  Correct?

15   **A.**    I believe so, yes.

16   **Q.**    And at some subsequent time, did you talk to

17   Mr. Baker about what the source of the information was?

18   **A.**    No.

19   **Q.**    Do you remember being interviewed in connection

20   with your trial preparation yesterday?

21   **A.**    Yes.

22   **Q.**    And do you remember in that trial preparation

23   telling someone in Chantilly that Baker wouldn't tell who

24   provided the thumb drives to Baker?

25   **A.**    That's correct.  I do have that memory of, after

1    meeting with Baker, having that thought of that Mr. Baker

2    would not tell me where the thumb drives came from.  I don't

3    have the distinct recollection of how it went down during

4    the actual meeting with Mr. Baker.

5        Q.    So you -- are you sure that at some point during

6    all of this, Mr. Baker refused to tell you where the

7    information came from.  Right?

8        A.    I don't know if it's that simple.  I am confident

9    that I have a memory of telling one of my colleagues in

10   Chantilly expressing some frustration that Mr. Baker would

11   not tell me where the thumb drives came from.

12       Q.    You've talked about this a number of times.

13   Correct?

14       A.    Yes.

15       Q.    In your first meeting with Mr. DeFilippis and

16   Special Agent Beutler, you had a fuzzy memory that Baker

17   told you it was a sensitive source kind of thing and he

18   could not tell you where he got it.  Correct?

19       A.    Yes.

20       Q.    You later reiterated that you're fairly confident

21   you got a note from Baker when trying to figure out who the

22   source of the thumb drive was.  Correct?

23       A.    Yes.

24       Q.    Meaning that Baker could not tell you.  Correct?

25       A.    Whether he could not tell me, I don't know.  He

1    did not tell me.

2           **Q.**    And you said it was the same with Sporre?

3           **A.**    Specifically, I do recall asking Mr. Sporre, and

4    he said it was from a sensitive source.

5           **Q.**    Now, did Mr. Batty know where it came from?

6           **A.**    I don't think so.

7           **Q.**    If Mr. Batty knew where it came from, it would

8    have made its way onto the chain of custody form.  Correct?

9           **A.**    It wouldn't go on the chain of custody form.  It

10   would go into a different form.  It would be written up in

11   some form or fashion, yes.

12          **Q.**    So the green sheet, we talked about that.  Right?

13          **A.**    Yes.

14          **Q.**    Explain to the jury what the green sheet is.  So

15   we got the chain of custody form which we saw, and it didn't

16   have a green sheet.  Right?

17          **A.**    Not in that image, no.

18          **Q.**    What is the green sheet?

19          **A.**    A green sheet is you collect a piece of evidence

20   and you've got two things, the chain of custody that shows

21   who all the people are that had custody over it.  And the

22   green sheet has some additional information about what the

23   item is and where you obtained it from and when it was

24   obtained.

25          **Q.**    So if you knew where it came from, you would have

1    filled out the green sheet.  Correct?

2         A.   I did not know where it came from, and I was not

3    checking into evidence, so I would not have filled out the

4    green sheet.

5         Q.   Who would have been the appropriate person to fill

6    out the green sheet?

7         A.   Whoever is checking it into evidence.

8         Q.   Mr. Batty?

9         A.   Sure.

10        Q.   Okay.  If Mr. Batty knew where it came from, he

11   should have filled out a green sheet.  Correct?

12        A.   That is part of the process of checking in

13   evidence is filling out a green sheet and providing it to

14   the evidence control room.

15        Q.   Did Jordan Kelly know where it came from?

16        A.   I don't know.

17        Q.   If it were a sensitive source, would it surprise

18   you that Jordan Kelly knew where it came from?

19        A.   I don't know that I knew enough or know enough

20   about what Jordan's role was at the time to be surprised one

21   way or the other.

22        Q.   Well, you said she was administrative.  Correct?

23        A.   Yes.

24        Q.   Would somebody who is in an administrative role

25   have more knowledge about who the source is than you?

1      **A.**   I don't know enough about the specific, like what

2  her connections were to the various people involved to know

3  one way or the other.

4      **Q.**   Is it possible that Special Agent Batty would have

5  known about it and not told you?

6      **A.**   Anything is possible, but I don't think that's

7  likely at all.

8      **Q.**   You thought that it was weird that Baker wouldn't

9  share the information with you.  Correct?

10     **A.**   I did, yes.

11     **Q.**   You thought it was off, didn't you?

12     **A.**   I did.

13     **Q.**   You thought that it was very troubling.  Correct?

14     **A.**   It was frustrating.

15     **Q.**   You said frustrating on the stand, but you also

16  thought that it was troubling, didn't you?

17     **A.**   It was troubling, yes.

18     **Q.**   Okay.  And you told Mr. DeFilippis and Special

19  Agent Beutler that on March 13th, didn't you?

20     **A.**   If that's what's in the notes, I don't remember

21  the specific dates.

22     **Q.**   But you told them that at some point?

23     **A.**   It sounds like -- it's an accurate

24  characterization now and so it wouldn't surprise me if

25  that's what I said.  I haven't memorized all of the

1    documents.

2        **Q.**   Okay.  Let me just refresh your recollection just

3    so we can be clear.

4        **A.**   Sure.

5        **Q.**   SH -- to just show the witness SH-2, a March 13th,

6    2020 report at Page 1, Paragraph 3.

7        **A.**   So I can see that that's what's in the document.

8    I don't disagree with the statement.  Those are not my

9    notes.

10        **Q.**   Understood, but when someone puts something in

11    quotes in a document -- what are you trained, when you're an

12    agent, to put something in quotes?

13        **A.**   Sure.  That's specifically the verbatim words that

14    the person said.

15        **Q.**   Does that refresh your recollection having read

16    that you said that or not?

17        **A.**   I don't have a distinct memory of saying it.

18        **Q.**   Okay.  But you're saying here today it is

19    troubling?

20        **A.**   Yes.

21        **Q.**   Okay.  So let's take a look.  We talked about

22    Jordan Kelly --

23        **A.**   Yes.

24        **Q.**   -- and Nate Batty.  Correct?  Two people who

25    worked with you on the chain of custody?

1      **A.**   Yes.

2      **Q.**   Now, they are -- are you familiar with something

3  called Lync messages?

4      **A.**   Yes.

5      **Q.**   And what are Lync messages?

6      **A.**   Yes.

7      **Q.**   Explain to the jury.  I wasn't even familiar with

8  them so --

9      **A.**   It's just an internal -- it is a Microsoft

10  product.  I don't know that it's used anymore but may have a

11  different name.  Now it's an internal chat system that the

12  FBI uses.

13      **Q.**   Okay.  So it's a way that FBI agents communicate

14  with each other.  Correct?

15      **A.**   Yes.

16      **Q.**   It's not email but it's similar to that?

17      **A.**   It's Instamessage.

18      **Q.**   It's Instamessage.  All right.  I'd like to show

19  you what will be marked for identification as Defense

20  Exhibit 509, and I would move for admission into evidence.

21          **MR. DeFILIPPIS:**  No objection, Your Honor.

22          **THE COURT:**  It's admitted.

23      (Defendant's Exhibit 509 was admitted.)

24      (Whereupon, the exhibit was published.)

25          **MR. BERKOWITZ:**  If you could blow up the first

1   four boxes down to 4788.

2   **BY MR. BERKOWITZ:**

3       **Q.**   This is Lync messages on September 20th.  To be

4   fair, it's between various people.  You are not on here.

5   Correct?

6       **A.**   I do not see my name on there, no.

7       **Q.**   Ncbatty, do you understand you've linked with him

8   before.  Right?

9       **A.**   Yes, that would be Nate Batty.

10      **Q.**   And Jrsmith, is that Jordan Kelly?

11      **A.**   I don't remember that, her name showing up as

12  Smith, but I've been told that that would represent Jordan

13  Kelly.

14      **Q.**   Do you know whether the time is correct or

15  sometimes it depends where it comes from because these are

16  after the chain of custody reference at 12:29?

17      **A.**   I don't know if those times are correct or not.

18      **Q.**   It says, "Jordan, the A/AD has two thumb drives.

19  We can come pick them up this a.m."  This is from Nate to

20  Jordan, "Did the A/AD do a chain of custody with the person

21  he got the drives from?" Do you see that?

22      **A.**   Yes.

23      **Q.**   Is the A/AD Sporre?

24      **A.**   Yes.

25      **Q.**   Okay.  Does this appear to reference the two thumb

1     drives that we've been talking about?

2          **A.**   I believe so, yes.

3          **Q.**   And the next one, the third one down is at

4     9/20/16.  It says, "You got the signatures from all of those

5     people?"  That's from Batty to Jordan Kelly.  Correct?

6          **A.**   Yes.

7          **Q.**   It says, from Jordan Kelly responding to Nate

8     Batty, "Sussmann to Strzok to Sporre, we can get."  Correct?

9          **A.**   That's what it says, yes.

10         **Q.**   If you'd seen that, you would have asked, who is

11    Sussmann.  Right?

12         **A.**   I don't know what I would have said.

13         **Q.**   In doing a chain of custody, would you have said,

14    "Well, I see Strzok and I see Sporre.  Who is Sussmann?"

15    You don't think you would have asked that?

16         **A.**   I have no knowledge of the name Sussmann, so

17    that's certainly a possible response I would have had.

18         **Q.**   Mr. Sussmann's name does not appear anywhere on

19    the FBI intake, the custody paperwork, or a green sheet that

20    you've seen.  Correct?

21         **A.**   Correct.  It does not.

22         **Q.**   All right.  Let's now talk about the data.  You

23    were asked to do two things.  Right?

24         **A.**   Yes.

25         **Q.**   First, was there a hacking.  Right?

1        **A.**   Correct.

2        **Q.**   We talked about that before you quickly concluded

3   and you said within a day that there was no intrusion and so

4   no cyber equity.  Correct?

5        **A.**   That's correct.

6        **Q.**   And then you were asked to review with your

7   technical background the data.  Right?

8        **A.**   That's correct.

9        **Q.**   Do you remember who asked you to do that?

10       **A.**   It was coming from Nate.

11       **Q.**   Okay.  And tell us, as best you can recall -- so I

12  think it said 12:29, you and Special Agent Batty -- Special

13  Agent Batty takes control of the evidence at 12:29 according

14  to that custody sheet.  Did you guys then go back to

15  Chantilly and start working it up?  Do you remember what you

16  did?

17       **A.**   I think so.  I think that's exactly what we did.

18       **Q.**   Explain what you would have done just so the jury

19  can understand from a technical standpoint?

20       **A.**   Sure.  So I mean the first thing we did was just

21  to read through what was there, just get an idea, what am I

22  looking at?  We were told very little about the information,

23  if anything at all.  And, I mean, before you can make any

24  sort of assessment, you've got to just understand what you

25  have.  So it was reading through the various documents.

1    **Q.**   The hard copy documents?

2    **A.**   I believe so, yes.

3    **Q.**   And do the hard copy documents contain the DNS

4    data or are they the white paper that Mr. DeFilippis showed

5    you?

6    **A.**   I think it was both, but I don't have a strong

7    recollection.

8    **Q.**   It's your recollection but not certainty that

9    there were, like 18 pages of DNS data?

10   **A.**   I don't remember.

11   **Q.**   Okay.  One way or the other?

12   **A.**   I know there was paper.  I know there were thumb

13   drives.  I know we looked at the various documents, but I

14   don't have a strong recollection one way or the other.

15   **Q.**   Do you remember when you plugged in the thumb

16   drive for the first time?

17   **A.**   No.

18   **Q.**   So fair to say that, in reading even the white

19   paper, you quickly started having scepticism about it.

20   Fair?

21   **A.**   Yes.

22   **Q.**   And in fact, relatively early on, you were linking

23   with Special Agent Batty about this.  I'm going to show you

24   what's been marked for identification as Defense Exhibit

25   513, and I'd move for admission of 513.

1          (Whereupon, the exhibit was published.)

2          **MR. DeFILIPPIS:**  No objection, Your Honor.

3          **THE COURT:**  So moved.

4     (Defendant's Exhibit 513 was admitted.)

5  **BY MR. BERKOWITZ:**

6     **Q.**  I'm going to say to you that I'm old and I had

7  trouble reading this, so I'm going to blow out a particular

8  section of it.

9          **MR. BERKOWITZ:**  The sort of third chunk from the

10 bottom, if you could blow that out.  We've highlighted some.

11 The highlighting was not in the original.  Okay?  Just to be

12 really clear.

13 **BY MR. BERKOWITZ:**

14    **Q.**  At 9/20, which is the same day that you picked up

15 the data.  Correct?

16    **A.**  Yes.

17    **Q.**  Showing at 18:58 from you to Nate Batty.  Correct?

18    **A.**  Yes.

19    **Q.**  It says, "The more I read this thing, it feels a

20 little 5150ish"?

21    **A.**  Yes.

22    **Q.**  That may be a technical term.  I think I know what

23 it means, but could you tell the jury what you meant when

24 you said, "it feels a little 5150ish"?

25    **A.**  I specifically meant that I thought perhaps the

1  person who had drafted this document was suffering from some

2  mental disability.

3      **Q.**   So you had quickly concluded within a relatively

4  short period of time that there was an issue.  Correct?

5      **A.**   Yes.

6      **Q.**   Okay.  And you at that time had not reviewed all

7  of the data, had you, sir?

8      **A.**   All of the data -- I'm not sure specifically what

9  you mean by that.

10      **Q.**   Well, you said that -- I think you said to

11  Mr. DeFilippis on direct that there was a limited amount of

12  data and you reviewed it.  Correct?

13      **A.**   We did review the data that it came with.  When

14  you said didn't review -- I'm just not quite sure what your

15  question is.

16      **Q.**   Do you remember when you reviewed the actual --

17  the DNS, the 18 pages of DNS data, single-space thousands of

18  lines, do you remember when you reviewed that?

19      **A.**   A specific time, no.

20      **Q.**   All right.  You did say that the information

21  contained an absurd amount of data.  Correct?

22      **A.**   If that's how it was characterized.

23      **Q.**   Your words, four down at 9/20 at 19:08:12.

24      **A.**   Yes.  I see it, yes.  Uh-huh.

25      **MR. BERKOWITZ:**  You can take that down.

1    BY MR. BERKOWITZ:

2        Q.   Within a short period of time you had essentially

3    dismissed what was in the white paper, correct, in your own

4    mind?

5        A.   Yes.

6        Q.   But you were then -- and you don't know for

7    certain by that time whether you had actually done an

8    analysis of the data.  Correct?

9        A.   I am not quite sure of your question.

10       Q.   There was the hard copy documents and then -- that

11   were words in English that I can understand at least at a

12   high level, and then there were thousands of lines of

13   numbers?

14       A.   Yes.

15       Q.   Had you looked at the thousands of lines of

16   numbers which we, I think in this courtroom, recognized are

17   what's called DNS data?

18       A.   Yes.

19       Q.   By that time?

20       A.   Looked at them, yes.  Had I plotted each

21   individual one out to make sure they matched the specific

22   summary, I don't think so.

23       Q.   Now, you're not a DNS expert?

24       A.   No, sir.

25       Q.   So at some point the next day you get asked to

 1    work on an analysis.  Correct?

 2        **A.**   Yes.

 3            **MR. BERKOWITZ:**  And let's pull back up our

 4    document DX-509, and we'll go to Page 2.  This is in

 5    evidence.  And please go to the sixth, seventh and eighth

 6    line.

 7    **BY MR. BERKOWITZ:**

 8        **Q.**   Okay.  So this is the next day at 12:47, 9/21/2016

 9    from Nate to you.  Correct?

10        **A.**   Yes.

11        **Q.**   It says, "Tim asked if we would write a brief

12    summary report of what we think about the DNC report."  Do

13    you see that?

14        **A.**   Yes.

15        **Q.**   Who's Tim?

16        **A.**   Tim would have been our acting section chief, so

17    it would have been two levels above me or one of our

18    direction supervisors.

19        **Q.**   And did he oversee a couple of different units or

20    just your unit?

21        **A.**   Multiple units.

22        **Q.**   Okay.  So he's within -- again, he's on the cyber

23    side.  Right?

24        **A.**   Yes.

25        **Q.**   Okay.  And among the divisions he oversaw was the

1    division that was looking into the DNC hack.  Correct?

2        **A.**   Yes.

3        **Q.**   You weren't involved in that investigation.

4    Correct?

5        **A.**   Not directly.  Very minimal.

6        **Q.**   Not --

7        **A.**   Not directly, no.

8        **Q.**   But Special Agent Stranahan was supervising that

9    investigation.  Correct?

10       **A.**   Yes.

11       **Q.**   And Nate writes back, at 9/21/16.  Correct?  And

12   he says, "I can do it"?

13       **A.**   Yes.

14       **Q.**   All right.  And then, with respect to Stranahan,

15   he asks you and Nate to write a report about the -- write a

16   summary of the DNC report.  Correct?  That's what it says?

17       **A.**   That's what it says in this chat, yes.

18       **Q.**   And did you understand, sir, that the information

19   had come from a DNC, meaning Democratic National Committee,

20   source?

21       **A.**   I did not understand that, no.

22       **Q.**   Did you know what Nate Batty knew about it?

23       **A.**   I don't think he knew anything about it.

24       **Q.**   Did you call up Tim and say, wait a second.  This

25   is a DNC report?  That's political motivation.

1       **A.**    No.

2       **Q.**    Didn't do anything or it didn't occur to you?

3       **A.**    The first time I saw this was two years ago when I

4    was being interviewed by Mr. DeFilippis, and I don't recall

5    ever seeing it.  I never had any recollection of this

6    information coming from the DNC.  I don't remember DNC being

7    a part of anything that we read or discussed.

8       **Q.**    Okay.  When you say, the first time you saw it was

9    two years ago when you met with Mr. DeFilippis, that's not

10   accurate.  Right?  You saw it on September 21st, 2016.

11   Correct?

12      **A.**    It's in there.  I don't have any memory of seeing

13   it.

14      **Q.**    So he writes back -- or he continues on.  As you

15   said, it's instant message, so he pings you at -47, -48.  He

16   pings you 12:47:50 and then at 12:48:05, he says, "I'm

17   thinking we should at least plug the thumb drives into

18   Frank's computer and look at the files."  Right?

19      **A.**    That's correct.

20      **Q.**    Had you not looked at the thumb drives before

21   September 21st, 2016 at 12:48?

22      **A.**    I don't think so.  I think what we had done was,

23   to the best of my recollection, is we reviewed the

24   information in the hard copy documents, and I was concerned

25   about plugging the thumb drives into -- since we were going

1   to be turning this into evidence, we wanted to make sure

2   that we didn't alter the thumb drives in any way.  So we had

3   not plugged them in at that point, but we wanted to make

4   sure that what was on the thumb drives actually matched what

5   we had in the hard copy papers.

6       **Q.**   So let's take a look, two more lines down, the

7   next two lines.  So after Batty saying, "We should at least

8   plug the thumb drives into Frank's computer," you ultimately

9   write back at 12:51:37, so that's you writing to him,

10   "Probably not an issue, but just FYI, pretty sure his write

11   blocker isn't BU approved."  Right?

12      **A.**   That's what I wrote, yes.

13      **Q.**   So it appears clear on the 21st, you and he were

14   actually communicating in this chat.  Correct?

15      **A.**   Yes.

16      **Q.**   It wasn't like it sort of went into a space that

17   you weren't paying attention to.  You were engaged in this

18   chat with him.  Right?

19      **A.**   At this point, yes.

20      **Q.**   And who's Frank?

21      **A.**   Frank would have been another special agent that

22   we worked within the ECOU.

23      **Q.**   Okay.  And let's just go to the last entry on this

24   document, which is on Page 3, Line 5313.  You say at

25   1:07:59, "Frank's write blocker won't work for thumb drives.

1      No USB input."  Correct?

2          **A.**    That's what I wrote, yes.

3          **Q.**    So as of 1:07:59, you and Special Agent Batty had

4      not opened the thumb drive in the computer.  Correct?

5          **A.**    I don't think so.

6          **Q.**    Do you remember when after that you did?

7          **A.**     I do not.  I believe it was shortly after that,

8      but I don't remember when.

9          **Q.**    Okay.  And do you remember -- and so -- other than

10     reading -- well, let's do this.  Do you remember when it was

11     you actually did the analysis that Tim Stranahan asked for

12     you to do and Mr. DeFilippis showed to you and the jury?

13         **A.**    The written product?

14         **Q.**    Yeah, the written product.

15         **A.**     I don't remember specifically, but it was between

16     the 20th and the 21st.

17         **Q.**     It was what?

18         **A.**     I don't remember specifically, but it would have

19     been between the 20th and the 21st.

20         **Q.**     All right.  So Tim Stranahan's -- Nate Batty's

21     text linked to you was the 21st at 12:47 asking you to do a

22     written -- a brief summary of the DNC report.  He said he

23     could do it.  So at some point after that presumably it was

24     prepared?

25         **A.**     Well, I don't know whether there was a separate

468

1   brief summary or whether or not he was referring to the

2   product that we wrote.  Like, our product was probably a

3   couple pages, let's say.  So I don't know whether or not we

4   were being asked for even a shorter version in that

5   statement.

6       **Q.**   So you think there might have been a longer

7   version.  Have you seen a longer version, sir?

8       **A.**   No, I'm saying I don't know if there was a shorter

9   version.

10      **Q.**   Okay.  Do you know when you circulated the

11  analysis, the written analysis?

12      **A.**   Yes, on the 21st, September 21st.

13      **Q.**   Time?

14      **A.**   I don't remember.

15      **Q.**   Okay.  Let me show you what we'll mark as Defense

16  Exhibit 514.

17          **MR. BERKOWITZ:**  Which is the cover email which

18  attaches the report that also has the redaction,

19  Mr. DeFilippis, on the ultimate page and ask -- I'd move it

20  into admission.

21          **MR. DeFILIPPIS:**  No objection, Your Honor.

22          **THE COURT:**  So moved.

23      (Whereupon, the exhibit was published.)

24      (Defendant's Exhibit 514 was admitted.)

25

1      BY MR. BERKOWITZ:

2          Q.    So this is an email.  If you could just look at

3      the top of it -- from Nate Batty, Wednesday September 21st

4      at 4:46.  Correct?

5          A.    Yes.

6          Q.    So about -- between three and four hours after the

7      thumb drive at least hadn't been plugged in.  Correct?

8          A.    Yes.

9          Q.    And it's to Josh Hubiak.  Can you tell the jury

10     who Mr. Hubiak is or Special Agent Hubiak?

11         A.    I think he's a special agent in Philadelphia

12     maybe.

13         Q.    And Curtis Heide, who's he?

14         A.    A special agent in Chicago, I believe.

15         Q.    Is he on the counter intelligence or cyber

16     division side?

17         A.    I think he was on the counter intelligence side.

18         Q.    And you're copied on this.  Correct?

19         A.    Yes.

20         Q.    It says "analysis of Trump white paper."  Right?

21         A.    That's in the subject, yes.

22         Q.    Attachment is Analysis of Trump server white paper

23     doc.  Correct?

24         A.    That's correct.

25              MR. BERKOWITZ:  Judge, at this point, I'd like to

1        publish a demonstrative, which I can pull it up.  It's

2        Sussmann Demonstrative 1 after he has a chance to look at it

3        -- don't pull it yet.  I don't want to be the one to tell

4        you.

5                **MR. DeFILIPPIS:**  Objection, Your Honor.  We'd ask

6        that he just walk him through the actual evidence.

7                **MR. BERKOWITZ:**  Your Honor, I can.

8                **THE COURT:**  Can you put up the slide and then just

9        populate the boxes as he testifies to each email?

10               **MR. BERKOWITZ:**  I've shown him all of these

11       already.  They are all in evidence.

12               **THE COURT:**  Okay.

13               **MR. BERKOWITZ:**  Just -- I want to make sure I'm

14       tracking what you'd like me to do, Judge.

15               **THE COURT:**  Ideally, if you were doing a

16       demonstrative, you would put up each box as he testifies to

17       what's in evidence.

18               **MR. BERKOWITZ:**  Yeah.

19               **THE COURT:**  To expedite it -- pick up the phone.

20           (Bench conference.)

21               **THE COURT:**  Is there any objection to any of the

22       actual emails that he's going to ask him about?

23               **MR. DeFILIPPIS:**  No, Your Honor.  Our objection is

24       just in the fact that -- well, I guess we don't understand.

25       Does Mr. Berkowitz intend this to go back to the jury as

1    evidence?

2              **MR. BERKOWITZ:**  No.

3              **THE COURT:**  No.  This is not a compilation

4    exhibit.  It's just a demonstrative as if he was writing it

5    on a white board.  Right?

6              **MR. BERKOWITZ:**  Correct.

7              **THE COURT:**  If there's no objection to any of the

8    individual emails or their admissibility, we'll let you do

9    that.

10             **MR. BERKOWITZ:**  Thank you, Your Honor.

11        (Bench conference concluded.)

12        (Whereupon, the exhibit was published.)

13   **BY MR. BERKOWITZ:**

14       **Q.**   I will show you what has been marked as Sussmann

15   Demonstrative 1.  So just to recap real quickly so we can --

16             **THE COURT:**  Just to be clear, this is not

17   introduced into evidence.

18             **MR. BERKOWITZ:**  No.  I'm sorry.

19   **BY MR. BERKOWITZ:**

20       **Q.**   September 20th at 12:29 is from the chain of

21   custody form is when Nate Batty received the thumb drives.

22   Correct?  I can show you the document if --

23       **A.**   Sure, yes.

24       **Q.**   And September 20th at 6:58, we looked at the

25   5150ish Lync message.  Correct?

1      **A.**   Yes.

2      **Q.**   On the 21st, there was a Lync message about Tim

3   asking if you'd write a brief summary of what you thought of

4   the DNC report.  Correct?

5      **A.**   Yes.

6      **Q.**   And those are combined three separate Lync

7   messages just to be clear?

8      **A.**   Yes, they did not all clear at 12:47, I don't

9   think.

10     **Q.**   And then the 21st at 1:07, you say, Frank's write

11  blocker won't work.

12         At 4:46 is when the assessment goes through.

13  Correct?

14     **A.**   Yes.

15     **Q.**   So between September 20th, 12:29 and September

16  21st at 4:46 was the extent of your analysis, at least from

17  a time standpoint.  Correct?

18     **A.**   Yes.

19     **Q.**   And during that time, how many interviews of

20  people did you conduct?

21     **A.**   None.

22     **Q.**   How many subpoenas did you serve?

23     **A.**   None.  I was not authorized to serve any subpoenas

24  at that point.

25     **Q.**   Did you do any search warrants?

1          **A.**    Absolutely not.

2          **Q.**    Other than looking at the materials, you did

3     nothing.  Correct?

4          **A.**    That's what I was tasked to do and that's exactly

5     what we did.

6               **MR. BERKOWITZ:**  Okay.  You can take that down.

7     **BY MR. BERKOWITZ:**

8          **Q.**    And the analysis, which we went through, let's

9     take a look at it.  It's attached to Defense Exhibit 514.

10    It's the same one.  I want to look at -- I think you

11    criticized, on direct, three things.  You criticized the

12    assumptions.  You said they jumped to conclusions.  Correct?

13         **A.**    Yes.

14         **Q.**    Criticized the methodology.  Correct?

15         **A.**    Yes.

16         **Q.**    And you criticized the Trump server as being too

17    obvious that somebody would call a server the Trump server

18    if you were trying to hide that.  Right?

19         **A.**    Yes.

20         **Q.**    You didn't say anything about mental health in

21    there.  Right?

22         **A.**    No.

23         **Q.**    So jumping to conclusions and methodology, do you

24    think you would have been aided in talking to the author of

25    the white paper if you wanted to better understand the

1    reasoning behind their methodology?

2         **A.**   Yes.

3         **Q.**   And did you try and talk to the author of the

4    white paper?

5         **A.**   I had no capability of doing so, because I didn't

6    know who was the author.  I didn't know where the documents

7    came from.

8         **Q.**   So you weren't able to do that, obviously.  Right?

9         **A.**   That's correct.

10        **Q.**   And with respect to the Trump server being

11   obvious, meaning -- I think you wrote, you wouldn't think

12   that somebody trying to hide the server would call it the

13   Trump server, essentially.  Right?

14        **A.**   That's correct.

15        **Q.**   Did you ask to speak to any confidential human

16   sources about your analysis of whether that was something

17   that somebody looking to hide contacts would do?

18        **A.**   No.

19        **Q.**   Do you know whether -- Special Agent Sands, you

20   testified about on direct.  Right?

21        **A.**   Yes.

22        **Q.**   She's in the counter intelligence side of the

23   world, and she actually did an investigation to the best of

24   your knowledge.  Right?

25        **A.**   Yes.

1      Q.    Did you talk to her about whether she spoke with

2  anyone about that issue?

3      A.    Whether she spoke with anyone, I know we discussed

4  whether or not we sort of came to the same conclusions based

5  on after she initiated some initial investigation and we

6  were sort of comparing our initial triage with her

7  investigation to see if we agreed.

8      Q.    So did she -- did you know that she spoke in or

9  around October with a confidential human source of the FBI

10  who thought that it was plausible or at least possible that

11  a -- somebody looking to hide the connection could call it

12  the Trump server?

13      A.    I did not know that she spoke to a confidential

14  human source about that.

15      Q.    That's something you could have done.  You could

16  have actually gone to confidential human sources and

17  developed more information if you were actually

18  investigating.  Right?

19      A.    Sure, if I were investigating.  Correct.

20      Q.    In fact, your paper really, while it was

21  skeptical, ultimately determined that the conclusions in the

22  paper that were made may or may not be true.  Correct?

23      A.    That's true.  It certainly could have been, but I

24  did not feel that the conclusions that were made in the

25  paper were supported by the data that they provided.

476

1      Q.   And so you weren't saying they're not true.  You

2   are saying they may or may not be true.  That's what you

3   wrote.  Correct?

4      A.   I don't know if it's that simple.  I think the

5   conclusions that they came to I felt were not -- were

6   completely -- I just disagreed with the conclusions they

7   came to and the analysis that they did based upon the data

8   that came along with the white paper.

9      Q.   So you didn't decide to open an investigation.

10  Correct?

11     A.   Correct.

12     Q.   It wasn't your call to make?

13     A.   No.

14     Q.   But cyber did not open an investigation.  Right?

15     A.   That's correct.

16     Q.   But counter intelligence actually did open an

17  investigation.  Correct?

18     A.   I believe so.

19     Q.   They had the same information you have?

20     A.   Yes.

21     Q.   And the benefit of your report.  Right?

22     A.   Yes.

23     Q.   And they still decided to open it up.  Right?

24     A.   I believe so, yes.

25     Q.   And do you know that, when they opened up the

1    investigation, they said that they received a referral from

2    the Department of Justice detailing an unusually-configured

3    email server in Pennsylvania belonging to the Trump

4    Organization and said that they received a white paper that

5    was produced by an anonymous third party.  Were you aware of

6    that?

7         **A.**   I was not.

8         **Q.**   Would it be strange to you that they thought the

9    referral came from the United States Department of Justice?

10        **A.**   Absolutely.

11        **Q.**   With respect to whether it mattered, is it fair to

12   say that your testimony on direct was in opening an

13   investigation, the level of the investigation would matter

14   what the motivations were or something to that effect?

15        **A.**   Yes.  Motivation of who's providing the data to

16   you could certainly color whether or not you believe the

17   data is true.

18        **Q.**   Okay.  But you didn't actually open an

19   investigation.  Correct?

20        **A.**   That's correct.

21        **Q.**   Without agreeing that there were political

22   motivations, okay, if there were political motivations, what

23   would you have done differently in the 36 hours that you

24   worked on this?

25        **A.**   I mean, from the technical review that we did,

1      nothing.  We would have done the same thing.  We would have

2      looked at the data.  We were asked to do a relatively sort

3      of a triage or a brief review of the actual data.  We would

4      have done that exactly the same.

5           The only thing I would have done differently is I

6      would have made sure to document that we believed this

7      information was coming from wherever it was coming from, and

8      that would be part of our report.  And then so when we

9      provide that to Chicago, that whole narrative goes.  It all

10     goes together, where the data came from, our analysis, and

11     then all of those things go together and they get passed on

12     to Chicago for further review.

13     **Q.**   And so, to be clear, you would not have changed

14     your analysis at all.  Correct?

15     **A.**   I would not have changed my analysis from the

16     technical side, but I would have documented where it came

17     from, yes.

18     **Q.**   You wouldn't have done your -- you would have done

19     your forensic analysis in exactly the same way.  Correct?

20     **A.**   The forensic piece or the technical review would

21     have been the same, yes.

22     **Q.**   And although you were surprised to see it today,

23     it appears that at least somebody, such as Mr. Batty was

24     aware and you were aware that somebody was calling this

25     white paper a DNC report.  Correct?

1      **A.**    I was not aware that anybody was calling it a DNC

2   report, and I don't believe Mr. Batty knew that either.

3      **Q.**    But you saw the Lync message.  Right?

4      **A.**    I did see the Lync message, yes.

5      **Q.**    What's your explanation for it?

6      **A.**    I have no recollection of seeing that Lync

7   message.  And there is -- I have absolutely no belief that

8   either me or Agent Batty knew where that data was coming

9   from, let alone that it was coming from DNC.  The only

10   explanation that popped or was discussed was that it could

11   have been a typo and somebody was trying to refer to DNS

12   instead of DNC.

13      **Q.**    So you think it was a typo?

14      **A.**    I don't know.

15      **Q.**    When you said the only one suggesting it -- isn't

16   it true that it was Mr. DeFilippis that suggested to you

17   that it might have been a typo recently?

18      **A.**    That's correct.

19      **Q.**    Okay.  You didn't think that at the time.  Right?

20      **A.**    I did not.  I had never seen it or had any memory

21   of seeing it ever before it was put in front of me.

22      **Q.**    And, sir, isn't it possible that you missed it

23   being a DNC report and, now that there is a huge focus on

24   whether there was a political motive, you're disappointed

25   that you didn't actually include it in your report?

1      A.   I don't think that's particularly likely because

2   there were so many other opportunities for Nate and I to

3   discuss where it was coming from.  And we never not once

4   discussed that we thought it was coming from DNC or that

5   anyone had told Nate it was coming from DNC.  I think, while

6   anything is possible, I don't think that is particularly

7   likely.

8      Q.   You knew that there was an election a couple

9   months away.  Correct?

10     A.   Yes.

11     Q.   You knew that the FBI was investigating issues

12   related to Trump and Russia.  Correct?

13     A.   I don't remember at that point what I was -- how

14   much exposure I had to any investigation on that side.

15     Q.   And you and Special Agent Batty at least talked

16   about whether this had political origins, didn't you?

17     A.   At that point I think the only thing that came up

18   was just questioning the motive of somebody providing --

19   like, who provided this report?  I don't recall any

20   discussion about political motivations.

21     Q.   Who would it have helped if the allegations were

22   true?

23     A.   It would have helped the opposing -- it would have

24   helped the democratic party.

25     Q.   And that didn't occur to you at all that that

1     motivation might have been involved?

2          **A.**   No.

3               **MR. BERKOWITZ:**  No further questions, Judge.

4          Thank you for your time, sir.

5               **THE WITNESS:**  Thank you.

6               **REDIRECT EXAMINATION OF SCOTT HELLMAN**

7     BY MR. DeFILIPPIS:

8          **Q.**   Special Agent Hellman, you were cross-examined

9     about the notion of writing a 302 when you receive

10    evidence -- do you recall that -- or conduct interviews?

11         **A.**   Yes.

12         **Q.**   And I think you also testified that General

13    Counsel Baker, you didn't believe he is a special agent.

14    Right?  He is just a lawyer.

15         **A.**   I don't think he is a special agent, no.

16         **Q.**   Now, typically at the FBI, between the lawyers and

17    the agents, who is it who would write a 302?

18         **A.**   It would be the agents who write the 302s.

19         **Q.**   And in your career as a FBI agent, have you ever

20    encountered a situation where someone who knows where to

21    reach FBI agents, brings evidence to an FBI lawyer?  Have

22    you ever encountered that before?

23         **A.**   Specifically to a FBI lawyer?

24         **Q.**   (Nodded head)

25         **A.**   It's possible but I don't have any specific

1      recollection of that happening, no.

2          **Q.**   Okay.  And are lawyers at the FBI trained in

3      writing 302s or is that training that agents receive?

4          **A.**   As far as I know, it's only training the agents

5      receive.

6          **Q.**   And is it typical, the practice of the FBI, that

7      agents take in evidence as opposed to lawyers?

8          **A.**   Yes.

9          **Q.**   Now, when you testified that you have a

10     recollection after meeting with Mr. Baker that you told

11     others you were frustrated you couldn't figure out where

12     this came from.  Did you testify you never spoke to

13     Mr. Baker again about this?

14         **A.**   That's correct.  I never spoke to Mr. Baker after

15     or -- I'm not sure what the conversation was during that

16     time, but I never spoke to Mr. Baker again after that.

17         **Q.**   So do you know whether or not Mr. Baker, for

18     example, immediately told someone else the name of the

19     person he got it from or not?  Do you have any way to know

20     that?

21         **A.**   Not investigatively.  I've read various

22     open-source reports, but I didn't have any knowledge at the

23     time.

24         **Q.**   Okay.  So you -- all you know is that you went to

25     Mr. Baker's office and, you think, could not discern where

1  this came from; is that right?

2          **MR. BERKOWITZ:**  I object.  Leading.

3          **THE COURT:**  Sustained.

4  **BY MR. DeFILIPPIS:**

5      **Q.**  What, if anything do you know about information

6  Mr. Baker shared with anyone else about the identity of the

7  person who gave this to him?

8      **A.**  In my investigative capacity?

9      **Q.**  Yes.

10     **A.**  Nothing.

11     **Q.**  Okay.  So anything else would have been something

12  you read more recently, perhaps in the media?

13     **A.**  Correct.

14     **Q.**  Okay.  Now you mentioned that the

15  counterintelligence division opened an investigation here?

16     **A.**  I believe so, yes.

17     **Q.**  And the cyber division, I think you testified, did

18  not open an investigation.  Right?

19     **A.**  That's correct.

20     **Q.**  In your view of the data in the white paper, would

21  it be fair to say you were skeptical or not skeptical of

22  that data?

23     **A.**  I was very skeptical of the data.

24     **Q.**  Now the counterintelligence division, when they

25  look at information like this, are they looking at it with

1     an eye towards the same issues or different issues from the

2     cyber division?

3          **A.**   Um, I think they'd probably be looking at it from

4     the same vantage point, but if you're not -- you don't have

5     experience looking at technical logs, you may not have the

6     capability of doing a review of those logs.  You might rely

7     on somebody else to do it.  And perhaps counterintelligence

8     agents are going to be thinking about other investigative

9     questions.  So I guess it would probably be a combination of

10    both.

11         **Q.**   To what extent did you try to capture your

12    skepticism about this data in your written report?

13         **A.**   Um, we did capture it in our report by saying that

14    we thought that the data and the narrative -- I think the

15    words were, you know, had some questionable motives or

16    something along those lines.

17         **Q.**   Now, is it your understanding that in deciding

18    whether and what level of investigation to open on this

19    matter, that the counterintelligence division -- the idea

20    was they would take into account your written report?

21         **A.**   Yes.

22         **Q.**   And if you had known, for example, or learned --

23    we don't want to assume, but if you had learned that the

24    data came from someone affiliated with or paid by the

25    opposing political campaign, to what extent would you have

1    noted that in the report?

2        A.    It would be written in the report, absolutely.

3        Q.    Why?

4        A.    Again, that type of context is what -- it's a data

5    point that an agent or really any investigator would use to

6    determine how truthful they believe the data is.  How much

7    stock they are going to put in the data.

8            And you want to make sure that you are relaying

9    the entire picture, the whole story of what it is you are

10   looking at.  So if someone else needs to perform some

11   additional analysis, you want them to know, Okay.  Here is

12   the raw data or here is the actual data.  You can make your

13   own decisions on that.  Here's what we thought about the

14   data ourselves.  And here are the other details.  And if it

15   was a detail and, Oh, it came from this place, you'd make

16   sure to put it in there so that they could assess it

17   themselves.

18       Q.    And would a fact like that have made your analysis

19   more skeptical, less skeptical or the same?

20       A.    I think it would have made it more skeptical.

21       Q.    And, again, is that -- to the extent that was your

22   analysis, would you have noted that in the report?

23       A.    Yes.

24       Q.    And based on your understanding of FBI procedure

25   and FBI rules -- and by the way, is there a FBI rulebook at

1    the FBI that sets out the way you are supposed to conduct

2    investigations?

3         **A.**   There are many, many books.

4         **Q.**   Is there a main one?

5         **A.**   Yes.

6         **Q.**   What's that called?

7         **A.**   It's called the DIOG, D-I-O-G.

8         **Q.**   And do you happen to know -- a lot of acronyms.

9    Do you know what that one stands for?

10        **A.**   Oh, gosh.  Um, sorry.  I don't remember the

11   acronym.

12        **Q.**   Okay.  So there's an FBI procedure called the DIOG

13   and that sets out what?

14        **A.**   It's going to set forth a wide range of policies

15   and procedures surrounding how we can perform

16   investigations.

17        **Q.**   And I think you mentioned before, there's

18   assessment, preliminary and a full investigation?

19        **A.**   Yes.

20        **Q.**   Would something like a political motivation to

21   provide data, affect an analysis under the DIOG of which of

22   those you should open?

23        **A.**   It could.  It's a datapoint that one could

24   consider when you are determining the authenticity of the

25   data or the truthfulness of the data.  Sure.

1    **Q.**   And do motivations -- to what extent do

2    motivations of a provider of information factor into those

3    decisions?

4             **MR. BERKOWITZ:**  Judge, I am going to object both

5    on asked and answered and on foundation -- [inaudible]

6             **COURT REPORTER:**  Can you restate your objection,

7    please?

8             **MR. BERKOWITZ:**  I'm going to object both on asked

9    and answered and foundation, in the sense that he was not

10   the one who made the decision to open the investigation.

11            **THE COURT:**  I'll overrule.  Just one more question

12   on this.

13            **MR. BERKOWITZ:**  Okay.

14   **BY MR. BERKOWITZ:**

15   **Q.**   In looking at the DIOG and deciding what level of

16   investigation to open, to what extent might motivation play

17   into that analysis?

18   **A.**   If someone's motivation for providing you data

19   suggests that -- depending upon the motivation, it could

20   suggest the data is less than truthful.  And if it's less

21   than truthful, you may not believe in it as much or consider

22   it factual.  And so if you don't have a factual basis, you

23   may not be able to open a full investigation.

24   **Q.**   Okay.  Now let's go to issue of that Lync message

25   you got that had the word DNC in it.

1      **A.**   Yes.

2      **Q.**   Now, first, on all of the occasions when you've

3   spoken to me or any member of the government's team in

4   connection with this matter, to what extent have you felt

5   free to express your true and accurate recollections?

6      **A.**   At all times.

7      **Q.**   And has anyone ever suggested anything to you

8   about the way you should testify or answer any question?   To

9   what extent have you been pressured to come to any

10   particular conclusion?

11      **A.**   Certainly not pressured to come to any conclusion.

12      **Q.**   Now, looking at that DNC message recalling that

13   DNC-related message that you were shown, to what extent did

14   you wonder after this all came in, where this stuff came

15   from?

16      **A.**   You mean after I saw the message?

17      **Q.**   No, I'm sorry.   After the Alfa-Bank/Trump

18   information came in, for how long after that would you say

19   you wondered, Where did this all come from?

20      **A.**   I mean, I probably didn't really think about it

21   very much until maybe 20 -- really until 2020.

22      **Q.**   Okay.   But is it fair to say that you, in your

23   mind, never had any insight into where it came from?

24      **A.**   No, that's correct.

25      **Q.**   So when you saw that message, how surprised or

1    unsurprised were you?

2         **A.**    I was very surprised.

3         **Q.**    And based on conversations you've had with

4    Mr. Batty over the years, was it your understanding from

5    your interactions with him that he similarly didn't know

6    where this came from?

7              **MR. BERKOWITZ:**  Objection.  Foundation.

8              **THE COURT:**  Sustained.

9    **BY MR. DeFILIPPIS:**

10        **Q.**    The cyber division, at the time in 2016, to what

11   extent were you aware of the Russian hack of the DNC?

12        **A.**    I was aware that it happened.  I don't remember

13   the dates so -- I was aware of it when I was working there,

14   but I was not assisting in that investigation in any

15   substantive matter or any substantive amount.

16        **Q.**    Okay.  And were you aware, one way or the other,

17   that there was an investigation at the FBI of the DNC hack?

18        **A.**    Yes.

19        **Q.**    And were you aware, one way or the other, whether

20   Mr. Sussmann was representing the DNC in that hack?

21        **A.**    I never heard the name Sussmann before.

22        **Q.**    Okay.  But to the extent -- [mic feedback] --

23   sorry.

24              To the extent there is an investigation of a hack,

25   is it common or uncommon for the FBI to communicate with a

1  victim of the hack or their lawyer?  Is that something that

2  happens?

3       **A.**  Both.  Absolutely.

4            So if you have a victim -- I work in San

5  Francisco.  It's typically a company.  And it's very common

6  for us to either work directly with the company or with

7  their outside counsel, their attorney representing them or

8  both.

9       **Q.**  And when the FBI is working with someone who is

10  the victim of a hack, what's the purpose of that?

11       **A.**  It's typically to collect information.  The

12  primary investigative question in any cyber investigation

13  is, Who did it?

14            You typically know that the hack occurred because

15  the company realizes that, Oh, gosh.  Somebody has broken

16  into our network, and they have some understanding of what

17  happened.  The hackers took this data.  But what we don't

18  know is who did it.

19            Typically when we are working with a victim, it's

20  we want to collect logs, pieces of digital evidence so we

21  can put those pieces together and identify who committed the

22  crime.

23       **Q.**  Now, let's suppose the FBI -- let's suppose you

24  are working with a political campaign.  You have occasion to

25  talk to someone who is representing a political campaign in

1    their political capacity.  Would you view those two

2    situations as different from one another?

3              **MR. BERKOWITZ:**  Objection, Your Honor.  Both

4    beyond the scope and lacking foundation, as he testified he

5    had no knowledge of the hack investigation.

6              **THE COURT:**  I'll sustain it.

7    BY MR. DeFILIPPIS:

8        **Q.**   Special Agent Hellman, the DNC hack -- so you said

9    you didn't participate in that investigation.  Correct?

10       **A.**   A very small amount.

11       **Q.**   Turning back to your paper, your analytical paper,

12   if you were to learn that that paper were written by someone

13   who was being paid by a political campaign, would you view

14   that as similar or different to dealing with a lawyer for a

15   hacked victim?

16       **A.**   Different.

17       **Q.**   In what respect?

18       **A.**    If I'm working with a lawyer who has a victim

19   company, let's say, who has been hacked, typically that

20   attorney is there to protect that company.  And so we are

21   working with that attorney to obtain information that we can

22   use for the investigation, and that attorney is there to

23   represent the interests of their victim.  I think that's

24   what I got.

25       **Q.**   Okay.  Now on those Lync messages that we saw, did

1    you actually collect and verify those Lync messages or their

2    authenticity?

3         **A.**   I did not.

4         **Q.**   And did you have occasion at any point to look

5    whether those timestamps were authentic or anything about

6    the timestamps on them?

7         **A.**   I did not.

8         **Q.**   Have you ever heard of something called UTC time?

9         **A.**   Sure.

10        **Q.**   What is that?

11        **A.**   UTC -- the U, I think, stands for universal.

12   Anyway, there are various different time zones:  PST, EDT,

13   Zulu time, UTC, Greenwich.  It's a wide range of different

14   time zones, but UTC is typically one that can be used if you

15   are trying to exchange logs between multiple entities, it's

16   useful if you all can use the same time zone, so that you

17   don't have to make, sort of, a calculation in your between,

18   Oh, well, this one is in Pacific time; so that's three hours

19   behind; that kind of thing.  So it's a time zone that is

20   commonly used in technical logs.

21        **Q.**   Okay.  Do you know one way or the other when the

22   FBI logs its Lync messages, does it do it in UTC time or

23   some other time?

24        **A.**   I do not know.

25        **Q.**   Okay.  Let's talk a little bit about --

493

1    Mr. Berkowitz asked you about this statement you think you

2    recall from Mr. Sporre that the information may have come

3    from a sensitive source.  Do you recall that?

4        **A.**   Yes.

5        **Q.**   When you recall the words "sensitive source," did

6    you have the understanding it was a signed up -- first of

7    all, what is a confidential human source?

8        **A.**   Someone who is providing information to the FBI

9    and we are taking steps to protect their identity.

10       **Q.**   Okay.  And is that a formalized procedure at the

11   FBI when someone is a confidential human source?

12       **A.**   It is, yes.

13       **Q.**   And to what extent is just the word "source" or

14   "sensitive source" sometimes used more broadly or

15   differently than "confidential human source"?

16       **A.**   Sure.  It could -- the term "sensitive source"

17   could just be a common term for you obtained some

18   information from someone and you are trying to protect their

19   identity, but they may not have gone through the formalized

20   process of becoming a confidential source.

21       **Q.**   So when Special Agent Sporre mentioned to you that

22   this information had come from a "sensitive source", as I

23   think it was your testimony, how did you take that phrase in

24   that context?

25       **A.**   Oh, you mean as in whether or not he was an

1    official --

2        **Q.**   Yes.

3        **A.**   I didn't know whether he was -- he or she or

4    whoever it was, was an official FBI confidential human

5    source.

6        **Q.**   Okay.  Now, if you knew or thought that the

7    information in that paper had been received from an actual,

8    signed-up, confidential human source, is that something you

9    would have wanted to know?

10       **A.**   Yes.

11       **Q.**   And why might that be?

12       **A.**   I think it would have provided at least some

13   understanding to me of maybe why we were being told we

14   couldn't know or I couldn't know who the person was.  But it

15   also would have given me some understanding of, Okay.  This

16   is sort of just an official thing.  It's an official

17   process.  Someone who has officially been signed up as a

18   confidential human source, has provided this information.

19   It had been documented somewhere.  And I'm just not the

20   person who is allowed to know.

21       **Q.**   Now, do confidential human sources -- are you

22   familiar with the term "handler"?

23       **A.**   Yes.

24       **Q.**   What is that?

25       **A.**   It's essentially an FBI agent whose responsibility

1    it is to communicate with this confidential human source and

2    document their interactions with this person.

3        **Q.**   And if a confidential human source has information

4    that they think is of interest to the FBI, is there a

5    particular person who they are supposed to give that

6    information to?

7        **A.**   Yes.

8        **MR. BERKOWITZ:**  Objection, Your Honor.  This is

9    beyond the scope.

10       **THE COURT:**  I'll overrule it.

11   **BY MR. DeFILIPPIS:**

12       **Q.**   So when a confidential human source has

13   information, to who if anyone are they supposed to give that

14   information?

15       **A.**   They are supposed to give it to their handler.

16       **Q.**   And in your experience as an FBI agent, are you

17   aware of any instances in which a confidential human source

18   directed information to the FBI's top lawyer, its general

19   counsel?

20       **A.**   It's certainly possible but I'm not aware.

21       **Q.**   Okay.  Thank you very much.

22       **BY THE COURT:**  Do you want to follow up on that

23   last point, Mr. Berkowitz?

24

25

1          <u>**RECROSS-EXAMINATION OF SCOTT HELLMAN**</u>

2      **BY MR. BERKOWITZ:**

3          **Q.**   Just briefly, sir.  Do you know who Special Agent

4      Tom Grasso is?

5          **A.**   Yes.

6          **Q.**   Could you tell the jury who that is?

7          **A.**   He is another FBI special agent.

8          **Q.**   And do you know whether he handles confidential

9      human sources?

10         **A.**   I don't know if at this point in his career he

11     handles confidential human sources.

12         **Q.**   Are you aware that in this case Rodney Joffe

13     approached Tom Grasso with information relevant to this

14     investigation in September of 2016?

15         **A.**   No, I'm not.

16         **Q.**   Let me show you one document marked 531 for

17     identification.  Take a look at the top of this email.

18             **MR. BERKOWITZ:**  Well, first of all let me move it

19     into evidence.

20             **MR. DeFILIPPIS:**  No objection, Your Honor.

21             **THE COURT:**  So moved.

22         (Defendant's Exhibit 531 was admitted.)

23     **BY MR. BERKOWITZ:**

24         **Q.**   Let's take a look at the top.  It's from Curtis

25     Hiede to Scott Hellman.  Do you see that?

1      **A.**   Yes.

2      **Q.**   And it's forwarding and email chain on Anonymous

3   Reporting on DNS Data.

4      **A.**   I see it, yes.

5      **Q.**   He's telling you to "Check this out"?

6      **A.**   Yes.

7      **MR. BERKOWITZ:**   If you would blow out the entire

8   document so that the witness has a chance to see it.

9   **BY MR. BERKOWITZ:**

10     **Q.**   I am going to focus you on the Tom Grasso line,

11  sir, from Mr. Grasso.  And the date it was forwarded to you

12  was October 3rd, but Mr. Grasso sends Mr. Wierzbicki an

13  "Anonymous Reporting on DNS Data".  Do you see that?

14     **A.**   Yes.

15     **Q.**   He says -- who is Special Agent Wierzbicki?

16     **A.**   Dan Wierzbicki was the supervisory special agent

17  in Chicago at that time.

18     **Q.**   And if you will take a look at the second

19  paragraph, I'm going to focus you on the third and fourth

20  lines.  It says, "There is one bit of data that was not

21  provided, and that is the IP address of the person of

22  interest at the bank.  Here's the additional information

23  that an anonymous reporter requested by provided to the

24  FBI."  Do you see that?

25     **A.**   Yes.

1      **Q.**   Sir, do you follow up with Tom Grasso to see who

2   the person was that had provided the additional information?

3      **A.**   I am not aware.

4      **Q.**   Are you aware that the person who provided that

5   was Rodney Joffe?

6      **A.**   I am not aware.

7           **MR. DeFILIPPIS:**  Objection.  Asked and answered.

8           **THE COURT:**  Overruled.

9   **BY MR. BERKOWITZ:**

10     **Q.**   And, sir, do you know who Rodney Joffe is?

11     **A.**   I do.

12     **Q.**   You didn't know who he was at the time.  Correct?

13     **A.**   That's correct.

14     **Q.**   Okay.  You met with him in 2017?

15     **A.**   Yes.

16     **Q.**   In connection with one of your cases?

17     **A.**   Not with one of my cases, no.

18     **Q.**   Was he a confidential human source at that point?

19     **A.**   I don't know.

20     **Q.**   And, sir, you knew that the data that had been

21   provided in the white paper was provided by a researcher.

22   Correct?

23     **A.**   I don't remember if that's what it said in the

24   narrative.  I think so, yes.

25     **Q.**   Do you remember that you referred to, in one of

1    your reports of interview, that the -- when criticizing the

2    report you talk about the researcher?

3         **A.**   I don't remember but it is certainly possible.

4         **Q.**   Okay.  Did you ever ask to speak to the

5    researcher --

6         **A.**   No.

7         **Q.**   -- who prepared the report?

8         **A.**   No, I didn't know who the researcher was.

9         **Q.**   All right.  And you never asked Mr. Grasso who it

10   was that provided this information.  Correct?

11        **A.**   I don't remember.

12             **MR. BERKOWITZ:**  Nothing further.

13             **THE COURT:**  All right.  Special Agent Hellman,

14   thank you very much for your testimony.  You are excused.

15   Please don't discuss your testimony with anyone until the

16   end of the case.

17             **THE WITNESS:**  Yes, Your Honor.

18             **THE COURT:**  Have a good day.

19             **THE WITNESS:**  Thank you.

20             **THE COURT:**  Ladies and gentlemen.  We are going to

21   take our afternoon break.  It is 3:45.  We will be ready to

22   go at 4:00.  All right?

23        (Jury exited the courtroom.)

24             **THE COURT:**  All right.  Who's next up?

25             **MR. DeFILIPPIS:**  Your Honor, it will be Steve

1      DeJong, D-e-J-o-n-g.

2              **THE COURT:**  Mr. DeJong.  Okay.

3              And I want to get them out of here like 4:30,

4      4:45, maybe.  So we will do 45 minutes.  Will you need that

5      long?

6              **MR. DeFILIPPIS:**  Short.

7              **THE COURT:**  Have a seat, everybody.

8              **MR. DeFILIPPIS:**  Your Honor, I would suspect the

9      direct will be shorter than that.

10             **THE COURT:**  Okay.  Cross?

11             **MR. BOSWORTH:**  Short.

12             **THE COURT:**  Short?  Okay.  Well, maybe we can get

13     him on and off and then knock off after that.  All right.

14     We stand in recess.

15             (Recess.)

16             **THE COURT:**  Okay.  Who is handling the direct?

17             **MR. DeFILIPPIS:**  That would be me, Your Honor.

18             **THE COURT:**  Okay.

19             **MR. DeFILIPPIS:**  Your Honor, the government calls

20     Steve --

21             **THE COURT:**  Well, let's wait for our jury.

22             **MR. DeFILIPPIS:**  Oh, I'm sorry.  That would be

23     helpful.

24         (Jury entered the courtroom.)

25             **THE COURT:**  Welcome back, everyone.  Please be

501

1    seated.

2           Mr. DeFilippis, I think the floor is yours.

3           **MR. DeFILIPPIS:**  Yes, Your Honor.  The government

4    calls Steve DeJong.

5           **THE COURT:**  Good afternoon, sir.

6           **THE WITNESS:**  Good afternoon.

7           **THE COURT:**  If you could remain standing and raise

8    your right hand, please.

9           **DEPUTY CLERK:**  Do you solemnly affirm and truly

10   declare the testimony you are about to give will be the

11   truth, the whole truth and nothing but the truth?  And this

12   you do under pain and penalty of perjury.  If so, please say

13   I do.

14          **THE WITNESS:**  I do.

15          **DEPUTY CLERK:**  Thank you.  You may be seated.

16          **THE COURT:**  All right.  Please get comfortable

17   there.  Make sure you speak into the mic.  Okay?

18          **THE WITNESS:**  Hi.

19            **DIRECT EXAMINATION OF STEVE DEJONG**

20   BY MR. DeFILIPPIS:

21      **Q.**  Good afternoon, Mr. DeJong.  Could you just state

22   and then spell your name for the record and the court

23   reporter?

24      **A.**  My name is Steve DeJong, D-e-J-o-n-g.

25      **Q.**  Where do you work?

1      **A.**   I work for Neustar Security Services.

2      **Q.**   And briefly speaking, what is Neustar Security

3   Services?

4      **A.**   The group I work for is focused on DNS, hosted DNS

5   servers and DDoS mitigation systems.  We work primarily in

6   the internet infrastructure providing services for our

7   customers.

8      **Q.**   Okay.  And we will come back to your role and some

9   of that terminology, but what is Neustar more broadly?

10     **A.**   Neustar was a media data clearinghouse, data for

11   media, advertising, marketing and internet services.

12     **Q.**   So what kinds of specific services or activities

13   does it engage in?

14     **A.**   I can't speak for the rest of Neustar.  My group

15   does DNS internet services and hosting DDoS mitigation.

16     **Q.**   When you say DNS internet services and internet

17   hosting, what does that mean?

18     **A.**   We provide a cloud-based DNS infrastructure for

19   large enterprises for TLD operators, for recursive

20   resolvers.  We have global infrastructure in data centers

21   all across the world.

22     **Q.**   Okay.  So is it fair to say, Mr. DeJong, that you

23   provide servers and infrastructure so that the DNS system

24   can function?  Is that fair?

25     **A.**   We provide services and infrastructure so that our

1    customers can have an internet presence.  Correct.

2        Q.    And what kinds of customers do you have?  Is this

3    individuals?  Companies?

4        A.    Companies.  Mostly large enterprises, brick and

5    mortar, shops, companies that want any sort of presence on

6    the internet.

7        Q.    So if a company -- if any company wants to hire

8    you, what is it that your services allow the company to do?

9        A.    The DNS service itself provides a system for

10   serving domain names and converting those names into

11   addresses.

12       Q.    So to what extent do those services facilitate the

13   web-based activities and browsing of a company?

14       A.    DNS is the first step in the lookup, the first

15   thing when you type something in your browser, you have to

16   give it a domain to go to.  DNS is the first step in that

17   lookup to convert that name to an address.

18       Q.    Okay.  In connection to providing DNS services to

19   companies and customers, does Neustar house quantities of

20   DNS?

21       A.    Ultra DNS keeps a large amount of the data that it

22   collects.  We do that for various reasons, operational

23   telemetry, forensic analysis in terms of attack, and just

24   analytics of what our customer's behavior is to bill them,

25   invoice them and answer any questions that they may have

1    about how the internet -- how their service is being used.

2         **Q.**   Okay.  So you mentioned Ultra DNS.  Is that a part

3    of --

4         **A.**   That is the product name.  Sorry.

5              **COURT REPORTER:**  Excuse me.  Please let him finish

6    his question before you answer.

7              **THE WITNESS:**  Okay.

8    BY MR. DeFILIPPIS:

9         **Q.**   That is a product name within Neustar?

10        **A.**   Yes, it was.

11        **Q.**   In providing services to its customers, does

12   Neustar come to possess those customers' DNS data?  Is

13   that --

14        **A.**   Correct.

15        **Q.**   Okay.  And if you could give a ballpark -- not

16   that it will necessarily be meaningful but what quantities

17   of data are we talking about?

18        **A.**   Um, right about now we do somewhere around 150

19   billion DNS transactions per day.  That works out to around

20   5 terabytes of data.

21        **Q.**   Per day?

22        **A.**   Per day.

23        **Q.**   Does Neustar store that data, at least for some

24   period of time?

25        **A.**   We store it for some period of time, yes.

1    Q.   If a person is browsing on the internet and they

2    trigger DNS lookups, to what extent might those be captured

3    in Neustar's holdings?

4    A.   Assuming they are going to one of our customer's

5    domains, we would see the timestamp.  We would see the

6    address that was being resolved too and where it came from.

7    Q.   And what does Neustar do with all of that data?

8    A.   We use it for forensic analysis.  When we come

9    under DDoS attack, we use it for operational analysis to

10   know that our services are running in a globally-distributed

11   fashion.  Data is going -- or queries are going where they

12   need to go.  They are being answered in a timely fashion.

13        We also use it for billing.  We bill our customers

14   for the number of queries we serve for them, and then we

15   also use it for research and analytics.

16   Q.   You mentioned a couple times DDoS attacks.  What

17   is a DDoS attack?

18   A.   When internet traffic and malicious behavior is

19   happening, we refer to as a DDoS attack or a -- some form of

20   abuse that happens against either the customer's network or

21   against our DNS name servers.

22   Q.   And you mentioned that Neustar also engages in

23   research and analytics.  What kind of research and

24   analytics?

25   A.   Typically what we are looking for is any sort of

1    anomalies in the traffic, abuse, detection of malicious

2    actors, threat actors of some form, usually in terms of

3    explaining why a customer's queries have gone abnormally

4    high or abnormally low.  Things like cache poisoning.

5    Things like DDoS abuse, hijacking of any kind.

6         Q.   Okay.  Those are basically bad things that happen

7    on the internet?

8         A.   Some of them.

9         Q.   To what extent does Neustar, to your knowledge, do

10   political research?  Is that part of its business?

11        A.   No.

12        Q.   Do you know an individual named Rodney Joffe?

13        A.   Yes.

14        Q.   And who is Mr. Joffe, as far as you know?

15        A.   Mr. Joffe, at one time, was the CTO of Neustar.

16        Q.   And CTO, what does that stand for?

17        A.   Chief Technology Officer.

18        Q.   Let me ask you, in the 2016 time period, were you

19   also working at Neustar?

20        A.   Yes.

21        Q.   What were you doing then?

22        A.   I was working on DNS operations and data analysis.

23        Q.   And in DNS operations and data analysis, what did

24   you do day to day?

25        A.   Kept the DNS servers running, made sure they

1    didn't break, answered questions for customers, things of

2    that nature.

3        **Q.**   Okay.  So are you the guy at Neustar who has

4    access to most of its data or is responsible for that

5    infrastructure?

6        **A.**   I had access to most of the data at that time,

7    yes.

8        **Q.**   Okay.  Now, going back to Mr. Joffe, when did you

9    first get acquainted with Mr. Joffe?

10       **A.**   When my company was acquired in 2007/2008

11   timeframe.

12       **Q.**   You say "your company," what company was that?

13       **A.**   I had a company in Seattle that was acquired by

14   Neustar.

15       **Q.**   In the 2016 time period, was Mr. Joffe your boss

16   or supervisor?

17       **A.**   In that timeframe he was the Chief Technology

18   Officer of Neustar, so he was over much of engineering and

19   technology.

20       **Q.**   Okay.  Now, how frequently would you say you

21   interacted with him in 2016?

22       **A.**   Probably once or twice a month.

23       **Q.**   And what would be the sorts of things that you

24   would deal with him on?

25       **A.**   Um, everything from operational decisions,

1    capacity, planning for our network, new feature sets that we

2    would be building into the DNS and other research projects

3    that we wanted to work on or explore.

4        **Q.**   Did there come a time in 2016 when Mr. Joffe asked

5    you to run some particular searches over Neustar's data that

6    related to a political topic?

7        **A.**   Yes.

8        **Q.**   And tell us about that.

9        **A.**   So in the August/September timeframe, 2016, he

10   asked me, as a favor, to run a query over our DNS data logs

11   to see if we saw any queries for several names related to

12   political campaigns and political organizations.

13       **Q.**   And was it -- at that time the 2016 presidential

14   election was gearing up; is that right?

15       **A.**   Yes.

16       **Q.**   And do you recall, was it both campaigns?  One

17   campaign?

18       **A.**   I don't recall at the time what it was.  I think

19   in retrospect it was mostly around the Trump campaign.

20       **Q.**   And what was your reaction when he asked you to do

21   that?

22       **A.**   I didn't think anything of it at the time.  Quite

23   honestly, we do, as I mentioned, we do research frequently.

24   We have done research for any number of behavioral projects.

25   So when someone comes and asks it's like, Okay.  It's just

1      another list of domains.

2           **Q.**    Okay.  So did he give you any background as to why

3      he was asking you to do it?

4           **A.**    None.

5           **Q.**    Did you ask any questions?

6           **A.**    No.

7           **Q.**    Why?

8           **A.**    He is the CTO of my company.  I don't ask

9      questions.

10          **Q.**    Now, do you know an individual named Manos

11     Antonakakis?

12          **A.**    Yes.

13          **Q.**    Who is that?

14          **A.**    He is a researcher at Georgia Tech.  I believe he

15     is a third degree.

16          **Q.**    Georgia Tech?

17          **A.**    Yes.

18          **Q.**    Is Georgia Tech a university?

19          **A.**    Yes.

20          **Q.**    What relationship, if any, did Mr. Antonakakis

21     have with Neustar?

22          **A.**    He would work with us on certain projects.  Manos

23     is very well-known in the research community.  He would work

24     on several projects with us from research topics, from

25     threat hunting, malware hunting and other things.

1    **Q.**   And was there any particular project or projects

2    in which Neustar shared its data with Georgia Tech and

3    Mr. Antonakakis?

4    **A.**   Yes, absolutely.

5    **Q.**   What was that?

6    **A.**   We had opportunity to explore, through some of his

7    research projects, to be able to do deep investigations.

8    And we had given him access.  That was in late 2016 as well

9    where we had given him access to most of our data lake.

10   **Q.**   And when you say you gave them access or him

11   access to most of your data, you mean all of or most of

12   Neustar's data, all of the terabytes?

13   **A.**   The Neustar, Ultra DNS data.  Not all of Neustar's

14   data, no.

15   **Q.**   Okay.  And would that be a large quantity of data?

16   **A.**   Yes.

17   **Q.**   And were you -- what was the point of that

18   information sharing?

19   **A.**   As far as I know, it was part of a deal to do

20   research and abuse detection and malware detection.

21   **Q.**   Were you sending Ultra DNS's internet traffic and

22   DNS traffic on a periodic basis?  On a realtime basis?  How

23   did that work?

24   **A.**   It was a periodic basis, once a week or daily.  I

25   can't recall.

1    **Q.**   And what quantities of data would that be?

2    **A.**   It was parsed-down data so probably around 2 or 3

3    terabytes of data a day.

4    **Q.**   Okay.  So a lot of data?

5    **A.**   It was a lot of data, yes.

6    **Q.**   Were they paying for that data?

7    **A.**   As far as I know.  I'm not part of the business

8    side so --

9    **Q.**   And to what extent are you aware of or did you

10   hear of any government contracts that that data transfer

11   related to?

12   **A.**   I was not aware of any government contracts.  They

13   had talked about it, but I was not directly involved in any

14   of it so I can't --

15   **Q.**   Okay.  Which government agency?

16   **A.**   DARPA.

17   **Q.**   Do you know what DARPA is?

18   **A.**   Defense Advanced Research Projects.

19   **Q.**   Defense research?

20   **A.**   Projects.

21   **Q.**   Okay.  Let me show you what's been marked

22   Government's Exhibit 111.  Do you recognize this document?

23   **A.**   Yes.

24   **Q.**   What is it?

25   **A.**   This is an email from Manos with what appears to

1   be a list of DNS domain names and IP addresses.

2       **MR. DeFILIPPIS:**  Okay.  Your Honor, the government

3   offers Government Exhibit 111.

4       **MR. BOSWORTH:**  No objection.

5       **THE COURT:**  So moved.

6       (Government's Exhibit 111 was admitted.)

7   **BY MR. DeFILIPPIS:**

8       **Q.**  If we look just at the header line of that email,

9   the header information.  It's from Manos Antonakakis to you

10  copying Rodney Joffe.  Do you see that?

11      **A.**  Yes.

12      **Q.**  And this was sent when?

13      **A.**  August 20, 2016.

14      **MR. DeFILIPPIS:**  If we could go to the body of the

15  email.

16  **BY MR. DeFILIPPIS:**

17      **Q.**  Could you just read the email?

18      **A.**  "Hey Steve, you know that if you are getting an

19  encrypted email with Rodney CCed, in the middle of the

20  night, something is up.

21      "I will need you to pull all data you have, Ultra

22  DNS, TLDs, ccTLDs and especially the data from 'Secondary'

23  dataset we talked about in May for the following zones and

24  IP addresses:"  Do you want me to go on?

25      **Q.**  Yeah.  What is the first domain there?

1      **A.**   The first domain is trump-email.com.

2      **Q.**   Okay.  And then what follows --

3          **MR. DeFILIPPIS:**  If we could just zoom out.

4   BY MR. DeFILIPPIS:

5      **Q.**   And then what follows in the rest of that email?

6      **A.**   So the remainder of the email appears to be some

7   more domains, the 29.135.216 is a reverse mapping domain.

8   Af-people.ru, just a list of domains that goes on and on and

9   on.

10     **Q.**   Okay.  And does it look like there is a particular

11  key word or phrase that recurs throughout a lot of those

12  domains?

13     **A.**   The word "alfa" appears in many of them, at least

14  on the first page.

15     **Q.**   Okay.

16         **MR. DeFILIPPIS:**  Ms. Arsenault, if we could scroll

17  through.

18  BY MR. DeFILIPPIS:

19     **Q.**   And does that continue on for a few pages?

20     **A.**   I forget how many are in the list total.

21         **THE COURT:**  She'll show you.

22         **THE WITNESS:**  There are international domain names

23  down at the end and debit cards.

24  BY MR. DeFILIPPIS:

25     **Q.**   Okay.

514

1      **A.**   Yeah.  I can't interpret the internationalized

2      domain names.  I don't know what those are.

3      **Q.**   Okay.  What, if anything, did you know about

4      Mr. Antonakakis' comment that, "if you are getting an

5      encrypted email with Rodney CCed in the middle of the night,

6      something is up."  What did you understand that to mean?

7      **A.**   It's not uncommon for us to get research requests

8      and data requests.  Rodney was well-known for working at all

9      hours, 24/7, depending on what time zone he happened to be

10     in.  It was not uncommon for us to get these requests.

11             It was a little uncommon that it would come from

12     Manos, but it wasn't unexpected that it would come from

13     Rodney in the middle of the night.

14     **Q.**   And how common or uncommon was it for you to get

15     requests on political subjects?

16     **A.**   Unless it was an actual customer that was involved

17     in politics, probably not very likely at all.

18     **Q.**   Now, you mentioned before this tasking you got

19     relating to -- I think you said some Trump-related things in

20     the summer or fall of '16?

21     **A.**   Uh-huh.

22     **Q.**   Was this related to that?

23     **A.**   I don't recall that this was related.  It was part

24     of that.  I think that list came -- this list came before

25     that initially, but they quickly turned into two lists that

1   were roughly the same topic.  They were related.

2       **Q.**   Okay.  Now let me direct your attention to

3   Government Exhibit 1600, what's been premarked.

4           Is this a document that you provided to the

5   government?

6       **A.**   Yes, it is.

7       **Q.**   And what is it?

8       **A.**   This is a list of domains that I used to seed a

9   job, a script, pulling the data.  So you will see that

10  several of the domain names in this list overlap with the

11  previous exhibit.

12      **Q.**   Okay.

13      **A.**   And there are some others on that.

14          **MR. DeFILIPPIS:**  Your Honor, the government offers

15  Government's Exhibit 1600.

16          **MR. BOSWORTH:**  No objection.

17          **THE COURT:**  So moved.

18      (Government's Exhibit 1600 was admitted.)

19  **BY MR. DeFILIPPIS:**

20      **Q.**   I'm sorry, Mr. DeJong.  Did you prepare this list

21  or was it given to you?

22      **A.**   I think what I did here was combined the list to

23  the previous email with Manos, along with some other domains

24  that I had been given on a list, and came up with this.  So

25  this would be the complete list of domains that were

1   related.

2       Q.    And what was the purpose of preparing this list?

3       A.    So that I didn't have to type them all by hand

4   into the script.

5       Q.    And when you say "a script," what is a script?

6       A.    So what I had was a small program that queried all

7   of the data that we had.  Looking for instant occurrences of

8   these names.

9       Q.    So would that be all of the terabytes of Neustar's

10  data?

11      A.    Yes.

12      Q.    Was that DNS data?

13      A.    Yes.  I was restricted to DNS data only.

14      Q.    And would that include all of Neustar's customers?

15      A.    Just the queries, the data that we saw.  All of

16  Ultra DNS customers.

17      Q.    Okay.  Now, turning your attention to what's been

18  marked as Government Exhibit 1602.  Do you recognize that

19  document?

20      A.    Yes.

21      Q.    What is it?

22      A.    That would be the header of one of my scripts.

23      Q.    Okay.

24          MR. DeFILIPPIS:  Your Honor, the government offers

25  Government Exhibit 1602.

1          **MR. BOSWORTH:**  No objection.

2          **THE COURT:**  So moved.

3      (Government's Exhibit 1602 was admitted.)

4  BY MR. DeFILIPPIS:

5      **Q.**  So, Mr. DeJong, what are we looking at here at a

6  high level?

7      **A.**  So at a high level this is the beginning of a

8  small program that would go through days in order, iterate

9  through all of the days in a month.  And if you scroll to

10  the next page, you will see that it's looking for DNS

11  responses where one of those names appears in the list --

12  appears in the data.

13      **Q.**  When you say "one of those names," what do you

14  mean?

15      **A.**  From the previous list they've been moved into

16  this script.  You can see the list of domains.  So

17  ACfactoring.com, ACIMM.com, afpeople, you know that list.

18      **Q.**  Now, do you prepare -- was this the only script

19  you prepared in response to Mr. Joffe's request or did you

20  prepare others?

21      **A.**  I probably would have split -- that original list

22  into multiple but they would all be the same thing where I

23  would just replace the domain names in each individual list.

24      **Q.**  And what was the purpose if any of breaking them

25  up any?

1      **A.**   To go faster.

2      **Q.**   Okay.

3           Now, how did these scripts work?  Did you then

4      program them to run over all of Neustar's data continuously?

5      **A.**   No.  So I would go -- it's programmed to go back

6      in time.  And look at historic data over a period of a

7      month.  And I just set it up to run a month at a time.

8      **Q.**   So going how far back?

9      **A.**   I don't recall exactly how far back in time I

10     went.  I know it was at least three months, but I don't

11     recall how long.

12     **Q.**   And as you would get results of this data -- I

13     assume you got results?

14     **A.**   Yes.

15     **Q.**   And then what did you do with that?

16     **A.**   So if you scroll to the very bottom of this

17     script, you'll see that at the end, any data that is

18     collected is put into a very -- into a single file, moved

19     into a compressed file format and then sent upstream, sent

20     to a different directory.

21     **Q.**   And who, if anyone, did you share the data with?

22     **A.**   As each month completed, I shared it with

23     Mr. Joffe.

24     **Q.**   How, if at all, did he respond or react when you

25     would share the data?

519

1        **A.**    "Thank you."  I don't recall.  I mean, he just

2     acknowledged receipt, basically.

3        **Q.**    And did you ever get any further insight into why

4     he was doing it or what he was doing with it?

5        **A.**    No.  I mean, no, I didn't.

6        **Q.**    Did you ever ask?

7        **A.**    I thought about it but, no, I didn't.

8        **Q.**    Why did you decide not to ask?

9        **A.**    I mean, it's not my business.  I have a day job.

10    I have other things that I am working on.

11       **Q.**    Let me show you what's been marked Government

12    Exhibit 717.  Is this an email from Mr. Joffe to you?

13       **A.**    Yes.

14          **MR. DeFILIPPIS:**  The government offers Government

15    Exhibit 717.

16          **MR. BOSWORTH:**  No objection.

17          **THE COURT:**  So moved.

18       (Government's Exhibit 717 was admitted.)

19    **BY MR. DeFILIPPIS:**

20       **Q.**    What are we looking at here?

21       **A.**    This is in response to an email that I sent to

22    him, which was -- it looks like just a file that contains --

23    contains some of the data.  And his response was, "Thank

24    you.  Surprised September is empty.  I am seeing normal data

25    in other sensors."

1      **Q.**   So when you said, "September is empty," what would

2    that mean?

3      **A.**   Given the file naming convention, it would mean

4    that the second file that I sent to him,

5    trumpemail2016-09.tgz, would have been an empty file.

6      **Q.**   Meaning there were no results?

7      **A.**   No results.

8      **Q.**   And what about the first file?

9      **A.**   It would have been 2016-06, so that would have

10   been June, I guess.  I don't recall, what was in any of

11   those files, if it was empty or not.

12     **Q.**   When you say, "I am seeing normal data in other

13   sensors."  What does that mean?

14     **A.**   Ultra DNS is not the only source of DNS

15   information.  So I am assuming that Mr. Joffe had other

16   sources of DNS information.

17     **Q.**   I apologize.  I said "you".  That was Mr. Joffe

18   that wrote that?

19     **A.**   Yes.

20     **Q.**   Did you know what he meant by that?

21     **A.**   No.  I assumed.  Sorry.

22     **Q.**   I'd like to show you what's been marked as

23   Government Exhibit 716.  Is this another email from you to

24   Mr. Joffe?

25     **A.**   Yes.

1          **MR. DeFILIPPIS:**  Your Honor, the government offers

2     Government Exhibit 716.

3          **MR. BOSWORTH:**  No objection.

4          **THE COURT:**  So moved.

5          (Government's Exhibit 716 was admitted.)

6     **BY MR. DeFILIPPIS:**

7     **Q.**   If we go to the bottom email in that chain, which

8     is dated September 14, 2016 --

9     **A.**   Uh-huh.

10    **Q.**   -- what is it that you say?

11    **A.**   I said -- I sent him a file, trumpemail-2016-07.

12    And I said, "Well, July finished."

13    **Q.**   What did you mean by that?

14    **A.**   So as I mentioned, that script would work over a

15    month of data and it takes quite a bit of time.  And it

16    takes quite a bit of time.  So I would check on it

17    periodically to see if a month had finished, and July had

18    finished.  So I sent it off.  And the second -- the first

19    email was for August, which meant that August had finished.

20    **Q.**   Okay.  So these are both emails from you to

21    Mr. Joffe?

22    **A.**   Yes.

23    **Q.**   And both sending him data?

24    **A.**   Yes.

25    **Q.**   If we then go to the attachment to this email,

1   which is -- appears to be data spread over multiple, sort of

2   partial pages.  Looking at this first page here, what are we

3   looking at?

4        A.   So this would have been -- this appears to be one

5   line out of a sample return dataset.  So the first field

6   there would give the date and then a timestamp.  The 46

7   would be our sensor location where Ultra DNS saw it.  And

8   then the destination address, which is a Ultra DNS name

9   server address.  And then the source address, which is where

10  it came from, and then the type and then what it was looking

11  for, which is mail1.trump-email.com.  And then how we

12  responded, what our answer was, which was

13  mail1.trump-email.com -- [indiscernible] -- of 3600 and an

14  address of 66.216.133.29 and that is repeated with different

15  timestamps.

16       Q.   Do you recall how long you ran these scripts for?

17       A.   I don't know.  I don't recall how long they took.

18       Q.   Did you ever stop them at some point?

19       A.   I was given a -- probably until I hit the current

20  time, basically.  I would have stopped when I ran out of

21  history to run through.

22       Q.   Okay.

23            I'd like to direct your attention to what has been

24  marked as Government Exhibit 719.  Is this an email from you

25  to Mr. Joffe dated July 18th of 2017?

1      **A.**    "I have 4 jobs that look specifically for trump

2   data."  Yes.

3          **MR. DeFILIPPIS:**  Your Honor, the government offers

4   Government Exhibit 719.

5          **MR. BOSWORTH:**  No objection.

6          **THE COURT:**  So moved.

7      (Government's Exhibit 719 was admitted.)

8   **BY MR. DeFILIPPIS:**

9      **Q.**    So again, Mr. DeJong, this is an email from you to

10  Mr. Joffe dated July 18th.

11          (Alarm)

12     **A.**    Child alarm.  Sorry.

13     **Q.**    This is from you to Mr. Joffe dated July 18th?

14     **A.**    Yes.

15     **Q.**    And that's 2017?

16     **A.**    Yes.

17     **Q.**    And what do you say to Mr. Joffe?

18     **A.**    "I have 4 jobs that look specifically for trump

19  data.  ClntID" --

20          **THE COURT:**  You don't need to read the whole body.

21          **THE WITNESS:**  All right.

22  **BY MR. DeFILIPPIS:**

23     **Q.**    And, again, to what -- how did this relate to the

24  prior emails and the project that you mentioned?

25     **A.**    So these were the four jobs that I had set up

1    specifically in response to their previous request that

2    we've looked at.

3         Q.   Did you ever hear or learn whether Mr. Joffe

4    shared this data with anyone, including the government?

5         A.   No.

6         Q.   Did you ever talk about this project or this task

7    with anyone other than Mr. Joffe?

8         A.   No.

9         Q.   And other than this, can you think of any occasion

10   in which you were asked to do a political-related search of

11   Neustar's data?

12        A.   We had done other searches based on subpoenas,

13   based on Court orders.  Based on other projects going on.  I

14   don't recall specifically that it was related to any

15   specific political organization.

16        Q.   And to what extent are you aware of new Neustar

17   working with or supporting or providing services to any

18   political campaign?

19        A.   I am not aware of that at all.

20        Q.   Okay.  Thank you.

21                **CROSS-EXAMINATION OF STEVE DEJONG**

22   **BY MR. BOSWORTH:**

23        Q.   Good afternoon, Mr. DeJong.

24        A.   Good afternoon.

25        Q.   If you don't like my questions, you can let the

1    alarm go off again.

2             We've never met before.  Correct?

3        **A.**   Correct.

4        **Q.**   I will be brief.  You were asked questions about

5    the data that you gathered in 2016.

6        **A.**   Uh-huh.

7        **Q.**   Correct?

8        **A.**   Yes.

9        **Q.**   And you just pulled the data.  Correct?

10       **A.**   Correct.

11       **Q.**   You didn't analyze the data.  Right?

12       **A.**   Correct.

13       **Q.**   You are an engineer?

14       **A.**   Correct.

15       **Q.**   Do you know who, if anyone, analyzed the data that

16   you pulled?

17       **A.**   No.

18       **Q.**   No idea?

19       **A.**   No.

20       **Q.**   Do you have any idea whether other people were

21   pulling data for Mr. Joffe?

22       **A.**   Specifically, no, I do not know.

23       **Q.**   Well, we saw that one email where you made

24   reference to data he was seeing from other places.

25       **A.**   Correct.

1      Q.   Did he have access to data to DNS data beyond what

2   Neustar had in its holdings?

3      A.   Yes.

4      Q.   And you know that?

5      A.   Yes.

6      Q.   Okay.  And you had no idea that whether the data

7   you were pulling was going to go to the New York Times or

8   anywhere else.  Right?

9      A.   Correct.

10      Q.   You talked about Ultra DNS before.  Who founded

11   Ultra DNS?

12      A.   Rodney Joffe.

13      Q.   How did Ultra DNS become part of Neustar?

14      A.   Neustar acquired Ultra DNS in 2006/2007, something

15   like that.

16      Q.   And do you know whether Mr. Joffe is

17   well-respected within the DNS field?

18      A.   He is very well-respected.

19      Q.   He's an expert in DNS technology.  Correct?

20      A.   Yes.

21      Q.   Do you know whether Mr. Joffe did business with

22   the U.S. government?

23      A.   Yes, he did.

24      Q.   And what at a high level can you say about that

25   business?

1      **A.**    Research projects.  As I mentioned earlier, the

2   DARPA project.  He worked on -- from his biography I know he

3   worked closely on the Conficker project to combat the

4   Conficker malware.  He's worked on other government-related

5   FBI investigations.

6      **Q.**    Fair to say, to your knowledge, he had a good

7   relationship with the government in 2016?

8      **A.**    To my knowledge, yes.

9      **Q.**    Do you know if he ever received any awards or

10   honors in connection with that work?

11      **A.**    Yes.  He was awarded an FBI Service Award at one

12   point.

13      **Q.**    You talked about the access that Neustar has to

14   data.  And you said -- and tell me if this is right -- the

15   Neustar process is 150 billion DNS responses a day.  Right?

16      **A.**    Correct.

17      **Q.**    And that's roughly one-tenth of 1 percent or more

18   of global DNS data?

19      **A.**    Probably around that, yes.

20      **Q.**    And Neustar made a lot of money selling that data.

21   Correct?

22      **A.**    I don't know that Neustar, in 2016, was selling

23   that data at all.

24      **Q.**    Does Neustar provide DNS data to anyone?

25      **A.**    For research purposes, yes.

1    **Q.**   And what about Ultra DNS?

2    **A.**   I'm sorry.  Could you rephrase the question?

3    **Q.**   Does Ultra DNS provide DNS data to customers?

4    **A.**   We provide it to our customers, in terms of

5    answering questions that they may have.

6    **Q.**   And you were asked some questions about whether

7    Mr. Joffe asked you to run other searches --

8    **A.**   Uh-huh.

9    **Q.**   -- on DNS data.  And you said that Mr. Joffe asked

10   you to run queries about a range of current events; is that

11   right?

12   **A.**   Occasionally, yes.

13   **Q.**   And the requests didn't just relate to politics.

14   Correct?

15   **A.**   No.

16   **Q.**   For example, Mr. Joffe asked you to gather data

17   relating to power companies during a hurricane.  Right?

18   **A.**   Correct.

19   **Q.**   It wasn't unusual to get a request from Mr. Joffe

20   looking for data?

21   **A.**   Not at all.

22   **Q.**   And regarding the data that you were talking about

23   that Mr. Joffe asked you for in 2016, I think there was one

24   email in 2017, did you work with Mr. Sussmann to gather that

25   data?

1    **A.**    No.

2    **Q.**    Did you talk with Mr. Sussmann in connection with

3    that data?

4    **A.**    No.

5    **Q.**    Did Mr. Joffe ever mention Mr. Sussmann in

6    connection with the data?

7    **A.**    No.

8    **Q.**    To your knowledge, was Mr. Sussmann involved in

9    any way in gathering that data?

10   **A.**    No.

11   **Q.**    Was Mr. Sussmann involved in any way in analyzing

12   the data, to your knowledge?

13   **A.**    No.

14   **Q.**    In fact, you never -- you hadn't even heard of

15   Mr. Sussmann until this investigation.  Correct?

16   **A.**    Correct.

17   **Q.**    And those emails and other documents you reviewed,

18   Mr. Sussmann wasn't copied on any of them.  Correct?

19   **A.**    No.

20           **MR. BOSWORTH:**  No further questions.

21           **MR. DeFILIPPIS:**  Nothing from the government, Your

22   Honor.

23           **THE COURT:**  All right.  Ladies and gentlemen --

24   excuse me, Mr. Joffe -- Mr. DeJong.  Thank you very much for

25   your testimony.  You are excused.  Please don't discuss your

1      testimony with anyone until the case is over.   Okay?

2              **THE WITNESS:**   Of course.

3              **THE COURT:**   Have a good day.

4              All right.   Obviously it's been a long day for me,

5      and I'm sure it's been a long day for you all as well.   We

6      are going to wrap up for the day, and dismiss you until

7      tomorrow morning at 9:00.

8              As always, no discussions about the case.   No

9      research about the case.   And I should have asked this favor

10     yesterday but I will ask you a favor in addition to my

11     instructions.   You know, obviously COVID cases have been

12     going up in our region.   We have taken all of the

13     precautions that we can to limit the risk.   We have these

14     plexiglass barriers up.   Everyone is wearing masks.   We are

15     trying to distance folks as much as we can.

16             But I made this request of the lawyers, and I will

17     make it of you.   We are all in the same pod now.   So it's

18     very important that we do all that we can to stay healthy

19     during the duration of the trial.

20             So just as you go about into the world and go back

21     home and, you know, try to limit your contacts with folks

22     and -- I'm not telling you to be a hermit, but just be aware

23     of your environment and our collective obligation to each

24     other to stay safe and to get through this trial.   Okay?

25             Have a great evening and we will see you tomorrow.

1          (Jury exited the courtroom.)

2               **THE COURT:**  All right.  So we will start with

3     Ms. Fine tomorrow.  Is that still the order?

4               **MR. DeFILIPPIS:**  Yes, Your Honor.

5               **THE COURT:**  And then Mr. Elias afterwards.  Is

6     that still the order?

7               **MR. DeFILIPPIS:**  Your Honor, we just slightly

8     modified the order.  It's Ms. Fine, Ms. Seago, Mr. Elias,

9     followed by Tom McMahon, followed by James Baker, if we get

10    to it.

11              **THE COURT:**  That would be ambitious for one day.

12    Right?

13              **MR. DeFILIPPIS:**  It would, Your Honor.  We sort of

14    overestimated for today as well.

15              **THE COURT:**  All right.  Then we can chat about

16    Mr. Steele in the morning.  I've started to review the

17    materials that you all have submitted.  I would like to

18    spend a little more time with them and ask questions before

19    we get to that.  Anything else?

20              **MR. DeFILIPPIS:**  Not from the government, Your

21    Honor.

22              **THE COURT:**  Mr. Berkowitz?

23              **MR. BERKOWITZ:**  [inaudible]

24              **COURT REPORTER:**  I can't hear you, sir.

25              **MR. BERKOWITZ:**  I don't usually have that problem

1    with my voice but I apologize.

2             **THE COURT:**  Remember, Counsel, we are also feeding

3    this.

4             **MR. BERKOWITZ:**  It's a good lesson to me.

5             **THE COURT:**  I'm sorry.  If you are not in front of

6    the mic, nobody in the media room or the overflow room is

7    going to hear anything.

8             **MR. BERKOWITZ:**  So one of the witnesses, Judge,

9    that we intend to call in our case in chief is Robby Mook.

10   Mr. Mook was originally on the government's witness list and

11   he was prepared to testify this week.  He has a vacation

12   planned to Spain, leaving Saturday and going through

13   Memorial Day.

14            His lawyer asked us whether we could ask to have

15   him called out of order.  I know that's a little bit

16   unusual.  I do want to be fair and represent Mr. Mook knows

17   he's under subpoena and would cancel his vacation if he has

18   to.

19            **THE COURT:**  Right.

20            **MR. BERKOWITZ:**  But if we could take him, even on

21   Friday, we would appreciate it.  We asked the government.

22   And I understand they get to try their case how they want,

23   but we do have third parties here who are really not

24   connected to anybody.  And we would expect it to be a

25   relatively tight thing.  The sort of extenuating

 1    circumstances here is he was on their list.  They met with

 2    him several times.  They know what he's going to say.

 3              **THE COURT:**  Mr. DeFilippis, do you want to tell me

 4    what you think now or wait until the morning?

 5              **MR. DeFILIPPIS:**  Your Honor, just briefly.  While

 6    we are certainly sympathetic to Mr. Mook's situation, we had

 7    all planned on not sitting Friday.  The government --

 8              **THE COURT:**  You hadn't gotten my okay to not sit

 9    on Friday.

10              **MR. DeFILIPPIS:**  Your Honor, I think in addition,

11    the complication with Mr. Novick's testimony is sort of

12    putting witnesses out of order.  And we think for the jury

13    to have a defense witness to be plopped in the middle of the

14    government's case, it will ruin the sequence and we think

15    make it more difficult for the jury to follow the story.

16              Again we are not unsympathetic, but our preference

17    would be to do the government's case in a discrete fashion.

18              **THE COURT:**  Okay.

19              When does he leave, Mr. Berkowitz?  Mr. Mook.

20              **MR. BERKOWITZ:**  We've been informed by his counsel

21    that he leaves on Saturday.

22              **THE COURT:**  How long is the trip?

23              **MR. BERKOWITZ:**  My recollection, and I will

24    confirm this, is it's through Memorial Day.  It was

25    represented as a 10-day vacation.

1          **THE COURT:**  Okay.  We will be back on this.  All

2   right.

3          **MR. BERKOWITZ:**  That's it.

4          **THE COURT:**  We are adjourned.

5          (Proceedings concluded at 4:48 p.m.)

1

**C E R T I F I C A T E**

2

3         I, **Lorraine T. Herman, Official Court Reporter,**

4    do hereby certify that the above and foregoing is a true and

5    accurate transcript of my stenographic notes and is a

6    complete transcript of the proceedings in the above-entitled

7    matter to the best of my ability.

8

9

10

11

12

13    _____May 18, 2022_____          _/s/_____
                **DATE**                          **Lorraine T. Herman, RPR, CRC**
14

15

16

17

18

19

20

21

22

23

24

25