1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2
         - - - - - - - - - - - - - - - - x
3        THE UNITED STATES OF AMERICA,
                                            Criminal Action No.
4                      Plaintiff,          1:21-cr-00582-CRC-1
                                            Wednesday, May 18, 2022
5        vs.                                9:11 a.m.

6        MICHAEL A. SUSSMANN,              **MORNING SESSION**

7                      Defendant.
         - - - - - - - - - - - - - - - - x
8

9        _____

10                       TRANSCRIPT OF JURY TRIAL
              HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                     UNITED STATES DISTRICT JUDGE
         _____
12
         APPEARANCES:

13       For the United States:     **ANDREW DeFILIPPIS, ESQ.**
                                     **JONATHAN EDGAR ALGOR, IV, ESQ.**
14                                   **BRITTAIN SHAW, ESQ.**
                                     **SPECIAL COUNSEL'S OFFICE**
                                     145 N Street Northeast
15                                   Washington, DC 20002
                                     (212) 637-2231
16
         For the Defendant:         **SEAN M. BERKOWITZ, ESQ.**
17                                   **MICHAEL BOSWORTH, ESQ.**
                                     **CATHERINE YAO, ESQ.**
18                                   **NATALIE HARDWICK RAO, ESQ.**
                                     **LATHAM & WATKINS LLP**
19                                   1271 Avenue of the Americas
                                     New York, NY 10020
20                                   (212) 906-1200

21
         Court Reporter:            Lisa A. Moreira, RDR, CRR
22                                   Official Court Reporter
                                     U.S. Courthouse, Room 6718
23                                   333 Constitution Avenue, NW
                                     Washington, DC  20001
24                                   (202) 354-3187

25

```
1                          I N D E X

2
      WITNESS                                          PAGE
3
      DEBORAH FINE
4          (By Mr. Algor)................................. 543
           (By Mr. Bosworth)............................. 558
5          (By Mr. Algor)................................. 568

6     LAURA A. SEAGO
           (By Mr. DeFilippis)........................... 570
7          (By Mr. Berkowitz)........................... 601
           (By Mr. DeFilippis)........................... 611
8
      MARC E. ELIAS
9          (By Mr. DeFilippis)........................... 620

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're back on
 3      the record for Criminal Case 21-582, United States of
 4      America vs. Michael Sussmann.
 5              MR. DeFILIPPIS:  Good morning, Your Honor; Andrew
 6      DeFilippis for the government.  With me at counsel table are
 7      Brittain Shaw, Jonathan Algor, and Kori Arsenault.
 8              THE COURT:  Okay.  Good morning, everybody.
 9              MR. BERKOWITZ:  Good morning, Your Honor; Sean
10      Berkowitz, Michael Bosworth, Catherine Yao, and Natalie Rao
11      on behalf of Mr. Sussman, who is present in court.
12              THE COURT:  Okay.  Good morning, everyone.
13              Please extend the Court's condolences, as well as
14      that of staff, to Mr. Keilty.  I understand there was an
15      unfortunate occurrence.
16              MR. DeFILIPPIS:  Yes, Your Honor.  Thank you very
17      much.  We will -- and after speaking with the defense, we'd
18      just ask, without objection from the defense, that the jury
19      be informed that he's away, may come back, and that they
20      should infer nothing from his lack of presence in the
21      courtroom.
22              THE COURT:  Okay.  And can I say personal
23      emergency or family emergency?
24              MR. DeFILIPPIS:  I think that's fine, Your Honor.
25              THE COURT:  Okay.
```

```
 1            All right.  On the question of Mr. Mook's
 2    testimony, the Court will accommodate the defense's request
 3    to call him out of turn.  I think we should be a little
 4    flexible on the timing.  I had left Friday open
 5    conditionally just to see where we were.  You know, it may
 6    be that Friday morning might be an opportune time, and we
 7    can take Friday afternoon off.  It seems like we've been
 8    making decent progress, but we'll see how things go.
 9            And I'll take my cues from you.  I can be
10    available.  But if it makes sense to try to get Mr. Mook in
11    on Friday morning and take off Friday afternoon, that might
12    be the best time to do it.
13            Just for the record, you know, he was on both
14    parties' witness lists initially.  He's given prior
15    testimony.  The government obviously knows what he is likely
16    to testify to.  So -- and we can, I think, get him in and
17    instruct the jury as to what's going on so as not to be too
18    disruptive to the government's case.  And, obviously, I
19    would like to let him go to Italy.
20            So for all those reasons, the Court will grant the
21    defense's request.
22            MR. BERKOWITZ:  We appreciate it, and we'll let
23    him know.  And for the record, I think it's Spain, but --
24            THE COURT:  Spain.  I'd take either.
25            MR. BERKOWITZ:  You and me both.
```

1          THE COURT:  All right.  On the Steele evidence.

2          I've reviewed the chronology of Mr. Steele's

3     interactions with Mr. Sussman and with Fusion with respect

4     to the Alfa-Bank allegations in the summer of 2016.  I've

5     also reviewed the witness statement that he submitted in the

6     London litigation, as well as testimony, which I presume is

7     deposition testimony -- or is that trial? -- deposition

8     testimony from the proceeding, and the Court is prepared to

9     rule as follows:

10          The, you know, evidence of Mr. Steele's meetings

11     with Mr. Sussman and with Fusion in July and his apparent

12     subsequent tasking by Fusion to conduct research on Alfa-

13     Bank, which I gather ultimately became the memorandum of the

14     dossier styled CR112, evidence of those meetings and

15     subsequent tasking can come in.  They are relevant to

16     Mr. Sussmann's activities for the campaign and his attorney-

17     client relationship, as far as it went, with the campaign as

18     it relates to Alfa-Bank.  And Steele's tasking by Fusion

19     after the meeting is relevant to the government's theory

20     that Fusion and the campaign were trying to disseminate

21     opposition research, and that that provided a motivation for

22     Mr. Sussman to conceal who his client may have been.

23          The record on Mr. Steele's provision of CR112 to

24     the FBI is anything but clear from the materials that I've

25     reviewed.  And obviously, there may be other materials out

1    there.  But based on the materials from the London

2    litigation, it appears that that report was one of many that

3    Mr. Steele recalled giving to the Bureau over a course of

4    months in the summer of 2016.

5         It is unclear from the materials why he may have

6    given CR112 to the FBI.  Steele testified that he gave

7    various reports to the FBI on his own at its request as part

8    of what appears to be an independent relationship and not at

9    the request of Fusion.

10        It is also unclear when he gave that report, if he

11   gave that report to the FBI.  While he said in his witness

12   statement that he recalls providing it to someone at the FBI

13   a few days after giving it to Fusion in September 2016,

14   there are FBI reports cited in his testimony indicating that

15   the FBI did not receive the report until much later in the

16   fall, and that Mr. Steele may have been mistaken in his

17   recollection, which he acknowledged that he could be.

18        It is even unclear whether the FBI received that

19   report from Steele or not.  There's other evidence cited in

20   the deposition testimony indicating that the FBI did not

21   actually get the report from Steele but rather through a

22   journalist or from a journalist through Mr. Baker.

23        So with all of that ambiguity in the materials

24   that the Court, at least, has been provided, and without

25   Mr. Steele here to testify, I've simply not seen anything to

1    support an inference that Mr. Steele provided that

2    particular report to the FBI in concert with some alleged

3    opposition research effort.  And so, if the only thing that

4    would suggest such to the jury is this Priestap note, which

5    I don't think I've seen, I think the jury would only be left

6    in a position to speculate as to any connection between the

7    provision of CR112 and this broader effort that the

8    government has alleged.

9              So unless the government gives me more to go on, I

10   will exclude evidence about the provision of that report to

11   the FBI.  All right?

12             All right.  Are our jurors here?  We have a

13   straggler or two still?

14             THE COURTROOM DEPUTY:  There was one straggler, so

15   let me check.

16             THE COURT:  Okay.  We have one straggler, so let's

17   see where they are.

18             (Pause)

19             THE COURT:  And who's first up?

20             MR. DeFILIPPIS:  Your Honor, first up will be

21   Debbie Fine, and Mr. Algor will be examining Ms. Fine.

22             THE COURT:  Okay.

23             (Pause)

24             THE COURTROOM DEPUTY:  Everybody's here.

25             THE COURT:  Okay.  We're lining them up.

```
 1                    (Jury enters courtroom)
 2              THE COURT:  Okay.  Good morning, ladies and
 3      gentlemen.  I hope you had a nice evening.
 4              Please be seated, everyone.
 5              All right.  We're ready to get started.
 6              You will notice that Mr. Keilty is not at counsel
 7      table for the government this morning.  He has been called
 8      away for a family matter, and the parties just wanted to
 9      have me advise you of that.  All right?
10              Mr. Algor.
11              MR. ALGOR:  Your Honor, the government calls
12      Deborah Fine.
13              THE COURT:  Very well.
14              Good morning, ma'am.  Step right up.
15              All right.  Welcome.  If you're comfortable
16      slipping off your mask, please do so, and raise your right
17      hand to be sworn in by the courtroom deputy.
18                    (Witness sworn)
19              THE COURT:  Okay.  Please have a seat.
20                       DEBORAH FINE, Sworn
21                       DIRECT EXAMINATION
22      BY MR. ALGOR:
23      Q.  Good morning, Ms. Fine.  I know we haven't met.  My name
24      is Jonathan Algor.  I'm a lawyer for the government.  I'm
25      going to ask you some questions this morning.
```

1    A.   Good morning.

2    Q.   Before we do that, can you please state and spell your

3    name for the record.

4    A.   Sure.  My name is Deborah Fine, D-E-B-O-R-A-H, F-I-N-E,

5    although you can call me Debbie.

6    Q.   And where do you currently work?

7    A.   I work at the Open Society Institute.

8    Q.   And what is the Open Society Institute?

9    A.   It's a private foundation that works to advance

10   democracy and human rights.

11   Q.   And what is your role at the Open Society Institute?

12   A.   Currently I'm in an interim position.  I'm acting

13   general counsel.

14        When they hire a permanent general counsel, I'll

15   go back to my permanent position, which is deputy general

16   counsel.

17   Q.   And what are your responsibilities in that role?

18   A.   Which one?

19   Q.   In your current role.

20   A.   In the current role.  Well, I undertake -- I have many

21   varied responsibilities.  They're all for the purpose of

22   providing advice to my client, yes.

23   Q.   And so you're a lawyer; is that correct?

24   A.   I am a lawyer.

25   Q.   Okay.  And prior to working at Open Society Institute,

1    where did you work?

2    A.  I worked at the Hillary Clinton for President Campaign.

3    Q.  And when did you first start working for the campaign?

4    A.  I think it was May of 2016.

5    Q.  May of 2016.

6    A.  Sorry.

7    Q.  Okay.  And what was your role at that time for the

8    campaign?

9    A.  I was one of several deputy general counsels.

10   Q.  And can you explain to the jury what the leadership

11   structure of the campaign was.

12   A.  Of the whole campaign?

13   Q.  Yes.

14   A.  No.  I'm sorry.

15   Q.  Who would you answer to at the campaign?

16   A.  Oh, I answered to Marc Elias, the general counsel.

17   Q.  And so he was the general counsel at the campaign?

18   A.  Correct.

19   Q.  And was Mr. Elias associated with any other

20   organizations at that time?

21   A.  He was a partner at Perkins Coie, the law firm.  I don't

22   know if at that time he was officially affiliated with them,

23   but I believe so.

24   Q.  Okay.  And as part of your role as deputy general

25   counsel of the campaign, what were your responsibilities in

1    a day-to-day fashion?

2    A.  I generally conducted or oversaw other attorneys

3    conducting legal research.

4    Q.  Okay.  And without getting into any of the specifics,

5    what areas of legal research were you working on?

6    A.  There were three primary areas:  Trump-related

7    litigation, state and local election law, and email hacking.

8    Q.  And what was Mr. Elias's role with HFA, with the

9    campaign?

10   A.  He was the general counsel.

11   Q.  And throughout the campaign and your time with it, how

12   often would you communicate with Mr. Elias?

13   A.  We communicated on a fairly regular basis.  I can't

14   attach a number to it.

15   Q.  Would it be daily?  Weekly?

16   A.  Closer to daily.

17   Q.  And when you were working for the campaign, where were

18   you based out of?

19   A.  Brooklyn, the headquarters.

20   Q.  In New York?

21   A.  Yes, Brooklyn, New York, sorry.

22   Q.  Ms. Fine, what is opposition research?

23   A.  I don't know that I'm the best person to explain what

24   opposition research is.

25   Q.  Do you not know what opposition research is?

1    A.  I know generally that it's research that is conducted to

2    learn more about the opposition in a political campaign.

3    Q.  You mentioned some areas that you were focused on as

4    part of the research that you conducted for that campaign;

5    is that correct?

6    A.  Yes.

7    Q.  And as part of that, was that also opposition research

8    against the opposing candidate?

9    A.  I would say that it's research, and what it was used

10   for, what its purpose was for, is -- I don't think I can

11   talk about that because of the privilege.

12   Q.  Okay.  I'm not asking for anything specific related to

13   your legal communications, but the research that was

14   conducted was against the opponent.  Correct?

15   A.  It was about the opponent.  I can say that.  It's Trump-

16   related.

17   Q.  And so it's fair to say that the campaign conducted

18   opposition research against Mr. Trump in 2016?

19   A.  That's my understanding.

20   Q.  And as part of your work, that was part of that.

21   Correct?

22   A.  I conducted research to support the campaign.  I'm not

23   comfortable saying what exactly it was used for.

24   Q.  Okay.  As part of the campaign, did there come a time

25   when it engaged any research firms?

```
 1    A.  Yes.
 2    Q.  Okay.  And how did you come to learn that?
 3    A.  I don't remember exactly how I came to learn it.  I did
 4    ultimately work with them, and so at some point I came to
 5    know that.
 6    Q.  Okay.  And you said "them."  Who is "them"?
 7    A.  Fusion GPS.
 8    Q.  Okay.  And, generally speaking, what type of firm was
 9    Fusion GPS, as you understood it?
10    A.  As I understand it, it's a research and investigatory
11    company.
12    Q.  And in your interactions with Fusion GPS, was that part
13    of the campaign's work as well?
14    A.  That was part of my work for the campaign, yes.
15    Q.  Okay.  And was that in relation to Fusion GPS's work on
16    Trump/Russia-related matters?
17    A.  They did work with me on Trump-related litigation.  That
18    was the research that we did together.  I don't know what
19    else they worked on.
20    Q.  Okay.  So generally speaking, what, as far as you were
21    aware, was Fusion GPS working on for the campaign?
22    A.  Trump-related litigation.
23    Q.  Okay.
24    A.  Researching it, learning when it happened, what it was,
25    that sort of thing.
```

1   Q.  And how often would you communicate with members of

2   Fusion GPS during your time with the campaign?

3   A.  I would say that that varied throughout the time --

4   throughout my time at the campaign, and I don't remember

5   specifically.  I would say, on average, several times

6   weekly.

7   Q.  And as far as you know, who from the campaign was aware

8   that Fusion GPS was doing research on behalf of the

9   campaign?

10  A.  I only know that Marc Elias knew that.

11  Q.  And so it's fair to say that only -- that as far as

12  you're aware, it's only you and Marc Elias who were aware of

13  this research?

14  A.  We were the only two people that I knew that knew of it,

15  but I only know what I know.

16  Q.  And why was it limited to just you and Mr. Elias?

17  A.  I don't know.

18  Q.  And you were never told why it was kept to just you and

19  Mr. Elias?

20  A.  No.  I operated -- I didn't share information with

21  anybody that I didn't need to.  Just as I would for any

22  client, I would use the same care.  So I just didn't talk

23  about it.

24  Q.  And you mentioned earlier that you obviously engaged

25  with other Fusion GPS employees; is that correct?

```
 1    A.  Yes.

 2    Q.  Okay.  And who were they?

 3    A.  I do not remember their last names, but Peter and Glenn

 4    are who I remember.

 5    Q.  If I can show you what's been marked as Government

 6    Exhibit 304.

 7              And, Ms. Fine, do you recognize this?

 8    A.  It's an appointment.

 9    Q.  And do you see on the "To" line your name with the

10    email?

11    A.  I do.

12              MR. ALGOR:  All right.  Your Honor, we move to

13    admit Government Exhibit 304.

14              MR. BOSWORTH:  No objection.

15              THE COURT:  So moved.

16    Q.  Okay.  And, Ms. Fine, what is this document, generally

17    speaking?

18    A.  It's a calendar invite for check-ins.

19    Q.  And on the "Sent" line, can you read that date?

20    A.  Uh-huh.  It says June 6, 2016.

21    Q.  Okay.  And can you read the subject line, please.

22    A.  Sure.  The subject line is "Daily Check In."

23    Q.  Okay.  And you mentioned earlier that you started with

24    the campaign in about May of 2016; is that correct?

25    A.  I think towards the end, yes.
```

1    Q.  And do you recall starting to have those fairly

2    regularly interactions with Fusion GPS in the early summer

3    months?  Is that fair?

4    A.  Yes.  Yes, towards the beginning of my engagement.

5    Q.  And on the "To" line, just starting with -- you

6    mentioned a few names earlier.

7    A.  Uh-huh.

8    Q.  Does this refresh who those individuals were?

9    A.  Yes.

10   Q.  Okay.  And can you read off those two names, please?

11   A.  Sure.  Glenn Simpson and Peter Fritsch.

12   Q.  And at the top, what's that name?

13   A.  Marc Elias.

14   Q.  Starting with Glenn Simpson and Peter Fritsch, are those

15   the individuals from Fusion GPS that you would regularly

16   interact with?

17   A.  Yes.

18   Q.  Now, at the line starting with "Recurrence," do you see

19   that?

20   A.  Yes, I do.

21   Q.  And what does that say?

22   A.  It says, "Weekly."

23   Q.  And does that jog your memory at all about how often you

24   would have these calls?

25   A.  Not really.  I know they were intended to be regular

1    check-in calls.  I don't remember exactly how often they did

2    occur.

3              I have a general memory that they did not occur

4    daily.

5    Q.  And without getting into the substance of those

6    conversations, generally what were the subjects and areas

7    that you would speak with the Fusion GPS folks about?

8    A.  The Trump-related litigation that I mentioned earlier.

9              MR. ALGOR:  Okay.  And if we can take that down

10   and show to the witness Government Exhibit 320.

11             THE WITNESS:  Excuse me, I'm sorry, is there any

12   water?

13             I'm sorry.

14             THE COURT:  No.  It's quite all right.

15             MR. ALGOR:  Your Honor, may I approach?

16             THE COURT:  You may.

17             We usually have a pitcher and cups, but because of

18   COVID we don't so...

19             And, Ms. Fine, just to clarify for the jury,

20   when you say "Trump litigation," do you mean lawsuits that

21   Mr. Trump or his organization had been involved in up to

22   that point?

23             THE WITNESS:  I do; either Trump, a Trump-related

24   company or organization, or even a family member.

25             THE COURT:  Okay.  Thank you.

```
 1              THE WITNESS:  Whether they were -- whatever party
 2    they were.
 3              THE COURT:  Whether they were bringing the lawsuit
 4    or had been sued by somebody else?
 5              THE WITNESS:  Correct.
 6              THE COURT:  Thank you.
 7    BY MR. ALGOR:
 8    Q.  Okay.  And just let me know when you're ready.
 9    A.  I'm ready.  Thank you.
10    Q.  Okay.  So just showing to you Government Exhibit 320, do
11    you recognize this document?
12    A.  I understand it to be similar to the last one.  That was
13    another -- it was a calendar invitation.  This says
14    "Notification," so...
15              MR. ALGOR:  Your Honor, we'd move to admit
16    Government Exhibit 320.
17              MR. BOSWORTH:  No objection.
18              THE COURT:  So moved.
19    Q.  Okay.  So, Ms. Fine, just starting with the "When:
20    August 12, 2016," do you see that?
21    A.  I do.
22    Q.  Do you recall having a daily check-in on this date and
23    time?
24    A.  I do not.  I do not remember which specific days.
25              I do have, as I said, a general memory of the
```

1    calls happening on a fairly regular basis for a period of

2    time, but I don't remember which days.

3    Q.  And going down to the "Who" lines, it has that first

4    bullet.  Do you see that?

5    A.  The one that's my name?

6    Q.  Yes.  And it says "Organizer."

7    A.  Okay.

8    Q.  Do you have any understanding of what that means?

9    A.  I believe it means that the calendar invitation

10   originated with me, which means that I sent it to the other

11   potential participants.

12   Q.  And then the other participants on there, can you just

13   read off who those are?

14   A.  Sure.  It's Glenn Simpson, Marc Elias, and Peter

15   Fritsch.

16           MR. ALGOR:  Okay.  We can take that down, and then

17   show to the witness Government Exhibit 326.

18   Q.  Okay.  And, Ms. Fine, do you recognize this document as

19   well?

20   A.  I recognize it in the way that I have the other ones.

21   It is -- I see what it is.  I don't remember it

22   specifically.

23           MR. ALGOR:  So, Your Honor, we'd move to admit

24   Government Exhibit 326.

25           MR. BOSWORTH:  No objection.

1          THE COURT:  So moved.

2  Q.  And, Ms. Fine, just showing you this document, again,

3  you have no recollection of having a daily check-in on

4  August 17th; is that correct?

5  A.  I'm sorry, but I don't.

6          MR. ALGOR:  Okay.  All right.  We can take that

7  down.

8  Q.  You testified earlier that you were aware of research by

9  Fusion GPS on behalf of the Clinton Campaign; is that

10  correct?

11  A.  Correct.

12  Q.  And what, if anything, were you aware regarding Fusion

13  GPS's research in relation to Alfa-Bank?

14  A.  I wasn't aware of research related to Alfa-Bank.

15  Q.  Ms. Fine, to what extent did Fusion GPS have discretion

16  to communicate with third parties without the Clinton

17  Campaign's approval?

18  A.  I actually don't know what the specific directions may

19  have been from Marc.

20  Q.  Okay.  And so you never gave any instructions regarding

21  anything related to the Trump litigation?

22  A.  I may have asked for material related to a case.  Do you

23  have this?  Can you get this?  A deposition, perhaps.  Just

24  that kind of direction.

25  Q.  Are you aware of any discretion that Fusion GPS had to

1    communicate with the media on behalf of the campaign?

2    A.  I am not.

3    Q.  Do you have any understanding of Fusion GPS's discretion

4    to pursue research leads on behalf of the campaign?

5    A.  Can you -- I'm sorry.  Can you repeat that, please?

6    Q.  Sure.  So were you daily telling Fusion GPS what was

7    necessary as part of the research, or were they free to go

8    and conduct research on their own?

9    A.  I personally didn't direct them to do specifically

10   everything they were doing.  I don't know what their

11   instructions were from Marc.

12   Q.  Okay.

13   A.  If that's helpful.

14   Q.  And when you worked -- and so is it fair to say when you

15   worked with Fusion GPS you didn't give them specific steps

16   that they needed to take as part of their research efforts?

17   A.  Not other than what I mentioned before about asking for

18   specific supporting materials about Trump-related

19   litigation.

20   Q.  Ms. Fine, did there ever come a time when you would

21   print documents for Mr. Elias as part of your role?

22   A.  Not generally, but I'm aware that I did.

23            MR. ALGOR:  Okay.  And if we could show the

24   witness Government Exhibit 495.

25   Q.  And so just starting at the top, do you recognize this

1    document?

2    A.  I recognize that it's an email from me to Marc on

3    October 31st regarding "Can you print this."

4            MR. ALGOR:  And, Your Honor, we'd move to admit

5    Government Exhibit 495.

6            MR. BOSWORTH:  No objection.

7            THE COURT:  So moved.

8    Q.  And without getting into anything specific with the

9    communications with Mr. Elias, in terms of the subject

10   matter, did this document relate to the Alfa-Bank

11   allegations?

12   A.  I'm aware that it related to an article related to Alfa-

13   Bank because I saw that just prior to the trial.  But I

14   don't remember it from then.

15   Q.  Okay.  And specifically, did it relate to a *Slate*

16   article that was published on October 31, 2016?

17   A.  My understanding is that it did.  Again, I don't

18   remember that specifically myself.

19           MR. ALGOR:  We can take that down.

20   Q.  Ms. Fine, in your time with the campaign, did you ever

21   share opposition research with the media?

22   A.  I did not.  I do not recall ever sharing research with

23   the media.

24   Q.  And with regards to the opposition research about, you

25   know, which you've testified, who did you understand was the

1    campaign's legal advisor?

2    A.  The legal advisor with regard to...?

3    Q.  Opposition research.

4    A.  I'm just aware that I provided some research.  Marc

5    likely provided some research.  To my awareness, there

6    wasn't somebody with that designated title.

7              MR. ALGOR:  No further questions, Your Honor.

8              MR. BOSWORTH:  I don't know how I lost a piece of

9    paper.

10             THE COURT:  Take your time.

11             MR. BOSWORTH:  Sorry.  I just wanted to build

12   suspense.

13                      CROSS-EXAMINATION

14   BY MR. BOSWORTH:

15   Q.  Good morning, Ms. Fine.

16   A.  Good morning.

17   Q.  We've never met before, correct?

18   A.  Correct.

19   Q.  The testimony that you were giving just a moment ago

20   relates to the work that you did while you were at the

21   Hillary Clinton Campaign, right?

22   A.  Correct.

23   Q.  And that was in 2016?

24   A.  Yes.

25   Q.  Long time ago?

1    A.  I'm sorry, I didn't hear that.

2    Q.  Virtually six years ago, correct?

3    A.  Oh, yes.

4    Q.  And you testified at various times that you didn't

5    remember this or you didn't remember that, and that's

6    presumably because some time has passed since that work?

7    A.  Yes.  I think that's true.

8    Q.  The Clinton Campaign was also known as Hillary For

9    America; is that right?

10   A.  Yes, HFA.

11   Q.  HFA.  So if you saw a document that said HFA and talked

12   about the Clinton Campaign, that would refer to the Hillary

13   Clinton Campaign?

14   A.  That's what I would think it was referring to.

15           THE COURT:  Ms. Fine, if you could move a little

16   bit closer to that mic and keep your voice up to make sure

17   the jury hears you.

18           THE WITNESS:  Oh, sure.  Is this better?

19           THE COURT:  That's better.

20           THE WITNESS:  Okay.

21   Q.  And you were asked -- and the judge asked you a little

22   bit -- about some of the work you did on Trump-related

23   litigation.

24   A.  Yes, sorry.

25   Q.  Great.  And that was litigation that Mr. Trump or his

1    business entities or his family was involved in, you said?

2    A.  Correct.

3    Q.  And I assume a good portion of that was litigation

4    brought by Mr. Trump or his organizations?

5    A.  Actually, a lot of it was slip -- public cases about

6    slip-and-falls and contractors not getting paid and things

7    like that.

8    Q.  Got it.  But was some of that litigation that Mr. Trump

9    or the parties or his businesses were the plaintiffs, the

10   ones bringing the lawsuits?

11   A.  I believe so.

12   Q.  You were also asked about the work that you did for

13   Fusion GPS, correct?  You were asked about that?

14   A.  I was, sorry.

15   Q.  No, that's okay.

16          And I just -- I know one document that wasn't

17   published was Government Exhibit 302, which I just want you

18   to take a look at.

19   A.  Okay.

20   Q.  Do you know what that document is?

21   A.  I have never seen it before.  I can sort of read it.

22   Q.  Okay.  Well, if you've never seen it before, then we can

23   move on.

24   A.  Okay.

25   Q.  You were also asked about opposition research, right?

```
 1    A.  Correct.

 2    Q.  Part of your job as a lawyer, was it not, was to make

 3    sure that the campaign wouldn't get sued?

 4    A.  Correct.

 5    Q.  And you wouldn't want to get sued, for example, for

 6    saying something that was false about Donald Trump or his

 7    campaign, correct?

 8    A.  That's exactly right.

 9    Q.  Okay.  And so the opposition research that you were --

10    or that the campaign was involved in was research into stuff

11    that you wanted to be true, correct?

12    A.  That I wanted to verify was true.

13    Q.  Okay.

14    A.  Yes.

15    Q.  In other words, you were doing research so that you

16    could develop information or find information that was

17    true that was negative and about the Trump campaign or about

18    Mr. Trump, right?

19    A.  That's correct.

20    Q.  The point was not to create false information about

21    Mr. Trump or his campaign, correct?

22    A.  Correct.

23    Q.  If the campaign, for example, went out with a whole

24    bunch of false information, that's exactly the kind of thing

25    that could lead you to get sued, right?
```

1    A.  That would be what I would try to prevent.

2    Q.  Right.  And that's why you were paid to do your job

3    there, correct?

4    A.  Yes.

5    Q.  Okay.  You were asked a little bit about the work that

6    Fusion did and who was aware of it and who wasn't.  I just

7    want to be clear.  You said you were aware of it, correct?

8    A.  I was aware that they were working for the campaign to

9    support Marc Elias.  I was aware of what I was doing with

10   them.  That's correct.

11   Q.  Okay.  So you were aware of what you just said.

12   A.  Yes.

13   Q.  You also said Mr. Elias was aware of Fusion's work, to

14   your knowledge.

15   A.  Yes.  To my knowledge, he generally was directing that

16   work.

17   Q.  Okay.  And you said you didn't know who else might have

18   been aware of that work, correct?

19   A.  That's correct.  I do not know.

20   Q.  Okay.  It wasn't, as one of the questions suggested,

21   something that was kept to you.  Was there a deliberate

22   effort, to your knowledge, to limit Fusion's work to you and

23   Marc Elias?

24   A.  Not to my knowledge.

25   Q.  You have no idea if Mr. Elias was talking to other

1    people at the campaign, for example?

2    A.  I don't know.  He regularly spoke with other people at

3    the campaign, and I was generally not present.

4    Q.  Okay.  Are you aware of someone named John Podesta?

5    A.  I am.

6    Q.  What role did he play at the campaign, if any?

7    A.  He was the chair.

8    Q.  And do you know who Robby Mook is?

9    A.  I do.

10   Q.  And what was his role at the campaign?

11   A.  He was the manager.

12   Q.  And do you know who Jake Sullivan is?

13   A.  I do.

14   Q.  And what role did he play at the campaign?

15   A.  A senior role related to foreign policy, is what I

16   recall.

17   Q.  And do you know who Jennifer Palmieri is?

18   A.  I do.

19   Q.  And what role did she play at the campaign?

20   A.  She was a senior worker on communications-related

21   issues.

22   Q.  And sitting here today, you have no idea whether

23   Mr. Elias spoke to any of them about the work that Fusion

24   did?

25   A.  I do not know.

1    Q.  One way or the other?

2    A.  Not one way or the other.

3    Q.  But, to your knowledge, Fusion's work was not kept

4    secret?

5    A.  No.  I -- no.  I operated on the assumption that, like

6    most of the work that I did for clients, it's on a need-to-

7    know basis, so I just -- I didn't share it, and I wasn't

8    told not to share it.  And I don't know whether or not Marc

9    Elias shared it with anyone.

10    Q.  Okay.  You were shown Government Exhibit 495, I believe.

11    A.  I don't --

12              MR. BOSWORTH:  Can you pull that up?

13    Q.  And just looking at the header there, can you just read

14    the "Subject" line so everyone's aware on it.

15    A.  Uh-huh.  It says, "Re:  Can you print this?"

16    Q.  And you were asked whether this related to an article

17    that was published that day?

18    A.  I was asked if it -- well, I don't know if I was

19    specifically asked that, to be honest.

20    Q.  Oh.  You were asked whether it related to an article

21    about the Alfa-Bank allegations.

22    A.  I know that's what I said.  I'm not sure -- I honestly

23    can't remember exactly what the question was, but yes, that

24    is true.

25    Q.  Right.  So this, to your knowledge, did relate to an

1    article about the Alfa-Bank allegations?

2    A.  Yes.

3    Q.  Okay.  And what's the date of this email?

4    A.  October 31, 2016.

5    Q.  Okay.  Great.

6         You were also asked about daily calls that you had

7    or that you were shown calendar entries for regarding Fusion

8    GPS.  Do you remember those questions?

9    A.  I do.

10   Q.  Okay.  And for those questions -- for those calls,

11   was -- did the topic of Alfa-Bank ever come up in any of

12   those calls?

13   A.  Not the calls that I was on.  Not that I recall.

14   Q.  Did allegations involving communications between the

15   Trump organization and a Russian bank come up in any of

16   those calls?

17   A.  Not that I recall.

18   Q.  Did Michael Sussmann come up in any of those calls?

19   A.  I have no memory of him coming up.

20   Q.  Did you hear about any effort to bring allegations

21   involving Russian banks to *The New York Times* in any of

22   those calls?

23   A.  I did not.

24   Q.  Did the topic of bringing allegations to the FBI come up

25   in any of those calls?

1    A.   No, they did not.

2    Q.   Did bringing allegations to any law enforcement

3    organization come up during any of those calls?

4    A.   No.

5    Q.   Okay.  And those calls -- you said you can't remember

6    which ones you were on and which ones you weren't.

7            At any time, let's say, prior to October 31st, you

8    know, when you were asked to print something, did you have

9    any knowledge of any allegations about communications

10   between Alfa-Bank and the Trump organization?

11   A.   I did not.

12   Q.   Did you have any knowledge of Michael Sussmann trying

13   to get a story published in *The New York Times* about

14   anything?

15   A.   I did not.

16   Q.   Did you have any knowledge about the campaign trying to

17   bring information to the FBI?

18   A.   No, I did not.

19   Q.   And is that the sort of thing you'd remember?

20   A.   Yes.  It sounds pretty notable and unusual, so I would

21   remember discussions about going to law enforcement of any

22   type, I think.

23   Q.   And did you have any knowledge that Mr. Sussman did go

24   to the FBI?

25   A.   I do not.

```
1    Q.  Did you --

2    A.  Well --

3    Q.  Please.

4    A.  I did not at that time.  I am aware from newspaper

5    coverage that that --

6    Q.  Okay.

7    A.  -- is being discussed.

8    Q.  Meaning this case, why we're here?

9    A.  Yes.

10   Q.  Okay.  But just to be clear, at any time prior to, you

11   know, Mr. Sussmann's charge in this case, did you have any

12   knowledge that he went to the FBI at all?

13   A.  No, I did not.

14   Q.  And you didn't authorize him to go to the FBI?

15   A.  Nope.  I had no such authority.

16   Q.  You didn't direct him to go to the FBI?

17   A.  I did not.

18   Q.  You don't know anyone else who authorized him to go to

19   the FBI?

20   A.  I do not.

21   Q.  You don't know anyone else who directed him to go to the

22   FBI?

23   A.  I do not.

24            MR. BOSWORTH:  Okay.  Thank you very much.

25            MR. ALGOR:  Very brief, Your Honor.
```

1                        REDIRECT EXAMINATION

2     BY MR. ALGOR:

3     Q.  Ms. Fine, you were just asked, during cross-examination,

4     about your calls with Fusion GPS.  Do you recall that?

5     A.  I do.

6     Q.  Okay.  Do you recall anyone else participating in those

7     calls besides yourself, Mr. Simpson, Mr. Fritsch, and

8     Mr. Elias?

9     A.  I don't recall anybody else participating in those

10    calls.

11    Q.  And you mentioned some of the areas that you focused on

12    as part of -- that you worked on with Fusion GPS; is that

13    correct?

14    A.  I did.

15    Q.  Did you work on all of Fusion's work related to Trump/

16    Russia?

17    A.  No, I did not.  That was not a primary focus of what I

18    did.  What I focused on with Fusion was Trump-related

19    litigation, which was largely not related to Russia.

20              It may have come up at some point as a -- you

21    know, as part of an ad hoc question, but I don't remember

22    doing work on Trump/Russia.

23    Q.  And you understood, though, that Fusion GPS was doing

24    work regarding Trump/Russia for the campaign?

25    A.  I know that Fusion GPS was doing research and

1    investigatory work, but I only knew directly what I was

2    working on with them.

3    Q.  And that was because it was being communicated from

4    Fusion through Mr. Elias; is that correct?

5    A.  I assume so, yes.  It wasn't me.

6              MR. ALGOR:  Nothing further, Your Honor.

7              THE COURT:  Okay.  Ms. Fine, thank you very

8    much for your testimony.  You are excused.  Please don't

9    discuss your testimony with anyone until the trial is over,

10   okay?

11             THE WITNESS:  Okay.  I won't.

12             THE COURT:  Have a good day.

13             MR. DeFILIPPIS:  Your Honor, the government's next

14   witness is Laura Seago.

15             THE COURT:  Good morning, ma'am.  Feel free to

16   slip your mask off and remain standing and raise your right

17   hand to be sworn by the courtroom deputy.

18             (Witness sworn)

19             THE COURT:  Okay.  Please have a seat, and make

20   yourself comfortable.

21             We usually have a water jug there.  If you'd like

22   water, I'm sure one of these gentlemen would be happy to get

23   it for you, okay?

24             THE WITNESS:  I'm all right.  Thank you.

25             THE COURT:  All right.

```
 1                        LAURA A. SEAGO, Sworn

 2                        DIRECT EXAMINATION

 3     BY MR. DeFILIPPIS:

 4     Q.  Good morning, Ms. Seago.  How are you?

 5     A.  Good morning.  I'm fine, thank you.

 6     Q.  If you would just state and spell your name for the

 7     record and the court reporter.

 8     A.  Sure.  It's Laura Allison Seago, L-A-U-R-A,

 9     A-L-L-I-S-O-N, S-E-A-G-O.

10     Q.  Ms. Seago, did you and I prepare for your testimony in

11     any way today?

12     A.  No.

13     Q.  Where do you work?

14     A.  Open Source Research.

15     Q.  And what is Open Source Research?

16     A.  It's a small research consultancy here in Washington.

17     Q.  Now, where did you work during the 2016 time period?

18     A.  Fusion GPS.

19     Q.  What is Fusion GPS?

20     A.  It's also a small research consultancy here in

21     Washington.

22     Q.  And is there a relationship or -- is there a

23     relationship between Open Source Research and Fusion GPS?

24     A.  Yes.  Open Source Research is owned by two of the former

25     partners of Fusion GPS, Tom Catan and Jason Felch.
```

1          Peter Fritsch and Glenn Simpson were involved in

2     the formation of Open Source Research, but my understanding

3     is that they've since been bought out.

4     Q.   Okay.  And when did you start working at Fusion GPS?

5     A.   July of 2015.

6     Q.   Generally speaking, what do you understand Fusion GPS

7     does day-to-day?

8     A.   It does research.  We gathered open source documents and

9     data and analyzed them for clients.

10          THE COURT:  Ma'am, when you say "open source," can

11     you explain to the jury what that means.

12          THE WITNESS:  Certainly.  I mean records that are

13     in the public domain.  Things that you might get via public

14     records requests, via public databases, or via the Internet.

15          THE COURT:  Thank you.

16     BY MR. DeFILIPPIS:

17     Q.   Who did you report to directly at Fusion GPS in the '16

18     time period?

19     A.   I reported to all of the partners in D.C.:  Tom Catan,

20     Peter Fritsch, Glenn Simpson.

21     Q.   And about how many people were working there at the

22     time?  Do you remember?

23     A.   At the time it was probably seven or eight.  I don't

24     recall the exact number.  Maybe it was as many as ten.

25     Q.   And where was your office?  Was it here in D.C. or...?

1    A.  Yes.  It was in Dupont Circle.

2    Q.  Now, do you recall at some point in the summer of 2016

3    or the spring whether Fusion started doing research relating

4    to the 2016 presidential election?

5    A.  Yes, I do.

6    Q.  And tell us generally, what was the nature of that

7    research and how did you first get involved with it?

8    A.  We were researching Donald Trump, his businesses and his

9    associates, gathering documents and data related to his

10   business associations.

11   Q.  From your vantage point, how did that work come about?

12   A.  You know, I don't know.  I wasn't involved in speaking

13   with clients much at all at the time.  I was quite new to

14   the firm.

15            So I was told that first we were working for anti-

16   Trump Republicans in the fall of 2015 and early 2016, and

17   then I know at some point we changed to Democratic clients.

18   Q.  And were you working on that project throughout; in

19   other words, from the beginning of that research?

20   A.  I wasn't heavily involved prior to 2016, and I was never

21   the primary analyst on that case, but I did pitch in here

22   and there throughout.

23   Q.  And as far as you knew or could see, about how many

24   people did Fusion devote to that research?  Estimate.

25   A.  That's difficult to say.  Maybe five or six.  There was

1    only one person who was on it full time.

2    Q.  And who was that?

3    A.  Jake Berkowitz.

4    Q.  Now, what, if anything, was your understanding in, say,

5    the summer and fall of 2016 as to who the client for that

6    work was?

7    A.  At the time I knew the clients were Democrats.  I didn't

8    know specifically which entities those were.

9    Q.  And who was your point of contact when you dealt with

10   the, quote, client?  Was it someone with the Democrats, or

11   was there someone in between?

12   A.  I only dealt with the client once, but my understanding

13   is that Marc Elias of Perkins Coie was the primary client

14   contact.

15   Q.  Did you have an understanding at that time of what his

16   position was vis-a-vis the clients or client?

17   A.  My understanding was that he represented the client as

18   their attorney.

19   Q.  And he was at the law firm of Perkins Coie?

20   A.  Yes.

21   Q.  But in all the time you were doing work on that, did you

22   ever learn specifically who the client was?

23   A.  Not until well after the election.  I think the fall of

24   2017.

25   Q.  To your understanding, was there a reason for that?

1   A.  It wasn't uncommon for analysts, particularly not the

2   primary analyst on the case, to not know who the ultimate

3   client is when working for a law firm.  And I was relatively

4   new to the company, so it wasn't unusual at all.

5   Q.  Did you ever ask who it was?

6   A.  No.  Again, it wasn't unusual.  I had no reason to ask.

7   Q.  Did you ever wonder?

8   A.  Not really.  I know it was the Democrats, but that could

9   be a donor.  It could be a PAC.  I didn't really wonder.  I

10  was very busy.

11  Q.  Okay.  Now, of the people at Fusion GPS, did you get a

12  sense for who did know who the client was?

13  A.  I imagine the partners would have known.

14  Q.  So Perkins Coie, more broadly, what did you know about

15  them?

16  A.  I knew that they were a law firm here in Washington.

17  They also have offices in Seattle.

18  Q.  Okay.  And other than Mr. Elias, who I think you

19  mentioned, did you know anyone else from Perkins Coie

20  through your work at Fusion GPS?

21  A.  I met Mr. Sussmann one time.  My understanding is he was

22  also an attorney at Perkins Coie.

23  Q.  And what was the circumstance in which you met

24  Mr. Sussmann?

25  A.  I met him at a meeting at Perkins Coie in the summer of

1    2016.

2    Q.  Who else attended that meeting?

3    A.  To the best of my recollection, it was Mr. Elias, my

4    colleague Peter Fritsch from Fusion GPS, Mr. Sussmann, and

5    Mr. Sussmann's client Rodney Joffe.

6    Q.  Now, if you can, as best as you can pinpoint it, when

7    did that meeting occur?

8    A.  I can't remember the exact date.  It would have been

9    July or August of 2016.

10   Q.  And how did that meeting come about?

11   A.  I don't know.  I was asked to attend by Mr. Fritsch.

12   Q.  Of the sort of management people at Fusion GPS, who did

13   you deal with most frequently?  Was there one person?

14   A.  It really depended on the case.  I couldn't say who I

15   dealt with most frequently.

16   Q.  Okay.  In that meeting that you mentioned in July or

17   August of 2016 -- now, of course, we have to be careful when

18   talking about conversations with lawyers, but what was the

19   general purpose of that meeting?

20   A.  The general purpose, to the best of my recollection, was

21   to discuss allegations of communications between the Trump

22   organization and Alfa-Bank.

23   Q.  And I think you might have testified to this, but were

24   you essentially asked or told to go to the meeting?

25   A.  Yes.

1   Q.  And were you told to go on short notice?  Was it a

2   preplanned meeting?

3   A.  I don't recall.  I'm sorry.

4   Q.  And when you got to the meeting, you saw Mr. Joffe

5   there, did you say?

6   A.  My recollection is that Mr. Elias and Mr. Fritsch

7   discussed a few business matters, and then Mr. Joffe and

8   Mr. Sussmann entered later together.

9   Q.  Okay.  And what, if any, understanding did you have as

10  to whether there was a lawyer/client relationship between

11  Mr. Joffe and Mr. Sussmann?

12  A.  I remember having that general impression.  I don't

13  remember what, if anything, was said about that

14  relationship.

15  Q.  And to what extent did you understand that this meeting

16  related to the work that you and Fusion were doing for I

17  think what you termed the Democrats?  Was it related to that

18  work?

19  A.  My general understanding is we were researching Donald

20  Trump.  At the time we had been researching Donald Trump's

21  connections to Russia, and so it was related inasmuch as it

22  was another connection between the Trump organization and

23  Russia.

24  Q.  Okay.  And just to be clear, had you ever met Mr. Joffe

25  before?

1   A.  No.

2   Q.  And had you ever met Mr. Sussmann before?

3   A.  No.

4   Q.  Had you met Mr. Elias before?

5   A.  Not that I can recall.

6   Q.  Okay.  Recognizing it was a long time ago, about how

7   long did that meeting last?

8   A.  Oh, I really don't remember.  I'm sorry.  Six years

9   later, it's difficult to say.

10  Q.  And, again, recognizing that conversations with

11  attorneys can be privileged, is there anything else you're

12  comfortable saying about the substance of that meeting or

13  what it was that came out of the meeting?

14  A.  Beyond the general subject matter of the connection

15  between the Trump organization and Alfa-Bank, I cannot

16  remember much.

17  Q.  Okay.  Now, was there follow-up to the meeting?  In

18  other words, did you do anything as a result of it?

19  A.  I exchanged a few emails with Mr. Joffe after the

20  meeting.

21  Q.  Now, let me ask you this.  Stepping away from just that

22  meeting, it sounds like at some point you became aware of

23  allegations of a purported communications channel between

24  the Trump organization and Alfa-Bank?

25  A.  Yes.

1    Q.  And how is it that you became aware of that?

2    A.  I became aware of it in that meeting.

3    Q.  Got it.  So before that meeting, had you heard anything

4    about that topic?

5    A.  Not that I can recall.

6    Q.  And when you came out of the meeting, did you then start

7    to focus on that as an aspect of your work at Fusion GPS?

8    A.  I did look at that matter, yes.

9    Q.  And, again, without getting into any conversations with

10   lawyers, what, if any -- what did you do in that regard?

11   A.  So all of the work that we did was on behalf of Perkins

12   Coie, and so I want to be very careful not to violate

13   privilege.

14   Q.  Yes.

15   A.  But I do recall analyzing allegations about the

16   connections between the Trump organization and Alfa-Bank.

17   There were allegations at some point posted to the web, and

18   I did download those files and look at them and attempt to

19   translate the technical claims into something that a lay

20   audience -- my colleagues -- could understand.

21   Q.  So you were getting this information from what you

22   called open source.  Is that one of the areas where you got

23   this information?

24   A.  Yes.

25   Q.  And did you -- you said that Mr. Joffe emailed you.  Was

1    that for the purpose of exchanging information that

2    Mr. Joffe had obtained?

3    A.  Again, the substance of those communications were part

4    of our work for Perkins Coie, so I don't think I can get

5    into those.

6    Q.  Okay.  After that meeting at Perkins Coie, did you have

7    any other meetings at Perkins Coie on that or any other

8    topic?

9    A.  Not that I can remember.

10   Q.  Now, did there come a time when you communicated with

11   members of -- let me ask you this:  Generally speaking, did

12   Fusion GPS communicate with members of the media as part of

13   its work?

14   A.  From time to time, yes.

15   Q.  And to what extent was that true in connection with the

16   Trump-related research?

17   A.  Yes, we did communicate with the media.

18   Q.  What was the purpose of those communications?

19   A.  Again, in general terms, when we had research findings

20   that we thought were interesting, we would communicate them

21   to the press.

22   Q.  Now, in connection with the Alfa-Bank matter, did you

23   have any communications with the media?

24   A.  Yes.

25   Q.  About how many?

1    A.  I met with one journalist, Frank Foer, about those

2    allegations.

3    Q.  Now, how did that meeting come about?

4    A.  I was asked to attend by Mr. Fritsch.  I don't know how

5    he and Mr. Foer set the meeting up.

6    Q.  And what was it about Mr. Foer that made him -- what, if

7    anything, about Mr. Foer made him the person who you

8    wanted -- who the firm wanted you to meet with?

9    A.  I don't know.

10   Q.  Did you have an understanding one way or the other

11   whether he was working on anything related to the Alfa-Bank

12   issue?

13   A.  I don't recall.

14   Q.  Do you recall anything about why it is you thought he

15   was someone they wanted you to meet with?

16   A.  No.  I'm afraid that was above my pay grade.

17   Q.  And what was the purpose of the meeting?

18   A.  We were discussing the allegations of communication

19   between the Trump organization and Alfa-Bank.

20   Q.  And just stepping back.  Best guess as to the time

21   period for this meeting?

22   A.  It would have been the fall of 2016, before the

23   election.  I couldn't say exactly when.

24   Q.  And you may have testified to this, I'm sorry.  Where

25   did it occur?

1    A.  Mr. Foer's home.

2    Q.  And who went with you?

3    A.  Jake Berkowitz of Fusion and Peter Fritsch, also of

4    Fusion.

5              THE COURT:  And just for the benefit of the court

6    reporter, it's F-O-E-R, correct?

7              THE WITNESS:  F-O-E-R.

8    Q.  And the first name, what did you say the first name was?

9    A.  Frank or Franklin.

10   Q.  Okay.  And, I'm sorry, who attended with you?

11   A.  Jake Berkowitz and Peter Fritsch, both of Fusion GPS.

12   Q.  And about how long was that meeting?  Again, recognizing

13   it's a long time ago.

14   A.  I couldn't say.  Maybe an hour.

15   Q.  And what was discussed?  What did you say, and what did

16   they say?

17   A.  I really don't remember the specifics six years on.  We

18   talked about the allegations between the Trump organization

19   and Alfa-Bank.  We talked about highly credible computer

20   scientists who seemed to think that these allegations were

21   credible.

22   Q.  And by that, are you referring to Mr. Joffe or somebody

23   else?

24   A.  There were others that ended up being cited in

25   Mr. Foer's article.  He cited L. Jean Camp and Paul Vixie,

1    who invented the DNS system.

2    Q.  And would you say that the system was more in the vein

3    of you providing information to Mr. Foer or Mr. Foer

4    providing information to you?

5    A.  Probably the former.

6    Q.  Okay.  And would that have been data?  Would that have

7    been -- what was the format of what you gave him?

8    A.  I don't recall.  I don't know if we gave him anything.

9    It may have been a verbal briefing.

10   Q.  And to what extent was the purpose of this meeting to

11   try and encourage Mr. Foer to publish an article?

12   A.  We certainly hoped that he would publish an article.

13   Q.  And did you have a sense of whether that was something

14   that was already in the works or something you were trying

15   to convince him to do?  Any recollection there?

16   A.  My understanding is he was already reporting on the

17   matter.

18   Q.  And by "reporting," do you mean he had already published

19   something, or just writing something?

20   A.  My understanding was that he was reaching out to sources

21   and investigating.

22   Q.  Okay.  Now, after that meeting, what, if anything, did

23   you do with regard to the effort to get him to publish an

24   article?

25   A.  Nothing that I can recall.

1    Q.  Now, around that same time period, what, if anything

2    else, did you do to communicate with people outside Fusion

3    GPS on the Alfa-Bank issue?

4    A.  I didn't have any other communications outside of

5    Fusion.

6    Q.  So, for example, these computer scientists who you

7    referenced, did you communicate or try to communicate with

8    any of them?

9    A.  No, I didn't.

10   Q.  Did you -- did others at Fusion GPS communicate or try

11   to communicate with them?

12   A.  Not that I'm aware of.

13   Q.  So to the extent that Fusion GPS was looking at this

14   issue, what, if anything, did you do to determine whether

15   the allegation was a true one?

16   A.  You know, validating the DNS records would have been

17   beyond my capabilities.  I was looking at the claims,

18   determined that they seemed credible, and was translating

19   claims into less technical terms for a law audience.

20   Q.  Okay.  So are you aware of steps that anyone at Fusion

21   GPS took to look into whether the data was, you know,

22   credible, authentic, supported, what was being alleged?

23   A.  Again, we looked at the claims, looked at whether they

24   looked like real DNS records.  But beyond that, no, that was

25   beyond our capability.

1    Q.  Okay.  So you said you looked at whether they were DNS

2    records.  Did you know where they came from?

3    A.  The claims posted to the web?  No.

4    Q.  Okay.  And how about the DNS records?  Did you have a --

5    who gathered the DNS?

6    A.  I don't know.

7    Q.  Was that something that Fusion wanted to find out or...?

8    A.  I wasn't tasked with that.  I don't know if others did.

9    Q.  Okay.  And do you know anyone else who was tasked with

10   trying to figure out where this came from?

11   A.  No.

12   Q.  Okay.  Let me show you what's been premarked Government

13   Exhibit 344.  And that will show up on your screen.

14           Does it appear that this is an email from

15   Mr. Joffe to you?

16   A.  Yes.

17   Q.  And is that your Fusion GPS email address?  It's

18   lseago@fusiongps.com?

19   A.  Yes, it is.

20           MR. DeFILIPPIS:  Okay.  Your Honor, the government

21   offers Government Exhibit 344.

22           MR. BERKOWITZ:  No objection.

23           THE COURT:  So moved.

24           MR. BERKOWITZ:  And no objection to all the

25   exhibits you shared with us earlier, so I don't have to keep

1    getting up and saying that.

2              THE COURT:  Okay.

3              MR. DeFILIPPIS:  Okay.

4    BY MR. DeFILIPPIS:

5    Q.  Ms. Seago, so this email is from who again, I'm sorry?

6    A.  It's from Mr. Joffe.

7    Q.  And there's an email from Mr. Joffe,

8    rjoffe@centergate.com.  Do you have any knowledge one way or

9    the other what Centergate.com is?

10   A.  I'm afraid I don't.

11   Q.  Okay.  And the date of this email?

12   A.  August 29, 2016.

13   Q.  So based on your earlier testimony, would it be your

14   understanding that the meeting you testified about would

15   have been before this email?

16   A.  I think so.

17             MR. BERKOWITZ:  Objection; form.  Just which

18   meeting?  Or foundation.

19             THE COURT:  Rephrase.

20             MR. DeFILIPPIS:  That's fine, Your Honor.

21   Q.  You testified earlier about a meeting you had at

22   Fusion -- I'm sorry -- at Perkins Coie with Mr. Joffe,

23   Mr. Sussmann, Mr. Elias, Mr. Fritsch -- and was Mr. Simpson

24   there?  I'm sorry, I forgot.

25   A.  Not that I can recall.

1    Q.   Okay.  So what is your best recollection as to whether

2    this email occurred before or after that meeting?

3    A.   My best recollection is that this email occurred after.

4    Q.   And in the "To" line of the communication is also

5    Mr. Sussmann; is that right?

6    A.   Yes, that appears to be the case.

7    Q.   And then what is the subject line of the email?

8    A.   "Privileged Client/Attorney Communication - New York 1."

9    Q.   Now, again, without getting into the contents of this

10   email, did the subject matter relate to the Alfa-Bank

11   allegations that you were referencing earlier?

12   A.   I don't recall.

13   Q.   Okay.  Did you interact with Mr. Joffe on anything other

14   than the Alfa-Bank-related allegations?

15   A.   Not that I can remember.

16   Q.   Okay.  And then if we have you look at Government

17   Exhibit 602, another email from Mr. Joffe?

18   A.   That's what this appears to be, yes.

19          MR. DeFILIPPIS:  And, Your Honor, without

20   objection from the defense, we offer Government's

21   Exhibit 602.

22          THE COURT:  So moved.

23   Q.   Now, this email looks similar to the last one; is that

24   right?

25   A.   Yes.

1   Q.  And just the last one, I think its time stamp was 11:15

2   p.m. on August 29th.  This looks like it's 3:15 a.m. on

3   August 30th.  So middle of the night?

4   A.  Yes, if the time stamps are correct.

5   Q.  Okay.  And do you think you were awake when you got this

6   email?

7   A.  I doubt it.

8   Q.  Okay.  And this one has an attachment.  Could you just

9   read the first couple of phrases of the attachment there?

10  A.  Sure.  "PGP_MIME Versions Identification.Dat; OpenPGP

11  encrypted message.asc."

12  Q.  Okay.  Again, without getting into the substance of

13  anything attorney-related, any sense of what the attachments

14  are?

15  A.  I don't recall.

16  Q.  Okay.  And the "Subject" line of this email?

17  A.  "Privileged Client/Attorney Communication - New York 1."

18  Q.  Okay.  And then next we have Government Exhibit 603,

19  which we'll put on your screen.

20          Does this appear to be an email from you to

21  Mr. Joffe?

22  A.  It does.

23          MR. DeFILIPPIS:  And, Your Honor, the government

24  offers 603.

25          THE COURT:  So moved.

 1    Q.   What is the date of this email from you to Mr. Joffe?

 2    A.   Tuesday, August 30, 2016.

 3    Q.   And does this look like it's a reply to one of the prior

 4    emails?

 5    A.   It says "Re:" so I assume it is a reply.

 6    Q.   And the time?

 7    A.   11:50 a.m.

 8    Q.   And, again, while you don't -- do you not recall the

 9    specific subject matter of this email?

10    A.   I'm afraid I don't.

11    Q.   Okay.  Next we'll put up on your screen Government

12    Exhibit 604.  Another email from you to Mr. Joffe, correct?

13    A.   Yes.

14              MR. DeFILIPPIS:   The government offers Government

15    Exhibit 604.

16              THE COURT:   604 is admitted.

17    Q.   Ms. Seago, does this appear to be part of the same chain

18    as the prior email exchanges?

19    A.   It has the same "Subject" line and says "Re," so that is

20    what it appears to be.  I have no independent recollection

21    of this email.

22    Q.   And what, if any, connection in your mind did the Alfa-

23    Bank issue have to New York?  I ask because "New York" is in

24    the "Subject" line.  Any sense?

25    A.   I don't know.

1    Q.  And the attachment on this email, any sense of what that

2    was?

3    A.  I don't know.

4    Q.  Okay.  And then finally on this same chain we have

5    Government Exhibit 605.  That will appear on your screen.

6           Is this another email from Mr. Joffe to you?

7    A.  Yes.  It appears to be.

8           MR. DeFILIPPIS:  Your Honor, the government offers

9    Government Exhibit 605.

10          THE COURT:  So moved.

11   Q.  What is the date and time of this email from Mr. Joffe

12   to you?

13   A.  Wednesday, August 31, 2016, 9:12 p.m.

14   Q.  And who's copied on this email?

15   A.  Mr. Sussmann.

16   Q.  And the subject line?

17   A.  "Privileged Client/Attorney Communication - New York 2."

18   Q.  In looking at this email with the "New York 2" notation,

19   does the existence of "New York 1" and "New York 2" in

20   emails from Mr. Joffe jog any recollection as to what this

21   might be?

22   A.  I'm afraid it doesn't.

23   Q.  Okay.  What, if anything, do you remember about your

24   interactions or communications with Mr. Joffe?

25   A.  I recall that we met the one time at Perkins Coie and

1    that we exchanged a handful of emails.  It was not very

2    extensive communication.

3    Q.  And to the extent that you exchanged the emails we just

4    went through, which you don't have a recollection of, did

5    you understand those to be part of the broader Trump

6    research that Fusion GPS was doing for its client and

7    Perkins Coie?

8    A.  Yes.

9    Q.  All right.  Now I'm going to show you what's been marked

10   Government Exhibit 648.  Does this appear to be an email

11   from Peter Fritsch to you in mid-October?

12   A.  Yes, it does.

13            MR. DeFILIPPIS:  Your Honor, the government offers

14   Government Exhibit 648.

15            THE COURT:  So moved.

16   Q.  Okay.  So just tell us the time and date -- the date and

17   time of the email from Mr. Fritsch.

18   A.  October 17, 2016, 4:04 p.m.

19   Q.  And briefly, if you could just remind us, who was Peter

20   Fritsch?  What was his title or position?

21   A.  Peter Fritsch was one of the partners at Fusion GPS.

22   Q.  How many partners were there, if you know?

23   A.  Four.

24   Q.  And not a memory test, but do you remember who they

25   were?

1    A.   Sure.   It was Peter Fritsch, Glenn Simpson, Tom Catan,

2    and Jason Felch.

3    Q.   For the court reporter, how do you spell "Catan"?

4    A.   C-A-T-A-N.

5    Q.   Now, this email is titled "Memos," and then it has two

6    attachments.   What are the names of those attachments?

7    A.   "Server Findings.doc.x" and "Alpha Group Overview

8    9.1.16.doc.x."

9    Q.   What, if anything, do you remember and can you say about

10   the purpose of this email and its attachments?

11   A.   I don't remember.

12   Q.   How much time would you say you spent on the Alfa-Bank

13   issue?  Was it a big part of your time?  Small time?  Small

14   part?

15   A.   I don't recall it being a big part of my time.  I always

16   had other cases in addition to the Trump matter, and there

17   was a lot going on in the Trump case as well.

18   Q.   Okay.

19           MR. DeFILIPPIS:  And then, Ms. Arsenault, if we

20   could just scroll briefly through.

21   Q.   It's all redacted, but I just want to show you,

22   Ms. Seago, it appears this is a fairly lengthy attachment

23   with multiple pages.  Is that --

24   A.   Yes, that's what it appears.

25   Q.   Okay.  So is it your inference that there was some kind

1    of paper or document attached to the email?

2    A.  Yes.

3    Q.  All right.  So we'll now turn to what's been premarked

4    as Government Exhibit 634.

5            Is this an email from you to Peter Fritsch?

6    A.  Yes.  That's what it appears to be.

7            MR. DeFILIPPIS:  Your Honor, the government offers

8    Exhibit 634.

9            THE COURT:  So moved.

10   Q.  And what's the date of the email from you to

11   Mr. Fritsch?

12   A.  October 5, 2016.

13   Q.  And you copied who?

14   A.  Glenn Simpson.

15   Q.  And then the "Subject" line?

16   A.  "Re:  Alfa."

17   Q.  And do you understand that to be Alfa-Bank?

18   A.  I have no independent memory of this email, but that's a

19   safe assumption.

20   Q.  For about how long in time would you say that you

21   focused on the Alfa-Bank issue?  Days?  Weeks?  Months?

22   A.  It's difficult to say.  You know, focused on it to the

23   exclusion of other work, only a few days.  I might have

24   dipped in and out of the matter for a month or two.

25   Q.  Okay.  Next is Government Exhibit 631, an email from

1    Mr. Fritsch to you copying Glenn Simpson; is that right?

2    A.  Yes.

3              MR. DeFILIPPIS:  Your Honor, the government offers

4    Government Exhibit 631.

5              THE COURT:  So moved.

6    Q.  And what is the date of this email?

7    A.  October 5, 2016, at 6:33 p.m.

8    Q.  And the "Subject" line?

9    A.  "Forward:  Alfa."

10   Q.  Okay.  So this is Mr. Fritsch presumably sending you

11   something titled with "Alfa" in the subject line?

12   A.  That's what it appears to be.

13   Q.  And then if we turn to what's been marked as Government

14   Exhibit 635, is that an email in which it appears that you

15   reply to what you had received from Mr. Fritsch?

16   A.  Yes, that's what it appears to be.

17             MR. DeFILIPPIS:  Your Honor, the government offers

18   Government Exhibit 635.

19             THE COURT:  So moved.

20   Q.  And, again, no recollection as to the substance?

21   A.  I'm afraid not.

22   Q.  Not too many more.  Don't worry.

23             The next exhibit that we'll show you has been

24   premarked Government Exhibit 677.  Is this an email from you

25   to Mr. Fritsch?

1    A.  Yes.

2            MR. DeFILIPPIS:  Your Honor, the government offers

3    Government Exhibit 677.

4            THE COURT:  So moved.

5    Q.  And what was the date and time of this particular email?

6    A.  November 1, 2016, at 2:48 p.m.

7    Q.  And you sent it to Mr. Fritsch.  Who did you copy?

8    A.  Jake Berkowitz.

9    Q.  And remind us who Mr. Berkowitz is.

10   A.  He was another analyst at Fusion GPS.

11   Q.  And how frequently did you work with Mr. Berkowitz?

12   Every day or...?

13   A.  Quite frequently.

14   Q.  And what's the subject line of this email?

15   A.  "What the other side is saying."

16   Q.  What did you mean by "the other side" there?

17   A.  To the best of my recollection, this was discussing

18   other opinions about the allegations of the connection

19   between Trump organization and Alfa-Bank, folks who were

20   skeptical of -- that those showed communication.

21   Q.  All right.  And finally, Ms. Seago, in terms of

22   documents, I'm going to show you what's been marked

23   Government's Exhibit 680.  Is this an email from you to

24   Mr. Fritsch?

25   A.  It appears to be, yes.

1            MR. DeFILIPPIS:  Your Honor, the government offers

2    Government Exhibit 680.

3            THE COURT:  So moved.

4    Q.  And, Ms. Seago, what was the date and time of this

5    particular email?

6    A.  November 3, 2016, at 3:33 p.m.

7    Q.  And you copy on the email Mr. Catan, who you mentioned

8    earlier, and then Patrick Corcoran.  Is that someone you

9    mentioned before?

10   A.  I'm not sure I have.

11   Q.  Who is Mr. Corcoran?

12   A.  He's the research director at Fusion GPS.

13   Q.  And what does the research director do?

14   A.  He oversees all of the analysts, makes sure that our

15   cases are staffed appropriately.

16   Q.  So was he a boss of yours, or not really?

17   A.  Not really.  He also does his own analysis.  He just had

18   a particular role in managing staffing.

19   Q.  And then there's an email address,

20   research@fusiongps.com.  What is that?

21   A.  To the best of my recollection, that address contacts

22   all of the analysts at Fusion GPS.

23   Q.  Okay.  So it's like a group Listserv?

24   A.  Exactly.

25   Q.  And then the subject line of this email is what?

 1    A.  "Re: Foer follo."

 2    Q.  Based on your subject-naming conventions, what do you

 3    think you meant by "Foer follo"?

 4    A.  I don't know.  I'm replying to somebody else's subject

 5    line, so I don't know.  I don't think I wrote that subject

 6    line.

 7    Q.  Okay.  Do you recall there being follow-up from the

 8    meeting with Mr. Foer?

 9    A.  I can't recall specifically.

10    Q.  Did there come a time when you learned that articles

11    came out in the news about the Alfa-Bank issue?

12    A.  Yes.

13    Q.  And do you remember who published those articles?

14    A.  Mr. Foer did publish an article.  *The New York Times*

15    also mentioned the allegations briefly in an article.

16    Q.  And to the extent you recall, what was the general time

17    period of those articles?

18    A.  I believe it was October 31st of 2016.

19    Q.  To the extent you met with Mr. Foer and -- you and

20    others met with Mr. Foer, is that the kind of thing that you

21    cleared with Perkins Coie before doing it?

22    A.  That would have been above my pay grade.  I don't know

23    if Mr. Fritsch or Mr. Simpson cleared it with Perkins Coie.

24    Q.  Okay.

25              Okay.  One more exhibit, Ms. Seago, that I'm going

1       to show you, which is Government Exhibit 612.  Do you

2       recognize this, which looks to be an email from you to

3       Mr. Fritsch?

4       A.  It appears to be an email from me to Mr. Fritsch.  I

5       don't recall this email specifically.

6               MR. DeFILIPPIS:  Okay.  And, Your Honor, if

7       there's no objection from the defense, we'll offer

8       Government's Exhibit 612.

9               MR. BERKOWITZ:  No objection.

10              THE COURT:  So moved.

11      Q.  Okay.  So what is the date and time of this email?

12      A.  October 5, 2016, at 5:23 p.m.

13      Q.  And the "Subject" line?

14      A.  "Re:  so is this safe to look at" -- excuse me -- "so

15      this is safe to look at."

16      Q.  And then the attachment name?

17      A.  gdd.zip.

18      Q.  Okay.  And then it looks like, off to the side of the

19      exhibit, there are some attachment names listed.

20              MR. DeFILIPPIS:  If we could just enlarge those a

21      bit.

22      Q.  Looking at these attachments, what were those

23      attachments?

24      A.  I don't recall documents specifically.  I actually don't

25      know.

1    Q.  I mean, based on your recollection and looking at them,

2    do they appear to be data?  Papers?  Any sense one way or

3    the other?

4    A.  It looks like an HTML file, and the files that would go

5    into a website.  So "all.html" is like a Web page, and

6    "exporting.js" or "highstock.js" are JavaScript files that

7    would go into a Web page to create certain features.

8              "Network_small.png" is an image file.

9    "Index.html" is another web-page-type file.  "Network.html"

10   is another web-page-type file.

11             "Result-light.css" is a cascading style sheet.

12   That's the sort of thing that just determines the fonts and

13   colors on a Web page, how it looks.

14             So it looks like all of the stuff that goes into

15   making a Web-page document.

16   Q.  Okay.  And going back to the attachment listed on the

17   header of the email itself, it was gdd.zip.  What was

18   "gdd.zip"?  Do you remember dealing with anything with the

19   acronym "gdd" in the Alpha-Bank or any other matter?

20   A.  The name sounds familiar.  My recollection is gdd.zip

21   was posted to the Internet by an anonymous person containing

22   documents related to the allegations that the Trump

23   organization was communicating with Alfa-Bank.

24   Q.  And was that something you found on your own?  Did

25   someone alert you to it?

1    A.  I don't remember.

2    Q.  Of the people at Fusion GPS, who was the most

3    technically proficient on cyber matters and things like

4    that?

5    A.  That would have been me.

6    Q.  And with regard to DNS data, how proficient or familiar

7    or unfamiliar were you with DNS data?

8    A.  I have no professional experience working with the DNS

9    system, but I've been working with computers my whole life.

10   I taught myself several programming languages, and so the

11   learning curve was a little less steep for me on

12   understanding technical matters.

13        So I was conversant in DNS.  I wouldn't call

14   myself an expert.

15   Q.  Okay.  And let me redirect you to Government Exhibit 612

16   and direct you to page 4 of the exhibit, which has some

17   metadata.  And you may understand this better than I do, but

18   the metadata lists gdd.zip as the file name, and then the

19   title is "mail1.trump-email.com DNS timeline."

20        Any sense of what that is?

21   A.  I'm afraid not.

22   Q.  Do you remember, in connection with the Alfa-Bank issue,

23   there being any particular domain at issue?

24   A.  I know that there was a trump-email.com server and an

25   Alfa-Bank server.  Those were the domains at issue.

```
 1                 This looks familiar.  The mail1.trump-email.com,
 2     that may have been the Trump domain at issue in these
 3     communications.
 4     Q.  Okay.  Now, were you aware of any other efforts -- other
 5     than your meeting with Mr. Foer -- other efforts that Fusion
 6     GPS made to disseminate the Alfa-Bank issue in the media?
 7     A.  I wasn't personally aware of any.
 8     Q.  And are you certain you would remember if you were, or
 9     do you just not remember any?
10     A.  I don't -- I'm not certain.  I don't think I was
11     personally involved in any other communications with
12     journalists about this.
13     Q.  Who did Mr. Foer work for?  Was there a particular
14     newspaper or media outlet?
15     A.  He was writing for *Slate* at the time.
16     Q.  And I think you testified earlier that they -- I think
17     you used the phrase "they" hoped to get an article published
18     about Alfa-Bank.  Who was the "they"?  Was that Perkins
19     Coie?  Fusion GPS?
20     A.  My bosses at Fusion.
21     Q.  Okay.
22     A.  I took direction from them.
23     Q.  And I think you testified earlier, you understood that
24     this Alfa-Bank work was related to the broader project for
25     Perkins Coie and the Democratic entity?
```

1    A.  That was my understanding, yes.

2              MR. DeFILIPPIS:  Okay.  Thank you very much.

3              THE WITNESS:  Thank you.

4              THE COURT:  Mr. Berkowitz, how long do we think

5    you have?  Should we take our morning break before your

6    cross?

7              MR. BERKOWITZ:  Less than 30 minutes.

8              THE COURT:  Ladies and gentlemen, why don't we

9    take our morning break.  It is 10:40 by my watch.  Why don't

10   we reconvene at 11:00.

11             No discussions about the case.  No research about

12   the case.

13             (Jury exits courtroom)

14             THE COURT:  Okay.

15             (Recess taken)

16             THE COURT:  All right.  Welcome back, everyone.

17   Please be seated.

18             Mr. Berkowitz.

19                      CROSS-EXAMINATION

20   BY MR. BERKOWITZ:

21   Q.  Good morning, Ms. Seago.

22   A.  Good morning.

23   Q.  We've never met before, have we?

24   A.  I don't believe so.

25   Q.  Okay.  My name is Sean Berkowitz, and I represent

1    Michael Sussmann.  I think you testified that you've met

2    Mr. Sussmann once, at least during the 2016 time period?

3    A.  That's right.

4    Q.  In July or August, to the best of your recollection?

5    A.  That's what I can recall, yes.

6    Q.  And it was at a meeting with him and Mr. Elias,

7    Mr. Joffe, and Mr. Fritsch, correct?

8    A.  Yes.

9    Q.  Other than that one meeting with Mr. Sussmann, do you

10   recall having any communications with him ever?

11   A.  No.

12   Q.  Now, let's kind of level set, because you mentioned a

13   couple of times certain things were above your pay grade,

14   and I want to make sure that the jury understands what your

15   role was and what it wasn't.

16           So a little bit about your background.  Where did

17   you work before you started at Fusion?

18   A.  Before Fusion I was in graduate school.  I was in a

19   joint PhD program in public policy and political science.

20           Before that, I was a research associate at the

21   Brennan Center for Justice.

22   Q.  And you graduated from the University of Chicago in

23   2007?

24   A.  That's right.

25   Q.  And then you did PhD work?

1    A.  That's right.

2    Q.  And after those couple of jobs in the not-for-profit

3    sector and the Brennan institute, you responded to a job

4    posting?

5    A.  That's correct.

6    Q.  That was in about 2015?

7    A.  That's right.

8    Q.  And what was the job posting for, Ms. Seago?

9    A.  It was for an analyst who had technical skills who knew

10   programming languages at Fusion GPS.

11   Q.  And you'd worked on computers and websites and things

12   like that since you were younger, right?

13   A.  That's right.

14   Q.  So you went to work for Fusion GPS in the 2015 time

15   period?

16   A.  Yes.

17   Q.  And your role, I think you said, was to do open source

18   research, meaning do research that's available to the

19   public.  Correct?

20   A.  Yes.

21   Q.  And report that information to whichever partner was

22   asking you for the information?

23   A.  Yes.  That's right.

24   Q.  When you did research, did you try and provide

25   information that was accurate?

1    A.   Always.

2    Q.   Now, in the 2015 time period, I think you said that the

3    work that your company, the company you had signed on for,

4    was working for anti-Trump Republicans, right?

5    A.   That was my understanding.

6    Q.   That was during the primary cycle, presumably?

7    A.   Yes.

8    Q.   And then in the general election cycle, you understood

9    that the firm had been hired by a Democratic entity to do

10   the same type of research?

11   A.   Yes.   That was my understanding.

12   Q.   And you were not the expert at Fusion about Alfa-Bank,

13   right?

14   A.   No.

15   Q.   There were others at Fusion who had more meaningful

16   engagement on the Alfa-Bank issues?

17   A.   Yes.

18   Q.   One of them you mentioned was Jake Berkowitz?

19   A.   Yes.

20   Q.   Just for -- I'm not related to Jake Berkowitz.  I'll

21   make that representation.  I don't know that that's evidence

22   or not, but I don't know him.

23             And you mentioned Mr. Fritsch?

24   A.   Yes.

25   Q.   And Mr. Simpson, correct?

1   A.  Correct.

2   Q.  All right.  So your work on the Alfa-Bank issues was

3   largely related to looking into any public source

4   information associated with the Alfa-Bank server

5   allegations?

6   A.  That's correct.

7   Q.  In other words, the suggestion or the possibility that

8   there were connections between a Trump server and a server

9   associated with a bank called Alfa-Bank, right?

10  A.  Yes.

11  Q.  And you had a meeting with Mr. Joffe, Mr. Sussmann,

12  Mr. Elias, and Mr. Fritsch about that, right?

13  A.  Yes.

14  Q.  And at that meeting, you understood, based on whatever

15  it was that caused you to do this, that Mr. Joffe, who was

16  there, was Mr. Sussmann's client, correct?

17  A.  That was my understanding, yes.

18  Q.  You'd never heard of Mr. Joffe before?

19  A.  Not before that meeting.

20  Q.  Okay.  And you never saw him after that meeting,

21  correct?

22  A.  Not that I can recall.

23  Q.  There were some emails exchanged, correct?

24  A.  Yes.

25  Q.  Okay.  And your impression -- well, and Mr. Joffe was

1    not, to the best of your knowledge, a client of Fusion, was

2    he?

3    A.  Not to my knowledge.

4    Q.  And your impression of Mr. Joffe that was made at that

5    meeting was that he was -- he seemed reliable?

6    A.  Yes.

7    Q.  And he seemed well-placed to have knowledge and

8    information about the server issues?

9    A.  Yes, he did.

10   Q.  And you understood that Mr. Joffe supported the

11   suggestion that there was at least potential contact between

12   Trump servers and Alfa-Bank servers?

13   A.  Yes, I did.

14         MR. DeFILIPPIS:  Objection, Your Honor.

15         THE COURT:  Overruled.

16   Q.  You answered the question?

17   A.  Yes, I did understand that.

18   Q.  So you then, after that meeting, I take it, did certain

19   open source research.  Correct?

20   A.  Yes.

21   Q.  And I think you testified that as a result of your open

22   source research you -- did you identify other people on the

23   Web that had agreed with the suggestion of the allegations?

24   A.  Yes.

25   Q.  Okay.  Who were they?

1    A.  There was somebody using a pseudonym, Tea Leaves, who

2    posted data and allegations on the Web largely agreeing with

3    these claims.

4    Q.  And you're not -- just to be really clear -- an expert

5    in DNS data, correct?

6    A.  No.

7    Q.  You know what it is?

8    A.  Yes.

9    Q.  And at some point, I take it, you were asked to speak

10   with someone from the press, correct?

11   A.  Yes.

12   Q.  Okay.  Now, to be clear, you did not, before the

13   election, ever speak with a gentleman named Eric Lichtblau,

14   did you?

15   A.  Not before the election.

16   Q.  And not -- and before the election you didn't speak with

17   anyone from *The New York Times* about these issues, correct?

18   A.  No.

19   Q.  And you were, it sounds like, asked to go to a meeting

20   with a gentleman named Franklin Foer?

21   A.  That's right.

22   Q.  And Mr. Foer, is he somebody you were familiar with

23   before you met with him?

24   A.  I knew the name.

25   Q.  Okay.  You didn't know why you were going before you

1    went there?

2    A.  Peter Fritsch asked me to attend.  I don't recall if he

3    told me the subject.

4    Q.  Okay.  And to the best of your recollection, if

5    anything, what was your role at that meeting?

6    A.  To explain the technical aspects of these allegations in

7    lay terms that a journalist like Mr. Foer could understand.

8    Q.  Did you try and accurately convey what you knew?

9    A.  Yes.

10   Q.  Did you provide him any names?

11   A.  I don't recall.

12   Q.  Okay.  Do you know or understand whether he did

13   independent research after your discussion with him?

14   A.  I don't know.

15   Q.  Did, in fact, a story ultimately come out by Mr. Foer?

16   A.  Yes.

17   Q.  Let me show you what has been marked as Government

18   Exhibit 54.  This is an October 31, 2016, document that

19   appears to be an article by Franklin Foer, correct?

20   A.  Yes.

21            MR. BERKOWITZ:  Judge, I'd move into evidence the

22   document.

23            MR. DeFILIPPIS:  No objection, Your Honor.

24            THE COURT:  So moved.

25   Q.  And we're not going to go through the extent of the

1    document, but did you read it at the time?

2    A.  Yes, I did.

3    Q.  All right.  And did Mr. Foer identify in that article,

4    to the best of your knowledge, other experts that he spoke

5    with?

6    A.  That's what I remember, yes.

7    Q.  And is that the Jean Camp and Paul Vixie?

8    A.  Yes.

9    Q.  Those were names that he came up with, correct?

10   A.  Yes.

11   Q.  And with respect to your meeting with Mr. Foer, did you

12   tell Mr. Foer that the FBI was investigating these

13   allegations?

14   A.  No.  I had no knowledge of that investigation.

15   Q.  So before your meeting with Franklin Foer, did you have

16   any information that the FBI was involved in any way?

17   A.  No.

18   Q.  All right.  Did Mr. Fritsch or anyone else at the

19   meeting say, "The FBI is looking into this"?

20   A.  Not that I can remember.

21   Q.  Okay.  And going back to the meeting with Mr. Sussmann,

22   Mr. Joffe, Mr. Fritsch, and Mr. Elias, do you recall any

23   discussion at that meeting about bringing these allegations,

24   these server allegations, to the FBI?

25   A.  No, I don't.

1    Q.  Okay.  We looked at about 12 emails.  When I say "we,"

2    Mr. DeFilippis showed you about 12 emails between -- some

3    were with Mr. Joffe, some had Mr. Sussmann on it, some were

4    internal Fusion emails.  Do you remember those?

5    A.  Yes.

6    Q.  Okay.  Did any of those communications reference, to the

7    best of your knowledge, discussions with law enforcement or

8    the FBI?

9    A.  Not that I can recall.

10   Q.  And that's something you think you would recall?

11   A.  I think I would.

12   Q.  Now, with respect to the further discussions with the

13   press, other than this one meeting with Mr. Foer, were you

14   involved in any discussions with the press?

15   A.  Not about the Alfa-Bank matter.

16   Q.  Okay.  Were you involved in any discussions internally

17   or with the press about leaking allegations about the FBI

18   looking into the server allegations to the press?

19   A.  No.

20   Q.  And when you met with the press, was the Alfa-Bank time

21   the only time you'd ever met with the press?

22   A.  No.  I met with them on other matters.

23   Q.  And did you find anything unusual about the meeting with

24   Mr. Foer?

25   A.  No.

1    Q.  Did you think the Alfa-Bank story was an important

2    story?

3    A.  Yes, I did.

4    Q.  Why?

5    A.  I thought it was a matter of national security, if a

6    Russian bank was interfering in our elections.

7    Q.  And you understand that Mr. Foer is a journalist who

8    would do his own research on matters?

9    A.  Yes.

10   Q.  And the information that you provided at that meeting

11   and any information you provided to your employers was

12   accurate, to the best of your knowledge?

13   A.  Absolutely, yes.

14             MR. BERKOWITZ:  I appreciate your time.

15             THE WITNESS:  Thank you.

16             MR. BERKOWITZ:  Nothing further.

17                      REDIRECT EXAMINATION

18   BY MR. DeFILIPPIS:

19   Q.  Ms. Seago, on cross-examination you were asked about

20   your task being part of looking for public source

21   information; is that right?

22   A.  Yes.

23   Q.  To the extent you received information on this matter

24   from Mr. Joffe, did you understand that to be public source

25   information or something else?

1    A.  I didn't understand that Mr. Joffe had open source

2    information, no.

3    Q.  Okay.  So it would have been non-open source

4    information?

5    A.  Correct.

6    Q.  Okay.  And what, if anything, did you do to inquire as

7    to where Mr. Joffe had gotten information he gave you on

8    this issue?

9    A.  I didn't inquire.  My understanding was that he had

10   access to that information.

11   Q.  And what, if anything, did others, as far as you know,

12   at Fusion do to inquire as to the origins of the

13   information?

14   A.  I don't recall anybody inquiring.

15   Q.  What, if anything, did you learn or hear at the time

16   about whether the server at issue was actually a server used

17   to send spam marketing email?

18   A.  I know there was speculation about that after Mr. Foer

19   published his story.  I certainly didn't hear anything about

20   that before.

21   Q.  Okay.  So if that was known to others around you, you

22   don't have any recollection of them mentioning that?

23   A.  I don't recall being aware of it.

24   Q.  Okay.  And do you think -- had someone mentioned -- to

25   what extent do you think you would remember if someone in

1    any of these meetings had mentioned that prior to it being

2    in the public domain?

3    A.  It's difficult to say.  I don't remember any mention of

4    that.

5    Q.  Okay.  You were asked about whether you knew that the

6    FBI was investigating this matter or was aware of this

7    matter.  To what extent were you aware whether others on the

8    team at Fusion were aware, based on any knowledge you have?

9    A.  I had no awareness that anybody knew that anybody was

10   talking to the FBI at that time.

11   Q.  Now, I think -- I may have misunderstood your testimony

12   on direct.  I think -- I thought you had testified on direct

13   that you had not reached out to the media in connection with

14   your Fusion work.  Was that just on the Alfa-Bank matter?

15   A.  Yes, just on the Alfa-Bank matter.

16                Mr. Foer was the only person I spoke with.  I

17   apologize if I was unclear.

18   Q.  Okay.  And with regard to the broader Trump/Russia

19   issues, did you communicate with the media on those issues?

20   A.  Yes, from time to time I did.

21   Q.  And tell us about that.  Which reporters and on what

22   sorts of issues?

23   A.  It's difficult to remember the specific communications

24   or reporters.  I know that we -- I pulled some business

25   records of Mr. Trump's businesses and spoke with the press

1    about those.

2    Q.  Okay.  And were those discussions on the record?  Off

3    the record?  Or a combination?

4    A.  It would have been on background.

5    Q.  Okay.  And what does that mean?

6    A.  They're welcome to use the information, but it's not for

7    attribution.

8    Q.  Okay.  So they wouldn't be able -- would they be able to

9    say publicly that they got it from Fusion GPS?

10   A.  No.

11   Q.  And to what extent, in those communications, would you

12   disclose to the media that you were working for a Democrat-

13   affiliated client?

14   A.  Again, client communications were really above my pay

15   grade.  I didn't set up meetings with journalists at that

16   time, and I didn't communicate about our clients with

17   anyone.

18   Q.  And did you ever receive instructions one way or the

19   other as to whether you could disclose who the client was to

20   the media?

21   A.  No.

22   Q.  Did you ever receive instructions that you couldn't

23   disclose your affiliation with Fusion GPS to the media?

24   A.  No.  I don't remember hiding that affiliation from the

25   media ever.

1   Q.  Do you ever remember hiding or considering hiding that

2   affiliation from anyone?

3   A.  No.

4   Q.  How certain are you of that?

5   A.  I'm quite certain.  You know, we don't go around

6   advertising who we are and where we work, but I certainly

7   don't lie to people, and I don't lie to the press about

8   where I work.

9   Q.  Okay.  So you're fairly certain you never sought to

10  conceal that?

11  A.  Not that I can recall.

12  Q.  With regard to the meeting with Mr. Foer, who, if

13  anyone, would be responsible for following up after that

14  meeting?

15  A.  I don't know.

16  Q.  When the article came out, what was your -- did you

17  speak to Mr. Foer again?

18  A.  I don't recall speaking to him about that article.

19          MR. DeFILIPPIS:  Okay.  Nothing further.  Thank

20  you very much.

21          THE WITNESS:  Thank you.

22          THE COURT:  Okay.  Ms. Seago, thank you very much

23  for your testimony.  You are excused.

24          THE WITNESS:  Thank you.

25          THE COURT:  Please don't discuss your testimony

1    with anyone until the end of the case, okay?

2            THE WITNESS:  Thank you.

3            THE COURT:  Have a good day.

4            Okay.  Ladies and gentlemen, you heard Ms. Seago

5    refer a couple of times to the attorney-client privilege.

6    As you all may know from personal experience, usually an

7    attorney's communication with his or her client is

8    confidential, and that's what the attorney-client privilege

9    refers to.  And so the witnesses have been instructed to

10   steer clear of privileged communications between themselves

11   and a client or that arise in the context of an attorney-

12   client relationship.

13           So the witnesses are not being evasive or refusing

14   to give testimony that they should be providing.  It's a

15   very natural thing when cases involve attorneys and

16   attorney-client relationships.

17           Similarly, you will see certain matters that are

18   redacted from documents.  One reason something might be

19   redacted is that it's covered by confidential attorney-

20   client communications.  So while you can consider that an

21   email was sent by one person to another on a certain day and

22   may have included an attachment, if that attachment is

23   redacted, consistent with my instructions yesterday, you

24   shouldn't speculate as to what may be behind that redaction.

25           Understood?

```
 1                    Okay.

 2                    MR. DeFILIPPIS:  Your Honor, could we speak to you

 3       on the phone?

 4                    THE COURT:  Excuse me?

 5                    MR. DeFILIPPIS:  Could we speak to you on the

 6       phone?

 7                    THE COURT:  Yes.

 8                       (The following is a bench conference

 9                        outside the hearing of the jury)

10                    MR. DeFILIPPIS:  Your Honor, can you hear me now?

11                    THE COURT:  Yes.

12                    MR. DeFILIPPIS:  So we have an issue with regard

13       to Ms. Seago's testimony.  The government followed carefully

14       Your Honor's order with regard to the Fusion emails that

15       were determined not to be privileged but that the government

16       had moved on.

17                    As Your Honor may recall, there was an email in

18       there in which Ms. Seago talks very explicitly about seeking

19       to approach someone associated with the Alfa-Bank matter and

20       concealing her affiliation with Fusion in the email.  When

21       we asked her broadly whether she ever did that, she

22       definitively said no when I, you know, revisited it with

23       her.  So it raises the prospect that she may be giving false

24       testimony.

25                    And so we were -- you know, I considered trying to
```

1   refresh her with that, but I didn't understand that to be in

2   line with Your Honor's ruling.  So the government is -- we'd

3   like to consider whether we should be -- we'd like Your

4   Honor to consider whether we should be able to at least

5   recall her and refresh her with that document?

6          THE COURT:  I don't remember that question, but

7   the subject matter was concealing Fusion or her identities

8   in conversations with the press.  If I recall correctly,

9   that email related to "tea leaves," correct?

10         MR. DeFILIPPIS:  Your Honor, I thought I had

11  phrased it more broadly.  We can go to the transcript.

12         THE COURT:  Mr. Berkowitz?

13         MR. BERKOWITZ:  Judge, I'm not familiar with the

14  specifics.  I'm happy to take a look at the transcript.  I

15  certainly got the impression he was asking if she had ever

16  concealed Fusion as an entity from the press.  That was what

17  was asked in her deposition, and she answered the same way

18  in her deposition.

19         One thing, just to note, some of our paralegals

20  can hear Mr. DeFilippis talking, so I suggest, just as a

21  reminder, to keep your voices down.

22         MR. DeFILIPPIS:  Sure, sure.

23         THE COURT:  All right.  Let me look at the

24  transcript.

25         (Pause)

```
1              THE COURT:  Can you hear me?

2              MR. DeFILIPPIS:  Yes, Your Honor.

3              THE COURT:  All right.  Looking at the transcript,

4    I think you did ask a more open-ended question.  She said,

5    "I don't remember hiding that affiliation from the media

6    ever."

7              And then you followed up, "Do you ever remember

8    hiding or considering hiding that affiliation from anyone?"

9              And she answered, "No."

10             I would -- so I think that she -- I think the

11   email is inconsistent with her answer, Mr. Berkowitz.  But

12   the question now is whether they can refresh her with that

13   email notwithstanding the Court's order.  And now she's

14   gone.

15             How are we going to do that even if we were to

16   allow it?  Is it worth the candle of calling her back?

17             MR. DeFILIPPIS:  Your Honor, I understand she's

18   still in the building.

19             MR. BERKOWITZ:  Your Honor, is this email

20   privileged?

21             MR. DeFILIPPIS:  This was one of the emails that

22   was determined not to be privileged by Your Honor.

23             MR. BERKOWITZ:  So why didn't they impeach her

24   with it when they had the chance?

25             MR. DeFILIPPIS:  Your Honor, the reason is because
```

1    I didn't want to violate Your Honor's order that we couldn't

2    use those affirmatively.

3              THE COURT:  Well, I think the time to have asked

4    the Court whether using the document to refresh was

5    consistent with the order was before she was tendered and

6    dismissed.

7              So I think you waived your opportunity.  All

8    right?  So we're going to move on.

9              (This is the end of the bench conference)

10             THE COURT:  All right.  Who is up next?

11             MR. DeFILIPPIS:  Your Honor, the government calls

12   Marc Elias.

13             THE COURT:  Okay.  Good morning, sir.  It's still

14   morning.

15             THE WITNESS:  Good morning, Your Honor.

16             THE COURT:  Please remain standing and raise your

17   right hand to be sworn in.

18             (Witness sworn)

19             THE COURT:  All right.  Have a seat, sir.  Make

20   yourself comfortable.

21                     MARC E. ELIAS, Sworn

22                       DIRECT EXAMINATION

23   BY MR. DeFILIPPIS:

24   Q.  Good morning, Mr. Elias.

25   A.  Good morning.

1    Q.  Would you please state and spell your name for the

2    record?

3    A.  Sure.  It's Marc, M-A-R-C; Erik is my middle name, with

4    a K; and then Elias, E-L-I-A-S.

5    Q.  Mr. Elias, where do you work?

6    A.  I work at the law firm Elias Law Group.

7    Q.  And where did you work before Elias Law Group?

8    A.  I was a partner and then before that an associate at a

9    law firm called Perkins Coie.

10   Q.  And in the 2016 time period, where did you work then?

11   A.  At Perkins Coie.

12   Q.  And what sorts of work did you do at Perkins Coie?

13   A.  So in that time frame I chaired the political law

14   practice, which meant I did -- I represented Democratic

15   campaigns, Democratic candidates, progressive causes in

16   matters relating to how they engaged in the political

17   process.  Everything from voting rights litigation to

18   campaign finance and everything in between.

19   Q.  And so in connection with that work, did there come a

20   time when you started doing work on behalf of the Hillary

21   For America Campaign?

22   A.  Yes.

23   Q.  And approximately when was that?

24   A.  It was around April of 2015.  It was -- it could have

25   been give or minus a few days.  It was shortly before she

1    announced her presidential campaign, which I think was in

2    April.

3    Q.  And how is it that you came to work on behalf of the

4    campaign?

5    A.  So I had worked on a large number of Democratic

6    campaigns.  I was the general counsel to the Democratic

7    Senatorial Campaign Committee and had worked on a lot of

8    Senate -- I represented lots of Democratic Senate races.

9    I'd been the general counsel to John Kerry's presidential

10   campaign.  I had done some work -- my firm was the general

11   counsel to the Obama for America Campaign in 2008 and 2012.

12            So at some point in late 2014 or early 2015 I was

13   contacted by people who were later to be associated with the

14   campaign and asked if it was something I was interested in.

15   Q.  And so you took them up on that offer?

16   A.  Yes.

17   Q.  And your title on the campaign was?

18   A.  So my title was general counsel.

19   Q.  And in terms of your staff or others who worked for you

20   in the legal area on the campaign, were they folks at

21   Perkins Coie or the campaign proper or a combination?

22   A.  Good question.  It was a mix.  So some campaigns have an

23   in-house general counsel and then outside counsel.

24            This campaign we -- I was the general counsel.  So

25   I relied on probably, you know, a couple of dozen lawyers at

1    Perkins who did one or more things for the campaign.  And

2    then I think -- by the time we got to the general election,

3    I think we had maybe eight in-house lawyers who were just

4    employees of Hillary For America --

5    Q.  Okay.

6    A.  -- or the DNC working with the Clinton Campaign.

7    Q.  Got it.  And who principally did you work closest with

8    in the legal realm, other lawyers?  Which other lawyers?

9    A.  In the campaign or at the firm?

10   Q.  In the campaign.

11   A.  In the campaign I'd say the people I worked closest with

12   depended a little bit on the phase.  So early in the

13   campaign -- and I don't know if you are interested in early

14   in the campaign -- I'd say it was the lawyers who were

15   corporate lawyers.

16          You know, first -- my piece of advice to everyone

17   who does a campaign is first thing get someone who knows

18   leases, contracts, database vendors --

19          THE COURT:  I'm sorry, Mr. Elias.  Could you slow

20   down just a little bit for the benefit of the jury and the

21   court reporter.

22          THE WITNESS:  I apologize.  It's my New York

23   coming out.

24          THE COURT:  I understand.

25   A.  So early in the campaign there was a woman, Joslyn

1    Massengale, who was the first lawyer we hired to do

2    corporate work.

3            As the campaign got going, it was more -- we had

4    someone who was dealing with HR issues inside the campaign

5    who I worked with, you know, periodically.

6            Then further along it would have been Debbie Fine,

7    who was handling pieces -- I think she joined the campaign,

8    though, later.  I think she joined the campaign in the

9    middle of 2016 or early 2016.

10           And then Hannah Freid, who was running the voter

11   protection program, which is huge, you know, preventing

12   election subversion and voter suppression.

13   Q.  Now, was your retention by the campaign memorialized in

14   an agreement?

15   A.  It was.

16   Q.  And if I could show you, Mr. Elias, what's been

17   premarked as Government Exhibit 301, which will show up on

18   your screen in a moment.

19   A.  Yes.

20   Q.  Do you recognize this?

21   A.  Yes.

22   Q.  What is it?

23   A.  This is the engagement letter for the Clinton Campaign.

24   HFACC, Inc., was the technical legal name of the campaign,

25   like if you looked in the New York State Registry of

1     Corporations.  It did business as Hillary For America.

2     Q.  Okay.  And just looking at the address line of who the

3     letter -- oh, I'm sorry.

4              MR. DeFILIPPIS:  Your Honor, the government offers

5     Government Exhibit 301.

6              THE COURT:  Any objection?

7              MR. BERKOWITZ:  No objection, Your Honor.

8              THE COURT:  So moved.

9     Q.  If we look at the address line of this retention letter,

10    there's an individual listed there, Mr. Robby Mook or Mook?

11    A.  Yes.

12    Q.  How do you pronounce that?

13    A.  I say "Mook," but I will tell you, if you ask five

14    people, they're going to give you five different answers.

15    Q.  Okay.  So Mr. Robby M., who is that?

16    A.  Robby Mook was, on April 1st of 2015, the campaign

17    manager.

18    Q.  And is he the one who formally retained you?

19    A.  He was, yes.

20    Q.  And did you interact with him frequently in your work at

21    the campaign?

22    A.  Yes.

23    Q.  So looking at the first two paragraphs of the letter

24    there.  The first paragraph says, "Thank you for selecting

25    the firm to serve as general counsel.  This includes legal

1      counseling and representation of Hillary For America in

2      connection to its legal affairs, including Federal Election

3      Commission and other regulatory requirements and general

4      organizational and compliance matters."

5              Then it says, "Our firm will not represent another

6      candidate for president in the 2016 election cycle."

7              Is this language common, uncommon, in terms of how

8      election retentions go?

9      A.  It's generally common.  We had a history and after this

10     of representing multiple candidates for president, so that

11     last sentence was I won't say uncommon -- well, less common.

12     Q.  Okay.  Now, were there any other retention letters

13     between Perkins Coie and the campaign covering the election

14     cycle in 2016?

15     A.  That were memorialized?  Not that I recall, but it's

16     possible.

17     Q.  Okay.  But was this the main --

18     A.  Yes, yes, this was the main one.  But I don't know

19     whether there was some matter we handled, a litigation

20     matter or something, that there was a separate engagement

21     letter for.  I don't recall.

22     Q.  Okay.  And if we go down to the third paragraph of that

23     letter there, so is this the paragraph about the fees, the

24     money?

25     A.  Yes.

1   Q.  And just generally speaking, what was the arrangement

2   for paying Perkins Coie by -- for the campaign to pay

3   Perkins Coie?  What was the -- how did the fees work?

4   A.  They paid us a flat monthly fee that scaled over time.

5   And then I think it said in the first paragraph that if

6   there was like litigation or recounts or contests, it would

7   be billed separately.

8   Q.  And so just for the jury's benefit, when a law firm's

9   being paid on a flat monthly fee, how does that work in

10  terms of if you work a lot of hours or not a lot of hours in

11  terms of how much the client pays?

12  A.  The client pays the same amount no matter how much you

13  work or don't work.

14  Q.  Okay.  So if we look at Paragraph 3, it says that -- it

15  sets out amounts that the firm will be paid.  It says

16  $130,000 per the month of April and May.  So was that

17  $130,000 each month?

18  A.  It was, yes.

19  Q.  Okay.  So --

20  A.  That's why I put the word "per" at the end.

21  Q.  Right.  Right.  If the firm only worked two hours in one

22  of those months, they would pay $130,000; is that --

23  A.  Correct.

24  Q.  And if they worked 2,000 hours, it would be the same?

25  A.  Correct.

1    Q.  Okay.  And any particular reason why the numbers trail

2    off a bit as time goes on?

3    A.  So the first two months were really -- were higher than

4    the others for the reason I said, which is a start-up

5    campaign has a zillion legal needs.  I mean, on Day 1 you

6    need a website, which means you need a privacy policy, which

7    means a website vendor, which means you need a hosting

8    company, which -- right?  And that's just the website.

9            Like, you have office leases.  You have HR issues,

10   right?  You have onboarding of hundreds of employees.  And

11   we didn't have the in-house staff yet, right?

12           So essentially at the very beginning Perkins Coie

13   was the only lawyers for the campaign, so we hadn't yet

14   hired -- so I said the first hire is always a corporate

15   lawyer to sort of take more of that work off of us.  But

16   that's why the first two months were higher.

17   Q.  Okay.  And about how many lawyers would Perkins Coie

18   have working for the campaign?

19   A.  I mean, I don't know if I can refer to a document or not

20   in evidence, but you could look at the pro formas and come

21   up with an actual number.  But my guess is there were

22   probably two dozen lawyers in any given months working on

23   the campaign.

24   Q.  Okay.  And who was the managing or billing partner for

25   that?

1    A.  I was.

2    Q.  That was you.

3          So to the extent that bills came back -- sorry,

4    that bills went out to the campaign, would you review them

5    or...?

6    A.  Depended on the time period, and it depended on the

7    client.  So, you know, my general practice -- you know, at

8    the same time that I was representing the Clinton Campaign I

9    had, you know, several dozens or more other clients, so I'd

10   get a lot of pro formas, are what they're called, every

11   month.  And often I would review the hourly ones, if I had

12   the most knowledge.

13         If I didn't have the most knowledge, I'd send it

14   to the lawyer who had the most knowledge.

15         For the flat fees, I would usually begin reviewing

16   them to make sure that we were essentially meeting our

17   agreement with the client.  But over time I oftentimes

18   didn't review them because it was just the same flat fee

19   every month, so I would have someone else at the firm review

20   them instead.

21   Q.  Now, the concept that's commonly referred to as

22   opposition research or campaign research, are you familiar

23   with that idea?

24   A.  I am.

25   Q.  Was that something that would have been covered under

1   this retention agreement that we just looked at?

2   A.  So I certainly included -- would have conceived of under

3   this retention consulting with all aspects of the campaign,

4   including its research department.  So if the research

5   department had a question about how do you read a financial

6   disclosure report, an SF278 or, you know, something like

7   that, you know, I'd consider it part of this because that's

8   just a department -- that was just a department of the

9   campaign.

10  Q.  Okay.  So did the campaign itself have opposition

11  research folks who did that kind of work outside of Perkins

12  Coie?

13  A.  So the campaign and the DNC, depending on the time

14  period.  So the campaign always had a robust research

15  department, both looking at herself, what's called self-

16  research, and looking at the opponents, which is called

17  opposition research.

18          The DNC, which was also a client, also had a

19  research operation that was, I would say, probably more

20  focused on pure opposition research.

21  Q.  And then to what extent was there opposition research

22  that fell under the supervision of Perkins Coie?

23  A.  So I don't know that I would use the term "opposition

24  research."  We did hire -- but I don't want to quibble.  We

25  hired an investigative firm to serve as sort of a general

1    contractor of research or investigative services that I

2    needed in order to represent the campaign.

3    Q.  Okay.  And what was the name of that firm?

4    A.  Fusion GPS.

5    Q.  And how did it come to be -- well, first, did you hire

6    Fusion GPS?  Was that principally your decision?

7    A.  For 2016, yes.

8    Q.  Okay.  And about when did you bring them on?

9    A.  So it was sometime in the spring.  I don't have a

10   specific recollection of a date.  But my -- but I place it

11   at about the time that Trump looked like he was going to be

12   the nominee.

13   Q.  Okay.  And was that retention memorialized in any kind

14   of agreement or --

15   A.  It was.

16   Q.  So let me show you what's been --

17   A.  I'm sorry.

18   Q.  -- premarked Government Exhibit -- sorry?

19   A.  I am apologizing to the court reporter.

20   Q.  Okay.

21   A.  Too fast, too cutting off.  I'll get the hang of it.

22   Q.  So let me show you what's been premarked Government

23   Exhibit 302.  It will show up on your screen there.

24   A.  Yes.

25   Q.  So just take a quick look.  Do you recognize that

1    document?

2    A.  I do.

3    Q.  What is it?

4    A.  This is the agreement between Perkins Coie and Fusion

5    GPS.

6    Q.  Okay.  And if we go to the first paragraph there, it

7    says, "This AGREEMENT is entered into as of April 1, 2016,

8    by and between Bean LLC d/b/a" -- do you know what that

9    stands for?

10   A.  Doing business as.  Like I said, Hillary For America was

11   a d/b/a of HFACC, Inc.

12   Q.  Okay.  -- "d/b/a Fusion GPS ('Consultant') and Perkins

13   Coie LLP.  PC and Consultant shall sometimes be referred to

14   herein collectively as the 'Parties' and individually as a

15   'Party'."

16   A.  Yes.

17   Q.  And then if we go down to the next two paragraphs --

18            MR. DeFILIPPIS:  What's that?

19            Oh, I'm sorry, the government offers Government

20   Exhibit 302.  I apologize, Your Honor.

21            MR. BERKOWITZ:  No objection.

22            THE COURT:  So moved.

23   Q.  So if we go down --

24            MR. DeFILIPPIS:  If we publish this to the jury.

25            And let's just show the jury those first three

1    paragraphs.

2    Q.  Okay.  So you just read the first paragraph, Mr. Elias?

3    A.  I did.

4    Q.  And then the next two paragraphs, "WITNESSETH, WHEREAS,

5    PC desires to avail itself of the expertise and consulting

6    services of Consultant, and Consultant desires to make its

7    expertise and consulting services available to PC upon the

8    terms and conditions herein set forth;

9           "WHEREAS, PC is providing legal advice to specific

10   clients identified to Consultant related to defamation,

11   libel and similar laws in which accuracy is an essential

12   legal element."

13          Other than the Clinton Campaign at this time, was

14   there any other client who Fusion did work for?

15   A.  The Democratic National Committee.

16   Q.  Okay.  So those were the two clients?

17   A.  Yes.

18   Q.  And are they referenced anywhere specifically in the

19   agreement, or is it just the clients referenced there?

20   A.  I'd have to look at the whole agreement, but I doubt it.

21   Q.  Okay.

22          MR. DeFILIPPIS:  And if we go down to the

23   signature page of that agreement.

24   Q.  So it's signed, it appears, by someone named Glenn

25   Simpson.  Who was that?

1    A.  Glenn Simpson, as far as I know, was one of the owners

2    of the company.

3    Q.  Okay.  And how frequently did you deal with -- so you

4    signed this agreement.  It looks like this was in April; is

5    that right?  I'm sorry, you didn't sign it.

6            Mr. Simpson signed the agreement in April?

7    A.  Correct.

8    Q.  And did they do work for the campaign and the DNC during

9    the duration of the election season?

10   A.  Yes.

11   Q.  And do you recall about when their work ended?  Was it

12   right after the election or...?

13   A.  I think -- and I don't know if it's in the agreement,

14   but I thought it actually ran through the end of October.

15   Q.  Okay.  So it ended before the election?

16   A.  I mean, again, this was six years ago, but I believe

17   election day in 2016 was relatively early.

18   Q.  Uh-huh.

19   A.  And so I -- maybe I went the last few days without -- I

20   didn't -- you know, the theory was I wasn't going to need

21   them for the last few days.

22            I don't specifically recall.  For some reason, in

23   the back of my mind, I thought it was the end of October,

24   but if you said it was November, then I wouldn't dispute it.

25   Q.  Okay.  That's fine.

1          Now, generally speaking, and without getting into

2     any conversations about legal advice, how did you manage or

3     interact with Fusion GPS?  What was the tenor of your

4     interactions?

5     A.  Mostly in person.  I tried -- one of the challenges for

6     me generally, and in that era, was managing a very, very

7     busy calendar.  So I tried, as I recall, to set up weekly

8     check-ins with them; and then in between, I would talk to

9     them typically by phone.

10    Q.  And the weekly check-ins that -- was that an in-person

11    meeting?

12    A.  Yes.

13    Q.  And would you do that at Perkins Coie or at Fusion GPS?

14    A.  Always at my office.  I don't think I was ever at Fusion

15    GPS.

16    Q.  Typically who would attend those meetings?

17    A.  My best recollection is it was Glenn and Peter --

18    occasionally one of them wouldn't come -- and sometimes

19    another guy.

20    Q.  Okay.  And how about from your side?  Anybody else go to

21    those meetings?

22    A.  Not usually.  On occasion -- not typically.  Yes, not

23    typically.

24    Q.  Okay.  How about -- you mentioned Ms. Debbie Fine.

25    A.  Yes.

```
1    Q.  Did she attend those meetings or --

2    A.  No.  She was in Brooklyn.

3    Q.  Okay.  And to the extent you -- so those were your in-

4    person meetings.  What -- again, without --

5    A.  Just so you know, the campaign was in Brooklyn.

6    Q.  Yes.  No, I understand.

7    A.  So that's why she was in Brooklyn.

8    Q.  Okay.  Now, again, without getting into any legal

9    advice, but generally speaking, what was the purpose of

10   those meetings?

11   A.  To discuss needs that I had and the fruits of what they

12   had -- of their work.

13   Q.  Now, to what extent did Fusion GPS report back on their

14   findings?  I think that's kind of implied in what you just

15   testified, but did they report back?

16   A.  I believe so.

17   Q.  Okay.  And were they, during the election period,

18   researching a range of issues related to Mr. Trump, the

19   then-candidate?

20   A.  Yes.

21   Q.  And were there any particular categories or buckets of

22   issues they were looking at?

23   A.  I'll try to do this, and if I'm going to breach the

24   privilege, someone will hopefully shock me.

25              I would put it in some broad categories.  There
```

1    was a broad swath about his litigiousness; and that was

2    something that -- you know, as part of my initial conception

3    of what was going to be the centerpiece of what they did,

4    that was definitely a big part of it.  And that came to

5    pass.  Like, there was a big part of it that was related to

6    issues involving litigation.

7           There was a bucket that was playing general

8    contractor for me to help obtain public records.  So

9    hypothetically, if I needed a court record in, you know,

10   South Dakota, I don't have any way to get a court record in

11   South Dakota.  I -- they might be able to just simply act as

12   a -- you know, find someone and do that.

13          And then, as things went along, there was a bucket

14   that related to the unusual connections that the Trump

15   Campaign, and people associated with it seemed to have an

16   affinity for Russia and Vladimir Putin.

17   Q.  Okay.  And in terms of your points of contact on those

18   different issues, did you have different points of contact?

19   A.  At Fusion?

20   Q.  Yes, I guess first at Fusion.

21   A.  No.  No, it was really Peter and Glenn.  And then, like

22   I said, there was another guy who sometimes came.  But in my

23   mind, it was Peter and Glenn.

24   Q.  Okay.  And then how about at the campaign?

25   A.  I'm sorry, I want to answer your question, so just --

1    what was it again?

2    Q.  Sorry.  At the campaign, did you have different points

3    of contact for the different aspects of the research?

4    A.  Not delineated that way, no.  I mean, a lot of it was

5    just research I needed for my own purposes.  Some of it was

6    definitely passed on to the campaign.

7           But, no, I mean, you know, if -- you know, if --

8    the campaign was so wide-ranging, there might be a need for

9    this knowledge that resided in the research department.

10   There might be needs that resided in the operations

11   department, you know, the people who keep the security for

12   the servers and all that.  There might be need for this

13   information in -- you know, by the management of the

14   campaign.

15          But so no, I wouldn't say -- I mean, Debbie Fine

16   was a particular point of contact that I had who oversaw

17   particular projects that intersected with Fusion, but I

18   wouldn't say otherwise.

19   Q.  Okay.  Now, at Perkins Coie -- actually, first, why

20   don't we just map out the campaign.

21          Who were your general points of contact on the

22   campaign?

23   A.  So I had lots of points of contact on the campaign

24   because basically it was a sprawling enterprise.  So I had

25   contacts with -- you know, with every department of the

1    campaign.  I would say, to try to help, you know, I was

2    mostly dealing with the senior staff at the campaign.

3          You know, Robby Mook was the campaign manager.  I

4    would say, if I had one boss on the campaign, it was Robby.

5          John Podesta was the chair of the campaign, so he

6    was kind of like the boss's boss.  So for sure I was

7    responsive to John.

8          Dennis Cheng was the finance director, a very

9    important department of the campaign.

10          Heather -- I forget her last name -- was the

11    deputy campaign manager.

12          Then I would say Gary Gensler was the CFO.  Beth

13    Jones was the COO.

14    Q.  And, I'm sorry, just for the jury, "COO" refers to...?

15    A.  Chief operating officer.

16    Q.  And CFO?

17    A.  Chief financial officer.

18    Q.  Okay.

19    A.  And then the people who make ads, the tele -- you know,

20    the television consultants.  And then Jen Palmieri was the

21    head of the -- was the head of the communication -- head of

22    communications, which is like media, like -- I don't want

23    to -- like what the White House press secretary does.  You

24    know, like talking to the media.

25    Q.  Okay.  And just for the reporter, can you spell the last

1    name "Palmieri"?

2    A.   P-A-L --

3    Q.   P-A-L-M-I-E-R-I, is it?

4    A.   That's right.

5    Q.   And then how about on the leadership of the campaign on

6    policy issues, was there a policy advisor?

7    A.   Yes.   So the policy director was Jake Sullivan, and Maya

8    Harris, Kamala's sister, was also like co-director like

9    right under him.

10   Q.   Okay.   And then how frequently did you speak with the

11   candidate herself?

12   A.   Relatively infrequently.

13        You know, I didn't come out of the Clinton world.

14   I was not -- I hadn't represented either her Senate campaign

15   or her prior presidential campaign.   Obviously we had worked

16   for President Obama.   And I had not represented President

17   Clinton.

18        So, you know, I would be invited to meetings or

19   calls, you know, maybe six, seven times throughout the

20   campaign where she had a particular legal question or where

21   it was important to brief her on the status of some legal

22   issue.

23   Q.   Now, who at Perkins Coie, to the extent you know, was

24   aware of the retention of Fusion GPS?

25   A.   That's a really good question.   So I assume -- so some

1   number of people in management were aware, right?  The firm

2   was aware because I would -- I had signed a contract on

3   behalf of the firm.  So the firm general counsel and his --

4   or his designee or someone in that world, whoever approved

5   contracts in 2016, and I don't remember who that was.

6           Michael Sussmann was because -- for reasons I

7   suspect is why we're here today.

8           I assume my assistant did.  And maybe other

9   lawyers in the political law group might have been aware,

10  but not really involved.

11  Q.  Okay.  But other than Mr. Sussmann and the top

12  management, any other names come to mind of people you know

13  were aware?

14  A.  I assume my assistant, my scheduler.

15  Q.  Yes.  Okay.  And other than that, any?

16  A.  I mean, it would have been that kind of thing.  It would

17  have been -- like associates might have seen on a calendar

18  that I was, like, not available and seen that I was meeting

19  with -- you know, I don't even remember how it appeared on

20  my calendar.  But no beyond that.

21  Q.  Okay.  And then how about at the campaign itself?  Who

22  there knew?

23  A.  I don't -- as best I can recall, you know, thinking back

24  on this six years ago, Debbie was aware that it was -- that

25  I was working with Fusion GPS.

1           Robby was aware that I had hired consultants but I

2     don't believe knew who the consultants were.

3     Q.   Okay.  Anyone else on the campaign who you can think of

4     who was aware that Fusion had been retained?

5     A.   By name or by concept?  That's what I'm --

6     Q.   Just by name.

7     A.   Yes.  I think -- I believe probably only Debbie, as I

8     sit here today.

9     Q.   Okay.  And then another question.  Recognizing you can't

10    get into anybody's head at Fusion, but anyone you're aware

11    of at Fusion who knew that their client was the Clinton

12    Campaign or the DNC?

13    A.   Glenn and Peter --

14    Q.   Okay.

15    A.   -- knew it was the Clinton Campaign and the DNC.

16    Q.   And anyone beyond that, as far as you were aware?

17    A.   The other guy who would come to some meetings might have

18    known.

19    Q.   Okay.

20    A.   But I don't know that it ever came -- I'm not sure that

21    it ever came up.

22           As best I can recall.  This was like six years

23    ago.

24    Q.   To what extent was there an effort by you or anyone to

25    keep the identity of the client, the campaign, or its

1     relationship with Fusion GPS confidential?

2     A.  So I typically -- when I hire any consulting firm, I

3     want there to be confidentiality.  I'm a lawyer, so I have

4     to worry about both attorney-client privilege.  I have to

5     worry about I think it's 101.6, maybe, which is the general

6     duty of confidentiality owed clients.

7           So, you know, we tend not -- in my business, given

8     who I tend to represent, I tend to not want more people to

9     know about it than have to know about it.

10    Q.  Okay.  And is that both at the campaign itself and at --

11    in other words, in both directions you want to keep that

12    tightly held?

13    A.  Yes.

14          I think my concern with the campaign would also

15    include -- I'm trying to think.  I typically worry -- and,

16    again, I can't say I specifically remember this here, but I

17    typically worry that campaigns will want to directly reach

18    out to consultants, and that they are not always, at the

19    staff level, as attentive to privilege; so that might have

20    been another additional animating concern.

21    Q.  Okay.  So to what extent would it be true that -- you

22    didn't want the public to know that Fusion GPS was working

23    with the campaign.  Is that fair?

24    A.  Sure.

25    Q.  Okay.  And to what extent would it be true you didn't

1    want people outside of Perkins Coie, Fusion GPS, and the

2    campaign to know about that relationship?

3    A.   Yeah, and I'm saying even within Perkins, I doubt I

4    advertised -- you know, I don't -- when you represent, you

5    know, presidents, former presidents, vice presidents, Senate

6    leaders, speakers, you know, there's just -- there is a

7    general sense that it is better to keep things more limited

8    because of leaks, because of, you know, things that can be

9    done to disadvantage the client.

10   Q.   Okay.  Now, you mentioned the work that was being done

11   in looking at Donald Trump's ties to Russia.  Even if folks

12   at the campaign were not aware who was doing that work -- in

13   other words, Fusion GPS -- were the folks you dealt with

14   aware that that work was going on, that there was somebody

15   looking into that issue?

16   A.   Yes.

17   Q.   And who, principally, would have known that?

18   A.   Depending on how broadly you draw that circle, it would

19   have been the senior -- the people we mentioned, John,

20   Robby.

21   Q.   Jake Sullivan?

22   A.   Jake Sullivan, thank you.  Palmieri, and also people in

23   the tech and cyber security part of the campaign, and also

24   in the operations part of the campaign.

25   Q.   Okay.

1    A.  And in the legal department.

2    Q.  Understood.

3           And are those the people who -- I think you

4    testified earlier that you would occasionally or regularly

5    pass back the fruits of Fusion GPS's work.  Are those the

6    people who would receive those --

7    A.  Not necessarily.

8    Q.  Okay.  I'm sorry, I don't want to mischaracterize.

9    A.  I mean, the -- if I thought that -- and I'll use a

10   hypothetical to try to advance this.

11          If I thought that we could say that Donald Trump

12   used nonunion labor in building Trump Towers, but that we

13   couldn't say he was a union buster, if I got that from

14   research or the circumstances surrounding why he had the

15   only casino on the Las Vegas strip without a gaming license,

16   like, if I had that information that I thought was going to

17   help the campaign understand an issue that I had legal

18   visibility into, I would pass that back to the -- typically,

19   you know, either a comms or research, you know.

20          If it was we have a new hack release of documents,

21   and Donald Trump is taking credit and asking for Russia to

22   release 30,000 more hacked emails, then that would -- that

23   might go to the people you're saying.

24          Like it just kind of depended.  Like this research

25   was -- the consultant was there to help me across a range of

1    issues that confronted a lot of different departments.

2    Q.  Okay.  But so on the -- whatever the issues, if Fusion

3    found something interesting, there were occasions when you'd

4    brief those people?

5    A.  Absolutely.

6    Q.  Okay.  Now, let me show you what's been marked as

7    Government Exhibit 307, which will come up on your screen.

8    And do you recognize this, which appears to be a calendar

9    entry from someone named Leslie Bull on behalf of you?

10   A.  Leslie was my assistant who I mentioned.  She probably

11   knew.

12   Q.  Understood.

13           MR. DeFILIPPIS:  So, Your Honor, the government

14   offers Government Exhibit 307.

15           MR. BERKOWITZ:  No objection.

16           THE COURT:  So moved.

17   Q.  All right.  So, Mr. Elias, we seem to be looking at a

18   calendar entry from Ms. Bull on your behalf.  And then who

19   is that addressed to?  Calendar invitation, maybe I should

20   say.

21   A.  Yes.  It's sent to Unknown, Michael Sussmann, Nicole

22   Leigh [sic].  Yeah.

23           I think that's it, right?

24   Q.  Okay.  And then the subject of the calendar invitation?

25   A.  "Marc/Michael/Fusion team."

1    Q.  And then the location?

2    A.  My office.

3    Q.  The date?

4    A.  7/29/2016.

5    Q.  And then the time and duration of the meeting?

6    A.  4:30 p.m. and for 30 minutes.

7    Q.  Okay.  And then the required attendees are the same as

8    those who were invited?

9    A.  Yes.  I'm not sure exactly who Leigh Nichols is, but --

10   I assume she was an assistant for Michael maybe, but I doubt

11   she was a required attendee.

12   Q.  Okay.  And then at the bottom there it says

13   "Categories."  And then what's aside "Categories"?

14   A.  Yes, "Clinton."

15   Q.  So, again, explain -- do you have a sense of why it

16   appears that way?  Was that one of --

17   A.  Yes, so one of the ways -- I still do this.  One of the

18   ways I managed my calendar at that point of -- for many

19   years, since Outlook became like a good calendar thing, is I

20   color-code it so that I know how much time in a given week I

21   am spending on the Clinton Campaign versus my other clients.

22   Or, for that matter, my other clients versus the Clinton

23   Campaign.  Because I just -- you know, I need to be

24   attentive to all of the different worlds in which I was --

25   have legal responsibilities.

1          So it was kind of a -- it's a visual way that at

2     the beginning of the week I can look at -- I'm sorry, I can

3     look at it and say, okay, I'm doing a lot for this or less

4     for that.  Or I can look at a given day when we were working

5     entirely in person and say, okay, you know, this is a

6     Clinton day, which means I'm probably in Brooklyn, so I

7     shouldn't schedule anything in D.C.

8          So it was -- that category corresponded with a

9     color.

10    Q.  Got it.  So looking at this calendar invite here, do you

11    think this was one of the regular update meetings you had

12    described earlier, one of the in-person meetings?

13    A.  So I don't know.  I don't know.

14         My understanding is that the Democratic Convention

15    was the week leading up to this.  This may have been either

16    the first day I was back in the office or among the first

17    days I was back, having been out of the office for several

18    days.

19         So I don't know what day of the week this was,

20    but -- so I don't know if it was recurring or if it was

21    because we had skipped meetings when I was away, and that

22    this was the first opportunity to meet up.  I don't know.

23    Q.  Okay.  But one way or the other, it appears it was a

24    meeting that you think would have been a physical meeting?

25    A.  Oh, definitely.

1    Q.  Since it says "Marc's office"?

2    A.  Definitely.

3    Q.  Okay.  And 4:30 to 5:00 p.m., was that a typical time

4    that you would meet Fusion, or did it vary throughout the --

5    A.  I don't specifically recall, but I thought I typically

6    met them earlier in the day.  I thought I typically met them

7    in the early, midmorning.

8              But I could be wrong.  I don't want to swear to

9    it.

10   Q.  Okay.  So this one could have been unusual?  Might not

11   have been?

12   A.  Yeah.

13   Q.  Got it.  Now, let me just ask you when -- and this is

14   for the benefit of the jury.  As a lawyer, when you have

15   meetings, what does it mean to bill your time?

16   A.  Okay.  So lawyers in private practice -- maybe in the

17   government, I don't know, but lawyers in private practice,

18   you have to account for every six minutes of time throughout

19   the day.  And so you will -- some people literally --

20   they're called time sheets because back in the day we used

21   to literally write it out on a preprinted sheet.

22             Some people still do it that way.  Some people do

23   it -- they track their time throughout the day

24   electronically using various apps.  Some people do it on a

25   notebook.

1          But basically you have to track how much time you

2     spent for particular clients.  And then you -- I gave it to

3     my assistant, and it was entered into firm software that

4     then generated the pre-bill or pro forma that then became a

5     bill.

6          So that's -- so when we talk about billing our

7     time, we talk about how we track how much time we spent and

8     what we spent it on for the client so that it can get put

9     eventually on a pro forma and then be billed.

10    Q.  Okay.  So am I understanding your testimony correctly?

11    You keep track in some way of what you're doing with every

12    six minutes of your time during the day.  And was it your

13    practice, then, to give a note to your secretary or an email

14    or something?

15    A.  Yes.

16    Q.  Okay.  And then what is it your understanding that she

17    would do to then record that?  There was a system or --

18    A.  There is.  And I'm embarrassed to say I think most

19    lawyers actually just learned the system themselves and

20    entered it directly.  I never -- I never did that.

21         So -- but my understanding is there's like --

22    there's a system where you type in the client number,

23    because every client has a number, has a code, right, so --

24    and then you type in the matter number.  Every client has

25    one or more matters.  And then you type in the description,

 1     and then I assume you type in the time.

 2               But I never actually entered my own time that way.

 3     Q.  Okay.  So for a meeting like this, you would then just

 4     note to your secretary who the client was?

 5     A.  Yes.

 6     Q.  And here who would that be?

 7     A.  Here it was probably -- you could check my time sheets,

 8     if you have them, or the bills.  I would have either billed

 9     it to the DNC or HFA or both.

10     Q.  Okay.  And you would note an amount of time?

11     A.  Yeah.  Yes, yes, yes.

12     Q.  And then do you delineate any further within the

13     particular client what subject or matter you're working on?

14     A.  So, yeah, really good question.  So some clients you

15     have a lot of matters for.  Some clients you have one matter

16     for.

17               The Clinton Campaign, because it was a flat fee,

18     most of the matters were collapsed -- most of the time, I

19     should say, not "matters."  Most of the time simply went

20     into Matter 1, which is like general or campaign advice or

21     something.

22               There was a separate billing number for research,

23     I believe.

24     Q.  Okay.  So your secretary receives your time.  She puts

25     them into a software.  And then how does the firm then keep

1   track of how they have to bill the client?

2   A.  So the firm then -- people enter their time, and it's

3   obviously entered by a lawyer, so there's -- there was a

4   code at Perkins Coie for me.  I think it was 02667.  And so

5   like every lawyer's got a code.  You enter -- so in my case

6   my assistant would enter the code, the lawyer's name, the

7   client, the client matter, and then the description.

8          That then gets collated by I believe the billing

9   department at Perkins.  I think that's what it's called.  It

10  might be called something different, but I thought of it

11  that way.

12         They collated it, and then they would -- then,

13  like at the end of the month or a few days after the end of

14  the month, they would generate what was called a pro forma,

15  I believe was the terminology.  At some point they changed

16  to pre-bill, or they were pre-bills and they changed to pro

17  forma.  But they generated essentially a printout of all of

18  the time entries on behalf of all the lawyers, and then that

19  was then sent to the bill-reviewing lawyer.

20  Q.  Okay.  So the bill-reviewing lawyer receives all the

21  entries, and the pro forma is essentially an internal

22  accounting.  Is that --

23  A.  It is, yes.

24  Q.  Okay.  And then -- I apologize for all the detail, but

25  we just want the jury to understand.

1    A.  That's all right.

2    Q.  What happens, then, when the billing department prepares

3    these pro forma internal bills?

4    A.  So the pro formas then -- and I can really only speak

5    for myself and a little bit about the political law group.

6    So it's possible other practice groups had different

7    practices.

8         But in our practice, they would then get

9    distributed to whoever was going to review the bill, review

10   the pro forma, edit it, and then given instructions about

11   any changes.

12        Oftentimes you remove time if it's extraneous; or

13   you might remove an expense, if it's wrongly billed; or you

14   might transfer time that's billed to the wrong matter or

15   client.  And then that -- those instructions go back to the

16   billing department, and then they, then, generated an

17   invoice, and the invoice then went to the client.

18   Q.  Okay.  And the person who reviews the internal bill, the

19   pro forma, is that the partner responsible for the matter?

20   A.  So it depends.  You know, if I -- you know, I was

21   responsible for -- you know, I probably had a hundred or

22   more pro formas a month, and they fell in kind of three

23   categories.  Like for some of them I was nominally -- I was

24   the client service lawyer, but I didn't really have anything

25   to do or didn't know what the -- what the -- what the --

1    what was actually going on.

2            So imagine I bring in a PAC, and they have a

3    trademark problem.  Like, I don't know anything about

4    trademark law.  So I'd probably hand it to a trademark

5    lawyer.  I would still get the pro forma, but I would have

6    no basis to review it so I would send it to that other

7    person.  So that's one bucket.

8            The second are clients where I knew that, you

9    know, I had the most visibility and knowledge.

10           And then the third were flat-fee clients.  And we

11   had a number of flat-fee clients.  It wasn't just the

12   Clinton Campaign and DNC.  And those would oftentimes get

13   divvied out to other lawyers who had enough visibility to

14   be able to review them at the level they needed to be since

15   the -- it was going to be the same amount charged either

16   way.

17   Q.  Okay.  And for the Clinton Campaign and the DNC, were

18   you the point of contact for the pro formas and the bills?

19   A.  They definitely would -- in the beginning went to me for

20   review.  I don't remember whether at the -- you know, when

21   we got into the thick of the campaign -- you know, the

22   general election -- whether I was still reviewing them or

23   not.

24   Q.  Okay.

25   A.  If you show them to me, I can tell you based on

1    handwriting.

2    Q.  Okay.  So, Mr. Elias, did you and I prepare in any way

3    for your testimony today?  Did we meet?

4    A.  Very briefly.

5    Q.  Okay.  And when we met very briefly, did I give you a

6    binder --

7    A.  You did.

8    Q.  So let me just --

9          MR. DeFILIPPIS:  May I approach, Your Honor?

10         THE COURT:  You may.

11   Q.  Okay.  Mr. Elias, if you would just take a quick look

12   at the binder that I've put on the stand there.  And does

13   that appear to contain exhibits marked 553 and also -- are

14   there -- I'm sorry.

15   A.  There are others.

16   Q.  There are others.  I just want to make sure to enter the

17   right ones.

18   A.  552, 553.

19   Q.  So the two there --

20   A.  So 552 --

21   Q.  Yes.  552, 553.

22   A.  -- 553, 562, 563.

23         THE COURT:  All right.  We're off the record

24   briefly.

25         (Discussion off the record)

```
1              THE COURT:  We're back on the record.

2              MR. DeFILIPPIS:  Sorry, Your Honor.

3    BY MR. DeFILIPPIS:

4    Q.  Looking at Exhibits 552, 553, 562, and 563, do they

5    appear to be -- what do they appear to be?

6    A.  So 552 and 553 are the pro formas that I was describing.

7              562 and 563 are actually client invoices.  So

8    these are the finished -- this is what went to the -- I'm

9    sorry.  For the record, 562 and 563 is what actually goes to

10   the client.

11   Q.  Okay.  And these were prepared by Perkins Coie?

12   A.  They were.

13             MR. DeFILIPPIS:  Your Honor, the government offers

14   Government Exhibits 552, 553, 562, and 563.

15             MR. BERKOWITZ:  No objection.

16             THE COURT:  Okay.  The Government Exhibits 552,

17   553, 562, and 563 are admitted.

18   Q.  Mr. Elias, I want to just return briefly to the meeting

19   invite that we had looked at, which was Government Exhibit

20   307.

21   A.  Can I put these away or keep these?

22   Q.  You can just --

23             THE COURT:  Leave them aside.

24   Q.  -- leave them there for now.

25   A.  Okay.
```

1   Q.  This was the meeting invite for a meeting on July 29,

2   2016; is that right?

3   A.  That's what it appears to be, yes.

4   Q.  And it was for about an hour and a half?

5   A.  That was for a half hour.

6   Q.  Okay.

7   A.  I mean, I'm reading the same --

8   Q.  Yes, sorry, for a half hour, okay.

9          Now, is that the type of meeting that you and the

10  other lawyers would typically bill time for?

11  A.  I don't know what happened at this particular meeting,

12  so I couldn't -- I couldn't tell you, but it would not be

13  atypical to bill time for a meeting.

14  Q.  Okay.  Let me show you Government Exhibit 553.1, which

15  will show up on your screen.

16          Now, this is just a one-page exhibit, Mr. Elias --

17  A.  Am I -- oh, looking on the screen.

18  Q.  The screen, yes.

19  A.  Sorry.

20  Q.  This is just a one-page exhibit, but what does it appear

21  to be?

22  A.  This is a time entry from a pro forma, it looks like.

23  Q.  And the --

24  A.  Do you want me to read the whole --

25  Q.  No, no, that's okay.

1          MR. DeFILIPPIS:  Your Honor, the government offers

2    Government Exhibit 553.1.

3          MR. BERKOWITZ:  No objection.

4          THE COURT:  So moved.

5    Q.  Now, you mentioned earlier that a pro forma is sort of

6    the internal bill that's prepared within Perkins Coie.

7    A.  Correct.

8    Q.  Now, looking at this pro forma, first we've excerpted a

9    section here.  And do you see several columns?

10   A.  I do, yes.

11   Q.  So starting with the left, can you just explain to the

12   jury what each column includes.

13   A.  So I don't actually know what the time entry column is.

14   I assume it's some internal tracking system, but I don't

15   know.

16          The date is the date that the time took place on,

17   so it's the day that the event you were billing for

18   occurred.

19   Q.  So here, what's the date?

20   A.  7/29/16.

21   Q.  Okay.

22   A.  The timekeeper name is the name of the person whose time

23   is going to be charged or is being -- was tracked for

24   billing.

25          The hours are the number of hours.  Again, the 0.3

1    is on a 10-point scale.  So 0.3 would be 12 minutes, one

2    second, to 18 minutes, for example.  So that's the hours.

3          And then the fees are how much the time is times

4    that lawyer's or timekeeper's billing rate.  So 5.3 times

5    whatever Mr. Sussmann's billing rate was will equal

6    $4,425.50.

7          The section that says "Redacted" is where the

8    narrative goes.  It's essentially where the description is

9    of what you were doing.

10         And then the "Circle Action," "WD" is write down;

11   "HD" is hold; and "TR" is transfer.

12         I think I mentioned sometimes time is incorrectly

13   billed, so you can do three things.  You can write it down,

14   which is just like we're not going to charge anyone for

15   this.  You can hold it and say, you know what, let's wait

16   until next month to see whether we're going to bill this.

17   Or you can transfer; you can say, okay, it wasn't correctly

18   billed to this client, but it could have been billed to that

19   client, so you would circle "Transfer."

20   Q.  Okay.  And "WD," write down, you said that means

21   basically don't charge?

22   A.  Yes, it means don't charge it.

23   Q.  So on this pro forma bill, then, the timekeeper is

24   Mr. Sussmann, and the total hours is 5.3.

25   A.  Yes.

1    Q.  Is it your understanding that if you have multiple

2    meetings or events for a particular client on a day, would

3    you lump them all together there?

4    A.  It depends on the billing practice of the lawyer.

5    Q.  Okay.  So if you look at the parts that are not

6    redacted, it says "Meeting with M. Elias, others," and then

7    there's some redactions, and "Confidential Project."

8         So would you understand that the unredacted

9    portions are a part of those 5.3 hours --

10   A.  Yes.

11   Q.  -- you just don't know how much?

12   A.  Yes, correct.

13   Q.  All right.  And let's go to the top of the document and

14   the header area.  There's a client and matter there.

15        So what does it mean that this is at the top of

16   the document?

17   A.  So the client is -- 116514 was the billing number for

18   Hillary For America.  Again, its legal name was HFACC, Inc.

19        The matter was Matter 1, which is why you have the

20   0.0001 after the "Matter."  And the name of the matter was

21   "General political advice."

22   Q.  Okay.  Now, those designations, how, again, do those get

23   reflected?  Does that come when you inform your secretary or

24   enter it into the software?

25   A.  That's my understanding, is -- yes, that basically in

1    the software you enter -- if I gave her time that said, you

2    know, 0.5 Clinton, you know, meet with Andrew, she would go

3    into the software, and rather than type in "Clinton," she'd

4    find that number, and that would prepopulate or allow them

5    to then track all of those things on the computer end into

6    one pro forma.

7    Q.  And is it the expectation of the firm, in your

8    experience, that lawyers are supposed to bill to whoever

9    they're doing the work for?

10   A.  Well, I mean, you'd have to ask the firm what their

11   expectations were.  I mean, there are certainly instances in

12   which you bill time to someone who is -- I'll give you a --

13   I'll give you an example.

14        You might -- you might represent -- and this is --

15   again, all I know is my world.  I might represent a party

16   committee, and the party, they say, you know what, help out

17   this campaign, you know.  Just do them a favor.  You know,

18   do us a favor.  You can bill us for it, but, you know, help

19   this campaign solve this problem.  In fact, the campaign

20   finance laws are set up to allow that.

21        So that would be an instance where you -- where I

22   would bill the time to a party committee, but not -- but it

23   would be for -- it would be for the benefit of the campaign.

24   Q.  Okay.

25   A.  I'm just trying to be -- I'm just trying to be, like,

1    precise.

2    Q.  Understood.  Understood.  But whoever you bill is going

3    to pay for the work?

4    A.  Correct.

5    Q.  All right.

6              MR. DeFILIPPIS:  Now, if we could just show the

7    full header of the document.

8    Q.  And then you see the other entries on the right side

9    there, "Pro Forma Number."  Any sense what that refers to?

10   A.  Again, I think that that's an internal tracking thing,

11   because sometimes, if I had not returned my pro formas,

12   you'd get these reminder emails, and they would say, "You

13   have not returned," and there would be a number.  And I'd

14   ask my assistant, "Can you find this?"  So I think this is

15   some way they track those pro formas that are outstanding.

16              The date is that date -- as I have always

17   understood it, the date is the date it was printed or it

18   was, like, generated.  I don't know if it was physically

19   printed.  There's some way that the system, like, generates

20   the pro forma, and, like, that date is that date.

21   Q.  Okay.  And then the bill reviewer?

22   A.  Bill reviewer, I described.  That's who the pro forma is

23   sent to.

24   Q.  Got it.  So does looking at these documents and

25   recognizing that you don't know what Mr. Sussmann did or

1    didn't do, but based on what you know about billing, does it

2    look like Mr. Sussmann billed a meeting with you on the 29th

3    to the Clinton Campaign?

4    A.  Yes.

5    Q.  Okay.  Let's look now at Government Exhibit 319, which

6    will come up on your screen.

7            Do you see a calendar invitation there?

8    A.  I do.

9            MR. DeFILIPPIS:  Your Honor, the government offers

10   Government Exhibit 319.

11           MR. BERKOWITZ:  No objection.

12           THE COURT:  So moved.

13   Q.  Mr. Elias, was it -- so this comes from Leigh Nichols.

14   I think you testified before you're not quite sure who that

15   is?

16   A.  I'm really not.

17   Q.  It's to Mr. Sussmann, right?

18   A.  It is.

19   Q.  And you're not actually a listed recipient of the

20   invite; is that correct?

21   A.  Correct.

22   Q.  What's the subject line?

23   A.  "Meeting with Rodney."

24   Q.  And the date and time?

25   A.  I'm sorry, August 12, 2016, at 7:30 a.m. to 9:00 a.m.

1    Q.  Okay.  Was it common or uncommon for you to have

2    meetings that early?

3    A.  Not common.

4    Q.  Okay.  And it looks like the location of this meeting is

5    what?

6    A.  If I had this meeting?

7    Q.  Yes, yes.

8    A.  I don't typically have 7:30 a.m. meetings.

9    Q.  Okay.  So this would be an unusual one?

10   A.  If I was -- if I was there.

11   Q.  Okay.  And the location?

12   A.  It says, "Elias' office."

13   Q.  Okay.  Any specific recollection of this meeting?

14   A.  No.

15   Q.  Do you know who "Rodney" is?

16   A.  I'm going to assume it's Rodney Joffe.

17   Q.  Okay.

18   A.  But that's contextual.

19   Q.  Got it.

20          So if we move now to Government Exhibit 316, which

21   is on your screen, does this look to be an email from you --

22   sorry -- from Mr. Sussmann to someone named Glenn Simpson

23   and Peter Fritsch?

24   A.  Yes.

25   Q.  Okay.  And you're copied?

```
 1    A.  Yes.
 2              MR. DeFILIPPIS:  Your Honor, the government offers
 3    Government Exhibit 316.
 4              MR. BERKOWITZ:  No objection.
 5              THE COURT:  So moved.
 6    Q.  So Mr. Elias, is it -- the last invitation we looked at
 7    was August 11th at 5:20 --
 8    A.  Yes.
 9    Q.  -- p.m.
10              Does it look like this one is a couple of hours
11    later?
12    A.  Yes.
13    Q.  Okay.  And that's on the same date, August 11th?
14    A.  Yes.
15    Q.  Okay.  So it looks like a couple of hours after the
16    scheduled meeting with Rodney.
17              This is from Mr. Sussmann to Mr. Fritsch and
18    Mr. Simpson.  Those are the Fusion GPS individuals you
19    mentioned before, at least one of them?
20    A.  They are.
21    Q.  And then what is the subject line of the email?
22    A.  "Connecting you all by email."
23    Q.  Now, Mr. Elias, does this jog any recollections in terms
24    of why you or someone might have been connecting these folks
25    by email?
```

1     A.  My best assumption is it's because I wasn't going to be

2     at the meeting.

3     Q.  Okay.

4     A.  That's an assumption.

5     Q.  So there was a meeting that was coming up after this

6     email?

7     A.  I'm looking at those two things back to back.

8     Q.  Yes.

9     A.  I get -- there's an invite that comes in.  I believe

10    that the 11th was a Thursday, which was the days I was in

11    New York until, like, really late.  So I am supposing here,

12    not recalling, that I get this invite, and then I am, like,

13    connecting you all by email so you guys can meet at 7:30 in

14    the morning.

15    Q.  Okay.

16    A.  But I don't have a specific recollection.

17    Q.  Okay.  Any specific recollection as to why you would be

18    connecting Mr. Sussmann to Fusion GPS for a meeting?

19    Anything?

20    A.  I don't recall.  I literally don't recall this, which is

21    why I said I was supposing.

22    Q.  Okay.  Any reason why shortly after a meeting with

23    Mr. Joffe you would be connecting Mr. Sussmann to a meeting

24    with Fusion GPS?  Anything on that?

25              MR. BERKOWITZ:  Objection; foundation.

1          THE COURT:  Overruled.

2     A.  I'm sorry, can you --

3     Q.  Yes.  Any recollection as to why, shortly after a

4     scheduled meeting with Rodney, you would be connecting

5     Mr. Sussmann to individuals at Fusion GPS?  Any sense there?

6     A.  Yes.

7     Q.  Okay.  And what is that sense?

8     A.  It is probably privileged for me to say.

9     Q.  Okay.  Let me ask you this.  Did there come a time --

10    without getting into any privileged matters, did there come

11    a time in the summer of 2016 when you learned about a

12    supposed secret channel of communications between the Trump

13    organization and Alfa-Bank?

14    A.  Like a secret server connection?

15    Q.  Yes.

16    A.  Yes.

17    Q.  Okay.  And would that have been around this time --

18    Earlier?  Later? -- when you learned about that?

19    A.  My recollection is it was sometime around this time.

20    Q.  Okay.

21    A.  In the August time frame, but I couldn't say what day.

22    Q.  Got it.  And without getting into anything that may be

23    the subject of legal advice, anything you can tell us about

24    how you learned about it?

25    A.  From Mr. Sussmann.

```
1    Q.  Okay.  Let's go to what's been premarked as Government

2    Exhibit 317.

3              Is this another email in which -- of the same

4    subject line, "Connecting you all by email"?

5    A.  Yes.

6              MR. DeFILIPPIS:  Your Honor, the government offers

7    Government Exhibit 317.

8              MR. BERKOWITZ:  No objection.

9              THE COURT:  So moved.

10   Q.  And, Mr. Elias, I'm going to assume that this similar

11   email jogs no further recollections?

12   A.  None.

13   Q.  Okay.  If we go back to Government Exhibit 319, that was

14   the meeting in your office with Rodney.  Do you recall that?

15   A.  I don't recall this --

16   Q.  I'm sorry, you recall the invite, not the meeting.

17   A.  Yes.  I recall the invite.  I do not recall the meeting.

18   Q.  Okay.  I just want to clarify.  It looks like it was

19   sent on August 11th, but the meeting was scheduled for

20   August 12th.  Does that seem right?

21   A.  Yes.

22   Q.  So August 12th at 7:30 a.m.?

23   A.  Yes.  It looks like I got a calendar invite while I was

24   in New York at 5:20 p.m. asking me to be at a meeting the

25   next morning at 7:30 a.m.
```

1    Q.  Got it.  And you have no recollection of whether the

2    meeting happened?

3    A.  I don't.

4    Q.  Okay.  So let's now look at Government Exhibit 553.3.

5            What are we looking at here?

6    A.  I'll leave out the control numbers.

7    Q.  Yes, sure.  I mean generally.

8    A.  Oh, I'm sorry.  I apologize.

9            This is a -- this is a time entry by -- from

10   Mr. Sussmann on a pro forma dated 10/25/16, and the time

11   entry is for August 12th.

12           MR. DeFILIPPIS:  Okay.  Your Honor, the government

13   offers Government Exhibit 553.3.

14           MR. BERKOWITZ:  No objection.

15           THE COURT:  So moved.

16   Q.  Now, the prior -- the calendar invite we looked at was

17   dated August 12th.  This appears to be the -- the time entry

18   listed here appears to be for the same date; is that right?

19   A.  It does, yes.

20   Q.  And who is the time keeper, the attorney?

21   A.  Mr. Sussmann.

22   Q.  And what's the amount of time?

23   A.  One and a half hours or 1.5.

24   Q.  Okay.  And then the fees charged, at least according to

25   this on the internal bill?

1    A.   $1,252.50.

2    Q.   And then what is the description listed by Mr. Sussmann?

3    A.   "Confidential meetings with M. Elias and others."  I'm

4    sorry, let me retry that.

5              "Confidential meetings with M. Elias, others."

6    Q.   Okay.  Does looking at that time entry jog any memories

7    about a meeting?

8    A.   It doesn't.

9    Q.   Okay.  And let's go to the top, to the client and matter

10   listed here.  Who are the client, and what is the matter?

11   Who is the client, and what is the matter?

12   A.   The client is the Clinton Campaign, and the matter is

13   that general political advice matter that was the flat fee.

14   Q.   And you did, I think, mention that earlier, but what

15   sorts of work fell under general political advice?

16   A.   So I think you saw it in the engagement letter actually.

17   Q.   Okay.

18   A.   It was basically all of our counseling work for the

19   campaign.

20   Q.   Understood.

21   A.   But it's in that first paragraph.

22   Q.   Okay.  Because you mentioned him earlier, Mr. Rodney

23   Joffe, to what extent do you recall him being connected to

24   the Alfa-Bank allegations, as far as you knew from your

25   interactions?  And putting aside anything privileged.

1    A.  My understanding was that he was the person who found --

2    discovered whatever the secret connection was.

3    Q.  Understood.

4         And did you -- is your best recollection that you

5    communicated with Mr. Joffe about that?

6    A.  My recollection is that I -- I I met him in person at

7    some point.  I remember he had, like, an accent that was,

8    like, either -- I don't think he was British.  I think it's,

9    like, one of those accents that I can't tell apart from

10   being British; so it was, like, a South African, Australian,

11   New Zealand, kind of that thing.  And I met him because I

12   remember that.

13        And then my recollection is otherwise I remember

14   talking to him on the phone.

15   Q.  Okay.  And would those -- during this time period, would

16   that have been about these allegations, the Alfa-Bank

17   allegations?

18   A.  Yes.

19        THE COURT:  Okay.  Mr. DeFilippis, how much longer

20   do you have?

21        MR. DeFILIPPIS:  Your Honor, I think we've got a

22   bit longer.  If now is a good time for a break -- I think we

23   have a lot.

24        THE COURT:  Okay.  Why don't we take our lunch

25   break, ladies and gentlemen.  It's about 12:35.  Why don't

```
1    we reconvene at -- be ready to go at 1:45, so about an hour

2    and ten minutes for lunch, okay?

3              Again, no discussions about the case.  No research

4    about the case.

5              And I'm sorry.  Juror No. 8, if you could stay

6    back, please.  Thanks.

7              (Jury exits courtroom)

8              THE COURT:  Okay.  Mr. Elias, you can step down.

9    Please don't discuss your testimony over the lunch break,

10   okay?

11             THE WITNESS:  Thank you very much.

12             THE COURT:  All right.  Be seated.

13             Okay, sir, would you mind coming up and taking the

14   stand, please.  How are you feeling?

15             JUROR NO. 8:  Good.

16             THE COURT:  Take your mask off.

17             Just for the record, you sent a text to the

18   courtroom deputy last night that we've now printed out and

19   have been able to review.  I understand you're supposed to

20   start a new job on Monday; is that correct?

21             JUROR NO. 8:  Yes, that's correct.

22             THE COURT:  Speak into the mic.  And what is that

23   job?

24             JUROR NO. 8:  It is a maintenance technician.

25             THE COURT:  A maintenance tech?
```

```
1                    JUROR NO. 8:  Yes.

2                    THE COURT:  And that's at an apartment building?

3                    JUROR NO. 8:  Yes, correct.

4                    THE COURT:  Okay.  And when you filled out your

5      questionnaire and when you were questioned, I don't remember

6      you told us anything about a new job; is that right?

7                    JUROR NO. 8:  No, I -- yes, that is correct.

8                    THE COURT:  And why didn't you tell us about that?

9                    JUROR NO. 8:  I was completely nervous, and I

10     didn't -- I forgot to tell.

11                   THE COURT:  Okay.  You forgot.

12                   Now, have you told your new employer that you're

13     on this jury?

14                   JUROR NO. 8:  Yes.  Yes, I did.

15                   THE COURT:  And who at your -- not the name of the

16     person.

17                   JUROR NO. 8:  Well, I called my manager.

18                   THE COURT:  So the person who is going to be your

19     manager?

20                   JUROR NO. 8:  Yes.

21                   THE COURT:  And what did they tell you?

22                   JUROR NO. 8:  They said it's fine to attend the

23     jury.

24                   THE COURT:  Okay.

25                   JUROR NO. 8:  That's it.
```

1          THE COURT:  All right.  And you mentioned that

2     there is some training that you're going to start on Monday?

3          JUROR NO. 8:  Yes, correct.

4          THE COURT:  Okay.  And can you -- is the manager

5     willing to postpone your training until you start?

6          JUROR NO. 8:  That I do not know because I am the

7     only staff there working for them, so I don't know if they

8     can reschedule.

9          THE COURT:  Okay.  Now, in addition to this new

10    job, you mentioned that it might be distracting for you to

11    stay on the jury because of the new job.  Is that -- tell me

12    more.  Why would it be distracting?

13         JUROR NO. 8:  Well, I'm going to be new to the

14    field, so I'll be learning like HVAC, plumbing, and

15    electrician.

16         THE COURT:  Okay.  But if your employer tells you

17    that you can wait a week or two and get your training then,

18    would that be less distracting?  Would you be okay with

19    that?

20         JUROR NO. 8:  Yes.

21         THE COURT:  Okay.  Now, in your questionnaire -- I

22    went back to your questionnaire, and I believe you told us

23    that you worked for -- and I want you to relax.  We're just

24    having a conversation here, okay?  I know you're nervous,

25    but that's natural.  We just need to figure out how to deal

```
1    with the situation, okay?

2              JUROR NO. 8:  Okay.

3              THE COURT:  You said that you were working for

4    something called Jamal Ellesworth or a person named Jamal

5    Ellesworth; is that correct?

6              JUROR NO. 8:  Yes.  Yes, correct.

7              THE COURT:  And it says here in your text that you

8    were employed by Swiss Post Solutions.  Is that the same

9    thing as Mr. Ellesworth or...?

10             JUROR NO. 8:  That's the company.

11             THE COURT:  Okay.  And Mr. Ellesworth is with the

12   company?

13             JUROR NO. 8:  Yes.  Yes, correct.

14             THE COURT:  All right.

15             All right.  Why don't you -- you can go to lunch,

16   and we'll discuss with the lawyers how we're going to go

17   forward, okay?

18             JUROR NO. 8:  All right.

19             THE COURT:  Okay.  Have a good lunch.

20             (Juror exits courtroom)

21             THE COURT:  Any thoughts?

22             MR. DeFILIPPIS:  Your Honor, it sounds like he

23   could do it.  It sounds like he's not happy to do it.  I

24   don't know that we have a particularly strong view.

25             MR. BERKOWITZ:  This may be one of the few things
```

1    that Mr. DeFilippis and I agree upon in this case, Judge.

2              THE COURT:  All right.

3              MR. BERKOWITZ:  And I hate to bump it to you.

4    You've got more experience, obviously, with these.  We'd be

5    accommodating either way.

6              THE COURT:  Yes.  I think he's nervous, but this

7    is not a conflict that we can't avoid.  I think we can

8    satisfy him, and if it requires a letter from the Court --

9    it sounds like the company is accommodating, but I think

10   he's just a little skittish.

11             So I think we'll keep him unless he tells us

12   otherwise.  All right?

13             MR. BERKOWITZ:  I think that's fine.  And I

14   certainly have seen Courts reach out to employers in other

15   instances and have that be effective.

16             THE COURT:  We're going to have him reach out

17   first; and if Court intervention is necessary, I'm happy to

18   do that.

19             MR. BERKOWITZ:  Thank you, Your Honor.

20             THE COURT:  All right.

21             (Lunch recess taken at 12:42 p.m.)

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 18th day of May, 2022.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                              Official Court Reporter
11                              United States Courthouse
                              Room 6718
12                              333 Constitution Avenue, NW
                              Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,252.50** [1] - 670:1
**$130,000** [3] - 627:16, 627:17, 627:22
**$4,425.50** [1] - 659:6

**'**

**'16** [1] - 571:17
**'Consultant'** [1] - 632:12
**'Parties'** [1] - 632:14

**/**

**/s/Lisa** [1] - 677:10

**0**

**0.0001** [1] - 660:20
**0.3** [2] - 658:25, 659:1
**0.5** [1] - 661:2
**02667** [1] - 652:4

**1**

**1** [8] - 586:8, 587:17, 589:19, 594:6, 628:5, 632:7, 651:20, 660:19
**1.5** [1] - 669:23
**10-point** [1] - 659:1
**10/25/16** [1] - 669:10
**10020** [1] - 536:19
**101.6** [1] - 643:5
**10:40** [1] - 601:9
**116514** [1] - 660:17
**11:00** [1] - 601:10
**11:15** [1] - 587:1
**11:50** [1] - 588:7
**11th** [4] - 665:7, 665:13, 666:10, 668:19
**12** [5] - 553:20, 610:1, 610:2, 659:1, 663:25
**1271** [1] - 536:19
**12:35** [1] - 671:25
**12:42** [1] - 676:21
**12th** [4] - 668:20, 668:22, 669:11, 669:17
**145** [1] - 536:14
**17** [1] - 590:18
**17th** [1] - 555:4
**18** [2] - 536:4, 659:2
**18th** [1] - 677:8
**1:21-cr-00582-CRC-1**
  [1] - 536:4
**1:45** [1] - 672:1
**1st** [1] - 625:16

**2**

**2** [3] - 589:17, 589:18, 589:19
**2,000** [1] - 627:24
**20001** [2] - 536:23, 677:13
**20002** [1] - 536:15
**2007** [1] - 602:23
**2008** [1] - 622:11
**2012** [1] - 622:11
**2014** [1] - 622:12
**2015** [8] - 571:5, 572:16, 603:6, 603:14, 604:2, 621:24, 622:12, 625:16
**2016** [46] - 540:4, 541:4, 541:13, 545:4, 545:5, 547:18, 550:20, 550:24, 553:20, 557:16, 558:23, 565:4, 570:17, 572:2, 572:4, 572:16, 572:20, 573:5, 575:1, 575:9, 575:17, 580:22, 585:12, 588:2, 589:13, 590:18, 592:12, 593:7, 594:6, 595:6, 596:18, 597:12, 602:2, 608:18, 621:10, 624:9, 626:6, 626:14, 631:7, 632:7, 634:17, 641:5, 657:2, 663:25, 667:11
**2017** [1] - 573:24
**202** [1] - 536:24
**2022** [2] - 536:4, 677:8
**21-582** [1] - 538:3
**212** [2] - 536:15, 536:20
**29** [2] - 585:12, 657:1
**29th** [2] - 587:2, 663:2
**2:48** [1] - 594:6

**3**

**3** [2] - 595:6, 627:14
**30** [3] - 588:2, 601:7, 647:6
**30,000** [1] - 645:22
**301** [2] - 624:17, 625:5
**302** [3] - 560:17, 631:23, 632:20
**304** [2] - 550:6, 550:13

**307** [3] - 646:7, 646:14, 656:20
**30th** [1] - 587:3
**31** [4] - 557:16, 565:4, 589:13, 608:18
**316** [2] - 664:20, 665:3
**317** [2] - 668:2, 668:7
**319** [3] - 663:5, 663:10, 668:13
**31st** [3] - 557:3, 566:7, 596:18
**320** [3] - 552:10, 553:10, 553:16
**326** [2] - 554:17, 554:24
**333** [2] - 536:23, 677:12
**344** [2] - 584:13, 584:21
**354-3187** [1] - 536:24
**3:15** [1] - 587:2
**3:33** [1] - 595:6

**4**

**4** [1] - 599:16
**495** [2] - 556:24, 557:5, 564:10
**4:04** [1] - 590:18
**4:30** [2] - 647:6, 649:3

**5**

**5** [3] - 592:12, 593:7, 597:12
**5.3** [3] - 659:4, 659:24, 660:9
**54** [1] - 608:18
**543** [1] - 537:4
**552** [7] - 655:18, 655:20, 655:21, 656:4, 656:6, 656:14, 656:16
**553** [8] - 655:13, 655:18, 655:21, 655:22, 656:4, 656:6, 656:14, 656:17
**553.1** [2] - 657:14, 658:2
**553.3** [2] - 669:4, 669:13
**558** [1] - 537:4
**562** [6] - 655:22, 656:4, 656:7, 656:9, 656:14, 656:17
**563** [6] - 655:22, 656:4, 656:7, 656:9, 656:14, 656:17
**568** [1] - 537:5

**570** [1] - 537:6
**5:00** [1] - 649:3
**5:20** [2] - 665:7, 668:24
**5:23** [1] - 597:12

**6**

**6** [1] - 550:20
**601** [1] - 537:7
**602** [2] - 586:17, 586:21
**603** [2] - 587:18, 587:24
**604** [3] - 588:12, 588:15, 588:16
**605** [2] - 589:5, 589:9
**611** [1] - 537:7
**612** [3] - 597:1, 597:8, 599:15
**620** [1] - 537:9
**631** [2] - 592:25, 593:4
**634** [2] - 592:4, 592:8
**635** [2] - 593:14, 593:18
**637-2231** [1] - 536:15
**648** [2] - 590:10, 590:14
**6718** [2] - 536:22, 677:12
**677** [2] - 593:24, 594:3
**680** [2] - 594:23, 595:2
**6:33** [1] - 593:7

**7**

**7/29/16** [1] - 658:20
**7/29/2016** [1] - 647:4
**7:30** [5] - 663:25, 664:8, 666:13, 668:22, 668:25

**8**

**8** [22] - 672:5, 672:15, 672:21, 672:24, 673:1, 673:3, 673:7, 673:9, 673:14, 673:17, 673:20, 673:22, 673:25, 674:3, 674:6, 674:13, 674:20, 675:2, 675:6, 675:10, 675:13, 675:18

**9**

**9.1.16.doc.x** [1] - 591:8
**906-1200** [1] - 536:20

**9:00** [1] - 663:25
**9:11** [1] - 536:5
**9:12** [1] - 589:13

**A**

**a.m** [8] - 536:5, 587:2, 588:7, 663:25, 664:8, 668:22, 668:25
**ability** [1] - 677:7
**able** [6] - 614:8, 618:4, 637:11, 654:14, 672:19
**absolutely** [2] - 611:13, 646:5
**accent** [1] - 671:7
**accents** [1] - 671:9
**access** [1] - 612:10
**accommodate** [1] - 539:2
**accommodating** [2] - 676:5, 676:9
**according** [1] - 669:24
**account** [1] - 649:18
**accounting** [1] - 652:22
**accuracy** [1] - 633:11
**accurate** [3] - 603:25, 611:12, 677:5
**accurately** [1] - 608:8
**acknowledged** [1] - 541:17
**acronym** [1] - 598:19
**act** [1] - 637:11
**acting** [1] - 544:12
**Action** [2] - 536:3, 659:10
**activities** [1] - 540:16
**actual** [1] - 628:21
**ad** [1] - 568:21
**addition** [2] - 591:16, 674:9
**additional** [1] - 643:20
**address** [5] - 584:17, 595:19, 595:21, 625:2, 625:9
**addressed** [1] - 646:19
**admit** [4] - 550:13, 553:15, 554:23, 557:4
**admitted** [2] - 588:16, 656:17
**ads** [1] - 639:19
**advance** [2] - 544:9, 645:10
**advertised** [1] - 644:4
**advertising** [1] - 615:6
**advice** [10] - 544:22,

623:16, 633:9,
635:2, 636:9,
651:20, 660:21,
667:23, 670:13,
670:15
**advise** [1] - 543:9
**advisor** [3] - 558:1,
558:2, 640:6
**affairs** [1] - 626:2
**affiliated** [2] - 545:22,
614:13
**affiliation** [6] - 614:23,
614:24, 615:2,
617:20, 619:5, 619:8
**affinity** [1] - 637:16
**affirmatively** [1] -
620:2
**afraid** [6] - 580:16,
585:10, 588:10,
589:22, 593:21,
599:21
**African** [1] - 671:10
**afternoon** [2] - 539:7,
539:11
**ago** [8] - 558:19,
558:25, 559:2,
577:6, 581:13,
634:16, 641:24,
642:23
**agree** [1] - 676:1
**agreed** [1] - 606:23
**agreeing** [1] - 607:2
**AGREEMENT** [1] -
632:7
**agreement** [11] -
624:14, 629:17,
630:1, 631:14,
632:4, 633:19,
633:20, 633:23,
634:4, 634:6, 634:13
**alert** [1] - 598:25
**Alfa** [52] - 540:4,
540:12, 540:18,
555:13, 555:14,
557:10, 557:12,
564:21, 565:1,
565:11, 566:10,
575:22, 577:15,
577:24, 578:16,
579:22, 580:19,
580:19, 581:19,
583:3, 586:10,
586:14, 588:22,
591:12, 592:16,
592:17, 592:21,
593:9, 593:11,
594:19, 596:11,
598:23, 599:22,
599:25, 600:6,
600:18, 600:24,

604:12, 604:16,
605:2, 605:4, 605:9,
606:12, 610:15,
610:20, 611:1,
613:14, 613:15,
617:19, 667:13,
670:24, 671:16
**Alfa-bank** [45] - 540:4,
540:18, 555:13,
555:14, 557:10,
564:21, 565:1,
565:11, 566:10,
575:22, 577:15,
577:24, 578:16,
579:22, 580:11,
580:19, 581:19,
583:3, 586:10,
591:12, 592:17,
592:21, 594:19,
596:11, 598:23,
599:22, 599:25,
600:6, 600:18,
600:24, 604:12,
604:16, 605:2,
605:4, 605:9,
606:12, 610:15,
610:20, 611:1,
613:14, 613:15,
617:19, 667:13,
670:24, 671:16
**Alfa-Bank-related** [1] -
586:14
**Algor** [4] - 538:7,
542:21, 543:10,
543:24
**ALGOR** [18] - 536:13,
543:11, 543:22,
550:12, 552:9,
552:15, 553:7,
553:15, 554:16,
554:23, 555:6,
556:23, 557:4,
557:19, 558:7,
567:25, 568:2, 569:6
**Algor**)......................
...........[2] - 537:4,
537:5
**all.html** [1] - 598:5
**allegation** [1] - 583:15
**allegations** [34] -
540:4, 557:11,
564:21, 565:1,
565:14, 565:20,
565:24, 566:2,
566:9, 575:21,
577:23, 578:15,
578:17, 580:2,
580:18, 581:18,
581:20, 586:11,
586:14, 594:18,

596:15, 598:22,
605:5, 606:23,
607:2, 608:6,
609:13, 609:23,
609:24, 610:17,
610:18, 670:24,
671:16, 671:17
**alleged** [3] - 542:2,
542:8, 583:22
**Allison** [1] - 570:8
**ALLISON** [1] - 571:6
**allow** [3] - 619:16,
661:4, 661:20
**Alpha** [2] - 591:7,
598:19
**Alpha-Bank** [1] -
598:19
**ambiguity** [1] - 541:23
**AMERICA** [1] - 536:3
**America** [9] - 538:4,
559:9, 621:21,
622:11, 623:4,
625:1, 626:1,
632:10, 660:18
**Americas** [1] - 536:19
**amount** [4] - 627:12,
651:10, 654:15,
669:22
**amounts** [1] - 627:15
**analysis** [1] - 595:17
**analyst** [4] - 572:21,
574:2, 594:10, 603:9
**analysts** [2] - 574:1,
595:14, 595:22
**analyzed** [1] - 571:9
**analyzing** [1] - 578:15
**ANDREW** [1] - 536:12
**Andrew** [2] - 538:5,
661:2
**animating** [1] - 643:20
**announced** [1] - 622:1
**anonymous** [1] -
598:21
**answer** [3] - 545:15,
619:11, 637:25
**answered** [4] - 545:16,
606:16, 618:17,
619:9
**answers** [1] - 625:14
**anti** [2] - 572:15, 604:4
**anti-Trump** [1] - 604:4
**apart** [1] - 671:9
**apartment** [1] - 673:2
**apologize** [5] - 613:17,
623:22, 632:20,
652:24, 669:8
**apologizing** [1] -
631:19
**apparent** [1] - 540:11
**appear** [10] - 584:14,

587:20, 588:17,
589:5, 590:10,
598:2, 655:13,
656:5, 657:20
**APPEARANCES** [1] -
536:11
**appeared** [1] - 641:19
**appointment** [1] -
550:8
**appreciate** [2] -
539:22, 611:14
**approach** [2] - 552:15,
617:19, 655:9
**appropriately** [1] -
595:15
**approval** [1] - 555:17
**approved** [1] - 641:4
**apps** [1] - 649:24
**April** [7] - 621:24,
622:2, 625:16,
627:16, 632:7,
634:4, 634:6
**area** [2] - 622:20,
660:14
**areas** [6] - 546:5,
546:6, 547:3, 552:6,
568:11, 578:22
**arise** [1] - 616:11
**arrangement** [1] -
627:1
**Arsenault** [2] - 538:7,
591:19
**article** [16] - 557:12,
557:16, 564:16,
564:20, 565:1,
581:25, 582:11,
582:12, 582:24,
596:14, 596:15,
600:17, 608:19,
609:3, 615:16,
615:18
**articles** [3] - 596:10,
596:13, 596:17
**aside** [3] - 647:13,
656:23, 670:25
**aspect** [1] - 578:7
**aspects** [3] - 608:6,
630:3, 638:3
**assistant** [7] - 641:8,
641:14, 646:10,
647:10, 650:3,
652:6, 662:14
**associate** [2] - 602:20,
621:8
**associated** [6] -
545:19, 605:4,
605:9, 617:19,
622:13, 637:15
**associates** [2] - 572:9,
641:17

**associations** [1] -
572:10
**assume** [11] - 560:3,
569:5, 588:5,
640:25, 641:8,
641:14, 647:10,
651:1, 658:14,
664:16, 668:10
**assumption** [4] -
564:5, 592:19,
666:1, 666:4
**attach** [1] - 546:14
**attached** [1] - 592:1
**attachment** [9] -
587:8, 587:9, 589:1,
591:22, 597:16,
597:19, 598:16,
616:22
**attachments** [6] -
587:13, 591:6,
591:10, 597:22,
597:23
**attempt** [1] - 578:18
**attend** [6] - 575:11,
580:4, 608:2,
635:16, 636:1,
673:22
**attended** [2] - 575:2,
581:10
**attendee** [1] - 647:11
**attendees** [1] - 647:7
**attentive** [2] - 643:19,
647:24
**attorney** [11] - 540:16,
573:18, 574:22,
587:13, 616:5,
616:8, 616:11,
616:16, 616:19,
643:4, 669:20
**attorney's** [1] - 616:7
**attorney-client** [4] -
616:5, 616:8,
616:16, 643:4
**attorney-related** [1] -
587:13
**attorneys** [3] - 546:2,
577:11, 616:15
**attribution** [1] - 614:7
**atypical** [1] - 657:13
**audience** [2] - 578:20,
583:19
**August** [19] - 553:20,
555:4, 575:9,
575:17, 585:12,
587:2, 587:3, 588:2,
589:13, 602:4,
663:25, 665:7,
665:13, 667:21,
668:19, 668:20,
668:22, 669:11,

669:17
**Australian** [1] - 671:10
**authentic** [1] - 583:22
**authority** [1] - 567:15
**authorize** [1] - 567:14
**authorized** [1] -
567:18
**avail** [1] - 633:5
**available** [4] - 539:10,
603:18, 633:7,
641:18
**Avenue** [3] - 536:19,
536:23, 677:12
**average** [1] - 549:5
**avoid** [1] - 676:7
**awake** [1] - 587:5
**aware** [44] - 548:21,
549:7, 549:12,
555:8, 555:12,
555:14, 555:25,
556:22, 557:12,
558:4, 562:6, 562:7,
562:8, 562:9,
562:11, 562:13,
562:18, 563:4,
564:14, 567:4,
577:22, 578:1,
578:2, 583:12,
583:20, 600:4,
600:7, 612:23,
613:6, 613:7, 613:8,
640:24, 641:1,
641:2, 641:9,
641:13, 641:24,
642:1, 642:4,
642:10, 642:16,
644:12, 644:14
**awareness** [2] - 558:5,
613:9

### B

**background** [2] -
602:16, 614:4
**Baker** [1] - 541:22
**Bank** [49] - 540:4,
540:13, 540:18,
555:13, 555:14,
557:10, 557:13,
564:21, 565:1,
565:11, 566:10,
575:22, 577:15,
577:24, 578:16,
579:22, 580:11,
580:19, 581:19,
583:3, 586:10,
586:14, 588:23,
591:12, 592:17,
592:21, 594:19,
596:11, 598:19,
598:23, 599:22,

599:25, 600:6,
600:18, 604:12,
604:16, 605:2,
605:4, 605:9,
606:12, 610:15,
610:20, 611:1,
613:14, 613:15,
617:19, 667:13,
670:24, 671:16
**bank** [4] - 565:15,
600:24, 605:9, 611:6
**banks** [1] - 565:21
**based** [9] - 541:1,
546:18, 585:13,
596:2, 598:1,
605:14, 613:8,
654:25, 663:1
**basis** [4] - 546:13,
554:1, 564:7, 654:6
**bean** [1] - 632:8
**became** [6] - 540:13,
577:22, 578:1,
578:2, 647:19, 650:4
**BEFORE** [1] - 536:10
**begin** [1] - 629:15
**beginning** [5] - 551:4,
572:19, 628:12,
648:2, 654:19
**behalf** [12] - 538:11,
549:8, 555:9, 556:1,
556:4, 578:11,
621:20, 622:3,
641:3, 646:9,
646:18, 652:18
**behind** [1] - 616:24
**bench** [2] - 617:8,
620:9
**benefit** [5] - 581:5,
623:20, 627:8,
649:14, 661:23
**BERKOWITZ** [30] -
536:16, 538:9,
539:22, 539:25,
584:22, 584:24,
585:17, 597:9,
601:7, 601:20,
608:21, 611:14,
611:16, 618:13,
619:19, 619:23,
625:7, 632:21,
646:15, 656:15,
658:3, 663:11,
665:4, 666:25,
668:8, 669:14,
675:25, 676:3,
676:13, 676:19
**Berkowitz** [14] -
538:10, 573:3,
581:3, 581:11,
594:8, 594:9,

594:11, 601:4,
601:18, 601:25,
604:18, 604:20,
618:12, 619:11
**Berkowitz)**..................
.............. [1] - 537:7
**best** [22] - 539:12,
546:23, 575:3,
575:6, 575:20,
580:20, 586:1,
586:3, 594:17,
595:21, 602:4,
606:1, 608:4, 609:4,
610:7, 611:12,
635:17, 641:23,
642:22, 666:1,
671:4, 677:6
**Beth** [1] - 639:12
**better** [4] - 559:18,
559:19, 599:17,
644:7
**between** [24] - 542:6,
565:14, 566:10,
570:23, 573:11,
575:21, 576:10,
576:22, 577:15,
577:23, 578:16,
580:19, 581:18,
594:19, 605:8,
606:11, 610:2,
616:10, 621:18,
626:13, 632:4,
632:8, 635:8, 667:12
**beyond** [6] - 577:14,
583:17, 583:24,
583:25, 641:20,
642:16
**big** [4] - 591:13,
591:15, 637:4, 637:5
**Bill** [1] - 662:22
**bill** [21] - 649:15,
650:4, 650:5, 652:1,
652:16, 652:19,
652:20, 653:9,
653:18, 657:10,
657:13, 658:6,
659:16, 659:23,
661:8, 661:12,
661:18, 661:22,
662:2, 662:21,
669:25
**bill-reviewing** [2] -
652:19, 652:20
**billed** [9] - 627:7,
650:9, 651:8,
653:13, 653:14,
659:13, 659:18,
663:2
**billing** [13] - 628:24,
650:6, 651:22,

652:8, 653:2,
653:16, 658:17,
658:24, 659:4,
659:5, 660:4,
660:17, 663:1
**bills** [6] - 629:3, 629:4,
651:8, 652:16,
653:3, 654:18
**binder** [2] - 655:6,
655:12
**bit** [10] - 559:16,
559:22, 562:5,
597:21, 602:16,
623:12, 623:20,
628:2, 653:5, 671:22
**boss** [2] - 595:16,
639:4, 639:6
**boss's** [1] - 639:6
**bosses** [1] - 600:20
**Bosworth** [1] - 538:10
**BOSWORTH** [10] -
536:17, 550:14,
553:17, 554:25,
557:6, 558:8,
558:11, 558:14,
564:12, 567:24
**Bosworth)**..................
.............. [1] - 537:4
**bottom** [1] - 647:12
**bought** [1] - 571:3
**breach** [1] - 636:23
**break** [5] - 601:5,
601:9, 671:22,
671:25, 672:9
**Brennan** [2] - 602:21,
603:3
**brief** [3] - 567:25,
640:21, 646:4
**briefing** [1] - 582:9
**briefly** [7] - 590:19,
591:20, 596:15,
655:4, 655:5,
655:24, 656:18
**bring** [4] - 565:20,
566:17, 631:8, 654:2
**bringing** [5] - 553:3,
560:10, 565:24,
566:2, 609:23
**British** [2] - 671:8,
671:10
**BRITTAIN** [1] - 536:13
**Brittain** [1] - 538:7
**broad** [2] - 636:25,
637:1
**broader** [4] - 542:7,
590:5, 600:24,
613:18
**broadly** [4] - 574:14,
617:21, 618:11,
644:18

**Brooklyn** [6] - 546:19,
546:21, 636:2,
636:5, 636:7, 648:6
**brought** [1] - 560:4
**bucket** [3] - 637:7,
637:13, 654:7
**buckets** [1] - 636:21
**build** [1] - 558:11
**building** [3] - 619:18,
645:12, 673:2
**bull** [1] - 646:9
**Bull** [1] - 646:18
**bullet** [1] - 554:4
**bump** [1] - 676:3
**bunch** [1] - 561:24
**Bureau** [1] - 541:3
**business** [7] - 560:1,
572:10, 576:7,
613:24, 625:1,
632:10, 643:7
**businesses** [3] -
560:9, 572:8, 613:25
**buster** [1] - 645:13
**busy** [2] - 574:10,
635:7
**BY** [11] - 543:22,
553:7, 558:14,
568:2, 570:3,
571:16, 585:4,
601:20, 611:18,
620:23, 656:3

### C

**C-A-T-A-N** [1] - 591:4
**calendar** [17] - 550:18,
553:13, 554:9,
565:7, 635:7,
641:17, 641:20,
646:8, 646:18,
646:19, 646:24,
647:18, 647:19,
648:10, 663:7,
668:23, 669:16
**camp** [1] - 581:25
**Camp** [1] - 609:7
**campaign** [124] -
540:16, 540:17,
540:20, 545:2,
545:3, 545:8,
545:11, 545:12,
545:15, 545:17,
545:25, 546:9,
546:11, 546:17,
547:2, 547:4,
547:17, 547:22,
547:24, 548:14,
548:21, 549:2,
549:4, 549:7, 549:9,
550:24, 556:1,

556:4, 557:20, 561:3, 561:7, 561:10, 561:17, 561:21, 561:23, 562:8, 563:1, 563:3, 563:6, 563:10, 563:14, 563:19, 566:16, 568:24, 621:18, 621:21, 622:1, 622:4, 622:10, 622:11, 622:14, 622:17, 622:20, 622:21, 622:24, 623:1, 623:9, 623:10, 623:11, 623:13, 623:14, 623:17, 623:25, 624:3, 624:4, 624:7, 624:8, 624:13, 624:24, 625:16, 625:21, 626:13, 627:2, 628:5, 628:13, 628:18, 628:23, 629:4, 629:22, 630:3, 630:9, 630:10, 630:13, 630:14, 631:2, 634:8, 636:5, 637:24, 638:2, 638:6, 638:8, 638:14, 638:20, 638:22, 638:23, 639:1, 639:2, 639:3, 639:4, 639:5, 639:9, 639:11, 640:5, 640:14, 640:15, 640:20, 641:21, 642:3, 642:25, 643:10, 643:14, 643:23, 644:2, 644:12, 644:23, 644:24, 645:17, 651:20, 654:21, 661:17, 661:19, 661:23, 670:19
**Campaign** [20] - 555:9, 558:21, 559:8, 559:12, 559:13, 622:7, 623:6, 624:23, 629:8, 633:13, 637:15, 642:12, 642:15, 647:21, 647:23, 651:17, 654:12, 654:17, 663:3, 670:12
**campaign's** [2] - 548:13, 558:1
**Campaign's** [1] - 555:17

**campaigns** [4] - 621:15, 622:6, 622:22, 643:17
**candidate** [4] - 547:8, 626:6, 636:19, 640:11
**candidates** [2] - 621:15, 626:10
**candle** [1] - 619:16
**cannot** [1] - 577:15
**capabilities** [1] - 583:17
**capability** [1] - 583:25
**care** [1] - 549:22
**careful** [2] - 575:17, 578:12
**carefully** [1] - 617:13
**cascading** [1] - 598:11
**case** [16] - 539:18, 555:22, 567:8, 567:11, 572:21, 574:2, 575:14, 586:6, 591:17, 601:11, 601:12, 616:1, 652:5, 672:3, 672:4, 676:1
**Case** [1] - 538:3
**cases** [4] - 560:5, 591:16, 595:15, 616:15
**casino** [1] - 645:15
**Catan** [5] - 570:25, 571:19, 591:1, 591:3, 595:7
**Categories** [2] - 647:13
**categories** [3] - 636:21, 636:25, 653:23
**category** [1] - 648:8
**CATHERINE** [1] - 536:17
**Catherine** [1] - 538:10
**caused** [1] - 605:15
**causes** [1] - 621:15
**Center** [1] - 602:21
**Centergate.com** [1] - 585:9
**centerpiece** [1] - 637:3
**certain** [10] - 598:7, 600:8, 600:10, 602:13, 606:18, 615:4, 615:5, 615:9, 616:17, 616:21
**certainly** [8] - 571:12, 582:12, 612:19, 615:6, 618:15, 630:2, 661:11, 676:14

**CERTIFICATE** [1] - 677:1
**certify** [1] - 677:4
**CFO** [2] - 639:12, 639:16
**chain** [2] - 588:17, 589:4
**chair** [2] - 563:7, 639:5
**chaired** [1] - 621:13
**challenges** [1] - 635:5
**chance** [1] - 619:24
**changed** [3] - 572:17, 652:15, 652:16
**changes** [1] - 653:11
**channel** [2] - 577:23, 667:12
**charge** [4] - 567:11, 659:14, 659:21, 659:22
**charged** [3] - 654:15, 658:23, 669:24
**check** [8] - 542:15, 550:18, 552:1, 553:22, 555:3, 635:8, 635:10, 651:7
**Check** [1] - 550:22
**check-in** [3] - 552:1, 553:22, 555:3
**check-ins** [3] - 550:18, 635:8, 635:10
**Cheng** [1] - 639:8
**Chicago** [1] - 602:22
**chief** [2] - 639:15, 639:17
**CHRISTOPHER** [1] - 536:10
**chronology** [1] - 540:2
**Circle** [2] - 572:1, 659:10
**circle** [2] - 644:18, 659:19
**circumstance** [1] - 574:23
**circumstances** [1] - 645:14
**cited** [4] - 541:14, 541:19, 581:24, 581:25
**claims** [6] - 578:19, 583:17, 583:19, 583:23, 584:3, 607:3
**clarify** [2] - 552:19, 668:18
**clear** [7] - 540:24, 562:7, 567:10, 576:24, 607:4, 607:12, 616:10
**cleared** [1] - 596:21, 596:23
**client** [60] - 540:17,

540:22, 544:22, 549:22, 573:5, 573:10, 573:12, 573:13, 573:16, 573:17, 573:22, 574:3, 574:12, 575:5, 590:6, 605:16, 606:1, 614:13, 614:14, 614:19, 616:5, 616:7, 616:8, 616:11, 616:12, 616:16, 616:20, 627:11, 627:12, 629:7, 629:17, 630:18, 633:14, 642:11, 642:25, 643:4, 644:9, 650:8, 650:22, 650:23, 650:24, 651:4, 651:13, 652:1, 652:7, 653:15, 653:17, 653:24, 656:7, 656:10, 659:18, 659:19, 660:2, 660:14, 660:17, 670:9, 670:10, 670:11, 670:12
**Client/Attorney** [3] - 586:8, 587:17, 589:17
**clients** [20] - 564:6, 571:9, 572:13, 572:17, 573:7, 573:16, 614:16, 629:9, 633:10, 633:16, 633:19, 643:6, 647:21, 647:22, 650:2, 651:14, 651:15, 654:8, 654:10, 654:11
**Clinton** [26] - 545:2, 555:9, 555:16, 558:21, 559:8, 559:12, 559:13, 623:6, 624:23, 629:8, 633:13, 640:13, 640:17, 642:11, 642:15, 647:14, 647:21, 647:22, 648:6, 651:17, 654:12, 654:17, 661:2, 661:3, 663:3, 670:12
**closer** [2] - 546:16, 559:16
**closest** [2] - 623:7, 623:11

**co** [1] - 640:8
**co-director** [1] - 640:8
**code** [5] - 647:20, 650:23, 652:4, 652:5, 652:6
**Coie** [38] - 545:21, 573:13, 573:19, 574:14, 574:19, 574:22, 574:25, 578:12, 579:4, 579:6, 579:7, 585:22, 589:25, 590:7, 596:21, 596:23, 600:19, 600:25, 621:9, 621:11, 621:12, 622:21, 626:13, 627:2, 627:3, 628:12, 628:17, 630:12, 630:22, 632:4, 632:13, 635:13, 638:19, 640:23, 644:1, 652:4, 656:11, 658:6
**collapsed** [1] - 651:18
**collated** [2] - 652:8, 652:12
**colleague** [1] - 575:4
**colleagues** [1] - 578:20
**collectively** [1] - 632:14
**color** [2] - 647:20, 648:9
**color-code** [1] - 647:20
**colors** [1] - 598:13
**COLUMBIA** [1] - 536:1
**column** [2] - 658:12, 658:13
**columns** [1] - 658:9
**combination** [2] - 614:3, 622:21
**comfortable** [5] - 543:15, 547:23, 569:20, 577:12, 620:20
**coming** [4] - 565:19, 623:23, 666:5, 672:13
**Commission** [1] - 626:3
**committee** [2] - 661:16, 661:22
**Committee** [2] - 622:7, 633:15
**common** [5] - 626:7, 626:9, 626:11, 664:1, 664:3
**commonly** [1] -

629:21
**comms** [1] - 645:19
**communicate** [14] -
546:12, 549:1,
555:16, 556:1,
579:12, 579:17,
579:20, 583:2,
583:7, 583:10,
583:11, 613:19,
614:16
**communicated** [4] -
546:13, 569:3,
579:10, 671:5
**communicating** [1] -
598:23
**communication** [6] -
580:18, 586:4,
590:2, 594:20,
616:7, 639:21
**Communication** [3] -
586:8, 587:17,
589:17
**communications** [23]
- 547:13, 557:9,
563:20, 565:14,
566:9, 575:21,
577:23, 579:3,
579:18, 579:23,
583:4, 589:24,
600:3, 600:11,
602:10, 610:6,
613:23, 614:11,
614:14, 616:10,
616:20, 639:22,
667:12
**communications-
related** [1] - 563:20
**company** [10] -
548:11, 552:24,
574:4, 604:3, 628:8,
634:2, 675:10,
675:12, 676:9
**complete** [1] - 677:6
**completely** [1] - 673:9
**compliance** [1] - 626:4
**computer** [3] - 581:19,
583:6, 661:5
**computers** [2] - 599:9,
603:11
**conceal** [2] - 540:22,
615:10
**concealed** [1] - 618:16
**concealing** [2] -
617:20, 618:7
**conceived** [1] - 630:2
**concept** [2] - 629:21,
642:5
**conception** [1] - 637:2
**concern** [2] - 643:14,
643:20

**concert** [1] - 542:2
**conditionally** [1] -
539:5
**conditions** [1] - 633:8
**condolences** [1] -
538:13
**conduct** [2] - 540:12,
556:8
**conducted** [6] - 546:2,
547:1, 547:4,
547:14, 547:17,
547:22
**conducting** [1] - 546:3
**conference** [2] -
617:8, 620:9
**Confidential** [1] -
660:7
**confidential** [5] -
616:8, 616:19,
643:1, 670:3, 670:5
**confidentiality** [2] -
643:3, 643:6
**conflict** [1] - 676:7
**confronted** [1] - 646:1
**connected** [1] -
670:23
**connecting** [6] -
665:22, 665:24,
666:13, 666:18,
666:23, 667:4
**Connecting** [1] - 668:4
**connection** [13] -
542:6, 576:22,
577:14, 579:15,
579:22, 588:22,
594:18, 599:22,
613:13, 621:19,
626:2, 667:14, 671:2
**connections** [4] -
576:21, 578:16,
605:8, 637:14
**consider** [4] - 616:20,
618:3, 618:4, 630:7
**considered** [1] -
617:25
**considering** [2] -
615:1, 619:8
**consistent** [2] -
616:23, 620:5
**constitutes** [1] - 677:4
**Constitution** [2] -
536:23, 677:12
**consultancy** [2] -
570:16, 570:20
**Consultant** [4] -
632:13, 633:6,
633:10
**consultant** [1] -
645:25
**consultants** [4] -

639:20, 642:1,
642:2, 643:18
**consulting** [4] - 630:3,
633:5, 633:7, 643:2
**contact** [10] - 573:9,
573:14, 606:11,
637:17, 637:18,
638:3, 638:16,
638:21, 638:23,
654:18
**contacted** [1] - 622:13
**contacts** [2] - 595:21,
638:25
**contain** [1] - 655:13
**containing** [1] -
598:21
**contents** [1] - 586:9
**contests** [1] - 627:6
**context** [1] - 616:11
**contextual** [1] -
664:18
**contract** [1] - 641:2
**contractor** [2] - 631:1,
637:8
**contractors** [1] - 560:6
**contracts** [2] - 623:18,
641:5
**control** [1] - 669:6
**Convention** [1] -
648:14
**conventions** [1] -
596:2
**conversant** [1] -
599:13
**conversation** [1] -
674:24
**conversations** [6] -
552:6, 575:18,
577:10, 578:9,
618:8, 635:2
**convey** [1] - 608:8
**convince** [1] - 582:15
**COO** [2] - 639:13,
639:14
**COOPER** [1] - 536:10
**copied** [3] - 589:14,
592:13, 664:25
**copy** [2] - 594:7, 595:7
**copying** [1] - 593:1
**Corcoran** [2] - 595:8,
595:11
**corporate** [3] - 623:15,
624:2, 628:14
**corporations** [1] -
625:1
**correct** [67] - 544:23,
545:18, 547:5,
547:14, 547:21,
549:25, 550:24,
553:5, 555:4,

555:10, 555:11,
558:17, 558:18,
558:22, 559:2,
560:2, 560:13,
561:1, 561:4, 561:7,
561:11, 561:19,
561:21, 561:22,
562:3, 562:7,
562:10, 562:18,
562:19, 568:13,
569:4, 581:6, 587:4,
588:12, 602:7,
603:5, 603:19,
604:25, 605:1,
605:6, 605:16,
605:21, 605:23,
606:19, 607:5,
607:10, 607:17,
608:19, 609:9,
612:5, 618:9,
627:23, 627:25,
634:7, 658:7,
660:12, 662:4,
663:20, 663:21,
672:20, 672:21,
673:3, 673:7, 674:3,
675:5, 675:6, 675:13
**correctly** [3] - 618:8,
650:10, 659:17
**corresponded** [1] -
648:8
**counsel** [18] - 538:6,
543:6, 544:13,
544:14, 544:16,
545:16, 545:17,
545:25, 546:10,
622:6, 622:9,
622:11, 622:18,
622:23, 622:24,
625:25, 641:3
**COUNSEL'S** [1] -
536:14
**counseling** [2] -
626:1, 670:18
**counsels** [1] - 545:9
**couple** [7] - 587:9,
602:13, 603:2,
616:5, 622:25,
665:10, 665:15
**course** [2] - 541:3,
575:17
**COURT** [118] - 536:1,
538:8, 538:12,
538:22, 538:25,
539:24, 540:1,
542:16, 542:19,
542:22, 542:25,
543:2, 543:13,
543:19, 550:15,
552:14, 552:16,

552:25, 553:3,
553:6, 553:18,
555:1, 557:7,
558:10, 559:15,
559:19, 569:7,
569:12, 569:15,
569:19, 569:25,
571:10, 571:15,
581:5, 584:23,
585:2, 585:19,
586:22, 587:25,
588:16, 589:10,
590:15, 592:9,
593:5, 593:19,
594:4, 595:3,
597:10, 601:4,
601:8, 601:14,
601:16, 606:15,
608:24, 615:22,
615:25, 616:3,
617:4, 617:7,
617:11, 618:6,
618:12, 618:23,
619:1, 619:3, 620:3,
620:10, 620:13,
620:16, 620:19,
623:19, 623:24,
625:6, 625:8,
632:22, 646:16,
655:10, 655:23,
656:1, 656:16,
656:23, 658:4,
663:12, 665:5,
667:1, 668:9,
669:15, 671:19,
671:24, 672:8,
672:12, 672:16,
672:22, 672:25,
673:2, 673:4, 673:8,
673:11, 673:15,
673:18, 673:21,
673:24, 674:1,
674:4, 674:9,
674:16, 674:21,
675:3, 675:7,
675:11, 675:14,
675:19, 675:21,
676:2, 676:6,
676:16, 676:20,
677:1
**Court** [10] - 536:21,
536:22, 539:2,
539:20, 540:8,
541:24, 620:4,
676:8, 676:17,
677:11
**court** [8] - 538:11,
570:7, 581:5, 591:3,
623:21, 631:19,
637:9, 637:10
**Court's** [2] - 538:13,

619:13
**Courthouse** [2] -
536:22, 677:11
**courtroom** [8] -
538:21, 543:1,
543:17, 569:17,
601:13, 672:7,
672:18, 675:20
**COURTROOM** [3] -
538:2, 542:14,
542:24
**Courts** [1] - 676:14
**coverage** [1] - 567:5
**covered** [2] - 616:19,
629:25
**covering** [1] - 626:13
**COVID** [1] - 552:18
**CR112** [4] - 540:14,
540:23, 541:6, 542:7
**create** [2] - 561:20,
598:7
**credible** [4] - 581:19,
581:21, 583:18,
583:22
**credit** [1] - 645:21
**Criminal** [2] - 536:3,
538:3
**CROSS** [2] - 558:13,
601:19
**cross** [3] - 568:3,
601:6, 611:19
**CROSS-**
**EXAMINATION** [2] -
558:13, 601:19
**cross-examination** [2]
- 568:3, 611:19
**CRR** [3] - 536:21,
677:3, 677:10
**cues** [1] - 539:9
**cups** [1] - 552:17
**current** [2] - 544:19,
544:20
**curve** [1] - 599:11
**cutting** [1] - 631:21
**cyber** [2] - 599:3,
644:23
**cycle** [4] - 604:6,
604:8, 626:6, 626:14

**D**

**D.C** [3] - 571:19,
571:25, 648:7
**d/b/a** [3] - 632:8,
632:11, 632:12
**daily** [7] - 546:15,
546:16, 552:4,
553:22, 555:3,
556:6, 565:6
**Daily** [1] - 550:22

**Dakota** [2] - 637:10,
637:11
**data** [9] - 571:9, 572:9,
582:6, 583:21,
598:2, 599:6, 599:7,
607:2, 607:5
**database** [1] - 623:18
**databases** [1] - 571:14
**date** [28] - 550:19,
553:22, 565:3,
575:8, 585:11,
588:1, 589:11,
590:16, 592:10,
593:6, 594:5, 595:4,
597:11, 631:10,
647:3, 658:16,
658:19, 662:16,
662:17, 662:20,
663:24, 665:13,
669:18
**dated** [2] - 669:10,
669:17
**Dated** [1] - 677:8
**day-to-day** [2] - 546:1,
571:7
**days** [12] - 541:13,
553:24, 554:2,
592:21, 592:23,
621:25, 634:19,
634:21, 648:17,
648:18, 652:13,
666:10
**DC** [3] - 536:15,
536:23, 677:13
**deal** [3] - 575:13,
634:3, 674:25
**dealing** [3] - 598:18,
624:4, 639:2
**dealt** [4] - 573:9,
573:12, 575:15,
644:13
**Debbie** [7] - 542:21,
544:5, 624:6,
635:24, 638:15,
641:24, 642:7
**DEBORAH** [3] - 537:3,
543:20, 544:4
**Deborah** [2] - 543:12,
544:4
**decent** [1] - 539:8
**decision** [1] - 631:6
**defamation** [1] -
633:10
**Defendant** [2] - 536:7,
536:16
**defense** [4] - 538:17,
538:18, 586:20,
597:7
**defense's** [2] - 539:2,
539:21

**DeFilippis** [64] -
536:12, 538:5,
538:6, 538:16,
538:24, 542:20,
569:13, 570:3,
571:16, 584:20,
585:3, 585:4,
585:20, 586:19,
587:23, 588:14,
589:8, 590:13,
591:19, 592:7,
593:3, 593:17,
594:2, 595:1, 597:6,
597:20, 601:2,
606:14, 608:23,
610:2, 611:18,
615:19, 617:2,
617:5, 617:10,
617:12, 618:10,
618:20, 618:22,
619:2, 619:17,
619:21, 619:25,
620:11, 620:23,
625:4, 632:18,
632:24, 633:22,
646:13, 655:9,
656:2, 656:3,
656:13, 658:1,
662:6, 663:9, 665:2,
668:6, 669:12,
671:19, 671:21,
675:22, 676:1
**DeFilippis)**.................
............ [3] - 537:6,
537:7, 537:9
**definitely** [5] - 637:4,
638:6, 648:25,
649:2, 654:19
**definitively** [1] -
617:22
**deliberate** [1] - 562:21
**delineate** [1] - 651:12
**delineated** [1] - 638:4
**democracy** [1] -
544:10
**Democrat** [1] - 614:12
**Democratic** [10] -
572:17, 600:25,
604:9, 621:14,
621:15, 622:5,
622:6, 622:8,
633:15, 648:14
**Democrats** [4] - 573:7,
573:10, 574:8,
576:17
**Dennis** [1] - 639:8
**department** [13] -
630:4, 630:5, 630:8,
630:15, 638:9,
638:11, 638:25,

639:9, 645:1, 652:9,
653:2, 653:16
**departments** [1] -
646:1
**depended** [5] -
575:14, 623:12,
629:6, 645:24
**deposition** [6] - 540:7,
541:20, 555:23,
618:17, 618:18
**DEPUTY** [3] - 538:2,
542:14, 542:24
**deputy** [7] - 543:17,
544:15, 545:9,
545:24, 569:17,
639:11, 672:18
**described** [2] -
648:12, 662:22
**describing** [1] - 656:6
**description** [4] -
650:25, 652:7,
659:8, 670:2
**designated** [1] - 558:6
**designations** [1] -
660:22
**designee** [1] - 641:4
**desires** [2] - 633:5,
633:6
**detail** [1] - 652:24
**determine** [1] - 583:14
**determined** [3] -
583:18, 617:15,
619:22
**determines** [1] -
598:12
**develop** [1] - 561:16
**devote** [1] - 572:24
**different** [9] - 625:14,
637:18, 638:2,
638:3, 646:1,
647:24, 652:10,
653:6
**difficult** [5] - 572:25,
577:9, 592:22,
613:3, 613:23
**dipped** [1] - 592:24
**DIRECT** [3] - 543:21,
570:2, 620:22
**direct** [5] - 556:9,
567:16, 599:16,
613:12
**directed** [1] - 567:21
**directing** [1] - 562:15
**direction** [1] - 555:24,
600:22
**directions** [2] -
555:18, 643:11
**directly** [4] - 569:1,
571:17, 643:17,
650:20

**director** [5] - 595:12,
595:13, 639:8,
640:7, 640:8
**disadvantage** [1] -
644:9
**disclose** [3] - 614:12,
614:19, 614:23
**disclosure** [1] - 630:6
**discovered** [1] - 671:2
**discretion** [3] -
555:15, 555:25,
556:3
**discuss** [6] - 569:9,
575:21, 615:25,
636:11, 672:9,
675:16
**discussed** [3] - 567:7,
576:7, 581:15
**discussing** [2] -
580:18, 594:17
**discussion** [2] -
608:13, 609:23
**Discussion** [1] -
655:25
**discussions** [8] -
566:21, 601:11,
610:7, 610:12,
610:14, 610:16,
614:2, 672:3
**dismissed** [1] - 620:6
**dispute** [1] - 634:24
**disruptive** [1] - 539:18
**disseminate** [2] -
540:20, 600:6
**distracting** [3] -
674:10, 674:12,
674:18
**distributed** [1] - 653:9
**DISTRICT** [3] - 536:1,
536:1, 536:10
**divvied** [1] - 654:13
**DNC** [9] - 623:6,
630:13, 630:18,
634:8, 642:12,
642:15, 651:9,
654:12, 654:17
**DNS** [12] - 582:1,
583:16, 583:24,
584:1, 584:4, 584:5,
599:6, 599:7, 599:8,
599:13, 599:19,
607:5
**document** [21] -
550:16, 553:11,
554:18, 555:2,
557:1, 557:10,
559:11, 560:16,
560:20, 592:1,
598:15, 608:18,
608:22, 609:1,

684

618:5, 620:4,
628:19, 632:1,
660:13, 660:16,
662:7
**documents** [9] -
556:21, 571:8,
572:9, 594:22,
597:24, 598:22,
616:18, 645:20,
662:24
**domain** [4] - 571:13,
599:23, 600:2, 613:2
**domains** [1] - 599:25
**Donald** [7] - 561:6,
572:8, 576:19,
576:20, 644:11,
645:11, 645:21
**done** [3] - 622:10,
644:9, 644:10
**donor** [1] - 574:9
**dossier** [1] - 540:14
**doubt** [4] - 587:7,
633:20, 644:3,
647:10
**down** [15] - 552:9,
554:3, 554:16,
555:7, 557:19,
618:21, 623:20,
626:22, 632:17,
632:23, 633:22,
659:10, 659:13,
659:20, 672:8
**download** [1] - 578:18
**dozen** [2] - 622:25,
628:22
**dozens** [1] - 629:9
**draw** [1] - 644:18
**Dupont** [1] - 572:1
**duration** [2] - 634:9,
647:5
**during** [10] - 549:2,
566:3, 568:3,
570:17, 602:2,
604:6, 634:8,
636:17, 650:12,
671:15
**duty** [1] - 643:6

# E

**E-L-I-A-S** [1] - 621:4
**early** [10] - 551:2,
572:16, 622:12,
623:12, 623:13,
623:25, 624:9,
634:17, 649:7, 664:2
**EDGAR** [1] - 536:13
**edit** [1] - 653:10
**effective** [1] - 676:15
**effort** [6] - 542:3,

542:7, 562:22,
565:20, 582:23,
642:24
**efforts** [3] - 556:16,
600:4, 600:5
**eight** [2] - 571:23,
623:3
**either** [9] - 539:24,
552:23, 640:14,
645:19, 648:15,
651:8, 654:15,
671:8, 676:5
**election** [19] - 546:7,
572:4, 573:23,
580:23, 604:8,
607:13, 607:15,
607:16, 623:2,
624:12, 626:6,
626:8, 626:13,
634:9, 634:12,
634:15, 634:17,
636:17, 654:22
**Election** [1] - 626:2
**elections** [1] - 611:6
**electrician** [1] - 674:15
**electronically** [1] -
649:24
**element** [1] - 633:12
**Elias** [50] - 545:16,
545:19, 546:12,
549:10, 549:12,
549:16, 549:19,
551:13, 554:14,
556:21, 557:9,
562:9, 562:13,
562:23, 562:25,
563:23, 564:9,
568:8, 569:4,
573:13, 574:18,
575:3, 576:6, 577:4,
585:23, 602:6,
605:12, 609:22,
620:12, 620:24,
621:4, 621:5, 621:6,
621:7, 623:19,
624:16, 633:2,
646:17, 655:2,
655:11, 656:18,
657:16, 660:6,
663:13, 665:6,
665:23, 668:10,
670:3, 670:5, 672:8
**ELIAS** [2] - 537:8,
620:21
**Elias'** [1] - 664:12
**Elias's** [1] - 546:8
**Ellesworth** [4] - 675:4,
675:5, 675:9, 675:11
**email** [71] - 546:7,
550:10, 557:2,

565:3, 584:14,
584:17, 585:5,
585:7, 585:11,
585:15, 586:2,
586:3, 586:7,
586:10, 586:17,
586:23, 587:6,
587:16, 587:20,
588:1, 588:9,
588:12, 588:18,
588:21, 589:1,
589:6, 589:11,
589:14, 589:18,
590:10, 590:17,
591:5, 591:10,
592:1, 592:5,
592:10, 592:18,
592:25, 593:6,
593:14, 593:24,
594:5, 594:14,
594:23, 595:5,
595:7, 595:19,
595:25, 597:2,
597:4, 597:5,
597:11, 598:17,
612:17, 616:21,
617:17, 617:20,
618:9, 619:11,
619:13, 619:19,
650:13, 664:21,
665:21, 665:22,
665:25, 666:6,
666:13, 668:3,
668:4, 668:11
**email.com** [3] -
599:19, 599:24,
600:1
**emailed** [1] - 578:25
**emails** [13] - 577:19,
588:4, 589:20,
590:1, 590:3,
605:23, 610:1,
610:2, 610:4,
617:14, 619:21,
645:22, 662:12
**embarrassed** [1] -
650:18
**emergency** [2] -
538:23
**employed** [1] - 675:8
**employees** [3] -
549:25, 623:4,
628:10
**employer** [2] - 673:12,
674:16
**employers** [2] -
611:11, 676:14
**encourage** [1] -
582:11
**encrypted** [1] - 587:11

**end** [9] - 550:25,
616:1, 620:9,
627:20, 634:14,
634:23, 652:13,
661:5
**ended** [4] - 581:24,
619:4, 634:11,
634:15
**enforcement** [3] -
566:2, 566:21, 610:7
**engaged** [3] - 547:25,
549:24, 621:16
**engagement** [5] -
551:4, 604:16,
624:23, 626:20,
670:16
**enlarge** [1] - 597:20
**enter** [6] - 652:2,
652:5, 652:6,
655:16, 660:24,
661:1
**entered** [6] - 576:8,
632:7, 650:3,
650:20, 651:2, 652:3
**enterprise** [1] - 638:24
**enters** [1] - 543:1
**entirely** [1] - 648:5
**entities** [2] - 560:1,
573:8
**entity** [3] - 600:25,
604:9, 618:16
**entries** [4] - 565:7,
652:18, 652:21,
662:8
**entry** [8] - 646:9,
646:18, 657:22,
658:13, 669:9,
669:11, 669:17,
670:6
**equal** [1] - 659:5
**era** [1] - 635:6
**Eric** [1] - 607:13
**Erik** [1] - 621:3
**ESQ** [7] - 536:12,
536:13, 536:13,
536:16, 536:17,
536:17, 536:18
**essential** [1] - 633:11
**essentially** [6] -
575:24, 628:12,
629:16, 652:17,
652:21, 659:8
**estimate** [1] - 572:24
**evasive** [1] - 616:13
**evening** [1] - 543:3
**event** [1] - 658:17
**events** [1] - 660:2
**eventually** [1] - 650:9
**evidence** [8] - 540:1,
540:10, 540:14,

541:19, 542:10,
604:21, 608:21,
628:20
**exact** [2] - 571:24,
575:8
**exactly** [9] - 547:23,
548:3, 552:1, 561:8,
561:24, 564:23,
580:23, 595:24,
647:9
**examination** [2] -
568:3, 611:19
**EXAMINATION** [7] -
543:21, 558:13,
568:1, 570:2,
601:19, 611:17,
620:22
**examining** [1] - 542:21
**example** [6] - 561:5,
561:23, 563:1,
583:6, 659:2, 661:13
**excerpted** [1] - 658:8
**exchanged** [4] -
577:19, 590:1,
590:3, 605:23
**exchanges** [1] -
588:18
**exchanging** [1] -
579:1
**exclude** [1] - 542:10
**exclusion** [1] - 592:23
**excuse** [3] - 552:11,
597:14, 617:4
**excused** [2] - 569:8,
615:23
**exhibit** [6] - 593:23,
596:25, 597:19,
599:16, 657:16,
657:20
**Exhibit** [55] - 550:6,
550:13, 552:10,
553:10, 553:16,
554:17, 554:24,
556:24, 557:5,
560:17, 564:10,
584:13, 584:21,
586:17, 586:21,
587:18, 588:12,
588:15, 589:5,
589:9, 590:10,
590:14, 592:4,
592:8, 592:25,
593:4, 593:14,
593:18, 593:24,
594:3, 594:23,
595:2, 597:1, 597:8,
599:15, 608:18,
624:17, 625:5,
631:18, 631:23,
632:20, 646:7,

646:14, 656:19,
657:14, 658:2,
663:5, 663:10,
664:20, 665:3,
668:2, 668:7,
668:13, 669:4,
669:13
**exhibits** [2] - 584:25,
655:13
**Exhibits** [3] - 656:4,
656:14, 656:16
**existence** [1] - 589:19
**exits** [3] - 601:13,
672:7, 675:20
**expectation** [1] -
661:7
**expectations** [1] -
661:11
**expense** [1] - 653:13
**experience** [4] - 599:8,
616:6, 661:8, 676:4
**expert** [3] - 599:14,
604:12, 607:4
**expertise** [2] - 633:5,
633:7
**experts** [1] - 609:4
**explain** [6] - 545:10,
546:23, 571:11,
608:6, 647:15,
658:11
**explicitly** [1] - 617:18
**exporting.js** [1] -
598:6
**extend** [1] - 538:13
**extensive** [1] - 590:2
**extent** [22] - 555:15,
576:15, 579:15,
582:10, 583:13,
590:3, 596:16,
596:19, 608:25,
611:23, 612:25,
613:7, 614:11,
629:3, 630:21,
636:3, 636:13,
640:23, 642:24,
643:21, 643:25,
670:23
**extraneous** [1] -
653:12

**F**

**F-O-E-R** [1] - 581:7
**fact** [2] - 608:15,
661:19
**fair** [5] - 547:17,
549:11, 551:3,
556:14, 643:23
**fairly** [5] - 546:13,
551:1, 554:1,

591:22, 615:9
**fall** [5] - 541:16,
572:16, 573:5,
573:23, 580:22
**falls** [1] - 560:6
**false** [4] - 561:6,
561:20, 561:24,
617:23
**familiar** [6] - 598:20,
599:6, 600:1,
607:22, 618:13,
629:22
**family** [4] - 538:23,
543:8, 552:24, 560:1
**far** [9] - 540:17,
548:20, 549:7,
549:11, 572:23,
612:11, 634:1,
642:16, 670:24
**fashion** [1] - 546:1
**fast** [1] - 631:21
**favor** [2] - 661:17,
661:18
**FBI** [27] - 540:24,
541:6, 541:7,
541:11, 541:12,
541:14, 541:15,
541:18, 541:20,
542:2, 542:11,
565:24, 566:17,
566:24, 567:12,
567:14, 567:16,
567:19, 567:22,
609:12, 609:16,
609:19, 609:24,
610:8, 610:17,
613:6, 613:10
**features** [1] - 598:7
**Federal** [1] - 626:2
**fee** [7] - 627:4, 627:9,
629:18, 651:17,
654:10, 654:11,
670:13
**fees** [5] - 626:23,
627:3, 629:15,
659:3, 669:24
**Felch** [2] - 570:25,
591:2
**fell** [3] - 630:22,
653:22, 670:15
**few** [10] - 541:13,
551:6, 576:7,
577:19, 592:23,
621:25, 634:19,
634:21, 652:13,
675:25
**field** [1] - 674:14
**figure** [2] - 584:10,
674:25
**file** [5] - 598:4, 598:8,

598:9, 598:10,
599:18
**files** [3] - 578:18,
598:4, 598:6
**filled** [1] - 673:4
**finally** [2] - 589:4,
594:21
**finance** [2] - 621:18,
639:8, 661:20
**financial** [2] - 630:5,
639:17
**findings** [2] - 579:19,
636:14
**Findings.doc.x** [1] -
591:7
**FINE** [3] - 537:3,
543:20, 544:4
**Fine** [22] - 542:21,
543:12, 543:23,
544:4, 546:22,
550:7, 550:16,
552:19, 553:19,
554:18, 555:2,
555:15, 556:20,
557:20, 558:15,
559:15, 568:3,
569:7, 624:6,
635:24, 638:15
**fine** [6] - 538:24,
570:5, 585:20,
634:25, 673:22,
676:13
**finished** [1] - 656:8
**firm** [28] - 545:21,
548:8, 572:14,
573:19, 574:3,
574:16, 580:8,
604:9, 621:6, 621:9,
622:10, 623:9,
625:25, 626:5,
627:15, 627:21,
629:19, 630:25,
631:3, 641:1, 641:3,
643:2, 650:3,
651:25, 652:2,
661:7, 661:10
**firm's** [1] - 627:8
**firms** [1] - 547:25
**first** [30] - 542:19,
542:20, 545:3,
554:3, 572:7,
572:15, 581:8,
587:9, 623:16,
623:17, 624:1,
625:23, 625:24,
627:5, 628:3,
628:14, 628:16,
631:5, 632:6,
632:25, 633:2,
637:23, 638:19,

648:16, 648:22,
658:8, 670:21,
676:17
**five** [3] - 572:25,
625:13, 625:14
**flat** [8] - 627:4, 627:9,
629:15, 629:18,
651:17, 654:10,
654:11, 670:13
**flat-fee** [2] - 654:10,
654:11
**flexible** [1] - 539:4
**focus** [2] - 568:17,
578:7
**focused** [6] - 547:3,
568:11, 568:18,
592:21, 592:22,
630:20
**foer** [1] - 609:3
**Foer** [30] - 580:1,
580:5, 580:6, 580:7,
582:3, 582:11,
596:1, 596:3, 596:8,
596:14, 596:19,
596:20, 600:5,
600:13, 607:20,
607:22, 608:7,
608:15, 608:19,
609:11, 609:12,
609:15, 610:13,
610:24, 611:7,
612:18, 613:16,
615:12, 615:17
**FOER** [1] - 581:6
**Foer's** [2] - 581:1,
581:25
**folks** [7] - 552:7,
594:19, 622:20,
630:11, 644:11,
644:13, 665:24
**follo** [2] - 596:1, 596:3
**follow** [2] - 577:17,
596:7
**follow-up** [2] - 577:17,
596:7
**followed** [2] - 617:13,
619:7
**following** [2] - 615:13,
617:8
**follows** [1] - 540:9
**fonts** [1] - 598:12
**FOR** [1] - 536:1
**foregoing** [1] - 677:4
**foreign** [1] - 563:15
**forget** [1] - 639:10
**forgot** [3] - 585:24,
673:10, 673:11
**form** [1] - 585:17
**Forma** [1] - 662:9
**forma** [17] - 650:4,

650:9, 652:14,
652:17, 652:21,
653:3, 653:10,
653:19, 654:5,
657:22, 658:5,
658:8, 659:23,
661:6, 662:20,
662:22, 669:10
**formally** [1] - 625:18
**formas** [8] - 628:20,
629:10, 653:4,
653:22, 654:18,
656:6, 662:11,
662:15
**format** [1] - 582:7
**formation** [1] - 571:2
**former** [3] - 570:24,
582:5, 644:5
**forth** [1] - 633:8
**forward** [2] - 593:9,
675:17
**foundation** [3] - 544:9,
585:18, 666:25
**four** [1] - 590:23
**frame** [2] - 621:13,
667:21
**Frank** [2] - 580:1,
581:9
**Franklin** [4] - 581:9,
607:20, 608:19,
609:15
**free** [2] - 556:7, 569:15
**Freid** [1] - 624:10
**frequently** [7] -
575:13, 575:15,
594:11, 594:13,
625:20, 634:3,
640:10
**Friday** [5] - 539:4,
539:6, 539:7, 539:11
**Fritsch** [37] - 551:11,
551:14, 554:15,
568:7, 571:1,
571:20, 575:4,
575:11, 576:6,
580:4, 581:3,
581:11, 585:23,
590:11, 590:17,
590:20, 590:21,
591:1, 592:5,
592:11, 593:1,
593:10, 593:15,
593:25, 594:7,
594:24, 596:23,
597:3, 597:4, 602:7,
604:23, 605:12,
608:2, 609:18,
609:22, 664:23,
665:17
**fruits** [2] - 636:11,

645:5
**full** [3] - 573:1, 662:7, 677:5
**Fusion** [116] - 540:3, 540:11, 540:12, 540:18, 540:20, 541:9, 541:13, 548:7, 548:9, 548:12, 548:15, 548:21, 549:2, 549:8, 549:25, 551:2, 551:15, 552:7, 555:9, 555:12, 555:15, 555:25, 556:3, 556:6, 556:15, 560:13, 562:6, 563:23, 565:7, 568:4, 568:12, 568:18, 568:23, 568:25, 569:4, 570:18, 570:19, 570:23, 570:25, 571:4, 571:6, 571:17, 572:3, 572:24, 574:11, 574:20, 575:4, 575:12, 576:16, 578:7, 579:12, 581:3, 581:4, 581:11, 583:2, 583:5, 583:10, 583:13, 583:20, 584:7, 584:17, 585:22, 590:6, 590:21, 594:10, 595:12, 595:22, 599:2, 600:5, 600:19, 600:20, 602:17, 602:18, 603:10, 603:14, 604:12, 604:15, 606:1, 610:4, 612:12, 613:8, 613:14, 614:9, 614:23, 617:14, 617:20, 618:7, 618:16, 631:4, 631:6, 632:4, 632:12, 633:14, 635:3, 635:13, 635:14, 636:13, 637:19, 637:20, 638:17, 640:24, 641:25, 642:4, 642:10, 642:11, 643:1, 643:22, 644:1, 644:13, 645:5, 646:2, 649:4, 665:18, 666:18, 666:24, 667:5

**Fusion's** [4] - 562:13, 562:22, 564:3, 568:15

# G

**gaming** [1] - 645:15
**Gary** [1] - 639:12
**gather** [1] - 540:13
**gathered** [2] - 571:8, 584:5
**gathering** [1] - 572:9
**gdd** [1] - 598:19
**gdd.zip** [5] - 597:17, 598:17, 598:18, 598:20, 599:18
**General** [1] - 660:21
**general** [38] - 544:13, 544:14, 544:15, 545:9, 545:16, 545:17, 545:24, 546:10, 552:3, 553:25, 575:19, 575:20, 576:12, 576:19, 577:14, 579:19, 596:16, 604:8, 622:6, 622:9, 622:10, 622:18, 622:23, 622:24, 623:2, 625:25, 626:3, 629:7, 630:25, 637:7, 638:21, 641:3, 643:5, 644:7, 651:20, 654:22, 670:13, 670:15
**generally** [18] - 546:2, 547:1, 548:8, 548:20, 550:16, 552:6, 556:22, 562:15, 563:3, 571:6, 572:6, 579:11, 626:9, 627:1, 635:1, 635:6, 636:9, 669:7
**generate** [1] - 652:14
**generated** [4] - 650:4, 652:17, 653:16, 662:18
**generates** [1] - 662:19
**Gensler** [1] - 639:12
**gentleman** [2] - 607:13, 607:20
**gentlemen** [5] - 543:3, 569:22, 601:8, 616:4, 671:25
**given** [7] - 539:14, 541:6, 628:22, 643:7, 647:20, 648:4, 653:10

**Glenn** [16] - 550:3, 551:11, 551:14, 554:14, 571:1, 571:20, 591:1, 592:14, 593:1, 633:24, 634:1, 635:17, 637:21, 637:23, 642:13, 664:22
**government** [32] - 538:6, 539:15, 542:8, 542:9, 543:7, 543:11, 543:24, 584:20, 587:23, 588:14, 589:8, 590:13, 592:7, 593:3, 593:17, 594:2, 595:1, 617:13, 617:15, 618:2, 620:11, 625:4, 632:19, 646:13, 649:17, 656:13, 656:14, 658:1, 663:9, 665:2, 668:6, 669:12
**Government** [52] - 550:5, 550:13, 552:10, 553:10, 553:16, 554:17, 554:24, 556:24, 557:5, 560:17, 564:10, 584:12, 584:21, 586:16, 587:18, 588:11, 588:14, 589:5, 589:9, 590:10, 590:14, 592:4, 592:25, 593:4, 593:13, 593:18, 593:24, 594:3, 595:2, 597:1, 599:15, 608:17, 624:17, 625:5, 631:18, 631:22, 632:19, 646:7, 646:14, 656:16, 656:19, 657:14, 658:2, 663:5, 663:10, 664:20, 665:3, 668:1, 668:7, 668:13, 669:4, 669:13
**Government's** [2] - 594:23, 597:8
**government's** [4] - 539:18, 540:19, 569:13, 586:20
**GPS** [70] - 548:7, 548:9, 548:12, 548:21, 549:2,

549:8, 549:25, 551:2, 551:15, 552:7, 555:9, 555:15, 555:25, 556:6, 556:15, 560:13, 565:8, 568:4, 568:12, 568:23, 568:25, 570:18, 570:19, 570:23, 570:25, 571:4, 571:6, 571:17, 574:11, 574:20, 575:4, 575:12, 578:7, 579:12, 581:11, 583:3, 583:10, 583:13, 583:21, 584:17, 590:6, 590:21, 594:10, 595:12, 595:22, 599:2, 600:6, 600:19, 603:10, 603:14, 614:9, 614:23, 631:4, 631:6, 632:5, 632:12, 635:3, 635:13, 635:15, 636:13, 640:24, 641:25, 643:1, 643:22, 644:1, 644:13, 665:18, 666:18, 666:24, 667:5
**GPS's** [4] - 548:15, 555:13, 556:3, 645:5
**grade** [4] - 580:16, 596:22, 602:13, 614:15
**graduate** [1] - 602:18
**graduated** [1] - 602:22
**grant** [1] - 539:20
**great** [2] - 559:25, 565:5
**group** [3] - 595:23, 641:9, 653:5
**Group** [3] - 591:7, 621:6, 621:7
**groups** [1] - 653:6
**guess** [3] - 580:20, 628:21, 637:20
**guy** [1] - 635:19, 637:22, 642:17
**guys** [1] - 666:13

# H

**hack** [1] - 645:20
**hacked** [1] - 645:22
**hacking** [1] - 546:7
**half** [4] - 657:4, 657:5, 657:8, 669:23

**hand** [4] - 543:17, 569:17, 620:17, 654:4
**handful** [1] - 590:1
**handled** [1] - 626:19
**handling** [1] - 624:7
**handwriting** [1] - 655:1
**hang** [1] - 631:21
**Hannah** [1] - 624:10
**happy** [4] - 569:22, 618:14, 675:23, 676:17
**HARDWICK** [1] - 536:18
**Harris** [1] - 640:8
**hate** [1] - 676:3
**HD** [1] - 659:11
**head** [4] - 639:21, 642:10
**header** [4] - 564:13, 598:17, 660:14, 662:7
**headquarters** [1] - 546:19
**hear** [7] - 559:1, 565:20, 612:15, 612:19, 617:10, 618:20, 619:1
**heard** [3] - 578:3, 605:18, 616:4
**hearing** [1] - 617:9
**hears** [1] - 559:17
**Heather** [1] - 639:10
**heavily** [1] - 572:20
**held** [1] - 643:12
**HELD** [1] - 536:10
**help** [6] - 637:8, 639:1, 645:17, 645:25, 661:16, 661:18
**helpful** [1] - 556:13
**hereby** [1] - 677:3
**herein** [2] - 632:14, 633:8
**herself** [2] - 630:15, 640:11
**HFA** [5] - 546:8, 559:10, 559:11, 651:9
**HFACC** [3] - 624:24, 632:11, 660:18
**hiding** [6] - 614:24, 615:1, 619:5, 619:8
**higher** [2] - 628:3, 628:16
**highly** [1] - 581:19
**highstock.js** [1] - 598:6
**Hillary** [10] - 545:2, 558:21, 559:8,

559:12, 621:20,
623:4, 625:1, 626:1,
632:10, 660:18
**hire** [5] - 544:14,
628:14, 630:24,
631:5, 643:2
**hired** [5] - 604:9,
624:1, 628:14,
630:25, 642:1
**history** [1] - 626:9
**hoc** [1] - 568:21
**hold** [2] - 659:11,
659:15
**home** [1] - 581:1
**honest** [1] - 564:19
**honestly** [1] - 564:22
**Honor** [57] - 538:2,
538:5, 538:9,
538:16, 538:24,
542:20, 543:11,
550:12, 552:15,
553:15, 554:23,
557:4, 558:7,
567:25, 569:6,
569:13, 584:20,
585:20, 586:19,
587:23, 589:8,
590:13, 592:7,
593:3, 593:17,
594:2, 595:1, 597:6,
606:14, 608:23,
617:2, 617:10,
617:17, 618:4,
618:10, 619:2,
619:17, 619:19,
619:22, 619:25,
620:11, 620:15,
625:4, 625:7,
632:20, 646:13,
655:9, 656:2,
656:13, 658:1,
663:9, 665:2, 668:6,
669:12, 671:21,
675:22, 676:19
**Honor's** [3] - 617:14,
618:2, 620:1
**HONORABLE** [1] -
536:10
**hope** [1] - 543:3
**hoped** [2] - 582:12,
600:17
**hopefully** [1] - 636:24
**hosting** [1] - 628:7
**hour** [5] - 581:14,
657:4, 657:5, 657:8,
672:1
**hourly** [1] - 629:11
**hours** [12] - 627:10,
627:21, 627:24,
658:25, 659:2,

659:24, 660:9,
665:10, 665:15,
669:23
**house** [3] - 622:23,
623:3, 628:11
**House** [1] - 639:23
**HR** [2] - 624:4, 628:9
**HTML** [1] - 598:4
**huge** [1] - 624:11
**human** [1] - 544:10
**hundred** [1] - 653:21
**hundreds** [1] - 628:10
**HVAC** [1] - 674:14
**hypothetical** [1] -
645:10
**hypothetically** [1] -
637:9

---

**I**

**idea** [3] - 562:25,
563:22, 629:23
**Identification.Dat** [1] -
587:10
**identified** [1] - 633:10
**identify** [2] - 606:22,
609:3
**identities** [1] - 618:7
**identity** [1] - 642:25
**image** [1] - 598:8
**imagine** [2] - 574:13,
654:2
**impeach** [1] - 619:23
**implied** [1] - 636:14
**important** [3] - 611:1,
639:9, 640:21
**impression** [4] -
576:12, 605:25,
606:4, 618:15
**IN** [1] - 536:1
**in-house** [3] - 622:23,
623:3, 628:11
**in-person** [2] - 635:10,
648:12
**inasmuch** [1] - 576:21
**Inc** [3] - 624:24,
632:11, 660:18
**include** [1] - 643:15
**included** [2] - 616:22,
630:2
**includes** [2] - 625:25,
658:12
**including** [2] - 626:2,
630:4
**inconsistent** [1] -
619:11
**incorrectly** [1] -
659:12
**independent** [4] -
541:8, 588:20,

592:18, 608:13
**Index.html** [1] - 598:9
**indicating** [2] -
541:14, 541:20
**individual** [1] - 625:10
**individually** [1] -
632:14
**individuals** [4] - 551:8,
551:15, 665:18,
667:5
**infer** [1] - 538:20
**inference** [2] - 542:1,
591:25
**inform** [1] - 660:23
**information** [30] -
549:20, 561:16,
561:20, 561:24,
566:17, 578:21,
578:23, 579:1,
582:3, 582:4,
603:21, 603:22,
603:25, 605:4,
606:8, 609:16,
611:10, 611:11,
611:21, 611:23,
611:25, 612:2,
612:4, 612:7,
612:10, 612:13,
614:6, 638:13,
645:16
**informed** [1] - 538:19
**infrequently** [1] -
640:12
**initial** [1] - 637:2
**inquire** [3] - 612:6,
612:9, 612:12
**inquiring** [1] - 612:14
**inside** [1] - 624:4
**instance** [1] - 661:21
**instances** [2] - 661:11,
676:15
**instead** [1] - 629:20
**institute** [1] - 603:3
**Institute** [4] - 544:7,
544:8, 544:11,
544:25
**instruct** [1] - 539:17
**instructed** [1] - 616:9
**instructions** [7] -
555:20, 556:11,
614:18, 614:22,
616:23, 653:10,
653:15
**intended** [1] - 551:25
**interact** [4] - 551:16,
586:13, 625:20,
635:3
**interactions** [6] -
540:3, 548:12,
551:2, 589:24,

635:4, 670:25
**interested** [2] -
622:14, 623:13
**interesting** [2] -
579:20, 646:3
**interfering** [1] - 611:6
**interim** [1] - 544:12
**internal** [8] - 610:4,
652:21, 653:3,
653:18, 658:6,
658:14, 662:10,
669:25
**internally** [1] - 610:16
**Internet** [2] - 571:14,
598:21
**intersected** [1] -
638:17
**intervention** [1] -
676:17
**invented** [1] - 582:1
**investigating** [3] -
582:21, 609:12,
613:6
**investigation** [1] -
609:14
**investigative** [2] -
630:25, 631:1
**investigatory** [2] -
548:10, 569:1
**invitation** [6] - 553:13,
554:9, 646:19,
646:24, 663:7, 665:6
**invite** [11] - 550:18,
648:10, 656:19,
657:1, 663:20,
666:9, 666:12,
668:16, 668:17,
668:23, 669:16
**invited** [2] - 640:18,
647:8
**invoice** [2] - 653:17
**invoices** [1] - 656:7
**involve** [1] - 616:15
**involved** [12] - 552:21,
560:1, 561:10,
571:1, 572:7,
572:12, 572:20,
600:11, 609:16,
610:14, 610:16,
641:10
**involving** [3] - 565:14,
565:21, 637:6
**issue** [18] - 580:12,
583:3, 583:14,
588:23, 591:13,
592:21, 596:11,
599:22, 599:23,
595:25, 600:2,
600:6, 612:8,
612:16, 617:12,

640:22, 644:15,
645:17
**issues** [17] - 563:21,
604:16, 605:2,
606:8, 607:17,
613:19, 613:22,
624:4, 628:9,
636:18, 636:22,
637:6, 637:18,
640:6, 646:1, 646:2
**Italy** [1] - 539:19
**itself** [5] - 598:17,
630:10, 633:5,
641:21, 643:10
**IV** [1] - 536:13

---

**J**

**Jake** [10] - 563:12,
573:3, 581:3,
581:11, 594:8,
604:18, 604:20,
640:7, 644:21,
644:22
**Jamal** [2] - 675:4
**Jason** [2] - 570:25,
591:2
**Javascript** [1] - 598:6
**Jean** [2] - 581:25,
609:7
**Jen** [1] - 639:20
**Jennifer** [1] - 563:17
**job** [9] - 561:2, 562:2,
603:3, 603:8,
672:20, 672:23,
673:6, 674:10,
674:11
**jobs** [1] - 603:2
**Joffe** [38] - 575:5,
576:4, 576:7,
576:11, 576:24,
577:19, 578:25,
579:2, 581:22,
584:15, 585:6,
585:7, 585:22,
586:13, 586:17,
587:21, 588:1,
588:12, 589:6,
589:11, 589:20,
589:24, 602:7,
605:11, 605:15,
605:18, 605:25,
606:4, 606:10,
609:22, 610:3,
611:24, 612:1,
612:7, 664:16,
666:23, 670:23,
671:15
**jog** [4] - 551:23,
589:20, 665:23,
670:6

**jogs** [1] - 668:11
**John** [5] - 563:4,
622:9, 639:5, 639:7,
644:19
**joined** [2] - 624:7,
624:8
**joint** [1] - 602:19
**Jonathan** [2] - 538:7,
543:24
**JONATHAN** [1] -
536:13
**Jones** [1] - 639:13
**Joslyn** [1] - 623:25
**journalist** [5] - 541:22,
580:1, 608:7, 611:7
**journalists** [2] -
600:12, 614:15
**Judge** [1] - 676:1
**judge** [3] - 559:21,
608:21, 618:13
**JUDGE** [1] - 536:10
**jug** [1] - 569:21
**July** [6] - 540:11,
571:5, 575:9,
575:16, 602:4, 657:1
**June** [1] - 550:20
**Juror** [2] - 672:5,
675:20
**JUROR** [21] - 672:15,
672:21, 672:24,
673:1, 673:3, 673:7,
673:9, 673:14,
673:17, 673:20,
673:22, 673:25,
674:3, 674:6,
674:13, 674:20,
675:2, 675:6,
675:10, 675:13,
675:18
**jurors** [1] - 542:12
**Jury** [1] - 672:7
**JURY** [1] - 536:9
**jury** [22] - 538:18,
539:17, 542:4,
542:5, 543:1,
545:10, 552:19,
559:17, 571:11,
601:13, 602:14,
617:9, 623:20,
632:24, 632:25,
639:14, 649:14,
652:25, 658:12,
673:13, 673:23,
674:11
**jury's** [1] - 627:8
**Justice** [1] - 602:21

## K

**Kamala's** [1] - 640:8

**keep** [11] - 559:16,
584:25, 618:21,
638:11, 642:25,
643:11, 644:7,
650:11, 651:25,
656:21, 676:11
**keeper** [1] - 669:20
**Keilty** [2] - 538:14,
543:6
**kept** [3] - 549:18,
562:21, 564:3
**Kerry's** [1] - 622:9
**kind** [14] - 555:24,
561:24, 591:25,
596:20, 602:12,
630:11, 631:13,
636:14, 639:6,
641:16, 645:24,
648:1, 653:22,
671:11
**knowledge** [25] -
562:14, 562:15,
562:22, 562:24,
564:3, 564:25,
566:9, 566:12,
566:16, 566:23,
567:12, 585:8,
606:1, 606:3, 606:7,
609:4, 609:14,
610:7, 611:12,
613:8, 629:12,
629:13, 629:14,
638:9, 654:9
**known** [5] - 559:8,
574:13, 612:21,
642:18, 644:17
**knows** [2] - 539:15,
623:17
**Kori** [1] - 538:7

## L

**labor** [1] - 645:12
**lack** [1] - 538:20
**ladies** [4] - 543:2,
601:8, 616:4, 671:25
**language** [1] - 626:7
**languages** [2] -
599:10, 603:10
**large** [1] - 622:5
**largely** [3] - 568:19,
605:3, 607:2
**Las** [1] - 645:15
**last** [12] - 550:3,
553:12, 577:7,
586:23, 587:1,
626:11, 634:19,
634:21, 639:10,
639:25, 665:6,
672:18

**late** [2] - 622:12,
666:11
**LATHAM** [1] - 536:18
**Laura** [1] - 569:14,
570:8
**LAURA** [3] - 537:6,
570:1, 570:8
**Law** [2] - 621:6, 621:7
**law** [16] - 545:21,
546:7, 566:2,
566:21, 573:19,
574:3, 574:16,
583:19, 610:7,
621:6, 621:9,
621:13, 627:8,
641:9, 653:5, 654:4
**laws** [2] - 633:11,
661:20
**lawsuit** [1] - 553:3
**lawsuits** [2] - 552:20,
560:10
**lawyer** [15] - 543:24,
544:23, 544:24,
561:2, 624:1,
628:15, 629:14,
643:3, 649:14,
652:3, 652:19,
652:20, 653:24,
654:5, 660:4
**lawyer's** [3] - 652:5,
652:6, 659:4
**lawyer/client** [1] -
576:10
**lawyers** [20] - 575:18,
578:10, 622:25,
623:3, 623:8,
623:14, 623:15,
628:13, 628:17,
628:22, 641:9,
649:16, 649:17,
650:19, 652:18,
654:13, 657:10,
661:8, 675:16
**lay** [2] - 578:19, 608:7
**lead** [1] - 561:25
**leaders** [1] - 644:6
**leadership** [2] -
545:10, 640:5
**leading** [1] - 648:15
**leads** [1] - 556:4
**leaking** [1] - 610:17
**leaks** [1] - 644:8
**learn** [5] - 547:2,
548:2, 548:3,
573:22, 612:15
**learned** [5] - 596:10,
650:19, 667:11,
667:18, 667:24
**learning** [3] - 548:24,
599:11, 674:14

**leases** [2] - 623:18,
628:9
**least** [6] - 541:24,
602:2, 606:11,
618:4, 665:19,
669:24
**leave** [3] - 656:23,
656:24, 669:6
**Leaves** [1] - 607:1
**leaves** [1] - 618:9
**left** [3] - 539:4, 542:5,
658:11
**legal** [22] - 546:3,
546:5, 547:13,
558:1, 558:2,
622:20, 623:8,
624:24, 625:25,
626:2, 628:5, 633:9,
633:12, 635:2,
636:8, 640:20,
640:21, 645:1,
645:17, 647:25,
660:18, 667:23
**Leigh** [3] - 646:22,
647:9, 663:13
**lengthy** [1] - 591:22
**Leslie** [2] - 646:9,
646:10
**less** [6] - 583:19,
599:11, 601:7,
626:11, 648:3,
674:18
**letter** [8] - 624:23,
625:3, 625:9,
625:23, 626:21,
626:23, 670:16,
676:8
**letters** [1] - 626:12
**level** [3] - 602:12,
643:19, 654:14
**libel** [1] - 633:11
**license** [1] - 645:15
**Lichtblau** [1] - 607:13
**lie** [2] - 615:7
**life** [1] - 599:9
**light.css** [1] - 598:11
**likely** [2] - 539:15,
558:5
**limit** [1] - 562:22
**limited** [2] - 549:16,
644:7
**line** [27] - 550:9,
550:19, 550:21,
550:22, 551:5,
551:18, 564:14,
586:4, 586:7,
587:16, 588:19,
588:24, 589:16,
592:15, 593:8,
593:11, 594:14,

595:25, 596:5,
596:6, 597:13,
618:2, 625:2, 625:9,
663:22, 665:21,
668:4
**lines** [1] - 554:3
**lining** [1] - 542:25
**Lisa** [1] - 536:21
**LISA** [1] - 677:3
**listed** [7] - 597:19,
598:16, 625:10,
663:19, 669:18,
670:2, 670:10
**lists** [2] - 539:14,
599:18
**Listserv** [1] - 595:23
**literally** [3] - 649:19,
649:21, 666:20
**litigation** [18] - 540:6,
541:2, 546:7,
548:17, 548:22,
552:8, 552:20,
555:21, 556:19,
559:23, 559:25,
560:3, 560:8,
568:19, 621:17,
626:19, 627:6, 637:6
**litigiousness** [1] -
637:1
**LLC** [1] - 632:8
**LLP** [2] - 536:18,
632:13
**local** [1] - 546:7
**location** [3] - 647:1,
664:4, 664:11
**London** [2] - 540:6,
541:1
**look** [25] - 560:18,
578:8, 578:18,
583:21, 586:16,
588:3, 597:14,
597:15, 618:14,
618:23, 625:9,
627:14, 628:20,
631:25, 633:20,
648:2, 648:3, 648:4,
655:11, 660:5,
663:2, 663:5,
664:21, 665:10,
669:4
**looked** [11] - 583:23,
583:24, 584:1,
610:1, 624:25,
630:1, 631:11,
656:19, 665:6,
669:16
**looking** [27] - 564:13,
583:13, 583:17,
589:18, 597:22,
598:1, 605:3,

609:19, 610:18,
611:20, 619:3,
625:2, 625:23,
630:15, 630:16,
636:22, 644:11,
644:15, 646:17,
648:10, 656:4,
657:17, 658:8,
662:24, 666:7,
669:5, 670:6
**looks** [14] - 586:23,
587:2, 597:2,
597:18, 598:4,
598:13, 598:14,
600:1, 634:4,
657:22, 664:4,
665:15, 668:18,
668:23
**lost** [1] - 558:8
**lseago@fusiongps.
com** [1] - 584:18
**lump** [1] - 660:3
**Lunch** [1] - 676:21
**lunch** [5] - 671:24,
672:2, 672:9,
675:15, 675:19

## M

**ma'am** [3] - 543:14,
569:15, 571:10
**mail1.trump** [2] -
599:19, 600:1
**mail1.trump-email.
com** [2] - 599:19,
600:1
**main** [2] - 626:17,
626:18
**maintenance** [2] -
672:24, 672:25
**manage** [1] - 635:2
**managed** [1] - 647:18
**management** [4] -
575:12, 638:13,
641:1, 641:12
**manager** [7] - 563:11,
625:17, 639:3,
639:11, 673:17,
673:19, 674:4
**managing** [3] -
595:18, 628:24,
635:6
**map** [1] - 638:20
**MARC** [3] - 537:8,
620:21, 621:3
**Marc** [15] - 545:16,
549:10, 549:12,
551:13, 554:14,
555:19, 556:11,
557:2, 558:4, 562:9,

562:23, 564:8,
573:13, 620:12,
621:3
**Marc's** [1] - 649:1
**Marc/Michael/Fusion**
[1] - 646:25
**marked** [7] - 550:5,
590:9, 593:13,
594:22, 608:17,
646:6, 655:13
**marketing** [1] - 612:17
**mask** [3] - 543:16,
569:16, 672:16
**Massengale** [1] -
624:1
**material** [1] - 555:22
**materials** [6] - 540:24,
540:25, 541:1,
541:5, 541:23,
556:18
**matter** [40] - 543:8,
557:10, 577:14,
578:8, 579:22,
582:17, 586:10,
588:9, 591:16,
592:24, 598:19,
610:15, 611:5,
611:23, 613:6,
613:7, 613:14,
613:15, 617:19,
618:7, 626:19,
626:20, 627:12,
647:22, 650:24,
651:13, 651:15,
652:7, 653:14,
653:19, 660:14,
660:19, 660:20,
670:9, 670:10,
670:11, 670:12,
670:13
**Matter** [1] - 651:20
**matters** [14] - 548:16,
576:7, 599:3,
599:12, 610:22,
611:8, 616:17,
621:16, 626:4,
650:25, 651:15,
651:18, 651:19,
667:10
**Maya** [1] - 640:7
**mean** [20] - 552:20,
571:12, 582:18,
594:16, 598:1,
614:5, 628:5,
628:19, 634:16,
638:4, 638:7,
638:15, 641:16,
645:9, 649:15,
657:7, 660:15,
661:10, 661:11,

669:7
**meaning** [2] - 567:8,
603:18
**meaningful** [1] -
604:15
**means** [10] - 554:8,
554:9, 554:10,
571:11, 628:6,
628:7, 648:6,
659:20, 659:22
**meant** [2] - 596:3,
621:14
**media** [17] - 556:1,
557:21, 557:23,
579:12, 579:17,
579:23, 600:6,
600:14, 613:13,
613:19, 614:12,
614:20, 614:23,
614:25, 619:5,
639:22, 639:24
**meet** [7] - 580:8,
580:15, 648:22,
649:4, 655:3, 661:2,
666:13
**Meeting** [1] - 660:6
**meeting** [86] - 540:19,
574:25, 575:2,
575:7, 575:10,
575:16, 575:19,
575:24, 576:2,
576:4, 576:15,
577:7, 577:12,
577:13, 577:17,
577:20, 577:22,
578:2, 578:3, 578:6,
579:6, 580:3, 580:5,
580:17, 580:21,
581:12, 582:10,
582:22, 585:14,
585:18, 585:21,
586:2, 596:8, 600:5,
602:6, 602:9,
605:11, 605:14,
605:19, 605:20,
606:5, 606:18,
607:19, 608:5,
609:11, 609:15,
609:19, 609:21,
609:23, 610:13,
610:23, 611:10,
615:12, 615:14,
629:16, 635:11,
641:18, 647:5,
648:24, 651:3,
656:18, 657:1,
657:9, 657:11,
657:13, 663:2,
663:23, 664:4,
664:6, 664:13,

665:16, 666:2,
666:5, 666:18,
666:22, 666:23,
667:4, 668:14,
668:16, 668:17,
668:19, 668:24,
669:2, 670:7
**meetings** [21] -
540:10, 540:14,
579:7, 613:1,
614:15, 635:16,
635:21, 636:1,
636:4, 636:10,
640:18, 642:17,
648:11, 648:12,
648:21, 649:15,
660:2, 664:2, 664:8,
670:3, 670:5
**member** [1] - 552:24
**members** [3] - 549:1,
579:11, 579:12
**memorandum** [1] -
540:13
**memorialized** [3] -
624:13, 626:15,
631:13
**memories** [1] - 670:6
**memory** [6] - 551:23,
552:3, 553:25,
565:19, 590:24,
592:18
**Memos** [1] - 591:5
**mention** [2] - 613:3,
670:14
**mentioned** [27] -
547:3, 549:24,
550:23, 551:6,
552:8, 556:17,
568:11, 574:19,
575:16, 595:7,
595:9, 596:15,
602:12, 604:18,
604:23, 612:24,
613:1, 635:24,
644:10, 644:19,
646:10, 658:5,
659:12, 665:19,
670:22, 674:1,
674:10
**mentioning** [1] -
612:22
**message.asc** [1] -
587:11
**met** [23] - 543:23,
558:17, 574:21,
574:23, 574:25,
576:24, 577:2,
577:4, 580:1,
589:25, 596:19,
596:20, 601:23,

602:1, 607:23,
610:20, 610:21,
610:22, 649:6,
655:5, 671:6, 671:11
**metadata** [2] - 599:17,
599:18
**mic** [2] - 559:16,
672:22
**Michael** [8] - 538:4,
538:10, 565:18,
566:12, 602:1,
641:6, 646:21,
647:10
**MICHAEL** [2] - 536:6,
536:17
**mid** [1] - 590:11
**mid-October** [1] -
590:11
**middle** [3] - 587:3,
621:3, 624:9
**midmorning** [1] -
649:7
**might** [26] - 539:6,
539:11, 562:17,
571:13, 575:23,
589:21, 592:23,
616:18, 637:11,
638:8, 638:10,
638:12, 641:9,
641:17, 642:17,
643:19, 645:23,
649:10, 652:10,
653:13, 653:14,
661:14, 661:15,
665:24, 674:10
**mind** [5] - 588:22,
634:23, 637:23,
641:12, 672:13
**minus** [1] - 621:25
**minutes** [7] - 601:7,
647:6, 649:18,
650:12, 659:1,
659:2, 672:2
**mischaracterize** [1] -
645:8
**mistaken** [1] - 541:16
**misunderstood** [1] -
613:11
**mix** [1] - 622:22
**moment** [2] - 558:19,
624:18
**Monday** [2] - 672:20,
674:2
**money** [1] - 626:24
**month** [9] - 592:24,
627:16, 627:17,
629:11, 629:19,
652:13, 652:14,
653:22, 659:16
**monthly** [2] - 627:4,

627:9
**months** [7] - 541:4,
551:3, 592:21,
627:22, 628:3,
628:16, 628:22
**Mook** [7] - 539:10,
563:8, 625:10,
625:13, 625:16,
639:3
**Mook's** [1] - 539:1
**MOREIRA** [1] - 677:3
**Moreira** [2] - 536:21,
677:10
**MORNING** [1] - 536:6
**morning** [28] - 538:5,
538:8, 538:9,
538:12, 539:6,
539:11, 543:2,
543:7, 543:14,
543:23, 543:25,
544:1, 558:15,
558:16, 569:15,
570:4, 570:5, 601:5,
601:9, 601:21,
601:22, 620:13,
620:14, 620:15,
620:24, 620:25,
666:14, 668:25
**most** [12] - 564:6,
575:13, 575:15,
599:2, 629:12,
629:13, 629:14,
650:18, 651:18,
651:19, 654:9
**mostly** [2] - 635:5,
639:2
**motivation** [1] -
540:21
**move** [9] - 550:12,
553:15, 554:23,
557:4, 559:15,
560:23, 608:21,
620:8, 664:20
**moved** [25] - 550:15,
553:18, 555:1,
557:7, 584:23,
586:22, 587:25,
589:10, 590:15,
592:9, 593:5,
593:19, 594:4,
595:3, 597:10,
608:24, 617:16,
625:8, 632:22,
646:16, 658:4,
663:12, 665:5,
668:9, 669:15
**MR** [113] - 538:5,
538:9, 538:16,
538:24, 539:22,
539:25, 542:20,

543:11, 543:22,
550:12, 550:14,
552:9, 552:15,
553:7, 553:15,
553:17, 554:16,
554:23, 554:25,
555:6, 556:23,
557:4, 557:6,
557:19, 558:7,
558:8, 558:11,
558:14, 564:12,
567:24, 567:25,
568:2, 569:6,
569:13, 570:3,
571:16, 584:20,
584:22, 584:24,
585:3, 585:4,
585:17, 585:20,
586:19, 587:23,
588:14, 589:8,
590:13, 591:19,
592:7, 593:3,
593:17, 594:2,
595:1, 597:6, 597:9,
597:20, 601:2,
601:7, 601:20,
606:14, 608:21,
608:23, 611:14,
611:16, 611:18,
615:19, 617:2,
617:5, 617:10,
617:12, 618:10,
618:13, 618:22,
619:2, 619:17,
619:19, 619:21,
619:23, 619:25,
620:11, 620:23,
625:4, 625:7,
632:18, 632:21,
632:24, 633:22,
646:13, 646:15,
655:9, 656:2, 656:3,
656:13, 656:15,
658:1, 658:3, 662:6,
663:9, 663:11,
665:2, 665:4,
666:25, 668:6,
668:8, 669:12,
669:14, 671:21,
675:22, 675:25,
676:3, 676:13,
676:19
**multiple** [3] - 591:23,
626:10, 660:1

## N

**name** [28] - 543:23,
544:3, 544:4, 550:9,
551:12, 554:5,
570:6, 581:8,

597:16, 598:20,
599:18, 601:25,
607:24, 621:1,
621:3, 624:24,
631:3, 639:10,
640:1, 642:5, 642:6,
652:6, 658:22,
660:18, 660:20,
673:15
**named** [7] - 563:4,
607:13, 607:20,
633:24, 646:9,
664:22, 675:4
**names** [8] - 550:3,
551:6, 551:10,
591:6, 597:19,
608:10, 609:9,
641:12
**naming** [1] - 596:2
**narrative** [1] - 659:8
**Natalie** [1] - 538:10
**NATALIE** [1] - 536:18
**national** [1] - 611:5
**National** [1] - 633:15
**natural** [2] - 616:15,
674:25
**nature** [1] - 572:6
**necessarily** [1] - 645:7
**necessary** [2] - 556:7,
676:17
**need** [10] - 549:21,
564:6, 628:6, 628:7,
634:20, 638:8,
638:12, 647:23,
674:25
**need-to** [1] - 564:6
**needed** [5] - 556:16,
631:2, 637:9, 638:5,
654:14
**needs** [3] - 628:5,
636:11, 638:10
**negative** [1] - 561:17
**nervous** [3] - 673:9,
674:24, 676:6
**Network.html** [1] -
598:9
**Network_small.png**
[1] - 598:8
**never** [13] - 549:18,
555:20, 558:17,
560:21, 560:22,
572:20, 601:23,
605:18, 605:20,
615:9, 650:20, 651:2
**new** [10] - 572:13,
574:4, 645:20,
671:11, 672:20,
673:6, 673:12,
674:9, 674:11,
674:13

**New** [19] - 536:19,
546:20, 546:21,
565:21, 566:13,
586:8, 587:17,
588:23, 589:17,
589:18, 589:19,
596:14, 607:17,
623:22, 624:25,
666:11, 668:24
**news** [1] - 596:11
**newspaper** [2] - 567:4,
600:14
**next** [10] - 569:13,
587:18, 588:11,
592:25, 593:23,
620:10, 632:17,
633:4, 659:16,
668:25
**nice** [1] - 543:3
**Nichols** [2] - 647:9,
663:13
**Nicole** [1] - 646:21
**night** [2] - 587:3,
672:18
**NO** [21] - 672:15,
672:21, 672:24,
673:1, 673:3, 673:7,
673:9, 673:14,
673:17, 673:20,
673:22, 673:25,
674:3, 674:6,
674:13, 674:20,
675:2, 675:6,
675:10, 675:13,
675:18
**nominally** [1] - 653:23
**nominee** [1] - 631:12
**non** [1] - 612:3
**non-open** [1] - 612:3
**none** [1] - 668:12
**nonunion** [1] - 645:12
**Northeast** [1] - 536:14
**not-for-profit** [1] -
603:2
**notable** [1] - 566:20
**notation** [1] - 589:18
**note** [5] - 542:4,
618:19, 650:13,
651:4, 651:10
**notebook** [1] - 649:25
**notes** [1] - 677:5
**nothing** [5] - 538:20,
569:6, 582:25,
611:16, 615:19
**notice** [2] - 543:6,
576:1
**notification** [1] -
553:14
**notwithstanding** [1] -
619:13

**November** [3] - 594:6,
595:6, 634:24
**Number** [1] - 662:9
**number** [14] - 546:14,
571:24, 622:5,
628:21, 641:1,
650:22, 650:23,
650:24, 651:22,
654:11, 658:25,
660:17, 661:4,
662:13
**numbers** [2] - 628:1,
669:6
**NW** [2] - 536:23,
677:12
**NY** [1] - 536:19

## O

**Obama** [2] - 622:11,
640:16
**objection** [24] -
538:18, 550:14,
553:17, 554:25,
557:6, 584:22,
584:24, 585:17,
586:20, 597:7,
597:9, 606:14,
608:23, 625:6,
625:7, 632:21,
646:15, 656:15,
658:3, 663:11,
665:4, 666:25,
668:8, 669:14
**obtain** [1] - 637:8
**obtained** [1] - 579:2
**obviously** [7] - 539:15,
539:18, 540:25,
549:24, 640:15,
652:3, 676:4
**occasion** [1] - 635:22
**occasionally** [2] -
635:18, 645:4
**occasions** [1] - 646:3
**occur** [4] - 552:2,
552:3, 575:7, 580:25
**occurred** [3] - 586:2,
586:3, 658:18
**occurrence** [1] -
538:15
**October** [13] - 557:3,
557:16, 565:4,
566:7, 590:11,
590:18, 592:12,
593:7, 596:18,
597:12, 608:18,
634:14, 634:23
**OF** [4] - 536:1, 536:3,
536:9, 677:1
**offer** [3] - 586:20,

597:7, 622:15
**offers** [19] - 584:21,
587:24, 588:14,
589:8, 590:13,
592:7, 593:3,
593:17, 594:2,
595:1, 625:4,
632:19, 646:14,
656:13, 658:1,
663:9, 665:2, 668:6,
669:13
**office** [9] - 571:25,
628:9, 635:14,
647:2, 648:16,
648:17, 649:1,
664:12, 668:14
**OFFICE** [1] - 536:14
**officer** [2] - 639:15,
639:17
**offices** [1] - 574:17
**Official** [1] - 536:12
**OFFICIAL** [1] - 677:1
**official** [1] - 677:11
**officially** [1] - 545:22
**often** [5] - 546:12,
549:1, 551:23,
552:1, 629:11
**oftentimes** [3] -
629:17, 653:12,
654:12
**onboarding** [1] -
628:10
**once** [2] - 573:12,
602:2
**one** [64] - 541:2,
542:14, 542:16,
544:18, 545:9,
553:12, 554:5,
560:16, 562:20,
564:1, 564:2,
569:22, 573:1,
574:21, 575:13,
578:22, 580:1,
580:10, 583:15,
585:8, 586:23,
587:1, 587:8, 588:3,
589:25, 590:21,
596:25, 598:2,
602:9, 604:18,
610:13, 614:18,
616:18, 616:21,
618:19, 619:21,
623:1, 625:18,
626:18, 627:21,
634:1, 635:5,
635:18, 639:4,
647:16, 647:17,
648:11, 648:12,
648:23, 649:10,
650:25, 651:15,

654:7, 657:16,
657:20, 659:1,
661:6, 664:9,
665:10, 665:19,
669:23, 671:9,
675:25
**one-page** [2] - 657:16,
657:20
**ones** [6] - 554:20,
560:10, 566:6,
629:11, 655:17
**open** [10] - 539:4,
571:8, 571:10,
578:22, 603:17,
606:19, 606:21,
612:1, 612:3, 619:4
**Open** [9] - 544:7,
544:8, 544:11,
544:25, 570:14,
570:15, 570:23,
570:24, 571:2
**open-ended** [1] -
619:4
**OpenPGP** [1] - 587:10
**operated** [2] - 549:20,
564:5
**operating** [1] - 639:15
**operation** [1] - 630:19
**operations** [2] -
638:10, 644:24
**opinions** [1] - 594:18
**opponent** [2] - 547:14,
547:15
**opponents** [1] -
630:16
**opportune** [1] - 539:6
**opportunity** [2] -
620:7, 648:22
**opposing** [1] - 547:8
**opposition** [19] -
540:21, 542:3,
546:22, 546:24,
546:25, 547:2,
547:7, 547:18,
557:21, 557:24,
558:3, 560:25,
561:9, 629:22,
630:10, 630:17,
630:20, 630:21,
630:23
**or..** [6] - 571:25, 584:7,
594:12, 629:5,
634:12, 675:9
**order** [5] - 617:14,
619:13, 620:1,
620:5, 631:2
**organization** [15] -
552:21, 552:24,
565:15, 566:3,
566:10, 575:22,

576:22, 577:15,
577:24, 578:16,
580:19, 581:18,
594:19, 598:23,
667:13
**organizational** [1] -
626:4
**organizations** [2] -
545:20, 560:4
**organizer** [1] - 554:6
**originated** [1] - 554:10
**origins** [1] - 612:12
**otherwise** [3] - 638:18,
671:13, 676:12
**outlet** [1] - 600:14
**Outlook** [1] - 647:19
**outside** [6] - 583:2,
583:4, 617:9,
622:23, 630:11,
644:1
**outstanding** [1] -
662:15
**overruled** [2] - 606:15,
667:1
**oversaw** [2] - 546:2,
638:16
**oversees** [1] - 595:14
**Overview** [1] - 591:7
**owed** [1] - 643:6
**own** [7] - 541:7, 556:8,
595:17, 598:24,
611:8, 638:5, 651:2
**owned** [1] - 570:24
**owners** [1] - 634:1

## P

**p.m** [12] - 587:2,
589:13, 590:18,
593:7, 594:6, 595:6,
597:12, 647:6,
649:3, 665:9,
668:24, 676:21
**PAC** [2] - 574:9, 654:2
**page** [10] - 598:5,
598:7, 598:9,
598:10, 598:13,
598:15, 599:16,
633:23, 657:16,
657:20
**PAGE** [1] - 537:2
**pages** [1] - 591:23
**paid** [5] - 560:6, 562:2,
627:4, 627:9, 627:15
**PAL** [1] - 640:2
**Palmieri** [4] - 563:17,
639:20, 640:1,
644:22
**PALMIERI** [1] - 640:3
**paper** [2] - 558:9,

592:1
**papers** [1] - 598:2
**Paragraph** [1] - 627:14
**paragraph** [7] -
625:24, 626:22,
626:23, 627:5,
632:6, 633:2, 670:21
**paragraphs** [4] -
625:23, 632:17,
633:1, 633:4
**paralegals** [1] - 618:19
**part** [30] - 541:7,
545:24, 547:4,
547:7, 547:20,
547:24, 548:12,
548:14, 556:7,
556:16, 556:21,
561:2, 568:12,
568:21, 579:3,
579:12, 588:17,
590:5, 591:13,
591:14, 591:15,
611:20, 630:7,
637:2, 637:4, 637:5,
644:23, 644:24,
660:9
**participants** [2] -
554:11, 554:12
**participating** [2] -
568:6, 568:9
**particular** [15] - 542:2,
594:5, 595:5,
595:18, 599:23,
600:13, 628:1,
636:21, 638:16,
638:17, 640:20,
650:2, 651:13,
657:11, 660:2
**particularly** [2] -
574:1, 675:24
**parties** [3] - 543:8,
555:16, 560:9
**parties'** [1] - 539:14
**partner** [5] - 545:21,
603:21, 621:8,
628:24, 653:19
**partners** [5] - 570:25,
571:19, 574:13,
590:21, 590:22
**parts** [1] - 660:5
**party** [4] - 553:1,
661:15, 661:16,
661:25
**Party'** [1] - 632:15
**pass** [3] - 637:5,
645:5, 645:18
**passed** [2] - 559:6,
651:17
**Patrick** [1] - 595:8
**Paul** [2] - 581:25,

609:7
**Pause** [3] - 542:18,
542:23, 618:25
**pay** [7] - 580:16,
596:22, 602:13,
614:14, 627:2,
627:22, 662:3
**paying** [1] - 627:2
**pays** [2] - 627:11,
627:12
**PC** [4] - 632:13, 633:5,
633:7, 633:9
**people** [32] - 549:14,
563:1, 563:2,
571:21, 572:24,
574:11, 575:12,
583:2, 599:2,
606:22, 615:7,
622:13, 623:11,
625:14, 637:15,
638:11, 639:19,
641:1, 641:12,
643:8, 644:1,
644:19, 644:22,
645:3, 645:6,
645:23, 646:4,
649:19, 649:22,
649:24, 652:2
**per** [2] - 627:16,
627:20
**perhaps** [1] - 555:23
**period** [14] - 554:1,
570:17, 571:18,
580:21, 583:1,
596:17, 602:2,
603:15, 604:2,
621:10, 629:6,
630:14, 636:17,
671:15
**periodically** [1] -
624:5
**Perkins** [41] - 545:21,
573:13, 573:19,
574:14, 574:19,
574:22, 574:25,
578:11, 579:4,
579:6, 579:7,
585:22, 589:25,
590:7, 596:21,
596:23, 600:18,
600:25, 621:9,
621:11, 621:12,
622:21, 623:1,
626:13, 627:2,
627:3, 628:12,
628:17, 630:11,
630:22, 632:4,
632:12, 635:13,
638:19, 640:23,
644:1, 644:3, 652:4,

692

652:9, 656:11, 658:6
**permanent** [2] -
544:14, 544:15
**person** [20] - 546:23,
573:1, 575:13,
580:7, 598:21,
613:16, 616:21,
635:5, 635:10,
636:4, 648:5,
648:12, 653:18,
654:7, 658:22,
671:1, 671:6,
673:16, 673:18,
675:4
**personal** [2] - 538:22,
616:6
**personally** [3] - 556:9,
600:7, 600:11
**Peter** [20] - 550:3,
551:11, 551:14,
554:14, 571:1,
571:20, 575:4,
581:3, 581:11,
590:11, 590:19,
590:21, 591:1,
592:5, 608:2,
635:17, 637:21,
637:23, 642:13,
664:23
**PGP_MIME** [1] -
587:10
**phase** [1] - 623:12
**PhD** [2] - 602:19,
602:25
**phone** [4] - 617:3,
617:6, 635:9, 671:14
**phrase** [1] - 600:17
**phrased** [1] - 618:11
**phrases** [1] - 587:9
**physical** [1] - 648:24
**physically** [1] - 662:18
**piece** [2] - 558:8,
623:16
**pieces** [1] - 624:7
**pinpoint** [1] - 575:6
**pitch** [1] - 572:21
**pitcher** [1] - 552:17
**place** [2] - 631:10,
658:16
**placed** [1] - 606:7
**Plaintiff** [1] - 536:4
**plaintiffs** [1] - 560:9
**play** [3] - 563:6,
563:14, 563:19
**playing** [1] - 637:7
**plumbing** [1] - 674:14
**Podesta** [2] - 563:4,
639:5
**point** [17] - 548:4,
552:22, 561:20,

568:20, 572:2,
572:11, 572:17,
573:9, 577:22,
578:17, 607:9,
622:12, 638:16,
647:18, 652:15,
654:18, 671:7
**points** [5] - 637:17,
637:18, 638:2,
638:21, 638:23
**policy** [6] - 563:15,
602:19, 628:6,
640:6, 640:7
**political** [9] - 547:2,
602:19, 621:13,
621:16, 641:9,
653:5, 660:21,
670:13, 670:15
**portion** [1] - 560:3
**portions** [1] - 660:9
**position** [5] - 542:6,
544:12, 544:15,
573:16, 590:20
**possibility** [1] - 605:7
**possible** [2] - 626:16,
653:6
**post** [1] - 675:8
**posted** [4] - 578:17,
584:3, 598:21, 607:2
**posting** [2] - 603:4,
603:8
**postpone** [1] - 674:5
**potential** [2] - 554:11,
606:11
**practice** [8] - 621:14,
629:7, 649:16,
649:17, 650:13,
653:6, 653:8, 660:4
**practices** [1] - 653:7
**pre** [3] - 650:4, 652:16
**pre-bill** [2] - 650:4,
652:16
**pre-bills** [1] - 652:16
**precise** [1] - 662:1
**premarked** [7] -
584:12, 592:3,
593:24, 624:17,
631:18, 631:22,
668:1
**prepare** [2] - 570:10,
655:2
**prepared** [3] - 540:8,
656:11, 658:6
**prepares** [1] - 653:2
**preplanned** [1] - 576:2
**prepopulate** [1] -
661:4
**preprinted** [1] - 649:21
**presence** [1] - 538:20
**present** [2] - 538:11,

563:3
**president** [3] - 545:2,
626:6, 626:10
**President** [2] - 640:16
**presidential** [4] -
572:4, 622:1, 622:9,
640:15
**presidents** [1] - 644:5
**press** [13] - 579:21,
607:10, 610:13,
610:14, 610:17,
610:18, 610:20,
610:21, 613:25,
615:7, 618:8,
618:16, 639:23
**presumably** [3] -
559:6, 593:10, 604:6
**presume** [1] - 540:6
**pretty** [1] - 566:20
**prevent** [1] - 562:1
**preventing** [1] -
624:11
**Priestap** [1] - 542:4
**primary** [6] - 546:6,
568:17, 572:21,
573:13, 574:2, 604:6
**principally** [3] - 623:7,
631:6, 644:17
**print** [4] - 556:21,
557:3, 564:15, 566:8
**printed** [3] - 662:17,
662:19, 672:18
**printout** [1] - 652:17
**privacy** [1] - 628:6
**private** [3] - 544:9,
649:16, 649:17
**privilege** [7] - 547:11,
578:13, 616:5,
616:8, 636:24,
643:4, 643:19
**privileged** [11] -
577:11, 586:8,
587:17, 589:17,
616:10, 617:15,
619:20, 619:22,
667:8, 667:10,
670:25
**Pro** [1] - 662:9
**pro** [25] - 628:20,
629:10, 650:4,
650:9, 652:14,
652:16, 652:21,
653:3, 653:4,
653:10, 653:19,
653:22, 654:5,
654:18, 656:6,
657:22, 658:5,
658:8, 659:23,
661:6, 662:11,
662:15, 662:20,

662:22, 669:10
**problem** [2] - 654:3,
661:19
**proceeding** [1] - 540:8
**proceedings** [1] -
677:6
**process** [1] - 621:17
**professional** [1] -
599:8
**proficient** [1] - 599:3,
599:6
**profit** [1] - 603:2
**program** [2] - 602:19,
624:11
**programming** [2] -
599:10, 603:10
**progress** [1] - 539:8
**progressive** [1] -
621:15
**Project** [1] - 660:7
**project** [2] - 572:18,
600:24
**projects** [1] - 638:17
**pronounce** [1] -
625:12
**proper** [1] - 622:21
**prospect** [1] - 617:23
**protection** [1] - 624:11
**provide** [2] - 603:24,
608:10
**provided** [7] - 540:21,
541:24, 542:1,
558:4, 558:5,
611:10, 611:11
**providing** [8] - 541:12,
544:22, 582:3,
582:4, 616:14, 633:9
**provision** [3] - 540:23,
542:7, 542:10
**pseudonym** [1] -
607:1
**public** [12] - 560:5,
571:13, 571:14,
602:19, 603:19,
605:3, 611:20,
611:24, 613:2,
637:8, 643:22
**publicly** [1] - 614:9
**publish** [5] - 582:11,
582:12, 582:23,
596:14, 632:24
**published** [8] -
557:16, 560:17,
564:17, 566:13,
582:18, 596:13,
600:17, 612:19
**pull** [1] - 564:12
**pulled** [1] - 613:24
**pure** [1] - 630:20
**purported** [1] - 577:23

**purpose** [10] - 544:21,
547:10, 575:19,
575:20, 579:1,
579:18, 580:17,
582:10, 591:10,
636:9
**purposes** [1] - 638:5
**pursue** [1] - 556:4
**put** [7] - 587:19,
588:11, 627:20,
636:25, 650:8,
655:12, 656:21
**Putin** [1] - 637:16
**puts** [1] - 651:24
**putting** [1] - 670:25

**Q**

**questioned** [1] - 673:5
**questionnaire** [3] -
673:5, 674:21,
674:22
**questions** [5] -
543:25, 558:7,
562:20, 565:8,
565:10
**quibble** [1] - 630:24
**quick** [2] - 631:25,
655:11
**quite** [5] - 552:14,
572:13, 594:13,
615:5, 663:14
**quote** [1] - 573:10

**R**

**races** [1] - 622:8
**raise** [3] - 543:16,
569:16, 620:16
**raises** [1] - 617:23
**ran** [1] - 634:14
**range** [2] - 636:18,
645:25
**ranging** [1] - 638:8
**RAO** [1] - 536:18
**Rao** [1] - 538:10
**rate** [2] - 659:4, 659:5
**rather** [2] - 541:21,
661:3
**RDR** [3] - 536:21,
677:3, 677:10
**re** [5] - 564:15, 588:5,
588:19, 592:16,
597:14
**Re** [1] - 596:1
**reach** [3] - 643:17,
676:14, 676:16
**reached** [1] - 613:13
**reaching** [1] - 582:20
**read** [11] - 550:19,

693

550:21, 551:10,
554:13, 560:21,
564:13, 587:9,
609:1, 630:5, 633:2,
657:24
**reading** [1] - 657:7
**ready** [4] - 543:5,
553:8, 553:9, 672:1
**real** [1] - 583:24
**really** [19] - 551:25,
574:8, 574:9,
575:14, 577:8,
581:17, 595:16,
595:17, 607:4,
614:14, 628:3,
637:21, 640:25,
641:10, 651:14,
653:4, 653:24,
663:16, 666:11
**realm** [1] - 623:8
**reason** [8] - 573:25,
574:6, 616:18,
619:25, 628:1,
628:4, 634:22,
666:22
**reasons** [2] - 539:20,
641:6
**recalled** [1] - 541:3
**recalling** [1] - 666:12
**receive** [4] - 541:15,
614:18, 614:22,
645:6
**received** [3] - 541:18,
593:15, 611:23
**receives** [2] - 651:24,
652:20
**Recess** [1] - 601:15
**recess** [1] - 676:21
**recipient** [1] - 663:19
**recognize** [10] - 550:7,
553:11, 554:18,
554:20, 556:25,
557:2, 597:2,
624:20, 631:25,
646:8
**recognizing** [5] -
577:6, 577:10,
581:12, 642:9,
662:25
**recollection** [30] -
541:17, 555:3,
575:3, 575:20,
576:6, 582:15,
586:1, 586:3,
588:20, 589:20,
590:4, 593:20,
594:17, 595:21,
598:1, 598:20,
602:4, 608:4,
612:22, 631:10,

635:17, 664:13,
666:16, 666:17,
667:3, 667:19,
669:1, 671:4, 671:6,
671:13
**recollections** [2] -
665:23, 668:11
**reconvene** [2] -
601:10, 672:1
**record** [17] - 538:3,
539:13, 539:23,
540:23, 544:3,
570:7, 614:2, 614:3,
621:2, 637:9,
637:10, 650:17,
655:23, 655:25,
656:1, 656:9, 672:17
**records** [8] - 571:12,
571:14, 583:16,
583:24, 584:2,
584:4, 613:25, 637:8
**recounts** [1] - 627:6
**Recurrence** [1] -
551:18
**recurring** [1] - 648:20
**Redacted** [1] - 659:7
**redacted** [5] - 591:21,
616:18, 616:19,
616:23, 660:6
**redaction** [1] - 616:24
**redactions** [1] - 660:7
**redirect** [1] - 599:15
**REDIRECT** [2] - 568:1,
611:17
**refer** [3] - 559:12,
616:5, 628:19
**reference** [1] - 610:6
**referenced** [3] - 583:7,
633:18, 633:19
**referencing** [1] -
586:11
**referred** [2] - 629:21,
632:13
**referring** [2] - 559:14,
581:22
**refers** [3] - 616:9,
639:14, 662:9
**reflected** [1] - 660:23
**refresh** [5] - 551:8,
618:1, 618:5,
619:12, 620:4
**refusing** [1] - 616:13
**regard** [8] - 558:2,
578:10, 582:23,
599:6, 613:18,
615:12, 617:12,
617:14
**regarding** [5] - 555:12,
555:20, 557:3,
565:7, 568:24

**regards** [1] - 557:24
**registry** [1] - 624:25
**regular** [4] - 546:13,
551:25, 554:1,
648:11
**regularly** [4] - 551:2,
551:15, 563:2, 645:4
**regulatory** [1] - 626:3
**relate** [4] - 557:10,
557:15, 564:25,
586:10
**related** [39] - 546:6,
547:12, 547:16,
548:16, 548:17,
548:22, 552:8,
552:23, 555:14,
555:21, 555:22,
556:18, 557:12,
559:22, 563:15,
563:20, 564:16,
564:20, 568:15,
568:18, 568:19,
572:9, 576:16,
576:17, 576:21,
579:16, 580:11,
586:14, 587:13,
598:22, 600:24,
604:20, 605:3,
618:9, 633:10,
636:18, 637:5,
637:14
**relates** [2] - 540:18,
558:20
**relating** [2] - 572:3,
621:16
**relation** [2] - 548:15,
555:13
**relationship** [9] -
540:17, 541:8,
570:22, 570:23,
576:10, 576:14,
616:12, 643:1, 644:2
**relationships** [1] -
616:16
**relatively** [3] - 574:3,
634:17, 640:12
**relax** [1] - 674:23
**release** [2] - 645:20,
645:22
**relevant** [2] - 540:15,
540:19
**reliable** [1] - 606:5
**relied** [1] - 622:25
**remain** [2] - 569:16,
620:16
**remember** [56] - 548:3,
549:4, 550:3, 550:4,
552:1, 553:24,
554:2, 554:21,
557:14, 557:18,

559:5, 564:23,
565:8, 566:5,
566:19, 566:21,
568:21, 571:22,
575:8, 576:12,
576:13, 577:8,
577:16, 579:9,
581:17, 586:15,
589:23, 590:24,
591:9, 591:11,
596:13, 598:18,
599:1, 599:22,
600:8, 600:9, 609:6,
609:20, 610:4,
612:25, 613:3,
613:23, 614:24,
615:1, 618:6, 619:5,
619:7, 641:5,
641:19, 643:16,
654:20, 671:7,
671:12, 671:13,
673:5
**remind** [2] - 590:19,
594:9
**reminder** [2] - 618:21,
662:12
**remove** [2] - 653:12,
653:13
**repeat** [1] - 556:5
**rephrase** [1] - 585:19
**reply** [3] - 588:3,
588:5, 593:15
**replying** [1] - 596:4
**report** [13] - 541:2,
541:10, 541:11,
541:15, 541:19,
541:21, 542:2,
542:10, 571:17,
603:21, 630:6,
636:13, 636:15
**reported** [1] - 571:19
**REPORTER** [1] -
677:1
**Reporter** [3] - 536:21,
536:22, 677:11
**reporter** [6] - 570:7,
581:6, 591:3,
623:21, 631:19,
639:25
**reporters** [2] - 613:21,
613:24
**reporting** [2] - 582:16,
582:18
**reports** [2] - 541:7,
541:14
**represent** [7] - 601:25,
626:5, 631:2, 643:8,
644:4, 661:14,
661:15
**representation** [2] -

604:21, 626:1
**represented** [5] -
573:17, 621:14,
622:8, 640:14,
640:16
**representing** [2] -
626:10, 629:8
**Republicans** [2] -
572:16, 604:4
**request** [4] - 539:2,
539:21, 541:7, 541:9
**requests** [1] - 571:14
**required** [2] - 647:7,
647:11
**requirements** [1] -
626:3
**requires** [1] - 676:8
**reschedule** [1] - 674:8
**Research** [5] - 570:14,
570:15, 570:23,
570:24, 571:2
**research** [81] - 540:12,
540:21, 542:3,
546:3, 546:5,
546:22, 546:24,
546:25, 547:1,
547:4, 547:7, 547:9,
547:13, 547:18,
547:22, 547:25,
548:10, 548:18,
549:8, 549:13,
555:8, 555:13,
555:14, 556:4,
556:7, 556:8,
556:16, 557:21,
557:22, 557:24,
558:3, 558:4, 558:5,
560:25, 561:9,
561:10, 561:15,
568:25, 570:16,
570:20, 571:8,
572:3, 572:7,
572:19, 572:24,
579:16, 579:19,
590:6, 595:12,
595:13, 601:11,
602:20, 603:18,
603:24, 604:10,
606:19, 606:22,
608:13, 611:8,
629:22, 630:4,
630:11, 630:14,
630:16, 630:17,
630:19, 630:20,
630:21, 630:24,
631:1, 638:3, 638:5,
638:9, 645:14,
645:19, 645:24,
651:22, 672:3
**research@fusiongps**

**.com** [1] - 595:20
**researching** [5] - 548:24, 572:8, 576:19, 576:20, 636:18
**resided** [2] - 638:9, 638:10
**respect** [3] - 540:3, 609:11, 610:12
**responded** [1] - 603:3
**responsibilities** [4] - 544:17, 544:21, 545:25, 647:25
**responsible** [3] - 615:13, 653:19, 653:21
**responsive** [1] - 639:7
**result** [2] - 577:18, 606:21
**Result** [1] - 598:11
**Result-light.css** [1] - 598:11
**retained** [2] - 625:18, 642:4
**retention** [7] - 624:13, 625:9, 626:12, 630:1, 630:3, 631:13, 640:24
**retentions** [1] - 626:8
**retry** [1] - 670:4
**return** [1] - 656:18
**returned** [2] - 662:11, 662:13
**review** [10] - 629:4, 629:11, 629:18, 629:19, 653:9, 654:6, 654:14, 654:20, 672:19
**reviewed** [3] - 540:2, 540:5, 540:25
**reviewer** [2] - 662:21, 662:22
**reviewing** [4] - 629:15, 652:19, 652:20, 654:22
**reviews** [1] - 653:18
**revisited** [1] - 617:22
**rights** [2] - 544:10, 621:17
**rjoffe@centergate.com** [1] - 585:8
**Robby** [8] - 563:8, 625:10, 625:15, 625:16, 639:3, 639:4, 642:1, 644:20
**robust** [1] - 630:14
**Rodney** [8] - 575:5, 663:23, 664:15, 664:16, 665:16, 667:4, 668:14,

670:22
**role** [17] - 544:11, 544:17, 544:19, 544:20, 545:7, 545:24, 546:8, 556:21, 563:6, 563:10, 563:14, 563:15, 563:19, 595:18, 602:15, 603:17, 608:5
**Room** [2] - 536:22, 677:12
**rule** [1] - 540:9
**ruling** [1] - 618:2
**running** [1] - 624:10
**Russia** [7] - 568:16, 568:19, 576:21, 576:23, 637:16, 644:11, 645:21
**Russian** [3] - 565:15, 565:21, 611:6

**S**

**S-E-A-G-O** [1] - 570:9
**safe** [3] - 592:19, 597:14, 597:15
**satisfy** [1] - 676:8
**saw** [5] - 557:13, 559:11, 576:4, 605:20, 670:16
**scale** [1] - 659:1
**scaled** [1] - 627:4
**schedule** [1] - 648:7
**scheduled** [3] - 665:16, 667:4, 668:19
**scheduler** [1] - 641:14
**school** [1] - 602:18
**science** [1] - 602:19
**scientists** [2] - 581:20, 583:6
**screen** [12] - 584:13, 587:19, 588:11, 589:5, 624:18, 631:23, 646:7, 657:15, 657:17, 657:18, 663:6, 664:21
**scroll** [1] - 591:20
**SEAGO** [2] - 537:6, 570:1
**Seago** [16] - 569:14, 570:4, 570:8, 570:10, 585:5, 588:17, 591:22, 594:21, 595:4, 596:25, 601:21, 603:8, 611:19, 615:22, 616:4,

617:18
**Seago's** [1] - 617:13
**SEAN** [1] - 536:16
**Sean** [2] - 538:9, 601:25
**season** [1] - 634:9
**seat** [3] - 543:19, 569:19, 620:19
**seated** [3] - 543:4, 601:17, 672:12
**Seattle** [1] - 574:17
**second** [2] - 654:8, 659:2
**secret** [4] - 564:4, 667:12, 667:14, 671:2
**secretary** [5] - 639:23, 650:13, 651:4, 651:24, 660:23
**section** [2] - 658:9, 659:7
**sector** [1] - 603:3
**security** [4] - 611:5, 638:11, 644:23
**see** [14] - 539:5, 539:8, 542:17, 550:9, 551:18, 553:20, 554:4, 554:21, 572:23, 616:17, 658:9, 659:16, 662:8, 663:7
**seeking** [1] - 617:18
**seem** [2] - 646:17, 668:20
**selecting** [1] - 625:24
**self** [1] - 630:15
**Senate** [4] - 622:8, 640:14, 644:5
**Senatorial** [1] - 622:7
**send** [3] - 612:17, 629:13, 644:19
**sending** [1] - 593:10
**senior** [4] - 563:15, 563:20, 639:2, 644:19
**sense** [13] - 539:10, 574:12, 582:13, 587:13, 588:24, 589:1, 598:2, 599:20, 644:7, 647:15, 662:9, 667:5, 667:7
**sent** [9] - 550:19, 554:10, 594:7, 616:21, 646:21, 652:19, 662:23, 668:19, 672:17
**sentence** [1] - 626:11
**separate** [2] - 626:20, 651:22

**separately** [1] - 627:7
**September** [1] - 541:13
**serve** [2] - 625:25, 630:25
**server** [11] - 599:24, 599:25, 605:4, 605:8, 606:8, 609:24, 610:18, 612:16, 667:14
**Server** [1] - 591:7
**servers** [3] - 606:12, 638:12
**service** [1] - 653:24
**services** [3] - 631:1, 633:6, 633:7
**SESSION** [1] - 536:6
**set** [6] - 580:5, 602:12, 614:15, 633:8, 635:7, 661:20
**sets** [1] - 627:15
**seven** [2] - 571:23, 640:19
**several** [6] - 545:9, 549:5, 599:10, 629:9, 648:17, 658:9
**SF278** [1] - 630:6
**shall** [1] - 632:13
**share** [4] - 549:20, 557:21, 564:7, 564:8
**shared** [2] - 564:9, 584:25
**sharing** [1] - 557:22
**SHAW** [1] - 536:13
**Shaw** [1] - 538:7
**sheet** [2] - 598:11, 649:21
**sheets** [2] - 649:20, 651:7
**shock** [1] - 636:24
**short** [1] - 576:1
**shortly** [3] - 621:25, 666:22, 667:3
**show** [23] - 550:5, 552:10, 554:17, 556:23, 584:12, 584:13, 590:9, 591:21, 593:23, 594:22, 597:1, 608:17, 624:16, 624:17, 631:16, 631:22, 631:23, 632:25, 646:6, 654:25, 657:14, 657:15, 662:6
**showed** [2] - 594:20, 610:2
**showing** [2] - 553:10, 555:2
**shown** [2] - 564:10,

565:7
**sic** [1] - 646:22
**side** [5] - 594:15, 594:16, 597:18, 635:20, 662:8
**sign** [1] - 634:5
**signature** [1] - 633:23
**signed** [5] - 604:3, 633:24, 634:4, 634:6, 641:2
**similar** [4] - 553:12, 586:23, 633:11, 668:10
**similarly** [1] - 616:17
**simply** [3] - 541:25, 637:11, 651:19
**Simpson** [17] - 551:11, 551:14, 554:14, 568:7, 571:1, 571:20, 585:23, 591:1, 592:14, 593:1, 596:23, 604:25, 633:25, 634:1, 634:6, 664:22, 665:18
**sister** [1] - 640:8
**sit** [1] - 642:8
**sitting** [1] - 563:22
**situation** [1] - 675:1
**six** [10] - 559:2, 572:25, 577:8, 581:17, 634:16, 640:19, 641:24, 642:22, 649:18, 650:12
**skeptical** [1] - 594:20
**skills** [1] - 603:9
**skipped** [1] - 648:21
**skittish** [1] - 676:10
**slate** [2] - 557:15, 600:15
**slip** [3] - 560:5, 560:6, 569:16
**slip-and-falls** [1] - 560:6
**slipping** [1] - 543:16
**slow** [1] - 623:19
**small** [4] - 570:16, 570:20, 591:13
**so..** [2] - 552:18, 553:14
**Society** [4] - 544:7, 544:8, 544:11, 544:25
**software** [5] - 650:3, 651:25, 660:24, 661:1, 661:3
**solutions** [1] - 675:8
**solve** [1] - 661:19
**someone** [22] -

541:12, 563:4,
573:10, 573:11,
580:15, 595:8,
598:25, 607:10,
612:24, 612:25,
617:19, 623:17,
624:4, 629:19,
633:24, 636:24,
637:12, 641:4,
646:9, 661:12,
664:22, 665:24
**sometime** [2] - 631:9,
667:19
**sometimes** [5] -
632:13, 635:18,
637:22, 659:12,
662:11
**sorry** [42] - 545:6,
545:14, 546:21,
552:11, 552:13,
555:5, 556:5,
558:11, 559:1,
559:24, 560:14,
576:3, 577:8,
580:24, 581:10,
585:5, 585:22,
585:24, 623:19,
625:3, 629:3,
631:17, 631:18,
632:19, 634:5,
637:25, 638:2,
639:14, 645:8,
648:2, 655:14,
656:2, 656:9, 657:8,
657:19, 663:25,
664:22, 667:2,
668:16, 669:8,
670:4, 672:5
**sort** [8] - 548:25,
560:21, 566:19,
575:12, 598:12,
628:15, 630:25,
658:5
**sorts** [3] - 613:22,
621:12, 670:15
**sought** [1] - 615:9
**sounds** [7] - 566:20,
577:22, 598:20,
607:19, 675:22,
675:23, 676:9
**Source** [5] - 570:14,
570:15, 570:23,
570:24, 571:2
**source** [11] - 571:8,
571:10, 578:22,
603:17, 605:3,
606:19, 606:22,
611:20, 611:24,
612:1, 612:3
**sources** [1] - 582:20

**South** [3] - 637:10,
637:11, 671:10
**Spain** [2] - 539:23,
539:24
**spam** [1] - 612:17
**speakers** [1] - 644:6
**speaking** [11] -
538:17, 548:8,
548:20, 550:17,
571:6, 572:12,
579:11, 615:18,
627:1, 635:1, 636:9
**SPECIAL** [1] - 536:14
**specific** [13] - 547:12,
553:24, 555:18,
556:15, 556:18,
557:8, 588:9,
613:23, 631:10,
633:9, 664:13,
666:16, 666:17
**specifically** [15] -
549:5, 554:22,
556:9, 557:15,
557:18, 564:19,
573:8, 573:22,
596:9, 597:5,
597:24, 633:18,
634:22, 643:16,
649:5
**specifics** [3] - 546:4,
581:17, 618:14
**speculate** [2] - 542:6,
616:24
**speculation** [1] -
612:18
**spell** [5] - 544:2,
570:6, 591:3, 621:1,
639:25
**spending** [1] - 647:21
**spent** [4] - 591:12,
650:2, 650:7, 650:8
**sprawling** [1] - 638:24
**spring** [2] - 572:3,
631:9
**staff** [6] - 538:14,
622:19, 628:11,
639:2, 643:19, 674:7
**staffed** [1] - 595:15
**staffing** [1] - 595:18
**stamp** [1] - 587:1
**stamps** [1] - 587:4
**stand** [2] - 655:12,
672:14
**standing** [2] - 569:16,
620:16
**stands** [1] - 632:9
**start** [7] - 545:3, 571:4,
578:6, 628:4,
672:20, 674:2, 674:5
**start-up** [1] - 628:4

**started** [5] - 543:5,
550:23, 572:3,
602:17, 621:20
**starting** [7] - 551:1,
551:5, 551:14,
551:18, 553:19,
556:25, 658:11
**state** [5] - 544:2,
546:7, 570:6, 621:1,
624:25
**statement** [2] - 540:5,
541:12
**STATES** [3] - 536:1,
536:3, 536:10
**States** [3] - 536:12,
538:3, 677:11
**status** [1] - 640:21
**stay** [2] - 672:5,
674:11
**Steele** [7] - 540:1,
541:6, 541:16,
541:19, 541:21,
541:25, 542:1
**steele** [1] - 541:3
**Steele's** [4] - 540:2,
540:10, 540:18,
540:23
**steep** [1] - 599:11
**steer** [1] - 616:10
**stenographic** [1] -
677:5
**step** [2] - 543:14,
672:8
**stepping** [2] - 577:21,
580:20
**steps** [2] - 556:15,
583:20
**still** [7] - 542:13,
619:18, 620:13,
647:17, 649:22,
654:5, 654:22
**story** [5] - 566:13,
608:15, 611:1,
611:2, 612:19
**straggler** [1] - 542:13,
542:14, 542:16
**Street** [1] - 536:14
**strip** [1] - 645:15
**strong** [1] - 675:24
**structure** [1] - 545:11
**stuff** [2] - 561:10,
598:14
**style** [1] - 598:11
**styled** [1] - 540:14
**Subject** [2] - 593:8,
597:13
**subject** [27] - 550:21,
550:22, 557:9,
564:14, 577:14,
586:7, 586:10,

587:16, 588:9,
588:19, 588:24,
589:16, 592:15,
593:11, 594:14,
595:25, 596:2,
596:4, 596:5, 608:3,
618:7, 646:24,
651:13, 663:22,
665:21, 667:23,
668:4
**subject-naming** [1] -
596:2
**subjects** [1] - 552:6
**submitted** [1] - 540:5
**subsequent** [2] -
540:12, 540:15
**substance** [5] - 552:5,
577:12, 579:3,
587:12, 593:20
**subversion** [1] -
624:12
**sued** [4] - 553:4,
561:3, 561:5, 561:25
**suggest** [2] - 542:4,
618:20
**suggested** [1] -
562:20
**suggestion** [3] -
605:7, 606:11,
606:23
**Sullivan** [4] - 563:12,
640:7, 644:21,
644:22
**summer** [7] - 540:4,
541:4, 551:2, 572:2,
573:5, 574:25,
667:11
**supervision** [1] -
630:22
**support** [3] - 542:1,
547:22, 562:9
**supported** [2] -
583:22, 606:10
**supporting** [1] -
556:18
**supposed** [3] - 661:8,
667:12, 672:19
**supposing** [2] -
666:11, 666:21
**suppression** [1] -
624:12
**surrounding** [1] -
645:14
**suspect** [1] - 641:7
**suspense** [1] - 558:12
**Sussman** [5] - 538:11,
540:3, 540:11,
540:22, 566:23
**SUSSMANN** [1] -
536:6

**Sussmann** [34] -
538:4, 565:18,
566:12, 574:21,
574:24, 575:4,
576:8, 576:11,
577:2, 585:23,
586:5, 589:15,
602:1, 602:2, 602:9,
605:11, 609:21,
610:3, 641:6,
641:11, 646:21,
659:24, 662:25,
663:2, 663:17,
664:22, 665:17,
666:18, 666:23,
667:5, 667:25,
669:10, 669:21,
670:2
**Sussmann's** [5] -
540:16, 567:11,
575:5, 605:16, 659:5
**swath** [1] - 637:1
**swear** [1] - 649:8
**Swiss** [1] - 675:8
**sworn** [6] - 543:17,
543:18, 569:17,
569:18, 620:17,
620:18
**Sworn** [3] - 543:20,
570:1, 620:21
**system** [8] - 582:1,
582:2, 599:9,
650:17, 650:19,
650:22, 658:14,
662:19

**T**

**table** [2] - 538:6, 543:7
**talks** [1] - 617:18
**task** [1] - 611:20
**tasked** [2] - 584:8,
584:9
**tasking** [3] - 540:12,
540:15, 540:18
**taught** [1] - 599:10
**tea** [1] - 618:9
**Tea** [1] - 607:1
**team** [2] - 613:8,
646:25
**tech** [2] - 644:23,
672:25
**technical** [6] - 578:19,
583:19, 599:12,
603:9, 608:6, 624:24
**technically** [1] - 599:3
**technician** [1] - 672:24
**tele** [1] - 639:19
**television** [1] - 639:20
**ten** [2] - 571:24, 672:2

**tend** [3] - 643:7, 643:8
**tendered** [1] - 620:5
**tenor** [1] - 635:3
**term** [1] - 630:23
**termed** [1] - 576:17
**terminology** [1] - 652:15
**terms** [12] - 557:9, 579:19, 583:19, 594:21, 608:7, 622:19, 626:7, 627:10, 627:11, 633:8, 637:17, 665:23
**test** [1] - 590:24
**testified** [16] - 541:6, 555:8, 557:25, 559:4, 575:23, 580:24, 585:14, 585:21, 600:16, 600:23, 602:1, 606:21, 613:12, 636:15, 645:4, 663:14
**testify** [2] - 539:16, 541:25
**testimony** [21] - 539:2, 539:15, 540:6, 540:7, 540:8, 541:14, 541:20, 558:19, 569:8, 569:9, 570:10, 585:13, 613:11, 615:23, 615:25, 616:14, 617:13, 617:24, 650:10, 655:3, 672:9
**text** [2] - 672:17, 675:7
**THE** [140] - 536:1, 536:1, 536:10, 538:2, 538:8, 538:12, 538:22, 538:25, 539:24, 540:1, 542:14, 542:16, 542:19, 542:22, 542:24, 542:25, 543:2, 543:13, 543:19, 550:15, 552:11, 552:14, 552:16, 552:23, 552:25, 553:1, 553:3, 553:5, 553:6, 553:18, 555:1, 557:7, 558:10, 559:15, 559:18, 559:19, 559:20, 569:7, 569:11, 569:12, 569:15, 569:19, 569:24, 569:25,

571:10, 571:12, 571:15, 581:5, 581:7, 584:23, 585:2, 585:19, 586:22, 587:25, 588:16, 589:10, 590:15, 592:9, 593:5, 593:19, 594:4, 595:3, 597:10, 601:3, 601:4, 601:8, 601:14, 601:16, 606:15, 608:24, 611:15, 615:21, 615:22, 615:24, 615:25, 616:2, 616:3, 617:4, 617:7, 617:11, 618:6, 618:12, 618:23, 619:1, 619:3, 620:3, 620:10, 620:13, 620:15, 620:16, 620:19, 623:19, 623:22, 623:24, 625:6, 625:8, 632:22, 646:16, 655:10, 655:23, 656:1, 656:16, 656:23, 658:4, 663:12, 665:5, 667:1, 668:9, 669:15, 671:19, 671:24, 672:8, 672:11, 672:12, 672:16, 672:22, 672:25, 673:2, 673:4, 673:8, 673:11, 673:15, 673:18, 673:21, 673:24, 674:1, 674:4, 674:9, 674:16, 674:21, 675:3, 675:7, 675:11, 675:14, 675:19, 675:21, 676:2, 676:6, 676:16, 676:20
**themselves** [2] - 616:10, 650:19
**then-candidate** [1] - 636:19
**theory** [2] - 540:19, 634:20
**they've** [1] - 571:3
**thick** [1] - 654:21
**thinking** [1] - 641:23
**third** [3] - 555:16, 626:22, 654:10
**thoughts** [1] - 675:21
**three** [4] - 546:6,

632:25, 653:22, 659:13
**throughout** [9] - 546:11, 549:3, 549:4, 572:18, 572:22, 640:19, 649:4, 649:18, 649:23
**Thursday** [1] - 666:10
**ties** [1] - 644:11
**tightly** [1] - 643:12
**timekeeper** [2] - 658:22, 659:23
**timekeeper's** [1] - 659:4
**timeline** [1] - 599:19
**timing** [1] - 539:4
**title** [5] - 558:6, 590:20, 599:19, 622:17, 622:18
**titled** [2] - 591:5, 593:11
**to..** [2] - 558:2, 639:14
**today** [5] - 563:22, 570:11, 641:7, 642:8, 655:3
**together** [3] - 548:18, 576:8, 660:3
**Tom** [3] - 570:25, 571:19, 591:1
**took** [4] - 583:21, 600:22, 622:15, 658:16
**top** [6] - 551:12, 556:25, 641:11, 660:13, 660:15, 670:9
**topic** [4] - 565:11, 565:24, 578:4, 579:8
**total** [1] - 659:24
**towards** [2] - 550:25, 551:4
**Towers** [1] - 645:12
**TR** [1] - 659:11
**track** [7] - 649:23, 650:1, 650:7, 650:11, 652:1, 661:5, 662:15
**tracked** [1] - 658:23
**tracking** [2] - 658:14, 662:10
**trademark** [3] - 654:3, 654:4
**trail** [1] - 628:1
**training** [3] - 674:2, 674:5, 674:17
**TRANSCRIPT** [1] - 536:9
**transcript** [6] - 618:11, 618:14, 618:24,

619:3, 677:5, 677:6
**Transfer** [1] - 659:19
**transfer** [3] - 653:14, 659:11, 659:17
**translate** [1] - 578:19
**translating** [1] - 583:18
**trial** [3] - 540:7, 557:13, 569:9
**TRIAL** [1] - 536:9
**tried** [2] - 635:5, 635:7
**true** [11] - 559:7, 561:11, 561:12, 561:17, 564:24, 579:15, 583:15, 643:21, 643:25, 677:4, 677:6
**trump** [1] - 599:24
**Trump** [51] - 546:6, 547:15, 547:18, 548:17, 548:22, 552:8, 552:20, 552:21, 552:23, 555:21, 556:18, 559:22, 559:25, 560:4, 560:8, 561:6, 561:17, 561:18, 561:21, 565:15, 566:10, 568:15, 568:18, 572:8, 572:16, 575:21, 576:20, 576:22, 577:15, 577:24, 578:16, 579:16, 580:19, 581:18, 590:5, 591:16, 591:17, 594:19, 598:22, 600:2, 604:4, 605:8, 606:12, 631:11, 636:18, 637:14, 645:11, 645:12, 645:21, 667:12
**Trump's** [3] - 576:20, 613:25, 644:11
**trump-email.com** [1] - 599:24
**Trump-related** [9] - 546:6, 548:17, 548:22, 552:8, 552:23, 556:18, 559:22, 568:18, 579:16
**Trump/Russia** [4] - 548:16, 568:22, 568:24, 613:18
**Trump/Russia-related** [1] - 548:16
**try** [10] - 539:10, 562:1, 582:11,

583:7, 583:10, 603:24, 608:8, 636:23, 639:1, 645:10
**trying** [9] - 540:20, 566:12, 566:16, 582:14, 584:10, 617:25, 643:15, 661:25
**Tuesday** [1] - 588:2
**turn** [3] - 539:3, 592:3, 593:13
**two** [17] - 542:13, 549:14, 551:10, 570:24, 591:5, 592:24, 625:23, 627:21, 628:3, 628:16, 628:22, 632:17, 633:4, 633:16, 655:19, 666:7, 674:17
**type** [11] - 548:8, 566:22, 598:9, 598:10, 604:10, 650:22, 650:24, 650:25, 651:1, 657:9, 661:3
**typical** [1] - 649:3
**typically** [12] - 635:9, 635:16, 635:22, 635:23, 643:2, 643:15, 643:17, 645:18, 649:5, 649:6, 657:10, 664:8

## U

**U.S** [1] - 536:22
**ultimate** [1] - 574:2
**ultimately** [3] - 540:13, 548:4, 608:15
**unclear** [4] - 541:5, 541:10, 541:18, 613:17
**uncommon** [4] - 574:1, 626:7, 626:11, 664:1
**under** [5] - 629:25, 630:2, 630:22, 640:9, 670:15
**understood** [14] - 548:9, 568:23, 600:23, 604:8, 605:14, 606:10, 616:25, 645:2, 646:12, 662:2, 662:17, 670:20, 671:3
**undertake** [1] - 544:20
**unfamiliar** [1] - 599:7
**unfortunate** [1] -

697

538:15
**union** [1] - 645:13
**UNITED** [3] - 536:1,
536:3, 536:10
**United** [3] - 536:12,
538:3, 677:11
**University** [1] - 602:22
**Unknown** [1] - 646:21
**unless** [2] - 542:9,
676:11
**unredacted** [1] - 660:8
**unusual** [7] - 566:20,
574:4, 574:6,
610:23, 637:14,
649:10, 664:9
**up** [41] - 542:19,
542:20, 542:25,
543:14, 552:21,
559:16, 564:12,
565:11, 565:15,
565:18, 565:19,
565:24, 566:3,
568:20, 577:17,
580:5, 581:24,
584:13, 585:1,
588:11, 596:7,
609:9, 614:15,
615:13, 619:7,
620:10, 622:15,
624:17, 628:4,
628:21, 631:23,
635:7, 642:21,
646:7, 648:15,
648:22, 657:15,
661:20, 663:6,
666:5, 672:13
**update** [1] - 648:11

**V**

**validating** [1] - 583:16
**vantage** [1] - 572:11
**varied** [2] - 544:21,
549:3
**various** [3] - 541:7,
559:4, 649:24
**vary** [1] - 649:4
**Vegas** [1] - 645:15
**vein** [1] - 582:2
**vendor** [1] - 628:7
**vendors** [1] - 623:18
**verbal** [1] - 582:9
**verify** [1] - 561:12
**Versions** [1] - 587:10
**versus** [2] - 647:21,
647:22
**via** [3] - 571:13,
571:14
**vice** [1] - 644:5
**view** [1] - 675:24

**violate** [2] - 578:12,
620:1
**virtually** [1] - 559:2
**vis** [2] - 573:16
**vis-a-vis** [1] - 573:16
**visibility** [3] - 645:18,
654:9, 654:13
**visual** [1] - 648:1
**Vixie** [2] - 581:25,
609:7
**Vladimir** [1] - 637:16
**voice** [1] - 559:16
**voices** [1] - 618:21
**voter** [2] - 624:10,
624:12
**voting** [1] - 621:17
**vs** [2] - 536:5, 538:4

**W**

**wait** [2] - 659:15,
674:17
**waived** [1] - 620:7
**Washington** [6] -
536:15, 536:23,
570:16, 570:21,
574:16, 677:13
**watch** [1] - 601:9
**water** [3] - 552:12,
569:21, 569:22
**WATKINS** [1] - 536:18
**ways** [2] - 647:17,
647:18
**WD** [2] - 659:10,
659:20
**web** [4] - 578:17,
584:3, 598:9, 598:10
**Web** [6] - 598:5, 598:7,
598:13, 598:15,
606:23, 607:2
**Web-page** [1] - 598:15
**web-page-type** [2] -
598:9, 598:10
**website** [4] - 598:5,
628:6, 628:7, 628:8
**websites** [1] - 603:11
**Wednesday** [2] -
536:4, 589:13
**week** [5] - 647:20,
648:2, 648:15,
648:19, 674:17
**weekly** [4] - 546:15,
549:6, 635:7, 635:10
**Weekly** [1] - 551:22
**weeks** [1] - 592:21
**welcome** [3] - 543:15,
601:16, 614:6
**well-placed** [1] - 606:7
**WHEREAS** [2] - 633:4,
633:9

**whichever** [1] - 603:21
**White** [1] - 639:23
**whole** [5] - 545:12,
561:23, 599:9,
633:20, 657:24
**wide** [1] - 638:8
**wide-ranging** [1] -
638:8
**willing** [1] - 674:5
**WITNESS** [19] - 537:2,
552:11, 552:23,
553:1, 553:5,
559:18, 559:20,
569:11, 569:24,
571:12, 581:7,
601:3, 611:15,
615:21, 615:24,
616:2, 620:15,
623:22, 672:11
**witness** [10] - 539:14,
540:5, 541:11,
543:18, 552:10,
554:17, 556:24,
569:14, 569:18,
620:18
**witnesses** [2] - 616:9,
616:13
**WITNESSETH** [1] -
633:4
**woman** [1] - 623:25
**wonder** [2] - 574:7,
574:9
**word** [1] - 627:20
**words** [6] - 561:15,
572:19, 577:18,
605:7, 643:11,
644:13
**worker** [1] - 563:20
**works** [2] - 544:9,
582:14
**world** [3] - 640:13,
641:4, 661:15
**worlds** [1] - 647:24
**worry** [5] - 593:22,
643:4, 643:5,
643:15, 643:17
**worth** [1] - 619:16
**write** [4] - 649:21,
659:10, 659:13,
659:20
**writing** [2] - 582:19,
600:15
**wrongly** [1] - 653:13
**wrote** [1] - 596:5

**Y**

**YAO** [1] - 536:17
**Yao** [1] - 538:10
**years** [7] - 559:2,

577:8, 581:17,
634:16, 641:24,
642:22, 647:19
**yesterday** [1] - 616:23
**York** [19] - 536:19,
546:20, 546:21,
565:21, 566:13,
586:8, 587:17,
588:23, 589:17,
589:18, 589:19,
596:14, 607:17,
623:22, 624:25,
666:11, 668:24
**younger** [1] - 603:12
**yourself** [3] - 568:7,
569:20, 620:20

**Z**

**Zealand** [1] - 671:11
**zillion** [1] - 628:5