```
 1                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
        * * * * * * * * * * * * * * *   )
 3     UNITED STATES OF AMERICA,        )  Criminal Action No.
                                        )  1:21-CR-00582-CRC-1
 4                   Plaintiff,         )  Wednesday, May 18, 2022
                                        )  1:57 p.m.
 5        vs.                           )  *AFTERNOON SESSION*
                                        )
 6     MICHAEL A. SUSSMANN,             )
                                        )
 7                   Defendant.         )
                                        )
 8      * * * * * * * * * * * * * * *   )

 9

10                      TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE

12

13     APPEARANCES:

14     FOR THE UNITED STATES:    ANDREW DeFILIPPIS, ESQ.
                                 JONATHAN EDGAR ALGOR, IV, ESQ.
15                               BRITTAIN SHAW, ESQ.
                                 SPECIAL COUNSEL'S OFFICE
16                               145 N Street, Northeast
                                 Washington, D.C. 20002
17

18     FOR THE DEFENDANT:        SEAN M. BERKOWITZ, ESQ.
                                 MICHAEL BOSWORTH, ESQ.
19                               CATHERINE YAO, ESQ.
                                 NATALIE H. RAO, ESQ.
20                               LATHAM & WATKINS, LLP
                                 1221 Avenue of the Americas
21                               New York, New York 10020

22

       REPORTED BY:             LISA EDWARDS, RDR, CRR
23                              Official Court Reporter
                                United States District Court for the
24                                District of Columbia
                                333 Constitution Avenue, Northwest
25                              Washington, D.C. 20001
                                (202) 354-3269
```

1                         I N D E X

2                              Direct      Cross        Red.

3

4      WITNESSES FOR THE GOVERNMENT:

5      Marc E. Elias                5          36           71

6      James A. Baker              89

7

8

9      EXHIBITS RECEIVED IN EVIDENCE                      PAGE

10

       Government's Exhibit No. 559                         5
11     Government's Exhibit No. 1900                       13
       Government's Exhibit No. 327                        15
12     Government's Exhibit No. 553.4                      17
       Government's Exhibit No. 331                        19
13     Government's Exhibit No. 553.6                      20
       Government's Exhibit No. 386                        25
14     Government's Exhibit No. 377                        27
       Government's Exhibit No. 553.23                     29
15     Government's Exhibit No. 1500                      101

16
       Defendant's Exhibit No. 431                         57
17     Defendant's Exhibit No. 433                         66
       Defendant's Exhibit No. 128                         68

18

19

20

21

22

23

24

25

```
1              THE COURT:  Have a seat, everyone.

2              We're back on the record.

3              You can step right up, Mr. Elias.

4              THE WITNESS:  (Retakes the witness stand.)

5              THE COURT:  So we let Juror No. 8 know that --

6    advised him to call his manager at the Court's request.  And

7    if he has any trouble, the Court will follow up.  I hope

8    that issue is taken care of.

9              Do you have a preliminary matter?

10             MR. DeFILIPPIS:  Yes, your Honor.  We have a

11   scheduling witness matter.

12             So Kevin P., who is scheduled to testify from the

13   CIA, has a family issue.  He has to go up to meet his

14   parents, who are in failing health.  And for that reason, we

15   would like to get him on the stand this week.

16             We would propose to -- because Mr. Mook will go on

17   on Friday, our proposal -- and I think the defense agrees --

18   would be to also do Mr. ███████ on Friday.  We don't think

19   his testimony will be -- his direct at least will not be

20   especially long.

21             THE COURT:  You estimated 30 minutes?

22             MR. DeFILIPPIS:  Yes, your Honor.  I'd say 30 to

23   40.

24             THE COURT:  That's fine with me.  Why don't we

25   plan to do that.
```

 1                MR. BERKOWITZ:  The Government consulted with us,

 2     and we certainly have no issues going Friday as long as we

 3     need to go.

 4                THE COURT:  Please get on the phone.

 5                (Whereupon, the following proceedings were had at

 6     sidebar:)

 7                THE COURT:  I think you may have inadvertently

 8     said his name.

 9                MR. DeFILIPPIS:  Kevin P., I think.  I think I

10     said Kevin P.

11                THE COURT:  If you did, I'll ask the court

12     reporter to redact the last name.

13                MR. DeFILIPPIS:  Thank you, your Honor.  I

14     appreciate it.

15                (Whereupon, the following proceedings were had in

16     open court:)

17                THE COURT:  There was a long line in the

18     cafeteria, I understand, so we may be a few minutes waiting

19     for our jury.

20                I hope you were able to get out, Mr. Elias?

21                THE WITNESS:  No.  I got out in the little room.

22                THE COURT:  We're off the record.

23                (Discussion had off the record.)

24                (Whereupon, the jury entered the courtroom at 2:06

25     p.m. and the following proceedings were had:)

1              THE COURT:  Welcome back, everybody.  Please be

2      seated.

3              Mr. Elias, I would remind you that you're still

4      under oath.  Okay?

5              THE WITNESS:  Thank you, your Honor.

6              MR. DeFILIPPIS:  Thank you, your Honor.

7                    CONTINUED DIRECT EXAMINATION

8      BY MR. DeFILIPPIS:

9      Q.  Mr. Elias, just before we get started, I believe the

10     binder included one more exhibit number that we hadn't read

11     outside before, which is Government's Exhibit 559.  I think

12     you said earlier you flipped through the whole binder?

13     A.  I did go through the whole binder.

14             MR. DeFILIPPIS:  Your Honor, the Government also

15     offers Exhibit 559.

16             THE COURT:  So moved.

17             MR. BERKOWITZ:  No objection.

18             (Whereupon, Government's Exhibit No. 559 was

19     entered into evidence.)

20     BY MR. DeFILIPPIS:

21     Q.  Now, Mr. Elias, before the lunch break, we were

22     discussing a number of billing records.  I just wanted to go

23     back and go a bit deeper into some of those pro formas that

24     we have been talking about.

25             But we spoke about exhibits --

```
 1              MR. DeFILIPPIS:  Ms. Arsenault, if we could just
 2      put on the screen Government's 307 and 553.1.
 3      BY MR. DeFILIPPIS:
 4      Q.  Mr. Elias, you'll recall the meeting, that we had
 5      discussed the invite for a meeting in your office on July
 6      29th.  Correct?
 7      A.  Yes.
 8      Q.  And that was a meeting, it looked like, with you and
 9      Mr. Sussmann and Rodney -- I'm sorry -- with the Fusion
10      team?
11      A.  Yes.  Yes.
12      Q.  Okay.  And then you also saw the billing record for that
13      meeting, which was 553.1.  That was Mr. Sussmann's billing
14      record of the same date.
15              Do you recall that?
16      A.  I do.
17      Q.  And that was billed -- your meeting invite had the
18      category Clinton?
19      A.  Correct.
20      Q.  And then Mr. Sussmann's billing entry, which was on the
21      pro forma there, that was billed to the Clinton Campaign.
22      Is that right?
23      A.  I'm sorry.  I was looking at the document.
24      Q.  No problem.
25              If we look at Government's Exhibit 553.1 for that
```

Elias - DIRECT - By Mr. DeFilippis

```
 1    July 29th meeting in your office --

 2    A.  Yes.

 3    Q.  -- Mr. Sussmann billed that meeting to HFACC, which is

 4    the Clinton Campaign.  Correct?

 5    A.  It appears.

 6              MR. DeFILIPPIS:  Now, let's pull up,

 7    Ms. Arsenault, Government's Exhibit 553.  If you could go to

 8    the first page of the pro forma bill reflected in 553.1.

 9    BY MR. DeFILIPPIS:

10    Q.  Do you see that, Mr. Elias, from Government's Exhibit

11    553?

12    A.  I do.

13    Q.  Is this the front page of what looks like a pro forma?

14    A.  It is.

15    Q.  And do you see the handwriting on the pro forma there?

16    A.  I do.

17    Q.  Is that your handwriting?

18    A.  No.

19    Q.  So do you know whose handwriting that would be?

20    A.  I don't, actually.

21    Q.  Now, do you recall before the break we -- let me just

22    direct your attention to the front page there.  There's an

23    84,897.093 at the bottom.  And above that, do you see the

24    84,000?

25    A.  Yes, I do.
```

1    Q.  And then above that, there's a W/D, which says

2    258,475.25.  Are you able to discern the meaning of those

3    looking at the handwriting and just knowing how these bills

4    worked?

5    A.  Yeah.  Again, without specific familiarity with this, I

6    assume that's either W/O or W/D.  I would have said W/O.

7    But either "write off" or "write down."  So I never really

8    understood the difference between the lingo that was used

9    around that, which means that $85,000-ish was being billed

10   to the client.  84,897 seems close to 85,000.  And 258,000

11   was being written off or written down.

12   Q.  So that's a discount of 258,000?

13   A.  I don't think of it as a discount.  It's a -- it is the

14   amount of billing in excess of the agreed-upon contract with

15   the client.

16   Q.  And any idea why the amount listed here exceeded the

17   monthly flat fee?  Does that make sense to you?

18   A.  No.  I didn't understand that.  Any idea why --

19   Q.  So you said the campaign was billed a monthly flat fee?

20   A.  Correct.  And I'm assuming that 85 was this month, but

21   we could look at the engagement letter.

22   Q.  I got you.

23          But your assumption would be that would be under

24   the flat fee?

25   A.  That's my -- that is -- again, without looking at the

1    engagement letter, that's what I suspect this is.

2              MR. DeFILIPPIS:  So just let's go back,

3    Ms. Arsenault, to 553.1 and 307.

4    BY MR. DeFILIPPIS:

5    Q.  So again, your understanding then is that that meeting

6    occurred in your office and Mr. Sussmann billed it to the

7    firm's client, the Clinton Campaign?

8    A.  That's my assumption with these records, yes.

9    Q.  Now, you remember we also looked at a calendar invite

10   for an August 12th meeting.  Does that ring a bell?

11   A.  It does.

12             MR. DeFILIPPIS:  Ms. Arsenault --

13             THE WITNESS:  The invite rings a bell, not the

14   meeting.

15             MR. DeFILIPPIS:  Exactly.

16             Ms. Arsenault, if you'd pull up Government's

17   Exhibit 319 and then also Government's Exhibit 553.3.

18   BY MR. DeFILIPPIS:

19   Q.  Mr. Elias, I think you'll recall this was the meeting

20   that said meeting with Rodney in your office.  Do you

21   remember that one?

22   A.  This is the calendar invite.  Correct.

23   Q.  Right.  And you said -- you testified you thought that

24   was probably Rodney Joffe.  Right?

25   A.  Yes.  That's my assumption.


Elias - DIRECT - By Mr. DeFilippis

1    Q.  Okay.  And then we have Mr. Sussmann's billing entry

2    which billed that as confidential meeting with M. Elias,

3    others.

4              Do you recall seeing that?

5    A.  I do see that.  Yeah.

6    Q.  Again, no recollection of who the "others," plural,

7    would have been?

8    A.  No.  In fact, I don't even have a recollection of being

9    at the meeting.

10   Q.  Did you understand whether Mr. Joffe was a client of the

11   firm Perkins Coie?

12   A.  My understanding is he was a firm client.

13   Q.  And who was -- was it Mr. Sussmann who was the primary

14   lawyer who handled --

15   A.  Yes.

16   Q.  And now going back to this meeting which was on August

17   12th, is it your understanding that Mr. Sussmann billed that

18   meeting between you, Rodney -- between you, Rodney and

19   Sussmann to the Clinton Campaign?

20   A.  I don't know whether I was at the meeting.  But if

21   you're asking whether the time entry corresponds with that

22   billing -- with that invite, it appears to.

23   Q.  Okay.  Now, if Mr. Sussmann had also billed Mr. Joffe

24   for that meeting, would that appear on the pro forma that we

25   looked at or on a different pro forma?

1    A.  It would be on a different pro forma.

2              MR. DeFILIPPIS:  And then finally, Ms. Arsenault,

3    if we could pull up the first page of the pro forma

4    reflected at Government's Exhibit 553.3.

5    BY MR. DeFILIPPIS:

6    Q.  So do you see the front page there, Mr. Elias?

7    A.  I do.

8    Q.  And again, is this a pro forma?

9    A.  It is.

10   Q.  For the Clinton Campaign?

11   A.  Yes.

12   Q.  And what's the time period covered by that one?

13   A.  So the date of it is November 30th.  So it's for -- so

14   it should have been for time billed in October, but

15   sometimes people enter their time late.  So it may have been

16   from before that.

17   Q.  Okay.  And in this --

18   A.  I'm sorry.  For November.  Sorry.  Not October.  As I

19   understand it, it says for services through November 30th at

20   the top.

21   Q.  Got it.

22   A.  Right?  So that suggests to me -- if you showed me the

23   next -- the next pages, we could see what the dates are.

24   But I assume this is for time entry in November, but people

25   sometimes bill their time late.  So there could have been

1    earlier entries.

2    Q.  And again, the same question as to the handwriting:  Is

3    that your handwriting?

4    A.  It is not.

5    Q.  Do you know whose handwriting it is?

6    A.  I don't.

7              MR. DeFILIPPIS:  Then returning back to the prior

8    two exhibits, Ms. Arsenault, 553.3 and 319.

9    BY MR. DeFILIPPIS:

10   Q.  A watched pot never boils, Mr. Elias.

11   A.  I'm just making sure you're not waiting on me.

12   Q.  No, no.

13             So this was the calendar invite and the billing

14   entry for the meeting with Rodney in your office.  Right?

15   A.  Yes.  This is what we were just looking at, right?

16   Q.  Yes.

17             And so is it your understanding, then, that

18   Mr. Sussmann billed his time for that meeting, at least

19   according to the pro forma, to the Clinton Campaign?

20   A.  Yes.

21   Q.  Okay.  Next I'd like to show you what's been premarked

22   as Government's Exhibit 1900.

23   A.  With the understanding that I don't remember being at

24   the meeting.

25   Q.  Understood.

```
1     A.  Yeah.

2     Q.  Do you recognize this as an email from Leigh Nichols to

3     Lisa Patel?

4     A.  That's what it says.

5     Q.  Am I correct that you're not on this particular email?

6     A.  I'm not.

7     Q.  And you said earlier that you weren't sure who Leigh

8     Nichols was.  In looking at this email, at least, does it

9     help you remember -- or maybe you don't remember -- but

10    determine who Leigh Nichols is?

11    A.  Yeah.  I don't remember, but I'm sure it was Michael's

12    assistant, I mean, just based on the practice of how invites

13    went out at the firm.

14          And it says -- I shouldn't say what it says.

15          MR. DeFILIPPIS:  Your Honor, the Government offers

16    Government's Exhibit 1900.

17          MR. BERKOWITZ:  No objection.

18          THE COURT:  So moved.

19          (Whereupon, Government's Exhibit No. 1900 was

20    entered into evidence.)

21    BY MR. DeFILIPPIS:

22    Q.  Now, Mr. Elias, recognizing you're not on this email,

23    but for the benefit of the jury, could you just read the

24    text of the email there?

25    A.  Sure.  "Hi, Lisa.  Michael Sussmann and Marc Elias would
```

Elias - DIRECT - By Mr. DeFilippis

1    like to set up a 30-minute telephone conference with Rodney

2    on his cell for this Wednesday, August 17th, between 5:30

3    and 6:45 p.m.  Would you be able to check Rodney's

4    availability and let me know what works for him?  Thanks

5    much."  Signed, Leigh.

6         And what I was starting to say when I said I

7    shouldn't say it is that it indicates in the signature block

8    that she is, in fact, Michael Sussmann's assistant.

9    Q.  Okay.  And again, does that jog a particular

10   recollection?

11   A.  It doesn't, but it makes sense.

12   Q.  Got it.

13        And would that be common for you as well, that

14   your secretary or administrative assistant would help set up

15   your meetings?

16   A.  Yeah.  I have a slightly differently arrangement in that

17   I had a full-time scheduler.  So yes.  My scheduler

18   definitely set up my meetings.

19   Q.  So it looks like from this email, is it your

20   understanding, then, that there was going to be a meeting on

21   the 17th of August, at least according to what it says?

22   A.  That's -- I mean, that's what it says.

23   Q.  Any recollection of that?

24   A.  Not specifically on the 17th, no.  Like I said, I

25   generally recall talking to Rodney on the phone at some

Elias - DIRECT - By Mr. DeFilippis

1    point.

2    Q.  So let me now direct your attention to what's been

3    marked Government's Exhibit 327.  Does it look like another

4    calendar invite from Leigh Nichols to you?

5    A.  It does.

6              MR. DeFILIPPIS:  Your Honor, the Government offers

7    Government's Exhibit 327.

8              MR. BERKOWITZ:  No objection.

9              THE COURT:  So moved.

10             (Whereupon, Government's Exhibit No. 327 was

11   entered into evidence.)

12   BY MR. DeFILIPPIS:

13   Q.  Mr. Elias, who else is on the invite from Leigh Nichols?

14   A.  Me and Rodney Joffe.

15   Q.  And what is the subject of that invite?

16   A.  Telephone conference re:  status.

17   Q.  And the location?

18   A.  "Michael and Marc will call Rodney."

19   Q.  And the date and time?

20   A.  The 17th of August, 2016, from 5:30 to 6:00 p.m.

21   Q.  Okay.  What, if anything, do you recall about that phone

22   conversation?

23   A.  I don't.  Like I said, I know -- I remember talking to

24   him on the phone.  I just don't have any recollection of

25   what day it was.

1    Q.  And when it says telephone conference re:  status,

2    looking at that now, status of what would be your

3    understanding?

4    A.  I don't have any recollection.  There's nothing other

5    than Alfa-Bank that I would have ever had any reason to

6    interact with Rodney Joffe.

7    Q.  And --

8    A.  But I don't remember.

9    Q.  Yeah.  Understood.

10         MR. DeFILIPPIS:  Ms. Arsenault, would it be

11   possible to keep that on the screen and pull up -- I'm

12   sorry.  Let's show just to the witness Government's Exhibit

13   553.4.

14         THE WITNESS:  There's nothing at that time I would

15   have had reason to intersect with him.

16   BY MR. DeFILIPPIS:

17   Q.  Understood.

18         So do I understand you to be saying there's

19   nothing other than the Alfa-Bank matter at that time that

20   you would have been talking to Mr. Joffe about?

21   A.  Correct.

22   Q.  So looking at Government's Exhibit 553.4 on the screen,

23   what does that appear to be?

24   A.  This is a pro forma billing entry for August 17th, 2016.

25   Michael Sussmann billed a half-hour for a telephone call

1    with -- between -- a telephone conference with R. Joffe and

2    M. Elias.

3            MR. DeFILIPPIS:  Your Honor, the Government offers

4    Government's Exhibit 553.4.

5            MR. BERKOWITZ:  No objection.

6            THE COURT:  So moved.

7            (Whereupon, Government's Exhibit No. 553.4 was

8    entered into evidence.)

9    BY MR. DeFILIPPIS:

10   Q.  Looking at this pro forma entry, Mr. Elias, you said the

11   date was August 17th, 2016.  Right?

12   A.  Yes.

13   Q.  And that's the same date as the calendar invite we

14   looked at, which was subject line "telephone conference re:

15   status"?

16   A.  Yes.

17   Q.  And that was the same one that the location was "Michael

18   and Marc will call Rodney"?

19   A.  Yes.

20   Q.  So Mr. Sussmann billed a half-hour on that same date,

21   the 17th of August.  Is that right?

22   A.  That's what it says.

23   Q.  And how much did he charge or how much was billed for

24   that half-hour?

25   A.  $417.50.

1   Q.  And what was the description that Mr. Sussmann put on

2   the --

3   A.  Telephone conference with R. Joffe, M. Elias.

4   Q.  So it looks like that call must have gone forward?

5   A.  I don't know.

6   Q.  I mean, unless Mr. Sussmann would have just imagined it.

7   Right?

8   A.  I just don't have a recollection of when particular --

9   when we spoke by phone.

10  Q.  Okay.  But --

11  A.  I'm not disputing it; I'm saying I don't know.

12  Q.  I mean, from looking at this, it --

13  A.  I'm sorry.  From looking at it, yes.  I'm sorry.

14  Q.  Now, if we can go to the upper left hand of the pro

15  forma there, who did Mr. Sussmann bill the call -- the

16  apparent call with Rodney to?

17  A.  The Clinton Campaign, Hillary for America, HFACC, Inc.,

18  which was the technical corporate name of Hillary for

19  America.

20  Q.  Got it.

21          And so would it be your inference from reading

22  these documents, putting aside your lack of recollection,

23  that Mr. Sussmann billed a call with you and Rodney Joffe

24  to the Clinton Campaign?

25  A.  Yes.

1   Q.  Okay.  That was August 17th.  Right?

2   A.  I'm sorry.  August -- yes.  August 17th.

3   Q.  And Mr. Joffe and the Clinton Campaign both then -- were

4   they both then clients of Perkins Coie?

5   A.  The Clinton Campaign, definitely.  My understanding was

6   that Rodney Joffe and his former company were -- or -- I'm

7   sorry.  Not former company; I guess his company.

8   Q.  I'm now going to show you what's been premarked

9   Government's Exhibit 331.  It appears to be another calendar

10  invite?

11  A.  Yes.

12           MR. DeFILIPPIS:  The Government offers

13  Government's Exhibit 331.

14           MR. BERKOWITZ:  No objection.

15           THE COURT:  So moved.

16           (Whereupon, Government's Exhibit No. 331 was

17  entered into evidence.)

18  BY MR. DeFILIPPIS:

19  Q.  Mr. Elias, who sent this particular calendar invite?

20  A.  Michael Sussmann.

21  Q.  And who's the recipient?

22  A.  Me.

23  Q.  And the subject?

24  A.  Meeting with Rodney.

25  Q.  And where does it look like the meeting was going to

Elias - DIRECT - By Mr. DeFilippis

1    take place?

2    A.  My office.

3    Q.  And the date?

4    A.  August 19th.

5    Q.  And for how long and what time?

6    A.  An hour and a half, from 10:30 a.m. to noon.

7    Q.  Okay.  And again, at this time, which is just a few

8    days, you know, not much later, the subject would have been

9    Alfa-Bank, do you think?

10   A.  At this time frame, there was no other topic that I can

11   recall other than Alfa-Bank.

12   Q.  So let's look at what's been marked Government's Exhibit

13   553.6, which is -- well, what does this appear to be, just

14   the general type of document?

15   A.  This is a pro forma, I think.  Right?  Yeah.  This is a

16   pro forma dated 8-23-2016.  It's a time entry.  Honestly,

17   you'd have to blow it up because it's hard for me to read.

18   I apologize.

19        MR. DeFILIPPIS:  Your Honor, the Government offers

20   Government's Exhibit 553.6.

21        MR. BERKOWITZ:  No objection.

22        THE COURT:  So moved.

23        (Whereupon, Government's Exhibit No. 553.6 was

24   entered into evidence.)

25

```
 1    BY MR. DeFILIPPIS:

 2    Q.  So, Mr. Elias, is the date, August 19th here, the same

 3    date as the calendar invite we had been looking at?

 4    A.  Yes.

 5    Q.  And the timekeeper?

 6    A.  Michael Sussmann.

 7    Q.  And how many hours did Mr. Sussmann log for that

 8    meeting, the apparent meeting?

 9    A.  Three and a half -- I'm sorry -- no.  No.  No.  3.3.

10    Q.  3.3 hours?

11    A.  3.3 hours, which is three hours and 18 minutes.

12    Q.  And then how much was the client charged, or at least

13    according to the --

14    A.  Sure.  2,755.50.

15    Q.  And the description?

16    A.  Confidential meeting with M. Elias, others, confidential

17    followup meeting, telephone conferences, work on document.

18    Q.  What, if any, document do you recall working on with

19    Mr. Sussmann in connection with all of this?

20    A.  I don't recall working on a document with Mr. Sussmann

21    about this.

22              MR. DeFILIPPIS:  Ms. Arsenault, if we could put

23    331 up, along with the current exhibit, 553.6.

24    BY MR. DeFILIPPIS:

25    Q.  Mr. Elias, looking at these two documents together, it
```

1   would appear that they reflect a meeting with Rodney in your

2   office along with Mr. Sussmann.  Does it appear that

3   Mr. Sussmann billed the Clinton Campaign for that meeting

4   with you and Rodney Joffe?

5   A.  Yes.

6   Q.  In the amount of $2,755.50?

7   A.  Yes.

8           MR. BERKOWITZ:  Objection.  Foundation.  Happy to

9   explain.

10          THE COURT:  I'll overrule it.

11          I think, Mr. DeFilippis, we get the concept of the

12  records, if we could get through these a little more

13  quickly.

14          MR. DeFILIPPIS:  Sure.  Yes, your Honor.

15  BY MR. DeFILIPPIS:

16  Q.  Mr. Elias, let me just ask you this:  If those meetings

17  did occur, would you have billed them the same -- and

18  attended them, would you have billed the same way?  In other

19  words, a pro forma to the Clinton Campaign?

20  A.  If they had happened and I had attended them for the

21  Clinton Campaign, I would have billed the time to the

22  Clinton Campaign.  Yes.

23  Q.  And did you consider your Alfa-Bank-related work with

24  Mr. Sussmann and Mr. Joffe to be part of your work for the

25  Clinton Campaign?

1    A.  Clinton Campaign and DNC, yes.

2    Q.  And DNC.  Okay.  Understood.

3            Let me ask you this:  Did there come a time when

4    you started making folks on the campaign aware of the

5    Alfa-Bank server issue?

6    A.  Yes.

7    Q.  And as best as you can recall or estimate, about when

8    was that?

9    A.  It's really hard.  So I will tell you it was -- it was

10   sometime, if I had to guess -- or more than guess; my best

11   recollection is it would have been sometime in the second

12   half -- sometime in August, maybe the second half of August.

13   Q.  Okay.  And --

14   A.  It would have been after the convention.  The

15   convention's like a marker date for me, right?  Because

16   that's like a big event in politics.  That's when you go

17   from being the nominee to the general election candidate.

18   And that was, I think, the last week of July.  So it was

19   after that.  And, you know, I think it was probably a few

20   weeks after that.

21   Q.  And would it be fair to say that -- what was the purpose

22   of alerting the folks on the campaign to that issue?

23   A.  I thought it was important for them to know.

24   Q.  And would it be fair to say that if the allegation were

25   to become public, to what extent did you think that the

1    campaign might benefit from the publication of the

2    allegation?

3    A.  I thought that if there was a news account of the

4    allegation, it would benefit the campaign.

5    Q.  And so putting aside any conversations that involved

6    legal advice, what, if anything, did you do to make that

7    happen?

8    A.  To make what happen?

9    Q.  To try to promote a news article on the subject, if you

10   did.

11   A.  I'm not sure that I -- I don't recall myself doing

12   anything in that time period to promote an article about

13   Alfa-Bank.

14   Q.  And how about others on the campaign or working on

15   behalf of the campaign?

16   A.  I don't recall anyone on the campaign.  I know that --

17   I'm trying to walk a privilege line here -- that there were

18   communications between Fusion and Mr. Sussmann.

19   Q.  And to what extent do you have a recollection of a

20   decision by the campaign that this should be provided to the

21   media?

22   A.  I don't recall that.

23   Q.  Did you learn at some point that it was going to be or

24   had been provided to the media?

25   A.  Yes.

1    Q.  And to the extent you can say, any further detail on

2    that?

3    A.  I learned it from Mr. Sussmann.

4    Q.  Okay.  Let me direct your attention to what's been

5    premarked as Government's Exhibit 386.

6           Is this an email from you to some folks at the

7    campaign?

8    A.  It is.

9           MR. DeFILIPPIS:  Your Honor, the Government offers

10   Government's Exhibit 386.

11          MR. BERKOWITZ:  No objection.

12          THE COURT:  So moved.

13          (Whereupon, Government's Exhibit No. 386 was

14   entered into evidence.)

15   BY MR. DeFILIPPIS:

16   Q.  Mr. Elias, who on the campaign did you send this email

17   to?

18   A.  Jake Sullivan, Robby Mook, John Podesta, Jen Palmieri.

19   Q.  And just remind us briefly what positions each of those

20   people held on the campaign.

21   A.  Absolutely.  Jake was the director of policy.  Robby was

22   the campaign manager.  John Podesta was the campaign chair.

23   Jen Palmieri was -- I think her title was communications

24   director, but it may have been actually more senior than

25   that.  It may have been like senior advisor for

Elias - DIRECT - By Mr. DeFilippis

1    communication.  But she essentially was the top person on

2    communications.

3    Q.  And then the subject of this email?

4    A.  Alfa article.

5    Q.  And does it look like there's an attachment there?

6    A.  Yes.

7    Q.  To the extent you can say, Mr. Elias, did this email

8    relate to the issues we've been discussing with the Alfa

9    server?

10   A.  I don't know.  I -- I mean, I don't remember

11   specifically other than I suspect the attachment had

12   something to do with Alfa-Bank.

13   Q.  And to the extent that you were sending an attachment

14   about something Alfa-Bank related to these folks on the

15   campaign, do you think that would have been because of your

16   awareness of the Alfa-Bank server issue?

17   A.  Oh, yeah.

18   Q.  Okay.  And do you think this is around the time or later

19   than the time or before when you first alerted folks on the

20   campaign to the Alfa-Bank server issue?

21   A.  I'm assuming this is after, because otherwise there'd be

22   no context.

23   Q.  Understood.

24        So is it your best understanding or recollection

25   that you probably had told these folks about the issue

1   relating to the Alfa-Bank server before September --

2   A.  Yeah.  Yeah.  I mean, yeah.  Just looking at this, I

3   think that is a fair inference.

4   Q.  Let me now direct your attention to what's been

5   premarked Government's Exhibit 377.  And is this an either

6   email or draft email that you appear to have composed?

7   A.  Yes.

8           MR. DeFILIPPIS:  Your Honor, the Government offers

9   Government's Exhibit 377.

10          MR. BERKOWITZ:  No objection.

11          THE COURT:  So moved.

12          (Whereupon, Government's Exhibit No. 377 was

13  entered into evidence.)

14  BY MR. DeFILIPPIS:

15  Q.  Mr. Elias, what are we looking at here to the best you

16  can tell?

17  A.  So I suspect -- I think I mentioned earlier I tended not

18  to enter my own time.  So I suspect that I was using email

19  as a way to -- for that day for whatever reason to track my

20  time.  And maybe I emailed.  I don't know enough about the

21  systems and like whether this is, as you say, draft or sent.

22  But I suspect this was my way of essentially keeping time on

23  that day.

24  Q.  So if we look at the part under the heading "Monday,

25  September 12th, 8.5," Mr. Elias, just explain why it is that

1  this was sent or composed on October 9th and then the

2  heading says September 12th.

3  A.  Because I was 60 days from an election and I was way

4  behind on getting my time completed.

5  Q.  Understood.

6          And what is the entry that's shown beside the

7  redactions?

8  A.  It's billing two-tenths -- I'm going to configure it to

9  what I think the pro forma looks like, if that's helpful.

10  It's showing that I billed the Clinton Campaign -- I think

11  it was Matter 4, not Matter 1; Matter 4, not Matter 1 --

12  two-tenths of an hour, which would be basically seven to 12

13  minutes for a telephone call with M. Sussmann regarding *The*

14  *New York Times*.

15  Q.  Sitting here today, do you have any recollection of the

16  subject more specific than *The New York Times*?

17  A.  No.

18  Q.  Let me show you Government's Exhibit 553.23.  Mr. Elias,

19  only a couple more billing records.

20  A.  That's okay.

21  Q.  Does this appear to be another pro forma?

22  A.  It does.

23          MR. DeFILIPPIS:  Your Honor, the Government offers

24  Government's Exhibit 553.23.

25          MR. BERKOWITZ:  No objection.

```
 1              THE COURT:  So moved.
 2              (Whereupon, Government's Exhibit No. 553.23 was
 3    entered into evidence.)
 4    BY MR. DeFILIPPIS:
 5    Q.  Mr. Elias, directing your attention to the entry listed
 6    on that billing entry, what's the date of it, of the work
 7    performed?
 8    A.  The 17th of September.
 9    Q.  And the hours?
10    A.  4.8.
11    Q.  And which lawyer is billing this?
12    A.  I'm sorry.  Michael Sussmann.
13    Q.  The amount charged to the client?
14    A.  The amount is $4,008.
15    Q.  And then the description?
16    A.  Multiple telephone conferences and other communications
17    with experts, media; communications with M. Elias.
18    Q.  And which experts do you understand that to refer to?
19    A.  I don't know.
20    Q.  Do you know one way or the other, Mr. Elias, whether
21    this related to the Alfa-Bank-related allegations?
22    A.  I don't.
23    Q.  Was that -- were you consulting with Mr. Sussmann during
24    that time period on the Alfa-Bank allegations?
25    A.  I think I was having occasional check-ins.
```

1    Q.  Mr. Elias, at some point, did you learn that

2    Mr. Sussmann provided the Alfa-Bank allegations to the FBI?

3    A.  Yes.

4    Q.  And what's the best estimate you can give us of the time

5    period in which you learned that?

6    A.  I think it was shortly after.  In other words, I think

7    he was telling me that he had gone to the FBI.  It is

8    possible that it was right before.  But it's hard for me --

9    if I had a gun to my head, I'd say it was right after.  If

10   you told me you had a record that says it was, like, the day

11   of or the night before, it could be.  You know, my

12   recollection on this is only as good as it's going to be

13   given the time that's passed.  But I think it was after.  I

14   think it was shortly after.

15   Q.  And we've talked previously in your testimony about

16   Mr. Rodney Joffe.  Did you ever represent Mr. Joffe yourself

17   or was that always Mr. Sussmann?

18   A.  I don't believe I ever did.

19   Q.  Do you recall at some point there were news articles

20   that came out about the Alfa-Bank issue?

21   A.  I do.

22   Q.  And to what extent did you -- leaving aside any legal

23   advice you gave, to what extent were you aware of that and

24   did you make folks on the campaign aware of that?

25   A.  I became aware -- I was aware of it because it was in

 1    the newspaper or I think online.  And I don't recall whether

 2    I made the campaign aware or the campaign made me aware.

 3    Q.  Is it the case, Mr. Elias, or to what extent do you know

 4    whether Mr. Sussmann advised the Clinton Campaign on

 5    cybersecurity issues?

 6    A.  I believe he did.

 7    Q.  And to what extent were you aware whether he visited

 8    with or communicated with the FBI in connection with that

 9    advice?

10    A.  I believe he did earlier.  I think he did around the

11    time of the convention.

12    Q.  Okay.  And then how about the DNC?  To what extent did

13    Mr. Sussmann advise the DNC on cybersecurity matters?

14    A.  Oh, extensively.

15    Q.  Extensively.  And that was because I assume the DNC had

16    been the victim of a major hack by the Russian government?

17    A.  Yeah.

18    Q.  And so to what extent from your vantage point did

19    Mr. Sussmann interact with or meet with the FBI in

20    connection with that matter?

21    A.  You know, I am not a cyber lawyer and I was not

22    supervising Mr. Sussmann's interactions with the FBI really

23    for either, but certainly not for the DNC.  He was dealing

24    directly with the client.  So, you know, my sense was that

25    there were considerable -- there was considerable need for

1    communications with the FBI.  But I don't believe I was

2    privy to that.

3    Q.  So if he wanted to go to the FBI to talk about a cyber

4    matter for the DNC, to what extent did he have to run it by

5    you, check it with you, anything like that?

6    A.  No.  I think he was dealing directly with the chair of

7    the DNC about it.

8    Q.  So did he have pretty much, from your vantage point,

9    total discretion on that?

10   A.  I don't think he had to run anything by me with respect

11   to going to the FBI with respect to the DNC.

12   Q.  Okay.  And then how about the campaign and its cyber

13   matters?  Was it similar?  Different?  Did he have to run

14   every meeting or communication by you?

15   A.  I don't think he had to run every communication by me.

16   I think that the campaign had -- you know, every client has

17   their own sensibility about its relationship with law

18   enforcement.  I think the campaign, you know, had a

19   sensibility that I would have hoped that I'd be aware of,

20   you know, not routine dealings with the FBI, but if there

21   was some, you know, if there was going to be like a meeting

22   with the FBI, like with the campaign.

23           In other words -- I'm gobbledygooking this up a

24   little bit.  If Mr. Sussmann wanted to deal with the FBI for

25   the campaign, he wouldn't necessarily have to come to me

1    first.  If he was, like, letting the FBI, like, meet with

2    the CTO, you know, I would expect to have known that,

3    whereas with the DNC, I would not necessarily have been in

4    that loop.

5    Q.  Okay.  So for the campaign, if he wanted to bring

6    somebody from the campaign, like an employee of the

7    campaign, you might have wanted to know about that?

8    A.  Yes.  Precisely.

9    Q.  But presumably, because cyber things were sort of hot at

10   the time, was it your assumption he was communicating with

11   the FBI on those things and he wasn't running it by you?

12   A.  Correct.  Yes.  That's exactly right.  That's exactly

13   the distinction I'm drawing.

14   Q.  Okay.  Mr. Elias, did you have a -- do you now have a

15   specific recollection of the date when the FBI received the

16   Alfa-Bank allegations?

17   A.  No.

18   Q.  And if I told you it was around September 19th, does

19   that --

20   A.  It doesn't ring a bell, but I am -- I am sort of aware

21   of that.

22   Q.  Okay.

23   A.  But not from recollection.  More from, you know --

24   Q.  Got it.

25                  So just situating us, then, in time, the July 29th

Elias - DIRECT - By Mr. DeFilippis

1    meeting we looked at; the August 12th; August 17th; August

2    19th; September 17th.  All those billing records, they would

3    have been in the run-up to the meeting with the FBI before.

4    Is that --

5    A.  Correct.

6    Q.  Now, when you briefed members of the campaign about the

7    Alfa-Bank matter, to the extent you recall, the first

8    question is:  Who would that be?

9    A.  So I don't specifically recall.  I sort of generally

10   recall.  And frankly, the email you sent to me -- not

11   sent -- I'm sorry; you didn't send it to me; you just showed

12   me -- is suggestive of a group that makes sense.  Like it

13   would have been Robby; it would have been John, if he was

14   around.  See, I just don't remember.  John was on the road a

15   ton.

16   Q.  That would be John?  Just --

17   A.  Podesta.  So the campaign chair is like a surrogate for

18   the campaign.  The campaign manager's, like, sitting at

19   headquarters every day, like managing the campaign.  John

20   certainly had input into campaign decisions, but he was on

21   the road a lot, like attending events instead of the

22   Secretary.  So I just don't remember whether John would have

23   been, like, readily available.

24            But that -- but Jake, you know, would make sense.

25   Palmieri would make sense.

1  Q.  To what extent do you remember the campaign issuing any

2  public statements on the Alfa-Bank matter?

3  A.  I think they did later.  Right?  I think they did, like,

4  shortly before the election; but not related to *The New York*

5  *Times*, I don't think.

6  Q.  And that --

7  A.  I could be wrong.  But I don't -- I don't remember.

8  Q.  And to the extent the campaign issued statements like

9  that, would they run it by you?  No?  Maybe?

10  A.  They might have been.  I don't know.  They might have

11  run it by me.  They might have run it, by the way, by any

12  number of lawyers.  So when you say me, it could have been,

13  you know -- I don't remember -- we oftentimes have a social

14  media review where we review literally every Facebook ad,

15  every, you know, post, every tweet, every -- I don't

16  remember how that was handled, whether that was inside the

17  campaign or external to the campaign.  But that's -- and I

18  also don't remember if we were doing tweets at that period

19  in time because Twitter was maybe -- I don't remember how

20  prominent Twitter was in the campaign.

21  Q.  And finally, on the opposition research or campaign

22  research that you oversaw, did you have discretion to

23  instruct Fusion to pursue leads and take investigative steps

24  without checking in each instance with folks at the

25  campaign?

```
 1    A.  Yes.
 2              MR. DeFILIPPIS:  Thank you.
 3                        CROSS-EXAMINATION
 4    BY MR. BERKOWITZ:
 5    Q.  Good afternoon, Mr. Elias.
 6    A.  Good afternoon.
 7    Q.  Let's get some preliminary matters out of the way.
 8              You know Michael Sussmann, don't you?
 9    A.  I do.
10    Q.  You were law partners with Michael Sussmann?
11    A.  We were.
12    Q.  Were you socially friendly with Mr. Sussmann?
13    A.  No.
14    Q.  You haven't talked to him in a couple years?
15    A.  I don't think I've talked to him in, yeah, in a long --
16    in a couple of years at least.
17    Q.  And you no longer are law partners.  You're at a
18    different law firm?
19    A.  Correct.
20    Q.  And you guys worked together at a firm called Perkins
21    Coie.  Right?
22    A.  Yes.
23    Q.  Can you tell the jury how big Perkins Coie was in the
24    2016 time period?
25    A.  You know, I always say it had like a thousand lawyers
```

```
1    and I think -- I'm always surprised that I understated it.

2    It was headquartered in the West, in Seattle, but it had

3    offices in, you know, L.A., in San Francisco, Menlo Park --

4    I never understood why you needed one in both, but they

5    did -- Chicago, New York, China, D.C. and then random places

6    like Arizona, Idaho.

7    Q.  All over the place?

8    A.  Yeah.

9    Q.  Now, you talked about working with Mr. Sussmann on

10   certain matters in 2016.  Right?

11   A.  Yes.

12   Q.  Before 2016, did you guys work together frequently?

13   A.  No.

14   Q.  And I think you told Mr. DeFilippis that you were the

15   chair of something called the political law group within

16   Perkins Coie.  Right?

17   A.  Yes.

18   Q.  I think you said you had several dozen people who worked

19   under you?

20   A.  Yes.

21   Q.  Was Mr. Sussmann in the political law group at Perkins

22   Coie?

23   A.  No.  He was, I think, in something called the privacy

24   group, which I think rolled up to litigation.  But no.  It

25   was a totally separate practice area.
```

1    Q.  With respect to his practice, what did you understand in

2    the 2016 time period to be Mr. Sussmann's area of expertise?

3    A.  My understanding is that Michael did privacy and

4    security law and that his sort of, you know, marketed

5    skill -- I mean, I'm sure he's a good lawyer -- was that

6    like he had relationships -- like he had security clearances

7    and various things.  So tech companies that needed to

8    interface with law enforcement would go to him.  But I

9    couldn't tell you what exactly that meant.

10   Q.  We've heard some testimony today about Rodney Joffe.

11   Correct?

12   A.  Yes.

13   Q.  And you remember generally speaking with him from time

14   to time in the 2016 time period about the Alfa-Bank server

15   allegations?

16   A.  I remember meeting him.  I don't remember whether the

17   meeting was, like, sitting with him or just, like, meeting

18   him and like in and out.  And I remember talking to him on

19   the phone.

20   Q.  And Mr. Joffe worked for or was -- worked for a company

21   called Neustar?

22   A.  Yes.

23   Q.  What did you understand his position at Neustar to be,

24   if you know?

25   A.  I don't know that I knew his position at Neustar.

```
1    Q.  Would you know whether he was Mr. Sussmann's client

2    contact at Neustar?

3    A.  I thought that he -- I thought that Rodney Joffe was a

4    client and was at Neustar, which was a client.

5    Q.  And how large, if you know, a client was Neustar for

6    Perkins Coie?

7    A.  I have no idea.

8    Q.  Was Mr. Sussmann the relationship partner for Neustar?

9    A.  I don't know.

10   Q.  Do you know what business Neustar was in?

11   A.  So I know they did number portability, because it was

12   revolutionary.  You used to have a phone and you literally

13   could not move from Verizon to AT&T or vice versa without

14   losing your cell phone number.

15        So during the Kerry Campaign, I remember that all

16   of a sudden you could magically call up your previous

17   provider and change carrier.  And I remember doing it.  And

18   I remember thinking this was like magic, and I remember that

19   that was Neustar.  That's literally what I knew about

20   Neustar.

21   Q.  Okay.  Well, let's talk about some things you know more

22   about, sir, and that's your practice.

23   A.  Yes.

24   Q.  Okay?  You indicated that you were the general counsel

25   for Hillary for America.  Correct?
```

```
 1    A.  Yes.

 2    Q.  And that started in around April of 2016?

 3    A.  Correct.

 4    Q.  You --

 5    A.  No, no, no.  April 2015.

 6    Q.  April of 2015.

 7              And you had previously been the outside general

 8    counsel for the Kerry Campaign?

 9    A.  Yes.

10    Q.  And the Obama Campaigns in both --

11    A.  So my practice group was the outside general counsel to

12    the Obama Campaigns.  Another partner named Bob Bauer had --

13    the role that I had with Kerry and Clinton he had with Obama

14    and Bill Bradley.  We're going back a few years.

15    Q.  So the Hillary for America Campaign, starting around

16    April of 2015, were you also the outside general counsel for

17    the Democratic National Committee?

18    A.  Yes.  I became the general counsel.  Mr. Bauer was the

19    outside general counsel to the DNC because President Obama

20    was the president.

21              And then at the point -- at some point in the

22    spring, when Secretary Clinton became the presumptive

23    nominee, essentially the nominee becomes the -- takes over

24    as the head of the party.  I became the general counsel to

25    the DNC.
```

1    Q.  So as of what time period?

2    A.  I mean, certainly by June.  But I couldn't tell you

3    whether it was April or May.  I'd have to go back and see

4    when did that -- when was it clear that Secretary Clinton

5    had wrapped up the nomination.

6    Q.  So as of at least mid-2016, you were the acting general

7    counsel for both the DNC and Hillary for America?

8    A.  Yeah.  There was sensitivity because Senator Sanders,

9    you know, was, you know, running in a competitive primary.

10   And so the DNC general counselship was not going to go to me

11   since I was also representing Hillary until after that

12   primary was essentially resolved.  The primary was resolved

13   sometime, obviously, before the convention.

14   Q.  Once Secretary Clinton became the presumptive nominee,

15   you were the outside general counsel for the DNC

16   effectively?

17   A.  Yes.

18   Q.  And in that time period, once she became the presumptive

19   nominee, the DNC was acting to support the election of

20   Hillary Clinton.  Correct?

21   A.  Absolutely.

22   Q.  Their interests were aligned.  Correct?

23   A.  Completely aligned.

24   Q.  Now, there was some discussion about the fee arrangement

25   that you had with the Clinton Campaign.  There was a flat

1    fee.  Correct?

2    A.  Yes.

3    Q.  Was that unusual or unorthodox in your experience,

4    having been on previous campaigns?

5    A.  No.  This was quite typical.  In fact, we had done a

6    flat fee arrangement with both Obama Campaigns and with the

7    Kerry Campaign and I suspect, though I don't recall, the

8    campaign before that.  It's -- and frankly, that's kind of

9    the standard for -- I won't say all presidential candidates.

10   I'm not sure how Mike Bloomberg runs.  But for most

11   non-self-funded candidates, that's typically how they

12   arrange things.

13   Q.  It's not unusual, is it, sir, for a political campaign

14   to have a lawyer acting as their general counsel?

15   A.  No.  Quite typical.

16   Q.  And in fact, every presidential campaign that you're

17   aware of has an outside general counsel, similar to what you

18   were doing?

19   A.  Yes.  I can't tell you that on the Republican side

20   because I'm less familiar with -- I mean, Don McGahn was the

21   outside general counsel of the Trump Campaign at Jones Day.

22   But I couldn't tell you, like, Marco Rubio and those folks.

23   Q.  And with respect to this particular campaign, the

24   Clinton versus Trump campaign, were there any particular

25   concerns relative to litigiousness that were in your mind?

1      A.  Yeah.

2      Q.  Can you explain?

3      A.  You know, it's a matter of public record.  So I'm not

4      going to go into privilege, but it was a matter of public

5      record that Donald Trump had been infamously litigious.  He

6      had as I recall sued an author for saying he was not as rich

7      as Donald Trump claimed to be.  And he had in the primary

8      election threatened to sue, like, Marco Rubio, Jeb Bush, I

9      think, Kasich.

10              Like Donald Trump was a bully who used litigation

11     as a tactic both to threaten and also to bring litigation as

12     a way to try to intimidate his opponents, whether it be in

13     business or in politics.

14     Q.  And in connection with your counseling to the campaign,

15     you mentioned that you hired a firm called Fusion.  Correct?

16     A.  Correct.

17     Q.  And was that unusual in your experience, hiring a firm

18     such as Fusion to work with a campaign?

19     A.  No.

20     Q.  And I think you mentioned that Mr. Sussmann was aware of

21     your hiring Fusion.  Correct?

22     A.  He became aware.

23     Q.  He didn't become aware until the July time period of

24     2016.  Is that fair?

25     A.  I couldn't tell you when, but at some point after the

1    convention.

2    Q.  We can probably pull up some of the exhibits, but do you

3    remember one of the exhibits said "Making the Connection" at

4    the end of July of -- the end of July 2016?

5    A.  It could have been.  I also saw the July 29th.  Like it

6    would have been after -- it would have been sometime in that

7    timeframe.

8    Q.  Now, before we get into some more detail --

9    A.  I don't recall, sir.  I don't recall specifics.

10              THE COURT:  Mr. Joffe, just let him finish.

11              THE WITNESS:  I am sorry.

12              THE COURT:  Go ahead.

13   BY MR. BERKOWITZ:

14   Q.  Before I --

15              THE COURT:  It's too hard for the court reporter

16   to pick up if you're speaking over him.

17   BY MR. BERKOWITZ:

18   Q.  Before I get into some more specific detail, let's kind

19   of set the stage, if we can.

20   A.  Sure.

21   Q.  There were, you said, over two dozen people in your

22   political law group?

23   A.  Yes.

24   Q.  You were outside general counsel for a busy campaign.

25   Correct?

```
 1    A.  Yes.
 2    Q.  You also had a law practice independent of your work for
 3    the campaign.  Correct?
 4    A.  Absolutely.
 5    Q.  I think you testified among other things you had a big
 6    calendar.  Correct?
 7    A.  Yes.
 8    Q.  Pretty busy during this time?
 9    A.  Very.
10    Q.  A wide-ranging scope of topics?
11    A.  Absolutely.
12    Q.  Interacting with, you know, hundreds if not more people
13    during this time period?
14    A.  Oh, easily.
15    Q.  And we've been talking about specific meetings, bullet
16    points, .2 hours, 1.5 hours, things of that nature.  This
17    happened a long time ago.  Correct?
18    A.  Yes.
19    Q.  Is your memory fuzzy with respect to specific issues?
20    A.  Very.
21    Q.  Was Alfa-Bank a primary focus of what you were working
22    on in 2016?
23    A.  Not relative to, you know, the -- not relative to the
24    large number of topics I was dealing with for a large number
25    of clients.
```

Elias - CROSS - By Mr. Berkowitz

1    Q.  And the reality is that in 2016, there was a lot going

2    on publicly, correct, with respect to the candidates?

3    A.  Are you talking about just the presidential or all

4    candidates?

5    Q.  For then, presidential.

6    A.  Yes.

7    Q.  And in fact, at some point in the spring of 2016, there

8    was a hack of the Democratic National Committee.  Correct?

9    A.  Correct.

10   Q.  Can you explain to the jury what that is or was?

11   A.  As far as I recall, on non-privileged information, is

12   that two branches of the Russian government, one being the

13   secret police and the other being the military -- and I

14   can't remember which was which, but one was code-named Fancy

15   Bear and one was code-named some other kind of bear.  So

16   there were like these two bears that got code-named by

17   someone, and one was the military and one was the

18   intelligence service.

19        And at some point, I became aware and it became

20   public -- it was in, I think, *The Washington Post* -- that

21   they had thoroughly infiltrated and hacked into the

22   Democratic National Committee as well as others of my

23   clients and had exfiltrated internal documents, which they

24   then proceeded over the course of months to leak in ways

25   that were very damaging.

1    Q.  And did you ask Mr. Sussmann to assist both the campaign

2    and the DNC in connection with these issues?

3    A.  I don't think I asked him to assist the DNC.  I think he

4    was -- I think -- as I said, my recollection, but as you

5    said, this was six years ago -- is that there was -- the

6    DNC's legal issues around this were so significant.  I think

7    he got connected up maybe by Mr. Bauer with them and worked

8    really hand in glove with them directly.

9    Q.  Were you aware that he was doing work for the DNC in

10   connection with the hack?

11   A.  Absolutely.

12   Q.  And aware that he was interacting regularly during the

13   April-to-September time period on behalf of the DNC relative

14   to the hack?

15   A.  Yes.

16   Q.  And was he also doing some work on the hack for HFA, at

17   least in terms of briefings and so forth?

18   A.  Yes.

19   Q.  Now, with respect to those issues, sir, did you have any

20   particular expertise in hacking or cybersecurity?

21   A.  No.

22   Q.  Did you participate personally, yourself, in connection

23   with any classified briefings with the FBI on the hacking

24   stuff?

25   A.  No.  I don't have a security clearance and I never

 1    obtained one.

 2    Q.  Let's take a look -- let me ask a different question.

 3           At some point in the summer of 2016, did Candidate

 4    Trump make any statements publicly about the hack?

 5    A.  Yes.

 6    Q.  What do you recall him saying and when?

 7    A.  There was a publication of emails, of DNC emails, in the

 8    days leading up to the Democratic National Convention.  And

 9    it was in my opinion at the time clearly an effort by Russia

10    to ruin what is the one clean shot that candidates get to

11    talk to the American public.  Right?  The networks give you

12    free coverage for your convention.

13           And in the days before the convention, there was a

14    major leak.  And rather than doing what any decent human

15    being might do and condemn it, Donald Trump said:  I hope

16    Russia is listening and, if so, will find the 30,000 Hillary

17    Clinton emails that he believed existed and release them.

18    That's what I remember.

19    Q.  Did you feel the campaign was under attack, sir?

20    A.  We absolutely were under attack.

21    Q.  And in connection with that, were there suggestions or

22    possibilities at least in your mind and in the campaign's

23    mind that there could be a connection between Russia and

24    Trump?

25    A.  Again, this is, you know -- this was public -- Donald

Elias - CROSS - By Mr. Berkowitz

1    Trump -- you know, the Republican Party historically has

2    been very anti-Russia.  Ronald Reagan was like the most

3    anti-communist, the most anti-Soviet Union president.

4              And all of a sudden you had this guy who becomes

5    the nominee; and they change the Russian National Committee

6    platform to become pro-Russian and he has all these kind

7    things to say about Putin.  And then he makes this

8    statement.

9              And in the meantime, he has hired, you know, Paul

10   Manafort, who is, you know, I think had some ties to -- I

11   don't recall anymore, but it was some pro-Russia thing in

12   Ukraine.

13             So yeah.  I thought that there were -- I thought

14   it was plausible.  I didn't know, but I thought it was an

15   unusual set of circumstances and I thought it was plausible

16   that Donald Trump had relations with -- through his company

17   with Russia.

18   Q.  And is it against that backdrop that you learned of the

19   potential, the potential communication network between a

20   Trump server and Alfa-Bank, that timeframe?

21   A.  Yes.

22   Q.  Now, I think you said Mr. Sussmann brought that

23   information to your attention?

24   A.  Yes.

25   Q.  And with respect, sir, to that information, I think you

Elias - CROSS - By Mr. Berkowitz

1    said that you don't recall any decision by the campaign to

2    provide that information to the media.  I think that's what

3    you testified to on Mr. DeFilippis's --

4    A.  Say that again.

5    Q.  That you don't recall a decision by the campaign that

6    that information be provided?

7    A.  Which information?

8    Q.  About the secret connection.

9    A.  Not that I recall.

10   Q.  You were getting updates from Mr. Sussmann.  Correct?

11   A.  Correct.

12   Q.  Fair to say that you and the campaign were in receive

13   mode about the potential for a media story?

14   A.  Certainly in August and September.  Yes.

15   Q.  In August and September 2016, largely in receive mode

16   about the potential for a story?

17   A.  Yeah.

18   Q.  Did the campaign to your knowledge or did you direct

19   Mr. Sussmann to communicate with *The New York Times* about

20   the server allegations?

21   A.  No.

22   Q.  Did you view the campaign or you as controlling that

23   story?

24   A.  No.

25   Q.  And who did you view as the person who was, at least

1    from your perspective, in charge of that story?

2    A.  Michael.

3    Q.  Michael Sussmann?

4    A.  Yes.

5    Q.  Now, I think Mr. DeFilippis asked you.  Would the story

6    have benefited the campaign?

7    A.  Yes.

8    Q.  A story that suggested there was a potential connection

9    between a Trump server and Alfa-Bank.  Correct?

10   A.  Yes.

11   Q.  And in that regard, the campaign was interested in the

12   possibility of a story coming out.  Correct?

13   A.  Absolutely.

14   Q.  Let's take a look at Government's Exhibit 377.  I think

15   it's in evidence.  And that notes a teleconference with

16   Michael Sussmann re:  *New York Times*.

17          Do you see that?

18   A.  I do.

19   Q.  And that's on September 12 of 2016, although the date of

20   it was October 9th, but it was for time on Monday, September

21   12th.  Correct?

22   A.  Correct.

23   Q.  And it's your testimony you don't recall what

24   specifically was being discussed about it?

25   A.  I don't.

1    Q.  .2 hours.  Let's just talk about that for a second,

2    Mr. Elias.  How much time is that?

3    A.  It's between seven minutes and 12 minutes.  I guess

4    technically six minutes and one second and 12 minutes.

5    Q.  So lawyers are -- bill by one-tenth-of-an-hour

6    increments, which is six minutes, essentially.  Correct?

7    A.  In my experience, yes.

8    Q.  And this call you're reflecting about discussing *The New*

9    *York Times* with Mr. Sussmann was between six minutes and one

10   second and 12 minutes.  Correct?

11   A.  Correct.

12   Q.  You don't recall what was communicated.  Correct?

13   A.  I don't.  So much of this is fuzzy from so many years

14   ago.

15   Q.  Let's take a look at Government's Exhibit 553.23.  And

16   the top entry there is on the 17th.  Correct?

17   A.  It is.

18   Q.  And let's blow that out.  We've looked at this earlier?

19   A.  I did.

20   Q.  And this entry for Mr. Sussmann on the 17th of September

21   says, "Multiple telephone conferences and other

22   communications with experts, media" -- and then it looks

23   like a semicolon.  Correct?

24   A.  Correct.

25   Q.  In your experience, what does a semicolon reflect in a

1    billing entry?

2    A.  That that's the end of the thought.  In other words,

3    that it's distinct from what comes next.

4    Q.  And what comes next is "communications with M. Elias."

5    Correct?

6    A.  Correct.

7    Q.  And with respect to these communications, do you

8    remember six years later what specifically they were about?

9    A.  I don't.

10   Q.  And the bill there is for 4.8 hours.  Correct?

11   A.  Correct.

12   Q.  Now, there was no -- I'm going to use a term of art and

13   then we're going to explain it to the jury.  There was no

14   task-based billing or breaking out at least in this entry as

15   to how much time was spent on any particular task.  Correct?

16   A.  Correct.  That's part of why I answered Mr. DeFilippis's

17   question the way I did about how I -- how people -- how

18   lawyers enter time, because I enter my time this way, but

19   some clients in not my practice group typically or

20   sometimes -- but don't.

21   Q.  And that's why I objected, because you and I probably

22   speak the same language in billing, unfortunately.  But with

23   respect to this issue, we don't know how much time was spent

24   on telephone conferences, how much time was spent on other

25   communications with experts, how much time was spent on --

1    A.  That's right.

2    Q.  -- communications with media or on the communications

3    with you.  Correct?

4    A.  Correct.

5    Q.  The total sum that's billed that day is 4.8.  Correct?

6    A.  Correct.

7    Q.  And that was billed to the HFA.  Correct?

8    A.  Yes.

9    Q.  Now, just as an aside, 4.8 hours translate into a little

10   over $4,000.  Do you see that?

11   A.  I do.

12   Q.  Can you explain to the jury the way a law firm works?

13   In other words, if Mr. Sussmann --

14   A.  If I could do that, I'd be in a different line of

15   business.

16   Q.  Fair enough.  And I appreciate that.

17          But I don't want to leave any misimpressions,

18   because that's a lot of money.

19   A.  Sure.

20   Q.  If Mr. Sussmann bills that, does that money go into his

21   pocket?

22   A.  No.  It goes to the law firm.

23   Q.  And the law firm has expenses.  Correct?

24   A.  They do.

25   Q.  And the partners share in the profits, but that's not

1    money that goes to him?

2    A.  No.

3    Q.  And with respect to this client, all of the time that

4    we've looked at today that Mr. Sussmann billed to HFA was

5    each month in excess of what HFA was actually paying.

6    Correct?

7    A.  Each -- I'm not sure I understand the question.  Sorry.

8    Q.  Okay.  So there was the fixed fee.  Correct?

9    A.  There was.

10   Q.  On a monthly basis?

11   A.  Correct.

12   Q.  What that means is that in a particular month, if 75,000

13   was a flat fee, everything over $75,000 would not be billed

14   to the client.  Correct?

15   A.  Correct.  They'd get a bill for $75,000.

16   Q.  And in each month in the year of 2016, was the cap

17   exceeded?

18   A.  You'd have to go through it.  I assume so.  I'd be

19   surprised if it wasn't.  But, you know, that's now --

20   Q.  It's a knowable fact.

21   A.  It's a knowable fact now.

22   Q.  You had several dozen people working on a whole host of

23   different matters.  Correct?

24   A.  Actually, we did.  Because of the way the engagement was

25   structured, there were not a lot of different matters.  You

1    know, there were some, but it was not -- it was neither

2    task-based billing nor was it like I got to open a new

3    matter every time something came in.  That Matter 1 covered

4    a lot of stuff.

5    Q.  Okay.  And just to say, we saw a bill that had I think

6    $85,000 and then 200-and-some thousand written off.  We saw

7    that.  Right?

8    A.  Yes.

9    Q.  So at least in this month that Mr. DeFilippis showed

10   you, the actual fees billed were well in excess of the cap.

11   Correct?

12   A.  Correct.  The pro forma amounts were in excess of the

13   amount billed the client.

14   Q.  The campaign never saw the underlying entries.  Correct?

15   A.  Correct.  The invoices they got would just say For

16   Services Rendered.

17   Q.  Okay.  Thank you for indulging that detour to do some

18   education on law firm billing.  Let's now get back to

19   September 17th of 2016.

20           You talked about July.  You talked about the

21   campaign feeling under attack.  You've talked about the fact

22   that you were getting information about a potential story

23   that would benefit the campaign.

24           Do you remember -- well, let's take a look at

25   Defense Exhibit 431, I believe.  Does this appear to be an

 1    email from Robby Mook to you on September 18th of 2016?

 2    A.  It does.

 3              MR. BERKOWITZ:  I'd move it into evidence.

 4              THE COURT:  Any objection?

 5              MR. DeFILIPPIS:  No objection, your Honor.

 6              THE COURT:  So moved.

 7              (Whereupon, Defendant's Exhibit No. 431 was

 8    entered into evidence.)

 9    BY MR. BERKOWITZ:

10    Q.  So with respect to this document, this is an email.

11    Let's blow out the top portion just for a second.  Robby

12    Mook -- just remind the jury who Mr. Mook is.

13    A.  He was the company manager.

14    Q.  Of HFA.  Correct?

15    A.  I'm sorry.  Yes.  He was the Clinton Campaign manager.

16    Q.  Who was Jake Sullivan?

17    A.  Jake was the policy director.

18    Q.  Jen Palmieri?

19    A.  She was what I'm going to call the communications

20    director, but I feel like I vaguely remember it was a bigger

21    title than that.

22    Q.  And Mr. Di Podesta -- or Podesta?

23    A.  "Podesta."  John Podesta was the campaign chair.

24    Q.  This is the day after those communications, and Mr. Mook

25    is forwarding you something.  Let's take a look at what it

```
1     is.  It's an email from Sidney Blumenthal, which is
2     attaching an article.  Let's go to the article.  Just blow
3     out the first paragraph.
4            And you can read along.  It says, "The Trump
5     company is having a major freak-out, according to a
6     Republican source who has been reliable in the past.  What
7     is causing the Trump freak-out is anticipation of an
8     investigative story to be published by The New York Times.
9     The subject is described as Russia and a disaster."
10           Do you see that?
11    A.  I do.
12    Q.  And then the last sentence of that paragraph says,
13    "Journalistic sources have independently said that reporters
14    at the Times are working on a Trump-Russia story."
15           Do you see that?
16    A.  I do.
17    Q.  And that is something that Mr. Mook forwarded to you as
18    well as others on the campaign on September 18th of 2016.
19    Correct?
20    A.  That's what it says.
21    Q.  Let's take a look at Defense Exhibit 433.  This is you,
22    Mr. Elias, to among others Mr. Sussmann forwarding that same
23    article, if we can take a look at it, at 5:08 p.m. on
24    September 18th of 2016.  Correct?
25    A.  Yes.
```

1   Q.  Let's take a look and just confirm it's the same

2   article.  Does this appear to be the same article that you

3   would have forwarded on after receiving it from Mr. Mook?

4   A.  It does.

5   Q.  Do you remember anything about the article, sir?

6   A.  Not really.

7   Q.  Or sending it to them?

8   A.  No.

9   Q.  And it is fair to say that if a story such as this were

10  to come out it would have been beneficial to the campaign?

11  Correct?

12  A.  Yes.

13  Q.  And did you take any action to try and stop the story

14  from coming out, a story in *The New York Times* about a

15  potential server connection between Russia and Trump?

16  A.  No.

17  Q.  Would that have been in the interest of the campaign to

18  try and stop the story?

19  A.  No.

20  Q.  And Mr. DeFilippis represented to you -- and I'll

21  concur; again, one of the few things we may agree on -- that

22  Mr. Sussmann met on September 19th with the FBI to give them

23  a heads-up about the possibility of the story coming out.

24  So I'll represent that to you.

25              You testified that you became aware that

Elias - CROSS - By Mr. Berkowitz

1    Mr. Sussmann went to the FBI.  Correct?

2    A.  Yes.

3    Q.  And your testimony was that you think that you were told

4    right after, although there's a possibility it was right

5    before?

6    A.  Yes.

7    Q.  Your best recollection is which of those?

8    A.  Is after.

9    Q.  Okay.  Did you tell him to go to the FBI?

10   A.  No.

11   Q.  Did he seek your permission to go to the FBI?

12   A.  No.

13   Q.  Did you authorize him to go to the FBI?

14   A.  No.

15   Q.  Are you aware of anyone at the Clinton Campaign that

16   authorized Mr. Sussmann to go to the FBI to share the

17   possibility of *The New York Times* story?

18   A.  Not that I'm aware of.  No.

19   Q.  Did you consent to his going to the FBI?

20   A.  No, not that I remember.  No.

21   Q.  Do you recall discussing with anybody at the campaign

22   the possibility of Mr. Sussmann going to the FBI to give

23   them a heads-up about the possibility of a story coming out

24   in *The New York Times*?

25   A.  I don't recall.  I think if I did, it would be

1    privileged, though.

2    Q.  So if there were a story that were to come out that were

3    about to come out in *The New York Times* that suggested a

4    potential connection between a Trump server and an Alfa-Bank

5    server, would it be a good or a bad thing from the

6    campaign's point of view to go to the FBI?

7    A.  I'm sorry.  Say that again.

8    Q.  Would it be a good or a bad thing from the campaign's

9    perspective to go to the FBI if there were a story about a

10   potential Trump connection to Russia coming out in *The New*

11   *York Times*?

12   A.  I can only really speak from my perspective.

13   Q.  Okay.

14   A.  I would not -- I don't believe that I would have thought

15   that was a good thing.

16   Q.  Why not?

17   A.  First of all, the FBI had in my view not been

18   particularly helpful in investigating or doing anything to

19   prevent the leaks of the emails.  The exfiltration is one

20   thing, you know, the stealing of the emails.  But the

21   publication of the emails, it was not just this one time.  I

22   mean, we were dealing with multiple publications of emails.

23   And it was not just this one client.

24              And I think my sense was that the FBI was not for

25   a variety of reasons going to do anything that was going to

1    be -- like stop bad things from happening, which would be

2    one reason to go for the FBI.

3              The second, which is more unique to the Clinton

4    Campaign, is that I think he was then the FBI director, but

5    James Comey had taken public stances in around that time

6    period that were in my view unfair and putting a thumb on

7    the scale against Secretary Clinton.

8              So I'm not sure that I would have thought that the

9    FBI was going to be -- give a fair shake to anything that

10   they viewed as anti-Trump or pro-Clinton.

11             And then the final thing is that if *The New York*

12   *Times* was going to run this story, like that's the goal.

13   Right?  *The New York Times* runs the story.  If you get the

14   FBI involved, any number of things could prevent that from

15   happening.  Right?

16             In the most extreme instance, the FBI can go to

17   the publication and say:  Please don't.  But the second is,

18   the newspaper itself might then want to do further reporting

19   on the FBI investigation and delay its story.  Right?

20             So, like, even in a world in which, like, the FBI

21   is being helpful -- not being helpful; even in a world in

22   which the FBI is doing stuff, the media may not run the

23   story because they want to get the full picture because they

24   view the FBI piece of it as an essential piece of the story.

25             This was six years ago.  Like, that's my best

1      recollection sitting here today.

2      Q.   Now, Mr. DeFilippis asked you some questions about

3      whether Mr. Sussmann went to the FBI on his own in

4      connection with the DNC hack and other issues related to

5      that.

6                 Do you remember those?

7      A.   I do.

8      Q.   And you said he didn't necessarily need to check with

9      you before he went to the FBI in connection with the hacking

10     or cybersecurity issues.  Correct?

11     A.   Correct.

12     Q.   With respect to this issue, do you expect that

13     Mr. Sussmann would have checked with you if he were going to

14     the FBI on behalf of the campaign?

15     A.   If he was going on behalf of the campaign, sure.  But

16     not if he was going to the FBI.

17     Q.   So if he were going to the FBI not on behalf of the

18     campaign, he wouldn't need to check with you?

19     A.   Right.

20     Q.   To your knowledge, did Mr. Sussmann go to the FBI on

21     September 19th on behalf of the HFA campaign?

22     A.   I think you'd have to ask Mr. Sussmann.  I mean, as far

23     as I -- I mean, I don't know.  From my standpoint, I would

24     say no.  But, like, "on behalf of" is kind of like a

25     subjective-intent thing.

1   Q.  The Government has suggested that the campaign was

2   planning to get the Alfa-Bank story out there as an October

3   surprise.  Can you tell the jury what an October surprise

4   is, to your knowledge?

5   A.  So first of all, an October surprise comes in October.

6   And what makes an October surprise useful is that not just

7   that it comes in October, but that it comes essentially too

8   late in the campaign process to essentially undo it.  Right?

9        So like your quintessential October surprise is

10  something that happens like a week before the election, you

11  know, where some negative story drops on a campaign.  And

12  the public is going to process that information in those

13  last few days and there's not going to be enough time for

14  the news cycle to move on to something else or for you to

15  get a counter-narrative out.

16       So my understanding of an October surprise, having

17  represented -- this is just, like, frankly representing lots

18  of campaigns -- is, you know, usually something comes in the

19  second half of October that -- where you are trying to land

20  something or the media is landing something that is both

21  explosive, but effectively too late to rebut.

22  Q.  Was getting the Alfa-Bank story in *The New York Times*

23  part of the campaign's plan for an October surprise?

24  A.  My recollection was that -- again, speaking for

25  myself -- was that I had expected and hoped that it would

1    come earlier, like, you know, before, before when it --

2    before whatever date you two have agreed on.  Like by the

3    time we got to that date, I was looking -- I had been hoping

4    for earlier.

5    Q.  And was sending Mr. Sussmann to the FBI something that

6    was part of an October surprise, to your knowledge, sir?

7    A.  Not to my knowledge.

8    Q.  Did you ever leak to the press that the FBI was looking

9    into the allegations?

10   A.  No.

11   Q.  Did you authorize anybody to leak to the press that the

12   FBI was looking into the allegations?

13   A.  No.

14   Q.  If you'd wanted to leak something to the press, do you

15   know how to do that?

16   A.  I do.  I do.  I wouldn't have in this case, in this

17   instance.  And Michael had a client.  And I'm his law

18   partner.  Like I can't leak -- I mean, assuming -- yes.  I

19   know how to leak.  But it was -- it wasn't mine to leak, if

20   you know what I'm saying.

21   Q.  And who did you understand Mr. Sussmann's client to be

22   in that regard?

23   A.  Rodney Joffe.

24   Q.  I want to show you, sir, a couple of other pieces of

25   information and documents, just to do some examples of

1    things.  Let's take a look --

2              MR. BERKOWITZ:  And if I could move -- I don't

3    think we need to publish it again to the jury, but let me

4    move 433 into evidence, Judge.  It was the email from

5    Mr. Elias to Mr. Sussmann and others about the possibility

6    of a story.

7              THE COURT:  Any objection?

8              MR. ALGOR:  No objection.

9              THE COURT:  So moved.

10             (Whereupon, Defendant's Exhibit No. 433 was

11   entered into evidence.)

12   BY MR. BERKOWITZ:

13   Q.  Let me show you what we'll mark for identification

14   purposes as Defendant's Exhibit 808.  We'll go to Page 2 of

15   it.

16             MR. BERKOWITZ:  One moment.

17             (Confers privately with co-counsel.)

18             I was told that maybe Government's Exhibit 559,

19   which is in evidence.

20   BY MR. BERKOWITZ:

21   Q.  Page 343.  Let's take a look at the date on this.  This

22   is a Michael Sussmann entry on August 9th of 2016?

23   A.  Yes.

24   Q.  And so that's well over a month before the issues we

25   were just talking about, just to reorient everybody.  And it

1  says, "Communications regarding FBI briefing."  Do you see

2  that?

3  A.  I do.

4  Q.  And "Followup with M. Elias."  Do you see that?

5  A.  I do.

6  Q.  And let's also take a look at Government's Exhibit

7  560.1.  This is August 11 of 2016.  Do you see that?

8  A.  I do.

9  Q.  And it says, "Communications with M. Elias, FBI, client

10  regarding 8-12 briefing."  Do you see that?

11  A.  Yes.

12  Q.  Do you recall at this time any briefings with the FBI on

13  behalf of HFA?

14  A.  I recall -- what I recall was an attempted briefing with

15  the FBI at this time.

16  Q.  Okay.  Let's take a look at --

17         MR. BERKOWITZ:  I'll move this into evidence.  I'm

18  sorry, Judge.  I don't think it's in evidence.

19         MR. DeFILIPPIS:  No objection.

20         THE COURT:  560.1 is admitted.

21         MR. BERKOWITZ:  Just to publish it.

22  BY MR. BERKOWITZ:

23  Q.  This is Mr. Sussmann billing time to among other things

24  communicating with you, the FBI and the client regarding an

25  August 12 briefing.  Correct?

```
 1    A.  That's what it says.  Yeah.

 2    Q.  Let's now take a look at Defense Exhibit 128.

 3            MR. BERKOWITZ:  And I would move this into

 4    evidence.

 5            MR. DeFILIPPIS:  No objection, your Honor.

 6            THE COURT:  So moved.

 7            (Whereupon, Defendant's Exhibit No. 128 was

 8    entered into evidence.)

 9    BY MR. BERKOWITZ:

10    Q.  So those two entries, I believe, were August 9th and

11    August 11th that we just looked at relative to an FBI

12    meeting.

13            MR. BERKOWITZ:  If we could just blow out the top

14    portion there so we see what we've got.

15    BY MR. BERKOWITZ:

16    Q.  And this is from Lucia Ziobro at the FBI to other people

17    within the FBI.

18            Do you see that, Mr. Elias?

19    A.  I do.

20    Q.  Let's take a look at the next page.

21            MR. BERKOWITZ:  And just blow out "Good afternoon,

22    Lucy."

23    BY MR. BERKOWITZ:

24    Q.  It says:  On August 11, 2016, a group of folks from the

25    DNC --
```

```
 1                    That's the Democratic National Committee, correct?
 2    A.  Correct.
 3    Q.  -- will receive a threat briefing at the secret level at
 4    FBIHQ.
 5                    Do you see that?
 6    A.  I do.
 7    Q.  And on Friday, August 12, it says:  A group of folks
 8    from HFA will receive the same threat briefing at the secret
 9    level at the FBI headquarters.
10                    Do you see that?
11    A.  I do.
12    Q.  And did you understand in or around this time what this
13    type of threat briefing would have related to?
14    A.  The hack.
15    Q.  Nothing to do with the Alfa-Bank story.  Right?
16    A.  No.
17    Q.  And let's take a look at the following planned
18    attendees.  And so you see the DNC attendees for an FBI
19    briefing included Donna Brazile, Tom McMahon, Michael
20    Sussmann, Perkins Coie.  Correct?
21    A.  I do.
22    Q.  And that's -- it appears to be internal FBI document
23    about a potential briefing.  Do you know whether that
24    briefing occurred with the DNC?
25    A.  I don't know.
```

1    Q.  And then HFA, Friday, 8-12-2016 --

2            MR. BERKOWITZ:  And if we can pull up just right

3    next to it, Mr. Cleaves, 560.1.

4    BY MR. BERKOWITZ:

5    Q.  And that talks about communications with you, the FBI

6    and client regarding an 8-12 briefing.  Correct?  That's

7    what it says?

8    A.  Yes.  That is what it says.  I'm sorry.

9    Q.  And then the Friday, August 12th, potential briefing

10   includes among others you and Mr. Sussmann on behalf of the

11   campaign.  Correct?

12   A.  That's what it says.

13   Q.  Do you recall whether that meeting happened?

14   A.  I didn't go.

15   Q.  But at that point, at least, it appeared Mr. Sussmann

16   was acting on behalf of HFA for the campaign in connection

17   with the hack.  Correct?

18   A.  Correct.

19   Q.  Just to conclude, Mr. Elias, our discussions on these

20   issues, I'll ask you to testify to your knowledge.

21           We talked about this meeting on September 19th.  I

22   want to be as clear as we can about whether you or anyone

23   that you are aware of on behalf of HFA, the Hillary For

24   America Campaign, authorized Michael Sussmann or directed

25   Michael Sussmann to go to the FBI to share the fact that *The*

1    *New York Times* was about to run a story about the

2    Alfa-Bank-Trump connection.

3    A.  Not that I recall.  No.

4    Q.  And you are not aware of him sharing any particular --

5    you were not aware beforehand of him sharing any particular

6    information with them on September 19th.  Correct?

7    A.  Sorry.  Say that again.

8    Q.  So let me rephrase.

9           Mr. Sussmann did not seek your consent or to the

10   best of your knowledge the consent of anybody from the

11   campaign to meet with the FBI and provide them any

12   information on or around September 19th of 2016.  Correct?

13   A.  To the best of my recollection, no.

14           MR. BERKOWITZ:  Nothing further.

15           THE COURT:  Ladies and gentlemen, how are we

16   doing?  Can we work through our break and take a break after

17   this?

18           THE JURY:  (Collectively nods head in the

19   affirmative.)

20                    REDIRECT EXAMINATION

21   BY MR. DeFILIPPIS:

22   Q.  Mr. Elias, I think when Mr. Berkowitz asked you about on

23   whose behalf Mr. Sussmann may have gone to the FBI for that

24   September 19th meeting, you indicated that that's something

25   that would be in Mr. Sussmann's knowledge.  Was that the

```
 1      essence of your --
 2                  MR. BERKOWITZ:  Objection, your Honor.
 3                  THE COURT:  Sustained.
 4      BY MR. DeFILIPPIS:
 5      Q.  Mr. Elias, how did you respond when you were asked about
 6      whether Mr. Sussmann went to the FBI on behalf of the
 7      campaign?
 8                  MR. BERKOWITZ:  Objection, your Honor.
 9                  THE COURT:  Sustained.
10                  Move on.
11      BY MR. DeFILIPPIS:
12      Q.  Mr. Elias, what is the best way to determine what client
13      an attorney is billing -- excuse me.
14                  What is the best way to determine on what -- on
15      whose behalf an attorney is spending his time other than by
16      asking them?
17      A.  I was going to say:  Ask him.
18      Q.  Other than that.
19      A.  I mean, billing records are a good -- are a reasonable
20      way to go, because lawyers track what they're doing.
21      Q.  And to the extent that attorneys incur expenses or have
22      to buy things, what is the best way to determine on whose
23      behalf, on which client's behalf, an attorney has done so?
24      A.  Same thing.  I mean, you look to see who they bill.
25      Right?
```

1    Q.  So at a law firm, if you have to buy 20 boxes of pens

2    and you don't want to pick up the cost yourself, what sort

3    of process exists to get reimbursed?  Is there a process?

4    A.  At my new law firm, a very small process.  At Perkins

5    Coie, a bigger process.

6              So I assume you want to know Perkins Coie?

7    Q.  Yes.

8    A.  If you wanted to buy, say, a box of pens and bill it to

9    a client.  Is that -- I think that's the question?

10             So you would -- if you were a partner and it was

11   under a certain amount of money, I think you didn't need

12   approvals.  If it was over a certain amount of money, you

13   needed a certain, like, series of approvals, as I recall.

14             I'm a little vague here whether it was like --

15   because I was both oftentimes a billing lawyer and also the

16   practice group chair.  So it was always a little -- it's a

17   little vague in my memory whether I was agreeing to things

18   wearing one hat or the other.  But there was a process for

19   approving expenses over a certain amount.

20   Q.  Okay.  But if you're working on a project and you incur

21   expenses on that project that have to be billed out, who

22   would you bill it to?

23   A.  I mean, typically you'd bill it to the client you're

24   working for.

25   Q.  Got it.

1    A.  I gave you the -- I'm hedging here only because I

2    represent political parties that will sometimes pick up the

3    costs of their campaigns.  And so I don't want to mislead

4    you in that scenario.

5    Q.  Understood.

6          Now, you mentioned that you think maybe shortly

7    after, maybe shortly before Mr. Sussmann went to the FBI, he

8    called you.  Was it a call?

9    A.  I don't remember.

10   Q.  Okay.  And you said your best recollection was that it

11   might have been after, but it could have been before.  If it

12   was before, fair to say you didn't tell him, "Wait, no, no,

13   no, don't go to the FBI"?

14   A.  I don't remember -- I honestly, I just don't remember.

15   That's part of why I think it's after.  But I don't -- but I

16   don't know.

17   Q.  Okay.  But fair to say that if he did call you before,

18   you didn't say anything that caused him not to go?

19   A.  Apparently.

20   Q.  And with regard to folks on the campaign, are you aware

21   one way or the other of any conversations he might have had

22   with others on the campaign?

23   A.  No.  I'm not aware one way or the other.  And also, this

24   was a long time ago.  It was all to the best of my

25   recollection.  But no.  I'm not -- I don't recall one way or

1     the other.

2     Q.  And turning to the news articles, I remember

3     Mr. Berkowitz questioned you about sharing with the media.

4              Are you aware of whether Mr. Sussmann had

5     conversations with others on the campaign about whether to

6     bring things to the media?

7     A.  No.  I'm not aware one way or the other.

8     Q.  And are you aware of whether others on the campaign made

9     a decision to bring that to the media one way or the other?

10    A.  No.

11    Q.  Are you aware, for example, whether anyone on the

12    campaign consulted the candidate about whether to share with

13    the media and whether she authorized it?

14    A.  I -- no.  Not that I remember.  No.

15    Q.  Okay.  Now, you mentioned that Fusion GPS was doing

16    work.  And did you understand them to be doing work on these

17    Alfa-Bank issues in addition to the broader issues?

18    A.  Yes.

19    Q.  And did Fusion GPS in doing their work only consult with

20    people in Fusion GPS and Perkins Coie or did they talk to

21    third parties?

22    A.  I guess I'm not understanding.

23    Q.  When Fusion GPS does its research, do they only talk to

24    each other or do they communicate with folks outside of

25    Fusion?

1   A.  I mean, you should ask someone from Fusion.  But I

2   assume they communicated with people outside of Fusion.

3   Q.  Okay.  When they communicated with people outside of

4   Fusion in connection with their work for the Clinton

5   Campaign and the DNC, did they ask you each time before they

6   did that?

7   A.  Not each time.  No.

8   Q.  And sometimes maybe they gave you a heads-up shortly

9   before or shortly after sometimes?

10  A.  Sure.

11  Q.  But all of that work was being done for the campaign,

12  right, to the extent that --

13  A.  The campaign and the DNC.

14  Q.  What's that?

15  A.  The campaign and the DNC.

16  Q.  I'm sorry.  For both.  And the DNC.

17          So all of that work was under that umbrella

18  regardless of whether they were consulting --

19  A.  Yes.  That's right.

20  Q.  Understood.

21          To what extent did they consult you before sharing

22  things or disseminating things to the media?  Did that

23  happen every time?  Sometimes?

24  A.  Not every time.

25  Q.  Okay.  But that all fell under the umbrella of the work

1    they were doing for the campaign?

2    A.  Yes.

3    Q.  Did the campaign get bills presumably every month or

4    every couple months from Fusion for all that work?

5    A.  It should have been every month.  I don't have the

6    billing records.  So if you told me it was -- they

7    skipped -- you know, they were late one month.  But I think

8    their practice was to bill monthly.

9    Q.  So if they were doing all the kinds of things that I've

10   been talking about and incurring hours and fees for it, that

11   all got included in the bill?

12   A.  Yes.

13   Q.  And that all got paid for?

14   A.  Yes.

15   Q.  And that was all in some sense for the campaign?

16   A.  It was all for the campaign.

17   Q.  And the DNC.  I'm sorry.

18   A.  Well, in part.  Like I said, parties oftentimes pay for

19   things that are beneficial to candidates.  So I'm not trying

20   to -- on the one hand, I'm not trying to tell you that there

21   was like -- they were 100 percent aligned and then tell you,

22   Oh, they were totally distinct.  Like it was billed to the

23   DNC and the Clinton Campaign pursuant to the campaign

24   finance laws.  But it was one project.

25   Q.  Understood.

1           And my only point and my only question to you is
2    just for all the different things they were doing under that
3    umbrella, under that service, they weren't consulting you on
4    everything?
5    A.  No.
6    Q.  Communications?
7    A.  No.  Definitely not.
8    Q.  So they had discretion to --
9    A.  They had a lot of discretion.
10   Q.  Okay.  And presumably, that applied -- they also, even
11   though they're acting at the behest of the campaign, they
12   weren't checking with people at the campaign before doing
13   it?
14   A.  I don't believe they -- I mean, I don't -- as I sit here
15   today, I don't recall them interacting with anyone at the
16   campaign other than Ms. Fine.  And I think that was on
17   pretty limited topics related to litigation.
18   Q.  Now, Mr. Berkowitz had asked you about the flat fee
19   arrangement and the -- how you routinely were sort of going
20   over what the flat fee was.
21           If for any given month you're going way over the
22   flat fee, all the lawyers doing that work are still doing
23   the work for the campaign.  Right?
24   A.  Yes.
25   Q.  It's not like they -- like after the 15th of the month

Elias - REDIRECT - By Mr. DeFilippis

1    all that work is considered for somebody else.  Right?

2    A.  If only.  But no.  No.  No.  It's all for the campaign.

3    Q.  So it's more like a sort of highly discounted -- again,

4    it's a reduced rate, a capped rate, but it doesn't mean

5    that, you know, some work is for the campaign and some

6    work's not for the campaign?  It's all for the campaign?

7    A.  It's all for the campaign.  Yeah.

8    Q.  Got it.

9             Now, you were asked some questions about news

10   stories and whether the campaign would have wanted there to

11   be a news story.

12            Are you aware of instances, first generally, where

13   the existence of an FBI investigation actually prompts news

14   stories?

15   A.  Absolutely.

16   Q.  And is it sometimes the case that when the FBI's

17   investigating something a reporter is more likely to publish

18   it because they can say the FBI --

19   A.  Yes.

20   Q.  -- [indiscernible]?

21   A.  Yes.

22            THE COURT REPORTER:  I'm sorry.  I missed the last

23   part of your question, counsel.

24            MR. DeFILIPPIS:  "Because they can say the FBI is

25   investigating."

Elias - REDIRECT - By Mr. DeFilippis

1          THE WITNESS:  That's my fault, because I jumped in

2     with the "yes" before you finished.

3     BY MR. DeFILIPPIS:

4     Q.  So to the extent you testified that it would be

5     beneficial if there were a news story on the Alfa-Bank

6     issue, might it also be beneficial if there were an FBI

7     investigation so that the news could report on that?

8     A.  If it was not -- in like a -- like in an ideal world,

9     you'd have your cake and eat it, too.  Right?

10         But the question I think I was answering was

11    whether in this instance the -- I think the concern that I

12    had was that the addition of the FBI into this was going to

13    actually slow it down.  So there wasn't like an endless

14    runway of time for this news story.  So that's -- you know,

15    if you told me you can either have a good story on a Monday

16    or maybe, or maybe not, have a great story three months from

17    now, sometimes you just take the good story on a Monday, if

18    that makes sense.

19    Q.  Right.

20         But if the FBI were -- if the FBI's involvement

21    would speed it up, then you'd be happy to have it involved?

22    A.  Speed it up, yeah.

23    Q.  And in fact, are you aware of whether when the articles

24    on this issue came out whether the campaign indicated that

25    they sort of hoped or presumed that the FBI would be

```
 1     investigating this?

 2               MR. BERKOWITZ:  Objection, your Honor.  It goes

 3     to, I think, a motion.  If we could have a conference.

 4               (Whereupon, the following proceedings were had at

 5     sidebar outside the presence of the jury:)

 6               MR. BERKOWITZ:  Judge, I think he's referring to

 7     the tweet.

 8               THE COURT:  Is that where you're going?

 9               MR. DeFILIPPIS:  Your Honor, I was just asking

10     about public statements generally.  If you want me to steer

11     clear, I will.

12               THE COURT:  Steer clear of the tweet.

13               MR. DeFILIPPIS:  Okay.

14               (Whereupon, the following proceedings were had in

15     open court:)

16     BY MR. DeFILIPPIS:

17     Q.  Mr. Elias, are there instances in your political

18     practice you can think of where FBI investigations have sped

19     up news stories?

20     A.  Where a story is stuck.

21     Q.  Where it's stuck?

22     A.  Not sped it up, but it will sometimes prompt it forward

23     where a reporter is otherwise stuck.

24     Q.  Understood.

25               Are you aware whether in the case -- are you aware
```

Elias - REDIRECT - By Mr. DeFilippis

1    that Eric Lichtblau published a story on the Alfa-Bank

2    matters?

3    A.  I am.

4    Q.  And are you aware of whether that story got stuck?

5    A.  I don't know.

6    Q.  So are you aware whether Mr. Lichtblau's editors were

7    reluctant to publish the story?

8    A.  I know that I thought a story was coming and then it

9    didn't.  And what the -- and then the story that came was,

10   like, not helpful.

11   Q.  Okay.  Got it.

12   A.  So I can't as I sit here tell you whether anyone said to

13   me what the role of editors or anything were.

14   Q.  So to the extent that story got stuck, to use your word,

15   do you know whether Mr. Sussmann was pushing anyone to --

16   Mr. Lichtblau to publish that story?

17   A.  I hope so.

18   Q.  Okay.

19   A.  Yes.

20   Q.  And so to the extent --

21   A.  I think so.

22   Q.  And you said that when a story gets stuck like that, it

23   may be in the campaign's interest, then, to go to the FBI?

24   A.  No.  You asked me a hypothetical question:  Am I aware

25   of instances where the FBI looking at something makes a

1      story go quicker?

2             And so I'm taking this at your word in the

3      hypothetical, not, you know -- so in that hypothetical, the

4      answer is yes.  And particularly if a story is stuck, it's

5      not so much that it makes it go faster; it just makes it

6      happen in a way that it wouldn't have otherwise happened

7      because it was stuck.

8      Q.  Right.  Because a reporter maybe gives added credibility

9      to a story or an allegation if the FBI is looking at it.

10     Right?

11     A.  Or it just creates another -- I was never a reporter, so

12     I don't know if it creates more credibility or more interest

13     or it adds another source.  I don't know.

14            But you asked me if ever.  And, like, yes.  I can

15     think of instances where that was true.

16     Q.  Okay.  You saw an email that was titled "Trump

17     freak-out."  It was forwarding an article called The Trump

18     Freak-Out.  Right?

19     A.  Yes.

20     Q.  Now, that was -- the email was from someone named Sidney

21     Blumenthal?

22     A.  Yes.

23     Q.  Is that a familiar name to you?

24     A.  I do.  It is familiar.

25     Q.  And who is that?

```
1    A.  So Sidney Blumenthal was a -- I want to say he may have

2    been in the Bill Clinton White House.  But I associate him

3    as a Bill Clinton comms person.  So he's like a

4    longstanding -- like I know who is Sidney Blumenthal,

5    really, frankly, you know, growing up in politics in the

6    '90s more than anything else.  He was a -- he was someone I

7    thought of like a longtime Clinton -- Bill Clinton aide.

8    But maybe I'm wrong.  Maybe he was a Hillary Clinton aide.

9    I don't know.

10   Q.  And that was the person who forwarded that article

11   about --

12   A.  That's what it said.  Yeah.

13   Q.  -- the insider and the opposing campaign?

14           So you saw some emails, I think, about potential

15   threat briefs at the FBI for the DNC and the Clinton

16   Campaign.

17           Do you recall that?

18   A.  Yes.

19   Q.  And your testimony earlier was that, generally speaking,

20   when Mr. Sussmann dealt with the FBI on those matters, he

21   didn't consult you each time?

22   A.  Correct.

23   Q.  And I think the August 12th briefing that we saw that

24   was scheduled for the campaign, that one was canceled.

25   Right?
```

1    A.   Yes.

2    Q.   Now, to your knowledge, Fusion GPS wasn't going to

3    participate in that briefing.   Right?

4    A.   No.

5    Q.   Rodney Joffe, would he have been participating?

6    A.   No.

7    Q.   To your knowledge, would he participate in that

8    briefing?

9    A.   No.

10   Q.   And so that briefing wouldn't have been connected to any

11   research that Fusion did or any work of Mr. Joffe?

12   A.   My recollection is it was the FBI's effort to make it

13   seem like they were doing something on a hack that was being

14   weaponized against a presidential campaign.

15   Q.   Okay.

16   A.   Let me repeat:   I didn't go.

17            MR. DeFILIPPIS:   Thank you very much, Mr. Elias.

18            THE WITNESS:   Thank you.

19            THE COURT:   Mr. Elias, thank you very much for

20   your testimony.   You are excused.   Please don't discuss your

21   testimony with anyone until the case is over.

22            THE WITNESS:   Thank you, your Honor.

23            THE COURT:   Have a great day.

24            (Witness excused.)

25            THE COURT:   Ladies and gentlemen, why don't we

Elias - REDIRECT - By Mr. DeFilippis

1    take a 15-minute break.  Come back at ten minutes after 4:00

2    and we will discuss where we go from here for the rest of

3    the day.

4                (Whereupon, the jury exited the courtroom at 3:56

5    p.m. and the following proceedings were had:)

6                THE COURT:  Please be seated, everybody.

7                Mr. DeFilippis, where do we stand?

8                MR. DeFILIPPIS:  Your Honor, our next witness is

9    James Baker, who will certainly be more than a 40-minute

10   witnesses.  But that's our next witness.

11               THE COURT:  Do you want to get started with him

12   today?

13               MR. DeFILIPPIS:  That's fine with us, your Honor.

14               THE COURT:  Why don't we get started and then

15   maybe go through a quarter to 5:00 or so.

16               MR. DeFILIPPIS:  Sure.  Perfect.

17               MR. BERKOWITZ:  Your Honor, let's come back a

18   little bit early before the jury does.  In light of some

19   things the witness said and Mr. DeFilippis's followup

20   question, I think we want to chat.

21               THE COURT:  Very well.

22               (Thereupon a recess was taken, after which the

23   following proceedings were had:)

24               THE COURT:  We're back on the record.

25               MR. BERKOWITZ:  Thank you, Judge.

```
1              Obviously, it's not something I'm interested in
2    doing, but I wanted to take time and ask for a break so that
3    we can consider what to do in light of not just the
4    witness's testimony, but Mr. DeFilippis's first two followup
5    questions, which commented on Mr. Sussmann's testimony or
6    failure to testify or at least implied to that.  And I think
7    we need to understand and explore with our client whether we
8    would be moving for a mistrial in light of those things.
9              THE COURT:  So you'll let me know tomorrow?
10             MR. BERKOWITZ:  (Nods head in the affirmative.)
11             THE COURT:  All right.  Mr. DeFilippis?
12             MR. DeFILIPPIS:  Your Honor, I just want to put on
13   the record the defense had informed us last evening that
14   they were -- in reviewing grand jury testimony of Mr. Elias,
15   that they asked the Government to be careful not to elicit
16   testimony that would elicit whether Mr. Elias -- there was a
17   comment in his grand jury testimony where he answered in
18   essentially that same way, where he said:  You'd have to ask
19   Mr. Sussmann.
20             It was the defense in this instance who elicited
21   that answer from Mr. Elias.
22             The Government in returning to the issue, which
23   was obviously an issue of relevance, the meeting at the FBI,
24   purposefully phrased the question in a way that did not use
25   that phrase, spoke just to what Mr. Elias's perception of
```

1    Mr. Sussmann was, who would know the answer to that

2    question.

3                So I just want to note for the record, your Honor,

4    that we were being very careful in that regard.

5                THE COURT:  Well, we'll deal with this tomorrow if

6    the defense raises it.  I just pulled the transcript.  The

7    question on cross was:  To your knowledge, did Mr. Sussmann

8    go to the FBI on September 19th on behalf of the Hillary

9    Clinton Campaign?

10               And the first part of his answer was, I think,

11   nonresponsive to Mr. Berkowitz's question.  So I don't think

12   that the defense elicited the response.  I think it was

13   somewhat gratuitous or unnecessary or --

14               MR. DeFILIPPIS:  No, your Honor.  I wasn't

15   suggesting it was gratuitous.  I was saying the Government

16   was careful to avoid that in its direct.  It wasn't the

17   Government that prompted the response.  I just wanted to be

18   clear on that.

19               THE COURT:  I'll leave it to you to decide what

20   you want to request.

21               MR. DeFILIPPIS:  Thank you, your Honor.

22               THE COURT:  Is the jury ready?

23               THE COURTROOM DEPUTY:  Yes.

24               THE COURT:  So, Mr. DeFilippis, whenever you reach

25   a natural stopping point before 5:00, I'll leave that up to

```
 1    you.  Okay?

 2              MR. DeFILIPPIS:  Okay.  Your Honor, the Government

 3    calls James Baker.

 4              (Thereupon, the witness entered the courtroom and

 5    the following proceedings were had:)

 6              (Whereupon, the jury entered the courtroom at 4:16

 7    p.m. and the following proceedings were had:)

 8              THE COURT:  Welcome back, ladies and gentlemen.

 9    Please be seated.

10              Mr. DeFilippis, is the Government prepared to call

11    its next witness?

12              MR. DeFILIPPIS:  Yes, your Honor.  The Government

13    calls James Baker.

14              THE COURT:  Mr. Baker, would you please remain

15    standing and raise your right hand.  You can slip your mask

16    off and the courtroom deputy will swear you in.

17              THE WITNESS:  Yes, sir.

18         JAMES A. BAKER, GOVERNMENT WITNESS, SWORN.

19              THE COURT:  Please have a seat.  Make yourself

20    comfortable.

21              THE WITNESS:  Thank you.

22              THE COURT:  Please proceed.

23                        DIRECT EXAMINATION

24    BY MR. DeFILIPPIS:

25    Q.  Good afternoon, Mr. Baker.
```

1    A.  Good afternoon.

2    Q.  If you could just state and spell your name for the jury

3    and the court reporter.

4    A.  James A. Baker, B-A-K-E-R.

5    Q.  Mr. Baker, where do you work currently?

6    A.  I currently work at Twitter, Incorporated, and I have

7    some other outside interests as well.  I'm a lecturer on law

8    at Harvard Law School as well.

9    Q.  And what's your position at Twitter?

10   A.  Deputy general counsel and vice president, legal.

11   Q.  At some point, did you work for the Federal Government?

12   A.  Yes, I did.

13   Q.  And what was the timespan that you worked for the

14   government?

15   A.  It was interrupted at various points in time, but

16   essentially from 1990 until 2018.

17   Q.  And what sorts of positions did you hold in the

18   government?  What departments and what kind of work?

19   A.  I worked for the Department of Justice in a variety of

20   different positions, including near the end I was the

21   general counsel of the FBI.

22   Q.  And before the FBI, what departments or department did

23   you work for?

24   A.  I started out in the criminal division of the Department

25   of Justice.  I was a federal prosecutor in the fraud section

1    for most of the time.

2              And then I held a national security-related job

3    as -- my title was counsel for intelligence policy in

4    something called the office of intelligence policy and

5    review, which is now part of the national security division

6    at DOJ.

7              And then I also served for a few years as an

8    associate deputy attorney general working directly for the

9    deputy attorney general, who's the number-two person at the

10   Department of Justice.

11   Q.   Okay.  And what year did you start at the FBI?

12   A.   At the FBI, I started in 2014.

13   Q.   And was that as general counsel?

14   A.   As general counsel.

15   Q.   And what is the general counsel of the FBI?

16   A.   The general counsel of the FBI is in essence the chief

17   legal officer of the Bureau.  And then I was responsible for

18   providing legal advice to Bureau officials, senior Bureau

19   officials, including the director and deputy director.  And

20   then I also ran the office of general counsel, which had

21   about 300 people in it, about 200 attorneys and then another

22   100 professionals.

23   Q.   And what year did you leave the FBI?

24   A.   I left the FBI in May of 2018.

25   Q.   Now, day-to-day, what does the general counsel do?

```
1    What's a typical day of the general counsel?

2    A.   It would start out with an intelligence security case

3    briefing with the leadership of the FBI, followed by a

4    similar briefing with some of the same group but with the

5    director.

6            And then I would work on a variety of matters

7    having to do with a large number of law enforcement-related

8    matters, national security-related matters,

9    cybersecurity-related matters, employment law, litigation,

10   technology, the FBI lab.  Really, the whole range of all the

11   work of the FBI would come across my desk on a regular basis

12   if not a daily basis.

13   Q.   And did a portion or a large portion of that work

14   involve national security matters?

15   A.   Yes, it did.

16   Q.   How about when you were at the Department of Justice?

17   To what extent did you deal with national security

18   specifically related things there?

19   A.   Well, certainly from 1996 until 2007 I was working in

20   this office of intelligence policy and review.  And that was

21   exclusively national security and intelligence matters,

22   including filing applications for electronic surveillance

23   and physical search with the Foreign Intelligence

24   Surveillance Court.  And I ended up at the head of that

25   office.
```

1    Q.  So over the years, fair to say you've been entrusted

2    with lots of classified information?

3    A.  That's correct.

4            Just as an aside, also, in the deputy attorney

5    general's office, my portfolio was national security and

6    cyber.  That was for two years.

7    Q.  And in terms of your background with national security

8    information, have you held clearances, security clearances?

9    A.  Yes, sir.

10   Q.  At the top-secret level, the highest levels?

11   A.  Top secret, yes.  Sensitive compartmentation information as

12   well.  Yes.

13   Q.  Now, in connection with your work on national security

14   matters, what's the sort of range of issues that the FBI

15   addresses in those areas?  What are some examples of

16   categories?

17   A.  Certainly counterterrorism; counterintelligence, which

18   means trying to thwart the activities of hostile foreign

19   intelligence services of hostile countries; numerous

20   cybersecurity-related matters that had a national security

21   aspect to them.

22           There are a range of domestic security issues as

23   well, protecting the United States from domestic threats,

24   the FBI's responsibilities with respect to that.  Really any

25   of the -- any national security-related matter involving the

1    protection of the United States is something that the FBI

2    would be involved with one way or another, either directly

3    or working with partner agencies inside the United States.

4    Q.  In your daily work at the FBI in the 2016 time period,

5    which officials at the FBI did you deal with most

6    frequently?

7    A.  In 2016?

8    Q.  '16.

9    A.  Well, the director, the deputy director.  Below them are

10   a series of executive assistant directors who handle a

11   variety of different portfolios, including one for national

12   security.  And then below them are numerous assistant

13   directors, so very high-ranking officials who handle

14   counterterrorism, counterintelligence, international

15   matters.

16        The FBI has a huge role overseas as well on the

17   national security side and on the law enforcement side.

18   Crime of a variety of different ranges, fraud, violent

19   crime, kidnappings, crimes against children, all those kinds

20   of activities as well.  So I was dealing with those folks.

21        So I was mainly dealing with FBI headquarters

22   officials, officials within the general counsel's office,

23   and then also with people who were the heads, called special

24   agents in charge, people who were the head of a particular

25   field office around the country.

1    Q.  And in the 2016 time period, to the best as you recall,

2    let's start with -- who was the director of the FBI?

3    A.  James Comey.

4    Q.  And was he someone you dealt with on a regular basis?

5    A.  Yes.

6    Q.  And who was the deputy director of the FBI?

7    A.  Mark Giuliano -- in 2016, Mark Giuliano had been the

8    deputy director and then eventually Andy McCabe became the

9    deputy director.  I'm not sure exactly when that transition

10   took place.

11   Q.  Now, the FBI, is it divided into divisions or sections?

12   A.  Both.  Yes.

13   Q.  And where does OGC, the office of general counsel, fit

14   within that hierarchy?  Is it separate?

15   A.  It's a separate office that reports directly to the

16   deputy director.  So my direct boss was the deputy director.

17   Q.  Within the office of general counsel, do you have a

18   ballpark of about how many attorneys you supervised?

19   A.  200 attorneys, approximately.

20   Q.  And who was on your leadership team in terms of titles?

21   How was your office structured?

22   A.  My office was structured that I was the general counsel;

23   and I had I think at that point in time three deputy general

24   counsels as well as a chief of staff and an executive

25   assistant and other folks around me directly to help me on a

1   daily basis.  But my direct reports were a series of three

2   deputy general counsels.

3   Q.  And going back to your time at the Department of

4   Justice, or at any time, actually, did you come to know

5   someone named Michael Sussmann?

6   A.  Yes.

7   Q.  How did you get to know Michael Sussmann?

8   A.  I think I knew Michael when he worked at DOJ.  But I

9   certainly got to know him better and became friends with

10  him, I remember, at the funeral of a friend of his and a

11  friend of mine who was a mentor to both of us.

12          And then after that point, I remember Michael and

13  I keeping in frequent contact with each other, checking in,

14  so we would have friendly interactions.  And then he also

15  did work with the Bureau and the Department, and so I had

16  interactions with him on a professional basis as well.

17  Q.  And what would be approximately the years when you and

18  Mr. Sussmann overlapped at the Department of Justice?

19  A.  I don't recall that exactly.

20  Q.  But some years ago?

21  A.  Some years ago.  Yes.

22  Q.  And when you left the Department of Justice and between

23  then and when you went to the FBI -- I'm sorry.

24          When Mr. Sussmann left the Department of Justice

25  and from that time, from when you went to the FBI, did you

Baker - DIRECT - By Mr. DeFilippis

```
1    keep in touch?

2    A.  I think we kept in touch irregularly, I guess you would

3    say.

4    Q.  Would you consider yourselves friends?  Colleagues?

5    Something in between?

6    A.  Both.

7    Q.  Now, what, if anything, did you know about where

8    Mr. Sussmann went -- what he did at the Department of

9    Justice?

10   A.  At the Department of Justice?

11   Q.  Yes.

12   A.  I believe he worked in the criminal division in the

13   computer crime and intellectual property section.

14   Q.  And what is the computer crime and intellectual property

15   section?

16   A.  It's -- they really are the Department of Justice's

17   experts on cybersecurity, basically.  And they assist

18   prosecutors throughout the country in prosecuting cyber -- a

19   range of cyber crimes.  They're also experts in a variety of

20   surveillance laws as well.

21   Q.  Okay.  So to what extent do they bring their own cases?

22   A.  I don't think they bring their own cases as much as they

23   support U.S. attorney's offices.

24           But I think from time to time -- it's called

25   CSIPS, the acronym -- they will, I think, go out to U.S.
```

1    attorney's offices and support prosecutions.  They certainly

2    deal with U.S. attorney's offices on a daily basis, is my

3    understanding, answering all kinds of questions for them.

4    Q.  Did you become aware of what work Mr. Sussmann did after

5    he left the DOJ?

6    A.  I'm not sure what he did throughout the time after DOJ.

7    But eventually, I knew that he worked at a law firm called

8    Perkins Coie.

9    Q.  And what sort of legal practice did you understand him

10   to have?

11   A.  I understood him to have a cybersecurity, national

12   security, surveillance and privacy practice.

13   Q.  And in the 2016 time period, how frequently would you

14   say you either spoke to or talked to or communicated with

15   Mr. Sussmann?

16   A.  Not frequently, but on a regular basis.

17   Q.  And at that time, did you still consider him a friend

18   and a colleague?

19   A.  Yes.

20   Q.  What, if anything, did you know about any work

21   Mr. Sussmann did for political clients or politically

22   affiliated clients?

23   A.  Well, at some point in time in 2016, I learned that he

24   was representing the Democratic National Committee and/or

25   the Hillary Clinton committee -- or campaign related to the

1    cyber incidents that had occurred that were of public

2    knowledge during the summer of 2016.  But I understood him

3    to represent those clients in connection with the cyber

4    matters, not in connection with a political type of issue.

5    Q.  And if you could just, Mr. Baker, set the scene for us a

6    little bit at the FBI during that time period.  Were those

7    hacks prominent on the FBI's radar as the election

8    approached in 2016?

9    A.  They were very prominent at the FBI.

10   Q.  And how deeply involved were you in the FBI's efforts to

11   respond to them and to address those issues?

12   A.  Well, I wasn't involved in a day-to-day basis like a

13   case agent or a line prosecutor.  I was supervising the

14   office of general counsel as we were giving advice in

15   relation to those matters and then I was advising the

16   leadership of the Bureau with respect to matters about that.

17   So I'm advising the high-level policymakers who do make

18   case-related decisions, but we're not -- I wasn't doing, you

19   know, casework day in and day out.

20   Q.  And to the extent that Mr. Sussmann was involved in

21   representing clients like that -- I think you said you

22   became aware of that -- did you personally meet with him on

23   any of those matters in connection with those matters?

24   A.  I don't think I ever met with him on those matters.

25   Q.  And do you think that you spoke with him specifically

```
1    about those matters, you know, in connection with your
2    Bureau work or was that handled by others?
3    A.  Not to my recollection today.  Yeah.  I heard about
4    him -- I heard a briefing where it was discussed that he was
5    representing them.
6    Q.  Did there come a time in 2016 when Mr. Sussmann provided
7    you with some information in your capacity at the FBI?
8    A.  Yes.
9    Q.  And when was that, approximately?
10   A.  September of 2016.
11   Q.  And how did Mr. Sussmann first reach out to you in
12   connection with that information?
13   A.  He sent me a text on my personal phone seeking to set up
14   a meeting with me.
15   Q.  Where were you when you received that text?
16   A.  To the best of my recollection, I was at my house.
17   Q.  And was it in the daytime?  The nighttime?
18   A.  It was in the evening.
19   Q.  And I'm going to show you what's been marked
20   Government's Exhibit 1500.  This is a multipage exhibit,
21   Mr. Baker.  Just looking at it there, do you recognize what
22   this is?
23   A.  This looks like a screenshot of my personal phone, of
24   part of my personal phone.
25   Q.  And do you have any awareness as to how this screenshot
```

1     came into the possession of the Government?

2     A.  Well, at some point in time I took a screenshot of it

3     and gave it to the Government.

4           MR. DeFILIPPIS:  Your Honor, the Government offers

5     Government's Exhibit 1500.

6           MR. BERKOWITZ:  No objection.

7           THE COURT:  So moved.

8           (Whereupon, Government's Exhibit No. 1500 was

9     entered into evidence.)

10    BY MR. DeFILIPPIS:

11    Q.  So, Mr. Baker, we're looking here at the first page of

12    Government's Exhibit 1500.  What do you understand this to

13    be a screenshot of?

14    A.  So this is my current phone.  And it's a screenshot, I

15    think, when you go into settings and look for information

16    about your -- you know, "my iPhone," this is one of the

17    screens that comes up.

18          MR. DeFILIPPIS:  If we could go ahead a couple

19    pages in that exhibit to a text message on September 18th.

20    BY MR. DeFILIPPIS:

21    Q.  So, Mr. Baker, what are we looking at here?

22    A.  This is a text message from my iPhone -- I'm sorry.

23    It's an iMessage technically, from my iPhone.  And it's a

24    message that I received on September 18th, 2016, at 7:24

25    p.m.

1          And it's -- there's the text.  Do you want me to

2     read the text?

3     Q.  Sure.  Thank you.

4     A.  "Jim, it's Michael Sussmann.  I have something

5     time-sensitive (and sensitive) I need to discuss.  Do you

6     have availability for a short meeting tomorrow?  I'm coming

7     on my own - not on behalf of a client or company - want to

8     help the Bureau.  Thanks."

9     Q.  Okay.  So we'll come back to that text, Mr. Baker.  But

10    I just want to ask you a few questions about again how this

11    was retrieved and when you located it.

12          Did you locate this text message a long time ago?

13    Recently?

14    A.  It was a few months ago.  It was recently.

15    Q.  And in that regard, was it something that the

16    Government -- that you found in response to a request from

17    the Government?

18    A.  Yes.

19    Q.  Are you familiar with the concept of *Jencks* materials or

20    3500 materials?

21    A.  Yes.

22    Q.  And briefly, what do you understand that to mean?

23    A.  Statements of a person like myself who's a witness.

24    Q.  Okay.  And is it your understanding that the Government

25    has an obligation to turn over to the defense any statements

```
1    in that regard for any witnesses it's going to call at the

2    trial?

3    A.   Correct.  Yes.  It's an act of Congress that requires

4    that -- the reference to 3500 is a section in the U.S. Code.

5    Q.   So did there come a time when you were asked by the

6    Government to give any statements you might have on the

7    subject of your testimony today?

8    A.   Yes.

9    Q.   And just tell us how that happened and then what you did

10   in response.

11   A.   There was a phone call with the Government.  I think it

12   was in March of this year.  And it was to discuss

13   discovery-related matters in part in the conversation.

14           And I think it was Mr. Durham who asked me, you

15   know:  You need -- we have an obligation to hand over

16   discovery to the defense in this case.  And can you go look

17   for emails and other communications that you might have had

18   with Mr. Sussmann?

19           And so in response to that, I -- after we got off

20   the phone, I immediately went to my phone and started

21   looking through emails and then I looked for texts.  And I

22   did a search for texts with Michael's last name; and texts

23   came up, and I scrolled through them.  They took a while to

24   down -- it was clear to me at least that they were

25   downloading from the cloud.
```

```
 1              And as I scrolled through and got to the beginning
 2    of my set of communications with Michael, this is the first
 3    one that I had.
 4    Q.  Now, had you -- have you spoken to and met with the
 5    Government in connection with this case previously?
 6    A.  Yes.
 7    Q.  And had you previously located this text message here?
 8    A.  Not to the best of my recollection.  No.
 9    Q.  What, if anything, was the reason for that?
10    A.  It's -- I was not -- I mean, the way I thought about it
11    was that frankly, like, I am not out to get Michael.  And
12    this is not my investigation; this is your investigation.
13    And so if you ask me a question, I answer it.  If you ask me
14    to look for something, I go look for it.  But to the best of
15    my recollection, nobody had asked me to go look for this
16    material before that.
17    Q.  And based on your recollection alone when you thought
18    back to your meeting with Mr. Sussmann, did you remember
19    specifically that this text message had come in or did you
20    think he had contacted you maybe in some other way?
21    A.  I had not recalled that he had texted me until I saw
22    this text in March.  I had thought that he had reached out
23    to me at the Bureau on the telephone or in some other way.
24    That was the best of my recollection at that point in time.
25    Q.  Okay.  And when you located the message, how soon did
```

1      you alert the Government?

2      A.  As quickly as I could.  I called my attorney and I

3      notified him about this and then he notified the Government.

4      And then that afternoon, FBI agents came to my house.

5      Q.  Got it.

6              Now, returning to the outreach that you said you

7      received from Mr. Sussmann, the date of this is what?

8      A.  September 18, 2016.

9      Q.  Do you happen to recall what day of the week that was?

10     A.  I think it was a Sunday.

11     Q.  And did you testify earlier, where were you at the time?

12     A.  I was at home.

13     Q.  Okay.  And when you received this message, what was your

14     reaction to it?

15     A.  I was a bit surprised to get it from Michael.  I kind of

16     wondered how he got my personal cell phone number.  But

17     Michael's a friend, so it didn't really freak me out.

18              So okay.  All right.  Michael wants to meet.  I

19     trust Michael.  I'll set up a meeting with him if he can

20     come tomorrow.  It seems -- based on what he was saying, it

21     seemed to me at the time that it was very important, and so

22     I thought I should meet with him right away.

23     Q.  So let's look at what, if any, response you sent to

24     that.

25              So, Mr. Baker, you wrote back.

```
1              MR. DeFILIPPIS:  Ms. Arsenault, can we see a
2      timestamp on that?  No?
3      BY MR. DeFILIPPIS:
4      Q.  It looks like you wrote back, Mr. Baker.  And what did
5      you say?
6      A.  I said:  "Okay.  We'll find a time.  What might work for
7      you?"
8      Q.  And then how did Mr. Sussmann respond?
9      A.  Michael responded:  "Anytime but lunchtime.  You name
10     it."
11     Q.  And then your response?
12     A.  So then I think I probably looked at my calendar on my
13     phone, on my Bureau phone, and suggested 2:00 p.m. at my
14     office.
15              And I asked him if he had a badge to get into FBI
16     headquarters or did he need my help getting him into the
17     building?  Obviously, people can't just walk out of the
18     street into FBI headquarters.  There's a whole process for
19     getting somebody in.  But for some reason I thought that
20     Michael, because he did a lot of business with the Bureau,
21     might have a security badge, which in fact it turns out that
22     he did, because he said:  "I have a badge.  Please remind me
23     of your room number."
24              And then you can see sort of at the bottom I gave
25     him my room number, which is 7427 in FBI headquarters on the
```

1    seventh floor.

2    Q.  Now, just going back to this overall text chain, I don't

3    see any text messages from Mr. Sussmann earlier than that

4    one in the chain.  When you went back on your phone, was

5    this the first or not the first message from him or with

6    him?

7    A.  This appeared be the first, because when I scrolled

8    through it, nothing else would download from the cloud.

9    Q.  Okay.  And so the -- it looks like you then gave your

10   office number.  Is that correct?

11   A.  Yes.  That's correct.  At the bottom there.

12           MR. DeFILIPPIS:  Your Honor, this might be a

13   logical time to stop.  You had said a quarter of.

14           THE COURT:  Ladies and gentlemen, we're going to

15   continue with Mr. Baker tomorrow, so we're going to break a

16   little bit early today.  So you'll be excused for the day.

17   We'll see you back here at 9:00 a.m. tomorrow.

18           You know the drill:  No discussions about the

19   case; no independent research about the case.  And stay

20   safe.  All right?  Have a great night.

21           (Whereupon, the jury exited the courtroom at 4:40

22   p.m. and the following proceedings were had:)

23           THE COURT:  You can step down, Mr. Baker.  Please

24   don't discuss your testimony overnight.

25           THE WITNESS:  Yes, sir.

```
 1                    (Witness excused.)

 2              THE COURT:  Please be seated, everyone.

 3              We'll see you around 9:00.  Anything else tonight?

 4              MR. BERKOWITZ:  Just briefly.  I know it's late in

 5        the day, Judge.

 6              We'll obviously think long and hard on this and

 7        speak with our client.  Do you have any direction to us if

 8        we do decide whether we should be prepared to deal with

 9        witnesses tomorrow?  Is it something you wanted to see

10        briefing on?

11              THE COURT:  I'm sorry.  Deal with witnesses?

12              MR. BERKOWITZ:  So if we were to move for a

13        mistrial tomorrow, do you want us to come prepared to argue

14        it?  Should we also be prepared to deal with witnesses?  I

15        don't want to put you on the spot.  I'm just trying --

16              THE COURT:  You should be prepared to deal with

17        witnesses.  I am not inclined to grant a mistrial.  Be your

18        own counsel as to what you want to request from the Court.

19              MR. BERKOWITZ:  Understood.  Thank you very much.

20              And if we could get the list of witnesses for

21        tomorrow, then, after Mr. Baker as well as the exhibits for

22        Mr. Baker, that would be great.

23              THE COURT:  Sure.

24              Who do we have tomorrow after Mr. Baker?

25              MR. DeFILIPPIS:  Your Honor, I think the witnesses
```

```
 1    we have tomorrow may depend on how long the cross will be.

 2    So I don't know if the defense has a vague estimate.

 3              THE COURT:  It depends on the direct.

 4              MR. BERKOWITZ:  Two hours.

 5              MR. DeFILIPPIS:  Your Honor, so we --

 6              THE COURT:  He's likely to go at least through the

 7    morning, I would think.

 8              Right?

 9              MR. DeFILIPPIS:  I would think so, your Honor.

10    But our next sort of lineup would be after Mr. Baker, it

11    will be Mr. Priestap, Ms. Anderson and then Special Agent

12    Gaynor.  I think that would almost certainly get us through

13    the day.

14              THE COURT:  And I don't believe I have Mr. Baker's

15    prior testimony for potential impeachment purposes.  If I

16    could get a binder with that.

17              MR. BERKOWITZ:  You will certainly have it before

18    my cross-examination.

19              THE COURT:  Yes.  Okay.

20              We're adjourned.  Have a great night.  Be safe,

21    everybody.

22              (Proceedings concluded.)

23

24

25
```

1                          **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 18th day of May, 2022.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$2,755.50** [1] - 719:6
**$4,000** [1] - 751:10
**$4,008** [1] - 726:14
**$417.50** [1] - 714:25
**$75,000** [2] - 752:13, 752:15
**$85,000** [1] - 753:6

## '

**'16** [1] - 791:8
**'90s** [1] - 781:6

## /

**/s** [1] - 807:12

## 1

**1** [3] - 725:11, 753:3
**1.5** [1] - 742:16
**100** [2] - 774:21, 788:22
**10020** [1] - 698:23
**101** [1] - 699:15
**10:30** [1] - 717:6
**11** [2] - 764:7, 765:24
**11th** [1] - 765:13
**12** [7] - 725:12, 748:19, 749:3, 749:4, 749:10, 764:25, 766:7
**1221** [1] - 698:20
**128** [3] - 699:17, 765:2, 765:7
**12th** [8] - 706:10, 707:17, 724:25, 725:2, 731:1, 748:21, 767:9, 781:23
**13** [1] - 699:11
**145** [1] - 698:16
**15** [1] - 699:11
**15-minute** [1] - 783:1
**1500** [5] - 699:15, 797:20, 798:5, 798:8, 798:12
**15th** [1] - 775:25
**17** [1] - 699:12
**17th** [15] - 711:2, 711:21, 711:24, 712:20, 713:24, 714:11, 714:21, 716:1, 716:2, 726:8, 731:1, 731:2, 749:16, 749:20, 753:19
**18** [3] - 698:4,

718:11, 802:8
**18th** [6] - 754:1, 755:18, 755:24, 798:19, 798:24, 807:10
**19** [1] - 699:12
**1900** [4] - 699:11, 709:22, 710:16, 710:19
**1990** [1] - 787:16
**1996** [1] - 789:19
**19th** [11] - 717:4, 718:2, 730:18, 731:2, 756:22, 760:21, 767:21, 768:6, 768:12, 768:24, 785:8
**1:21-CR-00582-CRC-1** [1] - 698:3
**1:57** [1] - 698:4

## 2

**2** [3] - 742:16, 749:1, 763:14
**2,755.50** [1] - 718:14
**20** [2] - 699:13, 770:1
**200** [2] - 788:21, 792:19
**200-and-some** [1] - 753:6
**20001** [1] - 698:25, 807:14
**20002** [1] - 698:16
**2007** [1] - 789:19
**2014** [1] - 788:12
**2015** [3] - 737:5, 737:6, 737:16
**2016** [38] - 712:20, 713:24, 714:11, 733:24, 734:10, 734:12, 735:2, 735:14, 737:2, 740:24, 741:4, 742:22, 743:1, 743:7, 745:3, 747:15, 748:19, 752:16, 753:19, 754:1, 755:18, 755:24, 763:22, 764:7, 765:24, 768:12, 791:4, 791:7, 792:1, 792:7, 795:13, 795:23, 796:2, 796:8, 797:6, 797:10, 798:24, 802:8
**2018** [2] - 787:16, 788:24
**202** [2] - 698:25, 807:15

**2022** [2] - 698:4, 807:10
**25** [1] - 699:13
**258,000** [2] - 705:10, 705:12
**258,475.25** [1] - 705:2
**27** [1] - 699:14
**29** [1] - 699:14
**29th** [4] - 703:6, 704:1, 730:25, 741:5
**2:00** [1] - 803:13
**2:06** [1] - 701:24

## 3

**3.3** [3] - 718:9, 718:10, 718:11
**30** [2] - 700:21, 700:22
**30,000** [1] - 745:16
**30-minute** [1] - 711:1
**300** [1] - 788:21
**307** [2] - 703:2, 706:3
**30th** [2] - 708:13, 708:19
**319** [2] - 706:17, 709:8
**327** [4] - 699:11, 712:3, 712:7, 712:10
**331** [5] - 699:12, 716:9, 716:13, 716:16, 718:23
**333** [2] - 698:24, 807:14
**343** [1] - 763:21
**3500** [2] - 799:20, 800:4
**354-3269** [2] - 698:25, 807:15
**36** [1] - 699:5
**377** [5] - 699:14, 724:5, 724:9, 724:12, 748:14
**386** [4] - 699:13, 722:5, 722:10, 722:13
**3:56** [1] - 783:4

## 4

**4** [2] - 725:11
**4.8** [4] - 726:10, 750:10, 751:5, 751:9
**40** [1] - 700:23
**40-minute** [1] - 783:9
**431** [3] - 699:16, 753:25, 754:7
**433** [4] - 699:17,

755:21, 763:4, 763:10
**4:00** [1] - 783:1
**4:16** [1] - 786:6
**4:40** [1] - 804:21

## 5

**5** [2] - 699:5, 699:10
**553** [2] - 704:7, 704:11
**553.1** [5] - 703:2, 703:13, 703:25, 704:8, 706:3
**553.23** [5] - 699:14, 725:18, 725:24, 726:2, 749:15
**553.3** [3] - 706:17, 708:4, 709:8
**553.4** [5] - 699:12, 713:13, 713:22, 714:4, 714:7
**553.6** [5] - 699:13, 717:13, 717:20, 717:23, 718:23
**559** [5] - 699:10, 702:11, 702:15, 702:18, 763:18
**560.1** [3] - 764:7, 764:20, 767:3
**57** [1] - 699:16
**5:00** [2] - 783:15, 785:25
**5:08** [1] - 755:23
**5:30** [2] - 711:2, 712:20

## 6

**60** [1] - 725:3
**66** [1] - 699:17
**68** [1] - 699:17
**6:00** [1] - 712:20
**6:45** [1] - 711:3

## 7

**71** [1] - 699:5
**7427** [1] - 803:25
**75,000** [1] - 752:12
**7:24** [1] - 798:24

## 8

**8** [1] - 700:5
**8-12** [2] - 764:10, 767:6
**8-12-2016** [1] - 767:1

**8-23-2016** [1] - 717:16
**8.5** [1] - 724:25
**808** [1] - 763:14
**84,000** [1] - 704:24
**84,897** [1] - 705:10
**84,897.093** [1] - 704:23
**85** [1] - 705:20
**85,000** [1] - 705:10
**85,000-ish** [1] - 705:9
**89** [1] - 699:6

## 9

**9:00** [2] - 804:17, 805:3
**9th** [4] - 725:1, 748:20, 763:22, 765:10

## A

**a.m** [2] - 717:6, 804:17
**ability** [1] - 807:7
**able** [3] - 701:20, 705:2, 711:3
**absolutely** [8] - 722:21, 738:21, 742:4, 742:11, 744:11, 745:20, 748:13, 776:15
**according** [4] - 709:19, 711:21, 718:13, 755:5
**account** [1] - 721:3
**accurate** [1] - 807:4
**acronym** [1] - 794:25
**act** [1] - 800:3
**acting** [5] - 738:6, 738:19, 739:14, 767:16, 775:11
**action** [1] - 756:13
**Action** [1] - 698:3
**activities** [2] - 790:18, 791:20
**actual** [1] - 753:10
**ad** [1] - 732:14
**added** [1] - 780:8
**addition** [2] - 772:17, 777:12
**address** [1] - 796:11
**addresses** [1] - 790:15
**adds** [1] - 780:13
**adjourned** [1] -

806:20
**administrative** [1] - 711:14
**admitted** [1] - 764:20
**advice** [5] - 721:6, 727:23, 728:9, 788:18, 796:14
**advise** [1] - 728:13
**advised** [2] - 700:6, 728:4
**advising** [2] - 796:15, 796:17
**advisor** [1] - 722:25
**affiliated** [1] - 795:22
**AFTERNOON** [1] - 698:5
**afternoon** [6] - 733:5, 733:6, 765:21, 786:25, 787:1, 802:4
**agencies** [1] - 791:3
**agent** [1] - 796:11
**Agent** [1] - 806:11
**agents** [2] - 791:24, 802:4
**ago** [9] - 742:17, 744:5, 749:14, 759:25, 771:24, 793:20, 793:21, 799:12, 799:14
**agree** [1] - 756:21
**agreed** [2] - 705:14, 762:2
**agreed-upon** [1] - 705:14
**agreeing** [1] - 770:17
**agrees** [1] - 700:17
**ahead** [2] - 741:12, 798:18
**aide** [2] - 781:7, 781:8
**alert** [1] - 802:1
**alerted** [1] - 723:19
**alerting** [1] - 720:22
**Alfa** [33] - 713:5, 713:19, 717:9, 717:11, 719:23, 720:5, 721:13, 723:4, 723:8, 723:12, 723:14, 723:16, 723:20, 724:1, 726:21, 726:24, 727:2, 727:20, 730:16, 731:7, 732:2, 735:14, 742:21, 746:20, 748:9, 758:4, 761:2, 761:22, 766:15, 768:2, 772:17, 777:5, 779:1
**Alfa-Bank** [28] - 713:5, 713:19, 717:9,

717:11, 720:5, 721:13, 723:12, 723:14, 723:16, 723:20, 724:1, 726:24, 727:2, 727:20, 730:16, 731:7, 732:2, 735:14, 742:21, 746:20, 748:9, 758:4, 761:2, 761:22, 766:15, 772:17, 777:5, 779:1
**Alfa-Bank-related** [2] - 719:23, 726:21
**Alfa-Bank-Trump** [1] - 768:2
**ALGOR** [2] - 698:14, 763:8
**aligned** [3] - 738:22, 738:23, 774:21
**allegation** [4] - 720:24, 721:2, 721:4, 780:9
**allegations** [8] - 726:21, 726:24, 727:2, 730:16, 735:15, 747:20, 762:9, 762:12
**almost** [1] - 806:12
**alone** [1] - 801:17
**AMERICA** [1] - 698:3
**America** [6] - 715:17, 715:19, 736:25, 737:15, 738:7, 767:24
**American** [1] - 745:11
**Americas** [1] - 698:20
**amount** [9] - 705:14, 705:16, 719:6, 726:13, 726:14, 753:13, 770:11, 770:12, 770:19
**amounts** [1] - 753:12
**Anderson** [1] - 806:11
**ANDREW** [1] - 698:14
**Andy** [1] - 792:8
**answer** [5] - 780:4, 784:21, 785:1, 785:10, 801:13
**answered** [2] - 750:16, 784:17
**answering** [2] - 777:10, 795:3
**anti** [4] - 746:2, 746:3, 759:10
**anti-communist** [1] - 746:3
**anti-Russia** [1] -

746:2
**anti-Soviet** [1] - 746:3
**anti-Trump** [1] - 759:10
**anticipation** [1] - 755:7
**anytime** [1] - 803:9
**apologize** [1] - 717:18
**apparent** [2] - 715:16, 718:8
**appear** [9] - 707:24, 713:23, 717:13, 719:1, 719:2, 724:6, 725:21, 753:25, 756:2
**aPPEARANCES** [1] - 698:13
**appeared** [2] - 767:15, 804:7
**applications** [1] - 789:22
**applied** [1] - 775:10
**appreciate** [2] - 701:14, 751:16
**approached** [1] - 796:8
**approvals** [2] - 770:12, 770:13
**approving** [1] - 770:19
**April** [6] - 737:2, 737:5, 737:6, 737:16, 738:3, 744:13
**April-to-September** [1] - 744:13
**area** [2] - 734:25, 735:2
**areas** [1] - 790:15
**argue** [1] - 805:13
**Arizona** [1] - 734:6
**arrange** [1] - 739:12
**arrangement** [4] - 711:16, 738:24, 739:6, 775:19
**arsenault** [1] - 718:22
**Arsenault** [9] - 703:1, 704:7, 706:3, 706:12, 706:16, 708:2, 709:8, 713:10, 803:1
**art** [1] - 750:12
**article** [11] - 721:9, 721:12, 723:4, 755:2, 755:23, 756:2, 756:5, 780:17, 781:10
**articles** [3] - 727:19, 772:2, 777:23
**aside** [5] - 715:22,

721:5, 727:22, 751:9, 790:4
**aspect** [1] - 790:21
**assist** [4] - 744:1, 744:3, 794:17
**assistant** [6] - 710:12, 711:8, 711:14, 791:10, 791:12, 792:25
**associate** [2] - 781:2, 788:8
**assume** [6] - 705:6, 708:24, 728:15, 752:18, 770:6, 773:2
**assuming** [3] - 705:20, 723:21, 762:18
**assumption** [4] - 705:23, 706:8, 706:25, 730:10
**AT&T** [1] - 736:13
**attaching** [1] - 755:2
**attachment** [3] - 723:5, 723:11, 723:13
**attack** [3] - 745:19, 745:20, 753:21
**attempted** [1] - 764:14
**attended** [2] - 719:18, 719:20
**attendees** [2] - 766:18
**attending** [1] - 731:21
**attention** [6] - 704:22, 712:2, 722:4, 724:4, 726:5, 746:23
**attorney** [7] - 769:13, 769:15, 769:23, 788:8, 788:9, 790:4, 802:2
**attorney's** [3] - 794:23, 795:1, 795:2
**attorneys** [4] - 769:21, 788:21, 792:19
**August** [29] - 706:10, 707:16, 711:2, 711:21, 712:20, 713:24, 714:11, 714:21, 716:1, 716:2, 717:4, 718:2, 720:12, 731:1, 747:14, 747:15, 763:22, 764:7, 764:25, 765:10, 765:11, 765:24, 766:7, 767:9, 781:23
**author** [1] - 740:6
**authorize** [2] -

757:13, 762:11
**authorized** [3] - 757:16, 767:24, 772:13
**availability** [2] - 711:4, 799:6
**available** [1] - 731:23
**Avenue** [3] - 698:20, 698:24, 807:14
**avoid** [1] - 785:16
**aware** [38] - 720:4, 727:23, 727:24, 727:25, 728:2, 728:7, 729:19, 730:20, 739:17, 740:20, 740:22, 740:23, 743:19, 744:9, 744:12, 756:25, 757:15, 757:18, 767:23, 768:4, 768:5, 771:20, 771:23, 772:4, 772:7, 772:8, 772:11, 776:12, 777:23, 778:25, 779:4, 779:6, 779:24, 795:4, 796:22
**awareness** [2] - 723:16, 797:25

**B**

**B-A-K-E-R** [1] - 787:4
**backdrop** [1] - 746:18
**background** [1] - 790:7
**bad** [3] - 758:5, 758:8, 759:1
**badge** [3] - 803:15, 803:21, 803:22
**BAKER** [1] - 786:18
**Baker** [21] - 699:6, 783:9, 786:3, 786:13, 786:14, 786:25, 787:4, 787:5, 796:5, 797:21, 798:11, 798:21, 799:9, 802:25, 803:4, 804:15, 804:23, 805:21, 805:22, 805:24, 806:10
**Baker's** [1] - 806:14
**ballpark** [1] - 792:18
**Bank** [31] - 713:5, 713:19, 717:9, 717:11, 719:23, 720:5, 721:13, 723:12, 723:14,

810

723:16, 723:20, 724:1, 726:21, 726:24, 727:2, 727:20, 730:16, 731:7, 732:2, 735:14, 742:21, 746:20, 748:9, 758:4, 761:2, 761:22, 766:15, 768:2, 772:17, 777:5, 779:1

**based** [5] - 710:12, 750:14, 753:2, 801:17, 802:20

**basis** [9] - 752:10, 789:11, 789:12, 792:4, 793:1, 793:16, 795:2, 795:16, 796:12

**Bauer** [3] - 737:12, 737:18, 744:7

**Bear** [1] - 743:15

**bear** [1] - 743:15

**bears** [1] - 743:16

**became** [13] - 727:25, 737:18, 737:22, 737:24, 738:14, 738:18, 740:22, 743:19, 756:25, 792:8, 793:9, 796:22

**become** [4] - 720:25, 740:23, 746:6, 795:4

**becomes** [2] - 737:23, 746:4

**BEFORE** [1] - 698:10

**beforehand** [1] - 768:5

**beginning** [1] - 801:1

**behalf** [18] - 721:15, 744:13, 760:14, 760:15, 760:17, 760:21, 760:24, 764:13, 767:10, 767:16, 767:23, 768:23, 769:6, 769:15, 769:23, 785:8, 799:7

**behest** [1] - 775:11

**behind** [1] - 725:4

**bell** [3] - 706:10, 706:13, 730:20

**below** [2] - 791:9, 791:12

**beneficial** [4] - 756:10, 774:19, 777:5, 777:6

**benefit** [4] - 710:23, 721:1, 721:4, 753:23

**benefited** [1] - 748:6

**Berkowitz** [3] - 768:22, 772:3, 775:18

**BERKOWITZ** [46] - 698:18, 701:1, 702:17, 710:17, 712:8, 714:5, 716:14, 717:21, 719:8, 722:11, 724:10, 725:25, 733:4, 741:13, 741:17, 754:3, 754:9, 763:2, 763:12, 763:16, 763:20, 764:17, 764:21, 764:22, 765:3, 765:9, 765:13, 765:15, 765:21, 765:23, 767:2, 767:4, 768:14, 769:2, 769:8, 778:2, 778:6, 783:17, 783:25, 784:10, 798:6, 805:4, 805:12, 805:19, 806:4, 806:17

**Berkowitz's** [1] - 785:11

**beside** [1] - 725:6

**best** [20] - 720:7, 720:10, 723:24, 724:15, 727:4, 757:7, 759:25, 768:10, 768:13, 769:12, 769:14, 769:22, 771:10, 771:24, 792:1, 797:16, 801:8, 801:14, 801:24, 807:7

**better** [1] - 793:9

**between** [15] - 705:8, 707:18, 711:2, 714:1, 721:18, 745:23, 746:19, 748:9, 749:3, 749:9, 756:15, 758:4, 793:22, 794:5

**big** [3] - 720:16, 733:23, 742:5

**bigger** [2] - 754:20, 770:5

**Bill** [4] - 737:14, 781:2, 781:3, 781:7

**bill** [13] - 704:8, 708:25, 715:15, 749:5, 750:10, 752:15, 753:5, 769:24, 770:8, 770:22, 770:23, 774:8, 774:11

**billed** [28] - 703:17, 703:21, 704:3, 705:9, 705:19, 706:6, 707:2, 707:17, 707:23, 708:14, 709:18, 713:25, 714:20, 714:23, 715:23, 719:3, 719:17,

719:18, 719:21, 725:10, 751:5, 751:7, 752:4, 752:13, 753:10, 753:13, 770:21, 774:22

**billing** [24] - 702:22, 703:12, 703:13, 703:20, 705:14, 707:1, 707:22, 709:13, 713:24, 725:8, 725:19, 726:6, 726:11, 731:2, 750:1, 750:14, 750:22, 753:2, 753:18, 764:23, 769:13, 769:19, 770:15, 774:6

**bills** [3] - 705:3, 751:20, 774:3

**binder** [4] - 702:10, 702:12, 702:13, 806:16

**bit** [6] - 702:23, 729:24, 783:18, 796:6, 802:15, 804:16

**block** [1] - 711:7

**Bloomberg** [1] - 739:10

**blow** [6] - 717:17, 749:18, 754:11, 755:2, 765:13, 765:21

**Blumenthal** [4] - 755:1, 780:21, 781:1, 781:4

**Bob** [1] - 737:12

**boils** [1] - 709:10

**boss** [1] - 792:16

**BOSWORTH** [1] - 698:18

**bottom** [3] - 704:23, 803:24, 804:11

**box** [1] - 770:8

**boxes** [1] - 770:1

**Bradley** [1] - 737:14

**branches** [1] - 743:12

**Brazile** [1] - 766:19

**break** [7] - 702:21, 704:21, 768:16, 783:1, 784:2, 804:15

**breaking** [1] - 750:14

**briefed** [1] - 731:6

**briefing** [20] - 764:1, 764:10, 764:14, 764:25, 766:3, 766:8, 766:13, 766:19, 766:23, 766:24, 767:6, 767:9, 781:23, 782:3, 782:8, 782:10, 789:3, 789:4, 797:4, 805:10

**briefings** [3] - 744:17, 744:23, 764:12

**briefly** [3] - 722:19, 799:22, 805:4

**briefs** [1] - 781:15

**bring** [6] - 730:5, 740:11, 772:6, 772:9, 794:21, 794:22

**BRITTAIN** [1] - 698:15

**broader** [1] - 772:17

**brought** [1] - 746:22

**building** [1] - 803:17

**bullet** [1] - 742:15

**bully** [1] - 740:10

**Bureau** [10] - 788:17, 788:18, 793:15, 796:16, 797:2, 799:8, 801:23, 803:13, 803:20

**Bush** [1] - 740:8

**business** [4] - 736:10, 740:13, 751:15, 803:20

**busy** [2] - 741:24, 742:8

**buy** [3] - 769:22, 770:1, 770:8

**BY** [40] - 698:22, 702:8, 702:20, 703:3, 704:9, 706:4, 706:18, 708:5, 709:9, 710:21, 712:12, 713:16, 714:9, 716:18, 718:1, 718:24, 719:15, 722:15, 724:14, 726:4, 733:4, 741:13, 741:17, 754:9, 763:12, 763:20, 764:22, 765:9, 765:15, 765:23, 767:4, 768:21, 769:4, 769:11, 777:3, 778:16, 786:24, 798:10, 798:20, 803:3

**C**

**cafeteria** [1] - 701:18

**cake** [1] - 777:9

**calendar** [10] - 706:9, 706:22, 709:13, 712:4, 714:13, 716:9, 716:19, 718:3, 742:6, 803:12

**Campaign** [32] - 703:21, 704:4, 706:7, 707:19, 708:10,

709:19, 715:17, 715:24, 716:3, 716:5, 719:3, 719:19, 719:21, 719:22, 719:25, 720:1, 725:10, 728:4, 736:15, 737:8, 737:15, 738:25, 739:7, 739:21, 754:15, 757:15, 759:4, 767:24, 773:5, 774:23, 781:16, 785:9

**campaign** [105] - 705:19, 720:4, 720:22, 721:1, 721:4, 721:14, 721:15, 721:16, 721:20, 722:7, 722:16, 722:20, 722:22, 723:15, 723:20, 727:24, 728:2, 729:12, 729:16, 729:18, 729:22, 729:25, 730:5, 730:6, 730:7, 731:6, 731:17, 731:18, 731:19, 731:20, 732:1, 732:8, 732:17, 732:20, 732:21, 732:25, 739:8, 739:13, 739:16, 739:23, 739:24, 740:14, 740:18, 741:24, 742:3, 744:1, 745:19, 747:1, 747:5, 747:12, 747:18, 747:22, 748:6, 748:11, 753:14, 753:21, 753:23, 754:23, 755:18, 756:10, 756:17, 757:21, 760:14, 760:15, 760:18, 760:21, 761:1, 761:8, 761:11, 767:11, 767:16, 768:11, 769:7, 771:20, 771:22, 772:5, 772:8, 772:12, 773:11, 773:13, 773:15, 774:1, 774:3, 774:15, 774:16, 774:23, 775:11, 775:12, 775:16, 775:23, 776:2, 776:5, 776:6, 776:7, 776:10, 777:24, 781:13, 781:24, 782:14, 795:25

**campaign's** [5] - 745:22, 758:6, 758:8, 761:23, 779:23

**campaigns** [3] - 739:4, 761:18, 771:3
**Campaigns** [3] - 737:10, 737:12, 739:6
**canceled** [1] - 781:24
**Candidate** [1] - 745:3
**candidate** [2] - 720:17, 772:12
**candidates** [6] - 739:9, 739:11, 743:2, 743:4, 745:10, 774:19
**cap** [2] - 752:16, 753:10
**capacity** [1] - 797:7
**capped** [1] - 776:4
**care** [1] - 700:8
**careful** [3] - 784:15, 785:4, 785:16
**carrier** [1] - 736:17
**case** [12] - 728:3, 762:16, 776:16, 778:25, 782:21, 789:2, 796:13, 796:18, 800:16, 801:5, 804:19
**case-related** [1] - 796:18
**cases** [2] - 794:21, 794:22
**casework** [1] - 796:19
**categories** [1] - 790:16
**category** [1] - 703:18
**CATHERINE** [1] - 698:19
**caused** [1] - 771:18
**causing** [1] - 755:7
**cell** [3] - 711:2, 736:14, 802:16
**certain** [5] - 734:10, 770:11, 770:12, 770:13, 770:19
**certainly** [12] - 701:2, 728:23, 731:20, 738:2, 747:14, 783:9, 789:19, 790:17, 793:9, 795:1, 806:12, 806:17
**CERTIFICATE** [1] - 807:1
**certify** [1] - 807:4
**chain** [2] - 804:2, 804:4
**chair** [6] - 722:22, 729:6, 731:17, 734:15, 754:23, 770:16

**change** [2] - 736:17, 746:5
**charge** [3] - 714:23, 748:1, 791:24
**charged** [2] - 718:12, 726:13
**chat** [1] - 783:20
**check** [5] - 711:3, 726:25, 729:5, 760:8, 760:18
**check-ins** [1] - 726:25
**checked** [1] - 760:13
**checking** [3] - 732:24, 775:12, 793:13
**Chicago** [1] - 734:5
**chief** [2] - 788:16, 792:24
**children** [1] - 791:19
**China** [1] - 734:5
**CHRISTOPHER** [1] - 698:10
**CIA** [1] - 700:13
**circumstances** [1] - 746:15
**claimed** [1] - 740:7
**classified** [2] - 744:23, 790:2
**clean** [1] - 745:10
**clear** [6] - 738:4, 767:22, 778:11, 778:12, 785:18, 800:24
**clearance** [1] - 744:25
**clearances** [3] - 735:6, 790:8
**clearly** [1] - 745:9
**Cleaves** [1] - 767:3
**client** [28] - 705:10, 705:15, 706:7, 707:10, 707:12, 718:12, 726:13, 728:24, 729:16, 736:1, 736:4, 736:5, 752:3, 752:14, 753:13, 758:23, 762:17, 762:21, 764:9, 764:24, 767:6, 769:12, 770:9, 770:23, 784:7, 799:7, 805:7
**client's** [1] - 769:23
**clients** [8] - 716:4, 742:25, 743:23, 750:19, 795:21, 795:22, 796:3, 796:21
**Clinton** [42] - 703:18, 703:21, 704:4, 706:7,

707:19, 708:10, 709:19, 715:17, 715:24, 716:3, 716:5, 719:3, 719:19, 719:21, 719:22, 719:25, 720:1, 725:10, 728:4, 737:13, 737:22, 738:4, 738:14, 738:20, 738:25, 739:24, 745:17, 754:15, 757:15, 759:3, 759:7, 759:10, 773:4, 774:23, 781:2, 781:3, 781:7, 781:8, 781:15, 785:9, 795:25
**close** [1] - 705:10
**cloud** [2] - 800:25, 804:8
**co** [1] - 763:17
**co-counsel** [1] - 763:17
**Code** [1] - 800:4
**code** [3] - 743:14, 743:15, 743:16
**code-named** [3] - 743:14, 743:15, 743:16
**Coie** [12] - 707:11, 716:4, 733:21, 733:23, 734:16, 734:22, 736:6, 766:20, 770:5, 770:6, 772:20, 795:8
**colleague** [1] - 795:18
**colleagues** [1] - 794:4
**collectively** [1] - 768:18
**Columbia** [2] - 698:24, 807:13
**COLUMBIA** [1] - 698:1
**Comey** [2] - 759:5, 792:3
**comfortable** [1] - 786:20
**coming** [7] - 748:12, 756:14, 756:23, 757:23, 758:10, 779:8, 799:6
**comment** [1] - 784:17
**commented** [1] - 784:5
**Committee** [6] - 737:17, 743:8, 743:22, 746:5, 766:1, 795:24

**committee** [1] - 795:25
**common** [1] - 711:13
**comms** [1] - 781:3
**communicate** [2] - 747:19, 772:24
**communicated** [5] - 728:8, 749:12, 773:2, 773:3, 795:14
**communicating** [2] - 730:10, 764:24
**communication** [4] - 723:1, 729:14, 729:15, 746:19
**communications** [20] - 721:18, 722:23, 723:2, 726:16, 726:17, 729:1, 749:22, 750:4, 750:7, 750:25, 751:2, 754:9, 764:1, 764:9, 767:5, 775:6, 800:17, 801:2
**communist** [1] - 746:3
**companies** [1] - 735:7
**company** [8] - 716:6, 716:7, 735:20, 746:16, 754:13, 755:5, 799:7
**compartmented** [1] - 790:11
**competitive** [1] - 738:9
**complete** [1] - 807:6
**completed** [1] - 725:4
**completely** [1] - 738:23
**composed** [2] - 724:6, 725:1
**computer** [2] - 794:13, 794:14
**concept** [2] - 719:11, 799:19
**concern** [1] - 777:21
**concerns** [1] - 739:25
**conclude** [1] - 767:19
**concluded** [1] - 806:22
**concur** [1] - 756:21
**condemn** [1] - 745:15
**conference** [7] - 711:1, 712:16, 713:1, 714:1, 714:14, 715:3, 778:3

**conferences** [4] - 718:17, 726:16, 749:21, 750:24
**confers** [1] - 763:17
**confidential** [3] - 707:2, 718:16
**configure** [1] - 725:8
**confirm** [1] - 756:1
**Congress** [1] - 800:3
**connected** [2] - 744:7, 782:10
**Connection** [1] - 741:3
**connection** [26] - 718:19, 728:8, 728:20, 740:14, 744:2, 744:10, 744:22, 745:21, 745:23, 747:8, 748:8, 756:15, 758:4, 758:10, 760:4, 760:9, 767:16, 768:2, 773:4, 790:13, 796:3, 796:4, 796:23, 797:1, 797:12, 801:5
**consent** [3] - 757:19, 768:9, 768:10
**consider** [4] - 719:23, 784:3, 794:4, 795:17
**considerable** [2] - 728:25
**considered** [1] - 776:1
**constitutes** [1] - 807:4
**Constitution** [2] - 698:24, 807:14
**consult** [3] - 772:19, 773:21, 781:21
**consulted** [2] - 701:1, 772:12
**consulting** [3] - 726:23, 773:18, 775:3
**contact** [2] - 736:2, 793:13
**contacted** [1] - 801:20
**context** [1] - 723:22
**continue** [1] - 804:15
**CONTINUED** [1] - 702:7
**contract** [1] - 705:14
**controlling** [1] - 747:22
**Convention** [1] - 745:8
**convention** [6] - 720:14, 728:11, 738:13, 741:1,

745:12, 745:13
**convention's** [1] -
720:15
**conversation** [2] -
712:22, 800:13
**conversations** [3] -
721:5, 771:21, 772:5
**COOPER** [1] -
698:10
**corporate** [1] -
715:18
**correct** [83] - 703:6,
703:19, 704:4,
705:20, 706:22,
710:5, 713:21,
730:12, 731:5,
733:19, 735:11,
736:25, 737:3,
738:20, 738:22,
739:1, 740:15,
740:16, 740:21,
741:25, 742:3, 742:6,
742:17, 743:2, 743:8,
743:9, 747:10,
747:11, 748:9,
748:12, 748:21,
748:22, 749:6,
749:10, 749:11,
749:12, 749:16,
749:23, 749:24,
750:5, 750:6, 750:10,
750:11, 750:15,
750:16, 751:3, 751:4,
751:5, 751:6, 751:7,
751:23, 752:6, 752:8,
752:11, 752:14,
752:15, 752:23,
753:11, 753:12,
753:14, 753:15,
754:14, 755:19,
755:24, 756:11,
757:1, 760:10,
760:11, 764:25,
766:1, 766:2, 766:20,
767:6, 767:11,
767:17, 767:18,
768:6, 768:12,
781:22, 790:3, 800:3,
804:10, 804:11
**corresponds** [1] -
707:21
**cost** [1] - 770:2
**costs** [1] - 771:3
**counsel** [30] -
736:24, 737:8,
737:11, 737:16,
737:18, 737:19,
737:24, 738:7,
738:15, 739:14,
739:17, 739:21,

741:24, 763:17,
776:23, 787:10,
787:21, 788:3,
788:13, 788:14,
788:15, 788:16,
788:20, 788:25,
789:1, 792:13,
792:17, 792:22,
796:14, 805:18
**COUNSEL'S** [1] -
788:15
**counsel's** [1] -
791:22
**counseling** [1] -
740:14
**counsels** [2] -
792:24, 793:2
**counselship** [1] -
738:10
**counter** [1] - 761:15
**counter-narrative** [1]
- 761:15
**counterintelligence**
[1] - 790:17, 791:14
**counterterrorism** [2]
- 790:17, 791:14
**countries** [1] -
790:19
**country** [2] - 791:25,
794:18
**couple** [6] - 725:19,
733:14, 733:16,
762:24, 774:4, 798:18
**course** [1] - 743:24
**Court** [7] - 698:23,
698:23, 700:7,
789:24, 805:18,
807:12, 807:13
**court** [5] - 701:11,
701:16, 741:15,
778:15, 787:3
**COURT** [65] - 698:1,
700:1, 700:5, 700:21,
700:24, 701:4, 701:7,
701:11, 701:17,
701:22, 702:1,
702:16, 710:18,
712:9, 714:6, 716:15,
717:22, 719:10,
722:12, 724:11,
726:1, 741:10,
741:12, 741:15,
754:4, 754:6, 763:7,
763:9, 764:20, 765:6,
768:15, 769:3, 769:9,
776:22, 778:8,
778:12, 782:19,
782:23, 782:25,
783:6, 783:11,
783:14, 783:21,

783:24, 784:9,
784:11, 785:5,
785:19, 785:22,
785:24, 786:8,
786:14, 786:19,
786:22, 798:7,
804:14, 804:23,
805:2, 805:11,
805:16, 805:23,
806:3, 806:6, 806:14,
806:19
**Court's** [1] - 700:6
**COURTROOM** [1] -
785:23
**courtroom** [6] -
701:24, 783:4, 786:4,
786:6, 786:16, 804:21
**coverage** [1] -
745:12
**covered** [2] - 708:12,
753:3
**creates** [2] - 780:11,
780:12
**credibility** [2] -
780:8, 780:12
**crime** [4] - 791:18,
791:19, 794:13,
794:14
**crimes** [2] - 791:19,
794:19
**Criminal** [1] - 698:3
**criminal** [2] - 787:24,
794:12
**Cross** [1] - 699:2
**CROSS** [1] - 733:3
**cross** [3] - 785:7,
806:1, 806:18
**cross-examination**
[1] - 806:18
**CROSS-**
**EXAMINATION** [1] -
733:3
**CRR** [3] - 698:22,
807:3, 807:12
**CSIPS** [1] - 794:25
**CTO** [1] - 730:2
**current** [2] - 718:23,
798:14
**cyber** [9] - 728:21,
729:3, 729:12, 730:9,
790:6, 794:18,
794:19, 796:1, 796:3
**cybersecurity** [8] -
728:5, 728:13,
744:20, 760:10,
789:9, 790:20,
794:17, 795:11
**cybersecurity-**
**related** [2] - 789:9,
790:20

**cycle** [1] - 761:14

# D

**D.C** [4] - 698:16,
698:25, 734:5, 807:14
**daily** [4] - 789:12,
791:4, 793:1, 795:2
**damaging** [1] -
743:25
**date** [17] - 703:14,
708:13, 712:19,
714:11, 714:13,
714:20, 717:3, 718:2,
718:3, 720:15, 726:6,
730:15, 748:19,
762:2, 762:3, 763:21,
802:7
**dated** [1] - 717:16
**Dated** [1] - 807:10
**dates** [1] - 708:23
**day-to-day** [2] -
788:25, 796:12
**days** [5] - 717:8,
725:3, 745:8, 745:13,
761:13
**daytime** [1] - 797:17
**deal** [9] - 729:24,
785:5, 789:17, 791:5,
795:2, 805:8, 805:11,
805:14, 805:16
**dealing** [6] - 728:23,
729:6, 742:24,
758:22, 791:20,
791:21
**dealings** [1] - 729:20
**dealt** [2] - 781:20,
792:4
**decent** [1] - 745:14
**decide** [2] - 785:19,
805:8
**decision** [4] -
721:20, 747:1, 747:5,
772:9
**decisions** [2] -
731:20, 796:18
**deeper** [1] - 702:23
**deeply** [1] - 796:10
**Defendant** [1] -
698:7
**DEFENDANT** [1] -
698:18
**Defendant's** [7] -
699:16, 699:17,
699:17, 754:7,
763:10, 763:14, 765:7
**Defense** [3] - 753:25,
755:21, 765:2
**defense** [8] - 700:17,

784:13, 784:20,
785:6, 785:12,
799:25, 800:16, 806:2
**DeFilippis** [86] -
698:14, 700:10,
700:22, 701:9,
701:13, 702:6, 702:8,
702:14, 702:20,
703:1, 703:3, 704:6,
704:9, 706:2, 706:4,
706:12, 706:15,
706:18, 708:2, 708:5,
709:7, 709:9, 710:15,
710:21, 712:6,
712:12, 713:10,
713:16, 714:3, 714:9,
716:12, 716:18,
717:19, 718:1,
718:22, 718:24,
719:11, 719:14,
719:15, 722:9,
722:15, 724:8,
724:14, 725:23,
726:4, 733:2, 734:14,
748:5, 753:9, 754:5,
756:20, 760:2,
764:19, 765:5,
768:21, 769:4,
769:11, 776:24,
777:3, 778:9, 778:13,
778:16, 782:17,
783:7, 783:8, 783:13,
783:16, 784:11,
784:12, 785:14,
785:21, 785:24,
786:2, 786:10,
786:12, 786:24,
798:4, 798:10,
798:18, 798:20,
803:1, 803:3, 804:12,
805:25, 806:5, 806:9
**DeFilippis's** [4] -
747:3, 750:16,
783:19, 784:4
**definitely** [3] -
711:18, 716:5, 775:7
**delay** [1] - 759:19
**Democratic** [6] -
737:17, 743:8,
743:22, 745:8, 766:1,
795:24
**Department** [12] -
787:19, 787:24,
788:10, 789:16,
793:3, 793:15,
793:18, 793:22,
793:24, 794:8,
794:10, 794:16
**department** [1] -
787:22

813

**departments** [2] - 787:18, 787:22
**DEPUTY** [1] - 785:23
**deputy** [14] - 786:16, 787:10, 788:8, 788:9, 788:19, 790:4, 791:9, 792:6, 792:8, 792:9, 792:16, 792:23, 793:2
**described** [1] - 755:9
**description** [3] - 715:1, 718:15, 726:15
**desk** [1] - 789:11
**detail** [3] - 722:1, 741:8, 741:18
**determine** [4] - 710:10, 769:12, 769:14, 769:22
**detour** [1] - 753:17
**di** [1] - 754:22
**difference** [1] - 705:8
**different** [12] - 707:25, 708:1, 729:13, 733:18, 745:2, 751:14, 752:23, 752:25, 775:2, 787:20, 791:11, 791:18
**differently** [1] - 711:16
**direct** [10] - 700:19, 704:22, 712:2, 722:4, 724:4, 747:18, 785:16, 792:16, 793:1, 806:3
**DIRECT** [2] - 702:7, 786:23
**Direct** [1] - 699:2
**directed** [1] - 767:24
**directing** [1] - 726:5
**direction** [1] - 805:7
**directly** [7] - 728:24, 729:6, 744:8, 788:8, 791:2, 792:15, 792:25
**director** [16] - 722:21, 722:24, 754:17, 754:20, 759:4, 788:19, 789:5, 791:9, 792:2, 792:6, 792:8, 792:9, 792:16
**directors** [2] - 791:10, 791:13
**disaster** [1] - 755:9
**discern** [1] - 705:2
**discount** [2] - 705:12, 705:13
**discounted** [1] - 776:3
**discovery** [2] - 800:13, 800:16
**discovery-related**

[1] - 800:13
**discretion** [4] - 729:9, 732:22, 775:8, 775:9
**discuss** [5] - 782:20, 783:2, 799:5, 800:12, 804:24
**discussed** [3] - 703:5, 748:24, 797:4
**discussing** [4] - 702:22, 723:8, 749:8, 757:21
**discussion** [1] - 738:24
**Discussion** [1] - 701:23
**discussions** [2] - 767:19, 804:18
**disputing** [1] - 715:11
**disseminating** [1] - 773:22
**distinct** [2] - 750:3, 774:22
**distinction** [1] - 730:13
**DISTRICT** [3] - 698:1, 698:1, 698:11
**district** [1] - 807:13
**District** [3] - 698:23, 698:24, 807:13
**divided** [1] - 792:11
**division** [2] - 787:24, 788:5, 794:12
**divisions** [1] - 792:11
**DNC** [32] - 720:1, 720:2, 728:12, 728:13, 728:15, 728:23, 729:4, 729:7, 729:11, 730:3, 737:19, 737:25, 738:7, 738:10, 738:15, 738:19, 744:2, 744:3, 744:9, 744:13, 745:7, 760:4, 765:25, 766:18, 766:24, 773:5, 773:13, 773:15, 773:16, 774:17, 774:23, 781:15
**DNC's** [1] - 744:6
**document** [7] - 703:23, 717:14, 718:17, 718:18, 718:20, 754:10, 766:22
**documents** [4] - 715:22, 718:25, 743:23, 762:25

**DOJ** [4] - 788:6, 793:8, 795:5, 795:6
**domestic** [2] - 790:22, 790:23
**Don** [1] - 739:20
**Donald** [6] - 740:5, 740:7, 740:10, 745:15, 745:25, 746:16
**done** [3] - 739:5, 769:23, 773:11
**Donna** [1] - 766:19
**down** [5] - 705:7, 705:11, 777:13, 800:24, 804:23
**download** [1] - 804:8
**downloading** [1] - 800:25
**dozen** [3] - 734:18, 741:21, 752:22
**draft** [2] - 724:6, 724:21
**drawing** [1] - 730:13
**drill** [1] - 804:18
**drops** [1] - 761:11
**Durham** [1] - 800:14
**during** [7] - 726:23, 736:15, 742:8, 742:13, 744:12, 796:2, 796:6

**E**

**early** [2] - 783:18, 804:16
**easily** [1] - 742:14
**eat** [1] - 777:9
**EDGAR** [1] - 698:14
**editors** [2] - 779:6, 779:13
**education** [1] - 753:18
**EDWARDS** [2] - 698:22, 807:3
**Edwards** [1] - 807:12
**effectively** [2] - 738:16, 761:21
**effort** [2] - 745:9, 782:12
**efforts** [1] - 796:10
**either** [7] - 705:6, 705:7, 724:5, 728:23, 777:15, 791:2, 795:14
**election** [7] - 720:17, 725:3, 732:4, 738:19, 740:8, 761:10, 796:7
**electronic** [1] - 789:22
**Elias** [52] - 699:5,

700:3, 701:20, 702:3, 702:9, 702:21, 703:4, 704:10, 706:19, 707:2, 708:6, 709:10, 710:22, 710:25, 712:13, 714:2, 714:10, 715:3, 716:19, 718:2, 718:16, 718:25, 719:16, 722:16, 723:7, 724:15, 724:25, 725:18, 726:5, 726:17, 726:20, 727:1, 728:3, 730:14, 733:5, 749:2, 750:4, 755:22, 763:5, 764:4, 764:9, 765:18, 767:19, 768:22, 769:5, 769:12, 778:17, 782:17, 782:19, 784:14, 784:16, 784:21
**Elias's** [1] - 784:25
**elicit** [2] - 784:15, 784:16
**elicited** [2] - 784:20, 785:12
**email** [20] - 710:2, 710:5, 710:8, 710:22, 710:24, 711:19, 722:6, 722:16, 723:3, 723:7, 724:6, 724:18, 731:10, 754:1, 754:10, 755:1, 763:4, 780:16, 780:20
**emailed** [1] - 724:20
**emails** [10] - 745:7, 745:17, 758:19, 758:20, 758:21, 758:22, 781:14, 800:17, 800:21
**employee** [1] - 730:6
**employment** [1] - 789:9
**end** [4] - 741:4, 750:2, 787:20
**ended** [1] - 789:24
**endless** [1] - 777:13
**enforcement** [4] - 729:18, 735:8, 789:7, 791:17
**enforcement-related** [1] - 789:7
**engagement** [3] - 705:21, 706:1, 752:24
**enter** [4] - 708:15, 724:18, 750:18
**entered** [16] - 701:24, 702:19, 710:20, 712:11,

714:8, 716:17, 717:24, 722:14, 724:13, 726:3, 754:8, 763:11, 765:8, 786:4, 786:6, 798:9
**entries** [2] - 709:1, 753:14, 765:10
**entrusted** [1] - 790:1
**entry** [16] - 703:20, 707:1, 707:21, 708:24, 709:14, 713:24, 714:10, 717:16, 725:6, 726:5, 726:6, 749:16, 749:20, 750:1, 750:14, 763:22
**Eric** [1] - 779:1
**especially** [1] - 700:20
**ESQ** [7] - 698:14, 698:14, 698:15, 698:18, 698:18, 698:19, 698:19
**essence** [2] - 769:1, 788:16
**essential** [1] - 759:24
**essentially** [9] - 723:1, 724:22, 737:23, 738:12, 749:6, 761:7, 761:8, 784:18, 787:16
**estimate** [3] - 720:7, 727:4, 806:2
**estimated** [1] - 700:21
**evening** [2] - 784:13, 797:18
**event** [1] - 720:16
**events** [1] - 731:21
**eventually** [2] - 792:8, 795:7
**evidence** [20] - 702:19, 710:20, 712:11, 714:8, 716:17, 717:24, 722:14, 724:13, 726:3, 748:15, 754:3, 754:8, 763:4, 763:11, 763:19, 764:17, 764:18, 765:4, 765:8, 798:9
**EVIDENCE** [1] - 699:9
**exactly** [6] - 706:15, 730:12, 735:9, 792:9, 793:19
**examination** [1] - 806:18
**EXAMINATION** [4] -

702:7, 733:3, 768:20, 786:23
**example** [1] - 772:11
**examples** [2] - 762:25, 790:15
**exceeded** [2] - 705:16, 752:17
**excess** [4] - 705:14, 752:5, 753:10, 753:12
**exclusively** [1] - 789:21
**excuse** [1] - 769:13
**excused** [4] - 782:20, 782:24, 804:16, 805:1
**executive** [2] - 791:10, 792:24
**exfiltrated** [1] - 743:23
**exfiltration** [1] - 758:19
**Exhibit** [62] - 699:10, 699:11, 699:11, 699:12, 699:12, 699:13, 699:13, 699:14, 699:14, 699:15, 699:16, 699:17, 699:17, 702:11, 702:15, 702:18, 703:25, 704:7, 704:10, 706:17, 708:4, 709:22, 710:16, 710:19, 712:3, 712:7, 712:10, 713:12, 713:22, 714:4, 714:7, 716:9, 716:13, 716:16, 717:12, 717:20, 717:23, 722:5, 722:10, 722:13, 724:5, 724:9, 724:12, 725:18, 725:24, 726:2, 748:14, 749:15, 753:25, 754:7, 755:21, 763:10, 763:14, 763:18, 764:6, 765:2, 765:7, 797:20, 798:5, 798:8, 798:12
**exhibit** [4] - 702:10, 718:23, 797:20, 798:19
**EXHIBITS** [1] - 699:9
**exhibits** [5] - 702:25, 709:8, 741:2, 741:3, 805:21
**existed** [1] - 745:17
**existence** [1] - 776:13

**exists** [1] - 770:3
**exited** [2] - 783:4, 804:21
**expect** [2] - 730:2, 760:12
**expected** [1] - 761:25
**expenses** [4] - 751:23, 769:21, 770:19, 770:21
**experience** [4] - 739:3, 740:17, 749:7, 749:25
**expertise** [2] - 735:2, 744:20
**experts** [6] - 726:17, 726:18, 749:22, 750:25, 794:17, 794:19
**explain** [6] - 719:9, 724:25, 740:2, 743:10, 750:13, 751:12
**explore** [1] - 784:7
**explosive** [1] - 761:21
**extensively** [2] - 728:14, 728:15
**extent** [24] - 720:25, 721:19, 722:1, 723:7, 723:13, 727:22, 727:23, 728:3, 728:7, 728:12, 728:18, 729:4, 731:7, 732:1, 732:8, 769:21, 772:12, 773:21, 777:4, 779:14, 779:20, 789:17, 794:21, 796:20
**external** [1] - 732:17
**extreme** [1] - 759:16

## F

**Facebook** [1] - 732:14
**fact** [11] - 707:8, 711:8, 739:5, 739:16, 743:7, 752:20, 752:21, 753:21, 767:25, 777:23, 803:21
**failing** [1] - 700:14
**failure** [1] - 784:6
**fair** [11] - 720:21, 720:24, 724:3, 740:24, 747:12, 751:16, 756:9, 759:9, 771:12, 771:17, 790:1

**familiar** [4] - 739:20, 780:23, 780:24, 799:19
**familiarity** [1] - 705:5
**family** [1] - 700:13
**Fancy** [1] - 743:14
**far** [2] - 743:11, 760:22
**faster** [1] - 780:5
**fault** [1] - 777:1
**FBI** [108] - 727:2, 727:7, 728:8, 728:19, 728:22, 729:1, 729:3, 729:11, 729:20, 729:22, 729:24, 730:1, 730:11, 730:15, 731:3, 744:23, 756:22, 757:1, 757:9, 757:11, 757:13, 757:16, 757:19, 757:22, 758:6, 758:9, 758:17, 758:24, 759:2, 759:4, 759:9, 759:14, 759:16, 759:19, 759:20, 759:22, 759:24, 760:3, 760:9, 760:14, 760:16, 760:17, 760:20, 762:5, 762:8, 762:12, 764:1, 764:9, 764:12, 764:15, 764:24, 765:11, 765:16, 765:17, 766:9, 766:18, 766:22, 767:5, 767:25, 768:11, 768:23, 769:6, 771:7, 771:13, 776:13, 776:18, 776:24, 777:6, 777:12, 777:20, 777:25, 778:18, 779:23, 779:25, 780:9, 781:15, 781:20, 784:23, 785:8, 787:21, 787:22, 788:11, 788:15, 788:16, 788:23, 788:24, 789:3, 789:10, 789:11, 790:14, 791:1, 791:4, 791:5, 791:16, 791:21, 792:2, 792:6, 792:11, 793:23, 793:25, 796:6, 796:9, 797:7, 802:4, 803:15, 803:18, 803:25
**FBI's** [6] - 776:16, 777:20, 782:12,

790:24, 796:7, 796:10
**FBIHQ** [1] - 766:4
**Federal** [1] - 787:11
**federal** [1] - 787:25
**fee** [11] - 705:17, 705:19, 705:24, 738:24, 739:1, 739:6, 752:8, 752:13, 775:18, 775:20, 775:22
**fees** [2] - 753:10, 774:10
**fell** [1] - 773:25
**few** [9] - 701:18, 717:7, 720:19, 737:14, 756:21, 761:13, 788:7, 799:10, 799:14
**field** [1] - 791:25
**filing** [1] - 789:22
**final** [1] - 791:15
**finally** [2] - 708:2, 732:21
**finance** [1] - 774:24
**fine** [3] - 700:24, 775:16, 783:13
**finish** [1] - 741:10
**finished** [1] - 777:2
**firm** [14] - 707:11, 707:12, 710:13, 733:18, 733:20, 740:15, 740:17, 751:12, 751:22, 751:23, 753:18, 770:1, 770:4, 795:7
**firm's** [1] - 706:7
**first** [17] - 704:8, 708:3, 723:19, 730:1, 731:7, 755:3, 758:17, 761:5, 776:12, 784:4, 785:10, 797:11, 798:11, 801:2, 804:5, 804:7
**fit** [1] - 792:13
**fixed** [1] - 752:8
**flat** [9] - 705:17, 705:19, 705:24, 738:25, 739:6, 752:13, 775:18, 775:20, 775:22
**flipped** [1] - 702:12
**floor** [1] - 804:1
**focus** [1] - 742:21
**folks** [15] - 720:4, 720:22, 722:6, 723:14, 723:19, 723:25, 727:24, 732:24, 739:22, 765:24, 766:7, 771:20, 772:24,

791:20, 792:25
**follow** [1] - 700:7
**followed** [1] - 789:3
**following** [11] - 701:5, 701:15, 701:25, 766:17, 778:4, 778:14, 783:5, 783:23, 786:5, 786:7, 804:22
**followup** [4] - 718:17, 764:4, 783:19, 784:4
**FOR** [4] - 698:1, 698:14, 698:18, 699:4
**foregoing** [1] - 807:4
**foreign** [1] - 790:18
**Foreign** [19] - 703:21, 704:8, 704:13, 704:15, 707:24, 707:25, 708:1, 708:3, 708:8, 709:19, 713:24, 714:10, 715:15, 717:15, 717:16, 719:19, 725:9, 725:21, 753:12
**formas** [1] - 702:23
**former** [2] - 716:6, 716:7
**forth** [1] - 744:17
**forward** [2] - 715:4, 778:22
**forwarded** [3] - 755:17, 756:3, 781:10
**forwarding** [3] - 754:25, 755:22, 780:17
**foundation** [1] - 719:8
**frame** [1] - 717:10
**Francisco** [1] - 734:3
**frankly** [5] - 731:10, 739:8, 761:17, 781:5, 801:11
**fraud** [2] - 787:25, 791:18
**Freak** [1] - 780:18
**freak** [4] - 755:5, 755:7, 780:17, 802:17
**Freak-Out** [1] - 780:18
**freak-out** [3] - 755:5, 755:7, 780:17
**free** [1] - 745:12
**frequent** [1] - 793:13
**frequently** [4] - 734:12, 791:6, 795:13, 795:16
**Friday** [6] - 700:17, 700:18, 701:2, 766:7,

767:1, 767:9
**friend** [4] - 793:10, 793:11, 795:17, 802:17
**friendly** [2] - 733:12, 793:14
**friends** [2] - 793:9, 794:4
**front** [3] - 704:13, 704:22, 708:6
**full** [3] - 711:17, 759:23, 807:5
**full-time** [1] - 711:17
**funded** [1] - 739:11
**funeral** [1] - 793:10
**Fusion** [17] - 703:9, 721:18, 732:23, 740:15, 740:18, 740:21, 772:15, 772:19, 772:20, 772:23, 772:25, 773:1, 773:2, 773:4, 774:4, 782:2, 782:11
**fuzzy** [2] - 742:19, 749:13

## G

**Gaynor** [1] - 806:12
**general** [34] - 717:14, 720:17, 736:24, 737:7, 737:11, 737:16, 737:18, 737:19, 737:24, 738:6, 738:10, 738:15, 739:14, 739:17, 739:21, 741:24, 787:10, 787:21, 788:8, 788:9, 788:13, 788:14, 788:15, 788:16, 788:20, 788:25, 789:1, 791:22, 792:13, 792:17, 792:22, 792:23, 793:2, 796:14
**general's** [1] - 790:5
**generally** [6] - 711:25, 731:9, 735:13, 776:12, 778:10, 781:19
**gentlemen** [4] - 768:15, 782:25, 786:8, 804:14
**Giuliano** [2] - 792:7
**given** [2] - 727:13, 775:21
**glove** [1] - 744:8
**goal** [1] - 759:12

**gobbledygooking** [1] - 729:23
**government** [4] - 728:16, 743:12, 787:14, 787:18
**Government** [30] - 701:1, 702:14, 710:15, 712:6, 714:3, 716:12, 717:19, 722:9, 724:8, 725:23, 761:1, 784:15, 784:22, 785:15, 785:17, 786:2, 786:10, 786:12, 787:11, 798:1, 798:3, 798:4, 799:16, 799:17, 799:24, 800:6, 800:11, 801:5, 802:1, 802:3
**GOVERNMENT** [2] - 699:4, 786:18
**Government's** [42] - 702:11, 702:18, 703:2, 703:25, 704:7, 704:10, 706:16, 706:17, 708:4, 709:22, 710:16, 710:19, 712:3, 712:7, 712:10, 713:12, 713:22, 714:4, 714:7, 716:9, 716:13, 716:16, 717:12, 717:20, 717:23, 722:5, 722:10, 722:13, 724:5, 724:9, 724:12, 725:18, 725:24, 726:2, 748:14, 749:15, 763:18, 764:6, 797:20, 798:5, 798:8, 798:12
**government's** [10] - 699:10, 699:11, 699:11, 699:12, 699:12, 699:13, 699:13, 699:14, 699:14, 699:15
**GPS** [5] - 772:15, 772:19, 772:20, 772:23, 782:2
**grand** [2] - 784:14, 784:17
**grant** [1] - 805:17
**gratuitous** [2] - 785:13, 785:15
**great** [5] - 777:16, 782:23, 804:20, 805:22, 806:20
**group** [11] - 731:12, 734:15, 734:21,

734:24, 737:11, 741:22, 750:19, 765:24, 766:7, 770:16, 789:4
**growing** [1] - 781:5
**guess** [6] - 716:7, 720:10, 749:3, 772:22, 794:2
**gun** [1] - 727:9
**guy** [1] - 746:4
**guys** [2] - 733:20, 734:12

## H

**hack** [10] - 728:16, 743:8, 744:10, 744:14, 744:16, 745:4, 760:4, 766:14, 767:17, 782:13
**hacked** [1] - 743:21
**hacking** [3] - 744:20, 744:23, 760:9
**hacks** [1] - 796:7
**half** [8] - 713:25, 714:20, 714:24, 717:6, 718:9, 720:12, 761:19
**half-hour** [3] - 713:25, 714:20, 714:24
**hand** [5] - 715:14, 744:8, 774:20, 786:15, 800:15
**handle** [2] - 791:10, 791:13
**handled** [3] - 707:14, 732:16, 797:2
**handwriting** [7] - 704:15, 704:17, 704:19, 705:3, 709:2, 709:3, 709:5
**happy** [2] - 719:8, 777:21
**hard** [5] - 717:17, 720:9, 727:8, 741:15, 805:6
**Harvard** [1] - 787:8
**hat** [1] - 770:18
**head** [6] - 727:9, 737:24, 768:18, 784:10, 789:24, 791:24
**heading** [2] - 724:24, 725:2
**headquartered** [1] - 734:2
**headquarters** [6] - 731:19, 766:9,

791:21, 803:16, 803:18, 803:25
**heads** [4] - 756:23, 757:23, 773:8, 791:23
**heads-up** [3] - 756:23, 757:23, 773:8
**health** [1] - 700:14
**heard** [3] - 735:10, 797:3, 797:4
**hedging** [1] - 771:1
**held** [3] - 722:20, 788:2, 790:8
**help** [5] - 710:9, 711:14, 792:25, 799:8, 803:16
**helpful** [5] - 725:9, 758:18, 759:21, 779:10
**hereby** [1] - 807:3
**HFA** [11] - 744:16, 751:7, 752:4, 752:5, 754:14, 760:21, 764:13, 766:8, 767:1, 767:16, 767:23
**HFACC** [2] - 704:3, 715:17
**hi** [1] - 710:25
**hierarchy** [1] - 792:14
**high** [2] - 791:13, 796:17
**high-level** [1] - 796:17
**high-ranking** [1] - 791:13
**highest** [1] - 790:10
**highly** [1] - 776:3
**Hillary** [12] - 715:17, 715:18, 736:25, 737:15, 738:7, 738:11, 738:20, 745:16, 767:23, 781:8, 785:8, 795:25
**hired** [2] - 740:15, 746:9
**hiring** [2] - 740:17, 740:21
**historically** [1] - 746:1
**hold** [1] - 787:17
**home** [1] - 802:12
**honestly** [2] - 717:16, 771:14
**Honor** [35] - 700:10, 700:22, 701:13, 702:5, 702:6, 702:14, 710:15, 712:6, 714:3, 717:19, 719:14, 722:9, 724:8, 725:23, 754:5, 765:5, 769:2,

769:8, 778:2, 778:9, 782:22, 783:8, 783:13, 783:17, 784:12, 785:3, 785:14, 785:21, 786:2, 786:12, 798:4, 804:12, 805:25, 806:5, 806:9
**HONORABLE** [1] - 698:10
**hope** [4] - 700:7, 701:20, 745:15, 779:17
**hoped** [3] - 729:19, 761:25, 777:25
**hoping** [1] - 762:3
**host** [1] - 752:22
**hostile** [2] - 790:18, 790:19
**hot** [1] - 730:9
**hour** [6] - 713:25, 714:20, 714:24, 717:6, 725:12, 749:5
**hours** [12] - 718:7, 718:10, 718:11, 726:9, 742:16, 749:1, 750:10, 751:9, 774:10, 806:4
**house** [2] - 797:16, 802:4
**House** [1] - 781:2
**huge** [1] - 791:16
**human** [1] - 745:14
**hundreds** [1] - 742:12
**hypothetical** [3] - 779:24, 780:3

## I

**Idaho** [1] - 734:6
**idea** [3] - 705:16, 705:18, 736:7
**ideal** [1] - 777:8
**identification** [1] - 763:13
**imagined** [1] - 715:6
**iMessage** [1] - 798:23
**immediately** [1] - 800:20
**impeachment** [1] - 806:15
**implied** [1] - 784:6
**important** [2] - 720:23, 802:21
**IN** [1] - 699:9
**inadvertently** [1] - 701:7

**Inc** [1] - 715:17
**incidents** [1] - 796:1
**inclined** [1] - 805:17
**included** [3] -
702:10, 766:19,
774:11
**includes** [1] - 767:10
**including** [4] -
787:20, 788:19,
789:22, 791:11
**Incorporated** [1] -
787:6
**increments** [1] -
749:6
**incur** [2] - 769:21,
770:20
**incurring** [1] -
774:10
**independent** [2] -
742:2, 804:19
**independently** [1] -
755:13
**indicated** [3] -
736:24, 768:24,
777:24
**indicates** [1] - 711:7
**indiscernible** [1] -
776:20
**indulging** [1] -
753:17
**infamously** [1] -
740:5
**inference** [2] -
715:21, 724:3
**infiltrated** [1] -
743:21
**information** [17] -
743:11, 746:23,
746:25, 747:2, 747:6,
747:7, 753:22,
761:12, 762:25,
768:6, 768:12, 790:2,
790:8, 790:11, 797:7,
797:12, 798:15
**informed** [1] -
784:13
**input** [1] - 731:20
**inside** [2] - 732:16,
791:3
**insider** [1] - 781:13
**instance** [5] -
732:24, 759:16,
762:17, 777:11,
784:20
**instances** [4] -
776:12, 778:17,
779:25, 780:15
**instead** [1] - 731:21
**instruct** [1] - 732:23
**intellectual** [2] -

794:13, 794:14
**intelligence** [7] -
743:18, 788:3, 788:4,
789:2, 789:20,
789:21, 790:19
**Intelligence** [1] -
789:23
**intent** [1] - 760:25
**interact** [2] - 713:6,
728:19
**interacting** [3] -
742:12, 744:12,
775:15
**interactions** [3] -
728:22, 793:14,
793:16
**interest** [3] - 756:17,
779:23, 780:12
**interested** [2] -
748:11, 784:1
**interests** [2] -
738:22, 787:7
**interface** [1] - 735:8
**internal** [2] - 743:23,
766:22
**international** [1] -
791:14
**interrupted** [1] -
787:15
**intersect** [1] - 713:15
**intimidate** [1] -
740:12
**investigating** [4] -
758:18, 776:17,
776:25, 778:1
**investigation** [5] -
759:19, 776:13,
777:7, 801:12
**investigations** [1] -
778:18
**investigative** [2] -
732:23, 755:8
**invite** [14] - 703:5,
703:17, 706:9,
706:13, 706:22,
707:22, 709:13,
712:4, 712:13,
712:15, 714:13,
716:10, 716:19, 718:3
**invites** [1] - 710:12
**invoices** [1] - 753:15
**involve** [1] - 789:14
**involved** [7] - 721:5,
759:14, 777:21,
791:2, 796:10,
796:12, 796:20
**involvement** [1] -
777:20
**involving** [1] -
790:25

**iPhone** [3] - 798:16,
798:22, 798:23
**irregularly** [1] -
794:2
**issue** [15] - 700:8,
700:13, 720:5,
720:22, 723:16,
723:20, 723:25,
727:20, 750:23,
760:12, 777:6,
777:24, 784:22,
784:23, 796:4
**issued** [1] - 732:8
**issues** [16] - 701:2,
723:8, 728:5, 742:19,
744:2, 744:6, 744:19,
760:4, 760:10,
763:24, 767:20,
772:17, 790:14,
790:22, 796:11
**issuing** [1] - 732:1
**itself** [1] - 759:18
**IV** [1] - 698:14

## J

**Jake** [5] - 722:18,
722:21, 731:24,
754:16, 754:17
**james** [1] - 699:6
**James** [6] - 759:5,
783:9, 786:3, 786:13,
787:4, 792:3
**JAMES** [1] - 786:18
**Jeb** [1] - 740:8
**Jen** [3] - 722:18,
722:23, 754:18
**Jencks** [1] - 799:19
**Jim** [1] - 799:4
**job** [1] - 788:2
**Joffe** [22] - 706:24,
707:10, 707:23,
712:14, 713:6,
713:20, 714:1, 715:3,
715:23, 716:3, 716:6,
719:4, 719:24,
727:16, 735:10,
735:20, 736:3,
741:10, 762:23,
782:5, 782:11
**jog** [1] - 711:9
**John** [8] - 722:18,
722:22, 731:13,
731:14, 731:16,
731:19, 731:22,
754:23
**JONATHAN** [1] -
698:14
**Jones** [1] - 739:21

**journalistic** [1] -
755:13
**judge** [1] - 778:6
**JUDGE** [1] - 698:11
**Judge** [4] - 763:4,
764:18, 783:25, 805:5
**July** [9] - 703:5,
704:1, 720:18,
730:25, 740:23,
741:4, 741:5, 753:20
**jumped** [1] - 777:1
**June** [1] - 738:2
**Juror** [1] - 700:5
**jury** [19] - 701:19,
701:24, 710:23,
733:23, 743:10,
750:13, 751:12,
754:12, 761:3, 763:3,
778:5, 783:4, 783:18,
784:14, 784:17,
785:22, 786:6, 787:2,
804:21
**JURY** [2] - 698:10,
768:18
**Justice** [10] - 787:19,
787:25, 788:10,
789:16, 793:4,
793:18, 793:22,
793:24, 794:9, 794:10
**Justice's** [1] - 794:16

## K

**Kasich** [1] - 740:9
**keep** [2] - 713:11,
794:1
**keeping** [2] - 724:22,
793:13
**kept** [1] - 794:2
**Kerry** [4] - 736:15,
737:8, 737:13, 739:7
**Kevin** [3] - 700:12,
701:9, 701:10
**kidnappings** [1] -
791:19
**kind** [7] - 739:8,
741:18, 743:15,
746:6, 760:24,
787:18, 802:15
**kinds** [3] - 774:9,
791:19, 795:3
**knowable** [2] -
752:20, 752:21
**knowing** [1] - 705:3
**knowledge** [12] -
747:18, 760:20,
761:4, 762:6, 762:7,
767:20, 768:10,
768:25, 782:2, 782:7,

785:7, 796:2
**known** [1] - 730:2

## L

**L.A** [1] - 734:3
**lab** [1] - 789:10
**lack** [1] - 715:22
**ladies** [4] - 768:15,
782:25, 786:8, 804:14
**land** [1] - 761:19
**landing** [1] - 761:20
**language** [1] -
750:22
**large** [5] - 736:5,
742:24, 789:7, 789:13
**largely** [1] - 747:15
**last** [7] - 701:12,
720:18, 755:12,
761:13, 776:22,
784:13, 800:22
**late** [6] - 708:15,
708:25, 761:8,
761:21, 774:7, 805:4
**LATHAM** [1] - 698:20
**Law** [1] - 787:8
**law** [22] - 729:17,
733:10, 733:17,
733:18, 734:15,
734:21, 735:4, 735:8,
741:22, 742:2,
751:12, 751:22,
751:23, 753:18,
762:17, 770:1, 770:4,
787:7, 789:7, 789:9,
791:17, 795:7
**laws** [2] - 774:24,
794:20
**lawyer** [6] - 707:14,
726:11, 728:21,
735:5, 739:14, 770:15
**lawyers** [6] - 732:12,
733:25, 749:5,
750:18, 769:20,
775:22
**leadership** [3] -
789:3, 792:20, 796:16
**leading** [1] - 745:8
**leads** [1] - 732:23
**leak** [8] - 743:24,
745:14, 762:8,
762:11, 762:14,
762:18, 762:19
**leaks** [1] - 758:19
**learn** [2] - 721:23,
727:1
**learned** [4] - 722:3,
727:5, 746:18, 795:23
**least** [16] - 700:19,

817

709:18, 710:8,
711:21, 718:12,
733:16, 738:6,
744:17, 745:22,
747:25, 750:14,
753:9, 767:15, 784:6,
800:24, 806:6
  **leave** [4] - 751:17,
785:19, 785:25,
788:23
  **leaving** [1] - 727:22
  **lecturer** [1] - 787:7
  **left** [5] - 715:14,
788:24, 793:22,
793:24, 795:5
  **legal** [7] - 721:6,
727:22, 744:6,
787:10, 788:17,
788:18, 795:9
  **Leigh** [6] - 710:2,
710:7, 710:10, 711:5,
712:4, 712:13
  **less** [1] - 739:20
  **letter** [2] - 705:21,
706:1
  **letting** [1] - 730:1
  **level** [4] - 766:3,
766:9, 790:10, 796:17
  **levels** [1] - 790:10
  **Lichtblau** [2] - 779:1,
779:16
  **Lichtblau's** [1] -
779:6
  **light** [3] - 783:18,
784:3, 784:8
  **likely** [2] - 776:17,
806:6
  **limited** [1] - 775:17
  **line** [5] - 701:17,
714:14, 721:17,
751:14, 796:13
  **lineup** [1] - 806:10
  **lingo** [1] - 705:8
  **Lisa** [3] - 710:3,
710:25, 807:12
  **LISA** [2] - 698:22,
807:3
  **list** [1] - 805:20
  **listed** [2] - 705:16,
726:5
  **listening** [1] - 745:16
  **literally** [3] - 732:14,
736:12, 736:19
  **litigation** [5] -
734:24, 740:10,
740:11, 775:17, 789:9
  **litigious** [1] - 740:5
  **litigiousness** [1] -
739:25
  **LLP** [1] - 698:20

  **locate** [1] - 799:12
  **located** [3] - 799:11,
801:7, 801:25
  **location** [2] - 712:17,
714:17
  **log** [1] - 718:7
  **logical** [1] - 804:13
  **longstanding** [1] -
781:4
  **longtime** [1] - 781:7
  **look** [29] - 703:25,
705:21, 712:3,
716:25, 717:12,
723:5, 724:24, 745:2,
748:14, 749:15,
753:24, 754:25,
755:21, 755:23,
756:1, 763:1, 763:21,
764:6, 764:16, 765:2,
765:20, 766:17,
769:24, 798:15,
800:16, 801:14,
801:15, 802:23
  **looked** [10] - 703:8,
706:9, 707:25,
714:14, 731:1,
749:18, 752:4,
765:11, 800:21,
803:12
  **looking** [23] -
703:23, 705:3,
705:25, 709:15,
710:8, 713:2, 713:22,
714:10, 715:12,
715:13, 718:3,
718:25, 724:2,
724:15, 762:3, 762:8,
762:12, 779:25,
780:9, 797:21,
798:11, 798:21,
800:21
  **looks** [8] - 704:13,
711:19, 715:4, 725:9,
749:22, 797:23,
803:4, 804:9
  **loop** [1] - 730:4
  **losing** [1] - 736:14
  **Lucia** [1] - 765:16
  **Lucy** [1] - 765:22
  **lunch** [1] - 702:21
  **lunchtime** [1] - 803:9

## M

  **magic** [1] - 736:18
  **magically** [1] -
736:16
  **major** [3] - 728:16,
745:14, 755:5

  **Manafort** [1] - 746:10
  **manager** [4] - 700:6,
722:22, 754:13,
754:15
  **manager's** [1] -
731:18
  **managing** [1] -
731:19
  **Marc** [4] - 699:5,
710:25, 712:18,
714:18
  **March** [2] - 800:12,
801:22
  **Marco** [2] - 739:22,
740:8
  **mark** [2] - 763:13,
792:7
  **Mark** [1] - 792:7
  **marked** [3] - 712:3,
717:12, 797:19
  **marker** [1] - 720:15
  **marketed** [1] - 735:4
  **mask** [1] - 786:15
  **material** [1] - 801:16
  **materials** [2] -
799:19, 799:20
  **matter** [11] - 700:9,
700:11, 713:19,
728:20, 729:4, 731:7,
732:2, 740:3, 740:4,
753:3, 790:25
  **Matter** [5] - 725:11,
753:3
  **matters** [25] -
728:13, 729:13,
733:7, 734:10,
752:23, 752:25,
779:2, 781:20, 789:6,
789:8, 789:9, 789:14,
789:21, 790:14,
790:20, 791:15,
796:4, 796:15,
796:16, 796:23,
796:24, 797:1, 800:13
  **McCabe** [1] - 792:8
  **McGahn** [1] - 739:20
  **McMahon** [1] -
766:19
  **mean** [21] - 710:12,
711:22, 715:6,
715:12, 723:10,
724:2, 735:5, 738:2,
739:20, 758:22,
760:22, 760:23,
762:18, 769:19,
769:24, 770:23,
773:1, 775:14, 776:4,
799:22, 801:10
  **meaning** [1] - 705:2
  **means** [3] - 705:9,

752:12, 790:18
  **meant** [1] - 735:9
  **meantime** [1] - 746:9
  **media** [15] - 721:21,
721:24, 726:17,
732:14, 747:2,
747:13, 749:22,
751:2, 759:22,
761:20, 772:3, 772:6,
772:9, 772:13, 773:22
  **meet** [7] - 700:13,
728:19, 730:1,
768:11, 796:22,
802:18, 802:22
  **meeting** [46] - 703:4,
703:5, 703:8, 703:13,
703:17, 704:1, 704:3,
704:5, 706:10,
706:14, 706:19,
706:20, 707:2, 707:9,
707:16, 707:18,
707:20, 707:24,
709:14, 709:18,
709:24, 711:20,
716:24, 716:25,
718:8, 718:16,
718:17, 719:1, 719:3,
729:14, 729:21,
731:1, 731:3, 735:16,
735:17, 765:12,
767:13, 767:21,
768:24, 784:23,
797:14, 799:6,
801:18, 802:19
  **meetings** [4] -
711:15, 711:18,
719:16, 742:15
  **members** [1] - 731:6
  **memory** [2] - 742:19,
770:17
  **Menlo** [1] - 734:3
  **mentioned** [5] -
724:17, 740:15,
740:20, 771:6, 772:15
  **mentor** [1] - 793:11
  **message** [9] -
798:19, 798:22,
798:24, 799:12,
801:7, 801:19,
801:25, 802:13, 804:5
  **messages** [1] -
804:3
  **met** [3] - 756:22,
796:24, 801:4
  **Michael** [30] -
710:25, 711:8,
712:18, 713:25,
714:17, 716:20,
718:6, 726:12, 733:8,
733:10, 735:3, 748:2,

748:3, 748:16,
762:17, 763:22,
766:19, 767:24,
767:25, 793:5, 793:7,
793:8, 793:12, 799:4,
801:2, 801:11,
802:15, 802:19,
803:9, 803:20
  **MICHAEL** [2] - 698:6,
698:18
  **michael** [1] - 802:18
  **Michael's** [3] -
710:11, 800:22,
802:17
  **mid-2016** [1] - 738:6
  **might** [15] - 721:1,
730:7, 732:10,
732:11, 745:15,
759:18, 771:11,
771:21, 777:6, 800:6,
800:17, 803:6,
803:21, 804:12
  **Mike** [1] - 739:10
  **military** [2] - 743:13,
743:17
  **mind** [3] - 739:25,
745:22, 745:23
  **mine** [2] - 762:19,
793:11
  **minutes** [12] -
700:21, 701:18,
718:11, 725:13,
749:3, 749:4, 749:6,
749:9, 749:10, 783:1
  **misimpressions** [1]
- 751:17
  **mislead** [1] - 771:3
  **missed** [1] - 776:22
  **mistrial** [3] - 784:8,
805:13, 805:17
  **mode** [2] - 747:13,
747:15
  **moment** [1] - 763:16
  **Monday** [4] - 724:24,
748:20, 777:15,
777:17
  **money** [5] - 751:18,
751:20, 752:1,
770:11, 770:12
  **month** [1] - 705:20,
752:5, 752:12,
752:16, 753:9,
763:24, 774:3, 774:5,
774:7, 775:21, 775:25
  **monthly** [4] - 705:17,
705:19, 752:10, 774:8
  **months** [4] - 743:24,
774:4, 777:16, 799:14
  **mook** [1] - 754:12
  **Mook** [7] - 700:16,

818

722:18, 754:1,
754:12, 754:24,
755:17, 756:3
**morning** [1] - 806:7
**most** [6] - 739:10,
746:2, 746:3, 759:16,
788:1, 791:5
**motion** [1] - 778:3
**move** [9] - 736:13,
754:3, 761:14, 763:2,
763:4, 764:17, 765:3,
769:10, 805:12
**moved** [13] - 702:16,
710:18, 712:9, 714:6,
716:15, 717:22,
722:12, 724:11,
726:1, 754:6, 763:9,
765:6, 798:7
**moving** [1] - 784:8
**MR** [121] - 700:10,
700:22, 701:1, 701:9,
701:13, 702:6, 702:8,
702:14, 702:17,
702:20, 703:1, 703:3,
704:6, 704:9, 706:2,
706:4, 706:12,
706:15, 706:18,
708:2, 708:5, 709:7,
709:9, 710:15,
710:17, 710:21,
712:6, 712:8, 712:12,
713:10, 713:16,
714:3, 714:5, 714:9,
716:12, 716:14,
716:18, 717:19,
717:21, 718:1,
718:22, 718:24,
719:8, 719:14,
719:15, 722:9,
722:11, 722:15,
724:8, 724:10,
724:14, 725:23,
725:25, 726:4, 733:2,
733:4, 741:13,
741:17, 754:3, 754:5,
754:9, 763:2, 763:8,
763:12, 763:16,
763:20, 764:17,
764:19, 764:21,
764:22, 765:3, 765:5,
765:9, 765:13,
765:15, 765:21,
765:23, 767:2, 767:4,
768:14, 768:21,
769:2, 769:4, 769:8,
769:11, 776:24,
777:3, 778:2, 778:6,
778:9, 778:13,
778:16, 782:17,
783:8, 783:13,

783:16, 783:17,
783:25, 784:10,
784:12, 785:14,
785:21, 786:2,
786:12, 786:24,
798:4, 798:6, 798:10,
798:18, 798:20,
803:1, 803:3, 804:12,
805:4, 805:12,
805:19, 805:25,
806:4, 806:5, 806:9,
806:17
**multipage** [1] -
797:20
**Multiple** [1] - 749:21
**multiple** [2] - 726:16,
758:22
**must** [1] - 715:4

## N

**name** [7] - 701:8,
701:12, 715:18,
780:23, 787:2,
800:22, 803:9
**named** [6] - 737:12,
743:14, 743:15,
743:16, 780:20, 793:5
**narrative** [1] - 761:15
**NATALIE** [1] -
698:19
**national** [14] - 788:2,
788:5, 789:8, 789:14,
789:17, 789:21,
790:5, 790:7, 790:13,
790:20, 790:25,
791:11, 791:17,
795:11
**National** [7] - 737:17,
743:8, 743:22, 745:8,
746:5, 766:1, 795:24
**natural** [1] - 785:25
**nature** [1] - 742:16
**near** [1] - 787:20
**necessarily** [3] -
729:25, 730:3, 760:8
**need** [10] - 701:3,
728:25, 760:8,
760:18, 763:3,
770:11, 784:7, 799:5,
800:15, 803:16
**needed** [3] - 734:4,
735:7, 770:13
**negative** [1] - 761:11
**network** [1] - 746:19
**networks** [1] -
745:11
**Neustar** [10] -
735:21, 735:23,

735:25, 736:2, 736:4,
736:5, 736:8, 736:10,
736:19, 736:20
**never** [6] - 705:7,
709:10, 734:4,
744:25, 753:14,
780:11
**New** [19] - 698:21,
725:14, 725:16,
732:4, 734:5, 747:19,
748:16, 749:8, 755:8,
756:14, 757:17,
757:24, 758:3,
758:10, 759:11,
759:13, 761:22, 768:1
**new** [2] - 753:2,
770:4
**news** [12] - 721:3,
721:9, 727:19,
761:14, 772:2, 776:9,
776:11, 776:13,
777:5, 777:7, 777:14,
778:19
**newspaper** [2] -
728:1, 759:18
**next** [11] - 708:23,
709:21, 750:3, 750:4,
765:20, 767:3, 783:8,
783:10, 786:11,
806:10
**Nichols** [5] - 710:2,
710:8, 710:10, 712:4,
712:13
**night** [3] - 727:11,
804:20, 806:20
**nighttime** [1] -
797:17
**nobody** [1] - 801:15
**nomination** [1] -
738:5
**nominee** [6] -
720:17, 737:23,
738:14, 738:19, 746:5
**non** [2] - 739:11,
743:11
**non-privileged** [1] -
743:11
**non-self-funded** [1] -
739:11
**nonresponsive** [1] -
785:11
**noon** [1] - 717:6
**Northeast** [1] -
698:16
**Northwest** [2] -
698:24, 807:14
**note** [1] - 785:3
**notes** [2] - 748:15,
807:5
**nothing** [6] - 713:4,

713:14, 713:19,
766:15, 768:14, 804:8
**notified** [1] - 802:3
**November** [4] -
708:13, 708:18,
708:19, 708:24
**number** [14] -
702:10, 702:22,
732:12, 736:11,
736:14, 742:24,
759:14, 788:9, 789:7,
802:16, 803:23,
803:25, 804:10
**number-two** [1] -
788:9
**numerous** [2] -
790:19, 791:12

## O

**oath** [1] - 702:4
**Obama** [5] - 737:10,
737:12, 737:13,
737:19, 739:6
**objected** [1] - 750:21
**objection** [20] -
702:17, 710:17,
712:8, 714:5, 716:14,
717:21, 719:8,
722:11, 724:10,
725:25, 754:4, 754:5,
763:7, 763:8, 764:19,
766:5, 769:2, 769:8,
778:2, 798:6
**obligation** [2] -
799:25, 800:15
**obtained** [1] - 745:1
**obviously** [5] -
738:13, 784:1,
784:23, 803:17, 805:6
**occasional** [1] -
726:25
**occur** [1] - 719:17
**occurred** [3] - 706:6,
766:24, 796:1
**October** [5] -
708:14, 708:18,
725:1, 748:20, 761:2,
761:3, 761:5, 761:6,
761:7, 761:9, 761:16,
761:19, 761:23, 762:6
**OF** [3] - 698:1, 698:3,
698:10
**offers** [10] - 702:15,
710:15, 712:6, 714:3,
716:12, 717:19,
722:9, 724:8, 725:23,
798:4
**OFFICE** [1] - 698:15

**office** [22] - 703:5,
704:1, 706:6, 706:20,
709:14, 717:2, 719:2,
788:4, 788:20,
789:20, 789:25,
790:5, 791:22,
791:25, 792:13,
792:15, 792:17,
792:21, 792:22,
796:14, 803:14,
804:10
**officer** [1] - 788:17
**offices** [4] - 734:3,
794:23, 795:1, 795:2
**official** [1] - 807:12
**Official** [1] - 698:23
**officials** [6] - 788:18,
788:19, 791:5,
791:13, 791:22
**oftentimes** [3] -
732:13, 770:15,
774:18
**OGC** [1] - 792:13
**once** [2] - 738:14,
738:18
**one** [38] - 702:10,
706:21, 708:12,
714:17, 726:20,
734:4, 741:3, 743:12,
743:14, 743:15,
743:17, 745:1,
745:10, 749:4, 749:5,
749:9, 756:21,
758:19, 758:21,
758:23, 759:2,
763:16, 770:18,
771:21, 771:23,
771:25, 772:7, 772:9,
774:7, 774:20,
774:24, 781:24,
791:2, 791:11,
798:16, 801:3, 804:4
**one-tenth-of-an-
hour** [1] - 749:5
**online** [1] - 728:1
**open** [3] - 701:16,
753:2, 778:15
**opinion** [1] - 745:9
**opponents** [1] -
740:12
**opposing** [1] -
781:13
**opposition** [1] -
732:21
**otherwise** [3] -
723:21, 778:23, 780:6
**outreach** [1] - 802:6
**outside** [14] -
702:11, 737:7,
737:11, 737:16,

737:19, 738:15,
739:17, 739:21,
741:24, 772:24,
773:2, 773:3, 778:5,
787:7
 **overall** [1] - 804:2
 **overlapped** [1] -
793:18
 **overnight** [1] -
804:24
 **overrule** [1] - 719:10
 **oversaw** [1] - 732:22
 **overseas** [1] -
791:16
 **own** [7] - 724:18,
729:17, 760:3,
794:21, 794:22,
799:7, 805:18

## P

 **p.m** [10] - 698:4,
701:25, 711:3,
712:20, 755:23,
783:5, 786:7, 798:25,
803:13, 804:22
 **PAGE** [1] - 699:9
 **Page** [2] - 763:14,
763:21
 **page** [7] - 704:8,
704:13, 704:22,
708:3, 708:6, 765:20,
798:11
 **pages** [2] - 708:23,
798:19
 **paid** [1] - 774:13
 **Palmieri** [4] - 722:18,
722:23, 731:25,
754:18
 **paragraph** [2] -
755:3, 755:12
 **parents** [1] - 700:14
 **Park** [1] - 734:3
 **part** [12] - 719:24,
724:24, 750:16,
761:23, 762:6,
771:15, 774:18,
776:23, 785:10,
788:5, 797:24, 800:13
 **participate** [3] -
744:22, 782:3, 782:7
 **participating** [1] -
782:5
 **particular** [12] -
710:5, 711:9, 715:8,
716:19, 739:23,
739:24, 744:20,
750:15, 752:12,
768:4, 768:5, 791:24

 **particularly** [2] -
758:18, 780:4
 **parties** [3] - 771:2,
772:21, 774:18
 **partner** [5] - 736:8,
737:12, 762:18,
770:10, 791:3
 **partners** [3] -
733:10, 733:17,
751:25
 **Party** [1] - 746:1
 **party** [1] - 737:24
 **passed** [1] - 727:13
 **past** [1] - 755:6
 **Patel** [1] - 710:3
 **Paul** [1] - 746:9
 **pay** [1] - 774:18
 **paying** [1] - 752:5
 **pens** [2] - 770:1,
770:8
 **people** [17] - 708:15,
708:24, 722:20,
734:18, 741:21,
742:12, 750:17,
752:22, 765:16,
772:20, 773:2, 773:3,
775:12, 788:21,
791:23, 791:24,
803:17
 **percent** [1] - 774:21
 **perception** [1] -
784:25
 **perfect** [1] - 783:16
 **performed** [1] -
726:7
 **period** [18] - 708:12,
721:12, 726:24,
727:5, 732:18,
733:24, 735:2,
735:14, 738:1,
738:18, 740:23,
742:13, 744:13,
759:6, 791:4, 792:1,
795:13, 796:6
 **Perkins** [12] -
707:11, 716:4,
733:20, 733:23,
734:16, 734:21,
736:6, 766:20, 770:4,
770:6, 772:20, 795:8
 **permission** [1] -
757:11
 **person** [6] - 723:1,
747:25, 781:3,
781:10, 788:9, 799:23
 **personal** [4] -
797:13, 797:23,
797:24, 802:16
 **personally** [2] -
744:22, 796:22

 **perspective** [3] -
748:1, 758:9, 758:12
 **phone** [19] - 701:4,
711:25, 712:21,
712:24, 715:9,
735:19, 736:12,
736:14, 797:13,
797:23, 797:24,
798:14, 800:11,
800:20, 802:16,
803:13, 804:4
 **phrase** [1] - 784:25
 **phrased** [1] - 784:24
 **physical** [1] - 789:23
 **pick** [3] - 741:16,
770:2, 771:2
 **picture** [1] - 759:23
 **piece** [1] - 759:24
 **pieces** [1] - 762:24
 **place** [3] - 717:1,
734:7, 792:10
 **places** [1] - 734:5
 **Plaintiff** [1] - 698:4
 **plan** [2] - 700:25,
761:23
 **planned** [1] - 766:17
 **planning** [1] - 761:2
 **platform** [1] - 746:6
 **plausible** [2] -
746:14, 746:15
 **plural** [1] - 707:6
 **pocket** [1] - 751:21
 **Podesta** [7] - 722:18,
722:22, 731:17,
754:22, 754:23
 **point** [22] - 712:1,
721:23, 727:1,
727:19, 728:18,
729:8, 737:21,
740:25, 743:7,
743:19, 745:3, 758:6,
767:15, 775:1,
785:25, 787:11,
792:23, 793:12,
795:23, 798:2, 801:24
 **points** [2] - 742:16,
787:15
 **police** [1] - 743:13
 **policy** [5] - 722:21,
754:17, 788:3, 788:4,
789:20
 **policymakers** [1] -
796:17
 **political** [8] - 734:15,
734:21, 739:13,
741:22, 771:2,
778:17, 795:21, 796:4
 **politically** [1] -
795:21
 **politics** [3] - 720:16,

740:13, 781:5
 **portability** [1] -
736:11
 **portfolio** [1] - 790:5
 **portfolios** [1] -
791:11
 **portion** [4] - 754:11,
765:14, 789:13
 **position** [3] - 735:23,
735:25, 787:9
 **positions** [3] -
722:19, 787:17,
787:20
 **possession** [1] -
798:1
 **possibilities** [1] -
745:22
 **possibility** [7] -
748:12, 756:23,
757:4, 757:17,
757:22, 757:23, 763:5
 **possible** [2] -
713:11, 727:8
 **post** [1] - 732:15
 **Post** [1] - 743:20
 **pot** [1] - 709:10
 **potential** [13] -
746:19, 747:13,
747:16, 748:8,
753:22, 756:15,
758:4, 758:10,
766:23, 767:9,
781:14, 806:15
 **practice** [12] -
710:12, 734:25,
735:1, 736:22,
737:11, 742:2,
750:19, 770:16,
774:8, 778:18, 795:9,
795:12
 **precisely** [1] - 730:8
 **preliminary** [2] -
700:9, 733:7
 **premarked** [4] -
709:21, 716:8, 722:5,
724:5
 **prepared** [5] -
786:10, 805:8,
805:13, 805:14,
805:16
 **presence** [1] - 778:5
 **President** [1] -
737:19
 **president** [3] -
737:20, 746:3, 787:10
 **presidential** [5] -
739:9, 739:16, 743:3,
743:5, 782:14
 **press** [3] - 762:8,
762:11, 762:14

 **presumably** [3] -
730:9, 774:3, 775:10
 **presumed** [1] -
777:25
 **presumptive** [3] -
737:22, 738:14,
738:18
 **pretty** [3] - 729:8,
742:8, 775:17
 **prevent** [2] - 758:19,
759:14
 **previous** [2] -
736:16, 739:4
 **previously** [4] -
727:15, 737:7, 801:5,
801:7
 **Priestap** [1] - 806:11
 **primary** [6] - 707:13,
738:9, 738:12, 740:7,
742:21
 **privacy** [3] - 734:23,
735:3, 795:12
 **privately** [1] - 763:17
 **privilege** [2] -
721:17, 740:4
 **privileged** [2] -
743:11, 758:1
 **privy** [1] - 729:2
 **pro** [23] - 702:23,
703:21, 704:8,
704:13, 704:15,
707:24, 707:25,
708:1, 708:3, 708:8,
709:19, 713:24,
714:10, 715:14,
717:15, 717:16,
719:19, 725:9,
725:21, 746:6,
746:11, 753:12,
759:10
 **pro-Clinton** [1] -
759:10
 **pro-Russia** [1] -
746:11
 **pro-Russian** [1] -
746:6
 **problem** [1] - 703:24
 **proceed** [1] - 786:22
 **proceeded** [1] -
743:24
 **Proceedings** [1] -
806:22
 **proceedings** [11] -
701:5, 701:15,
701:25, 778:4,
778:14, 783:5,
783:23, 786:5, 786:7,
804:22, 807:6
 **process** [8] - 761:8,
761:12, 770:3, 770:4,

770:5, 770:18, 803:18
  **produced** [1] - 807:6
  **professional** [1] -
793:16
  **professionals** [1] -
788:22
  **profits** [1] - 751:25
  **project** [3] - 770:20,
770:21, 774:24
  **prominent** [3] -
732:20, 796:7, 796:9
  **promote** [2] - 721:9,
721:12
  **prompt** [1] - 778:22
  **prompted** [1] -
785:17
  **prompts** [1] - 776:13
  **property** [2] -
794:13, 794:14
  **proposal** [1] - 700:17
  **propose** [1] - 700:16
  **prosecuting** [1] -
794:18
  **prosecutions** [1] -
795:1
  **prosecutor** [2] -
787:25, 796:13
  **prosecutors** [1] -
794:18
  **protecting** [1] -
790:23
  **protection** [1] -
791:1
  **provide** [2] - 747:2,
768:11
  **provided** [5] -
721:20, 721:24,
727:2, 747:6, 797:6
  **provider** [1] - 736:17
  **providing** [1] -
788:18
  **public** [11] - 720:25,
732:2, 740:3, 740:4,
743:20, 745:11,
745:25, 759:5,
761:12, 778:10, 796:1
  **publication** [4] -
721:1, 745:7, 758:21,
759:17
  **publications** [1] -
758:22
  **publicly** [2] - 743:2,
745:4
  **publish** [5] - 763:3,
764:21, 776:17,
779:7, 779:16
  **published** [2] -
755:8, 779:1
  **pull** [6] - 704:6,
706:16, 708:3,

713:11, 741:2, 767:2
  **pulled** [1] - 785:6
  **purpose** [1] - 720:21
  **purposefully** [1] -
784:24
  **purposes** [2] -
763:14, 806:15
  **pursuant** [1] -
774:23
  **pursue** [1] - 732:23
  **pushing** [1] - 779:15
  **put** [5] - 703:2,
715:1, 718:22,
784:12, 805:15
  **Putin** [1] - 746:7
  **putting** [3] - 715:22,
721:5, 759:6

**Q**

  **quarter** [2] - 783:15,
804:13
  **questioned** [1] -
772:3
  **questions** [5] -
760:2, 776:9, 784:5,
795:3, 799:10
  **quicker** [1] - 780:1
  **quickly** [2] - 719:13,
802:2
  **quintessential** [1] -
761:9
  **quite** [2] - 739:5,
739:15

**R**

  **radar** [1] - 796:7
  **raise** [1] - 786:15
  **raises** [1] - 785:6
  **ran** [1] - 788:20
  **random** [1] - 734:5
  **range** [4] - 789:10,
790:14, 790:22,
794:19
  **ranges** [1] - 791:18
  **ranging** [1] - 742:10
  **ranking** [1] - 791:13
  **RAO** [1] - 698:19
  **rate** [2] - 776:4
  **rather** [1] - 745:14
  **RDR** [3] - 698:22,
807:3, 807:12
  **re** [4] - 712:16,
713:1, 714:14, 748:16
  **reach** [2] - 785:24,
797:11
  **reached** [1] - 801:22

  **reaction** [1] - 802:14
  **read** [5] - 702:10,
710:23, 717:17,
755:4, 799:2
  **Red** [1] - 699:2
  **readily** [1] - 731:23
  **reading** [1] - 715:21
  **ready** [1] - 785:22
  **Reagan** [1] - 746:2
  **reality** [1] - 743:1
  **really** [11] - 705:7,
720:9, 728:22, 744:8,
756:6, 758:12, 781:5,
789:10, 790:24,
794:16, 802:17
  **reason** [7] - 700:14,
713:5, 713:15,
724:19, 759:2, 801:9,
803:19
  **reasonable** [1] -
769:19
  **reasons** [1] - 758:25
  **rebut** [1] - 761:21
  **recalled** [1] - 801:21
  **receive** [4] - 747:12,
747:15, 766:3, 766:8
  **RECEIVED** [1] -
699:9
  **received** [5] -
730:15, 797:15,
798:24, 802:7, 802:13
  **receiving** [1] - 756:3
  **recently** [2] - 799:13,
799:14
  **recess** [1] - 783:22
  **recipient** [1] - 716:21
  **recognize** [2] -
710:2, 797:21
  **recognizing** [1] -
710:22
  **recollection** [29] -
707:6, 707:8, 711:10,
711:23, 712:24,
713:4, 715:8, 715:22,
720:11, 721:19,
723:24, 725:15,
727:12, 730:15,
730:23, 744:4, 757:7,
760:1, 761:24,
768:13, 771:10,
771:25, 782:12,
797:3, 797:16, 801:8,
801:15, 801:17,
801:24
  **record** [1] - 700:2,
701:22, 701:23,
703:12, 703:14,
727:10, 740:3, 740:5,
783:24, 784:13, 785:3
  **records** [7] - 702:22,
706:8, 719:12,

725:19, 731:2,
769:19, 774:6
  **Red** [1] - 699:2
  **redact** [1] - 701:12
  **redactions** [1] -
725:7
  **REDIRECT** [1] -
768:20
  **reduced** [1] - 776:4
  **refer** [1] - 726:18
  **reference** [1] - 800:4
  **referring** [1] - 778:6
  **reflect** [2] - 719:1,
749:25
  **reflected** [2] - 704:8,
708:4
  **reflecting** [1] - 749:8
  **regard** [6] - 748:11,
762:22, 771:20,
785:4, 799:15, 800:1
  **regarding** [5] -
725:13, 764:1,
764:10, 764:24, 767:6
  **regardless** [1] -
773:18
  **regular** [3] - 789:11,
792:4, 795:16
  **regularly** [1] - 744:12
  **reimbursed** [1] -
770:3
  **relate** [1] - 723:8
  **related** [18] - 719:23,
723:14, 726:21,
732:4, 760:4, 766:13,
775:17, 788:2, 789:7,
789:8, 789:9, 789:18,
790:20, 790:25,
795:25, 796:18,
800:13
  **relating** [1] - 724:1
  **relation** [1] - 796:15
  **relations** [1] - 746:16
  **relationship** [2] -
729:17, 736:8
  **relationships** [1] -
735:6
  **relative** [5] - 739:25,
742:23, 744:13,
765:11
  **release** [1] - 745:17
  **relevance** [1] -
784:23
  **reliable** [1] - 755:6
  **reluctant** [1] - 779:7
  **remain** [1] - 786:14
  **remember** [42] -
706:9, 706:21,
709:23, 710:9,
710:11, 712:23,
713:8, 723:10,

731:14, 731:22,
732:1, 732:7, 732:13,
732:16, 732:18,
732:19, 735:13,
735:16, 735:18,
736:15, 736:17,
736:18, 741:3,
743:14, 745:18,
750:8, 753:24,
754:20, 756:5,
757:20, 760:6, 771:9,
771:14, 772:2,
772:14, 793:10,
793:12, 801:18
  **remind** [4] - 702:3,
722:19, 754:12,
803:22
  **Rendered** [1] -
753:16
  **reorient** [1] - 763:25
  **repeat** [1] - 782:16
  **rephrase** [1] - 768:8
  **report** [1] - 777:7
  **REPORTED** [1] -
698:22
  **REPORTER** [1] -
776:22
  **Reporter** [2] -
698:23, 807:12
  **reporter** [7] - 701:12,
741:15, 776:17,
778:23, 780:8,
780:11, 787:3
  **reporters** [1] -
755:13
  **reporting** [1] -
759:18
  **reports** [2] - 792:15,
793:1
  **represent** [4] -
727:16, 756:24,
771:2, 796:3
  **represented** [2] -
756:20, 761:17
  **representing** [5] -
738:11, 761:17,
795:24, 796:21, 797:5
  **Republican** [3] -
739:19, 746:1, 755:6
  **request** [4] - 700:6,
785:20, 799:16,
805:18
  **requires** [1] - 800:3
  **research** [5] -
732:21, 732:22,
772:23, 782:11,
804:19
  **resolved** [2] - 738:12
  **respect** [15] - 729:10,
729:11, 735:1,

739:23, 742:19,
743:2, 744:19,
746:25, 750:7,
750:23, 752:3,
754:10, 760:12,
790:24, 796:16
  **respond** [3] - 769:5,
796:11, 803:8
  **responded** [1] -
803:9
  **response** [7] -
785:12, 785:17,
799:16, 800:10,
800:19, 802:23,
803:11
  **responsibilities** [1] -
790:24
  **responsible** [1] -
788:17
  **rest** [1] - 783:2
  **retakes** [1] - 700:4
  **retrieved** [1] - 799:11
  **returning** [2] - 709:7,
784:22, 802:6
  **review** [4] - 732:14,
788:5, 789:20
  **reviewing** [1] -
784:14
  **revolutionary** [1] -
736:12
  **rich** [1] - 740:6
  **ring** [2] - 706:10,
730:20
  **rings** [1] - 706:13
  **road** [2] - 731:14,
731:21
  **Robby** [5] - 722:18,
722:21, 731:13,
754:1, 754:11
  **Rodney** [23] - 703:9,
706:20, 706:24,
707:18, 709:14,
711:1, 711:25,
712:14, 712:18,
713:6, 714:18,
715:16, 715:23,
716:6, 716:24, 719:1,
719:4, 727:16,
735:10, 736:3,
762:23, 782:5
  **Rodney's** [1] - 711:3
  **role** [3] - 737:13,
779:13, 791:16
  **rolled** [1] - 734:24
  **Ronald** [1] - 746:2
  **room** [3] - 701:21,
803:23, 803:25
  **routine** [1] - 729:20
  **routinely** [1] - 775:19
  **Rubio** [2] - 739:22,

740:8
  **ruin** [1] - 745:10
  **run** [1] - 729:4,
729:10, 729:13,
729:15, 731:3, 732:9,
731:21, 759:12,
759:22, 768:1
  **run-up** [1] - 731:3
  **running** [2] - 730:11,
738:9
  **runs** [2] - 739:10,
759:13
  **runway** [1] - 777:14
  **Russia** [10] - 745:9,
745:16, 745:23,
746:2, 746:11,
746:17, 755:9,
755:14, 756:15,
758:10
  **Russian** [4] - 728:16,
743:12, 746:5, 746:6

---

## S

  **safe** [2] - 804:20,
806:20
  **San** [1] - 734:3
  **Sanders** [1] - 738:8
  **saw** [9] - 703:12,
741:5, 753:5, 753:6,
753:14, 780:16,
781:14, 781:23,
801:21
  **scale** [1] - 759:7
  **scenario** [1] - 771:4
  **scene** [1] - 796:5
  **scheduled** [2] -
700:12, 781:24
  **scheduler** [2] -
711:17
  **scheduling** [1] -
700:11
  **School** [1] - 787:8
  **scope** [1] - 742:10
  **screen** [3] - 703:2,
713:11, 713:22
  **screens** [1] - 798:17
  **screenshot** [5] -
797:23, 797:25,
798:2, 798:13, 798:14
  **scrolled** [3] - 800:23,
801:1, 804:7
  **SEAN** [1] - 698:18
  **search** [2] - 789:23,
800:22
  **seat** [2] - 700:1,
786:19
  **seated** [4] - 702:2,
783:6, 786:9, 805:2

Seattle [1] - 734:2
  **second** [9] - 720:11,
720:12, 749:1, 749:4,
749:10, 754:11,
759:3, 759:17, 761:19
  **secret** [2] - 743:13,
747:8, 766:3, 766:8,
790:10, 790:11
  **secretary** [1] -
711:14
  **Secretary** [5] -
731:22, 737:22,
738:4, 738:14, 759:7
  **section** [4] - 787:25,
794:13, 794:15, 800:4
  **sections** [1] - 792:11
  **security** [21] - 735:4,
735:6, 744:25, 788:2,
788:5, 789:2, 789:8,
789:14, 789:17,
789:21, 790:5, 790:7,
790:8, 790:13,
790:20, 790:22,
790:25, 791:12,
791:17, 795:12,
803:21
  **security-related** [3] -
788:2, 789:8, 790:25
  **see** [28] - 704:10,
704:15, 704:23,
707:5, 708:6, 708:23,
731:14, 738:3,
748:17, 751:10,
755:10, 755:15,
764:1, 764:4, 764:7,
764:10, 765:14,
765:18, 766:5,
766:10, 766:18,
769:24, 803:1,
803:24, 804:3,
804:17, 805:3, 805:9
  **seeing** [1] - 707:4
  **seek** [2] - 757:11,
768:9
  **seeking** [1] - 797:13
  **seem** [1] - 782:13
  **self** [1] - 739:11
  **semicolon** [2] -
749:23, 749:25
  **Senator** [1] - 738:8
  **send** [2] - 722:16,
731:11
  **sending** [3] - 723:13,
756:7, 762:5
  **senior** [3] - 722:24,
722:25, 788:18
  **sense** [9] - 705:17,
711:11, 728:24,
731:12, 731:24,
731:25, 758:24,

774:15, 777:18
  **sensibility** [2] -
729:17, 729:19
  **sensitive** [2] -
790:11, 799:5
  **sensitivity** [1] -
738:8
  **sent** [2] - 716:19,
724:21, 725:1,
731:10, 731:11,
797:13, 802:23
  **sentence** [1] -
755:12
  **separate** [3] -
734:25, 792:14,
792:15
  **September** [27] -
724:1, 724:25, 725:2,
726:8, 730:18, 731:2,
744:13, 747:14,
747:15, 748:19,
748:20, 749:20,
753:19, 754:1,
755:18, 755:24,
756:22, 760:21,
767:21, 768:6,
768:12, 768:24,
785:8, 797:10,
798:19, 798:24, 802:8
  **series** [3] - 770:13,
791:10, 793:1
  **served** [1] - 788:7
  **server** [12] - 720:5,
723:9, 723:16,
723:20, 724:1,
735:14, 746:20,
747:20, 748:9,
756:15, 758:4, 758:5
  **service** [2] - 743:18,
775:3
  **Services** [1] - 753:16
  **services** [2] - 708:19,
790:19
  **SESSION** [1] - 698:5
  **set** [9] - 711:1,
711:14, 711:18,
741:19, 746:15,
796:5, 797:13, 801:2,
802:19
  **settings** [1] - 798:15
  **seven** [2] - 725:12,
749:3
  **seventh** [1] - 804:1
  **several** [2] - 734:18,
752:22
  **shake** [1] - 759:9
  **share** [4] - 751:25,
757:16, 767:25,
772:12
  **sharing** [4] - 768:4,

768:5, 772:3, 773:21
  **SHAW** [1] - 698:15
  **short** [7] - 799:6
  **shortly** [7] - 727:6,
727:14, 732:4, 771:6,
771:7, 773:8, 773:9
  **shot** [1] - 745:10
  **show** [7] - 709:21,
713:12, 716:8,
725:18, 762:24,
763:13, 797:19
  **showed** [3] - 708:22,
731:11, 753:9
  **showing** [1] - 725:10
  **shown** [1] - 725:6
  **side** [3] - 739:19,
791:17
  **sidebar** [2] - 701:6,
778:5
  **Sidney** [4] - 755:1,
780:20, 781:1, 781:4
  **signature** [1] - 711:7
  **signed** [1] - 711:5
  **significant** [1] -
744:6
  **similar** [3] - 729:13,
739:17, 789:4
  **sit** [2] - 775:14,
779:12
  **sitting** [4] - 725:15,
731:18, 735:17, 760:1
  **situating** [1] - 730:25
  **six** [6] - 744:5, 749:4,
749:6, 749:9, 750:8,
759:25
  **skill** [1] - 735:5
  **skipped** [1] - 774:7
  **slightly** [1] - 711:16
  **slip** [1] - 786:15
  **slow** [1] - 777:13
  **small** [1] - 770:4
  **social** [1] - 732:13
  **socially** [1] - 733:12
  **someone** [6] -
743:17, 773:1,
780:20, 781:6, 792:4,
793:5
  **sometime** [5] -
720:10, 720:11,
720:12, 738:13, 741:6
  **sometimes** [10] -
708:15, 708:25,
750:20, 771:2, 773:8,
773:9, 773:23,
776:16, 777:17,
778:22
  **somewhat** [1] -
785:13
  **soon** [1] - 801:25
  **sorry** [25] - 703:9,

703:23, 708:18,
713:12, 715:13,
716:2, 716:7, 718:9,
726:12, 731:11,
741:11, 752:7,
754:15, 758:7,
764:18, 767:8, 768:7,
773:16, 774:17,
776:22, 793:23,
798:22, 805:11
**sort** [12] - 730:9,
730:20, 731:9, 735:4,
770:2, 775:19, 776:3,
777:25, 790:14,
795:9, 803:24, 806:10
**sorts** [1] - 787:17
**source** [2] - 755:6,
780:13
**sources** [1] - 755:13
**Soviet** [1] - 746:3
**speaking** [4] -
735:13, 741:16,
761:24, 781:19
**Special** [1] - 806:11
**special** [1] - 791:23
**SPECIAL** [1] -
698:15
**specific** [6] - 705:5,
725:16, 730:15,
741:18, 742:15,
742:19
**specifically** [8] -
711:24, 723:11,
731:9, 748:24, 750:8,
789:18, 796:25,
801:19
**specifics** [1] - 741:9
**sped** [2] - 778:18,
778:22
**speed** [2] - 777:21,
777:22
**spell** [1] - 787:2
**spending** [1] -
769:15
**spent** [4] - 750:15,
750:23, 750:24,
750:25
**spoken** [1] - 801:4
**spot** [1] - 805:15
**spring** [2] - 737:22,
743:7
**staff** [1] - 792:24
**stage** [1] - 741:19
**stances** [1] - 759:5
**stand** [3] - 700:4,
700:15, 783:7
**standard** [1] - 739:9
**standing** [1] - 786:15
**standpoint** [1] -
760:23

**start** [3] - 788:11,
789:2, 792:2
**started** [8] - 702:9,
720:4, 737:2, 783:11,
783:14, 787:24,
788:12, 800:20
**starting** [2] - 711:6,
737:15
**state** [1] - 787:2
**statement** [1] - 746:8
**statements** [7] -
732:2, 732:8, 745:4,
778:10, 799:23,
799:25, 800:6
**STATES** [4] - 698:1,
698:3, 698:11, 698:14
**States** [5] - 698:23,
720:23, 791:1, 791:3,
807:13
**status** [4] - 712:16,
713:1, 713:2, 714:15
**stay** [1] - 804:19
**stealing** [1] - 758:20
**steer** [2] - 778:10,
778:12
**stenographic** [1] -
807:5
**step** [2] - 700:3,
804:23
**steps** [1] - 732:23
**still** [3] - 702:3,
775:22, 795:17
**stop** [4] - 756:13,
756:18, 759:1, 804:13
**stopping** [1] - 785:25
**stories** [3] - 776:10,
776:14, 778:19
**story** [48] - 747:13,
747:16, 747:23,
748:1, 748:5, 748:8,
748:12, 753:22,
755:8, 755:14, 756:9,
756:13, 756:14,
756:18, 756:23,
757:17, 757:23,
758:2, 758:9, 759:12,
759:13, 759:19,
759:23, 759:24,
761:2, 761:11,
761:22, 763:6,
766:15, 768:1,
776:11, 777:5,
777:14, 777:15,
777:16, 777:17,
778:20, 779:1, 779:4,
779:7, 779:8, 779:9,
779:14, 779:16,
779:22, 780:1, 780:4,
780:9
**street** [1] - 803:18

**Street** [1] - 698:16
**structured** [3] -
752:25, 792:21,
792:22
**stuck** [8] - 778:20,
778:21, 778:23,
779:4, 779:14,
779:22, 780:4, 780:7
**stuff** [3] - 744:24,
753:4, 759:22
**subject** [9] - 712:15,
714:14, 716:23,
717:8, 721:9, 723:3,
725:16, 755:9, 800:7
**subjective** [1] -
760:25
**subjective-intent** [1]
- 760:25
**sudden** [2] - 736:16,
746:4
**sue** [1] - 740:8
**sued** [1] - 740:6
**suggested** [4] -
748:8, 758:3, 761:1,
803:13
**suggesting** [1] -
785:15
**suggestions** [1] -
745:21
**suggestive** [1] -
731:12
**suggests** [1] -
708:22
**Sullivan** [2] - 722:18,
754:16
**sum** [1] - 751:5
**summer** [2] - 745:3,
796:2
**Sunday** [1] - 802:10
**supervised** [1] -
792:18
**supervising** [2] -
728:22, 796:13
**support** [3] - 738:19,
794:23, 795:1
**surprise** [6] - 761:3,
761:5, 761:6, 761:9,
761:16, 761:23, 762:6
**surprised** [3] -
734:1, 752:19, 802:15
**surrogate** [1] -
731:17
**surveillance** [3] -
789:22, 794:20,
795:12
**Surveillance** [1] -
789:24
**suspect** [6] - 706:1,
723:11, 724:17,
724:18, 724:22, 739:7

**Sussmann** [97] -
703:9, 704:3, 706:6,
707:13, 707:17,
707:19, 707:23,
709:18, 710:25,
713:25, 714:20,
715:1, 715:6, 715:15,
715:23, 716:20,
718:6, 718:7, 718:19,
718:20, 719:2, 719:3,
719:24, 721:18,
722:3, 725:13,
726:12, 726:23,
727:2, 727:17, 728:4,
728:13, 728:19,
729:24, 733:8,
733:10, 733:12,
734:9, 734:21, 736:8,
740:20, 744:1,
746:22, 747:10,
747:19, 748:3,
748:16, 749:9,
749:20, 751:13,
751:20, 752:4,
755:22, 756:22,
757:1, 757:16,
757:22, 760:3,
760:13, 760:20,
760:22, 762:5, 763:5,
763:22, 764:23,
766:20, 767:10,
767:15, 767:24,
767:25, 768:9,
768:23, 769:6, 771:7,
772:4, 779:15,
781:20, 784:19,
785:1, 785:7, 793:5,
793:7, 793:18,
793:24, 794:8, 795:4,
795:15, 795:21,
796:20, 797:6,
797:11, 799:4,
800:18, 801:18,
802:7, 803:8, 804:3
**SUSSMANN** [1] -
698:6
**Sussmann's** [10] -
703:13, 703:20,
707:1, 711:8, 728:22,
735:2, 736:1, 762:21,
768:25, 784:5
**sustained** [2] -
769:3, 769:9
**swear** [1] - 786:16
**SWORN** [1] - 786:18
**systems** [1] - 724:21

---

**T**

**tactic** [1] - 740:11

**talks** [1] - 767:5
**task** [3] - 750:14,
750:15, 753:2
**task-based** [2] -
750:14, 753:2
**team** [2] - 703:10,
792:20
**tech** [1] - 735:7
**technical** [1] -
715:18
**technically** [2] -
749:4, 798:23
**technology** [1] -
789:10
**teleconference** [1] -
748:15
**telephone** [13] -
711:1, 712:16, 713:1,
713:25, 714:1,
714:14, 715:3,
718:17, 725:13,
726:16, 749:21,
750:24, 801:23
**ten** [1] - 783:1
**tended** [1] - 724:17
**tenth** [1] - 749:5
**tenths** [2] - 725:8,
725:12
**term** [1] - 750:12
**terms** [3] - 744:17,
790:7, 792:20
**testified** [5] - 706:23,
742:5, 747:3, 756:25,
777:4
**testify** [4] - 700:12,
767:20, 784:6, 802:11
**testimony** [16] -
700:19, 727:15,
735:10, 748:23,
757:3, 781:19,
782:20, 782:21,
784:4, 784:5, 784:14,
784:16, 784:17,
800:7, 804:24, 806:15
**text** [14] - 710:24,
797:13, 797:15,
798:19, 798:22,
799:1, 799:2, 799:9,
799:12, 801:7,
801:19, 801:22,
804:2, 804:3
**texted** [1] - 801:21
**texts** [3] - 800:21,
800:22
**THE** [83] - 698:1,
698:10, 698:14,
698:18, 699:4, 700:1,
700:4, 700:5, 700:21,
700:24, 701:4, 701:7,
701:11, 701:17,

701:21, 701:22, 702:1, 702:5, 702:16, 706:13, 710:18, 712:9, 713:14, 714:6, 716:15, 717:22, 719:10, 722:12, 724:11, 726:1, 741:10, 741:11, 741:12, 741:15, 754:4, 754:6, 763:7, 763:9, 764:20, 765:6, 768:15, 768:18, 769:3, 769:9, 776:22, 777:1, 778:8, 778:12, 782:18, 782:19, 782:22, 782:23, 782:25, 783:6, 783:11, 783:14, 783:21, 783:24, 784:9, 784:11, 785:5, 785:19, 785:22, 785:23, 785:24, 786:8, 786:14, 786:17, 786:19, 786:21, 786:22, 798:7, 804:14, 804:23, 804:25, 805:2, 805:11, 805:16, 805:23, 806:3, 806:6, 806:14, 806:19

**there'd** [1] - 723:21
**Thereupon** [2] - 783:22, 786:4
**thinking** [1] - 736:18
**third** [1] - 772:21
**thoroughly** [1] - 743:21
**thousand** [2] - 733:25, 753:6
**threat** [4] - 766:3, 766:8, 766:13, 781:15
**threaten** [1] - 740:11
**threatened** [1] - 740:8
**threats** [1] - 790:23
**three** [5] - 718:9, 718:11, 777:16, 792:23, 793:1
**throughout** [2] - 794:18, 795:6
**thumb** [1] - 759:6
**thwart** [1] - 790:18
**ties** [1] - 746:10
**time-sensitive** [1] - 799:5
**timeframe** [2] - 741:7, 746:20
**timekeeper** [1] - 718:5

**timespan** [1] - 787:13
**timestamp** [1] - 803:2
**title** [3] - 722:23, 754:21, 788:3
**titled** [1] - 780:16
**titles** [1] - 792:20
**today** [9] - 725:15, 735:10, 752:4, 760:1, 775:15, 783:12, 797:3, 800:7, 804:16
**together** [3] - 718:25, 733:20, 734:12
**Tom** [1] - 766:19
**tomorrow** [11] - 784:9, 785:5, 799:6, 802:20, 804:15, 804:17, 805:9, 805:13, 805:21, 805:24, 806:1
**ton** [1] - 731:15
**tonight** [1] - 805:3
**took** [3] - 792:10, 798:2, 800:23
**top** [7] - 708:20, 723:1, 749:16, 754:11, 765:13, 790:10, 790:11
**top-secret** [1] - 790:10
**topic** [1] - 717:10
**topics** [3] - 742:10, 742:24, 775:17
**total** [2] - 729:9, 751:5
**totally** [2] - 734:25, 774:22
**touch** [2] - 794:1, 794:2
**track** [2] - 724:19, 769:20
**transcript** [3] - 785:6, 807:5, 807:6
**TRANSCRIPT** [1] - 698:10
**transition** [1] - 792:9
**translate** [1] - 751:9
**trial** [1] - 800:2
**TRIAL** [1] - 698:10
**trouble** [1] - 700:7
**true** [3] - 780:15, 807:4, 807:5
**Trump** [22] - 739:21, 739:24, 740:5, 740:7, 740:10, 745:4, 745:15, 745:24, 746:1, 746:16, 746:20, 748:9, 755:4,

755:7, 755:14, 756:15, 758:4, 758:10, 759:10, 768:2, 780:16, 780:17
**Trump-Russia** [1] - 755:14
**trust** [1] - 802:19
**try** [4] - 721:9, 740:12, 756:13, 756:18
**trying** [6] - 721:17, 761:19, 774:19, 774:20, 790:18, 805:15
**turn** [1] - 799:25
**turning** [1] - 772:2
**turns** [1] - 803:21
**tweet** [3] - 732:15, 778:7, 778:12
**tweets** [1] - 732:18
**Twitter** [4] - 732:19, 732:20, 787:6, 787:9
**two** [13] - 709:8, 718:25, 725:8, 725:12, 741:21, 743:12, 743:16, 762:2, 765:10, 784:4, 788:9, 790:6, 806:4
**two-tenths** [2] - 725:8, 725:12
**type** [3] - 717:14, 766:13, 796:4
**typical** [2] - 739:5, 739:15, 789:1
**typically** [3] - 739:11, 750:19, 770:23

**U**

**U.S** [4] - 794:23, 794:25, 795:2, 800:4
**Ukraine** [1] - 746:12
**umbrella** [3] - 773:17, 773:25, 775:3
**under** [12] - 702:4, 705:23, 724:24, 734:19, 745:19, 745:20, 753:21, 770:11, 773:17, 773:25, 775:2, 775:3
**underlying** [1] - 753:14
**understated** [1] - 734:1
**understood** [15] - 705:8, 709:25, 713:9, 713:17, 720:2, 723:23, 725:5, 734:4, 771:5, 773:20,

774:25, 778:24, 795:11, 796:2, 805:19
**undo** [1] - 761:8
**unfair** [1] - 759:6
**unfortunately** [1] - 750:22
**Union** [1] - 746:3
**unique** [1] - 759:3
**united** [1] - 698:23
**United** [4] - 790:23, 791:1, 791:3, 807:13
**UNITED** [4] - 698:1, 698:3, 698:11, 698:14
**unless** [1] - 715:6
**unnecessary** [1] - 785:13
**unorthodox** [1] - 739:3
**unusual** [4] - 739:3, 739:13, 740:17, 746:15
**up** [38] - 700:3, 700:7, 700:13, 704:6, 706:16, 708:3, 711:1, 711:14, 711:18, 713:11, 717:17, 718:23, 729:23, 731:3, 734:24, 736:16, 738:5, 741:2, 741:16, 744:7, 745:8, 756:23, 757:23, 767:2, 770:2, 771:2, 773:8, 777:21, 777:22, 778:19, 778:22, 781:5, 785:25, 789:24, 797:13, 798:17, 800:23, 802:19
**updates** [1] - 747:10
**upper** [1] - 715:14
**useful** [1] - 761:6

**V**

**vague** [3] - 770:14, 770:17, 806:2
**vaguely** [1] - 754:20
**vantage** [2] - 728:18, 729:8
**variety** [6] - 758:25, 787:19, 789:6, 791:11, 791:18, 794:19
**various** [2] - 735:7, 787:15
**Verizon** [1] - 736:13
**versa** [1] - 736:13
**versus** [1] - 739:24
**vice** [2] - 736:13,

787:10
**victim** [1] - 728:16
**view** [6] - 747:22, 747:25, 758:6, 758:17, 759:6, 759:24
**viewed** [1] - 759:10
**violent** [1] - 791:18
**visited** [1] - 728:7
**vs** [1] - 698:5

**W**

**W/D** [2] - 705:1, 705:6
**W/O** [1] - 705:6
**wait** [1] - 771:12
**waiting** [2] - 701:18, 709:11
**walk** [2] - 721:17, 803:17
**wants** [1] - 802:18
**Washington** [4] - 698:16, 698:25, 743:20, 807:14
**watched** [1] - 709:10
**WATKINS** [1] - 698:20
**ways** [1] - 743:24
**weaponized** [1] - 782:14
**wearing** [1] - 770:18
**Wednesday** [2] - 698:4, 711:2
**week** [4] - 700:15, 720:18, 761:10, 802:9
**weeks** [1] - 720:20
**welcome** [2] - 702:1, 786:8
**West** [1] - 734:2
**whereas** [1] - 730:3
**White** [1] - 781:2
**whole** [5] - 702:12, 702:13, 752:22, 789:10, 803:18
**wide** [1] - 742:10
**wide-ranging** [1] - 742:10
**WITNESS** [13] - 700:4, 701:21, 702:5, 706:13, 713:14, 741:11, 777:1, 782:18, 782:22, 786:17, 786:18, 786:21, 804:25
**Witness** [1] - 805:1
**witness** [10] - 700:4, 700:11, 713:12, 782:24, 783:8, 783:10, 783:19,

786:4, 786:11, 799:23
**witness's** [1] - 784:4
**WITNESSES** [1] -
699:4
**witnesses** [8] -
783:10, 800:1, 805:9,
805:11, 805:14,
805:17, 805:20,
805:25
**wondered** [1] -
802:16
**word** [2] - 779:14,
780:2
**words** [5] - 719:19,
727:6, 729:23, 750:2,
751:13
**work's** [1] - 776:6
**works** [2] - 711:4,
751:12
**world** [3] - 759:20,
759:21, 777:8
**wrapped** [1] - 738:5
**write** [2] - 705:7
**written** [3] - 705:11,
753:6
**wrote** [2] - 802:25,
803:4

## Y

**YAO** [1] - 698:19
**year** [4] - 752:16,
788:11, 788:23,
800:12
**years** [13] - 733:14,
733:16, 737:14,
744:5, 749:13, 750:8,
759:25, 788:7, 790:1,
790:6, 793:17,
793:20, 793:21
**York** [19] - 698:21,
725:14, 725:16,
732:4, 734:5, 747:19,
748:16, 749:9, 755:8,
756:14, 757:17,
757:24, 758:3,
758:11, 759:11,
759:13, 761:22, 768:1
**yourself** [4] - 727:16,
744:22, 770:2, 786:19
**yourselves** [1] -
794:4

## Z

**Ziobro** [1] - 765:16