```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
      - - - - - - - - - - - - - - - x
3     THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
4                    Plaintiff,         1:21-cr-00582-CRC-1
                                        Thursday, May 19, 2022
5     vs.                               9:09 a.m.

6     MICHAEL A. SUSSMANN,              *MORNING SESSION*

7                    Defendant.
      - - - - - - - - - - - - - - - x
8

9     _____

10                      TRANSCRIPT OF JURY TRIAL
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
      _____
12
      APPEARANCES:
13
      For the United States:    ANDREW DeFILIPPIS, ESQ.
14                              JONATHAN EDGAR ALGOR, IV, ESQ.
                                BRITTAIN SHAW, ESQ.
15                              SPECIAL COUNSEL'S OFFICE
                                145 N Street Northeast
16                              Washington, DC 20002
                                (212) 637-2231
17
      For the Defendant:        SEAN M. BERKOWITZ, ESQ.
18                              MICHAEL BOSWORTH, ESQ.
                                CATHERINE YAO, ESQ.
19                              NATALIE HARDWICK RAO, ESQ.
                                LATHAM & WATKINS LLP
20                              1271 Avenue of the Americas
                                New York, NY 10020
21                              (212) 906-1200

22    Court Reporter:           Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
23                              U.S. Courthouse, Room 6718
                                333 Constitution Avenue, NW
24                              Washington, DC  20001
                                (202) 354-3187
25
```

1                          I N D E X

2

   WITNESS                                                    PAGE

3

   JAMES A. BAKER
4        (By Ms. DeFilippis)............................ 832

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2          THE COURTROOM DEPUTY:  Your Honor, we're back on
 3    the record for Criminal Case 21-582, United States of
 4    America vs. Michael Sussmann.
 5          MS. SHAW:  Good morning, Your Honor.
 6          THE COURT:  Good morning.
 7          MS. SHAW:  Brittain Shaw on behalf of the United
 8    States.  I'm joined at counsel table by Jonathan Algor,
 9    Andrew DeFilippis, Kori Arsenault, and John Durham.
10          THE COURT:  Good morning.
11          MR. BERKOWITZ:  Good morning, Your Honor; Sean
12    Berkowitz, Michael Bosworth, Natalie Rao, Catherine Yao on
13    behalf of Mr. Sussmann, who is present in court.
14          THE COURT:  Good morning, everybody.
15          MR. BERKOWITZ:  Good morning.
16          THE COURT:  All right.
17          Mr. Berkowitz, I received your motion last night
18    on the motion to strike.  Do you want to be heard further?
19          MR. BERKOWITZ:  Your Honor, we very much
20    appreciate your counsel.  We had time to thoughtfully
21    deliberate, and I think that our motion speaks for itself.
22    If you have questions, we're here to answer them.
23          THE COURT:  Okay.  You say that Mr. Sussmann
24    hasn't made a decision to testify yet.  Is the motion
25    conditional on that decision?  Do we need to do anything if
```

1    he chooses to testify?

2              MR. BERKOWITZ:  I don't think we need to do

3    anything if he chooses to testify, Your Honor.

4              THE COURT:  Okay.

5              Mr. DeFilippis?  Ms. Shaw.

6              MS. SHAW:  Me again, I'm afraid.  Thank you, Your

7    Honor.

8              THE COURT:  You're his counsel.

9              MS. SHAW:  I guess so by default.

10             Your Honor, it would be the government's position

11   that certainly the motion for a mistrial is not needed in

12   this case.  As Your Honor noted yesterday, this was a

13   nonresponsive answer to a question elicited by defense

14   counsel, and it would certainly be within the Court's

15   discretion to strike certain portions of that and perhaps

16   make necessary instruction concerning the nonresponsiveness

17   at some point, but we don't believe it rises to the level of

18   anything that warrants a mistrial, Your Honor.

19             THE COURT:  Okay.  The Court will deny the

20   defense's motion for a mistrial, to the extent it has made

21   one, but is prepared to strike the nonresponsive portions of

22   the transcript.  And it is routine for parties to highlight

23   portions of the transcript in closings, and the defense --

24   and both sides would be able to do that based on the revised

25   transcript in the event Mr. Sussmann chooses not to testify,

```
1    okay?

2              MS. SHAW:  Thank you, Your Honor.

3              I just wanted to flag a few things for Your

4    Honor --

5              THE COURT:  Sure.

6              MS. SHAW:  -- before we started this morning.

7              First, during Mr. Baker's testimony we plan to

8    offer our first stipulation so, you know, the jury may

9    not -- you know, may need an instruction on what a

10   stipulation would be.

11             And then additionally, we plan to be offering the

12   notes of Mr. Priestap and Ms. Anderson through Mr. Baker,

13   and I understand that defense counsel's been consulted on

14   this matter and consents to this.  So I just wanted to flag

15   that for Your Honor.

16             THE COURT:  So how is it going to come in?  He has

17   not seen those notes, correct?

18             MS. SHAW:  Yes, he has seen those notes.  It's my

19   understanding he's seen those notes.

20             THE COURT:  So you're refreshing his recollection

21   with the notes or what's the -- how are you going to use

22   them?

23             MS. SHAW:  Perhaps Mr. DeFilippis should outline

24   that.

25             Thank you, Your Honor.
```

1          MR. DeFILIPPIS:  Yes, Your Honor.  So the parties

2     have been discussing both these notes and the notes from the

3     March 6th of '17 meeting, and the parties have agreed that

4     both notes -- both sets of notes will come in and be shown

5     to the jury, subject, of course, to Your Honor.  So we

6     thought, for purposes of efficiency, to put it in through

7     Mr. Baker, essentially subject to connection or foundation

8     when Mr. Priestap and Ms. Anderson testify.

9          The defense doesn't have an objection to that.  I

10    expect they may want to show him the March 6, '17, notes.  I

11    don't want to presume, but I think that was the idea, is

12    that if all these notes are going to come in anyway, the

13    jury might as well see them now.

14         But I'm happy to let defense give their thoughts

15    as well.

16         MR. BERKOWITZ:  Just briefly, Your Honor.

17    Mr. DeFilippis has correctly stated the parties' agreement.

18    And since the notes will come in, for efficiency purposes,

19    rather than go through the charade of me impeaching him and

20    them coming back and doing it, he can do it on direct and

21    not confront it.

22         THE COURT:  That sounds great.  I appreciate the

23    cooperation on this issue as well as the cooperation on the

24    privilege issues that were implicated yesterday.  I thought

25    that was handled very smoothly, and we didn't have to deal

 1   with objections on the fly.  So I appreciate the cooperation

 2   that both sides have shown on those issues.

 3            MR. BERKOWITZ:  Thank you, Your Honor.

 4            THE COURT:  All right.  We had a jury note that we

 5   gave to both sides.  I may just hold her back at the break,

 6   and we can talk about it at the beginning of the first

 7   break.  I don't see an issue, but I have a couple of

 8   questions for her.

 9            Anything else, Counsel?

10            MR. DeFILIPPIS:  No, Your Honor.

11            MR. BERKOWITZ:  Judge, one minute.

12            THE COURT:  Sure.

13            (Pause)

14            MR. BERKOWITZ:  We're good, Your Honor.

15            THE COURT:  All right.  We can bring Mr. Baker

16   back.

17            Welcome back, sir.  Have a seat.  You can have a

18   seat until the jury comes in.

19            MR. BERKOWITZ:  Your Honor, we have the 3500

20   material for Mr. Baker, if you want it now.  I don't know if

21   it will come up, but we're happy to provide it to you.

22            THE COURT:  You can give it to me now.

23            MR. BERKOWITZ:  Apparently we gave it to

24   Ms. Jenkins already, Your Honor.

25            THE COURT:  Yes, it's here.

```
 1                    (Pause)

 2                    (Jury enters courtroom)

 3                    THE COURT:  Welcome back, everyone.  Everyone have

 4        a nice night?

 5                    Good.

 6                    We are ready to get started with Mr. Baker again.

 7                    Mr. DeFilippis.  The floor is yours.

 8                    Mr. Baker, I would remind you that you're still

 9        under oath.

10                    THE WITNESS:  Yes, sir.

11                    THE COURT:  And you can slip your mask off.

12                    MR. DeFILIPPIS:  Thank you, Your Honor.

13                          JAMES BAKER, Resumed

14                    DIRECT EXAMINATION, Continued

15        BY MR. DeFILIPPIS:

16        Q.  And good morning, Mr. Baker.

17        A.  Good morning.

18        Q.  Mr. Baker, when we left off yesterday, we were talking

19        about an outreach that Mr. Sussmann made to you on September

20        18th of 2016.  Do you recall that?

21        A.  Yes.

22                    MR. DeFILIPPIS:  And, Ms. Arsenault, if we can

23        just bring up the relevant page of Government Exhibit 1500.

24        Q.  Mr. Baker, do you recall reading this text message to

25        the jury yesterday?
```

1    A.  Yes, I do.

2    Q.  Now, Mr. Baker, you had testified that you first

3    retrieved this text message in the context of this matter

4    back a few months ago.  I think you may have said it was

5    March.

6    A.  That's the best of my recollection, yes.

7    Q.  And was it your testimony that you did that in response

8    from a request that the government made to help comply with

9    its obligations to turn over your statements to the defense?

10   A.  Yes.

11   Q.  Now, just so the jury can understand exactly how you

12   retrieve these messages, first, do you -- what kind of cell

13   phone did you have?  What brand?

14   A.  It's an Apple iPhone.  I think it's a 13 Max Pro.

15   Q.  And when the government asked you and you then went to

16   look for any text messages you might have, was the message

17   right there on the screen in your chain with Mr. Sussmann,

18   or was it -- in other words, was it readily available, or

19   did you have to kind of go back further?

20   A.  What I recall is Mr. Durham asked me to look for

21   material like that.  I went to my -- after we completed that

22   all, I went to my phone.  I looked for emails, and then I

23   looked -- did a search of text -- for texts.

24              I typed in Mr. Sussmann's name in the search bar.

25   A text string came up.  iMessages, to be accurate.

 1           And then -- it started with the most recent first,

 2    and then I started to scroll through it to go back to the

 3    beginning.  And as I scrolled, there were various pauses as

 4    it was, in my estimation, being downloaded from my iCloud

 5    account.

 6    Q.  Got it.  So you have an iCloud --

 7    A.  I have an iCloud account with Apple.

 8           Yes, so the material downloaded as I went, and

 9    there were pauses, and then I kept going until I got to the

10    beginning -- or I got to the point where it wouldn't

11    download anymore.  And then this text that we're looking at

12    right now, this iMessage, was the top one in the string of

13    messages that I had with Michael.

14    Q.  Is the phone you're talking about the same phone that

15    you had back in 2016?

16    A.  No.

17    Q.  And so what is your understanding as to how that message

18    sort of was still retrievable to you, even though you were

19    retrieving it on a newer phone?

20    A.  When you get a new phone with Apple, there's a process

21    for transferring data from your old phone to your new phone

22    and from your iCloud account to your new phone.  And then,

23    when I got the new phone -- I think it was in November or

24    December of 2021 -- I went through that process and, you

25    know, a lot of the material was downloaded at that time.

1   But when I looked for this on that day, it seemed like it

2   took some time to download to my new phone.

3   Q.  Understood.  And then did you provide to the government

4   just that exchange we looked at yesterday, or the whole

5   chain, or something in between?

6   A.  It was the whole chain.

7   Q.  Understood.  So let's go back to that exchange we were

8   looking at yesterday.

9          MR. DeFILIPPIS:  Ms. Arsenault, if we could just

10  magnify all of the messages from September 18th.

11          I'm sorry, September -- yes, September 18th.

12  Q.  So, Mr. Baker, you recall getting this first message

13  here in which Mr. Sussmann asked you for a meeting?

14  A.  After I reviewed it, and after I thought about it, and

15  after I looked up -- there was something about the date that

16  reminded me that I had received this call on a Sunday, or

17  this message, I'm sorry, on a Sunday.  And so, yes, then I

18  recalled actually receiving it from Michael.

19  Q.  And when you responded, "Okay.  I will find a time.

20  What might work for you?" what, if anything, made you

21  willing to schedule something for the next day?

22  A.  Well, the message seemed very -- first of all, I knew

23  Michael and had high regard for him, and he -- from the text

24  and from the context and the text of the message, it seemed

25  urgent and important, and so I trusted that if Michael

1    needed to see me right away and in the way he described

2    it here as being time-sensitive and sensitive, I thought

3    it's -- I should try to meet with him as soon as possible.

4              And my schedule allowed for me to meet with him

5    the following day, so that's what I did.  That's what I told

6    him, that I could do that.

7    Q.  He then writes:  "Any time but lunchtime - you name it."

8              And then you reply, "2:00 p.m. at my office?  Do

9    you have a badge or do you need help getting into the

10   building?"

11             Now, you explained yesterday -- I think you

12   testified that Mr. Sussmann did have some kind of a badge.

13   Could you just it describe to the jury in a little bit more

14   detail.  What is that?  Is it like an FBI agent's badge, or

15   something else?

16   A.  No, it's a different badge for -- the FBI, to make

17   things easier to get in and out of the building, because

18   it's a complicated process with security and so on, for

19   certain people who come to the FBI building, the

20   headquarters building here in Washington, on a frequent

21   basis, they'll get -- it's a plastic ID badge that enables

22   them to go through the security gates quickly.  You just go

23   up, put your badge on the reader, and you get right in.

24             And there's different colors for different types

25   of folks so that people can spot that.  So FBI employees

1    have one color badge.  Contractors have a different color

2    badge.  People from different parts of the intelligence

3    community might have a different color badge.

4              I don't know what color Michael's badge was.

5              But in any event, there's a series of plastic ID

6    badges with your photo and with a little chip in them that

7    enables you to get in and out of the building.

8    Q.  So would that mean -- for example, would Mr. Sussmann

9    have to go through the magnetometer that we're all familiar

10   with, or would the badge allow you to just walk right in?

11   A.  I believe the badge that he had would have allowed him

12   to walk right in.

13   Q.  So Mr. Sussmann responds -- let me ask you this:  Do you

14   know of any particular reason why Mr. Sussmann needed

15   regular access to the FBI at that time?

16   A.  I think he had a -- I don't know what the word is --

17   vibrant national security practice that caused him to

18   interact with the Bureau a lot, and so I think somebody must

19   have sponsored him to have a badge of this nature.

20             And just to correct it, you don't get to walk

21   right in with the badge.  You have to go to security.  You

22   put the badge at the reader, and then you go through a

23   series of turnstiles and so on, so it makes a record of when

24   you're coming back and forth.

25   Q.  Okay.  But he was not in any sense an FBI employee,

1    correct?

2    A.  No.  No.

3    Q.  So Mr. Sussmann responds to you then, "I have a badge.

4    Please remind me of your room #."

5              And then you write back a number; is that right?

6    A.  Yes, sir.

7    Q.  Okay.  Did the meeting happen as planned on that next

8    day, which would have been the 19th of September?

9    A.  Yes, it did.

10   Q.  And did it happen, as far as you remember, around the

11   scheduled time?

12   A.  Yes.

13   Q.  Let me show you what's been premarked as Government's

14   Exhibit 240.

15   A.  Thank you for blowing it up.

16   Q.  What are we looking at here?

17   A.  To me, this looks like a document that's a record of my

18   calendar for the day that would have been retrieved from the

19   FBI computer.

20   Q.  Now, did you keep an electronic calendar at the FBI?

21   A.  I had an electronic calendar.  I had an executive

22   assistant, and she was in charge of the calendar.

23              MR. DeFILIPPIS:  Your Honor, the government offers

24   Government Exhibit 240.

25              MR. BERKOWITZ:  No objection.

```
 1              THE COURT:  So moved.
 2   Q.  Now, Mr. Baker, just walk us through the subject line
 3   and the other information on this calendar invite here.
 4   A.  It says, "Meeting w/Michael Sussmann."
 5              It's got the start time on September 19, 2016, at
 6   2:00 p.m.  End time September 19, 2016, at 2:30 p.m.  It
 7   says show the time as busy on the calendar.
 8              It was not a recurring meeting.  I was organizing
 9   it.  I believe it would have been through my executive
10   assistant.  And the required attendees within the FBI were
11   just me.
12   Q.  Mr. Baker, what floor at the FBI headquarters was your
13   office on?
14   A.  The seventh floor.
15   Q.  Is the seventh floor also sort of a term of art at the
16   FBI?
17   A.  Sort of.  It refers to the floor where the director is
18   and other senior executives.
19   Q.  So when people talk about the seventh floor, do they
20   sometimes use that to refer to FBI leadership?
21   A.  Yes.
22   Q.  And just for record purposes, where is FBI headquarters
23   located?  Is that here?
24   A.  It's on Pennsylvania Avenue in Washington, D.C.,
25   Northwest.
```

1    Q.  So tell us what happened, as best as you recall.  Did

2    Mr. Sussmann come to the meeting I think you said around the

3    scheduled time?

4    A.  That's my recollection, yes.

5    Q.  And did he go directly to your office, or did you meet

6    him somewhere else?

7    A.  No, I believe he came to my office.

8    Q.  Who, if anybody, was with him?

9    A.  No other person was with him at the time.  He had

10   materials with him that he brought, but no other people were

11   with him.

12   Q.  And just describe for us your office and, if you recall,

13   where this meeting happened.

14   A.  The meeting happened in my personal office.

15        So I have or had a personal office with my desk

16   and a set of -- there was a sofa.  There were a couple of

17   chairs.  I had a Sensitive Compartmented Information

18   Facility storage area for classified information adjacent to

19   my office, and then there was an entryway or sort of an

20   entry area where my executive assistant and a special

21   assistant sat.  And then across from them I had another

22   larger conference room with a big conference table.

23   Q.  And so where did the meeting happen?

24   A.  The meeting took place in my personal office.

25   Q.  Now, when Mr. Sussmann came in, did he have anything

1  with him?

2  A.  Yes.  He had some written materials and some electronic

3  media with him.

4  Q.  And so how did the meeting begin?  What happened?

5  A.  Michael started to explain why he was there.  He said

6  that he was not appearing before me on behalf of any

7  particular client, and that he had some information that was

8  of concern relating to an apparent surreptitious

9  communications channel between something called Alfa-Bank,

10  which he described as being connected to the Kremlin in

11  Russia, and some part of the Trump organization in the

12  United States.  And it looked, according to some cyber

13  security researchers that he was in contact with, as if it

14  were, again, some surreptitious way for those two entities

15  to communicate with each other.

16  Q.  As best as you recall, how long did the meeting last?

17  A.  30 minutes.

18  Q.  Give or take?

19  A.  Approximately.  Approximately 30 minutes, yes.

20  Q.  Mr. Baker, you mentioned a statement that Mr. Sussmann

21  said he was not doing this on behalf of a client.  Did that

22  statement occur towards the beginning of the meeting?  The

23  end of the meeting?  Or somewhere in between?

24  A.  I think it was pretty close to the beginning of the

25  meeting.  It was part of his introduction to the meeting.

1    Q.  Now, Mr. Baker --

2            MR. DeFILIPPIS:  Ms. Arsenault, if we could go

3    back to Government's Exhibit 1500, to the relevant page, to

4    the September 18th message.

5    Q.  Mr. Baker, you'll recall that this is the message

6    Mr. Sussmann sent you the night before.  Is it your

7    testimony that he repeated that statement in the meeting

8    with you?

9    A.  In essence.  I believe he said, "I'm" -- in the meeting

10   he said, "I'm not here on behalf of any particular client."

11   Q.  And how confident, Mr. Baker, are you that he said that,

12   repeated that, in the meeting?

13   A.  I'm 100 percent confident that he said that in the

14   meeting.

15   Q.  And when he said that, Mr. Baker, what impression did it

16   have on you?  How did you respond?

17   A.  Michael's a friend of mine and a colleague, and I

18   believed it and trusted that the statement was truthful.

19   Q.  And where it says in the text message the night before

20   "Want to help the Bureau," when you read that the night

21   before, what did you understand that to mean?

22   A.  That he was coming to see me as a good citizen who had

23   obtained some information that he wanted to share with me.

24           Again, from the text of this, I literally had no

25   idea what he was coming to see me about, what the subject

1   matter was at all.  But knowing Michael, I would expect

2   him -- if he had information, as a citizen, I think he would

3   want to help the government.  That's the kind of person that

4   I thought him to be.

5   Q.  And when he repeated that statement in the meeting, did

6   you come away with the same impression, that he was acting

7   as a good citizen?

8   A.  Yes.

9   Q.  Now, in connection with these allegations, you said he

10  described allegations of a secret communications channel

11  between the Trump organization and a Russian bank.  What, if

12  anything, did he say about where he had gotten these

13  allegations?

14  A.  He said -- to the best of my recollection, he said that

15  he had been in contact with or approached by some cyber

16  security experts that he said he was not going to identify

17  but he said were people like some people that he named who

18  he thought that I either knew or knew of.

19  Q.  And when you say that they were people like the people

20  he named, what do you mean there?

21  A.  Well, so he said -- again, to the best of my

22  recollection, he said that these people were like -- he

23  named Susan Landau, who is a professor of cyber security and

24  I think engineering; Steve Bellovin, who is also a professor

25  and expert on cyber security; and a person named Matt Blaze,

1   same, an academic who are -- all three of them are, I think,

2   nationally and even internationally recognized cyber

3   security experts in their field.

4           And one of them, Susan, I knew quite well and is a

5   friend.

6   Q.  And had you heard all three names?  Were you familiar

7   with all of them?

8   A.  I was familiar with all of them, yes.  I was familiar

9   with them and knew Susan personally.

10          I can't remember if, at that time, I had met Matt

11  and Steve by that point, but I knew -- I knew who they were

12  by reputation.

13  Q.  And when he said that they were like the people who had

14  gathered the information, what did you understand the

15  comparison to be?  In other words, what was similar about

16  them?

17  A.  Serious people who were experts in the field of cyber

18  security who were well-regarded and were trustworthy.

19  Q.  Did he mention any other names of the people who had

20  actually gathered the information?  Any other names?

21  A.  No.

22  Q.  What, if anything, did Mr. Sussmann say about whether

23  folks outside the FBI were aware of these allegations?

24  A.  My recollection is that he identified -- or he said that

25  some media organizations were aware of this material or

1    these allegations.

2    Q.  And to the best you recall, what did he say in that

3    regard?

4    A.  He said they were major news outlets, and either he said

5    or I construed him to mean like the *Washington Post*, *The New*

6    *York Times*, *The Wall Street Journal*.  I think that's what he

7    referenced.

8            So major, well-known news organizations had

9    received this information apparently from -- well, I didn't

10   know what source.  They had the information somehow.

11   Q.  Did he say one way or the other whether he had provided

12   them with the information or whether they got it from

13   someone else?

14   A.  I don't think he said.

15   Q.  And did you have an understanding one way or the other

16   whether --

17   A.  Yes.  My impression was that the cyber security experts

18   had given it to him, is what I recall today sitting here.

19   Q.  And when you say --

20   A.  I'm sorry.  That the cyber security experts had given

21   this material to whatever reporter it was or whatever news

22   organization it was.  I didn't have the impression that

23   Michael had given this information to the reporter.

24   Q.  Now, you testified that there was an allegation of a

25   secret channel between the Trump organization and Alfa-Bank,

1    which is a Russian bank; is that right?

2    A.  Yes.

3    Q.  Do you recall there being any other entities or

4    organizations referenced in the allegation Mr. Sussmann

5    conveyed?

6    A.  Two points.

7         One, he referenced something called Spectrum

8    Health, which I understood to be some type of a hospital or

9    health system.  And what I gathered from the conversation

10   was -- excuse me.  What I gathered from the conversation was

11   that somehow the communications from Alfa-Bank were being

12   sent -- or at least some of them were being sent -- through

13   this Spectrum Health organization and then to the Trump

14   organization in an effort to obscure the origin and the

15   destination of the communications.

16        This is a fairly typical thing that malicious

17   cyber actors do to obscure what it is that they're up to.

18   They'll find an innocent -- maybe an innocent or not

19   innocent, but anyway, they find a third party to go through,

20   sometimes multiple third parties, in order to make it harder

21   for anybody to trace the communications back to their

22   origin.

23        He also referenced then -- he referenced a system

24   that's called TOR, T-O-R, which refers to The Onion Router,

25   which is a publicly available methodology that people can

1    use, anybody can use, to, again, obscure the origin and

2    destination of communications on the Internet.

3    Q.  And what, if anything, did you understand the

4    relationship between TOR and these allegations was?  Was it

5    being used in some way?

6    A.  I think it was analogized to TOR in the sense of this

7    looked like something like TOR.

8              I don't -- I'm not -- I can't recall if he said

9    they were using TOR or this looks like TOR, but there's

10   efforts that the communicants, let's say -- so meaning the

11   Trump organization and Alfa-Bank -- were using some

12   methodology to make it hard for anybody who would see the

13   communications on the Internet to determine where they were

14   going or where they were from.

15   Q.  Now, going back to the reference to news media

16   organizations, what, if anything, did he say about whether

17   those organizations planned to publish anything, do

18   anything?  Did he say anything in that regard?

19   A.  Yes.

20   Q.  And what was that?

21   A.  My recollection is that he said that they were -- that

22   the information that he, Michael, had was that the news

23   organization was intent on publishing about -- publishing

24   something about this connection relatively soon.

25   Q.  Now, when you heard him say that, what, if any, reaction

1    did you have?  How did that affect your view of the

2    materials or the meeting?

3    A.  Well, it affected my thinking about the urgency of this

4    matter.  It affected my thinking of the urgency of the

5    matter and -- because I know, from my prior experience in

6    this field, that if a news organization were to publish

7    something about an alleged surreptitious communications

8    channel, it's likely that as soon as that article came out

9    the communications channel would disappear, and that would

10   make it much harder for the FBI to investigate the existence

11   of such a channel.  The users would just do something

12   different, and then whatever work had been done and

13   presented to us would not be of any -- it's not of any use.

14   It wouldn't be of as much use to the Bureau.  It would be

15   harder to find out if they had established a new

16   communications channel somehow.

17   Q.  So if we go back to Mr. Sussmann's text message from the

18   night before, he did say in the beginning of the message, "I

19   have something time-sensitive (and sensitive) I need to

20   discuss."

21          Did the news -- how did the news organization

22   information affect your view of that assertion?

23   A.  Time-sensitive.

24   Q.  Okay.

25   A.  And so accurate, in other words.

1    Q.  All right.

2    A.  So yes, if the FBI wanted to investigate this in the

3    counterintelligence world -- really, in any part of criminal

4    law but -- or criminal investigations, but especially in the

5    counterintelligence world, you don't want the bad guys to

6    know that you're looking at them.  You want to be able to

7    investigate without them being aware that you're looking at

8    them.  That's critically important.

9            And so if there was a news article about this that

10   was coming out in a few days or a week or whenever, then

11   that was just going to make it harder for us to figure out

12   what was going on.

13           And so, yes, based on what he was telling me, that

14   seemed 100 percent accurate.  This was very time-sensitive.

15   Q.  Okay.  Mr. Baker, give me just one moment.

16           Now, Mr. Baker, in connection with the computer

17   scientist who Mr. Sussmann referenced to you, the

18   researchers, at any point in describing them did he refer to

19   a client or clients?

20   A.  No.  As I said earlier, he said the opposite, that he

21   was not there on behalf of any particular client.

22   Q.  Now, during this meeting did Mr. Sussmann make any

23   particular asks of you?

24   A.  No.

25   Q.  And during the meeting, did you -- what, if anything,

1    did you tell Mr. Sussmann about what you would do?  Did you

2    make any asks of him?

3    A.  Not during that meeting.

4          Well, he presented to me -- let me back up.  He

5    presented to me a copy, a printed-out copy, of pages.  I

6    don't know how many pages, maybe a half-an-inch thick or so.

7    You know, I think they were 8 1/2 x 11 pages clipped

8    together with a binder clip.  And then he also provided me

9    with I think it was two or three thumb drives that had the

10   same information on them, at least as I understood it.

11         So he presented that to me, and I took that

12   information, but he didn't ask me to do anything.  He just

13   said, you know -- well, he said take whatever action you

14   think is appropriate.

15   Q.  And just for everyone's benefit, what is a thumb drive?

16   A.  A thumb drive is a small digital storage device, and

17   sometimes quite a bit of data can be stored on them.  It's

18   about the size of a thumb.

19   Q.  Got it.

20         Now, when the meeting ended, is that when he

21   handed over the thumb drives and the hard copy materials?

22   A.  He may have passed them to me during the course of the

23   meeting, and I held them -- I think I flipped through the

24   pages but didn't really look at them in any close detail.

25   Q.  Now, Mr. Baker, I think this was clear from your

1    testimony, but who, if anyone, did you bring into the

2    meeting?  Was anyone from the FBI in that meeting?

3    A.  No.  Nobody from anywhere was in the meeting.  It was

4    just Michael and me.

5    Q.  Okay.  And any particular reason for that?

6    A.  I hadn't -- from this -- from his text, saying that it

7    was time-sensitive and sensitive, I literally had no idea

8    what he was talking about, and so I wanted to hear from

9    Michael what it was that he had to say.

10          I mean, I didn't know who else it might pertain

11   to.  It might pertain to somebody else in the Bureau or

12   subject matter that was new or very sensitive.  I really had

13   no idea.

14          So not knowing who else to bring in, I didn't

15   bring anybody in.  I didn't know if this was

16   counterterrorism or counterintelligence or law enforcement

17   or some allegation that the FBI was doing something improper

18   or that the Justice Department was doing something improper.

19   I had no idea what this was about.  So I was -- it didn't

20   take me long to figure out that I should just meet with

21   Michael by myself.

22   Q.  In your role as the top lawyer at the FBI, how common or

23   uncommon was it for you to take in materials like this?  Was

24   it a common occurrence?

25   A.  It was uncommon.

1    Q.  Is there any reason for that?

2    A.  Well, I'm not a case agent.

3              And now having said that, the culture of the FBI

4    is to work with the public to protect the public.  So the

5    FBI has 1-800 numbers.  We have tip lines.  We have a

6    variety of ways we can take in information from the public.

7              Furthermore, taking information from the public is

8    specifically authorized in the Attorney General's guidelines

9    that govern how the FBI can conduct its investigative

10   activities.  And there's a provision in the FBI's internal

11   policies and procedures guidelines that say that any FBI

12   employee can take information from the public.

13             Again, the idea is to get the public's assistance

14   in helping prevent crime, protect national security, and so

15   on in the public interest.

16   Q.  So you said the meeting lasted about 30 minutes?

17   A.  Yes.

18   Q.  And after the meeting, what, if anything, did you do to

19   act on what you had learned and what Mr. Sussmann had given

20   you?

21   A.  To the best of my recollection, immediately or within

22   minutes I placed a phone call to the person who's the head

23   of the -- one of the highest-ranking officials of the FBI,

24   but the head of the counterintelligence division, the

25   assistant director of the counterintelligence division named

1    Bill Priestap.

2    Q.  And first, how confident are you that it was a phone

3    call, or could it have been another mode of communication?

4    A.  I'm pretty sure it was a phone call.  I could have gone

5    down to his office, but I want -- so it could have been -- I

6    think it was a phone call.  It could have been an in-person

7    meeting, but I know that I reached out for Bill as quickly

8    as I could.

9    Q.  You testified Mr. Priestap, I think, was head of the

10   counterintelligence division?  Is that what you said?

11   A.  He was the assistant director of the counterintelligence

12   division, the highest-ranking FBI official responsible for

13   counterterrorism -- sorry, counterintelligence information.

14   Q.  And just briefly for the jury, what does the assistant

15   director for counterintelligence do, including what is

16   really counterintelligence?

17   A.  Counterintelligence is the efforts of the FBI to thwart

18   the malicious activities of hostile foreign intelligence

19   services, so spy services of foreign countries who try to

20   harm the United States or our allies.

21         The FBI is responsible, on a global basis, to try

22   to thwart those efforts by conducting investigations, by

23   recruiting sources, by conducting electronic surveillance,

24   by making arrests, by recruiting spies on the other side to

25   help us.  It's a whole range of activities, again, intended

1    to -- a whole range of investigative activities intended to

2    thwart, for example, the Russian Foreign Intelligence

3    Service from spying on us.

4    Q.  And why was it that you thought these allegations were

5    appropriate to bring to Mr. Priestap's attention?

6    A.  Because it involved Russia and an allegation that this

7    bank had some connection to the Kremlin, which refers to the

8    leadership of the Russian Federation, the government of the

9    Russian Federation.  And so if there's some effort at that

10   point in time to communicate in some way with some part of

11   the Trump organization, that seemed to me, on its face, to

12   be a potential national security threat.

13           The FBI, at that point in time, was already

14   investigating allegations that there were connections

15   between the Trump campaign and the Russian Federation.  So

16   we all -- I already knew that we had an investigation going

17   on of that nature.  And then here was another set of

18   allegations relating to a different aspect of alleged

19   interactions or connections between the Russian government

20   and the Trump -- in this case some part of the Trump

21   organization.

22   Q.  And with regard to that investigation of ties between

23   the Trump organization and the Russian government, as the

24   top lawyer at the FBI, was that something that at the time

25   was a priority for you or one of the matters you were

```
 1    closely focused on?

 2    A.   Yes.   That was a very high priority for me.

 3    Q.   And was the FBI at that time devoting considerable

 4    resources to that investigation?

 5    A.   Yes, but -- the answer is yes.

 6              It was also a very sensitive investigation so we

 7    had to be very careful about how we discussed it internally

 8    and who was working on the case.   We wanted to make sure

 9    that nothing about the investigation leaked.

10    Q.   So let's get back to your call or interaction with

11    Mr. Priestap.

12              As best as you recall -- well, let me first --

13    before we do that, what did you do with the physical

14    materials?

15    A.   The physical materials I held on my desk in my office at

16    the moment -- for the moment.

17    Q.   Okay.   So at the time you interacted with Mr. Priestap

18    they were still with you?

19    A.   That's my recollection.   That's why I think it was a

20    phone call, because I still had the materials with me.

21    Q.   Okay.   So let's talk about the phone call.

22              What, if anything -- what was the gist of what you

23    told Mr. Priestap?

24    A.   So a couple of things.

25              So, first, I explained who Michael was, and I
```

1    identified him as Michael, as a partner at Perkins Coie.

2          And then I explained a little bit about Perkins

3    Coie, that they had -- it was a firm that I was familiar

4    with, and that there was at least one other partner there

5    with substantial national security -- with a substantial

6    national security background, a person named Todd Hinnen.

7    Q.  I'm sorry, Mr. Baker, just for the court reporter, how

8    do you spell Todd --

9    A.  H-I-N-E-N, I think.  I think there's -- that's the right

10   number of Ns.

11   Q.  Okay.  Sorry to interrupt.

12   A.  So Todd had been a Deputy Assistant Attorney General in

13   the Department of Justice's National Security Division, so a

14   pretty high-ranking national security official.  And then

15   for a period of time he was the head -- the acting head of

16   the National Security Division.  So a serious national

17   security lawyer who also worked for Perkins.

18          And then I explained -- yes.  So I explained -- I

19   explained that, and then I was explaining more about Michael

20   and, I think, who he was and his practice.

21   Q.  And what did you say in that regard?

22   A.  Well, I was trying to explain that Michael was -- in

23   essence, I was vouching for Michael because I was trying to

24   explain that Michael was a serious lawyer, a smart guy with

25   DOJ experience, with national security experience.  Somebody

1   who could under -- and with cyber experience; somebody who

2   could understand the importance and the validity of the

3   information that had been brought to him by the cyber

4   security experts.

5          So Michael was -- he wasn't a, you know, personal

6   injury lawyer.  He was somebody who could understand the

7   meaning of this cyber material.  And, therefore, when I

8   received it from him, him explaining to me that he took it

9   seriously made me take it seriously.  And so I was trying to

10  explain that to Priestap.

11  Q.  And what, if anything, did you tell Mr. Priestap about

12  other clients Mr. Sussmann might have had or anything in

13  that regard?

14  A.  I repeated to Mr. Priestap that Michael had said that he

15  was not there on behalf of any particular client, that he

16  was there as a citizen, as a -- essentially as a human

17  source of information, confidential human source.  That's

18  kind of how I thought about him.

19  Q.  Why did you want to share that piece with Mr. Priestap?

20  A.  Well, so that Bill would know -- so that Bill would know

21  who Michael was, and that Bill would be able to take

22  Michael, I think, as seriously as I took him.

23         And the other part of this was to tell Bill --

24  like I was quite concerned, after my discussion with

25  Michael, about us needing to move quickly to investigate

1    this material before the press published something about it,

2    and so I needed to explain to Bill, like, hey, this is

3    serious material from a serious guy, and we need to get

4    moving on it quickly if we're going to do something about

5    this.

6           So I was trying to imbue with him a sense of

7    seriousness and urgency.

8    Q.  I think you testified yesterday that by this time you

9    were at least generally aware that Mr. Sussmann represented

10   the DNC in connection with hacks; is that right?

11   A.  That's correct.

12   Q.  And what, if anything, did you say to Mr. Priestap about

13   that?

14   A.  I think I told him like, okay, this is who Michael is.

15   He's represented the Democratic party in the Russian hack

16   that we were also investigating and/or the Hillary Clinton

17   Campaign.  So just, again, to orient Bill to who Michael

18   was.  I mean, that's a serious credential in terms of being

19   a cyber security expert.

20          And then to explain:  But in this case he said

21   he's not appearing on behalf of them.  In this case he's

22   coming in as a good citizen.

23          So, you know, lawyers have clients.  They have

24   different clients, lots of clients sometimes, and -- but

25   this was not that situation.  Michael was doing this in a

1    different capacity.

2    Q.  So just to be clear, based on what Mr. Sussmann said

3    during the meeting, did you think he was there seeing you on

4    behalf of the DNC?

5    A.  No.

6    Q.  And just to be clear, when -- based on what he said in

7    the meeting, did you think he was there to see you on behalf

8    of the Hillary Clinton Campaign?

9    A.  No.

10   Q.  Why?

11   A.  Because he said he wasn't.  He said he was there on

12   behalf of -- in the text message that we have and also in

13   his statement to me, he said he was not there on behalf of

14   any client.

15   Q.  Okay.  So would it be fair to say you oriented

16   Mr. Priestap as to who Mr. Sussmann was?  Is that what you

17   were saying you were doing?

18   A.  Who Michael was and the importance and the urgency of

19   dealing with this material.

20   Q.  So after you did that, did you share with Mr. Priestap

21   more about the substance of the allegation?

22   A.  I described to Bill, yes, the substance of it, that this

23   was some type of surreptitious communications channel that

24   was somehow, perhaps, using this Spectrum Health node, if

25   you will, to try to obscure the communications.

```
 1              I explained to him about the TOR analogy, at

 2    least.  TOR was something that I was familiar with.  I

 3    wasn't sure if Bill was very familiar with it, so I think I

 4    explained a little bit about TOR to him, yes.

 5    Q.  Okay.

 6    A.  And then I also -- like, I wanted to get rid of this

 7    material as quickly as possible.  I hated having it on my

 8    desk because it was evidence of a crime, potentially, and

 9    it's certainly foreign intelligence information.  And so

10    being a lawyer and not an agent, I didn't want to have this

11    material any longer than I needed to.

12    Q.  And just so everyone is clear, as the assistant director

13    of the counterintelligence division, would Mr. Priestap be

14    an agent, a Special Agent?

15    A.  Yes.  He was a career FBI agent with many years of

16    experience.

17    Q.  Okay.  So not a lawyer?

18    A.  Does Bill have a -- Bill might have a law degree.  I

19    can't remember.

20    Q.  Okay.

21    A.  Some agents have law degrees.

22    Q.  Okay.

23    A.  But he was not serving in the capacity as a lawyer at

24    that time.

25    Q.  So he would have had a badge and a gun?
```

 1    A.  He had a badge and a gun.

 2    Q.  Okay.  Mr. Baker, presumably before testifying today and

 3    throughout the last months, have you had a chance to review

 4    records that have refreshed your recollection to these

 5    matters?

 6    A.  Yes.

 7    Q.  And do you recall at some point you were shown notes

 8    that were from a notebook of Mr. Priestap?

 9    A.  Yes.

10    Q.  In looking at those notes, when you did look at them,

11    did that help refresh your mind in terms of what happened on

12    that day, September 19th?

13    A.  Yes.  Yes.

14    Q.  If I could show you what's been marked as Government

15    Exhibit 243.  Do you recognize this?

16    A.  Yes, I do.

17    Q.  And what is it?

18    A.  Well, when I -- these are notes that I've seen

19    previously that were described to me as Bill Priestap's

20    notes.

21            MR. DeFILIPPIS:  Okay.  Your Honor, the government

22    offers Government Exhibit 243.

23            MR. BERKOWITZ:  No objection, subject to the

24    stipulation that we spoke about earlier.

25            THE COURT:  Government 243 is admitted.

1    Q.  Now, Mr. Baker, I know that -- I'm not going to ask you

2    to vouch for the fact that these are Mr. Priestap's notes,

3    but that's your understanding based on what others have told

4    you, right?

5    A.  Correct.

6    Q.  So why don't we just walk through these notes to see to

7    what extent they accord with your recollection of that

8    conversation with Mr. Priestap.

9         I also recognize it's not your handwriting so it

10   may not be easy for you to read.

11   A.  It's better than mine.

12   Q.  Would you just read to the jury the first part numbered

13   1 with the circle around it.

14   A.  Yes.  So it says "1," and then it says "Michael

15   Sussmann."  And then it goes up, and it looks like a "plus

16   Todd Hinnen" or Hinen.  And then back down to Michael's

17   line, it says, "Attorney, Perkins Coie," and then a dash,

18   "said not doing this for any client."

19   Q.  And let me just stop you there.  Does that accord or not

20   accord with your recollection of what you told Mr. Priestap

21   about the "not doing for any client" statement and when you

22   said it?  Does that accord with --

23   A.  That accords with what I told Mr. Priestap.

24   Q.  And the phrase "said not doing this for any client,"

25   again, does that accord with what you saw in the text

1    message and what you recall him repeating in the meeting?

2    A.  Yes.

3    Q.  Okay.  Continue.

4    A.  Then below that it says -- under "Michael" it says,

5    "represents DNC, Clinton Foundation, etc."

6    Q.  Now, just to stop you there.  Which part of your

7    testimony before does that reflect, if any?  In other words,

8    what is that?

9    A.  That was my recollection, that Michael had represented

10   the DNC.  It says "Clinton Foundation," but my recollection

11   was -- sitting here today, my recollection was that Michael

12   represented the Hillary Clinton Campaign, not the

13   Foundation.

14           But I may have said "Clinton Foundation," or Bill

15   may have misunderstood me or -- yes, so I can't explain

16   that.

17   Q.  Okay.  And just to be clear, when it says "represents

18   DNC, Clinton Foundation, etc.," do you understand that to

19   mean represents them here on September 19th or --

20   A.  No.

21   Q.  -- in other matters?

22   A.  No.  In other matters.

23           Again, I was trying to orient Bill with respect to

24   who Michael was and to establish his bona fides, his

25   credibility as a source.

1    Q.  Okay.  Continue.

2    A.  So below that it says, "Former DOJ officials."  And

3    that's a reference both to Michael, because I think I said

4    that Michael had been an attorney at DOJ, and that Todd also

5    was an attorney at DOJ or had been an attorney at DOJ.

6    Q.  And you were also a former DOJ, right?

7    A.  Correct.

8    Q.  Okay.  And then the next line, the next bullet, which

9    says "been approached"?

10   A.  "Been approached by prominent cyber people (academic or

11   Corp POCs)."

12   Q.  What did you understand that "Corp POCs" to mean?

13   A.  Some reference to corporation -- people who work for

14   corporations' points of contact.  "POC," I think that's a

15   reference to points of contact.

16   Q.  Now, Mr. Baker, in the text message that you received

17   the night before there was a portion of that message that

18   said --

19            MR. DeFILIPPIS:  I'm sorry, Ms. Arsenault, can we

20   bring up 1500, the text message.

21   Q.  So in the text message Mr. Sussmann said, "I'm coming on

22   my own - not on behalf of a client or company."

23            So when Mr. -- when you understood, from your

24   meeting, that Mr. Sussmann had received information or been

25   approached by academic or corporate POCs, did you understand

1   them to be his clients or not his clients?

2   A.  No, not his clients.  These were the cyber security

3   experts that he was in contact with, but not clients.

4   Q.  All right.  Returning back to Government Exhibit 243.

5           Now, to the right, sort of off to the side from

6   the "academic or corporate" -- I'm sorry, what is "POC"?

7   You might have said.

8   A.  I think it means point of contact.

9   Q.  Off to the right of that there's another little notation

10  there.  Just read that for us.

11  A.  It says, "People like:  Matt Blaze, Steve Bellovin

12  (ph)" -- I think he means phonetic; it means Bill is just

13  estimating, he's guessing, at the spelling -- "and Susan

14  Landau (ph)," again, phonetic, guessing at the spelling of

15  Susan's last name.

16  Q.  If you could just briefly remind the jury, how did they

17  come up in the conversation with Mr. Sussmann?

18  A.  My recollection is that Michael said the people he was

19  working with were people like this, like of high caliber;

20  highly respected academic people that I would probably know.

21  Q.  And did you understand that those were the people who

22  gathered the data, or you're just saying people like --

23  A.  People like that; not these people.  Specifically not

24  these people.  People like that, of that quality.

25  Q.  Turning to the lower section there beginning with the

1    "NYTs," what do we have there?

2    A.  So it says, "NYTs" -- which means *The New York Times* --

3    "Wash Post" -- the *Washington Post* -- "or WSJ" -- which

4    means *The Wall Street Journal* -- "on Friday."  So it was

5    sooner than I thought even.

6              Yes, so, to me, that means that -- I was telling

7    Bill that one of these organizations was going to publish

8    something as soon as Friday about these allegations.

9    Q.  To what extent did that affect your view of the urgency

10   of this information?

11   A.  Very urgent.  If we're going to do something, we need to

12   get going.

13   Q.  And, again, why is that?

14   A.  Because if this -- if they published some article, based

15   on my experience in the national security field for a long

16   time, the communicants, the people communicating with each

17   other, were going to switch to some other channel very

18   quickly.

19             And the communication streams on the Internet are

20   very ephemeral.  They disappear quickly.  And sometimes the

21   records exist for a period of time, and sometimes they

22   disappear very rapidly, especially if it involves

23   communications overseas.

24             And so it was going to be much, much harder, if

25   they switched their communications -- if the people

1    communicating with each other switched their communications

2    mode, it would be much, much harder for the Bureau to figure

3    out what was happening if they -- if the article is

4    published and they switched.

5    Q.   Mr. Baker, it sounds like -- were you operating under

6    the assumptions that this allegation could be true?  Was

7    that a part of your calculus here?

8    A.   Yes.

9    Q.   All right.  So below the part about the media there,

10   what do we have?

11   A.   Sort of off to the side it says, "Foreign power

12   contacting Trump org."  "Foreign power" means a foreign

13   government.  It could be a terrorist group also, but in this

14   context it means a foreign government or some part of a

15   foreign government.

16         So then it says -- same line basically -- "Secret

17   Trump org server that has had comms with Alfa-Bank Moscow."

18         And then below that it says, "(connected to

19   Kremlin)" and then it looks like a plus, "a hospital in U.S.

20   used as a" -- and then it just stops.  But below the

21   "hospital," it says "(Spectrum Health in MI?)", which I

22   think means in Michigan.

23         And below that, just to go back on the side just

24   to finish that sort of paragraph, if you will, "comm" --

25   C-O-M-M, which means communications -- "mode (TOR)," T-O-R.

1    Q.  The Spectrum Health piece, is that the entity you had

2    referenced early in your testimony as the organization, the

3    hospital?

4    A.  The hospital, some kind of an intermediary point between

5    Alfa-Bank and the Trump organization -- excuse me, Alfa-

6    Bank, the Trump organization, somehow through Spectrum

7    Health to make it harder for people like the FBI to figure

8    out what's going on.

9    Q.  And then "TOR."  I think you testified before you had

10   some general familiarity with TOR; is that correct?

11   A.  I was familiar with TOR from a series of other sensitive

12   investigations with the criminal division of the FBI.

13            And just while we're on the topic, if you drop

14   down to the very bottom line it says, "CID has a TOR

15   expert."  I think that was me telling Bill that there was an

16   expert in the criminal investigative division, CID.  This

17   guy was a genius with respect to TOR.  And so I was trying

18   to tell Bill, if we needed to investigate TOR in some way,

19   we had this guy to -- that we could rely on as well.

20   Q.  Okay.  And then finally, the next part of the text,

21   "Another article"?

22   A.  "Another article to come out later" -- I don't know what

23   that reference means, "approximately" maybe -- "(three to

24   four weeks) about Trump org contacting foreign nations."

25            So again, the same thing about the urgency of

1    this, that there was some other news organization that was

2    going to publish something relatively soon.

3              And, again, if I could just -- the FBI was already

4    conducting an investigation of alleged connections between

5    the Trump campaign and the Russians by this point in time,

6    and so that was a matter of great concern to all of us.  And

7    so these articles coming out revealing any part of what the

8    FBI might be doing in terms of investigate -- I'm sorry, not

9    what the FBI was doing -- what might be happening between

10   the Trump organization and Russia was of concern to me in

11   terms of the impact that it would have on the investigation

12   and our ability to conduct it without the other side knowing

13   what was happening.

14   Q.  Now, let's go back.  You said that you think you

15   probably had the materials still in your possession when you

16   spoke to Mr. Priestap?

17   A.  I think so, yes.

18   Q.  Okay.  And what, if anything -- so, again, best

19   estimate, recognizing it's six years ago, lengthier call

20   with Mr. Priestap?

21   A.  I don't think it was a lengthy call.  Maybe five, ten

22   minutes, something like that.

23   Q.  And after you spoke to Mr. Priestap, what did you do

24   with the materials?

25   A.  I believe that I asked Bill to send somebody to come get

1    this stuff because I wanted to get rid of it as quickly as
2    possible.
3    Q.  And do you know who came, or did somebody come?
4    A.  Somebody eventually came.  I can't remember specifically
5    who it was, but somebody eventually came, and relatively
6    quickly.
7    Q.  Other than Mr. Priestap on that day, did you tell anyone
8    else about the allegation?
9    A.  I believe that I told my senior leadership team in the
10   office of general counsel.
11   Q.  And in terms of how the office of general counsel was
12   structured, what title or position would the senior
13   leadership team have?  What was the structure?
14   A.  Again, it was me as the general counsel.  And I also
15   should say I also had the rank of assistant director, so I
16   was the same rank as Bill.
17          Anyway, the general counsel, and then below that
18   were -- at that point in time I think there were three
19   deputy general counsels:  one who was responsible for sort
20   of all of our criminal investigative matters and training;
21   another one who was responsible for all of our litigation
22   matters -- the FBI gets sued a lot, so we have a lot of
23   attorneys who deal with litigation -- and then there is a
24   third one who was responsible for national security and
25   cyber.

1       And then below that we had section chiefs and unit

2   chiefs and line attorneys and paralegals and a whole range

3   of other professional support staff.

4   Q.  And what was the name of your deputy for, I think you

5   said, national security and cyber?

6   A.  That was Trisha Anderson.

7   Q.  Did you view the allegations that Mr. Sussmann gave you

8   as falling within the national security and/or cyber areas?

9   A.  Yes.

10  Q.  Would you say it was one?  Both?  In other words, was --

11  A.  It was both.  It was both, which is why I had

12  reorganized that part of the office to encompass both of

13  those simultaneously.

14  Q.  Do you think you did speak to Mr. Anderson -- I'm sorry,

15  Ms. Anderson about this matter on that day?

16  A.  I believe so, yes.

17  Q.  And what, if anything, did you tell her?

18  A.  I believe I gave her a short summary of the matter and

19  also said that Michael had come to me not on behalf of any

20  particular client.

21  Q.  And with regard -- so you had told Mr. Priestap, you

22  testified, that statement "not on behalf of a client."  Why

23  is it that you also shared that with Ms. Anderson?

24  A.  Well, she was the main lawyer for Bill Priestap in terms

25  of day-to-day interactions.  National security and cyber

1   were her responsibilities.  So she handled

2   counterintelligence and cyber.  She also handled

3   counterterrorism and any other national security-related

4   matter.

5           But in any event, she was the main lawyer for Bill

6   on a day-to-day basis interacting with him.

7   Q.  You mentioned these deputies in the general counsel's

8   office.  What sort of regular meetings did you have with

9   your staff?  Did you have regular meetings?

10  A.  We had daily meetings.  For a period of time we had

11  twice-daily meetings with the senior staff.  Then we had

12  weekly meetings.  We had monthly meetings.  So I was meeting

13  with my team a lot.

14          But with the deputy general counsels and my chief

15  of staff and a couple of other folks, my special assistant,

16  we were meeting at least once a day and sometimes twice a

17  day.

18  Q.  Okay.  So that will be the deputies, your chief of

19  staff?

20  A.  Correct.

21  Q.  And where would those meetings occur?

22  A.  Usually in my conference room right across from my

23  office.

24  Q.  Did there come a time when you had the opportunity to

25  look at notes from what you understood to be Ms. Anderson's

1    notebook?

2    A.  Yes.

3    Q.  And if I could put on the screen for you what's been

4    premarked as Government's Exhibit 242.

5            Now, there were some redactions in the middle of

6    the page, but do you recognize this?

7    A.  I've seen these before, yes.

8    Q.  And are these the notes that you understood to be from

9    Ms. Anderson's notebook?

10   A.  Yes.

11           MR. DeFILIPPIS:  Your Honor, the government offers

12   Government Exhibit 242.

13           MR. BERKOWITZ:  No objection, subject to the

14   stipulation, Your Honor.

15           THE COURT:  So moved.

16   Q.  So, Mr. Baker, looking at these notes, just read for us

17   the top line.

18   A.  It says, "Deputies Mtg," which I think means meeting,

19   "9/16" -- I'm sorry, "9/19/16."

20   Q.  Deputies meeting.  From your vantage point, any idea

21   what that refers to?

22   A.  Yes.

23   Q.  What would that be?

24   A.  That was my daily meeting with my deputies.

25   Q.  The ones you referenced earlier?

874

1    A.  Yes, the deputy general counsels.

2    Q.  Now, let's say you had something sensitive on a national

3    security matter, a classified matter, and you needed to

4    discuss it with your deputy, Ms. Anderson.  Would you

5    typically do that at the deputies meeting?  Would you do it

6    after?  Would it depend?

7    A.  I had numerous interactions with Trisha throughout the

8    day, and so sometimes we met one on one, sometimes we met

9    with small groups, sometimes we met with the deputies.

10           I had -- as you can imagine, the FBI has a lot of

11   national security responsibilities; and so I was meeting

12   with her and talking with her on a frequent basis.

13           MR. DeFILIPPIS:  Ms. Arsenault, if we could just

14   show the full document to Mr. Baker and the jury just so

15   that we have the perspective.

16   Q.  So, Mr. Baker, the redactions on this document appear to

17   cover most of the page, but do you see how there's the

18   deputies meeting heading and a date, and then further down

19   on the page it looks like the writer wrote the date again?

20   A.  Yes.

21   Q.  And what is the date that the person wrote towards the

22   bottom of the page?

23   A.  Again, 9/19/16.

24           MR. DeFILIPPIS:  Okay.  And, Ms. Arsenault, if we

25   could just pull out the lower part.

1    Q.  Mr. Baker, just read for the jury the notes at the

2    bottom of that page, recognizing it's not your handwriting.

3    A.  Yes, "Sussmann" -- something, it looks like "meeting" --

4    "with Baker."

5            "No specific client but group of cyber academics

6    talked w/him about research.

7            "Article this Friday.  NYT, Wash" -- it looks

8    like -- I'm interpreting it as *Washington Post*, and then

9    something, and it fades out.

10   Q.  Okay.  Are those notes generally consistent or

11   inconsistent with what you recall from the meeting with

12   Mr. Sussmann?

13   A.  Yes.  Consistent, I'm sorry, consistent.

14   Q.  And how about with the text message you received the

15   night before the meeting?

16   A.  Consistent.

17   Q.  And then how about with what you told Mr. Priestap

18   shortly after your meeting with Mr. Sussmann?

19   A.  Consistent.

20           MR. BERKOWITZ:  Objection to the characterization.

21           THE COURT:  Sustained.

22   Q.  To what extent, Mr. Baker, do these notes reflect your

23   understanding of your meeting with Mr. Sussmann?

24   A.  I'm sorry, could you repeat that?

25   Q.  To what extent do these notes represent an accurate

1   summary of your meeting with Mr. Sussmann?

2   A.  Well, they're accurate on this one particular point for

3   sure and on the article point.  It doesn't go into great

4   detail about the other matters that were discussed.

5   Q.  Got it.

6   A.  It doesn't go into any detail about the matters that

7   were -- the other matters that were discussed.

8   Q.  And when you spoke to Ms. Anderson and Mr. -- with

9   Ms. Anderson, do you have a sense of whether your recounting

10   of the "no specific client" piece of it would have happened

11   at the beginning or the end of that conversation?

12   A.  I'm not sure.  I don't know.

13   Q.  Okay.  Now, who was your supervisory chain at the FBI?

14   In other words, who were your bosses?

15   A.  My boss was the deputy director, and then the director.

16   Q.  At this time who was the deputy director?

17   A.  Andy McCabe.

18   Q.  That's McCabe?

19   A.  McCabe, M-c-C-A-B-E.

20   Q.  And who was the director of the FBI at this time?

21   A.  At this point in time it was James Comey.

22   Q.  And what was the nature of your interactions with them

23   generally?  Did you speak to them often?

24   A.  Spoke -- when they were in town I spoke to them every

25   day, sometimes multiple times per day.

1    Q.  And were their offices on the same floor as yours?

2    A.  Same floor, just down the hallway a bit.

3    Q.  Okay.  Now, Mr. Baker, are you familiar with the concept

4    of a chain of custody?

5    A.  Yes.

6    Q.  What's a chain of custody?

7    A.  Chain of custody is a legal term that is intended to

8    describe how a piece of evidence has been handled from the

9    moment it came into the possession of the government until

10   the present moment.  So it's everybody who handled -- it's

11   everybody within the government who handled a piece of

12   evidence.

13          It's a list -- excuse me, it's a list of those

14   folks.

15   Q.  Do you recall whether there was a chain of custody done

16   here for these materials?

17   A.  Eventually, yes.

18   Q.  Okay.  And is it your best recollection that was like

19   the same day or a subsequent day?

20   A.  Sometime later, I believe.

21   Q.  Okay.  Let me show you what's been premarked as

22   Government Exhibit 282.  Do you recognize this?

23   A.  Yes, I do.

24   Q.  What is it?

25   A.  This is a chain of custody document that I signed and

1      other people signed after me.

2      Q.  Okay.  And this is already in evidence so it's on the

3      screen.

4           Mr. Baker, do you remember somebody coming to ask

5      you to fill out the chain of custody?

6      A.  Eventually, yes.

7      Q.  And tell us what you remember about that.

8      A.  Well, first, someone came and took those materials that

9      I described earlier and took them away.  I believe it was

10     either Bill Priestap or it may have been Pete Strzok, so

11     another high -- Bill's deputy.  One of those folks, I

12     believe, came and took the material.

13          Then later somebody came back to me with this

14     document to make sure that we had an accurate record of the

15     handling of this evidence.

16     Q.  And is that your signature there?

17     A.  My signature is in two places.  It's at the very top --

18     it's hard to read.  Thank you.

19          So "Initial Receipt, Signature of Seizing

20     Individual," meaning that I seized the material from someone

21     outside the government.  And that's my signature and my name

22     and so on, and the date, and approximate time that I seized

23     the material.

24     Q.  Mr. Baker, do you recall one way or the other whether

25     you told the person who came to ask you to sign this form

1    where you had gotten the materials?

2    A.  Sorry, could you repeat that?

3    Q.  Do you recall -- so someone came to ask you to sign this

4    form; is that right?

5    A.  That is correct.

6    Q.  Do you recall one way or the other whether you told that

7    person who had given you the materials?  Mr. Sussmann.

8    A.  I don't recall telling that person where the materials

9    had come from.

10   Q.  And do you recall one way or the other whether they

11   asked or didn't ask?

12   A.  I don't recall whether they asked or didn't ask.

13   Q.  Is it possible that you did not -- that you chose not to

14   reveal to that person who had given you the materials?

15   A.  Yes.

16   Q.  If that is what happened, why would you do that?

17   A.  Because, as I said earlier, this is a very sensitive

18   investigation, and if Michael was bringing me this very

19   sensitive information as a citizen, then at that point in

20   time I would -- I believe I thought of and would have

21   thought of Michael as a source for the FBI, somebody from

22   the public coming forward to give us that information.

23           And so, because of the sensitivity of it, I would

24   have wanted to protect his identity.  I wouldn't want

25   anybody to know who he was any more than absolutely had to.

 1          Protecting the identity of confidential human

 2     sources at the FBI is one of our most important priorities.

 3     Folks who are willing to help the FBI are critically

 4     important to our success in enforcing criminal law and

 5     protecting the country, and so we want to protect those

 6     folks very much.

 7          And so I would not have wanted to tell anybody who

 8     didn't have any need to know that information the identity

 9     of a person who had given me this type of material.  I had

10     already told the information to the head of the

11     counterintelligence division and, I believe, to Pete Strzok,

12     so I didn't think that I needed to expand that knowledge --

13     that circle of knowledge any more than had to be the case.

14     Q.  And when you said you might have thought of Mr. Sussmann

15     as a source, do you mean you thought of him as a signed-up

16     official FBI source or just someone providing information?

17     A.  No, not a signed-up source that we had a written

18     agreement with, but a person who had in their possession

19     very sensitive information that he was willing to give to

20     us.  That's a pretty important person to protect.

21     Q.  Now, if you had learned or known that Mr. Sussmann was a

22     lawyer coming for a client, would you have protected his

23     identity in that way?

24     A.  I don't think so.

25     Q.  And why is that?

1   A.  Well, because he'd be the lawyer representing somebody

2   whose identity he may or may not have disclosed.

3         So the person that he was representing, or

4   organization, or whatever it was, that would, to me, in my

5   mind, be the sensitive human source.  The lawyer wouldn't

6   be.  Because lawyers, as I said earlier, have lots of

7   clients, and people know they have lots of clients, and they

8   represent different clients in different matters over

9   different times to different people.

10  Q.  Mr. Baker, you testified earlier that your direct

11  reports, your bosses, were Mr. McCabe and Mr. Comey.  Do you

12  think you informed either Mr. McCabe or Mr. Comey of these

13  allegations after you learned about them?

14  A.  Yes.  I believe that I reported it to both of them.

15  Q.  And why is it that you'd report it up in that way?

16  A.  Because, again, the FBI was already conducting -- excuse

17  me, the FBI was already conducting an investigation of the

18  Trump/Russia matter.  Here was another piece of evidence

19  that had come to me about Trump and Russia.

20        And so it was very concerning, and it seemed very

21  time-sensitive, as Michael had described, with respect to

22  these reporters publishing something.  So it seemed to me of

23  great urgency and great seriousness that I would want to

24  make my bosses aware of this information.

25  Q.  Anything you recall about how -- first, do you think you

1    told both of them?  One of them?

2    A.  I think I told both of them.

3    Q.  Any recollection of how they responded or the general

4    tenor of their reaction?

5    A.  I think they were quite concerned about it also.

6         And just to state, for the record, Mr. Trump at

7    the time was a candidate for the office of President of the

8    United States, and so the FBI is investigating allegations

9    related to his potential interactions and those of his --

10   people on his campaign with the government of the Russian

11   Federation.  So that was of high, high importance to the FBI

12   at this time.

13   Q.  Let me show you what's been premarked as Government

14   Exhibit 285.

15        Is this an email sent by you to Mr. Comey and

16   others at the FBI?

17   A.  Yes.

18        MR. DeFILIPPIS:  Your Honor, the government offers

19   Government Exhibit 285.

20        MR. BERKOWITZ:  No objection, Your Honor.

21        THE COURT:  So moved.

22   A.  If I could just be clear, there's two emails embedded

23   here, right?  So there's an email that I sent originally --

24   Q.  Yes.

25   A.  -- and then an email that Bill Priestap sends to me?

 1    Q.  Yes.

 2              Okay.  So looking at the first of those emails,

 3    could you just walk us through, Mr. Baker, the date and time

 4    of it, and then the people you've put in the "To" line

 5    there.

 6    A.  So in the original message, it's from me sent Thursday,

 7    September 22, 2016, at 11:14 a.m.

 8              Whoops.  Thank you.

 9              And I'm sending it to Director Comey, Deputy

10    Director McCabe; Bill Priestap; Mike Kortan, K-O-R-T-A-N;

11    Dave Bowdich.  And that's it.

12    Q.  And can you tell us what positions each -- if you

13    remember, what position each of those folks held?

14    A.  Mr. Comey was the Director.  Mr. McCabe was the Deputy

15    Director.  Bill Priestap was the Assistant Director for

16    Counterintelligence, "CD" as that's referenced there.  Mike

17    Kortan was the head of public affairs for the FBI, so the

18    person who engaged with the press.  And Dave Bowdich -- I

19    believe Dave at the time was the ADD, which is, what,

20    Associate Deputy Director?  I think that's right.

21    Q.  Okay.  So the date of this is what?  September 22nd?

22    A.  Yes.

23    Q.  So let me back up a little bit and ask you.  You

24    testified that on the 19th Mr. Sussmann mentioned there were

25    some news organizations who might be publishing an article,

1    correct?

2    A.  Yes.

3    Q.  What, if any, follow-up did you do on that issue?

4    A.  On the press issue?

5    Q.  Yes.

6    A.  A number of things.

7         So I had conversations initially about it with

8    Bill and then the other leaders that we just -- that we just

9    saw on the email chain.  And I don't remember who had the

10   idea, but the basic agreed-upon plan that we came up with

11   was:  Hey, Jim, you should go back to Michael and see if

12   he's willing to disclose the name of the reporter or

13   reporters, because we need more time.  This material is --

14   just the way it is, we're going to need more time to

15   investigate it; so we've got to see if we can go to the

16   press and ask them to hold off on publishing this article

17   for a period of time so that we can do some preliminary

18   investigation or some investigation, as I said earlier, in

19   order to figure out what was going on and before the people

20   who were communicating were aware that we might be

21   investigating it or that somebody might be investigating it.

22        And so we wanted to see -- so we needed to figure

23   out who the reporter was, and then to try to see if there

24   was a way to sort of ask them to hold off on the story.

25   Q.  So is that something that you were sort of given the

1    task to do, which is to go back to Mr. Sussmann?

2    A.  Yes.

3    Q.  And was that within a couple of days of the meeting with

4    Mr. Sussmann?

5    A.  I think it was very soon after the meeting with

6    Mr. Sussmann, yes, because of the urgency of getting to

7    the -- figuring out who the reporter was, setting up a

8    meeting, asking them to hold it.  We expected that they

9    would have to talk to their senior leadership in the news

10   organization.

11            This is something that is done from time to time.

12   In my experience, the government will ask the press to hold

13   off on publishing an article in order to give the government

14   some time to do any number of different things.  So it's not

15   common, but it's -- but it does happen.

16   Q.  And so did you call Mr. Sussmann?

17   A.  Yes.  That's my recollection.

18   Q.  Now, Mr. Baker, I'm going to show you something you've

19   never seen before, but I'll show you what's been marked as

20   Government Exhibit 1400.

21            And looking at this, Mr. Baker, just based on your

22   life experience, what is this?

23   A.  It looks like a bill from Verizon.

24   Q.  Okay.  And who is the listed party on the bill?

25   A.  It looks like it's Michael Sussmann.

1          MR. DeFILIPPIS:  Your Honor, subject to a

2     stipulation that will be entered between the parties, the

3     government offers Government Exhibit 1400.

4          MR. BERKOWITZ:  No objection.

5          THE COURT:  So moved.

6          MR. DeFILIPPIS:  And if I could direct us,

7     Ms. Arsenault, to the first page of billing records, to the

8     entry at the bottom of -- second to the bottom of that first

9     page.

10               (The following is a bench conference

11                held outside the hearing of the jury)

12          MR. BERKOWITZ:  Your Honor, I hadn't seen this

13     particular exhibit before.  While I have no objection to the

14     phone record, it contains Mr. Sussmann's home address and

15     his current phone number, and I think that those should be

16     redacted.

17          THE COURT:  Okay.  Can we conceal them for now?

18          MR. DeFILIPPIS:  Sure.

19          THE COURT:  Before we publish to the jury?

20          MR. DeFILIPPIS:  Yes, no problem.

21          MR. BERKOWITZ:  Thank you.

22               (This is the end of the bench conference)

23          MR. DeFILIPPIS:  Thank you, Your Honor, and just a

24     moment.

25          THE COURT:  How much longer do you have?

```
 1                  MR. DeFILIPPIS:  Your Honor, it will be quite a
 2      while.
 3                  THE COURT:  Well, whenever you get to a natural
 4      stopping point --
 5                  MR. DeFILIPPIS:  Okay.
 6                  THE COURT:  -- why don't we take our break?
 7                  MR. DeFILIPPIS:  Your Honor, if you'd like to do
 8      it now.
 9                  THE COURT:  Why don't we do it now.
10                  MR. DeFILIPPIS:  Yes.
11                  THE COURT:  Ladies and gentlemen, we're going to
12      take our morning break for about 15 minutes.  I have 10:40.
13      So at about five minutes to 11:00 come back ready to go.
14                  And Juror No. 5, if you could just stay back,
15      please.
16                  Again, no discussions about the case, no research
17      about the case, no social media concerning the case.  Okay?
18                  (Jury exits courtroom)
19                  THE COURT:  All right, ma'am.  We received your
20      note, and I've shared it with counsel.  And I understand
21      that you've recently realized that your daughter and
22      Mr. Sussmann's daughter are on the same crew team; is that
23      correct?
24                  JUROR NO. 5:  Yes.
25                  THE COURT:  And you were not aware of that
```

1    information when you filled out your questionnaire?

2           JUROR NO. 5:  No, certainly not.  This is quite

3    surprising.

4           THE COURT:  And you were not aware of it when we

5    spoke at the bench here on Monday?

6           JUROR NO. 5:  No, sir.

7           THE COURT:  All right.  Okay.  Had you known about

8    that connection either when you filled out your

9    questionnaire or when we spoke on Monday, would your answers

10   have been any different to the questionnaire; particularly

11   those questions related to your ability to be fair as well

12   as those questions about any concern about others' reaction

13   to what your verdict may be in this case?

14          JUROR NO. 5:  No.  Obviously I would have

15   disclosed it had I known; but no, my answers are not --

16          THE COURT:  And you feel that way sitting here

17   today?

18          JUROR NO. 5:  Yes, I do.

19          THE COURT:  All right.  And do you know

20   Mr. Sussmann's daughter?

21          JUROR NO. 5:  I do not.  I believe she's a year or

22   two behind my daughter.  My daughter's a senior, so...

23          THE COURT:  Do you know Mr. Sussmann or his wife

24   or any other members of his family?

25          JUROR NO. 5:  No.  Obviously, when my daughter

1    mentioned it, I thought -- I talked to other crew parents.

2    I don't recall certainly meeting Mr. Sussmann, and I don't

3    recall meeting anybody else by that name on the crew team.

4              THE COURT:  Okay.  Counsel?

5              MS. SHAW:  Thank you, Your Honor.  Brittain Shaw

6    on behalf of the United States.

7              I believe, Your Honor, we would request that she

8    be excused.  I think this would be a very difficult

9    situation.

10             THE COURT:  Why don't we do that outside the

11   presence of the juror.

12             Any voir dire questions?

13             MS. SHAW:  In terms of your daughter's

14   relationship with Mr. Sussmann's daughter, do they also have

15   classes together?  Is that your understanding?

16             JUROR NO. 5:  I don't know.  I'm afraid this is

17   the first time she's ever mentioned it, and I don't actually

18   know his daughter's name.  She just mentioned, "Oh, a girl

19   on my crew team is -- her father is involved in this case,"

20   obviously not understanding the connection.

21             I believe she's a few years behind, but, you know,

22   it's a small crew team so she obviously would know her from

23   that.  I would doubt they would have classes together being

24   a senior and a few years earlier.

25             MS. SHAW:  And about how many girls or young women

1   are on the crew team?

2          JUROR NO. 5:  Between 30 and 40, I think.  I

3   should know that.

4          MS. SHAW:  Is it the practice of these parents to

5   go to these crew events?

6          JUROR NO. 5:  Yes.

7          MS. SHAW:  And do they sort of organize pre and

8   post gatherings for the team?

9          JUROR NO. 5:  Yes.  And actually, I should mention

10  my daughter is a coxswain, and she's one of the three

11  captains, one of the three senior captains, so I've had a

12  bit of a role this year, although less than the other

13  captains, in organizing things like, you know, the food and

14  things for the regattas and crew dinners and things.

15         I've never had a crew dinner at my house.  I

16  haven't met, you know, all the girls.  But of course I would

17  have seen the girls at the races.

18         MS. SHAW:  And just so we're clear, in addition to

19  being the captain, she's the coxswain.  And that's the

20  person that's in the boat with the other seven, or is it

21  eight, rowers?

22         JUROR NO. 5:  Fours and eights.  And I would say I

23  don't know if she's in a boat with Mr. Sussmann's daughter.

24  She's usually in a boat with other seniors, but I think she

25  has been coxswain for some of the younger girls.  But I

```
 1          don't know.

 2                    MS. SHAW:  Okay.

 3                    Thank you.

 4                    JUROR NO. 5:  Thank you.

 5                    MR. BERKOWITZ:  Hello.  I just want to make sure

 6          you haven't discussed the case with your daughter.

 7                    JUROR NO. 5:  No, I have not.  So I was -- when

 8          she mentioned it, I was, like, oh, that's interesting.

 9          Obviously I didn't say anything to her either way about

10          whether I am or am not on the jury.

11                    MR. BERKOWITZ:  Okay.

12                    THE COURT:  Have you discussed the case with

13          anybody else?

14                    JUROR NO. 5:  No, I have not.  You know, I just

15          told my family I can't say what it's about.

16                    THE COURT:  Okay.  So obviously our objective is

17          to have jurors who are fair and impartial.  Is there

18          anything at all about the connection that would make you

19          feel uncomfortable continuing as a juror in this case or to

20          question your ability to be impartial and to follow all of

21          the Court's instructions?

22                    JUROR NO. 5:  No, sir.  I mean, I certainly was

23          taken aback when she mentioned it, but no, I don't believe

24          that would affect my ability to be...

25                    THE COURT:  Okay.
```

```
1              (Juror exits courtroom)

2              THE COURT:  All right.  Let's take our break, and

3    I'll think about it.

4              (Recess taken)

5              THE COURTROOM DEPUTY:  Court is back in session.

6              THE COURT:  All right.  Please be seated,

7    everybody.

8              MS. SHAW:  Thank you, Your Honor.  Brittain Shaw

9    for the United States.

10             With respect to the juror, I just wanted to make

11   our record with respect to that.

12             As Your Honor noted, that if she had known this

13   when she was filling out the questionnaire, it certainly

14   would have been something that she would have included, and

15   the government would have moved to strike her for cause; and

16   if we had not succeeded on that, we would have exercised one

17   of our peremptories.

18             And I have no reason to doubt that she's being

19   truthful and would try to be fair to the best of her

20   ability, but, you know, anyone that's been a parent knows

21   that you can't really separate, you know, what might be best

22   for your child from your -- sort of how you think through

23   things, and we believe it could weigh on her.  And so our

24   position would be that she should not be -- she should not

25   stay on the jury.
```

1             THE COURT:  Okay.  Mr. Berkowitz?

2             MR. BERKOWITZ:  A couple of things, Your Honor.

3             First of all, on repeated questioning by both you

4    and of her own volition she said she can be fair and

5    impartial.  She raised the issue, which I thought was very

6    conscientious of her to do.  She didn't hide it.  At the

7    time she filled out her application, she noted it.

8             She has not met Mr. Sussmann.  She doesn't know

9    the daughter.  And, you know, there's no reason that she

10   can't sit as a fair and impartial juror.

11            Now, we obviously -- we'll leave it at that, Your

12   Honor.

13            THE COURT:  Okay.  The Court will deny the

14   government's motion to unseat Juror 5 for the reasons

15   Mr. Berkowitz noted.  The connection is not so close that I

16   think it necessarily affects her impartiality.  She

17   obviously did not know the connection, unfortunately, when

18   she filled out her questionnaire.  The fact that she brought

19   the connection voluntarily to the Court's attention as soon

20   as she learned it shows that she is conscientious and takes

21   her obligations as a juror seriously.  And she reiterated

22   quite confidently that she could continue to be fair and

23   that the connection would not affect or cause any concerns

24   about the reaction to any verdict that she might render.

25            And just for the record, the daughters are on the

1    same team, but they are not friends.  They are three years

2    apart.  The team is fairly large, upwards of 40 members, and

3    they are three years apart.  And as a senior, she is

4    probably out of there anyway.

5              So for all those reasons, the Court will keep

6    Juror 5.

7              All right.

8              (Jury enters courtroom)

9              THE COURT:  You can get Mr. Baker.

10             All right.  Welcome back, sir.

11             THE WITNESS:  Thank you, Judge.

12   BY MR. DeFILIPPIS:

13   Q.  Okay.  Mr. Baker, before the break I think we were

14   talking about -- first, you testified that you believe you

15   called Mr. Sussmann in connection with this decision to

16   reach out to him about the potential media article; is that

17   right?

18   A.  Yes.

19   Q.  And we were looking at Government Exhibit 1400.

20             MR. DeFILIPPIS:  And, Ms. Arsenault, if we could

21   bring up Page 93 of Government Exhibit 1400.

22   Q.  Now, Mr. Baker, recognizing you've never seen these

23   records before --

24             MR. DeFILIPPIS:  But, Ms. Arsenault, could we

25   highlight the second call from the bottom of that page.

1    Q.   Now, Mr. Baker, there's a phone number on this record,

2    which is 202-324-6825.  Is that number familiar to you?

3    A.   Yes.

4    Q.   And what number do you understand that to be?

5    A.   To the best of my recollection, that was the phone

6    number that was on my desk.

7    Q.   At the FBI?

8    A.   At the FBI.

9    Q.   And is there any particular pattern, if you remember,

10   that FBI phone numbers follow at FBI headquarters?

11   A.   Well, 202 is the D.C. area code, generally speaking; and

12   324 is generally the FBI headquarters prefix, I guess you

13   would say.

14   Q.   Okay.

15   A.   And 68 -- there were several 68 numbers that were

16   associated with the office of general counsel, to the best

17   of my recollection.

18   Q.   So looking at these phone records here, the date of the

19   call is what?

20   A.   The date of the call is 9/21.

21   Q.   The time?

22   A.   3:34 p.m.

23   Q.   And then we have the number you referenced, which is

24   your desk at the FBI?

25   A.   Yes.

1   Q.  And then, if you go further over to the right a few

2   columns, do you see where it says "Incoming Calls"?

3   A.  Yes.

4   Q.  Okay.  Now, Mr. Baker, does that accord generally with

5   around the time period when you might have spoken to

6   Mr. Sussmann about the issue we were just discussing?

7   A.  Yes.

8   Q.  Now, what's your recollection of what it is that you

9   said to Mr. Sussmann when you called him?

10  A.  The point of this phone call was to ask Michael the

11  identity of the reporter that he had referenced in the

12  meeting with me so that we could ask the reporter to slow

13  down on publishing the article.

14  Q.  And do you recall what he said when you made that

15  request?

16  A.  To the best of my recollection, he said he had to -- he

17  had to get back to me; that he couldn't answer that question

18  on the spot; that he would have to check with somebody

19  before he could get back to me.

20  Q.  And for the jury's benefit, again, what's the point of

21  trying to find out who the reporter is, from the FBI's

22  perspective?

23  A.  So that we could reach out to them directly and ask them

24  to delay publication of this article for some period of time

25  so that the FBI could do some investigation of this alleged

1   secret surreptitious communications channel.

2   Q.  Now, let's bring us back to Government Exhibit 1500,

3   which is your text message chain with Mr. Sussmann.

4          MR. DeFILIPPIS:  And, Ms. Arsenault, if we could

5   go to the page following the one that we've been focusing

6   on.

7          Next page.

8          Sorry, go further ahead.

9          Next page.

10          Okay.

11   BY MR. DeFILIPPIS:

12   Q.  So, Mr. Baker, if we look at the first message that

13   appears to have been sent on September 21st of 2016, again,

14   looking at the top of the page here, does this appear to be

15   a continuation of your exchanges with Mr. Sussmann?

16   A.  Yes.

17   Q.  Michael?

18   A.  Yes.

19   Q.  So just read for the jury the message that appears to

20   have been sent on September 21, 2016, at 10:07 p.m.

21   A.  It says, "Jim, sorry I have been unable to respond

22   sooner.  Travel and persons availability were not ideal this

23   afternoon and this evening.  I am working on your request

24   and expect to have an answer for you by 9:00 a.m. tomorrow -

25   and I'm hoping for a positive response."

1    Q.  Okay.  Now, just to remind ourselves, the phone record

2    that we had just looked at was a call that occurred at 3:34

3    p.m. on that same date, September 21st.  Do you recall that,

4    Mr. Baker?

5    A.  Yes.

6    Q.  And then this is Mr. Sussmann texting you into that

7    night at 10:07 p.m.?

8    A.  Yes.

9    Q.  So generally, what did you understand Mr. Sussmann to be

10   conveying to you?

11   A.  That he was working hard to respond to my request about

12   the identity of the reporter, but that he hadn't been able

13   to contact the people he needed to contact yet, and he would

14   get back to me, but it seemed like everything was going in

15   the direction that we had hoped -- we at the FBI had hoped

16   for, meaning I understood this to be optimistic about the

17   possibility of us getting the identity of that reporter.

18   Q.  Okay.  So when he said "I have been unable to respond

19   sooner," did that refer to the call earlier in the day in

20   which you had asked him for the identity of the reporter?

21   A.  That's what I think I concluded, yes.

22   Q.  And when he said "travel and persons availability were

23   not ideal this afternoon and evening," what did you

24   understand him to mean?

25   A.  I mean, Michael's a busy guy.  He might have been

1    traveling.  I didn't know.

2              And then he needed to talk -- my understanding was

3    from our prior conversation, he needed to talk to the cyber

4    security experts to run by them the idea of us learning the

5    identity -- "us" being the FBI -- learning the identity of

6    the reporter.

7    Q.  And when he said "travel and persons," what did

8    "persons" mean in your mind?

9    A.  In my mind it meant the cyber security experts that he

10   had referenced in the first conversation with me.

11   Q.  In your mind, did you think that "persons" referred to a

12   client or clients?

13   A.  No.

14   Q.  At any time between when you met with Mr. Sussmann and

15   this text exchange, did Mr. Sussmann tell you he had a

16   client or clients?

17   A.  No.

18   Q.  And in the phone call you had with Mr. Sussmann before

19   this exchange, did he mention something about a client or

20   clients?

21   A.  No.

22   Q.  So on September -- it looks like there are no further

23   text exchanges on that day; is that right?

24   A.  That looks like -- yes, that looks correct.

25   Q.  Mr. Baker, you must be an early riser.  There's a

1   message September 22nd at 4:37 a.m.  Do you see that one?

2   A.  Yes.  I probably was asleep by the time he sent the text

3   the night before, so I saw it first thing in the morning

4   when I woke up the next day.

5   Q.  Okay.  Why do you get up so early?

6   A.  To go running on a regular basis to deal with the stress

7   of being general counsel of the FBI.

8   Q.  Okay.  So September 22nd, if I could direct your

9   attention back to those Verizon records.

10               MR. DeFILIPPIS:  And, Ms. Arsenault, if we could

11   go to Page 94 of those records.

12   Q.  Now, I want to direct your attention first, Mr. Baker,

13   to a call that looks like it occurred on that same date,

14   September 22nd at 10:28 a.m.  Do you see that call?

15   A.  Yes, I do.

16   Q.  And is that -- so the number there is 202-324-6829,

17   which is one digit off from the prior number we saw, 6825.

18   Any recollection of the 6829 number?

19   A.  To the best of my recollection, that was the main number

20   for the office of general counsel.

21   Q.  Okay.

22   A.  So it's very likely that my executive assistant would

23   have answered that call.

24   Q.  And what was the time of that call?

25   A.  The time of day?

1    Q.   Yes.

2    A.   Yes, 10:28 a.m.

3    Q.   Okay.  And what is the duration of that call?

4    A.   Four minutes.

5    Q.   All right.  So 10:28 a.m. for four minutes.  Does that

6    accord with your recollection that you spoke to Mr. Sussmann

7    the day after receiving his text the night before that he

8    had been unable to respond sooner?

9    A.   Yes.

10   Q.   And tell us what you remember happening there.

11   A.   To the best of my recollection, I believe in this phone

12   call he conveyed to me the name of the reporter.

13   Q.   And is it possible that -- did he -- okay.  Let's go

14   back to Government Exhibit 1500.

15          So there is a text message that occurs, it looks

16   like, at 10:34 a.m., which would be a few minutes after that

17   10:28 a.m. call.

18   A.   Okay.

19   Q.   Do you see that there?

20   A.   Yes, I do.

21   Q.   And that text message says, "Yes, I can tell you.  I

22   called your office.  Call me when you can."

23   A.   Yes, okay.

24   Q.   In looking at the text message in comparison to the toll

25   records, does that refresh your recollection as to the

1    sequence?

2    A.  Yes.  I was wrong what I said a minute ago.  I think

3    it -- I think Michael called my office, probably spoke to my

4    executive assistant.  She probably took a message, and then

5    I think he also texted me roughly at the same time.

6    Q.  And when he said, "Yes, I can tell you," what is that

7    referring to in your mind?

8    A.  That he could tell me the identity of the reporter.

9    Q.  And in your recollection, did he eventually tell you the

10   identity of the reporter?

11   A.  Yes, he did.

12   Q.  If we can go back to the toll records, Page 94 of

13   Government Exhibit 1400.

14           And it looks like -- Mr. Baker, do you see where

15   there was a call at 11:05 a.m.?

16   A.  Yes.  Yes.

17   Q.  And that's to -- are we now back to your desk number,

18   what you think might have been your desk number?

19   A.  That's correct.

20   Q.  And how long is that call?

21   A.  That call was only two minutes.

22   Q.  And is that an incoming call?  Is that a call from you

23   to Mr. Sussmann, given that it's incoming on his billing

24   records?

25   A.  That's what it looks like.

1    Q.  So does that accord with your recollection that after

2    receiving this text message at some point you called

3    Mr. Sussmann?

4    A.  Yes.  Because also, when I just picked up the phone at

5    my desk and pushed the button, the 6825 number is my

6    recollection of what would be the number I would be calling

7    from.

8    Q.  Okay.  So are you fairly certain, then, that you spoke

9    to Mr. Sussmann on the 22nd about the issue of this media

10   report?

11   A.  Yes.

12   Q.  And when you spoke to him, and he revealed the identity

13   of the reporter, what did he say, and who was it?

14   A.  It was Eric Lichtblau from *The New York Times*.

15   Q.  Anything else you recall him saying?

16   A.  Not in that conversation.  It was maybe some

17   pleasantries at the start, but that was about it.

18          It was a short conversation where he conveyed the

19   information, and I thanked him.

20   Q.  So what did the FBI -- you and your colleagues -- decide

21   to do once you knew who the reporter was?

22   A.  So then I think, as we saw from the email before, I

23   notified folks in the leadership of the FBI about the

24   identity of the reporter, and then, I believe, Michael

25   Kortan, being the head of public affairs, is the one who

1    then reached out to either Eric or others from *The New York*

2    *Times* -- I'm not sure exactly who Kortan reached out to --

3    to get in touch with Eric Lichtblau.

4    Q.  Now, let me just back up and be clear.  In either of

5    those phone calls, or any of the phone calls you had with

6    Mr. Sussmann on the 21st or the 22nd, did he mention to you

7    that he had a client or clients?

8    A.  No.

9    Q.  And when you then relayed back to the FBI who the

10   reporter was, did you have any understanding in your mind

11   that Mr. Sussmann was working with a client or clients?

12   A.  No.

13   Q.  How many total meetings did the FBI have -- you said --

14   did a meeting go forward with Mr. Lichtblau?

15   A.  Yes.

16   Q.  How many total meetings were there, as best as you

17   remember?

18   A.  As best as I remember, there were two separate meetings.

19   Q.  So let me show you what's been marked as Government

20   Exhibit 285.

21        Is this an email from Mr. Priestap to you?

22   A.  It's an email from Priestap to me with this other email

23   from earlier embedded within it.

24        MR. DeFILIPPIS:  Okay.  Your Honor, the government

25   offers Government Exhibit 285.

```
 1                    THE COURTROOM DEPUTY:  It's already in.

 2                    MR. BERKOWITZ:  No objection.

 3                    THE COURT:  I think it's already in, Counsel.

 4                    MR. DeFILIPPIS:  Oh, okay.  I'm sorry.

 5    Q.  Mr. Baker -- I'm sorry, we put this in earlier.

 6                    So could you remind the jury, Mr. Comey was what

 7    position at the FBI?

 8    A.  He was the Director.

 9    Q.  And I think you testified earlier that Mr. Priestap was

10    the Director of Counterintelligence?

11    A.  Assistant Director for Counterintelligence.

12    Q.  And Mr. Kortan?

13    A.  He was Assistant Director for Public Affairs.

14    Q.  And then finally, Mr. McCabe you said was the Deputy

15    Director?

16    A.  Correct.

17    Q.  And how about Mr. Bowdich?

18    A.  I think his title was Associate Deputy Director at this

19    time.

20    Q.  Now, Mr. Baker, can you read for the jury the text of

21    that email which was sent on September 22nd by you?

22    A.  The one by me?

23    Q.  Uh-huh.

24    A.  It says, "The reporter on the matter we discussed is

25    Eric Lichtblau from The New York Times.  He is shooting for
```

1    Sunday, but may not have all of the details wrapped up by

2    that time.

3              "He has been informed that we might call.  Perhaps

4    we can discuss for a few minutes at the prep for Andy at

5    noon.

6              "Thanks.

7              "Jim."

8    Q.  Okay.  So when you said "he's shooting for Sunday, but

9    may not have all the details wrapped up by that time," what

10   did you mean?

11   A.  Well, that he, Eric Lichtblau, was shooting to publish

12   this article about Alfa-Bank on Sunday, but may not have had

13   all the details wrapped up by that Sunday, so it may get

14   delayed even beyond that point.

15   Q.  As best as you recall, what were you basing that on?

16   Where did you learn that?

17   A.  The only place I could have learned that would have been

18   from Michael.

19   Q.  And do you think it was on one of those calls in which

20   he revealed -- the call in which he revealed the identity of

21   Mr. Lichtblau?

22   A.  My guess is in that two-minute phone call, yes.

23   Q.  You then say, "He has been informed that we might call.

24   Perhaps we can discuss for a few minutes at the prep for

25   Andy at noon."

1          By "he" there, he had been informed, did you mean

2     Lichtblau?

3     A.  Yes.

4     Q.  And when you say "the prep for Andy at noon," what does

5     that mean?

6     A.  We must have been -- this group of people that I was

7     sending this email to must have been meeting with Andy

8     McCabe, the Deputy Director, at noon to prepare him for some

9     other meeting, which I don't remember what it was; you know,

10    like a pre-meeting to get ready for another meeting.

11    Q.  All right.  And then now let's turn to the reply that

12    Mr. Priestap sends.  It looks like he sends that about an

13    hour later; is that right?

14    A.  That's correct.

15    Q.  And he only copies you?

16    A.  Yes.

17    Q.  And just read for the jury the text of that email.

18    A.  "Jim.  Sorry, but I just now saw this email.  I will

19    call you this afternoon.  Thx, Bill."

20    Q.  And do you remember one way or the other whether you

21    spoke to Mr. Priestap that afternoon?

22    A.  I don't remember.

23    Q.  But in any event, did a meeting with Mr. Lichtblau go

24    forward?

25    A.  Yes.

1    Q.  Let me show you what's been marked Government Exhibit

2    286.

3             Is this an email chain that ends with an email

4    from Mr. Kortan to Mr. Priestap and you?

5    A.  Let's see.  Oh, at the top?  Yes, from Kortan to

6    Priestap and me, yes.

7             MR. DeFILIPPIS:  All right.  The government offers

8    Exhibit 286.

9             MR. BERKOWITZ:  No objection.

10             THE COURT:  So moved.

11    Q.  Let us start at the bottom of this email chain, which is

12    an email from Mr. Lichtblau to Mr. Kortan.

13    A.  Uh-huh.

14    Q.  So explain to the jury, Mr. Kortan had a public affairs

15    role; is that right?

16    A.  That's correct.

17    Q.  What does someone in his position do in their day-to-day

18    job?

19    A.  His job was to act on behalf of the FBI with respect to

20    all of our public matters.  This included interacting with

21    the press, responding to press inquiries, reaching out to

22    the press.

23             When there's an FBI TV show that people want to

24    interact with the FBI on, the producers or whatever, Mike

25    handles all that.  And, you know, he interacts with other

1    public affairs officials at the Department of Justice,

2    elsewhere in the government, if there's some issue involving

3    multiple agencies.

4              So -- yes.

5    Q.  Okay.  And so is he the principal one who would interact

6    directly with reporters on a matter like this?

7    A.  That's correct.

8    Q.  Mr. Lichtblau writes to Mr. Kortan, and you're not

9    copied.  Right?

10   A.  That's correct.

11   Q.  And he says, "you know what time we're meeting?"

12   A.  Yes.

13   Q.  So looking at that, does that accord with approximately

14   when you think the first meeting with Mr. Lichtblau might

15   have happened?

16   A.  Approximately, yes.

17   Q.  And then Mr. Kortan writes back, "Don't, but I know

18   Baker's tied up until later this afternoon.  Priestap says

19   he'll know more from his people this afternoon as well."

20              So planning for the meeting?

21   A.  It looks like it, yes.

22   Q.  And then Mr. Lichtblau sends another email, and it looks

23   like they set up a tentative time, and then -- of 3:00 p.m.?

24   A.  It looks that way, yes.

25   Q.  And what does Mr. Lichtblau say below there?

1    A.  "Also planning to bring Steve Myers, another reporter in

2    D.C. who's our Russo" -- I think meaning Russian -- "expert

3    (he just wrote a book on Putin, which he'd be happy to

4    autograph while he's there)."

5    Q.  Okay.  Did you get an autograph?

6    A.  No.

7    Q.  All right.  Then finally, the email from Mr. Kortan to

8    Mr. Priestap and you, and that's at 12:09 p.m., so a little

9    after noon.

10   A.  Yes.

11   Q.  What does Mr. Kortan say?

12   A.  "FYI.......  Not sure where we are investigatively, but

13   do we want to bring him by for some kind of recap later

14   today?"

15   Q.  What did you understand Mr. Kortan to be asking?

16   A.  It's a little bit unclear, frankly, but I think do we

17   still want -- Mike was checking in with Bill and me to see

18   if we still wanted to have this meeting with Eric Lichtblau

19   to ask him to hold off and slow down on this article.

20   Q.  Okay.  So you testified earlier there were a total of

21   two meetings with Mr. Lichtblau, right?

22   A.  Correct.

23   Q.  And were they close in time?  Days apart?

24   A.  There was some gap in between them.  I don't remember

25   how much.

1    Q.  All right.  So let's turn to the first meeting that you

2    recall.  Where did that meeting happen?

3    A.  That happened in my conference room.

4    Q.  And from the FBI side, who was there?

5    A.  To the best of my recollection, it was me, Bill

6    Priestap, Mike Kortan.

7    Q.  And from the media side, who was that?

8    A.  I think it was Eric Lichtblau, and I believe it was

9    Steve Myers.

10   Q.  Before that meeting had you ever met Mr. Lichtblau or

11   Mr. Myers?

12   A.  I don't think I'd ever met Mr. Myers before.  I believe

13   I -- somehow I knew who Eric was.  I don't remember -- I

14   think I had met him before.

15          I'm sorry, yes.  I had met him before.

16   Q.  Okay.  And were you guys in any sense friends or...?

17   A.  We had had interactions with each other, and I remember,

18   like, our kids played at the same basketball arena for like

19   one season or something like that, or he was playing

20   basketball at the same arena like in Maryland where my kid's

21   team was also playing, and I would see him occasionally

22   there.

23   Q.  From the FBI's perspective going into that meeting, what

24   was the goal?

25   A.  The goal was to ask them to continue to hold off on

1    publishing the article for some period of time so that we

2    could continue to investigate.

3    Q.  So tell us what you remember about what the Bureau said

4    and what Mr. Lichtblau and Mr. Myers said?

5    A.  I mean, to the best of my recollection, it was

6    straightforward in that regard.  We were asking them to slow

7    down, and then we just -- so we're asking them to slow down.

8             We discussed the substance of the cyber security

9    information that both sides had.  And then there was a

10   significant amount of probing from *The New York Times* of the

11   FBI to try to find out more about what we were investigating

12   with respect to Russia.

13   Q.  Okay.  And how did the discussions end?  What was the

14   outcome?

15   A.  I don't remember if it was in that meeting or shortly

16   thereafter, but *The New York Times* agreed to continue to

17   hold off on publishing an article, I think in part because

18   they also weren't just ready yet.

19            We were trying to move as quickly as we could, and

20   they weren't quite ready or as ready as I initially thought

21   with respect to publishing it, so it worked out basically

22   from both sides.

23            MR. BERKOWITZ:  Objection; foundation, Judge.  If

24   we could get what they said?

25            THE COURT:  Why don't you take him through it a

1    little more slowly.

2              MR. DeFILIPPIS:  Sure.

3    Q.  Mr. Baker, as best as you recall, recognizing it's a

4    long time ago, what did the FBI say to Mr. Lichtblau and

5    Mr. Myers to attempt to persuade them to not run the story?

6    A.  That we had this material, that we were taking it

7    seriously, that it was technical in nature, that it was

8    complicated, and that we needed more time to investigate

9    whether, in fact, there was a surreptitious communications

10   channel between Alfa-Bank and some part of the Trump

11   organization.

12   Q.  And did they react in any way or give you an initial

13   view?

14   A.  Their initial view was that they were open to that

15   request.

16             MR. BERKOWITZ:  Objection; again, foundation.  Who

17   said what?

18             THE COURT:  I'll overrule it.

19   Q.  Mr. Baker, let me just ask you before you answer that

20   question, who was speaking primarily for the FBI, if you

21   remember?

22   A.  Primarily -- my recollection is it was primarily Bill

23   Priestap.

24   Q.  Okay.  And who primarily, if anyone, was speaking for

25   *The New York Times*?

1    A.  Eric Lichtblau.

2    Q.  And did Mr. Myers chime in, or was he more silent, if

3    you remember?

4    A.  He chimed in occasionally, but Eric was the one who

5    spoke the most.

6    Q.  Okay.  So when you were just describing what *The New*

7    *York Times* reaction was, was that probably Mr. Lichtblau?

8    A.  That was Mr. Lichtblau.

9    Q.  And, I'm sorry, just continue in what you recall him

10   saying.

11   A.  My recollection is that he was trying to understand how

12   serious -- how seriously we were taking this allegation, I

13   guess you would say, and the extent to which we thought

14   there was some type of nefarious activity between the Trump

15   organization and Russia.

16        So he was asking us a series of probing questions,

17   most of which we rebuffed because we didn't want to disclose

18   really what it was that we were up to.  So I think he was

19   fairly -- he was frustrated, to some degree, with the

20   conversation.  That's my recollection.

21   Q.  And when you testified earlier that you were in some

22   sense comparing -- I forget the phrase used -- comparing

23   notes or comparing information with what you had versus what

24   they had, do you remember anything more specific about what

25   they said they'd had and what you said you had?

1    A.  To the best of my recollection, I think that they --

2    that they weren't quite persuaded yet either about the

3    veracity -- I don't want to say "the veracity" -- about

4    whether this material actually showed that there was the

5    existence of a surreptitious communications channel.  They

6    weren't yet convinced and were not yet ready to publish and

7    were doing additional resource -- research, I'm sorry, to

8    test the material, to validate the material, to make sure

9    that they understood the material.

10   Q.  And what, if anything, did you and Mr. Priestap or

11   others say about the FBI's view of that matter?  Did you

12   give them any specifics?

13   A.  Well, the -- yes.  That we were still working on it, and

14   that it was -- as I said earlier, it was complicated and

15   taking more time.  And we needed more time, I'm sorry.  We

16   needed more time to investigate it fully.

17   Q.  Now, stepping aside for a minute, in your job as FBI

18   director -- sorry, FBI General Counsel, did you become

19   familiar with reporters and deal with reporters on occasion?

20   A.  Yes.

21   Q.  And did you get experience with how national security

22   reporters gather information and the sort of factors that go

23   into stories they write?

24   A.  To some degree, yes.

25   Q.  Okay.  And, again, you're not an expert on the media,

1    but did you sort of get a feel for those things?

2    A.  Yes.

3    Q.  And in your experience observing reporters and their

4    interactions with the FBI, to what extent does an FBI

5    investigation sometimes affect whether a reporter publishes

6    a story or not?

7    A.  Sometimes if the FBI requests -- FBI or other elements

8    of the U.S. government, if they request the reporter to hold

9    off on a report, they will do it.  Sometimes you can ask for

10   them to not say certain specific things, and they will do

11   it.

12            And I was aware, from prior experience, that

13   Mr. Lichtblau had been involved in such discussions with

14   high levels of the U.S. government on another matter some

15   number of years before, so I knew that at least in that

16   instance he, I believe, is my recollection -- he or *The New*

17   *York Times* -- had agreed to not publish something.

18   Q.  Are you aware of any occasions where the investigation

19   of something by the FBI has the opposite effect, where it

20   prompts a news story?

21   A.  Well, if reporters learn that we are investigating

22   something and it's of interest to them, then yes, they will

23   sometimes publish things for sure.

24   Q.  Okay.  So at this meeting with Mr. Lichtblau and

25   Mr. Myers and you and Priestap, is there anything else you

1    recall specifically about what was said or any commitments

2    that were made?

3    A.  I think the commitment was that we would continue to do

4    our work, and that we might meet with him again, depending

5    upon what we found.

6             Can I just back --

7    Q.  Sure.

8    A.  To answer your question, your prior question more fully.

9             There's also a concern at the FBI that I

10   encountered in other situations where we would be worried

11   that sometimes reporters would want to report about the fact

12   that the FBI was investigating something, even if they

13   didn't have confidence in the underlying information and

14   themselves didn't want to report it.  So, in other words,

15   they might be investigating something they were unsure about

16   whether they had enough information to report about it, but

17   what they could report, if they could find it out, is that

18   the FBI was investigating a particular allegation or set of

19   allegations.

20            So they're not reporting necessarily directly

21   about the thing.  They're reporting about the FBI

22   investigating about the thing.  And if they had confidence

23   in that part of the story, they might publish some element

24   of that whole story.

25            Does that make sense?

1    Q.  Yes.  So are you saying, Mr. Baker, that the reporters

2    sometimes see the fact of an FBI investigation as a reason

3    to write a story on something they otherwise might not?

4              MR. BERKOWITZ:  Objection, Your Honor; leading.

5              THE COURT:  Rephrase.

6    Q.  Mr. Baker, in your experience, to what extent do

7    reporters sometimes publish things because the FBI is

8    looking at it, even if they wouldn't otherwise do a story on

9    it?

10   A.  In my experience, sometimes they do that; and also, the

11   FBI's very worried about them doing that.

12   Q.  Okay.  So that was the first meeting.  I think you

13   testified that either at the meeting or sometime fairly

14   shortly thereafter they agreed not to go with the story at

15   that point?

16   A.  Correct.

17   Q.  The second meeting, what is it you remember about that

18   meeting?

19   A.  It was the same people who attended.  It also took place

20   in the same location, my conference room.  And it was us --

21   to the best of my recollection, it was us informing them

22   that the Bureau had concluded that the materials that we had

23   obtained from Mr. Sussmann, as augmented or amplified by

24   whatever investigative activity the Bureau undertook, did

25   not substantiate that there was a surreptitious

1    communications channel between Alfa-Bank and some part of

2    the Trump organization.

3    Q.  And just so we're clear, that was the Bureau's

4    conclusion at that time?

5    A.  That's what we concluded.

6    Q.  And so what happened at the meeting?

7            MR. BERKOWITZ:  And, Judge, objection; foundation.

8    Date?

9            MR. DeFILIPPIS:  I'll rephrase it, Your Honor.

10           THE COURT:  Date of the meeting.

11   Q.  Mr. Baker, do you recall on what specific date this

12   second meeting happened?

13   A.  No.

14   Q.  And what's your best recollection of how close in time

15   it was to the first one, recognizing this is years ago?

16   A.  Relatively close, within -- it wasn't days, I don't

17   think.  It was more like a week or maybe two weeks,

18   something like that.

19   Q.  Okay.  And by that time the FBI's view of this

20   information was what?

21   A.  The FBI's view of the information at that point in

22   time -- excuse me.

23           The FBI's view of the information at that point in

24   time was that the data that we had from the cyber security

25   researchers that Mr. Sussmann had given me, plus whatever

1    investigative steps we were able to undertake, did not

2    reveal that there was some type of surreptitious

3    communications channel between Alfa-Bank and the Trump

4    organization.  We concluded there was no substance.

5           We couldn't confirm it, I guess, is the most

6    accurate way to say it.  We could not confirm that there was

7    a surreptitious communication channel.

8    Q.  As the FBI General Counsel, was it your -- did it fall

9    within your responsibilities to oversee investigations day-

10   to-day?

11   A.  The Office of General Counsel has an oversight

12   responsibility with respect to FBI investigations to make

13   sure that they're following the law and the Attorney General

14   guidelines and statutes and so on.

15          But day-to-day, we're not running cases.  We're

16   not deciding what leads to follow and who should be

17   responsible for obtaining what evidence, that type of thing.

18   That's what the agents in the field will do or the agents at

19   headquarters.

20          But it's the FBI agents that are running the

21   investigations with legal advice and oversight from my

22   office, my former office.

23   Q.  In the Alfa-Bank-related matters, did you -- were you

24   involved day-to-day in the weeds of the investigation?

25   A.  No.

1    Q.  What was the nature of any information or updates you

2    received on it?  Frequency?  Level of detail?

3    A.  To the best of my recollection, I just got summary --

4    meaning relatively short -- updates from Bill Priestap.

5    Possibly from Pete Strzok also, but I think mainly from Bill

6    Priestap.

7    Q.  I think you had mentioned Mr. Priestap before.  What was

8    Mr. Strzok's position?

9    A.  He was a Deputy Assistant Director, so he was one of

10   Bill Priestap's direct reports.

11   Q.  Okay.  And for the court reporter, is that S-T-R-Z-O-K?

12   A.  I think that's right, yes.

13   Q.  Okay.  So after that second meeting with *The New York*

14   *Times*, did an article eventually come out?  Do you know one

15   way or the other?

16   A.  I think an article eventually came out.

17   Q.  What, if anything, do you remember about that?

18   A.  Not much.  The only thing I can remember is that it -- I

19   really -- to be honest, I can't remember much about the

20   article.  I think they were also not able to -- I shouldn't

21   say any more.

22          I can't exactly remember what the article

23   concluded.

24   Q.  Okay.  Now, we were talking about the investigation.  Do

25   you know whether the FBI opened formally an investigation of

1     the Alfa-Bank matter?

2     A.  Opened like a particular file on the Alfa-Bank matter?

3     Q.  Yes.

4     A.  I don't know whether we opened a particular file number

5     on the Alfa-Bank matter.

6     Q.  But was it your understanding that somebody was looking

7     at it?

8     A.  Absolutely.

9     Q.  Okay.  And moving forward in time, by the time that that

10    was all concluded, by the time all the investigative steps

11    had been taken, do you know about how long that was?  Was it

12    weeks?  Months?

13    A.  I think it was a couple of -- I mean, several weeks.

14    Maybe a month, maybe a month and a half.

15    Q.  Okay.  And then are you -- at the FBI, do you have a

16    formal sort of case file system that logs evidence or

17    documents relating to cases?

18    A.  Yes.

19    Q.  And would you know, as the FBI General Counsel, when the

20    investigation was actually formally closed in that system?

21    Would you have any idea one way or the other?

22    A.  Not in this case I didn't.

23    Q.  Okay.  And last you heard of the investigation, at the

24    end of the steps that the FBI took, what was your

25    understanding of the final conclusion?

1    A.  That there was nothing there.

2    Q.  So let's go back to Government Exhibit 1500.

3            So, Mr. Baker, if you'll recall the meeting with

4    Mr. Lichtblau, the emails about meeting that day were

5    September 26th of 2016, right?

6    A.  I have to rely on the record.  I don't remember off the

7    top of my head.

8    Q.  Assume, for the argument, that it's the 26th.

9    A.  Okay.

10   Q.  We have --

11           MR. DeFILIPPIS:  If we go to the next page, and

12   then the one after that.

13   Q.  Okay.  So do you see a text message from Mr. Sussmann on

14   September 28, 2016?

15   A.  Yes.

16   Q.  At 6:19 p.m.?

17   A.  Yes.

18   Q.  And just what does that message say?

19   A.  It says, "Jim - I suspect a story may go live tomorrow.

20   Since the reporter started going to experts and then the

21   subjects, looks like rumors of a big story are trickling out

22   and I think that will force the media outlet's hand.  I have

23   no actual knowledge of the reporter's timetable so I'm

24   reading tea leaves but that's what it looks like to me."

25   Q.  So when Mr. Sussmann said -- let me ask you:  By this

1    point had Mr. Sussmann described to you or mentioned to you

2    any client or clients he was working with?

3    A.  No.

4    Q.  And so when he referred to "since the reporter started

5    going to experts and then the subjects," who did you

6    understand the subjects to be?

7    A.  I understood that to mean -- going to experts and then

8    the subjects.

9          Ah, it could be -- so the experts, I think, meant

10   the cyber experts.  Could be other experts, too.

11         But then the subjects, I believe that means the

12   Trump organization and Alfa-Bank.  That's -- in FBI

13   parlance, we would consider them to be the subjects of the

14   investigation, and so I think Michael would have been

15   referring to them.

16   Q.  And when he then says, "looks like rumors of a big story

17   are trickling out and I think that will force the media

18   outlet's hand," what did you mean -- what did you understand

19   that to mean?

20   A.  The way I understood that was that other news

21   organizations, other than *The New York Times*, had some part

22   of the story.  And news organizations, being very

23   competitive with each other, don't want to get scooped, and

24   so that puts pressure on them to put the story out quickly.

25   Q.  Where Mr. Sussmann says, "I have no actual knowledge of

1    the reporter's timetable so I'm reading tea leaves but

2    that's what it looks like to me," what did you think he

3    meant?

4    A.  I understood that to mean that he wasn't talking to Eric

5    Lichtblau directly, but he was getting this through some

6    other mechanism.

7    Q.  At this time did you have a sense from Mr. Sussmann,

8    from your calls or any other communications, of whether he

9    had given these materials to Mr. Lichtblau?  Did you know

10   one way or the other?

11   A.  I didn't know.  At the end of the day I didn't know one

12   way or the other.

13   Q.  And as best as you remember, did Mr. Sussmann ever say,

14   "I gave these materials to Mr. Lichtblau"?

15   A.  I don't think he ever said that.

16   Q.  So you respond, it looks like on that same day, "Ok.

17   Thanks."

18           And then we have another text message two days

19   later, September 30, 2016.

20           Between those two days, do you recall anything of

21   note between you and Mr. Sussmann, or no?

22   A.  Not that I can recall, no.

23   Q.  And then what does the text message say on September

24   30th?

25   A.  "Jim, I hear that another organization has a related

1  story - facts seem muddled - but sounds like it's coming out

2  tomorrow."

3  Q.  What, if anything, do you recall doing upon getting that

4  text message?

5  A.  I'm not sure.  I'm not sure.  I may have passed that

6  information on to Bill Priestap and Mike Kortan.

7  Q.  Okay.  Mr. Baker, when did you leave the FBI?

8  A.  I left the FBI in May of 2018.

9  Q.  Okay.  And in connection -- before you left the FBI, in

10  connection with your role as FBI General Counsel, I think

11  you've testified you accessed a lot of classified

12  information; is that right?

13  A.  Yes.

14  Q.  And you had security clearances and everything?

15  A.  Yes.

16  Q.  Now, in connection with all of that, in your experience

17  does classified information sometimes make its way to news

18  organizations or those outside the FBI?

19  A.  Yes.

20  Q.  And did you -- as being part of the FBI's leadership,

21  were there occasions when you would learn that classified

22  information had leaked?

23  A.  In the sense -- leak in the sense of an unauthorized

24  disclosure?

25  Q.  Yes.

1   A.  Yes.

2   Q.  And when a leak happens, what does the FBI typically do

3   to sort of get to the bottom of it, if anything?

4   A.  Well, sometimes the FBI will initiate a leak

5   investigation -- I'm sorry.

6        Sometimes the FBI will initiate a leak

7   investigation on its own, and sometimes it will wait until

8   it receives what's called a referral from another part of

9   the government.  So, in other words, if the information that

10  was unauthorized to be disclosed was generated by some part

11  of the government -- let's say the CIA -- the FBI might wait

12  to get a referral from the CIA saying, "Hey, this

13  information is classified, it's obviously leaked, and we

14  request that you investigate."

15  Q.  So in your role as FBI General Counsel, were there

16  occasions when you were interviewed in connection with

17  suspected leaks of classified information?

18  A.  Yes.

19  Q.  And for people who are at the top levels of the FBI with

20  access to lots of classified information, is that a fairly

21  common occurrence?

22  A.  Well, I was investigated and questioned many times, yes.

23  Q.  And for certain classified information, are there

24  specific rules that limit the distribution of it to an

25  actual list of people?  Have you encountered that?

1    A.   Yes.   Sometimes that happens.

2    Q.   And so when a leak investigation occurs of something

3    that's gone to people it shouldn't, how do investigators

4    sometimes get to the bottom of where the leak might have

5    come from?

6    A.   You start with the people who had access to the

7    information.   It's sort of like working out in a set of

8    concentric circles.   Who had access to the information that

9    was leaked; and then, of those people, who might have spoken

10   to the press.   Were there any phone records or emails or any

11   type of information that might reveal who was speaking to

12   the press.

13              And then the Bureau will go out and interview

14   people in a variety of different ways to try to figure out

15   who it was that was responsible for a particular

16   unauthorized disclosure.

17   Q.   So did -- have there been occasions when you've been

18   interviewed in situations like that?

19   A.   Yes.

20   Q.   And when you were interviewed, did you reveal what you

21   knew about -- if you knew anything about whether information

22   had been disclosed?

23   A.   I answered whatever questions the agents were asking me

24   as truthfully as I possibly could.

25   Q.   And was there a particular occasion or occasions where

1   you were a focus of the investigation in terms of where the

2   government was investigating whether you might have been the

3   one to disclose the information?

4   A.   Yes.

5   Q.   And was there anything like that in the 2018 time period

6   when you were preparing to depart the Bureau?

7   A.   Yes.

8   Q.   And without getting into any classified information

9   whatsoever or any particular news outlets, tell us just

10  briefly what the nature of that investigation was.

11  A.   The nature of that investigation, as I understood it,

12  was that -- was an investigation into whether I had been

13  involved in an unauthorized disclosure of classified

14  information.

15  Q.   And had you, in fact, spoken with a reporter in that

16  investigation?

17  A.   Prior to the investigation, yes.

18  Q.   Okay.  And what was -- again, without getting into any

19  classified information, did there come a time when you

20  disclosed something to a reporter about internal government

21  business?

22  A.   Yes.  I was in a conversation with a reporter and

23  Mr. Kortan on a telephone call during which I made an

24  authorized disclosure of information that I understood at

25  the time to no longer be classified.

```
1    Q.  Got it.  And in your mind, who had authorized you to
2    disclose that information?
3    A.  The director of the FBI, the office of the director of
4    national intelligence, including the director of national
5    intelligence.
6    Q.  And, again, without getting into the information, was
7    it -- what was the estimation --
8              THE COURT:  Hold on, Counsel.
9    Q.  -- of those people as you understood it in terms of --
10             THE COURT:  Quick conference.
11             MR. DeFILIPPIS:  Sure.
12             (The following is a bench conference
13              held outside the hearing of the jury)
14
15
16
17
18
19
20
21
22
23
24
25
```

931





17          (This is the end of the bench conference)

18   BY MR. DeFILIPPIS:

19   Q.  Sorry for the pause there, Mr. Baker.  And we'll come

20   back to the topic we've been discussing, but let me now

21   return you back to Government Exhibit 1500.

22          Now, Mr. Baker, when you left the FBI, did you

23   stay in contact with Mr. Sussmann?

24   A.  Yes.

25   Q.  And so at that time would you say you were friends?

1   Colleagues?  Something in between?

2   A.  Both.

3   Q.  And I want to direct your attention -- if we go a few

4   pages forward -- to September 30th.

5           MR. DeFILIPPIS:  I'm sorry, next page.

6   Q.  So, Mr. Baker, it looks like this is September 19th, but

7   it's two years later.  That's 2018; is that right?

8   A.  Yes.

9   Q.  And what does that message say?

10  A.  You want me to read the top message?

11  Q.  Yes.

12  A.  It says, "Jim FYI New Yorker story pushed back one week.

13  Will go live next Sunday.  Great seeing you this week.

14  We'll be back in touch soon.  Michael."

15  Q.  Okay.  So during the 2018 time period -- now, by this

16  date do you know whether you left the Bureau or not?

17  A.  I had left the Bureau.  I had left the Bureau in May of

18  2018.

19  Q.  And is it fair to assume, from reading this, that you

20  had interacted with Mr. Sussmann in some way?

21  A.  Yes.

22  Q.  Do you recall what that was, or not?

23  A.  To the best of my recollection, it was me talking about

24  possibly going to work at Michael's law firm.

25  Q.  Okay.  And what was the name of his law firm?

1     A.   Perkins Coie.

2     Q.   How did it come to be that you started to talk with

3     Mr. Sussmann about going to work there?

4     A.   To the best of my recollection, I think it was Michael's

5     idea.  I mean, Michael knew that I had left the Bureau, and

6     I was looking around for a job -- I had a job at the time,

7     so I was working -- I was working at the time, but I was

8     looking around at other jobs and -- including law firms.

9     And so somehow he became aware of that and inquired about

10    whether I would be interested in working at Perkins Coie.

11         That's the best of my recollection.

12    Q.   So when you reply at 9:41 a.m., which looks like it's

13    the next day, you say, "Thanks.  Great to see you as well.

14    Looking forward to continuing the conversation."

15         What did "continuing the conversation" refer to?

16    A.   Continuing the conversation about possibly working with

17    him.

18    Q.   So what happened with your effort -- now, let me ask you

19    first:  Were you looking at jobs at other places, too, or

20    was it just Perkins Coie?

21    A.   I was looking for jobs in numerous places, both at law

22    firms and in-house positions with companies.

23    Q.   And how did it go with respect to your efforts to

24    potentially get a job at Perkins Coie?

25    A.   Well, eventually Michael worked it out that I ended up

1    having interviews there.  I went in and spent some

2    significant part of the day meeting a number of different

3    folks -- meeting with Michael and meeting with a number of

4    different folks at the law firm.

5    Q.  And after you met with those folks, did they make you a

6    job offer?

7    A.  They never made me a job offer.

8    Q.  Did they give you a rejection letter?

9    A.  There was some confusion at one point in time.  I was

10   working with a headhunter to try to find a job, and she had

11   received a communication from Perkins Coie saying that they

12   had, for lack of a better word, rejected me.  And then I

13   told Michael about that.

14          And he's like, whoa, whoa, that's -- that doesn't

15   make sense, based on what he knew.  And so he went and got

16   it sorted out and figured out that that -- there had been a

17   miscommunication inside the firm or with the headhunter.

18   And so that was reversed, basically.  And so it was still --

19   the way I understood it, it was still possible.  They were

20   still considering whether they would make me a job offer.

21          But then eventually I got a different job and took

22   that.

23   Q.  And where was that job?

24   A.  That job was at something called the R Street -- the

25   letter R -- Street Institute.  It's a think tank, a center/

1    right think tank here in Washington, D.C.

2    Q.  And just to sort of -- you say you currently work at

3    Twitter?

4    A.  That's correct.

5    Q.  Where did you work in between the R Street Institute and

6    Twitter?

7    A.  In between the R Street Institute and Twitter -- well,

8    in addition to the R Street -- I worked at the R Street

9    Institute, I eventually worked at CNN also as a legal

10   analyst, and then I went from those two positions to

11   Twitter.

12   Q.  Got it.

13         So with regard to the offer at Perkins Coie, did

14   it just -- you never got an offer, but you never got a

15   rejection?

16   A.  At the end of the day, yes.

17   Q.  Do you know about how long the interview process and

18   formal part of the process took?

19   A.  Well, I think -- looking back at Exhibit 1500 and the

20   date of September 29th, I think I was roughly having initial

21   conversations with Michael during this time period, Michael

22   and others at the firm.  And then I got my job with the R

23   Street Institute in early December of 2018.

24         So it was during that time period that we were

25   having those conversations.

1    Q.  And at the end of the day, when you didn't get the job

2    offer from Perkins Coie, did that cause you to have negative

3    feelings in any way towards Mr. Sussmann?

4    A.  No.

5    Q.  Why was that?

6    A.  Because I thought that Michael was an ally for me inside

7    the firm.  He was the person sort of leading the effort to

8    try to get me to work there and had -- what would you call

9    it? -- shepherded me around when I was doing my interviews;

10   met me when I arrived, talked to me at the end of it, as

11   best I can recall.

12   Q.  And with regard to the firm more generally, did the

13   process give you any negative resentful feelings towards

14   anybody at the firm or the firm generally?

15   A.  No, not at all.

16   Q.  All right.  Let's continue along the text chain here

17   with Mr. Sussmann.

18           It looks like on October 8th of 2018 -- so a

19   little bit after the prior message -- Mr. Sussmann sent you,

20   it looks like, a New Yorker link.  Any recollection of what

21   that was?

22   A.  I believe it was a reference -- I believe it was an

23   article having to do with the Alfa-Bank matter.  I don't

24   specifically recall it, but it had to do with Alfa-Bank or

25   Russia or something along those lines.

1    Q.  Okay.  And then, if we go to the next page, there's the

2    text message.  There's a picture that sort of carries over.

3              In this text message Mr. Sussmann appears to have

4    sent you a picture of some kind.  What do you understand

5    that to be?

6    A.  Well, it says "Protesters outside of our Bellevue, WA

7    office..."

8              Yes, and it's a photograph of protesters holding a

9    sign that says -- do you want me to read it?

10   Q.  If you can.

11   A.  Okay.  "Sussmann, Baker, and Steele, Perkins Coie

12   D'Etat.  End British coup on Trump."

13             And then something below I can't read.

14   Q.  Okay.  Did you or do you have any idea what that means?

15   A.  Yes.

16   Q.  And what is that?

17   A.  I think -- could you show me the date again, if you

18   don't mind?

19             THE COURT:  Mr. DeFilippis.

20   A.  October 10.

21             (The following is a bench conference

22              held outside the hearing of the jury)

23             MR. BERKOWITZ:  I feel like this is becoming

24   regular.  I apologize, Your Honor.  I'd just note that the

25   name Steele is on there.  I don't know what he intends to

1    elicit, but I want to be cautious given the Court's ruling.

2              MR. DeFILIPPIS:  Your Honor, I don't intend to

3    elicit anything about that.  I don't know that he'll comment

4    on it, but I don't intend to elicit anything specific about

5    that.

6              THE COURT:  Okay.  Very well.

7              (This is the end of the bench conference)

8    BY MR. DeFILIPPIS:

9    Q.  Okay.  Sorry, Mr. Baker.  What, generally speaking, did

10   you understand this to be?

11   A.  Generally speaking, I understood it to be a photograph

12   taken by someone outside of Perkins Coie's office in

13   Bellevue, Washington, protesting that Michael and I and

14   others were involved in some type of coup with respect to

15   Donald Trump.

16   Q.  Were you involved in any coup against Donald Trump?

17   A.  No.

18   Q.  And why is it that he was sending this to you?  Was it

19   just commiserating as a friend?  Something else?

20   A.  Partly that, I believe, yes.  Partly also, at some

21   point in time in this -- I believe in October of 2018 -- I

22   testified -- well, it was an interview.

23              So I was interviewed on the record by two

24   committees of the U.S. House of Representatives regarding

25   the FBI's investigation of Russia and Mr. Trump.  And during

1    the course of that interview, Mr. Sussmann's name came up,

2    and facts related to the matters we've been discussing

3    today, the Alfa-Bank/Trump connection, came up; and I was

4    answering a series of questions about that.

5              And I believe that someone disclosed that

6    information, that I had talked about that during the --

7    during the interview, and that that became the source of

8    press articles, and that there was a -- among other things,

9    I was being highly criticized for having had this meeting in

10   the first place with Mr. Sussmann, and that somehow that

11   made me part of a coup.  It made me a traitor to the

12   country, and that people thought I should be hanged.

13   Q.  Mr. Baker, just to back up a little bit, you mentioned

14   Congressional testimony, Congressional inquiries.  Can you

15   explain to the jury why or in what context at that time

16   Congress was looking into something that would have involved

17   you?  In other words, what was the background for that?

18   A.  There were multiple committees of Congress.  I think in

19   this particular instance it was the Judiciary Committee and

20   the House Government Oversight and Reform Committee.  HGOR?

21   Anyway...  Plus, the Senate Intelligence Committee was also

22   looking at it.

23              They were investigating the FBI's investigation of

24   Donald Trump and his connection and the campaign's

25   connection to Russia.

1   Q.  So -- and I don't want to put words in your mouth, but

2   Congress was looking into the FBI's activities during that

3   investigation; is that --

4   A.  They were investigating the investigators.

5   Q.  Okay.  And in that regard, if you look back at

6   Government Exhibit 1500, there's -- Mr. Sussmann sends you

7   some kind of protest literature pamphlet and said, "And

8   here's the pamphlet they're handing out"?

9   A.  Yes.

10  Q.  Did you understand that to be more of the sort of

11  sending you things that were coming out of these public

12  issues?

13  A.  Yes, that Michael was keeping an eye on these things as

14  well and sending me updates.

15  Q.  Okay.

16          MR. DeFILIPPIS:  If we go to the next page of the

17  text exchange.

18  Q.  Mr. Sussmann appears to send you a news article of some

19  kind or an opinion article, and then another article.

20          Can you just explain to the jury what you

21  understand those to be.

22  A.  So these are *Wall Street Journal* -- it looks like it's

23  from the *Wall Street Journal* "Opinion" section, and I

24  believe -- I can't read it very well on the screen here.  I

25  believe the first one, "Who Is Michael Sussmann?" is highly

1    critical of Michael, and so he's sending that to me.

2    Q.   And when you received these articles, to the best that

3    you recall, did you read them in detail?  Did you read them

4    at all?

5    A.   I don't -- I think I skimmed them, but I don't recall

6    reading them in any detail, no.

7    Q.   And the first article, to what extent did it criticize

8    Michael for his meeting with you?  Was that a subject of the

9    article?

10   A.   I think that was the general tenor of these discussions,

11   that Michael was being criticized for meeting with me, that

12   he was somehow a traitor, that -- and a coup plotter, that I

13   was a coup plotter and a traitor; again, all of which is

14   false.  And then we were both being attacked for sort of

15   related but different reasons with respect to the meeting

16   that we had that is the subject of the discussion we've been

17   having to today.

18   Q.   All right.  And let's go to the next page where one of

19   those articles, the second one, appears to be magnified to

20   some degree.

21           Can you see, Mr. Baker, that that editorial there

22   is titled "Our Michael Sussmann is an Honorable Man"?

23   A.   Yes.

24   Q.   And then it's signed -- it's a letter of some sort

25   signed by John Devaney, managing partner of Perkins Coie,

1   LLP?

2   A.  Yes.

3   Q.  What do you understand that was?

4   A.  I think this was their -- I think this was the response

5   of John Devaney to the prior opinion piece that we just saw

6   a moment ago asking about who is Michael Sussmann.

7   Q.  Did you read -- again, as to this article, did you, when

8   you got it, read it and -- did you read it in detail?

9   A.  I don't recall reading it in detail, no.

10  Q.  So there's a paragraph at the end there that's a bit

11  difficult to read, but I think it says, "In addition and as

12  Perkins Coie has previously publicly stated, Mr. Sussmann's

13  meeting with the FBI general counsel, James Baker, was on

14  behalf of a client with no connections to either the Clinton

15  campaign, the DNC or any other Political Law Group client."

16          Do you think you read or focused on that paragraph

17  when you received this?

18  A.  To the best of my recollection sitting here today, I do

19  not remember reading that paragraph at the time that Michael

20  sent it to me.

21  Q.  And where it says in the end of that article or, sorry,

22  that letter there, "was on behalf of a client with no

23  connections to either the Clinton campaign, the DNC or any

24  other Political Law Group client," you don't remember

25  reading that specific line?

1    A.   Again, sitting here today, to the best of my

2    recollection, I don't remember reading that at the time.

3    Q.   And between your meeting with Mr. Sussmann in 2016 and

4    his sending of this article to you in 2018, to the best of

5    your recollection did Mr. Sussmann ever change his assertion

6    to you that he was not representing a client?

7    A.   No.

8    Q.   Just below that screenshot there's a message from

9    Mr. Sussmann that says, "Hope your Day 2 went well.  Here is

10   John Devaney's letter to the editor.  Let's talk next week

11   about the future."

12           Any idea what "Day 2" meant?

13   A.   So I believe this was the second interview I was having

14   with the two House committees members and staff.

15   Q.   And is that the Congressional matter that you've

16   described before that was looking into the FBI's conduct on

17   the Trump-related matters?

18   A.   Yes.

19   Q.   And so you had two total days of testimony?

20   A.   It was an interview, technically; but yes, two total

21   days, lengthy days.

22   Q.   So, I'm sorry, Mr. Baker, is it the case, then, that it

23   wasn't under oath, but it was just sort of an interview?

24   A.   It was an interview, but I understood that I could not

25   make false statements to Congress.

1   Q.   Okay.   When you said "it sucked," what did you mean?

2   A.   It sucked.   It was terrible.   I felt -- it sucked at

3   multiple levels.

4         It sucked because the experience itself, sitting

5   in the room being questioned the way that I was questioned,

6   was, as a citizen of the United States, upsetting and

7   appalling, to see members of Congress behaving the way that

8   they were behaving.   It was very upsetting to me.

9         It sucked because I felt as though I had dragged

10  Michael into a maelstrom by discussing him in the first

11  meeting and having this whole media thing blow up.

12        It sucked because I had literally had reporters,

13  when I left, chasing me down the hallway running at full

14  speed to try to catch up to me with cameras, you know,

15  running around in front of me to get in front of me to take

16  pictures of me walking -- just walking down the hallway.

17        It sucked because the allegation was somehow that

18  the FBI had engaged in some type of improper activity with

19  respect to Mr. Trump.

20        It sucked because my friends had been pilloried in

21  public, my friends and colleagues had been pilloried in

22  public, improperly in my view; that we were accused of being

23  traitors and coup plotters.   All of this was totally false

24  and wrong.

25        And so it -- as you can tell with me speaking

1    right now, all of this was an extremely traumatic

2    experience, having lived through that, and then having to

3    revisit it in this format in front of Congress.  It was

4    terrible.  And yet I thought -- and I still think -- that as

5    a person who held a position of power, that I should be held

6    accountable by any appropriate body that this country has,

7    and that any other official like me should be willing to do

8    the same.

9    Q.   Mr. Baker, during that interview with Congress, did

10   it -- was it only about your meeting with Mr. Sussmann, or

11   did it cover a wide range --

12   A.   A whole range of different things.

13   Q.   And in your sort of perspective on your time there, did

14   that constitute a major facet of what it was you were there

15   to speak about, or was it a relatively minor component?

16   A.   No, they turned it -- after the -- in the first session

17   Michael was -- my interaction with Michael was one of a

18   number of different things that they talked about.  But then

19   in the second session, they drilled into it to a greater

20   degree, is my recollection.

21   Q.   If I can ask you to look at what's been premarked as

22   Government Exhibit 57.  Do you recognize this from its

23   header?

24   A.   Yes.

25   Q.   What is it?

1    A.  This looks like a transcript of the interview that I

2    had.  This was probably the first one.

3    Q.  Okay.  And so the date of this one is October 3rd of

4    2018?

5    A.  That's correct.

6    Q.  And I think your text message to Sussmann said "Hope

7    your" -- sorry, his text message to you said "Hope your Day

8    2 went well," which he sent on October 19th.

9           Was your second one somewhere around October 19th?

10   A.  I think so, yes.

11   Q.  Okay.  But this was the first?

12   A.  Yes, sir.

13   Q.  Now, if I could --

14         MR. DeFILIPPIS:  Ms. Arsenault, if we could bring

15   up Page 52 of that transcript.

16   Q.  Okay.  And, Mr. Baker, just so the jury can absorb the

17   relevant portion here, I'll -- if I could read the

18   questions, and you just read the answer that you gave.

19   A.  Sure.

20         MR. DeFILIPPIS:  I'm sorry, Your Honor, the

21   government offers Government Exhibit 57.

22         MR. BERKOWITZ:  Your Honor, we would object other

23   than the specific questions and answers which could be

24   impeachment, but it's not being offered for its truth.

25         THE COURT:  All right.  So a couple of issues.

```
 1                    How long is this, and --
 2                    MR. DeFILIPPIS:  Your Honor, the full transcript
 3       is --
 4                    THE COURT:  You're not offering the full
 5       transcript, but just this excerpt?
 6                    MR. DeFILIPPIS:  Your Honor, we could do either.
 7                    THE COURT:  There's no reason for the full
 8       transcript to be admitted --
 9                    MR. DeFILIPPIS:  Sure.
10                    THE COURT:  -- assuming it's admissible.
11              And you just want an instruction that's it's being
12       offered in anticipation of your -- any challenge to
13       Mr. Baker's credibility; is that fair?
14                    MR. BERKOWITZ:  Correct.  I think it's addressing
15       impeachment, and it's all authentic, and we have no question
16       about that.  It's obviously -- he's here to testify today.
17       It's not his testimony being offered today.
18                    THE COURT:  Okay.  So, ladies and gentlemen, the
19       Court will admit this portion of this transcript not for the
20       truth of the words but for its consistency or inconsistency
21       with Mr. Baker's present testimony.
22                    Is that fair, Counsel?
23                    MR. DeFILIPPIS:  Fine, Your Honor.
24                    MR. BERKOWITZ:  Yes.
25                    MR. DeFILIPPIS:  And just to put everybody at
```

 1   ease, we're not reading the full transcript.

 2           THE COURT:  Yes, and we're not sending the full

 3   transcript back.

 4   BY MR. DeFILIPPIS:

 5   Q.  Okay.  Mr. Baker, so towards the bottom of Page 52

 6   there's a statement that says, "So in the last round the

 7   majority discussed evidence."  We'll start there, and then

 8   if you could just read the answers.  Is that all right?

 9   A.  Let me find my place here.

10           Okay.  That's helpful.  Thank you.

11   Q.  So in the last round, the majority discussed evidence

12   that Michael Sussmann from Perkins Coie.

13   A.  Sussmann.

14   Q.  S-U-S-S-M-A-N.  Oh, sorry.  That's you.

15   A.  S-U-S-S-M-A-N, yes.

16   Q.  And Mr. Sussmann --

17           MR. BERKOWITZ:  And, Judge, just -- I want to

18   object.  I don't think that this is impeaching or that we're

19   contending this.  If he wants to front impeachment, we can,

20   but we're going through what he's already covered.

21           THE COURT:  Well, as I understand it, he's

22   offering it as a prior consistent statement in anticipation

23   of a challenge to credibility, which I believe he can do.

24           Are you objecting to the form?

25           MR. BERKOWITZ:  Well, what I see on the screen is

1      something that we don't contest.  They were in the criminal

2      division together and knew each other there.

3                  THE COURT:  All right.  So just -- that frames it.

4      But why don't you get to the relevant testimony that you're

5      trying to --

6                  MR. DeFILIPPIS:  Sure.

7      BY MR. DeFILIPPIS:

8      Q.  Let's go then to Page 53, Mr. Baker.  And so there's the

9      question where I'll begin that says, "Okay."

10                 Okay.  And I believe last round it was mentioned

11     that Perkins Coie, his firm, had represented the DNC and the

12     Hillary Clinton Campaign.  Is that your understanding as

13     well?"

14     A.  That is what they said.  I have never confirmed that.  I

15     think I read that in the press.

16                 THE COURT:  And just so we're clear, these are

17     questions being asked by counsel for a House investigating

18     committee of Mr. Baker.  And Mr. DeFilippis is playing the

19     role of the questioner, and Mr. Baker is reciting the

20     answers that he gave that day.

21                 MR. DeFILIPPIS:  That's right.  Thank you, Your

22     Honor.

23     BY MR. DeFILIPPIS:

24     Q.  Okay.  So I believe last round it was mentioned that

25     Perkins Coie, his firm, had represented the DNC and the

1   Hillary Clinton campaign.  Is that your understanding as

2   well?

3              Same, we're just.

4   A.  I'm sorry, I lost the place on the page.  Yes -- I'm

5   sorry.

6              That is what they said.  I have never confirmed

7   that.  I think I read that in the press.

8   Q.  Okay.  So when Mr. Sussmann came to you to provide some

9   evidence, you were not specifically aware that he was

10  representing the DNC or the Hillary Clinton Campaign at the

11  time?

12  A.  I don't recall.  I don't recall him specifically saying

13  that at that time.

14  Q.  Okay.  So when Mr. Sussmann did provide you this

15  evidence, did you react in any way -- in any way with

16  concern.  Were you alarmed?  Were you -- did you believe it

17  was inappropriate for him to come to you with this

18  information?

19  A.  No, I did not believe it was inappropriate.  It was a

20  citizen providing information to the FBI about a matter that

21  they thought had either to do with a crime or some national

22  security threat.  And so it did not seem inappropriate to

23  me.

24  Q.  Okay.  So I guess it is just my interpretation, but I

25  believe last round it was somewhat implied that if he did

1    have an association to the Democratic National Committee and

2    the Hillary Clinton Campaign, that might lead someone to

3    believe that is something improper was done, and I wonder if

4    you could just explain to me, you know, why your view is

5    that it was not improper because just the mere notion that

6    someone who is a Democrat or Republican, you know, comes to

7    you with information, should that information somehow be

8    discounted or considered less credible because of, you know,

9    partisan affiliation?

10   A.  Well, the FBI is responsible for protecting everybody in

11   this country.  Period, full stop.  And we do that without

12   regard to who they are or what their political background is

13   or anything else.  If they believe they have evidence of a

14   crime or believe they have been a victim of a crime, we will

15   do what we can within our lawful authorities to protect

16   them.

17   Q.  Okay.  Go ahead.

18   A.  I can't see the rest of it.  I'm sorry.

19   Q.  Oh, sorry.

20   A.  And so when a citizen comes -- I'm sorry, let me start

21   again.

22           And so when a citizen comes with evidence, we

23   accept it.  That is my just general understanding over many,

24   many years.  We, the Bureau.  We, the Department of Justice.

25   And so that is how I construed what Michael was doing.  It

1    was -- he believed he had evidence, again, either of a crime

2    or of a national security threat, and he believed it was

3    appropriate -- he believed it was appropriate to provide it

4    to us.

5              When he did, I didn't think there was anything

6    improper about it whatsoever.

7              As I said, I recognized that I was obtaining

8    evidence and I wanted to get it out of my hands into the

9    hands of agents as quickly as possible.  And that is what I

10   did.

11   Q.  Okay.

12             So, Mr. Baker, are those -- is that still your

13   view today?

14   A.  About the impropriety part?

15   Q.  Yes.

16   A.  Yes, I do not believe that a citizen coming forward with

17   evidence that they believe to reflect evidence of a crime or

18   a national security threat is improper.  Indeed, as I said

19   earlier, it's fully authorized by the Attorney General

20   guidelines and the FBI's internal policies.

21   Q.  All right.  And briefly, let's return to Page 53 where

22   the questioner said:  "Okay, and I believe the last round it

23   was mentioned."

24   A.  Okay.  Go ahead.

25   Q.  Okay.

954

1          MR. DeFILIPPIS:  And let's just get another Q and

2     A in there, Ms. Arsenault.  Just show a little more.

3     Q.  All right.  So you were asked, the questioner said:  I

4     believe last round it was mentioned that Perkins Coie, his

5     firm, had represented the DNC and the Hillary Clinton

6     Campaign.  Is that your understanding as well?

7          You say:  That is what they said.  I have never

8     confirmed that.  I think I read it in the press.

9          When you were asked this question, had you had a

10    chance to reconstruct the chronology of when you knew

11    Mr. Sussmann represented the DNC or the Clinton Campaign,

12    when you learned it?

13    A.  When I was testifying at this -- or when I was being

14    interviewed at this point in time?

15    Q.  Yes.

16    A.  I'm sorry, what is the exact question?  I'm sorry.

17    Q.  When you were asked this question and answered that "I

18    read it in the press," had you had a chance to go back to

19    your records and figure out exactly when you learned that

20    Mr. Sussmann represented the DNC and the Clinton Campaign?

21    A.  No, I had not.

22    Q.  And the next question was:  So when Mr. Sussmann came to

23    you to provide some evidence, you were not specifically

24    aware that he was representing the DNC or the Clinton

25    Campaign at that time.  What did you understand that

1   question to be getting at?

2   A.   That -- well, looking at it today, I think that I was

3   thinking about the reference at the time to mean in the

4   actual meeting that was taking place in my office that I

5   described earlier today.

6   Q.   Okay.  And you responded:  I don't recall.  I don't

7   recall him specifically saying that at the time.

8          When you gave that answer, had you had a chance to

9   refresh your recollection of that meeting?

10  A.   No.  I honestly did -- to the best of my recollection, I

11  didn't know that Michael was going to come up at all in

12  these interviews.  I was going there to talk about the FBI's

13  overall investigation of Donald Trump and Russia, and so I

14  didn't think Michael was going to come up.

15         But it did.  And so I just started answering these

16  questions to the best of my ability at the time, having not

17  really prepared at all for that line of inquiry.

18  Q.   And when you said, "I don't recall him specifically

19  saying that at the time," did you mean Mr. Sussmann didn't

20  say that he was representing the DNC or the Clinton

21  Campaign?

22  A.   Yes.

23  Q.   And did you, during this exchange with the members of

24  Congress or their staff, volunteer or mention to them that

25  Mr. Sussmann had said he was not there for a client?

1      A.  I don't recall me saying that.

2      Q.  And if not, why?

3      A.  I think because I was not -- I just -- again, I had not

4      really prepared myself to be discussing my interaction with

5      Michael.  I just didn't think it would come up in this

6      session, so I hadn't thought about it in a while.  That's

7      one thing.

8           I mean, I think also that once we had -- "we" the

9      FBI -- investigated the allegations and that he had -- not

10     the allegations, the information that he had presented to me

11     in that meeting, I kind of honestly sort of dismissed it

12     from my mind as something that we had decided was a dead

13     end, and so I kind of like just forgot about it to some

14     degree.

15          And then I don't recall him -- they were honing

16     in -- they -- and my recollection is that in this set of

17     questions, and then in other questions by members, they were

18     focusing in on trying to find out whether he had said did he

19     say something about representing the DNC or Hillary Clinton

20     in that meeting.  And I was like, well no, I don't think so.

21     I don't remember him saying anything about representing the

22     DNC or Hillary in that meeting.

23     Q.  Got it.

24          And so you -- you testified on that day.  Was it a

25     lengthy day?  How long was --

1    A.  Yes.  They were like -- each session was like four, four

2    and a half hours each.

3    Q.  Now, did there come a time, Mr. Baker, when you were

4    interviewed by the DOJ's Office of Inspector General?

5    A.  I've been interviewed by the Office of Inspector General

6    many, many times.

7    Q.  And what does the DOJ Office of the Inspector General

8    do?

9    A.  The Office of the Inspector General is sort of a semi-

10   independent part of the Department of Justice that is

11   intended to conduct oversights of the functioning of the

12   Department of Justice, to do investigations of particular

13   things that the Department of Justice has done, including

14   the Bureau.  And then it also performs sort of a management

15   oversight to see if the Bureau or any other part of the

16   Department of Justice is actually being efficient.  Are they

17   spending money well; are they running their programs well;

18   are they wasting money.

19          So I guess at the end of the day they're looking

20   to determine whether there is any waste, fraud, or abuse by

21   any part of the Department of Justice, and also whether any

22   criminal activity might have taken place in connection with

23   any of that, any action by any department official.

24   Q.  So when -- were you -- did that office, the DOJ Office

25   of Inspector General, similarly start looking at the Trump/

1    Russia issues that Congress looked at?

2    A.   They were also investigating the investigators, yes.

3    Q.   And was it in that context that you sat down with them?

4    Probably not the only context, but did you sit down with

5    them in that context?

6    A.   To the best of my recollection, yes.  I think -- I think

7    multiple times.

8              But I've been interviewed by them so many times I

9    don't remember exactly what -- exactly with respect to what

10   investigation.

11   Q.   Let me show you what's been premarked as Government

12   Exhibit 65.

13             Looking at the header page here, the front page,

14   do you recognize this?

15   A.   Well, I mean, I see what it is.  I'm not sure that I

16   have seen this before.

17   Q.   Okay.

18   A.   Or I haven't seen the entirety of it before, let me put

19   it that way.

20   Q.   Got it.  But does this -- based on your experience with

21   the Inspector General's office, do they typically do

22   transcripts when they interview someone?

23   A.   I don't know that they typically do transcripts.  They

24   interview a lot of people, but I don't recall seeing a lot

25   of transcripts done by them of interviews.

1    Q.  Do you recall meeting with them at some point around

2    July of 2019?

3    A.  Probably.

4    Q.  And do you remember whether or not they were preparing a

5    transcript?

6    A.  I don't remember.

7    Q.  Okay.

8    A.  I've been interviewed by them when they've recorded the

9    interviews.  I've been interviewed by them when they don't

10   record the interviews.  So I can't remember exactly what

11   happened in this particular instance.

12   Q.  Okay.  But you're not doubting that you were interviewed

13   by them, July 15th?

14   A.  If they have a transcript of an interview with me, I'm

15   sure that that is what happened.

16           MR. DeFILIPPIS:  Okay.  Your Honor, the government

17   offers Government Exhibit 65 and will focus on only a

18   limited portion of the transcript.

19           MR. BERKOWITZ:  No objection to the portions that

20   are inconsistent with his testimony, Your Honor.

21           THE COURT:  So moved.

22           MR. DeFILIPPIS:  Ms. Arsenault, if we could go to

23   Page 30 of this transcript, the very bottom line, and then

24   we're going to go quickly to the next.

25           I'm sorry, yes, Page 30, like last third.

1    Q.   Okay.  Mr. Baker, I will play the role of Ms. Terzaken,

2    if you can play yourself.

3              Okay.  With Michael Sussmann, your conversations

4    with him before the election, if you could briefly describe

5    how the conversations came out, what information he provided

6    to you?

7    A.   So I'll go into the Sussmann stuff, yeah, okay.  So he

8    came in.  He -- he -- all of this is gone over in the

9    transcript with the committee, so I won't -- I'll try to

10   just summarize briefly.

11             My basic recollection is, in some way, shape, or

12   form, Michael reached out and wanted to come in and meet

13   with me.  And so we scheduled that.  So Michael came in and

14   met with me.  And he had some amount of information,

15   physical evidence, printed out, and also a thumb drive or

16   two, that he said related to strange interactions that were

17   some -- that some number of people that were his clients,

18   who were, he described, as I recall it, sort of cyber-

19   security experts, had found about some strange connection

20   between some part of Donald Trump's organizations and Alfa-

21   Bank, which was described as being controlled by the

22   Kremlin.  And that it appeared to be the case that this was

23   a -- it was -- it was surmised that this was a back-

24   channel -- what do you call it? -- a back-channel of

25   electronic communications, that somehow the Trump

1    organization and Alpha-Bank were using this what looked like

2    basically a surreptitious channel to communicate with each

3    other.

4           And so he presented me with this information.  I

5    listened to him.  I, you know, took the information from

6    him.  I think I immediately called up I believe it was

7    Priestap, and I either went down to Priestap or he sent

8    somebody to get it, but I got it out of my hands, like, you

9    know, that afternoon or that day, whatever it was.

10   Q.  Okay.  So, Mr. Baker, if I can direct your attention to

11   the paragraph starting "My basic recollection."

12          Towards the middle of that paragraph you say:  And

13   he had some amount of information, physical evidence,

14   printed out, and also a thumb drive or two, that he said

15   related to strange interactions that some number of people

16   that were his clients, who were, he described, as I recall

17   it, some sort of cyber-security experts.

18   A.  Uh-huh.

19   Q.  So you used the word "clients" there.  Do you see that?

20   A.  Yes.

21   Q.  Why did you say that?

22   A.  To the best of my recollection, I think I was trying

23   to -- just based on what we just read -- describe this

24   interaction at a high level using shorthand that in this

25   particular instance with using that word was obviously

1    inaccurate.

2    Q.   Okay.  At any time between your meeting with -- your

3    text message with Mr. Sussmann on September 18th of '16 and

4    then, did Mr. Sussmann tell you that he had been working for

5    a client or clients?

6    A.   No.

7    Q.   In between your Congressional testimony and this

8    interview, had Mr. Sussmann told you that the cyber security

9    experts were a client or clients of his?

10   A.   No.

11   Q.   And so when you made that statement there, was it

12   inaccurate?

13   A.   Yes.

14   Q.   Okay.  And was that something -- just a slip-up

15   essentially?

16   A.   It was an inaccurate statement, yes.  It was wrong.  I

17   don't know how else to describe it.  Yes.

18            Again, I believe I was trying to move quickly

19   through this based on what the question had been also to

20   speak -- if you could go back to the question.

21            "Briefly describe how the conversations came

22   about."

23            So I was trying to be brief, so I was using

24   shorthand and not going into deeply think about my

25   conversation with Michael, about the nature and scope of his

1  relationship with the people, cyber experts, that he was

2  referring to.

3  Q.  When you deal with lawyers outside the FBI in your role

4  as FBI General Counsel, when you did that, how typical was

5  it that those lawyers would be communicating with you on

6  behalf of a client?

7  A.  Usually the case.

8  Q.  Okay.  So to what extent does that affect -- did that

9  affect you when you spoke about --

10  A.  Yes, it was a shorthand way of referring to the people

11  that Michael was working with.  A shorthand and inaccurate

12  way to refer to them.  Imprecise.

13  Q.  Got it.  Mr. Baker, switching topics, have you ever

14  heard of a person --

15            THE COURT:  Counsel, how much longer do you have?

16            MR. DeFILIPPIS:  Your Honor, this might actually

17  be a great point to --

18            THE COURT:  Okay.

19            All right.  Ladies and gentlemen, we're going to

20  take our lunch break.

21            As always, no discussions about the case, no

22  social media about the case or any of the related issues,

23  and no independent research about the case.

24            We'll break for about an hour and 15 minutes.

25  Okay?

 1                    (Jury exits courtroom)

 2              THE COURT:  All right.  Sir, you can step down.

 3              Be seated, everyone.

 4              Okay.  Do you want to take up the issue that we

 5       had the sidebar about?

 6              As long as it's outside of the jury, we can do it

 7       in the courtroom, just avoid, obviously, any classified

 8       material.

 9              Sorry, I guess my question, to start, is:  There

10       was classified discovery on this issue, correct?

11              MR. BERKOWITZ:  Correct.  There's also been

12       public --

13              THE COURT:  Yes.

14              MR. BERKOWITZ:  -- discussion of it, and so

15       there's a matching, if you will, Judge, or there's an

16       overlapping.

17              THE COURT:  Okay.  And this was a topic in your

18       CIPA 5 notice, correct?

19              MR. BERKOWITZ:  Correct.

20              THE COURT:  Okay.  And was there an agreed-upon

21       declassification or stipulation or summary on this topic?

22              MR. BERKOWITZ:  There was.  It's a paragraph,

23       Judge.  There were also questions of Mr. Baker that were not

24       classified that may get into the subject of this leak

25       investigation, and we do intend to ask him, you know,

1    essentially whether there were competing stories about

2    whether he was authorized to do this.

3              THE COURT:  Okay.  So as long as that's within the

4    scope of what he testified to, can you do that confined to

5    either the public record or the agreed-upon CIPA

6    substitution?

7              MR. BERKOWITZ:  I believe that I can, Your Honor.

8    What concerns me is the suggestion of the outcome in the

9    findings of the investigation, which I don't know whether

10   those are outside the classified nature of the record.

11             THE COURT:  Okay.  Mr. DeFilippis, is that outside

12   either the CIPA stipulation or the public record?

13             MR. DeFILIPPIS:  Your Honor, I'm going to defer to

14   our CIPA expert, Mr. Algor.

15             THE COURT:  Okay.

16             MR. ALGOR:  Your Honor, I believe the ultimate

17   finding by Special Counsel Durham, then-US Attorney Durham,

18   was part of the substitution, and those were the elements

19   that the defense was going to cross him on.

20             THE COURT:  Okay.  Well, go back to the

21   substitution and the public record, and so long as you're --

22   the scope of your cross is within that, I don't think we

23   have a problem.  All right?

24             MR. BERKOWITZ:  Very good, Your Honor.  The scope

25   of my cross may be broad given the direct, but yes.

```
1          THE COURT:  But that's a scope issue.  We don't

2     have to deal with any CIPA concerns.

3          All right.  Are we generally on schedule, Counsel?

4     I'd like to give the jury a little sense of how things are

5     going when I tell them that they're going to have to come in

6     tomorrow morning.

7          MR. DeFILIPPIS:  We are generally on schedule,

8     Your Honor.  I think Mr. Baker's going slightly longer than

9     we anticipated.  I expect there will not be more than an

10    hour more with him.

11         THE COURT:  Okay.  So I can tell the jury that

12    we're basically on the schedule that I informed them of at

13    the beginning of the case?

14         MR. DeFILIPPIS:  I think that's right, Your Honor.

15         THE COURT:  Okay.  Thanks.  Have a good lunch.

16         (Lunch recess taken at 12:39 p.m.)

17

18

19

20

21

22

23

24

25
```

1                      <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3                   I, LISA A. MOREIRA, RDR, CRR, do hereby

4       certify that the above and foregoing constitutes a true and

5       accurate transcript of my stenographic notes and is a full,

6       true and complete transcript of the proceedings to the best

7       of my ability.

8            Dated this 19th day of May, 2022.

9

10                                   <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
13                                   Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'16** [1] - 962:3
**'17** [2] - 830:3, 830:10

**/**

**/s/Lisa** [1] - 967:10

**1**

**1** [2] - 862:13, 862:14
**1-800** [1] - 852:5
**1/2** [1] - 850:7
**10** [1] - 938:20
**100** [2] - 842:13, 849:14
**10020** [1] - 825:19
**10:07** [2] - 897:20, 898:7
**10:28** [4] - 900:14, 901:2, 901:5, 901:17
**10:34** [1] - 901:16
**10:40** [1] - 887:12
**11** [1] - 850:7
**11:00** [1] - 887:13
**11:05** [1] - 902:15
**11:14** [1] - 883:7
**1271** [1] - 825:19
**12:09** [1] - 910:8
**12:39** [1] - 966:16
**13** [1] - 833:14
**1400** [5] - 885:20, 886:3, 894:19, 894:21, 902:13
**145** [1] - 825:14
**15** [2] - 887:12, 963:24
**1500** [9] - 832:23, 842:3, 864:20, 897:2, 901:14, 923:2, 932:21, 936:19, 941:6
**15th** [1] - 959:13
**18th** [5] - 832:20, 835:10, 835:11, 842:4, 962:3
**19** [3] - 825:4, 839:5, 839:6
**19th** [8] - 838:8, 861:12, 863:19, 883:24, 933:6, 947:8, 947:9, 967:8
**1:21-cr-00582-CRC-1** [1] - 825:4

**2**

**2** [3] - 944:9, 944:12, 947:8
**20001** [2] - 825:23, 967:13

**20002** [1] - 825:15
**2016** [11] - 832:20, 834:15, 839:5, 839:6, 883:7, 897:13, 897:20, 923:5, 923:14, 925:19, 944:3
**2018** [10] - 926:8, 929:5, 933:7, 933:15, 933:18, 936:23, 937:18, 939:21, 944:4, 947:4
**2019** [1] - 959:2
**202** [2] - 825:24, 895:11
**202-324-6825** [1] - 895:2
**202-324-6829** [1] - 900:16
**2021** [1] - 834:24
**2022** [2] - 825:4, 967:8
**21** [1] - 897:20
**21-582** [1] - 827:3
**212** [2] - 825:15, 825:20
**21st** [3] - 897:13, 898:3, 904:6
**22** [1] - 883:7
**22nd** [7] - 883:21, 900:1, 900:8, 900:14, 903:9, 904:6, 905:21
**240** [2] - 838:14, 838:24
**242** [2] - 873:4, 873:12
**243** [4] - 861:15, 861:22, 861:25, 865:4
**26th** [2] - 923:5, 923:8
**28** [1] - 923:14
**282** [1] - 877:22
**285** [4] - 882:14, 882:19, 904:20, 904:25
**286** [2] - 908:2, 908:8
**29th** [1] - 936:20
**2:00** [2] - 836:8, 839:6
**2:30** [1] - 839:6

**3**

**30** [7] - 841:17, 841:19, 852:16, 890:2, 925:19, 959:23, 959:25
**30th** [2] - 925:24, 933:4
**324** [1] - 895:12
**333** [2] - 825:23, 967:12

**3500** [1] - 831:19
**354-3187** [1] - 825:24
**3:00** [1] - 909:23
**3:34** [2] - 895:22, 898:2
**3rd** [1] - 947:3

**4**

**40** [2] - 890:2, 894:2
**4:37** [1] - 900:1

**5**

**5** [20] - 887:14, 887:24, 888:2, 888:6, 888:14, 888:18, 888:21, 888:25, 889:16, 890:2, 890:6, 890:9, 890:22, 891:4, 891:7, 891:14, 891:22, 893:14, 894:6, 964:18
**52** [1] - 947:15, 949:5
**53** [1] - 950:8, 953:21
**57** [2] - 946:22, 947:21

**6**

**6** [1] - 830:10
**637-2231** [1] - 825:15
**65** [2] - 958:12, 959:17
**6718** [2] - 825:22, 967:12
**68** [2] - 895:15
**6825** [2] - 900:17, 903:5
**6829** [1] - 900:17
**6:19** [1] - 923:16
**6th** [1] - 830:3

**8**

**8** [1] - 850:7
**832** [1] - 826:4
**8th** [1] - 937:18

**9**

**9/16** [1] - 873:19
**9/19/16** [2] - 873:19, 874:23
**9/21** [1] - 895:20
**906-1200** [1] - 825:20
**93** [1] - 894:21
**94** [2] - 900:11, 902:12
**9:00** [1] - 897:24
**9:09** [1] - 825:5
**9:41** [1] - 934:12

**A**

**a.m** [11] - 825:5, 883:7, 897:24, 900:1, 900:14, 901:2, 901:5, 901:16, 901:17, 902:15, 934:12
**aback** [1] - 891:23
**ability** [7] - 869:12, 888:11, 891:20, 891:24, 892:20, 955:16, 967:7
**able** [6] - 828:24, 849:6, 857:21, 898:12, 920:1, 921:20
**absolutely** [2] - 879:25, 922:8
**absorb** [1] - 947:16
**abuse** [1] - 957:20
**academic** [5] - 844:1, 864:10, 864:25, 865:6, 865:20
**academics** [1] - 875:5
**accept** [1] - 952:23
**access** [4] - 837:15, 927:20, 928:6, 928:8
**accessed** [1] - 926:11
**accord** [6] - 862:7, 862:19, 862:20, 862:22, 862:25, 896:4, 901:6, 903:1, 909:13
**according** [1] - 841:12
**accords** [1] - 862:23
**account** [3] - 834:5, 834:7, 834:22
**accountable** [1] - 946:6
**accurate** [8] - 833:25, 848:25, 849:14, 875:25, 876:2, 878:14, 920:6, 967:5
**accused** [1] - 945:22
**act** [2] - 852:19, 908:19
**acting** [2] - 843:6, 856:15
**Action** [1] - 825:3
**action** [2] - 850:13, 957:23
**activities** [5] - 852:10, 853:18, 853:25, 854:1, 941:2
**activity** [4] - 914:14, 918:24, 945:18, 957:22
**actors** [1] - 846:17
**actual** [4] - 923:23,

924:25, 927:25, 955:4
**ADD** [1] - 883:19
**addition** [3] - 890:18, 936:8, 943:11
**additional** [1] - 915:7
**additionally** [1] - 829:11
**address** [1] - 886:14
**addressing** [1] - 948:14
**adjacent** [1] - 840:18
**admissible** [1] - 948:10
**admit** [1] - 948:19
**admitted** [2] - 861:25, 948:8
**advice** [1] - 920:21
**affairs** [5] - 883:17, 903:25, 905:13, 908:14, 909:1
**affect** [8] - 848:1, 848:22, 866:9, 891:24, 893:23, 916:5, 963:8, 963:9
**affected** [2] - 848:3, 848:4
**affects** [1] - 893:16
**affiliation** [1] - 952:9
**afraid** [2] - 828:6, 889:16
**afternoon** [1] - 897:23, 898:23, 907:19, 907:21, 909:18, 909:19, 961:9
**agencies** [1] - 909:3
**Agent** [1] - 860:14
**agent** [4] - 852:2, 860:10, 860:14, 860:15
**agent's** [1] - 836:14
**agents** [6] - 860:21, 920:18, 920:20, 928:23, 953:9
**ago** [6] - 833:4, 869:19, 902:2, 913:4, 919:15, 943:6
**agreed** [7] - 830:3, 884:10, 912:16, 916:17, 918:14, 964:20, 965:5
**agreed-upon** [3] - 884:10, 964:20, 965:5
**agreement** [2] - 830:17, 880:18
**ahead** [3] - 897:8, 952:17, 953:24
**alarmed** [1] - 951:16
**Alfa** [20] - 841:9,

845:25, 846:11, 847:11, 867:17, 868:5, 906:12, 913:10, 919:1, 920:3, 920:23, 922:1, 922:2, 922:5, 924:12, 937:23, 937:24, 940:3, 960:20

**Alfa-Bank** [16] - 841:9, 845:25, 846:11, 847:11, 867:17, 868:5, 906:12, 913:10, 919:1, 920:3, 922:1, 922:2, 922:5, 924:12, 937:23, 937:24

**Alfa-Bank-related** [1] - 920:23

**Alfa-Bank/Trump** [1] - 940:3

**Algor** [2] - 827:8, 965:14

**ALGOR** [2] - 825:13, 965:16

**allegation** [10] - 845:24, 846:4, 851:17, 854:6, 859:21, 867:6, 870:8, 914:12, 917:18, 945:17

**allegations** [16] - 843:9, 843:10, 843:13, 844:23, 845:1, 847:4, 854:4, 854:14, 854:18, 866:8, 871:7, 881:13, 882:8, 917:19, 956:9, 956:10

**alleged** [4] - 848:7, 854:18, 869:4, 896:25

**allies** [1] - 853:20

**allow** [1] - 837:10

**allowed** [2] - 836:4, 837:11

**ally** [1] - 937:6

**Alpha** [1] - 961:1

**Alpha-Bank** [1] - 961:1

**AMERICA** [1] - 825:3

**America** [1] - 827:4

**Americas** [1] - 825:19

**amount** [3] - 912:10, 960:14, 961:13

**amplified** [1] - 918:23

**analogized** [1] - 847:6

**analogy** [1] - 860:1

**analyst** [1] - 936:10

**Anderson** [9] - 829:12, 830:8, 871:6, 871:14, 871:15, 871:23, 874:4, 876:8, 876:9

**Anderson's** [2] - 872:25, 873:9

**ANDREW** [1] - 825:12

**Andrew** [1] - 827:9

**Andy** [5] - 876:17, 906:4, 906:25, 907:4, 907:7

**answer** [4] - 827:22, 828:13, 855:5, 896:17, 897:24, 913:19, 917:8, 947:18, 955:8

**answered** [3] - 900:23, 928:23, 954:17

**answering** [2] - 940:4, 955:15

**answers** [5] - 888:9, 888:15, 947:23, 949:8, 950:20

**anticipated** [1] - 966:9

**anticipation** [2] - 948:12, 949:22

**anyway** [4] - 830:12, 846:19, 870:17, 894:4

**anyway..** [1] - 940:21

**apart** [3] - 894:2, 894:3, 910:23

**apologize** [1] - 938:24

**appalling** [1] - 945:7

**apparent** [1] - 841:8

**appear** [2] - 874:16, 897:14

**APPEARANCES** [1] - 825:11

**appeared** [1] - 960:22

**appearing** [2] - 841:6, 858:21

**apple** [1] - 833:14

**Apple** [2] - 834:7, 834:20

**application** [1] - 893:7

**appreciate** [3] - 827:20, 830:22, 831:1

**approached** [4] - 843:15, 864:9, 864:10, 864:25

**appropriate** [5] - 850:14, 854:5, 946:6, 953:3

**approximate** [1] - 878:22

**area** [3] - 840:18, 840:20, 895:11

**areas** [1] - 871:8

**arena** [2] - 911:18, 911:20

**argument** [1] - 923:8

**arrests** [1] - 853:24

**arrived** [1] - 937:10

**Arsenault** [15] - 827:9, 832:22, 835:9, 842:2, 864:19, 874:13, 874:24, 886:7, 894:20, 894:24, 897:4, 900:10, 947:14, 954:2, 959:22

**art** [1] - 839:15

**article** [31] - 848:8, 849:9, 866:14, 867:3, 868:21, 868:22, 875:7, 876:3, 883:25, 884:16, 885:13, 894:16, 896:13, 896:24, 906:12, 910:19, 912:1, 912:17, 921:14, 921:16, 921:20, 921:22, 937:23, 941:18, 941:19, 942:7, 942:9, 943:7, 943:21, 944:4

**articles** [4] - 869:7, 940:8, 942:2, 942:19

**aside** [1] - 915:17

**asleep** [1] - 900:2

**aspect** [1] - 854:18

**assertion** [2] - 848:22, 944:5

**assistance** [1] - 852:13

**assistant** [17] - 838:22, 839:10, 840:20, 840:21, 852:25, 853:11, 853:14, 856:12, 860:12, 870:15, 872:15, 883:15, 900:22, 902:4, 905:11, 905:13, 921:9

**associate** [1] - 905:18

**Associate** [1] - 883:20

**associated** [1] - 895:16

**association** [1] - 952:1

**assume** [2] - 923:8, 933:19

**assuming** [1] - 948:10

**assumptions** [1] - 867:6

**attacked** [1] - 942:14

**attempt** [1] - 913:5

**attended** [1] - 918:19

**attendees** [1] - 839:10

**attention** [6] - 854:5, 893:19, 900:9, 900:12, 933:3, 961:10

**attorney** [5] - 862:17, 864:4, 864:5, 965:17

**Attorney** [4] - 852:8, 856:12, 920:13, 953:19

**attorneys** [2] - 870:23, 871:2

**augmented** [1] - 918:23

**authentic** [1] - 948:15

**authorities** [1] - 952:15

**authorized** [5] - 852:8, 929:24, 930:1, 953:19, 965:2

**autograph** [2] - 910:4, 910:5

**availability** [2] - 897:22, 898:22

**available** [2] - 833:18, 846:25

**Avenue** [4] - 825:19, 825:23, 839:24, 967:12

**avoid** [1] - 964:7

**aware** [13] - 844:23, 844:25, 849:7, 858:9, 881:24, 884:20, 887:25, 888:4, 916:12, 916:18, 934:9, 951:9, 954:24

**B**

**back-channel** [1] - 960:24

**background** [3] - 856:6, 940:17, 952:12

**bad** [1] - 849:5

**badge** [18] - 836:9, 836:12, 836:14, 836:16, 836:21, 836:23, 837:1, 837:2, 837:3, 837:4, 837:10, 837:11, 837:19, 837:21, 837:22, 838:3, 860:25, 861:1

**badges** [1] - 837:6

**BAKER** [2] - 826:3, 832:13

**Baker** [79] - 829:12, 830:7, 831:15, 831:20, 832:6, 832:8, 832:16, 832:18, 832:24, 833:2, 835:12, 839:2, 839:12, 841:20, 842:1, 842:5, 842:11, 842:15, 849:15, 849:16, 850:25, 856:7, 861:2, 862:1, 864:16, 867:5, 873:16, 874:14, 874:16, 875:1, 875:4, 875:22, 877:3, 878:4, 878:24, 881:10, 883:3, 885:18, 885:21, 894:9, 894:13, 894:22, 895:1, 896:4, 897:12, 898:4, 899:25, 900:12, 902:14, 905:5, 905:20, 913:3, 913:19, 918:1, 918:6, 919:11, 923:3, 926:7, 932:19, 932:22, 933:6, 938:11, 939:9, 940:13, 942:21, 943:13, 944:22, 946:9, 947:16, 949:5, 950:8, 950:18, 950:19, 953:12, 957:3, 960:1, 961:10, 963:13, 964:23

**Baker's** [5] - 829:7, 909:18, 948:13, 948:21, 966:8

**bank** [3] - 843:11, 846:1, 854:7

**Bank** [20] - 841:9, 845:25, 846:11, 847:11, 867:17, 868:5, 868:6, 906:12, 913:10, 919:1, 920:3, 920:23, 922:1, 922:2, 922:5, 924:12, 937:23, 937:24, 960:21, 961:1

**Bank/Trump** [1] - 940:3

**bar** [1] - 833:24

**based** [11] - 828:24,

849:13, 859:2, 859:6, 862:3, 866:14, 885:21, 935:15, 958:20, 961:23, 962:19
**basic** [3] - 884:10, 960:11, 961:11
**basing** [1] - 906:15
**basis** [5] - 836:21, 853:21, 872:6, 874:12, 900:6
**basketball** [2] - 911:18, 911:20
**be..** [1] - 891:24
**became** [2] - 934:9, 940:7
**become** [1] - 915:18
**becoming** [1] - 938:23
**BEFORE** [1] - 825:10
**begin** [2] - 841:4, 950:9
**beginning** [9] - 831:6, 834:3, 834:10, 841:22, 841:24, 848:18, 865:25, 876:11, 966:13
**behalf** [20] - 827:7, 827:13, 841:6, 841:21, 842:10, 849:21, 857:15, 858:21, 859:4, 859:7, 859:12, 859:13, 864:22, 871:19, 871:22, 889:6, 908:19, 943:14, 943:22, 963:6
**behaving** [2] - 945:7, 945:8
**behind** [2] - 888:22, 889:21
**Bellevue** [2] - 938:6, 939:13
**Bellovin** [1] - 843:24, 865:11
**below** [11] - 863:4, 864:2, 867:9, 867:18, 867:20, 867:23, 870:17, 871:1, 909:25, 938:13, 944:8
**bench** [7] - 886:10, 886:22, 888:5, 930:12, 932:17, 938:21, 939:7
**benefit** [2] - 850:15, 896:20
**Berkowitz** [4] - 827:12, 827:17, 893:1, 893:15

**BERKOWITZ** [41] - 825:16, 827:11, 827:15, 827:19, 828:2, 830:16, 831:3, 831:11, 831:14, 831:19, 831:23, 838:25, 861:23, 873:13, 875:20, 882:20, 886:4, 886:12, 886:21, 891:5, 891:11, 893:2, 905:2, 908:9, 912:23, 913:16, 918:4, 919:7, 938:23, 947:22, 948:14, 948:24, 949:17, 949:25, 959:19, 964:11, 964:14, 964:19, 964:22, 965:7, 965:24
**best** [41] - 833:6, 840:1, 841:16, 843:14, 843:21, 845:2, 852:21, 855:12, 869:18, 877:18, 892:19, 892:21, 895:5, 895:16, 896:16, 900:19, 901:11, 904:16, 904:18, 906:15, 911:5, 912:5, 913:3, 915:1, 918:21, 919:14, 921:3, 925:13, 933:23, 934:4, 934:11, 937:11, 942:2, 943:18, 944:1, 944:4, 955:10, 955:16, 958:6, 961:22, 967:6
**better** [2] - 862:11, 935:12
**between** [29] - 835:5, 841:9, 841:23, 843:11, 845:25, 847:4, 854:15, 854:19, 854:22, 868:4, 869:4, 869:9, 886:2, 890:2, 899:14, 910:24, 913:10, 914:14, 919:1, 920:3, 925:20, 925:21, 933:1, 936:5, 936:7, 944:3, 960:20, 962:2, 962:7
**beyond** [1] - 906:14
**big** [3] - 840:22,

923:21, 924:16
**Bill** [36] - 853:1, 853:7, 857:20, 857:21, 857:23, 858:2, 858:17, 859:22, 860:3, 860:18, 861:19, 863:14, 863:23, 865:12, 866:7, 868:15, 868:18, 869:25, 870:16, 871:24, 872:5, 878:10, 882:25, 883:10, 883:15, 884:8, 907:19, 910:17, 911:5, 913:22, 921:4, 921:5, 921:10, 926:6
**bill** [2] - 885:23, 885:24
**Bill's** [1] - 878:11
**billing** [2] - 886:7, 902:23
**binder** [1] - 850:8
**bit** [11] - 836:13, 850:17, 856:2, 860:4, 877:2, 883:23, 890:12, 910:16, 937:19, 940:13, 943:10
**Blaze** [2] - 843:25, 865:11
**blow** [1] - 945:11
**blowing** [1] - 838:15
**boat** [3] - 890:20, 890:23, 890:24
**body** [1] - 946:6
**bona** [1] - 863:24
**book** [1] - 910:3
**boss** [1] - 876:15
**bosses** [3] - 876:14, 881:11, 881:24
**BOSWORTH** [1] - 825:17
**Bosworth** [1] - 827:12
**bottom** [11] - 868:14, 874:22, 875:2, 886:8, 894:25, 908:11, 927:3, 928:4, 949:5, 959:23
**Bowdich** [3] - 883:11, 883:18, 905:17
**brand** [1] - 833:13
**break** [8] - 831:5, 831:7, 887:6, 887:12, 892:2, 894:13, 963:20, 963:24
**brief** [1] - 962:23
**briefly** [8] - 830:16,

853:14, 865:16, 929:10, 953:21, 960:4, 960:10, 962:21
**bring** [12] - 831:15, 832:23, 851:1, 851:14, 851:15, 854:5, 864:20, 894:21, 897:2, 910:1, 910:13, 947:14
**bringing** [1] - 879:18
**British** [1] - 938:12
**Brittain** [3] - 827:7, 889:5, 892:8
**BRITTAIN** [1] - 825:13
**broad** [1] - 965:25
**brought** [3] - 840:10, 857:3, 893:18
**building** [5] - 836:10, 836:17, 836:19, 836:20, 837:7
**bullet** [1] - 864:8
**Bureau** [17] - 837:18, 842:20, 848:14, 851:11, 867:2, 912:3, 918:22, 918:24, 928:13, 929:6, 933:16, 933:17, 934:5, 952:24, 957:14, 957:15
**Bureau's** [1] - 919:3
**business** [1] - 929:21
**busy** [2] - 839:7, 898:25
**button** [1] - 903:5
**BY** [8] - 832:15, 894:12, 897:11, 932:18, 939:8, 949:4, 950:7, 950:23

## C

**calculus** [1] - 867:7
**calendar** [6] - 838:18, 838:20, 838:21, 838:22, 839:3, 839:7
**caliber** [1] - 865:19
**cameras** [1] - 945:14
**Campaign** [11] - 858:17, 859:8, 863:12, 950:12, 951:10, 952:2, 954:6, 954:11, 954:20, 954:25, 955:21
**campaign** [6] - 854:15, 869:5, 882:10, 943:15, 943:23,

951:1
**campaign's** [1] - 940:24
**candidate** [1] - 882:7
**capacity** [2] - 859:1, 860:23
**captain** [1] - 890:19
**captains** [3] - 890:11, 890:13
**career** [1] - 860:15
**careful** [1] - 855:7
**carries** [1] - 938:2
**case** [24] - 828:12, 852:2, 854:20, 855:8, 858:20, 858:21, 880:13, 887:16, 887:17, 888:13, 889:19, 891:6, 891:12, 891:19, 922:16, 922:22, 944:22, 960:22, 963:7, 963:21, 963:22, 963:23, 966:13
**Case** [1] - 827:3
**cases** [2] - 920:15, 922:17
**catch** [1] - 945:14
**CATHERINE** [1] - 825:17
**Catherine** [1] - 827:12
**caused** [1] - 837:17
**cautious** [1] - 939:1
**CD** [1] - 883:16
**cell** [1] - 833:12
**center** [1] - 935:25
**certain** [5] - 828:15, 836:19, 903:8, 916:10, 927:23
**certainly** [7] - 828:11, 828:14, 860:9, 888:2, 889:2, 891:22, 892:13
**CERTIFICATE** [1] - 967:1
**certify** [1] - 967:4
**chain** [15] - 833:17, 835:5, 835:6, 876:13, 877:4, 877:6, 877:7, 877:15, 877:25, 878:5, 884:9, 897:3, 908:3, 908:11, 937:16
**chairs** [1] - 840:17
**challenge** [2] - 948:12, 949:23
**chance** [4] - 861:3, 954:10, 954:18, 955:8

**change** [1] - 944:5
**channel** [18] - 841:9, 843:10, 845:25, 848:8, 848:9, 848:11, 848:16, 859:23, 866:17, 897:1, 913:10, 915:5, 919:1, 920:3, 920:7, 960:24, 961:2
**characterization** [1] - 875:20
**charade** [1] - 830:19
**charge** [1] - 838:22
**chasing** [1] - 945:13
**check** [1] - 896:18
**checking** [1] - 910:17
**chief** [2] - 872:14, 872:18
**chiefs** [2] - 871:1, 871:2
**child** [1] - 892:22
**chime** [1] - 914:2
**chimed** [1] - 914:4
**chip** [1] - 837:6
**chooses** [3] - 828:1, 828:3, 828:25
**chose** [1] - 879:13
**CHRISTOPHER** [1] - 825:10
**chronology** [1] - 954:10
**CIA** [2] - 927:11, 927:12
**CID** [2] - 868:14, 868:16
**CIPA** [5] - 964:18, 965:5, 965:12, 965:14, 966:2
**circle** [2] - 862:13, 880:13
**circles** [1] - 928:8
**citizen** [11] - 842:22, 843:2, 843:7, 857:16, 858:22, 879:19, 945:6, 951:20, 952:20, 952:22, 953:16
**classes** [2] - 889:15, 889:23
**classified** [17] - 840:18, 874:3, 926:11, 926:17, 926:21, 927:13, 927:17, 927:20, 927:23, 929:8, 929:13, 929:19, 929:25, 964:7, 964:10, 964:24, 965:10
**clear** [10] - 850:25,

859:2, 859:6, 860:12, 863:17, 882:22, 890:18, 904:4, 919:3, 950:16
**clearances** [1] - 926:14
**client** [31] - 841:7, 841:21, 842:10, 849:19, 849:21, 857:15, 859:14, 862:18, 862:21, 862:24, 864:22, 871:20, 871:22, 875:5, 876:10, 880:22, 899:12, 899:16, 899:19, 904:7, 904:11, 924:2, 943:14, 943:15, 943:22, 943:24, 944:6, 955:25, 962:5, 962:9, 963:6
**clients** [23] - 849:19, 857:12, 858:23, 858:24, 865:1, 865:2, 865:3, 881:7, 881:8, 899:12, 899:16, 899:20, 904:7, 904:11, 924:2, 960:17, 961:16, 961:19, 962:5, 962:9
**Clinton** [19] - 858:16, 859:8, 863:5, 863:10, 863:12, 863:14, 863:18, 943:14, 943:23, 950:12, 951:1, 951:10, 952:2, 954:5, 954:11, 954:20, 954:24, 955:20, 956:19
**clip** [1] - 850:8
**clipped** [1] - 850:7
**close** [6] - 841:24, 850:24, 893:15, 910:23, 919:14, 919:16
**closed** [1] - 922:20
**closely** [1] - 855:1
**closings** [1] - 828:23
**CNN** [1] - 936:9
**code** [1] - 895:11
**Coie** [17] - 856:1, 856:3, 862:17, 934:1, 934:10, 934:20, 934:24, 935:11, 936:13, 937:2, 938:11, 942:25, 943:12,

949:12, 950:11, 950:25, 954:4
**Coie's** [1] - 939:12
**colleague** [1] - 842:17
**colleagues** [3] - 903:20, 933:1, 945:21
**color** [4] - 837:1, 837:3, 837:4
**colors** [1] - 836:24
**COLUMBIA** [1] - 825:1
**columns** [1] - 896:2
**Comey** [7] - 876:21, 881:11, 881:12, 882:15, 883:9, 883:14, 905:6
**coming** [14] - 830:20, 837:24, 842:22, 842:25, 849:10, 858:22, 864:21, 869:7, 878:4, 879:22, 880:22, 926:1, 941:11, 953:16
**comm** [1] - 867:24
**COMM** [1] - 867:25
**comment** [1] - 939:3
**commiserating** [1] - 939:19
**commitment** [1] - 917:3
**commitments** [1] - 917:1
**Committee** [1] - 952:1
**committee** [5] - 940:19, 940:20, 940:21, 950:18, 960:9
**committees** [3] - 939:24, 940:18, 944:14
**common** [4] - 851:22, 851:24, 885:15, 927:21
**comms** [1] - 867:17
**communicants** [2] - 847:10, 866:16
**communicate** [3] - 841:15, 854:10, 961:2
**communicating** [4] - 866:16, 867:1, 884:20, 963:5
**communication** [4] - 853:3, 862:17, 866:19, 920:7, 935:11
**communications** [23] - 841:9, 843:10, 846:11, 846:15, 846:21, 847:2,

847:13, 848:7, 848:9, 848:16, 859:23, 859:25, 866:23, 866:25, 867:1, 867:25, 897:1, 913:9, 915:5, 919:1, 920:3, 925:8, 960:25
**community** [1] - 837:3
**companies** [1] - 934:22
**company** [1] - 864:22
**comparing** [3] - 914:22, 914:23
**comparison** [2] - 844:15, 901:24
**compartmented** [1] - 840:17
**competing** [1] - 965:1
**competitive** [1] - 924:23
**complete** [1] - 967:6
**completed** [1] - 833:21
**complicated** [3] - 836:18, 913:8, 915:14
**comply** [1] - 833:8
**component** [2] - 838:19, 849:16
**computer** [2] - 838:19, 849:16
**conceal** [1] - 886:17
**concentric** [1] - 928:8
**concept** [1] - 877:3
**concern** [6] - 841:8, 869:6, 869:10, 888:12, 917:9, 951:16
**concerned** [2] - 857:24, 882:5
**concerning** [3] - 828:16, 881:20, 887:17
**concerns** [3] - 893:23, 965:8, 966:2
**concluded** [6] - 898:21, 918:22, 919:5, 920:4, 921:23, 922:10
**conclusion** [2] - 919:4, 922:25
**conditional** [1] - 827:25
**conduct** [4] - 852:9, 869:12, 944:16, 957:11
**conducting** [5] - 853:22, 853:23, 869:4, 881:16,

881:17
**conference** [12] - 840:22, 872:22, 886:10, 886:22, 911:3, 918:20, 930:10, 930:12, 932:17, 938:21, 939:7
**confidence** [2] - 917:13, 917:22
**confident** [3] - 842:11, 842:13, 853:2
**confidential** [2] - 857:17, 880:1
**confidently** [1] - 893:22
**confined** [1] - 965:4
**confirm** [2] - 920:5, 920:6
**confirmed** [3] - 950:14, 951:6, 954:8
**confront** [1] - 830:21
**confusion** [1] - 935:9
**Congress** [9] - 940:16, 940:18, 941:2, 944:25, 945:7, 946:3, 946:9, 955:24, 958:1
**congressional** [4] - 940:14, 944:15, 962:7
**connected** [2] - 841:10, 867:18
**connection** [23] - 830:7, 843:9, 847:24, 849:16, 854:7, 858:10, 888:8, 889:20, 891:18, 893:15, 893:17, 893:19, 893:23, 894:15, 926:9, 926:10, 926:16, 927:16, 940:3, 940:24, 940:25, 957:22, 960:19
**connections** [5] - 854:14, 854:19, 869:4, 943:14, 943:23
**conscientious** [2] - 893:6, 893:20
**consents** [1] - 829:14
**consider** [1] - 924:13
**considerable** [1] - 855:3
**considered** [1] - 952:8
**considering** [1] - 935:20
**consistency** [1] -

948:20
**consistent** [6] - 875:10, 875:13, 875:16, 875:19, 949:22
**constitute** [1] - 946:14
**constitutes** [1] - 967:4
**Constitution** [2] - 825:23, 967:12
**construed** [2] - 845:5, 952:25
**consulted** [1] - 829:13
**contact** [9] - 841:13, 843:15, 864:14, 864:15, 865:3, 865:8, 898:13, 932:23
**contacting** [2] - 867:12, 868:24
**contains** [1] - 886:14
**contending** [1] - 949:19
**contest** [1] - 950:1
**context** [7] - 833:3, 835:24, 867:14, 940:15, 958:3, 958:4, 958:5
**continuation** [1] - 897:15
**continue** [9] - 863:3, 864:1, 893:22, 911:25, 912:2, 912:16, 914:9, 917:3, 937:16
**Continued** [1] - 832:14
**continuing** [4] - 891:19, 934:14, 934:15, 934:16
**contractors** [1] - 837:1
**controlled** [1] - 960:21
**conversation** [15] - 846:9, 846:10, 862:8, 865:17, 876:11, 899:3, 899:10, 903:16, 903:18, 914:20, 929:22, 934:14, 934:15, 934:16, 962:25
**conversations** [6] - 884:7, 936:21, 936:25, 960:3, 960:5, 962:21
**conveyed** [3] - 846:5, 901:12, 903:18
**conveying** [1] - 898:10
**convinced** [1] - 915:6
**COOPER** [1] - 825:10
**cooperation** [3] - 830:23, 831:1

**copied** [1] - 909:9
**copies** [1] - 907:15
**copy** [3] - 850:5, 850:21
**Corp** [2] - 864:11, 864:12
**corporate** [2] - 864:25, 865:6
**corporation** [1] - 864:13
**corporations'** [1] - 864:14
**correct** [27] - 829:17, 837:20, 838:1, 858:11, 862:5, 864:7, 868:10, 872:20, 879:5, 884:1, 887:23, 899:24, 902:19, 905:16, 907:14, 908:16, 909:7, 909:10, 910:22, 918:16, 936:4, 947:5, 948:14, 964:10, 964:11, 964:18, 964:19
**correctly** [1] - 830:17
**counsel** [21] - 827:8, 827:20, 828:8, 828:14, 870:10, 870:11, 870:14, 870:17, 887:20, 889:4, 895:16, 900:7, 900:20, 920:8, 920:11, 922:19, 926:10, 927:15, 943:13, 950:17, 963:15
**Counsel** [8] - 831:9, 905:3, 915:18, 930:8, 948:22, 963:4, 965:17, 966:3
**COUNSEL'S** [1] - 825:14
**counsel's** [2] - 829:13, 872:7
**counsels** [3] - 870:19, 872:14, 874:1
**counterintelligence** [17] - 849:3, 849:5, 851:16, 852:24, 852:25, 853:10, 853:11, 853:13, 853:15, 853:16, 853:17, 860:13, 872:2, 880:11, 883:16, 905:10, 905:11
**counterterrorism** [3] - 851:16, 853:13,

872:3
**countries** [1] - 853:19
**country** [4] - 880:5, 940:12, 946:6, 952:11
**coup** [7] - 938:12, 939:14, 939:16, 940:11, 942:12, 942:13, 945:23
**couple** [8] - 831:7, 840:16, 855:24, 872:15, 885:3, 893:2, 922:13, 947:25
**course** [4] - 830:5, 850:22, 890:16, 940:1
**court** [4] - 827:13, 856:7, 892:5, 921:11
**COURT** [84] - 825:1, 827:6, 827:10, 827:14, 827:16, 827:23, 828:4, 828:8, 828:19, 829:5, 829:16, 829:20, 830:22, 831:4, 831:12, 831:15, 831:22, 831:25, 832:3, 832:11, 839:1, 861:25, 873:15, 875:21, 882:21, 886:5, 886:17, 886:19, 886:25, 887:3, 887:6, 887:9, 887:11, 887:19, 887:25, 888:4, 888:7, 888:16, 888:19, 888:23, 889:4, 891:10, 891:12, 891:16, 891:25, 892:2, 892:6, 893:1, 893:13, 894:9, 905:3, 908:10, 912:25, 913:18, 918:5, 919:10, 930:8, 930:10, 938:19, 939:6, 947:25, 948:4, 948:7, 948:10, 948:18, 949:2, 949:21, 950:3, 950:16, 959:21, 963:15, 963:18, 964:2, 964:13, 964:17, 964:20, 965:3, 965:11, 965:15, 965:20, 966:1, 966:11,

966:15, 967:1
**Court** [7] - 825:21, 825:22, 828:19, 893:13, 894:5, 948:19, 967:11
**Court's** [4] - 828:14, 891:21, 893:19, 939:1
**Courthouse** [2] - 825:22, 967:11
**courtroom** [6] - 832:2, 887:18, 892:1, 894:8, 964:1, 964:7
**COURTROOM** [3] - 827:2, 892:5, 905:1
**cover** [2] - 874:17, 946:11
**covered** [1] - 949:20
**coxswain** [3] - 890:10, 890:19, 890:25
**credential** [1] - 858:18
**credibility** [3] - 863:25, 948:13, 949:23
**credible** [1] - 952:8
**crew** [9] - 887:22, 889:1, 889:3, 889:19, 889:22, 890:1, 890:5, 890:14, 890:15
**crime** [7] - 852:14, 860:8, 951:21, 952:14, 953:1, 953:17
**criminal** [8] - 849:3, 849:4, 868:12, 868:16, 870:20, 880:4, 950:1, 957:22
**Criminal** [2] - 825:3, 827:3
**critical** [1] - 942:1
**critically** [2] - 849:8, 880:3
**criticize** [1] - 942:7
**criticized** [2] - 940:9, 942:11
**cross** [3] - 965:19, 965:22, 965:25
**CRR** [3] - 825:21, 967:3, 967:10
**culture** [1] - 852:3
**current** [1] - 886:15
**custody** [6] - 877:4, 877:6, 877:7, 877:15, 877:25, 878:5
**cyber** [30] - 841:12, 843:15, 843:23, 843:25, 844:2, 844:17, 845:17,

845:20, 846:17, 857:1, 857:3, 857:7, 858:19, 864:10, 865:2, 870:25, 871:5, 871:8, 871:25, 872:2, 875:5, 899:3, 899:9, 912:8, 919:24, 924:10, 960:18, 961:17, 962:8, 963:1
**cyber-security** [1] - 961:17

## D

**D'Etat** [1] - 938:12
**D.C** [4] - 839:24, 895:11, 910:2, 936:1
**daily** [3] - 872:10, 872:11, 873:24
**dash** [1] - 862:17
**data** [4] - 834:21, 850:17, 865:22, 919:24
**date** [18] - 835:15, 874:18, 874:19, 874:21, 878:22, 883:3, 883:21, 895:18, 895:20, 898:3, 900:13, 919:8, 919:10, 919:11, 933:16, 936:20, 938:17, 947:3
**Dated** [1] - 967:8
**daughter** [10] - 887:21, 887:22, 888:20, 888:22, 888:25, 889:14, 890:10, 890:23, 891:6, 893:9
**daughter's** [3] - 888:22, 889:13, 889:18
**daughters** [1] - 893:25
**Dave** [3] - 883:11, 883:18, 883:19
**day-to-day** [5] - 871:25, 872:6, 908:17, 920:15, 920:24
**days** [9] - 849:10, 885:3, 910:23, 919:16, 925:18, 925:20, 944:19, 944:21
**DC** [3] - 825:15, 825:23, 967:13
**dead** [1] - 956:12
**deal** [6] - 830:25, 870:23, 900:6,

915:19, 963:3, 966:2
**dealing** [1] - 859:19
**December** [2] -
834:24, 936:23
**decide** [1] - 903:20
**decided** [1] - 956:12
**deciding** [1] - 920:16
**decision** [3] - 827:24,
827:25, 894:15
**declassification** [1] -
964:21
**deeply** [1] - 962:24
**default** [1] - 828:9
**Defendant** [2] - 825:7,
825:16
**defense** [7] - 828:13,
828:23, 829:13,
830:9, 830:14,
833:9, 965:19
**defense's** [1] - 828:20
**defer** [1] - 965:13
**DeFilippis** [69] -
825:12, 827:9,
828:5, 829:23,
830:1, 830:17,
831:10, 832:7,
832:12, 832:15,
832:22, 835:9,
838:23, 842:2,
861:21, 864:19,
873:11, 874:13,
874:24, 882:18,
886:1, 886:6,
886:18, 886:20,
886:23, 887:1,
887:5, 887:7,
887:10, 894:12,
894:20, 894:24,
897:4, 897:11,
900:10, 904:24,
905:4, 908:7, 913:2,
919:9, 923:11,
930:11, 932:18,
933:5, 938:19,
939:2, 939:8,
941:16, 947:14,
947:20, 948:2,
948:6, 948:9,
948:23, 948:25,
949:4, 950:6, 950:7,
950:18, 950:21,
950:23, 954:1,
959:16, 959:22,
963:16, 965:11,
965:13, 966:7,
966:14
**DeFilippis)**................
............ [1] - 826:4
**degree** [6] - 860:18,
914:19, 915:24,

942:20, 946:20,
956:14
**degrees** [1] - 860:21
**delay** [1] - 896:24
**delayed** [1] - 906:14
**deliberate** [1] - 827:21
**Democrat** [1] - 952:6
**Democratic** [2] -
858:15, 952:1
**deny** [2] - 828:19,
893:13
**depart** [1] - 929:6
**Department** [9] -
851:18, 856:13,
909:1, 952:24,
957:10, 957:12,
957:13, 957:16,
957:21
**department** [1] -
957:23
**deputies** [7] - 872:7,
872:18, 873:20,
873:24, 874:5,
874:9, 874:18
**Deputies** [1] - 873:18
**deputy** [15] - 856:12,
870:19, 871:4,
872:14, 874:1,
874:4, 876:15,
876:16, 878:11,
883:14, 883:20,
905:14, 905:18,
907:8, 921:9
**Deputy** [1] - 883:9
**DEPUTY** [3] - 827:2,
892:5, 905:1
**describe** [7] - 836:13,
840:12, 877:8,
960:4, 961:23,
962:17, 962:21
**described** [13] - 836:1,
841:10, 843:10,
859:22, 861:19,
878:9, 881:21,
924:1, 944:16,
955:5, 960:18,
960:21, 961:16
**describing** [2] -
849:18, 914:6
**desk** [8] - 840:15,
855:15, 860:8,
895:6, 895:24,
902:17, 902:18,
903:5
**destination** [2] -
846:15, 847:2
**detail** [9] - 836:14,
850:24, 876:4,
876:6, 921:2, 942:3,
942:6, 943:8, 943:9

**details** [3] - 906:1,
906:9, 906:13
**determine** [2] -
847:13, 957:20
**Devaney** [2] - 942:25,
943:5
**Devaney's** [1] - 944:10
**device** [1] - 850:16
**devoting** [1] - 855:3
**different** [23] - 836:16,
836:24, 837:1,
837:2, 837:3,
848:12, 854:18,
858:24, 859:1,
881:8, 881:9,
885:14, 888:10,
928:14, 935:2,
935:4, 935:21,
942:15, 946:12,
946:18
**difficult** [2] - 889:8,
943:11
**digit** [1] - 900:17
**digital** [1] - 850:16
**dinner** [1] - 890:15
**dinners** [1] - 890:14
**dire** [1] - 889:12
**DIRECT** [1] - 832:14
**direct** [9] - 830:20,
881:10, 886:6,
900:8, 900:12,
921:10, 933:3,
961:10, 965:25
**direction** [1] - 898:15
**directly** [5] - 840:5,
896:23, 909:6,
917:20, 925:5
**Director** [2] - 883:9,
883:10
**director** [26] - 839:17,
852:25, 853:11,
853:15, 860:12,
870:15, 876:15,
876:16, 876:20,
883:14, 883:15,
883:20, 905:8,
905:10, 905:11,
905:13, 905:15,
905:18, 907:8,
915:18, 921:9,
930:3, 930:4
**disappear** [3] - 848:9,
866:20, 866:22
**disclose** [4] - 884:12,
914:17, 929:3, 930:2
**disclosed** [6] - 881:2,
888:15, 927:10,
928:22, 929:20,
940:5
**disclosure** [4] -

926:24, 928:16,
929:13, 929:24
**discounted** [1] - 952:8
**discovery** [1] - 964:10
**discretion** [1] - 828:15
**discuss** [4] - 848:20,
874:4, 906:4, 906:24
**discussed** [9] - 855:7,
876:4, 876:7, 891:6,
891:12, 905:24,
912:8, 949:7, 949:11
**discussing** [6] - 830:2,
896:6, 932:20,
940:2, 945:10, 956:4
**discussion** [3] -
857:24, 942:16,
964:14
**discussions** [5] -
887:16, 912:13,
916:13, 942:10,
963:21
**dismissed** [1] - 956:11
**distribution** [1] -
927:24
**DISTRICT** [3] - 825:1,
825:1, 825:10
**division** [9] - 852:24,
852:25, 853:10,
853:12, 860:13,
868:12, 868:16,
880:11, 950:2
**Division** [2] - 856:13,
856:16
**DNC** [17] - 858:10,
859:4, 863:5,
863:10, 863:18,
943:15, 943:23,
950:11, 950:25,
951:10, 954:5,
954:11, 954:20,
954:24, 955:20,
956:19, 956:22
**document** [5] -
838:17, 874:14,
874:16, 877:25,
878:14
**documents** [1] -
922:17
**DOJ** [8] - 856:25,
864:2, 864:4, 864:5,
864:6, 957:7, 957:24
**DOJ's** [1] - 957:4
**Donald** [5] - 939:15,
939:16, 940:24,
955:13, 960:22
**done** [6] - 848:12,
877:15, 885:11,
952:3, 957:13,
958:25
**doubt** [2] - 889:23,

892:18
**doubting** [1] - 959:12
**down** [15] - 853:5,
862:16, 868:14,
874:18, 877:2,
896:13, 910:19,
912:7, 945:13,
945:16, 958:3,
958:4, 961:7, 964:2
**download** [2] -
834:11, 835:2
**downloaded** [3] -
834:4, 834:8, 834:25
**dragged** [1] - 945:9
**drilled** [1] - 946:19
**drive** [4] - 850:15,
850:16, 960:15,
961:14
**drives** [2] - 850:9,
850:21
**drop** [1] - 868:13
**duration** [1] - 901:3
**Durham** [4] - 827:9,
833:20, 965:17
**during** [16] - 829:7,
849:22, 849:25,
850:3, 850:22,
859:3, 929:23,
933:15, 936:21,
936:24, 939:25,
940:6, 940:7, 941:2,
946:9, 955:23

# E

**early** [4] - 868:2,
899:25, 900:5,
936:23
**ease** [1] - 949:1
**easier** [1] - 836:17
**easy** [1] - 862:10
**EDGAR** [1] - 825:13
**editor** [1] - 944:10
**editorial** [1] - 942:21
**effect** [1] - 916:19
**efficiency** [2] - 830:6,
830:18
**efficient** [1] - 957:16
**effort** [4] - 846:14,
854:9, 934:18, 937:7
**efforts** [4] - 847:10,
853:17, 853:22,
934:23
**eight** [1] - 890:21
**eights** [1] - 890:22
**either** [18] - 843:18,
845:4, 878:10,
881:12, 888:8,
891:9, 904:1, 904:4,
915:2, 918:13,

943:14, 943:23,
948:6, 951:21,
953:1, 961:7, 965:5,
965:12
**election** [1] - 960:4
**electronic** [5] -
838:20, 838:21,
841:2, 853:23,
960:25
**element** [1] - 917:23
**elements** [2] - 916:7,
965:18
**elicit** [3] - 939:1,
939:3, 939:4
**elicited** [1] - 828:13
**elsewhere** [1] - 909:2
**email** [18] - 882:15,
882:23, 882:25,
884:9, 903:22,
904:21, 904:22,
905:21, 907:7,
907:17, 907:18,
908:3, 908:11,
908:12, 909:22,
910:7
**emails** [5] - 833:22,
882:22, 883:2,
923:4, 928:10
**embedded** [2] -
882:22, 904:23
**employee** [2] - 837:25,
852:12
**employees** [1] -
836:25
**enables** [2] - 836:21,
837:7
**encompass** [1] -
871:12
**encountered** [2] -
917:10, 927:25
**End** [1] - 839:6
**end** [16] - 841:23,
876:11, 886:22,
912:13, 922:24,
925:11, 932:17,
936:16, 937:1,
937:10, 938:12,
939:7, 943:10,
943:21, 956:13,
957:19
**ended** [2] - 850:20,
934:25
**ends** [1] - 908:3
**enforcement** [1] -
851:16
**enforcing** [1] - 880:4
**engaged** [2] - 883:18,
945:18
**engineering** [1] -
843:24

**entered** [1] - 886:2
**enters** [2] - 832:2,
894:8
**entirety** [1] - 958:18
**entities** [2] - 841:14,
846:3
**entity** [1] - 868:1
**entry** [2] - 840:20,
886:8
**entryway** [1] - 840:19
**ephemeral** [1] -
866:20
**Eric** [11] - 903:14,
904:1, 904:3,
905:25, 906:11,
910:18, 911:8,
911:13, 914:1,
914:4, 925:4
**especially** [2] - 849:4,
866:22
**ESQ** [7] - 825:12,
825:13, 825:13,
825:16, 825:17,
825:17, 825:18
**essence** [2] - 842:9,
856:23
**essentially** [4] - 830:7,
857:16, 962:15,
965:1
**establish** [1] - 863:24
**established** [1] -
848:15
**estimate** [1] - 869:19
**estimating** [1] -
865:13
**estimation** [2] - 834:4,
930:7
**etc** [2] - 863:5, 863:18
**evening** [2] - 897:23,
898:23
**event** [4] - 828:25,
837:5, 872:5, 907:23
**events** [1] - 890:5
**eventually** [10] -
870:4, 870:5,
877:17, 878:6,
902:9, 921:14,
921:16, 934:25,
935:21, 936:9
**evidence** [21] - 860:8,
877:8, 877:12,
878:2, 878:15,
881:18, 920:17,
922:16, 949:7,
949:11, 951:9,
951:15, 952:13,
952:22, 953:1,
953:8, 953:17,
954:23, 960:15,
961:13

**exact** [1] - 954:16
**exactly** [7] - 833:11,
904:2, 921:22,
954:19, 958:9,
959:10
**EXAMINATION** [1] -
832:14
**example** [2] - 837:8,
854:2
**excerpt** [1] - 948:5
**exchange** [6] - 835:4,
835:7, 899:15,
899:19, 941:17,
955:23
**exchanges** [2] -
897:15, 899:23
**excuse** [5] - 846:10,
868:5, 877:13,
881:16, 919:22
**excused** [1] - 889:8
**executive** [4] - 838:21,
839:9, 840:20,
900:22, 902:4
**executives** [1] -
839:18
**exercised** [1] - 892:16
**exhibit** [1] - 886:13
**Exhibit** [31] - 832:23,
838:14, 838:24,
842:3, 861:15,
861:22, 865:4,
873:4, 873:12,
877:22, 882:14,
882:19, 885:20,
886:3, 894:19,
894:21, 897:2,
901:14, 902:13,
904:20, 904:25,
908:1, 908:8, 923:2,
932:21, 936:19,
941:6, 946:22,
947:21, 958:12,
959:17
**exist** [1] - 866:21
**existence** [2] - 848:10,
915:5
**exits** [3] - 887:18,
892:1, 964:1
**expand** [1] - 880:12
**expect** [4] - 830:10,
843:1, 897:24, 966:9
**expected** [1] - 885:8
**experience** [17] -
848:5, 856:25,
857:1, 860:16,
866:15, 885:12,
885:22, 915:21,
916:3, 916:12,
918:6, 918:10,
926:16, 945:4,

946:2, 958:20
**expert** [7] - 843:25,
858:19, 868:15,
868:16, 910:2,
915:25, 965:14
**experts** [19] - 843:16,
844:3, 844:17,
845:17, 845:20,
857:4, 865:3, 899:4,
899:9, 923:20,
924:5, 924:7, 924:9,
924:10, 960:19,
961:17, 962:9, 963:1
**explain** [11] - 841:5,
856:22, 856:24,
857:10, 858:2,
858:20, 863:15,
908:14, 940:15,
941:20, 952:4
**explained** [8] - 836:11,
855:25, 856:2,
856:18, 856:19,
860:1, 860:4
**explaining** [2] -
856:19, 857:8
**extent** [10] - 828:20,
862:7, 866:9,
875:22, 875:25,
914:13, 916:4,
918:6, 942:7, 963:8
**extremely** [1] - 946:1
**eye** [1] - 941:13

# F

**face** [1] - 854:11
**facet** [1] - 946:14
**facility** [1] - 840:18
**fact** [6] - 862:2,
893:18, 913:9,
917:11, 918:2,
929:15
**factors** [1] - 915:22
**facts** [2] - 926:1, 940:2
**fades** [1] - 875:9
**fair** [10] - 859:15,
888:11, 891:17,
892:19, 893:4,
893:10, 893:22,
933:19, 948:13,
948:22
**fairly** [6] - 846:16,
894:2, 903:8,
914:19, 918:13,
927:20
**fall** [1] - 920:8
**falling** [1] - 871:8
**false** [3] - 942:14,
944:25, 945:23
**familiar** [11] - 837:9,

844:6, 844:8, 856:3,
860:2, 860:3,
868:11, 877:3,
895:2, 915:19
**familiarity** [1] - 868:10
**family** [2] - 888:24,
891:15
**far** [1] - 838:10
**father** [1] - 889:19
**FBI** [113] - 836:14,
836:16, 836:19,
836:25, 837:15,
837:25, 838:19,
838:20, 839:10,
839:12, 839:16,
839:20, 839:22,
844:23, 848:10,
849:2, 851:2,
851:17, 851:22,
852:3, 852:5, 852:9,
852:11, 852:23,
853:12, 853:17,
853:21, 854:13,
854:24, 855:3,
860:15, 868:7,
868:12, 869:3,
869:8, 869:9,
870:22, 874:10,
876:13, 876:20,
879:21, 880:2,
880:3, 880:16,
881:16, 881:17,
882:8, 882:11,
882:16, 883:17,
895:7, 895:8,
895:10, 895:12,
895:24, 896:25,
898:15, 899:5,
900:7, 903:20,
903:23, 904:9,
904:13, 905:7,
908:19, 908:23,
904:24, 911:4,
912:11, 913:4,
913:20, 915:17,
915:18, 916:4,
916:7, 916:19,
917:9, 917:12,
917:18, 917:21,
918:2, 918:7, 920:8,
920:12, 920:20,
921:25, 922:15,
922:19, 922:24,
924:12, 926:7,
926:8, 926:9,
926:10, 926:18,
927:2, 927:4, 927:6,
927:11, 927:15,
927:19, 930:3,
932:22, 943:13,

945:18, 951:20,
952:10, 956:9,
963:3, 963:4
**FBI's** [15] - 852:10,
896:21, 911:23,
915:11, 918:11,
919:19, 919:21,
919:23, 926:20,
939:25, 940:23,
941:2, 944:16,
953:20, 955:12
**federation** [1] - 882:11
**Federation** [3] - 854:8,
854:9, 854:15
**feelings** [2] - 937:3,
937:13
**felt** [2] - 945:2, 945:9
**few** [10] - 829:3, 833:4,
849:10, 889:21,
889:24, 896:1,
901:16, 906:4,
906:24, 933:3
**fides** [1] - 863:24
**field** [5] - 844:3,
844:17, 848:6,
866:15, 920:18
**figure** [8] - 849:11,
851:20, 867:2,
868:7, 884:19,
884:22, 928:14,
954:19
**figured** [1] - 935:16
**figuring** [1] - 885:7
**file** [3] - 922:2, 922:4,
922:16
**fill** [1] - 878:5
**filled** [4] - 888:1,
888:8, 893:7, 893:18
**filling** [1] - 892:13
**final** [1] - 922:25
**finally** [3] - 868:20,
905:14, 910:7
**findings** [1] - 965:9
**fine** [1] - 948:23
**finish** [1] - 867:24
**firm** [13] - 856:3,
933:24, 933:25,
935:4, 935:17,
936:22, 937:7,
937:12, 937:14,
950:11, 950:25,
954:5
**firms** [2] - 934:8,
934:22
**first** [36] - 829:7,
829:8, 831:6, 833:2,
833:12, 834:1,
835:12, 835:22,
853:2, 855:12,
855:25, 862:12,

878:8, 881:25,
883:2, 886:7, 886:8,
889:17, 893:3,
894:14, 897:12,
899:10, 900:3,
900:12, 909:14,
911:1, 918:12,
919:15, 934:19,
940:10, 941:25,
942:7, 945:10,
946:16, 947:2,
947:11
**five** [2] - 869:21,
887:13
**flag** [2] - 829:3, 829:14
**flipped** [1] - 850:23
**floor** [8] - 832:7,
839:12, 839:14,
839:15, 839:17,
839:19, 877:1, 877:2
**fly** [1] - 831:1
**focus** [2] - 929:1,
959:17
**focused** [2] - 855:1,
943:16
**focusing** [2] - 897:5,
956:18
**folks** [1] - 836:25,
844:23, 872:15,
877:14, 878:11,
880:3, 880:6,
883:13, 903:23,
935:3, 935:4, 935:5
**follow** [4] - 884:3,
891:20, 895:10,
920:16
**follow-up** [1] - 884:3
**following** [6] - 836:5,
886:10, 897:5,
920:13, 930:12,
938:21
**food** [1] - 890:13
**FOR** [1] - 825:1
**force** [2] - 923:22,
924:17
**foregoing** [1] - 967:4
**foreign** [8] - 853:18,
853:19, 860:9,
867:12, 867:14,
867:15, 868:24
**Foreign** [2] - 854:2,
867:11
**forget** [1] - 914:22
**forgot** [1] - 956:13
**form** [4] - 878:25,
879:4, 949:24,
960:12
**formal** [2] - 922:16,
936:18
**formally** [2] - 921:25,

922:20
**format** [1] - 946:3
**former** [3] - 864:2,
864:6, 920:22
**forth** [1] - 837:24
**forward** [7] - 879:22,
904:14, 907:24,
922:9, 933:4,
934:14, 953:16
**Foundation** [2] -
863:5, 863:14
**foundation** [7] - 830:7,
863:10, 863:13,
863:18, 912:23,
913:16, 919:7
**four** [5] - 868:24,
901:4, 901:5, 957:1
**fours** [1] - 890:22
**frames** [1] - 950:3
**frankly** [1] - 910:16
**fraud** [1] - 957:20
**frequency** [1] - 921:2
**frequent** [2] - 836:20,
874:12
**Friday** [3] - 866:4,
866:8, 875:7
**friend** [3] - 842:17,
844:5, 939:19
**friends** [5] - 894:1,
911:16, 932:25,
945:20, 945:21
**front** [5] - 945:15,
946:3, 949:19,
958:13
**frustrated** [1] - 914:19
**full** [9] - 874:14,
945:13, 948:2,
948:4, 948:7, 949:1,
949:2, 952:11, 967:5
**fully** [3] - 915:16,
917:8, 953:19
**functioning** [1] -
957:11
**furthermore** [1] -
852:7
**future** [1] - 944:11
**FYI** [1] - 933:12
**FYI......** [1] - 910:12

## G

**gap** [1] - 910:24
**gates** [1] - 836:22
**gather** [1] - 915:22
**gathered** [5] - 844:14,
844:20, 846:9,
846:10, 865:22
**gatherings** [1] - 890:8
**general** [22] - 868:10,
870:10, 870:11,

870:14, 870:17,
870:19, 872:7,
872:14, 874:1,
882:3, 895:16,
900:7, 900:20,
920:8, 920:11,
922:19, 926:10,
927:15, 942:10,
943:13, 952:23,
957:5
**General** [9] - 856:12,
915:18, 920:13,
953:19, 957:4,
957:7, 957:9,
957:25, 963:4
**General's** [1] - 852:8
**general's** [1] - 958:21
**generally** [13] - 858:9,
875:10, 876:23,
895:11, 895:12,
896:4, 898:9,
937:12, 937:14,
939:9, 939:11,
966:3, 966:7
**generated** [1] - 927:10
**genius** [1] - 868:17
**gentlemen** [3] -
887:11, 948:18,
963:19
**girl** [1] - 889:18
**girls** [4] - 889:25,
890:16, 890:17,
890:25
**gist** [1] - 855:22
**given** [13] - 845:18,
845:20, 845:23,
852:19, 879:7,
879:14, 880:9,
884:25, 902:23,
919:25, 925:9,
939:1, 965:25
**global** [1] - 853:21
**goal** [2] - 911:24,
911:25
**govern** [1] - 852:9
**government** [35] -
833:8, 833:15,
835:3, 838:23,
843:3, 854:8,
854:19, 854:23,
861:21, 861:25,
867:13, 867:14,
867:15, 873:11,
877:9, 877:11,
878:21, 882:10,
882:18, 885:12,
885:13, 886:3,
892:15, 904:24,
908:7, 909:2, 916:8,
916:14, 927:9,

927:11, 929:2,
929:20, 940:20,
947:21, 959:16
**Government** [26] -
832:23, 838:24,
861:14, 861:22,
865:4, 873:12,
877:22, 882:13,
882:19, 885:20,
886:3, 894:19,
894:21, 897:2,
901:14, 902:13,
904:19, 904:25,
908:1, 923:2,
932:21, 941:6,
946:22, 947:21,
958:11, 959:17
**government's** [2] -
828:10, 893:14
**Government's** [3] -
838:13, 842:3, 873:4
**great** [8] - 830:22,
869:6, 876:3,
881:23, 933:13,
934:13, 963:17
**greater** [1] - 946:19
**Group** [2] - 943:15,
943:24
**group** [3] - 867:13,
875:5, 907:6
**groups** [1] - 874:9
**guess** [8] - 828:9,
895:12, 906:22,
914:13, 920:5,
951:24, 957:19,
964:9
**guessing** [2] - 865:13,
865:14
**guidelines** [4] - 852:8,
852:11, 920:14,
953:20
**gun** [2] - 860:25, 861:1
**guy** [5] - 856:24,
858:3, 868:17,
868:19, 898:25
**guys** [2] - 849:5,
911:16

## H

**hack** [1] - 858:15
**hacks** [1] - 858:10
**half** [3] - 850:6,
922:14, 957:2
**half-an-inch** [1] -
850:6
**hallway** [3] - 877:2,
945:13, 945:16
**hand** [2] - 923:22,
924:18

handed [1] - 850:21
handing [1] - 941:8
handled [6] - 830:25,
872:1, 872:2, 877:8,
877:10, 877:11
handles [1] - 908:25
handling [1] - 878:15
hands [3] - 953:8,
953:9, 961:8
handwriting [2] -
862:9, 875:2
hanged [1] - 940:12
happy [3] - 830:14,
831:21, 910:3
hard [4] - 847:12,
850:21, 878:18,
898:11
harder [7] - 846:20,
848:10, 848:15,
849:11, 866:24,
867:2, 868:7
HARDWICK [1] -
825:18
harm [1] - 853:20
hated [1] - 860:7
head [5] - 852:22,
852:24, 853:9,
856:15, 880:10,
883:17, 903:25,
923:7
header [2] - 946:23,
958:13
headhunter [2] -
935:10, 935:17
heading [1] - 874:18
headquarters [6] -
836:20, 839:12,
839:22, 895:10,
895:12, 920:19
Health [6] - 846:8,
846:13, 859:24,
867:21, 868:1, 868:7
health [1] - 846:9
hear [2] - 851:8,
925:25
heard [5] - 827:18,
844:6, 847:25,
922:23, 963:14
hearing [3] - 886:11,
930:13, 938:22
held [8] - 850:23,
855:15, 883:13,
886:11, 930:13,
938:22, 946:5
HELD [1] - 825:10
hello [1] - 891:5
help [7] - 833:8, 836:9,
842:20, 843:3,
853:25, 861:11,
880:3

helpful [1] - 949:10
helping [1] - 852:14
hereby [1] - 967:3
HGOR [1] - 940:20
hide [1] - 893:6
high [9] - 835:23,
855:2, 856:14,
865:19, 878:11,
882:11, 916:14,
961:24
high-ranking [1] -
856:14
highest [1] - 852:23,
853:12
highest-ranking [2] -
852:23, 853:12
highlight [2] - 828:22,
894:25
highly [3] - 865:20,
940:9, 941:25
Hillary [10] - 858:16,
859:8, 863:12,
950:12, 951:1,
951:10, 952:2,
954:5, 956:19,
956:22
Hinen [1] - 862:16
HINEN [1] - 856:9
Hinnen [2] - 856:6,
862:16
hold [10] - 831:5,
884:16, 884:24,
885:8, 885:12,
910:19, 911:25,
912:17, 916:8, 930:8
holding [1] - 938:8
home [1] - 886:14
honest [1] - 921:19
honestly [2] - 955:10,
956:11
honing [1] - 956:15
Honor [59] - 827:2,
827:5, 827:11,
827:19, 828:3,
828:7, 828:10,
828:12, 828:18,
829:2, 829:4,
829:15, 829:25,
830:1, 830:5,
830:16, 831:3,
831:10, 831:14,
831:19, 831:24,
832:12, 838:23,
861:21, 873:11,
873:14, 882:18,
882:20, 886:1,
886:12, 886:23,
887:1, 887:7, 889:5,
889:7, 892:8,
892:12, 893:2,

893:12, 904:24,
918:4, 919:9,
938:24, 939:2,
947:20, 947:22,
948:2, 948:6,
948:23, 950:22,
959:16, 959:20,
963:16, 965:7,
965:13, 965:16,
965:24, 966:8,
966:14
HONORABLE [1] -
825:10
honorable [1] - 942:22
Hope [3] - 944:9,
947:6, 947:7
hoped [2] - 898:15
hoping [1] - 897:25
hospital [5] - 846:8,
867:19, 867:21,
868:3, 868:4
hostile [1] - 853:18
hour [3] - 907:13,
963:24, 966:10
hours [1] - 957:2
House [1] - 939:24
house [5] - 890:15,
934:22, 940:20,
944:14, 950:17
human [4] - 857:16,
857:17, 880:1, 881:5

---

## I

iCloud [4] - 834:4,
834:6, 834:7, 834:22
ID [2] - 836:21, 837:5
idea [13] - 830:11,
842:25, 851:7,
851:13, 851:19,
852:13, 873:20,
884:10, 899:4,
922:21, 934:5,
938:14, 944:12
ideal [2] - 897:22,
898:23
identified [2] - 844:24,
856:1
identify [1] - 843:16
identity [16] - 879:24,
880:1, 880:8,
880:23, 881:2,
896:11, 898:12,
898:17, 898:20,
899:5, 902:8,
902:10, 903:12,
903:24, 906:20
imagine [1] - 874:10
imbue [1] - 858:6
iMessage [1] - 834:12

imessages [1] -
833:25
immediately [2] -
852:21, 961:6
impact [1] - 869:11
impartial [4] - 891:17,
891:20, 893:5,
893:10
impartiality [1] -
893:16
impeaching [2] -
830:19, 949:18
impeachment [3] -
947:24, 948:15,
949:19
implicated [1] - 830:24
implied [1] - 951:25
importance [3] -
857:2, 859:18,
882:11
important [5] - 835:25,
849:8, 880:2, 880:4,
880:20
imprecise [1] - 963:12
impression [4] -
842:15, 843:6,
845:17, 845:22
improper [7] - 851:17,
851:18, 945:18,
952:3, 952:5, 953:6,
953:18
improperly [1] -
945:22
impropriety [1] -
953:14
IN [1] - 825:1
in-house [1] - 934:22
in-person [1] - 853:6
inaccurate [4] - 962:1,
962:12, 962:16,
963:11
inappropriate [3] -
951:17, 951:19,
951:22
inch [1] - 850:6
included [2] - 892:14,
908:20
including [4] - 853:15,
930:4, 934:8, 957:13
incoming [2] - 902:22,
902:23
Incoming [1] - 896:2
inconsistency [1] -
948:20
inconsistent [2] -
875:11, 959:20
indeed [1] - 953:18
independent [2] -
957:10, 963:23
Individual [1] - 878:20

information [74] -
839:3, 840:17,
840:18, 841:7,
842:23, 843:2,
844:14, 844:20,
845:9, 845:10,
845:12, 845:23,
847:22, 848:22,
850:10, 850:12,
852:6, 852:7,
852:12, 853:13,
857:3, 857:17,
860:9, 864:24,
866:10, 879:19,
879:22, 880:8,
880:10, 880:16,
880:19, 881:24,
888:1, 903:19,
912:9, 914:23,
915:22, 917:13,
917:16, 919:20,
919:21, 919:23,
921:1, 926:6,
926:12, 926:17,
926:22, 927:9,
927:13, 927:17,
927:20, 927:23,
928:7, 928:8,
928:11, 928:21,
929:3, 929:8,
929:14, 929:19,
929:24, 930:2,
930:6, 940:6,
951:18, 951:20,
952:7, 956:10,
960:5, 960:14,
961:4, 961:5, 961:13
informed [5] - 881:12,
906:3, 906:23,
907:1, 966:12
informing [1] - 918:21
initial [3] - 913:12,
913:14, 936:20
Initial [1] - 878:19
initiate [2] - 927:4,
927:6
injury [1] - 857:6
innocent [3] - 846:18,
846:19
inquired [1] - 934:9
inquiries [2] - 908:21,
940:14
inquiry [1] - 955:17
inside [2] - 935:17,
937:6
Inspector [4] - 957:4,
957:7, 957:9, 957:25
inspector [2] - 957:5,
958:21
instance [4] - 916:16,

940:19, 959:11,
961:25
**institute** [1] - 935:25
**Institute** [4] - 936:5,
936:7, 936:9, 936:23
**instruction** [3] -
828:16, 829:9,
948:11
**instructions** [1] -
891:21
**intelligence** [6] -
837:2, 853:18,
860:9, 930:4, 930:5,
940:21
**Intelligence** [1] - 854:2
**intend** [3] - 939:2,
939:4, 964:25
**intended** [4] - 853:25,
854:1, 877:7, 957:11
**intends** [1] - 938:25
**intent** [1] - 847:23
**interact** [3] - 837:18,
908:24, 909:5
**interacted** [2] -
855:17, 933:20
**interacting** [2] - 872:6,
908:20
**interaction** [4] -
855:10, 946:17,
956:4, 961:24
**interactions** [9] -
854:19, 871:25,
874:7, 876:22,
882:9, 911:17,
916:4, 960:16,
961:15
**interacts** [1] - 908:25
**interest** [2] - 852:15,
916:22
**interested** [1] - 934:10
**interesting** [1] - 891:8
**intermediary** [1] -
868:4
**internal** [3] - 852:10,
929:20, 953:20
**internally** [1] - 855:7
**internationally** [1] -
844:2
**Internet** [3] - 847:2,
847:13, 866:19
**interpretation** [1] -
951:24
**interpreting** [1] -
875:8
**interrupt** [1] - 856:11
**interview** [15] -
928:13, 936:17,
939:22, 940:1,
940:7, 944:13,
944:20, 944:23,

944:24, 946:9,
947:1, 958:22,
958:24, 959:14,
962:8
**interviewed** [11] -
927:16, 928:18,
928:20, 939:23,
954:14, 957:4,
957:5, 958:8, 959:8,
959:9, 959:12
**interviews** [6] - 935:1,
937:9, 955:12,
958:25, 959:9,
959:10
**introduction** [1] -
841:25
**investigate** [11] -
848:10, 849:2,
849:7, 857:25,
868:18, 869:8,
884:15, 912:2,
913:8, 915:16,
927:14
**investigated** [2] -
927:22, 956:9
**investigating** [16] -
854:14, 858:16,
882:8, 884:21,
912:11, 916:21,
917:12, 917:15,
917:18, 917:22,
929:2, 940:23,
941:4, 950:17, 958:2
**investigation** [37] -
854:16, 854:22,
855:4, 855:6, 855:9,
869:4, 869:11,
879:18, 881:17,
884:18, 896:25,
916:5, 916:18,
918:2, 920:24,
921:24, 921:25,
922:20, 922:23,
924:14, 927:5,
927:7, 928:2, 929:1,
929:10, 929:11,
929:12, 929:16,
929:17, 939:25,
940:23, 941:3,
955:13, 958:10,
964:25, 965:9
**investigations** [7] -
849:4, 853:22,
868:12, 920:9,
920:12, 920:21,
957:12
**investigative** [7] -
852:9, 854:1,
868:16, 870:20,
918:24, 920:1,

922:10
**investigatively** [1] -
910:12
**investigators** [3] -
928:3, 941:4, 958:2
**invite** [1] - 839:3
**involved** [8] - 854:6,
889:19, 916:13,
920:24, 929:13,
939:14, 939:16,
940:16
**involves** [1] - 866:22
**involving** [1] - 909:2
**iPhone** [1] - 833:14
**issue** [11] - 830:23,
831:7, 884:3, 884:4,
893:5, 896:6, 903:9,
909:2, 964:4,
964:10, 966:1
**issues** [6] - 830:24,
831:2, 941:12,
947:25, 958:1,
963:22
**itself** [2] - 827:21,
945:4
**IV** [1] - 825:13

**J**

**JAMES** [2] - 826:3,
832:13
**James** [2] - 876:21,
943:13
**Jenkins** [1] - 831:24
**Jim** [7] - 884:11,
897:21, 906:7,
907:18, 923:19,
925:25, 933:12
**job** [15] - 908:18,
908:19, 915:17,
934:6, 934:24,
935:6, 935:7,
935:10, 935:20,
935:21, 935:23,
935:24, 936:22,
937:1
**jobs** [3] - 934:8,
934:19, 934:21
**John** [4] - 827:9,
942:25, 943:5,
944:10
**joined** [1] - 827:8
**JONATHAN** [1] -
825:13
**Jonathan** [1] - 827:8
**journal** [1] - 941:23
**Journal** [3] - 845:6,
866:4, 941:22
**Judge** [5] - 894:11,
912:23, 919:7,

964:15, 964:23
**JUDGE** [1] - 825:10
**judge** [2] - 831:11,
949:17
**judiciary** [1] - 940:19
**July** [2] - 959:2,
959:13
**Juror** [3] - 887:14,
893:14, 894:6
**juror** [6] - 889:11,
891:19, 892:1,
892:10, 893:10,
893:21
**JUROR** [16] - 887:24,
888:2, 888:6,
888:14, 888:18,
888:21, 888:25,
889:16, 890:2,
890:6, 890:9,
890:22, 891:4,
891:7, 891:14,
891:22
**jurors** [1] - 891:17
**JURY** [1] - 825:9
**jury** [34] - 829:8,
830:5, 830:13,
831:4, 831:18,
832:2, 832:25,
833:11, 836:13,
853:14, 862:12,
865:16, 874:14,
875:1, 886:11,
886:19, 887:18,
891:10, 892:25,
894:8, 897:19,
905:6, 905:20,
907:17, 908:14,
930:13, 938:22,
940:15, 941:20,
947:16, 964:1,
964:6, 966:4, 966:11
**jury's** [1] - 896:20
**Justice** [8] - 851:18,
909:1, 952:24,
957:10, 957:12,
957:13, 957:16,
957:21
**Justice's** [1] - 856:13

**K**

**keep** [2] - 838:20,
894:5
**keeping** [1] - 941:13
**kept** [1] - 834:9
**kid's** [1] - 911:20
**kids** [1] - 911:18
**kind** [12] - 833:12,
833:19, 836:12,
843:3, 857:18,

868:4, 910:13,
938:4, 941:7,
941:19, 956:11,
956:13
**knowing** [3] - 843:1,
851:14, 869:12
**knowledge** [4] -
880:12, 880:13,
923:23, 924:25
**known** [5] - 845:8,
880:21, 888:7,
888:15, 892:12
**knows** [1] - 892:20
**Kori** [1] - 827:9
**Kortan** [17] - 883:10,
883:17, 903:25,
904:2, 905:12,
908:4, 908:5,
908:12, 908:14,
909:8, 909:17,
910:7, 910:11,
910:15, 911:6,
926:6, 929:23
**KORTAN** [1] - 883:10
**Kremlin** [4] - 841:10,
854:7, 867:19,
960:22

**L**

**lack** [1] - 935:12
**ladies** [3] - 887:11,
948:18, 963:19
**Landau** [2] - 843:23,
865:14
**large** [1] - 894:2
**larger** [1] - 840:22
**last** [13] - 827:17,
841:16, 861:3,
865:15, 922:23,
949:6, 949:11,
950:10, 950:24,
951:25, 953:22,
954:4, 959:25
**lasted** [1] - 852:16
**LATHAM** [1] - 825:18
**Law** [2] - 943:15,
943:24
**law** [11] - 849:4,
851:16, 860:18,
860:21, 880:4,
920:13, 933:24,
933:25, 934:8,
934:21, 935:4
**lawful** [1] - 952:15
**lawyer** [13] - 851:22,
854:24, 856:17,
856:24, 857:6,
860:10, 860:17,
860:23, 871:24,

978

872:5, 880:22,
881:1, 881:5
**lawyers** [4] - 858:23,
881:6, 963:3, 963:5
**lead** [1] - 952:2
**leaders** [1] - 884:8
**leadership** [7] -
839:20, 854:8,
870:9, 870:13,
885:9, 903:23,
926:20
**leading** [2] - 918:4,
937:7
**leads** [1] - 920:16
**leak** [7] - 926:23,
927:2, 927:4, 927:6,
928:2, 928:4, 964:24
**leaked** [4] - 855:9,
926:22, 927:13,
928:9
**leaks** [1] - 927:17
**learn** [3] - 906:16,
916:21, 926:21
**learned** [7] - 852:19,
880:21, 881:13,
893:20, 906:17,
954:12, 954:19
**learning** [2] - 899:4,
899:5
**least** [7] - 846:12,
850:10, 856:4,
858:9, 860:2,
872:16, 916:15
**leave** [2] - 893:11,
926:7
**leaves** [2] - 923:24,
925:1
**left** [9] - 832:18, 926:8,
926:9, 932:22,
933:16, 933:17,
934:5, 945:13
**legal** [3] - 877:7,
920:21, 936:9
**lengthier** [1] - 869:19
**lengthy** [3] - 869:21,
944:21, 956:25
**less** [2] - 890:12,
952:8
**letter** [5] - 935:8,
935:25, 942:24,
943:22, 944:10
**level** [3] - 828:17,
921:2, 961:24
**levels** [3] - 916:14,
927:19, 945:3
**Lichtblau** [28] -
903:14, 904:3,
904:14, 905:25,
906:11, 906:21,
907:2, 907:23,

908:12, 909:8,
909:14, 909:22,
909:25, 910:18,
910:21, 911:8,
911:10, 912:4,
913:4, 914:1, 914:7,
914:8, 916:13,
916:24, 923:4,
925:5, 925:9, 925:14
**life** [1] - 885:22
**likely** [2] - 848:8,
900:22
**limit** [1] - 927:24
**limited** [1] - 959:18
**line** [11] - 839:2,
862:17, 864:8,
867:16, 868:14,
871:2, 873:17,
883:4, 943:25,
955:17, 959:23
**lines** [2] - 852:5,
937:25
**link** [1] - 937:20
**LISA** [1] - 967:3
**Lisa** [1] - 825:21
**list** [3] - 877:13,
927:25
**listed** [1] - 885:24
**listened** [1] - 961:5
**literally** [3] - 842:24,
851:7, 945:12
**literature** [1] - 941:7
**litigation** [2] - 870:21,
870:23
**live** [2] - 923:19,
933:13
**lived** [1] - 946:2
**LLP** [2] - 825:18, 943:1
**located** [1] - 839:23
**location** [1] - 918:20
**logs** [1] - 922:16
**look** [8] - 833:16,
833:20, 850:24,
861:10, 872:25,
897:12, 941:5,
946:21
**looked** [10] - 833:22,
833:23, 835:1,
835:4, 835:15,
841:12, 847:7,
898:2, 958:1, 961:1
**looking** [30] - 834:11,
835:8, 838:16,
849:6, 849:7,
861:10, 873:16,
883:2, 885:21,
894:19, 895:18,
897:14, 901:24,
909:13, 918:8,
922:6, 934:6, 934:8,

934:14, 934:19,
934:21, 936:19,
940:16, 940:22,
941:2, 944:16,
955:2, 957:19,
957:25, 958:13
**looks** [31] - 838:17,
847:9, 862:15,
867:19, 874:19,
875:3, 875:7,
885:23, 885:25,
899:22, 899:24,
900:13, 901:15,
902:14, 902:25,
907:12, 909:21,
909:22, 909:24,
923:21, 923:24,
924:16, 925:2,
925:16, 933:6,
934:12, 937:18,
937:20, 941:22,
947:1
**lost** [1] - 951:4
**lower** [2] - 865:25,
874:25
**lunch** [3] - 963:20,
966:15, 966:16
**lunchtime** [1] - 836:7

## M

**M-c-C-A-B-E** [1] -
876:19
**ma'am** [1] - 887:19
**maelstrom** [1] -
945:10
**magnetometer** [1] -
837:9
**magnified** [1] - 942:19
**magnify** [1] - 835:10
**main** [3] - 871:24,
872:5, 900:19
**major** [3] - 845:4,
845:8, 946:14
**majority** [2] - 949:7,
949:11
**malicious** [2] - 846:16,
853:18
**man** [1] - 942:22
**management** [1] -
957:14
**managing** [1] - 942:25
**March** [3] - 830:3,
830:10, 833:5
**marked** [4] - 861:14,
885:19, 904:19,
908:1
**Maryland** [1] - 911:20
**mask** [1] - 832:11
**matching** [1] - 964:15

**material** [23] - 831:20,
833:21, 834:8,
834:25, 844:25,
845:21, 857:7,
858:1, 858:3,
859:19, 860:7,
860:11, 878:12,
878:20, 878:23,
880:9, 884:13,
913:6, 915:4, 915:8,
915:9, 964:8
**materials** [19] -
840:10, 841:2,
848:2, 850:21,
851:23, 855:14,
855:15, 855:20,
869:15, 869:24,
877:16, 878:8,
879:1, 879:7, 879:8,
879:14, 918:22,
925:9, 925:14
**Matt** [3] - 843:25,
844:10, 865:11
**matter** [23] - 829:14,
833:3, 843:1, 848:4,
848:5, 851:12,
869:6, 871:15,
871:18, 872:4,
874:3, 881:18,
905:24, 909:6,
915:11, 916:14,
922:1, 922:2, 922:5,
937:23, 944:15,
951:20
**matters** [14] - 854:25,
861:5, 863:21,
863:22, 870:20,
870:22, 876:4,
876:6, 876:7, 881:8,
908:20, 920:23,
940:2, 944:17
**max** [1] - 833:14
**McCabe** [9] - 876:17,
876:18, 876:19,
881:11, 881:12,
883:10, 883:14,
905:14, 907:8
**mean** [28] - 837:8,
842:21, 843:20,
845:5, 851:10,
858:18, 863:19,
864:12, 880:15,
891:22, 898:24,
898:25, 899:8,
906:10, 907:1,
907:5, 912:5,
922:13, 924:7,
924:18, 924:19,
925:4, 934:5, 945:1,
955:3, 955:19,

956:8, 958:15
**meaning** [6] - 847:10,
857:7, 878:20,
898:16, 910:2, 921:4
**means** [14] - 865:8,
865:12, 866:2,
866:4, 866:6,
867:12, 867:14,
867:22, 867:25,
868:23, 873:18,
924:11, 938:14
**meant** [4] - 899:9,
924:9, 925:3, 944:17
**mechanism** [1] - 925:6
**media** [13] - 841:3,
844:25, 847:15,
867:9, 887:17,
894:16, 903:9,
911:7, 915:25,
923:22, 924:17,
945:11, 963:22
**meet** [6] - 836:3,
836:4, 840:5,
851:20, 917:4,
960:12
**meeting** [100] - 830:3,
835:13, 838:7,
839:8, 840:2,
840:13, 840:14,
840:23, 840:24,
841:4, 841:16,
841:22, 841:23,
841:25, 842:7,
842:9, 842:12,
842:14, 843:5,
848:2, 849:22,
849:25, 850:3,
850:20, 850:23,
851:2, 851:3,
852:16, 852:18,
853:7, 859:3, 859:7,
863:1, 864:24,
872:12, 872:16,
873:18, 873:20,
873:24, 874:5,
874:11, 874:18,
875:3, 875:11,
875:15, 875:18,
875:23, 876:1,
885:3, 885:5, 885:8,
889:2, 889:3,
896:12, 904:14,
907:7, 907:9,
907:10, 907:23,
909:11, 909:14,
909:20, 910:18,
911:1, 911:2,
911:10, 911:23,
912:15, 916:24,
918:12, 918:13,

918:17, 918:18,
919:6, 919:10,
919:12, 921:13,
923:3, 923:4, 935:2,
935:3, 940:9, 942:8,
942:11, 942:15,
943:13, 944:3,
945:11, 946:10,
955:4, 955:9,
956:11, 956:20,
956:22, 959:1, 962:2
**Meeting** [1] - 839:4
**meetings** [11] - 872:8,
872:9, 872:10,
872:11, 872:12,
872:21, 904:13,
904:16, 904:18,
910:21
**members** [6] - 888:24,
894:2, 944:14,
945:7, 955:23,
956:17
**mention** [5] - 844:19,
890:9, 899:19,
904:6, 955:24
**mentioned** [15] -
841:20, 872:7,
883:24, 889:1,
889:17, 889:18,
891:8, 891:23,
921:7, 924:1,
940:13, 950:10,
950:24, 953:23,
954:4
**mere** [1] - 952:5
**message** [44] - 832:24,
833:3, 833:16,
834:17, 835:12,
835:17, 835:22,
835:24, 842:4,
842:5, 842:19,
848:17, 848:18,
859:12, 863:1,
864:16, 864:17,
864:20, 864:21,
875:14, 883:6,
897:3, 897:12,
897:19, 900:1,
901:15, 901:21,
901:24, 902:4,
903:2, 923:13,
923:18, 925:18,
925:23, 926:4,
933:9, 933:10,
937:19, 938:2,
938:3, 944:8, 947:6,
947:7, 962:3
**messages** [4] -
833:12, 833:16,
834:13, 835:10

**met** [14] - 844:10,
874:8, 874:9,
890:16, 893:8,
899:14, 911:10,
911:12, 911:14,
911:15, 935:5,
937:10, 960:14
**methodology** [2] -
846:25, 847:12
**MI** [1] - 867:21
**Michael** [78] - 827:4,
827:12, 834:13,
835:18, 835:23,
835:25, 841:5,
843:1, 845:23,
847:22, 851:4,
851:9, 851:21,
855:25, 856:1,
856:19, 856:22,
856:23, 856:24,
857:5, 857:14,
857:21, 857:22,
857:25, 858:14,
858:17, 858:25,
859:18, 862:14,
863:4, 863:9,
863:11, 863:24,
864:3, 864:4,
865:18, 871:19,
879:18, 879:21,
881:21, 884:11,
885:25, 896:10,
897:17, 902:3,
903:24, 906:18,
924:14, 933:14,
934:5, 934:25,
935:3, 935:13,
936:21, 937:6,
939:13, 941:13,
941:25, 942:1,
942:8, 942:11,
942:22, 943:6,
943:19, 945:10,
946:17, 949:12,
952:25, 955:11,
955:14, 956:5,
960:3, 960:12,
960:13, 962:25,
963:11
**MICHAEL** [2] - 825:6,
825:17
**Michael's** [6] - 837:4,
842:17, 862:16,
898:25, 933:24,
934:4
**Michigan** [1] - 867:22
**middle** [2] - 873:5,
961:12
**might** [35] - 830:13,
833:16, 835:20,

837:3, 851:10,
851:11, 857:12,
860:18, 865:7,
869:8, 869:9,
880:14, 883:25,
884:20, 884:21,
892:21, 893:24,
896:5, 898:25,
902:18, 906:3,
906:23, 909:14,
917:4, 917:15,
917:23, 918:3,
927:11, 928:4,
928:9, 928:11,
929:2, 952:2,
957:22, 963:16
**Mike** [6] - 883:10,
883:16, 908:24,
910:17, 911:6, 926:6
**mind** [10] - 861:11,
881:5, 899:8, 899:9,
899:11, 902:7,
904:10, 930:1,
938:18, 956:12
**mine** [2] - 842:17,
862:11
**minor** [1] - 946:15
**minute** [4] - 831:11,
902:2, 906:22,
915:17
**minutes** [14] - 841:17,
841:19, 852:16,
852:22, 869:22,
887:12, 887:13,
901:4, 901:5,
901:16, 902:21,
906:4, 906:24,
963:24
**miscommunication**
[1] - 935:17
**mistrial** [3] - 828:11,
828:18, 828:20
**misunderstood** [1] -
863:15
**mode** [3] - 853:3,
867:2, 867:25
**moment** [7] - 849:15,
855:16, 877:9,
877:10, 886:24,
943:6
**Monday** [2] - 888:5,
888:9
**money** [2] - 957:17,
957:18
**month** [2] - 922:14
**monthly** [1] - 872:12
**months** [3] - 833:4,
861:3, 922:12
**MOREIRA** [1] - 967:3
**Moreira** [2] - 825:21,

967:10
**MORNING** [1] - 825:6
**morning** [12] - 827:5,
827:6, 827:10,
827:11, 827:14,
827:15, 829:6,
832:16, 832:17,
887:12, 900:3, 966:6
**Moscow** [1] - 867:17
**most** [6] - 834:1,
874:17, 880:2,
914:5, 914:17, 920:5
**motion** [7] - 827:17,
827:18, 827:21,
827:24, 828:11,
828:20, 893:14
**mouth** [1] - 941:1
**move** [3] - 857:25,
912:19, 962:18
**moved** [7] - 839:1,
873:15, 882:21,
886:5, 892:15,
908:10, 959:21
**moving** [2] - 858:4,
922:9
**MR** [101] - 827:11,
827:15, 827:19,
828:2, 830:1,
830:16, 831:3,
831:10, 831:11,
831:14, 831:19,
831:23, 832:12,
832:15, 832:22,
835:9, 838:23,
838:25, 842:2,
861:21, 861:23,
864:19, 873:11,
873:13, 874:13,
874:24, 875:20,
882:18, 882:20,
886:1, 886:4, 886:6,
886:12, 886:18,
886:20, 886:21,
886:23, 887:1,
887:5, 887:7,
887:10, 891:5,
891:11, 893:2,
894:12, 894:20,
894:24, 897:4,
897:11, 900:10,
904:24, 905:2,
905:4, 908:7, 908:9,
912:23, 913:2,
913:16, 918:4,
919:7, 919:9,
923:11, 930:11,
932:18, 933:5,
938:23, 939:2,
939:8, 941:16,
947:14, 947:20,

947:22, 948:2,
948:6, 948:9,
948:14, 948:23,
948:24, 948:25,
949:4, 949:17,
949:25, 950:6,
950:7, 950:21,
950:23, 954:1,
959:16, 959:19,
959:22, 963:16,
964:11, 964:14,
964:19, 964:22,
965:7, 965:13,
965:16, 965:24,
966:7, 966:14
**MS** [16] - 827:5, 827:7,
828:6, 828:9, 829:2,
829:6, 829:18,
829:23, 889:5,
889:13, 889:25,
890:4, 890:7,
890:18, 891:2, 892:8
**Mtg** [1] - 873:18
**muddled** [1] - 926:1
**multiple** [6] - 846:20,
876:25, 909:3,
940:18, 945:3, 958:7
**must** [4] - 837:18,
899:25, 907:6, 907:7
**Myers** [4] - 910:1,
911:9, 912:4, 913:5
**myers** [4] - 911:11,
911:12, 914:2,
916:25

**N**

**name** [12] - 833:24,
836:7, 865:15,
871:4, 878:21,
884:12, 889:3,
889:18, 901:12,
933:25, 938:25,
940:1
**named** [6] - 843:17,
843:20, 843:23,
843:25, 852:25,
856:6
**names** [3] - 844:6,
844:19, 844:20
**Natalie** [1] - 827:12
**NATALIE** [1] - 825:18
**national** [22] - 837:17,
852:14, 854:12,
856:5, 856:6,
856:14, 856:16,
856:25, 866:15,
870:24, 871:5,
871:8, 871:25,
872:3, 874:2,
874:11, 915:21,

930:4, 951:21, 953:2, 953:18
**National** [3] - 856:13, 856:16, 952:1
**nationally** [1] - 844:2
**nations** [1] - 868:24
**natural** [1] - 887:3
**nature** [9] - 837:19, 854:17, 876:22, 913:7, 921:1, 929:10, 929:11, 962:25, 965:10
**necessarily** [2] - 893:16, 917:20
**necessary** [1] - 828:16
**need** [10] - 827:25, 828:2, 829:9, 836:9, 848:19, 858:3, 866:11, 880:8, 884:13, 884:14
**needed** [15] - 828:11, 836:1, 837:14, 858:2, 860:11, 868:18, 874:3, 880:12, 884:22, 898:13, 899:2, 899:3, 913:8, 915:15, 915:16
**needing** [1] - 857:25
**nefarious** [1] - 914:14
**negative** [2] - 937:2, 937:13
**never** [7] - 885:19, 890:15, 894:22, 935:7, 936:14, 950:14, 951:6, 954:7
**new** [7] - 834:20, 834:21, 834:22, 834:23, 835:2, 848:15, 851:12
**New** [15] - 825:19, 845:5, 866:2, 903:14, 904:1, 905:25, 912:10, 912:16, 913:25, 914:6, 916:16, 921:13, 924:21, 933:12, 937:20
**newer** [1] - 834:19
**news** [18] - 845:4, 845:8, 845:21, 847:15, 847:22, 848:6, 848:21, 849:9, 869:1, 883:25, 885:9, 916:20, 924:20, 924:22, 926:17, 929:9, 941:18
**next** [18] - 835:21, 838:7, 864:8,

868:20, 897:7, 897:9, 900:4, 923:11, 933:5, 933:13, 934:13, 938:1, 941:16, 942:18, 944:10, 954:22, 959:24
**nice** [1] - 832:4
**night** [11] - 827:17, 832:4, 842:6, 842:19, 842:20, 848:18, 864:17, 875:15, 898:7, 900:3, 901:7
**NO** [16] - 887:24, 888:2, 888:6, 888:14, 888:18, 888:21, 888:25, 889:16, 890:2, 890:6, 890:9, 890:22, 891:4, 891:7, 891:14, 891:22
**nobody** [1] - 851:3
**node** [1] - 859:24
**nonresponsive** [2] - 828:13, 828:21
**nonresponsiveness** [1] - 828:16
**noon** [5] - 906:5, 906:25, 907:4, 907:8, 910:9
**Northeast** [1] - 825:14
**northwest** [1] - 839:25
**notation** [1] - 865:9
**note** [4] - 831:4, 887:20, 925:21, 938:24
**notebook** [3] - 861:8, 873:1, 873:9
**noted** [4] - 828:12, 892:12, 893:7, 893:15
**notes** [27] - 829:12, 829:17, 829:18, 829:19, 829:21, 830:2, 830:4, 830:10, 830:12, 830:18, 861:7, 861:10, 861:18, 861:20, 862:2, 862:6, 872:25, 873:8, 873:16, 875:1, 875:10, 875:22, 875:25, 914:23, 967:5
**nothing** [2] - 855:9, 923:1
**notice** [1] - 964:18
**notified** [1] - 903:23

**notion** [1] - 952:5
**November** [1] - 834:23
**Ns** [1] - 856:10
**number** [25] - 838:5, 856:10, 884:6, 885:14, 886:15, 895:1, 895:2, 895:4, 895:6, 895:23, 900:16, 900:17, 900:18, 900:19, 902:17, 902:18, 903:5, 903:6, 916:15, 922:4, 935:2, 935:3, 946:18, 960:17, 961:15
**numbered** [1] - 862:12
**numbers** [3] - 852:5, 895:10, 895:15
**numerous** [2] - 874:7, 934:21
**NW** [2] - 825:23, 967:12
**NY** [1] - 825:19
**NYT** [1] - 875:7
**NYTs** [2] - 866:1, 866:2

## O

**oath** [2] - 832:9, 944:23
**object** [2] - 947:22, 949:18
**objecting** [1] - 949:24
**objection** [15] - 830:9, 838:25, 861:23, 873:13, 875:20, 882:20, 886:4, 886:13, 905:2, 908:9, 912:23, 913:16, 918:4, 919:7, 959:19
**objections** [1] - 831:1
**objective** [1] - 891:16
**obligations** [2] - 833:9, 893:21
**obscure** [4] - 846:14, 846:17, 847:1, 859:25
**observing** [1] - 916:3
**obtained** [2] - 842:23, 918:23
**obtaining** [2] - 920:17, 953:7
**obviously** [12] - 888:14, 888:25, 889:20, 889:22, 891:9, 891:16, 893:11, 893:17,

927:13, 948:16, 961:25, 964:7
**occasion** [2] - 915:19, 928:25
**occasionally** [2] - 911:21, 914:4
**occasions** [5] - 916:18, 926:21, 927:16, 928:17, 928:25
**occur** [2] - 841:22, 872:21
**occurred** [2] - 898:2, 900:13
**occurrence** [2] - 851:24, 927:21
**occurs** [2] - 901:15, 928:2
**October** [6] - 937:18, 938:20, 939:21, 947:3, 947:8, 947:9
**OF** [4] - 825:1, 825:3, 825:9, 967:1
**offer** [7] - 829:8, 935:6, 935:7, 935:20, 936:13, 936:14, 937:2
**offered** [3] - 947:24, 948:12, 948:17
**offering** [3] - 829:11, 948:4, 949:22
**offers** [9] - 838:23, 861:22, 873:11, 882:18, 886:3, 904:25, 908:7, 947:21, 959:17
**OFFICE** [1] - 825:14
**office** [30] - 836:8, 839:13, 840:5, 840:7, 840:12, 840:14, 840:15, 840:19, 840:24, 853:5, 855:15, 870:10, 870:11, 871:12, 872:8, 872:23, 882:7, 895:16, 900:20, 901:22, 902:3, 920:11, 920:22, 930:3, 939:12, 955:4, 957:5, 957:24, 958:21
**Office** [4] - 957:4, 957:7, 957:9, 957:24
**office..** [1] - 938:7
**offices** [1] - 877:1
**official** [6] - 853:12, 856:14, 880:16, 946:7, 957:23, 967:11

**OFFICIAL** [1] - 967:1
**Official** [1] - 825:22
**officials** [3] - 852:23, 864:2, 909:1
**often** [1] - 876:23
**old** [1] - 834:21
**once** [3] - 872:16, 903:21, 956:8
**one** [57] - 828:21, 831:11, 834:12, 837:1, 844:4, 845:11, 845:15, 846:7, 849:15, 852:23, 854:25, 856:4, 866:7, 870:19, 870:21, 870:24, 871:10, 874:8, 876:2, 878:11, 878:24, 879:6, 879:10, 880:2, 882:1, 890:10, 890:11, 892:16, 897:5, 900:1, 900:17, 903:25, 905:22, 906:19, 907:20, 909:5, 911:19, 914:4, 919:15, 921:9, 921:14, 922:21, 923:12, 925:10, 925:11, 929:3, 933:12, 935:9, 941:25, 942:18, 942:19, 946:17, 947:2, 947:3, 947:9, 956:7
**ones** [1] - 873:25
**onion** [1] - 846:24
**open** [1] - 913:14
**opened** [3] - 921:25, 922:2, 922:4
**operating** [1] - 867:5
**opinion** [2] - 941:19, 943:5
**Opinion** [1] - 941:23
**opportunity** [1] - 872:24
**opposite** [2] - 849:20, 916:19
**optimistic** [1] - 898:16
**or..** [1] - 911:16
**order** [3] - 846:20, 884:19, 885:13
**org** [3] - 867:12, 867:17, 868:24
**organization** [27] - 841:11, 843:11, 845:22, 845:25, 846:13, 846:14, 847:11, 847:23,

848:6, 848:21,
854:11, 854:21,
854:23, 868:2,
868:5, 868:6, 869:1,
869:10, 881:4,
885:10, 913:11,
914:15, 919:2,
920:4, 924:12,
925:25, 961:1
**organizations** [11] -
844:25, 845:8,
846:4, 847:16,
847:17, 866:7,
883:25, 924:21,
924:22, 926:18,
960:20
**organize** [1] - 890:7
**organizing** [2] - 839:8,
890:13
**orient** [2] - 858:17,
863:23
**oriented** [1] - 859:15
**origin** [3] - 846:14,
846:22, 847:1
**original** [1] - 883:6
**originally** [1] - 882:23
**others'** [1] - 888:12
**otherwise** [2] - 918:3,
918:8
**ourselves** [1] - 898:1
**outcome** [2] - 912:14,
965:8
**outlet's** [2] - 923:22,
924:18
**outlets** [2] - 845:4,
929:9
**outline** [1] - 829:23
**outreach** [1] - 832:19
**outside** [13] - 844:23,
878:21, 886:11,
889:10, 926:18,
930:13, 938:6,
938:22, 939:12,
963:3, 964:6,
965:10, 965:11
**overall** [1] - 955:13
**overlapping** [1] -
964:16
**overrule** [1] - 913:18
**overseas** [1] - 866:23
**oversee** [1] - 920:9
**oversight** [4] - 920:11,
920:21, 940:20,
957:15
**oversights** [1] -
957:11
**own** [3] - 864:22,
893:4, 927:7

**P**

**p.m** [11] - 836:8,
839:6, 895:22,
897:20, 898:3,
898:7, 909:23,
910:8, 923:16,
966:16
**PAGE** [1] - 826:2
**Page** [9] - 894:21,
900:11, 902:12,
947:15, 949:5,
950:8, 953:21,
959:23, 959:25
**page** [22] - 832:23,
842:3, 873:6,
874:17, 874:19,
874:22, 875:2,
886:7, 886:9,
894:25, 897:5,
897:7, 897:9,
897:14, 923:11,
933:5, 938:1,
941:16, 942:18,
951:4, 958:13
**pages** [5] - 850:5,
850:6, 850:7,
850:24, 933:4
**pamphlet** [2] - 941:7,
941:8
**paragraph** [7] -
867:24, 943:10,
943:16, 943:19,
961:11, 961:12,
964:22
**paralegals** [1] - 871:2
**parent** [1] - 892:20
**parents** [2] - 889:1,
890:4
**parlance** [1] - 924:13
**part** [32] - 841:11,
841:25, 849:3,
854:10, 854:20,
857:23, 862:12,
863:6, 867:7, 867:9,
867:14, 868:20,
869:7, 871:12,
874:25, 912:17,
913:10, 917:23,
919:1, 924:21,
926:20, 927:8,
927:10, 935:2,
936:18, 940:11,
953:14, 957:10,
957:15, 957:21,
960:20, 965:18
**particular** [21] -
837:14, 841:7,
842:10, 849:21,
849:23, 851:5,

857:15, 871:20,
876:2, 886:13,
895:9, 917:18,
922:2, 922:4,
928:15, 928:25,
929:9, 940:19,
957:12, 959:11,
961:25
**particularly** [1] -
888:10
**parties** [5] - 828:22,
830:1, 830:3,
846:20, 886:2
**parties'** [1] - 830:17
**partisan** [1] - 952:9
**partly** [2] - 939:20
**partner** [3] - 856:1,
856:4, 942:25
**parts** [1] - 837:2
**party** [3] - 846:19,
858:15, 885:24
**passed** [2] - 850:22,
926:5
**pattern** [1] - 895:9
**pause** [1] - 932:19
**Pause** [2] - 831:13,
832:1
**pauses** [2] - 834:3,
834:9
**Pennsylvania** [1] -
839:24
**people** [52] - 836:19,
836:25, 837:2,
839:19, 840:10,
843:17, 843:19,
843:22, 844:13,
844:17, 844:19,
846:25, 864:10,
864:13, 865:18,
865:19, 865:20,
865:21, 865:22,
865:23, 865:24,
866:16, 866:25,
868:7, 878:1, 881:7,
881:9, 882:10,
883:4, 884:19,
898:13, 907:6,
908:23, 909:19,
918:19, 927:19,
927:25, 928:3,
928:6, 928:9,
928:14, 930:9,
940:12, 958:24,
960:17, 961:15,
963:1, 963:10
**People** [1] - 865:11
**per** [1] - 876:25
**percent** [2] - 842:13,
849:14
**peremptories** [1] -

892:17
**performs** [1] - 957:14
**perhaps** [5] - 828:15,
829:23, 859:24,
906:3, 906:24
**period** [12] - 856:15,
866:21, 872:10,
884:17, 896:5,
896:24, 912:1,
929:5, 933:15,
936:21, 936:24,
952:11
**Perkins** [19] - 856:1,
856:2, 856:17,
862:17, 934:1,
934:10, 934:20,
934:24, 935:11,
936:13, 937:2,
938:11, 939:12,
942:25, 943:12,
949:12, 950:11,
950:25, 954:4
**person** [20] - 840:9,
843:3, 843:25,
852:22, 853:6,
856:6, 874:21,
878:25, 879:7,
879:8, 879:14,
880:9, 880:18,
880:20, 881:3,
883:18, 890:20,
937:7, 946:5, 963:14
**personal** [4] - 840:14,
840:15, 840:24,
857:5
**personally** [1] - 844:9
**persons** [5] - 897:22,
898:22, 899:7,
899:8, 899:11
**perspective** [4] -
874:15, 896:22,
911:23, 946:13
**persuade** [1] - 913:5
**persuaded** [1] - 915:2
**pertain** [2] - 851:10,
851:11
**Pete** [3] - 878:10,
880:11, 921:5
**ph** [2] - 865:12, 865:14
**phone** [2] - 833:13,
833:22, 834:14,
834:19, 834:20,
834:21, 834:22,
834:23, 835:2,
852:22, 853:2,
853:4, 853:6,
855:20, 855:21,
886:14, 886:15,
895:1, 895:5,
895:10, 895:18,

896:10, 898:1,
899:18, 901:11,
903:4, 904:5,
906:22, 928:10
**phonetic** [2] - 865:12,
865:14
**photo** [1] - 837:6
**photograph** [2] -
938:8, 939:11
**phrase** [2] - 862:24,
914:22
**physical** [4] - 855:13,
855:15, 960:15,
961:13
**picked** [1] - 903:4
**picture** [2] - 938:2,
938:4
**pictures** [1] - 945:16
**piece** [7] - 857:19,
868:1, 876:10,
877:8, 877:11,
881:18, 943:5
**pilloried** [2] - 945:20,
945:21
**place** [8] - 840:24,
906:17, 918:19,
940:10, 949:9,
951:4, 955:4, 957:22
**placed** [1] - 852:22
**places** [3] - 878:17,
934:19, 934:21
**Plaintiff** [1] - 825:4
**plan** [3] - 829:7,
829:11, 884:10
**planned** [2] - 838:7,
847:17
**planning** [2] - 909:20,
910:1
**plastic** [2] - 836:21,
837:5
**play** [2] - 960:1, 960:2
**played** [1] - 911:18
**playing** [3] - 911:19,
911:21, 950:18
**pleasantries** [1] -
903:17
**plotter** [2] - 942:12,
942:13
**plotters** [1] - 945:23
**Plus** [1] - 940:21
**plus** [3] - 862:15,
867:19, 919:25
**POC** [2] - 864:14,
865:6
**POCs** [2] - 864:12,
864:25
**POCs)** [1] - 864:11
**point** [30] - 828:17,
834:10, 844:11,
849:18, 854:10,

854:13, 861:7, 865:8, 868:4, 869:5, 870:18, 873:20, 876:2, 876:3, 876:21, 879:19, 887:4, 896:10, 896:20, 903:2, 906:14, 918:15, 919:21, 919:23, 924:1, 935:9, 939:21, 954:14, 959:1, 963:17
**points** [3] - 846:6, 864:14, 864:15
**policies** [2] - 852:11, 953:20
**Political** [2] - 943:15, 943:24
**political** [1] - 952:12
**portion** [4] - 864:17, 947:17, 948:19, 959:18
**portions** [4] - 828:15, 828:21, 828:23, 959:19
**position** [8] - 828:10, 870:12, 883:13, 892:24, 905:7, 908:17, 921:8, 946:5
**positions** [2] - 883:12, 934:22, 936:10
**positive** [1] - 897:25
**possession** [3] - 869:15, 877:9, 880:18
**possibility** [1] - 898:17
**possible** [7] - 836:3, 860:7, 870:2, 879:13, 901:13, 935:19, 953:9
**possibly** [4] - 921:5, 928:24, 933:24, 934:16
**post** [2] - 866:3, 890:8
**Post** [3] - 845:5, 866:3, 875:8
**potential** [3] - 854:12, 882:9, 894:16
**potentially** [2] - 860:8, 934:24
**power** [3] - 867:11, 867:12, 946:5
**practice** [3] - 837:17, 856:20, 890:4
**pre** [2] - 890:7, 907:10
**pre-meeting** [1] - 907:10
**prefix** [1] - 895:12
**preliminary** [1] - 884:17

**premarked** [6] - 838:13, 873:4, 877:21, 882:13, 946:21, 958:11
**prep** [3] - 906:4, 906:24, 907:4
**prepare** [1] - 907:8
**prepared** [3] - 828:21, 955:17, 956:4
**preparing** [2] - 929:6, 959:4
**presence** [1] - 889:11
**present** [3] - 827:13, 877:10, 948:21
**presented** [6] - 848:13, 850:4, 850:5, 850:11, 956:10, 961:4
**president** [1] - 882:7
**press** [15] - 858:1, 883:18, 884:4, 884:16, 885:12, 908:21, 908:22, 928:10, 928:12, 940:8, 950:15, 951:7, 954:8, 954:18
**pressure** [1] - 924:24
**presumably** [1] - 861:2
**presume** [1] - 830:11
**pretty** [4] - 841:24, 853:4, 856:14, 880:20
**prevent** [1] - 852:14
**previously** [2] - 861:19, 943:12
**Priestap** [49] - 829:12, 830:8, 853:1, 853:9, 855:11, 855:17, 855:23, 857:10, 857:11, 857:14, 857:19, 858:12, 859:16, 859:20, 860:13, 861:8, 862:8, 862:20, 862:23, 869:16, 869:20, 869:23, 870:7, 871:21, 871:24, 875:17, 878:10, 882:25, 883:10, 883:15, 904:21, 904:22, 905:9, 907:12, 907:21, 908:4, 908:6, 909:18, 910:8, 911:6, 913:23, 915:10, 916:25, 921:4, 921:6, 921:7, 926:6, 961:7

**Priestap's** [4] - 854:5, 861:19, 862:2, 921:10
**primarily** [4] - 913:20, 913:22, 913:24
**principal** [1] - 909:5
**printed** [3] - 850:5, 960:15, 961:14
**printed-out** [1] - 850:5
**priorities** [1] - 880:2
**priority** [2] - 854:25, 855:2
**privilege** [1] - 830:24
**pro** [1] - 833:14
**probing** [2] - 912:10, 914:16
**problem** [2] - 886:20, 965:23
**procedures** [1] - 852:11
**proceedings** [1] - 967:6
**process** [6] - 834:20, 834:24, 836:18, 936:17, 936:18, 937:13
**producers** [1] - 908:24
**professional** [1] - 871:3
**professor** [2] - 843:23, 843:24
**programs** [1] - 957:17
**prominent** [1] - 864:10
**prompts** [1] - 916:20
**protect** [6] - 852:4, 852:14, 879:24, 880:5, 880:20, 952:15
**protected** [1] - 880:22
**protecting** [3] - 880:1, 880:5, 952:10
**protest** [1] - 941:7
**Protesters** [1] - 938:6
**protesters** [1] - 938:8
**protesting** [1] - 939:13
**provide** [6] - 831:21, 835:3, 951:8, 951:14, 953:3, 954:23
**provided** [3] - 845:11, 850:8, 960:5
**providing** [2] - 880:16, 951:20
**provision** [1] - 852:10
**public** [20] - 852:4, 852:6, 852:7, 852:12, 852:15, 879:22, 883:17, 903:25, 905:13, 908:14, 908:20,

909:1, 941:11, 945:21, 945:22, 964:12, 965:5, 965:12, 965:21
**public's** [1] - 852:13
**publication** [1] - 896:24
**publicly** [2] - 846:25, 943:12
**publish** [11] - 847:17, 848:6, 866:7, 869:2, 886:19, 906:11, 915:6, 916:17, 916:23, 917:23, 918:7
**published** [3] - 858:1, 866:14, 867:4
**publishes** [1] - 916:5
**publishing** [10] - 847:23, 881:22, 883:25, 884:16, 885:13, 896:13, 912:1, 912:17, 912:21
**pull** [1] - 874:25
**purposes** [3] - 830:6, 830:18, 839:22
**pushed** [2] - 903:5, 933:12
**put** [10] - 830:6, 836:23, 837:22, 873:3, 883:4, 905:5, 924:24, 941:1, 948:25, 958:18
**Putin** [1] - 910:3
**puts** [1] - 924:24

**Q**

**quality** [1] - 865:24
**questioned** [3] - 927:22, 945:5
**questioner** [3] - 950:19, 953:22, 954:3
**questioning** [1] - 893:3
**questionnaire** [5] - 888:1, 888:9, 888:10, 892:13, 893:18
**questions** [15] - 827:22, 831:8, 888:11, 888:12, 889:12, 914:16, 928:23, 940:4, 947:18, 947:23, 950:17, 955:16, 956:17, 964:23
**quick** [1] - 930:10

**quickly** [14] - 836:22, 853:7, 857:25, 858:4, 860:7, 866:18, 866:20, 870:1, 870:6, 912:19, 924:24, 953:9, 959:24, 962:18
**quite** [9] - 844:4, 850:17, 857:24, 882:5, 887:1, 888:2, 893:22, 912:20, 915:2

**R**

**races** [1] - 890:17
**raised** [1] - 893:5
**range** [5] - 853:25, 854:1, 871:2, 946:11, 946:12
**rank** [2] - 870:15, 870:16
**ranking** [2] - 852:23, 853:12, 856:14
**RAO** [1] - 825:18
**Rao** [1] - 827:12
**rapidly** [1] - 866:22
**rather** [1] - 830:19
**RDR** [3] - 825:21, 967:3, 967:10
**reach** [2] - 894:16, 896:23
**reached** [4] - 853:7, 904:1, 904:2, 960:12
**reaching** [1] - 908:21
**react** [2] - 913:12, 951:15
**reaction** [5] - 847:25, 882:4, 888:12, 893:24, 914:7
**read** [29] - 842:20, 862:10, 862:12, 865:10, 873:16, 875:1, 878:18, 897:19, 905:20, 907:17, 933:10, 938:9, 938:13, 941:24, 942:3, 943:7, 943:8, 943:11, 943:16, 947:17, 947:18, 949:8, 950:15, 951:7, 954:8, 954:18, 961:23
**reader** [2] - 836:23, 837:22
**readily** [1] - 833:18
**reading** [10] - 832:24, 923:24, 925:1,

933:19, 942:6, 943:9, 943:19, 943:25, 944:2, 949:1
**ready** [7] - 832:6, 887:13, 907:10, 912:18, 912:20, 915:6
**realized** [1] - 887:21
**really** [9] - 849:3, 850:24, 851:12, 853:16, 892:21, 914:18, 921:19, 955:17, 956:4
**reason** [7] - 837:14, 851:5, 852:1, 892:18, 893:9, 918:2, 948:7
**reasons** [3] - 893:14, 894:5, 942:15
**rebuffed** [1] - 914:17
**recalled** [1] - 835:18
**recap** [1] - 910:13
**Receipt** [1] - 878:19
**received** [12] - 827:17, 835:16, 845:9, 857:8, 864:16, 864:24, 875:14, 887:19, 921:2, 935:11, 942:2, 943:17
**receives** [1] - 927:8
**receiving** [3] - 835:18, 901:7, 903:2
**recent** [1] - 834:1
**recently** [1] - 887:21
**recess** [1] - 966:16
**Recess** [1] - 892:4
**reciting** [1] - 950:19
**recognize** [6] - 861:15, 862:9, 873:6, 877:22, 946:22, 958:14
**recognized** [2] - 844:2, 953:7
**recognizing** [5] - 869:19, 875:2, 894:22, 913:3, 919:15
**recollection** [56] - 829:20, 833:6, 840:4, 843:14, 843:22, 844:24, 847:21, 852:21, 855:19, 861:4, 862:7, 862:20, 863:9, 863:10, 863:11, 865:18, 877:18, 882:3, 885:17, 895:5, 895:17, 896:8,

896:16, 900:18, 900:19, 901:6, 901:11, 901:25, 902:9, 903:1, 903:6, 911:5, 912:5, 913:22, 914:11, 914:20, 915:1, 916:16, 918:21, 919:14, 921:3, 933:23, 934:4, 934:11, 937:20, 943:18, 944:2, 944:5, 946:20, 955:9, 955:10, 956:16, 958:6, 960:11, 961:11, 961:22
**reconstruct** [1] - 954:10
**record** [18] - 827:3, 837:23, 838:17, 839:22, 878:14, 882:6, 886:14, 892:11, 893:25, 895:1, 898:1, 923:6, 939:23, 959:10, 965:5, 965:10, 965:12, 965:21
**recorded** [1] - 959:8
**records** [12] - 861:4, 866:21, 886:7, 894:23, 895:18, 900:9, 900:11, 901:25, 902:12, 902:24, 928:10, 954:19
**recounting** [1] - 876:9
**recruiting** [2] - 853:23, 853:24
**recurring** [1] - 839:8
**redacted** [1] - 886:16
**redactions** [2] - 873:5, 874:16
**refer** [5] - 839:20, 849:18, 898:19, 934:15, 963:12
**reference** [7] - 847:15, 864:3, 864:13, 864:15, 868:23, 937:22, 955:3
**referenced** [12] - 845:7, 846:4, 846:7, 846:23, 849:17, 868:2, 873:25, 883:16, 895:23, 896:11, 899:10
**referral** [2] - 927:8, 927:12
**referred** [2] - 899:11, 924:4

**referring** [4] - 902:7, 924:15, 963:2, 963:10
**refers** [4] - 839:17, 846:24, 854:7, 873:21
**reflect** [3] - 863:7, 875:22, 953:17
**reform** [1] - 940:20
**refresh** [3] - 861:11, 901:25, 955:9
**refreshed** [1] - 861:4
**refreshing** [1] - 829:20
**regard** [12] - 835:23, 845:3, 847:18, 854:22, 856:21, 857:13, 871:21, 912:6, 936:13, 937:12, 941:5, 952:12
**regarded** [1] - 844:18
**regarding** [1] - 939:24
**regattas** [1] - 890:14
**regular** [5] - 837:15, 872:8, 872:9, 900:6, 938:24
**reiterated** [1] - 893:21
**rejected** [1] - 935:12
**rejection** [2] - 935:8, 936:15
**related** [11] - 872:3, 882:9, 888:11, 920:23, 925:25, 940:2, 942:15, 944:17, 960:16, 961:15, 963:22
**relating** [3] - 841:8, 854:18, 922:17
**relationship** [3] - 847:4, 889:14, 963:1
**relatively** [6] - 847:24, 869:2, 870:5, 919:16, 921:4, 946:15
**relayed** [1] - 904:9
**relevant** [4] - 832:23, 842:3, 947:17, 950:4
**rely** [2] - 868:19, 923:6
**remember** [38] - 838:10, 844:10, 860:19, 870:4, 878:4, 878:7, 883:13, 884:9, 895:9, 901:10, 904:17, 904:18, 907:9, 907:20, 907:22, 910:24, 911:13, 911:17, 912:3, 912:15, 913:21, 914:3,

914:24, 918:17, 921:17, 921:18, 921:19, 921:22, 923:6, 925:13, 943:19, 943:24, 944:2, 956:21, 958:9, 959:4, 959:6, 959:10
**remind** [5] - 832:8, 838:4, 865:16, 898:1, 905:6
**reminded** [1] - 835:16
**render** [1] - 893:24
**reorganized** [1] - 871:12
**repeat** [2] - 875:24, 879:2
**repeated** [5] - 842:7, 842:12, 843:5, 857:14, 893:3
**repeating** [1] - 863:1
**rephrase** [2] - 918:5, 919:9
**reply** [3] - 836:8, 907:11, 934:12
**report** [7] - 881:15, 903:10, 916:9, 917:11, 917:14, 917:16, 917:17
**reported** [1] - 881:14
**REPORTER** [1] - 967:1
**Reporter** [3] - 825:21, 825:22, 967:11
**reporter** [30] - 845:21, 845:23, 856:7, 884:12, 884:23, 885:7, 896:11, 896:12, 896:21, 898:12, 898:17, 898:20, 899:6, 901:12, 902:8, 902:10, 903:13, 903:21, 903:24, 904:10, 905:24, 910:1, 916:5, 916:8, 921:11, 923:20, 924:4, 929:15, 929:20, 929:22
**reporter's** [2] - 923:23, 925:1
**reporters** [12] - 881:22, 884:13, 909:6, 915:19, 915:22, 916:3, 916:21, 917:11, 918:1, 918:7, 945:12
**reporting** [2] - 917:20, 917:21
**reports** [2] - 881:11,

921:10
**represent** [2] - 875:25, 881:8
**Representatives** [1] - 939:24
**represented** [9] - 858:9, 858:15, 863:9, 863:12, 950:11, 950:25, 954:5, 954:11, 954:20
**representing** [8] - 881:1, 881:3, 944:6, 951:10, 954:24, 955:20, 956:19, 956:21
**represents** [3] - 863:5, 863:17, 863:19
**Republican** [1] - 952:6
**reputation** [1] - 844:12
**request** [8] - 833:8, 889:7, 896:15, 897:23, 898:11, 913:15, 916:8, 927:14
**requests** [1] - 916:7
**required** [1] - 839:10
**research** [4] - 857:6, 887:16, 915:7, 963:23
**researchers** [3] - 841:13, 849:18, 919:25
**resentful** [1] - 937:13
**resource** [1] - 915:7
**resources** [1] - 855:4
**respect** [14] - 863:23, 868:17, 881:21, 892:10, 892:11, 908:19, 912:12, 912:21, 920:12, 934:23, 939:14, 942:15, 945:19, 958:9
**respected** [1] - 865:20
**respond** [6] - 842:16, 897:21, 898:11, 898:18, 901:8, 925:16
**responded** [2] - 835:19, 882:3, 955:6
**responding** [1] - 908:21
**responds** [2] - 837:13, 838:3
**response** [3] - 833:7, 897:25, 943:4
**responsibilities** [3] - 872:1, 874:11, 920:9
**responsibility** [1] -

984

920:12
**responsible** [8] -
853:12, 853:21,
870:19, 870:21,
870:24, 920:17,
928:15, 952:10
**rest** [1] - 952:18
**Resumed** [1] - 832:13
**retrievable** [1] -
834:18
**retrieve** [1] - 833:12
**retrieved** [2] - 833:3,
838:18
**retrieving** [1] - 834:19
**return** [2] - 932:21,
953:21
**returning** [1] - 865:4
**reveal** [4] - 879:14,
920:2, 928:11,
928:20
**revealed** [3] - 903:12,
906:20
**revealing** [1] - 869:7
**reversed** [1] - 935:18
**review** [1] - 861:3
**reviewed** [1] - 835:14
**revised** [1] - 828:24
**revisit** [1] - 946:3
**rid** [2] - 860:6, 870:1
**riser** [1] - 899:25
**rises** [1] - 828:17
**role** [8] - 851:22,
890:12, 908:15,
926:10, 927:15,
950:19, 960:1, 963:3
**room** [6] - 838:4,
840:22, 872:22,
911:3, 918:20, 945:5
**Room** [2] - 825:22,
967:12
**roughly** [2] - 902:5,
936:20
**round** [7] - 949:6,
949:11, 950:10,
950:24, 951:25,
953:22, 954:4
**router** [1] - 846:24
**routine** [1] - 828:22
**rowers** [1] - 890:21
**rules** [1] - 927:24
**ruling** [1] - 939:1
**rumors** [2] - 923:21,
924:16
**run** [2] - 899:4, 913:5
**running** [6] - 900:6,
920:15, 920:20,
945:13, 945:15,
957:17
**Russia** [11] - 841:11,
854:6, 869:10,

881:19, 912:12,
914:15, 937:25,
939:25, 940:25,
955:13, 958:1
**Russian** [11] - 843:11,
846:1, 854:2, 854:8,
854:9, 854:15,
854:19, 854:23,
858:15, 882:10,
910:2
**Russians** [1] - 869:5
**Russo** [1] - 910:2

---

# S

**S-U-S-S-M-A-N** [1] -
949:14
**sat** [2] - 840:21, 958:3
**saw** [7] - 862:25,
884:9, 900:3,
900:17, 903:22,
907:18, 943:5
**schedule** [5] - 835:21,
836:4, 966:3, 966:7,
966:12
**scheduled** [3] -
838:11, 840:3,
960:13
**scientist** [1] - 849:17
**scooped** [1] - 924:23
**scope** [5] - 962:25,
965:4, 965:22,
965:24, 966:1
**screen** [5] - 833:17,
873:3, 878:3,
941:24, 949:25
**screenshot** [1] - 944:8
**scroll** [1] - 834:2
**scrolled** [1] - 834:3
**SEAN** [1] - 825:16
**Sean** [1] - 827:11
**search** [2] - 833:23,
833:24
**season** [1] - 911:19
**seat** [2] - 831:17,
831:18
**seated** [2] - 892:6,
964:3
**second** [9] - 886:8,
894:25, 918:17,
919:12, 921:13,
942:19, 944:13,
946:19, 947:9
**Secret** [1] - 867:16
**secret** [3] - 843:10,
845:25, 897:1
**section** [3] - 865:25,
871:1, 941:23
**Security** [2] - 856:13,
856:16

**security** [42] - 836:18,
836:22, 837:17,
837:21, 841:13,
843:16, 843:23,
843:25, 844:3,
844:18, 845:17,
845:20, 852:14,
854:12, 856:5,
856:6, 856:14,
856:17, 856:25,
857:4, 858:19,
865:2, 866:15,
870:24, 871:5,
871:8, 871:25,
872:3, 874:3,
874:11, 899:4,
899:9, 912:8,
915:21, 919:24,
926:14, 951:22,
953:2, 953:18,
960:19, 961:17,
962:8
**security-related** [1] -
872:3
**see** [31] - 830:13,
831:7, 836:1,
842:22, 842:25,
847:12, 859:7,
862:6, 874:17,
884:11, 884:15,
884:22, 884:23,
896:2, 900:1,
900:14, 901:19,
902:14, 908:5,
910:17, 911:21,
918:2, 923:13,
934:13, 942:21,
945:7, 949:25,
952:18, 957:15,
958:15, 961:19
**seeing** [3] - 859:3,
933:13, 958:24
**seem** [2] - 926:1,
951:22
**seized** [2] - 878:20,
878:22
**Seizing** [1] - 878:19
**semi** [1] - 957:9
**Senate** [1] - 940:21
**send** [2] - 869:25,
941:18
**sending** [8] - 883:9,
907:7, 939:18,
941:11, 941:14,
942:1, 944:4, 949:2
**sends** [5] - 882:25,
907:12, 909:22,
941:6
**senior** [9] - 839:18,
870:9, 870:12,

872:11, 885:9,
888:22, 889:24,
890:11, 894:3
**seniors** [1] - 890:24
**sense** [12] - 837:25,
847:6, 856:8, 876:9,
911:16, 914:22,
917:25, 925:7,
926:23, 935:15,
966:4
**sensitive** [18] - 836:2,
840:17, 848:19,
848:23, 849:14,
851:7, 851:12,
855:6, 868:11,
874:2, 879:17,
879:19, 880:19,
881:5, 881:21
**sensitivity** [1] - 879:23
**sent** [15] - 842:6,
846:12, 882:15,
882:23, 883:6,
897:13, 897:20,
900:2, 905:21,
937:19, 938:4,
943:20, 947:8, 961:7
**separate** [2] - 892:21,
904:18
**September** [28] -
832:19, 835:10,
835:11, 838:8,
839:5, 839:6, 842:4,
861:12, 863:19,
883:7, 883:21,
897:13, 897:20,
898:3, 899:22,
900:1, 900:8,
900:14, 905:21,
923:5, 923:14,
925:19, 925:23,
933:4, 933:6,
936:20, 962:3
**sequence** [1] - 902:1
**series** [5] - 837:5,
837:23, 868:11,
914:16, 940:4
**serious** [7] - 844:17,
856:16, 856:24,
858:3, 858:18,
914:12
**seriously** [6] - 857:9,
857:22, 893:21,
913:7, 914:12
**seriousness** [2] -
858:7, 881:23
**server** [1] - 867:17
**Service** [1] - 854:3
**services** [2] - 853:19
**serving** [1] - 860:23
**SESSION** [1] - 825:6

**session** [5] - 892:5,
946:16, 946:19,
956:6, 957:1
**set** [6] - 840:16,
854:17, 909:23,
917:18, 928:7,
956:16
**sets** [1] - 830:4
**setting** [1] - 885:7
**seven** [1] - 890:20
**seventh** [3] - 839:14,
839:15, 839:19
**several** [2] - 895:15,
922:13
**shape** [1] - 960:11
**share** [3] - 842:23,
857:19, 859:20
**shared** [2] - 871:23,
887:20
**Shaw** [4] - 827:7,
828:5, 889:5, 892:8
**SHAW** [17] - 825:13,
827:5, 827:7, 828:6,
828:9, 829:2, 829:6,
829:18, 829:23,
889:5, 889:13,
889:25, 890:4,
890:7, 890:18,
891:2, 892:8
**shepherded** [1] -
937:9
**shooting** [3] - 905:25,
906:8, 906:11
**short** [3] - 871:18,
903:18, 921:4
**shorthand** [4] -
961:24, 962:24,
963:10, 963:11
**shortly** [3] - 875:18,
912:15, 918:14
**show** [15] - 830:10,
838:13, 839:7,
861:14, 874:14,
877:21, 882:13,
885:18, 885:19,
904:19, 908:1,
908:23, 938:17,
954:2, 958:11
**showed** [1] - 915:4
**shown** [3] - 830:4,
831:2, 861:7
**shows** [1] - 893:20
**side** [7] - 853:24,
865:5, 867:11,
867:23, 869:12,
911:4, 911:7
**sidebar** [1] - 964:5
**sides** [5] - 828:24,
831:2, 831:5, 912:9,
912:22

sign [3] - 878:25, 879:3, 938:9
signature [3] - 878:16, 878:17, 878:21
Signature [1] - 878:19
signed [6] - 877:25, 878:1, 880:15, 880:17, 942:24, 942:25
signed-up [2] - 880:15, 880:17
significant [2] - 912:10, 935:2
silent [1] - 914:2
similar [1] - 844:15
similarly [1] - 957:25
simultaneously [1] - 871:13
sit [2] - 893:10, 958:4
sitting [6] - 845:18, 863:11, 888:16, 943:18, 944:1, 945:4
situation [2] - 858:25, 889:9
situations [2] - 917:10, 928:18
six [1] - 869:19
size [1] - 850:18
skimmed [1] - 942:5
slightly [1] - 966:8
slip [2] - 832:11, 962:14
slip-up [1] - 962:14
slow [4] - 896:12, 910:19, 912:6, 912:7
slowly [1] - 913:1
small [3] - 850:16, 874:9, 889:22
smart [1] - 856:24
smoothly [1] - 830:25
so.. [1] - 888:22
social [2] - 887:17, 963:22
sofa [1] - 840:16
someone [11] - 845:13, 878:8, 878:20, 879:3, 880:16, 908:17, 939:12, 940:5, 952:2, 952:6, 958:22
sometime [2] - 877:20, 918:13
sometimes [25] - 839:20, 846:20, 850:17, 858:24, 866:20, 866:21, 872:16, 874:8, 874:9, 876:25, 916:5, 916:7, 916:9, 916:23, 917:11,

918:2, 918:7, 918:10, 926:17, 927:4, 927:6, 927:7, 928:1, 928:4
somewhat [1] - 951:25
somewhere [3] - 840:6, 841:23, 947:9
soon [8] - 836:3, 847:24, 848:8, 866:8, 869:2, 885:5, 893:19, 933:14
sooner [4] - 866:5, 897:22, 898:19, 901:8
sorry [42] - 835:11, 835:17, 845:20, 853:13, 856:7, 856:11, 864:19, 865:6, 869:8, 871:14, 873:19, 875:13, 875:24, 879:2, 897:8, 897:21, 905:4, 905:5, 907:18, 911:15, 914:9, 915:7, 915:15, 915:18, 927:5, 932:19, 933:5, 939:9, 943:21, 944:22, 947:7, 947:20, 949:14, 951:4, 951:5, 952:18, 952:19, 952:20, 954:16, 959:25, 964:9
sort [31] - 834:18, 839:15, 839:17, 840:19, 865:5, 867:11, 867:24, 870:19, 872:8, 884:24, 884:25, 890:7, 892:22, 915:22, 916:1, 922:16, 927:3, 928:7, 936:2, 937:7, 938:2, 941:10, 942:14, 942:24, 944:23, 946:13, 956:11, 957:9, 957:14, 960:18, 961:17
sorted [1] - 935:16
sounds [3] - 830:22, 867:5, 926:1
source [10] - 845:10, 857:17, 863:25, 879:21, 880:15, 880:16, 880:17, 881:5, 940:7
sources [2] - 853:23,

880:2
speaking [7] - 895:11, 913:20, 913:24, 928:11, 939:9, 939:11, 945:25
speaks [1] - 827:21
Special [2] - 860:14, 965:17
special [2] - 840:20, 872:15
SPECIAL [1] - 825:14
specific [9] - 875:5, 876:10, 914:24, 916:10, 919:11, 927:24, 939:4, 943:25, 947:23
specifically [10] - 852:8, 865:23, 870:4, 917:1, 937:24, 951:9, 951:12, 954:23, 955:7, 955:18
specifics [1] - 915:12
Spectrum [6] - 846:7, 846:13, 859:24, 867:21, 868:1, 868:6
speed [1] - 945:14
spell [1] - 865:8
spelling [2] - 865:13, 865:14
spending [1] - 957:17
spent [1] - 935:1
spies [1] - 853:24
spoken [3] - 896:5, 928:9, 929:15
sponsored [1] - 837:19
spot [2] - 836:25, 896:18
spy [1] - 853:19
spying [1] - 854:3
staff [7] - 871:3, 872:9, 872:11, 872:15, 872:19, 944:14, 955:24
start [8] - 839:5, 903:17, 908:11, 928:6, 949:7, 952:20, 957:25, 964:9
started [9] - 829:6, 832:6, 834:1, 834:2, 841:5, 923:20, 924:4, 934:2, 955:15
starting [1] - 961:11
state [1] - 882:6
statement [12] - 841:20, 841:22, 842:7, 842:18, 843:5, 859:13,

862:21, 871:22, 949:6, 949:22, 962:11, 962:16
statements [2] - 833:9, 944:25
STATES [3] - 825:1, 825:3, 825:10
States [10] - 825:12, 827:3, 827:8, 841:12, 853:20, 882:8, 889:6, 892:9, 945:6, 967:11
statutes [1] - 920:14
stay [1] - 887:14, 892:25, 932:23
Steele [2] - 938:11, 938:25
stenographic [1] - 967:5
step [1] - 964:2
stepping [1] - 915:17
steps [3] - 920:1, 922:10, 922:24
Steve [5] - 843:24, 844:11, 865:11, 910:1, 911:9
still [13] - 832:8, 834:18, 855:18, 855:20, 869:15, 910:17, 910:18, 915:13, 935:18, 935:19, 935:20, 946:4, 953:12
stipulation [7] - 829:8, 829:10, 861:24, 873:14, 886:2, 964:21, 965:12
stop [3] - 862:19, 863:6, 952:11
stopping [1] - 887:4
stops [1] - 867:20
storage [2] - 840:18, 850:16
stored [1] - 850:17
stories [2] - 915:23, 965:1
story [16] - 884:24, 913:5, 916:6, 916:20, 917:23, 917:24, 918:3, 918:8, 918:14, 923:19, 923:21, 924:16, 924:22, 924:24, 926:1, 933:12
straightforward [1] - 912:6
strange [3] - 960:16, 960:19, 961:15
streams [1] - 866:19

street [4] - 935:24, 935:25, 936:8, 941:23
Street [8] - 825:14, 845:6, 866:4, 936:5, 936:7, 936:8, 936:23, 941:22
stress [1] - 900:6
strike [4] - 827:18, 828:15, 828:21, 892:15
string [2] - 833:25, 834:12
structure [1] - 870:13
structured [1] - 870:12
STRZOK [1] - 921:11
Strzok [3] - 878:10, 880:11, 921:5
Strzok's [1] - 921:8
stuff [2] - 870:1, 960:7
subject [11] - 830:5, 830:7, 839:2, 842:25, 851:12, 861:23, 873:13, 886:1, 942:8, 942:16, 964:24
subjects [6] - 923:21, 924:5, 924:6, 924:8, 924:11, 924:13
subsequent [1] - 877:19
substance [4] - 859:21, 859:22, 912:8, 920:4
substantial [2] - 856:5
substantiate [1] - 918:25
substitution [3] - 965:6, 965:18, 965:21
succeeded [1] - 892:16
success [1] - 880:4
sucked [8] - 945:1, 945:2, 945:4, 945:9, 945:12, 945:17, 945:20
sued [1] - 870:22
suggestion [1] - 965:8
summarize [1] - 960:10
summary [4] - 871:18, 876:1, 921:3, 964:21
Sunday [1] - 835:16, 835:17, 906:1, 906:8, 906:12, 906:13, 933:13
supervisory [1] - 876:13
support [1] - 871:3

**surmised** [1] - 960:23
**surprising** [1] - 888:3
**surreptitious** [11] -
841:8, 841:14,
848:7, 859:23,
897:1, 913:9, 915:5,
918:25, 920:2,
920:7, 961:2
**surveillance** [1] -
853:23
**Susan** [4] - 843:23,
844:4, 844:9, 865:13
**Susan's** [1] - 865:15
**suspect** [1] - 923:19
**suspected** [1] - 927:17
**SUSSMAN** [1] - 949:15
**SUSSMANN** [1] -
825:6
**Sussmann** [108] -
827:4, 827:13,
827:23, 828:25,
832:19, 833:17,
835:13, 836:12,
837:8, 837:13,
837:14, 838:3,
839:4, 840:2,
840:25, 841:20,
842:6, 844:22,
846:4, 849:17,
849:22, 850:1,
852:19, 857:12,
858:9, 859:2,
859:16, 862:15,
864:21, 864:24,
865:17, 871:7,
875:3, 875:12,
875:18, 875:23,
876:1, 879:7,
880:14, 880:21,
883:24, 885:1,
885:4, 885:6,
885:16, 885:25,
888:23, 889:2,
893:8, 894:15,
896:6, 896:9, 897:3,
897:15, 898:6,
898:9, 899:14,
899:15, 899:18,
901:6, 902:23,
903:3, 903:9, 904:6,
904:11, 918:23,
919:25, 923:13,
923:25, 924:1,
924:25, 925:7,
925:13, 925:21,
932:23, 933:20,
934:3, 937:3,
937:17, 937:19,
938:3, 938:11,
940:10, 941:6,

941:18, 941:25,
942:22, 943:6,
944:3, 944:5, 944:9,
946:10, 947:6,
949:12, 949:13,
949:16, 951:8,
951:14, 954:11,
954:20, 954:22,
955:19, 955:25,
960:3, 960:7, 962:3,
962:4, 962:8
**Sussmann's** [9] -
833:24, 848:17,
886:14, 887:22,
888:20, 889:14,
890:23, 940:1,
943:12
**sustained** [1] - 875:21
**switch** [1] - 866:17
**switched** [3] - 866:25,
867:1, 867:4
**switching** [1] - 963:13
**system** [4] - 846:9,
846:23, 922:16,
922:20


**T**

**T-O-R** [1] - 867:25
**table** [2] - 827:8,
840:22
**tank** [2] - 935:25,
936:1
**task** [1] - 885:1
**tea** [2] - 923:24, 925:1
**team** [12] - 870:9,
870:13, 872:13,
887:22, 889:3,
889:19, 889:22,
890:1, 890:8, 894:1,
894:2, 911:21
**technical** [1] - 913:7
**technically** [1] -
944:20
**telephone** [1] - 929:23
**ten** [1] - 869:21
**tenor** [2] - 882:4,
942:10
**tentative** [1] - 909:23
**term** [2] - 839:15,
877:7
**terms** [9] - 858:18,
861:11, 869:8,
869:11, 870:11,
871:24, 889:13,
929:1, 930:9
**terrible** [2] - 945:2,
946:4
**terrorist** [1] - 867:13
**Terzaken** [1] - 960:1

**test** [1] - 915:8
**testified** [18] - 833:2,
836:12, 845:24,
853:9, 858:8, 868:9,
871:22, 881:10,
883:24, 894:14,
905:9, 910:20,
914:21, 918:13,
926:11, 939:22,
956:24, 965:4
**testify** [6] - 827:24,
828:1, 828:3,
828:25, 830:8,
948:16
**testifying** [2] - 861:2,
954:13
**testimony** [13] - 829:7,
833:7, 842:7, 851:1,
863:7, 868:2,
940:14, 944:19,
948:17, 948:21,
950:4, 959:20, 962:7
**text** [41] - 832:24,
833:3, 833:16,
833:23, 833:25,
834:11, 835:23,
835:24, 842:19,
842:24, 848:17,
851:6, 859:12,
862:25, 864:16,
864:20, 864:21,
868:20, 875:14,
897:3, 899:15,
899:23, 900:2,
901:7, 901:15,
901:21, 901:24,
903:2, 905:20,
907:17, 923:13,
925:18, 925:23,
926:4, 937:16,
938:2, 938:3,
941:17, 947:6,
947:7, 962:3
**texted** [1] - 902:5
**texting** [1] - 898:6
**texts** [1] - 833:23
**thanked** [1] - 903:19
**THE** [90] - 825:1,
825:1, 825:10,
827:2, 827:6,
827:10, 827:14,
827:16, 827:23,
828:4, 828:8,
828:19, 829:5,
829:16, 829:20,
830:22, 831:4,
831:12, 831:15,
831:22, 831:25,
832:3, 832:10,
832:11, 839:1,

861:25, 873:15,
875:21, 882:21,
886:5, 886:17,
886:19, 886:25,
887:3, 887:6, 887:9,
887:11, 887:19,
887:25, 888:4,
888:7, 888:16,
888:19, 888:23,
889:4, 889:10,
891:12, 891:16,
891:25, 892:2,
892:5, 892:6, 893:1,
893:13, 894:9,
894:11, 905:1,
905:3, 908:10,
912:25, 913:18,
918:5, 919:10,
930:8, 930:10,
938:19, 939:6,
947:25, 948:4,
948:7, 948:10,
948:18, 949:2,
949:21, 950:3,
950:16, 959:21,
963:15, 963:18,
964:2, 964:13,
964:17, 964:20,
965:3, 965:11,
965:15, 965:20,
966:1, 966:11,
966:15
**themselves** [1] -
917:14
**then-US** [1] - 965:17
**there)** [1] - 910:4
**thereafter** [2] - 912:16,
918:14
**therefore** [1] - 857:7
**they've** [1] - 959:8
**thick** [1] - 850:6
**thinking** [3] - 848:3,
848:4, 955:3
**third** [4] - 846:19,
846:20, 870:24,
959:25
**thoughtfully** [1] -
827:20
**thoughts** [1] - 830:14
**threat** [4] - 854:12,
951:22, 953:2,
953:18
**three** [9] - 844:1,
844:6, 850:9,
868:23, 870:18,
890:10, 890:11,
894:1, 894:3
**throughout** [2] -
861:3, 874:7
**thumb** [7] - 850:9,

850:15, 850:16,
850:18, 850:21,
960:15, 961:14
**Thursday** [2] - 825:4,
883:6
**thwart** [3] - 853:17,
853:22, 854:2
**Thx** [1] - 907:19
**tied** [1] - 909:18
**ties** [1] - 854:22
**time-sensitive** [6] -
836:2, 848:19,
848:23, 849:14,
851:7, 881:21
**timetable** [2] - 923:23,
925:1
**tip** [1] - 852:5
**title** [2] - 870:12,
905:18
**titled** [1] - 942:22
**to-day** [1] - 920:10
**today** [14] - 845:18,
861:2, 863:11,
888:17, 910:14,
940:3, 942:17,
943:18, 944:1,
948:16, 948:17,
953:13, 955:2, 955:5
**Todd** [5] - 856:6,
856:8, 856:12,
862:16, 864:4
**together** [4] - 850:8,
889:15, 889:23,
950:2
**toll** [2] - 901:24,
902:12
**tomorrow** [4] - 897:24,
923:19, 926:2, 966:6
**took** [14] - 835:2,
840:24, 850:11,
857:8, 857:22,
878:8, 878:9,
878:12, 902:4,
918:19, 922:24,
935:21, 936:18,
961:5
**top** [10] - 834:12,
851:22, 854:24,
873:17, 878:17,
897:14, 908:5,
923:7, 927:19,
933:10
**topic** [4] - 868:13,
932:20, 964:17,
964:21
**topics** [1] - 963:13
**TOR** [17] - 846:24,
847:4, 847:6, 847:7,
847:9, 860:1, 860:2,
860:4, 867:25,

868:9, 868:10, 868:11, 868:14, 868:17, 868:18
**total** [5] - 904:13, 904:16, 910:20, 944:19, 944:20
**totally** [1] - 945:23
**touch** [2] - 904:3, 933:14
**towards** [6] - 841:22, 874:21, 937:3, 937:13, 949:5, 961:12
**town** [1] - 876:24
**trace** [1] - 846:21
**training** [1] - 870:20
**traitor** [3] - 940:11, 942:12, 942:13
**traitors** [1] - 945:23
**TRANSCRIPT** [1] - 825:9
**transcript** [18] - 828:22, 828:23, 828:25, 947:1, 947:15, 948:2, 948:5, 948:8, 948:19, 949:1, 949:3, 959:5, 959:14, 959:18, 959:23, 960:9, 967:5, 967:6
**transcripts** [3] - 958:22, 958:23, 958:25
**transferring** [1] - 834:21
**traumatic** [1] - 946:1
**travel** [3] - 897:22, 898:22, 899:7
**traveling** [1] - 899:1
**TRIAL** [1] - 825:9
**trickling** [2] - 923:21, 924:17
**Trisha** [2] - 871:6, 874:7
**true** [3] - 867:6, 967:4, 967:6
**Trump** [34] - 841:11, 843:11, 845:25, 846:13, 847:11, 854:11, 854:15, 854:20, 854:23, 867:12, 867:17, 868:5, 868:6, 868:24, 869:5, 869:10, 881:19, 882:6, 913:10, 914:14, 919:2, 920:3, 924:12, 938:12, 939:15,

939:16, 939:25, 940:24, 944:17, 945:19, 955:13, 957:25, 960:25
**Trump's** [1] - 960:20
**Trump-related** [1] - 944:17
**Trump/Russia** [1] - 881:18
**trusted** [2] - 835:25, 842:18
**trustworthy** [1] - 844:18
**truth** [2] - 947:24, 948:20
**truthful** [2] - 842:18, 892:19
**truthfully** [1] - 928:24
**try** [12] - 836:3, 853:19, 853:21, 859:25, 884:23, 892:19, 912:11, 928:14, 935:10, 937:8, 945:14, 960:9
**trying** [14] - 856:22, 856:23, 857:9, 858:6, 863:23, 868:17, 896:21, 912:19, 914:11, 950:5, 956:18, 961:22, 962:18, 962:23
**turn** [1] - 833:9, 907:11, 911:1
**turned** [1] - 946:16
**turning** [1] - 865:25
**turnstiles** [1] - 837:23
**TV** [1] - 908:23
**twice** [2] - 872:11, 872:16
**twice-daily** [1] - 872:11
**Twitter** [4] - 936:3, 936:6, 936:7, 936:11
**two** [21] - 841:14, 846:6, 850:9, 878:17, 882:22, 888:22, 902:21, 904:18, 906:22, 910:21, 919:17, 925:18, 925:20, 933:7, 936:10, 939:23, 944:14, 944:19, 944:20, 960:16, 961:14
**two-minute** [1] - 906:22
**type** [9] - 846:8, 859:23, 880:9, 914:14, 920:2,

920:17, 928:11, 939:14, 945:18
**typed** [1] - 833:24
**types** [1] - 836:24
**typical** [2] - 846:16, 963:4
**typically** [4] - 874:5, 927:2, 958:21, 958:23

**U**

**U.S** [5] - 825:22, 867:19, 916:8, 916:14, 939:24
**ultimate** [1] - 965:16
**unable** [3] - 897:21, 898:18, 901:8
**unauthorized** [4] - 926:23, 927:10, 928:16, 929:13
**unclear** [1] - 910:16
**uncomfortable** [1] - 891:19
**uncommon** [2] - 851:23, 851:25
**under** [5] - 832:9, 857:1, 863:4, 867:5, 944:23
**underlying** [1] - 917:13
**understood** [18] - 835:3, 835:7, 846:8, 850:10, 864:23, 872:25, 873:8, 898:16, 915:9, 924:7, 924:20, 925:4, 929:11, 929:24, 930:9, 935:19, 939:11, 944:24
**undertake** [1] - 920:1
**undertook** [1] - 918:24
**unfortunately** [1] - 893:17
**unit** [1] - 871:1
**UNITED** [3] - 825:1, 825:3, 825:10
**United** [10] - 825:12, 827:3, 827:7, 841:12, 853:20, 882:8, 889:6, 892:9, 945:6, 967:11
**unseat** [1] - 893:14
**unsure** [1] - 917:15
**up** [42] - 831:21, 832:23, 833:25, 835:15, 836:23, 838:15, 846:17, 850:4, 862:15,

864:20, 865:17, 880:15, 880:17, 881:15, 883:23, 884:3, 884:10, 885:7, 894:21, 900:4, 900:5, 903:4, 904:4, 906:1, 906:9, 906:13, 909:18, 909:23, 914:18, 934:25, 940:1, 940:3, 940:13, 945:11, 945:14, 947:15, 955:11, 955:14, 956:5, 961:6, 962:14, 964:4
**updates** [3] - 921:1, 921:4, 941:14
**upsetting** [2] - 945:6, 945:8
**upwards** [1] - 894:2
**urgency** [8] - 848:3, 848:4, 858:7, 859:18, 866:9, 868:25, 881:23, 885:6
**urgent** [2] - 835:25, 866:11
**US** [1] - 965:17
**users** [1] - 848:11

**V**

**validate** [1] - 915:8
**validity** [1] - 857:2
**vantage** [1] - 873:20
**variety** [2] - 852:6, 928:14
**various** [1] - 834:3
**veracity** [2] - 915:3
**verdict** [2] - 888:13, 893:24
**Verizon** [2] - 885:23, 900:9
**versus** [1] - 914:23
**vibrant** [1] - 837:17
**victim** [1] - 952:14
**view** [13] - 848:1, 848:22, 866:9, 871:7, 913:13, 913:14, 915:11, 919:19, 919:21, 919:23, 945:22, 952:4, 953:13
**voir** [1] - 889:12
**volition** [1] - 893:4
**voluntarily** [1] - 893:19
**volunteer** [1] - 955:24
**vouch** [1] - 862:2
**vouching** [1] - 856:23

**vs** [2] - 825:5, 827:4

**W**

**w/him** [1] - 875:6
**w/Michael** [1] - 839:4
**WA** [1] - 938:6
**wait** [2] - 927:7, 927:11
**walk** [6] - 837:10, 837:12, 837:20, 839:2, 862:6, 883:3
**walking** [2] - 945:16
**Wall** [4] - 845:6, 866:4, 941:22, 941:23
**wants** [1] - 949:19
**warrants** [1] - 828:18
**wash** [2] - 866:3, 875:7
**Washington** [10] - 825:15, 825:23, 836:20, 839:24, 845:5, 866:3, 875:8, 936:1, 939:13, 967:13
**waste** [1] - 957:20
**wasting** [1] - 957:18
**WATKINS** [1] - 825:18
**ways** [2] - 852:6, 928:14
**weeds** [1] - 920:24
**week** [5] - 849:10, 919:17, 933:12, 933:13, 944:10
**weekly** [1] - 872:12
**weeks** [4] - 868:24, 919:17, 922:12, 922:13
**weigh** [1] - 892:23
**welcome** [3] - 831:17, 832:3, 894:10
**well-known** [1] - 845:8
**well-regarded** [1] - 844:18
**whatsoever** [2] - 929:9, 953:6
**whoa** [2] - 935:14
**whole** [8] - 835:4, 835:6, 853:25, 854:1, 871:2, 917:24, 945:11, 946:12
**Whoops** [1] - 883:8
**wide** [1] - 946:11
**wife** [1] - 888:23
**willing** [5] - 835:21, 880:3, 880:19, 884:12, 946:7
**WITNESS** [3] - 826:2, 832:10, 894:11

**woke** [1] - 900:4
**women** [1] - 889:25
**wonder** [1] - 952:3
**word** [4] - 837:16,
   935:12, 961:19,
   961:25
**words** [11] - 833:18,
   844:15, 848:25,
   863:7, 871:10,
   876:14, 917:14,
   927:9, 940:17,
   941:1, 948:20
**world** [2] - 849:3,
   849:5
**worried** [2] - 917:10,
   918:11
**wrapped** [3] - 906:1,
   906:9, 906:13
**write** [3] - 838:5,
   915:23, 918:3
**writer** [1] - 874:19
**writes** [3] - 836:7,
   909:8, 909:17
**written** [2] - 841:2,
   880:17
**wrote** [3] - 874:19,
   874:21, 910:3
**WSJ** [1] - 866:3

## Y

**YAO** [1] - 825:17
**Yao** [1] - 827:12
**year** [2] - 888:21,
   890:12
**years** [10] - 860:15,
   869:19, 889:21,
   889:24, 894:1,
   894:3, 916:15,
   919:15, 933:7,
   952:24
**yesterday** [8] - 828:12,
   830:24, 832:18,
   832:25, 835:4,
   835:8, 836:11, 858:8
**York** [13] - 825:19,
   845:6, 866:2,
   903:14, 904:1,
   905:25, 912:10,
   912:16, 913:25,
   914:7, 916:17,
   921:13, 924:21
**Yorker** [2] - 933:12,
   937:20
**young** [1] - 889:25
**younger** [1] - 890:25
**yourself** [1] - 960:2