<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - -x
 3      THE UNITED STATES OF AMERICA,
                                           Criminal Action No.
 4                   Plaintiff,            1:21-cr-00582-CRC-1
                                           Friday, May 20, 2022
 5      vs.                                9:10 a.m.

 6      MICHAEL A. SUSSMANN,               *MORNING SESSION*

 7                   Defendant.
        - - - - - - - - - - - - - - - -x
 8

 9      _____

10                      TRANSCRIPT OF JURY TRIAL
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
        _____
12
        APPEARANCES:
13
        For the United States:        ANDREW DeFILIPPIS, ESQ.
14                                     JONATHAN EDGAR ALGOR, IV, ESQ.
                                       MICHAEL T. KEILTY, ESQ.
15                                     BRITTAIN SHAW, ESQ.
                                       SPECIAL COUNSEL'S OFFICE
16                                     145 N Street Northeast
                                       Washington, DC 20002
17                                     (212) 637-2231

18      For the Defendant:            SEAN M. BERKOWITZ, ESQ.
                                       MICHAEL BOSWORTH, ESQ.
19                                     CATHERINE YAO, ESQ.
                                       NATALIE HARDWICK RAO, ESQ.
20                                     LATHAM & WATKINS LLP
                                       1271 Avenue of the Americas
21                                     New York, NY 10020
                                       (212) 906-1200
22
        Court Reporter:               Lisa A. Moreira, RDR, CRR
23                                     Official Court Reporter
                                       U.S. Courthouse, Room 6718
24                                     333 Constitution Avenue, NW
                                       Washington, DC  20001
25                                     (202) 354-3187
</pre>

I N D E X

WITNESS                                                      PAGE

**JAMES A. BAKER, Continued**
     (By Mr. Berkowitz)................................. 1169
     (By Mr. DeFilippis)............................... 1220

**ROBERT MOOK**
     (By Mr. Bosworth).................................. 1241
     (By Mr. DeFilippis)............................... 1258
     (By Mr. Bosworth).................................. 1293

```
 1                      P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Your Honor, we're back on

 3      the record for Criminal Case 21-582, United States of

 4      America vs. Michael Sussmann.

 5              MR. DeFILIPPIS:  Good morning, Your Honor; Andrew

 6      DeFilippis for the government.  With me at counsel table are

 7      Johnny Algor, Brittain Shaw, Michael Keilty, Kori Arsenault,

 8      and John Durham.

 9              THE COURT:  Okay.  Good morning.  Happy Friday,

10      everybody.

11              MR. BERKOWITZ:  Good morning, Your Honor; Sean

12      Berkowitz, Michael Bosworth, Natalie Rao, Catherine Yao on

13      behalf of Mr. Sussmann, who is present in court.

14              THE COURT:  Good morning.

15              All right.  Do you want to bring Mr. Baker up

16      before the jury comes in?

17              THE WITNESS:  Good morning, Your Honor.

18              THE COURT:  Good morning, sir.  How are you?

19              THE WITNESS:  Fine, thanks.

20              THE COURT:  Good.

21              (Jury enters courtroom)

22              THE COURT:  All right.  Please be seated.

23              Good morning, everyone.  Hope you had a nice

24      evening.

25              Juror 8, I spoke with your manager yesterday, and
```

1    he assured me that everything will be okay, all right?  So I

2    don't want you to worry about that.

3              All right.  We're going to proceed with the cross-

4    examination of Mr. Baker.

5              Mr. Berkowitz.

6                        JAMES BAKER, Resumed

7                   CROSS-EXAMINATION, Continued

8    BY MR. BERKOWITZ:

9    Q.  Good morning, Mr. Baker.

10   A.  Good morning.

11   Q.  I'm going to give you a little road map of where we're

12   going to go today to hopefully knock it out.  I tried to

13   sharpen my pencil a little bit.  We're going to knock off

14   the rest of what I've got on my chart.

15             We're going to cover Mr. Priestap and

16   Ms. Anderson's notes.  We're going to talk about the *New

17   York Times* and get into whether it mattered.  And so that's

18   kind of my road map.  We'll try to knock it out quickly.

19             With respect to the meeting that you had with

20   Mr. Sussmann, sir, you testified yesterday that the meeting

21   lasted approximately 30 minutes.  Do you remember that?

22   A.  Yes.

23   Q.  Okay.  Do you remember meeting with Mr. Durham and

24   Mr. DeFilippis in 2020?  We talked about that yesterday.

25   A.  I think yesterday we described a couple of meetings, at

1   least, in 2020.

2   Q.  And that was -- do you remember the first time that you

3   sat down and met with them to talk about this matter?

4   A.  We talked about it yesterday.  I don't remember a

5   specific date, but yes, I remember meeting with them about

6   this matter for the first time.

7   Q.  And do you remember telling them in that meeting that

8   the meeting that you had with Mr. Sussmann on September 19th

9   of 2020 lasted 15 to 20 minutes?

10  A.  I don't remember telling them that.

11  Q.  Would it refresh your recollection to see notes of the

12  interview, sir?

13  A.  It may, but I don't remember telling them that.

14  Q.  Okay.  Take a look, sir, at JB7 and Page 9, Paragraph 3,

15  the last four lines.

16  A.  Yes, sir.

17  Q.  Having looked at that, does that refresh your

18  recollection, sir, that you told Mr. DeFilippis and

19  Mr. Durham in that meeting in June of 2020 that that meeting

20  with Mr. Sussmann lasted approximately 15 to 20 minutes?

21  A.  No.

22  Q.  It doesn't refresh your recollection?

23  A.  No, sir.

24  Q.  Do you deny that you said that?

25  A.  I don't remember what I said.

1    Q.   Okay.  Let's now talk about the Priestap notes.

2              MR. BERKOWITZ:  You can take that down.

3    Q.   Those notes were pretty important in refreshing your

4    recollection about what happened substantively at the

5    meeting.  Correct, sir?

6    A.   Yes, sir.

7    Q.   And I think that you said yesterday that you were highly

8    confident that your discussion with Mr. Priestap occurred

9    via phone, correct?

10   A.   Yes, sir.

11   Q.   Do you remember meeting with Messrs. DeFilippis and

12   Durham on June 8th of 2021 and telling them that your

13   conversation with Mr. Priestap shortly after your meeting

14   with Mr. Sussmann was not likely a telephone conversation

15   because you would not have shared the details that Sussmann

16   provided to you in a phone conversation?

17   A.   I don't remember saying that.

18   Q.   All right.  Would it refresh your recollection to look

19   at the Report of Interview, sir?  This is JB9 at Page 2,

20   Paragraph 2.

21   A.   (Witness reviews document) I've read it.

22   Q.   Having seen that Report of Interview prepared by an FBI

23   agent, does it refresh your recollection that on June 8th of

24   2021 you said it was not likely a phone conversation because

25   you would not have shared the details Mr. Sussmann provided

1    to you in a phone conversation?

2    A.  It does not refresh my recollection about saying that at

3    that time.

4            What I believe I have said on several occasions is

5    that at various points in time I have had difficulty

6    recalling whether I spoke over the phone or whether it was

7    in person.

8    Q.  And at various times you've felt more confident that it

9    was over the phone, and at various times you've felt more

10   confident it was in person?

11   A.  That's fair to say.

12   Q.  So let's talk about, sir, the actual -- so we've hit the

13   phone.  We've hit the 30 minutes.  Let's talk about the

14   notes themselves.

15           MR. BERKOWITZ:  And if we can pull up

16   Mr. Priestap's notes, which are -- here we go --

17   Government's Exhibit 243.

18           THE WITNESS:  Could somebody blow it up, if you

19   don't mind?  I can't read it.

20   Q.  All right.  And just briefly with respect to these.

21   These are the notes that the government showed you to

22   refresh your recollection, correct, in or around June of

23   2021?

24   A.  That's my recollection, yes.

25   Q.  Do you remember the circumstances surrounding when they

1    provided you a copy of the notes, Mr. Baker?

2    A.   They didn't provide me a copy of the notes.  They showed

3    it to me in their office space that I, to the best of my

4    recollection, was in -- FBI headquarters here in Washington,

5    D.C. -- in their secure room that I think we described

6    yesterday.

7    Q.   Okay.  And so what I'm trying to figure out, and maybe

8    you can help me, you met with them on June 11th and -- I'm

9    sorry, June 8th of 2021 as well as -- you met with them

10   twice in the month of June in 2021.  Do you remember that?

11   A.   I remember meeting with them multiple times.  I don't

12   remember the dates.

13   Q.   All right.  Do you remember, in those two meetings in

14   the first half of June of 2021, when they first showed you

15   these notes or -- showed you these notes?

16   A.   Do I remember which meeting?

17   Q.   Yes.

18   A.   No, I do not.

19   Q.   Do you remember whether, when you first saw the notes,

20   your recollection was immediately refreshed?

21   A.   I don't remember that.

22        I think it took a little bit of time for me to

23   process what I was reading and to reflect on what I

24   remembered.

25   Q.   Is it possible that that's why the meetings were

1    approximately a week apart, the first and second meetings?

2    A.   It could be, I don't remember.

3    Q.   And so you thought about it and reflected upon it and

4    then your recollection was refreshed?

5    A.   I think that's right.

6              Also, I mean, you know, I only have so much

7    stamina, and I think we tried to keep these meetings to a

8    reasonable length of time, and so that's why I think we had

9    multiple meetings.  And for scheduling purposes as well.

10   Q.   And it was not, sir, was it, an immediate recollection

11   when you saw it, you said:  Bingo, yes, that's exactly what

12   happened.  Correct?

13   A.   I think that's right.

14   Q.   It was not, correct?

15   A.   It was not an immediate thing.  I think that's right,

16   yes, sir.

17   Q.   Now, the government did not show you other people's

18   notes in that June of 2021 time period, correct?

19   A.   At that point in time I don't think they showed me

20   anybody else's notes.

21   Q.   Let me ask Mr. Cleaves to pull up Defense Exhibit 558,

22   which are Ms. Gauhar's notes of the meeting from March of

23   2017, and ask whether they showed you these notes.

24             MR. BERKOWITZ:  And if you could blow up, "The

25   attorney brought to" -- Page 2, I believe.  Page 6.

```
1    A.  I'm sorry, these are the notes we looked at yesterday.

2    Q.  Right.  These are the notes -- just to be clear for

3    everybody -- March 6th of 2017.

4         Did the FBI or anybody from Special Counsel

5    Durham's team show you these notes in an attempt to refresh

6    your recollection of what happened in your interactions with

7    Mr. Sussmann in 2016?

8    A.  No.

9         MR. BERKOWITZ:  Take them down.

10   Q.  Let's go back, then, to Mr. Priestap's notes.  We'll

11   talk about them.

12        MR. BERKOWITZ:  And blow them up, please, for the

13   witness.

14   Q.  And you haven't spoken to Mr. Priestap about these notes

15   at all, correct?

16   A.  No, that's correct.

17   Q.  "Represents DNC, Clinton Foundation, etc."  Do you see

18   that?

19   A.  Yes, sir.

20   Q.  That was something you chose to tell Mr. Priestap to

21   orient him about who Mr. Sussmann was, correct?

22   A.  That's correct.

23   Q.  And you felt that that gave him added credence, correct?

24   A.  Gave who added credence?

25   Q.  What's that?
```

1   A.  It gave who added credence?

2   Q.  Mr. Sussmann, to Mr. Priestap.

3   A.  Well, I was trying to explain -- I was trying to explain

4   Michael's practice areas and the type of clients that he had

5   and who he was.  And to me, you know, telling Bill that

6   Michael was working on a cyber hack of this prominence

7   indicated to me, and I wanted to convey to Bill, that

8   Michael was a serious cyber security lawyer.

9   Q.  And it doesn't say "serious cyber security," correct?

10  A.  No.  It doesn't say that, but that was -- I believe that

11  was the reason that I was saying this, in part.  Saying like

12  he's got this big hack case that we all know about and have

13  been working on, and, you know, he has represented these

14  organizations in other matters, so that Bill had, from my

15  perspective, as much as I could convey, a 360-degree view of

16  Michael.

17  Q.  And you knew at that time that Mr. Sussmann also

18  represented big corporations like Twitter, correct?

19  A.  Correct.  I think -- at that point in time I think I

20  knew that he represented Twitter, yes.  I can't remember the

21  timing of that litigation, but...

22  Q.  Certainly other big-name companies?

23  A.  Yes; absolutely, yes.

24  Q.  You chose not to identify those?

25  A.  I don't think I mentioned those, correct.

1    Q.  And you again said "approached by prominent cyber

2    people," correct?

3    A.  Let me look at that.

4    Q.  It's the last bullet.

5    A.  Yes, yes, yes.

6    Q.  Did Mr. Priestap ask who the cyber people were?

7    A.  Did he ask?

8    Q.  Yes.

9    A.  I don't know if he asked or I conveyed.  What's in the

10   parenthetical there about "academic or corp POCs," I don't

11   know if he asked that or if I volunteered that in terms of

12   trying to describe who I thought these folks were.

13   Q.  Did Mr. Priestap -- who is a special agent, correct?

14   He's an investigator?

15   A.  Correct.  Senior official, yes.

16   Q.  Been with the Bureau for over 20 years?

17   A.  At that point close, I think, yes.

18   Q.  Okay.  Did he say:  Why did these prominent cyber people

19   approach Mr. Sussmann?

20   A.  I don't remember him asking that.

21   Q.  And also written, and you remember, is "said not doing

22   this for any client."  Do you see that?

23   A.  Yes, sir.

24   Q.  Okay.  He doesn't say for any particular client, right?

25   A.  He doesn't say that; that's right.

1    Q.  And you knew at that time that he had clients,

2    obviously, right?  You've been -- identified some?

3    A.  Michael?

4    Q.  Yes.

5    A.  Yes.

6    Q.  He's a lawyer?

7    A.  Yes.  In private practice, yes.

8    Q.  And then you mentioned news organizations.  Do you see

9    that?

10   A.  Let's see.  Yes.

11   Q.  And you don't recall one way or the other whether

12   Mr. Sussmann had specifically identified those news

13   organizations or you said these are the types?

14   A.  Either he said it or I surmised it, but there was some

15   discussion about major news organizations.

16   Q.  Did Mr. Priestap say to you:  Why did they go to the

17   news organizations first?

18   A.  I don't think he asked me that.  Excuse me, I don't

19   think he asked me that question.

20           MR. BERKOWITZ:  All right.  You can take that --

21   you can take that down.

22   Q.  In addition, I believe that you were shown

23   Ms. Anderson's notes.  I want to cover those briefly.

24           Trisha Anderson.  Remind the jury who she is.

25           MR. BERKOWITZ:  And put up Government Exhibit 242,

```
1    I believe.
2    A.  Trisha Anderson was the Deputy General Counsel working
3    directly for me responsible for national security and cyber.
4    Q.  And do you remember being shown these notes in December
5    of 2021?
6    A.  I don't recall when I saw these notes for the first
7    time.
8    Q.  All right.  Can you give the jury your best
9    recollection?
10   A.  It was not at the same time as the Priestap notes.  It
11   was sometime later.
12   Q.  Afterwards?
13   A.  Yes, sir.
14   Q.  And fair to say that you have no independent
15   recollection, sitting here today, of meeting with
16   Ms. Anderson or talking to her on September 19th of 2016?
17   A.  I think that's fair to say.
18   Q.  So you see these notes.  And did these notes cause you
19   to somehow have a different recollection?
20   A.  No.
21   Q.  And these notes use the words "no specific client but
22   group of cyber academics," correct?
23   A.  Let me read it.  One second.
24           Yes.
25   Q.  And I could ask you similar questions about what you two
```

1    might have talked about relative to this, but you don't have

2    any recollection of the meeting, right?

3    A.  Not really, no.

4    Q.  And you --

5    A.  Excuse me.  Just from the top of the document, as we

6    talked -- I think we talked about yesterday, it says

7    "Deputies Meeting" -- yes, thank you -- and then, just

8    looking at it with the separate date, it looks as though we

9    had our standard deputies meeting.  We probably covered a

10   number of different topics.

11            And then it looks like I may have had a side

12   conversation just with Trisha on this particular point.

13   Q.  But let's be clear.  You're guessing about that based on

14   the document?

15   A.  I'm guessing at that based on looking at the document,

16   yes, sir.

17   Q.  You don't remember the meeting?

18   A.  I don't remember this specifically, yes, that's correct.

19   Q.  Okay.  So let's talk about something -- we touched

20   briefly on the fact that Mr. Sussmann's name wasn't in the

21   investigative file.  Not something you knew.  You said you'd

22   be surprised about that, but do you remember that

23   discussion?

24   A.  Yes.  We discussed that yesterday.

25   Q.  And let me be really clear.  You are unaware of any

1    direction from anybody in the FBI to keep Mr. Sussmann's

2    identity hidden from the team investigating the Alfa-Bank

3    allegations, correct?

4    A.  That's correct.

5    Q.  And you would -- you believe that if you had been told

6    that, you would have remembered such a direction.  Correct?

7    A.  I think so, yes.

8    Q.  Let's talk about *The New York Times*.

9        MR. BERKOWITZ:  If we could blow up Government

10   Exhibit 285, put it up, the email.

11       THE WITNESS:  If you could blow that one up too.

12   Yes, thank you.

13       MR. BERKOWITZ:  You and me both.

14   Q.  So this is September 22nd of 2016.  And I'm going to

15   orient the jury, and if I get it wrong, let me know, because

16   it's going to be in the form of a question.

17   A.  Sure.

18   Q.  After Mr. Sussmann and you met on September 19th --

19   A.  Uh-huh.

20   Q.  -- you had a meeting internally at the FBI, or a

21   discussion, perhaps, with Mr. Priestap where he communicated

22   to you:  We want more time to look into this.  Could you get

23   the name of the news organization.  Correct?

24   A.  It was at least with Mr. Priestap, but then I think we

25   discussed that with others as well.

1    Q.  All right.  And it's a significant step to reach out

2    affirmatively to a news organization to ask them to hold

3    something, correct?

4    A.  Yes.

5    Q.  It's unusual?

6    A.  As I think I said yesterday, it happens.  It doesn't

7    happen all the time.  So "unusual," that's a fair word, I

8    guess.

9    Q.  And that was in part because there were potential

10   serious national security concerns at play.  Potential,

11   correct?

12   A.  I'm sorry, what's the first part of your question?

13   Q.  The reason that the decision was made to reach out to

14   the *New York Times* and ask them to hold a potential story

15   was because there were potential serious national security

16   concerns at play?

17   A.  Yes.  That's right.

18   Q.  And then on the 21st you talked to Mr. Sussmann, and he

19   said, "I need to check with somebody, and I'll call you

20   back."

21   A.  That's my recollection.

22   Q.  And there was the -- and you -- and then we saw the text

23   from him saying persons availability, difficult, hope to

24   have an answer tomorrow, correct?  That was late on the

25   21st.

1    A.  Yes, sir.

2    Q.  And you understood he was going to be talking to the

3    cyber security experts who had provided the information.

4    That was your understanding?

5    A.  That was my understanding, yes.

6    Q.  Okay.  And he then called you back and said -- spoke

7    with your secretary first and then sent you a text, and then

8    finally gets in touch with you and he gives you the name.

9    Right?

10   A.  Yes, sir.

11   Q.  And you know who Eric Lichtblau is, right?

12   A.  Yes, sir.

13   Q.  You've dealt with him before on serious national

14   security issues, correct?

15   A.  Well, I knew who he was, and I'm not sure that I dealt

16   with him -- I can't remember if I dealt with him personally

17   on articles or matters, but I was very well aware of his

18   involvement in a variety of national-security-related

19   matters.  I knew -- I knew very well who he was.

20   Q.  He won the Pulitzer Prize for reporting on national

21   security issues, didn't he, sir?

22   A.  I think so, yes.

23   Q.  And, in fact, that story for which he won the Pulitzer

24   Prize the FBI asked him to hold for a period of time,

25   correct?

1    A.  If you're talking about the Stellarwind matter -- is

2    that right?  Is that what he won for?

3    Q.  Yes, I believe so.  I don't want to be a witness here,

4    but I -- so you tell me what your recollection is.

5    A.  To the best of my recollection, he won that for at least

6    one article that he wrote in, I think, 2004/2005, somewhere

7    around there, about a government surveillance program.  And

8    my recollection is at that point, prior to that article

9    being published, I think it was the White House, not the

10   FBI -- it was, I think, the vice president, national

11   security advisor, and others at the White House who asked

12   *The New York Times* to hold that article for some period of

13   time.

14           I think they eventually did, I believe, having

15   thought about it, over the objection of Mr. Lichtblau.  So I

16   think he objected to it, and then eventually, through a

17   series of events, the *Times* was kind of forced to publish

18   the article.

19   Q.  And sometimes -- I think you testified about this

20   yesterday.  But sometimes, in order for the FBI to look into

21   serious national security concerns, it's better that the

22   public doesn't know about it.  Correct?

23   A.  Yes.

24   Q.  Because if you're investigating bad guys, and there's

25   reporting that the FBI is investigating bad guys, they can

1    change what they're doing.  Right?

2    A.  Yes.  If the public knows, the bad guys know.

3    Q.  And they can hide their surveillance.  They can take

4    down servers.  They can do any number of things that would

5    frustrate your ability to do your job at the FBI.

6    A.  Yes; destroy evidence, flee, take down servers,

7    terminate communications channels.  Exactly right.

8    Q.  And so it's helpful to the FBI, is it not, to get a

9    heads up if the *New York Times* or a publication is going to

10   publish something with national security concerns, correct?

11   A.  That is helpful, yes.

12   Q.  So you spoke with Mr. Sussmann, got Mr. Lichtblau's

13   name.  You reported it to some pretty senior people,

14   correct?

15   A.  Yes, sir.

16   Q.  Senior enough to -- it's Jim Comey, who was the Director

17   of the FBI at that time.  Right?

18   A.  Yes, sir.

19   Q.  Andrew McCabe, the number two person.  Right?

20   A.  Correct.

21   Q.  And you don't -- and you say, "The reporter on the

22   matter we discussed is Eric Lichtblau from *The New York*

23   *Times*.  He is shooting for Sunday, but may not have all of

24   the details wrapped up by that time," correct?

25   A.  Yes.

1   Q.  And you believe you got that information from

2   Mr. Sussmann, correct?

3   A.  Yes.

4   Q.  And he said go ahead and talk to Mr. Lichtblau about it,

5   right?  He was telling you to contact him, if you wanted to,

6   right?

7   A.  I'm not sure he literally said that, but Michael

8   understood why I was asking, and so he didn't seem to have

9   any objection to that.

10  Q.  "He has been informed that we might call."  Do you see

11  that?

12  A.  Ah, there we go.  Yes.  Thank you, yes.

13  Q.  And the only person that could have told you that was

14  Mr. Sussmann?

15  A.  Yes.  I didn't see that.

16  Q.  All right.  So you reached out to Mr. Lichtblau, as we

17  talked about.  You had --

18  A.  I think Michael Kortan reached out to Eric directly,

19  but...

20  Q.  In the FBI, as in many organizations, there's a press

21  person, correct?

22  A.  Correct.

23  Q.  And he was the person who dealt with the press?

24  A.  That was his job; that's right.

25  Q.  And you testified yesterday to some meetings with

1   Mr. Lichtblau and the guy who, you know, we talked about

2   getting an autographed book and joked about that.  But you

3   had that meeting, correct?

4   A.  Two meetings, yes, sir.

5   Q.  And you asked them to hold the story, and they did,

6   correct?

7   A.  Yes, sir.

8   Q.  And they didn't at that time publish a story in the

9   September time period saying the FBI's investigating this;

10  this is really serious?

11  A.  They did not do that, correct.

12  Q.  And you wouldn't have expected them to based on your

13  asking them to hold the story, correct?

14  A.  And once they -- based on our asking and the fact that

15  they said they wouldn't.

16  Q.  All right.  And Mr. Sussmann knew that the FBI was

17  investigating, correct?

18  A.  Yes.  I think I told him that because I said, "We need

19  more time to investigate.  Can you please give us the name

20  of the reporter?"  I think that's right.

21          So yes, he knew that we were investigating it.

22  Q.  And he did.  But there was no leak of that

23  investigation, sir, was there?

24  A.  Not to my knowledge.

25  Q.  And you would probably have remembered it, if there

1   were, wouldn't you, sir?

2   A.   Yes.

3   Q.   Now, you testified yesterday, I believe, that it was --

4   you believed that the cyber security experts had given the

5   material to whatever reporter was going to run the story.

6   At the September meeting he informed you -- Mr. Sussmann

7   informed you that a news organization had the data and was

8   going to run a story.

9             And your takeaway from that, according to your

10  testimony yesterday, was that it was the cyber security

11  people that had given the information to the news

12  organization?

13  A.   That's what I either was told or surmised.

14  Q.   And you had previously surmised, in discussions with

15  Mr. DeFilippis and Mr. Durham, that it was Mr. Sussmann that

16  provided the information to the media, correct?

17  A.   I don't remember if I told them that.

18  Q.   Okay.  Would it refresh your recollection to see a

19  couple of reports?

20  A.   Sure.

21  Q.   Okay.  Let's take a look at JB9 at Page 1, Paragraph 4.

22            And I'm going to show you one other thing from

23  that --

24  A.   Give me one second.

25  Q.   After you're done with that, let me know; reading it.

1    A.   (Witness reviews document) Okay.

2    Q.   And then let's take a look at Page 2 of that same

3    document at Paragraph 2.

4    A.   (Witness reviews document) No.  Wrong one.

5    Q.   No.  That's not it.

6         All right.  Well, with respect to that first one

7    you saw, does that refresh your recollection that you told

8    the people from the government in the meeting in June of

9    2021 that Mr. Sussmann may have provided the information

10   that he was giving to you to the media, but he didn't

11   specifically say that?

12   A.   Can you bring up that paragraph again?  I'm sorry.

13   Q.   Sure.

14   A.   (Witness reviews document)

15        "Later in the interview Baker said" --

16   Q.   You don't need to refer to --

17        THE COURT:  Don't read it.

18        THE WITNESS:  Okay.  Sorry.

19   A.   (Witness reviews document)

20   Q.   And once you're done with that, it's actually Paragraph

21   3 on the next page.

22        Tell me when you're done with that, and I'll show

23   you the other.

24   A.   Okay.

25   Q.   Take a look at Paragraph 3 of Page 2, last sentence.

1    A.   (Witness reviews document) Okay.  So -- yes.

2    Q.   And I can show you one more document to see if any of it

3    refreshes your recollection, if you'd like, to get the whole

4    panoply as opposed to go one by one.  What's your --

5    A.   Now I can't remember your exact question to start out

6    with.

7    Q.   Did you tell -- well, on June -- in June of 2021, did

8    you tell the government that Mr. Sussmann may have provided

9    the thumb drive to the media?

10   A.   Apparently.  I don't recall that, but that's what the

11   notes say.

12   Q.   Let's take a look, then -- and more recently -- and

13   maybe this will be more helpful because it just goes back to

14   March of 2022, although you did say that was the date you

15   discovered your phone and so it was a crazy day.

16              But in March of 2022 you met with agents of the

17   government, correct, of this year?  A couple of months ago.

18   A.   March 4th, I think it was, yes.

19   Q.   March 14th?

20   A.   I'm not -- I don't recall.  Agents came to my house on

21   the date that I found the text material.

22   Q.   Let's take a look at --

23   A.   And then I had other conversations, I believe, as well.

24   Q.   Let's take a look at JB17 at Page 3, middle of Paragraph

25   1 starting with -- well, read the whole thing.

1    A.   (Witness reviews document)

2    Q.   And my question, just to be clear, is:  Did you tell the

3    agents on March 14th of 2022, just a couple of months ago,

4    that you learned that *The New York Times* had gotten the

5    information about the servers from Sussmann?

6    A.   (Witness reviews document)  I don't recall this

7    particular conversation with the agents.

8                 MR. BERKOWITZ:  Okay.  You can take it down.

9    Q.   Now, sir, whether it was the cyber experts or

10   Mr. Sussmann, you knew that one of those two entities had

11   provided the information that you were getting to the news

12   organization, correct, to *The New York Times*?

13   A.   Yes.

14   Q.   And you knew Mr. Sussmann was in contact with *The New*

15   *York Times*, correct?

16   A.   Yes.

17   Q.   Did your alarm bells go off, sir?

18   A.   About what?

19   Q.   About the fact that the information that was coming to

20   you had gone to a news organization before it came to you.

21   A.   Well, alarm bells in what sense, I guess I should ask?

22   Q.   Well, did it cause you concern?  Well, why are these

23   people taking the information to a national publication?

24   A.   I think I surmised that they were very alarm -- either

25   Michael said something to the effect, or I surmised it, that

1    these cyber experts were very concerned about what they had

2    learned through their examination, and they, I think, were

3    ringing alarm bells.  So I think they wanted to go to the

4    FBI.  They wanted to raise the issue with the press.

5           And so I think -- that's sort of how I understood

6    it, that they were very concerned about the material that

7    they had uncovered.

8    Q.  And did Mr. Sussmann say that these cyber people or any

9    of these cyber people were his clients for purposes of going

10   to *The New York Times*?  Not coming to you, but for purposes

11   of going to *The New York Times*?

12   A.  No.  Not that I recall, no.

13   Q.  Okay.  You know that he had some relationship with them,

14   correct?

15   A.  Yes.

16   Q.  They came to him, correct?

17   A.  Some -- I don't know who came to whom, but somehow they

18   had a relationship with each other, yes.

19   Q.  You testified yesterday that you understood they

20   approached him?

21   A.  It could be, yes.  I specifically don't know, but

22   that's -- because I think you just now -- what I'm

23   responding to is just now you asked me if I knew what

24   happened.

25           I don't know what happened, but my recollection is

1   that they approached him --

2   Q.  And --

3   A.  -- that he said that they approached him.

4   Q.  And he's a lawyer, right?

5   A.  Yes.

6   Q.  Did you intuit that maybe they came to him because they

7   were clients?

8   A.  I did not intuit that at the time, no, because Michael

9   said the opposite.

10  Q.  No.  You testified, sir, yesterday, that Michael said he

11  wasn't coming to meet you on behalf of any particular

12  client, correct?

13  A.  Yes.

14  Q.  Did he tell you anything about whether he had a client

15  when he went to *The New York Times*?

16  A.  I guess the answer to the question is no.

17  Q.  And you don't know, sir, whether they were his clients

18  for purposes of attempting to get this story placed in *The

19  New York Times*, do you?

20  A.  That's fair.  I do not know that, that's correct.

21  Q.  You don't know whether he was working with the Clinton

22  Campaign to do that, do you?

23  A.  I do not.

24  Q.  And you don't know whether he was working with Rodney

25  Joffe to do that, do you?

1    A.  I do not.

2    Q.  All you know is that when he came to you -- again, your

3    testimony yesterday -- he didn't come to the FBI on behalf

4    of any particular client.  Correct?

5    A.  That's my testimony, yes.

6    Q.  Okay.

7            Okay.  Let's now move -- I think we hit -- not

8    that anybody can read it, but at least for my purposes, I

9    think we've hit everything on my list, and now I want to hit

10   whether it mattered.  Okay, sir?

11   A.  Okay.

12   Q.  You care deeply about the FBI as an institution, do you

13   not, Mr. Baker?

14   A.  Yes.

15   Q.  And taking information from the public is something that

16   is an important part of the culture of the FBI, correct?

17   A.  Yes.  That's my view, yes.

18   Q.  And you're here in your capacity -- I'm not asking you

19   to be a flagbearer; I'm asking your understanding, sir,

20   because you're giving testimony.

21   A.  Sure.

22   Q.  And there are a variety of ways that people from the

23   public with concerns -- national security or otherwise --

24   can give that information to the FBI, right?

25   A.  That's correct.

1    Q.   There are tip lines.   There are online vehicles and so

2    forth.   Right?

3    A.   That's right.

4    Q.   And taking information from the public is specifically

5    authorized by the Attorney General's guidelines that govern

6    how the FBI can conduct its investigative activities?

7    A.   That's correct.

8    Q.   Fair to say that without people cooperating with the

9    FBI, it's going to be awful hard for the FBI to do its job?

10   A.   That is correct.

11   Q.   And any FBI employee can take information from the

12   public, correct?

13   A.   Correct.

14   Q.   And the idea, again, is to get the public's assistance

15   in helping to prevent crime and preserve national security,

16   right?

17   A.   Protect -- yes, and to protect the country.   100

18   percent.

19   Q.   And you've even Tweeted about it, haven't you, sir?

20   A.   I think that's right, yes.   Some time ago, yes, that's

21   right.

22   Q.   First time I've used "Tweeted" in a courtroom, but

23   there's a first time for everything.

24            MR. BERKOWITZ:   Let's take a look at Defense

25   Exhibit 812.

1    Q.  And I'd just ask you if you recognize that before I move

2    it into evidence.

3    A.  Can we blow it up a little bit for me?  Thank you.

4              Yes, I recognize this.

5    Q.  Okay.  And the date of this, I think --

6              MR. BERKOWITZ:  I move it into evidence.

7    Q.  I think it's 2019, to be clear.  It's not as if it was

8    in '16?

9    A.  That's correct.

10             MR. DeFILIPPIS:  No objection, Your Honor.

11             THE COURT:  So moved.

12             I think this is the first time I've introduced a

13   Tweet in --

14             MR. BERKOWITZ:  I'm glad we could be the first.

15   Q.  Jim Baker, @theJimBaker.

16             "Please contact your local FBI office or submit a

17   tip electronically if you have information about...

18   suspicious activities that you believe threaten national

19   security, especially suspicious activities that involve

20   foreign powers or foreign organizations."

21             Your words, sir?

22   A.  These are words taken, I think, from the FBI website,

23   because I put quotes on it.  And so you can see in the

24   middle of the screen the link to the fbi.gov, contact us.

25             So I believe I cut-and-pasted these words from the

1    FBI website into the Tweet and put quotes on it.

2    Q.   And you believed them in 2019 when you reTweeted them,

3    right?

4    A.   Did I reTweet this?

5    Q.   Or when you Tweeted them.

6    A.   No, I Tweeted -- yes, yes.  I believed these words when

7    I Tweeted them, yes.

8    Q.   And those words were accurate as of September of 2016 as

9    well, correct?

10   A.   Taken from the website is my recollection, yes.

11   Q.   All right.  Now --

12   A.   Taken from the FBI's website, to be clear.

13   Q.   You spoke yesterday with Mr. DeFilippis about if you'd

14   received data from somebody -- and just to be really clear

15   so that everybody understands, when Mr. Sussmann came in, he

16   delivered to you certain thumb drives, correct?

17   A.   That's my recollection, yes.

18   Q.   And a thumb drive typically contains electronic data,

19   right?

20   A.   Correct.

21   Q.   Okay.  One or two or three?  Do you remember how many --

22   A.   Something like -- it was more than one.  Around two or

23   three.

24   Q.   Okay.  And you understood it contained certain data

25   reflecting potential suspicious connections between certain

1    servers, right?  That's what --

2    A.  Correct.

3    Q.  And there was also about a half-inch stack of papers?

4    A.  Yes, sir.

5    Q.  And you understood, sir, that those materials had been

6    provided to Mr. Sussmann by the cyber security experts,

7    correct?

8    A.  Correct.

9    Q.  And you didn't do any substantive review of them?

10   A.  No, sir.  As I said, I think I flipped through the

11   papers, but that was about it.

12   Q.  And so he was actually giving you something that could

13   be looked at by people who actually know what they're doing.

14   And I don't mean that with disrespect.

15   A.  No, absolutely not.  I -- yes.  He gave them to me to

16   give them to people who would be better able to analyze

17   them.

18   Q.  And if, in fact, sir, those matters reflected serious

19   national security concerns, the FBI would have wanted them,

20   correct?

21   A.  Yes.

22   Q.  To review, correct?

23   A.  Yes, provided that we could lawfully have them.  I think

24   I said that yesterday.

25   Q.  You did.  But you assumed that the data was lawfully

1   provided, correct?

2   A.   That was my assumption and assessment at the time.

3   Q.   All right.  And because, among other things,

4   Mr. Sussmann provided them to you, correct?

5   A.   Yes.

6   Q.   And because you assumed that the cyber experts had

7   gotten it from public areas, correct?

8   A.   Correct.

9   Q.   You didn't ask that question.  You didn't ask much about

10  the cyber experts, but you certainly didn't ask Mr. Sussmann

11  that, did you?

12  A.   I don't think I asked him that.  That's correct.

13  Q.   So you assumed it.

14  A.   I assumed it.

15  Q.   And you did not conduct any legal analysis of the data,

16  correct?

17  A.   I did not, no.

18  Q.   All right.  And you didn't ask your team to, correct?

19  A.   I'm sorry?

20  Q.   You didn't ask your team to, correct?

21  A.   I did not, no.

22  Q.   Now, you said yesterday --

23  A.   Can I also say I also had high regard for Michael's

24  legal abilities in this area because -- I think I had extra

25  confidence because it was him bringing it to me.  It wasn't

1    some person who practiced in some other area of law.

2    Q.  Yes, he -- Mr. Sussmann -- has credibility in this area,

3    does he not?

4    A.  Yes.

5    Q.  He has top secret -- he had, at the time, a high-level

6    security clearance, correct?

7    A.  I think he must have had a top secret clearance because

8    you need a top secret clearance to get a badge.  That's

9    my -- that's how I think about it.

10   Q.  And do you know that he had I think it's TS/SC -- he had

11   higher than top secret clearance.  Are you aware of that?

12   A.  Well, TS/SCI is a form of top secret.

13   Q.  Can you --

14   A.  There are two different types of clearances related to

15   each other.

16   Q.  What is TS/SCI?  Explain that to the jury.

17   A.  So there's three types of classified information:  top

18   secret, secret, and confidential, and they vary depending

19   upon the amount of harm that would be inflected on the

20   United States if someone made an unauthorized disclosure of

21   that information.

22         So I think confidential is there would be harm to

23   the country; secret, I think, is there would be serious

24   harm; and top secret, I think, it's extremely grave harm.  I

25   think that's what it is.  I have to look at it again.  So

1    you have top secret, secret, confidential.

2              And then there are a separate set of denominations

3    called sensitive compartmented information, which are sort

4    of special clearance -- special access types of programs

5    throughout the government.  And something will be Top

6    Secret/SCI.  You can have Secret/SCI.  You can have

7    Confidential/SCI.  So you can have this "SCI" information at

8    all those different levels.  And there are numerous code

9    names in the "SCI" sort of side of the ledger.

10             So if you -- I don't know if you'll hear

11   references to any of that, but that's basically how it

12   works.

13   Q.  And you were aware that Mr. Sussmann had, at the time he

14   met with you, Top Secret/SCI, the highest level?

15   A.  Well, I think to get into FBI headquarters you have to

16   have at least top secret.  You might not have to have SCI.

17   I can't remember.

18   Q.  So you knew --

19   A.  So he at least had top secret to have a badge, is my --

20   is how I think about it.

21   Q.  And that is trusting Mr. Sussmann -- the federal

22   government trusting Mr. Sussmann with information that, if

23   released, could cause grave danger to the United States?

24   A.  Something like that.  I think it was extremely grave

25   danger or something, but yes, very serious damage.

1    Q.  And that's not just given to anybody, is it, sir?

2    A.  Not at all.

3    Q.  There's a rigorous process that the government uses to

4    give somebody that level of clearance, correct?

5    A.  Full background investigation.  You have to fill out

6    all kinds of forms.  They do interviews of people that know

7    you, all kinds of investigative activities to make sure that

8    you -- to make sure that you're worthy of having that

9    clearance, yes.

10   Q.  And did you know at the time that Mr. Sussmann had had

11   that level of clearance for over 20 years?

12   A.  I didn't know that in particular, no.

13   Q.  You knew that he had it at that time when he came in

14   though, correct?

15   A.  Yes.  And I assumed that he had had it in the past

16   because of his prior work with DOJ.

17   Q.  So serious lawyer, serious credibility with you.  Right?

18   A.  Yes.  Absolutely, yes.

19   Q.  Now, you said if Mr. Sussmann had included in his text

20   message to you on the 18th of September 2016 that the

21   information he had was relative to Trump and Russia, you

22   would have said, "We've got to get somebody from Crossfire

23   Hurricane involved," correct?

24   A.  Yes.

25   Q.  And Crossfire Hurricane, Mr. Baker, was the FBI's

1    overarching investigation into potential connections between

2    Russia and individuals associated with the Trump campaign,

3    correct?

4    A.  Yes.

5    Q.  And when Mr. Sussmann came in, he told you on the 19th

6    that the information he had related to Trump and Russia,

7    correct?

8    A.  Correct.

9    Q.  Did you say:  Hold on.  Let me get somebody from

10   Crossfire Hurricane in here because they should be talking

11   to you, not me?

12   A.  I did not say that.

13   Q.  Okay.  Because you knew you were just going to pass it

14   along very quickly to someone in that area, correct?

15   A.  Yes.

16   Q.  You could have called Mr. Priestap, right?  You called

17   him right after Mr. Sussmann left.

18   A.  I could have called him, yes.

19   Q.  And that would have been, in hindsight, a prudent thing

20   to do, correct?

21   A.  Yes, probably.

22   Q.  Now, we also talked about -- well, let's talk briefly

23   about something you spoke about yesterday; that the

24   credibility and veracity and reliability of the source of

25   the information is something that's important to the FBI.

1    Correct?

2    A.  Yes.

3    Q.  Now, in this case the source of the information, at

4    least on passing it to you, was Mr. Sussmann at the first

5    level, correct?

6    A.  Yes.

7    Q.  And we've talked about Mr. Sussmann's credibility and

8    reliability, right?

9    A.  Yes.

10   Q.  You trusted him?

11   A.  Yes.

12   Q.  He was a serious lawyer?

13   A.  Yes.

14   Q.  Smart guy?

15   A.  Yes.

16   Q.  Serious national security experience?

17   A.  Yes.

18   Q.  Had been with the Department of Justice?

19   A.  Yes.

20   Q.  Had at least top secret clearance?

21   A.  That was my supposition, yes.

22   Q.  Pretty reliable, correct?

23   A.  Yes.

24   Q.  At the time --

25   A.  Yes.

1   Q.  -- in your mind?

2   A.  Yes, yes, yes.

3   Q.  And he was giving you information that he said had been

4   provided to him by certain cyber security experts, correct?

5   A.  Correct.

6   Q.  And did you say to him, "We need to assess, sir, who

7   these cyber experts are in order to determine the

8   reliability of the information because you didn't put it

9   together, Michael, they did"?

10  A.  Did I say that at the time is your question?

11  Q.  Yes.

12  A.  Right now I don't remember saying that.

13  Q.  And, in fact, sir, you specifically did not get

14  information, did you, about the cyber security experts?

15  Right?

16  A.  I did not.

17          As I've been trying to explain, I -- as soon as I

18  realized what this was about I wanted to get the basic

19  information from Michael, and then end the conversation and

20  turn this material and the whole follow-up with the matter

21  up to the right people within the Bureau.

22  Q.  Right.  And you specifically did not ask many questions

23  about the origins of the information because you believed

24  the more you asked, the more likely you would be a witness,

25  correct?

1   A.  Correct.  Or something like that, yes.

2   Q.  And so in terms of their reliability or accuracy, the

3   reason you didn't have more information was because you

4   chose not to get more information, correct?

5   A.  That is correct, yes.

6   Q.  And anybody that you passed the information off to, from

7   Mr. Priestap on to the agents who were getting the

8   information, could have reached out to Mr. Sussmann and

9   asked to speak to these cyber experts, correct?

10  A.  I -- yes.  I assumed that they would do that, for sure.

11  Q.  Okay.  And do you know that when Mr. Sussmann went to

12  the CIA they asked if they could speak to a cyber -- one of

13  the cyber experts, and he said, "I think I can make that

14  happen"?

15  A.  Wait, there's too many pronouns there.  Can you just

16  break that down for me.

17  Q.  Thank you.

18         Are you aware that Mr. Sussmann -- or do you have

19  any personal knowledge that Mr. Sussmann went to the CIA?

20  A.  No.  I've only read about that.

21  Q.  Okay.  Well, we won't get into what you know outside, if

22  you're --

23  A.  Okay.

24  Q.  All right.  But you assumed that somebody in the FBI

25  would have talked to these cyber experts to determine the

1   reliability, correct?

2   A.   That is what I assumed, yes.

3   Q.   Okay.  So -- and you said yesterday that "The FBI is

4   responsible for protecting everybody in this country.

5   Period, full stop.  And you do that without regard to who

6   they are or what their political background is or anything

7   else."  Correct?

8   A.   Yes, sir.

9   Q.   And that's true in this case, too, correct?

10  A.   Yes.

11  Q.   If Mr. Sussmann had serious -- had information about

12  serious national security concerns, you would have passed it

13  along to the appropriate people no matter who he was

14  representing, correct?

15  A.   You're saying if the meeting had taken place -- I'm not

16  sure I understand your question.  I guess I should say that.

17  Q.   If Mr. Sussmann had evidence of what he said were

18  serious national security concerns, and he provided you

19  actual evidence, you would have passed that along to

20  somebody else at the FBI to look into no matter who he was

21  representing, sir; isn't that right?

22  A.   I would have passed it along to somebody else in the

23  FBI, but not necessarily in the same way.

24  Q.   Okay.  But your job, sir, was to pass the information

25  along, correct, to somebody?

1    A.  Well, what I'm pausing here is about, you know, at that

2    point in time my specific role was as a lawyer for the FBI.

3    And so depending upon the various scenarios that I talked

4    about yesterday -- I can't remember when it was, in either

5    your questioning or the direct examination -- depending upon

6    who the client might have been, that might have raised

7    significant concerns about the legal implications of the FBI

8    obtaining this information, so I would have had concerns

9    about that.

10           And then I had other -- I might have had other

11   concerns about the role of the press in all of this.  And so

12   that all would have influenced my thinking about how I would

13   have passed that information on and to whom I would have

14   passed that information on and with respect to what sense of

15   urgency I would have passed that information on.

16   Q.  Sir, you said yesterday if it were Trump or Russia you

17   would have gotten somebody from Crossfire Hurricane

18   involved, correct?

19   A.  Yes, sure.

20   Q.  And you would have done that no matter what, correct?

21   A.  I would have -- if I had known that ahead of time, I

22   would have done that no matter what, yes.

23   Q.  And you don't decide whether an investigation at the FBI

24   gets opened, do you, sir?

25   A.  No.

1        Well, as I said yesterday, there are certain

2   investigative activities that require approval by a lawyer,

3   and so sometimes I have done that.  I have approved an

4   investigation.  The investigation could not have gone

5   forward without my signature.

6        But generally speaking, day-to-day, 99.9 percent

7   of the time I'm not sitting there signing off on

8   investigations.

9   Q.  And in this case, sir, your authorization or approval

10  was not needed to open an investigation, correct?

11  A.  Of this matter?

12  Q.  Correct.

13  A.  Well, I didn't think so at the time.

14  Q.  Okay.  And you're not even aware, or you weren't aware

15  at the time, as to whether an investigation was opened.  Are

16  you, sir?

17  A.  Well, it depends what you mean by that.

18  Q.  Well, let me ask it specifically.

19        And you were asked yesterday whether a particular

20  file in the Alfa-Bank -- you said you don't know; and I'm

21  happy to show you it -- whether we opened a particular file

22  number on the Alfa-Bank matter, but you understood someone

23  was at least looking at it.  Is that fair, sir?

24  A.  Yes.

25  Q.  Okay.

1    A.  But there's a difference -- I just want to be clear.

2    There's a difference between opening a file and assigning a

3    particular matter -- assigning a particular matter a

4    particular case number.

5            It's important.  I don't want to minimize that.

6    That's important for the FBI.

7            But at the same time the FBI starts investigating

8    immediately, if it needs to.  It doesn't need to open a

9    technical file number if there's, you know, a crime

10   happening in front of them, for example.

11   Q.  And especially if there are national security concerns,

12   correct?

13   A.  Exactly, yes.

14   Q.  And you were aware, though, because the government

15   showed you a document, that a particular file number here

16   was opened up, correct?

17   A.  I don't -- did I see that?  I don't remember seeing that

18   yesterday.

19   Q.  Let's show -- I don't think they showed it to you

20   yesterday.  They showed it to you in one of your preparation

21   exhibits.

22   A.  Okay.  Okay.

23           MR. BERKOWITZ:  Defense Exhibit 525 at Page 2,

24   first paragraph, just for the witness for identification.

25           That's not it.

```
1              Give me a minute.  We're usually pretty seamless

2       here, but...

3              Page 2.

4              No.

5              (Pause)

6    Q.  Sir, do you remember being told that, when the FBI

7    opened the matter up, it had indicated that the matter had

8    been referred by the Department of Justice?

9    A.  Referred by the Department of Justice to the FBI?

10   Q.  To -- correct.

11   A.  I don't remember being told that.

12   Q.  And if, in fact, that is what the basis of the opening

13   of the investigation was, that would have been incorrect,

14   right?

15   A.  That makes no sense to me; that's correct.

16   Q.  We'll see if we're close to getting the document.

17   A.  Okay.

18              (Pause)

19   Q.  Okay.  Page 2 -- I'm being told that they had the

20   correct document all along, and it was my error, so I will

21   own that.

22              And if you want to see the first page of it so you

23   can see what it is, I'd move this into evidence.

24   A.  Yes.  Let me just see the first page, if you don't mind.

25   Q.  Yes.
```

```
 1    A.  Could you blow it up, please.  Thank you.

 2              (Pause)

 3              MR. BERKOWITZ:  And while the witness is looking

 4    at it, I'd move Government [sic] Exhibit 525 into evidence.

 5              MR. DeFILIPPIS:  No objection, Your Honor.  It's a

 6    government exhibit as well.

 7              THE COURT:  So moved.

 8    Q.  And while you're looking at this, the name -- there's

 9    Allison Sands and Curtis Hiede are the names on there,

10    correct?

11    A.  Allison's name is on there, yes.  It looks like it got

12    referred to Chicago.

13    Q.  Yes.  It says, "Drafted by Allison Sands and Curtis

14    Hiede," correct?

15    A.  I don't see Curtis's name.  I'm sorry, I missed that.

16    Q.  "Drafted by"?

17    A.  Oh, down there.  I see it.  Got it.  Yes, sir.

18    Q.  Do you know who they are?

19    A.  Allison's name sounds familiar.  I don't know Curtis, I

20    don't think.

21    Q.  Okay.  And the case ID talks about Alfa-Bank and Russia,

22    correct?

23    A.  Yes.  Yes, sir.

24    Q.  And it says "Sensitive Investigative Matter."  Do you

25    see that?
```

1    A.  Yes, I do.  And that is one where I -- if my

2    recollection is correct, a lawyer may have had to sign off.

3    It didn't have to be me, but a lawyer, I think, has to sign

4    off on a sensitive investigative matter or a SIM, S-I-M.

5    Q.  Okay.  You yourself, sir, weren't involved in the

6    opening of the matter, were you?

7    A.  Not to my recollection, no.

8    Q.  All right.  And the various levels as to how it's

9    opened, that you talked about yesterday.  It's not your

10   decision.  It's somebody else's decision.  Right?

11   A.  This was somebody else's decision, yes.

12   Q.  Okay.  And this is dated September 23rd of 2016,

13   correct?

14   A.  Yes.

15   Q.  And copied on that document are Jonathan Moffa and Peter

16   Strzok, among other people, correct?

17   A.  Yes, sir.

18   Q.  They're people who work with you at FBI headquarters?

19   A.  Yes, sir.

20   Q.  They're people that you told Mr. Sussmann had provided

21   the information to, provided the data?

22   A.  I think at least I told Pete Strzok about it.

23   Q.  Let's take a look at the second page of this document,

24   opening up an official investigation.

25   A.  Can I just note that, just relative to the conversation

1   we had the other day also, this -- it appears they opened

2   a full investigation at this point right off the bat, so

3   just -- that's what the document said on the first page.

4           Anyway, sorry.

5   Q.  Based on what's in this document at least, among other

6   things, correct?

7   A.  Apparently.

8   Q.  And it reads, "On or about September 19, 2016, FBI

9   received a referral of information from the U.S. DEPARTMENT

10  OF JUSTICE detailing an unusually configured email server in

11  Pennsylvania belonging to the TRUMP ORGANIZATION.  In that

12  referral, the DEPARTMENT OF JUSTICE provided the FBI with a

13  white paper that was produced by an anonymous third party."

14          Do you see that?

15  A.  Yes, I do.

16  Q.  Mr. Sussmann's name is not listed there, is it?

17  A.  It's not.

18  Q.  And you don't know why his name wouldn't be, do you?

19  A.  I don't know why.

20  Q.  Okay.  And, sir, it would be incorrect to say that the

21  matter was referred by the Department of Justice, correct?

22  A.  It was not the Department of -- I did not receive the

23  information from the Department of Justice.  I received it

24  from Michael.

25  Q.  And you were shown this document at one point, and it

1   was suggested to you or you surmised that maybe there was

2   confusion because you'd said Mr. Sussmann had been at the

3   Department of Justice.

4   A.  Now that you say that, yes.  I think that's right.  I

5   recall now having had that conversation.

6   Q.  And that's an FBI issue.  That's almost a game of

7   telephone, right?

8        You speak to Mr. Priestap, he speaks to somebody,

9   and at some point it turns into this.  Correct?

10  A.  Yes.

11       But can we also see the classification on this on

12  the first page?  Can we see -- well, we can't see it because

13  it's blacked out.

14  Q.  And that's something that the Judge has instructed is

15  not anything either party did.  As you, of all people, know,

16  there's classified information and reasons for that,

17  correct?

18  A.  I think so.  But there could be this -- what I'm getting

19  at is the document could have been --

20  Q.  And I guess I'd ask you not to speculate, sir.

21  A.  Okay.  I won't speculate then.

22  Q.  But the bottom line, sir, is that -- well, let me ask

23  you this.

24       Are you aware that the text that we've seen from

25  September 18th, you didn't provide that to anybody in the

1    FBI?

2    A.  No, I did not.

3    Q.  It wasn't in the case file, correct?

4    A.  It was not.

5    Q.  Mr. Sussmann didn't say, "Hey keep that out," did he?

6    He didn't tell you to destroy it or anything?

7    A.  No, he did not.

8    Q.  You just didn't think to pass it along, correct?

9    A.  I did not think about it; that's correct.

10   Q.  And are you aware -- have you seen -- other than

11   Mr. Priestap's notes and Ms. Anderson's notes, are you aware

12   of anything at all in the FBI that talks about whether

13   Mr. Sussmann was providing these materials on behalf of a

14   client or not on behalf of a client?

15   A.  I'm unaware of any other documents in the FBI that talk

16   about that.

17   Q.  That use these words or any words like these words,

18   correct, not on behalf of any particular client?

19   A.  Sitting here today, I don't recall having seen other

20   documents in the FBI talking about the origin of the

21   material or -- other than this EC.  It's called an EC, the

22   opening of a case.

23          I don't recall seeing any other documents

24   generated by the FBI talking about how the information came

25   to the FBI or what Mr. Sussmann said.

1    Q.  And you don't know why that is, do you, sir?

2    A.  No, I don't.

3    Q.  Okay.  Would it surprise you to know that there are

4    documents in the FBI saying that the source of the material

5    was the DNC?

6    A.  Would it surprise me?

7    Q.  Yes.

8    A.  Yes.  I haven't heard that before, I don't recall.

9    Q.  All right.  So let's talk about Mr. Sussmann coming to

10   you on September 19th.  He's indicated to you that he

11   believed the information, he told you in September of 2016,

12   had apparently showed or showed apparent or suspicious

13   connections between a Trump-related server and an Alfa-Bank-

14   related server, correct?

15   A.  Yes.

16   Q.  And he believed that that presented potential serious

17   national security concerns, correct?

18   A.  That's my recollection, yes.

19   Q.  And at that point in time, September of 2016, Russia had

20   hacked the DNC emails, correct?

21   A.  Yes.

22   Q.  Then Candidate Trump had invited Russia to look for

23   30,000 Clinton emails, correct?

24   A.  He did that at some point.  I don't remember the exact

25   date of that.

1    Q.   Okay.  And if, in fact, there was an effort by Russia to

2    communicate in some part with Trump or the Trump

3    organization, that, in your view, would present a national

4    security concern, correct?

5    A.   At that time, yes, I would have thought that that

6    presented a national security concern.

7    Q.   In fact, at that time -- September 2016 -- the FBI was

8    already investigating allegations that there were

9    connections between Trump and the Russian Federation

10   unrelated to this, correct?

11   A.   That's correct.

12   Q.   This was another set of alleged interactions

13   Mr. Sussmann brought?

14   A.   That's correct.

15   Q.   And, in fact, it was a very high priority for you,

16   right?

17   A.   Yes, sir.  Yes, sir.

18   Q.   If there were a matter of actual national security, and

19   if there were a newspaper article about to come out about

20   the matter, the FBI would want a heads up, right?

21   A.   Yes, sir.

22   Q.   Because if the FBI wanted to investigate that type of

23   connection in the counterintelligence world, you don't want

24   the bad guys to know what you're looking at, right?

25   A.   Yes, sir.

1    Q.  That's critically important, correct?

2    A.  Yes.  I would say yes.

3    Q.  Because if they published some article the people

4    communicating with each other, to the extent they were,

5    would switch to another channel very quickly?

6    A.  And then it would be harder for the FBI to do its job,

7    yes.

8    Q.  And when Mr. Sussmann came to you, he told you he wanted

9    to give you a heads up about a potential national security

10   concern, correct?

11   A.  Yes.

12   Q.  Heads up that there was an article that was going to be

13   published, he believed, soon.  Correct?

14   A.  Yes.  There were two pieces:  the substantive material

15   itself, and then the fact of the article.

16   Q.  And when Mr. Sussmann came to you, sir -- and if we

17   could -- he didn't ask you to do anything, did he?

18   A.  To the best of my recollection, he did not ask me to

19   specifically do anything.  That's correct.

20   Q.  He said, "Take whatever action you think is

21   appropriate," right?

22   A.  I don't remember if he said exactly that, but he -- that

23   was the tenor of the conversation.

24   Q.  Well, sir, let's put up yesterday -- what you said just

25   yesterday that you apparently don't remember.

1    A.   Okay.

2    Q.   Page 850, Lines 11 to 14 of yesterday's transcript.

3              "QUESTION:  And during the meeting, did you --

4    what, if anything, did you tell Mr. Sussmann about what you

5    would do?  Did you make any asks of him?

6              "ANSWER:  So he presented that to me.  I took that

7    information, but he didn't ask me to do anything.  He just

8    said, you know -- well, he said take whatever action you

9    think is appropriate."

10             Were you asked that question, and did you give

11   that answer, sir?

12   A.   Apparently, yes.

13   Q.   And that's the truth, isn't it?

14   A.   Yes, sir.

15             MR. BERKOWITZ:  Nothing further.

16                       REDIRECT EXAMINATION

17   BY MR. DeFILIPPIS:

18   Q.   Mr. Baker, you were asked a number of questions about

19   the papers that Mr. Sussmann left with you.  Do you remember

20   that on cross-examination?

21   A.   Yes.

22   Q.   Did Mr. Sussmann say at any time in his meeting with you

23   that he had himself participated in drafting any of those

24   papers?

25   A.   I don't recall him saying anything about him

1    participating in drafting those materials.  I came away from

2    the meeting with the belief that the materials on the thumb

3    drives and the printed-out papers came from the cyber

4    security experts.

5    Q.  And did he say anything in the meeting about whether the

6    person who drafted these papers or a person who drafted

7    these papers was billing that time to the Clinton Campaign?

8    A.  He said nothing about that.

9    Q.  If that were the reality, and you knew that, would that

10   have had an effect on how you viewed the papers?

11          MR. BERKOWITZ:  Objection; assumes facts not in

12   evidence, Your Honor.

13          THE COURT:  Overruled.

14   A.  Could you restate the question?

15   Q.  Yes, sure.

16          If you were to learn that one or more of the

17   persons who drafted the papers that you received was billing

18   that time to the Clinton Campaign, would that have mattered

19   to you?

20   A.  Absolutely, yes.

21   Q.  In what ways?

22   A.  Because, as I think I explained the other day, it would

23   have concerned me greatly about whether the materials were

24   accurate, whether they were reliable, whether they were

25   credible.

1           It would have concerned me whether there was an

2   effort to play the FBI and drag us into some kind of a

3   political -- into the ongoing political campaign and make us

4   a pawn in the campaign in some fashion.

5           It would have alarmed me, I think, about the --

6   this nexus with the press and whether there was some effort

7   to engineer a situation where the FBI would be investigating

8   this material; and that the press, even though it couldn't

9   determine the reliability of the material and wouldn't

10  report on it, could report on the fact that, well, the FBI

11  is investigating it.

12          So that would have concerned me greatly, again,

13  whether the FBI was being played.

14          I would have been concerned about the legality of

15  the material.  Where did it come from?  What was the origin

16  of it?

17          So I would have wanted to make sure that our teams

18  slowed down and did a review of where that material came

19  from and had a solid understanding of that before we

20  ingested it into FBI investigative files and potentially

21  contaminated those files with something that was unlawfully

22  obtained.  So I would have changed my assessment of the

23  reliability and credibility of the information.

24          It would have changed -- it would have changed my

25  prioritization of the information within the FBI, because

1    obviously if I'm -- as the general counsel, if I'm asking

2    other parts of the FBI to do something, they're going to

3    take that seriously, and they're going to respond with, you

4    know, a higher level of concern because it's coming from the

5    general counsel.

6              So, yes.

7    Q.   Did Mr. Sussmann mention in his meeting with you an

8    entity or organization called Fusion GPS?

9    A.   No.

10   Q.   Are you generally familiar with Fusion GPS, or no?

11   A.   Generally speaking, yes.

12   Q.   And are you familiar that they're -- that they conduct

13   research?

14   A.   Yes.

15   Q.   And have you learned at any -- did you know, at the time

16   of your meeting with Mr. Sussmann, that they engaged in

17   opposition research for the Clinton Campaign?

18   A.   At some point in time I learned that.  I don't know if I

19   knew that at the time that I met with Michael.

20   Q.   Now, did Mr. Sussmann ever say, during your meeting or

21   any subsequent communications you had with him, that Fusion

22   GPS drafted one of the white papers that he gave to you?

23   A.   He -- to the best of my recollection, he never told me

24   that.

25   Q.   If you were to learn that Fusion GPS, while being paid

1   by the Clinton Campaign, had drafted one of the papers that

2   Mr. Sussmann handed to you, would that have mattered to you?

3   A.   Absolutely, yes.

4   Q.   In what respect?

5   A.   Well, it's sort of the same thing as I've described

6   before.  It's coming from a political opposition research

7   organization, and so I would have questioned the credibility

8   and reliability of the information.  I would have been

9   worried about the legality of the information; again,

10  whether it was lawfully obtained.  And I would have worried

11  about the press connection, the fact that it was being

12  mentioned that the press had some part of this information

13  and whether the FBI was, again, being pulled into some type

14  of political agenda, political ploy.

15          And so I would have -- I think I would have been

16  very concerned about that and raised all of those concerns,

17  both with the Fusion GPS question you're asking me now and

18  the one I just answered a minute ago about the Hillary

19  Clinton case.  I would have had serious conversations with

20  the senior leadership of the FBI about what, if anything --

21  excuse me, about what, if anything, to do with this material

22  and how to handle it.

23  Q.   And finally on that topic, Mr. Baker, you said he gave

24  you some actual physical thumb drives.

25  A.   Yes, sir.

1    Q.  Did he intimate in any way who had paid for the cost of

2    those thumb drives?

3    A.  I had -- no.  To the best of my recollection, he didn't

4    say anything about that.

5    Q.  And if you were to learn or hear that the thumb drives

6    themselves were purchased or reimbursed by a political

7    campaign, would it have concerned you for the same reasons

8    you've outlined?

9    A.  Yes.

10   Q.  So we've -- you were cross-examined on numerous

11   questions about the issue with Mr. Lichtblau and *The New*

12   *York Times.*  Do you recall that?

13   A.  Yes.  Yes.

14   Q.  Did Mr. Sussmann say in his meeting with you that he

15   wanted to help the FBI stop a news story?

16   A.  Sitting here today, I don't recall him saying that, no.

17   Q.  And, in fact, in that meeting did Mr. Sussmann provide

18   to you initially the name of the publication or the reporter

19   who was working on this story?

20   A.  No, he did not.

21   Q.  And I believe it was your testimony you had to

22   affirmatively call him and ask him for that; is that right?

23   A.  That's correct.  That's correct.

24   Q.  And if you were to learn that Mr. Sussmann -- so you met

25   with the reporter sometime in September, the first time when

1    the FBI met with Mr. Lichtblau.  Is that --

2    A.  I can't remember the exact date, but in that time frame,

3    yes.  As quickly as possible.

4    Q.  And do you know one way or the other whether

5    Mr. Sussmann was continuing to lobby that reporter to go

6    ahead with the story?

7    A.  I did not know that.

8    Q.  And if you were to learn that, would that -- might that

9    have affected your view of Mr. Sussmann's purpose in

10   providing you the materials he did?

11   A.  Yes.

12   Q.  In what way?

13   A.  Well, it would have made me question what was going on

14   here because if, as Michael said, he was bringing that

15   material to me because he wanted to help the Bureau, what

16   would help the Bureau is if we would slow down with respect

17   to the press article.  That's as I've described earlier in

18   my testimony.

19           It was quickly assessed that it was important to

20   slow down in that regard.  And so if I learned that Michael

21   was pushing to have the article published, it would have

22   caused me to have great doubts about -- it would have caused

23   me to have serious concerns about what was happening here.

24           And, again, to the extent that -- or whether

25   the FBI was being played or attempted to be played and

1   whether -- I mean, I think -- again, sitting here today

2   trying to reflect on this, I think it would have raised, in

3   my mind, the concern about, well, wait a minute, he actually

4   does also, in other matters, represent the DNC and the

5   Clinton Campaign, and so is that what's going on here, or is

6   that impacting his judgment with respect to this material?

7          I think it would have raised a whole series of

8   questions in my mind that I would absolutely have wanted to

9   talk about with other senior leaders of the FBI, including

10  the director and the deputy director.

11  Q.  And would that have been true regardless of whether the

12  topic of the information was a national security concern or

13  any other concern?  In other words, would you have had that

14  concern even though the topic related to national security?

15  A.  Yes, absolutely.

16  Q.  Going to the subject of your awareness of Mr. Sussmann's

17  affiliation with the DNC and the Clinton Campaign on cyber

18  matters, do you recall, when Mr. Berkowitz showed you your

19  Congressional testimony, in which at some point in that

20  testimony you indicated you weren't sure exactly when you

21  learned of Mr. Sussmann's affiliation with the DNC and the

22  hack?

23  A.  Yes.

24  Q.  And let me just direct your attention to a portion of

25  that testimony.  I don't think we looked at.  So let's look

1   at Government Exhibit 57.

2           And if we go to Page 112.

3   A.  (Witness reviews document)

4   Q.  At the top of that page, Mr. Baker -- so you had been

5   asked about the folks in the Congress, and as you recall,

6   you sort of at one point said "I don't know when I learned

7   it"  But here you say, "I'm not sure what I knew at the

8   time.  Remember hearing about him in connection with the

9   Bureau, its trying to deal with the hack, and investigating

10  the hack, that my recollection is that Michael was involved

11  in the process to some degree.  I didn't interact with him

12  on that, so I'm not sure if I knew that before the meeting

13  or after, but I don't recall him specifically saying."

14          Mr. Meadows then says, "But you said you were

15  friends with him, right?"

16          Mr. Baker:  "Yes, sir."

17          Mr. Meadows:  "So, I mean, you knew what his

18  career was?"

19          "Generally speaking," you say.

20          And Mr. Meadows says, "And you knew, generally

21  speaking, that he had some involvement with the Democratic

22  National Committee?"

23          And you say, "Yes."

24          Do you see that, Mr. Baker?

25  A.  Yes.

1    Q.  So does it appear that, in fact, on October 3rd of 2018

2    you did ultimately land on the view that by the time you met

3    with Mr. Sussmann you had some awareness of his affiliation

4    with the DNC?

5    A.  Well...

6            I don't -- so I'm having trouble with the

7    questions that were being asked and whether they were asking

8    me about did I know at all, ever, about his connection with

9    the DNC or at the time that I met.

10           And so I think I stand by the top part of the

11   answer, which is that at some point in time I learned this,

12   and having reconstructed it through looking at the various

13   documents, as I've described in my testimony, now I believe

14   that I knew this by the time that I met with Michael.

15   Q.  Okay.  So now your belief, and your confident belief, is

16   that when you met with him on that day you were aware of his

17   affiliation with the DNC?

18   A.  Correct.

19   Q.  Now, you were asked about several meetings that you had

20   with the team on this matter, correct?

21   A.  Yes, sir.

22   Q.  And there was -- Mr. Berkowitz focused numerous times on

23   the fact that there were two separate meetings in June; is

24   that right?

25   A.  We talked about those, yes.

1    Q.  And he, you know, indicated that, you know, there was --

2    you were asked to think about something, and he was

3    suggesting that, you know, you met very short in time, a

4    week apart, between those two meetings?

5    A.  Yes.

6    Q.  Mr. Baker, does this jog your recollection in any way?

7    Do you recall there was a meeting with the government in

8    which your attorney's child had an emergency, and so the

9    meeting was abruptly ended?

10   A.  Sitting here today I don't recall that, but I knew that

11   we had various scheduling issues with respect to our various

12   meetings.

13   Q.  Okay.  Now, you were cross-examined about another

14   meeting with the Special Counsel's Office.  I think it was a

15   virtual meeting.

16           You said in your testimony on direct a couple of

17   days ago that had Mr. Sussmann told you in his text message

18   that he was doing this for a client or multiple clients, you

19   might not have even taken that meeting at all, right?

20   A.  Depending on the identity of the client, that's correct.

21   Q.  And so you were then shown an interview report where you

22   said that because Mr. Sussmann identified the meeting -- the

23   matter as sensitive and time-sensitive, you didn't think

24   that the client thing factored heavily into your decision to

25   take the meeting, right?

1    A.  I think we went through that, yes.

2    Q.  Okay.  Mr. Baker, could it be true that the time

3    sensitivity, that you did not necessarily factor that

4    heavily into your decision to take the meeting?  That can be

5    true.

6            Can it also be true that, if he had expressly said

7    that he had a client, that you would not have taken the

8    meeting?

9            In other words, are those two things

10   contradictory, or could they both be true?

11   A.  Could you just go through that one more time?

12   Q.  Sorry.

13   A.  No, I just want to make sure I answer correctly.

14   Q.  Yes.  So let's assume, Mr. Baker, that you took the

15   meeting because Mr. Sussmann said it was sensitive and

16   time-sensitive.

17   A.  Yes.

18   Q.  Could it also be true that if he had said affirmatively,

19   "I'm doing this for a client," that you might not have taken

20   that meeting?

21   A.  They can both be true.

22   Q.  Mr. Baker, you were shown a number of -- you were shown

23   some notes from a meeting that occurred in I think it was

24   March of 2017 when there was a briefing to Dana Boente, the

25   Acting Attorney General; is that right?

1    A.  Acting Deputy Attorney General, yes.

2    Q.  So let's -- just to kind of set the stage.  Your meeting

3    with Mr. Sussmann occurred in September of 2016, right?

4    A.  Yes.

5    Q.  So almost six months apart?

6    A.  Yes.

7    Q.  Now, the meeting with Dana Boente, were you doing the

8    briefing there?

9    A.  Not to the best of my recollection, no.

10   Q.  To what extent did you draft whatever talking points or

11   notes the briefer was...

12   A.  As I said, I think, yesterday, I barely remember this

13   meeting at all, so I don't recall anything about the

14   preparation for it.

15   Q.  And in connection with that meeting, by that time, March

16   of 2017, what's your recollection of whether the Alfa-Bank

17   investigation was even still going?

18   A.  I can -- well, I don't know exactly what was happening

19   with it.

20          From my perspective, given the numerous other

21   matters of national and international importance that we

22   were dealing with over that time period, frankly, once I

23   heard that the Alfa-Bank information had washed out, I

24   honestly kind of just like flushed that from my mind to a

25   significant degree and just didn't think about that case

1    very much anymore.  Because the Bureau had looked at it, and

2    I was -- there was nothing there; and so, like, I had a

3    million other things to do and was moving on.

4    Q.  So is it fair to say that, at that briefing to the

5    Deputy Attorney General, the Alfa-Bank brief might have

6    been, in a sense, a retrospective as opposed to an ongoing

7    matter?

8    A.  Oh, absolutely, yes.  That's my supposition, sitting

9    here today, about why that was being briefed.

10   Q.  Now, I think you said that it may have been or more

11   logically might have been Andrew McCabe, the Deputy

12   Director, who would brief the Deputy Attorney General on

13   something like that?

14   A.  Given the -- I think -- in that meeting, I think we may

15   have looked at the list of attendees.

16   Q.  Uh-huh.

17   A.  And so given who was there, it's logical that Andy --

18   logical, at least to me, that Andy would have done the

19   briefing.

20   Q.  And he was the Deputy Director, right?

21   A.  Correct.

22   Q.  Now, Mr. McCabe was not present for your meeting in

23   September of 2016 with Mr. Sussmann, right?

24   A.  Correct.

25   Q.  And do you know one way or the other whether you even

1    shared with Mr. McCabe the statement that Mr. Sussmann made

2    to you, that he wasn't doing this for a particular client or

3    for a client?

4    A.  Sitting here today, I don't recall having said that to

5    Andy.

6    Q.  Okay.  And the people you know that you shared that

7    information with, that statement with, were who?

8    A.  Well, based on the notes, Bill -- that we've looked at

9    in the case -- Bill Priestap and Trisha Anderson.

10   Q.  And the only --

11   A.  And I think, based on the review of the chain-of-custody

12   document, I think I also told Pete Strzok about that.

13   Q.  Okay.  And the -- other than Mr. Priestap's notes, and

14   Mr. --

15   A.  Well, let me clarify.  I told Bill -- I told Strzok

16   about -- that the information came from Michael.  I might

17   not have said anything about the client issue --

18   Q.  Understood.

19   A.  -- to Pete, yes.

20   Q.  Okay.  And so the only places you're aware -- the places

21   you're aware where that statement of Mr. Sussmann's, "no

22   specific client," are recorded in writing are Ms. Anderson's

23   and Mr. Priestap's, right?

24   A.  To my understanding, yes.

25   Q.  And those were recorded -- you're confident they were

1    recorded the day that you spoke to Mr. Sussmann?

2    A.  Based on my review of the notes, it looks like they were

3    recorded the day that I spoke to Michael.

4    Q.  And then the -- I guess the third place where you are

5    aware that Mr. Sussmann's representation in that regard was

6    recorded was Mr. Sussmann's writing of it.  Is that fair?

7    The text message?

8    A.  The text message from the day before, yes.

9            MR. DeFILIPPIS:  Okay.  Ms. Arsenault, could we

10   put those three...

11   Q.  Okay.  So, Mr. Baker, here are the three places where

12   you are aware that this statement was recorded.

13           The text message from Mr. Sussmann, that was the

14   day before your meeting?

15   A.  Correct.

16   Q.  The notes from Mr. Priestap, that was day of probably?

17   Do you think within minutes or shortly after your meeting?

18   A.  To the best of my recollection, it was within minutes.

19   Q.  And then Ms. Anderson's notes dated the same date;

20   again, within a short time of your meeting with --

21   A.  Apparently that day, yes, sir.

22   Q.  So in looking at those, which -- in your own personal

23   evaluation of events and how they happened, which would you

24   weigh more strongly, these written records or a written

25   record taken by folks at the meeting with Dana Boente six

1     months later?

2     A.   These written records.

3              MR. DeFILIPPIS:  Thank you very much.

4              THE COURT:  So sidebar.

5              (The following is a bench conference

6               held outside the hearing of the jury)

7              THE COURT:  What do you want to raise?

8              MR. BERKOWITZ:  Yes, Your Honor.  I just want to

9     have about five minutes of redirect, Your Honor.  He raised

10    some issues that I think are worth going back on.

11             THE COURT:  Well, is there something that

12    Mr. DeFilippis raised outside of the scope of your cross?

13             MR. BERKOWITZ:  He asked a number of

14    hypotheticals, Judge, that were not contemplated by the

15    thoughts, including what if you'd known this, what if you'd

16    known this, what if you'd known this.  He just showed him

17    notes.  He went over the meeting.

18             It will be less than five minutes, and I think

19    that we've been very judicious on these issues.  And this is

20    an important witness.

21             MR. DeFILIPPIS:  Your Honor, we would object.

22             THE COURT:  All right.  We're going to leave it at

23    that, okay?

24             (This is the end of the bench conference)

25             THE COURT:  Thank you very much for your

 1   testimony, Mr. Baker.  You are dismissed.  Please do not

 2   discuss your testimony with anyone but your lawyer until the

 3   end of trial.  Okay?

 4                THE WITNESS:  Thank you, Your Honor.

 5                THE COURT:  Have a good day.

 6                All right.

 7                Okay.  Ladies and gentlemen, we're going to take

 8   our morning break.  No discussions about the case.  No

 9   research about the case.  We'll see you back here in 15

10   minutes.  Okay?

11                (Jury exits courtroom)

12                THE COURT:  All right.  Please be seated.

13                Just to elaborate, Mr. Berkowitz, I usually don't

14   allow recross unless the scope was exceeded, and I think

15   everything that Mr. DeFilippis went into was within the

16   scope of your cross, okay?

17                MR. BERKOWITZ:  I understand, and not to argue any

18   of it, it was --

19                THE COURT:  I know.

20                MR. BERKOWITZ:  There were a couple of key points

21   that, given the argumentative nature, I could have done.

22   But I respect what you're doing, and we're moving along.

23                THE COURT:  Because if we go down that road, it's

24   going to be a request for every witness, and I think I

25   allowed a recross on one witness where I thought some of

1    the --

2              MR. BERKOWITZ:  You did.

3              THE COURT:  -- some of the cross or the redirect

4    went a little far.  So I'm just trying to be fair to both

5    sides.

6              MR. BERKOWITZ:  We appreciate it, Your Honor.

7              THE COURT:  All right.  Who do we have next?

8              MR. DeFILIPPIS:  Your Honor, I think we thought

9    that now would be the time to have Mr. Mook from the defense

10   side, because we had accommodated -- Your Honor would --

11             THE COURT:  Okay.  Very well.  And so I need to

12   explain to the jury, then, that we're going out of order.

13             And just to be clear, Mr. Berkowitz, no Rule 29

14   implications to taking evidence in the government's case?

15   The government hasn't closed yet.  So that's not a --

16             MR. BERKOWITZ:  Judge, I believe that you can

17   separate out in your own mind Mr. Mook's testimony from --

18             THE COURT:  But nothing to preclude this in the

19   rules, correct?

20             MR. BERKOWITZ:  I don't believe so, Your Honor.

21             THE COURT:  I don't believe so either.  Okay.

22             All right.  See you in 15.  And will we get into

23   Kevin P. directly after Mr. Mook?

24             MR. ALGOR:  Your Honor, it will be Mark Chadason

25   first.

1           THE COURT:  Okay.

2           MR. ALGOR:  And then Kevin P. subsequent.

3           THE COURT:  Okay.  And have we come to ground on

4   how he will be referred to?

5           MR. ALGOR:  So for Mark Chadason, it will be Mark

6   Chadason.

7           THE COURT:  Obviously.

8           MR. ALGOR:  And we were just going to refer to him

9   as Kevin P. for the purpose --

10          THE COURT:  And we're fine with that,

11  Mr. Berkowitz?

12          MR. BERKOWITZ:  Since they're starting and it

13  won't make us look awkward, we're fine.  However they want

14  to do it.

15          THE COURT:  Okay.

16          MR. BERKOWITZ:  But you will explain to the jury

17  why he's being referred to by that?

18          MR. ALGOR:  We were just going to elicit basically

19  that for the purposes of this testimony we're going to refer

20  to you as Kevin P.  That was going to be the extent of it.

21          THE COURT:  And would you like me to provide

22  context for that, or no?

23          MR. ALGOR:  I don't think we need to provide

24  context.  I think -- you know, I think it will be pretty

25  evident based on his, you know, experience with the agency.

```
1              THE COURT:  Fair enough.
2              MR. BERKOWITZ:  And just briefly, I think -- and I
3   hate to make these predictions -- that these next three
4   witnesses will all be relatively short, and we may finish
5   early today.  I don't know if there are any other witnesses.
6   We're certainly not aware of any, and we'd be happy to
7   finish early, if that's where we end up.
8              THE COURT:  Well, I'm sure the jury will
9   appreciate that.
10             Okay.
11             (Recess taken)
12             (Jury enters courtroom)
13             THE COURT:  All right.  Please be seated.  Welcome
14  back, ladies and gentlemen.
15             As I explained to you all on Tuesday, the order of
16  trial always begins with the government's case-in-chief, and
17  we are obviously still in the government's case.  But
18  because of some scheduling issues, we are now going to hear
19  out of turn from one of the defense's witnesses, so the
20  order will be flipped.  The defense will present the direct
21  examination; the government, if it chooses to, will present
22  a cross-examination; and then the defense may come back with
23  a brief redirect.  All right?
24             So Mr. Bosworth.
25             MR. BOSWORTH:  Thank you, Your Honor.
```

```
 1        Mr. Sussmann calls Robert Mook.
 2                THE COURT:  Step right up, sir.
 3                Good morning.
 4                THE WITNESS:  Good morning.
 5                THE COURT:  All right.  Step right up and remain
 6        standing, and please raise your right hand, and the
 7        courtroom deputy will swear you in.
 8                (Witness sworn)
 9                THE COURT:  All right.  Feel free to slip your
10        mask off.
11                THE WITNESS:  Oh.
12                THE COURT:  And you can have a seat.
13                        ROBERT MOOK, Sworn
14                        DIRECT EXAMINATION
15        BY MR. BOSWORTH:
16        Q.  Good morning, Mr. Mook.
17        A.  Good morning.
18        Q.  Now I can't remember -- it's the first time I'm up
19        here -- did you state and spell your name for the record?
20        A.  No.  It's Robert Mook, M-O-O-K.
21        Q.  Okay.  Starting strong, Mr. Mook.
22                Mr. Mook, can you please tell the jury what you do
23        for a living.
24        A.  I currently am a -- I work for myself.  I do some
25        consulting, and then I also teach graduate students.
```

1    Q.  Got it.  Directing your attention to the 2016 election,

2    did you have any role in that election?

3    A.  I did.

4    Q.  And what was your role?

5    A.  I was the campaign manager for Hillary For America.

6    Q.  I'm going to come back to that in a minute.

7            Prior to your work for Hillary For America, did

8    you work on other political campaigns?

9    A.  I did.

10   Q.  Could you just briefly give the jury a sense of the

11   different campaigns you worked on and when?

12   A.  Yeah.  After I graduated from college, I was a field

13   director, for lack of a better term, on a campaign in

14   Vermont.  I worked for Howard Dean and John Kerry's

15   presidential campaigns.  I ran a campaign for state

16   representative in Virginia.  I worked for Hillary Clinton's

17   2008 presidential campaign; I ran some states for her.  I

18   was a political director and then ran the Democratic

19   Congressional Campaign Committee.  I ran a campaign for a

20   governor of Virginia.  And then I ran Hillary's 2016

21   campaign.

22   Q.  And just to be clear, all your work was for the

23   Democratic party?

24   A.  Correct.

25   Q.  Or Democratic party candidates?

1   A.  Correct.

2   Q.  Jumping back to the Hillary Clinton Campaign, when did

3   you begin work as campaign manager for Hillary For America?

4   A.  April of 2015.

5   Q.  And what happened then?

6   A.  We launched -- we formally launched and announced the

7   campaign, filed with the FEC, which is when you -- that

8   means the campaign has officially started.

9   Q.  And you worked on the Clinton Campaign from that point

10  until when?

11  A.  Until the end.  I think mid-November was when I came off

12  payroll.

13  Q.  After the election?

14  A.  Correct.

15  Q.  What were your duties and responsibilities as campaign

16  manager?

17  A.  Yes.  I was in charge of running the day-to-day of the

18  campaign; so building the staff team, managing the staff,

19  managing the budget, finances, that sort of thing.

20  Q.  Did your job touch on strategy for the campaign?

21  A.  Yes.  We had a senior staff team that tended to discuss

22  strategy, and I was certainly a part of that.

23  Q.  If an important strategic decision were to be made, who

24  were the folks that would have usually been involved in that

25  decision?

1    A.   John Podesta, the chair of our campaign, myself.

2    Typically our communications director, Jen Palmieri, Jake

3    Sullivan.   And then we had a number of consultants that were

4    often involved in those discussions, and certainly other

5    staff members as well that tended to be our core team.

6    Q.   So you said Mr. Podesta was the chairman of the

7    campaign.   What did he do in that role, in a nutshell?

8    A.   Yes, I believe there's an official legal role with the

9    Federal Election Commission as it relates to campaign chair.

10   He was really a senior advisor, senior strategist.

11   Definitely someone who was helping me, double-checking what

12   I was doing, and a resource, really, for all of us.

13   Q.   And you mentioned Jen Palmieri was communications

14   director.   What does that mean?

15   A.   She oversaw all of the external communications for the

16   campaign as well as our research.

17   Q.   And Jake Sullivan you mentioned.   I'm not sure you said

18   what he did.   So what did he do?

19   A.   He was another senior strategist on the campaign.

20   Specifically his portfolio included policy, speech-writing.

21   But he was really part of everything, including a lot of our

22   communications efforts.

23   Q.   Where was the campaign headquarters?

24   A.   Brooklyn, New York.

25   Q.   And approximately how many people worked there?

1    A.   It depended on when during the campaign.  We probably

2    started with around 50 people, but we were probably more in

3    the 500 to 600 range by the end of the campaign.

4    Q.   And were there people who worked for the campaign beyond

5    headquarters?

6    A.   Yes.  My recollection is around 4,000 around the

7    country.

8    Q.   And were you, as campaign manager, nominally in charge

9    of all of them?

10   A.   Nominally.

11   Q.   Okay.  And just to give a sense, what was a typical day

12   like for you as campaign manager?  How long a day did you

13   have?  How busy were you?  That sort of thing.

14   A.   Yes.  Well, the days are long.  I think our morning

15   meeting, our first morning meeting was usually around 7:30,

16   sometimes earlier.  I was usually in the office until at

17   least 10:30, sometimes midnight, sometimes later.

18            It was mostly back-to-back meetings.  There were

19   days when I was on the road, and so I would have back-to-

20   back meetings in whatever state I was in.  And content-wise,

21   it was any number of things on every day.

22   Q.   Fair to say a lot of issues on any given day?

23   A.   A lot of things.

24   Q.   Are you familiar with the law firm called Perkins Coie?

25   A.   I am.

1    Q.  Did Perkins Coie play a role in the Clinton Campaign in
2    2016?
3    A.  They did.
4    Q.  And can you describe what role?
5    A.  They were -- the firm was our general counsel for the
6    campaign.
7    Q.  And did you have lawyers that sat with you in Brooklyn
8    where the headquarters was?
9    A.  We had -- I recall one in-house counsel person.  There
10   might have been other lawyers present for any number of
11   things, functions.  But the only one I'm recalling right now
12   is an in-house general counsel.
13   Q.  And who was that?
14   A.  Deborah Fine.
15   Q.  Did Perkins Coie do most of the campaign's legal work?
16   A.  I think that's fair to say, yes.
17   Q.  Who was your main contact there?
18   A.  Marc Elias.
19   Q.  How often would you interact with Mr. Elias?
20   A.  It depended on the day, but at least a few times a week,
21   sometimes multiple times a day.
22   Q.  Without getting into the substance of communications you
23   had with your lawyer, what sorts of issues would you talk to
24   Mr. Elias about?
25   A.  Any number of things.  Campaigns are so heavily

1    regulated legally.  Everything from how we raise money to

2    how our staffing is structured.

3            Once we became a nominee, we had a relationship

4    with the DNC, and there's a lot of legal contours to that.

5            And then many basic, you know, HR issues.  And

6    then they also assisted with some of our research efforts.

7    Q.  Since you mentioned DNC, just briefly, what is the DNC?

8    A.  Democratic National Committee.

9    Q.  And what's the nature of the relationship between the

10   Democratic National Committee and the -- the Democratic

11   party and the Democratic party's candidate for president,

12   their nominee?

13   A.  Yes.  So once you're the nominee, you know, the

14   resources of building that really pivot to support your

15   campaign.  And so there's a process you go through to align

16   all the different staff and resources to make sure

17   everybody's rowing in the same direction.

18   Q.  And when did Secretary Clinton become the nominee, if

19   you remember?

20   A.  Well, technically at the convention, but we began the

21   process of integrating -- my recollection is sometime in

22   June after the last primary contest and we knew how many

23   delegates everybody had won.

24   Q.  And the convention took place when?

25   A.  In July.  Late July, as I recall.

1    Q.  So as of then, the Democratic party's main goal was to

2    elect Hillary Clinton president?

3    A.  Correct.

4    Q.  Getting back to Perkins Coie for a minute, you mentioned

5    you dealt mostly with Marc Elias.  During the 2016 campaign,

6    did you ever interact with a Perkins Coie lawyer named

7    Michael Sussmann?

8    A.  I do not recall interacting with him on the campaign.

9    Q.  Are you familiar with a firm named Fusion GPS?

10   A.  I am now.  I was not on the campaign.

11   Q.  So during the campaign period of time -- let's say when

12   you, you know, joined in April 2015 through the election,

13   November 2016, did you know the name Fusion GPS?

14   A.  I did not.

15   Q.  Are you familiar with the term "opposition research"?

16   A.  I am.

17   Q.  Okay.  What is opposition research?

18   A.  It's a process you go through on a campaign to research

19   your opponent -- understand their statements, their voting

20   record, their, you know, business dealings -- in order to

21   better communicate with voters about the choice they have in

22   the election and to indicate how the decisions someone's

23   made in the past might indicate how they'll lead as a

24   particular leader in the future.

25   Q.  Is it -- you worked on a lot of campaigns.  Have you

1    ever worked on a campaign that didn't conduct opposition

2    research?

3    A.  No.

4    Q.  Is it, in your experience, uncommon for a political

5    campaign to do research on their opponents?

6    A.  Not at all.  In fact, it's probably malpractice not to

7    do it.

8    Q.  How many people that the campaign employed as, you know,

9    campaign employees were involved in doing opposition

10   research?

11   A.  I don't recall precisely, but my guess would be about

12   two dozen full-time employees working at the headquarters.

13   Q.  Did Perkins Coie play any role in connection with

14   opposition research?

15   A.  They did.

16   Q.  Okay.  Can you describe that, that role, without getting

17   into anything privileged.

18   A.  Yes.  Opposition research on Donald Trump was really

19   complicated, and he was incredibly litigious, so there was a

20   lot of work to be done around different lawsuits that he'd

21   filed or that had been filed against him.

22        The other thing that was particularly complicated

23   about him was all these international business dealings he

24   had and obtaining those records.  Understanding what was a

25   very opaque web of businesses internationally was incredibly

1    complex; and so that piece of the work was assigned to

2    Perkins Coie, that international piece.

3            And then they assisted quite a bit in just helping

4    the staff team to sort through some of the domestic legal

5    issues.

6    Q.  To your knowledge, did Perkins Coie engage any third

7    parties, consultants or others, to assist them in that work?

8    A.  I was not aware during the campaign of anyone they were

9    engaging to do that work.  I've obviously read subsequent to

10   that that they did, but I didn't know that at the time.

11   Q.  Let's focus on the period of time.

12   A.  Okay.

13   Q.  When a campaign engages in opposition research, does the

14   campaign care whether it's true or false?

15   A.  Well, you absolutely care.  I mean, we spend a lot of

16   money and hire a bunch of staff to vet information for

17   reputational purposes.

18           For us to go out and say a bunch of things that

19   aren't true, you know, can cause a lot of damage to the

20   campaign.

21   Q.  And when you gather opposition research, what's the

22   ultimate point?  Like what are you going to do with it?

23   A.  I mean, the purpose of a campaign is to communicate with

24   the voters about the choice they're facing in the election.

25   So what we're trying to do is better understand everything

1    we can about this opponent so we can present the strongest

2    case we can about both why our candidate is the better

3    choice, but also why that opponent candidate might not be a

4    good choice.

5    Q.  One other question on Perkins Coie, and then we'll jump

6    into more on Mr. Trump.

7                Did you have any involvement, to your

8    recollection, in getting or approving Perkins Coie's bills

9    for the work they did for the campaign?

10   A.  I don't recall ever being engaged in approving or

11   processing any invoices for any vendor.

12   Q.  Okay.  Did you know how Perkins Coie charged the

13   campaign for its work?

14   A.  I didn't know.

15   Q.  Okay.  In the summer -- I think you said it, but just to

16   make sure we cover it, who is Hillary Clinton's opponent in

17   the 2016 election?

18   A.  Donald Trump.

19   Q.  In the summer of 2016, was Mr. Trump's relationship with

20   Russia something that the campaign was focused on?

21   A.  Yes.  I mean, it was frankly something we were focused

22   on before that time.  But absolutely.

23   Q.  Can you say more?

24   A.  Yes.  I mean, starting in 2015, Trump made very

25   favorable statements about Vladimir Putin, which was

1   incredibly unusual for a Republican nominee.  I recall him

2   suggesting, in the spring of 2016, that the United States

3   should leave the NATO alliance, or question whether it

4   should exist, something to that effect, which was incredibly

5   unusual for a Republican nominee.  For any nominee, frankly.

6          He had extensive business dealings in Russia, so

7   we knew that there was some kind of preexisting relationship

8   there.  And then we became particularly concerned when it

9   became evident that data that was stolen from the Democratic

10  National Committee and then later that was stolen from John

11  Podesta, that it had probably been stolen by Russian

12  government actors and then was being released at times that

13  were particularly strategic in terms of inflicting maximum

14  damage on Hillary.

15  Q.  You mentioned the, you know, emails that were stolen

16  from the Democratic National Committee.  Do you remember

17  when the DNC hack occurred or when you first learned of it?

18  A.  I first learned about it, my recollection is, in May,

19  maybe, of 2016, sometime in the spring.  And some data

20  started leaking out around that time.

21          But then the biggest release, as I recall, was

22  just before the Democratic convention in July.  It was timed

23  to drop right before that convention.

24  Q.  Okay.  And when you say that it was "timed to drop,"

25  from your perspective, what do you mean by that?

1  A.  Well, just -- we were about to begin the convention, and

2  all of a sudden this -- all this stolen information from the

3  DNC is released out to the public.

4  Q.  Was Mr. Trump's relationship with Russia something that

5  the campaign was speaking about publicly?

6  A.  Absolutely.  I spoke about it publicly.

7  Q.  Okay.  In connection with the general focus on Mr. Trump

8  and Russia, did there come a time when you learned of

9  potential links between the Trump organization, Mr. Trump's

10  business, and a Russian bank called Alfa-Bank?

11  A.  I did.  Yes, I was briefed on that.

12  Q.  Approximately when were you first briefed on that, if

13  you remember?

14  A.  I honestly can't recall.

15  Q.  Who participated in the briefing, if you remember?

16  A.  Myself, Marc Elias, Jen Palmieri, Jake Sullivan, John

17  Podesta.  There might have been others, but those are the

18  ones I definitely recall being there.

19  Q.  Was it prior to the summer of 2016?

20  A.  I don't think so.  I think the earliest it might have

21  been is in the summer, but I just -- I don't recall exactly.

22  Q.  And in a nutshell, what did the campaign want to do with

23  that kind of information?

24  A.  Well, on that particular issue, but on others as well,

25  we weren't totally -- we didn't totally understand it, and

1   we weren't totally confident in it, and so we wanted to get

2   it further vetted.

3            But if it was true that there was some sort of

4   passage of information between Trump Tower and a bank in

5   Russia owned by an oligarch which is a main supporter of

6   Vladimir Putin, that's obviously incredibly alarming and

7   concerning, and that's probably something the American

8   people should know when they're thinking about how they're

9   going to vote.

10  Q.  And so the campaign wouldn't want to be associated with

11  getting information out there that hadn't been vetted or

12  that you weren't confident enough in?

13  A.  Right.  We made a decision -- you know, we didn't -- we

14  didn't run out with it as soon as it came on to our radar.

15  You know, we wanted to get it where it could be looked at

16  further.

17  Q.  At some point did you come to understand that *The New*

18  *York Times* was working on a story on that issue, Trump/

19  Alfa-Bank?

20  A.  I notionally recall that.  I don't recall a lot of

21  details around that.

22  Q.  At the time did you know -- I asked you if you met, but

23  did you know of Mr. Sussmann?

24  A.  I don't recall knowing who he was during the campaign.

25  Q.  Were you aware that Mr. Sussmann or any other Perkins

1    Coie lawyer was in touch with *The New York Times* about the

2    Alfa-Bank/Trump story?

3    A.   No.

4    Q.   Were you aware that Mr. Sussmann went to the FBI in

5    September of 2016 to give them a heads-up about a *New York*

6    *Times* story about Trump and Alfa-Bank?

7    A.   No.

8    Q.   Do you have any recollection of anyone talking to you

9    about going to the FBI on behalf of the campaign on the

10   Trump/Alfa-Bank issue?

11   A.   No.

12   Q.   Did you direct Mr. Sussmann to go to the FBI on behalf

13   of the campaign?

14   A.   Absolutely not.

15   Q.   Did you authorize Mr. Sussmann to go to the FBI on

16   behalf of the campaign?

17   A.   No.

18   Q.   Did anyone else from the campaign, to your knowledge,

19   direct or authorize Mr. Sussmann to go to the FBI on behalf

20   of the campaign?

21   A.   To my knowledge, no.

22   Q.   As the campaign manager, would you have known about any

23   effort to engage with the FBI on an issue like Trump/

24   Alfa-Bank?

25   A.   I would definitely have expected to know if something

1    like that was happening, absolutely.

2    Q.  In September of 2016, would the campaign have wanted to

3    engage with the FBI voluntarily on the Trump/Alfa-Bank

4    issue?

5    A.  Speaking for myself, absolutely not.

6    Q.  Why not?

7    A.  Well, two reasons.

8         First is, again, this was alarming information,

9    and so if it was vetted to a place that we thought it was

10   accurate or someone else could vet it to that place, yes, we

11   would want that information out to the public.  Going to the

12   FBI does not seem like a very effective way to get

13   information out to the public.  You do that through the

14   media, which is why the information was shared with the

15   media.

16        Secondly, to be honest -- and I say this with

17   respect, because I'm sure a lot of the people at the FBI are

18   very patriotic and good people -- we did not trust them.

19   And I can say, you know, from a purely analytical

20   standpoint, as the campaign manager, two or three, probably,

21   of the most damaging days of the campaign were caused by

22   James Comey, not by Donald Trump.  And -- you know, he broke

23   protocol.  He talked openly about investigations into

24   Hillary and her emails.  Presumably it was FBI agents that

25   were leaking information about the investigation into her

1    emails.

2            So we did not trust the FBI at that time, and --

3    so much so that Director Comey invited some of us to a

4    briefing shortly before the election about election

5    security and something like that, and we didn't go because

6    we didn't -- we just didn't want to have anything to do, you

7    know, with the organization at that time or engage in that

8    way.

9    Q.  There's been an allegation that the campaign was

10   treating the Trump/Alfa-Bank issue as an October surprise.

11   Are you familiar with the concept of an October surprise?

12   A.  I am, yes.

13   Q.  What is it?

14   A.  Well, it's a little bit mythological, but it's the idea

15   that you have a devastating piece of opposition research on

16   a candidate, and you drop it at the last minute so -- you

17   know, so that that candidate doesn't have time to respond or

18   recover from it and, as a result, will lose the election.

19   Q.  Did you approach -- you, the campaign, to your

20   knowledge, approach the Trump/Alfa-Bank story or intend for

21   the Alfa-Bank story to be an October surprise?

22   A.  I don't recall thinking of it that way, in large part

23   because it was one of many pieces of information we had.

24   And, in fact, every day, you know, Donald Trump was saying

25   things about Putin and saying things about Russia.

1    So this was a constituent piece of information

2    among many pieces of information, and I don't think we saw

3    it as this silver bullet that was going to conclude the

4    campaign and, you know, determine the outcome, no.

5    Q.  There were a lot of Trump/Russia issues you were focused

6    on?

7    A.  Correct.

8    Q.  And this was one of many?

9    A.  Correct.

10                  MR. BOSWORTH:  Thank you.

11                          CROSS EXAMINATION

12   BY MR. DeFILIPPIS:

13   Q.  Mr. Mook, how are you?  Mook, I'm sorry.

14   A.  It's all good.

15   Q.  Mr. Mook, you testified that you were not aware at all

16   during the campaign that Fusion GPS had been retained to do

17   opposition research?

18   A.  Correct.

19   Q.  And you were the campaign manager of the campaign?

20   A.  Correct.

21   Q.  So responsible for overseeing its day-to-day operations?

22   A.  Correct.

23   Q.  Would it be fair to say that all of that activity was

24   delegated or most of that activity was delegated to Perkins

25   Coie?

1   A.  There was a particular piece of the research project

2   that was delegated to them, correct.

3   Q.  So the Trump/Russia stuff would fall under that piece?

4   A.  I don't know that that's a fair characterization

5   because, as I mentioned earlier, we were dealing with Trump/

6   Russia issues every day, right?  The hacks and all of that.

7   That wasn't -- the question of Trump's relationship with

8   Russia was not wholesale delegated to Perkins Coie, no.

9   Q.  But the international aspects of that were delegated to

10  Perkins Coie, would you say?

11  A.  The pieces of the opposition research that required

12  overseas work and so on, yes, that had been delegated to

13  them.

14  Q.  Okay.  So Perkins Coie was responsible for overseeing

15  the research that Fusion GPS was doing.  Is that fair to

16  say?

17  A.  I didn't know, and I still don't know the details of

18  what relationship they had, so --

19  Q.  So you weren't overseeing Fusion GPS's work?

20  A.  I was not.  I did not know that they had been retained,

21  no.

22  Q.  Okay.  So, in fact, others -- you said others on the

23  campaign that you knew of were not aware as well; is that

24  right?

25  A.  I'm not aware, and I don't recall anybody else -- any

1    other campaign staff knowing about any of that.

2    Q.  So any decisions -- if people on the campaign didn't

3    know, then the decisions were being made by people at

4    Perkins Coie, right?

5    A.  I guess I'm not clear on what the -- which decisions are

6    you --

7    Q.  To oversee Fusion GPS.

8    A.  All I can tell you is that Perkins Coie -- that I

9    engaged Perkins Coie to do some work, and I have read in the

10   press that they engaged Fusion.  But that's all I know.

11   That's all right now.  That's all that I can kind of tell

12   you about.

13   Q.  All right.  So you were not overseeing Perkins Coie's

14   work day to day?

15   A.  They were working on a number of things.  I --

16   Q.  Okay.  Were you -- which of their things were you

17   overseeing?

18   A.  They were our law firm, and I was going to them on a

19   regular basis for any number of sort of questions and

20   projects.

21   Q.  Okay.  And as to Fusion GPS, you were not overseeing any

22   of their work day to day?

23   A.  I didn't know that they were retained.

24   Q.  Right.  And so you can't oversee something you don't

25   know exists, right?

```
 1   A.  I mean, again, where this is hard for me is I don't know
 2   what the relationship is.  I don't know what they were
 3   doing.  I just don't know anything about it so...
 4   Q.  So were you or were you not overseeing GPS's work day to
 5   day?
 6   A.  I never engaged with Fusion GPS, and I didn't know that
 7   they were retained.
 8   Q.  Okay.  So you never spoke to Glenn Simpson?
 9   A.  No.
10   Q.  You never spoke to Peter Fritsch?
11   A.  No.
12   Q.  You never spoke to Laura Seago?
13           But it's your understanding now --
14           THE COURT:  I'm sorry, Mr. Mook, you have to say
15   yes.
16           THE WITNESS:  Oh, sorry.
17   A.  No, I did not.  I did not know any of those people,
18   didn't engage with them.
19   Q.  But it's your understanding now that all of those people
20   were doing work on behalf of the campaign, correct?
21   A.  I don't recognize some of the names you were saying.  I
22   don't know.  I don't know who was doing what.
23   Q.  Okay.  Is it your understanding that Fusion -- is it
24   your current understanding that Fusion GPS was doing work on
25   behalf of the Clinton Campaign?
```

1    MR. BOSWORTH:  Objection.

2    THE COURT:  Sustained.

3  Q.  Was Fusion GPS, to your knowledge, doing work on behalf

4  of the Clinton Campaign?

5  A.  What I know is what I've read in the press, which is

6  that they -- the press has reported that some work was being

7  done for Perkins Coie in service to the campaign.  But

8  that's all I know.

9  Q.  And you were dealing regularly with Marc Elias, right?

10  A.  Correct.

11  Q.  And so did you allow Marc Elias to make decisions for

12  the campaign?

13  A.  I definitely relied on his discretion.  So he was giving

14  legal advice, you know, throughout the campaign

15  organization.  I wasn't, like, vetting all of his decisions,

16  nor -- you know, it was a billion-dollar organization, so I

17  depended on people's judgment for any number of things.

18  Q.  Okay.  So to the -- so you depended on Marc's judgment

19  and others at Perkins Coie who were working with him; is

20  that fair?  Is wasn't just him at Perkins Coie?

21  A.  I mean, I definitely -- yes, they were hired for their

22  legal advice, and I was not double-checking their decisions,

23  nor was that really --

24  Q.  Okay.  So if they needed to make phone calls or have

25  meetings, you didn't -- they didn't check with you every

1   time they did that?

2   A.  I was not vetting their schedules or giving approval for

3   every engagement they had.

4   Q.  Now, let's talk about the Alfa-Bank allegations that

5   Mr. Bosworth mentioned.  You said you don't know exactly

6   when you learned of that, right?

7   A.  Yes, I can't remember the day, or even the month,

8   honestly.

9   Q.  And it was Perkins Coie -- it was Mr. Elias from Perkins

10  Coie who first told you about that, right?

11  A.  I was briefed about the Alfa-Bank issue first by Marc

12  Elias.

13  Q.  And when you learned about it, you did not know where

14  the information had come from, right?

15  A.  I don't recall.

16              MR. BOSWORTH:  Objection.

17              (The following is a bench conference

18               held outside the hearing of the jury)

19              THE COURT:  I can't hear you.

20              MR. BOSWORTH:  Your Honor, apologies.  We're

21  getting into material that I believe would be privileged.

22  The topic came up is one thing.  What specifically he knew

23  is going beyond what we think the privilege holders would

24  regard to be fair game.

25              MR. DeFILIPPIS:  Your Honor, I could probably

1    phrase it in a way that would exclude legal advice.

2                    THE COURT:  Okay.  Try to do that.

3                        (This is the end of the bench conference)

4    BY MR. DeFILIPPIS:

5    Q.  Mr. Mook, putting aside any legal advice that you might

6    have received on that topic, to what extent were you aware

7    where the allegations or data came from?

8    A.  I recall being told that the data had come from people

9    that had -- or that the information had come from people who

10   had expertise in this sort of matter.

11   Q.  And you testified today that you, quote, weren't totally

12   confident in it, right?

13   A.  Correct.

14   Q.  And in spite of the fact that you weren't totally

15   confident, did you -- you didn't meet any of those experts,

16   right?

17   A.  Correct.

18   Q.  You didn't get any of their names?

19   A.  I don't recall getting their names, no.

20   Q.  And you didn't -- you didn't gather any details about

21   the technical aspects of the data yourself?

22   A.  No.  I mean, that was part of the issue, is we didn't

23   have any subject matter expertise with which to judge what

24   we were briefed on.

25   Q.  And once you learned about it, you started discussing

1   with the campaign whether the campaign should affirmatively

2   push it to the media, right?

3   A.  Correct.

4   Q.  And you had that discussion with Mr. Sullivan?

5   A.  Correct.

6   Q.  With Mr. Podesta?

7   A.  Just to be clear, this is what -- I recall those people,

8   correct.

9   Q.  Okay.  You had that discussion with Mr. Sullivan?

10  A.  Yes.  I recall, yes.

11  Q.  Whether to push it to the media, right?

12  A.  Correct.

13  Q.  With Ms. Palmieri?

14  A.  Correct.

15  Q.  With Mr. Podesta?

16  A.  Correct.

17  Q.  Anyone else you recall having that discussion with?

18  A.  Those are the ones I recall definitely sort of -- I'm

19  fairly certain that they were all part of that discussion.

20  Q.  And the idea would be that the campaign would put this

21  information that you weren't totally confident in in the

22  media, right?

23  A.  Well, that was the discussion, was whether to share with

24  the media, how to share it with the media.

25  Q.  Ultimately who was the highest member of the campaign --

1    well, let me ask you this:  Did the campaign decide we're

2    going to push it to the media?

3    A.  We decided -- my recollection is that we decided to give

4    it to a reporter so the reporter could run it down more, and

5    then obviously it's their decision and their discretion to

6    publish it.

7    Q.  Okay.  But you -- the campaign wasn't going to ask the

8    reporter to hold off on a story, right?

9    A.  I don't recall ever asking a reporter to hold off on

10   this, no.

11   Q.  And, in fact, it's the height of an election season.

12   You're the Clinton Campaign.  You probably wouldn't want

13   them to hold off on a story, right?  If you can get a story

14   out there, that's a good thing.

15   A.  I mean, our hope was that they were going to run it

16   down.  It would be accurate, or it would be -- you know, it

17   would be substantive, and they would report it.

18   Q.  Okay.  But you guys -- the campaign had received the

19   information.  You hadn't, quote, run it down, right?

20   A.  Well, we just didn't have the subject matter

21   expertise --

22   Q.  Okay.

23   A.  -- or the data.

24   Q.  Now, so did the campaign ultimately decide to give it to

25   the media?

1   A.  We did.  I recall it was given to a reporter.

2   Q.  And you made that decision with the people you just

3   referenced, right?

4   A.  Correct.  We discussed it and then made that decision.

5   Q.  Who was the highest member of the campaign who either

6   was involved in or approved that decision?

7   A.  Well, John and I were involved.  I discussed it with

8   Hillary as well, but I believe I discussed it with her after

9   we kind of discussed it and made the decision.

10  Q.  So you told Ms. Clinton, "We want to give this to the

11  media"?

12  A.  I remember -- I don't really remember the substance of

13  the conversation, but notionally the discussion was, hey, we

14  have this, and we want to share it with a reporter.

15  Q.  And how did Ms. Clinton respond?

16  A.  She agreed to that.

17  Q.  Now, between the time when you started discussing this

18  and the time that Ms. Clinton approved putting this in the

19  media, what had you done to bolster your confidence in the

20  strength of the allegation?

21  A.  I'm sorry, what had who done?

22  Q.  You or anyone on the campaign.

23  A.  I don't think I understand the question.  What had we

24  done to bolster our confidence?

25  Q.  Yes.  So you said when you learned of these allegations,

```
1    you, quote, weren't totally confident in that.  Remember
2    that?
3    A.  Uh-huh.
4    Q.  From that time until when Ms. Clinton approved the
5    dissemination of this to the media, did it remain the case
6    that you weren't totally confident in it?
7    A.  Yes.  The point --
8    Q.  I'm sorry, just yes or no.  Sorry.
9              THE WITNESS:  I'm sorry, Your Honor.  I'm...
10             THE COURT:  He can explain.  Let him explain.
11             THE WITNESS:  Yes.
12   Q.  So at the time Ms. Clinton approved providing these
13   materials to the media, did it remain the case that you,
14   quote, weren't totally confident in it?
15   A.  So part of the --
16   Q.  I'm sorry, you have to answer yes or no.
17             THE COURT:  He can explain.
18   A.  Part of the point of giving it to a reporter was that
19   they could run it down further, that they could reach out to
20   subject matter expertise -- subject matter experts.  They
21   could have other people look at the data, the information.
22             So giving it to the media -- rather, your question
23   implied that we waited to give it to the media until we had
24   vetted it ourselves.  And, in fact, part of the purpose of
25   giving it to the media was that a reporter could vet the
```

1    information and then decide to print it.

2              MR. DeFILIPPIS:  Your Honor, could we have a quick

3    call?

4              (The following is a bench conference

5               held outside the hearing of the jury)

6              MR. DeFILIPPIS:  Your Honor, the government

7    believes we've now laid an adequate foundation for probing

8    into admissibility in connection with the Tweet and press

9    statement that we've been talking about.

10             Mr. Mook has testified that the candidate herself

11   approved a decision to send this to the media.  The Tweet

12   and press statement themselves refer to the FBI, and the

13   defense admitted a Tweet during their examination of

14   Mr. Baker.

15             We don't think it's, in light of this testimony,

16   in any way prejudicial or cumulative because it addresses

17   both the FBI issue and the issue of the decision to provide

18   it to the media.

19             So we would ask that we be able to present the

20   Tweet to Mr. Mook.

21             MR. BOSWORTH:  Your Honor, we object.  It remains

22   the case that the -- you know, Ms. Clinton is not on the

23   witness stand.  Jake Sullivan is not on the witness stand.

24             Jake Sullivan, weeks after Mr. Sussmann went to

25   the FBI, issued a statement about the *Slate* article that was

1     published that there's no evidence that Mr. Sussmann had

2     anything to do with.  And that press statement goes into an

3     area that goes beyond anything for which they've laid a

4     foundation.  And it's highly prejudicial in that that

5     statement doesn't just say this is a serious story.  It

6     calls on the FBI to investigate.

7          That is incredibly prejudicial because it suggests

8     that Mr. Sussmann was going to the campaign on their behalf,

9     and there was literally zero evidence that the campaign knew

10    Mr. Sussmann was going, including in Mr. Mook's testimony

11    today.

12         And second, that's weeks after Mr. Sussmann went

13    to the FBI.  And the statement itself doesn't say, "We're so

14    glad the FBI's already investigating."  They're steering far

15    clear of any knowledge they could have even conceivably had

16    about the investigation.

17         So we think Your Honor's prior ruling stands.

18         THE COURT:  All right.  I want to review the

19    statement again for the information that you say is

20    extraneous.

21         Generally, as I indicated, I think, earlier this

22    week, this does complete the story, and a lot of this is

23    subject to cross.  I think it can be explained that -- just

24    because it has Ms. Clinton's name on it and is a statement

25    of the campaign and it completes the narrative that the

1    government has tried to advance, but I am concerned about

2    any other extraneous information of the Tweet that may not

3    be pertinent.  So let me take a look at it.

4            Can you complete your cross, or shall we just take

5    a break?

6            MR. DeFILIPPIS:  Maybe take a break, Your Honor.

7                (This is the end of the bench conference)

8            THE COURT:  All right.  Ladies and gentlemen,

9    we're going to take about a five-minute break, so if you

10   could just -- to resolve an evidentiary issue.  So if you

11   could just retire to the deliberation room, we'll call you

12   when we're ready.

13               (Jury exits courtroom)

14               (Recess taken)

15           THE COURT:  You can step down.  Your counsel is

16   here?

17           THE WITNESS:  Yes.

18           THE COURT:  Why don't you and your counsel step

19   out into the waiting room.

20           THE WITNESS:  Yes, Your Honor.

21           MR. BOSWORTH:  Your Honor, do you want me to pass

22   it up?

23           THE COURT:  Yes, if you can pass it up.  We have

24   it back in chambers, but let me...

25           THE COURTROOM DEPUTY:  Everyone can be seated.

```
 1              THE COURT:  Please be seated.  And I'll tell you
 2     what, just give me five minutes.
 3              (Recess taken)
 4              THE COURT:  All right.  Mr. DeFilippis, if you can
 5     lay a foundation that he had knowledge that a story had come
 6     out and that the campaign decided to issue the release in
 7     response to the story, I'll let you admit the Tweet.
 8              However, the last paragraph, I agree with the
 9     defense, is substantially more prejudicial than it is
10     probative because he has testified that had neither -- he
11     nor anyone at the campaign knew that Mr. Sussmann went to
12     the FBI, no one authorized him to go to the FBI, and there's
13     been no other evidence admitted in the case that would
14     suggest that that took place.
15              And so this last paragraph, I think, would
16     unfairly suggest to the jury, without any evidentiary
17     foundation, that that was the case.  All right?
18              MR. DeFILIPPIS:  Your Honor, just two brief
19     questions on that.
20              THE COURT:  Okay.
21              MR. DeFILIPPIS:  Can we -- so can we use --
22     depending on what he says about whether he was aware of the
23     Tweet or the public statement, may we use it to refresh him?
24              THE COURT:  Sure.  Sure.
25              MR. DeFILIPPIS:  Okay.  And then, as to the last
```

1    paragraph, could it be used for impeachment or refreshing

2    purposes as well in terms of any dealings with the FBI?

3              THE COURT:  You can use anything to refresh.

4              MR. DeFILIPPIS:  Okay.

5              THE COURT:  But we're not going to publish it to

6    the jury.  We're not going to read from it.  And let's see

7    what he says.

8              MR. DeFILIPPIS:  Okay.

9              THE COURT:  I mean, given his testimony, I suspect

10   that he will not be refreshed, but you can do that.

11             MR. DeFILIPPIS:  Understood, Your Honor.

12             THE COURT:  Okay.

13             MR. DeFILIPPIS:  And we'll make the redaction.

14             THE COURT:  Please do.

15             MR. DeFILIPPIS: Your Honor, if we can just have a

16   couple of minutes to do that.

17             THE COURT:  Yes.  You can get the witness.

18             (Pause)

19             MR. DeFILIPPIS:  Your Honor, it's redacted so...

20             THE COURT:  Okay.  Great.

21             (Pause)

22             THE COURT:  All right.  Come back up, Mr. Mook.

23             (Jury enters courtroom)

24             THE COURT:  All right.  Sorry about that, ladies

25   and gentlemen, but I think we have everything worked out.

```
 1              Mr. DeFilippis.

 2              You can have a seat.

 3    BY MR. DeFILIPPIS:

 4    Q.  Sorry about the delay, Mr. Mook.

 5              Mr. Mook, before the break you had testified that

 6    there was a conversation in which you told Ms. Clinton about

 7    the proposed plan to provide the Alfa-Bank allegations to

 8    the media; is that correct?

 9    A.  Correct.

10    Q.  And what was her response?

11    A.  All I remember is that she agreed with the decision.

12    Q.  And at some point -- and, again, when, as best as you

13    can recall -- month -- would that have been?

14    A.  Honestly, I can't remember.  Sometime in the fall, but I

15    can't remember.

16    Q.  And sometime in the fall before the election?

17    A.  Correct.

18    Q.  So would that be September/October?

19    A.  Probably.  Again, my memory is not great on this, but...

20    Q.  And what was the reaction from the candidate?

21    A.  She thought we made the right decision.

22    Q.  And by the time you briefed the candidate, had it

23    already been given to the press or it was essentially

24    seeking final approval?

25    A.  I don't -- I can't recall the exact sequence of events,
```

1   honestly.

2   Q.  Now, you don't know who it was who provided it to the

3   media on behalf of the campaign, correct?

4   A.  I don't recall.  It was -- I notionally recall it was a

5   member of our staff, but I don't remember exactly who that

6   was.

7   Q.  Okay.  But -- and sitting here today, it could have been

8   someone at the campaign, or it could have been someone at

9   Perkins Coie?

10  A.  No, I -- my recollection is it was a campaign staffer.

11  I don't remember Perkins being part of the effort to provide

12  it to the media.

13  Q.  And at some point there was a -- but I guess you don't

14  know for sure, right?  One way or the other, you don't know

15  who gave it to the media?

16  A.  What I -- I recall the conversation with our press

17  department about them giving it to the media.  I don't

18  recall any discussion about Perkins Coie giving it to the

19  media.

20  Q.  Okay.  But you were not there when whoever gave it to

21  the media gave it to the media, right?

22  A.  I don't recall sitting next to the person calling the

23  reporter, no.

24  Q.  Okay.  And so from your knowledge, it could have been

25  anyone affiliated with the campaign?

1  A.  I recall it being a member of our press staff, so like

2  someone who worked in our headquarters.

3  Q.  That's who was going to give it.  But you didn't confirm

4  whether they were the ones who gave it?

5  A.  Oh, no.  I recall having follow-up conversations.

6  Q.  Okay.

7  A.  I just can't remember the precise staffers.  It was one

8  of a lot of things going on.

9  Q.  But in any event, the decision to provide this to the

10  media was authorized by the campaign, correct?

11  A.  We authorized a staff member of the campaign to provide

12  it to the media.

13  Q.  At some point there were news articles about the Alfa-

14  Bank issue, correct?

15  A.  I recall -- yes, I recall at least one story.

16  Q.  And is that the one that came out in -- from *The New*

17  *York Times*?  From *Slate* magazine?

18  A.  I recall a story from *Slate*.

19  Q.  Okay.  And, in fact, at the time of that article or

20  around the time of that article the campaign issued a public

21  statement, correct?

22  A.  We may well have.  I just don't recall.

23  Q.  Is there anything that would refresh your recollection

24  in that regard?

25  A.  I don't understand.

1    Q.  Is there anything I can show you that would remind you

2    whether the campaign issued a public statement?

3    A.  If there's a copy of it or something, I could --

4              MR. DeFILIPPIS:  Okay.  Your Honor, may I

5    approach?

6              THE WITNESS:  Yes.  This looks right.

7              THE COURT:  Okay.

8    Q.  Okay.  Does that refresh your recollection?

9    A.  Yes.  I don't -- I don't -- I don't recall, you know,

10   engaging directly in developing this, but this looks -- this

11   looks correct.

12             MR. DeFILIPPIS:  Okay.  Your Honor, the government

13   offers -- sorry, number? -- Government Exhibit 52.

14             MR. BOSWORTH:  No objection.

15             THE COURT:  So moved.

16   Q.  Mr. Mook, what does this appear to be?

17   A.  A Tweet from Hillary Clinton's account.

18   Q.  And if you wouldn't mind, just for the record, see how

19   there are two -- just describe for the jury what we see

20   here, the Tweet.  And then is there something else?

21   A.  So there's text in the Tweet, and then a statement from

22   Jake Sullivan.

23   Q.  All right.  Let's start with the statement from Jake

24   Sullivan.  Remind the jury, who is Jake Sullivan?

25   A.  He was a senior advisor on the campaign.

1   Q.  And is there any reason why he would be the one to issue

2   a statement like this?

3   A.  You know, Jake's a pretty highly regarded national

4   security expert.

5   Q.  Okay.

6   A.  So it makes sense that he's the voice on this.

7   Q.  Could you just read the content of Mr. Sullivan's

8   statement.

9   A.  Starting with "This could"?

10  Q.  Yes.

11  A.  "This could be the most direct link yet" --

12  Q.  I'm sorry, start at the top.

13  A.  "In response to a new report from *Slate* showing that the

14  Trump Organization has a secret server registered to Trump

15  Tower that has been covertly communicating with Russia,

16  Hillary For America Senior Policy Advisor Jake Sullivan

17  released the following statement Monday."

18          Keep going?

19  Q.  Yes.

20  A.  "This could be the most direct link yet between Donald

21  Trump and Moscow.  Computer scientists have apparently

22  uncovered a covert server linking the Trump Organization to

23  a Russian-based bank.

24          "This secret hotline may be the key to unlocking

25  the mystery of Trump's ties to Russia.  It certainly seems

1    the Trump Organization felt it had something to hide, given

2    that it apparently took steps to conceal the link when it

3    was discovered by journalists.

4    ████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ██████████████████████

11   Q.  Mr. Mook --

12            THE COURT:  I think -- all right.  We're fine.

13   Q.  Mr. Mook, can you please now go to the top part of the

14   Tweet there.

15   A.  The "Computer scientists"?

16   Q.  Yes.

17   A.  "Computer scientists have apparently uncovered a covert

18   server linking the Trump Organization to a Russian-based

19   bank."

20   Q.  And so who is the author of the Tweet there?

21   A.  I don't recall who authored it.  We often had -- well,

22   we had a whole team that was offering Tweets so...

23   Q.  Okay.  And so but it's in the name of the candidate?

24   A.  Correct.  And, you know, that's sort of a thing on

25   campaigns, frankly.  You know, you'll Tweet something from

1    the candidate's account, but it's sort of -- you know, what

2    the voice actually is and all that is always sort of a

3    question so...

4    Q.  Okay.  And so you don't know one way or the other

5    whether the candidate drafted the Tweet?

6    A.  Oh, I definitely don't.

7            I would not probably have involved myself in

8    crafting language on something like this.  That was really

9    for the press people to do.

10   Q.  Okay.  Now, is it fair to say at this time that you

11   still weren't totally confident in the allegation?

12   A.  Here's the hard part about your question.  I'm not a

13   cyber expert, so I -- you know, again, part of the reason we

14   gave it to the reporter and let the reporter go write for

15   the American people what it was was that they were in a

16   position to go and talk to a bunch of experts.

17           So I don't know how cyber links like this work, so

18   I can't -- I wasn't then and I'm not in a position today to

19   say how any of it functions.

20   Q.  Okay.  But when you testified earlier that you weren't

21   totally confident in the allegation, nothing changed between

22   then and the date of this Tweet in terms of your confidence?

23   A.  Well, except that a reporter had written about it.

24   Q.  Okay.

25   A.  And presumably --

1    Q.  Mr. Mook, I'm sure you know reporters often publish

2    things that aren't true.

3              MR. BOSWORTH:  Objection.

4              THE COURT:  Overruled.

5    A.  I mean, a reporter had written an article and put the

6    moniker of their media organization and their name on it.

7    Q.  And, Mr. Mook, the reporter -- the campaign had provided

8    information to reporters?

9    A.  Correct.  We had provided them with information.

10   Q.  So it's possible that the reporter got that information

11   from the campaign?

12   A.  My understanding -- I didn't speak to the reporter.  I

13   didn't watch them do their work.

14             My understanding was we gave the information to

15   the campaign [sic], and then the job of a reporter from

16   there is to take that information, talk to folks, call the

17   campaign for comment, call Trump Tower for comment, and so

18   on, and vet it out, and then write what they believe is true

19   and what they're comfortable putting their name on.

20   Q.  Do you know one way or the other whether it was the

21   Slate magazine reporter who the campaign leaked the

22   information to?

23   A.  Well, first of all, it's not a leak because we

24   weren't -- you know, a leak would be something that someone

25   was not authorized to share.

1            So it was information that had been obtained.  We

2     shared it with someone at *Slate*.  That's all I know.

3     Q.  Okay.  So it was the reporter who published the article

4     who the campaign gave the information to?

5     A.  I can't say because I -- I presume that's true, but I

6     didn't actually make the phone call.  I don't know.

7     Q.  Okay.  And is it fair to say that the campaign would

8     have been pleased that there was -- that this was now out in

9     the media?

10    A.  Again, we wanted -- we thought this was highly suspect,

11    and if it was something troubling, yes, we wanted the

12    American people to know about it, for sure.

13    Q.  Mr. Mook, turning to another topic that we discussed

14    previously, you testified that you had given discretion to

15    Mr. Elias to carry out certain responsibilities; is that

16    right?

17    A.  Yes.  He had discretion to give legal advice across the

18    campaign.

19    Q.  And that includes Perkins Coie, others at Perkins Coie?

20    A.  Yes.  I know that other lawyers at Perkins were working,

21    you know, with the campaign.

22    Q.  You were responsible for overseeing budget items for the

23    campaign; is that right?

24    A.  Ultimately, yes.  I wasn't managing it day-to-day, but

25    ultimately.

1    Q.  And you -- so the campaign paid Perkins Coie over a

2    million dollars throughout the election cycle, right?

3    A.  I don't recall the total sum.  I just don't recall.

4    Q.  Okay.  And it paid Fusion GPS over -- around half a

5    million dollars, is that right, through Perkins Coie?

6    A.  I don't know.

7    Q.  But did you approve each and every one of the line items

8    in the campaign's budget?

9    A.  I gave Perkins Coie a budget to work with.  I did not

10   then subsequently approve the line items of how they spent

11   that budget as long as they were working within the budget.

12   Q.  And when Perkins Coie lawyers billed time to the

13   campaign, did you trust that they were reflecting actual

14   work that they did for the campaign?

15   A.  I mean, I trusted -- I had to trust Perkins implicitly

16   to be honest and professional in everything they did,

17   absolutely.

18   Q.  So you had no reason to doubt that when a Perkins Coie

19   lawyer billed to the campaign, they were doing work for the

20   campaign?

21   A.  I was never involved in overseeing Perkins's billing,

22   so -- but I presume that they were honest with us on all the

23   things they did.

24   Q.  Okay.  Right.  You assume the attorneys working for you

25   weren't committing some kind of billing fraud; that if they

1    were billing work, it was for the campaign?

2    A.  Correct.  It would be a problem if one's lawyers --

3    Q.  Got it.

4         And so, for example, you mentioned the DNC hack

5    and the hack of Mr. Podesta's emails, right?

6    A.  Uh-huh.

7    Q.  Did you give Perkins Coie discretion to address those

8    issues and formulate their legal advice?  You know, did you

9    give them discretion to do things without checking with you

10   on every moment?

11   A.  Well, the hack in the DNC is complicated because that

12   was ultimately the DNC's matter, so I -- I was certainly

13   involved in discussions of that, but my understanding would

14   be that anything pertaining to that would ultimately be at

15   the DNC's discretion.

16   Q.  Understood.  How about just the campaign?  You allowed

17   Perkins Coie to conduct work at their discretion on the

18   hacking issues, cyber issues?

19   A.  I'm not recalling -- I'm honestly not recalling any

20   legal work regarding John Podesta's emails.

21   Q.  Okay.

22   A.  So I don't -- I don't recall delegating that to them or

23   anything like that.

24   Q.  Do you recall cyber issues though?  Do you recall

25   Perkins Coie addressing -- helping the campaign address

1    cyber issues?

2    A.  I mean, I recall that there was a set of legal work

3    related to the DNC.  I just don't recall anything related to

4    our campaign.

5            And I don't know if John sort of personally

6    somehow was engaging Perkins or somebody else.  I just don't

7    recall.

8    Q.  So let me show you what's in evidence as Government's

9    Exhibit 559, Page 283.

10            Mr. Mook, you wouldn't have, I think you've

11   testified, reviewed Perkins Coie bills or time entries,

12   correct?

13   A.  I did not.

14   Q.  But looking at this document, which is in evidence --

15   and if we go to the right, does looking -- so --

16   A.  There we go.

17   Q.  What we have here, Mr. Mook, is a time entry from one of

18   Perkins Coie's lawyers, Mr. Sussmann.  And the entry --

19   could you just read the entry there?

20   A.  You mean the "Meeting with Mr. R. Mook"?

21   Q.  Yes.  The whole thing.  The whole thing.

22   A.  Sorry, so start with "Client"?

23   Q.  Start with "Meeting with Mr. Mook."

24   A.  Oh, okay.

25            "Meeting with R. Mook, M. Elias, telephone

1    conference with HFA; draft CrowdStrike MFA modification for

2    HFA; telephone conference with S. Henry; email with HFA

3    regarding CrowdStrike; follow-up communications."

4    Q.  So one of the parties of the entry there is a meeting --

5    what appears to be a meeting with you, correct, and

6    Mr. Elias?

7    A.  It seems to be a telephone conference, is what he's

8    saying there.

9            I don't -- I don't recall --

10   Q.  I'm sorry, I'm just directing --

11   A.  Okay.

12   Q.  If you look at the very first part of the entry, it

13   says, "Meeting with R. Mook, M. Elias."

14   A.  Yes.

15   Q.  So presumably there may have been a meeting between the

16   three of you?

17   A.  Maybe, yes.  I don't remember a meeting.

18   Q.  Okay.  And if we look at the other entries, it looks --

19   do you agree there are other entries listed on those lines

20   that appear to relate to different things other than the

21   meeting with you and Mr. Elias?

22   A.  I don't know.  I honestly don't know what he's -- I

23   don't know what this is, so I can't help you.

24   Q.  Okay.  So, for example, it says "Draft CrowdStrike MFA

25   and CrowdStrike MFA modification for MFA."

```
 1              Who is CrowdStrike?
 2   A.  I've heard of a cyber security firm called CrowdStrike.
 3   Q.  And did they do work for the campaign and the DNC?
 4   A.  I recall CrowdStrike doing work for the DNC.  I am not
 5   certain if they ever actually did work for HFA.
 6   Q.  Okay.
 7   A.  And I do recall a discussion about whether different
 8   firms were required.
 9   Q.  Okay.  But if Mr. Sussmann billed an entry to the
10   campaign regarding a CrowdStrike MFA, would you have any
11   reason to doubt that, in fact, he was doing work for HFA?
12   A.  I don't even know what an MFA is, so I don't --
13   Q.  Okay.
14   A.  Honestly, I don't know what this is.  I think you'd have
15   to ask someone else.  I just -- I don't know.
16   Q.  All right.  And who -- if you look in the upper left-
17   hand corner of this document, who is billed for the work?
18   A.  HFACC.  So that would be the campaign.
19   Q.  Did HFA pay its legal bills each month as far as you
20   know in your budget role?
21   A.  Again, I just didn't -- we were a huge organization.
22   This was a tiny part of what we did.  I was not dealing with
23   bills day-to-day.  I don't know the answer to that.
24   Q.  Okay.  Because --
25   A.  I think we paid our bills, but I can't -- you're asking
```

1   me questions on things I didn't touch.

2   Q.   Is that because you delegated them to others?

3   A.   Our operations team handled all invoices and billing and

4   paying.

5   Q.   Let me show you one more billing record here.  This

6   is -- I'm sorry, we'll come back to it.

7            Mr. Mook, you had described the concept of an

8   October surprise; is that correct?

9   A.   Uh-huh.

10  Q.   Can you describe that again for the jury?

11  A.   You know, it's -- again, it's a -- I think it's a bit of

12  a myth, but it's this idea that you have some piece of

13  opposition research that is so damning, and you put it out

14  very late in the campaign such that the opponent doesn't

15  have time to respond, and, you know, they'll lose the

16  election.

17  Q.   And were you aware during the -- you said you didn't

18  even meet Mr. Sussmann during the campaign period?

19  A.   I do not recall meeting him on the campaign.

20  Q.   So to the extent he was working with Mr. Elias on the

21  Alfa-Bank issue, you weren't aware of that?

22  A.   No.

23  Q.   And to the extent Mr. Sussmann may have drafted any of

24  the materials or helped draft any of the materials that went

25  to the media in connection with that issue, you weren't

1    aware of that?

2    A.   I don't recall being aware of Mr. Sussmann, of any work

3    he did with Marc Elias, anything they might have done

4    regarding the media.   I just -- I don't know, and I don't

5    recall anything related to that.

6    Q.   Okay.   And it sounds like to the extent Mr. Sussmann was

7    doing something -- may have been doing something with

8    CrowdStrike related to the campaign, which we just saw in

9    the billing entry, it sounds like, at least as of now, you

10   don't think you were aware of that?

11   A.   I recall a whole bunch of calls and meetings regarding

12   what happened with the DNC, and, you know, I was aware that

13   CrowdStrike was involved in that.   I just don't recall

14   specific conversations, meetings.   I don't recall

15   Mr. Sussmann being a part of that.

16   Q.   But is it fair to say that you let him handle his work

17   and make decisions on that?

18   A.   Mr. Elias or Mr. Sussmann?

19   Q.   Mr. Sussmann.

20   A.   Well, I didn't -- I don't recall ever knowing him so --

21   Q.   Okay.   Then it would seem you definitely did allow him

22   to do it.   In other words, he wasn't checking with you on

23   those things?

24   A.   I don't recall talking or engaging with Mr. Sussmann.

25   That is what I know.

```
1              You'd have to ask other people about what he might
2      have been doing or all that kind of stuff.  I just don't
3      know.
4      Q.  Okay.  But it looks like -- assuming his billing is
5      accurate, it looks like he was doing something for the
6      campaign related to CrowdStrike, right?
7      A.  And I can't speak to what that bill is.  I just don't
8      know.
9      Q.  Okay.  Let me show you another -- one final billing
10     entry, which is Government Exhibit 553.12.
11             Do you see in the middle of the page there,
12     Mr. Mook, there's an entry that starts "Meeting in McLean"?
13     A.  Yes.
14     Q.  First of all, who is the billing attorney on this entry,
15     as far as you can see?
16     A.  Well, is that the same as "Timekeeper Name"?
17     Q.  Yes.  Who is the timekeeper?
18     A.  Okay.  I see under the "Timekeeper Name" column header
19     M. Sussmann.
20     Q.  And could you just read the billing entry for September
21     5, 2016?
22     A.  "Meeting in McLean, VA, work on white paper, follow-up
23     telephone conferences and email."
24     Q.  So in September of 2016, fair to say from your prior
25     testimony you weren't specifically aware of these bills or
```

1   Mr. Sussmann doing this work?

2   A.  Yes.  I don't know what these are.  I was not aware of

3   him doing any work.

4   Q.  Were you aware of a concept of a white paper or papers

5   in connection with the Alfa-Bank allegations?

6   A.  I don't recall anything like that.

7   Q.  Did you have an understanding that there were materials

8   that were being given to the press on the Alfa-Bank

9   allegations?

10  A.  As I've said, what I recall is that our staff provided

11  information to the media.  I don't recall specifically what

12  it was.

13  Q.  And were you aware that Mr. -- that anyone at Perkins

14  Coie was lobbying the media to publish a story on this

15  issue?

16  A.  I was not aware of that.

17  Q.  It would have been consistent, though, with the

18  campaign's decision to provide this to the media, no?

19  A.  Well, what I know -- you know, what I recall is -- I

20  don't recall Perkins playing a role in us sharing

21  information with the media, so...

22  Q.  Okay.  But you don't know for sure one way or the other?

23  A.  I don't know what they did.

24  Q.  Okay.  And the decision was made to share --

25  A.  You know, you'd have to ask them.

1    Q.  I'm sorry.  The decision was made to share it with the

2    media?

3    A.  What I recall is that our leadership team on the

4    campaign decided to direct members of our press team to

5    share information with the media, correct.

6    Q.  Going back to the concept of an October surprise, you

7    mentioned that it's a concept where you put information out

8    to the media that isn't strong or vetted.  Is that part of

9    it?

10   A.  That's not necessarily part of it, no.

11   Q.  Describe the October surprise idea again.

12   A.  Well, the idea is that you have damning information

13   about your opponent, you give it to the media, and they run

14   with it.  And, you know, it -- again, I think it's a bit of

15   a fantasy, but this idea is that it completely changes the

16   nature of the race, and you win because the opponent didn't

17   have time to respond to it.

18   Q.  Okay.  So it's supposed to be damning information; is

19   that your testimony?

20   A.  Correct.  It's supposed to be something that is so

21   scandalous or damning that a lot of voters change their

22   minds when it comes out.

23   Q.  And was the Alfa-Bank allegation damning information

24   about Donald Trump?

25   A.  Well, it was certainly alarming and suspicious.  The

1    issue is we didn't know what that data -- what this data

2    going back and forth was.

3                MR. DeFILIPPIS:  Can we pull up the Tweet again.

4    Q.  Mr. Mook, can you determine the date of the Tweet?

5    A.  Well, it says here October 31, 2016.

6                MR. DeFILIPPIS:  Thank you.

7                THE COURT:  Mr. Bosworth?

8                          REDIRECT EXAMINATION

9    BY MR. BOSWORTH:

10   Q.  Mr. Mook, a couple of follow-up questions.

11               First, just because we ended there, can you give

12   an example of an October surprise.

13   A.  You mean one that's happened in real life?

14   Q.  Sure.

15   A.  I can't think of a time when it's happened in my career,

16   or I haven't been part of one.  I can't -- I'm sure there's

17   been some campaign where there was a late-breaking scandal,

18   and it had an effect.  I can't think of one off the top of

19   my head right now.

20   Q.  So even if you -- you're familiar with the idea of an

21   October surprise?

22   A.  Correct.

23   Q.  Okay.  What is the type of thing that you have in mind

24   when you talk about an October surprise?

25   A.  You know, again, some piece of information that's very

1    damning or very scandalous that completely, you know,

2    changes the dynamic of the race.

3    Q.  Could -- in the fall of 2016, there were a lot of

4    stories about Trump's connections to Russia, yes?

5    A.  There were stories about Trump's connections to Russia

6    starting, I think, as early as the spring.

7    Q.  Would a story about additional connections between the

8    Trump organization and the Russian bank have been the sort

9    of thing that is so damning and game-changing that it could

10   be considered an October surprise?

11   A.  This was -- I never thought of it that way on this

12   campaign.  There was a lot of information about Trump and

13   Russia.

14        I mean, Trump himself at, you know -- at a rally

15   told Russia to leak Hillary's emails.  I mean, you know,

16   there were so many pieces to the story.

17        The Republican party changed their platform to say

18   the U.S. should not give aid to Ukraine.

19        So I thought there were a lot of pretty damning

20   stories as it relates to Trump and Russia throughout this

21   campaign.  I thought this might be one of many of them.  But

22   as I've expressed, we just -- there was a lot about this

23   particular story we didn't understand.

24        I did not see it as some sort of silver bullet,

25   and I don't believe that other people in the campaign did

1    either.

2    Q.  And you were asked about this Tweet that was issued on

3    October 31st.  And it was based on the publication of an

4    article in *Slate*, correct?

5    A.  That's what it appears to be, yes.

6           MR. BOSWORTH:  Okay.  Can we pull up Government

7    Exhibit 54 in evidence.

8    Q.  So what is *Slate*, by the way?

9    A.  It's an online news outlet.

10   Q.  And in the hierarchy of media organizations, where does

11   *Slate* sit?

12   A.  I mean, it's not -- with all due respect to *Slate*, you

13   know, it's not *The New York Times*.  It's not a paper of

14   record.

15          MR. BOSWORTH:  If we turn to -- forgive me.  I

16   don't know that -- it's the fifth-to-last page.

17          Okay.  If we could just blow up the bottom of the

18   page on the left and then the top of the page on the right.

19   Q.  So this article from *Slate* is from October 31st.  Can

20   you read what's on the bottom of the page that's been blown

21   up and then the top on the right?

22   A.  That starts with "In September"?

23   Q.  "In September," yes.

24          MR. DeFILIPPIS:  Objection, Your Honor.  Can we

25   talk on the phone?

1    (The following is a bench conference

2      held outside the hearing of the jury)

3          MR. DeFILIPPIS:  Your Honor, it's not entirely

4    clear where Mr. Bosworth is going, but it seems like he

5    could be getting into the zone of using the *Slate* article to

6    try and argue that there was legitimacy to the data, which,

7    if it were Mr. Sussmann reviewing the article, could -- may

8    be permissible, but as to Mr. Mook's state of mind, I don't

9    think it's within Your Honor's order.

10         MR. BOSWORTH:  So I'm going to use this article

11   for two purposes, Your Honor, which is in evidence.

12         THE COURT:  It's in evidence, right.

13         MR. BOSWORTH:  Number one, the fact that this

14   makes reference to a *New York Times* article being pursued in

15   September, because I want to distinguish Mr. Sussmann's work

16   on that from this article and then ask Mr. Mook whether the

17   conversations he talked about with press staff, et cetera,

18   were about *The New York Times* article or the *Slate* article

19   six weeks later.

20         THE COURT:  Okay.  I'll allow that.

21         MR. BOSWORTH:  Your Honor, one other piece,

22   though.  Mr. Mook testified that -- in response to

23   questioning from Mr. DeFilippis about, "Well, did you just

24   release this article without any vetting?"  And Mr. Mook's

25   testimony was that he assumed the reporter did vetting.  I

1    want to point out that there are numerous researchers and

2    independent experts that Mr. Foer consulted in connection

3    with the article.  That's it.

4            THE COURT:  Very well.

5            (This is the end of the bench conference)

6            MR. BOSWORTH:  If we could pull those pages back

7    up.

8    BY MR. BOSWORTH:

9    Q.  So, Mr. Mook, if you could read the portion beginning

10   "In September," just those couple of sentences.

11   A.  "In September, the scientists tried to get the public to

12   pay attention to their data.  One of them posted a link to

13   the logs in a Reddit thread.  Around the same time, *The New*

14   *York Times*' Eric Lichtblau and Steven Lee Myers began

15   chasing the story. (They are still pursuing it.) Lichtblau

16   met with a Washington representative of Alfa-Bank on

17   September 21, and the bank denied having any connection to

18   Trump.  (Lichtblau told me that *Times* policy prevents him

19   from commenting on his reporting.)"

20   Q.  So my question to you is:  The conversations that you

21   talked about with staff, et cetera, in the campaign about

22   going to the press, do you know, sitting here today, whether

23   they were about any *New York Times* story being pursued in

24   September?  A *Slate* article being pursued in October?

25   Something else?  Or you're not aware?

```
1    A.  I don't recall.
2              MR. BOSWORTH:  Okay.  We can take that down.
3    Q.  You were also asked on cross-examination about the
4    vetting of information and how that relates to the media.
5    And I believe you said that you trust reporters to do extra
6    vetting?
7    A.  It's helpful for them to do it because they can go out
8    in a way -- they can run something down in a way that it's
9    very hard for our campaign to do.
10   Q.  If we could go to Page 7, for example, there's a
11   reference to -- the "Earlier this month" paragraph.  If you
12   just read the first three sentences.
13   A.  "Earlier this month, the group of computer scientists
14   passed the logs to Paul Vixie.  In the world of DNS experts,
15   there's no higher authority.  Vixie wrote central strands of
16   the DNS code that makes the Internet work.  After studying
17   the logs, he concluded, 'The parties were communicating in a
18   secretive fashion.'"
19   Q.  Let's stop there.  Thank you.
20              And I can pass this to you, too.
21              MR. BOSWORTH:  But -- actually, can we -- is there
22   a clean copy of this I can pass to Mr. Mook, of Government
23   Exhibit 54?
24   Q.  I would just ask you --
25              THE COURT:  He can have mine.
```

```
 1                    MR. BOSWORTH:  Thank you, Your Honor.
 2                    THE COURT:  34?
 3                    MR. BOSWORTH:  Yes, please.  54, 54.
 4      BY MR. BOSWORTH:
 5      Q.  And I'll flag my questions so you can flip through
 6      understanding it.
 7                    I'm going to ask whether you see in this article
 8      published on October 31, 2016, any reference to the
 9      existence of an FBI investigation into Alfa-Bank's
10      connections to the Trump organization?
11                    So if you could just flip through and see if you
12      see any reference to an FBI investigation.
13      A.  (Witness reviews document)  Sorry.  This is long.
14                    (Pause)
15      A.  I don't see the FBI mentioned in here.
16      Q.  Okay.  No reference to an investigation?
17      A.  I don't see one.
18      Q.  If the campaign knew of information and wanted to get it
19      out in the press, does it know how to do it?
20      A.  I mean, I'd like to think we were pretty capable in
21      terms of sharing things with reporters.
22      Q.  You were asked some questions about Perkins Coie and its
23      discretion.  In your understanding, did the campaign give
24      discretion to Perkins Coie to make significant decisions
25      about strategy on behalf of the campaign?
```

1    A.   I think there's a distinction -- they were our legal

2    counsel, so I obviously deferred to them highly on legal

3    advice.

4         We had retained them for research projects in

5    particular because any time you're operating overseas or

6    dealing with businesses, it's just very -- it's complex, and

7    there are legalities involved.  So we'd defer to them on

8    that.

9         Sharing something with the media is a political

10   decision, a political strategic decision.  And I definitely

11   would have expected to be engaged in a decision like that.

12   And I certainly did not delegate to Perkins Coie to do

13   politics, to do press.

14   Q.   What about a decision to go to law enforcement on behalf

15   of the campaign?

16   A.   You know, it obviously depends.  But on this I would

17   have absolutely expected to have been told and for our

18   permission to be sought to report something to law

19   enforcement about our opponent.

20   Q.   You mentioned earlier that Secretary Clinton had to

21   approve the decision to go to the press with this article.

22   Did Secretary Clinton approve any decision for Michael

23   Sussmann to go to the FBI on behalf of the campaign?

24   A.   I'm not aware of anything like that.

25   Q.   And, to your knowledge, nobody did, correct?

1    A.  I don't know of anybody doing that.  I don't know why

2    she would.

3                MR. BOSWORTH:  Okay.  Thank you.

4                THE COURT:  All right.  Mr. Mook, thank you very

5    much for your testimony.  You are excused.

6                MR. DeFILIPPIS:  Can we be heard just for a

7    moment?

8                    (The following is a bench conference

9                     held outside the hearing of the jury)

10               MR. DeFILIPPIS:  Your Honor, we think that -- I

11   would ask for permission to ask one question, which is we

12   think that Mr. Bosworth exceeded the scope -- we purposely

13   excluded from our examination the FBI piece from the Tweet

14   and elsewhere.  I propose to ask just one question of

15   whether he's aware of *The New York Times* article that did

16   mention an FBI investigation.

17               MR. BOSWORTH:  Your Honor, Eric Lichtblau will be

18   testifying.  They can ask him.

19                   I asked about an article that's in evidence in

20   response to a Tweet they offered about that article.  I

21   think that that would open up a new line of questioning that

22   we'd want to respond to, too.

23               THE COURT:  All right.  So we're going to cut him

24   off at that.  Okay?

25                   (This is the end of the bench conference)

1    THE COURT:  All right.  You're excused.  Thank you

2    very much for your testimony.  Please don't discuss your

3    testimony with anyone, except your counsel, until the case

4    is over.  Have a good day.

5    THE WITNESS:  Thank you, sir.

6    THE COURT:  All right.  Ladies and gentlemen,

7    let's take our lunch break.  It is about 12:40, so why don't

8    we -- let's try to be back like quarter till 2:00.  All

9    right?

10   Have a great lunch.  No discussions about the

11   case.  No research about the case.

12   (Jury exits courtroom)

13   THE COURT:  All right.  Please be seated.

14   Just for the record, in addition to the 403

15   grounds for the last paragraph of the press statement, it's

16   also hearsay from Mr. Sullivan for the truth -- or whether

17   it's being offered for the truth, certainly it's likely to

18   be received for the truth that the campaign wished the FBI

19   to investigate or had some hand in the FBI investigation.

20   So that section of the Tweet, consistent with the Court's

21   prior ruling, is inadmissible as hearsay as well.

22   MR. BERKOWITZ:  Thank you, Your Honor.

23   Just briefly?

24   THE COURT:  Yes.

25   MR. BERKOWITZ:  Mr. DeFilippis, I'm sure, didn't

1    intend it, but he gave him the unredacted Tweet to perhaps

2    refresh his recollection.  He read probably two sentences,

3    and we would ask that you strike from the record his reading

4    of that.

5              I know that --

6              THE COURT:  The Court will strike those two

7    sentences, and we'll specify it for the court reporter.  And

8    obviously let's make sure that the redacted copy is included

9    in the exhibits that go to the jury.

10             MR. DeFILIPPIS:  Yes, we will, Your Honor.

11             THE COURT:  All right.  So the next two still --

12   how long do you think for the next two witnesses?

13             MR. ALGOR:  Your Honor, I expect Mark Chadason to

14   be about 15 minutes on direct and Kevin P. to be about 30

15   minutes at most.

16             THE COURT:  So we should finish up in plenty of

17   time, right?

18             MR. ALGOR:  I believe so, Your Honor.

19             THE COURT:  Okay.  Have a good lunch.

20             (Recess taken at 12:40 p.m.)

21

22

23

24

25

1        <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8        Dated this 20th day of May, 2022.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'16** [1] - 1196:8
**'the** [1] - 1298:17

**/**

**/s/Lisa** [1] - 1304:10

**1**

**1** [2] - 1188:21, 1190:25
**100** [1] - 1195:17
**10020** [1] - 1166:20
**10:30** [1] - 1245:17
**11** [1] - 1220:2
**112** [1] - 1228:2
**11th** [1] - 1173:8
**1271** [1] - 1166:19
**12:40** [2] - 1302:7, 1303:20
**14** [1] - 1220:2
**145** [1] - 1166:15
**14th** [2] - 1190:19, 1191:3
**15** [5] - 1170:9, 1170:20, 1237:9, 1238:22, 1303:14
**18th** [2] - 1202:20, 1215:25
**19** [1] - 1214:8
**19th** [5] - 1170:8, 1179:16, 1181:18, 1203:5, 1217:10
**1:21-cr-00582-CRC-1** [1] - 1166:4

**2**

**2** [9] - 1171:19, 1171:20, 1174:25, 1189:2, 1189:3, 1189:25, 1210:23, 1211:3, 1211:19
**20** [5] - 1166:4, 1170:9, 1170:20, 1177:16, 1202:11
**20001** [2] - 1166:24, 1304:13
**20002** [1] - 1166:15
**2004/2005** [1] - 1184:6
**2008** [1] - 1242:17
**2015** [3] - 1243:4, 1248:12, 1251:24
**2016** [29] - 1175:7, 1179:16, 1181:14, 1197:8, 1202:20, 1213:12, 1214:8, 1217:11, 1217:19, 1218:7, 1232:3,

1233:23, 1242:1, 1242:20, 1246:2, 1248:5, 1248:13, 1251:17, 1251:19, 1252:2, 1252:19, 1253:19, 1255:5, 1256:2, 1290:21, 1290:24, 1293:5, 1294:3, 1299:8
**2017** [4] - 1174:23, 1175:3, 1231:24, 1232:16
**2018** [1] - 1229:1
**2019** [2] - 1196:7, 1197:2
**202** [1] - 1166:24
**2020** [4] - 1169:24, 1170:1, 1170:9, 1170:19
**2021** [10] - 1171:12, 1171:24, 1172:23, 1173:9, 1173:10, 1173:14, 1174:18, 1179:5, 1189:9, 1190:7
**2022** [5] - 1166:4, 1190:14, 1190:16, 1191:3, 1304:8
**20th** [1] - 1304:8
**21** [1] - 1297:17
**21-582** [1] - 1168:3
**212** [2] - 1166:16, 1166:20
**21st** [2] - 1182:18, 1182:25
**22nd** [1] - 1181:14
**23rd** [1] - 1213:12
**242** [1] - 1178:25
**243** [1] - 1172:17
**283** [1] - 1285:9
**285** [1] - 1181:10
**29** [1] - 1238:13
**2:00** [1] - 1302:8

**3**

**3** [4] - 1170:14, 1189:21, 1189:25, 1190:24
**30** [3] - 1169:21, 1172:13, 1303:14
**30,000** [1] - 1217:23
**31** [2] - 1293:5, 1299:8
**31st** [2] - 1295:3, 1295:19
**333** [2] - 1166:23, 1304:12
**34** [1] - 1299:2
**354-3187** [1] - 1166:24
**360-degree** [1] -

1176:15
**3rd** [1] - 1229:1

**4**

**4** [1] - 1188:21
**4,000** [1] - 1245:6
**403** [1] - 1302:14
**4th** [1] - 1190:18

**5**

**5** [1] - 1290:21
**50** [1] - 1245:2
**500** [1] - 1245:3
**52** [1] - 1277:13
**525** [2] - 1210:23, 1212:4
**54** [4] - 1295:7, 1298:23, 1299:3
**553.12** [1] - 1290:10
**558** [1] - 1174:21
**559** [1] - 1285:9
**57** [1] - 1228:1

**6**

**6** [1] - 1174:25
**600** [1] - 1245:3
**637-2231** [1] - 1166:16
**6718** [2] - 1166:23, 1304:12
**6th** [1] - 1175:3

**7**

**7** [1] - 1298:10
**7:30** [1] - 1245:15

**8**

**8** [1] - 1168:25
**812** [1] - 1195:25
**850** [1] - 1220:2
**8th** [3] - 1171:12, 1171:23, 1173:9

**9**

**9** [1] - 1170:14
**906-1200** [1] - 1166:20
**99.9** [1] - 1209:6
**9:10** [1] - 1166:5

**A**

**a.m** [1] - 1166:5
**abilities** [1] - 1199:24
**ability** [2] - 1185:5, 1304:7
**able** [1] - 1198:16
**about..** [1] - 1196:17

**abruptly** [1] - 1230:9
**absolutely** [16] - 1176:23, 1198:15, 1202:18, 1221:20, 1224:3, 1227:8, 1227:15, 1233:8, 1250:15, 1251:22, 1253:6, 1255:14, 1256:1, 1256:5, 1283:17, 1300:17
**academic** [1] - 1177:10
**academics** [1] - 1179:22
**access** [1] - 1201:4
**accommodated** [1] - 1238:10
**according** [1] - 1188:9
**account** [2] - 1277:17, 1280:1
**accuracy** [1] - 1206:2
**accurate** [6] - 1197:8, 1221:24, 1256:10, 1266:16, 1290:5, 1304:5
**acting** [2] - 1231:25, 1232:1
**action** [2] - 1219:20, 1220:8
**Action** [1] - 1166:3
**activities** [5] - 1195:6, 1196:18, 1196:19, 1202:7, 1209:2
**activity** [2] - 1258:23, 1258:24
**actors** [1] - 1252:12
**actual** [5] - 1172:12, 1207:19, 1218:18, 1224:24, 1283:13
**added** [3] - 1175:23, 1175:24, 1176:1
**addition** [2] - 1178:22, 1302:14
**additional** [1] - 1294:7
**address** [2] - 1284:7, 1284:25
**addressing** [1] - 1284:25
**admit** [1] - 1272:7
**admitted** [1] - 1272:13
**advice** [7] - 1262:14, 1262:22, 1264:1, 1264:5, 1282:17, 1284:8, 1300:3
**advisor** [4] - 1184:11, 1244:10, 1277:25, 1278:16
**affected** [1] - 1226:9
**affiliated** [1] - 1275:25
**affiliation** [4] -

1227:17, 1227:21, 1229:3, 1229:17
**affirmatively** [4] - 1182:2, 1225:22, 1231:18, 1265:1
**afterwards** [1] - 1179:12
**agency** [1] - 1239:25
**agenda** [1] - 1224:14
**agent** [2] - 1171:23, 1177:13
**agents** [6] - 1190:16, 1190:20, 1191:3, 1191:7, 1206:7, 1256:24
**ago** [5] - 1190:17, 1191:3, 1195:20, 1224:18, 1230:17
**agree** [2] - 1272:8, 1286:19
**agreed** [2] - 1267:16, 1274:11
**ahead** [4] - 1186:4, 1208:21, 1226:6
**aid** [1] - 1294:18
**alarm** [4] - 1191:17, 1191:21, 1191:24, 1192:3
**alarmed** [1] - 1222:5
**alarming** [3] - 1254:6, 1256:8, 1292:25
**Alfa** [24] - 1181:2, 1209:20, 1209:22, 1212:21, 1217:13, 1232:16, 1232:23, 1233:5, 1253:10, 1254:19, 1255:2, 1255:6, 1255:24, 1257:21, 1263:4, 1263:11, 1274:7, 1276:13, 1288:21, 1291:5, 1291:8, 1292:23, 1297:16, 1299:9
**Alfa-bank** [21] - 1181:2, 1209:20, 1209:22, 1212:21, 1217:13, 1232:16, 1232:23, 1233:5, 1253:10, 1254:19, 1255:6, 1255:24, 1257:21, 1263:4, 1263:11, 1274:7, 1288:21, 1291:5, 1291:8, 1292:23, 1297:16
**Alfa-Bank's** [1] - 1299:9
**Alfa-Bank/Trump** [1] - 1255:2

**ALGOR** [9] - 1166:13, 1238:24, 1239:2, 1239:5, 1239:8, 1239:18, 1239:23, 1303:13, 1303:18
**Algor** [1] - 1168:7
**align** [1] - 1247:15
**allegation** [5] - 1257:9, 1267:20, 1280:11, 1280:21, 1292:23
**allegations** [8] - 1181:3, 1218:8, 1263:4, 1264:7, 1267:25, 1274:7, 1291:5, 1291:9
**alleged** [1] - 1218:12
**alliance** [1] - 1252:3
**Allison** [2] - 1212:9, 1212:13
**Allison's** [2] - 1212:11, 1212:19
**allow** [4] - 1237:14, 1262:11, 1289:21, 1296:20
**allowed** [1] - 1237:25, 1284:16
**almost** [2] - 1215:6, 1232:5
**AMERICA** [1] - 1166:3
**America** [5] - 1168:4, 1242:5, 1242:7, 1243:3, 1278:16
**American** [3] - 1254:7, 1280:15, 1282:12
**Americas** [1] - 1166:19
**amount** [1] - 1200:19
**analysis** [1] - 1199:15
**analytical** [1] - 1256:19
**analyze** [1] - 1198:16
**Anderson** [4] - 1178:24, 1179:2, 1179:16, 1234:9
**Anderson's** [5] - 1169:16, 1178:23, 1216:11, 1234:22, 1235:19
**Andrew** [3] - 1168:5, 1185:19, 1233:11
**ANDREW** [1] - 1166:12
**Andy** [3] - 1233:17, 1233:18, 1234:5
**announced** [1] - 1243:6
**anonymous** [1] - 1214:13
**ANSWER** [1] - 1220:6
**answer** [7] - 1182:24,

1193:16, 1220:11, 1229:11, 1231:13, 1268:16, 1287:23
**answered** [1] - 1224:18
**anyway** [1] - 1214:4
**apart** [3] - 1174:1, 1230:4, 1232:5
**apologies** [1] - 1263:20
**apparent** [1] - 1217:12
**appear** [3] - 1229:1, 1277:16, 1286:20
**APPEARANCES** [1] - 1166:11
**appreciate** [2] - 1238:6, 1240:9
**approach** [4] - 1177:19, 1257:19, 1257:20, 1277:5
**approached** [4] - 1177:1, 1192:20, 1193:1, 1193:3
**appropriate** [3] - 1207:13, 1219:21, 1220:9
**approval** [4] - 1209:2, 1209:9, 1263:2, 1274:24
**approve** [4] - 1283:7, 1283:10, 1300:21, 1300:22
**approved** [5] - 1209:3, 1267:6, 1267:18, 1268:4, 1268:12
**approving** [2] - 1251:8, 1251:10
**April** [2] - 1243:4, 1248:12
**area** [4] - 1199:24, 1200:1, 1200:2, 1203:14
**areas** [2] - 1176:4, 1199:7
**argue** [2] - 1237:17, 1296:6
**argumentative** [1] - 1237:21
**Arsenault** [2] - 1168:7, 1235:9
**article** [31] - 1184:6, 1184:8, 1184:12, 1184:18, 1218:19, 1219:3, 1219:12, 1219:15, 1226:17, 1226:21, 1276:19, 1276:20, 1281:5, 1282:3, 1295:4, 1295:19, 1296:5, 1296:7, 1296:10,

1296:14, 1296:16, 1296:18, 1296:24, 1297:3, 1297:24, 1299:7, 1300:21, 1301:15, 1301:19, 1301:20
**articles** [2] - 1183:17, 1276:13
**aside** [1] - 1264:5
**aspects** [2] - 1259:9, 1264:21
**assess** [1] - 1205:6
**assessed** [1] - 1226:19
**assessment** [2] - 1199:2, 1222:22
**assigned** [1] - 1250:1
**assigning** [2] - 1210:2, 1210:3
**assist** [1] - 1250:7
**assistance** [1] - 1195:14
**assisted** [2] - 1247:6, 1250:3
**associated** [2] - 1203:2, 1254:10
**assume** [2] - 1231:14, 1283:24
**assumed** [9] - 1198:25, 1199:6, 1199:13, 1199:14, 1202:15, 1206:10, 1206:24, 1207:2, 1296:25
**assumes** [1] - 1221:11
**assuming** [1] - 1290:4
**assumption** [1] - 1199:2
**assured** [1] - 1169:1
**attempt** [1] - 1175:5
**attempted** [1] - 1226:25
**attempting** [1] - 1193:18
**attendees** [1] - 1233:15
**attention** [3] - 1227:24, 1242:1, 1297:12
**Attorney** [5] - 1195:5, 1231:25, 1232:1, 1233:5, 1233:12
**attorney** [2] - 1174:25, 1290:14
**attorney's** [1] - 1230:8
**attorneys** [1] - 1283:24
**author** [1] - 1279:20
**authored** [1] - 1279:21
**authority** [1] - 1298:15

**authorization** [1] - 1209:9
**authorize** [2] - 1255:15, 1255:19
**authorized** [5] - 1195:5, 1272:12, 1276:10, 1276:11, 1281:25
**autographed** [1] - 1187:2
**availability** [1] - 1182:23
**Avenue** [3] - 1166:19, 1166:23, 1304:12
**aware** [38] - 1183:17, 1200:11, 1201:13, 1206:18, 1209:14, 1210:14, 1215:24, 1216:10, 1216:11, 1229:16, 1234:20, 1234:21, 1235:5, 1235:12, 1240:6, 1250:8, 1254:25, 1255:4, 1258:15, 1259:23, 1259:25, 1264:6, 1272:22, 1288:17, 1288:21, 1289:1, 1289:2, 1289:10, 1289:12, 1290:25, 1291:2, 1291:4, 1291:13, 1291:16, 1297:25, 1300:24, 1301:15
**awareness** [2] - 1227:16, 1229:3
**awful** [1] - 1195:9
**awkward** [1] - 1239:13

## B

**back-to** [1] - 1245:19
**back-to-back** [1] - 1245:18
**background** [2] - 1202:5, 1207:6
**bad** [4] - 1184:24, 1184:25, 1185:2, 1218:24
**badge** [2] - 1200:8, 1201:19
**bAKER** [1] - 1167:3
**Baker** [19] - 1168:15, 1169:4, 1169:9, 1173:1, 1189:15, 1194:13, 1196:15, 1202:25, 1220:18, 1224:23, 1228:4, 1228:16, 1228:24, 1230:6, 1231:2, 1231:14, 1231:22, 1235:11, 1237:1

**BAKER** [1] - 1169:6
**bank** [7] - 1217:13, 1253:10, 1254:4, 1278:23, 1279:19, 1294:8, 1297:17
**Bank** [25] - 1178:1, 1209:20, 1209:22, 1212:21, 1232:16, 1232:23, 1233:5, 1253:10, 1254:19, 1255:6, 1255:10, 1255:24, 1256:3, 1257:10, 1257:20, 1257:21, 1263:4, 1263:11, 1274:7, 1276:14, 1288:21, 1291:5, 1291:8, 1292:23, 1297:19, 1304:6
**Bank's** [1] - 1299:9
**Bank/Trump** [1] - 1255:2
**barely** [1] - 1232:12
**based** [12] - 1180:13, 1180:15, 1187:12, 1187:14, 1214:5, 1234:8, 1234:11, 1235:2, 1239:25, 1278:23, 1279:18, 1295:3
**basic** [2] - 1205:18, 1247:5
**basis** [2] - 1211:12, 1260:19
**bat** [1] - 1214:2
**became** [4] - 1247:3, 1252:8, 1252:9
**become** [1] - 1247:18
**BEFORE** [1] - 1166:10
**began** [2] - 1247:20, 1297:14
**begin** [2] - 1243:3, 1253:1
**beginning** [1] - 1297:9
**begins** [1] - 1240:16
**behalf** [17] - 1168:13, 1193:11, 1194:3, 1216:13, 1216:14, 1216:18, 1255:9, 1255:12, 1255:16, 1255:19, 1261:20, 1261:25, 1262:3, 1275:3, 1299:25, 1300:14, 1300:23
**belief** [2] - 1221:2, 1229:15
**bells** [3] - 1191:17, 1191:21, 1192:3
**belonging** [1] - 1214:11
**bench** [10] - 1236:5,

1236:24, 1263:17,
1264:3, 1269:4,
1271:7, 1296:1,
1297:5, 1301:8,
1301:25
**BERKOWITZ** [33] -
1166:17, 1168:11,
1169:8, 1171:2,
1172:15, 1174:24,
1175:9, 1175:12,
1178:20, 1178:25,
1181:9, 1181:13,
1191:8, 1195:24,
1196:6, 1196:14,
1210:23, 1212:3,
1220:15, 1221:11,
1236:8, 1236:13,
1237:17, 1237:20,
1238:2, 1238:6,
1238:16, 1238:20,
1239:12, 1239:16,
1240:2, 1302:22,
1302:25
Berkowitz [7] -
1168:12, 1169:5,
1227:18, 1229:22,
1237:13, 1238:13,
1239:11
Berkowitz)................
................ [1] - 1167:4
**best** [10] - 1173:3,
1179:8, 1184:5,
1219:18, 1223:23,
1225:3, 1232:9,
1235:18, 1274:12,
1304:6
**better** [6] - 1184:21,
1198:16, 1242:13,
1248:21, 1250:25,
1251:2
**between** [14] -
1197:25, 1203:1,
1210:2, 1217:13,
1218:9, 1230:4,
1247:9, 1253:9,
1254:4, 1267:17,
1278:20, 1280:21,
1286:15, 1294:7
**beyond** [2] - 1245:4,
1263:23
**big** [3] - 1176:12,
1176:18, 1176:22
**big-name** [1] -
1176:22
**biggest** [1] - 1252:21
**bill** [1] - 1290:7
**Bill** [6] - 1176:5,
1176:7, 1176:14,
1234:8, 1234:9,
1234:15

**billed** [4] - 1283:12,
1283:19, 1287:9,
1287:17
**billing** [12] - 1221:7,
1221:17, 1283:21,
1283:25, 1284:1,
1288:3, 1288:5,
1289:9, 1290:4,
1290:9, 1290:14,
1290:20
**billion** [1] - 1262:16
**billion-dollar** [1] -
1262:16
**bills** [6] - 1251:8,
1285:11, 1287:19,
1287:23, 1287:25,
1290:25
**bingo** [1] - 1174:11
**bit** [7] - 1169:13,
1173:22, 1196:3,
1250:3, 1257:14,
1288:11, 1292:14
**blacked** [1] - 1215:13
**blow** [8] - 1172:18,
1174:24, 1175:12,
1181:9, 1181:11,
1196:3, 1212:1,
1295:17
**blown** [1] - 1295:20
**Boente** [3] - 1231:24,
1232:7, 1235:25
**bolster** [2] - 1267:19,
1267:24
**book** [1] - 1187:2
**Bosworth** [6] -
1168:12, 1240:24,
1263:5, 1293:7,
1296:4, 1301:12
**BOSWORTH** [25] -
1166:17, 1240:25,
1241:15, 1258:10,
1262:1, 1263:16,
1263:20, 1271:21,
1277:14, 1281:3,
1293:9, 1295:6,
1295:15, 1296:10,
1296:13, 1296:21,
1297:6, 1297:8,
1298:2, 1298:21,
1299:1, 1299:3,
1299:4, 1301:3,
1301:17
Bosworth)................
................ [2] -
1167:6, 1167:7
**bottom** [3] - 1215:22,
1295:17, 1295:20
**break** [5] - 1206:16,
1237:8, 1271:9,
1274:5, 1302:7

**breaking** [1] - 1293:17
**brief** [4] - 1233:5,
1233:12, 1240:23,
1272:18
**briefed** [6] - 1233:9,
1253:11, 1253:12,
1263:11, 1264:24,
1274:22
**briefer** [1] - 1232:11
**briefing** [6] - 1231:24,
1232:8, 1233:4,
1233:19, 1253:15,
1257:4
**briefly** [8] - 1172:20,
1178:23, 1180:20,
1203:22, 1240:2,
1242:10, 1247:7,
1302:23
**bring** [2] - 1168:15,
1189:12
**bringing** [2] - 1199:25,
1226:14
**Brittain** [1] - 1168:7
**BRITTAIN** [1] -
1166:14
**broke** [1] - 1256:22
**Brooklyn** [2] -
1244:24, 1246:7
**brought** [2] - 1174:25,
1218:13
**budget** [7] - 1243:19,
1282:22, 1283:8,
1283:9, 1283:11,
1287:20
**building** [2] - 1243:18,
1247:14
**bullet** [3] - 1177:4,
1258:3, 1294:24
**bunch** [4] - 1250:16,
1250:18, 1280:16,
1289:11
**Bureau** [1] - 1228:9
**bureau** [5] - 1177:16,
1205:21, 1226:15,
1226:16, 1233:1
**business** [4] -
1248:20, 1249:23,
1252:6, 1253:10
**businesses** [2] -
1249:25, 1300:6
**busy** [1] - 1245:13
**but..** [4] - 1176:21,
1186:19, 1211:2,
1274:19
**BY** [9] - 1169:8,
1220:17, 1241:15,
1258:12, 1264:4,
1274:3, 1293:9,
1297:8, 1299:4

# C

**Campaign** [14] -
1193:22, 1221:7,
1221:18, 1223:17,
1224:1, 1227:5,
1227:17, 1242:19,
1243:2, 1243:9,
1246:1, 1261:25,
1262:4, 1266:12
**campaign** [133] -
1203:2, 1222:3,
1222:4, 1225:7,
1242:5, 1242:13,
1242:15, 1242:17,
1242:19, 1242:21,
1243:3, 1243:7,
1243:8, 1243:15,
1243:18, 1243:20,
1244:1, 1244:7,
1244:9, 1244:16,
1244:19, 1244:23,
1245:1, 1245:3,
1245:4, 1245:8,
1245:12, 1246:6,
1247:15, 1248:5,
1248:8, 1248:10,
1248:11, 1248:18,
1249:1, 1249:5,
1249:8, 1249:9,
1250:8, 1250:13,
1250:14, 1250:20,
1250:23, 1251:9,
1251:13, 1251:20,
1253:5, 1253:22,
1254:10, 1254:24,
1255:9, 1255:13,
1255:16, 1255:18,
1255:20, 1255:22,
1256:2, 1256:20,
1256:21, 1257:9,
1257:19, 1258:4,
1258:16, 1258:19,
1259:23, 1260:1,
1260:2, 1261:20,
1262:7, 1262:12,
1262:14, 1265:1,
1265:20, 1265:25,
1266:1, 1266:7,
1266:18, 1266:24,
1267:5, 1267:22,
1272:6, 1272:11,
1275:3, 1275:8,
1275:10, 1275:25,
1276:10, 1276:11,
1276:20, 1277:2,
1277:25, 1281:7,
1281:11, 1281:15,
1281:17, 1281:21,
1282:4, 1282:7,
1282:18, 1282:21,

1282:23, 1283:1,
1283:13, 1283:14,
1283:19, 1283:20,
1284:1, 1284:16,
1284:25, 1285:4,
1287:3, 1287:10,
1287:18, 1288:14,
1288:18, 1288:19,
1289:8, 1290:6,
1292:4, 1293:17,
1294:12, 1294:21,
1294:25, 1297:21,
1298:9, 1299:18,
1299:23, 1299:25,
1300:15, 1300:23,
1302:18
**campaign's** [3] -
1246:15, 1283:8,
1291:18
**campaigns** [6] -
1242:8, 1242:11,
1242:15, 1246:25,
1248:25, 1279:25
**Candidate** [1] -
1217:22
**candidate** [9] -
1247:11, 1251:2,
1251:3, 1257:16,
1257:17, 1274:20,
1274:22, 1279:23,
1280:5
**candidate's** [1] -
1280:1
**candidates** [1] -
1242:25
**capable** [1] - 1299:20
**capacity** [1] - 1194:18
**care** [3] - 1194:12,
1250:14, 1250:15
**career** [2] - 1228:18,
1293:15
**carry** [1] - 1282:15
**Case** [1] - 1168:3
**case** [24] - 1176:12,
1204:3, 1207:9,
1209:9, 1210:4,
1212:21, 1216:3,
1216:22, 1224:19,
1232:25, 1234:9,
1237:8, 1237:9,
1238:14, 1240:16,
1240:17, 1251:2,
1268:5, 1268:13,
1272:13, 1272:17,
1302:3, 1302:11
**case-in-chief** [1] -
1240:16
**CATHERINE** [1] -
1166:18
**Catherine** [1] -

1308

**chose** [3] - 1175:20, 1176:24, 1206:4
**CHRISTOPHER** [1] - 1166:10
**CIA** [2] - 1206:12, 1206:19
**circumstances** [1] - 1172:25
**clarify** [1] - 1234:15
**classification** [1] - 1215:11
**classified** [2] - 1200:17, 1215:16
**clean** [1] - 1298:22
**clear** [13] - 1175:2, 1180:13, 1180:25, 1191:2, 1196:7, 1197:12, 1197:14, 1210:1, 1238:13, 1242:22, 1260:5, 1265:7, 1296:4
**clearance** [9] - 1200:6, 1200:7, 1200:8, 1200:11, 1201:4, 1202:4, 1202:9, 1202:11, 1204:20
**clearances** [1] - 1200:14
**cleaves** [1] - 1174:21
**client** [19] - 1177:22, 1177:24, 1179:21, 1193:12, 1193:14, 1194:4, 1208:6, 1216:14, 1216:18, 1230:18, 1230:20, 1230:24, 1231:7, 1231:19, 1234:2, 1234:3, 1234:17, 1234:22
**Client** [1] - 1285:22
**clients** [6] - 1176:4, 1178:1, 1192:9, 1193:7, 1193:17, 1230:18
**Clinton** [26] - 1175:17, 1193:21, 1217:23, 1221:7, 1221:18, 1223:17, 1224:1, 1224:19, 1227:5, 1227:17, 1243:2, 1243:9, 1246:1, 1247:18, 1248:2, 1261:25, 1262:4, 1266:12, 1267:10, 1267:15, 1267:18, 1268:4, 1268:12, 1274:6, 1300:20, 1300:22
**Clinton's** [3] - 1242:16, 1251:16,

1277:17
**close** [2] - 1177:17, 1211:16
**closed** [1] - 1238:15
**code** [2] - 1201:8, 1298:16
**Coie** [40] - 1245:24, 1246:1, 1246:15, 1248:4, 1248:6, 1249:13, 1250:2, 1250:6, 1251:5, 1251:12, 1255:1, 1258:25, 1259:8, 1259:10, 1259:14, 1260:4, 1260:8, 1260:9, 1262:7, 1262:19, 1262:20, 1263:9, 1263:10, 1275:9, 1275:18, 1282:19, 1283:1, 1283:5, 1283:9, 1283:12, 1283:18, 1284:7, 1284:17, 1284:25, 1285:11, 1291:14, 1299:22, 1299:24, 1300:12
**Coie's** [3] - 1251:8, 1260:13, 1285:18
**college** [1] - 1242:12
**COLUMBIA** [1] - 1166:1
**column** [1] - 1290:18
**Comey** [3] - 1185:16, 1256:22, 1257:3
**comfortable** [1] - 1281:19
**coming** [6] - 1191:19, 1192:10, 1193:11, 1217:9, 1223:4, 1224:6
**comment** [2] - 1281:17
**commenting** [1] - 1297:19
**Commission** [1] - 1244:9
**Committee** [6] - 1228:22, 1242:19, 1247:8, 1247:10, 1252:10, 1252:16
**committing** [1] - 1283:25
**communicate** [3] - 1218:2, 1248:21, 1250:23
**communicated** [1] - 1181:21
**communicating** [3] - 1219:4, 1278:15, 1298:17

**communications** [8] - 1185:7, 1223:21, 1244:2, 1244:13, 1244:15, 1244:22, 1246:22, 1286:3
**companies** [1] - 1176:22
**compartmented** [1] - 1201:3
**complete** [1] - 1304:6
**completely** [2] - 1292:15, 1294:1
**complex** [2] - 1250:1, 1300:6
**complicated** [3] - 1249:19, 1249:22, 1284:11
**computer** [3] - 1278:21, 1279:17, 1298:13
**Computer** [1] - 1279:15
**conceal** [1] - 1279:2
**concept** [5] - 1257:11, 1288:7, 1291:4, 1292:6, 1292:7
**concern** [9] - 1191:22, 1218:4, 1218:6, 1219:10, 1223:4, 1227:3, 1227:12, 1227:13, 1227:14
**concerned** [9] - 1192:1, 1192:6, 1221:23, 1222:1, 1222:12, 1222:14, 1224:16, 1225:7, 1252:8
**concerning** [1] - 1254:7
**concerns** [15] - 1182:10, 1182:16, 1184:21, 1185:10, 1194:23, 1198:19, 1207:12, 1207:18, 1208:7, 1208:8, 1208:11, 1210:11, 1217:17, 1224:16, 1226:23
**conclude** [1] - 1258:3
**concluded** [1] - 1298:17
**conduct** [5] - 1195:6, 1199:15, 1223:12, 1249:1, 1284:17
**conference** [13] - 1236:5, 1236:24, 1263:17, 1264:3, 1269:4, 1271:7, 1286:1, 1286:2, 1286:7, 1296:1,

1297:5, 1301:8, 1301:25
**conferences** [1] - 1290:23
**confidence** [4] - 1199:25, 1267:19, 1267:24, 1280:22
**confident** [15] - 1171:8, 1172:8, 1172:10, 1229:15, 1234:25, 1254:1, 1254:12, 1264:12, 1264:15, 1265:21, 1268:1, 1268:6, 1268:14, 1280:11, 1280:21
**confidential** [3] - 1200:18, 1200:22, 1201:1
**Confidential/SCI** [1] - 1201:7
**configured** [1] - 1214:10
**confirm** [1] - 1276:3
**confusion** [1] - 1215:2
**Congress** [1] - 1228:5
**Congressional** [1] - 1242:19
**congressional** [1] - 1227:19
**connection** [11] - 1218:23, 1224:11, 1228:8, 1229:8, 1232:15, 1249:13, 1253:7, 1288:25, 1291:5, 1297:2, 1297:17
**connections** [8] - 1197:25, 1203:1, 1217:13, 1218:9, 1294:4, 1294:5, 1294:7, 1299:10
**considered** [1] - 1294:10
**consistent** [2] - 1291:17, 1302:20
**constituent** [1] - 1258:1
**constitutes** [1] - 1304:4
**Constitution** [2] - 1166:23, 1304:12
**consultants** [2] - 1244:3, 1250:7
**consulted** [1] - 1297:2
**consulting** [1] - 1241:25
**contact** [5] - 1186:5, 1191:14, 1196:16, 1196:24, 1246:17

1168:12
**caused** [3] - 1226:22, 1256:21
**central** [1] - 1298:15
**certain** [8] - 1197:16, 1197:24, 1197:25, 1205:4, 1209:1, 1265:19, 1282:15, 1287:5
**certainly** [10] - 1176:22, 1199:10, 1240:6, 1243:22, 1244:4, 1278:25, 1284:12, 1292:25, 1300:12, 1302:17
**CERTIFICATE** [1] - 1304:1
**certify** [1] - 1304:4
**cetera** [2] - 1296:17, 1297:21
**Chadason** [4] - 1238:24, 1239:5, 1239:6, 1303:13
**chain** [1] - 1234:11
**chain-of-custody** [1] - 1234:11
**chair** [2] - 1244:1, 1244:9
**chairman** [1] - 1244:6
**chambers** [1] - 1271:24
**change** [2] - 1185:1, 1292:21
**changed** [5] - 1222:22, 1222:24, 1280:21, 1294:17
**changes** [2] - 1292:15, 1294:2
**changing** [1] - 1294:9
**channel** [1] - 1219:5
**channels** [1] - 1185:7
**characterization** [1] - 1259:4
**charge** [2] - 1243:17, 1245:8
**charged** [1] - 1251:12
**chart** [1] - 1169:14
**chasing** [1] - 1297:15
**check** [2] - 1182:19, 1262:25
**checking** [4] - 1244:11, 1262:22, 1284:9, 1289:22
**Chicago** [1] - 1212:12
**chief** [1] - 1240:16
**child** [1] - 1230:8
**choice** [4] - 1248:21, 1250:24, 1251:3, 1251:4
**chooses** [1] - 1240:21

**contained** [1] - 1197:24
**contains** [1] - 1197:18
**contaminated** [1] - 1222:21
**contemplated** [1] - 1236:14
**content** [2] - 1245:20, 1278:7
**content-wise** [1] - 1245:20
**contest** [1] - 1247:22
**context** [2] - 1239:22, 1239:24
**Continued** [2] - 1167:3, 1169:7
**continuing** [1] - 1226:5
**contours** [1] - 1247:4
**contradictory** [1] - 1231:10
**convention** [5] - 1247:20, 1247:24, 1252:22, 1252:23, 1253:1
**conversation** [14] - 1171:13, 1171:14, 1171:16, 1171:24, 1172:1, 1180:12, 1191:7, 1205:19, 1213:25, 1215:5, 1219:23, 1267:13, 1274:6, 1275:16
**conversations** [6] - 1190:23, 1224:19, 1276:5, 1289:14, 1296:17, 1297:20
**convey** [2] - 1176:7, 1176:15
**conveyed** [1] - 1177:9
**COOPER** [1] - 1166:10
**cooperating** [1] - 1195:8
**copied** [1] - 1213:15
**copy** [5] - 1173:1, 1173:2, 1277:3, 1298:22, 1303:8
**core** [1] - 1244:5
**corner** [1] - 1287:17
**corp** [1] - 1177:10
**corporations** [1] - 1176:18
**correct** [182] - 1171:5, 1171:9, 1172:22, 1174:12, 1174:14, 1174:18, 1175:15, 1175:16, 1175:21, 1175:22, 1175:23, 1176:9, 1176:18, 1176:19, 1176:25,

1177:2, 1177:13, 1177:15, 1179:22, 1180:18, 1181:3, 1181:4, 1181:6, 1181:23, 1182:3, 1182:11, 1182:24, 1183:14, 1183:25, 1184:22, 1185:10, 1185:14, 1185:20, 1185:24, 1186:2, 1186:21, 1186:22, 1187:3, 1187:6, 1187:11, 1187:13, 1187:17, 1188:16, 1190:17, 1191:12, 1191:15, 1192:14, 1192:16, 1193:12, 1193:20, 1194:4, 1194:16, 1194:25, 1195:7, 1195:10, 1195:12, 1195:13, 1196:9, 1197:9, 1197:16, 1197:20, 1198:2, 1198:7, 1198:8, 1198:20, 1198:22, 1199:1, 1199:4, 1199:7, 1199:8, 1199:12, 1199:16, 1199:18, 1199:20, 1200:6, 1202:4, 1202:14, 1202:23, 1203:3, 1203:7, 1203:8, 1203:14, 1203:20, 1204:1, 1204:5, 1204:22, 1205:4, 1205:5, 1205:25, 1206:1, 1206:4, 1206:5, 1206:9, 1207:1, 1207:7, 1207:9, 1207:14, 1207:25, 1208:18, 1208:20, 1209:10, 1209:12, 1210:12, 1210:16, 1211:10, 1211:15, 1211:20, 1212:10, 1212:14, 1212:22, 1213:2, 1213:13, 1213:16, 1214:6, 1214:21, 1215:9, 1215:17, 1216:3, 1216:8, 1216:9, 1216:18, 1217:14, 1217:17, 1217:20, 1217:23, 1218:4, 1218:10, 1218:11, 1218:14, 1219:1, 1219:10, 1219:13, 1219:19, 1225:23, 1229:18, 1229:20, 1230:20,

1233:21, 1233:24, 1235:15, 1238:19, 1242:24, 1243:1, 1243:14, 1248:3, 1258:7, 1258:9, 1258:18, 1258:20, 1258:22, 1259:2, 1261:20, 1262:10, 1264:13, 1264:17, 1265:3, 1265:5, 1265:8, 1265:12, 1265:14, 1265:16, 1267:4, 1274:8, 1274:9, 1274:17, 1275:3, 1276:10, 1276:14, 1276:21, 1277:11, 1279:24, 1281:9, 1284:2, 1285:12, 1286:5, 1288:8, 1292:5, 1292:20, 1293:22, 1295:4, 1300:25
**correctly** [1] - 1231:13
**cost** [1] - 1225:1
**Counsel** [1] - 1175:4
**counsel** [11] - 1168:6, 1179:2, 1223:1, 1223:5, 1246:5, 1246:9, 1246:12, 1271:15, 1271:18, 1300:2, 1302:3
**Counsel's** [1] - 1230:14
**COUNSEL'S** [1] - 1166:14
**counterintelligence** [1] - 1218:23
**country** [4] - 1195:17, 1200:23, 1207:4, 1245:7
**couple** [9] - 1169:25, 1188:19, 1190:17, 1191:3, 1230:16, 1237:20, 1273:16, 1293:10, 1297:10
**court** [2] - 1168:13, 1303:7
**COURT** [81] - 1166:1, 1168:9, 1168:14, 1168:18, 1168:20, 1168:22, 1189:17, 1196:11, 1212:7, 1221:13, 1236:4, 1236:7, 1236:11, 1236:22, 1236:25, 1237:5, 1237:12, 1237:19, 1237:23, 1238:3, 1238:7, 1238:11, 1238:18, 1238:21, 1239:1,

1239:3, 1239:7, 1239:10, 1239:15, 1239:21, 1240:1, 1240:8, 1240:13, 1241:2, 1241:5, 1241:9, 1241:12, 1261:14, 1262:2, 1263:19, 1264:2, 1268:10, 1268:17, 1271:8, 1271:15, 1271:18, 1271:23, 1272:1, 1272:4, 1272:20, 1272:24, 1273:3, 1273:5, 1273:9, 1273:12, 1273:14, 1273:17, 1273:20, 1273:22, 1273:24, 1277:7, 1277:15, 1279:12, 1281:4, 1293:7, 1296:12, 1296:20, 1297:4, 1298:25, 1299:2, 1301:4, 1301:23, 1302:1, 1302:6, 1302:13, 1302:24, 1303:6, 1303:11, 1303:16, 1303:19, 1304:1
**Court** [4] - 1166:22, 1166:22, 1303:6, 1304:11
**Court's** [1] - 1302:20
**Courthouse** [2] - 1166:23, 1304:11
**courtroom** [8] - 1168:21, 1195:22, 1237:11, 1240:12, 1241:7, 1271:13, 1273:23, 1302:12
**COURTROOM** [2] - 1168:2, 1271:25
**cover** [3] - 1169:15, 1178:23, 1251:16
**covered** [1] - 1180:9
**covert** [2] - 1278:22, 1279:17
**covertly** [1] - 1278:15
**crafting** [1] - 1280:8
**crazy** [1] - 1190:15
**credence** [3] - 1175:23, 1175:24, 1176:1
**credibility** [6] - 1200:2, 1202:17, 1203:24, 1204:7, 1222:23, 1224:7
**credible** [1] - 1221:25
**crime** [2] - 1195:15, 1210:9
**Criminal** [2] - 1166:3,

1168:3
**critically** [1] - 1219:1
**cross** [9] - 1169:3, 1220:20, 1225:10, 1230:13, 1236:12, 1237:16, 1238:3, 1240:22, 1298:3
**CROSS** [2] - 1169:7, 1258:11
**cross-examination** [3] - 1220:20, 1240:22, 1298:3
**CROSS-EXAMINATION** [2] - 1169:7
**cross-examined** [2] - 1225:10, 1230:13
**Crossfire** [4] - 1202:22, 1202:25, 1203:10, 1208:17
**crowdstrike** [3] - 1286:1, 1286:3, 1286:25
**CrowdStrike** [8] - 1286:24, 1287:1, 1287:2, 1287:4, 1287:10, 1289:8, 1289:13, 1290:6
**CRR** [3] - 1166:22, 1304:3, 1304:10
**culture** [1] - 1194:16
**current** [1] - 1261:24
**Curtis** [3] - 1212:9, 1212:13, 1212:19
**Curtis's** [1] - 1212:15
**custody** [1] - 1234:11
**cut** [2] - 1196:25, 1301:23
**cut-and-pasted** [1] - 1196:25
**cyber** [33] - 1176:6, 1176:8, 1176:9, 1177:1, 1177:6, 1177:18, 1179:3, 1179:22, 1183:3, 1188:4, 1188:10, 1191:9, 1192:1, 1192:8, 1192:9, 1198:6, 1199:6, 1199:10, 1205:4, 1205:7, 1205:14, 1206:9, 1206:12, 1206:13, 1206:25, 1221:3, 1227:17, 1280:13, 1280:17, 1284:18, 1284:24, 1285:1, 1287:2
**cycle** [1] - 1283:2

1310

**D**

**D.C** [1] - 1173:5
**damage** [3] - 1201:25, 1250:19, 1252:14
**damaging** [1] - 1256:21
**damning** [6] - 1288:13, 1292:12, 1292:18, 1292:21, 1292:23, 1294:1, 1294:9, 1294:19
**Dana** [3] - 1231:24, 1232:7, 1235:25
**danger** [2] - 1201:23, 1201:25
**data** [18] - 1188:7, 1197:14, 1197:18, 1197:24, 1198:25, 1199:15, 1213:21, 1252:9, 1252:19, 1264:7, 1264:8, 1264:21, 1266:23, 1268:21, 1293:1, 1296:6, 1297:12
**date** [10] - 1170:5, 1180:8, 1190:14, 1190:21, 1196:5, 1217:25, 1226:2, 1235:19, 1280:22, 1293:4
**Dated** [1] - 1304:8
**dated** [2] - 1213:12, 1235:19
**dates** [1] - 1173:12
**day-to-day** [5] - 1209:6, 1243:17, 1258:21, 1282:24, 1287:23
**days** [4] - 1230:17, 1245:14, 1245:19, 1256:21
**DC** [3] - 1166:15, 1166:24, 1304:13
**deal** [1] - 1228:9
**dealing** [5] - 1232:22, 1259:5, 1262:9, 1287:22, 1300:6
**dealings** [4] - 1248:20, 1249:23, 1252:6, 1273:2
**dealt** [5] - 1183:13, 1183:15, 1183:16, 1186:23, 1248:5
**dean** [1] - 1242:14
**Deborah** [1] - 1246:14
**December** [1] - 1179:4
**decide** [4] - 1208:23, 1266:1, 1266:24, 1269:1

**decided** [4] - 1266:3, 1272:6, 1292:4
**decision** [26] - 1182:13, 1213:10, 1213:11, 1230:24, 1231:4, 1243:23, 1243:25, 1254:13, 1266:5, 1267:2, 1267:4, 1267:6, 1267:9, 1274:11, 1274:21, 1276:9, 1291:18, 1291:24, 1292:1, 1300:10, 1300:11, 1300:14, 1300:21, 1300:22
**decisions** [9] - 1248:22, 1260:2, 1260:3, 1260:5, 1262:11, 1262:15, 1262:22, 1289:17, 1299:24
**deeply** [1] - 1194:12
**Defendant** [2] - 1166:7, 1166:17
**Defense** [3] - 1174:21, 1195:24, 1210:23
**defense** [4] - 1238:9, 1240:20, 1240:22, 1272:9
**defense's** [1] - 1240:19
**defer** [1] - 1300:7
**deferred** [1] - 1300:2
**DeFilippis** [44] - 1166:12, 1168:5, 1168:6, 1169:24, 1170:18, 1171:11, 1188:15, 1196:10, 1197:13, 1212:5, 1220:17, 1235:9, 1236:3, 1236:12, 1236:21, 1237:15, 1238:8, 1258:12, 1263:25, 1264:4, 1269:2, 1272:4, 1272:18, 1272:21, 1272:25, 1273:4, 1273:8, 1273:11, 1273:13, 1273:15, 1273:19, 1274:1, 1274:3, 1277:4, 1277:12, 1293:3, 1293:6, 1295:24, 1296:3, 1296:23, 1301:6, 1301:10, 1302:25, 1303:10
**DeFilippis)**................
..............[2] - 1167:4, 1167:6
**definitely** [9] -

1244:11, 1253:18, 1255:25, 1262:13, 1262:21, 1265:18, 1280:6, 1289:21, 1300:10
**degree** [2] - 1228:11, 1232:25
**delay** [1] - 1274:4
**delegate** [1] - 1300:12
**delegated** [7] - 1258:24, 1259:2, 1259:8, 1259:9, 1259:12, 1288:2
**delegates** [1] - 1247:23
**delegating** [1] - 1284:22
**deliberation** [1] - 1271:11
**delivered** [1] - 1197:16
**Democratic** [12] - 1228:21, 1242:18, 1242:23, 1242:25, 1247:8, 1247:10, 1247:11, 1248:1, 1252:9, 1252:16, 1252:22
**denied** [1] - 1297:17
**denominations** [1] - 1201:2
**deny** [1] - 1170:24
**Department** [7] - 1204:18, 1211:8, 1211:9, 1214:21, 1214:22, 1214:23, 1215:3
**department** [1] - 1275:17
**DEPARTMENT** [2] - 1214:9, 1214:12
**depended** [4] - 1245:1, 1246:20, 1262:17, 1262:18
**Deputies** [1] - 1180:7
**deputies** [1] - 1180:9
**deputy** [8] - 1179:2, 1227:10, 1232:1, 1233:5, 1233:11, 1233:12, 1233:20, 1241:7
**DEPUTY** [2] - 1168:2, 1271:25
**describe** [6] - 1177:12, 1246:4, 1249:16, 1277:19, 1288:10, 1292:11
**described** [6] - 1169:25, 1173:5, 1224:5, 1226:17, 1229:13, 1288:7

**destroy** [2] - 1185:6, 1216:6
**detailing** [1] - 1214:10
**details** [6] - 1171:15, 1171:25, 1185:24, 1254:21, 1259:17, 1264:20
**determine** [5] - 1205:7, 1206:25, 1222:9, 1258:4, 1293:4
**devastating** [1] - 1257:15
**developing** [1] - 1277:10
**difference** [2] - 1210:1, 1210:2
**different** [9] - 1179:19, 1180:10, 1200:14, 1201:8, 1242:11, 1247:16, 1249:20, 1286:20, 1287:7
**difficult** [1] - 1182:23
**difficulty** [1] - 1172:5
**direct** [10] - 1208:5, 1227:24, 1230:16, 1240:20, 1255:12, 1255:19, 1278:11, 1278:20, 1292:4, 1303:14
**DIRECT** [1] - 1241:14
**directing** [2] - 1242:1, 1286:10
**direction** [3] - 1181:1, 1181:6, 1247:17
**directly** [4] - 1179:3, 1186:18, 1238:23, 1277:10
**director** [10] - 1185:16, 1227:10, 1233:12, 1233:20, 1242:13, 1242:18, 1244:2, 1244:14, 1257:3
**disclosure** [1] - 1200:20
**discovered** [2] - 1190:15, 1279:3
**discretion** [10] - 1262:13, 1266:5, 1282:14, 1282:17, 1284:7, 1284:9, 1284:15, 1284:17, 1299:23, 1299:24
**discuss** [3] - 1237:2, 1243:21, 1302:2
**discussed** [8] - 1180:24, 1181:25, 1185:22, 1267:4, 1267:7, 1267:8, 1267:9, 1282:13

**discussing** [2] - 1264:25, 1267:17
**discussion** [12] - 1171:8, 1178:15, 1180:23, 1181:21, 1265:4, 1265:9, 1265:17, 1265:19, 1265:23, 1267:13, 1275:18, 1287:7
**discussions** [5] - 1188:14, 1237:8, 1244:4, 1284:13, 1302:10
**dismissed** [1] - 1237:1
**disrespect** [1] - 1198:14
**dissemination** [1] - 1268:5
**distinction** [1] - 1300:1
**distinguish** [1] - 1296:15
**DISTRICT** [3] - 1166:1, 1166:1, 1166:10
**DNC** [20] - 1175:17, 1217:5, 1217:20, 1227:4, 1227:17, 1227:21, 1229:4, 1229:9, 1229:17, 1247:4, 1247:7, 1252:17, 1253:3, 1284:4, 1284:11, 1285:3, 1287:3, 1287:4, 1289:12
**DNC's** [2] - 1284:12, 1284:15
**DNS** [2] - 1298:14, 1298:16
**document** [27] - 1171:21, 1180:5, 1180:14, 1180:15, 1189:1, 1189:3, 1189:4, 1189:14, 1189:19, 1190:1, 1190:2, 1191:1, 1191:6, 1210:15, 1211:16, 1211:20, 1213:15, 1213:23, 1214:3, 1214:5, 1214:25, 1215:19, 1228:3, 1234:12, 1285:14, 1287:17, 1299:13
**documents** [5] - 1216:15, 1216:20, 1216:23, 1217:4, 1229:13
**DOJ** [1] - 1202:16
**dollar** [1] - 1262:16
**dollars** [2] - 1283:2,

1283:5
**domestic** [1] - 1250:4
**Donald** [6] - 1249:18,
1251:18, 1256:22,
1257:24, 1278:20,
1292:24
**done** [14] - 1188:25,
1189:20, 1189:22,
1208:20, 1208:22,
1209:3, 1233:18,
1237:21, 1249:20,
1262:7, 1267:19,
1267:21, 1267:24,
1289:3
**double** [2] - 1244:11,
1262:22
**double-checking** [2] -
1244:11, 1262:22
**doubt** [2] - 1283:18,
1287:11
**doubts** [1] - 1226:22
**down** [20] - 1170:3,
1171:2, 1175:9,
1178:21, 1185:4,
1185:6, 1191:8,
1206:16, 1212:17,
1222:18, 1226:16,
1226:20, 1237:23,
1266:4, 1266:16,
1266:19, 1268:19,
1271:15, 1298:2,
1298:8
**dozen** [1] - 1249:12
**Draft** [1] - 1286:24
**draft** [2] - 1232:10,
1286:1, 1288:24
**Drafted** [1] - 1212:13
**drafted** [8] - 1212:16,
1221:6, 1221:17,
1223:22, 1224:1,
1280:5, 1288:23
**drafting** [2] - 1220:23,
1221:1
**drag** [1] - 1222:2
**drive** [2] - 1190:9,
1197:18
**drives** [5] - 1197:16,
1221:3, 1224:24,
1225:2, 1225:5
**drop** [3] - 1252:23,
1252:24, 1257:16
**due** [1] - 1295:12
**Durham** [5] - 1168:8,
1169:23, 1170:19,
1171:12, 1188:15
**Durham's** [1] - 1175:5
**during** [10] - 1220:3,
1223:20, 1245:1,
1248:5, 1248:11,
1250:8, 1254:24,

1258:16, 1288:17,
1288:18
**duties** [1] - 1243:15
**dynamic** [1] - 1294:2

**E**

**earliest** [1] - 1253:20
**early** [3] - 1240:5,
1240:7, 1294:6
**EC** [2] - 1216:21
**EDGAR** [1] - 1166:13
**effect** [4] - 1191:25,
1221:10, 1252:4,
1293:18
**effective** [1] - 1256:12
**effort** [5] - 1218:1,
1222:2, 1222:6,
1255:23, 1275:11
**efforts** [2] - 1244:22,
1247:6
**either** [8] - 1178:14,
1188:13, 1191:24,
1208:4, 1215:15,
1238:21, 1267:5,
1295:1
**elaborate** [1] -
1237:13
**elect** [1] - 1248:2
**Election** [1] - 1244:9
**election** [14] - 1242:1,
1242:2, 1243:13,
1248:12, 1248:22,
1250:24, 1251:17,
1257:4, 1257:18,
1266:11, 1274:16,
1283:2, 1288:16
**electronic** [1] -
1197:18
**electronically** [1] -
1196:17
**Elias** [17] - 1246:18,
1246:19, 1246:24,
1248:5, 1253:16,
1262:9, 1262:11,
1263:9, 1263:12,
1282:15, 1285:25,
1286:6, 1286:13,
1286:21, 1288:20,
1289:3, 1289:18
**elicit** [1] - 1239:18
**elsewhere** [1] -
1301:14
**email** [4] - 1181:10,
1214:10, 1286:2,
1290:23
**emails** [8] - 1217:20,
1217:23, 1252:15,
1256:24, 1257:1,
1284:5, 1284:20,

1294:15
**emergency** [1] -
1230:8
**employed** [1] - 1249:8
**employee** [1] -
1195:11
**employees** [2] -
1249:9, 1249:12
**end** [10] - 1205:19,
1236:24, 1237:3,
1240:7, 1243:11,
1245:3, 1264:3,
1271:7, 1297:5,
1301:25
**ended** [2] - 1230:9,
1293:11
**enforcement** [2] -
1300:14, 1300:19
**engage** [5] - 1250:6,
1255:23, 1256:3,
1257:7, 1261:18
**engaged** [6] - 1223:16,
1251:10, 1260:9,
1260:10, 1261:6,
1300:11
**engagement** [1] -
1263:3
**engages** [1] - 1250:13
**engaging** [4] - 1250:9,
1277:10, 1285:6,
1289:24
**engineer** [1] - 1222:7
**enters** [3] - 1168:21,
1240:12, 1273:23
**entirely** [1] - 1296:3
**entities** [1] - 1191:10
**entity** [1] - 1223:8
**entries** [3] - 1285:11,
1286:18, 1286:19
**entry** [11] - 1285:17,
1285:18, 1285:19,
1286:4, 1286:12,
1287:9, 1289:9,
1290:10, 1290:12,
1290:14, 1290:20
**Eric** [5] - 1183:11,
1185:22, 1186:18,
1297:14, 1301:17
**error** [1] - 1211:20
**especially** [2] -
1196:19, 1210:11
**ESQ** [8] - 1166:12,
1166:13, 1166:13,
1166:14, 1166:17,
1166:17, 1166:18,
1166:18
**essentially** [1] -
1274:23
**et** [2] - 1296:17,
1297:21

**etc** [1] - 1175:17
**evaluation** [1] -
1235:23
**evening** [1] - 1168:24
**event** [1] - 1276:9
**events** [3] - 1184:17,
1235:23, 1274:25
**eventually** [2] -
1184:14, 1184:16
**evidence** [16] - 1185:6,
1196:2, 1196:6,
1207:17, 1207:19,
1211:23, 1212:4,
1221:12, 1238:14,
1272:13, 1285:8,
1285:14, 1295:7,
1296:11, 1296:12,
1301:19
**evident** [1] - 1239:25,
1252:9
**evidentiary** [2] -
1271:10, 1272:16
**exact** [4] - 1190:5,
1217:24, 1226:2,
1274:25
**exactly** [9] - 1174:11,
1185:7, 1210:13,
1219:22, 1227:20,
1232:18, 1253:21,
1263:5, 1275:5
**examination** [2] -
1169:4, 1192:2,
1208:5, 1220:20,
1240:21, 1240:22,
1298:3, 1301:13
**EXAMINATION** [5] -
1169:7, 1220:16,
1241:14, 1258:11,
1293:8
**examined** [2] -
1225:10, 1230:13
**example** [5] - 1210:10,
1284:4, 1286:24,
1293:12, 1298:10
**exceeded** [2] -
1237:14, 1301:12
**except** [2] - 1280:23,
1302:3
**exclude** [1] - 1264:1
**excluded** [1] - 1301:13
**excuse** [3] - 1178:18,
1180:5, 1224:21
**excused** [2] - 1301:5,
1302:1
**Exhibit** [13] - 1172:17,
1174:21, 1178:25,
1181:10, 1195:25,
1210:23, 1212:4,
1228:1, 1277:13,
1285:9, 1290:10,

1295:7, 1298:23
**exhibit** [1] - 1212:6
**exhibits** [2] - 1210:21,
1303:9
**exist** [1] - 1252:4
**existence** [1] - 1299:9
**exists** [1] - 1260:25
**exits** [3] - 1237:11,
1271:13, 1302:12
**expect** [1] - 1303:13
**expected** [4] -
1187:12, 1255:25,
1300:11, 1300:17
**experience** [3] -
1204:16, 1239:25,
1249:4
**expert** [2] - 1278:4,
1280:13
**expertise** [4] -
1264:10, 1264:23,
1266:21, 1268:20
**experts** [19] - 1183:3,
1188:4, 1191:9,
1192:1, 1198:6,
1199:6, 1199:10,
1205:4, 1205:7,
1205:14, 1206:9,
1206:13, 1206:25,
1221:4, 1264:15,
1268:20, 1280:16,
1297:2, 1298:14
**explain** [9] - 1176:3,
1200:16, 1205:17,
1238:12, 1239:16,
1268:10, 1268:17
**explained** [2] -
1221:22, 1240:15
**expressed** [1] -
1294:22
**expressly** [1] - 1231:6
**extensive** [1] - 1252:6
**extent** [8] - 1219:4,
1226:24, 1232:10,
1239:20, 1264:6,
1288:20, 1288:23,
1289:6
**external** [1] - 1244:15
**extra** [2] - 1199:24,
1298:5
**extremely** [2] -
1200:24, 1201:24

**F**

**facing** [1] - 1250:24
**fact** [25] - 1180:20,
1183:23, 1187:14,
1191:19, 1198:18,
1205:13, 1211:12,
1218:1, 1218:7,

1312

1218:15, 1219:15,
1222:10, 1224:11,
1225:17, 1229:1,
1229:23, 1249:6,
1257:24, 1259:22,
1264:14, 1266:11,
1268:24, 1276:19,
1287:11, 1296:13
**factor** [1] - 1231:3
**factored** [1] - 1230:24
**facts** [1] - 1221:11
**fair** [22] - 1172:11,
1179:14, 1179:17,
1182:7, 1193:20,
1195:8, 1209:23,
1233:4, 1235:6,
1238:4, 1240:1,
1245:22, 1246:16,
1258:23, 1259:4,
1259:15, 1262:20,
1263:24, 1280:10,
1282:7, 1289:16,
1290:24
**fairly** [1] - 1265:19
**fall** [4] - 1259:3,
1274:14, 1274:16,
1294:3
**false** [1] - 1250:14
**familiar** [8] - 1212:19,
1223:10, 1223:12,
1245:24, 1248:9,
1248:15, 1257:11,
1293:20
**fantasy** [1] - 1292:15
**far** [3] - 1238:4,
1287:19, 1290:15
**fashion** [2] - 1222:4,
1298:18
**favorable** [1] -
1251:25
**FBI** [90] - 1171:22,
1173:4, 1175:4,
1181:1, 1181:20,
1183:24, 1184:10,
1184:20, 1184:25,
1185:5, 1185:8,
1185:17, 1186:20,
1187:16, 1192:4,
1194:3, 1194:12,
1194:16, 1194:24,
1195:6, 1195:9,
1195:11, 1196:16,
1196:22, 1197:1,
1198:19, 1201:15,
1203:25, 1206:24,
1207:3, 1207:20,
1207:23, 1208:2,
1208:7, 1208:23,
1210:6, 1210:7,
1211:6, 1211:9,

1213:18, 1214:8,
1214:12, 1215:6,
1216:1, 1216:12,
1216:15, 1216:20,
1216:24, 1216:25,
1217:4, 1218:7,
1218:20, 1218:22,
1219:6, 1222:2,
1222:7, 1222:10,
1222:13, 1222:20,
1222:25, 1223:2,
1224:13, 1224:20,
1225:15, 1226:1,
1226:25, 1227:9,
1255:4, 1255:9,
1255:12, 1255:15,
1255:19, 1255:23,
1256:3, 1256:12,
1256:17, 1256:24,
1257:2, 1272:12,
1273:2, 1299:9,
1299:12, 1299:15,
1300:23, 1301:13,
1301:16, 1302:18,
1302:19
**FBI's** [3] - 1187:9,
1197:12, 1202:25
**fbi.gov** [1] - 1196:24
**FEC** [1] - 1243:7
**federal** [1] - 1201:21
**Federal** [1] - 1244:9
**federation** [1] - 1218:9
**felt** [4] - 1172:8,
1172:9, 1175:23,
1279:1
**few** [1] - 1246:20
**field** [1] - 1242:12
**fifth** [1] - 1295:16
**fifth-to-last** [1] -
1295:16
**figure** [1] - 1173:7
**file** [7] - 1180:21,
1209:20, 1209:21,
1210:2, 1210:9,
1210:15, 1216:3
**filed** [3] - 1243:7,
1249:21
**files** [2] - 1222:20,
1222:21
**fill** [1] - 1202:5
**final** [2] - 1274:24,
1290:9
**finally** [2] - 1183:8,
1224:23
**finances** [1] - 1243:19
**fine** [5] - 1168:19,
1239:10, 1239:13,
1246:14, 1279:12
**finish** [2] - 1240:4,
1240:7, 1303:16

**firm** [5] - 1245:24,
1246:5, 1248:9,
1260:18, 1287:2
**firms** [1] - 1287:8
**first** [36] - 1170:2,
1170:6, 1173:14,
1173:19, 1174:1,
1178:17, 1179:6,
1182:12, 1183:7,
1189:6, 1195:22,
1195:23, 1196:12,
1196:14, 1204:4,
1210:24, 1211:22,
1211:24, 1214:3,
1215:12, 1225:25,
1238:25, 1241:18,
1245:15, 1252:17,
1252:18, 1253:12,
1256:8, 1263:10,
1263:11, 1281:23,
1286:12, 1290:14,
1293:11, 1298:12
**five** [4] - 1236:9,
1236:18, 1271:9,
1272:2
**five-minute** [1] -
1271:9
**flag** [1] - 1299:5
**flagbearer** [1] -
1194:19
**flee** [1] - 1185:6
**flip** [2] - 1299:5,
1299:11
**flipped** [2] - 1198:10,
1240:20
**flushed** [1] - 1232:24
**focus** [2] - 1250:11,
1253:9
**focused** [4] - 1229:22,
1251:20, 1251:21,
1258:5
**Foer** [1] - 1297:2
**folks** [5] - 1177:12,
1228:5, 1235:25,
1243:24, 1281:16
**follow** [5] - 1205:20,
1276:5, 1286:3,
1290:22, 1293:10
**follow-up** [5] -
1205:20, 1276:5,
1286:3, 1290:22,
1293:10
**following** [6] - 1236:5,
1263:17, 1269:4,
1278:17, 1296:1,
1301:8
**FOR** [1] - 1166:1
**forced** [1] - 1184:17
**foregoing** [1] - 1304:4
**foreign** [2] - 1196:20

**forgive** [1] - 1295:15
**form** [2] - 1181:16,
1200:12
**formally** [1] - 1243:6
**forms** [1] - 1202:6
**formulate** [1] - 1284:8
**forth** [2] - 1195:2,
1293:2
**forward** [1] - 1209:5
**foundation** [3] -
1175:17, 1272:5,
1272:17
**four** [1] - 1170:15
**frame** [1] - 1226:2
**frankly** [4] - 1232:22,
1251:21, 1252:5,
1279:25
**fraud** [1] - 1283:25
**free** [1] - 1241:9
**Friday** [2] - 1166:4,
1168:9
**friends** [1] - 1228:15
**Fritsch** [1] - 1261:10
**front** [1] - 1210:10
**frustrate** [1] - 1185:5
**full** [5] - 1202:5,
1207:5, 1214:2,
1249:12, 1304:5
**full-time** [1] - 1249:12
**functions** [2] -
1246:11, 1280:19
**Fusion** [18] - 1223:8,
1223:10, 1223:21,
1223:25, 1224:17,
1248:9, 1248:13,
1258:16, 1259:15,
1259:19, 1260:7,
1260:10, 1260:21,
1261:6, 1261:23,
1261:24, 1262:3,
1283:4
**future** [1] - 1248:24

## G

**game** [3] - 1215:6,
1263:24, 1294:9
**game-changing** [1] -
1294:9
**gather** [2] - 1250:21,
1264:20
**Gauhar's** [1] - 1174:22
**General** [4] - 1231:25,
1232:1, 1233:5,
1233:12
**general** [6] - 1179:2,
1223:1, 1223:5,
1246:5, 1246:12,
1253:7
**General's** [1] - 1195:5

**generally** [5] - 1209:6,
1223:10, 1223:11,
1228:19, 1228:20
**generated** [1] -
1216:24
**gentlemen** [5] -
1237:7, 1240:14,
1271:8, 1273:25,
1302:6
**given** [14] - 1188:4,
1188:11, 1202:1,
1232:20, 1233:14,
1233:17, 1237:21,
1245:22, 1267:1,
1273:9, 1274:23,
1279:1, 1282:14,
1291:8
**glad** [1] - 1196:14
**Glenn** [1] - 1261:8
**goal** [1] - 1248:1
**govern** [1] - 1195:5
**government** [17] -
1168:6, 1172:21,
1174:17, 1184:7,
1189:8, 1190:8,
1190:17, 1201:5,
1201:22, 1202:3,
1210:14, 1212:6,
1230:7, 1238:15,
1240:21, 1252:12,
1277:12
**Government** [8] -
1178:25, 1181:9,
1212:4, 1228:1,
1277:13, 1290:10,
1295:6, 1298:22
**Government's** [2] -
1172:17, 1285:8
**government's** [3] -
1238:14, 1240:16,
1240:17
**governor** [1] - 1242:20
**GPS** [15] - 1223:8,
1223:10, 1223:22,
1223:25, 1224:17,
1248:9, 1248:13,
1258:16, 1259:15,
1260:7, 1260:21,
1261:6, 1261:24,
1262:3, 1283:4
**GPS's** [2] - 1259:19,
1261:4
**graduate** [1] - 1241:25
**graduated** [1] -
1242:12
**grave** [1] - 1200:24,
1201:23, 1201:24
**great** [4] - 1226:22,
1273:20, 1274:19,
1302:10

**greatly** [2] - 1221:23, 1222:12
**ground** [1] - 1239:3
**grounds** [1] - 1302:15
**group** [2] - 1179:22, 1298:13
**guess** [9] - 1182:8, 1191:21, 1193:16, 1207:16, 1215:20, 1235:4, 1249:11, 1260:5, 1275:13
**guessing** [2] - 1180:13, 1180:15
**guidelines** [1] - 1195:5
**guy** [2] - 1187:1, 1204:14
**guys** [5] - 1184:24, 1184:25, 1185:2, 1218:24, 1266:18

## H

**hack** [9] - 1176:6, 1176:12, 1227:22, 1228:9, 1228:10, 1252:17, 1284:4, 1284:5, 1284:11
**hacked** [1] - 1217:20
**hacking** [1] - 1284:18
**hacks** [1] - 1259:6
**half** [3] - 1173:14, 1198:3, 1283:4
**half-inch** [1] - 1198:3
**hand** [3] - 1241:6, 1287:17, 1302:19
**handed** [1] - 1224:2
**handle** [2] - 1224:22, 1289:16
**handled** [1] - 1288:3
**happy** [3] - 1168:9, 1209:21, 1240:6
**hard** [4] - 1195:9, 1261:1, 1280:12, 1298:9
**harder** [1] - 1219:6
**HARDWICK** [1] - 1166:18
**harm** [4] - 1200:19, 1200:22, 1200:24
**hate** [1] - 1240:3
**head** [1] - 1293:19
**header** [1] - 1290:18
**headquarters** [8] - 1173:4, 1201:15, 1213:18, 1244:23, 1245:5, 1246:8, 1249:12, 1276:2
**heads** [5] - 1185:9, 1218:20, 1219:9, 1219:12, 1255:5

**heads-up** [1] - 1255:5
**hear** [4] - 1201:10, 1225:5, 1240:18, 1263:19
**heard** [4] - 1217:8, 1232:23, 1287:2, 1301:6
**hearing** [6] - 1228:8, 1236:6, 1263:18, 1269:5, 1296:2, 1301:9
**hearsay** [2] - 1302:16, 1302:21
**heavily** [3] - 1230:24, 1231:4, 1246:25
**height** [1] - 1266:11
**HELD** [1] - 1166:10
**held** [5] - 1236:6, 1263:18, 1269:5, 1296:2, 1301:9
**help** [5] - 1173:8, 1225:15, 1226:15, 1226:16, 1286:23
**helped** [1] - 1288:24
**helpful** [4] - 1185:8, 1185:11, 1190:13, 1298:7
**helping** [4] - 1195:15, 1244:11, 1250:3, 1284:25
**Henry** [1] - 1286:2
**hereby** [1] - 1304:3
**HFA** [6] - 1286:1, 1286:2, 1287:5, 1287:11, 1287:19
**HFACC** [1] - 1287:18
**hidden** [1] - 1181:2
**hide** [2] - 1185:3, 1279:1
**Hiede** [2] - 1212:9, 1212:14
**hierarchy** [1] - 1295:10
**high** [3] - 1199:23, 1200:5, 1218:15
**high-level** [1] - 1200:5
**higher** [3] - 1200:11, 1223:4, 1298:15
**highest** [3] - 1201:14, 1265:25, 1267:5
**highly** [4] - 1171:7, 1278:3, 1282:10, 1300:2
**Hillary** [13] - 1224:18, 1242:5, 1242:7, 1242:16, 1243:2, 1243:3, 1248:2, 1251:16, 1252:14, 1256:24, 1267:8, 1277:17, 1278:16

**Hillary's** [2] - 1242:20, 1294:15
**himself** [2] - 1220:23, 1294:14
**hindsight** [1] - 1203:19
**hire** [1] - 1250:16
**hired** [1] - 1262:21
**hit** [5] - 1172:12, 1172:13, 1194:7, 1194:9
**hold** [9] - 1182:2, 1182:14, 1183:24, 1184:12, 1187:5, 1187:13, 1266:8, 1266:9, 1266:13
**Hold** [1] - 1203:9
**holders** [1] - 1263:23
**honest** [3] - 1256:16, 1283:16, 1283:22
**honestly** [8] - 1232:24, 1253:14, 1263:8, 1274:14, 1275:1, 1284:19, 1286:22, 1287:14
**Honor** [40] - 1168:2, 1168:5, 1168:11, 1168:17, 1196:10, 1212:5, 1221:12, 1236:8, 1236:9, 1236:21, 1237:4, 1238:6, 1238:8, 1238:10, 1238:20, 1238:24, 1240:25, 1263:20, 1263:25, 1268:9, 1269:2, 1271:20, 1271:21, 1272:18, 1273:11, 1273:15, 1273:19, 1277:4, 1277:12, 1295:24, 1296:3, 1296:11, 1296:21, 1299:1, 1301:10, 1301:17, 1302:22, 1303:10, 1303:13, 1303:18
**Honor's** [1] - 1296:9
**HONORABLE** [1] - 1166:10
**hope** [3] - 1168:23, 1182:23, 1266:15
**hopefully** [1] - 1169:12
**hotline** [1] - 1278:24
**house** [3] - 1190:20, 1246:9, 1246:12
**House** [2] - 1184:9, 1184:11
**Howard** [1] - 1242:14
**HR** [1] - 1247:5

**huge** [1] - 1287:21
**Hurricane** [4] - 1202:23, 1202:25, 1203:10, 1208:17
**hypotheticals** [1] - 1236:14

## I

**I'm..** [1] - 1268:9
**ID** [1] - 1212:21
**idea** [8] - 1195:14, 1257:14, 1265:20, 1288:12, 1292:11, 1292:12, 1292:15, 1293:20
**identification** [1] - 1210:24
**identified** [3] - 1178:2, 1178:12, 1230:22
**identify** [1] - 1176:24
**identity** [2] - 1181:2, 1230:20
**immediate** [2] - 1174:10, 1174:15
**immediately** [2] - 1173:20, 1210:8
**impacting** [1] - 1227:6
**impeachment** [1] - 1273:1
**implications** [2] - 1208:7, 1238:14
**implicitly** [1] - 1283:15
**implied** [1] - 1268:23
**importance** [1] - 1232:21
**important** [9] - 1171:3, 1194:16, 1203:25, 1210:5, 1210:6, 1219:1, 1226:19, 1236:20, 1243:23
**IN** [1] - 1166:1
**in-house** [2] - 1246:9, 1246:12
**inadmissible** [1] - 1302:21
**inch** [1] - 1198:3
**included** [3] - 1202:19, 1244:20, 1303:8
**includes** [1] - 1282:19
**including** [3] - 1227:9, 1236:15, 1244:21
**incorrect** [2] - 1211:13, 1214:20
**incredibly** [5] - 1249:19, 1249:25, 1252:1, 1252:4, 1254:6
**independent** [2] - 1179:14, 1297:2

**indicate** [2] - 1248:22, 1248:23
**indicated** [5] - 1176:7, 1211:7, 1217:10, 1227:20, 1230:1
**individuals** [1] - 1203:2
**inflected** [1] - 1200:19
**inflicting** [1] - 1252:13
**influenced** [1] - 1208:12
**information** [92] - 1183:3, 1186:1, 1188:11, 1188:16, 1189:9, 1191:5, 1191:11, 1191:19, 1191:23, 1194:15, 1194:24, 1195:4, 1195:11, 1196:17, 1200:17, 1200:21, 1201:3, 1201:7, 1201:22, 1202:21, 1203:6, 1203:25, 1204:3, 1205:3, 1205:8, 1205:14, 1205:19, 1205:23, 1206:3, 1206:4, 1206:8, 1207:11, 1207:24, 1208:8, 1208:13, 1208:14, 1208:15, 1213:21, 1214:9, 1214:23, 1215:16, 1216:24, 1217:11, 1220:7, 1222:23, 1222:25, 1224:8, 1224:9, 1224:12, 1227:12, 1232:23, 1234:7, 1234:16, 1250:16, 1253:2, 1253:23, 1254:4, 1254:11, 1256:8, 1256:11, 1256:13, 1256:14, 1256:25, 1257:23, 1258:1, 1258:2, 1263:14, 1264:9, 1265:21, 1266:19, 1268:21, 1269:1, 1281:8, 1281:9, 1281:10, 1281:14, 1281:16, 1281:22, 1282:1, 1282:4, 1291:11, 1291:21, 1292:5, 1292:7, 1292:12, 1292:18, 1292:23, 1293:25, 1294:12, 1298:4, 1299:18
**informed** [3] - 1186:10, 1188:6,

1188:7
**ingested** [1] - 1222:20
**institution** [1] - 1194:12
**instructed** [1] - 1215:14
**integrating** [1] - 1247:21
**intend** [2] - 1257:20, 1303:1
**interact** [3] - 1228:11, 1246:19, 1248:6
**interacting** [1] - 1248:8
**interactions** [2] - 1175:6, 1218:12
**internally** [1] - 1181:20
**international** [4] - 1232:21, 1249:23, 1250:2, 1259:9
**internationally** [1] - 1249:25
**Internet** [1] - 1298:16
**interview** [5] - 1170:12, 1171:19, 1171:22, 1189:15, 1230:21
**interviews** [1] - 1202:6
**intimate** [1] - 1225:1
**introduced** [1] - 1196:12
**intuit** [2] - 1193:6, 1193:8
**investigate** [3] - 1187:19, 1218:22, 1302:19
**investigating** [11] - 1181:2, 1184:24, 1184:25, 1187:9, 1187:17, 1187:21, 1210:7, 1218:8, 1222:7, 1222:11, 1228:9
**investigation** [18] - 1187:23, 1202:5, 1203:1, 1208:23, 1209:4, 1209:10, 1209:15, 1211:13, 1213:24, 1214:2, 1232:17, 1256:25, 1299:9, 1299:12, 1299:16, 1301:16, 1302:19
**investigations** [2] - 1209:8, 1256:23
**investigative** [6] - 1180:21, 1195:6, 1202:7, 1209:2, 1213:4, 1222:20

**Investigative** [1] - 1212:24
**investigator** [1] - 1177:14
**invited** [2] - 1217:22, 1257:3
**invoices** [2] - 1251:11, 1288:3
**involve** [1] - 1196:19
**involved** [14] - 1202:23, 1208:18, 1213:5, 1228:10, 1243:24, 1244:4, 1249:9, 1267:6, 1267:7, 1280:7, 1283:21, 1284:13, 1289:13, 1300:7
**involvement** [3] - 1183:18, 1228:21, 1251:7
**issue** [20] - 1192:4, 1215:6, 1225:11, 1234:17, 1253:24, 1254:18, 1255:10, 1255:23, 1256:4, 1257:10, 1263:11, 1264:22, 1271:10, 1272:6, 1276:14, 1278:1, 1288:21, 1288:25, 1291:15, 1293:1
**issued** [3] - 1276:20, 1277:2, 1295:2
**issues** [17] - 1183:14, 1183:21, 1230:11, 1236:10, 1236:19, 1240:18, 1245:22, 1246:23, 1247:5, 1250:5, 1258:5, 1259:6, 1284:8, 1284:18, 1284:24, 1285:1
**items** [3] - 1282:22, 1283:7, 1283:10
**itself** [1] - 1219:15
**IV** [1] - 1166:13

## J

**Jake** [7] - 1244:2, 1244:17, 1253:16, 1277:22, 1277:23, 1277:24, 1278:16
**Jake's** [1] - 1278:3
**JAMES** [2] - 1167:3, 1169:6
**James** [1] - 1256:22
**JB17** [1] - 1190:24
**JB7** [1] - 1170:14
**JB9** [2] - 1171:19,

1188:21
**Jen** [3] - 1244:2, 1244:13, 1253:16
**Jim** [2] - 1185:16, 1196:15
**job** [7] - 1185:5, 1186:24, 1195:9, 1207:24, 1219:6, 1243:20, 1281:15
**Joffe** [1] - 1193:25
**jog** [1] - 1230:6
**John** [8] - 1168:8, 1242:14, 1244:1, 1252:10, 1253:16, 1267:7, 1284:20, 1285:5
**Johnny** [1] - 1168:7
**joined** [1] - 1248:12
**joked** [1] - 1187:2
**Jonathan** [1] - 1213:15
**JONATHAN** [1] - 1166:13
**journalists** [1] - 1279:3
**Judge** [1] - 1236:14
**judge** [3] - 1215:14, 1238:16, 1264:23
**JUDGE** [1] - 1166:10
**judgment** [3] - 1227:6, 1262:17, 1262:18
**judicious** [1] - 1236:19
**July** [3] - 1247:25, 1252:22
**jump** [1] - 1251:5
**jumping** [1] - 1243:2
**June** [14] - 1170:19, 1171:12, 1171:23, 1172:22, 1173:8, 1173:9, 1173:10, 1173:14, 1174:18, 1189:8, 1190:7, 1229:23, 1247:22
**juror** [1] - 1168:25
**JURY** [1] - 1166:9
**jury** [27] - 1168:16, 1168:21, 1178:24, 1179:8, 1181:15, 1200:16, 1236:6, 1237:11, 1238:12, 1239:16, 1240:8, 1240:12, 1241:22, 1242:10, 1263:18, 1269:5, 1271:13, 1272:16, 1273:6, 1273:23, 1277:19, 1277:24, 1288:10, 1296:2, 1301:9, 1302:12, 1303:9
**Justice** [6] - 1204:18,

1211:8, 1211:9, 1214:21, 1214:23, 1215:3
**JUSTICE** [2] - 1214:10, 1214:12

## K

**keep** [4] - 1174:7, 1181:1, 1216:5, 1278:18
**KEILTY** [1] - 1166:13
**Keilty** [1] - 1168:7
**Kerry's** [1] - 1242:14
**Kevin** [5] - 1238:23, 1239:2, 1239:9, 1239:20, 1303:14
**key** [2] - 1237:20, 1278:24
**kind** [11] - 1169:18, 1184:17, 1222:2, 1232:2, 1232:24, 1252:7, 1253:23, 1260:11, 1267:9, 1283:25, 1290:2
**kinds** [2] - 1202:6, 1202:7
**knock** [3] - 1169:12, 1169:13, 1169:18
**knowing** [3] - 1254:24, 1260:1, 1289:20
**knowledge** [10] - 1187:24, 1206:19, 1250:6, 1255:18, 1255:21, 1257:20, 1262:3, 1272:5, 1275:24, 1300:25
**known** [5] - 1208:21, 1236:15, 1236:16, 1255:22
**knows** [1] - 1185:2
**Kori** [1] - 1168:7
**Kortan** [1] - 1186:18

## L

**lack** [1] - 1242:13
**ladies** [5] - 1237:7, 1240:14, 1271:8, 1273:24, 1302:6
**land** [1] - 1229:2
**language** [1] - 1280:8
**large** [1] - 1257:22
**last** [10] - 1170:15, 1177:4, 1189:25, 1247:22, 1257:16, 1272:8, 1272:15, 1272:25, 1295:16, 1302:15
**lasted** [3] - 1169:21, 1170:9, 1170:20

**late** [4] - 1182:24, 1247:25, 1288:14, 1293:17
**late-breaking** [1] - 1293:17
**LATHAM** [1] - 1166:19
**launched** [2] - 1243:6
**Laura** [1] - 1261:12
**law** [5] - 1200:1, 1245:24, 1260:18, 1300:14, 1300:18
**lawfully** [2] - 1198:23, 1198:25, 1224:10
**lawsuits** [1] - 1249:20
**lawyer** [14] - 1176:8, 1178:6, 1193:4, 1202:17, 1204:12, 1208:2, 1209:2, 1213:2, 1213:3, 1237:2, 1246:23, 1248:6, 1255:1, 1283:19
**lawyers** [6] - 1246:7, 1246:10, 1282:20, 1283:12, 1284:2, 1285:18
**lay** [1] - 1272:5
**lead** [1] - 1248:23
**leader** [1] - 1248:24
**leaders** [1] - 1227:9
**leadership** [2] - 1224:20, 1292:3
**leak** [4] - 1187:22, 1281:23, 1281:24, 1294:15
**leaked** [1] - 1281:21
**leaking** [2] - 1252:20, 1256:25
**learn** [5] - 1221:16, 1223:25, 1225:5, 1225:24, 1226:8
**learned** [15] - 1191:4, 1192:2, 1223:15, 1223:18, 1226:20, 1227:21, 1228:6, 1229:11, 1252:17, 1252:18, 1253:8, 1263:6, 1263:13, 1264:25, 1267:25
**least** [16] - 1170:1, 1181:24, 1184:5, 1194:8, 1201:16, 1201:19, 1204:4, 1204:20, 1209:23, 1213:22, 1214:5, 1233:18, 1245:17, 1246:20, 1276:15, 1289:9
**leave** [2] - 1236:22, 1252:3

**ledger** [1] - 1201:9
**Lee** [1] - 1297:14
**left** [4] - 1203:17,
1220:19, 1287:16,
1295:18
**legal** [18] - 1199:15,
1199:24, 1208:7,
1244:8, 1246:15,
1247:4, 1250:4,
1262:14, 1262:22,
1264:1, 1264:5,
1282:17, 1284:8,
1284:20, 1285:2,
1287:19, 1300:1,
1300:2
**legalities** [1] - 1300:7
**legality** [2] - 1222:14,
1224:9
**legally** [1] - 1247:1
**legitimacy** [1] - 1296:6
**length** [1] - 1174:8
**less** [1] - 1236:18
**level** [6] - 1200:5,
1201:14, 1202:4,
1202:11, 1204:5,
1223:4
**levels** [2] - 1201:8,
1213:8
**Lichtblau** [12] -
1183:11, 1184:15,
1185:22, 1186:4,
1186:16, 1187:1,
1225:11, 1226:1,
1297:14, 1297:15,
1297:18, 1301:17
**Lichtblau's** [1] -
1185:12
**life** [1] - 1293:13
**likely** [4] - 1171:14,
1171:24, 1205:24,
1302:17
**line** [4] - 1215:22,
1283:7, 1283:10,
1301:21
**Lines** [1] - 1220:2
**lines** [3] - 1170:15,
1195:1, 1286:19
**link** [5] - 1196:24,
1278:14, 1278:20,
1279:2, 1297:12
**linking** [2] - 1278:22,
1279:18
**links** [2] - 1253:9,
1280:17
**LISA** [1] - 1304:3
**Lisa** [1] - 1166:22
**list** [2] - 1194:9,
1233:15
**listed** [2] - 1214:16,
1286:19

**literally** [1] - 1186:7
**litigation** [1] - 1176:21
**litigious** [1] - 1249:19
**living** [1] - 1241:23
**LLP** [1] - 1166:19
**lobby** [1] - 1226:5
**lobbying** [1] - 1291:14
**local** [1] - 1196:16
**logical** [2] - 1233:17,
1233:18
**logically** [1] - 1233:11
**logs** [3] - 1297:13,
1298:14, 1298:17
**look** [22] - 1170:14,
1171:18, 1177:3,
1181:22, 1184:20,
1188:21, 1189:2,
1189:25, 1190:12,
1190:22, 1190:24,
1195:24, 1200:25,
1207:20, 1213:23,
1217:22, 1227:25,
1239:13, 1268:21,
1286:12, 1286:18,
1287:16
**looked** [8] - 1170:17,
1175:1, 1198:13,
1227:25, 1233:1,
1233:15, 1234:8,
1254:15
**looking** [10] - 1180:8,
1180:15, 1209:23,
1212:3, 1212:8,
1218:24, 1229:12,
1235:22, 1285:14,
1285:15
**looks** [10] - 1180:8,
1180:11, 1212:11,
1235:2, 1277:6,
1277:10, 1277:11,
1286:18, 1290:4,
1290:5
**lose** [2] - 1257:18,
1288:15
**lunch** [3] - 1302:7,
1302:10, 1303:19

---

**M**

**M-O-O-K** [1] - 1241:20
**magazine** [2] -
1276:17, 1281:21
**main** [3] - 1246:17,
1248:1, 1254:5
**major** [1] - 1178:15
**malpractice** [1] -
1249:6
**manager** [9] -
1168:25, 1242:5,
1243:3, 1243:16,

1245:8, 1245:12,
1255:22, 1256:20,
1258:19
**managing** [3] -
1243:18, 1243:19,
1282:24
**map** [2] - 1169:11,
1169:18
**Marc** [7] - 1246:18,
1248:5, 1253:16,
1262:9, 1262:11,
1263:11, 1289:3
**Marc's** [1] - 1262:18
**March** [9] - 1174:22,
1175:3, 1190:14,
1190:16, 1190:18,
1190:19, 1191:3,
1231:24, 1232:15
**Mark** [4] - 1238:24,
1239:5, 1303:13
**mask** [1] - 1241:10
**material** [15] - 1188:5,
1190:21, 1192:6,
1205:20, 1216:21,
1217:4, 1219:14,
1222:8, 1222:9,
1222:15, 1222:18,
1224:21, 1226:15,
1227:6, 1263:21
**materials** [10] -
1198:5, 1216:13,
1221:1, 1221:2,
1221:23, 1226:10,
1268:13, 1288:24,
1291:7
**Matter** [1] - 1212:24
**matter** [29] - 1170:3,
1170:6, 1184:1,
1185:22, 1205:20,
1207:13, 1207:20,
1208:20, 1208:22,
1209:11, 1209:22,
1210:3, 1211:7,
1213:4, 1213:6,
1214:21, 1218:18,
1218:20, 1229:20,
1230:23, 1233:7,
1264:10, 1264:23,
1266:20, 1268:20,
1284:12
**mattered** [4] -
1169:17, 1194:10,
1221:18, 1224:2
**matters** [7] - 1176:14,
1183:17, 1183:19,
1198:18, 1227:4,
1227:18, 1232:21
**maximum** [1] -
1252:13
**McCabe** [4] - 1185:19,

1233:11, 1233:22,
1234:1
**McLean** [2] - 1290:12,
1290:22
**me..** [1] - 1271:24
**meadows** [2] -
1228:14, 1228:17
**Meadows** [1] -
1228:20
**mean** [25] - 1174:6,
1198:14, 1209:17,
1227:1, 1228:17,
1244:14, 1250:15,
1250:23, 1251:21,
1251:24, 1252:25,
1261:1, 1262:21,
1264:22, 1266:15,
1273:9, 1281:5,
1283:15, 1285:2,
1285:20, 1293:13,
1294:14, 1294:15,
1295:12, 1299:20
**means** [1] - 1243:8
**media** [44] - 1188:16,
1189:10, 1190:9,
1256:14, 1256:15,
1265:2, 1265:11,
1265:22, 1265:24,
1266:2, 1266:25,
1267:11, 1267:19,
1268:5, 1268:13,
1268:22, 1268:23,
1268:25, 1274:8,
1275:3, 1275:12,
1275:15, 1275:17,
1275:19, 1275:21,
1276:10, 1276:12,
1281:6, 1282:9,
1288:25, 1289:4,
1291:11, 1291:14,
1291:18, 1291:21,
1292:2, 1292:5,
1292:8, 1292:13,
1295:10, 1298:4,
1300:9
**meet** [3] - 1193:11,
1264:15, 1288:18
**Meeting** [3] - 1180:7,
1285:20, 1285:23
**meeting** [68] -
1169:19, 1169:20,
1169:23, 1170:5,
1170:7, 1170:8,
1170:19, 1171:5,
1171:11, 1171:13,
1173:1, 1173:16,
1174:22, 1179:15,
1180:2, 1180:9,
1180:17, 1181:20,
1187:3, 1188:6,

1189:8, 1207:15,
1220:3, 1220:22,
1221:2, 1221:5,
1223:7, 1223:16,
1223:20, 1225:14,
1225:17, 1228:12,
1230:7, 1230:9,
1230:14, 1230:15,
1230:19, 1230:22,
1230:25, 1231:4,
1231:8, 1231:15,
1231:20, 1231:23,
1232:2, 1232:7,
1232:13, 1232:15,
1233:14, 1233:22,
1235:14, 1235:17,
1235:20, 1235:25,
1236:17, 1245:15,
1285:25, 1286:4,
1286:5, 1286:13,
1286:15, 1286:17,
1286:21, 1288:19,
1290:12, 1290:22
**meetings** [17] -
1169:25, 1173:13,
1173:25, 1174:1,
1174:7, 1174:9,
1186:25, 1187:4,
1229:19, 1229:23,
1230:4, 1230:12,
1245:18, 1245:20,
1262:25, 1289:11,
1289:14
**member** [5] - 1265:25,
1267:5, 1275:5,
1276:1, 1276:11
**members** [2] - 1244:5,
1292:4
**memory** [1] - 1274:19
**mention** [2] - 1223:7,
1301:16
**mentioned** [14] -
1176:25, 1178:8,
1224:12, 1244:13,
1244:17, 1247:7,
1248:4, 1252:15,
1259:5, 1263:5,
1284:4, 1292:7,
1299:15, 1300:20
**message** [5] -
1202:20, 1230:17,
1235:7, 1235:8,
1235:13
**Messrs** [1] - 1171:11
**met** [7] - 1170:3,
1173:8, 1173:9,
1181:18, 1190:16,
1201:14, 1223:19,
1225:24, 1226:1,
1229:2, 1229:9,

1229:14, 1229:16,
1230:3, 1254:22,
1297:16
**MFA** [6] - 1286:1,
1286:24, 1286:25,
1287:10, 1287:12
**Michael** [24] - 1168:4,
1168:7, 1168:12,
1176:6, 1176:8,
1176:16, 1178:3,
1186:7, 1186:18,
1191:25, 1193:8,
1193:10, 1205:9,
1205:19, 1214:24,
1223:19, 1226:14,
1226:20, 1228:10,
1229:14, 1234:16,
1235:3, 1248:7,
1300:22
**MICHAEL** [3] - 1166:6,
1166:13, 1166:17
**Michael's** [2] - 1176:4,
1199:23
**mid** [1] - 1243:11
**mid-November** [1] -
1243:11
**middle** [3] - 1190:24,
1196:24, 1290:11
**midnight** [1] - 1245:17
**might** [21] - 1180:1,
1186:10, 1201:16,
1208:6, 1208:10,
1226:8, 1230:19,
1231:19, 1233:5,
1233:11, 1234:16,
1246:10, 1248:23,
1251:3, 1253:17,
1253:20, 1264:5,
1289:3, 1290:1,
1294:21
**million** [3] - 1233:3,
1283:2, 1283:5
**mind** [10] - 1172:19,
1205:1, 1211:24,
1227:3, 1227:8,
1232:24, 1238:17,
1277:18, 1293:23,
1296:8
**minds** [1] - 1292:22
**mine** [1] - 1298:25
**minimize** [1] - 1210:5
**minute** [7] - 1211:1,
1224:18, 1227:3,
1242:6, 1248:4,
1257:16, 1271:9
**minutes** [13] -
1169:21, 1170:9,
1170:20, 1172:13,
1235:17, 1235:18,
1236:9, 1236:18,

1237:10, 1272:2,
1273:16, 1303:14,
1303:15
**missed** [1] - 1212:15
**modification** [2] -
1286:1, 1286:25
**Moffa** [1] - 1213:15
**moment** [2] - 1284:10,
1301:7
**Monday** [1] - 1278:17
**money** [2] - 1247:1,
1250:16
**moniker** [1] - 1281:6
**month** [6] - 1173:10,
1263:7, 1274:13,
1287:19, 1298:11,
1298:13
**months** [4] - 1190:17,
1191:3, 1232:5,
1236:1
**Mook** [36] - 1238:9,
1238:23, 1241:1,
1241:16, 1241:20,
1241:21, 1241:22,
1258:13, 1258:15,
1261:14, 1264:5,
1273:22, 1274:4,
1274:5, 1277:16,
1279:11, 1279:13,
1281:1, 1281:7,
1282:13, 1285:10,
1285:17, 1285:20,
1285:23, 1285:25,
1286:13, 1288:7,
1290:12, 1293:4,
1293:10, 1296:16,
1296:22, 1297:9,
1298:22, 1301:4
**MOOK** [2] - 1167:5,
1241:13
**Mook's** [3] - 1238:17,
1296:8, 1296:24
**MOREIRA** [1] - 1304:3
**Moreira** [2] - 1166:22,
1304:10
**MORNING** [1] - 1166:6
**morning** [16] - 1168:5,
1168:9, 1168:11,
1168:14, 1168:17,
1168:18, 1168:23,
1169:9, 1169:10,
1237:8, 1241:3,
1241:4, 1241:16,
1241:17, 1245:14,
1245:15
**Moscow** [1] - 1278:21
**most** [6] - 1246:15,
1256:21, 1258:24,
1278:11, 1278:20,
1303:15

**mostly** [2] - 1245:18,
1248:5
**move** [5] - 1194:7,
1196:1, 1196:6,
1211:23, 1212:4
**moved** [3] - 1196:11,
1212:7, 1277:15
**moving** [2] - 1233:3,
1237:22
**MR** [95] - 1168:5,
1168:11, 1169:8,
1171:2, 1172:15,
1174:24, 1175:9,
1175:12, 1178:20,
1178:25, 1181:9,
1181:13, 1191:8,
1195:24, 1196:6,
1196:10, 1196:14,
1210:23, 1212:3,
1212:5, 1220:15,
1220:17, 1221:11,
1235:9, 1236:3,
1236:8, 1236:13,
1236:21, 1237:17,
1237:20, 1238:2,
1238:6, 1238:8,
1238:16, 1238:20,
1238:24, 1239:2,
1239:5, 1239:8,
1239:12, 1239:16,
1239:18, 1239:23,
1240:2, 1240:25,
1241:15, 1258:10,
1258:12, 1262:1,
1263:16, 1263:20,
1263:25, 1264:4,
1269:2, 1271:21,
1272:18, 1272:21,
1272:25, 1273:4,
1273:8, 1273:11,
1273:13, 1273:15,
1273:19, 1274:3,
1277:4, 1277:12,
1277:14, 1281:3,
1293:3, 1293:6,
1293:9, 1295:6,
1295:15, 1295:24,
1296:3, 1296:10,
1296:13, 1296:21,
1297:6, 1297:8,
1298:2, 1298:21,
1299:1, 1299:3,
1299:4, 1301:3,
1301:6, 1301:10,
1301:17, 1302:22,
1302:25, 1303:10,
1303:13, 1303:18
**multiple** [4] - 1173:11,
1174:9, 1230:18,
1246:21

**must** [1] - 1200:7
**Myers** [1] - 1297:14
**mystery** [1] - 1278:25
**myth** [1] - 1288:12
**mythological** [1] -
1257:14

**N**

**name** [18] - 1176:22,
1180:20, 1181:23,
1183:8, 1185:13,
1187:19, 1212:8,
1212:11, 1212:15,
1212:19, 1214:16,
1214:18, 1225:18,
1241:19, 1248:13,
1279:23, 1281:6,
1281:19
**Name** [2] - 1290:16,
1290:18
**named** [2] - 1248:6,
1248:9
**names** [6] - 1201:9,
1212:9, 1261:21,
1264:18, 1264:19
**Natalie** [1] - 1168:12
**NATALIE** [1] - 1166:18
**national** [27] - 1179:3,
1182:10, 1182:15,
1183:13, 1183:18,
1183:20, 1184:10,
1184:21, 1185:10,
1191:23, 1194:23,
1195:15, 1196:18,
1198:19, 1204:16,
1207:12, 1207:18,
1210:11, 1217:17,
1218:3, 1218:6,
1218:18, 1219:9,
1227:12, 1227:14,
1232:21, 1278:3
**National** [5] - 1228:22,
1247:8, 1247:10,
1252:10, 1252:16
**national-security-
related** [1] - 1183:18
**NATO** [1] - 1252:3
**nature** [3] - 1237:21,
1247:9, 1292:16
**necessarily** [3] -
1207:23, 1231:3,
1292:10
**need** [8] - 1182:19,
1187:18, 1189:16,
1200:8, 1205:6,
1210:8, 1238:11,
1239:23
**needed** [2] - 1209:10,
1262:24

**needs** [1] - 1210:8
**never** [7] - 1223:23,
1261:6, 1261:8,
1261:10, 1261:12,
1283:21, 1294:11
**new** [2] - 1278:13,
1301:21
**New** [26] - 1166:20,
1169:16, 1181:8,
1182:14, 1184:12,
1185:9, 1185:22,
1191:4, 1191:12,
1191:14, 1192:10,
1192:11, 1193:15,
1193:19, 1225:11,
1244:24, 1254:17,
1255:1, 1255:5,
1276:16, 1295:13,
1296:14, 1296:18,
1297:13, 1297:23,
1301:15
**news** [13] - 1178:8,
1178:12, 1178:15,
1178:17, 1181:23,
1182:2, 1188:7,
1188:11, 1191:11,
1191:20, 1225:15,
1276:13, 1295:9
**newspaper** [1] -
1218:19
**next** [6] - 1189:21,
1238:7, 1240:3,
1275:22, 1303:11,
1303:12
**nexus** [1] - 1222:6
**nice** [1] - 1168:23
**nobody** [1] - 1300:25
**nominally** [2] - 1245:8,
1245:10
**nominee** [7] - 1247:3,
1247:12, 1247:13,
1247:18, 1252:1,
1252:5
**Northeast** [1] -
1166:15
**note** [1] - 1213:25
**notes** [40] - 1169:16,
1170:11, 1171:12,
1171:3, 1172:14,
1172:16, 1172:21,
1173:1, 1173:2,
1173:15, 1173:19,
1174:18, 1174:20,
1174:22, 1174:23,
1175:1, 1175:2,
1175:5, 1175:10,
1175:14, 1178:23,
1179:4, 1179:6,
1179:10, 1179:18,
1179:21, 1190:11,

1216:11, 1231:23, 1232:11, 1234:8, 1234:13, 1235:2, 1235:16, 1235:19, 1236:17, 1304:5

**nothing** [5] - 1220:15, 1221:8, 1233:2, 1238:18, 1280:21

**notionally** [3] - 1254:20, 1267:13, 1275:4

**November** [2] - 1243:11, 1248:13

**number** [19] - 1180:10, 1185:4, 1185:19, 1209:22, 1210:4, 1210:9, 1210:15, 1220:18, 1231:22, 1236:13, 1244:3, 1245:21, 1246:10, 1246:25, 1260:15, 1260:19, 1262:17, 1277:13, 1296:13

**numerous** [5] - 1201:8, 1225:10, 1229:22, 1232:20, 1297:1

**nutshell** [2] - 1244:7, 1253:22

**NW** [2] - 1166:23, 1304:12

**NY** [1] - 1166:20

## O

**object** [1] - 1236:21
**objected** [1] - 1184:16
**objection** [10] - 1184:15, 1186:9, 1196:10, 1212:5, 1221:11, 1262:1, 1263:16, 1277:14, 1281:3, 1295:24
**obtained** [3] - 1222:22, 1224:10, 1282:1
**obtaining** [2] - 1208:8, 1249:24
**obviously** [10] - 1178:2, 1223:1, 1239:7, 1240:17, 1250:9, 1254:6, 1266:5, 1300:2, 1300:16, 1303:8
**occasions** [1] - 1172:4
**occurred** [4] - 1171:8, 1231:23, 1232:3, 1252:17
**October** [16] - 1229:1, 1257:10, 1257:11, 1257:21, 1288:8,

1292:6, 1292:11, 1293:5, 1293:12, 1293:21, 1293:24, 1294:10, 1295:3, 1295:19, 1297:24, 1299:8

**OF** [6] - 1166:1, 1166:3, 1166:9, 1214:10, 1214:12, 1304:1

**offered** [2] - 1301:20, 1302:17

**offering** [1] - 1279:22
**offers** [1] - 1277:13
**office** [3] - 1173:3, 1196:16, 1245:16
**Office** [1] - 1230:14
**OFFICE** [1] - 1166:14
**Official** [1] - 1166:22
**official** [4] - 1177:15, 1213:24, 1244:8, 1304:11
**OFFICIAL** [1] - 1304:1
**officially** [1] - 1243:8
**often** [4] - 1244:4, 1246:19, 1279:21, 1281:1
**oligarch** [1] - 1254:5
**once** [6] - 1187:14, 1189:20, 1232:22, 1247:3, 1247:13, 1264:25
**one** [58] - 1178:11, 1179:23, 1181:11, 1184:6, 1188:22, 1188:24, 1189:4, 1189:6, 1190:2, 1190:4, 1191:10, 1197:21, 1197:22, 1206:12, 1210:20, 1213:1, 1214:25, 1221:16, 1223:22, 1224:1, 1224:18, 1226:4, 1228:6, 1231:11, 1233:25, 1237:25, 1240:19, 1246:9, 1246:11, 1251:5, 1257:23, 1258:8, 1263:22, 1272:12, 1275:14, 1276:7, 1276:15, 1276:16, 1278:1, 1280:4, 1281:20, 1283:7, 1285:17, 1286:4, 1288:5, 1290:9, 1291:22, 1293:13, 1293:16, 1293:18, 1294:21, 1296:13, 1296:21, 1297:12, 1299:17,

1301:11, 1301:14
**one's** [1] - 1284:2
**ones** [3] - 1253:18, 1265:18, 1276:4
**ongoing** [2] - 1222:3, 1233:6
**online** [2] - 1195:1, 1295:9
**opaque** [1] - 1249:25
**open** [3] - 1209:10, 1210:8, 1301:21
**opened** [7] - 1208:24, 1209:15, 1209:21, 1210:16, 1211:7, 1213:9, 1214:1
**opening** [5] - 1210:2, 1211:12, 1213:6, 1213:24, 1216:22
**openly** [1] - 1256:23
**operating** [1] - 1300:5
**operations** [2] - 1258:21, 1288:3
**opponent** [8] - 1248:19, 1251:1, 1251:3, 1251:16, 1288:14, 1292:13, 1292:16, 1300:19
**opponents** [1] - 1249:5
**opposed** [2] - 1190:4, 1233:6
**opposite** [1] - 1193:9
**opposition** [14] - 1223:17, 1224:6, 1248:15, 1248:17, 1249:1, 1249:9, 1249:14, 1249:18, 1250:13, 1250:21, 1257:15, 1258:17, 1259:11, 1288:13
**order** [7] - 1184:20, 1205:7, 1238:12, 1240:15, 1240:20, 1248:20, 1296:9
**organization** [17] - 1181:23, 1182:2, 1188:7, 1188:12, 1191:12, 1191:20, 1218:3, 1223:8, 1224:7, 1253:9, 1257:7, 1262:15, 1262:16, 1281:6, 1287:21, 1294:8, 1299:10
**Organization** [4] - 1278:14, 1278:22, 1279:1, 1279:18
**ORGANIZATION** [1] - 1214:11
**organizations** [8] -

1176:14, 1178:8, 1178:13, 1178:15, 1178:17, 1186:20, 1196:20, 1295:10
**orient** [2] - 1175:21, 1181:15
**origin** [2] - 1216:20, 1222:15
**origins** [1] - 1205:23
**otherwise** [1] - 1194:23
**outcome** [1] - 1258:4
**outlet** [1] - 1295:9
**outlined** [1] - 1225:8
**outside** [7] - 1206:21, 1236:6, 1236:12, 1263:18, 1269:5, 1296:2, 1301:9
**overarching** [1] - 1203:1
**overruled** [2] - 1221:13, 1281:4
**oversaw** [1] - 1244:15
**overseas** [2] - 1259:12, 1300:5
**oversee** [2] - 1260:7, 1260:24
**overseeing** [9] - 1258:21, 1259:14, 1259:19, 1260:13, 1260:17, 1260:21, 1261:4, 1282:22, 1283:21
**own** [3] - 1211:21, 1235:22, 1238:17
**owned** [1] - 1254:5

## P

**p.m** [1] - 1303:20
**PAGE** [1] - 1167:2
**Page** [14] - 1170:14, 1171:19, 1174:25, 1188:21, 1189:2, 1189:25, 1190:24, 1210:23, 1211:3, 1211:19, 1228:2, 1285:9, 1298:10
**page** [13] - 1189:21, 1211:22, 1211:24, 1213:23, 1214:3, 1215:12, 1220:2, 1228:4, 1290:11, 1295:16, 1295:18, 1295:20
**pages** [1] - 1297:6
**paid** [5] - 1223:25, 1225:1, 1283:1,

1283:4, 1287:25
**Palmieri** [4] - 1244:2, 1244:13, 1253:16, 1265:13
**panoply** [1] - 1190:4
**paper** [4] - 1214:13, 1290:22, 1291:4, 1295:13
**papers** [12] - 1198:3, 1198:11, 1220:19, 1220:24, 1221:3, 1221:6, 1221:7, 1221:10, 1221:17, 1223:22, 1224:1, 1291:4
**Paragraph** [7] - 1170:14, 1171:20, 1188:21, 1189:3, 1189:20, 1189:25, 1190:24
**paragraph** [7] - 1189:12, 1210:24, 1272:8, 1272:15, 1273:1, 1298:11, 1302:15
**parenthetical** [1] - 1177:10
**part** [25] - 1176:11, 1182:9, 1182:12, 1194:16, 1218:2, 1224:12, 1229:10, 1243:22, 1244:21, 1257:22, 1264:22, 1265:19, 1268:15, 1268:18, 1268:24, 1275:11, 1279:13, 1280:12, 1280:13, 1286:12, 1287:22, 1289:15, 1292:8, 1292:10, 1293:16
**participated** [2] - 1220:23, 1253:15
**participating** [1] - 1221:1
**particular** [19] - 1177:24, 1180:12, 1191:7, 1193:11, 1194:4, 1202:12, 1209:19, 1209:21, 1210:3, 1210:4, 1210:15, 1216:18, 1234:2, 1248:24, 1253:24, 1259:1, 1294:23, 1300:5
**particularly** [3] - 1249:22, 1252:8, 1252:13
**parties** [3] - 1250:7, 1286:4, 1298:17
**parts** [1] - 1223:2

1318

**party** [6] - 1214:13, 1215:15, 1242:23, 1242:25, 1247:11, 1294:17
**party's** [2] - 1247:11, 1248:1
**pass** [7] - 1203:13, 1207:24, 1216:8, 1271:21, 1271:23, 1298:20, 1298:22
**passage** [1] - 1254:4
**passed** [8] - 1206:6, 1207:12, 1207:19, 1207:22, 1208:13, 1208:14, 1208:15, 1298:14
**passing** [1] - 1204:4
**past** [2] - 1202:15, 1248:23
**pasted** [1] - 1196:25
**patriotic** [1] - 1256:18
**Paul** [1] - 1298:14
**Pause** [6] - 1211:5, 1211:18, 1212:2, 1273:18, 1273:21, 1299:14
**pausing** [1] - 1208:1
**pawn** [1] - 1222:4
**pay** [2] - 1287:19, 1297:12
**paying** [1] - 1288:4
**payroll** [1] - 1243:12
**pencil** [1] - 1169:13
**Pennsylvania** [1] - 1214:11
**people** [43] - 1177:2, 1177:6, 1177:18, 1185:13, 1188:11, 1189:8, 1191:23, 1192:8, 1192:9, 1194:22, 1195:8, 1198:13, 1198:16, 1202:6, 1205:21, 1207:13, 1213:16, 1213:18, 1213:20, 1215:15, 1219:3, 1234:6, 1244:25, 1245:2, 1245:4, 1249:8, 1254:8, 1256:17, 1256:18, 1260:2, 1260:3, 1261:17, 1261:19, 1264:8, 1264:9, 1265:7, 1267:2, 1268:21, 1280:9, 1280:15, 1282:12, 1290:1, 1294:25
**people's** [2] - 1174:17, 1262:17
**percent** [1] - 1195:18,

1209:6
**perhaps** [2] - 1181:21, 1303:1
**period** [9] - 1174:18, 1183:24, 1184:12, 1187:9, 1207:5, 1232:22, 1248:11, 1250:11, 1288:18
**Perkins** [48] - 1245:24, 1246:1, 1246:15, 1248:4, 1248:6, 1249:13, 1250:2, 1250:6, 1251:5, 1251:8, 1251:12, 1254:25, 1258:24, 1259:8, 1259:10, 1259:14, 1260:4, 1260:8, 1260:9, 1260:13, 1262:7, 1262:19, 1262:20, 1263:9, 1275:9, 1275:11, 1275:18, 1282:19, 1282:20, 1283:1, 1283:5, 1283:9, 1283:12, 1283:15, 1283:18, 1284:7, 1284:17, 1284:25, 1285:6, 1285:11, 1285:18, 1291:13, 1291:20, 1299:22, 1299:24, 1300:12
**Perkins's** [1] - 1283:21
**permissible** [1] - 1296:8
**permission** [2] - 1300:18, 1301:11
**person** [11] - 1172:7, 1172:10, 1185:19, 1186:13, 1186:21, 1186:23, 1200:1, 1221:6, 1246:9, 1275:22
**personal** [2] - 1206:19, 1235:22
**personally** [2] - 1183:16, 1285:5
**persons** [2] - 1182:23, 1221:17
**perspective** [3] - 1176:15, 1232:20, 1252:25
**pertaining** [1] - 1284:14
**Pete** [3] - 1213:22, 1234:12, 1234:19
**Peter** [2] - 1213:15, 1261:10
**phone** [1] - 1171:9, 1171:16, 1171:24,

1172:1, 1172:6, 1172:9, 1172:13, 1190:15, 1262:24, 1282:6, 1295:25
**phrase** [1] - 1264:1
**physical** [1] - 1224:24
**piece** [10] - 1250:1, 1250:2, 1257:15, 1258:1, 1259:1, 1259:3, 1288:12, 1293:25, 1296:21, 1301:13
**pieces** [5] - 1219:14, 1257:23, 1258:2, 1259:11, 1294:16
**pivot** [1] - 1247:14
**place** [6] - 1207:15, 1235:4, 1247:24, 1256:9, 1256:10, 1272:14
**placed** [1] - 1193:18
**places** [3] - 1234:20, 1235:11
**Plaintiff** [1] - 1166:4
**plan** [1] - 1274:7
**platform** [1] - 1294:17
**play** [5] - 1182:10, 1182:16, 1222:2, 1246:1, 1249:13
**played** [3] - 1222:13, 1226:25
**playing** [1] - 1291:20
**pleased** [1] - 1282:8
**plenty** [1] - 1303:16
**ploy** [1] - 1224:14
**POCs** [1] - 1177:10
**Podesta** [5] - 1244:1, 1244:6, 1252:11, 1253:17, 1265:6, 1265:15
**Podesta's** [2] - 1284:5, 1284:20
**point** [24] - 1174:19, 1176:19, 1177:17, 1180:12, 1184:8, 1208:2, 1214:2, 1214:25, 1215:9, 1217:19, 1217:24, 1223:18, 1227:19, 1228:6, 1229:11, 1243:9, 1250:22, 1254:17, 1268:7, 1268:18, 1274:12, 1275:13, 1276:13, 1297:1
**points** [3] - 1172:5, 1232:10, 1237:20
**policy** [3] - 1244:20, 1278:16, 1297:18
**political** [12] - 1207:6,

1222:3, 1224:6, 1224:14, 1225:6, 1242:8, 1242:18, 1249:4, 1300:9, 1300:10
**politics** [1] - 1300:13
**portfolio** [1] - 1244:20
**portion** [2] - 1227:24, 1297:9
**position** [2] - 1280:16, 1280:18
**possible** [3] - 1173:25, 1226:3, 1281:10
**posted** [1] - 1297:12
**potential** [9] - 1182:9, 1182:10, 1182:14, 1182:15, 1197:25, 1203:1, 1217:16, 1219:9, 1253:9
**potentially** [1] - 1222:20
**powers** [1] - 1196:20
**practice** [2] - 1176:4, 1178:7
**practiced** [1] - 1200:1
**precise** [1] - 1276:7
**precisely** [1] - 1249:11
**preclude** [1] - 1238:18
**predictions** [1] - 1240:3
**preexisting** [1] - 1252:7
**prejudicial** [1] - 1272:9
**preparation** [2] - 1210:20, 1232:14
**prepared** [1] - 1171:22
**present** [7] - 1168:13, 1218:3, 1233:22, 1240:20, 1240:21, 1246:10, 1251:1
**presented** [3] - 1217:16, 1218:6, 1220:6
**preserve** [1] - 1195:15
**president** [3] - 1184:10, 1247:11, 1248:2
**presidential** [2] - 1242:15, 1242:17
**press** [24] - 1186:20, 1186:23, 1192:4, 1208:11, 1222:6, 1222:8, 1224:11, 1224:12, 1226:17, 1260:10, 1262:5, 1262:6, 1274:23, 1275:16, 1276:1, 1280:9, 1291:8, 1292:4, 1296:17,

1297:22, 1299:19, 1300:13, 1300:21, 1302:15
**presumably** [3] - 1256:24, 1280:25, 1286:15
**presume** [2] - 1282:5, 1283:22
**pretty** [8] - 1171:3, 1185:13, 1204:22, 1211:1, 1239:24, 1278:3, 1294:19, 1299:20
**prevent** [1] - 1195:15
**prevents** [1] - 1297:18
**previously** [2] - 1188:14, 1282:14
**Priestap** [18] - 1169:15, 1171:1, 1171:8, 1171:13, 1175:14, 1175:20, 1176:2, 1177:6, 1177:13, 1178:16, 1179:10, 1181:21, 1181:24, 1203:16, 1206:7, 1215:8, 1234:9, 1235:16
**Priestap's** [5] - 1172:16, 1175:10, 1216:11, 1234:13, 1234:23
**primary** [1] - 1247:22
**print** [1] - 1269:1
**printed** [1] - 1221:3
**printed-out** [1] - 1221:3
**prioritization** [1] - 1222:25
**priority** [1] - 1218:15
**private** [1] - 1178:7
**privilege** [1] - 1263:23
**privileged** [2] - 1249:17, 1263:21
**Prize** [2] - 1183:20, 1183:24
**probative** [1] - 1272:10
**problem** [1] - 1284:2
**proceed** [1] - 1169:3
**proceedings** [1] - 1304:6
**process** [6] - 1173:23, 1202:3, 1228:11, 1247:15, 1247:21, 1248:18
**processing** [1] - 1251:11
**produced** [1] - 1214:13
**professional** [1] -

1283:16
**program** [1] - 1184:7
**programs** [1] - 1201:4
**project** [1] - 1259:1
**projects** [2] - 1260:20, 1300:4
**prominence** [1] - 1176:6
**prominent** [2] - 1177:1, 1177:18
**pronouns** [1] - 1206:15
**propose** [1] - 1301:14
**proposed** [1] - 1274:7
**protect** [2] - 1195:17
**protecting** [1] - 1207:4
**protocol** [1] - 1256:23
**provide** [10] - 1173:2, 1215:25, 1225:17, 1239:21, 1239:23, 1274:7, 1275:11, 1276:9, 1276:11, 1291:18
**provided** [21] - 1171:16, 1171:25, 1173:1, 1183:3, 1188:16, 1189:9, 1190:8, 1191:11, 1198:6, 1198:23, 1199:1, 1199:4, 1205:4, 1207:18, 1213:20, 1213:21, 1214:12, 1275:2, 1281:7, 1281:9, 1291:10
**providing** [3] - 1216:13, 1226:10, 1268:12
**prudent** [1] - 1203:19
**public** [14] - 1184:22, 1185:2, 1194:15, 1194:23, 1195:4, 1195:12, 1199:7, 1253:3, 1256:11, 1256:13, 1272:23, 1276:20, 1277:2, 1297:11
**public's** [1] - 1195:14
**publication** [4] - 1185:9, 1191:23, 1225:18, 1295:3
**publicly** [2] - 1253:5, 1253:6
**publish** [7] - 1184:17, 1185:10, 1187:8, 1266:6, 1273:5, 1281:1, 1291:14
**published** [6] - 1184:9, 1219:3, 1219:13, 1226:21,

1282:3, 1299:8
**Pulitzer** [2] - 1183:20, 1183:23
**pull** [5] - 1172:15, 1174:21, 1293:3, 1295:6, 1297:6
**pulled** [1] - 1224:13
**purchased** [1] - 1225:6
**purely** [1] - 1256:19
**purpose** [4] - 1226:9, 1239:9, 1250:23, 1268:24
**purposely** [1] - 1301:12
**purposes** [9] - 1174:9, 1192:9, 1192:10, 1193:18, 1194:8, 1239:19, 1250:17, 1273:2, 1296:11
**pursued** [3] - 1296:14, 1297:23, 1297:24
**pursuing** [1] - 1297:15
**push** [3] - 1265:2, 1265:11, 1266:2
**pushing** [1] - 1226:21
**put** [11] - 1178:25, 1181:10, 1196:23, 1197:1, 1205:8, 1219:24, 1235:10, 1265:20, 1281:5, 1288:13, 1292:7
**Putin** [3] - 1251:25, 1254:6, 1257:25
**putting** [3] - 1264:5, 1267:18, 1281:19

**Q**

**quarter** [1] - 1302:8
**QUESTION** [1] - 1220:3
**questioned** [1] - 1224:7
**questioning** [3] - 1208:5, 1296:23, 1301:21
**questions** [12] - 1179:25, 1205:22, 1220:18, 1225:11, 1227:8, 1229:7, 1260:19, 1272:19, 1288:1, 1293:10, 1299:5, 1299:22
**quick** [1] - 1269:2
**quickly** [5] - 1169:18, 1203:14, 1219:5, 1226:3, 1226:19
**quite** [1] - 1250:3
**quote** [4] - 1264:11,

1266:19, 1268:1, 1268:14
**quotes** [2] - 1196:23, 1197:1

**R**

**race** [2] - 1292:16, 1294:2
**radar** [1] - 1254:14
**raise** [4] - 1192:4, 1236:7, 1241:6, 1247:1
**raised** [6] - 1208:6, 1224:16, 1227:2, 1227:7, 1236:9, 1236:12
**rally** [1] - 1294:14
**ran** [5] - 1242:15, 1242:17, 1242:18, 1242:19, 1242:20
**range** [1] - 1245:3
**RAO** [1] - 1166:18
**Rao** [1] - 1168:12
**rather** [1] - 1268:22
**RDR** [3] - 1166:22, 1304:3, 1304:10
**reach** [3] - 1182:1, 1182:13, 1268:19
**reached** [3] - 1186:16, 1186:18, 1206:8
**reaction** [1] - 1274:20
**read** [18] - 1171:21, 1172:19, 1179:23, 1189:17, 1190:25, 1194:8, 1206:20, 1250:9, 1260:9, 1262:5, 1273:6, 1278:7, 1285:19, 1290:20, 1295:20, 1297:9, 1298:12, 1303:2
**reading** [3] - 1173:23, 1188:25, 1303:3
**reads** [1] - 1214:8
**ready** [1] - 1271:12
**real** [1] - 1293:13
**reality** [1] - 1221:9
**realized** [1] - 1205:18
**really** [12] - 1180:3, 1180:25, 1187:10, 1197:14, 1244:10, 1244:12, 1244:21, 1247:14, 1249:18, 1262:23, 1267:12, 1280:8
**reason** [7] - 1176:11, 1182:13, 1206:3, 1278:1, 1280:13, 1283:18, 1287:11

**reasonable** [1] - 1174:8
**reasons** [3] - 1215:16, 1225:7, 1256:7
**recalling** [4] - 1172:6, 1246:11, 1284:19
**receive** [1] - 1214:22
**received** [7] - 1197:14, 1214:9, 1214:23, 1221:17, 1264:6, 1266:18, 1302:18
**recently** [1] - 1190:12
**Recess** [4] - 1240:11, 1271:14, 1272:3, 1303:20
**recognize** [3] - 1196:1, 1196:4, 1261:21
**recollection** [49] - 1170:11, 1170:18, 1170:22, 1171:4, 1171:18, 1171:23, 1172:2, 1172:22, 1172:24, 1173:4, 1173:20, 1174:4, 1174:10, 1175:6, 1179:9, 1179:15, 1179:19, 1180:2, 1182:21, 1184:4, 1184:5, 1184:8, 1188:18, 1189:7, 1190:3, 1192:25, 1197:10, 1197:17, 1213:2, 1213:7, 1217:18, 1219:18, 1223:23, 1225:3, 1228:10, 1230:6, 1232:9, 1232:16, 1235:18, 1246:5, 1247:21, 1251:8, 1252:18, 1255:8, 1266:3, 1275:10, 1276:23, 1277:8, 1303:2
**reconstructed** [1] - 1229:12
**record** [9] - 1168:3, 1235:25, 1241:19, 1248:20, 1277:18, 1288:5, 1295:14, 1302:14, 1303:3
**recorded** [6] - 1234:22, 1234:25, 1235:1, 1235:3, 1235:6, 1235:12
**records** [3] - 1235:24, 1236:2, 1249:24
**recover** [1] - 1257:18
**recross** [2] - 1237:14, 1237:25
**redacted** [2] -

1273:19, 1303:8
**redaction** [1] - 1273:13
**Reddit** [1] - 1297:13
**REDIRECT** [2] - 1220:16, 1293:8
**redirect** [3] - 1236:9, 1238:3, 1240:23
**refer** [3] - 1189:16, 1239:8, 1239:19
**reference** [5] - 1296:14, 1298:11, 1299:8, 1299:12, 1299:16
**referenced** [1] - 1267:3
**references** [1] - 1201:11
**referral** [2] - 1214:9, 1214:12
**referred** [6] - 1211:8, 1211:9, 1212:12, 1214:21, 1239:4, 1239:17
**reflect** [2] - 1173:23, 1227:2
**reflected** [2] - 1174:3, 1198:18
**reflecting** [2] - 1197:25, 1283:13
**refresh** [15] - 1170:11, 1170:17, 1170:22, 1171:18, 1171:23, 1172:2, 1172:22, 1175:5, 1188:18, 1189:7, 1272:23, 1273:3, 1276:23, 1277:8, 1303:2
**refreshed** [3] - 1173:20, 1174:4, 1273:10
**refreshes** [1] - 1190:3
**refreshing** [2] - 1171:3, 1273:1
**regard** [6] - 1199:23, 1207:5, 1226:20, 1235:5, 1263:24, 1276:24
**regarded** [1] - 1278:3
**regarding** [5] - 1284:20, 1286:3, 1287:10, 1289:4, 1289:11
**regardless** [1] - 1227:11
**registered** [1] - 1278:14
**regular** [1] - 1260:19
**regularly** [1] - 1262:9
**regulated** [1] - 1247:1

**reimbursed** [1] - 1225:6
**relate** [1] - 1286:20
**related** [11] - 1183:18, 1200:14, 1203:6, 1217:13, 1217:14, 1227:14, 1285:3, 1289:5, 1289:8, 1290:6
**relates** [3] - 1244:9, 1294:20, 1298:4
**relationship** [10] - 1192:13, 1192:18, 1247:3, 1247:9, 1251:19, 1252:7, 1253:4, 1259:7, 1259:18, 1261:2
**relative** [3] - 1180:1, 1202:21, 1213:25
**relatively** [1] - 1240:4
**release** [3] - 1252:21, 1272:6, 1296:24
**released** [4] - 1201:23, 1252:12, 1253:3, 1278:17
**reliability** [8] - 1203:24, 1204:8, 1205:8, 1206:2, 1207:1, 1222:9, 1222:23, 1224:8
**reliable** [2] - 1204:22, 1221:24
**relied** [1] - 1262:13
**remain** [3] - 1241:5, 1268:5, 1268:13
**remember** [60] - 1169:21, 1169:23, 1170:2, 1170:4, 1170:5, 1170:7, 1170:10, 1170:13, 1170:25, 1171:11, 1171:17, 1172:25, 1173:10, 1173:11, 1173:12, 1173:13, 1173:16, 1173:19, 1173:21, 1174:2, 1176:20, 1177:20, 1177:21, 1179:4, 1180:17, 1180:18, 1180:22, 1183:16, 1188:17, 1190:5, 1197:21, 1201:17, 1205:12, 1208:4, 1210:17, 1211:6, 1211:11, 1217:24, 1219:22, 1219:25, 1220:19, 1226:2, 1228:8, 1232:12, 1241:18, 1247:19, 1252:16, 1253:13,

1253:15, 1263:7, 1267:12, 1268:1, 1274:11, 1274:14, 1274:15, 1275:5, 1275:11, 1276:7, 1286:17
**remembered** [3] - 1173:24, 1181:6, 1187:25
**remind** [3] - 1178:24, 1277:1, 1277:24
**report** [8] - 1171:19, 1171:22, 1222:10, 1230:21, 1266:17, 1278:13, 1300:18
**reported** [2] - 1185:13, 1262:6
**Reporter** [3] - 1166:22, 1166:22, 1304:11
**REPORTER** [1] - 1304:1
**reporter** [27] - 1185:21, 1187:20, 1188:5, 1225:18, 1225:25, 1226:5, 1266:4, 1266:8, 1266:9, 1267:1, 1267:14, 1268:18, 1268:25, 1275:23, 1280:14, 1280:23, 1281:5, 1281:7, 1281:10, 1281:12, 1281:15, 1281:21, 1282:3, 1296:25, 1303:7
**reporters** [4] - 1281:1, 1281:8, 1298:5, 1299:21
**reporting** [3] - 1183:20, 1184:25, 1297:19
**reports** [1] - 1188:19
**represent** [1] - 1227:4
**representation** [1] - 1235:5
**representative** [2] - 1242:16, 1297:16
**represented** [3] - 1176:13, 1176:18, 1176:20
**representing** [2] - 1207:14, 1207:21
**represents** [1] - 1175:17
**Republican** [3] - 1252:1, 1252:5, 1294:17
**reputational** [1] - 1250:17

**request** [1] - 1237:24
**require** [1] - 1209:2
**required** [2] - 1259:11, 1287:8
**research** [24] - 1223:13, 1223:17, 1224:6, 1237:9, 1244:16, 1247:6, 1248:15, 1248:17, 1248:18, 1249:2, 1249:5, 1249:10, 1249:14, 1249:18, 1250:13, 1250:21, 1257:15, 1258:17, 1259:1, 1259:11, 1259:15, 1288:13, 1300:4, 1302:11
**researchers** [1] - 1297:1
**resolve** [1] - 1271:10
**resource** [1] - 1244:12
**resources** [2] - 1247:14, 1247:16
**respect** [11] - 1169:19, 1172:20, 1189:6, 1208:14, 1224:4, 1226:16, 1227:6, 1230:11, 1237:22, 1256:17, 1295:12
**respond** [6] - 1223:3, 1257:17, 1267:15, 1288:15, 1292:17, 1301:22
**responding** [1] - 1192:23
**response** [5] - 1272:7, 1274:10, 1278:13, 1296:22, 1301:20
**responsibilities** [2] - 1243:15, 1282:15
**responsible** [5] - 1179:3, 1207:4, 1258:21, 1259:14, 1282:22
**rest** [1] - 1169:14
**restate** [1] - 1221:14
**result** [1] - 1257:18
**Resumed** [1] - 1169:6
**retained** [5] - 1258:16, 1259:20, 1260:23, 1261:7, 1300:4
**retire** [1] - 1271:11
**retrospective** [1] - 1233:6
**reTweet** [1] - 1197:4
**reTweeted** [1] - 1197:2
**review** [5] - 1198:9, 1198:22, 1222:18, 1234:11, 1235:2
**reviewed** [1] - 1285:11

**reviewing** [1] - 1296:7
**reviews** [10] - 1171:21, 1189:1, 1189:4, 1189:14, 1189:19, 1190:1, 1191:1, 1191:6, 1228:3, 1299:13
**rigorous** [1] - 1202:3
**ringing** [1] - 1192:3
**road** [4] - 1169:11, 1169:18, 1237:23, 1245:19
**Robert** [2] - 1241:1, 1241:20
**ROBERT** [2] - 1167:5, 1241:13
**Rodney** [1] - 1193:24
**role** [12] - 1208:2, 1208:11, 1242:2, 1242:4, 1244:7, 1244:8, 1246:1, 1246:4, 1249:13, 1249:16, 1287:20, 1291:20
**room** [3] - 1173:5, 1271:11, 1271:19
**Room** [2] - 1166:23, 1304:12
**rowing** [1] - 1247:17
**Rule** [1] - 1238:13
**rules** [1] - 1238:19
**ruling** [1] - 1302:21
**run** [9] - 1188:5, 1188:8, 1254:14, 1266:4, 1266:15, 1266:19, 1268:19, 1292:13, 1298:8
**running** [1] - 1243:17
**Russia** [23] - 1202:21, 1203:2, 1203:6, 1208:16, 1212:21, 1217:19, 1217:22, 1218:1, 1251:20, 1252:6, 1253:4, 1253:8, 1254:5, 1257:25, 1259:6, 1259:8, 1278:15, 1278:25, 1294:4, 1294:5, 1294:13, 1294:15, 1294:20
**Russian** [6] - 1218:9, 1252:11, 1253:10, 1278:23, 1279:18, 1294:8
**Russian-based** [2] - 1278:23, 1279:18

**S**

**S-I-M** [1] - 1213:4

**Sands** [2] - 1212:9, 1212:13
**sat** [2] - 1170:3, 1246:7
**saw** [7] - 1173:19, 1174:11, 1179:6, 1182:22, 1189:7, 1258:2, 1289:8
**scandal** [1] - 1293:17
**scandalous** [2] - 1292:21, 1294:1
**scenarios** [1] - 1208:3
**schedules** [1] - 1263:2
**scheduling** [3] - 1174:9, 1230:11, 1240:18
**SCI** [3] - 1201:7, 1201:9, 1201:16
**scientists** [5] - 1278:21, 1279:15, 1279:17, 1297:11, 1298:13
**scope** [1] - 1236:12, 1237:14, 1237:16, 1301:12
**screen** [1] - 1196:24
**Seago** [1] - 1261:12
**seamless** [1] - 1211:1
**SEAN** [1] - 1166:17
**Sean** [1] - 1168:11
**season** [1] - 1266:11
**seat** [2] - 1241:12, 1274:2
**seated** [6] - 1168:22, 1237:12, 1240:13, 1271:25, 1272:1, 1302:13
**second** [4] - 1174:1, 1179:23, 1188:24, 1213:23
**secondly** [1] - 1256:16
**secret** [16] - 1200:5, 1200:7, 1200:8, 1200:11, 1200:12, 1200:18, 1200:23, 1200:24, 1201:1, 1201:16, 1201:19, 1204:20, 1278:14, 1278:24
**Secret/SCI** [3] - 1201:6, 1201:14
**secretary** [1] - 1183:7
**Secretary** [3] - 1247:18, 1300:20, 1300:22
**secretive** [1] - 1298:18
**section** [1] - 1302:20
**secure** [1] - 1173:5
**security** [37] - 1176:8, 1176:9, 1179:3,

1182:10, 1182:15,
1183:3, 1183:14,
1183:18, 1183:21,
1184:11, 1184:21,
1185:10, 1188:4,
1188:10, 1194:23,
1195:15, 1196:19,
1198:6, 1198:19,
1200:6, 1204:16,
1205:4, 1205:14,
1207:12, 1207:18,
1210:11, 1217:17,
1218:4, 1218:6,
1218:18, 1219:9,
1221:4, 1227:12,
1227:14, 1257:5,
1278:4, 1287:2
**see** [38] - 1170:11,
1175:17, 1177:22,
1178:8, 1178:10,
1179:18, 1186:10,
1186:15, 1188:18,
1190:2, 1196:23,
1210:17, 1211:16,
1211:22, 1211:23,
1211:24, 1212:15,
1212:17, 1212:25,
1214:14, 1215:11,
1215:12, 1228:24,
1237:9, 1238:22,
1273:6, 1277:18,
1277:19, 1290:11,
1290:15, 1290:18,
1294:24, 1299:7,
1299:11, 1299:12,
1299:15, 1299:17
**seeing** [2] - 1210:17,
1216:23
**seeking** [1] - 1274:24
**seem** [3] - 1186:8,
1256:12, 1289:21
**senior** [11] - 1177:15,
1185:13, 1185:16,
1224:20, 1227:9,
1243:21, 1244:10,
1244:19, 1277:25,
1278:16
**sense** [7] - 1191:21,
1208:14, 1211:15,
1233:6, 1242:10,
1245:11, 1278:6
**sensitive** [5] - 1201:3,
1213:4, 1230:23,
1231:15, 1231:16
**Sensitive** [1] - 1212:24
**sensitivity** [1] - 1231:3
**sent** [1] - 1183:7
**sentence** [1] - 1189:25
**sentences** [4] -
1297:10, 1298:12,

1303:2, 1303:7
**separate** [4] - 1180:8,
1201:2, 1229:23,
1238:17
**September** [29] -
1170:8, 1179:16,
1181:14, 1181:18,
1187:9, 1188:6,
1197:8, 1202:20,
1213:12, 1214:8,
1215:25, 1217:10,
1217:11, 1217:19,
1218:7, 1225:25,
1232:3, 1233:23,
1255:5, 1256:2,
1290:20, 1290:24,
1295:22, 1295:23,
1296:15, 1297:10,
1297:11, 1297:17,
1297:24
**September/October**
[1] - 1274:18
**sequence** [1] -
1274:25
**series** [2] - 1184:17,
1227:7
**serious** [20] - 1176:8,
1176:9, 1182:10,
1182:15, 1183:13,
1184:21, 1187:10,
1198:18, 1200:23,
1201:25, 1202:17,
1204:12, 1204:16,
1207:11, 1207:12,
1207:18, 1217:16,
1224:19, 1226:23
**seriously** [1] - 1223:3
**server** [6] - 1214:10,
1217:13, 1217:14,
1278:14, 1278:22,
1279:18
**servers** [4] - 1185:4,
1185:6, 1191:5,
1198:1
**service** [1] - 1262:7
**SESSION** [1] - 1166:6
**set** [4] - 1201:2,
1218:12, 1232:2,
1285:2
**several** [2] - 1172:4,
1229:19
**share** [7] - 1265:23,
1265:24, 1267:14,
1281:25, 1291:24,
1292:1, 1292:5
**shared** [6] - 1171:15,
1171:25, 1234:1,
1234:6, 1256:14,
1282:2
**sharing** [3] - 1291:20,

1299:21, 1300:9
**sharpen** [1] - 1169:13
**Shaw** [1] - 1168:7
**SHAW** [1] - 1166:14
**shooting** [1] - 1185:23
**short** [3] - 1230:3,
1235:20, 1240:4
**shortly** [3] - 1171:13,
1235:17, 1257:4
**show** [11] - 1174:17,
1175:5, 1188:22,
1189:22, 1190:2,
1209:21, 1210:19,
1277:1, 1285:8,
1288:5, 1290:9
**showed** [13] -
1172:21, 1173:2,
1173:14, 1173:15,
1174:19, 1174:23,
1210:15, 1210:19,
1210:20, 1217:12,
1227:18, 1236:16
**showing** [1] - 1278:13
**shown** [6] - 1178:22,
1179:4, 1214:25,
1230:21, 1231:22
**sic** [2] - 1212:4,
1281:15
**side** [3] - 1180:11,
1201:9, 1238:10
**sidebar** [1] - 1236:4
**sides** [1] - 1238:5
**sign** [2] - 1213:2,
1213:3
**signature** [1] - 1209:5
**significant** [4] -
1182:1, 1208:7,
1232:25, 1299:24
**signing** [1] - 1209:7
**silver** [2] - 1258:3,
1294:24
**SIM** [1] - 1213:4
**similar** [1] - 1179:25
**Simpson** [1] - 1261:8
**sit** [1] - 1295:11
**sitting** [11] - 1179:15,
1209:7, 1216:19,
1225:16, 1227:1,
1230:10, 1233:8,
1234:4, 1275:7,
1275:22, 1297:22
**situation** [1] - 1222:7
**six** [3] - 1232:5,
1235:25, 1296:19
**Slate** [4] - 1276:18,
1278:13, 1295:8,
1295:11
**slate** [9] - 1276:17,
1281:21, 1282:2,
1295:4, 1295:12,

1295:19, 1296:5,
1296:18, 1297:24
**slip** [1] - 1241:9
**slow** [2] - 1226:16,
1226:20
**slowed** [1] - 1222:18
**smart** [1] - 1204:14
**so..** [5] - 1261:3,
1273:19, 1279:22,
1280:3, 1291:21
**solid** [1] - 1222:19
**someone** [11] -
1200:20, 1203:14,
1209:22, 1244:11,
1256:10, 1275:8,
1276:2, 1281:24,
1282:2, 1287:15
**sometime** [6] -
1179:11, 1225:25,
1247:21, 1252:19,
1274:14, 1274:16
**sometimes** [7] -
1184:19, 1184:20,
1209:3, 1245:16,
1245:17, 1246:21
**somewhere** [1] -
1184:6
**soon** [3] - 1205:17,
1219:13, 1254:14
**sorry** [25] - 1173:9,
1175:1, 1182:12,
1189:12, 1189:18,
1199:19, 1212:15,
1214:4, 1231:12,
1258:13, 1261:14,
1261:16, 1267:21,
1268:8, 1268:9,
1268:16, 1273:24,
1274:4, 1277:13,
1278:12, 1285:22,
1286:10, 1288:6,
1292:1
**Sorry** [1] - 1299:13
**sort** [18] - 1192:5,
1201:3, 1201:9,
1224:5, 1228:6,
1243:19, 1245:13,
1250:4, 1254:3,
1260:19, 1264:10,
1265:18, 1279:24,
1280:1, 1280:2,
1285:5, 1294:8,
1294:24
**sorts** [1] - 1246:23
**sought** [1] - 1300:18
**sounds** [3] - 1212:19,
1289:6, 1289:9
**source** [3] - 1203:24,
1204:3, 1217:4
**space** [1] - 1173:3

**speaking** [6] - 1209:6,
1223:11, 1228:19,
1228:21, 1253:5,
1256:5
**speaks** [1] - 1215:8
**SPECIAL** [1] - 1166:14
**Special** [2] - 1175:4,
1230:14
**special** [3] - 1177:13,
1201:4
**specific** [5] - 1170:5,
1179:21, 1208:2,
1234:22, 1289:14
**specifically** [14] -
1178:12, 1180:18,
1189:11, 1192:21,
1195:4, 1205:13,
1205:22, 1209:18,
1219:19, 1228:13,
1244:20, 1263:22,
1290:25, 1291:11
**specify** [1] - 1303:7
**speculate** [2] -
1215:20, 1215:21
**speech** [1] - 1244:20
**speech-writing** [1] -
1244:20
**spell** [1] - 1241:19
**spend** [1] - 1250:15
**spent** [1] - 1283:10
**spite** [1] - 1264:14
**spoken** [1] - 1175:14
**spring** [3] - 1252:2,
1252:19, 1294:6
**stack** [1] - 1198:3
**staff** [14] - 1243:18,
1243:21, 1244:5,
1247:16, 1250:4,
1250:16, 1260:1,
1275:5, 1276:1,
1276:11, 1291:10,
1296:17, 1297:21
**staffer** [1] - 1275:10
**staffers** [1] - 1276:7
**staffing** [1] - 1247:2
**stage** [1] - 1232:2
**stamina** [1] - 1174:7
**stand** [1] - 1229:10
**standard** [1] - 1180:9
**standing** [1] - 1241:6
**standpoint** [1] -
1256:20
**start** [5] - 1190:5,
1277:23, 1278:12,
1285:22, 1285:23
**started** [5] - 1243:8,
1245:2, 1252:20,
1264:25, 1267:17
**starting** [6] - 1190:25,
1239:12, 1241:21,

1322

1251:24, 1278:9,
1294:6
**starts** [3] - 1210:7,
1290:12, 1295:22
**state** [4] - 1241:19,
1242:15, 1245:20,
1296:8
**statement** [13] -
1234:1, 1234:7,
1234:21, 1235:12,
1272:23, 1276:21,
1277:2, 1277:21,
1277:23, 1278:2,
1278:8, 1278:17,
1302:15
**statements** [2] -
1248:19, 1251:25
**STATES** [3] - 1166:1,
1166:3, 1166:10
**states** [1] - 1242:17
**States** [6] - 1166:12,
1168:3, 1200:20,
1201:23, 1252:2,
1304:11
**stellarwind** [1] -
1184:1
**stenographic** [1] -
1304:5
**step** [5] - 1182:1,
1241:2, 1241:5,
1271:15, 1271:18
**steps** [1] - 1279:2
**Steven** [1] - 1297:14
**still** [6] - 1232:17,
1240:17, 1259:17,
1280:11, 1297:15,
1303:11
**stolen** [5] - 1252:9,
1252:10, 1252:11,
1252:15, 1253:2
**stop** [3] - 1207:5,
1225:15, 1298:19
**stories** [1] - 1294:4,
1294:5, 1294:20
**story** [29] - 1182:14,
1183:23, 1187:5,
1187:8, 1187:13,
1188:5, 1188:8,
1193:18, 1225:15,
1225:19, 1226:6,
1254:18, 1255:2,
1255:6, 1257:20,
1257:21, 1266:8,
1266:13, 1272:5,
1272:7, 1276:15,
1276:18, 1291:14,
1294:7, 1294:16,
1294:23, 1297:15,
1297:23
**strands** [1] - 1298:15

**strategic** [3] -
1243:23, 1252:13,
1300:10
**strategist** [2] -
1244:10, 1244:19
**strategy** [3] - 1243:20,
1243:22, 1299:25
**Street** [1] - 1166:15
**strength** [1] - 1267:20
**strike** [2] - 1303:3,
1303:6
**strong** [2] - 1241:21,
1292:8
**strongest** [1] - 1251:1
**strongly** [1] - 1235:24
**structured** [1] - 1247:2
**Strzok** [4] - 1213:16,
1213:22, 1234:12,
1234:15
**students** [1] - 1241:25
**studying** [1] - 1298:16
**stuff** [2] - 1259:3,
1290:2
**subject** [5] - 1227:16,
1264:23, 1266:20,
1268:20
**submit** [1] - 1196:16
**subsequent** [3] -
1223:21, 1239:2,
1250:9
**subsequently** [1] -
1283:10
**substance** [2] -
1246:22, 1267:12
**substantially** [1] -
1272:9
**substantive** [3] -
1198:9, 1219:14,
1266:17
**substantively** [1] -
1171:4
**sudden** [1] - 1253:2
**suggest** [2] - 1272:14,
1272:16
**suggested** [1] -
1215:1
**suggesting** [2] -
1230:3, 1252:2
**Sullivan** [10] - 1244:3,
1244:17, 1253:16,
1265:4, 1265:9,
1277:22, 1277:24,
1278:16, 1302:16
**Sullivan's** [1] - 1278:7
**sum** [1] - 1283:3
**summer** [4] - 1251:15,
1251:19, 1253:19,
1253:21
**Sunday** [1] - 1185:23
**support** [1] - 1247:14

**supporter** [1] - 1254:5
**supposed** [2] -
1292:18, 1292:20
**supposition** [2] -
1204:21, 1233:8
**surmised** [6] -
1178:14, 1188:13,
1188:14, 1191:24,
1191:25, 1215:1
**surprise** [12] - 1217:3,
1217:6, 1257:10,
1257:11, 1257:21,
1288:8, 1292:6,
1292:11, 1293:12,
1293:21, 1293:24,
1294:10
**surprised** [1] -
1180:22
**surrounding** [1] -
1172:25
**surveillance** [2] -
1184:7, 1185:3
**suspect** [2] - 1273:9,
1282:10
**suspicious** [5] -
1196:18, 1196:19,
1197:25, 1217:12,
1292:25
**Sussmann** [99] -
1168:4, 1168:13,
1169:20, 1170:8,
1170:20, 1171:14,
1171:15, 1171:25,
1175:7, 1175:21,
1176:2, 1176:17,
1177:19, 1178:12,
1181:18, 1182:18,
1185:12, 1186:2,
1186:14, 1187:16,
1188:6, 1188:15,
1189:9, 1190:8,
1191:5, 1191:10,
1191:14, 1192:8,
1197:15, 1198:6,
1199:4, 1199:10,
1200:2, 1201:13,
1201:21, 1201:22,
1202:10, 1202:19,
1203:5, 1203:17,
1204:4, 1206:8,
1206:11, 1206:18,
1206:19, 1207:11,
1207:17, 1213:20,
1215:2, 1216:5,
1216:13, 1216:25,
1217:9, 1218:13,
1219:8, 1219:16,
1220:4, 1220:19,
1220:22, 1223:7,
1223:16, 1223:20,

1224:2, 1225:14,
1225:17, 1225:24,
1226:5, 1229:3,
1230:17, 1230:22,
1231:15, 1232:3,
1233:23, 1234:1,
1235:1, 1235:13,
1241:1, 1248:7,
1254:23, 1254:25,
1255:4, 1255:12,
1255:15, 1255:19,
1272:11, 1285:18,
1287:9, 1288:18,
1288:23, 1289:2,
1289:6, 1289:15,
1289:18, 1289:19,
1289:24, 1290:19,
1291:1, 1296:7,
1300:23
**SUSSMANN** [1] -
1166:6
**Sussmann's** [11] -
1180:20, 1181:1,
1204:7, 1214:16,
1226:9, 1227:16,
1227:21, 1234:21,
1235:5, 1235:6,
1296:15
**sustained** [1] - 1262:2
**swear** [1] - 1241:7
**switch** [1] - 1219:5
**sworn** [1] - 1241:8
**Sworn** [1] - 1241:13

**T**

**table** [1] - 1168:6
**takeaway** [1] - 1188:9
**talks** [2] - 1212:21,
1216:12
**teach** [1] - 1241:25
**team** [13] - 1175:5,
1181:2, 1199:18,
1199:20, 1229:20,
1243:18, 1243:21,
1244:5, 1250:4,
1279:22, 1288:3,
1292:3, 1292:4
**teams** [1] - 1222:17
**technical** [2] - 1210:9,
1264:21
**technically** [1] -
1247:20
**telephone** [6] -
1171:14, 1215:7,
1285:25, 1286:2,
1286:7, 1290:23
**tended** [2] - 1243:21,
1244:5
**tenor** [1] - 1219:23

**term** [2] - 1242:13,
1248:15
**terminate** [1] - 1185:7
**terms** [6] - 1177:11,
1206:2, 1252:13,
1273:2, 1280:22,
1299:21
**testified** [14] -
1169:20, 1184:19,
1186:25, 1188:3,
1192:19, 1193:10,
1258:15, 1264:11,
1272:10, 1274:5,
1280:20, 1282:14,
1285:11, 1296:22
**testifying** [1] -
1301:18
**testimony** [22] -
1188:10, 1194:3,
1194:5, 1194:20,
1225:21, 1226:18,
1227:19, 1227:20,
1227:25, 1229:13,
1230:16, 1237:1,
1237:2, 1238:17,
1239:19, 1273:9,
1290:25, 1292:19,
1296:25, 1301:5,
1302:2, 1302:3
**text** [10] - 1182:22,
1183:7, 1190:21,
1202:19, 1215:24,
1230:17, 1235:7,
1235:8, 1235:13,
1277:21
**THE** [99] - 1166:1,
1166:1, 1166:10,
1168:2, 1168:9,
1168:14, 1168:17,
1168:18, 1168:19,
1168:20, 1168:22,
1172:18, 1181:11,
1189:17, 1189:18,
1196:11, 1212:7,
1221:13, 1236:4,
1236:7, 1236:11,
1236:22, 1236:25,
1237:4, 1237:5,
1237:12, 1237:19,
1237:23, 1238:3,
1238:7, 1238:11,
1238:18, 1238:21,
1239:1, 1239:3,
1239:7, 1239:10,
1239:15, 1239:21,
1240:1, 1240:8,
1240:13, 1241:2,
1241:4, 1241:5,
1241:9, 1241:11,
1241:12, 1261:14,

1323

1261:16, 1262:2, 1263:19, 1264:2, 1268:9, 1268:10, 1268:11, 1268:17, 1271:8, 1271:15, 1271:17, 1271:18, 1271:20, 1271:23, 1271:25, 1272:1, 1272:4, 1272:20, 1272:24, 1273:3, 1273:5, 1273:9, 1273:12, 1273:14, 1273:17, 1273:20, 1273:22, 1273:24, 1277:6, 1277:7, 1277:15, 1279:12, 1281:4, 1293:7, 1296:12, 1296:20, 1297:4, 1298:25, 1299:2, 1301:4, 1301:23, 1302:1, 1302:5, 1302:6, 1302:13, 1302:24, 1303:6, 1303:11, 1303:16, 1303:19
**theJimBaker** [1] - 1196:15
**themselves** [2] - 1172:14, 1225:6
**thinking** [3] - 1208:12, 1254:8, 1257:22
**third** [3] - 1214:13, 1235:4, 1250:6
**thoughts** [1] - 1236:15
**thread** [1] - 1297:13
**threaten** [1] - 1196:18
**three** [8] - 1197:21, 1197:23, 1200:17, 1235:11, 1240:3, 1256:20, 1286:16, 1298:12
**three..** [1] - 1235:10
**throughout** [4] - 1201:5, 1262:14, 1283:2, 1294:20
**thumb** [7] - 1190:9, 1197:16, 1197:18, 1221:2, 1224:24, 1225:2, 1225:5
**ties** [1] - 1278:25
**time-sensitive** [2] - 1230:23, 1231:16
**timed** [2] - 1252:22, 1252:24
**Timekeeper** [2] - 1290:16, 1290:18
**timekeeper** [1] - 1290:17
**Times'** [1] - 1297:14
**timing** [1] - 1176:21

**tiny** [1] - 1287:22
**tip** [2] - 1195:1, 1196:17
**today** [13] - 1169:12, 1179:15, 1216:19, 1225:16, 1227:1, 1230:10, 1233:9, 1234:4, 1240:5, 1264:11, 1275:7, 1280:18, 1297:22
**together** [1] - 1205:9
**tomorrow** [1] - 1182:24
**took** [6] - 1173:22, 1220:6, 1231:14, 1247:24, 1272:14, 1279:2
**Top** [2] - 1201:5, 1201:14
**top** [19] - 1180:5, 1200:5, 1200:7, 1200:8, 1200:11, 1200:12, 1200:17, 1200:24, 1201:1, 1201:16, 1201:19, 1204:20, 1228:4, 1229:10, 1278:12, 1279:13, 1293:18, 1295:18, 1295:21
**topic** [6] - 1224:23, 1227:12, 1227:14, 1263:22, 1264:6, 1282:13
**topics** [1] - 1180:10
**total** [1] - 1283:3
**totally** [14] - 1253:25, 1254:1, 1264:11, 1264:14, 1265:21, 1268:1, 1268:6, 1268:14, 1280:11, 1280:21
**touch** [4] - 1183:8, 1243:20, 1255:1, 1288:1
**touched** [1] - 1180:19
**Tower** [2] - 1278:15, 1281:17
**tower** [1] - 1254:4
**transcript** [3] - 1220:2, 1304:5, 1304:6
**TRANSCRIPT** [1] - 1166:9
**treating** [1] - 1257:10
**TRIAL** [1] - 1166:9
**trial** [2] - 1237:3, 1240:16
**tried** [3] - 1169:12, 1174:7, 1297:11
**Trisha** [4] - 1178:24, 1179:2, 1180:12,

1234:9
**trouble** [1] - 1229:6
**troubling** [1] - 1282:11
**true** [16] - 1207:9, 1227:11, 1231:2, 1231:5, 1231:6, 1231:10, 1231:18, 1231:21, 1250:14, 1250:19, 1254:3, 1281:2, 1281:18, 1282:5, 1304:4, 1304:6
**TRUMP** [1] - 1214:11
**Trump** [36] - 1202:21, 1203:2, 1203:6, 1208:16, 1217:13, 1217:22, 1218:2, 1218:9, 1249:18, 1251:6, 1251:18, 1251:24, 1253:7, 1253:9, 1254:4, 1254:18, 1255:6, 1255:23, 1256:22, 1257:24, 1259:5, 1278:14, 1278:21, 1278:22, 1279:1, 1279:18, 1281:17, 1292:24, 1294:8, 1294:12, 1294:14, 1294:20, 1297:18, 1299:10
**Trump's** [7] - 1251:19, 1253:4, 1253:9, 1259:7, 1278:25, 1294:4, 1294:5
**Trump-related** [1] - 1217:13
**Trump/Alfa** [4] - 1255:10, 1256:3, 1257:10, 1257:20
**Trump/Alfa-Bank** [4] - 1255:10, 1256:3, 1257:10, 1257:20
**Trump/Russia** [2] - 1258:5, 1259:3
**trust** [5] - 1256:18, 1257:2, 1283:13, 1283:15, 1298:5
**trusted** [2] - 1204:10, 1283:15
**trusting** [2] - 1201:21, 1201:22
**truth** [4] - 1220:13, 1302:16, 1302:17, 1302:18
**try** [4] - 1169:18, 1264:2, 1296:6, 1302:8
**trying** [9] - 1173:7, 1176:3, 1177:12,

1205:17, 1227:2, 1228:9, 1238:4, 1250:25
**TS/SC** [1] - 1200:10
**TS/SCI** [2] - 1200:12, 1200:16
**Tuesday** [1] - 1240:15
**turn** [3] - 1205:20, 1240:19, 1295:15
**turning** [1] - 1282:13
**turns** [1] - 1215:9
**Tweet** [19] - 1196:13, 1197:1, 1272:7, 1272:23, 1277:17, 1277:20, 1277:21, 1279:14, 1279:20, 1279:25, 1280:5, 1280:22, 1293:3, 1293:4, 1295:2, 1301:13, 1301:20, 1302:20, 1303:1
**Tweeted** [5] - 1195:19, 1195:22, 1197:5, 1197:6, 1197:7
**Tweets** [1] - 1279:22
**twice** [1] - 1173:10
**Twitter** [2] - 1176:18, 1176:20
**two** [22] - 1173:13, 1179:25, 1185:19, 1187:4, 1191:10, 1197:21, 1197:22, 1200:14, 1219:14, 1229:23, 1230:4, 1231:9, 1249:12, 1256:7, 1256:20, 1272:18, 1277:19, 1296:11, 1303:2, 1303:6, 1303:11, 1303:12
**type** [4] - 1176:4, 1218:22, 1224:13, 1293:23
**types** [4] - 1178:13, 1200:14, 1200:17, 1201:4
**typical** [1] - 1245:11
**typically** [2] - 1197:18, 1244:2

# U

**U.S** [3] - 1166:23, 1214:9, 1294:18
**Ukraine** [1] - 1294:18
**ultimate** [1] - 1250:22
**ultimately** [7] - 1229:2, 1265:25, 1266:24, 1282:24, 1282:25, 1284:12, 1284:14

**unauthorized** [1] - 1200:20
**unaware** [2] - 1180:25, 1216:15
**uncommon** [1] - 1249:4
**uncovered** [3] - 1192:7, 1278:22, 1279:17
**under** [2] - 1259:3, 1290:18
**understood** [10] - 1183:2, 1186:8, 1192:5, 1192:19, 1197:24, 1198:5, 1209:22, 1234:18, 1273:11, 1284:16
**unfairly** [1] - 1272:16
**UNITED** [3] - 1166:1, 1166:3, 1166:10
**United** [6] - 1166:12, 1168:3, 1200:20, 1201:23, 1252:2, 1304:11
**unlawfully** [1] - 1222:21
**unless** [1] - 1237:14
**unlocking** [1] - 1278:24
**unredacted** [1] - 1303:1
**unrelated** [1] - 1218:10
**unusual** [4] - 1182:5, 1182:7, 1252:1, 1252:5
**unusually** [1] - 1214:10
**up** [44] - 1168:15, 1172:15, 1172:18, 1174:21, 1174:24, 1175:12, 1178:25, 1181:9, 1181:10, 1181:11, 1185:9, 1185:24, 1189:12, 1196:3, 1205:20, 1205:21, 1210:16, 1211:7, 1212:1, 1213:24, 1218:20, 1219:9, 1219:12, 1219:24, 1240:7, 1241:2, 1241:5, 1241:18, 1255:5, 1263:22, 1271:22, 1271:23, 1273:22, 1276:5, 1286:3, 1290:22, 1293:3, 1293:10, 1295:6, 1295:17, 1295:21, 1297:7, 1301:21,

1303:16
**upper** [1] - 1287:16
**urgency** [1] - 1208:15
**uses** [1] - 1202:3

## V

**VA** [1] - 1290:22
**variety** [2] - 1183:18, 1194:22
**various** [8] - 1172:5, 1172:8, 1172:9, 1208:3, 1213:8, 1229:12, 1230:11
**vary** [1] - 1200:18
**vehicles** [1] - 1195:1
**vendor** [1] - 1251:11
**veracity** [1] - 1203:24
**Vermont** [1] - 1242:14
**vet** [4] - 1250:16, 1256:10, 1268:25, 1281:18
**vetted** [5] - 1254:2, 1254:11, 1256:9, 1268:24, 1292:8
**vetting** [6] - 1262:15, 1263:2, 1296:24, 1296:25, 1298:4, 1298:6
**via** [1] - 1171:9
**vice** [1] - 1184:10
**view** [5] - 1176:15, 1194:17, 1218:3, 1226:9, 1229:2
**viewed** [1] - 1221:10
**Virginia** [2] - 1242:16, 1242:20
**virtual** [1] - 1230:15
**Vixie** [2] - 1298:14, 1298:15
**Vladimir** [2] - 1251:25, 1254:6
**voice** [2] - 1278:6, 1280:2
**voluntarily** [1] - 1256:3
**volunteered** [1] - 1177:11
**vote** [1] - 1254:9
**voters** [3] - 1248:21, 1250:24, 1292:21
**voting** [1] - 1248:19
**vs** [2] - 1166:5, 1168:4

## W

**wait** [2] - 1206:15, 1227:3
**waited** [1] - 1268:23
**waiting** [1] - 1271:19

**was..** [1] - 1232:11
**washed** [1] - 1232:23
**Washington** [5] - 1166:15, 1166:24, 1173:4, 1297:16, 1304:13
**watch** [1] - 1281:13
**WATKINS** [1] - 1166:19
**ways** [2] - 1194:22, 1221:21
**web** [1] - 1249:25
**website** [4] - 1196:22, 1197:1, 1197:10, 1197:12
**week** [3] - 1174:1, 1230:4, 1246:20
**weeks** [1] - 1296:19
**weigh** [1] - 1235:24
**welcome** [1] - 1240:13
**well..** [1] - 1229:5
**White** [2] - 1184:9, 1184:11
**white** [4] - 1214:13, 1223:22, 1290:22, 1291:4
**whole** [8] - 1190:3, 1190:25, 1205:20, 1227:7, 1279:22, 1285:21, 1289:11
**wholesale** [1] - 1259:8
**win** [1] - 1292:16
**wise** [1] - 1245:20
**wished** [1] - 1302:18
**WITNESS** [16] - 1167:2, 1168:17, 1168:19, 1172:18, 1181:11, 1189:18, 1237:4, 1241:4, 1241:11, 1261:16, 1268:9, 1268:11, 1271:17, 1271:20, 1277:6, 1302:5
**witness** [11] - 1175:13, 1184:3, 1189:19, 1205:24, 1210:24, 1212:3, 1236:20, 1237:24, 1237:25, 1241:8, 1273:17
**Witness** [9] - 1171:21, 1189:1, 1189:4, 1189:14, 1190:1, 1191:1, 1191:6, 1228:3, 1299:13
**witnesses** [4] - 1240:4, 1240:5, 1240:19, 1303:12
**won** [5] - 1183:20, 1183:23, 1184:2, 1184:5, 1247:23

**word** [1] - 1182:7
**words** [12] - 1179:21, 1196:21, 1196:22, 1196:25, 1197:6, 1197:8, 1216:17, 1227:13, 1231:9, 1289:22
**works** [1] - 1201:12
**world** [2] - 1218:23, 1298:14
**worried** [2] - 1224:9, 1224:10
**worry** [1] - 1169:2
**worth** [1] - 1236:10
**worthy** [1] - 1202:8
**wrapped** [1] - 1185:24
**write** [2] - 1280:14, 1281:18
**writing** [3] - 1234:22, 1235:6, 1244:20
**written** [6] - 1177:21, 1235:24, 1236:2, 1280:23, 1281:5
**wrote** [2] - 1184:6, 1298:15

## Y

**YAO** [1] - 1166:18
**Yao** [1] - 1168:12
**year** [1] - 1190:17
**years** [2] - 1177:16, 1202:11
**yesterday** [33] - 1168:25, 1169:20, 1169:24, 1169:25, 1170:4, 1171:7, 1173:6, 1175:1, 1180:6, 1180:24, 1182:6, 1184:20, 1186:25, 1188:3, 1188:10, 1192:19, 1193:10, 1194:3, 1197:13, 1198:24, 1199:22, 1203:23, 1207:3, 1208:4, 1208:16, 1209:1, 1209:19, 1210:18, 1210:20, 1213:9, 1219:24, 1219:25, 1232:12
**yesterday's** [1] - 1220:2
**York** [26] - 1166:20, 1169:17, 1181:8, 1182:14, 1184:12, 1185:9, 1185:22, 1191:4, 1191:12, 1191:15, 1192:10, 1192:11, 1193:15,

1193:19, 1225:12, 1244:24, 1254:18, 1255:1, 1255:5, 1276:17, 1295:13, 1296:14, 1296:18, 1297:14, 1297:23, 1301:15
**yourself** [2] - 1213:5, 1264:21

## Z

**zone** [1] - 1296:5