1
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

2

   * * * * * * * * * * * * * * *   )

3  UNITED STATES OF AMERICA,        )   Criminal Action No.
                               )   1:21-CR-00582-CRC-1

4             Plaintiff,    )   Friday, May 20, 2022
                               )   1:51 p.m.

5   vs.                      )   **AFTERNOON SESSION**
                               )

6  MICHAEL A. SUSSMANN,          )
                               )

7            Defendant.   )
                               )

8   * * * * * * * * * * * * * * *   )

9

10
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE CHRISTOPHER R. COOPER

11
UNITED STATES DISTRICT JUDGE

12

13  APPEARANCES:

14  FOR THE UNITED STATES:   ANDREW DeFILIPPIS, ESQ.
                             JONATHAN EDGAR ALGOR, IV, ESQ.

15                        MICHAEL T. KEILTY, ESQ.
                        BRITTAIN SHAW, ESQ.

16                        SPECIAL COUNSEL'S OFFICE
                        145 N Street, Northeast

17                        Washington, D.C. 20002

18  FOR THE DEFENDANT:       SEAN M. BERKOWITZ, ESQ.
                             MICHAEL BOSWORTH, ESQ.

19                        CATHERINE YAO, ESQ.
                        NATALIE H. RAO, ESQ.

20                        LATHAM & WATKINS, LLP
                        1221 Avenue of the Americas

21                        New York, New York 10020

22  REPORTED BY:          LISA EDWARDS, RDR, CRR
                        Official Court Reporter

23                        United States District Court for the
                         District of Columbia

24                        333 Constitution Avenue, Northwest
                        Washington, D.C. 20001

25                        (202) 354-3269

1

I N D E X

2

|                               | Direct | Cross | Red. |
|-------------------------------|--------|-------|------|
| WITNESSES FOR THE GOVERNMENT: |        |       |      |
| Mark Chadason                 | 1327   | 1330  | 1358 |
| Kevin P.                      | 1361   | 1382  | 1398 |

| EXHIBITS RECEIVED IN EVIDENCE     | PAGE |
|-----------------------------------|------|
| Government's Exhibit No. 809       | 1331 |
| Government's Exhibit No. 812       | 1371 |
| Government's Exhibit No. 817       | 1376 |
| Government's Exhibit No. 814       | 1391 |
| Defendant's Exhibit No. 806        | 1357 |
| Defendant's Exhibit No. 600        | 1385 |
| Defendant's Exhibit No. 525        | 1385 |
| Defendant's Exhibit No. 806        | 1388 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                THE COURTROOM DEPUTY:  Your Honor, ready for the
 2     jury?
 3                THE COURT:  Yes, ma'am.
 4                (Whereupon, the jury entered the courtroom at 1:51
 5     p.m. and the following proceedings were had:)
 6                THE COURT:  Welcome back, ladies and gentlemen.  I
 7     hope everyone had a nice lunch.
 8                We are now back in the Government's case in chief
 9     for, I believe, two witnesses, the last two witnesses today.
10                Mr. Algor?
11                MR. ALGOR:  Thank you, your Honor.
12                The Government calls Mark Chadason.
13                THE COURT:  Step right up, sir.  Please remain
14     standing and raise your right hand.
15                MARK CHADASON, GOVERNMENT WITNESS, SWORN.
16                THE COURT:  You can have a seat.
17                          DIRECT EXAMINATION
18     BY MR. ALGOR:
19     Q.  Good afternoon.
20     A.  Good afternoon.
21     Q.  Can you please state and spell your name for the record.
22     A.  Mark Chadason, M-A-R-K C-H-A-D-A-S-O-N.
23     Q.  And what is the current type of your employment?
24     A.  I'm the CEO of a small tech consulting company.
25     Q.  And where did you work before that?
```

1    A.  I was employed with the Central Intelligence Agency.

2    Q.  And is that also known as the CIA?

3    A.  It is the CIA.

4    Q.  And in early 2017, what was your employment at that

5    time?

6    A.  I had a small private company, which I [indiscernible].

7            THE COURT REPORTER:  I'm sorry, sir.  Could you

8    sit closer to the microphone, please?

9            THE WITNESS:  I'm sorry.  I had a small private

10   company, a consulting company.

11   Q.  And did there come a time when you came to speak with an

12   individual named Michael Sussmann?

13   A.  Yes.

14   Q.  And when was that?

15   A.  January 31st, 2017.

16   Q.  And did you know Mr. Sussmann before then?

17   A.  I did not.

18   Q.  And so what were the circumstances in how you came to

19   meet Mr. Sussmann?

20   A.   I was called by a friend of mine, Gilman Louie, who

21   asked me to have a meeting with Mr. Sussmann.  Gilman and I

22   were colleagues and we both sat on the board of the CIA

23   Officers Memorial Foundation.

24   Q.  And what was your first interaction with Mr. Sussmann?

25   A.  I believe we had a breakfast on a day at a hotel in

Chadason - DIRECT - By Mr. Algor

1    Northern Virginia.

2    Q.   And that was on January 31st, 2017?

3    A.   That is correct.

4    Q.   What, if anything, did Mr. Sussmann say about whether he

5    knew you had previously worked for the CIA?

6    A.   I believe Gilman has told him that I was a retired CIA

7    officer.

8    Q.   And you met with Mr. Sussmann at that hotel; is that

9    correct?

10   A.   In a restaurant at that hotel.  Yes.

11   Q.   And approximately how long did the meeting last?

12   A.   I imagine about an hour, hour and a half.

13   Q.   And what did Mr. Sussmann say regarding what he wanted

14   to meet with you about?

15   A.   Mr. Sussmann had some allegations, I guess, against

16   President Trump that he wanted me to hear.

17   Q.   And what, if anything, did Mr. Sussmann ask you to do

18   during that meeting?

19   A.   Mr. Sussmann wanted to have a meeting with a senior CIA

20   active-duty person and asked me if I could make that happen.

21   Q.   And did Mr. Sussmann say whether he was there on behalf

22   of anyone else?

23   A.   He said he was there on behalf of a client.  Yes.

24   Q.   And what, if anything, did Mr. Sussmann say regarding

25   whether he had shared anything regarding the allegations

1    about Mr. Trump with anyone else?

2    A.  He said he did speak to the Office of General Counsel at

3    CIA and was told to talk to the FBI.  And he said he knew

4    someone at FBI, but he did not want to talk to the FBI or

5    his client did not trust the FBI and or his client did not

6    believe that the FBI had the necessary tools to deal with

7    the allegation.

8    Q.  Did Mr. Sussmann say anything regarding what he would do

9    if the CIA didn't take his meeting regarding these

10   allegations?

11   A.  He said that his client was prepared to go to *The New*

12   *York Times* if the CIA was not prepared to meet.

13   Q.  And after you met -- after that hour-and-a-half meeting

14   with Mr. Sussmann, what did you do in response to that

15   meeting?

16   A.  After the meeting, I wrote down my notes and I called a

17   friend of mine who is a senior officer and provided her the

18   memorandum of the conversation.

19           MR. ALGOR:  If I could bring up for the witness

20   Government's Exhibit 809.

21   BY MR. ALGOR:

22   Q.  Mr. Chadason, I'll wait for your glasses.

23   A.  Sorry.

24   Q.  No problem.

25   A.  This is a little blurry here.

1    Q.  Do you see your name at the top there?

2    A.  I do.

3    Q.  And what --

4            MR. ALGOR:  Your Honor, the Government would move

5    to admit Government's Exhibit 809.

6            MR. BOSWORTH:  No objection.

7            THE COURT:  So moved.

8            (Whereupon, Government's Exhibit No. 809 was

9    entered into evidence.)

10           MR. ALGOR:  If we could turn to Page 4, please.

11   And if we can blow up the top part.

12   BY MR. ALGOR:

13   Q.  Now, Mr. Chadason, you just testified that you had

14   written a report following your meeting with Mr. Sussmann.

15   Is that correct?

16   A.  That is correct.

17   Q.  And you also testified that the meeting was on January

18   31st, 2017.  Right?

19   A.  That is correct.

20   Q.  And so at the top, is this the memo that you just

21   mentioned previously?

22   A.  Yes, it is.

23           MR. ALGOR:  If we can take that down.  If we could

24   see the top part of the memo, please.

25

1   BY MR. ALGOR:

2   Q.  If you could just read that first paragraph, please.

3   A.  "On 31 January 2017, Mark Chadason was

4   virtually [deleted space] introduced by the former CEO of

5   INQTEL, Gilman Louie, to Michael Sussmann.  Sussman is a

6   partner at Perkins Coie, LLP, and is in charge of the

7   privacy and data security practice, IOT, consumer privacy,

8   computer and network intrusions, IOT and related

9   investigations, surveillance and regulatory compliance and

10  national security issues.  Sussmann claimed to have a TS/SCI

11  and IC badge."

12  Q.  So in this introductory paragraph, you're just basically

13  setting the stage of who the individual is that you met

14  with.  Is that correct?

15  A.  That is correct.

16          MR. ALGOR:  If we could come down to the second

17  paragraph, please.

18  BY MR. ALGOR:

19  Q.  This paragraph refers to Gilman Louie; is that correct?

20  A.  It does.

21  Q.  And Gilman Louie, who is he again?

22  A.  Gilman Louie is the former CEO of INQTEL.  INQTEL was a

23  CIA organization that dealt with private industry.  And he

24  also sits on the board of the CIA Officers Memorial

25  Foundation, about nine years.

1    Q.  In the next paragraph, it starts with "The Story."  Can

2    you read that, please, the story.

3    A.  "Sussmann said that he represents a client who does not

4    want to be known, but who had some interesting information

5    [redacted]."

6    Q.  And that's your recollection from what Mr. Sussmann had

7    told you during that January 31st meeting.  Is that correct?

8    A.  That is correct.

9    Q.  So now turning to the next page, please.

10           MR. ALGOR:  If you could just pull up "The

11   Client."

12   BY MR. ALGOR:

13   Q.  If you could read that first sentence after the word

14   "client."

15   A.  "The Client:  Sussmann would not provide client's

16   identity and was not sure if the client would reveal himself

17   to the CIA, but he would provide data sets supporting his

18   claims which then could be verified."

19   Q.  And then right after that, can you read that next

20   sentence, please?

21   A.  "Chadason was able to elicit that the client is an

22   engineer with number of patents, and is most likely a

23   contractor to the IC, as Sussmann claimed the client had

24   [deleted] and various projects.  The client has worked with

25   IC before.  Sussmann also said that the client is a

Chadason - DIRECT - By Mr. Algor

 1    Republican."

 2              MR. ALGOR:  If you can take that down, please.

 3    BY MR. ALGOR:

 4    Q.  So, Mr. Chadason, that -- is that the sum and substance

 5    of what Mr. Sussmann provided to you regarding his client?

 6    A.  To my best recollection, yes.

 7    Q.  Do you remember him identifying anyone regarding this or

 8    just maintaining just that it was his client?

 9    A.  He did not identify anyone.

10              MR. ALGOR:  If we could go to the next paragraph,

11    please.

12    BY MR. ALGOR:

13    Q.  Starting with the first sentence, if you could read

14    that, please.

15    A.  "Chadason asked if Sussmann has provided this data to

16    the FBI.  And initially he said he knew Jim Trainor, NFI,"

17    no further information.

18              "The FBI had then claimed that his client did not

19    want to -- claimed that his client did not want to provide

20    this to the FBI, as he knows that the FBI did not have the

21    resources to deal with these issues, or perhaps since

22    Sussmann is openly a Democrat and openly told Chadason that

23    he does a lot of work for DNC, did not trust the FBI."

24    Q.  You started out that you had asked Mr. Sussmann whether

25    he had provided this to the FBI.  Is that correct?

1   A.  I did.

2   Q.  And why did you ask him that question?

3   A.  The matter was of both domestic and foreign issue.  And

4   I was wondering if the FBI was dealing with the domestic

5   part of it.

6   Q.  And when Mr. Sussmann explained that there was a lack of

7   trust with the FBI, was he referring to himself or the

8   client, if you recall?

9   A.  To the best of my recollection, I believe he was

10  referring to the client.

11          MR. ALGOR:  If we could go down to the next

12  paragraph or two paragraphs.

13  BY MR. ALGOR:

14  Q.  You mentioned earlier that Mr. Sussmann had told you

15  that he had tried to reach out to the CIA.  Is that correct?

16  A.  That is correct.

17  Q.  And then if you could read that next paragraph, starting

18  with "Sussmann said that."

19  A.  "Sussmann said he did speak with the CIA general

20  counsel, NFI, before she retired, NFI, and she told him he

21  should contact the FBI."

22  Q.  And sorry.  If you could read that next one.

23  A.  "Sussmann said that his client would most likely only

24  provide the data to the senior bona fide CIA officers

25  (active duty) and if there is no interest, he would most

1   likely go to *New York Times*."

2   Q.  And so you've mentioned NFI a few times.  I think you

3   said it once before.  What does that stand for?

4   A.  No further information available to me.

5   Q.  And so the second paragraph -- and I think you testified

6   earlier -- your memory and what you wrote down here is that

7   Mr. Sussmann said that if the CIA didn't look at this, he

8   would take this to *The New York Times*.  Is that your

9   recollection?

10   A.  That is my recollection.

11        MR. ALGOR:  If we could turn to the next page,

12   please.  If we can blow up the first paragraph.

13   BY MR. ALGOR:

14   Q.  And this paragraph -- can you just explain generally to

15   the jury, what were you writing about here?

16   A.  I was writing that Mr. Sussmann's background is an

17   experienced attorney, had clearances, and he had experiences

18   in the intelligence community.  He has dealt with all kinds

19   of people and that his allegation would not have

20   unsubstantial allegations.

21   Q.  In the second line, it says, "Of IC experience, he sees

22   lots of quacks and unsubstantial allegations."

23        Did you recall him saying that to you or is that

24   your own words?

25   A.  It's probably a summary of my words, a summary of what

```
1     he said.
2     Q.  And then in the last line it says, "He cares about the
3     security of the country and wanted the IC to know or 'to IC
4     to know.'"
5              What does IC mean?
6     A.  Intelligence community.
7     Q.  And do you recall Mr. Sussmann saying that to you?
8     A.  Yes, I do.
9              MR. ALGOR:  Pull down the last one.  If we could
10    just blow up the Sussmann bio, please.
11    BY MR. ALGOR:
12    Q.  And, Mr. Chadason, this is in your memo as well.  Can
13    you explain to the jury why you put this into your memo?
14    A.  When I wrote the memo, I put some context to the person
15    that I was sending the memo to.  So in order for the person
16    to understand who Mr. Sussmann was, I was providing a
17    background so they can make a judgment whether they wanted
18    to meet with Mr. Sussmann or not.
19              MR. ALGOR:  If we could go back to the first page
20    of the exhibit.
21    BY MR. ALGOR:
22    Q.  So this is a series of email exchanges that you had with
23    other people.  Is that correct?
24    A.  That is correct.
25              MR. ALGOR:  If we could blow up the bottom email
```

1   right there.

2   BY MR. ALGOR:

3   Q.  So this is an email you sent on February 7th.  Is that

4   correct?

5   A.  That is correct.

6   Q.  And so it starts with "Steven."  Can you just read that,

7   please, that paragraph.

8   A.  "Steven, Michael [redacted] me and said he returned from

9   Amsterdam and he is looking forward to speaking with someone

10  ASAP.  I think the longer we wait, the murkier the waters

11  get with his source (that is, who else he will speak to in

12  frustration.)"

13  Q.  Let me stop you there.

14          What did you mean by that?

15  A.  That if this is a bona fide lead, the source goes to *The*

16  *New York Times*, this thing will be no longer valid.

17  Q.  When you used the term "murkier," what do you mean by

18  that?

19  A.  I think I was trying to say that it's not going to be --

20  if the information is public, difficult to have any sort of

21  intelligence [indiscernible].

22          THE COURT REPORTER:  I'm sorry, sir.  I missed the

23  last word.

24          THE WITNESS:  If the information becomes public,

25  it will make it more difficult to have intelligence

1    operation or anything like that.

2              MR. ALGOR:  If we can pull that down and if we can

3    blow up the top.

4    BY MR. ALGOR:

5    Q.  And, Mr. Chadason, what's the date of that email?

6    A.  Tuesday, February 7, 2017.

7              MR. ALGOR:  If we can pull that down.  Thanks.

8    BY MR. ALGOR:

9    Q.  Mr. Chadason, do you know whether Mr. Sussmann ever met

10   with anyone at the CIA?

11   A.  I received an email on 8th of February stating that they

12   made contact.  That was the last time I ever heard of the

13   matter.

14   Q.  Did you ever hear about anything regarding the meeting

15   the CIA had with Mr. Sussmann?

16   A.  I did not.

17   Q.  And did you ever speak with Mr. Sussmann again following

18   that January 31st, 2017, meeting?

19   A.  I don't believe so.  No.

20             MR. ALGOR:  Thank you.

21                      CROSS-EXAMINATION

22   BY MR. BOSWORTH:

23   Q.  Good afternoon, Mr. Chadason.

24   A.  Good afternoon.

25   Q.  We've never met before, right?

1    A.   No.

2    Q.   So I just want to ask you a few questions to start about

3    how it was that you came to meet with Mr. Sussmann.

4            I think you said initially that you spoke to a

5    person named Gilman Louie?

6    A.   Correct.

7    Q.   And Gilman Louie is who to you?

8    A.   He is a friend and a fellow board member at the CIA

9    Officers Memorial Foundation.

10   Q.   What is that organization?

11   A.   It is a foundation which raises funds for the survivors

12   of officers who have been killed in action for the spouses

13   and children, to put them through college, provide education

14   to spouses and try to provide benefits which are not

15   generally given to the CIA officers.

16   Q.   How long had you all worked together on the board of the

17   foundation?

18   A.   About nine years.

19   Q.   So he was someone you trusted?

20   A.   Yes, sir.

21   Q.   And what did -- how did it work?  What did he say to you

22   to see if you'd be willing to meet with Mr. Sussmann?

23   A.   Again, to the best of my memory, because this happened

24   about five years ago, I received communications that he

25   wanted to meet with a friend of his or a colleague of his.

1    I'm paraphrasing.  And would I take some time and meet with

2    him?  Because he may have some information of importance to

3    national security.  Again, I'm paraphrasing.

4              THE COURT:  I'm sorry, sir.  Could you move a

5    little closer to the microphone.

6              THE WITNESS:  I'm sorry.  I'm paraphrasing,

7    because I don't have notes in front of me.

8    BY MR. BOSWORTH:

9    Q.  Was that a conversation you had on the phone or in

10   person with Mr. Louie, if you remember?

11   A.  Via SMS app, as best I can tell.

12   Q.  And that was a conversation you said -- well, did that

13   happen shortly before the meeting you ultimately had with

14   Mr. Sussmann?

15   A.  That is correct.

16   Q.  So in or around January 2017?

17   A.  Yes.

18   Q.  So you said that that's a conversation that happened

19   five years ago, so you're paraphrasing because you don't

20   remember exactly what was said.  Right?

21   A.  That's correct.

22   Q.  In contrast to that conversation, where you don't have

23   notes so you don't know what was said, when you ultimately

24   met with Mr. Sussmann, you did take notes.  Correct?

25   A.  That's correct.

1    Q.  And so we were just looking at those notes that are your

2    record of that conversation?

3    A.  That is correct.

4    Q.  So we don't have to guess in the same way about what

5    might have been said in a conversation that there are no

6    notes for?

7    A.  Yes.

8    Q.  So Mr. Louie said Mr. Sussmann had information that was

9    possibly about some significant national security issue that

10   he wanted to share.

11           At that point, did you understand that

12   Mr. Sussmann wanted to share that information with the CIA?

13   A.  All I understood that he wanted to meet with me and

14   share it with me.

15   Q.  And you testified a moment ago that in meeting with you,

16   your understanding was Mr. Sussmann was hoping to get a

17   meeting with the CIA.  Correct?

18   A.  Correct.

19   Q.  That he wanted to be able to meet with them and he was

20   hoping he could convince you to somehow make that

21   arrangement or help him get to the CIA.  Correct?

22   A.  Correct.

23   Q.  So the conversation that you had with him was a

24   conversation that you had thinking:  All right.  He's

25   telling me this stuff because he wants me to pass this along

1    to the CIA.  Fair to say?

2    A.  Fair enough.

3    Q.  And when you had that conversation, which -- now remind

4    me.  It was at a restaurant?

5    A.  In a restaurant in a hotel in Northern Virginia.

6    Q.  And you took notes?

7    A.  I believe so.  Yes.

8    Q.  And what led you to take notes of the conversation?

9    A.  I generally have a book with me.  I'm older.  66.  I

10   don't tend to remember everything, so I take notes.

11   Q.  You look great, Mr. Chadason.

12   A.  Thank you.

13   Q.  So you took notes.  And I assume -- is it fair to say

14   that one of the reasons you took notes is you understood he

15   had information that could have national security

16   implications, and you wanted to keep a record of what it was

17   so that you could accurately tell the CIA about it?  Is that

18   right?

19   A.  I always take notes.  But yes.

20   Q.  And let's turn back for a moment to the memo that you

21   ultimately wrote.  You had the meeting with Mr. Sussmann.

22   You took notes.  And that same day, you turned those notes

23   into a memorandum.  Correct?

24   A.  Correct.

25   Q.  So let's take a look at the memo that you created, you

1344

1    know, that day, based on the notes that you took that day of

2    the conversation that you had with Mr. Sussmann.

3                MR. BOSWORTH:  If we could turn to Government's

4    Exhibit 809, just the first page of the memorandum of

5    conversation, and blow up the story for a moment.  The first

6    page, if we could.  If you can blow that up.  Thank you.

7    BY MR. BOSWORTH:

8    Q.  So from the get-go here, Mr. Sussmann's meeting with

9    you, hoping you're going to pass this information along to

10   the CIA.

11               You begin with:  Sussmann said he represents a

12   client.  Right?  That's the first substantive sentence.  Do

13   you see that?

14   A.  Yes, I do.

15   Q.  And you indicated that when Mr. Sussmann told you he's

16   got this client, he's got a client, though, that doesn't

17   want to be known, did you ask him more about that or try to

18   identify the client or just take it as represented?

19   A.  No.  I did ask him.

20   Q.  And do you recall what he said?

21   A.  That he didn't want to be identified.

22   Q.  And the word "client" is capitalized here.  Is there any

23   particular reason you capitalized the word "client"?

24   A.  It's just a habit in writing my memos in my years of

25   experience.

1345

```
1    Q.  And what was the habit?  Because he's referring to a
2    client or because it's a third-party person he's
3    referencing?
4              MR. ALGOR:  Objection, your Honor.
5              THE COURT:  Basis?
6              MR. ALGOR:  Can we get on the phone?
7              (Whereupon, the following proceedings were had at
8    sidebar outside the presence of the jury:)
9    
10   
11   
12   
13   
14   
15   
16   
17   
18   
19   
20   
21   
22   
23   
24             (Whereupon, the following proceedings were had in
25   open court:)
```

Chadason - CROSS - By Mr. Bosworth

1    BY MR. BOSWORTH:

2    Q.  I was just asking you about the capitalization of

3    "client."  "Client" is capitalized throughout the rest of

4    your memorandum.  Correct?

5    A.  That is correct.

6    Q.  So there's another reference to client right there, big

7    bold letters.  That's our highlighting, not yours.  Correct?

8    A.  Correct.

9         MR. BOSWORTH:  Can we go to the next page?  Blow

10   up the client paragraph.

11   BY MR. BOSWORTH:

12   Q.  Then there's a whole paragraph you put in your

13   memorandum about client.  So let's just go through that for

14   a minute.

15        You said at the start there:  Sussmann would not

16   provide client's identity.  You said that a moment ago.

17   Right?

18   A.  Correct.

19   Q.  And you indicated that -- it says:  Was not sure if the

20   client would reveal himself to the CIA, but he would provide

21   data assets supporting his claims which then could be

22   verified.

23        Was it you who were not sure if the client would

24   reveal himself or did Mr. Sussmann say he was not sure if

25   the client would reveal himself, if you remember?

1    A.  I believe it was Mr. Sussmann said the client -- he was

2    not sure the client would reveal himself.

3    Q.  So he said he's not sure if the client would reveal

4    himself, but he would provide -- did he use the word "he"?

5    Did he use "he" to refer to the client as opposed to "she,"

6    if you remember?

7    A.  I think the pronoun was "he."  But yes.  That's what I

8    wrote.

9    Q.  So he said:  But he, this client, unnamed, would provide

10   data sets supporting his claims which could then be

11   verified.

12           It then says:  Chadason, you, were able to elicit

13   that the client is an engineer.  So let's just stop there

14   for a second.

15           Did you press Mr. Sussmann for more information

16   about who this client is, recognizing he's not going to tell

17   you the name, but you're trying to gather info about him?

18   A.  I was trying to find more *bona fides* information he was

19   providing.  Yes.

20   Q.  So it sounds like in response to pushing from you, he

21   told you the client's an engineer.  Right?

22   A.  Correct.

23   Q.  Has a number of patents?

24   A.  Correct.

25   Q.  And is most likely a contractor to the IC, meaning that

1   he's got some relationship with the intelligence community.

2   Is that what you understood?

3   A.  Yes.

4   Q.  And Sussmann said the client has various projects.  He

5   then says the client, this engineer guy with patents, has

6   worked with the intelligence community before.  Right?  He

7   said that?

8   A.  Yes.

9   Q.  And he said the client's a Republican?

10  A.  Correct.

11  Q.  So in that one paragraph alone, we've got a whole lot of

12  client references because this is a paragraph about the

13  client.  Understood.

14          MR. ALGOR:  Let's go to the next chunk on this

15  page, please.

16  BY MR. BOSWORTH:

17  Q.  Here, you asked if Mr. Sussmann had provided data --

18  this data to the FBI.  We'll hear more about that.  And

19  initially, Mr. Sussmann, it seems, said he knew Jim Trainor

20  at the FBI.

21          Did you know who Jim Trainor was?

22  A.  I did not.

23  Q.  And he then claimed, Mr. Sussmann, that his client did

24  not want to provide this to the FBI, as he knows the FBI did

25  not have resources to deal with these issues.

```
1              What did you understand him to mean, if you
2     remember?
3     A.  The best of my recollection is that to deal with these
4     issues, he wants sophisticated, technical resources, which
5     FBI did not have, according to Mr. Sussmann.
6     Q.  And then he says that Sussmann, Mr. Sussmann, told you
7     he's openly a Democrat?
8     A.  He did.
9     Q.  And he told you he does -- openly told you that he does
10    a lot of work with DNC, the Democratic National Committee?
11    A.  He did.
12    Q.  And that -- did that matter to you, that he told you --
13    that he disclosed to you that he was a Democrat and did work
14    with the Democratic National Committee?
15    A.  No.  No party has a monopoly on patriotism.
16    Q.  Did the fact that he was, you know, a Democrat cause you
17    to question whether he might have some odd motivation here?
18    A.  No.
19    Q.  Did it cause you to question what the real story was
20    here?
21    A.  Well, the story was very -- "shocking" is not the word,
22    but it was very big story.  And I want to make sure that if
23    I send a memo or if I put Mr. Sussmann together with a
24    senior CIA officer, the story makes sense and the sourcing
25    makes sense.
```

1    Q.  You also were asked about -- on direct examination,

2    Mr. Sussmann said he did speak with the CIA general counsel

3    before retirement.

4         Did -- is there anything more you remember about

5    why he mentioned that, why that was relevant?

6    A.  I may have asked him if he spoke to the CIA before.  I

7    think his response was that he did speak to the general

8    counsel before he left or retired.  I'm not sure.

9    Q.  And then you were also asked about this last piece here

10   about:  Mr. Sussmann said his client would most likely only

11   provide the data to senior bona fide CIA officers.  And if

12   there's no interest, he would go to The New York Times.

13   Right?  That's what your memorandum reflects.  Right?  You

14   wrote those words?

15   A.  Yes.

16   Q.  What did you understand him to be saying there?

17   A.  That he would like to meet with a -- I was retired, so

18   not with me, obviously; with certain officer of the Agency

19   who is active duty.  And if the Agency had no interest, the

20   next step would be The New York Times.

21   Q.  And you didn't understand that to be any kind of threat

22   to you or the CIA, did you?

23   A.  I understood it as a frustration way.  Mr. Sussmann

24   seemed frustrated throughout the meeting.

25   Q.  Because your impression was that Mr. Sussmann had a

1    sense of frustration that no one was listening to him.

2    Isn't that right?

3    A.  He had a sense of frustration.  I'm not sure why.

4    Q.  Do you remember meeting with a group of investigators

5    that included FBI agents on August 5th of 2020?

6    A.  Yes.

7    Q.  And when you were interviewed, you were trying to be

8    accurate, obviously, and truthful.  Correct?

9    A.  Yes.

10   Q.  Do you remember being asked whether you took this bit

11   about going to the FBI -- going to the press as a threat and

12   your answer was, No, that your sense was that there was a

13   sense of frustration that no one was listening?  Do you

14   remember saying that?

15   A.  Possibly.  I don't remember the exact words.  But...

16   Q.  Would it refresh your recollection just to look briefly

17   at a memorandum of the interview you had, just to see the

18   notes?

19   A.  Sure.  I've never seen the memorandum of the interview

20   before.

21               MR. ALGOR:  Can we just show the witness MCO2,

22   Paragraph 4, Page 7.

23               THE WITNESS:  Okay.

24   BY MR. BOSWORTH:

25   Q.  Does that refresh your recollection about whether you

```
 1    told the investigators that this wasn't a threat, but that
 2    your interpretation was there was a sense of frustration on
 3    Mr. Sussmann's part that no one was listening?
 4    A.  That's correct.
 5    Q.  And so he had told you he tried to meet with the general
 6    counsel.  That didn't work out.  Right?
 7    A.  Correct.
 8    Q.  He's now trying to meet with you because he's trying to
 9    get this information into the hands of the CIA.  Correct?
10    A.  I assume so.  Yes.
11    Q.  Right.  Well, you said that's the purpose of his meeting
12    with you.  Right?
13    A.  Yes.
14    Q.  And you believed that he wanted someone to listen
15    because he was alarmed as an American about the situation.
16    Correct?
17    A.  Is that what I said?
18    Q.  Well, I'm asking you, Mr. Chadason.
19    A.  Well, you know, again, he was frustrated.  He wanted to
20    get information out.  The exact words escape me.
21    Q.  Again, that same meeting that you had, August 25,
22    2020 -- let's just show the witness -- Page 4, Paragraph 3,
23    just for the witness.
24    A.  Okay.
25    Q.  Does this refresh your recollection that you said that
```

1    he conveyed to you he was alarmed as an American about the

2    situation?  Right?

3    A.  Fair enough.

4    Q.  And he was alarmed at the potential national security

5    implications of the information he was giving.  Correct?

6    A.  Correct.

7    Q.  And by this time -- this is now January of 2017 -- the

8    2016 election was over.  Correct?

9    A.  Yes.

10   Q.  Hillary Clinton's not running for president anymore?

11   A.  No.

12   Q.  Donald Trump actually is president by now.  Right?

13   A.  Correct.

14   Q.  And you said before when we were talking that, you know,

15   he seemed concerned or seemed alarmed as an American; and

16   your view was that the information was credible enough to

17   pass along to the CIA.  Correct?

18   A.  My feeling was that information was interesting enough

19   to pass to the CIA to be [indiscernible] --

20          THE COURT REPORTER:  I'm sorry.  Could you repeat

21   that answer, please?

22          THE WITNESS:  It was my -- the information for me

23   was interesting enough for it to be passed to the CIA to be

24   vetted and validated; and they will find out whether it's

25   credible or not.  I am unable to make that kind of a

1    judgment, having breakfast with Mr. Sussmann.

2              MR. BOSWORTH:  Can we just pull up -- this is a

3    different set of notes of the same meeting you had on August

4    5, 2020 -- MC1 at 1, Paragraph 7.

5              THE WITNESS:  Okay.

6    BY MR. BOSWORTH:

7    Q.  Again, this is a meeting you had with various

8    investigators and Mr. DeFilippis from the prosecution.

9    A.  Uh-huh.

10   Q.  Does this refresh your recollection about whether you

11   told them that you thought the information was credible

12   enough to pass on to the CIA?

13   A.  What I told them was because Mr. Sussmann was a former

14   DOJ official and a very credible person based on his résumé,

15   I thought it was credible enough to pass it on.  I didn't

16   want to make a judgment whether the information itself was

17   credible because I have no ability to assess the credibility

18   of the information.

19              But based on what was told to me and the source,

20   Mr. Sussmann, who has twelve years in DOJ and a powerful DC

21   lawyer who has no reason as far as I know to say otherwise,

22   it seemed like a credible source.  Pass it on.

23   Q.  So just to be clear -- and I think you said -- I know

24   you said more than this.  But you thought it was credible

25   enough to pass on for a variety of reasons.  Correct?

1   A.  The source was credible enough to pass it on.

2   Q.  When you take notes, you're accurate.  Right?

3   A.  I take notes.

4   Q.  Do you have any reason to doubt the accuracy of your

5   notes?

6   A.  Oh, I don't take my notes verbatim.  I write general

7   sentences that jog my memory.  Yes.

8   Q.  And I know it may be a different agency, but do you have

9   any reason to doubt the accuracy of FBI agents' notes?

10  A.  No.

11  Q.  If you had said, "I thought the source was credible

12  enough to pass along the information he provided me," would

13  you figure the notes would reflect that?

14  A.  I assume so.

15  Q.  And so we had said, I think, you wrote these notes, if

16  you look at the first page of the memorandum, going back for

17  a minute, by 12:57 p.m. of your interview of Mr. Sussmann

18  that day.

19          MR. BOSWORTH:  Blow the header up there, please.

20  BY MR. BOSWORTH:

21  Q.  Do you see where it says Tuesday, January 31st, 12:57

22  p.m.?

23  A.  Yes.

24  Q.  So you are -- you've quickly turned your notes into a

25  memorandum that day and passed it along.  So this is all

```
 1    still fresh in your mind when you're taking the notes,

 2    you're writing the notes and creating the memorandum.

 3    Correct?

 4    A.  Yes.

 5    Q.  And then you pass this along.  So you knew -- so

 6    Mr. Sussmann met with you.  You took notes of your

 7    conversation.  He told you all about the client that was

 8    behind this, understanding that you were going to pass this

 9    along to the CIA.  And then you did pass this memorandum

10    along to the CIA.  Correct?

11    A.  Correct.

12    Q.  And when you did, you flagged for them that they should

13    remember this guy is a partisan lawyer who works closely

14    with the DNC.  Do you remember saying that?

15    A.  No.

16              MR. BOSWORTH:  Can we pull up for identification

17    Defendant's Exhibit 806.

18    BY MR. BOSWORTH:

19    Q.  This is just an email chain between you and various CIA

20    employees on Tuesday, January 31st, 2017.

21              MR. BOSWORTH:  We'd move it into evidence, your

22    Honor.

23              THE COURT:  Any objection?

24              MR. ALGOR:  No, your Honor.

25              THE COURT:  So moved.
```

```
 1              (Whereupon, Defendant's Exhibit No. 806 was

 2     entered into evidence.)

 3     BY MR. BOSWORTH:

 4     Q.  I just want to call your attention to Page 2, the top of

 5     the page.  There were redactions.  I think the Government

 6     would agree that reference to Employee 16 is just a

 7     reference to you.  And you sent an email to someone at the

 8     CIA at the top of the page.

 9              Do you see that?

10     A.  Yes, I do.

11     Q.  And can you read the third and fourth sentences of the

12     email.

13     A.  Starting with "Please"?

14     Q.  Yes.

15     A.  "Please remember, this guy is a partisan lawyer who

16     works closely with DNC.  So I am not sure what the real

17     story here is.  But I am sure you guys will figure it out."

18     Q.  So Mr. Sussmann didn't hide that he was a Democrat --

19     A.  He did not.

20     Q.  -- correct?

21              He told you he did work for the Democratic

22     National Committee?

23     A.  He did.

24     Q.  That raised some concern in your mind.  That's why you

25     said, "Not sure what the real story here is."  Correct?
```

1    A.  Correct.

2    Q.  And you said to the CIA, "But you guys will figure it

3    out."  Right?

4    A.  Yes.

5    Q.  And you passed your memo along that said "client client

6    client," explaining what the client was.  And you sent that

7    to the CIA.  Right?

8    A.  Yes.

9            MR. BOSWORTH:  No further questions.

10           MR. ALGOR:  Very briefly, your Honor.

11           THE COURT:  Sure.

12                    REDIRECT EXAMINATION

13   BY MR. ALGOR:

14   Q.  Mr. Chadason, during cross-examination, Mr. Bosworth

15   asked you a few questions about credibility.  And so your

16   assessment of Mr. Sussmann's credibility was based primarily

17   on his biography.  Is that correct?

18   A.  That's correct.  That's correct.

19   Q.  And you only met with him for approximately an hour and

20   a half.  Is that right?

21   A.  That's about right.

22   Q.  Now, turning to -- he also asked about the credibility

23   of the information that was provided to you.  Do you

24   remember questions regarding that?

25   A.  Yes.

1    Q.  Do you know if the information that Mr. Sussmann

2    provided to the CIA was found to be credible?

3    A.  I --

4            MR. BOSWORTH:  Objection.

5            (Whereupon, the following proceedings were had at

6    sidebar outside the presence of the jury:)

7            THE COURT:  Remind me what our ruling was on this.

8            MR. BOSWORTH:  Your Honor, I believe the ruling

9    was that we could introduce evidence of the conclusions of

10   the CIA to the extent that it affected the FBI's conclusions

11   and its investigation, which we previously told you at least

12   that ended in January of 2017, before this meeting took

13   place.

14           And I wasn't getting into -- just to anticipate

15   something Mr. Algor may say, I didn't elicit testimony about

16   whether it was or wasn't; just that he met with Sussmann and

17   felt that he could pass it along.  Obviously, he didn't look

18   at the evidence itself.

19           THE COURT:  Mr. Algor?

20           MR. ALGOR:  Yes, your Honor.  I mean, I do believe

21   that he was asking questions regarding the credibility of

22   the information and why he would then be passing it along.

23   And so I kind of think that -- I think the whole point of

24   asking that question was to elicit a "no," because I --

25   based on his questions and his prior testimony.

1           THE COURT:  I'm going to deny this line.  I think
2    we were pretty clear in saying that the CIA's conclusions
3    were out of bounds unless there was some evidence that they
4    influenced the investigation.
5           MR. ALGOR:  Understood.
6           (Whereupon, the following proceedings were had in
7    open court:)
8    BY MR. ALGOR:
9    Q.  Mr. Chadason, very briefly, you were asked about
10   Defendant's Exhibit 806 regarding you referring to
11   Mr. Sussmann as a partisan Democrat.
12   A.  Yes.
13   Q.  And why did you pass along that information to the CIA?
14   A.  I think it was characterizing his background.
15   Q.  And why would you consider that to be relevant to pass
16   along?
17   A.  Possibly of bias.  But it was very informal
18   communication.  Wasn't a memorandum or anything like that.
19   It was just an email.
20   Q.  And when you say "bias," is someone's motivations
21   important in understanding for when the CIA is assessing
22   something?
23   A.  My experience over 20 years in CIA is that sourcing is
24   very important.  And information coming from a source is
25   usually judged based on the source's credibility and

 1     background.

 2               MR. ALGOR:  Nothing further, your Honor.

 3               THE COURT:  Mr. Chadason, thank you very much for

 4     your testimony.  You're excused.

 5               THE WITNESS:  Yes, sir.

 6               THE COURT:  Please don't discuss your testimony

 7     with anyone until the end of the case.  And have a great

 8     weekend.

 9               THE WITNESS:  Thank you.

10               (Witness excused.)

11               THE COURT:  Good to see you, Mr. Keilty.

12               MR. KEILTY:  Good to see you.  Thank you, your

13     Honor.

14               Your Honor, the Government calls Kevin P.

15               THE COURT:  Step right up, sir.  If you could

16     remain standing and raise your right hand, sir, and we'll

17     have the courtroom deputy swear you in.

18                KEVIN P., GOVERNMENT WITNESS, SWORN.

19               THE COURT:  Have a seat and make yourself

20     comfortable.

21               MR. KEILTY:  Thank you, your Honor.

22                        DIRECT EXAMINATION

23     BY MR. KEILTY:

24     Q.  Could you please state and spell your name for the

25     record?

1    A.   Kevin, K-E-V-I-N, last initial P.

2    Q.   So for today's proceedings, is it okay if we just refer

3    to you as Kevin P.?

4    A.   Yes.

5    Q.   All right.  Kevin, are you employed?

6    A.   No.

7    Q.   What's your employment status right now?

8    A.   I'm retired.

9    Q.   And prior to your retirement, were you employed?

10   A.   Yes.

11   Q.   Where did you last work?

12   A.   CIA.

13   Q.   And how long -- is the CIA the Central Intelligence

14   Agency?

15   A.   Yes.

16   Q.   And how long did you work at the CIA?

17   A.   32 and a half years.

18   Q.   And what was the last position that you held at the CIA?

19   A.   Senior officer in the counterintelligence mission

20   center.

21   Q.   And turning to February of 2017, what position did you

22   hold at the CIA?

23   A.   That same position.

24   Q.   And I may refer to the CIA as "the Agency" at times.  Is

25   that okay?

Kevin P. - DIRECT - By Mr. Keilty

```
 1    A.  Sure.

 2    Q.  Kevin, are you familiar with an individual by the name

 3    of Michael Sussmann?

 4    A.  Yes.

 5    Q.  And how are you familiar with Mr. Sussmann?

 6    A.  I met with him in February of 2017.

 7    Q.  Do you recall when exactly that meeting took place?

 8    A.  On 9 February 2017.

 9    Q.  And where exactly did that meeting take place?

10    A.  CIA headquarters.

11    Q.  And prior to that meeting with Mr. Sussmann, what, if

12    anything, was your understanding of the purpose of the

13    meeting?

14    A.  He was offering information relative to a national

15    security threat.

16    Q.  And what, if anything, was your understanding, Kevin, of

17    how Mr. Sussmann arranged this meeting?

18    A.  He had someone he knew, a contact that he went through

19    from before.

20    Q.  This contact was associated -- was this particular

21    contact associated with a certain entity?

22    A.  It was my understanding that the contact was an Agency

23    contact that he had.

24    Q.  And prior to the meeting, did you have an understanding

25    of what Mr. Sussmann did for a living?
```

1    A.  Yes.  He was a lawyer.

2    Q.  And prior to the meeting with Mr. Sussmann, did you have

3    an opportunity to speak with Mr. Sussmann?

4    A.  Yes.

5    Q.  And what, if anything, did you discuss?

6    A.  I spoke with him on the phone to set up the meeting

7    time, place and location.

8    Q.  So it's fair to say this was just a scheduling meeting.

9    Is that --

10   A.  Scheduling meeting.  Yes.

11   Q.  And prior to the meeting with Mr. Sussmann at the CIA,

12   what, if anything, was your understanding of whether

13   Mr. Sussmann was representing a client in connection with

14   the meeting?

15   A.  I didn't have any knowledge of whether he was or wasn't

16   before the meeting.

17   Q.  Okay.  Kevin, did you meet with the Government in

18   preparation for your testimony?

19   A.  Yes.

20   Q.  Did you meet a couple of times with the Government?

21   A.  Yes.

22   Q.  And during those meetings with the Government, did the

23   Government show you certain email chains that relate to

24   Mr. Sussmann's meeting at the CIA?

25   A.  Yes.

1    Q.  And were those emails dated prior to Mr. Sussmann's

2    meeting at the CIA?

3    A.  Yes.  One of them was.

4    Q.  Did one of those emails that you looked at reference the

5    fact that Mr. Sussmann in fact had a client?

6    A.  Yes.

7    Q.  As you sit here today, do you recall seeing that email

8    in February of 2017?

9    A.  No.  I don't recall reading that particular email and

10   memo.  I saw it when you showed it to me, but I don't recall

11   reading it in advance of that meeting.

12   Q.  Is it possible that you read that email?

13   A.  It's possible I read it.  I just don't remember reading

14   it.

15   Q.  So turning to February of 2017, particularly February

16   9th, 2017, did a meeting with Mr. Sussmann occur?

17   A.  Yes.

18   Q.  And again, you testified this meeting was at the CIA.

19   Correct?

20   A.  Correct.

21   Q.  And who attended this meeting?

22   A.  Myself, Steve M. and Mr. Sussmann.

23   Q.  And who is Steve M.?

24   A.  He's an Agency lawyer, an employee.  Yes.  Employee and

25   lawyer.

```
1    Q.  And prior to the meeting with Mr. Sussmann on February
2    9th, did you receive -- what, if any, guidance did you
3    receive from your superiors at the Agency as a reference to
4    the conduct of this meeting with Mr. Sussmann?
5    A.  That we were simply to conduct this meeting so that we
6    could accept or listen to what information he had to
7    offer -- this was an offer -- and to document that for
8    appropriate forwarding.
9    Q.  And you previously testified that you had an
10   understanding that Mr. Sussmann was an attorney.  Is that
11   correct?
12   A.  Yes.
13   Q.  And during the meeting, what, if anything, did
14   Mr. Sussmann say about whether he was representing a client
15   in connection with the meeting?
16   A.  He said he wasn't representing a client.
17   Q.  And did you become aware that -- during the meeting
18   whether Mr. Sussmann was a part of a law firm?
19   A.  Yes.
20   Q.  And during that meeting with Mr. Sussmann, did he
21   provide any information about particular clients that that
22   firm represented in other matters?
23   A.  He said other lawyers at the firm represented the DNC
24   and Hillary Clinton.
25   Q.  What was your understanding, if any, of whether
```

1    Mr. Sussmann was representing those particular clients in

2    connection with the meeting on February 9th?

3    A.  He made it clear that he did not have any connection

4    with them.

5    Q.  And based on what you learned -- what was your

6    understanding based on what you learned in the meeting how

7    Mr. Sussmann came to possess the information he was to

8    provide to the CIA?

9    A.  He said he had contacts that provided him the

10   information.

11   Q.  And generally, Kevin, what information did Mr. Sussmann

12   provide to the CIA on February 9th of 2017?

13   A.  He said that there was a server, a Russian bank server,

14   that was communicating with a Trump candidate server; and he

15   also provided some other secondary information on another

16   technical security threat.

17   Q.  So you just testified that Mr. Sussmann came to possess

18   this information through certain contacts.  Is that correct?

19   A.  Yes.

20   Q.  Did Mr. Sussmann provide the names of those contacts?

21   A.  No.  At the time, he said they remained anonymous

22   because of the potential threat to them from Russians.

23   Q.  And based on what you learned in the meeting, what, if

24   any, concerns did you have about the CIA investigating these

25   particular allegations?

Kevin P. - DIRECT - By Mr. Keilty

1    A.  Well, at the time there wasn't any investigation.  We

2    were asked to meet with Mr. Sussmann because he was offering

3    information and that we were going to accurately collect it

4    and put it in the proper hands.

5    Q.  Given some concerns, did you have an understanding of

6    whether this information might possibly be forwarded to the

7    FBI?

8    A.  Yes.  Going in, I assumed based on the nature of the

9    information that we would be going to the FBI.  But that

10   became clear during the meeting, that it would have to go in

11   that direction.

12   Q.  And based on what you learned in the meeting, what, if

13   anything, was your understanding of whether these

14   allegations had ever been previously brought to the FBI by

15   Mr. Sussmann?

16   A.  Yes.  During the meeting, we came to understand that he

17   did talk to the FBI about related matters or matters related

18   to this.  But that was it.

19   Q.  Kevin, approximately how long did the meeting with

20   Mr. Sussmann last?

21   A.  60 to 120 minutes.

22   Q.  And during the meeting, did Mr. Sussmann provide you

23   with any materials -- what, if any, materials did

24   Mr. Sussmann provide to you?

25   A.  Some documents, papers and some thumb drives.

1    Q.  And at the conclusion of the meeting, what did you do

2    with those documents and thumb drives?

3    A.  We gave them to -- Steve and I gave them to our

4    technical folks to take a look at.

5    Q.  During the meeting, Kevin, did you take notes?

6    A.  Yes.

7    Q.  Is it your normal practice to take notes during

8    meetings?

9    A.  Yes.

10   Q.  Is it your normal practice to take accurate notes during

11   meetings?

12   A.  Yes.

13   Q.  And following the meeting with Mr. Sussmann, what, if

14   any, steps did you take to memorialize that meeting?

15   A.  Steve -- I would have asked Steve to prepare a memo

16   documenting the conversation.

17   Q.  Okay.  And what is the purpose of preparing a memo to

18   document the meeting?

19   A.  To memorialize it and also to forward it to appropriate

20   entities to handle.  And in this case, it was going to go to

21   the FBI.  In fact, in the meeting, I said to Mr. Sussmann

22   that it was likely this information would be forwarded to

23   the FBI.

24   Q.  So you testified that Steve M. was the -- after the

25   consultation was the primary drafter of this memo.  Is that

```
1    correct?

2    A.  Yes.

3    Q.  Sometimes -- is a memo sometimes referred to as a

4    memorandum for record --

5    A.  Correct.

6    Q.  -- called an MFR?

7    A.  Right.

8    Q.  Kevin, I'm going to show you what's been marked for

9    identification as Government's Exhibit 812.  It should pop

10   up on your screen.

11   A.  Oh, okay.

12   Q.  Kevin, what is Government's Exhibit 812?

13   A.  So this is the memorandum for record from Steve M. to

14   me.

15   Q.  Is this an email?

16   A.  Yes.

17   Q.  What's the date of the email?

18   A.  9 February 2017.

19   Q.  And there's an attachment to the email; is that correct?

20   A.  Yes.

21   Q.  And turning to the second page of Government's Exhibit

22   128, what does this appear to be?

23   A.  This is the draft memo Steve wrote.

24   Q.  And did you review this memorandum?

25   A.  Yes.
```

Kevin P. - DIRECT - By Mr. Keilty

1    Q.  And did you ultimately make edits to the memorandum?

2    A.  Yes.

3              MR. KEILTY:  Your Honor, the Government would move

4    812 into evidence.

5              MR. BERKOWITZ:  No objection.

6              THE COURT:  So moved.

7              (Whereupon, Government's Exhibit No. 812 was

8    entered into evidence.)

9    BY MR. KEILTY:

10   Q.  So if you could read the header information, Kevin, of

11   the email on the first page of Government's Exhibit 812.

12   A.  Sure.

13   Q.  So this is --

14   A.  This is still the Steve M. memo to me, the draft MFR,

15   memorandum for the record, of 9 February 2017.  And the body

16   just reads, "Here you go.  Feel free to add/subtract/edit as

17   needed."

18   Q.  And the date, February 9th, 2017, that's the same date

19   as Mr. Sussmann's meeting.  Is that correct?

20   A.  Yes.

21   Q.  And if we go to the second page of Government's Exhibit

22   812, I believe you just testified this was Steve's draft.

23   Is that correct?

24   A.  Correct.

25              MR. KEILTY:  Could you blow up -- thank you.

1  BY MR. KEILTY:

2  Q.  Could you read the first paragraph to the Court?

3  A.  "On 9 February 2017, Kevin P. and Steve M. met with

4  Michael Sussmann, a lawyer for the firm Perkins Coie, to

5  discuss information which Mr. Sussmann had previously

6  indicated might be of interest to the CIA.

7          "At the meeting, Sussmann provided both written

8  documents and thumb drives which he claimed contained data

9  related to potential Russian activities connected to the

10  presidential candidate/elect Trump."

11  Q.  And before we go further, I'm just going to ask you to

12  slow down a little bit for the benefit of the court

13  reporter.

14  A.  Okay.  Sorry.

15  Q.  No, no.  It's quite all right.

16          MR. KEILTY:  Could you blow up the second

17  paragraph, please.

18  BY MR. KEILTY:

19  Q.  Could you read the second paragraph, Kevin.

20  A.  Sure.  "As background, Sussmann had previously reached

21  out to CIA's general counsel, Caroline Krass, in December

22  2017.  As he recalled, she had advised that she would be in

23  touch after some coordination, but never heard back from her

24  or anyone from CIA OGC.

25          "He said that he tried to recontact the general

1    counsel" -- I'm sorry; it says "GC" --

2    Q.  Yes.

3    A.  -- "but that no one ever returned his call, which led

4    him to reach out to [blank], who referred the matter to

5    CIMC.

6    Q.  And just a couple of acronyms here.  What does OGC refer

7    to?

8    A.  Office of the General Counsel.

9    Q.  And I think you testified GC is the general counsel?

10   A.  Right.

11   Q.  And CIMC is what, Kevin?

12   A.  Counterintelligence mission center.

13          MR. KEILTY:  Could you blow up the third

14   paragraph, please, Ms. Arsenault.

15   BY MR. KEILTY:

16   Q.  Kevin, could you slowly read the third paragraph,

17   please.

18   A.  Sure.  "Sussmann advised that he was not representing a

19   particular client and the information he was volunteering to

20   us was not privileged.  His contacts wished to provide

21   information to the USG through Sussmann, but the clients

22   preferred to remain anonymous.

23          "Sussmann said that he believed his contacts were

24   acting in good faith out of a sense of loyalty to the USG.

25   Sussmann himself said that he did not expect anything from

1      the USG and did not seek any sort of feedback or further

2      contacts, though he would be open to future contact if the

3      CIA had such a need.

4              "He was upfront in disclosing that his firm was

5      active in supporting several Democratic causes and

6      officeholders, including both the DNC and then-presidential

7      candidate Hillary Clinton, but that such work was unrelated

8      to his reasons for contacting the CIA.  He merely wanted to

9      pass along information that he thought would be of interest

10     to the USG and then let the CIA and the FBI validate the

11     information and take whatever actions they felt were

12     necessary."

13             MR. KEILTY:  Can you blow up the next paragraph,

14     please.

15     BY MR. KEILTY:

16     Q.  And could you read it, please, Kevin.

17     A.  "Sussmann noted that one of his contacts was a U.S.

18     person and clearance-holder, but that the information that

19     his contact had collected (the content of the thumb drives)

20     was, quote, 'private collection,' closed quote, suggesting

21     that the data had been collected by his contact as a matter

22     of personal interest.

23             "He also advised that his contacts believe their

24     actions have put themselves at some personal risk, though

25     some of this could be simply paranoia."

1    Q.   Thanks.

2         And the next paragraph, which is Paragraph 5?

3    A.   "Sussmann gave a general description of the data he was

4    providing to us, noting that it was connected to, quote,

5    'domain name system,' closed quote, (DNS) information."

6    Q.   Okay.  And then the last paragraph on the first page,

7    please.

8    A.   "Kevin P. advised Sussmann that, given the location of

9    such visits (within the U.S.), we would refer any relevant

10   information to the FBI.  Steve M. also advised that we had a

11   crimes reporting obligation and"...

12        MR. KEILTY:  And just the last paragraph,

13   Ms. Arsenault.  Thanks.

14        THE WITNESS.  ..."would need to report any

15   evidence of criminal activity to the FBI/DOJ.

16        "Sussmann had no objections to providing any

17   relevant information to the FBI.  He mentioned he had

18   previously contacted FBI's general counsel, Jim Baker, on a

19   similar, though unrelated, matter.  Based on his perception

20   that the FBI had not handled the matter well and because he

21   thought the FBI might lack the relevant technical expertise,

22   he wanted to pass the information at issue directly to the

23   CIA."

24   Q.   Okay.  Great.  Thanks very much.

25        MR. KEILTY:  If you could go back to the first

Kevin P. - DIRECT - By Mr. Keilty

```
 1    page, Ms. Arsenault, of the email.

 2    BY MR. KEILTY:

 3    Q.  Now, Steve M. sent you this email on February 9th.  Is

 4    that correct?

 5    A.  Yes.

 6    Q.  And what was the purpose of forwarding his MFR on now?

 7    A.  For me to add, subtract and edit as needed.

 8    Q.  And in fact, did there come a time when you reviewed

 9    this memorandum for the record?

10    A.  Yes.

11    Q.  And did you eventually make edits to this memorandum for

12    the record?

13    A.  Yes.

14    Q.  Yes?

15    A.  Yes.

16    Q.  I'm showing you what's been marked for identification as

17    Government's Exhibit 817.

18              MR. BERKOWITZ:  No objection.

19              MR. KEILTY:  We'll move it.

20              Thanks.

21              The Government moves 817 into evidence, your

22    Honor.

23              THE COURT:  So moved.

24              (Whereupon, Government's Exhibit No. 817 was

25    entered into evidence.)
```

Kevin P. - DIRECT - By Mr. Keilty

1    BY MR. KEILTY:

2    Q.   So, Kevin, what is this on the screen?   What does this

3    appear to be?

4    A.   This is my response to Steve dated 23 February 2017,

5    message for the record 9 February 2017.

6    Q.   So this is an email.   Is that correct?

7    A.   Correct.

8    Q.   And can you read the email?

9    A.   Sure.   "Steve, I have reviewed and revised the attached

10   MFR.   If you concur with the verbiage, I will forward the

11   MFR to [blank] for them to craft [blank] using the MFR, the

12   [blank] assessment of the thumb drive's content, the copies

13   of the thumb drives and the text provided by Mr. Sussmann.

14   Thanks."

15   Q.   Okay.   Kevin, the date of this particular email is what?

16   A.   Is 23 February 2017.

17   Q.   So that's roughly, what --

18   A.   Almost two weeks.

19   Q.   Almost two weeks after Kevin sent up the email with

20   the --

21   A.   Yeah.   The 9th to the 23rd.

22        MR. KEILTY:   And turn to the next page of 817,

23   please.

24   BY MR. KEILTY:

25   Q.   What does this appear to be?

```
1    A.  It's kind of small.  If they can blow it up.

2            MR. KEILTY:  If you can blow up the top of it.

3    Well, let me go back.

4            THE WITNESS:  This appears to be my revised

5    memorandum for the record --

6    BY MR. KEILTY:

7    Q.  And that --

8    A.  -- with my changes.

9    Q.  And that was -- we just saw it.  That was attached to

10   your email to Steve.  Is that correct?

11   A.  Correct.

12   Q.  So you just testified that in fact you did make changes

13   to this MFR?

14   A.  Yes.

15           MR. KEILTY:  If we could blow up Paragraph 3.

16   BY MR. KEILTY:

17   Q.  And looking at this revised MFR, can you tell the jury

18   what changes that you made to Steve's MFR?

19   A.  That Mr. Sussmann was not representing a particular

20   client and --

21   Q.  So -- go ahead.

22   A.  -- and that the information he was volunteering was not

23   privileged.

24   Q.  Okay.

25           MR. KEILTY:  Let's go back to 812.  Go to the
```

1    second page, please.  And if you could blow up the third

2    paragraph.

3    BY MR. KEILTY:

4    Q.  If you could read the second sentence there, Kevin.

5    A.  The second sentence:  "His contacts wished to provide

6    information to the USG through Sussmann, but the clients

7    preferred to remain anonymous."

8    Q.  And do you see the word "client"?  Is that correct?

9    A.  Yes.

10            MR. KEILTY:  If you can go back to 817,

11   Ms. Arsenault.

12   BY MR. KEILTY:

13   Q.  And can you read the second sentence there.

14   A.  "His contacts wished to provide information to the USG

15   through Mr. Sussmann, preferring anonymity, citing a

16   potential threat from the Russian intelligence services."

17   Q.  And what is the difference there, Kevin, between what we

18   just read in 812 and 817?  Does the word "client" appear --

19   A.  Yes.

20   Q.  -- in 817?

21   A.  In the first one it says, "The clients preferred to

22   remain anonymous."

23            In the second it said, "His contacts wished to

24   provide information and remain anonymous."

25   Q.  Did you make that change, Kevin?

1    A.  I did.

2    Q.  Why did you make that change?

3    A.  Because he did not refer to them as "clients" during the

4    meeting.  He called them "contacts."

5    Q.  And did you make any other edits to Steve's initial

6    memorandum?

7    A.  At the end of the memo, there was some value judgments

8    about how the FBI handled the first interaction and meeting.

9    And it was not our place to put value judgments on how that

10   was handled.  And we just wanted to point them to the fact

11   that they had seen this matter before so they could find

12   whatever they had on it and put it together with what we

13   were providing them.

14   Q.  Is it fair to say you took out those value judgments?

15   A.  Yes.

16   Q.  Kevin, when you were revising this MFR, did you rely on

17   anything to refresh your recollection?

18   A.  Yes.  My notes.

19   Q.  And in the third paragraph that's up -- sorry.  In the

20   third paragraph of Government's Exhibit 817, the first

21   sentence says, "Mr. Sussmann advised that he was not

22   representing a particular client and the information that he

23   was volunteering to us was not privileged."  Is that

24   correct?

25   A.  Right.

```
1    Q.  And that's the same sentence that appeared in Steve M.'s

2    initial MFR.  Is that correct?

3    A.  Yes.

4    Q.  And did you agree with Steve M.'s drafting of that

5    sentence?

6    A.  Yes.

7    Q.  Why?

8    A.  Because that's what was stated in the meeting.

9    Q.  Okay.  Kevin, is it important that your memo be

10   factually accurate?

11   A.  Yes.

12   Q.  Why is that?

13   A.  Because we're conveying what could potentially be

14   relative to national security information to the FBI.

15   Q.  And you testified that you had an understanding that

16   this information potentially could go to the FBI.  Is that

17   correct?

18   A.  Yes.

19   Q.  And again, what was that understanding based on?

20   A.  Based on the fact that it was involving U.S. persons in

21   U.S. territories.

22   Q.  And is it important that the CIA pass on accurate

23   information to the FBI?

24   A.  Yes.

25            MR. KEILTY:  Thank you, your Honor.
```

```
 1                        CROSS-EXAMINATION

 2    BY MR. BERKOWITZ:

 3    Q.  Good afternoon, sir.

 4    A.  Good afternoon.

 5    Q.  My name is Sean Berkowitz, and I represent Michael

 6    Sussmann.

 7              Do you recognize him by any chance?

 8    A.  Yes.

 9    Q.  And you saw him in February of '17.  Correct?

10    A.  Correct.

11    Q.  And when you were interviewed first by the Government,

12    that was in or around June of 2021.  Does that sound about

13    right?

14    A.  It sounds about right.  I don't remember exactly.

15    Q.  So a little over four years after the meeting that you

16    had with Mr. Sussmann?

17    A.  Correct.

18    Q.  And at that time, you didn't even remember his name, did

19    you?

20    A.  No, I did not.

21    Q.  You didn't remember the meeting?

22    A.  I remembered the meeting.  Yes.

23    Q.  Did you remember the meeting before the Government

24    showed you materials?

25    A.  Yes.
```

1    Q.  Did you remember the substance of the meeting?

2    A.  Yes.

3    Q.  You didn't recall Mr. Sussmann's name, though.  Correct?

4    A.  Correct.

5    Q.  You didn't recall whether he worked for a law firm.

6    Correct?

7    A.  I only recalled that he was a lawyer, but I didn't

8    remember what law firm he worked for or if at the time he

9    was -- I didn't remember at that time whether he was working

10   for a law firm.

11   Q.  And you didn't remember the substance of any partisan

12   affiliation.  Correct?

13   A.  No.

14   Q.  Your memory of something that occurred four years before

15   you were talking about it was somewhat hazy.  Correct?

16   A.  It was dated.  Yes.

17   Q.  And the Government showed you the memorandum that had

18   been prepared in order to help you remember.  Correct?

19   A.  Correct.

20   Q.  And it's one of the reasons when you have a meeting

21   implicating national security issues you take notes.  Right?

22   A.  Correct.

23   Q.  So that if at some point in the future it's necessary,

24   you have your written record of what occurred.  Right?

25   A.  Correct.

1   Q.  And in this case, we've seen a copy of -- we're going to

2   go through it in a little bit of detail -- but fair to say

3   that what is contained in that memo is your best

4   recollection of what occurred on February 9th of 2017

5   relative to your meeting with Mr. Sussmann?

6   A.  Yes.

7   Q.  Before we get into the meeting itself, sir, before the

8   meeting, you had received certain information about

9   Mr. Sussmann.  Correct?

10  A.  I was on emails.  Yes.

11  Q.  And --

12  A.  About previous meetings.  Yes.

13  Q.  And as a general matter, when you're tasked with

14  attending a meeting with a source relative to national

15  security, do you try and familiarize yourself with what the

16  meeting is going to be about?

17  A.  Absolutely.

18  Q.  And if there were emails that were sent to you

19  summarizing what the meeting was going to be about, you

20  would have expected in the ordinary course of your practice

21  to have read those emails.  Correct?

22  A.  Correct.

23  Q.  Now, all of us get emails, and it may be difficult to

24  recall having received a particular email four or five years

25  ago.  Right?

```
 1    A.  Right.

 2    Q.  That's a long time.  Correct?

 3    A.  Yes.

 4    Q.  So let me just show you some to see if it refreshes your

 5    recollection, because you were generally asked about it.

 6    And I will show you, sir, for identification purposes

 7    Defense Exhibit 600.  And if you'd take a look, sir, at the

 8    second --

 9              MR. BERKOWITZ:  Well, let me move it into

10    evidence.

11              Any objection?

12              MR. KEILTY:  No objection.

13              THE COURT:  So moved.

14              (Whereupon, Defendant's Exhibit No. 600 was

15    entered into evidence.)

16    BY MR. BERKOWITZ:

17    Q.  While I'm at it and while you're looking at it, sir, I'm

18    going to ask the court reporter on the record to move into

19    evidence Defense Exhibit 525.  My team had told me that I

20    had called it Government's Exhibit 525.

21              THE COURT:  This is from the last witness?

22              MR. BERKOWITZ:  Yes, sir.

23              THE COURT:  Okay.  So moved.

24              (Whereupon, Defendant's Exhibit No. 525 was

25    entered into evidence.)
```

1  BY MR. BERKOWITZ:

2  Q.  Now back to realtime, Mr. P.  If you take a look at this

3  document, does it appear on Tuesday, January 31st, 2017, at

4  12:59 -- and you can blow that up, Mr. Cleaves -- you at

5  least according to the records of the Agency received an

6  email forwarding a memo of conversation "quick and dirty"?

7  A.  Yes.  Correct.

8  Q.  And let's take a look at the memo of conversation.

9       MR. BERKOWITZ:  If we can go to the bottom of that

10  page.  Just blow that out.

11  BY MR. BERKOWITZ:

12  Q.  It's dated 31 January 2017.  And it says, "On 31 January

13  2017, Mark Chadason was [virtually redacted] introduced by

14  former CEO of INQTEL Gilman Louie to Michael Sussmann."

15       And it says, "Sussmann is a partner at Perkins

16  Coie, LLP, and is in charge of the security -- of the

17  privacy and data security practice."  Correct?  That's what

18  it says?

19  A.  That's what it says.

20  Q.  And let's take a look at the second page.

21       MR. BERKOWITZ:  Blow that out.

22  BY MR. BERKOWITZ:

23  Q.  Let's just focus on -- it says, "The Story."  And it

24  says, "Sussmann said that he represents a client who does

25  not want to be known, but who had some interesting

Kevin P. - CROSS - By Mr. Berkowitz

1    information."

2            Do you see that?

3    A.  I do.

4    Q.  And then if we go down to the last two paragraphs,

5    there's a paragraph that reads "The Client."  Correct?

6    A.  Yes.

7    Q.  And it says, "Sussmann would not provide client's

8    identity and was not sure if the client would reveal himself

9    to the CIA, but he would provide data assets supporting his

10   claims which could then be verified.

11           "Chadason was able to elicit that the client is an

12   engineer with a number of patents and is most likely a

13   contractor to the IC.  As Sussmann claimed, client had

14   [blank] and various projects.  The client has worked with IC

15   before.  Sussmann also said the client is a Republican."

16           Do you see that?

17   A.  I do.

18   Q.  And on the next page, there are a couple more references

19   to "client," I think over ten in all, in total in the

20   document.

21           The third paragraph, "client."

22           And fourth paragraph, "client."

23           Do you see that?

24   A.  I do.

25   Q.  So although you don't recall having received that

1    document, you have no reason to believe you wouldn't have

2    received it?

3    A.  I didn't say I didn't recall receiving it; I said I

4    didn't recall reading it.

5    Q.  Do you have any reason to believe in preparation for a

6    meeting with the individual who was going to be providing

7    potential national security issues that you wouldn't have

8    read it?

9    A.  I do not recall reading it.  But I certainly may have

10   read it.

11   Q.  Would you say that in your practice and experience in

12   your over 30 years as a CIA agent that your practice would

13   have been to read such an email before meeting with a source

14   like this?

15   A.  Yes.

16   Q.  Now, let's take a look at Defense Exhibit 806 --

17          MR. BERKOWITZ:  -- which I will move into

18   evidence.

19          MR. ALGOR:  No objection.

20          THE COURT:  So moved.

21          (Whereupon, Defendant's Exhibit No. 806 was

22   entered into evidence.)

23   BY MR. BERKOWITZ:

24   Q.  And if we take a look at the top email, sir, are you

25   aware as to whether for purposes of this case you're known

1    as Employee 4?

2    A.  I do not.

3          MR. BERKOWITZ:  Can we get a stipulation to that

4    effect, meaning an agreement between the parties?

5          MR. ALGOR:  Yes.

6          MR. KEILTY:  Yes.

7    BY MR. BERKOWITZ:

8    Q.  So obviously, for confidentiality purposes, sir, we

9    redacted your name.  But the Government has agreed with us

10   that you are Employee 4.  So assuming that agreement between

11   the parties is correct, you would have received an email --

12   this email on Tuesday, January 31st, 2017, at 5:00 p.m.

13   Correct?

14   A.  So I'm Employee 4?

15   Q.  Yes.

16   A.  So I wasn't receiving this; it says it's from me.

17   Q.  Okay.  I'm sorry.  You're forwarding it.  Correct.  You

18   received it at 4:40 p.m. in the next chain below?

19         MR. BERKOWITZ:  Let's look at that, Mr. Cleaves.

20   Thank you, sir.  You can blow that out.  Take your time.

21   BY MR. BERKOWITZ:

22   Q.  Assuming that you are Employee 4, as we have agreed, you

23   would have received that email on January 31st, 2017 --

24   A.  Correct.

25   Q.  -- at 4:40 p.m.  Correct?

```
1    A.  Yes.

2    Q.  Let's take a look at the second page and the top email

3    with the body.  Employee 16, I will represent to you,

4    pursuant to stipulation of the parties, is Mark Chadason.

5    A.  Okay.

6    Q.  And he's sending it to Employee 14 in a chain that's

7    ultimately forwarded to you.  It says, "Just sent you memo.

8    Still waiting for his personal cell, which should have in an

9    hour or so.  Thanks and good luck.  I hope it's nothing

10   serious.  Please remember this guy is a partisan lawyer who

11   works closely with DNC.  So I'm not sure what the real story

12   is here.  But I am sure you guys will figure it out."

13   A.  Okay.

14   Q.  Per your ordinary practice, you likely would have read

15   such an email that was forwarded.  Correct?

16   A.  Right.

17   Q.  And then finally, on the next page, Page 3, that text in

18   the middle of the page, the second paragraph, it says, "I

19   need to speak with you or Employee 18 today, if possible,

20   regarding some teaser info I received today from a prominent

21   attorney who is representing a client with knowledge of what

22   possibly could be a major issue.  It may be old news to you

23   all, but just wanted to close the loop before [blank]."

24           Do you see that?

25   A.  I do.
```

1    Q.  So you don't have an independent recollection sitting

2    here today of having read those, but your normal practice

3    would have been that you would have read those in

4    preparation for the meeting.  Correct?

5    A.  Correct.  And this email, 16 to 14, was part of the

6    chain?

7    Q.  That's why you were an agent for so long.  Careful

8    question.  And the answer is yes.  It's all part of the same

9    document.  This is below the chain that was forwarded to

10   you.

11   A.  Okay.

12   Q.  Let us turn to Government's Exhibit 814.

13          MR. BERKOWITZ:  Mr. Keilty, was that moved into

14   evidence?

15          MR. KEILTY:  812 was moved in.

16          MR. BERKOWITZ:  812.  Okay.  I'm going to move

17   into evidence Government's Exhibit 814.

18          MR. KEILTY:  No objection.

19          THE COURT:  So moved.

20          (Whereupon, Government's Exhibit No. 814 was

21   entered into evidence.)

22   BY MR. BERKOWITZ:

23   Q.  If you could take a look at that document -- and I'm

24   happy to have -- this is dated February 9th.  And it appears

25   to be a copy of the memorandum dated 9 February 2017?

1    A.  Can you blow that up?  Can you blow the first paragraph

2    up for me, please?

3    Q.  Of course.

4    A.  Thank you.  Okay.

5    Q.  So let's go to the paragraph that Mr. Keilty focused you

6    on, which is Paragraph 3.  It says, "Mr. Sussmann advised

7    that he was not representing a particular client and the

8    information he was volunteering to us was not privileged."

9           Do you see that?

10   A.  Yes.

11   Q.  Did you ask him why, if he was not representing a

12   particular client, the information that you had received

13   suggested that his clients provided him certain information?

14   A.  Well, he came in and said he was not representing a

15   client and that the information was not privileged.  So he's

16   setting the scene himself as to what's happening.  He's

17   providing a lot of information at this point with sort of

18   caveats around it.

19   Q.  Did you ask Mr. Sussmann any questions in this meeting?

20   A.  Yes.  I'm sure I did.

21   Q.  Do you remember asking any -- do you remember any

22   specific questions you asked?  How's that?

23   A.  No, I don't.  What I did is I memorialized the meeting

24   with what was the outcome and the direction of the

25   information.  And that's why we do that, is so that it's --

1   that's the official record.  As you pointed out, I retired

2   and did not see any of this for four years later.  So it's

3   important that this be correct and in place because people

4   leave.

5   Q.  And memories can be funny things.  Right?

6   A.  When you handle as many things after that long, yes.

7   Q.  And he says, "His contacts wish to provide information

8   to the U.S. Government" --

9            Is that what USG stands for?

10  A.  Yes, it is.

11  Q.  -- "through Mr. Sussmann, preferring anonymity, citing a

12  potential threat from Russian intelligence services."

13           Do you see that?

14  A.  Yes.

15  Q.  And you in your capacity as a CIA agent, without getting

16  into any classified information, know that there could be

17  potential threats from Russian intelligence services.

18  That's not an unreasonable concern.  Correct?

19  A.  Correct.

20  Q.  Particularly when dealing with national security issues?

21  A.  Yes.

22  Q.  And did you ask Mr. Sussmann if his contact was also a

23  client of his?

24  A.  I don't recall asking that question.  No.

25  Q.  And Mr. Sussmann was a lawyer at the time.  Correct?

Kevin P. - CROSS - By Mr. Berkowitz

 1    A.  Yes.

 2    Q.  And he was providing information on behalf of an

 3    individual.  Correct?

 4    A.  Yes.  A contact.

 5    Q.  And the information appeared to be, at least according

 6    to what you had received on the incoming, that he was

 7    telling you something that had potential national security

 8    issues.  Correct?

 9    A.  Yes.

10    Q.  And did he describe his contact as an individual who had

11    patents and was an engineer?

12    A.  I don't recall a specific conversation in the room about

13    that.

14    Q.  And --

15    A.  He could have.  Yes.

16    Q.  And the information that Mr. Chadason had forwarded to

17    you that we just looked at talked about a client who had

18    information that they wanted to pass along through

19    Mr. Sussmann.  Correct?

20    A.  Yes.

21    Q.  Now, let's take a look at the next page.  If we could

22    look at the second paragraph, which Mr. Keilty had shown to

23    you.

24              MR. BERKOWITZ:  And blow that out, please.

25

1    BY MR. BERKOWITZ:

2    Q.  You had told him, am I right, sir:  Look, thanks for the

3    information.  It appears to be a domestic issue.  We're CIA.

4    This should go to the FBI.  More or less?

5    A.  Correct.  More or less.  Yes.

6    Q.  And there might have been more around it.  But you're

7    saying:  Look, this is not our jurisdiction.  We need to

8    pass it along to the domestic counterintelligence group.

9    Correct?

10   A.  Correct.

11   Q.  At or around the time you were talking about that,

12   Mr. Sussmann said he had no objection to providing any

13   relevant information to the FBI.  Correct?

14   A.  Yes.

15   Q.  And he volunteered, did he not, that he had previously

16   contacted the FBI's general counsel, Jim Baker, on a

17   similar, though unrelated, matter.  Correct?

18   A.  Yes.

19   Q.  And you don't know, sir, how the FBI handled that

20   matter.  Correct?

21   A.  No, I do not.

22   Q.  You ultimately did to the best of your knowledge pass

23   the information on this back to the FBI?

24   A.  Yes.

25   Q.  And you did ask, did you not, sir, whether Mr. Sussmann

1    was willing to ask his contact if they would be willing to

2    speak to the FBI.  Right?

3    A.  Yes.

4    Q.  And let's take a look at what he said in the last

5    paragraph.  I think the redaction is you, although you don't

6    need to take my word for it.  But in the meeting, someone

7    from the CIA asked if Mr. Sussmann's contact would be

8    willing to speak directly with the FBI.  And Mr. Sussmann

9    said, quote, "That could be on the table and he wouldn't

10   rule it out," end quote.

11            Do you see that?

12   A.  I do.

13   Q.  And when there are quotes around it, is that even more

14   authoritative in the sense of you were actually quoting the

15   specific words that Mr. Sussmann said?

16   A.  Yes.

17   Q.  And so at least in that memo of an important meeting at

18   the CIA, he said that the FBI -- if the FBI wanted to talk

19   to him, it could be on the table and he wouldn't rule it

20   out.  Correct?

21   A.  Yes.

22   Q.  You don't know whether the FBI ever asked to speak to

23   his contact, do you?

24   A.  No.

25   Q.  And Mr. Sussmann added that his contacts would likely be

1    willing at a future date to show U.S. Government authorities

2    how they could directly access information similar to that

3    which he provided on the thumb drives.  Correct?

4    A.  Yes.

5    Q.  Let me ask you, I mean, if this were an inquiry, without

6    getting into anything relative to this data, it would have

7    been reasonable to talk to the contact, correct, if the

8    contact were willing to speak with somebody?

9    A.  For who?  For the FBI to talk to the contact?

10   Q.  Correct.

11   A.  You could assume that.  But I didn't have any knowledge

12   of that.  Once we passed it, I had no knowledge of what

13   transpired following that.

14   Q.  Let's go back to the third page.  I think what you said

15   was that it was important that this memo be accurate and

16   this memo most accurately reflects what you believe occurred

17   on that day.  Correct?

18   A.  Yes.

19   Q.  Let's take a look at the third paragraph, the last three

20   lines, starting "He merely."

21           MR. BERKOWITZ:  If you could blow that up.  Just

22   blow that up, Mr. Cleaves, if you could, that area.

23   BY MR. BERKOWITZ:

24   Q.  The "he" in that sense is referring to Mr. Sussmann.

25   Correct?

1   A.  Yes.

2   Q.  And it reads, "He," Mr. Sussmann, "merely wanted to pass

3   along information that he thought would be of interest to

4   the U.S. Government and then let the CIA and FBI validate

5   the information and take whatever actions they believed were

6   necessary."

7           Correct?

8   A.  Yes.

9   Q.  In the middle of that paragraph, he said, "Mr. Sussmann

10  himself said that he did not expect anything from the USG,

11  nor did he require feedback or further contact, although he

12  would be open to contact if the CIA had such a need."

13  Correct?

14  A.  Yes.

15  Q.  And you believe that that accurately reflects what he

16  said to you on February 9 of 2017?

17  A.  I do.

18          MR. BERKOWITZ:  Thank you for your time.

19          THE WITNESS:  You're welcome.

20          MR. KEILTY:  Just briefly, your Honor.

21          THE COURT:  Yes.

22                  REDIRECT EXAMINATION

23  BY MR. KEILTY:

24  Q.  Kevin, you were asked a lot of questions by

25  Mr. Berkowitz and shown a bunch of emails by Mr. Berkowitz

1   that reference a client.  Is that correct?

2   A.  Yes.

3   Q.  And you testified on direct examination that you don't

4   recall reading those emails.  Is that correct?

5   A.  I did not at the time you showed them to me recall

6   reading them.

7   Q.  But you testified on cross that there is a chance that

8   you did read those emails?

9   A.  Absolutely.

10  Q.  Fair?

11  A.  Yes.  Absolutely.

12  Q.  Assuming that you did read those emails, during your

13  meeting with Mr. Sussmann, would you have expected him to

14  identify the client?

15  A.  I don't go in with any assumptions of what they will or

16  will not do with regards to the person they're talking

17  about.

18          In this case, he said they could be under threat

19  and had to stay anonymous.  So we wouldn't have pressed that

20  matter and tried to get the name from him.

21  Q.  And based on having seen the emails that were shown to

22  you by Mr. Berkowitz referencing a client, would you have

23  assumed that Mr. Sussmann would have told you that in the

24  meeting he was, in fact, representing a client without

25  getting into names?

1  A.  Yes.

2  Q.  And did he say that to you?

3  A.  No.  He said he was not representing a client.

4  Q.  And Mr. Berkowitz showed you a number of emails that

5  referenced that Mr. Sussmann had connections to the DNC and

6  other Democratic entities.  Is that correct?

7  A.  His law firm did.  He said he did not have

8  connections -- that he was not involved in those matters,

9  but his law firm was.

10  Q.  Okay.  And you testified on direct that Mr. Sussmann

11  informed you about those connections.  Is that correct?

12  A.  Yes.

13  Q.  But you also testified that those connections had

14  nothing to do with the meeting that he was in on February

15  9th.  Is that correct?

16  A.  Correct.

17  Q.  Kevin, you've been a CIA officer for 32 years.  Is that

18  correct?

19  A.  32 and a half.

20  Q.  And you've been in a lot of meetings.  Is that fair to

21  say?

22  A.  Absolutely.

23  Q.  And you've conducted a lot of interviews.  Is that a

24  fair statement?

25  A.  Yes.

1    Q.  Do people sometimes make inconsistent statements in

2    meetings that differ from what they've said in previous

3    interviews?

4    A.  Yes.

5    Q.  Now, in the meeting with Mr. Sussmann, he also stated,

6    according to your MFR, your memorandum, that he brought

7    the -- he previously brought the allegations of I think

8    similar but unrelated --

9              MR. KEILTY:  Actually, can you pull it up?  It's

10   817, please.  Go to the second page.  Can you highlight

11   the -- blow up the paragraph where it talks --

12             THE COURT:  Mr. Keilty, we have a side-bar,

13   please.

14             (Whereupon, the following proceedings were had at

15   sidebar outside the presence of the jury:)

16             MR. KEILTY:  Yes, your Honor.

17             MR. BERKOWITZ:  So I don't know where this is

18   going.  I just want to be careful about going too far afield

19   on the unrelated matters.  This was a paragraph that

20   Mr. Keilty was showing him in his direct.  So I'm just not

21   sure where we're going.  I want to be careful.

22             THE COURT:  Did you cross on it?

23             MR. BERKOWITZ:  I absolutely -- I asked him to

24   read it.  Correct.

25             THE COURT:  Okay.

```
1          MR. KEILTY:  Yeah, your Honor.  I was just going
2    to ask him if he believed that this was an unrelated matter.
3          MR. BERKOWITZ:  I think that could be misleading,
4    because it was both related.
5          THE COURT:  Let's see what you ask.  You can ask
6    him.
7          (Whereupon, the following proceedings were had in
8    open court:)
9          MR. KEILTY:  Ms. Arsenault, if you could blow up
10   the paragraph that we were referring to.
11   BY MR. KEILTY:
12   Q.  Kevin, do you see the sentence that begins "We
13   mentioned"?  Five lines down?
14   A.  Yes.
15   Q.  Can you read that?
16   A.  "He mentioned that he had previously contacted FBI's
17   general counsel, Jim Baker, on a similar, though unrelated,
18   matter."
19   Q.  Did you have any impression about whether when
20   Mr. Sussmann said that that it was -- that he's referring to
21   an unrelated matter?
22   A.  I don't understand the question.
23   Q.  Meaning was it your understanding that Mr. Sussmann had
24   previously brought the Alfa-Bank allegations to the FBI?
25   A.  I don't know what allegation it was.  It was similar and
```

1    unrelated.

2    Q.  Okay.

3              MR. KEILTY:  That's it.  Thank you, your Honor.

4              THE COURT:  All right, sir.  Thank you very much

5    for your testimony.  You are excused.  Please don't discuss

6    your testimony with anyone until the end of the case.  And

7    have a great weekend.

8              THE WITNESS:  Thank you.  You, too.

9              (Witness excused.)

10             THE COURT:  Okay, ladies and gentlemen.  That

11   brings us to the conclusion of a long and I think very

12   productive week.  You've earned your weekend off.  Thank you

13   for your attentiveness and your punctuality.

14             You know the drill:  No discussions about the

15   case.  No research about the case.  No contact with any

16   social media or other reporting regarding the case or any of

17   the surrounding issues.

18             So have a great weekend.  Stay safe.  Stay

19   healthy.  And I understand stay cool.  We're out for some

20   warm weather this weekend.  So we'll see you back here at

21   9:00 on Monday morning.

22             (Whereupon, the jury exited the courtroom at 3:32

23   p.m. and the following proceedings were had:)

24             THE COURT:  Be seated.

25             Mr. DeFilippis, who do we have for next week?

```
1            MR. DeFILIPPIS:  Sorry, your Honor.

2            MR. ALGOR:  Your Honor, just one moment.

3            THE COURT:  Sure.

4            (Counsel confer privately amongst themselves.)

5            MR. ALGOR:  Sorry, your Honor.

6            So we have potentially a scheduling conflict with

7    the next witness that we expect.  We had expected to call --

8    so we're going to try to figure that out.  But we had

9    expected to call next Trisha Anderson, then Bill Priestap,

10   Ryan Gaynor, and then Allison Sands.

11           THE COURT:  Have you streamlined your list at all

12   in light of what's come in this week?

13           MR. ALGOR:  Yes, your Honor.  And so Steve M. we

14   don't intend to call now, based on today's testimony.

15           THE COURT:  Anyone else?

16           MR. ALGOR:  We haven't cut anyone else yet, your

17   Honor.

18           THE COURT:  Okay.  And Mr. Novick has recovered or

19   no?

20           MR. ALGOR:  Our understanding is he's going to be

21   able to travel on Monday and so we should be able to call

22   him on Tuesday.

23           THE COURT:  Tuesday.  Okay.

24           MR. BERKOWITZ:  Your Honor, I just had one point.

25   I'm sure late last night you anxiously reviewed the
```

1    Government's response on the motion related to *The New York*

2    *Times*.

3              And we've been told by counsel for *The New York*

4    *Times* that they'd like an opportunity to either reply or be

5    heard.

6              THE COURT:  So I was going to raise that.

7              Obviously, the issues are a little tricky.  So I

8    think we have -- if we haven't issued it yet, we will soon

9    issue an order asking for a reply by Sunday evening.  And

10   I'd like to take this up as soon as we can early next week.

11             So it sounds like the Government will be wrapping

12   up Tuesday, Wednesday?

13             MR. ALGOR:  Yes.  I mean, we anticipate that, your

14   Honor.

15             THE COURT:  So I would anticipate both you and the

16   Intervenor to be heard at some point once we get the reply

17   and see what we have.

18             MR. BERKOWITZ:  No shortage of tricky, fun issues

19   in this case.

20             THE COURT:  No, no.  Well, it does keep me on my

21   toes.

22             MR. BERKOWITZ:  You have a nice weekend.

23             THE COURT:  You all have a very nice weekend.

24   Again, thanks for, you know, working hard and cooperatively

25   to get through this.  I thought everything came in as well

1    as could be expected.

2              MR. BERKOWITZ:  I appreciate it.

3              THE COURT:  Have a great weekend.  Are you all

4    traveling back home or sticking around?

5              MR. ALGOR:  Sticking around, your Honor.

6              MR. BERKOWITZ:  We're here for the duration.

7              THE COURT:  You'll finally get a D.C. summer

8    weekend.

9              MR. ALGOR:  That's true.

10             THE COURT:  See you Monday.

11             MR. ALGOR:  Thank you, your Honor.

12             (Proceedings concluded.)

1

## **CERTIFICATE**

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8

9

10             Dated this 20th day of May, 2022.

11

12             /s/ Lisa Edwards, RDR, CRR
               Official Court Reporter
13             United States District Court for the
                 District of Columbia
14             333 Constitution Avenue, Northwest
               Washington, D.C. 20001
15             (202) 354-3269

16

17

18

19

20

21

22

23

24

25

' [1] - 1382:9

'17 [1] - 1382:9
'domain [1] - 1375:5
'private [1] - 1374:20
'to [1] - 1337:3

/

/s [1] - 1407:12

1

1 [1] - 1354:4
10020 [1] - 1325:21
120 [1] - 1368:21
1221 [1] - 1325:20
128 [1] - 1370:22
12:57 [2] - 1355:17, 1355:21
12:59 [1] - 1386:4
14 [2] - 1390:6, 1391:5
145 [1] - 1325:16
15 [1] - 1326:5
16 [3] - 1357:6, 1390:3, 1391:5
18 [1] - 1390:19
1:21-CR-00582-CRC-1 [1] - 1325:3
1:51 [2] - 1325:4, 1327:4

2

2 [1] - 1357:4
20 [2] - 1325:4, 1360:23
20001 [2] - 1325:24, 1407:14
20002 [1] - 1325:17
2016 [1] - 1353:8
2017 [34] - 1328:4, 1328:15, 1329:2, 1331:18, 1332:3, 1339:6, 1339:18, 1341:16, 1353:7, 1356:20, 1359:12, 1362:21, 1363:6, 1363:8, 1365:8, 1365:15, 1365:16, 1367:12, 1370:18, 1371:15, 1371:18, 1372:3, 1372:22, 1377:4, 1377:5, 1377:16, 1384:4, 1386:3, 1386:12,

1386:13, 1389:12, 1389:23, 1391:25, 1398:16
202 [2] - 1325:25, 1407:15
2020 [3] - 1351:5, 1352:22, 1354:4
2021 [1] - 1382:12
2022 [2] - 1325:4, 1407:10
20th [1] - 1407:10
23 [2] - 1377:4, 1377:16
23rd [1] - 1377:21
25 [1] - 1352:21

3

3 [5] - 1326:5, 1352:22, 1378:15, 1390:17, 1392:6
30 [1] - 1388:12
31 [3] - 1332:3, 1386:12
31st [10] - 1328:15, 1329:2, 1331:18, 1333:7, 1339:18, 1355:21, 1356:20, 1386:3, 1389:12, 1389:23
32 [3] - 1362:17, 1400:17, 1400:19
33 [1] - 1326:12
333 [2] - 1325:24, 1407:14
34 [1] - 1326:5
354-3269 [2] - 1325:25, 1407:15
37 [1] - 1326:6
3:32 [1] - 1403:22

4

4 [7] - 1331:10, 1351:22, 1352:22, 1389:1, 1389:10, 1389:14, 1389:22
47 [1] - 1326:10
4:40 [2] - 1389:18, 1389:25

5

5 [2] - 1354:4, 1375:2
52 [1] - 1326:11
525 [4] - 1326:13, 1385:19, 1385:20, 1385:24

58 [1] - 1326:6
5:00 [1] - 1389:12
5th [1] - 1351:5

6

60 [1] - 1368:21
600 [3] - 1326:13, 1385:7, 1385:14
61 [1] - 1326:13
64 [1] - 1326:14
66 [1] - 1343:9

7

7 [4] - 1326:10, 1339:6, 1351:22, 1354:4
74 [1] - 1326:6
7th [1] - 1338:3

8

806 [7] - 1326:12, 1326:14, 1356:17, 1357:1, 1360:10, 1388:16, 1388:21
809 [5] - 1326:10, 1330:20, 1331:5, 1331:8, 1344:4
812 [11] - 1326:10, 1370:9, 1370:12, 1371:4, 1371:7, 1371:11, 1371:22, 1378:25, 1379:18, 1391:15, 1391:16
814 [4] - 1326:11, 1391:12, 1391:17, 1391:20
817 [10] - 1326:11, 1376:17, 1376:21, 1376:24, 1377:22, 1379:10, 1379:18, 1379:20, 1380:20, 1401:10
83 [1] - 1326:13
87 [1] - 1326:11
8th [1] - 1339:11

9

9 [7] - 1363:8, 1370:18, 1371:15, 1372:3, 1377:5, 1391:25, 1398:16
9:00 [1] - 1403:21
9th [10] - 1365:16,

1366:2, 1367:2, 1367:12, 1371:18, 1376:3, 1377:21, 1384:4, 1391:24, 1400:15

A

ability [2] - 1354:17, 1407:7
able [6] - 1333:21, 1342:19, 1347:12, 1387:11, 1404:21
absolutely [5] - 1384:17, 1399:9, 1399:11, 1400:22, 1401:23
accept [1] - 1366:6
access [1] - 1397:2
according [4] - 1349:5, 1386:5, 1394:5, 1401:6
accuracy [2] - 1355:4, 1355:9
accurate [7] - 1351:8, 1355:2, 1369:10, 1381:10, 1381:22, 1397:15, 1407:4
accurately [4] - 1343:17, 1368:3, 1397:16, 1398:15
acronyms [1] - 1373:6
acting [1] - 1373:24
Action [1] - 1325:3
action [1] - 1340:12
actions [3] - 1374:11, 1374:24, 1398:5
active [4] - 1329:20, 1335:25, 1350:19, 1374:5
active-duty [1] - 1329:20
activities [1] - 1372:9
activity [1] - 1375:15
add [1] - 1376:7
add/subtract/edit [1] - 1371:16
added [1] - 1396:25
admit [1] - 1331:5
advance [1] - 1365:11
advised [7] - 1372:22, 1373:18, 1374:23, 1375:8, 1375:10, 1380:21,

1392:6
affected [1] - 1359:10
affiliation [1] - 1383:12
afield [1] - 1401:18
afternoon [6] - 1327:19, 1327:20, 1339:23, 1339:24, 1382:3, 1382:4
AFTERNOON [1] - 1325:5
Agency [9] - 1328:1, 1350:18, 1350:19, 1362:14, 1362:24, 1363:22, 1365:24, 1366:3, 1386:5
agency [1] - 1355:8
agent [3] - 1388:12, 1391:7, 1393:15
agents [1] - 1351:5
agents' [1] - 1355:9
ago [5] - 1340:24, 1341:19, 1342:15, 1346:16, 1384:25
agree [2] - 1357:6, 1381:4
agreed [2] - 1389:9, 1389:22
agreement [2] - 1389:4, 1389:10
ahead [1] - 1378:21
alarmed [4] - 1352:15, 1353:1, 1353:4, 1353:15
Alfa [1] - 1402:24
Alfa-Bank [1] - 1402:24
ALGOR [55] - 1325:14, 1327:11, 1327:18, 1330:19, 1330:21, 1331:4, 1331:10, 1331:12, 1331:23, 1332:1, 1332:16, 1332:18, 1333:10, 1333:12, 1334:2, 1334:3, 1334:10, 1334:12, 1335:11, 1335:13, 1336:11, 1336:13, 1337:9, 1337:11, 1337:19, 1337:21, 1337:25, 1338:2, 1339:2, 1339:4, 1339:7, 1339:8, 1339:20, 1345:4, 1345:6, 1348:14, 1351:21, 1356:24, 1358:10, 1358:13, 1359:20, 1360:5,

1360:8, 1361:2,
1388:19, 1389:5,
1404:2, 1404:5,
1404:13, 1404:16,
1404:20, 1405:13,
1406:5, 1406:9,
1406:11
**Algor** [3] - 1327:10,
1359:15, 1359:19
**allegation** [3] -
1330:7, 1336:19,
1402:25
**allegations** [9] -
1329:15, 1329:25,
1330:10, 1336:20,
1336:22, 1367:25,
1368:14, 1401:7,
1402:24
**Allison** [1] - 1404:10
**almost** [2] - 1377:18,
1377:19
**alone** [1] - 1348:11
**AMERICA** [1] -
1325:3
**American** [3] -
1352:15, 1353:1,
1353:15
**Americas** [1] -
1325:20
**Amsterdam** [1] -
1338:9
**and".. ** [1] - 1375:11
**Anderson** [1] -
1404:9
**ANDREW** [1] -
1325:14
**anonymity** [2] -
1379:15, 1393:11
**anonymous** [6] -
1367:21, 1373:22,
1379:7, 1379:22,
1379:24, 1399:19
**answer** [3] -
1351:12, 1353:21,
1391:8
**anticipate** [3] -
1359:14, 1405:13,
1405:15
**anxiously** [1] -
1404:25
**app** [1] - 1341:11
**appear** [5] - 1370:22,
1377:3, 1377:25,
1379:18, 1386:3
**aPPEARANCES** [1] -
1325:13
**appeared** [2] -
1381:1, 1394:5
**appreciate** [1] -
1406:2

**appropriate** [2] -
1366:8, 1369:19
**area** [1] - 1397:22
**arranged** [1] -
1363:17
**arrangement** [1] -
1342:21
**Arsenault** [5] -
1373:14, 1375:13,
1376:1, 1379:11,
1402:9
**ASAP** [1] - 1338:10
**assess** [1] - 1354:17
**assessing** [1] -
1360:21
**assessment** [2] -
1358:16, 1377:12
**assets** [2] - 1346:21,
1387:9
**associated** [2] -
1363:20, 1363:21
**assume** [4] -
1343:13, 1352:10,
1355:14, 1397:11
**assumed** [2] -
1368:8, 1399:23
**assuming** [3] -
1389:10, 1389:22,
1399:12
**assumptions** [1] -
1399:15
**attached** [2] -
1377:9, 1378:9
**attachment** [1] -
1370:19
**attended** [1] -
1365:21
**attending** [1] -
1384:14
**attention** [1] - 1357:4
**attentiveness** [1] -
1403:13
**attorney** [3] -
1336:17, 1366:10,
1390:21
**August** [3] - 1351:5,
1352:21, 1354:3
**authoritative** [1] -
1396:14
**authorities** [1] -
1397:1
**available** [1] - 1336:4
**Avenue** [3] -
1325:20, 1325:24,
1407:14
**aware** [2] - 1366:17,
1388:25

# B

**background** [5] -
1336:16, 1337:17,
1360:14, 1361:1,
1372:20
**badge** [1] - 1332:11
**Baker** [3] - 1375:18,
1395:16, 1402:17
**Bank** [1] - 1402:24
**bank** [1] - 1367:13
**bar** [1] - 1401:12
**based** [16] - 1344:1,
1354:14, 1354:19,
1358:16, 1359:25,
1360:25, 1367:5,
1367:6, 1367:23,
1368:8, 1368:12,
1375:19, 1381:19,
1381:20, 1399:21,
1404:14
**basis** [1] - 1345:5
**became** [1] -
1368:10
**become** [1] -
1366:17
**becomes** [1] -
1338:24
**BEFORE** [1] -
1325:10
**begin** [1] - 1344:11
**begins** [1] - 1402:12
**behalf** [3] - 1329:21,
1329:23, 1394:2
**behind** [1] - 1356:8
**below** [2] - 1389:18,
1391:9
**benefit** [1] - 1372:12
**benefits** [1] -
1340:14
**Berkowitz** [5] -
1382:5, 1398:25,
1399:22, 1400:4
**BERKOWITZ** [34] -
1325:18, 1371:5,
1376:18, 1382:2,
1385:9, 1385:16,
1385:22, 1386:1,
1386:9, 1386:11,
1386:21, 1386:22,
1388:17, 1388:23,
1389:3, 1389:7,
1389:19, 1389:21,
1391:13, 1391:16,
1391:22, 1394:24,
1395:1, 1397:21,
1397:23, 1398:18,
1401:17, 1401:23,
1402:3, 1404:24,

1405:18, 1405:22,
1406:2, 1406:6
**best** [8] - 1334:6,
1335:9, 1340:23,
1341:11, 1349:3,
1384:3, 1395:22,
1407:7
**between** [4] -
1356:19, 1379:17,
1389:4, 1389:10
**bias** [2] - 1360:17,
1360:20
**big** [2] - 1346:6,
1349:22
**Bill** [1] - 1404:9
**bio** [1] - 1337:10
**biography** [1] -
1358:17
**bit** [5] - 1351:10,
1372:12, 1384:2
**blank** [5] - 1373:4,
1377:11, 1377:12,
1387:14
**blank]** [1] - 1390:23
**blow** [28] - 1331:11,
1336:12, 1337:10,
1337:25, 1339:3,
1344:5, 1344:6,
1346:9, 1355:19,
1371:25, 1372:16,
1373:13, 1374:13,
1378:1, 1378:2,
1378:15, 1379:1,
1386:4, 1386:10,
1386:21, 1389:20,
1392:1, 1394:24,
1397:21, 1397:22,
1401:11, 1402:9
**blurry** [1] - 1330:25
**board** [4] - 1328:22,
1332:24, 1340:8,
1340:16
**body** [2] - 1371:15,
1390:3
**bold** [1] - 1346:7
**bona** [4] - 1335:24,
1338:15, 1347:18,
1350:11
**book** [1] - 1343:9
**Bosworth** [1] -
1358:14
**BOSWORTH** [22] -
1325:18, 1331:6,
1339:22, 1341:8,
1344:3, 1344:7,
1346:1, 1346:9,
1346:11, 1348:16,
1351:24, 1354:2,
1354:6, 1355:19,
1355:20, 1356:16,

1356:18, 1356:21,
1357:3, 1358:9,
1359:4, 1359:8
**bottom** [2] - 1337:25,
1386:9
**bounds** [1] - 1360:3
**breakfast** [2] -
1328:25, 1354:1
**briefly** [4] - 1351:16,
1358:10, 1360:9,
1398:20
**bring** [1] - 1330:19
**brings** [1] - 1403:11
**BRITTAIN** [1] -
1325:15
**brought** [4] -
1368:14, 1401:6,
1401:7, 1402:24
**bunch** [1] - 1398:25
**but..** [1] - 1351:15
**BY** [55] - 1325:22,
1327:18, 1330:21,
1331:12, 1332:1,
1332:18, 1333:12,
1334:3, 1334:12,
1335:13, 1336:13,
1337:11, 1337:21,
1338:2, 1339:4,
1339:8, 1339:22,
1341:8, 1344:7,
1346:1, 1346:11,
1348:16, 1351:24,
1354:6, 1355:20,
1356:18, 1357:3,
1358:13, 1360:8,
1361:23, 1371:9,
1372:1, 1372:18,
1373:15, 1374:15,
1376:2, 1377:1,
1377:24, 1378:6,
1378:16, 1379:3,
1379:12, 1382:2,
1385:16, 1386:1,
1386:11, 1386:22,
1388:23, 1389:7,
1389:21, 1391:22,
1395:1, 1397:23,
1398:23, 1402:11

# C

**C-H-A-D-A-S-O-N** [1]
- 1327:22
**candidate** [2] -
1367:14, 1374:7
**candidate/elect** [1] -
1372:10
**capacity** [1] -
1393:15
**capitalization** [1] -

1346:2
**capitalized** [3] - 1344:22, 1344:23, 1346:3
**careful** [3] - 1391:7, 1401:18, 1401:21
**cares** [1] - 1337:2
**Caroline** [1] - 1372:21
**case** [11] - 1327:8, 1361:7, 1369:20, 1384:1, 1388:25, 1399:18, 1403:6, 1403:15, 1403:16, 1405:19
**CATHERINE** [1] - 1325:19
**causes** [1] - 1374:5
**caveats** [1] - 1392:18
**cell** [1] - 1390:8
**center** [2] - 1362:20, 1373:12
**Central** [2] - 1328:1, 1362:13
**CEO** [4] - 1327:24, 1332:4, 1332:22, 1386:14
**certain** [6] - 1350:18, 1363:21, 1364:23, 1367:18, 1384:8, 1392:13
**certainly** [1] - 1388:9
**CERTIFICATE** [1] - 1407:1
**certify** [1] - 1407:4
**Chadason** [24] - 1326:5, 1327:12, 1327:22, 1330:22, 1331:13, 1332:3, 1333:21, 1334:4, 1334:15, 1334:22, 1337:12, 1339:5, 1339:9, 1339:23, 1343:11, 1347:12, 1352:18, 1358:14, 1360:9, 1361:3, 1386:13, 1387:11, 1390:4, 1394:16
**CHADASON** [1] - 1327:15
**chain** [5] - 1356:19, 1389:18, 1390:6, 1391:6, 1391:9
**chains** [1] - 1364:23
**chance** [2] - 1382:7, 1399:7
**change** [2] - 1379:25, 1380:2
**changes** [3] - 1378:8, 1378:12,

1378:18
**characterizing** [1] - 1360:14
**charge** [2] - 1332:6, 1386:16
**chief** [1] - 1327:8
**children** [1] - 1340:13
**CHRISTOPHER** [1] - 1325:10
**chunk** [1] - 1348:14
**CIA** [78] - 1328:2, 1328:3, 1328:22, 1329:5, 1329:6, 1329:19, 1330:3, 1330:9, 1330:12, 1332:23, 1332:24, 1333:17, 1335:15, 1335:19, 1335:24, 1336:7, 1339:10, 1339:15, 1340:8, 1340:15, 1342:12, 1342:17, 1342:21, 1343:1, 1343:17, 1344:10, 1346:20, 1349:24, 1350:2, 1350:6, 1350:11, 1350:22, 1352:9, 1353:17, 1353:19, 1353:23, 1354:12, 1356:9, 1356:10, 1356:19, 1357:8, 1358:2, 1358:7, 1359:2, 1359:10, 1360:13, 1360:21, 1360:23, 1362:12, 1362:13, 1362:16, 1362:18, 1362:22, 1362:24, 1363:10, 1364:11, 1364:24, 1365:2, 1365:18, 1367:8, 1367:12, 1367:24, 1372:6, 1372:24, 1374:3, 1374:8, 1374:10, 1375:23, 1381:22, 1387:9, 1388:12, 1393:15, 1395:3, 1396:7, 1396:18, 1398:4, 1398:12, 1400:17
**CIA's** [2] - 1360:2, 1372:21
**CIMC** [2] - 1373:5, 1373:11
**circumstances** [1] - 1328:18
**citing** [2] - 1379:15, 1393:11
**claimed** [7] -

1332:10, 1333:23, 1334:18, 1334:19, 1348:23, 1372:8, 1387:13
**claims** [4] - 1333:18, 1346:21, 1347:10, 1387:10
**classified** [1] - 1393:16
**clear** [4] - 1354:23, 1360:2, 1367:3, 1368:10
**clearance** [1] - 1374:18
**clearance-holder** [1] - 1374:18
**clearances** [1] - 1336:17
**Cleaves** [3] - 1386:4, 1389:19, 1397:22
**Client** [4] - 1333:11, 1333:15, 1346:3, 1387:5
**client** [79] - 1329:23, 1330:5, 1330:11, 1333:3, 1333:14, 1333:16, 1333:21, 1333:23, 1333:24, 1333:25, 1334:5, 1334:8, 1334:18, 1334:19, 1335:8, 1335:10, 1335:23, 1344:12, 1344:16, 1344:18, 1344:22, 1344:23, 1345:2, 1346:3, 1346:6, 1346:10, 1346:13, 1346:20, 1346:23, 1346:25, 1347:1, 1347:2, 1347:3, 1347:5, 1347:9, 1347:13, 1347:16, 1348:4, 1348:5, 1348:12, 1348:13, 1348:23, 1350:10, 1356:7, 1358:5, 1358:6, 1364:13, 1365:5, 1366:14, 1366:16, 1373:19, 1378:20, 1379:8, 1379:18, 1380:22, 1386:24, 1387:8, 1387:11, 1387:13, 1387:14, 1387:15, 1387:19, 1387:21, 1387:22, 1390:21, 1392:7, 1392:12, 1392:15, 1393:23, 1394:17, 1399:1, 1399:14, 1399:22,

1399:24, 1400:3
**client's** [5] - 1333:15, 1346:16, 1347:21, 1348:9, 1387:7
**clients** [7] - 1366:21, 1367:1, 1373:21, 1379:6, 1379:21, 1380:3, 1392:13
**Clinton** [2] - 1366:24, 1374:7
**Clinton's** [1] - 1353:10
**close** [1] - 1390:23
**closed** [2] - 1374:20, 1375:5
**closely** [3] - 1356:13, 1357:16, 1390:11
**closer** [2] - 1328:8, 1341:5
**Coie** [3] - 1332:6, 1372:4, 1386:16
**colleague** [1] - 1340:25
**colleagues** [1] - 1328:22
**collect** [1] - 1368:3
**collected** [2] - 1374:19, 1374:21
**collection** [1] - 1374:20
**college** [1] - 1340:13
**COLUMBIA** [1] - 1325:1
**Columbia** [2] - 1325:23, 1407:13
**comfortable** [1] - 1361:20
**coming** [1] - 1360:24
**Committee** [3] - 1349:10, 1349:14, 1357:22
**communicating** [1] - 1367:14
**communication** [1] - 1360:18
**communications** [1] - 1340:24
**community** [4] - 1336:18, 1337:6, 1348:1, 1348:6
**company** [4] - 1327:24, 1328:6, 1328:10
**complete** [1] - 1407:6
**compliance** [1] - 1332:9
**computer** [1] - 1332:8
**concern** [2] -

1357:24, 1393:18
**concerned** [1] - 1353:15
**concerns** [2] - 1367:24, 1368:5
**concluded** [1] - 1406:12
**conclusion** [2] - 1369:1, 1403:11
**conclusions** [3] - 1359:9, 1359:10, 1360:2
**concur** [1] - 1377:10
**conduct** [2] - 1366:4, 1366:5
**conducted** [1] - 1400:23
**confer** [1] - 1404:4
**confidentiality** [1] - 1389:8
**conflict** [1] - 1404:6
**connected** [2] - 1372:9, 1375:4
**connection** [4] - 1364:13, 1366:15, 1367:2, 1367:3
**connections** [4] - 1400:5, 1400:8, 1400:11, 1400:13
**consider** [1] - 1360:15
**constitutes** [1] - 1407:4
**Constitution** [2] - 1325:24, 1407:14
**consultation** [1] - 1369:25
**consulting** [2] - 1327:24, 1328:10
**consumer** [1] - 1332:7
**contact** [22] - 1335:21, 1339:12, 1363:18, 1363:20, 1363:21, 1363:22, 1363:23, 1374:2, 1374:19, 1374:21, 1393:22, 1394:4, 1394:10, 1396:1, 1396:7, 1396:23, 1397:7, 1397:8, 1397:9, 1398:11, 1398:12, 1403:15
**contacted** [3] - 1375:18, 1395:16, 1402:16
**contacting** [1] - 1374:8
**contacts** [14] - 1367:9, 1367:18,

1367:20, 1373:20,
1373:23, 1374:2,
1374:17, 1374:23,
1379:5, 1379:14,
1379:23, 1380:4,
1393:7, 1396:25
 **contained** [2] -
1372:8, 1384:3
 **content** [2] -
1374:19, 1377:12
 **context** [1] - 1337:14
 **contractor** [3] -
1333:23, 1347:25,
1387:13
 **contrast** [1] -
1341:22
 **conversation** [18] -
1330:18, 1341:9,
1341:12, 1341:18,
1341:22, 1342:2,
1342:5, 1342:23,
1342:24, 1343:3,
1343:8, 1344:2,
1344:5, 1356:7,
1369:16, 1386:6,
1386:8, 1394:12
 **conveyed** [1] -
1353:1
 **conveying** [1] -
1381:13
 **convince** [1] -
1342:20
 **cool** [1] - 1403:19
 **COOPER** [1] -
1325:10
 **cooperatively** [1] -
1405:24
 **coordination** [1] -
1372:23
 **copies** [1] - 1377:12
 **copy** [2] - 1384:1,
1391:25
 **correct** [132] -
1329:3, 1329:9,
1331:15, 1331:16,
1331:19, 1332:14,
1332:15, 1332:19,
1333:7, 1333:8,
1334:25, 1335:15,
1335:16, 1337:23,
1337:24, 1338:4,
1338:5, 1340:6,
1341:15, 1341:21,
1341:24, 1341:25,
1342:3, 1342:17,
1342:18, 1342:21,
1342:22, 1343:23,
1343:24, 1346:4,
1346:5, 1346:7,
1346:8, 1346:18,

1347:22, 1347:24,
1348:10, 1351:8,
1352:4, 1352:7,
1352:9, 1352:16,
1353:5, 1353:6,
1353:8, 1353:13,
1353:17, 1354:25,
1356:3, 1356:10,
1356:11, 1357:20,
1357:25, 1358:1,
1358:17, 1358:18,
1365:19, 1365:20,
1366:11, 1367:18,
1370:1, 1370:5,
1370:19, 1371:19,
1371:23, 1371:24,
1376:4, 1377:6,
1377:7, 1378:10,
1378:11, 1379:8,
1380:24, 1381:2,
1381:17, 1382:9,
1382:10, 1382:17,
1383:3, 1383:4,
1383:6, 1383:12,
1383:15, 1383:18,
1383:19, 1383:22,
1383:25, 1384:9,
1384:21, 1384:22,
1385:2, 1386:7,
1386:17, 1387:5,
1389:11, 1389:13,
1389:17, 1389:24,
1389:25, 1390:15,
1391:4, 1391:5,
1393:3, 1393:18,
1393:19, 1393:25,
1394:3, 1394:8,
1394:19, 1395:5,
1395:9, 1395:10,
1395:13, 1395:17,
1395:20, 1396:20,
1397:3, 1397:7,
1397:10, 1397:17,
1397:25, 1398:7,
1398:13, 1399:1,
1399:4, 1400:6,
1400:11, 1400:15,
1400:16, 1400:18,
1401:24
 **counsel** [12] -
1335:20, 1350:2,
1350:8, 1352:6,
1372:21, 1373:1,
1373:9, 1375:18,
1395:16, 1402:17,
1404:4, 1405:3
 **Counsel** [2] - 1330:2,
1373:8
 **COUNSEL'S** [1] -
1325:16
 **counterintelligence**

[3] - 1362:19, 1373:12,
1395:8
 **country** [1] - 1337:3
 **couple** [3] - 1364:20,
1373:6, 1387:18
 **course** [1] - 1384:20,
1392:3
 **court** [5] - 1345:25,
1360:7, 1372:12,
1385:18, 1402:8
 **Court** [5] - 1325:22,
1325:23, 1372:2,
1407:12, 1407:13
 **COURT** [49] - 1325:1,
1327:3, 1327:6,
1327:13, 1327:16,
1328:7, 1331:7,
1338:22, 1341:4,
1345:5, 1353:20,
1356:23, 1356:25,
1358:11, 1359:7,
1359:19, 1360:1,
1361:3, 1361:6,
1361:11, 1361:15,
1361:19, 1371:6,
1376:23, 1385:13,
1385:21, 1385:23,
1388:20, 1391:19,
1398:21, 1401:12,
1401:22, 1401:25,
1402:5, 1403:4,
1403:10, 1403:24,
1404:3, 1404:11,
1404:15, 1404:18,
1404:23, 1405:6,
1405:15, 1405:20,
1405:23, 1406:3,
1406:7, 1406:10
 **courtroom** [3] -
1327:4, 1361:17,
1403:22
 **COURTROOM** [1] -
1327:1
 **craft** [1] - 1377:11
 **created** [1] - 1343:25
 **creating** [1] - 1356:2
 **credibility** [6] -
1354:17, 1358:15,
1358:16, 1358:22,
1359:21, 1360:25
 **credible** [11] -
1353:16, 1353:25,
1354:11, 1354:14,
1354:15, 1354:17,
1354:22, 1354:24,
1355:1, 1355:11,
1359:2
 **crimes** [1] - 1375:11
 **Criminal** [1] - 1325:3
 **criminal** [1] -

1375:15
 **CROSS** [2] -
1339:21, 1382:1
 **cross** [3] - 1358:14,
1399:7, 1401:22
 **Cross** [1] - 1326:2
 **CROSS-
EXAMINATION** [2] -
1339:21, 1382:1
 **cross-examination**
[1] - 1358:14
 **CRR** [3] - 1325:22,
1407:3, 1407:12
 **current** [1] - 1327:23
 **cut** [1] - 1404:16

## D

 **D.C** [4] - 1325:17,
1325:24, 1406:7,
1407:14
 **data** [15] - 1332:7,
1333:17, 1334:15,
1335:24, 1346:21,
1347:10, 1348:17,
1348:18, 1350:11,
1372:8, 1374:21,
1375:3, 1386:17,
1387:9, 1397:6
 **date** [6] - 1339:5,
1370:17, 1371:18,
1377:15, 1397:1
 **Dated** [1] - 1407:10
 **dated** [6] - 1365:1,
1377:4, 1383:16,
1386:12, 1391:24,
1391:25
 **DC** [1] - 1354:20
 **deal** [4] - 1330:6,
1334:21, 1348:25,
1349:3
 **dealing** [2] - 1335:4,
1393:20
 **dealt** [2] - 1332:23,
1336:18
 **December** [1] -
1372:21
 **Defendant** [1] -
1325:7
 **DEFENDANT** [1] -
1325:18
 **Defendant's** [10] -
1326:12, 1326:13,
1326:13, 1326:14,
1356:17, 1357:1,
1360:10, 1385:14,
1385:24, 1388:21
 **Defense** [3] - 1385:7,
1385:19, 1388:16

 **DeFilippis** [4] -
1325:14, 1354:8,
1403:25, 1404:1
 **deleted** [2] - 1332:4,
1333:24
 **Democrat** [6] -
1334:22, 1349:7,
1349:13, 1349:16,
1357:18, 1360:11
 **Democratic** [5] -
1349:10, 1349:14,
1357:21, 1374:5,
1400:6
 **deny** [1] - 1360:1
 **deputy** [1] - 1361:17
 **DEPUTY** [1] - 1327:1
 **describe** [1] -
1394:10
 **description** [1] -
1375:3
 **detail** [1] - 1384:2
 **differ** [1] - 1401:2
 **difference** [1] -
1379:17
 **different** [2] -
1354:3, 1355:8
 **difficult** [3] -
1338:20, 1338:25,
1384:23
 **direct** [4] - 1350:1,
1399:3, 1400:10,
1401:20
 **DIRECT** [2] -
1327:17, 1361:22
 **Direct** [1] - 1326:2
 **direction** [2] -
1368:11, 1392:24
 **directly** [3] -
1375:22, 1396:8,
1397:2
 **dirty** [1] - 1386:6
 **disclosed** [1] -
1349:13
 **disclosing** [1] -
1374:4
 **discuss** [4] - 1361:6,
1364:5, 1372:5,
1403:5
 **discussions** [1] -
1403:14
 **DISTRICT** [3] -
1325:1, 1325:1,
1325:11
 **District** [3] -
1325:23, 1325:23,
1407:13
 **district** [1] - 1407:13
 **DNC** [8] - 1334:23,
1349:10, 1356:14,
1357:16, 1366:23,

1374:6, 1390:11, 1400:5

**DNS** [1] - 1375:5
**document** [7] - 1366:7, 1369:18, 1386:3, 1387:20, 1388:1, 1391:9, 1391:23
**documenting** [1] - 1369:16
**documents** [3] - 1368:25, 1369:2, 1372:8
**DOJ** [2] - 1354:14, 1354:20
**domestic** [4] - 1335:3, 1335:4, 1395:3, 1395:8
**Donald** [1] - 1353:12
**doubt** [2] - 1355:4, 1355:9
**down** [12] - 1330:16, 1331:23, 1332:16, 1334:2, 1335:11, 1336:6, 1337:9, 1339:2, 1339:7, 1372:12, 1387:4, 1402:13
**draft** [3] - 1370:23, 1371:14, 1371:22
**drafter** [1] - 1369:25
**drafting** [1] - 1381:4
**drill** [1] - 1403:14
**drive's** [1] - 1377:12
**drives** [6] - 1368:25, 1369:2, 1372:8, 1374:19, 1377:13, 1397:3
**duration** [1] - 1406:6
**during** [15] - 1329:18, 1333:7, 1358:14, 1364:22, 1366:13, 1366:17, 1366:20, 1368:10, 1368:16, 1368:22, 1369:5, 1369:7, 1369:10, 1380:3, 1399:12
**duty** [3] - 1329:20, 1335:25, 1350:19

---

**E**

**early** [2] - 1328:4, 1405:10
**earned** [1] - 1403:12
**EDGAR** [1] - 1325:14
**edit** [1] - 1376:7
**edits** [3] - 1371:1,

1376:11, 1380:5
**education** [1] - 1340:13
**Edwards** [1] - 1407:12
**EDWARDS** [2] - 1325:22, 1407:3
**effect** [1] - 1389:4
**either** [1] - 1405:4
**election** [1] - 1353:8
**elicit** [5] - 1333:21, 1347:12, 1359:15, 1359:24, 1387:11
**email** [34] - 1337:22, 1337:25, 1338:3, 1339:5, 1339:11, 1356:19, 1357:7, 1357:12, 1360:19, 1364:23, 1365:7, 1365:9, 1365:12, 1370:15, 1370:17, 1370:19, 1371:11, 1376:1, 1376:3, 1377:6, 1377:8, 1377:15, 1377:19, 1378:10, 1384:24, 1386:6, 1388:13, 1388:24, 1389:11, 1389:12, 1389:23, 1390:2, 1390:15, 1391:5
**emails** [12] - 1365:1, 1365:4, 1384:10, 1384:18, 1384:21, 1384:23, 1388:25, 1399:4, 1399:8, 1399:12, 1399:21, 1400:4
**employed** [3] - 1328:1, 1362:5, 1362:9
**Employee** [8] - 1357:6, 1389:1, 1389:10, 1389:14, 1389:22, 1390:3, 1390:6, 1390:19
**employee** [2] - 1365:24
**employees** [1] - 1356:20
**employment** [3] - 1327:23, 1328:4, 1362:7
**end** [4] - 1361:7, 1380:7, 1396:10, 1403:6
**ended** [1] - 1359:12
**engineer** [6] - 1333:22, 1347:13, 1347:21, 1348:5,

1387:12, 1394:11
**entered** [9] - 1327:4, 1331:9, 1357:2, 1371:8, 1376:25, 1385:15, 1385:25, 1388:22, 1391:21
**entities** [2] - 1369:20, 1400:6
**entity** [1] - 1363:21
**escape** [1] - 1352:20
**ESQ** [8] - 1325:14, 1325:14, 1325:15, 1325:15, 1325:18, 1325:18, 1325:19, 1325:19
**evening** [1] - 1405:9
**eventually** [1] - 1376:11
**evidence** [20] - 1331:9, 1356:21, 1357:2, 1359:9, 1359:18, 1360:3, 1371:4, 1371:8, 1375:15, 1376:21, 1376:25, 1385:10, 1385:15, 1385:19, 1385:25, 1388:18, 1388:22, 1391:14, 1391:17, 1391:21
**EVIDENCE** [1] - 1326:8
**exact** [2] - 1351:15, 1352:20
**exactly** [4] - 1341:20, 1363:7, 1363:9, 1382:14
**EXAMINATION** [6] - 1327:17, 1339:21, 1358:12, 1361:22, 1382:1, 1398:22
**examination** [3] - 1350:1, 1358:14, 1399:3
**exchanges** [1] - 1337:22
**excused** [4] - 1361:4, 1361:10, 1403:5, 1403:9
**Exhibit** [34] - 1326:10, 1326:10, 1326:11, 1326:11, 1326:12, 1326:13, 1326:13, 1326:14, 1330:20, 1331:5, 1331:8, 1344:4, 1356:17, 1357:1, 1360:10, 1370:9, 1370:12, 1370:21, 1371:7, 1371:11, 1371:21, 1376:17,

1376:24, 1380:20, 1385:7, 1385:14, 1385:19, 1385:20, 1385:24, 1388:16, 1388:21, 1391:12, 1391:17, 1391:20
**exhibit** [1] - 1337:20
**EXHIBITS** [1] - 1326:8
**exited** [1] - 1403:22
**expect** [3] - 1373:25, 1398:10, 1404:7
**expected** [5] - 1384:20, 1399:13, 1404:7, 1404:9, 1406:1
**experience** [4] - 1336:21, 1344:25, 1360:23, 1388:11
**experienced** [1] - 1336:17
**experiences** [1] - 1336:17
**expertise** [1] - 1375:21
**explain** [2] - 1336:14, 1337:13
**explained** [1] - 1335:6
**explaining** [1] - 1358:6
**extent** [1] - 1359:10

---

**F**

**fact** [9] - 1349:16, 1365:5, 1369:21, 1376:8, 1378:12, 1380:10, 1381:20, 1399:24
**factually** [1] - 1381:10
**fair** [10] - 1343:1, 1343:2, 1343:13, 1353:3, 1364:8, 1380:14, 1384:2, 1399:10, 1400:20, 1400:24
**faith** [1] - 1373:24
**familiar** [2] - 1363:2, 1363:5
**familiarize** [1] - 1384:15
**far** [2] - 1354:21, 1401:18
**FBI** [49] - 1330:3, 1330:4, 1330:5, 1330:6, 1334:16, 1334:18, 1334:20,

1334:23, 1334:25, 1335:4, 1335:7, 1335:21, 1348:18, 1348:20, 1348:24, 1349:5, 1351:5, 1351:11, 1355:9, 1368:7, 1368:9, 1368:14, 1368:17, 1369:21, 1369:23, 1374:10, 1375:10, 1375:17, 1375:20, 1375:21, 1380:8, 1381:14, 1381:16, 1381:23, 1395:4, 1395:13, 1395:19, 1395:23, 1396:2, 1396:8, 1396:18, 1396:22, 1397:9, 1398:4, 1402:24
**FBI's** [4] - 1359:10, 1375:18, 1395:16, 1402:16
**FBI/DOJ** [1] - 1375:15
**February** [26] - 1338:3, 1339:6, 1339:11, 1362:21, 1363:6, 1363:8, 1365:8, 1365:15, 1366:1, 1367:2, 1367:12, 1370:18, 1371:15, 1371:18, 1372:3, 1376:3, 1377:4, 1377:5, 1377:16, 1382:9, 1384:4, 1391:24, 1391:25, 1398:16, 1400:14
**feedback** [2] - 1374:1, 1398:11
**fellow** [1] - 1340:8
**felt** [2] - 1359:17, 1374:11
**few** [3] - 1336:2, 1340:2, 1358:15
**fide** [3] - 1335:24, 1338:15, 1350:11
**fides** [1] - 1347:18
**figure** [5] - 1355:13, 1357:17, 1358:2, 1390:12, 1404:8
**finally** [2] - 1390:17, 1406:7
**firm** [10] - 1366:18, 1366:22, 1366:23, 1372:4, 1374:4, 1383:5, 1383:8, 1383:10, 1400:7, 1400:9
**first** [19] - 1328:24,

1332:2, 1333:13,
1334:13, 1336:12,
1337:19, 1344:4,
1344:5, 1344:12,
1355:16, 1371:11,
1372:2, 1375:6,
1375:25, 1379:21,
1380:8, 1380:20,
1382:11, 1392:1
**five** [4] - 1340:24,
1341:19, 1384:24,
1402:13
**flagged** [1] - 1356:12
**focus** [1] - 1386:23
**focused** [1] - 1392:5
**folks** [1] - 1369:4
**following** [12] -
1327:5, 1331:14,
1339:17, 1345:7,
1345:24, 1359:5,
1360:6, 1369:13,
1397:13, 1401:14,
1402:7, 1403:23
**FOR** [4] - 1325:1,
1325:14, 1325:18,
1326:4
**foregoing** [1] -
1407:4
**foreign** [1] - 1335:3
**former** [4] - 1332:4,
1332:22, 1354:13,
1386:14
**forward** [3] - 1338:9,
1369:19, 1377:10
**forwarded** [6] -
1368:6, 1369:22,
1390:7, 1390:15,
1391:9, 1394:16
**forwarding** [4] -
1366:8, 1376:6,
1386:6, 1389:17
**Foundation** [3] -
1328:23, 1332:25,
1340:9
**foundation** [2] -
1340:11, 1340:17
**four** [4] - 1382:15,
1383:14, 1384:24,
1393:2
**fourth** [2] - 1357:11,
1387:22
**free** [1] - 1371:16
**fresh** [1] - 1356:1
**Friday** [1] - 1325:4
**friend** [4] - 1328:20,
1330:17, 1340:8,
1340:25
**front** [1] - 1341:7
**frustrated** [2] -
1350:24, 1352:19

**frustration** [6] -
1338:12, 1350:23,
1351:1, 1351:3,
1351:13, 1352:2
**full** [1] - 1407:5
**fun** [1] - 1405:18
**funds** [1] - 1340:11
**funny** [1] - 1393:5
**future** [3] - 1374:2,
1383:23, 1397:1

## G

**gather** [1] - 1347:17
**Gaynor** [1] - 1404:10
**GC** [2] - 1373:1,
1373:9
**General** [2] - 1330:2,
1373:8
**general** [13] -
1335:19, 1350:2,
1350:7, 1352:5,
1355:6, 1372:21,
1372:25, 1373:9,
1375:3, 1375:18,
1384:13, 1395:16,
1402:17
**generally** [5] -
1336:14, 1340:15,
1343:9, 1367:11,
1385:5
**gentlemen** [2] -
1327:6, 1403:10
**get-go** [1] - 1344:8
**Gilman** [10] -
1328:20, 1328:21,
1329:6, 1332:5,
1332:19, 1332:21,
1332:22, 1340:5,
1340:7, 1386:14
**given** [3] - 1340:15,
1368:5, 1375:8
**glasses** [1] - 1330:22
**Government** [18] -
1327:12, 1331:4,
1357:5, 1361:14,
1364:17, 1364:20,
1364:22, 1364:23,
1371:3, 1376:21,
1382:11, 1382:23,
1383:17, 1389:9,
1393:8, 1397:1,
1398:4, 1405:11
**GOVERNMENT** [3] -
1326:4, 1327:15,
1361:18
**Government's** [19] -
1327:8, 1330:20,
1331:5, 1331:8,

1344:3, 1370:9,
1370:12, 1370:21,
1371:7, 1371:11,
1371:21, 1376:17,
1376:24, 1380:20,
1385:20, 1391:12,
1391:17, 1391:20,
1405:1
**government's** [4] -
1326:10, 1326:10,
1326:11, 1326:11
**great** [6] - 1343:11,
1361:7, 1375:24,
1403:7, 1403:18,
1406:3
**group** [2] - 1351:4,
1395:8
**guess** [3] - 1329:15,
1342:4
**guidance** [1] -
1366:2
**guy** [4] - 1348:5,
1356:13, 1357:15,
1390:10
**guys** [3] - 1357:17,
1358:2, 1390:12

## H

**habit** [2] - 1344:24,
1345:1
**half** [5] - 1329:12,
1330:13, 1358:20,
1362:17, 1400:19
**hand** [2] - 1327:14,
1361:16
**handle** [1] - 1369:20,
1393:6
**handled** [4] -
1375:20, 1380:8,
1380:10, 1395:19
**hands** [2] - 1352:9,
1368:4
**happy** [1] - 1391:24
**hard** [1] - 1405:24
**hazy** [1] - 1383:15
**header** [2] - 1355:19,
1371:10
**headquarters** [1] -
1363:10
**healthy** [1] - 1403:19
**hear** [3] - 1329:16,
1339:14, 1348:18
**heard** [4] - 1339:12,
1372:23, 1405:5,
1405:16
**held** [1] - 1362:18
**help** [2] - 1342:21,
1383:18

**hereby** [1] - 1407:3
**hide** [1] - 1357:18
**highlight** [1] -
1401:10
**highlighting** [1] -
1346:7
**Hillary** [3] - 1353:10,
1366:24, 1374:7
**himself** [11] -
1333:16, 1335:7,
1346:20, 1346:24,
1346:25, 1347:2,
1347:4, 1373:25,
1387:8, 1392:16,
1398:10
**hold** [1] - 1362:22
**holder** [1] - 1374:18
**home** [1] - 1406:4
**Honor** [29] - 1327:1,
1327:11, 1331:4,
1345:4, 1356:22,
1356:24, 1358:10,
1359:8, 1359:20,
1361:2, 1361:13,
1361:14, 1361:21,
1371:3, 1376:22,
1381:25, 1398:20,
1401:16, 1402:1,
1403:3, 1404:1,
1404:2, 1404:5,
1404:13, 1404:17,
1404:24, 1405:14,
1406:5, 1406:11
**HONORABLE** [1] -
1325:10
**hope** [1] - 1327:7,
1390:9
**hoping** [3] - 1342:16,
1342:20, 1344:9
**hotel** [1] - 1328:25,
1329:8, 1329:10,
1343:5
**hour** [1] - 1329:12,
1330:13, 1358:19,
1390:9
**hour-and-a-half** [1] -
1330:13

## I

**IC** [10] - 1332:11,
1333:23, 1333:25,
1336:21, 1337:3,
1337:5, 1347:25,
1387:13, 1387:14
**identification** [4] -
1356:16, 1370:9,
1376:16, 1385:6
**identified** [1] -

1344:21
**identify** [3] - 1334:9,
1344:18, 1399:14
**identifying** [1] -
1334:7
**identity** [3] -
1333:16, 1346:16,
1387:8
**imagine** [1] -
1329:12
**implicating** [1] -
1383:21
**implications** [2] -
1343:16, 1353:5
**importance** [1] -
1341:2
**important** [7] -
1360:21, 1360:24,
1381:9, 1381:22,
1393:3, 1396:17,
1397:15
**impression** [2] -
1350:25, 1402:19
**IN** [1] - 1326:8
**included** [1] - 1351:5
**including** [1] -
1374:6
**incoming** [1] -
1394:6
**inconsistent** [1] -
1401:1
**independent** [1] -
1391:1
**indicated** [3] -
1344:15, 1346:19,
1372:6
**indiscernible** [1] -
1353:19
**indiscernible]** [1] -
1328:6, 1338:21
**individual** [6] -
1328:12, 1332:13,
1363:2, 1388:6,
1394:3, 1394:10
**industry** [1] -
1332:23
**influenced** [1] -
1360:4
**info** [2] - 1347:17,
1390:20
**informal** [1] -
1360:17
**information** [78] -
1333:4, 1334:17,
1336:4, 1338:20,
1338:24, 1341:2,
1342:8, 1342:12,
1343:15, 1344:9,
1347:15, 1347:18,
1352:9, 1352:20,

1353:5, 1353:16,
1353:18, 1353:22,
1354:11, 1354:16,
1354:18, 1355:12,
1358:23, 1359:1,
1359:22, 1360:13,
1360:24, 1363:14,
1366:6, 1366:21,
1367:7, 1367:10,
1367:11, 1367:15,
1367:18, 1368:3,
1368:6, 1368:9,
1369:22, 1371:10,
1372:5, 1373:19,
1373:21, 1374:9,
1374:11, 1374:18,
1375:5, 1375:10,
1375:17, 1375:22,
1378:22, 1379:6,
1379:14, 1379:24,
1380:22, 1381:14,
1381:16, 1381:23,
1384:8, 1387:1,
1392:8, 1392:12,
1392:13, 1392:15,
1392:17, 1392:25,
1393:7, 1393:16,
1394:2, 1394:5,
1394:16, 1394:18,
1395:3, 1395:13,
1395:23, 1397:2,
1398:3, 1398:5
**informed** [1] -
1400:11
**initial** [3] - 1362:1,
1380:5, 1381:2
**INQTEL** [4] - 1332:5,
1332:22, 1386:14
**inquiry** [1] - 1397:5
**intelligence** [9] -
1336:18, 1337:6,
1338:21, 1338:25,
1348:1, 1348:6,
1379:16, 1393:12,
1393:17
**Intelligence** [2] -
1328:1, 1362:13
**intend** [1] - 1404:14
**interaction** [2] -
1328:24, 1380:8
**interest** [7] -
1335:25, 1350:12,
1350:19, 1372:6,
1374:9, 1374:22,
1398:3
**interesting** [4] -
1333:4, 1353:18,
1353:23, 1386:25
**interpretation** [1] -
1352:2

**Intervenor** [1] -
1405:16
**interview** [3] -
1351:17, 1351:19,
1355:17
**interviewed** [2] -
1351:7, 1382:11
**interviews** [2] -
1400:23, 1401:3
**introduce** [1] -
1359:9
**introduced** [2] -
1332:4, 1386:13
**introductory** [1] -
1332:12
**intrusions** [1] -
1332:8
**investigating** [1] -
1367:24
**investigation** [3] -
1359:11, 1360:4,
1368:1
**investigations** [1] -
1332:9
**investigators** [3] -
1351:4, 1352:1,
1354:8
**involved** [1] - 1400:8
**involving** [1] -
1381:20
**IOT** [2] - 1332:7,
1332:8
**issue** [6] - 1335:3,
1342:9, 1375:22,
1390:22, 1395:3,
1405:9
**issued** [1] - 1405:8
**issues** [11] -
1332:10, 1334:21,
1348:25, 1349:4,
1383:21, 1388:7,
1393:20, 1394:8,
1403:17, 1405:7,
1405:18
**itself** [3] - 1354:16,
1359:18, 1384:7
**IV** [1] - 1325:14

**J**

**January** [16] -
1328:15, 1329:2,
1331:17, 1332:3,
1333:7, 1339:18,
1341:16, 1353:7,
1355:21, 1356:20,
1359:12, 1386:3,
1386:12, 1389:12,
1389:23

**Jim** [6] - 1334:16,
1348:19, 1348:21,
1375:18, 1395:16,
1402:17
**jog** [1] - 1355:7
**JONATHAN** [1] -
1325:14
**JUDGE** [1] - 1325:11
**judged** [1] - 1360:25
**judgment** [3] -
1337:17, 1354:1,
1354:16
**judgments** [3] -
1380:7, 1380:9,
1380:14
**June** [1] - 1382:12
**jurisdiction** [1] -
1395:7
**JURY** [1] - 1325:10
**jury** [9] - 1327:2,
1327:4, 1336:15,
1337:13, 1345:8,
1359:6, 1378:17,
1401:15, 1403:22

**K**

**keep** [2] - 1343:16,
1405:20
**Keilty** [6] - 1361:11,
1391:13, 1392:5,
1394:22, 1401:12,
1401:20
**KEILTY** [42] -
1325:15, 1361:12,
1361:21, 1361:23,
1371:3, 1371:9,
1371:25, 1372:1,
1372:16, 1372:18,
1373:13, 1373:15,
1374:13, 1374:15,
1375:12, 1375:25,
1376:2, 1376:19,
1377:1, 1377:22,
1377:24, 1378:2,
1378:6, 1378:15,
1378:16, 1378:25,
1379:3, 1379:10,
1379:12, 1381:25,
1385:12, 1389:6,
1391:15, 1391:18,
1398:20, 1398:23,
1401:9, 1401:16,
1402:1, 1402:9,
1402:11, 1403:3
**Kevin** [31] - 1326:6,
1361:14, 1362:1,
1362:3, 1362:5,
1363:2, 1363:16,
1364:17, 1367:11,

1368:19, 1369:5,
1370:8, 1370:12,
1371:10, 1372:3,
1372:19, 1373:11,
1373:16, 1374:16,
1375:8, 1377:2,
1377:15, 1377:19,
1379:4, 1379:17,
1379:25, 1380:16,
1381:9, 1398:24,
1400:17, 1402:12
**KEVIN** [2] - 1361:18,
1362:1
**killed** [1] - 1340:12
**kind** [4] - 1350:21,
1353:25, 1359:23,
1378:1
**kinds** [1] - 1336:18
**knowledge** [5] -
1364:15, 1390:21,
1395:22, 1397:11,
1397:12
**known** [5] - 1328:2,
1333:4, 1344:17,
1386:25, 1388:25
**knows** [2] - 1334:20,
1348:24
**Krass** [1] - 1372:21

**L**

**lack** [2] - 1335:6,
1375:21
**ladies** [2] - 1327:6,
1403:10
**last** [18] - 1327:9,
1329:11, 1337:2,
1337:9, 1338:23,
1339:12, 1350:9,
1362:1, 1362:11,
1362:18, 1368:20,
1375:6, 1375:12,
1385:21, 1387:4,
1396:4, 1397:19,
1404:25
**late** [1] - 1404:25
**LATHAM** [1] -
1325:20
**law** [6] - 1366:18,
1383:5, 1383:8,
1383:10, 1400:7,
1400:9
**lawyer** [10] -
1354:21, 1356:13,
1357:15, 1364:1,
1365:24, 1365:25,
1372:4, 1383:7,
1390:10, 1393:25
**lawyers** [1] - 1366:23

**lead** [1] - 1338:15
**learned** [4] - 1367:5,
1367:6, 1367:23,
1368:12
**least** [4] - 1359:11,
1386:5, 1394:5,
1396:17
**leave** [1] - 1393:4
**led** [2] - 1343:8,
1373:3
**left** [1] - 1350:8
**less** [2] - 1395:4,
1395:5
**letters** [1] - 1346:7
**light** [1] - 1404:12
**likely** [9] - 1333:22,
1335:23, 1336:1,
1347:25, 1350:10,
1369:22, 1387:12,
1390:14, 1396:25
**line** [3] - 1336:21,
1337:2, 1360:1
**lines** [2] - 1397:20,
1402:13
**LISA** [2] - 1325:22,
1407:3
**Lisa** [1] - 1407:12
**list** [1] - 1404:11
**listen** [2] - 1352:14,
1366:6
**listening** [3] -
1351:1, 1351:13,
1352:3
**living** [1] - 1363:25
**LLP** [3] - 1325:20,
1332:6, 1386:16
**location** [2] - 1364:7,
1375:8
**look** [22] - 1336:7,
1343:11, 1343:25,
1351:16, 1355:16,
1359:17, 1369:4,
1385:7, 1386:2,
1386:8, 1386:20,
1388:16, 1388:24,
1389:19, 1390:2,
1391:23, 1394:21,
1394:22, 1395:2,
1395:7, 1396:4,
1397:19
**looked** [2] - 1365:4,
1394:17
**looking** [4] - 1338:9,
1342:1, 1378:17,
1385:17
**loop** [1] - 1390:23
**Louie** [10] - 1328:20,
1332:5, 1332:19,
1332:21, 1332:22,
1340:5, 1340:7,

1341:10, 1342:8, 1386:14
**loyalty** [1] - 1373:24
**luck** [1] - 1390:9
**lunch** [1] - 1327:7

# M

**M.'s** [2] - 1381:1, 1381:4
**ma'am** [1] - 1327:3
**maintaining** [1] - 1334:8
**major** [1] - 1390:22
**MARK** [2] - 1327:15, 1327:22
**Mark** [6] - 1326:5, 1327:12, 1327:22, 1332:3, 1386:13, 1390:4
**marked** [2] - 1370:8, 1376:16
**materials** [3] - 1368:23, 1382:24
**matter** [15] - 1335:3, 1339:13, 1349:12, 1373:4, 1374:21, 1375:19, 1375:20, 1380:11, 1384:13, 1395:17, 1395:20, 1399:20, 1402:2, 1402:18, 1402:21
**matters** [5] - 1366:22, 1368:17, 1400:8, 1401:19
**MC1** [1] - 1354:4
**MCO2** [1] - 1351:21
**mean** [7] - 1337:5, 1338:14, 1338:17, 1349:1, 1359:20, 1397:5, 1405:13
**meaning** [3] - 1347:25, 1389:4, 1402:23
**media** [1] - 1403:16
**meet** [16] - 1328:19, 1329:14, 1330:12, 1337:18, 1340:3, 1340:22, 1340:25, 1341:1, 1342:13, 1342:19, 1350:17, 1352:5, 1352:8, 1364:17, 1364:20, 1368:2
**meeting** [93] - 1328:21, 1329:11, 1329:18, 1329:19, 1330:9, 1330:13, 1330:15, 1330:16,

1331:14, 1331:17, 1333:7, 1339:14, 1339:18, 1341:13, 1342:15, 1342:17, 1343:21, 1344:8, 1350:24, 1351:4, 1352:11, 1352:21, 1354:3, 1354:7, 1359:12, 1363:7, 1363:9, 1363:11, 1363:13, 1363:17, 1363:24, 1364:2, 1364:6, 1364:8, 1364:10, 1364:11, 1364:14, 1364:16, 1364:24, 1365:2, 1365:11, 1365:16, 1365:18, 1365:21, 1366:1, 1366:4, 1366:5, 1366:13, 1366:15, 1366:17, 1366:20, 1367:2, 1367:6, 1367:23, 1368:10, 1368:12, 1368:16, 1368:19, 1368:22, 1369:1, 1369:5, 1369:13, 1369:14, 1369:18, 1369:21, 1371:19, 1372:7, 1380:4, 1380:8, 1381:8, 1382:15, 1382:21, 1382:22, 1382:23, 1383:1, 1383:20, 1384:5, 1384:7, 1384:8, 1384:14, 1384:16, 1384:19, 1388:6, 1388:13, 1391:4, 1392:19, 1392:23, 1396:6, 1396:17, 1399:13, 1399:24, 1400:14, 1401:5
**meetings** [6] - 1364:22, 1369:8, 1369:11, 1384:12, 1400:20, 1401:2
**member** [1] - 1340:8
**memo** [26] - 1331:20, 1331:24, 1337:12, 1337:13, 1337:14, 1337:15, 1343:20, 1343:25, 1349:23, 1358:5, 1365:10, 1369:15, 1369:17, 1369:25, 1370:3, 1370:23, 1371:14, 1380:7, 1381:9, 1384:3, 1386:6, 1386:8, 1390:7, 1396:17, 1397:15,

1397:16
**memorandum** [25] - 1330:18, 1343:23, 1344:4, 1346:4, 1346:13, 1350:13, 1351:17, 1351:19, 1355:16, 1355:25, 1356:2, 1356:9, 1360:18, 1370:4, 1370:13, 1370:24, 1371:1, 1371:15, 1376:9, 1376:11, 1378:5, 1380:6, 1383:17, 1391:25, 1401:6
**Memorial** [3] - 1328:23, 1332:24, 1340:9
**memorialize** [2] - 1369:14, 1369:19
**memorialized** [1] - 1392:23
**memories** [1] - 1393:5
**memory** [4] - 1336:6, 1340:23, 1355:7, 1383:14
**memos** [1] - 1344:24
**mentioned** [7] - 1331:21, 1335:14, 1336:2, 1350:5, 1375:17, 1402:13, 1402:16
**merely** [3] - 1374:8, 1397:20, 1398:2
**message** [1] - 1377:5
**met** [11] - 1329:8, 1330:13, 1332:13, 1339:9, 1339:25, 1341:24, 1356:6, 1358:19, 1359:16, 1363:6, 1372:3
**MFR** [12] - 1370:6, 1371:14, 1376:6, 1377:10, 1377:11, 1378:13, 1378:17, 1378:18, 1380:16, 1381:2, 1401:6
**MICHAEL** [3] - 1325:6, 1325:15, 1325:18
**Michael** [7] - 1328:12, 1332:5, 1338:8, 1363:3, 1372:4, 1382:5, 1386:14
**microphone** [2] - 1328:8, 1341:5
**middle** [2] - 1390:18,

1398:9
**might** [6] - 1342:5, 1349:17, 1368:6, 1372:6, 1375:21, 1395:6
**mind** [2] - 1356:1, 1357:24
**mine** [2] - 1328:20, 1330:17
**minute** [2] - 1346:14, 1355:17
**minutes** [1] - 1368:21
**misleading** [1] - 1402:3
**missed** [1] - 1338:22
**mission** [2] - 1362:19, 1373:12
**moment** [5] - 1342:15, 1343:20, 1344:5, 1346:16, 1404:2
**Monday** [3] - 1403:21, 1404:21, 1406:10
**monopoly** [1] - 1349:15
**morning** [1] - 1403:21
**most** [7] - 1333:22, 1335:23, 1335:25, 1347:25, 1350:10, 1387:12, 1397:16
**motion** [1] - 1405:1
**motivation** [1] - 1349:17
**motivations** [1] - 1360:20
**move** [9] - 1331:4, 1341:4, 1356:21, 1371:3, 1376:19, 1385:9, 1385:18, 1388:17, 1391:16
**moved** [10] - 1331:7, 1356:25, 1371:6, 1376:23, 1385:13, 1385:23, 1388:20, 1391:13, 1391:15, 1391:19
**moves** [1] - 1376:21
**MR** [150] - 1327:11, 1327:18, 1330:19, 1330:21, 1331:4, 1331:6, 1331:10, 1331:12, 1331:23, 1332:1, 1332:16, 1332:18, 1333:10, 1333:12, 1334:2, 1334:3, 1334:10, 1334:12, 1335:11,

1335:13, 1336:11, 1336:13, 1337:9, 1337:11, 1337:19, 1337:21, 1337:25, 1338:2, 1339:2, 1339:4, 1339:7, 1339:8, 1339:20, 1339:22, 1341:8, 1344:3, 1344:7, 1345:4, 1345:6, 1346:1, 1346:9, 1346:11, 1348:14, 1348:16, 1351:21, 1351:24, 1354:2, 1354:6, 1355:19, 1355:20, 1356:16, 1356:18, 1356:21, 1356:24, 1357:3, 1358:9, 1358:10, 1358:13, 1359:4, 1359:8, 1359:20, 1360:5, 1360:8, 1361:2, 1361:12, 1361:21, 1361:23, 1371:3, 1371:5, 1371:9, 1371:25, 1372:1, 1372:16, 1372:18, 1373:13, 1373:15, 1374:13, 1374:15, 1375:12, 1375:25, 1376:2, 1376:18, 1376:19, 1377:17, 1377:22, 1377:24, 1378:2, 1378:6, 1378:15, 1378:16, 1378:25, 1379:3, 1379:10, 1379:12, 1381:25, 1382:2, 1385:9, 1385:12, 1385:16, 1385:22, 1386:1, 1386:9, 1386:11, 1386:21, 1386:22, 1388:17, 1388:19, 1388:23, 1389:3, 1389:5, 1389:6, 1389:7, 1389:19, 1389:21, 1391:13, 1391:15, 1391:16, 1391:18, 1391:22, 1394:24, 1395:1, 1397:21, 1397:23, 1398:18, 1398:20, 1398:23, 1401:9, 1401:16, 1401:17, 1401:23, 1402:1, 1402:3, 1402:9, 1402:11, 1403:3, 1404:1, 1404:2, 1404:5, 1404:13, 1404:16, 1404:20,

1404:24, 1405:13, 1405:18, 1405:22, 1406:2, 1406:5, 1406:6, 1406:9, 1406:11
**murkier** [2] - 1338:10, 1338:17

## N

**name** [11] - 1327:21, 1331:1, 1347:17, 1361:24, 1363:2, 1375:5, 1382:5, 1382:18, 1383:3, 1389:9, 1399:20
**named** [2] - 1328:12, 1340:5
**names** [1] - 1367:20, 1399:25
**NATALIE** [1] - 1325:19
**National** [3] - 1349:10, 1349:14, 1357:22
**national** [12] - 1332:10, 1341:3, 1342:9, 1343:15, 1353:4, 1363:14, 1381:14, 1383:21, 1384:14, 1388:7, 1393:20, 1394:7
**nature** [1] - 1368:8
**necessary** [4] - 1330:6, 1374:12, 1383:23, 1398:6
**need** [6] - 1374:3, 1375:14, 1390:19, 1395:7, 1396:6, 1398:12
**needed** [2] - 1371:17, 1376:7
**network** [1] - 1332:8
**never** [3] - 1339:25, 1351:19, 1372:23
**New** [10] - 1325:21, 1330:11, 1336:1, 1336:8, 1338:16, 1350:12, 1350:20, 1405:1, 1405:3
**news** [1] - 1390:22
**next** [22] - 1333:1, 1333:9, 1333:19, 1334:10, 1335:11, 1335:17, 1335:22, 1336:11, 1346:9, 1348:14, 1350:20, 1374:13, 1375:2, 1377:22, 1387:18, 1389:18, 1390:17,

1394:21, 1403:25, 1404:7, 1404:9, 1405:10
**NFI** [4] - 1334:16, 1335:20, 1336:2
**nice** [3] - 1327:7, 1405:22, 1405:23
**night** [1] - 1404:25
**nine** [2] - 1332:25, 1340:18
**normal** [3] - 1369:7, 1369:10, 1391:2
**Northeast** [1] - 1325:16
**Northern** [2] - 1329:1, 1343:5
**Northwest** [2] - 1325:24, 1407:14
**noted** [1] - 1374:17
**notes** [34] - 1330:16, 1341:7, 1341:23, 1341:24, 1342:1, 1342:6, 1343:6, 1343:8, 1343:10, 1343:13, 1343:14, 1343:19, 1343:22, 1344:1, 1351:18, 1354:3, 1355:2, 1355:3, 1355:5, 1355:6, 1355:9, 1355:13, 1355:15, 1355:24, 1356:1, 1356:2, 1356:6, 1369:5, 1369:7, 1369:10, 1380:18, 1383:21, 1407:5
**nothing** [3] - 1361:2, 1390:9, 1400:14
**noting** [1] - 1375:4
**Novick** [1] - 1404:18
**number** [4] - 1333:22, 1347:23, 1387:12, 1400:4

## O

**objection** [11] - 1331:6, 1345:4, 1356:23, 1359:4, 1371:5, 1376:18, 1385:11, 1385:12, 1388:19, 1391:18, 1395:12
**objections** [1] - 1375:16
**obligation** [1] - 1375:11
**obviously** [5] - 1350:18, 1351:8,

1359:17, 1389:8, 1405:7
**occur** [1] - 1365:16
**occurred** [4] - 1383:14, 1383:24, 1384:4, 1397:16
**odd** [1] - 1349:17
**OF** [3] - 1325:1, 1325:3, 1325:10
**offer** [2] - 1366:7
**offering** [2] - 1363:14, 1368:2
**Office** [1] - 1330:2
**office** [1] - 1373:8
**OFFICE** [1] - 1325:16
**officeholders** [1] - 1374:6
**officer** [2] - 1329:7, 1330:17, 1349:24, 1350:18, 1362:19, 1400:17
**officers** [4] - 1335:24, 1340:12, 1340:15, 1350:11
**Officers** [3] - 1328:23, 1332:24, 1340:9
**Official** [1] - 1325:22
**official** [3] - 1354:14, 1393:1, 1407:12
**OGC** [2] - 1372:24, 1373:6
**old** [1] - 1390:22
**older** [1] - 1343:9
**once** [3] - 1336:3, 1397:12, 1405:16
**one** [15] - 1335:22, 1337:9, 1343:14, 1348:11, 1351:1, 1351:13, 1352:3, 1365:3, 1365:4, 1373:3, 1374:17, 1379:21, 1383:20, 1404:2, 1404:24
**open** [5] - 1345:25, 1360:7, 1374:2, 1398:12, 1402:8
**openly** [4] - 1334:22, 1349:7, 1349:9
**operation** [1] - 1339:1
**opportunity** [2] - 1364:3, 1405:4
**opposed** [1] - 1347:5
**order** [3] - 1337:15, 1383:18, 1405:9
**ordinary** [2] - 1384:20, 1390:14
**organization** [2] - 1332:23, 1340:10

**otherwise** [1] - 1354:21
**outcome** [1] - 1392:24
**outside** [3] - 1345:8, 1359:6, 1401:15
**own** [1] - 1336:24

## P

**p.m** [8] - 1325:4, 1327:5, 1355:17, 1355:22, 1389:12, 1389:18, 1389:25, 1403:23
**Page** [5] - 1331:10, 1351:22, 1352:22, 1357:4, 1390:17
**PAGE** [1] - 1326:8
**page** [26] - 1333:9, 1336:11, 1337:19, 1344:4, 1344:6, 1346:9, 1348:15, 1355:16, 1357:5, 1357:8, 1370:21, 1371:11, 1371:21, 1375:6, 1376:1, 1377:22, 1379:1, 1386:10, 1386:20, 1387:18, 1390:2, 1390:17, 1390:18, 1394:21, 1397:14, 1401:10
**papers** [1] - 1368:25
**Paragraph** [6] - 1351:22, 1352:22, 1354:4, 1375:2, 1378:15, 1392:6
**paragraph** [41] - 1332:2, 1332:12, 1332:17, 1332:19, 1333:1, 1334:10, 1335:12, 1335:17, 1336:5, 1336:12, 1336:14, 1338:7, 1346:10, 1346:12, 1348:11, 1348:12, 1372:2, 1372:17, 1372:19, 1373:14, 1373:16, 1374:13, 1375:2, 1375:6, 1375:12, 1379:2, 1380:19, 1380:20, 1387:5, 1387:21, 1387:22, 1390:18, 1392:1, 1392:5, 1394:22, 1396:5, 1397:19, 1398:9, 1401:11, 1401:19, 1402:10

**paragraphs** [2] - 1335:12, 1387:4
**paranoia** [1] - 1374:25
**paraphrasing** [4] - 1341:1, 1341:3, 1341:6, 1341:19
**part** [7] - 1331:11, 1331:24, 1335:5, 1352:3, 1366:18, 1391:5, 1391:8
**particular** [13] - 1344:23, 1363:20, 1365:9, 1366:21, 1367:1, 1367:25, 1373:19, 1377:15, 1378:19, 1380:22, 1384:24, 1392:7, 1392:12
**particularly** [2] - 1365:15, 1393:20
**parties** [3] - 1389:4, 1389:11, 1390:4
**partisan** [5] - 1356:13, 1357:15, 1360:11, 1383:11, 1390:10
**partner** [2] - 1332:6, 1386:15
**party** [2] - 1345:2, 1349:15
**pass** [23] - 1342:25, 1344:9, 1353:17, 1353:19, 1354:12, 1354:15, 1354:22, 1354:25, 1355:1, 1355:12, 1356:5, 1356:8, 1356:9, 1359:17, 1360:13, 1360:15, 1374:9, 1375:22, 1381:22, 1394:18, 1395:8, 1395:22, 1398:2
**passed** [4] - 1353:23, 1355:25, 1358:5, 1397:12
**passing** [1] - 1359:22
**patents** [5] - 1333:22, 1347:23, 1348:5, 1387:12, 1394:11
**patriotism** [1] - 1349:15
**people** [4] - 1336:19, 1337:23, 1393:3, 1401:1
**per** [1] - 1390:14
**perception** [1] - 1375:19

**perhaps** [1] - 1334:21

**Perkins** [3] - 1332:6, 1372:4, 1386:15

**person** [9] - 1329:20, 1337:14, 1337:15, 1340:5, 1341:10, 1345:2, 1354:14, 1374:18, 1399:16

**personal** [3] - 1374:22, 1374:24, 1390:8

**persons** [1] - 1381:20

**phone** [3] - 1341:9, 1345:6, 1364:6

**piece** [1] - 1350:9

**place** [6] - 1359:13, 1363:7, 1363:9, 1364:7, 1380:9, 1393:3

**Plaintiff** [1] - 1325:4

**point** [7] - 1342:11, 1359:23, 1380:10, 1383:23, 1392:17, 1404:24, 1405:16

**pointed** [1] - 1393:1

**pop** [1] - 1370:9

**position** [3] - 1362:18, 1362:21, 1362:23

**possess** [2] - 1367:7, 1367:17

**possible** [3] - 1365:12, 1365:13, 1390:19

**possibly** [5] - 1342:9, 1351:15, 1360:17, 1368:6, 1390:22

**potential** [8] - 1353:4, 1367:22, 1372:9, 1379:16, 1388:7, 1393:12, 1393:17, 1394:7

**potentially** [3] - 1381:13, 1381:16, 1404:6

**powerful** [1] - 1354:20

**practice** [9] - 1332:7, 1369:7, 1369:10, 1384:20, 1386:17, 1388:11, 1388:12, 1390:14, 1391:2

**preferred** [3] - 1373:22, 1379:7, 1379:21

**preferring** [2] - 1379:15, 1393:11

**preparation** [3] - 1364:18, 1388:5, 1391:4

**prepare** [1] - 1369:15

**prepared** [3] - 1330:11, 1330:12, 1383:18

**preparing** [1] - 1369:17

**presence** [3] - 1345:8, 1359:6, 1401:15

**president** [2] - 1353:10, 1353:12

**President** [1] - 1329:16

**presidential** [2] - 1372:10, 1374:6

**press** [2] - 1347:15, 1351:11

**pressed** [1] - 1399:19

**pretty** [1] - 1360:2

**previous** [2] - 1384:12, 1401:2

**previously** [12] - 1329:5, 1331:21, 1359:11, 1366:9, 1368:14, 1372:5, 1372:20, 1375:18, 1395:15, 1401:7, 1402:16, 1402:24

**Priestap** [1] - 1404:9

**primarily** [1] - 1358:16

**primary** [1] - 1369:25

**privacy** [3] - 1332:7, 1386:17

**private** [3] - 1328:6, 1328:9, 1332:23

**privately** [1] - 1404:4

**privileged** [5] - 1373:20, 1378:23, 1380:23, 1392:8, 1392:15

**problem** [1] - 1330:24

**Proceedings** [1] - 1406:12

**proceedings** [10] - 1327:5, 1345:7, 1345:24, 1359:5, 1360:6, 1362:2, 1401:14, 1402:7, 1403:23, 1407:6

**produced** [1] - 1407:6

**productive** [1] - 1403:12

**projects** [3] -

1333:24, 1348:4, 1387:14

**prominent** [1] - 1390:20

**pronoun** [1] - 1347:7

**proper** [1] - 1368:4

**prosecution** [1] - 1354:8

**provide** [25] - 1333:15, 1333:17, 1334:19, 1335:24, 1340:13, 1340:14, 1346:16, 1346:20, 1347:4, 1347:9, 1348:24, 1350:11, 1366:21, 1367:8, 1367:12, 1367:20, 1368:22, 1368:24, 1373:20, 1379:5, 1379:14, 1379:24, 1387:7, 1387:9, 1393:7

**provided** [14] - 1330:17, 1334:5, 1334:15, 1334:25, 1348:17, 1355:12, 1358:23, 1359:2, 1367:9, 1367:15, 1372:7, 1377:13, 1392:13, 1397:3

**providing** [9] - 1337:16, 1347:19, 1375:4, 1375:16, 1380:13, 1388:6, 1392:17, 1394:2, 1395:12

**public** [2] - 1338:20, 1338:24

**pull** [7] - 1333:10, 1337:9, 1339:2, 1339:7, 1354:2, 1356:16, 1401:9

**punctuality** [1] - 1403:13

**purpose** [4] - 1352:11, 1363:12, 1369:17, 1376:6

**purposes** [3] - 1385:6, 1388:25, 1389:8

**pursuant** [1] - 1390:4

**pushing** [1] - 1347:20

**put** [9] - 1337:13, 1337:14, 1340:13, 1346:12, 1349:23, 1368:4, 1374:24, 1380:9, 1380:12

## Q

**quacks** [1] - 1336:22

**questions** [9] - 1340:2, 1358:9, 1358:15, 1358:24, 1359:21, 1359:25, 1392:19, 1392:22, 1398:24

**quick** [1] - 1386:6

**quickly** [1] - 1355:24

**quite** [1] - 1372:15

**quote** [6] - 1374:20, 1375:4, 1375:5, 1396:9, 1396:10

**quotes** [1] - 1396:13

**quoting** [1] - 1396:14

## R

**raise** [3] - 1327:14, 1361:16, 1405:6

**raised** [1] - 1357:24

**raises** [1] - 1340:11

**RAO** [1] - 1325:19

**RDR** [3] - 1325:22, 1407:3, 1407:12

**reach** [2] - 1335:15, 1373:4

**reached** [1] - 1372:20

**read** [31] - 1332:2, 1333:2, 1333:13, 1333:19, 1334:13, 1335:17, 1335:22, 1338:6, 1357:11, 1365:12, 1365:13, 1371:10, 1372:2, 1372:19, 1373:16, 1374:16, 1377:8, 1379:4, 1379:13, 1379:18, 1384:21, 1388:8, 1388:10, 1388:13, 1390:14, 1391:2, 1391:3, 1399:8, 1399:12, 1401:24, 1402:15

**reading** [7] - 1365:9, 1365:11, 1365:13, 1388:4, 1388:9, 1399:4, 1399:6

**reads** [3] - 1371:16, 1375:3, 1398:2

**ready** [1] - 1327:1

**real** [4] - 1349:19, 1357:16, 1357:25, 1390:11

**realtime** [1] - 1386:2

**reason** [6] - 1344:23,

1354:21, 1355:4, 1355:9, 1388:1, 1388:5

**reasonable** [1] - 1397:7

**reasons** [4] - 1343:14, 1354:25, 1374:8, 1383:20

**recalled** [2] - 1372:22, 1383:7

**receive** [2] - 1366:2, 1366:3

**received** [13] - 1339:11, 1340:24, 1384:8, 1384:24, 1385:6, 1387:25, 1388:2, 1389:11, 1389:18, 1389:23, 1390:20, 1392:12, 1394:6

**RECEIVED** [1] - 1326:8

**receiving** [2] - 1388:3, 1389:16

**recognize** [1] - 1382:7

**recognizing** [1] - 1347:16

**recollection** [14] - 1333:6, 1334:6, 1335:9, 1336:9, 1336:10, 1349:3, 1351:16, 1351:25, 1352:25, 1354:10, 1380:17, 1384:4, 1385:5, 1391:1

**recontact** [1] - 1372:25

**record** [14] - 1327:21, 1342:2, 1343:16, 1361:25, 1370:4, 1370:13, 1371:15, 1376:9, 1376:12, 1377:5, 1378:5, 1383:24, 1385:18, 1393:1

**records** [1] - 1386:5

**recovered** [1] - 1404:18

**Red** [1] - 1326:2

**redacted** [3] - 1338:8, 1386:13, 1389:9

**redacted]** [1] - 1333:5

**redaction** [1] - 1396:5

**redactions** [1] - 1357:5

**REDIRECT** [2] -

1358:12, 1398:22
**refer** [6] - 1347:5,
1362:2, 1362:24,
1373:6, 1375:9,
1380:3
**reference** [6] -
1346:6, 1357:6,
1357:7, 1365:4,
1366:3, 1399:1
**referenced** [1] -
1400:5
**references** [2] -
1348:12, 1387:18
**referencing** [2] -
1345:3, 1399:22
**referred** [2] - 1370:3,
1373:4
**referring** [7] -
1335:7, 1335:10,
1345:1, 1360:10,
1397:24, 1402:10,
1402:20
**refers** [1] - 1332:19
**reflect** [1] - 1355:13
**reflects** [3] -
1350:13, 1397:16,
1398:15
**refresh** [5] - 1351:16,
1351:25, 1352:25,
1354:10, 1380:17
**refreshes** [1] -
1385:4
**regarding** [13] -
1329:13, 1329:24,
1329:25, 1330:8,
1330:9, 1334:5,
1334:7, 1339:14,
1358:24, 1359:21,
1360:10, 1390:20,
1403:16
**regards** [1] - 1399:16
**regulatory** [1] -
1332:9
**relate** [1] - 1364:23
**related** [6] - 1332:8,
1368:17, 1372:9,
1402:4, 1405:1
**relationship** [1] -
1348:1
**relative** [2] -
1363:14, 1381:14,
1384:5, 1384:14,
1397:6
**relevant** [6] - 1350:5,
1360:15, 1375:9,
1375:17, 1375:21,
1395:13
**rely** [1] - 1380:16
**remain** [6] - 1327:13,
1361:16, 1373:22,

1379:7, 1379:22,
1379:24
**remained** [1] -
1367:21
**remember** [29] -
1334:7, 1341:10,
1341:20, 1343:10,
1346:25, 1347:6,
1349:2, 1350:4,
1351:4, 1351:10,
1351:14, 1351:15,
1356:13, 1356:14,
1357:15, 1358:24,
1365:13, 1382:14,
1382:18, 1382:21,
1382:23, 1383:1,
1383:8, 1383:9,
1383:11, 1383:18,
1390:10, 1392:21
**remembered** [1] -
1382:22
**remind** [2] - 1343:3,
1359:7
**repeat** [1] - 1353:20
**reply** [3] - 1405:4,
1405:9, 1405:16
**report** [2] - 1331:14,
1375:14
**REPORTED** [1] -
1325:22
**REPORTER** [3] -
1328:7, 1338:22,
1353:20
**Reporter** [2] -
1325:22, 1407:12
**reporter** [2] -
1372:13, 1385:18
**reporting** [2] -
1375:11, 1403:16
**represent** [2] -
1382:5, 1390:3
**represented** [3] -
1344:18, 1366:22,
1366:24
**representing** [13] -
1364:13, 1366:14,
1366:16, 1367:1,
1373:18, 1378:19,
1380:22, 1390:21,
1392:7, 1392:11,
1392:14, 1399:24,
1400:3
**represents** [3] -
1333:3, 1344:11,
1386:24
**Republican** [3] -
1334:1, 1348:9,
1362:9
**require** [1] - 1398:11
**research** [1] -

1403:15
**resources** [3] -
1334:21, 1348:25,
1349:4
**response** [5] -
1330:14, 1347:20,
1350:7, 1377:4,
1405:1
**rest** [1] - 1346:3
**restaurant** [3] -
1329:10, 1343:4,
1343:5
**retired** [6] - 1329:6,
1335:20, 1350:8,
1350:17, 1362:8,
1393:1
**retirement** [2] -
1350:3, 1362:9
**returned** [2] -
1338:8, 1373:3
**reveal** [7] - 1333:16,
1346:20, 1346:24,
1346:25, 1347:2,
1347:3, 1387:8
**review** [1] - 1370:24
**reviewed** [2] -
1376:8, 1377:9,
1404:25
**revised** [3] - 1377:9,
1378:4, 1378:17
**revising** [1] -
1380:16
**risk** [1] - 1374:24
**room** [1] - 1394:12
**roughly** [1] - 1377:17
**rule** [2] - 1396:10,
1396:19
**ruling** [2] - 1359:7,
1359:8
**running** [1] -
1353:10
**Russian** [5] -
1367:13, 1372:9,
1379:16, 1393:12,
1393:17
**Russians** [1] -
1367:22
**Ryan** [1] - 1404:10
**résumé** [1] - 1354:14

## S

**safe** [1] - 1403:18
**Sands** [1] - 1404:10
**sat** [1] - 1328:22
**saw** [3] - 1365:10,
1378:9, 1382:9
**scene** [1] - 1392:16
**scheduling** [3] -

1364:8, 1364:10,
1404:6
**screen** [2] - 1370:10,
1377:2
**Sean** [1] - 1382:5
**SEAN** [1] - 1325:18
**seat** [2] - 1327:16,
1361:19
**seated** [1] - 1403:24
**second** [19] -
1332:16, 1336:5,
1336:21, 1347:14,
1370:21, 1371:21,
1372:16, 1372:19,
1379:1, 1379:4,
1379:5, 1379:13,
1379:23, 1385:8,
1386:20, 1390:2,
1390:18, 1394:22,
1401:10
**secondary** [1] -
1367:15
**security** [17] -
1332:7, 1332:10,
1337:3, 1341:3,
1342:9, 1343:15,
1353:4, 1363:15,
1367:16, 1381:14,
1383:21, 1384:15,
1386:16, 1386:17,
1388:7, 1393:20,
1394:7
**see** [24] - 1331:1,
1331:24, 1340:22,
1344:13, 1351:17,
1355:21, 1357:9,
1361:11, 1361:12,
1379:8, 1385:4,
1387:2, 1387:16,
1387:23, 1390:24,
1392:9, 1393:2,
1393:13, 1396:11,
1402:5, 1402:12,
1403:20, 1405:17,
1406:10
**seeing** [1] - 1365:7
**seek** [1] - 1374:1
**sees** [1] - 1336:21
**send** [1] - 1349:23
**sending** [2] -
1337:15, 1390:6
**senior** [6] - 1329:19,
1330:17, 1335:24,
1349:24, 1350:11,
1362:19
**sense** [10] - 1349:24,
1349:25, 1351:1,
1351:3, 1351:12,
1351:13, 1352:2,
1373:24, 1396:14,

1397:24
**sent** [7] - 1338:3,
1357:7, 1358:6,
1376:3, 1377:19,
1384:18, 1390:7
**sentence** [11] -
1333:13, 1333:20,
1344:13, 1344:12,
1379:4, 1379:5,
1379:13, 1380:21,
1381:1, 1381:5,
1402:12
**sentences** [2] -
1355:7, 1357:11
**series** [1] - 1337:22
**serious** [1] - 1390:10
**server** [3] - 1367:13,
1367:14
**services** [3] -
1379:16, 1393:12,
1393:17
**SESSION** [1] -
1325:5
**set** [2] - 1354:3,
1364:6
**sets** [2] - 1333:17,
1347:10
**setting** [2] - 1332:13,
1392:16
**several** [1] - 1374:5
**share** [3] - 1342:10,
1342:12, 1342:14
**shared** [1] - 1329:25
**SHAW** [1] - 1325:15
**shocking** [1] -
1349:21
**shortage** [1] -
1405:18
**shortly** [1] - 1341:13
**show** [7] - 1351:21,
1352:22, 1364:23,
1370:8, 1385:4,
1385:6, 1397:1
**showed** [5] -
1365:10, 1382:24,
1383:17, 1399:5,
1400:4
**showing** [2] -
1376:16, 1401:20
**shown** [3] - 1394:22,
1398:25, 1399:21
**side** [1] - 1401:12
**side-bar** [1] -
1401:12
**sidebar** [3] - 1345:8,
1359:6, 1401:15
**significant** [1] -
1342:9
**similar** [6] - 1375:19,
1395:17, 1397:2,

1401:8, 1402:17, 1402:25
**simply** [2] - 1366:5, 1374:25
**sit** [2] - 1328:8, 1365:7
**sits** [1] - 1332:24
**sitting** [1] - 1391:1
**situation** [2] - 1352:15, 1353:2
**slow** [1] - 1372:12
**slowly** [1] - 1373:16
**small** [4] - 1327:24, 1328:6, 1328:9, 1378:1
**SMS** [1] - 1341:11
**social** [1] - 1403:16
**someone** [7] - 1330:4, 1338:9, 1340:19, 1352:14, 1357:7, 1363:18, 1396:6
**sometimes** [3] - 1370:3, 1401:1
**somewhat** [1] - 1383:15
**soon** [2] - 1405:8, 1405:10
**sophisticated** [1] - 1349:4
**sorry** [14] - 1328:7, 1328:9, 1330:23, 1335:22, 1338:22, 1341:4, 1341:6, 1353:20, 1372:14, 1373:1, 1380:19, 1389:17, 1404:1, 1404:5
**sort** [3] - 1338:20, 1374:1, 1392:17
**sound** [1] - 1382:12
**sounds** [3] - 1347:20, 1382:14, 1405:11
**source** [9] - 1338:11, 1338:15, 1354:19, 1354:22, 1355:1, 1355:11, 1360:24, 1384:14, 1388:13
**source's** [1] - 1360:25
**sourcing** [2] - 1349:24, 1360:23
**space** [1] - 1332:4
**speaking** [1] - 1338:9
**SPECIAL** [1] - 1325:16
**specific** [3] - 1392:22, 1394:12,

1396:15
**spell** [2] - 1327:21, 1361:24
**spouses** [2] - 1340:12, 1340:14
**stage** [1] - 1332:13
**stand** [1] - 1336:3
**standing** [2] - 1327:14, 1361:16
**stands** [1] - 1393:9
**start** [2] - 1340:2, 1346:15
**started** [1] - 1334:24
**starting** [4] - 1334:13, 1335:17, 1357:13, 1397:20
**starts** [2] - 1333:1, 1338:6
**state** [2] - 1327:21, 1361:24
**statement** [1] - 1400:24
**statements** [1] - 1401:1
**STATES** [4] - 1325:1, 1325:3, 1325:11, 1325:14
**States** [2] - 1325:23, 1407:13
**stating** [1] - 1339:11
**status** [1] - 1362:7
**stay** [4] - 1399:19, 1403:18, 1403:19
**stenographic** [1] - 1407:5
**step** [3] - 1327:13, 1350:20, 1361:15
**steps** [1] - 1369:14
**Steve** [18] - 1365:22, 1365:23, 1369:3, 1369:15, 1369:24, 1370:13, 1370:23, 1371:14, 1372:3, 1375:10, 1376:3, 1377:4, 1377:9, 1378:10, 1381:1, 1381:4, 1404:13
**Steve's** [3] - 1371:22, 1378:18, 1380:5
**Steven** [2] - 1338:6, 1338:8
**sticking** [2] - 1406:4, 1406:5
**still** [3] - 1356:1, 1371:14, 1390:8
**stipulation** [2] - 1389:3, 1390:4
**stop** [2] - 1338:13, 1347:13

**Story** [2] - 1333:1, 1386:23
**story** [9] - 1333:2, 1344:5, 1349:19, 1349:21, 1349:22, 1349:24, 1357:17, 1357:25, 1390:11
**streamlined** [1] - 1404:11
**Street** [1] - 1325:16
**stuff** [1] - 1342:25
**substance** [3] - 1334:4, 1383:1, 1383:11
**substantive** [1] - 1344:12
**subtract** [1] - 1376:7
**suggested** [1] - 1392:13
**suggesting** [1] - 1374:20
**sum** [1] - 1334:4
**summarizing** [1] - 1384:19
**summary** [2] - 1336:25
**summer** [1] - 1406:7
**Sunday** [1] - 1405:9
**superiors** [1] - 1366:3
**supporting** [5] - 1333:17, 1346:21, 1347:10, 1374:5, 1387:9
**surrounding** [1] - 1403:17
**surveillance** [1] - 1332:9
**survivors** [1] - 1340:11
**Sussman** [1] - 1332:5
**Sussmann** [154] - 1328:12, 1328:16, 1328:19, 1328:21, 1328:24, 1329:4, 1329:8, 1329:13, 1329:15, 1329:17, 1329:19, 1329:21, 1329:24, 1330:8, 1330:14, 1331:14, 1332:5, 1332:10, 1333:3, 1333:6, 1333:15, 1333:23, 1333:25, 1334:5, 1334:15, 1334:22, 1334:24, 1335:6, 1335:14, 1335:18, 1335:19, 1335:23, 1336:7, 1337:7,

1337:10, 1337:16, 1337:18, 1339:9, 1339:15, 1339:17, 1340:3, 1340:22, 1341:14, 1341:24, 1342:8, 1342:12, 1342:16, 1343:21, 1344:2, 1344:11, 1344:15, 1346:15, 1346:24, 1347:1, 1347:15, 1348:4, 1348:17, 1348:19, 1348:23, 1349:5, 1349:6, 1349:23, 1350:2, 1350:10, 1350:23, 1350:25, 1354:1, 1354:13, 1354:20, 1355:17, 1356:6, 1357:18, 1359:1, 1359:16, 1360:11, 1363:3, 1363:5, 1363:11, 1363:17, 1363:25, 1364:2, 1364:3, 1364:11, 1364:13, 1365:5, 1365:16, 1365:22, 1366:1, 1366:4, 1366:10, 1366:14, 1366:18, 1366:20, 1367:1, 1367:7, 1367:11, 1367:17, 1367:20, 1368:2, 1368:15, 1368:20, 1368:22, 1368:24, 1369:13, 1369:21, 1372:4, 1372:5, 1372:7, 1372:20, 1373:18, 1373:21, 1373:23, 1373:25, 1374:17, 1375:3, 1375:8, 1375:16, 1377:13, 1378:19, 1379:6, 1379:15, 1380:21, 1382:6, 1382:16, 1384:5, 1384:9, 1386:14, 1386:15, 1386:24, 1387:7, 1387:13, 1387:15, 1392:6, 1392:19, 1393:11, 1393:22, 1393:25, 1394:19, 1395:12, 1395:25, 1396:8, 1396:15, 1396:25, 1397:24, 1398:2, 1398:9, 1399:13, 1399:23, 1400:5, 1400:10, 1401:5, 1402:20, 1402:23
**SUSSMANN** [1] -

1325:6
**Sussmann's** [9] - 1336:16, 1344:8, 1352:3, 1358:16, 1364:24, 1365:1, 1371:19, 1383:3, 1396:7
**swear** [1] - 1361:17
**SWORN** [1] - 1327:15, 1361:18
**system** [1] - 1375:5

**T**

**table** [2] - 1396:9, 1396:19
**talks** [1] - 1401:11
**tasked** [1] - 1384:13
**team** [1] - 1385:19
**teaser** [1] - 1390:20
**tech** [1] - 1327:24
**technical** [4] - 1349:4, 1367:16, 1369:4, 1375:21
**ten** [1] - 1387:19
**tend** [1] - 1343:10
**term** [1] - 1338:17
**territories** [1] - 1381:21
**testified** [16] - 1331:13, 1331:17, 1336:5, 1342:15, 1365:18, 1366:9, 1367:17, 1369:24, 1371:22, 1373:9, 1378:12, 1381:15, 1399:3, 1399:7, 1400:10, 1400:13
**testimony** [8] - 1359:15, 1359:25, 1361:4, 1361:6, 1364:18, 1403:5, 1403:6, 1404:14
**text** [2] - 1377:13, 1390:17
**THE** [66] - 1325:1, 1325:10, 1325:14, 1325:18, 1326:4, 1327:1, 1327:3, 1327:6, 1327:13, 1327:16, 1328:7, 1328:9, 1331:7, 1338:22, 1338:24, 1341:4, 1341:6, 1345:5, 1351:23, 1353:20, 1353:22, 1354:5, 1356:23, 1356:25, 1358:11, 1359:7, 1359:19,

1360:1, 1361:3,
1361:5, 1361:6,
1361:9, 1361:11,
1361:15, 1361:19,
1371:6, 1375:14,
1376:23, 1378:4,
1385:13, 1385:21,
1385:23, 1388:20,
1391:19, 1398:19,
1398:21, 1401:12,
1401:22, 1401:25,
1402:5, 1403:4,
1403:8, 1403:10,
1403:24, 1404:3,
1404:11, 1404:15,
1404:18, 1404:23,
1405:6, 1405:15,
1405:20, 1405:23,
1406:3, 1406:7,
1406:10
    **themselves** [2] -
1374:24, 1404:4
    **then-presidential** [1]
- 1374:6
    **they've** [1] - 1401:2
    **thinking** [1] -
1342:24
    **third** [10] - 1345:2,
1357:11, 1373:13,
1373:16, 1379:1,
1380:19, 1380:20,
1387:21, 1397:14,
1397:19
    **third-party** [1] -
1345:2
    **threat** [9] - 1350:21,
1351:11, 1352:1,
1363:15, 1367:16,
1367:22, 1379:16,
1393:12, 1399:18
    **threats** [1] - 1393:17
    **three** [1] - 1397:19
    **throughout** [2] -
1346:3, 1350:24
    **thumb** [7] - 1368:25,
1369:2, 1372:8,
1374:19, 1377:12,
1377:13, 1397:3
    **today** [5] - 1327:9,
1365:7, 1390:19,
1390:20, 1391:2
    **today's** [2] - 1362:2,
1404:14
    **toes** [1] - 1405:21
    **together** [3] -
1340:16, 1349:23,
1380:12
    **took** [10] - 1343:6,
1343:13, 1343:14,
1343:22, 1344:1,

1351:10, 1356:6,
1359:12, 1363:7,
1380:14
    **tools** [1] - 1330:6
    **top** [10] - 1331:1,
1331:11, 1331:20,
1331:24, 1339:3,
1357:4, 1357:8,
1378:2, 1388:24,
1390:2
    **total** [1] - 1387:19
    **touch** [1] - 1372:23
    **Trainor** [3] -
1334:16, 1348:19,
1348:21
    **transcript** [2] -
1407:5, 1407:6
    **TRANSCRIPT** [1] -
1325:10
    **transpired** [1] -
1397:13
    **travel** [1] - 1404:21
    **traveling** [1] - 1406:4
    **TRIAL** [1] - 1325:10
    **tricky** [2] - 1405:7,
1405:18
    **tried** [4] - 1335:15,
1352:5, 1372:25,
1399:20
    **Trisha** [1] - 1404:9
    **true** [3] - 1406:9,
1407:4, 1407:5
    **Trump** [5] - 1329:16,
1330:1, 1353:12,
1367:14, 1372:10
    **trust** [3] - 1330:5,
1334:23, 1335:7
    **trusted** [1] - 1340:19
    **truthful** [1] - 1351:8
    **try** [4] - 1340:14,
1344:17, 1384:15,
1404:8
    **trying** [6] - 1338:19,
1347:17, 1347:18,
1351:7, 1352:8
    **TS/SCI** [1] - 1332:10
    **Tuesday** [8] -
1339:6, 1355:21,
1356:20, 1386:3,
1389:12, 1404:22,
1404:23, 1405:12
    **turn** [6] - 1331:10,
1336:11, 1343:20,
1344:3, 1377:22,
1391:12
    **turned** [2] - 1343:22,
1355:24
    **turning** [5] - 1333:9,
1358:22, 1362:21,
1365:15, 1370:21

twelve [1] - 1354:20
    **two** [6] - 1327:9,
1335:12, 1377:18,
1377:19, 1387:4
    **type** [1] - 1327:23

## U

    **U.S** [7] - 1374:17,
1375:9, 1381:20,
1381:21, 1393:8,
1397:1, 1398:4
    **ultimately** [6] -
1341:13, 1341:23,
1343:21, 1371:1,
1390:7, 1395:22
    **unable** [1] - 1353:25
    **under** [1] - 1399:18
    **understood** [6] -
1342:13, 1343:14,
1348:2, 1348:13,
1350:23, 1360:5
    **united** [1] - 1325:23
    **UNITED** [4] - 1325:1,
1325:3, 1325:11,
1325:14
    **United** [1] - 1407:13
    **unless** [1] - 1360:3
    **unnamed** [1] -
1347:9
    **unreasonable** [1] -
1393:18
    **unrelated** [9] -
1374:7, 1375:19,
1395:17, 1401:8,
1401:19, 1402:2,
1402:17, 1402:21,
1403:1
    **unsubstantial** [2] -
1336:20, 1336:22
    **up** [37] - 1327:13,
1330:19, 1331:11,
1333:10, 1336:12,
1337:10, 1337:25,
1339:3, 1344:5,
1344:6, 1346:10,
1354:2, 1355:19,
1356:16, 1361:15,
1364:6, 1370:10,
1371:25, 1372:16,
1373:13, 1374:13,
1377:19, 1378:1,
1378:2, 1378:15,
1379:18, 1380:19,
1386:4, 1392:1,
1392:2, 1397:21,
1397:22, 1401:9,
1401:11, 1402:9,
1405:10, 1405:12

upfront [1] - 1374:4
    **USG** [8] - 1373:21,
1373:24, 1374:1,
1374:10, 1379:6,
1379:14, 1393:9,
1398:10

## V

    **valid** [1] - 1338:16
    **validate** [2] -
1374:10, 1398:4
    **validated** [1] -
1353:24
    **value** [3] - 1380:7,
1380:9, 1380:14
    **variety** [1] - 1354:25
    **various** [5] -
1333:24, 1348:4,
1354:7, 1356:19,
1387:14
    **verbatim** [1] - 1355:6
    **verbiage** [1] -
1377:10
    **verified** [4] -
1333:18, 1346:22,
1347:11, 1387:10
    **vetted** [1] - 1353:24
    **via** [1] - 1341:11
    **view** [1] - 1353:16
    **Virginia** [2] - 1329:1,
1343:5
    **virtually** [2] - 1332:4,
1386:13
    **visits** [1] - 1375:9
    **volunteered** [1] -
1395:15
    **volunteering** [4] -
1373:19, 1378:22,
1380:23, 1392:8
    **vs** [1] - 1325:5

## W

    **wait** [2] - 1330:22,
1338:10
    **waiting** [1] - 1390:8
    **wants** [2] - 1342:25,
1349:4
    **warm** [1] - 1403:20
    **Washington** [3] -
1325:17, 1325:24,
1407:14
    **waters** [1] - 1338:10
    **WATKINS** [1] -
1325:20
    **weather** [1] -
1403:20

Wednesday [1] -
1405:12
    **week** [4] - 1403:12,
1403:25, 1404:12,
1405:10
    **weekend** [9] -
1361:8, 1403:7,
1403:12, 1403:18,
1403:20, 1405:22,
1405:23, 1406:3,
1406:8
    **weeks** [2] - 1377:18,
1377:19
    **welcome** [2] -
1327:6, 1398:19
    **whole** [3] - 1346:12,
1348:11, 1359:23
    **willing** [4] - 1340:22,
1396:1, 1396:8,
1397:1, 1397:8
    **wish** [1] - 1393:7
    **wished** [4] - 1373:20,
1379:5, 1379:14,
1379:23
    **WITNESS** [14] -
1327:15, 1328:9,
1338:24, 1341:6,
1351:23, 1353:22,
1354:5, 1361:5,
1361:9, 1361:18,
1375:14, 1378:4,
1398:19, 1403:8
    **witness** [8] -
1330:19, 1351:21,
1352:22, 1352:23,
1361:10, 1385:21,
1403:9, 1404:7
    **WITNESSES** [1] -
1326:4
    **witnesses** [2] -
1327:9
    **wondering** [1] -
1335:4
    **word** [9] - 1333:13,
1338:23, 1344:22,
1344:23, 1347:4,
1349:21, 1379:8,
1379:18, 1396:6
    **words** [6] - 1336:24,
1336:25, 1350:14,
1351:15, 1352:20,
1396:15
    **works** [3] - 1356:13,
1357:16, 1390:11
    **wrapping** [1] -
1405:11
    **write** [1] - 1355:6
    **writing** [4] - 1336:15,
1336:16, 1344:24,
1356:2

**written** [3] - 1331:14, 1372:7, 1383:24
**wrote** [8] - 1330:16, 1336:6, 1337:14, 1343:21, 1347:8, 1350:14, 1355:15, 1370:23

## Y

**YAO** [1] - 1325:19
**years** [14] - 1332:25, 1340:18, 1340:24, 1341:19, 1344:24, 1354:20, 1360:23, 1362:17, 1382:15, 1383:14, 1384:24, 1388:12, 1393:2, 1400:17
**York** [10] - 1325:21, 1330:12, 1336:1, 1336:8, 1338:16, 1350:12, 1350:20, 1405:1, 1405:3
**yourself** [2] - 1361:19, 1384:15