```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    THE UNITED STATES OF AMERICA,
                                      Criminal Action No.
 4              Plaintiff,            1:21-cr-00582-CRC-1
                                      Monday, May 23, 2022
 5    vs.                            9:05 a.m.

 6    MICHAEL A. SUSSMANN,           *MORNING SESSION*

 7              Defendant.
      - - - - - - - - - - - - - - - x
 8

 9    _____

10                 TRANSCRIPT OF JURY TRIAL
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE
      _____
12
      APPEARANCES:
13    For the United States:    ANDREW DeFILIPPIS, ESQ.
                                JONATHAN EDGAR ALGOR, IV, ESQ.
14                              MICHAEL T. KEILTY, ESQ.
                                BRITTAIN SHAW, ESQ.
15                              SPECIAL COUNSEL'S OFFICE
                                145 N Street Northeast
16                              Washington, DC 20002
                                (212) 637-2231
17
      For the Defendant:        SEAN M. BERKOWITZ, ESQ.
18                              MICHAEL BOSWORTH, ESQ.
                                CATHERINE YAO, ESQ.
19                              NATALIE HARDWICK RAO, ESQ.
                                LATHAM & WATKINS LLP
20                              1271 Avenue of the Americas
                                New York, NY 10020
21                              (212) 906-1200

22    Court Reporter:           Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
23                              U.S. Courthouse, Room 6718
                                333 Constitution Avenue, NW
24                              Washington, DC  20001
                                (202) 354-3187
25
```

1                          I N D E X

2

WITNESS                                                  PAGE

3

**EDWARD PRIESTAP**
    (By Mr. Keilty)..................................... 1437
    (By Mr. Bosworth).................................. 1457
    (By Mr. Keilty)..................................... 1484

**SPECIAL AGENT RYAN GAYNOR**
    (By Mr. DeFilippis)............................... 1485
    (By Mr. Bosworth).................................. 1528

```
 1                    P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Your Honor, we're back on

 3      the record for Criminal Case 21-582, United States of

 4      America vs. Michael Sussman.

 5              MR. KEILTY:  Good morning, Your Honor; Michael

 6      Keilty, Andrew DeFilippis, Jonathan Algor, and Brittain Shaw

 7      for the government.

 8              THE COURT:  Good morning.

 9              MR. BERKOWITZ:  Good morning, Your Honor; Sean

10      Berkowitz, Michael Bosworth, Natalie Rao, Catherine Yao, on

11      behalf of Mr. Sussmann, who is present in court.

12              THE COURT:  Okay.  Good morning, everybody.  I

13      hope everybody had a nice weekend.

14              MR. BERKOWITZ:  Yes.

15              THE COURT:  Mr. Berkowitz, why don't you stay up

16      there.  I would like to pick up where we left off Friday,

17      which is Mr. Lichtblau's anticipated testimony.  And I

18      guess -- without getting into the First Amendment issues and

19      whether there is or to what extent there is a qualified

20      reporter's privilege, I guess I'd like some clarification on

21      the expected direct testimony and then some questions of the

22      government on scope of cross, given what you told me about

23      the direct.

24              You know, I have allowed, in this case, or at

25      least have been prepared to allow examination on cross that
```

1       might exceed, somewhat, the scope of direct as long as

2       the -- you know, it would be testimony that would be

3       admissible in the other side's case-in-chief in order to

4       avoid having to call a witness back.  But here it seems to

5       me that the government would be precluded from calling

6       Mr. Lichtblau in its case under the Department of Justice

7       policy.  You can correct me if I'm wrong about that, but I

8       read the policy that way.

9              So the question becomes, then, what is the

10      appropriate scope of cross, given what you intend to ask

11      him, knowing that the government would not have been able to

12      call Mr. Lichtblau in their case?

13             So I guess the question is, you know, what do you

14      intend -- I know you've said you are going to limit it to

15      direct conversations with Mr. Sussmann, but the question is

16      to what end and on what issues; to what issues in the case

17      will Mr. Lichtblau's testimony go to?

18             MR. BERKOWITZ:  Sure, and I won't speak to the

19      Department of Justice policy in a situation where the

20      reporter is willing to because somebody has waived.  I don't

21      know whether that's the case but --

22             THE COURT:  Putting that -- if Mr. Lichtblau had

23      not been called by the defense, the question I had is would

24      the government have been able to call him, okay?

25             MR. BERKOWITZ:  So in summary, Your Honor, we

1    would expect that our -- the scope of our direct would be to

2    discuss Mr. Sussmann and Mr. Joffe's approach to

3    Mr. Lichtblau, the communications that they had with him in

4    setting up a meeting with him, any meetings that they had

5    with him and information that was conveyed during those

6    meetings, discussions that Mr. Sussmann had with

7    Mr. Lichtblau after they met in person in the September time

8    period, and communications from Mr. Lichtblau about the

9    status of the story and keeping him updated on what was

10   proceeding.

11          We would then focus on, or at least potentially

12   elicit testimony relative to, Mr. Sussmann reaching out to

13   Mr. Lichtblau after Mr. Baker had called him and asked for

14   his identity to let him know that there would be a potential

15   FBI reach-out.  We would inquire of Mr. Lichtblau as well

16   any communications that he had with the FBI that were

17   testified to by the FBI about his interactions with them.

18          As you'll remember, Mr. Baker said that he had a

19   couple of meetings.  You'll remember the book that somebody

20   might sign by Mr. Myers, and -- just to orient you on that

21   interaction.

22          And so potentially -- I don't know that we would

23   go into that, but that would at least be fair game given

24   what had been covered and any follow-up communications that

25   Mr. Lichtblau had with Mr. Sussmann about the story.

1    THE COURT:  Okay.  So without going through all of

2    those areas, part of that would appear to go to whether

3    Mr. Sussmann disclosed clients to Mr. Lichtblau and what his

4    knowledge was of who Mr. Sussmann may or may not have been

5    representing.  That seems to me to go to whether he intended

6    to deceive Mr. Baker, if he did.

7    Do any of those areas that you've just listed also

8    go to or -- also go to rebutting the joint venture motive

9    theory that the government has advanced?

10    MR. BERKOWITZ:  I think so, Your Honor.  But more

11    fundamentally, it goes to the state of mind of Mr. Sussmann

12    in terms of his timing, you know, his reasons for going to

13    the FBI.

14    The government has suggested and argued, both in

15    opening as well as in cross-examination of witnesses, that

16    somehow his meeting with the FBI was designed to help elicit

17    a story about this issue, whereas the defense's theory is

18    that the story was going to come out or was likely to come

19    out or was close to coming out, and Mr. Sussmann wanted to

20    give a heads up.  And there are questions about the status

21    of the story, and that goes to Mr. Sussmann's state of mind

22    as well.  It also, to your point, goes to issues relative to

23    the interactions with Mr. Baker.

24    THE COURT:  Right.  If part of the direct would go

25    to his intent in reaching out to the press, whether it was

 1   independently or as part of some joint effort involving

 2   others, then why wouldn't -- putting aside the privilege

 3   issues, why wouldn't testimony about other contacts that

 4   Mr. Lichtblau had, particularly with Fusion, be within the

 5   scope of that issue?  His state of mind in going to the

 6   press.

 7          MR. BERKOWITZ:  Unless they were connected to

 8   Mr. Sussmann or to establish that Mr. Sussmann was aware of

 9   those contacts or helped set up those contacts, or

10   Mr. Lichtblau mentioned to him those contacts, it shouldn't

11   go to Mr. Sussmann's state of mind, Your Honor.

12          THE COURT:  All right.

13          Good morning.

14          MR. DeFILIPPIS:  Good morning, Your Honor.

15          THE COURT:  You see what I'm getting at?

16          MR. DeFILIPPIS:  Yes, I do.

17          THE COURT:  I would like to avoid these privilege

18   issues, if possible, as well as any, you know, contempt

19   proceedings that they might raise, if we can handle this in

20   a -- as a matter of scope and relevance.

21          MR. DeFILIPPIS:  Yes.  And, Your Honor, let me

22   just -- and it's difficult without hearing the testimony,

23   but let me describe the categories of people with whom

24   Mr. Lichtblau likely communicated and who we might seek to

25   inquire in cross-examination.

1          So beyond any conversations he had with

2    Mr. Sussmann and Mr. Joffe, the government, I think, would

3    intend to inquire about communications that Mr. Lichtblau

4    had with Fusion GPS, and that's for a couple of reasons.

5          First, Fusion GPS was acting as an agent of the

6    Clinton Campaign, so we think that his communications with

7    them are inherently probative of the allegation here that

8    Mr. Sussmann was acting on behalf of the Clinton Campaign.

9    And we have produced to the defense dozens of emails where

10   Fusion GPS communicates with Mr. Lichtblau and other members

11   of the press.

12          THE COURT:  Are you taking the position that those

13   are waivers of a sort?  If the concern is the

14   confidentiality of a client, but you have emails showing

15   communications between Fusion and Lichtblau, the reporter

16   holds the privilege, so it wouldn't be a waiver,

17   necessarily, but it would no longer be confidential in a

18   sense.

19          MR. DeFILIPPIS:  So I think -- as to the face of

20   the emails themselves, I think those are just no longer

21   privileged; not by waiver but by, I guess, legal process,

22   the grand jury subpoena.

23          I think our argument would be that Mr. Lichtblau

24   cannot then -- the privilege is a qualified one.  To the

25   extent those emails are obviously probative of issues

1    relevant to the charge, the government's position is that

2    we've met the burden under *Zerilli* and *Brandenberg* [sic]

3    that they're at the heart of what are the probative matters.

4         THE COURT:  Okay.  Let's put that aside and talk

5    about relevance and scope.

6         MR. DeFILIPPIS:  So then the other individuals or

7    categories of people with whom Mr. Lichtblau, we know,

8    communicated would include researchers.

9         So Mr. Sussmann, in his meeting with Mr. Baker,

10    mentioned Paul Vixie, Susan Landau, and Steve Bellovin.

11    Those were the three names Mr. Sussmann gave to Mr. Baker.

12         We are aware that Mr. Lichtblau was communicating

13    with each of those -- I think all three of those -- and have

14    produced some emails to the defense as to at least some of

15    those people.

16         Again, because Mr. Sussmann mentioned those

17    people, was apparently aware of them, and it was part of the

18    representations he made to Mr. Baker, we think, again, that

19    any communications Mr. Lichtblau had with those researchers

20    would sit at the heart of the charge here and of

21    Mr. Sussmann's representations to Mr. Baker.

22         And then --

23         THE COURT:  Well, you don't -- those researchers

24    weren't acting as agents of the Clinton Campaign or involved

25    in any of the, you know, joint venture that you've put

1      forward.

2            What relevance, other than just completing the

3      story, would testimony about his contacts with them have?

4            MR. DeFILIPPIS:  So as to those three, Your Honor,

5      I think because Mr. Sussmann was aware.  He chose to

6      identify those three researchers as -- I'm sorry, it was

7      Matt Blaze.  It was not Paul Vixie; it was Matt Blaze.

8            THE COURT:  Yes.

9            MR. DeFILIPPIS:  Mr. Sussmann chose to identify

10      them to essentially, you know, cast an inference of

11      legitimacy over the allegations; and Mr. Lichtblau did, in

12      fact, reach out to those individuals.

13            I think a logical inference is that in order for

14      the jury to understand why Mr. Sussmann mentioned those

15      individuals, we think that it's fair game to probe

16      Mr. Lichtblau on the exact circumstances of that.

17            Absent Mr. Lichtblau -- and, look, if it turns out

18      that Mr. Lichtblau says that Mr. Sussmann had no idea about

19      his communications with those people, it may be grounds to

20      sort of cut off the examination and, you know, not go too

21      far down that road, but we think we're at least entitled to

22      probe as to what those individuals -- what role they may

23      have had vis-à-vis Mr. Sussmann.

24            We also know that Dr. Bellovin and Mr. Lichtblau

25      exchanged communications at a time in which they both seemed

1    pretty unsure of the veracity of these allegations, and so

2    we think that that is probative to whether *The New York*

3    *Times* was, in fact, ready to pull the trigger on a story

4    when Mr. Lichtblau went to Mr. Baker, which is what

5    Mr. Sussmann said.

6          I would say, Your Honor, there's a final category

7    of researchers who we may want to inquire about, and that is

8    people like David Dagon.  We did not call Mr. Dagon, but we

9    are aware, from his grand jury testimony and otherwise, that

10   Mr. Sussmann and Mr. Joffe requested or tasked Mr. Dagon to

11   speak to the media, including Mr. Lichtblau and Mr. Foer of

12   *Slate.*

13         And so to the extent that the government has

14   alleged that this was a coordinated effort, we think that

15   Mr. Lichtblau's communications with researchers like that

16   are, perhaps, even more probative because they were being

17   directed in some sense by Mr. Sussmann and Mr. Joffe.  There

18   was a phone call that Mr. Sussmann had with David Dagon on

19   September 17th in which Mr. Dagon says Sussmann and began to

20   ask him to communicate with the media.

21         So I think, Your Honor, that is why we think that

22   these communications are highly probative and can't just be

23   sort of cut out from the story.  I do think we will, of

24   course, be mindful of whether -- if we're going down a

25   particular line of questioning, if it's proving to not tie

1    to Mr. Sussmann in any way or tie to a relevant issue, we're

2    not going to press it.  But we think that as -- you know, as

3    an overall matter, the qualified privilege has not -- has

4    been overcome, at least for initial inquiry.

5             THE COURT:  Okay.  Well, to the extent there is a

6    qualified privilege -- and I have tackled this in the civil

7    context -- one of the requirements is that the government

8    have exhausted other available sources.  And obviously you

9    had the ability to call many of the people you've just

10   mentioned and, for whatever reason, chose not to.

11            MR. DeFILIPPIS:  Your Honor, on that I would say

12   that most -- so as to the three researchers mentioned by

13   Mr. Sussmann, we have spoken to them.  As to the Fusion GPS

14   folks, they all invoked their rights and were not willing to

15   speak with us.  And Mr. Dagon, of course, testified in grand

16   jury, but...

17            THE COURT:  You could have immunized him.

18            MR. DeFILIPPIS:  What's that?

19            THE COURT:  You could have immunized him.

20            All right.  Final word briefly, Mr. Berkowitz?

21            MR. BERKOWITZ:  With respect to Fusion, to the

22   extent that they have email communications with

23   Mr. Lichtblau and it's important for them to establish, for

24   whatever reason, that he spoke to them, they can show him

25   those emails and say you spoke with them or you communicated

1    with them.  I think that that would be fair.

2            To the extent --

3            THE COURT:  And get the emails in?

4            MR. BERKOWITZ:  Correct.

5            THE COURT:  Yes.

6            MR. BERKOWITZ:  Number two, with respect to the

7    three researchers, I think it's fair inquiry to ask

8    Mr. Lichtblau what, if anything, he recalls asking or

9    communicating to Mr. Sussmann about the three researchers.

10   That's what would be relevant; not what Mr. Lichtblau

11   actually spoke with them about, but what it is he

12   communicated to them.  Because, as you'll recall, there were

13   communications about those three to Mr. Baker, and so any

14   information that he got from Mr. Lichtblau would be in his

15   head and would tie up to that.

16           With respect to Mr. Dagon, again, the -- you know,

17   they could call Mr. Dagon, if they wanted to and it were

18   important to do that.

19           So I guess what I would say is that everything

20   that they're talking about is obtainable in various ways.

21   And even the likelihood of a *New York Times* story is

22   unimportant except to the extent that something was

23   communicated to Mr. Sussmann.  If, in fact, Mr. Lichtblau

24   says the story is coming out Sunday, and it really wasn't,

25   that's not something that Mr. -- that's really relevant in

 1    this case.

 2              THE COURT:  Okay.

 3              All right.  We will continue to noodle about this,

 4    and why don't -- are we ready to call our next witness?

 5              MR. KEILTY:  We are, Your Honor.  Just one

 6    issue --

 7              THE COURT:  Yes.

 8              MR. KEILTY:  -- mechanically to discuss, and I've

 9    discussed this with defense.  With this particular witness,

10    Mr. Priestap --

11              THE COURT:  Yes.

12              MR. KEILTY:  -- we are going to show him his

13    notebook.  We've marked it for identification.  And we're

14    going to ask to approach, show him his notebook to establish

15    that this, in fact, was his notebook, and then we plan on

16    putting certain pages of the notebook on the ELMO and moving

17    those pages into evidence as well as showing him basically a

18    copy of those three pages that we move into evidence, which

19    would ultimately go back to the jury.

20              We don't plan on sending the whole -- introducing

21    the whole notebook as evidence due to the nature of the

22    information that's in the notebook, and defense is okay with

23    this.  I've spoken with them.

24              THE COURT:  All right.  So just to review, you're

25    going to show him particular pages, move only those pages --

```
1              MR. KEILTY:  Correct.

2              THE COURT:  -- and send copies of the pages to the

3      jury in lieu of the entire notebook?

4              MR. KEILTY:  Correct.

5              THE COURT:  Okay.  That sounds fine.

6              And who do we have today?

7              MR. KEILTY:  We have Mr. Priestap, Your Honor,

8      Mr. Gaynor, Ms. Sands, Mr. Heide.

9              THE COURT:  Okay.  And I received your motion

10     regarding Mr. Heide.  We'll obviously have to talk about

11     that before he comes on.

12             MR. KEILTY:  Yes, Your Honor.

13             THE COURT:  All right.  We're ready.

14             (Jury enters courtroom)

15             THE COURT:  Good morning, ladies and gentlemen.

16     Welcome back.

17             Everyone have a nice weekend?

18             Please be seated.

19             All right.  We are ready to get started again.  I

20     hope everyone has rested and is ready to go.

21             Mr. Keilty, would you like to call the

22     government's next witness?

23             MR. KEILTY:  Yes, Your Honor.

24             Your Honor, the government calls Bill Priestap to

25     the stand.
```

```
 1            THE COURT:  Good morning, sir.  Step right up.
 2   You can slip your mask off, remain standing, and raise your
 3   right hand to be sworn in.
 4            (Witness sworn)
 5            THE COURT:  Okay.  Please have a seat.
 6                      EDWARD PRIESTAP, Sworn
 7                      DIRECT EXAMINATION
 8   BY MR. KEILTY:
 9   Q.  Good morning, sir.  How are you?
10   A.  Good morning.
11   Q.  Could you please state and spell your name for the
12   record.
13   A.  Sure.  My legal name is Edward, E-D-W-A-R-D; last name
14   is Priestap, P-R-I-E-S-T-A-P.
15   Q.  Thank you.
16            Mr. Priestap, are you currently employed?
17   A.  I am.
18   Q.  And where are you employed?
19   A.  A consulting firm called Trenchcoat Advisors.
20   Q.  Okay.  And what, generally, is Trenchcoat Advisors?
21   A.  We try to protect businesses from nation state threats.
22   Q.  Okay.  And what is your position at Trenchcoat Advisors?
23   A.  I am a founder.
24   Q.  Great.  And prior to Trenchcoat Advisors, were you
25   employed?
```

1   A.  I was.

2   Q.  And where were you employed, sir?

3   A.  The FBI.

4   Q.  And how long were you employed by the FBI?

5   A.  21 years.

6   Q.  And what was your -- and when did you retire from the

7   FBI?

8   A.  I believe the official date was April -- April of '19, I

9   believe.

10  Q.  Okay.  And what was your most recent position with the

11  FBI prior to your retirement?

12  A.  I was the Assistant Director for Counterintelligence.

13  Q.  And, Mr. Priestap, turning your attention to September

14  2016, what position did you hold at the FBI?

15  A.  September of 2016?  I believe I was the Assistant

16  Director of Counterintelligence.

17  Q.  Okay.  And you mentioned counterintelligence.  What

18  exactly is counterintelligence as that term is used by the

19  FBI?

20  A.  It's the FBI's efforts to protect basically the United

21  States, United States's interests from nation state threats

22  and related threats.

23  Q.  Okay.  And what are some of the -- what were some of

24  your duties as the Assistant Director for

25  Counterintelligence at the FBI?

1    A.  My duties.  I basically oversaw the FBI's

2    counterintelligence efforts globally.

3    Q.  Okay.  So you were in charge of counterintelligence for

4    the FBI; is that fair to say?

5    A.  Yes.

6    Q.  Okay.  Does counterintelligence investigate cases?

7    A.  Yes.

8    Q.  And at any one time, Mr. Priestap, approximately how

9    many cases are under the counterintelligence division?

10   A.  The exact number is classified, but thousands.

11   Q.  Thousands?

12   A.  Yes.

13   Q.  Okay.  Thank you.

14           Turning your attention to September 2016, did

15   there come a time when you learned about an allegation

16   involving the Trump organization and a Russian bank called

17   Alfa-Bank?

18   A.  Yes.

19   Q.  And what is your understanding, if any, of whether those

20   allegations were brought to the attention of the FBI?

21   A.  Was the information at all given to the FBI?

22   Q.  Yes.

23   A.  Yes.  Yes.

24   Q.  Do you know how that information was brought to the FBI?

25   A.  I do not.

1    Q.  Okay.  Did you have an understanding of whether the FBI
2    opened an investigation into those allegations?
3    A.  Let me put it this way:  I know the FBI looked into the
4    allegations.
5    Q.  Okay.  But you're unsure if a case was opened.  Is that
6    fair?
7    A.  A formal case, I am unsure.
8    Q.  And did you have any role in that investigation?
9    A.  Role?  I was advised of -- I guess at some point
10   possibly more than once people provided me a briefing, like
11   summarized what we learned.
12   Q.  Sure.  Let me ask you this question:  Would this
13   investigation have fallen under the counterintelligence
14   division?
15   A.  Yes.
16   Q.  And as head of the counterintelligence division, the
17   investigation was ultimately under your control; is that
18   correct?
19   A.  Yes.
20          MR. KEILTY:  Your Honor, may I approach the
21   witness?
22          THE COURT:  You may.
23   Q.  Mr. Priestap, I'm showing you what's been marked for
24   identification as Government Exhibit 2.  Does this appear to
25   be a notebook?

1    A.   Yes.

2    Q.   And if you open the inside cover of the notebook, is

3    there a name listed there?

4    A.   Yes, my name.

5    Q.   Okay.  Does that appear to be your handwriting?

6    A.   Yes.

7    Q.   Is there an entry for the dates when this notebook was

8    used?

9    A.   Yes.  September 2nd of '16 through December 27th of '16.

10   Q.   Okay.  And is there a phone number in that inside cover

11   as well?

12   A.   Yes.

13   Q.   Okay.  Does that appear to be your phone number in

14   September of 2016?

15   A.   Yes.

16   Q.   Okay.  Mr. Priestap, I'm going to ask you to flip

17   through a couple of pages of the notebook to see if you

18   recognize the handwriting in the notebook.

19   A.   (Witness reviews document) Oh, just any pages?

20   Q.   Just take a look through to make sure if you recognize

21   the handwriting.

22   A.   Yes.  I recognize the handwriting as my own.

23   Q.   Great.  Thank you.  I'm going to take that notebook

24   back.

25            Mr. Priestap, does Government Exhibit 2 appear to

1    be your notebook?

2    A.  Yes.

3    Q.  Okay.  Now what I would like to do is I'm going to show

4    you some pages that are in this notebook.  I'm going to put

5    this on the ELMO, and it will appear on your screen.  Okay?

6            Bear with me here, because this is our first time

7    using the ELMO.

8    A.  Okay.

9    Q.  Okay.  Do you see the first page that's on the screen

10   right now?

11   A.  Yes.

12   Q.  And it's redacted, but do you see a date in the top-

13   right corner?

14   A.  I do.

15   Q.  Okay.  And what is that date?

16   A.  September 16th of '16.

17   Q.  And for the record, that page has been marked as

18   Government Exhibit -- for identification -- 2A.

19           Now, turning to Government Exhibit 2B for

20   identification, does this appear to be your handwriting,

21   Mr. Priestap?

22   A.  It does.  It's a little tough for me to see though.

23   Q.  Yes, let me see if I can work on this one second.

24           THE COURT:  Ms. Jenkins, can we adjust the

25   contrast on the ELMO?

```
 1              THE COURTROOM DEPUTY:  Yes, Your Honor.

 2              THE COURT:  Thanks.

 3              (Pause)

 4              THE COURT:  Bear with us, sir.

 5              (Pause)

 6              MR. KEILTY:  I can bring him up the notebook, Your

 7    Honor, so he can read.

 8              THE COURT:  Let's see if we can get it so the jury

 9    can see it.  Is that the best we can do?

10              THE COURTROOM DEPUTY:  I'm trying.

11              THE COURT:  Okay.  You might want to zoom in a

12    little.

13              (Pause)

14              MR. KEILTY:  There we go.

15              THE COURT:  There we go.

16              MR. KEILTY:  That looks good?

17              THE COURT:  Yes.

18              MR. KEILTY:  Okay.

19    BY MR. KEILTY:

20    Q.  Mr. Priestap, does that look like your handwriting?

21    A.  Yes.

22    Q.  Okay.  And turning to 2C for identification.

23              Okay.  2C for identification, do you see the top

24    left, the date there?

25    A.  Yes.
```

1    Q.  What's that date, Mr. Priestap?

2    A.  September 22nd of 2016.

3    Q.  Okay.  And does that appear to be your initials next to

4    the date?

5    A.  They do, yes.

6    Q.  Okay.

7             Okay.  Turning back to Government Exhibit 2B, can

8    you just read those notes to yourself.

9    A.  (Witness reviews document) Okay.

10   Q.  Okay.  And do these notes appear to refer to the Alfa-

11   Bank allegations?

12   A.  They do appear to refer to that.

13   Q.  Okay.  Mr. Priestap, I'm now going to show you for

14   identification Government Exhibit 289.  Does that appear to

15   be just a copy of what we looked at as Government Exhibit 2A

16   from the original book?

17   A.  Yes.

18   Q.  And does the second page of 289 appear to be a copy of

19   Government Exhibit 2B that we looked at in the notebook?

20   A.  Yes.

21   Q.  And lastly, the last page of Government Exhibit 289,

22   does that appear to be a copy of Government Exhibit 2C that

23   we looked at in the notebook?

24   A.  Yes.

25   Q.  Mr. Priestap, in your role as the Assistant Director for

1    Counterintelligence, was it your practice to take notes

2    during meetings?

3    A.   Some meetings.

4    Q.   Okay.  In your role as the -- what would be the reason

5    to take notes at meetings?

6    A.   To help me remember what was being discussed or what I

7    was told.

8    Q.   Okay.  In your role as the assistant director, was it

9    your practice to take notes during telephone calls?

10   A.   Sometimes.

11   Q.   Okay.  What about conversations with people?

12   A.   Sometimes.

13   Q.   And was it your practice to record -- when you did take

14   notes, was it your practice to record information as

15   accurately as possible?

16   A.   Yes.

17   Q.   And why is that?

18   A.   I wanted to be reminded of the information that I was

19   conveyed as accurately as possible.

20   Q.   And that was important; is that correct?

21   A.   Yes.

22   Q.   With regard to the particular notes that you read,

23   Government Exhibit 2B and the second page of Government

24   Exhibit 289, do you remember in what context you took those

25   notes?

1    A.   I do not.

2    Q.   Based on your note practice -- note-taking practices at

3    the time, does it appear that these notes were taken on a

4    matter that you were aware of?  Meaning -- let me ask you a

5    different question.

6              Based on your note-taking practices, do you think

7    you took these notes when the matters were fresh in your

8    memory?

9    A.   I'm sorry?

10   Q.   Is it your practice to take contemporaneous notes?

11   A.   Yes.

12   Q.   Okay.  And is it fair to say that you now don't fully

13   and accurately recall the events that led you to take these

14   notes; is that fair?

15   A.   Correct.

16   Q.   And based on your note-taking practices, do you believe

17   these notes fairly and accurately reflected your knowledge

18   at the time, to the best of your ability?

19   A.   That would have been my intention in taking the notes.

20             MR. KEILTY:  Okay.  Your Honor, the government

21   would move Government Exhibits 289 as well as 2A, B, and C

22   into evidence.

23             MR. BOSWORTH:  No objection to the notes

24   themselves, Your Honor.

25             THE COURT:  So moved.

```
 1              Did we get all those numbers, Ms. Jenkins?

 2              MR. KEILTY:  So it was Government Exhibits 289,

 3    2A, 2B, and 2C.

 4    BY MR. KEILTY:

 5    Q.  Okay.  I'm going to put on the screen the second page of

 6    Government Exhibit 289.  Mr. Priestap, can you read these

 7    notes to the jury?

 8    A.  Sure.

 9    Q.  Thank you.

10              You can start from the top and move left and then

11    just go down.

12    A.  Okay.  The whole thing?

13    Q.  Yes, sir.

14    A.  Okay.

15              There's a number 1 in the upper left corner.  Then

16    it says "Michael Sussmann."  Above that, kind of at an

17    angle, it says "and Todd Hinnen (or Hinen)."

18              After Michael Sussmann's name, my abbreviation for

19    "attorney, Perkins Coie."  There's a dash, "said not doing

20    this for any client."  And then there's a couple of bullets

21    under that.

22              The first bullet reads "represents DNC, Clinton

23    Foundation, etc."

24              Second bullet reads, "former DOJ officials."

25              Third bullet reads, "been approached by prominent
```

1    cyber people."  And then in parentheses, "academic or

2    corp" -- corporate -- "POCs," or point of contacts.

3            To the right of that, kind of in the margin, it

4    reads, "People like."  It looks to me like -- it's a list of

5    names.  But "Matt," I think it's Blaze or Bloze, "Steven

6    Bellovin" then "Susan Landau."

7            After Steve and Susan's name there's the letters

8    "ph" in parentheses.  I put "ph" for phonetic; in other

9    words, I don't know the exact spelling.

10           Under that it says "NYTS" -- the abbreviation for

11   *New York Times* -- "*Washington Post* or WSJ," *Wall Street*

12   *Journal*, dash, "on Friday."

13           On the left in the margin it says "foreign power

14   contacting Trump org," or organization.

15           And then to the right of that it reads, "Secret

16   Trump org server that has had comms" -- communications --

17   "w/Alfa-Bank Moscow."

18           The line below that in parentheses, "connected to

19   Kremlin," close parentheses, and "a hospital in U.S. used as

20   a" -- next line -- "comm" -- or communication -- "node."

21           After that is the word "TOR."

22           And then to the far right in parentheses with a

23   dash up toward the hospital it says, "Spectrum Health in

24   Michigan?"

25           Below that is another line.  It says, "another

1    article to come out later."  Then in parentheses,

2    "approximately three to four weeks about Trump organization

3    contacting foreign nations."

4           And then the last line reads, "CID" -- in FBI

5    parlance, that stands for criminal investigative division --

6    "has a TOR expert."

7    Q.  Okay.  Great.  Thank you.  We'll get through some

8    more -- a couple more of these acronyms that are in these

9    notes in a second.

10          Mr. Priestap, were any of the names listed in

11   these notes familiar to you in September of 2016?

12   A.  Just the Trump one.

13   Q.  Okay.

14   A.  Yes.

15   Q.  Is it your understanding that someone provided this

16   information to you?

17   A.  Yes.

18   Q.  And just getting back to the FBI jargon, you mentioned

19   the term "TOR."  Do you have a general understanding of what

20   TOR is?

21   A.  I used to have a much better one.

22          You know what, I'd rather not.

23   Q.  Fair enough.

24          You just mentioned CID.  Is that the criminal

25   investigative division?

1  A.  Yes.

2  Q.  And is that a different division than the one you led,

3  the counterintelligence division?

4  A.  Correct.

5  Q.  In the top left corner of the notes to the right of the

6  circled 1 it says, "Michael Sussmann, attorney Perkins

7  Coie."  And then there's a -- do you see that?

8  A.  Yes.

9  Q.  And then there's a dash, and it says -- on the side it

10  says, "said not doing this for any client."  Do you see

11  that?

12  A.  I do.

13  Q.  In September 2016, Mr. Priestap, did you know who

14  Mr. Sussmann was?

15  A.  I did not.

16  Q.  And, again, when taking notes, was it your practice to

17  write down pertinent information?

18  A.  It was.

19  Q.  Why was it your practice to take down pertinent

20  information?

21  A.  I wanted to document as accurately as possible what I

22  heard.

23  Q.  Mr. Priestap, in your role as the assistant director,

24  were there occasions when you had to brief superiors at the

25  FBI?

1    A.  Yes.

2    Q.  And what role, if any, did your notes play in that

3    process?

4    A.  It depended, frankly.  Sometimes I wouldn't use notes;

5    sometimes I'd use these type of notes.  Other times I'd have

6    more formal typed talking points.  It depends on the

7    briefing topic, all that stuff.

8    Q.  But there were times when you would use notes; is that

9    fair?

10   A.  Yes.

11   Q.  In the notes in the -- I guess it would be the beginning

12   of the second paragraph, it says -- you wrote "*New York*

13   *Times*, *Washington Post*, or *Wall Street Journal*."  Is that

14   correct?

15   A.  Yes.

16   Q.  What, if any, is your understanding of what that refers

17   to?

18   A.  I don't recall what that refers to, but let's just say,

19   generally speaking, if I were to write something like that,

20   it generally meant an article on a topic would be coming

21   out.

22   Q.  Okay.  But you don't have any specific recollection of

23   that with regard to these notes?

24   A.  I do not.

25   Q.  Do you have any recollection of meeting with any media

1    outlets with regard to the Alfa-Bank allegations?

2    A.  I do not.

3    Q.  Mr. Priestap, turning your attention to March 6th of

4    2017, what was your position in the FBI at that time?

5    A.  The same one, the Assistant Director for

6    Counterintelligence.

7    Q.  Do you have any recollection of attending a meeting on

8    March 6th at the Justice Command Center at the Department of

9    Justice?

10   A.  No.

11            To be clear, I attended lots of meetings.

12   Q.  I'm sure you did.

13            Mr. Priestap, based on your experience as the

14   former Assistant Director of Counterintelligence for the

15   FBI, does the FBI collect and analyze a significant amount

16   of information on a day-to-day basis?

17   A.  Yes.

18   Q.  And what are some of the sources of that information?

19   A.  Oh, it runs the gamut, meaning about every source you

20   could imagine.

21   Q.  Does the FBI collect information from outside of the

22   government?

23   A.  Yes.

24   Q.  Okay.  And what is your understanding, if any, of how

25   the FBI collects information from outside of the government?

1    A.  The FBI collects it in a variety of ways.  We couldn't

2    do our job, if we didn't.

3    Q.  So what are some of those sort -- what are some of those

4    ways that the FBI collects information?

5    A.  There's times the FBI engages in what I'd refer to as

6    technical collection.

7    Q.  Yes.

8    A.  There's times the FBI talks to people who provide us

9    information.

10   Q.  Okay.

11   A.  Those two are very common.

12   Q.  And when you say you talk to people, are these like

13   people, human people -- human people.  Yes, I'm assuming

14   they're human people.

15          These are people who come into the FBI who are not

16   part of the government; is that correct?

17   A.  Yes.

18   Q.  And with respect to human sources, is it important for

19   the FBI to understand how those individuals came into

20   possession of that information that they provide?

21   A.  Important?  It's something we would like to know.

22   Q.  Okay.  And why is that?

23   A.  When we -- I say "we"; I'm not with the FBI anymore.

24          When the FBI obtains information, it basically has

25   to look at it and decide what to do with it.

1    Q.  Right.

2    A.  In other words, is it something that the FBI should look

3    into further, so on and so forth.

4             But as a result, it considers a variety of factors

5    before deciding what, if anything, to do with information.

6    Q.  Okay.  Is it -- based on your experience, is it

7    important to understand the motivation of an individual

8    bringing information to the FBI?

9    A.  Important?  I guess I'd say it is relevant.  It's not

10   dispositive.

11   Q.  Okay.  Based on your experience, is it important to

12   understand if someone is providing information to the FBI on

13   behalf of someone else?

14   A.  Again, we get information from a variety of sources, to

15   include a variety of human beings who come to the FBI

16   motivated by a variety of things.

17   Q.  And your testimony is that that motivation is important

18   to the FBI; is that correct?

19   A.  It's certainly relevant.

20   Q.  Mr. Priestap, the jury's heard testimony in this case

21   that Mr. Sussmann brought in the Alfa-Bank allegations to

22   the FBI on September 19, 2016.

23            Based on your experience, if Mr. Sussmann had

24   brought these allegations to the FBI on behalf of the

25   Hillary Clinton Campaign, would that have mattered to the

1    FBI?

2    A.  Again, the -- somebody -- anybody bringing information

3    to the FBI, we're interested -- the FBI is interested in

4    knowing the motivation of the person providing the

5    information.

6    Q.  Right.  But particularly if -- if someone's bringing

7    information on behalf of a political campaign, is that

8    important information for the FBI to know?

9    A.  I guess -- I'm struggling a bit on your use of the word

10   "important."

11          There's a variety of factors on the importance of

12   that, and so it -- again, it's -- a motivation is relevant,

13   but it's not -- it's not the only factor.

14   Q.  Right.  But I'm asking, if somebody's bringing

15   information on behalf of a political campaign, is that a

16   factor that the FBI would look into?

17   A.  Yes.  Yes.

18   Q.  If Mr. Sussmann had brought the allegations into the FBI

19   on behalf of a -- first of all, let me back up.

20          What is a confidential human source as the FBI

21   defines that term?

22   A.  Yes, I no longer -- I apologize.  I don't remember the

23   strict definition, but it's basically somebody who is

24   providing the FBI information that the FBI is not, let's

25   just say, publicly acknowledging that they're doing so.

1    Q.  Okay.

2    A.  So try to keep the relationship private.

3    Q.  Understood, okay.

4         If Mr. Sussmann had brought in the Alfa-Bank

5    allegations to the FBI on behalf of a confidential human

6    source of the FBI, would that have mattered?

7    A.  Again, relevant, yes.  It would have been relevant.

8    Q.  And why is that?

9    A.  Again, a variety of people are providing the FBI all day

10   every day.  The FBI can't look into every, let's call it,

11   allegation that people are bringing to our attention.  And

12   so as a result, when we do obtain information, we're trying

13   to make the decision:  Is this something that in effect

14   requires our efforts to look into?  Is it something we

15   should be spending taxpayer money to -- and resources to

16   investigate?

17        As a result, again, when somebody brings us

18   information, we look at a variety of things in making that

19   calculation.

20   Q.  Sure.

21   A.  And so if a confidential human source provided

22   information, that confidential -- or somebody else

23   information, that -- let's call it that track record of the

24   confidential human source would be taken into account before

25   making the determination whether to go forward or not.

1    Q.  Understood.

2          Generally, how do confidential human sources bring

3    information into the FBI?

4    A.  Generally they have a primary point of contact within

5    the organization; and so when a confidential human source

6    has such information to provide, they would contact their --

7    the person they deal with on a regular basis and provide

8    information through that.

9    Q.  And what, if any, concerns would you have if a

10   confidential human source bypassed his handler to bring

11   information to the FBI?

12   A.  I would want to know why he or she was doing that.

13          MR. KEILTY:  Okay.  Nothing further.

14          Thank you, Your Honor.

15          Thank you, Mr. Priestap.

16          THE WITNESS:  Thank you.

17                    CROSS-EXAMINATION

18   BY MR. BOSWORTH:

19   Q.  Good morning, Mr. Priestap.

20   A.  Good morning.

21   Q.  I'm Michael Bosworth, and I'm one of the lawyers

22   representing Mr. Sussmann.

23   A.  Okay.

24   Q.  We've never met before, correct?

25   A.  Correct.

1    Q.  Okay.  You didn't meet with the defense to prepare for

2    your testimony today?

3    A.  No.

4    Q.  And you didn't meet with the government to prepare for

5    your testimony today either, correct?

6    A.  I met with the government previously.

7    Q.  You testified before the grand jury in June of 2021.

8    A.  Yes.

9    Q.  Since that time have you met with either side?

10   A.  No.

11   Q.  And you never met Mr. Sussmann, correct?

12   A.  I don't recall ever meeting him, no.

13   Q.  Okay.  Do you recall ever speaking to him?

14   A.  I don't.

15   Q.  And in September 2016, do you remember being in any

16   meeting with Mr. Sussmann?

17   A.  I do not.

18   Q.  Do you remember being in any meeting with whoever it was

19   that was telling you the information you recorded in your

20   notes?

21   A.  No.

22   Q.  You spoke before about your long career at the FBI.  You

23   started as a special agent; is that right?

24   A.  Yes.

25   Q.  And you rose up through the ranks?

1    A.  Yes.

2    Q.  Did you spend most of your time over those years in the

3    counterintelligence division working counterintelligence

4    cases?

5    A.  I wouldn't say most of the years.  I bounced around.

6    Q.  Okay.  The counterintelligence division, though, is

7    where cases regarding the sort of nation state threats that

8    you described take place, right?

9    A.  Yes.

10   Q.  Okay.  Can you just provide a little more of an

11   explanation about what those threats are.  When you talk

12   about nation state threats, what do you mean?

13   A.  How much time do you have?

14          THE COURT:  Not that much.

15   Q.  Let's go for the short version, Mr. Priestap.

16   A.  Short version.  The U.S. is the sole super power on the

17   face of this earth, and as a result, there are a whole lot

18   of nations who don't like that; and so a lot of nations are

19   doing things every day to try to either steal from us,

20   undermine what we're trying to accomplish, and/or otherwise

21   influence our activities so that they can gain strategic

22   advantage over our country.

23   Q.  And Russia is one of those countries, right?

24   A.  Yes.

25   Q.  In the fall of 2016, there was an extensive

1    investigation taking place in the counterintelligence

2    division into Russia's potential connections to Mr. Trump,

3    correct?

4    A.  Yes.

5    Q.  And what was that investigation called, if you remember?

6    A.  I think the one you're referring to is Crossfire

7    Hurricane.

8    Q.  It is.

9    A.  Okay.

10   Q.  And can you tell us what Crossfire Hurricane was?  What

11   was the focus?

12   A.  Oh.

13   Q.  Again, briefly.

14   A.  I guess let me put it this way:  It was whether the

15   Russians were or were trying to interfere with the 2016

16   presidential election.

17   Q.  And is that the kind of threat from a nation state that

18   the counterintelligence division would investigate?

19   A.  Yes.

20   Q.  Because that's a threat to the United States democracy,

21   correct?

22   A.  Yes.

23   Q.  And that's something that's important for you to

24   protect?

25   A.  Yes.

1    Q.  Because your job is to protect our country against

2    threats from foreign actors?

3    A.  Correct.

4    Q.  And that's an investigation that you do remember about,

5    correct, the Crossfire Hurricane investigation?

6    A.  I certainly remember pieces, correct.

7    Q.  Okay.  Do you remember approximately how many agents

8    were involved in that investigation?

9    A.  No.

10   Q.  Fair to say a good number of people, though, were

11   involved?

12   A.  Yes.

13   Q.  And you were asked on direct examination about this

14   allegation of another connection between Mr. Trump and

15   Russia specifically concerning Alfa-Bank, correct?

16   A.  Yes.

17   Q.  And you don't remember much about that investigation?

18   A.  That is correct.

19   Q.  How come you remember more of the details of the

20   Crossfire Hurricane investigation than you do of the Alfa-

21   Bank investigation?

22   A.  If I recall, the -- and, again, it's a big "if" because

23   I don't remember the particulars, but it was not something

24   that I was regularly briefed on.  And if I recall correctly,

25   at the end of the day it didn't amount to much.

1    Q.  And the Crossfire Hurricane investigation was something

2    you were more regularly briefed on?

3    A.  Yes.

4    Q.  And Alfa-Bank not so much?

5    A.  Correct.

6    Q.  But you received some information about that

7    investigation as it took place?

8    A.  Yes.

9    Q.  Okay.  And you don't remember the details.  That was six

10   years ago, right?

11   A.  Correct.

12   Q.  Okay.  And it's hard to remember details of events from

13   six years ago, correct?

14   A.  Yes, correct.

15   Q.  You were asked about your notes.  And just to be clear,

16   you don't remember actually taking those notes down that

17   Mr. Keilty asked you about, correct?

18   A.  I do not.

19   Q.  You don't remember who you were talking to when you took

20   those notes down?

21   A.  I do not.

22   Q.  You don't remember when you took those notes down?

23   A.  Correct.

24   Q.  You don't remember what you did with those notes,

25   correct?

1    A.  Correct.

2    Q.  And these are your notes, right?

3    A.  It certainly looks like my handwriting, yes.

4    Q.  And looking at those notes, which you've reviewed,

5    presumably, you know, today and before, it still doesn't jog

6    your memory of that conversation, correct?

7    A.  It does not.

8    Q.  Okay.  Let's look briefly at just a couple of pieces.  I

9    want to ask you a couple of questions about that

10   investigation itself and some other meetings that you may or

11   may not remember, and we'll see what you remember.

12   A.  Okay.

13        MR. BOSWORTH:  So if we could put up Government

14   Exhibit 243, which I think is just another version of the

15   same notes we've been talking about.

16        MR. KEILTY:  Yes, that's fine.

17        MR. BOSWORTH:  Okay.

18   Q.  Let's look at the portion of the government exhibit that

19   Mr. Keilty just put in evidence that is the substance of

20   your notes.

21   A.  Okay.

22   Q.  Apparently it's hard to remember events of five minutes

23   ago, too.

24        Okay.  So under "Michael Sussmann, attorney,

25   Perkins Coie," the very first line there is "represents DNC,

1    Clinton Foundation, etc."

2              Looking at the notes, do you remember what the DNC

3    is?

4    A.  Again, I don't remember writing this, but when I think

5    of the DNC, I think of the Democratic National Committee.

6    Q.  Okay.  And "Clinton Foundation" is next, right?

7    A.  Yes.

8    Q.  Okay.  And those are the only clients or the only

9    parties that are listed as being parties that Mr. Sussmann

10   represents, right?

11   A.  Yes.  On these notes, yes.

12   Q.  On your notes, right?

13   A.  Yes.

14   Q.  So either those were the only parties you were told

15   Mr. Sussmann represents, right, or they were the only

16   parties mentioned to you that you wrote down.  One of those

17   two things is true; is that fair to say?

18   A.  Yes, because like I see the word or the abbreviation for

19   et cetera.

20   Q.  Okay.  And you were asked questions before about how you

21   might use your notes to brief people higher in the food

22   chain.  And there weren't a whole lot of folks above you in

23   the FBI; is that fair?

24   A.  Correct.

25   Q.  Above you there's the Director of the FBI, right?  Is

```
 1    that --
 2    A.  Yes.  Yes, I'm sorry, yes.
 3    Q.  There's a deputy director, who is the number two?
 4    A.  Yes.
 5    Q.  There are executive assistant directors, and then there
 6    were all the assistant directors each in charge of a
 7    division, right?
 8    A.  Correct.
 9    Q.  You reported to whom, by the way?
10    A.  It depends which year.  There was a lot of movement.
11    Q.  Did you report to the executive assistant director?
12    A.  Yes.
13    Q.  And the deputy director?
14    A.  Yes.  I'm sorry, I thought you were asking by name.
15    Q.  No, that's all right.
16            And then below you, just so we've got it,
17    approximately how many people did you supervise?
18    A.  That's classified, but a lot.
19    Q.  A lot of people, okay.
20            And just while we're on personnel, before I go on,
21    do you remember someone named Joseph Pientka?
22    A.  Yes.
23    Q.  Okay.  Can you tell us who he is?
24    A.  I actually don't know his role today.
25            At the time, if I recall correctly, he was an
```

1    agent in the FBI's Washington Field Office.

2    Q.  And did he have any association with Crossfire

3    Hurricane?

4    A.  I believe he did.

5    Q.  And how about Peter Strzok?

6    A.  Yes.

7    Q.  Who is that?

8    A.  Peter -- I only hesitate on this because of the years.

9    At some point Peter was one of my deputies, what they call a

10   deputy assistant director.

11   Q.  Got it.

12   A.  I don't remember the exact dates Peter was in the role.

13   Q.  Okay.  And how about somebody named Curtis Heide?  Is

14   that a name you know?

15   A.  Yes.

16   Q.  And who is Mr. Heide?

17   A.  If I'm remembering Curtis correctly, he was a special

18   agent out of the FBI's Chicago office, I believe.

19   Q.  Okay.  Back to the notes.

20           There's that dash up there, "said not doing this

21   for any client."

22           Do you see that?  You were asked about that.

23   A.  Yes.

24   Q.  Okay.  Do you remember anything more about why you wrote

25   that down?

1    A.  I do not.

2    Q.  You don't remember anything about the context in which

3    that was said to you?

4    A.  I do not.

5    Q.  Or what those words mean?

6    A.  No.

7    Q.  Do you even have any sense of when that was written

8    relative to the rest of these notes?

9    A.  No.

10   Q.  No idea if that was written two minutes into the

11   conversation or later?

12   A.  I do not know.

13   Q.  Okay.  You never typed these notes up into a formal

14   report of any kind, did you?

15   A.  No, not that I recall.

16   Q.  Okay.  And do you remember who you shared the

17   information with?

18   A.  I don't.

19   Q.  Okay.  You were asked some questions about the

20   importance of, you know, sources and the information they

21   get.  Let me just ask you a few questions before we go on in

22   the Alfa-Bank story.

23            One question is, when information comes into the

24   FBI from one of the human people that we were talking about

25   before, the FBI has the power to reach out to that person

1   and ask them follow-up questions, right?

2   A.  Yes.

3   Q.  Right.  And that's what's often called a clarifying

4   interview, correct?

5   A.  Yes.

6   Q.  And the FBI regularly engages in clarifying interviews

7   to ask clarifying questions:  What did you mean by this?

8   What did you mean by that?  Correct?

9   A.  Yes.

10  Q.  Okay.  You didn't do that in this case.  You didn't

11  interview Mr. Sussmann, for example?

12  A.  No.

13  Q.  Do you have any idea whether anyone else did?

14  A.  No idea.

15  Q.  Okay.  And if -- you know, you were testifying before

16  that there might be information you'd like to know, for

17  example, motivations about who's providing information, the

18  easiest way to clear that up is by asking, right?

19  A.  Yes.

20  Q.  One other question just briefly.  You were asked a

21  couple of questions about confidential human sources, and

22  you talked about the track record of confidential human

23  sources being something that's relevant.

24          There were rules for when the FBI can open

25  different kinds of investigations, right?  One of them is a

1    full investigation, right?  You can do it -- you know, use

2    all your powers.  Then there's something called a

3    preliminary investigation; is that right?

4    A.  Yes.

5    Q.  And the things that you can do in a full investigation

6    but not a preliminary are things like getting a wiretap on

7    someone, right?

8    A.  Yes.

9    Q.  Or getting a search warrant?

10   A.  Yes.

11   Q.  Or going to the Special Foreign Intelligence

12   Surveillance Court for warrants, right?

13   A.  Right.

14   Q.  For preliminary investigations, though, if you're going

15   to open an investigation, the rules that apply to

16   investigations say you can open a preliminary investigation

17   where you've got a confidential human source with no

18   established record whatsoever if the allegation is related

19   to national security.  Do you remember that?

20   A.  I remember something to that effect, yes.

21   Q.  Okay.  So getting back to Alfa-Bank, after this

22   conversation, you know, whenever it was, do you remember

23   talking to senior leaders at the FBI about whether or not to

24   look into these allegations?

25   A.  I do not.

1    Q.  And do you remember talking to senior leaders at the FBI

2    about whether to reach out to any media outlets to ask them

3    to hold on a story?

4    A.  I do not.

5    Q.  I want to just show you briefly Government Exhibit 285,

6    which I think has been admitted into evidence.  Mr. Keilty

7    will tell me if that's wrong.

8            MR. KEILTY:  Yes.

9            MR. BOSWORTH:  Okay.  And if we could just blow

10   this up.

11   Q.  So this is an email from James Baker -- at the top at

12   least is from you to James Baker responding to an email from

13   James Baker to you and a bunch of other senior leaders at

14   the FBI, including Director Comey?

15   A.  Okay.

16   Q.  Do you see that?

17           Can I just ask you to read this really briefly

18   just so that you can --

19   A.  Sure.  I'm sorry, even the "From" and "Sent"?

20   Q.  Oh, no, read it to yourself.

21   A.  Oh, to myself.

22   Q.  And then I'll ask you just a couple of quick questions.

23   A.  (Witness reviews document) Okay.

24   Q.  Do you remember this email or the discussions this

25   relates to?

1    A.   No.

2    Q.   And do you see where it says, for example, on

3    Mr. Baker's email, "The reporter on the matter we discussed

4    is Eric Lichtblau from *The New York Times*"?   You don't

5    remember actually discussing that with Mr. Baker or anyone

6    else?

7    A.   I do not.

8    Q.   And by the way, Mr. Baker is...?

9    A.   At this time he was the FBI's general counsel.

10   Q.   Top lawyer?

11   A.   Yes.

12   Q.   Okay.   And do you see where it says "Mr. Lichtblau is

13   shooting for Sunday"?

14   A.   Yes.

15   Q.   You don't remember that?

16   A.   No.

17   Q.   Okay.   Do you remember any conversations that you had

18   with Mr. Baker in or around this time concerning the Alfa-

19   Bank story?

20   A.   No.

21   Q.   Okay.   You don't know -- for example, whoever gave you

22   the notes that you took, you didn't follow up with them,

23   find out about more information they may have gathered about

24   Alfa-Bank?

25   A.   I would have eventually -- I don't recall at the time

1    what I did, who gave me the information, what I did with it.

2    Q.  Okay.

3    A.  But I'm assuming I gave it to somebody to look into.  At

4    some point I would ask what's going on with, in effect, that

5    matter so that I'm apprised of the situation.

6    Q.  Sure.

7    A.  And that would have told me whether I needed to do

8    anything further.

9    Q.  Sure.  But to the extent that Mr. Baker's talking about

10   discussions that he had with you, you don't remember any

11   discussions with Mr. Baker that week about Alfa-Bank,

12   correct?

13   A.  I do not.

14   Q.  As a general matter, if the FBI knew that a newspaper

15   story was coming out about a threat from a nation state, are

16   there ever occasions in which you would, at the FBI, want to

17   ask a newspaper to hold off on running that story?

18   A.  Yes.

19   Q.  Okay.  And that's because there are situations in which

20   the FBI would want to have the chance to investigate before

21   a story came out, right?

22   A.  Yes.

23          If the FBI thought, let's just say, that publicly

24   revealing a certain matter could potentially negatively

25   impact not just things the FBI was doing but potentially

1   negatively impact the country, we'd want to have a

2   conversation about it.

3   Q.  Okay.  Because when something goes public, bad guys

4   change their behavior --

5   A.  Correct.

6   Q.  -- right?

7          And you, as the institution that's trying to

8   protect us, want to get the chance to gather information

9   about a potential threat, correct?

10  A.  Yes.

11  Q.  And you want a chance to gather evidence of potential

12  crimes that relate to these threats?

13  A.  Yes.

14  Q.  You were asked before about whether or not the FBI

15  opened a formal investigation into Alfa-Bank.

16         I just want to show you Defense Exhibit 525, which

17  I think is in evidence.

18         MR. BOSWORTH:  And if we can just blow up the top

19  there that says "Opening EC."

20  Q.  Mr. Priestap, what is an "Opening EC," if you can tell

21  us?

22  A.  It's a document -- well, that documents the opening of a

23  case.

24  Q.  Okay.  And here this is an "Opening EC" that relates to

25  Alfa-Bank dated September 23, 2016, right?

```
1    A.  Yes.
2    Q.  And on that list of people copied, at the bottom there
3    is Peter Strzok, who you said is one of the deputy assistant
4    directors who worked for you at least at some point in time?
5    A.  Correct.
6    Q.  And up top, there's Jonathan Moffa.  Is he another
7    senior leader in the counterintelligence division?
8    A.  He was.
9    Q.  And some other folks, too.
10          Do you remember whether you were involved in the
11   decision to open the investigation?
12   A.  I don't remember.
13   Q.  And you're not denying that you were; you just don't
14   remember sitting here today?
15   A.  Exactly.  No, I'm not denying.
16   Q.  Okay.  I want to show you Defense Exhibit 515 for
17   identification.
18          MR. BOSWORTH:  I think that's a government
19   exhibit.  And if I can ask, just for you, if Mr. Cleaves can
20   blow up the fifth through, let's say, tenth lines.
21   Q.  These are various Link messages.  Are you familiar with
22   Link, Mr. Priestap?
23   A.  Yes.
24   Q.  And what's Link?
25   A.  If I recall, it was the -- it's an internal FBI
```

1   communication, medium.

2   Q.  So like instant messaging for FBI agents?

3   A.  Yes.

4           MR. BOSWORTH:  We'd move to admit Defense Exhibit

5   515.

6           MR. KEILTY:  No objection.

7           THE COURT:  So moved.

8   Q.  Okay.  So this Link is a chain between Joseph Pientka,

9   who you mentioned a moment ago is that Washington field

10  agent, and Curtis Heide, the Chicago agent you mentioned.

11  And this says, "People on the 7th floor to include Director

12  are fired up about this server."

13          Now, sitting here do you remember -- well,

14  presumably you've not seen this before?

15  A.  I -- no.

16  Q.  Do you remember the Director of the FBI being fired up

17  about the Alfa-Bank server?

18  A.  I don't.

19  Q.  And Mr. Pientka says to Mr. Heide, "Did you guys open a

20  case?  Reach out and put tools on?"

21          What does it mean to put tools on something, if

22  you know?

23  A.  I guess I want to be careful because, when I think of

24  it, I think of it as classified.  But let's just --

25  Q.  Okay.  Broadly speaking, something that the FBI can do

1    to investigate?

2    A.  Yes.

3    Q.  Okay.  And then he says, Mr. Pientka does, "If not I

4    will call Dan as Priestap says it's not an option - we must

5    do it."

6              Do you remember communicating to anybody that

7    opening an investigation was a must do?

8    A.  No.

9    Q.  You're not denying that; you're just saying you don't

10   remember?

11   A.  I don't recall that, no.

12   Q.  Okay.  And when there's that reference to the "7th

13   floor," what's the 7th floor?

14   A.  It's where the director and deputy directors sit.

15   Q.  Now, then, I'd like to just turn your attention to

16   Defense Exhibit 707, also this same week in September of

17   2016.  And this is just a calendar entry.

18              MR. BOSWORTH:  We'd move to admit it.

19              MR. KEILTY:  No objection.

20              THE COURT:  So moved.

21   Q.  And so the calendar entry here is for September 23rd,

22   and it says it's for a meeting with Kortan and Priestap.

23              Do you remember who Kortan is?

24   A.  Sure.

25   Q.  Who is that?

1    A.  Mike Kortan.  At the time I think he was the assistant

2    director of the FBI's public affairs office.

3    Q.  And there's a meeting for you and the public affairs

4    officer.  Do you remember anything about what happened that

5    day?

6    A.  No.

7    Q.  I'll show you another calendar entry, Defense Exhibit

8    707 at Page 41.

9              MR. BOSWORTH:  We'd move this one as well.

10             MR. KEILTY:  No objection.

11             THE COURT:  So moved.

12   Q.  So this is a calendar entry for a meeting on September

13   26th, and it says it's a meeting with Lichtblau, Kortan, and

14   Priestap.

15             Do you know who Lichtblau is?

16   A.  From that previous email you showed me, it looks like

17   he's a *New York Times* reporter.

18   Q.  Okay.  But sitting here today you don't --

19   A.  No.

20   Q.  -- have any view one way or the other?

21             Do you remember anything about that meeting?

22   A.  No.

23             MR. BOSWORTH:  Okay.  We can take that down.

24   Q.  You were also asked on direct examination about a

25   meeting that occurred at the Department of Justice on

1    March 6, 2017.

2    A.  Yes.

3    Q.  And you said you didn't remember that meeting?

4    A.  Correct.

5    Q.  Let me show you Defense Exhibit 559, which is in

6    evidence.  This is just an invitation for the meeting, and

7    it's a briefing for the (A)DAG, and it lists a whole bunch

8    of required attendees.  You are among them.

9              Any memory, still sitting here today, whether you

10   went or didn't go to that meeting?

11   A.  No.

12   Q.  When the FBI at senior levels is asked to brief the

13   Department of Justice at senior levels about cases,

14   typically do you do anything to prepare for those meetings?

15   A.  Sure.

16   Q.  What sorts of things do you do when you're asked to come

17   brief senior DOJ leadership about the status of

18   investigations typically?

19   A.  Basically we -- you try to organize the information in

20   the most clear and concise manner as possible.  You'd choose

21   the briefer.  You -- I mean, all those -- you do a variety

22   of prep work so that, in fact, you're not wasting anybody's

23   time when providing this information.

24   Q.  And fair to say you do that prep work so that the

25   information you're communicating to DOJ leadership is

1    communicated effectively, yes?

2    A.  Yes.

3    Q.  And accurately?

4    A.  Yes.

5    Q.  And fairly?

6    A.  Yes.

7            MR. BOSWORTH:  Okay.  We can take that one down.

8    Q.  Just some final questions, Mr. Priestap.

9            Regarding this Alfa-Bank investigation, so you've

10   said, in the, let's say, August/September time period of

11   2016, that the FBI was investigating potential connections

12   between Mr. Trump and Russia, correct?

13   A.  Yes.

14   Q.  Or the Trump Campaign and Russia?

15   A.  Yes.

16   Q.  And that was a matter that there were serious national

17   security concerns about; fair to say?

18   A.  Yes.

19   Q.  And the FBI viewed that as a national security threat

20   that had to be investigated?

21   A.  Yes.

22   Q.  And then you learned about this other allegation

23   involving Alfa-Bank and the Trump organization.  I'd like to

24   direct your attention to Defense Exhibit 563 just for you,

25   focusing on Pages 18 to 22.

 1          And just briefly, you can eyeball it, and then

 2     I'll ask you a couple of questions about it.  These are

 3     pages --

 4          MR. BOSWORTH:  We can go to 19, flip through for

 5     Mr. Priestap.  And 20.  And 21.  And 22.

 6     Q.  These are pages of an intelligence memo prepared by the

 7     FBI counterintelligence division on September 26, 2016.

 8          MR. BOSWORTH:  I'd like to move that into

 9     evidence.

10          MR. KEILTY:  No objection.

11          THE COURT:  So moved.

12     Q.  So this is a memo -- just looking at Page 1 on Page 18

13     there, up top it says, "Intelligence Memo, FBI

14     Counterintelligence Division, Special Project, September 26,

15     2016."  And the title is "Server in Russia registered to

16     Alfa-Bank communicating with Trump Organization server."

17          Do you see that?

18     A.  Yes.

19     Q.  Okay.  And these sorts of intelligence memos are

20     regularly prepared by the counterintelligence division on

21     various issues, correct?

22     A.  Yes.

23     Q.  Okay.  And I want to direct your attention to Page 20.

24     The subheading there we'll blow up for you.

25          If you could just read that?

1    A.  "FBI Reporting on Alfa-Bank and Its Connection to

2    Russian Government Officials and Russian Intelligence

3    Services (RIS)."

4    Q.  And if you could just read what else is there?

5    A.  I'm sorry, am I reading out loud or to myself?

6    Q.  No, you can read out loud.  You read very well.

7    A.  So "Alfa Group Consortium, also known as Alfa Group, is

8    one of Russia's largest privately-owned investment groups.

9    Open source reporting on Alfa-Bank, owned by Alfa Group,

10   identifies Mikhail Fridman, German Khan, Petr Aven, and

11   Alexei," it looks likes "Kuzmichov," "as its key executives.

12          "From 2008 to '15, FBI reporting described ties

13   between Alfa-Bank and/or key executives and the Russian

14   intelligence services (RIS.)"

15   Q.  Okay.  So let me stop you there.

16          There's a reference to open source reporting.

17   What's that generally?

18   A.  Basically it's reporting that's -- it's like media

19   reporting.  It's available to the general public.

20   Q.  Okay.  And there's a reference to "FBI reporting."  Is

21   that a term that's used to describe the FBI's collection of

22   information?

23   A.  Yes, exactly.

24          MR. BOSWORTH:  Let's go to the next page.  And if

25   we can just blow up the bottom two paragraphs.

1    Q.  So here -- all right.  So you had said Mikhail Fridman

2    is one of the key executives, and Petr Aven is one of the

3    key executives.

4              In this intelligence memo, your division says that

5    an FBI contact reported that Fridman received financial

6    support from the government of Russia.  Do you see that?

7    A.  I do.

8    Q.  And then your intelligence memo also says Petr Aven, the

9    president of Alfa-Bank for a time, maintains a close

10   relationship with Vladimir Putin.  Do you see that?

11   A.  I do.

12   Q.  And Putin, we know, is the leader of Russia, correct?

13   A.  Yes.

14   Q.  And, in fact, if you look at the next sentence, it says,

15   "According to an FBI report, the two men - Aven and Putin -

16   were business partners in the early 1990s, and as of late

17   1998 Putin was on Alfa-Bank's payroll."

18             Do you see that?

19   A.  I do.

20   Q.  So at the time --

21             MR. BOSWORTH:  You can take that down.

22   Q.  At the time that this allegation came in and the

23   counterintelligence division investigated it, you were

24   investigating potential connections between the Trump

25   Campaign and Russia because of the national security threat

1    it posed, right?

2    A.  Yes.

3    Q.  And you've got allegations about another connection

4    between the Trump organization and a Russian bank that had

5    the leader of Russia on the payroll, correct?

6    A.  According to this memo, yes.

7    Q.  Okay.  And that's something that the FBI is going to

8    investigate then, correct?

9    A.  Yes.

10   Q.  Because it's your job to figure out if this information

11   is true or false?

12   A.  Yes.

13   Q.  And you talked about looking at a variety of factors to

14   figure out if you're going to investigate something, but

15   given this kind of threat, given what's at stake, and given

16   what else you know about the relationship between -- or

17   potential relationship between Mr. Trump and Russia, this

18   allegation of Alfa-Bank's connection to Russia -- to the

19   Trump organization is something that you are going to

20   investigate as the FBI?

21   A.  Are you saying like does it meet our threshold?

22   Q.  Well, that is a topic that you will regard as a serious

23   national security threat?

24   A.  Yes.

25   Q.  And the only way to figure out whether the allegations

1    are true or false is by investigating, correct?

2    A.  Yes.

3              MR. BOSWORTH:  Thank you.

4              MR. KEILTY:  Just one question, Your Honor.

5                         REDIRECT EXAMINATION

6    BY MR. KEILTY:

7    Q.  Agent Priestap, you testified on direct that you had an

8    understanding that the FBI did, in fact, open an

9    investigation into the Alfa-Bank allegations?

10   A.  Yes, according to the electronic communication.  That

11   looks like an opening -- that looks like a document that

12   signifies the opening of a case on this.

13   Q.  And what is your understanding of what the result of

14   that investigation was?

15   A.  Again, I only have a vague recollection, but if I recall

16   correctly, not much came of it, meaning it -- I guess I'd

17   call it fizzled out.

18   Q.  Thank you.

19             MR. KEILTY:  No further questions.

20             THE COURT:  Okay.  Mr. Priestap, thank you very

21   much for your testimony.  You're excused.

22             Please don't discuss your testimony with anyone

23   except your counsel until the case is over, all right?

24             THE WITNESS:  Thank you.

25             THE COURT:  Have a good day.

```
 1              Call your next witness.
 2              MR. DeFILIPPIS:  Your Honor, the government calls
 3   Ryan Gaynor.
 4              THE COURT:  Mr. DeFilippis, we may break in 15.
 5              MR. DeFILIPPIS:  Sure.
 6              THE COURT:  So when you get to a stopping point.
 7              MR. DeFILIPPIS:  Okay.
 8              THE COURT:  Good morning, sir.  Step right up.
 9              All right.  Please remain standing, take your mask
10   off, and raise your right hand for the courtroom deputy.
11              (Witness sworn)
12              THE COURT:  Okay.  Please have a seat.
13                  SPECIAL AGENT RYAN GAYNOR, Sworn
14                       DIRECT EXAMINATION
15   BY MR. DeFILIPPIS:
16   Q.  Good morning, Special Agent Gaynor.  How are you?
17   A.  Good morning.
18   Q.  If you could just state and spell your name for the
19   court reporter.
20   A.  Ryan Gaynor, R-Y-A-N, G-A-Y-N-O-R.
21   Q.  And Agent Gaynor, where do you currently work?
22   A.  I currently work at the FBI's Norfolk Field Office.
23   Q.  What's your position there?
24   A.  I'm an Assistant Special Agent in Charge of national
25   security.
```

1    Q.  What does an Assistant Special Agent in Charge do?

2    A.  So in an FBI field office, there's a Special Agent in

3    Charge who is responsible for the entirety of the field

4    office, and then a Special Agent in Charge has assistant

5    special agents in charge.  Some cover criminal, some cover

6    national security.  In this case I cover all national

7    security programs.

8    Q.  Broadly speaking, Agent Gaynor, what sorts of work have

9    you done during your time at the FBI?

10   A.  During my time in the FBI my entire career has been in

11   the national security field, working terrorism and

12   counterintelligence and human.

13   Q.  And has that mostly been in the Washington, D.C., area,

14   or have you been elsewhere?

15   A.  I have been elsewhere.  I started my career in St. Louis

16   before coming to D.C.

17   Q.  What were you doing back in the 2016 time period, say

18   the summer of 2016?

19   A.  During the summer of 2016, I was currently assigned as a

20   unit chief within the counterintelligence division working

21   infrastructure protection.

22   Q.  And where was that?  Was that in Washington?

23   A.  That was in Washington, D.C., at our headquarters.

24   Q.  Now, did there come a time in 2016 when you learned of a

25   set of allegations about the Trump organization and a

```
 1    Russian bank called Alfa-Bank?

 2    A.  Yes.

 3    Q.  When was that?

 4    A.  So I learned of the allegation related to Alfa-Bank

 5    sometime around September 23rd, which was a Friday, of 2016.

 6    Q.  Now, how did you first learn about that allegation?

 7    A.  So I was attending a briefing where I heard the

 8    allegation described.

 9    Q.  Who was giving that briefing?

10    A.  I believe that the Chicago Field Office was on a

11    videoconference call with our headquarters, and Chicago was

12    giving the briefing.

13    Q.  You said you think that was on September 23rd, which was

14    a Friday?

15    A.  Yes.

16    Q.  And what, if anything, did you do in response to hearing

17    that briefing?

18    A.  So upon hearing the briefing, I offered to Supervisory

19    Special Agent Joe Pientka that I would be willing to

20    continue to track that for our front office.

21    Q.  You said continue to track it for your front office.

22    What do you mean by that?

23    A.  By "front office," I'm referring to the senior

24    leadership within counterintelligence division.

25              By "track it," I mean that they had already
```

1    initiated an investigation, and it seemed like it was

2    going to be relatively straightforward, so I offered to help

3    Mr. Pientka by -- and continuing to brief that to the front.

4    Q.  Who was Mr. Pientka?  You said Joseph Pientka?

5    A.  So Joseph Pientka was a Supervisory Special Agent that

6    was at headquarters at that time.

7    Q.  So would it be fair to say you volunteered to work on

8    the case?

9    A.  I did volunteer.

10   Q.  And what happened from there?  Did you speak to the

11   agent or agents in Chicago who were already working the

12   case?

13   A.  I did.

14   Q.  Was that the same day or another day?

15   A.  I believe that was the same day.

16   Q.  And what was the nature of those discussions?

17   A.  So during those discussions I learned further details

18   about the allegation and the material that the investigative

19   team had already collected.

20   Q.  And did you talk to Mr. Pientka that day, or just the

21   interaction at the meeting?

22   A.  So I had talked to Mr. Pientka that morning and, I

23   believe, IM'd him later that day.  And then after that, I

24   don't believe I had any further communication with him.  I

25   was talking with the investigative team.

1  Q.  Do you recall the name of the Chicago agent or agents

2  who you spoke to at the beginning?

3  A.  Yes.  So Special Agent Curtis Heide and Special Agent

4  Allison Sands.

5  Q.  And other than describing the allegations to you,

6  anything else you recall Mr. Heide saying or describing to

7  you or asking you?

8  A.  So other than describing the allegation, Mr. Heide and I

9  also believe Ms. Sands sent me documents related to the

10  case.

11  Q.  Now, that was a Friday, right?

12  A.  Yes.

13  Q.  So when was the next time -- and let me ask you this,

14  Agent Gaynor:  In preparation for your testimony, have you

15  had a chance to look at documents, records, emails?

16  A.  I have.

17  Q.  So did you remember all of this before you looked at

18  those documents and records, or have you refreshed your

19  recollection?

20  A.  I had to refresh my recollection.

21  Q.  So the date -- the exact date, for example, is that

22  something you reminded yourself of from the documents?

23  A.  It was.  It's been four to five years.

24  Q.  Okay.  So you learn about this on a Friday, and then

25  when was the next time you said that you spoke about the

1    case?

2    A.  So the next time that I spoke about the case was on the

3    following Monday.

4    Q.  Now, do you recall any questions that Agent Heide had

5    asked of you given that you were going to handle this case

6    from a headquarters perspective, or not at that time?

7    A.  I recall that Mr. Heide had asked if he could -- if I

8    could find out who or where these allegations had come from.

9    Q.  All right.  So now we're at Monday after September 23rd,

10   so that's September 26th?

11   A.  Correct.

12   Q.  And what happened on that day as far as you recall with

13   relation to your role in the case?

14   A.  So that Monday I went to ask Mr. Pientka if he knew

15   where the information had come from that initiated the case

16   in Chicago, and I ended up speaking with Section Chief

17   Moffa.

18   Q.  So when you asked Mr. Pientka, did he respond in any

19   way, or he just sort of referred you?

20   A.  I don't remember if I even ran into Mr. Pientka.  I

21   believe I ran into Mr. -- or I met with Mr. Moffa first.

22   Q.  As best as you recall, where did that meeting take

23   place?

24   A.  I don't recall the specific room.  I believe it would

25   have been in Section Chief Moffa's office, likely.

1    Q.   At FBI's headquarters?

2    A.   At FBI headquarters.

3    Q.   As best as you recall, anybody else in the meeting?

4    A.   So I don't remember anyone else in the meeting, but that

5    doesn't preclude someone else from having been in the

6    meeting.  I just don't remember them there.

7    Q.   What happened in the meeting with Mr. Moffa?

8    A.   So in meeting with Section Chief Moffa, I informed him

9    of what had gone on on the prior Friday, because he'd been

10   out of work.  And after doing so, I also informed him that I

11   had volunteered to assist with the Alfa-Bank matter by

12   briefing it to the front office.

13   Q.   And did you have some further discussions about the

14   case?

15   A.   Yes.

16   Q.   And what was the nature of those discussions?

17   A.   So what I recall is Mr. Moffa informed me that the

18   allegation had come from Michael Sussmann.

19   Q.   And what, if anything, did he say about who Mr. Sussmann

20   had provided that information to?

21   A.   So my understanding from the meeting with him was that

22   he had provided the information to James Baker, who was the

23   General Counsel for the FBI at the time.

24   Q.   And what, if anything, did he say about Mr. Sussmann,

25   any work he might do, or anything in that regard?

1    A.  So what I wrote on my briefing sheet is that he noted

2    that he was an attorney for the DNC or a DNC attorney.  He

3    may have said more during that meeting; I just don't

4    remember what that is at this time.

5    Q.  And when he said that Mr. Sussmann was attorney for the

6    DNC, what did you -- what impression did you come away with?

7    What did you understand that to mean?

8    A.  I understood that to mean that he had been affiliated

9    with the Democratic party, but that he had come representing

10   himself.

11   Q.  Okay.  And what if -- recognizing it's a long time, any

12   specifics that contributed to that understanding, or do you

13   not recall sitting here today?

14   A.  Sitting here today five years later, I don't recall

15   specifically other information that came out, but I do

16   recall leaving that meeting with the impression that he'd

17   been associated with the Democratic party.  He was a DNC

18   attorney, but that that wasn't the reason for him bringing

19   the material forward, the allegation.

20   Q.  And what, if anything, did Mr. Moffa tell you about

21   whether you could share the fact of Mr. Sussmann's

22   involvement with others?  Did he say anything on that?

23   A.  He did.

24   Q.  And what was that?

25   A.  He informed me that our senior leadership had put what's

1    called a close hold on the material, which meant that the

2    specific information about who had provided the allegation

3    could not be provided to the field.

4    Q.  And when you say "senior leadership," was it any more

5    specific than that, or just "senior leadership"?

6    A.  At this point in time I just remember it being senior

7    leadership, which I took to mean the most senior leadership

8    in the Bureau since the information had come in through

9    Mr. Baker.

10   Q.  And what, if anything, were you asked to do in relation

11   to the case, and specifically that so-called close hold?

12   What were your tasks?

13   A.  I was asked to determine, based on the information that

14   I had and what I learned from the investigative team, if

15   that close hold was helping or hindering the investigation.

16   Q.  If the close hold itself was helping or hindering the

17   Chicago investigation of the matter?

18   A.  Correct.

19   Q.  And so what, if anything -- so does that take us to the

20   end of the meeting with Mr. Moffa?  Anything else you recall

21   about that meeting?

22   A.  That takes us to the end of what I recall from that

23   meeting.

24   Q.  And generally speaking, what was your role on this case

25   to be, if you were at headquarters and the case was being

1    investigated out of FBI Chicago?

2    A.  So the case had a program management team in place.  My

3    role was, as I viewed it, liaison in that I would be able to

4    provide understanding of brief and kind of common terms --

5    language they would understand -- to our leadership what the

6    technical aspects of this investigation meant.

7    Q.  And let me ask you this:  Did you have significant cyber

8    experience?  Were you someone who dealt with cyber jargon a

9    lot?

10   A.  So while I didn't have significant cyber experience, I

11   was in the FBI's technically trained agent program, and I

12   did maintain enterprise grade equipment in our field

13   offices.  So I have an understanding of the technology, and

14   I had spent the last few years working on infrastructure

15   matters related to this type of threat.

16   Q.  What was the status of the FBI's investigative efforts

17   at the time you met with Mr. Moffa?  In other words, what

18   had FBI Chicago done?

19   A.  So at that point the FBI had initiated an investigation

20   through the Chicago Field Office.  The initial allegation

21   had been reviewed by our ECOL, which is the European Cyber

22   Operations Unit, and they had produced an analysis of our

23   findings related to the allegation.

24          And the field office had also reached out to the

25   first company, Central Dynamics, to initiate an effort to

 1    gather logs, additional logs.  I believe they had also

 2    potentially collected initial logs related to a spam filter

 3    system in place by Barracuda for the company.

 4    Q.  Okay.  So when you say the company at issue, did you say

 5    Central Dynamics?

 6    A.  Yes.

 7    Q.  What, if any, understanding did you have about their

 8    role in these allegations?

 9    A.  So my understanding was, and is, that Central Dynamics

10    was a marketing firm, and that the email address or email

11    domain, server domain, if you will, that's associated with

12    this case was one that they had potentially used.

13    Q.  And so was the idea to get technical data that might

14    help the FBI find an answer to the allegation?

15    A.  Yes.  So if the allegation was a covert communication

16    system, we could look for the covert communication that we

17    would be able to see via the logs that the U.S. companies

18    had in their possession.

19    Q.  So is it your testimony that, after your meeting with

20    Mr. Moffa, essentially the field was waiting to gather or to

21    receive further information from the company?

22    A.  Correct.

23           My initial assessment, which I made on that prior

24    Friday in a write-up, was that we were essentially waiting

25    for the logs from Central Dynamics to make an assessment of

1    whether or not there was a covert communication system.

2    Essentially if the firms aren't talking to each other or the

3    emails aren't talking to each other, there isn't one.

4    Q.  Now, you said you were tasked to figure out whether the

5    so-called close hold was helping or hindering FBI Chicago's

6    investigation.  Did you come to an initial view on that?

7    A.  I did.

8    Q.  And what was that view, and what was the reason you came

9    to that view?

10   A.  I came to the conclusion that if the object was whether

11   or not we were hindering the investigation with that close

12   hold, that since we were waiting on logs to determine

13   whether or not an actual threat allegation -- or rather a

14   threat existed, that it wasn't hindering that investigation

15   or at least I couldn't argue that there was a compelling

16   reason why they needed to pull the hold at that time.

17   Q.  So did you communicate that back to Mr. Moffa?

18   A.  I believe I did.

19   Q.  Now, Mr. Gaynor, what else -- at this time, what, if

20   anything else, did the FBI do or begin to do to investigate

21   these allegations, as best as you recall?

22   A.  So there were several efforts underway.  As we've

23   already mentioned, the Chicago Field Office is waiting for

24   the Central Dynamics' logs.  We had received the analysis

25   from our ECOL unit.

1    We had done an initial review of the Barracuda

2    firewall spam filter and determined that that spam filter

3    made it pretty clear, even though they weren't complete

4    logs, that while there had been 15 communications, 14 of

5    them inbound had been blocked.  One outbound communication

6    had been attempted but blocked.  And as a result, the

7    Barracuda logs seemed to indicate that there wasn't a covert

8    system, although incomplete.

9    Additionally, the special agent in Chicago,

10   Allison Sands, conducted a review of the data herself and

11   made determinations related to the allegation that the TOR

12   node that was mentioned within the allegation did not pass

13   analytical muster.  It didn't have merit.

14   Later she would make other analysis, including

15   that the Central Dynamics logs themselves did not show a

16   covert communication system.

17   We also initiated a liaison contact with Mandiant,

18   and through that liaison contact we determined that they had

19   independently come to the conclusion that the allegation

20   lacked merit as well.

21   Q.  Okay.  So let's break that down and then come back to

22   some of it.

23   But when you talk about a Barracuda filter, what

24   is that?

25   A.  Yes.  So essentially, even though Central Dynamics is

1   themselves a marketing firm that sends out email campaigns,

2   similar to spam, they also suffer from being spammed

3   themselves and so --

4            THE COURT:  Agent Gaynor, if you could slow down

5   just a little bit for the benefit of the court reporter.

6            THE WITNESS:  I apologize, Your Honor.

7   A.  So Barracuda is a company, in this case, that was used

8   to try and prevent Central Dynamics and their service

9   provider from being spammed themselves, even though they

10  sent out spam.  So essentially the Barracuda firewall would

11  prevent them from being the victims of spam attacks.

12  Q.  And how, if at all, is that firewall or its data

13  relevant to the FBI's investigation?

14  A.  Because data that would have had to traverse this covert

15  communication would have necessarily had to traverse that

16  firewall as well.

17  Q.  Okay.  So it's a data source for the FBI to look at?

18  A.  It was.

19           MR. DeFILIPPIS:  Your Honor, this may be a good

20  time for the break.

21           THE COURT:  All right.  Ladies and gentlemen,

22  we're going to take our morning break.  Let's reconvene at

23  11:00 a.m.

24           No discussions about the case.  No research about

25  the case.

1           (Jury exits courtroom)

2           (Recess taken)

3           THE COURT:  All right.  Please be seated,

4    everyone.

5           MR. DeFILIPPIS:  Thank you, Your Honor.

6    BY MR. DeFILIPPIS:

7    Q.  Special Agent Gaynor, just going back to a couple of

8    things that you testified about before.  You mentioned this

9    close hold that FBI leadership had imposed on Mr. Sussmann

10   as being the one who provided the information.  Do you

11   recall that?

12   A.  I do.

13   Q.  What, if any, reason did you receive for that close

14   hold?

15   A.  If I was given a reason at the time, I do not remember

16   what it was.

17   Q.  And do you recall having several meetings with the

18   Special Counsel's Office over the course of their looking

19   into these matters, our looking into these matters?

20   A.  I do.

21   Q.  And when you first met with the government on these

22   matters, was the close hold something you recalled and told

23   the government about it?

24   A.  It was not.

25   Q.  And what was the reason for that?

1    A.  I did not recall that there was a close hold in place at

2    the time, when we had our first meeting.

3    Q.  And after that meeting, did you have a chance to go back

4    and do what it is you said you did to get ready for today,

5    which is review records and documents, emails and the like?

6    A.  I did.

7    Q.  To what extent did doing that refresh your recollection

8    or jog your memory about this close hold issue?

9    A.  Yes.  As it had been several years from the actual

10   event, between the time between when we met and when these

11   events had occurred, looking at the material helped me to

12   reconstruct and remember and refresh my recollection on the

13   chain of events, and specifically a to-do list allowed me to

14   recall the close hold itself.

15   Q.  Okay.  So a to-do list that you prepared?

16   A.  Correct.

17   Q.  Now, let me ask you, you mentioned that when you

18   finished your meeting with Mr. Moffa on September 26th of

19   2016, you had the impression that Mr. Sussmann represented

20   the DNC in other matters but that on this occasion he wasn't

21   there for the DNC.  Is that a fair summary of what you said?

22   A.  Yes.

23   Q.  Now, has your recollection on that issue been refreshed

24   or jogged over time?

25   A.  Yes.

1    Q.  So when you first met with the government, was that as

2    clear in your mind?

3    A.  No.

4    Q.  And which aspects of your preparation was it that jogged

5    that aspect of your memory?  Was it the document review you

6    did when you first started meeting with the government, or

7    was it your preparation for trial?

8    A.  It was document review in preparation for meeting with

9    the government, specifically the to-do list and specifically

10   the help or hinder issue that reminded me and helped me

11   remember what had occurred.

12   Q.  Okay.  But I mean specifically, when you testified that

13   Mr. -- your impression was that Mr. Sussmann had not come

14   into the FBI for the DNC on the Alfa-Bank matter, was that

15   something that became clear in your mind more recently or

16   closer to when you first met with the government?

17   A.  It was after I first met with the government that I

18   remembered meeting with Mr. Moffa, and as a result of

19   remembering the meeting with Mr. Moffa and going through and

20   seeing the to-do list on the help or hinder, I recalled that

21   that was what I took away from my discussion with him.

22   Q.  Okay.  But were there meetings with the government where

23   you described Mr. Sussmann just as a DNC attorney or

24   bringing in information from the DNC attorney?

25   A.  Yes.

1   Q.  Okay.  And did you study pretty hard for your testimony,
2   look at a lot of documents?
3   A.  Yes.
4   Q.  Okay.  So I think we were talking about a Barracuda
5   server right before the break.  Do you recall that?
6   A.  I do.
7   Q.  So did there come a point in time when these logs that
8   you've talked about from Central Dynamics actually came into
9   the FBI?
10  A.  Yes.
11  Q.  Let me show you what's been premarked as Government's
12  Exhibit 265.
13          And first, just briefly, Mr. Gaynor, does this
14  look like it's an email chain which at the top has an email
15  from you to others on October 4th of 2016?
16  A.  Yes.
17  Q.  And it's a chain to -- who's at the top there in the
18  "To" line?
19  A.  So in the "To" line is Supervisory Special Agent Daniel
20  Wierzbicki, Special Agent Curtis Heide, Special Agent
21  Allison Sands.
22          MR. DeFILIPPIS:  Okay.  Your Honor, the government
23  offers Government Exhibit 265.
24          MR. BOSWORTH:  No objection.
25          THE COURT:  So moved.

1          MR. DeFILIPPIS:  All right.  And if we can go down

2    to the second page, the top email on that page.

3    Q.  Now, Mr. Gaynor, we'll see in a second that this email

4    comes from Curtis Heide and goes to you and others.  Just

5    remind us, who was Curtis Heide?

6    A.  So Curtis Heide was one of the special agents in the

7    Chicago Field Office that was assigned to investigate the

8    Alfa-Bank matter, along with Special Agent Allison Sands.

9    Q.  All right.  And Mr. Heide says --

10         MR. DeFILIPPIS:  And, Ms. Arsenault, can we bring

11   up the header for that email, which is on the prior page.

12   Sorry, the very bottom of the first page.

13   Q.  All right.  So, Mr. Gaynor, sorry for the spanning two

14   pages.

15         This is from Mr. Heide on October 3rd of 2016.  Do

16   you see that there?

17   A.  I do.

18   Q.  So that's a week or two after you first got on the case;

19   is that right?

20   A.  Yes.

21         MR. DeFILIPPIS:  All right.  Then let's go to the

22   body of that email again.

23   Q.  Could you just read the body of that email?

24   A.  "Yeah we got the logs from MM" -- and MM is the

25   abbreviation for FBI's Miami Field Office -- "so we'll look

1    through those for these IPs.

2              "We really want to interview, the 'source' of all

3    this information.  Any way we can track down who this guy is

4    and how we're getting this information?

5              "Curtis."

6    Q.  Focusing first on the sentence, the first sentence

7    there, "we got the logs from MM," or Miami, "so we'll look

8    through those for these IPs," what did "the logs from Miami"

9    refer to?

10   A.  "The logs from Miami" referred to the logs we had been

11   seeking from Central Dynamics since when I first started

12   monitoring this case.

13   Q.  And was that the spam marketing company that you

14   mentioned?

15   A.  That is the spam marketing company.

16   Q.  And then when you say "looked through those for these

17   IPs," did you have an understanding of what "these IPs"

18   meant?

19   A.  I did.

20   Q.  And what was that?

21   A.  There were -- and we might have to go through the email

22   chain, but throughout this matter there were several IP

23   addresses of interest that came up.  Three of them, I

24   believe, were associated with Alfa-Bank.

25              And I would have to refresh my recollection by

1    looking at the chain, but there was one other IP address as

2    well that we were looking for.  I think there was a total of

3    four.

4    Q.  Got it.

5           Now, moving to the second sentence of Mr. Heide's

6    email, it says, "We really want to interview the 'source' of

7    all this information.  Any way we can track down who this

8    guy is and how we're getting this information?"

9           Why did you understand, if you understood, the

10   reason Curtis was asking that?

11   A.  Curtis had asked, I believe, on the Friday, when I

12   joined looking at this investigation, who -- if we could

13   determine who the person was that had provided the

14   allegation to the Bureau, and he was still asking.

15   Q.  And is it fair to say that because of the close hold

16   that you testified about earlier, you weren't in a position

17   to tell him that?

18   A.  Yes.  I was waiting for the results of the logs.

19   Q.  All right.  And it looks -- so it looks like on the same

20   day the logs came in Curtis sort of re-raised the question.

21   Is that fair?

22   A.  Yes.

23   Q.  So let's go to the next email in that chain, which is

24   from someone named Daniel Wierzbicki.  And I think you

25   testified, who is Daniel Wierzbicki?

1   A.  So Daniel Wierzbicki was a supervisory special agent.

2   He was the supervisor of the Chicago squad.

3   Q.  His email is dated October 3rd at 3:00 p.m., so about 11

4   minutes after Mr. Heide's email.

5           And could you just read to the jury what it is

6   that Mr. Wierzbicki said?

7   A.  Okay.  "I agree with Curtis...an interview with the

8   source of info would be the logical step in this (as well as

9   any) investigation.  It may allow us to understand the what

10  and why of the white paper."

11  Q.  So how did you understand what Mr. Wierzbicki was saying

12  in response to Mr. Heide's email?

13  A.  He was supporting Curtis's request or Curtis Heide's

14  request to try to determine the source of the information.

15  Q.  Finally, Special Agent Gaynor, let's go to the top email

16  in this chain, which is the email from you on October 4th at

17  10:00 a.m.

18          So October 4th, that was the next day; is that

19  right?

20  A.  Correct.

21  Q.  And to the best you recall, any reason you didn't

22  respond on the same day?

23  A.  So I do know that that afternoon I had a meeting with

24  the criminal investigative division to discuss a separate

25  but semirelated matter on the primary reason for my TDY,

1   which was election infrastructure protection.

2   Q.  And when you say "TDY," what does that mean at the FBI?

3   A.  "TDY" is temporary duty.  It's when you're temporarily

4   removed from one role to another to assist in one capacity

5   or another for some other matter you wouldn't normally work

6   on.

7   Q.  And I think you testified to this, at the time the Alfa-

8   Bank case started up, you were on a temporary duty

9   assignment at FBI headquarters working to protect election

10  infrastructure; is that fair?

11  A.  That's correct.

12  Q.  Okay.  What is it that you say in response to

13  Mr. Wierzbicki and Mr. Heide's emails?

14  A.  "Got it and being discussed at HQ.  Before we make any

15  decisions on that front, we will need to know what we can

16  learn from the logs we have now obtained regarding the

17  nature of the actual activity between Alfa-Bank and the

18  domain/server.

19          "CG" -- which is the FBI's abbreviation for the

20  Chicago Field Office -- "and MM" -- and this isn't from the

21  email, but MM is the FBI abbreviation for Miami -- "have

22  done great work on this and it is very much appreciated

23  here.  We continue to highlight the progress on this matter

24  to CD and CyD leadership on a daily basis."

25  Q.  All right.  So starting with the first paragraph of

1    that, when you said "got it and being discussed at HQ," what

2    did you mean?

3    A.  I was referring to the fact -- although I'm saying it's

4    being discussed, it had been discussed, and we were awaiting

5    the log results to determine whether or not it was going to

6    be necessary to pull the close hold.

7    Q.  So when it said "got it," "got it" referred to their

8    request for an interview of the source of the allegation?

9    A.  A determination on where the allegation came from.

10   Q.  And when you said "being discussed at headquarters," you

11   were signaling to them that headquarters was aware that they

12   wanted to interview the source; is that fair?

13   A.  I was signaling both that headquarters was aware, and

14   also that I had information in my own possession.

15   Q.  At that time did you go back to Mr. Moffa to check

16   whether the close hold can be lifted, or not?

17   A.  I don't remember going back to Mr. Moffa to ask that the

18   close hold be lifted based on this, because I was waiting, I

19   believe, for the log review itself to determine if there was

20   a covert communication system.

21   Q.  All right.  So it looks like as of October 3rd/4th the

22   logs have come back.  As best as you recall, and without

23   getting into the, you know, sort of minute detail, what did

24   the logs show, and how did the investigation proceed from

25   there?

1    A.  So Special Agent Sands conducted an analysis of the

2    logs.  I believe the logs came in as early as Monday of that

3    week, and they were being analyzed.

4           Upon her review, she informed me that the logs did

5    not indicate that there was a covert communication system.

6    They didn't support the allegation.

7           In addition, I mentioned earlier at the same time

8    we learned that Mandiant had done an independent assessment

9    and determined that there wasn't sufficient -- there wasn't

10   a reason to believe that the allegation had merit.

11   Q.  All right.  So let's turn to the Mandiant part.  Who is

12   Mandiant?

13   A.  Mandiant is a respected cyber security firm.

14   Q.  And are they U.S. based or based overseas?

15   A.  They're U.S. based.

16   Q.  And in the cyber security field, are they a fairly

17   prominent firm?

18   A.  Yes.

19   Q.  Now, how is it that they had a role in this allegation?

20   A.  Without looking at my notes, I believe that they were

21   actually hired by Alfa-Bank to take a look.

22   Q.  To take a look at whether there was actually a channel?

23   A.  Yes.

24   Q.  And so did the Bureau somehow become aware that

25   Mandiant, a prominent U.S. cyber firm, was looking at the

1    allegation?

2    A.  We did.

3    Q.  And what did the Bureau do, if anything, to figure out

4    what Mandiant's conclusions were?

5    A.  My understanding is that the field office discreetly

6    reached out to an employee of Mandiant to talk about their

7    findings.

8    Q.  And what happened from there?

9    A.  I know that as of October 5th, I believe it was, that

10   based on those discussions we had learned that they had

11   independently determined that the allegations didn't have

12   merit, or that the allegation, rather, didn't have merit.

13   Q.  So Mandiant, you said, is a U.S. firm, but they had been

14   hired by a Russian bank.  Did the FBI have reason to trust

15   Mandiant's conclusion there?  Do you know?

16   A.  I would assess that any for-profit organization can have

17   a potential ulterior motive, but what they found was

18   consistent with what we had found looking at the data, so it

19   just seemed to be corroborating but not definitive.  So it

20   was corroborating of our finding that there was no covert

21   communication system.

22   Q.  Now, you're familiar with the concept, Special Agent

23   Gaynor, of a confidential human source?

24   A.  Yes.

25   Q.  In connection with this investigation, did the FBI

1  receive any confidential human source reporting that was

2  relevant to the allegation?

3  A.  We did.

4  Q.  Could you just describe that briefly to the jury.

5  A.  So the FBI, through our Chicago Field Office, received

6  confidential human source reporting that indicated that the

7  confidential human source believed that the allegation had

8  merit, and that this particular story/allegation had been

9  provided to media outlets.

10  Q.  So the source told the FBI that this allegation had been

11  given to media outlets?

12  A.  They did.

13  Q.  And was this confidential human -- this confidential

14  human source, to your knowledge, was not Mr. Sussmann; is

15  that correct?

16  A.  To the best of my knowledge, it was not Mr. Sussmann.

17  Q.  Okay.  And that confidential human source, when he or

18  she told the FBI that the media had these allegations, what,

19  if anything, do you recall the Chicago squad or the FBI

20  doing vis-a-vis that source?

21  A.  The Chicago Field Office, I think, passed questions that

22  were given to the CHS, and the CHS provided answers related

23  to the various aspects of the allegation.

24         And then they evaluated the Chicago -- Chicago

25  evaluated the CHS's response to those and didn't believe

1   that the CHS was correct.  They thought the CHS was wrong.

2   Q.  And what were the reason or reasons why Chicago

3   concluded that the confidential human source was incorrect?

4   A.  So they actually listed out multiple reasons for that,

5   probably best given through an exhibit that we could refresh

6   my recollection with by bringing up, if you need to.

7   Q.  Okay.  But generally speaking, do you recall why -- what

8   was the thrust of why the FBI didn't believe the conclusions

9   of the source to be accurate?

10  A.  The source made several technical assertions that didn't

11  pass an analytical merit.

12  Q.  Okay.  Are you familiar with the name David Dagon?

13  A.  Yes.

14  Q.  And who is that?

15  A.  During the investigation, David Dagon came up.  He was a

16  professor at Georgia Tech.

17  Q.  And how did he come up in connection with these

18  allegations?

19  A.  The CHS was reporting on David Dagon.

20  Q.  And did he say whether Mr. Dagon had any particular role

21  in the allegations or this subject matter?

22  A.  He did.

23  Q.  What was that?

24  A.  So David Dagon -- the CHS alleged that David Dagon was

25  the potential author of the white paper itself.

1    Q.   Okay.   And I think the jury's heard testimony there may

2    have been several white papers given to the FBI.   Was the

3    idea that he was the author of one or more of them?

4    A.   Yes.

5    Q.   Now, did the FBI go interview Mr. Dagon, as far as you

6    know?

7    A.   As far as I know, no.

8    Q.   And what, if anything, was the reason for that, or

9    reasons?

10   A.   So the FBI -- at least in our headquarters, and the

11   field office concurred -- had determined that the allegation

12   lacked merit; that based upon what we had on hand, that

13   there wasn't a covert communication system.   And the

14   decision was made that doing an overt interview of an

15   individual so close to the election could inadvertently

16   impact the potential election and, as a result, would be a

17   potential violation of policy.

18            Also, it was not the least intrusive technique

19   available to us to make an ascertation regarding Mr. Dagon's

20   knowledge.

21   Q.   All right.   So you said an overt interview and then

22   mentioned the fact that there was an election year.   What

23   did you mean "overt interview"?

24   A.   So an overt interview would be going out publicly to

25   talk to someone in their everyday capacity.

1   Q.  Are there FBI or Department of Justice policies that

2   govern whether you can do those sorts of things close to an

3   election?

4   A.  There are.

5   Q.  And generally speaking, what do those policies say?

6   A.  In general?  Generally speaking, the policies are pretty

7   clear that the spirit of the policy is that we shouldn't

8   conduct investigative activity overtly that could impact an

9   election in close proximity to an election, and we may have

10  to wait until after an election, if that investigative step

11  is still necessary.

12  Q.  How, if at all, did it affect that decision not to

13  interview Mr. Dagon, that you had heard from the source that

14  folks were talking to the media on this?  Did that have any

15  role?

16  A.  It does.

17  Q.  How is that?

18  A.  The FBI also has policy related to First Amendment

19  protected speech.  One of the key aspects of that First

20  Amendment protected speech is that we're not allowed to

21  engage in overt activity that could be interpreted to be

22  dissuading people from engaging in First Amendment protected

23  speech.

24          Essentially we're not supposed to conduct activity

25  that might cause a person not to do First Amendment

1    protected activity that they had planned to do.  And in this

2    case both Mr. Dagon and the CHS were engaged with the media,

3    which is a form of protected speech.

4    Q.  Now, at the time did you have any idea one way or the

5    other whether Mr. Dagon had been in touch with Mr. Sussmann

6    or anyone else?

7    A.  So at the time the closest information that I had that

8    potentially Mr. Sussmann had been in touch with Mr. Dagon

9    would have been a work-in-progress paper that had been

10   passed back and forth to a D.C. attorney.  The D.C. attorney

11   potentially could have been Mr. Sussmann.

12   Q.  Okay.  But did you draw that connection at the time, or

13   no?

14   A.  I don't remember drawing that connection at the time,

15   but it would have been one that makes sense.

16           MR. DeFILIPPIS:  If I could show you what's been

17   premarked as Government's Exhibit 283.

18           And if we could go to the --

19   Q.  So first, Special Agent Gaynor, does this appear to be

20   an email chain ending in an email from Mr. Peter -- Special

21   Agent Peter Strzok to you?

22   A.  Yes.

23           MR. DeFILIPPIS:  Your Honor, the government offers

24   Government Exhibit 283.

25           MR. BOSWORTH:  No objection.

1           THE COURT:  So moved.

2           MR. DeFILIPPIS:  And if we could go to the

3    earliest email in that chain.

4    Q.  So what's the date of this email, Special Agent Gaynor?

5    A.  October 5th.

6    Q.  So that's, if I recall, a couple of days after -- or the

7    day after the logs had come back from Miami; is that right?

8    A.  So the logs had come back on at least as early as

9    Monday, October 3rd.

10   Q.  Okay.

11   A.  And they were being analyzed from that period forward.

12   Q.  And the email here is from Mark Hosenball.  You're not

13   on this initial part of the chain, but do you know one way

14   or the other who is Mark Hosenball?

15   A.  Based on the email address, I would assume he's with

16   Reuters, and he's -- well, and he's a national security

17   correspondent based on the signature line.

18   Q.  Okay.  And who is in the "To" field of that email, to

19   the extent you know those folks?

20   A.  The only individual that I recognize on that list is I

21   think Carol Cratty, and I believe that she was in public

22   relations or public affairs at the time.

23   Q.  The FBI's public affairs?

24   A.  The FBI's public affairs.

25   Q.  And could you just read the email from Mr. Hosenball?

1    A.  "The information below, supposedly posted by private

2    computer experts, suggests some kind of transactions through

3    a secret data channel between Alfa-Bank and Russia and a

4    supposed 'hidden' Donald Trump Organization data server.  It

5    has been suggested to me that this information and scenario

6    is under careful investigation by the FBI.  What can you

7    tell me about all of this?  Many thanks."

8    Q.  All right, Mr. Gaynor.  Did you have a reason to know

9    one way or the other how Mr. Hosenball would know that the

10   Alfa-Bank matter was being investigated by the FBI?

11   A.  I knew that the European cyber operations unit had been

12   aware that Reuters was looking at this matter; but Reuters I

13   don't believe was one of the media outlets that I was aware

14   that the CHS, Mr. Dagon, or Mr. Sussmann, had reached out

15   to.

16   Q.  All right.  So there's then a subsequent email in the

17   chain from someone named Jordan Kelly.  Who, if you know, is

18   Jordan Kelly?

19   A.  I do not know, but based on the signature line, she's

20   within cyber division.

21   Q.  All right.  And do you see in parentheses where it says,

22   next to several individuals' names, "CYD" and then "FBI"?

23   A.  Yes.

24   Q.  What does "CYD" signify?

25   A.  "CYD" signifies cyber division within our FBI

1    headquarters.

2    Q.   Okay.  So if you go to the next email in that chain.

3    This is from Mr. Sporre, Eric Sporre, copying a bunch of

4    other individuals at the FBI.

5         Do you know who Mr. Sporre is?

6    A.   I believe Mr. Sporre was either the DAD or deputy

7    assistant director or assistant director of cyber division

8    at the time.  Bottom line, he was in senior leadership

9    within cyber division at headquarters.

10   Q.   All right.  And now returning to the top of that chain.

11        It looks like Peter Strzok forwards that email to

12   you on October 5th.  Who was Peter Strzok?

13   A.   So Peter Strzok was the Deputy Assistant Director within

14   our counterintelligence division.

15   Q.   So would he have fallen just below someone named

16   Priestap?  Do you recall?

17   A.   Yes.  So Bill Priestap was the Assistant Director within

18   the counterintelligence division, and so Peter Strzok would

19   be the Deputy Assistant Director and falls right underneath

20   the Assistant Director.

21   Q.   And finally, if we could go to the part of the

22   email chain that contains some kind of attachment that

23   Mr. Hosenball attached to his email.

24        Does it look like there was a collection of

25   materials or text about global DNS data?

1    A.  Yes.

2    Q.  And if you would just read the first line of that down

3    to number 1, until the end of number 1.

4    A.  Okay.  "This site provides neutral, factual DNS data,

5    showing how networks communicate with each other.  Lookups

6    for mail1.trump-email.com.  This data shows communication

7    between Trump, Spectrum, and Russia Alfa-Bank networks.

8           "Network diagram scenario.  This diagram, PNG

9    file, and the size, shows how parties communicated via email

10   using different servers.

11          "Check back for more.

12          "Leave questions at tea.leaves@tuta.io."

13   Q.  All right.  So that appears to be what Mr. Hosenball had

14   been sending to the FBI; is that right?

15   A.  Yes.

16   Q.  Now, what, if anything, do you remember doing when you

17   got this?  Did you act on it, or not?

18   A.  I don't remember acting on this.  I think I did send

19   this to the field office and asked them if this needed -- if

20   they could evaluate this, if this was coming from, for

21   instance, our CHS.

22   Q.  All right.  So let's -- we'll show you what's been

23   premarked as Government's Exhibit 270.

24          Is this an email from you to Daniel Wierzbicki,

25   Curtis Heide, and others?

 1    A.  Yes.

 2              MR. DeFILIPPIS:  Your Honor, the government offers

 3    Government Exhibit 270.

 4              MR. BOSWORTH:  No objection.

 5              THE COURT:  So moved.

 6    Q.  And looking first at the body of this email, this is

 7    dated October 13th, so it's about a week and a half after

 8    the email from Mr. Hosenball we just looked at; is that

 9    right?

10    A.  Yes.

11    Q.  And, Special Agent Gaynor, could you just read this

12    email to the jury minus the redacted parts.

13    A.  Okay.  "CG," Chicago.

14              "I am interested on your thoughts on the attached

15    paper.  This was found online at the address noted at the

16    top of the paper (mediafire.com).  Looks like the argument

17    in this paper is largely supported by activity likely caused

18    by our investigation and other acts by (redacted) but I

19    would like your technical opinion on this paper.  Is this

20    related to the (redacted) and do we have information which

21    can help explain the 'new' Trump email domain now pointed at

22    the original server?

23              "As always, thank you for the great work on this.

24              "Ryan."

25    Q.  So, Mr. Gaynor, is this what you were referring to when

1    you said you think at some point you passed this along to

2    Chicago to have them take a look?

3    A.  It is.

4    Q.  And what, if anything, do you remember about the outcome

5    of that?

6    A.  I do not remember the outcome of that.  If there's an

7    exhibit to refresh my recollection, I can look at that.

8    Q.  Okay.  But fair to say that -- what do you recall

9    generally about the outcome of the Alfa-Bank investigation?

10   A.  Generally, the outcome of the Alfa-Bank investigation

11   was that there was no covert communication system as spelled

12   out within the white paper or white papers.  That's it.

13   Q.  How long did you remain involved in the investigation?

14   A.  So I became involved I believe on Friday, September

15   23rd, and my TDY -- actually, my temporary duty actually

16   ended mid-November.  But my primary duty and what I was

17   working on on election infrastructure, which was a

18   significant national security threat, went all the way

19   through that time period.

20          And then I took on, towards the end of that time

21   period, a threat via social media, a concern related to what

22   other nation states were using social media against the

23   United States to do, which took up much of the end of my

24   TDY.  So the last two weeks of my TDY were spent creating a

25   write-up for my primary duty about the threat to our

1    election infrastructure by foreign adversaries.

2    Q.  So you said you sort of phased off the case sometime in

3    November?

4    A.  Yes.

5    Q.  Was the investigation still open at that point?

6    A.  Yes.

7    Q.  All right.  So you weren't there for the very end of it,

8    whenever it was closed?

9    A.  I was not.

10   Q.  Do you have a sense of when it was closed, or no?

11   A.  I do, based on what I learned subsequent during my

12   meetings with the government.

13   Q.  All right.  And based on what you looked at, about when

14   was the case closed?

15   A.  I believe -- was it January?  Roughly January of '17 was

16   when they finally closed the investigation.

17   Q.  Mr. Gaynor, you testified towards the beginning of your

18   testimony that you knew Mr. Sussmann had some affiliation

19   with the DNC; is that right?

20   A.  Yes.

21   Q.  And your impression was that here -- at least your

22   refreshed impression was that here he was not doing this for

23   the DNC; is that right?

24   A.  Yes.

25   Q.  If Mr. Sussmann had been billing his time on these

1    matters or being paid on these matters by either the DNC or

2    a political campaign, would that have mattered to you in

3    your role?

4    A.   Yes.

5    Q.   Why?

6    A.   While the investigation was already initiated when I

7    joined, I think that information would have had an impact

8    when they were making considerations for opening prior to my

9    joining and also might have impacted decisions made about

10   the close hold, if it was even in place, and likely would

11   have impacted whether or not I either would have been

12   involved in this investigation.

13   Q.   All right.  So just to break that down, when you say it

14   may have impacted the opening or whether to open, what do

15   you mean there?

16   A.   The FBI has different levels, if you will, of opening,

17   and it's based on the predication or information you have at

18   the initiation of the case.  This information may have

19   changed whatever the senior leadership in Chicago's

20   decision-making process was at the time that they opened the

21   investigation.

22   Q.   Okay.  And are you basing that view on your experience

23   with other FBI investigations and your involvement in

24   national security matters?

25   A.   I am.

1    Q.  Now, when you say that it might have affected the close

2    hold and your view of the close hold or recommendation about

3    the close hold, what do you mean there?

4    A.  I mean if that was information that wasn't known to

5    leadership at the time, and then it was information that

6    then had been known by leadership, I feel that knowing that

7    information would have impacted our senior leadership's

8    decisions on the investigation.  Maybe they wouldn't have

9    put a close hold in place.

10   Q.  And in terms of your role as determining whether the

11   close hold was an appropriate decision, the help/hinder

12   discussion you mentioned, might it have affected your view

13   on that?

14   A.  If I had been informed that the individual was motivated

15   specifically the way you described, it would have

16   potentially impacted the way I viewed the close hold.

17   Q.  In what way?

18   A.  I believe that I would have had more of an issue with

19   the close hold on the hinder side, and it might have been

20   something that we would want to address.

21   Q.  Okay.  So are you saying that you might have recommended

22   to leadership disclosing Mr. Sussmann's involvement to the

23   case agents in Chicago?

24   A.  So in fairness to the leadership, I truly do not

25   remember what, if any, reason they gave me for this close

1  hold in the first place.  But assuming it wasn't a legal

2  requirement, then yes, I think it would have impacted what I

3  viewed were the reasons for the close hold.

4  Q.  If you were to learn or hear that Mr. Sussmann was

5  working on behalf of a client who had business interests

6  with the FBI, would that have mattered to you?

7  A.  Yes.

8  Q.  Why?

9  A.  So being a person associated with one political party or

10  another doesn't necessarily infringe upon the validity of an

11  allegation brought to the FBI.  But being financially

12  motivated to bring an allegation to the FBI is something

13  that I feel would need to be taken into account.

14  Q.  And how might you take that into account?

15  A.  So I think that would have been taken into account when

16  they went to open the investigation.

17  Q.  Would that be the level of opening?  Whether to open?

18  Which part?

19  A.  So it could be all of the above depending on what

20  information they had at the time.

21         There are different levels of opening that we can

22  do in the Bureau.  It's not different levels of

23  investigation, but it's different levels of predication,

24  information that allows us to open.

25         So we have preassessment work we can do.  We have

1    assessment work that we can do.  We have preliminary

2    investigations.  And then finally we have full

3    investigations.

4           So depending on what information you have and your

5    evaluation of that information determines what level you're

6    going to open at, and that's key, because from a First

7    Amendment and American standpoint, we don't want to be able

8    to just open a full investigation on anything.

9    Q.  Now, finally, if you had learned that Mr. Sussmann was

10   bringing in this information on behalf of someone who was

11   already a confidential human source of the FBI, would that

12   have mattered to you?

13   A.  Can you repeat that one more time?

14   Q.  If you were to learn that Mr. Sussmann brought this

15   information to the FBI on behalf of someone who was already

16   a confidential human source of the FBI, would that have

17   mattered to you?

18   A.  Yes.

19   Q.  Why and how?

20   A.  So the first issue would be confidential human sources.

21   The reason they're confidential is we're seeking to protect

22   their engagement with the government so that they're not

23   harmed by it.

24          So the fact that a CHS would have provided that

25   information means that we would need to determine how to

1    handle that information in order to protect, potentially,

2    the confidentiality of the CHS.  But in addition, it could

3    go to the validity or corroboration of that CHS, whether or

4    not they're being truthful with the FBI.

5            So if they provided information through another

6    party to the Bureau, the question might be why didn't the

7    CHS provide the information directly to the Bureau.  So it

8    could go to the veracity of that source or the truthfulness

9    of that source.

10            So those are things we would need to look into.

11   Q.  And when you say whether they would have provided it to

12   the Bureau, do you mean another channel in the Bureau?

13   A.  Yes, the individual that would be, quote, handling them

14   or meeting with them.

15   Q.  Finally, Special Agent Gaynor, you said that these kinds

16   of factors might have affected whether you would even be

17   involved in this case to begin with.  What did you mean by

18   that?

19   A.  So I had been working on a national election or national

20   infrastructure program for a few years, and there was a

21   discussion about whether or not the election infrastructure

22   issue was a high-enough risk to pull me from the program I

23   was already working on.

24            Leadership decided, I was told, that it was worth

25   pulling me from this project I'd been working on to this new

1  project, this election infrastructure project.  It was an

2  important threat to address.  And when I heard the briefing

3  on Alfa-Bank, I made the determination that it was something

4  that I could assist with, but it was going to divert time

5  away from what I was working on.

6         Had I known that this information had been

7  provided with this other potential motive, it's highly

8  unlikely that I would have volunteered to assist with that

9  matter, and I would have continued to work just what I was

10 assigned to do on the TDY, which was the election

11 infrastructure piece, which was already both stressful and

12 important.

13 Q.  Thank you.

14         MR. DeFILIPPIS:  No further questions.

15                    CROSS-EXAMINATION

16 BY MR. BOSWORTH:

17 Q.  Good morning, Mr. Gaynor.

18 A.  Good morning.

19 Q.  We've never met before, correct?

20 A.  Correct.

21 Q.  And you've never met Mr. Sussmann?

22 A.  Correct.

23 Q.  You've never interviewed Mr. Sussmann?

24 A.  No.

25 Q.  You've never allowed other agents to interview

```
 1    Mr. Sussmann?
 2    A.  What do you mean by "allowed other agents to interview
 3    Mr. Sussmann"?
 4    Q.  You concealed Mr. Sussmann's identity from the Chicago
 5    agents running the investigation, correct?
 6    A.  So there was a close hold put in place by senior
 7    leadership.  A decision had been made on information that I
 8    didn't have to withhold that information from the field
 9    office.
10    Q.  Did you share his identity with the Chicago agents?  Yes
11    or no?
12    A.  The leadership did not allow me to share the information
13    with the Chicago Field Office.
14    Q.  So you didn't share his identity with the agents,
15    correct?
16    A.  Correct.
17    Q.  Now, you talked about your election infrastructure
18    project.  You were working on protecting election
19    infrastructure from Russian interference, correct?
20    A.  Yes.
21    Q.  And that overlapped with the investigation known as
22    Crossfire Hurricane, which was an investigation into ties
23    between the Trump Campaign and Russia, correct?
24    A.  The election infrastructure program that I was looking
25    into did not overlap with Crossfire Hurricane directly, no.
```

1    There was a potential for overlap, if we found that there

2    were links, but the actual election infrastructure project

3    did not.

4           And I was being briefed on Crossfire Hurricane to

5    ensure that I had awareness of what was going on.

6    Q.   Okay.  And you came to the Alfa investigation on

7    September 23, 2016, correct?

8    A.   Yes.

9    Q.   That was a Friday?

10   A.   Yes.

11   Q.   And on that day you attended a briefing about the status

12   of the Alfa-Bank allegations; is that right?

13   A.   I attended a briefing with the Crossfire Hurricane team

14   to learn and understand what was going on within the

15   Crossfire Hurricane program, and during that meeting the

16   Alfa-Bank matter was briefed as well.

17   Q.   And after hearing the briefing about the Alfa-Bank case,

18   you volunteered to work on the Alfa-Bank project, right?

19   A.   I volunteered to track it for the front office, yes.

20   Q.   Okay.  So you were working in connection with that

21   project?

22   A.   Yes.

23   Q.   Okay.  And at the time that you volunteered to help that

24   project, you knew, didn't you, that the FBI's cyber division

25   had already done a quick assessment and found there wasn't

1    anything much to this allegation, correct?

2    A.  So I learned after the meeting where I offered to help,

3    that ECOL, the European Cyber Operations Unit, had evaluated

4    the allegation, and it was sent to -- the actual paper that

5    they created describing their findings was sent to me by

6    Special Agent Curtis Heide on that day, on Friday.

7    Q.  Okay.  And after seeing that the cyber division said

8    that there wasn't much to this and it was compiled by

9    questionable methods, you still proceeded to do work in

10   connection with the Alfa-Bank project, right?

11   A.  I continued to talk with the field office and learn

12   about the progress of their investigation, yes.

13   Q.  But everything that you said you did on direct

14   examination in connection with the investigation, you did

15   notwithstanding the fact that cyber division had looked at

16   this and said "nothing here," right?

17   A.  Yes.

18   Q.  Okay.  And why was it that you were interested in

19   working on the project?

20   A.  So it was clear to me from the Crossfire Hurricane brief

21   that Supervisory Special Agent Joe Pientka had a lot on his

22   plate.  I had just taken on this election infrastructure

23   project myself.  But while I was doing that, recognizing

24   that this was just going to be tracking when these data logs

25   came in, I figured I could help him by offering -- basically

1   volunteering to track it for him.

2   Q.  And as of the time that you began your volunteer work on

3   this project, the investigation into the Alfa-Bank

4   allegation had already been opened, correct?

5   A.  They had already conducted investigative activity and

6   initiated it, yes.

7   Q.  Okay.  But they had submitted, as of Friday, September

8   23rd, the electronic communication formally opening a full

9   investigation into Alfa-Bank, correct?

10  A.  So I learned that after 2016, but yes.

11  Q.  Okay.  You don't doubt that it was opened that day?

12  A.  I do not doubt that.

13  Q.  And you played absolutely no role in the decision to

14  open the investigation, correct?

15  A.  That's correct.

16  Q.  And that investigation was consistent with the overall

17  objective of the Crossfire Hurricane investigation, right?

18  Looking into ties between Mr. Trump and Russia, correct?

19  A.  I would say it definitely was tangentially related to

20  the Crossfire Hurricane investigation, because if there was

21  a covert communication channel, then potentially it was a

22  link between the two.

23  Q.  Okay.  And you testified that on Monday, September 26th,

24  you met with Jonathan Moffa, section chief in the

25  counterintelligence division, correct?

1   A.   Yes.

2   Q.   And he told you about the allegations and the

3   investigation in more detail than you had heard on Friday,

4   September 23rd, correct?

5   A.   He provided information to me that I don't remember the

6   breadth and depth of, but I do remember what I testified to,

7   which is what I also put on my briefing sheet.

8   Q.   Okay.  So you don't -- you don't remember the breadth

9   and depth of your conversation with Mr. Moffa on the 26th?

10  A.   So he was off work on Friday the 23rd, and so I know

11  that during the meeting on the 26th I must have discussed

12  with him various topics about things he had missed on the

13  prior Friday.  And I also know that he had a tremendous

14  amount of experience in the investigations related to

15  Crossfire Hurricane and also experience on the DNC matters.

16       So I know that he knew more than obviously I

17  would, so I'm sure there was a lot discussed during that

18  meeting.  But my -- I've already testified to my take-away

19  from the meeting.

20  Q.   We're going to get there.

21       And one of the things that he told you was that

22  the allegation was provided by Michael Sussmann, correct?

23  A.   Correct.

24  Q.   And he told you Michael Sussmann, quote, was a DNC

25  lawyer, correct?

1    A.  DNC lawyer or DNC attorney.

2    Q.  Okay.  So he told you Mr. Sussmann was either a DNC

3    lawyer or a DNC attorney, correct?

4    A.  Yes.

5    Q.  Now, you testified a moment ago about your take-away

6    impression from what either Mr. Moffa had told you about

7    Mr. Sussmann's DNC connection.  I want to ask you about

8    that.

9           But first, because you talked about refreshing

10   your recollection, I just want to briefly set out -- and I'm

11   going to go one by one -- every meeting that you had with

12   the government leading up to your testimony today.  Okay?

13   A.  Yes.

14   Q.  Okay.  So first of all, there were your notes from the

15   fall of 2016, correct?

16   A.  Say that one more time, sir.

17   Q.  You had notes from the fall of 2016 on the Alfa-Bank

18   investigation, right?

19   A.  To be clear, so the sheet that I had that's often

20   referred to as notes, it was a briefing sheet.  It was a

21   sheet that I created so that I could brief executives on

22   what the Chicago investigation was finding.

23   Q.  Okay.  Let me just publish to you, because I don't think

24   it's in evidence yet, Defense Exhibit 524.

25           Is this the briefing sheet that you were just

1    talking about?

2    A.  Yes.

3              MR. BOSWORTH:  Okay.  We'd move to admit those,

4    Your Honor.

5              MR. DeFILIPPIS:  No objection, Your Honor.

6              THE COURT:  So moved.

7    Q.  Okay.  So those are -- we can publish it, and then we'll

8    ask questions about it in a minute.

9              This is just a set of notes -- a briefing sheet,

10   as you described it -- that you were keeping in the fall of

11   2016 to sort of keep track of the important information in

12   the investigation, right?

13   A.  Yes.

14             MR. BOSWORTH:  Okay.  We can take that down.

15   Q.  Now, I assume you don't remember the dates of all of

16   your meetings with the government.  I can just refresh your

17   recollection, if that's helpful.

18   A.  That would be helpful.  Thank you.

19             MR. BOSWORTH:  Okay.  If we could show the witness

20   RG01.

21   Q.  And this is a 302 from your first meeting with the

22   government.

23             Does this jog your memory of the date of that

24   first meeting?

25   A.  It does.

1   Q.  Okay.  And what's that?

2   A.  10/30/2020.

3   Q.  Okay.  And, Mr. Gaynor, I want to make sure you can see

4   this and the jury can see this.  Can you see this okay?

5   A.  I can.  Thank you.

6            MR. BOSWORTH:  And if the jury can't, I assume

7   they'll tell you, Your Honor.

8            Okay.  Second, if we show the witness RG02.

9   Q.  This is a consolidated report of two interviews you had.

10  Can you just flag the dates of those?

11  A.  I can.  I'm sorry, as I get older, I need --

12  Q.  We'll blow up the first paragraph, and if you'll look at

13  the second line and the eighth line.

14  A.  So the date -- the first date is December 15th,

15  12/15/2020.  And the next date is February 24, 2021.

16  Q.  And if we could, just take a look at the second

17  paragraph.

18  A.  (Witness reviews document)

19  Q.  And let me ask you, Mr. Gaynor, when you prepared for

20  that second meeting in December of 2020 with the government,

21  you reviewed relevant documents that you had gathered about

22  the case, correct?

23  A.  Correct.

24  Q.  Because your attorney had advised you it might help you

25  refresh your recollection by reviewing documents, notes, and

1   emails, correct?

2   A.  Correct.

3   Q.  So you reviewed the relevant documents so that you were

4   walking into that meeting with a refreshed recollection,

5   right?

6   A.  That is correct.

7   Q.  Okay.  If we could show you RG03.  You testified in the

8   grand jury in this case, correct?

9   A.  Yes.

10   Q.  Okay.  So you swore the same oath you swore today,

11   walked in, and gave under oath testimony to the grand jury,

12   correct?

13   A.  Yes.

14   Q.  Okay.  And what was the date of that grand jury

15   testimony?

16   A.  June 24, 2021.

17   Q.  Are you pretty sure about the year?  Yes, right.

18   A.  Yes.

19   Q.  Okay.  And how long did you testify in the grand jury?

20   A.  I don't know.  I mean, an hour.  I truly don't recall

21   how long I was in there.

22   Q.  And did you review documents in preparation for the

23   grand jury?

24   A.  I did.

25   Q.  Okay.  Because you wanted to give truthful and accurate

1    testimony to the grand jury, correct?

2    A.  Correct.

3    Q.  So you studied pretty hard for that testimony, too,

4    correct?

5    A.  Yes.

6    Q.  And then in the lead-up to this trial you met with the

7    government, correct?

8    A.  Yes.

9    Q.  You didn't meet with the defense, just to be clear?

10   A.  I have not met with the defense.

11   Q.  And if I direct your attention to -- well, actually, let

12   me just ask you:  How many times did you meet with the

13   government to prepare for your testimony today either in

14   person or on Zoom or by phone?

15   A.  I would say contact back and forth, roughly four or five

16   times.

17   Q.  Four or five times in the past month?

18   A.  Let me think that through.  In the past -- leading up to

19   this trial.

20   Q.  Okay.  Well, let me -- I'll ask you about the notes I

21   have, so if I can direct your attention to RG04.  These are

22   notes of a trial preparation session you had.  I don't know

23   which one of the four or five it was.

24           What's the date of this one though?

25   A.  I believe that says 5/3.

```
 1    Q.  Of this year?

 2    A.  It would be of this year.

 3    Q.  Okay.

 4              Okay.  Let me direct your attention to RG05.

 5    Those are notes of another preparation session.  Can you

 6    tell me the date of this preparation session?

 7    A.  5/13.

 8    Q.  And apparently you had other preparation sessions, too.

 9    Do you have a rough sense of when those additional

10    preparation sessions would have been?

11    A.  So I don't know that I would call them preparation

12    sessions, but there were like questions to follow up off of

13    meetings that had occurred that I answered.

14    Q.  And when did you have questions that you answered?

15    A.  The last question that came in from the prosecution was

16    yesterday.

17    Q.  Okay, yesterday.  Was yesterday the twenty --

18    A.  22nd.

19    Q.  22nd.

20    A.  Yes.

21    Q.  Okay.  I want to ask you, first, about testimony that

22    you gave today where you said that when Mr. Moffa told you

23    that Mr. Sussmann was a DNC attorney, you said, "I

24    understood that to mean that he had been affiliated with the

25    Democratic party but that he had come representing himself
```

```
 1    on the Alfa-Bank allegations."

 2              Do you remember giving that testimony?

 3    A.  That was my take-away.

 4    Q.  And you gave that testimony that I just read?

 5    A.  Yes; that he was a DNC attorney, but that my take-away

 6    from that discussion was that he wasn't there representing

 7    the DNC.

 8    Q.  When you were asked, "When Mr. Moffa said Mr. Sussmann

 9    was an attorney for the DNC, what impression did you come

10    away with?" what did you understand that to mean?

11              And your answer was:  "I understood that to mean

12    that he had been affiliated with the Democratic party, but

13    that he had come representing himself," right?

14    A.  So he's affiliated with the Democratic party because he

15    was a DNC attorney.

16    Q.  And your impression was he had come representing

17    himself?

18    A.  My take-away from that meeting, what I recall, is that I

19    did not believe that he was there representing the DNC

20    specifically because, had he been, that would have been

21    information that would have impacted it.

22    Q.  Very important for you to know that information?

23    A.  Yes.

24    Q.  And you said that that wasn't the impression that you

25    first had communicated to the government, correct?
```

1    A.  That is correct.

2    Q.  And you were asked several times, so let's go one by one

3    which aspects of your preparation was it that jogged that

4    aspect of your memory.

5           You were asked:  Was it the document review you

6    did when you first started meeting with the government, or

7    was it your preparation for trial?

8           And your first answer was:  It was document review

9    in preparation for meeting with the government, specifically

10   the to-do list -- I'll show you that in a moment -- and

11   specifically the help or hinder issue that reminded you and

12   helped you remember what had occurred.

13          That was your testimony?

14   A.  Yes.

15   Q.  And then you were asked:  "I mean specifically, when you

16   testified your impression was Mr. Sussmann had not come into

17   the FBI for the DNC on the Alfa-Bank matter, was that

18   something that became clear in your mind more recently or

19   closer to when you first met with the government?"

20          And you said, "It was after I first met with the

21   government that I remembered meeting with Mr. Moffa."

22          Do you remember testifying to that?

23   A.  I do.

24   Q.  And you said:  And as a result of remembering the

25   meeting with Mr. Moffa and going through and seeing the to-

1    do list or on the help or hinder issue, I recall that's what

2    it was -- that was what I took away with my discussion with

3    him.

4              Meaning after you had looked at your to-do list

5    you came -- you reminded yourself that that was the

6    impression you had from your conversation with Mr. Moffa,

7    was that Mr. Sussmann was affiliated with the DNC, but that

8    he had come to the FBI representing himself on the Alfa-Bank

9    matter, correct?

10   A.   That's correct.  It's the hinder piece that helped me

11   remember the piece that you're now raising.

12   Q.   Okay.  And let me just show you Defense Exhibit 526.

13              Actually, excuse me.

14              (Pause)

15   Q.   Let me just show this to you.

16              MR. DeFILIPPIS:  279.

17              MR. BOSWORTH:  279?  Okay.

18              Can we have Government's Exhibit 279.

19   Q.   And I'm showing you Government Exhibit 279.  Is this the

20   to-do list that you were talking about that jogged your

21   memory?

22   A.   It is.

23   Q.   Okay.  And we'll get to the help/hinder bit in a minute.

24   But this is the document that you say jogged your memory and

25   gave you the impression that when Mr. Moffa said

1    Mr. Sussmann's a DNC attorney, you took that to mean he was

2    affiliated with the DNC, but that he was coming to the FBI

3    representing himself, correct?

4    A.  So this particular line "is this holding help/hinder,"

5    is the line that helped me recall the conversation with

6    Moffa and other information.

7         It was the question related to the hinder piece

8    that helped me remember that my walk-away impression from

9    the meeting was that he wasn't there representing, and that

10   only came up when I was asked a question by the government

11   later about whether or not this is information that would

12   have changed my view.  And I remembered absolutely it is,

13   and so I must have not known that at the time, and I

14   recalled that.

15   Q.  Okay.  So the government asked you if this document

16   would change your view of your impression, yes?

17   A.  No.

18   Q.  Okay.  But this document is the one that gave you the

19   impression that you testified about today, correct?

20   A.  This document --

21   Q.  That plus the remembering about the conversation with

22   Mr. Moffa.

23   A.  This document plus the later question from the

24   government about whether or not this information would have

25   caused me to read out the hinder issue.

```
 1              MR. BOSWORTH:  Okay.  Let's take that down.
 2     Q.  And let's go one by one through these meetings, what you
 3     knew, and what you said.
 4              In the fall of 2016 -- let's just start there with
 5     Defense Exhibit 524.
 6              MR. BOSWORTH:  We'll publish this to the jury.
 7     Q.  These are the notes that you took for yourself?
 8              MR. BOSWORTH:  If we can just blow up the top
 9     portion.  Right.
10     Q.  And as you said, these are the notes that you took for
11     yourself as the investigation was going on so you could keep
12     track of things, know how to brief people, keep things
13     straight in your mind, correct?
14     A.  Correct.
15     Q.  Okay.  And if we can just highlight on the left, you
16     wrote down "Michael Sussmann, DNC attorney."  Right?
17     A.  Correct.
18     Q.  Okay.  And just to state the obvious, you didn't write
19     "Michael Sussmann, attorney affiliated with the DNC."  You
20     just wrote "DNC attorney," correct?
21     A.  Correct.
22     Q.  And there's no notation at this point that Mr. Sussmann
23     was representing himself in passing along information to Jim
24     Baker, correct?
25     A.  On this piece of paper, no.
```

1   Q.  Okay.  So let's take that.

2           And then you went into the government on October

3   30, 2020, and you were interviewed, were you not, on that

4   date at some length, yes?

5   A.  Yes.

6   Q.  And you met with, among others, Mr. DeFilippis?

7   A.  Yes.

8   Q.  And other attorneys and investigators, yes?

9   A.  Yes.

10  Q.  And on that date you talked about your meeting with

11  Mr. Moffa, yes?

12  A.  I believe that I -- I don't believe I recalled -- can we

13  pull up the interview?  Because I don't recall.

14  Q.  Well, you testified -- you, in that meeting, explained

15  that you had been advised that Mr. Sussmann was a DNC

16  attorney, right?

17  A.  Can we point to --

18  Q.  Sure.

19          MR. BOSWORTH:  Why don't we go to RG01 --

20          THE WITNESS:  Thank you.

21          MR. BOSWORTH:  -- at Page 3, Paragraph 1.

22  Q.  My only question here is just you said at that meeting

23  that Mr. Sussmann was an attorney working for the Democratic

24  National Committee.  At that point you couldn't remember

25  exactly who it was that advised you of that source?

1    A.  Yes, so that would be --

2    Q.  That's what you remembered, right?

3    A.  So that would be a correction or a reply to the question

4    you had about Section Chief Moffa informing me on Monday.  I

5    did not recall that in this meeting.

6    Q.  Okay.  So let's go to the next meeting, which is

7    December 15th.

8           So in this meeting -- so in your notes it just

9    says "DNC attorney," and there's nothing about him

10   representing himself or being affiliated.  It just says "DNC

11   attorney."  That's what we looked at on your briefing page,

12   right?

13   A.  So it --

14   Q.  I'm just writing it down.

15   A.  Yes.  So I think it's important to note that prior to

16   that meeting I definitely had not done a thorough review of

17   the material that I had in my possession.

18   Q.  Okay.

19   A.  I have to take responsibility for that.

20   Q.  On October 30th, you mean?

21   A.  Correct.

22   Q.  Okay.  So not in your notes.  Not said in your first

23   meeting.

24          And then you went back on December 15, 2020,

25   right?

1    A.  Yes.

2    Q.  Okay.  And here we discussed that you did review and

3    gather relevant documents before coming back for this

4    meeting with the government, right?

5    A.  Yes.

6    Q.  Okay.  And you wanted to be careful about what you were

7    communicating, and you wanted to get it right, correct?

8    A.  To the best of my ability four years later, yes.

9    Q.  Okay.  Right.  Because a lot of -- even as of 2020,

10   right, a lot of time had passed since these events, right?

11   A.  That is correct.

12   Q.  And, you know, it wouldn't -- with the passage of time,

13   you can't remember things as clearly.  You want to look at

14   documents that will refresh your recollection, right?

15   A.  Yes.

16   Q.  Which is why you looked at documents for this meeting?

17   A.  I did.

18   Q.  And at this meeting you said on December 20th that you

19   believed -- you talked about this to-do sheet, Government

20   Exhibit 526.

21          And we'll get to this help/hinder bit.  But the

22   document that you said refreshed your recollection about the

23   impression you had that Sussmann was affiliated with the DNC

24   but was representing himself on the Alfa-Bank issue, that's

25   a document that you had reviewed as of December 2020,

1    correct?

2    A.  That is correct.

3    Q.  Okay.

4    A.  I hadn't been asked the follow-up question.

5    Q.  And what's the --

6         THE COURT:  Mr. Gaynor, Mr. DeFilippis will have

7    an opportunity to allow you to explain, okay?  But for now,

8    to get through this, let's just focus on what you said when.

9    Okay?

10        THE WITNESS:  Yes, Your Honor.

11        THE COURT:  All right.

12   BY MR. BOSWORTH:

13   Q.  So you had reviewed this document at this meeting,

14   correct?

15   A.  Yes.

16   Q.  And you also spoke about the note on there that said

17   help/hinder.  So the help/hinder issue was on your mind,

18   correct?

19   A.  Yes.

20   Q.  Okay.  But you didn't say at this meeting that Michael

21   Sussmann -- that your impression was that Mr. Sussmann was

22   affiliated with the Democratic National Committee and was

23   representing himself on the Alfa-Bank issue, right?  You

24   didn't tell the government that after you reviewed the

25   document, correct?

```
1    A.  I did not.

2    Q.  Okay.  And you went back on February 24th of 2021, and

3    you didn't say it then either, did you?

4    A.  I don't know that that came up during the follow-up

5    interview.

6    Q.  Do you remember telling them that?

7    A.  I do not.

8    Q.  And then you testified under oath at length on this

9    issue.  Do you remember that?

10   A.  I do.

11   Q.  And you were asked a series of questions about whether

12   you thought Mr. Sussmann was representing the DNC on this

13   matter or just generally.  Do you remember those questions?

14   A.  I do.

15   Q.  Okay.  And you repeatedly denied knowing one way or the

16   other whether Mr. Sussmann was representing the DNC on this

17   matter or generally.  All you knew was what Mr. Moffa told

18   you, right?

19   A.  Can we pull up the grand jury material?

20   Q.  Sure.  Let's go one by one.

21        MR. BOSWORTH:  RG03 -- and this is under oath

22   testimony so we can publish it -- at Page 12, Lines 2

23   through 11.

24   Q.  This is the first question.

25        You said, "It's an attorney named" -- this is
```

1550

```
1    Mr. DeFilippis asking questions.  "It's an attorney named
2    Michael Sussmann, who was a DNC lawyer, gave it to Jim
3    Baker?"
4              Your answer:  "That's correct.
5              "Jim Baker the general counsel of the FBI?
6              "Yes."
7              "QUESTION:  Now, when you learned this from
8    Mr. Moffa, when he" -- Mr. Sussmann -- "said he was a DNC
9    lawyer, did you know whether Mr. Sussmann was representing
10   the DNC on this particular matter, or did you not know?"
11             And your answer was, "I did not know."
12             Right?
13   A.  Yes.
14   Q.  Okay.  Not "I didn't know but my impression was that he
15   was here alone and was affiliated with the DNC"; just "I
16   don't know."  Correct?
17   A.  Correct.
18   Q.  Then you got asked again because that answer wasn't good
19   enough:
20             "Okay.  So when he was described as a DNC lawyer,
21   did you know whether, in fact, he was employed by the DNC or
22   just represented the DNC on other matters, or you didn't
23   know one way or the other?"
24             And your answer, was it not, was:  "As best as I
25   can remember, my take -- my impression -- was that he
```

1     represented the DNC, that he worked for the DNC.  That was

2     the extent of what I understood."

3                Correct?  That was your answer?

4     A.  Correct.

5     Q.  Not "I understood, my impression was he was coming to

6     the FBI on his own for the Alfa-Bank matter and was

7     generally affiliated"; just "my take was he represented the

8     DNC, and that was the extent of what I knew."  Correct?

9     A.  As a DNC attorney, he does represent the DNC, yes.

10    Q.  And then you were asked again, "And did Mr. Moffa say

11    that, or did he just say he was a DNC attorney?"

12                And, again, you explained, "So I specifically

13    wrote in my notes that he was a DNC, I believe, attorney.  I

14    know that I also noted an abbreviation in my notes, which at

15    this point I don't know what that abbreviation meant.  But I

16    believe Mr. Moffa described him as a DNC attorney who had

17    provided it.  He may have given additional background.  I

18    don't know."

19                And then you were asked -- is that correct?  Is

20    that your testimony?

21    A.  Yes.

22    Q.  You were asked a fourth time:  "Okay, but is it your

23    testimony, though, that you didn't know the particular and

24    Mr. Moffa didn't say whether he was representing the DNC in

25    this instance?

```
 1                   "Yes.

 2                   "Meaning you didn't know?

 3                   "Right."

 4      A.  One moment.  I was waiting for the --

 5      Q.  Oh, sure.

 6      A.  (Witness reviews document) Correct.

 7      Q.  And let me just quickly -- sorry, I thought this was

 8      being published.

 9                   MR. BOSWORTH:  And, Your Honor, can we just

10      publish these for the jury so they can see?  We can put them

11      all in one run together.

12                   THE COURT:  Yes, they may be published.  They're

13      not in evidence, correct?

14                   MR. BOSWORTH:  Correct.

15                   THE COURT:  Okay.

16                   MR. BOSWORTH:  So this is under-oath testimony.

17      Let's just show them one by one.

18                   Let's do the first excerpt and publish for the

19      jury RG03 at 12, Lines 2 through 11.

20      Q.  At the bottom there is when you're asked, "When you

21      learned this from Moffa, when you said he was a DNC lawyer,

22      did you know whether Sussmann was representing the DNC on

23      this particular matter, or did you not know?"

24                   And you said, "I did not know," right?  That's

25      Question 1.
```

```
1            Then we've got Question 2, Lines 12 to 18.

2            "Okay.  When he was described as a DNC lawyer, did

3   you know whether he, in fact, was employed by the DNC or

4   just represented the DNC in other matters, or you didn't

5   know one way or the other?"

6            And your answer -- right, we just went over --

7   wasn't "my impression was he was affiliated, but he came on

8   this on his own."  Your answer was:  "As best I can

9   remember, my take was that he represented the DNC, that he

10  worked for the DNC.  That was the extent of what I

11  understood."

12           Right?  We went over that.

13  A.  Correct.

14  Q.  And then we go to Question 3:  "Did Mr. Moffa say

15  that" -- this is 12, Page 12, Line 19, to Page 13, Line 2.

16  "Did Mr. Moffa say that or did he just say he was a DNC

17  attorney?"

18           And you said -- and we just went over it.  You

19  specifically wrote in your notes he was a DNC attorney.

20  Moffa described him as a DNC attorney.

21           Moving on.  "He may have given additional

22  background, I don't know."

23           Again, nothing about his affiliation.  Nothing

24  about your impression being that he came to the FBI on Alfa-

25  Bank representing himself, correct?
```

1    A.  Correct.

2    Q.  Question 4:  "Okay.  But is it your testimony, though,

3    that you didn't know the particular -- and Mr. Moffa didn't

4    say whether he was representing the DNC in this instance?

5            "Yes.

6            "Right?

7            "I don't know."

8            Not "My impression was he was here on his own,"

9    but "I don't know; you'd have to ask him," right?  Just

10   that?

11   A.  That Mr. Moffa didn't say whether he was representing

12   the DNC in this instance, yes.

13   Q.  Okay.

14           MR. BOSWORTH:  Okay.  Let's take that down.

15   Q.  And then you started some of your trial prep sessions

16   more recently, right?

17           That was your under-oath grand jury testimony.  No

18   mention of this impression.  No mention of believing

19   Mr. Sussmann came on his own.

20           Then you started preparing for this trial, right?

21   A.  Correct.

22   Q.  Those were your next meetings with the government, to

23   get ready for today, correct?

24   A.  Yes.

25   Q.  Okay.  And looking at the notes from your prep session,

1    it looks like you were asked again about this topic, and you

2    were asked what your view was on Mr. Sussmann's

3    representation of the DNC on this matter.

4           Do you remember being asked questions about this

5    topic again?

6    A.  We talked about it, yes.

7    Q.  Okay.  And you first said on May 13th that you didn't

8    know Mr. Sussmann repped the DNC in this matter, and you

9    repeated that again.

10          Do you remember saying that?

11   A.  I don't remember that said that way, no, I don't.

12   but -- could you repeat that?

13   Q.  That you did not know Mr. Sussmann repped the DNC in

14   this matter, and that you didn't know if that is who he was

15   representing?

16   A.  So what actually occurred in that prep session -- and I

17   do remember this -- is I asked the question because I didn't

18   know whether Mr. Sussmann actually was a DNC attorney at the

19   time.

20   Q.  And when you asked that question, what answer were you

21   given?

22   A.  I was told that it would be best, because of my

23   recollection, for me not to know or to be told by them.

24          So essentially I was told that I wouldn't be told

25   whether or not he was or wasn't.  It was better for me just

1    to go as a witness with my recollection at the time, and

2    that makes sense.

3    Q.   Okay.  And your recollection at the time, in the fall of

4    2016, in October 2020, in December 2020, in June of 2021, in

5    I guess May of 2022 up to this point, was that you didn't

6    know one way or the other who he was representing on Alfa-

7    Bank, correct?

8    A.   I didn't know or -- to be clear, in the grand jury there

9    was a statement about whether or not I was specifically told

10   that he was representing or not.

11         I do not recall being told whether or not he was

12   specifically representing or not.  But I do recall that my

13   take-away from it was that he was not specifically

14   representing.

15   Q.   Uh-huh.

16   A.   But I don't remember Mr. Moffa actually telling me that,

17   so I can't testify to that.

18   Q.   Right.  But do you remember ever saying that before

19   May 13th of 2022?  Do you remember ever saying to the

20   government, "My impression is he was a DNC-affiliated

21   attorney, but he was on this one on his own?"

22         Do you remember ever saying that?

23   A.   I don't remember ever referring to him as a DNC-

24   affiliated attorney.  I don't remember making the statement

25   that you're saying, no.

1    Q.  Okay.  Let me be clear.  At any time prior to May 13th

2    of 2022, two weeks ago, did you ever tell the government

3    that your impression was that Michael Sussmann was

4    representing himself, was coming on his own, when he

5    presented the Alfa-Bank allegations, yes or no?

6    A.  I don't believe that came up in an interview, no.

7    Q.  Okay.  Never once, correct?

8    A.  Correct.

9    Q.  Not in your 2020 interviews, correct?

10   A.  Correct.

11   Q.  Not in your sworn under-oath grand jury testimony in

12   2021, correct?

13   A.  Correct.

14   Q.  Not even in your first prep session for this trial in

15   May of 2022, correct?

16   A.  That is --

17   Q.  May 3, 2022.

18   A.  I don't believe that's correct.

19   Q.  Right.  The first time when you said what you said on

20   the witness stand was two weeks ago, correct?

21   A.  No.  When was the first prep session?

22   Q.  May 3rd.  We went through this before.  You met with the

23   government on May 3, 2022.

24   A.  Okay.  If that was the first prep session for this

25   trial, that was the first time that that was brought up,

```
 1      yes.

 2      Q.  Okay.  Let me show you the notes for that meeting and

 3      ask if you can point out to me where you said that.

 4              MR. BOSWORTH:  This is RG04 just for the witness.

 5      A.  Okay.

 6      Q.  These are --

 7      A.  I can see it.

 8      Q.  -- the notes from your prep session.

 9              Does this refresh your recollection about whether

10      you said anything about having an impression Mr. Sussmann

11      came to the FBI on his own?

12      A.  These notes are very sparse.

13      Q.  Okay.  And they don't say that, though, correct?

14      A.  I see no reference to any content really from that

15      meeting, no.

16      Q.  Okay.  Now, let's look at the notes from the next prep

17      session you went to.  So not the first, as you just said,

18      but the second prep session.

19              MR. BOSWORTH:  Let's go to RG07, just for the

20      witness.  If you can blow up the second paragraph.

21      Q.  So this is May 13th -- not May 3rd, May 13th -- 2022.

22              Does this refresh your recollection about what you

23      told the government on this date about whether Mr. Sussmann

24      was coming on his own?

25      A.  Yes.  And I believe this is a reflection of what was
```

1    said at the prior prep session as well.

2    Q.  So here -- and May 3rd, you said you told them this, but

3    it's not in your notes.  Correct?

4    A.  I do believe that's the case, yes.

5    Q.  You're an FBI agent.  You know what it's like to take

6    notes of trial preparation, correct?

7    A.  Yes.

8    Q.  And you know, don't you, that when you meet with a

9    witness, and the witness says something new, something that

10   isn't reflected in their notes, you have to write it down,

11   correct?

12   A.  That is correct.

13   Q.  Okay.  So if, for example, you said something you hadn't

14   said before, the agents taking notes would have to write

15   down "Here's what Mr. Gaynor said that he hadn't said

16   before," correct?

17   A.  Correct.  And that's why the prior notes, I think,

18   reflect that the statements were consistent with prior

19   testimony.

20   Q.  Okay.  But the first time that the notes that you've

21   reviewed show you saying anything about having the

22   impression that Mr. Sussmann represented the DNC in this

23   matter was May 13, 2022, these notes you're looking at right

24   now.  Correct?

25   A.  I'm sorry, could you repeat that?

1    Q.  The first notes that show any reflection of your saying

2    Mr. Sussmann wasn't representing the DNC on this matter is

3    these notes from a session on May 13, 2022, correct?

4    A.  Yes.

5    Q.  And you said, by the way, that the thing that jogged

6    your memory was this to-do list, right?  Defense Exhibit

7    526.  Plus remembering this meeting with Mr. Moffa and the

8    help/hinder issue, right?

9    A.  Plus emails, calendar, et cetera, yes.

10   Q.  All things that you had reviewed and testified about in

11   the grand jury, correct?

12   A.  I had reviewed the material prior to the grand jury,

13   yes.

14   Q.  Okay.  And even though you reviewed all that material,

15   you didn't say anything about this impression then, did you?

16   A.  That is correct.

17   Q.  Let's keep going.

18              You also said not simply that Mr. Sussmann was a

19   DNC attorney; you've said that you believed that the DNC

20   itself was the source of the allegations, correct?

21   A.  I believe that was said during the very first meeting

22   that I had with the government.

23   Q.  Okay.  So in your first meeting with the government,

24   you -- this is October of 2020, correct?

25   A.  Yes.

1    Q.  You told them multiple times that you believed that the

2    Democratic National Committee was the source of the

3    allegations of connections between Alfa-Bank and Russia,

4    correct?

5    A.  Correct, which was wrong.

6    Q.  Okay.  But you said that you thought the Democratic

7    party itself was who provided the information, correct?

8    A.  I did say that in the meeting.

9    Q.  Okay.  And you similarly indicated in your grand jury

10   testimony that you believed the Democratic National

11   Committee was the place that had information about where

12   this stuff came from, didn't you?

13   A.  Could you say that one more time, sir?

14   Q.  When you testified in the grand jury -- do you remember

15   that?

16   A.  Yes.

17   Q.  -- you believed that the DNC is who had information

18   about where the allegations came from; that you'd have to

19   ask the DNC in order to figure out who provided this cyber

20   data.  You'd have to ask the DNC who authored the white

21   papers.

22           Do you remember saying that?

23   A.  Could we refer back to the grand jury testimony on that?

24   Q.  Sure.

25           MR. BOSWORTH:  So let's go to RG03 and publish for

1    the jury starting at Page 32, Lines 18 to 25.

2    Q.   And this is in the context of explaining this help/

3    hinder issue that we're going to talk about that you said

4    jogged your memory about Mr. Sussmann coming on his own,

5    right?

6    A.   Yes.

7    Q.   So you testified about the help/hinder issue in the

8    grand jury, right?

9    A.   Correct.

10    Q.   But you never said there that Mr. Sussmann came with the

11    Alfa-Bank allegations on his own, right?

12    A.   That's correct.

13    Q.   We went over that.

14         Okay.  So you were asked:  "What, if anything, did

15    you do to determine whether this help/hinder" -- the close

16    hold we'll get to -- "was hindering the investigation?"

17         And you said, "Upon reviewing what we already knew

18    from the investigation as of Monday" -- we'll get to the

19    date, but this is in the fall of 2016 -- "I determined that

20    at that time we didn't have an argument that it hindered the

21    investigation."

22         Right?

23    A.   Yes.

24    Q.   Okay.  And you were asked why was that.

25         And your answer was:  "At the time, because the

1     information had come from where it came from, it didn't

2     appear that we would be able to" -- carry over to the next

3     page -- "utilize it.  We weren't going to be able to go to

4     the Democratic National Committee in such close proximity to

5     the election."

6              Right?  You gave that answer?

7     A.  Yes.

8     Q.  You were asked:  "Is it hindering you not to know the

9     source?"  Right?

10             That's the context of these questions.

11             And you said, "No, because we couldn't go to the

12    Democratic National Committee so close to the election to

13    get answers to our questions."

14             Correct?

15    A.  So I was referencing the fact that Mr. Sussmann was

16    associated with the DNC, and that by going to someone at the

17    DNC working for the DNC, representing them as a DNC attorney

18    potentially, we would be in violation of the policy, yes.

19    Q.  Okay.  So it's your testimony that Mr. Sussmann is the

20    embodiment of the Democratic National Committee?

21    A.  It is not.

22             It is my testimony, however, my statement, that

23    the DNC itself, in such close proximity to the election and

24    conducting an overt investigative act related to it, would

25    have been a potential violation of policy.

```
1     Q.  Uh-huh.  Okay.  Well, let's keep going.
2            Now, you believed, didn't you, that the
3     investigation into the links between Alfa-Bank and Russia
4     should be driven by data, correct?
5            THE COURT:  Mr. Bosworth, how much longer do you
6     think you might have?
7            MR. BOSWORTH:  Quite a while.
8            THE COURT:  Okay.  This might be a good time to
9     break, if you're moving to a new subject.
10           MR. BOSWORTH:  Thank you, Your Honor.
11           THE COURT:  Ladies and gentlemen, we're going to
12    take our lunch break.  It's about 12:30.  Why don't we plan
13    to come back at 1:45.  All right?
14           Have a great lunch.  No discussions about the
15    case.  No research about the case.
16           (Jury exits courtroom)
17           THE COURT:  All right.  Sir, you can step down.
18    Please don't discuss your testimony over the lunch break.
19           All right.  Please be seated, everybody.
20           With respect to the sealed motion that the
21    government filed last night, I wonder whether we can deal
22    with this in an unsealed way that does not disclose too much
23    about the motion, but just discusses the government's legal
24    basis for excluding this or limiting the cross.
25           MR. ALGOR:  Yes, Your Honor.  I think we can --
```

1           THE COURT:  Okay.

2           MR. ALGOR:  -- without referring to whatever

3     witness.  We believe that this is, you know, a matter that

4     hasn't been adjudicated yet.  So it's an open investigation,

5     there's no findings related to it, and that it doesn't go at

6     all to the witness's truthfulness; and as a result, it's not

7     appropriate to cross-examine him, the witness, regarding

8     that investigation.  And so that's the basis that's laid out

9     in our motion.

10          THE COURT:  Okay.  Do you want to address both

11    those issues in a general way?  And if you think I need to

12    take sealed testimony in order to resolve it, we can cross

13    that bridge then.  But generally, if, you know, an officer

14    takes the stand and a citizen has made a complaint but

15    there's been no finding one way or the other, I would not

16    ordinarily allow that to be used to impeach credibility.

17          MR. BERKOWITZ:  Understood.  And I will tread

18    carefully on the specifics of what I know and don't know.

19          Here, Your Honor, you're right.  608(b) would

20    typically prohibit, you know, collateral impeachment about a

21    matter that's not yet been adjudicated.

22          I think the issue here is different because the

23    complaint -- we're not aware that it's a citizen complaint

24    as opposed to, perhaps, a governmental complaint that's

25    being looked into, which could go to the witness's

1    credibility to curry favor with the very agency that is

2    complaining about this issue potentially.  And without

3    knowing the specifics of it, I think we can fairly interpret

4    that the complaint may have come from within an agency

5    rather than from without, which would distinguish it from

6    the *Horsford* case.

7         And I have a couple of cases I can cite to you

8    that suggest, if there is a government investigation, and

9    that government is questioning the witnesses, there is a

10   motive to curry favor before there is an adjudication.

11        I'll give you two cites.  I won't overwhelm you.

12   And I have the cases, if you prefer.

13        The first one is *United States vs. Parker*, which

14   is a Fourth Circuit case, 790 F. 3d 550.

15        And the second case that I would cite to you is

16   *U.S. vs. Whitmore*, which is a D.C. Circuit -- I'm sorry,

17   District of Columbia case, 359 F. 3d 609.

18        I can make those cases available.  They're not

19   highlighted in any way.

20        THE COURT:  Okay.  We can pull them.

21        MR. BERKOWITZ:  Happy to answer any questions, but

22   that's our theory, Judge.

23        THE COURT:  Okay.  We'll take a look.

24        And this issue came up in a similar fashion with

25   Mr. Baker's testimony, if I recall, and there was no

1    objection from the government.

2              MR. BERKOWITZ:  And I think in that situation what

3    Mr. Baker said was his understanding was that the matter had

4    been closed, and so there was no -- we weren't sure, but

5    whether it was closed or not, I think at least in his mind

6    it was closed from an IG perspective, and so it was asked

7    and answered in that way.

8              THE COURT:  Okay.

9              MR. ALGOR:  Can I just briefly, Your Honor?

10             THE COURT:  Sure.

11             MR. ALGOR:  So, Your Honor, with -- I think

12   there's a clear distinction between Mr. Baker's cross-

13   examination and this witness.  The defense was arguing that

14   Mr. Baker was trying to curry favor with the Special Counsel

15   because of the Special Counsel prior investigation.

16             In this instance, this is not an investigation

17   being done by the Special Counsel.  This is being done

18   by the FBI.  And so I think there's a clear distinction

19   there.

20             THE COURT:  Okay.

21             All right.  Let's come back at quarter until

22   2:00, and we'll -- if I need to take sealed evidence, we

23   can figure out how to do that, but I don't think that I

24   will.

25             MR. BERKOWITZ:  And he's not even the next

1        witness, so we may not get to him today.

2                    THE COURT:  Yes, okay.

3                    MR. BERKOWITZ:  Thank you, Judge.

4                    (Lunch recess taken at 12:34 p.m.)

5

6

7              **CERTIFICATE OF OFFICIAL COURT REPORTER**

8

9                    I, LISA A. MOREIRA, RDR, CRR, do hereby

10       certify that the above and foregoing constitutes a true and

11       accurate transcript of my stenographic notes and is a full,

12       true and complete transcript of the proceedings to the best

13       of my ability.

14            Dated this 23rd day of May, 2022.

15

16

17                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
                                United States Courthouse
18                              Room 6718
                                333 Constitution Avenue, NW
19                              Washington, DC 20001

20

21

22

23

24

25

**'** 

**'15** [1] - 1481:12
**'16** [3] - 1441:9, 1442:16
**'17** [1] - 1522:15
**'19** [1] - 1438:8
**'hidden'** [1] - 1517:4
**'new'** [1] - 1520:21
**'source'** [2] - 1504:2, 1505:6

**/**

**/s/Lisa** - 1568:16

**1**

**1** [7] - 1447:15, 1450:6, 1480:12, 1519:3, 1545:21, 1552:25
**10/30/2020** [1] - 1536:2
**10020** [1] - 1422:20
**10:00** [1] - 1506:17
**11** [3] - 1506:3, 1549:23, 1552:19
**11:00** [1] - 1498:23
**12** [5] - 1549:22, 1552:19, 1553:1, 1553:15
**12/15/2020** [1] - 1536:15
**1271** [1] - 1422:19
**12:30** [1] - 1564:12
**12:34** [1] - 1508:4
**13** [3] - 1553:15, 1559:23, 1560:3
**13th** [6] - 1520:7, 1555:7, 1556:19, 1557:1, 1558:21
**14** [1] - 1497:4
**1437** [1] - 1423:4
**145** [1] - 1422:15
**1457** [1] - 1423:4
**1484** [1] - 1423:5
**1485** [1] - 1423:7
**15** [3] - 1485:4, 1497:4, 1546:24
**1528** [1] - 1423:7
**15th** [2] - 1536:14, 1546:7
**16th** [1] - 1442:16
**17th** [1] - 1432:19
**18** [4] - 1479:25, 1480:12, 1553:1, 1562:1
**19** [3] - 1454:22, 1480:4, 1553:15
**1990s** [1] - 1482:16

**1998** [1] - 1482:17
**1:21-cr-00582-CRC-1** [1] - 1422:4
**1:45** [1] - 1564:13

**2**

**2** [6] - 1440:24, 1441:25, 1549:22, 1552:19, 1553:1, 1553:15
**20** [2] - 1480:5, 1480:23
**20001** [2] - 1422:24, 1568:19
**20002** [1] - 1422:15
**2008** [1] - 1481:12
**2016** [32] - 1438:14, 1438:15, 1439:14, 1441:14, 1444:2, 1449:11, 1450:13, 1454:22, 1458:15, 1459:25, 1460:15, 1473:25, 1476:17, 1479:11, 1480:7, 1480:15, 1486:17, 1486:18, 1486:19, 1486:24, 1487:5, 1500:19, 1502:15, 1503:15, 1530:7, 1532:10, 1534:15, 1534:17, 1535:11, 1544:4, 1556:4, 1562:19
**2017** [2] - 1452:4, 1478:1
**202** [1] - 1422:24
**2020** [9] - 1536:20, 1545:3, 1546:24, 1547:9, 1547:25, 1556:4, 1557:9, 1560:24
**2021** [6] - 1458:7, 1536:15, 1537:16, 1549:2, 1556:4, 1557:12
**2022** [11] - 1422:4, 1556:5, 1556:19, 1557:2, 1557:15, 1557:17, 1557:23, 1558:21, 1559:23, 1560:3, 1568:14
**20th** [1] - 1547:18
**21** [2] - 1438:5, 1480:5
**21-582** [1] - 1424:3
**212** [2] - 1422:16, 1422:20
**22** [2] - 1479:25, 1480:5
**22nd** [3] - 1444:2,

**1539:18**, 1539:19
**23** [3] - 1422:4, 1473:25, 1530:7
**23rd** [9] - 1476:21, 1487:5, 1487:13, 1490:9, 1521:15, 1532:8, 1533:4, 1533:10, 1568:14
**24** [2] - 1536:15, 1537:16
**243** [1] - 1463:14
**24th** [1] - 1549:2
**25** [1] - 1562:1
**26** [2] - 1480:7, 1480:14
**265** [2] - 1502:12, 1502:23
**26th** [6] - 1477:13, 1490:10, 1500:18, 1532:23, 1533:9, 1533:11
**270** [2] - 1519:23, 1520:3
**279** [4] - 1542:16, 1542:17, 1542:18, 1542:19
**27th** [1] - 1441:9
**283** [2] - 1515:17, 1515:24
**285** [1] - 1470:5
**289** [7] - 1444:14, 1444:18, 1444:21, 1445:24, 1446:21, 1447:2, 1447:6
**2:00** [1] - 1567:22
**2A** [4] - 1442:18, 1444:15, 1446:21, 1447:3
**2B** [5] - 1442:19, 1444:7, 1444:19, 1445:23, 1447:3
**2C** [4] - 1443:22, 1443:23, 1444:22, 1447:3
**2nd** [1] - 1441:9

**3**

**3** [4] - 1545:21, 1553:14, 1557:17, 1557:23
**30** [1] - 1545:3
**302** [1] - 1535:21
**30th** [1] - 1546:20
**32** [1] - 1562:1
**333** [1] - 1422:23, 1568:18
**354-3187** [1] - 1422:24
**359** [1] - 1566:17
**3:00** [1] - 1506:3

**3d** [2] - 1566:14, 1566:17
**3rd** [6] - 1503:15, 1506:3, 1516:9, 1557:22, 1558:21, 1559:2
**3rd/4th** [1] - 1508:21

**4**

**4** [1] - 1554:2
**41** [1] - 1477:8
**4th** [3] - 1502:15, 1506:16, 1506:18

**5**

**5/13** [1] - 1539:7
**5/3** [1] - 1538:25
**515** [2] - 1474:16, 1475:5
**524** [2] - 1534:24, 1544:5
**525** [1] - 1473:16
**526** [3] - 1542:12, 1547:20, 1560:7
**550** [1] - 1566:14
**559** [1] - 1478:5
**563** [1] - 1479:24
**5th** [3] - 1510:9, 1516:5, 1518:12

**6**

**6** [1] - 1478:1
**608(b** [1] - 1565:19
**609** [1] - 1566:17
**637-2231** [1] - 1422:16
**6718** [2] - 1422:23, 1568:18
**6th** [2] - 1452:3, 1452:8

**7**

**707** [2] - 1476:16, 1477:8
**790** [1] - 1566:14
**7th** [3] - 1475:11, 1476:12, 1476:13

**9**

**906-1200** [1] - 1422:20
**9:05** [1] - 1422:5

**A**

**A)DAG** [1] - 1478:7
**a.m** [3] - 1422:5, 1498:23, 1506:17
**abbreviation** [8] -

**1447:18**, 1448:10, 1464:18, 1503:25, 1507:19, 1507:21, 1551:14, 1551:15
**ability** [4] - 1433:9, 1446:18, 1547:8, 1568:13
**able** [7] - 1425:11, 1425:24, 1494:3, 1495:17, 1526:7, 1563:2, 1563:3
**absent** [1] - 1431:17
**absolutely** [2] - 1532:13, 1543:12
**academic** [1] - 1448:1
**accomplish** [1] - 1459:20
**according** [3] - 1482:15, 1483:6, 1484:10
**account** [4] - 1456:24, 1525:13, 1525:14, 1525:15
**accurate** [3] - 1512:9, 1537:25, 1568:11
**accurately** [6] - 1445:15, 1445:19, 1446:13, 1446:17, 1450:21, 1479:3
**acknowledging** [1] - 1455:25
**acronyms** [1] - 1449:8
**act** [2] - 1519:17, 1563:24
**acting** [4] - 1429:5, 1429:8, 1430:24, 1519:18
**Action** [1] - 1422:3
**activities** [1] - 1459:21
**activity** [7] - 1507:17, 1514:8, 1514:21, 1514:24, 1515:1, 1520:17, 1532:5
**actors** [1] - 1461:2
**acts** [1] - 1520:18
**actual** [5] - 1496:13, 1500:9, 1507:17, 1530:2, 1531:4
**addition** [2] - 1509:7, 1527:2
**additional** [4] - 1495:1, 1539:9, 1551:17, 1553:21
**additionally** [1] - 1497:9
**address** [7] - 1495:10, 1505:1, 1516:15, 1520:15, 1524:20, 1528:2, 1565:10
**addresses** [1] -

1504:23
**adjudicated** [2] -
1565:4, 1565:21
**adjudication** [1] -
1566:10
**adjust** [1] - 1442:24
**admissible** [1] -
1425:3
**admit** [3] - 1475:4,
1476:18, 1535:3
**admitted** [1] - 1470:6
**advanced** [1] - 1427:9
**advantage** [1] -
1459:22
**adversaries** [1] -
1522:1
**advised** [4] - 1440:9,
1536:24, 1545:15,
1545:25
**Advisors** [4] -
1437:19, 1437:20,
1437:22, 1437:24
**affairs** [5] - 1477:2,
1477:3, 1516:22,
1516:23, 1516:24
**affect** [1] - 1514:12
**affected** [3] - 1524:1,
1524:12, 1527:16
**affiliated** [15] - 1492:8,
1539:24, 1540:12,
1540:14, 1542:7,
1543:2, 1544:19,
1546:10, 1547:23,
1548:22, 1550:15,
1551:7, 1553:7,
1556:20, 1556:24
**affiliation** [2] -
1522:18, 1553:23
**afternoon** [1] -
1506:23
**agency** [2] - 1566:1,
1566:4
**AGENT** [2] - 1423:6,
1485:13
**Agent** [21] - 1485:16,
1485:21, 1485:24,
1486:1, 1486:8,
1487:19, 1489:3,
1489:14, 1490:4,
1499:7, 1502:19,
1502:20, 1503:8,
1506:15, 1509:1,
1510:22, 1515:19,
1516:4, 1520:11,
1527:15, 1531:21
**agent** [21] - 1429:5,
1458:23, 1466:1,
1466:18, 1475:10,
1484:7, 1486:2,
1486:4, 1488:5,

1488:11, 1489:1,
1489:3, 1494:11,
1497:9, 1498:4,
1502:20, 1506:1,
1515:21, 1531:6,
1559:5
**agents** [14] - 1430:24,
1461:7, 1475:2,
1486:5, 1488:11,
1489:1, 1503:6,
1524:23, 1528:25,
1529:2, 1529:5,
1529:10, 1529:14,
1559:14
**ago** [7] - 1462:10,
1462:13, 1463:23,
1475:9, 1534:5,
1557:2, 1557:20
**agree** [1] - 1506:7
**Alexei** [1] - 1481:11
**Alfa** [65] - 1439:17,
1444:10, 1452:1,
1454:21, 1456:4,
1461:15, 1461:20,
1462:4, 1467:22,
1469:21, 1471:18,
1471:24, 1472:11,
1473:15, 1473:25,
1475:17, 1479:9,
1479:23, 1480:16,
1481:1, 1481:7,
1481:9, 1482:17,
1483:18, 1484:9,
1487:1, 1487:4,
1491:11, 1501:14,
1503:8, 1504:24,
1507:7, 1507:17,
1509:21, 1517:3,
1517:10, 1519:7,
1521:9, 1521:10,
1528:3, 1530:6,
1530:12, 1530:16,
1530:17, 1530:18,
1531:10, 1532:3,
1532:9, 1534:17,
1540:1, 1541:17,
1542:8, 1547:24,
1548:23, 1551:6,
1553:24, 1556:6,
1557:5, 1561:3,
1562:11, 1564:3
**Alfa-Bank** [53] -
1439:17, 1452:1,
1454:21, 1456:4,
1461:15, 1462:4,
1467:22, 1469:21,
1471:24, 1472:11,
1473:15, 1473:25,
1475:17, 1479:9,

1479:23, 1480:16,
1481:1, 1481:9,
1481:13, 1482:9,
1484:9, 1487:1,
1487:4, 1491:11,
1501:14, 1503:8,
1504:24, 1507:17,
1509:21, 1517:3,
1517:10, 1519:7,
1521:9, 1521:10,
1528:3, 1530:12,
1530:16, 1530:17,
1530:18, 1532:3,
1532:9, 1534:17,
1540:1, 1541:17,
1547:24, 1548:23,
1551:6, 1561:3,
1562:11, 1564:3
**Alfa-Bank's** [2] -
1482:17, 1483:18
**ALGOR** [5] - 1422:13,
1564:25, 1565:2,
1567:9, 1567:11
**Algor** [1] - 1424:6
**allegation** [43] -
1429:7, 1439:15,
1456:11, 1461:14,
1469:18, 1479:22,
1482:22, 1483:18,
1487:4, 1487:6,
1487:8, 1488:18,
1489:8, 1491:18,
1492:19, 1493:2,
1494:20, 1494:23,
1495:14, 1495:15,
1496:13, 1497:11,
1497:12, 1497:19,
1505:14, 1508:8,
1508:9, 1509:6,
1509:10, 1509:19,
1510:1, 1510:12,
1511:2, 1511:7,
1511:10, 1511:23,
1513:11, 1525:11,
1525:12, 1531:1,
1531:4, 1532:4,
1533:22
**allegations** [32] -
1431:11, 1432:1,
1439:20, 1440:2,
1440:4, 1444:11,
1452:1, 1454:21,
1454:24, 1455:18,
1456:5, 1469:24,
1483:3, 1483:25,
1484:9, 1486:25,
1489:5, 1490:8,
1495:8, 1496:21,

1510:11, 1511:18,
1512:18, 1512:21,
1530:12, 1533:2,
1540:1, 1557:5,
1560:20, 1561:3,
1561:18, 1562:11
**alleged** [2] - 1432:14,
1512:24
**Allison** [4] - 1489:4,
1497:10, 1502:21,
1503:8
**allow** [5] - 1424:25,
1506:9, 1529:12,
1548:7, 1565:16
**allowed** [5] - 1424:24,
1500:13, 1514:20,
1528:25, 1529:2
**allows** [1] - 1525:24
**alone** [1] - 1550:15
**Amendment** [6] -
1424:18, 1514:18,
1514:20, 1514:22,
1514:25, 1526:7
**AMERICA** [1] - 1422:3
**America** [1] - 1424:4
**American** [1] - 1526:7
**Americas** [1] -
1422:19
**amount** [3] - 1452:15,
1461:25, 1533:14
**analysis** [4] - 1494:22,
1496:24, 1497:14,
1509:1
**analytical** [2] -
1497:13, 1512:11
**analyze** [1] - 1452:15
**analyzed** [2] - 1509:3,
1516:11
**ANDREW** [1] -
1422:12
**Andrew** [1] - 1424:6
**angle** [1] - 1447:17
**answer** [14] - 1495:14,
1540:11, 1541:8,
1550:4, 1550:11,
1550:18, 1550:24,
1551:3, 1553:6,
1553:8, 1555:20,
1562:25, 1563:6,
1566:21
**answered** [3] -
1539:13, 1539:14,
1567:7
**answers** [2] - 1511:22,
1563:13
**anticipated** [1] -
1424:17
**apologize** [2] -
1455:22, 1498:6
**appear** [16] - 1427:2,

1440:24, 1441:5,
1441:13, 1441:25,
1442:5, 1442:20,
1444:3, 1444:10,
1444:12, 1444:14,
1444:18, 1444:22,
1446:3, 1515:19,
1563:2
**APPEARANCES** [1] -
1422:11
**apply** [1] - 1469:15
**appreciated** [1] -
1507:22
**apprised** [1] - 1472:5
**approach** [3] - 1426:2,
1435:14, 1440:20
**approached** [1] -
1447:25
**appropriate** [3] -
1425:10, 1524:11,
1565:7
**April** [2] - 1438:8
**area** [1] - 1486:13
**areas** [2] - 1427:2,
1427:7
**argue** [1] - 1496:15
**argued** [1] - 1427:14
**arguing** [1] - 1567:13
**argument** [3] -
1429:23, 1520:16,
1562:20
**Arsenault** [1] -
1503:10
**article** [2] - 1449:1,
1451:20
**ascertation** [1] -
1513:19
**aside** [2] - 1428:2,
1430:4
**aspect** [2] - 1501:5,
1541:4
**aspects** [5] - 1494:6,
1501:4, 1511:23,
1514:19, 1541:3
**assertions** [1] -
1512:10
**assess** [1] - 1510:16
**assessment** [5] -
1495:23, 1495:25,
1509:8, 1526:1,
1530:25
**assigned** [3] -
1486:19, 1503:7,
1528:10
**assignment** [1] -
1507:9
**assist** [4] - 1491:11,
1507:4, 1528:4,
1528:8
**assistant** [21] -

1438:12, 1438:15, 1438:24, 1444:25, 1445:8, 1450:23, 1452:5, 1452:14, 1465:5, 1465:6, 1465:11, 1466:10, 1474:3, 1477:1, 1486:4, 1518:7, 1518:13, 1518:17, 1518:19, 1518:20
**Assistant** [2] - 1485:24, 1486:1
**associated** [5] - 1492:17, 1495:11, 1504:24, 1525:9, 1563:16
**association** [1] - 1466:2
**assume** [3] - 1516:15, 1535:15, 1536:6
**assuming** [3] - 1453:13, 1472:3, 1525:1
**attached** [2] - 1518:23, 1520:14
**attachment** [1] - 1518:22
**attacks** [1] - 1498:11
**attempted** [1] - 1497:6
**attended** [3] - 1452:11, 1530:11, 1530:13
**attendees** [1] - 1478:8
**attending** [2] - 1452:7, 1487:7
**attention** [11] - 1438:13, 1439:14, 1439:20, 1452:3, 1456:11, 1476:15, 1479:24, 1480:23, 1538:11, 1538:21, 1539:4
**attorney** [40] - 1447:19, 1450:6, 1463:24, 1492:2, 1492:5, 1492:18, 1501:23, 1501:24, 1515:10, 1534:1, 1534:3, 1536:24, 1539:23, 1540:5, 1540:9, 1540:15, 1543:1, 1544:16, 1544:19, 1544:20, 1545:16, 1545:23, 1546:9, 1546:11, 1549:25, 1550:1, 1551:9, 1551:11, 1551:13, 1551:16, 1553:17, 1553:19, 1553:20, 1555:18,

1556:21, 1556:24, 1560:19, 1563:17
**attorneys** [1] - 1545:8
**August/September** [1] - 1479:10
**author** [2] - 1512:25, 1513:3
**authored** [1] - 1561:20
**available** [4] - 1433:8, 1481:19, 1513:19, 1566:18
**Aven** [4] - 1481:10, 1482:2, 1482:8, 1482:15
**Avenue** [3] - 1422:19, 1422:23, 1568:18
**avoid** [2] - 1425:4, 1428:17
**awaiting** [1] - 1508:4
**aware** [12] - 1428:8, 1430:12, 1430:17, 1431:5, 1432:9, 1446:4, 1508:11, 1508:13, 1509:24, 1517:12, 1517:13, 1565:23
**awareness** [1] - 1530:5

## B

**background** [2] - 1551:17, 1553:22
**bad** [1] - 1473:3
**Baker** [24] - 1426:13, 1426:18, 1427:6, 1427:23, 1430:9, 1430:11, 1430:18, 1430:21, 1432:4, 1434:13, 1470:11, 1470:12, 1470:13, 1471:5, 1471:8, 1471:18, 1472:11, 1491:22, 1493:9, 1544:24, 1550:3, 1550:5, 1567:3, 1567:14
**Baker's** [4] - 1471:3, 1472:9, 1566:25, 1567:12
**bank** [4] - 1439:16, 1483:4, 1487:1, 1510:14
**Bank** [60] - 1439:17, 1444:11, 1448:17, 1452:1, 1454:21, 1456:4, 1461:15, 1461:21, 1462:4, 1467:22, 1469:21, 1471:19, 1471:24, 1472:11, 1473:15,

1473:25, 1475:17, 1479:9, 1479:23, 1480:16, 1481:1, 1481:9, 1481:13, 1482:9, 1484:9, 1487:1, 1487:4, 1491:11, 1501:14, 1503:8, 1504:24, 1507:8, 1507:17, 1509:21, 1517:3, 1517:10, 1519:7, 1521:9, 1521:10, 1528:3, 1530:12, 1530:16, 1530:17, 1530:18, 1531:10, 1532:3, 1532:9, 1534:17, 1540:1, 1541:17, 1542:8, 1547:24, 1548:23, 1551:6, 1553:25, 1556:7, 1557:5, 1561:3, 1562:11, 1564:3
**Bank's** [2] - 1482:17, 1483:18
**Barracuda** [1] - 1495:3
**barracuda** [6] - 1497:1, 1497:7, 1497:23, 1498:7, 1498:10, 1502:4
**based** [20] - 1446:2, 1446:6, 1446:16, 1452:13, 1454:6, 1454:11, 1454:23, 1493:13, 1508:18, 1509:14, 1509:15, 1510:10, 1513:12, 1516:15, 1516:17, 1517:19, 1522:11, 1522:13, 1523:17
**basing** [1] - 1523:22
**basis** [5] - 1452:16, 1457:7, 1507:24, 1564:24, 1565:8
**bear** [2] - 1442:6, 1443:4
**became** [3] - 1501:15, 1521:14, 1541:18
**become** [1] - 1509:24
**becomes** [1] - 1425:9
**BEFORE** [1] - 1422:10
**began** [2] - 1432:19, 1532:2
**begin** [2] - 1496:20, 1527:17
**beginning** [3] - 1451:11, 1489:2, 1522:17
**behalf** [11] - 1424:11, 1429:8, 1454:13,

1454:24, 1455:7, 1455:15, 1455:19, 1456:5, 1525:5, 1526:10, 1526:15
**behavior** [1] - 1473:4
**beings** [1] - 1454:15
**Bellovin** [3] - 1430:10, 1431:24, 1448:6
**below** [5] - 1448:18, 1448:25, 1465:16, 1517:1, 1518:15
**benefit** [1] - 1498:5
**BERKOWITZ** [15] - 1422:17, 1424:9, 1424:14, 1425:18, 1425:25, 1427:10, 1428:7, 1433:21, 1434:4, 1434:6, 1565:17, 1566:21, 1567:2, 1567:25, 1568:3
**Berkowitz** [3] - 1424:10, 1424:15, 1433:20
**best** [14] - 1443:9, 1446:18, 1490:22, 1491:3, 1496:21, 1506:21, 1508:22, 1511:16, 1512:5, 1547:8, 1550:24, 1553:8, 1555:22, 1568:12
**better** [2] - 1449:21, 1555:25
**between** [20] - 1429:15, 1461:14, 1475:8, 1479:12, 1481:13, 1482:24, 1483:4, 1483:16, 1483:17, 1500:10, 1507:17, 1517:3, 1519:7, 1529:23, 1532:18, 1532:22, 1561:3, 1564:3, 1567:12
**beyond** [1] - 1429:1
**big** [1] - 1461:22
**Bill** [1] - 1436:24, 1518:17
**billing** [1] - 1522:25
**bit** [4] - 1455:9, 1498:5, 1542:23, 1547:21
**blaze** [1] - 1448:5
**Blaze** [2] - 1431:7
**blocked** [2] - 1497:5, 1497:6
**blow** [8] - 1470:9, 1473:18, 1474:20, 1480:24, 1481:25,

1536:12, 1544:8, 1558:20
**Bloze** [1] - 1448:5
**body** [3] - 1503:22, 1503:23, 1520:6
**book** [2] - 1426:19, 1444:16
**Bosworth** [3] - 1424:10, 1457:21, 1564:5
**BOSWORTH** [43] - 1422:17, 1446:23, 1457:18, 1463:13, 1463:17, 1470:9, 1473:18, 1474:18, 1475:4, 1476:18, 1477:9, 1477:23, 1479:7, 1480:4, 1480:8, 1481:24, 1482:21, 1484:3, 1502:24, 1515:25, 1520:4, 1528:16, 1535:3, 1535:14, 1535:19, 1536:6, 1542:17, 1544:1, 1544:6, 1544:8, 1545:19, 1545:21, 1548:12, 1549:21, 1552:9, 1552:14, 1552:16, 1554:14, 1558:4, 1558:19, 1561:25, 1564:7, 1564:10
**Bosworth**)................. ................ [2] - 1423:4, 1423:7
**bottom** [5] - 1474:2, 1481:25, 1503:12, 1518:8, 1552:20
**bounced** [1] - 1459:5
**Brandenberg** [1] - 1430:2
**breadth** [2] - 1533:6, 1533:8
**break** [9] - 1485:4, 1497:21, 1498:20, 1498:22, 1502:5, 1523:13, 1564:9, 1564:12, 1564:18
**bridge** [1] - 1565:13
**brief** [9] - 1450:24, 1464:21, 1478:12, 1478:17, 1488:3, 1494:4, 1531:20, 1534:21, 1544:12
**briefed** [4] - 1461:24, 1462:2, 1530:4, 1530:16
**briefer** [1] - 1478:21
**briefing** [19] - 1440:10,

1451:7, 1478:7,
1487:7, 1487:9,
1487:12, 1487:17,
1487:18, 1491:12,
1492:1, 1528:2,
1530:11, 1530:13,
1530:17, 1533:7,
1534:20, 1534:25,
1535:9, 1546:11
**briefly** [11] - 1433:20,
1460:13, 1463:8,
1468:20, 1470:5,
1470:17, 1480:1,
1502:13, 1511:4,
1534:10, 1567:9
**bring** [5] - 1443:6,
1457:2, 1457:10,
1503:10, 1525:12
**bringing** [9] - 1454:8,
1455:2, 1455:6,
1455:14, 1456:11,
1492:18, 1501:24,
1512:6, 1526:10
**brings** [1] - 1456:17
**BRITTAIN** [1] -
1422:14
**Brittain** [1] - 1424:6
**broadly** [2] - 1475:25,
1486:8
**brought** [9] - 1439:20,
1439:24, 1454:21,
1454:24, 1455:18,
1456:4, 1525:11,
1526:14, 1557:25
**bullet** [3] - 1447:22,
1447:24, 1447:25
**bullets** [1] - 1447:20
**bunch** [3] - 1470:13,
1478:7, 1518:3
**burden** [1] - 1430:2
**Bureau** [9] - 1493:8,
1505:14, 1509:24,
1510:3, 1525:22,
1527:6, 1527:7,
1527:12
**business** [2] -
1482:16, 1525:5
**businesses** [1] -
1437:21
**but..** [1] - 1433:16
**BY** [9] - 1437:8,
1443:19, 1447:4,
1457:18, 1484:6,
1485:15, 1499:6,
1528:16, 1548:12
**bypassed** [1] -
1457:10

**C**

**calculation** [1] -
1456:19
**calendar** [5] - 1476:17,
1476:21, 1477:7,
1477:12, 1560:9
**Campaign** [7] -
1429:6, 1429:8,
1430:24, 1454:25,
1479:14, 1482:25,
1529:23
**campaign** [3] - 1455:7,
1455:15, 1523:2
**campaigns** [1] -
1498:1
**cannot** [1] - 1429:24
**capacity** [2] - 1507:4,
1513:25
**career** [3] - 1458:22,
1486:10, 1486:15
**careful** [3] - 1475:23,
1517:6, 1547:6
**carefully** [1] - 1565:18
**Carol** [1] - 1516:21
**carry** [1] - 1563:2
**case** [52] - 1424:24,
1425:3, 1425:6,
1425:12, 1425:16,
1425:21, 1435:1,
1440:5, 1440:7,
1454:20, 1468:10,
1473:23, 1475:20,
1484:12, 1484:23,
1486:6, 1488:8,
1488:12, 1489:10,
1490:1, 1490:2,
1490:5, 1490:13,
1490:15, 1491:14,
1493:11, 1493:24,
1493:25, 1494:2,
1495:12, 1498:7,
1498:24, 1498:25,
1503:18, 1504:12,
1507:8, 1515:2,
1522:2, 1522:14,
1523:18, 1524:23,
1527:17, 1530:17,
1536:22, 1537:8,
1559:4, 1564:15,
1566:6, 1566:14,
1566:15, 1566:17
**Case** [1] - 1424:3
**case-in-chief** [1] -
1425:3
**cases** [8] - 1439:6,
1439:9, 1459:4,
1459:7, 1478:13,
1566:7, 1566:12,
1566:18

**cast** [1] - 1431:10
**categories** [2] -
1428:23, 1430:7
**category** [1] - 1432:6
**CATHERINE** [1] -
1422:18
**Catherine** [1] -
1424:10
**caused** [2] - 1520:17,
1543:25
**CD** [1] - 1507:24
**center** [1] - 1452:8
**central** [4] - 1496:24,
1497:15, 1502:8,
1504:11
**Central** [6] - 1494:25,
1495:5, 1495:9,
1495:25, 1497:25,
1498:8
**certain** [2] - 1435:16,
1472:24
**certainly** [3] - 1454:19,
1461:6, 1463:3
**CERTIFICATE** [1] -
1568:7
**certify** [1] - 1568:10
**cetera** [2] - 1464:19,
1560:9
**CG** [2] - 1507:19,
1520:13
**chain** [16] - 1464:22,
1475:8, 1500:13,
1502:14, 1502:17,
1504:22, 1505:1,
1505:23, 1506:16,
1515:20, 1516:3,
1516:13, 1517:17,
1518:2, 1518:10,
1518:22
**chance** [5] - 1472:20,
1473:8, 1473:11,
1489:15, 1500:3
**change** [2] - 1473:4,
1543:16
**changed** [2] - 1523:19,
1543:12
**channel** [4] - 1509:22,
1517:3, 1527:12,
1532:21
**charge** [7] - 1430:1,
1430:20, 1439:3,
1465:6, 1486:3,
1486:4, 1486:5
**Charge** [2] - 1485:24,
1486:1
**check** [2] - 1508:15,
1519:11
**Chicago** [29] -
1466:18, 1475:10,
1487:10, 1487:11,

1488:11, 1489:1,
1490:16, 1493:17,
1494:1, 1494:18,
1494:20, 1496:23,
1497:9, 1503:7,
1506:2, 1507:20,
1511:5, 1511:19,
1511:21, 1511:24,
1512:2, 1520:13,
1521:2, 1524:23,
1529:4, 1529:10,
1529:13, 1534:22
**Chicago's** [2] -
1496:5, 1523:19
**Chief** [2] - 1490:16,
1491:8
**chief** [5] - 1425:3,
1486:20, 1490:25,
1532:24, 1546:4
**choose** [1] - 1478:20
**chose** [3] - 1431:5,
1431:9, 1433:10
**CHRISTOPHER** [1] -
1422:10
**CHS** [13] - 1511:22,
1512:1, 1512:19,
1512:24, 1515:2,
1517:14, 1519:21,
1526:24, 1527:2,
1527:3, 1527:7
**CHS's** [1] - 1511:25
**CID** [2] - 1449:4,
1449:24
**circled** [1] - 1450:6
**Circuit** [2] - 1566:14,
1566:16
**circumstances** [1] -
1431:16
**cite** [2] - 1566:7,
1566:15
**cites** [1] - 1566:11
**citizen** [2] - 1565:14,
1565:23
**civil** [1] - 1433:6
**clarification** [1] -
1424:20
**clarifying** [3] - 1468:3,
1468:6, 1468:7
**classified** [3] -
1439:10, 1465:18,
1475:24
**clear** [16] - 1452:11,
1462:15, 1468:18,
1478:20, 1497:3,
1501:2, 1501:15,
1514:7, 1531:20,
1534:19, 1538:9,
1541:18, 1556:8,
1557:1, 1567:12,
1567:18

**clearly** [1] - 1547:13
**cleaves** [1] - 1474:19
**client** [5] - 1429:14,
1447:20, 1450:10,
1466:21, 1525:5
**clients** [2] - 1427:3,
1464:8
**Clinton** [7] - 1429:6,
1429:8, 1430:24,
1447:22, 1454:25,
1464:1, 1464:6
**close** [37] - 1427:19,
1448:19, 1482:9,
1493:1, 1493:11,
1493:15, 1493:16,
1496:5, 1496:11,
1499:9, 1499:13,
1499:22, 1500:1,
1500:8, 1500:14,
1505:15, 1508:6,
1508:16, 1508:18,
1513:15, 1514:2,
1514:9, 1523:10,
1524:1, 1524:2,
1524:3, 1524:9,
1524:11, 1524:16,
1524:19, 1524:25,
1525:3, 1529:6,
1562:15, 1563:4,
1563:12, 1563:23
**closed** [7] - 1522:8,
1522:10, 1522:14,
1522:16, 1567:4,
1567:5, 1567:6
**closer** [2] - 1501:16,
1541:19
**closest** [1] - 1515:7
**Coie** [3] - 1447:19,
1450:7, 1463:25
**collateral** [1] - 1565:20
**collect** [2] - 1452:15,
1452:21
**collected** [2] -
1488:19, 1495:2
**collection** [3] - 1453:6,
1481:21, 1518:24
**collects** [3] - 1452:25,
1453:1, 1453:4
**COLUMBIA** [1] -
1422:1
**Columbia** [1] -
1566:17
**Comey** [1] - 1470:14
**coming** [12] - 1427:19,
1434:24, 1451:20,
1472:15, 1486:16,
1519:20, 1543:2,
1547:3, 1551:5,
1557:4, 1558:24,
1562:4

**comm** [1] - 1448:20
**command** [1] - 1452:8
**Committee** [8] -
   1464:5, 1545:24,
   1548:22, 1561:2,
   1561:11, 1563:4,
   1563:12, 1563:20
**common** [2] -
   1453:11, 1494:4
**comms** [1] - 1448:16
**communicate** [3] -
   1432:20, 1496:17,
   1519:5
**communicated** [8] -
   1428:24, 1430:8,
   1433:25, 1434:12,
   1434:23, 1479:1,
   1519:9, 1540:25
**communicates** [1] -
   1429:10
**communicating** [6] -
   1430:12, 1434:9,
   1476:6, 1478:25,
   1480:16, 1547:7
**communication** [18] -
   1448:20, 1475:1,
   1484:10, 1488:24,
   1495:15, 1495:16,
   1496:1, 1497:5,
   1497:16, 1498:15,
   1508:20, 1509:5,
   1510:21, 1513:13,
   1519:6, 1521:11,
   1532:8, 1532:21
**communications** [16]
   - 1426:3, 1426:8,
   1426:16, 1426:24,
   1429:3, 1429:6,
   1429:15, 1430:19,
   1431:19, 1431:25,
   1432:15, 1432:22,
   1433:22, 1434:13,
   1448:16, 1497:4
**companies** [1] -
   1495:17
**company** [7] -
   1494:25, 1495:3,
   1495:4, 1495:21,
   1498:7, 1504:13,
   1504:15
**compelling** [1] -
   1496:15
**compiled** [1] - 1531:8
**complaining** [1] -
   1566:2
**complaint** [5] -
   1565:14, 1565:23,
   1565:24, 1566:4
**complete** [2] - 1497:3,
   1568:12

**completing** [1] -
   1431:2
**computer** [1] - 1517:2
**concealed** [1] - 1529:4
**concept** [1] - 1510:22
**concern** [2] - 1429:13,
   1521:21
**concerning** [2] -
   1461:15, 1471:18
**concerns** [2] - 1457:9,
   1479:17
**concise** [1] - 1478:20
**concluded** [1] -
   1512:3
**conclusion** [3] -
   1496:10, 1497:19,
   1510:15
**conclusions** [2] -
   1510:4, 1512:8
**concurred** [1] -
   1513:11
**conduct** [2] - 1514:8,
   1514:24
**conducted** [3] -
   1497:10, 1509:1,
   1532:5
**conducting** [1] -
   1563:24
**confidential** [24] -
   1429:17, 1455:20,
   1456:5, 1456:21,
   1456:22, 1456:24,
   1457:2, 1457:5,
   1457:10, 1468:21,
   1468:22, 1469:17,
   1510:23, 1511:1,
   1511:6, 1511:7,
   1511:13, 1511:17,
   1512:3, 1526:11,
   1526:16, 1526:20,
   1526:21
**confidentiality** [2] -
   1429:14, 1527:2
**connected** [2] -
   1428:7, 1448:18
**connection** [11] -
   1461:14, 1483:3,
   1483:18, 1510:25,
   1512:17, 1515:12,
   1515:14, 1530:20,
   1531:10, 1531:14,
   1534:7
**Connection** [1] -
   1481:1
**connections** [4] -
   1460:2, 1479:11,
   1482:24, 1561:3
**considerations** [1] -
   1523:8
**considers** [1] - 1454:4

**consistent** [3] -
   1510:18, 1532:16,
   1559:18
**consolidated** [1] -
   1536:9
**Consortium** [1] -
   1481:7
**constitutes** [1] -
   1568:10
**Constitution** [2] -
   1422:23, 1568:18
**consulting** [1] -
   1437:19
**contact** [6] - 1457:4,
   1457:6, 1482:5,
   1497:17, 1497:18,
   1538:15
**contacting** [2] -
   1448:14, 1449:3
**contacts** [6] - 1428:3,
   1428:9, 1428:10,
   1431:3, 1448:2
**contains** [1] - 1518:22
**contemporaneous** [1]
   - 1446:10
**contempt** [1] -
   1428:18
**content** [1] - 1558:14
**context** [5] - 1433:7,
   1445:24, 1467:2,
   1562:2, 1563:10
**continue** [4] - 1435:3,
   1487:20, 1487:21,
   1507:23
**continued** [2] -
   1528:9, 1531:11
**continuing** [1] -
   1488:3
**contrast** [1] - 1442:25
**contributed** [1] -
   1492:12
**control** [1] - 1440:17
**conversation** [8] -
   1463:6, 1467:11,
   1469:22, 1473:2,
   1533:9, 1542:6,
   1543:5, 1543:21
**conversations** [4] -
   1425:15, 1429:1,
   1445:11, 1471:17
**conveyed** [2] - 1426:5,
   1445:19
**COOPER** [1] - 1422:10
**coordinated** [1] -
   1432:14
**copied** [1] - 1474:2
**copies** [1] - 1436:2
**copy** [4] - 1435:18,
   1444:15, 1444:18,
   1444:22

**copying** [1] - 1518:3
**corner** [3] - 1442:13,
   1447:15, 1450:5
**corp** [1] - 1448:2
**corporate** [1] - 1448:2
**correct** [151] - 1425:7,
   1434:4, 1436:1,
   1436:4, 1440:18,
   1445:20, 1446:15,
   1450:4, 1451:14,
   1453:16, 1454:18,
   1457:24, 1457:25,
   1458:5, 1458:11,
   1460:3, 1460:21,
   1461:3, 1461:5,
   1461:6, 1461:15,
   1461:18, 1462:5,
   1462:11, 1462:13,
   1462:14, 1462:17,
   1462:23, 1462:25,
   1463:1, 1463:6,
   1464:24, 1465:8,
   1468:4, 1468:8,
   1472:12, 1473:5,
   1473:9, 1474:5,
   1478:4, 1479:12,
   1480:21, 1482:12,
   1483:5, 1483:8,
   1484:1, 1490:11,
   1493:18, 1495:22,
   1500:16, 1506:20,
   1507:11, 1511:15,
   1512:1, 1528:19,
   1528:20, 1528:22,
   1529:5, 1529:15,
   1529:16, 1529:19,
   1529:23, 1530:7,
   1531:1, 1532:4,
   1532:9, 1532:14,
   1532:15, 1532:18,
   1532:25, 1533:4,
   1533:22, 1533:23,
   1533:25, 1534:3,
   1534:15, 1536:22,
   1536:23, 1537:1,
   1537:2, 1537:6,
   1537:8, 1537:12,
   1538:1, 1538:2,
   1538:4, 1538:7,
   1540:25, 1541:1,
   1542:9, 1542:10,
   1543:3, 1543:19,
   1544:13, 1544:14,
   1544:17, 1544:20,
   1544:21, 1544:24,
   1546:21, 1547:7,
   1547:11, 1548:1,
   1548:2, 1548:14,
   1548:18, 1548:25,
   1550:4, 1550:16,

   1550:17, 1551:3,
   1551:4, 1551:8,
   1551:19, 1552:13,
   1552:14, 1553:13,
   1553:25, 1554:1,
   1554:21, 1554:23,
   1556:7, 1557:7,
   1557:8, 1557:9,
   1557:10, 1557:12,
   1557:13, 1557:15,
   1557:18, 1557:20,
   1558:13, 1559:3,
   1559:6, 1559:11,
   1559:12, 1559:16,
   1559:17, 1559:24,
   1560:3, 1560:11,
   1560:16, 1560:20,
   1560:24, 1561:4,
   1561:5, 1561:7,
   1562:9, 1562:12,
   1563:14, 1564:4
**Correct** [1] - 1552:6
**correction** [1] - 1546:3
**correctly** [4] -
   1461:24, 1465:25,
   1466:17, 1484:16
**correspondent** [1] -
   1516:17
**corroborating** [2] -
   1510:19, 1510:20
**corroboration** [1] -
   1527:3
**counsel** [4] - 1471:9,
   1484:23, 1491:23,
   1550:5
**Counsel** [3] - 1567:14,
   1567:15, 1567:17
**Counsel's** [1] -
   1499:18
**COUNSEL'S** [1] -
   1422:14
**counterintelligence**
   [31] - 1438:12,
   1438:16, 1438:17,
   1438:18, 1438:25,
   1439:2, 1439:3,
   1439:6, 1439:9,
   1440:13, 1440:16,
   1445:1, 1450:3,
   1452:6, 1452:14,
   1459:3, 1459:6,
   1460:1, 1460:18,
   1474:7, 1480:7,
   1480:14, 1480:20,
   1482:23, 1486:12,
   1486:20, 1487:24,
   1518:14, 1518:18,
   1532:25
**countries** [1] -
   1459:23

**country** [3] - 1459:22, 1461:1, 1473:1
**couple** [13] - 1426:19, 1429:4, 1441:17, 1447:20, 1449:8, 1463:8, 1463:9, 1468:21, 1470:22, 1480:2, 1499:7, 1516:6, 1566:7
**course** [3] - 1432:24, 1433:15, 1499:18
**Court** [4] - 1422:22, 1422:22, 1469:12, 1568:17
**court** [3] - 1424:11, 1485:19, 1498:5
**COURT** [74] - 1422:1, 1424:8, 1424:12, 1424:15, 1425:22, 1427:1, 1427:24, 1428:12, 1428:15, 1428:17, 1429:12, 1430:4, 1430:23, 1431:8, 1433:5, 1433:17, 1433:19, 1434:3, 1434:5, 1435:2, 1435:7, 1435:11, 1435:24, 1436:2, 1436:5, 1436:9, 1436:13, 1436:15, 1437:1, 1437:5, 1440:22, 1442:24, 1443:2, 1443:4, 1443:8, 1443:11, 1443:15, 1443:17, 1446:25, 1459:14, 1475:7, 1476:20, 1477:11, 1480:11, 1484:20, 1484:25, 1485:4, 1485:6, 1485:8, 1485:12, 1498:4, 1498:21, 1499:3, 1502:25, 1516:1, 1520:5, 1535:6, 1548:6, 1548:11, 1552:12, 1552:15, 1564:5, 1564:8, 1564:11, 1564:17, 1565:1, 1565:10, 1566:20, 1566:23, 1567:8, 1567:10, 1567:20, 1568:2, 1568:7
**Courthouse** [2] - 1422:23, 1568:17
**courtroom** [4] - 1436:14, 1485:10, 1499:1, 1564:16
**COURTROOM** [3] -

1424:2, 1443:1, 1443:10
**cover** [5] - 1441:2, 1441:10, 1486:5, 1486:6
**covered** [1] - 1426:24
**covert** [12] - 1495:15, 1495:16, 1496:1, 1497:7, 1497:16, 1498:14, 1508:20, 1509:5, 1510:20, 1513:13, 1521:11, 1532:21
**Cratty** [1] - 1516:21
**created** [2] - 1531:5, 1534:21
**creating** [1] - 1521:24
**credibility** [2] - 1565:16, 1566:1
**crimes** [1] - 1473:12
**Criminal** [2] - 1422:3, 1424:3
**criminal** [4] - 1449:5, 1449:24, 1486:5, 1506:24
**CROSS** [2] - 1457:17, 1528:15
**cross** [9] - 1424:22, 1424:25, 1425:10, 1427:15, 1428:25, 1564:24, 1565:7, 1565:12, 1567:12
**cross-examination** [2] - 1427:15, 1428:25
**CROSS-EXAMINATION** [2] - 1457:17, 1528:15
**cross-examine** [1] - 1565:7
**Crossfire** [15] - 1460:6, 1460:10, 1461:5, 1461:20, 1462:1, 1466:2, 1529:22, 1529:25, 1530:4, 1530:13, 1530:15, 1531:20, 1532:17, 1532:20, 1533:15
**CRR** [3] - 1422:22, 1568:9, 1568:16
**curry** [3] - 1566:1, 1566:10, 1567:14
**Curtis** [15] - 1466:13, 1466:17, 1475:10, 1489:3, 1502:20, 1503:4, 1503:5, 1503:6, 1504:5, 1505:10, 1505:11, 1505:20, 1506:13, 1519:25, 1531:6

**Curtis's** [1] - 1506:13
**Curtis...an** [1] - 1506:7
**cut** [2] - 1431:20, 1432:23
**cyber** [17] - 1448:1, 1494:7, 1494:8, 1494:10, 1494:21, 1509:13, 1509:16, 1509:25, 1517:11, 1517:20, 1517:25, 1518:7, 1518:9, 1530:24, 1531:7, 1531:15, 1561:19
**Cyber** [1] - 1531:3
**CYD** [3] - 1517:22, 1517:24, 1517:25
**CyD** [1] - 1507:24

## D

**D.C** [6] - 1486:13, 1486:16, 1486:23, 1515:10, 1566:16
**DAD** [1] - 1518:6
**Dagon** [20] - 1432:8, 1432:10, 1432:18, 1432:19, 1433:15, 1434:16, 1434:17, 1512:12, 1512:15, 1512:19, 1512:20, 1512:24, 1513:5, 1514:13, 1515:2, 1515:5, 1515:8, 1517:14
**Dagon's** [1] - 1513:19
**daily** [1] - 1507:24
**Dan** [1] - 1476:4
**Daniel** [5] - 1502:19, 1505:24, 1505:25, 1506:1, 1519:24
**dash** [5] - 1447:19, 1448:12, 1448:23, 1450:9, 1466:20
**data** [14] - 1495:13, 1497:10, 1498:12, 1498:14, 1498:17, 1510:18, 1517:3, 1517:4, 1518:25, 1519:4, 1519:6, 1531:24, 1561:20, 1564:4
**date** [20] - 1438:8, 1442:12, 1442:15, 1443:24, 1444:1, 1444:4, 1489:21, 1516:4, 1535:23, 1536:14, 1536:15, 1537:14, 1538:24, 1539:6, 1545:4, 1545:10, 1558:23, 1562:19

**Dated** [1] - 1568:14
**dated** [3] - 1473:25, 1506:3, 1520:7
**dates** [4] - 1441:7, 1466:12, 1535:15, 1536:10
**David** [7] - 1432:8, 1432:18, 1512:12, 1512:15, 1512:19, 1512:24
**day-to-day** [1] - 1452:16
**days** [1] - 1516:6
**DC** [3] - 1422:15, 1422:24, 1568:19
**deal** [2] - 1457:7, 1564:21
**dealt** [1] - 1494:8
**deceive** [1] - 1427:6
**December** [8] - 1441:9, 1536:14, 1536:20, 1546:7, 1546:24, 1547:18, 1547:25, 1556:4
**decide** [1] - 1453:25
**decided** [1] - 1527:24
**deciding** [1] - 1454:5
**decision** [8] - 1456:13, 1474:11, 1513:14, 1514:12, 1523:20, 1524:11, 1529:7, 1532:13
**decision-making** [1] - 1523:20
**decisions** [3] - 1507:15, 1523:9, 1524:8
**Defendant** [2] - 1422:7, 1422:17
**Defense** [11] - 1473:16, 1474:16, 1475:4, 1476:16, 1477:7, 1478:5, 1479:24, 1534:24, 1542:12, 1544:5, 1560:6
**defense** [9] - 1425:23, 1429:9, 1430:14, 1435:9, 1435:22, 1458:1, 1538:9, 1538:10, 1567:13
**defense's** [1] - 1427:17
**DeFilippis** [33] - 1422:12, 1424:6, 1428:14, 1428:16, 1428:21, 1429:19, 1430:6, 1431:4, 1431:9, 1433:11, 1433:18, 1485:2,

1485:4, 1485:5, 1485:7, 1485:15, 1498:19, 1499:5, 1499:6, 1502:22, 1503:1, 1503:10, 1503:21, 1515:16, 1515:23, 1516:2, 1520:2, 1528:14, 1535:5, 1542:16, 1545:6, 1548:6, 1550:1
**DeFilippis**................ ............. [1] - 1423:7
**defines** [1] - 1455:21
**definitely** [2] - 1532:19, 1546:16
**definition** [1] - 1455:23
**definitive** [1] - 1510:19
**democracy** [1] - 1460:20
**Democratic** [14] - 1464:5, 1492:9, 1492:17, 1539:25, 1540:12, 1540:14, 1545:23, 1548:22, 1561:2, 1561:6, 1561:10, 1563:4, 1563:12, 1563:20
**denied** [1] - 1549:15
**denying** [3] - 1474:13, 1474:15, 1476:9
**Department** [6] - 1425:6, 1425:19, 1452:8, 1477:25, 1478:13, 1514:1
**depended** [1] - 1451:4
**depth** [2] - 1533:6, 1533:9
**deputies** [1] - 1466:9
**DEPUTY** [3] - 1424:2, 1443:1, 1443:10
**deputy** [9] - 1465:3, 1465:13, 1466:10, 1474:3, 1476:14, 1485:10, 1518:6, 1518:13, 1518:19
**describe** [3] - 1428:23, 1481:21, 1511:4
**described** [10] - 1459:8, 1481:12, 1487:8, 1501:23, 1524:15, 1535:10, 1550:20, 1551:16, 1553:2, 1553:20
**describing** [4] - 1489:5, 1489:6, 1489:8, 1531:5
**designed** [1] - 1427:16
**detail** [2] - 1508:23,

1533:3
**details** [4] - 1461:19,
1462:9, 1462:12,
1488:17
**determination** [3] -
1456:25, 1508:9,
1528:3
**determinations** [1] -
1497:11
**determine** [8] -
1493:13, 1496:12,
1505:13, 1506:14,
1508:5, 1508:19,
1526:25, 1562:15
**determined** [6] -
1497:2, 1497:18,
1509:9, 1510:11,
1513:11, 1562:19
**determines** [1] -
1526:5
**determining** [1] -
1524:10
**diagram** [2] - 1519:8
**different** [9] - 1446:5,
1450:2, 1468:25,
1519:10, 1523:16,
1525:21, 1525:22,
1525:23, 1565:22
**difficult** [1] - 1428:22
**DIRECT** [2] - 1437:7,
1485:14
**direct** [15] - 1424:21,
1424:23, 1425:1,
1425:15, 1426:1,
1427:24, 1461:13,
1477:24, 1479:24,
1480:23, 1484:7,
1531:13, 1538:11,
1538:21, 1539:4
**directed** [1] - 1432:17
**directly** [2] - 1527:7,
1529:25
**Director** [1] - 1475:11
**director** [23] - 1438:12,
1438:16, 1438:24,
1444:25, 1445:8,
1450:23, 1452:5,
1452:14, 1464:25,
1465:3, 1465:11,
1465:13, 1466:10,
1470:14, 1475:16,
1476:14, 1477:2,
1518:7, 1518:13,
1518:17, 1518:19,
1518:20
**directors** [4] - 1465:5,
1465:6, 1474:4,
1476:14
**disclose** [1] - 1564:22
**disclosed** [1] - 1427:3

---

disclosing [1] -
1524:22
**discreetly** [1] - 1510:5
**discuss** [5] - 1426:2,
1435:8, 1484:22,
1506:24, 1564:18
**discussed** [11] -
1435:9, 1445:6,
1471:3, 1507:14,
1508:1, 1508:4,
1508:10, 1533:11,
1533:17, 1547:2
**discusses** [1] -
1564:23
**discussing** [1] -
1471:5
**discussion** [5] -
1501:21, 1524:12,
1527:21, 1540:6,
1542:2
**discussions** [11] -
1426:6, 1470:24,
1472:10, 1472:11,
1488:16, 1488:17,
1491:13, 1491:16,
1498:24, 1510:10,
1564:14
**dispositive** [1] -
1454:10
**dissuading** [1] -
1514:22
**distinction** [2] -
1567:12, 1567:18
**distinguish** [1] -
1566:5
**DISTRICT** [3] - 1422:1,
1422:1, 1422:10
**District** [1] - 1566:17
**divert** [1] - 1528:4
**division** [31] - 1439:9,
1440:14, 1440:16,
1449:5, 1449:25,
1450:2, 1450:3,
1459:3, 1459:6,
1460:2, 1460:18,
1465:7, 1474:7,
1480:7, 1480:14,
1480:20, 1482:4,
1482:23, 1486:20,
1487:24, 1506:24,
1517:20, 1517:25,
1518:7, 1518:9,
1518:14, 1518:18,
1530:24, 1531:7,
1531:15, 1532:25
**DNC** [88] - 1447:22,
1463:25, 1464:2,
1464:5, 1492:2,
1492:6, 1492:17,
1500:20, 1500:21,

---

1501:14, 1501:23,
1501:24, 1522:19,
1522:23, 1523:1,
1533:15, 1533:24,
1534:1, 1534:2,
1534:3, 1534:7,
1539:23, 1540:5,
1540:7, 1540:9,
1540:15, 1540:19,
1541:17, 1542:7,
1543:1, 1543:2,
1544:16, 1544:19,
1544:20, 1545:15,
1546:9, 1546:10,
1547:23, 1549:12,
1549:16, 1550:2,
1550:8, 1550:10,
1550:15, 1550:20,
1550:21, 1550:22,
1551:1, 1551:8,
1551:9, 1551:11,
1551:13, 1551:16,
1551:24, 1552:21,
1552:22, 1553:2,
1553:3, 1553:4,
1553:9, 1553:10,
1553:16, 1553:19,
1553:20, 1554:4,
1554:12, 1555:3,
1555:8, 1555:13,
1555:18, 1556:20,
1556:23, 1559:22,
1560:2, 1560:19,
1561:17, 1561:19,
1561:20, 1563:16,
1563:17, 1563:23
**DNC-affiliated** [1] -
1556:20
**DNS** [2] - 1518:25,
1519:4
**document** [21] -
1441:19, 1444:9,
1450:21, 1470:23,
1473:22, 1484:11,
1501:5, 1501:8,
1536:18, 1541:5,
1541:8, 1542:24,
1543:15, 1543:18,
1543:20, 1543:23,
1547:22, 1547:25,
1548:13, 1548:25,
1552:6
**documents** [14] -
1473:22, 1489:9,
1489:15, 1489:18,
1489:22, 1500:5,
1502:2, 1536:21,
1536:25, 1537:3,
1537:22, 1547:3,
1547:14, 1547:16

---

**DOJ** [3] - 1447:24,
1478:17, 1478:25
**domain** [3] - 1495:11,
1520:21
**domain/server** [1] -
1507:18
**Donald** [1] - 1517:4
**done** [9] - 1486:9,
1494:18, 1497:1,
1507:22, 1509:8,
1530:25, 1546:16,
1567:17
**doubt** [2] - 1532:11,
1532:12
**down** [28] - 1431:21,
1432:24, 1447:11,
1450:17, 1450:19,
1462:16, 1462:20,
1462:22, 1464:16,
1466:25, 1477:23,
1479:7, 1482:21,
1497:21, 1498:4,
1503:1, 1504:3,
1505:7, 1519:2,
1523:13, 1535:14,
1544:1, 1544:16,
1546:14, 1554:14,
1559:10, 1559:15,
1564:17
**dozens** [1] - 1429:9
**Dr** [1] - 1431:24
**draw** [1] - 1515:12
**drawing** [1] - 1515:14
**driven** [1] - 1564:4
**due** [1] - 1435:21
**during** [15] - 1426:5,
1445:2, 1445:9,
1486:9, 1486:10,
1486:19, 1488:17,
1492:3, 1512:15,
1522:11, 1530:15,
1533:11, 1533:17,
1549:4, 1560:21
**duties** [2] - 1438:24,
1439:1
**duty** [5] - 1507:3,
1507:8, 1521:15,
1521:16, 1521:25
**dynamics** [3] -
1497:15, 1502:8,
1504:11
**Dynamics** [6] -
1494:25, 1495:5,
1495:9, 1495:25,
1497:25, 1498:8
**dynamics'** [1] -
1496:24

---

**E**

**earliest** [1] - 1516:3
**early** [3] - 1482:16,
1509:2, 1516:8
**earth** [1] - 1459:17
**easiest** [1] - 1468:18
**EC** [3] - 1473:19,
1473:20, 1473:24
**ECOL** [3] - 1494:21,
1496:25, 1531:3
**EDGAR** [1] - 1422:13
**EDWARD** [3] - 1423:3,
1437:6, 1437:13
**Edward** [1] - 1437:13
**effect** [3] - 1456:13,
1469:20, 1472:4
**effectively** [1] - 1479:1
**effort** [3] - 1428:1,
1432:14, 1494:25
**efforts** [5] - 1438:20,
1439:2, 1456:14,
1494:16, 1496:22
**eighth** [1] - 1536:13
**either** [11] - 1458:5,
1458:9, 1459:19,
1464:14, 1518:6,
1523:1, 1523:11,
1534:2, 1534:6,
1538:13, 1549:3
**election** [24] -
1460:16, 1507:1,
1507:9, 1513:15,
1513:16, 1513:22,
1514:3, 1514:9,
1514:10, 1521:17,
1522:1, 1527:19,
1527:21, 1528:1,
1528:10, 1529:17,
1529:18, 1529:24,
1530:2, 1531:22,
1563:5, 1563:12,
1563:23
**electronic** [2] -
1484:10, 1532:8
**elicit** [2] - 1426:12,
1427:16
**ELMO** [4] - 1435:16,
1442:5, 1442:7,
1442:25
**elsewhere** [2] -
1486:14, 1486:15
**email** [44] - 1433:22,
1470:11, 1470:12,
1470:24, 1471:3,
1477:16, 1495:10,
1498:1, 1502:14,
1503:2, 1503:3,
1503:11, 1503:22,
1503:23, 1504:21,

1505:6, 1505:23, 1506:3, 1506:4, 1506:12, 1506:15, 1506:16, 1507:21, 1515:20, 1516:3, 1516:4, 1516:12, 1516:15, 1516:18, 1516:25, 1517:16, 1518:2, 1518:11, 1518:22, 1518:23, 1519:9, 1519:24, 1520:6, 1520:8, 1520:12, 1520:21
**email.com** [1] - 1519:6
**emails** [13] - 1429:9, 1429:14, 1429:20, 1429:25, 1430:14, 1433:25, 1434:3, 1489:15, 1496:3, 1500:5, 1507:13, 1537:1, 1560:9
**embodiment** [1] - 1563:20
**employed** [7] - 1437:16, 1437:18, 1437:25, 1438:2, 1438:4, 1550:21, 1553:3
**employee** [1] - 1510:6
**end** [8] - 1425:16, 1461:25, 1493:20, 1493:22, 1519:3, 1521:20, 1521:23, 1522:7
**ended** [2] - 1490:16, 1521:16
**ending** [1] - 1515:20
**engage** [1] - 1514:21
**engaged** [1] - 1515:2
**engagement** [1] - 1526:22
**engages** [2] - 1453:5, 1468:6
**engaging** [1] - 1514:22
**ensure** [1] - 1530:5
**enterprise** [1] - 1494:12
**enters** [1] - 1436:14
**entire** [2] - 1436:3, 1486:10
**entirety** [1] - 1486:3
**entitled** [1] - 1431:21
**entry** [5] - 1441:7, 1476:17, 1476:21, 1477:7, 1477:12
**equipment** [1] - 1494:12
**Eric** [2] - 1471:4, 1518:3

**ESQ** [8] - 1422:12, 1422:13, 1422:13, 1422:14, 1422:17, 1422:17, 1422:18, 1422:18
**essentially** [8] - 1431:10, 1495:20, 1495:24, 1496:2, 1497:25, 1498:10, 1514:24, 1555:24
**establish** [3] - 1428:8, 1433:23, 1435:14
**established** [1] - 1469:18
**et** [2] - 1464:19, 1560:9
**etc** [2] - 1447:23, 1464:1
**European** [3] - 1494:21, 1517:11, 1531:3
**evaluate** [1] - 1519:20
**evaluated** [3] - 1511:24, 1511:25, 1531:3
**evaluation** [1] - 1526:5
**event** [1] - 1500:10
**events** [6] - 1446:13, 1462:12, 1463:22, 1500:11, 1500:13, 1547:10
**eventually** [1] - 1471:25
**everyday** [1] - 1513:25
**evidence** [13] - 1435:17, 1435:18, 1435:21, 1446:22, 1463:19, 1470:6, 1473:11, 1473:17, 1478:6, 1480:9, 1534:24, 1552:13, 1567:22
**exact** [5] - 1431:16, 1439:10, 1448:9, 1466:12, 1489:21
**exactly** [4] - 1438:18, 1474:15, 1481:23, 1545:25
**examination** [8] - 1424:25, 1427:15, 1428:25, 1431:20, 1461:13, 1477:24, 1531:14, 1567:13
**EXAMINATION** [5] - 1437:7, 1457:17, 1484:5, 1485:14, 1528:15
**examine** [1] - 1565:7
**example** [6] - 1468:11, 1468:17, 1471:2,

1471:21, 1489:21, 1559:13
**exceed** [1] - 1425:1
**except** [2] - 1434:22, 1484:23
**excerpt** [1] - 1552:18
**exchanged** [1] - 1431:25
**excluding** [1] - 1564:24
**excuse** [1] - 1542:13
**excused** [1] - 1484:21
**executive** [2] - 1465:5, 1465:11
**executives** [5] - 1481:11, 1481:13, 1482:2, 1482:3, 1534:21
**exhausted** [1] - 1433:8
**Exhibit** [35] - 1440:24, 1441:25, 1442:18, 1442:19, 1444:7, 1444:14, 1444:15, 1444:19, 1444:21, 1444:22, 1445:23, 1445:24, 1447:6, 1463:14, 1470:5, 1473:16, 1474:16, 1475:4, 1476:16, 1477:7, 1478:5, 1479:24, 1502:12, 1502:23, 1515:17, 1515:24, 1519:23, 1520:3, 1534:24, 1542:12, 1542:18, 1542:19, 1544:5, 1547:20, 1560:6
**exhibit** [4] - 1463:18, 1474:19, 1512:5, 1521:7
**Exhibits** [2] - 1446:21, 1447:2
**existed** [1] - 1496:14
**exits** [2] - 1499:1, 1564:16
**expect** [1] - 1426:1
**expected** [1] - 1424:21
**experience** [9] - 1452:13, 1454:6, 1454:11, 1454:23, 1494:8, 1494:10, 1523:22, 1533:14, 1533:15
**expert** [1] - 1449:6
**experts** [1] - 1517:2
**explain** [2] - 1520:21, 1548:7
**explained** [2] - 1545:14, 1551:12
**explaining** [1] - 1562:2

**explanation** [1] - 1459:11
**extensive** [1] - 1459:25
**extent** [13] - 1424:19, 1429:25, 1432:13, 1433:5, 1433:22, 1434:2, 1434:22, 1472:9, 1500:7, 1516:19, 1551:2, 1551:8, 1553:10
**eyeball** [1] - 1480:1

# F

**face** [2] - 1429:19, 1459:17
**fact** [15] - 1431:12, 1432:3, 1434:23, 1435:15, 1478:22, 1482:14, 1484:8, 1492:21, 1508:3, 1513:22, 1526:24, 1531:15, 1550:21, 1553:3, 1563:15
**factor** [2] - 1455:13, 1455:16
**factors** [4] - 1454:4, 1455:11, 1483:13, 1527:16
**factual** [1] - 1519:4
**fair** [22] - 1426:23, 1431:15, 1434:1, 1434:7, 1439:4, 1440:6, 1446:12, 1446:14, 1449:23, 1451:9, 1461:10, 1464:17, 1464:23, 1478:24, 1479:17, 1488:7, 1500:21, 1505:15, 1505:21, 1507:10, 1508:12, 1521:8
**fairly** [4] - 1446:17, 1479:5, 1509:16, 1566:3
**fairness** [1] - 1524:24
**fall** [7] - 1459:25, 1534:15, 1534:17, 1535:10, 1544:4, 1556:3, 1562:19
**fallen** [2] - 1440:13, 1518:15
**falls** [1] - 1518:19
**false** [2] - 1483:11, 1484:1
**familiar** [4] - 1449:11, 1474:21, 1510:22, 1512:12
**far** [5] - 1431:21,

1448:22, 1490:12, 1513:5, 1513:7
**fashion** [1] - 1566:24
**favor** [3] - 1566:1, 1566:10, 1567:14
**FBI** [143] - 1426:15, 1426:16, 1426:17, 1427:13, 1427:16, 1438:3, 1438:4, 1438:7, 1438:11, 1438:14, 1438:19, 1438:25, 1439:4, 1439:20, 1439:21, 1439:24, 1440:1, 1440:3, 1449:4, 1449:18, 1450:25, 1452:4, 1452:15, 1452:21, 1452:25, 1453:1, 1453:4, 1453:5, 1453:8, 1453:15, 1453:19, 1453:23, 1453:24, 1454:2, 1454:8, 1454:12, 1454:15, 1454:18, 1454:22, 1454:24, 1455:1, 1455:3, 1455:8, 1456:15, 1456:18, 1455:20, 1455:24, 1456:5, 1456:6, 1456:9, 1456:10, 1457:3, 1457:11, 1458:22, 1464:23, 1464:25, 1467:24, 1467:25, 1468:6, 1468:24, 1469:23, 1470:1, 1470:14, 1472:14, 1472:16, 1472:20, 1472:23, 1472:25, 1473:14, 1474:25, 1475:2, 1475:16, 1475:25, 1478:12, 1479:11, 1479:19, 1480:7, 1480:13, 1481:1, 1481:12, 1481:20, 1482:5, 1482:15, 1483:7, 1483:20, 1484:8, 1486:2, 1486:9, 1486:10, 1491:2, 1491:23, 1494:1, 1494:18, 1494:19, 1495:14, 1496:5, 1496:20, 1498:17, 1499:9, 1501:14, 1502:9, 1507:2, 1507:9, 1507:21, 1510:14, 1510:25, 1511:5, 1511:10, 1511:18, 1511:19, 1512:8,

1513:2, 1513:5,
1513:10, 1514:1,
1514:18, 1517:6,
1517:10, 1517:22,
1517:25, 1518:4,
1519:14, 1523:16,
1523:23, 1525:6,
1525:11, 1525:12,
1526:11, 1526:15,
1526:16, 1527:4,
1541:17, 1542:8,
1543:2, 1550:5,
1551:6, 1553:24,
1558:11, 1559:5,
1567:18
**FBI's** [2] - 1438:20,
1439:1, 1466:1,
1466:18, 1471:9,
1477:2, 1481:21,
1485:22, 1491:1,
1494:11, 1494:16,
1498:13, 1503:25,
1507:19, 1516:23,
1516:24, 1530:24
**February** [2] -
1536:15, 1549:2
**few** [3] - 1467:21,
1494:14, 1527:20
**field** [17] - 1475:9,
1485:22, 1486:2,
1486:3, 1486:11,
1493:3, 1494:12,
1494:24, 1495:20,
1503:25, 1509:16,
1510:5, 1513:11,
1516:18, 1519:19,
1529:8, 1531:11
**Field** [9] - 1466:1,
1487:10, 1494:20,
1496:23, 1503:7,
1507:20, 1511:5,
1511:21, 1529:13
**fifth** [1] - 1474:20
**figure** [7] - 1483:10,
1483:14, 1483:25,
1496:4, 1510:3,
1561:19, 1567:23
**figured** [1] - 1531:25
**file** [1] - 1519:9
**filed** [1] - 1564:21
**filter** [4] - 1495:2,
1497:2, 1497:23
**final** [3] - 1432:6,
1433:20, 1479:8
**finally** [6] - 1506:15,
1518:21, 1522:16,
1526:2, 1526:9,
1527:15
**financial** [1] - 1482:5
**financially** [1] -

1525:11
**findings** [4] - 1494:23,
1510:7, 1531:5,
1565:5
**fine** [2] - 1436:5,
1463:16
**finished** [1] - 1500:18
**fired** [2] - 1475:12,
1475:16
**firewall** [4] - 1497:2,
1498:10, 1498:12,
1498:16
**firm** [7] - 1437:19,
1495:10, 1498:1,
1509:13, 1509:17,
1509:25, 1510:13
**firms** [1] - 1496:2
**first** [54] - 1429:5,
1442:6, 1442:9,
1447:22, 1455:19,
1463:25, 1487:6,
1490:21, 1494:25,
1499:21, 1500:2,
1501:1, 1501:6,
1501:16, 1501:17,
1502:13, 1503:12,
1503:18, 1504:6,
1504:11, 1507:25,
1515:19, 1519:2,
1520:6, 1525:1,
1526:20, 1534:9,
1534:14, 1535:21,
1535:24, 1536:12,
1536:14, 1539:21,
1540:25, 1541:6,
1541:8, 1541:19,
1541:20, 1546:22,
1549:24, 1552:18,
1555:7, 1557:14,
1557:19, 1557:21,
1557:24, 1557:25,
1558:17, 1559:20,
1560:1, 1560:21,
1560:23, 1566:13
**First** [6] - 1424:18,
1514:18, 1514:19,
1514:22, 1514:25,
1526:6
**five** [6] - 1463:22,
1489:23, 1492:14,
1538:15, 1538:17,
1538:23
**fizzled** [1] - 1484:17
**flag** [1] - 1536:10
**flip** [2] - 1441:16,
1480:4
**floor** [3] - 1475:11,
1476:13
**focus** [3] - 1426:11,
1460:11, 1548:8

**focusing** [2] -
1479:25, 1504:6
**Foer** [1] - 1432:11
**folks** [5] - 1433:14,
1464:22, 1474:9,
1514:14, 1516:19
**follow** [6] - 1426:24,
1468:1, 1471:22,
1539:12, 1548:4,
1549:4
**follow-up** [4] -
1426:24, 1468:1,
1548:4, 1549:4
**following** [1] - 1490:3
**food** [1] - 1464:21
**FOR** [1] - 1422:1
**for-profit** [1] - 1510:16
**foregoing** [1] -
1568:10
**Foreign** [1] - 1469:11
**foreign** [4] - 1448:13,
1449:3, 1461:2,
1522:1
**form** [1] - 1515:3
**formal** [4] - 1440:7,
1451:6, 1467:13,
1473:15
**formally** [1] - 1532:8
**former** [2] - 1447:24,
1452:14
**forth** [3] - 1454:3,
1515:10, 1538:15
**forward** [4] - 1431:1,
1456:25, 1492:19,
1516:11
**forwards** [1] - 1518:11
**Foundation** [3] -
1447:23, 1464:1,
1464:6
**founder** [1] - 1437:23
**four** [7] - 1449:2,
1489:23, 1505:3,
1538:15, 1538:17,
1538:23, 1547:8
**Fourth** [1] - 1566:14
**fourth** [1] - 1551:22
**frankly** [1] - 1451:4
**fresh** [1] - 1446:7
**Friday** [16] - 1424:16,
1448:12, 1487:5,
1487:14, 1489:11,
1489:24, 1491:9,
1495:24, 1505:11,
1521:14, 1530:9,
1531:6, 1532:7,
1533:3, 1533:10,
1533:13
**Fridman** [3] - 1481:10,
1482:1, 1482:5
**front** [2] - 1487:20,

1487:21, 1487:23,
1488:3, 1491:12,
1507:15, 1530:19
**full** [6] - 1469:1,
1469:5, 1526:2,
1526:8, 1532:8,
1568:11
**fully** [1] - 1446:12
**fundamentally** [1] -
1427:11
**Fusion** [7] - 1428:4,
1429:4, 1429:5,
1429:10, 1429:15,
1433:13, 1433:21

**G**

**G-A-Y-N-O-R** [1] -
1485:20
**gain** [1] - 1459:21
**game** [2] - 1426:23,
1431:15
**gamut** [1] - 1452:19
**gather** [5] - 1473:8,
1473:11, 1495:1,
1495:20, 1547:3
**gathered** [2] -
1471:23, 1536:21
**GAYNOR** [2] - 1423:6,
1485:13
**Gaynor** [27] - 1436:8,
1485:3, 1485:16,
1485:20, 1485:21,
1486:8, 1489:14,
1496:19, 1498:4,
1499:7, 1502:13,
1503:3, 1503:13,
1506:15, 1510:23,
1515:19, 1516:4,
1517:8, 1520:11,
1520:25, 1522:17,
1527:15, 1528:17,
1536:3, 1536:19,
1548:6, 1559:15
**general** [8] - 1449:19,
1471:9, 1472:14,
1481:19, 1491:23,
1514:6, 1550:5,
1565:11
**generally** [16] -
1437:20, 1451:19,
1451:20, 1457:2,
1457:4, 1481:17,
1493:24, 1512:7,
1514:5, 1514:6,
1521:9, 1521:10,
1549:13, 1549:17,
1551:7, 1565:13
**gentlemen** [3] -
1436:15, 1498:21,
1564:11

**Georgia** [1] - 1512:16
**German** [1] - 1481:10
**given** [16] - 1424:22,
1425:10, 1426:23,
1439:21, 1483:15,
1490:5, 1499:15,
1511:11, 1511:22,
1512:5, 1513:2,
1551:17, 1553:21,
1555:21
**global** [1] - 1518:25
**globally** [1] - 1439:2
**govern** [1] - 1514:2
**Government** [23] -
1440:24, 1441:25,
1442:18, 1442:19,
1444:7, 1444:14,
1444:15, 1444:19,
1444:21, 1444:22,
1445:23, 1446:21,
1447:2, 1447:6,
1463:13, 1470:5,
1481:2, 1502:23,
1515:24, 1520:3,
1542:19, 1547:19
**government** [62] -
1424:7, 1424:22,
1425:5, 1425:11,
1425:24, 1427:9,
1427:14, 1429:2,
1432:13, 1433:7,
1436:24, 1446:20,
1452:22, 1452:25,
1453:16, 1458:4,
1458:6, 1463:18,
1474:18, 1482:6,
1485:2, 1499:21,
1499:23, 1501:1,
1501:6, 1501:9,
1501:16, 1501:17,
1501:22, 1502:22,
1515:23, 1520:2,
1522:12, 1526:22,
1534:12, 1535:16,
1535:22, 1536:20,
1538:7, 1538:13,
1540:25, 1541:6,
1541:9, 1541:19,
1541:21, 1543:10,
1543:15, 1543:24,
1545:2, 1547:4,
1548:24, 1554:22,
1556:20, 1557:2,
1557:23, 1558:23,
1560:22, 1560:23,
1564:21, 1566:8,
1566:9, 1567:1
**government's** [3] -
1430:1, 1436:22,
1564:23

**Government's** [4] - 1502:11, 1515:17, 1519:23, 1542:18
**governmental** [1] - 1565:24
**GPS** [4] - 1429:4, 1429:5, 1429:10, 1433:13
**grade** [1] - 1494:12
**grand** [20] - 1429:22, 1432:9, 1433:15, 1458:7, 1537:8, 1537:11, 1537:14, 1537:19, 1537:23, 1538:1, 1549:19, 1554:17, 1556:8, 1557:11, 1560:11, 1560:12, 1561:9, 1561:14, 1561:23, 1562:8
**great** [6] - 1437:24, 1441:23, 1449:7, 1507:22, 1520:23, 1564:14
**grounds** [1] - 1431:19
**Group** [3] - 1481:7, 1481:9
**groups** [1] - 1481:8
**guess** [13] - 1424:18, 1424:20, 1425:13, 1429:21, 1434:19, 1440:9, 1451:11, 1454:9, 1455:9, 1460:14, 1475:23, 1484:16, 1556:5
**guy** [2] - 1504:3, 1505:8
**guys** [2] - 1473:3, 1475:19

## H

**half** [1] - 1520:7
**hand** [3] - 1437:3, 1485:10, 1513:12
**handle** [3] - 1428:19, 1490:5, 1527:1
**handler** [1] - 1457:10
**handling** [1] - 1527:13
**handwriting** [7] - 1441:5, 1441:18, 1441:21, 1441:22, 1442:20, 1443:20, 1463:3
**happy** [1] - 1566:21
**hard** [4] - 1462:12, 1463:22, 1502:1, 1538:3
**HARDWICK** [1] - 1422:18

**harmed** [1] - 1526:23
**head** [2] - 1434:15, 1440:16
**header** [1] - 1503:11
**headquarters** [14] - 1486:23, 1487:11, 1488:6, 1490:6, 1491:1, 1491:2, 1493:25, 1507:9, 1508:10, 1508:11, 1508:13, 1513:10, 1518:1, 1518:9
**heads** [1] - 1427:20
**Health** [1] - 1448:23
**hear** [1] - 1525:4
**heard** [7] - 1450:22, 1454:20, 1457:2, 1513:1, 1514:13, 1528:2, 1533:3
**hearing** [4] - 1428:22, 1487:16, 1487:18, 1530:17
**heart** [2] - 1430:3, 1430:20
**Heide** [19] - 1436:8, 1436:10, 1466:13, 1466:16, 1475:10, 1475:19, 1489:3, 1489:6, 1489:8, 1490:4, 1490:7, 1502:20, 1503:4, 1503:5, 1503:6, 1503:9, 1503:15, 1519:25, 1531:6
**Heide's** [5] - 1505:5, 1506:4, 1506:12, 1506:13, 1507:13
**HELD** [1] - 1422:10
**help** [14] - 1427:16, 1445:6, 1488:2, 1495:14, 1501:10, 1501:20, 1520:21, 1530:23, 1531:2, 1531:25, 1536:24, 1541:11, 1542:1, 1562:2
**help/hinder** [9] - 1524:11, 1542:23, 1543:4, 1547:21, 1548:17, 1560:8, 1562:7, 1562:15
**helped** [7] - 1428:9, 1500:11, 1501:10, 1541:12, 1542:10, 1543:5, 1543:8
**helpful** [2] - 1535:17, 1535:18
**helping** [3] - 1493:15, 1493:16, 1496:5
**hereby** [1] - 1568:9

**herself** [1] - 1497:10
**hesitate** [1] - 1466:8
**high** [1] - 1527:22
**high-enough** [1] - 1527:22
**higher** [1] - 1464:21
**highlight** [2] - 1507:23, 1544:15
**highlighted** [1] - 1566:19
**highly** [2] - 1432:22, 1528:7
**Hillary** [1] - 1454:25
**himself** [12] - 1492:10, 1539:25, 1540:13, 1540:17, 1542:8, 1543:3, 1544:23, 1546:10, 1547:24, 1548:23, 1553:25, 1557:4
**hinder** [9] - 1501:10, 1501:20, 1524:19, 1541:11, 1542:1, 1542:10, 1543:7, 1543:25, 1562:3
**hindered** [1] - 1562:20
**hindering** [7] - 1493:15, 1493:16, 1496:5, 1496:11, 1496:14, 1562:16, 1563:8
**Hinen)** [1] - 1447:17
**Hinnen** [1] - 1447:17
**hired** [2] - 1509:21, 1510:14
**hold** [32] - 1438:14, 1470:3, 1472:17, 1493:1, 1493:11, 1493:15, 1493:16, 1496:5, 1496:12, 1496:16, 1499:9, 1499:14, 1499:22, 1500:1, 1500:8, 1500:14, 1505:15, 1508:6, 1508:16, 1508:18, 1523:10, 1524:2, 1524:3, 1524:9, 1524:11, 1524:16, 1524:19, 1525:1, 1525:3, 1529:6, 1562:16
**holding** [1] - 1543:4
**holds** [1] - 1429:16
**Honor** [41] - 1424:2, 1424:5, 1424:9, 1425:25, 1427:10, 1428:11, 1428:14, 1428:21, 1431:4, 1432:6, 1432:21, 1433:11, 1435:5,

1436:7, 1436:12, 1436:23, 1436:24, 1440:20, 1443:1, 1443:7, 1446:20, 1446:24, 1457:14, 1484:4, 1485:2, 1498:6, 1498:19, 1499:5, 1502:22, 1515:23, 1520:2, 1535:4, 1535:5, 1536:7, 1548:10, 1552:9, 1564:10, 1564:25, 1565:19, 1567:9, 1567:11
**HONORABLE** [1] - 1422:10
**hope** [2] - 1424:13, 1436:20
**Horsford** [1] - 1566:6
**Hosenball** [7] - 1516:12, 1516:14, 1516:25, 1517:9, 1518:23, 1519:13, 1520:8
**hospital** [2] - 1448:19, 1448:23
**hour** [1] - 1537:20
**HQ** [2] - 1507:14, 1508:1
**human** [28] - 1453:13, 1453:14, 1453:18, 1454:15, 1455:20, 1456:5, 1456:21, 1456:24, 1457:2, 1457:5, 1457:10, 1467:24, 1468:21, 1468:22, 1469:17, 1486:12, 1510:23, 1511:1, 1511:6, 1511:7, 1511:13, 1511:14, 1511:17, 1512:3, 1526:11, 1526:16, 1526:20
**Hurricane** [15] - 1460:7, 1460:10, 1461:5, 1461:20, 1462:1, 1466:3, 1529:22, 1529:25, 1530:4, 1530:13, 1530:15, 1531:20, 1532:17, 1532:20, 1533:15

## I

**idea** [7] - 1431:18, 1467:10, 1468:13, 1468:14, 1495:13, 1513:3, 1515:4
**identification** [8] - 1435:13, 1440:24,

1442:18, 1442:20, 1443:22, 1443:23, 1444:14, 1474:17
**identifies** [1] - 1481:10
**identify** [2] - 1431:6, 1431:9
**identity** [4] - 1426:14, 1529:4, 1529:10, 1529:14
**IG** [1] - 1567:6
**IM'd** [1] - 1488:23
**imagine** [1] - 1452:20
**immunized** [2] - 1433:17, 1433:19
**impact** [5] - 1472:25, 1473:1, 1513:16, 1514:8, 1523:7
**impacted** [7] - 1523:9, 1523:11, 1523:14, 1524:7, 1524:16, 1525:2, 1540:21
**impeach** [1] - 1565:16
**impeachment** [1] - 1565:20
**importance** [2] - 1455:11, 1467:20
**important** [17] - 1433:23, 1434:18, 1445:20, 1453:18, 1453:21, 1454:7, 1454:9, 1454:11, 1454:17, 1455:8, 1455:10, 1460:23, 1528:2, 1528:12, 1535:11, 1540:22, 1546:15
**imposed** [1] - 1499:9
**impression** [30] - 1492:6, 1492:16, 1500:19, 1501:13, 1522:21, 1522:22, 1534:6, 1540:9, 1540:16, 1540:24, 1541:16, 1542:6, 1542:25, 1543:8, 1543:16, 1543:19, 1547:23, 1548:21, 1550:14, 1550:25, 1551:5, 1553:7, 1553:24, 1554:8, 1554:18, 1556:20, 1557:3, 1558:10, 1559:22, 1560:15
**IN** [1] - 1422:1
**inadvertently** [1] - 1513:15
**inbound** [1] - 1497:5
**include** [3] - 1430:8, 1454:15, 1475:11
**including** [3] -

1432:11, 1470:14, 1497:14
**incomplete** [1] - 1497:8
**incorrect** [1] - 1512:3
**independent** [1] - 1509:8
**independently** [3] - 1428:1, 1497:19, 1510:11
**indicate** [2] - 1497:7, 1509:5
**indicated** [2] - 1511:6, 1561:9
**individual** [5] - 1454:7, 1513:15, 1516:20, 1524:14, 1527:13
**individuals** [6] - 1430:6, 1431:12, 1431:15, 1431:22, 1453:19, 1518:4
**individuals'** [1] - 1517:22
**inference** [2] - 1431:10, 1431:13
**influence** [1] - 1459:21
**info** [1] - 1506:8
**information** [103] - 1426:5, 1434:14, 1435:22, 1439:21, 1439:24, 1445:14, 1445:18, 1449:16, 1450:17, 1450:20, 1452:16, 1452:18, 1452:21, 1452:25, 1453:4, 1453:9, 1453:20, 1453:24, 1454:5, 1454:8, 1454:12, 1454:14, 1455:2, 1455:5, 1455:7, 1455:8, 1455:15, 1455:24, 1456:12, 1456:18, 1456:22, 1456:23, 1457:3, 1457:6, 1457:8, 1457:11, 1458:19, 1462:6, 1467:17, 1467:20, 1467:23, 1468:16, 1468:17, 1471:23, 1472:1, 1473:8, 1478:19, 1478:23, 1478:25, 1481:22, 1483:10, 1490:15, 1491:20, 1491:22, 1492:15, 1493:2, 1493:8, 1493:13, 1495:21, 1499:10, 1501:24, 1504:3, 1504:4, 1505:7,

1505:8, 1506:14, 1508:14, 1515:7, 1517:1, 1517:5, 1520:20, 1523:7, 1523:17, 1523:18, 1524:4, 1524:5, 1524:7, 1525:20, 1525:24, 1526:4, 1526:5, 1526:10, 1526:15, 1526:25, 1527:1, 1527:5, 1527:7, 1528:6, 1529:7, 1529:8, 1529:12, 1533:5, 1535:11, 1540:21, 1540:22, 1543:6, 1543:11, 1543:24, 1544:23, 1561:7, 1561:11, 1561:17, 1563:1
**informed** [6] - 1491:8, 1491:10, 1491:17, 1492:25, 1509:4, 1524:14
**informing** [1] - 1546:4
**infrastructure** [15] - 1486:21, 1494:14, 1507:1, 1507:10, 1521:17, 1522:1, 1527:20, 1527:21, 1528:1, 1528:11, 1529:17, 1529:19, 1529:24, 1530:2, 1531:22
**infringe** [1] - 1525:10
**inherently** [1] - 1429:7
**initial** [7] - 1433:4, 1494:20, 1495:2, 1495:23, 1496:6, 1497:1, 1516:13
**initials** [1] - 1444:3
**initiate** [1] - 1494:25
**initiated** [6] - 1488:1, 1490:15, 1494:19, 1497:17, 1523:6, 1532:6
**initiation** [1] - 1523:18
**inquire** [4] - 1426:15, 1428:25, 1429:3, 1432:7
**inquiry** [2] - 1433:4, 1434:7
**inside** [2] - 1441:2, 1441:10
**instance** [5] - 1519:21, 1551:25, 1554:4, 1554:12, 1567:16
**instant** [1] - 1475:2
**institution** [1] - 1473:7
**intelligence** [6] -

1480:6, 1480:13, 1480:19, 1481:14, 1482:4, 1482:8
**Intelligence** [2] - 1469:11, 1481:2
**intend** [3] - 1425:10, 1425:14, 1429:3
**intended** [1] - 1427:5
**intent** [1] - 1427:25
**intention** [1] - 1446:19
**interaction** [2] - 1426:21, 1488:21
**interactions** [2] - 1426:17, 1427:23
**interest** [1] - 1504:23
**interested** [4] - 1455:3, 1520:14, 1531:18
**interests** [2] - 1438:21, 1525:5
**interfere** [1] - 1460:15
**interference** [1] - 1529:19
**internal** [1] - 1474:25
**interpret** [1] - 1566:3
**interpreted** [1] - 1514:21
**interview** [18] - 1468:4, 1468:11, 1504:2, 1505:6, 1506:7, 1508:8, 1508:12, 1513:5, 1513:14, 1513:21, 1513:23, 1513:24, 1514:13, 1528:25, 1529:2, 1545:13, 1549:5, 1557:6
**interviewed** [2] - 1528:23, 1545:3
**interviews** [3] - 1468:6, 1536:9, 1557:9
**introducing** [1] - 1435:20
**intrusive** [1] - 1513:18
**investigate** [10] - 1439:6, 1456:16, 1460:18, 1472:20, 1476:1, 1483:8, 1483:14, 1483:20, 1496:20, 1503:7
**investigated** [4] - 1479:20, 1482:23, 1494:1, 1517:10
**investigating** [3] - 1479:11, 1482:24, 1484:1
**investigation** [80] - 1440:2, 1440:8, 1440:13, 1440:17,

1460:1, 1460:5, 1461:4, 1461:5, 1461:8, 1461:17, 1461:20, 1461:21, 1462:1, 1462:7, 1463:10, 1469:1, 1469:3, 1469:5, 1469:15, 1469:16, 1473:15, 1474:11, 1476:7, 1479:9, 1484:9, 1484:14, 1488:1, 1493:15, 1493:17, 1494:6, 1494:19, 1496:6, 1496:11, 1496:14, 1498:13, 1505:12, 1506:9, 1508:24, 1510:25, 1512:15, 1517:6, 1520:18, 1521:9, 1521:10, 1521:13, 1522:5, 1522:16, 1523:6, 1523:12, 1523:21, 1524:8, 1525:16, 1525:23, 1526:8, 1529:5, 1529:21, 1529:22, 1530:6, 1531:12, 1531:14, 1532:3, 1532:9, 1532:14, 1532:16, 1532:17, 1532:20, 1533:3, 1534:18, 1534:22, 1535:12, 1544:11, 1562:16, 1562:18, 1562:21, 1564:3, 1565:4, 1565:8, 1566:8, 1567:15, 1567:16
**investigations** [8] - 1468:25, 1469:14, 1469:16, 1478:18, 1523:23, 1526:2, 1526:3, 1533:14
**investigative** [11] - 1449:5, 1449:25, 1488:18, 1488:25, 1493:14, 1494:16, 1506:24, 1514:8, 1514:10, 1532:5, 1563:24
**investigators** [1] - 1545:8
**investment** [1] - 1481:8
**invitation** [1] - 1478:6
**invoked** [1] - 1433:14
**involved** [8] - 1430:24, 1461:8, 1461:11, 1474:10, 1521:13, 1521:14, 1523:12,

1527:17
**involvement** [3] - 1492:22, 1523:23, 1524:22
**involving** [3] - 1428:1, 1439:16, 1479:23
**IP** [2] - 1504:22, 1505:1
**IPs** [4] - 1504:1, 1504:8, 1504:17
**is..** [1] - 1471:8
**issue** [24] - 1427:17, 1428:5, 1433:1, 1435:6, 1495:4, 1500:8, 1500:23, 1501:10, 1524:18, 1526:20, 1527:22, 1541:11, 1542:1, 1543:25, 1547:24, 1548:17, 1548:23, 1549:9, 1560:8, 1562:3, 1562:7, 1565:22, 1566:2, 1566:24
**issues** [9] - 1424:18, 1425:16, 1427:22, 1428:3, 1428:18, 1429:25, 1480:21, 1565:11
**itself** [8] - 1463:10, 1493:16, 1500:14, 1508:19, 1512:25, 1560:20, 1561:7, 1563:23
**IV** [1] - 1422:13

**J**

**James** [4] - 1470:11, 1470:12, 1470:13, 1491:22
**January** [2] - 1522:15
**jargon** [2] - 1449:18, 1494:8
**Jenkins** [2] - 1442:24, 1447:1
**Jim** [3] - 1544:23, 1550:2, 1550:5
**job** [3] - 1453:2, 1461:1, 1483:10
**Joe** [2] - 1487:19, 1531:21
**Joffe** [3] - 1429:2, 1432:10, 1432:17
**Joffe's** [1] - 1426:2
**jog** [3] - 1463:5, 1500:8, 1535:23
**jogged** [7] - 1500:24, 1501:4, 1541:3, 1542:20, 1542:24,

1560:5, 1562:4
**joined** [2] - 1505:12, 1523:7
**joining** [1] - 1523:9
**joint** [3] - 1427:8, 1428:1, 1430:25
**Jonathan** [3] - 1424:6, 1474:6, 1532:24
**JONATHAN** [1] - 1422:13
**Jordan** [2] - 1517:17, 1517:18
**Joseph** [4] - 1465:21, 1475:8, 1488:4, 1488:5
**Journal** [2] - 1448:12, 1451:13
**Judge** [2] - 1566:22, 1568:3
**JUDGE** [1] - 1422:10
**June** [3] - 1458:7, 1537:16, 1556:4
**jury** [37] - 1429:22, 1431:14, 1432:9, 1433:16, 1435:19, 1436:3, 1436:14, 1443:8, 1447:7, 1458:7, 1499:1, 1506:5, 1511:4, 1520:12, 1536:4, 1536:6, 1537:8, 1537:11, 1537:14, 1537:19, 1537:23, 1538:1, 1544:6, 1549:19, 1552:10, 1552:19, 1554:17, 1556:8, 1557:11, 1560:11, 1560:12, 1561:9, 1561:14, 1561:23, 1562:1, 1562:8, 1564:16
**JURY** [1] - 1422:9
**jury's** [2] - 1454:20, 1513:1
**justice** [1] - 1452:8
**Justice** [6] - 1425:6, 1425:19, 1452:9, 1477:25, 1478:13, 1514:1

**K**

**keep** [6] - 1456:2, 1535:11, 1544:11, 1544:12, 1560:17, 1564:1
**keeping** [2] - 1426:9, 1535:10
**Keilty** [5] - 1424:6, 1436:21, 1462:17,

1463:19, 1470:6
**KEILTY** [30] - 1422:13, 1424:5, 1435:5, 1435:8, 1435:12, 1436:1, 1436:4, 1436:7, 1436:12, 1436:23, 1437:8, 1440:20, 1443:6, 1443:14, 1443:16, 1443:18, 1443:19, 1446:20, 1447:2, 1447:4, 1457:13, 1463:16, 1470:8, 1475:6, 1476:19, 1477:10, 1480:10, 1484:4, 1484:6, 1484:19
**Keilty**).....................
..............[2] - 1423:4, 1423:5
**Kelly** [2] - 1517:17, 1517:18
**key** [6] - 1481:11, 1481:13, 1482:2, 1482:3, 1514:19, 1526:6
**Khan** [1] - 1481:10
**kind** [8] - 1447:16, 1448:3, 1460:17, 1467:14, 1483:15, 1494:4, 1517:2, 1518:22
**kinds** [2] - 1468:25, 1527:15
**knowing** [5] - 1425:11, 1455:4, 1524:6, 1549:15, 1566:3
**knowledge** [5] - 1427:4, 1446:17, 1511:14, 1511:16, 1513:20
**known** [6] - 1481:7, 1524:4, 1524:6, 1528:6, 1529:21, 1543:13
**Kortan** [4] - 1476:22, 1476:23, 1477:1, 1477:13
**Kremlin** [1] - 1448:19
**Kuzmichov** [1] - 1481:11

**L**

**lacked** [2] - 1497:20, 1513:12
**ladies** [3] - 1436:15, 1498:21, 1564:11
**laid** [1] - 1565:8
**Landau** [2] - 1430:10,

1448:6
**language** [1] - 1494:5
**largely** [1] - 1520:17
**largest** [1] - 1481:8
**last** [7] - 1437:13, 1444:21, 1449:4, 1494:14, 1521:24, 1539:15, 1564:21
**lastly** [1] - 1444:21
**late** [1] - 1482:16
**LATHAM** [1] - 1422:19
**lawyer** [9] - 1471:10, 1533:25, 1534:1, 1534:3, 1550:2, 1550:9, 1550:20, 1552:21, 1553:2
**lawyers** [1] - 1457:21
**lead** [1] - 1538:6
**lead-up** [1] - 1538:6
**leader** [3] - 1474:7, 1482:12, 1483:5
**leaders** [3] - 1469:23, 1470:1, 1470:13
**leadership** [20] - 1478:17, 1478:25, 1487:24, 1492:25, 1493:4, 1493:5, 1493:7, 1494:5, 1499:9, 1507:24, 1518:8, 1523:19, 1524:5, 1524:6, 1524:22, 1524:24, 1527:24, 1529:7, 1529:12
**leadership's** [1] - 1524:7
**leading** [2] - 1534:12, 1538:18
**learn** [7] - 1487:6, 1489:24, 1507:16, 1525:4, 1526:14, 1530:14, 1531:11
**learned** [15] - 1439:15, 1440:11, 1479:22, 1486:24, 1487:4, 1488:17, 1493:14, 1509:8, 1510:10, 1522:11, 1526:9, 1531:2, 1532:10, 1550:7, 1552:21
**least** [14] - 1424:25, 1426:11, 1426:23, 1430:14, 1431:21, 1433:4, 1470:12, 1474:4, 1496:15, 1513:10, 1513:18, 1516:8, 1522:21, 1567:5
**leave** [1] - 1519:12
**leaving** [1] - 1492:16

**led** [2] - 1446:13, 1450:2
**left** [7] - 1424:16, 1443:24, 1447:10, 1447:15, 1448:13, 1450:5, 1544:15
**legal** [4] - 1429:21, 1437:13, 1525:1, 1564:23
**legitimacy** [1] - 1431:11
**length** [2] - 1545:4, 1549:8
**letters** [1] - 1448:7
**level** [2] - 1525:17, 1525:5
**levels** [6] - 1478:12, 1478:13, 1523:16, 1525:21, 1525:22, 1525:23
**liaison** [3] - 1494:3, 1497:17, 1497:18
**Lichtblau** [36] - 1425:6, 1425:12, 1425:22, 1426:3, 1426:7, 1426:8, 1426:13, 1426:15, 1426:25, 1427:3, 1428:4, 1428:10, 1428:24, 1429:3, 1429:10, 1429:15, 1429:23, 1430:7, 1430:12, 1430:19, 1431:11, 1431:16, 1431:17, 1431:18, 1431:24, 1432:4, 1432:11, 1433:23, 1434:8, 1434:10, 1434:14, 1434:23, 1471:4, 1471:12, 1477:13, 1477:15
**Lichtblau's** [3] - 1424:17, 1425:17, 1432:15
**lieu** [1] - 1436:3
**lifted** [2] - 1508:16, 1508:18
**likelihood** [1] - 1434:21
**likely** [5] - 1427:18, 1428:24, 1490:25, 1520:17, 1523:10
**limit** [1] - 1425:14
**limiting** [1] - 1564:24
**line** [16] - 1432:25, 1448:18, 1448:20, 1448:25, 1449:4, 1463:25, 1502:18, 1502:19, 1516:17, 1517:19, 1518:8,

1519:2, 1536:13, 1543:4, 1543:5
**Line** [2] - 1553:15
**lines** [1] - 1474:20
**Lines** [4] - 1549:22, 1552:19, 1553:1, 1562:1
**link** [5] - 1474:21, 1474:22, 1474:24, 1475:8, 1532:22
**links** [2] - 1530:2, 1564:3
**Lisa** [1] - 1422:22
**LISA** [1] - 1568:9
**list** [12] - 1448:4, 1474:2, 1500:13, 1500:15, 1501:9, 1501:20, 1516:20, 1541:10, 1542:1, 1542:4, 1542:20, 1560:6
**listed** [1] - 1427:7, 1441:3, 1449:10, 1464:9, 1512:4
**lists** [1] - 1478:7
**LLP** [1] - 1422:19
**log** [2] - 1508:5, 1508:19
**logical** [1] - 1431:13, 1506:8
**logs** [27] - 1495:1, 1495:2, 1495:17, 1495:25, 1496:12, 1496:24, 1497:4, 1497:7, 1497:15, 1502:7, 1503:24, 1504:7, 1504:8, 1504:10, 1505:18, 1505:20, 1507:16, 1508:22, 1508:24, 1509:2, 1509:4, 1516:7, 1516:8, 1531:24
**look** [32] - 1431:17, 1441:20, 1443:20, 1453:25, 1454:2, 1455:16, 1456:10, 1456:14, 1456:18, 1463:8, 1463:18, 1469:24, 1472:3, 1482:14, 1489:15, 1495:16, 1498:17, 1502:2, 1502:14, 1503:25, 1504:7, 1509:21, 1509:22, 1518:24, 1521:2, 1521:7, 1527:10, 1536:12, 1536:16, 1547:13, 1558:16, 1566:23

**looked** [13] - 1440:3, 1444:15, 1444:19, 1444:23, 1489:17, 1504:16, 1520:8, 1522:13, 1531:15, 1542:4, 1546:11, 1547:16, 1565:25
**looking** [19] - 1463:4, 1464:2, 1480:12, 1483:13, 1499:18, 1499:19, 1500:11, 1505:1, 1505:2, 1505:12, 1509:20, 1509:25, 1510:18, 1517:12, 1520:6, 1529:24, 1532:18, 1554:25, 1559:23
**looks** [13] - 1443:16, 1448:4, 1463:3, 1477:16, 1481:11, 1484:11, 1505:19, 1508:21, 1518:11, 1520:16, 1555:1
**lookups** [1] - 1519:5
**loud** [2] - 1481:5, 1481:6
**Louis** [1] - 1486:15
**lunch** [3] - 1564:12, 1564:14, 1564:18
**Lunch** [1] - 1568:4

## M

**mail1.trump** [1] - 1519:6
**mail1.trump-email. com** [1] - 1519:6
**maintain** [1] - 1494:12
**maintains** [1] - 1482:9
**management** [1] - 1494:2
**Mandiant** [8] - 1497:17, 1509:8, 1509:11, 1509:12, 1509:13, 1509:25, 1510:6, 1510:13
**Mandiant's** [2] - 1510:4, 1510:15
**manner** [1] - 1478:20
**March** [3] - 1452:3, 1452:8, 1478:1
**margin** [2] - 1448:3, 1448:13
**Mark** [2] - 1516:12, 1516:14
**marked** [3] - 1435:13, 1440:23, 1442:17
**marketing** [4] - 1495:10, 1498:1, 1504:13, 1504:15

**mask** [2] - 1437:2, 1485:9
**material** [8] - 1488:18, 1492:19, 1493:1, 1500:11, 1546:17, 1549:19, 1560:12, 1560:14
**materials** [1] - 1518:25
**Matt** [3] - 1431:7, 1448:5
**matter** [36] - 1428:20, 1433:3, 1446:4, 1471:3, 1472:5, 1472:14, 1472:24, 1479:16, 1491:11, 1493:17, 1501:14, 1503:8, 1504:22, 1506:25, 1507:5, 1507:23, 1512:21, 1517:10, 1517:12, 1528:9, 1530:16, 1541:17, 1542:9, 1549:13, 1549:17, 1550:10, 1551:6, 1552:23, 1555:3, 1555:8, 1555:14, 1559:23, 1560:2, 1565:3, 1565:21, 1567:3
**mattered** [6] - 1454:25, 1456:6, 1523:2, 1525:6, 1526:12, 1526:17
**matters** [13] - 1430:3, 1446:7, 1494:15, 1499:19, 1499:22, 1500:20, 1523:1, 1523:24, 1533:15, 1550:22, 1553:4
**mean** [28] - 1459:12, 1467:5, 1468:7, 1468:8, 1475:21, 1478:21, 1487:22, 1487:25, 1492:7, 1492:8, 1493:7, 1501:12, 1507:2, 1508:2, 1513:23, 1523:15, 1524:3, 1524:4, 1527:12, 1527:17, 1529:2, 1537:20, 1539:24, 1540:10, 1540:11, 1541:15, 1543:1, 1546:20
**meaning** [5] - 1446:4, 1452:19, 1484:16, 1542:4, 1552:2
**means** [1] - 1526:25
**meant** [5] - 1451:20, 1493:1, 1494:6,

1504:18, 1551:15
**mechanically** [1] - 1435:8
**media** [13] - 1432:11, 1432:20, 1451:25, 1470:2, 1481:18, 1511:9, 1511:11, 1511:18, 1514:14, 1515:2, 1517:13, 1521:21, 1521:22
**mediafire.com)** [1] - 1520:16
**medium** [1] - 1475:1
**meet** [6] - 1458:1, 1458:4, 1483:21, 1538:9, 1538:12, 1559:8
**meeting** [75] - 1426:4, 1427:16, 1430:9, 1451:25, 1452:7, 1458:12, 1458:16, 1458:18, 1476:22, 1477:3, 1477:12, 1477:13, 1477:21, 1477:25, 1478:3, 1478:6, 1478:10, 1488:21, 1490:22, 1491:3, 1491:4, 1491:6, 1491:7, 1491:8, 1491:21, 1492:3, 1492:16, 1493:20, 1493:21, 1493:23, 1495:19, 1500:2, 1500:3, 1500:18, 1501:6, 1501:8, 1501:18, 1501:19, 1506:23, 1527:14, 1530:15, 1531:2, 1533:11, 1533:18, 1533:19, 1534:11, 1535:21, 1535:24, 1536:20, 1537:4, 1540:18, 1541:6, 1541:9, 1541:21, 1541:25, 1543:9, 1545:10, 1545:14, 1545:22, 1546:5, 1546:6, 1546:8, 1546:16, 1546:23, 1547:4, 1547:16, 1547:18, 1548:13, 1548:20, 1558:2, 1558:15, 1560:7, 1560:21, 1560:23, 1561:8
**meetings** [16] - 1426:4, 1426:6, 1426:19, 1445:2, 1445:3, 1445:5, 1452:11, 1463:10,

1478:14, 1499:17, 1501:22, 1522:12, 1535:16, 1539:13, 1544:2, 1554:22
**members** [1] - 1429:10
**memo** [5] - 1480:6, 1480:12, 1482:4, 1482:8, 1483:6
**Memo** [1] - 1480:13
**memory** [11] - 1446:8, 1463:6, 1478:9, 1500:8, 1501:5, 1535:23, 1541:4, 1542:21, 1542:24, 1560:6, 1562:4
**memos** [1] - 1480:19
**men** [1] - 1482:15
**mention** [2] - 1554:18
**mentioned** [20] - 1428:10, 1430:10, 1430:16, 1431:14, 1433:10, 1433:12, 1438:17, 1449:18, 1449:24, 1464:16, 1475:9, 1475:10, 1496:23, 1497:12, 1499:8, 1500:17, 1504:14, 1509:7, 1513:22, 1524:12
**merit** [8] - 1497:13, 1497:20, 1509:10, 1510:12, 1511:8, 1512:11, 1513:12
**messages** [1] - 1474:21
**messaging** [1] - 1475:2
**met** [22] - 1426:7, 1430:2, 1457:24, 1458:6, 1458:9, 1458:11, 1490:21, 1494:17, 1499:21, 1500:10, 1501:1, 1501:16, 1501:17, 1528:19, 1528:21, 1532:24, 1538:6, 1538:10, 1541:19, 1541:20, 1545:6, 1557:22
**methods** [1] - 1531:9
**Miami** [6] - 1503:25, 1504:7, 1504:8, 1504:10, 1507:21, 1516:7
**MICHAEL** [3] - 1422:6, 1422:13, 1422:17
**Michael** [16] - 1424:4, 1424:5, 1424:10, 1447:16, 1447:18,

1450:6, 1457:21, 1463:24, 1491:18, 1533:22, 1533:24, 1544:16, 1544:19, 1548:20, 1550:2, 1557:3
**Michigan** [1] - 1448:24
**mid** [1] - 1521:16
**mid-November** [1] - 1521:16
**might** [22] - 1425:1, 1426:20, 1428:19, 1428:24, 1443:11, 1464:21, 1468:16, 1491:25, 1495:13, 1504:21, 1514:25, 1523:9, 1524:1, 1524:12, 1524:19, 1524:21, 1525:14, 1527:6, 1527:16, 1536:24, 1564:4, 1564:8
**Mike** [1] - 1477:1
**Mikhail** [2] - 1481:10, 1482:1
**mind** [10] - 1427:11, 1427:21, 1428:5, 1428:11, 1501:2, 1501:15, 1541:18, 1544:13, 1548:17, 1567:5
**mindful** [1] - 1432:24
**minus** [1] - 1520:12
**minute** [3] - 1508:23, 1535:8, 1542:23
**minutes** [3] - 1463:22, 1467:10, 1506:4
**missed** [1] - 1533:12
**MM** [5] - 1503:24, 1504:7, 1507:20, 1507:21
**Moffa** [42] - 1474:6, 1490:17, 1490:21, 1491:7, 1491:8, 1491:17, 1492:20, 1493:20, 1494:17, 1495:20, 1496:17, 1500:18, 1501:18, 1501:19, 1508:15, 1508:17, 1532:24, 1533:9, 1534:6, 1539:22, 1540:8, 1541:21, 1541:25, 1542:6, 1542:25, 1543:6, 1543:22, 1545:11, 1546:4, 1549:17, 1550:8, 1551:10, 1551:16, 1551:24, 1552:21, 1553:14, 1553:16,

1553:20, 1554:3,
1554:11, 1556:16,
1560:7
**Moffa's** [1] - 1490:25
**moment** [4] - 1475:9,
1534:5, 1541:10,
1552:4
**Monday** [6] - 1422:4,
1490:3, 1490:9,
1490:14, 1509:2,
1516:9, 1532:23,
1546:4, 1562:18
**money** [1] - 1456:15
**monitoring** [1] -
1504:12
**month** [1] - 1538:17
**MOREIRA** [1] - 1568:9
**Moreira** [2] - 1422:22,
1568:16
**MORNING** [1] - 1422:6
**morning** [19] - 1424:5,
1424:8, 1424:9,
1424:12, 1428:13,
1428:14, 1436:15,
1437:1, 1437:9,
1437:10, 1457:19,
1457:20, 1485:8,
1485:16, 1485:17,
1488:22, 1498:22,
1528:17, 1528:18
**Moscow** [1] - 1448:17
**most** [6] - 1433:12,
1438:10, 1459:2,
1459:5, 1478:20,
1493:7
**mostly** [1] - 1486:13
**motion** [4] - 1436:9,
1564:20, 1564:23,
1565:9
**motivated** [3] -
1454:16, 1524:14,
1525:12
**motivation** [4] -
1454:7, 1454:17,
1455:4, 1455:12
**motivations** [1] -
1468:17
**motive** [4] - 1427:8,
1510:17, 1528:7,
1566:10
**move** [9] - 1435:18,
1435:25, 1446:21,
1447:10, 1475:4,
1476:18, 1477:9,
1480:8, 1535:3
**moved** [9] - 1446:25,
1475:7, 1476:20,
1477:11, 1480:11,
1502:25, 1516:1,
1520:5, 1535:6

**movement** [1] -
1465:10
**moving** [4] - 1435:16,
1505:5, 1553:21,
1564:9
**MR** [116] - 1424:5,
1424:9, 1424:14,
1425:18, 1425:25,
1427:10, 1428:7,
1428:14, 1428:16,
1428:21, 1429:19,
1430:6, 1431:4,
1431:9, 1433:11,
1433:18, 1433:21,
1434:4, 1434:6,
1435:5, 1435:8,
1435:12, 1436:1,
1436:4, 1436:7,
1436:12, 1436:23,
1437:8, 1440:20,
1443:6, 1443:14,
1443:16, 1443:18,
1443:19, 1446:20,
1446:23, 1447:2,
1447:4, 1457:13,
1457:18, 1463:13,
1463:16, 1463:17,
1470:8, 1470:9,
1473:18, 1474:18,
1475:4, 1475:6,
1476:18, 1476:19,
1477:9, 1477:10,
1477:23, 1479:7,
1480:4, 1480:8,
1480:10, 1481:24,
1482:21, 1484:3,
1484:4, 1484:6,
1484:19, 1485:2,
1485:5, 1485:7,
1485:15, 1498:19,
1499:5, 1499:6,
1502:22, 1502:24,
1503:1, 1503:10,
1503:21, 1515:16,
1515:23, 1515:25,
1516:2, 1520:2,
1520:4, 1528:14,
1528:16, 1535:3,
1535:5, 1535:14,
1535:19, 1536:6,
1542:16, 1542:17,
1544:1, 1544:6,
1544:8, 1545:19,
1545:21, 1548:12,
1549:21, 1552:9,
1552:14, 1552:16,
1554:14, 1558:4,
1558:19, 1561:25,
1564:7, 1564:10,
1564:25, 1565:2,
1565:17, 1566:21,

1567:2, 1567:9,
1567:11, 1567:25,
1568:3
**multiple** [2] - 1512:4,
1561:1
**must** [4] - 1476:4,
1476:7, 1533:11,
1543:13
**muster** [1] - 1497:13
**Myers** [1] - 1426:20

## N

**name** [12] - 1437:11,
1437:13, 1441:3,
1441:4, 1447:18,
1448:7, 1465:14,
1466:14, 1485:18,
1489:1, 1512:12
**named** [7] - 1465:21,
1466:13, 1505:24,
1517:17, 1518:15,
1549:25, 1550:1
**names** [4] - 1430:11,
1448:5, 1449:10,
1517:22
**NATALIE** [1] - 1422:18
**Natalie** [1] - 1424:10
**nation** [7] - 1437:21,
1438:21, 1459:7,
1459:12, 1460:17,
1472:15, 1521:22
**national** [14] -
1469:19, 1479:16,
1479:19, 1482:25,
1483:23, 1485:24,
1486:6, 1486:11,
1516:16, 1521:18,
1523:24, 1527:19
**National** [8] - 1464:5,
1545:24, 1548:22,
1561:2, 1561:10,
1563:4, 1563:12,
1563:20
**nations** [3] - 1449:3,
1459:18
**nature** [4] - 1435:21,
1488:16, 1491:16,
1507:17
**necessarily** [3] -
1429:17, 1498:15,
1525:10
**necessary** [2] -
1508:6, 1514:11
**need** [8] - 1507:15,
1512:6, 1525:13,
1526:25, 1527:10,
1536:11, 1565:11,
1567:22
**needed** [3] - 1472:7,

1496:16, 1519:19
**negatively** [2] -
1472:24, 1473:1
**network** [1] - 1519:8
**networks** [2] - 1519:5,
1519:7
**neutral** [1] - 1519:4
**never** [9] - 1457:24,
1458:11, 1467:13,
1528:19, 1528:21,
1528:23, 1528:25,
1557:7, 1562:10
**New** [7] - 1422:20,
1432:2, 1434:21,
1448:11, 1451:12,
1471:4, 1477:17
**new** [3] - 1527:25,
1559:9, 1564:9
**newspaper** [9] -
1472:14, 1472:17
**next** [21] - 1435:4,
1436:22, 1444:3,
1448:20, 1464:6,
1481:24, 1482:14,
1489:25, 1490:2,
1505:23, 1506:18,
1517:22, 1518:2,
1536:15, 1546:6,
1554:22, 1558:16,
1563:2, 1567:25
**nice** [2] - 1424:13,
1436:17
**night** [1] - 1564:21
**node** [2] - 1448:20,
1497:12
**noodle** [1] - 1435:3
**Norfolk** [1] - 1485:22
**normally** [1] - 1507:5
**Northeast** [1] -
1422:15
**notation** [1] - 1544:22
**note** [6] - 1446:2,
1446:6, 1446:16,
1546:15, 1548:16
**note-taking** [1] -
1446:2, 1446:6,
1446:16
**notebook** [18] -
1435:13, 1435:14,
1435:15, 1435:16,
1435:21, 1435:22,
1436:3, 1440:25,
1441:2, 1441:7,
1441:17, 1441:18,
1441:23, 1442:1,
1442:4, 1443:6,
1444:19, 1444:23
**noted** [3] - 1492:1,
1520:15, 1551:14

**notes** [75] - 1444:8,
1444:10, 1445:1,
1445:5, 1445:9,
1445:14, 1445:22,
1445:25, 1446:3,
1446:7, 1446:10,
1446:14, 1446:17,
1446:19, 1446:23,
1447:7, 1449:9,
1449:11, 1450:5,
1450:16, 1451:2,
1451:4, 1451:5,
1451:8, 1451:11,
1451:23, 1458:20,
1462:15, 1462:16,
1462:20, 1462:22,
1462:24, 1463:2,
1463:4, 1463:15,
1463:20, 1464:2,
1464:11, 1464:12,
1464:21, 1466:19,
1467:8, 1467:13,
1471:22, 1509:20,
1534:14, 1534:17,
1534:20, 1535:9,
1536:25, 1538:20,
1538:22, 1539:5,
1544:7, 1544:10,
1546:8, 1546:22,
1551:13, 1551:14,
1553:19, 1554:25,
1558:2, 1558:8,
1558:12, 1558:16,
1559:3, 1559:6,
1559:10, 1559:14,
1559:17, 1559:20,
1559:23, 1560:1,
1560:3, 1568:11
**nothing** [5] - 1457:13,
1531:16, 1546:9,
1553:23
**notwithstanding** [1] -
1531:15
**November** [2] -
1521:16, 1522:3
**number** [9] - 1434:6,
1439:10, 1441:10,
1441:13, 1447:15,
1461:10, 1465:3,
1519:3
**numbers** [1] - 1447:1
**NW** [2] - 1422:23,
1568:18
**NY** [1] - 1422:20
**NYTS** [1] - 1448:10

## O

**oath** [7] - 1537:10,
1537:11, 1549:8,
1549:21, 1552:16,

1554:17, 1557:11
**object** [1] - 1496:10
**objection** [10] -
1446:23, 1475:6,
1476:19, 1477:10,
1480:10, 1502:24,
1515:25, 1520:4,
1535:5, 1567:1
**objective** [1] - 1532:17
**obtain** [1] - 1456:12
**obtainable** [1] -
1434:20
**obtained** [1] - 1507:16
**obtains** [1] - 1453:24
**obvious** [1] - 1544:18
**obviously** [4] -
1429:25, 1433:8,
1436:10, 1533:16
**occasion** [1] - 1500:20
**occasions** [2] -
1450:24, 1472:16
**occurred** [6] -
1477:25, 1500:11,
1501:11, 1539:13,
1541:12, 1555:16
**October** [15] -
1502:15, 1503:15,
1506:3, 1506:16,
1506:18, 1508:21,
1510:9, 1516:5,
1516:9, 1518:12,
1520:7, 1545:2,
1546:20, 1556:4,
1560:24
**OF** [4] - 1422:1,
1422:3, 1422:9,
1568:7
**offered** [3] - 1487:18,
1488:2, 1531:2
**offering** [1] - 1531:25
**offers** [3] - 1502:23,
1515:23, 1520:2
**OFFICE** [1] - 1422:14
**Office** [10] - 1466:1,
1487:10, 1494:20,
1496:23, 1499:18,
1503:7, 1507:20,
1511:5, 1511:21,
1529:13
**office** [18] - 1466:18,
1477:2, 1485:22,
1486:2, 1486:4,
1487:20, 1487:21,
1487:23, 1490:25,
1491:12, 1494:24,
1503:25, 1510:5,
1513:11, 1519:19,
1529:9, 1530:19,
1531:11
**officer** [2] - 1477:4,

1565:13
**offices** [1] - 1494:13
**Official** [1] - 1422:22
**OFFICIAL** [1] - 1568:7
**official** [2] - 1438:8,
1568:17
**officials** [1] - 1447:24
**Officials** [1] - 1481:2
**often** [2] - 1468:3,
1534:19
**older** [1] - 1536:11
**once** [2] - 1440:10,
1557:7
**one** [68] - 1429:24,
1433:7, 1435:5,
1439:8, 1442:23,
1449:12, 1449:21,
1450:2, 1452:5,
1457:21, 1459:23,
1460:6, 1464:16,
1466:9, 1467:23,
1467:24, 1468:20,
1468:25, 1474:3,
1477:9, 1477:20,
1479:7, 1481:8,
1482:2, 1484:4,
1495:12, 1496:3,
1497:5, 1499:10,
1503:6, 1505:1,
1507:4, 1513:3,
1514:19, 1515:4,
1515:15, 1516:13,
1517:9, 1517:13,
1525:9, 1526:13,
1533:21, 1534:11,
1534:16, 1538:23,
1538:24, 1541:2,
1543:18, 1544:2,
1549:15, 1549:20,
1550:23, 1552:4,
1552:11, 1552:17,
1553:5, 1556:6,
1556:21, 1561:13,
1565:15, 1566:13
**online** [1] - 1520:15
**open** [18] - 1441:2,
1468:24, 1469:15,
1469:16, 1474:11,
1475:19, 1481:9,
1481:16, 1484:8,
1522:5, 1523:14,
1525:16, 1525:17,
1525:24, 1526:6,
1526:8, 1532:14,
1565:4
**opened** [6] - 1440:2,
1440:5, 1473:15,
1523:20, 1532:4,
1532:11
**Opening** [1] - 1473:19

**opening** [13] -
1427:15, 1473:20,
1473:22, 1473:24,
1476:7, 1484:11,
1484:12, 1523:8,
1523:14, 1523:16,
1525:17, 1525:21,
1532:8
**Operations** [1] -
1531:3
**operations** [2] -
1494:22, 1517:11
**opinion** [1] - 1520:19
**opportunity** [1] -
1548:7
**opposed** [1] - 1565:24
**option** [1] - 1476:4
**order** [5] - 1425:3,
1431:13, 1527:1,
1561:19, 1565:12
**ordinarily** [1] -
1565:16
**org** [2] - 1448:14,
1448:16
**organization** [11] -
1439:16, 1448:14,
1449:2, 1457:5,
1479:23, 1480:16,
1483:4, 1483:19,
1486:25, 1510:16,
1517:4
**organize** [1] - 1478:19
**orient** [1] - 1426:20
**original** [2] - 1444:16,
1520:22
**otherwise** [2] - 1432:9,
1459:20
**outbound** [1] - 1497:5
**outcome** [4] - 1521:4,
1521:6, 1521:9,
1521:10
**outlets** [5] - 1452:1,
1470:2, 1511:9,
1511:11, 1517:13
**outside** [2] - 1452:21,
1452:25
**overall** [2] - 1433:3,
1532:16
**overcome** [1] - 1433:4
**overlap** [2] - 1529:25,
1530:1
**overlapped** [1] -
1529:21
**oversaw** [1] - 1439:1
**overseas** [1] - 1509:14
**overt** [6] - 1513:14,
1513:21, 1513:23,
1513:24, 1514:21,
1563:24
**overtly** [1] - 1514:8

**overwhelm** [1] -
1566:11
**own** [12] - 1441:22,
1508:14, 1551:6,
1553:8, 1554:8,
1554:19, 1556:21,
1557:4, 1558:11,
1558:24, 1562:4,
1562:11
**owned** [2] - 1481:8,
1481:9

## P

**P-R-I-E-S-T-A-P** [1] -
1437:14
**p.m** [2] - 1506:3,
1568:4
**PAGE** [1] - 1423:2
**page** [13] - 1442:9,
1442:17, 1444:18,
1444:21, 1445:23,
1447:5, 1481:24,
1503:2, 1503:11,
1503:12, 1546:11,
1563:3
**Page** [9] - 1477:8,
1480:12, 1480:23,
1545:21, 1549:22,
1553:15, 1562:1
**pages** [12] - 1435:16,
1435:17, 1435:18,
1435:25, 1436:2,
1441:17, 1441:19,
1442:4, 1480:3,
1480:6, 1503:14
**Pages** [1] - 1479:25
**paid** [1] - 1523:1
**paper** [10] - 1506:10,
1512:25, 1515:9,
1520:15, 1520:16,
1520:17, 1520:19,
1521:12, 1531:4,
1544:25
**papers** [3] - 1513:2,
1521:12, 1561:21
**Paragraph** [1] -
1545:21
**paragraph** [5] -
1451:12, 1507:25,
1536:12, 1536:17,
1558:20
**paragraphs** [1] -
1481:25
**parentheses** [7] -
1448:1, 1448:8,
1448:18, 1448:19,
1448:22, 1449:1,
1517:21
**Parker** [1] - 1566:13

**parlance** [1] - 1449:5
**part** [9] - 1427:2,
1427:24, 1428:1,
1430:17, 1453:16,
1509:11, 1516:13,
1518:21, 1525:18
**particular** [11] -
1432:25, 1435:9,
1435:25, 1445:22,
1511:8, 1512:20,
1543:4, 1550:10,
1551:23, 1552:23,
1554:3
**particularly** [2] -
1428:4, 1455:6
**particulars** [1] -
1461:23
**parties** [5] - 1464:9,
1464:14, 1464:16,
1519:9
**partners** [1] - 1482:16
**parts** [1] - 1520:12
**party** [8] - 1492:9,
1492:17, 1525:9,
1527:6, 1539:25,
1540:12, 1540:14,
1561:7
**pass** [2] - 1497:12,
1512:11
**passage** [1] - 1547:12
**passed** [4] - 1511:21,
1515:10, 1521:1,
1547:10
**passing** [1] - 1544:23
**past** [2] - 1538:17,
1538:18
**Paul** [2] - 1430:10,
1431:7
**Pause** [4] - 1443:3,
1443:5, 1443:13,
1542:14
**payroll** [2] - 1482:17,
1483:5
**people** [28] - 1428:23,
1430:7, 1430:15,
1430:17, 1431:19,
1432:8, 1433:9,
1440:10, 1445:11,
1448:1, 1453:8,
1453:12, 1453:13,
1453:14, 1453:15,
1456:9, 1456:11,
1461:10, 1464:21,
1465:17, 1465:19,
1467:24, 1474:2,
1475:11, 1514:22,
1544:12
**People** [1] - 1448:4
**perhaps** [2] - 1432:16,
1565:24

**period** [6] - 1426:8, 1479:10, 1486:17, 1516:11, 1521:19, 1521:21
**Perkins** [3] - 1447:19, 1450:6, 1463:25
**person** [8] - 1426:7, 1455:4, 1457:7, 1467:25, 1505:13, 1514:25, 1525:9, 1538:14
**personnel** [1] - 1465:20
**perspective** [2] - 1490:6, 1567:6
**pertinent** [2] - 1450:17, 1450:19
**Peter** [11] - 1466:5, 1466:8, 1466:9, 1466:12, 1474:3, 1515:20, 1515:21, 1518:11, 1518:12, 1518:13, 1518:18
**Petr** [3] - 1481:10, 1482:2, 1482:8
**ph** [2] - 1448:8
**phased** [1] - 1522:2
**phone** [4] - 1432:18, 1441:10, 1441:13, 1538:14
**phonetic** [1] - 1448:8
**pick** [1] - 1424:16
**piece** [5] - 1528:11, 1542:10, 1542:11, 1543:7, 1544:25
**pieces** [2] - 1461:6, 1463:8
**Pientka** [15] - 1465:21, 1475:8, 1475:19, 1476:3, 1487:19, 1488:3, 1488:4, 1488:5, 1488:20, 1488:22, 1490:14, 1490:18, 1490:20, 1531:21
**place** [12] - 1459:8, 1460:1, 1462:7, 1490:23, 1494:2, 1495:3, 1500:1, 1523:10, 1524:9, 1525:1, 1529:6, 1561:11
**Plaintiff** [1] - 1422:4
**plan** [3] - 1435:15, 1435:20, 1564:12
**planned** [1] - 1515:1
**plate** [1] - 1531:22
**play** [1] - 1451:2
**played** [1] - 1532:13
**plus** [4] - 1543:21,

1543:23, 1560:7, 1560:9
**PNG** [1] - 1519:8
**POCs** [1] - 1448:2
**point** [19] - 1427:22, 1440:9, 1448:2, 1457:4, 1466:9, 1472:4, 1474:4, 1485:6, 1493:6, 1494:19, 1502:7, 1521:1, 1522:5, 1544:22, 1545:17, 1545:24, 1551:15, 1556:5, 1558:3
**pointed** [1] - 1520:21
**points** [1] - 1451:6
**policies** [3] - 1514:1, 1514:5, 1514:6
**policy** [8] - 1425:7, 1425:8, 1425:19, 1513:17, 1514:7, 1514:18, 1563:18, 1563:25
**political** [4] - 1455:7, 1455:15, 1523:2, 1525:9
**portion** [2] - 1463:18, 1544:9
**posed** [1] - 1483:1
**position** [8] - 1429:12, 1430:1, 1437:22, 1438:10, 1438:14, 1452:4, 1485:23, 1505:16
**possession** [4] - 1453:20, 1495:18, 1508:14, 1546:17
**possible** [5] - 1428:18, 1445:15, 1445:19, 1450:21, 1478:20
**possibly** [1] - 1440:10
**Post** [2] - 1448:11, 1451:13
**posted** [1] - 1517:1
**potential** [14] - 1426:14, 1460:2, 1473:9, 1473:11, 1479:11, 1482:24, 1483:17, 1510:17, 1512:25, 1513:16, 1513:17, 1528:7, 1530:1, 1563:25
**potentially** [13] - 1426:11, 1426:22, 1472:24, 1472:25, 1495:2, 1495:12, 1515:8, 1515:11, 1524:16, 1527:1, 1532:21, 1563:18, 1566:2

**power** [3] - 1448:13, 1459:16, 1467:25
**powers** [1] - 1469:2
**practice** [8] - 1445:1, 1445:9, 1445:13, 1445:14, 1446:2, 1446:10, 1450:16, 1450:19
**practices** [3] - 1446:2, 1446:6, 1446:16
**preassessment** [1] - 1525:25
**preclude** [1] - 1491:5
**precluded** [1] - 1425:5
**predication** [2] - 1523:17, 1525:23
**prefer** [1] - 1566:12
**preliminary** [5] - 1469:3, 1469:6, 1469:14, 1469:16, 1526:1
**premarked** [3] - 1502:11, 1515:17, 1519:23
**prep** [12] - 1478:22, 1478:24, 1554:15, 1554:25, 1555:16, 1557:14, 1557:21, 1557:24, 1558:8, 1558:16, 1558:18, 1559:1
**preparation** [15] - 1489:14, 1501:4, 1501:7, 1501:8, 1537:22, 1538:22, 1539:5, 1539:6, 1539:8, 1539:10, 1539:11, 1541:3, 1541:7, 1541:9, 1559:6
**prepare** [4] - 1458:1, 1458:4, 1478:14, 1538:13
**prepared** [5] - 1424:25, 1480:6, 1480:20, 1500:15, 1536:19
**preparing** [1] - 1554:20
**present** [1] - 1424:11
**presented** [1] - 1557:5
**president** [1] - 1482:9
**presidential** [1] - 1460:16
**press** [4] - 1427:25, 1428:6, 1429:11, 1433:2
**presumably** [2] - 1463:5, 1475:14
**pretty** [6] - 1432:1,

1497:3, 1502:1, 1514:6, 1537:17, 1538:3
**prevent** [2] - 1498:8, 1498:11
**previous** [1] - 1477:16
**previously** [1] - 1458:6
**Priestap** [36] - 1435:10, 1436:7, 1436:24, 1437:14, 1437:16, 1438:13, 1439:8, 1440:23, 1441:16, 1441:25, 1442:21, 1443:20, 1444:1, 1444:13, 1444:25, 1447:6, 1449:10, 1450:13, 1450:23, 1452:3, 1452:13, 1454:20, 1457:15, 1457:19, 1459:15, 1473:20, 1474:22, 1476:4, 1476:22, 1477:14, 1479:8, 1480:5, 1484:7, 1484:20, 1518:16, 1518:17
**PRIESTAP** [2] - 1423:3, 1437:6
**primary** [4] - 1457:4, 1506:25, 1521:16, 1521:25
**private** [2] - 1456:2, 1517:1
**privately** [1] - 1481:8
**privately-owned** [1] - 1481:8
**privilege** [7] - 1424:20, 1428:2, 1428:17, 1429:16, 1429:24, 1433:3, 1433:6
**privileged** [1] - 1429:21
**probative** [6] - 1429:7, 1429:25, 1430:3, 1432:2, 1432:16, 1432:22
**probe** [2] - 1431:15, 1431:22
**proceed** [1] - 1508:24
**proceeded** [1] - 1531:9
**proceeding** [1] - 1426:10
**proceedings** [2] - 1428:19, 1568:12
**process** [3] - 1429:21, 1451:3, 1523:20
**produced** [3] - 1429:9, 1430:14, 1494:22
**professor** [1] -

1512:16
**profit** [1] - 1510:16
**program** [6] - 1494:2, 1494:11, 1527:20, 1527:22, 1529:24, 1530:15
**programs** [1] - 1486:7
**progress** [3] - 1507:23, 1515:9, 1531:12
**prohibit** [1] - 1565:20
**project** [13] - 1480:14, 1527:25, 1528:1, 1529:18, 1530:2, 1530:18, 1530:21, 1530:24, 1531:10, 1531:19, 1531:23, 1532:3
**prominent** [3] - 1447:25, 1509:17, 1509:25
**prosecution** [1] - 1539:15
**protect** [8] - 1437:21, 1438:20, 1460:24, 1461:1, 1473:8, 1507:9, 1526:21, 1527:1
**protected** [5] - 1514:19, 1514:20, 1514:22, 1515:1, 1515:3
**protecting** [1] - 1529:18
**protection** [2] - 1486:21, 1507:1
**provide** [7] - 1453:8, 1453:20, 1457:6, 1457:7, 1459:10, 1494:4, 1527:7
**provided** [20] - 1440:10, 1449:15, 1456:21, 1491:20, 1491:22, 1493:2, 1493:3, 1499:10, 1505:13, 1511:9, 1511:22, 1526:24, 1527:5, 1527:11, 1528:7, 1533:5, 1533:22, 1551:17, 1561:7, 1561:19
**provider** [1] - 1498:9
**provides** [1] - 1519:4
**providing** [6] - 1454:12, 1455:4, 1455:24, 1456:9, 1468:17, 1478:23
**proving** [1] - 1432:25
**proximity** [3] - 1514:9, 1563:4, 1563:23

**public** [8] - 1473:3,
1477:2, 1477:3,
1481:19, 1516:21,
1516:22, 1516:23,
1516:24
**publicly** [1] - 1455:25,
1472:23, 1513:24
**publish** [7] - 1534:23,
1535:7, 1544:6,
1549:22, 1552:10,
1552:18, 1561:25
**published** [2] -
1552:8, 1552:12
**pull** [7] - 1432:3,
1496:16, 1508:6,
1527:22, 1545:13,
1549:19, 1566:20
**pulling** [1] - 1527:25
**put** [16] - 1430:4,
1430:25, 1440:3,
1442:4, 1447:5,
1448:8, 1460:14,
1463:13, 1463:19,
1475:20, 1475:21,
1492:25, 1524:9,
1529:6, 1533:7,
1552:10
**Putin** [4] - 1482:10,
1482:12, 1482:15,
1482:17
**putting** [3] - 1425:22,
1428:2, 1435:16

**Q**

**qualified** [4] - 1424:19,
1429:24, 1433:3,
1433:6
**quarter** [1] - 1567:21
**QUESTION** [1] -
1550:7
**questionable** [1] -
1531:9
**questioning** [2] -
1432:25, 1566:9
**questions** [27] -
1424:21, 1427:20,
1463:9, 1464:20,
1467:19, 1467:21,
1468:1, 1468:7,
1468:21, 1470:22,
1479:8, 1480:2,
1484:19, 1490:4,
1511:21, 1519:12,
1528:14, 1535:8,
1539:12, 1539:14,
1549:11, 1549:13,
1550:1, 1555:4,
1563:10, 1563:13,
1566:21
**quick** [2] - 1470:22,

1530:25
**quickly** [1] - 1552:7
**quite** [1] - 1564:7
**quote** [2] - 1527:13,
1533:24

**R**

**raise** [3] - 1428:19,
1437:2, 1485:10
**raised** [1] - 1505:20
**raising** [1] - 1542:11
**ran** [2] - 1490:20,
1490:21
**ranks** [1] - 1458:25
**Rao** [1] - 1424:10
**RAO** [1] - 1422:18
**rather** [4] - 1449:22,
1496:13, 1510:12,
1566:5
**RDR** [3] - 1422:22,
1568:9, 1568:16
**re** [1] - 1505:20
**re-raised** [1] - 1505:20
**reach** [5] - 1426:15,
1431:12, 1467:25,
1470:2, 1475:20
**reach-out** [1] -
1426:15
**reached** [3] - 1494:24,
1510:6, 1517:14
**reaching** [2] -
1426:12, 1427:25
**read** [18] - 1425:8,
1443:7, 1444:8,
1445:22, 1447:6,
1470:17, 1470:20,
1480:25, 1481:4,
1481:6, 1503:23,
1506:5, 1516:25,
1519:2, 1520:11,
1540:4, 1543:25
**reading** [1] - 1481:5
**reads** [6] - 1447:22,
1447:24, 1447:25,
1448:4, 1448:15,
1449:4
**ready** [7] - 1432:3,
1435:4, 1436:13,
1436:19, 1436:20,
1500:4, 1554:23
**really** [6] - 1434:24,
1434:25, 1470:17,
1504:2, 1505:6,
1558:14
**reason** [19] - 1433:10,
1433:24, 1445:4,
1492:18, 1496:8,
1496:16, 1499:13,
1499:15, 1499:25,

1505:10, 1506:21,
1506:25, 1509:10,
1510:14, 1512:2,
1513:8, 1517:8,
1524:25, 1526:21
**reasons** [6] - 1427:12,
1429:4, 1512:2,
1512:4, 1513:9,
1525:3
**rebutting** [1] - 1427:8
**recalled** [4] - 1499:22,
1501:20, 1543:14,
1545:12
**receive** [3] - 1495:21,
1499:13, 1511:1
**received** [5] - 1436:9,
1462:6, 1482:5,
1496:24, 1511:5
**recent** [1] - 1438:10
**recently** [3] - 1501:15,
1541:18, 1554:16
**recess** [1] - 1568:4
**Recess** [1] - 1499:2
**recognize** [4] -
1441:18, 1441:20,
1441:22, 1516:20
**recognizing** [2] -
1492:11, 1531:23
**recollection** [23] -
1451:22, 1451:25,
1452:7, 1484:15,
1489:19, 1489:20,
1500:7, 1500:12,
1500:23, 1504:25,
1512:6, 1521:7,
1534:10, 1535:17,
1536:25, 1537:4,
1547:14, 1547:22,
1555:23, 1556:1,
1556:3, 1558:9,
1558:22
**recommendation** [1] -
1524:2
**recommended** [1] -
1524:21
**reconstruct** [1] -
1500:12
**reconvene** [1] -
1498:22
**record** [8] - 1424:3,
1437:12, 1442:17,
1445:13, 1445:14,
1456:23, 1468:22,
1469:18
**recorded** [1] - 1458:19
**records** [3] - 1489:15,
1489:18, 1500:5
**redacted** [4] -
1442:12, 1520:12,
1520:18, 1520:20

**REDIRECT** [1] -
1484:5
**refer** [5] - 1444:10,
1444:12, 1453:5,
1504:9, 1561:23
**reference** [4] -
1476:12, 1481:16,
1481:20, 1558:14
**referencing** [1] -
1563:15
**referred** [4] - 1490:19,
1504:10, 1508:7,
1534:20
**referring** [6] - 1460:6,
1487:23, 1508:3,
1520:25, 1556:23,
1565:2
**refers** [2] - 1451:16,
1451:18
**reflect** [1] - 1559:18
**reflected** [2] -
1446:17, 1559:10
**reflection** [2] -
1558:25, 1560:1
**refresh** [11] - 1489:20,
1500:7, 1500:12,
1504:25, 1512:5,
1521:7, 1535:16,
1536:25, 1547:14,
1558:9, 1558:22
**refreshed** [5] -
1489:18, 1500:23,
1522:22, 1537:4,
1547:22
**refreshing** [1] - 1534:9
**regard** [5] - 1445:22,
1451:23, 1452:1,
1483:22, 1491:25
**regarding** [6] -
1436:10, 1459:7,
1479:9, 1507:16,
1513:19, 1565:7
**registered** [1] -
1480:15
**regular** [1] - 1457:7
**regularly** [4] -
1461:24, 1462:2,
1468:6, 1480:20
**relate** [1] - 1473:12
**related** [17] - 1438:22,
1469:18, 1487:4,
1489:9, 1494:15,
1494:23, 1495:2,
1497:11, 1511:22,
1514:18, 1520:20,
1521:21, 1532:19,
1533:14, 1543:7,
1563:24, 1565:5
**relates** [2] - 1470:25,
1473:24

**relation** [2] - 1490:13,
1493:10
**relations** [1] - 1516:22
**relationship** [4] -
1456:2, 1482:10,
1483:16, 1483:17
**relative** [3] - 1426:12,
1427:22, 1467:8
**relatively** [1] - 1488:2
**relevance** [3] -
1428:20, 1430:5,
1431:2
**relevant** [15] - 1430:1,
1433:1, 1434:10,
1434:25, 1454:9,
1454:19, 1455:12,
1456:7, 1468:23,
1498:13, 1511:2,
1536:21, 1537:3,
1547:3
**remain** [3] - 1437:2,
1485:9, 1521:13
**remember** [94] -
1426:18, 1426:19,
1445:6, 1445:24,
1455:22, 1458:15,
1458:18, 1460:5,
1461:4, 1461:6,
1461:7, 1461:17,
1461:19, 1461:23,
1462:9, 1462:12,
1462:16, 1462:19,
1462:22, 1462:24,
1463:11, 1463:22,
1464:2, 1464:4,
1465:21, 1466:12,
1466:24, 1467:2,
1467:16, 1469:19,
1469:20, 1469:22,
1470:1, 1470:24,
1471:5, 1471:15,
1471:17, 1472:10,
1474:10, 1474:12,
1474:14, 1475:13,
1475:16, 1476:6,
1476:10, 1476:23,
1477:4, 1477:21,
1478:3, 1489:17,
1490:20, 1491:4,
1491:6, 1492:4,
1493:6, 1499:15,
1500:12, 1501:11,
1508:17, 1515:14,
1519:16, 1519:18,
1521:4, 1521:6,
1524:25, 1533:5,
1533:6, 1533:8,
1535:15, 1540:2,
1541:12, 1541:22,
1542:11, 1543:8,

1545:24, 1547:13,
1549:6, 1549:9,
1549:13, 1550:25,
1553:9, 1555:4,
1555:10, 1555:11,
1555:17, 1556:16,
1556:18, 1556:19,
1556:22, 1556:23,
1556:24, 1561:14,
1561:22
**remembered** [4] -
1501:18, 1541:21,
1543:12, 1546:2
**remembering** [5] -
1466:17, 1501:19,
1541:24, 1543:21,
1560:7
**remind** [1] - 1503:5
**reminded** [5] -
1445:18, 1489:22,
1501:10, 1541:11,
1542:5
**removed** [1] - 1507:4
**repeat** [3] - 1526:13,
1555:12, 1559:25
**repeated** [1] - 1555:9
**repeatedly** [1] -
1549:15
**reply** [1] - 1546:3
**report** [4] - 1465:11,
1467:14, 1482:15,
1536:9
**reported** [2] - 1465:9,
1482:5
**reporter** [5] - 1425:20,
1429:15, 1471:3,
1477:17, 1485:19,
1498:5
**Reporter** [3] -
1422:22, 1422:22,
1568:17
**REPORTER** [1] -
1568:7
**reporter's** [1] -
1424:20
**Reporting** [1] - 1481:1
**reporting** [9] - 1481:9,
1481:12, 1481:16,
1481:18, 1481:19,
1481:20, 1511:1,
1511:6, 1512:19
**repped** [2] - 1555:8,
1555:13
**represent** [1] - 1551:9
**representation** [1] -
1555:3
**representations** [2] -
1430:18, 1430:21
**represented** [7] -
1500:19, 1550:22,

1551:1, 1551:7,
1553:4, 1553:9,
1559:22
**representing** [31] -
1427:5, 1457:22,
1492:9, 1539:25,
1540:6, 1540:13,
1540:16, 1540:19,
1542:8, 1543:3,
1543:9, 1544:23,
1546:10, 1547:24,
1548:23, 1549:12,
1549:16, 1550:9,
1551:24, 1552:22,
1553:25, 1554:4,
1554:11, 1555:15,
1556:6, 1556:10,
1556:12, 1556:14,
1557:4, 1560:2,
1563:17
**represents** [4] -
1447:22, 1463:25,
1464:10, 1464:15
**request** [3] - 1506:13,
1506:14, 1508:8
**requested** [1] -
1432:10
**required** [1] - 1478:8
**requirement** [1] -
1525:2
**requirements** [1] -
1433:7
**requires** [1] - 1456:14
**research** [2] -
1498:24, 1564:15
**researchers** [9] -
1430:8, 1430:19,
1430:23, 1431:6,
1432:7, 1432:15,
1433:12, 1434:7,
1434:9
**resolve** [1] - 1565:12
**resources** [1] -
1456:15
**respect** [5] - 1433:21,
1434:6, 1434:16,
1453:18, 1564:20
**respected** [1] -
1509:13
**respond** [2] - 1490:18,
1506:22
**responding** [1] -
1470:12
**response** [4] -
1487:16, 1506:12,
1507:12, 1511:25
**responsibility** [1] -
1546:19
**responsible** [1] -
1486:3

**rest** [1] - 1467:8
**rested** [1] - 1436:20
**result** [10] - 1454:4,
1456:12, 1456:17,
1459:17, 1484:13,
1497:6, 1501:18,
1513:16, 1541:24,
1565:6
**results** [2] - 1505:18,
1508:5
**retire** [1] - 1438:6
**retirement** [1] -
1438:11
**returning** [1] - 1518:10
**Reuters** [3] - 1516:16,
1517:12
**revealing** [1] - 1472:24
**review** [7] - 1435:24,
1497:1, 1497:10,
1500:5, 1501:5,
1501:8, 1508:19,
1509:4, 1537:22,
1541:5, 1541:8,
1546:16, 1547:2
**reviewed** [11] - 1463:4,
1494:21, 1536:21,
1537:3, 1547:25,
1548:13, 1548:24,
1559:21, 1560:10,
1560:12, 1560:14
**reviewing** [2] -
1536:25, 1562:17
**reviews** [5] - 1441:19,
1444:9, 1470:23,
1536:18, 1552:6
**RG01** [2] - 1535:20,
1545:19
**RG02** [1] - 1536:8
**RG03** [4] - 1537:7,
1549:21, 1552:19,
1561:25
**RG04** [2] - 1538:21,
1558:4
**RG05** [1] - 1539:4
**RG07** [1] - 1558:19
**rights** [1] - 1433:14
**RIS** [1] - 1481:14
**RIS)** [1] - 1481:3
**risk** [1] - 1527:22
**road** [1] - 1431:21
**role** [21] - 1431:22,
1440:8, 1440:9,
1444:25, 1445:4,
1445:8, 1450:23,
1451:2, 1465:24,
1466:12, 1490:13,
1493:24, 1494:3,
1495:8, 1507:4,
1509:19, 1512:20,
1514:15, 1523:3,

1524:10, 1532:13
**room** [1] - 1490:24
**Room** [2] - 1422:23,
1568:18
**rose** [1] - 1458:25
**rough** [1] - 1539:9
**roughly** [2] - 1522:15,
1538:15
**rules** [2] - 1468:24,
1469:15
**run** [1] - 1552:11
**running** [2] - 1472:17,
1529:5
**runs** [1] - 1452:19
**Russia** [17] - 1459:23,
1461:15, 1479:12,
1479:14, 1480:15,
1482:6, 1482:12,
1482:25, 1483:5,
1483:17, 1483:18,
1517:3, 1519:7,
1529:23, 1532:18,
1561:3, 1564:3
**Russia's** [2] - 1460:2,
1481:8
**Russian** [8] - 1439:16,
1481:2, 1481:13,
1483:4, 1487:1,
1510:14, 1529:19
**Russians** [1] -
1460:15
**Ryan** [3] - 1485:3,
1485:20, 1520:24
**RYAN** [3] - 1423:6,
1485:13, 1485:20

## S

**Sands** [7] - 1436:8,
1489:4, 1489:9,
1497:10, 1502:21,
1503:8, 1509:1
**scenario** [2] - 1517:5,
1519:8
**scope** [7] - 1424:22,
1425:1, 1425:10,
1426:1, 1428:5,
1428:20, 1430:5
**screen** [3] - 1442:5,
1442:9, 1447:5
**sealed** [3] - 1564:20,
1565:12, 1567:22
**SEAN** [1] - 1422:17
**Sean** [1] - 1424:9
**search** [1] - 1469:9
**seat** [2] - 1437:5,
1485:12
**seated** [3] - 1436:18,
1499:3, 1564:19
**second** [17] - 1442:23,

1444:18, 1445:23,
1447:5, 1447:24,
1449:9, 1451:12,
1503:2, 1503:3,
1505:5, 1536:8,
1536:13, 1536:16,
1536:20, 1558:18,
1558:20, 1566:15
**secret** [1] - 1517:3
**Secret** [1] - 1448:15
**Section** [2] - 1490:16,
1491:8
**section** [4] - 1490:25,
1532:24, 1546:4
**security** [14] -
1469:19, 1479:17,
1479:19, 1482:25,
1483:23, 1485:25,
1486:6, 1486:7,
1486:11, 1509:13,
1509:16, 1516:16,
1521:18, 1523:24
**see** [31] - 1428:15,
1441:17, 1442:9,
1442:12, 1442:22,
1442:23, 1443:8,
1443:9, 1443:23,
1450:7, 1450:10,
1463:11, 1464:18,
1466:22, 1470:16,
1471:2, 1471:12,
1480:17, 1482:6,
1482:10, 1482:18,
1495:17, 1503:3,
1503:16, 1517:21,
1536:3, 1536:4,
1552:10, 1558:7,
1558:14
**seeing** [3] - 1501:20,
1531:7, 1541:25
**seek** [1] - 1428:24
**seeking** [2] - 1504:11,
1526:21
**semirelated** [1] -
1506:25
**send** [2] - 1436:2,
1519:18
**sending** [2] - 1435:20,
1519:14
**sends** [1] - 1498:1
**senior** [17] - 1469:23,
1470:1, 1470:13,
1474:7, 1478:12,
1478:13, 1478:17,
1487:23, 1492:25,
1493:4, 1493:5,
1493:6, 1493:7,
1518:8, 1523:19,
1524:7, 1529:6
**sense** [7] - 1429:18,

1432:17, 1467:7, 1515:15, 1522:10, 1539:9, 1556:2
**sent** [5] - 1470:19, 1489:9, 1498:10, 1531:4, 1531:5
**sentence** [4] - 1482:14, 1504:6, 1505:5
**separate** [1] - 1506:24
**September** [29] - 1426:7, 1432:19, 1438:13, 1438:15, 1439:14, 1441:9, 1441:14, 1442:16, 1444:2, 1449:11, 1450:13, 1454:22, 1458:15, 1473:25, 1476:16, 1476:21, 1477:12, 1480:7, 1480:14, 1487:5, 1487:13, 1490:9, 1490:10, 1500:18, 1521:14, 1530:7, 1532:7, 1532:23, 1533:4
**series** [1] - 1549:11
**serious** [2] - 1479:16, 1483:22
**server** [9] - 1448:16, 1475:12, 1475:17, 1480:15, 1480:16, 1495:11, 1502:5, 1517:4, 1520:22
**servers** [1] - 1519:10
**service** [1] - 1498:8
**Services** [1] - 1481:3
**services** [1] - 1481:14
**session** [13] - 1538:22, 1539:5, 1539:6, 1554:25, 1555:16, 1557:14, 1557:21, 1557:24, 1558:8, 1558:17, 1558:18, 1559:1, 1560:3
**SESSION** [1] - 1422:6
**sessions** [4] - 1539:8, 1539:10, 1539:12, 1554:15
**set** [4] - 1428:9, 1486:25, 1534:10, 1535:9
**setting** [1] - 1426:4
**several** [8] - 1496:22, 1499:17, 1500:9, 1504:22, 1512:10, 1513:2, 1517:22, 1541:2
**share** [4] - 1492:21, 1529:10, 1529:12,

1529:14
**shared** [1] - 1467:16
**Shaw** [1] - 1424:6
**SHAW** [1] - 1422:14
**sheet** [8] - 1492:1, 1533:7, 1534:19, 1534:20, 1534:21, 1534:25, 1535:9, 1547:19
**shooting** [1] - 1471:13
**short** [2] - 1459:15, 1459:16
**show** [26] - 1433:24, 1435:12, 1435:14, 1435:25, 1442:3, 1444:13, 1470:5, 1473:16, 1474:16, 1477:7, 1478:5, 1497:15, 1502:11, 1508:24, 1515:16, 1519:22, 1535:19, 1536:8, 1537:7, 1541:10, 1542:12, 1542:15, 1552:17, 1558:2, 1559:21, 1560:1
**showed** [1] - 1477:16
**showing** [5] - 1429:14, 1435:17, 1440:23, 1519:5, 1542:19
**shows** [2] - 1519:6, 1519:9
**sic** [1] - 1430:2
**side** [3] - 1450:9, 1458:9, 1524:19
**side's** [1] - 1425:3
**sign** [1] - 1426:20
**signaling** [2] - 1508:11, 1508:13
**signature** [2] - 1516:17, 1517:19
**significant** [4] - 1452:15, 1494:7, 1494:10, 1521:18
**signifies** [2] - 1484:12, 1517:25
**signify** [1] - 1517:24
**similar** [2] - 1498:2, 1566:24
**similarly** [1] - 1561:9
**simply** [1] - 1560:18
**sit** [2] - 1430:20, 1476:14
**site** [1] - 1519:4
**sitting** [6] - 1474:14, 1475:13, 1477:18, 1478:9, 1492:13, 1492:14
**situation** [3] - 1425:19, 1472:5,

1567:2
**situations** [1] - 1472:19
**six** [2] - 1462:9, 1462:13
**size** [1] - 1519:9
**slate** [1] - 1432:12
**slip** [1] - 1437:2
**slow** [1] - 1498:4
**so-called** [2] - 1493:11, 1496:5
**social** [2] - 1521:21, 1521:22
**sole** [1] - 1459:16
**someone** [14] - 1449:15, 1454:12, 1454:13, 1465:21, 1469:7, 1491:5, 1494:8, 1505:24, 1513:25, 1517:17, 1518:15, 1526:10, 1526:15, 1563:16
**sometime** [2] - 1487:5, 1522:2
**sometimes** [4] - 1445:10, 1445:12, 1451:4, 1451:5
**somewhat** [1] - 1425:1
**sorry** [12] - 1431:6, 1446:9, 1465:2, 1465:14, 1470:19, 1481:5, 1503:12, 1503:13, 1536:11, 1552:7, 1559:25, 1566:16
**sort** [10] - 1429:13, 1431:20, 1432:23, 1453:3, 1459:7, 1490:19, 1505:20, 1508:23, 1522:2, 1535:11
**sorts** [4] - 1478:16, 1480:19, 1486:8, 1514:2
**sounds** [1] - 1436:5
**source** [35] - 1452:19, 1455:20, 1456:6, 1456:21, 1456:24, 1457:5, 1457:10, 1469:17, 1481:9, 1481:16, 1498:17, 1506:8, 1506:14, 1508:8, 1508:12, 1510:23, 1511:1, 1511:6, 1511:7, 1511:10, 1511:14, 1511:17, 1511:20, 1512:3, 1512:9, 1512:10, 1514:13, 1526:11, 1526:16,

1527:8, 1527:9, 1545:25, 1560:20, 1561:2, 1563:9
**sources** [9] - 1433:8, 1452:18, 1453:18, 1454:14, 1457:2, 1467:20, 1468:21, 1468:23, 1526:20
**spam** [8] - 1495:2, 1497:2, 1498:2, 1498:10, 1498:11, 1504:13, 1504:15
**spammed** [2] - 1498:2, 1498:9
**spanning** [1] - 1503:13
**sparse** [1] - 1558:12
**speaking** [9] - 1451:19, 1458:13, 1475:25, 1486:8, 1490:16, 1493:24, 1512:7, 1514:5, 1514:6
**SPECIAL** [3] - 1422:14, 1423:6, 1485:13
**special** [15] - 1458:23, 1466:17, 1469:11, 1480:14, 1486:2, 1486:4, 1486:5, 1488:5, 1489:3, 1497:9, 1502:20, 1503:6, 1506:1, 1509:1, 1510:22, 1515:19, 1516:4, 1520:11, 1527:15, 1531:21, 1567:14, 1567:15, 1567:17
**Special** [21] - 1485:16, 1485:24, 1486:1, 1487:19, 1489:3, 1499:7, 1499:18, 1502:19, 1502:20, 1503:8, 1506:15, 1509:1, 1510:22, 1515:19, 1516:4, 1520:11, 1527:15, 1531:21, 1567:14, 1567:17
**specific** [4] - 1451:22, 1490:24, 1493:2, 1493:5
**specifically** [17] - 1461:15, 1492:15, 1493:11, 1500:13, 1501:9, 1501:12, 1524:15, 1540:20, 1541:9, 1541:11, 1541:15, 1551:12, 1553:19, 1556:9, 1556:12, 1556:13
**specifics** [2] - 1492:12, 1565:18, 1566:3

**spectrum** [1] - 1519:7
**Spectrum** [1] - 1448:23
**speech** [4] - 1514:19, 1514:20, 1514:23, 1515:3
**spell** [2] - 1437:11, 1485:18
**spelled** [1] - 1521:11
**spelling** [1] - 1448:9
**spend** [1] - 1459:2
**spending** [1] - 1456:15
**spent** [2] - 1494:14, 1521:24
**spirit** [1] - 1514:7
**spoken** [2] - 1433:13, 1435:23
**Sporre** [3] - 1518:3, 1518:5, 1518:6
**sporre** [1] - 1518:3
**squad** [2] - 1506:2, 1511:19
**St** [1] - 1486:15
**stake** [1] - 1483:15
**stand** [3] - 1436:25, 1557:20, 1565:14
**standing** [2] - 1437:2, 1485:9
**standpoint** [1] - 1526:7
**stands** [1] - 1449:5
**start** [2] - 1447:10, 1544:4
**started** [9] - 1436:19, 1458:23, 1486:15, 1501:6, 1504:11, 1507:8, 1541:6, 1554:15, 1554:20
**starting** [2] - 1507:25, 1562:1
**state** [13] - 1427:11, 1427:21, 1428:5, 1428:11, 1437:11, 1437:21, 1438:21, 1459:7, 1459:12, 1460:17, 1472:15, 1485:18, 1544:18
**statement** [3] - 1556:9, 1556:24, 1563:22
**statements** [1] - 1559:18
**STATES** [3] - 1422:1, 1422:3, 1422:10
**states** [1] - 1521:22
**States** [7] - 1422:12, 1424:3, 1438:21, 1460:20, 1521:23, 1566:13, 1568:17

**States's** [1] - 1438:21
**status** [5] - 1426:9, 1427:20, 1478:17, 1494:16, 1530:11
**stay** [1] - 1424:15
**steal** [1] - 1459:19
**stenographic** [1] - 1568:11
**step** [5] - 1437:1, 1485:8, 1506:8, 1514:10, 1564:17
**Steve** [2] - 1430:10, 1448:7
**Steven** [1] - 1448:5
**still** [6] - 1463:5, 1478:9, 1505:14, 1514:11, 1522:5, 1531:9
**stop** [1] - 1481:15
**stopping** [1] - 1485:6
**story** [16] - 1426:9, 1426:25, 1427:17, 1427:18, 1427:21, 1431:3, 1432:3, 1432:23, 1434:21, 1434:24, 1467:22, 1470:3, 1471:19, 1472:15, 1472:17, 1472:21
**story/allegation** [1] - 1511:8
**straight** [1] - 1544:13
**straightforward** [1] - 1488:2
**strategic** [1] - 1459:21
**Street** [3] - 1422:15, 1448:11, 1451:13
**stressful** [1] - 1528:11
**strict** [1] - 1455:23
**struggling** [1] - 1455:9
**Strzok** [7] - 1466:5, 1474:3, 1515:21, 1518:11, 1518:12, 1518:13, 1518:18
**studied** [1] - 1538:3
**study** [1] - 1502:1
**stuff** [2] - 1451:7, 1561:12
**subheading** [1] - 1480:24
**subject** [2] - 1512:21, 1564:9
**submitted** [1] - 1532:7
**subpoena** [1] - 1429:22
**subsequent** [2] - 1517:16, 1522:11
**substance** [1] - 1463:19
**suffer** [1] - 1498:2

**sufficient** [1] - 1509:9
**suggest** [1] - 1566:8
**suggested** [2] - 1427:14, 1517:5
**suggests** [1] - 1517:2
**summarized** [1] - 1440:11
**summary** [2] - 1425:25, 1500:21
**summer** [2] - 1486:18, 1486:19
**Sunday** [2] - 1434:24, 1471:13
**super** [1] - 1459:16
**superiors** [1] - 1450:24
**supervise** [1] - 1465:17
**supervisor** [1] - 1506:2
**Supervisory** [3] - 1487:18, 1502:19, 1531:21
**supervisory** [2] - 1488:5, 1506:1
**support** [2] - 1482:6, 1509:6
**supported** [1] - 1520:17
**supporting** [1] - 1506:13
**supposed** [2] - 1514:24, 1517:4
**supposedly** [1] - 1517:1
**Surveillance** [1] - 1469:12
**Susan** [2] - 1430:10, 1448:6
**Susan's** [1] - 1448:7
**Sussman** [1] - 1424:4
**Sussmann** [103] - 1424:11, 1425:15, 1426:2, 1426:6, 1426:12, 1426:25, 1427:3, 1427:4, 1427:11, 1427:19, 1428:8, 1429:2, 1429:8, 1430:9, 1430:11, 1430:16, 1431:5, 1431:9, 1431:14, 1431:18, 1431:23, 1432:5, 1432:10, 1432:17, 1432:18, 1432:19, 1433:1, 1433:13, 1434:9, 1434:23, 1447:16, 1450:6, 1450:14, 1454:21, 1454:23, 1455:18,

1456:4, 1457:22, 1458:11, 1458:16, 1463:24, 1464:9, 1464:15, 1468:11, 1491:18, 1491:19, 1491:24, 1492:5, 1499:9, 1500:19, 1501:13, 1501:23, 1511:14, 1511:16, 1515:5, 1515:8, 1515:11, 1517:14, 1522:18, 1522:25, 1525:4, 1526:9, 1526:14, 1528:21, 1528:23, 1529:1, 1529:3, 1533:22, 1533:24, 1534:2, 1539:23, 1540:8, 1541:16, 1542:7, 1544:16, 1544:19, 1544:22, 1545:15, 1545:23, 1547:23, 1548:21, 1549:12, 1549:16, 1550:2, 1550:8, 1550:9, 1552:22, 1554:19, 1555:8, 1555:13, 1555:18, 1557:3, 1558:10, 1558:23, 1559:22, 1560:2, 1560:18, 1562:4, 1562:10, 1563:15, 1563:19
**SUSSMANN** [1] - 1422:6
**Sussmann's** [10] - 1427:21, 1428:11, 1430:21, 1447:18, 1492:21, 1524:22, 1529:4, 1534:7, 1543:1, 1555:2
**swore** [1] - 1537:10
**sworn** [4] - 1437:3, 1437:4, 1485:11, 1557:11
**Sworn** [2] - 1437:6, 1485:13
**system** [10] - 1495:3, 1495:16, 1496:1, 1497:8, 1497:16, 1508:20, 1509:5, 1510:21, 1513:13, 1521:11

**T**

**tackled** [1] - 1433:6
**take-away** [6] - 1533:18, 1533:24, 1540:3, 1540:5, 1540:18, 1556:13

**talks** [1] - 1453:8
**tangentially** [1] - 1532:19
**tasked** [2] - 1432:10, 1496:4
**tasks** [1] - 1493:12
**taxpayer** [1] - 1456:15
**TDY** [7] - 1506:25, 1507:2, 1507:3, 1521:15, 1521:24, 1528:10
**tea.leaves@tuta.io** [1] - 1519:12
**team** [5] - 1488:19, 1488:25, 1493:14, 1494:2, 1530:13
**Tech** [1] - 1512:16
**technical** [5] - 1453:6, 1494:6, 1495:13, 1512:10, 1520:19
**technically** [1] - 1494:11
**technique** [1] - 1513:18
**technology** [1] - 1494:13
**telephone** [1] - 1445:9
**temporarily** [1] - 1507:3
**temporary** [3] - 1507:3, 1507:8, 1521:15
**tenth** [1] - 1474:20
**term** [4] - 1438:18, 1449:19, 1455:21, 1481:21
**terms** [3] - 1427:12, 1494:4, 1524:10
**terrorism** [1] - 1486:11
**testified** [22] - 1426:17, 1433:15, 1458:7, 1484:7, 1499:8, 1501:12, 1505:16, 1505:25, 1507:7, 1522:17, 1532:23, 1533:6, 1533:18, 1534:5, 1537:7, 1541:16, 1543:19, 1545:14, 1549:8, 1560:10, 1561:14, 1562:7
**testify** [2] - 1537:19, 1556:17
**testifying** [2] - 1468:15, 1541:22
**testimony** [45] - 1424:17, 1424:21, 1425:2, 1425:17, 1426:12, 1428:3, 1428:22, 1431:3,

1432:9, 1454:17, 1454:20, 1458:2, 1458:5, 1484:21, 1484:22, 1489:14, 1495:19, 1502:1, 1513:1, 1522:18, 1534:12, 1537:11, 1537:15, 1538:1, 1538:3, 1538:13, 1539:21, 1540:2, 1540:4, 1541:13, 1549:22, 1551:20, 1551:23, 1552:16, 1554:2, 1554:17, 1557:11, 1559:19, 1561:10, 1561:23, 1563:19, 1563:22, 1564:18, 1565:12, 1566:25
**text** [1] - 1518:25
**THE** [83] - 1422:1, 1422:1, 1422:10, 1424:2, 1424:8, 1424:12, 1424:15, 1425:22, 1427:1, 1427:24, 1428:12, 1428:15, 1428:17, 1429:12, 1430:4, 1430:23, 1431:8, 1433:5, 1433:17, 1433:19, 1434:3, 1434:5, 1435:2, 1435:7, 1435:11, 1435:24, 1436:2, 1436:5, 1436:9, 1436:13, 1436:15, 1437:1, 1437:5, 1440:22, 1442:24, 1443:1, 1443:2, 1443:4, 1443:8, 1443:10, 1443:11, 1443:15, 1443:17, 1446:25, 1457:16, 1459:14, 1475:7, 1476:20, 1477:11, 1480:11, 1484:20, 1484:24, 1484:25, 1485:4, 1485:6, 1485:8, 1485:12, 1498:4, 1498:6, 1498:21, 1499:3, 1502:25, 1516:1, 1520:5, 1535:6, 1545:20, 1548:6, 1548:10, 1548:11, 1552:12, 1552:15, 1564:5, 1564:8, 1564:11, 1564:17, 1565:1, 1565:10, 1566:20, 1566:23, 1567:8, 1567:10,

1567:20, 1568:2
**themselves** [6] -
1429:20, 1446:24,
1497:15, 1498:1,
1498:3, 1498:9
**theory** [3] - 1427:9,
1427:17, 1566:22
**third** [1] - 1447:25
**thorough** [1] - 1546:16
**thoughts** [1] - 1520:14
**thousands** [2] -
1439:10, 1439:11
**threat** [15] - 1460:17,
1460:20, 1472:15,
1473:9, 1479:19,
1482:25, 1483:15,
1483:23, 1494:15,
1496:13, 1496:14,
1521:18, 1521:21,
1521:25, 1528:2
**threats** [8] - 1437:21,
1438:21, 1438:22,
1459:7, 1459:11,
1459:12, 1461:2,
1473:12
**three** [11] - 1430:11,
1430:13, 1431:4,
1431:6, 1433:12,
1434:7, 1434:9,
1434:13, 1435:18,
1449:2, 1504:23
**threshold** [1] -
1483:21
**throughout** [1] -
1504:22
**thrust** [1] - 1512:8
**tie** [3] - 1432:25,
1433:1, 1434:15
**ties** [3] - 1481:12,
1529:22, 1532:18
**timing** [1] - 1427:12
**title** [1] - 1480:15
**to-do** [9] - 1500:13,
1500:15, 1501:9,
1501:20, 1541:10,
1542:4, 1542:20,
1547:19, 1560:6
**today** [10] - 1436:6,
1458:2, 1458:5,
1463:5, 1465:24,
1474:14, 1477:18,
1478:9, 1492:13,
1492:14, 1500:4,
1534:12, 1537:10,
1538:13, 1539:22,
1543:19, 1554:23,
1568:1
**Todd** [1] - 1447:17
**together** [1] - 1552:11
**took** [14] - 1445:24,

1446:7, 1462:7,
1462:19, 1462:22,
1471:22, 1493:7,
1501:21, 1521:20,
1521:23, 1542:2,
1543:1, 1544:7,
1544:10
**tools** [2] - 1475:20,
1475:21
**top** [16] - 1442:12,
1443:23, 1447:10,
1450:5, 1470:11,
1471:10, 1473:18,
1474:6, 1480:13,
1502:14, 1502:17,
1503:2, 1506:15,
1518:10, 1520:16,
1544:8
**topic** [5] - 1451:7,
1451:20, 1483:22,
1555:1, 1555:5
**topics** [1] - 1533:12
**TOR** [5] - 1448:21,
1449:6, 1449:19,
1449:20, 1497:11
**total** [1] - 1505:2
**touch** [2] - 1515:5,
1515:8
**tough** [1] - 1442:22
**toward** [1] - 1448:23
**towards** [2] - 1521:20,
1522:17
**track** [11] - 1456:23,
1468:22, 1487:20,
1487:21, 1487:25,
1504:3, 1505:7,
1530:19, 1532:1,
1535:11, 1544:12
**tracking** [1] - 1531:24
**trained** [1] - 1494:11
**transactions** [1] -
1517:2
**transcript** [2] -
1568:11, 1568:12
**TRANSCRIPT** [1] -
1422:9
**traverse** [2] - 1498:14,
1498:15
**tread** [1] - 1565:17
**tremendous** [1] -
1533:13
**Trenchcoat** [4] -
1437:19, 1437:20,
1437:22, 1437:24
**TRIAL** [1] - 1422:9
**trial** [10] - 1501:7,
1538:6, 1538:19,
1538:22, 1541:7,
1554:15, 1554:20,
1557:14, 1557:25,

1559:6
**trigger** [1] - 1432:3
**true** [5] - 1464:17,
1483:11, 1484:1,
1568:10, 1568:12
**truly** [2] - 1524:24,
1537:20
**Trump** [21] - 1439:16,
1448:14, 1448:16,
1449:2, 1449:12,
1460:2, 1461:14,
1479:12, 1479:14,
1479:23, 1480:16,
1482:24, 1483:4,
1483:17, 1483:19,
1486:25, 1517:4,
1519:7, 1520:21,
1529:23, 1532:18
**trust** [1] - 1510:14
**truthful** [2] - 1527:4,
1537:25
**truthfulness** [1] -
1527:8, 1565:6
**try** [6] - 1437:21,
1456:2, 1459:19,
1478:19, 1498:8,
1506:14
**trying** [6] - 1443:10,
1456:12, 1459:20,
1460:15, 1473:7,
1567:14
**turn** [2] - 1476:15,
1509:11
**turning** [6] - 1438:13,
1439:14, 1442:19,
1443:22, 1444:7,
1452:3
**turns** [1] - 1431:17
**twenty** [1] - 1539:17
**two** [15] - 1434:6,
1453:11, 1464:17,
1465:3, 1467:10,
1481:25, 1482:15,
1503:13, 1503:18,
1521:24, 1532:22,
1536:9, 1557:2,
1557:20, 1566:11
**type** [2] - 1451:5,
1494:15
**typed** [2] - 1451:6,
1467:13
**typically** [3] - 1478:14,
1478:18, 1565:20

## U

**U.S** [9] - 1422:23,
1448:19, 1459:16,
1495:17, 1509:14,
1509:15, 1509:25,

1510:13, 1566:16
**ulterior** [1] - 1510:17
**ultimately** [2] -
1435:19, 1440:17
**under** [15] - 1425:6,
1430:2, 1439:9,
1440:13, 1440:17,
1447:21, 1448:10,
1463:24, 1517:6,
1537:11, 1549:8,
1549:21, 1552:16,
1554:17, 1557:11
**under-oath** [3] -
1552:16, 1554:17,
1557:11
**undermine** [1] -
1459:20
**underneath** [1] -
1518:19
**understood** [10] -
1456:3, 1457:1,
1492:8, 1505:9,
1539:24, 1540:11,
1551:2, 1551:5,
1553:11, 1565:17
**underway** [1] -
1496:22
**unimportant** [1] -
1434:22
**unit** [4] - 1486:20,
1494:22, 1496:25,
1517:11
**Unit** [1] - 1531:3
**UNITED** [3] - 1422:1,
1422:3, 1422:10
**United** [8] - 1422:12,
1424:3, 1438:20,
1438:21, 1460:20,
1521:23, 1566:13,
1568:17
**unless** [1] - 1428:7
**unlikely** [1] - 1528:8
**unsealed** [1] - 1564:22
**unsure** [3] - 1432:1,
1440:5, 1440:7
**up** [55] - 1424:15,
1424:16, 1426:4,
1426:24, 1427:20,
1428:9, 1434:15,
1437:1, 1443:6,
1448:23, 1455:19,
1458:25, 1463:13,
1466:20, 1467:13,
1468:1, 1468:18,
1470:10, 1471:22,
1473:18, 1474:6,
1474:20, 1475:12,
1475:16, 1480:13,
1480:24, 1481:25,
1485:8, 1490:16,

1495:24, 1503:11,
1504:23, 1507:8,
1512:6, 1512:15,
1512:17, 1521:23,
1521:25, 1534:12,
1536:12, 1538:6,
1538:18, 1539:12,
1543:10, 1544:8,
1545:13, 1548:4,
1549:4, 1549:19,
1556:5, 1557:6,
1557:25, 1558:20,
1566:24
**updated** [1] - 1426:9
**upper** [1] - 1447:15
**utilize** [1] - 1563:3

## V

**vague** [1] - 1484:15
**validity** [2] - 1525:10,
1527:3
**variety** [1] - 1453:1,
1454:4, 1454:14,
1454:15, 1454:16,
1455:11, 1456:9,
1456:18, 1478:21,
1483:13
**various** [5] - 1434:20,
1474:21, 1480:21,
1511:23, 1533:12
**venture** [1] - 1427:8,
1430:25
**veracity** [2] - 1432:1,
1527:8
**version** [1] - 1459:15,
1459:16, 1463:14
**via** [3] - 1495:17,
1519:9, 1521:21
**victims** [1] - 1498:11
**videoconference** [1] -
1487:11
**view** [10] - 1477:20,
1496:6, 1496:8,
1496:9, 1523:22,
1524:2, 1524:12,
1543:12, 1543:16,
1555:2
**viewed** [4] - 1479:19,
1494:3, 1524:16,
1525:3
**violation** [3] - 1513:17,
1563:18, 1563:25
**vis** [2] - 1511:20
**vis-a-vis** [1] - 1511:20
**vis-à-vis** [1] - 1431:23
**Vixie** [2] - 1430:10,
1431:7
**Vladimir** [1] - 1482:10
**volunteer** [2] - 1488:9,

1532:2
**volunteered** [6] - 1488:7, 1491:11, 1528:8, 1530:18, 1530:19, 1530:23
**volunteering** [1] - 1532:1
**vs** [4] - 1422:5, 1424:4, 1566:13, 1566:16

## W

**w/Alfa** [1] - 1448:17
**w/Alfa-Bank** [1] - 1448:17
**wait** [1] - 1514:10
**waiting** [7] - 1495:20, 1495:24, 1496:12, 1496:23, 1505:18, 1508:18, 1552:4
**waived** [1] - 1425:20
**waiver** [2] - 1429:16, 1429:21
**waivers** [1] - 1429:13
**walk** [1] - 1543:8
**walk-away** [1] - 1543:8
**walked** [1] - 1537:11
**walking** [1] - 1537:4
**Wall** [2] - 1448:11, 1451:13
**warrant** [1] - 1469:9
**warrants** [1] - 1469:12
**Washington** [10] - 1422:15, 1422:24, 1448:11, 1451:13, 1466:1, 1475:9, 1486:13, 1486:22, 1486:23, 1568:19
**wasting** [1] - 1478:22
**WATKINS** [1] - 1422:19
**ways** [3] - 1434:20, 1453:1, 1453:4
**week** [5] - 1472:11, 1476:16, 1503:18, 1509:3, 1520:7
**weekend** [2] - 1424:13, 1436:17
**weeks** [4] - 1449:2, 1521:24, 1557:2, 1557:20
**welcome** [1] - 1436:16
**whatsoever** [1] - 1469:18
**whereas** [1] - 1427:17
**white** [6] - 1506:10, 1512:25, 1513:2, 1521:12, 1561:20
**whitmore** [1] -

1566:16
**whole** [6] - 1435:20, 1435:21, 1447:12, 1459:17, 1464:22, 1478:7
**Wierzbicki** [8] - 1502:20, 1505:24, 1505:25, 1506:1, 1506:6, 1506:11, 1507:13, 1519:24
**willing** [3] - 1425:20, 1433:14, 1487:19
**wiretap** [1] - 1469:6
**withhold** [1] - 1529:8
**witness** [20] - 1425:4, 1435:4, 1435:9, 1436:22, 1437:4, 1440:21, 1485:1, 1485:11, 1535:19, 1536:8, 1556:1, 1557:20, 1558:4, 1558:20, 1559:9, 1565:3, 1565:7, 1567:13, 1568:1
**Witness** [5] - 1441:19, 1444:9, 1470:23, 1536:18, 1552:6
**WITNESS** [6] - 1423:2, 1457:16, 1484:24, 1498:6, 1545:20, 1548:10
**witness's** [2] - 1565:6, 1565:25
**witnesses** [2] - 1427:15, 1566:9
**wonder** [1] - 1564:21
**word** [4] - 1433:20, 1448:21, 1455:9, 1464:18
**words** [4] - 1448:9, 1454:2, 1467:5, 1494:17
**work-in-progress** [1] - 1515:9
**worth** [1] - 1527:24
**write** [7] - 1450:17, 1451:19, 1495:24, 1521:25, 1544:18, 1559:10, 1559:14
**write-up** [2] - 1495:24, 1521:25
**writing** [2] - 1464:4, 1546:14
**written** [2] - 1467:7, 1467:10
**wrote** [8] - 1451:12, 1464:16, 1466:24, 1492:1, 1544:16, 1544:20, 1551:13, 1553:19

**WSJ** [1] - 1448:11

## Y

**Yao** [1] - 1424:10
**YAO** [1] - 1422:18
**year** [5] - 1465:10, 1513:22, 1537:17, 1539:1, 1539:2
**years** [12] - 1438:5, 1459:2, 1459:5, 1462:10, 1462:13, 1466:8, 1489:23, 1492:14, 1494:14, 1500:9, 1527:20, 1547:8
**yesterday** [3] - 1539:16, 1539:17
**York** [7] - 1422:20, 1432:2, 1434:21, 1448:11, 1451:12, 1471:4, 1477:17
**yourself** [6] - 1444:8, 1470:20, 1489:22, 1542:5, 1544:7, 1544:11

## Z

**Zerilli** [1] - 1430:2
**Zoom** [1] - 1538:14
**zoom** [1] - 1443:11