```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
 4                      Plaintiff,        1:21-cr-00582-CRC-1
                                          Tuesday, May 24, 2022
 5      vs.                               9:05 a.m.

 6      MICHAEL A. SUSSMANN,              *MORNING SESSION*

 7                      Defendant.
        - - - - - - - - - - - - - - - x
 8

 9      _____

10                      TRANSCRIPT OF JURY TRIAL
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
        _____
12
        APPEARANCES:

13      For the United States:    ANDREW DeFILIPPIS, ESQ.
                                   JONATHAN EDGAR ALGOR, IV, ESQ.
14                                 MICHAEL T. KEILTY, ESQ.
                                   BRITTAIN SHAW, ESQ.
15                                 SPECIAL COUNSEL'S OFFICE
                                   145 N Street Northeast
16                                 Washington, DC 20002
                                   (212) 637-2231

17      For the Defendant:        SEAN M. BERKOWITZ, ESQ.
                                   MICHAEL BOSWORTH, ESQ.
18                                 CATHERINE YAO, ESQ.
                                   NATALIE HARDWICK RAO, ESQ.
19                                 LATHAM & WATKINS LLP
                                   1271 Avenue of the Americas
20                                 New York, NY 10020
                                   (212) 906-1200

21

22      Court Reporter:           Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
23                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
24                                 Washington, DC  20001
                                   (202) 354-3187

25
```

1                            I N D E X

2

WITNESS                                                   PAGE

3

**TRISHA ANDERSON**
    (By Ms. Shaw)...................................... 1784
    (By Mr. Berkowitz)................................ 1791
    (By Ms. Shaw)...................................... 1806

**SPECIAL AGENT CURTIS HEIDE**
    (By Mr. Algor).................................... 1808
    (By Mr. Berkowitz)................................ 1851

1                    P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  Good morning, Your Honor.

3    We are back on the record for Criminal Case 21-582, *United*

4    *States of America vs. Michael Sussmann*.

5            MS. SHAW:  Good morning, Your Honor; Brittain Shaw

6    for the United States, along with Jonathan Algor, Michael

7    Keilty and Andrew DeFilippis.

8            THE COURT:  Good morning, everybody.

9            MR. BERKOWITZ:  Good morning, Your Honor; Sean

10   Berkowitz, Michael Bosworth, Natalie Rao, and Catherine Yao

11   on behalf of Mr. Sussmann, who is present in court.

12           THE COURT:  Good morning.  I thought we were on a

13   glide path.

14           MR. BERKOWITZ:  There are always a couple of bumps

15   in the glide path, Judge.

16           I don't mean to interrupt things.  We actually

17   communicated this morning about the summary exhibit.  And

18   just to preview that, to at least take it off your plate for

19   the moment, there was some confusion between our email

20   servers, which were apparently pinging each other but not

21   sending actual communications.  And we thought it would be

22   productive, at the morning break and over lunch, to see if

23   we can narrow our differences with respect to that and then

24   come back and report to you after lunch, before the jury

25   comes in, as to where we stand on that issue.

```
1          THE COURT:  That sounds great.
2          MR. BERKOWITZ:  And we can talk about Mr. Novick
3    before he testifies.  We can limit that issue somewhat as
4    well, I think, but there are still some things we need to
5    discuss.
6          THE COURT:  Okay.  Why don't we deal with that
7    before he testifies.
8          And there was a reference to an in-camera review
9    of a particular document.  Is that still on the table?  If
10   so, maybe give me that sooner rather than later.
11         MR. BERKOWITZ:  I believe that the Crimson Rhino
12   report, which is at 1801, is no longer going to be offered.
13   There is an 1802, and I don't think that that implicates the
14   document from Mr. Sussmann's office, so I don't think you
15   need it.
16         THE COURT:  Okay.  Good.
17         We may have a straggler or two, so let's just sit
18   tight.
19         (Jury enters courtroom)
20         THE COURT:  Welcome back, ladies and gentlemen.
21   Hope you had a nice evening.
22         Okay.  Please be seated.
23         Ms. Shaw, are you prepared to call the
24   government's next witness?
25         MS. SHAW:  I am, Your Honor.  Thank you.
```

```
 1                    The United States calls Trisha Anderson.
 2                    THE COURT:  All right.  Step right up, ma'am.
 3          Please remove your mask, if you wouldn't mind, remain
 4          standing, and raise your right hand.
 5                    (Witness sworn)
 6                          TRISHA ANDERSON, Sworn
 7                          DIRECT EXAMINATION
 8          BY MS. SHAW:
 9          Q.  Good morning, Ms. Anderson.
10          A.  Good morning.
11          Q.  Could you please state and spell your name for the court
12          reporter.
13          A.  Trisha Anderson; T-R-I-S-H-A, Anderson, A-N-D-E-R-S-O-N.
14          Q.  And, Ms. Anderson, are you currently employed?
15          A.  I am.
16          Q.  Where do you work?
17          A.  The Department of Justice.
18          Q.  And what is your position at the Department of Justice?
19          A.  I'm a Deputy Assistant Attorney General in the Office of
20          Legal Counsel.
21          Q.  And prior to that position, did you once work at the
22          FBI?
23          A.  I did.
24          Q.  And what was your position there?
25          A.  I was a deputy general counsel.
```

1   Q.  And in that position, who did you report to?

2   A.  I reported to James Baker.

3   Q.  And what was his position?

4   A.  General counsel.

5   Q.  And did you have a particular area of focus in your role

6   as deputy general counsel at the FBI?

7   A.  Yes.  I had responsibilities for national security and

8   cyber.

9   Q.  Now, in that role or when you were in that role, was it

10  a practice in the office for Mr. Baker to hold deputies

11  meetings?

12  A.  Yes, it was.

13  Q.  And about how often were those meetings held?

14  A.  Almost every day.

15  Q.  Okay.  And what was the purpose of those?

16  A.  To coordinate on time-sensitive issues.

17  Q.  Now, in addition to deputies meetings, would it also

18  have been Mr. Baker's practice to hold one-on-one meetings

19  with his deputies?

20  A.  Sometimes, yes.

21  Q.  And why was that?

22  A.  To discuss issues that required more in-depth discussion

23  or that were sensitive and not appropriate for the group.

24  Q.  Now, I want to turn your attention to September of 2016.

25  Did there come a time when you learned about allegations

1  involving Alfa-Bank and the Trump organization?

2  A.  Yes.

3  Q.  And sitting here today, do you have any recollection of

4  the specifics of those allegations?

5  A.  No.

6  Q.  And do you have any recollection of the specifics of how

7  those allegations came to the FBI?

8  A.  I understand they were brought to Mr. Baker by Michael

9  Sussmann.

10  Q.  Okay.  Now, prior to your testimony today, have you met

11  with the government?

12  A.  Yes, I have.

13  Q.  And about how many times, if you can recall?

14  A.  A handful.

15  Q.  And during those meetings, were you able to recall all

16  the specifics of those Alfa-Bank allegations we're

17  discussing?

18  A.  No, just the fact of the allegations.

19  Q.  And were you shown documents during those meetings?

20  A.  Yes.

21  Q.  And do you recall what documents you were shown?

22  A.  I recall that I was shown a page of notes.

23  Q.  And did those assist you in recalling specifics from

24  that meeting, or regarding those allegations?

25  A.  No.

1      MS. SHAW:  Permission to approach the witness?

2  I'm going to mark what's marked as Government's Exhibit 3.

3      THE COURT:  Of course.

4  Q.  Ms. Anderson, if you could open up what's marked as

5  Government's Exhibit 3 and let us know if you recognize what

6  that is.

7  A.  I do.

8  Q.  And what is that?

9  A.  A page of notes from my notebook.

10  Q.  And how do you recognize that it's your notebook?

11  A.  I recognize my own handwriting.

12  Q.  All right.  And do you see that there's an exhibit

13  sticker marked 3A?

14  A.  Yes.

15  Q.  And what date is -- what does that page refer to?  What

16  is that marked?

17  A.  I'm sorry, I'm not sure I understand your question.

18  Q.  What page is that marking?  Is there a particular date

19  on that page?

20  A.  Yes.  It's September 19, 2016.

21      MS. SHAW:  I'd offer Government's Exhibit 3A.

22      MR. BERKOWITZ:  No objection, Your Honor.

23      THE COURT:  So moved.

24      MS. SHAW:  If I could have Government's Exhibit

25  242, please.

1          THE COURT:  I'm sorry, Ms. Shaw, just to keep

2    track.  There's no electronic exhibit?  That's just the

3    physical notebook page; is that correct?

4          MS. SHAW:  Yes.  And then we're going to have an

5    electronic one that could -- that is a duplicate.

6          THE COURT:  Okay.

7    BY MS. SHAW:

8    Q.  Ms. Anderson, can you take a look at Government's

9    Exhibit 242?

10   A.  Yes.

11   Q.  And what is that?

12   A.  It looks like an electronic version of my notebook page

13   that I was just shown.

14         MS. SHAW:  Your Honor, I'd move in Government's

15   Exhibit 242.

16         MR. BERKOWITZ:  No objection.

17         THE COURT:  So moved.

18   Q.  So, Ms. Anderson, looking at these notes, what is your

19   understanding, if any, of who gave you the information that

20   was in these notes?

21   A.  I believe it was Mr. Baker.

22   Q.  All right.  And do you recall the specifics of the

23   meeting with Mr. Baker?

24   A.  No, I do not.

25   Q.  And when you met with Mr. Baker, was it your practice --

1    or with any supervisor, was it your practice to take notes

2    contemporaneous during those meetings?

3    A.  Sometimes, yes.

4    Q.  And was it your practice to make sure that your notes

5    were as accurate as possible?

6    A.  Yes.

7    Q.  And do you believe that these notes accurately reflected

8    your knowledge as it existed on September 19, 2016?

9    A.  I have no reason to doubt that they're accurate.

10   Q.  Okay.  And looking at these notes, do they appear to

11   refer to the Alfa-Bank allegations?

12   A.  Yes, they do.

13   Q.  All right.  And, again, noting the date on this, what is

14   the date?

15   A.  September 19, 2016.

16   Q.  All right.  And could you read the entire contents of

17   242 to the jury, please.

18   A.  Yes.  It says, "Sussmann meeting w/Baker.

19          "No specific client but group of cyber academics

20   talked with him about research.

21          "Article this Friday, NYT/WAPO."

22          And then it trails off.  My pen appears to have

23   run out of ink.

24   Q.  Okay.  And what, if anything, is your understanding of

25   who brought the allegations to the FBI based on these notes?

```
 1   A.  Mr. Sussmann.
 2   Q.  All right.  Now, did you know Mr. Sussmann?
 3   A.  I had met him before, yes.
 4   Q.  And generally speaking, without giving us any particular
 5   nonpublic information, how did you meet Mr. Sussmann?
 6   A.  He was involved in litigation against the FBI that I was
 7   also involved in.
 8   Q.  And just for clarification, unrelated to this matter?
 9   A.  Correct.
10   Q.  Now, based on your experience as a deputy general
11   counsel, was it common for evidence to be brought into the
12   general counsel's office?
13   A.  No, it was not common.
14   Q.  And did you personally ever receive any evidence that
15   was brought in?
16   A.  No, I did not.
17   Q.  Now, I want to turn your attention to later, March 17,
18   2017.  And in your meetings with the government, do you
19   recall the government asking you about a meeting that may
20   have happened on March 6, 2017?
21   A.  Yes, I do.
22   Q.  And do you recall whether the government asked you if
23   you had recollections of that meeting?
24   A.  Yes.
25   Q.  And do you recall whether you did?
```

```
1    A.  I don't recall the specifics of the meeting, no.

2    Q.  All right.

3           MS. SHAW:  If I could have Government's Exhibit

4    288, please.

5    Q.  Ms. Anderson, do you recognize what Government's 288 is?

6    A.  I do.

7    Q.  And what is that?

8    A.  It appears to be another page of my notes.

9           MS. SHAW:  Your Honor, I'd offer Government's

10   Exhibit 288.

11          MR. BERKOWITZ:  No objection.

12          THE COURT:  So moved.

13   Q.  And, Ms. Anderson, in reviewing those notes, does

14   that -- do those notes indicate whether you noted that Alfa-

15   Bank or the allegations were discussed?

16   A.  I did not.

17   Q.  And independent of those notes, do you have any specific

18   recollection of whether Alfa-Bank was discussed?

19   A.  I do not.

20          MS. SHAW:  That's all I have, Your Honor.

21          THE COURT:  Thank you.

22                      CROSS-EXAMINATION

23   BY MR. BERKOWITZ:

24   Q.  Good morning, Ms. Anderson.  My name is Sean Berkowitz.

25   I represent Mr. Sussmann.
```

1  A.  Good morning.

2  Q.  So you were brought down here to read a couple of notes

3  that you don't have much recollection of the underlying

4  meetings?

5  A.  I guess that's right.

6  Q.  Okay.  You know Mr. Sussmann.  You've met him before,

7  right?

8  A.  Yes, I have.

9  Q.  And you knew him in the 2016 time period to be a privacy

10  lawyer, correct?

11  A.  A national security and cyber lawyer.

12  Q.  All right.  Well-respected, from what you recall?

13  A.  From what I recall.

14  Q.  Your interactions with him, you had no reason to doubt

15  what he told you, correct?

16  A.  Correct.

17  Q.  And the litigation that you spoke about was you said

18  litigation against the FBI where you were a lawyer

19  representing the FBI, and Mr. Sussmann was representing the

20  company.  Correct?

21  A.  That's right.

22  Q.  For privacy reasons we won't name what that company is,

23  but it had to do with privacy-related issues and a dispute

24  with what could be made public or issues related to that?

25  A.  Yes.  It concerned a national security -- sorry, a

1   national security letter.

2   Q.  You also knew, did you not, around that time that

3   Mr. Sussmann represented the Democratic National Committee;

4   is that right?

5   A.  No, that is not right.

6   Q.  You don't have any recollection in or around the 2016

7   time period of being aware that Mr. Sussmann represented the

8   DNC in connection with the hacking of the DNC's email

9   server?

10  A.  I do not recall that Mr. Sussmann was representing the

11  DNC.

12  Q.  It's possible that you knew that, but you don't recall;

13  or you're sure that you didn't know?

14  A.  It's possible that I knew at the time and don't recall,

15  but I don't remember being aware of that at the time.

16  Q.  Okay.  Well, these events happened a long time ago,

17  right?  2016 is -- my gosh -- almost -- it's seven years

18  ago, right?

19  A.  Yes.

20  Q.  Or six, I guess, is a better way of asking it, if I can

21  do my math right.

22  A.  Yes, that's right.

23  Q.  We all make mistakes.  Sorry about that.

24          Let me show you what we'll mark for identification

25  as Defense Exhibit 105.

```
 1              MS. SHAW:  No objection.

 2              THE COURT:  So moved.

 3              MR. BERKOWITZ:  Okay.  So let's move that into

 4    evidence.

 5    Q.  And if you could take a look at the top of that

 6    document.

 7              MR. BERKOWITZ:  Just blow that up, Mr. Cleaves.

 8    Q.  So this says "DNC and CrowdStrike meeting this

 9    afternoon -- UNCLASSIFIED."

10              Do you know who Alison Pendleton is?

11    A.  She's a paralegal in the office of general counsel.

12    Q.  So that "OGC" means office of general counsel?

13    A.  Yes.

14    Q.  All right.  And who is Shawn Farrell?

15    A.  He was a unit chief of the cyber law unit.

16    Q.  Also with the OGC, which is the office of general

17    counsel?

18    A.  Correct.

19    Q.  And then you're listed as well, correct, Trisha

20    Anderson?

21    A.  Yes.

22    Q.  Okay.  And that email is dated June 16th of 2016,

23    correct?

24    A.  Yes.

25    Q.  I assume, but I'll ask:  Do you have any recollection of
```

```
 1    receiving an email about a DNC and CrowdStrike briefing --
 2    A.  No.
 3    Q.  -- in or around June of 2016?
 4    A.  No, I do not.
 5    Q.  Do you have any reason to doubt that you would have
 6    received that email in or around June of 2016?
 7    A.  No.
 8    Q.  No reason to doubt, right?
 9    A.  No, assuming that what you're showing me here is an
10    authentic email from the FBI system.
11    Q.  And I'll represent to you that it was produced by the
12    government and has been admitted as an authentic document.
13    And I appreciate you being careful; most of us lawyers are.
14    So I'm not trying to trick you.
15            Did you know who CrowdStrike was in June of '16?
16    A.  Yes.
17    Q.  Can you tell the jury who CrowdStrike was.
18    A.  CrowdStrike is a cyber security company.
19    Q.  Okay.  And there's a gentleman named Shawn Henry who
20    runs CrowdStrike, or who is involved with CrowdStrike.  Are
21    you aware of that?
22    A.  That's my understanding.
23    Q.  And who was Shawn Henry in June of 2016?
24    A.  I don't recall what his position was, but he was
25    relatively senior within CrowdStrike.  He may have been a
```

1   founder of the company.  I'm not sure.

2   Q.  He's a former FBI person?

3   A.  Yes.

4   Q.  Did you know him when he was at the FBI?

5   A.  Yes.  I interacted with him.

6   Q.  Okay.  What was his position there?

7   A.  I don't recall.

8   Q.  Okay.  Senior person or not?

9   A.  He was an executive, yes.

10  Q.  Okay.  Respected at the FBI when he was there?

11  A.  Yes, I believe so.

12  Q.  So let's take a look --

13  A.  For clarification, that wasn't when I was at the FBI.

14  It was when I was at the Department of Justice earlier,

15  prior to 2016.

16  Q.  That's when you interacted with Mr. Henry?

17  A.  Correct.

18  Q.  When he was at the FBI?

19  A.  Correct.

20  Q.  Let's take a look at the email itself, and I'll read it

21  for you.  It says, June 16, 2016, "Hi guys.  FYI, the

22  meeting between AD Trainor and DNC CEO, Amy Dacey, DNC

23  outside counsel Michael Sussmann (Perkins Coie), and Shawn

24  Henry of CrowdStrike is scheduled for 3:00 p.m. this

25  afternoon.  AD Trainor advised the meeting will focus on

1    providing the entities with information relating to the

2    FBI's efforts to date, as well as requesting additional

3    information from CrowdStrike and the DNC regarding the

4    intrusion."

5            I'll stop there.  Actually let me skip now to the

6    last paragraph, and it says, "Alison, can you make sure

7    Trisha is alerted to this email?"

8            Do you see that?

9    A.  Yes, I do.

10   Q.  Having seen this document, does it refresh your

11   recollection that in or around June of 2016 you would have

12   been aware that Mr. Sussmann was representing the DNC in

13   connection with matters related to security issues?

14   A.  No, it does not.

15   Q.  Do you have any reason to doubt that you would have

16   received that email at that time?

17   A.  No, I do not.

18   Q.  And just so the jury understands, because there's a lot

19   of legalistic back-and-forth about recalling.  You have no

20   present recollection today of having received that email,

21   correct?

22   A.  That's correct.

23   Q.  Which is understandable since it was six years ago.  But

24   you have no reason to doubt that you would have received

25   that at the time, correct?

```
 1    A.  That's right.

 2    Q.  All right.  So let's, then, talk about your notes, which

 3    we can put up.  It's Government Exhibit 242.

 4              MR. BERKOWITZ:  And we can blow those up,

 5    Mr. Cleaves.

 6    Q.  So these are notes that you found when you were asked by

 7    the government to go back and produce copies of notes from

 8    the September 2016 time period; is that right?

 9    A.  No, that's not right.  I didn't have possession of these

10    notes.

11    Q.  When you -- so that's helpful.  When you leave the

12    FBI -- you're no longer at the FBI, or are you?

13    A.  No, I'm no longer at the FBI.

14    Q.  And when you leave the FBI, sometimes you leave behind

15    official records or documents.  Is that fair?

16    A.  Yes.

17    Q.  All right.  So they came to you with these notes.  It

18    wasn't in your possession at the time they approached you

19    with it, right?

20    A.  Correct.

21    Q.  And much like that email from June of 2016, you have no

22    independent recollection, sitting here today, of having met

23    with Mr. Baker on September 19th of 2016, right?

24    A.  I recall that I met with Mr. Baker.  I remember him

25    telling me the fact of the allegations, but I do not recall
```

1    the specifics of that conversation.

2    Q.  Do you remember how long his conversation with you

3    lasted?

4    A.  I do not.

5    Q.  And do you remember one way or the other whether it was

6    within a group of other people or whether it was just you

7    and him in kind of a post meeting?

8    A.  I don't remember the specifics, no.  It's possible

9    Mr. Priestap was there, but I'm not sure.

10   Q.  And with respect to the interaction with Mr. Baker, do

11   you remember whether it was at the beginning of the day,

12   middle of the day, or the end of the day?

13            I think you talked about morning meetings and

14   afternoon meetings maybe.

15   A.  I talked about deputies meetings.

16   Q.  And when did those typically take place?

17   A.  In the morning.

18   Q.  Okay.  So do you believe that this meeting would have

19   taken place in the morning?

20   A.  I don't think so based on the entirety of the notes that

21   I have been shown.

22   Q.  Okay.  When do you believe --

23   A.  But I don't know for sure.

24   Q.  Because they're not time-stamped, if you will, correct?

25   A.  Correct.  And there are a couple of intervening topics

1    on the actual notepad that are redacted.

2    Q.  Is it your typical practice to take notes of

3    interactions with colleagues?

4    A.  Yes.

5    Q.  And you carry a notepad around with you regularly?

6    A.  Yes.

7    Q.  You did at the time?

8    A.  I did.

9    Q.  Did Mr. Baker carry a notepad around taking notes of his

10   interactions with people from your observations and

11   interactions with him in the 2016 time period?

12   A.  No.

13   Q.  Okay.  Was he a note-taker at all, to your knowledge?

14   A.  Occasionally, but not very often.

15   Q.  I think you mentioned, just as an aside, that it would

16   be uncommon for somebody from the OGC to have evidence

17   brought in to them, correct?

18   A.  Correct.

19   Q.  And, in fact, you've never had that happen, you said,

20   correct?

21   A.  Correct.

22   Q.  Do you know how many times Mr. Baker has had it happen?

23   A.  I do not.

24   Q.  Do you know that the FBI specifically provides for

25   acceptance of evidence by anyone from the FBI?

1    A.   I know it's the FBI's practice to encourage anyone to

2    bring information into the FBI.

3    Q.   Okay.  And if somebody, to the extent that you have a

4    view, had brought evidence to you of materials, would you

5    have taken notes of the interaction with them?

6    A.   As I said, nobody ever brought evidence in to me.

7    Q.   Okay.  So you don't know what you would have done?

8    A.   That's right.

9    Q.   Okay.  So on these notes -- take us back to the

10   September 19, 2016, time period.  Other than what's in these

11   notes, do you have any recollection of what was said?

12   A.   I do not.

13   Q.   Okay.  You do recall from the context that it was

14   related to the Alfa-Bank allegations, though, even though

15   that's not written.  Correct?

16   A.   Yes, that's right.

17   Q.   Did Mr. Baker tell you how long his meeting with

18   Mr. Sussmann was?

19   A.   No, he did not.

20   Q.   And when he said "no specific client," did he mention

21   that there were clients that Mr. Sussmann had but that there

22   was no specific client related here?

23   A.   I don't remember.

24   Q.   And with respect to a group of cyber academics, was it

25   your understanding or do you know whether the cyber

1    academics gave Mr. Sussmann information which he then

2    provided to Mr. Baker?

3    A.  That was my understanding.

4    Q.  Did you ask Mr. Baker any questions when he was relaying

5    this information to you?

6    A.  I don't remember.

7    Q.  And did he talk to you at all -- did Mr. Baker talk to

8    you at all about what Mr. Sussmann said about the research?

9    A.  I don't remember.

10   Q.  Did Mr. Baker tell you Mr. Sussmann found the

11   information credible and reliable?

12   A.  I don't remember.

13   Q.  And you believe that there was a communication to you

14   about an article this Friday, correct?

15   A.  Yes, based on the notes.

16   Q.  So this is the -- fair to say that what's written here

17   is, in addition to the fact that it was about Alfa-Bank, the

18   extent of your recollection?

19   A.  Yes, it is.

20   Q.  And did Mr. Baker follow up with you after your

21   discussion with him in or around September 19th of 2016

22   relative to the Alfa-Bank allegations?

23   A.  I don't recall.

24   Q.  Did Mr. Baker tell you that Mr. McCabe and potentially

25   Mr. Comey talked about asking *The New York Times* to hold off

1   on publishing an article?

2   A.  I don't know.

3   Q.  Did Mr. Baker tell you that he had a follow-up

4   conversation -- two follow-up conversations with

5   Mr. Sussmann after this meeting on the 19th?

6   A.  No.

7   Q.  Did he talk to you at all about a 13-minute call that he

8   had with Mr. Sussmann on the 21st of September 2016?

9   A.  No.

10  Q.  So you don't know what would have been said in that

11  call, correct?

12  A.  I do not.

13  Q.  And did Mr. Sussmann say -- did Mr. Baker say anything

14  to you about whether you could share the identity of

15  Mr. Sussmann with anybody else, if they were to ask about

16  it?

17  A.  No, he did not.

18  Q.  And so there was no prohibition on your sharing the

19  information if somebody asked you about the information,

20  correct?

21  A.  I don't think that's correct.

22  Q.  Okay.  If somebody from the FBI asked you, you could

23  have shared Mr. Sussmann's identity, correct?

24  A.  If they were an appropriate person within the FBI.

25  Q.  Okay.  Would an investigator be an appropriate person?

1   A.  If they were working on the matter, yes.

2   Q.  Okay.  And you certainly were unaware of any close hold

3   being placed on the identification of Mr. Sussmann as a

4   source of the Alfa-Bank information, correct?

5   A.  No.

6   Q.  You were unaware of any close hold; is that correct?

7   A.  That's correct.  But the investigation itself was very

8   close hold.

9   Q.  Okay.  Do you remember meeting with the FBI in January

10   of 2022?

11   A.  Meeting with the FBI?  I'm sorry, I'm not...

12   Q.  Meeting with the government, the prosecutors, in January

13   of this year?

14   A.  Yes, I do.

15   Q.  Do you remember telling them in January -- and you've

16   met with them a number of times, correct?

17   A.  Yes, I did.

18   Q.  Was your lawyer present when you met with them?

19   A.  Yes, he was.

20   Q.  Okay.  And do you remember telling them -- by "them," I

21   mean the prosecutors -- on January 5th of 2022 that you were

22   unaware of a close hold being placed on the identification

23   of Sussmann as the source of the Alfa-Bank information?

24   A.  I don't remember specifically, but that seems right.

25   Q.  Okay.  So sitting here today, your testimony today would

1  be you were unaware of a close hold being placed on the

2  identification of Mr. Sussmann as a source of the Alfa-Bank

3  allegations, correct?

4  A.  That's correct.

5  Q.  Okay.  And you have not heard anything about Mr. Baker

6  refusing to share the identification of Mr. Sussmann's

7  identification as a source of the information to agents who

8  assisted him in completing the chain-of-custody form,

9  correct?

10  A.  That's right.

11  Q.  Okay.  Now -- and you don't know what Mr. Sussmann's

12  motivations were in providing the information to Mr. Baker,

13  correct?

14  A.  I do not.

15  Q.  That's something that would be the job of an

16  investigator, not a lawyer, correct?

17  A.  That's correct.

18  Q.  Now, with respect, Ms. Anderson, to the time period at

19  issue, which was the summer of 2016, there was an

20  investigation going on into potential connections between

21  Mr. Trump and Russia, correct?

22  A.  That's right.

23  Q.  That's -- Crossfire Hurricane was the name of the

24  investigation?

25  A.  Yes, it was.

1    Q.  And those at least allegations related to potential

2    connections were very significant in terms of the level of

3    threat to the country's national security, correct?

4    A.  Yes.

5    Q.  And it was an unusual set of circumstances, correct?

6    A.  Yes.

7    Q.  And information, if it were credible, related to

8    potential connections is something that the FBI would have

9    wanted to know about, correct?

10   A.  Credible -- I'm sorry.  I didn't understand your

11   question.

12   Q.  Okay.  I'll try and be clearer.

13          Information regarding allegations about potential

14   connections between Trump and Russia that a person believed

15   were credible is the type of information that the FBI would

16   have wanted someone to share, correct?

17   A.  Yes.

18          MR. BERKOWITZ:  I have no further questions.  I

19   appreciate your time.

20          MS. SHAW:  Very briefly, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MS. SHAW:

23   Q.  So, Ms. Anderson, you were asked about a particular

24   email from 2017.  Did you receive many emails when you were

25   at the FBI?

```
 1    A.  I did.

 2    Q.  Perhaps thousands over the course of your time there?

 3    A.  At least.

 4    Q.  And maybe even hundreds during each day?

 5    A.  Yes.

 6    Q.  All right.  There was only one time you recall being

 7    told about evidence being brought into the general counsel's

 8    office, correct?

 9    A.  No.

10    Q.  How many other times?

11    A.  At least one.

12    Q.  But not hundreds per day?

13    A.  No.

14    Q.  And with respect to your notes --

15              MS. SHAW:  If we could have Government's Exhibit

16    242 up again, please.

17    Q.  Underneath the first notation you write, "No specific

18    client but group of cyber academics."  You wrote "no

19    specific client" because that was something important to

20    note?

21    A.  I don't recall why I wrote it.

22    Q.  Now, during this meeting do you recall Mr. Baker ever

23    telling you about any restrictions on telling anyone about

24    Mr. Sussmann's meeting?

25    A.  No.
```

1    Q.  And you weren't an agent on this case, correct?

2    A.  That's right.

3    Q.  And you were asked about various follow-up calls

4    Mr. Baker may have had with others.  Were you tasked with

5    following up with him on a, you know, daily basis as to

6    everything he did with respect to this matter?

7    A.  No.

8              MS. SHAW:  I don't have anything further, Your

9    Honor.

10             THE COURT:  Okay.  Ms. Anderson, thank you very

11   much for your testimony.  You're excused.  Have a good day,

12   and please don't discuss your testimony with anyone except

13   for your counsel.  Okay?

14             MR. ALGOR:  Your Honor, the government calls

15   Curtis Heide.

16             THE COURT:  Very well.

17             Okay.  Step right up, sir.  You can remove your

18   mask, remain standing, and raise your right hand.

19             (Witness sworn)

20             THE COURT:  All right.  Please have a seat.  Make

21   yourself comfortable.

22                  SPECIAL AGENT CURTIS HEIDE, Sworn

23                       DIRECT EXAMINATION

24   BY MR. ALGOR:

25   Q.  All right.  Good morning.

1    A.  Good morning.

2    Q.  Please state and spell your name for the record.

3    A.  Yes.  My name is Curtis Heide; C-U-R-T-I-S, H-E-I-D-E.

4    Q.  And where do you work?

5    A.  At the FBI.

6    Q.  And how long have you worked for the FBI?

7    A.  For a little over 16 years.

8    Q.  And what is your current title?

9    A.  My current title is the supervisory senior resident

10   agent.

11   Q.  And where do you currently work within the FBI?

12   A.  In Des Moines, Iowa.

13   Q.  And what are your responsibilities in Des Moines, Iowa,

14   currently?

15   A.  I supervise the Des Moines resident agency, which is

16   the -- within the Omaha Field Offices, it's a satellite

17   office of the Omaha Field Office.

18   Q.  And approximately how many individuals do you supervise

19   as part of that role?

20   A.  Approximately 25 to 30.

21   Q.  And when did you first take on that assignment?

22   A.  That was approximately a year and a half ago.

23   Q.  Can you please describe to the jury, generally speaking,

24   the positions you've held within the FBI over the 16 years

25   that you've worked with the FBI?

1   A.   Sure.   I graduated the FBI Academy in 2006.

2          From 2006 to 2009 I was assigned to the

3   Albuquerque Field Office.   In Albuquerque I primarily worked

4   matters of counterintelligence.

5          In 2009 I received a transfer to the Chicago Field

6   Office and was again assigned to counterintelligence

7   matters.   I worked there for approximately three or four

8   years.

9          And then our office was -- the Chicago office was

10  standing up a Eurasian cyber squad, so I was asked to

11  transfer over to the cyber side of the house and help with

12  standing up that squad.

13         In approximately January of 2016 I started a

14  series of temporary duty assignments out here in Washington,

15  D.C., to help support various investigations related to the

16  election.

17         And then in 2019 I went back to the Chicago Field

18  Office where I worked white colla/public corruption matters

19  for approximately a year, and then I received my transfer to

20  the Des Moines office.

21  Q.   Now, you mentioned in 2016 you were working on election-

22  related investigations?

23  A.   Yes, sir.

24  Q.   Can you explain to the jury briefly what types of

25  investigations you were working on.

1    A.   In January of 2016, I was asked to come out to

2    Washington, D.C., to support the mid-year exam

3    investigation.

4    Q.   And what is the Mid-Year Exam investigation related to?

5    A.   That was the FBI's investigation into Hillary Clinton's

6    email matters.

7    Q.   And then were you working on other election-related

8    investigations?

9    A.   I was.  When that temporary duty assignment concluded, I

10   went back to Chicago for approximately a month, and then was

11   asked to come back out and help support the initial efforts

12   of Crossfire Hurricane.

13   Q.   And explain to the jury what Crossfire Hurricane is.

14   A.   Crossfire Hurricane was our efforts at looking into the

15   allegations of the Trump Campaign and the Russian matters.

16   Q.   Now, as part of the Crossfire Hurricane investigation,

17   is the FBI currently conducting an administrative inquiry

18   regarding that investigation?

19   A.   Yes.

20   Q.   And are you being investigated individually as part of

21   that investigation?

22   A.   Yes.  Myself and I believe others as well.

23   Q.   And do you know approximately how many others are being

24   investigated regarding that?

25   A.   I do not.

1    Q.  And as part of that investigation, do you understand

2    what specifically you're being investigated regarding?

3    A.  Yes.

4    Q.  And what is that?

5    A.  Not identifying exculpatory information as it pertained

6    to one of the Crossfire Hurricane investigations.

7    Q.  And is the investigation related into whether you

8    intentionally withheld exculpatory information?

9    A.  Yes.

10   Q.  And can you explain to the jury what exculpatory

11   information is.

12   A.  Exculpatory information would be information that

13   negates an allegation or proves innocence rather than guilt.

14   Q.  And has that administrative inquiry been completed as

15   far as you know?

16   A.  No.

17   Q.  And did you intentionally withhold exculpatory

18   information from the case team?

19   A.  No.

20   Q.  Okay.  And what did you, then -- what was the issue

21   regarding exculpatory information as far as you understand?

22   A.  There were various consensual recordings that were

23   obtained from one of the subjects, and there were

24   statements, I believe, used in a FISA application that

25   were -- the exculpatory information was not divulged to the

1    FISA court.

2    Q.   I want to now turn your attention back to the fall of

3    2016.   You mentioned working on other election-related

4    issues; is that correct?

5    A.   Yes, sir.

6    Q.   And what section or group of the FBI did you work for at

7    that time?

8    A.   I was TDY'd out here for two weeks to support the

9    Crossfire Hurricane investigation, and then I went back to

10   the Chicago office where I conducted the majority of those

11   activities remotely from Chicago.

12   Q.   And what type of squad was that, if you can explain that

13   to the jury?

14   A.   The squad was the -- it was a hybrid squad of -- working

15   Eurasian counterintelligence and cyber matters.

16   Q.   And as part of your training and experience, have you

17   trained regarding cyber investigations?

18   A.   Yes.

19   Q.   Okay.   And what types of training have you received?

20   A.   I have a bachelor's of science from Iowa State

21   University in management information systems.   I received

22   various trainings internally within the Bureau, and from

23   private sources like the SANS organization related to

24   information, security, and white hat hacking matters.

25   Q.   Now, in your experience at the FBI, approximately how

1    many cases have you investigated over the 16 years?

2    A.  I'd say dozens.

3    Q.  And those investigations included multiple Russian cyber

4    investigations?

5    A.  Yes, sir.

6    Q.  So turning your attention to September of 2016, did

7    there come a time when you learned about an allegation

8    involving the Trump organization and Alfa-Bank?

9    A.  I'm sorry, did you say December?

10   Q.  No, September.

11   A.  September, yes.

12   Q.  Okay.  And what role, if any, did you have regarding the

13   FBI's investigation into those allegations?

14   A.  I was -- I received the information from FBI

15   headquarters, and then ultimately the Chicago Field Office

16   opened an investigation, and I was assigned to the

17   investigation in a co-case-agent capacity.

18   Q.  And where was that FBI investigation ran out of?

19   A.  The Chicago office.

20   Q.  And you mentioned a co-case agent.  What is a co-case

21   agent?

22   A.  A co-case agent would be an agent that's assigned to a

23   case that shares the duties of the primary case agent.

24   Q.  Okay.  And who was your co-case agent for this case?

25   A.  It would have been Allison Sands.

1    Q.   Okay.  And what was Allison Sands's role on this case

2    more specifically?

3    A.   Allison was my trainee at the time, and she was looking

4    for additional case work.  So we assigned her this case, and

5    she took on the primary lead, and I assisted her as needed

6    with the investigation.

7    Q.   Now, Agent Heide, can you please explain to the jury, to

8    the best of your recollection, what you understood the

9    investigation to be about?

10   A.   It was my understanding that the investigation had an

11   allegation that there was a secret communication channel

12   between the Russian Alfa-Bank and the Trump organization

13   using cyber means, and that the communication channel was

14   being obfuscated using DNS traffic.

15   Q.   You mentioned the word "DNS traffic."  What does that

16   mean?

17   A.   "DNS" is the Domain Name System, which is a way of

18   translating human readable domains to locations on the

19   Internet or IP addresses.  It's a system that is kind of the

20   infrastructure of -- underlying infrastructure behind that.

21   Q.   And, Agent Heide, how did you first come to learn about

22   this investigation and these allegations?

23   A.   It was -- it came to me from FBI headquarters.

24   Q.   And more specifically, was there any other -- were there

25   any individuals from FBI headquarters that you spoke with

1    regarding this initially?

2    A.   Yes.  It would have been Joe Pientka, who is the --

3    Q.   And who is Joe Pientka?

4    A.   He's the Supervisory Special Agent assigned to the

5    Crossfire Hurricane team.

6    Q.   And explain to the jury what that meant at that time,

7    who Joe Pientka was?

8    A.   Joe Pientka would have been the supervisor leading the

9    efforts in D.C. for the Crossfire Hurricane team.

10   Q.   And the Crossfire Hurricane team was investigating

11   multiple matters; is that correct?

12   A.   Yes.

13   Q.   What is your understanding, Agent Heide, as to how the

14   allegation first came to the FBI?

15   A.   It's my understanding that it was provided to the FBI by

16   anonymous -- by an anonymous source, and that it was

17   provided to our office of general counsel through our

18   general counsel, Jim Baker.

19   Q.   Okay.  And did you ever learn who the anonymous source

20   was that brought the allegation to the FBI?

21   A.   No.

22   Q.   And, if you recall, what, if anything, did the anonymous

23   source provide to the FBI at that time?

24   A.   I believe it was a series of documents, multiple white

25   papers, and underlying data that was supporting their

1    allegations or allegedly supporting their allegations --

2    Q.  Okay.

3    A.  -- on two thumb drives.

4         MR. ALGOR:  And if we could show Government

5    Exhibit 200, which is already in evidence.

6    Q.  And if we could first start with "Drafted By."

7         And, Agent Heide, do you recognize this document?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's our opening communication.

11   Q.  Okay.  And it says "Drafted By Allison Sands," and

12   that's your name, correct?

13   A.  Yes.

14   Q.  And do you recall drafting this document?

15   A.  Yes.

16        MR. ALGOR:  Okay.  And if we could just turn now

17   to -- go down to the synopsis.

18   Q.  And if you could read that, please.

19   A.  It says "Documents the opening of a Full Field

20   Investigation into the network communications between a

21   US-based server and the Russian ALFA BANK ORGANIZATION."

22   Q.  So, Agent Heide, it says "Full Field Investigation."  Do

23   you see that?

24   A.  Yes, sir.

25   Q.  What's a full field investigation?

1    A.  A full field investigation would be our -- an

2    investigation that employs all of our resources.

3    Q.  Okay.  And, generally speaking, are there different

4    types of investigations that the FBI can conduct?

5    A.  Yes.

6    Q.  Okay.  And what types of investigations are there?

7    A.  There's different levels.  The first would be an

8    assessment.  That basically allows limited investigative

9    techniques in order to see if an allegation or an

10   investigation is warranted.

11           The next step would be preliminary investigation,

12   which would require information or allegation that a threat

13   to the US national security occurs or there's a violation of

14   federal criminal law.

15           And then there would be a full field investigation

16   that allows all of our investigative techniques, if

17   warranted.

18   Q.  Okay.  And when making an assessment as to -- or making

19   a decision as to whether to conduct an assessment, a

20   preliminary investigation, or a full field investigation,

21   what types of considerations are taken into account?

22   A.  The considerations would be the allegations or the

23   information that's brought itself.

24           In order to open a full field investigation, we

25   would need specific and articulable facts that a threat to

1    U.S. national security has occurred or there's been a

2    violation of federal law.

3    Q.  And you mentioned briefly about certain things that you

4    can do regarding these investigations.  Within a full field

5    investigation, what does that mean?

6              I'll rephrase.

7              So the differences between -- you mentioned

8    differences between assessment, a preliminary, and a full

9    field investigation; is that correct?

10   A.  Yes.

11   Q.  And does the FBI have different sets of ability to

12   investigate regarding those?

13   A.  Yes.  We have different tools.

14   Q.  Okay.  And what do you mean by "tools"?

15   A.  We have different investigative tools that we could

16   deploy towards a certain investigation.

17             In an assessment, we would generally -- we would

18   not have full capability as opposed to a full field

19   investigation.

20             In a preliminary investigation, we could conduct

21   the same -- we conduct more investigation or deploy more

22   tools as opposed to an assessment for a period of six

23   months.

24             And then a full field investigation, there's no

25   time limit with respect to an investigation, and it employs

1    all of our resources, or could employ all of our resources.

2              MR. ALGOR:  If we can go up just right above the

3    synopsis with the case ID.

4    Q.  So it says there "Sensitive Investigative Matter."  Do

5    you see that?

6    A.  Yes.

7    Q.  What does that mean?

8    A.  A sensitive investigative matter or a SIM, as we call

9    them, is a matter that requires special oversight and review

10   for specifically sensitive matters.

11   Q.  And why was this investigation deemed a sensitive

12   investigative matter?

13   A.  Because this investigation in particular involved an

14   organization that was affiliated with a political candidate.

15             MR. ALGOR:  If we could turn to the next page of

16   Government Exhibit 200.

17             Okay.  If we could pull up the first paragraph of

18   "Details."

19   Q.  Okay.  If you could read the first sentence, please.

20   A.  It says, "On or about September 19, 2016, FBI received a

21   referral of information from the U.S. DEPARTMENT OF JUSTICE

22   detailing an unusually configured email server in

23   Pennsylvania belonging to the TRUMP ORGANIZATION."

24   Q.  Is that sentence accurate, as far as you're aware?

25   A.  No.  That's a mistake in our paperwork.

1    Q.  Okay.  And why was that a mistake -- or, excuse me, how

2    is that a mistake?

3    A.  I honestly don't know.  I believe the information may

4    have been conflated when it was provided to us.  I know it

5    was provided to me over a Lync hold with Joe Pientka, and we

6    may have been conflating U.S. Department of Justice and the

7    office of general counsel at our own organization.

8    Q.  And you've met with the government previously; is that

9    correct?

10   A.  Yes.

11   Q.  And multiple times?

12   A.  Yes.

13   Q.  And within those times, is there -- have you previously

14   explained to the government regarding whether you understand

15   it to be from the Department of Justice or an anonymous

16   source?

17   A.  Yes.

18   Q.  And so your testimony earlier today was that your

19   understanding at first came to the FBI through an anonymous

20   source given to the office of general counsel?

21   A.  Yes.

22   Q.  And so looking back at this sentence, is that an

23   accurate statement?

24   A.  No.  It's a mistake.

25   Q.  Now, you mentioned earlier that the anonymous source

1    provided materials to the FBI; is that correct?

2    A.  Yes.

3    Q.  And did you review those materials as part of the

4    investigation?

5    A.  I reviewed the digital contents of those -- the thumb

6    drives, yes.

7    Q.  Okay.  And do you recall, generally speaking, what those

8    materials involved?

9    A.  Yes.

10   Q.  And what were they?

11   A.  There was a set of three white papers and multiple text

12   files, I believe, that had data associated with the

13   allegations in the white papers.

14   Q.  So I'm going to show you what's already in evidence as

15   Government Exhibit 217.

16           Okay.  And, Agent Heide, do you recognize this

17   document?

18   A.  Yes.

19   Q.  And what is it?

20   A.  That's one of the white papers that was included on the

21   thumb drives.

22   Q.  Okay.  Now, so I'd like to highlight the first -- under

23   "Findings," that first paragraph.

24           And if you could read that to the -- out loud to

25   the jury, please.

1    A.  It says, "The Trump Organization is using a very

2    unusually-configured 'secret' email server in Pennsylvania

3    for current and ongoing email communications with Alfa-Bank

4    (Moscow) and with Alfa-Bank (Moscow) through another

5    unusually-configured server (a TOR exit node) at Spectrum

6    Health in Michigan."

7    Q.  So, Agent Heide, to the best of your recollection, is

8    this the allegation, as you understood it, when you received

9    it from headquarters?

10   A.  Yes.

11   Q.  Now, if we could turn to the next paragraph, please.

12   And if you could read that paragraph?

13   A.  It says, "These servers are configured for direct

14   communications between the Trump Organization and Alfa-Bank

15   to the exclusion of all other systems."

16   Q.  Okay.  And if we could pull up the third paragraph,

17   please.  If you could read that.

18   A.  "The only plausible explanation for this server

19   configuration is that it shows the Trump Organization and

20   Alfa-Bank to be using multiple sophisticated layers of

21   protection in order to obfuscate their considerable recent

22   email traffic."

23   Q.  Now, Agent Heide, what, if anything, did you find

24   regarding these allegations and the purported findings in

25   this white paper?

1    A.  We were not able to substantiate any of the allegations

2    in the white paper.

3                MR. ALGOR:  So we can take that down.

4    Q.  Turning back to the start of the investigation, what

5    initial steps were taken to investigate these allegations?

6    A.  This information was provided to us, and it was provided

7    to our cyber division through FBI headquarters who conducted

8    initial review of the investigation.

9    Q.  Okay.  And do you recall who at cyber division this was

10   passed along to?

11   A.  I believe it was given to Nate Batty, who was the unit

12   chief at the Eurasian cyber operations unit, and who was a

13   supervisor we dealt with on a regular basis in Chicago.

14   Q.  And as far as you remember, what was the purpose of

15   sending it to the cyber division initially?

16   A.  I believe that some of the allegations initially

17   appeared to be -- not track with how we understood Russian

18   cyber operations to be conducted, and we wanted ECOU to take

19   a look at the allegations to provide an assessment of their

20   findings or what they thought of the paper.

21   Q.  And what did they ultimately conclude regarding it?

22   A.  They were also unable to substantiate any of the

23   allegations in the white paper, and they deemed that the

24   information provided was not in accordance with how the

25   Russians would conduct cyber activities.

1   Q.  Were there any decisions -- what, if any, decisions were

2   made regarding cyber's role in the investigation once they

3   had made that initial assessment?

4   A.  The cyber division took an initial review of the data

5   and then determined that there were no equities, no

6   intrusion equities related to this particular matter, so

7   that they deferred the matter to the counterintelligence

8   division for further investigation.

9           MR. ALGOR:  Okay.  If we could show Government

10  Exhibit 249 just to the witness.

11  Q.  Do you recognize this document?

12  A.  Yes, sir.

13  Q.  Okay.  And what is it?

14  A.  This is a series of Lync messages that I had with it

15  looks like Joe Pientka and Scott Hellman.

16          MR. ALGOR:  Okay.  And, Your Honor, the government

17  would offer Government Exhibit 249.

18          MR. BERKOWITZ:  No objection.

19          THE COURT:  So moved.

20          MR. ALGOR:  Okay.  If we could just focus on the

21  line starting at 9/22 14:10:39, please, that section.

22          Thank you.

23  Q.  If you could -- and so September 22nd, do you see that

24  date?

25  A.  Yes, sir.

1    Q.   Okay.  And do you recall approximately -- do you recall

2    when the allegations first came in to the FBI?

3    A.   Yes.  It was shortly before that, I believe.

4    Q.   Okay.  And you just were testifying previously about

5    that cyber division had taken a look at this as well?

6    A.   Yes.

7    Q.   Okay.  And so if you could read that first line?

8    A.   The first line is from me to Joe, and it says, "I talked

9    to cyber division, we're leaning towards this being a false

10   server not attributed to the Trump organization."

11   Q.   Okay.  And the next line?

12   A.   And I said, "We'll run it down."

13   Q.   All right.  And so then Joe Pientka, that's the SSA, the

14   senior agent over Crossfire Hurricane; is that correct?

15   A.   Yes, sir.

16   Q.   Okay.  And so he writes at 14:11:07 "crayons at 1030."

17   What did you understand that to mean?

18   A.   I believe Joe was making a joke about his cyber

19   capabilities and that he wanted me to explain this to him at

20   an elementary level.

21            MR. ALGOR:  We can take that down.

22   Q.   Now, following the cyber analysis that you received,

23   what next steps did the investigative team take?

24   A.   With any cyber investigation, we would look -- we would

25   conduct research, open source research, on a domain to find

```
 1    out who it's registered to and where the underlying cyber

 2    infrastructure actually lies.  And then we would reach out

 3    to organizations if we have contacts at those Internet

 4    service providers in order to see if we could obtain any

 5    sort of log files or seek cooperation from the Internet

 6    service provider to see if the information could be

 7    substantiated.

 8    Q.  Okay.  So you mentioned a couple of steps in there.

 9    We'll work through them.

10          So you mentioned doing some, again, open source

11    research; is that correct?

12    A.  Yes.

13    Q.  And so did you do that in this instance?

14    A.  We did.

15    Q.  Okay.  And what ultimately did you find regarding that

16    open source research?

17    A.  We -- the open source research for this particular

18    domain, the Trump-email.com domain, was being -- was

19    registered to a company called Central Dynamics or CenDyn,

20    and the underlying actual physical infrastructure was housed

21    in Pennsylvania in a company called Listrak.

22    Q.  And so the next step that you had explained is that you

23    were going to potentially reach out to those companies; is

24    that correct?

25    A.  Yes.
```

1   Q.  And did your team do so?

2   A.  We did.

3   Q.  And so starting with Central Dynamics, what type of

4   company was Central Dynamics?

5   A.  Central Dynamics is a mass marketing email company.  I

6   believe it's specifically for the hospitality industry.

7   Q.  And as part of the investigation, did you personally

8   reach out to Central Dynamics?

9   A.  No.  We had -- Central Dynamics was located in Florida,

10  so we had an agent from our Miami Field Office reach out to

11  Central Dynamics.

12  Q.  And so just talking about the team, this investigation

13  was operated out of Chicago; is that correct?

14  A.  Yes.

15  Q.  But you've mentioned that there were other individuals

16  at the cyber division working on this as well?

17  A.  Yes.

18  Q.  And so approximately how many agents were working in the

19  Miami office on this?

20  A.  Just one that I'm aware of.

21  Q.  And so that agent reached out to Central Dynamics?

22  A.  Yes.

23  Q.  And what ultimately came of that meeting?

24  A.  That meeting sparked a series of conversations with

25  Central Dynamics and afforded us an opportunity to request

1    additional data and log files from the company.

2    Q.  Now, you also mentioned a company called Listrak; is

3    that correct?

4    A.  Yes.

5    Q.  Okay.  And what type of company is Listrak?

6    A.  Listrak is also a mass marketing company as well, I

7    believe, that has -- they're a data center and house,

8    actually the physical infrastructure.

9            MR. ALGOR:  If we can show Government Exhibit 217

10   and go to Page 3.

11           And if we could highlight the footnote at the

12   bottom.

13   Q.  And, Agent Heide, you recall that Government Exhibit 217

14   was one of the white papers that came in; is that correct?

15   A.  Yes, sir.

16   Q.  Okay.  And so it says, "mail1.trump-email.com is hosted

17   by a Pennsylvania-based company, Listrak, which is a

18   reasonably well known CRM."  Do you recall that?

19   A.  Yes.

20   Q.  All right.  What did you understand --

21           MR. ALGOR:  We can take that down.

22   Q.  What did you understand Listrak -- what type of company

23   Listrak was within this?

24   A.  Listrak actually housed the virtual or the mail transfer

25   agent on a virtual machine for CenDyn.

1   Q.  That's a complicated sentence.  What do you mean by

2   that?

3   A.  They housed the virtual -- the actual computer systems

4   were housed in Pennsylvania at their facility.

5   Q.  Okay.  Is it fair to say that that's where the servers

6   were located?

7   A.  Yes.

8   Q.  Once -- and did the FBI send out agents to interview

9   Listrak as well?

10  A.  We did.

11  Q.  And what was the purpose of sending agents to Listrak?

12  A.  To do the same sort of outreach we did with Central

13  Dynamics where we would ask for underlying log files or data

14  associated with the domain or the IP addresses in question.

15  Q.  Okay.  You mentioned doing some interviews and asking

16  for log files; is that correct?

17  A.  Yes.

18  Q.  And you did that -- and the team did that as well with

19  Central Dynamics?

20  A.  Yes, with both companies we did.

21  Q.  Did you ultimately receive log files from those

22  companies?

23  A.  We did.

24  Q.  And what was the purpose in requesting that information?

25  A.  Log files from the company could potentially have data

1    about what the computers or the servers were actually doing

2    historically, which could potentially identify or

3    corroborate information that was provided in the white

4    paper.

5    Q.  And ultimately what -- once you received that data and

6    those log files, what did the FBI do with that?

7    A.  Within our squad in Chicago, we had computer scientists

8    and cyber forensic folks that took a look at the data and

9    conducted an analysis of it.

10   Q.  Okay.  And what was the ultimate conclusion regarding

11   the team's analysis of that data?

12   A.  The analysis was not able to substantiate anything in

13   the white papers.

14   Q.  Was there any additional steps that the FBI took

15   regarding this allegation?

16   A.  Yes.  We also reached out to a private security firm,

17   Mandiant.

18   Q.  And how did the FBI first come to learn about Mandiant

19   regarding these allegations?

20   A.  I believe Agent Sands either received a call or reached

21   out to them regarding it.  I don't remember how it exactly

22   came into the FBI.

23   Q.  Okay.  And did you participate in any way regarding the

24   meetings with Mandiant?

25   A.  No.

1    Q.   Okay.  Did Agent Sands brief you after following up on

2    those meetings?

3    A.   Yes.

4    Q.   And what came about from those meetings as far as you

5    were aware?

6    A.   It's my understanding that Mandiant was hired by Alfa-

7    Bank to do their own analysis into these allegations as

8    well.

9    Q.   And did they report on their findings as well?

10   A.   Yes.  They negated anything that was alleged in the

11   white paper as well.

12   Q.   And those were consistent with the FBI's assessment at

13   that time?

14   A.   Yes, sir.

15   Q.   Had you ever dealt with Mandiant in previous cases?

16   A.   I had not, but I know our cyber division had.

17   Q.   Did you have any understanding of what type of company

18   Mandiant was?

19   A.   I understand them to be a cyber security and

20   investigative -- cyber investigative firm.

21              MR. ALGOR:  If we could turn back to Government

22   Exhibit 217 again, and if we could highlight the first

23   paragraph, please.

24   Q.   There's also a finding or an allegation within the white

25   paper about "an unusually-configured server (a TOR exit

1    node) at Spectrum Health in Michigan."  Do you see that?

2    A.  Yes, sir.

3    Q.  And did you investigate that allegation as well?

4    A.  We did.

5    Q.  Okay.  And so if you could, explain to the jury what a

6    TOR exit node is.

7    A.  TOR is a way of obfuscating or hiding your activities on

8    the Internet.  It basically reroutes all of your traffic to

9    a location where you're not physically at through the

10   Internet, through a series of hops.

11            And an exit node would be the ultimate destination

12   of where your activity is actually coming out of on the

13   Internet.

14   Q.  Okay.  What steps did the FBI take regarding this

15   allegation?

16   A.  We conducted, again, open source research --

17            MR. BERKOWITZ:  Judge, just object on foundation

18   to make sure whether it was him or Agent Sands briefing him.

19            THE COURT:  Okay.  Clarify.

20   Q.  Did you or Agent Sands take any actions regarding the

21   investigation into this allegation?

22   A.  Into this allegation?

23   Q.  Yes.

24   A.  We had a computer scientist conduct this activity.

25   Q.  And that was part of the FBI investigative team

1    regarding this allegation?

2    A.   Yes.  He sat with us in the Chicago office.

3    Q.   And were you briefed regarding this allegation?

4    A.   Yes.

5    Q.   And so what ultimately did the FBI find regarding this

6    allegation?

7    A.   The research that was conducted was that -- through the

8    TOR Project there's a historical list of TOR exit nodes, and

9    this was -- the TOR exit node that was listed in this white

10   paper was not listed on that list.

11   Q.   Okay.  And so, generally speaking, what's this list of

12   TOR exit nodes?

13   A.   I believe the TOR Project maintains those as a way of...

14   Q.   And can you explain to the jury what the TOR Project is.

15   A.   The TOR Project is the project that is the underlying

16   editors for the TOR program, is the way I understand it.

17   Q.   And it's publicly available; is that correct?

18   A.   Yes.

19   Q.   And so your team did research regarding TOR exit nodes?

20   A.   Yes, one of our computer scientists did.

21   Q.   And ultimately what did they find regarding this

22   allegation?

23   A.   That the allegation was not substantiated.

24            MR. ALGOR:  We can take that down.

25   Q.   So now I want to show you what's been marked for

1    identification as Government Exhibit 257.

2             And do you recognize this?

3    A.  I do.

4    Q.  And what is it?

5    A.  It's another series of Lync messages between myself and

6    Joe Pientka.

7             MR. ALGOR:  Okay.  Your Honor, we move to admit

8    Government Exhibit 257.

9             MR. BERKOWITZ:  No objection.

10            THE COURT:  257 is admitted.

11   Q.  Okay.  Agent Heide, did there come a time where you were

12   interested in interviewing the source of the white papers at

13   issue here?

14   A.  Yes.

15   Q.  Okay.  And if you can just read that first line, please.

16   A.  It says, "We want to interview the source of the white

17   paper."

18   Q.  And then the next line?

19   A.  "Any chance of that?"

20   Q.  And you're sending this to Joe Pientka; is that correct?

21   A.  Yes.

22   Q.  Okay.  And why were you asking to interview the source

23   of the white paper?

24   A.  It was my understanding at the time that the information

25   came to me from Joe, so we were asking Joe if we could put

1   processes in place to ultimately interview the source of the

2   white paper.  I was going back to who provided me with the

3   information.

4   Q.  Okay.  And this is -- the date is September 26th.  Do

5   you see that?

6   A.  Yes.

7   Q.  So it's approximately one week after the allegations

8   came to the FBI?

9   A.  Yes.

10  Q.  Now, I want to show you Government Exhibit 265, which is

11  already in evidence.  And I want to turn your attention to

12  the bottom, which is October 3rd, right at the bottom.  A

13  little farther down, please.

14          So this is a -- straddles the exhibit, but you see

15  that's an email from yourself to Ryan Gaynor, Allison Sands,

16  and it cc'd Jonathan Moffa, Joe Pientka, Brian Auten, and

17  Daniel Wierzbicki.  Do you see that?

18  A.  Yes.

19  Q.  So you've mentioned a few of the names on this email,

20  but who is Ryan Gaynor?

21  A.  Ryan Gaynor was one of the supervisors at FBI

22  headquarters assigned to this matter.

23  Q.  Okay.  And what was his role within the matter?

24  A.  I believe he took on a program manager role with respect

25  to this.

1  Q.  And so how did you interact with him as part of the

2  investigation?

3  A.  Primarily through email and Lync messages and maybe Lync

4  phone calls.

5  Q.  Okay.  And then you mentioned Ms. Sands.

6          Jonathan Moffa, who is that?

7  A.  Jonathan Moffa was the supervisory intelligence

8  analyst -- or one of them -- up at FBI headquarters.

9  Q.  And what was his role regarding this investigation?

10  A.  I believe supervising the intelligence activities that

11  were conducted on the support or the intelligence side of

12  the house of the FBI.

13  Q.  You've mentioned Joe Pientka.  Brian Auten, who is that?

14  A.  Brian Auten was another supervisory intelligence analyst

15  at FBI headquarters.

16  Q.  And so he was assisting as well at this time regarding

17  the investigation?

18  A.  Yes.

19  Q.  And finally, Daniel Wierzbicki.  Who is that?

20  A.  Dan Wierzbicki was my supervisor at the time in the

21  Chicago office.

22          MR. ALGOR:  Okay.  And if we can just scroll to

23  the next page.

24  Q.  Okay.  And if you could read that first line, please.

25  A.  It says, "Yeah we got the logs from MM so we'll look

1    through those for these IPs."

2    Q.  Okay.  And so what does "MM" stand for?

3    A.  That's our internal code for the Miami division of the

4    FBI.

5    Q.  Okay.  And so it says "we got the logs from" Miami and

6    "we'll look through those for these IPs."  What are you

7    referring to?

8    A.  For the IPs referenced in the white papers.

9         Actually, I don't believe that's correct.  Is

10   there any way to go down further?

11   Q.  Yes.

12        MR. ALGOR:  So we can go down.  A little farther

13   down.

14   Q.  Do you see that?

15   A.  Yes.  I think this was the information that came in

16   through another anonymous source from the cyber division

17   that provided us with two IP addresses.

18   Q.  Okay.  So let's talk about that briefly.

19        What do you recall regarding additional

20   information and these two IPs coming to your case team?

21   A.  There was another agent also at FBI headquarters in the

22   cyber division that provided us information from an

23   anonymous source and said there was another IP address of I

24   believe it was the Alfa-Bank activity, and also a

25   residential IP address for an alleged person from Russia who

1   was conducting the activity.

2   Q.  And do you recall who from cyber division provided this

3   information to --

4   A.  Tom Grasso.

5   Q.  Okay.  And who is Tom Grasso?

6   A.  I hadn't met Tom Grasso, but he was in our cyber

7   division at the time in Chantilly.

8   Q.  Okay.  Did you ever speak with Mr. Grasso regarding

9   these IP addresses?

10  A.  No.

11  Q.  Okay.  And did anyone on the team ever speak to him?

12  A.  I don't believe we did.

13  Q.  Do you have any recollection of whether -- of how the

14  information was passed to the case team?

15  A.  No.

16  Q.  Okay.  All right.  So that's referring --

17  A.  I'm sorry, how it was passed to the case team?

18  Q.  Yes.

19  A.  From Tom Grasso sending an email to Allison -- or, I'm

20  sorry, maybe it was Dan Wierzbicki -- on our external or our

21  U-Net, which is our unclassified email system.  It was sent

22  to us.

23  Q.  And so you mentioned that it came from an anonymous

24  source.  Is that -- that was your understanding at that

25  time?

1    A.   That's what it said in the email.

2              MR. ALGOR:   If we could go up to the prior email.

3    Q.   Okay.  So now we have a little clarification

4    regarding -- if you could just now explain that first

5    sentence again to the jury.

6    A.   So Tom Grasso provided us with two IP addresses that

7    were of interest, so we wanted to look through the IP

8    addresses that we obtained from Miami to see if there were

9    any references in those holdings.

10   Q.   And why would you do that?

11   A.   To see if we had run across them before in any other

12   investigations; or if they were referenced in the CenDyn

13   logs, then it could potentially substantiate the

14   allegations.

15   Q.   Do you remember if anyone in the case team ended up

16   doing that?

17   A.   I believe we did run the IP addresses through our

18   holdings and through the Central Dynamics' holdings.

19   Q.   And what was the result of that?

20   A.   I believe they were in -- or they were -- we were not --

21   we didn't find any references of them in our holdings.

22   Q.   So this email is October 3rd; is that correct?

23   A.   Yes, sir.

24   Q.   Okay.  And so if you could read that next paragraph,

25   please.

1    A.  It says, "We really want to interview the 'source' of

2    all this information.  Any way we can track down who this

3    guy is and how we're getting this information?"

4    Q.  So, Agent Heide, you saw the message from September

5    26th.  We see this email from October 3rd.  Why did you want

6    to know the source of the information?

7    A.  I believe at this time our investigation was reaching, I

8    would say, a logical conclusion, and this was another

9    example of FBI headquarters providing us with another

10   anonymous source who was providing us with information.

11        And I think our investigative team in Chicago was

12   looking to identify the original source of the information

13   to get to the bottom of the original allegation because

14   everything we were looking at was coming up unsubstantiated.

15   Q.  And what, if any, importance did it have to you who

16   would have brought that information to the FBI?

17   A.  We had -- specifically with respect to this

18   investigation, we had a lot of questions regarding the

19   information in the white paper, so we wanted to interview

20   the individual who ultimately compiled it to make sure that

21   we weren't missing something.

22   Q.  Now, turning to the top of the email, so the first page,

23   please.

24        Excuse me, let's start here.

25        So Dan Wierzbicki you mentioned earlier.  That was

1    your boss at the time?

2    A.  Yes, sir.

3    Q.  Okay.  And so -- and he states, "I agree with

4    Curtis...an interview with the source of info would be the

5    logical step in this (as well as any) investigation.  It may

6    allow us to understand the what and why of the white paper."

7          And is that consistent with what you were -- why

8    you wanted to interview the source of the information?

9    A.  Yes.

10          MR. ALGOR:  Okay.  And if we can go one email

11   above that.

12   Q.  Okay.  And so this email is from Ryan Gaynor; is that

13   correct?

14   A.  Yes.

15   Q.  And, again, you said Ryan Gaynor was your liaison to FBI

16   headquarters?

17   A.  Yes.  I believe he was responsible for program managing

18   this particular investigation.

19   Q.  Okay.  And so if you could read that first sentence?

20   A.  He says, "Got it and being discussed at HQ.  Before we

21   make any decisions on that front, we will need to know what

22   we can learn from the logs we have now obtained regarding

23   the nature of the allegation -- or the actual activity

24   between Alfa-Bank and the domain/server."

25   Q.  Agent Heide, did you ever learn who the source of the

 1    information was of the white papers and data?

 2    A.  No.

 3    Q.  Okay.  And in here Ryan Gaynor is saying that before we

 4    make any decision on that front, we'll need to know what we

 5    can learn from the logs.

 6              What did you understand that to mean?

 7    A.  It meant keep reviewing the logs, and we will -- we were

 8    not able to interview the original source at that time.

 9              MR. ALGOR:  We can take that down.  Thanks.

10    Q.  Do you recall how long the FBI's investigation into

11    these allegations took?

12    A.  I believe several months.

13    Q.  And so you mentioned that you were nearing a logical

14    conclusion in early October.  Do you remember just briefly

15    testifying to that?

16    A.  Yes.

17    Q.  Did the FBI take additional steps following that early

18    October --

19    A.  I think there were several other investigative steps.  I

20    know there was additional conversations that we had with

21    Spectrum Health, and there were additional conversations

22    that we had with Mandiant that went to that.

23    Q.  You mentioned Spectrum Health.  Why did the FBI reach

24    out to Spectrum Health?

25    A.  I don't remember what initially sparked the dialogue,

1  and I don't think I participated in those conversations.

2  But in the case file, we have documented 302s with Spectrum

3  Health regarding the internal investigation that they

4  conducted with respect to their systems.  And they

5  identified that the DNS traffic that was being conducted on

6  their system was actually the result of a misconfigured

7  server on their side.

8  Q.  And the Spectrum Health allegation, that involved the

9  TOR exit node; is that correct?

10  A.  Yes.

11  Q.  As part of your testimony earlier, you mentioned that it

12  was not -- that the servers were not attributable to the

13  Trump organization when you were talking about Listrak.

14  A.  Yes.

15  Q.  Can you explain to the jury what you meant by that.

16  A.  When we conducted our open source research, I think

17  there was a typo or a misspelling in the registrant

18  information, which made us initially think that it could

19  possibly be someone who had just established a look-alike

20  domain for the Trump organization.  And that was our initial

21  thoughts.

22          And that was later unsubstantiated -- or not -- it

23  was negated by our conversations with CenDyn, who actually

24  confirmed that it did actually belong to the Trump

25  organization, I think the same day.

1    Q.  So you mentioned that the case was eventually closed; is

2    that correct?

3    A.  Yes.

4    Q.  And is that approximately early 2017?

5    A.  In January, I believe.

6    Q.  And what type of procedures are taken when you close a

7    case?

8    A.  The same with our opening communication.  We would do a

9    closing communication.

10   Q.  And did someone do a closing EC for this case?

11   A.  Yes.

12   Q.  Okay.  And who did that?

13   A.  I believe it was Allison.

14             MR. ALGOR:  Okay.  So if we could show Government

15   Exhibit 233, please.

16   Q.  And do you recognize -- this is already in evidence.

17             Do you recognize this?

18   A.  Yes.

19   Q.  Okay.  And what is it?

20   A.  That would be our closing EC.

21   Q.  Okay.  And if we could just go down to the details,

22   please, at the bottom.

23             Okay.  And so it says here in the second -- the

24   first sentence it says, "Chicago open Preliminary

25   Investigation."  Do you see that?

1    A.  Yes.

2    Q.  And is that accurate?

3    A.  That's a typo as well.

4    Q.  Okay.  And you were shown the opening EC earlier --

5    A.  Yes.

6    Q.  -- Agent Heide.

7            And that was full field investigation?

8    A.  Yes.

9    Q.  And your understanding was that this matter was opened

10   as a full field investigation?

11   A.  Yes.

12   Q.  All right.  And then I want to take you down to "on or

13   about."  If you could just read that sentence as well.  You

14   can read it out loud.

15   A.  I'm sorry.  "On or about September 19, 2016, FBI

16   received a white paper that was produced by an anonymous

17   third party from the U.S. DEPARTMENT OF JUSTICE"  --

18   Q.  Slow down.

19   A.  I'm sorry.

20   Q.  Yes, go ahead.  You can read it again, and just slow

21   down for the court reporter.

22   A.  I'm sorry.

23           "On or about September 19, 2016, FBI received a

24   white paper that was produced by an anonymous third party

25   from the U.S. DEPARTMENT OF JUSTICE."

1    Q.   Okay.  And so it again says U.S. Department of Justice.

2    Is that accurate?

3    A.   No, it is not.

4    Q.   Okay.  And your testimony today, what is your

5    understanding as to how the allegations came into the FBI?

6    A.   My understanding is that it came in as an anonymous

7    source to the office of general counsel to Jim Baker.

8              MR. ALGOR:  We can take that down, please.

9    Q.   So this is the closing EC in January 2017.  What was the

10   ultimate conclusion that the FBI came to regarding these

11   allegations?

12   A.   Our investigation was unable to substantiate any of the

13   allegations in the white paper.

14   Q.   And based on your involvement in the case, what were the

15   reasons for coming to that conclusion?

16   A.   It would have been our initial research conducted by our

17   cyber division coupled with our review of network logs that

18   we received from the CenDyn and Listrak company as well as

19   our outreach to Mandiant and our conversations with Spectrum

20   Health.

21   Q.   In your experience as an FBI agent, how important or

22   unimportant is it to know the source of a particular

23   information?

24   A.   I think it's important to know the source of the

25   information to find out why they would bring it to the FBI.

1    Q.  And in this case did you consider that to be an

2    important --

3    A.  Yes.

4    Q.  And why?

5    A.  Specifically with respect to this matter, this involved

6    a presidential candidate approximately a month and a half

7    before an election.

8    Q.  And how important or unimportant is it to know whether a

9    person who provides information to the FBI is acting on

10   their own behalf or on someone else's behalf?

11   A.  It would be important to know because either one of the

12   individuals could potentially have some sort of bias or

13   motivation in providing it to the FBI.

14   Q.  And, Agent Heide, the anonymous source that provided the

15   information on September 19th, if you were to know that the

16   information that was provided on October 3rd to the FBI was

17   from the same source of the information, would that have

18   mattered to you?

19   A.  Yes.

20   Q.  Why?

21   A.  You're talking about the information that came from Tom

22   Grasso?

23   Q.  Correct.

24   A.  And the original reporting?

25   Q.  Correct.

1    A.  That would be important for us because that was, I

2    think, our gut instinct when we received the information,

3    but I didn't know that at the time.  I think it would be

4    important because it would corroborate what we believed

5    might be the case.

6    Q.  Now, Agent Heide, you mentioned that you worked on

7    multiple investigations regarding election-related matters.

8    A.  Yes.

9    Q.  And that involved -- you mentioned Mid-Year, and that

10   involved the Clinton -- Secretary Clinton; is that correct?

11   A.  Yes.

12   Q.  And you also mentioned that you investigated Crossfire

13   Hurricane, which was related to affiliates of President

14   Trump and potential connections to Russia?

15   A.  Certain investigations associated with Crossfire

16   Hurricane, yes.

17   Q.  If you had known that the source of this information was

18   working with a political campaign, would that have mattered

19   to you?

20   A.  Yes.

21   Q.  Why?

22   A.  When we worked the Mid-Year Exam information, we had, I

23   would say, a similar instance where an individual brought

24   forth data that we believed to have political motivations.

25   We sent two FBI agents to go interview that individual and

1    ultimately determined that we weren't going to follow up

2    with it any further.

3              So in this case, if that were the case and we knew

4    who the person was who initially brought us the information,

5    we may have conducted the same activity.  I don't know.

6    Q.  If the source of the information had been working on a

7    client with business interests, would that have mattered to

8    you at all?

9    A.  Yes, because one would want to know whether the person

10   has a financial benefit of bringing the information or a

11   benefit to their business of bringing the information to the

12   FBI.

13   Q.  And if the source of the information -- and let me start

14   here.

15             Do you know what a confidential human source is?

16   A.  Yes.

17   Q.  Okay.  What's a confidential human source?

18   A.  Somebody who provides information to the FBI on a

19   confidential basis.

20   Q.  If the source of the information that was brought to you

21   was brought on behalf of a confidential human source, would

22   that have mattered to you?

23   A.  Yes.

24   Q.  Why?

25   A.  If the information came from a confidential human

1   source, then we could ultimately reach out to the handling

2   agent and ask about the source's previous reporting and

3   whether or not any of the information has been corroborated

4   in the past.

5         We could talk about his reliability, his

6   motivations in providing data to the FBI; and then

7   potentially, we could use the handling agent to go back and

8   ask the questions that we ultimately wanted answered in the

9   white paper from the very get-go.

10        MR. ALGOR:  Nothing further, Your Honor.

11        THE COURT:  All right.  Ladies and gentlemen, why

12   don't we take our break a little bit early this morning.

13   Let's come back at ten minutes to 11:00.

14        No discussions about the case.  No research about

15   the case.

16        (Jury exits courtroom)

17        (Recess taken)

18        THE COURT:  All right.  Please be seated,

19   everyone.

20                    CROSS-EXAMINATION

21   BY MR. BERKOWITZ:

22   Q.  Good morning, Mr. Heidi.

23   A.  Good morning, sir.

24   Q.  My name is Sean Berkowitz, and I represent Michael

25   Sussmann.  I usually start these cross-examinations by

1   saying we've never met, but that's not actually true, is it?

2   We ran into each other in the lobby today, right?

3   A.   Oh, we did, yes.

4   Q.   But other than that we haven't met, right?

5   A.   That's true.

6   Q.   All right.  I try and give everybody a road map as to

7   where I might be going in these, just to give you a sense.

8   We're going to talk about the investigation pending against

9   you.  We'll talk about the number of times you've met with

10  the government.  We'll cover some background information

11  about your role in all of this, and we're going to walk

12  chronologically through a timeline of what happened during

13  this period of time.  And then we'll talk about whether any

14  of this matters.  Okay?

15  A.   Okay.

16  Q.   So let's start with that investigation that you told

17  Mr. Algor about.  That's a serious allegation, right?

18  A.   It's an allegation that's still pending.

19  Q.   Understood.  But it's serious.  If you have an adverse

20  finding against you, it could have significant consequences

21  on your career, right?

22  A.   It could potentially, I guess.

23  Q.   Well, the allegation, according to what you told

24  Mr. Algor, is that you intentionally withheld information

25  that could help prove a defendant's or an individual's

1    innocence in connection with an application to a court,

2    right?

3    A.   That's the allegation.

4    Q.   And that's a serious allegation.

5    A.   Yes, sir.

6    Q.   You deny it though, right?

7    A.   Yes, sir.

8    Q.   But it is still pending, and the FBI is still

9    investigating; is that correct?

10   A.   Yes.

11   Q.   And just to give a little bit more detail, you said that

12   it was in connection with an application to the FISA court,

13   right?

14   A.   I believe that's what it was for, yes.

15   Q.   And the FISA court, just so the jury knows, is a court

16   that can issue search warrants, correct?

17   A.   Yes.

18   Q.   And it can also issue wiretaps on people's phones,

19   right?

20   A.   Yes.

21   Q.   And was this an application for a wiretap or a search

22   warrant or something else?

23   A.   I don't know for sure.  I didn't author any of the

24   affidavits or any of the materials related to the

25   applications in question.

1    Q.  And so it's possible that a warrant or a wiretap was

2    issued based on information that wasn't fully complete,

3    correct?

4    A.  I believe that's what the inspection division is

5    investigating right now.

6    Q.  All right.  And you're -- stepping back.

7              You are testifying in this case about your role in

8    the investigation of the Alfa-Bank allegations that were

9    provided to the FBI in or around September of 2016, right?

10   A.  Yes, sir.

11   Q.  That's a long time ago?

12   A.  Almost six years ago.

13   Q.  Yes.  And when you first -- you met with the gentlemen

14   and ladies -- probably the gentlemen at this table.  I don't

15   think Ms. Shaw was involved.  But you met with some of the

16   gentlemen at the table going back to November of 2019,

17   right?

18   A.  Yes, sir.

19   Q.  Is that the first time you remember meeting with them?

20   A.  I don't remember the exact date, but I think it was

21   about three years ago.

22   Q.  Okay.  And do you remember also meeting with them on

23   June 9th of 2020, on or about?

24   A.  Yes, on or about.

25   Q.  And just to remind the jury, when you met with the

1    prosecutors in this case, was there an FBI agent that was

2    actually taking notes?

3    A.  I believe either a current FBI agent or a former one.

4    Q.  A former one would have been -- but somebody who was

5    there as an agent to take notes of what you were saying,

6    correct?

7    A.  Yes.  Yup.

8    Q.  All right.  You yourself didn't take notes of those

9    meetings, correct?

10   A.  I did not.

11   Q.  And you also met with them in preparation for your grand

12   jury in or around June 16th of 2021, right?

13   A.  Yes.

14   Q.  And then you actually testified in the grand jury the

15   next day, correct?

16   A.  I believe so.

17   Q.  And then we've had a series of trial prep meetings.

18   When I say "we," you and the government have had a series of

19   preparations for your testimony today, right?

20   A.  I would say a few, yes.

21   Q.  Well, March 15th?

22   A.  Okay.

23   Q.  April 26, 2022?

24   A.  Okay.

25   Q.  Does that sound about right?

```
1    A.  I believe so.

2    Q.  May 6th of 2022?

3    A.  Okay.

4    Q.  And, again --

5    A.  They do sound correct.  A handful of times, sir.

6    Q.  Okay.  So that's three so far.  I'm happy to show you

7    notes of those, if that would help.  I don't want to mislead

8    you.  So if you don't recall and want to see notes, let me

9    know.

10   A.  No.  I met with them a handful of times, yes.

11   Q.  May 18th of 2022, that's not that long ago.  That

12   happened?

13   A.  Yes.

14   Q.  May 19th of 2022?

15   A.  Yes.

16   Q.  That was last Friday?

17   A.  Yes.

18   Q.  Or actually it would have been Thursday.

19   A.  I think Thursday, yes.

20   Q.  Thursday night?

21   A.  Yes.

22   Q.  After court?

23   A.  Yes.

24   Q.  Have you met with them at all since last Thursday in

25   preparation for your testimony?
```

1    A.  No, I don't believe so.

2    Q.  All right.  So a total of about five times.  You call

3    that a handful.  I guess it is a hand, five, right?

4    A.  I think pretty close.

5    Q.  Okay.  Now, when you first met with the government, you

6    didn't have a particularly clear recollection of the case,

7    correct?

8    A.  Correct.

9    Q.  In fact, you would say that your memory was somewhat

10   hazy, would you not?

11   A.  Yes.

12   Q.  And that was because Agent Sands, who the jury saw

13   yesterday, actually ran the day-to-day investigation,

14   correct?

15   A.  She was assigned as the lead case agent.

16   Q.  And she ran with it, and that's why you don't have a

17   clear memory of the investigation as you normally might

18   have?

19   A.  I believe that when I first sat down with the Special

20   Counsel's team, we discussed not only this matter but a

21   series of other matters, and I believe that my recollection

22   on it was a little bit hazy at the time, yes.

23   Q.  So do you remember telling the government, when you met

24   with them in November of 2019, that your recollection of the

25   case is somewhat hazy given that you recalled that you

1  watched over Agent Sands as she ran with the case and

2  conducted a significant amount of the investigation?

3  A.  Yes.  I believe I played more of a support role in the

4  case, yes.

5  Q.  Okay.  But is that accurate, that your recollection, at

6  least at the time of the case, was because Agent Sands ran

7  with the case?  She did most of the significant activities,

8  and you generally oversaw it, correct?

9  A.  I believe that's accurate, yes.

10 Q.  And, in part, that's because you were in the middle of

11 something called the Papadopoulos investigation, right?

12 A.  Yes.

13 Q.  That was a significant investigation that resulted in a

14 federal indictment, correct?

15 A.  It was.

16 Q.  All right.  And you were investigating that case at the

17 same time you were doing this, correct?

18 A.  Correct.

19 Q.  And the focus of your attention during September and

20 October of 2016 was more on the Papadopoulos case and not as

21 much on this case, correct?

22 A.  I had multiple cases, not just the Papadopoulos case and

23 not just the Alfa-Bank case.  I also had other cases in

24 Chicago that I was investigating as well.

25 Q.  Fair to say that you were significantly occupied and so

1   the Alfa-Bank case in September and October of 2016 was not

2   a focus of yours at that time?

3   A.   It was a focus during the weeks that we investigated it.

4   It was.

5   Q.   How many weeks did you investigate the case, sir?

6   A.   I think it went on for several months.

7   Q.   Weeks or months?

8   A.   I believe we investigated it for several months.

9   Q.   Okay.  We'll get -- we'll do the timeline and see.  But

10  how long do your investigations typically last?

11  A.   I think it varies.  It depends on the investigation.

12  Q.   You said, when Mr. Algor asked you, that you've done

13  dozens of investigations in your career, correct?

14  A.   Yes.

15  Q.   What's the -- do you have an average length?

16  A.   I don't think I would have an average length about a

17  case.  It would depend on the type of the investigation or,

18  you know, perhaps whatever was found in the investigation.

19  Q.   And is a couple of months on the shorter side, or is it

20  not short?

21  A.   I would say a couple-of-month investigation would be on

22  the shorter side.

23  Q.   Okay.  And with respect to interviews in this

24  investigation, how many interviews did you personally

25  conduct?

1   A.  I don't believe I conducted any interviews.

2   Q.  Are you aware that Agent Sands didn't conduct any

3   interviews either?

4   A.  I don't know.  I would have to go back and look at the

5   file.

6   Q.  Okay.  And you've had plenty of opportunity.  You've met

7   with the government five times.

8        Do you -- what files or what notes would help you

9   determine whether Agent Sands conducted any interviews?

10  A.  I remember there being 302s in the file from discussions

11  we had with Mandiant and, I think, Kirkland & Ellis, but I

12  don't recall right offhand who authored those.

13  Q.  Okay.  Well, let's bookmark Mandiant, because we're

14  going to get to that, and Kirkland & Ellis.

15       All right.  And I think what you said in your

16  direct testimony was that Agent Sands was looking for

17  additional work, right?

18  A.  She was a new agent assigned to the squad, and I don't

19  think she had a heavy caseload at that time.

20  Q.  Okay.  And I think you said that she was looking for

21  additional work and came to you and volunteered for this,

22  right?

23  A.  No.  I believe I approached her and asked her to work

24  with it or open the case.

25  Q.  Because she didn't have a full caseload?

1    A.  I was looking to give her an opportunity to work a case

2    with me and learn how to open an investigation and learn the

3    FBI systems.

4    Q.  And this was -- was it her first investigation?

5    A.  I don't know if it was for sure.  It may have been.

6    Q.  Okay.  And you wanted to help train her and teach her

7    how to do things properly, right?

8    A.  Yes.

9    Q.  And I think you said you wanted to help her learn how to

10   open a case, right?

11   A.  Yes.

12   Q.  Okay.  Let's see how that went.

13            Let's take a look at Government Exhibit 200, which

14   we looked at on your direct.  And let's take a look in the

15   upper left-hand corner here.

16            Well, actually, let's take a look at the "To" and

17   "From" here, "Drafted By."

18            MR. BERKOWITZ:  All the way down to drafted by,

19   Mr. Cleaves.

20   Q.  And this was the opening of the Alfa-Bank case, correct?

21   A.  Yes.

22   Q.  You guys were basically ordered to open the case, right?

23   A.  We were told to by headquarters, yes.

24   Q.  Told, ordered.  I mean, you didn't have a choice.

25   A.  Yes.

1    Q.  Okay.  And in this opening document you actually, I

2    think, testified on direct, that you drafted this, right?

3    A.  We -- yes, we both drafted it.

4    Q.  Did she draft it, and you reviewed it for accuracy?

5    A.  We may have both drafted portions of it.  I don't recall

6    right offhand.

7    Q.  Okay.  So how does that work?  Explain that to the jury.

8           Would you say, "Hey, this is your first case,

9    Allison" -- or Special Agent Sands, I don't know how you

10   would address her -- "here's what the form is.  Do you want

11   to fill it out?"  Or would you have filled it out?  Do you

12   remember?

13   A.  In the system, we would have -- there's an option for

14   you to draft a document together.  So in this particular

15   instance Allison is listed as the primary author, and then

16   I'm second on it.

17   Q.  Would you have reviewed it for accuracy before you

18   submitted it?

19   A.  Yes.

20          MR. BERKOWITZ:  And let's take a look at the

21   second page.

22   Q.  And you went over this on your direct.  This is the

23   first sentence.

24          All right.  The first sentence of the first case

25   that Agent Sands opened, it says, "On or about September 19,

1    2016, FBI received a referral of information from the U.S.

2    DEPARTMENT OF JUSTICE detailing an unusually configured

3    email server in Pennsylvania belonging to the TRUMP

4    ORGANIZATION."

5            That's the first sentence of the report, correct?

6    A.  Yes.

7    Q.  And it's your testimony today that that contains a typo?

8    A.  Yes.  That's a mistake.

9    Q.  And did you know it was a mistake when you filled it

10   out?

11   A.  I don't believe we did, no.

12   Q.  Okay.  When did you first learn, Mr. Heide, that the

13   referral in this case was not done by the Department of

14   Justice?

15   A.  I want to say that I first learned of it during an OIG

16   interview related to this matter.

17   Q.  Which would have been when?

18   A.  I don't remember for sure.

19   Q.  Well after it was closed, correct?

20   A.  Yes.  Yes.

21           THE COURT:  Sir, explain to the jury what an OIG

22   interview or what the OIG is.

23   Q.  And maybe I can help refresh your recollection by taking

24   a look at CH04 just for you, because there's a date on it.

25           MR. BERKOWITZ:  So let's put that up.  And this is

1    just for you.

2    Q.  And it's a declaration that you gave in connection with

3    an OIG matter, correct?

4    A.  Yes, sir.

5    Q.  That's what it appears to be?

6    A.  Yes.

7    Q.  Is that the first time that you believe that you --

8    A.  Actually, this is not OIG.  This would be our internal

9    inspection division.

10   Q.  Okay.  And is that when you learned, or is it something

11   else?

12           I can take this away, if this isn't it.

13   A.  I thought that it was during an OIG interview that I

14   first learned that we had a typo in there.

15   Q.  Then let's take a look at CH01, and see if that's it.

16   A.  (Witness reviews document)

17           MR. BERKOWITZ:  And you can blow out the whole

18   page for him, Mr. Cleaves, so that he sees what it is.

19   Q.  Does that appear to be it?

20   A.  I believe so, sir.

21   Q.  And that's dated October 29th of 2018?

22   A.  Yes.

23   Q.  So the first time you learned that the materials in this

24   case were brought to the office of general counsel and

25   Mr. Baker would have been in connection with an OIG

1    investigation in October of 2018?

2    A.  I believe this is the first time that we identified the

3    typo in our paperwork, that it was brought to our attention.

4    Q.  And as the judge asked, can you explain to the jury what

5    an OIG investigation is.

6    A.  It would be the Office of Inspector General that

7    conducts investigations and oversight of FBI investigations.

8    Q.  And this Office of Inspector General, were they

9    investigating your typo?

10   A.  I don't believe so.

11   Q.  But they told -- what did they tell you that caused you

12   to realize there had been a typo in your report?

13   A.  I believe they brought it to my attention and asked me

14   if it was accurate, and my response was the same, that I

15   don't believe it was accurate.  I believe that the

16   information was brought to our office of general counsel,

17   and that we may have conflated office of general counsel and

18   the Department of Justice somehow in communication with

19   headquarters.

20           I don't know how that information got in there.

21   Q.  And when is it that you knew, in your mind, that the

22   information was actually provided to the office of general

23   counsel and not the Department of Justice?

24   A.  In reading through the emails and the materials

25   provided, I believe it was when I first -- I believe it was

1    when I looked at this IG interview, I believe.

2              But I know, when the information was first

3    provided to us, the cyber division said that the office of

4    general counsel had a chain of custody signed by Jim Baker,

5    so we knew that it came in from -- into the office of

6    general counsel at the FBI.  But I believe that we first

7    identified this typo during this IG interview.

8    Q.  Well, let's take a look.  You closed the matter in

9    January of 2017, correct?

10   A.  Yes.

11   Q.  Opened in September of '16, closed in January of 2017.

12   Correct?

13   A.  Yes.

14   Q.  And by that time is it your testimony you knew that this

15   had come into the office of general counsel?

16   A.  I believe we knew that.  I believe our paperwork got

17   conflated or improperly documented on our opening

18   communication.

19   Q.  Let's take a look.  And so your testimony sitting here

20   today is by October of 2018 you were firm that it had come

21   into the office of general counsel, right?

22   A.  Yes.  I received an email from Nate Batty saying that

23   Jim Baker had signed a chain of custody for the information

24   and that it came into the office of general counsel.

25   Q.  Okay.  So when you closed this -- let's take a look at

```
1    Government Exhibit 233 in evidence.  I believe the first

2    page.

3              You're listed here, sir, as one of the drafters,

4    correct?

5    A.  Yes.

6    Q.  Okay.  And let's see what it says about where you

7    received the information from.

8              MR. BERKOWITZ:  Next page.

9    Q.  The portion that reads "On or about September 19th FBI

10   received a white paper that was produced by an anonymous

11   third party from the DEPARTMENT OF JUSTICE."

12             So it's your testimony sitting here today, sir,

13   that in both the account opening or the opening of the case

14   and the closing of the case you had a typo?

15   A.  I believe this is a product of us cutting-and-pasting

16   our predication from the opening EC, and then this is the

17   time before Sentinel had templates, and that's why we were

18   cutting-and-pasting as opposed to generating a new template

19   to open the investigation.

20   Q.  Not a lot of attention to detail, I take it.

21   A.  There were a couple of mistakes, yes.

22   Q.  Now, with respect, sir, to this issue, it was an issue

23   that was of some interest to the Special Counsel in the

24   sense that they asked you questions about it, correct?

25   A.  Yes.
```

1    Q.  And, in fact, when you met with them in November of '19,

2    over a year after the inspector general discussion, you told

3    them in an interview that you believed the original evidence

4    was provided to the FBI by the Department of Justice.  Do

5    you remember telling them that, sir, in November of '19?

6    A.  I don't right offhand.

7    Q.  Okay.  Would it refresh your recollection to take a look

8    at your reports of that interview?

9            MR. BERKOWITZ:  Let's take a look at CH02, Page 2,

10   Paragraph 2.

11   Q.  And it says -- well, read it to yourself.  I'm sorry.

12   Read the first sentence to yourself and see if that

13   refreshes your recollection that you told them in November

14   that you -- of '19 that you received the information from --

15   it was provided to the FBI by the Department of Justice.

16   A.  (Witness reviews document) Yes, sir.

17   Q.  And then you had an opportunity to meet -- and your

18   lawyer was present, right, at that meeting?  Remember your

19   lawyer being there?

20   A.  I believe so.

21   Q.  All right.  And your lawyer is in court today?

22   A.  Yes.

23   Q.  Okay.  And you met again with them in June of 2020, so

24   about seven or eight months later.  And at that discussion

25   you told them again that you recalled that you believed

1    initially the information came from the FBI from an

2    anonymous DOJ source as reflected in the account opening --

3    in the account -- in the case opening communication,

4    correct?

5    A.   Yes.  I think there was some confusion about that in my

6    mind.

7    Q.   Did you remember telling them in June of 2020 that while

8    you can't recall precisely who you talked with, you believed

9    it was likely Supervisory Intelligence Analyst Brian Auten

10   who provided that information to you?

11   A.   This was before I was allowed to review any of my

12   materials from before, so this is prior to me reviewing any

13   of my emails or Lync messages.  My memory was a little bit

14   hazy at that time.

15   Q.   So let me get this straight.  You had a lawyer, right?

16   Yes?

17   A.   Yes.

18   Q.   You were interviewed by the Office of Inspector General

19   in 2018, yes?

20   A.   Yes.

21   Q.   You met with these folks in November of '19, correct?

22   A.   Yes.

23   Q.   You met with them again in 2020, correct?

24   A.   Yes.

25   Q.   And nobody provided you any information that you could

1    review before that time during any of those interviews?

2    A.  I don't believe so.

3    Q.  It says they showed you the electronic communication

4    form in the interviews.  They put what we just saw in front

5    of you, right; the account open -- the case opening matter,

6    correct?

7    A.  Yes.

8    Q.  So you at least saw that, right?

9    A.  I did.

10   Q.  And do you remember saying if it wasn't Agent Auten,

11   then it must have been Joe Pientka that you discussed the

12   information with, correct?

13   A.  Yes.

14   Q.  And today you're saying you're sure it was Mr. Pientka

15   who you spoke with, correct?

16   A.  It was.

17   Q.  And do you remember meeting with them in advance of your

18   grand jury testimony in 2021?  Correct?

19   A.  Yes.

20   Q.  And in June of 2021, in your preparation for the grand

21   jury, you said it could have been either you or Allison who

22   thought it came from the Department of Justice, correct?

23   A.  Yes.

24   Q.  And today you're sure that you knew back then that it

25   came from -- through Special Agent Baker or through --

1    through General Counsel Baker?

2    A.  The information that came in -- I think there was

3    confusion about where it had come in.

4    Q.  And is it fair to say that anybody who was conducting

5    the investigation, based at least on the case opening thing,

6    would have been led to believe that the information came in

7    through the Department of Justice, correct?

8    A.  That's what we had written in our opening communication.

9    Q.  All right.  And let's now run through, as best we

10   can -- and I'll try and show you documents so there are no

11   mistakes -- the history of this investigation that appears

12   to have been from September '21st through mid-October.  But

13   let's take a look at it.

14          I think the first thing you said is that you

15   received, from your cyber assessment folks, an analysis of

16   the white paper, correct?

17   A.  Yes.

18   Q.  And that came in from Nate Batty and Scott Hellman; is

19   that right?

20   A.  Yes.

21   Q.  Fair to say you don't know how much time either Agent

22   Batty or Agent Hellman took to analyze the white paper,

23   correct?

24   A.  I do not.

25   Q.  Okay.  You didn't quiz them as to whether they reviewed

1    the materials.  You just reviewed what they sent to you,

2    correct?

3    A.  Yes.

4    Q.  Okay.  Let's take a look at Defense Exhibit 514 in

5    evidence.

6            And this is dated September 21, 2016, from Nate

7    Batty, and you're listed, I believe, in the "To" line,

8    Curtis Heide, correct?

9    A.  Yes, sir.

10   Q.  And attached to this document is an assessment.  And I'm

11   just going to blow out the assessment, just the top of it.

12           It's a couple-page document.  Agent Hellman has

13   spoken about it.

14           But for your purposes, on the 21st you're advised,

15   ECOU -- which is the cyber division, correct?

16   A.  Yes.

17   Q.  -- "assesses there is no cyber equity in this report and

18   the research conducted in the report reveals some

19   questionable investigative steps taken and conclusions

20   drawn."

21           And then it lists the observations that it's based

22   on, correct?

23   A.  Yes.

24   Q.  And you talked a little bit about that, but you were

25   summarizing what they believed the deficiencies in the white

1     paper were, correct?

2     A.  Yes.

3     Q.  You don't know, do you, Mr. Heide, whether either Batty

4     or Hellman spoke with the author of the white paper?

5     A.  I do not.

6     Q.  All right.  And do you know whether they knew who the

7     author of the white paper was?

8     A.  I do not.

9     Q.  You expect, if they knew who the author of the white

10    paper or the source of the information was, they would have

11    told you?

12    A.  Yes.

13    Q.  Now, let's take a look at a demonstrative that I'm going

14    to be showing to the jury.  That was Defense Exhibit 514,

15    which is September 21st.  So what we're going to do with

16    this is build as we go along.

17              That was September 21st, and that is a cyber

18    assessment that you received, correct?

19    A.  Yes.

20    Q.  Next, later that day you get a Lync message from -- or

21    there's a Lync message that's in evidence from Bill

22    Priestap, DX515.

23              MR. BERKOWITZ:  Let's take a look at that.  And I

24    want to blow out the fifth through the eighth line, I think.

25    Q.  This is, again, September 21st.  Let's take a look at

1       it.

2                   It says Joe Pientka to CA Heide, correct?

3       A.  Yes.

4       Q.  And just tell the jury, if you would, who those people

5       are, Pientka and Heide.

6       A.  Pientka was the supervisor.  That's Joe Pientka.  He was

7       a supervisor at the Crossfire Hurricane team.

8                   And CA Heide, that's me.

9       Q.  Okay.  And he tells you initially on the 21st, "people

10      on the 7th floor to include Director are fired up about this

11      server," correct?

12      A.  Yes.

13      Q.  And he says, "Did you guys open a case?  Reachout and

14      put tools on?"

15                  And "if not, I will call Dan as Priestap says it's

16      not an option - we must do it."  Correct?

17      A.  Yes.

18      Q.  And you say, "Roger.  We're opening a CI case today."

19      Correct?

20      A.  Yes.

21      Q.  So based on what Mr. Priestap told you, you kind of had

22      no choice but to open a case, correct?

23      A.  I'm sorry, Priestap or...?

24      Q.  What Pientka told you about Priestap, I'm sorry.

25      A.  Yes.

1    Q.  And a full case was opened up, you said, right?

2    A.  Yes.

3    Q.  And you ran through -- there's a full -- there's an

4    assessment -- there's a full, a preliminary, and an

5    assessment, right?

6    A.  Correct.

7    Q.  Now, let's just talk a little bit about the differences

8    between a preliminary and a full investigation, okay?

9    A.  Yes.

10   Q.  What additional things are available to you, as an

11   agent, to investigate if you have a full as opposed to just

12   a preliminary?

13   A.  I would have to actually look at our matrix that lists

14   all the investigative tools.  There are certain sensitive

15   investigative techniques or -- I'm blanking on the term, but

16   certain sophisticated techniques that are available only in

17   full investigations.

18   Q.  Such as a search warrant?

19   A.  Yes.

20   Q.  A wiretap?

21   A.  Yes.

22   Q.  Anything -- let me ask it this way:  Is there anything

23   that's available in a full that is not available in a

24   preliminary that you did in this investigation?

25   A.  In this particular investigation, no.

1    Q.  So if it had been opened as a preliminary, you would

2    have been able to take all the steps that you took in this

3    case, correct?

4    A.  Yes.

5    Q.  And I think you said with a full you can keep it open

6    for six months or longer, correct?

7    A.  With a full, there's no -- there's no duration, no time

8    limit duration, right.

9    Q.  But with a preliminary, there's a six-month window?

10   A.  Yes.  With an availability to extend with SAC

11   authorization.

12   Q.  And in this case, the investigation was open for less

13   than six months, right?

14   A.  Yes.  From the opening to the closing, yes.

15   Q.  September to January.  I think that's about four --

16   A.  Yes.

17   Q.  -- four months?

18   A.  Yes.  It was held open in an administrative capacity due

19   to an evidence issue.

20   Q.  Couldn't figure out who to return the thumb drives to?

21   A.  Yes.

22   Q.  All right.  So we've now -- let's take a look at our

23   timeline.

24           Still on the 21st, you get the cyber assessment.

25   Priestap says it's not an option.

```
1              And then on the 22nd --

2              MR. BERKOWITZ:  If we can just show you Defense

3      Exhibit 520.

4      Q.  And this is another Lync server from you to Mr. Pientka.

5      We looked at this on your direct.

6              And you say to him, "I just talked to cyber

7      division.  We're leaning towards this being a false server

8      not attributed to the Trump organization.

9              "We'll run it down."

10             Right?

11     A.  Yes.

12     Q.  Mr. Pientka is not that sophisticated when it comes to

13     cyber issues and needs -- you joke with him and say you'll

14     explain it with crayons.  But that's a joke, right?

15     A.  I believe it was, yes.

16     Q.  And so at least your initial assessment, on a quick

17     look, is maybe the server that they'd suggested associated

18     with Trump isn't even associated with him, right?

19     A.  That was one of our initial thoughts, yes.

20     Q.  And then you ultimately ran it down --

21             MR. BERKOWITZ:  And let's move that into evidence.

22     I'm -- it's in evidence, I believe, so we can publish it.

23     It was shown -- well, we'll move it into evidence.

24             MR. ALGOR:  No objection.

25             THE COURT:  So moved, if it's not already in.
```

1    Q.  Okay.  So leaning towards it being a false server.

2                MR. BERKOWITZ:  Let's now take a look at Defense

3    Exhibit 521.

4                And I'd move that into evidence while the witness

5    is looking at it.  It's another series of Lync messages.

6                MR. ALGOR:  No objection.

7                THE COURT:  So moved.

8                MR. BERKOWITZ:  And publish that.

9    Q.  And you relatively quickly determined it was a

10   legitimate Trump domain, correct?

11   A.  Yes.  I think that came from -- after our conversation

12   with Central Dynamics.

13   Q.  Okay.  Well, let's take a look at that time.

14               MR. BERKOWITZ:  And we'll put up 537 and actually

15   turn to Pages 10 and 11 of that.

16   Q.  In the first email I think it talks about this, so let's

17   take a look at this.  This is in evidence.  This is the

18   discussion with CenDyn.

19               MR. BERKOWITZ:  And if we could go, Mr. Cleaves,

20   to the portion where they reference that they checked, and

21   it was a legitimate server.

22   A.  (Witness reviews document)

23   Q.  And you'll see it says that research revealed that it

24   was registered to Central Dynamics and that it was a

25   legitimate server.  That's what it was based on, correct,

```
1    sir?

2    A.  I'm sorry, what was the question again?

3    Q.  That this is how you determined it was a legitimate

4    server, by talking to CenDyn, correct?

5    A.  Yes.

6    Q.  And not you, but the Miami case agents?

7    A.  Yes, the Miami agent.

8    Q.  Okay.  Let's go back and take a look at our timeline.

9              So let's build that out.  We saw you were leaning

10   towards it being a false server.  There was that update we

11   just saw, and then you Lync'd Mr. Pientka to say it's a

12   legit domain, right?

13             So this is still within a couple of days of first

14   receiving the information, right?

15   A.  Yes.

16   Q.  And then the next day we saw -- the 23rd was the day of

17   the opening EC with a typo, DOJ, in it, right?

18   A.  Yes.

19   Q.  So we'll put that up there.

20             And on the 26th -- do you remember anything,

21   sitting here today, that happened between the 23rd and the

22   26th, sir?

23   A.  Not right offhand.

24   Q.  Okay.  And on the 26th, let's take a look, just to you,

25   at Exhibit -- Defense Exhibit 804.
```

```
1              MR. BERKOWITZ:  And I'd move that into evidence.
2      This is another series of Lyncs.
3              MR. ALGOR:  No objection.
4              THE COURT:  So moved.
5      Q.  So on the 26th, you are communicating the last three
6      portions there with Mr. Sahaw, correct?
7      A.  Yes, that's Sierra Shaw.
8      Q.  Who is that?
9      A.  She was an analyst at FBI headquarters.
10     Q.  And you say to her, "apparently it's going to hit the
11     times?"
12              Do you see that?
13     A.  Yes.
14     Q.  Were you referring to the potential for a story on the
15     Alfa-Bank issues to hit *The New York Times*?
16     A.   I believe that's what we were preparing for, yes.
17     Q.  Were you aware that the person who brought the
18     information to the FBI had also brought the information to
19     the *New York Times*?
20     A.   I don't believe I was, but I believe the urgency was
21     relayed to me possibly through a conversation with Joe
22     Pientka.
23     Q.  Wanting to say let's get our -- let's see what we can
24     do, because we don't want it to hit *The New York Times*
25     before we've had a chance to at least understand what may be
```

1   here, correct?

2   A.  I believe our -- yes.  I believe the FBI wanted to

3   investigate this because, if it actually hit the media, then

4   potentially the alleged activity might cease to occur or go

5   away.  We wanted to be able to investigate it.

6   Q.  So it was helpful to your investigation, at least, that

7   you had the information before it was public, right?

8   A.  Yes.

9   Q.  Okay.  And you then say, "just making sure we're all on

10  the same page with where we're at.  Not sure what else we

11  can find on that thing."  Correct?

12  A.  Yes, that's what I said.

13  Q.  And so your assessment, at least at this point, five

14  days into the investigation, is:  Not sure what else we can

15  do; I want to make sure we're on the same page.  Right?

16  A.  Yes.

17  Q.  And do you remember saying that you thought it was a

18  bunk report?

19  A.  Yes.

20  Q.  Okay.  Let's take a look at Defense Exhibit 803, same

21  day.

22          MR. BERKOWITZ:  And I'd move that into evidence.

23          MR. ALGOR:  No objection.

24          THE COURT:  So moved.

25  Q.  And you send Agent Hellman, who we heard from earlier in

1   this trial, "no pressure on us, but the article is going to

2   hit *The New York Times* soon....hope our assessment is

3   good...."  Correct?

4   A.  Yes.

5   Q.  And then you then say, "I just briefed up to the AD-

6   level that we still think it's a bunk report" -- or that "we

7   think it's a bunk report still," correct?

8   A.  Yes.

9   Q.  That was your assessment as of September 26th, correct?

10  A.  Yes.

11  Q.  And you told some senior people that, right?

12  A.  Yes.

13  Q.  And at that point the extent of what was done was your

14  reliance, from an investigative standpoint, on what Agent

15  Hellman had done, correct?

16  A.  Yes.

17  Q.  Let's take a look at -- well, one other thing.

18          And one of the things, probably -- what is the

19  most logical thing at this point to get more information

20  that you would have done as an agent, if you had the

21  opportunity, on September 26th?

22  A.  With respect to...?  I'm not sure I'm following --

23  understanding the question.

24  Q.  Okay.  Let me ask it in a leading way then.

25          Sir, isn't the next logical step or one of the

1    next logical steps in an investigation like this to say:

2    Hey, can we talk to the person who provided the information?

3    A.  Yes.

4    Q.  Okay.

5    A.  Interview the original source of the information.

6    Q.  That is like -- I mean, with no disrespect, even Agent

7    Sands would know that, right?  That is a clear, obvious

8    thing to do here, right?

9    A.  Yes.

10   Q.  And, in fact, you asked to do it.  And let's take a look

11   at Defense Exhibit 801.

12           MR. BERKOWITZ:  And I'd move this into evidence,

13   if it's not already in evidence.

14           MR. ALGOR:  No objection.  It's already in.

15           THE COURT:  I think it's already in.

16   Q.  And so Mr. Pientka, you say, "We want to interview the

17   source of the white paper?

18           "Any chance of that?"

19           Correct?

20   A.  Yes.

21   Q.  Now, a couple of things before we go into some further

22   detail, but tell us about your relationship at the time with

23   Joe Pientka.

24   A.  Joe was the supervisor on the Crossfire Hurricane team,

25   and I had worked with him for two weeks out in Washington,

1    D.C. and then was supporting the Crossfire Hurricane team

2    from Chicago at this time.

3    Q.  And did you have a good relationship with him?

4    A.  I would say yes.

5    Q.  You trusted him?  Respected him?

6    A.  Yes.

7    Q.  And you didn't hear back from him in response to this.

8    You don't recall ever hearing a positive or negative

9    reaction to this request, correct?

10   A.  Not that I remember.

11   Q.  But you believed, even at this time on the 26th, that

12   the investigation of the case smelled from the beginning,

13   right?

14   A.  I did say that, yes.

15   Q.  And you wanted to, therefore, interview the source,

16   right?

17   A.  Yes.

18   Q.  And you expressed frustration to Agent Sands about your

19   inability to interview the source of the white paper, right?

20   A.  Yes; the original source that provided it to us, yes.

21   Q.  And more of that, but let's assume that there was an

22   original source who provided the white paper, but that

23   source got it from somebody else.  If you'd known that, you

24   would have wanted to interview both the source and the

25   original source, correct?

1    A.  Yes.

2    Q.  The author of the white paper?

3    A.  Yes.

4    Q.  And do you know whether Special Agent Pientka at that

5    time knew the source of the white paper?

6    A.  I do not.

7    Q.  Would it surprise you that he was aware at that time

8    that the source of the white paper had Democratic

9    connections?

10   A.  I was not aware of that.

11   Q.  Is that something you would have wanted to know?

12   A.  Yes, I would have wanted to know that.

13   Q.  Something you would have expected Special Agent Pientka

14   to share with you?

15   A.  Yes.

16   Q.  Let's take a look at Defense Exhibit 511.

17           MR. BERKOWITZ:  And I'd move that into evidence.

18           MR. ALGOR:  No objection.

19           THE COURT:  So moved.

20   Q.  All right.  Do you know who B. Gessford is?

21   A.  Yes.  That's Ben Gessford.

22   Q.  Okay.  Who is he?

23   A.  He's retired now, but he was an agent assigned to the

24   Crossfire Hurricane team.

25   Q.  Okay.  And this is something from the 19th, the day the

1    information was brought in, and it says -- and it's to

2    Mr. Pientka, correct?  It appears to be?

3    A.  Yes, from Ben to Joe.

4    Q.  And it says, "Heads up.  Moffa over here with some info

5    that was dropped off to GC Baker this a.m."

6           Who is Moffa?

7    A.  That would be Jon Moffa.

8    Q.  Okay.  And it says, "Essentially a lawyer representing

9    DNC and Clinto brought an envelope to GC Baker this a.m.

10   with info that a private cyber group had identified an IP

11   associated with Trump company (not necessarily campaign) is

12   using a computer in a hospital in Michigan to talk to a

13   Russian bank.  Nobody knows what that means but Moffa is

14   going to drop the packet at Cyber Division because the

15   lawyer said he also gave the info to the media and it will

16   go public on Friday."

17          You were not aware of that, I take it, sir.

18   A.  No.

19   Q.  And that's something you would have wanted to know,

20   correct?

21   A.  Yes.

22   Q.  And, in fact, you asked to speak to the source, correct?

23   A.  Yes.

24   Q.  You asked Mr. Pientka, correct?

25   A.  Yes.

1    Q.  So let's go back to our timeline.

2            Within a week of the information being dropped

3    off, you'd taken some steps, and you've asked to speak to --

4            MR. BERKOWITZ:  We can put up the next one.

5    Q.  -- speak to the source, and you never heard back,

6    correct?  Never heard back on that request, correct, to

7    speak to the source?

8    A.  Not that I can recall.

9    Q.  Well, sir, if you -- to the extent that you heard

10   anything, it was no, right?

11   A.  Yes.

12   Q.  Because if they told you you could, you would have

13   interviewed the source, correct?

14   A.  Yes.

15   Q.  All right.  Let's now take a look ahead, I think, at

16   Defense Exhibit 546.

17           And this is just reflecting, sir --

18           MR. BERKOWITZ:  Let me move it into evidence.

19   It's another series of Lync messages.

20           MR. ALGOR:  No objection.

21           THE COURT:  So moved.

22   Q.  Okay.  And this is reflecting from Allison Sands --

23   you're not on it, but it shows that she got the logs from

24   CenDyn, correct?

25           An analysis of the logs was something that you

1    guys wanted to do in connection with this investigation,

2    right?

3    A.  Yes.

4    Q.  And she was reporting that -- she ultimately reported

5    that to you as to what was going on with the logs, correct?

6    A.  Yes.

7    Q.  You didn't yourself review the logs to see anything,

8    right?

9    A.  No.

10   Q.  Okay.

11   A.  I may have looked through them, but we had a computer

12   scientist assigned to review the logs.

13   Q.  You're not a DNS expert, right?

14   A.  I'm not.

15   Q.  And you would rely on others to help tell you what you

16   could draw from that, correct?

17   A.  Yes.

18   Q.  So going back to our timeline.

19          On September 30th, the logs have arrived.  Still

20   haven't interviewed anybody and don't know the source.

21   We're now about nine days in.

22          And then let's take a look at Defense Exhibit 532,

23   which is an email from Mr. Grasso.

24          So on the 2nd of October, Mr. Grasso sends

25   Mr. Wierzbicki some information called "Anonymous Reporting

1    on DNS Data."  Do you see that?

2    A.  Yes.

3         MR. BERKOWITZ:  And I'll -- just for a minute,

4    Mr. Cleaves, could you blow it out and show Agent Heide that

5    he received this document, middle there.

6    Q.  So he sends this to you, and Allison's saying, "I hope

7    this makes sense to you guys," right?

8    A.  Yes.

9    Q.  Okay.  Let's go back and see what the email says.

10        "Hello" -- and remind the jury who Agent

11   Wierzbicki is.

12   A.  He was our supervisor in Chicago on the squad that

13   Allison and I worked on.

14   Q.  Okay.  And Tom Grasso sends an email that says, "Hello,

15   Dan, how is Chicago treating you?  That was my first office

16   and I do miss the place.  It's an awesome city."

17        Parenthetically, I agree with that.  But we'll go

18   back to this.

19        And it says, "Keith contacted you on Friday

20   concerning some anonymous reporting we received related to a

21   matter you may be working.  I don't have many details but

22   from what I understand you were provided with some info

23   having to do with a *New York Times* story involving the

24   upcoming election.  There is one bit of data which was not

25   provided and that is the IP address of the person of

1   interest at the bank.  Here's the additional information

2   that an anonymous reporter requested by provided to the

3   FBI."

4              Do you see that?

5   A.  Yes.

6   Q.  And do you remember getting that at or around the time,

7   sir?

8   A.  Yes.

9   Q.  And do you remember whether, in fact, anybody followed

10  up with Grasso about getting that information?

11  A.  I don't believe we did.

12  Q.  All right.  Let's take a look at I think Defense Exhibit

13  533, which is in evidence.  I believe I saw that the other

14  day.  And it's between Tom -- well, take that down for a

15  second.  We'll come back to that.  That's my bad.

16              So you don't believe anybody followed up on the

17  anonymous reporter?

18  A.  I don't believe we did because when it was provided to

19  us this was yet another instance of headquarters telling us:

20  Here's more data; Here's some IP addresses; Do what you can

21  with it, but this is coming from a person that doesn't --

22  that wants to remain anonymous.

23  Q.  Okay.  But sometimes somebody wants to remain anonymous,

24  but you at least had Tom Grasso, and you can say:  Hey, Tom,

25  who is this person that came to you?  Can you talk to him or

1    her and see whether they're willing to talk with us, even if

2    on background, and we'll protect their anonymity.

3              You could have done that, right?

4    A.  We could have done that, yes.

5    Q.  And that's something that is done sometimes.  Just

6    because someone initially wants to remain anonymous doesn't

7    mean they will, if an agent pushes them.  Correct?

8    A.  Correct.

9    Q.  And would it surprise you to know that the individual

10   who provided that additional information was also one of the

11   sources of the information that had been provided to the FBI

12   on September 19th?

13   A.  It would not surprise me, no.

14   Q.  And so wanting to talk to that person, I'm just not

15   clear why you wouldn't have pressed to at least try and get

16   more information.

17   A.  I think there were several reasons.  I think we reached

18   out to FBI headquarters, and we were told no, that

19   interviewing the original source was not an option.

20              And then it appeared that we were getting more and

21   more information from people who were anonymous, and

22   headquarters was not giving us the -- you know, the ability

23   to go interview these people.

24   Q.  Fair to say that was pretty frustrating for you?

25   A.  Yes, sir.

1    Q.  It interfered with your ability to do a full

2    investigation?

3    A.  It was important for us to interview the source.

4    Q.  So you did follow up after receiving that email, not to

5    Tom Grasso but to Ryan Gaynor?

6            MR. BERKOWITZ:  And let's take a look at 5 --

7    we'll do Government Exhibit 265, which is also Defense

8    Exhibit 537.

9    Q.  And this is on October 3rd.  And you'll see a request

10   that says, "Dan" -- I'm sorry, to Ryan Gaynor -- "we really

11   want to interview" -- we'll find it in a second, I'm sorry.

12           So this is again October 3rd, and you say:  We got

13   the logs.  We'll look for these IPs.

14           Do you remember on direct that was a reference to

15   the logs that Tom Grasso, through this anonymous source, put

16   in?  Correct?

17   A.  Yes.

18   Q.  And you say, "We really want to interview the 'source'

19   of all this information.  Any way we can track down the

20   guy" -- "who this guy is and how we're getting this

21   information?

22           "Curtis."

23           You did that because it was important to you to

24   get that information, correct?

25   A.  Yes.  And I believe this was a direct result of having

1    received that email from Tom Grasso.

2    Q.  And the -- you didn't know at the time, but the person

3    providing the information, Tom Grasso, was not the person

4    who walked it into the FBI.  Were you aware of that?

5    A.  We did not know that, but I think at this point in the

6    investigation we were starting to surmise that.

7    Q.  So Wierzbicki adds on top of what you said on October

8    3rd, "I agree with Curtis...an interview with the source

9    would be" -- "an interview with the source of the info would

10   be the logical step in this (as well as any) investigation.

11   It may allow us to understand the what and the why of the

12   white paper."  Correct?

13   A.  Yes.

14   Q.  And Mr. Gaynor replied, "Got it and being discussed at

15   HQ.  Before we make any decisions on that front, we will

16   need to know what we can learn from the logs we have now

17   obtained regarding the nature of the actual activity between

18   Alfa-Bank and the domain/server."  Correct?

19   A.  Yes.

20   Q.  Okay.  That was not your assessment, right?  You

21   believed that talking to the source at that time would have

22   been helpful, correct?

23   A.  Yes.  I believe we were reaching our logical conclusion

24   with this investigation, and we wanted to interview the

25   source.

1    Q.  So by October 3rd you're reaching a logical conclusion,

2    and really the only helpful information would be to talk to

3    the source, right?

4    A.  I believe that's what we were wanting to do, yes.

5    Q.  Now, no one ever responded to that other than that email

6    that we'll get back to, right?

7    A.  With respect to interviewing the source?

8    Q.  Correct.

9    A.  Yes, the one that I received from Ryan.

10   Q.  The one from Ryan saying "being discussed at

11   headquarters."  That was the last you recall hearing from

12   headquarters on whether they would share with you the

13   identity of the source to speak to, correct?

14   A.  Yes.

15   Q.  Now, in cyber cases, it's relevant to you, as the

16   investigator, where the data or the allegation came from,

17   correct?

18   A.  Yes.

19   Q.  And you want to understand where the data was collected,

20   how it was being collected in order to accurately determine

21   whether there was a legitimate threat or not, correct?

22   A.  Yes.

23   Q.  You want to know the underlying source of the

24   information and whether or not it's being provided in terms

25   of someone having a motivation, right?

```
 1    A.  Yes.
 2    Q.  And if you had interviewed the source, you could have
 3    asked them that information, correct?
 4    A.  Yes.
 5    Q.  And you're pretty good at your job?
 6    A.  I don't know about that.
 7    Q.  You've been doing it 16 years?
 8    A.  Yes.
 9    Q.  Are you a good investigator?  You're not sure?
10    A.  I'm an investigator.
11    Q.  Okay.  You certainly knew what questions to ask, right?
12    You could have said:  Hey, why are you doing this?
13    A.  Yes.
14    Q.  It doesn't take a super special agent to come up with
15    questions for someone, correct?
16    A.  Yes, we had questions that we --
17    Q.  In fact, Allison Sands was fired up to do the interview,
18    right?
19    A.  I don't remember.
20    Q.  Do you remember telling them that, the government?
21    A.  I don't right offhand.
22    Q.  If you knew that someone went to the FBI and provided
23    information that had been given to them by somebody else,
24    you would have wanted to talk to both the person who went
25    into the FBI as well as the person who provided it to the
```

1  person that went to the FBI, right?

2  A.  Yes.

3  Q.  The person -- the original source would have been the

4  most important person to talk to from a data standpoint,

5  correct?

6  A.  The original source that collected the data, yes.

7  Q.  And with respect to the person who went into the FBI

8  with the information, you would have generally done what's

9  called a baseline check, right?

10  A.  Yes.

11  Q.  A record check generally to see whether that person has

12  provided reliable information in the past, right?

13  A.  Yes.

14  Q.  All right.  And with respect to the original source, the

15  collector of the data, wanting to interview that to see how

16  it was collected, correct?

17  A.  Yes.

18  Q.  And any other questions about the reliability of the

19  data and those people's motivation or that person's

20  motivation, right?

21  A.  Yes.

22  Q.  Now, in your experience, if your fellow agents or

23  officials at FBI headquarters know who the source is, it's

24  something they would typically provide to you as the case

25  agent.  Correct?

1   A.  I would assume so, yes.

2   Q.  And you never gave any insight in this case as to why

3   that information wasn't provided to you, correct?

4   A.  No.

5           MR. BERKOWITZ:  Let's go back to our timeline.

6   Q.  So on October 2nd, when you're getting near the logical

7   conclusion of the investigation, you get an email from

8   Grasso.  And then on the 3rd you make the request to speak

9   to the sources, correct?

10  A.  Yes.

11  Q.  And at that point are you aware of whether Agent Sands

12  is continuing to have discussions with people like Scott

13  Hellman?

14  A.  I believe we had ongoing discussions with Scott Hellman

15  throughout this.

16  Q.  And do you think that Agent Sands took this

17  investigation seriously?

18  A.  Yes.

19          MR. BERKOWITZ:  Okay.  Let's take a look at

20  Defense Exhibit 534.

21  Q.  So this is a Lync message that came in evidence

22  yesterday, and I just want to focus on the second page.

23          MR. BERKOWITZ:  Okay.  You can blow that up.

24  Q.  And this is between Agent Sands and Hellman, just to be

25  clear, Mr. Heide.  It's not something that you're on, but it

```
1    is in evidence.
2              And she says on October 4th, "I get to mark off
3    open/close on a case on my logbook!  So that's something."
4              And she said, "Thanks again for all your help."
5              Hellman writes back, "LOL no problem."
6              And he then writes, "Any chance you get to work on
7    something like this that truly has 0 repercussions, if you
8    mess it up....take those opportunities."
9              Do you see that?
10   A.  I do.
11   Q.  Were you aware that they were discussing the case in
12   those tones at that time?
13   A.  I was not.
14   Q.  Would that be inappropriate?
15   A.  This is not something that I would say.
16   Q.  All right.  So let's -- that's October 4th.  Let's see
17   what else is happening on October 4th.
18             There's another email from Agent Grasso, and let's
19   take a look at DX533.
20             MR. BERKOWITZ:  Can you blow that out?
21   Q.  And this is in evidence.
22             So after the initial communication from Agent
23   Grasso where he provided additional information from an
24   anonymous source, he says, "Hello Allison, I have a private
25   sector SME who can help give context to the data we
```

1    discussed.  Let's discuss sometime tomorrow.

2              "Thanks.

3              "Tom."

4              Do you see that?

5    A.  Yes.

6    Q.  Can you tell the jury what "a private sector SME" is.

7    A.  An SME would be a subject matter expert.

8    Q.  Okay.  And private sector subject matter experts can be

9    helpful in an investigation, correct?

10   A.  Yes.

11   Q.  Particularly if they can give context to the data that

12   you're analyzing, right?

13   A.  Yes.

14   Q.  If you had seen this email -- and I don't have anything

15   right now.  I'm not trying to trick you.

16              But if you had seen this, you would have suggested

17   that -- Agent Sands that she take Grasso up on talking to

18   the private sector subject matter expert?  Would you have

19   expected that to be something that was done?

20   A.  Possibly.

21   Q.  Okay.  Why wouldn't you?

22   A.  I think we would have to have a conversation with Tom

23   about it.  I don't know.  I wasn't part of this so...

24   Q.  He says, "let's discuss tomorrow," right?

25   A.  Yes.

1    Q.  And then Allison says, "sounds great."

2            Do you know whether that conversation ever

3    happened?

4    A.  I don't, but I knew -- no, I don't know whether they

5    talked.

6    Q.  Okay.  It would have been logical to take him up.  He

7    was offering somebody up, right?

8    A.  Yes.

9    Q.  And you don't know whether that happened or whether you

10   were aware of that particular interaction, correct?

11   A.  Correct.

12   Q.  Let's take a look at our timeline.  And we're making

13   good progress on it.

14           October 5th -- October 4th, that was the second

15   email from --

16           MR. BERKOWITZ:  You can hit the next one,

17   Mr. Cleaves.

18   Q.  -- second email from Mr. Grasso offering up the subject

19   matter expert to help with the data, correct?

20   A.  Yes.

21   Q.  And then you got the -- the investigation got

22   information from a confidential human source, correct?

23   A.  Yes.

24   Q.  Okay.  And just remind the jury what a confidential

25   human source is.

1    A.  It would be someone who provides data to the FBI or

2    information to the FBI on a confidential level.

3    Q.  And are they typically -- are confidential human sources

4    typically that the FBI has, there's a reliability to them,

5    or they wouldn't be -- they wouldn't be kept open?

6    A.  Yes, reliability and suitability.

7    Q.  If there's a confidential human source, that means

8    that's somebody that the FBI has deemed to have historically

9    provided reliable advice, correct?

10   A.  Yes.

11   Q.  So let's take a look at Defense Exhibit 538.

12           And, again, this is -- we can look at the top of

13   it; on our timeline, we're on October 5th -- from Allison

14   Sands to a variety of people.  And you are copied on it,

15   correct?

16   A.  Yes.

17   Q.  And during this time period, while you're busy with a

18   lot of cases and Agent Sands is running with things, does

19   she brief you daily on what's going on?

20   A.  I believe we had conversations with headquarters --

21   Q.  And --

22   A.  -- and updates with headquarters, status meetings.

23   Q.  And you didn't --

24   A.  I would --

25   Q.  -- everything she did, even though she --

1          THE COURT REPORTER:  Can you start again, please.

2    Q.  This wonderful woman is trying to take down what we're

3    saying, and we can't talk over each other, and I think that

4    was my fault, so we'll be careful.

5          My question is:  You didn't participate in every

6    interview and investigative step that Agent Sands took,

7    correct?

8    A.  No.

9    Q.  She would take the steps and report to you what was

10   going on, correct?

11   A.  Yes.

12   Q.  So this is an October 5, 2016, communication that says

13   "Status update on Alfa-Bank case," correct?

14   A.  Yes.

15   Q.  So let's take a look at it.  It says, "Good afternoon.

16   We have several important updates and I want to make sure

17   everyone is on the same page.

18          "We spoke to a CHS who said he was contacted by

19   David Dagon at Georgia Tech to provide technical analysis on

20   the white paper."  Correct?

21   A.  Yes.

22   Q.  "He believed the white paper was credible, and was going

23   to share that assessment this afternoon with the *Washington*

24   *Post*.  Prior to his interview with the *Washington Post*, he

25   was speaking to representatives of the Trump Organization

1   who wanted to 'explain their side of the story.'"

2             And it then goes on to say, "Claims of suspicious

3   activity have already been debunked by our analysis of the

4   logs from Central Dynamics.  And other claims of suspicious

5   activity were in fact the result of investigative activity

6   taken by the FBI and Alfa-Bank."  Correct?

7   A.  Yes.

8   Q.  So let's just break that down a little bit.

9             There was a confidential human source who was

10  willing to -- who identified David Dagon as somebody who

11  could potentially provide technical analysis on the white

12  paper, correct?

13  A.  Yes.

14  Q.  And at least Mr. Dagon, according to this report,

15  believed the white paper was credible, correct?  That's what

16  it says.

17  A.  Yes.

18  Q.  And Agent Sands says that that's inconsistent with our

19  findings, essentially, correct?

20  A.  Yes.

21  Q.  And the FBI's findings at that point were the result of

22  logs that had been obtained from CenDyn, correct?

23  A.  Yes.

24  Q.  Not publicly available, right?

25  A.  Yes.

1   Q.  And then the FBI's own internal analysis of those logs,

2   right?

3   A.  Yes.

4   Q.  What the FBI didn't have was any conversation with the

5   person who had actually provided the underlying information,

6   to talk to them about why they drew the conclusions they

7   drew.  Right?

8   A.  Yes.

9   Q.  And next page, top bullet.  It reads:  "The

10  aforementioned confidential human source, as well as David

11  Dagan, are expected to directly contradict FBI assessments

12  and will report that there is credible evidence of covert

13  communications between Trump email servers and Alfa-Bank.

14  Their assessments do not change ours, but pose a challenge

15  in refuting their claims using only open source

16  information."

17       Do you see that?

18  A.  Yes.

19  Q.  Do you remember seeing that at the time?

20  A.  I remember this matter coming up at the time, yes.

21  Q.  Now -- and I'm going to try and summarize, but I want to

22  make sure that we're on the same page.

23       As you read this today, is it your understanding

24  that Agent Sands is communicating there are a confidential

25  human source as well as a named person who believe that the

1  allegations are credible, which are inconsistent with what

2  the FBI at this point had concluded, correct?

3  A.  Yes.

4  Q.  And the FBI's conclusions are based on information

5  that's not available to the public, correct?

6  A.  Yes.

7  Q.  All right.  And you don't know -- I mean, you've never

8  met Mr. Sussmann before, right?

9  A.  No.

10 Q.  You don't know what he knew or didn't know at this time

11 about the allegations one way or the other, right?

12 A.  Right.

13 Q.  You don't know whether Mr. Dagon had communicated to him

14 or anybody else, correct?

15 A.  Correct.

16 Q.  Now, and if we go down to the fourth bullet point, it

17 says, "We are going to speak with David Dagon, and see if he

18 has any new information for us."  Right?

19 A.  Yes.

20 Q.  And that makes sense to you, doesn't it, that the --

21 A.  Yes.

22 Q.  -- in an investigation where you were eager to speak

23 with the underlying source of the information, to have an

24 actual identified person who says they can provide

25 assistance, and they're at Georgia Tech, you would normally

1    say:  Yes, let's go talk to that person.  Right?

2    A.  Yes.

3    Q.  So we can take a look at Defense Exhibit 539, which is

4    also that same day, October 5th.  And this is between

5    Mr. Grasso and Ms. Sands.  And he says, "One other thing, I

6    told Dagon that you would be able to protect his identity

7    and that his name is not made public.  Please take that into

8    consideration when talking to him.  It may be more forthing

9    coming in a protect-identity type conversation."

10             Do you see that?

11   A.  Yes.

12   Q.  And Sands asks about clearance.  But was it your

13   understanding that Agent Sands was going to speak with

14   Mr. Dagon?

15   A.  I believe we had discussions about interviewing him,

16   yes.

17   Q.  And can you think of any reason why she wouldn't have

18   spoken with him?

19   A.  The one thing that I can think of is the information

20   that was coming from this source was the source was

21   reporting on information, new information or allegations

22   related to information that had surfaced regarding the

23   domain and the activity associated with this suspicious

24   activity as a result of what the FBI's activities were.

25             For example, when we interviewed CenDyn, CenDyn

1    updated their DNS tables, and that's something that this

2    source was reporting on.  And it appears that they were just

3    reporting on information that was related to FBI action or

4    activity or operational activity, and that the information

5    coming from the source was not anything that would provide

6    additional value as opposed to the -- additional value other

7    than what was being reported in open source information.

8    Q.  Okay.  Let's break that down.

9         First of all, you don't recall that discussion

10   actually happening at the time?

11   A.  No.

12   Q.  You're today trying to come up with an explanation as to

13   why somebody might not have spoken with them?

14   A.  Yes.

15   Q.  Okay.  And let me ask you this:  If Mr. Dagon was one of

16   the authors of the white paper, it would have made perfect

17   sense to talk to him irrespective of the potential

18   befuddling information that was coming out as a result of

19   the FBI's investigation, right?

20   A.  Yes.

21   Q.  So were you aware that the FBI believed or had reason to

22   believe he was one of the authors of the white paper?

23   A.  Based on the information that was in these emails, yes.

24   Q.  And you said that one of the things that was going on is

25   when the FBI started doing a couple of things that it did,

1    that sent messages out into the -- I won't call it the dark

2    web, but messages out that might have supported or appeared

3    to support the allegations.  For example, asking Alfa-Bank

4    about the servers could have caused them to take down the

5    servers, correct?

6    A.  Possibly.

7    Q.  And CenDyn updating its logs could have looked like

8    nefarious or bad activity, correct?

9    A.  Yes.

10   Q.  And so the FBI's own investigative techniques might have

11   made it more plausible to somebody on the outside that the

12   allegations were accurate, correct?

13   A.  Possibly.

14   Q.  I think Special Agent Sands said she didn't ultimately

15   talk to David Dagon.  Do you know one way or the other

16   whether anybody did?

17   A.  I do not.

18   Q.  And as one of the co-lead case agents, if somebody had

19   you would have expected to have been informed, right?

20   A.  Yes.

21   Q.  And what about that other confidential source?  Because

22   in addition to Mr. Dagon, there was this other confidential

23   source that was indicating that the allegations were

24   credible, correct?

25   A.  I don't believe we talked to that person either.

1   Q.  Now, let's take a look at 5 -- Defense -- let's go back

2   to our timeline.

3            So here we are.  That was up through October 5th.

4   On October 5th, Ms. Sands and Mr. Grasso discuss Mr. Dagon.

5   We just saw that.

6            Let's take a look at the next day, October 6th.

7   And this is Defense Exhibit 542, I believe.  Let me show it

8   just to you.

9            MR. BERKOWITZ:  And I'd move 542 into evidence.

10           MR. ALGOR:  No objection.

11  Q.  So this is the next day.  And there's reporting where

12  the confidential human source that nobody has talked to

13  provides some information that raises some questions,

14  correct?  Do you remember that?

15  A.  Yes.

16           MR. BERKOWITZ:  Let's take a look at that.

17           And I think we're, Mr. Cleaves, looking at the

18  information where they say that the value depends on the

19  data.

20  Q.  I think this is -- let me ask you, sir, generally -- one

21  second.

22           This is a further report, sir, from the

23  confidential human source.

24           MR. BERKOWITZ:  And if you'd blow out the relevant

25  portion, Mr. Cleaves, we'll take a look at that.

```
 1              Go down below.
 2    Q.  "And the CHS provided answers to questions regarding
 3    information previously provided." And that's from
 4    Mr. Trifiletti.
 5              MR. BERKOWITZ:  And you can take that down.
 6    Q.  Do you remember that generally, sir?
 7    A.  Yes.
 8    Q.  Do you remember anything specific about that?
 9    A.  I don't specifically.  Allison was handling this matter
10    with this agent.
11    Q.  Okay.  Let's take a look at Defense Exhibit 548.  And
12    this is an email from Ryan Gaynor on October 19th.  And it
13    says "Online information."  We see Mr. Wierzbicki, you, and
14    Joe Pientka, correct?
15    A.  Yes.
16    Q.  And there are some questions on that document, are there
17    not?
18              And let's take a look at those questions on --
19              MR. BERKOWITZ:  We'll move that into evidence,
20    548.
21              MR. ALGOR:  No objection.
22              THE COURT:  So moved.
23    Q.  So on October 19th, about a month after the allegations
24    were first brought to the FBI, "Team CG" -- that's Team
25    Chicago, correct?
```

1    A.  Yes.

2    Q.  And he says, "I have a few outstanding questions on my

3    tracking list regarding the Trump domain server in

4    anticipation of future AD and higher briefs of the matter,"

5    right?

6    A.  Yes.

7    Q.  So he's trying to say:  Where do we stand; let's get

8    some type of summary.  Right?

9    A.  Yes.

10   Q.  And first question, "On the information provided to the

11   FBI 'anonymously' on October 2, what has investigation found

12   regarding the 'Person of Interest' allegedly working at

13   Alfa-Bank with home IP addresses?"

14           That relates to the information that Grasso

15   provided on behalf of an anonymous source, correct?

16   A.  Yes.

17   Q.  And you had nothing further to report on that, correct?

18   A.  When this particular email was sent?  Is that --

19   Q.  Yes.

20   A.  I believe we could report up our findings on our results

21   of running those IP addresses through our holdings if --

22   Q.  But you still had not talked to the anonymous source,

23   correct?

24   A.  We had not.

25   Q.  And then the third question is, "Do we have reason to

1    believe David Dagon at Georgia Tech (my school) is the

2    author of the original white paper that started this

3    investigation?"

4           Right?

5    A.  Yes.

6    Q.  Did you have an answer to that question?

7    A.  I don't believe we did.

8    Q.  Okay.  And in part that's because nobody talked to him,

9    right?

10   A.  I believe that's -- I believe that's correct.

11   Q.  Okay.  Let's take a look at our timeline.  I think we're

12   drawing to the end of it.

13          Okay.  So, sir, do you remember anything

14   substantive from an investigative standpoint that happened

15   after October 19th?

16   A.  Not right offhand.

17   Q.  Okay.  I think near the end of your examination by

18   Mr. Algor he questioned you about your basis for concluding

19   that there was -- that the allegations were unsubstantiated.

20   And I think you gave four reasons.  I'm going to run through

21   them.  If there's more, that's okay.

22          Number one, you said the assessment done by Agents

23   Hellman and Batty.  Correct?

24   A.  Yes.

25   Q.  Two, the review of the logs.  Correct?

1    A.   Yes.

2    Q.   Three, the Mandiant conclusion.   Correct?

3    A.   Yes.

4    Q.   And four, the discussions with Spectrum Health about the

5    TOR node.   Correct?

6    A.   Yes.

7    Q.   Anything else that you can recall, sir, as to why it was

8    that your investigation, or rather the investigation that

9    you oversaw, suggested that the allegations were

10   unsubstantiated?

11   A.   The only other thing I can think of would be my training

12   and experience with -- relating to Russia and cyber

13   investigations.

14   Q.   And is there anything in particular about that that you

15   recall today?

16   A.   With respect to the white paper, it didn't -- when I

17   read through it initially, I had several questions, and it

18   didn't appear to be consistent with Russian TTPs.

19   Q.   And the thing that you would have wanted to do or things

20   that you felt were inconsistent would have been to talk to

21   the author and say:  Hey, help me understand.   Right?

22   A.   Yes.

23   Q.   And you weren't allowed to do that, right?

24   A.   No.

25   Q.   "No" meaning you weren't allowed to --

1    A.  We weren't allowed to interview the original source that

2    provided it to the FBI, no.

3    Q.  So with respect to the initial research done by Hellman

4    and Batty, we spoke about that.  That was something they

5    did, and you don't know what steps they took.  Correct?

6    A.  I do not.

7    Q.  In fact, Special Agent Hellman would be a much better

8    source for what they did than you, right?

9    A.  Yes.

10   Q.  And with respect to the review of the logs, although you

11   might have looked at them, the cyber analysts who actually

12   looked at those logs would be much better placed to tell us

13   what their conclusions were based on than you, correct?

14   A.  Yes.

15   Q.  And with respect to Mandiant, fair to say that you did

16   not speak with anyone at Mandiant, right?

17   A.  I did not.

18   Q.  I think that you said that Agent Sands may have spoken

19   with somebody there?

20   A.  I believe so.

21   Q.  And just to remind the jury, Mandiant was hired by Alfa-

22   Bank, correct?

23   A.  I believe that's correct.

24   Q.  And as a typical investigative step, if somebody makes

25   an allegation against a company, right, is the best source

1    of determining whether that allegation is true talking to

2    somebody who the company has hired?

3    A.  I think it would depend on the company.

4    Q.  Okay.  Well, the motivations of the company in hiring

5    Mandiant might be important, right?

6    A.  Yes.

7    Q.  And do you know what Mandiant was provided when they

8    went to go look into these allegations by Alfa-Bank?

9    A.  I do not.

10   Q.  Fair to say that it depends on the company; that you

11   would be more suspicious, in the summer of 2016, of a

12   company that had ties to Vladimir Putin.  Correct?

13   A.  I'm sorry, say that question one more time, please.

14   Q.  I think I said would you -- would you be suspicious of a

15   company -- you said -- remember I asked you, would talking

16   to somebody hired by the company to refute allegations be

17   the best source?  And you said:  It depends on the company.

18   Remember that?

19   A.  Yes.

20   Q.  So this company was Alfa-Bank, right?

21   A.  This company was Alfa-Bank, yes.

22   Q.  They hired Mandiant, right?

23   A.  Yes.  I was referring to the cyber security firm

24   Mandiant.  It depends on the cyber security firm that we

25   were dealing with.

1    Q.  But fair to say that Alfa-Bank at this time was a

2    company that you would have had great suspicions of given

3    its ties to Vladimir Putin, correct?

4    A.  Yes.

5    Q.  And were you aware, while you were doing the

6    investigation, that Mandiant, when it went to talk to Alfa-

7    Bank to look into these allegations, did not have any

8    historical data, that Alfa-Bank did not provide any

9    historical data to Mandiant?

10            Did you know that?

11   A.  No.

12   Q.  Were you aware that Alfa-Bank only saved logs for 24

13   hours?

14            MR. ALGOR:  Objection.

15            THE COURT:  Sustained.

16   Q.  Okay.  Let me show you, sir, DX567.

17            MR. BERKOWITZ:  Blow that up.  Don't publish it.

18   Q.  This is a 302.  Date of entry, April 3, 2017.  Do you

19   see that?

20   A.  Yes.

21   Q.  And I think early on in your testimony, when I asked

22   about Mandiant, you said there was some follow-on

23   investigation involving potentially Kirkland & Ellis, right?

24   A.  Yes.

25   Q.  Do you know that Agent Sands wrote a 302 in or around

```
 1    April of 2017 about the Mandiant investigation?

 2    A.  Yes.

 3            MR. BERKOWITZ:  Judge, I'd move it into evidence.

 4            MR. ALGOR:  No objection.

 5            THE COURT:  So moved.

 6    Q.  So I just want to focus on the second paragraph.  And it

 7    says, "MANDIANT was hired by ALFA BANK in September 2016 and

 8    investigate an allegation that ALFA BANK was engaged in

 9    covert communications with the TRUMP ORGANIZATION."

10            And it says, "When the MANDIANT investigative team

11    arrived, ALFA BANK did not have any historical data, and

12    only saved logs for 24 hours."

13            Do you see that?

14    A.  Yes.

15    Q.  That is not helpful for an investigation, is it, if they

16    did not have any historical data?

17    A.  It would depend on what's in those specific -- in that

18    data.  But no, it would not have historical data for us, for

19    this particular investigation.

20            MR. BERKOWITZ:  Okay.  We can take that down.

21    Q.  And you also talked about the Spectrum Health situation,

22    correct?

23    A.  Yes.

24    Q.  And you said that the discussions with Spectrum Health

25    didn't corroborate a TOR node, or something to that effect,
```

1   right?

2   A.  Yes.

3   Q.  You were not personally involved in contacting Spectrum

4   Health, were you?

5   A.  I was not.

6   Q.  And, in fact, when you spoke to the agents in this case

7   in 2020, you told them you couldn't recall if the

8   investigators ever reached out to Spectrum Health in

9   connection with the investigation, correct?

10  A.  Yes.

11  Q.  Now, Mr. Algor asked you a number of questions about if

12  you had known that the source of the information was

13  politically connected would it have mattered.  Remember

14  that?

15  A.  Yes.

16  Q.  If you had a chance to interview the source of the

17  information, would you have asked them those questions, sir?

18  A.  I think it would -- asked which question?  Can you ask

19  it one more time?  Sorry.

20  Q.  Asked whatever questions you wanted to about their

21  motives.

22  A.  Yes.

23  Q.  And if you had known they were a DNC attorney, would you

24  have asked questions about that?

25  A.  Yes.

1   Q.  And he asked would it have mattered if it had business

2   interests, right?

3   A.  Yes.

4   Q.  Who is the best person to tell you whether the source of

5   the information had business interests?

6   A.  The source of the information.

7   Q.  And, in fact, sir, if you had been able to talk to the

8   source of the information, you would have written a 302,

9   correct?

10  A.  Yes.

11  Q.  And you would have been able to ask them any questions

12  that you wanted, correct?

13  A.  Yes.

14  Q.  And whether you were a great investigator or a terrible

15  investigator, you would have gotten whatever answers you

16  wanted, correct?

17  A.  Yes.

18  Q.  And you were not allowed to speak to either the source

19  of the information, the author of the white paper, or the

20  person who provided the source of the information, the data,

21  correct?

22  A.  Correct.

23  Q.  And that made your investigation incomplete, did it not?

24  A.  Yes.

25          MR. BERKOWITZ:  Nothing further.

 1              MR. ALGOR:  Your Honor, can I have a moment on

 2      the...?

 3              THE COURT:  Sure.

 4              (The following is a bench conference

 5               held outside the hearing of the jury)

 6              MR. ALGOR:  So, Your Honor, there was a good

 7      amount of cross-examination regarding David Dagon.

 8              THE COURT:  Yes.

 9              MR. ALGOR:  And specifically asking about reaching

10      out to him and also going into that he was the source of the

11      white paper and what types of questions you would ask him

12      and all.  I think that this goes right to the red herring

13      email.

14              THE COURT:  I'm sorry, the what email?

15              MR. ALGOR:  The red herring email, which you've

16      previously excluded.  It was Government Exhibit 124, when

17      you would go through what type of questions.

18              Now that Mr. Berkowitz has asked these, I would

19      ask:  What would you have asked having to provide data

20      related to it?  You know, Were there drafts of the white

21      paper?  Would Agent Heide ask who else he communicated with

22      and what he believed regarding all of that data?  And so I

23      think he's opened the door regarding that email.

24              THE COURT:  I'm not quite remembering the email.

25      GX124?

```
 1              MR. ALGOR:  Yes.

 2              THE COURT:  Hold on.

 3              (Pause)

 4              THE COURT:  All right.  Unfortunately there's a

 5     gap in my binder from GX111 through 132.

 6              MR. BERKOWITZ:  And we're happy to publish it to

 7     discuss it, Your Honor, and I'm happy to be heard on it.

 8     Obviously not to the jury publish it.

 9              But, you know, this goes to their investigation,

10     not to the accuracy of anything, and they chose not to speak

11     with him to get this information.

12              THE COURT:  How long is your redirect?

13              MR. ALGOR:  Probably 20 minutes.

14              THE COURT:  20 minutes.  All right.  Why don't we

15     take our lunch break, and we'll resolve this issue, and then

16     you can start after lunch, okay?

17              MR. ALGOR:  Understood.

18              MR. BERKOWITZ:  And instruct him not to speak with

19     the witness on this.

20                  (This is the end of the bench conference)

21              THE COURT:  Ladies and gentlemen, we are going to

22     take our lunch break.  It is 12:25.  Let's reconvene at

23     about 1:30, okay?

24              No discussions about the case.  No research about

25     the case.
```

```
1              (Jury exits courtroom)
2              THE COURT:  All right.  You can step down, sir,
3    and just wait in the waiting area.
4              MR. BERKOWITZ:  And, Your Honor, just to let the
5    witness know, there is no communication -- I know everybody
6    knows that.
7              THE COURT:  Sir, no discussions about the case
8    during your break.
9              All right.  Do you have a copy of the email?
10             MR. ALGOR:  We can put it up on the screen, Your
11   Honor.
12             Can you just highlight No. 4?
13             Do you recall this email, Your Honor?
14             THE COURT:  Yes, vaguely.
15             So this is from Mr. Joffe to Mr. -- to the
16   researchers, essentially?
17             MR. ALGOR:  Correct.  And you had allowed the
18   email below it, but not this email.  And I think -- you
19   know, obviously the defense was raising, on cross-
20   examination, questions that go to really eliciting about the
21   state of mind of David Dagon, who was the drafter of the
22   white paper.  They've done that with Mr. Joffe in their
23   cross-examining questions.
24             And so this email clearly shows what the state of
25   mind was of Mr. Joffe at that time; and so when they're
```

1    going into questions about Mandiant, the accuracy of the

2    data, and their investigation, I think that this clearly

3    opens the door to this email.

4            THE COURT:  Okay.  Mr. Berkowitz?

5            MR. BERKOWITZ:  Judge, this is not an email that

6    was authored by Mr. Dagon.  My cross-examination went

7    directly to their investigation, who they spoke to, who

8    they didn't speak to.  I asked him, he doesn't know what

9    Mr. Dagon said to Mr. Sussmann, if anything, and he said he

10   didn't.  And I don't think that opening the door to these

11   communications where there's no indication that it went to

12   Mr. Sussmann is appropriate.

13           The motive issues are ones that they have done,

14   not us, Judge.  And my cross-examination was well within the

15   field of play relative to what they did and didn't do in

16   their investigation.

17           THE COURT:  Okay.  I'll think about it, and we'll

18   get you a ruling before the redirect, okay?

19           MR. BERKOWITZ:  And from a scheduling standpoint,

20   Judge, we have Mr. Novick that is coming up, and there are

21   some issues to talk about with respect to him.  We can do

22   those -- we can come back a little bit early, if you want.

23   However you want to handle it.

24           THE COURT:  Why don't we come back about five

25   minutes early.  So you all have not come to ground

1    completely on that issue?

2           MR. BERKOWITZ:  On a couple of things, but not on

3    issues such as, just to think about it, whether he can get

4    into Mr. Joffe's political motives, Mr. Joffe's business

5    motives, as well as conclusions that were drawn from the

6    collection of data that were obtained.

7           THE COURT:  Okay.  Let's -- go ahead.

8           MR. ALGOR:  And, as I said, Your Honor, I can

9    address each one of those exhibits that we're introducing

10   with Mr. Novick when we come back.

11          But just to be clear, we would be asking Agent

12   Heide the questions related to Mr. Dagon and the

13   understanding of the collection of the data and interviewing

14   the authors of the white paper.  And so those questions

15   would have come, and then this would be offered, if you had

16   understood that they believed that this was a red herring in

17   interviewing David Dagon, who is being offered by the

18   defense as one of the authors of the white paper.

19          And so that's where we're going with this, and we

20   think that they've clearly opened the door to that.

21          THE COURT:  I understand.  Why don't we come back

22   around 1:30.

23          (Lunch recess taken at 12:30 p.m.)

24

25

1        <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 24th day of May, 2022.

9

10                                   <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
13                                   Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'16** [2] - 1795:15, 1866:11
**'19** [4] - 1868:1, 1868:5, 1868:14, 1869:21
**'21st** [1] - 1871:12
**'anonymously'** [1] - 1911:11
**'explain** [1] - 1903:1
**'Person** [1] - 1911:12
**'secret'** [1] - 1823:2
**'source'** [2] - 1841:1, 1892:18

**/**

**/s/Lisa** [1] - 1925:10

**0**

**0** [1] - 1898:7

**1**

**10** [1] - 1878:15
**10020** [1] - 1780:20
**1030** [1] - 1826:16
**105** [1] - 1793:25
**11** [1] - 1878:15
**11:00** [1] - 1851:13
**124** [1] - 1920:16
**1271** [1] - 1780:19
**12:25** [1] - 1921:22
**12:30** [1] - 1924:23
**13-minute** [1] - 1803:7
**132** [1] - 1921:5
**145** [1] - 1780:15
**14:10:39** [1] - 1825:21
**14:11:07** [1] - 1826:16
**15th** [1] - 1855:21
**16** [5] - 1796:21, 1809:7, 1809:24, 1814:1, 1895:7
**16th** [2] - 1794:22, 1855:12
**17** [1] - 1790:17
**1784** [1] - 1781:4
**1791** [1] - 1781:4
**1801** [1] - 1783:12
**1802** [1] - 1783:13
**1806** [1] - 1781:5
**1808** [1] - 1781:6
**1851** [1] - 1781:7
**18th** [1] - 1856:11
**19** [8] - 1787:20, 1789:8, 1789:15, 1801:10, 1820:20, 1846:15, 1846:23, 1862:25

**19th** [11] - 1798:23, 1802:21, 1803:5, 1848:15, 1856:14, 1867:9, 1885:25, 1891:12, 1910:12, 1910:23, 1912:15
**1:21-cr-00582-CRC-1** [1] - 1780:4
**1:30** [2] - 1921:23, 1924:22

**2**

**2** [3] - 1868:9, 1868:10, 1911:11
**20** [2] - 1921:13, 1921:14
**200** [3] - 1817:5, 1820:16, 1861:13
**20001** [2] - 1780:24, 1925:13
**20002** [1] - 1780:15
**2006** [2] - 1810:1, 1810:2
**2009** [2] - 1810:2, 1810:5
**2016** [38] - 1785:24, 1787:20, 1789:8, 1789:15, 1792:9, 1793:6, 1793:17, 1794:22, 1795:3, 1795:6, 1795:23, 1796:15, 1796:21, 1797:11, 1798:8, 1798:21, 1798:23, 1800:11, 1801:10, 1802:21, 1803:8, 1805:19, 1810:13, 1810:21, 1811:1, 1813:3, 1814:6, 1820:20, 1846:15, 1846:23, 1854:9, 1858:20, 1859:1, 1863:1, 1872:6, 1902:12, 1915:11, 1917:7
**2017** [9] - 1790:18, 1790:20, 1806:24, 1845:4, 1847:9, 1866:9, 1866:11, 1916:18, 1917:1
**2018** [4] - 1864:21, 1865:1, 1866:20, 1869:19
**2019** [3] - 1810:17, 1854:16, 1857:24
**202** [1] - 1780:24
**2020** [5] - 1854:23, 1868:23, 1869:7, 1869:23, 1918:7
**2021** [3] - 1855:12,

**1870:18, 1870:20
**2022** [8] - 1780:4, 1804:10, 1804:21, 1855:23, 1856:2, 1856:11, 1856:14, 1925:8
**21** [1] - 1872:6
**21-582** [1] - 1782:3
**212** [2] - 1780:16, 1780:20
**217** [4] - 1822:15, 1829:9, 1829:13, 1832:22
**21st** [7] - 1803:8, 1872:14, 1873:15, 1873:17, 1873:25, 1874:9, 1876:24
**22nd** [2] - 1825:23, 1877:1
**233** [2] - 1845:15, 1867:1
**23rd** [2] - 1879:16, 1879:21
**24** [3] - 1780:4, 1916:12, 1917:12
**242** [6] - 1787:25, 1788:9, 1788:15, 1789:17, 1798:3, 1807:16
**249** [2] - 1825:10, 1825:17
**24th** [1] - 1925:8
**25** [1] - 1809:20
**257** [2] - 1835:1, 1835:8, 1835:10
**26** [1] - 1855:23
**265** [2] - 1836:10, 1892:7
**26th** [9] - 1836:4, 1841:5, 1879:20, 1879:22, 1879:24, 1880:5, 1882:9, 1882:21, 1884:11
**288** [3] - 1791:4, 1791:5, 1791:10
**29th** [1] - 1864:21
**2nd** [2] - 1888:24, 1897:6

**3**

**3** [4] - 1787:2, 1787:5, 1829:10, 1916:18
**30** [1] - 1809:20
**302** [3] - 1916:18, 1916:25, 1919:8
**302s** [2] - 1844:2, 1860:10
**30th** [1] - 1888:19
**333** [2] - 1780:23,

**1925:12
**354-3187** [1] - 1780:24
**3:00** [1] - 1796:24
**3A** [2] - 1787:13, 1787:21
**3rd** [9] - 1836:12, 1840:22, 1841:5, 1848:16, 1892:9, 1892:12, 1893:8, 1894:1, 1897:8

**4**

**4** [1] - 1922:12
**4th** [4] - 1898:2, 1898:16, 1898:17, 1900:14

**5**

**5** [3] - 1892:6, 1902:12, 1909:1
**511** [1] - 1885:16
**514** [2] - 1872:4, 1873:14
**520** [1] - 1877:3
**521** [1] - 1878:3
**532** [1] - 1888:22
**533** [1] - 1890:13
**534** [1] - 1897:20
**537** [2] - 1878:14, 1892:8
**538** [1] - 1901:11
**539** [1] - 1906:3
**542** [2] - 1909:7, 1909:9
**546** [1] - 1887:16
**548** [2] - 1910:11, 1910:20
**5th** [6] - 1804:21, 1900:14, 1901:13, 1906:4, 1909:3, 1909:4

**6**

**6** [1] - 1790:20
**637-2231** [1] - 1780:16
**6718** [2] - 1780:23, 1925:12
**6th** [2] - 1856:2, 1909:6

**7**

**7th** [1] - 1874:10

**8**

**801** [1] - 1883:11
**803** [1] - 1881:20
**804** [1] - 1879:25

**9**

**9/22** [1] - 1825:21
**906-1200** [1] - 1780:20
**9:05** [1] - 1780:5
**9th** [1] - 1854:23

**A**

**A-N-D-E-R-S-O-N** [1] - 1784:13
**a.m** [3] - 1780:5, 1886:5, 1886:9
**ability** [4] - 1819:11, 1891:22, 1892:1, 1925:7
**able** [9] - 1786:15, 1824:1, 1831:12, 1843:8, 1876:2, 1881:5, 1906:6, 1919:7, 1919:11
**academics** [4] - 1789:19, 1801:24, 1802:1, 1807:18
**Academy** [1] - 1810:1
**acceptance** [1] - 1800:25
**accordance** [1] - 1824:24
**according** [2] - 1852:23, 1903:14
**account** [5] - 1818:21, 1867:13, 1869:2, 1869:3, 1870:5
**accuracy** [4] - 1862:4, 1862:17, 1921:10, 1923:1
**accurate** [12] - 1789:5, 1789:9, 1820:24, 1821:23, 1846:2, 1847:2, 1858:5, 1858:9, 1865:14, 1865:15, 1908:12, 1925:5
**accurately** [2] - 1789:7, 1894:20
**acting** [1] - 1848:9
**action** [1] - 1907:3
**Action** [1] - 1780:3
**actions** [1] - 1833:20
**activities** [6] - 1813:11, 1824:25, 1833:7, 1837:10, 1858:7, 1906:24
**activity** [16] - 1833:12, 1833:24, 1838:24, 1839:1, 1842:23, 1850:5, 1881:4, 1893:17, 1903:3, 1903:5, 1906:23, 1906:24, 1907:4,

1908:8

**actual** [7] - 1782:21,
1800:1, 1827:20,
1830:3, 1842:23,
1893:17, 1905:24

**AD** [4] - 1796:22,
1796:25, 1882:5,
1911:4

**addition** [3] - 1785:17,
1802:17, 1908:22

**additional** [16] -
1797:2, 1815:4,
1829:1, 1831:14,
1838:19, 1843:17,
1843:20, 1843:21,
1860:17, 1860:21,
1875:10, 1890:1,
1891:10, 1898:23,
1907:6

**address** [5] - 1838:23,
1838:25, 1862:10,
1889:25, 1924:9

**addresses** [10] -
1815:19, 1830:14,
1838:17, 1839:9,
1840:6, 1840:8,
1840:17, 1890:20,
1911:13, 1911:21

**adds** [1] - 1893:7

**administrative** [3] -
1811:17, 1812:14,
1876:18

**admit** [1] - 1835:7

**admitted** [2] -
1795:12, 1835:10

**advance** [1] - 1870:17

**adverse** [1] - 1852:19

**advice** [1] - 1901:9

**advised** [2] - 1796:25,
1872:14

**affidavits** [1] - 1853:24

**affiliated** [1] - 1820:14

**affiliates** [1] - 1849:13

**afforded** [1] - 1828:25

**aforementioned** [1] -
1904:10

**afternoon** [5] - 1794:9,
1796:25, 1799:14,
1902:15, 1902:23

**agency** [1] - 1809:15

**AGENT** [2] - 1781:6,
1808:22

**agent** [34] - 1808:1,
1809:10, 1814:17,
1814:20, 1814:21,
1814:22, 1814:23,
1814:24, 1826:14,
1828:10, 1828:21,
1829:25, 1838:21,
1847:21, 1851:2,

1851:7, 1855:1,
1855:3, 1855:5,
1857:15, 1860:18,
1870:25, 1875:11,
1879:7, 1882:20,
1885:4, 1885:13,
1885:23, 1889:10,
1891:7, 1895:14,
1896:25, 1910:10

**Agent** [54] - 1815:7,
1815:21, 1816:4,
1816:13, 1817:7,
1817:22, 1822:16,
1823:7, 1823:23,
1829:13, 1831:20,
1832:1, 1833:18,
1833:20, 1835:11,
1841:4, 1842:25,
1846:6, 1848:14,
1849:6, 1857:12,
1858:1, 1858:6,
1860:2, 1860:9,
1860:16, 1862:9,
1862:25, 1870:10,
1871:21, 1871:22,
1872:12, 1881:25,
1882:14, 1883:6,
1884:18, 1889:4,
1897:11, 1897:16,
1897:24, 1898:18,
1898:22, 1899:17,
1901:18, 1902:6,
1903:18, 1904:24,
1906:13, 1908:14,
1914:7, 1914:18,
1916:25, 1920:21,
1924:11

**agents** [9] - 1805:7,
1828:18, 1830:8,
1830:11, 1849:25,
1879:6, 1896:22,
1908:18, 1918:6

**Agents** [1] - 1912:22

**ago** [8] - 1793:16,
1793:18, 1797:23,
1809:22, 1854:11,
1854:12, 1854:21,
1856:11

**agree** [3] - 1842:3,
1889:17, 1893:8

**ahead** [3] - 1846:20,
1887:15, 1924:7

**Albuquerque** [2] -
1810:3

**alerted** [1] - 1797:7

**Alfa** [39] - 1786:1,
1786:16, 1789:11,
1791:14, 1791:18,
1801:14, 1802:17,
1802:22, 1804:4,

1804:23, 1805:2,
1814:8, 1815:12,
1823:3, 1823:4,
1823:14, 1823:20,
1832:6, 1838:24,
1842:24, 1854:8,
1858:23, 1859:1,
1861:20, 1880:15,
1893:18, 1902:13,
1903:6, 1904:13,
1908:3, 1911:13,
1914:21, 1915:8,
1915:20, 1915:21,
1916:1, 1916:6,
1916:8, 1916:12

**ALFA** [4] - 1817:21,
1917:7, 1917:8,
1917:11

**Alfa-Bank** [35] -
1786:1, 1786:16,
1789:11, 1791:18,
1801:14, 1802:17,
1802:22, 1804:4,
1804:23, 1805:2,
1814:8, 1815:12,
1823:3, 1823:4,
1823:14, 1823:20,
1838:24, 1842:24,
1854:8, 1858:23,
1859:1, 1861:20,
1880:15, 1893:18,
1902:13, 1903:6,
1904:13, 1908:3,
1911:13, 1915:8,
1915:20, 1915:21,
1916:1, 1916:8,
1916:12

**Algor** [6] - 1782:6,
1852:17, 1852:24,
1859:12, 1912:18,
1918:11

**ALGOR** [46] - 1780:13,
1808:14, 1808:24,
1817:4, 1817:16,
1820:2, 1820:15,
1824:3, 1825:9,
1825:16, 1825:20,
1826:21, 1829:9,
1829:21, 1832:21,
1834:24, 1835:7,
1837:22, 1838:12,
1840:2, 1842:10,
1843:9, 1845:14,
1847:8, 1851:10,
1877:24, 1878:6,
1880:3, 1881:23,
1883:14, 1885:18,
1887:20, 1909:10,
1910:21, 1916:14,
1917:4, 1920:1,
1920:6, 1920:9,

1920:15, 1921:1,
1921:13, 1921:17,
1922:10, 1922:17,
1924:8

**Algor**.........................
.............. [1] - 1781:6

**alike** [1] - 1844:19

**Alison** [2] - 1794:10,
1797:6

**allegation** [31] -
1812:13, 1814:7,
1815:11, 1816:14,
1816:20, 1818:9,
1818:12, 1823:8,
1831:15, 1832:24,
1833:3, 1833:15,
1833:21, 1833:22,
1834:1, 1834:3,
1834:6, 1834:22,
1834:23, 1841:13,
1842:23, 1844:8,
1852:17, 1852:18,
1852:23, 1853:3,
1853:4, 1894:16,
1914:25, 1915:1,
1917:8

**allegations** [50] -
1785:25, 1786:4,
1786:7, 1786:16,
1786:18, 1786:24,
1789:11, 1789:25,
1791:15, 1798:25,
1801:14, 1802:22,
1805:3, 1806:1,
1806:13, 1811:15,
1814:13, 1815:22,
1817:1, 1818:22,
1822:13, 1823:24,
1824:1, 1824:5,
1824:16, 1824:19,
1824:23, 1826:2,
1831:19, 1832:7,
1836:7, 1840:14,
1843:11, 1847:5,
1847:11, 1847:13,
1854:8, 1905:1,
1905:11, 1906:21,
1908:3, 1908:12,
1908:23, 1910:23,
1912:19, 1913:9,
1915:8, 1915:16,
1916:7

**alleged** [3] - 1832:10,
1838:25, 1881:4

**allegedly** [2] - 1817:1,
1911:12

**Allison** [17] - 1814:25,
1815:1, 1815:3,
1817:11, 1836:15,
1839:19, 1845:13,

1862:9, 1862:15,
1870:21, 1887:22,
1889:13, 1895:17,
1898:24, 1900:1,
1901:13, 1910:9

**Allison's** [1] - 1889:6

**allow** [2] - 1842:6,
1893:11

**allowed** [6] - 1869:11,
1913:23, 1913:25,
1914:1, 1919:18,
1922:17

**allows** [2] - 1818:8,
1818:16

**almost** [3] - 1785:14,
1793:17, 1854:12

**America** [1] - 1782:4

**AMERICA** [1] - 1780:3

**Americas** [1] -
1780:19

**amount** [2] - 1858:2,
1920:7

**Amy** [1] - 1796:22

**analysis** [11] -
1826:22, 1831:9,
1831:11, 1831:12,
1832:7, 1871:15,
1887:25, 1902:19,
1903:3, 1903:11,
1904:1

**analyst** [4] - 1837:8,
1837:14, 1869:9,
1880:9

**analysts** [1] - 1914:11

**analyze** [1] - 1871:22

**analyzing** [1] -
1899:12

**Anderson** [15] -
1784:1, 1784:9,
1784:13, 1784:14,
1787:4, 1788:8,
1788:18, 1791:5,
1791:13, 1791:24,
1794:20, 1805:18,
1806:23, 1808:10

**ANDERSON** [2] -
1781:3, 1784:6

**ANDREW** [1] -
1780:12

**Andrew** [1] - 1782:7

**anonymity** [1] - 1891:2

**anonymous** [29] -
1816:16, 1816:19,
1816:22, 1821:15,
1821:19, 1821:25,
1838:16, 1838:23,
1839:23, 1841:10,
1846:16, 1846:24,
1847:6, 1848:14,
1867:10, 1869:2,

1888:25, 1889:20,
1890:2, 1890:17,
1890:22, 1890:23,
1891:6, 1891:21,
1892:15, 1898:24,
1911:15, 1911:22
**answer** [1] - 1912:6
**answered** [1] - 1851:8
**answers** [2] - 1910:2,
1919:15
**anticipation** [1] -
1911:4
**appear** [3] - 1789:10,
1864:19, 1913:18
**APPEARANCES** [1] -
1780:11
**appeared** [3] -
1824:17, 1891:20,
1908:2
**application** [4] -
1812:24, 1853:1,
1853:12, 1853:21
**applications** [1] -
1853:25
**appreciate** [2] -
1795:13, 1806:19
**approach** [1] - 1787:1
**approached** [2] -
1798:18, 1860:23
**appropriate** [4] -
1785:23, 1803:24,
1803:25, 1923:12
**April** [3] - 1855:23,
1916:18, 1917:1
**area** [2] - 1785:5,
1922:3
**arrived** [2] - 1888:19,
1917:11
**article** [4] - 1789:21,
1802:14, 1803:1,
1882:1
**articulable** [1] -
1818:25
**aside** [1] - 1800:15
**assesses** [1] - 1872:17
**assessment** [23] -
1818:8, 1818:18,
1818:19, 1819:8,
1819:17, 1819:22,
1824:19, 1825:3,
1832:12, 1871:15,
1872:10, 1872:11,
1873:18, 1875:4,
1875:5, 1876:24,
1877:16, 1881:13,
1882:2, 1882:9,
1893:20, 1902:23,
1912:22
**assessments** [2] -
1904:11, 1904:14

**assigned** [11] -
1810:2, 1810:6,
1814:16, 1814:22,
1815:4, 1816:4,
1836:22, 1857:15,
1860:18, 1885:23,
1888:12
**assignment** [2] -
1809:21, 1811:9
**assignments** [1] -
1810:14
**assist** [1] - 1786:23
**assistance** [1] -
1905:25
**assistant** [1] - 1784:19
**assisted** [2] - 1805:8,
1815:5
**assisting** [1] - 1837:16
**associated** [7] -
1822:12, 1830:14,
1849:15, 1877:17,
1877:18, 1886:11,
1906:23
**assume** [3] - 1794:25,
1884:21, 1897:1
**assuming** [1] - 1795:9
**attached** [1] - 1872:10
**attention** [9] -
1785:24, 1790:17,
1813:2, 1814:6,
1836:11, 1858:19,
1865:3, 1865:13,
1867:20
**attorney** [1] - 1918:23
**Attorney** [1] - 1784:19
**attributable** [1] -
1844:12
**attributed** [2] -
1826:10, 1877:8
**Auten** [5] - 1836:16,
1837:13, 1837:14,
1869:9, 1870:10
**authentic** [2] -
1795:10, 1795:12
**author** [9] - 1853:23,
1862:15, 1873:4,
1873:7, 1873:9,
1885:2, 1912:2,
1913:21, 1919:19
**authored** [2] -
1860:12, 1923:6
**authorization** [1] -
1876:11
**authors** [4] - 1907:16,
1907:22, 1924:14,
1924:18
**availability** [1] -
1876:10
**available** [7] -
1834:17, 1875:10,

1875:16, 1875:23,
1903:24, 1905:5
**Avenue** [3] - 1780:19,
1780:23, 1925:12
**average** [2] - 1859:15,
1859:16
**aware** [19] - 1793:7,
1793:15, 1795:21,
1797:12, 1820:24,
1828:20, 1832:5,
1860:2, 1880:17,
1885:7, 1885:10,
1886:17, 1893:4,
1897:11, 1898:11,
1900:10, 1907:21,
1916:5, 1916:12
**awesome** [1] -
1889:16

# B

**bachelor's** [1] -
1813:20
**back-and-forth** [1] -
1797:19
**background** [2] -
1852:10, 1891:2
**bad** [2] - 1890:15,
1908:8
**Baker** [33] - 1785:2,
1785:10, 1786:8,
1788:21, 1788:23,
1788:25, 1798:23,
1798:24, 1799:10,
1800:9, 1800:22,
1801:17, 1802:2,
1802:4, 1802:7,
1802:10, 1802:20,
1802:24, 1803:3,
1803:13, 1805:5,
1805:12, 1807:22,
1808:4, 1816:18,
1847:7, 1864:25,
1866:4, 1866:23,
1870:25, 1871:1,
1886:5, 1886:9
**Baker's** [1] - 1785:18
**bank** [2] - 1886:13,
1890:1
**Bank** [39] - 1786:1,
1786:16, 1789:11,
1791:15, 1791:18,
1801:14, 1802:17,
1802:22, 1804:4,
1804:23, 1805:2,
1814:8, 1815:12,
1823:3, 1823:4,
1823:14, 1823:20,
1832:7, 1838:24,
1842:24, 1854:8,
1858:23, 1859:1,

1861:20, 1880:15,
1893:18, 1902:13,
1903:6, 1904:13,
1908:3, 1911:13,
1914:22, 1915:8,
1915:20, 1915:21,
1916:1, 1916:7,
1916:8, 1916:12
**BANK** [4] - 1817:21,
1917:7, 1917:8,
1917:11
**based** [15] - 1789:25,
1790:10, 1799:20,
1802:15, 1817:21,
1829:17, 1847:14,
1854:2, 1871:5,
1872:21, 1874:21,
1878:25, 1905:4,
1907:23, 1914:13
**baseline** [1] - 1896:9
**basis** [4] - 1808:5,
1824:13, 1850:19,
1912:18
**Batty** [8] - 1824:11,
1866:22, 1871:18,
1871:22, 1872:7,
1873:3, 1912:23,
1914:4
**BEFORE** [1] - 1780:10
**befuddling** [1] -
1907:18
**beginning** [2] -
1799:11, 1884:12
**behalf** [5] - 1782:11,
1848:10, 1850:21,
1911:15
**behind** [2] - 1798:14,
1815:20
**belong** [1] - 1844:24
**belonging** [2] -
1820:23, 1863:3
**below** [2] - 1910:1,
1922:18
**Ben** [2] - 1885:21,
1886:3
**bench** [2] - 1920:4,
1921:20
**benefit** [2] - 1850:10,
1850:11
**BERKOWITZ** [58] -
1780:17, 1782:9,
1782:14, 1783:2,
1783:11, 1787:22,
1788:16, 1791:11,
1791:23, 1794:3,
1794:7, 1798:4,
1806:18, 1825:18,
1833:17, 1835:9,
1851:21, 1861:18,
1862:20, 1863:25,

1864:17, 1867:8,
1868:9, 1873:23,
1877:2, 1877:21,
1878:2, 1878:8,
1878:14, 1878:19,
1880:1, 1881:22,
1883:12, 1885:17,
1887:4, 1887:18,
1889:3, 1892:6,
1897:5, 1897:19,
1897:23, 1898:20,
1900:16, 1909:9,
1909:16, 1909:24,
1910:5, 1910:19,
1916:17, 1917:3,
1917:20, 1919:25,
1921:6, 1921:18,
1922:4, 1923:5,
1923:19, 1924:2
**Berkowitz** [5] -
1782:10, 1791:24,
1851:24, 1920:18,
1923:4
**Berkowitz**).................
...............[2] - 1781:4,
1781:7
**best** [7] - 1815:8,
1823:7, 1871:9,
1914:25, 1915:17,
1919:4, 1925:6
**better** [3] - 1793:20,
1914:7, 1914:12
**between** [18] -
1782:19, 1796:22,
1805:20, 1806:14,
1815:12, 1817:20,
1819:7, 1819:8,
1823:14, 1835:5,
1842:24, 1875:8,
1879:21, 1890:14,
1893:17, 1897:24,
1904:13, 1906:4
**bias** [1] - 1848:12
**Bill** [1] - 1873:21
**binder** [1] - 1921:5
**bit** [9] - 1851:12,
1853:11, 1857:22,
1869:13, 1872:24,
1875:7, 1889:24,
1903:8, 1923:22
**blanking** [1] - 1875:15
**blow** [10] - 1794:7,
1798:4, 1864:17,
1872:11, 1873:24,
1889:4, 1897:23,
1898:20, 1909:24,
1916:17
**bookmark** [1] -
1860:13
**boss** [1] - 1842:1

## C

**Bosworth** [1] - 1782:10
**BOSWORTH** [1] - 1780:17
**bottom** [5] - 1829:12, 1836:12, 1841:13, 1845:22
**break** [7] - 1782:22, 1851:12, 1903:8, 1907:8, 1921:15, 1921:22, 1922:8
**Brian** [4] - 1836:16, 1837:13, 1837:14, 1869:9
**brief** [2] - 1832:1, 1901:19
**briefed** [2] - 1834:3, 1882:5
**briefing** [2] - 1795:1, 1833:18
**briefly** [5] - 1806:20, 1810:24, 1819:3, 1838:18, 1843:14
**briefs** [1] - 1911:4
**bring** [2] - 1801:2, 1847:25
**bringing** [2] - 1850:10, 1850:11
**BRITTAIN** [1] - 1780:14
**Brittain** [1] - 1782:5
**brought** [25] - 1786:8, 1789:25, 1790:11, 1790:15, 1792:2, 1800:17, 1801:4, 1801:6, 1807:7, 1816:20, 1818:23, 1841:16, 1849:23, 1850:4, 1850:20, 1850:21, 1864:24, 1865:3, 1865:13, 1865:16, 1880:17, 1880:18, 1886:1, 1886:9, 1910:24
**build** [2] - 1873:16, 1879:9
**bullet** [2] - 1904:9, 1905:16
**bumps** [1] - 1782:14
**bunk** [3] - 1881:18, 1882:6, 1882:7
**Bureau** [1] - 1813:22
**business** [5] - 1850:7, 1850:11, 1919:1, 1919:5, 1924:4
**busy** [1] - 1901:17
**BY** [6] - 1784:8, 1788:7, 1791:23, 1806:22, 1808:24, 1851:21

**CA** [2] - 1874:2, 1874:8
**camera** [1] - 1783:8
**Campaign** [1] - 1811:15
**campaign** [2] - 1849:18, 1886:11
**candidate** [2] - 1820:14, 1848:6
**capabilities** [1] - 1826:19
**capability** [1] - 1819:18
**capacity** [2] - 1814:17, 1876:18
**career** [2] - 1852:21, 1859:13
**careful** [2] - 1795:13, 1902:4
**carry** [2] - 1800:5, 1800:9
**case** [78] - 1808:1, 1812:18, 1814:17, 1814:20, 1814:22, 1814:23, 1814:24, 1815:1, 1815:4, 1820:3, 1838:20, 1839:14, 1839:17, 1840:15, 1844:2, 1845:1, 1845:7, 1845:10, 1847:14, 1848:1, 1849:5, 1850:3, 1851:14, 1851:15, 1854:7, 1855:1, 1857:6, 1857:15, 1857:25, 1858:1, 1858:4, 1858:6, 1858:7, 1858:16, 1858:20, 1858:21, 1858:22, 1858:23, 1859:1, 1859:5, 1859:17, 1860:24, 1861:1, 1861:10, 1861:20, 1861:22, 1862:8, 1862:24, 1863:13, 1864:24, 1867:13, 1867:14, 1869:3, 1870:5, 1871:5, 1874:13, 1874:18, 1874:22, 1875:1, 1876:3, 1876:12, 1879:6, 1884:12, 1896:24, 1897:2, 1898:3, 1898:11, 1902:13, 1908:18, 1918:6, 1921:24, 1921:25, 1922:7

**Case** [1] - 1782:3
**caseload** [2] - 1860:19, 1860:25
**cases** [6] - 1814:1, 1832:15, 1858:22, 1858:23, 1894:15, 1901:18
**Catherine** [1] - 1782:10
**CATHERINE** [1] - 1780:18
**caused** [2] - 1865:11, 1908:4
**cc'd** [1] - 1836:16
**cease** [1] - 1881:4
**CenDyn** [12] - 1827:19, 1829:25, 1840:12, 1844:23, 1847:18, 1878:18, 1879:4, 1887:24, 1903:22, 1906:25, 1908:7
**center** [1] - 1829:7
**central** [3] - 1840:18, 1878:24, 1903:4
**Central** [12] - 1827:19, 1828:3, 1828:4, 1828:5, 1828:8, 1828:9, 1828:11, 1828:21, 1828:25, 1830:12, 1830:19, 1878:12
**CEO** [1] - 1796:22
**certain** [5] - 1819:3, 1819:16, 1849:15, 1875:14, 1875:16
**certainly** [2] - 1804:2, 1895:11
**CERTIFICATE** [1] - 1925:1
**certify** [1] - 1925:4
**CG** [1] - 1910:24
**CH01** [1] - 1864:15
**CH02** [1] - 1868:9
**CH04** [1] - 1863:24
**chain** [3] - 1805:8, 1866:4, 1866:23
**chain-of-custody** [1] - 1805:8
**challenge** [1] - 1904:14
**chance** [5] - 1835:19, 1880:25, 1883:18, 1898:6, 1918:16
**change** [1] - 1904:14
**channel** [2] - 1815:11, 1815:13
**Chantilly** [1] - 1839:7
**check** [2] - 1896:9, 1896:11

**checked** [1] - 1878:20
**Chicago** [20] - 1810:5, 1810:9, 1810:17, 1811:10, 1813:10, 1813:11, 1814:15, 1814:19, 1824:13, 1828:13, 1831:7, 1834:2, 1837:21, 1841:11, 1845:24, 1858:24, 1884:2, 1889:12, 1889:15, 1910:25
**chief** [2] - 1794:15, 1824:12
**choice** [2] - 1861:24, 1874:22
**chose** [1] - 1921:10
**CHRISTOPHER** [1] - 1780:10
**chronologically** [1] - 1852:12
**CHS** [2] - 1902:18, 1910:2
**CI** [1] - 1874:18
**circumstances** [1] - 1806:5
**city** [1] - 1889:16
**claims** [3] - 1903:2, 1903:4, 1904:15
**clarification** [3] - 1790:8, 1796:13, 1840:3
**clarify** [1] - 1833:19
**clear** [6] - 1857:6, 1857:17, 1883:7, 1891:15, 1897:25, 1924:11
**clearance** [1] - 1906:12
**clearer** [1] - 1806:12
**clearly** [3] - 1922:24, 1923:2, 1924:20
**cleaves** [9] - 1794:7, 1798:5, 1861:19, 1864:18, 1878:19, 1889:4, 1900:17, 1909:17, 1909:25
**client** [6] - 1789:19, 1801:20, 1801:22, 1807:18, 1807:19, 1850:7
**clients** [1] - 1801:21
**Clinto** [1] - 1886:9
**Clinton** [2] - 1849:10
**Clinton's** [1] - 1811:5
**close** [7] - 1804:2, 1804:6, 1804:8, 1804:22, 1805:1, 1845:6, 1857:4
**closed** [5] - 1845:1,

1863:19, 1866:8, 1866:11, 1866:25
**closing** [6] - 1845:9, 1845:10, 1845:20, 1847:9, 1867:14, 1876:14
**co** [6] - 1814:17, 1814:20, 1814:22, 1814:24, 1908:18
**co-case** [4] - 1814:20, 1814:22, 1814:24
**co-case-agent** [1] - 1814:17
**co-lead** [1] - 1908:18
**code** [1] - 1838:3
**Coie** [1] - 1796:23
**colla/public** [1] - 1810:18
**colleagues** [1] - 1800:3
**collected** [4] - 1894:19, 1894:20, 1896:6, 1896:16
**collection** [2] - 1924:6, 1924:13
**collector** [1] - 1896:15
**COLUMBIA** [1] - 1780:1
**Comey** [1] - 1802:25
**comfortable** [1] - 1808:21
**coming** [11] - 1833:12, 1838:20, 1841:14, 1847:15, 1890:21, 1904:20, 1906:9, 1906:20, 1907:5, 1907:18, 1923:20
**Committee** [1] - 1793:3
**common** [2] - 1790:11, 1790:13
**communicated** [3] - 1782:17, 1905:13, 1920:21
**communicating** [2] - 1880:5, 1904:24
**communication** [14] - 1802:13, 1815:11, 1815:13, 1817:10, 1845:8, 1845:9, 1865:18, 1866:18, 1869:3, 1870:3, 1871:8, 1898:22, 1902:12, 1922:5
**communications** [7] - 1782:21, 1817:20, 1823:3, 1823:14, 1904:13, 1917:9, 1923:11
**companies** [3] -

1827:23, 1830:20, 1830:22
**company** [30] - 1792:20, 1792:22, 1795:18, 1796:1, 1827:19, 1827:21, 1828:4, 1828:5, 1829:1, 1829:2, 1829:5, 1829:6, 1829:17, 1829:22, 1830:25, 1832:17, 1847:18, 1886:11, 1914:25, 1915:2, 1915:3, 1915:4, 1915:10, 1915:12, 1915:15, 1915:16, 1915:17, 1915:20, 1915:21, 1916:2
**compiled** [1] - 1841:20
**complete** [2] - 1854:2, 1925:6
**completed** [1] - 1812:14
**completely** [1] - 1924:1
**completing** [1] - 1805:8
**complicated** [1] - 1830:1
**computer** [6] - 1830:3, 1831:7, 1833:24, 1834:20, 1886:12, 1888:11
**computers** [1] - 1831:1
**concerned** [1] - 1792:25
**concerning** [1] - 1889:20
**conclude** [1] - 1824:21
**concluded** [2] - 1811:9, 1905:2
**concluding** [1] - 1912:18
**conclusion** [9] - 1831:10, 1841:8, 1843:14, 1847:10, 1847:15, 1893:23, 1894:1, 1897:7, 1913:2
**conclusions** [5] - 1872:19, 1904:6, 1905:4, 1914:13, 1924:5
**conduct** [9] - 1818:4, 1818:19, 1819:20, 1819:21, 1824:25, 1826:25, 1833:24, 1859:25, 1860:2
**conducted** [16] -

1813:10, 1824:7, 1824:18, 1831:9, 1833:16, 1834:7, 1837:11, 1844:4, 1844:5, 1844:16, 1847:16, 1850:5, 1858:2, 1860:1, 1860:9, 1872:18
**conducting** [3] - 1811:17, 1839:1, 1871:4
**conducts** [1] - 1865:7
**conference** [2] - 1920:4, 1921:20
**confidential** [17] - 1850:15, 1850:17, 1850:19, 1850:21, 1850:25, 1900:22, 1900:24, 1901:2, 1901:3, 1901:7, 1903:9, 1904:10, 1904:24, 1908:21, 1908:22, 1909:12, 1909:23
**configuration** [1] - 1823:19
**configured** [6] - 1820:22, 1823:2, 1823:5, 1823:13, 1832:25, 1863:2
**confirmed** [1] - 1844:24
**conflated** [3] - 1821:4, 1865:17, 1866:17
**conflating** [1] - 1821:6
**confusion** [3] - 1782:19, 1869:5, 1871:3
**connected** [1] - 1918:13
**connection** [8] - 1793:8, 1797:13, 1853:1, 1853:12, 1864:2, 1864:25, 1888:1, 1918:9
**connections** [6] - 1805:20, 1806:2, 1806:8, 1806:14, 1849:14, 1885:9
**consensual** [1] - 1812:22
**consequences** [1] - 1852:20
**consider** [1] - 1848:1
**considerable** [1] - 1823:21
**consideration** [1] - 1906:8
**considerations** [2] - 1818:21, 1818:22

**consistent** [3] - 1832:12, 1842:7, 1913:18
**constitutes** [1] - 1925:4
**Constitution** [2] - 1780:23, 1925:12
**contacted** [2] - 1889:19, 1902:18
**contacting** [1] - 1918:3
**contacts** [1] - 1827:3
**contains** [1] - 1863:7
**contemporaneous** [1] - 1789:2
**contents** [2] - 1789:16, 1822:5
**context** [3] - 1801:13, 1898:25, 1899:11
**continuing** [1] - 1897:12
**contradict** [1] - 1904:11
**conversation** [9] - 1799:1, 1799:2, 1803:4, 1878:11, 1880:21, 1899:22, 1900:2, 1904:4, 1906:9
**conversations** [8] - 1803:4, 1828:24, 1843:20, 1843:21, 1844:1, 1844:23, 1847:19, 1901:20
**COOPER** [1] - 1780:10
**cooperation** [1] - 1827:5
**coordinate** [1] - 1785:16
**copied** [1] - 1901:14
**copies** [1] - 1798:7
**copy** [1] - 1922:9
**corner** [1] - 1861:15
**correct** [205] - 1788:3, 1790:9, 1792:10, 1792:15, 1792:16, 1792:20, 1794:18, 1794:19, 1794:23, 1796:17, 1796:19, 1797:21, 1797:22, 1797:25, 1798:20, 1799:24, 1799:25, 1800:17, 1800:18, 1800:20, 1800:21, 1801:15, 1802:14, 1803:11, 1803:20, 1803:21, 1803:23, 1804:4, 1804:6, 1804:7, 1804:16, 1805:3, 1805:4,

1805:9, 1805:13, 1805:16, 1805:17, 1805:21, 1806:3, 1806:5, 1806:9, 1806:16, 1807:8, 1808:1, 1813:4, 1816:11, 1817:12, 1819:9, 1821:9, 1822:1, 1826:14, 1827:11, 1827:24, 1828:13, 1829:3, 1829:14, 1830:16, 1834:17, 1835:20, 1838:9, 1840:22, 1842:13, 1844:9, 1845:2, 1848:23, 1848:25, 1849:10, 1853:9, 1853:16, 1854:3, 1855:6, 1855:9, 1855:15, 1856:5, 1857:7, 1857:8, 1857:14, 1858:8, 1858:14, 1858:17, 1858:18, 1858:21, 1859:13, 1861:20, 1863:5, 1863:19, 1864:3, 1866:9, 1866:12, 1867:4, 1867:24, 1869:4, 1869:21, 1869:23, 1870:6, 1870:12, 1870:15, 1870:18, 1870:22, 1871:7, 1871:16, 1871:23, 1872:2, 1872:8, 1872:15, 1872:22, 1873:1, 1873:18, 1874:2, 1874:11, 1874:16, 1874:19, 1874:22, 1875:6, 1876:3, 1876:6, 1878:10, 1878:25, 1879:4, 1880:6, 1881:1, 1881:11, 1882:7, 1882:9, 1882:15, 1883:19, 1884:9, 1884:25, 1886:2, 1886:20, 1886:22, 1886:24, 1887:6, 1887:13, 1887:24, 1888:5, 1888:16, 1891:7, 1891:8, 1892:16, 1892:24, 1893:12, 1893:18, 1893:22, 1894:8, 1894:13, 1894:17, 1894:21, 1895:3, 1895:15, 1896:5, 1896:16, 1896:25, 1897:3, 1897:9,

1899:9, 1900:10, 1900:11, 1900:19, 1900:22, 1901:9, 1901:15, 1902:7, 1902:10, 1902:13, 1902:20, 1903:6, 1903:12, 1903:15, 1903:19, 1903:22, 1905:2, 1905:5, 1905:14, 1905:15, 1908:5, 1908:8, 1908:12, 1908:24, 1909:14, 1910:14, 1910:25, 1911:15, 1911:17, 1911:23, 1912:10, 1912:23, 1912:25, 1913:2, 1913:5, 1914:5, 1914:13, 1914:22, 1914:23, 1915:12, 1916:3, 1917:22, 1918:9, 1919:9, 1919:12, 1919:16, 1919:21, 1919:22, 1922:17
**Correct** [1] - 1882:3
**corroborate** [3] - 1831:3, 1849:4, 1917:25
**corroborated** [1] - 1851:3
**corruption** [1] - 1810:18
**Counsel** [2] - 1784:20, 1867:23
**counsel** [24] - 1784:25, 1785:4, 1785:6, 1790:11, 1794:11, 1794:12, 1794:17, 1796:23, 1808:13, 1816:17, 1816:18, 1821:7, 1821:20, 1847:7, 1864:24, 1865:16, 1865:17, 1865:23, 1866:4, 1866:6, 1866:15, 1866:21, 1866:24, 1871:1
**COUNSEL'S** [1] - 1780:14
**Counsel's** [1] - 1857:20
**counsel's** [2] - 1790:12, 1807:7
**counterintelligence** [4] - 1810:4, 1810:6, 1813:15, 1825:7
**country's** [1] - 1806:3
**couple** [12] - 1782:14, 1792:2, 1799:25,

1827:8, 1859:19, 1859:21, 1867:21, 1872:12, 1879:13, 1883:21, 1907:25, 1924:2
**couple-of-month** [1] - 1859:21
**couple-page** [1] - 1872:12
**coupled** [1] - 1847:17
**course** [2] - 1787:3, 1807:2
**COURT** [54] - 1780:1, 1782:8, 1782:12, 1783:1, 1783:6, 1783:16, 1783:20, 1784:2, 1787:3, 1787:23, 1788:1, 1788:6, 1788:17, 1791:12, 1791:21, 1794:2, 1808:10, 1808:16, 1808:20, 1825:19, 1833:19, 1835:10, 1851:11, 1851:18, 1863:21, 1877:25, 1878:7, 1880:4, 1881:24, 1883:15, 1885:19, 1887:21, 1902:1, 1910:22, 1916:15, 1917:5, 1920:3, 1920:8, 1920:14, 1920:24, 1921:2, 1921:4, 1921:12, 1921:14, 1921:21, 1922:2, 1922:7, 1922:14, 1923:4, 1923:17, 1923:24, 1924:7, 1924:21, 1925:1
**court** [10] - 1782:11, 1784:11, 1813:1, 1846:21, 1853:1, 1853:12, 1853:15, 1856:22, 1868:21
**Court** [3] - 1780:22, 1780:22, 1925:11
**Courthouse** [2] - 1780:23, 1925:11
**courtroom** [3] - 1783:19, 1851:16, 1922:1
**COURTROOM** [1] - 1782:2
**cover** [1] - 1852:10
**covert** [2] - 1904:12, 1917:9
**crayons** [2] - 1826:16, 1877:14
**credible** [9] - 1802:11,

1806:7, 1806:10, 1806:15, 1902:22, 1903:15, 1904:12, 1905:1, 1908:24
**Criminal** [2] - 1780:3, 1782:3
**criminal** [1] - 1818:14
**Crimson** [1] - 1783:11
**CRM** [1] - 1829:18
**CROSS** [2] - 1791:22, 1851:20
**cross** [6] - 1851:25, 1920:7, 1922:19, 1922:23, 1923:6, 1923:14
**cross-examination** [3] - 1920:7, 1923:6, 1923:14
**CROSS-EXAMINATION** [2] - 1791:22, 1851:20
**cross-examinations** [1] - 1851:25
**cross-examining** [1] - 1922:23
**Crossfire** [17] - 1805:23, 1811:12, 1811:13, 1811:14, 1811:16, 1812:6, 1813:9, 1816:5, 1816:9, 1816:10, 1826:14, 1849:12, 1849:15, 1874:7, 1883:24, 1884:1, 1885:24
**CrowdStrike** [10] - 1794:8, 1795:1, 1795:15, 1795:17, 1795:18, 1795:20, 1795:25, 1796:24, 1797:3
**CRR** [3] - 1780:22, 1925:3, 1925:10
**current** [4] - 1809:8, 1809:9, 1823:3, 1855:3
**CURTIS** [3] - 1781:6, 1808:22, 1809:3
**Curtis** [4] - 1808:15, 1809:3, 1872:8, 1892:22
**Curtis...an** [1] - 1842:4, 1893:8
**custody** [3] - 1805:8, 1866:4, 1866:23
**cutting** [1] - 1867:15, 1867:18
**cutting-and-pasting** [2] - 1867:15, 1867:18

**cyber** [51] - 1785:8, 1789:19, 1792:11, 1794:15, 1795:18, 1801:24, 1801:25, 1807:18, 1810:10, 1810:11, 1813:15, 1813:17, 1814:3, 1815:13, 1824:7, 1824:9, 1824:12, 1824:15, 1824:18, 1824:25, 1825:4, 1826:5, 1826:9, 1826:18, 1826:22, 1826:24, 1827:1, 1828:16, 1831:8, 1832:16, 1832:19, 1832:20, 1838:16, 1838:22, 1839:2, 1839:6, 1847:17, 1866:3, 1871:15, 1872:15, 1872:17, 1873:17, 1876:24, 1877:6, 1877:13, 1886:10, 1894:15, 1913:12, 1914:11, 1915:23, 1915:24
**Cyber** [1] - 1886:14
**cyber's** [1] - 1825:2

# D

**D.C** [4] - 1810:15, 1811:2, 1816:9, 1884:1
**Dacey** [1] - 1796:22
**Dagan** [1] - 1904:11
**Dagon** [18] - 1902:19, 1903:10, 1903:14, 1905:13, 1905:17, 1906:6, 1906:14, 1907:15, 1908:15, 1908:22, 1909:4, 1912:1, 1920:7, 1922:21, 1923:6, 1923:9, 1924:12, 1924:17
**daily** [2] - 1808:5, 1901:19
**Dan** [6] - 1837:20, 1839:20, 1841:25, 1874:15, 1889:15, 1892:10
**Daniel** [2] - 1836:17, 1837:19
**dark** [1] - 1908:1
**Data** [1] - 1889:1
**data** [38] - 1816:25, 1822:12, 1825:4, 1829:1, 1829:7, 1830:13, 1830:25, 1831:5, 1831:8,

1831:11, 1843:1, 1849:24, 1851:6, 1889:24, 1890:20, 1894:16, 1894:19, 1896:4, 1896:6, 1896:15, 1896:19, 1898:25, 1899:11, 1900:19, 1901:1, 1909:19, 1916:8, 1916:9, 1917:11, 1917:16, 1917:18, 1919:20, 1920:19, 1920:22, 1923:2, 1924:6, 1924:13
**date** [10] - 1787:15, 1787:18, 1789:13, 1789:14, 1797:2, 1825:24, 1836:4, 1854:20, 1863:24, 1916:18
**dated** [3] - 1794:22, 1864:21, 1872:6
**Dated** [1] - 1925:8
**David** [9] - 1902:19, 1903:10, 1904:10, 1905:17, 1908:15, 1912:1, 1920:7, 1922:21, 1924:17
**day-to-day** [1] - 1857:13
**days** [3] - 1879:13, 1881:14, 1888:21
**DC** [3] - 1780:15, 1780:24, 1925:13
**deal** [1] - 1783:6
**dealing** [1] - 1915:25
**dealt** [2] - 1824:13, 1832:15
**debunked** [1] - 1903:3
**December** [1] - 1814:9
**decision** [2] - 1818:19, 1843:4
**decisions** [4] - 1825:1, 1842:21, 1893:15
**declaration** [1] - 1864:2
**deemed** [3] - 1820:11, 1824:23, 1901:8
**Defendant** [2] - 1780:7, 1780:17
**defendant's** [1] - 1852:25
**Defense** [19] - 1793:25, 1872:4, 1873:14, 1877:2, 1878:2, 1879:25, 1881:20, 1883:11, 1885:16, 1887:16, 1888:22, 1890:12, 1892:7, 1897:20,

1901:11, 1906:3, 1909:1, 1909:7, 1910:11
**defense** [2] - 1922:19, 1924:18
**deferred** [1] - 1825:7
**deficiencies** [1] - 1872:25
**DeFilippis** [2] - 1780:12, 1782:7
**Democratic** [2] - 1793:3, 1885:8
**demonstrative** [1] - 1873:13
**deny** [1] - 1853:6
**Department** [13] - 1784:17, 1784:18, 1796:14, 1821:6, 1821:15, 1847:1, 1863:13, 1865:18, 1865:23, 1868:4, 1868:15, 1870:22, 1871:7
**DEPARTMENT** [5] - 1820:21, 1846:17, 1846:25, 1863:2, 1867:11
**deploy** [2] - 1819:16, 1819:21
**depth** [1] - 1785:22
**deputies** [4] - 1785:10, 1785:17, 1785:19, 1799:15
**DEPUTY** [1] - 1782:2
**deputy** [4] - 1784:19, 1784:25, 1785:6, 1790:10
**Des** [4] - 1809:12, 1809:13, 1809:15, 1810:20
**describe** [1] - 1809:23
**destination** [1] - 1833:11
**detail** [2] - 1853:11, 1867:20, 1883:22
**detailing** [2] - 1820:22, 1863:2
**details** [2] - 1845:21, 1889:21
**Details** [1] - 1820:18
**determine** [2] - 1860:9, 1894:20
**determined** [4] - 1825:5, 1850:1, 1878:9, 1879:3
**determining** [1] - 1915:1
**dialogue** [1] - 1843:25
**differences** [4] - 1782:23, 1819:7,

1819:8, 1875:7
**different** [5] - 1818:3,
1818:7, 1819:11,
1819:13, 1819:15
**digital** [1] - 1822:5
**DIRECT** [2] - 1784:7,
1808:23
**direct** [8] - 1823:13,
1860:16, 1861:14,
1862:2, 1862:22,
1877:5, 1892:14,
1892:25
**directly** [2] - 1904:11,
1923:7
**Director** [1] - 1874:10
**discuss** [2] - 1783:5,
1785:22, 1808:12,
1899:1, 1899:24,
1909:4, 1921:7
**discussed** [8] -
1791:15, 1791:18,
1842:20, 1857:20,
1870:11, 1893:14,
1894:10, 1899:1
**discussing** [2] -
1786:17, 1898:11
**discussion** [6] -
1785:22, 1802:21,
1868:2, 1868:24,
1878:18, 1907:9
**discussions** [9] -
1851:14, 1860:10,
1897:12, 1897:14,
1906:15, 1913:4,
1917:24, 1921:24,
1922:7
**dispute** [1] - 1792:23
**disrespect** [1] -
1883:6
**DISTRICT** [3] - 1780:1,
1780:1, 1780:10
**Division** [1] - 1886:14
**division** [20] - 1824:7,
1824:9, 1824:15,
1825:4, 1825:8,
1826:5, 1826:9,
1828:16, 1832:16,
1838:3, 1838:16,
1838:22, 1839:2,
1839:7, 1847:17,
1854:4, 1864:9,
1866:3, 1872:15,
1877:7
**divulged** [1] - 1812:25
**DNC** [10] - 1793:8,
1793:11, 1794:8,
1795:1, 1796:22,
1797:3, 1797:12,
1886:9, 1918:23
**DNC's** [1] - 1793:8

**DNS** [7] - 1815:14,
1815:15, 1815:17,
1844:5, 1888:13,
1889:1, 1907:1
**document** [18] -
1783:9, 1783:14,
1794:6, 1795:12,
1797:10, 1817:7,
1817:14, 1822:17,
1825:11, 1862:1,
1862:14, 1864:16,
1868:16, 1872:10,
1872:12, 1878:22,
1889:5, 1910:16
**documented** [2] -
1844:2, 1866:17
**documents** [5] -
1786:19, 1786:21,
1798:15, 1816:24,
1871:10
**Documents** [1] -
1817:19
**DOJ** [2] - 1869:2,
1879:17
**domain** [10] - 1815:17,
1826:25, 1827:18,
1830:14, 1844:20,
1878:10, 1879:12,
1906:23, 1911:3
**domain/server** [2] -
1842:24, 1893:18
**domains** [1] - 1815:18
**done** [15] - 1801:7,
1859:12, 1863:13,
1882:13, 1882:15,
1882:20, 1891:3,
1891:4, 1891:5,
1896:8, 1899:19,
1912:22, 1914:3,
1922:22, 1923:13
**door** [4] - 1920:23,
1923:3, 1923:10,
1924:20
**doubt** [6] - 1789:9,
1792:14, 1795:5,
1795:8, 1797:15,
1797:24
**down** [33] - 1792:2,
1817:17, 1824:3,
1826:12, 1826:21,
1829:21, 1834:24,
1836:13, 1838:10,
1838:12, 1838:13,
1841:2, 1843:9,
1845:21, 1846:12,
1846:18, 1846:21,
1847:8, 1857:19,
1861:18, 1877:9,
1877:20, 1890:14,
1892:19, 1902:2,

1903:8, 1905:16,
1907:8, 1908:4,
1910:1, 1910:5,
1917:20, 1922:2
**dozens** [2] - 1814:2,
1859:13
**draft** [2] - 1862:4,
1862:14
**Drafted** [3] - 1817:6,
1817:11, 1861:17
**drafted** [4] - 1861:18,
1862:2, 1862:3,
1862:5
**drafter** [1] - 1922:21
**drafters** [1] - 1867:3
**drafting** [1] - 1817:14
**drafts** [1] - 1920:20
**draw** [1] - 1888:16
**drawing** [1] - 1912:12
**drawn** [2] - 1872:20,
1924:5
**drew** [2] - 1904:6,
1904:7
**drives** [4] - 1817:3,
1822:6, 1822:21,
1876:20
**drop** [1] - 1886:14
**dropped** [2] - 1886:5,
1887:2
**due** [1] - 1876:18
**duplicate** [1] - 1788:5
**duration** [2] - 1876:7,
1876:8
**during** [14] - 1786:14,
1786:19, 1789:2,
1807:4, 1807:22,
1852:12, 1858:19,
1859:3, 1863:15,
1864:13, 1866:7,
1870:1, 1901:17,
1922:8
**duties** [1] - 1814:23
**duty** [2] - 1810:14,
1811:9
**DX515** [1] - 1873:22
**DX533** [1] - 1898:19
**DX567** [1] - 1916:16
**dynamics** [2] -
1878:24, 1903:4
**Dynamics** [12] -
1827:19, 1828:3,
1828:4, 1828:5,
1828:8, 1828:9,
1828:11, 1828:21,
1828:25, 1830:13,
1830:19, 1878:12
**dynamics'** [1] -
1840:18

# E

**eager** [1] - 1905:22
**early** [7] - 1843:14,
1843:17, 1845:4,
1851:12, 1916:21,
1923:22, 1923:25
**EC** [6] - 1845:10,
1845:20, 1846:4,
1847:9, 1867:16,
1879:17
**ECOU** [2] - 1824:18,
1872:15
**EDGAR** [1] - 1780:13
**editors** [1] - 1834:16
**effect** [1] - 1917:25
**efforts** [4] - 1797:2,
1811:11, 1811:14,
1816:9
**eight** [1] - 1868:24
**eighth** [1] - 1873:24
**either** [9] - 1831:20,
1848:11, 1855:3,
1860:3, 1870:21,
1871:21, 1873:3,
1908:25, 1919:18
**election** [7] - 1810:16,
1810:21, 1811:7,
1813:3, 1848:7,
1849:7, 1889:24
**election-related** [3] -
1811:7, 1813:3,
1849:7
**electronic** [4] -
1788:2, 1788:5,
1788:12, 1870:3
**elementary** [1] -
1826:20
**eliciting** [1] - 1922:20
**Ellis** [3] - 1860:11,
1860:14, 1916:23
**email** [59] - 1782:19,
1793:8, 1794:22,
1795:1, 1795:6,
1795:10, 1796:20,
1797:7, 1797:16,
1797:20, 1798:21,
1806:24, 1811:6,
1820:22, 1823:2,
1823:3, 1823:22,
1828:5, 1836:15,
1836:19, 1837:3,
1839:19, 1839:21,
1840:1, 1840:2,
1840:22, 1841:5,
1841:22, 1842:10,
1842:12, 1863:3,
1866:22, 1878:16,
1888:23, 1889:9,
1889:14, 1892:4,

1893:1, 1894:5,
1897:7, 1898:18,
1899:14, 1900:15,
1900:18, 1904:13,
1910:12, 1911:18,
1920:13, 1920:14,
1920:15, 1920:23,
1920:24, 1922:9,
1922:13, 1922:18,
1922:24, 1923:3,
1923:5
**email.com** [2] -
1827:18, 1829:16
**emails** [4] - 1806:24,
1865:24, 1869:13,
1907:23
**employ** [1] - 1820:1
**employed** [1] -
1784:14
**employs** [2] - 1818:2,
1819:25
**encourage** [1] -
1801:1
**end** [4] - 1799:12,
1912:12, 1912:17,
1921:20
**ended** [1] - 1840:15
**engaged** [1] - 1917:8
**enters** [1] - 1783:19
**entire** [1] - 1789:16
**entirety** [1] - 1799:20
**entities** [1] - 1797:1
**entry** [1] - 1916:18
**envelope** [1] - 1886:9
**equities** [2] - 1825:5,
1825:6
**equity** [1] - 1872:17
**ESQ** [8] - 1780:12,
1780:13, 1780:13,
1780:14, 1780:17,
1780:17, 1780:18,
1780:18
**Essentially** [1] -
1886:8
**essentially** [2] -
1903:19, 1922:16
**established** [1] -
1844:19
**Eurasian** [3] -
1810:10, 1813:15,
1824:12
**evening** [1] - 1783:21
**events** [1] - 1793:16
**eventually** [1] - 1845:1
**evidence** [36] -
1790:11, 1790:14,
1794:4, 1800:16,
1800:25, 1801:4,
1801:6, 1807:7,
1817:5, 1822:14,

1836:11, 1845:16,
1867:1, 1868:3,
1872:5, 1873:21,
1876:19, 1877:21,
1877:22, 1877:23,
1878:4, 1878:17,
1880:1, 1881:22,
1883:12, 1883:13,
1885:17, 1887:18,
1890:13, 1897:21,
1898:1, 1898:21,
1904:12, 1909:9,
1910:19, 1917:3
**exact** [1] - 1854:20
**exactly** [1] - 1831:21
**exam** [1] - 1811:2
**Exam** [2] - 1811:4,
1849:22
**examination** [5] -
1912:17, 1920:7,
1922:20, 1923:6,
1923:14
**EXAMINATION** [5] -
1784:7, 1791:22,
1806:21, 1808:23,
1851:20
**examinations** [1] -
1851:25
**examining** [1] -
1922:23
**example** [3] - 1841:9,
1906:25, 1908:3
**except** [1] - 1808:12
**excluded** [1] - 1920:16
**exclusion** [1] -
1823:15
**exculpatory** [7] -
1812:5, 1812:8,
1812:10, 1812:12,
1812:17, 1812:21,
1812:25
**excuse** [2] - 1821:1,
1841:24
**excused** [1] - 1808:11
**executive** [1] - 1796:9
**exhibit** [4] - 1782:17,
1787:12, 1788:2,
1836:14
**Exhibit** [45] - 1787:2,
1787:5, 1787:21,
1787:24, 1788:9,
1788:15, 1791:3,
1791:10, 1793:25,
1798:3, 1807:15,
1817:5, 1820:16,
1822:15, 1825:10,
1825:17, 1829:9,
1829:13, 1832:22,
1835:1, 1835:8,
1836:10, 1845:15,

1861:13, 1867:1,
1872:4, 1873:14,
1877:3, 1878:3,
1879:25, 1881:20,
1883:11, 1885:16,
1887:16, 1888:22,
1890:12, 1892:7,
1892:8, 1897:20,
1901:11, 1906:3,
1909:7, 1910:11,
1920:16
**exhibits** [1] - 1924:9
**existed** [1] - 1789:8
**exit** [9] - 1823:5,
1832:25, 1833:6,
1833:11, 1834:8,
1834:9, 1834:12,
1834:19, 1844:9
**exits** [2] - 1851:16,
1922:1
**expect** [1] - 1873:9
**expected** [4] -
1885:13, 1899:19,
1904:11, 1908:19
**experience** [6] -
1790:10, 1813:16,
1813:25, 1847:21,
1896:22, 1913:12
**expert** [4] - 1888:13,
1899:7, 1899:18,
1900:19
**experts** [1] - 1899:8
**explain** [15] - 1810:24,
1811:13, 1812:10,
1813:12, 1815:7,
1816:6, 1826:19,
1833:5, 1834:14,
1840:4, 1844:15,
1862:7, 1863:21,
1865:4, 1877:14
**explained** [2] -
1821:14, 1827:22
**explanation** [2] -
1823:18, 1907:12
**expressed** [1] -
1884:18
**extend** [1] - 1876:10
**extent** [4] - 1801:3,
1802:18, 1882:13,
1887:9
**external** [1] - 1839:20

**F**

**facility** [1] - 1830:4
**fact** [14] - 1786:18,
1798:25, 1800:19,
1802:17, 1857:9,
1868:1, 1883:10,
1886:22, 1890:9,

1895:17, 1903:5,
1914:7, 1918:6,
1919:7
**facts** [1] - 1818:25
**fair** [10] - 1798:15,
1802:16, 1830:5,
1858:25, 1871:4,
1871:21, 1891:24,
1914:15, 1915:10,
1916:1
**fall** [1] - 1813:2
**false** [4] - 1826:9,
1877:7, 1878:1,
1879:10
**far** [6] - 1812:15,
1812:21, 1820:24,
1824:14, 1832:4,
1856:6
**Farrell** [1] - 1794:14
**fault** [1] - 1902:4
**FBI** [122] - 1784:22,
1785:6, 1786:7,
1789:25, 1790:6,
1792:18, 1792:19,
1795:10, 1796:2,
1796:4, 1796:10,
1796:13, 1796:18,
1798:12, 1798:13,
1798:14, 1800:24,
1800:25, 1801:2,
1803:22, 1803:24,
1804:9, 1804:11,
1806:8, 1806:15,
1806:25, 1809:5,
1809:6, 1809:11,
1809:24, 1809:25,
1810:1, 1811:17,
1813:6, 1813:25,
1814:14, 1814:18,
1815:23, 1815:25,
1816:14, 1816:15,
1816:20, 1816:23,
1818:4, 1819:11,
1820:20, 1821:19,
1822:1, 1824:7,
1826:2, 1830:8,
1831:6, 1831:14,
1831:18, 1831:22,
1833:14, 1833:25,
1834:5, 1836:8,
1836:21, 1837:8,
1837:12, 1837:15,
1838:4, 1838:21,
1841:9, 1841:16,
1842:15, 1843:17,
1843:23, 1846:15,
1846:23, 1847:5,
1847:10, 1847:21,
1847:25, 1848:9,
1848:13, 1848:16,

1849:25, 1850:12,
1850:18, 1851:6,
1853:8, 1854:9,
1855:1, 1855:3,
1861:3, 1863:1,
1865:7, 1866:6,
1867:9, 1868:4,
1868:15, 1869:1,
1880:9, 1880:18,
1881:2, 1890:3,
1891:11, 1891:18,
1893:4, 1895:22,
1895:25, 1896:1,
1896:7, 1896:23,
1901:1, 1901:2,
1901:4, 1901:8,
1903:6, 1904:4,
1904:11, 1905:2,
1907:3, 1907:21,
1907:25, 1910:24,
1911:11, 1914:2
**FBI's** [12] - 1797:2,
1801:1, 1811:5,
1814:13, 1832:12,
1843:10, 1903:21,
1904:1, 1905:4,
1906:24, 1907:19,
1908:10
**federal** [3] - 1818:14,
1819:2, 1858:14
**fellow** [1] - 1896:22
**felt** [1] - 1913:20
**few** [3] - 1836:19,
1855:20, 1911:2
**field** [15] - 1809:16,
1810:3, 1817:25,
1818:1, 1818:15,
1818:20, 1818:24,
1819:4, 1819:9,
1819:18, 1819:24,
1828:10, 1846:7,
1846:10, 1923:15
**Field** [6] - 1809:17,
1810:5, 1810:17,
1814:15, 1817:19,
1817:22
**fifth** [1] - 1873:24
**figure** [1] - 1876:20
**file** [3] - 1844:2,
1860:5, 1860:10
**files** [9] - 1822:12,
1827:5, 1829:1,
1830:13, 1830:16,
1830:21, 1830:25,
1831:6, 1860:8
**fill** [1] - 1862:11
**filled** [2] - 1862:11,
1863:9
**finally** [1] - 1837:19
**financial** [1] - 1850:10

**findings** [7] - 1822:23,
1823:24, 1824:20,
1832:9, 1903:19,
1903:21, 1911:20
**fired** [2] - 1874:10,
1895:17
**firm** [5] - 1831:16,
1832:20, 1866:20,
1915:23, 1915:24
**first** [50] - 1807:17,
1809:21, 1815:21,
1816:14, 1817:6,
1818:7, 1820:17,
1820:19, 1821:19,
1822:22, 1822:23,
1826:2, 1826:7,
1826:8, 1831:18,
1832:22, 1835:15,
1837:24, 1840:4,
1841:22, 1842:19,
1845:24, 1854:13,
1854:19, 1857:5,
1857:19, 1861:4,
1862:8, 1862:23,
1862:24, 1863:5,
1863:12, 1863:15,
1864:7, 1864:14,
1864:23, 1865:2,
1865:25, 1866:2,
1866:6, 1867:1,
1868:12, 1871:14,
1878:16, 1879:13,
1889:15, 1907:9,
1910:24, 1911:10
**FISA** [4] - 1812:24,
1813:1, 1853:12,
1853:15
**five** [5] - 1857:2,
1857:3, 1860:7,
1881:13, 1923:24
**floor** [1] - 1874:10
**Florida** [1] - 1828:9
**focus** [6] - 1785:5,
1796:25, 1825:20,
1858:19, 1859:2,
1859:3, 1897:22,
1917:6
**folks** [3] - 1831:8,
1869:21, 1871:15
**follow** [7] - 1802:20,
1803:3, 1803:4,
1808:3, 1850:1,
1892:4, 1916:22
**follow-on** [1] -
1916:22
**follow-up** [3] - 1803:3,
1803:4, 1808:3
**followed** [2] - 1890:9,
1890:16
**following** [6] - 1808:5,

1826:22, 1832:1,
1843:17, 1882:22,
1920:4
**footnote** [1] - 1829:11
**FOR** [1] - 1780:1
**foregoing** [1] - 1925:4
**forensic** [1] - 1831:8
**form** [3] - 1805:8,
1862:10, 1870:4
**former** [3] - 1796:2,
1855:3, 1855:4
**forth** [2] - 1797:19,
1849:24
**forthing** [1] - 1906:8
**foundation** [1] -
1833:17
**founder** [1] - 1796:1
**four** [5] - 1810:7,
1876:15, 1876:17,
1912:20, 1913:4
**fourth** [1] - 1905:16
**Friday** [5] - 1789:21,
1802:14, 1856:16,
1886:16, 1889:19
**front** [4] - 1842:21,
1843:4, 1870:4,
1893:15
**frustrating** [1] -
1891:24
**frustration** [1] -
1884:18
**Full** [2] - 1817:19,
1817:22
**full** [24] - 1817:25,
1818:1, 1818:15,
1818:20, 1818:24,
1819:4, 1819:8,
1819:18, 1819:24,
1846:7, 1846:10,
1860:25, 1875:1,
1875:3, 1875:4,
1875:8, 1875:11,
1875:17, 1875:23,
1876:5, 1876:7,
1892:1, 1925:5
**fully** [1] - 1854:2
**future** [1] - 1911:4
**FYI** [1] - 1796:21

## G

**gap** [1] - 1921:5
**Gaynor** [10] - 1836:15,
1836:20, 1836:21,
1842:12, 1842:15,
1843:3, 1892:5,
1892:10, 1893:14,
1910:12
**GC** [2] - 1886:5,
1886:9

**General** [4] - 1784:19,
1865:6, 1865:8,
1869:18
**general** [25] - 1784:25,
1785:4, 1785:6,
1790:10, 1790:12,
1794:11, 1794:12,
1794:16, 1807:7,
1816:17, 1816:18,
1821:7, 1821:20,
1847:7, 1864:24,
1865:16, 1865:17,
1865:22, 1866:4,
1866:6, 1866:15,
1866:21, 1866:24,
1868:2, 1871:1
**generally** [11] -
1790:4, 1809:23,
1818:3, 1819:17,
1822:7, 1834:11,
1858:8, 1896:8,
1896:11, 1909:20,
1910:6
**generating** [1] -
1867:18
**gentleman** [1] -
1795:19
**gentlemen** [6] -
1783:20, 1851:11,
1854:13, 1854:14,
1854:16, 1921:21
**Georgia** [3] - 1902:19,
1905:25, 1912:1
**Gessford** [2] -
1885:20, 1885:21
**get-go** [1] - 1851:9
**given** [5] - 1821:20,
1824:11, 1857:25,
1895:23, 1916:2
**glide** [2] - 1782:13,
1782:15
**good...** [1] - 1882:3
**gosh** [1] - 1793:17
**Government** [17] -
1798:3, 1817:4,
1820:16, 1822:15,
1825:9, 1825:17,
1829:9, 1829:13,
1832:21, 1835:1,
1835:8, 1836:10,
1845:14, 1861:13,
1867:1, 1892:7,
1920:16
**government** [17] -
1786:11, 1790:18,
1790:19, 1790:22,
1795:12, 1798:7,
1804:12, 1808:14,
1821:8, 1821:14,
1825:16, 1852:10,

1855:18, 1857:5,
1857:23, 1860:7,
1895:20
**government's** [1] -
1783:24
**Government's** [10] -
1787:2, 1787:5,
1787:21, 1787:24,
1788:8, 1788:14,
1791:3, 1791:5,
1791:9, 1807:15
**graduated** [1] - 1810:1
**grand** [4] - 1855:11,
1855:14, 1870:18,
1870:20
**Grasso** [24] - 1839:4,
1839:5, 1839:6,
1839:8, 1839:19,
1840:6, 1848:22,
1888:23, 1888:24,
1889:14, 1890:10,
1890:24, 1892:5,
1892:15, 1893:1,
1893:3, 1897:8,
1898:18, 1898:23,
1899:17, 1900:18,
1906:5, 1909:4,
1911:14
**great** [4] - 1783:1,
1900:1, 1916:2,
1919:14
**ground** [1] - 1923:25
**group** [7] - 1785:23,
1789:19, 1799:6,
1801:24, 1807:18,
1813:6, 1886:10
**guess** [4] - 1792:5,
1793:20, 1852:22,
1857:3
**guilt** [1] - 1812:13
**gut** [1] - 1849:2
**guy** [3] - 1841:3,
1852:20
**guys** [5] - 1796:21,
1861:22, 1874:13,
1888:1, 1889:7
**GX111** [1] - 1921:5
**GX124** [1] - 1920:25

## H

**H-E-I-D-E** [1] - 1809:3
**hacking** [2] - 1793:8,
1813:24
**half** [2] - 1809:22,
1848:6
**hand** [4] - 1784:4,
1808:18, 1857:3,
1861:15
**handful** [4] - 1786:14,

1856:5, 1856:10,
1857:3
**handle** [1] - 1923:23
**handling** [3] - 1851:1,
1851:7, 1910:9
**handwriting** [1] -
1787:11
**happy** [3] - 1856:6,
1921:6, 1921:7
**HARDWICK** [1] -
1780:18
**hat** [1] - 1813:24
**hazy** [4] - 1857:10,
1857:22, 1857:25,
1869:14
**headquarters** [22] -
1814:15, 1815:23,
1815:25, 1823:9,
1824:7, 1836:22,
1837:8, 1837:15,
1838:21, 1841:9,
1842:16, 1861:23,
1865:19, 1880:9,
1890:19, 1891:18,
1891:22, 1894:11,
1894:12, 1896:23,
1901:20, 1901:22
**heads** [1] - 1886:4
**Health** [13] - 1823:6,
1833:1, 1843:21,
1843:23, 1843:24,
1844:3, 1844:8,
1847:20, 1913:4,
1917:21, 1917:24,
1918:4, 1918:8
**hear** [1] - 1884:7
**heard** [6] - 1805:5,
1881:25, 1887:5,
1887:6, 1887:9,
1921:7
**hearing** [3] - 1884:8,
1894:11, 1920:5
**heavy** [1] - 1860:19
**HEIDE** [2] - 1781:6,
1808:22
**Heide** [27] - 1808:15,
1809:3, 1815:7,
1815:21, 1816:13,
1817:7, 1817:22,
1822:16, 1823:7,
1823:23, 1829:13,
1835:11, 1841:4,
1842:25, 1846:6,
1848:14, 1849:6,
1863:12, 1872:8,
1873:3, 1874:2,
1874:5, 1874:8,
1889:4, 1897:25,
1920:21, 1924:12
**Heidi** [1] - 1851:22

**held** [4] - 1785:13,
1809:24, 1876:18,
1920:5
**HELD** [1] - 1780:10
**Hellman** [14] -
1825:15, 1871:18,
1871:22, 1872:12,
1873:4, 1881:25,
1882:15, 1897:13,
1897:14, 1897:24,
1898:5, 1912:23,
1914:3, 1914:7
**hello** [3] - 1889:10,
1889:14, 1898:24
**help** [14] - 1810:11,
1810:15, 1811:11,
1852:25, 1856:7,
1860:8, 1861:6,
1861:9, 1863:23,
1888:15, 1898:4,
1898:25, 1900:19,
1913:21
**helpful** [6] - 1798:11,
1881:6, 1893:22,
1894:2, 1899:9,
1917:15
**Henry** [4] - 1795:19,
1795:23, 1796:16,
1796:24
**hereby** [1] - 1925:3
**herring** [3] - 1920:12,
1920:15, 1924:16
**hi** [1] - 1796:21
**hiding** [1] - 1833:7
**higher** [1] - 1911:4
**highlight** [4] -
1822:22, 1829:11,
1832:22, 1922:12
**Hillary** [1] - 1811:5
**hired** [6] - 1832:6,
1914:21, 1915:2,
1915:16, 1915:22,
1917:7
**hiring** [1] - 1915:4
**historical** [6] - 1834:8,
1916:8, 1916:9,
1917:11, 1917:16,
1917:18
**historically** [2] -
1831:2, 1901:8
**history** [1] - 1871:11
**hit** [6] - 1880:10,
1880:15, 1880:24,
1881:3, 1882:2,
1900:16
**hold** [10] - 1785:10,
1785:18, 1802:25,
1804:2, 1804:6,
1804:8, 1804:22,
1805:1, 1821:5,

1921:2
**holdings** [5] - 1840:9, 1840:18, 1840:21, 1911:21
**home** [1] - 1911:13
**honestly** [1] - 1821:3
**Honor** [21] - 1782:2, 1782:5, 1782:9, 1783:25, 1787:22, 1788:14, 1791:9, 1791:20, 1806:20, 1808:9, 1808:14, 1825:16, 1835:7, 1851:10, 1920:1, 1920:6, 1921:7, 1922:4, 1922:11, 1922:13, 1924:8
**HONORABLE** [1] - 1780:10
**hope** [2] - 1783:21, 1889:6
**hops** [1] - 1833:10
**hospital** [1] - 1886:12
**hospitality** [1] - 1828:6
**hosted** [1] - 1829:16
**hours** [2] - 1916:13, 1917:12
**house** [3] - 1810:11, 1829:7, 1837:12
**housed** [4] - 1827:20, 1829:24, 1830:3, 1830:4
**HQ** [2] - 1842:20, 1893:15
**human** [14] - 1815:18, 1850:15, 1850:17, 1850:21, 1850:25, 1900:22, 1900:25, 1901:3, 1901:7, 1903:9, 1904:10, 1904:25, 1909:12, 1909:23
**hundreds** [2] - 1807:4, 1807:12
**Hurricane** [17] - 1805:23, 1811:12, 1811:13, 1811:14, 1811:16, 1812:6, 1813:9, 1816:5, 1816:9, 1816:10, 1826:14, 1849:13, 1849:16, 1874:7, 1883:24, 1884:1, 1885:24
**hybrid** [1] - 1813:14

**I**

**ID** [1] - 1820:3

**identification** [7] - 1793:24, 1804:3, 1804:22, 1805:2, 1805:6, 1805:7, 1835:1
**identified** [6] - 1844:5, 1865:2, 1866:7, 1886:10, 1903:10, 1905:24
**identify** [2] - 1831:2, 1841:12
**identifying** [1] - 1812:5
**identity** [5] - 1803:14, 1803:23, 1894:13, 1906:6, 1906:9
**IG** [2] - 1866:1, 1866:7
**implicates** [1] - 1783:13
**importance** [1] - 1841:15
**important** [13] - 1807:19, 1847:21, 1847:24, 1848:2, 1848:8, 1848:11, 1849:1, 1849:4, 1892:3, 1892:23, 1896:4, 1902:16, 1915:5
**improperly** [1] - 1866:17
**IN** [1] - 1780:1
**in-camera** [1] - 1783:8
**in-depth** [1] - 1785:22
**inability** [1] - 1884:19
**inappropriate** [1] - 1898:14
**include** [1] - 1874:10
**included** [2] - 1814:3, 1822:20
**incomplete** [1] - 1919:23
**inconsistent** [3] - 1903:18, 1905:1, 1913:20
**independent** [2] - 1791:17, 1798:22
**indicate** [1] - 1791:14
**indicating** [1] - 1908:23
**indication** [1] - 1923:11
**indictment** [1] - 1858:14
**individual** [4] - 1841:20, 1849:23, 1849:25, 1891:9
**individual's** [1] - 1852:25
**individually** [1] -

1811:20
**individuals** [4] - 1809:18, 1815:25, 1828:15, 1848:12
**industry** [1] - 1828:6
**info** [6] - 1842:4, 1886:4, 1886:10, 1886:15, 1889:22, 1893:9
**information** [149] - 1788:19, 1790:5, 1797:1, 1797:3, 1801:2, 1802:1, 1802:5, 1802:11, 1803:19, 1804:4, 1804:23, 1805:7, 1805:12, 1806:7, 1806:13, 1806:15, 1812:5, 1812:8, 1812:11, 1812:12, 1812:18, 1812:21, 1812:25, 1813:21, 1813:24, 1814:14, 1818:12, 1818:23, 1820:21, 1821:3, 1824:6, 1824:24, 1827:6, 1830:24, 1831:3, 1835:24, 1836:3, 1838:15, 1838:20, 1838:22, 1839:3, 1839:14, 1841:2, 1841:3, 1841:6, 1841:10, 1841:12, 1841:16, 1841:19, 1842:8, 1843:1, 1844:18, 1847:23, 1847:25, 1848:9, 1848:15, 1848:16, 1848:17, 1848:21, 1849:2, 1849:17, 1849:22, 1850:4, 1850:6, 1850:10, 1850:11, 1850:13, 1850:18, 1850:20, 1850:25, 1851:3, 1852:10, 1852:24, 1854:2, 1863:1, 1865:16, 1865:20, 1865:22, 1866:2, 1866:23, 1867:7, 1868:14, 1869:1, 1869:10, 1869:25, 1870:12, 1871:2, 1871:6, 1873:10, 1879:14, 1880:18, 1881:7, 1882:19, 1883:2, 1883:5, 1886:1, 1887:2, 1888:25, 1890:1, 1890:10, 1891:10, 1891:11,

1891:16, 1891:21, 1892:19, 1892:21, 1892:24, 1893:3, 1894:2, 1894:24, 1895:3, 1895:23, 1896:8, 1896:12, 1897:3, 1898:23, 1900:22, 1901:2, 1904:5, 1904:16, 1905:4, 1905:18, 1905:23, 1906:19, 1906:21, 1906:22, 1907:3, 1907:4, 1907:7, 1907:18, 1907:23, 1909:13, 1909:18, 1910:3, 1910:13, 1911:10, 1911:14, 1918:12, 1918:17, 1919:5, 1919:6, 1919:8, 1919:19, 1919:20, 1921:11
**informed** [1] - 1908:19
**infrastructure** [5] - 1815:20, 1827:2, 1827:20, 1829:8
**initial** [11] - 1811:11, 1824:5, 1824:8, 1825:3, 1825:4, 1844:20, 1847:16, 1877:16, 1877:19, 1898:22, 1914:3
**ink** [1] - 1789:23
**innocence** [2] - 1812:13, 1853:1
**inquiry** [2] - 1811:17, 1812:14
**insight** [1] - 1897:2
**inspection** [2] - 1854:4, 1864:9
**Inspector** [3] - 1865:6, 1865:8, 1869:18
**inspector** [1] - 1868:2
**instance** [4] - 1827:13, 1849:23, 1862:15, 1890:19
**instinct** [1] - 1849:2
**instruct** [1] - 1921:18
**intelligence** [4] - 1837:7, 1837:10, 1837:11, 1837:14
**Intelligence** [1] - 1869:9
**intentionally** [3] - 1812:8, 1812:17, 1852:24
**interact** [1] - 1837:1
**interacted** [2] - 1796:5, 1796:16
**interaction** [3] -

1799:10, 1801:5, 1900:10
**interactions** [4] - 1792:14, 1800:3, 1800:10, 1800:11
**interest** [3] - 1840:7, 1867:23, 1890:1
**Interest'** [1] - 1911:12
**interested** [1] - 1835:12
**interests** [3] - 1850:7, 1919:2, 1919:5
**interfered** [1] - 1892:1
**internal** [4] - 1838:3, 1844:3, 1864:8, 1904:1
**internally** [1] - 1813:22
**Internet** [6] - 1815:19, 1827:3, 1827:5, 1833:8, 1833:10, 1833:13
**interrupt** [1] - 1782:16
**intervening** [1] - 1799:25
**interview** [35] - 1830:8, 1835:16, 1835:22, 1836:1, 1841:1, 1841:19, 1842:4, 1842:8, 1843:8, 1849:25, 1863:16, 1863:22, 1864:13, 1866:1, 1866:7, 1868:3, 1868:8, 1883:5, 1883:16, 1884:15, 1884:19, 1884:24, 1891:23, 1892:3, 1892:11, 1892:18, 1893:8, 1893:9, 1893:24, 1895:17, 1896:15, 1902:6, 1902:24, 1914:1, 1918:16
**interviewed** [5] - 1869:18, 1887:13, 1888:20, 1895:2, 1906:25
**interviewing** [6] - 1835:12, 1891:19, 1894:7, 1906:15, 1924:13, 1924:17
**interviews** [8] - 1830:15, 1859:23, 1859:24, 1860:1, 1860:3, 1860:9, 1870:1, 1870:4
**introducing** [1] - 1924:9
**intrusion** [2] - 1797:4,

1825:6
**investigate** [8] -
1819:12, 1824:5,
1833:3, 1859:5,
1875:11, 1881:3,
1881:5, 1917:8
**investigated** [7] -
1811:20, 1811:24,
1812:2, 1814:1,
1849:12, 1859:3,
1859:8
**investigating** [6] -
1816:10, 1853:9,
1854:5, 1858:16,
1858:24, 1865:9
**investigation** [114] -
1804:7, 1805:20,
1805:24, 1811:3,
1811:4, 1811:5,
1811:16, 1811:18,
1811:21, 1812:1,
1812:7, 1813:9,
1814:13, 1814:16,
1814:17, 1814:18,
1815:6, 1815:9,
1815:10, 1815:22,
1817:25, 1818:1,
1818:2, 1818:10,
1818:11, 1818:15,
1818:20, 1818:24,
1819:5, 1819:9,
1819:16, 1819:19,
1819:20, 1819:21,
1819:24, 1819:25,
1820:11, 1820:13,
1822:4, 1824:4,
1824:8, 1825:2,
1825:8, 1826:24,
1828:7, 1828:12,
1833:21, 1837:2,
1837:9, 1837:17,
1841:7, 1841:18,
1842:5, 1842:18,
1843:10, 1844:3,
1846:7, 1846:10,
1847:12, 1852:8,
1852:16, 1854:8,
1857:13, 1857:17,
1858:2, 1858:11,
1858:13, 1859:11,
1859:17, 1859:18,
1859:21, 1859:24,
1861:2, 1861:4,
1865:1, 1865:5,
1867:19, 1871:5,
1871:11, 1875:8,
1875:24, 1875:25,
1876:12, 1881:6,
1881:14, 1883:1,
1884:12, 1888:1,
1892:2, 1893:6,

1893:10, 1893:24,
1897:7, 1897:17,
1899:9, 1900:21,
1905:22, 1907:19,
1911:11, 1912:3,
1913:8, 1916:6,
1916:23, 1917:1,
1917:15, 1917:19,
1918:9, 1919:23,
1921:9, 1923:2,
1923:7, 1923:16
**Investigation** [3] -
1817:20, 1817:22,
1845:25
**investigations** [20] -
1810:15, 1810:22,
1810:25, 1811:8,
1812:6, 1813:17,
1814:3, 1814:4,
1818:4, 1818:6,
1819:4, 1840:12,
1849:7, 1849:15,
1859:10, 1859:13,
1865:7, 1875:17,
1913:13
**Investigative** [1] -
1820:4
**investigative** [21] -
1818:8, 1818:16,
1819:15, 1820:8,
1820:12, 1826:23,
1832:20, 1833:25,
1841:11, 1843:19,
1872:19, 1875:14,
1875:15, 1882:14,
1902:6, 1903:5,
1908:10, 1912:14,
1914:24, 1917:10
**investigator** [7] -
1803:25, 1805:16,
1894:16, 1895:9,
1895:10, 1919:14,
1919:15
**investigators** [1] -
1918:8
**involved** [11] - 1790:6,
1790:7, 1795:20,
1820:13, 1822:8,
1844:8, 1848:5,
1849:9, 1849:10,
1854:15, 1918:3
**involvement** [1] -
1847:14
**involving** [4] - 1786:1,
1814:8, 1889:23,
1916:23
**Iowa** [1] - 1809:12,
1809:13, 1813:20
**IP** [14] - 1815:19,
1830:14, 1838:17,

1838:23, 1838:25,
1839:9, 1840:6,
1840:7, 1840:17,
1886:10, 1889:25,
1890:20, 1911:13,
1911:21
**IPs** [5] - 1838:1,
1838:6, 1838:8,
1838:20, 1892:13
**irrespective** [1] -
1907:17
**issue** [12] - 1782:25,
1783:3, 1805:19,
1812:20, 1835:13,
1853:16, 1853:18,
1867:22, 1876:19,
1921:15, 1924:1
**issued** [1] - 1854:2
**issues** [11] - 1785:6,
1785:22, 1792:23,
1792:24, 1797:13,
1813:4, 1877:13,
1880:15, 1923:13,
1923:21, 1924:3
**itself** [3] - 1796:20,
1804:7, 1818:23
**IV** [1] - 1780:13

## J

**James** [1] - 1785:2
**January** [11] - 1804:9,
1804:12, 1804:15,
1804:21, 1810:13,
1811:1, 1845:5,
1847:9, 1866:9,
1866:11, 1876:15
**Jim** [4] - 1816:18,
1847:7, 1866:4,
1866:23
**job** [2] - 1805:15,
1895:5
**Joe** [23] - 1816:2,
1816:3, 1816:7,
1816:8, 1821:5,
1825:15, 1826:8,
1826:13, 1826:18,
1835:6, 1835:20,
1835:25, 1836:16,
1837:13, 1870:11,
1874:2, 1874:6,
1880:21, 1883:23,
1883:24, 1886:3,
1910:14
**Joffe** [3] - 1922:15,
1922:22, 1922:25
**Joffe's** [2] - 1924:4
**joke** [3] - 1826:18,
1877:13, 1877:14
**Jon** [1] - 1886:7
**Jonathan** [4] - 1782:6,

1836:16, 1837:6,
1837:7
**JONATHAN** [1] -
1780:13
**judge** [4] - 1833:17,
1865:4, 1917:3,
1923:5
**JUDGE** [1] - 1780:10
**Judge** [3] - 1782:15,
1923:14, 1923:20
**June** [13] - 1794:22,
1795:3, 1795:6,
1795:15, 1795:23,
1796:21, 1797:11,
1798:21, 1854:23,
1855:12, 1868:23,
1869:7, 1870:20
**jury** [37] - 1782:24,
1783:19, 1789:17,
1795:17, 1797:18,
1809:23, 1810:24,
1811:13, 1812:10,
1813:13, 1815:7,
1816:6, 1822:25,
1833:5, 1834:14,
1840:5, 1844:15,
1851:16, 1853:15,
1854:25, 1855:12,
1855:14, 1857:12,
1862:7, 1863:21,
1865:4, 1870:18,
1870:21, 1873:14,
1874:4, 1889:10,
1899:6, 1900:24,
1914:21, 1920:5,
1921:8, 1922:1
**JURY** [1] - 1780:9
**JUSTICE** [5] -
1820:21, 1846:17,
1846:25, 1863:2,
1867:11
**Justice** [13] - 1784:17,
1784:18, 1796:14,
1821:6, 1821:15,
1847:1, 1863:14,
1865:18, 1865:23,
1868:4, 1868:15,
1870:22, 1871:7

## K

**keep** [3] - 1788:1,
1843:7, 1876:5
**KEILTY** [1] - 1780:13
**Keilty** [1] - 1782:7
**Keith** [1] - 1889:19
**kept** [1] - 1901:5
**kind** [3] - 1799:7,
1815:19, 1874:21
**Kirkland** [3] - 1860:11,
1860:14, 1916:23

**knowledge** [2] -
1789:8, 1800:13
**known** [5] - 1829:18,
1849:17, 1884:23,
1918:12, 1918:23
**knows** [3] - 1853:15,
1886:13, 1922:6

## L

**ladies** [4] - 1783:20,
1851:11, 1854:14,
1921:21
**last** [6] - 1797:6,
1856:16, 1856:24,
1859:10, 1880:5,
1894:11
**lasted** [1] - 1799:3
**LATHAM** [1] - 1780:19
**law** [3] - 1794:15,
1818:14, 1819:2
**lawyer** [11] - 1792:10,
1792:11, 1792:18,
1804:18, 1805:16,
1868:18, 1868:19,
1868:21, 1869:15,
1886:8, 1886:15
**lawyers** [1] - 1795:13
**layers** [1] - 1823:20
**lead** [3] - 1815:5,
1857:15, 1908:18
**leading** [2] - 1816:8,
1882:24
**leaning** [4] - 1826:9,
1877:7, 1878:1,
1879:9
**learn** [11] - 1815:21,
1816:19, 1831:18,
1842:22, 1842:25,
1843:5, 1861:2,
1861:9, 1863:12,
1893:16
**learned** [6] - 1785:25,
1814:7, 1863:15,
1864:10, 1864:14,
1864:23
**least** [14] - 1782:18,
1806:1, 1807:3,
1807:11, 1858:6,
1870:8, 1871:5,
1877:16, 1880:25,
1881:6, 1881:13,
1890:24, 1891:15,
1903:14
**leave** [2] - 1798:11,
1798:14
**led** [1] - 1871:6
**left** [1] - 1861:15
**left-hand** [1] - 1861:15
**Legal** [1] - 1784:20

**legalistic** [1] - 1797:19
**legit** [1] - 1879:12
**legitimate** [5] -
1878:10, 1878:21,
1878:25, 1879:3,
1894:21
**length** [2] - 1859:15,
1859:16
**less** [1] - 1876:12
**letter** [1] - 1793:1
**level** [4] - 1806:2,
1826:20, 1882:6,
1901:2
**levels** [1] - 1818:7
**liaison** [1] - 1842:15
**lies** [1] - 1827:2
**likely** [1] - 1869:9
**limit** [3] - 1783:3,
1819:25, 1876:8
**limited** [1] - 1818:8
**line** [9] - 1825:21,
1826:7, 1826:8,
1826:11, 1835:15,
1835:18, 1837:24,
1872:7, 1873:24
**Lisa** [1] - 1780:22
**LISA** [1] - 1925:3
**list** [4] - 1834:8,
1834:10, 1834:11,
1911:3
**listed** [6] - 1794:19,
1834:9, 1834:10,
1862:15, 1867:3,
1872:7
**Listrak** [12] - 1827:21,
1829:2, 1829:5,
1829:6, 1829:17,
1829:22, 1829:23,
1829:24, 1830:9,
1830:11, 1844:13,
1847:18
**lists** [2] - 1872:21,
1875:13
**litigation** [3] - 1790:6,
1792:17, 1792:18
**LLP** [1] - 1780:19
**lobby** [1] - 1852:2
**located** [2] - 1828:9,
1830:6
**location** [1] - 1833:9
**locations** [1] - 1815:18
**log** [7] - 1827:5,
1829:1, 1830:13,
1830:16, 1830:21,
1830:25, 1831:6
**logbook** [1] - 1898:3
**logical** [11] - 1841:8,
1842:5, 1843:13,
1882:19, 1882:25,
1883:1, 1893:10,

1893:23, 1894:1,
1897:6, 1900:6
**logs** [25] - 1837:25,
1838:5, 1840:13,
1842:22, 1843:5,
1843:7, 1847:17,
1887:23, 1887:25,
1888:5, 1888:7,
1888:12, 1888:19,
1892:13, 1892:15,
1893:16, 1903:4,
1903:22, 1904:1,
1908:7, 1912:25,
1914:10, 1914:12,
1916:12, 1917:12
**LOL** [1] - 1898:5
**look** [62] - 1788:8,
1794:5, 1796:12,
1796:20, 1824:19,
1826:5, 1826:24,
1831:8, 1837:25,
1838:6, 1840:7,
1844:19, 1860:4,
1861:13, 1861:14,
1861:16, 1862:20,
1863:24, 1864:15,
1866:8, 1866:19,
1866:25, 1868:7,
1868:9, 1871:13,
1872:4, 1873:13,
1873:23, 1873:25,
1875:13, 1876:22,
1877:17, 1878:2,
1878:13, 1878:17,
1879:8, 1879:24,
1881:20, 1882:17,
1883:10, 1885:16,
1887:15, 1888:22,
1890:12, 1892:6,
1892:13, 1897:19,
1898:19, 1900:12,
1901:11, 1901:12,
1902:15, 1906:3,
1909:1, 1909:6,
1909:16, 1909:25,
1910:11, 1910:18,
1912:11, 1915:8,
1916:7
**look-alike** [1] -
1844:19
**looked** [7] - 1861:14,
1866:1, 1877:5,
1888:11, 1908:7,
1914:11, 1914:12
**looking** [12] - 1788:18,
1789:10, 1811:14,
1815:3, 1821:22,
1841:12, 1841:14,
1860:16, 1860:20,
1861:1, 1878:5,

1909:17
**looks** [2] - 1788:12,
1825:15
**loud** [2] - 1822:24,
1846:14
**Lunch** [1] - 1924:23
**lunch** [5] - 1782:22,
1782:24, 1921:15,
1921:16, 1921:22
**Lync** [12] - 1821:5,
1825:14, 1835:5,
1837:3, 1869:13,
1873:20, 1873:21,
1877:4, 1878:5,
1887:19, 1897:21
**Lync'd** [1] - 1879:11
**Lyncs** [1] - 1880:2

## M

**ma'am** [1] - 1784:2
**machine** [1] - 1829:25
**mail** [1] - 1829:24
**mail1.trump** [1] -
1829:16
**mail1.trump-email.
com** [1] - 1829:16
**maintains** [1] -
1834:13
**majority** [1] - 1813:10
**management** [1] -
1813:21
**manager** [1] - 1836:24
**managing** [1] -
1842:17
**Mandiant** [23] -
1831:17, 1831:18,
1831:24, 1832:6,
1832:15, 1832:18,
1843:22, 1847:19,
1860:11, 1860:13,
1913:2, 1914:15,
1914:16, 1914:21,
1915:5, 1915:7,
1915:22, 1915:24,
1916:6, 1916:9,
1916:22, 1917:1,
1923:1
**MANDIANT** [2] -
1917:7, 1917:10
**map** [1] - 1852:6
**March** [3] - 1790:17,
1790:20, 1855:21
**mark** [3] - 1787:2,
1793:24, 1898:2
**marked** [5] - 1787:2,
1787:4, 1787:13,
1787:16, 1834:25
**marketing** [2] -
1828:5, 1829:6

**marking** [1] - 1787:18
**mask** [2] - 1784:3,
1808:18
**mass** [2] - 1828:5,
1829:6
**materials** [9] - 1801:4,
1822:1, 1822:3,
1822:8, 1853:24,
1864:23, 1865:24,
1869:12, 1872:1
**math** [1] - 1793:21
**matrix** [1] - 1875:13
**Matter** [1] - 1820:4
**matter** [25] - 1790:8,
1804:1, 1808:6,
1820:8, 1820:9,
1820:12, 1825:6,
1825:7, 1836:22,
1836:23, 1846:9,
1848:5, 1857:20,
1863:16, 1864:3,
1866:8, 1870:5,
1889:21, 1899:7,
1899:8, 1899:18,
1900:19, 1904:20,
1910:9, 1911:4
**mattered** [6] -
1848:18, 1849:18,
1850:7, 1850:22,
1918:13, 1919:1
**matters** [13] - 1797:13,
1810:4, 1810:7,
1810:18, 1811:6,
1811:15, 1813:15,
1813:24, 1816:11,
1820:10, 1849:7,
1852:14, 1857:21
**McCabe** [1] - 1802:24
**mean** [13] - 1782:16,
1804:21, 1815:16,
1819:5, 1819:14,
1820:7, 1826:17,
1830:1, 1843:6,
1861:24, 1883:6,
1891:7, 1905:7
**meaning** [1] - 1913:25
**means** [4] - 1794:12,
1815:13, 1886:13,
1901:7
**meant** [3] - 1816:6,
1843:7, 1844:15
**media** [2] - 1881:3,
1886:15
**meet** [2] - 1790:5,
1868:17
**meeting** [24] -
1786:24, 1788:23,
1789:18, 1790:19,
1790:23, 1791:1,
1794:8, 1796:22,

1796:25, 1799:7,
1799:18, 1801:17,
1803:5, 1804:9,
1804:11, 1804:12,
1807:22, 1807:24,
1828:23, 1828:24,
1854:19, 1854:22,
1868:18, 1870:17
**meetings** [18] -
1785:11, 1785:13,
1785:17, 1785:18,
1786:15, 1786:19,
1789:2, 1790:18,
1792:4, 1799:13,
1799:14, 1799:15,
1831:24, 1832:2,
1832:4, 1855:9,
1855:17, 1901:22
**memory** [3] - 1857:9,
1857:17, 1869:13
**mention** [1] - 1801:20
**mentioned** [25] -
1800:15, 1810:21,
1813:3, 1814:20,
1815:15, 1819:3,
1819:7, 1821:25,
1827:8, 1827:10,
1828:15, 1829:2,
1830:15, 1836:19,
1837:5, 1837:13,
1839:23, 1841:25,
1843:13, 1843:23,
1844:11, 1845:1,
1849:6, 1849:9,
1849:12
**mess** [1] - 1898:8
**message** [4] - 1841:4,
1873:20, 1873:21,
1897:21
**messages** [8] -
1825:14, 1835:5,
1837:3, 1869:13,
1878:5, 1887:19,
1908:1, 1908:2
**met** [27] - 1786:10,
1788:25, 1790:3,
1792:6, 1798:22,
1798:24, 1804:16,
1804:18, 1821:8,
1839:6, 1852:1,
1852:4, 1852:9,
1854:13, 1854:15,
1854:25, 1855:11,
1856:10, 1856:24,
1857:5, 1857:23,
1860:6, 1868:1,
1868:23, 1869:21,
1869:23, 1905:8
**Miami** [7] - 1828:10,
1828:19, 1838:3,

1838:5, 1840:8, 1879:6, 1879:7
**Michael** [6] - 1782:4, 1782:6, 1782:10, 1786:8, 1796:23, 1851:24
**MICHAEL** [3] - 1780:6, 1780:13, 1780:17
**Michigan** [3] - 1823:6, 1833:1, 1886:12
**mid** [2] - 1811:2, 1871:12
**Mid** [3] - 1811:4, 1849:9, 1849:22
**mid-October** [1] - 1871:12
**mid-year** [1] - 1811:2
**Mid-Year** [3] - 1811:4, 1849:9, 1849:22
**middle** [3] - 1799:12, 1858:10, 1889:5
**might** [9] - 1849:5, 1852:7, 1857:17, 1881:4, 1907:13, 1908:2, 1908:10, 1914:11, 1915:5
**mind** [5] - 1784:3, 1865:21, 1869:6, 1922:21, 1922:25
**minute** [1] - 1889:3
**minutes** [4] - 1851:13, 1921:13, 1921:14, 1923:25
**misconfigured** [1] - 1844:6
**mislead** [1] - 1856:7
**miss** [1] - 1889:16
**missing** [1] - 1841:21
**misspelling** [1] - 1844:17
**mistake** [6] - 1820:25, 1821:1, 1821:2, 1821:24, 1863:8, 1863:9
**mistakes** [3] - 1793:23, 1867:21, 1871:11
**MM** [2] - 1837:25, 1838:2
**Moffa** [7] - 1836:16, 1837:6, 1837:7, 1886:4, 1886:6, 1886:7, 1886:13
**Moines** [4] - 1809:12, 1809:13, 1809:15, 1810:20
**moment** [2] - 1782:19, 1920:1
**month** [5] - 1811:10, 1848:6, 1859:21,

1876:9, 1910:23
**months** [10] - 1819:23, 1843:12, 1859:6, 1859:7, 1859:8, 1859:19, 1868:24, 1876:6, 1876:13, 1876:17
**MOREIRA** [1] - 1925:3
**Moreira** [2] - 1780:22, 1925:10
**MORNING** [1] - 1780:6
**morning** [19] - 1782:2, 1782:5, 1782:8, 1782:9, 1782:12, 1782:17, 1782:22, 1784:9, 1784:10, 1791:24, 1792:1, 1799:13, 1799:17, 1799:19, 1808:25, 1809:1, 1851:12, 1851:22, 1851:23
**Moscow** [2] - 1823:4
**most** [7] - 1795:13, 1858:7, 1882:19, 1896:4
**motivation** [4] - 1848:13, 1894:25, 1896:19, 1896:20
**motivations** [4] - 1805:12, 1849:24, 1851:6, 1915:4
**motive** [1] - 1923:13
**motives** [3] - 1918:21, 1924:4, 1924:5
**move** [14] - 1788:14, 1794:3, 1835:7, 1877:21, 1877:23, 1878:4, 1880:1, 1881:22, 1883:12, 1885:17, 1887:18, 1909:9, 1910:19, 1917:3
**moved** [13] - 1787:23, 1788:17, 1791:12, 1794:2, 1825:19, 1877:25, 1878:7, 1880:4, 1881:24, 1885:19, 1887:21, 1910:22, 1917:5
**MR** [102] - 1782:9, 1782:14, 1783:2, 1783:11, 1787:22, 1788:16, 1791:11, 1791:23, 1794:3, 1794:7, 1798:4, 1806:18, 1808:14, 1808:24, 1817:4, 1817:16, 1820:2, 1820:15, 1824:3, 1825:9, 1825:16,

1825:18, 1825:20, 1826:21, 1829:9, 1829:21, 1832:21, 1833:17, 1834:24, 1835:7, 1835:9, 1837:22, 1838:12, 1840:2, 1842:10, 1843:9, 1845:14, 1847:8, 1851:10, 1851:21, 1861:18, 1862:20, 1863:25, 1864:17, 1867:8, 1868:9, 1873:23, 1877:2, 1877:21, 1877:24, 1878:2, 1878:6, 1878:8, 1878:14, 1878:19, 1880:1, 1880:3, 1881:22, 1881:23, 1883:12, 1883:14, 1885:17, 1885:18, 1887:4, 1887:18, 1887:20, 1889:3, 1892:6, 1897:5, 1897:19, 1897:23, 1898:20, 1900:16, 1909:9, 1909:10, 1909:16, 1909:24, 1910:5, 1910:19, 1910:21, 1916:14, 1916:17, 1917:3, 1917:4, 1917:20, 1919:25, 1920:1, 1920:6, 1920:9, 1920:15, 1921:1, 1921:6, 1921:13, 1921:17, 1921:18, 1922:4, 1922:10, 1922:17, 1923:5, 1923:19, 1924:2, 1924:8
**MS** [17] - 1782:5, 1783:25, 1784:8, 1787:1, 1787:21, 1787:24, 1788:4, 1788:7, 1788:14, 1791:3, 1791:9, 1791:20, 1794:1, 1806:20, 1806:22, 1807:15, 1808:8
**multiple** [8] - 1814:3, 1816:11, 1816:24, 1821:11, 1822:11, 1823:20, 1849:7, 1858:22
**must** [2] - 1870:11, 1874:16

### N

**name** [10] - 1784:11,

1791:24, 1792:22, 1805:23, 1809:2, 1809:3, 1815:17, 1817:12, 1851:24, 1906:7
**named** [2] - 1795:19, 1904:25
**names** [1] - 1836:19
**narrow** [1] - 1782:23
**NATALIE** [1] - 1780:18
**Natalie** [1] - 1782:10
**Nate** [4] - 1824:11, 1866:22, 1871:18, 1872:6
**National** [1] - 1793:3
**national** [7] - 1785:7, 1792:11, 1792:25, 1793:1, 1806:3, 1818:13, 1819:1
**nature** [2] - 1842:23, 1893:17
**near** [2] - 1897:6, 1912:17
**nearing** [1] - 1843:13
**necessarily** [1] - 1886:11
**need** [6] - 1783:4, 1783:15, 1818:25, 1842:21, 1843:4, 1893:16
**needed** [1] - 1815:5
**needs** [1] - 1877:13
**nefarious** [1] - 1908:8
**negated** [2] - 1832:10, 1844:23
**negates** [1] - 1812:13
**negative** [1] - 1884:8
**Net** [1] - 1839:21
**network** [2] - 1817:20, 1847:17
**never** [6] - 1800:19, 1852:1, 1887:5, 1887:6, 1897:2, 1905:7
**New** [7] - 1780:20, 1802:25, 1880:15, 1880:19, 1880:24, 1882:2, 1889:23
**new** [4] - 1860:18, 1867:18, 1905:18, 1906:21
**next** [21] - 1783:24, 1818:11, 1820:15, 1823:11, 1826:11, 1826:23, 1827:22, 1835:18, 1837:23, 1840:24, 1855:15, 1867:8, 1873:20, 1879:16, 1882:25, 1883:1, 1887:4,

1900:16, 1904:9, 1909:6, 1909:11
**nice** [1] - 1783:21
**night** [1] - 1856:20
**nine** [1] - 1888:21
**nobody** [5] - 1801:6, 1869:25, 1886:13, 1909:12, 1913:9
**node** [8] - 1823:5, 1833:1, 1833:6, 1833:11, 1834:9, 1844:9, 1913:5, 1917:25
**nodes** [3] - 1834:8, 1834:12, 1834:19
**nonpublic** [1] - 1790:5
**normally** [2] - 1857:17, 1905:25
**Northeast** [1] - 1780:15
**not..** [1] - 1804:11
**notation** [1] - 1807:17
**note** [2] - 1800:13, 1807:20
**note-taker** [1] - 1800:13
**notebook** [4] - 1787:9, 1787:10, 1788:3, 1788:12
**noted** [1] - 1791:14
**notepad** [3] - 1800:1, 1800:5, 1800:9
**notes** [34] - 1786:22, 1787:9, 1788:18, 1788:20, 1789:1, 1789:4, 1789:7, 1789:10, 1789:25, 1791:8, 1791:13, 1791:14, 1791:17, 1792:2, 1798:2, 1798:6, 1798:7, 1798:10, 1798:17, 1799:20, 1800:2, 1800:9, 1801:5, 1801:9, 1801:11, 1802:15, 1807:14, 1855:2, 1855:5, 1855:8, 1856:7, 1856:8, 1860:8, 1925:5
**nothing** [3] - 1851:10, 1911:17, 1919:25
**noting** [1] - 1789:13
**November** [6] - 1854:16, 1857:24, 1868:1, 1868:5, 1868:13, 1869:21
**Novick** [3] - 1783:2, 1923:20, 1924:10
**number** [4] - 1804:16,

1852:9, 1912:22, 1918:11
**NW** [2] - 1780:23, 1925:12
**NY** [1] - 1780:20
**NYT/WAPO** [1] - 1789:21

## O

**obfuscate** [1] - 1823:21
**obfuscated** [1] - 1815:14
**obfuscating** [1] - 1833:7
**object** [1] - 1833:17
**objection** [17] - 1787:22, 1788:16, 1791:11, 1794:1, 1825:18, 1835:9, 1877:24, 1878:6, 1880:3, 1881:23, 1883:14, 1885:18, 1887:20, 1909:10, 1910:21, 1916:14, 1917:4
**observations** [2] - 1800:10, 1872:21
**obtain** [1] - 1827:4
**obtained** [6] - 1812:23, 1840:8, 1842:22, 1893:17, 1903:22, 1924:6
**obvious** [1] - 1883:7
**obviously** [2] - 1921:8, 1922:19
**occasionally** [1] - 1800:14
**occupied** [1] - 1858:25
**occur** [1] - 1881:4
**occurred** [1] - 1819:1
**occurs** [1] - 1818:13
**October** [33] - 1836:12, 1840:22, 1841:5, 1843:14, 1843:18, 1848:16, 1858:20, 1859:1, 1864:21, 1865:1, 1866:20, 1871:12, 1888:24, 1892:9, 1892:12, 1893:7, 1894:1, 1897:6, 1898:2, 1898:16, 1898:17, 1900:14, 1901:13, 1902:12, 1906:4, 1909:3, 1909:4, 1909:6, 1910:12, 1910:23, 1911:11, 1912:15

**OF** [9] - 1780:1, 1780:3, 1780:9, 1820:21, 1846:17, 1846:25, 1863:2, 1867:11, 1925:1
**of..** [1] - 1834:13
**offer** [3] - 1787:21, 1791:9, 1825:17
**offered** [3] - 1783:12, 1924:15, 1924:17
**offering** [2] - 1900:7, 1900:18
**offhand** [6] - 1860:12, 1862:6, 1868:6, 1879:23, 1895:21, 1912:16
**OFFICE** [1] - 1780:14
**office** [32] - 1783:14, 1785:10, 1790:10, 1794:11, 1794:12, 1794:16, 1807:8, 1809:17, 1810:3, 1810:9, 1810:20, 1813:10, 1814:19, 1816:17, 1821:7, 1821:20, 1828:10, 1828:19, 1834:2, 1837:21, 1847:7, 1864:24, 1865:16, 1865:17, 1865:22, 1866:3, 1866:5, 1866:15, 1866:21, 1866:24, 1889:15
**Office** [8] - 1784:19, 1809:17, 1810:6, 1810:18, 1814:15, 1865:6, 1865:8, 1869:18
**offices** [1] - 1809:16
**Official** [1] - 1780:22
**official** [2] - 1798:15, 1925:11
**OFFICIAL** [1] - 1925:1
**officials** [1] - 1896:23
**often** [2] - 1785:13, 1800:14
**OGC** [3] - 1794:12, 1794:16, 1800:16
**OIG** [8] - 1863:15, 1863:21, 1863:22, 1864:3, 1864:8, 1864:13, 1864:25, 1865:5
**Omaha** [2] - 1809:16, 1809:17
**once** [4] - 1784:21, 1825:2, 1830:8, 1831:5
**one** [46] - 1785:18, 1788:5, 1799:5,

1807:6, 1807:11, 1812:6, 1812:23, 1822:20, 1828:20, 1829:14, 1834:20, 1836:7, 1836:21, 1837:8, 1842:10, 1848:11, 1850:9, 1855:3, 1855:4, 1867:3, 1877:19, 1882:17, 1882:18, 1882:25, 1887:4, 1889:24, 1891:10, 1894:5, 1894:9, 1894:10, 1900:16, 1906:19, 1907:15, 1907:22, 1907:24, 1908:15, 1908:18, 1909:20, 1912:22, 1915:13, 1918:19, 1924:9, 1924:18
**one-on-one** [1] - 1785:18
**ones** [1] - 1923:13
**ongoing** [2] - 1823:3, 1897:14
**online** [1] - 1910:13
**open** [23] - 1787:4, 1818:24, 1826:25, 1827:10, 1827:16, 1827:17, 1833:16, 1844:16, 1845:24, 1860:24, 1861:2, 1861:10, 1861:22, 1867:19, 1870:5, 1874:13, 1874:22, 1876:5, 1876:12, 1876:18, 1901:5, 1904:15, 1907:7
**open/close** [1] - 1898:3
**opened** [8] - 1814:16, 1846:9, 1862:25, 1866:11, 1875:1, 1876:1, 1920:23, 1924:20
**opening** [19] - 1817:10, 1817:19, 1845:8, 1846:4, 1861:20, 1862:1, 1866:17, 1867:13, 1867:16, 1869:2, 1869:3, 1870:5, 1871:5, 1871:8, 1874:18, 1876:14, 1879:17, 1923:10
**opens** [1] - 1923:3
**operated** [1] - 1828:13
**operational** [1] - 1907:4

**operations** [2] - 1824:12, 1824:18
**opportunities** [1] - 1898:8
**opportunity** [5] - 1828:25, 1860:6, 1861:1, 1868:17, 1882:21
**opposed** [5] - 1819:18, 1819:22, 1867:18, 1875:11, 1907:6
**option** [4] - 1862:13, 1874:16, 1876:25, 1891:19
**or..** [1] - 1874:23
**order** [5] - 1818:9, 1818:24, 1823:21, 1827:4, 1894:20
**ordered** [2] - 1861:22, 1861:24
**organization** [11] - 1786:1, 1813:23, 1814:8, 1815:12, 1820:14, 1821:7, 1826:10, 1844:13, 1844:20, 1844:25, 1877:8
**Organization** [4] - 1823:1, 1823:14, 1823:19, 1902:25
**ORGANIZATION** [4] - 1817:21, 1820:23, 1863:4, 1917:9
**organizations** [1] - 1827:3
**original** [15] - 1841:12, 1841:13, 1843:8, 1848:24, 1868:3, 1883:5, 1884:20, 1884:22, 1884:25, 1891:19, 1896:3, 1896:6, 1896:14, 1912:2, 1914:1
**outreach** [2] - 1830:12, 1847:19
**outside** [3] - 1796:23, 1908:11, 1920:5
**outstanding** [1] - 1911:2
**oversaw** [2] - 1858:8, 1913:9
**oversight** [2] - 1820:9, 1865:7
**own** [6] - 1787:11, 1821:7, 1832:7, 1848:10, 1904:1, 1908:10

## P

**p.m** [2] - 1796:24, 1924:23
**packet** [1] - 1886:14
**page** [22] - 1786:22, 1787:9, 1787:15, 1787:18, 1787:19, 1788:3, 1788:12, 1791:8, 1820:15, 1837:23, 1841:22, 1862:21, 1864:18, 1867:2, 1867:8, 1872:12, 1881:10, 1881:15, 1897:22, 1902:17, 1904:9, 1904:22
**Page** [2] - 1829:10, 1868:9
**PAGE** [1] - 1781:2
**Pages** [1] - 1878:15
**Papadopoulos** [3] - 1858:11, 1858:20, 1858:22
**paper** [45] - 1823:25, 1824:2, 1824:20, 1824:23, 1831:4, 1832:11, 1832:25, 1834:10, 1835:17, 1835:23, 1836:2, 1841:19, 1842:6, 1846:16, 1846:24, 1847:13, 1851:9, 1867:10, 1871:16, 1871:22, 1873:1, 1873:4, 1873:7, 1873:10, 1883:17, 1884:19, 1884:22, 1885:2, 1885:5, 1885:8, 1893:12, 1902:20, 1902:22, 1903:12, 1903:15, 1907:16, 1907:22, 1912:2, 1913:16, 1919:19, 1920:11, 1920:21, 1922:22, 1924:14, 1924:18
**papers** [9] - 1816:25, 1822:11, 1822:13, 1822:20, 1829:14, 1831:13, 1835:12, 1838:8, 1843:1
**paperwork** [3] - 1820:25, 1865:3, 1866:16
**Paragraph** [1] - 1868:10
**paragraph** [9] - 1797:6, 1820:17, 1822:23, 1823:11,

1823:12, 1823:16,
1832:23, 1840:24,
1917:6
**paralegal** [1] - 1794:11
**parenthetically** [1] -
1889:17
**part** [13] - 1809:19,
1811:16, 1811:20,
1812:1, 1813:16,
1822:3, 1828:7,
1833:25, 1837:1,
1844:11, 1858:10,
1899:23, 1912:8
**participate** [2] -
1831:23, 1902:5
**participated** [1] -
1844:1
**particular** [16] -
1783:9, 1785:5,
1787:18, 1790:4,
1806:23, 1820:13,
1825:6, 1827:17,
1842:18, 1847:22,
1862:14, 1875:25,
1900:10, 1911:18,
1913:14, 1917:19
**particularly** [2] -
1857:6, 1899:11
**party** [3] - 1846:17,
1846:24, 1867:11
**passed** [3] - 1824:10,
1839:14, 1839:17
**past** [2] - 1851:4,
1896:12
**pasting** [2] - 1867:15,
1867:18
**path** [2] - 1782:13,
1782:15
**Pause** [1] - 1921:3
**pen** [1] - 1789:22
**pending** [3] - 1852:8,
1852:18, 1853:8
**Pendleton** [1] -
1794:10
**Pennsylvania** [6] -
1820:23, 1823:2,
1827:21, 1829:17,
1830:4, 1863:3
**Pennsylvania-based**
[1] - 1829:17
**people** [9] - 1799:6,
1800:10, 1874:4,
1874:9, 1882:11,
1891:21, 1891:23,
1897:12, 1901:14
**people's** [2] - 1853:18,
1896:19
**per** [1] - 1807:12
**perfect** [1] - 1907:16
**perhaps** [2] - 1807:2,

1859:18
**period** [9] - 1792:9,
1793:7, 1798:8,
1800:11, 1801:10,
1805:18, 1819:22,
1852:13, 1901:17
**Perkins** [1] - 1796:23
**permission** [1] -
1787:1
**person** [31] - 1796:2,
1796:8, 1803:24,
1803:25, 1806:14,
1838:25, 1848:9,
1850:4, 1850:9,
1880:17, 1883:2,
1889:25, 1890:21,
1890:25, 1891:14,
1893:2, 1893:3,
1895:24, 1895:25,
1896:1, 1896:3,
1896:4, 1896:7,
1896:11, 1904:5,
1904:25, 1905:24,
1906:1, 1908:25,
1919:4, 1919:20
**person's** [1] - 1896:19
**personally** [4] -
1790:14, 1828:7,
1859:24, 1918:3
**pertained** [1] - 1812:5
**phone** [1] - 1837:4
**phones** [1] - 1853:18
**physical** [3] - 1788:3,
1827:20, 1829:8
**physically** [1] - 1833:9
**Pientka** [29] - 1816:2,
1816:3, 1816:7,
1816:8, 1821:5,
1825:15, 1826:13,
1835:6, 1835:20,
1836:16, 1837:13,
1870:11, 1870:14,
1874:2, 1874:5,
1874:6, 1874:24,
1877:4, 1877:12,
1879:11, 1880:22,
1883:16, 1883:23,
1885:4, 1885:13,
1886:2, 1886:24,
1910:14
**pinging** [1] - 1782:20
**place** [4] - 1799:16,
1799:19, 1836:1,
1889:16
**placed** [4] - 1804:3,
1804:22, 1805:1,
1914:12
**Plaintiff** [1] - 1780:4
**plate** [1] - 1782:18
**plausible** [2] -

1823:18, 1908:11
**play** [1] - 1923:15
**played** [1] - 1858:3
**plenty** [1] - 1860:6
**point** [8] - 1881:13,
1882:13, 1882:19,
1893:5, 1897:11,
1903:21, 1905:2,
1905:16
**political** [4] - 1820:14,
1849:18, 1849:24,
1924:4
**politically** [1] -
1918:13
**portion** [3] - 1867:9,
1878:20, 1909:25
**portions** [2] - 1862:5,
1880:6
**pose** [1] - 1904:14
**position** [7] - 1784:18,
1784:21, 1784:24,
1785:1, 1785:3,
1795:24, 1796:6
**positions** [1] -
1809:24
**positive** [1] - 1884:8
**possession** [2] -
1798:9, 1798:18
**possible** [5] - 1789:5,
1793:12, 1793:14,
1799:8, 1854:1
**possibly** [5] - 1844:19,
1880:21, 1899:20,
1908:6, 1908:13
**post** [1] - 1799:7
**Post** [2] - 1902:24
**potential** [7] -
1805:20, 1806:1,
1806:8, 1806:13,
1849:14, 1880:14,
1907:17
**potentially** [11] -
1802:24, 1827:23,
1830:25, 1831:2,
1840:13, 1848:12,
1851:7, 1852:22,
1881:4, 1903:11,
1916:23
**practice** [7] - 1785:10,
1785:18, 1788:25,
1789:1, 1789:4,
1800:2, 1801:1
**precisely** [1] - 1869:8
**predication** [1] -
1867:16
**preliminary** [10] -
1818:11, 1818:20,
1819:8, 1819:20,
1875:4, 1875:8,
1875:12, 1875:24,

1876:1, 1876:9
**Preliminary** [1] -
1845:24
**prep** [1] - 1855:17
**preparation** [3] -
1855:11, 1856:25,
1870:20
**preparations** [1] -
1855:19
**prepared** [1] - 1783:23
**preparing** [1] -
1880:16
**present** [4] - 1782:11,
1797:20, 1804:18,
1868:18
**President** [1] -
1849:13
**presidential** [1] -
1848:6
**pressed** [1] - 1891:15
**pressure** [1] - 1882:1
**pretty** [3] - 1857:4,
1891:24, 1895:5
**preview** [1] - 1782:18
**previous** [2] -
1832:15, 1851:2
**previously** [5] -
1821:8, 1821:13,
1826:4, 1910:3,
1920:16
**Priestap** [7] - 1799:9,
1873:22, 1874:15,
1874:21, 1874:23,
1874:24, 1876:25
**primarily** [2] - 1810:3,
1837:3
**primary** [3] - 1814:23,
1815:5, 1862:15
**privacy** [3] - 1792:9,
1792:22, 1792:23
**privacy-related** [1] -
1792:23
**private** [7] - 1813:23,
1831:16, 1886:10,
1898:24, 1899:6,
1899:8, 1899:18
**problem** [1] - 1898:5
**procedures** [1] -
1845:6
**proceedings** [1] -
1925:6
**processes** [1] - 1836:1
**produce** [1] - 1798:7
**produced** [4] -
1795:11, 1846:16,
1846:24, 1867:10
**product** [1] - 1867:15
**productive** [1] -
1782:22
**program** [3] - 1834:16,

1836:24, 1842:17
**progress** [1] - 1900:13
**prohibition** [1] -
1803:18
**Project** [4] - 1834:8,
1834:13, 1834:14,
1834:15
**project** [1] - 1834:15
**properly** [1] - 1861:7
**prosecutors** [3] -
1804:12, 1804:21,
1855:1
**protect** [3] - 1891:2,
1906:6, 1906:9
**protect-identity** [1] -
1906:9
**protection** [1] -
1823:21
**prove** [1] - 1852:25
**proves** [1] - 1812:13
**provide** [9] - 1816:23,
1824:19, 1896:24,
1902:19, 1903:11,
1905:24, 1907:5,
1916:8, 1920:19
**provided** [49] - 1802:2,
1816:15, 1816:17,
1821:4, 1821:5,
1822:1, 1824:6,
1824:24, 1831:3,
1836:2, 1838:17,
1838:22, 1839:2,
1840:6, 1848:14,
1848:16, 1854:9,
1865:22, 1865:25,
1866:3, 1868:4,
1868:15, 1869:10,
1869:25, 1883:2,
1884:20, 1884:22,
1889:22, 1889:25,
1890:2, 1890:18,
1891:10, 1891:11,
1894:24, 1895:22,
1895:25, 1896:12,
1897:3, 1898:23,
1901:9, 1904:5,
1910:2, 1910:3,
1911:10, 1911:15,
1914:2, 1915:7,
1919:20
**provider** [1] - 1827:6
**providers** [1] - 1827:4
**provides** [5] -
1800:24, 1848:9,
1850:18, 1901:1,
1909:13
**providing** [7] - 1797:1,
1805:12, 1841:9,
1841:10, 1848:13,
1851:6, 1893:3

**public** [5] - 1792:24,
1881:7, 1886:16,
1905:5, 1906:7
**publicly** [2] - 1834:17,
1903:24
**publish** [5] - 1877:22,
1878:8, 1916:17,
1921:6, 1921:8
**publishing** [1] -
1803:1
**pull** [2] - 1820:17,
1823:16
**purported** [1] -
1823:24
**purpose** [4] - 1785:15,
1824:14, 1830:11,
1830:24
**purposes** [1] -
1872:14
**pushes** [1] - 1891:7
**put** [10] - 1798:3,
1835:25, 1863:25,
1870:4, 1874:14,
1878:14, 1879:19,
1887:4, 1892:15,
1922:10
**Putin** [2] - 1915:12,
1916:3

**Q**

**questionable** [1] -
1872:19
**questioned** [1] -
1912:18
**questions** [27] -
1802:4, 1806:18,
1841:18, 1851:8,
1867:24, 1895:11,
1895:15, 1895:16,
1896:18, 1909:13,
1910:2, 1910:16,
1910:18, 1911:2,
1913:17, 1918:11,
1918:17, 1918:20,
1918:24, 1919:11,
1920:11, 1920:17,
1922:20, 1922:23,
1923:1, 1924:12,
1924:14
**quick** [1] - 1877:16
**quickly** [1] - 1878:9
**quite** [1] - 1920:24
**quiz** [1] - 1871:25

**R**

**raise** [2] - 1784:4,
1808:18
**raises** [1] - 1909:13
**raising** [1] - 1922:19

**ran** [8] - 1814:18,
1852:2, 1857:13,
1857:16, 1858:1,
1858:6, 1875:3,
1877:20
**Rao** [1] - 1782:10
**RAO** [1] - 1780:18
**rather** [3] - 1783:10,
1812:13, 1913:8
**RDR** [3] - 1780:22,
1925:3, 1925:10
**reach** [6] - 1827:2,
1827:23, 1828:8,
1828:10, 1843:23,
1851:1
**reached** [5] - 1828:21,
1831:16, 1831:20,
1891:17, 1918:8
**reaching** [4] - 1841:7,
1893:23, 1894:1,
1920:9
**reachout** [1] - 1874:13
**reaction** [1] - 1884:9
**read** [20] - 1789:16,
1792:2, 1796:20,
1817:18, 1820:19,
1822:24, 1823:12,
1823:17, 1826:7,
1835:15, 1837:24,
1840:24, 1842:19,
1846:13, 1846:14,
1846:20, 1868:11,
1868:12, 1904:23,
1913:17
**readable** [1] - 1815:18
**reading** [1] - 1865:24
**reads** [2] - 1867:9,
1904:9
**realize** [1] - 1865:12
**really** [5] - 1841:1,
1892:10, 1892:18,
1894:2, 1922:20
**reason** [9] - 1789:9,
1792:14, 1795:13,
1795:8, 1797:15,
1797:24, 1906:17,
1907:21, 1911:25
**reasonably** [1] -
1829:18
**reasons** [4] - 1792:22,
1847:15, 1891:17,
1912:20
**recalled** [2] - 1857:25,
1868:25
**recalling** [2] - 1786:23,
1797:19
**receive** [3] - 1790:14,
1806:24, 1830:21
**received** [29] - 1795:6,
1797:16, 1797:20,

1797:24, 1810:5,
1810:19, 1813:19,
1813:21, 1814:14,
1820:20, 1823:8,
1826:22, 1831:5,
1831:20, 1846:16,
1846:23, 1847:18,
1849:2, 1863:1,
1866:22, 1867:7,
1867:10, 1868:14,
1871:15, 1873:18,
1889:5, 1889:20,
1893:1, 1894:9
**receiving** [3] - 1795:1,
1879:14, 1892:4
**recent** [1] - 1823:21
**Recess** [1] - 1851:17
**recess** [1] - 1924:23
**recognize** [10] -
1787:5, 1787:10,
1787:11, 1791:5,
1817:7, 1822:16,
1825:11, 1835:2,
1845:16, 1845:17
**recollection** [21] -
1786:3, 1786:6,
1791:18, 1792:3,
1793:6, 1794:25,
1797:11, 1797:20,
1798:22, 1801:11,
1802:18, 1815:8,
1823:7, 1839:13,
1857:6, 1857:21,
1857:24, 1858:5,
1863:23, 1868:7,
1868:13
**recollections** [1] -
1790:23
**reconvene** [1] -
1921:22
**record** [3] - 1782:3,
1809:2, 1896:11
**recordings** [1] -
1812:22
**records** [1] - 1798:15
**red** [3] - 1920:12,
1920:15, 1924:16
**redacted** [1] - 1800:1
**REDIRECT** [1] -
1806:21
**redirect** [2] - 1921:12,
1923:18
**refer** [2] - 1787:15,
1789:11
**reference** [3] - 1783:8,
1878:20, 1892:14
**referenced** [2] -
1838:8, 1840:12
**references** [2] -
1840:9, 1840:21

**referral** [3] - 1820:21,
1863:1, 1863:13
**referring** [4] - 1838:7,
1839:16, 1880:14,
1915:23
**reflected** [2] - 1789:7,
1869:2
**reflecting** [2] -
1887:17, 1887:22
**refresh** [3] - 1797:10,
1863:23, 1868:7
**refreshes** [1] -
1868:13
**refusing** [1] - 1805:6
**refute** [1] - 1915:16
**refuting** [1] - 1904:15
**regarding** [47] -
1786:24, 1797:3,
1806:13, 1811:18,
1811:24, 1812:2,
1812:21, 1813:17,
1814:12, 1816:1,
1819:4, 1819:12,
1821:14, 1823:24,
1824:21, 1825:2,
1827:15, 1831:10,
1831:15, 1831:19,
1831:21, 1831:23,
1833:14, 1833:20,
1834:1, 1834:3,
1834:5, 1834:19,
1834:21, 1837:9,
1837:16, 1838:19,
1839:8, 1840:4,
1841:18, 1842:22,
1844:3, 1847:10,
1849:7, 1893:17,
1906:22, 1910:2,
1911:3, 1911:12,
1920:7, 1920:22,
1920:23
**registered** [3] -
1827:1, 1827:19,
1878:24
**registrant** [1] -
1844:17
**regular** [1] - 1824:13
**regularly** [1] - 1800:5
**related** [24] - 1792:23,
1792:24, 1797:13,
1801:14, 1801:22,
1806:1, 1806:7,
1810:15, 1810:22,
1811:4, 1811:7,
1812:7, 1813:3,
1813:23, 1825:6,
1849:7, 1849:13,
1853:24, 1863:16,
1889:20, 1906:22,
1907:3, 1920:20,

1924:12
**relates** [1] - 1911:14
**relating** [2] - 1797:1,
1913:12
**relationship** [2] -
1883:22, 1884:3
**relative** [2] - 1802:22,
1923:15
**relatively** [2] -
1795:25, 1878:9
**relayed** [1] - 1880:21
**relaying** [1] - 1802:4
**relevant** [2] - 1894:15,
1909:24
**reliability** [4] - 1851:5,
1896:18, 1901:4,
1901:6
**reliable** [3] - 1802:11,
1896:12, 1901:9
**reliance** [1] - 1882:14
**rely** [1] - 1888:15
**remain** [5] - 1784:3,
1808:18, 1890:22,
1890:23, 1891:6
**remember** [48] -
1793:15, 1798:24,
1799:2, 1799:5,
1799:8, 1799:11,
1801:23, 1802:6,
1802:9, 1802:12,
1804:9, 1804:15,
1804:20, 1804:24,
1824:14, 1831:21,
1840:15, 1843:14,
1843:25, 1854:19,
1854:20, 1854:22,
1857:23, 1860:10,
1862:12, 1863:18,
1868:5, 1868:18,
1869:7, 1870:10,
1870:17, 1879:20,
1881:17, 1884:10,
1890:6, 1890:9,
1892:14, 1895:19,
1895:20, 1904:19,
1904:20, 1909:14,
1910:6, 1910:8,
1912:13, 1915:15,
1915:18, 1918:13
**remembering** [1] -
1920:24
**remind** [4] - 1854:25,
1889:10, 1900:24,
1914:21
**remotely** [1] - 1813:11
**remove** [2] - 1784:3,
1808:17
**repercussions** [1] -
1898:7
**rephrase** [1] - 1819:6

**replied** [1] - 1893:14
**report** [17] - 1782:24, 1783:12, 1785:1, 1832:9, 1863:5, 1865:12, 1872:17, 1872:18, 1881:18, 1882:6, 1882:7, 1902:9, 1903:14, 1904:12, 1909:22, 1911:17, 1911:20
**reported** [3] - 1785:2, 1888:4, 1907:7
**REPORTER** [2] - 1902:1, 1925:1
**reporter** [4] - 1784:12, 1846:21, 1890:2, 1890:17
**Reporter** [3] - 1780:22, 1780:22, 1925:11
**Reporting** [1] - 1888:25
**reporting** [8] - 1848:24, 1851:2, 1888:4, 1889:20, 1906:21, 1907:2, 1907:3, 1909:11
**reports** [1] - 1868:8
**represent** [3] - 1791:25, 1795:11, 1851:24
**representatives** [1] - 1902:25
**represented** [2] - 1793:3, 1793:7
**representing** [5] - 1792:19, 1793:10, 1797:12, 1886:8
**request** [5] - 1828:25, 1884:9, 1887:6, 1892:9, 1897:8
**requested** [1] - 1890:2
**requesting** [2] - 1797:2, 1830:24
**require** [1] - 1818:12
**required** [1] - 1785:22
**requires** [1] - 1820:9
**reroutes** [1] - 1833:8
**research** [17] - 1789:20, 1802:8, 1826:25, 1827:11, 1827:16, 1827:17, 1833:16, 1834:7, 1834:19, 1844:16, 1847:16, 1851:14, 1872:18, 1878:23, 1914:3, 1921:24
**researchers** [1] - 1922:16
**resident** [2] - 1809:9,

1809:15
**residential** [1] - 1838:25
**resolve** [1] - 1921:15
**resources** [3] - 1818:2, 1820:1
**respect** [22] - 1782:23, 1799:10, 1801:24, 1805:18, 1807:14, 1808:6, 1819:25, 1836:24, 1841:17, 1844:4, 1848:5, 1859:23, 1867:22, 1882:22, 1894:7, 1896:7, 1896:14, 1913:16, 1914:3, 1914:10, 1914:15, 1923:21
**respected** [3] - 1792:12, 1796:10, 1884:5
**responded** [1] - 1894:5
**response** [2] - 1865:14, 1884:7
**responsibilities** [2] - 1785:7, 1809:13
**responsible** [1] - 1842:17
**restrictions** [1] - 1807:23
**result** [7] - 1840:19, 1844:6, 1892:25, 1903:5, 1903:21, 1906:24, 1907:18
**resulted** [1] - 1858:13
**results** [1] - 1911:20
**retired** [1] - 1885:23
**return** [1] - 1876:20
**revealed** [1] - 1878:23
**reveals** [1] - 1872:18
**review** [12] - 1783:8, 1820:9, 1822:3, 1824:8, 1825:4, 1847:17, 1869:11, 1870:1, 1888:7, 1888:12, 1912:25, 1914:10
**reviewed** [5] - 1822:5, 1862:4, 1862:17, 1871:25, 1872:1
**reviewing** [3] - 1791:13, 1843:7, 1869:12
**reviews** [1] - 1864:16, 1868:16, 1878:22
**Rhino** [1] - 1783:11
**road** [1] - 1852:6
**Roger** [1] - 1874:18
**role** [13] - 1785:5,

1785:9, 1809:19, 1814:12, 1815:1, 1825:2, 1836:23, 1836:24, 1837:9, 1852:11, 1854:7, 1858:3
**Room** [2] - 1780:23, 1925:12
**ruling** [1] - 1923:18
**run** [7] - 1789:23, 1826:12, 1840:11, 1840:17, 1871:9, 1877:9, 1912:20
**running** [2] - 1901:18, 1911:21
**runs** [1] - 1795:20
**Russia** [5] - 1805:21, 1806:14, 1838:25, 1849:14, 1913:12
**Russian** [7] - 1811:15, 1814:3, 1815:12, 1817:21, 1824:17, 1886:13, 1913:18
**Russians** [1] - 1824:25
**Ryan** [11] - 1836:15, 1836:20, 1836:21, 1842:12, 1842:15, 1843:3, 1892:5, 1892:10, 1894:9, 1894:10, 1910:12

**S**

**SAC** [1] - 1876:10
**Sahaw** [1] - 1880:6
**Sands** [36] - 1814:25, 1817:11, 1831:20, 1832:1, 1833:18, 1833:20, 1836:15, 1837:5, 1857:12, 1858:1, 1858:6, 1860:2, 1860:9, 1860:16, 1862:9, 1862:25, 1883:7, 1884:18, 1887:22, 1895:17, 1897:11, 1897:16, 1897:24, 1899:17, 1901:14, 1901:18, 1902:6, 1903:18, 1904:24, 1906:5, 1906:12, 1906:13, 1908:14, 1909:4, 1914:18, 1916:25
**Sands's** [1] - 1815:1
**SANS** [1] - 1813:23
**sat** [2] - 1834:2, 1857:19
**satellite** [1] - 1809:16
**saved** [1] - 1916:12,

1917:12
**saw** [9] - 1841:4, 1857:12, 1870:4, 1870:8, 1879:9, 1879:11, 1879:16, 1890:13, 1909:5
**scheduled** [1] - 1796:24
**scheduling** [1] - 1923:19
**school** [1] - 1912:1
**science** [1] - 1813:20
**scientist** [2] - 1833:24, 1888:12
**scientists** [2] - 1831:7, 1834:20
**Scott** [4] - 1825:15, 1871:18, 1897:12, 1897:14
**screen** [1] - 1922:10
**scroll** [1] - 1837:22
**SEAN** [1] - 1780:17
**Sean** [3] - 1782:9, 1791:24, 1851:24
**search** [3] - 1853:16, 1853:21, 1875:18
**seat** [1] - 1808:20
**seated** [2] - 1783:22, 1851:18
**second** [10] - 1845:23, 1862:16, 1862:21, 1890:15, 1892:11, 1897:22, 1900:14, 1900:18, 1909:21, 1917:6
**secret** [1] - 1815:11
**Secretary** [1] - 1849:10
**section** [2] - 1813:6, 1825:21
**sector** [4] - 1898:25, 1899:6, 1899:8, 1899:18
**security** [14] - 1785:7, 1792:11, 1792:25, 1793:1, 1795:18, 1797:13, 1806:3, 1813:24, 1818:13, 1819:1, 1831:16, 1832:19, 1915:23, 1915:24
**see** [44] - 1782:22, 1787:12, 1797:8, 1817:23, 1818:9, 1820:5, 1825:23, 1827:4, 1827:6, 1833:1, 1836:5, 1836:14, 1836:17, 1838:14, 1840:8, 1840:11, 1841:5,

1845:25, 1856:8, 1859:9, 1861:12, 1864:15, 1867:6, 1868:12, 1878:23, 1880:12, 1880:23, 1888:7, 1889:1, 1889:9, 1890:4, 1891:1, 1892:9, 1896:11, 1896:15, 1898:9, 1898:16, 1899:4, 1904:17, 1905:17, 1906:10, 1910:13, 1916:19, 1917:13
**seeing** [1] - 1904:19
**seek** [1] - 1827:5
**sees** [1] - 1864:18
**send** [2] - 1830:8, 1881:25
**sending** [5] - 1782:21, 1824:15, 1830:11, 1835:20, 1839:19
**sends** [3] - 1888:24, 1889:6, 1889:14
**senior** [5] - 1795:25, 1796:8, 1809:9, 1826:14, 1882:11
**sense** [5] - 1852:7, 1867:24, 1889:7, 1905:20, 1907:17
**Sensitive** [1] - 1820:4
**sensitive** [6] - 1785:16, 1785:23, 1820:8, 1820:10, 1820:11, 1875:14
**sent** [5] - 1839:21, 1849:25, 1872:1, 1908:1, 1911:18
**sentence** [12] - 1820:19, 1820:24, 1821:22, 1830:1, 1840:5, 1842:19, 1845:24, 1846:13, 1862:23, 1862:24, 1863:5, 1868:12
**sentinel** [1] - 1867:17
**September** [36] - 1785:24, 1787:20, 1789:8, 1789:15, 1798:8, 1798:23, 1801:10, 1802:21, 1803:8, 1814:6, 1814:10, 1814:11, 1820:20, 1825:23, 1836:4, 1841:4, 1846:15, 1846:23, 1848:15, 1854:9, 1858:19, 1859:1, 1862:25, 1866:11, 1867:9, 1871:12,

1872:6, 1873:15, 1873:17, 1873:25, 1876:15, 1882:9, 1882:21, 1888:19, 1891:12, 1917:7
**series** [12] - 1810:14, 1816:24, 1825:14, 1828:24, 1833:10, 1835:5, 1855:17, 1855:18, 1857:21, 1878:5, 1880:2, 1887:19
**serious** [3] - 1852:17, 1852:19, 1853:4
**seriously** [1] - 1897:17
**server** [20] - 1793:9, 1817:21, 1820:22, 1823:2, 1823:5, 1823:18, 1826:10, 1832:25, 1844:7, 1863:3, 1874:11, 1877:4, 1877:7, 1877:17, 1878:1, 1878:21, 1878:25, 1879:4, 1879:10, 1911:3
**servers** [8] - 1782:20, 1823:13, 1830:5, 1831:1, 1844:12, 1904:13, 1908:4, 1908:5
**service** [2] - 1827:4, 1827:6
**SESSION** [1] - 1780:6
**set** [2] - 1806:5, 1822:11
**sets** [1] - 1819:11
**seven** [2] - 1793:17, 1868:24
**several** [7] - 1843:12, 1843:19, 1859:6, 1859:8, 1891:17, 1902:16, 1913:17
**share** [6] - 1803:14, 1805:6, 1806:16, 1885:14, 1894:12, 1902:23
**shared** [1] - 1803:23
**shares** [1] - 1814:23
**sharing** [1] - 1803:18
**Shaw** [5] - 1782:5, 1783:23, 1788:1, 1854:15, 1880:7
**SHAW** [18] - 1780:14, 1782:5, 1783:25, 1784:8, 1787:1, 1787:21, 1787:24, 1788:4, 1788:7, 1788:14, 1791:3, 1791:9, 1791:20,

1794:1, 1806:20, 1806:22, 1807:15, 1808:8
**Shaw)**........................
............. [2] - 1781:4, 1781:5
**Shawn** [4] - 1794:14, 1795:19, 1795:23, 1796:23
**short** [1] - 1859:20
**shorter** [2] - 1859:19, 1859:22
**shortly** [1] - 1826:3
**show** [14] - 1793:24, 1817:4, 1822:14, 1825:9, 1829:9, 1834:25, 1836:10, 1845:14, 1856:6, 1871:10, 1877:2, 1889:4, 1909:7, 1916:16
**showed** [1] - 1870:3
**showing** [2] - 1795:9, 1873:14
**shown** [7] - 1786:19, 1786:21, 1786:22, 1788:13, 1799:21, 1846:4, 1877:23
**shows** [3] - 1823:19, 1887:23, 1922:24
**side** [6] - 1810:11, 1837:11, 1844:7, 1859:19, 1859:22, 1903:1
**Sierra** [1] - 1880:7
**signed** [2] - 1866:4, 1866:23
**significant** [5] - 1806:2, 1852:20, 1858:2, 1858:7, 1858:13
**significantly** [1] - 1858:25
**SIM** [1] - 1820:8
**similar** [1] - 1849:23
**sit** [1] - 1783:17
**sitting** [6] - 1786:3, 1798:22, 1804:25, 1866:19, 1867:12, 1879:21
**situation** [1] - 1917:21
**six** [7] - 1793:20, 1797:23, 1819:22, 1854:12, 1876:6, 1876:9, 1876:13
**six-month** [1] - 1876:9
**skip** [1] - 1797:5
**slow** [2] - 1846:18, 1846:20
**SME** [3] - 1898:25,

1899:6, 1899:7
**smelled** [1] - 1884:12
**so..** [1] - 1899:23
**someone** [9] - 1806:16, 1844:19, 1845:10, 1848:10, 1891:6, 1894:25, 1895:15, 1895:22, 1901:1
**sometime** [1] - 1899:1
**sometimes** [6] - 1785:20, 1789:3, 1798:14, 1890:23, 1891:5
**somewhat** [3] - 1783:3, 1857:9, 1857:25
**soon....hope** [1] - 1882:2
**sooner** [1] - 1783:10
**sophisticated** [3] - 1823:20, 1875:16, 1877:12
**sorry** [21] - 1787:17, 1788:1, 1792:25, 1793:23, 1804:11, 1806:10, 1814:9, 1839:17, 1839:20, 1846:15, 1846:19, 1846:22, 1868:11, 1874:23, 1874:24, 1879:2, 1892:10, 1892:11, 1915:13, 1918:19, 1920:14
**sort** [3] - 1827:5, 1830:12, 1848:12
**sound** [2] - 1855:25, 1856:5
**sounds** [2] - 1783:1, 1900:1
**source** [109] - 1804:4, 1804:23, 1805:2, 1805:7, 1816:16, 1816:19, 1816:23, 1821:16, 1821:20, 1821:25, 1826:25, 1827:10, 1827:16, 1827:17, 1833:16, 1835:12, 1835:16, 1835:22, 1836:1, 1838:16, 1838:23, 1839:24, 1841:6, 1841:10, 1841:12, 1842:4, 1842:8, 1842:25, 1843:8, 1844:16, 1847:7, 1847:22, 1847:24, 1848:14, 1848:17, 1849:17, 1850:6, 1850:13, 1850:15,

1850:17, 1850:20, 1850:21, 1851:1, 1869:2, 1873:10, 1883:5, 1883:17, 1884:15, 1884:19, 1884:20, 1884:22, 1884:23, 1884:24, 1884:25, 1885:5, 1885:8, 1886:22, 1887:5, 1887:7, 1887:13, 1888:20, 1891:19, 1892:3, 1892:15, 1893:8, 1893:9, 1893:21, 1893:25, 1894:3, 1894:7, 1894:13, 1894:23, 1895:2, 1896:3, 1896:6, 1896:14, 1896:23, 1898:24, 1900:22, 1900:25, 1901:7, 1903:9, 1904:10, 1904:15, 1904:25, 1905:23, 1906:20, 1907:2, 1907:5, 1907:7, 1908:21, 1908:23, 1909:12, 1909:23, 1911:15, 1911:22, 1914:1, 1914:8, 1914:25, 1915:17, 1918:12, 1918:16, 1919:4, 1919:6, 1919:8, 1919:18, 1919:20, 1920:10
**source's** [1] - 1851:2
**sources** [4] - 1813:23, 1891:11, 1897:9, 1901:3
**sparked** [2] - 1828:24, 1843:25
**speaking** [6] - 1790:4, 1809:23, 1818:3, 1822:7, 1834:11, 1902:25
**special** [5] - 1820:9, 1870:25, 1885:4, 1885:13, 1895:14
**SPECIAL** [3] - 1780:14, 1781:6, 1808:22
**Special** [6] - 1816:4, 1857:19, 1862:9, 1867:23, 1908:14, 1914:7
**specific** [9] - 1789:19, 1791:17, 1801:20, 1801:22, 1807:17, 1807:19, 1818:25, 1910:8, 1917:17

**specifically** [11] - 1800:24, 1804:24, 1812:2, 1815:2, 1815:24, 1820:10, 1828:6, 1841:17, 1848:5, 1910:9, 1920:9
**specifics** [8] - 1786:4, 1786:6, 1786:16, 1786:23, 1788:22, 1791:1, 1799:1, 1799:8
**Spectrum** [13] - 1823:5, 1833:1, 1843:21, 1843:23, 1843:24, 1844:2, 1844:8, 1847:19, 1913:4, 1917:21, 1917:24, 1918:3, 1918:8
**spell** [2] - 1784:11, 1809:2
**spoken** [4] - 1872:13, 1906:18, 1907:13, 1914:18
**squad** [8] - 1810:10, 1810:12, 1813:12, 1813:14, 1831:7, 1860:18, 1889:12
**SSA** [1] - 1826:13
**stamped** [1] - 1799:24
**stand** [3] - 1782:25, 1838:2, 1911:7
**standing** [4] - 1784:4, 1808:18, 1810:10, 1810:12
**standpoint** [4] - 1882:14, 1896:4, 1912:14, 1923:19
**start** [8] - 1817:6, 1824:4, 1841:24, 1850:13, 1851:25, 1852:16, 1902:1, 1921:16
**started** [3] - 1810:13, 1907:25, 1912:2
**starting** [3] - 1825:21, 1828:3, 1893:6
**State** [1] - 1813:20
**state** [4] - 1784:11, 1809:2, 1922:21, 1922:24
**statement** [1] - 1821:23
**statements** [1] - 1812:24
**STATES** [3] - 1780:1, 1780:3, 1780:10
**states** [1] - 1842:3
**States** [5] - 1780:12,

1782:4, 1782:6, 1784:1, 1925:11
**status** [1] - 1901:22
**Status** [1] - 1902:13
**stenographic** [1] - 1925:5
**step** [10] - 1784:2, 1808:17, 1818:11, 1827:22, 1842:5, 1882:25, 1893:10, 1902:6, 1914:24, 1922:2
**stepping** [1] - 1854:6
**steps** [13] - 1824:5, 1826:23, 1827:8, 1831:14, 1833:14, 1843:17, 1843:19, 1872:19, 1876:2, 1883:1, 1887:3, 1902:9, 1914:5
**sticker** [1] - 1787:13
**still** [11] - 1783:4, 1783:9, 1852:18, 1853:8, 1876:24, 1879:13, 1882:6, 1882:7, 1888:19, 1911:22
**stop** [1] - 1797:5
**story** [3] - 1880:14, 1889:23, 1903:1
**straddles** [1] - 1836:14
**straggler** [1] - 1783:17
**straight** [1] - 1869:15
**Street** [1] - 1780:15
**subject** [4] - 1899:7, 1899:8, 1899:18, 1900:18
**subjects** [1] - 1812:23
**submitted** [1] - 1862:18
**substantiate** [5] - 1824:1, 1824:22, 1831:12, 1840:13, 1847:12
**substantiated** [2] - 1827:7, 1834:23
**substantive** [1] - 1912:14
**suggested** [3] - 1877:17, 1899:16, 1913:9
**suitability** [1] - 1901:6
**summarize** [1] - 1904:21
**summarizing** [1] - 1872:25
**summary** [2] - 1782:17, 1911:8
**summer** [2] - 1805:19,

1915:11
**super** [1] - 1895:14
**supervise** [2] - 1809:15, 1809:18
**supervising** [1] - 1837:10
**supervisor** [8] - 1789:1, 1816:8, 1824:13, 1837:20, 1874:6, 1874:7, 1883:24, 1889:12
**supervisors** [1] - 1836:21
**supervisory** [4] - 1809:9, 1837:7, 1837:14, 1869:9
**Supervisory** [1] - 1816:4
**support** [7] - 1810:15, 1811:2, 1811:11, 1813:8, 1837:11, 1858:3, 1908:3
**supported** [1] - 1908:2
**supporting** [3] - 1816:25, 1817:1, 1884:1
**surfaced** [1] - 1906:22
**surmise** [1] - 1893:6
**surprise** [3] - 1885:7, 1891:9, 1891:13
**suspicions** [1] - 1916:2
**suspicious** [5] - 1903:2, 1903:4, 1906:23, 1915:11, 1915:14
**SUSSMANN** [1] - 1780:6
**Sussmann** [31] - 1782:4, 1782:11, 1786:9, 1789:18, 1790:1, 1790:2, 1790:5, 1791:25, 1792:6, 1792:19, 1793:3, 1793:7, 1793:10, 1796:23, 1797:12, 1801:18, 1801:21, 1802:1, 1802:8, 1802:10, 1803:5, 1803:8, 1803:13, 1803:15, 1804:3, 1804:23, 1805:2, 1851:25, 1905:8, 1923:9, 1923:12
**Sussmann's** [5] - 1783:14, 1803:23, 1805:6, 1805:11, 1807:24
**sustained** [1] -

1916:15
**sworn** [2] - 1784:5, 1808:19
**Sworn** [1] - 1784:6, 1808:22
**synopsis** [2] - 1817:17, 1820:3
**system** [6] - 1795:10, 1815:17, 1815:19, 1839:21, 1844:6, 1862:13
**systems** [5] - 1813:21, 1823:15, 1830:3, 1844:4, 1861:3

## T

**table** [3] - 1783:9, 1854:14, 1854:16
**tables** [1] - 1907:1
**taker** [1] - 1800:13
**talks** [1] - 1878:16
**tasked** [1] - 1808:4
**TDY'd** [1] - 1813:8
**teach** [1] - 1861:6
**Team** [2] - 1910:24
**team** [22] - 1812:18, 1816:5, 1816:9, 1816:10, 1826:23, 1828:1, 1828:12, 1830:18, 1833:25, 1834:19, 1838:20, 1839:11, 1839:14, 1839:17, 1840:15, 1841:11, 1857:20, 1874:7, 1883:24, 1884:1, 1885:24, 1917:10
**team's** [1] - 1831:11
**Tech** [3] - 1902:19, 1905:25, 1912:1
**technical** [2] - 1902:19, 1903:11
**techniques** [5] - 1818:9, 1818:16, 1875:15, 1875:16, 1908:10
**template** [1] - 1867:18
**templates** [1] - 1867:17
**temporary** [2] - 1810:14, 1811:9
**ten** [1] - 1851:13
**term** [1] - 1875:15
**terms** [2] - 1806:2, 1894:24
**terrible** [1] - 1919:14
**testified** [2] - 1855:14, 1862:2
**testifies** [2] - 1783:3,

1783:7
**testifying** [3] - 1826:4, 1843:15, 1854:7
**testimony** [16] - 1786:10, 1804:25, 1808:11, 1808:12, 1821:18, 1844:11, 1847:4, 1855:19, 1856:25, 1860:16, 1863:7, 1866:14, 1866:19, 1867:12, 1870:18, 1916:21
**text** [1] - 1822:11
**THE** [56] - 1780:1, 1780:1, 1780:10, 1782:2, 1782:8, 1782:12, 1783:1, 1783:6, 1783:16, 1783:20, 1784:2, 1787:3, 1787:23, 1788:1, 1788:6, 1788:17, 1791:12, 1791:21, 1794:2, 1808:10, 1808:16, 1808:20, 1825:19, 1833:19, 1835:10, 1851:11, 1851:18, 1863:21, 1877:25, 1878:7, 1880:4, 1881:24, 1883:15, 1885:19, 1887:21, 1902:1, 1910:22, 1916:15, 1917:5, 1920:3, 1920:8, 1920:14, 1920:24, 1921:2, 1921:4, 1921:12, 1921:14, 1921:21, 1922:2, 1922:7, 1922:14, 1923:4, 1923:17, 1923:24, 1924:7, 1924:21
**the..** [1] - 1920:2
**therefore** [1] - 1884:15
**they've** [2] - 1922:22, 1924:20
**third** [5] - 1823:16, 1846:17, 1846:24, 1867:11, 1911:25
**thoughts** [2] - 1844:21, 1877:19
**thousands** [1] - 1807:2
**threat** [4] - 1806:3, 1818:12, 1818:25, 1894:21
**three** [6] - 1810:7, 1822:11, 1854:21, 1856:6, 1880:5, 1913:2

**throughout** [1] - 1897:15
**thumb** [4] - 1817:3, 1822:5, 1822:21, 1876:20
**Thursday** [4] - 1856:18, 1856:19, 1856:20, 1856:24
**ties** [2] - 1915:12, 1916:3
**tight** [1] - 1783:18
**time-sensitive** [1] - 1785:16
**time-stamped** [1] - 1799:24
**timeline** [11] - 1852:12, 1859:9, 1876:23, 1879:8, 1887:1, 1888:18, 1897:5, 1900:12, 1901:13, 1909:2, 1912:11
**title** [2] - 1809:8, 1809:9
**to..** [1] - 1882:22
**today** [21] - 1786:3, 1786:10, 1797:20, 1798:22, 1804:25, 1821:18, 1847:4, 1852:2, 1855:19, 1863:7, 1866:20, 1867:12, 1868:21, 1870:14, 1870:24, 1874:18, 1879:21, 1904:23, 1907:12, 1913:15
**together** [1] - 1862:14
**Tom** [16] - 1839:4, 1839:5, 1839:6, 1839:19, 1840:6, 1848:21, 1889:14, 1890:14, 1890:24, 1892:5, 1892:15, 1893:1, 1893:3, 1899:3, 1899:22
**tomorrow** [2] - 1899:1, 1899:24
**tones** [1] - 1898:12
**took** [11] - 1815:5, 1825:4, 1831:8, 1831:14, 1836:24, 1843:11, 1871:22, 1876:2, 1897:16, 1902:6, 1914:5
**tools** [6] - 1819:13, 1819:14, 1819:15, 1819:22, 1874:14, 1875:14
**top** [6] - 1794:5, 1841:22, 1872:11,

1893:7, 1901:12, 1904:9

**topics** [1] - 1799:25

**TOR** [16] - 1823:5, 1832:25, 1833:6, 1833:7, 1834:8, 1834:9, 1834:12, 1834:13, 1834:14, 1834:15, 1834:16, 1834:19, 1844:9, 1913:5, 1917:25

**total** [1] - 1857:2

**towards** [5] - 1819:16, 1826:9, 1877:7, 1878:1, 1879:10

**track** [4] - 1788:2, 1824:17, 1841:2, 1892:19

**tracking** [1] - 1911:3

**traffic** [5] - 1815:14, 1815:15, 1823:22, 1833:8, 1844:5

**trails** [1] - 1789:22

**train** [1] - 1861:6

**trained** [1] - 1813:17

**trainee** [1] - 1815:3

**training** [3] - 1813:16, 1813:19, 1913:11

**trainings** [1] - 1813:22

**Trainor** [2] - 1796:22, 1796:25

**TRANSCRIPT** [1] - 1780:9

**transcript** [2] - 1925:5, 1925:6

**transfer** [4] - 1810:5, 1810:11, 1810:19, 1829:24

**translating** [1] - 1815:18

**treating** [1] - 1889:15

**trial** [2] - 1855:17, 1882:1

**TRIAL** [1] - 1780:9

**trick** [2] - 1795:14, 1899:15

**Trifiletti** [1] - 1910:4

**TRISHA** [3] - 1781:3, 1784:6, 1784:13

**Trisha** [4] - 1784:1, 1784:13, 1794:19, 1797:7

**true** [5] - 1852:1, 1852:5, 1915:1, 1925:4, 1925:6

**truly** [1] - 1898:7

**Trump** [22] - 1786:1, 1805:21, 1806:14, 1811:15, 1814:8, 1815:12, 1823:1,

1823:14, 1823:19, 1826:10, 1827:18, 1844:13, 1844:20, 1844:24, 1849:14, 1877:8, 1877:18, 1878:10, 1886:11, 1902:25, 1904:13, 1911:3

**TRUMP** [3] - 1820:23, 1863:3, 1917:9

**Trump-email.com** [1] - 1827:18

**trusted** [1] - 1884:5

**try** [5] - 1806:12, 1852:6, 1871:10, 1891:15, 1904:21

**trying** [5] - 1795:14, 1899:15, 1902:2, 1907:12, 1911:7

**TTPs** [1] - 1913:18

**Tuesday** [1] - 1780:4

**turn** [9] - 1785:24, 1790:17, 1813:2, 1817:16, 1820:15, 1823:11, 1832:21, 1836:11, 1878:15

**turning** [3] - 1814:6, 1824:4, 1841:22

**two** [10] - 1783:17, 1803:4, 1813:8, 1817:3, 1838:17, 1838:20, 1840:6, 1849:25, 1883:25, 1912:25

**type** [11] - 1806:15, 1813:12, 1828:3, 1829:5, 1829:22, 1832:17, 1845:6, 1859:17, 1906:9, 1911:8, 1920:17

**types** [6] - 1810:24, 1813:19, 1818:4, 1818:6, 1818:21, 1920:11

**typical** [2] - 1800:2, 1914:24

**typically** [5] - 1799:16, 1859:10, 1896:24, 1901:3, 1901:4

**typo** [10] - 1844:17, 1846:3, 1863:7, 1864:14, 1865:3, 1865:9, 1865:12, 1866:7, 1867:14, 1879:17

---

## U

**U-Net** [1] - 1839:21

**U.S** [8] - 1780:23, 1819:1, 1820:21,

1821:6, 1846:17, 1846:25, 1847:1, 1863:1

**ultimate** [3] - 1831:10, 1833:11, 1847:10

**ultimately** [16] - 1814:15, 1824:21, 1827:15, 1828:23, 1830:21, 1831:5, 1834:5, 1834:21, 1836:1, 1841:20, 1850:1, 1851:1, 1851:8, 1877:20, 1888:4, 1908:14

**unable** [2] - 1824:22, 1847:12

**unaware** [4] - 1804:2, 1804:6, 1804:22, 1805:1

**UNCLASSIFIED** [1] - 1794:9

**unclassified** [1] - 1839:21

**uncommon** [1] - 1800:16

**under** [1] - 1822:22

**underlying** [10] - 1792:3, 1815:20, 1816:25, 1827:1, 1827:20, 1830:13, 1834:15, 1894:23, 1904:5, 1905:23

**underneath** [1] - 1807:17

**understandable** [1] - 1797:23

**understood** [6] - 1815:8, 1823:8, 1824:17, 1852:19, 1921:17, 1924:16

**unfortunately** [1] - 1921:4

**unimportant** [2] - 1847:22, 1848:8

**unit** [4] - 1794:15, 1824:11, 1824:12

**UNITED** [3] - 1780:1, 1780:3, 1780:10

**United** [5] - 1780:12, 1782:3, 1782:6, 1784:1, 1925:11

**University** [1] - 1813:21

**unrelated** [1] - 1790:8

**unsubstantiated** [4] - 1841:14, 1844:22, 1912:19, 1913:10

**unusual** [1] - 1806:5

**unusually** [5] - 1820:22, 1823:2,

1823:5, 1832:25, 1863:2

**unusually-configured** [3] - 1823:2, 1823:5, 1832:25

**up** [48] - 1784:2, 1787:4, 1794:7, 1798:3, 1798:4, 1802:20, 1803:3, 1803:4, 1807:16, 1808:3, 1808:5, 1808:17, 1810:10, 1810:12, 1820:2, 1820:17, 1823:16, 1832:1, 1837:8, 1840:2, 1840:15, 1841:14, 1850:1, 1863:25, 1874:10, 1875:1, 1878:14, 1879:19, 1882:5, 1886:4, 1887:4, 1890:10, 1890:16, 1892:4, 1895:14, 1895:17, 1897:23, 1899:17, 1900:6, 1900:7, 1900:18, 1904:20, 1907:12, 1909:3, 1911:20, 1916:17, 1922:10, 1923:20

**up....take** [1] - 1898:8

**upcoming** [1] - 1889:24

**update** [2] - 1879:10, 1902:13

**updated** [1] - 1907:1

**updates** [2] - 1901:22, 1902:16

**updating** [1] - 1908:7

**upper** [1] - 1861:15

**urgency** [1] - 1880:20

**US** [2] - 1817:21, 1818:13

**US-based** [1] - 1817:21

---

## V

**vaguely** [1] - 1922:14

**value** [3] - 1907:6, 1909:18

**varies** [1] - 1859:11

**variety** [1] - 1901:14

**various** [4] - 1808:3, 1810:15, 1812:22, 1813:22

**version** [1] - 1788:12

**view** [1] - 1801:4

**violation** [2] - 1818:13,

1819:2

**virtual** [3] - 1829:24, 1829:25, 1830:3

**Vladimir** [2] - 1915:12, 1916:3

**volunteered** [1] - 1860:21

**vs** [2] - 1780:5, 1782:4

---

## W

**w/Baker** [1] - 1789:18

**wait** [1] - 1922:3

**waiting** [1] - 1922:3

**walk** [1] - 1852:11

**walked** [1] - 1893:4

**wants** [3] - 1890:22, 1890:23, 1891:6

**warrant** [3] - 1853:22, 1854:1, 1875:18

**warranted** [2] - 1818:10, 1818:17

**warrants** [1] - 1853:16

**Washington** [8] - 1780:15, 1780:24, 1810:14, 1811:2, 1883:25, 1902:23, 1902:24, 1925:13

**watched** [1] - 1858:1

**WATKINS** [1] - 1780:19

**web** [1] - 1908:2

**week** [2] - 1836:7, 1887:2

**weeks** [5] - 1813:8, 1859:3, 1859:5, 1859:7, 1883:25

**welcome** [1] - 1783:20

**well-respected** [1] - 1792:12

**white** [55] - 1810:18, 1813:24, 1816:24, 1822:11, 1822:13, 1822:20, 1823:25, 1824:2, 1824:23, 1829:14, 1831:3, 1831:13, 1832:11, 1832:24, 1834:9, 1835:12, 1835:16, 1835:23, 1836:2, 1838:8, 1841:19, 1842:6, 1843:1, 1846:16, 1846:24, 1847:13, 1851:9, 1867:10, 1871:16, 1871:22, 1872:25, 1873:4, 1873:7, 1873:9, 1883:17, 1884:19, 1884:22, 1885:2, 1885:5,

1946

1885:8, 1893:12,
1902:20, 1902:22,
1903:11, 1903:15,
1907:16, 1907:22,
1912:2, 1913:16,
1919:19, 1920:11,
1920:20, 1922:22,
1924:14, 1924:18

**whole** [1] - 1864:17

**Wierzbicki** [9] -
1836:17, 1837:19,
1837:20, 1839:20,
1841:25, 1888:25,
1889:11, 1893:7,
1910:13

**willing** [2] - 1891:1,
1903:10

**window** [1] - 1876:9

**wiretap** [3] - 1853:21,
1854:1, 1875:20

**wiretaps** [1] - 1853:18

**withheld** [2] - 1812:8,
1852:24

**withhold** [1] - 1812:17

**WITNESS** [1] - 1781:2

**Witness** [3] - 1864:16,
1868:16, 1878:22

**witness** [8] - 1783:24,
1784:5, 1787:1,
1808:19, 1825:10,
1878:4, 1921:19,
1922:5

**woman** [1] - 1902:2

**wonderful** [1] - 1902:2

**word** [1] - 1815:15

**write** [1] - 1807:17

**writes** [3] - 1826:16,
1898:5, 1898:6

**written** [4] - 1801:15,
1802:16, 1871:8,
1919:8

**wrote** [3] - 1807:18,
1807:21, 1916:25

## Y

**Yao** [1] - 1782:10

**YAO** [1] - 1780:18

**year** [5] - 1804:13,
1809:22, 1810:19,
1811:2, 1868:2

**Year** [3] - 1811:4,
1849:9, 1849:22

**years** [9] - 1793:17,
1797:23, 1809:7,
1809:24, 1810:8,
1814:1, 1854:12,
1854:21, 1895:7

**yesterday** [2] -
1857:13, 1897:22

**York** [7] - 1780:20,
1802:25, 1880:15,
1880:19, 1880:24,
1882:2, 1889:23

**yourself** [6] - 1808:21,
1836:15, 1855:8,
1868:11, 1868:12,
1888:7

**yup** [1] - 1855:7