1   **UNITED STATES DISTRICT COURT**
    **FOR THE DISTRICT OF COLUMBIA**

2   _____

3   United States of America,      ) Criminal Action
                                   ) No. 1:21-cr-00582-CRC-1
4                   Plaintiff,     )
                                   ) <u>**Jury Trial**</u>
5   vs.                            ) **\* AFTERNOON SESSION \***
                                   )
6   Michael A. Sussmann,           ) Washington, D.C.
                                   ) **May 24, 2022**
7                   Defendant.     ) Time:  1:30 p.m.

    _____

8

9        Transcript of <u>Jury Trial \* AFTERNOON SESSION \*</u>
                        Held Before
10       The Honorable Christopher R. Cooper
                United States District Judge

11

12                  A P P E A R A N C E S

13  For the United States:   **Jonathan E. Algor**
                             UNITED STATES ATTORNEY'S OFFICE
14                           601 D Street, Northwest
                             Washington, D.C. 20530

15
                             **Andrew J. DeFilippis**
16                           SPECIAL COUNSEL'S OFFICE
                             145 N Street, Northeast
17                           Washington, D.C. 20002

18                           **Michael T. Keilty**
                             UNITED STATES DEPARTMENT OF JUSTICE
19                           145 N Street, Northeast, Room 3E 803
                             Washington, D.C. 20530

20
                             **Brittain Shaw**
21                           UNITED STATES DEPARTMENT OF JUSTICE
                             1400 New York Avenue, Northwest
22                           Washington, D.C. 20005

23  For the Defendant:       **Sean M. Berkowitz**
                             LATHAM & WATKINS LLP
24                           330 North Wabash Avenue, Suite 2800
                             Chicago, Illinois 60611

25
    (continued on next page)

1          A P P E A R A N C E S, continued

2    For the Defendant:      **Michael Bosworth**
     (continued)             LATHAM & WATKINS LLP
3                            1271 Avenue of the Americas
                             New York, New York 10020
4
                             **Natalie Hardwick Rao**
5                            **Catherine Yao**
                             LATHAM & WATKINS LLP
6                            555 Eleventh Street, Northwest
                             Washington, D.C. 20004
7    _____

8    Stenographic Official Court Reporter:
                             Nancy J. Meyer
9                            Registered Diplomate Reporter
                             Certified Realtime Reporter
10                           333 Constitution Avenue, Northwest
                             Washington, D.C. 20001
11   _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

<u>PAGE</u>:

3

**<u>Witnesses</u>**:

4

<u>Curtis Heide</u>

5

Redirect Examination by Mr. Algor................ 1963

6

<u>Jared Novick</u>

7

Direct Examination by Mr. Algor.................. 1979
Cross-Examination by Mr. Berkowitz.............. 2005

8

Redirect Examination by Mr. Algor............... 2023

9

10

**<u>Exhibits Admitted</u>**:

11

Government Exhibit 132........................... 1970

12

Government Exhibit 1200.......................... 1998
Government Exhibit 1800.......................... 1983

13

14

15

16

17

18

19

20

21

22

23

24

25

1         P R O C E E D I N G S

2              (REPORTER'S NOTE:  The morning session of the

3    proceedings was reported and transcribed by Lisa Moreira and is

4    bound under separate cover.)

5              (Proceedings held outside of the jury.)

6              THE COURTROOM DEPUTY:  Your Honor, we're back on the

7    record for Criminal Case 21-582, United States of America v.

8    Michael Sussmann.

9              THE COURT:  I apologize, Counsel.  I need to get one

10   thing from my office.

11             THE COURTROOM DEPUTY:  Please be seated.  Thank you.

12             (Off the record.)

13             THE COURT:  All right.  I've reviewed the email that

14   the government would like to admit on redirect.  Just so that

15   the record is clear, some of this was done on sidebar.  The

16   Court's original ruling was that emails between Mr. Joffe and

17   the researchers, which Mr. Sussmann did not receive, and that

18   don't mention him, were not probative of any of Mr. Sussmann's

19   state of mind or any motive to conceal or, for that matter, his

20   attorney-client relationship with Mr. Joffe.

21             Separately, the Court previously ruled that such

22   statements were not admissible as statements of co-conspirators

23   under Rule 802(d)(2)(E).  The government argues that

24   Mr. Berkowitz opened the door to the admission of Government

25   Exhibit 124, which is an email from Mr. Joffe to a group of

1    researchers, including Mr. Dagon, from August 21st, 2016, by

2    asking Mr. Heide on cross-examination about what he could have

3    explored with Mr. Dagon had he chosen to interview him.

4         The Court does not believe that Mr. Berkowitz opened the

5    door to the admission of that document.  The questions on

6    cross-examination went directly to the government's theory of

7    materiality; namely, that it could have -- that it would have

8    been important to the investigation to know the identity of the

9    source in order to, among other things, assess the source's

10   motivations.  Mr. Berkowitz confined his questioning to

11   Agent Heide on that -- to that point by establishing that the

12   FBI could, indeed, have interviewed Mr. Dagon and asked him

13   anything it wanted to, including questions about his

14   motivations; and that, in fact, the government -- that there

15   appears to have been a plan to actually do that at some point.

16        That did not open the door to the excluded email about

17   which -- about what his and the other researchers' views on the

18   data or motivations may have been.  In any case, the emails

19   reflect -- or the email reflects the views of Mr. Joffe, not

20   Mr. Dagon, and those views came a full month and a half before

21   the FBI was in a position to interview Mr. Dagon.  They are,

22   therefore, not relevant to Mr. Dagon's views or motivations in

23   any event.

24        So you can -- you can certainly ask him, as you have in

25   direct, what he would have done differently, what he would have

 1    questioned Mr. Dagon about, you know, to establish a

 2    materiality argument, but we're not going to get into what the

 3    researchers' motivations were.  Okay?

 4            MR. ALGOR:  Understood, Your Honor.

 5        And just to flag, we're going to introduce Government

 6    Exhibit 132, which is the email from Mr. Joffe regarding the

 7    white paper, which you had said, you know, is admissible here.

 8    And so we --

 9            THE COURT:  Which -- is there an objection to that,

10    Mr. Berkowitz?

11            MR. BERKOWITZ:  I need -- I need to see it, Judge, if

12    it's been the specific subject of a prior ruling of yours.

13            MR. ALGOR:  Yeah.  We're just going to ask him

14    about --

15            MR. BERKOWITZ:  If it's been the subject of your

16    prior ruling, I -- whether I agree with the prior ruling or

17    not, I'm not going to reargue that point.

18            THE COURT:  Very well.

19            MR. BERKOWITZ:  Assuming it has been.

20            MR. ALGOR:  Your Honor --

21            THE COURT:  Is Mr. Novick next after Mr. Heide?

22            MR. ALGOR:  Yes, Your Honor.

23            THE COURT:  Okay.  Where do things stand on him?

24            MR. ALGOR:  Do you want a -- it's the defense's

25    motion.

1953

```
 1              THE COURT:  Yeah.

 2              MR. BERKOWITZ:  It's our understanding that the

 3     government no longer intends to introduce the Crimson Rhino

 4     report at -- I think it's 1801.

 5              THE COURT:  Right.

 6              MR. BERKOWITZ:  So we would ask if there -- any

 7     questions about that report be limited solely to the gathering

 8     of data and not the conclusions that were reached, number one.

 9          There is a second document.

10              THE COURT:  So just so that I'm clear, Mr. Novick is

11     the principal of a company --

12              MR. BERKOWITZ:  Called --

13              THE COURT:  -- in which Mr. Joffe has an interest?

14              MR. BERKOWITZ:  Correct.

15              THE COURT:  And conducted some of the research that

16     we've been talking about regarding the DNS lookup?

17              MR. BERKOWITZ:  He supervised certain researchers

18     within a company called BitVoyant --

19              THE COURT:  Okay.

20              MR. BERKOWITZ:  -- at Mr. Joffe's direction, didn't

21     do the research himself.

22              THE COURT:  Okay.  And we'll see this photograph of

23     the team; is that correct?

24              MR. BERKOWITZ:  I'm not going to object to the

25     photograph.
```

```
 1              THE COURT:  All right.  Good to finally put faces
 2     with some of these folks.
 3              MR. BERKOWITZ:  So just -- the -- the 3500 materials
 4     suggest that Mr. Novick could testify in some substance that
 5     Mr. Joffe asked him to perform collection and analysis work;
 6     that Mr. Novick was uncomfortable with the request; that he did
 7     so, in any event; that he understood from Mr. Joffe that one of
 8     the recipients of the results of the analysis could be somebody
 9     with close affiliations to the Democratic Party.  Although he
10     doesn't recognize Mr. Sussmann's name, he would say that he
11     would say -- that he could say, according to his 3500 material,
12     Mr. Joffe didn't care for Mr. Trump, doesn't understand why
13     anyone would vote for him, things of that nature.  He would
14     also -- could also --
15              THE COURT:  Let's stop there.  Any objection so far?
16              MR. BERKOWITZ:  Yes.
17              THE COURT:  Okay.
18              MR. BERKOWITZ:  To all of the political issues.  And
19     to the extent that the discomfort is based on, you know,
20     Mr. Joffe's -- you know, anything improper and he just didn't
21     want to do it because it was a time suck, if you will, that's
22     thing one.  Thing two is --
23              THE COURT:  Okay.  And the -- and the basis for that
24     objection is 403?
25              MR. BERKOWITZ:  It -- it -- yes, it's 403,
```

1    Your Honor.  It is -- it goes to Mr. Joffe's motivations that

2    were not communicated to Mr. Sussmann, and it's also hearsay in

3    the sense that what Mr. Joffe may or may not have said, we

4    don't know if it's true, and we also don't know what -- what --

5    what the basis for --

6            THE COURT:  So -- let's stop there.  To the extent

7    it's being offered, it's not being offered for the truth.  It's

8    being offered, I assume, to show Mr. Sussmann's state of mind;

9    that he had a motive to conceal the whole conspiracy; right?

10           MR. BERKOWITZ:  If -- if he was -- if he was aware of

11   that.

12           THE COURT:  And does that depend on his awareness?  I

13   think the Court has already pretty much said that it does;

14   that things that he was not aware of don't go to his state of

15   mind or his motivations and on -- in the meeting with

16   Mr. Baker.

17           MR. BERKOWITZ:  Similarly, Mr. --

18           THE COURT:  Okay.  Let's hear from the government

19   on that point.  Why is this any different than the other

20   evidence that the Court has excluded on that same general

21   basis?

22           MR. ALGOR:  Your Honor, I expect that Mr. Novick's

23   testimony is going to be pretty much in line with Steve DeJong,

24   who you've already heard from, and the collection of data,

25   Rodney Joffe tasking him regarding that.

1     THE COURT:  Okay.

2     MR. ALGOR:  And, again, Mr. Novick will testify that

3  it was his understanding based on the type of research that he

4  was being asked to do, how that was quite distinct from

5  BitVoyant's actual role.  They were -- they were supposed to be

6  a commercial -- focus on commercial entities; whereas, this

7  was --

8     THE COURT:  Okay.  I think -- I think all that's

9  fine.

10    MR. ALGOR:  This is all -- this is focused on

11 individuals.

12    THE COURT:  And Mr. DeJong said, I didn't ask any

13 questions and I didn't care.  I just did what I was told.

14 Right?

15    MR. ALGOR:  Yeah.  So we'll elicit that, and I think

16 those exhibits get to that.  You'll see that he was pulling

17 data that is consistent with the domains and also Alfa-Bank;

18 that the individuals that he was given a listing -- a

19 seven-individual -- that he was tasked with to look at, that

20 those were associated with -- with President Trump in some form

21 or fashion, that included Richard Burt.  You'll see Alfa-Bank

22 references in that.  And so we don't think that that's outside

23 the scope.

24    And what he will also testify to is that he understood

25 that this was for a political campaign and that this was

1    opposition research.  And one of the things -- how he came to

2    that was, notwithstanding the individuals and the focus and how

3    this was different, was that he was sent by Mr. Joffe a

4    document that had attorney-client privilege on it related to

5    this.  And so his full understanding was that this was for an

6    attorney.

7            THE COURT:  Okay.  I don't think I have any issues

8    with any of that.  That's not asking him whether Joffe hates

9    Trump or not or, you know, who he voted for or any of that.

10           MR. ALGOR:  No, Your Honor, we'll get into none of

11   that.

12           THE COURT:  That's fine.

13           MR. ALGOR:  Your Honor, he will testify regarding how

14   he felt uncomfortable regarding this because it was outside of

15   the -- BitVoyant's normal practices.

16           THE COURT:  That's fine.  That's fine.  Okay.  Make

17   your record.

18           MR. BERKOWITZ:  So with respect, Judge, to that, it

19   sounds as if outside the norm of what he normally does, that he

20   thought it was likely for a political campaign.  I'm not sure

21   that his determination that he thought it was for an attorney

22   is relevant.  If they want to put in an

23   attorney-client-privileged document that he saw, I think he can

24   do that.  But if he says I understood this was going to an

25   attorney connected to the campaign, that's hearsay.  And it

1    really doesn't have anything to do with Mr. Sussmann, unless

2    they can tie it up in any way.

3              THE COURT:  Is there -- is there any link to the

4    defendant?

5              MR. ALGOR:  Your Honor, just that he understood the

6    tasking was related to opposition research regarding Trump;

7    that he was told by Mr. Joffe -- and his understanding was --

8    that it was -- it was someone tied to the Clinton campaign.

9    But his understanding overall, full context and understanding,

10   regardless of what Mr. Joffe said, was that this was going to

11   someone tied to the campaign; and that also in receiving the

12   document that had attorney-client privilege, that he understood

13   it to be for an attorney.

14             THE COURT:  How is that not hearsay if Mr. Joffe

15   offered for the purpose of showing that, in fact, it was

16   from --

17             MR. ALGOR:  Because it's a full understanding.  It's

18   not getting into the actual specific statements that Mr. Joffe

19   told him, but just the full context of what he was tasked to do

20   and who the ultimate receiver was.

21             THE COURT:  Okay.

22             MR. KEILTY:  One second, Your Honor.

23             THE COURT:  You can elicit his understanding that it

24   was for a campaign, that it was unusual, that it may have had

25   some political purpose.  But I want you to stay away from any

1    suggestion, which I don't think has been established, that it

2    was from Mr. Sussmann, including by suggesting it was from an

3    attorney.  Okay?

4               MR. ALGOR:  Understood, Your Honor.

5               MR. BERKOWITZ:  Two other issues.

6               THE COURT:  Yep.

7               MR. BERKOWITZ:  Two other issues.  The second one,

8    Your Honor, is they also -- at least to the 3500 material --

9    intend to elicit that Mr. Joffe believed that doing this type

10   of work could help the business if the firm were recognized as

11   being able to capitalize on this data in some way, shape, or

12   form.  Whether that's true is almost irrelevant because there's

13   no suggestion that Mr. Sussmann was aware that this could have

14   been done for business purposes.  And, in fact, no money was

15   exchanged for this work.

16        And so the suggestion as to Mr. Joffe's motivations --

17   and a witness who's been immunized -- wanted to do this to make

18   money or to expand the business is, we believe, un- -- you

19   know, number one, irrelevant; number two, hearsay; number

20   three, unduly prejudicial as it relates to Mr. Sussmann.

21              MR. ALGOR:  So, Your Honor, I think that testimony

22   does go to Mr. Sussmann's representation of Mr. Joffe here.  I

23   would be hard-pressed to see how representing his client wasn't

24   in his business interests as well within this; so we think that

25   that would be fairly within the scope.

1    THE COURT:  Tease that out a little bit.  The notion

2  is that he was meeting with Mr. Baker on behalf of a client

3  because the client had a business interest in --

4    MR. ALGOR:  That in being --

5    THE COURT:  -- the acceptance of the data.

6    MR. ALGOR:  In the acceptance of the data and being

7  able to speak to the fact that the FBI had considered it; that

8  it could be used in a commercial way to promote the business.

9  So an attorney, obviously, would want to advance that.

10    THE COURT:  All right.  Let me think about that one.

11    The final word.

12    MR. BERKOWITZ:  Two points about that, and then the

13  final issue on this.  There's no evidence he was representing

14  the business when he went and met with Mr. Baker at all, and so

15  the -- the concept that they're going to argue that he was

16  hiding Mr. Joffe's identity because he didn't want to disclose

17  a business interest seems incredibly far-fetched to do through

18  this witness.  Again, that would be a Mr. Joffe-type thing if

19  they wanted to go there.

20    The final issue, Judge -- and I'll let you know what it

21  is -- there's this document, Exhibit 1802, that they apparently

22  want to introduce that contains a number of people's names;

23  Carter Page, Sergei Millian.

24    THE COURT:  Yep.  I got it.

25    MR. BERKOWITZ:  I don't know how they're going to tie

1    that up.  The only one that seems relevant remotely would be

2    Richard Burt because there's some Alfa-Bank connections.  At

3    least according to the 3500 material I've reviewed, there's not

4    a connection to Mr. Joffe on this, and certainly no

5    connection -- let me say, the -- the choice of these people,

6    there's not a connection.  It was Mr. Joffe's choice to choose

7    these people.

8            And number two, there's not a whisper of a suggestion

9    that Mr. Sussmann was aware of any of these names.  And, in

10   fact, Mr. Novick never met or communicated with Mr. Sussmann.

11           MR. ALGOR:  So, Your Honor, we'd expect testimony

12   from Mr. Novick that this list was provided to him by Mr. Joffe

13   that then was used as part -- to start as the Crimson Rhino

14   project and to -- to draft a paper and to do analysis into the

15   ties and political opposition research.

16           Obviously, you can start at the top part of the page.

17   There's a reference to Alfa-Bank there.  In addition, as

18   Mr. Berkowitz mentioned, the U.S. advisor to Alfa-Bank as well.

19   And so this is also getting into, though, what Mr. Joffe's

20   taskings were in the middle of August right when all of this is

21   coming to fruition.

22           And we see, again, in one of the Alfa Group overview,

23   which comes from Fusion GPS, a specific reference to

24   Richard Burt as well.  And so as part of this tasking, this was

25   the initial document that was provided from Mr. Joffe to

1    Mr. Novick.  And then going forward, his team researched and,

2    of course, brought -- was able to obtain additional data so

3    that they could produce their initial findings regarding

4    connections between Trump and -- and Russia.

5            THE COURT:  Okay.

6            MR. BERKOWITZ:  Final document is 1200, Judge, which

7    you have.  We're not going to object to the bottom email, which

8    is Mr. Novick to Mr. Joffe talking about requests that had been

9    attached.

10           The top email is very similar to the one you just looked

11   at.  It's between Mr. Oppleman and Mr. Kanner.  It does not

12   include Mr. Novick.  And it talks about not explaining

13   limitations or whatever.  No connection to Mr. Sussmann

14   whatsoever on this document.

15           THE COURT:  And, again, Oppleman and Kanner are

16   researchers within the same group of companies?

17           MR. BERKOWITZ:  Oppleman is an owner of Littoral

18   Ventures, which is -- a -- an owner, along with Mr. Novick and

19   Mr. Joffe, in BitVoyant.  Mr. Kanner, I believe, is at the

20   researcher level -- actually, he's -- he's not an owner of the

21   business.  I believe he would be more at the researcher level.

22           THE COURT:  Okay.

23           MR. BERKOWITZ:  And the final issue, Judge, is

24   conclusions of -- I don't know if we've run that to ground --

25   conclusions that they drew from this data.  In other words,

1    substantiated, not substantiated; I think that's the subject of

2    your prior ruling, but I want to make sure we don't get into

3    that.

4              THE COURT:  Okay.  All right.  If the witness is not

5    on the email, there's no foundation for its introduction.  So

6    if you want to introduce 1200, redact the top email; okay?

7              MR. ALGOR:  Yes, Your Honor.

8              THE COURT:  All right.

9         All right.  Why don't we get started with -- I guess

10   we're on redirect.

11             (Proceedings held in the presence of the jury.)

12             THE COURT:  All right.  Welcome back, everyone.  I

13   hope you had a nice lunch.

14        We're ready to roll.

15                      REDIRECT EXAMINATION

16   BY MR. ALGOR:

17   Q.  Good afternoon, Agent Heide.

18   A.  Good afternoon.

19   Q.  I want to start -- Mr. Berkowitz asked you a series of

20   questions regarding types of investigations.  Do you recall

21   that?

22   A.  Yes.

23   Q.  And -- and he walked you through a series of questions

24   regarding preliminary investigations and full investigations.

25   And you testified earlier that this was a full investigation;

```
1    correct?

2    A.  Yes.

3    Q.  Okay.  And can you -- can you just remind the jury about

4    the -- the distinction in what you referred to as tools between

5    a preliminary and a full investigation?

6    A.  A full investigation would authorize the use of more

7    sophisticated tool sets within the FBI investigative tool sets

8    than a preliminary investigation would.  And a preliminary

9    investigation is limited to a time period of an initial

10   six-month review.

11   Q.  Okay.  And Mr. Berkowitz mentioned some of the tools that

12   you can use, and that included search warrants and wiretaps.

13   Do you recall that?

14   A.  Certain types of search warrants, yes.

15   Q.  And when you're -- when you're putting together a search

16   warrant, what's the process of that?

17   A.  Putting together a search warrant?

18   Q.  Yep.

19   A.  You would write up information that demonstrates probable

20   cause.

21   Q.  And can you explain to the -- the jury what probable cause

22   is.

23   A.  Probable cause would be enough information that leads

24   someone that there would be probable cause that evidence exists

25   in a certain place or the evidence that you're searching for
```

1    exists in a certain place.

2    Q.  And on September 23rd, when you opened the full

3    investigation, was -- was it your understanding that -- that

4    there could potentially be search warrants done in the case?

5    A.  Possibly.

6    Q.  And what about wiretaps?

7    A.  I don't know that that was necessarily on our radar, but

8    potentially it could have been.

9    Q.  But, ultimately, you didn't get a chance to -- to use any

10   of those tools; is that correct?

11   A.  No.

12   Q.  And that's because you didn't find enough information that

13   would -- that would -- that you could put into a search

14   warrant; is that -- is that fair?

15   A.  Correct.

16   Q.  And so you weren't able to pull enough information and

17   enough evidence where you could achieve probable cause for a

18   search warrant; is that a fair statement?

19   A.  Yes.

20   Q.  And -- and you were -- Mr. Berkowitz asked you a number of

21   questions about where you -- about your -- your views of the

22   white paper.  Do you recall that?

23   A.  Yes.

24   Q.  Okay.  And -- and what you thought about the allegations,

25   more broadly speaking.  Do you recall that?

1    A.  Yes.

2              MR. ALGOR:  And -- and if we could pull up Defense

3    Exhibit 803.  If you could just highlight that -- or expand

4    that, please.

5    BY MR. ALGOR:

6    Q.  And on September 26, you started talking about -- that

7    there might be a *New York Times* article.  Do you remember that?

8    A.  Yes.

9    Q.  And then you refer to it as a -- you think it's a bunk

10   report still; right?

11   A.  Yes.

12   Q.  Do you remember you called that?  Did the investigation

13   stop on September 26th?

14   A.  No.

15   Q.  Okay.  Why not?

16   A.  We continued to run down any other leads that we had

17   outstanding.

18   Q.  And --

19   A.  We --

20   Q.  And as part of that, you -- you conducted interviews; is

21   that correct?

22   A.  Certain -- I did not personally --

23   Q.  Did the team?

24   A.  -- conduct them but the team did.

25   Q.  The team conducted interviews?

```
1    A.  Yes.

2    Q.  And the team reviewed data logs; right?

3    A.  Yes.

4    Q.  And within this, you -- you had your sense that it was a

5    bunk report on September 26th, but you continued -- the team

6    continued the investigation anyway; is that accurate?

7    A.  Yes.

8              MR. ALGOR:  We can take that down.

9    BY MR. ALGOR:

10   Q.  Mr. Berkowitz asked you a series of questions regarding

11   Spectrum Health.  Do you recall that?

12   A.  Yes.

13   Q.  Okay.  And you testified earlier that you didn't

14   participate in the interview of Spectrum Health; right?

15   A.  Right.

16   Q.  And do you recall -- just if you can explain to the jury

17   again -- what -- what was the initial allegations regarding

18   Spectrum Health from the white paper?

19   A.  That there was a Tor node being used by Alfa-Bank to

20   communicate exclusively with the Trump Organization through

21   that specific Tor node.

22   Q.  And -- and your team investigated that allegation as well;

23   right?

24   A.  Yes.

25   Q.  And the ultimate conclusion was what?
```

1    A.  We were not able to substantiate that allegation either.

2    Q.  And so the team interviewed Spectrum Health regarding that;

3    right?

4    A.  Yes.

5    Q.  But the team also did an initial assessment regarding that

6    allegation; correct?

7    A.  An initial assessment of --

8    Q.  Of the allegation regarding the Tor node.

9    A.  The Tor node?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And -- and the steps that the team took was to go online

13   and look up -- I think you mentioned the Tor Project; is that

14   correct?

15   A.  Yes.

16   Q.  Did a cyber security expert need to do that to figure out

17   that assessment?

18   A.  I don't -- I believe it's open source.

19   Q.  And so I could do that, if -- if possible?  I can look up

20   the Tor Project?

21   A.  I believe so.

22   Q.  Now, Mr. Berkowitz during cross-examination also asked you

23   a series of questions regarding the white paper.  Do you

24   remember those questions?

25   A.  Not right offhand.

1    Q.  But do you recall -- you were asked --

2    A.  Yes.

3    Q.  -- about the white paper, generally?

4    A.  Yes.

5    Q.  And you were also asked about the source of the white

6    paper; right?

7    A.  Yes.

8    Q.  And that, you know, you had testified that there was an

9    anonymous source; right?

10   A.  Yes.

11   Q.  And that you, ultimately, were never able to interview that

12   source; correct?

13   A.  Correct.

14   Q.  Were you aware that the -- the anonymous source of the

15   information had other sources that provided him information

16   regarding the white paper?

17   A.  I was not.

18   Q.  So the jury's heard information regarding an individual

19   named Rodney Joffe.  Do you know who Rodney Joffe is?

20   A.  I do not.

21   Q.  And so I want to ask you:  Would it be important for you to

22   know that in drafting a white paper that a nonexpert would be

23   fooled by that information?  Would that be important to you?

24   A.  That a nonexpert would be fooled by that information?  Yes,

25   that would be important.

1    Q.  Okay.

2              MR. ALGOR:  Your Honor -- excuse me.  If we can show

3    Government Exhibit 132 just to Agent Heide.

4    BY MR. ALGOR:

5    Q.  And you're on this email, but do you see at the top --

6    who's that from?

7    A.  Rodney Joffe.

8    Q.  And the subject?

9    A.  It says "White Paper."

10             MR. ALGOR:  Your Honor, we would move to admit

11   Government Exhibit 132.

12             MR. BERKOWITZ:  No objection.

13             THE COURT:  So moved.

14             (Government Exhibit 132 admitted into evidence.)

15   BY MR. ALGOR:

16   Q.  So you mentioned -- so this is Government 132, and the

17   subject is -- can you read that off, please.

18   A.  Subject -- I'm sorry.  You said the subject?  "White

19   Paper."

20   Q.  Okay.  And it -- the "from" is Rodney Joffe.  Do you see

21   that?

22   A.  Yes.

23   Q.  And then the "to" is to Manos Antonakakis.  Do you see

24   that?

25   A.  Yes.

1    Q.  Do you know who that is?

2    A.  I do not.

3    Q.  And David Dagon, do you see that second name?

4    A.  Yes.

5    Q.  Do you know who David Dagon is?

6    A.  No.

7    Q.  You testified --

8    A.  I'm sorry.

9    Q.  -- earlier --

10   A.  I never met David Dagon, but I do know that he was the

11   information that the source came forward and said he was

12   potentially the author of the white paper.

13   Q.  Okay.  And that's from a CHS that your team was contacted

14   by?

15   A.  Yes.  Yes.

16   Q.  And then, finally, April Lorenzen.  Do you know who April

17   Lorenzen is?

18   A.  I do not.

19   Q.  So let's read that -- if you can just read that first

20   sentence, please.

21   A.  It says, "Please read as if you had no prior knowledge or

22   involvement, and you were handed this document as a" cyber --

23   "security expert (NOT a dns expert) and were asked."

24   Q.  Okay.  And if you can read the next line.

25   A.  "'Is this plausible as an explanation?'"

1  Q.  And then if you can just read the next line, please,

2  starting with not.

3  A.  "NOT to be able to say that this is, with out doubt, fact,

4  but to merely be plausible."

5  Q.  Okay.  So, Agent Heide, you mentioned earlier during

6  cross-examination that you wanted to interview the -- the

7  source of the white paper; is that correct?

8  A.  Yes.

9  Q.  And in interviewing the source of the white paper, you

10  would have asked a series of questions, I presume?

11  A.  Yes.

12  Q.  Okay.  And what's -- what would be some of those questions?

13  A.  Some of the questions would include:  how they were

14  collecting the information, where the -- the analysis was

15  coming from, is -- is the person the original author of the

16  document.  There were a lot of questions that we had based on

17  the -- the data that was contained in the white paper.

18  Q.  Would you also want to know whether the authors of the

19  white paper were trying to make it out so that it wasn't -- so

20  that it couldn't be understood if you weren't a DNS expert?

21  A.  That would be important.

22  Q.  And if you could read that last line, please.

23  A.  It says, "Do NOT spend more than a short while on this (if

24  you spend more than an hour you have failed the assignment).

25  Hopefully less."

1   Q.  And just going back to the line above, it says, without --

2   it says, "NOT to be able to say this is, with out doubt, fact,

3   but to merely be plausible," would you want to understand that

4   coming from the source of the white paper?

5   A.  Yes.

6   ███  ██████

7   ██ ███████████████████████████████████████████████████████

8   ████████████████████████████

9           MR. ALGOR:  If we can go back to Government

10  Exhibit 217.  Okay.  If we can bring up the third paragraph.

11  BY MR. ALGOR:

12  Q.  And do you recall reading this paragraph earlier in your

13  testimony?

14  A.  Yes, sir.

15  Q.  And the first line, could you read that.

16  A.  "*The only plausible explanation for this server*

17  *configuration is that it shows the Trump Organization and Alfa*

18  *Bank to be using multiple sophisticated layers of protection in*

19  *order to obfuscate their considerable recent email traffic.*"

20  Q.  Okay.

21          MR. ALGOR:  We can take that down.

22  BY MR. ALGOR:

23  Q.  Mr. Berkowitz also asked you about the FBI's ultimate

24  conclusion regarding the investigation.  Do you remember that?

25  A.  Yes.

1    Q.  And he asked you about the views of the allegations

2    regarding the investigation.  Do you recall those questions?

3    A.  Yes.

4    Q.  And fair to say that the investigation was focused on

5    whether there was a secret, covert channel; is that accurate?

6    A.  Yes.

7    Q.  And you testified regarding what steps you took in the

8    investigation.  Do you recall those?

9    A.  Yes.

10   Q.  And, again, you mentioned earlier that, you know, at times

11   you thought that it might have been a debunked report.  Do you

12   recall that?

13   A.  Yes.

14   Q.  But the -- you continued to investigate; right?

15   A.  We did.

16   Q.  And why?

17   A.  Because headquarters told us that not investigating the

18   matter was not an option.

19   Q.  And has anything happened since you came with the ultimate

20   conclusion -- let me rephrase.

21       Has anything changed, in your view, regarding the

22   ultimate conclusion that the FBI had as part of this

23   investigation?

24   A.  That the allegations were -- were unsubstantiated?  No.

25               MR. ALGOR:  If we can just bring back, just briefly,

 1    Government Exhibit 132.  And I apologize, but if you can go to

 2    the second page, please, and if we can just blow up the top

 3    portion of that.

 4    BY MR. ALGOR:

 5    Q.  Okay.  And do you see that document?

 6    A.  Yes.

 7    Q.  Does that -- does that look different in any ways?

 8    A.  I don't notice anything different about it right off.

 9    Q.  Okay.  It has Auditable -- Auditable V2.

10    A.  Okay.

11    Q.  In the other, do you recall whether it was a different

12    version?

13    A.  I don't remember right offhand.

14          MR. ALGOR:  Okay.  If we could just show him

15    Government Exhibit -- could we bring both up next to each

16    other.  If you could just pull up the top two parts.

17    BY MR. ALGOR:

18    Q.  Okay.  Do you notice any differences?

19    A.  Yes.  It looks like the third paragraph has some additions

20    to it.

21    Q.  Sum and substance, about the same -- sorry.

22    A.  I'm sorry.  In Version 3.

23    Q.  In Version 3.  Does it -- does it basically say the same

24    allegations, though?  Is that fair?

25    A.  Yes.

1     MR. ALGOR:  Nothing further, Your Honor.

2     THE COURT:  All right.  Very well.

3    Agent Heide, thank you very much for your testimony.

4 You are excused.  Don't discuss your testimony with anyone

5 until the end of the case.

6     THE WITNESS:  Thank you, Judge.

7     (Witness excused.)

8     MR. BERKOWITZ:  Your Honor.

9     (Bench conference on the record.)

10    MR. BERKOWITZ:  Your Honor, we would move to strike

11 the question and the answer that elicited it looks like it's

12 fabricated.  They've been working with this witness.  They put

13 the document before him.  That was not what the input of the

14 document is.  And I think that it was prejudicial.  I did not

15 want to draw attention to it.  But given the parameters of the

16 Court's prior ruling and the way that they went through that, I

17 think that was improper -- improper to elicit and

18 nonresponsive.

19    THE COURT:  Mr. Algor.

20    MR. ALGOR:  Your Honor, I don't recall ever eliciting

21 that it was fabricated.  I don't actually --

22    THE COURT:  Well, he said that he was prompted to say

23 that or -- so part of the problem with this is that, you know,

24 when we made our evidentiary ruling, it was under the

25 assumption that Mr. Dagon or one of the researchers would be a

1    witness.  And the purpose of that -- the foundation for the

2    admission of that document was to explain the creation of the

3    white paper from their perspective.  I didn't anticipate that

4    it would be introduced through the agent to go to, you know,

5    materiality.  And -- and there was no objection to the

6    foundation, you know, or the purpose for which it was being

7    used.  But I've got to say, I didn't expect that document

8    through him.

9         MR. ALGOR:  Yes, Your Honor.  And I don't think we

10   necessarily did either.  We -- we were going to introduce it

11   through the summary witness, but, obviously, through the

12   cross-examination they raised, you know, a series of questions

13   regarding Mr. Dagon and the source of the white paper, which

14   led to what we believe was legitimate means for redirect.

15        THE COURT:  Okay.  Whether it is -- whether it was

16   solicited or prompted or not, I do think the answer is at odds

17   with the Court's ruling on getting into the veracity or the

18   falsity or truthfulness, and by saying that it's fabricated,

19   that is much different than saying that it is -- that it

20   doesn't substantiate the allegations, which is what we've been

21   talking about and that's how we termed it before.  So I'll

22   grant the motion to strike that question and answer.

23        MR. DEFILIPPIS:  Your Honor -- Your Honor, can you

24   hear me?  I don't know that we disagree, but I don't think any

25   of us, because we don't have the realtime feed, actually heard

1    or saw the word fabricated.  It's kind of a surprise to us.

2         Does anyone just have the wording of what he said?

3              THE COURT:  Hold on.  Let me just pull it up.

4              MR. BERKOWITZ:  I have it.

5         "QUESTION:  And just going back to the line above, it

6    says, without -- it says, "NOT to be able to say this is, with

7    out doubt, fact, but to merely be plausible," would you want to

8    understand that coming from the source of the white paper?

9         "ANSWER:  Yes.

10        "QUESTION:  Why?

11        "Because it appears -- from this email, it appears that

12   this report may have been fabricated."

13        And then it was compounded by going back to the

14   document.

15             THE COURT:  Okay.  We will -- we'll take a look at

16   the transcript and -- and direct the court reporter to strike

17   the relevant parts.  I don't have it in front of me; so I don't

18   want to do it on the fly.

19             MR. BERKOWITZ:  Very good, Your Honor.  Thank you.

20             (Proceedings held in open court.)

21             THE COURT:  All right.  Mr. Algor, who's next?

22             MR. ALGOR:  Thank you, Your Honor.

23        The government calls Jared Novick.

24             THE COURT:  You're doing double duty today.

25             MR. ALGOR:  Yes, Your Honor.

```
1            THE COURT:  Step right up, sir.

2       How are you?

3            THE WITNESS:  Great.  How are you?

4            THE COURT:  Doing well.

5       Please take your mask off, remain standing, and raise

6   your right hand.

7            (Oath administered.)

8            THE WITNESS:  I do.

9            THE COURT:  Okay.  Counsel, could we have a quick

10  sidebar before we start.

11           (Bench conference held on the record.)

12           THE COURT:  Try to conform to the areas that the

13  Court has ruled on, and if there any -- if there any areas that

14  we haven't explicitly ruled on, just lodge an objection and

15  I'll rule on it.

16           MR. BERKOWITZ:  Understood.  Thank you, Your Honor.

17           MR. ALGOR:  Thank you.

18           (Proceedings held in open court.)

19                        DIRECT EXAMINATION

20  BY MR. ALGOR:

21  Q.  Good afternoon.

22  A.  Good afternoon.  How are you?

23  Q.  Good.

24       Please state and spell your name for the record.

25  A.  Jared Evans Novick.  J-a-r-e-d.  Evans, E-v-a-n-s.  Novick,
```

1  N-o-v-i-c-k.

2  Q.  And, Mr. Novick, can you please tell us your educational

3  background.

4  A.  I have a bachelor's degree in physics from the University

5  of Florida.

6  Q.  Are you currently employed?

7  A.  I am not.

8  Q.  Okay.  And what was your most recent employment?

9  A.  I was the head of strategy at a company named BitVoyant --

10 or BlueVoyant.  Sorry.

11 Q.  Okay.  And before BlueVoyant, did you work for another

12 company?

13 A.  The company name was BitVoyant, where I was a CEO.

14 Q.  Okay.  And in what year -- and so you were the CEO of

15 BitVoyant?

16 A.  Yes.

17 Q.  And what year was BitVoyant created?

18 A.  BitVoyant was founded in 2015.  I was a cofounder.

19 Q.  And who -- and you said cofounder.  Who were the other

20 cofounders in BitVoyant?

21 A.  It was spun out from something called the Littoral

22 Ventures, and I was another founder, besides the Littoral

23 Ventures.

24 Q.  So you've mentioned a couple of companies.  What is

25 Littoral Ventures?

1   A.  Littoral Ventures was trying to commercialize cyber data,

2   and they were -- the company behind Littoral -- or the people

3   behind Littoral Ventures was Rodney Joffe, Victor Oppleman, and

4   Raymond Saulino.  They were my business partners in BitVoyant.

5   Q.  Okay.  And so you mentioned a few names.  Who's

6   Victor Oppleman?

7   A.  Victor Oppleman is the CEO of a cyber company called Packet

8   Forensics.

9   Q.  So the jury's going to have to follow all these companies

10  and names, but --

11  A.  Yes.

12  Q.  -- what type of company is Packet Forensics?

13  A.  Packet Forensics collects cyber intelligence on the

14  internet, largely for support to the U.S. government.

15  Q.  And you mentioned Rodney Joffe.

16  A.  Yes.

17  Q.  Who is that?

18  A.  Rodney Joffe is another business partner of

19  Victor Oppleman's at Packet Forensics, and Rodney had several

20  companies -- involved with several companies.

21  Q.  And in 2016, you mentioned that Mr. Joffe was associated

22  with Packet Forensics and Littoral Ventures.  Do you recall any

23  other companies?

24  A.  I think Rodney was employed at Neustar.  He also had

25  involvement in other companies, including Packet Forensics,

1    Littoral Ventures, the company we cofounded, BitVoyant, and

2    ZETAlytics, among others.

3    Q.  And you mentioned Neustar.  What type of company was

4    Neustar?

5    A.  Neustar is a publicly traded company, I believe, that is in

6    telecommunications and analytics, internet analytics.

7    Q.  Finally, you mentioned an individual named Raymond Saulino.

8    A.  Yes.

9    Q.  And what was Mr. Saulino's role related to BitVoyant?

10   A.  He was dedicated as my business contact from BitVoyant to

11   Littoral Ventures.  So Raymond Saulino was the manager of

12   Littoral Ventures.

13   Q.  And did Mr. Saulino have any association with other

14   companies that you've mentioned?

15   A.  Yes, he did.

16   Q.  And what others?

17   A.  He was also related to -- as the manager of Littoral

18   Ventures, he was related to ZETAlytics to Packet Forensics.

19            MR. ALGOR:  If we could bring up Government

20   Exhibit 1800, please.

21   BY MR. ALGOR:

22   Q.  And, Mr. Novick, do you recognize this picture?

23   A.  I do.

24   Q.  And how do you recognize it?

25   A.  It's a photo that I submitted to the government.

```
 1     Q.  Okay.

 2               MR. ALGOR:  Your Honor, we'd move to admit Government

 3     Exhibit 1800.

 4               MR. BERKOWITZ:  No objection.

 5               THE COURT:  So moved.

 6               (Government Exhibit 1800 admitted into evidence.)

 7     BY MR. ALGOR:

 8     Q.  Okay.  Mr. Novick, I think this is the first picture --

 9               THE COURT:  We finally get something besides an

10     email, ladies and gentlemen.

11               MR. ALGOR:  The first picture the jury has seen.

12     BY MR. ALGOR:

13     Q.  So, Mr. Novick --

14     A.  Yes.

15     Q.  -- what was this picture related to?

16     A.  This was a picture Rodney Joffe took from his phone.  It

17     was a picture of launching Littoral Ventures, and there I am in

18     it.

19     Q.  Okay.  So let's -- let's work around so the jury can

20     understand who --

21     A.  Sure.  Sure.

22     Q.  You mentioned another -- a bunch of names and companies.

23     So who's the first person on the left?

24     A.  Sure.  On the left is Rodney Joffe.

25     Q.  Okay.  We've learned about him a bit.
```

```
 1            Who's the next person next to him?
 2   A.  Zachary Kanner.
 3   Q.  And who is Mr. Kanner?
 4   A.  He works at Packet Forensics, like their CTO.
 5   Q.  And what's a CTO?  What does that mean?
 6   A.  Sorry.  Sorry.  Chief technology officer.
 7   Q.  What is a -- if you could explain what a CTO does.
 8   A.  Yeah.  I mean, Packet Forensics is a cyber company filled
 9   with hardware and software devices.  So he is one of the big
10   brains at the company that helps figure out how to make those
11   things valuable for the U.S. government.  So he gives technical
12   direction to Packet Forensics.
13   Q.  Third person I think we recognize, but if you could --
14   A.  Okay.  That --
15   Q.  -- identify that.
16   A.  -- is a picture of me.
17            THE COURT REPORTER:  Hold on.
18            THE WITNESS:  Yes.  Okay.
19   BY MR. ALGOR:
20   Q.  And -- and that's a picture of you?
21   A.  Yes.
22   Q.  Okay.  Next person to your left?
23   A.  That would be Victor Oppleman.
24   Q.  Okay.  And you've already described Mr. Oppleman.  And to
25   Mr. Oppleman's left, who is that?
```

1    A.   Michael Reichert (phonetic).

2    Q.   Who's Mike Reichert?

3    A.   An employee of Packet Forensics at that time.  He was,

4    likely, chief operating officer.  So helping the company

5    function from a business perspective.

6    Q.   And then to Mr. Reichert's left, who is that?

7    A.   A woman named April Lorenzen.

8    Q.   And Ms. Lorenzen, who was she associated with?

9    A.   She was the president and CEO of ZETAlytics.

10   Q.   And, finally, Ray Saulino, is that -- excuse me.  Is that

11   Ray Saulino?

12   A.   Yes, that's right.  It's Ray Saulino.  Yeah.

13   Q.   Okay.  Now, turning back to BitVoyant, if you could explain

14   to the jury what type of company BitVoyant was in 2016.

15   A.   It -- BitVoyant is a cybersecurity company focused on

16   selling services to the private sector, exclusively.  No

17   government work whatsoever, and we were doing cyber risk data

18   for companies.

19   Q.   Okay.  And you -- you say cyber risk data for companies.

20   How would you go about doing that?

21   A.   Yeah.  Maybe it's helpful if I can explain the relationship

22   of these companies.  I know I've said a lot of companies and --

23   Packet Forensics was long -- been around long before I ever

24   showed up.  And they were out collecting information on the

25   internet globally, and they did that largely in support of

1    requirements from the U.S. government.

2           But given all the data they had access to, they wanted

3    to start commercial companies.  And the way they went to go

4    start commercial companies was standing up something called

5    Littoral Ventures.  Raymond Saulino was my contact there, just

6    as he was the contact to April.  And they wanted to say, "Go

7    forth and do good things.  Solve private sector problems."

8           And so ZETAlytics was a company to solve private sector

9    problems.

10          BitVoyant was a company -- my company that I helped

11   found -- to solve private sector problems.

12          But we were different in many ways.

13   Q.  Okay.  And you mentioned that BitVoyant received certain

14   types of data from Packet Forensics; is that correct?

15   A.  That's right.

16   Q.  And if you could -- generally speaking, what types of data

17   did -- did BitVoyant receive from Packet Forensics?

18   A.  It would be internet data that's called DNS data, among

19   other formats of data.  But, largely, the biggest data set we

20   have is DNS data, which I had to learn when I was in the

21   company.  I didn't know what DNS was at the time.

22   Q.  And -- but you understand what DNS data is now?

23   A.  I do.  I do.  I had to get smart quickly on that.

24   Q.  Okay.  And what is DNS data?

25   A.  It stands for domain name service.  It's like the Yellow

1    Pages of the internet.  You know, if you go to your phone or

2    computer, you type in google.com, the computers have to

3    understand what Google means.  So it translates that into

4    numbers and pulls information out of Google for you.  That's

5    all a DNS.

6    Q.  And do you have an awareness of how Packet Forensics

7    collected data that would be used by BitVoyant?

8    A.  They collected data many ways, but I -- I understand them

9    to put internet sensors around the world that would observe

10   internet traffic data.

11   Q.  And then BitVoyant would use that data for commercial

12   purposes?

13   A.  That's right.

14   Q.  Okay.  I want to turn your attention now to 2016.  Can you

15   briefly explain to the jury what the leadership structure was

16   at BitVoyant at that time.

17   A.  We were a small company figuring out our way.  I was the

18   CEO.  There was no other chief names.  I even felt funny about

19   the CEO name, but I was the CEO of the company.  And beneath

20   me -- or I worked alongside researchers and analysts who were

21   very good with this data, in analyzing it and putting reports

22   together, and doing that in support of private sector

23   companies.

24   Q.  And approximately how many analysts and researchers worked

25   underneath your -- your leadership?

1    A.  I would ballpark ten or so.

2    Q.  And so as CEO, who did you report to?

3    A.  I reported to Littoral Ventures and the board.  And the

4    board were Rodney Joffe, Victor Oppleman, and Raymond Saulino.

5    That was my board.  They had the majority ownership of my

6    company, and I had a small part of BitVoyant.

7    Q.  And can you explain the relationships that you had with

8    each of those individuals as -- as CEO of BitVoyant?

9    A.  Right.  Before I started at BitVoyant, I was friends with

10   Victor Oppleman.  He and I did work together in the past in

11   support of the government.  And Victor wanted to commercialize

12   data out of Packet Forensics.  He thought there was a private

13   sector opportunity to go do, and I expressed interest in

14   starting a company with him.

15        But in order to start the company, he told me I had to

16   meet his other business partners.  And his other business

17   partners were Rodney Joffe and Raymond Saulino.  And only until

18   after I met them were they all comfortable enough for me to be

19   the CEO of the company.

20   Q.  And so when working as a CEO, how would you engage with

21   Mr. Oppleman on a -- day-to-day, week-to-week?

22   A.  Well, again, since Victor was a friend of mine, we would

23   text and call each other, sometimes related to the company,

24   sometimes as friends would.  But when it came to corporate

25   decision-making, it was largely Raymond Saulino -- as dedicated

1    as the paperwork told me to is Raymond Saulino.  And then if

2    Raymond, or Ray, didn't know, I would call Victor, because

3    Victor is my friend and he's on the board.  So he would help me

4    out.

5    Q.  And what was your relationship with Mr. Joffe as CEO of

6    BitVoyant?

7    A.  Yeah.  It was --

8              MR. BERKOWITZ:  Objection.  Timing.

9              THE COURT:  Rephrase.

10   BY MR. ALGOR:

11   Q.  And, Mr. Novick, in 2016, as CEO of BitVoyant, how would

12   you interact with Mr. Joffe related -- as your role as the CEO

13   of BitVoyant?

14   A.  It was more infrequent.  It was more on a profession --

15   professional level.  It was during board meetings where he

16   would ask hard questions about the company performance and

17   direction.

18   Q.  And did Mr. Joffe ever give you any taskings in 2016?

19   A.  He did.

20   Q.  And, generally speaking, what type of taskings would

21   Mr. Joffe give you as CEO of BitVoyant?

22   A.  Generally, he would ask us to be proactive and look at a

23   company and understand if they are vulnerable to cyberattacks.

24   And so the general tasking, maybe once every two months, once

25   every three months, would be a proactive assessment on a

1   private sector company to assess their vulnerabilities.  And

2   that's what we would do.

3   Q.  So with that in mind, did there come a time in the summer

4   of 2016 that you got a tasking from Mr. Joffe?

5   A.  Yes.

6   Q.  And -- and can you describe to the jury what that tasking

7   involved.

8   A.  In -- in August of 2016, he called me asking to -- to look

9   at research and data related to Donald Trump and Russia and

10  Russia and Donald Trump.

11  Q.  And was this type of tasking common or uncommon for you at

12  BitVoyant?

13  A.  It was extremely uncommon.  It was -- it was unique.  We

14  never before did any tasking like this.

15  Q.  Okay.  And -- and can you explain to the jury why it was

16  unique.

17  A.  It was about an indiv- -- I mean, we're a private company

18  trying to help other private companies defend themselves.

19  This was a tasking about an individual or a group of

20  individuals, and it was in August of 2016, based on that

21  individual, Donald Trump as a presidential candidate; felt

22  very political.  So the whole thing to me felt like opposition

23  research.

24  Q.  Okay.  And you mentioned -- so if you could just explain.

25  What -- what about the tasking did you think was political?

```
 1    A.  Well, I -- Rodney tasked me, and I received a PDF document.

 2    And in that PDF document, there were, you know, a handful --

 3    five, seven names -- of individuals, their home addresses, if

 4    they had a spouse, their spouse name and companies related to

 5    their spouse, their personal email addresses.  So everything

 6    about the document was -- it was very personal.  It was --

 7    Q.  I'm going to show you what's been marked as Government

 8    Exhibit --

 9                THE COURT:  Counsel, hold on.  Can we do a sidebar.

10                (Bench conference on the record.)

11                THE COURT:  So I'm a little concerned about all the

12    personal stuff that's -- that's in this document.  This is the

13    one you might have to seek to introduce.  Is it relevant

14    that -- all of the information in it or that we put the

15    document in and just describe who generally these people were

16    that he was tasked with gathering data about?

17                MR. ALGOR:  I mean, Your Honor, I think we would want

18    to show the -- the individuals -- that it was a list of

19    individuals tied to -- that related to opposition research and

20    then --

21                THE COURT:  And he mentioned one was related to

22    Alfa-Bank.  Is this -- isn't this a little tangential?

23                MR. ALGOR:  I don't believe so, Your Honor.  I mean,

24    this was tasking, and they then went about doing this and

25    received data related to this, and which included the domain
```

1      that's at issue here that was produced into the white paper as

2      part of this tasking.

3              MR. BERKOWITZ:  And if I could add, Judge, this was a

4      concern.  Richard Burt is the only one associated with

5      Alfa-Bank.

6              MR. DEFILIPPIS:  And Carter Page as well, and

7      Sergei Millian.

8              MR. BERKOWITZ:  I would make a proffer he doesn't

9      know -- those names haven't been mentioned here.  The relevance

10     is that Mr. Joffe was collecting and gathering information that

11     ended up, ultimately, in the white paper.  This isn't -- I

12     think it's prejudicial, and it's one of the concerns that we

13     had when we objected to the document.  The document is not tied

14     to anybody.  There's not an email.  The witness for the first

15     time is saying -- he actually hasn't even said he received it

16     from Mr. Joffe.  He said he received a PDF.  So the extent and

17     scope of the --

18             THE COURT REPORTER:  I'm sorry, Mr. Berkowitz.  I

19     can't hear you.  Can you speak up just a little bit more.

20             MR. BERKOWITZ:  The extent and scope of the gathering

21     of data seems to be coming far afield with the names of these

22     people who have never before been mentioned in this case.

23             THE COURT:  All right.  I'm going to exclude it under

24     403.  I think it is -- that showing the document itself with

25     all the personal information is unnecessary and duplicative of

1    what he's -- he will testify on the stand.  You can ask him

2    generally what he received and if he remembers particular

3    names, that's fine.  You can refresh him, that's fine, I

4    think, but I will reluctantly let you do that, but this may

5    be more inflammatory than it is helpful.  I mean, we voir dired

6    the jurors about many of those names, and I don't think that

7    they, you know -- that they will register with the jury.  But

8    for other reasons that I think you'll appreciate, I'm not

9    sure this is necessary.  But I'll let you do it in that way.

10   Okay?

11          MR. ALGOR:  Yes, Your Honor.  I just want to be clear

12   in what -- so my -- I'm going to ask him about the type of

13   information that he received, generally speaking, and that

14   there were certain individuals.  And then I -- I would like to

15   see if he can remember Richard Burt --

16          MR. KEILTY:  And Carter Page.

17          MR. ALGOR:  -- and Carter Page.  So we'll have the

18   references.

19          THE COURT:  You seem to be very interested in him.

20          MR. KEILTY:  Your Honor, sorry.  They -- they both

21   appear in the white paper.  That's the only reason we're trying

22   to draw the connection.

23          THE COURT:  Okay.  I'll let you do that.

24          MR. ALGOR:  Okay.  Thank you, Your Honor.

25          (Proceedings held in open court.)

1    BY MR. ALGOR:

2    Q.   Mr. Novick, you mentioned that you received a PDF right

3    before we broke; is that -- is that accurate?

4    A.   Yes, sir.

5    Q.   And -- and who did you receive that PDF from?

6    A.   Rodney Joffe.

7    Q.   And can you just describe, generally speaking, what -- what

8    the contents of the paper was -- or the PDF.  Excuse me.

9    A.   It's a very nondescript PDF, no images, all text.  The --

10   there were names of individuals that were bold, a sentence or

11   two on the individual, maybe some other activity, business

12   relationships, and a lot of email addresses.  Names of some

13   Russian companies, Russian affiliations, some names that seemed

14   foreign to me.  And some names that I recognized at the time

15   that were in the news.  So, immediately, I knew it was a

16   political request.

17   Q.   Okay.  And within some of the names, do you recognize the

18   name Carter Page?

19   A.   I do now.  I remember seeing that name in the paper, but I

20   didn't know who he was at the time.

21   Q.   And do you recall whether that document had a reference to

22   Carter Page in it?

23   A.   It did.  It was one of the first names.

24   Q.   And do you recall any references regarding Carter Page and

25   his affiliation with Alfa-Bank in that document?

1    A.  Yes.

2    Q.  Okay.  I'm going to ask you about another name.

3    Richard Burt, do you recognize that name?

4    A.  I do.

5    Q.  And how do you recognize it?

6    A.  It was in the tasking document.

7    Q.  Okay.  And, again, did you recall anything regarding,

8    generally speaking, Mr. Burt's affiliations?

9    A.  Well, I knew he was related to Donald Trump.  That is what

10   all came into tasking, and it was -- associates of Donald Trump

11   and Russian entities.

12   Q.  Okay.  If I were to show you a document, would that help

13   you refresh?

14   A.  Yes, it would.

15           MR. ALGOR:  Just to the witness, Government

16   Exhibit 1802.

17       If we could go -- I think it's page 3, please.

18           THE COURT:  If you can just read that to yourself.

19   BY MR. ALGOR:

20   Q.  Without reading it out loud, if you can just read the

21   bottom portion, or what's blown up.  Don't read it out loud.

22       And, Mr. Novick, does that help to refresh your

23   recollection?

24   A.  Yes.

25   Q.  Okay.  And so I'll ask you again.  Richard Burt, do you

```
1    recall --
2              MR. ALGOR:  We can take that down, please.
3    BY MR. ALGOR:
4    Q.  Do you recall any associations that Richard Burt had at
5    that time?
6    A.  Yes.
7    Q.  And what do you recall?
8    A.  I remember -- recall a relationship to Alfa-Bank.
9    Q.  Okay.  Now, Mr. Novick, you mentioned that you received
10   this PDF from Mr. Joffe; right?
11   A.  Yes, sir.
12   Q.  And what did you do next?
13   A.  Well, I was immediately uncomfortable with the tasking, so
14   uncomfortable that I called Victor Oppleman, because I felt
15   like this would be opposition research --
16             MR. BERKOWITZ:  Objection.
17             THE COURT:  Overruled.
18   A.  -- opposition research.  And Victor, as a board member, as
19   an equity member and a fiduciary of the company, I wanted to
20   know if he was okay with our company looking up activity
21   of pers- -- of people, people's activity, and what they're
22   doing.  And he was also uncomfortable, but said, let's do it,
23   see what comes out, and if you find anything, we'll handle it
24   at that point.
25             So at that point, I reluctantly moved forward with the
```

1  tasking, but I was extremely uncomfortable.

2  BY MR. ALGOR:

3  Q.  Okay.  And you said you moved forward with the tasking.

4  How did you move forward?

5  A.  Given the political nature of the work and of the

6  individuals, I knew I could only trust certain people in the

7  company who both had a preexisting relationship with Rodney

8  and Victor, who had worked in the secure space.  And I felt

9  that if I had just three people work on it and we would give it

10  a name, we could keep that research separate from the other

11  people in the company and, hopefully, do it quickly and get rid

12  of it.

13  Q.  Okay.  And who were the -- those three individuals that you

14  selected for the team?

15  A.  So inside the company, it was Lori Stotler, who previously

16  worked with Rodney in previous companies; Rory Yegerman, who

17  had a preexisting relationship with Victor Oppleman; and

18  Michael Spencer, who had a preexisting relationship with Rodney

19  Joffe.

20  Q.  And did all those individuals work for BitVoyant at that

21  time?

22  A.  Yes, they did.

23  Q.  Okay.  And once you created the team, what tasking did you

24  provide to them?

25  A.  Well, we gave it a name.  We called it Crimson Rhino,

1    because in our office we had whiteboards, and the last thing I

2    would want in the office was Donald Trump's name, a

3    presidential candidate, in the office and people walking in and

4    saying, "What are we doing with President Trump?"  So we called

5    it Crimson Rhino, and that was the name internal for the

6    project.

7        I did not -- I'm not a cyber guy, so I did not have

8    access to the data, only the analysts did.  I gave that tasking

9    document, the name of the five or seven people in that

10   document, to the researchers, and they started their work.  And

11   I told them, "In a couple days, come back and tell me what you

12   got."

13   Q.  Okay.

14        MR. ALGOR:  Just one moment, Your Honor.

15        If I could show the witness Government Exhibit 1200.

16   BY MR. ALGOR:

17   Q.  And, Mr. Novick, do you see at the bottom -- do you

18   recognize your name as the "from"?

19   A.  Yes.

20   Q.  Okay.

21        MR. ALGOR:  Your Honor, government would move to

22   admit Government Exhibit 1200.

23        MR. BERKOWITZ:  No objection.

24        THE COURT:  So moved.

25        (Government Exhibit 1200 admitted into evidence.)

1    BY MR. ALGOR:

2    Q.  Okay.  And, Mr. Novick, what date is this email?

3    A.  August 15th, 2016.

4    Q.  Okay.  And the subject?

5    A.  Subject says, "Fwd: Lists."

6    Q.  If you could read the email to the jury, please.

7    A.  Sure.  It says -- sorry.  It's an email from me to

8    Zachary Kanner, who is the CTO of Packet Forensics, copied to

9    Victor Oppleman and Rodney Joffe, my board members.  And the

10   email reads, "Hi Zach,

11        "Please find our requests attached.  We cast a large net

12   based on our initial analysis pass.

13        "1.  Files named 'Deep' are special requests where we

14   want specific increased details (if possible).

15        "2.  Files named 'Wide' are meant to cover the breadth

16   of potential analysis (relationship discovery).

17        "Please call me with any questions.

18        "Thanks."

19   Q.  And so let's -- let's talk a little bit about part of this

20   email.  And so at the start it says here are our requests.  And

21   then you say, "We cast a large net based on our initial

22   analysis pass."  What did you mean by that?

23   A.  I think it's helpful for context to understand how this

24   works, how the research worked.  When Rodney called me,

25   whatever day that was, we have a 90-day history -- I talk with

1    my hands.  I apologize.  We have a 90-day history of data.

2         So the first thing when analysts jump in, they look at

3    historical past 90-day data.  So the question is historically

4    based on data we have access to through Packet Forensics; are

5    there any relationships between the tasking document

6    individuals and Russia.  That was called Crimson Rhino.

7         This email is about, well, since we're still collecting

8    data every day, every second, how can we change the way we

9    collect data so we can get better data, if any, on things

10   related to individuals and Russia.  Number 1 is saying, go

11   deep, as detailed as possible, based on this PDF.  Number 2's

12   request, go wide.  Based on our initial pass, we want you not

13   to look through a soda straw, but look everywhere for things

14   that -- that were related to this.

15   Q.  Okay.

16             MR. ALGOR:  And so if we can take that and then go to

17   page 3 of the document.

18        So there was -- you can go to the page prior to that.

19   Okay.  And if we can blow up that top part.

20   BY MR. ALGOR:

21   Q.  So there was a series of attachments to this email; is

22   that -- is that correct?

23   A.  That's right.

24   Q.  Okay.  And if you could read the file name.

25   A.  The file name reads forward-- "Fwd: Lists.msg," for

 1    message.

 2              MR. ALGOR:  And if we can go to the next page,

 3    please.  If we can expand that.

 4    BY MR. ALGOR:

 5    Q.  And so you see at the top, if you read to the jury that

 6    first -- that first, up through .edu.

 7    A.  Sure.  It's tor-exit.eecs.umich -- which, I guess, stands

 8    for University of Michigan -- .edu.

 9    Q.  And the next line down, can you read that, please.

10    A.  "Mail1.Trump-email.com."

11    Q.  Okay.  And the two names that you just read, are those

12    what's called domains?

13    A.  Those are domains, yes.

14    Q.  And what's a domain?

15    A.  A domain is anything -- most commonly people know .com, it

16    stands for commercial.  So the thing before .com is the domain.

17    And the things that are sometimes before that are called the

18    subdomains.  So these are subdomains within the domains here.

19    And the .com is something that tells you a little bit more

20    about the domain.  When it's .com, it's commercial.  When it's

21    .edu, it means education.  So probably a university.

22              MR. ALGOR:  If we can now turn to page 7, please.  If

23    we can expand that out as well.

24    BY MR. ALGOR:

25    Q.  So there was a series of attachments to this email, I think

1    you testified to.

2    A.  That's right.  And --

3    Q.  So this was another attachment.  Do you see that?

4    A.  Yes.

5    Q.  Okay.  If you could read that file name, please.

6    A.  It reads deep ip.txt.

7    Q.  And you testified just previously about a reference to

8    deep.

9    A.  Yes.

10   Q.  Is this the type of information that would go to that

11   category?

12   A.  That's correct.

13   Q.  Okay.

14          MR. ALGOR:  And so if we could turn to the next page,

15   please.  If you can expand that out.

16   BY MR. ALGOR:

17   Q.  And what is this?

18   A.  These are lists of IPs.

19   Q.  And what are IPs?

20   A.  It's embarrassing if I don't know what -- internet

21   protocols, I believe.

22   Q.  And what -- why would you have been sending this type of

23   information?

24   A.  I sent it on behalf of our analysts.  I was a broker

25   between what the analysts needed and the sensitivity to -- to

 1    Packet Forensics.  I -- I'm looking at a bunch of numbers here

 2    that are IP addresses, but it is so different from what we

 3    typically do, you know.  And I'm --

 4         I told you I talk with my hands.  I -- I'm a visual guy.

 5         And sometimes I like to think of it this way:  Our

 6    company is like a commercial satellite company looking at

 7    floodplains around a river, about risk to insurance companies

 8    in this metaphor.

 9         This request was take the satellite that's doing

10    floodplain analysis and look in someone's backyard at this

11    address.  So what we're looking at in IP addresses are the

12    equivalent of someone's backyard in IP space related to people

13    and not companies or maybe the companies related to people.

14         And so when we made this request in this email, it was

15    go deep.  Focus that satellite with the best resolution you

16    have in someone's backyard, an individual's backyard, and tell

17    me what you see.

18         And go wide.  Here are all the companies that they are

19    and take pictures of all those companies and analyze that.

20    And, hopefully, we can see something related to Trump.  That is

21    the Crimson Rhino activity.

22              MR. ALGOR:  And so if we can turn to page 200,

23    please.

24    BY MR. ALGOR:

25    Q.  And if you could read that file name.

1    A.  That's wide ip.txt.

2            MR. ALGOR:  And if we can turn to page 202.  Okay.

3    And -- if you can just expand that.

4    BY MR. ALGOR:

5    Q.  And so you mentioned the term -- you mentioned wide.  Is --

6    what is this information that we're looking at here?

7    A.  So wide would be -- we're looking at Alfa-Bank domains or

8    domains with the word alpha in it.  So we see alfa dot --

9    alfa-bank.com, alfa-bank.ru, for Russia, and maybe other alfa

10   things that are not related to Alfa-Bank at all.

11           Our analysts in their initial pass, like you're sifting

12   through things -- you know, like anything that says alfa, put

13   it in this bucket.  And this list is a bucket of anything that

14   has alfa in the domain name.  And that's why we're going wide.

15   So it may not be related to Alfa-Bank, but maybe some are.  And

16   I can tell in this short list some things may not be Alfa-Bank

17   and certain things definitely are.

18   Q.  Okay.

19   A.  And that's the wide request.

20   Q.  And so -- did you ultimately write a report about this?

21   A.  Our team did, you know.  I'm not -- I'm not an analyst; so

22   I didn't write the report, but the team wrote a report.

23   Q.  And without getting into anything related to the report,

24   who did you provide that report to?

25   A.  The report went to Rodney Joffe because he tasked me.

```
 1              MR. ALGOR:  Nothing further, Your Honor.
 2                        CROSS-EXAMINATION
 3   BY MR. BERKOWITZ:
 4   Q.  Good afternoon, Mr. Novick.  How are you doing today?
 5   A.  Great.  How are you?
 6   Q.  Are you feeling better?
 7   A.  I am feeling -- thank you for asking.  I am feeling better.
 8   Q.  We haven't met before, have we?
 9   A.  We have not.
10   Q.  My name is Sean Berkowitz, and I represent Michael Sussmann
11   over here.
12   A.  Okay.
13   Q.  You've not met Mr. Sussmann, have you?
14   A.  No.  The first time was just outside.  I think I got a
15   glance of him.
16   Q.  And you've never spoken with him --
17   A.  That's correct.
18   Q.  -- correct?
19   A.  That's right.
20   Q.  Never emailed with him; correct?
21   A.  Never emailed him.  He was much taller than I even thought
22   too.
23              THE COURT:  Mr. Novick, if you could wait until
24   Mr. Berkowitz finishes his question so the court reporter can
25   pick it up.
```

```
 1              THE WITNESS:  Okay.  Thank you.
 2    BY MR. BERKOWITZ:
 3    Q.  But you do know Mr. Joffe, don't you?
 4    A.  Yes, sir.
 5    Q.  And Mr. Joffe, at least in 2016 -- right? -- was a
 6    tremendously well-respected DNS expert?
 7    A.  He was -- I think he was respected by some and not
 8    respected by others.  I mean, I know of people like Paul Vixie,
 9    who is at Farsight Security, and some -- sometime in the past
10    they had a big blowout.  And so you people in the community
11    were either on Team Rodney or Team Paul Vixie.  And I don't
12    know the details, but...
13    Q.  But in terms of his DNS capabilities, he had patents in
14    DNS; correct?
15    A.  I believe he did.
16    Q.  You were in business with him in 2016, were you not?
17    A.  Yes, sir.
18    Q.  And you're not a DNS expert, are you?
19    A.  No, I'm not.
20    Q.  In fact, I think -- do you know what DNS stands for?
21    A.  I do.
22    Q.  Which is what?
23    A.  Domain name service.
24    Q.  Would it surprise you to know that it actually stands for
25    domain name system?
```

1    A.  That would surprise me.

2    Q.  Would or would not?

3    A.  It would -- it would be surprising, but I -- again, I'm not

4    a cyber expert, and I had to learn DNS from a team of analysts.

5    Q.  And you're aware of Mr. Joffe's connections to the

6    government communities and their respect for him?

7    A.  I'm sorry.  Say again.

8    Q.  Are you aware of the respect that Mr. Joffe had in the

9    government communities in 2016?

10   A.  It's an interesting question because I do know some

11   government agencies were suspect of Rodney.

12   Q.  Are you aware that he was a confidential human source for

13   the FBI?

14   A.  I did not know that at the time, but more recently --

15   Q.  At the time.

16   A.  I did not know that.

17   Q.  Are you aware his company was receiving tens of millions of

18   dollars in payments from government agencies for DNS data that

19   was supplied to them?

20   A.  Is that Neustar?

21   Q.  Anything related to Mr. Joffe.

22   A.  He was not open with any money, amounts of money; so I

23   would not be able to guess how much money he was making.

24   Q.  You don't like Mr. Joffe much, do you, sir?

25   A.  We argue at times, but, you know, we have disagreements.

1    Q.   Okay.  You were -- you argued with Mr. Joffe about your

2    performance as CEO; correct?

3    A.   I'd say, again, I argued with him about my performance.

4    Q.   There was friction between you and Mr. Joffe; is that

5    correct?

6    A.   A friction?

7    Q.   Yes.

8    A.   I don't know if I would characterize it that way at all.

9    Q.   You were interviewed by the government a number of times in

10   connection with this matter; is that right?

11   A.   I'm sorry.  Was I interviewed within the government?

12   Q.   Yeah, interviewed over the phone or in person by the

13   government.

14   A.   I submitted evidence to them, and they asked me a question

15   about that evidence.

16   Q.   Okay.  Do you consider that something other than an

17   interview?  You talked to them?

18   A.   I have spoken with them in advance of this, yes.

19   Q.   A number of times; right?

20   A.   Again, I -- I'm not understanding.  So, yes, it's several

21   times I have connected with them about the evidence I supported

22   them with.

23   Q.   That supported what they wanted?

24   A.   No, sir.

25   Q.   Okay.  So let me -- let me just ask you, sir, a couple of

1    questions.

2    A.  Yeah.

3    Q.  You had a phone conversation with people from the

4    government team on August 12th, 2021; correct?  A phone

5    conversation with people from the government team on

6    August 12th of 2021?

7    A.  I remember talking with them in August.  I don't know if it

8    was the 12th.

9    Q.  Okay.  And you then had a follow-up Webex with them on --

10   in August of 2021-- correct? -- in that time frame?

11   A.  Yes.

12   Q.  You then had a couple of more phone conversations with them

13   in the late summer of 2021; correct?

14   A.  I think it's helpful --

15   Q.  Answer my question, sir.  You can be helpful on redirect.

16   A.  I know.  But I was at home, and I was served with a

17   subpoena.  My son opened the door, and he was surprised to see

18   a man with a gun subpoenaing me, and I had no idea what

19   anything was about.

20   Q.  And when was that they came with a gun to your home, sir?

21   A.  It was -- it was the time that they served the subpoena.

22   Q.  Do you remember when that was?  That's a pretty shocking

23   event to have someone with a gun show up at your home.  When

24   was that?

25   A.  I don't know the exact date of that.  It's when I received

1    the subpoena.

2    Q.  Okay.  Summer of 2021?

3    A.  Yes, I would say that's right.

4    Q.  And after the man with the subpoena came to your home with

5    a gun, what happened next?  Did you talk to him?

6    A.  I did not.  I received the piece of paper, and that was it.

7    I went inside.

8    Q.  And then you followed up with the people who sent the man

9    with the gun?

10   A.  The piece of paper had a phone number on it, and I was

11   curious what this was about.

12   Q.  I can imagine you were.

13   A.  Yeah.  Yeah, I was.  Yeah.

14   Q.  And did you then call the people and ask what it was about?

15   A.  It took a while, and I was routed -- there wasn't much

16   information on it.  So it took a while to get to it, but then I

17   ultimately learned what it was about.

18   Q.  But since the time that the man with the gun came to visit

19   you, sir, you've met and spoken with these people voluntarily a

20   number of times; correct?

21   A.  Well, I -- and I contacted an attorney.  And so an attorney

22   and I were there when we spoke with them; that's correct.

23   Q.  Several times; correct?

24   A.  Yes.

25   Q.  Okay.  And you went in the grand jury; correct?

1    A.   That's right.

2    Q.   And when you spoke with them in the summer of 2021, they

3    had somebody that was taking notes; right?

4    A.   When I spoke with -- where is this?

5    Q.   Are you aware that the agents had somebody taking notes of

6    what you were saying to them, sir?

7    A.   In the grand jury?

8    Q.   No, before the grand jury.

9    A.   I -- I don't know if they were taking notes.  I would -- I

10   would assume they would be.

11   Q.   Okay.  And I'm going to ask you, now that you recognize

12   that you assume they were taking notes when you spoke with

13   them, whether you told them in August -- on August 12th of 2021

14   that there was a bit of friction between you and Mr. Joffe.

15   A.   Are you saying that's what I said in the notes?

16   Q.   I'm actually asking you if you told them that there was a

17   bit of friction between you and Mr. Joffe, sir.

18   A.    I probably gave them examples of why I was uncomfortable

19   how Rodney would give me --

20   Q.   Sir -- sir, I'm asking you a question.

21   A.   Uh-huh.

22   Q.   Simple question.  Did you tell them that there was a bit of

23   friction between you and Mr. Joffe?

24   A.   Yeah, I think you're asking me about a specific word, and I

25   cannot tell you with any certainty that I used a word or

1    didn't.

2    Q.  Would it refresh your recollection to see a report of that

3    interview?

4    A.  It -- again, we're down the path of maybe somebody was

5    taking notes, maybe I used this word.  I -- I want to tell you

6    about why I thought I had a difficult relationship with Rodney

7    through examples.

8    Q.  So fair to say -- and I think if the government feels it's

9    important, they can get into it.  But you acknowledge that in

10   2016, you had what you would describe as a, quote, difficult

11   relationship with Mr. Joffe; correct?

12   A.  I would -- I had a challenging time with Rodney, that's

13   correct.

14   Q.  And he thought you could do a better job as CEO; correct?

15   A.  Well, he told me if I don't do certain things, I could find

16   a new job.

17   Q.  Sir, you told the agency he thought you could do a better

18   job as CEO; correct?

19   A.  Again, I've got to tell you, I'm uncomfortable because

20   you're telling me what I said, and I don't remember the exact

21   words of what I said.  I can give you examples of why things

22   were difficult and challenging.

23          THE COURT:  Sir, let me make this a little easier.

24   If you don't remember saying something, say you don't remember.

25   And if you can be refreshed with a document, Mr. Berkowitz

1    would be happy to do that.

2            THE WITNESS:  Okay.  Yes, that's -- that is helpful

3    for me.  Because I would be -- it would be helpful if you can

4    give me a document, and I don't recall specific words.  I was

5    trying to be as helpful by --

6            THE COURT:  Just listen to the question and try to

7    answer it.  Okay?

8            THE WITNESS:  Yeah.

9    BY MR. BERKOWITZ:

10   Q.  All right.  Let's try this.  Let's take a look, just for

11   you, at JN-02 at page 3, last paragraph.  And I'm going to ask

12   you to read it yourself, sir.  Okay?

13   A.  Okay.

14   Q.  And once you've read it, I'm going to ask you a question.

15   A.  Okay.

16   Q.  Do you recall telling the agents in August of 2021 that you

17   believe Mr. Joffe thought you could have done a better job as

18   CEO at BitVoyant?

19   A.  Reading this, yes.

20   Q.  Okay.  Now, you mentioned that you were, sort of, a bit

21   player in BitVoyant, so to speak.  Pun intended.

22   A.  A what player?

23   Q.  A smaller player in Bit- -- correct?

24   A.  That's correct.

25   Q.  Let's remind the jury exactly what we mean by that.  You

1    owned 25 percent of the company BitVoyant; correct?

2    A.   That's incorrect.

3    Q.   QWERTY was your company; correct?

4    A.   Yes, sir.

5    Q.   You were 100 percent owner of QWERTY?

6    A.   Yes.  But the number 25 percent is not correct at all.

7    Q.   What is the number?

8    A.   Less than 20 percent, and much less today.

9    Q.   In 2016?

10   A.   In 2016, there was an operating agreement in the LLC, and

11   my equity would be based on performance and metrics.  And so my

12   equity, as complicated as it seems, was actually a formula.

13   There's -- there's an attachment to the operating agreement.

14   And based on the formula, my equity would be determined.  It

15   was not 25 percent, and it did not -- it was less than

16   20 percent.  And today --

17   Q.   Sir -- sorry.  In 2016, what percentage of the company do

18   you say you owned?

19   A.   It's -- it's not possible to tell you because the operating

20   agreement said at the conclusion of the first year based on

21   metrics, my ownership would then be determined at a later

22   point.

23   Q.   Okay.  The company has subsequently been sold to private

24   equity; correct?

25   A.   It's been sold to -- it was being combined into a company

1    now named BlueVoyant.

2    Q.  And you are no longer an officer in that company; correct?

3    A.  I was never an officer in BlueVoyant.  I'm an owner,

4    partial owner, through what is BitVoyant, which is now called

5    BV Associates.

6    Q.  You are no longer serving as CEO of the company that is

7    BlueVoyant; correct?

8    A.  I was never CEO of BlueVoyant.  I was the CEO of BitVoyant.

9    Q.  And you had a disagreement with management at BlueVoyant,

10   and you're no longer in an active employment role at that

11   company; correct?

12   A.  No, sir.  And I want to make sure we're clear.  You're

13   asking about BlueVoyant?

14   Q.  Correct.

15   A.  No, I am no longer employed by BlueVoyant.

16   Q.  Okay.

17   A.  Yeah.

18   Q.  Very good.

19        Now, going back to the summer of 2016, you say that you

20   were tasked with something by Mr. Joffe; correct?

21   A.  That's correct.

22   Q.  And I think your words, you were extremely uncomfortable

23   with it; correct?

24   A.  That's right.

25   Q.  Because it was polarizing, among other reasons; correct?

1    A.  Among other reasons; correct.

2    Q.  And with respect to that, you went to your friend,

3    Mr. Oppleman; correct?

4    A.  Yes, sir.

5    Q.  And he told you that you should go ahead and do it;

6    correct?

7    A.  Yes, sir.

8    Q.  Now, you are not an analyst; correct?

9    A.  That's right.

10   Q.  You're not a cyber expert; correct?

11   A.  I am not a cyber expert.

12   Q.  You're not a technical expert; correct?

13   A.  I feel like I'm a technical expert in other areas, yes.

14   But --

15   Q.  You're not a technical expert when it comes to the data

16   that you were asked to supervise a project on; correct?

17   A.  That's right.

18   Q.  And you don't believe you're qualified to comment on the

19   nature or content of that data; correct?

20   A.  I do believe I'm qualified.  I think you can be qualified

21   but not be a technical expert.

22   Q.  Do you remember, sir, telling the agents when you met with

23   them on August 16th of 2021 that you were not a technical

24   expert so you were not able to explain -- I'm sorry -- so you

25   were never qualified to comment on the nature or content of the

1    data?  Do you remember telling them that?

2    A.  I'm sure you have the document that says I did.  I did

3    something to that effect, but doesn't mean that I can't talk to

4    the value of the data, which is different than a technical

5    assessment.  Technical assessment is one part.

6    Q.  You're not an internet researcher; correct?

7    A.  That's right.

8    Q.  And I think that you told Mr. Algor when you were looking

9    at something, it looked like a bunch of numbers to you;

10   correct?

11   A.  Colloquially, yes.

12   Q.  Now, you were essentially a project manager of this task;

13   correct?

14   A.  That's what it felt like.

15   Q.  Took a couple weeks?

16   A.  Yes.  My -- my -- it's a guess.  I don't have the exact

17   times, but I would say it's a couple weeks.

18   Q.  And you didn't write the report; correct?

19   A.  I did not author the report.

20   Q.  And you were -- you relayed it ultimately to Mr. Joffe

21   after the researchers gave it to you; correct?

22   A.  That's right.

23   Q.  And Mr. Joffe was involved in a number of different

24   companies, was he not?

25   A.  Yes, that's right.

1    Q.   I think we talked about Packet Forensics; correct?

2    A.   That's right.

3    Q.   ZETAlytics; correct?

4    A.   Correct.

5    Q.   Littoral Ventures; correct?

6    A.   Yes, sir.

7    Q.   And the data that was ultimately analyzed came from

8    Littoral Ventures, not from BitVoyant; correct?

9    A.   The data was provided by a licensing agreement from

10   Littoral Ventures, but a lot of the tools that were developed

11   were BitVoyant tools, analytical tools.

12   Q.   There was also, you came to learn, other people working on

13   related projects; correct?

14   A.   Yes.

15   Q.   And that would have been April Lorenzen?

16   A.   Yes.

17   Q.   Anybody at Georgia Tech working on the project?

18   A.   I had no knowledge of anyone at Georgia Tech working on a

19   project.

20   Q.   Anybody else other than April Lorenzen that you were aware

21   was working on a related project?

22   A.   The only people I knew were people at BitVoyant that --

23   that I selected:  April Lorenzen at ZETAlytics; certainly

24   individuals at Packet, like Zach in the email that we saw; and

25   Rodney.

1    Q.  And you don't have any personal knowledge of any analysis

2    that others did on this type of work for Mr. Joffe; correct?

3    A.  I -- Rodney sent a document to me with additional analysis

4    on it, which was not our analysis, and that additional

5    analysis --

6    Q.  Let me stop you.

7    A.  -- did not support -- our researchers did not --

8    Q.  Let me stop you right there.

9    A.  Yeah.

10   Q.  That additional analysis was not something that your folks

11   had done; correct?

12   A.  That's right.

13   Q.  And so you don't know what went into other people's

14   analysis, is my question; correct?

15   A.  That's right.

16   Q.  Now -- and with respect, sir, to that sheet that -- I'm

17   sorry -- that was shown to you to refresh your recollection --

18   remember that list of names that you talked a fair amount

19   about?

20   A.  The list of the tasking document --

21   Q.  Carter Page?

22   A.  Yes, sir.  Yes.

23   Q.  Correct.

24   A.  Uh-huh.

25   Q.  And, sir, isn't it true that you told the government that

1    you didn't get any of the selectors from Mr. Joffe yourself?

2    A.  I would be -- I don't think I said that.  The selectors

3    were that document, and that -- that document came from Rodney

4    Joffe.

5    Q.  Let's take a --

6    A.  But I'm not sure how -- how Rodney got those names.

7    Q.  Let's take a look, sir.  You don't recall telling them you

8    didn't get any selectors from Mr. Joffe; correct?

9    A.  Can you rephrase that?  I don't recall -- I -- I got

10   selectors from Rodney in that PDF document.

11   Q.  Okay.  Let's take a look, sir, at JN-02, page 6 at

12   paragraph 5, second from the bottom.  And let me ask you if you

13   told the government in August of 2021 that you did not see any

14   selectors from Joffe for this project; correct?

15   A.  This does not look like anything I said.

16   Q.  Okay.  And, sir, do you remember saying that sometimes

17   Mr. Joffe would give Mr. Yegerman selectors?

18   A.  Oh.  I'm still in shock from reading this, because that's

19   not --

20   Q.  So you don't recall?  You deny saying it?

21   A.  I don't -- correct.

22   Q.  And although you testified on direct that you got

23   Mr. Page's name from Mr. Joffe, do you remember telling the

24   agents that when asked if there was discussion about

25   Carter Page, given that his email was included in an

1    attachment, you advised you did not remember Mr. Joffe

2    mentioning Carter Page?  Do you remember telling the agents

3    that?

4    A.  I do not recall that.

5    Q.  Take a look at JN-02_07, paragraph 3, second sentence.

6    Read it to yourself.

7    A.  Okay.  This is a discussion about Carter Page, not a

8    selector.  So maybe you have a terminology issue.

9    Q.  Sir, you were shown an email attachment with a reference to

10   Mr. Page's email address; correct?

11   A.  Yes.  I -- I agree with this, but not what you said with

12   selector.  Selector meant something different to me.

13   Q.  That was on the previous page, selector.

14   A.  Oh.

15   Q.  Okay?

16   A.  Okay.

17   Q.  This is a new topic.  That was selectors.  And you denied

18   saying that, which is fine.

19          I'm now asking you, sir --

20   A.  Yes.

21   Q.  -- about Carter Page.  Okay?

22   A.  Yes.

23   Q.  And I'm over here.

24   A.  Oh.

25   Q.  So with respect to Carter Page, sir, were you shown in an

1    interview with the government in August of 2021 an email

2    attachment that had Carter Page's name on it?

3    A.  Yes.  That's the tasking document that I referenced

4    earlier.

5    Q.  When you were asked if there was a discussion about

6    Carter Page, given his email address, you advised you did not

7    remember Mr. Joffe mentioning Page; correct?

8    A.  He didn't mention anything in that document.  He sent it to

9    me in an email.

10   Q.  Did you remember then following up and saying it could have

11   been a selector given to Gibson or ZETAlytics or another person

12   Novick did not know?

13   A.  I remember saying that because Rodney would call other

14   analysts on my team without me knowing.  He had a preexisting

15   relationship with them.

16   Q.  Okay.  There was another name on that document called

17   Sergei Millian; correct?

18   A.  Yes.

19   Q.  And you told the government that that name did not seem

20   familiar to you; correct?

21   A.  That's correct.

22   Q.  Sir, you did not get that document from Mr. Joffe; correct?

23   A.  The tasking document I did get from Mr. Joffe.

24   Q.  And you handed that document off to researchers who did all

25   the work; correct?

1    A.  They did most of the work.  They sent it to me.  I sent --

2    I formatted it and then I sent it to Rodney.

3    Q.  Okay.  So your role in all this, coming up and testifying

4    in court, was Mr. Joffe asked you to do something, you asked

5    researchers to do it, they did it, they gave it to you, you did

6    it, and you gave it to Mr. Joffe; correct?

7    A.  I formatted it and gave it to Mr. Joffe, yes.

8              MR. BERKOWITZ:  Nothing further.

9              MR. ALGOR:  Just briefly, Your Honor.

10                     REDIRECT EXAMINATION

11   BY MR. ALGOR:

12   Q.  So during cross-examination, Mr. Berkowitz asked you about

13   some friction you had with Mr. Joffe.  Do you recall that?

14   A.  Yes.

15   Q.  And -- and you -- you also mentioned -- you discussed the

16   report; right?  Do you recall discussing that from questions

17   from Mr. Berkowitz?

18   A.  Yes.

19   Q.  And that -- you provided a report to Mr. Joffe as part of

20   your Crimson Rhino tasking?

21   A.  Yes, that's correct.

22   Q.  And you just -- through Mr. Berkowitz's cross-examination,

23   you discussed that Mr. Joffe had sent you a document back.  Do

24   you recall that?

25   A.  He sent -- yes, Mr. Joffe sent a document back to me, a

1    different document than I sent him.

2    Q.  And --

3              THE COURT:  Hold on.  Sidebar.

4              (Bench conference on the record.)

5              MR. BERKOWITZ:  Judge, I'm worried this is getting

6    potentially into an area that is fraught with peril.  I expect

7    that the testimony would be that Mr. Joffe sent him back a

8    document from Ms. Lorenzen, the conclusions of which were

9    different than the conclusions in his report and he said this

10   isn't our report and Joffe hung up.  And we believe the

11   conclusions in Ms. Lorenzen's report, which are actually

12   inconsistent, would actually be exculpatory and the subject of

13   that privilege.  And so I suspect that there's not much

14   relevance to this line.

15             THE COURT:  This is the document that -- that there

16   was a suggestion which the task came from Mr. Sussmann?

17             MR. BERKOWITZ:  What I would say is we don't know

18   what the document was that was sent back -- or that Mr. Joffe

19   had.  In fact, I don't believe that Mr. Novick ever actually

20   saw it, but he was reading a conclusion to Mr. Novick on the

21   phone related to this document.  Mr. Novick said it's not our

22   document.  So it's getting into the conclusions and other

23   issues.  And I don't understand why it would be relevant if

24   Ms. Lorenzen sent another document, other than that there were

25   other people working on other issues.

1          THE COURT:  Mr. Algor.

2          MR. ALGOR:  Yes, Your Honor.  So by -- what I would

3     expect that Mr. Novick would testify to is that he received a

4     document back from Mr. Joffe that was similar or the same as

5     his report that he had sent to them but that the findings had

6     been changed.  And that also was marked with -- it was marked

7     as attorney-client privilege.

8          THE COURT:  I'm going to exclude that.

9          (Proceedings held in open court.)

10    BY MR. ALGOR:

11    Q.  Okay.  Mr. Berkowitz, you were asked a series of questions

12    by Mr. Berkowitz about the tasking document.  Do you recall

13    that?

14    A.  Yes, sir.

15    Q.  Okay.  And there's some back-and-forth regarding selectors

16    and names.  Earlier we showed -- or excuse me.  Earlier you

17    testified regarding that PDF that you received.

18    A.  Yes.

19    Q.  And your testimony today is -- who did you receive that

20    document from?

21    A.  Rodney Joffe.

22    Q.  Okay.  And you testified regarding certain individuals that

23    were on that list.  Do you recall that?

24    A.  Yes.

25    Q.  And there was some back and forth during cross-examination

1    about who Carter Page was, do you remember that?

2    A.  Yes.

3    Q.  And what was the distinction between the PDF and what you

4    were just trying to explain to Mr. Berkowitz?  Can you explain

5    that?

6    A.  When he said selector, to me that -- my researchers taught

7    me that a selector is very technical.  And it's a way for them

8    to take that and search the data.

9         The difference between a selector and a discussion about

10   a name is more conversational.  It's like saying I know Bob,

11   but here's Bob's address.  His address would be a selector, but

12   Bob is a name conversationally.  So that was the distinguish --

13   that I was trying to distinguish between those two.

14   Q.  There was also testimony where there was a difference

15   between domain name system and domain name service.  Can you

16   explain that?

17   A.  Yes.  I misspoke.  And I, again, learned about DNS when I

18   took the job.

19   Q.  And, again, you -- during cross-examination, Mr. Berkowitz

20   asked you a series of questions regarding -- regarding your

21   work for Mr. Joffe on this project?

22   A.  Uh-huh.

23   Q.  And without getting into any specific conversations, based

24   on the totality of your work, who was the intended audience for

25   the project?

 1    A.  It was to go to an attorney with ties.

 2              MR. BERKOWITZ:  Objection, Your Honor.

 3              THE COURT:  Sustained.

 4              MR. ALGOR:  Nothing further, Your Honor.

 5              THE COURT:  All right.  Mr. Novick, thank you very

 6    much for your testimony.  You're excused.

 7              THE WITNESS:  Thank you, sir.

 8              THE COURT:  Please don't discuss your testimony with

 9    anyone other than your counsel until the end of the case.

10         Have a good day.

11              THE WITNESS:  Okay.  Thank you, sir.

12              (Witness excused.)

13              THE COURT:  All right.  Ready to press forward?

14              MR. KEILTY:  Your Honor, maybe if we could have

15    five minutes to speak with the Court and then bring the jury

16    back.

17              THE COURT:  Sure.  Ladies and gentlemen of the jury,

18    we're going to take a five-minute recess to deal with some

19    legal issues, and we'll have you back in as soon as we can.

20         My counsel advises me we should take our afternoon

21    break.  So we'll break for about 15 minutes, come back at about

22    3:35, and get ready to go.

23              (Proceedings held outside of the jury.)

24              THE COURT:  All right.  Have a seat.

25              MR. KEILTY:  So, Your Honor, the -- the one issue

1     that we wanted to discuss, which we sent to the Court last

2     night, is the presentation of our summary witness.

3            As -- as the Court is aware, we plan on putting a fairly

4     voluminous amount of exhibits in through our summary witness,

5     who is going to be our paralegal, Ms. Arsenault.  And in an

6     attempt to streamline that process, we thought that a

7     demonstrative might be most effective.

8            Using the process of working with defense counsel to --

9     first of all, the parties agree that -- I believe the parties

10    agree that all the exhibits that would go in through

11    Ms. Arsenault are authentic.  Then it's just a question of

12    relevance, Your Honor.  And I think the parties -- I think the

13    parties would like to work together to, kind of, cull down any

14    disagreements that we might have about those exhibits going in.

15           My understanding is that the defense objects to the

16    PowerPoint presentation style of the process.  But, again, we

17    think it just streamlines it in terms of -- the alternative is

18    to have to put literally a hundred exhibits in through

19    Ms. Arsenault one at a time.  And that could take a day.

20           THE COURT:  Well, I'm somewhat frustrated that this

21    issue didn't get raised before.  I think there's some

22    fundamental issues to having -- you know, a lay summary witness

23    that is not offering, you know, a summary of voluminous

24    testimony under 1006 simply -- who doesn't have personal

25    knowledge of the -- of the evidence that's being admitted.  You

1    know, so she's not like a case agent who's a forensic agent

2    who's going to be testifying about, you know, phone records or

3    financial transactions that he or she has analyzed as part of

4    the government's case.  But, rather, it's just a way to, you

5    know, get in exhibits that have not been admitted through other

6    witnesses and to provide, you know, a summation through a

7    PowerPoint or otherwise of the government's evidence before the

8    government's closing statement.

9        And this would apply to the defense as well.  I mean,

10   for all those reasons, I think, you know, a number of courts,

11   while -- you know, have allowed some summary testimony along

12   these lines, or similar lines, have expressed some reservations

13   in all of those areas about, you know, a member of the

14   government's case team simply, you know, summarizing the

15   government's evidence at the end of the case before closing

16   arguments.

17       So with those general concerns in mind, I don't know if

18   there are objections to the approach or whether we're just

19   talking about what evidence she's going to talk about or how

20   it's going to be displayed.

21       And so maybe, Mr. Berkowitz, talk about that.  I mean,

22   and you've obviously used -- you know, you just used a

23   PowerPoint through a witness, but, you know, that -- that's

24   someone who's testifying to emails that he or she was on or

25   wrote or received.

1              MR. BERKOWITZ:  Yeah.  So a couple things,

2    Your Honor.

3              THE COURT:  Yeah.

4              MR. BERKOWITZ:  And I think we're tracking where

5    you're coming from and agree.  And that was the objection we

6    had.  We actually received this last night.  We sent an email

7    saying let's talk about it.  Due to, as I indicated, I think,

8    some good-faith email communication problems, the call wasn't

9    set up.

10             And our objections would be a couple-fold.  Number one,

11   it's essentially a closing argument.  You've looked at it,

12   136 slides, much of which has evidence that's already admitted,

13   put in chronological order, walking through their case -- and

14   whether it's Mr. DeFilippis, Mr. Keilty, or Mr. Algor, or

15   Ms. Shaw will do a wonderful job, I'm sure, in closing with a

16   deck similar to that -- but it's inappropriate to do a closing

17   through a summary witness.

18             There are a number of documents which we have agreed are

19   authentic that the government is allowed to introduce.  There

20   are -- I wouldn't say a handful.  I wouldn't say a dozen -- but

21   a number of documents that we believe are not relevant, that we

22   can tee up and discuss as to whether they come in or not, and

23   you can evaluate them.

24             With respect to whatever remains -- in other words, the

25   universe of documents that are relevant, have not yet come

1     in --

2                 THE COURT:  And we can, I assume, introduce those as

3     a compilation exhibit as opposed to, you know, going through

4     each one and asking Ms. Arsenault has she seen them, has she

5     read them.

6                 MR. BERKOWITZ:  Yeah.  These -- are these documents

7     and emails that are relevant in the case?  Yes, they are.  What

8     do they consist of?  They're billing records.  They're phone

9     records.  They're emails.  And they can use them in their

10    closing.  Correct.  That -- that would be fine.

11          In -- in addition, there were some -- they've summarized

12    phone records, and that is the type of thing that could be

13    something that's consistent with a summary witness.

14                THE COURT:  I've had agents summarize the voluminous

15    phone records and call out particular ones and have charts

16    saying, you know, this is how many calls took place on this

17    date between these people, you know.  I think that's -- I've

18    done that before.

19                MR. BERKOWITZ:  Understood.  And I think that -- that

20    we would be fine with appropriate charts.  The one that we got

21    last night has emails between people's spouses and things.  We

22    just don't understand any connection to relevance to -- it's

23    one thing to say phone calls between Mr. Joffe and Mr. Sussmann

24    or phone calls between Mr. Sussmann and Mr. Lichtblau.

25    Those -- obviously, whether we agree they're relevant, we're

1    not going to object to those.

2         But ones that are between unrelated people that we don't

3    have an understanding of, we don't want to have summarized even

4    if they're in the voluminous records because they could be

5    misleading.  And so we're happy to talk with the government

6    with those parameters about working through something like

7    this.  And we're happy to do that this afternoon, early this

8    evening.

9         I think there was a suggestion from the government that

10   it probably doesn't make sense -- and I think both sides

11   apologize to you, Your Honor, that there may be a waste of

12   90 minutes because we don't have any more witnesses from the

13   government.  It certainly is not anybody's intention to waste

14   the Court's time.  This issue came up, as you noted, at the

15   last minute, at least from our perspective.  And we'll work

16   with them, but I do think they're going to need a steer, and

17   we're going to have some objections on which documents can get

18   included in that thing, in the packet, so to speak.

19        THE COURT:  Why don't you continue to work together.

20        You may -- for, sort of, general principles from the

21   D.C. Circuit on the use of a summary witness, *United States v.*

22   *Lemire*, L-e-m-i-r-e, 720 F.2d 1327; *United States v. Rodney*

23   *Moore*, D.C. Circuit, 651 F.3d 30; *United States v. Hampton*,

24   718 F.3d 978, and there are others.  And we also mentioned

25   some -- some concerns with this approach from -- in the

1    Second Circuit, particularly where some of you folks practice.

2            MR. BERKOWITZ:  And -- and just briefly, Your Honor,

3    I don't know when is an appropriate time to -- to raise this.

4    I want to express what -- and I am not a -- a hotheaded

5    person --

6            THE COURT:  You're not a what?

7            MR. BERKOWITZ:  I'm not a hotheaded person, but I

8    have deep concern over the last line of questioning with the

9    witness eliciting something that I think was clearly

10   prohibited.  And it's consistent, in our view, with the line of

11   questioning relative to Mr. Elias, relative to them reading the

12   tweet that had been excluded.

13           And, again, I know you don't apportion bad faith, and

14   I'm not asking you to do that at this point, but I just -- I'm

15   -- I'm really concerned about the number of those issues that

16   have come in and the prejudice to Mr. Sussmann.  And I don't

17   know how best to deal with it, but I want to raise that to your

18   attention.

19           THE COURT:  All right.  Let's deal with the summary

20   witness issue first, and then we'll move to that.

21           MR. KEILTY:  Thank you, Your Honor.

22           And we'll work with defense tonight.  We'll take a look

23   at those -- those cases.  And -- and I agree.  I think we

24   can -- as far as the phone records go, that seems to be

25   something that's an easy fix.

1          And just -- just as far as the call records between

2     spouses, that was a mistake.  That wasn't supposed to be in

3     those.  So we'll take care of that as well.

4          THE COURT:  And so if we have exhausted our

5     witnesses, what about -- I thought Mr. McMahon and Mr. Grasso

6     were being --

7          MR. KEILTY:  So the government is not going to call

8     Mr. McMahon.  We informed the defense of that this morning,

9     Your Honor.  He would have been a ten-minute witness anyway.

10          THE COURT:  And Mr. Grasso?

11          MR. KEILTY:  And I don't believe we're calling

12     Mr. Grasso.  We had never -- we had taken him off our list,

13     Your Honor.

14          THE COURT:  He's -- he's on my list as of 5/13, but

15     that's fine.

16          Okay.  So we're down to Ms. Arsenault.  So we'll take

17     the night off, then, and start with her tomorrow morning,

18     subject to whatever agreement the parties reach as to the

19     scope.

20          MR. KEILTY:  Yes, Your Honor.

21          THE COURT:  I will hold my thought for the minute,

22     but we may address this other issue in the morning.  Okay?

23          MR. KEILTY:  Yes, Your Honor.

24          THE COURT:  All right.  So your case, Mr. Berkowitz,

25     what should I expect?

1          MR. BERKOWITZ:  So we're prepared to start our case

2    tomorrow, Your Honor.  I expect the witnesses, at least as of

3    this moment, would include Mr. Lichtblau, pending Your Honor's

4    ruling.  It would include Mr. Grasso.  It would include --

5          THE COURT:  I'm sorry.  He's -- he's on your list?

6    Oh, no, no, no.  If we exclude Mr. Grasso.  Okay.

7          MR. BERKOWITZ:  No, no.  We would call Mr. Grasso.

8          THE COURT:  You're calling Mr. Grasso.

9          MR. BERKOWITZ:  And some character witnesses.  And

10   Ms. Gauhar, who we previously mentioned.  We would also,

11   Judge -- we'll likely file, when the government rests, not just

12   a Rule 29 motion, but a -- a motion to preclude certain

13   information that could inform Mr. Sussmann's testimony if he

14   were to testify.  And so we would probably -- I think we can

15   finish with our witnesses tomorrow, assuming Ms. Arsenault is

16   not crazy in length.  And if Mr. Sussmann were to testify, we

17   would expect that to start on Thursday morning, pending your

18   ruling on the preclusive issue.

19         THE COURT:  Ruling on the what issue?

20         MR. BERKOWITZ:  I'm sorry.  We intend to file a

21   motion on some documents that we would preclude -- look to

22   preclude and get your direction on.

23         THE COURT:  I see.  Okay.  Why don't we start fresh

24   in the morning.  And we'll -- Mr. Lichtblau's counsel should

25   plan to be present tomorrow morning.

```
1              MR. BERKOWITZ:  Understood, Your Honor.

2              THE COURT:  And why don't we deal with that, maybe,

3      first --

4              MR. BERKOWITZ:  Okay.

5              THE COURT:  -- you know at ten minutes to nine so

6      we're not taking up the jury's time on that.

7              MR. KEILTY:  Your Honor, could the government have

8      the names of the character witnesses?

9              THE COURT:  That's fair, Mr. Berkowitz.  Just provide

10     them to the government tonight.

11             MR. BERKOWITZ:  We will send them tonight for sure.

12     We really appreciate your patience and time with what we know

13     is a challenging week and a half.

14             THE COURT:  All right.  Let's call our jury back.

15             (Proceedings held in the presence of the jury.)

16             THE COURT:  All right.  Please have a seat, everyone.

17       Okay.  Ladies and gentlemen, because the lawyers have

18     been efficient in their presentations and have moved things

19     along, we have exhausted our witnesses for today.  I understand

20     that the government has one additional witness to call in this

21     case, who will -- who we will hear from tomorrow morning.  Then

22     we will move into the defense case.

23       So the good news is, I believe, we remain on schedule,

24     subject to a couple of wild cards that we will work out, but

25     that means that you're going to go home early today.
```

1      Have a great night.  We will see you back here at

2   9:00 a.m. tomorrow morning.  No discussions about the case, no

3   research about the case, and have a great night.

4           (Proceedings held outside of the jury.)

5           THE COURT:  All right.  Have a seat.

6      Just for scheduling purposes, if Mr. Sussmann winds up

7   not testifying, could we get to closings Friday morning?  I

8   don't think the charge conference will last very long.  I have

9   to read the instructions, obviously, which we could do Thursday

10  or first thing Friday.  I need to leave here about 2:00 p.m. on

11  Friday, but that sounds like enough time to do closings Friday,

12  if he does not testify.

13          MR. ALGOR:  That sounds good to the government,

14  Your Honor.

15          MR. BERKOWITZ:  Yes.

16          THE COURT:  Good.  Okay.  I like agreement.

17      And my general practice is to allow each side the same

18  amount of time.  Obviously, the government splits it between

19  its opening and rebuttal.  So an hour each.

20          MR. ALGOR:  We were saying between an hour and hour

21  and a half, I think.  So I guess total would -- we were

22  thinking that closing might -- closing might take between an

23  hour and hour and a half, and 30 minutes' rebuttal.  So I don't

24  know what defense had intended.

25          MR. BERKOWITZ:  If it allows us to get done in

1    sufficient time, I think two hours is fine.  If you told me I

2    had to do it in 90 minutes and they had to as well, I'm sure we

3    would accommodate.

4              THE COURT:  Okay.  All right.  Well, you may have to

5    sharpen your pencil again, Mr. Berkowitz.

6          All right.  We're adjourned.  See you in the morning.

7              (Proceedings were concluded at 3:42 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Nancy J. Meyer, Registered Diplomate Reporter,
Certified Realtime Reporter, do hereby certify that the above
and foregoing constitutes a true and accurate transcript of my
stenograph notes and is a full, true, and complete transcript
of the proceedings to the best of my ability.


                    Dated this 24th day of May, 2022.


                    /s/ Nancy J. Meyer
                    Nancy J. Meyer
                    Official Court Reporter
                    Registered Diplomate Reporter
                    Certified Realtime Reporter
                    333 Constitution Avenue Northwest
                    Washington, D.C. 20001

**'**

**'Deep'** [1] - 1999:13
**'Is'** [1] - 1971:25
**'Wide'** [1] - 1999:15

**1**

**1** [2] - 1999:13, 2000:10
**100** [1] - 2014:5
**1006** [1] - 2028:24
**1200** [5] - 1962:6, 1963:6, 1998:15, 1998:22, 1998:25
**1200**........................
[1] - 1949:12
**124** [1] - 1950:25
**12th** [4] - 2009:4, 2009:6, 2009:8, 2011:13
**132** [6] - 1952:6, 1970:3, 1970:11, 1970:14, 1970:16, 1975:1
**132**........................
[1] - 1949:11
**1327** [1] - 2032:22
**136** [1] - 2030:12
**15** [1] - 2027:21
**15th** [1] - 1999:3
**16th** [1] - 2016:23
**1800** [3] - 1982:20, 1983:3, 1983:6
**1800**........................
[1] - 1949:12
**1801** [1] - 1953:4
**1802** [2] - 1960:21, 1995:16
**1963** [1] - 1949:5
**1970** [1] - 1949:11
**1979** [1] - 1949:7
**1983** [1] - 1949:12
**1998** [1] - 1949:12

**2**

**2** [1] - 1999:15
**2's** [1] - 2000:11
**20** [2] - 2014:8, 2014:16
**200** [1] - 2003:22
**2005** [1] - 1949:7
**2015** [1] - 1980:18
**2016** [18] - 1951:1, 1981:21, 1985:14, 1987:14, 1989:11, 1989:18, 1990:4, 1990:8, 1990:20, 1999:3, 2006:5, 2006:16, 2007:9,

2012:10, 2014:9, 2014:10, 2014:17, 2015:19
**202** [1] - 2004:2
**2021** [11] - 2009:4, 2009:6, 2009:10, 2009:13, 2010:2, 2011:2, 2011:13, 2013:16, 2016:23, 2020:13, 2022:1
**2023** [1] - 1949:8
**21-582** [1] - 1950:7
**217** [1] - 1973:10
**21st** [1] - 1951:1
**23rd** [1] - 1965:2
**25** [3] - 2014:1, 2014:6, 2014:15
**26** [1] - 1966:6
**26th** [2] - 1966:13, 1967:5
**29** [1] - 2035:12
**2:00** [1] - 2037:10

**3**

**3** [6] - 1975:22, 1975:23, 1995:17, 2000:17, 2013:11, 2021:5
**30** [2] - 2032:23, 2037:23
**3500** [4] - 1954:3, 1954:11, 1959:8, 1961:3
**3:35** [1] - 2027:22
**3:42** [1] - 2038:7

**4**

**403** [3] - 1954:24, 1954:25, 1992:24

**5**

**5** [1] - 2020:12
**5/13** [1] - 2034:14

**6**

**6** [1] - 2020:11
**651** [1] - 2032:23

**7**

**7** [1] - 2001:22
**718** [1] - 2032:24
**720** [1] - 2032:22

**8**

**802(d)(2)(E)** [1] - 1950:23

**803** [1] - 1966:3

**9**

**90** [2] - 2032:12, 2038:2
**90-day** [3] - 1999:25, 2000:1, 2000:3
**978** [1] - 2032:24
**9:00** [1] - 2037:2

**A**

**a.m** [1] - 2037:2
**able** [10] - 1959:11, 1960:7, 1962:2, 1965:16, 1968:1, 1969:11, 1972:3, 1973:2, 2007:23, 2016:24
**acceptance** [2] - 1960:5, 1960:6
**access** [3] - 1986:2, 1998:8, 2000:4
**accommodate** [1] - 2038:3
**according** [2] - 1954:11, 1961:3
**accurate** [3] - 1967:6, 1974:5, 1994:3
**achieve** [1] - 1965:17
**acknowledge** [1] - 2012:9
**active** [1] - 2015:10
**activity** [4] - 1994:11, 1996:20, 1996:21, 2003:21
**actual** [2] - 1956:5, 1958:18
**add** [1] - 1992:3
**addition** [2] - 1961:17, 2031:11
**additional** [5] - 1962:2, 2019:3, 2019:4, 2019:10, 2036:20
**additions** [1] - 1975:19
**address** [6] - 2003:11, 2021:10, 2022:6, 2026:11, 2034:22
**addresses** [5] - 1991:3, 1991:5, 1994:12, 2003:2, 2003:11
**adjourned** [1] - 2038:6
**administered** [1] - 1979:7
**admissible** [2] - 1950:22, 1952:7
**admission** [2] -

1950:24, 1951:5
**admit** [4] - 1950:14, 1970:10, 1983:2, 1998:22
**admitted** [6] - 1970:14, 1983:6, 1998:25, 2028:25, 2029:5, 2030:12
**Admitted** [1] - 1949:10
**advance** [2] - 1960:9, 2008:18
**advised** [2] - 2021:1, 2022:6
**advises** [1] - 2027:20
**advisor** [1] - 1961:18
**affiliation** [1] - 1994:25
**affiliations** [3] - 1954:9, 1994:13, 1995:8
**afield** [1] - 1992:21
**afternoon** [7] - 1963:17, 1963:18, 1979:21, 1979:22, 2005:4, 2027:20, 2032:7
**agencies** [2] - 2007:11, 2007:18
**agency** [1] - 2012:17
**agent** [2] - 2029:1
**Agent** [5] - 1951:11, 1963:17, 1970:3, 1972:5, 1976:3
**agents** [6] - 2011:5, 2013:16, 2016:22, 2020:24, 2021:2, 2031:14
**agree** [7] - 1952:16, 2021:11, 2028:9, 2028:10, 2030:5, 2031:25, 2033:23
**agreed** [1] - 2030:18
**agreement** [6] - 2014:10, 2014:13, 2014:20, 2018:9, 2034:18, 2037:16
**ahead** [1] - 2016:5
**alfa** [6] - 2004:8, 2004:9, 2004:12, 2004:14
**Alfa** [16] - 1956:17, 1956:21, 1961:2, 1961:17, 1961:18, 1961:22, 1967:19, 1973:17, 1991:22, 1992:5, 1994:25, 1996:8, 2004:7, 2004:10, 2004:15, 2004:16
**Alfa-Bank** [14] -

1956:17, 1956:21, 1961:2, 1961:17, 1961:18, 1967:19, 1991:22, 1992:5, 1994:25, 1996:8, 2004:7, 2004:10, 2004:15, 2004:16
**alfa-bank.com** [1] - 2004:9
**alfa-bank.ru** [1] - 2004:9
**ALGOR** [84] - 1952:4, 1952:13, 1952:20, 1952:22, 1952:24, 1955:22, 1956:2, 1956:10, 1956:15, 1957:10, 1957:13, 1958:5, 1958:17, 1959:4, 1959:21, 1960:4, 1960:6, 1961:11, 1963:7, 1963:16, 1966:2, 1966:5, 1967:8, 1967:9, 1970:2, 1970:4, 1970:10, 1970:15, 1973:9, 1973:11, 1973:21, 1973:22, 1974:25, 1975:4, 1975:14, 1975:17, 1976:1, 1978:22, 1978:25, 1979:17, 1979:20, 1982:19, 1982:21, 1983:2, 1983:7, 1983:11, 1983:12, 1984:19, 1989:10, 1991:17, 1991:23, 1993:11, 1993:17, 1993:24, 1994:1, 1995:15, 1995:19, 1996:2, 1996:3, 1997:2, 1998:14, 1998:16, 1998:21, 1999:1, 2000:16, 2000:20, 2001:2, 2001:4, 2001:22, 2001:24, 2002:14, 2002:16, 2003:22, 2003:24, 2004:2, 2004:4, 2005:1, 2023:9, 2023:11, 2025:2, 2025:10, 2027:4, 2037:13, 2037:20
**Algor** [4] - 1978:21, 2017:8, 2025:1, 2030:14
**Algor**............... [2] - 1949:5, 1949:8
**Algor**................. [1] -

1949:7
**allegation** [4] -
1967:22, 1968:1,
1968:6, 1968:8
**allegations** [5] -
1965:24, 1967:17,
1974:1, 1974:24,
1975:24
**allow** [1] - 2037:17
**allowed** [2] - 2029:11,
2030:19
**allows** [1] - 2037:25
**almost** [1] - 1959:12
**alongside** [1] -
1987:20
**alpha** [1] - 2004:8
**alternative** [1] -
2028:17
**America** [1] - 1950:7
**amount** [3] - 2019:18,
2028:4, 2037:18
**amounts** [1] - 2007:22
**analysis** [14] - 1954:5,
1954:8, 1961:14,
1972:14, 1999:12,
1999:16, 1999:22,
2003:10, 2019:1,
2019:3, 2019:4,
2019:5, 2019:10,
2019:14
**analyst** [2] - 2004:21,
2016:8
**analysts** [9] - 1987:20,
1987:24, 1998:8,
2000:2, 2002:24,
2002:25, 2004:11,
2007:4, 2022:14
**analytical** [1] -
2018:11
**analytics** [2] - 1982:6
**analyze** [1] - 2003:19
**analyzed** [2] - 2018:7,
2029:3
**analyzing** [1] -
1987:21
**anonymous** [2] -
1969:9, 1969:14
**answer** [2] - 2009:15,
2013:7
**Antonakakis** [1] -
1970:23
**anyway** [2] - 1967:6,
2034:9
**apologize** [4] -
1950:9, 1975:1,
2000:1, 2032:11
**appear** [1] - 1993:21
**apply** [1] - 2029:9
**apportion** [1] -
2033:13

**appreciate** [2] -
1993:8, 2036:12
**approach** [2] -
2029:18, 2032:25
**appropriate** [2] -
2031:20, 2033:3
**April** [7] - 1971:16,
1985:7, 1986:6,
2018:15, 2018:20,
2018:23
**area** [1] - 2024:6
**areas** [4] - 1979:12,
1979:13, 2016:13,
2029:13
**argue** [2] - 1960:15,
2007:25
**argued** [2] - 2008:1,
2008:3
**argues** [1] - 1950:23
**argument** [2] - 1952:2,
2030:11
**arguments** [1] -
2029:16
**Arsenault** [6] - 2028:5,
2028:11, 2028:19,
2031:4, 2034:16,
2035:15
**article** [1] - 1966:7
**assess** [2] - 1951:9,
1990:1
**assessment** [6] -
1968:5, 1968:7,
1968:17, 1989:25,
2017:5
**assignment)** [1] -
1972:24
**associated** [4] -
1956:20, 1981:21,
1985:8, 1992:4
**associates** [1] -
1995:10
**Associates** [1] -
2015:5
**association** [1] -
1982:13
**associations** [1] -
1996:4
**assume** [4] - 1955:8,
2011:10, 2011:12,
2031:2
**assuming** [2] -
1952:19, 2035:15
**attached** [2] - 1962:9,
1999:11
**attachment** [5] -
2002:3, 2014:13,
2021:1, 2021:9,
2022:2
**attachments** [2] -
2000:21, 2001:25

**attempt** [1] - 2028:6
**attention** [2] -
1987:14, 2033:18
**attorney** [14] -
1950:20, 1957:4,
1957:6, 1957:21,
1957:23, 1957:25,
1958:12, 1958:13,
1959:3, 1960:9,
2010:21, 2025:7,
2027:1
**attorney-client** [4] -
1950:20, 1957:4,
1958:12, 2025:7
**attorney-client-
privileged** [1] -
1957:23
**audience** [1] -
2026:24
**Auditable** [2] - 1975:9
**August** [15] - 1951:1,
1961:20, 1990:8,
1990:20, 1999:3,
2009:4, 2009:6,
2009:7, 2009:10,
2011:13, 2013:16,
2016:23, 2020:13,
2022:1
**authentic** [2] -
2028:11, 2030:19
**author** [3] - 1971:12,
1972:15, 2017:19
**authorize** [1] - 1964:6
**authors** [1] - 1972:18
**aware** [12] - 1955:10,
1955:14, 1959:13,
1961:9, 1969:14,
2007:5, 2007:8,
2007:12, 2007:17,
2011:5, 2018:20,
2028:3
**awareness** [2] -
1955:12, 1987:6

**B**

**bachelor's** [1] -
1980:4
**back-and-forth** [1] -
2025:15
**background** [1] -
1980:3
**backyard** [4] -
2003:10, 2003:12,
2003:16
**bad** [1] - 2033:13
**baker** [3] - 1955:16,
1960:2, 1960:14
**ballpark** [1] - 1988:1
**Bank** [15] - 1956:17,

1956:21, 1961:2,
1961:17, 1961:18,
1967:19, 1973:18,
1991:22, 1992:5,
1994:25, 1996:8,
2004:7, 2004:10,
2004:15, 2004:16
**bank.com** [1] - 2004:9
**bank.ru** [1] - 2004:9
**based** [13] - 1954:19,
1956:3, 1972:16,
1990:20, 1999:12,
1999:21, 2000:4,
2000:11, 2000:12,
2014:11, 2014:14,
2014:20, 2026:23
**basis** [3] - 1954:23,
1955:5, 1955:21
**behalf** [2] - 1960:2,
2002:24
**behind** [2] - 1981:2,
1981:3
**bench** [1] - 1976:9
**Bench** [3] - 1979:11,
1991:10, 2024:4
**beneath** [1] - 1987:19
**BERKOWITZ** [56] -
1952:11, 1952:15,
1952:19, 1953:2,
1953:6, 1953:12,
1953:14, 1953:17,
1953:20, 1953:24,
1954:3, 1954:16,
1954:18, 1954:25,
1955:10, 1955:17,
1957:18, 1959:5,
1959:7, 1960:12,
1960:25, 1962:6,
1962:17, 1962:23,
1970:12, 1976:8,
1979:16, 1983:4,
1989:8, 1992:3,
1992:8, 1992:20,
1996:16, 1998:23,
2005:3, 2006:2,
2013:9, 2023:8,
2024:5, 2024:17,
2027:2, 2030:1,
2030:4, 2031:6,
2031:19, 2033:2,
2033:7, 2035:1,
2035:7, 2035:9,
2035:20, 2036:1,
2036:4, 2036:11,
2037:15, 2037:25
**Berkowitz** [25] -
1950:24, 1951:4,
1951:10, 1952:10,
1961:18, 1963:19,
1964:11, 1965:20,

1967:10, 1968:22,
1973:23, 1992:18,
2005:10, 2005:24,
2012:25, 2023:12,
2023:17, 2025:11,
2025:12, 2026:4,
2026:19, 2029:21,
2034:24, 2036:9,
2038:5
**Berkowitz's** [1] -
2023:22
**Berkowitz.............** [1]
- 1949:7
**best** [2] - 2003:15,
2033:17
**better** [6] - 2000:9,
2005:6, 2005:7,
2012:14, 2012:17,
2013:17
**between** [23] -
1950:16, 1962:4,
1962:11, 1964:4,
2000:5, 2002:25,
2008:4, 2011:14,
2011:17, 2011:23,
2026:3, 2026:9,
2026:13, 2026:15,
2031:17, 2031:21,
2031:23, 2031:24,
2032:2, 2034:1,
2037:18, 2037:20,
2037:22
**big** [2] - 1984:9,
2006:10
**biggest** [1] - 1986:19
**billing** [1] - 2031:8
**Bit** [1] - 2013:23
**bit** [9] - 1960:1,
1983:25, 1992:19,
1999:19, 2001:19,
2011:14, 2011:17,
2011:22, 2013:20
**BitVoyant** [38] -
1953:18, 1962:19,
1980:9, 1980:13,
1980:15, 1980:17,
1980:18, 1980:20,
1981:4, 1982:1,
1982:9, 1982:10,
1985:13, 1985:14,
1985:15, 1986:10,
1986:13, 1986:17,
1987:7, 1987:11,
1987:16, 1988:6,
1988:8, 1988:9,
1989:6, 1989:11,
1989:13, 1989:21,
1990:12, 1997:20,
2013:18, 2013:21,
2014:1, 2015:4,

2015:8, 2018:8, 2018:11, 2018:22
**BitVoyant's** [2] - 1956:5, 1957:15
**blow** [2] - 1975:2, 2000:19
**blown** [1] - 1995:21
**blowout** [1] - 2006:10
**BlueVoyant** [9] - 1980:10, 1980:11, 2015:1, 2015:3, 2015:7, 2015:8, 2015:9, 2015:13, 2015:15
**board** [7] - 1988:3, 1988:4, 1988:5, 1989:3, 1989:15, 1996:18, 1999:9
**Bob** [2] - 2026:10, 2026:12
**Bob's** [1] - 2026:11
**bold** [1] - 1994:10
**bottom** [4] - 1962:7, 1995:21, 1998:17, 2020:12
**bound** [1] - 1950:4
**brains** [1] - 1984:10
**breadth** [1] - 1999:15
**break** [2] - 2027:21
**briefly** [4] - 1974:25, 1987:15, 2023:9, 2033:2
**bring** [5] - 1973:10, 1974:25, 1975:15, 1982:19, 2027:15
**broadly** [1] - 1965:25
**broke** [1] - 1994:3
**broker** [1] - 2002:24
**brought** [1] - 1962:2
**bucket** [2] - 2004:13
**bunch** [3] - 1983:22, 2003:1, 2017:9
**bunk** [2] - 1966:9, 1967:5
**Burt** [8] - 1956:21, 1961:2, 1961:24, 1992:4, 1993:15, 1995:3, 1995:25, 1996:4
**Burt's** [1] - 1995:8
**business** [17] - 1959:10, 1959:14, 1959:18, 1959:24, 1960:3, 1960:8, 1960:14, 1960:17, 1962:21, 1981:4, 1981:18, 1982:10, 1985:5, 1988:16, 1994:11, 2006:16
**but..** [1] - 2006:12

**BV** [1] - 2015:5
**BY** [32] - 1963:16, 1966:5, 1967:9, 1970:4, 1970:15, 1973:11, 1973:22, 1975:4, 1975:17, 1979:20, 1982:21, 1983:7, 1983:12, 1984:19, 1989:10, 1994:1, 1995:19, 1996:3, 1997:2, 1998:16, 1999:1, 2000:20, 2001:4, 2001:24, 2002:16, 2003:24, 2004:4, 2005:3, 2006:2, 2013:9, 2023:11, 2025:10

## C

**campaign** [6] - 1956:25, 1957:20, 1957:25, 1958:8, 1958:11, 1958:24
**candidate** [2] - 1990:21, 1998:3
**cannot** [1] - 2011:25
**capabilities** [1] - 2006:13
**capitalize** [1] - 1959:11
**cards** [1] - 2036:24
**care** [3] - 1954:12, 1956:13, 2034:3
**Carter** [16] - 1960:23, 1992:6, 1993:16, 1993:17, 1994:18, 1994:22, 1994:24, 2019:21, 2020:25, 2021:2, 2021:7, 2021:21, 2021:25, 2022:2, 2022:6, 2026:1
**case** [17] - 1951:18, 1965:4, 1976:5, 1992:22, 2027:9, 2029:1, 2029:4, 2029:14, 2029:15, 2030:13, 2031:7, 2034:24, 2035:1, 2036:21, 2036:22, 2037:2, 2037:3
**Case** [1] - 1950:7
**cases** [1] - 2033:23
**cast** [2] - 1999:14, 1999:21
**category** [1] - 2002:11
**CEO** [22] - 1980:13, 1980:14, 1981:7, 1985:9, 1987:18,

1987:19, 1988:2, 1988:8, 1988:19, 1988:20, 1989:5, 1989:11, 1989:12, 1989:21, 2008:2, 2012:14, 2012:18, 2013:18, 2015:6, 2015:8
**certain** [12] - 1953:17, 1964:14, 1964:25, 1965:1, 1966:22, 1986:13, 1993:14, 1997:6, 2004:17, 2012:15, 2025:22, 2035:12
**certainly** [4] - 1951:24, 1961:4, 2018:23, 2032:13
**certainty** [1] - 2011:25
**challenging** [3] - 2012:12, 2012:22, 2036:13
**chance** [1] - 1965:9
**change** [1] - 2000:8
**changed** [2] - 1974:21, 2025:6
**channel** [1] - 1974:5
**character** [2] - 2035:9, 2036:8
**characterize** [1] - 2008:8
**charge** [1] - 2037:8
**charts** [2] - 2031:15, 2031:20
**chief** [3] - 1984:6, 1985:4, 1987:18
**choice** [2] - 1961:5, 1961:6
**choose** [1] - 1961:6
**chosen** [1] - 1951:3
**chronological** [1] - 2030:13
**CHS** [1] - 1971:13
**Circuit** [3] - 2032:21, 2032:23, 2033:1
**clear** [4] - 1950:15, 1953:10, 1993:11, 2015:12
**clearly** [1] - 2033:9
**client** [8] - 1950:20, 1957:4, 1957:23, 1958:12, 1959:23, 1960:2, 1960:3, 2025:7
**Clinton** [1] - 1958:8
**close** [1] - 1954:9
**closing** [8] - 2029:8, 2029:15, 2030:11, 2030:15, 2030:16, 2031:10, 2037:22

**closings** [2] - 2037:7, 2037:11
**co** [1] - 1950:22
**co-conspirators** [1] - 1950:22
**cofounded** [1] - 1982:1
**cofounder** [2] - 1980:18, 1980:19
**cofounders** [1] - 1980:20
**collect** [1] - 2000:9
**collected** [2] - 1987:7, 1987:8
**collecting** [4] - 1972:14, 1985:24, 1992:10, 2000:7
**collection** [2] - 1954:5, 1955:24
**collects** [1] - 1981:13
**colloquially** [1] - 2017:11
**com** [4] - 2001:15, 2001:16, 2001:19, 2001:20
**combined** [1] - 2014:25
**comfortable** [1] - 1988:18
**coming** [6] - 1961:21, 1972:15, 1973:4, 1992:21, 2023:3, 2030:5
**comment** [2] - 2016:18, 2016:25
**commercial** [1] - 1956:6, 1960:8, 1986:3, 1986:4, 1987:11, 2001:16, 2001:20, 2003:6
**commercialize** [2] - 1981:1, 1988:11
**common** [1] - 1990:11
**commonly** [1] - 2001:15
**communicate** [1] - 1967:20
**communicated** [2] - 1955:2, 1961:10
**communication** [1] - 2030:8
**communities** [2] - 2007:6, 2007:9
**community** [1] - 2006:10
**companies** [26] - 1962:16, 1980:24, 1981:9, 1981:20, 1981:23, 1981:25, 1982:14, 1983:22,

1985:18, 1985:19, 1985:22, 1986:3, 1986:4, 1987:23, 1990:18, 1991:4, 1994:13, 1997:16, 2003:7, 2003:13, 2003:18, 2003:19, 2017:24
**company** [47] - 1953:11, 1953:18, 1980:9, 1980:12, 1980:13, 1981:2, 1981:7, 1981:12, 1982:1, 1982:3, 1982:5, 1984:8, 1984:10, 1985:4, 1985:14, 1985:15, 1986:8, 1986:10, 1986:21, 1987:17, 1987:19, 1988:6, 1988:14, 1988:15, 1988:19, 1988:23, 1989:16, 1989:23, 1990:1, 1990:17, 1996:19, 1996:20, 1997:7, 1997:11, 1997:15, 2003:6, 2007:17, 2014:1, 2014:3, 2014:17, 2014:23, 2014:25, 2015:2, 2015:6, 2015:11
**compilation** [1] - 2031:3
**complicated** [1] - 2014:12
**computer** [1] - 1987:2
**computers** [1] - 1987:2
**conceal** [2] - 1950:19, 1955:9
**concept** [1] - 1960:15
**concern** [2] - 1992:4, 2033:8
**concerned** [2] - 1991:11, 2033:15
**concerns** [3] - 1992:12, 2029:17, 2032:25
**concluded** [1] - 2038:7
**conclusion** [6] - 1967:25, 1973:24, 1974:20, 1974:22, 2014:20, 2024:20
**conclusions** [7] - 1953:8, 1962:24, 1962:25, 2024:8, 2024:9, 2024:11, 2024:22

**conduct** [1] - 1966:24
**conducted** [3] -
1953:15, 1966:20,
1966:25
**conference** [5] -
1976:9, 1979:11,
1991:10, 2024:4,
2037:8
**confidential** [1] -
2007:12
**configuration** [1] -
1973:17
**confined** [1] - 1951:10
**conform** [1] - 1979:12
**connected** [2] -
1957:25, 2008:21
**connection** [7] -
1961:4, 1961:5,
1961:6, 1962:13,
1993:22, 2008:10,
2031:22
**connections** [3] -
1961:2, 1962:4,
2007:5
**consider** [1] - 2008:16
**considerable** [1] -
1973:19
**considered** [1] -
1960:7
**consist** [1] - 2031:8
**consistent** [3] -
1956:17, 2031:13,
2033:10
**conspiracy** [1] -
1955:9
**conspirators** [1] -
1950:22
**contact** [3] - 1982:10,
1986:5, 1986:6
**contacted** [2] -
1971:13, 2010:21
**contained** [1] -
1972:17
**contains** [1] - 1960:22
**content** [2] - 2016:19,
2016:25
**contents** [1] - 1994:8
**context** [3] - 1958:9,
1958:19, 1999:23
**continue** [1] - 2032:19
**continued** [4] -
1966:16, 1967:5,
1967:6, 1974:14
**conversation** [2] -
2009:3, 2009:5
**conversational** [1] -
2026:10
**conversationally** [1] -
2026:12
**conversations** [2] -

2009:12, 2026:23
**copied** [1] - 1999:8
**corporate** [1] -
1988:24
**correct** [81] - 1953:14,
1953:23, 1964:1,
1965:10, 1965:15,
1966:21, 1968:6,
1968:14, 1969:12,
1969:13, 1972:7,
1986:14, 2000:22,
2002:12, 2005:17,
2005:18, 2005:20,
2006:14, 2008:2,
2008:5, 2009:4,
2009:10, 2009:13,
2010:20, 2010:22,
2010:23, 2010:25,
2012:11, 2012:13,
2012:14, 2012:18,
2013:23, 2013:24,
2014:1, 2014:3,
2014:6, 2014:24,
2015:2, 2015:7,
2015:11, 2015:14,
2015:20, 2015:21,
2015:23, 2015:25,
2016:1, 2016:3,
2016:6, 2016:8,
2016:10, 2016:12,
2016:16, 2016:19,
2017:6, 2017:10,
2017:13, 2017:18,
2017:21, 2018:1,
2018:3, 2018:4,
2018:5, 2018:8,
2018:13, 2019:2,
2019:11, 2019:14,
2019:23, 2020:8,
2020:14, 2020:21,
2021:10, 2022:7,
2022:17, 2022:20,
2022:21, 2022:22,
2022:25, 2023:6,
2023:21, 2031:14
**counsel** [6] - 1979:9,
1991:9, 2027:9,
2027:20, 2028:8,
2035:24
**Counsel** [1] - 1950:9
**couple** [9] - 1980:24,
1998:11, 2008:25,
2009:12, 2017:15,
2017:17, 2030:1,
2030:10, 2036:24
**couple-fold** [1] -
2030:10
**course** [1] - 1962:2
**COURT** [100] - 1950:9,
1950:13, 1952:9,

1952:18, 1952:21,
1952:23, 1953:1,
1953:5, 1953:10,
1953:13, 1953:15,
1953:19, 1953:22,
1954:1, 1954:15,
1954:17, 1954:23,
1955:6, 1955:12,
1955:18, 1956:1,
1956:8, 1956:12,
1957:7, 1957:12,
1957:16, 1958:3,
1958:14, 1958:21,
1958:23, 1959:6,
1960:1, 1960:5,
1960:10, 1960:24,
1962:5, 1962:15,
1962:22, 1963:4,
1963:8, 1963:12,
1970:13, 1976:2,
1978:21, 1978:24,
1979:1, 1979:4,
1979:9, 1979:12,
1983:5, 1983:9,
1984:17, 1989:9,
1991:9, 1991:11,
1991:21, 1992:18,
1992:23, 1993:19,
1993:23, 1995:18,
1996:17, 1998:24,
2005:23, 2012:23,
2013:6, 2024:3,
2024:15, 2025:1,
2025:8, 2027:3,
2027:5, 2027:8,
2027:13, 2027:17,
2027:24, 2028:20,
2030:3, 2031:2,
2031:14, 2032:19,
2033:6, 2033:19,
2034:4, 2034:10,
2034:14, 2034:21,
2034:24, 2035:5,
2035:8, 2035:19,
2035:23, 2036:2,
2036:5, 2036:9,
2036:14, 2036:16,
2037:5, 2037:16,
2038:4
**Court** [8] - 1950:21,
1951:4, 1955:13,
1955:20, 1979:13,
2027:15, 2028:1,
2028:3
**court** [6] - 1978:20,
1979:18, 1993:25,
2005:24, 2023:4,
2025:9
**Court's** [2] - 1950:16,
2032:14
**COURTROOM** [2] -

1950:6, 1950:11
**courts** [1] - 2029:10
**cover** [2] - 1950:4,
1999:15
**covert** [1] - 1974:5
**crazy** [1] - 2035:16
**created** [2] - 1980:17,
1997:23
**Criminal** [1] - 1950:7
**Crimson** [7] - 1953:3,
1961:13, 1997:25,
1998:5, 2000:6,
2003:21, 2023:20
**cross** [8] - 1951:2,
1951:6, 1968:22,
1972:6, 2023:12,
2023:22, 2025:25,
2026:19
**Cross** [1] - 1949:7
**CROSS** [1] - 2005:2
**cross-examination** [8]
- 1951:2, 1951:6,
1968:22, 1972:6,
2023:12, 2023:22,
2025:25, 2026:19
**CROSS-
EXAMINATION** [1] -
2005:2
**Cross-Examination**
[1] - 1949:7
**CTO** [4] - 1984:4,
1984:5, 1984:7,
1999:8
**cull** [1] - 2028:13
**curious** [1] - 2010:11
**Curtis** [1] - 1949:4
**cyber** [12] - 1968:16,
1971:22, 1981:1,
1981:7, 1981:13,
1984:8, 1985:17,
1985:19, 1998:7,
2007:4, 2016:10,
2016:11
**cyberattacks** [1] -
1989:23
**cybersecurity** [1] -
1985:15

# D

**D.C** [2] - 2032:21,
2032:23
**Dagon** [9] - 1951:1,
1951:3, 1951:12,
1951:20, 1951:21,
1952:1, 1971:3,
1971:5, 1971:10
**Dagon's** [1] - 1951:22
**data** [49] - 1951:18,
1953:8, 1955:24,

1956:17, 1959:11,
1960:5, 1960:6,
1962:2, 1962:25,
1967:2, 1972:17,
1981:1, 1985:17,
1985:19, 1986:2,
1986:14, 1986:16,
1986:18, 1986:19,
1986:20, 1986:22,
1986:24, 1987:7,
1987:8, 1987:10,
1987:11, 1987:21,
1988:12, 1990:9,
1991:16, 1991:25,
1992:21, 1998:8,
2000:1, 2000:3,
2000:4, 2000:8,
2000:9, 2007:18,
2016:15, 2016:19,
2017:1, 2017:4,
2018:7, 2018:9,
2026:8
**date** [3] - 1999:2,
2009:25, 2031:17
**David** [3] - 1971:3,
1971:5, 1971:10
**day-to-day** [1] -
1988:21
**days** [1] - 1998:11
**deal** [4] - 2027:18,
2033:17, 2033:19,
2036:2
**debunked** [1] -
1974:11
**decision** [1] - 1988:25
**decision-making** [1] -
1988:25
**deck** [1] - 2030:16
**dedicated** [2] -
1982:10, 1988:25
**deep** [5] - 2000:11,
2002:6, 2002:8,
2003:15, 2033:8
**defend** [1] - 1990:18
**defendant** [1] - 1958:4
**Defense** [1] - 1966:2
**defense** [7] - 2028:8,
2028:15, 2029:9,
2033:22, 2034:8,
2036:22, 2037:24
**defense's** [1] -
1952:24
**DEFILIPPIS** [1] -
1992:6
**DeFilippis** [1] -
2030:14
**definitely** [1] -
2004:17
**degree** [1] - 1980:4
**DeJong** [2] - 1955:23,

1956:12
**Democratic** [1] - 1954:9
**demonstrates** [1] - 1964:19
**demonstrative** [1] - 2028:7
**denied** [1] - 2021:17
**deny** [1] - 2020:20
**DEPUTY** [2] - 1950:6, 1950:11
**describe** [4] - 1990:6, 1991:15, 1994:7, 2012:10
**described** [1] - 1984:24
**detailed** [1] - 2000:11
**details** [2] - 1999:14, 2006:12
**determination** [1] - 1957:21
**determined** [2] - 2014:14, 2014:21
**developed** [1] - 2018:10
**devices** [1] - 1984:9
**difference** [2] - 2026:9, 2026:14
**differences** [1] - 1975:18
**different** [12] - 1955:19, 1957:3, 1975:7, 1975:8, 1975:11, 1986:12, 2003:2, 2017:4, 2017:23, 2021:12, 2024:1, 2024:9
**differently** [1] - 1951:25
**difficult** [3] - 2012:6, 2012:10, 2012:22
**Direct** [1] - 1949:7
**DIRECT** [1] - 1979:19
**direct** [2] - 1951:25, 2020:22
**direction** [4] - 1953:20, 1984:12, 1989:17, 2035:22
**directly** [1] - 1951:6
**dired** [1] - 1993:5
**disagreement** [1] - 2015:9
**disagreements** [2] - 2007:25, 2028:14
**disclose** [1] - 1960:16
**discomfort** [1] - 1954:19
**discovery)** [1] - 1999:16
**discuss** [4] - 1976:4,

2027:8, 2028:1, 2030:22
**discussed** [2] - 2023:15, 2023:23
**discussing** [1] - 2023:16
**discussion** [4] - 2020:24, 2021:7, 2022:5, 2026:9
**discussions** [1] - 2037:2
**displayed** [1] - 2029:20
**distinct** [1] - 1956:4
**distinction** [2] - 1964:4, 2026:3
**distinguish** [2] - 2026:12, 2026:13
**DNS** [16] - 1953:16, 1972:20, 1986:18, 1986:20, 1986:21, 1986:22, 1986:24, 1987:5, 2006:6, 2006:13, 2006:14, 2006:18, 2006:20, 2007:4, 2007:18, 2026:17
**dns** [1] - 1971:23
**document** [54] - 1951:5, 1953:9, 1957:4, 1957:23, 1958:12, 1960:21, 1961:25, 1962:6, 1962:14, 1971:22, 1972:16, 1975:5, 1991:1, 1991:2, 1991:6, 1991:12, 1991:15, 1992:13, 1992:24, 1994:21, 1994:25, 1995:6, 1995:12, 1998:9, 1998:10, 2000:5, 2000:17, 2012:25, 2013:4, 2017:2, 2019:3, 2019:20, 2020:3, 2020:10, 2022:3, 2022:8, 2022:16, 2022:22, 2022:23, 2022:24, 2023:23, 2023:25, 2024:1, 2024:8, 2024:15, 2024:18, 2024:21, 2024:22, 2024:24, 2025:4, 2025:12, 2025:20
**documents** [6] - 2030:18, 2030:21, 2030:25, 2031:6, 2032:17, 2035:21
**dollars** [1] - 2007:18

**domain** [11] - 1986:25, 1991:25, 2001:14, 2001:15, 2001:16, 2001:20, 2004:14, 2006:23, 2006:25, 2026:15
**domains** [6] - 1956:17, 2001:12, 2001:13, 2001:18, 2004:7, 2004:8
**Donald** [6] - 1990:9, 1990:10, 1990:21, 1995:9, 1995:10, 1998:2
**done** [8] - 1950:15, 1951:25, 1959:14, 1965:4, 2013:17, 2019:11, 2031:18, 2037:25
**door** [4] - 1950:24, 1951:5, 1951:16, 2009:17
**dot** [1] - 2004:8
**double** [1] - 1978:24
**doubt** [2] - 1972:3, 1973:2
**down** [8] - 1966:16, 1967:8, 1973:21, 1996:2, 2001:9, 2012:4, 2028:13, 2034:16
**dozen** [1] - 2030:20
**draft** [1] - 1961:14
**drafting** [1] - 1969:22
**draw** [1] - 1993:22
**drew** [1] - 1962:25
**due** [1] - 2030:7
**duplicative** [1] - 1992:25
**during** [6] - 1968:22, 1972:5, 1989:15, 2023:12, 2025:25, 2026:19
**duty** [1] - 1978:24

## E

**E-v-a-n-s** [1] - 1979:25
**early** [2] - 2032:7, 2036:25
**easier** [1] - 2012:23
**easy** [1] - 2033:25
**edu** [3] - 2001:6, 2001:8, 2001:21
**education** [1] - 2001:21
**educational** [1] - 1980:2
**effect** [1] - 2017:3
**effective** [1] - 2028:7

**efficient** [1] - 2036:18
**either** [2] - 1968:1, 2006:11
**Elias** [1] - 2033:11
**elicit** [3] - 1956:15, 1958:23, 1959:9
**eliciting** [1] - 2033:9
**email** [33] - 1950:13, 1950:25, 1951:16, 1951:19, 1952:6, 1962:7, 1962:10, 1963:5, 1963:6, 1970:5, 1973:19, 1983:10, 1991:5, 1992:14, 1994:12, 1999:2, 1999:6, 1999:7, 1999:10, 1999:20, 2000:7, 2000:21, 2001:25, 2003:14, 2018:24, 2020:25, 2021:9, 2021:10, 2022:1, 2022:6, 2022:9, 2030:6, 2030:8
**email.com** [1] - 2001:10
**emailed** [2] - 2005:20, 2005:21
**emails** [6] - 1950:16, 1951:18, 2029:24, 2031:7, 2031:9, 2031:21
**embarrassing** [1] - 2002:20
**employed** [3] - 1980:6, 1981:24, 2015:15
**employee** [1] - 1985:3
**employment** [2] - 1980:8, 2015:10
**end** [2] - 1976:5, 2027:9, 2029:15
**ended** [1] - 1992:11
**engage** [1] - 1988:20
**entities** [2] - 1956:6, 1995:11
**equity** [5] - 1996:19, 2014:11, 2014:12, 2014:14, 2014:24
**equivalent** [1] - 2003:12
**essentially** [2] - 2017:12, 2030:11
**establish** [1] - 1952:1
**established** [1] - 1959:1
**establishing** [1] - 1951:11
**evaluate** [1] - 2030:23
**Evans** [2] - 1979:25

**evening** [1] - 2032:8
**event** [3] - 1951:23, 1954:7, 2009:23
**everywhere** [1] - 2000:13
**evidence** [16] - 1955:20, 1960:13, 1964:24, 1964:25, 1965:17, 1970:14, 1983:6, 1998:25, 2008:14, 2008:15, 2008:21, 2028:25, 2029:7, 2029:15, 2029:19, 2030:12
**exact** [3] - 2009:25, 2012:20, 2017:16
**exactly** [1] - 2013:25
**EXAMINATION** [4] - 1963:15, 1979:19, 2005:2, 2023:10
**Examination** [4] - 1949:5, 1949:7, 1949:7, 1949:8
**examination** [8] - 1951:2, 1951:6, 1968:22, 1972:6, 2023:12, 2023:22, 2025:25, 2026:19
**examples** [3] - 2011:18, 2012:7, 2012:21
**exchanged** [1] - 1959:15
**exclude** [3] - 1992:23, 2025:8, 2035:6
**excluded** [3] - 1951:16, 1955:20, 2033:12
**exclusively** [2] - 1967:20, 1985:16
**exculpatory** [1] - 2024:12
**excuse** [4] - 1970:2, 1985:10, 1994:8, 2025:16
**excused** [4] - 1976:4, 1976:7, 2027:6, 2027:12
**exhausted** [2] - 2034:4, 2036:19
**exhibit** [1] - 2031:3
**Exhibit** [21] - 1949:11, 1949:12, 1949:12, 1950:25, 1952:6, 1960:21, 1966:3, 1970:3, 1970:11, 1970:14, 1973:10, 1975:1, 1975:15, 1982:20, 1983:3, 1983:6, 1991:8,

1995:16, 1998:15, 1998:22, 1998:25
**exhibits** [7] - 1949:10, 1956:16, 2028:4, 2028:10, 2028:14, 2028:18, 2029:5
**exists** [2] - 1964:24, 1965:1
**exit.eecs.umich** [1] - 2001:7
**expand** [6] - 1959:18, 1966:3, 2001:3, 2001:23, 2002:15, 2004:3
**expect** [7] - 1955:22, 1961:11, 2024:6, 2025:3, 2034:25, 2035:2, 2035:17
**expert** [14] - 1968:16, 1971:23, 1972:20, 2006:6, 2006:18, 2007:4, 2016:10, 2016:11, 2016:12, 2016:13, 2016:15, 2016:21, 2016:24
**explain** [13] - 1964:21, 1967:16, 1984:7, 1985:13, 1985:21, 1987:15, 1988:7, 1990:15, 1990:24, 2016:24, 2026:4, 2026:16
**explaining** [1] - 1962:12
**explanation** [2] - 1971:25, 1973:16
**explicitly** [1] - 1979:14
**explored** [1] - 1951:3
**express** [1] - 2033:4
**expressed** [2] - 1988:13, 2029:12
**extent** [4] - 1954:19, 1955:6, 1992:16, 1992:20
**extremely** [3] - 1990:13, 1997:1, 2015:22

---

## F

**F.2d** [1] - 2032:22
**F.3d** [2] - 2032:23, 2032:24
**faces** [1] - 1954:1
**fact** [9] - 1951:14, 1958:15, 1959:14, 1960:7, 1961:10, 1972:3, 1973:2, 2006:20, 2024:19
**failed** [1] - 1972:24

**fair** [7] - 1965:14, 1965:18, 1974:4, 1975:24, 2012:8, 2019:18, 2036:9
**fairly** [2] - 1959:25, 2028:3
**faith** [2] - 2030:8, 2033:13
**familiar** [1] - 2022:20
**far** [5] - 1954:15, 1960:17, 1992:21, 2033:24, 2034:1
**far-fetched** [1] - 1960:17
**Farsight** [1] - 2006:9
**fashion** [1] - 1956:21
**FBI** [6] - 1951:12, 1951:21, 1960:7, 1964:7, 1974:22, 2007:13
**FBI's** [1] - 1973:23
**felt** [7] - 1957:14, 1987:18, 1990:21, 1990:22, 1996:14, 1997:8, 2017:14
**fetched** [1] - 1960:17
**few** [1] - 1981:5
**fiduciary** [1] - 1996:19
**figure** [2] - 1968:16, 1984:10
**figuring** [1] - 1987:17
**file** [6] - 2000:24, 2000:25, 2002:5, 2003:25, 2035:11, 2035:20
**files** [2] - 1999:13, 1999:15
**filled** [1] - 1984:8
**final** [5] - 1960:11, 1960:13, 1960:20, 1962:6, 1962:23
**finally** [5] - 1954:1, 1971:16, 1982:7, 1983:9, 1985:10
**financial** [1] - 2029:3
**findings** [2] - 1962:3, 2025:5
**fine** [11] - 1956:9, 1957:12, 1957:16, 1993:3, 2021:18, 2031:10, 2031:20, 2034:15, 2038:1
**finish** [1] - 2035:15
**finishes** [1] - 2005:24
**firm** [1] - 1959:10
**first** [16] - 1971:19, 1973:15, 1983:8, 1983:11, 1983:23, 1992:14, 1994:23, 2000:2, 2001:6,

2005:14, 2014:20, 2028:9, 2033:20, 2036:3, 2037:10
**five** [4] - 1991:3, 1998:9, 2027:15, 2027:18
**five-minute** [1] - 2027:18
**fix** [1] - 2033:25
**flag** [1] - 1952:5
**floodplain** [1] - 2003:10
**floodplains** [1] - 2003:7
**Florida** [1] - 1980:5
**focus** [3] - 1956:6, 1957:2, 2003:15
**focused** [3] - 1956:10, 1974:4, 1985:15
**fold** [1] - 2030:10
**folks** [3] - 1954:2, 2019:10, 2033:1
**follow** [2] - 1981:9, 2009:9
**follow-up** [1] - 2009:9
**followed** [1] - 2010:8
**following** [1] - 2022:10
**fooled** [2] - 1969:23, 1969:24
**foreign** [1] - 1994:14
**forensic** [1] - 2029:1
**Forensics** [20] - 1981:8, 1981:12, 1981:13, 1981:19, 1981:22, 1981:25, 1982:18, 1984:4, 1984:8, 1984:12, 1985:3, 1985:23, 1986:14, 1986:17, 1987:6, 1988:12, 1999:8, 2000:4, 2003:1, 2018:1
**form** [2] - 1956:20, 1959:12
**formats** [1] - 1986:19
**formatted** [2] - 2023:2, 2023:7
**formula** [2] - 2014:12, 2014:14
**forth** [3] - 1986:7, 2025:15, 2025:25
**forward** [7] - 1962:1, 1971:11, 1996:25, 1997:3, 1997:4, 2000:25, 2027:13
**foundation** [1] - 1963:5
**founded** [1] - 1980:18
**founder** [1] - 1980:22

**frame** [1] - 2009:10
**fraught** [1] - 2024:6
**fresh** [1] - 2035:23
**friction** [6] - 2008:4, 2008:6, 2011:14, 2011:17, 2011:23, 2023:13
**Friday** [4] - 2037:7, 2037:10, 2037:11
**friend** [3] - 1988:22, 1989:3, 2016:2
**friends** [2] - 1988:9, 1988:24
**fruition** [1] - 1961:21
**frustrated** [1] - 2028:20
**full** [10] - 1951:20, 1957:5, 1958:9, 1958:17, 1958:19, 1963:24, 1963:25, 1964:5, 1964:6, 1965:2
**function** [1] - 1985:5
**fundamental** [1] - 2028:22
**funny** [1] - 1987:18
**Fusion** [1] - 1961:23
**Fwd** [2] - 1999:5, 2000:25

---

## G

**gathering** [4] - 1953:7, 1991:16, 1992:10, 1992:20
**Gauhar** [1] - 2035:10
**general** [5] - 1955:20, 1989:24, 2029:17, 2032:20, 2037:17
**generally** [9] - 1969:3, 1986:16, 1989:20, 1989:22, 1991:15, 1993:2, 1993:13, 1994:7, 1995:8
**gentlemen** [1] - 1983:10, 2027:17, 2036:17
**Georgia** [2] - 2018:17, 2018:18
**Gibson** [1] - 2022:11
**given** [6] - 1956:18, 1986:2, 1997:5, 2020:25, 2022:6, 2022:11
**glance** [1] - 2005:15
**globally** [1] - 1985:25
**good-faith** [1] - 2030:8
**Google** [2] - 1987:3, 1987:4

**google.com** [1] - 1987:2
**Government** [20] - 1949:11, 1949:12, 1949:12, 1950:24, 1952:5, 1970:3, 1970:11, 1970:14, 1970:16, 1973:9, 1975:1, 1975:15, 1982:19, 1983:2, 1983:6, 1991:7, 1995:15, 1998:15, 1998:22, 1998:25
**government** [38] - 1950:14, 1950:23, 1951:14, 1953:3, 1955:18, 1978:23, 1981:14, 1982:25, 1984:11, 1985:17, 1986:1, 1988:11, 1998:21, 2007:6, 2007:9, 2007:11, 2007:18, 2008:9, 2008:11, 2008:13, 2009:4, 2009:5, 2012:8, 2019:25, 2020:13, 2022:1, 2022:19, 2030:19, 2032:5, 2032:9, 2032:13, 2034:7, 2035:11, 2036:7, 2036:10, 2036:20, 2037:13, 2037:18
**government's** [6] - 1951:6, 2029:4, 2029:7, 2029:8, 2029:14, 2029:15
**GPS** [1] - 1961:23
**grand** [3] - 2010:25, 2011:7, 2011:8
**Grasso** [7] - 2034:5, 2034:10, 2034:12, 2035:4, 2035:6, 2035:7, 2035:8
**great** [4] - 1979:3, 2005:5, 2037:1, 2037:3
**ground** [1] - 1962:24
**group** [3] - 1950:25, 1962:16, 1990:19
**Group** [1] - 1961:22
**guess** [5] - 1963:9, 2001:7, 2007:23, 2017:16, 2037:21
**gun** [6] - 2009:18, 2009:20, 2009:23, 2010:5, 2010:9, 2010:8
**guy** [2] - 1998:7, 2003:4

## H

half [4] - 1951:20, 2036:13, 2037:21, 2037:23
Hampton [1] - 2032:23
hand [1] - 1979:6
handed [2] - 1971:22, 2022:24
handful [2] - 1991:2, 2030:20
handle [1] - 1996:23
hands [2] - 2000:1, 2003:4
happy [3] - 2013:1, 2032:5, 2032:7
hard [2] - 1959:23, 1989:16
hard-pressed [1] - 1959:23
hardware [1] - 1984:9
hates [1] - 1957:8
head [1] - 1980:9
headquarters [1] - 1974:17
Health [4] - 1967:11, 1967:14, 1967:18, 1968:2
hear [3] - 1955:18, 1992:19, 2036:21
heard [2] - 1955:24, 1969:18
hearsay [4] - 1955:2, 1957:25, 1958:14, 1959:19
heide [1] - 1951:2
Heide [7] - 1949:4, 1951:11, 1952:21, 1963:17, 1970:3, 1972:5, 1976:3
held [10] - 1950:5, 1963:11, 1978:20, 1979:11, 1979:18, 1993:25, 2025:9, 2027:23, 2036:15, 2037:4
help [5] - 1959:10, 1989:3, 1990:18, 1995:12, 1995:22
helped [1] - 1986:10
helpful [8] - 1985:21, 1993:5, 1999:23, 2009:14, 2009:15, 2013:2, 2013:3, 2013:5
helping [1] - 1985:4
helps [1] - 1984:10
Hi [1] - 1999:10
hiding [1] - 1960:16

highlight [1] - 1966:3
himself [1] - 1953:21
historical [1] - 2000:3
historically [1] - 2000:3
history [2] - 1999:25, 2000:1
hold [3] - 1991:9, 2024:3, 2034:21
Hold [1] - 1984:17
home [6] - 1991:3, 2009:16, 2009:20, 2009:23, 2010:4, 2036:25
Honor [50] - 1950:6, 1952:4, 1952:20, 1952:22, 1955:1, 1955:22, 1957:10, 1957:13, 1958:5, 1958:22, 1959:4, 1959:8, 1959:21, 1961:11, 1963:7, 1970:2, 1970:10, 1976:1, 1976:8, 1978:22, 1978:25, 1979:16, 1983:2, 1991:17, 1991:23, 1993:11, 1993:20, 1993:24, 1998:14, 1998:21, 2005:1, 2023:9, 2025:2, 2027:2, 2027:4, 2027:14, 2027:25, 2028:12, 2030:2, 2032:11, 2033:2, 2033:21, 2034:9, 2034:13, 2034:20, 2034:23, 2035:2, 2036:1, 2036:7, 2037:14
Honor's [1] - 2035:3
hope [1] - 1963:13
hopefully [3] - 1972:25, 1997:11, 2003:20
hotheaded [2] - 2033:4, 2033:7
hour [2] - 1972:24, 2037:19, 2037:20, 2037:23
hours [1] - 2038:1
human [1] - 2007:12
hundred [1] - 2028:18
hung [1] - 2024:10

## I

idea [1] - 2009:18
identify [1] - 1984:15
identity [2] - 1951:8,

1960:16
images [1] - 1994:9
imagine [1] - 2010:12
immediately [1] - 1994:15, 1996:13
immunized [1] - 1959:17
important [4] - 1951:8, 1969:21, 1969:23, 1969:25, 1972:21, 2012:9
improper [1] - 1954:20
inappropriate [1] - 2030:16
include [5] - 1962:12, 1972:13, 2035:3, 2035:4
included [5] - 1956:21, 1964:12, 1991:25, 2020:25, 2032:18
including [4] - 1951:1, 1951:13, 1959:2, 1981:25
inconsistent [1] - 2024:12
incorrect [1] - 2014:2
increased [1] - 1999:14
incredibly [1] - 1960:17
indeed [1] - 1951:12
indicated [1] - 2030:7
indiv [1] - 1990:17
individual [6] - 1956:19, 1969:18, 1982:7, 1990:19, 1990:21, 1994:11
individual's [1] - 2003:16
individuals [17] - 1956:11, 1956:18, 1957:2, 1988:8, 1990:20, 1991:3, 1991:18, 1991:19, 1993:14, 1994:10, 1997:6, 1997:13, 1997:20, 2000:6, 2000:10, 2018:24, 2025:22
inflammatory [1] - 1993:5
inform [1] - 2035:13
information [22] - 1964:19, 1964:23, 1965:12, 1965:16, 1969:15, 1969:18, 1969:23, 1969:24, 1971:11, 1972:14, 1985:24, 1987:4,

1991:14, 1992:10, 1992:25, 1993:13, 2002:10, 2002:23, 2004:6, 2010:16, 2035:13
informed [1] - 2034:8
infrequent [1] - 1989:14
initial [10] - 1961:25, 1962:3, 1964:9, 1967:17, 1968:5, 1968:7, 1999:12, 1999:21, 2000:12, 2004:11
inside [2] - 1997:15, 2010:7
instructions [1] - 2037:9
insurance [1] - 2003:7
intelligence [1] - 1981:13
intend [1] - 1959:9, 2035:20
intended [3] - 2013:21, 2026:24, 2037:24
intends [1] - 1953:3
intention [1] - 2032:13
interact [1] - 1989:12
interest [4] - 1953:13, 1960:3, 1960:17, 1988:13
interested [1] - 1993:19
interesting [1] - 2007:10
interests [1] - 1959:24
internal [1] - 1998:5
internet [9] - 1981:14, 1982:6, 1985:25, 1986:18, 1987:1, 1987:9, 1987:10, 2002:20, 2017:6
interview [8] - 1951:3, 1951:21, 1967:14, 1969:11, 1972:6, 2008:17, 2012:3, 2022:1
interviewed [5] - 1951:12, 1968:2, 2008:9, 2008:11, 2008:12
interviewing [1] - 1972:9
interviews [2] - 1966:20, 1966:25
introduce [7] - 1952:5, 1953:3, 1960:22, 1963:6, 1991:13, 2030:19, 2031:2

introduction [1] - 1963:5
investigate [1] - 1974:14
investigated [1] - 1967:22
investigating [1] - 1974:17
investigation [14] - 1951:8, 1963:25, 1964:5, 1964:6, 1964:8, 1964:9, 1965:3, 1966:12, 1967:6, 1973:24, 1974:2, 1974:4, 1974:8, 1974:23
investigations [3] - 1963:20, 1963:24
investigative [1] - 1964:7
involved [3] - 1981:20, 1990:7, 2017:23
involvement [2] - 1971:22, 1981:25
IP [3] - 2003:2, 2003:11, 2003:12
ip.txt [2] - 2002:6, 2004:1
IPs [2] - 2002:18, 2002:19
irrelevant [2] - 1959:12, 1959:19
issue [12] - 1960:13, 1960:20, 1962:23, 1992:1, 2021:8, 2027:25, 2028:21, 2032:14, 2033:20, 2034:22, 2035:18, 2035:19
issues [9] - 1954:18, 1957:7, 1959:5, 1959:7, 2024:23, 2024:25, 2027:19, 2028:22, 2033:15
itself [1] - 1992:24

## J

J-a-r-e-d [1] - 1979:25
Jared [3] - 1949:6, 1978:23, 1979:25
JN-02 [2] - 2013:11, 2020:11
JN-02_07 [1] - 2021:5
job [6] - 2012:14, 2012:16, 2012:18, 2013:17, 2026:18, 2030:15
Joffe [89] - 1950:16, 1950:20, 1950:25,

1951:19, 1952:6,
1953:13, 1954:5,
1954:7, 1954:12,
1955:3, 1955:25,
1957:3, 1957:8,
1958:7, 1958:10,
1958:14, 1958:18,
1959:9, 1959:22,
1960:18, 1961:4,
1961:12, 1961:25,
1962:8, 1962:19,
1969:19, 1970:7,
1970:20, 1981:3,
1981:15, 1981:18,
1981:21, 1983:16,
1983:24, 1988:4,
1988:17, 1989:5,
1989:12, 1989:18,
1989:21, 1990:4,
1992:10, 1992:16,
1994:6, 1996:10,
1997:19, 1999:9,
2004:25, 2006:3,
2006:5, 2007:8,
2007:21, 2007:24,
2008:1, 2008:4,
2011:14, 2011:17,
2011:23, 2012:11,
2013:17, 2015:20,
2017:20, 2017:23,
2019:2, 2020:1,
2020:4, 2020:8,
2020:14, 2020:17,
2020:23, 2021:1,
2022:7, 2022:22,
2022:23, 2023:4,
2023:6, 2023:7,
2023:13, 2023:19,
2023:23, 2023:25,
2024:7, 2024:10,
2024:18, 2025:4,
2025:21, 2026:21,
2031:23
**Joffe's** [8] - 1953:20,
1954:20, 1955:1,
1959:16, 1960:16,
1961:6, 1961:19,
2007:5
**Joffe-type** [1] -
1960:18
**Judge** [8] - 1952:11,
1957:18, 1960:20,
1962:6, 1962:23,
1976:6, 1992:3,
2035:11
**judge** [1] - 2024:5
**jump** [1] - 2000:2
**jurors** [1] - 1993:6
**jury** [24] - 1950:5,
1963:11, 1964:3,

1964:21, 1967:16,
1983:11, 1983:19,
1985:14, 1987:15,
1990:6, 1990:15,
1993:7, 1999:6,
2001:5, 2010:25,
2011:7, 2011:8,
2013:25, 2027:15,
2027:17, 2027:23,
2036:14, 2036:15,
2037:4
**jury's** [3] - 1969:18,
1981:9, 2036:6

## K

**Kanner** [6] - 1962:11,
1962:15, 1962:19,
1984:2, 1984:3,
1999:8
**keep** [1] - 1997:10
**Keilty** [1] - 2030:14
**KEILTY** [11] - 1958:22,
1993:16, 1993:20,
2027:14, 2027:25,
2033:21, 2034:7,
2034:11, 2034:20,
2034:23, 2036:7
**kind** [1] - 2028:13
**knowing** [1] - 2022:14
**knowledge** [4] -
1971:21, 2018:18,
2019:1, 2028:25

## L

**ladies** [3] - 1983:10,
2027:17, 2036:17
**large** [2] - 1999:11,
1999:21
**largely** [4] - 1981:14,
1985:25, 1986:19,
1988:25
**last** [9] - 1972:22,
1998:1, 2013:11,
2028:1, 2030:6,
2031:21, 2032:15,
2033:8, 2037:8
**late** [1] - 2009:13
**launching** [1] -
1983:17
**lawyers** [1] - 2036:17
**lay** [1] - 2028:22
**layers** [1] - 1973:18
**leadership** [2] -
1987:15, 1987:25
**leads** [2] - 1964:23,
1966:16
**learn** [1] - 1986:20,
2007:4, 2018:12
**learned** [3] - 1983:25,

2010:17, 2026:17
**least** [5] - 1959:8,
1961:3, 2006:5,
2032:15, 2035:2
**leave** [1] - 2037:10
**left** [5] - 1983:23,
1983:24, 1984:22,
1984:25, 1985:6
**legal** [1] - 2027:19
**Lemire** [1] - 2032:22
**LEMIRE** [1] - 2032:22
**length** [1] - 2035:16
**less** [4] - 1972:25,
2014:8, 2014:15
**level** [3] - 1962:20,
1962:21, 1989:15
**licensing** [1] - 2018:9
**Lichtblau** [2] -
2031:24, 2035:3
**Lichtblau's** [1] -
2035:24
**likely** [3] - 1957:20,
1985:4, 2035:11
**limitations** [1] -
1962:13
**limited** [2] - 1953:7,
1964:9
**line** [10] - 1955:23,
1971:24, 1972:1,
1972:22, 1973:1,
1973:15, 2001:9,
2024:14, 2033:8,
2033:10
**lines** [2] - 2029:12
**link** [1] - 1958:3
**Lisa** [1] - 1950:3
**list** [10] - 1961:12,
1991:18, 2004:13,
2004:16, 2019:18,
2019:20, 2025:23,
2034:12, 2034:14,
2035:5
**listen** [1] - 2013:6
**listing** [1] - 1956:18
**lists** [2] - 1999:5,
2002:18
**lists.msg** [1] -
2000:25
**literally** [1] - 2028:18
**Littoral** [18] - 1962:17,
1980:21, 1980:22,
1980:25, 1981:1,
1981:2, 1981:3,
1981:22, 1982:1,
1982:11, 1982:12,
1982:17, 1983:17,
1986:5, 1988:3,
2018:5, 2018:8,
2018:10
**LLC** [1] - 2014:10

**lodge** [1] - 1979:14
**logs** [1] - 1967:2
**look** [17] - 1956:19,
1968:13, 1968:19,
1975:7, 1989:22,
1990:8, 2000:2,
2000:13, 2003:10,
2013:10, 2020:7,
2020:11, 2020:15,
2021:5, 2033:22,
2035:21
**looked** [3] - 1962:10,
2017:9, 2030:11
**looking** [7] - 1996:20,
2003:1, 2003:6,
2003:11, 2004:6,
2004:7, 2017:8
**looks** [1] - 1975:19
**lookup** [1] - 1953:16
**Lorenzen** [9] -
1971:16, 1971:17,
1985:7, 1985:8,
2018:15, 2018:20,
2018:23, 2024:8,
2024:24
**Lorenzen's** [1] -
2024:11
**Lori** [1] - 1997:15
**loud** [2] - 1995:20,
1995:21
**lunch** [1] - 1963:13

## M

**mail1.Trump** [1] -
2001:10
**mail1.Trump-email.
com** [1] - 2001:10
**majority** [1] - 1988:5
**man** [4] - 2009:18,
2010:4, 2010:8,
2010:18
**management** [1] -
2015:9
**manager** [3] -
1982:11, 1982:17,
2017:12
**Manos** [1] - 1970:23
**marked** [3] - 1991:7,
2025:6
**mask** [1] - 1979:5
**material** [3] - 1954:11,
1959:8, 1961:3
**materiality** [2] -
1951:7, 1952:2
**materials** [1] - 1954:3
**matter** [3] - 1950:19,
1974:18, 2008:10
**McMahon** [2] - 2034:5,
2034:8

**mean** [12] - 1984:5,
1984:8, 1990:17,
1991:17, 1991:23,
1993:5, 1999:22,
2006:8, 2013:25,
2017:3, 2029:9,
2029:21
**means** [3] - 1987:3,
2001:21, 2036:25
**meant** [2] - 1999:15,
2021:12
**meet** [1] - 1988:16
**meeting** [2] - 1955:15,
1960:2
**meetings** [1] -
1989:15
**member** [3] - 1996:18,
1996:19, 2029:13
**members** [1] - 1999:9
**mention** [2] - 1950:18,
2022:8
**mentioned** [27] -
1961:18, 1964:11,
1968:13, 1970:16,
1972:5, 1974:10,
1980:24, 1981:5,
1981:15, 1981:21,
1982:3, 1982:7,
1982:14, 1983:22,
1986:13, 1990:24,
1991:21, 1992:9,
1992:22, 1994:2,
1996:9, 2004:5,
2013:20, 2023:15,
2032:24, 2035:10
**mentioning** [2] -
2021:2, 2022:7
**merely** [2] - 1972:4,
1973:3
**message** [1] - 2001:1
**met** [8] - 1960:14,
1961:10, 1971:10,
1988:18, 2005:8,
2005:13, 2010:19,
2016:22
**metaphor** [1] - 2003:8
**metrics** [2] - 2014:11,
2014:21
**Michael** [4] - 1950:8,
1985:1, 1997:18,
2005:10
**Michigan** [1] - 2001:8
**middle** [1] - 1961:20
**might** [7] - 1966:7,
1974:11, 1991:13,
2028:7, 2028:14,
2037:22
**Mike** [1] - 1985:2
**Millian** [3] - 1960:23,
1992:7, 2022:17

**millions** [1] - 2007:17
**mind** [5] - 1950:19,
1955:8, 1955:15,
1990:3, 2029:17
**mine** [1] - 1988:22
**minute** [4] - 2027:18,
2032:15, 2034:9,
2034:21
**minutes** [5] - 2027:15,
2027:21, 2032:12,
2036:5, 2038:2
**minutes'** [1] - 2037:23
**misleading** [1] -
2032:5
**misspoke** [1] -
2026:17
**mistake** [1] - 2034:2
**moment** [2] - 1998:14,
2035:3
**money** [5] - 1959:14,
1959:18, 2007:22,
2007:23
**month** [2] - 1951:20,
1964:10
**months** [2] - 1989:24,
1989:25
**Moore** [1] - 2032:23
**Moreira** [1] - 1950:3
**morning** [11] - 1950:2,
2034:8, 2034:17,
2034:22, 2035:17,
2035:24, 2035:25,
2036:21, 2037:2,
2037:7, 2038:6
**most** [4] - 1980:8,
2001:15, 2023:1,
2028:7
**motion** [4] - 1952:25,
2035:12, 2035:21
**motivations** [8] -
1951:10, 1951:14,
1951:18, 1951:22,
1952:3, 1955:1,
1955:15, 1959:16
**motive** [2] - 1950:19,
1955:9
**move** [6] - 1970:10,
1983:2, 1997:4,
1998:21, 2033:20,
2036:22
**moved** [6] - 1970:13,
1983:5, 1996:25,
1997:3, 1998:24,
2036:18
**MR** [152] - 1952:4,
1952:11, 1952:13,
1952:15, 1952:19,
1952:20, 1952:22,
1952:24, 1953:2,
1953:6, 1953:12,

1953:14, 1953:17,
1953:20, 1953:24,
1954:3, 1954:16,
1954:18, 1954:25,
1955:10, 1955:17,
1955:22, 1956:2,
1956:10, 1956:15,
1957:10, 1957:13,
1957:18, 1958:5,
1958:17, 1958:22,
1959:4, 1959:5,
1959:7, 1959:21,
1960:4, 1960:6,
1960:12, 1960:25,
1961:11, 1962:6,
1962:17, 1962:23,
1963:7, 1963:16,
1966:2, 1966:5,
1967:8, 1967:9,
1970:2, 1970:4,
1970:10, 1970:12,
1970:15, 1973:9,
1973:11, 1973:21,
1973:22, 1974:25,
1975:4, 1975:14,
1975:17, 1976:1,
1976:8, 1978:22,
1978:25, 1979:16,
1979:17, 1979:20,
1982:19, 1982:21,
1983:2, 1983:4,
1983:7, 1983:11,
1983:12, 1984:19,
1989:8, 1989:10,
1991:17, 1991:23,
1992:3, 1992:6,
1992:8, 1992:20,
1993:11, 1993:16,
1993:17, 1993:20,
1993:24, 1994:1,
1995:15, 1995:19,
1996:2, 1996:3,
1996:16, 1997:2,
1998:14, 1998:16,
1998:21, 1998:23,
1999:1, 2000:16,
2000:20, 2001:2,
2001:4, 2001:22,
2001:24, 2002:14,
2002:16, 2003:22,
2003:24, 2004:2,
2004:4, 2005:1,
2005:3, 2006:2,
2013:9, 2023:8,
2023:9, 2023:11,
2024:5, 2024:17,
2025:2, 2025:10,
2027:2, 2027:4,
2027:14, 2027:25,
2030:1, 2030:4,
2031:6, 2031:19,

2033:2, 2033:7,
2033:21, 2034:7,
2034:11, 2034:20,
2034:23, 2035:1,
2035:7, 2035:9,
2035:20, 2036:1,
2036:4, 2036:7,
2036:11, 2037:13,
2037:15, 2037:20,
2037:25
**multiple** [1] - 1973:18

**N**

**N-o-v-i-c-k** [1] -
1980:1
**name** [33] - 1954:10,
1971:3, 1979:24,
1980:13, 1986:25,
1987:19, 1991:4,
1994:18, 1994:19,
1995:2, 1995:3,
1997:10, 1997:25,
1998:2, 1998:5,
1998:9, 1998:18,
2000:24, 2000:25,
2002:5, 2003:25,
2004:14, 2005:10,
2006:23, 2006:25,
2020:23, 2022:2,
2022:16, 2022:19,
2026:10, 2026:12,
2026:15
**named** [7] - 1969:19,
1980:9, 1982:7,
1985:7, 1999:13,
1999:15, 2015:1
**namely** [1] - 1951:7
**names** [22] - 1960:22,
1961:9, 1981:5,
1981:10, 1983:22,
1987:18, 1991:3,
1992:9, 1992:21,
1993:3, 1993:6,
1994:10, 1994:12,
1994:13, 1994:14,
1994:17, 1994:23,
2001:11, 2019:18,
2020:6, 2025:16,
2036:8
**nature** [4] - 1954:13,
1997:5, 2016:19,
2016:25
**necessarily** [1] -
1965:7
**necessary** [1] - 1993:9
**need** [6] - 1950:9,
1952:11, 1968:16,
2032:16, 2037:10
**needed** [1] - 2002:25
**net** [2] - 1999:11,

1999:21
**Neustar** [5] - 1981:24,
1982:3, 1982:4,
1982:5, 2007:20
**never** [12] - 1961:10,
1969:11, 1971:10,
1990:14, 1992:22,
2005:16, 2005:20,
2005:21, 2015:3,
2015:8, 2016:25,
2034:12
**new** [2] - 2012:16,
2021:17
**New** [1] - 1966:7
**news** [2] - 1994:15,
2036:23
**next** [13] - 1952:21,
1971:24, 1972:1,
1975:15, 1978:21,
1984:1, 1984:22,
1996:12, 2001:2,
2001:9, 2002:14,
2010:5
**nice** [1] - 1963:13
**night** [6] - 2028:2,
2030:6, 2031:21,
2034:17, 2037:1,
2037:3
**nine** [1] - 2036:5
**node** [4] - 1967:19,
1967:21, 1968:8,
1968:9
**nondescript** [1] -
1994:9
**none** [1] - 1957:10
**nonexpert** [2] -
1969:22, 1969:24
**norm** [1] - 1957:19
**normal** [1] - 1957:15
**normally** [1] - 1957:19
**NOT** [4] - 1971:23,
1972:3, 1972:23,
1973:2
**NOTE** [1] - 1950:2
**noted** [1] - 2032:14
**notes** [6] - 2011:3,
2011:5, 2011:9,
2011:12, 2011:15,
2012:5
**nothing** [4] - 1976:1,
2005:1, 2023:8,
2027:4
**notice** [2] - 1975:8,
1975:18
**notion** [1] - 1960:1
**notwithstanding** [1] -
1957:2
**novick** [1] - 1953:10
**Novick** [32] - 1949:6,
1952:21, 1954:4,

1954:6, 1956:2,
1961:10, 1961:12,
1962:1, 1962:8,
1962:12, 1962:18,
1978:23, 1979:25,
1980:2, 1982:22,
1983:8, 1983:13,
1989:11, 1994:2,
1995:22, 1996:9,
1998:17, 1999:2,
2005:4, 2005:23,
2022:12, 2024:19,
2024:20, 2024:21,
2025:3, 2027:5
**Novick's** [1] - 1955:22
**number** [21] - 1953:8,
1959:19, 1960:22,
1961:8, 1965:20,
2000:10, 2000:11,
2008:9, 2008:19,
2010:10, 2010:20,
2014:6, 2014:7,
2017:23, 2029:10,
2030:10, 2030:18,
2030:21, 2033:15
**numbers** [3] - 1987:4,
2003:1, 2017:9

**O**

**Oath** [1] - 1979:7
**obfuscate** [1] -
1973:19
**object** [3] - 1953:24,
1962:7, 2032:1
**objected** [1] - 1992:13
**objection** [11] -
1952:9, 1954:15,
1954:24, 1970:12,
1979:14, 1983:4,
1989:8, 1996:16,
1998:23, 2027:2,
2030:5
**objections** [3] -
2029:18, 2030:10,
2032:17
**objects** [1] - 2028:15
**observe** [1] - 1987:9
**obtain** [1] - 1962:2
**obviously** [6] -
1960:9, 1961:16,
2029:22, 2031:25,
2037:9, 2037:18
**offered** [4] - 1955:7,
1955:8, 1958:15
**offering** [1] - 2028:23
**offhand** [2] - 1968:25,
1975:13
**office** [4] - 1950:10,
1998:1, 1998:2,

1998:3
**officer** [4] - 1984:6, 1985:4, 2015:2, 2015:3
**once** [4] - 1989:24, 1997:23, 2013:14
**one** [27] - 1950:9, 1953:8, 1954:7, 1954:22, 1957:1, 1958:22, 1959:7, 1959:19, 1960:10, 1961:1, 1961:22, 1962:10, 1984:9, 1991:13, 1991:21, 1992:4, 1992:12, 1994:23, 1998:14, 2017:5, 2027:25, 2028:19, 2030:10, 2031:4, 2031:20, 2031:23, 2036:20
**ones** [2] - 2031:15, 2032:2
**online** [1] - 1968:12
**open** [7] - 1951:16, 1968:18, 1978:20, 1979:18, 1993:25, 2007:22, 2025:9
**opened** [4] - 1950:24, 1951:4, 1965:2, 2009:17
**opening** [1] - 2037:19
**operating** [4] - 1985:4, 2014:10, 2014:13, 2014:19
**Oppleman** [15] - 1962:11, 1962:15, 1962:17, 1981:3, 1981:6, 1981:7, 1984:23, 1984:24, 1988:4, 1988:10, 1988:21, 1996:14, 1997:17, 1999:9, 2016:3
**Oppleman's** [2] - 1981:19, 1984:25
**opportunity** [1] - 1988:13
**opposed** [1] - 2031:3
**opposition** [7] - 1957:1, 1958:6, 1961:15, 1990:22, 1991:19, 1996:15, 1996:18
**option** [1] - 1974:18
**order** [4] - 1951:9, 1973:19, 1988:15, 2030:13
**Organization** [2] - 1967:20, 1973:17
**original** [2] - 1950:16,

1972:15
**otherwise** [1] - 2029:7
**outside** [7] - 1950:5, 1956:22, 1957:14, 1957:19, 2005:14, 2027:23, 2037:4
**outstanding** [1] - 1966:17
**overall** [1] - 1958:9
**overruled** [1] - 1996:17
**overview** [1] - 1961:22
**owned** [2] - 2014:1, 2014:18
**owner** [6] - 1962:17, 1962:18, 1962:20, 2014:5, 2015:3, 2015:4
**ownership** [2] - 1988:5, 2014:21

---

# P

**p.m** [2] - 2037:10, 2038:7
**Packet** [20] - 1981:7, 1981:12, 1981:19, 1981:22, 1981:25, 1982:18, 1984:4, 1984:8, 1984:12, 1985:3, 1985:23, 1986:14, 1986:17, 1987:6, 1988:12, 1999:8, 2000:4, 2003:1, 2018:1, 2018:24
**packet** [2] - 1981:13, 2032:18
**Page** [16] - 1960:23, 1992:6, 1993:16, 1993:17, 1994:18, 1994:22, 1994:24, 2019:21, 2020:25, 2021:2, 2021:7, 2021:21, 2021:25, 2022:6, 2022:7, 2026:1
**PAGE** [1] - 1949:2
**page** [13] - 1961:16, 1975:2, 1995:17, 2000:17, 2000:18, 2001:2, 2001:22, 2002:14, 2003:22, 2004:2, 2013:11, 2020:11, 2021:13
**page's** [2] - 2020:23, 2021:10
**Page's** [1] - 2022:2
**Pages** [1] - 1987:1
**paper** [22] - 1952:7,

1961:14, 1965:22, 1967:18, 1968:23, 1969:3, 1969:6, 1969:16, 1969:22, 1971:12, 1972:7, 1972:9, 1972:17, 1972:19, 1973:4, 1992:1, 1992:11, 1993:21, 1994:8, 1994:19, 2010:6, 2010:10
**Paper** [2] - 1970:9, 1970:19
**paperwork** [1] - 1989:1
**paragraph** [6] - 1973:10, 1973:12, 1975:19, 2013:11, 2020:12, 2021:5
**paralegal** [1] - 2028:5
**parameters** [1] - 2032:6
**part** [12] - 1961:13, 1961:16, 1961:24, 1966:20, 1974:22, 1988:6, 1992:2, 1999:19, 2000:19, 2017:5, 2023:19, 2029:3
**partial** [1] - 2015:4
**participate** [1] - 1967:14
**particular** [2] - 1993:2, 2031:15
**particularly** [1] - 2033:1
**parties** [5] - 2028:9, 2028:12, 2028:13, 2034:18
**partner** [1] - 1981:18
**partners** [3] - 1981:4, 1988:16, 1988:17
**parts** [1] - 1975:16
**Party** [1] - 1954:9
**pass** [4] - 1999:12, 1999:22, 2000:12, 2004:11
**past** [3] - 1988:10, 2000:3, 2006:9
**patents** [1] - 2006:13
**path** [1] - 2012:4
**patience** [1] - 2036:12
**Paul** [2] - 2006:8, 2006:11
**payments** [1] - 2007:18
**PDF** [12] - 1991:1, 1991:2, 1992:16, 1994:2, 1994:5, 1994:8, 1994:9,

1996:10, 2000:11, 2020:10, 2025:17, 2026:3
**pencil** [1] - 2038:5
**pending** [2] - 2035:3, 2035:17
**people** [27] - 1961:5, 1961:7, 1981:2, 1991:15, 1992:22, 1996:21, 1997:6, 1997:9, 1997:11, 1998:3, 1998:9, 2001:15, 2003:12, 2003:13, 2006:8, 2006:10, 2009:3, 2009:5, 2010:8, 2010:14, 2010:19, 2018:12, 2018:22, 2024:25, 2031:17, 2032:2
**people's** [4] - 1960:22, 1996:21, 2019:13, 2031:21
**percent** [6] - 2014:1, 2014:5, 2014:6, 2014:8, 2014:15, 2014:16
**percentage** [1] - 2014:17
**perform** [1] - 1954:5
**performance** [4] - 1989:16, 2008:2, 2008:3, 2014:11
**peril** [1] - 2024:6
**period** [1] - 1964:9
**pers** [1] - 1996:21
**person** [9] - 1972:15, 1983:23, 1984:1, 1984:13, 1984:22, 2008:12, 2022:11, 2033:5, 2033:7
**personal** [6] - 1991:5, 1991:6, 1991:12, 1992:25, 2019:1, 2028:24
**personally** [1] - 1966:22
**perspective** [2] - 1985:5, 2032:15
**phone** [15] - 1983:16, 1987:1, 2008:12, 2009:3, 2009:4, 2009:12, 2010:10, 2024:21, 2029:2, 2031:8, 2031:12, 2031:15, 2031:23, 2031:24, 2033:24
**phonetic)** [1] - 1985:1
**photo** [1] - 1982:25
**photograph** [2] -

1953:22, 1953:25
**physics** [1] - 1980:4
**pick** [1] - 2005:25
**picture** [8] - 1982:22, 1983:8, 1983:11, 1983:15, 1983:16, 1983:17, 1984:16, 1984:20
**pictures** [1] - 2003:19
**piece** [2] - 2010:6, 2010:10
**place** [3] - 1964:25, 1965:1, 2031:16
**plan** [3] - 1951:15, 2028:3, 2035:25
**plausible** [4] - 1971:25, 1972:4, 1973:3, 1973:16
**player** [3] - 2013:21, 2013:22, 2013:23
**point** [8] - 1951:11, 1951:15, 1952:17, 1955:19, 1996:24, 1996:25, 2014:22, 2033:14
**points** [1] - 1960:12
**polarizing** [1] - 2015:25
**political** [9] - 1954:18, 1956:25, 1957:20, 1958:25, 1961:15, 1990:22, 1990:25, 1994:16, 1997:5
**portion** [2] - 1975:3, 1995:21
**position** [1] - 1951:21
**possible** [3] - 1968:19, 2000:11, 2014:19
**possible)** [1] - 1999:14
**possibly** [1] - 1965:5
**potential** [1] - 1999:16
**potentially** [4] - 1965:4, 1965:8, 1971:12, 2024:6
**PowerPoint** [3] - 2028:16, 2029:7, 2029:23
**practice** [2] - 2033:1, 2037:17
**practices** [1] - 1957:15
**preclude** [3] - 2035:12, 2035:21, 2035:22
**preclusive** [1] - 2035:18
**preexisting** [4] - 1997:7, 1997:17,

2050

1997:18, 2022:14
**prejudice** [1] -
   2033:16
**prejudicial** [2] -
   1959:20, 1992:12
**preliminary** [4] -
   1963:24, 1964:5,
   1964:8
**prepared** [1] - 2035:1
**presence** [2] -
   1963:11, 2036:15
**present** [1] - 2035:25
**presentation** [2] -
   2028:2, 2028:16
**presentations** [1] -
   2036:18
**president** [1] - 1985:9
**President** [2] -
   1956:20, 1998:4
**presidential** [2] -
   1990:21, 1998:3
**press** [1] - 2027:13
**pressed** [1] - 1959:23
**presume** [1] - 1972:10
**pretty** [3] - 1955:13,
   1955:23, 2009:22
**previous** [2] -
   1997:16, 2021:13
**previously** [4] -
   1950:21, 1997:15,
   2002:7, 2035:10
**principal** [1] - 1953:11
**principles** [1] -
   2032:20
**private** [10] - 1985:16,
   1986:7, 1986:8,
   1986:11, 1987:22,
   1988:12, 1990:1,
   1990:17, 1990:18,
   2014:23
**privilege** [4] - 1957:4,
   1958:12, 2024:13,
   2025:7
**privileged** [1] -
   1957:23
**proactive** [2] -
   1989:22, 1989:25
**probable** [5] -
   1964:19, 1964:21,
   1964:23, 1964:24,
   1965:17
**probative** [1] -
   1950:18
**problems** [4] - 1986:7,
   1986:9, 1986:11,
   2030:8
**proceedings** [1] -
   1950:3
**Proceedings** [10] -
   1950:5, 1963:11,

1978:20, 1979:18,
   1993:25, 2025:9,
   2027:23, 2036:15,
   2037:4, 2038:7
**process** [4] - 1964:16,
   2028:6, 2028:8,
   2028:16
**produce** [1] - 1962:3
**produced** [1] - 1992:1
**profession** [1] -
   1989:14
**professional** [1] -
   1989:15
**proffer** [1] - 1992:8
**prohibited** [1] -
   2033:10
**Project** [2] - 1968:13,
   1968:20
**project** [10] - 1961:14,
   1998:6, 2016:16,
   2017:12, 2018:17,
   2018:19, 2018:21,
   2020:14, 2026:21,
   2026:25
**projects** [1] - 2018:13
**promote** [1] - 1960:8
**protection** [1] -
   1973:18
**protocols** [1] -
   2002:21
**provide** [4] - 1997:24,
   2004:24, 2029:6,
   2036:9
**provided** [5] -
   1961:12, 1961:25,
   1969:15, 2018:9,
   2023:19
**publicly** [1] - 1982:5
**pull** [3] - 1965:16,
   1966:2, 1975:16
**pulling** [1] - 1956:16
**pulls** [1] - 1987:4
**pun** [1] - 2013:21
**purpose** [2] - 1958:15,
   1958:25
**purposes** [3] -
   1959:14, 1987:12,
   2037:6
**putting** [4] - 1964:15,
   1964:17, 1987:21,
   2028:3

## Q

**qualified** [4] -
   2016:18, 2016:20,
   2016:25
**questioned** [1] -
   1952:1
**questioning** [3] -

1951:10, 2033:8,
   2033:11
**questions** [21] -
   1951:5, 1951:13,
   1953:7, 1956:13,
   1963:20, 1963:23,
   1965:21, 1967:10,
   1968:23, 1968:24,
   1972:10, 1972:12,
   1972:13, 1972:16,
   1974:2, 1989:16,
   1999:17, 2009:1,
   2023:16, 2025:11,
   2026:20
**quick** [1] - 1979:9
**quickly** [2] - 1986:23,
   1997:11
**quite** [1] - 1956:4
**quote** [1] - 2012:10
**QWERTY** [2] - 2014:3,
   2014:5

## R

**radar** [1] - 1965:7
**raise** [3] - 1979:5,
   2033:3, 2033:17
**raised** [1] - 2028:21
**rather** [1] - 2029:4
**Ray** [4] - 1985:10,
   1985:11, 1985:12,
   1989:2
**Raymond** [9] - 1981:4,
   1982:7, 1982:11,
   1986:5, 1988:4,
   1988:17, 1988:25,
   1989:1, 1989:2
**reach** [1] - 2034:18
**reached** [1] - 1953:8
**read** [23] - 1970:17,
   1971:19, 1971:21,
   1971:24, 1972:1,
   1972:22, 1973:15,
   1995:18, 1995:20,
   1995:21, 1999:6,
   2000:24, 2001:5,
   2001:9, 2001:11,
   2002:5, 2003:25,
   2013:12, 2013:14,
   2021:6, 2031:5,
   2037:9
**reading** [6] - 1973:12,
   1995:20, 2013:19,
   2020:18, 2024:20,
   2033:11
**reads** [3] - 1999:10,
   2000:25, 2002:6
**ready** [3] - 1963:14,
   2027:13, 2027:22
**really** [3] - 1958:1,

2033:15, 2036:12
**reargue** [1] - 1952:17
**reason** [1] - 1993:21
**reasons** [4] - 1993:8,
   2015:25, 2016:1,
   2029:10
**rebuttal** [2] - 2037:19,
   2037:23
**receive** [4] - 1950:17,
   1986:17, 1994:5,
   2025:19
**received** [15] -
   1986:13, 1991:1,
   1991:25, 1992:15,
   1992:16, 1993:2,
   1993:13, 1994:2,
   1996:9, 2009:25,
   2010:6, 2025:3,
   2025:17, 2029:25,
   2030:6
**receiver** [1] - 1958:20
**receiving** [2] -
   1958:11, 2007:17
**recent** [2] - 1973:19,
   1980:8
**recently** [1] - 2007:14
**recess** [1] - 2027:18
**recipients** [1] - 1954:8
**recognize** [9] -
   1954:10, 1982:22,
   1982:24, 1984:13,
   1994:17, 1995:3,
   1995:5, 1998:18,
   2011:11
**recognized** [2] -
   1959:10, 1994:14
**recollection** [3] -
   1995:23, 2012:2,
   2019:17
**record** [9] - 1950:7,
   1950:12, 1950:15,
   1957:17, 1976:9,
   1979:11, 1979:24,
   1991:10, 2024:4
**records** [8] - 2029:2,
   2031:8, 2031:9,
   2031:12, 2031:15,
   2032:4, 2033:24,
   2034:1
**redact** [1] - 1963:6
**redirect** [3] - 1950:14,
   1963:10, 2009:15
**REDIRECT** [2] -
   1963:15, 2023:10
**Redirect** [2] - 1949:5,
   1949:8
**refer** [1] - 1966:9
**reference** [5] -
   1961:17, 1961:23,
   1994:21, 2002:7,

2021:9
**referenced** [1] -
   2022:3
**references** [3] -
   1956:22, 1993:18,
   1994:24
**referred** [1] - 1964:4
**reflect** [1] - 1951:19
**reflects** [1] - 1951:19
**refresh** [5] - 1993:3,
   1995:13, 1995:22,
   2012:2, 2019:17
**refreshed** [1] -
   2012:25
**regarding** [28] -
   1952:6, 1953:16,
   1955:25, 1957:13,
   1957:14, 1958:6,
   1962:3, 1963:20,
   1963:24, 1967:10,
   1967:17, 1968:2,
   1968:5, 1968:8,
   1968:23, 1969:16,
   1969:18, 1973:24,
   1974:2, 1974:7,
   1974:21, 1994:24,
   1995:7, 2025:15,
   2025:17, 2025:22,
   2026:20
**regardless** [1] -
   1958:10
**register** [1] - 1993:7
**Reichert** [2] - 1985:1,
   1985:2
**Reichert's** [1] - 1985:6
**related** [26] - 1957:4,
   1958:6, 1982:9,
   1982:17, 1982:18,
   1983:15, 1988:23,
   1989:12, 1990:9,
   1991:4, 1991:19,
   1991:21, 1991:25,
   1995:9, 2000:10,
   2000:14, 2003:12,
   2003:13, 2003:20,
   2004:10, 2004:15,
   2004:23, 2007:21,
   2018:13, 2018:21,
   2024:21
**relates** [1] - 1959:20
**relationship** [11] -
   1950:20, 1985:21,
   1989:5, 1996:8,
   1997:7, 1997:17,
   1997:18, 1999:16,
   2012:6, 2012:11,
   2022:15
**relationships** [3] -
   1988:7, 1994:12,
   2000:5

relative [2] - 2033:11
relayed [1] - 2017:20
relevance [4] - 1992:9,
  2024:14, 2028:12,
  2031:22
relevant [9] - 1951:22,
  1957:22, 1961:1,
  1991:13, 2024:23,
  2030:21, 2030:25,
  2031:7, 2031:25
reluctantly [2] -
  1993:4, 1996:25
remain [2] - 1979:5,
  2036:23
remains [1] - 2030:24
remember [24] -
  1966:7, 1966:12,
  1968:24, 1973:24,
  1975:13, 1993:15,
  1994:19, 1996:8,
  2009:7, 2009:22,
  2012:20, 2012:24,
  2016:22, 2017:1,
  2019:18, 2020:16,
  2020:23, 2021:1,
  2021:2, 2022:7,
  2022:10, 2022:13,
  2026:1
remembers [1] -
  1993:2
remind [2] - 1964:3,
  2013:25
remotely [1] - 1961:1
rephrase [3] -
  1974:20, 1989:9,
  2020:9
report [21] - 1953:4,
  1953:7, 1966:10,
  1967:5, 1974:11,
  1988:2, 2004:20,
  2004:22, 2004:23,
  2004:24, 2004:25,
  2012:2, 2017:18,
  2017:19, 2023:16,
  2023:19, 2024:9,
  2024:10, 2024:11,
  2025:5
reported [2] - 1950:3,
  1988:3
reporter [1] - 2005:24
REPORTER [2] -
  1984:17, 1992:18
REPORTER'S [1] -
  1950:2
reports [1] - 1987:21
represent [1] -
  2005:10
representation [1] -
  1959:22
representing [2] -

1959:23, 1960:13
request [6] - 1954:6,
  1994:16, 2000:12,
  2003:9, 2003:14,
  2004:19
requests [4] - 1962:8,
  1999:11, 1999:13,
  1999:20
requirements [1] -
  1986:1
research [14] -
  1953:15, 1953:21,
  1956:3, 1957:1,
  1958:6, 1961:15,
  1990:9, 1990:23,
  1991:19, 1996:15,
  1996:18, 1997:10,
  1999:24, 2037:3
researched [1] -
  1962:1
researcher [3] -
  1962:20, 1962:21,
  2017:6
researchers [12] -
  1950:17, 1951:1,
  1953:17, 1962:16,
  1987:20, 1987:24,
  1998:10, 2017:21,
  2019:7, 2022:24,
  2023:5, 2026:6
researchers' [2] -
  1951:17, 1952:3
reservations [1] -
  2029:12
resolution [1] -
  2003:15
respect [7] - 1957:18,
  2007:6, 2007:8,
  2016:2, 2019:16,
  2021:25, 2030:24
respected [3] -
  2006:6, 2006:7,
  2006:8
rests [1] - 2035:11
results [1] - 1954:8
review [1] - 1964:10
reviewed [3] -
  1950:13, 1961:3,
  1967:2
Rhino [7] - 1953:3,
  1961:13, 1997:25,
  1998:5, 2000:6,
  2003:21, 2023:20
Richard [8] - 1956:21,
  1961:2, 1961:24,
  1992:4, 1993:15,
  1995:3, 1995:25,
  1996:4
rid [1] - 1997:11
risk [3] - 1985:17,

1985:19, 2003:7
river [1] - 2003:7
Rodney [36] -
  1955:25, 1969:19,
  1970:7, 1970:20,
  1981:3, 1981:15,
  1981:18, 1981:19,
  1981:24, 1983:16,
  1983:24, 1988:4,
  1988:17, 1991:1,
  1994:6, 1997:7,
  1997:16, 1997:18,
  1999:9, 1999:24,
  2004:25, 2006:11,
  2007:11, 2011:19,
  2012:6, 2012:12,
  2018:25, 2019:3,
  2020:3, 2020:6,
  2020:10, 2022:13,
  2023:2, 2025:21,
  2032:22
role [5] - 1956:5,
  1982:9, 1989:12,
  2015:10, 2023:3
roll [1] - 1963:14
Rory [1] - 1997:16
routed [1] - 2010:15
rule [1] - 1979:15
Rule [2] - 1950:23,
  2035:12
ruled [1] - 1950:21,
  1979:13, 1979:14
ruling [8] - 1950:16,
  1952:12, 1952:16,
  1963:2, 2035:4,
  2035:18, 2035:19
run [2] - 1962:24,
  1966:16
Russia [6] - 1962:4,
  1990:9, 1990:10,
  2000:6, 2000:10,
  2004:9
Russian [3] - 1994:13,
  1995:11

S

satellite [3] - 2003:6,
  2003:9, 2003:15
Saulino [12] - 1981:4,
  1982:7, 1982:11,
  1982:13, 1985:10,
  1985:11, 1985:12,
  1986:5, 1988:4,
  1988:17, 1988:25,
  1989:1
Saulino's [1] - 1982:9
saw [3] - 1957:23,
  2018:24, 2024:20
schedule [1] -

2036:23
scheduling [1] -
  2037:6
scope [5] - 1956:23,
  1959:25, 1992:17,
  1992:20, 2034:19
Sean [1] - 2005:10
search [8] - 1964:12,
  1964:14, 1964:15,
  1964:17, 1965:4,
  1965:13, 1965:18,
  2026:8
searching [1] -
  1964:25
seat [3] - 2027:24,
  2036:16, 2037:5
seated [1] - 1950:11
second [8] - 1953:9,
  1958:22, 1959:7,
  1971:3, 1975:2,
  2000:8, 2020:12,
  2021:5
Second [1] - 2033:1
secret [1] - 1974:5
sector [7] - 1985:16,
  1986:7, 1986:8,
  1986:11, 1987:22,
  1988:13, 1990:1
secure [1] - 1997:8
Security [1] - 2006:9
security [2] - 1968:16,
  1971:23
see [25] - 1952:11,
  1953:22, 1956:16,
  1956:21, 1959:23,
  1961:22, 1970:5,
  1970:20, 1970:23,
  1971:3, 1975:5,
  1993:15, 1996:23,
  1998:17, 2001:5,
  2002:3, 2003:17,
  2003:20, 2004:8,
  2009:17, 2012:2,
  2020:13, 2035:23,
  2037:1, 2038:6
seeing [1] - 1994:19
seek [1] - 1991:13
seem [2] - 1993:19,
  2022:19
selected [2] - 1997:14,
  2018:23
selector [9] - 2021:8,
  2021:12, 2021:13,
  2022:11, 2026:6,
  2026:7, 2026:9,
  2026:11
selectors [8] - 2020:1,
  2020:2, 2020:8,
  2020:10, 2020:14,
  2020:17, 2021:17,

2025:15
selling [1] - 1985:16
send [1] - 2036:11
sending [1] - 2002:22
sense [3] - 1955:3,
  1967:4, 2032:10
sensitivity [1] -
  2002:25
sensors [1] - 1987:9
sent [18] - 1957:3,
  2002:24, 2010:8,
  2019:3, 2022:8,
  2023:1, 2023:2,
  2023:23, 2023:25,
  2024:1, 2024:7,
  2024:18, 2024:24,
  2025:5, 2028:1,
  2030:6
sentence [1] -
  1971:20, 1994:10,
  2021:5
separate [2] - 1950:4,
  1997:10
separately [1] -
  1950:21
September [4] -
  1965:2, 1966:6,
  1966:13, 1967:5
Sergei [1] - 1960:23,
  1992:7, 2022:17
series [9] - 1963:19,
  1963:23, 1967:10,
  1968:23, 1972:10,
  2000:21, 2001:25,
  2025:11, 2026:20
served [2] - 2009:16,
  2009:21
server [1] - 1973:16
service [3] - 1986:25,
  2006:23, 2026:15
services [1] - 1985:16
serving [1] - 2015:6
session [1] - 1950:2
set [2] - 1986:19,
  2030:9
sets [2] - 1964:7
seven [3] - 1956:19,
  1991:3, 1998:9
seven-individual [1] -
  1956:19
several [4] - 1981:19,
  1981:20, 2008:20,
  2010:23
shape [1] - 1959:11
sharpen [1] - 2038:5
Shaw [1] - 2030:15
sheet [1] - 2019:16
shock [1] - 2020:18
shocking [1] -
  2009:22

**short** [2] - 1972:23, 2004:16
**show** [8] - 1955:8, 1970:2, 1975:14, 1991:7, 1991:18, 1995:12, 1998:15, 2009:23
**showed** [2] - 1985:24, 2025:16
**showing** [2] - 1958:15, 1992:24
**shown** [3] - 2019:17, 2021:9, 2021:25
**shows** [1] - 1973:17
**side** [1] - 2037:17
**sidebar** [4] - 1950:15, 1979:10, 1991:9, 2024:3
**sides** [1] - 2032:10
**sifting** [1] - 2004:11
**similar** [4] - 1962:10, 2025:4, 2029:12, 2030:16
**similarly** [1] - 1955:17
**simple** [1] - 2011:22
**simply** [2] - 2028:24, 2029:14
**six** [1] - 1964:10
**six-month** [1] - 1964:10
**slides** [1] - 2030:12
**small** [2] - 1987:17, 1988:6
**smaller** [1] - 2013:23
**smart** [1] - 1986:23
**soda** [1] - 2000:13
**software** [1] - 1984:9
**sold** [2] - 2014:23, 2014:25
**solely** [1] - 1953:7
**solve** [3] - 1986:7, 1986:8, 1986:11
**someone** [5] - 1958:8, 1958:11, 1964:24, 2009:23, 2029:24
**sometime** [1] - 2006:9
**sometimes** [5] - 1988:23, 1988:24, 2001:17, 2003:5, 2020:16
**somewhat** [1] - 2028:20
**son** [1] - 2009:17
**soon** [1] - 2027:19
**sophisticated** [2] - 1964:7, 1973:18
**sorry** [17] - 1970:18, 1971:8, 1975:21, 1975:22, 1980:10, 1984:6, 1992:18,

1993:20, 1999:7, 2007:7, 2008:11, 2014:17, 2016:24, 2019:17, 2035:5, 2035:20
**sort** [2] - 2013:20, 2032:20
**sounds** [3] - 1957:19, 2037:11, 2037:13
**source** [11] - 1951:9, 1968:18, 1969:5, 1969:9, 1969:12, 1969:14, 1971:11, 1972:7, 1972:9, 1973:4, 2007:12
**source's** [1] - 1951:9
**sources** [1] - 1969:15
**space** [2] - 1997:8, 2003:12
**speaking** [6] - 1965:25, 1986:16, 1989:20, 1993:13, 1994:7, 1995:8
**special** [1] - 1999:13
**specific** [8] - 1952:12, 1958:18, 1961:23, 1967:21, 1999:14, 2011:24, 2013:4, 2026:23
**Spectrum** [4] - 1967:11, 1967:14, 1967:18, 1968:2
**spell** [1] - 1979:24
**Spencer** [1] - 1997:18
**spend** [2] - 1972:23, 1972:24
**splits** [1] - 2037:18
**spoken** [3] - 2005:16, 2008:18, 2010:19
**spouse** [3] - 1991:4, 1991:5
**spouses** [2] - 2031:21, 2034:2
**spun** [1] - 1980:21
**stand** [2] - 1952:23, 1993:1
**standing** [2] - 1979:5, 1986:4
**stands** [5] - 1986:25, 2001:7, 2001:16, 2006:20, 2006:24
**start** [12] - 1961:13, 1961:16, 1963:19, 1979:10, 1986:3, 1986:4, 1988:15, 1999:20, 2034:17, 2035:1, 2035:17, 2035:23
**started** [4] - 1963:9, 1966:6, 1988:9,

1998:10
**starting** [2] - 1972:2, 1988:14
**state** [4] - 1950:19, 1955:8, 1955:14, 1979:24
**statement** [2] - 1965:18, 2029:8
**statements** [3] - 1950:22, 1958:18
**States** [4] - 1950:7, 2032:21, 2032:22, 2032:23
**stay** [1] - 1958:25
**steer** [1] - 2032:16
**step** [1] - 1979:1
**steps** [2] - 1968:12, 1974:7
**Steve** [1] - 1955:23
**still** [3] - 1966:10, 2000:7, 2020:18
**stop** [5] - 1954:15, 1955:6, 1966:13, 2019:6, 2019:8
**Stotler** [1] - 1997:15
**strategy** [1] - 1980:9
**straw** [1] - 2000:13
**streamline** [1] - 2028:6
**streamlines** [1] - 2028:17
**structure** [1] - 1987:15
**stuff** [1] - 1991:12
**style** [1] - 2028:16
**subdomains** [2] - 2001:18
**subject** [12] - 1952:12, 1952:15, 1963:1, 1970:8, 1970:17, 1970:18, 1999:4, 1999:5, 2024:12, 2034:18, 2036:24
**submitted** [2] - 1982:25, 2008:14
**subpoena** [4] - 2009:17, 2009:21, 2010:1, 2010:4
**subpoenaing** [1] - 2009:18
**subsequently** [1] - 2014:23
**substance** [2] - 1954:4, 1975:21
**substantiate** [1] - 1968:1
**substantiated** [1] - 1963:1
**suck** [1] - 1954:21
**sufficient** [1] - 2038:1
**suggest** [1] - 1954:4

**suggesting** [1] - 1959:2
**suggestion** [6] - 1959:1, 1959:13, 1959:16, 1961:8, 2024:16, 2032:9
**sum** [1] - 1975:21
**summarize** [1] - 2031:14
**summarized** [2] - 2031:11, 2032:3
**summarizing** [1] - 2029:14
**summary** [9] - 2028:2, 2028:4, 2028:22, 2028:23, 2029:11, 2030:17, 2031:13, 2032:21, 2033:19
**summation** [1] - 2029:6
**summer** [5] - 1990:3, 2009:13, 2010:2, 2011:2, 2015:19
**supervise** [1] - 2016:16
**supervised** [1] - 1953:17
**supplied** [1] - 2007:19
**support** [5] - 1981:14, 1985:25, 1987:22, 1988:11, 2019:7
**supported** [2] - 2008:21, 2008:23
**supposed** [2] - 1956:5, 2034:2
**surprise** [2] - 2006:24, 2007:1
**surprised** [1] - 2009:17
**surprising** [1] - 2007:3
**suspect** [2] - 2007:11, 2024:13
**Sussmann** [18] - 1950:8, 1950:17, 1955:2, 1958:1, 1959:2, 1959:13, 1959:20, 1961:9, 1961:10, 1962:13, 2005:10, 2005:13, 2024:16, 2031:23, 2031:24, 2033:16, 2035:16, 2037:6
**Sussmann's** [5] - 1950:18, 1954:10, 1955:8, 1959:22, 2035:13
**sustained** [1] - 2027:3
**system** [2] - 2006:25, 2026:15

**T**

**talks** [1] - 1962:12
**taller** [1] - 2005:21
**tangential** [1] - 1991:22
**task** [2] - 2017:12, 2024:16
**tasked** [6] - 1956:19, 1958:19, 1991:1, 1991:16, 2004:25, 2015:20
**tasking** [25] - 1955:25, 1958:6, 1961:24, 1989:24, 1990:4, 1990:6, 1990:11, 1990:14, 1990:19, 1990:25, 1991:24, 1992:2, 1995:6, 1995:10, 1996:13, 1997:1, 1997:3, 1997:23, 1998:8, 2000:5, 2019:20, 2022:3, 2022:23, 2023:20, 2025:12
**taskings** [3] - 1961:20, 1989:18, 1989:20
**taught** [1] - 2026:6
**team** [21] - 1953:23, 1962:1, 1966:23, 1966:24, 1966:25, 1967:2, 1967:5, 1967:22, 1968:2, 1968:5, 1968:12, 1971:13, 1997:14, 1997:23, 2004:21, 2004:22, 2007:4, 2009:4, 2009:5, 2022:14, 2029:14
**Team** [2] - 2006:11
**tease** [1] - 1960:1
**Tech** [2] - 2018:17, 2018:18
**technical** [9] - 1984:11, 2016:12, 2016:13, 2016:15, 2016:21, 2016:23, 2017:4, 2017:5, 2026:7
**technology** [1] - 1984:6
**tee** [1] - 2030:22
**telecommunications** [1] - 1982:6
**ten** [3] - 1988:1, 2034:9, 2036:5
**ten-minute** [1] - 2034:9
**tens** [1] - 2007:17

2053

**term** [1] - 2004:5
**terminology** [1] - 2021:8
**terms** [2] - 2006:13, 2028:17
**testified** [10] - 1963:25, 1967:13, 1969:8, 1971:7, 1974:7, 2002:1, 2002:7, 2020:22, 2025:17, 2025:22
**testify** [9] - 1954:4, 1956:2, 1956:24, 1957:13, 1993:1, 2025:3, 2035:14, 2035:16, 2037:12
**testifying** [4] - 2023:3, 2029:2, 2029:24, 2037:7
**testimony** [14] - 1955:23, 1959:21, 1961:11, 1973:13, 1976:3, 1976:4, 2024:7, 2025:19, 2026:14, 2027:6, 2027:8, 2028:24, 2029:11, 2035:13
**text** [2] - 1988:23, 1994:9
**themselves** [1] - 1990:18
**theory** [1] - 1951:6
**therefore** [1] - 1951:22
**they've** [1] - 2031:11
**thinking** [1] - 2037:22
**third** [3] - 1973:10, 1975:19, 1984:13
**three** [4] - 1959:20, 1989:25, 1997:9, 1997:13
**Thursday** [2] - 2035:17, 2037:9
**tie** [2] - 1958:2, 1960:25
**tied** [4] - 1958:8, 1958:11, 1991:19, 1992:13
**ties** [2] - 1961:15, 2027:1
**timing** [1] - 1989:8
**today** [7] - 1978:24, 2005:4, 2014:8, 2014:16, 2025:19, 2036:19, 2036:25
**together** [6] - 1964:15, 1964:17, 1987:22, 1988:10, 2028:13, 2032:19
**tomorrow** [6] - 2034:17, 2035:2,

2035:15, 2035:25, 2036:21, 2037:2
**tonight** [3] - 2033:22, 2036:10, 2036:11
**took** [8] - 1968:12, 1974:7, 1983:16, 2010:15, 2010:16, 2017:15, 2026:18, 2031:16
**tool** [2] - 1964:7
**tools** [6] - 1964:4, 1964:11, 1965:10, 2018:10, 2018:11
**top** [8] - 1961:16, 1962:10, 1963:6, 1970:5, 1975:2, 1975:16, 2000:19, 2001:5
**topic** [1] - 2021:17
**tor** [1] - 2001:7
**Tor** [6] - 1967:19, 1967:21, 1968:8, 1968:9, 1968:13, 1968:20
**tor-exit.eecs.umich** [1] - 2001:7
**total** [1] - 2037:21
**totality** [1] - 2026:24
**tracking** [1] - 2030:4
**traded** [1] - 1982:5
**traffic** [2] - 1973:19, 1987:10
**transactions** [1] - 2029:3
**transcribed** [1] - 1950:3
**translates** [1] - 1987:3
**tremendously** [1] - 2006:6
**true** [3] - 1955:4, 1959:12, 2019:25
**Trump** [14] - 1954:12, 1956:20, 1957:9, 1958:6, 1962:4, 1967:20, 1973:17, 1990:9, 1990:10, 1990:21, 1995:9, 1995:10, 1998:4, 2003:20
**Trump's** [1] - 1998:2
**trust** [1] - 1997:6
**truth** [1] - 1955:7
**try** [3] - 1979:12, 2013:6, 2013:10
**trying** [7] - 1972:19, 1981:1, 1990:18, 1993:21, 2013:5, 2026:4, 2026:13
**turn** [5] - 1987:14, 2001:22, 2002:14,

2003:22, 2004:2
**turning** [1] - 1985:13
**tweet** [1] - 2033:12
**two** [12] - 1954:22, 1959:5, 1959:7, 1959:19, 1960:12, 1961:8, 1975:16, 1989:24, 1994:11, 2001:11, 2026:13, 2038:1
**type** [14] - 1956:3, 1959:9, 1960:18, 1981:12, 1982:3, 1985:14, 1987:2, 1989:20, 1990:11, 1993:12, 2002:10, 2002:22, 2019:2, 2031:12
**types** [4] - 1963:20, 1964:14, 1986:14, 1986:16
**typically** [1] - 2003:3

## U

**U.S** [4] - 1961:18, 1981:14, 1984:11, 1986:1
**ultimate** [5] - 1958:20, 1967:25, 1973:23, 1974:19, 1974:22
**ultimately** [7] - 1965:9, 1969:11, 1992:11, 2004:20, 2010:17, 2017:20, 2018:7
**uncomfortable** [9] - 1954:6, 1957:14, 1996:13, 1996:14, 1996:22, 1997:1, 2011:18, 2012:19, 2015:22
**uncommon** [2] - 1990:11, 1990:13
**under** [4] - 1950:4, 1950:23, 1992:23, 2028:24
**underneath** [1] - 1987:25
**understood** [11] - 1952:4, 1954:7, 1956:24, 1957:24, 1958:5, 1958:12, 1959:4, 1972:20, 1979:16, 2031:19, 2036:1
**unduly** [1] - 1959:20
**unique** [2] - 1990:13, 1990:16
**United** [4] - 1950:7,

2032:21, 2032:22, 2032:23
**universe** [1] - 2030:25
**university** [1] - 2001:21
**University** [2] - 1980:4, 2001:8
**unless** [1] - 1958:1
**unnecessary** [1] - 1992:25
**unrelated** [1] - 2032:2
**unsubstantiated** [1] - 1974:24
**unusual** [1] - 1958:24
**up** [32] - 1958:2, 1961:1, 1964:19, 1966:2, 1968:13, 1968:19, 1973:10, 1975:2, 1975:15, 1975:16, 1979:1, 1982:19, 1985:24, 1986:4, 1992:11, 1992:19, 1995:21, 1996:20, 2000:19, 2001:6, 2005:25, 2009:9, 2009:23, 2010:8, 2022:10, 2023:3, 2024:10, 2030:9, 2030:22, 2032:14, 2036:6, 2037:6

## V

**V2** [1] - 1975:9
**valuable** [1] - 1984:11
**value** [1] - 2017:4
**Ventures** [17] - 1962:18, 1980:22, 1980:23, 1980:25, 1981:1, 1981:3, 1981:22, 1982:1, 1982:11, 1982:12, 1982:18, 1983:17, 1986:5, 1988:3, 2018:5, 2018:8, 2018:10
**version** [1] - 1975:12
**Version** [2] - 1975:22, 1975:23
**Victor** [16] - 1981:3, 1981:6, 1981:7, 1981:19, 1984:23, 1988:4, 1988:10, 1988:11, 1988:22, 1989:2, 1989:3, 1996:14, 1996:18, 1997:8, 1997:17, 1999:9
**view** [2] - 1974:21,

2033:10
**views** [6] - 1951:17, 1951:19, 1951:20, 1951:22, 1965:21, 1974:1
**visit** [1] - 2010:18
**visual** [1] - 2003:4
**Vixie** [2] - 2006:8, 2006:11
**voir** [1] - 1993:5
**voluminous** [4] - 2028:4, 2028:23, 2031:14, 2032:4
**voluntarily** [1] - 2010:19
**vote** [1] - 1954:13
**voted** [1] - 1957:9
**vulnerabilities** [1] - 1990:1
**vulnerable** [1] - 1989:23

## W

**wait** [1] - 2005:23
**walked** [1] - 1963:23
**walking** [2] - 1998:3, 2030:13
**warrant** [4] - 1964:16, 1964:17, 1965:14, 1965:18
**warrants** [3] - 1964:12, 1964:14, 1965:4
**waste** [2] - 2032:11, 2032:13
**ways** [3] - 1975:7, 1986:12, 1987:8
**Webex** [1] - 2009:9
**week** [3] - 1988:21, 2036:13
**week-to-week** [1] - 1988:21
**weeks** [2] - 2017:15, 2017:17
**welcome** [1] - 1963:12
**well-respected** [1] - 2006:6
**whatsoever** [2] - 1962:14, 1985:17
**whereas** [1] - 1956:6
**whisper** [1] - 1961:8
**white** [17] - 1952:7, 1965:22, 1967:18, 1968:23, 1969:3, 1969:5, 1969:16, 1969:22, 1971:12, 1972:7, 1972:9, 1972:17, 1972:19, 1973:4, 1992:1,

2054

1992:11, 1993:21
**White** [2] - 1970:9, 1970:18
**whiteboards** [1] - 1998:1
**whole** [2] - 1955:9, 1990:22
**wide** [7] - 2000:12, 2003:18, 2004:1, 2004:5, 2004:7, 2004:14, 2004:19
**wild** [1] - 2036:24
**winds** [1] - 2037:6
**wiretaps** [2] - 1964:12, 1965:6
**witness** [17] - 1959:17, 1960:18, 1963:4, 1992:14, 1995:15, 1998:15, 2028:2, 2028:4, 2028:22, 2029:23, 2030:17, 2031:13, 2032:21, 2033:9, 2033:20, 2034:9, 2036:20
**WITNESS** [9] - 1976:6, 1979:3, 1979:8, 1984:18, 2006:1, 2013:2, 2013:8, 2027:7, 2027:11
**Witness** [2] - 1976:7, 2027:12
**witnesses** [8] - 2029:6, 2032:12, 2034:5, 2035:2, 2035:9, 2035:15, 2036:8, 2036:19
**Witnesses** [1] - 1949:3
**woman** [1] - 1985:7
**wonderful** [1] - 2030:15
**word** [5] - 1960:11, 2004:8, 2011:24, 2011:25, 2012:5
**words** [5] - 1962:25, 2012:21, 2013:4, 2015:22, 2030:24
**works** [2] - 1984:4, 1999:24
**world** [1] - 1987:9
**worried** [1] - 2024:5
**write** [4] - 1964:19, 2004:20, 2004:22, 2017:18
**wrote** [2] - 2004:22, 2029:25

## Y

**year** [3] - 1980:14, 1980:17, 2014:20
**Yegerman** [2] - 1997:16, 2020:17
**Yellow** [1] - 1986:25
**York** [1] - 1966:7
**yourself** [4] - 1995:18, 2013:12, 2020:1, 2021:6

## Z

**Zach** [2] - 1999:10, 2018:24
**Zachary** [2] - 1984:2, 1999:8
**ZETAlytics** [7] - 1982:2, 1982:18, 1985:9, 1986:8, 2018:3, 2018:23, 2022:11