<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                   Plaintiff,         1:21-cr-00582-CRC-1
                                        Friday, May 27, 2022
 5     vs.                              8:58 a.m.

 6     MICHAEL A. SUSSMANN,

 7                   Defendant.
       - - - - - - - - - - - - - - - x
 8

 9     _____

10                      TRANSCRIPT OF JURY TRIAL
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
       _____
12
       APPEARANCES:

13     For the United States:    ANDREW DeFILIPPIS, ESQ.
                                 JONATHAN EDGAR ALGOR, IV, ESQ.
14                               MICHAEL T. KEILTY, ESQ.
                                 BRITTAIN SHAW, ESQ.
15                               SPECIAL COUNSEL'S OFFICE
                                 145 N Street Northeast
16                               Washington, DC 20002
                                 (212) 637-2231

17     For the Defendant:        SEAN M. BERKOWITZ, ESQ.
                                 MICHAEL BOSWORTH, ESQ.
18                               CATHERINE YAO, ESQ.
                                 NATALIE HARDWICK RAO, ESQ.
19                               LATHAM & WATKINS LLP
                                 1271 Avenue of the Americas
20                               New York, NY 10020
                                 (212) 906-1200

21

22     Court Reporter:           Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
23                               U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
24                               Washington, DC  20001
                                 (202) 354-3187
25
</pre>

```
 1                    P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Your Honor, we are on the

 3    record for Criminal Case 21-582, United States of America

 4    vs. Michael A. Sussmann.

 5              MR. DeFILIPPIS:  Good morning, Your Honor; Andrew

 6    DeFilippis for the United States, along with Michael Keilty,

 7    Jonathan Algor, and Brittain Shaw.

 8              THE COURT:  Good morning.

 9              MR. BERKOWITZ:  Good morning, Your Honor; Sean

10    Berkowitz, Michael Bosworth, Natalie Rao, and Catherine Yao

11    on behalf of Mr. Sussmann, who is present in court.

12              THE COURT:  Good morning.

13              MR. BERKOWITZ:  Good morning.

14              THE COURT:  All right.  Before we bring the jury

15    in, for the record, the defense has proposed an additional

16    jury instruction on character evidence.  We heard from two

17    character witnesses, but neglected to instruct the jury on

18    how they should consider the character evidence.

19              The government has objected to that instruction on

20    timeliness grounds and also has raised a concern that it

21    might highlight that instruction over others.

22              I'm inclined to give the instruction.  I think it

23    would be helpful to the jury.  They're going to wonder how

24    they are to consider the character evidence.

25              Unfortunately it wasn't read to them initially,
```

1     but I think the Court has an independent obligation to make

2     sure that the jury knows how to consider evidence in the

3     case.  Had we left out a -- you know, the reasonable doubt

4     instruction, you know, I would obviously include that

5     despite the fact that it wasn't raised in the charge

6     conference or in the initial proposed instructions.

7              I will, you know, soft pedal it, to the extent

8     that I can, and instruct them again that they should not

9     focus on any one instruction over others.  I'll reiterate

10    that standard instruction that we gave.

11             Mr. DeFilippis, would you prefer that I give it

12    now, or wait until after closings and just include it in the

13    Court's, you know, sort of predeliberation instructions?

14             MR. DeFILIPPIS:  Yes, Your Honor.  We'd ask that

15    you do it now and that you preface it with some kind of

16    statement that it was an oversight and that -- you know,

17    something like that.  Thank you.

18             THE COURT:  Okay.  And who will be giving the

19    initial closing?

20             MR. DeFILIPPIS:  That will be Mr. Algor.

21             THE COURT:  Okay.

22             (Pause)

23             (Jury enters courtroom)

24             THE COURT:  All right.  Please be seated,

25    everyone.

1          Good morning, ladies and gentlemen.  Good to see

2      you.  Hope you had a good evening.

3          Before we get started with closing arguments, you

4      will recall that you heard from two character witnesses on

5      Wednesday.  It has been brought to my attention that I

6      neglected to give you an instruction on how you may consider

7      that character evidence, so I will instruct you as follows:

8          The defendant has introduced testimony that he has

9      a good character for truthfulness and honesty.  Such

10     evidence may indicate to you that it is unlikely that a

11     truthful and honest person would commit the crime charged,

12     or it may not.  You may consider this evidence along with

13     other evidence in the case and give it as much weight as you

14     think it deserves.

15         Notwithstanding the evidence of character, if,

16     after weighing all of the evidence, you are convinced beyond

17     a reasonable doubt that the defendant is guilty of the crime

18     charged, it is your duty to find him guilty.

19         On the other hand, evidence of good character

20     alone may create a reasonable doubt as to a defendant's

21     guilt; although without it, the other evidence would be

22     convincing.

23         And this instruction will be included in the

24     written jury instructions that you receive.  But I would

25     also remind you, as I told you yesterday, that you are to

1      consider all of the instructions as a whole.  You may not

2      follow some and ignore others.  All right?

3              So with that, the government will proceed with its

4      initial closing argument.

5              Mr. Algor.

6              MR. ALGOR:  Thank you, Your Honor.

7              Can we have the slides up, please.

8              Good morning, ladies and gentlemen of the jury.

9      The evidence has proved beyond a reasonable doubt that the

10     defendant, Michael Sussmann, made a false statement to the

11     FBI General Counsel Jim Baker on September 19, 2016.

12             On that day, the defendant used his privilege as a

13     high-powered Washington lawyer, as a former DOJ prosecutor,

14     and as a friend of the defendant to bypass normal channels

15     and to expedite a meeting with the FBI's general counsel.

16     And in that meeting the defendant made a false statement

17     when he told Mr. Baker that he was not there on behalf of

18     any client; that, instead, he was there as a good citizen

19     bringing it on his own.

20             And why did the defendant do this?  Because he

21     knew he had to conceal his representation of the Clinton

22     Campaign and Rodney Joffe to be able to push the Alfa-Bank

23     allegations to the FBI.  He knew that if he told Mr. Baker

24     that he was there on behalf of the Clinton Campaign, the

25     chances of the FBI investigation would be diminished, would

1     be seriously less; that Mr. Baker might not even take the

2     meeting.  And he knew that his other client, Rodney Joffe,

3     did not want the FBI to know about his role in the

4     allegations.

5            The defendant knew that he had to hide his clients

6     if there was any chance of getting the allegations into the

7     FBI.  And that, ladies and gentlemen, is why the defendant

8     lied.

9            Now, ladies and gentlemen, in this summation I'm

10    going to do three things.

11           First, I'm going to briefly explain the charge, as

12    Judge Cooper instructed you yesterday, and I ask that you

13    keep it in mind as we go through the summation today.

14           And second, I'll discuss the evidence that has

15    been shown in this case and address the only two questions

16    that I think will be before you:  whether the defendant

17    lied, and whether that lie was material to the FBI.

18           And throughout this summation I will cover in

19    detail the defendant's false statement and how it was

20    material to the FBI.

21           But let me just briefly discuss with you the

22    evidence on each of these points because it's overwhelming.

23           You have the billing records showing the defendant

24    billing his work, day in and day out, to the Clinton

25    Campaign.  Day after day the defendant continued to bill his

1    work to Hillary For America.

2          And there's also the defendant's own words:  the

3    lie in his text message on September 18th, which he then

4    repeated as a false statement to Mr. Baker the next day on

5    September 19th.

6          And you also saw his Congressional testimony in

7    December of 2017 where he admits that he was representing a

8    client when he met with Mr. Baker on that day.  And we all

9    know who that client was:  Rodney Joffe.  And within that

10   testimony he also concealed the fact that he was

11   representing the Clinton Campaign during that meeting.

12         What else do you have?

13         You have the thumb drives, the ones that he

14   provided to the FBI.  And who did he bill?  The Clinton

15   Campaign.

16         What else?  You have the defendant's actions as he

17   pushed the Alfa-Bank allegations to the FBI, and then

18   subsequently pushed it to the media.  He continued to

19   promote all of the allegations to the press, both before his

20   meeting and after.

21         It wasn't about national security.  It was about

22   promoting opposition research against the opposition

23   candidate, Donald Trump.

24         And what else do you have?  You have the

25   defendant's same lie to the CIA less than six months later.

1          You'll also see the testimony of the FBI's

2    witnesses about how it was material to the FBI in conducting

3    the functions of the FBI.

4          Finally, ladies and gentlemen, after talking to

5    you about all the evidence of the defendant's false

6    statement and how that was material to the FBI, I'll explain

7    why the evidence proves beyond a reasonable doubt that the

8    defendant is guilty.

9          So as I said, I'm going to explain the charge.

10   The defendant is charged with making a false statement to

11   the FBI.

12         Now, yesterday Judge Cooper instructed you on the

13   law, and he is the sole authority on the law.  Whatever he

14   says controls.

15         You will have the jury instructions as you

16   deliberate; and as you heard yesterday, Judge Cooper told

17   you that the government is required to prove each of the

18   following elements beyond a reasonable doubt.  So let's take

19   a look at the elements.

20         First, you have the defendant made a statement or

21   representation.  This element is met by showing that the

22   defendant made a statement, which in this case was the

23   statement to Jim Baker on September 19th.

24         The next element is that the statement was false,

25   fictitious, or fraudulent.  That is the evidence which shows

1    that the statement in question was untrue when it was made,

2    and that the defendant knew it would be untrue when he said

3    it.

4            With respect to materiality, it is simply whether

5    the defendant's statement had a natural tendency or was

6    capable of influencing the function of the FBI.

7            Now, ladies and gentlemen, as Judge Cooper

8    instructed you, the government is not required to prove that

9    this statement actually influenced the FBI, only that the

10   statement could have influenced the FBI.

11           The next element:  knowing and willful conduct.

12   That is the evidence which shows that the defendant meant to

13   make the statement and did so knowing, as a former

14   Department of Justice prosecutor, as a lawyer, that it was

15   wrong.

16           And last, there's a reference to federal

17   jurisdiction.  And you've heard that as part of a

18   stipulation, that the FBI is part of the Executive Branch.

19           So let's turn to what happened.  As I said, I'll

20   review some of the evidence.  I encourage you to review it

21   as well; to review the defendant's text message to Mr. Baker

22   on September 18th; to review Jim Baker's testimony; to read

23   all of the defendant's billing records to Hillary For

24   America during this time; and the testimony of Jim Baker and

25   the various other FBI employees as they discussed all the

1   ways that it could have impacted the FBI when the defendant

2   made the false statement on September 19th.  All that

3   evidence will be available to you.

4          So let's start with what's not in dispute.

5          The first element:  statement or representation.

6   There is no dispute that the defendant made a statement to

7   Jim Baker on September 19th.  The evidence on this element

8   is overwhelming.  You've heard that through Jim Baker's

9   testimony; you've seen it through Bill Priestap's notes; and

10  you've also seen it through Trisha Anderson's notes.  That

11  element is met.

12         And what other element?  A matter within the

13  jurisdiction of the United States government.  That's the

14  one I just discussed, the fifth element that the parties

15  stipulated to, that the FBI is part of the Executive Branch

16  of the United States.

17         So let's get into what is in dispute.

18         So how do you know that the defendant's statement

19  to Jim Baker was false?  This is the element:  false,

20  fictitious, or fraudulent.  It's shown through his billing

21  records, through his coordination with Fusion GPS and others

22  to push the allegations into the FBI.  It's shown through

23  his own words, his own actions, and his own testimony.

24         So we start with the clients.

25         We saw some early evidence regarding contracts

1    that Perkins Coie and Fusion GPS had entered into, and we

2    start with Perkins Coie's engagement letter for Hillary For

3    America.  And you recall testimony from Marc Elias and Robby

4    Mook about this, that Perkins Coie represented the Clinton

5    Campaign for the 2016 presidential election.

6           Next we turn to Fusion GPS.  You learned that

7    Fusion GPS was a research consulting firm that was hired by

8    Perkins Coie to provide opposition research for the Clinton

9    Campaign, to focus on research about Presidential Candidate

10   Trump's ties to Russia.  And that's Government Exhibit 302.

11          And finally, Rodney Joffe.  This is an engagement

12   letter that shows Mr. Sussmann represented Mr. Joffe

13   personally.  Government Exhibit 300.

14          And Mr. Sussmann also represented Mr. Joffe's

15   company, Neustar.  You heard testimony about that.

16          So let's look at the origins of the Alfa-Bank

17   allegations.  You heard a lot about these allegations, that

18   there was an alleged secret covert communication channel

19   between the Trump organization and a Russian bank known as

20   Alfa-Bank.

21          And where does the story begin?

22          Well, you heard testimony that in the summer of

23   2016 the defendant, Fusion GPS, and Rodney Joffe were all

24   working on the Alfa-Bank allegations.  And we start with

25   July 29, 2016.

 1          Now, ladies and gentlemen, there are a lot of

 2     exhibits in this case, and I'll try to mention them to you

 3     as I describe them, but, as you can see at the bottom of

 4     each of the slides, it makes references to the exhibits

 5     should you need that for your benefit.

 6          So we'll start with the defendant emailing Marc

 7     Elias's assistant confirming that he will be attending a

 8     meeting with Mr. Elias and Fusion GPS.  That's Government

 9     Exhibit 306.

10          And you also see that in a calendar entry that

11     day.  Subject Title:  "Marc/Michael Fusion team."  That's a

12     30-minute meeting.  And what does it say as the category?

13     "Clinton."  The defendant joined forces with Fusion GPS, the

14     Clinton Campaign's opposition research firm.

15          And on July 29th, who does the defendant bill his

16     time to for that 30-minute meeting?  Hillary For America,

17     Client 116514.0001, 5.3 hours.  And how does he describe his

18     time?  "Meeting with M. Elias, others, regarding

19     confidential project."

20          Now, ladies and gentlemen, you will see that the

21     defendant's billing entries are sometimes vague and

22     sometimes precise.  But I submit that you have seen

23     indisputable evidence that the defendant was billing his

24     work on the Alfa-Bank matter to Hillary For America.  Your

25     common sense tells you that.

1          So let's turn to two days later, July 31st.  This

2     is another billing entry, Government Exhibit 553.2.  And

3     he's billing it again to the Clinton Campaign,

4     "Communications with Marc Elias regarding server issue."

5     The server issue is the Alfa-Bank issue.

6          And we fast forward to August 11, 2016, and we see

7     emails between the defendant and Marc Elias, his partner,

8     and a top Clinton Campaign lawyer; and Glenn Simpson, and

9     Peter Fritsch.  Now, ladies and gentlemen you heard

10    testimony regarding these individuals, how Glenn Simpson and

11    Peter Fritsch were the co-founders of Fusion GPS, the

12    Clinton Campaign's research firm.

13         So what happened the next day?  The defendant is

14    meeting with Fusion GPS, Marc Elias, and -- who else? --

15    Rodney Joffe, his client.  That's Government Exhibits 318

16    and 319.

17         And who does the defendant bill for those

18    meetings?  The Clinton Campaign, 1.5 hours, "Confidential

19    meetings with Marc Elias, others."  The "others"?  Fusion

20    GPS and Rodney Joffe.  That's 553.3.

21         And we fast forward a few days to August 15th, and

22    around this time Rodney Joffe was tasking his employees at

23    his companies to use cyber security resources to conduct

24    opposition research.  You heard testimony from Steve DeJong,

25    an employee at Neustar, who was pulling data for Mr. Joffe.

1    You also heard from Jared Novick, the CEO of BitVoyant at

2    that time, how he had received a tasking from Mr. Joffe, and

3    how it was extremely uncommon because it was to look for

4    research and data related to individuals tied to Donald

5    Trump and Russia.

6            Now, if you recall, BitVoyant's mission was to do

7    cyber security research for companies, for businesses; not

8    to do opposition research against individuals.  And you are

9    able to see that opposition research that BitVoyant did for

10   Mr. Joffe.  That's Government Exhibit 1200 on the screen.

11   Research that included references to Alfa-Bank.  Research

12   related to domains which would eventually end up in the

13   white paper that Mr. Sussmann brought to the FBI on

14   September 19.  You see that tor.exit.eecs@umich.edu,

15   mail1.trump-email.com.  And you also see references to Alfa-

16   Bank in the data.

17           Ladies and gentlemen, I submit that this is

18   evidence which shows the defendant leveraging his client,

19   Rodney Joffe, to benefit his other client, the Clinton

20   Campaign.  This is not cyber security work.  This is nothing

21   related to national security.  This is pure opposition

22   research.

23           And that same day the defendant, in his

24   communications, who is he communicating with?  Fusion GPS,

25   the Clinton Campaign's research firm.

1          Two days later, on August 17th, we see a calendar

2     entry for a 30-minute call this day.  The subject:

3     "Telephone conference regarding status."  And when we see

4     the location, "Michael and Marc will call Rodney."  The

5     defendant and Marc Elias will call Rodney Joffe, the

6     defendant's client.

7          And it says that the defendant -- and how does the

8     defendant bill this call?  You see that at Government

9     Exhibit 553.4, a half-hour telephone conference with Rodney

10    Joffe, Marc Elias.  Who is he billing that to?  The Clinton

11    Campaign.

12         And then you have Mr. Elias's testimony, how he

13    had no other reason to interact with Rodney Joffe other than

14    related to the Alfa-Bank allegations.

15         Why would Rodney Joffe, a cyber security person,

16    need to interact with a political lawyer, with the head

17    lawyer of the Clinton Campaign?  Not for a national security

18    concern, but for opposition research.

19         Two days later, August 19, 2016.  Once again,

20    another meeting between the defendant, Marc Elias, and

21    Rodney Joffe.  That's Government Exhibit 331.  And you see

22    telephone calls between the defendant and Mr. Joffe.  That's

23    at Government Exhibit 1703.  And multiple emails back and

24    forth between Mr. Joffe and the defendant.  That's

25    Government Exhibit 332.

 1              And, again, ladies and gentlemen, who does the

 2     defendant bill his time to?  The Clinton Campaign.  3.3

 3     hours, "Confidential meeting, M. Elias, others."  And you

 4     also see "work on document."

 5              I submit that this shows the defendant starting to

 6     bill his time to the Clinton Campaign as he starts to work

 7     on one of the white papers that he will eventually give to

 8     the FBI.

 9              Ten days later, August 29, 2016, the defendant

10     sends Mr. Joffe an email with the subject "Key."  That's

11     Government Exhibit 342.  And, ladies and gentlemen, I want

12     you to remember this exhibit as I make reference to it

13     later.  And what does the defendant bill to today?  He bills

14     again to the Clinton Campaign for his work on the Alfa-Bank

15     allegations, 2.3 hours.  Government Exhibit 553.9.

16              The next day, August 30, 2016, we see an email

17     from Peter Fritsch to Ed Baumgartner cc'ing Glenn Simpson.

18     These are members of Fusion GPS, as you heard through

19     various testimony.  The subject:  "You will see the hole and

20     what this needs."  And what's the attachment?

21     alfagroupoverview.docx.

22              Now, ladies and gentlemen, you'll recall that one

23     of the white papers that went to the FBI involved Alfa Group

24     Overview.  You recall seeing that.  This is Fusion GPS, the

25     Clinton Campaign's research firm, drafting a white paper

1  that would eventually go to the FBI.

2          And now we look at Government Exhibit 348.  Who is

3  the defendant communicating with on this day?  His client,

4  Rodney Joffe.

5          But who else is the defendant communicating with?

6  Eric Lichtblau, *The New York Times* reporter.  They're

7  talking about setting up a meeting later that week.  That's

8  Government Exhibit 349.  And you see Mr. Lichtblau write,

9  "I'm back in town.  I see Russians are still hacking away.

10  Any big news?"

11          Now, ladies and gentlemen, this is August 30th.

12  If the defendant and Rodney Joffe are so concerned about

13  national security, would their priority be to meet with the

14  media or to flag this for the FBI?  And what is the

15  defendant's priority here?  The media, promoting this.  And

16  who is he promoting this on behalf of?  The Clinton

17  Campaign.

18          What else do we see on this day?  Government

19  Exhibit 350.  The defendant emailing and coordinating with

20  Fusion GPS and Marc Elias, the Clinton Campaign's top lawyer

21  and the research firm.

22          And how does he bill his time for this day?  1.5

23  hours, "Communications and work regarding confidential

24  project."  This is from Perkins Coie's own records.  That's

25  Government Exhibit 553.10.

1          Now, ladies and gentlemen, I'll submit that

2     Government Exhibit 602 says it all.  This email speaks a

3     thousand words about how this was pure opposition research,

4     and that the defendant was representing Rodney Joffe and the

5     Clinton Campaign when he was putting together the Alfa-Bank

6     allegations; an email with the defendant, Rodney Joffe, and

7     Laura Seago, a Fusion GPS employee who was working on

8     research for the Clinton Campaign.

9          And what is the subject?  "Privileged Client/

10    Attorney Communication - New York 1."  That says it all.

11         So what happens the next day?  The defendant

12    continues to communicate with Fusion and Mr. Joffe.

13         Excuse me.

14         What does this show?  This is Government Exhibit

15    688 on August 31st.  And what do we see here?  This is

16    Fusion GPS continuing to work on the Alfa Group Overview

17    white paper, the one that would go to the FBI, the Clinton

18    Campaign's research firm working on material that would be

19    promoted by the defendant to the FBI.  That's Government

20    Exhibit 688.

21         And how does he bill his time?  The defendant

22    bills it to the Clinton Campaign on that day,

23    "Communications regarding confidential project," one hour.

24         Turning to the next day.  Again, the defendant is

25    conducting multiple meetings with Rodney Joffe, Fusion GPS,

1    and others as he works to promote the Alfa-Bank allegations.

2    This is Government Exhibit 356.  There's a calendar entry

3    regarding holding for a confidential meeting.  And who is

4    the defendant meeting with later that day?  Eric Lichtblau,

5    *The New York Times* reporter, "Meet at 4:00 p.m.?"  And we

6    see phone communications from Government Exhibit 1703

7    between the defendant and Mr. Lichtblau on that day.

8            What else do we see?  We see additional emails

9    between the defendant and Mr. Lichtblau about setting up a

10   meeting.

11           And how does the defendant bill his time?  Two

12   hours, "Confidential meetings regarding confidential

13   project."  Government Exhibit 553.11.  And who is he billing

14   it to?  The Clinton Campaign.

15           A few days later, September 5th, the defendant

16   again spends a considerable amount of time working on the

17   Alfa-Bank allegations, and you see that in his billing entry

18   for the Clinton Campaign.  And you see also that the

19   defendant is meeting with Fusion GPS.  This is Government

20   Exhibit 362.

21           And you see all the communications he's having

22   with his client, Rodney Joffe, as they're continuing to

23   build the Alfa-Bank allegations, the opposition research.

24   That's Government Exhibit 1703.

25           And again, ladies and gentlemen, how does he bill

1    his time for that day?  "Meeting in McLean, VA; work on

2    white paper, follow-up teleconferences and email."  8.1

3    hours.  8.1 hours.

4           And what was he working on?  A white paper, a

5    white paper that will eventually go to the FBI.

6           The next day, September 6, 2016.  We see a

7    calendar entry.  And what's it about?  "Fusion/Sussmann

8    meeting with Marc Elias."  And what's the category?

9    Government Exhibit 367.

10           Now, you heard testimony from Laura Seago

11    regarding her interactions with Mr. Joffe and the defendant.

12    Ms. Seago testified that she participated in a meeting on

13    behalf of Fusion GPS, which included Peter Fritsch from

14    Fusion.  And as you can see from her testimony, it also

15    included the defendant and his client, Rodney Joffe.  And

16    you heard Ms. Seago's testimony.  She mentioned that she was

17    there with Mr. Sussmann's client, Rodney Joffe.

18           And what was the purpose of that meeting?  To

19    discuss allegations of communications between the Trump

20    organization and Alfa-Bank; to discuss the opposition

21    research that Fusion GPS was doing for the Clinton Campaign

22    that Rodney Joffe was working on, that the defendant was

23    working on.

24           And so what else do we see on September 6th?  The

25    defendant, again, is spending a considerable amount of time

1    working on the Alfa-Bank allegations, and he's holding for a

2    confidential meeting.  This is Government Exhibit 368.  And

3    this is sent on September 4th, but you see that it's for a

4    meeting on September 6th.

5          And how does he bill his time?  Again, ladies and

6    gentlemen, you've heard this over and over again, but day

7    after day after day, when the defendant is working on the

8    Alfa-Bank allegations, he's billing it to the Clinton

9    Campaign.  "Meeting with consultant, M. Elias; revisions to

10   white paper; meeting with expert; meeting with expert and

11   reporter; follow-up meeting with reporter; conversations

12   with Marc Elias."  That's Government Exhibit 553.16.  And

13   how much time does he spend?  4.4 hours.

14         The next day the defendant continues to work for

15   the Clinton Campaign regarding the Alfa-Bank allegations.

16   This is Government Exhibit 553.17.  And what do we see here?

17   "Work on written materials."  Working on the white paper,

18   the white paper that's going to go to the FBI.

19         So let's turn to September 8, 2016.  Less than two

20   weeks before his meeting with Jim Baker, the defendant still

21   has not talked to the FBI about the Alfa-Bank allegations.

22   There is no national security concern.  But what's he doing?

23   He's calling his client Rodney; that's Government Exhibit

24   371.  And he's also conducting confidential meetings, an

25   hour and a half.  That's Government Exhibit 372.

1           And who is he calling?  Eric Lichtblau, *The New*

2     *York Times* reporter.  No national security concern, but he's

3     willing to meet with the press.  He's willing to meet with

4     the press so that he can benefit his client, the Clinton

5     Campaign, and push the opposition research, the Alfa-Bank

6     allegations.

7           And how does the defendant bill his time for that

8     day?  This is Government Exhibit 553.17.  "A.M. and P.M.

9     confidential meetings; telephone conferences; preparing

10    materials."  4.5 hours, over half his day, spent working for

11    the Clinton Campaign on the Alfa-Bank allegations.

12          And a few days later, on September 12th, what is

13    the defendant doing?  Having calls on behalf of the Clinton

14    Campaign with Marc Elias and Eric Lichtblau, *The New York*

15    *Times* reporter.  You see that in Mr. Elias's email for his

16    billing entry for that day, and you see it from the phone

17    records showing the defendant calling Mr. Lichtblau.  That's

18    Government Exhibit 17.03.

19          And how does he bill his time?  2.7 hours, "Work

20    regarding confidential project."  Government Exhibit 553.18.

21          Now, ladies and gentlemen, you saw records from

22    September 13th.  And what are these?  It's a receipt from

23    Staples for some thumb drives.  That's Government Exhibit

24    380.  A receipt from Staples that is just down the street

25    from Perkins Coie's Washington, D.C., office.

1          And I want you to focus your attention on the

2     highlighted portion of that receipt, the "PNY 2 Pack 16

3     gigabytes" referenced on the receipt.  Ladies and gentlemen,

4     I want you to remember that.

5          So who does the defendant meet with on that day?

6     "R. Meeting."  His client, Rodney Joffe.  An hour-and-a-half

7     meeting.  That's Government Exhibit 379.

8          Turning to the next day, who is he meeting with

9     again?  His client, Rodney Joffe.  That's Government Exhibit

10    382.  Another hour-and-a-half meeting.  And how does he bill

11    his time for that day?  Who does he bill it to?  The Clinton

12    Campaign.  Multiple meetings regarding confidential project;

13    again, draft white paper; further meetings and telephone

14    conferences; meeting with Marc Elias, the Clinton Campaign's

15    top lawyer.  That's Government Exhibit 553.22.

16         What else is the defendant doing?  Well, he's

17    emailing Eric Lichtblau.  He's promoting the Alfa-Bank

18    allegations to the *New York Times*.  You see the reference to

19    "Alfa's orbit."  He's making reference to Alfa-Bank.  And he

20    again bills his time to the Clinton Campaign, five hours,

21    "Work regarding confidential project."

22         What is the confidential project?  Ladies and

23    gentlemen, you can use your common sense.  It's the Alfa-

24    Bank project.

25         Two days later I submit that, based on the

1    testimony that you've heard, that September 17th was a

2    Saturday.  You learned that Mr. Baker had received a text

3    message on a Sunday night, September 18th.  And you see

4    here, in Government Exhibits 1400 and 1703, that the

5    defendant had a 20-minute phone call with David Dagon.  Now,

6    ladies and gentlemen, you heard testimony about Mr. Dagon,

7    how he was a cyber expert and one of the authors of the

8    white paper.

9         So let's see how the defendant billed his time

10   that day:  4.8 hours, "Multiple telephone conferences and

11   other communications with experts, media; communications

12   with Marc Elias."

13        And then we get to the defendant's false

14   statement, and it starts with September 18th.  And you've

15   seen this text message, which was sent by the defendant at

16   7:24 p.m.  "Jim - it's Michael Sussmann.  I have something

17   time-sensitive (and sensitive) I need to discuss.  Do you

18   have availability for a short meeting tomorrow?  I'm coming

19   on my own - not on behalf of a client or company - want to

20   help the Bureau.  Thanks."

21        Ladies and gentlemen, the defendant used 42 words

22   in that text message, and 20 words of them was a lie.

23        And how did the defendant bill his time for that?

24   Government Exhibit 553.23.  5.5 hours on a Sunday, "Further

25   communications and work regarding confidential project."

1    Who does he bill it to?  The Clinton Campaign.

2            Now, what is the truthful statement here in this

3    prior text message?  The truthful statement is, "I'm coming

4    on behalf of the Clinton Campaign, my client."  The truthful

5    statement is "I'm coming on behalf of Rodney Joffe, my

6    client.  The truth is "I promoted these allegations to *The*

7    *New York Times*."  But you don't see that in the defendant's

8    text message here.

9            And so we fast forward to September 19th, the next

10   day, the meeting with Jim Baker, a 30-minute meeting that

11   was held at FBI headquarters here in Washington, D.C.  And

12   that's a calendar entry, Government Exhibit 240.

13           And you learned from Jim Baker's testimony that

14   the defendant repeated his lie as a false statement to Jim

15   Baker on September 19th.  You saw that Jim Baker said that

16   Mr. Sussmann told him "I'm not here on behalf of any

17   particular client" in his meeting on September 19th.

18           And when asked how confident Mr. Baker was

19   regarding whether the defendant made that statement, "I'm

20   100 percent confident that he said that in the meeting."

21           And again, ladies and gentlemen, what would have

22   been the truthful statement in that meeting?  That the

23   defendant was there on behalf of the Clinton Campaign, that

24   the defendant was there on behalf of Rodney Joffe, and that

25   the defendant had provided these allegations to *The New York*

1     *Times.*

2            And how do we know that Jim Baker's testimony is

3     right and credible?  By Government Exhibit 243.  That's the

4     notes from Bill Priestap's notes on September 19th.  And

5     what does it say?  It said, "not doing this for any client."

6     He wrote the notes after speaking with Mr. Baker, what

7     Mr. Baker told him that Mr. Sussmann said to him during the

8     September 19th meeting, the false statement that

9     Mr. Sussmann told Jim Baker.

10            And how else do we know?  We see Trisha Anderson's

11     notes, Government Exhibit 242:

12            "Sussmann meeting w/Baker.

13            "No specific client."

14            And when did Ms. Anderson take those notes?

15     September 19, 2016.

16            Now, ladies and gentlemen, we now see how the

17     defendant bills his time.

18            And so you've heard the defense make arguments

19     regarding that the defendant was working for the Clinton

20     Campaign on the Alfa-Bank allegations, and he was working

21     with Rodney Joffe as well, and that up until September 19th

22     at 2:00 p.m. he was representing the Clinton Campaign and

23     Rodney Joffe.  But when he went into that meeting he stepped

24     out of those roles.  He was no longer representing the

25     Clinton Campaign or Rodney Joffe.  Instead, he was there as

1    a good citizen.

2            But look at how the defendant bills his time less

3    than 12 hours after he has the meeting with Mr. Baker.

4    Time:  Monday 9-19.  And who is the defendant sending it to?

5    Leigh Nichols.  This is Government Exhibit 402.  "Work on

6    written materials" -- the white paper -- "other work and

7    multiple teleconferences regarding confidential project."

8    How many hours?  4.5.

9            But you'll see that in the Perkins Coie billing

10   records for that day Mr. Sussmann has only 3.3 hours, "Work

11   and communications regarding confidential project."  553.24.

12   And how did that happen?

13           So you have the September 20th email and what the

14   defendant was thinking about who he was representing that

15   day, and now you have an email from 11/6/2016, Time:  Monday

16   September 19.  The defendant is sending this to his

17   assistant Leigh Nichols, "HFA.  Work and comms regarding

18   confidential project."  That's Government Exhibit 401.  The

19   defendant is covering his meeting with Mr. Baker, his

20   representation of the Clinton Campaign and Rodney Joffe when

21   he changed that time entry two months later.

22           So what else do we know about how the defendant

23   was representing the Clinton Campaign in that meeting with

24   Mr. Baker?  We see it in the reimbursements for the thumb

25   drives that I mentioned earlier which were purchased on

1    September 13th.  Government Exhibit 553.19.

2              Who is the defendant billing for those thumb

3    drives?  Hillary For America.  And what does it say?

4    "Purchase of new, single use flash drives for secure sharing

5    of files," September 13, 2016.  And what is the expense

6    report?  It goes to the Clinton Campaign, "Purchase of new,

7    single use flash drives for secure sharing of files."

8    That's Government Exhibit 380.

9              Who did the defendant think he was going on behalf

10   of when he was bringing these thumb drives to the FBI?  The

11   Clinton Campaign.  He brought those two thumb drives, PNY

12   16-gigabyte red and blue.  And you saw those.  That is

13   Government Exhibit 1.

14             And you can look back at Government Exhibit 380,

15   the Staples receipt, and you look at the highlights from

16   that receipt.  PNY 2 Pack 16 gigabytes.

17             Who did the defendant think he was representing in

18   that meeting on September 19th?  I submit that this shows

19   the defendant was representing the Clinton Campaign.

20             So how else do we know that the defendant's false

21   statement was a lie on September 19, 2016?  We see it also

22   in the defendant's meeting with the CIA.  And you heard

23   testimony from two FBI -- excuse me, two CIA former

24   employees.

25             First you had Mark Chadason.  And you may recall

1    that the defendant told Mr. Chadason that he wanted a

2    meeting on behalf of a client.

3             But what did the defendant do once he actually was

4    able to obtain that meeting and when he was in the room with

5    the CIA?  He lied again.  And you saw that from Government

6    Exhibit 817.  That's the memorandum that Kevin P. and Steve

7    M. wrote after meeting with Mr. Sussmann.  "The defendant

8    said that he was not representing a particular client and

9    that the information he was volunteering to us was not

10   privileged."  The same false statement that he said to the

11   FBI on September 19th.  The same false statement that brings

12   us here today.

13            So how else do we know that the defendant made a

14   false statement to Mr. Baker on September 19th?  We know

15   through the defendant's own words.  You may recall some

16   excerpts read to you that was from the defendant's testimony

17   in front of Congress on December 18, 2017, and that can be

18   found at Government Exhibit 56.  And he was asked

19   specifically about his attorney-client relationships when he

20   went to the FBI and CIA with the Alfa-Bank allegations.

21            And what did he do when he asked -- when he was

22   asked this?  He admitted what he couldn't deny, but denied

23   what he couldn't admit.  He said, "I think it's most

24   accurate to say it was done on behalf of my client."

25            And who was that client?  Well, he actually never

1    provided the name.  He referred to them as an anonymous

2    client.  But ladies and gentlemen, we all know who that

3    client is.  It's Rodney Joffe.

4         Now, Mr. Sussmann was also asked by Congress about

5    Fusion GPS.  And what does he say?  "Fusion GPS was not my

6    client."  But he concealed his relationship with Fusion GPS

7    regarding the Alfa-Bank allegations.  Not once does he

8    disclose that he worked with Fusion GPS, that one of the

9    white papers that went to the FBI was drafted by Fusion GPS,

10   nor does he tell Congress about his other client.  He makes

11   no mention that he was representing the Clinton Campaign for

12   the Alfa-Bank allegations, that he was billing time to the

13   Clinton Campaign day after day.

14        So now we turn back to September 21st, a few days

15   after his meeting with the FBI.  And what is Mr. Sussmann

16   doing?  He's calling Marc Elias, the Clinton Campaign's top

17   lawyer.  He's calling Eric Lichtblau, *The New York Times*

18   reporter.  And he's also calling Jim Baker.  And you

19   remember testimony regarding this, that Jim Baker wanted to

20   know who -- what reporter -- was working on the Alfa-Bank

21   allegations.

22        And, ladies and gentlemen, you may recall that the

23   defense has tried to argue that the defendant was concerned

24   with national security, that he wanted to give a heads up to

25   the FBI.  But in that meeting with Mr. Baker on September

```
1    19th, he never disclosed who he was working with from the
2    press.  He never disclosed all of his communications with
3    Mr. Lichtblau.  He only waited until a few days after he had
4    gotten the material into the FBI to disclose that The New
5    York Times was working on the story.
6         Who else is he talking to?  His client, Rodney
7    Joffe.  And we saw that following his meeting with the FBI
8    the defendant and Fusion GPS continued to push the Alfa-Bank
9    allegations to the press.  We see September 27th, Government
10   Exhibit 427.
11        And you may recall a reference to a subject "Key"
12   between the defendant and Rodney Joffe.  And what's the
13   defendant doing here?  He's providing that key regarding how
14   to read and review DNS data.  That's Government Exhibit 427.
15        And what else is he doing?  He's now back again
16   representing the Clinton Campaign and Rodney Joffe; no
17   longer a good citizen, but promoting the Alfa-Bank
18   allegations to the press.  That's September 27th, 3.9 hours,
19   working on a confidential project.
20        And what else is going on at this time?  Well, we
21   see emails and communications with Fusion GPS, the Clinton
22   Campaign's opposition research firm, promoting this to the
23   press.  And we see an email from Mark Hosenball on October
24   5th.  And what does that show?  A secret data channel
25   between Alfa-Bank and Russia and a supposed hidden Donald
```

1    Trump organization data server.  It has been suggested that

2    this information and scenario is under careful investigation

3    by the FBI.  The Clinton Campaign and Fusion GPS is using

4    the fact that the FBI is investigating this to promote it to

5    other reporters, to promote it to Mark Hosenball.  That's

6    Government Exhibit 283.

7         Two weeks later what do we see?  Fusion GPS again

8    promoting it to Mark Hosenball, a reporter.  "Meantime do

9    the f'ing Alfa-Bank secret comms story.  It is hugely

10   important."  Government Exhibit 652.

11        And we get to October 31, 2016.  Now, ladies and

12   gentlemen, you heard testimony about an October surprise,

13   whether it's mythological or not.  This is an article --

14   these are articles that come out less than two weeks before

15   a presidential election that were built-up opposition

16   research paid for by the Clinton Campaign, and we see that

17   it's being promoted by Fusion GPS.  That's Government

18   Exhibit 668.

19        And we learned a bit about the articles that were

20   published that day from Eric Lichtblau, who is talking with

21   Mr. Sussmann repeatedly, and also about Franklin Foer,

22   another article for *Slate* magazine.  And see we Mr. Sussmann

23   on that day, working for the Clinton Campaign, communicating

24   with Eric Lichtblau.  That's Government Exhibit 1703.

25        And he's also promoting it to other reporters, to

1    Nancy Cordes of CBS News.  And we see the promotion of these

2    articles by the Clinton Campaign themselves.  This is

3    Government Exhibit 52.

4           We saw the Tweet from Secretary Clinton and the

5    press release from Jake Sullivan regarding the Alfa-Bank

6    allegations, the work that the defendant and Rodney Joffe/

7    Fusion GPS had been doing since July 29th coming to fruition

8    and pushing an article -- and pushing it to the press, an

9    October surprise, October 31, 2016.

10          And how does the defendant bill his time?

11   "Communications regarding *Slate* story, *New York Times*

12   reporting, communications with CBS."

13          So let's now turn to the next element, that the

14   false statement was material to the FBI.

15          Now, before we get into the various ways that it

16   was material to the FBI, I want to remind you again of Judge

17   Cooper's instructions.  The defendant's false statement is

18   material if it was capable of influencing the FBI and its

19   decisions and functions.  That's it.

20          You do not have to spend time thinking about how

21   it did impact the FBI, just how it could have influenced the

22   FBI.  The government does not have to prove that the FBI

23   actually relied on the defendant's false statement.

24          So we start with the FBI's investigation, and we

25   see the white papers that the defendant and Fusion GPS

1   drafted, which he provided to the FBI.  That's Government

2   Exhibits 217 and 207.

3          And you recall the findings in the white paper

4   that Mr. Sussmann worked on and billed to the Clinton

5   Campaign, and that final paragraph, "The only plausible

6   explanation for this server configuration is that it shows

7   the Trump Organization and Alfa-Bank to be using multiple

8   sophisticated layers of protection in order to obfuscate

9   their considerable recent email traffic."

10          And you also see the Alfa Group Overview, and you

11   heard references about the research being done by Jared

12   Novick regarding Richard Burt and how that entered into the

13   Alfa Group Overview white paper.

14          And you heard about the FBI's ultimate conclusion

15   from Scott Hellman:

16          "And what did your analysis, generally speaking,

17   find?

18          "We did not agree with the conclusions in the

19   paper.  We did not agree that this data represented the

20   findings of a secret channel of communications."

21          You also saw testimony from Allison Sands that

22   there is no evidence of U.S. companies -- from all the

23   things they had done, from talking to U.S. companies,

24   Listrak and CenDyn, talking to Mandiant, that there was no

25   evidence that this covert communication channel existed.

1            And you also heard from Agent Heide, "We were not

2     able to substantiate any of the allegations in the white

3     paper," the opposition research that the Clinton Campaign

4     paid for that the defendant brought to the FBI.

5            And so how is this material to the FBI?  So we

6     know that the defendant's false -- so how do we know that

7     the defendant's false statements were material?  Well, you

8     saw the defendant's text the night before meeting with Jim

9     Baker, and it's the same lie that he told to Mr. Baker the

10    next day.

11           And how do you know that it mattered?  Because Jim

12    Baker said that he might not even have taken the meeting if

13    he had known that the defendant was representing the Clinton

14    Campaign when he brought the allegation to him.

15           And how else did it matter?  It mattered because

16    the defendant hid his client's political affiliations, his

17    business interests, and the fact that one of them was a

18    confidential human source.

19           And so we look at Mr. Baker's testimony, and,

20    ladies and gentlemen, I submit that Mr. Baker's testimony

21    alone proves the materiality element here.  Mr. Baker made

22    multiple references to all the different things he would

23    have done if he would have known that Mr. Sussmann was

24    representing the Clinton Campaign and Rodney Joffe in that

25    meeting on September 19th.

1          He would have paused the investigation.  He would

2     have consulted with the front office about whether to even

3     go forward with an investigation.  He would have had others

4     participate in that meeting.  He would have had

5     consideration for this being literally a month and a half

6     before a presidential election.

7          So let's talk about the ways and how it was

8     material regarding the defendant's political affiliation and

9     his clients in this meeting.

10          If an opponent brought this information -- and we

11     heard this from Mr. Baker.  He talked about if an opponent

12     had brought this information, they would want to know more

13     about it.  They would question the credibility of the source

14     and whether the FBI was being used, was being played by

15     politics.

16          And you heard this also from the testimony of

17     Allison Sands, why bringing this information and learning

18     that it was politically affiliated would matter to the FBI,

19     that they would have wanted to know about the motivations of

20     the clients.

21          And you also heard this from Agent Heide, that the

22     timing would have been of great concern, that it was one and

23     a half months before an election.

24          And what about the defendant's client's business

25     interests?  The defendant's false statement was material

1    because it also hid the business interests of one of the

2    defendant's clients, Rodney Joffe, someone who profited off

3    the FBI and the intelligence community through lucrative

4    contracts worth tens of millions of dollars.  But in this

5    instance, Mr. Joffe was unwilling to show his face.

6            So how could the defendant's concealment of Rodney

7    Joffe have been material to the FBI?  Well, you heard that

8    it would raise alarm bells if a guy who had lucrative

9    contracts with the FBI was unwilling to give this to the FBI

10   under his own name and under his own relationship.

11           And you saw that through the testimony of Scott

12   Hellman.  You also saw it through the testimony of Agent

13   Heide, how one would want to know whether the person had a

14   financial benefit of bringing the information to the FBI.

15           And next, the knowledge that a confidential human

16   source, or a CHS, how would that matter to the FBI?

17           You heard a little bit about circular reporting,

18   how you could bring information and stream it into the FBI

19   through two means, and that it would be an attempt to do so.

20   And you heard testimony from Tom Grasso, the one who

21   received information from Mr. Joffe, and how Mr. Grasso

22   never knew that Mr. Joffe had provided it otherwise.

23           And you heard why that would matter.  You saw it

24   through the testimony of Allison Sands, how they would want

25   to speak to the handler, how they'd want to know about the

1    motivation and credibility of the CHS.  And Agent Heide

2    reiterated that as well.

3            And why was that?  Because the CHS was known for

4    providing cyber security information.  But this was not

5    national security information.  This was opposition

6    research.  And Mr. Joffe needed to conceal his connections

7    to this.

8            So, ladies and gentlemen, I want to now walk you

9    back through the elements.  And we've addressed many of

10   these:  the statement; that it was false; that it was

11   material; and that the matter was within the federal

12   jurisdiction of the United States government.  And so I want

13   to finish with knowing and willful conduct.

14           Now, I expect that the defense will stand up here

15   today and they're going to try and convince you that this

16   was a misunderstanding, that Michael Sussmann was acting in

17   good faith when he brought the allegations to the FBI.  And

18   when they make that argument to you, I want you to use your

19   common sense.  I want you to remember that text message that

20   he sent to Mr. Baker on September 18th.  You see that at the

21   bottom left.  He says "not on behalf of a client."

22           And you remember Mr. Baker's testimony that he was

23   100 percent certain that the defendant stated the same thing

24   in his meeting on September 19th.  And you remember seeing

25   this through Mr. Priestap's notes, which said "not doing

1   this for any client."  And you remember the defendant's own

2   testimony in front of Congress, his admission to the lie.

3          When you look at all of the evidence, is the

4   defendant's statement that he was not acting on behalf of a

5   client the truth?  No.

6          A person acting in good faith, a person who knows

7   the law, would not say and do the things that Mr. Sussmann

8   did on September 19th.  The fact that Mr. Sussmann said that

9   he was not there on behalf of a client shows you exactly

10  what was in his head all along.

11         Ladies and gentlemen, when you take a look at all

12  the evidence, the defendant's own words, and the defendant's

13  own actions, it is overwhelming.  The evidence has proven

14  beyond a reasonable doubt that Michael Sussmann made a false

15  statement to the FBI on September 19, 2016.  You should

16  return the only verdict supported by the evidence in this

17  case:  Guilty.

18         Thank you.

19         THE COURT:  Thank you, Mr. Algor.

20         Ladies and gentlemen, we're going to take a brief

21  ten-minute break and allow the defense to get ready to

22  deliver its summation.

23         So no discussions about the case.  No research

24  about the case.

25         (Jury exits courtroom)

1          (Recess taken)

2          THE COURT:  All right.  Please be seated.

3          Mr. Berkowitz.

4          MR. BERKOWITZ:  In 1983, the famous magician David

5    Copperfield made the Statue of Liberty disappear.  He was in

6    the Bay of New York Harbor in a live studio audience facing

7    the Statue of Liberty.  He had 100 people on the stage, and

8    he started talking.  The Statue of Liberty was there.  He

9    was looking at it.  It was surrounded by lights and

10   helicopters, and on the platform he was on, there was

11   scaffolding.

12         And then the curtains dropped -- and he talked

13   about -- at them for about 10 or 15 minutes, and he talked

14   about the Statue of Liberty and what it meant.  And he

15   talked, and there was loud music, and there were lights, and

16   there was smoke.

17         And then he dropped the curtains, and the Statue

18   of Liberty was gone.  The lights were there, the helicopters

19   were there, but Lady Liberty had disappeared.

20         How did he do it?  Something called misdirection.

21   While he was talking at them, while he was talking about the

22   Statue of Liberty, while the loud music was going on, while

23   the lights were going, slowly, ever so slowly, the platform

24   in New York Harbor turned.  And by the time he was done, the

25   curtains dropped, and he was faced -- they were facing New

1  Jersey.

2          Why do I tell you that story?  Because this is a

3  case about misdirection.

4          What you just heard from the Special Counsel,

5  their magic trick, was they had made a short meeting on

6  September 19, 2016, 15 to 30 minutes at most, what did they

7  make it turn into?  The giant political conspiracy theory.

8  That's what you just heard.  All right?

9          This case is not about a giant political

10  conspiracy theory.  It's about a short meeting.  But because

11  they don't have evidence to prove this to you, they want to

12  misdirect you and focus on this.

13          Let me talk to you about the evidence, because

14  these are serious charges.  Mr. Sussmann's liberty is at

15  stake.  And the time for political conspiracy theories is

16  over.  The time to talk about the evidence is now.

17          The witnesses.  So the people who were part of

18  this large political conspiracy theory are the people at

19  HFA, Rodney Joffe, and Fusion GPS.  They're the people that

20  are supposedly involved in this conspiracy.  And you heard

21  from all of those people on the witness stand.  All right?

22          The government witnesses we'll talk about later,

23  but Mr. Algor, in his opening remarks, quoted the testimony

24  minimally.  Laura Seago was in one meeting with Michael

25  Sussmann where they talked about Alfa-Bank.  They did.

1          I'm not going to come up here and say that

2    Mr. Sussmann was not working on a story related to Alfa-Bank

3    and working with *The New York Times* on that.  Of course he

4    was.  Opposition research is not illegal.  If it were, the

5    jails of Washington, D.C., would be teeming over.  All

6    right?  Nobody got up there and said there was anything

7    wrong with it.

8          Let's talk about what the people actually said

9    from that witness stand, not what Mr. Algor said.

10          And as Mr. Algor said, the judge is going to give

11    you instructions.  He's given them to you.  And he will say

12    that what I'm saying is not evidence, what Mr. Algor is

13    saying is not evidence, and what Mr. DeFilippis says, when

14    he gets up here after me, is not evidence.

15          First of all, we saw two witnesses associated with

16    Rodney Joffe.

17          Steve DeJong.  You may or may not remember him.

18    He was an early witness.  He pulled data and had no idea

19    where it was going.

20          Jared Novick.  Remember him?  He doesn't even know

21    what "DNS" stands for.  He supervised three people

22    collecting data.  He formatted a spreadsheet, and he sent it

23    to Mr. Joffe.

24          Laura Seago.  When you hear Mr. DeFilippis talk

25    about Fusion, think about Laura Seago because that is the

1     only witness you heard from Fusion.  The only witness.  And

2     it is their burden to bring people in, and they brought in

3     Laura Seago.  She said her role was to do open source

4     research.  She had one meeting with Mr. Sussmann, and she

5     had one meeting with the reporter.  And the information she

6     provided was accurate.

7              HFA?  All of these people again.

8              I want to focus you on the short meeting that took

9     place.  None of them -- they all came up here.  They're the

10    supposed client.  They didn't authorize him.  They didn't

11    direct him.  And Mr. Mook said it would be malpractice --

12    the head of the campaign -- not to do opposition research.

13             So what are the facts?

14             Michael Sussmann is a serious national security

15    lawyer.  Everybody that knew him that got on that stand said

16    it.  And he received what he believed to be credible data

17    from a world-leading DNS expert.  They together provided

18    that data to a Pulitzer-Prize-winning journalist at the *New

19    York Times*.  *The New York Times* vetted and decided to run

20    the story.

21             Mr. Sussmann went to the FBI to give them a heads

22    up.  He did not ask for anything on behalf of anybody.

23             The FBI called him back and said:  Hey, let us

24    know the name of the reporter because we want to hold the

25    story.

 1          And the *New York Times* held the story so that the

 2     FBI could do what -- we'll discuss what they did, an

 3     investigation, so to speak.

 4          There was no leak of the FBI investigation, and

 5     the only story that ultimately came out that mentioned the

 6     FBI investigation was *The New York Times* story that said

 7     that the allegations, according to the investigation, were

 8     unsubstantiated.  And we'll get to all that.

 9          Those are the facts.  That's what you heard from

10     the witness stand.

11          And what are the key questions?  Mr. Bosworth told

12     you what they were, and we're going to run through them with

13     the evidence this time.

14          The first one:  What did Mr. Sussmann actually say

15     to Jim Baker on September 19th?

16          Mr. Algor said there's not going to be any dispute

17     about this.  Wrong.  There's a big dispute.

18          There is no doubt that Mr. Sussmann sent this

19     text.  "I'm coming on my own - not on behalf of a client or

20     company - want to help the Bureau."  It's a true statement,

21     by the way, and we'll get to that.  He sent that.  We own

22     that.

23          But you know what?  That's not what's charged in

24     this case.

25          What's charged in this case is what was said on

1    September 19th in that meeting with Mr. Baker where there

2    are no notes, where there are no -- nobody other than

3    Mr. Baker's word.  And we'll talk about that.  All right?

4            It is highly unlikely that Mr. Sussmann would have

5    repeated that statement on September 19th.  He had told him

6    on September 18th he wasn't coming on behalf of a client.

7    There was a short meeting where information was exchanged.

8    You'll see some of the other things that were talked about.

9    But there is -- the only evidence you have of a specific

10   memory of specific words used on September 19th are from

11   Mr. Baker.

12           So he got on that stand.  Any notes?  No.  Pretty

13   confident?  100 percent that I didn't take notes.  Another

14   thing he's 100 percent confident of.  No agent.

15           Did you bring anybody in the room with you for

16   this 15- to 20- or 30-minute meeting?  Didn't do that.  No

17   other witnesses.

18           FBI policy -- and it makes sense -- is when you

19   talk to somebody about something that might be important,

20   you do a report.  Special Agent Hellman:  The FBI pretty

21   much take notes during any interview.

22           The purpose of a 302 -- that's the FBI Report of

23   Interview -- is to document pretty much any observation an

24   FBI agent might take.  If that's an interview, you interview

25   somebody, you're going to take notes, and you're going to

1    document anything that was talked about during the

2    interview.

3            It makes a lot of sense.  And if Mr. Baker took

4    notes, maybe we wouldn't be here today.  Right?  He said he

5    didn't want to be a witness.  The last thing he wanted to do

6    was get any information from Mr. Sussmann.  He wanted to

7    move him out as quickly as possible, take the information,

8    and pass it along.

9            Let's talk about Mr. Baker's memory, because

10   that's the only thing you have as to what was said on

11   September 19th.  We tallied up these I don't remembers.  You

12   can write it down.  It's 116.

13           And you remember him on the stand.  He remembered

14   certain things when Mr. DeFilippis was questioning him, and

15   he didn't remember a lot when I was questioning him.  His

16   recollection was, of course, refreshed.

17           Now, keep in mind that the notes that they used to

18   refresh his recollection did not say "doing this for any

19   client" and "no specific client, but group of cyber

20   experts."  That's what he did -- that's what their notes

21   reflect Mr. Baker told them on September 19th.

22           Isn't it possible -- perhaps likely -- that what

23   happened is that he knew from the text he'd received

24   literally less than 24 hours before that the -- that he

25   wasn't coming on behalf of a specific client, and that's

1    what he was relaying?  The rest of the information is what

2    he learned in the meeting.

3              Think about it.  Why would Mr. Sussmann repeat it

4    when he's coming with information?

5              Do you have a reasonable doubt about whether

6    Mr. Baker's recollection that it was repeated in the meeting

7    actually happened?

8              Well, let's talk about how it is that Mr. Baker's

9    memory about this meeting came about.  Either 15 minutes, 20

10   minutes, or up to 30 minutes.  Okay?  On September 19th.

11             In October of 2018 he says, "I don't remember him

12   specifically saying he was acting on behalf of a particular

13   client."

14             Fair enough.  It's about a year later, or two

15   years later.  You would expect him not to have a great

16   memory.

17             And then in 2019, "Wait a second.  He related some

18   strange interactions with some number of people that were

19   his clients."

20             So Mr. Baker in 2019 suddenly remembers that

21   Mr. Sussmann mentioned clients.  Okay?

22             And on the stand Mr. DeFilippis said, "Well, was

23   that a slip-up?"

24             And Mr. Baker at least owned it and said, "No,

25   that was wrong.  It wasn't a lie because I didn't intend it

1    to be wrong, but that was wrong."

2            And then in June of 2020, almost three years after

3    that meeting, Mr. DeFilippis and Mr. Durham talk with

4    Mr. Baker, and he says:  Mr. Sussmann did not specify that

5    he was representing a client regarding the matter, nor did

6    he get asked in that meeting.  That's what he said

7    originally in the June 11th interview.

8            And then they show him the notes.  Fair enough.

9            And remember when I said, "Did the notes

10   immediately refresh your recollection?"

11           He said it took a little bit of time.  "I think it

12   took a little bit of time for me to process what I was

13   reading and to reflect on what I remembered."  Okay?

14           So he's looking at those notes trying to

15   understand what happened.  And he sees that that's said.

16   And then he says:  Well, it must have been said.  But he

17   places it in the meeting as opposed to the text, because he

18   didn't have the text.  Remember?  He didn't recover that

19   until March of this year.

20           And so isn't it probable, at least likely, that

21   the information about "no specific client" came on September

22   18th, which is not charged, and not September 19th?

23           And what does he say about it?  What does he say

24   from that witness stand?  "I'm 100 percent confident that he

25   said that in the meeting."

1        Are you 100 percent confident of what you said to

2   somebody yesterday?  Are you 100 percent confident of what

3   you may have learned three months ago?  And something that's

4   even important to you, an important interaction, are you

5   sure that it happened on that day as opposed to another day?

6   All right?

7        That is reasonable doubt.  And the case is over if

8   you don't believe beyond a reasonable doubt Mr. Baker's

9   memory, 100 percent confident that he said it in that

10  meeting.

11       Let's think about what else Mr. Baker, with the

12  benefit of his notes being refreshed, has changed on.

13  Right?  How long was the meeting?  30 minutes on the stand.

14       What he told these guys earlier is 15 to 20

15  minutes.  He says:  I don't remember that.

16       What about how he spoke with Mr. Priestap?

17  Remember he said:  I'm pretty sure it was a phone call from

18  up there.  That was my terrible handwriting.  You remember

19  that?

20       And earlier:  Do you remember telling

21  Messrs. DeFilippis and Durham that it was not likely a phone

22  conversation?  I don't remember saying that.

23       And where did -- what did you know at the meeting

24  about whether Mr. Sussmann had given the information that

25  you got to reporters?  He says up here that it was his

1    impression -- that it was not his impression that Michael

2    had given it, but that the cyber experts had.

3             And then back in March of this year I asked him if

4    he remembered telling the agents that *The New York Times* had

5    gotten the information from Mr. Sussmann.  "I don't recall

6    this particular conversation."  Back in March, okay?

7             And by the way, I don't blame him.  It's hard to

8    remember what happened two months ago, let alone five years

9    ago.

10            Instruction No. 16, you get to assess the

11   credibility of the witnesses.  Whatever I say about

12   Mr. Baker's memory, whatever they say about his memory, it's

13   up to you.  You guys get to decide.

14            But there are certain guideposts that the judge

15   gives you:  the demeanor and behavior on the witness stand;

16   his manner of testifying; whether he impressed you as a

17   truthful person; and whether he impresses you as having an

18   accurate memory and recollection.  You can consider the

19   circumstances, including the time that elapsed between the

20   event and later recollections of the event.

21            I submit to you that the government has not proved

22   beyond a reasonable doubt that on September 19th

23   Mr. Sussmann repeated the words from his text.

24            And you know what?  If you go back to the jury

25   room, and if they didn't prove that beyond a reasonable

1    doubt, you don't even need to get to the other questions.

2    You can go home.

3              Is what he said false?  That is the second issue.

4              So remember the issue -- let's assume that the

5    statement was made:  I did not go on behalf of a particular

6    client.  Okay?  That is a true statement.  There were two

7    clients that he had talked about.  The two clients are

8    Hillary For America and Rodney Joffe.  Let's take them in

9    turn.

10             Number one.  When you go somewhere on behalf of a

11   client, you're advocating for the client.  You're asking for

12   something.  You want feedback.  You're advocating.  You're

13   asking.  Mr. Sussmann didn't ask Jim Baker for anything.

14   Undisputed.

15             His HSPCI testimony before Congress:  "I told him

16   the information" -- this is Mr. Sussmann -- "didn't want any

17   follow-up.  I wasn't looking for the FBI to do anything.  I

18   had no ask.  And I remember saying I'm not -- you don't need

19   to follow up with me.  I feel like I have left this in the

20   right hands, and he said yes."  That's what Mr. Sussmann

21   testified to before Congress.

22             Jim Baker, question by Mr. DeFilippis:  "Now,

23   during this meeting did Mr. Sussmann make any particular ask

24   of you?"

25             "No.  He didn't ask me to do anything.  He said,

1    you know -- well, he said take whatever action you think is

2    appropriate."  That's what Mr. Baker said on the stand.

3              And the February CIA memorandum, which is

4    Government Exhibit 814 -- my team wants me to write these

5    down.  I want you to take a look at it.  814.  You're going

6    to have a bunch of exhibits back there.  Government Exhibit

7    814.  That's the CIA memo.

8              And if you look at that CIA memo from February of

9    2017, keep in mind -- keep in mind they actually took notes

10   of what Mr. Sussmann said.  And he said he wasn't

11   representing a particular client; he didn't need anything

12   back; and he was just leaving it in their hands.  He merely

13   wanted to pass along information that he thought would be of

14   interest to the U.S. government and let the CIA and FBI

15   invalidate or validate the information and take whatever

16   actions they deemed appropriate.

17             Pretty consistent, all right?  Did not ask for

18   anything.  He wasn't there on behalf of any clients.

19             That doesn't mean he didn't have clients.  HFA was

20   a client, and Rodney Joffe were clients.  But there's a

21   difference between having a client and going somewhere on

22   their behalf.

23             Let's now talk about the evidence that the Special

24   Counsel points to relative to whether HFA was his client at

25   that meeting.  What's the first thing that you do?  How

1    about ask the client:  Was he there on your behalf?

2              Mr. Elias:  Did he seek your permission?

3              No.

4              Did you authorize him to go?

5              No.

6              Did you tell him to go?

7              No.

8              General counsel of HFA on that stand.

9              Mr. Mook, who we called:  Did you direct

10   Mr. Sussmann to go to the FBI?

11             Absolutely not.

12             Did you authorize him?

13             No.

14             Did anyone?

15             No.

16             The only other HFA witness, Ms. Fine, same thing:

17   Nobody from the client asked him to go or authorized him to

18   go.

19             And it's even more significant than that.  It

20   wasn't in their interests for him to go.

21             In September of 2016 would the campaign have

22   wanted to engage with the FBI?

23             Mook:  Speaking for myself, no.

24             Remember, he said they were investigating Hillary

25   with the email issues.  There were a whole host of things.

1    They didn't trust them.  They even refused to go to a

2    briefing with the FBI, they disliked them so much.  You

3    heard that from Mr. Mook, who I would submit to you had

4    nothing to gain from doing anything other than being honest.

5           Mr. Elias:  Would it be a good or bad thing for

6    the campaign to go to the FBI?

7           I don't believe I would have thought that was a

8    good thing.  If *The New York Times* was going to run this

9    story -- like that's the goal, right? -- *New York Times* runs

10   a story to get the FBI involved, any number of things can

11   prevent that from happening.

12          And he was right.  Okay?  Mr. Sussmann did work

13   with Mr. Joffe, and they provided the information to the *New*

14   *York Times*.  That's absolutely true.  Right?  That's

15   different than whether they went to -- and that story would

16   have benefited the campaign, and therefore time was billed

17   to the campaign in connection with that work.  All right?

18   That's different than the charge in this case.

19          They point to his billing records.  Okay?  Let's

20   take a look at those.

21          Mr. Algor put up something for 4.5 hours and 3.3

22   hours.  They seem to think this is compelling evidence.  All

23   right?  He said:  Use your common sense; it's obviously the

24   Alfa-Bank project.

25          Where is that evidence?  There is certainly some

1    Alfa-Bank work that's done.  But Mr. Sussmann, you heard

2    from different witnesses, was doing other things.

3            What's missing here is a meeting, number one.

4    Look at these records, 401.  A meeting is missing, and FBI

5    is missing.

6            Don't you think if he went to the FBI on their

7    behalf he would say FBI meeting?  Meeting with Jim Baker?

8    Right?  Nothing.  No proof.  Smoke.  Mirrors.  Noise.

9            And do you know what?  Mr. Sussmann, when he

10   wanted to, he knew how to bill the campaign for meetings.

11   This is Government Exhibit 559.  Okay.  You'll have it back

12   there.

13           These are just a few examples.  There are

14   voluminous exhibits, all right?  This is HFA and DNC.  Okay?

15   That's what these bills are.  Meeting, meeting, meeting,

16   meeting, meeting.  No meeting on September 19th.

17           But do you know what?  He doesn't just know how to

18   bill meetings.  He knows how to bill with FBI engagement,

19   and he knows how to write those letters in this time.

20           August 5th, FBI; August 6th, FBI; 8th, 24th, 27th.

21   Government exhibit billing records.  All right?  All of

22   those are engagements.

23           And it is not a surprise because Mr. Sussmann was

24   representing these entities in connection with the

25   tremendous hack that you heard all about.  Right?  You heard

1   Marc Elias from the stand saying:  The Russians hacked our

2   servers, and they were releasing it -- remember he said they

3   were releasing it on the eve of the convention,

4   systematically doing it.  And then he says Donald Trump gets

5   up and talks about, you know, go find her other emails.  He

6   is representing them before the FBI on these issues, and he

7   bills for it.

8           And not just that.  He knows how to bill for

9   meetings, for FBI, and for FBI meetings.

10          This is a meeting from April of 2015.  Okay?  Over

11  a year beforehand.  And it's with Mr. Joffe, meeting with

12  FBI.  In June of '16, meeting at FBI.  August of '16,

13  meeting at FBI.  October of '16, meeting with FBI.

14          Don't you think that that's the sort of evidence

15  that you'd want if someone was on trial for their liberty,

16  and they have to prove something beyond a reasonable doubt?

17  The billing records are their best evidence?  No FBI

18  meeting.

19          The flash drives?  Smoke.  Mirrors.  Noise.  They

20  come here with a Staples receipt and a Google map and say:

21  You guys are all set.  Okay?

22          What don't they tell you?  Those were purchased on

23  September 13th of 2016.  He was doing a tremendous amount of

24  work for the campaign.  Flash drives purchased on September

25  13th.  September 13th.

1          When did he have the meeting?  September 19th.

2          When did he send the text asking for the meeting?

3     September 18th.

4          What else happened on September 18th?  Do you

5     remember that's the Trump freak-out email?  Remember there

6     was that story that's about to come out, and Trump is

7     freaking out?  And that happens at 508.

8          The Sidney Blumenthal thing.  "'The Trump campaign

9     is having a major freak-out,' according to a Republican

10    source.  What is causing it?  Anticipation of an

11    investigative story to be published by *The New York Times*.

12    The subject is described as Russia and a disaster."  It's

13    after receiving that email that Mr. Sussmann reaches out to

14    the FBI, five days after the flash drives.

15         But you know what?  You don't need to even

16    understand that to know that he didn't bill expenses to HFA

17    for this meeting.

18         All right.  So this is the date.  7:24 is when he

19    sends the text setting up the meeting.  Flash drive

20    purchased five days before.

21         Now, who does he bill the transportation to and

22    from the meeting to?  Does he bill HFA for that, the cab

23    back and forth?  No.  FBI meeting, 9/19 in his records.

24    Attend meeting at FBI, 9/19.  Firm charge.  You heard from

25    the stand that it was a charge to the firm -- you heard that

1    from Ms. Arsenault -- not to HFA.

2              Same thing on the taxi, office/back.  And this is

3    another exhibit that I'm supposed to write down.  403,

4    Government Exhibit.

5              All right.  And do you know what?  Mr. Sussmann

6    knew how to bill his clients for transportation.  Just take

7    a look.  DNC, data breach.  Cab, from office and client,

8    attend client meeting.  Okay?  When he went on behalf of a

9    client, he billed the client for those expenses.

10             Now let's talk about Rodney Joffe.  Again, this is

11   to show he was not at the meeting on behalf of clients.

12             Again, looking at his Congressional testimony,

13   which we already saw.  Mr. Sussmann testified in October

14   that he wasn't looking for the FBI to do anything, and he

15   had no ask.

16             Baker, same thing.  You saw the slide before.  No

17   ask on behalf of anybody.

18             CIA memorandum, you saw that.  No ask of them.

19   All consistent.

20             Okay.  So Mr. Joffe was Mr. Sussmann's client, a

21   client of Perkins Coie.  This is a February engagement

22   letter in 2015.  And what it says is, "Unless otherwise

23   agreed, the terms of this letter apply to any additional

24   matters that we undertake at your request."

25             So he was a client, and he provided data to

1     Mr. Sussmann.  All of that is true.

2          But you know what?  There are no billing records

3     for Mr. Joffe for attending a September 19th meeting or

4     anything else in August, September, or October of 2016.  Let

5     me repeat:  There are no records of any bills to Mr. Joffe

6     for a meeting on September 19th of 2016.  There are no

7     records of any expenses charged to Mr. Joffe.

8          And their theory seems to be that he was there

9     because Mr. Joffe was going to get some sort of business

10    benefit.  Remember that questioning in what Mr. Algor said?

11    It doesn't make any sense.  He received tens of millions of

12    dollars in contracts that he had with the government for not

13    for this type of stuff.  It was for DNS data that he

14    separately provided.

15         What business benefit would Mr. Joffe get from

16    Mr. Sussmann going to the FBI?  What economic interest would

17    he get?  Zero evidence of that.

18         What's the evidence of Mr. Joffe's motivations?

19    Well, we called to the stand Special Agent Grasso.  Remember

20    that?  He had spoken with the government numerous times, but

21    we called him, and we said:  What was his interest?

22         Retired Special Agent, 30 years, FBI.  He was in

23    it for the good and a good samaritan.

24         You heard testimony that he was terrified for his

25    security about being associated with this information

1    because he was concerned about what the Russians could do.

2    And you heard from the special agents that that is a real

3    threat.  Right?  If you try and establish something, he was

4    paranoid.  He was concerned.

5              Business interests?  No.

6              Now, their best evidence -- and they will show

7    you -- is Mr. Sussmann's Congressional testimony.  All

8    right?  And I want to hit this head on and directly.  We're

9    going to talk some more about this.  In Congress, over a

10   year after the meeting.

11             And they put this up.  Remember?  They went up and

12   read it.  And it's midway through a lengthy Congressional

13   testimony where they talked about the DNC hack and

14   otherwise.

15             And Mr. Sussmann says, "It's not not correct" --

16   and this is in response to questioning about whether he was

17   directed by his client to go.  He said, "But when you say my

18   client directed me, we had a conversation, as lawyers do

19   with their clients, about clients' needs and objectives and

20   the best course to take for a client.  And so it may have

21   been a decision we came to together.  I mean, I don't want

22   to imply that I was directed to do something against my

23   better judgment or that we were in any sort of conflict, but

24   this was -- I think the most accurate to say it was done on

25   behalf of my client."  Okay?

1              Now, Mr. Joffe was a client.  Mr. Joffe had

2     provided him this information.  They had gone to the *New*

3     *York Times* together.  Mr. Sussmann passed along the

4     information to the FBI.  All right?  He even spoke with

5     Mr. Joffe about that.

6              Was he there advocating on behalf of, or are those

7     words inaccurate, imprecise, and the result of, you know, it

8     being over a year and some afterwards?

9              You heard plenty of witnesses from that stand.  Do

10    you think he intentionally lied about this?  Or do you think

11    it's the product of confusion?

12             Let's see what else he said that day.

13             At the end of Wednesday I got up and, under what's

14    called the Rule of Completeness, read another portion of his

15    testimony.  And I suggest to you that it's really important

16    to read the testimony as a whole to see if you think that

17    he's being deceitful or it's somehow proof of this element.

18             Context matters.  It's Pages 57 and 58 of the

19    government exhibit on the Congressional testimony.

20             "But to be clear, I told Mr. Baker, I didn't want

21    any follow-on.  I mean, I was sharing information, and I

22    remember telling him at the outset I was meeting with him

23    specifically because any information involving a political

24    candidate, particularly information of this sort involving

25    potential relationship or activity with a foreign government

1    was highly volatile and controversial.

2             "And so I was coming to him mostly because I

3    wanted to be able to decide whether or not to act or not to

4    act, or to share or not to share, with information I was

5    bringing him to insulate or protect the Bureau.  I don't

6    know.  I just thought he would know best.

7             "I told him this information, but didn't want any

8    follow-up, didn't -- in other words, I wasn't looking for

9    the FBI to do anything.  I had no ask.  I had no requests.

10   And I remember him saying, I'm not -- you don't need to

11   follow up with me.  I just feel like I have left this in the

12   right hands, and he said, yes."

13            Context matters.  Does it look like he's there on

14   behalf of Mr. Joffe, or does it look like he was there to

15   help the Bureau?  Same testimony.  Same day.

16            Jim Baker's trial testimony:  "If there were a

17   matter of actual national security, and if there was a

18   newspaper article about to come out about the matter, the

19   FBI would wants a heads up?

20            "Yes, sir.

21            "Because if the FBI wanted to investigate, you

22   don't want the bad guys to know what you're looking at?

23            "Yes, sir.

24            "Because if they published some article the other

25   people could take that down, and it would be harder for the

1   FBI to do their job."

2          Now, Mr. Algor raised the point, well, why didn't

3   he go to the FBI initially, if that was his concern?

4          You heard he went to a Pulitzer-Prize-winning

5   journalist with information or data that showed something.

6   Nobody has suggested that it showed direct communication.

7   It showed links and look-ups and so forth, and he gave it to

8   the *New York Times* to vet.

9          And when *The New York Times* actually decided to

10  publish a story, after presumably doing research, that's

11  when he said:  I didn't want the FBI to be caught flat-

12  footed, so I gave them the information.

13         He gave them the same information that he gave to

14  *The New York Times*.  Right?  You heard.  He said:  This is

15  what has already been provided.

16         And what's important about that is they talk about

17  the white paper.  They talk about the various things as if

18  that was prepared for the FBI meeting.  No.  He said:  This

19  is what's been given to the press already.  It's not

20  material that was prepared for that meeting.

21         And you heard about the Fusion white paper, which

22  we'll get to.  That's a Wikipedia, essentially, document.

23  It's all open source communications, meaning it's -- the

24  Alfa-Bank paper itself is not anything that you couldn't

25  find online by Googling it.

1          All right.  Did he intend to say something false?

2     Question 3.

3          Who is Michael Sussmann?  All right.  You heard

4     from Jim Baker that "Mr. Sussmann is ethical, credible,

5     honest, a serious lawyer, a smart guy with DOJ experience,

6     with national security experience."

7          Trisha Anderson, who took the notes of Mr. Baker

8     meeting with her.  You remember her.  Well-respected

9     national security and cyber lawyer, had no reason to doubt

10    what he told her.

11         And you heard from some character witnesses,

12    integrity beyond reproach, Jimma Elliott-Stevens; and Martha

13    Stansell-Gamm, "had confidence in his truthfulness.  I would

14    bank on it."

15         You heard nothing other than Mr. Sussmann was a

16    respected national security lawyer who was serious and who

17    was their -- everybody's experience with him was ethical,

18    credible, honest.

19         What did he have to gain by giving this

20    information to the FBI on the eve of *The New York Times*

21    publishing a story?  He had a vibrant national security

22    practice.  He had top secret clearance.  All right?  I mean,

23    he had a badge that allowed him to go into the FBI.  Top

24    secret clearance.  He had relationships with tech companies

25    that needed to interface with law enforcement to go with

1        him.

2               What possibly happened on the evening of September

3        18th that caused this man, who has a reputation for

4        credibility and honesty, to decide to break the law and lie

5        to the FBI?  It doesn't make any sense.  Everything to lose;

6        nothing to gain.  The motive is this political conspiracy to

7        do opposition research?  Doesn't make any sense.

8               So let's talk about Mr. Sussmann's state of mind

9        with respect to this information.  You've heard a lot of

10       information from the FBI who did some sort of investigation,

11       which we'll talk about.  They never got back to

12       Mr. Sussmann.  They didn't say to him:  Right, this stuff is

13       nuts.  Nobody ever got back to him.

14               That's why he went to the CIA in February and

15       said:  I'm frustrated.  Nobody said anything.  I think that

16       this is concerning.  After the election, mind you.

17               So he had reason to believe Rodney Joffe.

18       Mr. Joffe was his client both personally as well as from a

19       business that paid him -- that paid the firm well over a

20       million dollars a year in 2016.

21               And what does Steve DeJong say?  Very well

22       respected.  He's an expert.

23               Grasso, right:  He is reliable, and I nominated

24       him for the FBI Director's Award.  Always found the

25       information he provided to me to be reliable and credible.

1    He was in it for the good and a good samaritan.

2            And the stipulation that I read on the last day of

3    trial, yesterday, his company's received payments by the

4    U.S. government of tens of millions of dollars.

5            Why would Mr. Sussmann have any reason to doubt

6    Mr. Joffe when Mr. Joffe said:  I've got DNS data that shows

7    X, and I'm concerned about Y.  Why would he have any reason

8    to doubt that?  It doesn't make any sense.

9            Mr. Sussmann, there's no evidence he's a DNS

10   expert.

11           And what do they do?  Well, if you had shoddy

12   evidence, are you going to go to a Pulitzer-Prize-winning

13   reporter with it?

14           And what did that Pulitzer Prize winner do?

15   Certainly Mr. Sussmann was talking with Mr. Lichtblau.  He

16   met with him, right?

17           And on the 22nd of September, after Mr. Sussmann

18   had gone to the FBI because there was that article that was

19   coming -- that came out on the 18th saying that there was an

20   imminent story, Baker writes and says:  "The reporter on the

21   matter we discussed is Eric Lichtblau.  He's shooting for

22   Sunday, but may not have all of the details wrapped up by

23   that time."

24           So Mr. Sussmann relays that information, and he

25   gives Lichtblau's name so that Baker and the FBI can call

1    Lichtblau and check on any of that.

2              Jim Baker trial testimony.  Right?  Source of the

3    information:  You believed Sussmann, a former prosecutor to

4    be an ethical person?

5              Yes.

6              You remember him -- you remember telling them,

7    meaning the government, that you also believed that he

8    wouldn't have brought the information to you if he didn't

9    think it was credible?

10             And you remember telling him the -- you remember

11   telling the government, I believe that is, you can look at

12   the testimony or not.  The researchers who found the

13   information believed it to be credible.

14             So Mr. Sussmann, when he relayed the information

15   says, you know:  I believe it is as to the people.

16             And you saw the names of the people on those

17   notes.  Right?  He gives it to him, and that's the sort of

18   thing that they talked about on the 19th.

19             Now, how else do you know that Mr. Sussmann

20   believed -- what other evidence is there of what was in his

21   mind at the time?  Okay.

22             And I'm going to write this down.  There's

23   actually two exhibits here:  285, that's that September 18th

24   email; and Government Exhibit 1500, which is the text.

25             So on October 19th of 2018 Mr. Sussmann forwards

1    Mr. Baker a text.  Okay?  We're now -- we're now two years

2    after the conduct.  September 19th -- right? -- 2016.  We're

3    now in October of '18 at a time when Mr. Baker happens to be

4    interviewing at Mr. Sussmann's law firm.  And he said, "I

5    believe I met with John Devaney, the head of your firm."  He

6    said that from the stand.

7          So what does Mr. Sussmann send him?  "Our Michael

8    Sussmann Is An Honorable Man."

9          Now, what do you know about that text?  Remember

10   the testimony from Mr. Baker that about a week before this

11   time *The Wall Street Journal* reporter had put something out

12   because Mr. Baker's testimony about meeting with

13   Mr. Sussmann had been leaked to somebody.  That was a real

14   leak.  And *The Wall Street Journal* and other publications

15   said:  Aha, this information was used improperly.  It must

16   have been given by Hillary Clinton because his law firm

17   represents Hillary Clinton.

18          And it went crazy.  You saw some of those

19   protests.  You saw other things.  Right?

20          Mr. Baker says:  Horrible time.

21          So Perkins Coie -- Mr. Sussmann's knowledge -- do

22   a response in *The Wall Street Journal*, a letter to the

23   editor.  "Our Michael Sussmann Is An Honorable Man."  And it

24   says, "The *Journal's* readers had a misleading impression

25   about Mr. Sussmann and our law firm."  It says, "He is not

1    the head of the Political Law Group."  Right?  That was Marc

2    Elias.

3           And what does it say in the last paragraph?  "In

4    addition, and as Perkins Coie has previously publicly

5    stated, Mr. Sussmann's meeting with the FBI General Counsel

6    James Baker was on behalf of a client with no connections to

7    either the Clinton campaign, the DNC, or any other Political

8    Law Group."

9           Now, what's important about that is not that it's

10   necessarily accurate, right?  But that was the state of mind

11   at the time from all of these people.

12          Who does he send it to?  This is critical.  Who

13   does he send this to?  He sends it to Jim Baker, the person

14   he supposedly lied to.  Right?  Was on behalf of a client.

15          If you had lied intentionally to Jim Baker, are

16   you going to say:  Hey, in case you missed it, I just

17   published in a national publication something showing you I

18   lied to you.

19          Isn't it much more likely that he didn't believe

20   there was anything inconsistent with this because Rodney

21   Joffe was his client, Rodney Joffe had provided the

22   information to him, and he went to the FBI with that

23   information?

24          This was in response to the suggestion that

25   somehow the Clinton Campaign had sent him to the FBI.  Okay?

1    This proves there was no intent because the last thing

2    somebody who is a serious person and intelligent does is

3    send information to the person you lied to that you lied to

4    them.  Doesn't make any sense at all.

5            So let's talk about what actually happened here

6    because this is really interesting.  Okay?  How does that

7    come about?  How is it that in October of '18, in

8    Mr. Sussmann's mind -- you know, he's on behalf of a client

9    and -- Mr. Joffe, and, look, we don't know.  I'm going to

10   tell you what I think the evidence supports.  All right?

11           And where does it start?  It starts in March of

12   '17.

13           I have a handy little timeline here which I'm sure

14   you guys are thrilled with.

15           But, right, the meeting happens in September, and

16   then in March of '17 there's that big briefing, five or six

17   months later.  Right?  An enormous briefing among the big

18   wigs.  And you heard two of our witnesses come in and talk

19   about it.

20           And what do they say?  What do those notes say in

21   March of '17?

22           Ms. Gauhar's notes, "Attorney brought to FBI on

23   behalf of his client."  They are briefing the Acting

24   Attorney General, all of the big wigs from the FBI and the

25   Department of Justice are there, and Andy McCabe, who is

1     number two at the FBI, is describing all of the different

2     Russia investigations.  And she says "Attorney brought to

3     FBI on behalf of a client."  That's from Ms. Gauhar, who you

4     heard from the stand just the other day.

5            And in March, same meeting, "did not say who

6     client was."  This is government -- Defense Exhibit 556 and

7     558.  556 and 558.

8            So how does that happen?  Right?  Priestap and

9     Anderson were at this meeting.  Jim Baker was at this

10    meeting.  Nobody stood up and goes:  You got it wrong.  No,

11    no, this is really super important.  He was not there on

12    behalf of a client.  Nobody says anything.  You heard that.

13           So what happened?  It's a great question, right?

14           Well, this meeting is in March.  The interactions

15    with Mr. Baker and Mr. Sussmann were over a four-day period,

16    September 18th with the text to the 22nd.  That's it.  Okay?

17    Those four days; a 15- to 30-minute meeting on the 19th, and

18    then a couple of phone calls afterwards.

19           And what's really significant about the phone

20    calls afterwards is they happened after Mr. Priestap and

21    Ms. Anderson's notes of the 19th.  Okay?  So you're with me

22    so far?

23           One thing to think about is to look at the CIA

24    notes because that's going to tell you what was going on in

25    Mr. Sussmann's mind at that time.  What does he say to the

1  CIA?

2           Well, he meets with Mr. Chadason.  You heard him

3  from the stand.  He had somewhat of an accent, but he was --

4  he reached -- he spoke with Mr. Sussmann who reached out

5  after the election to provide this information.  It

6  certainly wasn't helping HFA at that point.  And he says:

7  I've got a client who does not want to be known but who has

8  interesting information.

9           And then the paragraph below:  The client would

10  not provide the identity but he was able to elicit that the

11  client is an engineer with a number of patents and is most

12  likely a contractor in the intelligence community.

13           And it says:  Sussmann had client worked with IC

14  before.

15           And it says:  Sussmann said the clients were

16  Republican.  Okay?  He's describing Rodney Joffe there.

17           February 9th memorandum, when he meets with Kevin

18  P., who you heard from the stand, right?  Kevin P. got this

19  memo.  It was emailed to him about a client.

20           And what does he say on February 9th?  "I'm not

21  representing a particular client."  And then he goes on to

22  talk about a contact that he has.  Right?  Contact, client.

23  He certainly wasn't hiding the client from the CIA.  He told

24  Mr. Chadason that.

25           But that's how it happens.  "I have a client who

1     has information, but I'm not asking for anything for him."

2     Okay?  That is the most likely scenario as to what happened

3     and how you can have confusion.  Keep in mind Mr. Baker, at

4     one point, said Mr. Sussmann had clients.

5              So here's the real question:  What did Mr. Baker

6     and Mr. Sussmann talk about on September 21st, right?

7     That's that 13-minute call when Mr. Baker calls him back

8     after the meeting on the 19th.  The 13 minutes.

9              And I asked him:  What was said?

10             And he said:  I asked -- told him we wanted the

11    name of the reporter, and he said he had to check with the

12    person, and he'd get back to me.  Okay?

13             I just said it in ten seconds.  What happened in

14    those other 12 and a half minutes?

15             I'd suggest to you it's certainly reasonable --

16    and you can use your common sense -- that he would have said

17    "I have to talk to my client because I can't release the

18    name of the reporter without checking with my client."

19             Mr. Baker said, "I thought he was checking with

20    the cyber experts."

21             Well, they're the source of the information.

22    Right?  And he would have said:  I'm not -- he certainly

23    would have indicated it's most likely -- and it's the only

24    explanation for why, in March -- so let's take a look at the

25    text.

1    So he has that 13-minute call, and he writes back

2    that night: "Jim, sorry, I have been unable to respond

3    sooner.  Travel and persons availability were not ideal this

4    afternoon."

5    It's clear from that conversation they talked

6    about who Mr. Sussmann had to check with.  That's Government

7    Exhibit 1500, and those other materials that I had written

8    for you.  Let me just put them down.  Government Exhibit

9    809, that was the CIA memo that we went through; and 1703,

10   that's the 13-minute call.

11   That brings us back to March 6th, right?  13

12   minutes.

13   Oh, he calls Mr. Baker back after that.  And then

14   he says:  Yes, I can tell you on the 22nd, that morning.  I

15   called your office.  Call me when you can.

16   Okay?  That's what happens.  He clearly checked

17   and comes back to him and gives him the name.

18   And that brings us to March when people briefing

19   in Mr. Baker's presence say he was there on behalf of a

20   client.  He did not say who the client was.  Very consistent

21   with what happened at the CIA.

22   These are not necessarily precise terms.  There's

23   confusion.  There's discussions.  It's ongoing dialogue.

24   They want to give you a snapshot in time.  I want

25   to give you context.  I want to give you evidence.

1          Ask yourselves:  If you have a reasonable doubt

2     about whether in the September 21st call they talked about

3     clients, ask yourself if that's not what caused both

4     Mr. Baker and Mr. Sussmann to talk about clients in their

5     subsequent Congressional and IG testimony?

6          Final question:  Did it matter?

7          Did it matter?  Let's assume, for the sake of

8     argument, that he was working on behalf of the Hillary

9     Clinton Campaign.  Would it have mattered?  No, it would not

10    have mattered.

11         Think about the context.  Okay?  Take yourselves

12    back, as people from that witness chair did, to the summer

13    of 2016.  Okay?  It was a very contentious time.  The

14    Russians had hacked the DNC.  They were leaking emails.  And

15    there was an ongoing FBI investigation irrespective of this

16    called Crossfire Hurricane -- Crossfire Hurricane -- into

17    allegations of Trump connections to Russia.  That was going

18    on, and that was viewed as incredibly serious.

19         Agent -- former Special Agent Priestap.  Right?

20    One of the few noncurrent government employees in this case

21    who came in and tried to tell you what he remembered.  He's

22    at Trenchcoat Advisors now, which I thought was kind of a

23    funny name.  But you remember him.  Very serious.  Very much

24    like a former federal agent.

25         "There were serious national concerns about Trump

 1    connections to Russia?

 2            "Yes.

 3            "And they viewed it as a national security threat

 4    that had to be investigated?

 5            "Yes.

 6            "A tip concerning potential links between Alfa and

 7    Trump was seen as similarly serious?

 8            Agent Priestap:  Of course it was."

 9            Right?  Coming from a credible and reliable

10    source.  Of course it was.

11            Mr. Baker:  Serious, credible, et cetera.

12            All right.  When he walks that information in,

13    he is a serious national security lawyer, serious cyber

14    expert -- or privacy lawyer, rather, I'm sorry, and brings

15    it in to Mr. Baker.  All right?

16            They want to say that the -- that Mr. Baker

17    wouldn't have taken the meeting if he'd known.  First of

18    all, that's a red herring, and let me tell you why.  Because

19    the text is not what's charged here.  That's not a false

20    statement.  That's not what's meant to be material.  It's

21    the statement on the 19th.  So whatever happened on the 18th

22    can't go to materiality because that's not the false

23    statement he's charged with.

24            But you don't even need to get to that technical

25    legal argument because remember the last thing I read into

1    evidence?  Mr. Baker, on that stand, thought and said, you

2    know, it would have been important, and I probably wouldn't

3    have taken the meeting.  He said that on the stand.

4           And I said:  Do you remember what you said to the

5    agents two months ago?

6           And here's what was read from the agent's notes,

7    okay?

8           Now, you're going to hear from the judge that

9    inconsistent statements that are not under oath are not

10   necessarily offered for the truth of the matter; they're

11   offered for the credibility of the witness.

12          Do you believe it when he said it mattered if two

13   months earlier he said he was prompted to take the meeting

14   by Sussmann and the text message for two reasons?  First,

15   because the text message specifically refers to the subject

16   as time-sensitive and sensitive; and second, because Baker

17   trusted Sussmann.  Baker does not believe that the fact that

18   Sussmann stated specifically in his text that he was acting

19   on his own and not for a client factored heavily into his

20   decision to meet with Sussmann the very next day.  That is

21   Defense Exhibit 832.

22          It makes sense, too.  Sussmann's trusted.  He

23   says:  I've got a serious -- sensitive and time-sensitive

24   thing.  Of course he's going to take the meeting.

25          And once he shows up -- remember him on the stand?

1    Remember what I said?  I said:  Well, he shows up, and what

2    does he do?  "I didn't want to be a witness.  I just wanted

3    to get rid of it, take this information and pass it along.

4    I did not want to hold it.  I was uncomfortable holding it.

5    I wanted to get it out of my hands."

6              On the stand:  "If it involved Trump or Russia you

7    would have gotten somebody from Crossfire Hurricane

8    involved?

9              "Yes, sir.  Yes, sure.

10             "And you would have done that no matter what?

11             "Correct.  I would have.  If I had known that

12   ahead of time I would have done that no matter what."

13             Okay.  Sussmann walks in, gives him this material,

14   and says it shows some links, do with it what you want.

15             And what does Mr. Baker do?  He calls Mr. Priestap

16   or he stops by Mr. Priestap's office and he tells him, "I've

17   got this stuff.  I'm not an agent.  I'm a lawyer."  Right?

18   "Let me give it to the people who know this stuff."

19             And what does Mr. Priestap say?  He is the senior-

20   most agent and investigator who gets this stuff.  Okay?

21   He's told Sussmann's a DNC lawyer, et cetera.  And he says:

22             "QUESTION:  In August/September the FBI was

23   investigating potential connections?

24             "Yes.

25             "And that was a matter where there were serious

1    concerns.  Fair to say?

2              "Yes.

3              "And the FBI viewed that as a national security

4    threat that had to be investigated?

5              "ANSWER:  Yes."

6              Jim Baker:  "The FBI was responsible for

7    protecting everybody in the country.  Period, full stop.

8              "And you do that without regard to who they are or

9    what their political backgrounds are?

10             "Yes, sir.

11             "QUESTION:  And that's true in this case, too?"

12             "ANSWER:  Yes."

13             Look at what they did back then, not what they're

14   saying now.  Look at what they did, not what they're saying

15   now.

16             And if you're saying politics actually matter,

17   right -- if somehow we get past this and say it would have

18   mattered, "I would have investigated a potential national

19   security concern," they would have taken the same

20   investigative steps no matter what.

21             Special Agent Hellman:

22             "QUESTION:  If there were political motivations,

23   would you have done anything differently?

24             "ANSWER:  I mean, from the technical review that

25   we did, nothing.  We would have done the same thing.  We

 1      would have looked at the data."

 2              Remember, he gave them data to verify.  It's not

 3      like he gave them a tip about something being planted

 4      somewhere.  He gave them data.  It's like saying, look,

 5      here's a jar of jelly beans.  I think there's 5,662 in here.

 6      But have at it.  You count them yourself.  Right?

 7              He gave them the actual data, and they would have

 8      done the same thing looking at it.

 9              Agent Sands, first investigation ever.  She said:

10              "QUESTION:  At the time if you had known the FBI

11      received the allegations from a political source, you

12      wouldn't have changed the investigative steps you took,

13      right?

14              "ANSWER:  Yes.

15              "That's what you said then?

16              "ANSWER:  Yes."

17              They wouldn't have done anything different.  And

18      it makes sense.  They were given actual data that had

19      national security implications.

20              Now, by the way, everybody at the FBI actually

21      thought the data came from a political party.  I mean, it's

22      kind of an odd type of thing.  It actually was not, but

23      because Mr. Sussmann has DNC and HFA tattooed on his

24      forehead -- right? he's dealing with them all the time --

25      they assumed that that's where the data came from.

```
1              Jim Baker and Bill Priestap -- so in the notes,

2    what's the first thing that Mr. Baker says when he describes

3    Michael Sussmann?  "Represents DNC/Clinton Foundation."  He

4    says "not on a particular client," but he says that's who

5    his clients are.  So that's what Priestap knows.  All right?

6              By the way, how significant is this?  That other

7    than those two, this supposed important lie doesn't get

8    passed down to anybody, right?  There's no record in the

9    file of the text or of the statement or of a 302 that says

10   "doesn't represent a particular client, not on behalf of a

11   particular client."

12             But the file is littered with references to DNC,

13   FBI headquarters, Ryan Gaynor, DNC attorney.  Remember his

14   chicken scratch notes?  He's the liaison from the

15   headquarters to the case agents.

16             And Gessford:  Essentially a lawyer representing

17   DNC and Clinton brought an envelope to GC Baker this a.m.

18             Scott Hellman:  Tim asked if we would write a

19   brief summary of what we think about the DNC report.

20             Remember he struggled with that?  "I can't" -- "I

21   don't know where that came from"?  Mr. DeFilippis suggested

22   it might be a typo, right?

23             I mean, but the more logical explanation is they

24   all thought it came from the DNC, and this is why.  This was

25   a chart -- do you remember Brandon from Latham & Watkins up
```

1     there and he looked at all these contacts and connections?

2     From June through October look at all of those connections

3     with Mr. Sussmann and the DNC and HFA and the DCCC.

4     Everybody knew who he was.

5              Do you think, if they were truly trying to conceal

6     something and there was this conspiracy, that they would

7     have sent Michael Sussmann in?  He's a lawyer representing

8     the DNC even though he wasn't there on their behalf.

9     Everybody assumed that there was some connection.  Right?

10             He'd also gone to the *New York Times* with the

11    information.  None of that was hidden.

12             Now, I don't know if you guys remember what was,

13    from my perspective, one of the more dramatic moments in the

14    trial.  Ryan Gaynor being cross-examined by Mr. Bosworth.

15             And Mr. Bosworth kept going after him because

16    Mr. Gaynor's notes -- Mr. Gaynor, by the way, he's the

17    one -- he is the one who wouldn't let anybody interview

18    Mr. -- he wouldn't tell them who Sussmann was or who

19    Sussmann's clients were, contacts were, right?  The cyber

20    people.  He stopped it.  He said there was a close hold.

21    We'll get to that.

22             In his first interview he says:  A DNC attorney

23    provided the allegations.  I don't know more than that.

24             Second interview, same thing.

25             Third interview, same thing.

1        Grand jury, same thing.

2        Mr. Bosworth said:  They kept going after you

3   question after question, Are you sure that he wasn't there

4   just for something else or on his own?  Over and over and

5   over again they tried to break him to get him to say that:

6   Okay, he was a DNC attorney, but not on this particular

7   matter, right?  That's a convoluted theory that the Special

8   Counsel has come up with.

9        In trial prep, he suddenly changes:  Well, my

10  impression was that Mr. Sussmann represented the DNC but not

11  on this matter.  First time.  Two weeks before -- less than

12  two weeks before he testifies.

13       Then he testifies, "I understood he had been

14  affiliated with the Democratic party, but that he had come

15  representing himself."

16       And why was it so important that he said that from

17  the stand?  Why was that so important that they went over

18  and over and over again?

19       Because if he thought the information came from a

20  DNC lawyer, the case is over, right?  If he thought it was

21  DNC information, the case is over.  And here is why.

22       In his first interview he tells the government he

23  did not receive an instruction not to share the information.

24  Okay?  He told them:  I didn't get an instruction from

25  anybody, but I didn't share it because I didn't want to

1    color -- I didn't want to share his name because I didn't

2    want to color the investigation.  I didn't want to color it

3    with politics.

4            He wanted them to evaluate the data independent of

5    politics.  That's what he said; that it didn't matter and

6    specifically wanted to withhold it from them.  He's not on

7    trial here.

8            But what happens when he tells them that?  Do you

9    guys remember that?  It was shocking.  They said in the

10   interview that he was made a subject; meaning, hey, when you

11   came in here before you told us this information, you were a

12   witness.  Now you're in a criminal investigation by telling

13   us that.  That's what they told him.

14           "When my attorney came back, he advised me that my

15   status was in jeopardy."  He said, "I've never been under

16   criminal investigation before," in the middle of an

17   interview where he tells them that he withheld it on that.

18   And you know what?  He comes back, and he says, probably a

19   month or two later, "I've looked at my notes, and it says CH

20   holding, help/hinder.  Chicago holding, help/hinder.  That

21   meant there was a close hold.  So I was told I couldn't

22   share the information."

23           That's what he tells them after he's told that he

24   was going to be a -- he was the subject of criminal

25   investigation.

1          And then he's a witness again.  Status has changed

2     back.  Nobody else talked about that.  In fact, everybody --

3     everybody that was spoken to indicated that they didn't know

4     of any close hold.  Senior people.  There's no memo in the

5     file.  There's no -- and you know why?  Because it's not

6     true.  Right?

7          CH holding, years later, oh, yeah, there was a

8     close hold.  He didn't share the information.

9          He didn't let them interview Mr. Sussmann or the

10    people who were there.  We wouldn't be here if they did.

11         That's on them.  It's not on Mr. Sussmann.  They

12    didn't even talk to him.

13         Mr. Baker:  "Anybody who you passed the

14    information off to from Mr. Priestap on to the agents who

15    were getting the information could have reached out?

16         "Yes, I assumed they would do that."

17         Allison Sands:  "You were the case agent,

18    correct --

19         "Uh-huh.

20         "-- during the course of the investigation.  You

21    never interviewed Sussmann?

22         "Correct."

23         Heide:  "The next logical step would have been to

24    talk to the person who provided the information and

25    interview the original source?

1              "Right."

2              Nobody even went to the people who did the data,

3     right?  They're the ones whose motivations might be

4     important.  Nobody even talked to them.  They didn't even

5     ask.

6              The cyber experts.  Remember Mr. Dagon's name came

7     up, and they showed you this 20-minute call that

8     Mr. Sussmann had with him?  Well, good for him.

9              Do you know who didn't have a 20-minute call with

10    him?  The FBI.  They didn't talk to somebody they believed

11    to be the author of the white paper to get their

12    motivations, to say:  Hey, maybe you could help us

13    understand what this is about.

14             Curtis Heide:  "Who is the best person to tell you

15    whether the source of the information had business

16    interests?

17             "ANSWER:  The source of the information.

18             "And you were not allowed to speak to either the

19    source of the information, the author of the white paper, or

20    the person who provided the source of the information and

21    the data?

22             "Correct.

23             "And that made your investigation incomplete?

24             "Correct."

25             Shocking.

1      Ryan Gaynor:  "So you didn't know that the

2  individual providing the information directly to Tom Grasso

3  was Rodney Joffe?

4          "No.

5          "And you didn't know because either the Chicago

6  agents never tried to interview him or, if they did, they

7  never told you, right?

8          "Correct."

9          We called Mr. Grasso, and he said Rodney Joffe

10  himself came and provided additional data.  He did it

11  anonymously because he was concerned.  But nobody even went

12  back to him; and the FBI was aware of that, and they didn't

13  push, and they didn't press.  They didn't want to know.

14  He's on trial, and they didn't even talk to him or the

15  people who provided him the information.

16          Look at what they did, not what they're saying

17  now.

18          Materiality.  Instruction No. 27.  "A statement is

19  not material if it relates to an ancillary, nondeterminative

20  factor or to a trivial detail.  A statement may be relevant

21  but not material."

22          Ask yourselves if that sounds like the testimony

23  that you heard from the stand.

24          Agent Priestap, the senior-most investigator who

25  talked to Mr. Baker:  "Based on your experience, is it

1    important to understand the motivation of an individual

2    bringing information to the FBI?

3              "ANSWER:  Important?  I guess I'd say it's

4    relevant.  It's not dispositive."

5              Match that with the jury instruction.  Relevant,

6    but not dispositive.

7              Priestap again; no longer with the FBI, not under

8    their control:  "Based on your experience, is it important

9    to understand if someone is providing information to the FBI

10   on behalf of someone else?

11             "Again" -- answer -- "we get information from a

12   variety of sources to include a variety of human beings who

13   come to the FBI motivated by a variety of things.

14             "Right.  But particularly if someone's bringing

15   information on behalf of a political campaign, that's

16   important, right?"

17             That's Mr. -- I forget which one of the Special

18   Counsels going back at him:  "It's important, isn't it?"

19   Someone who didn't meet with them to prepare for his

20   testimony?

21             And he says, "I guess -- I'm struggling a bit on

22   your use of the word 'important.'"  There's a variety of

23   factors on the importance of that.  And so, again, its --

24   motivation is relevant, but it's not -- it's not the only

25   factor."

1              That's a witness who wasn't prepared ten times

2       like Mr. Baker was.  That's a witness who was not under

3       investigation -- right? -- like Ryan Gaynor, who was made

4       the subject of a criminal investigation.  That's someone

5       giving you their best information.  That's the testimony you

6       should credit.

7              All right.  Let's go back to the giant political

8       conspiracy theory because I expect you're going to hear a

9       lot from Mr. DeFilippis about this.

10             First of all, I'm going to ask you to use your

11      common sense and look at the evidence.  You know, don't come

12      here with meeting minutes that don't reflect any substance.

13      Don't come here with phone records that could show any

14      number of things.  All these phone records with Mr. Joffe,

15      "Look, he's talking to him, he's talking to him."  He's

16      talking to his client.  Right?  He is also a client at

17      Neustar.

18             You don't know what's happening in those calls.

19      That's not proof beyond a reasonable doubt.

20             And when you see the things that Mr. DeFilippis

21      puts up, ask yourself:  Where is Mr. Sussmann?  He's going

22      to be on some of them, but he's not on most of them.  And

23      ask yourself who from the witness stand actually said what

24      he's saying.

25             Now, I expect that you remember the instruction

1    about circumstantial evidence, right?  Well, you can assume

2    there was a billing record, there was a meeting, and so it

3    must be this.  Circumstantial evidence.

4           And I think the example that he gave -- and I've

5    been doing this for 30 years; it's the same example -- you

6    go to bed at night.  There's no snow on the ground.  You

7    wake up.  There's snow.  It must have snowed.

8           Well, what's happened here is that the Special

9    Counsel's Office bought a snow-making machine, and they blew

10   that over the lawn and want you to think it snowed.

11          That's not what happened.  Okay?  They didn't call

12   witnesses to prove any of this information that they put out

13   there.

14          And I'm going to try and talk about the evidence.

15   Speculation, reporters.  Mr. Sussmann talks to reporters.

16   Yes, yes, yes.  Look at his records.

17          Ellen Nakashima at the *Washington Post*.  In June

18   of 2018 she puts out a story about the hack.  Mr. Sussmann's

19   quoted in the story.

20          Further communications in May, in June, the

21   *Washington Post* reporter, et cetera.

22          He has relationships with reporters about things

23   that impact his clients.  Absolutely.  Look at that.  And

24   it's billed, and it's talked about, and it's legitimate.

25   That's DX200 and Government Exhibit 554.

1          You heard about Mark Hosenball as if there's

2    something evil about talking to somebody from Thompson

3    Reuters.  Must be a crime.  Well, he bills it to "Respond to

4    request from reporters," July 27th, before the Alfa-Bank

5    stuff.

6          August 1st, "Communications regarding Reuters

7    story and questions."  Right?

8          There's no evidence that the calls that he had

9    with Mr. Hosenball relate to Alfa-Bank.  He has a whole host

10   of clients and a whole host of interests.

11          Fusion.  Fusion.  Again, think Laura Seago.

12   Fusion was researching Donald Trump before the campaign came

13   along.  Laura Seago, the only person -- you didn't hear from

14   Peter Fritsch.  You didn't hear from Glenn Simpson.  You

15   heard from Laura Seago.

16          "Open source research meaning I look at what's in

17   the public record."

18          One meeting with Mr. Sussmann and Mr. Joffe where

19   they talked about Alfa-Bank.  Absolutely.  One meeting.

20   They talked about that work.  Mr. Joffe had provided

21   information to Mr. Sussmann, and they discussed it.

22   Opposition research.  Nothing illegal about that.

23          She had no knowledge of Mr. Sussmann's meeting

24   with Mr. Baker.  That came from the witness stand.  Never

25   discussed leaking and never leaked the fact that the FBI was

1     investigating the allegations.

2              She had one meeting with Franklin Foer and

3     Fritsch, and no one said the FBI was investigating.

4              They put up a Peter Fritsch email from October

5     where he talks about the U.S. government investigating.  Why

6     did that come from Mr. Sussmann?  The FBI themselves went to

7     the *New York Times*.  Why do you think that that information

8     came from Mr. Sussmann?  Where is the proof?

9              Laura Seago's the only one you heard from from

10    Fusion, and they thought it was an important story.

11             And you know what, there was no leak.  Think about

12    that.  There was no leak.

13             The story that came out, the Franklin Foer story,

14    you saw Mr. Mook, who was up there for an uncomfortable five

15    minutes, looking for the story.  Hey, does it say anything

16    about an FBI leak in there, Mr. Mook?

17             And he read it carefully.  "No."

18             And you've got the article.  You can look at it

19    yourself.  They're not mentioned in Franklin Foer's story.

20             Don't you think, if the intention of the campaign

21    and of Mr. Sussmann was to leak the FBI story, it would have

22    been in this?  The only publication that reported -- that's

23    in evidence -- an FBI investigation was *The New York Times*,

24    the very *New York Times* that the FBI went to.

25             And what do they report at the end of October?

1      "FBI officials spent weeks examining computer data showing

2      an odd stream of activity, but the FBI ultimately concluded

3      that there could be an innocuous explanation like marketing

4      email or spam."  That's the story?  That's the leak?  That's

5      the conspiracy?

6             Please.

7             And you could even say this is misleading, right?

8      He acted like there was a real investigation.

9             Let's talk about that investigation.  It was

10     shoddy.  It was an embarrassment.

11            They get the name wrong of who referred the

12     information, right?  And that was a typo.  Whoops.  From the

13     original opening.

14            Hellman, within, you know, half a day of getting

15     information, said it looked like it was written by someone

16     with a mental disability.

17            They never interviewed Mr. Sussmann.  They never

18     asked to interview the people who were the source of the

19     information, despite the fact that they knew who they were.

20            Grasso had an anonymous reporter who turned out to

21     be Mr. Joffe.  They didn't talk to him.

22            Do you know what they did?  Let's go talk to Alfa-

23     Bank.  They paid somebody to look at this.  What kind of

24     investigation -- this is the FBI.  Go talk to the Russian

25     bank who they hired?

1          The FBI had reached a, quote, logical conclusion

2     to the investigation within two weeks.  And the only thing

3     left was to interview Mr. Sussmann for whatever, and they

4     weren't allowed to do it.  They weren't even told who it

5     was.  That was their investigation.

6          And look at this document, 538.  Let me put that

7     down.  538 defense exhibit.  "Aforementioned CHS" --

8     confidential human source -- "as well as David Dagan [sic]

9     are expected to directly contradict FBI assessments and will

10    report there is credible evidence of covert communications.

11    Their assessments do not change ours, but pose a challenge

12    in refuting their claims using only open source

13    information."

14         They didn't talk to the people who challenged

15    their investigation.  Who does that sound like?  I'd submit

16    to you it sounds like the Special Counsel.  Any piece of

17    evidence that they get that doesn't fit their tunnel-vision

18    theory they ignore.  DNC?  It must be DNS.  Client?  That's

19    a slip-up.

20         Tunnel vision.  Thank God you are here to

21    objectively evaluate the evidence.

22         Let's talk about the witnesses who they brought to

23    you.  Okay?

24         Jim Baker, Curtis Heide, Ryan Gaynor all faced

25    investigation or are under investigation.

1           Baker, investigated by Mr. Durham.  Remember the

2     Tweet he sent saying -- Tweet, text -- "I'm looking forward

3     to another two years of this.  Met with them over ten

4     times."

5           And he delivered.  All right?

6           And I'm going to say:  You evaluate his

7     credibility.  You look at what he did.  You assess whether

8     he's accurate.  Met with them ten times.  He had been under

9     investigation.  He was concerned about being investigated

10    again.

11          Curtis Heide, Ryan Gaynor, a number of times, over

12    and over and over again they met with them.  Why so many

13    times?  What did they need to get out of them?  Why not just

14    ask them to tell what happened?

15          Jim Baker:  "When you made the statement, was it

16    inaccurate?

17          "Yes.

18          "Okay.  And that was something -- just a slip-up?"

19    That was Mr. DeFilippis's question.

20          Here he's talking about "I get to be investigated

21    for another year or two by John Durham.  Lovely."

22          All right?  It's no wonder he delivered on the

23    stand.

24          Curtis Heide.  He was accused and under

25    investigation for holding back information that suggests

1    somebody could be innocent in connection with a warrant to

2    get either a wiretap or a search warrant.  You don't think

3    he was concerned?

4              Agent Hellman:  "DNC.  Was that a typo?

5              "I don't know.

6              "When you said the only one suggesting it, isn't

7    it true that it was Mr. DeFilippis who suggested to you it

8    might be a typo?

9              "That's correct."

10             Agent Gaynor.  We talked about him at length.  It

11   was intimated -- he was told, when he gave them information

12   they didn't like, that he was the subject of a criminal

13   investigation, and then he changed his story, and then he

14   went back.

15             Number 16:  You consider the credibility of

16   witnesses, accuracy of witnesses' memory, circumstances

17   under which they were asked to recall details, consistencies

18   or inconsistencies.

19             Practically every government witness on that stand

20   was inconsistent with what they'd said before.  They were

21   talked to in trial prep and after.  You'll remember it.

22   That's what they bring against Mr. Sussmann.  What about

23   him?

24             Okay.  You heard the two character witnesses.  I

25   won't go into detail about them.  You'll remember them.

1   They were just the other day.

2          And you heard the instruction, and it's going to

3   be in the materials back to you.  You may consider this

4   evidence, along with other evidence.  And it says:  Evidence

5   of good character alone may create a reasonable doubt as to

6   a defendant's guilt, although without it the other evidence

7   would be convincing.  On its own you can consider that, and

8   that's reasonable doubt.

9          Take a look at the instruction.  Think about their

10  testimony.

11         Think about who he is, and think about who they

12  brought to the stand against him from the government.

13         Now, I've probably got about five or seven minutes

14  left, I think.  About right?

15         THE COURT:  Ten.

16         MR. BERKOWITZ:  Ten.  Okay.

17         So Mr. DeFilippis is getting up here, and he's a

18  talented lawyer.  You've seen him in the courtroom.  The

19  government has the burden of proof in this case, and so he

20  gets the opportunity to speak last.  Right?  I don't get a

21  chance to come back up here and respond to what he says so I

22  need each of you to do what I would do.  Right?

23         They put a witness on.  Me or Mr. Bosworth come

24  and question them over and over and over again.  And when we

25  do that, other information comes out.

1          You can bet that whatever he says, one of us has

2    an answer to, but we're not going to get a chance to do it.

3    So each of you, when he says something, think to yourselves

4    in that jury room:  What would Mr. Berkowitz say?  What

5    would Mr. Bosworth say?  Right?  I need you to do that.

6          And I've got some questions for Mr. DeFilippis.

7          How can Mr. Baker be so confident that Michael

8    Sussmann made the statement on September 19th when he took

9    no notes as opposed to September 18th, the date of the text?

10   100 percent confident.

11         How could Mr. Sussmann go to the FBI on behalf of

12   the Clinton Campaign when no one from the campaign

13   authorized or directed him to do so, and when it was not in

14   their interests?

15         How come the March 6, 2017, notes say the Alfa-

16   Bank allegations were brought to the FBI by an attorney on

17   behalf of his client?

18         Why did the Special Counsel only show Mr. Baker

19   the Priestap notes but not the March 6, 2017, notes?  He was

20   at that meeting.  Why didn't they show him something that's

21   not on behalf of a client?  Maybe that would have refreshed

22   his recollection.

23         What did Mr. Baker and Mr. Sussmann talk about on

24   July -- on September 21, 2016?

25         Why did Mr. Sussmann text Jim Baker a copy of *The*

 1    *Wall Street Journal* letter to the editor where it said he

 2    was acting on behalf of a client?

 3              Why did Mr. Sussmann go to the CIA after the

 4    election if this was all some part of a giant political

 5    conspiracy?  She lost.  January, February.  It doesn't make

 6    any sense.

 7              The most logical answer there would be that he

 8    actually was concerned.  And you heard the testimony, he

 9    said he was frustrated.  Nobody got back to him.  He was

10    concerned.

11              Mr. Joffe was concerned.  Why didn't they

12    interview him or the underlying source of their data, if

13    their motivations mattered?  If they'd done that, maybe we

14    wouldn't be here.

15              Why did they meet with the witnesses so many

16    times?

17              We'll get to the instruction in a second.

18              I'm not from D.C.  I'm not a politician.  I'm a

19    lawyer.  I represent Mr. Sussmann.

20              Your job is to listen to the evidence.  I asked

21    each one of you if you would do that -- what comes from the

22    witness stand, not from their mouths or my mouth -- and you

23    all said you would do that.

24              It's your turn to do justice, to prevent an

25    injustice.  I ask you to listen to the evidence and think

 1    about the evidence.

 2            And it's a special part of being in a court like

 3    this.  I love practicing law because you get to be a part of

 4    justice and to prevent injustices; and it's now going to be

 5    on you.

 6            Let me read the instruction to you:  The

 7    government has the burden of proving Mr. Sussmann guilty

 8    beyond a reasonable doubt.  Some of you may have served as

 9    jurors in civil cases where it is only necessary to prove a

10    fact is more likely true than not, or, in some cases, that

11    truth is highly probable.  In criminal cases such as this

12    one, the government's proof must be more powerful than that.

13    It must be beyond a reasonable doubt.  Reasonable doubt is,

14    as the name implies, a doubt based on reason, a doubt for

15    which you have a reason based on the evidence or a lack of

16    evidence in the case.  If, after careful, honest, and

17    impartial consideration of all the evidence you cannot say

18    you were firmly convinced of the defendant's guilt, then you

19    have a reasonable doubt.

20            Reasonable doubt is the kind of doubt that would

21    cause a reasonable person, after careful and thoughtful

22    reflection, to hesitate to act in the graver or more

23    important moments -- matters in life.  However, it's not an

24    imaginary doubt nor a doubt based on speculation or

25    guesswork.  It is a doubt based on reason.  The government

1    is not required to provide guilt beyond all doubt or to a

2    mathematical or to a scientific certainty.  Its burden is to

3    prove guilt beyond a reasonable doubt.

4           They haven't met that burden.  They haven't come

5    close.  This case should never have been broughten [sic].  I

6    ask you to return not guilty.  Not guilty.  Not guilty.

7           Thank you.

8           THE COURT:  Thank you, Mr. Berkowitz.

9           We're going to take another short ten-minute

10   break, and then we'll have the government's rebuttal.

11           (Jury exits courtroom)

12           (Recess taken)

13           THE COURT:  Okay.  Please be seated, everyone.

14           Mr. DeFilippis.

15           MR. DeFILIPPIS:  Thank you, Your Honor.

16           Ladies and gentlemen, there are sometimes close

17   cases.  This is not a close case.  This is not even close to

18   a close case.

19           Now, ladies and gentlemen, I want to start by

20   reminding you of one of the instructions that Judge Cooper

21   gave you, which is that lawyers' arguments are not evidence.

22   The evidence are the documents, the testimony, and the

23   materials you saw and heard over the last couple of weeks.

24           Ladies and gentlemen, it's appropriate that the

25   defense started by talking about a magic trick, because what

 1    you just saw was a magic trick.  The defense is trying to

 2    make all of the evidence you saw in the last couple of weeks

 3    go away, and they've come up with a retroactive explanation

 4    for that evidence that doesn't fit together.

 5         Ladies and gentlemen, when you look at the actual

 6    evidence, your common sense will tell you what happened

 7    here.  Your common sense tells you what happened here, which

 8    is that the defendant made a false statement.  He knew it

 9    was false, and it was material.

10         The defense is trying to explain away that lie.

11    They're trying to lawyer away the defendant's lie.  Don't

12    let them do that.

13         And let me say, ladies and gentlemen, we

14    absolutely agree that it is the government's burden here.

15    It is the government's burden, and we embrace that burden.

16    But the government has met its burden.

17         Now, Mr. Berkowitz walked through a number of

18    arguments very quickly.  It was a lot to take in.  So let's

19    just break it down.  Let's get to work and consider the

20    arguments he made, as I know you will in the jury room.

21         Ladies and gentlemen, Mr. Berkowitz began by

22    saying that you don't have proof beyond a reasonable doubt

23    that this false statement was made, that you don't have

24    proof beyond a reasonable doubt that Mr. Sussmann lied to

25    Mr. Baker in the September 19th meeting.

1          That's false.  You do have proof beyond a

2     reasonable doubt.

3          And what is it?

4          First and most importantly, you have the testimony

5     of Mr. Baker.  Mr. Baker came on the stand to testify at the

6     trial of his friend.  He came on the stand, and he told you

7     he was 100 percent confident of what Mr. Sussmann said in

8     that meeting, and you could hear.  You saw him on the stand

9     right before he said "100 percent."  He choked up.  He

10    hesitated.

11         Why did he do that?  Because he didn't want to be

12    here.  He didn't want to testify against his friend.  But he

13    did it because he had to and because it's the truth.

14         Mr. Baker -- this was probably the last place in

15    the world that Mr. Baker wanted to be last week, and he said

16    under oath that he was 100 percent confident that his

17    friend, Michael Sussmann, said in the meeting that he was

18    not doing this for any particular client.

19         Ladies and gentlemen, would James Baker come on

20    the stand, under oath, a former high-ranking FBI official,

21    and subject himself to the penalty of perjury to do that

22    against a friend, if it weren't true?  No, he wouldn't do

23    that.  None of us would do that, would take that risk for a

24    friend.  The reason he did that is because it is true.

25         Ladies and gentlemen, that alone is proof -- if

1    you credit Mr. Baker and his 100 percent recollection that

2    Mr. Sussmann said in the meeting what he also said the night

3    before in the text message, you can conclude beyond a

4    reasonable doubt that the false statement was made in that

5    meeting.

6           But that is far from all you have, ladies and

7    gentlemen.  You have a lot more to support that conclusion.

8    What is it?

9           So let's look at a slide of some of the evidence

10   you've seen.

11          Ladies and gentlemen, even if you put aside

12   Mr. Baker, even if you didn't believe what he said, you have

13   notes from that day from multiple people recording the lie

14   that the defendant made in that meeting.

15          You have, as you've seen several times, Bill

16   Priestap's notes.  And what do they say?  They don't say:

17   Texted me the night before.  They don't say:  Wrote me a

18   message.  They say, "said not doing this for any client."

19          And you heard Mr. Baker testify that he spoke to

20   Mr. Priestap immediately after the meeting about what

21   happened in the meeting.  If you credit Mr. Baker's

22   testimony that he 100 percent remembers that, and that he

23   100 percent remembers that he told Mr. Priestap what

24   happened in that meeting, done.  You know Mr. Sussmann made

25   that statement in the meeting.

1          You also know that for other reasons.

2          You know it because Ms. Anderson, Mr. Baker's

3    deputy, also has notes, also taken that day, also taken in a

4    conversation that Mr. Baker had about the meeting.  Not a

5    conversation he had about a text message the night before,

6    about the meeting.  And Ms. Anderson's notes say "no

7    specific client," just like Mr. Sussmann said in the

8    meeting.

9          Now, those are all sufficient reasons to conclude

10   beyond a reasonable doubt that Mr. Sussmann lied in that

11   September 19th meeting.

12         But, ladies and gentlemen, you have more reasons,

13   because you know that five months later Mr. Sussmann went

14   over to the CIA.  And I want you to go back to James Baker's

15   testimony and look at how he phrased exactly what

16   Mr. Sussmann said in the meeting.  He said, "no particular

17   client."

18         Now, Mr. Baker wasn't at the CIA meeting.

19   Mr. Baker didn't write or review the CIA memo, but his 100

20   percent recollection was that Mr. Sussmann said in that

21   meeting "no particular client."

22         And what did Mr. Sussmann say according to the

23   contemporaneous memo from the CIA?  "Not representing a

24   particular client."

25         Those kinds of details, ladies and gentlemen, are

1    what allow you to conclude that someone's recollection is

2    genuine, that it's accurate, because it lines up with other

3    things that they haven't even seen.

4            And it also convinces you that he made -- it can

5    also convince you that he made that statement because this

6    was obviously Mr. Sussmann's plan.  He did the same thing in

7    two separate meetings with the government and made the same

8    statement.  That's what happened.  That is exactly what

9    happened.

10           And don't allow any distractions about

11   Mr. Sussmann may not have repeated it or may not have said

12   it to distract you from the evidence.  The evidence is

13   crystal clear on that point.

14           And, ladies and gentlemen, it makes sense.

15   Because when lawyers go into meetings, they have their

16   talking points.  They have their -- they know what they're

17   going to say.

18           And his plan was the same for both of those

19   meetings.  He went in.  You heard that he told Mark

20   Chadason, the former CIA person, before the meeting that he

21   had a client, but once he got in those government walls, he

22   had a plan, and the plan was the same.  It was to say that

23   he wasn't there for a client.

24           Ladies and gentlemen, there is no doubt that

25   Mr. Sussmann said that statement in that meeting.

1            So as Mr. Berkowitz said, let's go through all of

2    the theories the defense has and explain why it's just a

3    magic trick to say that none of this happened, to say that

4    none of this mattered.  You know it happened.  You know it

5    mattered.

6            So the next argument Mr. Berkowitz made was that,

7    well, Mr. Sussmann wasn't really there on behalf of a client

8    or may not -- it was nonsensical, ladies and gentlemen.  If

9    you look -- if we put the slide up again, and you look at

10   the defendant's sworn words against his words in these

11   meetings, there's no way to reconcile those two.  "It was

12   done on behalf of my client."

13           Look at his text message, "not on behalf of a

14   client."

15           Ladies and gentlemen, this powerful, accomplished

16   lawyer, former prosecutor, knows how to use words.  And when

17   he says one thing under oath before Congress and another

18   thing to two separate government agencies, one at the height

19   of a presidential election while he's billing time to a

20   campaign, you know that's not a mistake.  You know that's

21   not a misunderstanding.  You know that that's intentional.

22   You know that that's a plan.  And your common sense tells

23   you that.  All of the evidence tells you that.  All of it.

24   And anything that the defense says otherwise is a

25   distraction.

1           Now, you heard arguments that this couldn't have

2    been on behalf of the Clinton Campaign because the Clinton

3    Campaign didn't authorize it.  They wouldn't have wanted it.

4           Now, ladies and gentlemen, as an initial matter, I

5    think we need to scrutinize the witnesses.  Compare the

6    witnesses who testified from the Clinton Campaign -- their

7    demeanor, what they told you -- to the witnesses like

8    Mr. Baker and other witnesses.

9           Ladies and gentlemen, if we take the campaign at

10   its word, if we take Mr. Elias and Mr. Mook at their word,

11   they acknowledge that the best way to figure out -- the best

12   way to figure out what someone -- on whose behalf someone is

13   working when they do something, when they go to a meeting,

14   when they make a phone call, is who they bill.  It's who

15   they bill.

16          Mr. Elias, top lawyer for the Clinton Campaign:  I

17   mean, billing records are a reasonable way to go because

18   lawyers track what they're doing.  You look at who they

19   bill.

20          Ladies and gentlemen, look where Mr. Sussmann

21   billed.  He billed everything to the Clinton Campaign.

22          You remember the thumb drives, ladies and

23   gentlemen.  I want to focus on those.  We'll come back to

24   them, but that is damning evidence.

25          The fact that Mr. Sussmann meets with Rodney Joffe

1   on September -- he buys the thumb drives on September 13th.

2   He meets with Mr. Joffe that same day.  He meets with

3   Mr. Joffe September 14th, and you saw that receipt, PNY 16

4   gigabytes.  He then gives those PNY 16 gigabytes to

5   Mr. Baker and goes back to Perkins Coie.

6           Now, look at the date.  When you go back to that

7   reimbursement form for those thumb drives, look at the date

8   on those forms.  September 22, 2016.  Three days after

9   Mr. Sussmann's meeting.

10          Now, I want you to think about what the campaign

11  witnesses told you, how they wouldn't -- might not have

12  wanted this meeting.  They might not have authorized it.

13  But think to yourself -- and oftentimes in life it's the --

14  it's when we spend a big effort on a little thing that's

15  most revealing about our state of mind.

16          Mr. Sussmann took the time three days after that

17  meeting to bill thumb drives that were probably no more than

18  $15 to the Clinton Campaign.  Why would you do that unless

19  you thought you had been at the meeting for the Clinton

20  Campaign?  Why would you take that effort?  Why would you do

21  that at all?

22          And if the campaign had made clear to Mr. Sussmann

23  by that point that they didn't authorize this, that they

24  didn't want it -- Mr. Elias said that he was notified either

25  shortly before or shortly after the meeting, he thinks, that

1    Mr. Sussmann was going to do this.  Well, if it was shortly

2    before, nothing was said that kept him from going.  And if

3    it was shortly after, it didn't stop Mr. Sussmann from then

4    billing less than $15 to the Clinton Campaign.

5            Again, when you put that much effort into a small

6    thing, it says a lot about your state of mind.  It says a

7    lot about who Mr. Sussmann thought he was working for.

8            Now, you heard some arguments about how the

9    billing entry for that meeting was vague, how you can't tell

10   because Mr. Sussmann would have said -- he would have said

11   "Meeting with the FBI."  He would have noted that in his

12   billing entries.

13           Now, you'll see the defendant's billing entries.

14   They are, in some cases, imprecise; in some cases, vague.

15   And, ladies and gentlemen, let's look, for example -- we

16   talked about the thumb drives.  We talked about his meeting

17   with Mr. Joffe on September 13th.

18           Now, if you put the pieces together in context

19   with the other evidence, you know what was happening on

20   September 13th before that meeting because he's getting

21   ready to go to the FBI.  He's been billing "drafting of

22   white paper" -- you know what white paper he's talking

23   about -- to the campaign.

24           And he meets with Mr. Joffe both on the 13th and

25   on the 14th.  And you know, because your common sense tells

1    you, they're getting the materials ready for the FBI.

2    They're loading the thumb drives.  They're gathering the

3    data.  They're gathering the three white papers that they

4    gave to the FBI.

5            And how does Mr. Sussmann bill the September 13th

6    meeting with Mr. Joffe?  If we look together at Government

7    Exhibit 379 and Government Exhibit 553.18, he doesn't say

8    "Meeting with R" or "Meeting with Rodney."  He says "Work

9    regarding confidential project."

10           So that right there, ladies and gentlemen,

11   destroys any argument by the defense that just because there

12   was a vague billing entry Mr. Sussmann didn't think his

13   meeting was for the Clinton Campaign.  Mr. Sussmann

14   obviously thought the meeting was for the campaign because

15   he billed the time for it, and then three days later he got

16   himself reimbursed for the very thumb drives that he handed

17   to Jim Baker.

18           So, ladies and gentlemen, those are the kinds of

19   things that, as the defense rattles through arguments, you

20   have to pause and consider and apply your common sense.

21           And, ladies and gentlemen, again, it is the

22   government's burden.  The government -- the defense has no

23   burden to put on evidence, and they have no burden to

24   present any affirmative case.  But when they do present

25   arguments, you need to scrutinize those arguments and

1   compare them to the evidence.  And on each and every

2   argument they've made, you will see that the arguments don't

3   hold up.

4           Now, ladies and gentlemen, we heard a lot about

5   the 13-minute call.  And the defense's argument there is

6   that that 13-minute call between Mr. Baker and Mr. Sussmann

7   on September -- a few days after the meeting in September,

8   that Mr. Sussmann must have told Mr. Baker that he had a

9   client because what else would they talk about on that

10  13-minute call?  You know that that is a huge leap that is

11  not supported by any evidence.

12          Ladies and gentlemen, first of all, Mr. Sussmann

13  and Mr. Baker were friends.  Nothing about the fact of a 13-

14  minute call supports the argument that Mr. Sussmann

15  mentioned a client.

16          But you know he didn't mention a client for a

17  couple of reasons.  First, let's look at their text

18  exchanges after that call.

19          So if we go to Government Exhibit 1500 on Page 8,

20  ladies and gentlemen, this is after their call in which

21  Mr. Baker says:  Mr. Sussmann, you didn't tell me who the

22  reporter from *The New York Times* was.  Could you get that

23  information and get it to me?

24          And Mr. Sussmann doesn't disclose who it is in the

25  first meeting.  He's hesitant after this call.  He's got to

1     check.  But what does he say?  What are the words that he

2     uses?  "Jim, sorry I have been unable to respond sooner.

3     Travel and persons availability were not ideal this

4     evening."

5            Now, ladies and gentlemen, you know -- we know now

6     that the person he had to check with was Rodney Joffe.  He

7     needed to go back and see if Rodney Joffe was okay giving

8     Eric Lichtblau's name.  But there's a very intentional use

9     of a name here.  He doesn't say "travel and client's

10    availability," what he would say if they had a call and

11    talked about a client.  He says "persons availability."

12           Now, I don't know about you, I've never heard of

13    an attorney-person privilege or an attorney-person

14    relationship.  You say attorney-client.  This was an

15    intentional effort by Mr. Sussmann to continue his lie, to

16    continue to mislead Mr. Baker into thinking he didn't have a

17    client, that he had a person or persons.

18           Ladies and gentlemen, that text message right

19    there refutes the notion that any client was disclosed on

20    the call.  And it's also refuted by the fact of the meeting

21    five months later with the CIA when Mr. Sussmann tells the

22    same lie.

23           So, ladies and gentlemen, you can see how on

24    initial -- when you first hear one of the defendant's

25    arguments, comes at you quickly, it might make some initial

1    sense.  It might start to create doubt in your mind.  But

2    when you look through the evidence, when you look through

3    the testimony, when you look through what actually happened

4    here, it will all make sense.  And the way it makes sense is

5    that Mr. Sussmann made a false statement, and he made that

6    statement because he had reason to do so and because he

7    wanted to achieve a certain effect.

8            Now, why did Mr. Sussmann make that false

9    statement?  You've heard a number of arguments, ladies and

10   gentlemen, to suggest that this lie, even if it happened, it

11   was no harm/no foul because everybody at the FBI knew that

12   Mr. Sussmann was a DNC lawyer.  Everybody knew that

13   Mr. Sussmann was working for the Clinton Campaign.

14           But you have to think about how words matter.  You

15   have to think about what they actually knew.

16           They knew about Sussmann as a DNC cyber lawyer.

17   They knew him as a lawyer who represented a number of

18   different victims in cyber hacks.  That's why he worked with

19   the FBI's cyber division.

20           And I want you to go back to the evidence, when

21   you go to deliberate, and look for an exhibit, look for

22   testimony, look for a document where anyone at the FBI says

23   that they knew Mr. Sussmann worked with political campaigns

24   on opposition research.

25           You're not going to find that because they didn't

1    know.  They thought of him as a cyber lawyer, as someone who

2    represented victims of hacks; not the kind of person you

3    might suspect would bring in opposition research.

4             Now, ladies and gentlemen, of course everybody

5    knows who the DNC is.  Most people know.  Everyone at that

6    time knew who the Clinton Campaign was.

7             Now, you saw a chart from the defense, both from

8    Mr. Berkowitz and from the summary witness.  They put this

9    chart together, and they argued to you that:  Look.  Look at

10   these blue colors.  They show you that Mr. Sussmann was a

11   known DNC/Clinton Campaign lawyer at the FBI, and anything

12   he said, any lie he told, couldn't have really mattered

13   because they all knew it, and they all should have known he

14   was coming in with political materials.

15            Ladies and gentlemen, it is exactly because the

16   defendant knew that people affiliated him with the DNC and

17   the Clinton Campaign on cyber matters that he had to lie.

18   It was the motive for his lie, ladies and gentlemen, because

19   he had to lull Mr. Baker away from the notion that these

20   allegations might be sponsored by political entities.  He

21   wanted to create the false impression that this was neutral

22   computer scientists who stumbled upon the data and brought

23   it to Mr. Baker as a matter of urgent national security.

24            But that is the motive, ladies and gentlemen.

25            And the defense has seized on a number of text

1     messages and emails within the FBI where you do see

2     individuals referring to him as a DNC attorney or a Clinton

3     Campaign attorney.

4          But, ladies and gentlemen, you know exactly how

5     that happened.  It's not that those people knew he was there

6     as a political hack and decided that it didn't matter.  It

7     all starts with Mr. Baker's notes.

8          And let's go to the next slide.

9          So if we look at Mr. Baker's notes, ladies and

10    gentlemen, look on the left.  "Represents DNC, Clinton

11    Foundation."

12         You remember Mr. Baker telling you that he was

13    situating Mr. Priestap in that discussion.  He wasn't

14    saying:  Michael Sussmann came in with a bunch of opposition

15    research, and this seems kind of shady to me.  He said, "I

16    was explaining to Mr. Priestap that Mr. Sussmann represented

17    the DNC and the Clinton Campaign or the Clinton Foundation

18    in cyber hacks."

19         That's how they thought of him at the FBI, and

20    that's exactly why he felt the need to lie.

21         Ladies and gentlemen, you then see on the right

22    something that the defense showed you where an FBI agent

23    says exactly what Mr. Baker said in his notes:  "essentially

24    a lawyer representing the DNC and Clinton."  In other words,

25    the DNC and Clinton's cyber lawyer brought something to the

1    government, not that he came into the government with

2    political opposition research put together by Fusion GPS and

3    someone working with the Clinton Campaign.

4           So once again, ladies and gentlemen, the

5    defendant's arguments confuse.  They want you to think --

6    they want to convince you that none of this mattered; that

7    this was a harmless lie; that if you come in and tell the

8    FBI you're there for the Clinton Campaign, and they know

9    that you've represented them on cyber matters, that it's no

10   harm/no foul if you come in to provide opposition research

11   and spur an investigation weeks before an election.  But

12   once again, ladies and gentlemen, your common sense tells

13   you why that's not the case.

14          Now, ladies and gentlemen, we've heard a lot of

15   arguments about materiality, and we just -- keep in mind,

16   ladies and gentlemen, I want you to follow very closely

17   Judge Cooper's instructions on materiality, and there are

18   two components to that.

19          "A statement is material if it has a natural

20   tendency to influence, or is capable of influencing, the

21   FBI."

22          So you heard arguments from the defense to

23   suggest, as I was just describing, that, look, it wouldn't

24   have mattered.  The FBI would have investigated this as they

25   did anyway; and whether they knew Mr. Sussmann was working

1    for a campaign wouldn't have mattered, couldn't have

2    affected things.  The lie didn't matter.

3          But there's another part of the instruction as

4    well:  "Proof of actual reliance on the statement is not

5    required."

6          Keep those instructions in mind.

7          Materiality, as a requirement, is intended, as the

8    instructions also say, to weed out trivial lies, things that

9    don't matter, things that aren't relevant and don't affect

10   the FBI's decision-making, thinking, or functions.  That's

11   not the kind of lie Mr. Sussmann told here.  His lie was

12   material.

13         Now, let's take Mr. Berkowitz's arguments and

14   break them down.

15         He told you that this wouldn't have affected the

16   investigation because there was the -- because there was

17   technical data, they would have done the same thing.  He

18   told you that the agents conceded that they really wouldn't

19   have done much different.

20         That's not what the testimony says.  So let's do

21   an exercise and look at the time period before the

22   investigation was even opened.  Let's look first at

23   Mr. Sussmann's text message the night before.

24         Now, this isn't the lie that the defendant is

25   charged with.  He's charged with the lie in the meeting the

1    next day.  But it's the same lie that he told the night

2    before, and it was a material lie.

3            Now, first let's see what the Bureau actually did,

4    because in order to determine if something is capable of

5    influencing the FBI, you have to look at what the FBI did

6    and say:  Okay, how might that have been different if

7    Mr. Sussmann had told the truth?  So let's look at that.

8            We have the meeting on September 19th.  The FBI

9    opened an investigation, and they decided to open a full

10   investigation.  Do you remember testimony about assessments,

11   preliminary investigations, and full?  The FBI here opened a

12   full investigation.

13           Now, ladies and gentlemen, from the very

14   beginning, before the charged false statement was even made,

15   you know that it was material because what did Jim Baker say

16   about that text message the night before?  He said he might

17   not have even taken the meeting if Mr. Sussmann told the

18   truth.

19           And what would the truth be?  The truth would have

20   been if Mr. Sussmann said:  I'm coming on behalf of a

21   client.  And you heard sworn testimony from Mr. Baker that

22   he might not have taken that meeting.  That shows you how

23   important the difference is.  It shows you how much it

24   matters that Mr. Sussmann concealed his clients.

25           But let's play this forward and see how things

1      might have been different if Mr. Sussmann had told the

2      truth.

3              Mr. Baker testified that he would have immediately

4      had conversations with senior FBI leadership about whether

5      this is something the Bureau should even move on, whether

6      it's even something the Bureau should act on.  And that's

7      because there were political ramifications.  There were

8      legal ramifications.  There were any number of reasons why

9      this might have slowed the Bureau down.

10              What else did you hear?

11              Mr. Baker said that he was getting data.  He

12      didn't know where it came from.  And if he gained some

13      inkling that this was coming from a company with business

14      with the Bureau or a telecommunications provider, he would

15      need to examine legal issues.  He would have to say:  Okay,

16      should we, as the FBI, even be using this as the basis for

17      an investigation?

18              That would have taken time.  That would have

19      pushed things down a different road.  That would have

20      involved more lawyers at the FBI.  That's affecting the

21      functions of the FBI.

22              What else did you hear?  Take more time.

23      Mr. Baker said something to the effect of:  We would have

24      slowed this down.  Because you remember seeing text messages

25      and emails.  The director's fired up.  The FBI's fired up on

 1    this.

 2            They were fired up because Mr. Sussmann came in as

 3    a supposedly credible attorney working on his cyber

 4    credentials bringing credible information.  They would have

 5    taken more time.  That's affecting the functions of the

 6    government agency.

 7            Now, you also heard Mr. Baker say:  Look, if I

 8    knew this was for a client, a paid client, a political

 9    campaign, or a business or a representative of a business, I

10    wouldn't have done this meeting alone.  I would have pulled

11    in an agent.  And he also testified that he might have had a

12    team of lawyers at that meeting.

13            And how would things have gone if you had an agent

14    there trained in investigating, trained in interviews?  How

15    would it have gone if you had more lawyers there trained in

16    spotting legal issues that might arise in a case like this?

17            Things might have been very different.  It might

18    not have moved forward.  They might have asked more

19    questions.  They might have done different things.  All of

20    that would have happened on the day of the meeting itself.

21            Ladies and gentlemen, you also heard Mr. Baker and

22    countless other witnesses tell you that what Mr. Sussmann's

23    lie concealed, in part, was that Mr. Joffe was behind the

24    allegations.  And you learned through the evidence that

25    Mr. Joffe was an active confidential human source of the

1    FBI.  And every witness who was asked this question said

2    that would have been highly important; that would have been

3    highly consequential.

4          Why?  Because confidential human sources at the

5    FBI have handlers.  They don't just walk into the local FBI

6    offices and present whatever they're finding.  They have

7    somebody designated to talk to them.

8          And if an FBI source who has a handler and a

9    channel for bringing things into the FBI is standing behind

10   an attorney who is claiming he has no client, that would

11   have raised serious questions.  Mr. Baker said he would have

12   been alarmed.  He would have wanted to get in touch with the

13   handler and said:  Why is this confidential human source not

14   willing to come bring this to his handler?

15         Ladies and gentlemen, you also heard testimony

16   from Curtis Heide, the special agent on the case, and he

17   described to you an instance on another matter.  He

18   described how he was assigned to the Mid-Year Exam

19   investigation, which was the investigation of Ms. Clinton's

20   email server.  And he told you that in that case there was

21   someone who came into the FBI who was openly politically

22   affiliated, someone with a political affiliation.

23         And what did Mr. Heide say they did there?  We did

24   an interview, and that was the end of it.  They didn't open

25   anything.  They didn't move forward.

1            Ladies and gentlemen, that, very likely, may have

2      happened here as well.  In other words, all of these things

3      could have and likely would have happened had Mr. Sussmann

4      been honest.  And all of this, ladies and gentlemen, is

5      before the investigation even starts.

6            But let's play the exercise forward.  Ladies and

7      gentlemen, in light of all of those factors, in light of all

8      of those different things that could have happened if

9      Mr. Sussmann had told the truth, the FBI never may have

10     investigated this at all.

11            But let's say it did.  Once again, the FBI could

12     have opened just a preliminary investigation, which, as you

13     heard, was sort of the middle category.  It might have taken

14     a more modest approach to this investigation.  Or it might

15     have opened just an assessment.  That's the lowest level.

16            And you heard testimony that the credibility of

17     the allegation -- the likelihood that the allegation is true

18     or credible or reliable or free of motives -- affects where

19     you put an investigation on that scale.  So there again,

20     ladies and gentlemen, the simple fact that the FBI might

21     have opened a different level of investigation, that is an

22     effect on the functions of the government agency.

23            Now, you also heard testimony from Mr. Gaynor, and

24     Mr. Gaynor told you about this close hold.  And Mr. Gaynor

25     said that if he were aware of where this information was

1      coming from, if Mr. Sussmann had disclosed the existence of

2      his political affiliations, he might not even have

3      recommended the close hold to begin with.  He might have

4      recommended to leadership that they tell the agents in the

5      field where the information came from.  That would have an

6      effect on the functions of a government agency.  That would

7      have made things play out in a very, very different manner.

8              Ladies and gentlemen, you also heard testimony

9      from Special Agent Sands that she was briefing headquarters

10     every day on this matter.  She was getting into the office

11     at 6:00 a.m., and she was staying there until 6:00 at night

12     and daily briefings.

13             People at headquarters were spun up about this.

14     People in the field were working day and night on it.  If

15     Mr. Sussmann had told the truth, the FBI, even if it opened

16     an investigation, might have devoted fewer resources.  It

17     might have taken a far more limited approach to looking into

18     these allegations.

19             Ladies and gentlemen, in considering materiality,

20     if any one -- any one -- of these decisions might have been

21     different, if any one of these branches might have been

22     followed, if any one of these forks in the road would have

23     been different, it's material.  If any of these might have

24     played out in a different way, the defendant's false

25     statement was material.

1          Ladies and gentlemen, there is overwhelming proof

2     that the lie the defendant told to the general counsel on

3     September 19, 2016, was material.

4          Now, ladies and gentlemen, how do you know that

5     the defendant's lie was intentional?  In other words, why

6     did he tell that lie?

7          You heard other evidence in the case that the

8     meeting with Mr. Baker wasn't just -- wasn't the only part

9     of the plan.  It wasn't the only part of the effort.

10         Because you heard testimony from Agent Grasso, who

11    knew Mr. Joffe.  And what you heard from Agent Grasso was

12    that Mr. Joffe, a little bit -- a couple of weeks after

13    Mr. Sussmann's meeting with General Counsel Baker, received

14    additional information from Mr. Joffe.  But what did

15    Mr. Joffe tell Agent Grasso?  "Don't reveal my name to

16    anyone in the FBI."

17         And you saw, when Mr. Grasso was asked about

18    circular reporting, and it seems -- it's not a thought that

19    had occurred to him before.  But when you look at the

20    evidence of this case, ladies and gentlemen, you know what

21    was going on with Agent Grasso.

22         Mr. Joffe, a confidential human source at the

23    Bureau, whose lawyer had just gone in and falsely stated he

24    didn't have a client, was then putting evidence and

25    allegations -- but not the same evidence and allegations;

1    you heard it was just two IP addresses -- was putting

2    additional evidence through another aspect of the Bureau in

3    order to make it look like corroboration.  But he was

4    careful to say:  Don't tell anyone at the FBI who is giving

5    this to you.

6          And so you saw Agent Grasso's email on October 2,

7    2016, "Keith contacted you on Friday concerning some

8    anonymous reporting, anonymous reporter, two IP addresses."

9    This is Mr. Joffe trying to put these politically charged

10   allegations into another part of the FBI in order to create

11   the appearance of two different streams of information.  And

12   that makes sense with the broader plan that was at work

13   here.  They were trying to hide origins, hide the

14   involvement of clients in order to get the FBI to

15   investigate.

16          Now, you also heard testimony that it wasn't part

17   of the plan to get the FBI to investigate or to get the FBI

18   to cause a news story that the FBI was investigating.  But,

19   ladies and gentlemen, your common sense tells you that

20   that's exactly what the plan was.  Because if you look at

21   the date of the email from Mr. Grasso, which is October 2nd,

22   and you look three days later, there's an email from a

23   reporter, Mark Hosenball, to folks at the FBI.  And you

24   heard testimony that one of those people, Michael Kortan,

25   who was the press officer, the public affairs officer for

1    the FBI.

2              And what does Mr. Hosenball say?  "The information

3    below supposedly posted by private computer experts suggests

4    some kind of transactions, some sorts of secret data channel

5    between Alfa-Bank and Russia and a supposed hidden Donald

6    Trump organization server."  And then comes the key part:

7    "It has been suggested to me that this information and

8    scenario is under careful investigation by the FBI."

9              Ladies and gentlemen, you saw communications

10   between Mr. Hosenball and Fusion GPS with Fusion GPS urging

11   Mr. Hosenball to run with this story.  Can there be any

12   doubt, ladies and gentlemen, that the plan here was to give

13   information to the FBI, give information to the media, and

14   then cause the media to write about an FBI investigation?

15   You have it here in an email to the FBI.

16             And you'll remember, if you look at Mr. Sussmann's

17   testimony before Congress, he said that he gave the Alfa-

18   Bank allegations to Ellen Nakashima and Eric Lichtblau;

19   *Washington Post*, *New York Times* -- sorry, go back to the

20   prior slide -- Ellen Nakashima and Eric Lichtblau from *The*

21   *New York Times*.  They were communicating all this time with

22   Mr. Sussmann.

23             Now, let's go back to Mr. Hosenball.  He's urging

24   the FBI to give him information on this.  He's saying that

25   he knows that it's -- or thinks it's under careful

1    investigation by the FBI.  Who did Mr. Hosenball speak to

2    just the week before?  Mr. Sussmann.

3          Ladies and gentlemen, you can see what the plan

4    was here.  You can see what the motive was here.  It was to

5    create an October surprise by giving information both to the

6    media and to the FBI and to get the media to write that

7    there was an FBI investigation.

8          And that is why, ladies and gentlemen, when

9    Mr. Sussmann went to the FBI, he said that he wasn't doing

10   it for a client.  Because if the public were to know that

11   this was all circular reporting, that the very things they

12   were reading were coming from Mr. Joffe and the campaign

13   working for Mr. Sussmann, it would have gravely undermined

14   the credibility of those allegations.  It would have gravely

15   undermined the entire effort.

16         Now, ladies and gentlemen, you have heard

17   testimony about how the FBI handled this investigation.

18   And, ladies and gentlemen, you've seen that the FBI didn't

19   necessarily do everything right here.  They missed

20   opportunities.  They made mistakes.  They even kept

21   information from themselves.

22         That is not relevant to your evaluation of the

23   defendant's lie.  It's not relevant to your evaluation of

24   whether that lie was material because, ladies and gentlemen,

25   the folks in the field knew that it was material.  You saw

1    that email from Curtis Heide and his boss, Dan Wierzbicki,

2    where they said, "We really" -- in sum and substance, "We

3    really want to interview the source of all these

4    allegations.  We really want to know where it's coming from

5    as we would do in this and any other investigation."

6            THE COURT:  Mr. DeFilippis, let's wrap it up.

7            MR. DeFILIPPIS:  Yes.

8            And so, ladies and gentlemen, the fact that the

9    FBI made mistakes here, the fact that the FBI might have

10   handled this in a way that you wouldn't have handled it or

11   that they should have handled it has no bearing on whether

12   the lie took place and on whether that lie could have

13   affected the functions of the FBI, which, as you saw from

14   the demonstrative before, it very well would have before any

15   investigation was opened.

16           Ladies and gentlemen, let me end with this.  The

17   government has said throughout this trial that this case is

18   about privilege.  You've heard a lot about the privilege of

19   a lawyer who thought he had a license to lie.  You've heard

20   about the privilege of a technology executive who used

21   sensitive access to conduct opposition research.  You've

22   heard also about attorney-client privilege.

23           Ladies and gentlemen, today you have a different

24   kind of privilege.  You will have the privilege and the very

25   weighty obligation to render a fair and just verdict based

1     on the evidence, the law, and the truth.

2          And the defense started talking about the Statue

3     of Liberty.  I want you to think of the Statue of Liberty,

4     Lady Liberty, holding her arm up high.  And your guiding

5     torch in that jury deliberation room is the truth and the

6     evidence, and nothing else.

7          Under the law, no one has a license to lie to the

8     FBI.  Under the law, having the FBI general counsel in your

9     phone contacts does not exempt you from the truth.  Under

10    the law, no one is entitled to make a false statement to

11    weaponize a law enforcement agency in support of a political

12    agenda; not Republicans, not Democrats, not anyone.

13         Ladies and gentlemen, this case is not about

14    politics.  It's not about conspiracies.  It's about the

15    truth.  And when you came into this courtroom and raised

16    your right hand, you swore to apply the law fairly.  As

17    Judge Cooper has instructed you, that means you should not

18    and cannot be influenced in your deliberations by anyone's

19    race, ethnic origin, gender, or political views, including

20    your own.

21         Now, in just a few minutes it will be your time to

22    deliberate.  It has been an honor and a privilege to present

23    the evidence to you in this trial.  And as you go back to

24    the deliberation room, I'm going to quickly ask you to do

25    three things:

1          First, carefully consider the evidence, the actual

2     evidence, in this case.

3          Second, follow Judge Cooper's instructions on the

4     law, the instructions you have.

5          And third, use your common sense.  Don't abandon

6     it.  The same common sense you use every day in your lives.

7          If you do those three things, I am confident you

8     will reach the one and only verdict that's consistent with

9     the law, consistent with the evidence, and consistent with

10    the truth, which is that the defendant is guilty as charged.

11         Thank you.

12         THE COURT:  Thank you, Mr. DeFilippis.

13         Ladies and gentlemen, before you retire for your

14    deliberations I have just a few minutes of concluding

15    instructions for you.

16         First, a verdict must represent the considered

17    judgment of each juror, and in order to return a verdict,

18    each juror must agree on the verdict.  In other words, your

19    verdict must be unanimous.

20         You will be provided with a Verdict Form for use

21    when you have concluded your deliberations.  The form is not

22    evidence in the case, and nothing in it should be taken to

23    suggest or convey any opinion by me as to what the verdict

24    should be.  Nothing in the form replaces the instructions of

25    law I have already given you, and nothing in it replaces or

1    modifies the instructions about the elements which the

2    government must prove beyond a reasonable doubt.  The form

3    is meant only to assist you in recording your verdict.

4             We will be sending into the jury room with you the

5    exhibits that have been admitted into evidence.  And I

6    believe they will all be loaded on a laptop computer, and

7    you will be given instructions as to how to access the

8    particular exhibits.  You may examine any or all of them as

9    you consider your verdict.  Please keep in mind that

10   exhibits that were only marked for identification but were

11   not admitted into evidence will not be given to you to

12   examine or to consider in reaching your verdict.

13            When you return to the verdict -- excuse me, when

14   you return to the jury room, probably the first thing you're

15   going to do is eat lunch.  But after that, the first thing

16   that you should do is to select a foreperson to preside over

17   your deliberations and to be your spokesperson here in

18   court.  There are no specific rules regarding how you should

19   select a foreperson.  That is up to you.  However, as you go

20   about the task, be mindful of your mission:  to reach a fair

21   and just verdict based on the evidence.  Consider selecting

22   a foreperson who will be able to facilitate your

23   discussions, who can help you organize the evidence, who

24   will encourage civility and mutual respect among all of you,

25   who will invite each juror to speak up regarding his or her

1    views about the evidence, and who will promote a full and

2    fair consideration of that evidence.

3         The question of possible punishment of the

4    defendant in the event of a conviction is not a concern of

5    yours and should not enter into or influence your

6    deliberations in any way.  The duty of imposing a sentence

7    in the event of a conviction rests exclusively with me.

8    Your verdict should be based solely on the evidence in this

9    case, and you should not consider the matter of punishment

10   at all.

11        I know that I have reminded you throughout the

12   trial about research about the case and encountering or

13   exposure to media about the case, and that instruction, I'm

14   sure, feels sort of routine and rote by the end of the

15   trial, but it is extremely important.

16        And obviously, you know, there is media coverage

17   of this case.  There will be stories about the case over the

18   weekend; and it is very important that you continue to avoid

19   any coverage of the case.  I know that it is tempting to get

20   on your phones or your computers and pull up information

21   about the case, but you may not do that, and it's very

22   important that you do not do that.

23        If any publicity about this trial inadvertently

24   comes to your attention, do not discuss it with other jurors

25   or anyone else.  Just let me or court staff know as soon as

1        it happens, and I will briefly discuss it with you and the

2        lawyers and figure out a way to deal with it.

3               As you retire to the jury room to deliberate, I

4        also wish to remind you of an instruction I gave you at the

5        beginning of the trial.  During deliberations, you may not

6        communicate with anyone not on the jury about the case.

7        This includes any electronic communication such as email or

8        text or blogging about the case.  In addition, you may not

9        conduct any independent investigation during your

10       deliberations.

11              If it becomes necessary during your deliberations

12       to communicate with me, you may send me a note through

13       Ms. Jenkins or Ms. Calloway or through one of the marshals

14       signed by your foreperson or by one or more members of the

15       jury.  No member of the jury should try to communicate with

16       me about the case except by such a signed note, and I will

17       not communicate with any member of the jury on any matter

18       concerning the merits of the case, except in writing or

19       orally here in open court.

20              Bear in mind also that you are never, under any

21       circumstances, to reveal to any person -- not court staff,

22       not the marshal, or me -- how the jurors are voting until

23       after you have reached a unanimous verdict.  This means you

24       should never tell me, in writing or in open court, how the

25       jury is divided on the charge; for example, six to six or

1    seven to five or what have you, whether the vote is for

2    conviction or acquittal or any other issue in the case.

3         The attitude and conduct of jurors at the

4    beginning of their deliberations are matters of considerable

5    importance.  It may not be useful for a juror, upon entering

6    the jury room, to voice a strong expression of an opinion on

7    the case or to announce a determination to stand for a

8    certain verdict.  When one does that at the outset, a sense

9    of pride may cause that juror to hesitate to back away from

10   an announced position after a discussion of the case.

11   Furthermore, many juries find it useful to avoid an initial

12   vote upon retiring to the jury room.  Calmly reviewing and

13   discussing the case at the beginning of deliberations is

14   often a more useful way to proceed.  Remember that you are

15   not partisans or advocates in this matter, but you are

16   judges of the facts.

17        The last thing that I must do before you begin

18   your deliberations is a task that I take no joy in at all,

19   and I will apologize for having to do it, but that is to

20   excuse the alternate jurors in the case.  I know that it is

21   frustrating to sit through two weeks of evidence, to

22   sacrifice time from your schedule, and not ultimately be

23   involved in the resolution of the case.  But as I told you

24   before the trial began, the selection of an alternate was an

25   entirely random process.  It is nothing personal.

1          We selected four seats to be the alternate seats

2     before any of you entered the courtroom, and, as you know,

3     we have lost one juror due to illness, so there are three

4     alternate seats remaining.  And since the rest of you have

5     remained healthy and attentive throughout the trial, I can

6     now excuse the jurors in Seat No. 1, Seat No. 6, and Seat

7     No. 10.

8          But before you leave, I'm going to ask you to make

9     sure that Ms. Calloway has all of your current information,

10    and I do so because it is possible that we will need to

11    summon you back for deliberations and to rejoin the jury in

12    the event that something happens to a regular juror.  Since

13    that possibility exists, I'm going to instruct you not to

14    discuss the case with anyone until we call you and tell you

15    that your service is excused.

16         My earlier instruction on use of the Internet

17    still applies.  Do not research this case or communicate

18    about it in any way on the Internet.  If you are not needed,

19    we will be calling you to let you know that a verdict has

20    been reached, and that you are now free to discuss the case.

21         So thank you very much for your service.  When

22    we break here, please just return your juror badges to

23    Ms. Calloway, and you will be free to go for the rest of the

24    day.

25         When you have reached a verdict, please send me a

1    note informing me of this fact, and have your foreperson

2    sign the note.  Do not tell me what your verdict is.  The

3    foreperson should fill out and sign the Verdict Form that

4    will be provided.  I will then call you back into the

5    courtroom, examine your verdict, and ask the foreperson to

6    read the verdict in open court.

7           Now, I have to be out of the building this

8    afternoon, unfortunately, so I will not be in a position to

9    answer any substantive notes that you may have this

10   afternoon or to accept any verdict that you might reach this

11   afternoon.  But we have discussed this, and I would like for

12   you to begin your deliberations because we have had so much

13   slack time this week, if you all are comfortable doing that.

14          Ordinarily, if I were here, I would call you back

15   into the courtroom at 5:00 and dismiss you and give you a

16   final instruction and a reminder about avoiding any contact

17   about the case over the long weekend, but since I will not

18   be here to do that, I will do that now.

19          You'll have three days off.  You know, in addition

20   to the instructions about avoiding press and not discussing

21   the case, you know, we are still in a pandemic.  We have

22   fortunately not had any, you know, jurors or court staff

23   have any issues in that regard, but as you go about your

24   social life over the weekend, continue to be mindful of that

25   and keep yourselves safe and healthy.

1    So with that, Ms. Calloway will escort you back to

2  the deliberation room, and good luck.

3    (Jury exits courtroom)

4    THE COURT:  Okay.  Please be seated.

5    Congratulations.  Well-tried, both sides.

6    I'm available by phone this afternoon if some, you

7  know, routine or logistical issues come up.  We'll just

8  bring them back Monday morning and let them know -- excuse

9  me, Tuesday morning, and let them know that they can come

10  straight back to the deliberation room, but that they should

11  not start deliberating until all 12 are present.

12    Anything else?

13    MR. DeFILIPPIS:  Not from the government, Your

14  Honor.

15    MR. BERKOWITZ:  Just briefly, Your Honor.  Is it

16  your intention to have them deliberate until 5:00, or are

17  you going to excuse them when you leave?

18    THE COURT:  Given that we're not going to take any

19  verdict today or answer any notes, I would suggest, for the

20  benefit of court staff who don't want to stay here on a

21  Friday before a long weekend, that we cut it off at 5:00.

22  So we'll excuse them at 5:00 unless they ask to go before

23  then.

24    MR. BERKOWITZ:  And in the very unlikely event

25  that they reach a verdict, would you have them hold it?

1    Would you have somebody else take it?

2              And I know that's an unlikely scenario, but since

3    you'll be gone, I figured I'd ask.

4              THE COURT:  I would like to take the verdict, so

5    we would likely hold that until Tuesday.

6              MR. BERKOWITZ:  Great.  Thank you very much, Your

7    Honor.  We appreciate all that you've done for both sides

8    during this.  We very much appreciate it.

9              THE COURT:  My pleasure.

10             And Tuesday, when we come back, you know, I don't

11   know if you have arrangements in the courthouse, but either

12   stay in the courthouse or someplace close so that we can,

13   you know, resolve any notes as quickly as possible.  All

14   right?

15             MR. BERKOWITZ:  Understood.

16             THE COURT:  All right.  Have a good weekend.

17                  (Whereupon the hearing was

18                   concluded at 1:02 p.m.)

19

20

21

22

23

24

25

1        <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3            I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8        Dated this 27th day of May, 2022.

9

10                                  <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                    Official Court Reporter
11                                  United States Courthouse
                                    Room 6718
12                                  333 Constitution Avenue, NW
                                    Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25